EILEEN M. DECKER
United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
BRANDON D. FOX (Cal. Bar No.290409)
Assistant United States Attorney
Chief, Public Corruption & Civil Rights Section
LIZABETH A. RHODES (Cal. Bar No. 155299)
Assistant United States Attorney
Chief, General Crimes Section
EDDIE A. JAUREGUI (Cal. Bar No. 297986)
Assistant United States Attorney
General Crimes Section
    1500/1200 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-0284/3541/4849
    Facsimile: (213) 894-7631
    E-mail:    Brandon.Fox@usdoj.gov
            Lizabeth.Rhodes@usdoj.gov
            Eddie.Jauregui@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 16-00066-PA |
|---|---|
| Plaintiff, | GOVERNMENT'S POSITION RE: SENTENCING OF DEFENDANT LEROY BACA |
| v. | |
| LEROY BACA, | Hearing Date: July 11, 2016 Hearing Time: 8:30 a.m. Location:    Courtroom of the |
| Defendant. | Hon. Percy Anderson |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Brandon D. Fox, Lizabeth A. Rhodes and Eddie A. Jauregui, hereby files its sentencing position pursuant to Federal Rules of Criminal Procedure Rule 32(b)(6)(B) with regard to defendant Leroy Baca.

1

This sentencing position paper is based upon the attached memorandum of points and authorities, the trial testimony and exhibits, files and records in this case, and such further evidence and argument as the Court may permit.

Dated: June 20, 2016                    Respectfully submitted,

                                        Respectfully submitted,

                                        EILEEN M. DECKER
                                        United States Attorney

                                        LAWRENCE S. MIDDLETON
                                        Assistant United States Attorney
                                        Chief, Criminal Division


                                              /s/
                                        Brandon D. Fox
                                        Lizabeth A. Rhodes
                                        Eddie A. Jauregui
                                        Assistant United States Attorneys

                                        Attorneys for Plaintiff
                                        UNITED STATES OF AMERICA

2

**TABLE OF CONTENTS**

DESCRIPTION                                                                PAGE

MEMORANDUM OF POINTS AND AUTHORITIES.................................1

I.    INTRODUCTION...................................................1

II.   HISTORY.......................................................2

III.  STATEMENT OF FACTS............................................2

      A.   Defendant's Tenure as Sheriff............................2

      B.   Defendant Learns of Federal Investigation................2

      C.   The FBI Interviews Brown.................................3

           1.   The Plan to Keep the FBI away from Men's Central
                Jail is Implemented.................................4

           2.   Further Concealment of Brown after Writ is Issued....4

      D.   Defendant Baca Expresses Anger to the U.S. Attorney.......5

      E.   The Sheriff's Department Tampers with Witnesses..........6

      F.   The Sheriff's Department Seeks a Superior Court Order
           to Obtain FBI Records and Information.....................6

      G.   The Sheriff's Department Threatens to Arrest FBI
           Special Agent Leah Marx..................................7

IV.   FALSE STATEMENTS..............................................9

V.    MEDICAL DIAGNOSIS.............................................9

VI.   ARGUMENT......................................................11

      A.   Section 3553 Factors.....................................11

           1.   The Nature and Circumstances of the Offense, the
                Seriousness of the Offense, and Just Punishment.....11

           2.   History and Characteristics of the Defendant........11

           3.   Promote Respect for the Law and Afford Adequate
                Deterrence..........................................12

           4.   Avoiding Unwanted Disparity.........................13

VII.  CONCLUSION...................................................17

i

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.    INTRODUCTION**

Defendant Leroy Baca is a study in contrasts.  He was a champion of certain reforms in the criminal justice system, yet ignored warnings that his deputies were committing serious abuses in the Los Angeles County jails.  He touted his close relationship with federal officials, yet became angry when he learned that the federal government was investigating his department.  He issued orders that, taken literally, may not have been corrupt, but were carried out in an obstructive manner by his subordinates and without his objection.  He recited the Sheriff's Department's "Core Values," which emphasize honor, respect, and integrity, during the same interview in which he lied to the federal government.  The same year he committed his offense, he was named Sheriff of the Year.

And now, as he comes before the Court for sentencing, defendant Baca is a physically fit 74-year-old who is able to function in his daily life, yet he has been diagnosed as being in the early stages of Alzheimer's disease with an uncertain prognosis for how quickly it will deteriorate his cognitive function.

