Michael Zweiback (State Bar No. 143549)
michael.zweiback@alston.com
Rachel L. Fiset (State Bar No. 240828)
rachel.fiset@alston.com
Erin C. Coleman (State Bar No. 281092)
erin.coleman@alston.com

**ALSTON & BIRD LLP**
333 South Hope Street, 16th Floor
Los Angeles, CA  90071-1410
Telephone:  213-576-1000

Attorneys for Defendant Leroy Baca

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br><br>    v.<br><br>LEROY BACA,<br><br>            Defendant. | Case No.: CR16-0066-PA<br><br>**DEFENDANT SHERIFF LEROY BACA'S SENTENCING POSITION**<br><br>Date: July 11, 2016<br>Time: 8:30 AM<br>Ctrm: No. 15<br><br>[Filed concurrently with the Defendant's Objections to the Presentence Report and Declaration of Michael Zweiback in Support of the Sentencing Position] |

Defendant Sheriff Leroy David Baca, by and through his attorney of record, Michael Zweiback of Alston & Bird LLP, hereby submits his sentencing position pursuant to Federal Rules of Criminal Procedure Rule 32(b)(6)(B).

This sentencing position paper is based upon the attached memorandum of points and authorities, files and records in this case, and such further evidence and argument as the Court may permit at the hearing in this matter.

DATED:  June 20, 2016                    **ALSTON & BIRD LLP**

By:  *Michael Zweiback*
Michael Zweiback
Rachel L. Fiset
Erin Coleman

Attorneys for Defendant,
LEROY BACA

i

DEFENDANT SHERIFF LEROY BACA'S SENTENCING POSITION

LEGAL02/36485406v1

## TABLE OF CONTENTS

I.  INTRODUCTION ......................................................................................1

II.  SHERIFF BACA ACCEPTS RESPONSIBILITY FOR HIS CONDUCT AND THIS CASE STANDS ALONE.............................................................2

III.  A PROBATION ONLY SENTENCE, WHICH IS PERMISSIBLE UNDER THE PLEA AGREEMENT, IS SUFFICIENT......................................4

IV.  THE HISTORY AND CHARACTERISTICS OF SHERIFF BACA SUPPORT A PROBATION ONLY SENTENCE ..................................5

   A.  Sheriff Baca Worked Hard to Serve His Country and Community ...........7

   B.  Sheriff Baca's Commitment to Inmates' Education Shows His Dedication to Improving Lives...........................................................8

   C.  Sheriff Baca is Dedicated to Disadvantaged Youth ................................10

   D.  Sheriff Baca United People to Strengthen and Protect Communities......11

   E.  Sheriff Baca Served the Homeless and Less Fortunate............................13

   F.  Sheriff Baca Worked to Ensure Better Lives for Deputy Sheriffs...........13

V.  SHERIFF BACA HAS ALZHEIMER'S DISEASE AND SHOULD NOT BE INCARCERATED ......................................................................15

   A.  Sheriff Baca Suffers From A Progressive Disease Which Will Worsen Over Time ....................................................................16

   B.  Sheriff Baca is Unlikely to Receive Medically Appropriate Prescription Medications and Treatments in Prison...............................17

   C.  Sheriff Baca Would Not Receive the Care and Monitoring in Prison That He Receives at Home..............................................................19

   D.  Sheriff Baca Would Have a Difficult Time Adapting to a Prison Setting due to His Cognitive Impairments ...............................................20

   E.  The Stress of Prison Could Exacerbate Sheriff Baca's Medical Condition ............................................................................21

VI.  SHERIFF BACA IS EXTREMELY VULNERABLE TO HARM IN PRISON ...............................................................................................22

DEFENDANT SHERIFF LEROY BACA'S SENTENCING POSITION

LEGAL02/36485406v1

A.    Sheriff Baca is Vulnerable to Victimization as an Older Adult with Alzheimer's Disease ............................................................................................22

B.    Sheriff Baca is Vulnerable to Victimization as a Well-Known Law Enforcement Officer "Embroiled" in a High-Profile Scandal ..................23

VII.   SHERIFF BACA POSES NO THREAT OF RECIDIVISM ............................25

VIII.  SHERIFF BACA SHOULD REMAIN IN HIS FAMILY'S CARE..................27

IX.   CONCLUSION..............................................................................................28

DEFENDANT SHERIFF LEROY BACA'S SENTENCING POSITION

LEGAL02/36485406v1

# **TABLE OF AUTHORITIES**

**Page(s)**

**FEDERAL CASES**

*Gall v. United States,*
    552 U.S. 38 (2007) .................................................................................4, 5

*Kimbrough v. United States,*
    552 U.S. 85 (2007) ....................................................................................5

*Koon v. United States,*
    518 U.S. 81 (1996) ...............................................................................24, 25

*Pepper v. United States,*
    562 U.S. 476 (2011) .............................................................................5, 6, 8

*Peugh v. United States,*
    133 S. Ct. 2072 (2013) ...........................................................................4, 5

*Simon v. United States,*
    361 F.Supp.2d 35 (E.D.N.Y. 2005) .........................................................21

*United States v. Autery,*
    555 F.3d 864 (9th Cir. 2009) ...............................................................5, 6, 26

*United States v. Baron,*
    914 F. Supp. 660 (D. Mass. 1995) ......................................................15, 17, 25

*United States v. Carty,*
    520 F.3d 984 (9th Cir. 2008) .....................................................................4

*United States v. Cooper,*
    394 F.3d 172 (3d Cir. 2005) .......................................................................6

*United States v. Coughlin,*
    2008 WL 313099 (W.D. Ark. 2008) ......................................................19, 21

*United States v. Edwards,*
    595 F.3d 1004 (9th Cir. 2010) ..............................................................15, 20

*United States v. Heldeman,*
    402 F.3d 220 ......................................................................................16, 20

DEFENDANT SHERIFF LEROY BACA'S SENTENCING POSITION
LEGAL02/36485406v1

*United States v. Hernandez,*
302 F. Appx. 699 (9th Cir. 2008)........................................................26

*United States v. Hildebrand,*
152 F.3d 756 (8th Cir. 1998)..............................................................16

*United States v. Lara,*
905 F.2d 599 (2d Cir. 1990).......................................... 22, 23, 24, 25

*United States v. Lavallee,*
439 F.3d 670 (10th Cir. 2006)............................................................25

*United States v. Long,*
977 F.2d 1264 (8th Cir. 1992)......................................................22, 23

*United States v. Maltese,*
1993 WL 222350 (N.D. Ill. 1993) .....................................................15

*United States v. Marsh,*
820 F.Supp.2d 320 (S.D.N.Y. 2011)..................................................16

*United States v. Martin,*
363 F.3d 25 (1st Cir. 2004) ...............................................................22

*United States v. Rioux,*
97 F.3d 648 (2d Cir. 1996)...................................................6, 15, 16

*United States v. Ruiz,*
2006 WL 1311982 (S.D.N.Y. May 10, 2006) ...................................26

*United States v. Takai,*
941 F. 2d 738 (9th Cir. 1991).............................................................14

*United States v. White,*
506 F.3d 635 (8th Cir. 2007)..............................................................15

*Whitfield v. United States,*
543 U.S. 209 (2005) ...........................................................................16

**FEDERAL STATUTES**

18 U.S.C. § 1001(a)(2) .............................................................................2

18 U.S.C. § 3551 ...............................................................................26, 27

18 U.S.C. § 3553(a).............................................................................4, 5

DEFENDANT SHERIFF LEROY BACA'S SENTENCING POSITION

LEGAL02/36485406v1

18 U.S.C. § 3553(a)(1) ........................................................................... 5, 10, 15, 16

18 U.S.C. § 3553(a)(2)(B-C) ............................................................................. 25

18 U.S.C. § 3553(a)(2)(D) .......................................................................... 15, 17

18 U.S.C. §§ 3582(c)(1)(A) and 4205(g) ........................................................ 17

Pub. L. No. 98-473, § 239, 98 Stat. 1987, 3039 (1984) ............................... 26, 27

U.S.S.G. § 2B1.1(a)(2) ....................................................................................... 2

U.S.S.G. § 3E1.1 ................................................................................................ 2

U.S.S.G. § 5H1.1 .............................................................................................. 15

U.S.S.G. § 5H1.4 .............................................................................................. 15

U.S.S.G. § 5K2.0 ................................................................................................ 6

**RULES**

Fed. R. Crim. P. 11(c)(1)(C) ............................................................................. 2

**REGULATIONS**

Bureau of Prisons Program Statement No. 5050.49, CN-1 ................................ 17

DEFENDANT SHERIFF LEROY BACA'S SENTENCING POSITION

LEGAL02/36485406v1

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

Sheriff Leroy Baca ("Sheriff Baca") has dedicated his heart, his soul and his life to the community of Los Angeles. Now, he accepts that he failed this same community. His life's work has ended in a large scale breakdown of the Los Angeles Sheriff's Department ("LASD") at a time when he was its leader. His career filled with accomplishments and accolades with the LASD "too numerous to list" has ended in failure. (*See* Presentence Report ("PSR") ¶ 75.) His career is over, and he cannot right this wrong.

