# EXHIBIT A

12

# FILED UNDER SEAL

# EXHIBIT B

Phillip S. Wise

Assistant Director (Retired), Federal Bureau of Prisons

140 Parham Rd. N.W.

Milledgeville, Georgia 31061

phone: 478.968.7907    cellphone: 478.456.4904   email: pswise@msn.com

Reference:    Mr. Leroy Baca

Docket Number:  CR16 0066

Prepared for:  Mr. Michael Zweiback, Esq.

I, PHILLIP S. WISE, declare:

1. From 1999 until my retirement in February 2002, I served as the Assistant Director of the Federal Bureau of Prisons, with responsibility for Health Care for the agency. In this position, I was responsible for the formulation and implementation of health care policies for the agency, and served as a member of the Executive Staff which is the senior policy making body of the Bureau. For three years prior to that, I was the Warden of the Federal Medical Center (of the Federal Bureau of Prisons) at Rochester, Minnesota, where I had overall operational responsibility for that facility. While in this position, I was appointed to the Senior Executive Service of the U.S. Government. For two years prior to that, I was the Warden of the Federal Prison Camp at Alderson, W.V. My career with the Federal Bureau of Prisons dates back to 1977, and my assignments with the Bureau of Prisons include service in Federal Penitentiaries, Federal Prison Camps, Federal Medical Centers, and Federal Correctional Institutions. I am fully familiar with the health care and inmate management policies of that organization.

Page 1 of 26

From December 2003 through September 2005, I was employed as Vice President of a national firm that provides specialty medical care to inmates in federal and private correctional facilities.

Since my retirement from the Bureau of Prisons, I have maintained current knowledge of changes in its health care policies and practices through contact with current BOP officials; monitoring published changes in policy; review of reports and documents issued by BOP, the U.S. Department of Justice, and outside agencies; review of testimony of BOP officials before oversight bodies as well as court testimony, and through request for information from the BOP through the Freedom of Information Act.

A copy of my resume which includes my relevant work experience is attached (Attachment 1)

2.  I was contacted by Ms. Rachel Fiset of Mr. Zweiback's (counsel for Mr. Baca) office, who asked that I review documents related to the health care requirements of Mr. Baca and address issues related to incarceration. This statement is prepared in response to that request.

3.  In preparation of this statement, I have reviewed the following Program Statements of the Federal Bureau of Prisons: Inmate Security Designation and Custody Classification (September 12, 2006); Patient Care (6/13/2014), Medical Designations and Referral Services for Federal Prisoners (1/15/2005), Health Services Administration (6/2014), Pharmacy Services (1/15/2005); the National Formulary of the Federal Bureau of Prisons for 2013/2014; and the website for

Page 2 of 26

16

the Federal Bureau of Prisons (              ).  In addition, I reviewed the following documents provided by Mr. Zweiback:  Letters from Qian Zhang, M.D. dated September 8, 2015 and February 26, 2016; Final Report of Initial Consultation dated October 16, 2015 and Final report of Follow-Up Consultation dated December 23, 2015 by Helene Chui, M.D.; Neuropsychological Assessment Report by David D. Fox, Ph.D. dated May 15, 2014; Neuropsychological Evaluation by Lina M. D'Orazio, Ph.D. dated October 26, 2015; Diagnostic Service Report from Athena Diagnostics dated January 29, 2016; and a letter from Helena Chang Chui, M.D. dated May 17, 2016.

4.  From the information available to me, it appears that Mr. Baca has been diagnosed with early stage Alzheimer's Disease that currently involves mild cognitive impairment as summarized by Dr. Chui:  "My overall impression is mild cognitive impairment, predominantly amnestic type, although there was slight weakness in semantic verbal fluency, suggesting possible mild weakness in executive function as well. The FOG PET scan shows mild decreased metabolism in both temporal lobes, which is consistent with the predominant weakness in memory shown on neuropsychological testing. "  Dr. Chui indicates that Mr. Baca has had progressive problems with short term memory over the past year.  He remains independent in basic activities of daily living.

5.  In my opinion, Mr. Baca  and the Bureau of Prisons will face the following challenges should Mr. Baca receive a period of incarceration:

First, his impaired short term memory may make adaptation to a correctional setting difficult initially;

Page 3 of 26

17

Second, the scope of care and access to medical specialists will be more limited in a correctional setting than in the community;

Third, none of the five FDA approved medications for the treatment of Alzheimer's disease is available through the BOP national formulary.

Fourth, he will be at substantially greater risk of assault or abuse based both on his prior employment and cognitive deficiency;

Fifth, the Bureau of Prisons is ill equipped to manage the needs of elderly inmates;

Sixth, the effects on his mental status of common stressors associated with incarceration are unknown;

Seventh, successful management of chronic conditions over time in a correctional setting is difficult.

My opinion is based on the following:

IMPAIRED SHORT TERM MEMORY

6. A correctional setting is highly structured with a great many rules, many of which are not intuitive and whose enforcement is generally rigid. It is essential that any newly arriving inmate learn those rules quickly and thoroughly. With short term memory impairments, it is likely that Mr. Baca will have some difficulty in learning and retaining these rules, at least initially. Similarly, adapting to a new environment, learning to navigate an institution where many buildings look very similar and substantial areas are off limits may be difficult with memory impairment. Finally, there is little tolerance in the inmate population for those who intentionally or inadvertently wander into living areas that are not theirs. In

Page 4 of 26

18

an correctional setting, housing areas look very much alike, and cubicles in dormitories are very standardized, and for an individual with memory impairment, finding his cubicle can be challenging. Dr. Chui has indicated that as a result of Alzheimer's Disease, in custody, Dr. Baca may become aggressive with staff or other inmates. Should this occur, other inmates are very unlikely to consider his mental status when responding, and he may be at risk of injury. Similarly, aggression toward staff will initially likely be managed as a disciplinary issue and may result in significant periods of placement in administrative detention or disciplinary segregation.

