## DECLARATION OF JAMES PELTON

I, James Pelton, declare:

1.   I am the Western Regional Medical Director for the United States Department of Justice, Federal Bureau of Prisons (BOP).  I have served in this capacity since April 2003. My office is located at the Management and Specialty Training Center in Aurora, Colorado. I have been employed by the BOP since July of 1997.  Since my employment with the BOP, I have served as a staff physician at FCI Terminal Island, California; at the Federal Medical Center (FMC) Butner, North Carolina; and, until April 2003, as the Clinical Director for FCI Terminal Island.  Prior to my employment with the BOP, I was employed as the Chief Resident at Olive View - UCLA Medical Center.  I received my medical degree at the University of Southern California.  I am currently licensed to practice medicine in the States of California, Colorado, and North Carolina.  I am board certified in Internal Medicine and a Fellow of the American College of Physicians.

2.   As the Western Regional Medical Director, I am responsible for overseeing delivery of medical care in the Region and advising other BOP physicians in the management of especially difficult or complicated cases.  As part of my responsibilities as a clinical consultant, I am occasionally requested to provide information and assistance to United States Attorney's Offices in connection with ongoing civil and criminal litigation.

3.   As part of my duties, I am thoroughly familiar with the health care and treatment available throughout BOP

- 1 -

institutions and, more specifically, with the care and treatment that is available for inmates with different types of chronic medical conditions.  I have prepared this declaration in response to a request by the United States Attorney's Office for the Central District of California regarding the medical condition and care available for Leroy Baca, a defendant in U.S. v. Baca, CR 16-66-PA.

4.    In preparing this declaration, I reviewed the portion of the defendant's sentencing memorandum regarding his medical condition.

5.    It is my understanding that Mr. Baca has been diagnosed as being in the early stages of Alzheimer's disease, that doctors evaluating his condition believe him to be minimally impaired at this time, and that doctors believe his condition will decline significantly within several years.  It is also my understanding that pursuant to the plea agreement, if accepted by the Court, Mr. Baca will be sentenced to no more than six months' imprisonment.

6.    If Mr. Baca were to be sentenced to a term of imprisonment of up to six months, the BOP could provide him with appropriate medical care and treatment for his condition. Indeed, Mr. Baca's medical condition is not unusual in the BOP system.  As discussed below, there are hundreds of inmates who have cognitive impairment that is more severe than Mr. Baca's condition.  Additionally, contrary to the assertion of Mr. Baca and the declaration of Phil Wise, it is very likely that Mr. Baca would continue to be able to take medication prescribed to him to treat his disease while incarcerated.  I make this

- 2 -

statement as the person who would be deciding whether Mr. Baca would receive this medication.

**A.    BOP Institution Classification System and Resources to Manage Inmates with Serious Medical Conditions**

'7.    The BOP classifies its institutions' medical resources on a one to four (I - IV) scale.

a.    Level I institutions house essentially healthy inmates.

b.    Level II institutions accept inmates with chronic, but stable medical conditions.  Care Level II facilities are able to provide inmates with heightened level of medical services, including access to on-site doctors, nurses, and other medical staff as well as ready access to specialists and specialized medical services in the local community.

c.    Level III institutions manage inmates with potentially unstable medical problems.  Inmates assigned to a Level III facility are considered medically complex outpatients who require at least monthly clinician evaluations, close monitoring and may have limitations in their ability to perform activities of daily living, but do not require daily nursing care.

d.    The BOP's six Federal Medical Centers (FMC) are classified as Level IV institutions.  FMC's provide inpatient and outpatient medical, surgical, and psychiatric services to inmates commensurate with services provided in the community by hospitals and skilled nursing facilities.  Inmates assigned to Level IV institutions suffer from conditions that require daily nursing care.  Less than 1% of the approximate 210,000 inmates

- 3 -

in BOP custody are designated to an FMC for their medical conditions.

