Nathan J. Hochman, Bar No. 139137
Brianna Leigh Abrams, SBN 239474
MORGAN, LEWIS & BOCKIUS LLP
The Water Garden
Suite 2050 North
1601 Cloverfield Boulevard
Santa Monica, CA  90404-4082
Tel:    +1.310.907.1000
Fax:    +1.310.907.1001
e-mail:  nathan.hochman@morganlewis.com
e-mail: brianna.abrams@morganlewis.com

Attorneys for Defendant
LEROY BACA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>LEROY BACA,<br><br>Defendant. | Case No. CR 16-66(A) - PA<br><br>NOTICE OF MOTION AND MOTION OF DEFENDANT LEROY BACA TO CHANGE VENUE; MEMORANDUM OF POINTS AND AUTHORITIES; EXHIBITS [Declaration of Nathan J. Hochman in Support of Motion to Change Venue And [Proposed] Order Filed and Served Concurrently]<br><br>Hearing Date: October 31, 2016<br>Hearing Time: 3:00 p.m.<br>Courtroom:  15 |

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SANTA MONICA

DB1/ 88941045.2

CR 16-66(A) - PA

To the Clerk of the Court, and all parties and their counsel of record, PLEASE TAKE NOTICE THAT on October 31, 2016 at 3:00 p.m. or as soon thereafter as counsel may be heard, in Courtroom 15 of the United States District Court at 312 North Spring Street, Los Angeles, California, Defendant LEROY BACA, by and through his counsel of record, will and hereby does move the Court for an order transferring this case to another district within California, or alternatively, to the federal courts located in Orange County or Riverside County.

The motion is made pursuant to Federal Rule of Criminal Procedure 21(a). Based on the constant, inflammatory, and far-reaching media coverage surrounding this matter, a trial within the Central District of Califronia, particularly within Los Angeles County, will violate Mr. Baca's due process rights.

The motion is based on this Notice of Motion, the Memorandum of Points and Authorities attached hereto, exhibits, Declaration of Nathan Hochman, the files and records of the case and such further and additional evidence and argument as may be presented at the hearing on the motion.

Respectfully submitted,

Dated:   September 26, 2016          MORGAN, LEWIS & BOCKIUS LLP

By */s/ Nathan J. Hochman*
Nathan J. Hochman
Attorneys for Defendant
LEROY BACA

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SANTA MONICA

2

CR 16-66(A) - PA

DB1/ 88941045.2

# **TABLE OF CONTENTS**

Notice of Motion..................................................................................................2

Table of Contents.................................................................................................i

Table of Authorities.............................................................................................ii

I.    INTRODUCTION AND BACKGROUND.................................................3

    A.    Procedural Background...........................................................................4

    B.    Mr. Baca's Service as Sheriff of Los Angeles County .......................4

    C.    Los Angeles County Juror Demographics ...........................................5

    D.    Media Coverage ....................................................................................5

        i.    Mr. Baca was the focus of the news stories covering this investigation even before charges were brought .....................6

        ii.    The press made a spectacle of Mr. Baca's entry of guilty plea ..............................................................................6

        iii.    The media coverage of Tanaka's trial focussed on Mr. Baca "admitting" he lied to the FBI ...................................8

        iv.    The media focused on the Court's opinions when the Court rejected Mr. Baca's plea .........................................10

        v.    Mr. Baca's withdrawal of his guilty plea caused the media to discuss Mr. Baca's "admission" even more ...........11

        vi.    The media continues to fixate on Mr. Baca's guilty plea even though Mr. Baca withdrew it and pled not guilty...................12

        vii.    All the while, the United States Attorney's Office was publicizing Mr. Baca's guilty plea in the press .......................12

II.    ARGUMENT .............................................................................................13

    A.    The size of the jury pool in Los Angeles County does not cure the expansive media coverage of this case ...............................................18

    B.    The media coverage in this case has been highly prejudicial.............19

    C.    The negative publicity in this case has been constant and voluminous, continues to this day, and will continue through trial...........................................................................................20

III.    CONCLUSION .........................................................................................21

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SANTA MONICA

CR 16-66(A) - PA

DB1/ 88941045.2

# TABLE OF AUTHORITIES

## CASES

*Ainsworth v. Calderon*, 138 F.3d 787 (9th Cir. 1998)...............................................15

*Casey v. Moore*, 386 F.3d 896 (9th Cir. 2004)........................................................14

*Daniels v. Woodford*, 428 F.3d 1181 (9th Cir. 2005)................................15, 16, 17

*Harris v. Pulley*, 885 F.2d 1354 (9th Cir. 1988) ...................................................3, 14

*Hayes v. Ayers*, 632 F.3d 500 (9th Cir. 2011) .....................................................13, 15

*Irvin v. Dowd*, 366 U.S. 717 (1961) ............................................................................16

*Marshall v. United States*, 360 U.S. 310 (1959) .......................................................15

*Parker v. Randolph*, 442 U.S. 62 (1979)....................................................................15

*Patterson v. Colorado ex rel. Attorney General of Colo.*, 205 U.S. 454 (1907)....................................................................................................14

*Powell v. Superior Court for Los Angeles*, 232 Cal.App.3d 785 (1991) ....................................................................14, 17, 18

*Rideau v. Louisiana*, 373 U.S. 723 (1963) .......................................................16, 19, 21

