EILEEN M. DECKER
United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
BRANDON D. FOX (Cal. Bar No. 290409)
Chief, Public Corruption & Civil Rights Section
LIZABETH A. RHODES (Cal. Bar No. 155299)
Chief, General Crimes Section
EDDIE A. JAUREGUI (Cal. Bar No. 297986)
General Crimes Section
Assistant United States Attorneys
     1500/1200 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-0284/3541/4849
     Facsimile: (213) 894-7631
     E-mail:    Brandon.Fox@usdoj.gov
                Lizabeth.Rhodes@usdoj.gov
                Eddie.Jauregui@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 16-66(A)-PA |
|---|---|
| Plaintiff, | GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION FOR CHANGE OF VENUE; EXHIBITS; DECLARATION |
| v. | |
| LEROY BACA, | Hearing Date: October 31, 2016 |
| Defendant. | Hearing Time: 3:00 p.m. Location:    Courtroom of the           Hon. Percy Anderson |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Brandon D. Fox, Lizabeth A. Rhodes, and Eddie A. Jauregui, hereby files its response to defendant's motion for change of venue.

As explained in the accompanying brief, defendant has failed to show that this case presents "extreme" circumstances warranting

transfer to another district, or even to another division.  While defendant's case has received publicity, the press coverage has not "utterly corrupted" the trial atmosphere or interfered with defendant's right to a fair and impartial jury.  Defendant's motion should be denied.

Dated: October 10, 2016          Respectfully submitted,

                                 EILEEN M. DECKER
                                 United States Attorney

                                 LAWRENCE S. MIDDLETON
                                 Assistant United States Attorney
                                 Chief, Criminal Division


                                 _/s/ Brandon D. Fox_
                                 BRANDON F. FOX
                                 LIZABETH A. RHODES
                                 EDDIE A. JAUREGUI
                                 Assistant United States Attorneys

                                 Attorneys for Plaintiff
                                 UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

DESCRIPTION                                                          PAGE

I.    INTRODUCTION...............................................1

II.   STATEMENT OF FACTS.........................................1

III.  ARGUMENT..................................................1

      A.    Defendant Has Failed to Show Extraordinary Local
            Prejudice.............................................3

            1.    Defendant's Evidence Fails to Show "Huge Wave of
                  Public Passion" In This District Immediately
                  Prior to Trial..................................3

            2.    Defendant's Argument Ignores Evidence of
                  Continued Support in the Community.............12

      B.    The Court Can Take Steps to Ensure an Impartial Jury.....14

IV.   CONCLUSION...............................................15

**TABLE OF AUTHORITIES**

DESCRIPTION                                                                PAGE

**CASES**

Ainsworth v. Calderon, 138 F.3d 787, 795 (9th Cir. 1998)........3, 8

Daniels v. Woodford, 428 F.3d 1181, 1211-12 (9th Cir. 2005)..8, 9, 10

Estes v. Texas, 381 U.S. 532, 536 (1995)............................2

Gallego v. McDaniel, 124 F.3d 1065, 1070 (9th Cir. 1997)............6

Harris v. Pulley, 885 F.2d 1354, 1361 (9th Cir. 1988)...........2, 13

Hayes v. Ayers, 632 F.3d 500, 508 (9th Cir. 2011)...............2, 10

Irvin v. Dowd, 366 U.S. 717, 722 (1961).......................10, 12

Jeffries v. Blodgett, 5 F.3d 1180, 1189 (9th Cir. 1993).............2

Los Angeles Memorial Coliseum Com'n v. National Football League,
      726 F.2d 1381, 1400 (9th Cir. 1984)..........................14

Murphy v. Florida, 421 U.S. 794, 798-99 (1975)....................12

Patton v. Yount, 467 U.S. 1025 (1984).........................10, 12

Rideau v. Louisiana, 373 U.S. 723 (1963.....................8, 9, 10

Sheppard v. Maxwell, 384 U.S. 333, 353, 355 (1966).................2

Skilling v. United States, 561 U.S. 358, 380-81 (2010).........passim

United States v. Croft, 124 F.3d 1109, 1115 (9th Cir. 1997).........2

United States v. Rewald, 889 F.2d 836, 863 (9th Cir. 1989).......3, 9

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.    INTRODUCTION**

Defendant asks this Court to take the extraordinary step moving his trial outside of this District — or, alternatively, outside of the Western Division — on the ground that he cannot receive a fair trial by an impartial jury here.  Defendant's motion rests on the theory of "presumed prejudice," which requires defendant to show the community has been so saturated with prejudicial and inflammatory publicity about his case, it would be "impossible" to seat twelve impartial and indifferent jurors at the time of trial.  A presumption of prejudice due to pretrial publicity, however, "attends only the extreme case."  This is not that case.

