# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF DOCUMENT DISCREPANCIES

FILED
CLERK, U.S. DISTRICT COURT

NOV - 7 2016

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

To: ☑ U.S. District Judge / ☐ U.S. Magistrate Judge  Percy Anderson

From: Andres _____ , Deputy Clerk    Date Received: 11/04/2016

Case No.: 2:16-cr-00066-PA _____    Case Title: USA v. Lee Baca

Document Entitled: Notice of Motion and Movant's Motion to Intervene

---

Upon the submission of the attached document(s), it was noted that the following discrepancies exist:

| | | |
|---|---|---|
| ☐ | Local Rule 5-4.1 | Documents must be filed electronically |
| ☑ | Local Rule 6-1 | Written notice of motion lacking or timeliness of notice incorrect |
| ☐ | Local Rule 7-19.1 | Notice to other parties of ex parte application lacking |
| ☐ | Local Rule 7.1-1 | No Certification of Interested Parties and/or no copies |
| ☐ | Local Rule 11-3.1 | Document not legible |
| ☐ | Local Rule 11-3.8 | Lacking name, address, phone, facsimile numbers, and e-mail address |
| ☐ | Local Rule 11-4.1 | No copy provided for judge |
| ☐ | Local Rule 11-6 | Memorandum/brief exceeds 25 pages |
| ☐ | Local Rule 11-8 | Memorandum/brief exceeding 10 pages shall contain table of contents |
| ☐ | Local Rule 15-1 | Proposed amended pleading not under separate cover |
| ☐ | Local Rule 16-7 | Pretrial conference order not signed by all counsel |
| ☐ | Local Rule 19-1 | Complaint/Petition includes more than 10 Does or fictitiously named parties |
| ☐ | Local Rule 56-1 | Statement of uncontroverted facts and/or proposed judgment lacking |
| ☐ | Local Rule 56-2 | Statement of genuine disputes of material fact lacking |
| ☐ | Local Rule 83-2.5 | No letters to the judge |
| ☐ | Fed. R. Civ. P. 5 | No proof of service attached to document(s) |
| ☑ | Other: | Not a party to the case. |

**Please refer to the Court's website at www.cacd.uscourts.gov for Local Rules, General Orders, and applicable forms.**

---

### ORDER OF THE JUDGE/MAGISTRATE JUDGE

IT IS HEREBY ORDERED:

☐  The document is to be filed and processed. The filing date is ORDERED to be the date the document was stamped "received but not filed" with the Clerk. Counsel* is advised that any further failure to comply with the Local Rules may lead to penalties pursuant to Local Rule 83-7.

_____          _____
Date                             U.S. District Judge / U.S. Magistrate Judge

☑  The document is **NOT** to be filed, but instead **REJECTED**, and is ORDERED returned to counsel.* Counsel* shall immediately notify, in writing, all parties previously served with the attached documents that said documents have **not** been filed with the Court.

11/7/16 _____          _____
Date                             U.S. District Judge / U.S. Magistrate Judge

\* The term "counsel" as used herein also includes any pro se party. See Local Rule 1-3.

| COPY 1 -ORIGINAL-OFFICE | COPY 2 -JUDGE | COPY 3 -SIGNED & RETURNED TO FILER | COPY 4 -FILER RECEIPT |
|---|---|---|---|

Laurack D. Bray
P.O. Box 611432
Los Angeles, California
Tel. : (805) 901-2693

Movant Pro Se

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,      )   NO. CR 16-66(A) - PA
                     Plaintiff, )
                                )   NOTICE OF MOTION AND MOVANT'S
v.                              )   MOTION TO INTERVENE AND MOTION
                                )   TO DISMISS DEFENDANT LEE BACA'S
LEROY BACA,                     )   INDICTMENT FOR SELECTIVE PROSE-
PROSECUTION                     )   CUTION AND/OR ENFORCEMENT AND
          Defendant.            )   FOR SELECTIVE **NON**-PROSECUTION
                                )   AND/OR  ENFORCEMENT
                                )
                                )
                                )   Hearing date  : TBD
                                )   Hearing Time : TBD
                                )   Location  :  TBD by Judge
                                )                    Percy Anderson

RECEIVED BUT NOT FILED
CLERK, U.S. DISTRICT COURT

NOV - 4 2016

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

Prospective intervenor  and Movant ("Movant") Laurack D. Bray, a Black male,

and proceeding pro se, hereby moves the Court to intervene in the above-entitled

case for the purpose of filing a motion to dismiss Defendant Leroy ("Lee") Baca's

indictment for the government's (i.e., the Federal Bureau of Investigation, or FBI;

1

the United States Attorney's Office in Los Angeles, or USAO; or the U.S. Justice Department, or DOJ; or any other DOJ agencies or agents that were utilized to prosecute Defendant Baca (and Tanaka)) selective prosecution of Baca (and Paul Tanaka) or selective enforcement of the federal criminal laws in prosecuting Baca (and Tanaka); and the government's selective non-prosecution of the accused (or, hereinafter, "defendants") in Movant's submitted or filed criminal-civil rights Complaint with the FBI and the USAO,  on the grounds that:

1.  Movant has met the requirements to intervene in the above-entitled proceeding or case.

2.  Movant has met the requirements for having Defendant Baca's indictment dismissed for the government selectively prosecuting Baca , or selectively enforcing  the federal criminal laws against Baca, while selectively refusing to prosecute the defendants in Movant's criminal Complaint, or selectively refusing to enforce the law against them.

3.  Both the motion to intervene and the motion to dismiss are necessary and required in order to avoid a miscarriage of justice.

WHEREFORE, Movant requests the Court to grant both his motion to intervene and his motion to dismiss Baca's indictment, and thereafter to afford the appropriate relief.

## POINTS AND AUTHORITIES IN SUPPORT OF MOTIONS

## I MOVANT HAS MET THE REQUREMENTS FOR INTERVENTION IN THE BACA CASE.

### A. TIMELINESS OF THE MOTIONS

Movant has filed this pre-trial motion in as reasonably expeditious time as possible under the circumstances. The time the motion is being filed is based on the time Movant first filed his criminal Complaint with the government, August 22, 2016, determined that the government was not prosecuting his Complaint, October 15, 2016 or before, and determined that Defendant Baca was not going to file a motion to dismiss himself, October 22, 2016—Movant gave Baca until October 21, 2016 to let Movant know if he was going to file a motion to dismiss—Baca did not contact Movant; and the date Baca's trial is scheduled (December 6, 2016).

## B. THE MOST BASIC AND/OR FUNDAMENTAL REQUIREMENT FOR FOR INTERVENTION IS "INTEREST" THAT NEEDS PROTECTION, AND PROSPECTIVE INTERVENOR HAS MET THAT REQUIREMENT.

It seems clear now that intervention in a federal criminal proceeding cannot be based solely on the *civil* Rule 24 for intervention in a federal civil proceeding, "There is no provision in the Federal Rules of Criminal Procedure for intervention by a third party in a criminal proceeding, intervention in civil proceedings is governed by Rule 24 of the Federal Rules of Civil Procedure, which does not apply in a criminal case. United States v. Kollintzas,501 F.3d 796 (7th Cir. 2007). However, both Movant and the Court can certainly rely on Rule 24 for guidance in deciding whether or not prospective intervenor has met the requirements for intervention. See, e.g., Fed. R. Crim.P., Rule 57(b), where "A judge may regulate practice in any manner consistent with federal law, these rules , and the local rules of the district."

Thus, Movant will rely on the Court's discretion and inherent authority to regulate its court proceedings and Rule 57(b) as authority for granting intervenor relief.

Now, Movant proceeds to the interest requirement. In being guided by the provisions of Rule 24, Section (a)(2) states, in pertinent part, "the court

4

(may) permit anyone to intervene who : (2) claims an interest relating to the . .

. . *transaction* that is the subject of the action, and is so situated that

disposing of the action may as a practical matter impair or impede the

movant's ability to protect its interest, unless existing parties *adequately*

represent that interest."   Emphasis added.   Because this Court's grant of

intervention will be discretionary, rather than required, intervenor has

substituted the word "may" for the word "must" in the aforementioned

quoted provision.

　　But, intervenor has met this "interest" requirement.  Movant's "interest",

"relating to the transaction (i.e., prosecution of Defendant Baca) that is the

subject  of the action (i.e., Baca's criminal trial)", is in having the defendants

named and/or identified in Movant's criminal Complaint prosecuted and

punished or held accountable for their criminal conduct.   Further, Movant has

an interest in properly caring for his mother, and a conviction of the Defendant

judges would probably result in a vacation of the improper conservatorship

and restraining order judgments which were entered by the respective judges.

And, those interests "(are) so situated that disposing of the action (i.e., trial)

(without the intervention and motion to dismiss) may as a practical matter

5

impair or impede the movant's ability to protect its interest, unless existing

parties adequately represent (those) interest(s)."

1. **HOW CAN MOVANT ACHIEVE OR SATISFY THESE INTERESTS THROUGH THE GRANT OF A MOTION TO DISMISS THE INDICTMENT AGAINST DEFENDANT BACA ?**

Movant can achieve or satisfy these interests through a grant of the motion in this way : If the Court grants the motion to dismiss, it will ordinarily, similar to a habeas corpus reversal of a state court conviction (where a federal court usually offers the government the option of either trying the Defendant again or releasing him from custody)  offer the government the  option of either prosecuting the defendants in Movant's criminal Complaint or having Baca's  indictment dismissed *with* prejudice.   However, the options would be exercised differently based on who brought the motion to dismiss.

If Baca would have filed the motion to dismiss, he could have requested the Court, as relief, to dismiss his indictment  *with* prejudice, if the government chose not to prosecute the Complaint defendants.   However, Baca did not bring the motion, and, therefore cannot request any relief based on the grant of the motion itself (because it's not his motion),  so the most that he can get is a dismissal without prejudice (depending on how the Court views the matter).

However, since Movant is filing the motion, and not Baca, the Court must consider granting the relief requested by Movant.  And, Movant is requesting that the Court order the government to prosecute the Complaint defendants; and the Court has the power and authority to do so.  Therefore,  because Movant is bringing the motion, and not Baca, the government will be without an option if the Court grants  Movant's requested relief, and prosecution of the Complaint defendants is the *only*  relief Movant can derive from filing the motion (for Movant is only bringing the motion on his own behalf—but, as a matter of justice, on behalf of other similarly-situated Black males)(and to a lesser and necessary extent, other minorities).  But, unless the Court dismiss the indictment <u>with</u> prejudice, the government will be able to indict Baca again .

Finally, as mentioned above,  Movant also has an interest in the proper care of his mother, and it is most probable that with a conviction of the Defendant judges and commissioner , the judgments of those individuals, including the conservatorship judgment , will be vacated.

And, clearly, Movant has standing to invoke the Court's jurisdiction and intervention, because he has asserted  "a personal stake in the outcome of the

7

controversy" and he has suffered 'some threatened or actual injury resulting from the putatively illegal action (i.e., the government's refusal to prosecute the Complaint defendants based on *race,* or their being white, or selective prosecution). . . .' " (Citations omitted). <u>Warth v. Seldin</u> , 422 U.S. 490 (1975).

2. EXISTING PARTIES CANNOT ADEQUATELY REPRESENT MOVANT'S INTEREST

The government certainly cannot and will not represent Movant's interest because it is opposed to Movant's interest. In fact, the government created Movant's interest by refusing to prosecute the individuals in his Complaint in the first instance.

And, defendant Baca cannot adequately represent Movant's interest because he has refused to file a selective prosecution motion. I have concluded that he is not filing a motion based on his failure to respond to a letter that I wrote to him, informing him that without a response I would "assume , and accept as your decision that you do not wish to go forward with the defense" (Movant gave him until October 21, 2016 to respond—he has not responded, in any way).

**II MOVANT HAS MET THE REQUIREMENTS FOR PROVING THAT THE GOVERNMENT HAS SELECTIVELY PROSECUTED BACA AND PAUL TANAKA AND SELECTIVELY NOT PROSECUTED THE INDIVIDUALS IN MOVANT'S CRIMINAL COMPLAINT.**

The selective prosecution claim or defense (and in Movant's case, it is a claim) is grounded in a claim of discrimination which is founded on the U.S. Constitution and the Fifth and Fourteenth amendments dealing with due process and equal protection of the laws, which provides protection from governmental discrimination. The discrimination in this case is being asserted against the Federal Bureau of Investigation (FBI) and the U.S. Attorney's Office (USAO) in Los Angeles, in essence, the U.S. Justice Department.

Movant is basically asserting that the Justice Department's California agencies have selectively chosen to investigate and prosecute criminal claims or laws against Defendants Leroy ("Lee") Baca and Paul Tanaka because of their race, ethnicity, or color, or being non-white (upon information and belief, Baca is of Hispanic or Latin heritage and Tanaka is of Asian heritage), and, conversely, have chosen not to investigate and prosecute criminal laws or claims against the white defendants in Movant's Complaint, see Exhibit #1, especially Superior Court of California judges David J. Cowan and Carol Najera (Movant is unsure of Najera's race or color, for he did not actually appear

9

before her in person, so her being designated as white here is an assumption), California Second District Court of Appeal judge Laurie Zelon, and L.A. County Superior Court Commissioner Stephen M. Lowry.   These individuals are particularly identified for the similarly-situated requirement, see infra. Additionally, Movant charge that the aforesaid white Defendants were not charged because Movant (who is also a victim) is a  Black male.   Movant argues that this disparate treatment violates the Equal Protection Clause of the Fourteenth and Fifth Amendments, and requires the Court to provide relief for the constitutional violation(s).

### A.  A DEFINITION OF SELECTED PROSECUTION THAT MOVANT  WILL RELY ON

While  there may be various definitions of selective prosecution, Movant shall rely, at least in part, on the definition set forth by uslegal.com, "Selective Prosecution Law & Legal Definition", where :

"Selective prosecution happens when a criminal prosecution is brought at the discretion of. . . prosecutor(s) ( i.e., personally and intentionally choosing illegal factors such as race) rather than as a matter of course in the normal functioning of the prosecuting  authority's office (i.e., a decision based on the

10

facts, law, and evidence of the case).  It can also be enforcement or prosecution of criminal laws against a particular class of persons and the simultaneous failure to administer criminal laws against others outside the targeted class.  Selective prosecution violates the Equal Protection Clause of the 14th Amendment  if a defendant is singled out for prosecution when others similarly-situated have not been prosecuted. . . ."

Moreover , "a prosecutor's discretion is 'subject to constitutional constraints' . (Citation omitted).  One of these constraints, imposed by the equal protection component of the Due Process Clause of the Fifth Amendment (citation omitted) is that the decision whether to prosecute may not be based on 'an unjustifiable standard such as *race*, religion, or other arbitrary classification' (Citation omitted).  U.S. v. Armstrong, 517 U.S. 456 (1996).  "The requirements for a selective prosecution claim draw on 'ordinary equal protection standards.' " Id.

### B. PURSUANT TO U.S. V. ARMSTRONG , MOVANT HAS EASILY  MET THE REQUIREMENTS TO DEMONSTRATE OR PROVE A SELECTIVE PROSECUTION CLAIM AND/OR  VIOLATION

11

Although Movant must and will rely on *Armstrong* in demonstrating that he has met the requirements for providing his selective prosecution claim, in some respects Armstrong is simply not applicable. That is, while Armstrong was based on policy, statistics, and discovery, this case is not. This case is based on direct or disparate treatment discrimination, not "impact" discrimination, so it is unnecessary to search for and gather data or statistics to try and find similarly-situated defendants. They have already been found. Thus, discovery is also unnecessary.

In Armstrong, the Court stated " 'the requirements for a selective prosecution claim draw on 'ordinary equal protection standards'. . . . The claimant must demonstrate that the federal prosecutorial policy had a discriminatory effect and that it was motivated by a discriminatory purpose." Id. "To establish a discriminatory effect in a *race* case, the claimant must show that similarly-situated individuals of a different race were not prosecuted." Id. (Emphasis added).

## 1. A DEMONSTRATION OF DISCRIMINATORY "EFFECT"

Again, as pointed out above, the Armstrong Court stated, "To establish a discriminatory effect in a race case (which this case is), the claimant must

12

show that similarly-situated individuals of a different race were not prosecuted." Id.  Movant, here, has done so.  The individuals in Movant's Complaint charged with committing federal crimes are mostly white, and they were neither investigated nor prosecuted.

And, they (both the Baca-Tanaka defendants and the white defendants, referred to here as the "Cowan defendants", referring to the white defendants in Movant's criminal Complaint—upon information and belief, at least California Superior Court judge David J. Cowan, California Court of Appeals judge Laurie Zelon, and Superior Court Commissioner Stephen Lowry)  are **materially**  similarly-situated in the following ways :

1. Both the Baca-Tanaka defendants (or minority high level defendants) and the Cowan defendants (with Cowan representing all of the white high level officials in Movant's Complaint) are state officials (as opposed to ordinary citizens or federal officials).

2.  Both the Baca-Tanaka defendants and the Cowan defendants are high level state officials charged (through either Movant's Complaint or government or grand jury Complaint, information, or indictment) with committing federal

13

crimes or offenses (although, in the law, their level or rank is irrelevant as to prosecution for the crimes charged).

3. Both the Baca-Tanaka defendants and the Cowan defendants are charged with federal crimes or offenses which arose or evolved from an *initial* determination or complaint of civil rights abuses requiring or calling for federal investigation.   See Movant's Complaint, et. seq.; and see Exhibit #2, Baca's Indictment, at p. 4 , where  "The Federal Investigation of the LASD" and "10. Some of the criminal investigations conducted by the DOJ, FBI, USAO, and federal grand juries included allegations of : (a) civil rights abuses. . . ."; and "11.  Inmate AB was an inmate in the custody of the LASD at MCJ who was a cooperating witness in a *federal investigation of alleged federal civil rights. . . violations* committed by employees of the LASD working at the Los Angeles County jail (the "Federal Investigation"),  and  "Additionally, Inmate AB was providing *information about alleged federal civil rights offenses* being committed by employees of the LASD  working at MCJ  who were allegedly abusing inmates."   See also Exhibit #3, Paul Tanaka's Indictment,  at p. 7, where  "The Federal Investigation of the LASD"  and  "15.  Inmate AB was an inmate in the custody of the LASD  at the MCJ who was a cooperating witness

14

in a *federal investigation of alleged federal civil rights and public corruption violations . . . .*"; and "Additionally , Inmate AB was providing information about *alleged federal civil rights offenses* being committed by employees of the LASD working at the MCJ who were allegedly abusing inmates"; and "16. Special Agent LM and Special Agent DL were Special Agents with the FBI. Special Agent LM and Special Agent DL were among *the FBI agents participating in the Federal Investigation probing civil rights abuses and public corruption offenses* occurring within the  Los Angeles County Jails."

4. There were sufficient allegations of violations of federal criminal law by both the Baca-Tanaka defendants  (apparently by the gov't's investigation and indictment of both) and the Cowan defendants (see Exhibit #1,  Movant's Complaint) for a federal investigation of both sets of defendants, see also Exhibit #4 ("Standards for FBI investigation—Investigation Required", one page only, "Title 8-86" page number);  and sufficient probable cause evidence for the arrest of both sets of defendants, the Baca-Tanaka defendants (apparently by the gov't's arrest and prosecution of Baca and Tanaka) and the Cowan defendants (see Exhibit #1, Movant's criminal Complaint supported by evidence).  Further,  Cowan, at least, and defendant Armen Gregorian could

15

and can easily be charged with obstruction of justice and conspiracy to
obstruct justice, as were  Baca and Tanaka.

So, Movant has demonstrated discriminatory effect, and the requirement
of discriminatory effect.

Moreover, Paul Tanaka, of Asian heritage, was convicted and sentenced to
5 years of imprisonment for the commission of his federal crimes, while the
white defendants in my Complaint are not facing any prosecution or
imprisonment  for their commission of similar federal crimes.   This is
"indisputable evidence" that the government's refusal to investigate and
prosecute Cowan (and the other white defendants) had a discriminatory effect
on Tanaka and Baca (who faces the same faith as Tanaka).   The Court stated,
in part, "if the claim of selective prosecution (is) well founded, it should not
( be) an insuperable task to prove that persons of other races were being
treated differently than respondents." Id.   Movant agrees.   Thus, this is
further proof that his claim is well founded.

## 2.  A DEMONSTRATION OF DISCRIMINATORY "PURPOSE"

Clearly, Armstrong suggested and dictated that discriminatory "effect"
and discriminatory "purpose" are inextricably intertwined ,   and that proof of

16

effect also provides proof of purpose.    That is,  "The Courts of Appeals 'require some evidence tending to show the existence of the *essential elements of the defense'* , discriminatory effect and discriminatory intent."  Id.  And, then, "In the case before us, respondents 'study' did not constitute 'some evidence tending to show the existence of *the essential elements of a selective prosecution claim.'* (Citation omitted).    The study failed to identify individuals who were not black, could have been prosecuted for the offenses for which respondents were charged, but were not so prosecuted."  Id.

Movant, on the other  hand, has identified individuals who are white (Cowan, Zelon, Lowry, at least--Movant  is  unsure of  Superior Court judge Carol Najera's race or color), who could have been prosecuted for the offenses for which respondent (Baca)(and Tanaka) were charged, but were not so prosecuted."   And, Cowan, Zelon, and Lowry, were *"known to federal law enforcement officers, but were not prosecuted in federal court."*  Id.  "We think the required threshold—a  credible showing of different treatment of similarly situated persons—adequately balances the Government's interest in vigorous prosecution and the defendant's interest in avoiding selective prosecution."  Id.

17

Apparently, with strong enough evidence of discriminatory effect , discriminatory purpose may be inferred.

**III  SO WHAT IS THE PROPER REMEDY?  MOVANT REQUESTS THAT THE  COURT ORDER THE JUSTICE DEPARTMENT (FBI  AND USAO) TO PROSECUTE THE DEFENDANTS IN MOVANT'S CRIMINAL  COMPLAINT.**

Regarding a remedy for a finding of selective prosecution, the Armstrong Court stated,  "We have never determined whether dismissal of the indictment,  or **some other sanction,** is the proper remedy if a court determines that a defendant has been the victim of prosecution on the basis of his race." Id. (Emphasis added).   And, since it was the government that suggested dismissal, and not the defendants themselves, the Court did not have to decide what a proper sanction or remedy is.

Thus, Movant is not precluded from offering and requesting prosecution of the defendants named in his Complaint as a remedy.   "In theory, a court might try to correct selective prosecution by ordering the state to prosecute the similarly situated members of other races who had so far escaped punishment."  Richard H. McAdams, "Race and Selective Prosecution: Discovering the Pitfalls of Armstrong," 73 Chicago-Kent Law Review 605 (1998).  In support of this "theory", McAdams offers an additional notion,

18

"Arguably, a prosecutor cannot legitimately decide not to charge someone with murder if the prosecutor believes the individual committed the crime and that a jury will convict.   On this view, murder is simply too serious an offense to be subject to discretionary nonenforcement.  The only appropriate remedy for selective prosecution is an order to prosecute the remaining offenders." Id. Movant believes such is the case here, even though the defendants are not being charged with murder.  Movant believes that the seriousness of the constitutional offenses involved, along with the particular actors involved, e.g., Superior Court judges, a Court of Appeal judge, and a Superior Court Commissioner, makes prosecuting "the remaining offenders" an appropriate, and perhaps the only appropriate, remedy for the selective prosecution in this case.  So,  in theory, at least, prosecuting the Defendants in Movant's Complaint is a possible remedy.   Thus, although "The conventional remedy for such claims is dismissal of the criminal charges, an apparent windfall for the perpetrator", Id.,  Movant believes that prosecuting  "the remaining offenders" is beyond theory.  It is simply practical and prudent.  And the Court certainly has the power and authority to issue the remedy.

19

Therefore, Movant contends (and requests) that, upon a finding of selective prosecution in this case, the Court should and must order the government to prosecute the Defendants in his Complaint, for at least two reasons:

## A. DEFENDANT BACA DID NOT FILE THE MOTION, SO HE CANNOT REQUEST THE DISMISSAL OPTION

Defendant Baca did not file the motion, rather Movant did, therefore, Baca has no right to request any kind of relief based on the grant of the motion. Baca must accept any relief the court issues for the motion. Had Baca filed the motion himself, he could have requested a dismissal *with* prejudice. But, now, he can't.

## B. THE ONLY MEANINGFUL RELIEF THE COURT CAN GRANT MOVANT IS AN ORDER FOR THE GOVERNMENT TO PROSECUTE THE DEFENDANTS IN MOVANT'S CRIMINAL COMPLAINT.

As actual *relief* for the motion, Movant is neither seeking nor would he be satisfied with a dismissal of Baca's indictment.

The only meaningful relief Movant can receive for a grant of the motion is for the Court to order the government to prosecute the Defendants in his Complaint. Indeed, that is the main reason for Movant filing the motion himself, on his own behalf, in addition to achieving justice for Movant as a

20

Black male, and for other Black males in particular, and for minorities in general.

## CONCLUSION

Movant has satisfied the requirements for a grant of his motions, both to intervene and to dismiss Baca's indictment for selective prosecution of Defendant Lee Baca (or for selective enforcement of the federal criminal laws).

The only meaningful relief, and the relief Movant seeks, that the Court can grant Movant is to prosecute the individuals named and/or identified in his criminal civil rights Complaint.  Justice requires nothing less.

PROOF OF SERVICE

I hereby certify that a copy of the foregoing Motion to Intervene and the Motion to Dismiss the Indictment of Defendant Leroy Baca for selective prosecution /enforcement  and  selective non-prosecution/enforcement was mailed, postage pre-paid to :

1.  Eileen M. Decker
    United States Attorney
    1500/1200 United States Courthouse
    312 North Spring Street
    Los Angeles, California  90012     by  Priority Mail

2.  Nathan J. Hochman
    Morgan Lewis and Bockius  LLP
    The Water Garden
    1601 Cloverfield Boulevard , Suite 2050  North
    Santa Monica, CA  90404-4082     by Priority Mail

On this 3rd   day November,  2016.

Laurack D. Bray, Esq.

22

# Exhibit 1



**U.S. Department of Justice**

RECEIVED
U.S. ATTORNEY'S OFFICE

*United States Attorney*CORNIA
*Central District of California*

2016 AUG 22 AM 11:01

*United States Courthouse*
*312 North Spring* CRIMINAL DIVISION
*Los Angeles, California 90012*

) 894-8809

DATE ___August 22, 2016___

## COMPLAINT REPORT

**Instructions:**    A complaint regarding a federal crime may be registered with the United States Attorney's Office for the Central District of California, by completing this form and delivering it to the receptionist or mailing it to: United States Attorney's Office, 312 North Spring Street, Los Angeles, California 90012, ATTN: Citizen Complaint Coordinator.  Use the reverse side of this form if more space is required.

### Your information

Name: ___LAURACK D. BRAY___

Address: ___P.O. BOX 611432___

City, State, Zip Code: ___LOS Angeles, CA 90061___

Telephone: Area Code (805) Number: ___901-2693___    Age: ___6___

Occupation: ___LAWYER___

1. What federal crime do you believe has been committed? _____

    ___SEE Attached "Complaint REPORT"___

2. Explain in detail what you know about the crime, including when and where it occurred, what you have heard and observed and when you heard and observed it, what others have told you (include their names) and what other evidence may exist.

    ___SEE Attached "Complaint Report"___

3. Have you reported the crime to any federal, state, or local offices or agencies? ___NO___

    If yes, who did you report it to, when did you report it, and what action was taken?

SEE Attached "Complaint Report"

3. Have you reported the crime to any federal, state, or local offices or agencies? __NO__

If yes, who did you report it to, when did you report it, and what action was taken?

4. Have you reported the crime to a private attorney? __NO, I AM A private attorney.__

If yes, who did you report it to, when did you report it and what action was taken?

Revised April 06, 2007

RECEIVED
U.S. ATTORNEY'S OFFICE
C.D. OF CALIFORNIA

2016 AUG 22 AM II: 02

12TH FL. CRIMINAL DIVISION

**COMPLAINT REPORT**

**PART #1**
**(Introduction)**

August 22, 2016

TO: Federal Bureau of Investigation (FBI)

FROM: Laurack D. Bray, Complainant

RE: Federal Criminal/Civil Rights Complaint

This Complaint is being submitted or filed against the identified individuals, and it arises from a conservatorship proceeding/hearing that took place in June, 2015 in the Superior Court of California, Los Angeles County, and continued through subsequent proceedings in the California Court of Appeals, Second District and the Superior Court's Compton Courthouse that extended to June 24, 2016.

However, this Complaint should not be reviewed in a vacuum or in isolation. Rather, it should be reviewed within the following contexts:

1. A current class action civil rights complaint filed with the U.S. Department of Justice in Los Angeles, alleging "that court-appointed attorneys routinely violate the Americans with Disabilities Act during limited-conservatorship proceedings." L.A. Times, "Disability complaint targets Superior Court," June 27, 2015. "The court-appointed attorneys represent the conservatees during the process." Id. "The court also places a conflict of

1

interests on these attorneys, the Complaint alleges." Id.  "The court requires attorneys to advocate for the client while assisting the court in resolving the matter, violating the client's rights to due process, the complaint alleges." Id.

Finally, "Thomas F. Coleman, an attorney and Executive director of the Disability and Guardianship Project who filed the complaint, called on federal authorities to investigate and force court officials to 'clean up their act.'" Id. "Last month, federal authorities announced they were investigating the allegations." Id.

This criminal complaint is directed towards that aspect of the aforementioned civil rights complaint that deals with a "conflict of interest" being placed on court-appointed attorneys, that is, "The court requires attorneys to advocate for the client while *assisting the court* in resolving the matter, violating the client's right to due process." Emphasis added.  More specifically, this criminal complaint is directed to the relationship between the court-appointed attorneys and the court (in conservatorship cases), and how that relationship evolved into criminal and constitutional violations in my case.

2. The status of the accused should also be considered in reviewing this Complaint. The primary defendants are an attorney, judges, a commissioner, and an investigator.  One judge is an appellate judge of the California Court of Appeal. The point of this disclosure is that these individuals, in my opinion, because of their status and relationship to the justice system, should be held to a higher standard than the average citizen because their conduct relates specifically to the

2

justice system and process.  And that higher standard causes their misconduct to be more significant.

3.  The FBI should also consider the more particular and specific status of the primary defendants or accused in this matter.  That is, they are all "officers of the court", not ordinary or regular citizens.  An "officer of the court" is "(A)ny person who has an obligation to promote justice and effective operation of the judicial system, including judges, the attorneys who appear in court, bailiffs, clerks, and other personnel.  As officers of the court lawyers have an absolute *ethical duty* to tell judges the **truth**, including avoiding *dishonesty. . . .*" Legal-Dictionary.The Free Dictionary.com.  Emphasis added.

4.  The Department of Justice has just recently prosecuted several high profile or high level officials from the L.A. County Sheriff's Department, such as Sheriff Lee Baca and Undersheriff Paul Tanaka for civil rights or civil rights related violations, and that should also be considered.

5.  Most of the individuals charged in this Complaint are charged with lying or making false statements.  Sheriff Lee Baca was convicted of making a false statement to federal officials.

To federal judges and federal courts, lying or making false statements is a big thing.  "Federal Judge Beth Labson Freeman of San Jose last week found that Merck & Co. *lied* to a business partner and to the court itself.  Freeman threw out a patent infringement (decision) Merck had won against Gilead Sciences, and overturned a $200-million jury award."  "Judge Finds drug firm lied", June 12, 2016.  "She described the company's behavior as 'systematic and outrageous deception in conjunction with unethical business practices and

3

*litigation misconduct.'* That conduct included **lying** to Phamasset. . . and **lying** under oath at deposition and trial.' " Id. (emphasis added). "What irked the judge even more, she ruled, is that Durette **lied**. In a deposition, he repeatedly denied having been on call. He recanted at trial only after he was confronted with notes taken by a Pharmasset employee during the call, proving that he had participated. At that point, he pleaded a faulty memory.

So lying or making false statements are a big thing to federal judges and federal courts, even if they may not be to state officials or judges; and the FBI should consider this in evaluating this Complaint.

6. False Evidence —The following concepts are taken from a criminal case, but the use of false evidence in a civil case can be no less significant (as is the due process right to a fair trial in both civil and criminal cases). The case is the U.S. Supreme Court case of Napue v. Illinois, 360 U.S. 264 (1959) :

1. "It is established that a conviction (or judgment) obtained through use of false evidence known to be such by representatives of the State, must fall under the Fourteenth Amendment."

2. "The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears."

3. "A lie is a lie, no matter what its subject, and if it is in any way relevant to the case, the district attorney (or an attorney) has the responsibility and duty to correct what he knows to be false and elicit the truth. . . . That the district attorney's (or an attorney's) silence was not the result of guile or a desire to

4

prejudice matters little, for its impact was the same, preventing, as it did, a

trial (or a hearing) that could in any real sense be termed fair."

## COMPLAINT REPORT

## PART #2

Laurack D. Bray
P.O. Box 611432
Los Angeles, CA 90061
(805) 901-2693
Lawyer

Method of Responding :  I will generally respond to this report by addressing questions #1 and #2 (of the Complaint Report form) and responding to them regarding each specifically-named individual.   That is, I will name or identify the individual or individuals, and thereafter, address questions  #1 and #2 (for each individual named).

1.  Name of individual that I believe committed a federal crime :   Armen Gregorian, attorney.

   Question #1.  What federal crime do you believe has been committed? (Hereinafter "Question #1").

      **ANS. :**   18 U.S.C.  secs.  241 and 242.   I believe attorney Armen Gregorian committed the crime of willfully depriving  or causing  me to be deprived of a fair and impartial process in arriving at a  conservatorship decision and of the conservatorship appointment itself or a conservatorship judgment (so that I could take charge of my mother's affairs) in the Superior Court of California, Los Angeles County, Case No. BP159733;  in violation of the Constitution and laws

6

of the United States, and/or he deprived me of those rights "secured or protected by the Constitution and laws of the U.S.", and under the color of California or other law, by submitting false evidence in a prepared report for the specific purpose of causing me to be denied a conservatorship judgment in my favor (and I was *denied* the appointment or judgment); and I believe that he conspired with judge David J. Cowan of the Superior Court of California, Los Angeles County in depriving me of my constitutional rights under color of law.

And, Gregorian's efforts in causing me to be deprived of a due process fair and honest judgment was successful because the trial judge, in fact, relied on the false statement and/or false evidence in reaching his conservatorship decision . That is, I was denied the conservatorship, based, at least in part, on the false evidence or false statement submitted by Gregorian. And, Gregorian inserted the false statement into his report *specifically* to accomplish the goal of my being denied the conservatorship, and he was successful.

I believe Gregorian and judge Cowan worked together in denying my conservatorship, and Gregorian really wasn't representing the best interest of my mother, the conservatee (although he did present at least one of her wishes, overall, he did not represent her best interest in terms of what was "best" for her) . The relationship between Gregorian and Cowan is what caused Cowan not to correct or discipline Gregorian and to rely on Gregorian's false evidence to support his (Cowan's) conservatorship decision.

Question #2. Explain in detail what you know about the crime, including when and where it occurred, what you have heard and observed and when you heard

and observed it, what others have told you (include their names) and what other
evidence may exist. (Hereinafter "Question #2").

**ANS.:** I know that Gregorian submitted a Probate Volunteer Panel ("PVP")
Report containing a false statement and/or false evidence to the Superior Court
of California, Los Angeles County, in the case of the Conservatorship of Helen H.
Davis, BP159733, see Exhibit #1 (Page (and title page) from Gregorian's PVP
Report showing false statement). I know the proof of the false statement came
from myself, through my testimony, under oath, at the June 4, 2015 hearing on
the conservatorship matter, see Exhibit #2 (Cowan Reporter's Transcript #1, June
4, 2015 ("CRT1"), p. 2, line 25 to p. 3, line 5, where I stated that the statement
was "absolutely false", and I know that my testimony was corroborated by my
sister and now conservator Dianne Jackson, who was present and testified at the
June 4th, 2015 hearing that "His attempt to take her to the bank was intervened
by the Carson Police Department who told him he could not take her out of the
facility.... He couldn't take her to the bank." Exhibit #2 )(CRT1), at p. 3, lines 13-
28. And, "He came. He tried to take her out, but the police stopped it. That's the
only thing that happened." Id. As a matter of fact, I was attempting to take my
mother to the bank, so that she could put me on her account, so that I could
continue paying her bills, not to withdraw money. In any event, the statement is
false because it states that I completed the act of taking my mother to the bank
"to withdraw money", and whatever the reason I attempted to take my mother to
the bank, the act was never "completed". That's why the statement is false.

I know that when I confronted Gregorian and Cowan in court, at the hearing,
about the false statement, initially, that they both remained silent for a period of

8

time, before Cowan asked a question about my mother, the conservatee. When I confronted them a second time, see Exh. #2 (CRT1), at p. 4, line 19, where, "Judge, let's not get away from this point about the false statement because I think it was a (sic) egregious statement, and I think that I am going to take action. . . ."), still nothing was done by Gregorian or Cowan. Cowan never asked Gregorian about the statement.

I know that Gregorian never voluntarily withdrew the statement, and I know that Cowan never made Gregorian withdraw the statement, and that Cowan did not disregard the statement. In fact, Cowan chose to believe the statement, notwithstanding the evidence dictating otherwise; and he relied on the false statement in reaching his conservatorship decision, see Exhibit #3 (Cowan Reporter's Transcript #2, June 12, 2015 ("CRT2"), p. 46, lines 12-18, where "There's compelling evidence that it would not be in the proposed conservatee's best interest for Mr. Bray to be her conservator . . . . That is not in Ms. Davis's interest, including *taking money out of her account*" (emphasis added); that is, he denied me the conservatorship "with prejudice", and he deprived me of the conservatorship and a conservatorship judgment based, at least in part, on the false statement, which was a denial of both procedural and substantive due process and my due process rights.

I know that Gregorian was a court-appointed attorney, assigned, upon information and belief, by Cowan. Cowan never criticized Gregorian during the hearing, where criticism would appear to be dictated, e.g., regarding the false statement, and see below or next.

9

I know that Gregorian made another false statement during the hearing, which I objected to and to which Cowan overruled my objection. See Exh. #3 (CRT2), at p. 43, lines 21-27.

I know that even though Gregorian was supposed to be representing my mother, the conservatee, in actuality, he represented my sister during the hearing. He met with her on at least two separate occasions, on two separate hearing days, and he supported her during the hearing. And, I believe this, in turn, created a disservice to my mother, because Gregorian refused to be critical of my sister's faults, to the detriment of my mother, the conservatee.

Finally, I observed that the act of submitting a false statement in a report that is submitted to the court is a violation of CA Penal Code, Section 134 , which prohibits and penalizes such conduct or activity, which means it's a crime, and which helps demonstrate the significance of the false statement being submitted to deprive me of a judgment and appointment in my favor.

2. Name of individual that I believe committed a federal crime : Superior Court of California, Los Angeles County judge David J. Cowan

Question #1. What federal crime do you believe has been committed (hereinafter "Question #1") ?

ANS. : 18 U.S.C. sec. 241 and 242. I believe the crime of willfully depriving me of a conservatorship judgment and appointment without due process of law, and in violation of the Constitution and laws of the United States, at least, and under the color of law, was committed. I believe that part of the Due Process

10

I observed that judge Cowan had accepted the "truth" of the statement at the beginning of the proceeding, i.e., "That's consistent with what Ms. Davis wants and for *other reasons* stated in. . . the Reports including that. . . contentions that *Mr. Bray has been using money of Ms. Davis that perhaps he should not have been doing. . . .*" (Emphasis added). Id. , p. 2, lines 2-6; and he refused to deter from that position through his judgment. See Exh. #3, at 46 ("where (he's) taking money out of her account"). Consequently, judge Cowan, in essence, adopted and made the false statement himself, in view of the evidence of its falsity.

Further, Cowan made the same or similar false statement, i.e.,that I was stealing from my mother, based on false statements by Gregorian, Jackson, and Gailyn Spence, see infra.

I observed that I provided several and specific reasons why cross-petitioner Jackson should not be the conservator, and Jackson did not provide a single reason why I should not be conservator. Yet, Cowan gave no regard to those reasons, not even on behalf of my mother (conservatee) or her welfare. See Exh. #3, pgs. 13-45. And I had more reasons, which Cowan wouldn't allow me to give. He actually stated, "I've heard enough."

Finally, I observed judge Cowan intentionally and willfully rely on his bias against me and the previously mentioned false statement to grant a conservatorship judgment to my sister; and to deny my petition for a conservatorship *"with prejudice"*, without justification.

See also the assertions above regarding Gregorian, which are incorporated by reference here.

I observed that Cowan exercised bias against me throughout the hearing,
Cowan did not draw any conclusions that were favorable to me; and this bias
contributed to depriving me of a fair and impartial hearing and due process of law.

3.  Name of individuals who I believe committed a federal crime :  Gailyn Spence,
Court Investigator, Superior Court of California, L.A. County  and individuals in the
Civil Appeals Section of the Superior Court of California, L.A. County.

   Question #1.

   **ANS. :** 18 U.S.C.  secs.  241 and 242, and sec. 1503.  I believe the crime of
willfully depriving me of a conservatorship judgment without due process of law,
and in violation of the United States Constitution, including the 14th amendment,
and the laws of the United States, at least, and under color of law was committed;
and  the crime of conspiracy to deny me due process of law and to deny me the
conservatorship appointment and judgment was committed.  And, I  believe the
crime of obstruction of justice was committed by  individuals in the Civil Appeals
Section of the Superior Court.

   I believe that Gailyn Spence willfully and deliberately made and inserted a false
statement in her Probate Investigator's Petition Report with the intent to
influence and have a conservatorship decision be made on behalf of Dianne
Jackson and against me.  Her efforts were successful and I was denied the
conservatorship, with prejudice.

   I believe that Spence conspired with  Dianne  Jackson to provide the false
statement that "At Bright Days, he has tried to take her out and to the bank. . .

14

I believe that Spence conspired with Jackson to provide the false statement that "At Bright Days, he has tried to take her out and to the bank. . . (with the implication that I tried and intended to steal money from my mother),  for the specific purpose of having the trial court to consider, receive, and rely upon the false statement to deny me the conservatorship that both Jackson and I were competing for.   I never tried to take my mother out of Bright Days care facility, for any reason,  so the statement is false.

I believe the trial judge in fact relied upon the statement in conjunction with the false statement submitted by Spence, above, to influence his decision to grant Jackson the conservatorship, and more importantly, to deny me the conservatorship.

I believe that Spence also submitted another false statement, while less significant in comparison with her previously mentioned statement regarding "taking my mother to the bank", but nonetheless important as a credibility or character impeachment tool, with the more specific purpose of  having me be denied the conservatorship in mind.  Spence stated "Laurack reported he took his mother shopping. . . and (to) medical appointments." I did not tell Spence that I take my mother to "medical appointments".  So, the purpose of this false statement was to impeach my character, knowing that Jackson actually takes my mother to medical appointments and can  prove it, and I do not take my mother to medical appointments, generally.

I believe that both false statements were inserted into Spence's investigator's report for the specific purpose of having me be deprived of a conservatorship appointment, which actually happened.

15

Finally, I believe that an individual or individuals from the Civil Appeals Section of the Superior Court of California intentionally and purposefully kept Spence's Investigator's Reports out of the record transmitted to the California Court of Appeal on **two** separate occasions, initial and supplemental records, in an attempt to keep the Reports from the Court of Appeal and from review, which was an attempt to deprive me of evidence on appeal and a fair appeal, and due process of law, under color of law; and it is possible that the individuals conspired to do so. And, I believe this conduct was an obstruction of justice.

Question #2.

**ANS. :** I know that Spence's Probate Investigator's Petition Reports, see Exhibits #4 and #5, were part of the conservatorship proceeding in the Superior Court of California, L.A. County, which generally occurred from April to June, 2015. And, the reports, particularly the March, 2015 report (Exh. #4), were relied upon at and during the June, 2015 hearing, esp. June 12, 2015.

I observed that Spence made a false statement in her first report, stating, "At Bright Days, he has tried to take her (my mother) out and to the bank" (with the implication that I was taking her to the bank to withdraw money for me). However, I never made *any* attempt of any kind to take my mother out of Bright Days. An investigation of Bright Days' employees, at the time, should assist in proving this.

I observed that Spence made a second false statement in both Reports (with a slight variation between the two, e.g., misspelling my name) stating that "Lorick reported he took his mother. . . to. . . medical appointments." See Exhs. #4 and #5. But, I did not tell Spence that I took my mother to medical appointments. I

16

am well aware that Jackson takes my mother to medical appointments. And, if I told Spence such a thing, I would be lying, which would support Jackson, see, e.g., Exh. #4, where, "Per Ms. Jackson, he did not take his mother anywhere, including appointments." But see Exh. #3, at p. 9, where :

THE COURT : Who took your mother to the doctor?

MR. BRAY : My sister took my mother to the doctor.

I observed that Spence's Reports were made and submitted under the penalty of perjury.

I know that Spence's Reports were relied upon by the trial judge in making his decision to deny me a conservatorship appointment or judgment. See Exh. #3, p. 22-23, where :

THE COURT : . . . The courtroom assistant has given me the court's own investigator's report. It has some fairly disturbing information in this that I think is worth discussing here.

THE COURT : . . . He has tried to take his mother out of the facility and to the bank, but she informed staff that he's not to take her out of the facility.

NOTE : The word "allegedly" did not precede "he has tried to take his mother out of the facility and to the bank. . . ." That was the result of court reporter editing. The court reporter supplied that word or term.

I observed that Spence and Jackson both made the same false statement, that is, "At Bright Days, he has tried to take her out and to the bank. . . " to

17

deprive me of my constitutional right to a fair and honest hearing and appeal, and a substantive due process right to a conservatorship appointment or judgment.

I observed that during the previously-mentioned conservatorship proceedings, including the appeal, both Spence and Jackson made the same false statement regarding Bright Days care facility. Spence made the statement through reports during trial court hearing proceedings, see supra, and Jackson made the statement in her appellate brief before the Second District Court of Appeal. See Exhibit #6 (page 7-8 from Jackson's Appellate Brief), where "Statement of Fact: Yes, Bray tried to take Davis out of two board and care facilities (Vergie's Manor and Bright Days care Center)" and, at p. 8, "Statement of Fact: The Torrance police came to the Bright Days Care Center on March 22, 2015. The police interviewed Davis (my mother, the conservatee) and reported to the board and care staff that Bray had called into the station and ask for police intervention to remove Davis from the board and care facility." Again, I *never* made *any* attempt to remove or take my mother (Davis) out of Bright Days Care Center for any reason. And, similarly, I did __not__ call or contact the Torrance Police Department for any reason.

I did make an attempt to take my mother from Vergie's Manor, and I contacted the Sheriff in Carson, CA for assistance, but, *not* for Bright Days.

I observed that Spence received her information about Bright Days from her interview with Jackson prior to Spence's first investigator report.

Finally, after I filed my notice of appeal in the Civil Appeal Section, and designated the documents I wanted included in the record on appeal, including Spence's investigator reports, see Exh. #7 (Designation of Record, including

18

attached page), Spence's reports were not included in the original record (i.e., Clerk's Transcript). So, I filed a "Letter of Omission" with the Civil Appeals Section, whereby I identified multiple documents which had been omitted from the Clerk's Transcript. See Exh. #8 (Letter of Omission). But, again, after the "Supplemental Clerk's Transcript", see Exh. #9 (Supp. Clerk Transcript)(title page and index pages only), was produced, Spence's Investigator's Reports (2) still weren't included in the record (or clerk's transcript). So, I had to attach the Reports myself to my appellate brief, see Exh. #10 (page of table of contents, appellate brief), whereby I noted that I thought (and still believe) that the omission was intentional.

And, judge Laurie D. Zelon (of the 2nd District Court of Appeal) relied on the Civil Appeals Office's misconduct to state, in her written decision, "Neither report is contained in the record" (implying that I had not designated it). See Exh. #11( 2nd Dist. Court of Appeal appellate decision), p.2. See infra. Nevertheless, she still relied on that report (that I submitted in my brief) to make an adverse ruling against me. "Bray also fails to acknowledge the court's reference to the investigator's report indicating that Bray had attempted to cash checks he had signed on his mother's account; Bray did not object to the court's consideration of this report." Id. At 4. Of course I didn't object, I'm the one who made the reports available to the court.

4. Name of individual that I believe committed a federal crime : Judge Laurie D. Zelon,  CA, Second District Court of Appeal.

Question #1.

19

ANS. : 18 U.S.C. sec. 242.  I believe the crime of willfully depriving me of my constitutional rights, including substantive due process or a conservatorship appointment or judgment, under color of California law, was committed.

I believe judge Zelon's exercise of bias, in favor of Respondent Dianne Jackson, and against me, was a major source of the denial of due process.

I believe the crime of willfully depriving me of a fair and impartial appeal and of due process of law, under the color of California law was committed.

I believe judge Zelon's deprivation of my substantive due process right to a conservatorship judgment or appointment was willful , and that part of that willfulness was shown by the bias demonstrated against me, and judge Zelon's false statement regarding the testimonial facts.

I believe that the primary purpose for judge Zelon's decision was to help attorney Gregorian and judge Cowan avoid or escape guilt (of the crime of making a false statement, submitting a false statement to the court, or aiding and abetting the submission of a false statement to the court by attorney Gregorian) or liability, rather than to provide me with a fair and impartial appeal.

Question #2.

ANS. : I know that the written opinion of judge Zelon was completely one-sided, favoring Jackson.  Zelon only pointed out  what she perceived as deficiencies by me,  but none by Jackson.  In fact, she ignored any deficiencies by Jackson.  See Exh. #11, et. seq.. Zelon's bias against me mirrored the trial judge's (Cowan) bias against me, and favoring Jackson.  There was nothing fair and

20

impartial about Zelon's written decision about the underlying conservatorship case.

Finally, I observed that Zelon made a material false statement in her decision that directly and specifically denied me due process of law, under color of law. That statement was(is): "(T)here was *testimony*, apparently believed by the court, that Bray *had not been involved* in *assisting* his mother. . . ." (Emphasis added). See Id., at p. 6. The statement is false because the *testimony* (of both Jackson and myself—the *only* testimony, under oath, below) in fact revealed that I *had* been involved in assisting my mother. See Exhibit #3 (CRT2), at p. 3 :

MR. BRAY : . . . . I've spent more time with my mother ever since I moved back in with my mother in 2003.

At p. 4 :

THE COURT : Who lived with her (my mother) at home?

MS. JACKSON : My brother lived in front, and I lived in back. We both lived on the premises.

THE COURT : . . . What do you have to say about what your brother said, that he is more involved in looking after her when she was still living with both of you?

MS. JACKSON : We both were involved.

At p. 5 (continuation of Jackson testimony):

MS. JACKSON : . . . So I participated in buying food. My brother participated in buying food. He would sometimes go buy Tylenol.

21

I observed that when Zelon stated that there was "testimony" that revealed certain things, that it presumes that she had read the testimony and knows what the testimony said. Therefore, she knew her false statement was "false", and willfully made it.

I observed that the above false statement made by Zelon was a part of the public record and was issued for public examination, and is relied upon by the public as to the true facts of the case. Therefore, the statement is also a fraud upon the public. The public doesn't, ordinarily (although it can), read the testimony, so it must rely on the court to inform it of the true facts of the testimony.

I also know that the above false statement by Zelon is also a source of the bias exercised against me by judge Zelon.

5. Name of individual that I believe committed a federal crime : Judge Carol A. Najera, Superior Court of California, Los Angeles County (Compton Courthouse)

Question #1.   What crime do you believe has been committed?

ANS. : 18 U.S.C. secs. 241 and 242.  I believe the crime of willfully depriving me of my constitutional rights under color of law was committed.  I believe that I was willfully denied a fair process in the evaluation of my request for a temporary restraining order and, *more importantly at the time,*  a **stay** of Dianne Jackson's TRO and move-out order.

I believe that I was willfully deprived of my 14th amendment Due Process right to possession of property by being made to move out of my home (and being

22

deprived of that same home for approximately 3 weeks) based on a false statement made by judge Najera regarding the facts that were presented in my petition for a restraining order and *request for a stay* of my sister's restraining order (contained therein).

I believe that I was willfully subjected to the deprivation of my right secured and protected by the Fourteenth Amendment to the Constitution of the United States not to be deprived of my home or property for approximately three weeks without due process of law by a person acting under color of the laws of the State of California,  and I was deprived of due process by judge Najera disregarding the evidence that I submitted which should have required that I, at least, be granted a stay of the move-out order until a hearing on the restraining order motion.  I believe the judge gave no regard to my constitutional rights in making her decision to require a move-out order,  thereby depriving me of  due process.

I  believe judge Najera's actions in depriving me of  my due process rights were willful because she denied having the very facts before her that would have required her to grant me relief.

I believe the fact that judge Najera decided both Jackson's petition (decided *first* and *granted*) and my petition (thereafter), denied me due process based on a conflict of interest.  I should have been assigned a different and independent judge.  The two petitions were decided within days of each other, which, in essence, converted Jackson's petition from an ex parte petition to a two-party petition, which, at minimum, required a hearing before issuing a move-out order. The denial of an independent judge also shows that judge Najera's denial of due

23

process was willful and deliberate, because she knew that she had just recently granted Jackson's TRO against me, and my request for a TRO was against Jackson.

Question #2.

ANS. : The crime took place between June 1, 2016 when petitioner Dianne Jackson requested, and was granted, a temporary restraining order against me and June 3, 2016, when I applied for a restraining order against Jackson for harassment and requested a *stay* of the *move-out order* contained in Jackson's granted restraining order.

I know that judge Najera granted Jackson a move-out order that required me to "immediately" move-out and not return to my home and residence, Exhibit #12 (Jackson's Temporary Restraining Order, pgs. 1-2, here p.2 of 6).

I know that on June 3, 2016, I filed a petition for a restraining order against Jackson, and the petition was denied. See Exhibit #13 (DV-109, Bray's Petition for Temporary Restraining Order) (selected pages, 3 of 3, here, p. 1 of 3).

I know that in denying my petition, judge Najera gave as her reasons : ("1) The facts as stated in form DV-100 (see infra) do not show reasonable proof of a past act or acts of abuse. (Citations omitted)"; and "(2) The facts do not describe in sufficient detail the most recent incidents of abuse, such as what happened, the dates, who did what to whom, or any injuries or history of abuse ." Id.

I know that judge Najera's reasons were *false.* See Exhibit 13A (DV-100, Bray's Petition for Temporary Domestic Restraining order, selected pages, 1& 4-5 of 5 and 5 of 5 Attachment to #26 "Describe Abuse" (the pages describing the abuse), and DV-101, one page). My petition, in fact, "show reasonable proof of a past act

24

"show reasonable proof of a past act or acts of abuse", i.e., "June 3, 2016, Sheriff serving a restraining order. The person abused me through harassment by seeking and obtaining a restraining order with a move-out provision, knowing that I only have this one residence only to live in while we await a hearing." "(T)his current restraining order by my sister is neither warranted or called for because I have not done anything to be restrained for." (From attachment).

And, my petition, does, in fact , "describe in sufficient detail the most recent incidents of abuse, such as what happened, the dates, who did what to whom, or any injuries or history of abuse", that is, "(M)y sister has falsely accused me just recently, May 31, 2016, in order to try and get the police to arrive faster. I was having locks put on my room doors, and she called the police to try and prevent me from doing so. The police wasn't arriving fast enough, so she called back and told the dispatcher that I "pushed" her out of (the) door, hoping that this false statement would get the police to our home faster. The police finally arrived (and I don't believe any faster) and, told her that I could put locks on my bedroom doors, even with her conservatorship in regards to my mother (who is now in a nursing facility). So, she tell lies to get her way. And, she has told a lie to obtain the "move-out" order. . . . The 'move-out' order, instituted without a hearing is specifically for the purpose of harassing me. . . . I am a lawyer, and my room is also used for my business files. . . . So, it would be very damaging to me to "move-out" without a hearing to determine if I should do so. I have current important work to do where I need my room." Id. And, finally, I also cited the previous TRO that she obtained (which was dissolved at the hearing without me saying anything) .

25

So, judge Najera provided false reasons, i.e., *false evidence*, for denying my petition for a restraining order and a *stay* of Jackson's restraining order (see Id, p. 5 of 5, where, "so, I request the court to order that the 'move-out' portion of my sister's temporary restraining order be *'stayed'* or restrained until the hearing on the restraining order."

I know that all of the information previously mentioned was contained in my petition for a restraining order and for a stay.  And, judge Najera *knew* about this information when she denied the petition for a stay, in particular.  And, because of this, I know that judge Najera's decision to deny my request for a restraining order and stay was *willful* and deliberate.

And, I know that judge Najera did not provide any other reason for denying my petition than the reasons in nos. "(1)" and "(2)" of my (Bray's) Petition, see Exhibit #13.  An opportunity to provide another reason was left blank in no. "(3)".

Finally, I know that judge Najera decided **both** my petition and Jackson's petition for a restraining order, which presented a "conflict of interest", and which means that my petition should have been decided by an independent judge after Najera had already decided and granted Jackson's petition.

Finally, I know that judge Najera is an "officer of the court".  And, I know that her false reasons were false evidence, used to deny me relief.  And, her false reasons or false evidence help demonstrate that her deprivation of my constitutional due process rights, procedural and substantive, was *willful*.

26

6.  Name of individuals that I believe committed a federal crime :  Stephen M. Lowry, Commissioner, Superior Court of California, L.A. County (Compton Court), and court reporter Suzanne Wood (Compton Court).

Question #1.

**ANS. :** 18 U.S.C. secs. 241 and 242, and sec. 1503.  I believe that Commissioner Lowry, acting under color of California law, willfully deprived me of my constitutional rights, both procedural and substantive due process, at least, secured or protected by the laws of the United States, and based on my race or color and gender, i.e., black male.

I believe Lowry willfully deprived me of my constitutional rights, under color of law, by exercising racial and gender bias and discrimination, and depriving me of a fair and impartial hearing and decision.

I believed Lowry willfully deprived me of my constitutional rights by discriminating against me based on my race or color, and that some evidence of the discrimination was name-calling, threats, and prejudging my case against me, i.e., prejudice, from the inception of the hearing, throughout, and to the end of the hearing;  and making a false statement in open court regarding the evidence.

I believe Lowry willfully deprived me of my constitutional rights, under color of law,  by limiting me to three minutes to make one point  and limiting me to one sentence per point regarding another issue; and while not requiring the same of Jackson.

I believe that Lowry willfully deprived me of my constitutional due process rights under color of law by denying me a fair and impartial hearing by an impartial judicial officer.

27

I believe that Lowry willfully deprived me of my constitutional rights, including at least my right to liberty, and my right not to be harassed while exercising that liberty, under color of law, by disregarding my petition or the contents of that petition (or the specific reasons) outlining the harassment, and denying me a restraining order, which was warranted under the facts and circumstances.

Question #2.

**ANS.:** I know that on June 24th, 2016, at a restraining order hearing before Commissioner Stephen M. Lowry, that at the inception of the hearing, Comm. Lowry *pre-judged* my case against me before hearing *any* of my reasons for requesting a restraining order. See Exhibit #14 ( Lowry's Reporter's Transcript of Bray's June 24, 2016 Restraining Order Hearing)("LRT"), p. 10, lines 18-26, where :

THE COURT : What have you got to respond?

MR. BRAY : Are you ready for me to respond ?

THE COURT : I'm ready for you to tell me whatever would cause me to believe that you need a restraining order.

MR. BRAY : First of all, again, my motion for the restraining order is for harassment by my sister.

THE COURT : She hasn't harassed you.

28

THE TRANSCRIPT

**\*\*NOTE :  At this point, I must comment about the transcript for this June 24, 2016 hearing by court reporter Suzanne Wood.  This transcript was <u>altered :</u> by including passages that were not said at the hearing, by either me or Lowry, and, <u>not</u> including passages that were  said, i.e.,  <u>omitted</u>  from the transcript.**

To begin with, after completion of the hearing, and upon my decision that I wanted the transcripts of the hearing, I had "unusual" occurrences in securing the transcripts from Wood.  First, I tried to make arrangements with Wood to obtain the transcripts during a court break.  Wood refused to speak with me herself, but relayed through a court deputy (sheriff) for me to call her.  Usually, the court reporter would speak with me herself during a court break.  After the deputy gave me Wood's business card and told me to call Wood, I tried to call her but couldn't get through.  Second, I caught Wood  coming out of her courthouse office, at the end of the day, but she wouldn't make arrangements for the transcripts.  Again, she said to call her (after I told her that I had trouble getting through, she told me to try again, after she tried a method and said it worked).  So, I called, got through (through a different method than Wood's), and left information for the transcripts.  Third, from this point on, I only communicated with Wood through the court deputy, who relayed messages and money for the transcripts.  Usually, I would make arrangements with the court reporter herself.  Fourth, on two occasions, Wood was supposed to call me about the transcripts and never did (but, she did call me when the transcripts were ready for pickup).  Fifth, when I finally made arrangements to order the transcripts, Wood didn't tell me that there are two ways of ordering the transcripts, expeditiously or regular,

29

she simply treated it as a regular order (two to three weeks for production—which would give her more time to make changes in the transcript; but expedited action, which costs more, requires production in a week—which means less time to make changes). Usually, a court reporter informs the requestor of both ways when he first requests the transcripts. I received the transcripts in about 2 weeks, after making several trips to the court . **Now, continuing with the alterations :**

The transcript was basically *"cleansed"* to some degree to provide a less compelling picture of commissioner Lowry's animus or animosity or the hostility of the hearing. For example, when Lowry called me a "squatter", at p. 19, lines 13-15, Lowry used more words in describing the "squatter" title and in calling me a "squatter". He didn't simply say "you're a squatter" in such a formal way. Wood left out the descriptive dialogue supporting the use of the term. And, more importantly, I did **not** say, "I'm not a squatter, sir". I didn't use the term "squatter" at all. I simply replied that it was my mother's house and that she could do what she wanted with her property, including letting me live there without requiring rent.

Other alterations that I can specifically recall are : (1) , at p. 21, lines 15-19 :

MR. BRAY : I do want this on the record because I'm going to get a transcript of all of this.

THE COURT : Oh, we hope you do.

MR. BRAY : I will.

THE COURT : We hope you take me up.

30

MR. BRAY: All right.

These are *all* the court reporter's words, not mine or Lowry's. This dialogue simply did not take place. I didn't mention getting the transcripts during the hearing.

(2), at p. 20, lines 6-10 :

THE COURT : Do you have anything like that from your mother?

MR. BRAY : I didn't have to get anything. No, I do not have that sir. There was no need for me to get that, sir.

THE COURT : Now, there is.

**After the above line by the commissioner,** "Now there is", is where he made the *threat,* which is <u>omitted</u> by Wood. Lowry *threatened* me with an order requiring my mother to sign a letter saying that she permits me to live in her home and *"for how long".*

Answer #2 (continued)

**ANS. :**

Name-calling

I know that at the hearing, Comm. Lowry called me a "squatter", along with associated descriptive information, see Exh. 14, at p. 19, lines 13-14, and I was highly offended by his use of the term. And, I know that I consider the term only one step below him calling me a "nigger". Especially, in view of my professional background. I know that the term is usually used derogatorily and is meant to be derogatory. And, it was used derogatorily and meant to be derogatory when said

31

and used by Lowry, and I understood and received it as such, especially where it was used and said in open court with other litigants, attorneys, and office personnel and/or workers present.

### Threats

I know that Lowry threatened me on at least two occasions : (1) regarding sanctioning me for interrupting Jackson—which was unwarranted, see Id., at p.23 lines 13-14, where "You do that one more time and I will sanctioned you $250.00, and "I will sanction you so be quiet while she's talking," at lines 20-21; and (2) threatening to order me to prepare a letter and have my mother sign it that she voluntarily allows me to live in her home. Again, the court reporter, Suzanne Wood, intentionally omitted this threat or information from the transcript. But, it followed the passage in the transcript beginning at p. 19, line 28 -- p. 20, line 10, which ended with "Now there is" (and he then made the threat, "I'll order you" or "I can order you to. . . ." And, he didn't even have *jurisdiction* to make or carry-out such an order. It would have to come from the conservatorship court or Probate court.

### Bias and Discrimination

I know that Lowry exercised racial and gender bias or discrimination throughout the hearing; so if I were to attempt to quote all instances, I would be quoting the entire transcript (which is included—it's not that long, see Exhibit #14, et.seq.). But, I will give two vivid examples : (1) the issue of "rent-free" living (with my mother). After my sister (Jackson) had argued (in her written response to my petition) that I live with my mother rent-free, and Lowry pointed this out in

32

open court, see Id. P. 6, where, "my brother's not paying any rent, right?  He doesn't pay any rent; rent-free, he lives there; correct ma'am ?" :

JACKSON : Yes

When I pointed out that *my sister also lives at the same house rent-free*, see Id., line 20:

MR. BRAY :  That's the same thing for my sister, judge.  ;

Lowry  moved away from the subject and never returned to it.  Moreover, Lowry called me a "squatter" based on this rent-free status, but, he didn't call Jackson a "squatter" based on the same status.

(2) The issue of evidence to support our (Jackson and mine) respective positions regarding  whether I "pushed" Jackson or not.  Jackson claimed I pushed her. I claimed I did not  :

THE COURT : Have you got a witness from next door who was standing there watching who can testify?

MR. BRAY :  I don't have a witness here.  And she doesn't have a witness that can testify --

THE COURT :  I didn't ask what she has or doesn't have.

And the bias evolved into discrimination.

## False Statement

I know that Lowry made at least one material false statement in open court regarding the evidence.  First, he indirectly conceded that he had read my petition by concluding  and stating  that my sister had not harassed me:

MR. BRAY :  First of all, again, my motion for the restraining order is for harassment by my sister

THE COURT:  She hasn't harassed you.        Id.,  at p. 10

Following the indirect concession,  Lowry directly admits and concedes that he has read my petition or request for a restraining order, and the reasons for it :

MR. BRAY :  Well, judge , you said you read the pleadings before.

THE  COURT:  I did.   There's nothing there.    Id., at p. 11

And see Id., at p. 3, where "I don't ever come out on the bench without reading the papers; okay? So I know what's in the papers, and to make sure I know what's in the papers I make notes like that (indicating) you couldn't read them but, you know, I can read these hand scratchings. . . ."

Yet, on two occasions, see above, he states "you haven't told me one instance of harassment" and "there's  nothing there", in open court to people who have not seen the pleadings and do not know whether I have identified instances of harassment or not.  And if they believed Lowry, I had not.  But, Lowry's assertions were **false.**  Clearly, I had asserted at least "one instance of harassment".  In my petition, I indicated that my main reason for the restraining order was "The person abused me through harassment by seeking a restraining order with a

34

'move-out' provision, knowing that I only have this one residence only to live in (and) that I have no other place to live while we await a hearing". See Exhibit 13A (p. 5 of 5); and see p. 1 of 5, where "My sister has filed this current restraining order for the specific purpose of harassing me, especially with the inclusion of the 'move-out' provision." So, in fact and *truth* , I had told Lowry of at least one instance of harassment in my restraining order request, which Lowry claimed he had read.

Even if Lowry's statements went to the merits of my harassment claims, e.g., "there's nothing there", the statements are still false, because the claims are clearly meritorious.

And, I know that the above *false statement(s)* goes directly to the merits of the grant or denial of my request for a restraining order, and it (the false statement) provides proof of the *willfulness* in Lowry denying my request and in Lowry depriving me of my constitutional right of liberty and not to be harassed.

Moreover, not only does the above reveal that Lowry intentionally made a false statement, but, it also shows that Lowry intentionally *disregarded* the grounds for my request for a restraining order because he had earlier identified the ground or reason himself , at least in part, see the transcript, Exh. 14, at p. 6, lines 8-13, where, "Your concern is that your sister, the conservator, is trying to get you out of the house, and that she is trying to get a move-out order against you, and you find this to be harassing and stressful that she would want to get you out of the house."

35

A PATTERN OF RACIAL AND GENDER BIAS AND MAKING FALSE STATEMENTS

Finally, with Lowry's exercise of racial and gender bias, and making false statements, a pattern is formed by judges David J. Cowan (of the Superior Court of California, Los Angeles County), Laurie D. Zelon (of the CA Second Circuit Court of Appeal), and Lowry of exercising racial and gender bias, and making false statements during the course of the conservatorship proceedings between Bray and Jackson. With the pattern resulting in the deprivation of my constitutional rights, under color of law. And, in Lowry's case, it is clear that he recognized that a constitutional liberty issue was at issue. See Id. (transcript), at p. 10, lines 5-10, where :

THE COURT : You did not have a move-out order granted against you apparently, but that was. . . your victory in the matter, and so far you're still able to reside in the house ; okay? Other than that it looks like she's *narrowed* your *liberty* with regard to the house by a great deal; okay ? (Emphasis added).

1

ARMEN D. GREGORIAN, ESQ. CSB# 240371
Pettler & Miller, LLP
3465 Torrance Blvd., Suite D
Torrance, CA 90503
Telephone:  (310) 543-1616
Facsimile: (310) 543-5019

Attorney for HELEN DAVIS,
Proposed Conservatee

FILED
Superior Court of California
County of Los Angeles

APR 0 6 2015

Sherri R. Carter, Executive Officer/Clerk

By_____, Deputy
        Bella Gasper

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

| CONSERVATORSHIP OF | Case No.: BP 159733 |
|---|---|
| HELEN DAVIS, | REPORT OF PVP ATTORNEY |
| PROPOSED CONSERVATEE | RE: PETITION FOR APPOINTMENT OF CONSERVATOR OF THE PERSON AND ESTATE OF HELEN DAVIS |
| | Date:     April 9, 2015<br>Time:     10:30 a.m.<br>Dept.:     79<br>Cal No.: |

PRELIMINARY STATEMENT

I am an active member of the State Bar of California.  No disciplinary actions are pending and none has been filed against me during the past twelve months, or ever.  I have professional liability insurance coverage in effect.  I have not represented and do not presently represent any person associated with this matter.

As to the statements in the preceding paragraph, I declare under penalty of perjury that they are true and correct and that, if sworn, I could competently testify to them.  All other portions of this Report are unverified.

1

PVP REPORT

have learned after speaking with the social workers, the proposed Conservatee's granddaughter, and the documents I have reviewed, DIANE has gone out of her way to assist her mother both financially and by providing the care she needs. She seems very capable to be the conservator of the person and estate of her mother.

DIANE also shared that her mother has limited income, which barely covers her living expenses when she is at home. There were insufficient funds to pay for the assisted care facilities where the proposed Conservatee has resided after her hospitalization. As a result, DIANE has been forced to pay several thousand dollars to cover the expenses. She plans to return her mother home as soon as she is able.

DIANE also relayed several incidents involving her brother LAURECK. Ever since returning to Los Angeles, he has resided at the residence and has demanded that he be in charge of the care of their mother's finances. He had received several hundred dollars per month from their mother as an allowance to pay for his expenses. He has signed checks on their mother's account. Most significantly, he recently went to a care facility and removed the proposed Conservatee and took her to her bank to withdraw money. This led to the proposed Conservatee being taken to the hospital for chest pains. While cardiac issues were ruled out, the discharge summary from the hospital indicates it was due to stress related. Social workers were involved.

DIANE has obtained temporary restraining orders again LAURECK in the past, but has been advised by Adult Protective

7

PVP REPORT

**2**

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

DEPARTMENT 79                          HON. DAVID J. COWAN, JUDGE


IN RE THE MATTER OF THE:         ) SUPERIOR COURT
                                 ) CASE NO. BP159733
HELEN DAVIS CONSERVATORSHIP      )
                                 )
     CONSERVATEE.                )
_____) *CERTIFIED COPY*




REPORTER'S TRANSCRIPT OF PROCEEDINGS

THURSDAY, JUNE 4, 2015




APPEARANCES:

FOR THE CONSERVATEE:             ARMEN D. GREGORIAN,
                                 ATTORNEY AT LAW

ALSO PRESENT:                    LAURACK D. BRAY

                                 DIANE JACKSON




                                 REPORTED BY:
                                 ANGELA ZARATAN PARADELA
                                 OFFICIAL COURT REPORTER
                                 CSR NO. 9659

CASE NUMBER:                    BP159733

CASE NAME:                      IN RE THE MATTER OF THE:

                                HELEN DAVIS CONSERVATORSHIP

LOS ANGELES, CALIFORNIA    THURSDAY, JUNE 4, 2015

DEPARTMENT  79             HON. DAVID COWAN, JUDGE

APPEARANCES:                    (SEE TITLE PAGE.)

REPORTER:                       ANGELA Z. PARADELA, CSR NO. 9659

TIME:                           10:47 A.M.

        (THE FOLLOWING PROCEEDINGS WERE HELD IN

    OPEN COURT:)

        THE COURT:  4003 AND -4, DAVIS.

        MR. GREGORIAN:  GOOD MORNING, YOUR HONOR.  ARMEN GREGORIAN, G-R-E-G-O-R-I-A-N, PVP COUNSEL FOR MS. DAVIS WHO IS NOT PRESENT.  I HAVE WAIVED HER APPEARANCE FOR COURT TODAY.

        THE COURT:  ALL RIGHT.

        MR. BRAY:  MY NAME IS LAURACK D. BRAY.  I'M THE SON OF MS. DAVIS.

        THE COURT:  MA'AM.

        MS. JACKSON:  DIANE JACKSON, DAUGHTER OF MRS. DAVIS.

        THE COURT:  ALL RIGHT.  THANK YOU.

            THIS IS HERE FOR A CONSERVATORSHIP OF THE PERSON AND ESTATE OF MS. DAVIS.  THE COURT'S HAD AN OPPORTUNITY TO REVIEW PVP COUNSEL'S FURTHER REPORT AS WELL AS THE COURT INVESTIGATOR'S REPORT, BOTH OF WHICH RECOMMEND THAT

ON THESE COMPETING PETITIONS, 4003 AND -4, THAT THE COURT GRANT MS. JACKSON'S PETITION.  THAT'S CONSISTENT WITH WHAT MS. DAVIS WANTS AND FOR OTHER REASONS STATED IN -- IN THE REPORTS INCLUDING THAT -- CONTENTIONS THAT MR. BRAY HAS BEEN USING MONEY OF MS. DAVIS THAT PERHAPS HE SHOULD NOT HAVE BEEN DOING AND HE'S ALSO LIVING IN THE BACK UNIT.

THE COURT UNDERSTANDS ALSO THAT MR. BRAY WANTS TO BE CONSERVATOR ALSO.  THE COURT -- MR. BRAY CAN ACCEPT THE COURT'S -- CAN ACCEPT -- HAS A CHOICE HERE.  WE CAN SET THIS FOR AN EVIDENTIARY HEARING.  DO YOU WANT TO BE HEARD MORE ON THIS?  HE WANTS TO PUT ON EVIDENCE OR WE CAN -- HE KNOWS WHAT THE COURT'S LIKELY TO DO BASED ON THESE REPORTS.

SO HOW DO YOU WANT TO -- HOW DO YOU WANT TO HANDLE THIS, SIR?

MR. BRAY:  WELL, ABSOLUTELY.  I DON'T ACCEPT THE FACT SHE WOULD BE APPOINTED WITHOUT EVIDENTIARY HEARING BECAUSE I CLEARLY HAVE EVIDENCE THAT'S NOT PART OF EITHER THE PVP REPORT OR THE INVESTIGATIVE REPORT THAT I THINK WOULD BE DETERMINATIVE AS TO WHETHER OR NOT MY SISTER WOULD BE APPOINTED.  I SHOULD BE APPOINTED.

I ALSO SHOULD POINT OUT SOMETHING, JUDGE, AT THIS POINT THAT THERE WAS A EGREGIOUS FALSE STATEMENT MADE IN THE PVP REPORT THAT --

THE COURT:  WHAT IS THAT?

MR. BRAY:  HE STATED -- MOST SIGNIFICANTLY, HE RECENTLY WENT TO A CARE FACILITY AND REMOVED THE PROPOSED CONSERVATEE AND TOOK HER TO HER BANK TO WITHDRAW MONEY.  THIS LED TO -- THIS LED THE PROPOSED CONSERVATEE BEING TAKEN TO

THE HOSPITAL FOR CHEST PAINS.

THAT ENTIRE THING IS ABSOLUTELY FALSE, PARTICULARLY THE PREVIOUS STATEMENT ABOUT ME TAKING HER TO HER BANK TO WITHDRAW MONEY.  THAT NEVER HAPPENED.  IT'S ABSOLUTELY FALSE.

THE COURT:  MR. GREGORIAN, MS. DAVIS IS IN A HOME RIGHT NOW?

MR. GREGORIAN:  SHE'S IN A CARE FACILITY, YOUR HONOR.

THE COURT:  SHE'S IN A CARE FACILITY.  ALL RIGHT.

MA'AM, DO TO YOU WANT TO SAY SOMETHING?

MS. JACKSON:  YES.

HIS ATTEMPT TO TAKE HER TO THE BANK WAS INTERVENED BY THE CARSON POLICE DEPARTMENT WHO TOLD HIM HE COULD NOT TAKE HER OUT OF THE FACILITY BECAUSE I HAD POWER OF ATTORNEY FOR HEALTH ON FILE WITH THE BOARD AND CARE.  HE COULDN'T TAKE HER TO THE BANK.

DURING THAT PROCESS, SHE STARTED HAVING CHEST PAINS.  SHE WAS TAKEN TO KAISER IN ER.  THE DIAGNOSIS ON HER KAISER DISCHARGE FORM WAS THAT SHE WAS UNDER EMOTIONAL STRESS.  WE WERE PUT UNDER SOCIAL SERVICES AT THAT TIME BECAUSE SHE COULD NOT RETURN TO THAT FACILITY BECAUSE MR. BRAY HAD ON TWO OR THREE OTHER ATTEMPTS TRIED TO TAKE HER OUT OF THE FACILITY AND I HAD TO CALL THE CARSON POLICE.

SO I HAD TO GO AND FIND ANOTHER BOARD AND CARE WHILE SHE WAS IN ER.  BUT THAT DID HAPPEN.  HE CAME.  HE TRIED TO TAKE HER OUT, BUT THE POLICE STOPPED IT.  THAT'S THE ONLY THING THAT HAPPENED.

THE COURT:  YOU'RE DISPUTING THAT, SIR?

MR. BRAY:  JUDGE, LET ME --

THE COURT:  ARE YOU DISPUTING THAT?

MR. BRAY:  I'M DISPUTING THAT, THE STATEMENT THAT I ACTUALLY TOOK MY MOTHER.

THE COURT:  YOU ARE DISPUTING WHAT YOUR SISTER JUST SAID?

MR. BRAY:  I'M DISPUTING WHAT THE STATEMENT SAYS.

THE COURT:  ARE YOU JUST NOW ALSO DISPUTING WHAT YOUR SISTER JUST SAID?

MR. BRAY:  I -- I CAN ELABORATE ON WHAT SHE JUST SAID --

THE COURT:  ALL RIGHT.

MR. BRAY:  -- WHAT SHE JUST SAID ABOUT ME ATTEMPTING TO TAKE MY MOTHER TO THE BANK.  AND YOU HAVE TO KNOW WHY.

I ABSOLUTELY WAS TRYING TO TAKE MY MOTHER TO THE BANK BECAUSE MY MOTHER NEEDED TO  -- I PAY MY MOTHER'S BILLS.  OKAY.  BUT I STILL THINK -- JUDGE, LET'S NOT GET AWAY FROM THIS POINT ABOUT THE FALSE STATEMENT BECAUSE I THINK IT WAS A EGREGIOUS STATEMENT, AND I THINK THAT I AM GOING TO TAKE ACTION TO FILE.

HE STATED THAT I RECENTLY TOOK MY MOTHER TO THE BANK TO WITHDRAW MONEY.  THAT NEVER HAPPENED.  I NEVER TOOK MY MOTHER TO THE BANK.

THE COURT:  I THOUGHT YOU JUST SAID YOU DID TAKE HER TO THE BANK.

MR. BRAY:  NO.  I DID NOT SAY THAT, SIR.

THE COURT: YOU JUST SAID -- SO SHE -- BECAUSE YOU'RE PAYING HER BILLS?

MR. BRAY: I SAID I'M PAYING HER BILLS, BUT I DIDN'T SAY I TOOK HER TO THE BANK. I NEVER TOOK HER TO THE BANK, SIR. I SAID I WAS GOING TO TAKE HER TO THE BANK SO THAT SHE COULD GET ME ON HER BANKING ACCOUNT SO THAT I COULD PAY -- I COULD CONTINUE TO PAY HER BILLS. SHE COULD NOT -- SHE COULD NO LONGER --

THE COURT: WHAT DID YOUR SISTER SAY ABOUT THE POLICE BEING INVOLVED? DID YOU HAVE ANY POLICE INTERACTION?

MR. BRAY: THERE WAS POLICE INTERACTION BECAUSE ACTUALLY FOR THAT -- FOR THIS PARTICULAR EVENT SHE'S TALKING ABOUT, I HAD CALLED THE POLICE MYSELF.

THE COURT: ALL RIGHT.

MR. BRAY: BECAUSE SHE HAD PREVIOUSLY CALLED THE POLICE.

THE COURT: I'M GOING TO ASK THE CLERK FOR THE NEXT AVAILABLE DATE FOR AFTERNOON HEARING.

THE CLERK: WE HAVE JULY -- ACTUALLY NEXT FRIDAY OS AVAILABLE, IF YOU WANT IT THAT SOON.

THE COURT: NEXT FRIDAY?

MR. BRAY: THAT WILL BE FINE WITH ME, JUDGE.

MS. JACKSON: THAT'S FINE WITH ME.

THE COURT: COUNSEL?

MR. GREGORIAN: THAT WORKS.

THE COURT: 1:30, NEXT FRIDAY WHICH IS --

THE CLERK: JUNE 12TH.

THE COURT: JUNE 12TH.

THE COURT STRONGLY URGES THE PARTIES TO GET THEIR OWN LAWYERS SO THAT THEY CAN UNDERSTAND BETTER WHAT THE COURT'S LIKELY TO WANT TO KNOW AND TO PRESENT YOUR CASES IN A WAY THAT MAY BE MORE EFFECTIVE FOR YOU.

MR. GREGORIAN:  YOUR HONOR, MAY MY CLIENT BE EXCUSED FROM APPEARING AT THAT HEARING.  THIS --

THE COURT:  YES.

MR. GREGORIAN:  THIS WHOLE SITUATION HAS BEEN VERY, VERY STRESSFUL FOR HER.

THE COURT:  THAT'S YOUR CHOICE.

MR. GREGORIAN:  THANK YOU VERY MUCH, YOUR HONOR.

MR. BRAY:  1:30, JUDGE, NEXT FRIDAY?

THE COURT:  1:30 P.M., THIS DEPARTMENT, NEXT FRIDAY.  AND I'M NOT GOING TO REQUIRE A JOINT TRIAL STATEMENT.  I DON'T THINK THAT'S GOING TO BE PRODUCTIVE.

MR. GREGORIAN:  VERY WELL.

THE COURT:  THANK YOU.

MR. BRAY:  THANK YOU, YOUR HONOR.

MR. GREGORIAN:  THANK YOU, YOUR HONOR.

(PROCEEDINGS CONCLUDED.)

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

DEPARTMENT 79                          HON. DAVID J. COWAN, JUDGE


IN RE THE MATTER OF THE:          ) SUPERIOR COURT
                                  ) CASE NO. BP159733
HELEN DAVIS CONSERVATORSHIP        )
                                  ) REPORTER'S
     CONSERVATEE.                  ) CERTIFICATE
_____)


STATE OF CALIFORNIA    )
                       )  SS
COUNTY OF LOS ANGELES  )


        I, ANGELA Z. PARADELA, CSR NO. 9659, OFFICIAL

REPORTER OF THE SUPERIOR COURT OF THE STATE OF CALIFORNIA,

FOR THE COUNTY OF LOS ANGELES, DO HEREBY CERTIFY THAT THE

FOREGOING PAGES 1 THROUGH 6 COMPRISE A FULL, TRUE, AND

CORRECT TRANSCRIPT OF THE PROCEEDINGS AND TESTIMONY TAKEN IN

THE MATTER OF THE ABOVE-ENTITLED CAUSE ON JUNE 4, 2015.


        DATED THIS 17TH DAY OF JUNE, 2015



        _____, CSR NO. 9659
        ANGELA Z. PARADELA, OFFICIAL REPORTER

MASTER INDEX

VOLUME

(DATE)

CHRONOLOGICAL/ALPHABETICAL INDEX OF WITNESSES

(NONE)

EXHIBITS

(NONE)

**3**

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

DEPARTMENT 79                    HON. DAVID J. COWAN, JUDGE

IN RE THE CONSERVATORSHIP )
                          )
OF HELEN JACKSON          )    NO. BP159733
                          )

REPORTER'S TRANSCRIPT OF PROCEEDINGS

JUNE 12, 2015

APPEARANCES:

FOR LAURACK BRAY:
          IN PROPRIA PERSONA

FOR DIANE JACKSON:
          IN PROPRIA PERSONA

PROBATE VOLUNTEER PANEL:
          ARMEN GREGORIAN
          ATTORNEY AT LAW

TAMARA M. VOGL, CSR NO. 10186
OFFICIAL REPORTER

CASE NUMBER:                    BP159733

CASE NAME:                      HELEN DAVIS

LOS ANGELES, CALIFORNIA    JUNE 12, 2015

DEPARTMENT 79              DAVID J. COWAN, JUDGE

APPEARANCES:               (AS HERETOFORE NOTED.)

REPORTER:                  TAMARA M. VOGL, CSR NO. 10186

TIME:                      P.M. SESSION


     (THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT:)


     THE COURT:  I'M GOING TO CALL 5001 AND 2, DAVIS.
PLEASE COME FORWARD.

     MR. GREGORIAN:  ARMEN GREGORIAN.  I'M THE P.V.P.
ATTORNEY FOR THE PROPOSED CONSERVATEE.

     THE COURT:  DO YOU WAIVE HER APPEARANCE TODAY?

     MR. GREGORIAN:  I DO, YOUR HONOR.

     THE COURT:  THEN I'LL ASK THE CLERK TO SWEAR IN
BOTH PARTIES.

     THE CLERK:  YOU DO SOLEMNLY STATE THAT THE
TESTIMONY YOU ARE ABOUT TO GIVE IN THE CAUSE NOW PENDING
BEFORE THIS COURT SHALL BE THE TRUTH, THE WHOLE TRUTH,
AND NOTHING BUT THE TRUTH, SO HELP YOU GOD.

     MR. BRAY:  I DO.

     MS. JACKSON:  YES.

     THE COURT:  IF YOU'LL STATE YOUR NAME.

     MS. JACKSON:  DIANE JACKSON.

     MR. BRAY:  LAURACK BRAY.

     THE COURT:  THIS IS HERE FOR TWO COMPETING

PETITIONS FOR CONSERVATORSHIP OF PERSON AND ESTATE FOR HELEN DAVIS, ONE FILED BY MR. BRAY AND ONE FILED BY MS. JACKSON.  THE COURT HAS SET THIS FOR A HEARING TO REVIEW THE SECOND REPORT OF MR. GREGORIAN, WHICH INDICATES, AMONG OTHER THINGS, THAT HIS CLIENT STATES A PREFERENCE FOR MS. JACKSON TO BE CONSERVATOR IF ONE IS NECESSARY.

MR. GREGORIAN:  THAT IS CORRECT, YOUR HONOR.

THE COURT:  MS. JACKSON IS MS. DAVIS'S DAUGHTER; MR. BRAY IS HER SON?

MR. BRAY:  YES.

THE COURT:  THE PROBATE CODE PROVIDES, AMONG OTHER SOLUTIONS, THAT PROPOSED CONSERVATEE'S PREFERENCE IS TO BE GIVEN CONSIDERATION IN DECIDING BETWEEN TWO CHILDREN WHO WOULD OTHERWISE BE OF EQUAL PRIORITY BETWEEN ONE ANOTHER, AND SO I'M GOING TO ASK MR. BRAY FIRST WHY IT IS THAT THE COURT SHOULD NOT FOLLOW MS. DAVIS'S WISHES.

MR. BRAY:  WELL, FIRST OF ALL, JUDGE, MY MOTHER -- I THINK SHE LOVES BOTH HER CHILDREN BUT I THINK SOMEHOW SHE MIGHT HAVE A SPECIAL LOVE FOR MY SISTER.  THAT MAY BE PROBABLY ONE OF THE REASONS, BECAUSE MY SISTER WAS BORN OUT OF WEDLOCK, AND I THINK, TO A CERTAIN EXTENT, THAT LOVE MAY BE A LOVE THAT MAY BE A BIT HIGHER THAN THE LOVE SHE HAS FOR ME.  BUT SHE LOVES US.

I THINK MY MOTHER DO HAVE A LOVE, BUT SHE'S INTIMIDATED BY MY SISTER AND, BECAUSE OF THAT, I THINK SHE GIVES HER PREFERENCE AS TO MY SISTER AND I DON'T THINK THAT, WHEN MY MOTHER SAYS SHE WANTS MY SISTER AS

PREFERENCE, MY MOTHER HAS NOT VIEWED THE WHOLE, THE ADMINISTRATION OF HER AFFAIRS IN HER ESTATE. SHE'S GOING STRICTLY ON LOVE AND INTIMIDATION.

THE COURT: ONE OF THE OTHER THINGS THAT MR. GREGORIAN'S REPORT STATES, IN HIS INTERVIEWS WITH THE SOCIAL WORKERS, THAT, WHEN YOUR MOTHER SAYS SHE WANTS MS. JACKSON, SHE HAS BEEN SPENDING MORE TIME WITH HER MOTHER THAN YOU'VE BEEN ABLE TO DO OR HAVE BEEN DOING AND THAT THAT WOULD BE ANOTHER REASON WHY IT MIGHT MAKE SENSE FOR MS. JACKSON TO SERVE AS CONSERVATOR. APPARENTLY FROM WHAT THE SOCIAL WORKERS SAY, SHE'S BEEN MORE INVOLVED IN HER CARE THAN YOU.

MR. BRAY: NO, THAT'S ABSOLUTELY FALSE. I'VE SPENT MORE TIME WITH MY MOTHER EVER SINCE I MOVED BACK IN WITH MY MOTHER IN 2003. THAT'S ABSOLUTELY FALSE.

THE COURT: HOW LONG, MR. GREGORIAN, HAS MS. DAVIS BEEN WHERE SHE IS NOW?

MR. GREGORIAN: I BELIEVE THE PETITIONER HAS A BETTER KNOWLEDGE OF THAT BECAUSE SHE WAS MOVED FROM ONE FACILITY --

MS. JACKSON: THE CURRENT FACILITY SHE'S BEEN IN NOW, SHE'S BEEN THERE SINCE NOVEMBER 13TH, AND I HAVE A SUMMARY OF ALL THE ACTIVITIES THAT I PERFORMED FOR MY MOTHER.

THE COURT: SHE'S BEEN IN THE PRESENT FACILITY SINCE NOVEMBER LAST YEAR?

MS. JACKSON: THE CURRENT FACILITY, NOVEMBER 13, 2004.

THE COURT:  SHE WAS IN A FACILITY BEFORE THAT?

MS. JACKSON:  YES, SHE WAS.

THE COURT:  HOW LONG WAS SHE IN THAT FACILITY?

MS. JACKSON:  SHE WAS IN THAT ONE ABOUT A MONTH AND A HALF.

THE COURT:  BEFORE THAT?

MS. JACKSON:  SHE WAS IN REHAB.  SHE WAS IN A CONVALESCENT REHAB SHORTLY AFTER HER FALL FOR TWO WEEKS.

THE COURT:  WHEN WAS HER FALL?

MS. JACKSON:  HER FALL WAS SEPTEMBER 20TH, 2014. SHE WAS -- SHE CAME OUT OF THE REHAB ON OCTOBER 9, AND SHE WENT INTO A FACILITY.  THERE WAS A PROBLEM WITH THE LICENSE OF THE FACILITY.  SO SHE HAD TO BE MOVED.  SO I VISITED 10 DIFFERENT FACILITIES IN ORDER TO FACILITATE HER MOVING BECAUSE THE STATE GAVE THEM A SPECIFIC AMOUNT OF TIME TO DO THAT.

THE COURT:  BEFORE SHE HAD HER FALL, WHERE WAS SHE LIVING?

MS. JACKSON:  SHE WAS AT HOME.

THE COURT:  WHO LIVED WITH HER AT HOME?

MS. JACKSON:  MY BROTHER LIVED IN THE FRONT, AND I LIVED IN THE BACK.  WE BOTH LIVED ON THE PREMISES.

THE COURT:  OKAY.  WHAT IS YOUR -- WHAT DO YOU HAVE TO SAY ABOUT WHAT YOUR BROTHER SAID, THAT HE IS MORE INVOLVED IN LOOKING AFTER HER WHEN SHE WAS STILL LIVING WITH BOTH OF YOU?

MS. JACKSON:  WE BOTH WERE INVOLVED.  I TOOK CARE OF ALL OF MY MOTHER'S HEALTH NEEDS.  WITHIN 5 YEARS --

MY FATHER HAS BEEN DEAD FOR ABOUT 17 YEARS, 18 YEARS. AFTER THAT, I STARTED TAKING HER TO ALL HER DOCTORS' APPOINTMENTS. MY BROTHER PROBABLY WENT TO AN APPOINTMENT MAYBE THREE TIMES IN 15 YEARS. SO ALL OF HER MEDICATIONS, I GAVE. ALL OF HER DOCTORS' APPOINTMENTS, I ACCOMPANIED HER TO.

THE PHYSICIAN THAT SHE HAS JUST RETIRED A COUPLE OF WEEKS AGO, AND THAT PHYSICIAN HAS BEEN HER PHYSICIAN FOR ALMOST 20 YEARS. SO SHE KNEW ME. ALL I HAD TO DO WAS CALL IN, AND I WOULD GET A CALL DIRECTLY BACK FROM HER.

SO I PARTICIPATED IN BUYING FOOD. MY BROTHER PARTICIPATED IN BUYING FOOD. HE WOULD SOMETIMES GO BUY TYLENOL. ALL OF HER PRESCRIPTIONS, MEDS -- SHE WAS TAKING 12 MEDICATIONS THAT HAD TO BE PREPACKAGED THREE TIMES A DAY. I DID THAT. IF I LEFT ON A VACATION, I HAD TO PACKAGE THOSE MEDICATIONS FOR A WHOLE WEEK FOR MY MOTHER BECAUSE MY BROTHER REFUSED TO ADMINISTER ANY MEDS.

MY BROTHER WAS NOT INVOLVED IN HER CARE. HE WOULD TAKE HER TO THE BANK, AND THAT WAS SO HE COULD GET WHAT HE NEEDED TO GET -- GAS MONEY, THE CHECK SHE NORMALLY GAVE HIM EVERY MONTH AND WHATEVER OTHER MONIES, THAT WAS THE ONLY THING HE WAS PRIMARILY INVOLVED IN, WAS TAKING HER TO THE BANK.

THE COURT: SIR, WHAT DO YOU HAVE TO SAY?

MR. BRAY: I HAVE TO SAY I MOVED IN WITH MY MOTHER IN 2003 FROM VENTURA. I WAS LIVING IN VENTURA, AND I

MOVED IN WITH HER IN 2003.  WHEN I MOVED IN WITH MY MOTHER IN 2003, I FOUND THAT MY MOTHER HAD BEEN NEGLECTED BASICALLY PRIMARILY BECAUSE OF COMPANY MORE THAN ANYTHING ELSE.  I WOULDN'T SAY BECAUSE OF FOOD AND WHATEVER BECAUSE I USED TO SEE HER EVERY WEEKEND WHEN I LIVED IN VENTURA.  SO SHE WOULDN'T HAVE A PROBLEM WITH THAT ANYWAY BECAUSE I WOULD BUY ENOUGH FOOD THAT WOULD LAST HER UNTIL THE NEXT WEEK THAT I SAW HER.

BUT IN TERMS OF COMPANY, JUDGE, SHE WAS ALONE DURING THE DAY.  SHE WAS ALONE DURING THE NIGHT, AND THAT HAPPENED EVER SINCE THE TIME THAT I MOVED IN FROM 2003 UNTIL REALLY UP UNTIL SHE HAD HER FALL.  MY SISTER WAS RARELY HOME, WAS RARELY HOME FROM 2003 UNTIL MY MOTHER HAD HER FALL.

THE COURT:  WHY IS IT THAT YOUR SISTER WOULD BE RARELY AT HOME?

MR. BRAY:  I DON'T KNOW.  SHE WASN'T THERE.

THE COURT:  YOU'VE HEARD HER TESTIFY HERE TODAY THAT SHE, NOT YOU, ACCORDING TO HER, WAS THE ONE WHO WAS PRIMARILY INVOLVED IN MAKING SURE THAT YOUR MOTHER HAD THE DIFFERENT MEDICINES THAT SHE USED TO TAKE.

MR. BRAY:  YES, THAT'S CORRECT.  SHE PREPARED THE MEDICATION FOR MY MOTHER, BUT THAT'S THE ONLY THING THAT SHE DID.  LET ME BACK UP.  BEFORE WE GET TO THE PREPARATION OF MEDICATIONS, ANOTHER POINT, MY SISTER DIDN'T EVEN WANT TO TAKE MY MOTHER TO THE DOCTOR.  IT WAS VERY NEAR AT THE TIME WHEN I FIRST MOVED IN, BUT MAYBE I WOULD GUESS, JUST TO BE SAFEKEEPING, WITHIN A

YEAR, THERE CAME A TIME WHEN MY MOTHER WAS IN NEED OF EMERGENCY CARE AND I FELT EMERGENCY CARE -- MY MOTHER NEEDED TO GO TO THE DOCTOR.  I WENT TO MY SISTER TO ASK MY SISTER TO TAKE MY MOTHER TO THE DOCTOR.  AT THE TIME SHE HAD A NEWER VEHICLE.  SHE HAD A LARGER ONE.  I HAD AN OLDER 1986 FORD MUSTANG.  SHE HAD A NEWER TRUCK AND S.U.V.  SHE REFUSED TO TAKE HER.  SHE DIDN'T WANT TO TAKE HER TO THE HOSPITAL AT THAT TIME, AND SO I TOLD MY MOTHER THEN I WAS GOING TO TAKE HER.  AND I ALSO TOLD MY SISTER AT THE SAME TIME, BECAUSE SHE REFUSED TO TAKE MY MOTHER TO THE HOSPITAL, I SAID, "IF I WAS MY MOTHER, I'D PUT YOU OUT."

THE COURT:  THIS WAS IN 2003?

MR. BRAY:  THIS WAS -- I DON'T KNOW, JUDGE.  I WOULD SAY IT WASN'T 2003.  IT HAD BEEN A YEAR OR SO, SOMETHING LIKE THAT.

THE COURT:  THAT'S ALREADY 10 YEARS AGO.

MR. BRAY:  THAT'S RIGHT.

THE COURT:  SO YOU'RE ASKING ME NOT TO APPOINT HER BECAUSE OF ONE INCIDENT ABOUT 10 YEARS AGO?

MR. BRAY:  NO, NO.  WE HAVEN'T GOT TO THAT YET.  IT'S NOT NO ANSWER THEN, JUDGE.  I'M TELLING WHERE IN THE WHOLE SCENARIO COME ABOUT GIVING MY MOTHER MEDICINE.  I'M TRYING TO TELL YOU HOW ALL IT DEVELOPED.

THE COURT:  HOW DID IT DEVELOP?

MR. BRAY:  THAT'S WHAT I'M GETTING TO, IF YOU LET ME TELL YOU.  IN THE VERY BEGINNING, I DON'T -- AT THAT PARTICULAR TIME, MY MOTHER DIDN'T NEED THAT MUCH

MEDICINE. SHE WASN'T PREPARING NO MEDICINE AT THIS TIME. OKAY. ABSOLUTELY SHE WAS NOT PREPARING ANY MEDICINE. MY MOTHER BECAME MORE INVOLVED, AND I THINK HAD TO HAVE MEDICINE. AS THE YEARS WENT ALONG, SHE HAD TO HAVE MORE MEDICINE. AT THIS TIME SHE DIDN'T NEED THAT MUCH MEDICINE. SO MY SISTER WASN'T PREPARING NO MEDICINE AT THIS TIME. SO AT THIS TIME, SHE DIDN'T WANT TO -- SHE WAS TALKING TO, I BELIEVE, SOMEBODY ON THE PHONE, A FRIEND OF HERS, AND AFTER I TOLD HER, IF I WAS MY MOTHER I WOULD PUT HER OUT OF THE HOUSE WITHOUT TAKING HER TO THE HOSPITAL, AT THE TIME I GUESS SHE THOUGHT ABOUT IT OR SOMETHING AND SO LATER SHE DID TAKE HER TO THE HOSPITAL.

SO THE POINT OF THAT INFORMATION IS THAT MY SISTER IS TRYING TO GET YOU TO BELIEVE, BECAUSE SHE PREPARED THIS MEDICINE FOR MY MOTHER AND ALL THAT, SHE CARED, SHE'S CARED AND LOVED FOR MY MOTHER. AT THAT PARTICULAR TIME, SHE DIDN'T CARE ENOUGH TO WANT TO TAKE HER TO THE HOSPITAL AND --

THE COURT: HOW LONG HAS YOUR SISTER BEEN ADMINISTERING MEDICINES FOR YOUR MOTHER?

MR. BRAY: THAT'S A GOOD QUESTION, JUDGE. I WOULD SAY MAYBE -- I WOULD SAY MAYBE A YEAR OR SO AFTER THAT.

THE COURT: SO FOR THE LAST AGAIN 10 YEARS -- THAT'S A LONG TIME -- YOUR SISTER HAS BEEN THE ONE WHO HAS BEEN ADMINISTERING THE MEDICATION?

MR. BRAY: I WOULD SAY FOR MOST OF THAT, YES, SHE PROBABLY HAVE.

THE COURT: IF YOU WERE IN MY SHOES AND YOU HEARD THAT PIECE OF INFORMATION, WOULDN'T THAT BE PRETTY PERSUASIVE?

MR. BRAY: NO, IT WON'T BE PERSUASIVE, YOUR HONOR, BECAUSE MY MOTHER NEEDS MORE THAN JUST HAVING HER MEDICATION PREPARED, AND I COULD HAVE DONE THAT.

THE COURT: TELL ME WHAT ELSE I'M MISSING.

MR. BRAY: WE'RE GOING TO GET TO THAT, JUDGE. MEDICINE IS ONE ASPECT OF MY MOTHER'S LIFE. IT WASN'T A MAJOR ASPECT OR PART OF HER LIFE.

THE COURT: AS WE GET OLDER, MEDICINE GETS MORE AND MORE IMPORTANT.

MR. BRAY: ABSOLUTELY RIGHT. LET'S GO BACK TO WHO WAS TAKING CARE OF MY MOTHER. I WAS TAKING CARE OF MY MOTHER. OTHER THAN PREPARING OF MEDICINE, MY SISTER DID NOTHING ELSE FOR HER.

THE COURT: TELL ME WHAT YOU DID.

MR. BRAY: I RAN ERRANDS FOR MY MOTHER, MADE SURE MY MOTHER ATE HER MEALS THREE TIMES A DAY ABSOLUTELY IN THE EVENINGS AND THIS WAS FROM 2003 UP UNTIL SHE HAD HER FALL AND WENT INTO THE HOSPITAL. I MADE SURE SHE HAD A MEAL. I MADE SURE SHE -- I MADE SURE -- SHE HAD MEDICAL PROBLEMS. MY MOTHER HAD CONSTIPATION PROBLEMS.

THE COURT: WHO TOOK YOUR MOTHER TO THE DOCTOR?

MR. BRAY: MY SISTER TOOK MY MOTHER TO THE DOCTOR. OKAY? LET ME TELL YOU THIS: WHY I MADE A POINT SO SHE COULD TAKE HER TO THE DOCTOR BECAUSE SHE WASN'T DOING ANYTHING ELSE. SHE SHOULD TAKE HER TO THE DOCTOR

BECAUSE SHE HAD A BETTER VEHICLE, LIKE I SAID.

THE COURT:  WHY DID SHE TAKE HER TO THE DOCTOR AND YOU DID NOT TAKE HER?

MR. BRAY:  LIKE I SAID, SHE HAD A BETTER VEHICLE, FOR ONE THING, TO TAKE HER TO THE DOCTOR.  SO I FELT -- AND THE SECOND THING IS I FELT SHE NEEDED TO DO SOMETHING.  SHE WASN'T DOING NOTHING ELSE FOR MY MOTHER.  SHE WAS NEVER HOME TO DO ANYTHING ELSE.  SHE WAS NEVER HOME.  AND NOW THAT MY MOTHER WENT INTO THE HOSPITAL, NOW THAT MY MOTHER WENT INTO THE HOSPITAL AS OF SEPTEMBER, SHE'S ABSOLUTELY NOT HOME AT ALL.  SHE DON'T LIVE AT HOME.  WHEN MY MOTHER WAS THERE, SHE WAS VERY RARELY THERE.  NOW MY MOTHER IS NOT THERE, SHE DON'T LIVE AT HOME.  I THINK SHE'S WITH HER BOYFRIEND OR SOMETHING.  SHE'S NOT LIVING AT THE HOUSE.

THE COURT:  IS THERE SOMETHING WRONG WITH HER LIVING WITH HER BOYFRIEND?

MR. BRAY:  WHAT DO YOU MEAN?

THE COURT:  WHEN SHE'S NOT AROUND.

MR. BRAY:  WELL, SHE'S NOT TAKING CARE OF MY MOTHER.

THE COURT:  WAS IT CORRECT THAT HE, NOT YOU, WERE THE ONE WHO PRIMARILY MADE SURE SHE HAD DINNER?

MS. JACKSON:  NO.  I BROUGHT HER FOOD.  MY DAUGHTER BROUGHT HER FOOD.  FIRST, IT'S TOTALLY INCORRECT.  MY BROTHER WAS GONE FROM LOS ANGELES FOR OVER 20 YEARS, AND DURING THAT TIME, HE NEVER CAME HOME TO SEE HIS MOTHER.  THE ONLY TIME HE SAW HIS MOTHER IS

WHEN MY MOTHER AND FATHER WERE TRAVELING EN ROUTE AND THEN THEY WOULD MAKE PROVISIONS TO SEE HIM.  THEN WHEN HE MOVED BACK TO CALIFORNIA, HE DIDN'T MOVE TO LOS ANGELES.  HE MOVED TO VENTURA, GOT EVICTED, AND THEN CAME TO L.A.  THE ONLY THING IS MY MOTHER WOULD DO -- LIKE HE SAID, I WAS RARELY HOME.  I WORKED.  I WAS HOME IN THE AFTERNOON.  I LIVE IN THE BACK.  HE DON'T KNOW IF I'M HOME OR NOT.  I MADE SURE SHE HAD FOOD.  I MADE SURE HER MEDS WERE ALWAYS THERE EVERY SINGLE DAY.  I MADE SURE THAT, IF SHE NEEDED TO GO TO ANY KIND OF AN APPOINTMENT, I TOOK HER.

THE DAY MY MOTHER FELL, I WAS THERE WITH MY MOTHER WHEN THE AMBULANCE CAME.  MY BROTHER WAS NOT.  MY BROTHER DIDN'T EVEN SHOW UP TO THE EMERGENCY ROOM.  MY MOTHER HAD TO GO BACK TO THE EMERGENCY TWO DAYS LATER ON 9-22.  I TOO BRING HER TO THE EMERGENCY ALONE.  MY BROTHER WAS NOT THERE.  I HAD A NEIGHBOR TO PUT HER IN THE CAR BECAUSE I COULDN'T PUT HER IN THE CAR.  THAT WAS THE SECOND EMERGENCY VISIT.

THE THIRD EMERGENCY VISIT WHICH WAS 9-24, HE REFUSED TO HELP ME.  I WENT ACROSS THE STREET, GOT THE SAME NEIGHBOR TO PUT HER IN THE CAR.  WITHIN ONE WEEK, SHE WENT TO E.R. THREE TIMES, AND HE WAS NOT AVAILABLE, NOT ONE TIME DURING THAT WEEK WHEN SHE FELL.

THE COURT:  WHAT ABOUT WHAT HE HAS TO SAY THAT APPARENTLY YOU WERE NOT THERE FOR HER IN 2003?

MS. JACKSON:  I'M ALWAYS THERE FOR HER.  THAT'S WHY MY MOTHER PUT ME ON HER HEALTH DIRECTIVE WHICH WAS

2008.

THE COURT: ARE YOU THE ONLY PERSON?

MS. JACKSON: HE'S THE ALTERNATE. I'M THE PRIMARY. HE'S THE ALTERNATE. THAT'S WHY I'VE BEEN ON HER BANK ACCOUNTS FOR OVER 10 YEARS.

THE COURT: WHEN WAS THIS HEALTH DIRECTIVE EXECUTED?

MS. JACKSON: 2008.

THE COURT: SINCE 2008, THE LAST SEVEN YEARS, YOUR MOTHER'S WANTED YOU TO BE THE ONE IN CHARGE OF HER HEALTH?

MS. JACKSON: YES.

THE COURT: IF SHE --

MS. JACKSON: YES. I HAVE A NURSING BACKGROUND PLUS I HAVE A MASTER'S IN PUBLIC HEALTH. SO WHENEVER SHE HAD PROBLEMS, LIKE HE TALKED ABOUT CONSTIPATION, I BOUGHT PRUNE JUICE, I BOUGHT LAXATIVE. I BOUGHT SOMETHING -- IT'S LIKE NOW IN THE NURSING HOME YESTERDAY, I WENT AND GOT SUPPOSITORIES.

THE COURT: WHAT WAS THE OTHER DOCUMENT YOU WERE ABOUT TO REFER TO? WAS THERE A FINANCIAL DOCUMENT AS WELL?

MS. JACKSON: I'M ON HER -- WE HAVE A JOINT BANK ACCOUNT WHICH HAS BEEN IN EFFECT OVER 10 YEARS.

THE COURT: DOES YOUR MOTHER HAVE A JOINT ACCOUNT WITH YOUR BROTHER?

MS. JACKSON: NO, SHE DOES NOT.

THE COURT: WHAT IS IN THE JOINT BANK ACCOUNT?

MS. JACKSON:  MY MOTHER'S MONEY.

THE COURT:  DOES YOUR MOTHER GET -- FOR EXAMPLE, PRESUMABLY SHE GETS SOCIAL SECURITY.

MS. JACKSON:  IT'S DIRECTLY DEPOSITED INTO HER ACCOUNT.  SHE HAS A PENSION THAT ALSO IS DIRECT DEPOSITED INTO HER ACCOUNT.

THE COURT:  YOU'RE ON A JOINT ACCOUNT WITH HER?

MS. JACKSON:  YES.

THE COURT:  SO YOUR MOTHER TRUSTED YOU TO BE THE PERSON WHO SHE SHARED HER PENSION AND SOCIAL SECURITY MONIES WITH?

MS. JACKSON:  YES.

MR. GREGORIAN:  YOUR HONOR, IF I MAY JUST ADD THAT THIS IS ALL CONSISTENT WITH WHAT MY CLIENT HAS EXPRESSED, MS. JACKSON HAS BEEN TAKING CARE OF HER PRIMARILY FOR THE LAST SEVERAL YEARS.

THE COURT:  I'M GOING TO ASK THE COURTROOM ASSISTANT IF SHE CAN PULL FOR ME PLEASE THE COURT INVESTIGATOR'S REPORT, WHICH I'D LIKE TO ALSO REVIEW BEFORE I MAKE A DECISION.

IS THERE ANYTHING ELSE YOU WANT ME TO KNOW BEFORE I MAKE A DECISION?

MR. BRAY:  ARE YOU SPEAKING TO ME, JUDGE?

THE COURT:  YES.

MR. BRAY:  YES, THERE'S A LOT OF THINGS I WANT YOU TO KNOW.

THE COURT:  GO AHEAD.

MR. BRAY:  I HAVE THREE IMPORTANT REASONS,

ABSOLUTE REASONS, WHY MY SISTER SHOULD NOT BE OVER THE CARE OF MY MOTHER'S AFFAIRS.

THE COURT:  WHAT IS THE FIRST REASON?

MR. BRAY:  WELL, THEY BOTH HAVE -- ONE IS MY SISTER HAS TAKEN ADVANTAGE OF MY MOTHER IN AT LEAST THREE OR FOUR WAYS, THE OTHER IS MY SISTER PUTS HER INTEREST ABOVE MY MOTHER, AND LASTLY, BECAUSE SHE HAVE BAD CHARACTER.

THE COURT:  LET'S START WITH THE FIRST ONE.

MR. BRAY:  THE FIRST ONE, SHE'S TAKEN ADVANTAGE OF MY MOTHER FIRST WITH THIS SO-CALLED -- WELL, LET ME BACK UP BECAUSE I THINK SHE GOT THE CHECKING ACCOUNT LONG BEFORE THIS HEALTHCARE DIRECTIVE.  FIRST, ONE THING, THE CHECKING ACCOUNT, GETTING ON THE CHECKING ACCOUNT.  I BELIEVE SHE TOOK ADVANTAGE OF MY MOTHER WITH THIS CHECKING ACCOUNT BECAUSE, FIRST OF ALL, I BELIEVE SHE WANTED TO GET ON MY MOTHER'S CHECKING ACCOUNT FOR HER OWN INTEREST RATHER THAN MY MOTHER'S INTEREST AND SHE PERSUADED MY MOTHER AND THAT'S WHAT I MEAN TAKING ADVANTAGE OF.

THE COURT:  WELL, YOU'VE HEARD THIS STARTED -- WHEN DID THIS START, MA'AM?

MS. JACKSON:  AFTER MY DAD DIED OVER 10 YEARS AGO.

THE COURT:  SO LET'S JUST SAY YOU'RE RIGHT, SIR, THAT SHE INITIALLY TRIED TO TAKE ADVANTAGE OF YOUR MOTHER BY GETTING ON HER ACCOUNT.

WHY HAVEN'T YOU DONE ANYTHING?

MR. BRAY:  WHAT DO YOU MEAN WHY I HAVEN'T DONE

ANYTHING?

THE COURT:  IF YOUR SISTER WAS TAKING ADVANTAGE OF GETTING ON YOUR MOTHER'S ACCOUNT BEING A JOINT SIGNATORY, SHE'S HAD MANY YEARS TO HAVE THAT AND/OR YOU HAVE HAD MANY YEARS TO DO SOMETHING ABOUT IT, IF SHE WAS DOING WHAT YOU SAY SHE WAS DOING.

MR. BRAY:  I MEAN, MY MOTHER DIDN'T DO ANYTHING ABOUT IT BECAUSE SHE WENT ALONG WITH MY SISTER'S WANTS. THAT'S WHY SHE TOOK ADVANTAGE OF HER.

THE COURT:  WHY HAVEN'T YOU DONE ANYTHING TO STOP --

MR. BRAY:  THERE'S NOTHING I HAD TO DO.  SHE WAS ON HER CHECKING ACCOUNT.

THE COURT:  WHY DIDN'T YOU COME TO COURT, FOR EXAMPLE, AND SAY "LISTEN, JUDGE," OR SOME OTHER JUDGE, "MY SISTER IS STEALING MY MOM'S MONEY.  PLEASE STOP IT."

MR. BRAY:  I DIDN'T SAY MY SISTER WAS STEALING HER MONEY, JUDGE.  SHE TOOK ADVANTAGE OF HER BY PUTTING HER ON THE CHECKING ACCOUNT.  WHAT SHE SHOULD HAVE DONE WAS PUT US BOTH ON HER CHECKING ACCOUNT IF THE REASON WAS FOR BACKUP FOR MY MOTHER BECAUSE IT WAS MY MOTHER -- IT WAS NOT MY SISTER'S ACCOUNT.

THE COURT:  I NEED THE COURT INVESTIGATOR'S REPORT.

THE COURTROOM ASSISTANT:  I'M SORRY.

MR. GREGORIAN:  I HAVE A COPY HERE, YOUR HONOR.

MR. BRAY:  IT WAS MY MOTHER.  IT WAS NOT MY SISTER'S ACCOUNT.  MY MOTHER SAID -- SHE TOLD ME THAT

SHE ONLY PUT DIANE ON THERE BECAUSE SHE WANTED BACKUP IN CASE SOMETHING HAPPENED ON THE ACCOUNT AND SHE FELT -- SHE WAS PERSUADED TO BELIEVE THAT I WAS IN VENTURA, THAT I COULDN'T PROVIDE AS MUCH BACKUP AS MY SISTER COULD SINCE MY SISTER WAS STAYING THERE WITH HER.  SHE TOLD ME THAT WAS HER REASON FOR PUTTING HER ON; HOWEVER, MY SISTER MOTIVE WAS TO GET ON THAT ACCOUNT, WASN'T JUST TO HELP MY MOTHER BE BACKUP BECAUSE SHE PUT HER DAUGHTER ON THERE AND MY MOTHER DID NOT EVEN KNOW HER DAUGHTER WAS ON THE ACCOUNT BECAUSE, ONCE WE WENT THROUGH THIS THING ABOUT THE ACCOUNT COMING UP, I WENT TO THE BANK AND FOUND OUT THAT HER DAUGHTER WAS ON THE ACCOUNT.

I DIDN'T KNOW THAT AND MY MOTHER DIDN'T KNOW THAT AND I ASKED MY MOTHER.  SHE SAID SHE DIDN'T KNOW THAT.  AND MY MOTHER RESPONDED.  AS KEEN AS SHE IS AT 93, SHE SAID, "NEITHER ONE OF THEM IS ON MY SAVINGS ACCOUNT," WHICH IS TRUE.  SO THEY CAN'T MESS WITH HER SAVINGS ACCOUNT.  HER SAVINGS ACCOUNT IS IN HER NAME ONLY.  SO THIS IS WHAT I MEAN BY MY SISTER TAKING ADVANTAGE WITH MY MOTHER WITH HER CHECKING ACCOUNT.  IF HER --

THE COURT:  DO YOU HAVE ANY EVIDENCE THAT YOUR SISTER TOOK MONEY FROM THIS JOINT ACCOUNT THAT SHE SHOULDN'T HAVE?

MR. BRAY:  I'M NOT EVEN MAKING THAT CLAIM, JUDGE, THAT SHE TOOK MONEY FROM THE ACCOUNT.  THAT'S NOT MY POINT.

THE COURT:  WELL, THEN I'M MISSING IT BECAUSE --

MR. BRAY: THE POINT IS WHEN SHE -- WHEN MY MOTHER WANTED BACKUP FOR THIS ACCOUNT, BOTH OF US SHOULD HAVE BEEN PUT ON, ME AND MY SISTER, IN CASE SOMETHING HAPPENS, BUT INSTEAD OF PUTTING ME ON, MY SISTER PUT HER DAUGHTER ON.

THE COURT: LET ME ASK HER ABOUT THAT. WHAT ABOUT YOUR DAUGHTER BEING ON THE ACCOUNT?

MS. JACKSON: MY BROTHER WAS NOT HERE. SO BOTH OF THEM -- MY MOTHER WAS SITTING THERE, MY DAUGHTER WAS SITTING THERE, EVERYBODY WAS SITTING THERE. SO NOTHING WAS DONE UNDER THE TABLE. THE ONLY PERSON THAT'S TAKEN ADVANTAGE OF MY MOTHER'S ACCOUNT IS MY BROTHER. SHE'S WRITTEN HIM CHECKS EVERY MONTH, PLUS HE'S WRITTEN HIMSELF CHECKS AND SIGNED HER NAME, WHICH I HAVE COPIES OF. I ASKED HIM TO STOP. HE REFUSED TO STOP.

I HAVE A VOICEMAIL WHERE HE'S TELLING ME WHERE THE BANK CANNOT TELL HIM WHAT TO DO. I WENT TO THE BANK. WE HAD TO CANCEL EVERY CHECK IN THE HOUSE TO KEEP HIM FROM WRITING OTHER CHECKS AND SIGNING HER NAME, AND I HAVE COPIES OF ALL OF THOSE. SO THE ONLY PERSON THAT HAS GOTTEN CHECKS OUT OF MY MOTHER'S ACCOUNT IS MY BROTHER. MY COPY'S HERE.

THE COURT: YOU'RE TELLING ME, WHEN YOUR MOTHER, SHE PUT YOU ON THE ACCOUNT, ALSO PUT YOUR DAUGHTER AS A BACKUP?

MS. JACKSON: YES.

THE COURT: THAT WAS DONE ALL AT THE SAME TIME?

MS. JACKSON: YES.

THE COURT: WHAT ABOUT THE BAD CHARACTER ISSUE?

MR. BRAY: JUDGE, BEFORE THAT, I WANT TO GET TO THE ISSUE ABOUT -- WE -- THAT WAS JUST ONE THING, THE CHECKING ACCOUNT.

THE NEXT THING I WANT TO TALK ABOUT IS HEALTHCARE DIRECTIVE. THAT'S ANOTHER WAY MY SISTER TOOK ADVANTAGE OF MY MOTHER. I BELIEVE WHEN MY MOTHER -- OH, AND LET ME SAY THIS, JUDGE, WHILE I'M TAKING ABOUT IT RIGHT NOW: ALL OF THESE THINGS I'M LISTING TO YOU WAS DONE WITHOUT MY KNOWLEDGE, WITHOUT MY PRESENCE. SO I COULD NOT GIVE MY MOTHER MY INPUT ON ANY OF THESE THINGS, AND THAT'S GOING TO BE THE CHECKING ACCOUNT, THE HEALTHCARE DIRECTIVE.

OH, A LOAN. SHE INDUCED MY MOTHER TO TAKE OUT A LOAN AND MORTGAGE ON THE HOUSE AND A PERSONAL LOCK SHE GOT PUT ON THE BACK DOOR. I'LL GET TO THIS RIGHT NOW. WE'RE JUST ON THE CHECKING ACCOUNT.

SO THE NEXT THING IS THE HEALTHCARE DIRECTIVE. HERE AGAIN SHE TOOK ADVANTAGE OF MY MOTHER WITH THIS HEALTHCARE DIRECTIVE. I WASN'T THERE AND DIDN'T KNOW ANYTHING ABOUT IT. EVEN THOUGH I WAS APPOINTED THE FIRST ALTERNATIVE, I DIDN'T KNOW.

THE COURT: YOU WEREN'T LIVING THERE AROUND THAT TIME?

MR. BRAY: I WAS THERE, JUDGE. I WAS LIVING AT THE HOUSE. THAT'S 2008.

THE COURT: IF YOU WERE THERE AT THE HOUSE OVER 10 YEARS AGO, WHY DIDN'T YOUR MOTHER PUT YOU ON?

MR. BRAY:  THIS IS WHAT I'M TRYING TO TELL YOU, JUDGE.  YOU KEEP ASKING.  THIS WAS DONE WITHOUT ME EVEN KNOWING IT.

THE COURT:  SHE DOES NOT NEED YOU TO KNOW ABOUT IT.  SHE COULD HAVE JUST SAID, "LISTEN, I'VE GOT THIS HEALTHCARE DIRECTIVE.  I WANT BOTH MY CHILDREN TO DO IT."  SHE, FOR WHATEVER REASON, CHOSE ONE OF HER CHILDREN.

MR. BRAY:  NO, IT WASN'T HER IDEA TO GET NO HEALTH DIRECTIVE.  IT WAS MY SISTER'S IDEA TO GET THIS HEALTH DIRECTIVE.  I DIDN'T KNOW ANYTHING ABOUT IT.  NOW IF I WAS PUT DOWN AS THE FIRST ALTERNATIVE, JUDGE, WHY WASN'T I TOLD ABOUT IT?

THE COURT:  WELL, WHY IS IT THAT YOUR SISTER DID ANYTHING WRONG BY YOUR MOTHER CHOOSING HER TO BE ON THE HEALTHCARE DIRECTIVE?  IT'S NOT LIKE SHE'S GETTING SOME MONEY OR SOME ADVANTAGE AS YOU PUT IT, RATHER IT'S A RESPONSIBILITY TO BE THERE FOR HER MOTHER IF SOMETHING WERE TO HAPPEN TO HER.

MR. BRAY:  THAT'S RIGHT.  AND THAT'S WHAT I'M TELLING YOU ABOUT.  THIS PARTICULAR HEALTHCARE GOES BEYOND.  THAT'S THE POINT OF HER TAKING ADVANTAGE OF MY MOTHER.  THIS PARTICULAR HEALTH DIRECTIVE GIVES MY SISTER NOT ONLY TO MAKE DECISIONS REGARDING HER HEALTHCARE IT GIVES HER THE POWER EVEN IF SHE CAN MAKE THEM HERSELF AND MY MOTHER --

THE COURT:  THAT'S A STANDARD PROVISION IN THESE KINDS OF THINGS.

MR. BRAY: IT'S NOT A STANDARD PROVISION THAT EVERYBODY HAS TO SIGN, AND I DON'T THINK MY MOTHER WOULD HAVE SIGNED HAD SHE BEEN --

THE COURT: IS THERE ANY EVIDENCE OF THAT --

MR. BRAY: -- ADVISED --

THE COURT: -- THAT SHE WAS FORCED TO SIGN THIS?

MR. BRAY: JUDGE, SHE WASN'T FORCED TO SIGN IT. AS I TOLD YOU BEFORE, THIS IS THE PURPOSE OF TAKING ADVANTAGE OF SOMEONE. SHE DIDN'T FORCE HER. SHE DID IT OUT OF LOVE AND INTIMIDATION OF MY SISTER. THAT'S WHY SHE DID IT. AND OF COURSE --

THE COURT: I COULDN'T UNDERSTAND WHAT YOU'RE SAYING. PERHAPS WHEN WE'RE TALKING ABOUT MONEY, BUT WHEN WE'RE TALKING ABOUT HEALTHCARE DIRECTIVES, IT'S A DIFFERENT KIND OF PROPOSITION. IT'S NOT AS IF SHE'S NOW GOT MONEY SHE WOULDN'T OTHERWISE HAVE. HERE'S SHE'S GOT THE RESPONSIBILITY SHE OTHERWISE WOULDN'T HAVE.

MR. BRAY: THAT HEALTHCARE DIRECTIVE ALLOWED MY SISTER ALMOST COMPLETE CONTROL OF MY MOTHER'S LIFE. I DON'T THINK SHE WOULD HAVE DONE THAT WITHOUT ADVICE. I BELIEVE IT WAS INTENTIONAL THAT MY SISTER DIDN'T INFORM ME ABOUT THIS. THIS WAS A COMPLETE SURPRISE WHEN IT WAS BROUGHT UP IN THE HOSPITAL TO ME. SO WHY WASN'T I BROUGHT AWARE OF IT? IF I HAD BEEN BROUGHT AWARE OF IT, I WOULDN'T THINK MY MOM WOULD HAVE SIGNED THIS.

LET ME GIVE YOU THE TWO PASSAGES THAT GIVE HER ALMOST EVERYTHING, "MY HEALTHCARE AGENT AND HEALTHCARE DECISIONS WHILE I STILL HAVE MENTAL CAPACITY

TO MAKE DECISIONS."  THAT'S EXTRAORDINARY.  WHY WOULD MY MOTHER WANT MY SISTER TO MAKE DECISIONS --

THE COURT:  YOU'RE NOT PERSUADING ME ON THIS ARGUMENT.  WHY DON'T YOU MOVE TO THE NEXT ARGUMENT.

MR. BRAY:  WELL, THERE'S ANOTHER PART HERE ALSO, JUDGE.  "MY AGENT MAY MAKE ALL OTHER DECISIONS OF A PERSONAL NATURE, NOT INCLUDING A DESCRIPTION OF MY HEALTHCARE."  THIS IS SUPPOSED TO BE JUST HER HEALTHCARE DIRECTIVE THAT GAVE HER BROADER POWER OVER MY MOTHER SHE SHOULD NOT HAVE HAD, AND IF SHE HAD BEEN INFORMED, I WOULD ADVISE MY MOTHER NOT TO SIGN THIS AND I'M A LAWYER.

THE COURT:  YOU'RE AN ATTORNEY?

MR. BRAY:  YES, I AM.

THE COURT:  IN CALIFORNIA?

MR. BRAY:  I PRACTICED FEDERAL LAW HERE.  I'M LICENSED IN D.C.

THE COURT:  YOU HAVE AN ACTIVE LICENSE?

MR. BRAY:  YEAH, ABSOLUTELY.

THE COURT:  YOU'RE NOT PRACTICING THERE?

MR. BRAY:  PARDON ME?  I'M PRACTICING HERE IN CALIFORNIA.  I ONLY PRACTICE FEDERAL LAW, JUDGE, AND YOU HAVE A RECORD.  YOU CAN LOOK AT MY RECORD AS AN ATTORNEY.  I'VE GOT MULTIPLE PUBLIC DECISIONS.  I'M GOOD.

THE COURT:  ALL RIGHT.

MS. JACKSON:  YOUR HONOR, WHEN YOU REACH A CERTAIN AGE AT KAISER, I THINK IT'S REALLY EARLY THAN 90, IT'S

LIKE 80, EVERY TIME YOU GO IN, THEY MAKE SURE THAT -- ASK YOU ABOUT A HEALTH DIRECTIVE.  IT'S NOT ANYTHING I HAD TO PUSH.  MR. BRAY WAS WITH ME THE LAST TIME -- THE LAST TIME.  HE WENT TO THE DOCTOR WHICH WAS THE FIRST TIME IN YEARS.  AT THAT MEETING DR. MENA (PHONETIC) ASKED US, "DOES YOUR MOTHER HAVE A HEALTH DIRECTIVE?"  I SAID YES.  SHE LOOKED IN THE FILE.  SHE SAID YES.  HE DOESN'T SAY A WORD.  WE GOT IN THE CAR.  WE TALK TO MY MOTHER AGAIN ABOUT THE RESUSCITATION, DID SHE WANT TO BE RESUSCITATED.  SHE SAID AGAIN, "NO, I DO NOT WANT TO BE RESUSCITATED."

THE COURT:  JUST ONE MOMENT.  I THINK WE'RE REALLY -- THE COURTROOM ASSISTANT HAS GIVEN ME THE COURT'S OWN INVESTIGATOR'S REPORT.  IT HAS SOME FAIRLY DISTURBING INFORMATION IN THIS THAT I THINK IS WORTH DISCUSSING HERE.  IN PARTICULAR, I'M GOING TO READ FROM --

MR. GREGORIAN:  WHICH DATE IS THE REPORT, YOUR HONOR?  BECAUSE I BELIEVE THERE ARE TWO.

THE COURT:  I'M READING FROM THE ONE DATED MARCH 23 OF THIS YEAR.

MR. GREGORIAN:  OKAY.

THE COURT:  AND IT INDICATES THAT "MR. BRAY IS A LICENSED ATTORNEY IN D.C.," BUT THEN GOES ON TO INDICATE THAT "ALLEGEDLY HE HAS TRIED TO TAKE HIS MOTHER OUT OF THE FACILITY AND TO THE BANK BUT SHE INFORMED STAFF THAT HE'S NOT TO TAKE HER OUT OF THE FACILITY."  IN ADDITION, IT STATES THAT, "WHEN THE BANK ALLEGEDLY PROTESTED HIS

TRYING TO CASH CHECKS THAT HE HAD SIGNED ON HIS MOTHER'S ACCOUNT, HE CLAIMED HE WAS NOT DOING ANYTHING ILLEGAL."

WHAT DO YOU HAVE TO SAY ABOUT ALL OF THAT?

MR. BRAY:  ALL OF WHAT NOW, JUDGE?

THE COURT:  WHAT I JUST SAID.  IN ESSENCE, THAT ACCORDING TO THIS REPORT --

MR. BRAY:  UH-HUH.

THE COURT:  -- THE INVESTIGATOR WAS ADVISED THAT YOU WERE SIGNING CHECKS ON YOU YOUR MOTHER'S ACCOUNT, TAKING HER OUT OF THE FACILITY TO THE BANK TO TRY TO CASH THOSE.  THE BANK WOULD NOT CASH THE CHECKS UNDER THE CIRCUMSTANCES.

IS THAT TRUE?

MR. BRAY:  I DON'T KNOW ABOUT THESE -- FIRST OF ALL -- WAIT A MINUTE.  LET'S TAKE THESE -- BECAUSE THEY'RE TRYING TO CONNECT ITEMS THAT ARE SEPARATE.  FIRST OF ALL, DID I SIGN CHECKS FOR MY MOTHER?  YES, I DID, BECAUSE I CAN DO IT WITH HER CONSENT AND WITH HER KNOWLEDGE.  I ABSOLUTELY DID TO PAY HER BILLS.

LET'S GET -- WHILE WE'RE ON THAT, I DID, I ABSOLUTELY DID SIGN CHECKS FOR MY MOTHER.

THE COURT:  DID YOU TAKE HER OUT OF THE FACILITY TO CASH CHECKS?

MR. BRAY:  THAT'S WHAT I'M TRYING TO TELL YOU.  NO, ABSOLUTELY NOT.

MS. JACKSON:  HE TRIED --

MR. BRAY:  ABSOLUTELY NOT.

THE COURT:  EVEN THOUGH YOU MAY NOT HAVE BEEN

SUCCESSFUL, DID YOU TAKE HER OUT OF THE FACILITY TO TAKE HER TO THE BANK?

MR. GREGORIAN:  DID --

MR. BRAY:  I TAKE HER TO THE BANK TO PUT ME ON HER ACCOUNT SO I COULD WRITE CHECKS FOR HER?

THE COURT:  BANK WOULD NOT AGREE TO DO THAT; IS THAT RIGHT?

MR. BRAY:  NO.

MS. JACKSON:  HE DIDN'T --

MR. BRAY:  WE DID NOT GO TO THE BANK.  WE DIDN'T GET TO THE BANK.

MS. JACKSON:  HE WASN'T SUCCESSFUL IN GETTING HER OUT BECAUSE I CALLED THE POLICE TWICE.  THE THIRD TIME HE CALLED THE POLICE TO TAKE HER OUT, THE POLICE REFUSED TO ASSIST HIM.  WHEN HE SIGNED MY MOTHER'S NAME, I WENT TO THE BANK.  FIRST BANK CALLED ME.  I WENT TO THE BANK. THEN THEY TOLD ME THAT I COULD EITHER PUT THE CHECK INTO THE FRAUD UNIT BUT THEY WOULD HAVE TO CLOSE HER ACCOUNT AND I COULDN'T PAY ANY BILLS.

THEY SAID THE OTHER OPTION WAS TO GIVE HIM A WARNING, WHICH I DID.  I CAME, I CALLED HIM, I SAID "YOU CANNOT SIGN HER NAME ANYMORE.  THE BANK SAYS THAT YOU DO NOT HAVE AUTHORIZATION.  YOU'RE NOT ON THIS ACCOUNT."  HE LEFT ME A VOICEMAIL, AND I HAVE THE VOICEMAIL SAYING THAT THE BANK COULD NOT TELL HIM WHAT TO DO AND HE WROTE ANOTHER CHECK OCTOBER 30TH AND SIGNED HER NAME AGAIN AND I HAVE THESE CHECKS.

THE COURT:  WHAT DO YOU HAVE TO SAY ABOUT THAT?

MR. BRAY: THIS IS WHAT I'M SAYING ABOUT THIS, JUDGE. FIRST OF ALL, I PAY MY MOTHER'S BILLS FROM AT LEAST SOME TIME IN 2003 OR MAYBE BETWEEN 2003 AND 2004.

THE COURT: FORGET ABOUT 2003 OR 2004. LET'S TALK ABOUT WHAT HAS HAPPENED SINCE.

MR. BRAY: NO. WE CAN'T FORGET ABOUT THAT.

THE COURT: NO. I'M TELLING YOU I WANT TO KNOW WHY IT IS THAT YOU WENT AND TOOK HER OUT OF THE FACILITY.

MR. BRAY: I DID NOT TAKE HER OUT. STOP THERE BECAUSE I DIDN'T TAKE HER.

MS. JACKSON: THE POLICE INTERVENED. THAT'S WHY HE WASN'T ABLE TO GET HER OUT.

THE COURT: I SEE. YOU WANTED TO TAKE HER OUT?

MR. BRAY: THAT'S RIGHT. I WANTED TO TAKE HER OUT SO SHE COULD PUT ME ON HER CHECKING ACCOUNT SO I COULD PAY HER BILLS.

THE COURT: NOW I UNDERSTAND. AND DID THE POLICE INTERVENE?

MR. BRAY: I CALLED THE POLICE. THEY INTERVENED WHEN SHE RELIED ON THIS SO-CALLED HEALTHCARE AGREEMENT.

THE COURT: YOU MEAN, YOU CALLED THE POLICE ON YOUR MOTHER WHEN SHE WOULDN'T LEAVE?

MR. BRAY: I DIDN'T CALL THE POLICE -- JUDGE, YOU'RE MISCONSTRUING. I CALLED THE POLICE SO I COULD TAKE MY MOM TO THE BANK TO GET ON HER ACCOUNT. THE REASON THEY DIDN'T INTERVENE BECAUSE SHE TRIED TO ERRONEOUSLY RELY ON THAT AND GOT THE HEALTHCARE

DIRECTIVE AND THE FACILITY SAYING SHE DIDN'T WANT TO BE LIABLE BASED ON THAT. SO THE POLICE, WHO WOULD AGREE THAT SHE COULD GO AT FIRST, AFTER HE TALKED TO THE DIRECTOR, HE WENT ALONG WITH THE DIRECTOR.

BUT LET ME GET BACK TO WHY I WAS TAKING MY MOTHER TO THE BANK, JUDGE. BUT YOU CANNOT SEPARATE THAT. FROM THE TIME I MOVED IN BACK WITH MY MOTHER IN 2003, AT THAT PARTICULAR TIME, ME AND MY SISTER BOTH WAS PAYING MY MOTHER'S BILLS. OKAY. BUT THEN IN AWHILE MY MOTHER BEGAN TO SEE MY SISTER WAS NOT PAYING THE BILLS ON TIME AND SHE WAS NOT MAKING HER CHECKBOOK -- SHE WASN'T DOING CALCULATIONS IN HER CHECKBOOK TO KEEP THE PROPER BALANCE. SHE WOULD DO THINGS AND PAY HER A CHECK, BUT SHE WOULDN'T PUT THE BALANCE IN THERE. SO I HAD TO COME BACK OVER THERE AND PUT THE BALANCE AND ALL THAT.

SO AT THAT POINT, MY MOTHER DECIDED THAT SHE DIDN'T WANT HER TO DO HER CHECKS ANYMORE. SO FROM THAT POINT ON, PROBABLY IN 2004 UP UNTIL MY MOTHER HAD HER FALL, I DID HER CHECKS FOR HER. I DID HER BILLS FOR HER, ONLY ME, AND SHE DID THAT BECAUSE OF THAT AND I HAVE EVIDENCE NOW TOO THAT, ALTHOUGH MY SISTER TRIED DILIGENTLY TO TRY TO PAY THE BILLS DURING THE TIME -- LET ME GET BACK TO THIS, JUDGE.

OKAY. SO I WAS PAYING MY BILLS, MY MOTHER'S BILLS, UNTIL SHE HAD HER FALL. NOW ONCE SHE HAD HER FALL, BECAUSE OF HER DISABILITY, SHE COULD NO LONGER SIGN HER CHECKS AND DO THAT. SO FOR THAT LIMITED

TIME, THE COUPLE OF CHECKS, I DID SIGN.  IT'S PERFECTLY LEGAL.  I KNOW AS A LAWYER.

THE BANK DIDN'T APPROVE -- THE BANK DIDN'T APPROVE OF ME WRITING A CHECK FOR MY MOTHER.  I WAS TRYING TO DO THE CHECKS FOR MY MOTHER TO CONTINUE TO PAY HER BILLS.  SO NOW ONE OF THE BANK OFFICIALS, ONE OF THE BANK OFFICIALS THEN TOLD ME MY SISTER COULD PUT ME ON THE ACCOUNT AND THEN I COULD WRITE THE CHECKS ON MY OWN AND IT WOULDN'T BE A PROBLEM.

I WENT TO MY SISTER AND ASKED HER TO DO IT.  SHE REFUSED TO DO IT.  SHE REFUSED TO PUT ME ON MY MOTHER'S ACCOUNT.  SO I COULD NOT CONTINUE TO WRITE CHECKS AND PAY THE BILLS.  THE REASON SHE REFUSED TO DO IT IS FOR HER OWN PERSONAL INTEREST.  SHE CHECKED MY MOTHER'S CHECKING ACCOUNT AS HER CHECKING ACCOUNT.  THAT'S THE WAY SHE BELIEVED IT WAS, EVEN THOUGH IT'S HERS.

THE COURT:  WHAT IS THE EVIDENCE OF HER BAD CHARACTER?

MR. BRAY:  OH, YEAH.  I'M GOING TO GET TO THAT, JUDGE, IN A MINUTE.

THE COURT:  I WANT TO GET TO THAT NOW.

MR. BRAY:  ALL RIGHT.

MS. JACKSON:  CAN I SAY SOMETHING?

MR. BRAY:  FIRST OF ALL, NUMBER ONE, SHE USED THE HEALTHCARE DIRECTIVES TO KEEP ME FROM SEEING MY MOM BIRTHDAY -- ON MY BIRTHDAY AFTER SHE'D BEEN IN THE EMERGENCY.  THAT WAS MY BIRTHDAY.  I HAD SEEN MY MOTHER

THE NIGHT BEFORE.

THE COURT: THIS IS NOT ABOUT YOU, SIR. IT'S ABOUT YOUR MOTHER. I'M NOT CONCERNED ABOUT YOUR BIRTHDAY. I'M CONCERNED ABOUT WHAT --

MR. BRAY: WE'RE TALKING ABOUT MY SISTER'S BAD CHARACTER, JUDGE. ALL RIGHT? I UNDERSTAND THAT. SO WE'RE GETTING TO THAT, JUDGE. YOU KEEP CUTTING ME OFF BEFORE WE GET TO THE POINT I'M MAKING ABOUT HER BAD CHARACTER.

SO THIS IS MY BIRTHDAY. I WANT TO SEE MY MOTHER THE NEXT DAY, AND MY MOTHER WANTED TO SEE ME. I FOUND OUT LATER, BECAUSE SHE KEPT TALKING ABOUT MY BIRTHDAY AFTERWARDS. ANYWAY, I GOT THERE THE NEXT DAY WHICH WAS MY BIRTHDAY, EARLY BEFORE MY SISTER, AND AT THIS TIME MY MOTHER WAS ASLEEP. I GUESS THEY DIDN'T WANT ANYBODY TO DISTURB HER AT THAT TIME. SO I WAS WAITING. SO THEN LATER -- AT THIS TIME THEY WERE ONLY ALLOWING ONE VISITOR AT A TIME, ONE PERSON AT A TIME. ALTHOUGH I HAD GOTTEN THERE BEFORE MY SISTER WHEN THE DOCTOR CAME IN AND HAD THE ARRANGEMENTS -- SO SHE CAME LATE.

SO THEY SAY ONE OF US HAD TO LEAVE, WE COULDN'T BOTH SEE MY MOTHER AT THE SAME TIME. I SAID, "WELL, I WAS HERE FIRST. I SHOULD GET TO SEE MY MOTHER FIRST." THAT'S WHEN SHE AGAIN USED THIS HEALTHCARE DIRECTIVE TO SAY, "WELL, I'M THE MAJOR DECISIONMAKER HERE. SO I SHOULD GET TO SEE HER FIRST." SO THEN THEY WENT ALONG WITH THAT, ALTHOUGH I KNOW LEGALLY IN TERMS

OF HOSPITAL POLICY THEY SHOULD HAVE IGNORED THAT. THAT WASN'T A FACTOR OF ME SEEING HER AS A REGULAR VISITOR, BUT THE HOSPITAL, THEY RELIED ON THIS THING.

SHE'S BEEN ABUSING THIS HOSPITAL DIRECTIVE. ONCE SHE GOT TO SEE HER FIRST, I NEVER GOT TO SEE MY MOTHER AFTER THAT BECAUSE SHE'S SUPPOSED TO COME OUT. THE FIRST VISITOR SUPPOSED TO COME OUT AND LET THE OTHER ONE IN. SHE WOULD NEVER LET ME IN. SHE WOULD NEVER COME OUT BECAUSE OF HER USING THIS HEALTHCARE DIRECTIVE KEEPING ME OUT. BASICALLY SHE STAY IN FOR A WHILE.

THE COURT: WHAT IS YOUR RESPONSE TO THAT, MS. JACKSON?

MS. JACKSON: WE WERE TOLD THAT MY MOTHER WOULD BE DISCHARGED BETWEEN 8:00 AND 10:00. I GOT THERE AT 8:00 O'CLOCK. MY BROTHER HAD GOTTEN THERE, TRYING TO CONVINCE THE DOCTOR TO DISCHARGE HER, AND THE DOCTOR, WHEN HE RECOGNIZED THE HEALTHCARE DIRECTIVE -- AND MY MOTHER DIDN'T HAVE NOWHERE TO GO BECAUSE THE PLACE SHE HAD BEEN AT WOULD NOT TAKE HER BACK. SO I HAD TO FIND PLACEMENT FOR HER.

ONCE THE DOCTOR STARTED TALKING ABOUT THE HEALTH DIRECTIVE, MY BROTHER WENT OFF. THEY CALLED SECURITY. THEY ESCORTED HIM TO THE WAITING ROOM WHERE HE HAD TO STAY. DURING THAT TIME, I TALKED TO THE SOCIAL WORKERS TRYING TO FIND PLACEMENT. I LEFT THE HOSPITAL, WENT, LOOKED AT THREE FACILITIES BECAUSE THEY COULD NOT DISCHARGE HER UNTIL I HAD SOMEPLACE FOR HER TO GO THAT HAD 24-7 CARE.

WHILE I WAS GONE -- WHEN I CAME BACK, I WAS TOLD BY THE PHYSICIAN THAT MY BROTHER HAD TRIED TO GET BACK IN THERE, RAISING ALL OF THIS COMMOTION ABOUT HE SHOULD BE ABLE TO SEE HIS MOTHER, HOLLERING AND YELLING, AND HE THREATENED TO CALL THE TORRANCE POLICE DEPARTMENT.  SO ONCE I GOT THE SITE IDENTIFIED AND I HAD TO GO AND GET THE ARRANGEMENTS MADE AND GET A CHECK, THEY DISCHARGED MY MOTHER.  I DIDN'T KNOW WHERE HE WAS BY THEN BECAUSE THAT WAS, LIKE, 4:00 O'CLOCK IN THE AFTERNOON AND I HAD BEEN RUNNING AROUND TRYING TO FIND PLACEMENT FOR HER.  THEY DISCHARGED HER.

WHEN I TOOK HER OUT OF THERE, REMEMBER I'M EXHAUSTED DEALING WITH TRYING TO GET MY MOTHER SITUATED AND DEALING WITH HIM GOING TO COURT, RUNNING IN THERE. I'M CALLING THE POLICE THREE, FOUR TIMES A WEEK.  PEOPLE ARE GETTING UPSET, WANT HER TO GET OUT OF THE FACILITY BECAUSE IT'S TOO MUCH DISRUPTION.

WHEN I TOOK HER TO THE NEW BOARD AND CARE, I HAD ALREADY TALKED TO THE ADULT PROTECTIVE SERVICES BECAUSE KAISER HAD OPENED A CASE AT 9/22.  HE ACT A FOOL WITH THE SOCIAL WORKERS ABOUT NEEDING 24-7 CARE.  I HAD TALKED TO HER DOCTOR AND I TOOK HER TO A FACILITY.  I CALLED HIM AND SAID, "I'M NOT GIVING YOU THE ADDRESS."

THE COURT:  JUST GO A LITTLE BIT MORE SLOWLY FOR ME AND THE REPORTER.

MS. JACKSON:  WHEN SHE WAS DISCHARGED, I TOOK HER TO THE FACILITY.  I CALLED.  I SAID, "SHE'S OKAY, BUT I'M NOT GIVING YOU THE ADDRESS," BECAUSE I NEED TO PUT

HER SOMEWHERE SAFE UNTIL I CAN FIGURE OUT WHAT TO DO.  I HAD BEEN TOLD BY ADULT PROTECTIVE SERVICE TO FILE A DOMESTIC VIOLENCE T.R.O.

I WENT ON MONDAY MORNING AND I FILED IT AND IT WAS GRANTED AND HE COULD NOT COME WITHIN A HUNDRED YARDS OF ME OR HER UNTIL OUR HEARING, AND THAT'S WHAT HAPPENED.

THE COURT:  THANK YOU.  ANY OTHER EVIDENCE OF BAD CHARACTER, SIR?

MR. BRAY:  SIR, ALL THAT I DISAGREE WITH, AND A LOT OF THAT IS JUST FALSE.

THE COURT:  IS IT TRUE, FOR EXAMPLE, THAT THE COURT --

MS. JACKSON:  I HAVE A DISCHARGE DIAGNOSIS.

THE COURT:  IS IT TRUE THE COURT ISSUED A RESTRAINING ORDER AGAINST YOU?

MR. BRAY:  IT'S TRUE AN EX PARTE TEMPORARY RESTRAINING ORDER.  IT'S TRUE.  WHEN WE GOT TO THE COURT, IT WAS DISSOLVED.

MS. JACKSON:  BUT IT WAS GRANTED ON THE 4TH UNTIL WE HAD A HEARING.

MR. BRAY:  THAT WAS EX PARTE.

THE COURT:  WAS THERE A HEARING ON THE RESTRAINING ORDER AFTERWARDS?

MR. BRAY:  YES, IT WAS -- IT WAS DISSOLVED.

MS. JACKSON:  THEY TOLD US TO GO TO CONSERVATORSHIP COURT.  WHEN I FILED FOR CONSERVATORSHIP, I FILED FOR CONSERVATORSHIP BACK IN

OCTOBER BASED ON THE ADULT PROTECTIVE SERVICES, AND I HAVE THE E-MAIL FROM HER GIVING ME ALL THE COURT CLINICS. AND I WAS TOLD 2014 -- HE FILED APRIL OF 2015, BUT I WAS ADVISED THROUGH KAISER SOCIAL SERVICES ADULT PROTECTIVE SERVICES, WHICH I HAVE AN E-MAIL FROM HER WHICH I GAVE ALL OF THOSE TO THE ATTORNEY TO FILE A RESTRAINING ORDER.

THE COURT:  ALL RIGHT.  WHAT OTHER EVIDENCE DO YOU HAVE --

MS. JACKSON:  I HAVE THE DISCHARGE SUMMARY TOO. THIS IS WHAT HAPPENED WITH HER CHEST PAIN.  SHE STARTED HAVING CHEST PAIN WHEN HE CALLED THE POLICE TO TAKE HER OUT.

MR. BRAY:  I DIDN'T CALL THE POLICE.

MS. JACKSON:  YES, YOU DID.

MR. BRAY:  I DID NOT.

THE BAILIFF:  DON'T ARGUE.

THE COURT:  TALK TO ME, NOT TO EACH OTHER.

MS. JACKSON:  YOU SAID YOU CALLED THE POLICE.

MR. BRAY:  I SAID I CALLED THE POLICE, NOT FOR THE POLICE TO TAKE HER OUT.

THE COURT:  MA'AM, DON'T GET ENGAGED.

MS. JACKSON:  BUT I HAVE THE DISCHARGE SUMMARY.

MR. BRAY:  ALL OF THAT SHOWS THE FACT SHE USED THAT TO STOP ME FROM SEEING MY MOTHER.  THAT WAS THE WHOLE PURPOSE OF THAT.  ALL THAT OTHER STUFF THAT TOOK PLACE HAD NOTHING TO DO WITH THAT.

THE COURT:  MOVE ON TO THE NEXT POINT.

MR. BRAY:  ALL RIGHT.  THE NEXT POINT WAS SHE USED THE HEALTHCARE DIRECTIVE TO HIDE MY MOTHER FROM ME. WHEN SHE HAD HER TRANSFERRED FROM THE EMERGENCY ROOM, SHE DIDN'T TELL ME WHERE SHE WAS.  I HAD THE JUDGE AT THIS RESTRAINING ORDER HEARING TO ORDER HER TO GIVE ME THE ADDRESS SO I COULD SEE MY MOTHER; OTHERWISE, SHE HAD REFUSED TO TELL ME WHERE MY MOTHER WAS FOR NO GOOD REASON OTHER THAN MALICE.

THE COURT:  WHAT DO YOU HAVE TO SAY ABOUT WHAT YOUR SISTER SAID CONCERNING WHAT HAPPENED AT THE HOSPITAL?

MR. BRAY:  WHAT HAPPENED AT THE HOSPITAL?

THE COURT:  IN TERMS OF THEM TELLING YOU THAT YOU NEEDED TO SIT IN ANOTHER ROOM AND NOT CAUSE A COMMOTION.

MR. BRAY:  NO, I WASN'T CAUSING NO COMMOTION. THAT'S WHAT -- THEY DID THAT WHEN I TOLD YOU WHO TO DECIDE WHO COULD SEE MOM FIRST.  I HAD BEEN A --

THE COURT:  WERE YOU TRYING TO GET HER DISCHARGED?

MR. BRAY:  OH, NO.  IT HAD NOTHING TO DO WITH NO DISCHARGE.  AT THAT POINT, ALL I DID WANT IS TO SEE MY MOTHER AND DISCHARGE NEVER EVEN COME UP AND I DIDN'T EVEN ASK FOR SOME DISCHARGE.  I WASN'T EVEN CONCERNED ABOUT NO DISCHARGE AT THIS TIME.

THE COURT:  GO ON TO YOUR NEXT POINT.

MR. BRAY:  SHE USED THIS HEALTHCARE DIRECTIVE TO HIDE MY MOTHER FROM ME FOR NO OTHER REASON BUT MALICE. THERE'S -- MY MOTHER WANTED TO SEE ME ABOUT -- SHE JUST WANTED MY MOTHER TO KNOW WHERE MY -- WHERE MY -- JUDGE,

THIS ALL WAS BECAUSE I WANTED TO GET ON MY MOTHER'S CHECKING ACCOUNT SO I CAN PAY HER BILLS.

THE COURT:  WHY COULDN'T YOUR SISTER PAY HER BILLS?

MR. BRAY:  BECAUSE SHE WOULDN'T PAY THEM.

THE COURT:  WHAT EVIDENCE DO YOU HAVE TODAY THAT YOUR SISTER WASN'T PAYING THE BILLS?

MR. BRAY:  I'M GIVING YOU EVERYTHING THAT I'VE BEEN PAYING.

THE COURT:  NO.  I WANT TO KNOW WHAT EVIDENCE THAT YOU HAVE THAT YOUR SISTER WAS NOT PAYING THE BILLS.

MR. BRAY:  I KNOW SHE WASN'T PAYING THE BILLS BECAUSE I WAS PAYING THEM.

THE COURT:  IF YOU WERE PAYING THEM, THEN WHY DID YOU NEED YOUR MOTHER -- TO GET ON YOUR MOTHER'S ACCOUNT?

MR. BRAY:  WHEN I WAS PAYING THEM, MY MOTHER WAS ABLE TO SIGN HER OWN CHECKS.  THAT'S WHY.

THE COURT:  WHEN SHE WAS NOT ABLE TO, WHY DIDN'T YOUR SISTER DO IT?

MR. BRAY:  BECAUSE MY MOTHER DIDN'T WANT HER TO DO IT.  THAT'S WHY I STARTED DOING IT.

THE COURT:  BUT YOUR MOTHER HAD PUT YOUR SISTER ON HER ACCOUNT YEARS EARLIER.

MR. BRAY:  THAT'S WHY SHE WANTED ME TO PAY HER BILL.

THE COURT:  THERE'S NO EVIDENCE OF THAT, IS THERE, THAT YOUR MOTHER WANTED TO TAKE YOUR SISTER OFF OF THE ACCOUNT?

MR. BRAY:  THERE'S NO EVIDENCE SHE WANTED TO TAKE NEITHER ONE OF US OFF THE ACCOUNT.  I WAS PAYING THE BILLS.  THE REASON WAS BECAUSE MY MOTHER DIDN'T WANT --

THE COURT:  NEXT POINT.

MR. BRAY:  SO, LIKE, AGAIN, SHE HID MY MOTHER FROM ME.  THERE WAS NO MEDICAL REASON, NO HEALTH REASON OTHER THAN SHE DIDN'T WANT ME SEE HER, MY SISTER, AND ANOTHER THING IS, WHICH WE OVERLOOKED -- I WANT TO GET BACK TO HOW SHE WAS PUTTING HER INTEREST OVER MY MOTHER'S INTEREST TOO IN TERMS OF SENDING HER TO THESE HEALTH FACILITIES WHEN SHE SHOULD HAVE COME HOME.  I'LL GET TO THAT LATER.

OTHER POINT OF BAD CHARACTER IS SHE STOLE THE HOUSE KEY FROM OUR HOUSE FOR NO OTHER REASON THAN MALICE.  IT SHOULD BE RETURNED.  THE COURT SHOULD ORDER HER TO RETURN THEM HOUSE KEYS.  I DON'T KNOW WHY SHE DID IT.

THE COURT:  I'LL ASK HER ABOUT THAT.  NEXT POINT.

MR. BRAY:  THE OTHER ONE IS SHE TOOK MY INFORMATION -- STEPFATHER'S WALLET.  SHE HAD SOMETHING THAT WENT TO ASSISTING MY MOTHER, ASSISTING WITH HER PENSION, AND SHE TOOK THAT OUT OF THE HOUSE TOO, ANOTHER THING SHE STOLE FROM THE HOUSE.  THAT'S OTHER EVIDENCE OF BAD CHARACTER.

THEN SHE -- THEN THE BILL THAT NORMALLY COMES TO MY MOTHER'S HOUSE NOW, INSTEAD OF LEAVING THOSE BILLS THERE, NOW SHE TAKES THEM OVER SOMEWHERE ELSE, MAYBE OVER TO HER BOYFRIEND'S HOUSE.  SHE TAKES THEM OUT

OF THE HOUSE. THESE ARE MY MOTHER'S BILLS. THIS IS MY MOTHER'S. THESE THINGS SHOULD NOT BE TAKEN OUT. SO NO OTHER REASON BUT MALICE.

SHE TOLD LIES, FALSE STATEMENTS, TO GET THIS EX PARTE RESTRAINING ORDER AND THAT'S WHY, WHEN WE GOT TO THE COURT, WE GOT TO THE COURT AND THE JUDGE SAID, "IS THERE ANYTHING TO SUPPORT THIS RESTRAINING ORDER? I MEAN, I DON'T EVEN NEED YOU TO TESTIFY," AND I DIDN'T HAVE TO TESTIFY. SHE DISSOLVED IT WITHOUT ME SAYING ANYTHING. ALL THE THINGS SHE SAID WERE LIES, AND EVEN THE LIES WASN'T ENOUGH EVIDENCE TO GET HER TO GET A RESTRAINING ORDER. THAT RESTRAINING ORDER WAS EX PARTE.

THE COURT: WHY DON'T YOU GO BACK NOW TO HOW SHE ALLEGEDLY PUT HER INTEREST INSTEAD OF YOUR MOTHER'S INTEREST.

MR. BRAY: OH, YES, ABSOLUTELY. SHE WAS AT THE HEALTHCARE FACILITY. THIS IS ON THE STREET IN CARSON, I BELIEVE. AT THIS TIME MY MOTHER SAID SHE DIDN'T WANT ANY VISITORS AT ALL FROM ANYBODY BECAUSE MY NEIGHBOR HAD BEEN WANTING TO COME SEE MY MOTHER AND VISIT HER BUT MY MOTHER SAID SHE DIDN'T WANT TO HAVE ANY VISITORS. SHE BROUGHT HER ANYWAY. I DON'T KNOW HER NAME, BUT SHE HAD A SHORT HAIRCUT WITH BLOND LIKE HERS.

MY MOTHER DIDN'T WANT NO VISITORS. SHE DIDN'T WANT TO SEE ANYBODY. ANYWAY SHE PUT HER INTEREST ABOVE MY MOTHER'S. THESE ARE NOT IN ANY PARTICULAR ORDER. SHE HAD THE CABLE CANCELLED NOW, EVEN THOUGH MY MOTHER HAD BEEN PAYING FOR THESE CABLE CHANNELS.

THE COURT:  COME ON.  THAT ONE YOU'RE REALLY STRETCHING IT.  HOW WOULD IT BE IN YOUR MOTHER'S INTEREST TO KEEP CABLE CHANNELS AT THE HOUSE WHEN SHE'S NO LONGER LIVING THERE?

MR. BRAY:  WHAT I'M SAYING IS, JUDGE, I'M LIVING THERE, AND THE POINT IS MY MOTHER -- SHE DID NOT WANT -- SHE DIDN'T WANT THE CABLE CHANNEL CANCELLED, JUDGE.

THE COURT:  THAT'S NOT HELPING YOU.

MR. BRAY:  SHE DIDN'T WANT THE CABLE CHANNELS -- THIS WAS SOMETHING SHE WANTED, NOT MY MOTHER.  SHE WAS PUTTING HER INTERESTS ABOVE MY MOTHER'S.

MR. GREGORIAN:  IF I MAY, YOUR HONOR.  I'VE SEEN THE MOST RECENT CABLE BILL WHILE MS. DAVIS WAS IN THE CARE FACILITY AND OBVIOUSLY SHE'S NOT ENJOYING THE CABLE.  MR. BRAY HAS ORDERED THE MAYWEATHER/PACQUIAO FIGHT, A HUNDRED DOLLARS, EXPECTING HIS MOTHER TO PAY FOR IT WHILE SHE'S IN THE CARE FACILITY.

THE COURT:  HE DIDN'T PAY --

MR. GREGORIAN:  THE MOST RECENT BOXING MATCH IS A HUNDRED DOLLARS.  MEANWHILE, HIS MOTHER IS IN THE CARE FACILITY.  ON HIS MOTHER'S ACCOUNT.  NATURALLY IT'S NOT IN HER BEST INTEREST TO PAY FOR --

THE COURT:  THAT ARGUMENT IS NOT HELPING, SIR. MOVE ON.

MR. BRAY:  ALL RIGHT.  SIR, THE POINT IS THIS DECISION WASN'T MADE FROM MY MOTHER.  IT WAS MADE FROM MY SISTER.  THAT'S THE POINT.  I DON'T KNOW WHAT COST, HOW MUCH SHE WAS PAYING, HOW MUCH, WHATEVER.  MY MOTHER

DID NOT MAKE THE DECISION TO CANCEL THESE STATIONS. IT SHOULD HAVE BEEN MY MOTHER. IT'S IN HER ACCOUNT. IT'S PAID FROM HER ACCOUNT.

BUT AS FAR AS THE FIGHT, I COULD PAY FOR THIS FIGHT MYSELF IF MY MOTHER WANTED IT TO BE PAID. THAT'S NOT THE POINT, JUDGE. THE POINT IS IT WAS NOT MY MOTHER'S INTEREST THAT SHE MADE THAT DECISION. IT WAS HER DECISION, NOT MY MOTHER'S.

NEXT THING IS -- THE HOUSE KEY WAS ALREADY DISCUSSED. SHE TOOK THE HOUSE KEY FROM MY MOTHER'S HOUSE. SOME OF THE KEYS ON THERE, IF I WAS TO LOSE MINE, I WOULDN'T BE ABLE TO GET IN PART OF THE HOUSE. SHE TOOK THEM KEYS FOR HER INTEREST ABOVE MY MOTHER'S OUT OF THE HOUSE. THOSE ARE HOUSE KEYS TO BE USED FOR THE HOUSE.

MY MOTHER WANTED TO SEE ME ON MY BIRTHDAY. SHE DIDN'T GET TO SEE ME BECAUSE OF MY SISTER'S MISDEEDS. THAT'S MY SISTER PUTTING HER INTEREST ABOVE MY MOTHER'S.

AGAIN, WE ALREADY TALKED ABOUT THE CHECKING ACCOUNT. WHEN MY MOTHER WAS UNABLE TO CONTINUE TO WRITE THESE CHECKS AND I ASKED HER TO PUT ME ON THE ACCOUNT, SHE REFUSED TO DO SO. THAT WAS FOR HER INTEREST AND NOT MY MOTHER'S BECAUSE MY MOTHER'S INTEREST WAS FOR ME TO CONTINUE TO PAY HER BILLS. SHE REFUSED TO DO IT. IT WAS ONLY HURTING MY MOTHER, NOT HER.

THE COURT: WHY DID YOU HAVE TO PAY THE BILLS? WHY CAN'T YOUR SISTER DO IT?

MR. BRAY:  JUDGE, I JUST TOLD YOU MY SISTER DIDN'T DO IT BECAUSE MY MOTHER ASKED ME TO DO IT AND I'VE BEEN DOING IT AT LEAST FOR THE LAST 10 YEARS.  SHE WAS MESSING UP THE BILLS.  SHE WASN'T PAYING THEM ON TIME. SHE WAS NOT USING MY MOTHER'S CHECKBOOK.

WHILE WE'RE ON THAT, ALTHOUGH SHE DILIGENTLY NOW ATTEMPTED TO PAY BILLS, I HAVE EVERYTHING.  SHE STILL WASN'T PAYING CERTAIN BILLS ON TIME, INCLUDING THE MORTGAGE BILL AND THE TELEPHONE BILL.  SHE WASN'T PAYING ON TIME, AND THAT'S WHY MY MOTHER HAD ME DOING IT.

I HAVE THE TELEPHONE BILL RIGHT HERE.  IT WASN'T PAID ON TIME.  IF YOU NOTICE, IT WAS PAID --

THE COURT:  WHY DIDN'T YOU JUST PAY IT YOURSELF?

MR. BRAY:  BECAUSE SHE WAS PAYING THE BILLS, SIR, AND I PUT ALL THE BILLS ON THE TABLE FOR HER TO PAY.

THE COURT:  SHE DOES NOT NEED A PHONE ANYMORE. WHY DON'T YOU --

MR. BRAY:  WHAT DO YOU MEAN SHE DOES NOT NEED TO PAY A PHONE ANYMORE?

THE COURT:  YOU MOTHER IS NOT LIVING THERE.

MR. BRAY:  MY MOTHER STILL HAS CALLS.  I'M NOT GOING TO CUT THE PHONE OF.  I'M STILL LIVING THERE.

THE COURT:  WELL, THEN PAY FOR IT.

MR. BRAY:  WHAT DO YOU MEAN I PAY FOR IT?  I DID PAY FOR IT THIS TIME, BUT SHE WAS PAYING ALL THE BILLS, SIR.  YOU'RE GETTING AROUND THE POINT.  THE POINT IS EVERYTHING SHE DID SHE WAS SUPPOSED TO BE PAYING THE

BILLS. SHE DIDN'T PAY THEM ON TIME. THAT WAS THE POINT, THAT MY MOTHER HAD ME START DOING THE BILLS BECAUSE SHE DIDN'T PAY THEM ON TIME, SIR.

THE COURT: LET'S GO THROUGH AND HAVE MS. JACKSON RESPOND TO ALL OF THESE.

MS. JACKSON: I HAVE THEM WRITTEN DOWN.

THE COURT: I'M GOING TO DO IT IN THE ORDER I HAVE. WHAT IS THE ISSUE WITH THE KEY?

MS. JACKSON: JUDGE, YOUR HONOR, I TAKE MY MOTHER TO THE EMERGENCY ROOM. I ADMITTED HER IN TO EVERY FACILITY. SHE WENT, SHE GAVE ME HER KEYS, AND ASKED ME TO HOLD THEM. THAT'S HOW I GOT THE KEYS. I DIDN'T STEAL THEM OUT OF THE HOUSE.

THE COURT: WERE YOU HIDING YOUR MOTHER?

MS. JACKSON: WHEN I GOT HER DISCHARGED FROM THE HOSPITAL WHEN HE WAS HAVING ALL THE COMMOTION AND I CALLED AND I GOT SOCIAL SERVICE AND KAISER TO HELP ME, I MOVED HER TO A FACILITY. WHEN WE WENT TO THE HEARING, THE JUDGE MODIFIED THE RESTRAINING ORDER TO LET HIM VISIT BUT HE COULD NOT REMOVE HER FROM THE FACILITY AND THAT WAS A MODIFICATION TO THE RESTRAINING ORDER. I CALLED HIM --

THE COURT: THE OTHER JUDGE -- THE JUDGE MODIFIED THE ORDER BUT HE KEPT IT IN PLACE?

MS. JACKSON: YES. I HAVE IT.

THE COURT: WAS THE ORDER DISSOLVED, OR WAS IT KEPT IN PLACE?

MS. JACKSON: IT WAS KEPT IN PLACE AT THAT POINT.

WHEN WE WENT TO THE NEXT HEARING IS WHEN THEY DISSOLVED IT AND TOLD US TO GO TO CONSERVATORSHIP COURT.

THE COURT:  THAT'S WHY THE ORDER WAS DISSOLVED, BECAUSE YOU WERE GOING TO GO TO THE CONSERVATORSHIP COURT?

MS. JACKSON:  THAT'S WHAT WE WERE TOLD TO DO, BUT SHORTLY AFTER THIS, MY MOTHER FILED ANOTHER DOMESTIC VIOLENCE CASE AGAINST --

THE COURT:  WHAT HAPPENED WITH THAT?

MS. JACKSON:  IT WAS DISMISSED.  THAT WAS NOT GRANTED, AND IT WAS DISMISSED.

THE COURT:  HAVE YOU BEEN MAKING THE PAYMENTS ON A TIMELY BASIS ON THE MORTGAGE?

MS. JACKSON:  YES.  JUDGE, YOUR HONOR, MY BROTHER HIDES ALL THE BILLS.  HE HIDES THEM, AND THEN HE SAYS IN COURT, "OH, SHE'S NOT PAYING THEM."  HE HIDES EVERYTHING THAT COMES THROUGH:  FOLLOW-UP VISITS, CORRESPONDENCE ABOUT MY MOTHER'S CO-PAYS, CHANGE OF DOCTORS.  HE HIDES EVERYTHING, BUT WHAT I DID IS I WENT ON-LINE AND SET UP NEW ACCOUNTS FOR EVERYTHING.  I HAVE AN ACCOUNTS PAYABLE LIST.

INITIALLY MY BROTHER GAVE ME TWO CHECKS. WHEN MY MOTHER WAS ADMITTED, WHEN SHE FELL, ALL OF THE BILLS WERE CURRENT BECAUSE I HAVE HIS LEDGER -- HE GAVE ME TWO CHECKS TO SIGN.  THEN HE TOLD ME HE WANTED TO BE ON THE ACCOUNT.  I HAVE COPIES OF THOSE CHECKS THAT HE SIGNED.  HE KNEW HOW TO GET CHECKS SIGNED, BUT HE WANTED TO BE ON THE ACCOUNT.  I EVEN OFFERED TO GIVE HIM A

CHECK IF HE WOULD JUST LEAVE HER ALONE AND QUIT TRYING TO TAKE HER OUT OF THE FACILITY.

THE COURT:  WHAT ABOUT YOUR STEPFATHER'S WALLET?

MS. JACKSON:  MY FATHER HAS BEEN DEAD ALMOST 20 YEARS.  I DIDN'T KNOW WHERE IT WAS.  SHE TOLD ME TO GET IT AND KEEP IT UNTIL SHE CAME HOME.

THE COURT:  WHAT WAS IN THE WALLET?

MS. JACKSON:  NOTHING BUT HIS SOCIAL SECURITY CARD, MASONS CARD, THAT KIND OF STUFF, VETERANS CARD. HE'S BEEN DEAD 18 YEARS.

THE COURT:  MR. GREGORIAN, IS THERE ANYTHING YOU WANT TO SAY?

MR. GREGORIAN:  I'M SORT OF BAFFLED HERE, YOUR HONOR.  I HEAR TESTIMONY FROM MR. BRAY.  IT SEEMS LIKE IT'S MORE HIS INTEREST THAN MY CLIENT'S INTEREST.  IT HAS BEEN HOW HE HAS BEEN WRONGED, HE'S NOT BEEN INCLUDED IN EVERY DECISION THAT'S MADE REGARDING THE PROPOSED CONSERVATEE.

A POINT I KEPT HEARING IS THAT HE'S NOT BEEN ABLE TO VISIT HIS MOTHER WHILE HE'S KNOWN WHAT CARE FACILITY SHE'S IN.  I LOOKED AT THEIR VISITOR LOGS.  I SEE ONE HOUR MAYBE EVERY WEEK OR MAYBE EVERY TWO WEEKS A VISIT.  THIS, TO ME, DOES NOT SEEM TO BE A PERSON WHO CARES ABOUT VISITING HIS MOTHER AT A CARE FACILITY, EVEN THOUGH HE KNOWS FULL WELL WHERE SHE IS AND HE HAS FULL ACCESS TO HER AT ANY TIME.

ANOTHER POINT OF CONCERN FOR ME AND MY CLIENT, YOUR HONOR, ARE THESE CHECKS THAT ARE EITHER

WRITTEN BY MR. BRAY OR SIGNED BY HIM OR ASKING MY CLIENT TO SIGN THESE CHECKS AND THESE ARE NOTHING BUT JUST ALLOWANCE PAYMENTS TO MR. BRAY.

THE COURT:  HAVE YOU TALKED TO YOUR CLIENT?  I'M NOT SURE WHAT HER CAPACITY IS.  DOES SHE UNDERSTAND ABOUT THE CHECKS?

MR. GREGORIAN:  SHE UNDERSTANDS ABOUT THE CHECKS.

THE COURT:  DID YOU ASK HER IN SO MANY WORDS WHETHER SHE AUTHORIZED -- SHE WANTS HER SON TO RECEIVE MONEY FROM HER?

MR. GREGORIAN:  THAT, I HAVE NOT DISCUSSED, YOUR HONOR.

THE COURT:  SO HE'S CONTENDING SHE AGREED THAT HE COULD HAVE -- HE COULD HAVE CHECKS WRITTEN BY HER.  DO YOU HAVE ANYTHING OR EVIDENCE OR ANYTHING TO SAY ABOUT THAT?

MR. GREGORIAN:  I HAVE NOT DISCUSSED THAT WITH HER, YOUR HONOR.  IT WAS MY UNDERSTANDING IN 2004 HER CAPACITY WAS ALREADY DECLINING.  I DON'T THINK SHE WOULD EVEN UNDERSTAND WHAT IT IS SHE WAS SIGNING ON THESE CHECKS.  WHEN I SPOKE TO MR. BRAY ABOUT IT, HE SAYS, YOU KNOW, "EVERY MOTHER WANTS TO PAY THEIR SON AS MUCH MONEY AS HE'S ENTITLED TO."  IN THE MEANWHILE, SHE'S LIVING ON SOCIAL SECURITY --

MR. BRAY:  I DIDN'T SAY NO SUCH THING.  I OBJECT TO THAT.

THE COURT:  OVERRULED.

MR. GREGORIAN:  -- EVEN THOUGH HER SOCIAL SECURITY

INCOME IS NOT ENOUGH TO PAY FOR HER CARE AND I UNDERSTAND MS. JACKSON IS PAYING FOR THE CARE FACILITY.

MR. BRAY:  I HAVE NO KNOWLEDGE OF THAT.

MR. GREGORIAN:  WHEN YOU ADD IT UP, YOUR HONOR, IT DOESN'T MAKE SENSE THIS IS IN THE BEST INTEREST OF MS. DAVIS.  IT SEEMS LIKE WE'RE HERE ARGUING ABOUT WHAT IS IN THE BEST INTEREST OF MR. BRAY.

THE COURT:  ONE OTHER POINT, SUPPOSEDLY YOU'RE BRINGING A VISITOR TO VISIT YOUR MOTHER EVEN THOUGH ALLEGEDLY SHE DIDN'T WANT VISITORS.

MS. JACKSON:  MAY I SAY SOMETHING TO THAT?  MY BROTHER GAVE MY COUSIN THE ADDRESS.  MY COUSIN CAME OVER TWICE.  THE PERSON THAT CAME -- SHE DIDN'T COME TO VISIT MY MOTHER.  SHE CAME TO PICK ME UP, AND CAME INTO THE ROOM BECAUSE EVERYBODY KNEW WHERE I WAS.  ON MY BIRTHDAY PEOPLE HAD TO COME TO THE FACILITY BECAUSE I'M THERE EVERY DAY BUT SUNDAY AND I'VE BEEN DOING THIS SINCE DAY ONE.  FOUR, FIVE, SIX DAYS A WEEK I'M AT EVERY FACILITY MY MOTHER'S BEEN AT.  SO WHEN PEOPLE WANT ME, THEY HAVE TO COME TO THE FACILITY TO FIND ME.  THEY DON'T COME TO SEE HER.  HE SENT MY COUSIN OVER THERE TWICE.

THE COURT:  ALL RIGHT.

MR. BRAY:  JUDGE, JUST ONE THING WE NEED TO GET TO BEFORE YOU FINISH.  THIS OTHER THING AGAIN WHERE SHE TOOK ADVANTAGE OF MY MOTHER IS WITH THIS LOAN, THIS $50,000 LOAN ON THE HOUSE.  AGAIN SHE INDUCED MY MOTHER INTO SIGNING THIS.  WHEN MY FATHER DIED, THE HOUSE WAS PAID FOR.  HE LEFT IT PAID FOR WITH MY MOTHER.  MY

SISTER INDUCED MY MOTHER TO TAKE OUT A $50,000 LOAN UNDER THE RUBRIC OF DOING HOUSE IMPROVEMENTS, BUT THERE WAS NO $50,000 WORK, HOUSE IMPROVEMENT WORK, ON THAT HOUSE.

THE COURT:  WHEN WAS THIS LOAN TAKEN OUT?

MS. JACKSON:  2005.

MR. BRAY:  NO.  IT WAS 2007 ACCORDING TO WELLS FARGO.

MS. JACKSON:  2005 OR 2006, I THINK.

THE COURT:  WHY WAS A LOAN TAKEN OUT AT THAT TIME?

MS. JACKSON:  FOR HOME IMPROVEMENT.  MY PARENTS' HOME HAD NOT HAD ANY MAJOR IMPROVEMENT.  THE HOME WAS BUILT IN 1940.  MY MOTHER GOT TWO ROOFS, OLD ROOFS TAKEN OFF, NEW ROOFS PUT ON.  SHE GOT A FLOOR HEATING SYSTEM CONVERTED TO A WALL HEATING SYSTEM.  SHE GOT TERMITE TREATMENT AND WHATEVER THEY DO FOR THAT, RE-STUCCO, PAINTING DONE.  HE WAS IN THE HOUSE THE WHOLE TIME.  HE WAS HARASSING THE WORKERS, WHAT THEY WERE DOING.  THEN SHE PAID OFF ALL OF HER BILLS.

THE LOAN WAS THROUGH WELLS FARGO.  NONE OF IT CAME TO ME.  IT WAS STRICTLY MY MOTHER, AND MY MOTHER HAD ALREADY DECIDED TO MAKE IMPROVEMENTS BUT MY FATHER DIED.  MY MOTHER DIDN'T GET BACK TO IT UNTIL SHE SORT OF GOT THROUGH THE GRIEVING.  I DIDN'T INDUCE HER TO DO IT.

THE COURT:  SIR, I'VE HEARD YOUR LAST POINT.  THE EVIDENCE IS OVERWHELMINGLY IN FAVOR OF MS. JACKSON'S PETITION FOR THE FOLLOWING REASONS:  IT'S YOUR MOTHER'S PREFERENCE.  SHE SIGNED THE HEALTHCARE DIRECTIVE IN

FAVOR OF MS. JACKSON, NOT YOU, AS A JOINT SIGNATORY ON THE ACCOUNT.  SHE EVEN PUT HER GRANDDAUGHTER AS A SIGNATORY ON THE ACCOUNT.

MR. BRAY:  SHE DIDN'T KNOW IT, JUDGE.

THE COURT:  LET ME FINISH, SIR.  THERE'S EVIDENCE FROM THE HOSPITAL, FROM THE FACILITY, OF RECORDS THAT IT'S MS. JACKSON, NOT MR. BRAY, WHO VISITS HER ON A REGULAR BASIS.  THE EVIDENCE IS UNDISPUTED THAT IT'S MS. JACKSON, NOT MR. BRAY, THAT PROVIDES FOR HER, WHAT DRUGS FOR HER TO TAKE.  IT'S MS. JACKSON, NOT MR. BRAY, WHO TAKES HER TO SEE THE DOCTOR.

MOREOVER, THERE'S COMPELLING EVIDENCE THAT IT WOULD NOT BE IN THE PROPOSED CONSERVATEE'S BEST INTEREST FOR MR. BRAY TO BE HER CONSERVATOR WHERE IT APPEARS THAT THE HOSPITAL FACILITY HAD POLICE OR OTHER PERSONNEL TO BE CALLED TO PREVENT CONDUCT ON THE PART OF MR. BRAY.  THAT IS NOT IN MS. DAVIS'S INTEREST, INCLUDING TAKING MONEY OUT OF HER ACCOUNT.

COUNSEL INDICATES THAT HER CAPACITY SINCE LAST YEAR OR EARLIER HAS BEEN SUCH THAT SHE WOULD NOT HAVE UNDERSTOOD WHAT MR. BRAY WAS TRYING TO DO; AND THEREFORE, THE COURT HAS GRAVE CONCERN ABOUT MR. BRAY BEING IN CHARGE OF MONEY THAT HE'S BEEN TRYING TO GET IN CHARGE OF APPARENTLY FOR SOME TIME WITHOUT COMPLETE SUCCESS.

IN ADDITION, WE HAVE THE EVIDENCE OF MR. BRAY TURNING ON THE CABLE CHANNEL TO RECEIVE A BOXING MATCH AT HIS MOTHER'S EXPENSE NOTWITHSTANDING

THAT MS. DAVIS HAS LONG AGO UNFORTUNATELY HAD TO BE IN THE FACILITY WHERE SHE COULDN'T HAVE WATCHED THE MATCH EVEN IF SHE WANTED TO.

SO FOR ALL OF THOSE REASONS, THE COURT IS GOING TO DENY WITH PREJUDICE MR. BRAY'S PETITION AT 5001 AND GRANTS MS. JACKSON'S COMPETING PETITION AT 5002.

THE COURT CLEARS MATTER A.  NO CITATION IS NECESSARY WHERE COUNSEL HAS WAIVED HER APPEARANCE.  IN ADDITION, WHAT I DID ALREADY MENTION WAS THAT THE COURT INVESTIGATOR'S REPORT ALSO RECOMMENDED MS. JACKSON BE APPOINTED AS DOES P.V.P. COUNSEL AS OPPOSED TO A PROFESSIONAL OR A NEUTRAL IN THIS MATTER.

MR. BRAY:  WE'RE NOT NEUTRAL, JUDGE.

THE COURT:  FOR THE FOLLOWING REASONS, I'M GOING TO MAKE THE FOLLOWING FINDINGS:  IS THERE AN OBJECTION TO THE PETITION?

MR. GREGORIAN:  NO, YOUR HONOR.

THE COURT:  JTD 1, NO OBJECTION.  JTD 2, CLEAR AND CONVINCING EVIDENCE A CONSERVATORSHIP OF THE PERSON AND ESTATE IS NECESSARY AND APPROPRIATE, UNABLE TO CARE FOR HER OWN AFFAIRS, LEAST RESTRICTIVE ALTERNATIVE NEEDED FOR HER OWN PROTECTION.  3, PROPOSED CONSERVATOR, MS. JACKSON, IS SUITABLE AND QUALIFIED AND IS HEREBY APPOINTED CONSERVATOR OF THE PERSON AND ESTATE.

4, DOES SHE HAVE THE ABILITY TO FILL OUT A VOTER REGISTRATION AFFIDAVIT?

MR. GREGORIAN:  I BELIEVE WITH ASSISTANCE SHE DOES.

THE COURT: SHE RETAINS THAT ABILITY. 5, THE CAPACITY DECLARATION THAT HAS BEEN FILED PREVIOUSLY INDICATES THAT SHE LACKS CAPACITY. I'M GOING TO MAKE A FINDING ON 5. 6 IS MOOT. SHE'S ALREADY IN A FACILITY. I DON'T NEED TO MAKE -- THAT CAN BE DENIED WITHOUT PREJUDICE. 7, THE COURT DOES MAKE THAT FINDING GIVING CONSERVATOR AUTHORITY TO ADMINISTER MEDICATIONS CONSISTENT WITH WHAT SHE'S DOING ALREADY.

COUNSEL, IS THERE AN ESTATE THAT IS OVER THE LIMITS REQUIRING AN ACCOUNTING, OR IS IT JUST SOCIAL SECURITY?

MR. GREGORIAN: IT'S JUST SOCIAL SECURITY.

THE COURT: WHAT ABOUT A PENSION?

MS. JACKSON: SHE HAS A SMALL PENSION.

MR. GREGORIAN: VERY SMALL PENSION.

THE COURT: HOW MUCH IS THE --

MS. JACKSON: 450-SOMETHING, I THINK.

THE COURT: THERE'S NOT ENOUGH HERE TO QUALIFY OR TO REQUIRE A BOND OR AN ACCOUNTING.

A LEVEL OF CARE FORM NEEDS TO BE FILED WITHIN 60 DAYS.

COUNSEL, YOUR FEES ARE HOW MUCH?

MR. GREGORIAN: IT'S COUNTY PAY, YOUR HONOR, AND THE ESTIMATE FOR TODAY'S HEARING -- I HAVE TOTAL AMOUNT OF FEES IN THE AMOUNT OF 3,200 AND COSTS OF $54 FOR A TOTAL OF 3,254, YOUR HONOR.

THE COURT: GRANTED, TO BE PAID BY THE COUNTY. COUNSEL IS DISCHARGED. JTD 11, DENIED WITHOUT

PREJUDICE, AND NO. 12, I ALREADY ADDRESSED.

THANK YOU.  THAT'S MY DECISION.

MR. GREGORIAN:  THANK YOU, YOUR HONOR.


(PROCEEDINGS CONCLUDED.)

///.

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

DEPARTMENT 79                    HON. DAVID J. COWAN, JUDGE

IN RE THE CONSERVATORSHIP  )
                           )
OF HELEN JACKSON           )    NO. BP159733
_____)

I, TAMARA M. VOGL, OFFICIAL REPORTER OF THE SUPERIOR COURT OF THE STATE OF CALIFORNIA, FOR THE COUNTY OF LOS ANGELES, DO HEREBY CERTIFY THAT I DID CORRECTLY REPORT THE PROCEEDINGS CONTAINED HEREIN AND THAT THE FOREGOING PAGES 1 THROUGH 48, INCLUSIVE, COMPRISE A FULL, TRUE, AND CORRECT TRANSCRIPT OF THE PROCEEDINGS AND TESTIMONY TAKEN IN THE MATTER OF THE ABOVE-ENTITLED CAUSE ON JUNE 12, 2015.

DATED THIS  23RD  DAY OF JUNE, 2015.


_____
TAMARA M. VOGL, CSR NO. 10186
OFFICIAL REPORTER

**4**

# LOS ANGELES COUNTY SUPERIOR COURT
## PROBATE INVESTIGATOR'S PETITION REPORT
(Due 5 Days Prior to Hearing)
CONFIDENTIAL

| INVESTIGATOR:<br>GAILYN SPENCE | | | CASE NAME:<br>HELEN DAVIS | |
|---|---|---|---|---|
| ☑ Person  ☑ Estate  ☐ Successor | | | CASE NO:<br>BP159733<br>☐ Consolidated | Hearing Date: 04/09/2015<br>District: Central District<br>Department: 79 |
| ☑ Dementia  ☐ Dev. Disabled  ☐ Limited | | | | |
| ☐ Medical  ☐ Change of Adr.<br>Investigation.  ☐ Temporary<br>Hearing | | | | |

1. The conservatee resides at <u>Bright Days , 5010 Torrance Blvd, Torrance, Ca 90503 Tel. No. (818) 590-2878</u> .
The conservatee was visited on <u>03/04/2015</u> at <u>Same</u> .
At that time, I informed him/her of the contents of the citation naming the following party/parties as the proposed conservator(s).
PROPOSED CONSERVATOR 'S ADDRESS

☐ PROFESSIONAL  ☐ REGISTERED     ☐ VS   ☐ PROFESSIONAL   ☐ REGISTERED

<u>DIANNE JACKSON</u>

<u>402 E. 93RD STREET</u>

<u>LOS ANGELES, CA 90003</u>

<u>Phone: (323) 397-1832</u>                     Phone:

Also See Attachment   ☐

I explained the nature, purpose and effect of the proceeding. I informed him/her of his/her right to be present at the hearing; to oppose the proceedings; have a jury trial and of his/her right to have counsel. I answered all questions concerning the citation.

2. I have determined that the proposed conservatee:
   a. ☐ is ☐ is not able/willing to attend the hearing.   ☑ See #4
   b. ☐ does ☐ does not wish to contest the proceeding.   ☑ See #4
   c. ☐ does ☐ does not object to the proposed conservator.   ☑ See #4
      ☐ Prefers _____   Phone: _____
      to act as conservator.
   d. ☐ does ☑ does not wish to be represented by counsel.   ☐ See #4
      1) The proposed conservatee has retained/wishes to retain counsel:
         Attorney's Name: _____   Phone: _____
         Address: _____
      2) It would be ☑ helpful ☐ not helpful to have an attorney to protect the interest of the proposed conservatee.   ☐ See #4
   e. ☐ is ☑ is not a developmentally disabled person   ☐ See #4
   f. ☑ lacks ☐ does not lack the capacity to give an informed consent to medical treatment   ☐ See #4
   g. ☐ is ☑ is not able to complete the Affidavit of Voter Registration per section 2208 of the Elections Code.   ☐ See #4

CASE NUMBER:  BP159733          CASE NAME: HELEN DAVIS

3. ☑ a) I have considered, to the extent practicable, whether I believe that the proposed conservatee suffers from any of the mental function deficits listed in subdivision (a) of Section 811 that significantly impairs the proposed conservatee's ability to understand and appreciate the consequences of his/her action in connection with any of the functions described in subdivision (a) or (b) of Section 1801, and my observations that support the belief are set forth in paragraph 4 below.

☐ b) I am unable to consider whether the proposed conservatee has any of the mental function deficits as set forth in ☐ above because the proposed conservatee is: unconscious; comatose; non-communicative; OR, ☐ it is not practicable and requires expertise of a doctor trained and licensed in the field.

☐ c) It appears the proposed conservatee is ☐ is not ☐ in need of the Temporary Conservatorship.

4. Narrative (which includes proposed conservatee's express communication concerning items 2 and/or 3):

2.

This is an investigative report regarding the petition for conservatorship of person and estate with dementia powers for Helen Davis. The hearing for the petition is April 9, 2015. A fee waiver was granted February 6, 2015. A physician's declaration has been filed for dementia powers. PVP counsel has not been appointed at the time of the writing of this report per CourtNet.

Helen Davis is a 93 year-old (DOB: 2/28/1923) woman seen at Brighter Days Home (License# 198204201, no expiration). Brighter Days is a group home for the elderly with a capacity of 6 adults. It is a large two-story home maintained in an appropriate manner. It is located on a major street in an upscale residential area. It is in close proximity to an acute hospital, other care facilities and a major mall.

Ms. Davis was admitted to the facility on November 13, 2014 from an acute setting. She shares a nicely appointed room, decorated in bright colors, with another resident at a private cost of $2000.00 per month. Staff reported the petitioner is meeting the financial obligations and needs of the conservatee. The petitioner visits and there are no issues.

INTERVIEW WITH THE PROPOSED CONSERVATEE:
Helen Davis was interviewed in the living room area of the house. She was watching television with another resident. The proposed conservatee was sitting in an easy chair with a blanket over her lap and a cap covering her head. She was attired in street clothing and her personal appearance was satisfactory. Helen verbalized simple needs, made eye contact, smiled and was friendly. She seemed to enjoy the attention from the undersigned and wanted to know when the undersigned was going to visit with her, again.

Ms. Davis could recall her date of birth but not an address or her age. She was not sure why she was living in the group home. According to her something happened. She went to the hospital and ended up at the group home. Helen stated some of her memory is gone and she is shaky in trying to remember. Most of all, she wants to feel better and stated she takes medicine for aches and pain. The proposed conservatee stated staff is good to her, she does not have any complaints and there are no problems. Ms. Davis said she is content.

The conservatorship issues and rights were explained, one time. Ms. Davis inquired, "Why are you here?" The purpose of the visit, the conservatorship and rights were explained a second time. Helen stated she trusts her daughter and thinks her daughter taking responsibility for her is a good idea. Although the proposed conservatee did not oppose the conservatorship, it is highly doubtful if she retained the information or understood the conservatorship

CASE NUMBER: BP159733    CASE NAME: HELEN DAVIS

issues or rights. Ms. Davis stated her daughter visits and brings whatever she needs. Per staff, the proposed conservatee requires extensive assistance with activities of daily living.

During the course of the interview, the undersigned observed that at times, the proposed conservatee was at a loss for words. She could not recall the words to complete her ideations. The nature of the visit, the proposed conservatorship and rights were explained. Ms. Davis did not oppose the conservatorship or the appointment of her daughter as conservator. According to her, she trusts Dianne and Dianne will do right by her. Helen does not want to come to court. Limited mobility and medical deficits may preclude her attendance. She did not desire legal counsel but the court may wish to appoint PVP counsel for the exploration of dementia powers. The proposed conservatee was not able to conduct a meaningful conversation regarding medical issues and appeared to lack the capacity to give informed medical consent. Helen was not able to provide the information that is required to complete the voter's registration form.

FAMILY CONTACT:
Lorick Brae, son, contacted the undersigned via the telephone. He is opposed to the petition' for conservatorship and the appointment of Dianne, his sister, as conservator. Mr. Brae reported he is going to file a competing petition.

Lorick gave a history that he moved from Ventura County and into his mother's home in 2003. He became the primary caregiver and helped his mother manage her affairs. According to Mr. Brae, his sister lives in a separate unit in the rear of his mother's property and she was rarely home to take care of their mother. Lorick reported he took his mother shopping, to  the bank and medical appointments. He stated that he went over monthly expenses with his mother, filled out the checks and his mother signed the checks. After a fall on September 2014, Ms. Davis could not sign the checks and Lorick started signing the checks with their mother's permission but ceased when the bank protested.

Mr. Brae stated he is opposed to Dianne being appointed as conservator because she wants to control their mother and he is of the opinion their mother can make her own decisions. He reported that Dianne took out a loan on the house for $50,000.00 to do home improvements and the house did not have any encumbrances. He has seen minimal home improvement and wonders about the money. According to him, Dianne is on his mother's checking account and is using their mother's money to pay the loan. The petitioner has refused to put her brother on the checking account.

INTERVIEW WITH PETITIONER AND FINANCIAL INFORMATION:
Dianne Jackson, daughter and petitioner, was contacted by the undersigned, telephonically. She gives a history that her mother lived in her own home until she had a fall in September 2014. In 2004, Ms. Davis placed the petitioner on her bank accounts and gave Dianne Jackson, power of attorney for health care in 2008. According to the petitioner, her mother's condition started to decline due to the diagnosis of dementia and she was assisting her mother in paying the bills. The petitioner requires the conservatorship to make decisions regarding care, manage the affairs of her mother and to protect her assets.

After the fall in 2014, the proposed conservatee's physician advised the family that Ms. Davis would require care, all the time and advised that she be placed. According to the recommendations of the physician, Ms. Davis was placed at Bright Days after a stay in a facility for rehabilitation. Ms. Jackson would like to bring her mother home, but cost of care in the home is not supported by the proposed conservatee's estate. Ms. David will remain at Bright Days and there are no imminent plans to change the placement of the proposed conservattee.

Ms. Jackson has monthly income that is comprised of Social Security and a pension at approximately $1750.00. Ms. Davis owns her home, but there is a small mortgage payment due to a home improvement loan at $50,000.00 and the monthly mortgage is approximately $340.00. According to the petitioner,

4.

CASE NUMBER: BP159 733     CASE NAME: HELEN DAVIS

her mother has expressed that she wants to sell the house. The petitioner stated there were extensive home improvements, including the rewiring of the whole house. Dianne is paying cost of care at Bright Days and any additional expenses incurred by her mother. She is visiting 2 to 3 times a week.

The petitioner admitted there is conflict with Lorick Brae, her brother. When their mother was hospitalized, Mr. Brae was confrontational with physicians and social workers. Kaiser made a referral regarding his behavior and non-compliance with medical staff regarding placement of the proposed conservatee to Adult Protective Services. Furthermore, if the petitioner did not place the mother and returned her home, per the wishes of Mr. Brae, staff at Kaiser was going to allege neglect. Lorick was not willing to compromise or provide the appropriate care of his mother if their mother returned home per the petitioner. Placement was the only option.

Ms. Jackson reported Lorick lived with his mother but did not contribute to the household at any time. He does have license to practice law in D. C., but Ms. Jackson stated that she has never known her brother to make a living at practicing law. While living with their mother, Ms. Davis would give Lorick a check for $300.00, monthly. Per Ms. Jackson, he did not take his mother anywhere, including appointments. In her lifetime, she estimated that Lorick may have taken their mother to medical appointments 3 times and when she asked him to help, he had other things to do.

Dianne reported that since their mother has been taken out of the home, Lorick has signed checks and cashed them. When the bank protested, he told Dianne that he was not doing anything illegal. He is upset that Dianne will not place him on the bank account. At Bright Days, he has tried to take her out and to the bank, but she informed staff that he is not to take her out of the facility. There has been an exchange of restraining order between Dianne and Lorick, but each has been dismissed. Currently, the petitioner is consulting with legal counsel regarding an unlawful detainer for Lorick.

CONCERNS:
After visiting the proposed conservatee, the undersigned opines she is not able to manage her affairs due to cognitive deficits. Lorick is of the opinion his mother can make decisions, independently and is capable of being in control. Yet, he reported he was assisting his mother in management of her affairs. After the fall, he reported he was signing checks for his mother. For the undersigned, there is a contradiction in his theory, the proposed conservatee can make decisions in her best interests and manage her affairs.

The petitioner is requesting dementia powers. The court may wish to appoint PVP counsel for the exploration of dementia powers.

CONCLUSIONS:
Ms. Davis was a lovely, friendly person and interacted well with the undersigned. However, she presented with memory and cognitive deficits that impede her ability to make appropriate decisions regarding her welfare. Helen appeared to be an appropriate candidate for conservatorship and the petition should be granted. The petitioner is involved in her mother's care, visits and appeared to be appropriate to serve in the capacity as conservator.

The statements contained in the Confidential Supplemental Information Report appeared to give an accurate depiction of the proposed conservatee.

RECOMMENDATIONS:
A) The petition for conservatorship of person and estate with dementia powers should be granted.
B) The petitioner should be appointed to serve in said capacity.
C) Care is in the least restrictive environment.
D) The proposed conservatee appeared to lack the capacity to give informed medical consent.
E) The proposed conservatee was able to provide the information that is required to complete the voter's registration form.

Medical information is under a separate cover.

5.

CASE NUMBER: BP159 733      CASE NAME: HELEN DAVIS

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on _____03/23/2015_____ , at _____LOS ANGELES_____ ,California

GAILYN SPENCE
PROBATE INVESTIGATOR

6.

**5**

# LOS ANGELES COUNTY SUPERIOR COURT
## PROBATE INVESTIGATOR'S PETITION REPORT
(Due 5 Days Prior to Hearing)
### CONFIDENTIAL

| INVESTIGATOR:<br>GAILYN SPENCE | | | CASE NAME:<br>HELEN DAVIS | |
|---|---|---|---|---|
| ☑ Person   ☑ Estate   ▦ Successor<br>☑ Dementia  ☐ Dev. Disabled  ☐ Limited<br>☐ Medical  ☐ Change of Adr.  ▦ Temporary<br>Investigation.  Hearing | | | CASE NO:<br>BP159733<br>☐ Consolidated | Hearing Date: 06/04/2015<br>District: Central District<br>Department: 79 |

1. The conservatee resides at <u>Bright Days 5010 Torrance Blvd. Torrance, Ca 90503 Tel. No. (818) 590-2878</u> .
   The conservatee was visited on <u>05/07/2015</u> at <u>Same</u> .
   At that time, I informed him/her of the contents of the citation naming the following party/parties as the proposed conservator(s).
   PROPOSED CONSERVATOR 'S ADDRESS

   ▦ PROFESSIONAL   ☐ REGISTERED     ☑ VS   ▦ PROFESSIONAL   ▦ REGISTERED

   <u>DIANNE JACKSON</u>                          <u>LAURACK BRAY</u>

   <u>402 E. 93RD STREET</u>                       <u>402 E. 93RD STREET</u>

   <u>LOS ANGELES, CA 90003</u>                    <u>LOS ANGELES, CA 90003</u>

   Phone: <u>(323) 397-1832</u>                    Phone: <u>(805) 901-2593</u>

   Also See Attachment   ☐
   I explained the nature, purpose and effect of the proceeding. I informed him/her of his/her right to be present at
   the hearing; to oppose the proceedings; have a jury trial and of his/her right to have counsel. I answered
   all questions concerning the citation.

2. I have determined that the proposed conservatee:
   a. ☐ is ☐ is not able/willing to attend the hearing.   ☑ See #4
   b. ☐ does ☑ does not wish to contest the proceeding.   ☐ See #4
   c. ☐ does ☑ does not object to the proposed conservator.   ☐ See #4
      ☐ Prefers _____   Phone: _____
      to act as conservator.
   d. ☐ does ☑ does not wish to be represented by counsel.   ☐ See #4
      1) The proposed conservatee has retained/wishes to retain counsel:
         Attorney's Name: ARMEN DEREK GREGORIAN      Phone: (310) 543-1616
         Address: 3465 TORRANCE BLVD STE D, TORRANCE, CA 90503
      2) It would be ☑ helpful ☐ not helpful to have an attorney to protect the interest of the proposed
         conservatee.   ☐ See #4
   e. ☐ is ☑ is not a developmentally disabled person   ☐ See #4
   f. ☑ lacks ☐ does not lack the capacity to give an informed consent to medical treatment   ☐ See #4
   g. ☐ is ☑ is not able to complete the Affidavit of Voter Registration per section 2208 of
      the Elections Code.   ☐ See #4

CASE NUMBER: BP159733          CASE NAME: HELEN DAVIS

3. ☑ a) I have considered, to the extent practicable, whether I believe that the proposed conservatee suffers from any of the mental function deficits listed in subdivision (a) of Section 811 that significantly impairs the proposed conservatee's ability to understand and appreciate the consequences of his/her action in connection with any of the functions described in subdivision (a) or (b) of Section 1801, and my observations that support the belief are set forth in paragraph 4 below.

☐ b) I am unable to consider whether the proposed conservatee has any of the mental function deficits as set forth in ☐ above because the proposed conservatee is: unconscious; comatose; non-communicative; OR, ☐ it is not practicable and requires expertise of a doctor trained and licensed in the field.

☐ c) It appears the proposed conservatee is ☐ is not ☐ in need of the Temporary Conservatorship.

4. Narrative (which includes proposed conservatee's express communication concerning items 2 and/or 3):

2.

This is an investigative report regarding the competing petition for conservatorship of person and estate with dementia powers for Helen Davis. The hearing for the petition is June 4, 2015. A fee waiver was not granted for this petition due to insufficient information. A physician's declaration has been filed for dementia powers. Armen Gregorian has been appointed as PVP counsel.

Helen Davis is a 92 year-old (DOB: 2/28/1923) woman seen at Brighter Days Home (License# 198204201, no expiration). Brighter Days is a group home for the elderly with a capacity of 6 adults. It is a large two-story home maintained in an appropriate manner. It is located on a major street in an upscale residential area. It is in close proximity to an acute hospital, other care facilities and a major mall.

Ms. Davis was admitted to the facility on November 13, 2014 from an acute setting. She shares a nicely appointed room, decorated in bright colors, with another resident at a private cost of $2000.00 per month. Staff reported the petitioner is meeting the financial obligations and needs of the conservatee. The petitioner visits and there are no issues.

INTERVIEW WITH THE PROPOSED CONSERVAT EE:
Helen Davis was interviewed in the living room area of the house away from staff and residents. Prior to the visit, the proposed conservatee was sitting at the dining room table and staff escorted her in the wheelchair to the living room. The undersigned observed staff has to assist her in transfers from the wheelchair.

The proposed conservatee was sitting in an easy chair with a blanket over her lap. She was attired in street clothing and her personal appearance was satisfactory. Helen verbalized simple needs, made eye contact and was friendly. She interacted well.

Ms. Davis could recall her date of birth but not an address or her age. Again, she was not able to explain why she is in a facility and not at home. Helen stated some of her memory is gone and she is shaky in trying to remember. The proposed conservatee stated staff is good to her, she does not have any complaints and there are no problems.

The conservatorship issues and rights were explained. Water formed in her eyes and she went silent. She stayed silent for a while. It appeared it was very stressful to discuss her children. Helen stated it is very hard for her to choose between her children and she loves both of them. However, she knows Dianne will manage her affairs appropriately and desires that she is responsible for her. After the proposed conservatee stated her preference, she

*3.*

CASE NUMBER: BP159 733    CASE NAME: HELEN DAVIS

continued to cry. Furthermore, she wanted to know what she was doing wrong as a mother that would cause the situation between her children. She opined it is her fault and she does not know what to do. Helen opined she just wants everything to be okay, with everybody.

Per staff, the proposed conservatee requires extensive assistance with activities of daily living. Also, she is sad about the problems with her adult children and this causes to her to cry. On the other hand, the progression of the dementia is causing some depression.

The nature of the visit, the proposed conservatorship and rights were explained. Again, Ms. Davis did not oppose the conservatorship or the appointment of her daughter as conservator. According to her, she trusts Dianne and Dianne will do right by her. Helen does not want to come to court. Limited mobility and medical deficits may preclude her attendance. Armen Gregorian was appointed as PVP counsel. The proposed conservatee was not able to conduct a meaningful conversation regarding medical issues and appeared to lack the capacity to give informed medical consent. Helen was not able to provide the information that is required to complete the voter's registration form.

INTERVIEW WITH PETITIONER AND FINANCIAL INFORMATION:
Laurack Bray, son and petition, was contacted by the undersigned via the telephone. He is opposed to the petition for conservatorship and the appointment of Dianne, his sister, as conservator, citing undue influence. Mr. Bray stated he is opposed to Dianne being appointed as conservator because she wants to control their mother and he is of the opinion their mother can make her own decisions. He reported that Dianne took out a loan on the house for $50,000.00 to do home improvements and the house did not have any encumbrances. He has seen minimal home improvement and wonders about the money. According to him, Dianne is on his mother's checking account and is using their mother's money to pay the loan. The petitioner has refused to put her brother on the checking account. As a result, Mr. Bray has filed a competing petition.

Laurack gave a history that he moved from Ventura County and into his mother's home in 2003. He became the primary caregiver and helped his mother manage her affairs. According to Mr. Bray, his sister lives in a separate unit in the rear of his mother's property and she was rarely home to take care of their mother. Laurack reported he took his mother shopping, to the bank and medical appointments. He stated that he went over monthly expenses with his mother, filled out the checks and his mother signed the checks. After a fall on September 2014, Ms. Davis could not sign the checks and Laurack started signing the checks with their mother's permission but ceased when the bank protested.

He cited that that the conservatorship is required because his mother no longer is able to manage her affairs. According to the petitioner, the proposed conservatee is able to manage her care and affairs, if she desired. After the fall in 2014 and due to her age, it appeared to him that Ms. Davis is resigned to not doing things for herself. He is of the opinion his mother does not have dementia. Laurack stated that he is the better person to serve as conservator because his decisions would be in the best interests of his mother and Dianne's decisions are not in their mother's best interests.

The petitioner's care plan is to return the proposed conservatee to her home. He stated he will be able to manage care along with the assistance of caregivers. Laurack noted Helen has difficulty in managing her personal care since the fall.

Mr. Bray stated his mother's income is comprised of Social Security and a pension at $1600.00 per month. She owns a home with an outstanding loan. There is approximately $8,000.00 in a bank account.

The undersigned wishes to note that Mr. Bray did leave a voicemail message in May 18, 2015, citing he had additional information that should be investigated regarding his sister, Dianne, the competing petitioner. The undersigned called the number left by Mr. Bray on two occasions and each time, the greeting stated the telephone was not accepting any calls. The undersigned attempted to reach the petitioner at the number for the residence. The phone continued to

4.

CASE NUMBER: BP159 733     CASE NAME: HELEN DAVIS

ring and there was no answering device.

CONCERNS:
After visiting the proposed conservatee for a second time, the undersigned opines she is not able to manage her affairs due to cognitive deficits. Laurack is of the opinion his mother can make decisions, independently, does not have dementia and is capable of being in control of her care and affairs, if she desired. Yet, he reported, at some point he was assisting his mother in management of her affairs. For the undersigned, there is a contradiction in his theory that his mother can make decisions regarding her care and manage her affairs.

The undersigned wishes to note that during the visit, the dementia seems to be progressing. Mr. Davis cried during most of the interview and appeared to be depressed. Granted, the struggle between her adult children is stressful, but the undersigned worked hard at trying to cheer her up but only heard words of hopelessness from the proposed conservatee.

CONCLUSIONS:
Ms. Davis was a lovely, friendly person and interacted well with the undersigned. However, she presented with memory and cognitive deficits that impede her ability to make appropriate decisions regarding her welfare. Helen appeared to be an appropriate candidate for conservatorship and the petition should be granted.

The undersigned reviewed the report from PVP counsel, consulted with Ms. Davis, again and she has not wavered in her desire regarding the petition. Based on all the information reviewed by the undersigned and interviews, Dianne Jackson, petitioner, is involved in her mother's care, visits and appeared to be appropriate to serve in the capacity as conservator.

The statements contained in the Confidential Supplemental Information Report appeared to give an accurate depiction of the proposed conservatee.

RECOMMENDATIONS:
A) The petition for conservatorship of person and estate with dementia powers should be granted.
B) Dianne Jackson should be appointed to serve in said capacity.
C) Care is in the least restrictive environment.
D) The proposed conservatee appeared to lack the capacity to give informed medical consent.
E) The proposed conservatee was not able to provide the information that is required to complete the voter's registration form.

Medical information is under a separate cover.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on   05/20/2015   , at        LOS ANGELES              , California

_GAILYN SPENCE_
GAILYN SPENCE
PROBATE INVESTIGATOR

5.

**6**

ISSUE: Davis took out a personal loan in the amount of $ 50,000.

STATEMENT OF FACT:  Yes, Davis (with sound mental capacity) took out a home improvement loan (approximately 2008) to pay for much needed repairs on a home over 60 years old.  It was not Jackson's loan; Jackson received no money from the proceeds, and Bray has no evidence to the contrary. Davis' loan paid for home improvements. Davis also paid off credit card debt and placed money in a saving account. Bray misrepresented the value of Davis's property, which is accessed at $278,000.  This is another reason why the lower court's decision should be upheld.


ISSUE: The PVP attorney Armen Gregorian included a false statement in a report submitted to the court, Clerk's Supplemental Transcript (CST) at p.2.

STATEMENT OF FACT: Yes, Bray tried to take Davis out of two board and care facilities (Vergie's Manor and Bright Days Care Center).  On November 5, 2014 and November 9, 2014, Bray tried to take Davis from Vergie's Manor and Jackson called the police. On November 12, 2014, Bray called the Carson police to take Davis to the bank and while the police was intervening, Davis started having chest pains and the police called the ambulance. CST, at 8, lines 20-23.  Davis' discharge diagnose was "Chest pains due to emotional stress brought on by a family dispute." A copy of Kaiser's Discharge Summary, Appx, p. 21.  When Davis was discharged after this admission, Bray was disruptive in Kaiser ER and refused to accept Jackson as the primary agent on the California Health Care Directive. Security was called and Bray was escorted to the waiting area was not allowed back into the emergency area, RT2

7

at 46. This is another example of why the lower court's decision should be upheld.

ISSUE: Gailyn Spence, made false statements in her report submitted to the court regarding Bray's attempt to take Davis out of Bright Days Care Center, Spence's first Report, Appx.at 4)

STATEMENT OF FACT: The Torrance police came to the Bright Days Care Center on March 22, 2015.  The police interviewed Davis and reported to the board and care staff that Bray had called into the station and ask for police intervention to remove Davis from the board and care facility.  The board and staff called Jackson and reported the incident and stated that the Torrance police interviewed Davis and left after being told that Bray had no authority for Davis' healthcare.  The next day, the incident was also reported to the PVP attorney by the board and care staff, when he arrived to interview Davis. This is another example of how Bray will disrupt Davis's healthcare, well being and peace of mind to get what he wants and why the lower court's decision should be upheld.


ISSUE: Unauthorized money withdrawn from Davis' bank account.

FACT: Bray who was paying Davis' bills and had possession of Davis' bank statement. Bray informed Jackson on January 7, 2013 (around 8pm) that a large amount of money ($3,900) was withdrawn from Davis' bank account. The next morning when the bank opened, Jackson and Davis went to the bank and reported the unauthorized withdrawal, filed a fraud report and closed the account. Bray has no evidence to the contrary. Chase Bank Service Correspondence, Appx. p. 22.

8

**7**

APP-003

**ATTORNEY OR PARTY WITHOUT ATTORNEY** *(Name, State Bar number, and address):*

Laurack D. Bray
409 E. 93rd Street, L.A., CA 90003

TELEPHONE NO.: (805) 901-2693    FAX NO. *(optional)*:
E-MAIL ADDRESS *(optional)*:
ATTORNEY FOR *(Name)*:

SUPERIOR COURT OF CALIFORNIA, COUNTY OF
STREET ADDRESS: 111 N. Hill Street
MAILING ADDRESS:
CITY AND ZIP CODE: L.A., CA 90012
BRANCH NAME:

Plaintiff/Petitioner: Laurack D. Bray
Defendant/Respondent: Dianne Jackson

**ORIGINAL FILED**

JUN 23 2015

CIVIL APPEALS
ROOM 111

| APPELLANT'S NOTICE DESIGNATING RECORD ON APPEAL (UNLIMITED CIVIL CASE) | Superior Court Case Number: BP159733 |
|---|---|
| RE: Appeal filed on *(date)*: 6/23/2015 | Court of Appeal Case Number *(if known)*: |

Notice: Please read form APP-001 before completing this form. This form must be filed in the superior court, not in the Court of Appeal.

1. **RECORD OF THE DOCUMENTS FILED IN THE SUPERIOR COURT**

   I elect to use the following method of providing the Court of Appeal with a record of the documents filed in the superior *(check a, b, c, d, or e and fill in any required information)*:

   a. ☒ A clerk's transcript under rule 8.122. *(You must check (1) or (2) and fill out the clerk's transcript section on page 2 of this form.)*

      (1) ☒ I will pay the superior court clerk for this transcript myself when I receive the clerk's estimate of the costs of this transcript. I understand that if I do not pay for this transcript, it will not be prepared and provided to the Court of Appeal.

      (2) ☐ I request that the clerk's transcript be provided to me at no cost because I cannot afford to pay this cost. I have attached the following document *(check (a) or (b))*:

         (a) ☐ An order granting a waiver of court fees and costs under rule 3.50 et seq.; or

         (b) ☐ An application for a waiver of court fees and costs under rule 3.50 et seq. *(Use  Request to Waive Court Fees (form FW-001) to prepare and file this application.)*

   b. ☒ An appendix under rule 8.124.

   c. ☒ The original superior court file under rule 8.128. *(NOTE: Local rules in the Court of Appeal, First, Third, Fourth, and Fifth Appellate Districts, permit parties to stipulate to use the original superior court file instead of a clerk's transcript; you may select this option if your appeal is in one of these districts and all the parties have stipulated to use the original superior court file instead of a clerk's transcript in this case. Attach a copy of this stipulation.)*

   d. ☐ An agreed statement under rule 8.134. *(You must complete item 2b(2) below and attach to your agreed statement copies of all the documents that are required to be included in the clerk's transcript. These documents are listed in rule 8.134(e).)*

   e. ☐ A settled statement under rule 8.137. *(You must complete item 2b(3) below and attach to your proposed statement on appeal copies of all the documents that are required to be included in the clerk's transcript. These documents are listed in rule 8.137(b)(3).)*

2. **RECORD OF ORAL PROCEEDINGS IN THE SUPERIOR COURT**

   I elect to proceed:

   a. ☐ WITHOUT a record of the oral proceedings in the superior court. I understand that without a record of the oral proceedings  in the superior court, the Court of Appeal will not be able to consider what was said during those proceedings in  determining whether an error was made in the superior court proceedings.

Form Approved for Optional Use
Judicial Council of California
APP-003 [Rev. Jan. 1, 2014]
**APPELLANT'S NOTICE DESIGNATING RECORD ON APPEAL
(Unlimited Civil Case)**
Cal. Rules of Court, rules 3.50,
8.121–8.124, 8.128, 8.130, 8.134, 8.137
www.courts.ca.gov

| Case Name: | | APP-003 |
|---|---|---|
| | Superior Court Case Number: | |

b. ☒ WITH the following record of the oral proceedings in the superior court:

(1) ☒ A reporter's transcript under rule 3.130. *(You must fill out the reporter's transcript section on page 3 of this form.)* I have *(check all that apply):*

(a) ☐ Deposited the approximate cost of transcribing the designated proceedings with this notice as provided in rule 8.130(b)(1).

(b) ☐ Attached a copy of a Transcript Reimbursement Fund application filed under rule 8.130(c)(1).

(c) ☐ Attached the reporter's written waiver of a deposit for *(check either (i) or (ii)):*

(i) ☐ all of the designated proceedings.

(ii) ☐ part of the designated proceedings.

(d) ☐ Attached a certified transcript under rule 8.130(b)(3).

(2) ☐ An agreed statement. *(Check and complete either (a) or (b) below.)*

(a) ☐ I have attached an agreed statement to this notice.

(b) ☐ All the parties have agreed in writing (stipulated) to try to agree on a statement. *(You must attach a copy of this stipulation to this notice.)* I understand that, within 40 days after I file the notice of appeal, I must file either the agreed statement or a notice indicating the parties were unable to agree on a statement and a new notice designating the record on appeal.

(3) ☐ A settled statement under rule 8.137. *(You must attach the motion required under rule 8.137(a) to this form.)*

## 3. RECORD OF AN ADMINISTRATIVE PROCEEDING TO BE TRANSMITTED TO THE REVIEWING COURT

☐ I request that the clerk transmit to the reviewing court under rule 8.123 the record of the following administrative proceeding that was admitted into evidence, refused, or lodged in the superior court *(give the title and date or dates of the administrative proceeding):*

| Title of Administrative Proceeding | Date or Dates |
|---|---|
| | |

## 4. NOTICE DESIGNATING CLERK'S TRANSCRIPT

*(You must complete this section if you checked item 1a, above indicating that you elect to use a clerk's transcript as the record of the documents filed in the superior court.)*

a. **Required documents.** The clerk will automatically include the following items in the clerk's transcript, but you must provide the date each document was filed or, if that is not available, the date the document was signed.

| Document Title and Description | Date of Filing |
|---|---|
| (1) Notice of appeal | June 23, 2015 |
| (2) Notice designating record on appeal *(this document)* | June 23, 2015 |
| (3) Judgment or order appealed from | June 12, 2015 |
| (4) Notice of entry of judgment *(if any)* | |
| (5) Notice of intention to move for new trial or motion to vacate the judgment, for judgment notwithstanding the verdict, or for reconsideration of an appealed order *(if any)* | |
| (6) Ruling on one or more of the items listed in (5). | |
| (7) Register of actions or docket *(if any)* | |

APP-003

| Case Name: Conservatorship of Helen Davis | Superior Court Case Number: BP159733 |

### 4.  NOTICE DESIGNATING CLERK'S TRANSCRIPT

b. **Additional documents.** *(If you want any documents from the superior court proceeding in addition to the items listed in a. above to be included in the clerk's transcript, you must identify those documents here.)*

☐ I request that the clerk include the following documents from the superior court proceeding in the transcript. *(You must identify each document you want included by its title and provide the date it was filed or, if that is not available, the date the document was signed)*

| Document Title and Description | Date of Filing |
|---|---|
| (8) Report of P.V.P Attorney re: Conservatorship | 4/6/2015 |
| (9) Citation for Conservatorship | 5/11/2015 |
| (10) Notice of Hearing (Conservator) | 5/11/2015 |
| (11) Proof of Service (Probate investigator) | 5/19/2015 |
| (12) Second Report of P.V.P Attorney | 6/2/2015 |

☒ See additional pages.

c.  Exhibits to be included in clerk's transcript.

☐ I request that the clerk include in the transcript the following exhibits that were admitted in evidence, refused, or lodged in the superior court *(for each exhibit, give the exhibit number, such as Plaintiff's #1 or Defendant's A, and a brief description of the exhibit. Indicate whether or not the court admitted the exhibit into evidence):*

| Exhibit Number | Description | Admitted (Yes/No) |
|---|---|---|
| (1) | | |
| (2) | | |
| (3) | | |
| (4) | | |
| (5) | | |

☐ See additional pages.

### 5.  NOTICE DESIGNATING REPORTER'S TRANSCRIPT

*(You must complete this section if you checked item 2b(1) above indicating that you elect to use a reporter's transcript as the record of the oral proceedings in the superior court. Please remember that you must pay for the cost of preparing the reporter's transcript.)*

a.  I request that the reporters provide *(check one):*

(1) ☒ My copy of the reporter's transcript in paper format.

(2) ☐ My copy of the reporter's transcript in computer-readable format.

(3) ☐ My copy of the reporter's transcript in paper format and a second copy in computer-readable format.

*(Code Civ. Proc., § 271; Cal. Rules of Court, rule 8.130(f)(4).)*

| Case Name: | | | | | | APP-003 |
|---|---|---|---|---|---|---|
| | | | | Superior Court Case Number: | | |

b. Proceedings.

I request that the following proceedings in the superior court be included in the reporter's transcript. *(You must identify each proceeding you want included by its date, the department in which it took place, a description of the proceedings—for example, the examination of jurors, motions before trial, the taking of testimony, or the giving of jury instructions—the name of the court reporter who recorded the proceedings, and whether a certified transcript of the designated proceeding was previously prepared.)*

| | Date | Department | Full/Partial Day | Description | Reporter's Name | Prev. prepared? |
|---|---|---|---|---|---|---|
| (1) | 6/4/15 | 79 | Pretrial | Hearing | | ☑ Yes  ☐ No |
| (2) | 6/12/15 | 79 | " | New Evidentiary | | ☑ Yes  ☐ No |
| (3) | | | | | | ☐ Yes  ☐ No |
| (4) | | | | | | ☐ Yes  ☐ No |
| (5) | | | | | | ☐ Yes  ☐ No |
| (6) | | | | | | ☐ Yes  ☐ No |
| (7) | | | | | | ☐ Yes  ☐ No |

c. The proceedings designated in 5b  ☒ include    ☐ do not include    all of the testimony in the superior court.

If the designated proceedings DO NOT include all of the testimony, state the points that you intend to raise on appeal *(rule 8.130(a)(2) provides that your appeal will be limited to these points unless, on motion, the reviewing court permits otherwise).*

Date: June 23, 2015

Lavada D. Bray
_____
(TYPE OR PRINT NAME)

_____
(SIGNATURE OF APPELLANT OR ATTORNEY)

APPELLANT'S NOTICE DESIGNATING RECORD ON APPEAL
(Unlimited Civil Case)

13. Petition for Appointment of Probate Conservator — 4/28/15

14. Minute Order - Conservatorship — 6/12/2015

15. Minute Order - Conservatorship — 6/12/2015

16. Minute Order - Conservatorship — 6/14/2015

17. Minute Order - Conservatorship — 6/14/2015

18. Probate Investigator Report #1   ? — 5/19/2015

19. Probate Investigator Report #2   ?   ?

**8**

Case 2:16-cr-00066-PA    Document 142    Filed 11/07/16    Page 148 of 211   Page ID
#:3576

B265052

CLERK'S OFFICE
RECEIVED

2015 SEP 25  PM 3: 35

JOSEPH A. LANE   CLERK

REC'D CIVIL APPEALS
ROOM 111 A
SEP 25 2015

Laurack  D. Bray
402 E. 93rd Street
Los Angeles, CA 90003

Civil Appeals
111 N. Hill Street
Los Angeles, CA 90012

September 24, 2015

RE:  Laurack D. Bray  v. Dianne Jackson, Case No. BP159733

## LETTER OF OMISSION

Dear Sir or Madam:

This is a **Letter of Omission**, filed pursuant to the direction of the civil clerk, to notify the Civil Appeals Office, and the Second District Court of Appeals, that multiple documents identified in my Designation of Records statement were omitted from the recently produced Clerk's Transcript, received by me on September 23, 2015.  Apparently, and *mysteriously,* my correct designation statement was not included in the file  received by the clerk who actually prepared the transcript (pgs. 3-4 and an additional page were missing, see attached), therefore, the clerk prepared the transcript without the missing pages and documents.

The following documents were designated in my statement, but were not included in the completed transcript, or, were omitted :

Date of filing

1. Reporter's Transcript (June 4, 2015)
2. Reporter's Transcript (June 12, 2015)
3. *First* Report of P.V.P. Attorney                              4/6/ 2015
4. Citation for Conservatorship                               5/11/ 2015
5. Notice of Hearing (Conservatorship)                        5/11/2015

1

6. Proof of Service (Probate Investigator)                      5/19/ 2015
7. *Second* Report of P.V.P. Attorney                          6/2/ 2015
8. Petition for Appointment of Probate Conservator             4/28/ 2015
9. Minute Order- Conservatorship                               6/14/2015 *
10. Minute Order Conservatorship                               6/14/2015 *
11. *First* Probate Investigator's Report                      3/23/2015
12. *Second* Probate Investigator's Report                     5/19/2015

*I also designated the 6/12/2015 Minute Orders, but they were included in the Transcript.

These matters were designated in my designation statement and were omitted.

Further, I request that the Court of Appeals treat this Letter of Omission as a request for an extension of time to file Appellant's Opening Brief.

Thank you for your consideration.

Sincerely yours,

Laurack D. Bray

2

**9**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
SECOND APPELLATE DISTRICT

| | |
|---|---|
| LAURACK D. BRAY | Case Number: BP 159733 |
| Plaintiff(s) and APPELLANT | Court of Appeal Case Number: B265052 |
| | Notice(s) of Appeal Filed: JUNE 23, 2015 |
| v. | |
| DIANNE JACKSON | VOLUME 1 OF 1 |
| | Pages 1 to 52 |
| Defendant(s) and RESPONDENT | |

SUPPLEMENTAL - CLERK'S TRANSCRIPT
HONORABLE DAVID J. COWAN, JUDGE
Appeal from the Superior Court, County of Los Angeles

LAURACK D. BRAY
402 East 93rd STREET
LOS ANGELES,   CA   90003


Telephone Number: (805)  901-2693
Counsel for APPELLANT, LAURACK D. BRAY


DIANNE JACKSON
402 East 93rd STREET
LOS ANGELES,   CA   90003


Telephone Number: (323)  397-1832
Counsel for RESPONDENT, DIANNE JACKSON


ARMEN D. GREGORIAN, Esq.
PETTLER & MILLER, LLP
3465 TORRANCE BLVD.,  SUITE D
TORRANCE,  CA  90503

Telephone Number: (310)  543-1616
Counsel for RESPONDENT, HELEN DAVIS (proposed conservatee)

# S U P P L E M E N T A L

## The Superior Court
## County of Los Angeles
## CIVIL APPEAL TRANSCRIPT INDEX

Case Number: BP 159733        Court of Appeal Case Number:  B265052        Page: 1

| Description | Filing date | Volume | Page |
|---|---|---|---|
| PROOF of MAILING of COURT INVESTIGATION REPORT | 3/24/15 | 1 | 1 |
| REPORT of PVP ATTORENY re: PETITION for APPOINTMENT of CONSERVATOR of the PERSON and ESTATE of HELEN DAVIS | 4/6/15 | 1 | 2 |
| PETITION for APPOINTMENT of PROBATE CONSERVATOR | 4/28/15 | 1 | 16 |
| NOTICE of HEARING – GUARDIANSHIP or CONSERVATORSHIP | 5/11/15 | 1 | 24 |
| CITATION for CONSERVATORSHIP | 5/11/15 | 1 | 27 |
| PROOF of MAILING of COURT INVESTIGATION REPORT | 5/20/15 | 1 | 29 |
| SECOND REPORT of PVP ATTORNEY re: PETITION for APPOINTMENT of CONSERVATOR of the PERSON and ESTATE of HELEN DAVIS | 6/2/15 | 1 | 30 |
| MINUTE ORDER | 6/4/15 | 1 | 38 |
| MINUTE ORDER | 6/4/15 | 1 | 41 |
| MINUTE ORDER | 6/12/15 | 1 | 44 |
| MINUTE ORDER | 6/12/15 | 1 | 47 |
| APPELLANTS' NOTICE DESIGNATING RECORD on APPEAL (correction) | 6/23/15 | 1 | 50 |

September 25, 2015

# SUPPLEMENTAL

## The Superior Court
## County of Los Angeles
## CIVIL APPEAL TRANSCRIPT INDEX

Case Number: BP 159733          Court of Appeal Case Number: B265052          Page: 1

| Description | Filing date | Volume | Page |
| --- | --- | --- | --- |
| APPELLANTS' NOTICE DESIGNATING RECORD on APPEAL (correction) | 6/23/15 | 1 | 50 |
| CITATION for CONSERVATORSHIP | 5/11/15 | 1 | 27 |
| MINUTE ORDER | 6/4/15 | 1 | 38 |
| MINUTE ORDER | 6/4/15 | 1 | 41 |
| MINUTE ORDER | 6/12/15 | 1 | 44 |
| MINUTE ORDER | 6/12/15 | 1 | 47 |
| NOTICE of HEARING – GUARDIANSHIP or CONSERVATORSHIP | 5/11/15 | 1 | 24 |
| PETITION for APPOINTMENT of PROBATE CONSERVATOR | 4/28/15 | 1 | 16 |
| PROOF of MAILING of COURT INVESTIGATION REPORT | 3/24/15 | 1 | 1 |
| PROOF of MAILING of COURT INVESTIGATION REPORT | 5/20/15 | 1 | 29 |
| REPORT of PVP ATTORENY re: PETITION for APPOINTMENT of CONSERVATOR of the PERSON and ESTATE of HELEN DAVIS | 4/6/15 | 1 | 2 |
| SECOND REPORT of PVP ATTORNEY re: PETITION for APPOINTMENT of CONSERVATOR of the PERSON and ESTATE of HELEN DAVIS | 6/2/15 | 1 | 30 |

September 25, 2015

**10**

# TABLE OF CONTENTS
## (Cont'd)

|  | Page |
|---|---|
| RELIEF SOUGHT | 22 |
| CONCLUSION | 23 |
| APPENDIX** | Appx |
| A. Court Investigator's Report#1 | 1 |
| B. Court Investigator's Report #2 | 6 |

**NOTE: Although Appellant specifically designated these documents in his
Letter of Omission submitted to the Civil Appeals Office, it was
nonetheless omitted a *second* time. Thus, the need for an
Appendix.   Admittedly, Appellant believes the omission was
Intentional (both times).

**11**

Filed 4/19/16

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for
publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or
ordered published for purposes of rule 8.1115.

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

COURT OF APPEAL – SECOND DIST.

# FILED

### Apr 19, 2016

JOSEPH A. LANE, Clerk

Derrick L. Sanders  Deputy Clerk

| | |
|---|---|
| Conservatorship of the Person and Estate of HELEN DAVIS. | B265052 |
| LAURACK D. BRAY, Petitioner and Appellant, v. DIANNE JACKSON, Objector and Respondent. | (Los Angeles County Super. Ct. No. BP159733) |

APPEAL from an order of the Superior Court of Los Angeles County, David J. Cowan, Judge. Affirmed.

Laurack D. Bray, in pro. per., for Petitioner and Appellant.

Dianne Jackson, in pro. per., for Objector and Respondent.

Appellant Laurack Bray and his sister, Respondent Dianne Jackson, filed competing petitions for conservatorship for their 93-year-old mother, Helen Davis.  The probate court, after appointing counsel for Davis and conducting an evidentiary hearing, granted Jackson's petition and denied Bray's.  Finding no error, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

During intra-familial disputes concerning the care of Helen Davis, her daughter, Dianne Jackson, filed a petition to be appointed conservator of her person and estate on February 6, 2015.[1]  Two months later, Davis's son Laurack Bray filed a second petition seeking his own appointment.

The probate investigator prepared a report, which was mailed on March 24, 2015.  A second report was mailed to all parties on May 30, 2015.  Neither report is contained in the record.  However, the record does contain two reports from the probate Volunteer Panel (PVP) attorney appointed for Davis.  The first, dated April 9, 2015, reflects his investigation, including interviews with Davis and both of her children.  The report indicated that Davis consented to the conservatorship and to the appointment of Jackson as the conservator, and recommended that appointment.  On June 2, 2015, after Bray filed his petition, the PVP attorney prepared a second report, making the same recommendation after review of additional documents and re-interviewing Davis and others.

The parties, each self-represented, appeared in court on June 4, 2015, at which time the court indicated it had reviewed the report of the PVP attorney, as well as the court investigator, and that both recommended the granting of Jackson's petition.  Bray challenged statements in the PVP report, and requested an evidentiary hearing.  The court set that hearing for June 12, 2015.

On June 12, the court took testimony from both Bray and Jackson.  At the conclusion of that testimony, the court found that the evidence was "overwhelmingly in favor of Jackson's petition," stating as its reasons:  Davis's stated preference and her previous signature of a healthcare directive naming Jackson; that Jackson, and not Bray, visited

---

[1]  No copy of the petition is contained in the record on appeal, but neither party disputes its filing.

2

regularly and provided assistance to Davis; and that Bray's conduct demonstrated that it would not be in Davis's best interest for him to be her conservator.  The court denied Bray's petition and granted Jackson's.  Bray appealed.

## DISCUSSION

### Standard of Review

The relevant Probate Code provision, section 1801, subdivision (e), requires the showing to establish a conservatorship to be made by clear and convincing evidence. (*Conservatorship of Sanderson* (1980) 106 Cal.App.3d 611, 620; *People v. Karriker* (2007) 149 Cal.App.4th 763, 780.)

In reviewing the probate court's determination, however, we determine only whether the findings made by the court are supported by substantial evidence.  (See *Sheila S. v. Superior Court* (2000) 84 Cal.App.4th 872, 880-881 ["The 'clear and convincing' standard . . . is for the edification and guidance of the trial court and not a standard for appellate review."]

"A challenge in an appellate court to the sufficiency of the evidence is reviewed under the substantial evidence rule.  [Citations.]  '"'Where findings of fact are challenged on a civil appeal, we are bound by the 'elementary, but often overlooked principle of law, that . . . the power of an appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted,' to support the findings below. [Citation.]  We must therefore view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor in accordance with the standard of review so long adhered to by this court." [Citation.]' [Citations.]" (*Lenk v. Total-Western, Inc.* (2001) 89 Cal.App.4th 959, 968.)  We do not reevaluate the credibility determinations made by the probate court.  (See *Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 334; *In re Jasmon O.* (1994) 8 Cal.4th 398, 423; *In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1654.)

### 1. Appellant Has Not Demonstrated That The Ruling Was Not Supported by Substantial Evidence

Bray asserts that the court's determination was not supported by substantial evidence. He claims that he had offered reasons why he should be the conservator, but that Jackson

3

had offered no legitimate reasons why he should not; that the court relied on false evidence in Jackson's testimony; that he never took money out of his mother's account; and that the question of who provided care for Davis was disputed. None of these arguments survive review. Primarily, Bray disagrees with the court's apparent reliance on Ms. Jackson's testimony, rather than his own. However, that argument would require us to make credibility determinations that are not ours to make. We will not disturb the court's determination concerning the credibility of the witnesses. (*In re Jasmon O., supra,* 8 Cal.4th 398, 423; *In re Kristin H., supra,* 46 Cal.App.4th 1635, 1654.)

With respect to Bray's argument that there was no evidence on which the court could rely to make the finding that he took money from his mother's account, Bray ignores Jackson's testimony that Bray had written checks to himself, signing his mother's name. Bray also fails to acknowledge the court's reference to the investigator's report indicating that Bray had attempted to cash checks he had signed on his mother's account; Bray did not object to the court's consideration of this report. The evidence, taken as a whole, supported the court's determination.

## 2.  Appellant Has Not Demonstrated A Criminal Act

Bray also asserts that a criminally false statement of fact was made by the PVP attorney, relying on a statement in the PVP report that Bray had removed Davis from her care facility to take her to the bank to withdraw money and that, as a result, Davis was taken to the hospital for chest pains. The court heard testimony on this issue at the hearing on June 12, at which time Bray admitted that he had attempted to take Davis from the care facility to go to the bank but had been prevented from doing so. While Bray asserts that the court relied on the misstatement, the record instead demonstrates that the trial court fully understood that his attempt had been unsuccessful. Appealed judgments and orders are presumed correct, and error must be affirmatively shown. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564, 86 Cal.Rptr. 65, 468 P.2d 193.) The record demonstrates there was no error.

4

### 3. Appellant Has Not Demonstrated Bias

Relying on a seminal employment discrimination case, *McDonnell Douglas v. Green* (1973) 411 U.S. 792, Bray asserts that the court was biased against him. In *McDonnell Douglas*, the Supreme Court framed the issue to be determined as "the order and allocation of proof in a private, non-class action challenging employment discrimination." (411 U. S. at 800.) The Court held that the complainant in such a case must establish a prima facie case of racial discrimination "by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." (*Id.* 411 U.S. at 802.) After the prima facie showing is made, the burden shifts to the employer "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." (*Ibid.*)

Bray has not cited any cases applying this test to either the conservatorship or judicial bias context, instead relying on it without explanation. He argues that he has shown that he is a racial minority, and thus a member of a protected class; that he was subjected to an adverse action when his petition was denied; and, as a result, he has made the required prima facie showing of bias. On that basis, he asserts reversal is required.

We do not believe the *McDonnell Douglas* analysis is appropriate in this circumstance. Even a cursory examination of the framework demonstrates that it cannot be applied here.

Bray does not address in any way the second part of the *McDonnell Douglas* formula, which shifts the burden to the employer to show a legitimate explanation for the action taken that does not rest on discrimination. That burden shifting analysis demonstrates the inherent conflict in trying to apply this test to the actions of a court: the court is not a party to the litigation, and has neither the opportunity nor the burden to make a showing Rather, what a court must do is reach the conclusions required by the applicable law based on the record before it, which we review in accordance with the

5

applicable standard of review.  Here, the record demonstrates the basis for the court's ruling.

Reviewing the evidence in the light most favorable to the ruling, as we must, there was substantial evidence supporting the court's conclusion that Jackson was the better candidate for conservator.  Davis had previously placed Jackson on her bank accounts and signed a healthcare directive giving authority to Jackson; Davis expressed a preference for Jackson as her conservator; and there was testimony, apparently believed by the court, that Bray had not been involved in assisting his mother, or providing care to her, but had instead taken a series of actions that appeared to benefit himself at his mother's expense.

## DISPOSITION

The order is affirmed.  Respondent is to recover her costs on appeal.

ZELON, J.

We concur:

PERLUSS, P. J.

SEGAL, J.

6

**12**

**EA-110**      **Temporary Restraining Order**

*Clerk stamps date here when form is filed.*

*Person in ① must complete items ①, ② and ③ only.*

**① Protected Elder or Dependent Adult**

  a. Full Name: <u>Dianne Jackson</u>

☐ Person requesting protection for the elder or dependent adult, if different *(person named in item ③ of Form EA-100):*

  Full Name: _____

  Lawyer for person named above *(if any, for this case):*

  Name: _____ State Bar No.: _____

  Firm Name: _____

  b. Your Address *(If you have a lawyer, give your lawyer's information. If you do not have a lawyer and want to keep your home address private, you may give a different mailing address instead. You do not have to give telephone, fax, or e-mail.):*

  Address: <u>402 E. 93rd Street</u>

  City: <u>Los Angeles</u>      State: <u>CA</u>   Zip: <u>90003</u>

  Telephone: _____ Fax: _____

  E-Mail Address: _____

**FILED**
Superior Court of California
County of Los Angeles

**JUN 01 2016**

Sherri R. Carter, Executive Officer/Clerk

By <u>Denpuey Rae</u>, Deputy
Dezarey Rojas

*Fill in court name and street address:*

Superior Court of California, County of
Los Angeles
Compton Superior Court
200 West Compton Blvd.
same as above
Compton, CA 90220
South Central

*Court fills in case number when form is filed.*

**Case Number:** **TS019800**

*Prepared by Compton Legal Aid*

**② Restrained Person**

Full Name: <u>Laurack Bray</u>

Description:

| | |
|---|---|
| Sex: ☒ M ☐ F  Height: <u>6'</u>   Weight: <u>295</u>   Date of Birth: <u>11/13/1949</u> | |
| Hair Color: <u>Black</u>   Eye Color: <u>Brown</u>   Age: <u>66</u>   Race: <u>Black</u> | |
| Home Address *(if known):* <u>402 E. 93rd Street</u> | |
| City: <u>Los Angeles</u>   State: <u>CA</u>   Zip: <u>90003</u> | |
| Relationship to Protected Person: <u>Brother</u> | |

**③ ☒ Additional Protected Persons**

In addition to the elder or dependent adult named in ①, the following family or household members or conservator of that person are protected by the temporary orders indicated below:

| Full Name | Sex | Age | Household Member? | Relation to Protected Person |
|---|---|---|---|---|
| <u>Helen Davis</u> | F | 94 | ☐ Yes ☒ No | <u>Mother (Conservatee</u> |
| | | | ☐ Yes ☐ No | |

☐ *Check here if there are additional protected persons. List them on an attached sheet of paper and write "Attachment 3—Additional Protected Persons" as a title. You may use Form MC-025, Attachment.*

**④ Expiration Date**

*This Order expires at the end of the hearing scheduled for the date and time below:*

Date: <u>6-22-16</u>      Time: <u>8:30</u>      ☒ a.m. ☐ p.m.

**This is a Court Order.**

**Temporary Restraining Order**
**(CLETS-TEA or TEF)**
*(Elder or Dependent Adult Abuse Prevention)*



EA-110, Page 1 of 6

Case Number: **TS019800**

The court has issued the temporary orders checked as granted below. If you do not obey these orders, you can be arrested and charged with a crime. You may have to go to jail for up to one year, pay a fine of up to $1,000, or both.

## ⑤ Personal Conduct Orders

☐ **Not Requested**    ☐ **Denied Until the Hearing**    ☒ **Granted as Follows:**

a. You must **not** do the following things to the elder or dependent adult named in ①

☒ and to the other protected persons listed in ③:

(1) ☒ Physically abuse, financially abuse, intimidate, molest, attack, strike, stalk, threaten, assault (sexually or otherwise), hit, harass, destroy personal property of, or disturb the peace of the person.

(2) ☒ Contact the person, either directly or indirectly, in **any** way, including, but not limited to, in person, by telephone, in writing, by public or private mail, by interoffice mail, by e-mail, by text messages, by fax, or by other electronic means.

(3) ☒ Take any action to obtain the person's address or location. If this item ③ is not checked, the court has found good cause not to make this order.

(4) ☐ Other *(specify):*

☐ Other personal conduct orders are attached at the end of this Order on Attachment 5a(4).

_____

_____

_____

b. Peaceful written contact through a lawyer or a process server or other person for service of legal papers related to a court case is allowed and does not violate this order. However, you may have your papers served by mail on the person in ①.

## ⑥ Stay-Away Orders

☐ **Not Requested**    ☐ **Denied Until the Hearing**    ☒ **Granted as Follows:**

a. You **must** stay at least _____ 100 yards away from *(check all that apply):*

(1) ☒ The elder or dependent adult in ①          (5) ☒ The vehicle of the person in ①

(2) ☒ Each person in ③                            (6) ☐ Other *(specify):*

(3) ☒ The home of the elder or                    _____
        dependent adult
                                                   _____
(4) ☐ The job or workplace of the elder
        or dependent adult                         _____

b. This stay-away order does not prevent you from going to or from your home or place of employment.

## ⑦ Move-Out Order

☐ **Not Requested**    ☐ **Denied Until the Hearing**    ☒ **Granted as Follows:**

You must immediately move out from and not return to *(address):*

_____ 402 E 93rd St, Los Angeles CA 90003



**13**

**DV-109**    Notice of Court Hearing

Clerk stamps date here when form is filed.

**FILED**
Superior Court of California
County of Los Angeles

JUN 03 2016

Sherri R. Carter, Executive Officer/Clerk

By _____, Deputy

(1)  **Name of Person Asking for Order:**

Lawrack D. Bray

Your lawyer in this case *(if you have one):*

Name:_____  State Bar No.: _____

Firm Name: _____

**Address** *(If you have a lawyer for this case, give your lawyer's
information. If you do not have a lawyer and want to keep your home
address private, give a different mailing address instead. You do not
have to give your telephone, fax, or e-mail):*

Address: 402 E. 93RD Street

City: L.A.  State: CA  Zip: 90003

Telephone: (805-901-2693  Fax:_____

E-Mail Address: _____

Fill in court name and street address:

Superior Court of California, County of
LOS ANGELES SUPERIOR COURT
SOUTH CENTRAL DISTRICT OFFICE
200 W. COMPTON BLVD.-ROOM 902
COMPTON, CA 90220

(2)  **Name of Person to Be Restrained:**

Dianne Jackson

Clerk fills in case number when form is filed.

Case Number:
TQ023579

*The court will fill out the rest of this form.*

(3)  **Notice of Court Hearing**

A court hearing is scheduled on the request for restraining orders against the person in (2).

| Hearing Date | → Date: 6-24-16  Time: 8:30 | Name and address of court if different from above: |
|---|---|---|
|  | Dept.: M  Room: 1211 | 12th Flr. |

(4)  **Temporary Restraining Orders** (any orders granted are attached on Form DV-110)

a.  Temporary restraining orders for personal conduct, stay away, and protection of animals, as requested in Form
DV-100, *Request for Domestic Violence Restraining Order,* are:

   (1)  ☐  **All granted** until the court hearing

   (2)  ☒  **All denied** until the court hearing *(specify reasons for denial in (b)):*

   (3)  ☐  **Partly granted** and partly **denied** until the court hearing *(specify reasons for denial in (b)):*

b.  Requested temporary restraining orders for personal conduct, stay away, and protection of animals are denied
because:

   (1)  ☒  The facts as stated in form DV-100 do not show reasonable proof of a past act or acts of abuse. (Family
Code, §§ 6320 and 6320.5)

   (2)  ☒  The facts do not describe in sufficient detail the most recent incidents of abuse, such as what happened,
the dates, who did what to whom, or any injuries or history of abuse.

   (3)  ☐  Further explanation of reason for denial, or reason not listed above:

_____

_____

_____

**This is a Court Order.**

Judicial Council of California, www.courts.ca.gov
Revised January 1, 2012, Mandatory Form
Family Code, § 242, Approved by DOJ

**Notice of Court Hearing**
(Domestic Violence Prevention)

DV-109, Page 1 of 3

→

Case Number: **TQ023579**

**(5)** **Service of Documents and Time for Service—for Person in (1)**

At least ☒ five or ☐ ___ days before the hearing, someone age 18 or older—**not you or anyone else to be protected**—must personally give (serve) a court's file-stamped copy of this form (DV-109, *Notice of Court Hearing*) to the person in (2) along with a copy of all the forms indicated below:

a.  Form DV-100, *Request for Domestic Violence Restraining Order,* (file-stamped) with applicable attachments

b.  ☐ Form DV-110, *Temporary Restraining Order* (file-stamped) with applicable attachments **if granted by the judge**

c.  Form DV-120, *Response to Request for Domestic Violence Restraining Order* (blank form)

d.  Form DV-250, *Proof of Service by Mail* (blank form)

e.  ☐ Other *(specify):* _____

Date: 6-3-16 _____

_____
Judicial Officer    *Carol J. Najera*

## Right to Cancel Hearing: Information for the Person in (1)

- If item (4)(a)(2) or (4)(a)(3) is checked, the judge has denied some or all of the temporary orders you requested until the court hearing. The judge may make the orders you want after the court hearing. You can keep the hearing date, or you can cancel your request for orders so there is no court hearing.
- If you want to cancel the hearing, use Form DV-112, *Waiver of Hearing on Denied Request for Temporary Restraining Order.* Fill it out and file it with the court as soon as possible. You may file a new request for orders, on the same or different facts, at a later time.
- If you cancel the hearing, do not serve the documents listed in item (5) on the other person.
- If you want to keep the hearing date, you must have all of the documents listed in item (5) served on the other person within the time listed in item (5).
- At the hearing, the judge will consider whether denial of any requested orders will jeopardize your safety and the safety of children for whom you are requesting custody or visitation.
- You must come to the hearing if you want the judge to make restraining orders or continue any orders already made. If you cancel the hearing or do not come to the hearing, any restraining orders made on Form DV-110 will end on the date of the hearing.

## To the Person in (1)

- The court cannot make the restraining orders after the court hearing unless the person in (2) has been personally given (served) a copy of your request and any temporary orders. To show that the person in (2) has been served, the person who served the forms must fill out a proof of service form. Form DV-200, *Proof of Personal Service* may be used.
- For information about service, read Form DV-210-INFO, *What Is "Proof of Personal Service"?*
- If you are unable to serve the person in (2) in time, you may ask for more time to serve the documents. Read Form DV-115-INFO, *How to Ask for a New Hearing Date.*

## This Is a Court Order.

**Notice of Court Hearing**
(Domestic Violence Prevention)

DV-109, Page 2 of 3
→

Case Number: ** In023570**

**(17)** ☐ Spousal Support

I am married to or have a registered domestic partnership with the person in ② and no spousal support order exists. I ask the court to order the person in ② to pay spousal support. *(You must complete, file, and serve Form FL-150, Income and Expense Declaration, before your hearing).*

**(18)** ☐ Insurance

I ask the court to order the person in ② NOT to cash, borrow against, cancel, transfer, dispose of, or change the beneficiaries of any insurance or coverage held for the benefit of me or the person in ②, or our child(ren), for whom support may be ordered, or both.

**(19)** ☐ Lawyer's Fees and Costs

I ask that the person in ② pay some or all of my lawyer's fees and costs.
*You must complete, file, and serve Form FL-150, Income and Expense Declaration, before your hearing.*

**(20)** ☒ Payments for Costs and Services

I ask the court to order the person in ② to pay the following:
*You can ask for lost earnings or your costs for services caused directly by the person in ② (damaged property, medical care, counseling, temporary housing, etc.). You must bring proof of these expenses to your hearing.*

Pay to: _____ For: _____ Amount: $ _____

Pay to: _____ For: _____ Amount: $ _____

**(21)** ☐ Batterer Intervention Program

I ask the court to order the person listed in ② to go to a 52-week batterer intervention program and show proof of completion to the court.

**(22)** ☒ Other Orders

What other orders are you asking for? Order restraining person in ② from obtaining any future restraining orders with a "move out" provision without a hearing or specific proof

☐ Check here if you need more space. Attach a sheet of paper and write "DV-100, Other Orders" for a title.

**(23)** ☐ Time for Service (Notice)

*The papers must be personally served on the person in ② at least five days before the hearing, unless the court orders a shorter time for service. If you want there to be fewer than five days between service and the hearing, explain why below. For help, read Form DV-200-INFO, "What Is Proof of Personal Service"?*

_____

_____

_____

**(24)** No Fee to Serve (Notify) Restrained Person

*If you want the sheriff or marshal to serve (notify) the restrained person about the orders for free, ask the court clerk what you need to do.*

**(25)** Court Hearing

The court will schedule a hearing on your request. If the judge does not make the orders effective right away ("temporary restraining orders"), the judge may still make the orders after the hearing. If the judge does not make the orders effective right away, you can ask the court to cancel the hearing. Read Form DV-112, *Waiver of Hearing on Denied Request for Temporary Restraining Order,* for more information.

**This is not a Court Order**

EXHIBIT #13A

Case Number:
**TQ023579**

(26) **Describe Abuse**

Describe how the person in (2) abused you. Abuse means to intentionally or recklessly cause or attempt to cause bodily injury to you; or to place you or another person in reasonable fear of imminent serious bodily injury; or to harass, attack, strike, threaten, assault (sexually or otherwise), hit, follow, stalk, molest, keep you under surveillance, impersonate (on the Internet, electronically or otherwise), batter, telephone, or contact you; or to disturb your peace; or to destroy your personal property. (For a complete definition, see Fam. Code, §§ 6203, 6320.)

a. Date of most recent abuse: *June 3, 2016*

b. Who was there? *Sheriff serving as restraining order*

c. Describe how the person in (2) abused you or your child(ren): *The person abused me through harassment by seeking and obtaining a restraining order with a "move-out" provision, knowing that I only have this one residence, only to live in + that I have no other place to live while we await a hearing.*

☒ *Check here if you need more space. Attach a sheet of paper and write "DV-100, Recent Abuse" for a title.*

d. Did the person in (2) use or threaten to use a gun or any other weapon?  ☐ No  ☐ Yes *(If yes, describe):*

e. Describe any injuries: *Emotional - because of the "move-out" provision of Respondent's restraining order*

f. Did the police come?  ☒ No  ☐ Yes
If yes, did they give you or the person in (2) an Emergency Protective Order?  ☐ Yes  ☐ No  ☐ I don't know
*Attach a copy if you have one.*
The order protects  ☐ you or  ☐ the person in (2).

g. Has the person in (2) abused you (or your child(ren)) other times?
*If yes,* ☐ *check here and use* *Form DV-101*, *Description of Abuse or describe any previous abuse on an attached sheet of paper and write "DV-100, Previous Abuse" for a title.*

(27) **Other Persons to Be Protected**

The persons listed in item (3) need an order for protection because *(describe):*

_____

_____

(28) Number of pages attached to this form, if any: _____

I declare under penalty of perjury under the laws of the State of California that the information above is true and correct.

Date: _____

_____         ▶ _____
*Type or print your name*              *Sign your name*

Date: _____

_____         ▶ _____
*Lawyer's name, if you have one*        *Lawyer's signature*

**This is not a Court Order**

EXHIBIT #13A

SHORT TITLE: PV-100, RECENT ABUSE

CASE NUMBER: TQ023579

MC-025

ATTACHMENT (Number): #26 Describe Abuse

(This Attachment may be used with any Judicial Council form.)

My Sister has filed this current restraining order for the specific purpose of harassing me, especially with the inclusion of the "move-out" provision. This "move-out" provision is specifically included for the purpose of harassment, with her knowing that until the leaving I will not have any place to live.

· THERE IS NO NEED OR foundation for A "move-out" provision in the temporary restraining order because my sister and I live in two separate portions of the same house, that is, the separate units, while a property of the same property, where my sister lives is separated from the main house where I live, and my sister can + does enter her room without entering the main house where I (and my mother when she is at home) live.

Secondly, my sister, even though she uses the address of the house (402 E. 93rd

(If the item that this Attachment concerns is made under penalty of perjury, all statements in this Attachment are made under penalty of perjury.)

Page 1 of 5

Form Approved for Optional Use
Judicial Council of California
MC-025 [Rev July 1, 2009]

ATTACHMENT
to Judicial Council Form

(Add pages as required)

www.courtinfo.ca.gov

EXHIBIT

SHORT TITLE:

MC-025

CASE NUMBER

T0023579

ATTACHMENT (Number): _____

(This Attachment may be used with any Judicial Council form.)

Street, L.A.), She physically does not live at the house, or in her room. I believe she lives with a boyfriend somewhere else in Los Angeles. And, it has been this way at least for more than 2 years. So, while she uses the address of the home and receives mail at the house, She physically doesn't ~~xx~~ live at the house. So there is no reason for me moving out or having to move out. I am being safe when I say its 2 years that she haven't actually lived there. I believe it's probably more like 4-5 years that she has not physically lived in the house.

Third, I have never touched my sister in terms of abusing her and my sister knows this. But, she knows that the only way that she can obtain a restraining order is to falsely say that I "pushed" her or in

(If the item that this Attachment concerns is made under penalty of perjury, all statements in this Attachment are made under penalty of perjury.)

Page 2 of 5

Form Approved for Optional Use
Judicial Council of California
MC-025 [Rev July 1, 2009]

ATTACHMENT
to Judicial Council F...

(Add pages as required)

www.courtinfo.ca.gov

EXHIBIT #121

SHORT TITLE:

MC-025

CASE NUMBER

TQ023579

ATTACHMENT (Number): _____

(This Attachment may be used with any Judicial Council form.)

Some other way, physically contacted her. I have no problem with attending the hearing. In fact, I want too. So, her false statements will be revealed.

Fourth, I am also requesting a stay away order, so I have no intention of contacting or coming into contact with my sister.

Fifth, my sister has falsely accused me just recently, May 31, 2016. In order to try and get the police to arrive faster. I was having locks put on my room doors, and she called the police to try and prevent me from doing so. The police wasn't arriving fast enough, so she called back and told the dispatcher that I "pushed" her out of door, hoping that this fake statement would get the police to our home faster. The police finally

(If the item that this Attachment concerns is made under penalty of perjury, all statements in this Attachment are made under penalty of perjury.)

Page 3 of 5

Form Approved for Optional Use
Judicial Council of California
MC-025 [Rev July 1, 2009]

(Add pages as required)

**ATTACHMENT**
to Judicial Council Form

www.courtinfo.ca.gov

EXHIBIT #120

SHORT TITLE:

CASE NUMBER: TQ023579

MC-025

ATTACHMENT (Number): _____

(This Attachment may be used with any Judicial Council form.)

Arrived (and I don't believe any faster) and told her that I could put locks on my bedroom doors. ~~even~~ even with her conserva-torship, in regards to my mother (who is now in a nursing facility). So, she tell lies to get her way. And, she has told a lie to obtain the "move-out" order. I was getting locks put on my doors, because I discovered a legal file missing, and I believed my sister had removed it or taken it, because she has taken other things from the house and my room. I found the file later, and I called and apologized to her.

Finally, this current restraining order by my sister is neither wawanted or called for because I have not done anything to be restrained for. I put a note up for my sister to prevent her entrance into the house until I could get locks on my bedroom door. P t, That has been resolved, and my sister

(If the item that this Attachment concerns is made under penalty of perjury, all statements in this Attachment are made under penalty of perjury.)

Form Approved for Optional Use
Judicial Council of California
MC-025 [Rev July 1, 2009]

Page 4 of 5

(Add pages as required)

ATTACHMENT

www.courtinfo.ca.gov

SHORT TITLE: _____

MC-025

CASE NUMBER
TQ023579

ATTACHMENT (Number): _____

(This Attachment may be used with any Judicial Council form.)

Knows it.

The "move-out" order, instituted without a hearing is specifically for the purpose of harassing me! My sister knows that this is my only residence and I have no other place. I also use my residence for my business office. I am a lawyer, and my room is also used for my business files. I am not doing that well financially, though, I am semi-retired. So, it would be very damaging to me, to have to "move-out" without a hearing, to determine if I should do so. I have current work to do where I need my room.

So, I request the court to order that the "move-out" portion of my sister's temporary restraining order be "stayed" or restrained until the hearing on the restraining order.

(If the item that this Attachment concerns is made under penalty of perjury, all statements in this Attachment are made under penalty of perjury.)

Page 5 of 5

(Add pages as required)

Form Approved for Optional Use
Judicial Council of California
MC-025 (Rev July 1, 2009)

ATTACHMENT
to Judicial Council Form

www.courtinfo.ca.gov

EXHIBIT #12 A

**DV-101    Description of Abuse**

Case Number: TQU23579

This form is attached to DV-100, *Request for Domestic Violence Restraining Order.*

(1) Name of person asking for protection: Laurack D. Bray

(2) Name of person you want protection from: Dianne Jackson

(3) Describe the 2nd most recent abuse.

   a. Date of 2nd most recent abuse: Previous restraining order - date?

   b. Who was there? _____

   c. Describe how the person in (2) abused you or your children: _____

   Again, my sister filed an unwarranted restraining order claiming that I had ~~somehow~~ contacted her in some way, or harmed her.

   d. Describe any use or threatened use of guns or other weapons: _____

   e. Describe any injuries: _____

   f. Did the police or other law enforcement come? ☒ No   ☐ Yes

   If yes, did they give you or the person in (2) an Emergency Protective Order? ☐ Yes ☐ No ☐ I don't know

   The Emergency Protective Order protects ☐ You ☐ The person in (2)

   *Attach a copy of the Emergency Protective Order if you have one.*

Judicial Council of California, www.courts.ca.gov
Re     nuary 1, 2012, Optional Form
Fa     ode, § 6200 et seq.

Description of Abuse
(Domestic Violence Prevention)

DV-101, Page 1 of 2

→

Exhibit #13A

**14**

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES


DEPARTMENT SC-M                HON. STEPHEN LOWRY, COMMISSIONER


LAURACK D. BRAY,                          )
                                          )
                        PETITIONER,       )
                                          )
                VS.                       )     NO. TQ023579
                                          )
DIANNE JACKSON,                           )
                                          )
                        RESPONDENT.       )
_____

REPORTER'S TRANSCRIPT OF PROCEEDINGS

FRIDAY, JUNE 24, 2016


APPEARANCES:

    FOR THE PETITIONER:        IN PROPRIA PERSONA


    FOR THE RESPONDENT:        IN PROPRIA PERSONA


COPY


SUZANNE WOOD, CSR #11359
OFFICIAL REPORTER

COMPTON, CALIFORNIA, FRIDAY, JUNE 24, 2016

A.M. SESSION


THE COURT:  CASE NUMBER 10, LAURACK D. BRAY VERSUS DIANNE JACKSON.  GOOD MORNING TO YOU BOTH.

MS. JACKSON:  GOOD MORNING.

MR. BRAY:  GOOD MORNING.

THE COURT:  HELP YOURSELF TO A RICOLA THERE IF YOU WANT ONE.

MR. BRAY, AS I UNDERSTAND IT, YOU CAME IN ON THE 3RD OF JUNE SEEKING A RESTRAINING ORDER AGAINST MS. JACKSON, WHO IS YOUR SISTER, AND THE BENCH OFFICER WHO LOOKED AT YOUR PAPERWORK AND EVALUATED IT SAID NO, I DO NOT BELIEVE THERE ARE ANY FACTS HERE THAT WARRANT THE GRANTING OF A RESTRAINING ORDER, SO YOU WERE DENIED A RESTRAINING ORDER.

MR. BRAY:  THAT'S CORRECT.

THE COURT:  NONE WAS GIVEN TO YOU.

MR. BRAY:  CORRECT.

THE COURT:  BUT UNDER THE LAW THAT BENCH OFFICER DID WHAT SHE WAS SUPPOSED TO DO, WHICH WAS SHE WENT AHEAD AND SET A HEARING DATE AND GAVE YOU AN OPPORTUNITY TO HAVE YOUR PAPERWORK SERVED ON MS. JACKSON AND GAVE YOU AN OPPORTUNITY IF YOU WERE SUCCESSFUL IN DOING THAT TO COME IN HERE AND TRY TO CONVINCE ANOTHER BENCH OFFICER, IN THIS CASE ME, BECAUSE I'M NOT THE ONE WOULD REVIEWED IT ORIGINALLY, THAT YOU SHOULD HAVE HAD A RESTRAINING ORDER.

MR. BRAY:  THAT'S CORRECT, SIR, YES.

THE COURT:  AFTER SHE GOT THE PAPERS -- AND I'VE GOT A PROOF OF SERVICE HERE THAT SHOWS THAT YOU HAD MS. JACKSON SERVED ON THE 15TH OF THE MONTH, WHICH IS A TIMELY SERVICE; THE SHERIFFS SERVED HER.

MS. JACKSON FILED A RESPONSE AND LAID OUT IN GREAT DETAIL THROUGH SEVERAL SINGLE-SPACED, TYPEWRITTEN PAGES OF INFORMATION PLUS SOME ATTACHMENTS, ALL OF WHICH IS DESIGNED TO SHOW THAT IF I WAS GOING TO BE LIKELY TO CONSIDER OR RECONSIDER YOUR MATTER, AND POSSIBLY GIVE YOU A RESTRAINING ORDER, THAT NO RESTRAINING ORDER SHOULD BE GRANTED TO YOU BECAUSE OF THE COUNTER FACTS.

DO YOU BELIEVE THAT YOU STILL NEED A RESTRAINING ORDER OF SOME KIND AGAINST MS. JACKSON IF THE COURT WERE GOING TO GIVE YOU ONE?

MR. BRAY:  ABSOLUTELY, SIR.

THE COURT:  HERE'S THE FACTS AS I UNDERSTAND THEM -- AND I WILL HEAR FROM YOU, MA'AM, IF I NEED TO.  RIGHT NOW YOU'VE GOT THE UPPER HAND; YOU UNDERSTAND THAT?

MS. JACKSON:  YES.

THE COURT:  HE'S DOWN, YOU'RE UP; OKAY?

MS. JACKSON:  YES.

THE COURT:  AND YOU DON'T.  KEEP IN MIND ALTHOUGH HE'S A TRAINED LAWYER, HE'S NOT IMBARRED IN CALIFORNIA SO HE'S NOT LICENSED HERE, BUT HE CAN CERTAINLY BE HERE AND SPEAK HIMSELF.  I'LL GIVE YOU ONE WORD OF ADVICE FOR LAWYERS, HE MAY KNOW THIS, MAY NOT, HE CAN TAKE IT IF HE WANTS.

HERE'S THE FACTS AS I UNDERSTAND THEM:

THE TWO OF YOU HAVE A 94-YEAR-OLD MOTHER; OKAY? I DON'T EVER COME OUT ON THE BENCH WITHOUT READING THE PAPERS; OKAY?  SO I KNOW WHAT'S IN THE PAPERS, AND TO MAKE SURE I KNOW WHAT'S IN THE PAPERS I MAKE NOTES LIKE THAT (INDICATING)  YOU COULDN'T READ THEM BUT, YOU KNOW, I CAN READ THESE HAND SCRATCHINGS, AND THE REASON IS THAT AS I PRACTICED LAW 35 YEARS BEFORE I CAME  ON THE BENCH, AND THE THING I HATED MORE THAN ANYTHING ELSE WAS TO COME INTO COURT FULLY PREPARED, HAVING DONE GREAT PAPERS -- AND I ONLY DID CIVIL LITIGATION; I DIDN'T DO ANY FAMILY LAW, I DIDN'T DO ANY CRIMINAL, JUST CIVIL LITIGATION, JUST OVER MONEY; BIG DISPUTES BETWEEN BIG PARTIES, PARTNERSHIP BREAK-UPS, THINGS OF THAT SORT.

AND THE WORST POSSIBLE THING THAT YOU FEEL AS A LAWYER IS WHEN YOU'VE DONE ALL THE WORK, AND YOU KNOW THAT YOU HAVE WON IT ON THE LAW AND ON THE FACTS, AND YOU COME IN AND THE BENCH -- THE JUDGE ON THE BENCH COMES OUT AND SMILES AND SAYS SOMETHING LIKE THE FOLLOWING:

"WELL, LADIES AND GENTLEMEN, WHAT ARE WE HERE FOR TODAY?" OR SOMETHING EVEN WORSE:

"I HAVEN'T HAD A CHANCE TO LOOK OVER THE PAPERS, BUT I'M SURE YOU CAN TELL ME WHAT'S THERE AND WE CAN GET RIGHT TO THIS."  WELL, THEN YOU KNOW AUTOMATICALLY THAT ALL THE WORK THAT YOU PUT IN ON YOUR CASE WAS WASTED.  SO ANYWAY, THAT ISN'T THE CASE.

HERE'S THE FACTS AS I UNDERSTAND THEM.  IN YOUR CASE YOU HAVE A 94-YEAR-OLD MOTHER WHO IS DISABLED AND NOT ABLE TO TAKE CARE OF HERSELF.  MS. JACKSON HAS BEEN

DESIGNATED AS HER CONSERVATOR IN THE COURT OF LAW IN THE STATE OF CALIFORNIA; SHE'S RESPONSIBLE FOR SEEING TO YOUR MOTHER'S CARE.  SHE'S IN A HOME RIGHT NOW WHERE SHE'S BEING CARED FOR AND --

MS. JACKSON:  SHE'S IN THE HOSPITAL RIGHT NOW.

THE COURT:  SHE'S IN THE HOSPITAL RIGHT.NOW?

MS. JACKSON:  SHE WAS ADMITTED ON --

THE COURT:  THAT'S CHANGED SINCE I GOT YOUR PAPERS.

MS. JACKSON:  SHE WAS ADMITTED WEDNESDAY WITH PNEUMONIA.

THE COURT:  YOUR MOTHER HAS A HOME LOCATED IN THE AREA AT 402 EAST 93RD STREET.

MS. JACKSON:  YES.

MR. BRAY:  CORRECT.

THE COURT:  BOTH OF YOU WERE PERMITTED TO LIVE IN THE HOUSE SINCE YOUR MOTHER HAS LEFT THE HOME AND TAKEN INTO CARE, AND FOR A WHILE BOTH OF YOU WERE LIVING IN THE HOME, BUT BOTH OF YOU STILL HAVE ACCESS TO THE HOME, BUT THE PERSON WHO PRIMARILY LIVES IN THE HOME IS YOU, MR. BRAY, AND MS. JACKSON COMES TO THE HOME IN HER ROLE AS CONSERVATOR.

SHE ALSO HAS PROPERTY THERE IN THE HOME THAT IS HERS, OR CERTAINLY BELONGINGS; SHE GETS MAIL THERE FOR YOUR MOTHER AND FOR HER, SO THAT'S HOW SHE COMES THERE.

MR. BRAY:  THAT'S CORRECT.

THE COURT:  YOU ARE LIVING IN THE HOME, HAVE BEEN CONCERNED THAT MS. JACKSON IS SNOOPING AROUND IN YOUR STUFF, POSSIBLY GOING INTO YOUR ROOM AND TAKING THINGS,

SO YOU TOOK IT UPON YOURSELF TO PUT LOCKS UP ON THE DOOR INSIDE THE HOUSE, AND THEN YOU CALLED THE POLICE AND TOLD THE POLICE SHE WAS TAKING LEGAL DOCUMENTS FROM YOUR ROOM.

MR. BRAY:  THAT'S INCORRECT.

THE COURT:  YOU DIDN'T CALL THE POLICE?

MR. BRAY:  NO.

THE COURT:  YOU TALKED TO HER ABOUT IT.

MR. BRAY:  SHE CALLED THE POLICE.

MS. JACKSON:  I CAME IN WHEN IT WAS HAPPENING AND I CALLED THE POLICE.

THE COURT:  ALL RIGHT.  OKAY.  AND THEN AFTERWARDS YOU FOUND THE DOCUMENTS AND YOU REALIZED YOU'D MADE A MISTAKE, AND YOU APOLOGIZED FOR HAVING FALSELY ACCUSED YOUR SISTER OF TAKING YOUR DOCUMENTS.

MR. BRAY:  RIGHT.

THE COURT:  AND IT'S ALSO THE CASE THAT ALTHOUGH YOU'RE NOT IMBARRED IN THIS STATE, YOU'RE NOT LICENSED HERE, YOU DO LEGAL WORK FOR SOME PEOPLE, SOME CLIENTS, AND YOU DO THE WORK YOU SAY OUT OF THE HOUSE, SO YOU USE YOUR ROOMS IN THE HOUSE AS YOUR OFFICE.

MR. BRAY:  RIGHT.  I'M NOT -- I DO FEDERAL LAW HERE, JUDGE, SO THE FACT THAT I'M NOT BARRED HERE DOES NOT AFFECT MY LEGAL PRACTICE.

THE COURT:  OH, IT DOES, IN CASE YOU DIDN'T KNOW IT. I WOULD TELL YOU THAT IT DOES.  WHEN YOU DO FEDERAL CASES YOU HAVE TO BE ADMITTED PRO HOC VICE.  IF YOU'RE NOT ADMITTED PRO HOC VICE THEY COULD COME DOWN ON YOU PRETTY HARD.  I KNOW THAT BECAUSE DURING MY PRACTICE I HAD

WORKED ALL OVER THE UNITED STATES, AND I'VE SPENT THREE YEARS IN MISSISSIPPI AND LOUISIANA IN FEDERAL COURT DOING MATTERS, AND LET ME TELL YOU, YOU'D BETTER BE ADMITTED IN EVERY PLACE YOU GO, AND HAVE A PRO HOC VICE ADMISSION ON BOARD OR YOU'RE IN TROUBLE.  BUT AT ANY RATE, WE WON'T GET INTO THAT

MR. BRAY:  THAT'S NOT RELEVANT HERE.

THE COURT:  NO, IT'S NOT.  YOUR CONCERN IS THAT YOUR SISTER, THE CONSERVATOR, IS TRYING TO GET YOU OUT OF THE HOUSE, AND THAT SHE IS TRYING TO GET A MOVE-OUT ORDER AGAINST YOU, AND YOU FIND THIS TO BE HARASSING AND STRESSFUL THAT SHE WOULD WANT TO GET YOU OUT OF THE HOUSE.

AND SHE SAYS, YOU KNOW, AS CONSERVATOR I HAVE A DUTY TO PRESERVE THE PROPERTY, MY BROTHER'S NOT PAYING ANY RENT, RIGHT?  HE DOESN'T PAY ANY RENT; RENT-FREE HE LIVES THERE; CORRECT, MA'AM?

MS. JACKSON:  YES.

THE COURT:  HE DOESN'T PAY ANYTHING.

MR. BRAY:  THAT'S THE SAME THING FOR MY SISTER, JUDGE.

THE COURT:  HOLD ON.  WE ONLY TALK ONE AT A TIME IN HERE.  SO THAT'S THE BASIS OF YOUR SITUATION HERE.  YOUR SISTER IS HARASSING YOU BY DOING THINGS LIKE THIS RESTRAINING ORDER CASE, SO YOU GOT THE JUMP ON HER AND CAME IN TO TRY TO GET A RESTRAINING ORDER AGAINST HER TO PREVENT HER FROM SEEKING A MOVE-OUT ORDER AGAINST YOU.

MR. BRAY:  NO, THAT'S INCORRECT, JUDGE.  THE FACTS --

THE COURT: HOLD ON. BE PATIENT. I'LL HEAR FROM YOU.

MS. JACKSON: THE MOVE-OUT ORDER WAS GRANTED SO HE JUST GOT BACK INTO THE HOUSE WEDNESDAY. WE WENT TO A HEARING ON WEDNESDAY AND I WAS GRANTED A PERMANENT RESTRAINING ORDER.

THE COURT: FOR A RESTRAINING ORDER, WHICH WHERE IS THAT CASE PENDING?

MS. JACKSON: HERE WEDNESDAY MORNING.

THE COURT: IN FRONT OF JUDGE GOULD-SALTMAN. I DON'T THINK I'VE SEEN YOU BEFORE; I WOULD REMEMBER THE TWO OF YOU.

MS. JACKSON: YOU WERE OUR JUDGE IN 2014 WHEN I CAME HERE. SHE GRANTED THE RESTRAINING ORDER.

THE COURT: RIGHT. SO YOU HAVE A RESTRAINING ORDER CASE, OR YOU'VE HAD ONE AGAINST MR. BRAY, AND JUST IN THE LAST COUPLE OF DAYS JUDGE GOULD-SALTMAN GRANTED YOU A PERMANENT MOVE-OUT ORDER AGAINST HIM.

MS. JACKSON: SHE DIDN'T DO THE MOVE-OUT ORDER, SHE DID A RESTRAINING ORDER FOR HIM TO STAY AWAY, NOT TO OBSTRUCT MY ACCESS TO THE HOUSE, NOT TO OPEN ANY MAIL THAT WASN'T ADDRESSED TO HIM; I HAVE THE ORDER HERE.

THE COURT: OKAY. BUT SHE DIDN'T FORCE HIM TO MOVE OUT?

MS. JACKSON: NO, SHE DIDN'T IMPOSE THE MOVE-OUT.

THE COURT: THE MOVE-OUT ORDER --

MS. JACKSON: I MEAN, SHE LIFTED IT.

THE COURT: DID SHE SAY YOU CAN CHARGE HIM RENT?

INCLUDE ALL THE LOCKS.

THE COURT:  OKAY.  ALL RIGHT.  ANYWAY, MR. BRAY, THAT'S ALL I SEE HERE, IS THAT YOU WERE TRYING TO PREVENT WHAT HAPPENED TWO DAYS AGO, WHICH IS THAT A RESTRAINING ORDER WAS GRANTED AGAINST YOU.  YOU DID NOT HAVE A MOVE-OUT ORDER GRANTED AGAINST YOU APPARENTLY, BUT THAT WAS -- THAT WAS YOUR VICTORY IN THE MATTER, AND SO FAR YOU'RE STILL ABLE TO RESIDE IN THE HOUSE; OKAY?  OTHER THAN THAT IT LOOKS LIKE SHE'S NARROWED YOUR LIBERTY WITH REGARD TO THE HOUSE BY A GREAT DEAL; OKAY?

SO WHAT HAVE YOU GOT THAT YOU THINK DESERVES -- GIVES YOU CAUSE TO HAVE A CIVIL HARASSMENT RESTRAINING ORDER AGAINST HER?  I DIDN'T SEE SHE'S DONE ANYTHING OTHER THAN ACT IN A LAWFUL MANNER AS A CONSERVATOR.

AS A CONSERVATOR I WOULD SAY SHE'S BEEN EVEN KINDLY TOWARD YOU.  MOST CONSERVATORS I KNOW, THEY GO RIDING ROUGH SHOT OVER YOU, AND THEY HAVE THE RIGHT.

WHAT HAVE YOU GOT TO RESPOND?

MR. BRAY:  ARE YOU READY FOR ME TO RESPOND?

THE COURT:  I'M READY FOR YOU TO TELL ME WHATEVER WOULD CAUSE ME TO BELIEVE THAT YOU NEED A RESTRAINING ORDER.

MR. BRAY:  FIRST OF ALL, AGAIN, MY MOTION FOR THE RESTRAINING ORDER IS FOR HARASSMENT BY MY SISTER.

THE COURT:  SHE HASN'T HARASSED YOU.  YOU HAVEN'T TOLD ME ONE INSTANCE OF HARASSMENT YET.  IF YOU CAN TELL ME SOMETHING THAT'S HARASSING I'LL HEAR IT, OTHERWISE I DON'T WANT TO HAVE YOU JUST SAY "SHE HARASSES ME.  SHE

HARASSES ME."

THAT IS NOTHING, YOU'VE GOT TO HAVE FACTS.
YOU'VE GOT TO HAVE TIME, PLACE, AND SPECIFIC INSTANCES OF
HARASSMENT.  THAT'S ALL I'LL HEAR.  I DON'T WANT TO HEAR
ANY OF THIS "I FEEL HARASSED.  SHE'S HARASSING ME.  SHE'S
STRESSING ME OUT IN MY PLACE OF LIVING."

THAT'S NOT ANY GOOD.  YOU'VE GOT TO HAVE
SOMETHING THAT'S BASED ON FACTS.  LET'S HEAR THEM IF
YOU'VE GOT THEM.

MR. BRAY:  WELL, JUDGE, YOU SAID YOU READ THE
PLEADINGS BEFORE.

THE COURT:  I DID.  THERE'S NOTHING THERE.

MR. BRAY:  ABSOLUTELY.  THERE'S ABSOLUTELY A LOT
THERE.  FIRST OF ALL --

THE COURT:  THERE'S NO INSTANCES OF HARASSMENT, SIR.

MR. BRAY:  FIRST OF ALL, SIR, YOU DIDN'T LET ME
FINISH.  AFTER I SAID "HARASSMENT" YOU DIDN'T LET ME GET
TO EXPLAIN THE TYPE OF HARASSMENT IT WAS BEFORE YOU WERE
COMING IN HERE WITH THESE STATEMENTS.  IF I'M NOT GOING
TO GET A FAIR HEARING, JUDGE --

THE COURT:  DON'T GO INTO THE FAIR HEARING, YOU'RE
GETTING ONE.

MR. BRAY:  I'M NOT, APPARENTLY, BECAUSE YOU'RE NOT
LETTING ME SAY WHAT I'M SUPPOSED TO SAY.

THE COURT:  I'LL LET YOU SPEAK WITHOUT INTERRUPTION
FOR THE NEXT THREE MINUTES, FOR THE NEXT THREE MINUTES;
THAT'S MORE THAN I GIVE ALMOST ANYONE THAT COMES IN HERE.
THREE MINUTES; I WON'T INTERRUPT AT ALL, SAY WHAT YOU

WANT SAY BUT SAY IT SLOWLY SO MY COURT REPORTER CAN TAKE IT ALL DOWN.

MR. BRAY:  ALL RIGHT.  FIRST OF ALL, THIS -- MY REQUEST FOR A RESTRAINING ORDER IS BASED ON DOMESTIC VIOLENCE HARASSMENT; ALL RIGHT?  IT'S NOT CIVIL, IT'S DOMESTIC VIOLENCE HARASSMENT.  THAT'S DEFINED IN TERMS OF THE CALIFORNIA COURT'S WEBSITE FOR THE JUDICIAL BRANCH OF CALIFORNIA.

THAT TYPE OF DOMESTIC VIOLENCE HARASSMENT AND ABUSE IS DEFINED AS BEHAVING -- DEFINED AS BEHAVIOR LIKE HARASSING, DISTURBING SOMEONE'S PEACE, AND PREDOMINANTLY THAT'S WHAT I'M RELYING ON, DISTURBING MY PEACE WITHOUT SUFFICIENT EVIDENCE OR CLAIM THAT WOULD PERMIT HER TO DO THAT, AND SHE'S HARASSED ME IN VARIOUS WAYS.

FIRST OF ALL, SHE HARASSED ME BY CALLING THE POLICE FOR MATTERS THAT THE POLICE SHOULD NOT BE CALLED FOR, AND THAT HAS HAPPENED ON SEVERAL OCCASIONS.  THAT HAS HAPPENED EVEN WITH HER FIRST RESTRAINING ORDER IN 2014; SHE GOT THAT BASED ON FALSE EVIDENCE.  I WAS SUPPOSED TO HAVE ABUSED HER, PHYSICALLY ABUSED HER; THAT RESTRAINING ORDER WAS DISSOLVED IN 2014.

THEN WE CAME BACK AND SEVERAL TIMES SHE CALLED THE POLICE WHEN I WAS TRYING TO GET MY MOTHER TO THE BANK -- BECAUSE I WAS PAYING MY MOTHER'S BILLS -- TO GET HER TO THE BANK TO PUT ME ON HER ACCOUNTS SO THAT I COULD CONTINUE TO PAY HER BILLS.

MY SISTER WAS ON HER ACCOUNT BUT SHE REFUSED TO PUT ME ON HER ACCOUNT, SO I WAS TRYING TO GET MY MOTHER

TO THE BANK TO PUT ME ON THE ACCOUNT SO I COULD PAY HER BILLS.  SHE CALLED THE POLICE TO TRY TO INTERVENE ON THAT UNNECESSARILY.  THERE WAS NO NEED FOR THE POLICE TO BE CALLED.  AGAIN, THAT'S ANOTHER OCCASION.

THEN HERE ON MAY 5TH SHE CALLED THE POLICE REGARDING ME PUTTING LOCKS ON MY DOORS.  THE REASON I WAS PUTTING LOCKS ON MY DOOR IS BECAUSE MY SISTER HAD PREVIOUSLY TAKEN THINGS OUT AND STOLEN THINGS FROM THE HOUSE AND FROM MY ROOM, MY PERSONAL ROOM.  SHE HAD TAKEN ADDRESSES -- NAMES AND ADDRESSES THAT BELONGED TO MY MOTHER AND MYSELF WITHOUT LETTING ME KNOW, WITHOUT -- SO AND SHE TOOK SOMETHING, A CARD OR SOMETHING THAT WAS FROM MY RELATIVES, FROM MY ROOM WITHOUT LETTING ME KNOW WITHOUT PERMISSION, AND THAT WAS THE REASON WHY I PUT LOCKS ON MY DOORS, TO PREVENT HER FROM DOING THAT; SHE HAD ADMITTED TO TAKING THOSE THINGS.  OKAY.

THE COURT:  ONE MORE MINUTE.

MR. BRAY:  OKAY.  SO THAT WAS THE REASON FOR THE LOCKS.  OKAY.  AGAIN, THEN SHE CALLED THE POLICE REGARDING THE LOCKS.  THE POLICE ARRIVED AND TOLD HER THAT I WAS -- I I HAD A RIGHT TO PUT LOCKS ON MY DOORS.

SHE ALSO HAD REPORTED TO THE POLICE THAT I HAD PUSHED HER OR -- AND CAUSED HER PAIN IN HER SHOULDER, WHICH WAS A LIE AND FALSE, AND PREDOMINANTLY THAT WAS THE REASON WHY SHE GOT THIS T.R.O., THAT WAS SUPPOSED TO BE THE MAIN REASON WHY SHE GOT THE T.R.O., THAT I WAS SUPPOSEDLY HAD PUSHED HER.  THAT WAS FALSE, THAT WAS ABSOLUTELY FALSE, AND I BELIEVE THE JUDGE AT THE ACTUAL

HEARING FOUND IT TO BE FALSE.

AND FURTHERMORE, I'M GOING TO HAVE THAT -- I WANT THAT ADMITTED HERE, THE RESTRAINING ORDER THAT SHE GOT, BECAUSE THAT RESTRAINING ORDER SUPPORTS ME AS MUCH AS IT DOES HER, PROBABLY MORE. IT SUPPORTS ME MORE THAN IT DOES HER BECAUSE THAT'S THE -- THE RESTRAINING ORDER THAT WAS ISSUED WASN'T BASED ON ANY PHYSICAL CONTACT OR -- THAT SHE -- AND SHE PREDOMINANTLY IN HER RESPONSE, AND EVERYTHING AFTER THIS MAIN -- THE FIRST THING SHE SAID, EVERYTHING ELSE IS IRRELEVANT IN THIS RESPONSE.

HER FIRST THING WAS I FILED A T.R.O. ON JUNE 1ST BECAUSE ON MAY 31ST MY BROTHER, MR. BRAY, PUSHED ME OUT OF THE DOOR OF OUR MOTHER'S RESIDENCE. THAT WAS ABSOLUTELY COMPLETELY FALSE. I'M UNDER OATH NOW AND I'M SAYING IT'S FALSE. SO THAT'S DISPUTED.

THEN IT COMES DOWN TO WHETHER I'M CORRECT OR SHE'S CORRECT IN TERMS OF ME PUSHING HER. AND I HAVE -- I BELIEVE THAT I HAVE MORE EVIDENCE THAN HER THAT IT DIDN'T OCCUR, THAT I DIDN'T PUSH HER. AND, IN FACT -- IN FACT, THE JUDGE'S ORDER -- THE RESTRAINING ORDER DIDN'T GO TO THE FACTS OF WHAT SHE ALLEGED TO GET THE T.R.O. THAT I PUSHED HER, THE JUDGE'S RESTRAINING ORDER JUST WENT DOWN TO A MATTER REGARDING MAIL AND HER CONSERVATORSHIP.

BUT THE JUDGE INDICATED -- AND YOU ARE A COMMISSIONER AND YOU DEAL WITH THESE RESTRAINING ORDER CASES YOURSELF SO I CAN POINT TO YOU IN TERMS OF THE JUDGE'S ORDER HOW IT HELPS ME, AND THE JUDGE DID NOT

BELIEVE, IN FACT, THAT I HAD EXERCISED ANY PHYSICAL EVIDENCE AGAINST HER.

THE COURT:  OKAY.  YOU'VE HAD THREE MINUTES NOW.  YOU CAN STOP.  I GAVE YOU FIVE MINUTES; OKAY?

MR. BRAY:  ALL RIGHT.

THE COURT:  NOW, I'M GOING TO ASK YOU SOME QUESTIONS ABOUT THESE AND I EXPECT YOU TO ANSWER MY QUESTIONS. THAT'S ALL I WANT; I DON'T WANT YOU GIVING ME, YOU KNOW, ANOTHER NARRATIVE.  I JUST WANT YOU TO ANSWER MY QUESTIONS.

WHAT WAS THE YEAR THAT YOU WENT TO THE BANK WITH YOUR MOTHER?

MR. BRAY:  THE YEAR?

THE COURT:  YES.  WHAT YEAR?  WHEN DID YOU DO THAT?

MR. BRAY:  I DIDN'T ACTUALLY GO TO THE BANK WITH MY MOTHER.

THE COURT:  WELL, YOU TRIED TO TAKE YOUR MOTHER TO THE BANK SO YOU COULD BE PUT ONTO HER ACCOUNT?

MR. BRAY:  RIGHT.

THE COURT:  WHEN WAS THAT?

MR. BRAY:  I BELIEVE THAT WAS 15.

THE COURT:  SO LAST YEAR?

MR. BRAY:  I'M NOT SURE.  LAST YEAR OR 2014, ONE OF THEM TIMES.  IT MIGHT BE 2014.

THE COURT:  WELL, LAST YEAR WAS 2015.

MR. BRAY:  RIGHT, I KNOW THAT.

THE COURT:  THE YEAR BEFORE THAT WAS 2014.

MR. BRAY:  RIGHT, I UNDERSTAND THAT, BUT I'M SAYING

I'M NOT GOING TO PUT IN IT --

THE COURT:  COULD HAVE BEEN EITHER OF THOSE.

MR. BRAY:  -- EITHER 2014 OR 2015, ONE OF THEM.

THE COURT:  AND WHEN WAS YOUR SISTER MADE THE CONSERVATOR OF YOUR MOTHER'S ESTATE?

AND I'LL HOLD IT THERE.  I'LL ASK HER, SHE'LL KNOW.

WHEN DID YOU BECOME THE CONSERVATOR?

MS. JACKSON:  ON JUNE 12TH, 2015, WE HAD THE HEARING, AND I ACTUALLY GOT THE PHYSICAL ORDER IN NOVEMBER, BECAUSE I WENT THROUGH THE CONSERVATORSHIP COURT CLINIC. SO BY THE TIME I GOT ALL THE PAPERWORK, IT WAS LIKE NOVEMBER OF 2015.

THE COURT:  OKAY.  AND YOUR CONCERN ABOUT YOUR BROTHER TAKING YOUR MOTHER, WHO WAS NOT MENTALLY SOUND, TO A BANK TO HAVE HIS NAME PUT ON THE ACCOUNT WAS THAT YOU HAD SERIOUS DOUBTS AS TO WHETHER YOUR MOTHER WOULD KNOW WHAT HE WAS DOING, WHEN HE WAS DOING IT, AND WHY?

MS. JACKSON:  AND SHE HAD TWO FRACTURES.

THE COURT:  OKAY.  SO HE WAS PREVENTED FROM DOING THAT.

MS. JACKSON:  YES, I CALLED THE POLICE.

THE COURT:  OKAY.  NOW, WHAT EVIDENCE DO YOU HAVE, SIR, THAT IS BETTER THAN THE EVIDENCE THAT YOUR SISTER HAS REGARDING THE INCIDENT ON 5-31-16 WHEN MS. JACKSON SAYS YOU PUSHED HER AND SLAMMED THE DOOR ON HER, OR PUSHED HER OUT THROUGH THAT DOOR AND HARMED HER.

HAVE YOU GOT A VIDEOTAPE THAT YOU CAN SHOW ME?

MR. BRAY:  NO, I DO NOT HAVE A VIDEOTAPE.

THE COURT:  HAVE YOU GOT A WITNESS FROM NEXT DOOR WHO WAS STANDING THERE WATCHING WHO CAN TESTIFY?

MR. BRAY:  I DON'T HAVE A WITNESS HERE.  AND SHE DOESN'T HAVE A WITNESS THAT CAN TESTIFY --

THE COURT:  I DIDN'T ASK WHAT SHE HAS OR DOESN'T HAVE.

MR. BRAY:  NO, I DON'T HAVE A WITNESS.

THE COURT:  YOU'RE TELLING ME YOU'VE GOT BETTER EVIDENCE THAN SHE DOES.

MR. BRAY:  I'LL GET TO THAT.  ARE YOU ASKING FOR ALL THE EVIDENCE I HAVE, JUDGE?

THE COURT:  I WANT TO KNOW WHAT IT IS.

MR. BRAY:  ALL RIGHT.  WELL, FIRST OF ALL, SINCE SHE CLAIMED THAT I PUSHED HER, AND I SHOVED HER, AND SHE CALLED THE POLICE, AND SHE TOLD THE POLICE -- SHE ACCUSED ME WITH THE POLICE THAT I DID THESE THINGS.  ALL RIGHT.

MY EVIDENCE IS -- IT'S GOING TO BE CIRCUMSTANTIAL EVIDENCE, JUDGE, BECAUSE SHE HAS NO EVIDENCE THAT I DID IT.  I HAVE NO EVIDENCE THAT SHE DIDN'T DO IT.  ALL RIGHT.  BUT I AT LEAST HAVE CIRCUMSTANTIAL EVIDENCE THAT SHE DIDN'T DO IT.  SHE HAVE NO OTHER EVIDENCE THAT I DID IT.

THE COURT:  WHAT IS THAT CIRCUMSTANTIAL EVIDENCE, SIR?  THAT'S WHAT I'M ASKING ABOUT.

MR. BRAY:  ALL RIGHT.  I'M GOING TO GET TO THAT RIGHT NOW.

THE COURT:  NO, JUST TELL ME.

MR. BRAY: I'M GOING TO TELL YOU, SIR.

THE COURT: WELL, THEN SPEAK.

MR. BRAY: ALL RIGHT. I'M SPEAKING NOW, SIR.

FIRST OF ALL, THAT SINCE SHE MADE THIS REPORT TO THE POLICE THAT I PUSHED HER, AND SHOVED HER, AND CALLED CAUSED HER SHOULDER TO BE INJURED, THAT IS ASSAULT AND BATTERY, SIR, THAT'S WHAT SHE ACCUSED ME OF, ASSAULT AND BATTERY.

ALL RIGHT. IF THIS HAD HAPPENED, WHY DIDN'T, WHEN THE POLICE ARRIVED AT THAT --

THE COURT: DON'T ASK THAT QUESTION. YOU'RE A LAWYER, YOU KNOW BETTER THAN THAT TO ASK THAT. NO, STOP. LET ME TELL YOU. YOU DON'T ASK A QUESTION LIKE THAT OF A BENCH OFFICER, BECAUSE A BENCH OFFICER CAN GIVE YOU 50 REASONS WHY IT DIDN'T HAPPEN THE WAY YOU CONJECTURE THAT IT SHOULD, THAT THE POLICE SHOULD HAVE ARRESTED YOU.

THE POLICE ARE CALLED OUT ON THOUSANDS OF INCIDENTS EVERY DAY; THEY MAKE VERY FEW ARRESTS, VERY FEW ARRESTS. AND IN REGARD TO ANY KIND OF A DOMESTIC VIOLENCE ACT, WE KNOW FROM ALL KINDS OF HISTORY BY ALL KINDS OF PEOPLE THAT MOST PEOPLE NEVER REPORT IT AT ALL, THE VICTIMS ALMOST NEVER REPORT IT BECAUSE THEY FEAR RETALIATION.

NOW, LET ME START YOU RIGHT BACK AT THE BEGINNING OF YOUR NARRATIVE. YOU SAID YOU WERE NOT HERE ON A HARASSMENT CIVIL RESTRAINING ORDER, YOU'RE HERE ON A DOMESTIC VIOLENCE RESTRAINING ORDER. WRONG. WRONG; OKAY? YOU HAVE NOT ASSERTED ONE INSTANCE OF DOMESTIC

VIOLENCE AT ALL TOWARD YOU.  NONE.  ABSOLUTELY NONE.

MR. BRAY:  I DEFINE IT, JUDGE.  I JUST DEFINED TO YOU HOW IT IS DEFINED BY A CALIFORNIA COURT.

THE COURT:  RIGHT.  YOU SAY THAT THE DOMESTIC VIOLENCE PERPETRATED UPON YOU BY YOUR SISTER IS ONE OF DISTURBING THE PEACE.

MR. BRAY:  DISTURBING MY PEACE, NOT DISTURBING --

THE COURT:  THAT'S RIGHT DISTURBING YOUR PEACE.

MR. BRAY:  BEHAVIOR THAT'S HARASSING, SIR.

THE COURT:  YOUR SISTER HAS A RIGHT TO BE IN THE HOUSE AT ALL TIMES, AT ALL TIMES.  SHE HAS MORE OF A RIGHT TO BE IN THE HOUSE THAN YOU DO BECAUSE SHE IS -- SHE IS THE CONSERVATOR, YOU ARE NOT.  YOU'RE A SQUATTER. PLAIN AND SIMPLE, YOU'RE A SQUATTER.

MR. BRAY:  I'M NOT A SQUATTER, SIR, AS LONG AS MY MOTHER ALLOWS ME TO LIVE ON THOSE PREMISES I'M NOT A SQUATTER; ALL RIGHT?

THE COURT:  WELL, EXCEPT FOR THE FACT THAT YOUR SISTER SPEAKS FOR YOUR MOTHER.  YOUR MOTHER IS NOT IN A CONDITION TO BE ABLE TO SAY ONE WAY OR ANOTHER WHETHER YOU SHOULD BE THERE OR NOT.

MR. BRAY:  THAT'S ABSOLUTELY INCORRECT, SIR.  MY MOTHER IS NOT MENTALLY IMPAIRED, SIR.  MY MOTHER IS NOT MENTALLY IMPAIRED.  AND THE CONSERVATOR HAS TO REGARD AND FOLLOW THE WISHES OF THE CONSERVATEE.  AND MY MOTHER IS THE CONSERVATEE, JUDGE, AND THAT'S ONE OF THE PRINCIPLES OF THE CONSERVATORSHIP.

THE COURT:  DO YOU HAVE ANYTHING IN WRITING FROM YOUR

MOTHER THAT SAYS AS LONG AS I LIVE IT IS MY WISH THAT MY DEAR SON, LAURACK BRAY, D. BRAY BE ALLOWED TO LIVE PEACEFULLY IN MY HOME WITHOUT CHARGING ANY RENT TO HIM, WITHOUT HIM HAVING TO PAY ANY EXPENSES, AND THAT ALL SUCH EXPENSES WILL BE PAID BY MY CONSERVATOR?

DO YOU HAVE ANYTHING LIKE THAT FROM YOUR MOTHER?

MR. BRAY:  I DIDN'T HAVE TO GET ANYTHING.  NO, I DO NOT HAVE THAT, SIR.  THERE WAS NO NEED FOR ME TO GET THAT, SIR.

THE COURT:  NOW THERE IS.

YES, MA'AM, WHAT DID YOU WISH TO SAY?

MS. JACKSON:  IN OUR HEARING ON WEDNESDAY THE JUDGE EXPLAINED AND SAID EXACTLY WHAT YOU ARE SAYING TO MY BROTHER.  WHEN THE POLICE -- ON THAT -- ON THE 31ST WHEN THE POLICE WERE CALLED, THEY GAVE ME THE RECOMMENDATION TO GET THE TEMPORARY RESTRAINING ORDER AND A MOVE-OUT ORDER, AND THAT'S WHAT I DID THE NEXT MORNING; THEY WROTE IT ON THE BUSINESS CARD AND THEY ALSO FILED AN INCIDENT REPORT BUT I CAN'T -- I WENT IN THERE YESTERDAY AND THEY TOLD ME IT WASN'T WRITTEN UP, AND YOU CAN STILL USE THEIR CARD.

THE COURT:  DO YOU UNDERSTAND, SIR, THAT WHEN YOUR SISTER WENT BEFORE JUDGE GOULD-SALTMAN ON HER RESTRAINING ORDER, AND YOU DID AS WELL, AND THE JUDGE GRANTED HER A RESTRAINING ORDER AGAINST YOU, YOU DID NOT WIN?  YOU DID NOT WIN.  YOU MAY THINK YOU WON, AND YOU WON ONE THING AS FAR AS I CAN TELL, AND THAT IS THAT YOU COULD CONTINUE TO RESIDE THERE UNLESS AND UNTIL SHE EVICTS YOU PROPERLY

UNDER THE LAW.  THAT'S ALL YOU WON.  SHE GOT EVERYTHING ELSE THAT SHE WANTED.

HOW LONG IS THE RESTRAINING ORDER FOR, MA'AM?

MS. JACKSON:  TWO YEARS.

MR. BRAY:  CAN I TELL YOU, SIR, THE DIFFERENCE BETWEEN WHEN SHE GOT FROM THAT -- AFTER THE HEARING AND WHAT SHE HAD BEFORE THE HEARING, AND I CAN SHOW YOU HOW I ACTUALLY HAVE BENEFITTED FROM THAT RESTRAINING ORDER THAT THE JUDGE -- FROM WHAT THE JUDGE ACTUALLY FOUND?

THE COURT:  I TOLD YOU --

MR. BRAY:  MAY I DO THAT, SIR?

THE COURT:  I TOLD YOU THAT YOU WON SOME LIMITED, SOME LIMITED RELIEF.

MR. BRAY:  I WON MORE THAN LIMITED RELIEF, SIR.  AND I'LL TELL YOU.  I DO WANT THIS ON THE RECORD BECAUSE I'M GOING TO GET A TRANSCRIPT OF ALL OF THIS.

THE COURT:  OH, WE HOPE YOU DO.

MR. BRAY:  I WILL.

THE COURT:  WE HOPE YOU TAKE ME UP.

MR. BRAY:  ALL RIGHT.  THESE ARE FULL MATERIAL THINGS, SIR, THAT WAS --

THE COURT:  OKAY.  I'M NOT GOING TO HEAR ANOTHER TEN MINUTES, SO YOU BETTER SAY THESE --

MR. BRAY:  THEY WON'T BE TEN MINUTES.

THE COURT:  YOU BETTER SAY THESE NO. 1, NO. 2, NO. 3, NO. 4.  THAT'S ALL I WANT TO HEAR, ONE SENTENCE ON EACH.

WHAT'S THE FIRST THING YOU WON?

MR. BRAY:  NO, I'M TELLING YOU ABOUT FULL MATERIAL

DIFFERENCES, FROM WHAT SHE GOT AT THE PRELIMINARY -- OR THE TEMPORARY RESTRAINING STAGE TO WHAT SHE GOT AFTER OUR HEARING ON MERITS.

THE COURT:  I'M HEARING IT.  NO. 1?

MR. BRAY:  NO. 1, SHE GOT NO ORDER.  AT THE TEMPORARY RESTRAINING STAGE SHE GOT AN ORDER FOR -- NOT TO -- TO REFRAIN FROM PHYSICAL ABUSE.  AFTER THE HEARING THE JUDGE DID NOT GIVE HER -- DID NOT GRANT ANY RECORD FOR ME TO REFRAIN FOR PHYSICAL ABUSE, WHICH MEANS THAT SHE FOUND AT THE HEARING THAT THERE WAS NO PHYSICAL ABUSE.

THE COURT:  NO, THAT'S NOT WHAT THAT MEANS.

BUT GO AHEAD.  LET'S HEAR NO. 2.

MR. BRAY:  THERE WAS NO NEED FOR ANY PHYSICAL ABUSE. NO. 2.  SHE GOT -- THERE WAS AN ORDER SHE GOT AT THE PRELIMINARY STAGE THAT I WAS NOT TO GET HER ADDRESS OR WHEREABOUTS OF WHERE SHE IS; ALL RIGHT?  AFTER THE HEARING THE COURTS DID ALLOW ME TO GET HER ADDRESS OR WHEREABOUTS AFTER SHE -- AND WHERE SHE LIVES IF I SO SOUGHT IT.

ALL RIGHT.  NO. 3.  SHE HAD AN ORDER TO STAY AWAY FROM MY MOTHER AT THE PRELIMINARY STAGE, THE TEMPORARY STAGE.  AFTER THE HEARING THERE WAS NO ORDER TO STAY AWAY FROM MY MOTHER, BECAUSE THERE WAS NO BASIS FOR IT.

NO. 4.  SHE HAD A -- SHE GOT A MOVE-OUT ORDER AT THE PRELIMINARY -- AT THE TEMPORARY STAGE.  AFTER THE HEARING NO MOVE-OUT ORDER, NO EXTENSION OF THE MOVE-OUT ORDER AND NO MOVE-OUT ORDER BECAUSE THERE WAS NO BASIS

FOR EITHER OF ONE OF THEM.  SO THAT'S THE DIFFERENCE.

THE COURT:  THAT'S NOT NECESSARILY THE CASE.  LET ME SEE YOUR RESTRAINING ORDER, MA'AM, IF YOU HAVE IT HERE WITH YOU.  THE BAILIFF WILL BRING IT UP TO ME.

MS. JACKSON:  MAY I SAY SOMETHING?

THE COURT:  YOU MAY, MA'AM.

MS. JACKSON:  MY BROTHER -- WE WENT TO AN APPEALS HEARING; HIS APPEAL WAS DENIED.  HE ALSO DID A WRIT OF EMERGENCY STAY WITH THE SUPREME COURT; WHICH WAS ALSO DENIED --

MR. BRAY:  THAT'S INCORRECT.

MS. JACKSON:  -- ON THE 22ND.

THE COURT:  PLEASE DO NOT TALK WHEN SHE'S TALKING. YOU DO THAT ONE MORE TIME AND I WILL SANCTION YOU $250.

SHE DID NOT INTERRUPT ONE TIME WHEN YOU WERE SPEAKING AND I EXPECT YOU TO EXHIBIT THE SAME BEHAVIOR.

HAVE YOU HEARD ME?

MR. BRAY:  YEAH, I HEARD YOU, SIR.

THE COURT:  DO NOT DO IT.  DON'T CHALLENGE ME ON THAT.  I WILL SANCTION YOU SO BE QUIET WHILE SHE'S TALKING.  CONTINUE, MA'AM.

MS. JACKSON:  I WENT ONLINE FOR THE -- THE COURT OF APPEALS DENIED HIS APPLICATION AND THEY UPHELD THE LOWER COURT'S DECISION FOR MY CONSERVATORSHIP.

HE DID A WRIT OF EMERGENCY STAY WITH THE SUPREME COURT.  I WENT ONLINE YESTERDAY; THAT WAS DENIED ON THE 22ND OF JUNE.  IT WAS POSTED ONLINE.

THE COURT:  OKAY.  YOU DID NOT HAVE AN ORDER AGAINST

YOU NOT TO PHYSICALLY ABUSE YOUR SISTER. THE JUDGE DID NOT CHECK THAT BOX, I AGREE WITH YOU ON THAT BUT THAT DOESN'T MEAN THAT YOU MAY DO SO, THAT DOESN'T MEAN THAT YOU MAY DO SO; ALL RIGHT? KEEP THAT IN MIND.

YOU DO NOT HAVE AN ORDER AGAINST YOU THAT -- THERE'S NO ORDER HERE THAT SHE HAS TO GIVE YOU HER ADDRESS. THERE'S NOTHING IN HERE THAT SAYS SHE HAS TO GIVE YOU HER ADDRESS.

MR. BRAY: SIR, I DIDN'T SAY THAT, SIR.

THE COURT: YOU SAID THAT SHE COULD NOT MAINTAIN HER ADDRESS SECRETLY FROM YOU AND NOT PROVIDE IT TO YOU.

MR. BRAY: RIGHT.

THE COURT: THERE'S NOTHING HERE THAT SAYS SHE HAS TO GIVE THAT TO YOU.

MR. BRAY: SIR, I DID NOT SAY THERE WAS AN ORDER SAYING SHE HAD TO GIVE IT TO ME. THERE'S AN ORDER THAT DOESN'T PREVENT ME FROM TRYING TO GET HER ADDRESS; THAT'S WHAT THE ORDER DOESN'T SAY.

BEFORE SHE GOT AN ORDER THAT I COULD NOT -- AT THE PRELIMINARY STAGE, THE TEMPORARY STAGE, THERE WAS AN ORDER THAT I COULD NOT TRY TO SECURE MY ADDRESS.

AFTER THE HEARING THE JUDGE DID NOT SAY THAT I COULD NOT SECURE MY ADDRESS, SIR. AND IF I WAS REALLY -- IF SHE WAS -- IF THE JUDGE WAS REALLY SUSTAINING HER RESTRAINING ORDER ON THE BASIS OF PHYSICAL ABUSE OR WHATEVER THEN SHE PROBABLY -- SHE WOULD NOT HAVE GRANTED ME AN ORDER TO GET HER ACCESS WHERE SHE AT, HER ADDRESS WHERE SHE IS AT.

THE COURT:  MAKES LOGICAL SENSE.  I'LL AGREE WITH YOU ON THAT.  FOR WHATEVER REASON THE JUDGE -- AND JUDGES ARE NOT PERFECT AND CERTAINLY IT'S THE CASE THAT COMMISSIONERS ARE NOT PERFECT BUT --

MS. JACKSON:  YOUR HONOR --

THE COURT:  SHE LIST YOUR MOTHER AS AN ADDITIONAL PROTECTED PERSON AND THEN SHE NEGLECTED TO CHECK THE BOX WHICH WOULD HAVE GIVEN HER THE PROTECTION; THOSE THINGS HAPPEN TOO OFTEN.  YOU MAY HAVE THIS BACK.

YES, MA'AM.

MS. JACKSON:  ON MY INITIAL PETITION, THERE WAS NOTHING ON THAT PETITION WHICH IS INCLUDED WITH THAT ABOUT AN ADDRESS.  IT'S AT THE BACK OF THAT --

THE COURT:  YEAH, I KNOW, BUT A DIFFERENT JURIST LOOKED AT IT, MA'AM, AND GRANTED IT; OKAY?  AND IT STATED THAT -- AND THERE'S A BOX CHECKED BY THE JUDGE THAT -- ANOTHER JUDGE HERE IN THE COURTHOUSE, AND SHE CHECKED THE BOX THAT SAID HE COULD NOT TAKE ANY ACTION TO OBTAIN YOUR ADDRESS OR LOCATION.

MS. JACKSON:  OH.

THE COURT:  OKAY.  AND THIS MOST RESENT JUDGE DID NOT CHECK THAT BOX.

ALL RIGHT.  SO YOU GOT SOME THINGS, BUT YOU LOST SOME THINGS; ALL RIGHT?  SO YOU'RE NOT -- YOU DIDN'T WIN A HUNDRED PERCENT.  IF YOU WON A HUNDRED PERCENT YOU WOULDN'T BE UNDER ANY RESTRAINT.  YOU'RE UNDER RESTRAINT; TWO YEARS.  YOU'RE NOT TO INTERFERE IN ANY WAY WITH HER DOING HER DUTIES AS A CONSERVATOR, IN ANY WAY, TWO YEARS.

I'M DENYING YOUR REQUEST FOR A DOMESTIC VIOLENCE RESTRAINING ORDER AGAINST YOUR SISTER.  NONE WAS GRANTED TO YOU AND I CONCUR WITH THE JURIST THAT REVIEWED YOUR PAPERS ORIGINALLY.

THERE IS NOTHING THAT WOULD SUGGEST THAT YOU HAVE BEEN SUBJECTED TO DOMESTIC VIOLENCE, ANY KIND OF ABUSE.  THIS NOTION THAT YOUR PEACE HAS BEEN DISTURBED, IF ANYTHING, I WOULD FIND VERY READILY THAT YOU HAVE DISTURBED THE PEACE OF MS. JACKSON, BUT THAT SHE HAS NOT DISTURBED YOUR PEACE.

SHE HAS NOT COME AROUND THE HOUSE, NOT TRIED TO BANG OPEN YOUR DOORS, NOT TRIED TO FORCIBLY REMOVE THE LOCK, SHE HAS SIMPLY PERFORMED AS A CONSERVATOR AND SHE'S DONE IT IN A MOST LIMITED AND RESTRAINED MANNER, SO YOUR DOMESTIC VIOLENCE RESTRAINING ORDER REQUEST CONTINUES TO BE NOT GRANTED AND YOUR CASE IS DISMISSED WITH PREJUDICE. THAT'S IT.

(END OF PROCEEDINGS.)

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

DEPT. SC-M                    HON. STEPHEN LOWRY, COMMISSIONER

LAURACK D. BRAY,                          )
                                          )
                         PETITIONER,      )
                                          )
              VS.                         )   NO. TQ023579
                                          )
DIANNE JACKSON,                           )   REPORTER'S
                                          )   CERTIFICATE
                                          )
                         RESPONDENT.      )
_____  )

        I, SUZANNE WOOD, OFFICIAL REPORTER OF THE

SUPERIOR COURT, COMPTON JUDICIAL DISTRICT, COUNTY OF

LOS ANGELES, STATE OF CALIFORNIA, DO HEREBY CERTIFY THAT

THE FOLLOWING PAGES DO COMPRISE A FULL, TRUE, AND CORRECT

TRANSCRIPT OF THE PROCEEDINGS HELD IN DEPARTMENT SC-M ON

JUNE 24, 2016, IN THE ABOVE-ENTITLED MATTER.


        DATED THIS 5TH DAY OF JULY, 2016.




                _____
                     SUZANNE WOOD, CSR 11359
                     OFFICIAL COURT REPORTER

# Exhibit 2

acted as an arm of federal grand juries by, among other things, serving grand jury subpoenas, obtaining evidence to be presented to the grand jury, and interviewing witnesses to alleged crimes being investigated by the grand jury.

10. Some of the criminal investigations conducted by the DOJ, FBI, USAO, and federal grand juries included allegations of: (a) civil rights abuses, such as deputies using excessive force on inmates in jails; and (b) public corruption offenses, such as deputies smuggling contraband into jails in exchange for bribes.

The Federal Investigation of the LASD

11. Inmate AB was an inmate in the custody of the LASD at MCJ who was a cooperating witness in a federal investigation of alleged federal civil rights and public corruption violations committed by employees of the LASD working at the Los Angeles County jails (the "Federal Investigation"). The Federal Investigation concerned the alleged use of excessive force by LASD deputies against inmates within MCJ and TTCF and the alleged smuggling of contraband by LASD deputies into MCJ and TTCF in exchange for bribes. Specifically, Inmate AB was assisting in a covert public corruption investigation of LASD Deputy Gilbert Michel ("Deputy Michel"), who worked at MCJ. Additionally, Inmate AB was providing information about alleged federal civil rights offenses being committed by employees of the LASD working at MCJ who were allegedly abusing inmates.

12. Special Agent LM was a Special Agent with the FBI. Special Agent LM was among the FBI agents participating in the Federal Investigation.

4

EXH. #2

# Exhibit 3

which were federal court orders signed by United States District Judges.

14. The United States Marshals Service ("USMS") was a federal law enforcement agency that, among other duties, helped federal grand juries obtain the testimony of inmates located at local jails. The USMS served Writs on entities operating local jails, including the LASD, and arranged for the transportation of inmates in LASD custody scheduled to testify before federal grand juries. The USMS served Writs on the LASD at the LASD's Inmate Reception Center.

The Federal Investigation of the LASD

15. Inmate AB was an inmate in the custody of the LASD at the MCJ who was a cooperating witness in a federal investigation of alleged federal civil rights and public corruption violations committed and being committed by employees of the LASD working at the Los Angeles County Jails (the "Federal Investigation"). The Federal Investigation concerned the alleged use of excessive force by LASD deputies against inmates within the MCJ and TTCF and the alleged smuggling of contraband by LASD deputies into the MCJ and TTCF in exchange for bribes. Specifically, Inmate AB was assisting in a covert public corruption investigation of LASD Deputy Gilbert Michel ("Deputy Michel"), who worked at the MCJ. Additionally, Inmate AB was providing information about alleged federal civil rights offenses being committed by employees of the LASD working at the MCJ who were allegedly abusing inmates.

16. Special Agent LM and Special Agent DL were Special Agents with the FBI. Special Agent LM and Special Agent DL were

7

EXH.#3

# Exhibit 4

## CIVIL RIGHTS RESOURCE MANUAL NO. 42

### STANDARDS FOR FBI INVESTIGATION — INVESTIGATION REQUIRED

The following instructions are taken from the FBI's standards of investigation:

*Investigation Required.*
The following circumstances represent examples of situations in which a civil rights investigation should be initiated:

A. Upon receipt of a civil rights allegation from a complainant or victim not known to be unreliable.

B. Upon receipt of a written request from the Civil Rights Division (CRD), Department of Justice (the Department), which is transmitted via FBIHQ. The United States Attorney does not have the authority to advise a field office to discontinue investigation specifically requested by the Department. Any questions regarding the deletion of any portion of a Department request must be promptly resolved with FBIHQ.

C. Upon receipt of a request from a United States Attorney. If the field office believes the United States Attorney's request is not warranted and cannot resolve this with the United States Attorney, promptly advise the Civil Rights Unit (CRU), Criminal Investigative Division (CID), FBIHQ.

D. Upon receipt of specific information appearing in the legitimate news media reporting apparent violation(s) of civil rights statutes.

E. Upon receipt of a civil rights complaint alleging a "Color of Law" violation (Title 18, U.S.C., Sec. 242) from any source not known to be unreliable. The FBI has investigative jurisdiction for any civil rights complaint against any Federal, state, or local law enforcement officials. Upon receipt of a Civil Rights complaint involving allegations against personnel of a Federal law enforcement agency, obtain initial facts of the complaint from complainant, victim or other original source and advise FBIHQ. Conduct no further investigation unless specifically instructed to do so by FBIHQ. The complaint will then be discussed by FBIHQ with the Civil Rights Division for a determination as to whether the Department will request a criminal civil rights investigation by the FBI or whether the Division will decline criminal prosecution in favor of an administrative inquiry. Civil rights allegations against any Federal law enforcement agency official should be promptly brought to the attention of the CRU, FBIHQ. "Color of Law" can also apply to non-law enforcement officials who have lawful authority due to their position, such as mayor, councilman, tax collector, proprietor of a nursing home, security guard, etc., and who are likewise bound by laws, statutes, ordinances, regulations or customs. Law enforcement personnel are therefore only a few of the "officials" who act under color of law. "Color of Law" is further defined in Section 44-1.2 of the FBI Field Manual.

F. Upon receipt of a complaint involving civil rights allegations against FBI personnel, the following procedures are to be followed:

1. Advise the CRU, CID, and the Office of Professional Responsibility (OPR), Inspection Division (INSD), by telephone, followed by appropriate communications so that FBIHQ may furnish appropriate guidance. The CRU will coordinate with OPR and other FBIHQ components and advise the SAC concerning the proper handling of the matter;

2. If a civil rights complaint arises during an administrative inquiry, the pertinent administrative inquiry relating only to the civil rights allegation must stop in order

EXH. #4



United States Department of Justice

---

OFFICES *of* THE

# UNITED STATES ATTORNEYS

U.S. Attorneys » Resources » U.S. Attorneys' Manual » Civil Rights Resource Manual

## Civil Rights Resource Manual

The Civil Rights Resource Manual is currently being revised.

‹ Civil Rights Resource Manual                    up                    Criminal Resource Manual ›

EXH. #4

