Nathan J. Hochman, SBN 139137
Brianna Leigh Abrams, SBN 239474
MORGAN, LEWIS & BOCKIUS LLP
The Water Garden
Suite 2050 North
1601 Cloverfield Boulevard
Santa Monica, CA  90404-4082
Tel:    +1.310.255.9025
Fax:   +1.310.907.2025
e-mail: nathan.hochman@morganlewis.com
e-mail: brianna.abrams@morganlewis.com

Attorneys for Defendant
LEROY BACA

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>LEROY BACA,<br><br>Defendant. | Case No. CR 16-66 (A) - PA<br><br>**DEFENDANT'S OPPOSITION TO GOVERNMENT'S MOTION TO BAR TESTIMONY OF DEFENDANT'S PROPOSED EXPERT JAMES SPAR PURSUANT TO FEDERAL RULES OF EVIDENCE 401, 403, AND 702 AND *DAUBERT*; DECLARATION OF JAMES E. SPAR AND EXHIBITS**<br><br>Hearing date:   November 21, 2016<br>Time:              3:00 p.m.<br>Courtroom:      15 |

Defendant LEROY BACA, by and through his attorneys of record, hereby submits his opposition to the Government's Motion To Bar Testimony Of Defendant's Proposed Expert James Spar.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SANTA MONICA

DB2/ 30809663.1

DEF.'S OPPOSITION TO GOVERNMENT'S
MOTION TO BAR TESTIMONY OF DEF.'S.
PROPOSED EXPERT JAMES SPAR
CASE NO. CR 16-66 (A) - PA

This opposition is based on the files and records of the case, the attached Memorandum of Points and Authorities, Declaration of James E. Spar and Exhibits, and any such argument and evidence as may be heard by the Court.

Respectfully submitted,

Dated:   November 14, 2016                    MORGAN, LEWIS & BOCKIUS LLP


By  */s/ NATHAN J. HOCHMAN /s/*
    Nathan J. Hochman
    Brianna L. Abrams
    Tinos Diamantatos
    Attorneys for Defendant
    LEROY BACA

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
SANTA MONICA

DB2/ 30809663.1

2

DEF.'S OPPOSITION TO GOVERNMENT'S MOTION TO BAR TESTIMONY OF DEF.'S. PROPOSED EXPERT JAMES SPAR
CASE NO. CR 16-66 (A) - PA

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Dr. James Spar is one of the nation's leading experts on Alzheimer's disease ("Alzheimer's") and other mental illnesses affecting the elderly, is a Professor of Clinical Psychiatry in the Department of Psychiatry and Biobehavioral Sciences at the David Geffen School of Medicine at UCLA, and has spent his 38-year career devoted mainly to clinical and training program administration, teaching, and research in the evaluation and treatment of elderly patients with mental illness. Based on his extensive background, training, research and experience with Alzheimer's and his review of the medical literature concerning Alzheimer's as well as Mr. Baca's medical records, the relevant facts of this case, and the transcript of the April 12, 2013 government interview of Mr. Baca, Dr. Spar will be able to testify to a reasonable medical certainty based on valid reasoning and methodology that:

(i) Mr. Baca was either in the pre-clinical stage (which can occur 10 years or more before the onset of clinical symptoms) or the mild cognitive impairment ("MCI") stage of Alzheimer's during his April 12, 2013 government interview; and

(ii) In either stage, Mr. Baca's Alzheimer's increased the probability that during his April 12, 2013 government interview, memory impairment affected his answers to questions about events and conversations that occurred 20 months earlier in August-September 2011.

While the Court must exercise its gate-keeping role under *Daubert* to ensure by a preponderance of the evidence that Dr. Spar's expert testimony "rests on a reliable foundation and is relevant to the task at hand," Dr. Spar's expert testimony readily meets this standard. The government's motion has disguised a credibility and weight of the of evidence argument as a challenge to admissibility based on *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 588 (1993). *See*

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SANTA MONICA

DB2/ 30809663.1

DEF.'S OPPOSITION TO GOVERNMENT'S
MOTION TO BAR TESTIMONY OF DEF.'S.
PROPOSED EXPERT JAMES SPAR
CASE NO. CR 16-66 (A) - PA

*Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1199 (9th Cir. 2014) (in reversing district court's exclusion of expert, the Ninth Circuit stated, "issues regarding the correctness of [an expert's] opinion, as opposed to its relevancy and reliability, are a matter of weight, not admissibility."); *Primiano v. Cook*, 598 F.3d 558, 568 (9th Cir. 2010) (though opinion of doctor is admitted, jury may reject the opinion); *United States v. Vallejo*, 237 F.3d 1008, 1021 (9th Cir. 2001) (reversing exclusion of psychologist's expert testimony and noting admissibility of expert opinion different than weight to be accorded); *see also McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995) (disputes as to the strength of an expert's credentials, faults in the use of a methodology, or lack of textual authority for an opinion go to the weight, and not the admissibility, of an expert's testimony).  At most, the government has presented a dispute between its expert, Dr. Dimitri Krainc, and Dr. Spar -- a dispute that should be settled by cross-examination before the jury not precluded from occurring in the first place by the Court.

Accordingly, since Rule 702 is to be applied with a "liberal thrust" favoring admission, *Daubert*, 509 U.S. at 588, and "[t]he rejection of expert testimony is the exception rather than the rule,"  Fed. R. Evid. 702 (advisory committee notes), Mr. Baca respectfully requests that the Court permit the expert testimony of Dr. Spar on the highly relevant issue of whether Mr. Baca's Alzheimer's increased the probability that during his April 12, 2013 government interview, memory impairment affected his answers to questions about events and conversations that occurred 20 months earlier in August-September 2011.

## II.   STATEMENT OF FACTS

### A.   The Five Alleged False Statements During The April 12, 2013 Government Interview Of Mr. Baca

Mr. Baca has been charged with making five false statements to the FBI and U.S. Attorney's Office during an April 12, 2013 interview they conducted of Mr.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SANTA MONICA

DB2/ 30809663.1

2

DEF.'S OPPOSITION TO GOVERNMENT'S MOTION TO BAR TESTIMONY OF DEF.'S. PROPOSED EXPERT JAMES SPAR CASE NO. CR 16-66 (A) - PA

Baca, and conspiring to commit and committing obstruction of justice during the period of August to September 2011. *See* ECF No. 70. These five alleged false statements during the April 12, 2013 interview all relate to **Mr. Baca's memory** of events and conversations that occurred 20 months before the April 12, 2013 interview -- in August and September 2011. The five alleged false statements are:

(i) **Mr. Baca's memory** of whether he knew as of August 20, 2011 that the FBI was conducting a civil rights investigation of the LASD;

(ii) **Mr. Baca's memory** of whether as of August 20, 2011 he was directly involved in keeping the Inmate Brown away from the FBI;

(iii) **Mr. Baca's memory** of whether he was informed that on August 23, 2011 FBI agents were not allowed to continue their interview of Inmate Brown;

(iv) **Mr. Baca's memory** of whether he was aware that LASD officials were going to approach FBI agent Leah Marx and threaten to arrest her before the evening of September 26, 2011; and

(v) **Mr. Baca's memory** of whether he stated on September 26, 2011 that he did not believe the FBI should be investigating the LASD.

### B. Dr. Spar's Proposed Expert Testimony

Dr. Spar is highly qualified to render the proposed expert testimony on Alzheimer's and its impact on Mr. Baca's memory during the April 12, 2013 interview; such testimony is based on valid reasoning and methodology, and such reasoning and methodology properly can be applied to the facts of this case, is relevant to understanding whether Mr. Baca knowingly and willfully made the five alleged statements, and will aid the jury in making such a determination.

### 1. Dr. Spar's Qualifications

As set forth in paragraph 1 of his declaration and his more detailed curriculum vitae, Dr. Spar is a highly qualified expert on Alzheimer's. *See* Spar Decl. ¶ 1, Exhibit 1. He is a physician and psychiatrist licensed to practice

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SANTA MONICA

DB2/ 30809663.1

3

DEF.'S OPPOSITION TO GOVERNMENT'S
MOTION TO BAR TESTIMONY OF DEF.'S.
PROPOSED EXPERT JAMES SPAR
CASE NO. CR 16-66 (A) - PA

medicine in the State of California and is Board Certified in Psychiatry and in Geriatric Psychiatry.  He received an M.D. degree from the UCLA School of Medicine in 1972, completed residency training in Psychiatry at UCLA in 1977, and completed a Fellowship in Geriatric Psychiatry at UCLA in 1978.  He is presently Professor of Clinical Psychiatry in the Department of Psychiatry and Biobehavioral Sciences at the David Geffen School of Medicine at UCLA.  During his 38-year academic career, he has devoted the great majority of his time to clinical and training program administration (particularly hospital-based inpatient care and residency education), teaching, and research in the evaluation and treatment of elderly patients with mental illness.  He has published scholarly articles and chapters on aspects of clinical geriatric psychiatry, including Alzheimer's and other dementing illnesses, and on competency and susceptibility to undue influence.

## 2.    The Stages and Effects of Alzheimer's

Based on his extensive background, training, research and experience with Alzheimer's disease, and review of the pertinent medical literature concerning Alzheimer's disease, Dr. Spar will testify to a reasonable medical certainty as to the following, among other things, with respect to Mr. Baca's diagnosis of Alzheimer's disease.

First, Alzheimer's is an aging-associated, chronic neurodegenerative brain disorder with no known cure that occurs in approximately 13% of people over 65 years of age.  Exactly what occurs in the brains of individuals with Alzheimer's is not completely known, but increasing evidence suggests that the accumulation and deposition of abnormal proteins inside nerve cells in the brain, and in the spaces between nerve cells in the brain, leads to gradual loss of nerve cells and impairment in the functions they serve.  The most important consequence of this impairment is decline in cognitive function; as nerve cell loss progresses, cognitive impairment

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
SANTA MONICA

DB2/ 30809663.1

4

DEF.'S OPPOSITION TO GOVERNMENT'S MOTION TO BAR TESTIMONY OF DEF.'S. PROPOSED EXPERT JAMES SPAR
CASE NO. CR 16-66 (A) - PA

increases.  *See* Spar Decl., ¶ 3A.

Second, three stages of progressive nerve cell loss in Alzheimer's have been identified: The pre-clinical stage, when underlying brain changes have occurred but there are no symptoms.  The second stage is the mild cognitive impairment ("MCI" or "prodromal") stage, where cognitive functions are clearly impaired but mildly so, and the impairment does not interfere with everyday function.  The third stage is the dementia stage where cognitive impairment does interfere with everyday function.  *Id.* at ¶ 3B.

