EILEEN M. DECKER
United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
BRANDON D. FOX (Cal. Bar No. 290409)
Assistant United States Attorney
Chief, Public Corruption & Civil Rights Section
LIZABETH A. RHODES (Cal. Bar No. 155299)
Assistant United States Attorney
Chief, General Crimes Section
EDDIE A. JAUREGUI (Cal. Bar No. 297986)
Assistant United States Attorney
Major Frauds Section
      1500/1200/1100 United States Courthouse
      312 North Spring Street
      Los Angeles, California 90012
      Telephone: (213) 894-0284/3541/4849
      Facsimile: (213) 894-0141
      E-mail:    Brandon.Fox@usdoj.gov
                 Lizabeth.Rhodes@usdoj.gov
                 Eddie.Jauregui@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br><br>            v.<br><br>LEROY BACA,<br><br>            Defendant. | No. CR 16-66(A)-PA<br><br>GOVERNMENT'S MOTION IN LIMINE TO PRECLUDE DEFENDANT BACA FROM INTRODUCING HIS OWN HEASRSAY STATEMENTS<br><br>Hearing Date: November 21, 2016<br>Hearing Time: 3:00 p.m.<br>Location:    Courtroom of the<br>             Hon. Percy Anderson |

     Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Brandon D. Fox, Lizabeth A. Rhodes, and Eddie A. Jauregui, hereby moves in limine to preclude defendant from offering evidence, argument, or cross-

examination regarding any hearsay statements made by defendant during his interview with the government.

This motion is based upon the attached memorandum of points and authorities, the attached exhibits, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: November_16, 2016          Respectfully submitted,

EILEEN M. DECKER
United States Attorney

LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division


/s/ Brandon D. Fox
Brandon D. Fox
Lizabeth A. Rhodes
Eddie A. Jauregui
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

2

**TABLE OF CONTENTS**

DESCRIPTION                                                                    PAGE

**Table of Contents**

TABLE OF AUTHORITIES..............................................................ii

MEMORANDUM OF POINTS AND AUTHORITIES..............................................1

I.    GOVERNMENT'S INTRODUCTION...................................................1

II.   GOVERNMENT'S STATEMENT OF FACTS.............................................1

III.  GOVERNMENT'S ARGUMENT.......................................................5

      A.    Defendant May Not Introduce His Own Out-of-Court
            Statements...........................................................5

      B.    The Rule of Completeness Does Not Require Admission of
            Additional Statements Made During Defendant's
            Interview............................................................5

      C.    The Defendant's Specific Requested Inclusions Do Not
            Meet the Requirements of Admissibility...............................7

IV.   DEFENDANT'S ARGUMENT.......................................................12

V.    GOVERNMENT'S RESPONSE......................................................23

VI.   CONCLUSION.................................................................26

i

**TABLE OF AUTHORITIES**

DESCRIPTION                                                              PAGE

**CASES**

Beech Aircraft Corp. v. Rainey,
        488 U.S. 153...........................................................6

United States v. Castro-Cabrera,
        534 F. Supp. 2d 1156...................................................6

United States v. Collicott,
        92 F.3d 973 (9th Cir. 2006)....................................5, 6, 25

United States v. Cunningham,
        194 F.3d 1186 (11th Cir. 1999)........................................24

United States v. Fernandez,
        839 F.2d 639 (9th Cir. 1988)...........................................5

United States v. Ortega,
        203 F.3d 675 (9th Cir. 2000).............................5, 6, 24, 25

United States v. Vallejos,
        742 F.3d 902 (9th Cir. 2014)........................................6, 13

United States v. Wilkerson,
        84 F.3d 692 (4th Cir. 1996)...........................................25

United States v. Willis,
        759 F.2d 1486 (11th Cir. 1985)......................................5, 24

Williamson v. United States,
        512 U.S. 594 (1994)...................................................24

**RULES**

Fed. R. Evid. 801(c)..............................................5, 24

Fed. R. Evid. 801(d)(1).................................................5

Fed. R. Evid. 801(d)(2).................................................5

### <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

**I.   GOVERNMENT'S INTRODUCTION**

On April 12, 2013, federal agents and prosecutors interviewed defendant Leroy Baca at his attorneys' offices.  He had two attorneys present for the interview, which was audio recorded.  Some of those statements are the source of the false statements charged in Count Three of the Indictment.  Others are arguably both inculpatory and exculpatory.  At trial, the government will introduce portions of the recording of that interview.[1]  When introduced by the government, these excerpts are statements of a party-opponent, and thus not hearsay.

Defendant may not introduce his own out-of-court statements by playing other portions of the recorded interview, or through witness testimony, as such statements do not fall within any hearsay exception when offered by the party making them.  The only exception to this rule would be if the failure to include such statements would make the included statements misleading.   This exception is inapplicable here.  Accordingly, the Court should preclude defendant from introducing his own self-serving statements.