The government believes the Court should accept the parties' agreement and sentence defendant to a six-month term of imprisonment, which represents the maximum sentence this Court can provide pursuant to the agreement.  The agreement and the six-month sentence are appropriate after taking into account all sides of defendant Baca, including his crime, his current health, and his likely prognosis.

**II.   HISTORY**

On February 3, 2016, defendant Baca pled guilty to an information that charged him with making false statements to the federal government, in violation of 18 U.S.C. § 1001.  The plea was part of a Rule 11(c)(1)(C) agreement in which the parties agreed that Baca should be sentenced within the offense's Guidelines range of zero-to-six months' imprisonment.  Sentencing is set for July 11, 2016, at 8:30 a.m.

**III. STATEMENT OF FACTS**

**A.    Defendant's Tenure as Sheriff**

Defendant Baca was the elected Sheriff of Los Angeles County for more than 15 years.  He became Sheriff in December 1998 and won re-election on several occasions.  Baca retired in January 2014, just one month after many of his deputies were charged with federal crimes such as civil rights and obstruction of justice offenses.

**B.    Defendant Learns of Federal Investigation**

Beginning in 2010, the federal government began investigating the Sheriff's Department based on allegations of widespread deputy abuse of inmates in the Los Angeles County jails.  In August 2011, the Sheriff's Department recovered a phone from Anthony Brown, an inmate at Men's Central Jail.  The phone was part of the FBI's attempt to covertly gather evidence related to corruption and abuse within Men's Central Jail.  On August 18, 2011, defendant Baca spoke to Steve Martinez, the Assistant Director in Charge of the Federal Bureau of Investigation, on the telephone.  ADIC Martinez told Baca that the Sheriff's Department had recovered a phone that was part of the FBI's civil rights investigation and that he wanted the FBI's phone back.

2

On August 19 and 20, 2011, defendant met with Undersheriff Paul Tanaka, Captain William "Tom" Carey, Lieutenant Greg Thompson, Deputy Gerard Smith, Deputy Mickey Manzo, and others.  During these two meetings, Baca was told that inmate Brown had admitted to being an informant in a federal investigation concerning deputy abuse and corruption within the jails.  Baca stated that he wanted the Sheriff's Department to investigate how the phone was brought into the jail and to keep the inmate secure and in its custody.

At some point during the August 20 meeting, defendant walked out of the conference room with Tanaka.  The Undersheriff came back into the room and announced that the Sheriff put him in charge of the operation.  Tanaka explained that he had never seen the Sheriff so angry.  Tanaka stated that the FBI was not to have access to Brown.

### C.    The FBI Interviews Brown

On August 23, 2011, the FBI visited Men's Central Jail to interview Brown.  A deputy, who was unaware of the order to keep the FBI away from Brown, allowed the agents to interview him.  Later, Thompson, Carey, Smith and Manzo reported to Tanaka's office, where Tanaka berated them for letting the FBI meet with Brown.  They came up with a plan to move Brown out of MCJ and to have two deputies serving under Thompson guard Brown at all times to ensure the FBI could not interview him again.

After Tanaka said that Thompson needed to brief the Sheriff, Thompson entered defendant Baca's office and explained what happened. According to Thompson, defendant Baca showed understanding and was not upset.  Baca's measured tone was in sharp contrast to Tanaka's reaction to learning the same news just minutes earlier.

1.    The Plan to Keep the FBI away from Men's Central Jail is Implemented

Between August 24, 2011 and August 26, 2011, the Sheriff's Department created a policy to keep the FBI out of the county jails absent approval from Tanaka (although Tanaka had Thompson change the policy to remove his name from it).  The investigation has revealed no documents or witnesses connecting this policy to defendant Baca.

2.    Further Concealment of Brown after Writ is Issued

On August 25, 2011, the District Court issued a writ for the testimony of Brown before the federal grand jury on September 7, 2011.  After the Sheriff's Department received the writ, a lieutenant and three deputies approached employees at the Inmate Records Center and asked to have Brown "released" from the jail's computer system. The deputy and head records clerk assigned to IRC informed the deputies that they needed a court order to do so.  The lieutenant informed the clerk that the chain of command up to Tanaka all knew what was happening.  When they still balked at the idea, another deputy ominously asked, "Are you going to say no to Tanaka?"  The Inmate Records Center deputy answered, "Yes."  Ultimately, the head clerk signed out Brown's records jacket and made the computer system reflect that Brown was released.