Even so, Sheriff Baca's fifty years of service to his community has been extraordinary, and will hopefully be considered by the Court. Friends, colleagues, elected officials, religious leaders and business owners remain thankful that "[h]e was a tremendous advocate and constantly gave back to his community." Letter of Gov. A. Schwarzenegger, Ex. D,[1] pgs. 361-62. He "spent his life dedicated to doing good for others." Letter of T. Lasorda, Ex. D, p. 255. His life's work is hailed by former inmates and troubled youth in Los Angeles County who claim "there are not enough sheets of paper in the world to express how grateful" they are for Sheriff Baca's kindness. Letter of R. Hernandez, Ex. D, pgs. 220-22. Sheriff Baca's "vision and dedication to provide education and rehabilitation to inmates even against the protest of deputies and senior staff" was life-changing for them. Letter of C. Saul, Ex. D, pgs. 350-53. Sheriff Baca believed that LASD inmates were "more than the worst thing [they had] ever done" and he worked to "radically and positively alter" their lives. Letter of C. Quincey, Ex. D, pgs. 330-32.

Sheriff Baca did the unthinkable for someone who has played such a significant

---

[1] All exhibits referenced herein are found in the Declaration of Michael Zweiback in Support of Defendant Sheriff Leroy Baca's Sentencing Position ("Zweiback Decl."). Exhibit D to the Zweiback Decl. is a collection of 229 letters in support of Sheriff Baca (hereinafter, referred to as "Ex. D").

1

LEGAL02/36485406v1

role in law enforcement not just in Los Angeles, but also nationally and internationally. He accepted responsibility and pleaded guilty to a crime. That crime carries a sentencing guidelines range of zero to six months, and there are no "factors that warrant a departure" from that range. (PSR ¶ 110.)

Sheriff Baca is seventy-four years old and suffers from Alzheimer's disease. He needs consistent monitoring, prescription medications, and any treatment available that may stall or slow the progression of this degenerative disease. No one contends he is a threat to the community. He will not offend again. All considerations support a probation only sentence.

In sentencing, Sheriff Baca's crime "must be tempered with the profoundly positive impact [he] has had on the public throughout his career." Letter of R. Parris, Ex. D, p. 321. Sheriff Baca respectfully requests that the Court impose a probation only sentence thereby permitting him to receive appropriate medical care in the most effective manner and contribute to the community of Los Angeles in any way that it sees fit.

## II.    SHERIFF BACA ACCEPTS RESPONSIBILITY FOR HIS CONDUCT AND THIS CASE STANDS ALONE

Sherriff Baca is a first time offender who pleaded guilty to one count of willfully making a false statement in violation of Title 18 U.S.C. § 1001(a)(2). The Plea Agreement reached between Sheriff Baca and the government pursuant to Fed. R. Crim. P. Rule 11(c)(1)(C) calculates a total offense level of four (4).[2] (*See* Plea Agreement for Leroy Baca ("Plea Agreement") ¶ 12.) The parties agree that an "appropriate disposition" of this case is a sentence of zero-to-six months' imprisonment; three years' supervised release, with conditions to be fixed by the Court; no fine; and a $100 special assessment. (*Id.* at ¶ 14.) Sheriff Baca respectfully requests that the Court accept the

---

[2] The guideline range was calculated with a Base Offense Level of six (6) under U.S.S.G. § 2B1.1(a)(2) with a two (2) point reduction for Acceptance of Responsibility under U.S.S.G. § 3E1.1. Sheriff Baca is a first time offender and falls within Criminal History Category I.

DEFENDANT SHERIFF LEROY BACA'S SENTENCING POSITION

terms of the Plea Agreement and sentence him within the range set forth therein.

Sheriff Baca entered the Plea Agreement with the United States Attorney's Office after the sentencing of Defendants in "Related Case – 2:13CR00819," and after pleas were entered in the "Related Cases" of Gilbert Michel, No. 2:12CR0039, and William Carey, No. 2:15CR00255. (*Id.* at ¶¶ 7-9.) Deputy Sheriff Paul Tanaka was convicted in Case No. 2:15CR00255 subsequent to Sheriff Baca entering into the Plea Agreement and awaits sentencing. (*Id.* at ¶ 9.) Sheriff Baca's conviction, however, is not based on the same set of facts as the "Related Cases." Sheriff Baca's conviction relates to a false statement that was made after the events upon which the "Related Cases" of obstruction and bribery are based against the other Defendants.

The government is clear "the evidence showed [] that [Tanaka] was the ringleader" of the alleged obstruction plot and corresponding actions that led to the convictions of Tanaka and his co-conspirators in the "Related Cases." (Government's Position Re: Sentencing of Defendant Paul Tanaka ("Tanaka Sent.") 1:23-2:1, 3:11-13.) Tanaka "over[saw] the day-to-day operations of the Sheriff's Department" and was in charge of the operation that led to the alleged obstruction upon which the "Related Cases" are based. (*Id.* at 1:10-11; *see also* Reporter's Transcript of Jury Trial for P. Tanaka, April 5, 2016, Ex. C at 11:7-8 ("This was Mr. Tanaka's operation. He was running the show. We knew that from the beginning.").) Sheriff Baca, on the other hand, "wanted the Sheriff's Department to investigate" the issues leading to the obstruction and "keep the inmate secure in its custody," not deny the FBI access to him. (Tanaka Sent. 3:7-10; *see* PSR ¶ 22 ("The Probation Officer has no information indicating the defendant impeded or obstructed justice.").)

The government does not contend that Sheriff Baca should be considered as part of the conspiracy that led to the events upon which the "Related Cases" have been brought. Instead, Sheriff Baca pled guilty to a crime of making a false statement during

3
DEFENDANT SHERIFF LEROY BACA'S SENTENCING POSITION

an interview his prior counsel, Brian Hershman of Jones Day,[3] agreed Sheriff Baca would participate in to facilitate the FBI's investigation into allegations in the "Related Cases." The interview of Sheriff Baca was conducted after he received assurances that he was not a "target" by the United States Attorney's Office.[4]

Sheriff Baca is to be sentenced for the crime of making a false statement in connection with that interview, not obstruction, bribery, or any other alleged illegal acts upon which the "Related Cases" are based. He is not similarly situated to any other Defendant. Thus, no sentencing disparity will be created if the Court imposes the probationary sentence requested herein.

## III. A PROBATION ONLY SENTENCE, WHICH IS PERMISSIBLE UNDER THE PLEA AGREEMENT, IS SUFFICIENT

The Court must arrive at a sufficient sentence – not one greater than necessary – to achieve the goals of sentencing. *See* 18 U.S.C. § 3553(a). A district court's goal is to impose a particularized sentence minimally sufficient to accomplish the statutory purposes of sentencing. *See United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008). A minimally sufficient sentence balances considerations of punishment, protection and deterrence with the unique characteristics and history of the defendant, including needed provisions for age and medical care. *See id.*; 18 U.S.C. § 3553(a).

To arrive at the minimally sufficient sentence, a district court should begin by "correctly calculating the applicable Guidelines range" recognizing that the Guidelines are the "starting point and the initial benchmark" for sentencing. *Gall v. United States,* 552 U.S. 38, 49 (2007) (citation omitted). A court "must then consider the arguments of the parties and the factors set forth in § 3553(a)" to arrive at the least punitive sentence that achieves the goals of sentencing. *Peugh v. United States*, 133 S. Ct. 2072,

---

[3] Brian Hershman and his law firm were hired by the County of Los Angeles during this investigation to represent the County along with several members of the LASD command staff, including Sheriff Baca.