LIMITED SCOPE OF CARE AND ACCESS TO MEDICAL SPECIALISTS

7.  Attachment #2 contains an overview of the structure of health care in the Bureau of Prisons. While the Bureau of Prisons seeks to provide medically necessary care for its inmates, it may decline to provide all medically appropriate care. In Mr. Baca's case, for example, some activities used by therapists to maintain cognitive functioning (for example, computer applications that stimulate problem solving) may be viewed as medically appropriate, but not medically necessary, and thereby denied. None of the five medications approved by the FDA for the treatment of Alzheimer's Disease are available through the BOP national formulary (see below for further discussion). This limited scope of care applies to medications, as well as evaluations and interventions, and represents a more limited scope than is available to him in the community.

Page 5 of 26

19

8. In the community, Mr. Baca apparently has family members who are able to monitor his behavior and note changes over time, and arrange for medical evaluation when needed.  Similarly, in the community, Mr. Baca or his family may self refer to a medical specialist or, if concerned, may directly contact a medical specialist such as a neurologist or psychiatrist. If incarcerated, his behavior and changes that may be significant may not be noted by staff with periodic interaction or with medical staff who may evaluate him on a frequency as low as once per year.  While the Bureau of Prisons facilities typically have a number of medical specialists available under contract provisions, individual access to those clinicians is limited by an administrative policy that requires multiple levels of review. Changes to BOP practices over the past several years have reduced the number of inmates who receive medical trips into the community to see medical specialists by approximately 10%.

9. Dr Chui has indicated that Mr. Baca appears to qualify for one or more clinical research studies available at USC.  If in custody, it is almost certain that his participation in such studies will not be approved by the Bureau of Prisons. While some kinds of clinical trials may be considered, because of the unfortunate history of inmate participation in medical research and the significant ethical questions such participation raises, participation in such studies is rarely allowed.

MEDICATIONS

10. According to the Alzheimer's Association Research Center, five medications have been approved by the FDA for the treatment of Alzheimer's.  None of those

Page 6 of 26

medications are available through the BOP national formulary. A BOP physician, after determining the necessity of treatment with one of these medications, can request authorization for a non-formulary prescription approval. If such a request is made, it requires completion of an additional algorithm as well as submission of imaging and laboratory results, and must be approved by the BOP Medical Director in the agency's headquarters.

GREATER VULNERABILITY

11. If incarcerated, Mr. Baca will be at increased risk for assault, abuse, threats, and intimidation in a general population setting. Three factors that increase his vulnerability include his former long-term occupation in law enforcement as the Sheriff of a major jurisdiction, his advanced age, and his memory deficits. Mr. Baca's vulnerability is increased over that of a member of his staff because of the very public nature of his work. If incarcerated, the BOP will likely take steps to address that vulnerability, including placing him in a facility substantially distant from his home, possibly initially placing him in administrative detention to assess the level of threat he may encounter, and moving him to different facilities should his background become known in the general population and threat levels increase. Internally, his work and housing assignments may be restricted to those where staff more frequently monitor. While these measures may help in the early identification of a threat or problem, he cannot be monitored continuously around the clock, and there are areas of every institution where he will be alone with other inmates.

Page 7 of 26

ELDERLY INMATES

12. In May 2015, the Inspector General of the U.S. Department of Justice released a report regarding aging inmates in the Bureau of Prisons. For the purposes of that report, and consistent with the definition used by the National Institute of Corrections (a division of the Bureau of Prisons), aging inmates were defined as those over 50 years of age. The findings of that report are summarized:

> "The OIG found that aging inmates are more costly to incarcerate than their younger counterparts due to increased medical needs. We further found that limited institution staff and inadequate staff training affect the BOP's ability to address the needs of aging inmates. The physical infrastructure of BOP institutions also limits the availability of appropriate housing for aging inmates. Further, the BOP does not provide programming opportunities designed specifically to meet the needs of aging inmates. We also determined that aging inmates engage in fewer misconduct incidents while incarcerated and have a lower rate of re-arrest once released; however, BOP policies limit the number of aging inmates who can be considered for early release and, as a result, few are actually released early." [1]

---

[1]    The Impact of an Aging Inmate Population on the Federal Bureau of Prisons, Office of the Inspector General, U.S. Department of Justice, May 2015.

Page 8 of 26

As an example, the report cites instances where the number of inmates who require lower bunks for medical reasons exceed the total number of lower bunks available in the entire institution.

13. An earlier report by the National Institute of Corrections[2] indicated that older inmates, particularly those first incarcerated at an advanced age, have a substantially different experience of incarceration than younger inmates and that their specific needs are not generally addressed by typical correctional programs. They have different medical needs with more chronic illnesses, they are more likely to become socially withdrawn, there are few programs or activities geared for that age group, and they are more subject to abuse or threats by other, younger inmates. They adapt to the noise and crowding of prison life more poorly and their physical needs such as mobility, temperature regulation, noise management, and diet are more likely to be problematic.