**B.    Inmate Placement Process**

8.    If sentenced to a term of imprisonment, Mr. Baca will be assessed by BOP staff at the Designation and Sentence Computation Center ("DSCC") in Grand Prairie, Texas, to determine the appropriate institution to which he should be designated.  In addition, given Mr. Baca's medical conditions, the BOP's Office of Medical Designations and Transportation ("OMDT") will evaluate his medical status and current course of treatment.  This medical evaluation will be done using all available information, including any letters or medical records submitted by Mr. Baca, his treating physicians and/or his counsel.  Further, the BOP encourages defendants like Mr. Baca to bring their complete medical records with them at the time of their surrender.  This process will ensure that defendant is sent to a facility able to accommodate his medical needs and that continuity of care will be provided.

9.    From the information I have reviewed, I believe Mr. Baca would be housed in either a Care Level II or III facility, depending on the BOP's assessment of his medical condition.

10.    If at any time, including upon admission, the facility's medical staff determine that Mr. Baca's medical condition requires a higher level of care, the institution' Clinical Director will contact the OMDT to request that he be re-designated to a higher care level institution.

11.    Because the exact designation decision takes into account the defendant's security classification, space

- 4 -

availability and other correctional factors in addition to his medical condition, I cannot precisely predict to which specific institution Mr. Baca will ultimately be designated.

**C.    Appropriate Monitoring of Defendant's Medical Status and Needs**

12.    It is my opinion that BOP facilities can provide Mr. Baca with access to the medical treatment and medications to treat Alzheimer's disease, especially in its early stages. Indeed, the conditions Mr. Baca describes (being elderly, needing exercise and having progressive cognitive deficits) are ones for which the BOP routinely provides medical care and treatment on a daily basis throughout the United States.

13.    Regarding Mr. Baca's age, if sentenced to prison, Mr. Baca would be in the top 2% of the oldest inmates housed in the BOP. There are, however, approximately 4,600 inmates housed in the BOP that are over the age of 65.

14.    Additionally, the BOP houses approximately 300 inmates who have been diagnosed as having cognitive impairment. Based on my review of Mr. Baca's records and my understanding of his ability to function, I believe these inmates have more severe cognitive impairment than he has at this stage.

15.    Upon arrival at his designated facility, Mr. Baca will undergo an initial intake screening and medication reconciliation.

16.    At his designated facility, Mr. Baca will also be enrolled in appropriate Chronic Care Clinics so that his various medical conditions can be monitored closely, and so that he can be provided with any diagnostic tests or specialty referrals he

needs.  Chronic Care Clinics are a scheduling device implemented by the BOP to ensure that inmates with chronic medical conditions receive regular, routine medical assessments and monitoring without the necessity of going through the ordinary "sick call" appointment process.  The frequency of Chronic Care Clinic follow-up care is determined by the treating physician based on the inmate's clinical needs and is communicated to the inmate's primary BOP mid-level provider, who will provide this care.  High risk or medically complex chronic care inmates are seen more frequently in accordance with the physician's clinical judgment, in addition to or in conjunction with regular visits with their primary provider.  In some cases, it is appropriate to assign an inmate to multiple Chronic Care Clinics if this allows better tracking for follow-up by outside specialists.

17.  In addition, inmates can access medical care via the sick call appointment process.  This process provides supplemental medical access to inmates already enrolled in a Chronic Care Clinic.  The sick call process is one in which an inmate lines up for the morning "sick call" to obtain a same day, in-house medical appointment.  Sick call requests can be made on paper or electronically.  An inmate who has regular medical appointments pursuant to a Chronic Care Clinic plan may appear at sick call for any routine problems or needs that arise in between regularly scheduled medical visits.

18.  Mr. Baca has noted that a February 2008 audit concluded that 18% of BOP inmates in Chronic Care Clinics were not monitored as required.  Since that audit, however, the BOP has taken steps to fix that problem.  Specifically, the BOP has

- 6 -

improved its oversight and monitoring of BOP inmates in Chronic Care Clinics in the last eight years.

19. Additionally, the BOP has specialists that are available to treat Mr. Baca. Specific to Mr. Baca's condition, each institute I am aware of has a general practice neurologist available under contract to the facility.