*Sheppard v. Maxwell*, 384 U.S. 333 (1966) ...........................................3, 13, 14, 15

*Skilling v. United States*, 561 U.S. 358 (2010)...............................13, 14, 15, 18, 21

*Smith v. Superior Court for Los Angeles County*, 276 Cal.App.2d 145 (1969) ........................................................................................14

*United States v. Chagra*, 669 F.2d 241 (5th Cir. 1982) ...........................................15

*United States v. Croft*, 124 F.3d 1109 (9th Cir. 1997) .............................................14

*United States v. Rewald*, 889 F.2d 836 (9th Cir. 1989)......................................13, 14

## STATUTES

18 U.S.C. § 1001(a)(2) ......................................................................................................4

///

///

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SANTA MONICA

ii

CR 16-66(A) - PA

DB1/ 88941045.2

## **RULES**

Fed. R. Crim. P. 21(a). .......................................................................................... 13

Fed. R. Crim. P. 21(d)............................................................................................ 13

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SANTA MONICA

CR 16-66(A) - PA

DB1/ 88941045.2

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION AND BACKGROUND

For fifty years, it has been black letter law that due process under the Fifth Amendment to the United States Constitution "requires that the accused receive a trial by an impartial jury free from outside influences." *Sheppard v. Maxwell*, 384 U.S. 333, 362 (1966).  In this case, having such a trial in Los Angeles County by an impartial jury free from outside influences will be virtually impossible. Both before and after Mr. Baca pleaded and confessed guilt in February 2016 through his sentencing hearing in July 2016, his withdrawal of his guilty plea in August 2016 and his subsequent indictment on conspiracy, obstruction of justice and false statements charges and not guilty plea, there has been a tsunami of highly prejudical media coverage of the case.  That coverage, which has occurred on television, radio, print and social media, has consistently blanketed and reached millions of people, particularly in Los Angeles County through thousands of stories on Mr. Baca's guilty plea and confession of guilt to the false statement charge relating to the FBI's obstruction of justice investigation.  The pervasiveness of the coverage and its prejudicial effect to Mr. Baca receiving a fair trial by an impartial jury free from outside influence cannot be overstated.

Indeed, prejudice may be presumed without having to demonstrate actual bias where, as here, the record demonstrates that the community was saturated with prejudicial and inflammatory media publicity about the crime.  *See Harris v. Pulley*, 885 F.2d 1354, 1361 (9th Cir. 1988).

Accordingly, since Mr. Baca cannot receive a fair trial by an impartial jury free from the outside influences of the highly prejudicial media stories that have inundated Los Angeles County, Mr. Baca respectfully requests that the Court move the venue for the trial to another district in California or alternatively to the federal courts located in Orange or Riverside Counties.

///

**A.     Procedural Background**

On February 10, 2016, Mr. Baca was charged in a single-count Information with making  a false statement to a government agency in violation of 18 U.S.C. § 1001(a)(2). *See* ECF No. 1. On that same day, Mr. Baca entered a plea of guilty to the Information, which exposed him to the statutory maximum sentence of five years. *See* ECF No. 5. On April 22, 2016, May 24, 2016, and July 8, 2016, the Court granted stipulations to continue Mr. Baca's sentencing on the guilty plea agreement. *See* ECF Nos. 28, 31, & 60. On July 18, 2016, at the scheduled sentencing, the Court declined to accept Mr. Baca's binding guilty plea agreement, and continued the sentencing to August 1, 2016. *See* ECF No. 62. At the rescheduled sentencing on August 1. 2016, Mr. Baca withdrew his guilty plea, and trial was set. *See* ECF No. 68. The government filed a First Superseding Indictment on August 5, 2016. *See* ECF No. 70. Mr. Baca entered a plea of not guilty on August 12, 2016. *See* ECF No. 81.

**B.     Mr. Baca's Service as Sheriff of Los Angeles County**

Mr. Baca was elected four times as Sheriff of Los Angeles County, serving as one of the County's most prominent public figures for fifteen years from January of 1999 through January of 2014. In 1998, he was first elected with 1,112,166 votes, or 61.3% of the vote. In 2002, Mr. Baca was reelected with an outright majority in the primary election, winning 646,556 votes, or 72.3% of the vote. Mr. Baca again won an outright majority in the primary election of 2006, with 547,302 votes, or 66.8% of the vote. Mr. Baca won his final reelection, also in the primary of 2010 with 100% of the vote, 640,606 votes. Mr. Baca retired from service effective January 1, 2014. *See* Los Angeles County Sheriff Election Results, a true and correct copy of which is attached as **Exhibit 1**.

///

///

///

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SANTA MONICA

4

### C.    Los Angeles County Juror Demographics

There were 6,205,977 eligible voters in Los Angeles County as of July 7, 2016. *See* California Secretary of State Report of Registration, a true and correct copy of which is attached as **Exhibit 2**, at 3. There are 4,967,922 registered voters in Los Angeles County. *Id.*

### D.    Media Coverage

Since January of 2016, and through the present, the criminal allegations against or involving Mr. Baca have been publicized in Los Angeles County each and every month, often daily, and sometimes hundreds of times a month. The publicity has appeared in every medium, print, radio, and television. The news stories have described the nature of the allegations, made a spectacle of Mr. Baca's guilty plea, and oftentimes presented the allegations against Mr. Baca as manifestly true. The oversaturation of inflammatory press coverage is a trend that will only increase as the trial date approaches.