**II.    STATEMENT OF FACTS**

This Court, having presided over the trials of numerous Los Angeles County Sheriff's Department ("LASD") deputies, sergeants, and lieutenants, and, most recently, Undersheriff Paul Tanaka, is familiar with the factual background.  For purposes of this motion, the government incorporates the factual allegations in the First Superseding Indictment, the factual basis to the parties' plea agreement (Dkt. 5, ¶¶ 9-10), and its sentencing brief (Dkt. 32).

**III. ARGUMENT**

Defendant's motion is based on Fed. R. Crim. P. 21(a).  Pursuant to that rule, "the court must transfer the proceeding . . . to another district" only if "so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there."  Defendant claims he cannot receive a fair trial in the Central District of California due to a "barrage" of pretrial publicity.  Because no potential jurors have

been questioned, defendant's motion is based upon "presumed prejudice" from the media coverage.  (See Def.'s Br. at 14-21.)

Prejudice is presumed only "when the record demonstrates that the community where the trial was held was saturated with prejudicial and inflammatory media publicity about the crime."  Hayes v. Ayers, 632 F.3d 500, 508 (9th Cir. 2011) (quoting Harris v. Pulley, 885 F.2d 1354, 1361 (9th Cir. 1988)).  The doctrine is rooted in the notion that a defendant cannot obtain a fair trial where press coverage of his alleged crime has "utterly corrupted" the "trial atmosphere."  See Skilling v. United States, 561 U.S. 358, 380-81 (2010).  The publicity must be "so pervasive and inflammatory that jurors cannot be believed when they assert that they can be impartial."  United States v. Croft, 124 F.3d 1109, 1115 (9th Cir. 1997).

The presumption of prejudice based on publicity "'attends only the extreme case.'"  See Hayes, 632 F.3d at 508 (quoting Skilling, 561 U.S. at 361); Jeffries v. Blodgett, 5 F.3d 1180, 1189 (9th Cir. 1993) (prejudice is "rarely presumed because 'saturation' defines conditions found only in extreme situations"); Harris, 885 F.3d at 1361 (presumed prejudice "rarely applicable" and "reserved for an extreme situation").  Given these standards, it is not surprising that the few cases in which presumed prejudice has been found involved media overrunning courtrooms, creating bedlam, and bombarding the community with excessive and detailed coverage.  See Estes v. Texas, 381 U.S. 532, 536 (1995) (press overran the courtroom and "bombard[ed] the community with the sights and sounds" of pretrial hearing); Sheppard v. Maxwell, 384 U.S. 333, 353, 355 (1966) ("bedlam reigned" at courthouse as "newsmen took over practically the entire courtroom," creating a "carnival atmosphere").

This is not the "extreme" case.  As explained below, defendant's evidence fails to show "saturation" of this district, the largest federal judicial district in the nation, with prejudicial and inflammatory publicity a fair trial.  Although the case has received publicity, it has not "utterly corrupted" the trial atmosphere, or generated a "huge wave of public passion" against the defendant.

**A.   Defendant Has Failed to Show Extraordinary Local Prejudice**

Defendant bears the burden of showing it would be impossible to select a fair and impartial jury at the time of trial due to outside influences.  <u>Skilling</u>, 561 U.S. at 360-61, 379; <u>United States v. Rewald</u>, 889 F.2d 836, 863 (9th Cir. 1989).  Defendant has not met that burden.