Third, with respect to the pre-clinical stage, this stage is believed to extend ten years or more before the onset of clinical symptoms.  *See, e.g.*, Sperling R, Mormino E, Johnson K. The evolution of pre-clinical Alzheimer's disease: implications for prevention trials. Neuron. 2014 Nov 5;84(3):608-22.  Papp et al (2016) studied cognitive function in individuals with PET scan evidence of Alzheimer's (deposits of abnormal proteins in the brain) and found subtle deficits in language function (word list generation by letter or category). They concluded that that "changes in semantic processing occur earlier in the AD [Alzheimer's Disease] trajectory than previously hypothesized." Papp, Kathryn V.; Mormino, Elizabeth C.; Amariglio, Rebecca E.; Munro, Catherine; Dagley, Alex; Schultz, Aaron P.; Johnson, Keith A.; Sperling, Reisa A.; Rentz, Dorene M.: Biomarker validation of a decline in semantic processing in preclinical Alzheimer's disease. Brain Imaging Behav. 2016 Oct 13. [Epub ahead of print].  Similarly, Edmonds et al (2016) studied subjects with pre-clinical Alzheimer's and found that "subtle cognitive decline" (defined based upon tests of language and memory) was found with increasing frequency as the number of biochemical markers of Alzheimer's increased, and that "subtle cognitive decline" could be used to predict the future development of MCI or dementia. Edmonds, Emily C., Delano-Wood, Lisa, Galaskoa Douglas R., Salmonc, David P., Bondia, Mark W: Subtle Cognitive

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SANTA MONICA

DB2/ 30809663.1

5

DEF.'S OPPOSITION TO GOVERNMENT'S
MOTION TO BAR TESTIMONY OF DEF.'S.
PROPOSED EXPERT JAMES SPAR
CASE NO. CR 16-66 (A) - PA

Decline and Biomarker Staging in Preclinical Alzheimer's Disease Journal of Alzheimer's Disease 47 (2015) 231–242.  Based on these and other studies, Dr. Spar will state that it is clear to a reasonable medical certainty that the impact of Alzheimer's on objective measures of cognition and clinical manifestations is a gradual process beginning in the pre-clinical stage and continuing progressively and inexorably into the MCI and dementia stages and that memory impairment may occur during the pre-clinical stage.  *See, e.g*., Dubois B, Hampel H, Feldman HH, Scheltens P, et al, Preclinical Alzheimer's disease: Definition, natural history, and diagnostic criteria.  Alzheimers Dement. 2016 Mar; 12(3):292-323.  *Id*. at ¶3C.

Fourth, the MCI stage is typically diagnosed when patients or their families first notice symptoms of cognitive impairment, see a doctor, and formal testing is performed. There is no consistent relationship between the presence or severity of cognitive deficits in patients with Alzheimer's and the point in time when the patient or family first notice those deficits, or when they decide to seek medical care and the first formal tests are administered. This is because patients with Alzheimer's often are not aware of their deficits ("lack of insight") and deny or cover for them, even when they are obvious to others; similarly, family members may try to "explain away" the deficits they observe and may be reluctant to share their concerns with the patient.  This means that clearly impaired cognitive function is often present before patients are diagnosed with MCI.  *Id*. at ¶ 3D.

Fifth, the specific cognitive functions that are affected earliest in patients with Alzheimer's are variable.  Typically, memory loss occurs first, along with subtle changes in language function, and other functions are affected later.  When memory is affected, the ability to store and recall new information tends to be impaired earlier and more severely than the ability to recall previously stored information, but this is not always the pattern as Alzheimer's can also affect the ability to recall past information early in its course.  *Id*. at ¶ 3E.

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
SANTA MONICA

DB2/ 30809663.1

6

DEF.'S OPPOSITION TO GOVERNMENT'S MOTION TO BAR TESTIMONY OF DEF.'S. PROPOSED EXPERT JAMES SPAR CASE NO. CR 16-66 (A) - PA

### 3.   **Mr. Baca's Alzheimer's**

While Dr. Spar will testify that it is difficult to determine when Mr. Baca first began to have symptoms of cognitive impairment relating to his Alzheimer's, he has examined the relevant records and determined that there are observations going back to June 2011 of such cognitive impairment. *Id*. at ¶ 4.  For instance, in June of 2011 Baca was unable to recall the name of the "bladder medication" he had recently been started on.  On August 18, 2011 (during the charged conspiracy), as Steven Martinez, the head of the FBI's Los Angeles office, stated in his July 22, 2013 FBI interview: "When MARTINEZ first explained the situation to BACA [about the FBI cell phone in the LASD jail during an August 18, 2011 phone call], it was clear to MARTINEZ that BACA was confused. . . MARTINEZ had to explain the situation to BACA three times before BACA understood." *See id*.; Exhibit 2.  On August 19, 2011 (during the charged conspiracy), Mickey Manzo, a former LASD Deputy Sheriff, testified about Mr. Baca's demeanor that day during their meeting, stating: "He [Baca] was confused or kind of -- he didn't understand what was going on."  *See id*.; Exhibit 3.  William Tom Carey, a former LASD Captain, stated during his August 12, 2015 proffer with the government, that during a January 2014 meeting he had with Mr. Baca, Mr. Baca "seemed like a confused old man." *See id*; Exhibit 4.  In his August 19, 2015 testimony, Mr. Carey referred to Mr. Baca during the January 2014 meetings as seeming "goofy that he couldn't comprehend.  Almost like he's senile." *See id*; Exhibit 5.

On April 12, 2013, when Mr. Baca was interviewed by the FBI and U.S. Attorney's Office, Mr. Baca showed repeated signs of cognitive impairment related to his Alzheimer's throughout the over 4.5 hour interview. As Dr. Spar will testify, Mr. Baca admitted over 25 times during the interview that he could not recall or remember information asked for by the questions involving events, conversations and people during the August-September 2011 time frame.  Mr. Baca also gave

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
SANTA MONICA

DB2/ 30809663.1

7

DEF.'S OPPOSITION TO GOVERNMENT'S MOTION TO BAR TESTIMONY OF DEF.'S. PROPOSED EXPERT JAMES SPAR
CASE NO. CR 16-66 (A) - PA

objectively incorrect memory responses on other questions. For example, Mr. Baca referred to one of the ICIB investigators as "Jim Leavins," and even after being corrected by Mr. Fox that Mr. Leavins' name was Steve Leavins, Mr. Baca continued later in the interview to repeatedly refer to Mr. Leavins as "Jim Leavins." *Id.* at ¶ 5

Mr. Baca retired in January 2014. Prior to his retirement, he was surrounded on a daily basis by people who assisted him throughout his 12-16 hour days as Sheriff of Los Angeles County, including a full-time driver, two secretaries, two aides, and dozens in the management structure, from an Undersheriff, Assistant Sheriffs, Chiefs, Commanders and Captains. Mr. Baca employed these interpersonal compensatory mechanisms to continue to function in the highly demanding role of Sheriff, leaning heavily on those around him to remind him of key facts and information he needed in order to meet the demands of his job. Given this support network, many around Mr. Baca may not have seen or appreciated the cognitive deficits he was experiencing. As is typical for someone suffering from Alzheimer's, Mr. Baca also "lacked insight" into his condition. Once he retired and this interpersonal structure was removed, problems of cognitive impairment were observed by his wife that led Mr. Baca to be formally evaluated for memory complaints in March 2014. After the evaluation and testing, he was first diagnosed with MCI in May 2014. Subsequent evaluations have confirmed that finding, and Alzheimer's was first identified as the cause of his MCI in early 2016. Id. at ¶ 6.

Dr. Spar will testify to a reasonable medical certainty that the diagnosis of Alzheimer's was properly made on the basis of:

(i)  A history and evidence of slowly progressive cognitive decline during the period of consecutive medical evaluations, with normal motor and sensory examination;

(ii)  Neuropsychological testing that showed predominant impairment in

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SANTA MONICA

DB2/ 30809663.1

8

DEF.'S OPPOSITION TO GOVERNMENT'S
MOTION TO BAR TESTIMONY OF DEF.'S.
PROPOSED EXPERT JAMES SPAR
CASE NO. CR 16-66 (A) - PA

the domain of episodic memory, with secondary impairment in executive function;

(iii)   MRI scans showing loss of hippocampal and brain volume;

(iv)   A PET scan that showed glucose hypometabolism in both temporal lobes; and,

(v)   CSF studies that showed markedly elevated levels of tau and ptau, and low levels of beta-amyloid, consistent with Alzheimer's.  Id. at ¶ 7.

The government's own experts do not disagree with this diagnosis. *See* Declaration of Brandon Fox to Gov't Motion, Exhibits 1 and 3.

### 4. **Dr. Spar's Opinions of Mr. Baca's Alzheimer's Regarding Memory Impairment during the April 12, 2013 Government Interview**

In addressing whether Mr. Baca's Alzheimer's increased the probability that he had memory impairment during his April 12, 2013 government interview relating to his five answers to questions about events and conversations that occurred 20 months earlier in August-September 2011, Dr. Spar reviewed the transcript of the April 12, 2013 interview and the particular questions and answers at issue, in addition to relying on his background, training and experience with Alzheimer's particularly in its pre-clinical and MCI stages, He looked at, among other things, the context and language of the questions/answers, the responsiveness of the answers to the questions, and whether questions on the same topics were asked with differing answers given, since all five answers related solely to Mr. Baca's memory of events and conversations 20 months before.  For instance, Mr. Baca was asked if Mr. Thompson ever came to him and apologized for allowing the FBI to interview Anthony Brown in the jail; Mr. Baca answered "no" in one part of the interview while later in the interview he answered the same question by saying he "did not recall" that occurring.  As another example, Mr. Baca was asked whether he was aware prior to a telephone call with Steven Martinez on September

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SANTA MONICA

DB2/ 30809663.1

9

DEF.'S OPPOSITION TO GOVERNMENT'S
MOTION TO BAR TESTIMONY OF DEF.'S.
PROPOSED EXPERT JAMES SPAR
CASE NO. CR 16-66 (A) - PA

26, 2011, that someone was going to approach Leah Marx and threaten to arrest her. No context was given for where or when any prior conversation would have occurred on this issue (e.g., a prior meeting identifying the participants where the topic was discussed) and Mr. Baca gave differing answers to this question asked at different times during the interview involving his recollection. Id. at ¶ 8.