**II.   GOVERNMENT'S STATEMENT OF FACTS**

The conspiracy to obstruct justice and the obstruction of justice took place in August and September 2011.  The false statements were made on April 12, 2013, when defendant met with

---

[1] For the Court's reference, attached to this motion as Exhibit A is a draft transcript of the entire recorded interview.  The portions of the transcript that are crossed out are those that the government does not intend to play.  The defendant has highlighted in yellow the additional portions that he believes should be played for the reasons stated herein.  All references to Exhibit A will be to the page number followed by a colon and the line numbers.

representatives of the FBI and the United States Attorney's Office at his attorneys' office in Los Angeles.

The obstruction started when the LASD discovered that a cell phone they had found on an inmate within Men's Central Jail ("MCJ") was linked to an FBI investigation.  This discovery was made, almost simultaneously, at many levels of the LASD.  For example, deputies discovered that Anthony Brown had been calling a number that belonged to a desk phone of an FBI Special Agent in the civil rights section. They told their lieutenant, co-conspirator Gregory Thompson.  At his direction they also interviewed inmate Anthony Brown, who told them that he was an FBI informant who was tasked with reporting excessive force.  At the same time, the Assistant Director in Charge of the FBI for Los Angeles ("ADIC") Steve Martinez called defendant and told defendant that the phone the LASD had discovered in MCJ belonged to the FBI.  After this confluence of events, defendant called for meetings on August 19 and 20, 2011.  Deputy Smith, Deputy Manzo and Lieutenant Thompson briefed the attendees, including defendant, on what they had learned about Brown's phone calls to the FBI and about what Brown had said about being an FBI informant looking into excessive force.

When interviewed, defendant told the federal government that, by August 20, 2011, he had "no clue" that the federal government was conducting a civil rights investigation.  (Ex. A, 44:3-45:1.)  This is False Statement #1.

The conspirators decided to take action to thwart the federal investigation.  The first step was to make sure that the FBI did not have access to its informant, Brown.  Thompson said he would see to it that no access was granted.  Nonetheless, despite his presence at

2

the Saturday meeting and direct order that inmate Brown should be isolated, defendant told the government that he did not have any "direct involvement with any conversation about keeping the FBI and Mr. Brown away from one another." (Ex. A, 68:3-11.)  This is False Statement #2.

Despite defendant Baca's orders and the numerous precautions taken by members of the conspiracy to ensure that the FBI would not be able to talk to Brown, on August 23, 2011, members of the FBI conducted an interview of Brown within MCJ.  When co-conspirator Leavins found out about this meeting, he put a stop to it immediately and Brown was yanked out of the interview room.  Thereafter, members of the conspiracy were summoned to Sheriff's Headquarters where they were berated by co-conspirator and Undersheriff Paul Tanaka.  Tanaka told Thompson that he, Thompson, would have to tell defendant that the FBI had been allowed access to Brown.  Thompson went into defendant's office, explained what happened, and apologized to defendant.

On April 12, 2013, however, defendant told the federal government, in no uncertain terms, that he was not aware that the FBI was kicked out of an interview.  He expanded on his denial by stating that he was not later informed that such action had taken place and that Thompson never apologized for allowing the FBI to interview Brown in the jail.  (Ex. A, 77: 4-21.)  Defendant's statement about his purported lack of awareness is False Statement #3.

The conspirators continued their pattern of obstruction, including by conducting surveillance on at least two of the FBI agents working on the investigation.  Defendant held a meeting where the participants discussed approaching the lead FBI agent, Special

Agent Leah Marx.  Defendant said that the deputies just should not put handcuffs on her.  Later, co-conspirators Craig and Long did as directed -- they approached Special Agent Marx outside her home and threatened to arrest her, but stopped short of putting handcuffs on her.  In words and gestures, however, they made clear that she would be arrested at some point, and that the arrest would possibly occur outside of her home.  One of the deputies later told Special Agent Marx's supervisor that a warrant could come the next day, and that defendant was aware of the situation.

When asked about the encounter in the interview, defendant told the federal government that he was not aware that his deputies were going to approach Special Agent Marx until he later heard about the encounter from Steve Martinez, who was the Assistant Director of the FBI.  (Ex. A, 28:13-29:18.)  This is False Statement #4.

On the same day that co-conspirators threatened to arrest Special Agent Marx, defendant appeared on television.  One of the anchors of the morning news show asked defendant about what was "going on between the Sheriff's Department and the FBI" having to do with "alleged brutality within the jails."  Another anchor asked defendant, "Do you resent the FBI's intrusion?"  Baca responded "Oh yeah."  Later, a second reporter asked, "Well, if you don't want the FBI in there, then who polices the police?"  Baca responded "We police ourselves."

Still on April 12, 2013, defendant Baca said that he had "never said" he did not believe that the FBI should be investigating the LASD.  (Ex. A., 122:20-123:3.)  This is the final charged false statement, False Statement #5.