Over the next several days, the Sheriff's Department changed Brown's name on a regular basis, input false information in the Sheriff's Department's records, and claimed that that Brown refused to provide his fingerprints and social security number.  Brown's aliases included "John Rodriguez," "Kevin King," and "Chris Johnson."

On August 26, Thompson communicated with others about what to do if the FBI showed up at Men's Central Jail with a "possible Court

4

Order" demanding Brown's production to the federal government. Thompson and the others decided that they would accept the court order "if forced," but would not release the inmate.  Instead, they would have a county attorney "on vacation for a month" review the court order before releasing Brown.  Thompson agreed to put a note on Brown's cell door to that effect.  The captain at Men's Central Jail emailed his lieutenants and sergeants:

> If any federal law enforcement agency comes to MCJ with an inmate removal order, visitation order, or ANY OTHER order of the court you shall:
>
> - Receive the order and advise the federal officer that before you can proceed, you have to submit the order to the Department's legal advisor for review.  DO NOT RELEASE THE INMATE OR ALLOW CONTACT.

(emphasis in original).

Thompson, Carey and others informed Tanaka that they were going to move Brown out of Men's Central Jail and take him to a station jail.  Indeed, on August 26, 2011, they moved Brown to the Sheriff's Department's San Dimas station jail.  Despite the extensive investigation and multiple trials, the evidence has not revealed whether defendant Baca was aware of the Sheriff's Department movement of Brown, his name changes, or the federal writ.

**D.    Defendant Baca Expresses Anger to the U.S. Attorney**

On August 29, 2011, defendant Baca brought representatives of the Sheriff's Department and Los Angeles County to the U.S. Attorney's Office (the FBI was not present).  Baca told the U.S. Attorney's Office that he was angry that he had not been told about the investigation.  Baca informed the U.S. Attorney of his disagreement with the FBI's decision to introduce a cellular phone

5

into the jail and implored the U.S. Attorney's Office to stop working with the FBI and instead work with the Sheriff's Department to investigate any crimes by deputies in the jails.

**E.    The Sheriff's Department Tampers with Witnesses**

On August 30, 2011, Leavins, Sergeant Scott Craig and Sergeant Maricela Long went to Men's Central Jail to speak to deputies who may have been in contact with the FBI (Tanaka also made a rare appearance there that day).  They spoke to Gilbert Michel, the deputy who was the target of the FBI undercover operation regarding the phone. Leavins, Craig, and Long told Michel he had been "manipulated" by the FBI.  After Michel told Leavins, Craig, and Long that the FBI was trying to get information from him about brutality inside the jails, the Sheriff's Department ordered Michel not to talk to the FBI.

That same day, Leavins, Craig and Long interviewed Deputy William David Courson, who had unknowingly provided the FBI with information on abuse at Men's Central Jail.  The Sheriff's Department once again ordered Courson not to talk to the FBI.

The extensive investigation and multiple trials have revealed no evidence that suggests defendant Baca was ever aware of this witness tampering.

**F.    The Sheriff's Department Seeks a Superior Court Order to Obtain FBI Records and Information**

On September 8, 2011, Craig sought a Superior Court order that purportedly would have compelled the FBI to turn over its records related to the FBI's investigation of the Sheriff's Department. Tanaka's aide asked Leavins, "After the document gets signed . . . , would you please make a copy for Mr. Tanaka?"  Leavins responded, "You got it."  The proposed order sought information about the FBI

investigation, investigative reports and the agents' true identities. Judge John Torribio denied the order and wrote, "Denied - Court has no jurisdiction over any federal agency."

The investigation has revealed no evidence that defendant Baca was aware of the failed attempt to obtain this court order. Indeed, Baca was on his way out of the country when this occurred. He would not return to work for two weeks.

**G.    The Sheriff's Department Threatens to Arrest FBI Agent**

One day after Judge Torribio refused to sign the order based on the Supremacy Clause, Craig left a voicemail message on an FBI phone he believed belonged to the FBI case agent, Leah Marx.[1]  Craig stated on the message that Special Agent Marx was "named as a suspect" and offered to meet her "as a professional courtesy . . . prior to me signing a declaration in support of an arrest warrant."  Days later, the Sheriff's Department began to conduct surveillance of Special Agent Marx.

On or about September 25, 2011, defendant had a meeting with Tanaka, Carey, and Leavins.  During this meeting, they discussed approaching Special Agent Marx.  Defendant stated that the Sheriff's Department's Internal Criminal Investigations Bureau should approach Special Agent Marx.  Defendant further stated that the LASD should do everything but put handcuffs on her.