[4] The interview was conducted at the Jones Day offices in Los Angeles with a court reporter over a five hour time period.

DEFENDANT SHERIFF LEROY BACA'S SENTENCING POSITION

LEGAL02/36485406v1

2080 (2013); *see Kimbrough v. United States,* 552 U.S. 85, 111 (2007) (the final determination of the court should be "in line with § 3553(a)'s overarching instruction to impose a sentence sufficient, but not greater than necessary") (internal citations omitted).

A court may rely on attributes of a defendant that make the defendant more likely to become "a productive, non-threatening member of free society" when determining the least punitive sentence. *See United States v. Autery,* 555 F.3d 864, 874 (9th Cir. 2009) (upholding a probation only sentence for a first time offender with a career history as a police officer in possession of child pornography); 18 U.S.C. § 3553(a) (a court should consider "the history and characteristics of the defendant"). In determining a sentence, a court makes credibility determinations and gains insights into an individual defendant that may not be in the record. *Autery,* 555 F.3d at 872-73 (the sentencing judge is familiar with "the individual case and the individual defendant before him") (internal citations omitted).

## IV.    THE HISTORY AND CHARACTERISTICS OF SHERIFF BACA SUPPORT A PROBATION ONLY SENTENCE

The requirement that courts consider the "history and circumstances" of each defendant reflects the "federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." 18 U.S.C. § 3553(a)(1); *Gall,* 552 U.S. at 52 (citations omitted). The Supreme Court has emphasized that "the fullest information possible concerning the defendant's life and characteristics" is "[h]ighly relevant – if not essential – to [the] selection of an appropriate sentence." *Pepper v. United States,* 562 U.S. 476, 488 (2011) (internal citations omitted). Considering the widest information available "ensures that the punishment will suit not merely the offense but the individual defendant." *Id.* (internal citations omitted).

In "extraordinary" cases, civic deeds, charitable contributions, public service and

similar prior good works are highly relevant to sentencing and may even be the grounds for a downward departure. U.S.S.G. § 5K2.0; *see United States v. Rioux*, 97 F.3d 648, 663 (2d Cir. 1996) ("the district court may downwardly depart when a number of factors that, when considered individually, would not permit a downward departure, combine to create a situation that differs significantly from the heartland cases") (internal citations omitted). Acts of a "personal nature" are "exceptional" and may be the basis for leniency or departure from the Guidelines. *United States v. Cooper*, 394 F.3d 172, 178 (3d Cir. 2005) (affirming downward departure for defendant who did not merely donate money, but "took it upon himself to mentor" youth).

This is an "extraordinary" case. *Id.; Rioux*, 97 F.3d at 663. Sheriff Baca's long and well-documented history of integrity, "visionary" service, and "compassion and kindness" for his community is "essential" to his sentencing. *See id.; Pepper*, 562 U.S. at 488 (the defendant's life and characteristics are "essential" to sentencing); Letter from J. Lim, Ex. D, pgs. 260-61; Letter from L. Mattice, Ex. D, pgs. 277-78 ("Lee Baca is also one of the most visionary law enforcement executives in the world."). Sheriff Baca is a self-made man with a long and successful history in law enforcement and public service, including "accomplishments with the LASD [that] are too numerous to list." PSR ¶ 75; *see Autery*, 555 F.3d at 874 (a defendant's law enforcement service may "constitute a mitigating factor in sentencing because a former law enforcement officer has shown at some point in his past that he can lead an honorable and responsible life"); Letter from D. Fernandez, Ex. D, pgs. 183-84 ("Lee is a man of the people, he came from similar circumstances, educated himself, was diligent in life and now made it his life's mission to teach others how they can do the same while also serving to protect them."). "If anyone deserves the benefit of the doubt for all the contributions he has made to our community, it would be Lee." Letter from M. Roos, Ex. D, pgs. 340-41.

DEFENDANT SHERIFF LEROY BACA'S SENTENCING POSITION

## A.    Sheriff Baca Worked Hard to Serve His Country and Community

Sheriff Baca's "compassion for the poor and less fortunate grew out of his own humble beginnings." Letter from J. Lim, Ex. D, pgs. 260-61. Sheriff Baca was raised by his grandparents who were also caring for a mentally handicapped relative because his mother, a Mexican immigrant, was unable to support him. (PSR ¶¶ 48-49.) He received his Associates Degree from East Los Angeles College, and in 1965, Sheriff Baca was granted his lifelong wish when he was hired as a sheriff deputy for Los Angeles County at the age of twenty-three. (PSR ¶¶ 70, 75.) At this time, he was simultaneously serving in the United States Marine Corps Reserves where he served for six years. (PSR ¶ 53.) Over the course of the next thirty-three years he continued to move up the ranks of the LASD. (PSR ¶¶ 75-80.) He worked long days and nights as a deputy sheriff, and simultaneously pursued higher education eventually receiving a doctorate in public administration from the University of Southern California. (PSR ¶¶ 69-74.)

Sheriff Baca began his elected term as Sheriff in 1998, which allowed him to implement various programs to further his vision for the LASD. Many of these programs sought to reach the poor and disenfranchised, protect the "safety of our community and rehabilitate [] those who were incarcerated." Letter from M. Fellhauer, Ex. D, p. 182; *see, e.g.*, Letter from H. Englander, Ex. D, p. 170 ("He was committed to changing the cycle of crime that infects young people in too many communities."); Letter from M. Roos, Ex. D, pgs. 340-41 ("I had never met a law enforcement official with the empathy for those on and beyond the margin . . . constantly trying to create positive avenues for self-improvement and mainstream society.").

Throughout his career, Sheriff Baca has taken pride in reaching out to the community for the betterment, and protection, of the public and inmates alike. Letter from P. Pietrantoni, Ex. D, pgs. 325-26 ("I worked for Mr. Baca [as a Deputy Sheriff] for 10 years prior to his becoming the Sheriff of Los Angeles County, and could not have dealt with a more compassionate, caring individual."). "[T]o exercise true justice,

7

LEGAL02/36485406v1

this mistake must be tempered with the profoundly positive impact Mr. Baca has had on the public throughout his career." Letter from R. Parris, Ex. D, p. 321. Sheriff Baca has a unique and "extraordinary" history of public service, community protection, and compassion toward the less fortunate, all of which support the sufficiency of a probation only sentence. *See Pepper*, 562 U.S. at 488 ("the punishment will suit not merely the offense but the individual defendant").

### B.  Sheriff Baca's Commitment to Inmates' Education Shows His Dedication to Improving Lives

Sheriff Baca was a "fervent advocate for education programs in our jails." Letter from D. Knabe, Ex. D, p. 243. He is motivated by his "obvious dedication to improving the lives of those who live on society's margins" and sought "to reduce recidivism and aid offenders in adapting to society and becoming productive citizens." Letter from A. Normore, Ex. D, pgs. 312-16. The LASD's Education Based Incarceration ("EBI") programs that were created under his leadership are a testament to his "sincere concern for people, regardless of their race, religion, gender, sexual orientation and economic status." Letter of W. Fujioka, Ex. D, pgs. 191-92. "[H]is dedication to the rehabilitation of inmates [was] refreshing and highly innovative." Letter from B. Choate, Ex. D, p. 135.