COMMON STRESSORS OF DAILY PRISON LIFE

14. It has been my experience that inmates often seek assistance, either medically, administratively, or through other means in dealing with a number of specific conditions of confinement that appear inherently stressful. A listing of those stressors most commonly brought to my attention by inmates or staff seeking to address them is included as Attachment #3. While some of these are quite apparent, others are more subtle, and the response of older inmates to these

---

[2]    Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates, National Institute of Corrections, 2004.

Page 9 of 26

stressors is often different from that of younger inmates. Those most frequently brought to my attention are sleep disturbances, noise, interaction with younger, more aggressive inmates, crowding, and food. It is uncertain what, if any effect these stressors might have on Mr. Baca's medical condition, and that may be best addressed by his treating physician.

CHRONIC CARE

15. If incarcerated, Mr. Baca will be assigned to a chronic care clinic to facilitate monitoring his Alzheimer's Disease progression. Chronic care clinics are a computerized scheduling device designed to ensure that inmates with chronic conditions are seen by a clinician on a regular basis to monitor specific conditions and provide changes to care as needed. Unfortunately a February 2008 audit conducted by the Inspector General of the Department of Justice, found that in over 18% of the BOP facilities inspected, inmates in chronic care clinics "were not monitored as required." [3] In a correctional setting, there may be any number of reasons for the required monitoring to fail, such as inmate transfers, unavailability of consulting specialists, or security requirements. However, while chronic care clinics appear to provide the required monitoring the majority of the time, enrollment in such a clinic does not assure the monitoring will be provided in all cases.

---

[3]    "Federal Bureau of Prisons' Efforts to Manage Inmate Health Care, Audit Report 08-08, Office of the Inspector General, Department of Justice, Audit Division, February 2008.

Page 10 of 26

16. It should be noted that there are multiple reasons that optimal chronic care may not be achieved in any correctional setting, including the BOP. Inmates may not be compliant with administration of medication, they may make poor nutritional choices, they may fail to achieve exercise or activity goals, or, they may be transferred to different housing units or facilities and experience disruption of care, or they may miss appointments and subsequently not receive adequate follow-up and monitoring. While failure to achieve moderate internal goals for management of chronic conditions over time is not an indictment of the health care delivery system of the BOP, it does make clear the challenges of managing a complex chronic disorder in a correctional environment.

I declare under penalty of perjury that the foregoing is true and correct.

Executed at Milledgeville, Georgia, on June 1, 2016.

_____

PHILLIP S. WISE

Page 11 of 26

25

ATTACHMENT #1

**Resume for**

Phillip Steven Wise
140 Parham Rd. N.W.
Milledgeville, Georgia 31061
Phone:  478-968-7907
Cellphone:  478-456-4904
Email:

## PERSONAL INFORMATION

Date and place of birth: December 2, 1951, Atlanta, Georgia
Family:  Married to Dianne Wise since December 28, 1974
        One son, Joshua, former Petty Officer aboard the USS Avenger, MCM-1,
Hobbies/interests: Running, bicycling, cooking, traveling, gardening

## EDUCATION

High School:
    Danbury High School
    Danbury, Connecticut
    Graduated June 1969

Undergraduate Studies:
    Emory University
    Atlanta, Georgia
    Enrolled September 1969
    Awarded BA (major in Psychology) August 1972
    Awards:  Phi Beta Kappa

Graduate School
    University of Minnesota
    Center for Research in Human Learning
    September 1972 through May 1973

    Georgia State University
    School of Education
    Enrolled 1975
    Awarded M.Ed. (Counseling and Psychological Services) March 1977

## RELEVANT EMPLOYMENT

Page 12 of 26

26

**Bureau of Prisons**

    **Psychology Technician**

        U.S. Penitentiary

        Atlanta, Georgia

        March 1977-September 1978

        Major Duties: Administration of psychological assessment instruments; collection, analysis and organization of material for completion of forensic evaluations; group and individual therapy; development and delivery of counselor training; general correctional duties.

    **Case Manager**

        U.S. Penitentiary

        Atlanta, Georgia

        September 1978-February 1981

        Major Duties: Overall management of the cases of 250 federal convicted felons, to include reception; coordination with courts and pre-trial services; sentence monitoring; development of individual program plans; release planning; coordination with post release services.

    **Case management Coordinator**

        Federal Correctional Institution

        El Reno, Oklahoma

        February 1981- February 1983

        Major Duties: Coordination of activities of 8 casemangers, development and implementation of local policy regarding inmate management; advise Warden about case management policy; coordinate institution activities with U.S. Parole Commission; coordinate activities related to Interstate Agreement on Detainers, International transfer of inmates, and extradition issues.

    **Drug Abuse Treatment Unit Manager**

        Federal Correctional Institution

        Fort Worth, Texas

        February 1983-October 1983

        Major duties: Management of a comprehensive, residential drug treatment unit for 200 convicted federal felons; supervision of clinical psychologist, casemanagers, counselors, correctional officers and support staff; general correctional responsibilities.

    **Instructor**

        Bureau of Prisons Staff Training Academy

        Federal Law Enforcement Training Center (FLETC)

        Brunswick, Georgia

Page 13 of 26

October 1983-April 1985
Major duties: Instructing new Bureau of Prisons employees in firearms, self-defense, and policy; development and implementation of practical exercises for new employees; development of computer based instruction programs; firearms instruction for staff from other federal law enforcement agencies.