D.   'Emergency Treatment

20. As for immediate medical emergencies or urgent acute medical complaints, it is my experience that, the correctional setting is one that lends itself to quick response time. A BOP inmate is virtually never alone or unsupervised, as he might be while he is living in the outside community. An inmate would likely be living in either a dormitory setting with other inmates or in a housing unit assigned to a cell. In either case, he will be under the continual observation of correctional officers who are on duty around the clock. It is my experience that correctional staff routinely refer inmates with medical complaints to the institution's medical staff enabling a swift clinical determination as to the urgency of the complaint.

21. All correctional officers carry a "body alarm" that notifies the facility's control center of an emergency at the officer's location. For any medical emergency, Correctional Supervisors are trained to activate 911 in the absence of clinical staff during off-duty hours, even before notifying the on-call BOP physician. In addition, an inmate suffering from an emergent acute medical event which cannot be managed at the institution's health services will be transported by ambulance and admitted to the local hospital. On each shift, specific

- 7 -

staff members are pre-designated to act as escorts during emergency transports, so that there will be no delay in transporting the inmate when the ambulance arrives.  In short, the correctional setting facilitates, rather than interferes with, the immediacy of care an individual like defendant may require, because of the continual monitoring and availability of medical assistance for incarcerated inmates.

**E.     Availability of Medications**

22.   Mr. Baca reports that he is currently taking prescription medication for symptoms associated with Alzheimer's disease, but none of the FDA approved medications for Alzheimer's disease is available through the BOP national formulary.  (CR 34 at 18.)[1]  Even though Mr. Baca's medication is not on the BOP's formulary, the BOP routinely provides medication that is not on its formulary.

23.   When an inmate's physician determines that the inmate requires a medication that is not on the BOP formulary, then the physician will submit a request to provide him with the appropriate non-formulary medication.  The physician can provide up to four days of non-formulary medication while awaiting approval.  It is my experience that requests for approval of non-formulary drugs are assessed quickly and that a response is

---

[1] Mr. Wise's declaration later states that a BOP physician, after determining the necessity of treatment with one of these medications can request authorization for non-formulary prescription approval which must be approved by the BOP medical director in the agencies' headquarters.  (Baca Ex B at paragraph 10.)  As noted above, I am the Western Regional Medical Director for the United States Department of Justice, Federal Bureau of Prisons (BOP).  Accordingly, I will be the deciding authority for whether Mr. Baca receives this medication.

provided to the requesting physician with twenty-four to forty-eight hours of its submission.  If the request is urgent, the non-formulary approval can be given even more quickly.  Thus, I do not anticipate any problems in providing Mr. Baca with any medication he needs.

24.   Additionally, Mr. Baca has already gone through much of the testing and assessments that he would need to go through to be placed on the non-formulary medicine.  As a result, I expect any decision about supplying Mr. Baca with non-formulary medicine to treat his Alzheimer's disease to be quicker than normal.

25.   More importantly, based on my review of Mr. Baca's medical records, it appears that he meets the criteria for being placed on this medication.  BOP records indicate that there are currently approximately 25 inmates within the BOP who are taking the same medication Mr. Baca takes to treat his condition.  Because of this, I believe it is very likely that I will place Mr. Baca on his current medication to treat Alzheimer's disease, even though it is not on the formulary, if he is sentenced to a period of incarceration.

**F.   Ability to Function**

26.   Mr. Baca asserts that functioning in custody would be a problem for him based on his diagnosis.  It is my experience that while adaptation can be difficult initially, inmates with cognitive impairment do well in custodial settings because of the routine and structure in the facilities.  This is especially true while Mr. Baca is minimally impaired.  As a result, I

believe Mr. Baca would function well if sentenced to a period of incarceration of up to six months.

27.  Mr. Baca also claims that he is at a higher risk of assault based on his condition and his status as former Sheriff of Los Angeles County.  The BOP houses many well-known inmates. According to BOP records, there are rarely any serious assaults at low or minimum security facilities of any inmate, no matter whether they are well-known or not.  Accordingly, if Mr. Baca is designated to serve his time at one of these facilities, it is unlikely that he would face assaults.

I declare under the penalty of perjury, that the foregoing is true and correct to the best of my information, knowledge and belief.  Executed this 7th day of July, 2016, in Aurora, Colorado.

_____

JAMES PELTON, M.D.
Regional Medical Director
Federal Bureau of Prisons
Western Region

- 10 -