In just the last nine months, there were 438 discrete television broadcasts in Los Angeles County discussing Mr. Baca's case and his guilty plea, which were watched more than **35 million times**. *See* Media Coverage Report by Cutaway Media, a true and correct copy of which is attached as **Exhibit 3**.[1] In the same time period, all of the radio broadcasts about Mr. Baca's case were heard a total of **414,000 times**. *Id.* More than 1,500 individual newspaper stories about Mr. Baca's case appeared in dozens of Los Angeles County publications, which were accessed cummulatively **tens of millions of times**, both online and in print. *Id.*

///

---

[1] The methodology used to produce the report is explained in the Declaration of Lisa Regehr, president of Cutaway Media, attached as **Exhibit 4**. This analysis has focused on the last nine months and does not include the enormous amount of negative publicity that Baca has received since the initial charges were brought against Los Angeles County Sheriff's Department deputies over almost three years ago.

### i.    Mr. Baca was the focus of the news stories covering this investigation even before charges were brought

The coverage of Mr. Baca and the allegations against him by no means started when he pled guilty, or when he was initially charged. As early as January 10, 2016, the *Los Angeles Times* ran an editorial titled, "Jim McDonnell has De-Tanakafied the L.A. Sheriff's Department." *Id.* at ¶ 1950. The editorial decries, as a matter of fact, "beatings of jail inmates by L.A. County sheriff's deputies," and mentions that McDonnell sought Mr. Baca's ouster. *Id.* The newspaper was read by 11,853,053 people that day. *Id.* On January 18, 2016, KCAL-TV editorialized that "after not meeting with the press for months, Sheriff Lee Baca has emerged from his bat cave to speak with reporters." *Id.* at ¶ 1945. That broadcast was viewed by 1,112,430 people. *Id.* In the three weeks that followed, at least 38 news stories were published in Los Angeles County, in outlets read or viewed by millions of people. All of the stories linked Mr. Baca to the jail probe and the trials of Sheriff's Department deputies. *Id.* at ¶¶ 1906-1944.

### ii.    The press made a spectacle of Mr. Baca's entry of guilty plea

On February 10, 2016, the day Mr. Baca entered his plea, at least 181 Los Angeles County news stories bandied his admission of guilt. *Id.* at ¶¶ 1724-1905. The *Los Angeles Times*, with a readership of 14,128,174 people that day, ran a story titled "Ex-L.A. County Sheriff to plead guilty in jail scandal." *Id.* at ¶ 1876. Coverage was not limited to the major Los Angeles outlets. The *Hermosa Beach Patch* ran a story explaining that Mr. Baca will "plead guilty…to a federal charge of lying to investigators." *Id.* at ¶ 1799. At least 5,109,473 people accessed that publication during the month of February, when the plea deal coverage started. *Id.* That same story ran in 65 regional publications throughout Los Angeles County. *Id.* at ¶¶ 1776-1841. On the evening of February 10, 2016, Southern California Public Radio's website reported that Mr. Baca "knowingly and willfully made a material

false and fictitious statement and representation" to the FBI. *Id.* at ¶ 1864. Its website was accessed by 498,566 people that day. *Id.*

Newspapers also featured cartoons, editorials, and letters to editors. On February 12, 2016, the *Los Angeles Times* editorial board opined that "it is tempting to imagine the disgraced former Sheriff Lee Baca, who now faces up to 6 months in federal prison, serving his time behind bars[.]" *Id.* at ¶ 1653. That issue was read by more than 14 million people. *Id.* The same issue of the *Times* ran a section titled "Readers React: Federal officials should have made an example of Lee Baca." *Id.* One Culver City reader opined that "[f]or [Mr. Baca] to lie about allowing his deputies to threaten a federal agent who was investigating inmate abuse at L.A. County jails demonstrates knowledge of malice aforethought, and for him to get a tap on the wrist is sickening." *Id.* Another reader from Van Nuys stated that Mr. Baca "will receive (inappropriately short) prison time[.]" *Id.* A South Pasadena reader weighed in: "Oh my goodness. Guilty? A sheriff? …My parents are celebrating at Calgary Cemetary." *Id.* Also on February 12, 2016, the Los Angeles Downtown News published a cartoon depicting Mr. Baca as a fallen and broken "Humpty Dumpty," proclaiming "your mother goose is cooked." *See L.A. Downtown News*, Urban Scrawl (Feb. 12, 2016), a true and correct copy of which is attached as **Exhibit 5**. On February 14, 2016, the *Los Angeles Times* published another editorial, "Judge should seek more jail time for Lee Baca." **Exh. 3** at ¶ 1601. Therein, a Los Angeles resident wrote that "[t]he truth is that Baca failed to do the right thing when confronted with jailhouse corruption," adding "[Mr. Baca's] deal is no more than a golden slap on the wrist." *Id.* The editorial was republished in four other local Los Angeles County newspapers. *Id.* at ¶¶ 1597-1600.