1.   <u>Defendant's Evidence Fails to Show "Huge Wave of Public Passion" In This District Immediately Prior to Trial</u>

Courts typically consider three factors in evaluating presumed prejudice: (1) whether there was a "barrage of inflammatory publicity immediately prior to trial amounting to a huge wave of public passion"; (2) whether the media accounts were primarily factual or editorial; and (3) whether the media coverage "contained inflammatory, prejudicial information that was not admissible at trial."  <u>Ainsworth v. Calderon</u>, 138 F.3d 787, 795 (9th Cir. 1998) (internal quotations and citations omitted).  In <u>Skilling</u>, the Supreme Court noted that, in addition to other factors, the Court has, in its prior decisions, emphasized the "size and characteristics of the community in which the crime occurred."  <u>Id.</u>, 561 U.S. at 358 (given the large, diverse pool of potential jurors in Houston, "the suggestion that 12 impartial individuals could not be empaneled is hard to sustain").

a.    *Defendant's Report Does Not Show "Saturation"*

In an effort to meet his heavy burden, defendant has filed with this Court a media report listing 1,950 news stories from Los Angeles County mentioning defendant's name starting on or about January 10, 2016.  (See Def. Ex. 3 (compilation of news accounts) and Ex. 4 (declaration of Lisa C. Regehr)).  Defendant contends that this report establishes "saturation" and demonstrates that the coverage has been "prejudicial and inflammatory."  The report does neither.

First, a review of defendant's overstuffed compilation of stories reveals that, by and large, the media coverage of this case has focused on discrete events, such as defendant's initial plea in February 2016, the trial of former Undersheriff Paul Tanaka, and defendant's sentencing hearings.  The coverage has not been constant, but rather has ebbed and flowed.  (See generally Def. Ex. 3.)

Second, although defendant makes much of the number of stories his compilation, it is plain that the report overstates the expansiveness of the coverage by counting as separate entries the republication of the same story in seemingly every "Patch" homepage in Southern California.[1]  Defendant does not provide any clear indication of how many people read those articles.  Defendant instead presents the data in an extraordinarily misleading fashion.  For example, entry number 914 in the report is a June 27, 2016 online article from the Altadena Patch regarding Tanaka's sentencing.  (See

---

[1] "Patch" is an online network of "community-specific," or "hyperlocal," news sites operating throughout the country.  See Jack Marshall, Patch Rebounds After Split From AOL, Wall Street Journal, Feb. 2, 2016, available at http://www.wsj.com/articles/patch-rebounds-after-split-from-aol-1454445340, attached as Gov. Ex. 1. The Patch's website lists over 100 California communities for which the Patch operates "platforms."  (See http://patch.com/california.)

Def. Ex. 3, Dkt. 104-43, ¶ 914.)  Listed is a tally reading "Unique Visitors: 5,951,615."  (Id.)  At first blush, the reader would be led to believe that nearly 6 million individuals read this article in the Altadena Patch, which would be astonishing given the "hyperlocal" focus of that website.  But closer inspection of defendant's report reveals that every other entry from every other Patch outlet (e.g., the Eagle Rock Patch, the Sherman Oaks Patch, etc.) in the month of June – even related to different stories and events – lists the same number of "unique visitors": 5,951,615.  (See Def. Ex. 3, ¶¶ 915-928, 1052-75, 1088-1120.)[2]  Contrary to defendant's assertions, it appears that 5.9 million people simply visited a Patch website in June 2016.[3] The above-cited Wall Street Journal article suggests that this could be the number of visitors to the entire Patch network nationwide that month,[4] and there is no way to know if they were there to read about Tanaka or Michel, the shootings in Orlando, the NBA Finals, Brexit, or the local chili cook-off.  The same is true for the Patch entries from every other month, and together there are hundreds of them. (See, e.g., Def. Ex. 3, ¶¶ 58, 93-125, 282-338, 376-403, 435, 479-506, 655, 680-775, 1112-1120, 1139.)  These data are not reliable.

---

[2] For example, the report shows a June 13, 2016 article in the Eagle Rock Patch regarding former deputy Gilbert Michel's sentencing also had 5,951,615 "unique visitors."  (Def.'s Ex. 3, Dkt. 104-50, ¶ 1052.)  Similarly, a June 7, 2016, article in the Agoura Hills Patch regarding the government's sentencing position in Tanaka is listed as having 5,951,615 "unique visitors."  (Id., Dkt. 104-53, ¶ 1088.)

[3] Defendant misleadingly suggests these numbers represent the number of visitors to each local Patch website.  For example, in discussing a Hermosa Beach Patch story from February 2016, defendant asserts that "[a]t least 5,109,473 people accessed that publication during the month of February, when the plea deal coverage started." (Def.'s Br. at 6) (emphasis added).