In light of Dr. Spar's professional background, training, research and experience in the Alzheimer's field for over 38 years, his review of the pertinent literature on Alzheimer's, his review of Mr. Baca's medical records, and his review of the transcript of Mr. Baca's April 12, 2013 interview, including Mr. Baca's repeated statements of lack of memory or recall, his objectively incorrect answers relating to his memory, and the context, language used, responsiveness of answers to questions, and differing answers to the same questions concerning the five false statements at issue, Dr. Spar will testify to a reasonable medical certainty that:

(i) Mr. Baca was either in the pre-clinical stage (which can occur 10 years or more before the onset of clinical symptoms) or the MCI stage of Alzheimer's during his April 12, 2013 government interview, as he may have been demonstrating clinical symptoms of MCI which were not formally diagnosed until May 2014; and

(ii) In either stage, Mr. Baca's Alzheimer's increased the probability that during his April 12, 2013 government interview, memory impairment affected his answers to questions about events and conversations that occurred 20 months earlier in August-September 2011.  Id. at ¶ 9.

**5.    Dr. Spar's Responses to Certain Incomplete and Misleading Statements Made by Dr. Krainc**

With respect to the proposed testimony of the government's expert, Dr. Dimitri Krainc, Dr. Spar will testify that certain of Dr. Krainc's statements are incomplete and/or misleading.  This includes the following:

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SANTA MONICA

DB2/ 30809663.1

10

DEF.'S OPPOSITION TO GOVERNMENT'S
MOTION TO BAR TESTIMONY OF DEF.'S.
PROPOSED EXPERT JAMES SPAR
CASE NO. CR 16-66 (A) - PA

Dr. Dimitri Krainc's statement, "Indeed, there is a lack of objective evidence that Mr. Baca suffered from any cognitive deficits at the time of the alleged offenses in 2011 and 2013.  If there were cognitive deficits present at that time, Mr. Baca would have exhibited such deficits on multiple occasions in various situations."  Gov't Motion, Fox Decl., Ex. 3 at 2.  Based on Dr. Spar's medical experience and education and his review of medical literature and the evidence in the case described in his declaration, Dr. Spar believes that Dr. Krainc's statement is incomplete and misleading.  While it is true that since Mr. Baca did not have formal tests performed in 2011 and 2013 to reveal cognitive impairment, it is not correct to state that no "objective evidence" exists from such lack of testing.  Spar Decl. at ¶ 4, 5 (examples of "objective evidence" of Mr. Baca's cognitive impairment including during the April 12, 2013 interview itself). Dr. Krainc cannot state to a reasonable medical certainty that Mr. Baca was not in the pre-clinical stage of Alzheimer's a year before he was diagnosed in 2014 and that as a result of being in that stage, he could not suffer memory impairment during the April 12, 2013 interview.  The more scientifically accurate statement that Dr. Spar would testify to is that with reasonable medical certainty, Mr. Baca was in the pre-clinical stage at a minimum on April 12, 2013.  As such, it can be said with reasonable medical certainty that Mr. Baca's Alzheimer's increased the probability that he had memory impairment during his April 12, 2013 interview relating to his answers to questions about events and conversations that occurred 20 months earlier in August-September 2011.  *See* Spar Decl. at ¶ 11.

In addition, Dr. Krainc has stated that "…it is not possible to link Mr. Baca's conduct in 2011 and 2013 to Alzheimer's disease.  Any attempt to do so would be purely speculative."  Gov't Motion, Fox Decl., Ex. 3 at 2.  While Dr. Krainc is correct that Dr. Spar cannot state with certainty that Mr. Baca's Alzheimer's completely impaired his ability to provide accurate and truthful answers to the five

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SANTA MONICA

DB2/ 30809663.1

11

questions that have been charged as false statements in the indictment from the April 12, 2013 interview, Dr. Spar is not making such a claim.  The opinion Dr. Spar is rendering to a reasonable medical certainty is that Mr. Baca's Alzheimer's increased the probability that memory impairment negatively affected his ability to provide accurate and truthful answers during his April 12, 2013 interview.  *See* Spar Decl. at ¶ 12.

## III.   ARGUMENT

The admissibility of expert testimony is governed by Federal Rule of Evidence 702.  Fed. R. Evid. 702.  Rule 702 is to be applied with a "liberal thrust" favoring admission.  *Messick*, 747 F.3d at 1196-1197, quoting *Daubert*, 509 U.S. at 588.  And "[t]he rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702 (advisory committee notes).  *See also United States v. Morales*, 108 F.3d 1031 (9th Cir. Cal. 1997) (conviction reversed, expert testimony should have been admissible); *United States v. Cohen*, 510 F.3d 1114, 1126 (9th Cir. 2007) (psychiatrist testimony admissible); *McCullock v. H.B. Fuller Co.*, 61 F.3d at 1043 (affirming admission of treating doctor's testimony despite the fact that he "could not point to a single piece of medical literature that says glue fumes cause throat polyps").  The expert's opinion must also be helpful to the trier of fact.  *See Messick,* 747 F.3d at 1199 ("while the district court must act as a gatekeeper to exclude 'junk science' under *Daubert*, Federal Rule of Evidence 702(a) includes within its scope all evidence that would 'help the trier of fact . . . to determine a fact in issue.'  A doctor using a differential diagnosis grounded in significant clinical experience and examination of medical records and literature can certainly aid the trier of fact and cannot be considered to be offering 'junk science.'").  Similarly here, Dr. Spar's testimony—based on his extensive background, training, research and clinical experience, examination of pertinent medical records, and significant review of the literature on Alzheimer's—that Mr. Baca was either in the pre-clinical

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SANTA MONICA

DB2/ 30809663.1

12

DEF.'S OPPOSITION TO GOVERNMENT'S
MOTION TO BAR TESTIMONY OF DEF.'S.
PROPOSED EXPERT JAMES SPAR
CASE NO. CR 16-66 (A) - PA

stage (which can occur 10 years or more before the onset of clinical symptoms) or the MCI stage of Alzheimer's during his April 12, 2013 government interview -- will be helpful to the jury and cannot credibly be defined as "junk science."

In *Daubert v.* Merrell *Dow Pharmaceuticals, Inc.*, the Supreme Court moved away from the "general acceptance" test set forth in *Frye v. United States*, 293 F. 1013 (1923), that had been relied upon by district courts for nearly 70 years, in favor of a broader probe of the reliability and relevance of scientific evidence.  In doing so, the Supreme Court made clear: "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 595.  Where an expert's testimony is predicated on "good grounds . . . it should be tested by the adversary process—competing expert testimony and active cross-examination—rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies."  *United States v. Mitchell*, 365 F.3d 215, 244 (3d Cir. 2004).

Since *Daubert*, courts have focused primarily on the qualifications of the expert, the reliability of the methods employed by the expert, and the relevance of the testimony.  Moreover, the emphasis is not on the conclusions of the experts, but the methods relied upon.  This was made clear in *Daubert* where the Supreme Court stated, "the focus . . . must be solely on principles and methodology, not on the conclusions that they generate."  509 U.S. at 595.  In *Bonner v. ISP Techs*, the Eighth Circuit stated, the "Court's role is not to determine whether an expert's opinion is correct.  It is an expert witness's methodology, rather than his or her conclusions, that is the primary concern of Rule 702."  259 F.3d 924, 929 (8th Cir. 2001). The test for admissibility pursuant to Rule 702 is that an expert must be qualified, and his testimony must be relevant and reliable. *Racies v. Quincy Bioscience*, LLC, 2016 U.S. Dist. LEXIS 136197 (N.D. Cal. Sept. 30, 2016), citing

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SANTA MONICA

DB2/ 30809663.1

13

DEF.'S OPPOSITION TO GOVERNMENT'S
MOTION TO BAR TESTIMONY OF DEF.'S.
PROPOSED EXPERT JAMES SPAR
CASE NO. CR 16-66 (A) - PA

*United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000), *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) (*en banc*), and *Daubert*, 509 U.S. at 589.  Specifically, Rule 702 provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

As set forth herein, Dr. Spar is qualified, his opinions are based on reliable methods and reasoning (including many of the same facts and data reviewed by the government's purported expert), and it is clearly relevant to charged conduct in this case.

**A.    Dr. Spar Is Qualified To Testify As An Expert About Alzheimer's**

To determine whether an expert is qualified, the "courts should consider a purported expert's knowledge, skill, experience, training, and education in the subject matter of his asserted expertise." *Racies v. Quincy Bioscience*, LLC, 2016 U.S. Dist. LEXIS 136197 at *8.

Although the government has raised a factual challenge to Dr. Spar's medical opinions, they have lodged no challenge to Dr. Spar's extensive qualifications as an expert in the field of clinical geriatric psychiatry, including Alzheimer's disease and other mental illnesses. *See* Spar Decl. ¶ 1; Exhibit 1.   Thus, Dr. Spar is fully qualified to render his opinions concerning the impact of Mr. Baca's Alzheimer's on any memory impairment during the April 12, 2013 interview.

Morgan, Lewis &
Bockius LLP
Attorneys at Law
Santa Monica

DB2/ 30809663.1

14

DEF.'S OPPOSITION TO GOVERNMENT'S
MOTION TO BAR TESTIMONY OF DEF.'S.
PROPOSED EXPERT JAMES SPAR
CASE NO. CR 16-66 (A) - PA

**B.     Dr. Spar's Testimony is Relevant as It Relates to Mr. Baca's Alzheimer's During the Time of the Alleged False Statements in the April 12, 2013 Government Interview**

"The relevancy bar is low, demanding only that the evidence 'logically advances a material aspect of the proposing party's case.'" *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995) ("Daubert II").  Relevancy is determined with respect to the "particular law at issue because '[e]xpert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry.'" *Messick*, 747 F.3d at 1197 (9th Cir. Cal. 2014), quoting *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010).  The standard for relevancy is that the "evidence logically advance a material aspect of the party's case." *Racies v. Quincy Bioscience*, LLC, 2016 U.S. Dist. LEXIS 136197.

Pursuant to the Ninth Circuit Model Jury Instructions Section 8.73 relating to the elements of a false statement, the government has to prove, *inter alia*, beyond a reasonable doubt that Mr. Baca "acted willfully; that is, the defendant acted deliberately and with knowledge both that the statement was untrue and that his or her conduct was unlawful."  Manual of Model Criminal Jury Instruction for the District Courts of the Ninth Circuit Section 8.73.  In the comment to Section 8.73, the Ninth Circuit Jury Instructions Committee elaborates that, "[t]o make a false statement 'willfully' under Section 1001, the defendant must have both the specific intent to make a false statement and the knowledge that his or her conduct was unlawful." *Id*.

Dr. Spar's testimony that Mr. Baca's Alzheimer's increased the probability of his memory impairment during the April 12, 2013 interview is highly relevant to whether or not Mr. Baca had the specific intent to make the charged false statements, all of which related to his **memory** of events and conversations that occurred 20 months prior to the interview.  If his memory was impaired, then the

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
SANTA MONICA

DB2/ 30809663.1

15

DEF.'S OPPOSITION TO GOVERNMENT'S MOTION TO BAR TESTIMONY OF DEF.'S. PROPOSED EXPERT JAMES SPAR CASE NO. CR 16-66 (A) - PA

jury can and should be able to consider that memory impairment to determine if Mr. Baca formed the specific intent necessary to commit the crime.  Thus, the proposed expert testimony is highly relevant to a central issue at trial dealing with the charged false statements.