**III. GOVERNMENT'S ARGUMENT**

> **A.    Defendant May Not Introduce His Own Out-of-Court Statements.**

Defendant's prior, out-of-court statements are admissible only if offered against him.  Fed. R. Evid. 801(d)(2).  If elicited by defendant, such statements are inadmissible hearsay.  Fed. R. Evid. 801(c); United States v. Fernandez, 839 F.2d 639, 640 (9th Cir. 1988) (district court properly sustained government's hearsay objection to defendant's attempt to solicit defendant's post-arrest statement during cross-examination of government witness).

A defendant does not have the right to present self-serving hearsay statements.  See Fed. R. Evid. 801(d)(1); see also United States v. Ortega, 203 F.3d 675, 682 (9th Cir. 2000) (affirming order limiting defendant's ability to elicit his exculpatory hearsay statements on cross-examination); Fernandez, 839 F.2d at 640; United States v. Willis, 759 F.2d 1486, 1501 (11th Cir. 1985) (defendant's attempt to elicit exculpatory statements made at the time of arrest to prove he lacked requisite knowledge was inadmissible hearsay).  To permit defendants to place their statements before the jury without subjecting them to cross-examination would be to allow "precisely what the hearsay rule forbids."  Fernandez, 839 F.2d at 640.

> **B.    The Rule of Completeness Does Not Require Admission of Additional Statements Made During Defendant's Interview.**

Defendant may not invoke Federal Rule of Evidence 106, also known as the "rule of completeness," to circumvent the rules barring hearsay evidence.  "[R]ule 106 does not compel admission of otherwise inadmissible hearsay evidence."  United States v. Collicott, 92 F.3d 973, 983 (9th Cir. 2006).  Indeed, Rule 106 cannot be used as a means

5

for defendant to introduce statements that would otherwise be inadmissible. In other words, "[t]he Rule does not . . . require the introduction of any unedited writing or statement merely because an adverse party has introduced an edited version." United States v. Vallejos, 742 F.3d 902, 905 (9th Cir. 2014). Thus, the rule of completeness does not require the government to enter all of defendants' statements made during an interview or permit defendant to circumvent the rules against hearsay by seeking to elicit other, non-incriminating statements from government witnesses, or defense witnesses other than defendants. See, e.g., Ortega, 203 F.3d at 682; Collicott, 92 F.3d at 983. "[I]f the complete statement does not serve to correct a misleading impression in the edited statement that is created by taking something out of context, the Rule of Completeness will not be applied to admit the full statement." United States v. Vallejos, 742 F.3d 902, 905 (9th Cir. 2014).

Instead, the other portions of the statement should be admitted only if the edited version causes a misunderstanding or distortion. United States v. Castro-Cabrera, 534 F. Supp. 2d 1156, 1159-60 (C.D. Cal. 2008) (quoting Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 172 (1988)). And defendant may not introduce exculpatory sections of his statement merely because the government is introducing inculpatory portions of his statement:

> A defendant may, during the course of an interrogation, make an inculpatory statement and later make an exculpatory statement. The general rule precluding the Rule of Completeness from being the basis for admitting the exculpatory statement would apply. A defendant would then need to base admission of the exculpatory statement on some other rule of evidence, if such rule were applicable to the particular situation at hand. In the situation just stated, the actual meaning of what was communicated in the inculpatory statement does not

6

depend on the meaning of what was communicated in the exculpatory statement.

Id.  Accordingly, "each analysis must be done on a case-by-case basis."  Id.

Despite the need for this case-by-case analysis, defendant does not (and cannot) point to any specific portion of the testimony that is purportedly misleading, distorted, or taken out of context. Certain examples are listed below.

**C.    The Defendant's Specific Requested Inclusions Do Not Meet the Requirements of Admissibility**

    1.    <u>False Statement #1 – Baca Claimed That, As Of August 20, 2011, He Did Not Know That The FBI Was Conducting A Civil Rights Investigation Of The LASD</u>

As evidence of False Statement #1, the government will introduce the following:

Q.  At the Saturday meeting, was it presented to you that there were calls between Anthony Brown and the Civil Rights Unit of the FBI?

A.  No.

Q.  Would that have been important for you to know?

A.  Yeah.  It's part of the whole package.  You know, there is no question that I consider all information regarding any incident of this type -- and this is the only one we've ever had -- that everything should be on the table.

Q.  Okay.  But why would it have been important for you to know that Mr. Brown was in contact with the Civil Rights Unit of the FBI?  What about that fact makes it important to you?

A.  A lot of things, but I don't know exactly what the whole process was at this time in terms of this phone.  You

know, it -- **I had no clue that this is a civil rights investigation.**  And, therefore, I don't have any predetermined perspective on pieces of information.

(See Ex. A, p. 44:3- 45:1 (emphasis added)).