On September 26, 2011, defendant Baca appeared on a television show in Los Angeles and again expressed his displeasure over the FBI's decision to investigate and its manner of investigating the Sheriff's Department.  When asked "who polices the police?" defendant

---

[1]  In providing Craig with the telephone number for Special Agent Marx, Brown switched the last two digits of her phone number.

Baca replied that the Sheriff's Department polices itself.  Baca said that inmates "lie" and that having a phone in the jail was a crime.

That evening, Craig and Long approached Special Agent Marx outside of her home.  Craig informed Special Agent Marx that she was a "named suspect in a felony complaint."  Craig then stated the he was "in the process of swearing out a declaration for an arrest warrant" for her.

Shortly thereafter, then-Supervisory Special Agent Carlos Narro and Special Agent Teresa Tambubolon, called Long.  Narro stated that Special Agent Marx, "indicated to me that you guys indicated to her that there's going to be a warrant for her arrest?"  Long responded, "There's going to be."  After Narro asked Long if Baca was aware of the looming arrest warrant, Long replied, "The Sheriff knows this, sir."  When Narro asked what the charges would be, Long told him he would "have to speak to the Undersheriff, and that's Mr. Paul Tanaka."  Narro asked, "Do you have any idea when the warrant's going to come out?"  Long responded, "It could be tomorrow, sir.  You're going to have to talk to the Undersheriff."  After the call ended, the recording device captured laughter and Long telling Craig, "They're scared.  They're like, do you know when . . . the warrant . . ."  Craig informed Long, "You're still rolling."  Long then stopped the recording device.

The U.S. Attorney and ADIC Martinez called Baca, who provided his personal assurance that Special Agent Marx would not be arrested.

8

**IV.    FALSE STATEMENTS**

During the investigation into the obstruction, the U.S. Attorney's Office and the FBI interviewed defendant Baca on April 12, 2013.  Baca made the following false statements:

- He was not involved in a conversation about keeping the FBI and Brown away from each other.

- He was not aware and was not informed that FBI agents were not allowed to continue an interview they were conducting of Brown at Men's Central Jail on August 23, 2011.

- He was not aware until he subsequently spoke to ADIC Martinez that Sheriff's Department officials were going to approach Special Agent Marx to try to talk to her, to threaten to charge her, or to threaten to arrest her.

This interview occurred before any of Baca's subordinates were charged with obstruction of justice.

**V.    MEDICAL DIAGNOSIS**

Defendant Baca began consulting with a physician about memory issues in May 2014 and has had many consultations and tests since that time.  It is first important to note that the government does not view defendant's current condition as having any effect on his decision to lie to the federal government during his interview.  Part of the government's opinion is based on the diagnosis, discussed below, that defendant has mild cognitive impairment and that his memory deficiencies began before his visit to his doctor in May 2014 (the interview occurred more than a year earlier).  Additionally, defendant's tone and demeanor during his interview in April 2013

9

provided no indication that he was suffering from any cognitive defects at that time.[2]

But his diagnosis and his prognosis do impact the appropriate sentence.  The government has consulted with Dr. Dimitri Krainc, an expert in the field of neurodegenerative disorders.[3]  Dr. Krainc reviewed the testing, results, and clinical reports conducted by defendant's doctors.  After Dr. Krainc asked for further testing to take place in order to eliminate possible diagnoses, defendant Baca complied with that request.

The parties and their experts are in substantial agreement that: (a) Baca is in the early stages of Alzheimer's disease; (b) his cognitive impairment is mild and has not significantly diminished in the last several months; (c) Baca is able to function in his everyday life; and (d) while Alzheimer's disease's progression is hard to predict, his long term prognosis is bleak.  Dr. Krainc believes that Baca's cognitive impairment will be severe in five to ten years.

---

[2] The government will submit the interview and transcript to the Court if the Court believes it would be helpful to review these items.

[3] As stated herein, the parties' experts substantially agree about defendant's diagnosis and prognosis.  The government understands that defendant will provide the Court with his doctors' written results of testing and opinions.  Dr. Krainc has given his opinions in emails and in conference calls with the government, but has not produced a written report.  Neither side believes there needs to be an evidentiary hearing on this issue because there does not appear to be a material fact in dispute.  Should the Court believe it would be beneficial to receive a declaration, a report, or testimony from Dr. Krainc, the government will work with the expert to provide it to the Court.