One former inmate writes that the program turned him "from being someone who had no dreams or goals, into someone who spent his days talking about [his] dreams and goals with deputies." Letter of C. Saul, Ex. D, pgs. 350-53. Inmates became teachers within the program, allowing other inmates to learn from them even where the program was not popular with other deputies. *Id.* ("His decision was not popular with some deputies as they did not believe in inmates changing their ways. This was never Sheriff Baca's belief."). "Many inmate's views of the LASD changed because . . . [t]hey saw a man who supported us, and believed in us." *Id.* Another former inmate writes that through the EBI programs he "learned the kind of self esteem [he] never found on the streets." Letter from S. Rogers, Ex. D, pgs. 337-79. He "learned to set

DEFENDANT SHERIFF LEROY BACA'S SENTENCING POSITION

LEGAL02/36485406v1

goals and live for a purpose, and more than anything that helping people is the right thing to do." *Id.* "Lee Baca didn't just teach us that, he modeled it for us." *Id.* Another former inmate writes that "[i]f it were not for Sheriff Lee Baca's insight and vision in creating the EBI and Merit program, which focused on values, attitudes and positive thinking I would not be the person I am today." Letter from C. Quincey, Ex. D, pgs. 330-32. "Sheriff Lee Baca realized our future depended on undoing our past." *Id.*

The EBI program is a "model of how rehabilitation through incarceration should work." Letter from H. Erwin, Ex. D, p. 174. It "has graduated thousands of inmates from the LA County Jails with high school diplomas and certificates that helped future employers hire ex-offenders" and resulted in a record reduction of crime in Los Angeles. Letter from Gov. A. Schwarzenegger, Ex. D, pgs. 361-62; Letter from R. Cheng, Ex. D, p. 250 ("I have personally seen inmates . . . express how much they appreciate the programs we've provided and how they were able to complete their High School Education" and beyond); Letter from J. Sullivan, Ex. D, p. 389 ("Without Lee's support I would not have a guiding light to show me what it looks like to be a good man, friend, family member and business man."). Sheriff Baca attended most of the inmate graduations and often spoke on the importance of education and its link to lowering recidivism and improving public safety. Sheriff Baca's programs "demand that we serve with integrity so that the inmates could live a life with dignity both inside and outside of incarceration." *Id.* Sheriff Baca's "care and regard extended way beyond his deputies, to the people in his custody and to the community he swore to serve." Letter from J. McNeil, Ex. D, p. 285.

Sheriff Baca "changed the way we incarcerate . . . creating a safer jail for inmates and the deputies." Letter from J. Moriarity, Ex. D, pgs. 292-94. Sheriff Baca's "positive and profound results" harken from Sheriff Baca's "commitment to changing lives." Letter of J. Smith, Ex. D, p. 382; Letter from S. Rogers, Ex. D, pgs. 337-39 ("it's important to me to tell you how much Sheriff Baca and his transformative justice

programs have done for me and countless others"). Sheriff Baca humbly requests that the Court consider them. *See* 18 U.S.C. § 3553(a)(1).

### C. Sheriff Baca is Dedicated to Disadvantaged Youth

Sheriff Baca's involvement in the Sheriff's Youth Foundation to improve the lives of disadvantaged youth was "truly a labor of love" for him. Letter from B. Corbell, Ex. D, p. 142 ("I saw how real his care [is] for these young people"). The Sheriff's Youth Foundation serves 2,500 at-risk youth at seventeen locations with after-school programs designed as an alternative to the street or gang affiliations the youth may otherwise participate. Letter from J.P. Guerin, Ex. D, pgs. 202-03. He actively sought participation by the community, committing much of his own time and effort to the programs and their funding. Even from a law enforcement perspective, it was "clear [] that Mr. Baca was more interested in the education of young men and women than he was to incarcerate them when they went afoul of the law." Letter from P. Pietrantoni, Ex. D, pgs. 325-26 (recounting how Sheriff Baca directed him to get a constant count of student attendance and sent Deputy Sheriffs to the homes of truant students to get them back in school). "[U]nder his leadership, thousands of youth who would have otherwise gone astray were instead directed to living productive and meaningful lives." Letter from D. Shaby, Ex. D, pgs. 368-69.

Sheriff Baca personally took interest in the lives of young people in crisis who could have ended up in the criminal justice system. As one former disadvantaged youth writes, over twenty years ago Sheriff Baca "literally showed up at my doorstep and introduced himself to me" after hearing about a troubled youth with "potential for change" from a community organizer. Letter from R. Hernandez, Ex. D, pgs. 220-22. "I was just a young kid with nothing to offer in return. He was not being paid and this was not part of his job." *Id.* Sheriff Baca's continued "guidance" helped that "troubled kid" graduate from college, become a high school teacher and a business owner. *Id.* Sheriff Baca "continued to remain involved in [his] life coming to the school as the

Sheriff . . . and speaking to [his] students on a regular basis. No cameras or reporters, just [him] and the students." *Id.*

Sheriff Baca has been involved with multiple youth programs, including a job fair to promote interest in law enforcement, serving on the Board of Homeboy Industries, which seeks an alternative life for former gang members, working with the East Los Angeles Boys Club, instituting elementary school tutoring and volunteering for the Metropolitan YMCA Board of Directors. Letter from J. O'Connell, Ex. D, pgs. 319-20 (Sheriff Baca had a "passion for the kids"); Letter from G. Shouse, Ex. D, pgs. 375-76 ("The young boys were kept out of gangs by association with individuals like Lee Baca . . . who openly voiced their concern for these young men."). "Literacy programs have been a priority for the Sheriff keeping kids out of gangs and on a trajectory toward higher education." Letter from C. Darian, Ex. D, pgs. 154-55. Sheriff Baca has helped "turn around the lives of many young people, and as a result of his guidance they have turned into good citizens and successful men." Letter from K. Thompson, Ex. D, p. 396. "[A]n all inclusive look at the man, including over 45 years of service to Los Angeles County and thousands of young lives touched, for the good" supports a probation only sentence. Letter from J. March, Ex. D, p. 279.

### D.    Sheriff Baca United People to Strengthen and Protect Communities

Sheriff Baca was "unique and unprecedented in the way he reached out to various ethnic groups, nationalities, and races in an inclusive and welcoming way." Letter from S. Cooley, Ex. D, pgs. 140-41; Letter from Pres. V. Fox, Ex. D, pgs. 186-87 (Sheriff Baca visited Mexico to train police when "no other law enforcement agency from the United States lent a hand in a time of need"). He brought "together people of different faiths, cultures and political affiliations to better understand our need as a society to coexist and for tolerance." Letter from W. Ru, Ex. D, pgs. 343-44.

He saw the "importance of the relationship between law enforcement and the faith-based communities." Letter from J. Moriarity, Ex. D, pgs. 292-94. Sheriff Baca

11

DEFENDANT SHERIFF LEROY BACA'S SENTENCING POSITION

LEGAL02/36485406v1

showed "great courage in his insistence in embracing all faiths." Letter from Rabbi D. Wolpe, Ex. D, p. 422. He founded the LA County Sheriff's Clergy Council, which brought together over 4,000 community and faith leaders throughout Los Angeles in a forum where he spoke monthly for the past ten years "to use the religious community to raise communication and combat crime in LA County." Letter from J. Glass, Ex. D, p. 197. Sheriff Baca, along with the hundreds of opinion leaders in the faith community, helped "steer young men and women from entering gangs, selling drugs or dealing in human trafficking." Letter from B. Adams, Ex. D, pgs. 49-50. The Council effectively introduced the idea of "faith and justice" to clergy and community leaders such that they could work together with law enforcement. Letter from K. Coulson, Ex. D, p. 143.

Following the attacks on 9/11, Sheriff Baca organized inter-faith services to unite Christians, Muslims and Jews to signal that "we are all God's children, that we are all in this together and that we had to stand united." Letter from Gov. G. Davis, Ex. D, p. 156 (Governor Davis and Sheriff Baca attended more than thirty services together to help unite the faiths); Letter from Rabbi S. Jacobs, Ex. D, pgs. 232-33 ("Sheriff Baca dedicated himself to help deepen the understanding of Muslim Americans."). Sheriff Baca "brought people together from all different walks of life." Letter from K. McCarthy, Ex. D, p. 284; Letter from A. Friedman, Ex. D, pgs. 189-90 ("he has worked tirelessly throughout the years in inter-faith programs, bringing Christian[s], Jews and Muslims together"). The Clergy Council was highly diverse and "willingly worked together to improve the community." Letter from R. Dowell, Ex. D, pgs. 164-65.

Sheriff Baca's "most valuable and unique contribution to the community has been his highly-visible substantive efforts to participate in multiple interfaith and interracial dialogues during the past several decades." Letter from J. Epstein, Ex. D, pgs. 171-72. "[T]here is unanimity in the recognition that the Sheriff genuinely cared about everyone with whom he came into contact." Letter from B. Melekian, Ex. D, pgs. 287-88; Letter from E. Stein, Ex. D, pgs. 387-88 ("He put thousands of volunteer hours to inspire people to come together under the name of peace."). Sheriff Baca's valiant

12

DEFENDANT SHERIFF LEROY BACA'S SENTENCING POSITION

efforts toward uniting the community merit consideration.