**Assistant Regional Administrator for Correctional Programs**
North Central Regional Office
Bureau of Prisons
Kansas City, Missouri
April 1985 – October 1986
Major Duties: Assisted the Regional Administrator in the evaluation of correctional programs in the 15 correctional facilities located within the North Central Region; management of inmate pay programs within the region; coordination of activities of the U.S. Parole Commission within the region.

**Regional Administrator, Correctional Programs**
North Central Regional Office
Bureau of Prisons
Kansas City, Missouri
October 1986 – April 1988
Major Duties: Provided oversight of correctional programs (including unit management, case management, inmate performance pay, monitoring of disruptive groups, placement of newly sentenced inmates, separation of gang members, placement of federal inmates in state systems and receipt of state inmates in federal facilities), coordination of parole hearings and releases, coordination of release planning and coordination with offices of U.S. Probation, monitoring of interstate agreement on detainers, and coordination of movement of inmates.

**Executive Assistant, Correctional Programs Division**
Central Office (Headquarters)
Bureau of Prisons
Washington, D.C.
April 1988 – May 1989
Major Duties: Provided administrative assistance to the Assistant Director of the Bureau of Prisons who was responsible for all correctional programs, including community corrections, case management, unit management, chaplaincy programs, psychology services, and custody and security. Managed transfer of inmates to and from other countries, working with the Department of State to administer international treaties, managed covert operations in conjunction with the Office of Enforcement Operations, Department of Justice.

**National Administrator, Correctional Programs Branch**
Central Office (Headquarters)
Bureau of Prisons
Washington, D.C.
May 1989 – June 1990
Major Duties: Responsible for development of agency wide policy governing correctional programs, including case management, unit management, and management of disruptive groups. Oversight of programs agency wide in those areas, including a program of regular institution audits. Management of national program for the placement of Mariel Cubans and repatriation of those eligible, in conjunction with the Department of Justice, Department of State, Immigration and Naturalization Service and St. Elizabeth's Hospital. Participation in the development of administration social policy, including sentencing, legislative initiatives, and probation and parole policies.

**Executive Associate Warden**
Federal Correctional Institution
Lexington, Kentucky
June 1990 – July 1991
Major Duties: Responsible for all operational areas of a major correctional facility with both male and female populations and a significant medical mission. Included direct responsibility for budget development and execution, facilities management, food service, health services, personnel, and training.

**Deputy Assistant Director**
Bureau of Prisons
Central Office (Headquarters)
Washington, D.C.
July 1991 – June 1994
Major Duties: Responsible for policy development and oversight of agency activities in information management and technology, research and evaluation, security technology, and international affairs. Oversaw operations of agency information management development, including expansion of legacy system and development of agency wide local and wide area networks, the migration to distributed data bases, and integration of systems with other components of the criminal justice system. Worked collaboratively with U.S. Marshal's Service and Immigration and Naturalization Service to implement a joint automated booking system as a demonstration project in the Vice President's initiative to reinvent government. Participated regularly with Department of Justice and other agency officials in the development of administration policies for the Department and White House regarding criminal justice issues, including sentencing and alternatives to incarceration, probation and parole policies, legislative initiatives and assessment of impact of legislative proposals. Participated in briefings of members of Congress, federal judges, and administration officials. Coordinated international assistance in corrections with Department of State and Department of Justice.

**Warden**
Federal Prison Camp
Alderson, West Virginia
June 1994 – September 1996
Major Duties: Responsible for the overall administration of a major prison camp for federal female offenders, including all operational areas such as custody, financial management with a budget of $20 million, facilities management, personnel and food service, as well as program areas such as unit management, case management, chaplaincy and psychology services, education, drug abuse treatment and vocational training programs. Of particular note were programs specifically designed for pregnancy, childbirth, and parenting.

**Warden**
Federal Medical Center for Prisoners
Rochester, Minnesota
September 1996 – March 1999
Major Duties: Responsible for the overall administration of a complex medical facility for federal prisoners, including the highest levels of inmate custody, all operational areas and program areas, an annual budget of $45 million, and management of contractual relationship with the Mayo Clinic. Management of medical and surgical inpatient and outpatient programs and populations, and in-patient, out patient and forensic mental health programs and populations. Responsible for ensuring compliance with all federal health care laws and regulations, ethical medical decision making, and accreditation by external health care review organizations. Responsible for coordination of activities with other components of state and federal criminal justice components, including courts, probation and parole agencies, local, state and federal law enforcement organizations and other Department of Justice components. Participated in the development of health care policies for the Bureau of Prisons. Member of the U.S. Senior Executive Service.

**Assistant Director of the Federal Bureau of Prisons with responsibility for Health Services Division**

Federal Bureau of Prisons
Central Office (Headquarters)
Washington, D.C.
March 1999 – February 2, 2002
Major Duties: Responsible for agency wide programs in health services, food service, and safety, including policy development, integration of services across 93 institutions and 7 major medical referral centers, and oversight of those programs in each

Page 16 of 26

facility. Management and oversight of $500 million annual health services/food service budget. Participate as one of 15 members of the agency Executive Staff that makes major agency policy and personnel decisions and collectively directs operations of the agency components. Provide briefings to members of Congress and testimony at relevant Congressional hearings, provide briefings to senior administration officials and participate in the development of national social policies related to corrections, correctional health care, public health, post release services, and legislative initiatives. Member of the U.S. Senior Executive Service.