These excerpts represent a tiny fraction of the stories that ran in Los Angeles County after Mr. Baca's guilty plea. News stories detailing the plea were printed or aired in the County for nine consecutive days after his plea. *Id.* at ¶¶ 1588-1723. In just those nine days, a total of 317 stories were published in Los Angeles County

about Mr. Baca's plea. *Id.* at ¶¶ 1588-1905. Millions of peole read, viewed, or listened to the media that published those stories. *Id.* Mr. Baca's statement, "I made a mistake and accept being held accountable," was printed or broadcast 158 separate times. *Id.* Stories referred to Mr. Baca as "disgraced" at least 122 times. *Id.*

In the month following the guilty plea coverage, various Los Angeles County news outlets read cumulatively by millions of people a day published another 33 stories mentioning Mr. Baca in relation to the Sheriff's Department. *Id.* at ¶¶ 1554-87. Almost all of them showcase Mr. Baca's admission of guilt. *See id.* at ¶¶ 1555-63; 1572-87. The sheer volume of coverage is further demonstrated by a simple Google search of "Baca guilty," which produces 395,000 hits.[2]

### iii.    The media coverage of Tanaka's trial focussed on Mr. Baca "admitting" he lied to the FBI

The media furor picked up full steam again toward the end of March 2016, on the eve of Undersheriff Paul Tanaka's ("Tanaka") trial. Again, almost every story about Tanaka's trial draws attention to Mr. Baca and his admission of guilt. *See, e.g., id.* at ¶ 1547 ("Baca admitted he lied during [the FBI] interview."). For example, on March 24, 2016, the *Los Angeles Times* published an article titled "After Baca's guilty plea, L.A. jail corruption case turns toward trial of his top aid." *Id.* at ¶ 1513. While summarizing the charges against Tanaka, the article mentions those who already pled guilty and states, "Last month, Baca himself joined the disgraced group when he admitted to lying to FBI agents[.]" The paper was read by 15,092,236 people that day. *Id.* The article was reprinted in five other Los Angeles publications. *Id.* at ¶¶ 1508-12.

Over the following two weeks, before the jury convicted Tanaka, 185 more articles were printed or broadcast about the case in outlets read by millions daily.

_____

[2] *See* https://www.google.com/?gws_rd=ssl#q=baca+guilty, last accessed on September 19, 2016.

*Id.* at ¶¶ 1322-1507. All of them mention Mr. Baca, and almost all of them highlight Mr. Baca's admission of guilt. *Id.*

On April 6, 2016, the day Tanaka was convicted, 62 stories were published in Los Angeles County about the case. *Id.* at ¶¶ 1259-1321. They all mention Mr. Baca and almost uniformly discuss Mr. Baca's guilty plea. A *Los Angeles Times* article in an issue read by 19 million people quotes Tanaka's counsel at closing arguments: "The driving force behind everything you've seen was Leroy Baca, not Paul Tanaka." *Id.* at ¶ 1320. The article also mentions that Mr. Baca "admits he lied to the FBI in the jail abuse scandal." *Id.* Another article quotes Tanaka's counsel as saying Mr. Baca "was in control of this entire situation," and notes Mr. Baca's guilty plea. *Id.* at ¶ 1277. The article was reprinted in 32 regional Los Angeles County news outlets read cumulatively by 6,138,777 people during April. *Id.* at ¶¶ 1278-1309. The *Times* ran an editorial the following day, April 7, 2016, that remarks, "the idea that former Undersheriff Paul Tanaka, and his old boss, Sheriff Lee Baca, would one day be wearing prison blues was all but unthinkable." *Id.* at ¶ 1253.

Between Tanaka's conviction on April 6, 2016 and this Court's rejection of the terms of Mr. Baca's guilty plea agreement on July 18, 2016, Los Angeles County news outlets accessed by millions published 478 stories mentioning Mr. Baca in connection to the jail investigation. *Id.* at ¶¶ 780-1258. They adopted the same tenor as the others: many recount Mr. Baca's admission of guilt; many quote Mr. Baca's statement, "I made a mistake;" and many refer to Mr. Baca as "disgraced." *Id.* As the media report indicates, they were published in outlets read by millions of people. *Id.* In the days leading up to the July 18, 2016 hearing, before the Court addressed the plea agreement, 70 stories were published in the County anticipating Mr. Baca's sentencing. *Id.* at ¶¶ 778-849. The *Los Angeles Times* article, "Is ex-L.A. County Sheriff Lee Baca, once one of the nation's most

powerful cops, headed to prison?," was published in an issue read by19,365,041 people. *Id.* at ¶ 805.

#### iv.    The media focused on the Court's opinions when the Court rejected Mr. Baca's plea

On July 18, 2016, this Court rejected the plea agreement's terms. On that day alone,169 stories in Los Angeles County published the details. *Id.* at ¶¶ 610-779. KTLA-TV published a story stating that "[a] federal judge…rejected a plea deal for former Los Angeles County Sheriff Lee Baca, who had admitted he lied to FBI agents[.]" *Id.* at ¶ 779. The story continues, "U.S. District Judge Percy Anderson said the February plea agreement between Mr. Baca and federal prosecutors would have allowed the longtime head of the Sheriffs Department to get off too easy." *Id.* Its website was read by 2,526,816 people that day. *Id.* The *Los Angeles Times* story, "Judge throws out ex-L.A. County Sheriff Lee Baca's plea deal, saying six months in prison not enough," quotes the Court as saying the deal "would trivialize the seriousness of the offenses[.]" *Id.* at ¶ 676. KCAL-TV's story reported that "[d]uring Baca's sentencing hearing, the judge announced the deal was too lenient." *Id.* at ¶ 668. Its website was read by 1,743,155 people that day. *Id.* The NBC affiliate, accessed by 1,272,703 people on July 18, offered the same information, but also noted that Judge Beverly Reid O'Connell had recently called Mr. Baca's deal "troublesome" from the bench in another related case *Id.* at ¶ 667. Southern California Public Radio's website, accessed by 1,272,703 people on July 18, opined that the entire ordeal "was an example of the former sheriff's hubris." *Id.* at ¶ 659.