[4] See Marshall, J., Patch Rebounds After Split From AOL, supra n.1 (indicating that, in December 2015, about 7 million users visited the Patch network nationwide).

5

Cf. Gallego v. McDaniel, 124 F.3d 1065, 1070 (9th Cir. 1997) (rejecting defendant's proffered community poll as "being itself biased as well as unscientific").

Even outside the realm of the Patch articles, which constitute a significant portion of defendant's Exhibit 3, defendant's report is not a reliable indicator of media saturation in his case. This is evident both from the report itself and in the way defendant discusses the media coverage. For instance, on July 18, 2016, this Court declined to accept the binding plea agreement entered into by the parties. The Court's decision was publicized in the Los Angeles Times, Southern California Public Radio, and other media outlets. (See Def.'s Br. at 10.) Yet, there is no way to know how many members of the community in this District were exposed to that information. At best, defendant's report indicates how many people accessed a specific news website or viewed a particular broadcast, and even then it is not clear what the number of "unique visitors" means.[5] Ultimately, defendant's media report does not help this Court, or anyone, understand the breadth and depth of the news

---

[5] Defendant seeks to raise the inference that because millions of people may have read a specific website on that day, they must have been exposed to the news regarding defendant's guilty plea. (See Def.'s Br. at 10, noting, for instance, that KTLA published a story about the July 18, 2016 hearing and that "its website was read by [approximately 2.5 million] people that day.") That, of course, cannot be presumed. Indeed, July 18, 2016 was also the first day of the Republican National Convention, which surely drew substantial interest from the reading public. The same is true of news coverage regarding the First Superseding Indictment, which issued on August 5, 2016, the opening day of the Rio Olympic Games. Moreover, even if millions of people visited a website like the Los Angeles Times' website on a given date, defendant's report does not tell the Court where those individuals were geographically located, or how many of them read about defendant's case.

6

coverage of his case, which is important to determining whether this District, the most populous in the nation, has been "saturated" with prejudicial and inflammatory publicity.  The same is true of the declaration by Regehr (Def.'s Ex. 4), which does not provide the "keywords provided by our clients" to compile the report, nor does it explain how the "unique readership numbers" were calculated.

Third, defendant's media report – and his entire motion, for that matter – is focused only on Los Angeles County.  (Def.'s Br. at 17-18.)  As this Court well knows, the Central District of California has jurisdiction over seven counties, from San Luis Obispo to Riverside.[6]  Within the Western Division alone, there are four counties: Los Angeles, Ventura, Santa Barbara and San Luis Obispo. The potential jury pool in this case is not drawn from Los Angeles County alone, although Los Angeles is the most populous county in the nation;[7] it is drawn from a vastly larger, more numerous, and even more diverse jurisdiction.[8]  Defendant does not even attempt to show "saturation" district-wide because he cannot.

---

[6] See Gov. Ex. 2, Central District of California Profile, 2014, also available at https://www.cacd.uscourts.gov/sites/default/ files/CACD_Profile_2014.pdf (last visited October 9, 2010).

[7] See Gov. Ex. 3, Census Bureau Press Release dated March 26, 2015 (noting that Los Angeles "is still the nation's most populous county with a July 1, 2014, population surpassing 10.1 million"), available at http://www.census.gov/newsroom/press-releases/2015/cb15-56.html.

[8] As of September 2016, Ventura County had 420,024 registered voters; San Luis Obispo had 157,837 registered voters; Santa Barbara had 206,277 registered voters; Los Angeles had 5,020,210 registered voters; Orange had 1,433,025 registered voters; Riverside had 936,703 registered voters; and San Bernardino had 818,853 registered voters. See Gov. Ex. 4, California Secretary of State Report of Registration as of September 9, 2016, Registration by County, also available at http://elections.cdn.sos.ca.gov/ror/ror-pages/60day-gen-16/county.pdf.  The number of eligible voters in each of these counties is much larger.  (Id.)