The government makes passing reference to Federal Rules of Evidence 401 and 403 but cites no case and offers no persuasive analysis.   Gov't Motion at 1, 12. This is telling.  Rule 401 states that evidence is relevant if it has "any tendency to make a fact more or less probable than it would be without the evidence," and "the fact is of consequence in determining the action."  Fed. R. Evid. § 401(a) and (b). As analyzed above, the evidence of Mr. Baca's Alzheimer's and its impact on his memory in answering memory-related questions during the April 12, 2013 interview are clearly relevant to alleged conduct in this case.

Rule 403 allows the court to exclude evidence if its probative value is **substantially** outweighed by the danger of unfair prejudice, confusing the issues, misleading the jury, among other reasons.  Fed. R. Evid. 403 (emphasis added). Here, the government has merely insinuated "Dr. Spar's testimony would have little, if any, probative value to Count Three…"  Gov't Motion at 12.  This is contrary to the substance of Dr. Spar's proposed testimony.  The government does not dispute that Mr. Baca was diagnosed with Alzheimer's disease by Dr. Chui in 2016 and determined to have MCI in May 2014 but argues that this diagnosis occurred "years after" the charged offenses and is thus not relevant. *Id*. at 7.  This argument is not persuasive.  The high probative value of Dr. Spar's testimony that Mr. Baca's Alzheimer's in its pre-clinical stage at a minimum increased the probability of memory impairment during the April 12, 2013 interview clearly is not substantially outweighed by any of the concerns contemplated by Rule 403. Rule 702 and the related case law mandate that the Court view the admission of

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
SANTA MONICA

DB2/ 30809663.1

16

DEF.'S OPPOSITION TO GOVERNMENT'S MOTION TO BAR TESTIMONY OF DEF.'S. PROPOSED EXPERT JAMES SPAR
CASE NO. CR 16-66 (A) - PA

such expert testimony liberally and posit that the appropriate vehicle to test such testimony is through "vigorous cross-examination," not exclusion.

### C.    **Dr. Spar's Testimony is the Product of Reliable Principles, Methods, and Reasoning**

Following *Daubert*, the Supreme Court revisited the admissibility of expert testimony and reiterated that "the test of reliability is 'flexible,' and *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).  The Court continued, "the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." *Id*. at 142.  As the Court emphasized in *Kumho*, however, a trial court has "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable," and in doing so, it may consider any "reasonable measures" of that testimony's reliability." *Id*. at 152.

The reliability analysis focuses on whether an "expert's testimony has 'a reliable basis in the knowledge and experience of the relevant discipline.'" *Racies v. Quincy Bioscience*, LLC, 2016 U.S. Dist. LEXIS 136197, quoting *Kumho Tire*, 526 U.S. at 149.  A non-exclusive list of factors utilized by courts to determine reliability include:  "(1) whether a theory or technique 'can be (and has been) tested;' (2) 'whether the theory or technique has been subjected to peer review and publication;' (3) 'the known or potential rate of error;' and (4) whether it is generally accepted in the scientific community." *Id*. at 9 (citations omitted).

As stated above, Dr. Spar based his opinions on reliable methods and reasoning.  Dr. Spar's opinion that Mr. Baca was in the pre-clinical stage of Alzheimer's at a minimum during the April 12, 2013 interview, approximately one year before he was formally diagnosed with MCI, is based on his extensive background, training, research, and experience over 38 years with Alzheimer's and

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
SANTA MONICA

DB2/ 30809663.1

17

DEF.'S OPPOSITION TO GOVERNMENT'S MOTION TO BAR TESTIMONY OF DEF.'S. PROPOSED EXPERT JAMES SPAR
CASE NO. CR 16-66 (A) - PA

mental illness as well as his review of the pertinent medical literature, Mr. Baca's medical records, and the objective indications of Mr. Baca's cognitive impairment starting as far back as June 2011 but particularly evidenced during the April 12, 2013 interview.  Dr. Spar's further opinion that Mr. Baca's Alzheimer's increased the probability that during his April 12, 2013 government interview, memory impairment affected his answers to questions about events and conversations that occurred 20 months earlier in August-September 2011 emanates from the same reliable methodology and reasoning.  Such expert testimony falls squarely within Rule 702's policy favoring admission.  *See Cota v. Maxwell-Jolly*, 688 F. Supp. 2d 980, 999-1000 (N.D. Cal. 2010) ("even though experts may not be able to opine with absolute certainty as to what impact the loss of ADHC services will have on each individual, they certainly are qualified to opine about what is likely to occur in the event services to their clients are terminated"); *United States v. Sandoval-Mendoza*, 472 F.3d 645, 656 (9th Cir. 2006) (in reversing district court exclusion of expert opinion testimony based on FRE 403, court held that "without the medical expert testimony, the real issue was hidden from the jury. . .medical knowledge is often uncertain [because] the human body is complex" [and] etiology is often uncertain…").

The government's reliance on *United States v. Harmanek*, 289 F.3d 1076, (9th Cir. 2002), is misplaced.  That case involved charges of conspiracy to operate a large-scale cocaine trafficking organization and relied heavily on wiretapped cellular phone calls.  The participants on the phone calls never used the word cocaine.  Over defendant's objection, the government offered the expert testimony of an FBI Special Agent to "interpret the coded language contained in the conversations as referring to or being consistent with cocaine." *Id.* at 1083. Although the agent was generally qualified as an expert base on his experience with investigating the narcotics trade, defendant contended that that the government

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SANTA MONICA

DB2/ 30809663.1

18

failed to establish a "reliable basis" for the expert's interpretations of words and phrases "he encountered for the first time in this case as referring to cocaine." Specifically, the government's offer of proof included words such as "Gucci watches" it described as commonly used drug terms. However, the agent conceded that he heard "Gucci watch" as a synonym for cocaine for the first time while testifying.

In finding Rule 702 error, the *Harmanek* court explained, "[t]he district court relied solely on [the agent's] general qualifications without requiring the government to explain the method [he] used to arrive at his interpretations of words he had never encountered before." *Id*. at 1094. The court determined, "[t]his was error." *Id*. The court continued, [a]s a prerequisite to making the Rule 702 determination that an expert's methods are reliable, the court must assure that the methods are adequately explained." *Id*. The court concluded, "[t]he expert must establish the reliability of the principles and methods employed 'to draw a conclusion regarding *the particular matter to which the expert testimony was directly relevant*." (original emphasis) *Harmanek* at 1094, quoting *Kumho* 526 U.S. at 154. The testimony should have been excluded because the agent "failed to explain in any detail the knowledge, investigatory facts and evidence he was drawing from." *Id*.

*Harmanek* has no application to the case at bar. The expert in *Harmanek* admitted that he was not familiar with the terms for which he was asked to interpret. The witness simply had no reliable foundation for interpreting the language. Here, in contrast, Dr. Spar is fully familiar with the issues on which he is asked to opine and rests his opinions concerning Mr. Baca's Alzheimer's and the increased probability that it impaired his memory during the April 12, 2013 interview on reliable scientific methods and reasoning. *See* Spar Decl. at ¶¶ 3-10.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SANTA MONICA

DB2/ 30809663.1

19

DEF.'S OPPOSITION TO GOVERNMENT'S
MOTION TO BAR TESTIMONY OF DEF.'S.
PROPOSED EXPERT JAMES SPAR
CASE NO. CR 16-66 (A) - PA

Unlike *Harmanek*, this case finds parallels with *Keller v. Feasterville Family Health Care Ctr.*, 557 F. Supp. 2d 671 (E.D. Pa. 2008), where a district court permitted expert testimony of a posthumous diagnosis of Alzheimer's.  In *Keller*, Plaintiff Mrs. Keller brought a malpractice suit against her deceased husband's primary care physicians alleging they were negligent in failing to diagnose a pulmonary embolism—which she alleged caused her husband's death.  She sought to exclude the testimony of multiple experts, including testimony of one expert who opined of her husband's post-autopsy diagnosis of Alzheimer's disease which defendant's alleged related directly to the husband's work-life expectancy.  Specifically, plaintiff asserted the expert's opinion regarding a post-autopsy diagnosis of Alzheimer's disease and her husband's future with the disease was unreliable because it was "speculative, lack[ed] foundation, lack[ed] the requisite degree of medical certainty, and would confuse the jury and/or cause the jury to speculate decedent's future."  *Keller*, at 677.

Since the expert was conceded to be qualified and the testimony was relevant to the issues in the case, the court analyzed the expert's opinion through the lens of reliability.  The court determined the expert's testimony was reliable as it was based on methods and procedures of science, including an examination of decedent's medical records, the expert's extensive experience with Alzheimer's patients, and the expert's and other experts' research and data in the field.  *Id*.

Like the Alzheimer's expert in *Keller*, Dr. Spar bases his opinions on his extensive background, training, research and experience in Alzheimer's and his review of pertinent medical literature, Mr. Baca's medical records, and the salient facts of the case. This methodology and reasoning passes the gate-keeping threshold of reliability, in contrast to situations where the courts have kept out "junk science."

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
SANTA MONICA

DB2/ 30809663.1

20

DEF.'S OPPOSITION TO GOVERNMENT'S MOTION TO BAR TESTIMONY OF DEF.'S. PROPOSED EXPERT JAMES SPAR CASE NO. CR 16-66 (A) - PA

The remaining cases cited by the government are equally inapposite. *United States v. Cruz-Ramirez*, 2011 WL 2446278, at \*6 (N.D. Cal. June 17, 2011), as the government concedes, did not involve a medical diagnosis. Gov't Motion at 10-11. Moreover, although the case acknowledges the government filed a *Daubert* memo, the case does not analyze *Daubert*, the qualifications of an expert, or the reliability of the methods utilized by the expert. Instead, the court merely analyzed a confusing non-diagnosis and determined it would likely confuse the jury.

Remarkably, the government cites to *United States v. Amaral*, 488 F.2d 1148, 1152 (9th Cir. 1973), for the proposition that the defense is trying to "exploit the 'aura of special reliability and trustworthiness' that attaches to expert witnesses." Gov't Motion at 11. First, *Amaral* predates *Daubert* by nearly twenty years and relies on the *Frye v. United States* "general acceptance test" that was replaced by the *Daubert* test which favors admissibility. Second, the court excluded the expert witness's testimony regarding the general effect of stress on perception and the unreliability of an eye-witness identification. *Amaral,* 488 F.2d at 1153. This testimony was excluded under the *Frye* test because this was a new area of psychological study in 1973 and it was not generally accepted. In contrast to the expert in *Amaral*, as demonstrated above, Dr. Spar's expert testimony will rely on valid reasoning and methodology that can be applied to the facts at issue and must be viewed under *Daubert's* more liberal admissibility standards.