This statement deals with a very simple issue: whether defendant knew as of August 20, 2011 that the FBI was conducting a civil rights investigation of the LASD.  It is not misleading and is not distorted.  Defendant seeks to introduce an additional statement that he claims is related to this statement.  See Exhibit B (Each statement that defendant seeks to introduce has been given a number for ease of reference at argument.)  The statement is not necessary to clear up anything in False Statement #1 because that statement is clear on its own.

### 2.    False Statement #2 — Baca Stated That He Was Not Involved in Keeping The FBI Away From Inmate Brown

As evidence of False Statement #2, the government will introduce the portion transcribed in Exhibit A, 68:3-11:

    Q.    So assuming, for the sake of this question, that there was a discussion at that Saturday meeting about how to keep Mr. Brown away from the FBI, were you present for such a discussion?

    A.    May I say this?  Whether Saturday or ensuing days, or however timeframe you'd want to reference, I am not aware of any direct involvement with any conversation about keeping the FBI and Mr. Brown away from one another.

(Id.)  This is a simple statement that defendant made.  He claimed he was not part of any conversation about keeping the FBI and Anthony Brown away from each other.  There is nothing misleading or distorted about this statement.

8

Among other things, defendant seeks to add to that statement the next three pages, which are Baca's soliloquy about the fact that the FBI could have investigated the allegations of civil rights violations differently and that ADIC Martinez could have called him about the civil rights investigation.  (Ex. A 68:12-69:5.)  These statements are simply defendant's attempt to show he is cooperative and assign some blame to the FBI.  The statements do nothing to clear up defendant's denial that he was involved in discussions about keeping the FBI and Brown away from another.

Thus, the statements that defendant seeks to introduce are inadmissible under any rule.  Even if they were otherwise admissible, Federal Rule of Evidence 403 would bar the admission because the statements are confusing, unfairly prejudicial and a waste of time.

3.    False Statement #3 -- Baca Stated That He Was Not Informed that FBI Special Agents Were Not Allowed to Continue Their Interview of Brown on August 23, 2011

As evidence of False Statement #3, the government will introduce defendant's claim that, on August 23, 2011, he was not informed that the FBI had been kicked out of an interview they were conducting of Anthony Brown at the MCJ, and that he was never later informed of this.  Defendant also stated that co-conspirator Thompson never came to him and apologized for allowing the FBI to interview Anthony Brown in the jail.  The specific false statements are:

Q.    [T]he FBI came to interview Anthony Brown.

A.    Uh-huh.

Q.    Were you aware that they were kicked out of an interview that they were conducting of Anthony Brown with your jail?

A.    No.

9

Q.    You were never later informed --

A.    No.

Q.    -- of that?  And so Mr. Thompson never came to you and apologized for allowing the FBI to interview Anthony Brown in the jail?

A.    No.

(Ex. A, 77:9-21.)  Defendant confirms this false statement later in the interview.  (See, e.g. Ex. A, 221:13- 222:1 (does not recall Thompson apologizing).)  These statements are once again simple concepts.  They are not taken out of context and are not misleading.

Defendant claims that other statements should be included, such as his claims that he does not recall discussions about a federal agency having access to Brown; that he did not get into "operational talk"; and that communication between the FBI and LASD was important should be included.  This is wrong on many levels.  First, the statements do nothing to clear up a misleading or distorted portion the government seeks to introduce.  Indeed, the portion that defendant seeks to add has little, if anything, to do with the FBI being kicked of its meeting with Brown on August 23, 2011, or Thompson's apology to defendant for letting that happen.  Second, the additions requested by defendant are repetitive to the extent they seek to introduce additional statements that defendant does not recall discussions about access to Brown.  Third, defendant is really seeking to introduce them for a hearsay purpose, as exculpatory statements, because he wants to claim that he did not get into "operational talk" about what the LASD would do with regard to Brown.  Fourth, they are irrelevant to the extent that he wants to introduce

10

statements about communication between the FBI and LASD.  None of these reasons justify admission under Rule 106.  The statements the government seeks to introduce are not misleading and these additional statements therefore are not necessary to cure any distortion.

    4.    <u>False Statement #4 -- Baca Stated That Before the Evening of September 26, 2011, He was Not Aware that LASD Officials Were Going to Approach an FBI Special Agent and Threaten Her Arrest</u>

As evidence of False Statement #4, the government will introduce defendant's statement that, prior to ADIC Martinez's call on September 26, 2011, he was not aware that LASD officials were going to approach Special Agent Marx to try to talk to her, to threaten to charge her, or to threaten to arrest her.  Specifically, the government will introduce the following as to false statement #4:

    Q.    When did you first hear that somebody within your department had threatened to arrest an FBI agent?

    A.    When I got the second call from Mr. Martinez.

    Q.    Okay.  And was this -- I assume it was soon after that agent was approached by someone within your department; is that correct?

    A.    Yes.

    Q.    We'll get into the substance of the call.  So if I'm understanding you correctly, you did not -- you were not aware that anybody had gone out to Leah Marx's house to threaten to charge her and arrest her, is that correct?