**VI.    ARGUMENT**

The Court must decide two issues: (1) whether to accept the parties' Rule 11(c)(1)(C) agreement and (2) the appropriate punishment pursuant to Section 3553(a).  The Court is as familiar with the evidence as any sentencing court could possibly be, having presided over four trials related to this prosecution and having already sentenced several of the convicted defendants.

    **A.    Section 3553 Factors**

        1.    The Nature and Circumstances of the Offense, the Seriousness of the Offense, and Just Punishment

The false statements by defendant Baca were serious given the context of the investigation into the Sheriff's Department generally and obstruction of justice specifically.  Baca lied either to avoid political fallout or to attempt to escape criminal liability.  Instead of acting as a leader, Baca distanced himself from the actions of his subordinates.

Defendant's lies showed that corruption went all the way to the top of the Sheriff's Department.  But his crime is not as serious as the crimes by the members of the Sheriff's Department who were convicted of beating inmates and filing false reports in order to have people charged with offenses they did not commit.  Further, while he was at the top of the organization, the evidence does not show that he was as involved in the hiding of Brown and tampering with witnesses as his subordinates were.

        2.    History and Characteristics of the Defendant

Defendant was the elected Sheriff from 1998 to 2014.  During that time, he won numerous awards from a variety of entities.

11

Defendant suffers from a mild cognitive impairment.  It does not currently have a significant effect on his ability to function in daily life.  According to experts, the impairment will become severe within a few years.  This factor supports the Rule 11(c)(1)(C) agreement because a sentence that causes defendant to serve time in custody while his condition materially deteriorates would not be in the interests of justice.  A short term of imprisonment, however, balances the other § 3553 factors with this one.

          3.    <u>Promote Respect for the Law and Afford Adequate Deterrence</u>

A sentence that provides for specific and general deterrence is necessary.  Instead of upholding the law, defendant Baca committed a crime by lying to the federal government.  Baca's actions showed that he believed he was above the law.  This was the same attitude exhibited by other Sheriff's Department officials involved in the offenses.

Defendant Baca recently made comments that can be interpreted to mean that he still believes he is above the law and refuses to acknowledge the problems within the Los Angeles County jails.  On May 29, 2016, Baca stated, "I'm not afraid of jail.  I'm not afraid of anything."  (Ex. A.)  He later continued, "I can serve time, I don't care what the circumstances are."  (Id.)  Despite committing a crime while in office, Baca said, "I'll stand on my record proudly, anywhere, whether it's in the free world or in jail."  (Id.)  Baca continued to ignore the obvious problems that occurred in Men's Central Jail, including by stating that there was "no safer jail of that size."  (Id.)  Importantly, Baca made these comments at an event where he received an award.  Among the attendees were a number of

high ranking public officials, all of whom appeared to downplay Baca's felony offense.  (See id.)

A sentence of six months' imprisonment will inform others, no matter who they are, that they must obey the law and that they risk going to prison if they decide to lie to the federal government.

                4.   <u>Avoiding Unwanted Disparity</u>

To date, the Court has imposed the following sentences in related cases:

- Deputy James Sexton – 18 months (PSR ¶ 18.)
- Deputy Gerard Smith – 21 months (PSR ¶ 16.)
- Deputy Mickey Manzo – 24 months (PSR ¶ 17.)
- Sergeant Maricela Long – 24 months (PSR ¶ 20.)
- Sergeant Scott Craig – 33 months (PSR ¶ 19.)
- Lieutenant Gregory Thompson – 37 months (PSR ¶ 14.)
- Lieutenant Stephen Leavins – 41 months (PSR ¶ 15.)

This Court is scheduled to sentence Undersheriff Paul Tanaka on June 27, 2016, and will sentence Captain William "Tom" Carey on August 1, 2016.

There are plenty of reasons why a sentencing disparity is warranted here.  First, defendant Baca accepted responsibility and pled guilty while the others (besides Carey, who has not been sentenced) all went to trial.  Second, Baca's involvement in the obstruction is not as clear as that of the others.  He pled guilty to willfully making false statements, which was the most readily provable offense.  Given the intelligence of many of the others who were convicted, the likely reason for the difference in quality and quantity of evidence is not that Baca was more cunning.  Instead, it appears that his involvement may have been more limited than the

others.  Third, and relatedly, Baca's Sentencing Guidelines range for violating 18 U.S.C. § 1001 is zero-to-six months, which is a much lower range than the others who were convicted.  Fourth, Baca's age, diagnosis and prognosis are very different than any other defendant who came before this Court in these related cases.