### E.    Sheriff Baca Served the Homeless and Less Fortunate

Sheriff Baca is a "devoted humanitarian, working relentlessly to help the homeless and less fortunate." Letter from M. Bostic, Ex. D, pgs. 100-01. "He was the first in local law enforcement to develop a plan for the homeless." Letter from S. Whitmore, Ex. D, pgs. 416-17. Under his leadership, the LASD implemented an outreach program offering social services to the homeless. *See* Letter from A. Curry, Ex. D, pgs. 145-51. Sheriff Baca developed training programs to improve how law enforcement could improve their treatment of the homeless. Letter of J. Santoro, Ex. D, pgs. 348-49. He created the first homeless summit in Los Angeles and was applauded for his "innovative and groundbreaking efforts to get the homeless into suitable housing and respectable jobs." Letter from S. Whitmore, Ex. D, pgs. 416-17; Letter from S. Chiang, Ex. D, p. 134 ("Many people called Baca a social worker with a badge.").

"His instinct is to treat a homeless man with compassion and dignity." Letter from H. DeNero, Ex. D, pgs. 158-61 (recounting a story where Sheriff Baca put his arm around a homeless man to gracefully direct him from an encounter with local police). Sheriff Baca's work towards improving the lives of the homeless in Los Angeles is one more way in which he has shown his "morality and commitment to making a difference in the community." Letter from E. Chiang, Ex. D, p. 133.

### F.    Sheriff Baca Worked to Ensure Better Lives for Deputy Sheriffs

Sheriff Baca's vision of inclusion and betterment for society also extended to the Deputy Sheriffs in LASD. "Lee Baca was absolutely committed to making a difference in the lives of young people everywhere, including young law enforcement officers." Letter from B. Melekian, Ex. D, pgs. 287-88. Sheriff Baca worked "to promote a better sense of respect and tolerance for fellow officers regardless of faith, color, ethnicity or gender." Letter from G. Moss, Ex. D, pgs. 296-97. Sheriff Baca instituted the Los Angeles County Sheriff's Department University ("LASDU") to help employees earn

13

DEFENDANT SHERIFF LEROY BACA'S SENTENCING POSITION

college and graduate degrees at lower rates of tuition. LASDU is a consortium of colleges and universities that is designed to "give working adults the highest quality and most convenient, educational experiences." Letter from J. Moriarity, Ex. D, pgs. 292-94. LASDU was part of Sheriff Baca's vision for a more "humane law enforcement agency." Letter from R. Weintraub, Ex. D, pgs. 414-15. LASDU has graduated well over one thousand employees with Master's, Bachelor's and Associate's degrees.

"In the 15 years he served as Sheriff, and in all his years as a deputy before that, the events giving rise to the charges in this case are an anomaly, and truly not indicative of his service and career." Letter from C. Trutanich, Ex. D, pgs. 400-01; *see United States v. Takai*, 941 F. 2d 738, 743 (9th Cir. 1991) (the court may consider an "aberrant" act by a defendant). Sheriff Baca is "one of the most dedicated and effective leaders Los Angeles County has been fortunate to have." Letter from C. Covitz, Ex. D, p. 144. "He worked to eliminate barriers between his department and the community they are charged with serving." Letter from R. Dowell, Ex. D, pgs. 164-65. "[Sheriff] Baca was an extraordinary public servant and will always be an extraordinary human being." Letter from P. Pietrantoni, Ex. D, pgs. 325-26. "No one will know how many lives were saved because of this wise and genuine man." Letter from M. Khan, Ex. D, pgs. 240-42; Letter from I. Haque, Ex. D, p. 210 ("I know of no one who isn't grateful for the community service rendered by Sheriff Baca.").

Sheriff Baca humbly appeals to the Court to consider his "history and characteristics" as exhibited by his years of contributions to the homeless, disenfranchised, youth, inmate population, Deputy Sheriffs and civilian staff "who will always consider him a hero and a man of honor," regardless of the organization's failures. Letter from R. Weintraub, Ex. D, pgs. 414-15. There is no question that Sheriff Baca committed a criminal act, but he also gave "his life as a workaholic on behalf of the 10 million people in the County of L.A." Letter of J. Moriarity, Ex. D, pgs. 292-94. "He deserves to be judged as a 'whole' person, for all of his contributions to the community and to the common good." Letter from R. Hertzberg, Ex. D, pgs.

14

DEFENDANT SHERIFF LEROY BACA'S SENTENCING POSITION

223-24. This consideration unquestionably supports a probation only sentence. *See Rioux*, 97 F.3d at 663 (granting downward departure for "extraordinary" prior good works and civil, charitable, and public service).

## V. SHERIFF BACA HAS ALZHEIMER'S DISEASE AND SHOULD NOT BE INCARCERATED

The Court's consideration of an individual's medical needs, age and deteriorating health is implicit in determining the minimally sufficient sentence for a defendant. *See* 18 U.S.C. § 3553(a)(1); 18 U.S.C. § 3553(a)(2)(D) (the court shall consider the need for the sentence imposed to provide the defendant with needed "medical care . . . in the most effective manner"); *United States v. White*, 506 F.3d 635, 644 (8th Cir. 2007) (the "mandate" to consider a defendant's history and characteristics "includes consideration of a defendant's age and medical condition"); *United States v. Baron*, 914 F. Supp. 660, 662 (D. Mass. 1995) ("At the same time as the guidelines discourage age and infirmity departure, the language of this section invites the district court to give the matter serious consideration.").

Probationary sentences, or home confinement, are appropriate where they "would be equally efficient and less costly than incarceration." *United States v. Maltese*, 1993 WL 222350 at *10 (N.D. Ill. 1993); U.S.S.G. § 5H1.1 ("Age may be a reason to depart downward in a case in which the defendant is elderly and infirm and where a form of punishment . . . might be equally efficient as and less costly than incarceration."); U.S.S.G. § 5H1.4 ("in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment"). Even where the Bureau of Prisons ("BOP") is capable of caring for a defendant, courts consider the burden of the cost of a defendant's "medical care on [] taxpayers" in satisfying the "requirement of providing needed care in the most effective manner." *United States v. Edwards*, 595 F.3d 1004, 1011 (9th Cir. 2010) (affirming sentence below guideline range because, while "Bureau of Prisons was capable of providing" appropriate medical care, probation allowed for the "needed care in the most effective manner").

A court may offer leniency or impose a sentence below the guideline range as a result of "an extraordinary physical impairment." *Rioux*, 97 F.3d at 663. Such conditions include stable conditions that need monitoring, have complications, require blood tests and need prescription medicines. *Id.* (affirming a ten-point downward departure where defendant's kidney disease was stable but he required blood tests, prescription medicines, and had complications as a result of medications); *see* 18 U.S.C. § 3553(a)(1); *United States v. Heldeman*, 402 F.3d 220. 224 (1st Cir. 2005) (remanding for resentencing in light of 72 year old defendant's age and "unstable" medical condition that needed monitoring); *United States v. Hildebrand*, 152 F.3d 756, 767 (8th Cir. 1998), *abrogated on other grounds by Whitfield v. United States*, 543 U.S. 209 (2005) (affirming downward departure of probationary sentence where the district court found life-threatening health conditions and government argued there was no extraordinary infirmary); *United States v. Marsh*, 820 F.Supp.2d 320, 387-88 (S.D.N.Y. 2011) (imposing sentence with drastic downward departure for 52 year old defendant with ailments needing prescription medications, in part, because "the defendant's many health problems . . . make it harder for him to serve a prison term").

### A. Sheriff Baca Suffers From A Progressive Disease Which Will Worsen Over Time

Sheriff Baca has been diagnosed with Alzheimer's disease and suffers from memory loss and various cognitive deficits, which are continually progressing.[5] Report of Dr. Helena Chui (hereinafter "Chui Report"), Ex. A. "The symptoms of Alzheimer's worsen over time, although the rate at which the disease progresses varies" depending on the individual. Stages of Alzheimer's, alz.org, http://www.alz.org/alzheimers_disease_stages_of_alzheimers.asp#overview (last visited Jun. 13, 2016). The average life span of an individual suffering from Alzheimer's disease is four to eight years after diagnosis. *Id.*

---

[5] Any suggestion that Sheriff Baca is still seen in the community and thus is not sick, ignores both the present and future realities of his diagnosis of Alzheimer's disease.