**Medical Development International**
**822 Highway A1A North, Suite 310**
**Ponte Vedra Beach, Florida 32082**

       **Vice President, Client Services**
       December 1, 2003 to September 30, 2005

Medical Development International (MDI) is a medical service organization that arranges for specialty health care for inmates in federal, state, local, and private correctional facilities. Through contractual arrangements with providers and correctional facilities, MDI assembles provider networks, schedules appointments, adjudicates bills and provides fund control assistance. Major duties include participating in development of company policies and strategies, oversight of operations, and intervention on behalf of clients in contract management.

**Consultant**
**140 Parham Rd. N.W.**
**Milledgeville, Georgia 31061**
**478-968-7907**

**September 30, 2005 to Present**

Currently serve as consultant regarding prison health care with focus on Federal Bureau of Prisons. I have provided declarations, affidavits and/or testified in over 30 cases, generally during the sentencing phase, in the following Federal Judicial Districts: Central District of California, Eastern District of California, Southern District of New York, Maryland, Southern District of Florida, Colorado, Eastern District of Kentucky, District of Puerto Rico, Eastern District of Pennsylvania, Western District of Arkansas, Northern District of Ohio, and Middle District of Tennessee.

**ATTACHMENT #2**
**Structure of Health Care in the Bureau of Prisons**

### STRUCTURE OF BOP HEALTH CARE SYSTEM

Each Bureau of Prisons Health Services Unit includes health care providers. They are, the Clinical Director, staff physician, mid-level practitioners and ancillary staff such as pharmacists, radiology technicians, lab technicians. The primary health care of the inmates is provided primarily by the mid-level practitioners (physician assistants, nurse practitioners, or unlicensed foreign medical graduates) under the supervision of a staff physician. These staff physicians are generally family practice or internal medicine specialists, and control an inmate's access to specialty medical care and review any recommendations made by medical specialists to determine whether they are within the scope of services and policy of the Bureau of Prisons before implementation.

In order for an inmate to receive care or treatment by a specialist, including physical therapy, the mid level practitioner would have to identify the inmate's medical problem and alert the staff physician who would then decide whether to refer the inmate to a specialist if one is available. If the staff physician determines that a referral to a specialist is warranted for a non-emergency condition, such as physical therapy, that referral must be approved by the Utilization Review committee. The Utilization Review Committee is composed of the Clinical Director, Health Services Administrator, Medical Trip Coordinator, health care providers, Director of Nursing (if applicable) and a chaplain or social worker.

Page 18 of 26

These committees typically convene every two weeks to consider the non-emergency referrals. The intent of these committee reviews is to ensure that services outside the scope of those defined in policy **are not provided** and to establish an initial assessment of priority for the recommended intervention. Recently, the Bureau of Prisons has modified this procedure to require utilization review at the Regional Office Level, and as a result, the number of escorted trips for inmates to see medical specialists in the community has been reduced by 10%.

While there is no certainty that a utilization review committee will approve a specific recommendation for treatment, so long as the recommended intervention falls clearly within the category of "medically necessary – non-emergent", it is likely to be approved. Those that are within the category of "medically acceptable – not always necessary" are far less likely to be approved by the committee. Some institutions assign an initial priority for approved consultations/interventions using a numeric system (where 1 requires attention within one week, a priority 2 requires attention within 2-4 weeks, and a priority 3 can be delayed for a month or more), while others use a color code with similar requirements.

The Bureau of Prisons seeks to obtain medical specialty care for its inmates through contracting with local hospitals. However, contracts with hospitals do not necessarily include services of specialty physicians. In fact, each facility of the Bureau of Prisons uses a variety of procurement practices to establish agreements with both hospitals and individual physicians and other medical specialists for specialty care. The success of establishing those agreements depends on the

Page 19 of 26

availability of any particular medical specialist or facility in the community in which the prison is located, the willingness of that provider or facility to travel to the prison and subject him/herself to the security requirements for entrance and the constraints of treating individuals in prison, the willingness of that provider to see inmates in his office/practice/facility, and increasingly significantly, the ability of that specialty provider to obtain medical malpractice insurance when his practice includes inmates. The refusal of many malpractice insurers to cover practices that include inmate patients severely limits the number of specialty providers willing to treat inmates. The Bureau of Prisons does not indemnify contract medical specialists who treat inmates.

The Bureau of Prisons provides five major levels of care that define the agency's "scope of services. These levels are:

Medically Necessary – Acute or Emergent. Medical conditions that are of an immediate, acute or emergent nature, which without care would cause rapid deterioration of the inmate's health, significant irreversible loss of function, or may be life threatening.

Medically Necessary – Non-Emergent. Medical conditions that are not immediately life-threatening but which without care the inmate could not be maintained without significant risk of: serious deterioration leading to premature death; significant reduction in the possibility of repair later without present treatment; or significant pain or discomfort which impairs the inmates participation in activities of daily living.

Page 20 of 26

34

Medically Acceptable – Not Always Necessary. Medical conditions which are considered elective procedures, when treatment may improve the inmate's quality of life.

Limited Medical Value. Medical conditions in which treatment provides little or no medical value, are not likely to provide substantial long-term gain, or are expressly for the inmate's convenience. Procedures in this category are usually excluded from the scope of services provided to Bureau inmates.