The smaller town newspapers circulated a story that presented the allegations against Mr. Baca as true: "U.S. District Judge Percy Anderson said a six-month sentence would 'trivialize' Baca's role in setting in motion a wide-ranging conspiracy to obstruct justice in the jail system that did 'substantial harm' to the community." *Id.* at ¶ 655. The article, titled "One Thing to Lie... Another to Cover Up Abuse, Judge Says in Baca Plea Rejection," was printed in various regional

publications read cumulatively by more than six million people in July. *Id.* The article also mentions Judge O'Connell's description of Mr. Baca's plea deal as "troublesome." *Id.*

In the two weeks between the July 18, 2016 hearing and the August 1, 2016 sentencing, 80 more news stories were published in the County discussing Mr. Baca and his case. *Id.* at ¶¶ 531-610.

### v.    Mr. Baca's withdrawal of his guilty plea caused the media to discuss Mr. Baca's "admission" even more

On August 1, 2016, Mr. Baca withdrew his guilty plea. In the runup to the hearing, that day's *Los Angeles Times*, with 19,365,041 readers, ran a story titled, "Ex-L.A. Sheriff Lee Baca's dilemma: Withdraw his guilty plea or face prison?" *Id.* at ¶ 630. The article framed the "dilemma" as follows: "Withdraw his guilty plea for lying to federal investigators or accept the likelihood of a significant stint behind bars." *Id.* The *Los Angeles Daily News*, with 648,730 readers, broke the news that Mr. Baca withdrew his plea. *Id.* at ¶ 513. The article explained that this Court "rejected the former sheriff's plea agreement with prosecutors, saying it was not tough enough after Baca admitted to lying to federal investigators." *Id.* The smaller town newspapers, with an August cumulative readership of more than 6 million, circulated an article about the withdrawal that stated, matter-of-factly, that Mr. Baca "committed the offense." *Id.* at ¶¶ 479-505. The local NBC affiliate's website, which posted a substantively similar story, was read by 1,272,703 people on August 1. *Id.* at ¶ 443. In all, on August 1 and August 2, 2016, nearly a hundred stories discussing Mr. Baca's guilty plea withdrawal were published in Los Angeles County. *See id.* at ¶¶ 408-513.

In the ten days between August 2, 2016 and Mr. Baca's arraignment, another 167 stories mentioned various aspects of the case, including the superseding indictment. *Id.* at ¶¶ 260-407.

///

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SANTA MONICA

DB1/ 88941045.2                                                                    CR 16-66(A) - PA

### vi.     The media continues to fixate on Mr. Baca's guilty plea even though Mr. Baca withdrew it and pled not guilty

Mr. Baca was arraigned on the superseding indictment on August 12, 2016. KCAL-TV's website, accessed that day by 1,743,155 people, reported that Mr. Baca was expected to plead not guilty. *Id.* at ¶ 234. But, the article mentioned that Mr. Baca had previously admitted guilt on one of the charges. *Id.* The *Los Angeles Times*, read by more than 19 million people on August 12, ran an article titled "Ex-L.A. County Sheriff Lee Baca pleads not guilty to new obstruction charges." *Id.* at ¶ 221. Again, the article mentions Mr. Baca's previous admission of guilt. *Id.* Both the new charges and the old guilty plea were also covered by the smaller town papers, again with a cumulative readership above six million for August. *Id.* at ¶¶ 168-200. In all, Mr. Baca's arraignment was covered in 93 Los Angeles County stories from August 12 through August 14, 2016. *Id.* at ¶¶ 141-234. All but one mentioned that Mr. Baca had previously pled guilty. *Id.*

Coverage continues to the present. Fifty-nine stories regarding the trial date and 28 stories regarding the competency hearing appeared in Los Angeles County between August 14 and August 31, 2016. *See id.* at ¶¶ 81-140; 1-28. Most stories have continued to cast Mr. Baca's guilty plea as an ongoing admission of guilt. *See id.*

### vii.     All the while, the United States Attorney's Office was publicizing Mr. Baca's guilty plea in the press

Between December 9, 2013 and June 27, 2016, the United States Attorney's Office ("USAO") issued at least 12 written press releases in this case. *See* USAO Press Releases, true and correct copies of which are attached as **Exhibit 6**. On February 10, 2016**,** the USAO issued a release entitled, "Former L.A. County Sheriff Lee Baca Agrees to Plead Guilty to Lying to Federal Authorities during Investigation into His Department." *Id.* at A141164. Therein, U.S. Attorney Eileen Decker stated, "Today's charge and plea agreement demonstrate that illegal

behavior within the Sheriff's Department went to the very top of the organization."

*Id.* The release continued:

> The case against Baca is the result of an investigation by the FBI, and is one in a series of cases resulting from an investigation into corruption and civil rights abuses at county jail facilities in downtown Los Angeles. As a result of the investigation, 17 current or former members of the Los Angeles Sheriff's Department have now been convicted of federal charges. If a federal judge accepts the plea agreement this afternoon, Baca would become the 18th person to be convicted.