*b.*    *Publicity Has Not Been So Prejudicial and Inflammatory So As To Require Transfer*

Even accepting that there have been a number of articles and news broadcasts referencing defendant and this case, almost of all of the accounts in the record are accurate and factual, and many mention defendant's case only in passing.  See Ainsworth, 138 F.3d at 795 (9th Cir. 1998), as amended, 152 F.3d 1223 (9th Cir. 1998) (no presumption of prejudice where most media accounts were primarily factual in nature and, as here, printed several months before trial).  This is a key difference separating defendant's case from Rideau v. Louisiana, 373 U.S. 723 (1963), the "touchstone for presuming prejudice from pretrial publicity," (Def.'s Br. at 16), and Daniels v. Woodford, the only Ninth Circuit case cited by defendant in which the court found a change of venue to be warranted.  See Woodford, 428 F.3d 1181, 1211-12 (9th Cir. 2005).  Those cases presented extreme and dramatic facts demonstrating a "huge wave of public passion."

In Rideau, the defendant was charged with committing a bank robbery that involved kidnapping and murder.  The crimes occurred in a "small Louisiana town" of approximately 150,000 people.  See Skilling, 561 U.S. at 379.  The defendant, Wilbert Rideau, confessed during a filmed interrogation by police.  Id.  "On three separate occasions shortly before the trial, a local television station broadcast the [20-minute] film to audiences ranging from 24,000 to 53,000 individuals."  Id.  "What people . . . saw on their television sets was Rideau, in jail, flanked by the sheriff and two state troopers, admitting in detail the commission of the robbery, kidnapping, and murder."  Rideau, at 373 U.S. at 725.  The Supreme Court found that to the "tens of thousands of people who saw and

8

heard" the film, the interrogation "in a very real sense was Rideau's trial – at which he pleaded guilty." Id. at 726 (emphasis in original). The Court deemed Rideau's actual trial a "hollow formality" and called it a kangaroo court. Id. at 727; see also Rewald, 889 F.2d at 863 (defendant Rideau already "subjected . . . to an inquisition before the community's 150,000 residents").

This case is not Rideau. Although this prosecution has received media coverage and is of public interest, it has not been attended by the kind of widespread, prejudicial, and inflammatory publicity requiring transfer of the case outside of this District. Defendant's guilty plea received some publicity, but the proceedings were not repeatedly televised as they were in Rideau, nor did they capture the community in the same dramatic way. Rideau confessed on film in detail to robbery, kidnapping, and murder, and was held to an "inquisition" before his "small town" community in Louisiana. The same cannot fairly be said here. Rewald, 889 F.2d at 863.

Similarly, this case is not comparable to Woodford, which involved the killing of police officers in Riverside County. In Woodford, the police were "deluged" with citizens' calls, newspapers printed readers' letters calling for defendant's execution, 3,000 people attended the officers' funerals, and 87% of the jury pool recognized the case from media coverage. Id. at 1211-12. Moreover, news reports described the perpetrator in unforgettable terms – calling him a "Black paraplegic" – and identified defendant "as the killer from the very beginning." Id. at 1211. Thus, it is hardly surprising that the Ninth Circuit concluded defendant could not get a fair trial in Riverside County. But Woodford is so factually distinct from this case as to make it inapposite.

9

While defendant cites a handful of editorials, letters, and one cartoon from February 2016 mocking the defendant, none demonstrate the kind of communal bloodthirst described in Woodford, nor the "'vivid, unforgettable information' that viewers of Rideau's confession were exposed to." Hayes, 632 F.3d at 509. And while the community likely is interested in this case, the record does not demonstrate that it is "obsessed with anticipation of the criminal trial." Irvin v. Dowd, 366 U.S. 717, 722 (1961).

Defendant's guilty plea received extensive publicity, but that fact alone does not require transfer. See Patton v. Yount, 467 U.S. 1025 (1984); see also Skilling, 561 U.S. at 384 ("'[P]retrial publicity — even pervasive, adverse publicity — does not inevitably lead to an unfair trial.'"). Patton v. Yount is instructive. In Yount, the defendant was tried and convicted of first degree murder for killing an 18-year-old female high school student. 467 U.S. at 1026-27. At trial, defendant's confession to the crime was admitted into evidence. Id. at 1027. Defendant's conviction was overturned and he was retried again in the same community. "Press coverage reported not only the facts of the crime but also Yount's confession, his prior plea of temporary insanity, and his conviction for the very same murder." Hayes, 632 F.3d at 510. Yet the Supreme Court affirmed the finding that the "voir dire testimony and the record of publicity [did] not reveal the kind of 'wave of public passion' that would have made a fair trial unlikely by the jury that was empaneled as a whole." Yount, 467 U.S. at 1040. Of particular import was the fact that the publicity had died down and "there had not been any great effect created by any publicity." Id. at 1035 (internal quotations omitted).