In *United States v. Byers*, 730 F.2d 568 (9th Cir. 1984), another pre-*Daubert* case relied on by the government, Gov't Motion at 6, the magistrate judge excluded expert psychiatric testimony offered to show that the defendant did not have the specific intent to file a false tax return. In a short three page opinion, light on factual analysis, the Ninth Circuit first pointed out there is no rule in the circuit that "expert testimony from qualified psychiatrists is inadmissible when it is offered to prove that a defendant was or was not capable of forming a specific intent that is an

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SANTA MONICA

DB2/ 30809663.1

21

DEF.'S OPPOSITION TO GOVERNMENT'S MOTION TO BAR TESTIMONY OF DEF.'S. PROPOSED EXPERT JAMES SPAR
CASE NO. CR 16-66 (A) - PA

element of the offense." *Id*. at 571.  Instead, the district court is given "wide latitude in admitting or excluding psychiatric evidence directed to the capacity of a defendant to entertain a specific intent or directed to the credibility of a witness." *Id*. In *Byers*, the magistrate judge apparently excluded the psychiatrist's testimony as "ambiguous" and would not have materially assisted the jury.  The Ninth Circuit, in reviewing the record of the specific psychiatrist's testimony affirmed this decision.  This pre-*Daubert* case, like the *Harmanek*, *Cruz-Ramirez*, and *Amaral* cases cited by the government, has no bearing on the case at bar.

## IV.   CONCLUSION

For the reasons set forth above, the Court should deny the government's motion to exclude Dr. Spar's expert medical testimony and permit such testimony under the liberal rules of admission under Rule 702, *Daubert* and the related case law.  The government's motion is an attempt to have the Court usurp the jury's function as factfinder by preventing them an opportunity to hear the relevant testimony of a qualified medical expert who has analyzed sufficient facts and data using reliable methods and reasoning and whose opinions and methodology can be tested through cross-examination.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SANTA MONICA

DB2/ 30809663.1

22

DEF.'S OPPOSITION TO GOVERNMENT'S
MOTION TO BAR TESTIMONY OF DEF.'S.
PROPOSED EXPERT JAMES SPAR
CASE NO. CR 16-66 (A) - PA

Accordingly, Dr. Spar should be allowed to testify that, in his expert opinion to a reasonable medical certainty, Mr. Baca was either in the pre-clinical stage or the MCI stage of Alzheimer's during his April 12, 2013 government interview, and that in either stage, Mr. Baca's Alzheimer's increased the probability that during his April 12, 2013 government interview, memory impairment affected his answers to questions about events and conversations that occurred 20 months earlier in August-September 2011.

Respectfully submitted,

Dated:   November 14, 2016          MORGAN, LEWIS & BOCKIUS LLP


By  */s/ NATHAN J. HOCHMAN /s/*
    Nathan J. Hochman
    Brianna L. Abrams
    Tinos Diamantatos
    Attorneys for Defendant
    LEROY BACA

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SANTA MONICA

DB2/ 30809663.1

23

DEF.'S OPPOSITION TO GOVERNMENT'S
MOTION TO BAR TESTIMONY OF DEF.'S.
PROPOSED EXPERT JAMES SPAR
CASE NO. CR 16-66 (A) - PA

# DECLARATION OF
# DR. JAMES E. SPAR

Spar Declaration, pg. 24

## DECLARATION OF DR. JAMES E. SPAR

I, DR. JAMES E. SPAR, hereby declare as follows:

1.     I am a physician and psychiatrist licensed to practice medicine in the State of California and am Board Certified in Psychiatry and in Geriatric Psychiatry. I received my M.D. degree from the UCLA School of Medicine in 1972, completed residency training in Psychiatry at UCLA in 1977, and completed a Fellowship in Geriatric Psychiatry at UCLA in 1978. I am presently Professor of Clinical Psychiatry in the Department of Psychiatry and Biobehavioral Sciences at the David Geffen School of Medicine at UCLA. I was the founder and first Director of the Division of Geriatric Psychiatry between 1998 and 2004. During my thirty-eight-year academic career, I have devoted the great majority of my time to clinical and training program administration (particularly hospital-based inpatient care and residency education), teaching, and research in the evaluation and treatment of elderly patients with mental illness. In this work I am very frequently called upon to evaluate the mental competency of patients to consent to hospitalization, psychotropic medication administration, and electroconvulsive therapy. I am also regularly engaged in evaluation (contemporaneous and retrospective) of individuals' competencies for various legal purposes, such as the execution of wills, trusts, gifts and contracts. I have been consulted in about 1500 cases in which competency and/or undue influence were at issue, and have testified in deposition and in trial, each over 100 times. I have published scholarly articles and chapters on aspects of clinical geriatric psychiatry, including Alzheimer's disease and other dementing illnesses, and on competency and susceptibility to undue influence. I have lectured to various medical and legal audiences on these topics, and was a major contributor in the drafting of several California statutes (codified as Calif. Probate Code sections 6100.5 re: persons not competent to make a will; sections

Morgan, Lewis &
Bockius LLP
Attorneys at Law
Santa Monica

810 – 813 re: legal mental capacity; and Civil Code Sec. 39b re: contractual capacity) related to competency determination.  A more detailed and true and correct copy of my curriculum vitae is attached as Exhibit 1.

2.     This declaration is made in support of Defendant Leroy Baca's Opposition to the Government's Motion to Bar Testimony of Defendant's Proposed Expert James Spar.  The statements made herein are based on my personal knowledge unless stated otherwise and if called to be a witness, I could and would testify competently thereto.

3.     Based on my extensive background, training, and experience with Alzheimer's disease ("Alzheimer's), and review of the pertinent medical literature concerning Alzheimer's disease, I can state the following to a reasonable medical certainty:

        A.     Alzheimer's is an aging-associated, chronic neurodegenerative brain disorder with no known cure that occurs in approximately 13% of people over 65 years of age.  Exactly what occurs in the brains of individuals with Alzheimer's is not completely known, but increasing evidence suggests that the accumulation and deposition of abnormal proteins inside nerve cells in the brain, and in the spaces between nerve cells in the brain, leads to gradual loss of nerve cells and impairment in the functions they serve. The most important consequence of this impairment is decline in cognitive function; as nerve cell loss progresses, cognitive impairment increases.

        B.     Three stages of progressive nerve cell loss in Alzheimer's have been identified: The **pre-clinical stage**, when underlying brain changes have occurred but there are no symptoms. The second stage is the **mild cognitive impairment ("MCI" or "prodromal") stage**, where cognitive functions are clearly impaired but mildly so, and the impairment does not interfere with everyday function.  The third stage is the **dementia stage** where cognitive impairment does interfere with everyday function.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SANTA MONICA

2

C.    With respect to the pre-clinical stage, this stage is believed to extend **ten years or more** before the onset of clinical symptoms. *See, e.g.,* Sperling R, Mormino E, Johnson K. The evolution of pre-clinical Alzheimer's disease: implications for prevention trials. Neuron. 2014 Nov 5;84(3):608-22.  Papp et al (2016) studied cognitive function in individuals with PET scan evidence of Alzheimer's (deposits of abnormal proteins in the brain) and found subtle deficits in language function (word list generation by letter or category). They concluded that that "changes in semantic processing occur earlier in the AD [Alzheimer's Disease] trajectory than previously hypothesized." Papp, Kathryn V.; Mormino, Elizabeth C.; Amariglio, Rebecca E.; Munro, Catherine; Dagley, Alex; Schultz, Aaron P.; Johnson, Keith A.; Sperling, Reisa A.; Rentz, Dorene M.: Biomarker validation of a decline in semantic processing in preclinical Alzheimer's disease. Brain Imaging Behav. 2016 Oct 13. [Epub ahead of print].  Similarly, Edmonds et al (2016) studied subjects with pre-clinical Alzheimer's and found that "subtle cognitive decline" (defined based upon tests of language and memory) was found with increasing frequency as the number of biochemical markers of AD increased, and that "subtle cognitive decline" could be used to predict the future development of MCI or dementia. Edmonds, Emily C., Delano-Wood, Lisa, Galaskoa Douglas R., Salmonc, David P., Bondia, Mark W: Subtle Cognitive Decline and Biomarker Staging in Preclinical Alzheimer's Disease Journal of Alzheimer's Disease 47 (2015) 231–242.  Based on these and other studies, it is clear to a reasonable medical certainty that the impact of Alzheimer's on objective measures of cognition and clinical manifestations is a gradual process beginning in the pre-clinical stage and continuing progressively and inexorably into the MCI and dementia stages and that memory impairment may occur during the pre-clinical stage. *See, e.g.,* Dubois B, Hampel H, Feldman HH, Scheltens P, et al, Preclinical Alzheimer's disease: Definition, natural history, and diagnostic criteria.  Alzheimers Dement. 2016 Mar; 12(3):292-323.

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
SANTA MONICA

3

D.    The MCI stage is typically diagnosed when patients or their families first notice symptoms of cognitive impairment, see a doctor, and formal testing is performed. There is no consistent relationship between the presence or severity of cognitive deficits in patients with Alzheimer's and the point in time when the patient or family first notice those deficits, or when they decide to seek medical care and the first formal tests are administered. This is because patients with Alzheimer's often are not aware of their deficits ("lack of insight") and deny or cover for them, even when they are obvious to others; similarly, family members may try to "explain away" the deficits they observe and may be reluctant to share their concerns with the patient. This means that clearly impaired cognitive function is often present before patients are diagnosed with MCI.

E.    The specific cognitive functions that are affected earliest in patients with Alzheimer's are variable. Typically, memory loss occurs first, along with subtle changes in language function, and other functions are affected later. When memory is affected, the ability to store and recall new information tends to be impaired earlier and more severely than the ability to recall previously stored information, but this is not always the pattern as Alzheimer's can also affect the ability to recall past information early in its course.