    A.    When I received that call, that's correct.  I was -- I received that call within perhaps an hour or so after that alleged act occurred.

11

Q. So the call from Mr. Martinez was the first time that you were aware that somebody was going out to Leah Marx's house to threaten to charge and arrest her; is that correct?

A. Yes.

Q. Were you aware when you received that call from Mr. Martinez, even more generally than that, that someone within LASD was going to approach Leah Marx to try to talk to her?

A. I wasn't aware of any of the investigative particulars. But once Mr. Martinez made the call to me, I was aware something occurred.

(Ex. A, 28:13-29:18; see also 158:4-159:2 and 203:15-204:6.) As defendant's unambiguous statements are not misleading, the Rule of Completeness has no bearing.

     5.    False Statement #5 – Despite Previous Admissions on Television, Baca Stated That He Never Said That He Did Not Believe the FBI should be investigating the LASD

As evidence of the fifth and last charged false statement, the government will introduce the following:

Q . . . And did you ever -- do you recall ever stating that you didn't believe that the FBI should be investigating LASD?

A. I have never said such a thing. I mean, you know, I don't know any other way to explain this to you.

(Exh. A., 123:3 -123:8). Defendant makes an assertion that the government intends to prove false. There is nothing misleading about it.

**IV. DEFENDANT'S ARGUMENT**

Count Three charges as the actus reus five answers that Mr. Baca gave to more than 600 questions during a government interview on

April 12, 2013 lasting more than 4.5 hours that the government alleges were knowingly and willfully false and material.  As an initial argument, Mr. Baca submits that the entire interview, not just select portions of it, should be permitted to be played for the jury.  Only by being able to evaluate Mr. Baca's answers to all the questions asked will the jury be able to decide whether there are any audio indications of whether he is telling the truth or not for the five false statements.  For instance, if Mr. Baca raises or lowers his voice or pauses or rushes as part of a pattern of either telling the truth or lying, only by hearing the entire audiotape will the jury be able to decipher whether his particular answers to the five questions at issue fit that pattern.  This is especially true since the government chose not to videotape the interview.  Thus, Mr. Baca seeks to introduce the entire audiotape.

To the extent the Court does not admit the entire audiotape of the interview, then Mr. Baca seeks to admit under Rule 106 the following redacted statements from the audiotape, that are highlighted in yellow in Exhibit A, in order to "correct a misleading impression in the edited statement that is created by taking something out of context" *See* Vallejos, 742 F.3d at 905. Mr. Baca seeks to admit the following redacted statements that fall into the following categories:

1) statements involving the government cutting off the question and only including the answer so it is not clear what question Mr. Baca is answering;

2) statements seeking to include Mr. Baca's full answer that the government has excised for no apparent reason that distorts the evidence;

13

3) statements seeking to introduce Mr. Baca's multiple answers to the very same question that the government has chosen to introduce only one answer for that would otherwise mislead the jury into believing Mr. Baca answered the question only one way when he actually answered it in multiple ways.

1.    On Pages 48-50 As It Relates to False Statement #1: Incomplete Answer Will Mislead the Jury

Q    **So at that Saturday meeting, you knew that Anthony Brown was providing information about civil rights violations in the jails to the FBI --**

A    **No, I didn't say that.  I didn't make a connection to the Saturday meeting.  I'm saying that, as this investigation -- you know, in answer to your point, as this investigation proceeded we were able to get more information from Mr. Brown, and then that information alluded to what his purpose was.**

Q    But at the Saturday meeting, you were concerned about his safety.  You stated that; correct?

A    That's correct.

Q    And the reason you were concerned about his safety was because he -- you knew he was providing information to the **FBI about deputies who may have engaged in excessive force**; correct?

A    The nature of my concern was that no one harm him, and I don't care who.  It could be a deputy; it could be another inmate. **The nature of what his engagement was with the FBI was not known entirely as it was in the ensuing following weeks**.

Q    But it was known at that time that there was a potential safety issue for Brown because --

A    From my perspective, I believed there was.

14

Q    And that's because **he was providing information to the FBI about deputies who were engaged in excessive force**; correct?

A    That he was the subject, as an informant, about deputies, and that I didn't want him to be in a general population setting.  He can't be compromised by other inmates or deputies or anybody else.  That no one should be going around him and intervening with whatever his particular security rights are.

False Statement #1 relates to Mr. Baca stating that he did not have a clue that the FBI was conducting a civil rights investigation as of the August 20, 2011 Saturday meeting (Exhibit A, pg. 44).  The above statements come soon thereafter (pgs. 48-50) and clarify Mr. Baca's prior answers by stating that he did not make a connection by the Saturday meeting to the FBI conducting a civil rights investigation.  To leave in only the former statement and not the latter clarifying statement will mislead the jury and distort the evidence regarding Mr. Baca's memory of when he knew the FBI was conducting a civil rights investigation.