There are additional important differences specific to Tanaka, who ran the day-to-day operations of the Sheriff's Department, and Baca, who was its face.  As the investigation and trials revealed:

- While Baca cannot be entirely absolved for the culture of abuse and misconduct over the years, Tanaka's conduct actively fostered it.

- During the obstructive conduct, records show Baca was rarely in contact with any of those involved in the obstruction, with the exception of Tanaka.  Tanaka himself was routinely in contact with the others.

- Tanaka was extremely angry when the FBI was able to interview Anthony Brown.  When Baca learned the FBI had interviewed Brown, he did not act concerned.

- Tanaka was present at Men's Central Jail when his co-conspirators tampered with witnesses.  Baca was not there and no evidence to date shows Baca was told what happened.

Given all the circumstances, defendant Baca should receive a sentence that is lower than the others convicted of the obstructive actions.

Nine deputies have been convicted of offenses relating the beating of people in the jails, the false prosecution of the victims of the assaults, and the falsification of records to cover up the deputies' beatings.  Although the defendants have been sentenced to terms of imprisonment of greater than six months, such disparity is

warranted even discounting any age and health issues because their conduct was much more egregious.  Further, not one defendant who has been sentenced accepted responsibility:

- In United States v. Gonzalez, CR No. 13-574-GHK, three defendants were convicted at trial of conspiring to violate the civil rights of a handcuffed visitor to the jails through excessive force and false prosecution, beating the handcuffed visitor, and falsifying reports about that beating.  They were sentenced to terms of imprisonment of six, seven, and eight years.  One defendant pled guilty to two misdemeanors based on a cooperation agreement.  He has yet to be sentenced.  A fifth defendant pled guilty to a § 1001 violation pursuant to a cooperation agreement and has yet to be sentenced.

- In United States v. Aguiar, CR No. 14-69-BRO, two defendants were convicted at trial of falsifying reports about the force they used on a shackled and mentally ill inmate.  Although jurors could not decide unanimously whether the defendants also committed excessive force, the sentencing court found that the defendants had abused the inmate.  The court sentenced one defendant to 18 months and the second defendant to 13 months.

- In United States v. Brunsting, CR No. 13-573-GW, two defendants were convicted at trial of conspiring to violate the civil rights of a mentally ill inmate through excessive force and false prosecution, beating the mentally ill inmate, and falsifying reports about that beating.  The defendants have yet to be sentenced.

15

Any disparity between Baca and those convicted of and sentenced for abusing inmates and filing false reports is warranted.  Unlike those defendants, Baca was not involved in physically abusing individuals who were handcuffed, shackled, and/or mentally ill.  He did not try to cause the victims to be prosecuted for offenses they did not commit.  The Guidelines ranges for these defendants were also much higher than Baca's Guidelines range.

The final defendant to compare Baca to is Gilbert Michel.  This Court recently sentenced Michel to six months' imprisonment for accepting a bribe from an undercover agent to smuggle the phone to Anthony Brown.  Although he was not charged with the conduct, Michel admitted to beating inmates during the course of his short career as a deputy.  His crime and conduct were therefore more serious than Baca's offense.  Michel, however, cooperated with the federal government and assisted in the prosecution of Sheriff's Department officials, including by testifying in the Thompson and Tanaka trials.  Accordingly, there are different aggravating and mitigating circumstances when comparing Michel to Baca.  In some ways, balancing all the factors shows a sentence similar to the one the Court imposed on Michel is warranted.

More generally and outside of the context of the Sheriff's Department prosecutions, a sentence of up to six months' imprisonment prevents unwanted disparity in comparison to other defendants across the country who lied to federal investigations as Baca did.  This is because others who admit to committing the offense and who do not have a criminal history also would be facing a sentence of zero-to-six months' imprisonment.

16

## VII. CONCLUSION

There are plenty of aggravating and mitigating circumstances in this case.  Taking all of them into account, the Court should accept the parties' Rule 11(c)(1)(C) plea and sentence defendant to six months' imprisonment.

June 6, 2016                              Respectfully submitted,

EILEEN M. DECKER
United States Attorney

LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division


  */s/ Brandon D. Fox*
BRANDON D. FOX
LIZABETH A. RHODES
EDDIE A. JAUREGUI
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

17