16

"Prison has potential to cause increased harm to persons with Alzheimer's disease." Chui Report, Ex. A. The Department of Justice specifically contemplates sentence reductions and compassionate release for defendants suffering from Alzheimer's disease. *See* Bureau of Prisons Program Statement No. 5050.49, CN-1, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582(c)(1)(A) and 4205(g), at 3 (March 25, 2015), available at https://www.bop.gov/policy/progstat/5050_049_CN-1.pdf (The BOP's review of requests based on medical circumstances should include "any cognitive deficits of the inmate, [including] . . . Alzheimer's disease"). The BOP guidance reflects the serious effects that incarceration may have on individuals with impairments resulting from Alzheimer's disease. *See Baron*, 914 F. Supp. at 665 (granting an 8 level downward departure where defendant would risk rapid deterioration in a prison setting due to his medical condition). Sheriff Baca respectfully requests that the Court consider his medical condition in imposing a sentence that provides for his medical needs and care "in the most effective manner." 18 U.S.C. § 3553(a)(2)(D).

**B.    <u>Sheriff Baca is Unlikely to Receive Medically Appropriate Prescription Medications and Treatments in Prison</u>**

Sheriff Baca is unlikely to receive "medically appropriate" care in prison. Declaration of Phillip S. Wise, Assistant Director (Retired), Federal Bureau of Prisons ("Wise Decl."), Ex. B ¶ 7 ("some activities used by therapists to maintain cognitive functioning . . . may be viewed as medically appropriate, but not medically necessary, and thereby denied"). The BOP seeks to approve "medically necessary" care; however, care that is deemed "medically acceptable" and is not a life-saving measure is "far less likely to be approved." *Id.* at Attachment 2, p. 19. The "limited scope of care [available through the BOP] applies to medications, as well as evaluations and interventions, and represents a more limited scope than is available to him in the community." Wise Decl., Ex. B ¶ 7. Sheriff Baca is currently on a regime to attempt to minimize the progression of the cognitive impairments of Alzheimer's disease. Report

17

DEFENDANT SHERIFF LEROY BACA'S SENTENCING POSITION

from Dr. Helena Chang Chui, M.D. ("Chui Report"), Ex. A. The constraints of care in prison, however, have the potential to increase the progression of his disease. *Id.*

Sheriff Baca is currently taking prescription medication for symptoms associated with Alzheimer's disease and has noted improvement on the medication. Chui Report, Ex. A. However, "[n]one of the five medications approved by the FDA for the treatment of Alzheimer's Disease are available through the BOP national formulary." Wise Decl., Ex. B ¶ 7. Sheriff Baca would need to request authorization for a non-formulary prescription approval though the BOP Medical Director, which may not authorize the continuation of his prescription medications if they are deemed merely "medically acceptable" treatments. *Id.* at ¶ 10. Similarly, Sheriff Baca is unlikely to have access to treatments and activities used by therapists to maintain cognitive functioning that are not considered "medically necessary" or lifesaving. *Id.* at ¶ 7.

It is "particularly important" that Sheriff Baca maintain a regular and intense aerobic exercise regime to "minimize cognitive, behavioral and affective symptoms" of Alzheimer's disease and "achieving sufficient levels of physical activity in a highly regimented, confined environment can be difficult." Chui Report, Ex. A. Even in a chronic care facility, it is highly unlikely that Sheriff Baca would meet the exercise or activity goals associated with a treatment plan that could minimize the effects of Alzheimer's disease. Wise Decl., Ex. B ¶ 16.

Sheriff Baca is eligible for a clinical study for a new medication at the USC Alzheimer's Disease Research Center, of which Dr. Chui is the Director. Chui Report, Ex. A ("[h]e is a good candidate" for the study). To participate in the study, it would be necessary for Sheriff Baca to be available for monthly intravenous infusions over the course of two years. *Id.* Sheriff Baca hopes to have the opportunity to participate in this study that could change the course of this currently incurable disease. A prison sentence, however, all but forecloses that opportunity. Wise Decl., Ex. B ¶ 9 ("participation in such studies is rarely allowed").

At best, a prison sentence would place Sheriff Baca in grave danger of not

18

LEGAL02/36485406v1

receiving the medically appropriate care for his disease. *Id.* At worst, medically, a prison sentence hastens his deterioration of cognitive deficits and dementia associated with Alzheimer's disease and prevents him from receiving medication that could change the course of his progression. Chui Report, Ex. A. Any society "would deride a legal system that imposed a sentence that threatened the life of the defendant unnecessarily." *United States v. Coughlin*, 2008 WL 313099 at *4 (W.D. Ark. 2008).

C. **Sheriff Baca Would Not Receive the Care and Monitoring in Prison That He Receives at Home**

Sheriff Baca is assisted and monitored by his devoted family, including daily assistance from his wife, Carol Baca ("Mrs. Baca"). Letter from C. Baca, Ex. D, pgs. 65-79. Mrs. Baca is able to reach out to medical specialists when necessary, seek medications, and closely monitor the progression of Sheriff Baca's symptoms. *Id.* It was Mrs. Baca who first recognized Sheriff Baca's memory loss and sought medical attention for him as a result. *Id.* She notes changes in his behavior and arranges for medical evaluations by specialists when needed. *Id.* In prison, significant changes and behavior may only be noted "by staff with periodic interaction or with medical staff who may evaluate him on a frequency as low as once per year." Wise Decl., Ex. B ¶ 8.

The BOP typically has medical specialists available, however, "individual access to those clinicians is limited by an administrative policy that requires multiple levels of review." *Id.* Access to clinicians continues to decline because BOP practices have recently reduced the number of inmates who have access to medical specialists. *Id.* Sheriff Baca currently sees two specialists to monitor his progression and treat his symptoms. Chui Report, Ex. A. Mrs. Baca often makes the appointments when necessary and assists in his day-to-day treatments. Letter from C. Baca, Ex. D, pgs. 65-79.

Sheriff Baca's medical condition needs constant monitoring. Because Alzheimer's symptoms amount largely to cognitive deficits resulting in memory loss and dementia, it is particularly important to have assistance in taking medications,

transporting (even by foot) and other day-to-day tasks. Chui Report, Ex. A. A prison setting simply cannot offer the monitoring and assistance necessary to provide the most "effective" medical care for Sheriff Baca's Alzheimer's disease. *See United States v. Heldeman*, 402 F.3d 220. 224 (1st Cir. 2005) (remanding for resentencing in light of 72 year old defendant's age and "unstable" medical condition that needed monitoring); *United States v. Edwards*, 595 F.3d 1004, 1011 (9th Cir. 2010) (considering the burden of "medical care on [] taxpayers" in satisfying the "requirement of providing needed care in the most effective manner").

**D.    Sheriff Baca Would Have a Difficult Time Adapting to a Prison Setting due to His Cognitive Impairments**

Sheriff Baca would have a difficult time adapting to prison because prison is "highly structured with a great many rules" that are not intuitive and are rigidly enforced. *Id.* at ¶ 6. Inmates must quickly learn the rules and abide by them as there is "little tolerance" for those who fall outside of the structure. *Id.* Sheriff Baca's loss of memory and executive functioning skills would make a transition to a rule based system of which he is unfamiliar extremely difficult. *Id.*; Chui Report, Ex. A. Sheriff Baca is also likely to be lost in a prison setting because housing areas and cubicles are all very similar, and "for an individual with memory impairment, finding his cubicle can be challenging." Wise Decl., Ex. B ¶ 6. His "wandering into living areas" of other inmates could put him "at risk of injury" from other inmates. *Id.* He is also likely to be subject to a multitude of institutional remands as a result of his losses, none of which would facilitate him learning the rules, and may lead to frustration and increased stress accelerating his cognitive and mental decline. *Id.*; Wise Decl., Ex. B ¶ 6. Alzheimer's disease also increases the likelihood that Sheriff Baca may become aggressive with staff and other inmates as a result of his disorientation, his new surroundings and the rules. *Id.*; Chui Report, Ex. A. The difficulty Sheriff Baca would suffer in adapting to prison, along with his need for medications, care and monitoring, renders incarceration a "greater burden on the federal prison system, and incarceration a greater burden on the

defendant." *Simon v. United States*, 361 F.Supp.2d 35, 42-43 (E.D.N.Y. 2005). Neither Sheriff Baca, nor the BOP need shoulder this burden.