Extraordinary. Medical interventions are deemed extraordinary if they affect the life of another individual, such as organ transplantation, or are considered investigational in nature.[4]

In order for an inmate to be seen by a medical specialist such as a cardiologist or neurologist outside the facility for a non-emergency condition, an escorted trip must be approved and arranged in advance. The number of correctional officers required for each medical escorted trip ranges from one to over five, depending on the characteristics of the inmate involved. Because of staffing limitations, a facility will typically schedule a limited number of medical escorted trips each day, and generally, the number of inmates requiring such trips exceeds the number approved daily. As a result, Bureau of Prisons medical staff, generally the Clinical Director, establish priorities to determine which inmates should fill the limited number of escorted trip "slots" available. These are clinical decisions based on the Clinical Director's assessment of acuity. Thus, while an inmate may

---

[4]    Bureau of Prisons Program Statement P6031.04, Patient Care, June 13, 2014.

Page 21 of 26

have received medical approval for specialty consultation/intervention, the delivery of that care depends heavily on the number of escorted trips available and the acuity of his condition. The likelihood that an inmate will receive regular medical escorted trips for medical specialist consultation over an extended period of time is diminished in light of these logistical variables. It is most likely that at some point his care, even if approved by the Utilization Review Committee will be interrupted as he is displaced for one of the escorted trip "slots" by inmates with more acute needs.

It is likely that the Bureau of Prisons will have access to the services of medical specialists that most inmates will require. In larger or higher security facilities, the wait for an approved outside consultation may be extensive, based on limited escort staff. In some instances, medically appropriate-non emergent appointments (specifically orthopedics) have been delayed for months, up to a year after the initial recommendation for consultation. Should such consultation occur, any intervention/treatment suggested by the medical specialist is considered a recommendation subject to the review and approval of the institution Clinical Director in compliance with the scope of services defined by agency policy and the national formulary. It is not unusual for an institution Clinical Director to decline to pursue a recommendation made by a consulting specialist, particularly if that recommendation includes intervention that is seen as medically acceptable – not always necessary or includes a non-formulary medication.

**ATTACHMENT #3**
Stressors of daily life in prison

Crowding

All Bureau of Prisons facilities are overcrowded (house more inmates than designed for), with the lower security levels typically more overcrowded than the higher security levels. As a result, all rooms/cubicles are doubled or tripled, and in some facilities, inmates are placed on mattresses on the floor temporarily. Some facilities are sufficiently overcrowded that inmates "live" in areas like day rooms or gyms that were designed for other purposes, and provide even less privacy than multi-man rooms or cubicles. In every facility, there is little or no privacy or space away from other inmates at any time. Not all inmates practice the same level of personal hygiene or respect for the space and property of others, and there is little opportunity to avoid those inmates in a closed setting.

Regimentation

Prisons have very clear and unbending rules, some of which likely seem unusual or unnecessarily rigid to new inmates and staff, like standing for the 4:00pm count, or checking the "call out" list daily, or no T shirts or caps in the dining room. Failure to remember and abide by these "odd" prison specific rules results in disciplinary sanctions which can include restrictions on activities, visiting, and phone privileges. There are no "sick days" in prison, and even if an inmate didn't sleep well the night before, he has to clear the unit by a given time. Generally, an inmate HAS to be where he is expected to be all the time, or disciplinary action is taken. Activities operate on a predetermined schedule and failure to meet that schedule means missing that activity, such as weekly visits to commissary, laundry exchange, meals. Movement throughout the facility is controlled, with access from one location to the other only allowed for 5-10 minutes each hour. In summary, there are literally dozens of prison specific rules and schedules that apply to every day living, and failure to meet those schedules or abide by those rules can make life there significantly more difficult.

Younger/more aggressive population

One of the difficulties those over 50 face is dealing with a younger, more aggressive and criminally sophisticated population. Those over 50 are seen as potential victims by both themselves and more aggressive younger inmates. Further, they are seen as potential subjects for manipulation in schemes to circumvent institution regulations. For example, they may be perceived by more sophisticated inmates as potential couriers of contraband or messages throughout the facility based on the belief that correctional staff are less likely to suspect them. Similarly, they may be more vulnerable to threats or coercion for limited goods such as commissary items. The threat of physical violence is always present in prison, even in lower security levels. Untreated mental illness exists in that population at substantially higher rates than in the community, as well, and there is little opportunity to avoid troublesome inmates in a general housing unit.

Noise

There are extreme cultural differences within any prison population, and in some of those cultures represented, loud and constant noise is completely acceptable. Day rooms or TV rooms in housing units are notoriously loud during evening hours, and well into evening hours, housing units are loud. At night, especially in lower security level facilities that house inmates in multi-man cubicles, noise from snoring and other night noises are quite pronounced and ever present. Most correctional officers carry institution two-way radios, and the communication on these devices is almost constant and generally adds to the level of background noise. The dining room is generally loud during every meal except breakfast, with groups of inmates creating substantial noise. Even visiting rooms are loud on typical visiting days, with the conversations of multiple groups of inmates and visitors and their children. It is an inescapable part of prison life.

Fear of sanctions/inadvertently becoming involved

As described above, there are dozens of institution specific rules and schedules that have to be attended to all the time for fear of incurring a disciplinary infraction. In addition, every prison, even the lowest security level facility, has inmates attempting to circumvent rules and regulations through activities as simple as gambling or as sophisticated as dealing in contraband or drugs. Inmates not wishing to be involved in those efforts have to constantly be aware of what is going on around them to keep from inadvertently becoming involved.