*Id.* The USAO continued to issue press releases each time someone in the investigation was convicted. *See generally, id.* The USAO also issued four video press releases regarding Mr. Baca between July 31, 2015 and February 10, 2016. *See* Letter from USAO, a true and correcty copy of which is attached as **Exhibit 7**.

## II.   ARGUMENT

Defendants have a right to trial in the "state and district wherein the crime shall have been committed." U.S. Const. amend. VI. "Due process," however, "requires that the accused receive a trial by an impartial jury free from outside influences." *Sheppard*, 384 U.S. at 362. Accordingly, "[u]pon the defendant's motion, the court must transfer the proceeding against that defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there." Fed. R. Crim. P. 21(a). When a Rule 21(a) motion is made, "the ultimate question is whether it is possible to select a fair and impartial jury[.]" *United States v. Rewald*, 889 F.2d 836, 863 (9th Cir. 1989). An accused may file such a motion "at or before arraignment or at any other time" the court permits. Fed. R. Crim. P. 21(d). Where pretrial publicity has proved significant, a defendant may move for change of venue on that ground alone before the commencement of *voir dire*. *See, e.g., Hayes v. Ayers*, 632 F.3d 500, 508 (9th Cir. 2011).

Occasionally, media coverage "taint[s] a criminal prosecution." *Skilling v. United States*, 561 U.S. 358, 360 (2010). Due process may therefore require a

change in venue "[w]here there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial[.]" *Sheppard*, 384 U.S. at 363. This is because jurors must reach their conclusions in a case "only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print." *Patterson v. Colorado ex rel. Attorney General of Colo.*, 205 U.S. 454, 462 (1907). Prejudice may be presumed "when the record demonstrates that the community…was saturated with prejudicial and inflammatory media publicity about the crime." *Harris*, 885 F.2d at 1361. Under such circumstances, "it is not necessary to demonstrate actual bias." *Harris*, 885 F.2d at 1361.

Courts consider a number of factors in determining whether to presume prejudice. First, the Supreme Court has emphasized "the size and characteristics of the community in which the crime occurred." *Skilling*, 561 U.S. at 382. There is no bright-line population cutoff; rather, a defendant must only show a "reasonable likelihood" that the publicity will prevent a fair trial. *Casey v. Moore*, 386 F.3d 896, 906 (9th Cir. 2004). Again, the guidepost is whether the court can seat an impartial jury. *See Rewald, supra.* For example, the California Supreme Court has found prejudice warranted removing a trial from Los Angeles County, based wholly on pretrial coverage in the Los Angeles Times. *See Smith v. Superior Court for Los Angeles County*, 276 Cal.App.2d 145, 150-51 (1969). *See also Powell v. Superior Court for Los Angeles*, 232 Cal.App.3d 785, 795-96 (1991) (finding that the County of Los Angeles, despite its size, may "also become so hostile to a defendant as to make a fair trial unlikely.").

Second, courts consider the nature of the publicty in question. Specifically, courts look for "blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight." *Skilling*, 561 U.S. at 382. In the face of such publicity, potential jurors "cannot be believed when they assert that they can be impartial." *United States v. Croft*, 124 F.3d 1109, 1115 (9th Cir. 1997).

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SANTA MONICA

DB1/ 88941045.2

14

CR 16-66(A) - PA

Some types of publicity are more damaging than others. Media stories discussing "material not admissible at trial" are especially prejudicial. *Daniels v. Woodford*, 428 F.3d 1181, 1211 (9th Cir. 2005). The inadmissibility of evidence is "rendered meaningless when news media make it available to the public." *Sheppard*, 384 U.S. at 361. Indeed, the resulting prejudice to the defendant "is almost certain to be as great when that evidence reaches the jury through news accounts as when it is a part of the prosecution's evidence," because "it is then not tempered by protective procedures." *Marshall v. United States*, 360 U.S. 310, 313 (1959).

It is even more prejudicial when the media discusses a defendant's confession. *See, e.g., Skilling*, 561 U.S. at 383 (quoting *Parker v. Randolph*, 442 U.S. 62, 72 (1979)) ("[T]he defendant's own confession [is] probably the most probative and damaging evidence that can be admitted against him."). A defendant's "admission of guilt" is likely to be "imprinted indelibly in the mind of anyone" exposed to it. *Id*. Potential jurors naturally "may have difficulty in disbeliefving or forgetting a defendant's opinion of his own guilt[.]" *United States v. Chagra*, 669 F.2d 241, 251-52 n. 11 (5th Cir. 1982).

Finally, in assessing whether pretrial publicity has presumptively prejudiced a defendant, courts examine how frequently and recently the media publicized the case.[3] *See Skilling*, 561 U.S. at 383. Of importance is whether the community was "saturated" with publicity about the alleged crime. *Ainsworth v. Calderon*, 138 F.3d 787, 795 (9th Cir. 1998). Equally important is whether or not the publicity died down. If the "decibel level of media attention diminishe[s]" following the alleged crime, prejudice may dissipate. *Skilling*, 561 U.S. at 383. Contrarily, a "barrage of newspaper headlines, articles," and the like even within "the six or seven months

---

[3] The Supreme Court enumerated a fourth factor, whether the jury's verdict undermined any supposition of juror bias. *See Skilling*, 561 U.S. at 383. But, when a defendant preemptively moves for a change of venue before the court seats a jury, this factor is disregarded. *See, e.g., Hayes*, 632 F.3d at 508.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SANTA MONICA

DB1/ 88941045.2

15

CR 16-66(A) - PA

preceding [a defendant's] trial" militates in favor of presuming prejudice. *Irvin v. Dowd*, 366 U.S. 717, 725 (1961).