Here, trial is months away and not a single potential juror has been questioned.  It is impossible to know what impact the coverage to date has had on potential jurors – whether they will recall a cartoon published 10 months earlier in the L.A. Downtown News (whose readership is less than 1.5% of the Los Angeles County population),[9] or that defendant pled guilty to one of the charges, if they know that at all.

The record, as it stands now, does not show saturation of the community with both prejudicial and inflammatory publicity.  And it cannot show that such publicity occurred "immediately" prior to trial because trial is not scheduled until December.  Defendant has not shown a "huge wave," let alone a "tsunami," of "public passion" against the defendant.  The record demonstrates that the reporting has largely been factual and accurate.  At times, the press has even been sympathetic to defendant and has repeated his claims that the charges against him were "untruthful," that the government's case was "weak," and that he needed to "set the record straight."  (See., e.g., Def. Ex. 3, ¶¶ 171, 294, 435, 443, 448, 593, 652.)  Moreover, many broadcasts cited by defendant lasted only seconds.  (Id. at ¶¶ 3, 66-67, 428, 567-570, 679, 1012, 1015-1024, 1038, 1041.)  Defendant's evidence does not show the media have "utterly corrupted" the trial atmosphere in this courthouse, county, or district.

While there is no doubt that some of the potential jurors called to service in December will have heard of this case, that is not grounds for a change of venue, now or ever.  The Supreme Court has

---

[9] The Los Angeles Downtown News reports that it has a readership of over 150,000.  See Gov. Ex. 5, DTLA News, "Advertising With Us" landing page, also available at http://www.ladowntownnews.com/site/advertise.html.

said, in no uncertain terms, "[p]rominence does not necessarily produce prejudice, and juror impartiality . . . does not require ignorance." Skilling, 561 U.S. at 381 (emphasis in original); id. at 380 ("[O]ur decisions . . . 'cannot be made to stand for the proposition that juror exposure to . . . news accounts of the crime . . . alone presumptively deprives the defendant of due process.'") (quoting Murphy v. Florida, 421 U.S. 794, 798-99 (1975)); Irvin, 366 U.S. at 722 (jurors not required to be "totally ignorant of the facts and issues involved"; "scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case"). What matters is whether the jurors have such fixed opinions that they cannot judge impartially the guilt of the defendant. Yount, 467 U.S. at 1035. Given the size and diversity of this District, the dates and nature of the publicity, and the date of the trial itself, "the suggestion that 12 impartial individuals could not be empaneled is hard to sustain." Skilling, 561 U.S. at 382.

2.    Defendant's Argument Ignores Evidence of Continued Support in the Community

Defendant highlights his status as a former county-wide elected official to suggest that the facts of his criminal case are well-known and likely have tainted the jury pool. But what defendant fails to acknowledge is that because of his years of service and electoral popularity, there is a well of good will in the county that inures to his benefit. Unlike the defendants in the above-cited cases, the people of the county and perhaps the District have known defendant as a public figure for decades; they likely know him from his prior campaigns and his good deeds and public service, which are catalogued in defendant's initial sentencing brief. Indeed, even

after pleading guilty to the felony crime of making false statements to the FBI, defendant was able to deliver to this Court 229 letters of support from members of the community and leaders in politics, law, religion, and other areas.  (See Ex. D to Defendant's Initial Sentencing Brief, Dkt. 34, as well as Dkt. 35 (Decl. of Michael Zweiback)) (listing letters from former California governors Arnold Schwarzenegger and Gray Davis, Los Angeles County Supervisor Don Knabe, former Los Angeles County Supervisors Yvonne Brathwaite Burke and Zev Yaroslavsky, former members of Congress, a sitting member of the Los Angeles City Council, former Los Angeles Dodgers manager Tommy Lasorda, and others).  And as the Court undoubtedly recognized, rather than being overrun by the press or detractors, this courtroom has at times been packed with defendant's supporters, so much so that some of his supporters were turned away at the July 18, 2016 hearing.