4.    It is difficult to determine when Mr. Baca first began to have symptoms of cognitive impairment but there are observations going back to June 2011 of such cognitive impairment. In June of 2011 Baca was unable to recall the name of the "bladder medication" he had recently been started on. On August 18, 2011 (during the charged conspiracy), as Steven Martinez, the head of the FBI's Los Angeles office, stated in his July 22, 2013 FBI interview: "When MARTINEZ first explained the situation to BACA [about the FBI cell phone in the LASD jail during an August 18, 2011 phone call], it was clear to MARTINEZ that BACA was confused. . . MARTINEZ had to explain the situation to BACA three times before BACA understood." *See* Exhibit 2. On August 19, 2011 (during the charged

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SANTA MONICA

4

Spar Declaration, pg. 28

conspiracy), Mickey Manzo, a former LASD Deputy Sheriff, testified about Mr. Baca's demeanor that day during their meeting, stating: "He [Baca] was confused or kind of -- he didn't understand what was going on." *See* Exhibit 3. William Tom Carey, a former LASD Captain, stated during his August 12, 2015 proffer with the government, that during a January 2014 meeting he had with Mr. Baca, Mr. Baca "seemed like a confused old man." *See* Exhibit 4. In his August 19, 2015 testimony, Mr. Carey referred to Mr. Baca during the January 2014 meetings as seeming "goofy that he couldn't comprehend. Almost like he's senile." *See* Exhibit 5.

5.      With respect to the April 12, 2013 interview Mr. Baca gave to the FBI and U.S. Attorney's Office, a transcript of which I have reviewed, Mr. Baca repeatedly demonstrated memory impairment throughout the over 4.5 hour interview. Mr. Baca admitted over 25 times during the interview that he could not recall or remember information asked for by the questions involving events, conversations and people during the August-September 2011 time frame. Mr. Baca also gave objectively incorrect memory responses on other questions. For example, Mr. Baca referred to one of the ICIB investigators as "Jim Leavins," and even after being corrected by Mr. Fox that Mr. Leavins' name was Steve Leavins, Mr. Baca continued later in the interview to repeatedly refer to Mr. Leavins as "Jim Leavins."

6.      Mr. Baca retired in January 2014. Prior to his retirement, he was surrounded on a daily basis by people who assisted him throughout his 12-16 hour days as Sheriff of Los Angeles County, including a full-time driver, two secretaries, two aides, and dozens in the management structure, from an Undersheriff, Assistant Sheriffs, Chiefs, Commanders and Captains. Mr. Baca employed these interpersonal compensatory mechanisms to continue to function in the highly demanding role of Sheriff, leaning heavily on those around him to remind him of key facts and information he needed in order to meet the demands of his job. Given this support network, many around Mr. Baca may not have seen or appreciated the

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SANTA MONICA

5

Spar Declaration, pg. 29

cognitive deficits he was experiencing. As is typical for someone suffering from Alzheimer's, Mr. Baca also "lacked insight" into his condition. Once he retired and this interpersonnel structure was removed, problems of cognitive impairment were observed by his wife that led Mr. Baca to be formally evaluated for memory complaints in March 2014. After the evaluation and testing, he was first diagnosed with MCI in May 2014. Subsequent evaluations have confirmed that finding, and Alzheimer's was first identified as the cause of his MCI in early 2016.

7.    I believe to a reasonable medical certainty that the diagnosis of Alzheimer's was properly made on the basis of:

(i)    A history and evidence of slowly progressive cognitive decline during the period of consecutive medical evaluations, with normal motor and sensory examination;

(ii)    Neuropsychological testing that showed predominant impairment in the domain of episodic memory, with secondary impairment in executive function;

(iii)    MRI scans showing loss of hippocampal and brain volume;

(iv)    A PET scan that showed glucose hypometabolism in both temporal lobes; and,

(v)    CSF studies that showed markedly elevated levels of tau and ptau, and low levels of beta-amyloid, consistent with Alzheimer's.

8.    I have been asked to evaluate whether Mr. Baca's Alzheimer's increased the probability that he had memory impairment during his April 12, 2013 government interview relating to his five answers to questions about events and conversations that occurred 20 months earlier in August-September 2011. Those questions and answers asked on April 12, 2013, that form the basis for the false statements charged in Count Three of the First Superseding Indictment, all relate to Mr. Baca's memory of events and conversations that occurred approximately 20 months before in August-September 2011. In reviewing the questions and answers at issue, in addition to relying on my background, training and experience with Alzheimer's

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SANTA MONICA

6

particularly in its pre-clinical and MCI stages, I also looked at, among other things, the context and language of the questions/answers, the responsiveness of the answers to the questions, and whether questions on the same topics were asked with differing answers given. For instance, Mr. Baca was asked if Mr. Thompson ever came to him and apologized for allowing the FBI to interview Anthony Brown in the jail; Mr. Baca answered "no" in one part of the interview while later in the interview he answered the same question by saying he "did not recall" that occurring. As another example, Mr. Baca was asked whether he was aware prior to a telephone call with Steven Martinez on September 26, 2011, that someone was going to approach Leah Marx and threaten to arrest her. No context was given for where or when any prior conversation would have occurred on this issue (e.g., a prior meeting identifying the participants where the topic was discussed) and Mr. Baca gave differing answers to this question asked at different times during the interview involving his recollection. The five alleged false statements were:

(i) Mr. Baca's memory of whether he knew as of August 20, 2011 that the FBI was conducting a civil rights investigation of the LASD;

(ii) Mr. Baca's memory of whether as of August 20, 2011 he was directly involved in keeping the Inmate Brown away from the FBI;

(iii) Mr. Baca's memory of whether he was informed that on August 23, 2011 FBI agents were not allowed to continue their interview of Inmate Brown;

(iv) Mr. Baca's memory of whether he was aware that LASD officials were going to approach FBI agent Leah Marx and threaten to arrest her before the evening of September 26, 2011; and

(v) Mr. Baca's memory of whether he stated on September 26, 2011 that he did not believe the FBI should be investigating the LASD.

9. I can state to a reasonable medical certainty that:

(i) Mr. Baca was either in the pre-clinical stage (which can occur 10 years or more before the onset of clinical symptoms) or the MCI stage of Alzheimer's

during his April 12, 2013 government interview, as he may have been demonstrating clinical symptoms of MCI which were not formally diagnosed until May 2014; and

(ii) In either stage, Mr. Baca's Alzheimer's increased the probability that during his April 12, 2013 government interview, memory impairment affected his answers to questions about events and conversations that occurred 20 months earlier in August-September 2011.

10. The basis for these opinions incorporates and is set forth in the prior paragraphs 1 and 3-8, includes my professional background, training and experience over the past 38 years relating to Alzheimer's, my review of the pertinent medical literature on Alzheimer's and Mr. Baca's medical records, and my review of the transcript of Mr. Baca's April 12, 2013 interview, including Mr. Baca's repeated statements of lack of memory or recall, his objectively incorrect answers relating to his memory, and the context, language used, responsiveness of answers to questions, and differing answers to the same questions concerning the five false statements at issue.

11. With respect to Government expert Dr. Dimitri Krainc's statement, "Indeed, there is a lack of objective evidence that Mr. Baca suffered from any cognitive deficits at the time of the alleged offenses in 2011 and 2013. If there were cognitive deficits present at that time, Mr. Baca would have exhibited such deficits on multiple occasions in various situations" Based on my medical experience and education and my review of medical literature and the evidence in the case described, in part, above, I believe that Dr. Krainc's statement is incomplete and misleading.  While it is true that since Mr. Baca did not have formal tests performed in 2011 and 2013 to reveal cognitive impairment, it is not correct to state that no "objective evidence" exists from such lack of testing. Dr. Krainc cannot state to a reasonable medical certainty that Mr. Baca was *not* in the pre-clinical stage of Alzheimer's a year before he was diagnosed in 2014 and that as a result of being in

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SANTA MONICA

that stage, he could not suffer memory impairment during the April 12, 2013 interview. The more scientifically accurate statement is that with reasonable medical certainty, Mr. Baca was in the pre-clinical stage at a minimum on April 12, 2013. As such, it can be said with reasonable medical certainty that Mr. Baca's Alzheimer's increased the probability that he had memory impairment during his April 12, 2013 interview relating to his answers to questions about events and conversations that occurred 20 months earlier in August-September 2011.

12.     Dr. Krainc also states, "…it is not possible to link Mr. Baca's conduct in 2011 and 2013 to Alzheimer's disease. Any attempt to do so would be purely speculative." While Dr. Krainc is correct that it cannot be stated with certainty that Mr. Baca's Alzheimer's completely impaired his ability to provide accurate and truthful answers to the five questions that have been charged as false statements in the indictment from the April 12, 2013 interview, it is not necessary to make such a claim. The opinion I am rendering to a reasonable medical certainty is that Mr. Baca's Alzheimer's increased the probability that memory impairment negatively affected his ability to provide accurate and truthful answers during his April 12, 2013 interview. To further elucidate this opinion, an analogy may be useful. In California, drivers with a blood alcohol concentration ("BAC") of .08 or higher are guilty of "Driving under the Influence". However, there is nothing magical about this concentration, and any level of BAC can compromise the ability to drive safely. If a driver with an illegal BAC runs a red light and causes an accident, it will be assumed that the BAC contributed to the accident, but this "attempt to link the accident to the BAC" is also "strictly speculative" with regard to single episodes. There is simply no way to know the extent to which alcohol plays a role in any single behavior by a particular person at a particular point in time. Yet we make that "link" all the time. The "link" in this case is this: Mr. Baca exhibited conduct that reflected impaired memory in the April 12, 2013 interview and Mr. Baca had a condition -- pre-clinical Alzheimer's -- at that time that can cause those kinds of

impairments. The conclusion that one could have contributed to the other is no more speculative than the link between blood alcohol and unsafe driving.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

DATED: November 14, 2016

_____
DR. JAMES SPAR

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SANTA MONICA

10

# EXHIBIT 1

CURRICULUM VITAE (9/16)

## JAMES EDWARD SPAR, M.D.

Date & place of birth:   September 11, 1946, Los Angeles, California

Address:   Semel Institute for Neuroscience and Human Behavior, University of California at Los Angeles (UCLA), 760 Westwood Plaza, Los Angeles, California 90024, (310) 825-0038

### Education and Professional Training

| | |
|---|---|
| 1966 -1968 | UCLA B.A. Zoology 1968, *cum laude*; Honors in Zoology |
| 1968 -1972 | UCLA School of Medicine, M.D., June, 1972 |
| 1973 -1974 | Internship in Internal Medicine, Children's Hospital, San Francisco, California |
| 1974 -1977 | Psychiatric Residency, UCLA - Brentwood V.A. Hospital |
| 1977 - 1978 | Fellowship, Geriatric Psychiatry, NPI&H, UCLA |
| 1993 – 1998 | Fellow, Faculty Development Program in Substance Abuse (J. Thomas Ungerleider, M.D., Principal Investigator), funded by Center for Substance Abuse Prevention |

### Military Service

| | |
|---|---|
| 1963 - 1964 | United States Army National Guard; Honorable Discharge, March 18, 1964 |