2.    On Pages 56-57 As It Relates to False Statement #2. Same Question, Different Answer:

Q    Right.  At that meeting, that **Saturday meeting**, did -- were there **discussions about whether the FBI or any federal law enforcement agency should have access to Anthony Brown?**

A    **I don't recall that**.

Q    Do you recall anyone **instructing Lieutenant Thompson to ensure that no federal law enforcement or outside law enforcement speaks to Anthony Brown**?

A    Well, like I mentioned, **I didn't get into operational talk**.  If that kind of talk were to occur, I would hope, as Mr.

15

Martinez did, that he would call me and that he would say, you know, "We need to communicate about the process that we should agree to to facilitate our investigation."  You know --  3.   On page 60:

Q    Was there **any conversation about preventing Anthony Brown from speaking to outside law enforcement at the Saturday meeting**?

A    **I don't know.**  If there was, you know, I came in at a point when it was going on, and I left at a point when it continued.

False statement #2 addresses whether Mr. Baca during the Saturday meeting discussed keeping the FBI away from Mr. Brown (page 68).  In the government's alleged false statement on page 68, Mr. Baca is asked a hypothetical about a discussion during the Saturday meeting and says he is not aware of any direct involvement with any conversations about keeping the FBI and Mr. Brown away from one another.  Here, in the above statements, Mr. Baca is explicitly asked the same question and gives different answers -- "I don't recall that," "I didn't get into operational talk," and "I don't know."  To only include his page 68 statement to the hypothetical and not include the above pages 56-57, 60 answers to essentially the same question will completely distort the evidence and mislead the jury.

        4.   On Page 68: Incomplete Answer Will Mislead the Jury

On page 68, the government includes the first question and answer and then redacts the subsequent questions and answers that clarify Mr. Baca's initial response.  Without those clarifications, Mr. Baca's initial response is distorted into making it seem that he had no involvement with keeping the FBI away from Mr. Brown when the intent of his initial response was to emphasize his cooperation with the FBI:

16

Q   [START 1:08:10] So assuming, for the sake of this question, that there was a discussion at that Saturday meeting about how to keep Mr. Brown away from the FBI, were you present for such a discussion?

A   May I say this?  Whether Saturday or ensuing days, or however timeframe you'd want to reference, I am not aware of any direct involvement with any conversation about keeping the FBI and Mr. Brown away from one another. [END AT 1:08:37]

Q   And in your opinion, **that would have been the wrong thing to do, because you believe that it's important for LASD and the FBI to be partners**; is that correct?

A   Well, **definitely**, if it were -- see, I felt this way, that Mr. Martinez had no hesitation to tell me about the phone.  Mr. Martinez had no hesitation to tell me about the concern regarding Agent Marx.  Had Mr. Martinez called me about the issue of what you are describing now in the question, I would have had a clear understanding of what was going on in the minds of the FBI, and I would have honored the request.

You see, and I know that we are trying to deal with things that are important to the Civil Rights Unit and the FBI.  I get it. But what is important is that I needed more communication.

5.   On Pages 116-17: An Answer With No Question Will Confuse the Jury

On page 116, the government includes the following:

Q   Is it fair to say that you were pretty animated at this meeting or were you talking --

A   No. I was animated, yeah. [END 28:22]

17

The government immediately follows up and asks Mr. Baca what he meant by "animated."  Mr. Baca then answers.  To leave the jury with the statement that he was "animated" and to not tell them what Mr. Baca meant by "animated" will distort the evidence and mislead the jury.  The additional question and answer that follow are:

**Q    And what at that point in time had you learned other than just the fact that a phone was introduced to the jail that made you animated, or was it just the fact that a phone was introduced to the jail that made you animated?**

**A    I think the concern that I had was predicated on the fact that my high regard for the FBI, my trust for the FBI, and my trust, particularly for all the directors, who I most have contact with, that I don't believe that it had to go the way it did.  That had they called me and I said it was -- if you called me and told me "We've got an issue.  We need to deal with it," I would have kept it to myself.**

6.    On Pages 120-21 As It Relates to False Statement #5: Truncating the Answer Will Confuse and Mislead the Jury

False statement #5 addresses whether Mr. Baca believed the FBI should be investigating the LASD.  The government seeks to enter the initial question and answer dealing with Mr. Baca's alleged "resentment" of the FBI but then cuts off Mr. Baca's entire answer that provides the clarification for the initial part of his response.  To cut off that answer will mislead the jury and distort the evidence concerning Baca's alleged "resentment" of the FBI.

Q    [31:58] Have you ever stated, since learning that the FBI was investigating the jails, that you resented the FBI investigating the jails at LASD?