**E.    The Stress of Prison Could Exacerbate Sheriff Baca's Medical Condition**

"Many conditions in prison may increase risk of cognitive and mental decline" in persons with Alzheimer's disease. *Id.* Even common "stressors" inherent in a prison setting may exacerbate Sheriff Baca's symptoms associated with Alzheimer's disease. *Id.*; Wise Decl., Ex. B ¶ 14. Risks to Sheriff Baca's condition include inactivity, poor nutrition, sleep disturbance, and a lack of social interaction. *Id.*; Chui Report, Ex. A. "[N]oise is incessant," the lights are constantly on and overcrowding often leads to multiple persons (strangers) in a cubicle leaving little space for the inmates. Wise Decl., Ex. B at Attachment 3. Moreover, social interaction is limited, particularly for older inmates that may be at risk in a general population. *Id.*

The prevalent problems related to older inmates in prison, regardless of their medical condition, "accelerate their aging processes to an average of 11.5 years older than their chronological ages after age 50." B. Jaye Anno et al., U.S. Dep't of Justice, *Correctional Health Care: Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates* at pg. 9 (2004). Limited social interaction, lack of sleep and overcrowding in living quarters could only serve to exacerbate Sheriff Baca's symptoms of confusion, memory loss and dementia. *Id.* ("Ordinary cognitive impairments of age aside, decreased sensory acuity, muscle mass loss, intolerance of adverse environmental conditions, dietary intolerance, and general vulnerability precipitate collateral emotional and mental health problems.").

Sheriff Baca should not be sentenced to a quick deterioration of his condition in prison when an alternative sentence is available that provides him with the means to receive medical care in "the most effective manner." *See Coughlin*, 2008 WL 313099 at *4 (imposing a probationary sentence where defendant's condition was "progressive and likely to deteriorate" in prison). The BOP "would be unable to adequately meet

21

DEFENDANT SHERIFF LEROY BACA'S SENTENCING POSITION

[Sheriff Baca's] medical needs," and imprisonment poses a threat to shortening his life. *United States v. Martin,* 363 F.3d 25, 49 (1st Cir. 2004) ("A court may find such an extraordinary impairment when imprisonment would threaten or shorten a defendant's life or when the Bureau of Prisons would be unable to adequately meet the defendant's medical needs.") On this basis, the Court should impose a probationary sentence – a sentence that falls squarely within the Guideline range of the crime to which he pled.

## VI.    SHERIFF BACA IS EXTREMELY VULNERABLE TO HARM IN PRISON

"If incarcerated, Sheriff Baca will be at increased risk for assault, abuse, threats, and intimidation in a general population setting." Wise Decl., Ex. B ¶ 11.  Not only is he an older adult suffering from Alzheimer's disease, but he is also the former Sheriff of the largest Sheriff's Department in the United States.  The risk of victimization to a seventy-four year old man with Alzheimer's disease is high, however, when that risk is coupled with the vulnerability associated with being a well-known law enforcement officer in prison the results can be devastating and deserve the utmost consideration. *Id.* ("Three factors that increase his vulnerability include his former long-term occupation in law enforcement as the Sheriff of a major jurisdiction, his advanced age, and his memory deficits.").

### A.    Sheriff Baca is Vulnerable to Victimization as an Older Adult with Alzheimer's Disease

Age and "physical impairment that results in extreme vulnerability" is a legitimate basis to forego a prison sentence. *United States v. Long,* 977 F.2d 1264, 1278 (8th Cir. 1992).  A court should consider personal characteristics of a defendant, which make "him particularly vulnerable to in-prison victimization" because assaults against vulnerable prisoners "make prison life especially dangerous for such individuals." *United States v. Lara,* 905 F.2d 599, 605 (2d Cir. 1990) (affirming significant downward departure because defendant had a "particular vulnerability due to his immature appearance, sexual orientation and fragility"). "[P]ersons with cognitive

22
LEGAL02/36485406v1

impairment have increased vulnerability to physical, emotional, and cognitive harm in prison settings." Chui Report, Ex. A. "Older adults with dementia are at risk of victimization by other prisoners." *Id.* They are "easy prey" for abuse. *See* Human Rights Watch, *Old Behind Bars: The Aging Prison Population in the United States*, at 59 (Jan. 2012), available at https://www.hrw.org/sites/default/files/reports/usprisons 0112webwcover_0.pdf (the aging population face a high "vulnerability to abuse and predation" in prison); *see* B. Jaye Anno et al., U.S. Dep't of Justice, *Correctional Health Care: Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates* at pg. 10 (2004).

Sheriff Baca has a "particular vulnerability" to assault as a result of his age and health – and former career – that would make prison life "especially dangerous." *Lara*, 905 F.2d at 605; Chui Report, Ex. A; *see Long*, 977 F.2d at 1278 (relying on doctor's reports stating that defendant would be vulnerable to victimization in prison to impose a sentence that excluded prison time). Sheriff Baca faces considerable risks as part of the older population in prison, and he faces the risks associated with victimization as a result of his Alzheimer's disease. Chui Report, Ex. A; *see* Human Rights Watch, *Old Behind Bars: The Aging Prison Population in the United States*, at 59 (Jan. 2012), available at https://www.hrw.org/sites/default/files/reports/usprisons0112webwcover_0.pdf.

Sheriff Baca's "particular vulnerabilities" for victimization may surface through something as simple as inadvertently wondering into the living area of another prisoner because he cannot recognize his own living area. Wise Decl., Ex. B ¶ 6. Thus, in prison, Sheriff Baca is extraordinarily vulnerable at every turn. He should not have to endure an "especially dangerous" prison term.

**B.      Sheriff Baca is Vulnerable to Victimization as a Well-Known Law Enforcement Officer "Embroiled" in a High-Profile Scandal**

Sheriff Baca's well-known history and career is yet another, and perhaps an even more severe, "particular vulnerability" for victimization in prison, making prison life "especially dangerous." *Lara*, 905 F.2d at 605. Sheriff Baca is an elected official and

23

in many ways a local celebrity. He was the Sheriff of Los Angeles County – the largest metropolitan Sheriff's Department in the country – for sixteen years. During that time he reinvented prison education, united races and religions, reduced the crime rate in Los Angeles and implemented successful youth programs. He was also enmeshed in high-profile, widely-publicized prison abuse scandals, regardless of his involvement in the events leading to the scandals. Sheriff Baca is highly vulnerable to prison abuse "because of the very public nature of his work." Wise Decl., Ex. B ¶ 11 ("Mr. Baca's vulnerability is increased over that of a member of his staff").

Over the last decade, news coverage about police brutality scandals plaguing the LASD have been inescapable. There have been multiple convictions of former deputies in cases "Related" to those scandals, including the resulting charges and convictions for deputies' obstruction of the FBI investigation. The cases have been covered by countless news outlets, including ABC News, CNN, Fox, LA Times, Daily News, Washington Post, and KTLA. People are familiar with Sheriff Baca and the allegations relating to the LASD. Convicted criminals, be it federal or state, are familiar with Sheriff Baca.

In *Koon v. United States*, 518 U.S. 81 (1996), the Supreme Court affirmed a decision basing a downward departure on the defendant police officers' high susceptibility to abuse in prison. 518 U.S. 81 (1996). The police officers were convicted of abusing a suspect (Rodney King) during an arrest. *Id.* The Court found that "[t]he extraordinary notoriety and national media coverage of [the] case, coupled with the defendants' status as police officers, make [the defendants] unusually susceptible to prison abuse (citations omitted)." *Id.* at 111-12. The Court recognized that the defendants were extremely vulnerable to prison abuse because of the "widespread publicity and emotional outrage . . . surround[ing] [the] case from the outset." *Id.* at 112 (citations omitted). Defendants were "particularly likely to be targets of abuse during their incarceration" and a reduced sentence was warranted as a result. *Id.*

24

DEFENDANT SHERIFF LEROY BACA'S SENTENCING POSITION

LEGAL02/36485406v1

Following *Koon*, the court in *United States v. Lavallee*, 439 F.3d 670 (10th Cir. 2006) granted a downward departure for police officers convicted in a large-scale investigation into a conspiracy to abuse inmates because of their "susceptibility to abuse in prison." 439 F.3d 670, 78 (10th Cir. 2006). Defendants were former prison guards convicted of depriving inmates of their constitutional rights through beatings and assaults. The Court found that a downward departure was warranted because the case "was part of a vast investigation, spanning several years, [] involv[ing] not only the abuse of inmates by correctional officers but also the conspiracy to abuse inmates," which was well-known among inmates. *Id.* at 708.