Health concerns (meds, sufficiency of care)

Access to health care is limited in every facility, except for emergency care. Non-emergency medical issues are typically dealt with the following day at sick call. There are no 24-hour pharmacies available for over the counter medications after hours. If an inmate becomes ill during off hours and it is determined to be "non-emergent," he may not have access to a health care provider until the next day. For inmates with chronic or serious ongoing medical issues, this distance between them and direct access to their health care provider may be stressful. Further, inmates don't control their health care in a correctional facility. They can't arrange on their own for a second opinion or a consultation with a particular medical specialist. Those decisions are made by institution staff.

Food

While the Bureau of Prisons does a remarkable job of providing healthy choice meals, they are institution food, and may be difficult for some inmates to adjust to. Serving portions are limited on some items, and there is generally only one choice of entrée per meal. While possible, it may be difficult for an inmate to maintain a particular diet, for example kosher or vegetarian, and medical restrictions, such as low fat or low sodium will necessarily limit an inmate's choices from the main line. Eating times are often unusual for most inmates, as well. Breakfast is generally finished by 7:15am, lunch may be as early as 10:30am, and dinner may start as early as 4:30pm. There are not generally "snack" times available at other than regularly scheduled meals, and many inmates elect to prepare some kind of evening food in the housing unit between the early dinner and bed time.

Security requirements (strip searches, counts)

Obviously, security is the primary concern for prison administrators, and procedures are in place at all facilities, even the least secure, to ensure the presence and security of the inmates assigned. Every Bureau of Prisons facility counts its inmates five times per day, with the majority of those occurring between 4:00pm and 6:00am. In addition, inmates are subject to unscheduled counts at any time, during which all activity is ceased and the institution is "locked down." During each of these counts, the counting officer must see enough flesh and/or movement to be convinced that the object he is counting is a real person. This means that an inmate is subject to being awakened repeatedly in the night to ensure a good count.

Inmates in any facility are subject to "pat" searches at any time, and "strip" searches at specific activities or when an officer determines they are warranted. At secure facilities, inmates are strip searched before and after each visit, at some facilities, they may be routinely pat searched entering or leaving a work area, and strip searches may be conducted anytime an officer suspects contraband. Any time an inmate leaves a facility, such as for a medical appointment or court appearance, he is strip searched on leaving and on returning to the facility.

Whenever there is an unusual event or in some cases for heavy weather or fog, an institution may be "locked down," restricting inmates to quarters for extended periods. During these periods, which can last for days, inmates are served meals in their housing units, are not allowed out for recreation, visiting is suspended, and the result is a large number of men in a very small area with little to do. Tensions and stress generally rise fairly quickly during lockdowns.

Bathrooms

Most inmates are accustomed to some privacy in bathroom facilities, and there is little in a prison facility. Showers may or may not be curtained, toilet stalls may or may not have doors. In almost every instance in the Bureau of Prisons, inmates are required to share these facilities, and of course, inmates have varying levels of personal hygiene. Further, diseases such as MRSA and athlete's foot can be spread through these areas, increasing the level of concern some inmates might have. In some of the more secure housing areas, such as Special Housing Units (where an inmate may be placed for disciplinary infractions), toilet facilities are located in the cell and are shared with one or more inmates, and there is typically no "stall" or partition around those facilities.

Sleep disturbances (cots, snoring, counts, light, movement)

As mentioned above, noise is incessant in a correctional facility, and in some (those that use cubicles, for example), there is little to absorb or otherwise block night time noise. Inmates may be waked repeatedly for counts, and necessarily, there is some level of lighting in a housing unit at all times. Inmates in open housing units, such as at camps may be up all through the night to use the common bathroom facilities, and are thus moving throughout the unit. The beds in most housing units are bunk beds with metal springs and non-innerspring mattresses. In a cubicle setting, the inmate on the top bunk is likely to be shoulder to shoulder with the inmate in the next cube, separated only by the width of the cement block partial wall between the lower bunks. The inmate on

the bottom bunk gets the extra noise and motion each time the inmate above him shifts. Sleep disruption is very common at least initially because of these combined factors.

Separation and limited communication

For inmates from stable families/relationships, the separation from those with whom he is accustomed to daily contact is stressful. This is exacerbated by limited visiting and restricted access to telephone contact. That stress may extend to business concerns or be exacerbated by sick or troubled family members that have relied on the inmate for support in the past. For female offenders, particularly, child care is a significant source of stress.

# EXHIBIT C

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE PERCY ANDERSON, U.S. DISTRICT JUDGE

UNITED STATES OF AMERICA,                )
                                         )
                    Plaintiff,           )
                                         )
        vs.                              )    CASE NO. CR 15-255-PA
                                         )
PAUL TANAKA,                             )
                                         )
                    Defendant.           )
_____)

REPORTER'S TRANSCRIPT OF

PARTIAL JURY TRIAL PROCEEDINGS - DAY 9

---PLAINTIFF'S CLOSING ARGUMENT/REBUTTAL CLOSING ARGUMENT---

TUESDAY, APRIL 5, 2016

LOS ANGELES, CALIFORNIA

_____

SHAYNA MONTGOMERY, CSR, RPR, CRR
FORMER FEDERAL OFFICIAL COURT REPORTER
312 NORTH SPRING STREET
LOS ANGELES, CALIFORNIA 90012
SHAYNAMONTGOMERY@YAHOO.COM