The touchstone for presuming prejudice from pretrial publicity is *Rideau v. Louisiana*, 373 U.S. 723 (1963). There, the defendant was apprehended shortly after a Calcasieu Parish bank was robbed, and one of its employees killed. *Id.* at 724. The sherrif, while videotaped by some unknown person, extracted a confession from the defendant to both the robbery and the murder. *Id.* Over the following three days the confession was broadcast on television in Calcasieu Parish, and about one third of the Parish's population saw it at least once. *Id.* A number of weeks later, after the defense motion to change venue was denied, the defendant was tried and convicted in Calcasieu Parish. *Id.* at 724-25. The Supreme Court found that enough of the Parish had been exposed "to the spectacle of [the defendant] confessing[.]" *Id.* at 726. The Supreme Court continued that, in violation of the defendant's due process rights, the television broadcast, "in a very real sense *was* [the defendant's] trial." *Id.* (emphasis in original). The Court, without examining the *voir dire* transcript for any actual prejudice, reversed the trial court and conviction. *Id.* at 727.

In *Woodford*, 428 F.3d 1181, the Ninth Circuit similarly reversed a trial court's denial of a venue change. The defendant, an African-American paraplegic, was tried for and convicted of murdering two police officers in Riverside County, where the crime occurred, over defense objections. *Id.* at 1210. Initial news accounts described the assailant as a "Black paraplegic," and some identified the defendant as the killer. *Id.* at 1211. Although the publicity diminished after the murders, coverage resumed in the months leading up to the defendant's trial. *Id.* The local news also showcased numerous editorials and citizens' letters to editors. *Id.* Additionally, because the victims were public servants, much media attention was given to memorializing them. *Id.* Without any measurable media dissemination data in the record, the court nevertheless found that the publicity "amounted to a

huge wave of public passion," and that "the news coverage saturated the county[.]" *Id.* The court continued that some of the information in the media was "highly prejudicial" because it "would not have been admissible" at trial. *Id.* at 1212. The court concluded that trying the defendant in Riverside County was a violation of his due process rights. *Id.*

Finally, although not binding on this Court, *Powell*, 232 Cal.App.3d 785, illustrates that a county as populous as Los Angeles is not immune from harboring prejudice sufficient to violate a defendant's due process rights. There, the defendants, who were all police officers, stood charged with assaulting an individual while apprehending him. *Id.* at 789. The incident was surreptitiously videotaped, and the recording sold to and widely disseminated by the media. *Id.* Additionally, the *Los Angeles Times* and publications of lesser circulation "blanketed Los Angeles County with coverage of the incident," including "front page pictures, feature stories, in-depth analyses, editorials, letters to the editors," and political cartoons. *Id.* at 798. The California Supreme Court also noted that the resulting prejudice was "exacerbated by the fact the defendants [were] police officers, sworn to protect citizens[.]" *Id.* "Their status," the court continued, "caused a high level of indignation, outrage, and anxiety." *Id.*

Of particular concern to the *Powell* court was the size of the potential jury pool in Los Angeles County. *Id.* at 795-96. The government, of course, contended that the County's population would render even the widest media coverage irrelevant. *Id.* at 795. The court rejected this argument, explaining that "[c]arried to its logical conclusion, the [] argument, if valid, would require that all motions for a change of venue in Los Angeles County must be denied because of its population, regardless of the amount of pretrial publicity which surrounds a notorious criminal case." *Id.* (internal quotations and citations omitted). Ultimately, the court found that the other factors "lessen[ed] the significance of the fact that the case arises in an expansive metropolitan area with a large pool of potential jurors." *Id.* at 796.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SANTA MONICA

DB1/ 88941045.2

17

CR 16-66(A) - PA

Accordingly, the court concluded that the defendants could not "receive a fair trial in Los Angeles County," and mandated that the trial court grant the venue change motion. *Id.* at 802-03.

In this case, circumstances have aligned that support a presumption of prejudice. There is a rare combination of a very high profile case with a very high profile defendant—one of the most popular elected officials in the County and the highest ranking County official to be charged with a crime within at least the last 50 years. There has also been an extraordinary confluence of events: (1) Mr. Baca admitted guilt in this case; (2) the Court rejected the terms of the guilty plea agreement; (3) Mr. Baca withdrew his admission of guilt; (4) a similarly high-profile defendant, Tanaka, was recently tried on charges arising out of the same circumstances as Mr. Baca's; and (5) the press doggedly reported on every last detail, all the while endlessly rehashing Mr. Baca's guilty plea.

Thus, an analysis of the three *Skilling* factors—the size and characteristics of the community in which the crime occurred, the blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight, and how frequently and recently the media publicized the case—militates strongly in favor of requiring a change of venue from federal court based in Los Angeles County.