As recently as May 2016, while his sentencing was pending, defendant was honored with an award by Congregation Bais Naftoli in Los Angeles for his "nearly 50 years of service to the county community and for his longstanding friendship to the local Jewish community . . . ."  (See Gov. Ex. 6.)  In an article about the award, the president of the synagogue was quoted as saying that he was "positive that if Lee Baca were to run for re-election today, he would win in a landslide" and noted that everywhere he goes, defendant is bombarded by supporters.  (Id.; see also Def. Ex. 3 ¶ 1190 (news article regarding award)).  This clearly is not a community "obsessed" with defendant's criminal case, nor has the community displayed a "huge wave of passion" against him.  Harris, 885 F.2d at 1365 (facts did not reveal "sufficiently inflammatory"

"atmosphere in the community or courtroom"; "totality of circumstances" did not warrant finding of "community prejudice").

**B.    The Court Can Take Steps to Ensure an Impartial Jury**

It would be extraordinary for the Court to grant a change of venue at this stage due to pretrial publicity, when not a single potential juror has been questioned.  Defendant has failed to meet his burden under the theory of presumed prejudice and his motion should be denied.  While defendant may move again for a change of venue based on <u>actual prejudice</u>, should the Court deny this motion, there are steps the Court can take to ensure an impartial jury.  The government, in fact, has created a proposed jury questionnaire that be sent out to the venire in advance of trial.[10]  The government attaches this proposed jury questionnaire as Gov. Ex. 7.

The Court could also order an extra-large pool of potential jurors, and consider using its discretion to order jurors from all counties in the district, not just from the Western Division. Lastly, the Court can, as it typically does, question potential jurors during the voir dire process about their knowledge, opinions, and potential biases, and determine whether they can be fair and impartial.  <u>See</u> <u>Los Angeles Memorial Coliseum Com'n v. National Football League</u>, 726 F.2d 1381, 1400 (9th Cir. 1984) (denying motion for change of venue and noting, among other things, that "trial court used a very thorough voir dire process to ensure the jury panel members were not influenced by the publicity prior to trial, including administering a 48-page questionnaire . . . to all

_____

[10] The government shared this proposed questionnaire with the defense on October 7, 2016, but has not received any feedback from the defense.

14

prospective jurors, giving each side ten peremptory challenges instead of the normal three, and dismissing jurors for cause if even the slightest doubt of prejudice was raised.").  If the Court finds, based on the voir dire process, that actual prejudice may exist, the Court can have a back-up jury pool on stand-by in Santa Ana or elsewhere.

**IV.   CONCLUSION**

Defendant has not carried his burden of showing that the community has been saturated with inflammatory and prejudicial publicity about his case.  While this case is of public interest, as many cases in this district are, the trial atmosphere has not been "utterly corrupted" such that defendant cannot obtain a fair trial.  The idea that twelve impartial individuals could not be empaneled in this, the largest federal judicial district in the nation, is indeed "hard to sustain."  Defendant's motion should be denied.

## DECLARATION OF EDDIE A. JAUREGUI

I, Eddie A. Jauregui, declare as follows:

1.    I am an Assistant United States Attorney.  I am one of the prosecutors assigned to United States v. Leroy Baca, No. CR 16-66(A)-PA.

2.    Attached as Government Exhibit 1 is true and correct copy of a Wall Street Journal article entitled Patch Rebounds After Split from AOL, dated February 2, 2016, as accessed on the Wall Street Journal's website.

3.    Attached as Government Exhibit 2 is true and correct copy of a Central District of California Profile (2014), as found on the Central District's website.

4.    Attached as Government Exhibit 3 is true and correct copy of a Census Bureau Press release dated March 26, 2015, as found on Census.gov.

5.    Attached as Government Exhibit 4 is true and correct copy a Report of Registration as of September 9, 2016 (Registration by County), as found on the California Secretary of State's website.

6.    Attached as Government Exhibit 5 is true and correct copy of the landing page entitled "Advertise With Us" from the Los Angeles Downtown News website, as accessed on October 10, 2016.

7.    Attached as Government Exhibit 6 is true and correct copy of a May 31, 2016 news article from the Jewish Journal entitled "Ex-Sheriff Baca Is Honored by Congregation Bais Naftoli While Awaiting Sentencing."  The article is written by Ryan Torok.

//

//

16

8.     Attached as Government Exhibit 7 is a proposed jury questionnaire, which the government has shared with defense counsel on October 7, 2016.  As of the time of filing, the government has not received a response.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration is executed at Los Angeles, California, on October 10, 2016.

_____
Eddie A. Jauregui

17