### Licensures/Certification

| | |
|---|---|
| 1973 - Present | California State Medical License #G24955 |
| 1973 - Present | Narcotics License #AS1011357 |
| 1979 - Present | Diplomate, Am. Bd. of Psychiatry & Neurology (ABPN) |
| 1991 – 2001 | Diplomate, Added Qualifications in Geriatric Psychiatry (ABPN) |
| 2001 - Present | Diplomate, Subspecialty of Geriatric Psychiatry (ABPN) |

### Professional Societies

| | |
|---|---|
| 1981 - 1992 | Member, Am. Assoc. for Geriatric Psychiatry |
| 1982 - 1987 | Member, Intern. Psychogeriatric Society |
| 1984 - 1987 | Member of Board of Directors, Am. Assoc. for Geriatric Psychiatry |
| 2003 - | Member, American Psychiatric Association, Southern California Psychiatric Society |

### Academic Appointments

| | |
|---|---|
| 1978 - 1979 | Acting Assistant Professor, Dept. of Psychiatry & Biobehavioral Sciences, UCLA School of Medicine |
| 1979 - 1988 | Assistant Professor, Dept. of Psychiatry & Biobehavioral Sciences, UCLA School of Medicine |

1

Exh. 1, pg. 36

| 1988 - 1993 | Associate Clinical Professor, Dept. of Psychiatry & Biobehavioral Sciences, UCLA School of Medicine |
| 1993-1998 | Associate Professor of Clinical Psychiatry, Dept. of Psychiatry & Biobehavioral Sciences, UCLA School of Medicine |
| 1996-97 | Associate Chair, Dept. of Psychiatry & Biobehavioral Sciences, UCLA School of Medicine |
| 1998 - | Professor of Clinical Psychiatry, Dept. of Psychiatry & Biobehavioral Sciences, UCLA School of Medicine |
| 2002- | Senior Research Scientist, UCLA Neuropsychiatric Institute |

<u>Professional Experience</u>

| 1972 - 1973 | Internship in Internal Medicine, Children's Hospital, San Francisco, California |
| 1973 | Staff Physician, Los Angeles County Methadone Maintenance Clinic, Los Angeles, California |
| 1973 - 1974 | Emergency Physician, Mercy Hospital, Bakersfield, & San Leandro Memorial Hospital, San Leandro, California |
| 1974 - 1977 | Psychiatric Residency, UCLA - West LA VA Medical Center, Brentwood, California |
| 1977 - 1978 | Fellowship, Geriatric Psychiatry, NPI&H, UCLA |
| 1978 - 1979 | Associate Ward Director, geriatric psychiatry inpatient unit, NPI&H, UCLA |
| 1979 - Present | Ward Director, geriatric psychiatry inpatient unit, Resnick Neuropsychiatric Hospital, UCLA |
| 1988 - 1997 | Coordinator, Clinical Geriatric Services, NPI&H, UCLA |
| 1995 - | Director, Psychiatric Residency Education, Department of Psychiatry and Biobehavioral Sciences, UCLA |
| 1998 - 2004 | Director, Division of Geriatric Psychiatry, Department of Psychiatry and Biobehavioral Sciences, UCLA |

<u>Teaching/Supervisory Experience/Selected Presentations</u>

| 1977 - 1995 | Individual supervision of interns, 1st and 3rd year psychiatric residents assigned to 3-South, NPI&H, UCLA |
| 1979 - 1995 | Seminar in Geriatric Psychiatry given to interns, residents, medical and psychiatric fellows, and medical students assigned to Ward 3-South, NPI&H, UCLA |

Exh. 1, pg. 37

| | |
|---|---|
| 1980 - 1995 | Individual supervision of geriatric medical and psychiatry fellows in geriatric psychiatry training rotation, Ward 3-South, NPI&H, UCLA |
| 1980 - 1990 | Occasional guest lecturer, UCLA School of Law, "Testamentary capacity and the expert witness" |
| 1993 | Guest co-lecturer, Loyola Law School Continuing Legal Education Program, Los Angeles, Calif. "Competence related litigation and Estate Planning" (with M. Hankin, Esq.) |
| 1994 | Co-lecturer, Twentieth Annual USC Probate and Trust Conference, "Assessing competency and susceptibility to undue influence: conceptual and procedural issues" (with B. Bailey, Esq.) |
| 1997 | Luncheon Speaker, Twenty-third Annual USC Probate and Trust Conference, "An Attorney's Guide to Rapid Assessment of Mental Status" |
| 1998 | Luncheon Speaker, Twenty-second Annual Fall Program, Estate Planning, Trust and Probate Law Section, State Bar of California, "An M.D.'s Guide for Lawyers: Elders and Competency" |
| 1999 | Speaker, Beverly Hills Bar Association Spring meeting on "Capacity and Undue Influence" |
| 2005 | Luncheon Speaker, Beverly Hills Bar Association Trusts and Estates Section meeting, "Competency and Undue Influence – An Update" |
| 2006 | Speaker, St. John's Hospital 58th Post-Graduate Assembly, "Determining Medical Decision Making Capacity" |
| 2008 | Speaker, National Organization of Bar Counsel Mid-Year Conference, "The Aging Lawyer: Assessment, Diagnosis, and Treatment" |
| 2008 | Speaker, 30th Annual UCLA/CEB Estate Planning Institute, "A Lawyers Guide to Diminished Capacity and Effective Use of Experts" (with Adam Streisand, LLB) |
| 2008 | Speaker, American College of Trust and Estate Counsel Fall Meeting, Savannah, Georgia, "A Psychiatrist's View of Capacity and Undue Influence" (with Adam Streisand, LLB, and Meg Lodise, LLB). |
| 2010 | Panelist (with Stuart Zimring, Esq., and Elizabeth Botsford, Esq), Trusts and Estates Section of the Beverly Hills Bar Association Program Meeting. Topic: Drafting, administration and litigation of vice clauses |
| 2010 | Panelist (with Ed Stone, Esq.), Southern California Probate Conference, Semi-Annual Update and Roundtable. |
| 2010 | Speaker, LA County Bar Probate Volunteer Panel Annual Training Program: "Psychotropic medications and the myth of chemical restraints" |
| 2011 | Panelist (with Jane Boubelik, Esq., Isla Garraway, M.D., John Brooks, M.D., and James Hynds, Ph.D.), UCLA Health Systems Special Conference on "Treating The Incapable Medical Patient Needing Urgent Care" |

3

Exh. 1, pg. 38

| | |
|---|---|
| 2012 | Panelist (with Hon. Reva Goetz, Bruce Ross, Esq, and Alice Salvo, Esq.) Trusts & Estates Section of the Los Angeles County Bar Association Annual Symposium. Topic: Mental Capacity and Undue Influence. |
| 2014 | Speaker, UCLA Department of Psychiatry and Biobehavioral Sciences Grand Rounds, "Assessing Competency in the Elderly" |
| 2015 | Speaker, California CPA Advanced Estate Planning Institute, San Francisco, CA (with Adam Streisand), "Mental Disorders that can Erode Capacity and Increase Vulnerability to Undue Influence" |
| 2016 | Speaker, International Psychogeriatric Association 3rd International Conference on Capacity, San Francisco, "Assessing decisional capacity and vulnerability to undue influence" |

**Grants: Research**

| | |
|---|---|
| 1978 | Spar, J.E. (Principal Investigator).   Grant #S781018. "A double-blind placebo-controlled, multi-clinic study to evaluate the safety and efficacy of a total daily dose of 6.0 mg of dihydrogenated ergot alkaloids for the treatment of the cognitive, affective and behavioral symptoms of dementia associated with aging."  Sandoz Pharmaceuticals, East Hanover, New Jersey. |
| 1983 | Spar, J.E. (Principal Investigator).  Faculty Development Award, Summer Qtr. |
| 1983 | Spar, J.E. (Principal Investigator).  Basic Research Service Grant (BRSG). In support of study, "Long-term follow-up of elderly patients with major depression or dementia" |
| 1984 | La Rue, A. (P.I.), Spar, J.E. (Co-Principal Investigator). Opportunity Funds Grant.  For continuation of study: "Long-term follow-up of elderly patients with major depression or dementia." Also funded by the Alzheimer's Disease and Related Disorders Association. |
| 1986 | Leuchter, A. (P.I.), Spar, J.E. (Co-Principal Investigator). "Mental illness in the elderly: Diagnostic testing."  NIMH Grant 1 RO1 MH/NS 40705-01.  3/1/86-2/28/89. |

**Grants: Training**

| | |
|---|---|
| 1982 | Principal Investigator, NIMH Grant 1 T3116590-01. "Multidisciplinary Clinical Training: Mentally Ill Aged" 8/1/82-10/31/83. |
| 1983-89 | Principal Investigator, NIMH Grant 1 TO1MH17251-01 thru 06. "Multidisciplinary Clinical Training: Mentally Ill Aged" 7/1/83-6/30/89. |
| 1989-92 | Multidisciplinary Clinical Training: Mentally Ill Aged 7/1/89-6/30/92 |

4

| 1992-95 | Co-principal Investigator, NIMH Grant 1TO1SM19744-03 Multidisciplinary Clinical Training:  Mentally Ill Aged 7/1/92-6/30/95 |
| --- | --- |
| 1991- Present | Co-Principal Investigator, "Department of Veterans Affairs: West Los Angeles Veterans Administration Medical Center, Brentwood Division; Sepulveda Veterans Administration Medical Center; and UCLA Multicampus Fellowship Program in Geriatric Psychiatry" |

## Legislative Consultation

| 1985 | Co-drafter (with Andrew S. Garb, Esq.) of California Probate Code Section 6100.5 *"Persons Not Mentally Competent to Make a Will; specified circumstances"* |
| --- | --- |
| 1995 | Co-drafter (with Marc B. Hankin, Esq, et al) of the *Due Process in Competency Determinations Act* (SB 730), codified as California Probate Code Sections 810 - 813, and Civil Code Section 39 (b) |

## Publications - Books

1.   Colby K, **Spar JE**: The Fundamental Crisis in Psychiatry: Unreliability of Diagnosis.  Springfield, Illinois: Charles C. Thomas, 1983.
2.   **Spar JE,** La Rue A: Concise Guide to Geriatric Psychiatry Washington DC: American Psychiatric Press, Inc., 1990; Second Edition, 1997; Third Edition, 2002.
3.   **Spar JE**, La Rue A: Clinical Manual of Geriatric Psychiatry Washington DC: American Psychiatric Publishing, Inc., 2006