A    Let me say this:  "resentment" is not a word that I typically use on anything, including the FBI. Am I -- was I angry? Yes.  Did I feel that it caused more difficulty than it should have? Yes.  Do I believe that communication should have been a consideration with me? Yes.  And so these aren't things that need to be argued about at an investigative level. These are things that you argue about at my level. [END 32:54]

Q    Do you --

A    **And I was doing that.  I was talking to the U.S. Attorney.  And then subsequently I talked to Steve.  And then I pressured Steve in the second meeting, and I said, "Steve, you and I have done a lot of things together. And I don't understand why you did this the way you did. It's not your agents that I'm angry with. It's you." Okay?**

**And so once he got that into his mind, he felt something for it, because we don't succeed -- in the criminal justice world of looking for rogue deputies or criminals at large, we don't succeed when we don't work together.  We might win one battle, but if you lose trust with each other, it doesn't help the future battles.**

**And so his first line of business after we had settled our little top-level disputes over this was, "All right.  You do what you do.  I'll do what I do.  We'll just give you all the copies of what we do. We've got this process with the District Attorney's office. We've got this process with the U.S. Attorneys' office.  We're through.  There's no disagreement on anything."**

7. On Page 130: Truncating the Answer Will Confuse and Mislead the Jury

The government again cuts off Mr. Baca's answer that is directly responsive to the question asked.  There is no basis to cut off the answer.  By cutting off the complete answer, the evidence will be distorted and the jury misled.

Q    You state, "I am very hopeful that we truly agree upon resolution, but if not, the Sheriff's Department will not be able to continue the participation with the FBI, in many ongoing joint taskforce missions." So at this point in time, your anger, I would assume had subsided, because it had been about a month, since you had learned about this. Yet, you're also, at this point, I'm reading this as telling the FBI, telling the U.S. Attorney, you will not continue to participate in task forces if . . .

A    If we don't reach an understanding that there was a breach of trust with my office, as a leader of the organization, then I feel that there was no reciprocal respect for the difficulty of both agencies. [END 2:10] **So this letter, to me, was fixed, based our meetings that we had.  And the one that cleared the air for me, was the one Mr. Martinez had explained himself to me, and I accepted that, and I said, "That's understandable."**

8.    On Page 131: A Truncated Answer With No Question Will Confuse and Mislead the Jury

The government seeks to include an answer without a question it is responding to and then cut off the complete answer.  Such a tactic will distort the evidence and mislead the jury.

**Q    Are you aware of any meetings that occurred within LASD, in which the executives within LASD told taskforce officers that they would be pulled off the taskforce because of this investigation?**

20

**A    I'd never given such direction, and I would be surprised if that occurred at all.  This was private conversation.  See.**  [BEGIN 3:13] Let me explain this anger business.  I don't get really angry.  I get more tactical. All right?  And anger is a part of it, but it's not the overriding part of it. [END 3:26]  **The idea that the Sheriff's Department cannot be trusted has some validation, if you know what it is.  If we work together in the past and somebody was acting like a knucklehead on the taskforce and wasn't going along with whatever the flow was, I could understand that.  But that was never brought to my attention, even when it occurred.  All of a sudden, there was an abrupt cessation of the investigation.  The FBI pulled out and the U.S. Attorney's Office pulled out, and no one called me, and said, "Let me tell you why we're not doing this anymore."**

9.    On Pages 134-36: <u>A Truncated Answer Will Confuse and Mislead the Jury</u>

The government asks a question, receives an answer from Mr. Baca, and then acknowledges that the answer is confusing but seeks to redact Mr. Baca's follow-up answer that clarifies what he meant.  To allow this redaction would distort the evidence and mislead the jury.

A    I wanted a full and clear understanding, that we can't afford to have a fight between two agencies.  You know, I didn't start this fight.  Okay?  But let me say this.  I believe in fairness, and I believe that fairness is a very important quality in everything that we do, whether it's with crooks, or whether it's with ourselves.

Q    When you said, just there, "you didn't start this fight," who started the fight?

21

A    Whoever decided to do all this, and say that you can't trust the Sheriff, even. [END 6:55]

Q    Wait, I'm confused.  Are you talking about the FBI starting the fight? Or are you talking about the person who, before, breached the trust of the FBI?

A    Whoever motivated Mr. Martinez to do it the way it was done, and then get the U.S. Attorney's Office involved, and not consider that there's other ways to do this, is what led to this whole breach. It wasn't done with maliciousness in mind, but it was done with high risk in mind.  Because the investigation was compromised.

Q    Okay.  In your opinion, it was compromised?

A    Am I the only one that feels this way, in the room?

Q    I'm saying, it's your opinion that it was compromised. It's not Mr. Birotte or Mr. Martinez ever said that the investigation, itself, is compromised. The phone was compromised.

A    Well, that's part of it.  I'm using Mr. Martinez's words.  But, you know, the difficulty is simple.  The guys at the top have to deal with each other a certain way.  I don't fight with FBI agents.  I don't fight with supervising agents.  I don't fight with anybody, but I will fight with Congress, and I will fight any level of government that thinks that they can just do anything they want, and never even have to explain it. I'm not asking for a public anything.  I'm asking for a mere sense of fair play. And then, if I were told about this, I would be on your side.  You would have my green light to do whatever you want to do, as an agency.