Sheriff Baca is also "unusually susceptible to prison abuse" as a result of the "extraordinary notoriety and the national media coverage" of his case and the "Related cases" involving the LASD. *Koon*, 518 U.S. at 111. He "was part of a vast investigation, spanning several years, [] involv[ing] not only the abuse of inmates by correctional officers but also the conspiracy to abuse inmates" causing "emotional outrage" and notoriety, which make him susceptible to abuse in prison. *Id.*; *Lavallee*, 439 F.3d 78. This "particular vulnerability" stemming directly from his former career, and the widespread notoriety of his case and the "Related Cases" make prison "especially dangerous." *Lara*, 905 F.2d at 605. When this particular vulnerability is coupled with the vulnerabilities inherent in his age and symptoms of his illness, "incarceration simply makes no sense." *Baron*, 914 F. Supp. at 665 ("Some offenders would be destroyed by a term in prison.") (citations omitted).

## VII.    SHERIFF BACA POSES NO THREAT OF RECIDIVISM

Sheriff Baca spent the entirety of his career attempting to reduce recidivism in Los Angeles County. The Court now must consider the risk of him engaging in future criminal conduct. *See* 18 U.S.C. § 3553(a)(2)(B-C) (factoring in need for "adequate deterrence to criminal conduct" and public protection from further crimes by the defendant). The Court's sentencing consideration should "ensure that prison resources

are, first and foremost, reserved for those violent and serious criminal offenders who pose the most dangerous threat to society." Pub. L. No. 98-473, §239, 98 Stat. 1987, 3039 (1984) (note to 18 U.S.C. § 3551). Sheriff Baca falls in a class of individuals unlikely to offend again even without consideration for his unique history of public safety and law enforcement. *See United States v. Ruiz,* No. 04-CR-1146-03-RWS, 2006 WL 1311982, at *4 (S.D.N.Y. May 10, 2006) (discussing that defendants over the age of forty "exhibit markedly lower rates of recidivism in comparison to younger defendants"); *see also* David Weisburd, et al., *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes,* 33 Criminology 587 (1995) (finding that prison and probation sentences have the same deterrent effect for white collar offenders).

Sheriff Baca's crime is an "aberration" in an otherwise extraordinary life of community service and integrity, which the Court may consider in determining the "reasonableness of his sentence." *United States v. Hernandez,* 302 F. Appx. 699, 700 (9th Cir. 2008); *see* Letter from Caryn Quincey ("[Sheriff Baca] helped me realize it's not what we do occasionally that makes us who we are: it's what we do consistently.") Sheriff Baca's life has been unquestionably dedicated to the protection of society and the prevention of crime. *See Autery,* 555 F.3d at 874 (relying on various attributes that "increase[] the likelihood that [the defendant] can again become a productive non-threatening member of free society, thus making more severe punishment less appropriate"). Although he no longer serves in a position that permits him to directly reduce crime in the community, his commitment to doing so is no less.

Sheriff Baca has a demonstrated record of rehabilitating those that have committed crimes and now he must work to rehabilitate himself. One thing is certain in this rehabilitation – his life's work, character, failing health and advanced age foreclose any possible need to incarcerate him to reduce the risk that he will offend again. Sheriff Baca poses absolutely no "threat to society" and society is better served with him actively engaged within it in any way possible. Pub. L. No. 98-473, §239, 98 Stat.

26

DEFENDANT SHERIFF LEROY BACA'S SENTENCING POSITION

1987, 3039 (1984) (note to 18 U.S.C. § 3551).

## VIII. SHERIFF BACA SHOULD REMAIN IN HIS FAMILY'S CARE

As a result of Sheriff Baca's increased vulnerability in prison, the "BOP will likely take steps to address that vulnerability, including placing him in a facility substantially distant from his home." Wise Decl., Ex. B ¶ 11. He would likely be placed in administrative detention to assess "the level of threat he may encounter," and then moved to various facilities throughout a prison sentence as his identity becomes known to the general population. *Id.* While these measures would be implemented to help protect him from victimization, they would serve to tear him away from contact with his family and support network at a time when he needs them most. *Id.*

A sentence which takes him from his family makes re-acclamation to their care at home more difficult following a prison sentence. If placed in custody, Sheriff Baca would be returned to his family's care with increased cognitive deficits making any adjustment back to their care difficult, if not impossible, as compared to leaving him in his family's care during a period of probation. Sheriff Baca's need for palliative care following his sentence, a burden his family is willing to shoulder, supports the imposition of a probationary sentence. Leaving him in his family's care allows him to receive the "most effective" care for his serious illness, both during the sentence and after it.

Custodial time would also cruelly diminish the precious time he has left with his family. Sheriff Baca has been a "great provider and protector" for his family. Letter of D. Baca, Ex. D, p. 80. He is a devoted husband, the father of adult twins, the step-father of two adult children and the grandfather of four. (PSR ¶¶ 55-57.) Sheriff Baca assists in college tuition payments for his older grandson and will assist in payments for the other grandchildren to attend college as well. (PSR ¶ 56.) "[H]e is upright and good and an aspirational example for a son." Letter of D. Baca, Ex. D, p. 80. His stepchildren laud his integrity as a husband to their mother, kindness to them, and

DEFENDANT SHERIFF LEROY BACA'S SENTENCING POSITION

LEGAL02/36485406v1

dedication to his community. Letter of B. Chiang, Ex. D, pgs. 131-32 ("he has always been very generous and kind to not only me, but everyone I've seen him interact with"); Letter of E. Chiang, Ex. D, p. 133 ("Lee Baca has shown integrity as a husband to my mother, as a stepfather to me and my brother, as a mentor to today's youth, and as a Los Angeles County Sheriff"). He is even close to his ex-wife to whom he was married for thirty years. Letter of J. Baca, Ex. D, p. 81 ("I am proud we are good friends and as a family we love him.").

No one is more devoted to Sheriff Baca than his wife. She is grateful for his support, love and generosity – "Lee always give[s], he doesn't like to take." Letter of C. Baca, Ex. D, pgs. 65-79. She has served as a constant aid to him through his memory loss and medical issues over the last few years, and she remains willing to dedicate her life to his care. *Id.* She is distraught by his diagnosis of Alzheimer's, and her biggest worry is that she will not be able to care for him. *Id.* ("I am stressed out and worried constantly that I might get sick too. Then, who could take care of this great man?"). She only hopes that he will be permitted to stay with her so that she can keep him in her care to ensure that he continues to get all medically appropriate treatments available. As she expresses, "the more I know him, the more I love him and can't live without him." *Id.*

Sheriff Baca requests to be placed on probation where he can be properly cared for in the loving environment that he has spent a lifetime building. Sheriff Baca sincerely appreciates the Court's consideration of his commitment to his family, and the commitment his family is now willing to make for his care.

## IX.   CONCLUSION

The foregoing is offered for the Court's consideration in "balancing the tremendous work and accomplishments by [Sheriff] Baca during his tenure against an isolated incident that resulted in a criminal conviction" to arrive at the minimally sufficient sentence. Letter of R. Shapiro, Ex. D, pgs. 370-71. All factors support a

28

LEGAL02/36485406v1

probation only sentence, which would permit Sheriff Baca to receive the most effective medical care and allow him "to continue his journey doing what he does best: Serving people." Letter of S. Whitmore, Ex. D, pgs. 416-17. Sheriff Baca respectfully requests that the court impose a probation only sentence along with any community service that it sees fit to order.

DATED:  June 20, 2016

**ALSTON & BIRD LLP**

By: *Michael Zweiback*
Michael Zweiback
Rachel L. Fiset
Erin Coleman

Attorneys for Defendant,
LEROY BACA

DEFENDANT SHERIFF LEROY BACA'S SENTENCING POSITION

LEGAL02/36485406v1

## CERTIFICATE OF SERVICE

I hereby certify that on June 20, 2016, I caused a copy of **DEFENDANT SHERIFF LEROY BACA'S SENTENCING POSITION**to be served upon the following counsel in the manner described below:

Via the Court's CM/ECF system:
Michael Zweiback
michael.zweiback@alston.com


/s/   Michael Zweiback
Attorney for LEROY BACA

DEFENDANT SHERIFF LEROY BACA'S SENTENCING POSITION

LEGAL02/36485406v1