UNITED STATES DISTRICT COURT

APPEARANCES OF COUNSEL:


FOR THE PLAINTIFF:

    EILEEN DECKER
    United States Attorney
    BY: BRANDON D. FOX
        EDDIE A. JAUREGUI
        Assistant United States Attorneys
    United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012


FOR THE DEFENDANT PAUL TANAKA:

    H. DEAN STEWARD, ATTORNEY-PROFESSIONAL CORPORATION
    BY: H. DEAN STEWARD
        Attorney at Law
    107 Avenida Miramar, Suite C
    San Clemente, California 92672
    (949) 481-4900


FOR THE DEFENDANT PAUL TANAKA:

    LAW OFFICE OF JEROME J. HAIG
    BY: JEROME HAIG
        Attorney at Law
    21143 Hawthorne Boulevard, Suite 454
    Torrance, California 90503
    (424) 488-0686


ALSO PRESENT:

    Leah Tanner, FBI Special Agent

my door.  We want to clean our own house.  Those recordings also showed you that they knew on August 19th that the FBI was setting up deals with their dirty deputies, that the FBI was investigating abuse by the deputies.  That's what they knew, and that's what they took up their chain of command.

You also, of course, have heard, and I'll take you through, some of the recordings that happened thereafter. Steve Leavins saying, Did the FBI ask you if you'd testify in this matter?  Right after the FBI had been kicked out of the facility.  And then he says right after that, Because I don't want anybody to be misleading you here.  From there on, they tell him he's been left for dead, that the FBI has not come back for him.  They don't want him to testify.

You also heard the recordings of the witness tampering, Gilbert Michel, David Courson.  I'm not going to belabor that now because we're going to go through some of that.  And you saw the phone records.  Very important in this case.  Why so important?  In our case in chief, when we presented them to you, you were able to see all the contact that all the coconspirators were having with one another, how often they contacted Paul Tanaka.

And then Mr. Tanaka gets on the stand.  He tells you on direct examination, I didn't know anything about what was going on.  The sheriff would ask me what was happening, and I couldn't give him an answer, so I had the investigators call

11

the sheriff. Then on cross-examination, taking him through each day of those records, taking him through the dates that we set out for you, five or six selected dates, one phone call between any of the coconspirators besides Mr. Tanaka and Leroy Baca. Many calls between Mr. Tanaka and Baca, but only one between any of the ICIB or OSJ deputies and Mr. Baca.

This was Mr. Tanaka's operation. He was running the show. We knew that from the beginning.

So let me take you back to the beginning. August 18th of 2011. This is when the Sheriff's Department learns that the phone traces back to the FBI. First they learn it at the deputy level. Mickey Manzo, Gerard Smith learned that that phone number that Anthony Brown called through the inmate telephone monitoring system tracked back to the FBI civil rights unit. Same date, Leroy Baca receives the call from the assistant director in charge, Steve Martinez, who tells Mr. Baca, That phone that was found on an inmate, it was the FBI's phone. It's reflected in Government Exhibit 172, Leah Tanner's summary phone chart. You'll see that and a call five minutes later between the FBI director and Leroy Baca.

Just a few minutes later, you'll see that Mr. Baca called Mr. Tanaka's cell phone. And we heard from Mr. Tanaka's previous testimony that Mr. Baca told him then that the phone was found -- that was found on the inmate was the FBI's phone.

The next day Greg Thompson, one of Mr. Tanaka's close

associates, sends his deputies in to find out what was going on with Anthony Brown, and there was one purpose for doing that.

(Exhibit 81 played in open court.)

MR. FOX:  So who were those very influential people. Certainly not the line deputies.  Documents show who they were. There are e-mails starting at Exhibit 15 that show you who these important people were, who these influential people were. Gerard Smith, Mickey Manzo, Greg Thompson have a meeting set up at 1:30 August 19th with Mr. Tanaka.  Mr. Tanaka tells you on the stand, I don't recall anything about that meeting.

E-mails also reflect that there's a two o'clock meeting with Sheriff Baca afterwards that Mr. Tanaka, Greg Thompson, all the OSJ guys, Mr. Carey were supposed to attend, and also Internal Affairs.  In the 1:30 meeting or the two o'clock meeting, Mr. Manzo didn't know which, he said, Mr. Tanaka was visibly upset after learning that Anthony Brown was an informant for the FBI civil rights unit, civil rights squad. Mickey Manzo, again, no dog in the fight, didn't want to be here, telling you about that meeting.  Didn't even meet with us ahead of time.

Mr. Tanaka, at that meeting on August 19th, orders no one to interview Anthony Brown without whose approval?  Paul Tanaka's approval.  Now, I expect defense counsel to get up here and talk to you about the last question they asked of Mickey Manzo.  Mr. Steward, very good lawyer, asked Mr. Manzo,

**CERTIFICATE OF OFFICIAL REPORTER**


COUNTY OF LOS ANGELES     )
                          )
STATE OF CALIFORNIA       )


I, SHAYNA MONTGOMERY, Former Federal Official Realtime Court Reporter, in and for the United States District Court for the Central District of California, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the judicial conference of the United States.


Date:    *June 9, 2016*


/s/ SHAYNA MONTGOMERY
_____
SHAYNA MONTGOMERY, CSR, RPR, CRR
Former Federal Official Court Reporter