### A. The size of the jury pool in Los Angeles County does not cure the expansive media coverage of this case

The media coverage of this case has reached millions of Los Angeles County residents. Factual expositions and editorials regularly reached between five and 15 million readers or viewers on a daily basis. Even the smaller town publications that would not draw any significant readership outside the region, such as the *Sierra Madre Patch*, cumulatively registered upwards of six million readers during the time they covered this case. Television broadcasts of local network afilliates, which by definition do not reach beyond the Los Angeles area, routinely reached between

one and two milllion viewers during each major development. In the aggregate over nine months, the local outlets that covered this story were read or viewed tens of millions of times.

In *Rideau*, the Supreme Court found that a third of the parish watching the defendant's confession—which was only shown three times total—was sufficient to create a presumption of prejudice. The readership and viewership numbers in this case insist that well over a third of the potential jury pool has been repeatedly exposed to Mr. Baca's admission of guilt. Half the jury pool could have been tainted by almost any network broadcast on almost any day. The entire jury pool and then some could have been tained by almost any printed story on almost any day. Every week, and almost every day, during the last nine months, there was at least one such broadcast or story—and usually many, many more. The sheer circulation of the press coverage in this case is sufficient to overcome Los Angeles County's metropolitan expanse.

### B.      The media coverage in this case has been highly prejudicial

The coverage in this case has been the kind that "viewers could not reasonably be expected to shut from sight," if for no other reason than the press would not let them. Aside from routinely presenting the allegations as true, the press published a constant stream of highly prejudicial information that will be completely inadmissible at Mr. Baca's upcoming trial. First, there was the widespread reporting of this Court's findings regarding the guilty plea agreement— that the punishment was not harsh enough. More than that, when the Court made its findings, the posture of the case allowed the Court to describe the offense conduct not as mere allegations, but as fact. The press followed suit. Second, the press made much of Judge O'Connell's description of the plea deal as "troubling." The potential jury pool has thus been widely exposed to certain opinions of the Court that are as prejudicial in the case's current posture as they are inadmissible. Third, the press reported on Tanaka's defense and the comments by his counsel in closing

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SANTA MONICA

19

CR 16-66(A) - PA

DB1/ 88941045.2

arguments painting Mr. Baca as a mastermind. Most damaging of all, of course, and the matter most reported, was Mr. Baca's own confession of guilt in the plea agreement, at the guilty plea hearing, in his sentencing position, and at the sentencing hearing—blasted all over Los Angeles County in every form of media. Even well after the withdrawal of the plea, Mr. Baca's admission has featured in almost every story.

Finally, there has been substantial editorializing in the press. After Mr. Baca's guilty plea—and even after the plea's withdrawal—the newspapers regularly referred to Mr. Baca as the "disgraced" former sheriff. Readers and editorialists have chimed in with equal parts outrage and incredulity. On two separate occasions, editorialists in the most widely circulated paper in the County relished the thought of Mr. Baca serving time in prison. Dozens of smaller publications reprinted at least one of the editorials. The readers' opinions were no kinder.

It's "reasonably likely," then, that a Los Angeles jury could have at least one or more member who knows the Court's strongly worded and negative opinions regarding Mr. Baca's actions, guilt, and punishment, and/or knows that Mr. Baca previously admitted to one of the charges, and/or remembers an avalanche of stories that reported the allegations as fact. These sorts of the things, the Supreme Court has held, are likely to be "imprinted indelibly in the mind of anyone" exposed to them, regardless of how impartial they claim to be.

### C. The negative publicity in this case has been constant and voluminous, continues to this day, and will continue through trial.

To call the press coverage in this case "saturated" or a "huge waive of public passion" would be an understatement. Thousands of news stories across every medium have been circulated in Los Angeles County in just the last nine months, an average of eight stories every single day. Furthermore, the "decibel level" of coverage has not diminished. There has hardly been a break in coverage lasting

more than a number of days. The "barrage of headlines" continues to this day, every time there is a development in the case. As the case draws closer to trial, the enormous amount of media attention will only increase, reaching the televisions, radios, newspapers, and computer screens of millions of potential jurors.

**III.   CONCLUSION**

This is the kind of case the *Skilling* Court had in mind when clarifying the factors for presuming prejudice. Mr. Baca was one of the most high-profile elected officials in the County for 15 years. Moreover, Mr. Baca was the County's top law enforcement officer and is the highest ranking County official to be charged with a crime in at least the last 50 years. Not surprisingly, then, his confession of guilt in a criminal case has attracted unrelenting press coverage in every imaginable form. Like the defendant in *Rideau*, Mr. Baca has already had his trial in Los Angeles County's media, and has been found guilty before any witness has testified or any exhibit has been admitted. Seating a jury from this County would violate his due process rights. Accordingly, Mr. Baca respectfully requests that the Court transfer this case to another district in California.

Alternatively, in the event the Court is unwilling to transfer this case to another district, Mr. Baca respectfully requests that the case be transferred outside Los Angeles County to either Riverside or Orange Counties. Finally, should the Court deny this motion, Mr. Baca respectfully requests leave to renew it at *voir dire*.

Dated:       September 26, 2016            MORGAN, LEWIS & BOCKIUS LLP


                                           By  */s/ Nathan J. Hochman*
                                               Nathan J. Hochman
                                               Attorneys for Defendant Baca

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SANTA MONICA

DB1/ 88941045.2

21                              CR 16-66(A) - PA