## Original research articles

1.   Van Putten T, **Spar JE**:  The board and care home:  Does it deserve a bad press?  Hospital & Community Psychiatry 30:461-464, 1979.
2.   **Spar JE**, Ford CV, Liston E:  Bipolar affective disorder in aged patients.  Journal of Clinical Psychiatry 504-507, 1979.
3.   **Spar JE**, Gerner R:  Does the dexamethasone suppression test distinguish depression from dementia?  American Journal of Psychiatry 139:2, 1982.
4.   **Spar JE**, La Rue A:  Major depression in the elderly: DSM-III criteria and the dexamethasone suppression test as predictors of treatment response.  American Journal of Psychiatry 140:844-847, 1983.
5.   **Spar JE**, La Rue A, Liston E:  Opiate antagonists in patients with Alzheimer's disease.  New England Journal of Medicine 209(9):354-355, 1983. (Letter to the Editor, with J. Blass & M. Reding; D. Drachman et al.; R. Katzman et al.)
6.   **Spar JE**, La Rue A:  Acute response to methylphenidate as a predictor of outcome of tricyclic antidepressant therapy in the elderly. Journal of Clinical Psychiatry 46(11): 466-469, 1985.
7.   Leuchter A, **Spar JE:** The late-onset psychoses: Clinical and diagnostic features.  Journal of Nervous and Mental Disease 173(8):488-493, 1985.
8.   La Rue A, D'Elia LF, Clark EO, **Spar JE**, Jarvik LF:  Clinical tests of memory in dementia, depression and healthy aging.  Journal of Psychology and Aging 1(1):69-77, 1986.
9.   La Rue A, **Spar JE**, Dessonville Hill C: Cognitive impairment in late-life depression:  Clinical correlates and treatment implications.  Journal of Affective Disorders 11:179-184, 1986.
10.   Leuchter A, **Spar JE**, Walter DO, Weiner H: Electroencephalographic spectra and coherence in the diagnosis of Alzheimer's type and multi-infarct dementia. Archives of General Psychiatry 44:993-998, 1987.
11.   **Spar JE**: Plasma trazodone concentrations in elderly depressed inpatients:  Cardiac effects and short-term efficacy. Journal of Clinical Psychopharmacology 7:406-409, 1987.

5

Exh. 1, pg. 40

12. **Spar JE**, La Rue A, Hewes CJ, Fairbanks L: Multivariate prediction of falls in elderly inpatients. International Journal of Geriatric Psychiatry 2:185-188, 1987.

13. Wilkins JN, **Spar JE**, Carlson HE: Desipramine increases circulating growth hormone in elderly depressed patients: A Pilot Study. Psychoneuroendocrinology 14(3):195-202, 1989

14. Small GW, Matsuyama SS, Ramanujam K, **Spar JE**, Fairbanks L: HLA antigens in depressed, demented, and non-demented elderly. Journal of Geriatric Psychiatry and Neurology 2:70-75, 1989

15. La Rue A, Goodman S, **Spar JE**: Risk factors for memory impairment in geriatric depression. Neuropsychiatry, Neuropsychology, and Behavioral Neurology 5(3):178-184, 1992

16. Leuchter AF, Simon SL, Daly KA, Rosenberg-Thompson S, Abrams M, Dunkin JJ, Cook IA, Newton TF, **Spar JE**: Quantitative EEG correlates of outcome in older psychiatric patients. Part II. Two-year follow-up of patients with depression. American Journal of Geriatric Psychiatry. 2(4):290-299, 1994

17. McGuire MT, Fawzy F, **Spar JE**, Weigel RM, Triosi A: Altruism and mental disorders. Ethology and Sociobiology 15:299-321, 1994

18. **Spar JE**, Hankin M, Stodden A: Assessing mental capacity and susceptibility to undue influence Behavioral Sciences and the Law 13(3):391-403, 1995

## Other articles

1. Ford CV, **Spar JE**, Davis B, Liston E: Hospital treatment of the elderly neuropsychiatric patient. Part I. Journal of American Geriatric Society, Vol. XXVIII, No. 10, 446-450, 1980.

2. **Spar JE**, Ford CV, Liston E: Hospital treatment of the elderly neuropsychiatric patient, Part II. Journal of American Geriatric Society, Vol. XXVIII, No. 12, 539-543, 1980.

3. **Spar JE**: Dementia in the aged. In L.F. Jarvik and G. Small (Eds.), Psychiatric Clinics of North America - Aging, Vol. 5, #1. Philadelphia: W.B. Saunders, 1982.

4. **Spar JE**: Pathophysiology of dementia. J. Beck (Moderator): Dementia in the elderly: The silent epidemic. Annals of Internal Medicine 97(2):231-241, 1982

5. **Spar JE**: Affective disorders and dementia. J. Beck (Moderator): Dementia. Annals of Internal Medicine 97(2):231-241, 1982.

6. Jarvik L, **Spar JE**: Aging and organic mental disorders in the elderly. In B. Wolman (Ed.), International Encyclopedia of Psychiatry, Psychology, Psychoanalysis and Neurology. Progress Volume I. New York: Van Nostrand Aesculapius, 1983.

7. **Spar JE**: Psychopharmacology of Alzheimer's disease. Psychiatric Annals 14(3):186-189, 1984.

8. Marin RS, Foster JR, Ford CV, Reifler BV, Reisberg B, Robinowitz CB, Sledge WH, **Spar JE**, Tighe PJ: A curriculum for education in geriatric psychiatry. American Journal of Psychiatry 145(7): 836-843, 1988

9. **Spar JE**, Garb A: Assessing competency to make a will. American Journal of Psychiatry 49(2):169-174, 1992

10. Chen ST, Altshuler LL, **Spar JE**: Bipolar disorder in late life: A review. Journal of Geriatric Psychiatry & Neurology, 11:29-35, 1998

11. **Spar, JE**: Attorney's guide to competency and undue influence. National Association of Elder Law Attorneys Quarterly, 13(3), 7-12, 2000

12. Streisand AF, **Spar JE**: A Lawyer's guide to diminishing capacity and effective use of medical experts in contemporaneous and retrospective evaluations. American College of Trust and Estate Counsel Journal 33 (2), winter, 2008.

13. Streisand AF, **Spar JE**: Mental Disorders that Erode Capacity. ABA Trust & Investments, 132, 12-17, November-December, 2009

14. Carico CD, **Spar JE**: Escaping the LPS Revolving Door. Trust and Estates Quarterly 16(1), 24-32, Fall, 2010

15. Bales A, **Spar JE**: The Psychodynamics of Factitious Sexual Harassment Claims. Psychiatry, Psychology and Law, DOI: 10.1080/13218719.2015.1055854, 2015

16. Plotkin D, **Spar JE**, Horwitz, H: Assessing Undue Influence. Journal of the American Academy of Psychiatry and the Law. 44, 344-351, 2016

6

17.

## Book Chapters

1. **Spar JE**: Drug treatment. In G. Maureen Chaisson (Ed.), Depression in the Elderly: An Interdisciplinary Approach. New York:  John Wiley & Sons, 1985, p. 193-213.
2. **Spar JE**: Psychopharmacologic treatment of depression in elderly patients with cardiovascular disease. In C. Shamoian (Ed.), Treatment of Affective Disorders in the Elderly (Monograph). American Psychiatric Press, Inc., 1985.
3. **Spar JE**: Principles of diagnosis and treatment in geriatric psychiatry. In Lazarus LW, "Essentials of Geriatric Psychiatry" New York, Springer, 1988
4. **Spar JE**: Organic Mood Syndrome.  Chapter 97 in: Treatments of Psychiatric Disorders. (Karasu TB, Ed.) A Task Force Report of the American Psychiatric Association. Washington, D.C. American Psychiatric Press, Inc. 1989.
5. **Spar JE**: Organic Personality Syndrome.  Chapter 98 in: Treatments of Psychiatric Disorders. (Karasu TB, Ed.) A Task Force Report of the American Psychiatric Association. Washington, D.C. American Psychiatric Press, Inc. 1989.
6. **Spar, JE:** Competency and Related Forensic Issues, in the American Psychiatric Press Textbook of Geriatric Neuropsychiatry, (Coffey CE, Cummings JL eds.)  2nd ed. Washington, DC The American Psychiatric Press,  1999
7. McGuire M, Fawzy F, **Spar JE**, Troisi A: Dysthymic disorder, Regulation-Dysregulation Theory, CNS Blood Flow, and CNS Metabolism in Sloman L, Gilbert P (Eds): Subordination and Defeat An Evolutionary Approach to Mood Disorders and Their Therapy New Jersey Lawrence Erlbaum Associates, Inc. 2000

## Letters to editors

1. Irwin M, **Spar JE**: Reversible cardiac conduction abnormality associated with administration of trazodone. American Journal of Psychiatry 140:7, 1983
2. **Spar JE**, La Rue A, Liston E:  Opiate antagonists in patients with Alzheimer's disease.  New England Journal of Medicine 209(9):354-355, 1983. (this letter, listed above as "original research article" entry #5, also reported original research data by J. Blass & M. Reding; D. Drachman et al.; and R. Katzman et al.)
3. Small GW, **Spar JE**, Plotkin DA:  Oral tetrahydroaminoacridine (THA) in treatment of senile dementia, Alzheimer type. New England Journal of Medicine 316(25):1604, 1987.
4. Strouse TB; Salehmoghaddam S; **Spar JE**. Acute delirium and parkinsonism in a bupropion-treated liver transplant recipient.  Journal of Clinical Psychiatry: 54(12):489-90, 1993
5. **Spar JE**: Virtual Publication. Archives of General Psychiatry 58:203-204, 2001

## In press

1. Read S, **Spar, JE**: Capacity, Informed Consent and Guardianship, in J. Holzer (Ed.),The Oxford University Press Textbook of Geriatric Forensic Psychiatry, 2015

7

Exh. 1, pg. 42

# EXHIBIT 2

Interview of Steven Martinez _____, On  07/08/2013 , Page

After playing some phone tag, MARTINEZ and BACA first spoke on the phone regarding the cell phone in the afternoon/evening of August 18, 2011.  When MARTINEZ first explained the situation to BACA, it was clear to MARTINEZ that BACA was confused.  MARTINEZ thinks BACA initially thought the FBI had information about a third party smuggling a phone into the jail.  MARTINEZ had to explain the situation to BACA three times before BACA understood what MARTINEZ was saying.

Exh. 2, pg. 44

# EXHIBIT 3



Q    (BY MR. FOX)    Do you recall what Mr. Baca's was at that meeting?

A    He was confused or kind of -- he didn't understand what was going on.

**UNITED STATES DISTRICT COURT**

# EXHIBIT 4

Exh. 4, pg. 47



Proffer of WILLIAM TOM CAREY _____ , On  08/12/2015 , Page

During the meetings, CAREY felt like BACA was attempting to re-write history about his knowledge. BACA seemed like he had a lack of confidence. CAREY stated BACA seemed like a confused old man.

# EXHIBIT 5

WILLIAM THOMAS CAREY - 8/19/2015



A.    I mean, I don't have any factual basis, but he -- he just seemed goofy that he couldn't comprehend. Almost like he's senile.

Page 48