///

///

22

**10.   On Page 173 As It Relates to False Statement #5: Clarification of a Prior Answer Should Be Admitted to Avoid Misleading or Confusing the Jury**

False statement #5 involves Mr. Baca stating that he never said the FBI should not be investigating the LASD.  The evidence the government intends to use to show that Mr. Baca is lying is the statements Mr. Baca made during a "Good Day LA" appearance in which he said he "resented" the FBI's intrusion.  The government asked Mr. Baca this question directly in the interview on page 173 and Mr. Baca's response should be permitted in order not to distort the evidence or mislead the jury on his alleged feelings of resentment of the FBI.

**Q    But what you're resentful of, though, is the FBI investigating LASD, without informing you of that?  Is that correct?**

**A    Only in the sense of the phone coming in. You know you can do it whatever way you need to.  But this phone somehow doesn't really give me any comfort at all.**

**V.   GOVERNMENT'S RESPONSE**

Defendant does not dispute that the statements he seeks to include are hearsay.  He merely argues that the exclusion of the ten statements will confuse or mislead the jury.  It is not clear how or why they jury will be misled or confused.  In reality, when one looks at the statements he seeks to admit, they are nothing more than an attempt to introduce a defense theory at trial by way of defendant's out-of-court statements.  This is classic hearsay.  Moreover, Rule 106 does not operate to change hearsay into admissible testimony just because, as defendant believes, defendant's favored portions are "better answers" or provide "context" to his other statements.  See

Ortega, 203 F.3d 675, 682 (9th Cir. 2000) (district court properly granted the government's motion in limine to exclude introducing defendant's post-arrest statements through cross-examination of INS agent), quoting Fernandez, 839 F.2d 639, 640 (9th Cir. 1988); United States v. Cunningham, 194 F.3d 1186, 1199 (11th Cir. 1999) ("a defendant cannot attempt to introduce an exculpatory statement made at the time of his arrest without subjecting himself to cross-examination"); United States v. Willis, 759 F.2d 1486, 1501 (11th Cir. 1985) (to the same effect).

The reason for this is clear:  Defendants are not prevented from introducing evidence necessary to put on their defense, but they must do so by testifying.  It is obvious that defense counsel will challenge the government's theory of this case, but defense counsel cannot place a defendant's self-serving prior statement before the jury without subjecting defendant to cross-examination.  Fed. R. Evid. 801(c); Fernandez, 839 F.2d at 640; Cunningham, 194 F.3d at 1199; Willis, 759 F.2d at 1501.

As the Ninth Circuit noted in Ortega, a defendant's non-self-inculpatory statements are inadmissible hearsay even if they were made contemporaneously with other self-inculpatory statements. Ortega, 203 F.3d at 682 (9th Cir. 2000)(citing Williamson v. United States, 512 U.S. 594, 599 (1994)).  The self-inculpatory statements offered by the government here are admissions by a party-opponent under Rule 801(d)(2) and are therefore not hearsay.  However, if offered by the defendant, the non-self-inculpatory statements by defendant are inadmissible hearsay.  See Ortega, 203 F.3d at 682 (citing Williamson, 512 U.S. at 599, which found that "[t]he fact that a person is making a broadly self-inculpatory confession does

24

not make more credible the confession's non-self-inculpatory parts [which are hearsay]").

If defendant wants to admit evidence explaining why he made certain statements, he will have to place his own credibility at issue by testifying in his case-in-chief.  Any other holding would allow for the admission of inadmissible hearsay contrary to the Federal Rules of Evidence, Ortega, and Collicott.  "Rule 106 does not compel admission of otherwise inadmissible hearsay evidence[]" offered by a criminal defendant. Collicott, 92 F.3d at 983 (punctuation omitted); United States v. Wilkerson, 84 F.3d 692, 696 (4th Cir. 1996) (cited by Collicott) ("Rule 106 . . .  would not render admissible the evidence which is otherwise inadmissible under the hearsay rules.").

In this case, when one looks at the statements that defendant seeks to admit, it is clear that defendant's goals have nothing to do with fairness or completeness, but are an effort to advance his own theories of the case in his own words.  Those theories include:

• The hiding of Brown was done for Brown's safety.  (See insert 1);

• The FBI should have communicated with defendant and, had it done so, the "misunderstanding" leading to this case would not have existed.  (See inserts 2, 4 -8);

• This is really just a turf-war between two agencies. (See insert 9).

Thus, it is not the rule of completeness the defendant seeks to satisfy, but rather his desire to put forward his case by his own out-of-court statements.  This is inadmissible hearsay.

25

## VI.    CONCLUSION

The government's excerpts of defendant's statements are relevant and not misleading.  As such, there need be no additional excerpts admitted.