# GOVERNMENT EXHIBIT A

INTERVIEW

OF

LEROY BACA

Friday, April 12, 2013

2

P A R T I C I P A N T S

<u>Interviewee and Representatives</u>

Leroy Baca, Interviewee

Brian Hershman, Attorney for Leroy Baca

Beong Soo Kim, Attorney for Leroy Baca

<u>United States Attorney's Office</u>

Brandon Fox, Assistant United States Attorney

Margaret Carter, Assistant United States Attorney

Lizabeth Rhodes, Assistant United States Attorney

<u>Federal Bureau of Investigation</u>

David Dahle, FBI Special Agent

Jason Dalton, FBI Special Agent

3

**START AT 0:00**

SPECIAL AGENT DALTON:  All right.  This is Special Agent Jason Dalton.  It is Friday, April 12th, 2013, at approximately 1:57 p.m.

We are at the Law Offices of Jones Day in Los Angeles, California.

I'm here with Margaret Carter, Lizabeth Rhodes, Brandon Fox, David Dahle, Beong Kim, Brian Hershman, and Leroy Baca.

We are beginning the consensually recorded interview of Leroy Baca.

END AT 00:26

EXAMINATION BY MR. FOX:

Q    All right.  Mr. Baca, I would like to go over a few things first before we get started in the substance of the interview.  The first thing I want to talk to you about is the letter that we just provided to your attorneys.  I assume that you have it in front of you, or you've seen it?

This is the non-target letter that we talked to your attorneys about, and I just want to go over it with you to make sure that you understand what it is

4

and how a target is defined, because what we -- when we talked to Brian and Beong earlier, they asked us to provide you with a non-target letter.  And I just want to explain what that term means.

A target is somebody who is linked by substantial evidence to a crime, and who, in the prosecutor's judgment, based on the evidence to date, is likely to be charged.  And at this point we are giving you the assurance at this point that you are not a target.

Now, I say this to everybody -- and I think everyone in this room has probably similar analogies to it -- that doesn't mean that your status forever is going to be a non-target.  For example, even if today you told me, "You know what?  I killed JFK," and we go off and we find the gun that you used to kill JFK, that could change your status as a target.

Obviously, we are not looking at the murder of JFK, nor were you involved in that.  I'm just giving you an example.

A    Right.

Q    It's an example that I have given to many people.  So do you have any questions about this

5

letter or about your status before we begin with the substance of your testimony?

A    No.  Just that I appreciate the letter.

[END 1:57]

Q    Okay.  And the other thing that we want to go over with you -- and this is very important also -- I know that that was important to you.  What's important to us is we, as the criminal investigators in this matter, cannot be exposed to compelled statements that you may have learned about.

We know that you ultimately are the person who IAB is held accountable to, and that you are somebody who has been exposed to compelled statements by deputies and other people under you.  We cannot learn that information, and we do not want to learn that information.

So if an answer to one of our questions here today -- a truthful answer would cause you to tell us something that you learned from IAB or from a compelled statement, we want to at that point have you consult with your attorneys, not answer the question at that point, and we will work on it with Mr.

6

~~Hershman and Mr. Kim.  Do you understand that?~~

~~A     I do.~~

~~MR. HERSHMAN:   And if you have any question about whether or not something might reveal a compelled statement, I'm sure they would want you to take a break and talk to us before you said anything.~~

~~MR. BACA:   Sure.~~

**START AT 2:58**

~~BY MR. FOX:~~

Formatted: Not Highlight

Q     All right.  And let me sort of explain what we have talked to Mr. Kim and Mr. Hershman about.  I'm sure that they've talked to you about it.  We know that we have a limited amount of time here today, and we appreciate you meeting with us.

The substance of what we want to talk to you about is what was happening in August and September of 2011 in terms of Anthony Brown, the LASD's response to learning about the FBI's investigation, eventually the Leah Marx encounter, and we want to limit what we are going to be talking about for the most part to those topics today.

And there may be, on a few occasions, where if we

7

start going off on a tangent I may interrupt you and
bring us back to where I want to go, because, again,
we have a limited amount of time today.  And I don't
mean that to be disrespectful to you.  In fact, I'm
trying to be the opposite.  We want to -- we value
your time, we value our time, and we want to make sure
that if we're given three hours to talk about it
today, we cover all of these issues.  And there is a
lot to discuss about that.

Any questions before going forward?

A    I don't have any questions.

Q    Okay.  The first thing that I think we were
interested in talking to you about today is the first
time that you learned that -- from Steve Martinez
about a phone that had been discovered in the jails by
LASD. Can you -- do you recall that conversation,
first of all, that you had with him?  I think -- I
believe it was a telephone conversation.

A    Yes.

Q    Okay.  Can you explain as best you can if
you remember the date of that approximately, and if
you remember whether you received the phone call or

8

whether he had -- or whether you had called him?  If you could go through that, I'd appreciate it.

A    I don't have the date, but I can get you the date if you need that.

Q    How would you find the date?

A    On my notes that I have back in the office perhaps. I don't remember the exact date, but it was in that period of August sometime shortly after the phone was discovered.

Q    You mentioned your notes back in the office. Do you have specific notes related to the subject matter that we're talking about today?

A    Only in my calendar.  You know, I'm trying to associate the events in a recollected fashion.  I didn't really take notes that on this date Mr. Martinez called me, and, therefore, I am now recording what Mr. Martinez said.  So I don't have the precise date, but it's in a week framework of activity.

Q    All right.  And --

A    It would be like a day or two after we found the phone.  So what I'll do I'll trigger the phone in terms of when that was discovered, and then work a day

9

or two beyond that time period.

**END AT 5:41**

Q    ~~It sounds like you're talking about~~
~~something that may not even be your notes but might be~~
~~a timeline of what had happened?~~

A    ~~Right.  It would be a process of elimination~~
~~in terms of time that the phone was --~~

~~Q    All right.~~

~~A        found.~~

**START AT 5:56**

Q    And we may go through some documents today that might remind you of when that time was.  But after -- well, let's talk about that phone call that you received from him.  What is it that he said to you on that phone call?

A    He called to inform me that an FBI phone had been compromised.

Q    And by "compromised," what did you understand him to mean?

A    He really didn't explain much more than that. And then I responded to him, and I think I knew then that that was the connection with the phone that

10

he wanted me to know about.

Q    At the time you received that phone call, were you aware that a phone had been found in a prison? In one of your facilities, I should say.

A    Like I mentioned, I believe that there was a phone that was discovered in the jail.  But I don't -- I'm not positive as to whether we knew whether it was an FBI phone or not.  I can't recollect that part of it.

Q    Okay.  And one thing that's important for us today is to distinguish between what you believe your - - what you believed LASD knew versus what you knew. And we are going to go over that quite a bit.  So when you say "we knew," were you yourself familiar with the fact, when you received the call from Steve Martinez, that LASD had found a phone on an inmate?

A    That I can't recall.  It was too early in the process.

Q    Okay.  So he tells you that a phone has been compromised, but at some point you had the understanding what that meant was that LASD had found a phone on an inmate during this conversation you were

11

having with Mr. Martinez.  Is that correct?

A    I would say that the notion of the phone was the subject of Mr. Martinez's call, and what I can recollect is that there was a phone that was being looked into.

Q    But in that conversation when you got off the phone with him, you were aware that the phone had something to do with LASD; correct?

A    That's correct.

Q    And you were aware, after you got off the phone with him, that there was an FBI phone that had been compromised somehow by LASD; is that correct?

A    Not at that point.  I mean, I had to inquire back as to, what do we know about this phone, and what are the things that we don't know about this phone.

Q    Okay.  Maybe I'm missing something, but if I get a phone call from somebody and they say -- Mr. Kim calls me and he said, "Mr. Fox, there is a Jones Day phone that has been compromised."  I wouldn't immediately suspect that it was in my office or in the U.S. Attorneys' Office.  So it sounds like there is some level of detail there that I'm missing.

12

As best as you can recall, what did he say to you that made you believe that that phone that he discussed being compromised was within the LASD jail system?

A    He told me it was.

Q    Okay.  So what did he say, as best as you can recall?

A    That an FBI phone had been compromised inside the county jail.

Q    Did you understand from the conversation that the FBI phone was part of an operation that the FBI had conducted or was conducting?

A    He offered no explanation, and I didn't ask him.

Q    All right.  So then you've said that you had to do some research, basically, to figure out what it was that he was talking about.  How did you conduct that research?  What did you do?

A    I asked individuals within the chain of command as to what was the knowledge that we had relative to the phone.  What information do we have? It was a very wide open type inquiry.

13

Q    All right.  And so did you tell Mr. Martinez that after you did this research you would get back to him, or how did you end that conversation with Mr. Martinez?

A    There was no request on Mr. Martinez's part, to my recollection, that I needed to get back to him. And all he indicated was that there had been a phone -- to my recollection, a phone compromised.

Q    Okay.  So who did you call to do the inquiries?

A    I can't recall whom.  But it was definitely to the executives that are running the jail.  I don't know which one at this point in time that I was asking this information of, but that I wanted a little more knowledge as to what this was about.

Q    And when you say "executives," what rank are we talking about?  Are we talking about captains?

A    Talking about the Division Chief and the people who are essentially running the jail.

Q    Would this have been Chief Yim at the time, then?

A    No.

14

Q    Who would it have been?  Which Chief?

A    I can't recall if it was Burns or if it was another person, but there was a number of people that I wanted to have some feedback from on this whole matter.

**END AT 10:52**

Q    ~~What about assistant sheriffs, did you talk to any of your assistant sheriffs about it at that time or after receiving the call from Mr. Martinez?~~

~~A    Not that I can recall, but it is likely that I would have.  You know, this is a long time ago.~~

~~Q    Sure.  I understand it's a year and a half ago, but I also understand that it was something that was -- this was an important issue to you at the time. So I understand what you're saying.~~

**START AT 11:17**

Q    The Undersheriff, was that somebody that you talked to about this?

A    Yes.

Q    After the phone call from Mr. Martinez. What is it that you said to Mr. Tanaka about the phone call you received from Mr. Martinez?

15

A    Well, that there was a phone that was compromised in the jail and that we needed to know a little more information about it, what we know.

Q    All right.  And in August and September when you get this phone call from Mr. Martinez, you obviously, as a very high-ranking person, law enforcement officer, you're aware of what the FBI does in the crimes it investigates; is that correct?

A    Am I aware of what the FBI does?

Q    Well, generally, you're aware that the FBI investigates federal crimes; correct?

A    Yes. [END AT 12:01]

Q    And you're aware that some of the federal crimes include public corruption offenses, is that correct?

A    I don't have an intimate knowledge as to all of the things the FBI is charged with doing.  But I do have a lot of experience with all of the directors, and I have worked with six in my term of office.  And I have over 20 deputies fused into the FBI's operations, but I couldn't tell you, as we stand right here — or sit here — that I know exactly what you

16

are doing.

Q    And I'm not asking you about that level of detail.  I'm just talking about generally.  Are you aware that the FBI does investigate public corruption offenses as one of its mandates by Congress?

A    I'm not aware of that, but I assume that just by this conversation.

Q    Okay.  But, you know, August and September, you were not aware that the FBI investigates public corruption offenses?

A    No.  I know the District Attorney's Office does, but I am not sure of whether or not the FBI does that. But if you assert that it does, then now I am.

Q    Well, and I'm not trying to put any knowledge in your head at all.  I'm just trying to figure out what you do have as a recollection in your head, and knowledge you do have in your head.  Were you aware at the time that the FBI investigates civil rights offenses?

A    I have never met anyone from the Civil Rights Unit that I can ever recall.  If they are doing that, then that's appropriate.

17

**START AT 13:30**

Q   Okay.  Are you aware that there are federal statutes dealing with civil rights offenses?

A   Yes.  Yes.

Q   All right.  And so --

A   And I'm generally aware that that has happened in headquarters U.S. Attorneys' Office with Mr. Tom Perez, who I'm very familiar with and have worked with. But I wasn't aware as much as what had gone on locally.

Q   Well, you were around certainly during the Rodney King investigation and trial regarding the LAPD officers that had beaten Rodney King; is that correct?

A   Yes.  Yes.

Q   And you were aware that at some point some LAPD officers were charged with beating Rodney King on the federal level, correct?

A   Somewhat, yes.

Q   Okay.  I mean, if --

A   It has been a long time for that.

Q   Highly publicized, though, and --

18

A    Yes.

Q    -- so you were aware of that.  So, and as part of LASD's training, do you know if people informed deputies about the fact that what -- if they were to commit excessive force on people on the streets, or within the jails, that they could be committing a federal offense?

A    I believe that's correct, that the idea that brutality coming from police will be scrutinized by the Federal Government is appropriate.  But I didn't have any awareness of the local office until this happened.

Q    Oh.  In terms of what the U.S. Attorneys' Office and the local FBI did, you did not have --

A    Right.

Q    -- an awareness of.  But you knew that generally the Federal Government investigated civil rights offenses.

A    That's correct.

**END AT 15:01**

BY MS. CARTER:

Q    Aren't there task force officers who work

19

~~with the local FBI office on civil rights violations?~~

~~A    Within the Sheriff's Department, with the FBI, combined?  We worked together on an investigation regarding smuggling of drugs into the jail about five or so years ago, maybe it's six or seven years ago. But I have never asked, "Well, is this the Civil Rights Unit, or is this some kind of a -- other named unit?" I just dealt directly with the people who were doing the work in the meetings we had, but I never queried them as to the organizational assignments.~~

**START AT 15:41**

BY MR. FOX:

Q    It sounds to me like you are -- it's just a question of degree.  You may not know what the local office does, but you generally are aware of federal statutes and federal enforcement of civil rights laws.

A    Yes.

Q    And are you -- is that the same with public corruption, you are generally aware of federal enforcement of public corruption laws?

A    Yes.

Q    And you are aware that sometimes the

20

enforcement of public corruption laws causes the Federal Government to look at law enforcement's agency employees as well, is that correct?

A    Yes.

**END AT 16:14**

~~Q    Okay.   And are you familiar with    not, again, in incredible detail, but the concept of a Federal Grand Jury and that a Federal Grand Jury also investigates public corruption and civil rights offenses?~~

~~A    Yes.~~

~~Q    And you were aware of that back in August and September of 2011?~~

~~A    It was in my mind.  But unless    if it exists, it exists.~~

~~Q    Okay.  But were you    whether it was in your mind at the time that you were doing these activities, were you generally aware of it?  It would have come as no surprise to you that a Federal Grand Jury could investigate public corruption or its offenses.~~

~~A    I have no    as I indicate, I don't have a~~

21

finite form of training when it comes to the organizational responsibilities of the FBI, when it comes to anything other than traditional crime. My focus has always been on the crime level and the counterterrorism level.

Q   Okay.

A   You know, the things that we do together.

Q   Okay.  Are you aware in -- you know, in those investigations that there are Federal Grand Juries that can investigate those federal crimes?

A   However the Grand Jury factors in will factor in.  I'm just learning the process as we talk.

Q   Okay.  So you did not know in August and September of 2011 about the fact that the Federal Grand Juries could investigate federal crimes.

A   I have never seen the action of -- up front and directly until now.  So the learning process for me was, one, Mr. Martinez called me.  He did not describe a Federal Grand Jury.  He did not describe anything regarding the telephone as a part of an investigative authorization.  He didn't tell me anything specifically at all.

22

~~My career has not been substantially involved with Federal Grand Jury thought processes.  It has been on the other end of the scale, just dealing with the local mandates from our constitution our bill of rights, you know, civil rights and responding directly to the constitutional mandates and not seeing the Sheriff's Department as some potential violator of these things, but recognizing that civil rights has to be first and foremost in our practices.~~

**START AT 18:32**

Q   All right.  So you start doing this research and start calling around, and how do you find out that a phone had been recovered in MCJ?

A   Well, let me modify your question.  I didn't call around.  I just talked to one person.  I said I needed to know something.

Q   And that one person was -- was that --

A   That could have been my aide, it could have been Mr. Tanaka, but I didn't -- I don't just call around.  I need to know information, and then they do the calling around.

Q   Got it.  And who would your aide have been

23

at the time?

A    I've had several since then.  I'll have to go back and look in that -- give you that person's name.

Q    Okay.  Was it soon after you placed the call either to your aide or to Mr. Tanaka that you learned that a phone had been recovered in MCJ?

A    As I mentioned before, there was information provided that a phone was found on an inmate maybe a day or two before I received the call from Mr. Martinez.

Q    Okay.

A    Mr. Martinez confirmed that the phone was an FBI phone.

Q    And that is when you made the connection?  I thought you just said that you had to do an inquiry of your aide or Mr. Tanaka about to find out?

A    Well, that was after Mr. Martinez's phone call. When he confirmed that it was an FBI phone, that's when I made stronger inquiry into, what are the circumstances?

Q    And at some point you made the connection

24

that that phone was the FBI phone, and I guess I'm asking you, how did you make that connection?

A   Mr. Martinez told me that a phone was compromised that the FBI had owned.

Q   Maybe I'm missing you, because I think you told us just a little bit ago that you didn't know which phone he was talking about when you had the conversation with him and that you had to call to find out.

A   Well, I testified right now --

Q   And, well, it's obviously on the recording, so I'm not trying to say --

A   It's all right.  That there was information a few days before Mr. Martinez's call that there was a phone discovered in the jail.  And in the process of finding out the status of this phone, it wasn't clear to me whose phone it was.

Then, when Mr. Martinez made his call, then it gave me a stronger belief that it might be one and the same phone.

Q   Okay.  And so you placed a call in order to find out what?

25

A    I wanted to know what was going on with this phone.

Q    Okay.  So you wanted to know the details of that phone at that point.

A    Yes.

Q    And you called either your aide or Mr. Tanaka to find out the details of that phone.

A    Yes.  Uh-huh.

Q    And then, how did you find out the details of the phone?  Was it that day that you were placing the call, or was it in the coming days that you found out the level of detail you needed?

A    It was in the following days.

Q    How did you come to learn more about it?  Were there additional phone calls or a meeting set up?

A    What happened is our Internal Criminals Bureau was brought into the case, and Captain Tom Carey and Lieutenant Jim Leavins were the two individuals that were tasked with reporting to me as to what the phone situation was.

Q    And was it Steve Leavins, rather than Jim Leavins?

26

A    Could be Jim Leavins.  I only --

Q    But it wasn't Steve Leavins?

A    -- know them by their last names, but --

Q    Okay.

A    -- give me -- that's what I remember.

**END AT 22:04**

Q    That's fine.  I'm going to ask you a little bit more about sort of your knowledge of -- at that time of what -- of the law.  Were you aware in August of 2011 that a local law enforcement agency can't arrest an FBI agent for engaging in conduct that might violate a local law while that agent is engaged in the course of their duties?

A    Well, I'm not familiar with that law at all, but the concern for what you could describe as an arrest was never a part of my idea.

Q    Okay.  Well, we'll get into that.  I'm just trying to get your knowledge.  So in August of 2011, you were not aware that an FBI agent couldn't be arrested for performing their duty?

A    No, I wasn't aware of that at all.

Q    Did you subsequently become aware of that?

27

~~MR. HERSHMAN:  Well, I don't want you to discuss any communications you might have had with counsel. So if you want to exclude any communications with counsel, then you can~~

~~BY MR. FOX:~~

~~Q   Well, and I guess we should talk about the timing of the    let's talk about some certain timing, then.~~

~~A    Uh huh.~~

**START AT 23:17**

Q    Other than the last week or so that maybe you were aware that we wanted to talk to you and may have been talking to attorneys about this interview, did you become aware of the fact that an FBI agent couldn't be arrested for performing their job?

A    I have never asked that an FBI agent be arrested. I don't know what circumstances even that comes into play in this interview.  I assume you are aware that one of my deputies may have made the comment to an FBI agent about being arrested?

Q    And I want to get into that at some point, but I'm trying to focus on your knowledge of the fact

28

that an FBI agent couldn't be arrested by a local law enforcement agency until --

A    I --

Q    I'm understanding you to say --

A    I mean, it's a non sequitur.  I don't have a knowledge that we have an interest in arresting an FBI agent.  That to me strikes me as extreme.  What I believe is important is if we were to decide to make that type of a decision, we ought to know whether or not it can be done.  But if we are not intending to do such a thing, we don't really have an interest to decide whether or not it's proper or improper, legal or illegal.

Q    When did you first hear that somebody within your department had threatened to arrest an FBI agent?

A    When I got the second call from Mr. Martinez.

Q    Okay.  And was this -- I assume it was soon after that agent was approached by someone within your department; is that correct?

A    Yes.

Q    We'll get into the substance of the call.

29

So if I'm understanding you correctly, you did not -- you were not aware that anybody had gone out to Leah Marx's house to threaten to charge her and arrest her, is that correct?

A    When I received that call, that's correct. I was -- I received that call within perhaps an hour or so after that alleged act occurred.

Q    So the call from Mr. Martinez was the first time that you were aware that somebody was going out to Leah Marx's house to threaten to charge and arrest her; is that correct?

A    Yes.

Q    Were you aware when you received that call from Mr. Martinez, even more generally than that, that someone within LASD was going to approach Leah Marx to try to talk to her?

A    I wasn't aware of any of the investigative particulars.  But once Mr. Martinez made the call to me, I was aware something occurred.

Q    Were you aware that anybody within LASD was conducting surveillance of Leah Marx at night outside of her home?

30

A    No.

Q    Did Mr. -- well, I guess Mr. Martinez would not have known that.  Did somebody within LASD subsequently tell you that?

A    I had asked internally, "Well, what's going on with this process with a threat or even Leah Marx as an individual?"  And then I was given information that the deputies were seeking to question her about the phone.

Q    Who provided you with that information?

A    It had to be either Captain Carey or Jim Leavins, one of the two.

**END AT 26:50**

Q    All right.  We talked a little bit about whether, based on the supremacy clause, an FBI agent could be arrested by local law enforcement.

A    Uh-huh.

Q    I also want to talk to you about something called a public authority defense.  And you probably don't -- I'm not sure if you know that title, but I'm going to describe it --

A    I'm learning a lot in the interview.

31

Q    Okay.  I'm not trying to, again, teach you anything.  I'm just trying to get out what you knew. So I assume that you know, based on your experience, that if a local law enforcement officer, let's say one of your deputies, was going to be doing an undercover drug deal, that the deputy that you sent out to go do the drug deal could not be arrested for committing a crime by drug dealing.  Do you agree with that?

A    To a certain degree.  I have my own belief about that practice.  And, obviously, if I think a practice is too risky, I will prohibit it whether it's legal or not.

Q    But you know that, taking aside risk, that there are undercover operations and the undercover officer engaging in the course of his duties or her duties could not be arrested for doing what he or she was asked to do by a law enforcement agency.

A    It depends on what it is.  I think that playing on the edge is always going to be problematic, and I've had enough experience with that where deputies actually do more than what is an approved strategy.

32

Q    What I'm asking is, what    within the scope of their duties.  So if you're going outside and    outside of what their duties are, or outside of policy, that's a separate deal.  I'm asking you about    and I'll give you, again, the example of a drug deal.  If one of your duties goes on the street in an undercover capacity, records a conversation with somebody, and buys drugs off of them, you are aware that that deputy himself, who then logs in the evidence and provides the recording to LASD, that deputy himself has not committed any crime.  Is that    would you agree with me on that?

A    It depends if they lose the drugs.  It also can be applied to weapons as well.

Q    Yeah.  And I

A    If you lose something in the process, and someone else picks it up that's a criminal and causes them harm, I don't think you can fully testify what you did if you didn't do it the right way.

Q    I guess just please follow my factual scenario here.

A    I understand.  I'm just trying to say that

33

~~in the training that I received in the local law~~

~~enforcement context, you always have to work within~~

~~the framework of making sure that nothing unintended~~

~~occurs.~~

~~Q    I understand what you're saying.  Follow my~~

~~hypothetical once more, and limit it to the facts that~~

~~I'm asking you about, please.  If one of your deputies~~

~~is tasked with going out on the street, buying drugs~~

~~off of somebody, and coming back, logging in the~~

~~evidence, bringing the drugs back, reporting on the~~

~~incidents, and the deputy does that exactly as told,~~

~~does not let a gun or drugs walk on the streets --~~

~~A    Uh-huh.~~

~~Q    -- that that deputy cannot be charged with~~

~~purchasing drugs as a crime.  Do you agree with that?~~

~~A    Yes.~~

Q    **[START AT 30:22]** ~~Ok.~~ When you began getting
engaged in finding out about this phone and did -- do
you recall having a meeting?  You mentioned ICIB.  Did
you meet with ICIB to discuss --

A    I only met with two people principally
during this whole process, some intervening people

34

occasionally, but it was Captain Carey and Jim Leavins. We didn't want this to be scattered around the organization.

Q   Do you recall a meeting in which you met with ICIB, IAB, and OSJ to discuss what the plan would be once you learned that an FBI phone was found in MCJ?

A   Are you talking about the Saturday meeting?

Q   The famous Saturday meeting.

A   Uh-huh.  Yeah, I remember that meeting in the general sense.

Q   Okay.  And can you generally describe approximately when that meeting was?

A   Well, it was a Saturday.  I'd have to check the calendar or, if it's not on my calendar, it was just rather impromptu.  It was -- it could have been even in that same sequence of time that Mr. Martinez had called me about the phone.

[END AT 31:50]

Q   Okay.  So sometime around the time that Mr. Martinez called you about the phone.

A   Yeah.

35

Q   You generally are aware of a meeting that you had   that you just referred to as a Saturday meeting. Is that correct?

A   Yes.   And I think you confirmed that that's the meeting you were referring to.

Q   I just want to always be careful.   I'm not the one   I'm not testifying, so I'm not trying to give you any facts.   I'm just trying to have   and so I'm going to be asking questions that you may think are stupid questions, because obviously everybody knows this.

A   They're all important questions.

Q   Okay.

A   Right.

[START AT 32:20]

Q   And You had this meeting with IAB, ICIB, and the Undersheriff, and OSJ.  What is it that you discussed at this meeting, at the Saturday meeting?

A   Well, I think the question is, how do we handle all of this?  You know, what is the -- what do you know, and what do you not know?  And what are we going to do here?  I just wanted to hear from the

36

people that were involved in this to find out a little more as to, how do you handle this unprecedented situation?

[END AT 32:53]

~~Q    Are you somebody who    well, obviously, you've got a lot of cases within LASD, a lot of investigations, and there are some investigations that have your attention more than others, I'm sure, as a leader of the Department.  Is this one that had your attention during the times August and September of 2011, where you were monitoring it and you were getting briefed on it frequently?~~

~~A    Well, I was wanting to know that, one    and this is    in the meeting it was important in the one area, as to the safety of this particular inmate has got to be our highest priority here.  If anything happens to this man, if you think we have some questions that we don't have answers to, we're going to have more questions as to what happened and why did this person who is a high profile inmate    why was he hurt?  Why was he not properly cared for?  And on and on and on.~~

37

So the methods under which this person's safety was going to be cared for is not something I said, "I want you to do this.  I want you to do that. I want you to do this.  I want you to"    I mean, I believe that the people that are closer to the investigative process, in the leading investigative process, should handle those decisions.

Q    So you were operating at a macro level, is that right?

A    That's correct.

Q    Okay.  And you generally told people to do what, though, other than to keep him safe?  Did you tell    for example, did you tell people to interview this inmate?

A    Well, I think    I assumed that, because, you know, that's what our Internal Criminals Bureau does.  I mean, you know, I didn't have to tell them. They pretty well knew that we wanted an investigation, we wanted to know the various pieces of it, as you must be aware, that it did involve a deputy as part of the entry team in terms of the phone.  And that posed another part of the investigative strategy that I left

38

it up to them to decide.

Q    In terms of the safety of this inmate, at that Saturday meeting, did you discuss how Mr. Brown would be kept safe?

A    No.

Q    You didn't discuss the specifics of, "We need to get him out of MCJ, or we need to change his name," at that time; is that correct?

A    No, I didn't discuss any of that with them.

Q    You have said, maybe it was on Good Day LA or something else — said that you were aware that Anthony Brown had been sentenced to some 400 plus years in prison. Did you know that, if you recall, as of the Saturday meeting, that he had been sentenced to a long period of time in prison?

A    I don't recall that part.

Q    Do you recall that he had been sentenced to prison at all at that point?

A    Like I said, I don't recall at that time.

Q    I'm not talking about the number of years. I'm just saying, just generally, that he had been sentenced to the state prison?

39

A    I found out that number much later, but that was evidently one of the issues that came up as far as his long term sentence.

Q    Were you aware, though, that he had actually been sentenced -- that he was post sentence at that point. Regardless of the number of years, that he had already been convicted and had already been sentenced to state prison.

A    That could be true. I mean, I don't recall independently at the moment. But I do know later on that became a point of information.

Q    When did that become a point of information?

A    Later on. I don't remember exactly.

Q    Was it internally a point of information, meaning your discussions with Mr. Carey and Mr. Leavins, you discussed the fact that he had been sentenced to a long period of time in state prison?

A    I can't recall, but it's likely.

Q    Okay. So you did not know that -- well, did you know around the time that you had received the call from Mr. Martinez that deputies had arranged for his -- for Mr. Brown's transport to state prison?

40

A    I don't know all of those details.  It wasn't brought to my attention.

Q    Or that deputies had believed that they had discovered that there was an FBI hold on the prisoner that was preventing him from going to state prison?  Do you remember hearing anything about that?

A    No.

Q    Did you hear at that Saturday meeting anything about any phone calls that had occurred between Mr. Brown and the FBI Civil Rights Unit?

A    No.

Q    You had mentioned earlier a timeline that you had seen at some point.  I'm showing you what appears to be a timeline.  For the recording, it's LASD 080359.52.

Mr. Baca, I'm going to give you a copy of that, and also give Mr. Dalton a copy of it as well. Take your time and look through this document.

MR. HERSHMAN:  Yeah.  I mean, are you going to ask him questions about the document, or just if he has seen the document before?  Because that may depend how much level of detail he is going to need to look

41

at.

MR. FOX:  I want him to review it first, and then I'll ask him if he is    if he has seen it before.

MR. BACA:  I have never seen this document before.

BY MR. FOX:

Q    Okay.  So this is not the timeline you were referring to?

A    No.

Q    This document, then, was not presented to you at that Saturday meeting?

A    No.

Q    How do you know that?  What makes you look at it and say, "I have never seen this, and this was not presented to me at the Saturday meeting"?

A    Because I would have remembered this format. I would have remembered even its title, in the sense of who the author is.

Q    All right.  And the substance of what is in here, looking at it, was the substance of what was in the timeline presented to you at the Saturday meeting?

A    No.

42

Q    What about this document makes you believe that the substance was not presented to you at the Saturday meeting?

A    Well, it's very comprehensive.  It has a lot of times when calls were made.  But for anyone to remember all of these calls in an oral presentation would be very difficult.  Generally, this kind of information is best shared in the format that you have just given it to me, because then, you know, whether you remember any one of these calls, you can remember that there were a lot of calls made.

Now, I was told that there was a lot of calls made, but --

Q    There's a level of detail that's new to you, is that what I'm understanding?

A    Yeah.  There was no -- there was no content of calls remunerated.

Q    Okay.  So if you look at this timeline, it begins August 5th of 2009 and ends, if you look at the last -- the second to the last page, the last date on there, it ends August 19th of 2011.  And there is nothing written in there after August 19th of 2011.

43

Q    From talking to Mr. Hershman and Mr. Kim — actually, I think it was in a phone call with Mr. Kim — I believe that he related to us that the best — I don't know if it was he could figure it out or you could figure it out, was that August 20th was the date of the Saturday meeting.

Mr. Kim, am I misrepresenting anything or is that your — I'm not sure if it's in this witness' mind or if it's in yours.

MR. KIM:   Yeah.   That's our best understanding circumstantially, because of an entry in Sheriff Baca's calendar relating to a 5K race.

MR. BACA:   Right.   That was the Saturday that I was supposed to run the 5K race and didn't do it because of this meeting.   It was going to be a briefing, and I thought I should go to it.

BY MR. FOX:

Q    Okay.   So I want to ask you about some high level things that are in here.   So we're not going to get into the specificity.   I just want to know if this was presented to you at the Saturday meeting.

A    No.

44

~~Q    Well, again, not getting into specificity,
I'm going to ask you a few questions.~~

[BEGIN 41:30]

At the Saturday meeting, was it presented to you that there were calls between Anthony Brown and the Civil Rights Unit of the FBI?

A    No.

Q    Would that have been important for you to know?

A    Yeah.  It's part of the whole package.  You know, there is no question that I consider all information regarding any incident of this type -- and this is the only one we've ever had -- that everything should be on the table.

Q    Okay.  But why would it have been important for you to know that Mr. Brown was in contact with the Civil Rights Unit of the FBI?  What about that fact makes it important to you?

A    A lot of things, but I don't know exactly what the whole process was at this time in terms of this phone.  You know, it -- I had no clue that this is a civil rights investigation.  And, therefore, I

**Formatted:** Indent: First line:  0.5"

45

don't have any predetermined perspective on pieces of information. [END 42:36]

Q    To jump around just a little bit for a second, when you had the first meeting at the U.S. Attorneys' Office with Mr. Birotte, at that point in time you were aware that it was an excessive force investigation, I believe, is that correct?  That's what you discussed, the fact that the FBI was investigating excessive force within the jails?

A    I think our first meeting with Mr. Birotte was in regards to my concern about this phone being introduced in the jail.  And, if I may, here is one of the things that prompts me deeply on the issue, which is an FBI Bulletin about how perilous phones are in jail.  So I am kind of operating on a premise that phones are dangerous, no matter who has them in the jail.

Q    And have you also seen studies or research that has shown that phones are prevalent in the jail system?

A    In the sense of being monitored they are.  I have a lot of phones that are in the jail, and they

Formatted: Highlight

46

are constantly being monitored.

Q    I'm talking about cell phones, that cell phones are prevalent in    as contraband are prevalent in the jail system.

A    I would say that phones get taken into the jail on occasion by rogue type efforts by employees. And that's a    when we discover through information sources that this is happening, then we go straight towards the persons that are doing this or person and do an investigation and try and catch them.

Q    Okay.

BY MS. RHODES:

Q    How about in the prison system, as opposed to the jail?  You are aware that cell phones are prevalent in prisons.

A    I think the word "prevalent" is where we're having some need for more communication, clarity, or    what does "prevalent" mean to you?  It may not mean the same to me.

BY MR. FOX:

Q    It is not unique or rare.

A    I would say that it is not unique.

47

~~Q    Here's —~~

~~A    And I would also —~~

~~Q    This is a good example.  Mr. Baca, let me just — you gave me this article, and this for the record is an article that was printed off from the FBI, Bureau of Investigation — the Federal Bureau of Investigation, FBI Law Enforcement Bulletin.  The printout states that it was printed on September 28th of 2011, and it is an eight page document.  And in this I'm going to quote one part of it, "Seriousness of the problem.  For example, in 2008, approximately 2,800 devices were confiscated by California officials alone."  I'll call that what —~~

~~A    That could be.  You know, I say that the context of what I experience in the L.A. County Jail, and what the prison system may experience, and then what the other 57 counties may experience, would be variable depending on what institutions we're talking about.  That's all.~~

BY MS. CARTER:

Q    [START AT 46:06] Now, you mentioned that this was unprecedented. What was unprecedented?

48

A    What was unprecedented, in my experience, was that we had a phone in the jail that belonged to the FBI. That's all.

Q    So it wasn't that there was a contraband cell phone in the jail.  What was unprecedented was that it was an FBI cell phone that was found in the jail.  Is that correct?

A    Yes. [END AT 46:35]

Q    You also mentioned that safety was a concern at the Saturday meeting.  Why was Anthony Brown's safety a concern at the Saturday meeting?

A    Well, he was basically pointing out deputies that he was tasked, I assume -- I don't know what his instructions were in terms of the phone itself.  But he was tasked to provide names of deputies who were engaged in excessive force.

Q    So at that Saturday meeting, you knew that Anthony Brown was providing information about civil rights violations in the jails to the FBI --

A    No, I didn't say that.  I didn't make a connection to the Saturday meeting.  I'm saying that, as this investigation -- you know, in answer to your

Formatted: Highlight



49

point, as this investigation proceeded we were able to get more information from Mr. Brown, and then that information alluded to what his purpose was.

Q    But at the Saturday meeting, you were concerned about his safety.  You stated that; correct?

A    That's correct.

Q    And the reason you were concerned about his safety was because he -- you knew he was providing information to the FBI about deputies who may have engaged in excessive force; correct?

A    The nature of my concern was that no one harm him, and I don't care who.  It could be a deputy; it could be another inmate.  The nature of what his engagement was with the FBI was not known entirely as it was in the ensuing following weeks.

Q    But it was known at that time that there was a potential safety issue for Brown because --

A    From my perspective, I believed there was.

Q    And that's because he was providing information to the FBI about deputies who were engaged in excessive force; correct?

A    That he was the subject, as an informant,

**Formatted:** Highlight

**Formatted:** Highlight

50

about deputies, and that I didn't want him to be in a general population setting. He can't be compromised by other inmates or deputies or anybody else. That no one should be going around him and intervening with whatever his particular security rights are.

BY MR. FOX:

Q   Now, You've had a lot of inmates that either have claimed they have been retaliated against or an outsider could say this is a guy that we are concerned could be retaliated against. Let me give you an example. The ACLU provided you over time with dozens of declarations of inmates who have stated that they were either abused or retaliated against. And at that time, in 2009 when they provided you with a couple dozen of these names, you didn't order them to be protected or moved. Is that correct?

A   The ACLU cases are important cases, and the ACLU themselves are a long-term partner with the Sheriff's Department in spite of the points that they make publicly and privately. They have been a court appoin8ted monitor for well over 30 years. So --

Q   Yeah. I guess I'm focusing, though, on

51

September of — I think it was September of 2009.

A    So whatever their allegations are, they are not looking for a particular monetary settlement themselves. I know that lawyers that see the cases in the newspapers will jump into an inmates' world and represent them.  But the ACLU is prohibited from engaging in lawsuits themselves that are predicated on damages, and the like.

Q    What I'm trying to focus you on, what LASD did in response to Anthony Brown versus what LASD did in response to people who previously had alleged that deputies had abused them or had committed misconduct, this is the first time — and talking about unprecedented, this was unprecedented levels of security that were taken with Anthony Brown.  Would you agree with that?

A    Well, there are other inmates that we classified at the same level that Mr. Brown is.  He is not the only person that has the highest of security.

Q    That's not what I'm referring to.  I'm not talking about K-10 status or anything like that.  I'm talking about having two OSJ deputies taking him out

52

to a station facility and keep watching him 24 hours a day, not letting him have any encounters with any other LASD employees, not letting him have any encounters with the FBI, not letting him have any encounters with station personnel or other defendants.

A   Uh huh.

Q   So that's not something that ordinarily occurs with the highest level classification inmates, correct?

A   Well, let me say this on your point, because I think what you indicated about everything, but then you put the FBI in the group of everything, anything that the FBI would have asked me to do concerning Mr. Brown.  If they would have asked me directly, they would have gotten what they wanted.

Q   So if they had asked you for his body, "We want Anthony Brown brought to our control," you would have done that?

A   Yes.

Q   If they had asked you to allow them to interview deputies at the time, would you have allowed them to do that?

53

A    Yes.

Q    And if a deputy had said, "I want to talk to the FBI about certain issues," would you have let that deputy do that?

A    Yes.

Q    Okay.  But I want to focus, just to close out this line of questioning, will you agree that that same level of security with respect to Anthony Brown was not used with any other inmate that you encountered?

A    Well, first of all, Mr. Brown's security, described as you have in that question, it doesn't surprise me.  But at the same time, the decisions to do these things were things that those that were responsible for his safety decided, and I have to accept that they used their best judgment at the time.

This is an unprecedented issue here, and I believe that the FBI has plenty of justification for what it needs.  But the easier part of all of this is that if we had better communication we would have had a different outcome.

Q    Can you -- I guess I still didn't get an

54

answer to that question. So —

A    Well, this is the answer.

Q    Well, if I'm understanding you correctly, and I just want to summarize —

A    Yes.

Q    — it, and tell me if this —

A    Right.

Q    — is correct, is that — so we can move on, what you're saying is that you didn't know the level of detail. Again, you were micromanaging — macro managing this instead of micromanaging this.

A    Uh huh.

Q    So you were not aware that OSJ deputies had taken Anthony Brown to a station to watch over him, is that correct?

A    Right. The only place of discussion in my presence was the hospital that was at the USC Medical Center, which would be a more appropriate place, because Mr. Brown, as it was reported to me, was very stressed about everything.

Q    Were you aware that he had heart issues and —

55

A    Things of that nature.

Q    diabetic issues?

A    Yeah.  Things of that nature.  I don't know if I am that specific, but

Q    Right.

A    But I said, you know, this man cannot be a victim in any of this.

Q    Are you aware that MCJ and Twin Towers are especially run in order to make sure that inmates get their Title 15 rights?

A    Pardon me with that?

Q    You're aware of Title 15 rights

A    Of course.

Q    that inmates have, especially post-sentenced inmates have.  And you're aware that MCJ and Twin Towers are run in order to ensure that those prisoners get their Title 15 rights; is that correct?

A    Yes.  Including the hospital.

Q    And are you aware that the station jails are not run in that fashion, they don't necessarily have the capability of providing prisoners with their Title 15 rights?

56

A    Most of the Title 15 rules in county jails don't cover the medical side of this.  But I can assure you if something were to occur in a local jail we would take them to the local hospital or whatever the need would be. So it's true, it's not a hospital setting, but our policies have always been with the Title 15 restrictions and guidelines, that we have to do something and not just let them die or let them stay —

Q    Right.  But you are also aware of the distinction between the Twin Towers facility and MCJ versus the station jails.  It is certainly —

A    Let me answer you this way.  The last point of my knowledge of where he was, I was lead to believe that the intent was to put him at the main county hospital's jail ward.

Q    Right.  At that meeting, that Saturday meeting, did — were there discussions about whether the FBI or any federal law enforcement agency should have access to Anthony Brown?

A    I don't recall that.

Q    Do you recall anyone instructing Lieutenant

Formatted: Highlight



57

Thompson to ensure that no federal law enforcement or outside law enforcement speaks to Anthony Brown?

A    Well, like I mentioned, I didn't get into operational talk.  If that kind of talk were to occur, I would hope, as Mr. Martinez did, that he would call me and that he would say, you know, "We need to communicate about the process that we should agree to to facilitate our investigation."  You know --

Q    Let me bring it back here, because this is what -- let me interrupt you.

A    Let me --

Q    No, I need to, because you're going on what dialogue should have occurred and --

A    Well --

Q    I want to focus on what dialogue did occur. And so I'm talking about --

A    I understand --

Q    the dialogue --

A    -- that.

Q    between you and anybody else at that Saturday meeting with Mr. Thompson.

A    I don't disagree with your approach here.

58

What I'm trying to say to you is is that my job is to work closely with the FBI.  And the nature of your questions are dealing at your level and not mine.  And mine is with Mr. Martinez, and any issue -- obviously, two times Mr. Martinez called on concerns of his.  One was the aspect of the phone being introduced and compromised.  The other one was the alleged threat to Leah Marx.  I fixed both of those.

Q    All right.

A    And so the points that you are making to me is, did I know if someone knew that the FBI wanted to interview Mr. Brown?  Did I know that the FBI had rights to do certain things, and so forth?  All Mr. Martinez had to do is call me and say, "We need to reconcile our communication gaps."

Q    All right.  So you have talked about two phone calls with Mr. Martinez, one is September 27th -- 26th/27th, one is August -- let's say mid August.  So there is a big gap in there, and I understand that that's one of your points of contention, that there should not have been a big gap in there.  But what we need to do today is focus --

59

A    Yes.

Q    what was occurring during those gaps.

A    How would I know?

Q    So, well, that's    if you don't know, then that's important to

A    On your side, how would I know if I'm not being told by someone from the FBI?

Q    [START AT 59:06] What I want to focus on is many internal discussions that you had, and that is what our focus is today.  So the internal discussions you were having, and if you don't know -- if you weren't involved in those discussions, we need to know that.  If you were involved in those discussions, we need to know that.

So I'm asking, what was in your head, your awareness?  Were you aware that Mr. Thompson was tasked with making sure that no FBI agent or outside law enforcement should have contacted --

A    I'm not aware, nor would I instruct a lieutenant to take that position. [END AT 59:37]

Q    All right.

BY MS. CARTER:



60

**Formatted:** Highlight

Q    Was there any conversation about preventing Anthony Brown from speaking to outside law enforcement at the Saturday meeting?

A    I don't know.  If there was, you know, I came in at a point when it was going on, and I left at a point when it continued.

Q    Who called the meeting?

A    I don't know.  Either it could have been me, it could have been someone else, but I thought it was important to    if there is a meeting, which is good, I think there should be a meeting.  I think that people should coordinate.  I think that people should understand their roles.

So the point is is whoever called the meeting, it was the right thing to do.

BY MR. FOX:

Q    All right.  So at the Saturday meeting, if you can turn to    again, I'm going to strike the Saturday meeting comment.  Could you turn two pages into this, so it should have 5 4 at the very end.  Do you see 5.4?

A    5 4.

61

Q   Yep.  You're on it.  No, you did it right.

A   Oh, I'm sorry.  Yes.

Q   Do you see at 8/18 at 8:45 hours it says, "State line recontacted and request to remove the FBI hold was submitted and honored.  Inmate Brown will be transported to state prison on 8/20 of 2011."

A   Where is that?

MR. HERSHMAN:  Right here.

MR. BACA:  Okay.  I read that.

BY MR. FOX:

Q   Okay.  Do you remember if that information was presented to you either at the Saturday meeting or at any other time during this time period?

A   It was not.

Q   Two items down from there, it says 8/18/11 at 1130 hours, discusses that a phone number that Inmate Brown was in contact with was connected to the Civil Rights Unit of the FBI in Los Angeles.  Do you see that?

A   Yes.

Q   Do you recall if that information was presented to you at either the Saturday meeting or any

62

other meeting at the time?

A    No, I don't.

Q    Okay.   Look a few entries down from there, 8/19/11, 8:30 hours, this is discussing an interview conducted by LASD of Inmate Brown.   Do you see that? And it says he vaguely explains how the process works, and also insinuates that he is working with the FBI to "clean up our backyard."   Do you recall that information being presented to you either at the Saturday meeting or another meeting around this time?

A    It was not.   Like I mentioned earlier, if I may, this document    it's the first time I've seen it.

Q    I understand you said that, and that's why I was asking about the substance of what was in there, whether that information was presented to you, rather than whether --

A    Well, the details of the characteristics of whatever my people said and what Mr. Brown said were not in my scope of thought.   My scope of thought was on the broader do what's right, try to get facts to what you do, and not just run off and do something

63

that is not sensible or safe.

Q    May I have that document back?  That's the last question that I have for you

A    Of course.

Q    about that document. [START 1:03:05] Did you at this Saturday meeting inform people of what Mr. Martinez had said to you on the telephone?

A    Let me see, the Saturday meeting.  No, you know, Mr. Martinez was giving me a heads up relative to the phone being compromised.  By then, everyone knew, because Mr. Brown had already revealed that and we were on the trail of Deputy Michel.  We knew pieces of enough of a story that it was satisfactory to me. [END 1:03:43]

Q    What was communicated to you about Deputy Michel at that Saturday meeting?

A    Well, Mr. Brown had made some statements to the investigators that he had made a friendship with Deputy Michel, and that Deputy Michel was a friendlier type deputy, and yet at the same time there was a money transaction agreement that would occur if you brought the phone in. [END 1:04:18]

**Formatted:** Strikethrough

64

~~And so Deputy Michel was believed to have been the person that brought in the phone through Mr. Brown, and that we would go out and do the appropriate interviewing. And then, if in fact the interviews are substantiated through evidence and statements and other things, that he would be arrested.~~

~~Q    You had made the connection at that point between the phone and the FBI, as I believe you have stated, so —~~

~~MR. HERSHMAN:   Do you need more coffee or anything?~~

~~MR. BACA:   I'm not much of a coffee drinker, so this is just a way to stay pertinent to your questioning.~~

BY MR. FOX:

Q    ~~Okay.~~ [START 1:05:05] Understanding at this point in time that there was a connection between Deputy Michel, the phone, the inmate, and the FBI, you at that point in time must have been aware that the FBI had conducted an operation to see if Deputy Michel had smuggled in a phone in exchange for money.  Is that correct?

65

A    That was what Mr. Brown was stating, and then Michel himself acknowledged it when he was interviewed.

Q    And you were informed of what he said around the time that he was interviewed because this was important to you, is that correct?

A    It was after he was interviewed.  You know, this takes a while to let people do what they have to do when they're doing an investigation.  So I wasn't pressing for any timetables.  But if something significant emerges --

Q    If you had a dirty deputy, though, you didn't want him employed by LASD or working in the jails --

A    Right.

Q    -- is that correct?

A    That's correct.

Q    So you would have wanted action taken if Deputy Michel had admitted to committing bribery, correct?

A    Absolutely.

Q    So it would have been important for you to

66

know, as soon as possible, that Deputy Michel had

admitted to accepting bribes; correct?

    A    Yes.

    Q    And so do you think that they informed you

soon after Deputy Michel admitted to accepting bribes?

Do you think that they told you about that soon after

he admitted that conduct?

    A    Yes.

    Q    Okay.  Do you recall who told you that?

    A    Well, the principals that I was talking to

in the subsequent week or so was Captain Carey.

    Q    And the subsequent week or so, you mean the

subsequent week or so after the Saturday meeting, or

after --

    A    Well, as this whole thing emerged, once we

put our internal criminals investigators on this,

then, as information emerged, Captain Carey would call

me and tell me. [END 1:06:55]

    Q    Did you, at the Saturday meeting, ask Greg

Thompson, "How are we going to fix this?"

    A    I don't recall ever saying that.

    Q    Do you recall whether there was plan at the

67

Saturday meeting to keep Brown away from the FBI?

A    I don't know.  Could be.  I mean, I mentioned earlier that I came in as they were there and I left earlier.  But the key point is that I wanted Mr. Brown to be safe.

Q    Okay.  So you were not present during any point in time, you're saying, that there was this discussion about how to keep Mr. Brown away from the FBI, if there was such a discussion.

MR. HERSHMAN:  And I think that's a good point.  You've asked us to keep quiet, so I have kept quiet.  But there is a lot of I think assumptions and hypotheticals that I am not objecting to, but —

Q    It's not a court proceeding.  We are —

A    And that's why I'm keeping quiet, but I just want to put on the record that I would preserve there's a lot of assumptions and hypotheticals that I would — I would object to if it were a —

Q    It's not a deposition.  It's not a court proceeding.  This is just —

A    No, I —

Q    — an interview.

68

A    I want to help you get your answers.

Q    Okay.

A    That's why I'm here.  It's

Q    [START 1:08:10] So assuming, for the sake of this question, that there was a discussion at that Saturday meeting about how to keep Mr. Brown away from the FBI, were you present for such a discussion?

A    May I say this?  Whether Saturday or ensuing days, or however timeframe you'd want to reference, I am not aware of any direct involvement with any conversation about keeping the FBI and Mr. Brown away from one another. [END AT 1:08:37]

Q    And in your opinion, that would have been the wrong thing to do, because you believe that it's important for LASD and the FBI to be partners; is that correct?

A    Well, definitely, if it were -- see, I felt this way, that Mr. Martinez had no hesitation to tell me about the phone.  Mr. Martinez had no hesitation to tell me about the concern regarding Agent Marx.  Had Mr. Martinez called me about the issue of what you are describing now in the question, I would have had a

Formatted: Highlight

69

clear understanding of what was going on in the minds of the FBI, and I would have honored the request.

You see, and I know that we are trying to deal with things that are important to the Civil Rights Unit and the FBI. I get it. But what is important is that I needed more communication.

Now, what I haven't told you is Mr. Martinez, when I asked him in the U.S. Attorneys' Office, "Why did you do it the way you did it?" And he attributed that one of the agents inside his office alluded to a prior investigation in the jails that we have worked together on, and that the agent did not trust the L.A. County Sheriff's Department to be a partner in something as sensitive as this.

Again, they are obstructive, obstructionist, and on and on and on. Then, I understood where he was coming from, and at that point I said, "Well, that is an unfortunate reality." But I can say this, that I have deputies who often say to me that they would not want to work with the agents of the FBI.

But I don't stop with justice is in terms of my interest to partner with the FBI. And I said, "I

70

would not have done that to you, Steve."  I hear the same kind of comments occasionally on different task forces, but I do not stop my authority because of someone in the chain of command feeling a certain way.

What I try to do is bridge back and say, "Okay. What is it that you don't like about the FBI? Because I happen to like the FBI.  I happen to trust the FBI. I happen to believe in the FBI."  And people like me are not going to be led by my underlings on anything that is negative.

So this is kind of where when Steve was bold enough to tell me how this all came about in that regard. At that point, we're not after FBI agents. We're not after anything but the truth.  But we are also not out to cause problems for our partners, because the relationship means more to me than me being right all the time or me having some need for somebody to kowtow to a sheriff.  I don't put my authority on the street.

As a leader of a big organization, I believe that the FBI has done so many things.  Ron and I did things together.  Jim Desarden was the reason for our high-

71

~~tech lab.  We did things with Steve Tidwell to build~~

~~the JRIC.  We have done so many things together that~~

~~although this is a major thing in the Civil Rights~~

~~Unit, to me it doesn't distract from the whole of the~~

~~mission of the FBI.  And all I ask is for us to have~~

~~lessons learned, better communication, and it is~~

~~communication that leads to a lot of incomplete effort~~

~~on whoever's part, in this case the FBI, I assume.~~

~~Q    Okay.  Let's focus, then    I think I may~~

~~have gotten the answer to my question in my part of~~

~~that, and so I'll summarize for you what I took from~~

~~there as being what you said important to my question,~~

~~and tell me if this is correct.~~

~~A    Uh huh.~~

Q    [START 1:12:53] It would have been wrong, in your mind, for LASD to keep the FBI away from Anthony Brown --

A    Yes.

Q    -- understanding that he was an informant. Is that correct?

A    Yes. [END 1:13:07]

~~Q    All right.  And during that Saturday meeting~~

72

or a meeting around that time, do you recall whether there was a discussion about unlimited overtime approved for deputies working on the Gilbert Michel/Anthony Brown investigation?

A    No.

Q    There is a -- there was an article -- I'm not sure if you saw it today -- that was published in the paper that discussed that this investigation by LASD was called Operation Pandora's Box.  I'm not sure if you saw that today.

A    I saw that.  That's the first time I've ever heard that particular phrase, but, you know, the newspapers and even their clandestine informants from within -- and I apologize to you for the article, because it's obviously coming out of someone in my department. But as you know, or if you don't, I have people who are, you know, usurping the core values in the Department and basically have grudges that they bury into legitimacy in terms of what you and I are trying to achieve with weeding out rogue deputies in jail.

And so I look at that as just part of the freedom

73

of the press mandate that I respect.  But when the day
is done, I have a list of all of the deputies that
I've fired.  We were firing them at a rate that was
pretty interestingly important.

But since all of the ACLU stuff, I have been
going into the system and changing the culture and
create a force prevention policy, developed a force
training bureau within custody, doing education based
incarceration, changing it all to the point where
inmates are in a positive relationship with deputies,
on and on.

And so, you know, what is fascinating here is
that irrespective of the difficulties, our mission is
the same.

Q    Okay.  So let me just ask you about that
operation name.  If I understood you correctly, this
is the first time that you've heard that it was
referred to as Operation Pandora's Box?

A    Yes.  In the newspaper today.

Q    Yes.

BY MS. CARTER:

Q    [1:15:34] You had previously mentioned that

74

you worked with your Internal Criminal Unit on this matter, and that it —

A    That I what with that matter?

Q    That you worked with the Internal Criminal Unit and it was primarily Carey and Leavins who were briefing you on this; is that correct?

A    Yeah.  They were the ones who were reporting to me.

Q    Now, at the Saturday meeting, OSJ deputies were also there, correct?

A    It's possible.  I don't recall.  There was a number of people there, but more than —

Q    Was Greg Thompson there?

A    I can't remember if he was or not.  It is likely.

Q    Why is that likely?  Why was OSJ there?

A    I don't know.  You know, the meeting was designed to put the personnel in place that would do the investigation, keep Mr. Thompson safe, and I guess they wanted to collaborate on what each other was up to.  But, you know, as you probably are aware, Mr. Thompson is in my radar as far as one of the issues

75

that I have to deal with here.

BY MR. FOX:

Q    Let's    and I just want to make sure if there is any

MR. HERSHMAN: Oh, yeah, yeah, yeah.  That's right.  That's part an investigation you can't discuss.

BY MR. FOX:

Q    Okay.  So we don't want to know anything about that investigation, because I'm assuming that's an Internal Affairs Division

A    Right.  And I

MR. HERSHMAN:  Yeah.  So, yeah, you can't

BY MR. FOX:

Q    So we want to cut you off there. [START 1:16:57] So I think you said a while ago that after you met and discussed this investigation, whether it was at the Saturday meeting or sometime around then, that you just assumed that Anthony Brown would be interviewed.  Were you briefed on what he was telling the people who were interviewing him?

A    In pieces, yes.

76

Q    And what did -- do you recall him, you know, saying more of what I went through with you, him saying that he was an FBI informant, were you briefed on the fact that he was saying that he was an FBI informant?

A    Well, Mr. Brown doesn't use formal language. But it was a -- that "I'm working with the FBI."

Q    When you say that he doesn't use formal language, have you met him?

A    No.

Q    Oh, okay.

A    But he -- in his way of expressing things according to what I'm told, was not exactly at the highest level of linguistical skills.

Q    Did you ever hear any recordings of any interviews with him?

A    No.

Q    Any --

A    No.  This is all hearsay to me.

Q    I understand.  I'm just trying to figure out what he --

A    I don't have any firsthand

77

communication/contact with Mr. Brown.

Q    Do you recall seeing any transcripts, or was it just people reporting to you what he was saying?

A    All people reporting to me.

Q    On August 23rd -- Mr. Hershman is going to not like me for this, but I'll tell you --

A    Mr. Hershman?  Oh, that's you.

MR. HERSHMAN:  That's me.

BY MR. FOX:

Q    That's Brian there.  The FBI came to interview Anthony Brown.

A    Uh-huh.

Q    Were you aware that they were kicked out of an interview that they were conducting of Anthony Brown with your jail?

A    No.

Q    You were never later informed --

A    No.

Q    -- of that?  And so Mr. Thompson never came to you and apologized for allowing the FBI to interview Anthony Brown in the jail?

A    No.

78

Q    Do you recall having any meetings with Mr. Thompson about Anthony Brown or the Gilbert Michel investigation?

A    Not that I recall.

Q    So the only meetings you recall were meetings involving Mr. Carey and Mr. Leavins --

A    Yes.

Q    -- after the Saturday meeting, is that correct?

A    Yes.  We didn't want this to be discussed. At my level, I didn't want it to be discussed by a lot of different players in this.  I wanted to keep the integrity of the chain of command on this one. [END 1:19:32]

Q    Were you -- I don't know if you follow the newspaper articles.  I know many people do and many people don't.  And the newspaper has reported that there was an effort at some point to change Mr. Brown's name, and his name changed quite a bit within LASD's system from August 24th, let's say, until September 12th.  Were you aware of LASD changing Mr. Brown's name?

79

A    No.

Q    Were you aware that they caused him to be released, according to the computer system, that would show -- if anybody was looking for Anthony Brown they couldn't find him within your system?

A    No.

Q    And I assume that you also weren't aware that they weren't live scanning him, allowing the FBI to find him under any alias; is that correct?

A    That's correct.

Q    You also weren't aware that he was being taken, it sounds like, to Temple Station or to San Dimas; is that correct?

A    That's correct.

Q    [START 1:20:29] When were you first aware, or when did you first become aware that -- talking -- big picture -- not talking about the attempted arrest of -- or the alleged arrest of Leah Marx, but big picture, when were you aware that some of your people were attempting to investigate the FBI agents for possibly committing crimes?

A    Well, I think within the Internal Criminal

80

Investigations Bureau, they were looking at every aspect of the phone circumstance.  And, you know, I think that we wanted to know why and how and all of the things that are pertinent to any investigation.

[STOP 1:21:18]

The fact that the FBI -- and you've made it real clear to me, and I'm clear on that law now -- that you have some immunities that allow you to violate the local law, and that that's, you know, part of the structure and the legal authorization points.

But Mr. Brown does not have the legal right to hold a phone, so the -- there is some confluences here that we had to sort out as to how much did Mr. Brown get into beyond just the FBI.

Q    So in terms of subjects of the investigation, or suspects in the investigation --

A    Uh-huh.

Q    -- were you ever aware that the FBI agents were considered subjects or suspects of the investigation by ICIB?

A    Well, I think that typically their structure is designed to look at that as a possibility.  And I

81

assumed that they were seeing it in that respect, and
I can understand that.

Q    Were you seeing it in that respect?

A    Well, I'm not one that would say that I
believe that I can predict an outcome of an
investigation.  But this is an unprecedented
experience that I know of no other like it, even in
the nation.

Q    So you said that you assumed that they
treated it in that respect.  [START 1:22:34] Did you
have any conversations with anybody within ICIB, or
anywhere else before getting the call from Mr.
Martinez, in which you were informed that the FBI
agents were being treated as suspects or subjects of
the investigation?

A    Well, I didn't have any details of any
report that you would physically look at that says,
you know, here is the charge lines and here are the
names of the suspects, and all of this other stuff.
What I assume is they were presuming that they had to
do these interviews before they could arrive at a
conclusion. So that's really at the point when I got

82

the call.

And I believe that it was appropriate to not have any ambiguity or confusion on that point, and that's when I said to Mr. Martinez, "I'm not interested in the Sheriff's Department prosecuting or causing criminal charges to be contemplated and filed with the District Attorney's Office.  So rest assured, and you can tell Ms. Marx that I am interceding on her behalf if this worries her."

Q    That you personally, Sheriff Lee Baca, were interceding on her behalf, or Mr. Martinez was interceding?

A    No, I was.

Q    You were.

A    That I will tell the investigators to cease any effort in that respect if they are engaged in building a case, as they say.

Q    So what did you do intercede?

A    Called Mr. Carey or called somebody and said, "If we're doing this, stop it.  We're not going to cause any problems in that respect for an agent."
The agent is only doing what their bosses want them to

83

do.

Q    I think you said that you received this call from Mr. Martinez very soon after Special Agent Marx was approached.

A    The very day, very night --

Q    Very day.

A    -- or whenever it occurred.

Q    And then it sounds like you interceded immediately after that phone call; is that correct?

A    That's correct. [1:24:33]

Q    Are you aware -- again, providing you with some facts that you can take as an assumption for the purpose of this question -- that ICIB continued to conduct surveillance of Leah Marx after that day?

A    I'm not aware of that.

Q    And does that surprise you, if that is true, given your --

A    It's possible.  I mean, you know, investigators will pursue what they pursue.  But it may not be for a criminal purpose.  I don't know what their motive is in this.

Q    But you interceded, and so I would think if

84

~~I heard that the U.S. Attorney or whoever it was would tell me to stop an investigation, I would stop an investigation.  So does it surprise you to learn that ICIB may have continued --~~

~~A    How does she know that it was ICIB?~~

~~Q    Or that LASD continued to conduct surveillance? And I'm not saying she knows this.  I'm telling you that there have been documents.  And, again, for the purposes --~~

~~A    Yes.~~

~~Q       of this discussion, we have seen documents from    produced by LASD that are surveillance logs that occurred after September 26th of 2011.~~

~~A    Yes.  Well, that could be.  You know, I don't have any knowledge of it.  But if there were co-missions occurring at the same time, then that may be some of it. I don't know.~~

~~Q    "Co-missions" meaning another investigation of --~~

~~A    Yes.  There's --~~

~~Q       Leah Marx?~~

85

A    other people involved in it in terms of whatever they thought their strategy was.  But this is the first time I have ever heard this.

Q    Okay.  It would surprise you, it sounds like, if it was ICIB that was conducting that surveillance because you had told Tom Carey and Steve Leavins -- or Steve Leavins to stop this investigation, is that correct?

A    Right.

Q    Okay.  Let me ask you about this email. This one is not Bates Stamped for some reason.  I must have printed off the wrong copy of it.  But I'll describe it for you.  This is an email from Greg Thompson to Mr. Carey that is a forwarded email that says, "Court Order Presented by Federal Officers."  So I'm going to provide that to you --

A    Okay.

Q    -- and I'm going to ask you to read it.

A    Uh-huh.

(Pause.) Okay.

Q    This comes one day after a court issued a writ, a court order, to have Anthony Brown brought

86

into the custody of the federal agents.  Do you know
whether there is a connection between that court
order, that writ, and this email?

A    I don't know.  I mean, this is the first
time I've seen this.

Q    Were you aware of this order going out, or
this email -- not necessarily this specific email, but
that there was communication going out throughout MCJ
that if there was an inmate removal order, or any
other order like that, that it should go through the
legal channels to see whether it should be complied
with first before the inmate is released?

A    Like I mentioned, this is the first time I
have seen this.

Q    And that's why I'm not saying this specific
email.  I'm saying any communication.  Were you aware
that any communication --

A    No.

Q    -- was going on?  And let me give you an
example of what I'm talking about there.  I may ask
somebody to send an email out.  I may not see that
email specifically, but I may know that that email has

87

occurred or that some communication has occurred.

And I'm assuming that, Sheriff, that happens to you quite a bit where you're saying, "Get this done. Tell this person something."  And then you may not hear about that conversation.  Were you -- well, did you give an order regarding any communication with MCJ about compliance with federal court orders?

A    Now, I don't get into operational matters. I do create change when the big force issues started to emerge from the ACLU.  You know, I change policy, I change procedures, I change culture, I change a lot of stuff.

But when it comes to something like this, there is more questions that need to be asked, and we do have a County Council.  I don't know if the individuals involved call the County Council and they in turn advise them of this.  That's why the Department's legal advisor is written in here.  I would assume that's what they must have done.

And so to me, back to the communication theme, I am always available.  And, as you know, the directors all have my home phone, including Mr. Lewis. There is

88

no issue with how to get through the bureaucracy at the line level of the FBI unless it is not known within the chain of command of the FBI that they can just call the Director and the Director will call the Sheriff, and we'll get through all of the difficulties.

But until I get an answer as to the legal advisor being part of this, I don't know why we'd even do this.

Q    Well, let's talk timing.  Right.  So why would we even do this?  And so that brings up the question of timing that I wanted to discuss with you. So certainly federal removal orders, writs, have been in place for a very, very long time.  And you know that many LASD inmates are brought over to federal custodies as high end court proceedings come up.

A    Oh, yes.

Q    And as far as you are aware, has there ever been any question about whether LASD would comply with the federal writ or court order for the body of an LASD inmate?

A    Well, I would hope not, that there would be

89

any question, just do it.

Q    Okay.  So you -- do you believe that it would be wrong for someone within LASD to refuse to produce an inmate if there was a court order, a federal court order in place that said produce that inmate to the federal agents?

A    If the -- I would have to see the order, because -- you know, you're asking me a specific decision question.  If the order indicated where you wanted the person to be delivered, and it has whatever the due process obligation is for such an order, then we ought to honor the order.

Q    So a valid and specific order, you can think of no reason why that should not be honored; correct?

A    That's correct.

Q    You know, again, talking about sort of what type of investigations come to your attention, I see that, you know, LASD has had some incredibly significant investigations.  I know that, you know, in the last few years there have been deputies that have been murdered, and then, you know, defendants have been prosecuted for that, and that they remain in

90

LASD's jail system, the charged offenders have remained in the LASD jail system.

Are you -- do you get involved in those type of investigations where a deputy has been murdered or somebody else who is high profile has been murdered?

A    When you ask, "Do I get involved" --

Q    Yeah.  Do you -- I mean, in terms of your supervision?

A    No, of course not.  I don't -- I think, you know, I have 17,000 employees.  If I took that stance, that would be nothing other than supervising investigations.  The role I play is about two notches lower than Bob Mueller's role in terms of the volume. I have 23 sheriff stations and huge contracts, and I have to rely on the people that I have in the intermediate managers that are there doing the business at hand.

Q    Would you get briefed on those investigations frequently?  That's a lot of what --

A    No.

Q    -- what a lot of managers do.

A    No, not really.  Only the -- specific to

91

your question is the death of a deputy. Yes, I — the LAPD, when there has been murdered deputies in the city's area, and other such Long Beach, they give us constant updates. In fact, they go a little further. They fuse in some of our investigators with their own.

Q    Have you ever done anything to make — ensure — the same way you did with Anthony Brown — ensure the safety of a defendant who has been charged with murdering a deputy or law enforcement officer, and there might be retaliation concerns against?

A    Yes.  You do have to have them in the highest of the classification, standardly called a K-10.

Q    And do you get into the nitty gritty knowing where they are placed within the jails —

A    No.

Q    -- or how they are kept safe?

A    I know generally where they are, because we have certain cell block areas for that type individual.

Q    So 1750, you're aware of that?

A    It could be.

92

Q    Okay.   [START 1:33:59] Want to take a break?

MR. KIM:  At a convenient time, could we take a break, just for the bathroom?

MR. FOX:  I think that's fine.  I think that now is a fine time to do that.

MR. BACA:  Okay.

MR. FOX:  Yeah.  Stop it for now.  We'll start it again.

SPECIAL AGENT DALTON:  This is Special Agent Jason Dalton.  It is 3:31 p.m., on Friday, April 12th, 2013.  And we are taking a short recess, and I am stopping the recording device. [END 134:29]

(Brief recess taken.)

[BEGIN LS10062 AT 0:00:00]

SPECIAL AGENT DALTON:  This is Special Agent Jason Dalton.  It is Friday, April 12th, 2013 at 3:40 p.m.

Present are the same parties as previous. This is the office of Jones Day in Los Angeles, California.

Resuming the consensually recorded interview of Leroy Baca. [END 0:00:20]

Formatted: Not Strikethrough

Formatted: Not Strikethrough

Formatted: Not Strikethrough

Formatted: Not Strikethrough

Formatted: Not Strikethrough

Formatted: Not Strikethrough

Formatted: Not Strikethrough

Formatted: Not Strikethrough

93

BY MR. FOX:

Q   All right.  Mr. Baca, you — earlier when you — I think you were referring to the Wayside incidence when the FBI felt like they were conducting an investigation and somehow in their opinion, some — their investigation was obstructed by LASD.  Is that what you were referring to?

A   Well, it was a joint — yes.  It was a joint investigation.  We had a pre-meet in my office at our executive conference room before we started.  And everybody was on board with that we had to work this together, and so we did.

Q   Yeah.  And I don't want to get into the specifics of that because, I think it will go off on a tangent that will take too long.  So I'm going to actually steer your attention to something else.  You had mentioned the term that it was an "unfortunate reality," that their interests they felt had been obstructed.  And then you said that you would not obstruct the FBI's interest, I believe, is what you said.

And then we have been talking about how Mr.

94

Martinez informs you that there's a phone in the jail. And next thing you know, ICIB is investigating the exact same thing that the FBI was investigating.  ICIB is interviewing the inmates.  As you are aware right now, ICIB goes off and then tries to threaten an FBI agent with an arrest.  And I'm trying to see how that's consistent with the statement that "We would not obstruct the FBI's interest in the investigation." Can you comment on that?

A    Well, let's deal with the first part.  We didn't know exactly what the FBI was trying to accomplish at that point, of the first example.

In the second example, where    the alleged threat to the FBI agent, the way it was characterized to me is they just wanted to ask her questions.  I think    and this is without any verification or any confirmation on my part -- that when the agent said she did not want to talk to him, that she would call her director and the director will be the person that will speak on her behalf, that the deputy then made an impetuous remark. That is my unproven assessment.

And so the point, then, is that once she refused

95

to say anything, he should have just backed away and gone back to whatever else he's doing, but —

Q    Did you ever see the video or the audio? Have you heard the audio?

A    No, I have not heard the audio.

Q    And just be specific:  the audio recording of the approach of Leah Marx?

A    No.

Q    You have not ever heard?

A    No.

Q    Have you ever heard a subsequent telephone conversation between her supervisor and the ICIB investigators regarding the same incident?

A    No.  That's why I qualified my assessment.

Q    Okay.

A    I don't know what prompted him to say what he said, but I would not have said that myself.  And I don't think that it's appropriate to make threats.

Q    Okay. [START LS10062 AT 03:38] And with the approach of Gilbert Michel that ICIB did, after ICIB found out that Gilbert Michel admitted to accepting bribes to the FBI and after ICIB found out that the

96

FBI had threatened to arrest Gilbert Michel when they

confronted him, at that point in time, you knew what

the FBI was investigating, correct?  When you were

informed what he told ICIB?

A    I don't know if I can say that's absolutely

correct.  I think that Mr. Brown gave us a much better

indication than the Michel introduction of the phone.

Q    In other words, the scope was better with

Mr. Brown, the fact that it was a bigger

investigation.  Is that correct?

A    Correct. [END 4:25]

~~Q    And with Michel, all you knew was the little~~

~~part of the Michel investigation.  Is that correct?~~

~~A    That is correct.~~

~~Q    But you -- so after -- I think you were in~~

~~agreement with the statement that after ICIB reported~~

~~to you what Gilbert Michel said his encounters were~~

~~with the FBI, you knew at that time that the FBI was~~

~~conducting an investigation, at least in part focused~~

~~on bribery of Gilbert Michel.  Is that correct?~~

~~A    I would not agree with that because I was~~

~~still at that point not sure of anything.~~

97

Q    Do you recall hearing that Mr. Michel told ICIB that he was shown a recording of him taking money from somebody in order to give the phone to Anthony Brown?  Do you recall hearing that it was a recording that he was shown?

A    No, I don't.  I haven't heard any recordings. I have not read any investigative reports on this whole matter since it started until this day. All of it is oral representations to me.

Q    And did anyone orally tell you that he had said that he had seen a recording of him accepting money?

A    No.  No one has told me that.

BY MR. DAHLE:

Q    [START 5:48] Did they tell you he confessed to smuggling the phone?

A    He did.  Yes, it was indicated to me that he had acknowledged what he did. [END 5:59]

BY MR. FOX:

Q    And did    was it indicated to you that he acknowledged what he did not only with ICIB, but that he told ICIB he acknowledged what he did to the FBI?

98

A    There wasn't a distinction between the two made orally to me.

Q    Okay.  And then, again, focusing on the whole "We won't obstruct the FBI," ICIB then goes out and does a bunch of interviews of people around Gilbert Michel, his wife, other -- another deputy that I can think of, and a few inmates.  And focusing again on if the FBI is investigating Gilbert Michel, do you feel that that is appropriate for ICIB to do?

A    Well, let me say that I don't have the facts that you may know, but in the context of this whole emerging investigation that the Sheriff's Department was involved in, once I know more than what is being piecemealed to me, I can have a better way of understanding it all.  And it takes time to get the perspective that we're talking about today.

And so when I see the mission of, first of all, downloading phone conversations that were made in the jail to whoever is involved with this, whether it's FBI- related phone call conversations, meaning you have an agent on the other side, Mr. Brown in the jails, and then the content of the conversations

99

alluding to Mr. Brown wanting more communication with the agents and the FBI, things of that nature, then it leads to more questions than answers as to what were the priorities of the entire process the FBI was engaged in.  I didn't make any conclusions about any of it because it was all being piecemealed in.

Q    All right.  So let's, then, take some assumptions again.  [8:22] Assuming that ICIB was aware that the FBI was conducting a public corruption investigation of Gilbert Michel to see if he would accept money for committing an official act, smuggling a phone in the jail, do you agree that it would be inappropriate if ICIB was aware of that information to conduct its own investigation of the same subject matter?

A    Well, there -- that could be, but I can't draw that conclusion, because the phone recordings of the inmate were such that he was wanting to talk to the agents on the other side.

Q    The FBI agents?

A    Yes.  This is how it's being reported as we are moving along, and that the agent was reporting

100

back to Mr. Brown that "A phone is on its way.  Don't make these calls anymore because the jails are being monitored by the Department."

So it is a logical belief that Mr. Brown's mission at that point was to try and find out who these rogue deputies are that are beating up inmates. So I think that in the early onset of this, Michel happened to be a vehicle in which to get the phone to Mr. Brown. [STOP AT 10:12]

Q    All right.  So you

A       but I don't think that had the phone been compromised, that Mr.    that Deputy Michel wouldn't have been asked to do continual tasks to facilitate the bigger mission, which was what Mr. Brown was supposed to do.

Q    Okay.  So, going back to my question, do you think it would have been inappropriate for ICIB to investigate the same subject matter that the FBI was investigating knowing --

A    Well

Q    -- that the FBI investigation existed?

A    Candidly, no.  I believe that this phone was

101

the key to the reality that Mr. Brown had an illegal status with that phone.  We certainly didn't know as much about whether the FBI's authority allows this, but now I know it.  So I feel good about that, that I didn't want to believe that the FBI does anything wrong, quite frankly, but I definitely know that Mr. Brown cannot be protected from an investigation about the phone.

So he laid it all out.  And so he did implicate the FBI.  You know, he did offer things that perhaps are not something that you would want to know about.  Michel offered the same information.  And so —

Q    I'm not sure I'm understanding what you're saying there.  What things we wouldn't "want to know about," what you mean by that?

A    Well, that you think that a concurrent investigation compromises your investigation when, in fact, your investigation doesn't get compromised.  It's the same facts.  You know, the facts are Michel is corrupt.  We agree with that.  He deserves to be arrested and prosecuted.  The second fact is that we both have an interest in deputies that are not doing

102

~~their job the right way.~~

Q    [12:11] So you think it was appropriate certainly for the FBI to approach Gilbert Michel and --

A    Oh, yes.

Q    -- get the confession --

A    Yes.

Q    -- and prosecute him.  Is that correct?

A    Yes. [END 12:19]

~~Q    And there was nothing wrong with the way the FBI approached that confrontation with Mr. Michel. Is that correct?~~

~~A    I don't judge what your process are.  You know, if the FBI does something that my department would not do, you have to be held accountable to your own standards.  And we are    have to definitely be held accountable to our standards.~~

~~So if Mr.    if one of the    if the deputy gets subjected to extensive inquiry, or whatever it is that the FBI chooses to do, the deputy should have never put himself in that place in the first place.~~

~~Q    Are you aware of whether there was an effort~~

103

to distance Anthony Brown from the FBI by pointing out
to him that the FBI hadn't come for him to get him
from LASD custody?

A    That's a little convoluted.  I'm not sure I
understand your point.

Q    Do you know whether LASD employees informed
Anthony Brown that the FBI agents had not come back
for him after the FBI was told they couldn't interview
Anthony Brown?

A    I don't recall anything of that nature.  The
most significant thing that I received about Mr.
Brown's state of mind, that he was extremely fearful
of going to prison.

Q    State prison?

A    Yes.

Q    Who told you that?

A    He did, meaning --

Q    He told you that?

A    No.  He didn't tell me directly.  He was
told to the investigators, who told Mr. Carey, who
then -- Captain Carey, who then told me.

Q    Okay.

104

A    Those -- that's how the characterizations came through.

Q    So you're not aware of any efforts to have LASD make Anthony Brown feel like he was abandoned by the FBI?

A    Definitely -- now, I don't know, really.  I would be surprised if we were trying to spin his mind about the FBI.  I don't know.

Q    Are you aware that Anthony Brown was writing notes to LASD employees, investigators, stating that he would no longer cooperate with the FBI and he believed that LASD could clean up its own house?

A    I have no knowledge of those notes.

Q    And are you aware of any writings by Anthony Brown stating that he was feeling as though the FBI had abandoned him after the FBI had been kicked out of its interview of Anthony Brown?

A    I know of no such thoughts.

Q    [START 15:30] I'm going to show you what's been produced to us as your calendar.

A    Uh-huh.

Q    And I would like you to -- I'm not sure if

105

you've seen it in this form ever, but I'd like you to tell me if this is -- this appears to be your calendar.

A    Yes.

Q    This is going to be Bates numbers LASD 242794 through 242808.

A    Okay.  Thank you.

Q    Just take a brief look at it and see if you recognize these documents.

(Pause.)

A    It looks like my calendar.

Q    Okay.  Can I then focus your attention on Saturday, August 20th?

A    Yes.  Okay.

Q    You had referred to a 5K run.

A    Yes.

Q    Do you see on Saturday, August 20th, it says, "AltaMed 5K race/walk."  Is that the race you think you did not go to because of the Saturday meeting?

A    Yes.

Q    And then, looking at this calendar, if you

106

look at just the preceding days, maybe start with August 17th and continue to August 19th.  In terms of that phone call you received from Mr. Martinez, I don't know if you remember where you were when you received that phone call, but are there any calendar entries that refresh your memory about when that phone call would have occurred?

A    No.  There's no indication of the call here.  It wasn't scheduled, obviously.  And it was to my cell phone.  So I don't believe I was even near the calendar itself.

Q    You had mentioned before that you had notes of the conversation that you had with Mr. Martinez.  I believe you said it was a calendar entry that you would have had.

A    No.  I alluded to saying -- no, there's no notes about our conversation on either of the two, but that there could be something on my calendar that would trigger me to believe --

Q    Okay.

A    -- that it happened on this day --

Q    Okay.  And if you briefly --

107

A    -- or a day.

Q    -- can you briefly look through this and see if you can see if there is anything that triggers your memory on which day that would have occurred?

A    Uh-huh.

(Pause.) I'm not positive.  Okay?  But, as I said, I believe it was -- I believed it was two days before the Saturday meeting and --

Q    Two days before the --

A    Yes, because I notice here that there's a 2:00 o'clock to 2:30 meeting with the Undersheriff, Captain Carey, Lieutenant Gallagher, and Lieutenant Thompson.

Q    Okay.  And that's the day before the Saturday meeting.

A    Yes.

Q    So you think that there was a pre-meeting that we haven't talked about yet, a pre-Saturday meeting?

A    Very likely, very likely.  But I don't recall this particular meeting in content other than assuming -- and this is what it is.  It's not a thing

108

that I'm clear on in my head.  But if Mr. Martinez's call was on a Thursday, of which I want to believe that it was then -- now, we'd have to check his phone to make sure or mine, either way, to make sure that it was actually on that Thursday -- then that would be the reason for this other meeting here, to ferret out what is going on here at this point that Mr. Martinez has alerted us.

Q    Do you keep your cell phone records so it's easy to access?

A    I don't keep any records.  That's unfortunate, but --

BY MS. RHODES:

Q    What is your cell phone number?

A    Which one?

BY MR. FOX:

Q    Well, which one did he call you on?  That's probably the best way for us to track it down.

A    It would be area code (323) 829-7184. [END 19:56]

MR. HERSHMAN:  Obviously, that will be kept very confidential.

109

MR. FOX: ~~You will not be seeing it from our side~~

~~on the L.A. Times —~~

~~MR. HERSHMAN: Okay.~~

~~MR. FOX: website. Okay.~~

MR. BACA: [START 20:07] Now, that phone I don't use anymore, but that is the phone that I would have been using at the time.

~~BY MR. FOX:~~

Q    Okay.  So let me now direct your attention to August 29th in this calendar.

A    Okay.

Q    Do you see the 1:32 p.m. entry, "Meet with Andre Birotte, Jr."?

A    Yes.

Q    At the Federal Building?

A    Yes.

Q    Courthouse?  Is that the meeting that you had with the U.S. Attorneys' Office to discuss initially this investigation?

A    Well, it's one of two.  So if further into the schedule, you see the second meeting after that, then it would be more helpful for me to --

110

Q   Okay.  Well, let's talk about the first meeting that you had.  Was that just with LASD, county counsel, Mike Gennaco, and the U.S. Attorneys' Office? In other words, the FBI was not at this meeting?

A   It's -- that's likely.  I don't recall the FBI's presence at that particular --

Q   Okay.

A   -- time, but it could be that Mr. Martinez might have been not in this particular meeting but maybe in a subsequent meeting.

Q   Let's talk about the first meeting that you recall that you had with Mr. Birotte.  What is it that you -- well, first of all, why did you call the meeting?

A   It was actually Mr. Birotte, I believe, that called it in response to some of the discussion that was being put forth relative to what's going on here. And I can't recall if I called for the meeting or he called for the meeting, but, nonetheless, we set the meeting.

Q   Okay.  So you set the meeting.  And you obviously decided who you would bring to the meeting.

111

So how did you decide who would go to the meeting?

A    Okay.  Let me see here.

Q    We're focusing on the 29th meeting.

A    Right.

Q    But just in -- and we're going to make this clear, Mr. Baca.  You said that you -- this may be the first meeting.  So instead of looking at this calendar entry and saying, "On August 29th, this is what we talked about," I'd rather that you just stick to "In the first meeting that we had, here is what we discussed."  Do you understand what I am saying?

A    Okay.  Yeah.

Q    If you can't place this for sure as the first meeting, let's just talk about what you recall happening in the first meeting.

A    Okay.  The first meeting was to discuss what's going on here with this investigation.  And I believe Mr. Gennaco was in that meeting and --

Q    In what role was he there?

A    Well, he was the former U.S. Attorney of Civil Rights for the U.S. Attorneys' Office.  And he had been involved in the prosecuting of police

112

officers who were in violation of civil rights law.

[END 23:17] So he is our Office of Independent Review

attorney.   And I have six civil rights lawyers working

there independently of the Department to vet out all

of our investigations.

Q    So he was there as the OIR person —

A    Yes.

Q    — or he was there — okay.  So was he there

as your personal attorney?

A    No, of course not.

Q    Is he your personal attorney?

A    No.  I don't — he's independent.

Q    In any capacity, do you — does he advise

you as a lawyer —

A    No.

Q    — and you as a client —

A    Of course --

Q    — in any capacity?

A    Of course not.

Q    Okay.

A    Yeah.  You see, back to this whole point of

what I did years ago on the Rampart investigation, I

Formatted: Not Strikethrough

Formatted: Highlight

113

was asked by a Times reporter what would I have done had I read the report. I said, "I did." And he said, "What would you do different?"

I said, "Well, the problem is the investigative culture has no independent monitor. So the only remedy is to have civil rights lawyers overseeing the investigations for content quality and not let the public's part of this be totally unaddressed. Police departments that investigate themselves are always subjects to suspicious conclusions, even though the investigation may or may not have any reason for that."

Q    Does OIR send its own investigators out to investigate things or does it just --

A    No. They basically are effused in monitoring every investigation from start to finish.

Q    But in terms of monitoring, they're not the ones saying as they're monitoring it, "Go out and interview this person," are they? In other words --

A    They can, yes.

Q    -- they are just receiving the --

A    They can do that.

**Formatted:** Highlight

114

Q    Do they do that, though?  I mean, they may have the power to, but do they do that?

A    Yeah.  On occasion, they do, that this is this person here needs to be contacted and you need to find out what this person has to say.

Q    And is that after the IAB investigation has concluded or the ICIB investigation has concluded that OIR gets involved?

A    No.  They're right at the beginning.  They have unprecedented access.  And I was relying on this, on everything, quite frankly, including jail force.  I thought that the system was doing its job.

Q    And now you believe it was not?

A    That is correct.

Q    And you have just talked about how a police force that investigates itself — I can't remember if you used the term that they wouldn't do a good job or that the public would be suspicious of it.

A    That's right.

Q    So you don't in theory have a problem with a federal agency investigating a local law enforcement agency, correct?

115

A    That is correct.

Q    For those very same reasons; that is, a local law enforcement agency cannot police itself successfully. Is that correct?

A    That is correct —

Q    Okay.

A    — meaning most of the time, yes, but when you deal with certain things that are shootings and excessive force, where there's a higher level of threshold of misconduct and — then I think the police agency is not ill served by having, say, the FBI come in and look at this.

There are some cases that I have even asked the FBI to look at.  And, of course, they ran it up, and it didn't get approved, but it's just a matter of, you know, resources perhaps.

Q    All right.  So at that meeting with Mr. Birotte, that first meeting, did you tell him that you wanted the FBI off the case, off the investigation?

A    Oh, no.

Q    You --

A    I was more focused on the phone being a

116

dangerous invasion of the safety and security of the jails, not just in the relaying of deputy misconduct, but phones in jails are not a positive thing.  They can lead to many problems.

Q    Okay.  Did you explain to Mr. Birotte that you wanted to work the case with the U.S. Attorneys' Office, "you" meaning the LASD's ICIB Department?

A    [START 27:39] I indicated something that would represent that these cases are hard to do under best circumstances. Even if you had everything going exactly as you would want it to go in terms of cooperation and the like, that they're difficult to do, that this is a world that has a lot of variability to it that is laced in doing the right thing, and then the wrong thing becomes at the very tail end of the right thing.

Q    Is it fair to say that you were pretty animated at this meeting or were you talking --

A    No. I was animated, yeah. [END 28:22]

Q    And what at that point in time had you learned other than just the fact that a phone was introduced to the jail that made you animated, or was

**Formatted:** Highlight

**Formatted:** Strikethrough

**Formatted:** Highlight

117

it just the fact that a phone was introduced to the jail that made you animated?

A    I think the concern that I had was predicated on the fact that my high regard for the FBI, my trust for the FBI, and my trust, particularly for all the directors, who I most have contact with, that I don't believe that it had to go the way it did. That had they called me and I said it was -- if you called me and told me "We've got an issue.  We need to deal with it," I would have kept it to myself.

Q    We have seen, even in fact today, the leaks that occur within LASD, as you have described them.

A    There are systemic leaks, but not me.  You don't find me saying anything about anything that is confidential.

Q    So, in this case, though, Mr. Martinez called you and you immediately got ICIB, IAB, Mr. Tanaka -- and I'm not sure if there were any others involved.

A    Uh huh.

Q    And OSJ involved in that meeting.

A    Right.

118

Q    So, in that instance, you didn't keep it confidential.  So I'm trying to figure out what's the difference.

A    Well, the difference is that the    in all due respect, the FBI's investigation was compromised.  I didn't do that.

Q    Well, a portion of it was

A    Right.

Q        to the phone?

A    With all due respect, the truth and the facts say that when you do this kind of investigation, it shouldn't be compromised.  And it was.  And so the nature of this investigation is that had it not been compromised, we wouldn't be here talking about anything.

But the truth of it is that it was.  And, see, I have a lot of experience in this department of the jails, in spite of this whole thing with force that now becomes a major issue, and that is that people in prison and jails are not reliable.  And they very much have an agenda as to why they do what they do.  And it isn't purely to make law enforcement successful.

119

And so where I am going is that if the FBI mistrusts my deputies, I understand, but the FBI has no reason to mistrust me. I have never given the FBI anything other than my fullest support. Now, if this happens and it gets compromised, I have to take the pressure as well. I have to explain within my own system the actions of the FBI and —

Q   Have you ever stated that you resented that the FBI had investigated the jails?

A   Did I —

Q   Have you ever stated —

A   I didn't know the FBI was investigating anything until this phone was brought forward.

Q   I'm saying, have you ever? I'm not saying this is not — this one is not on anymore.

SPECIAL AGENT DALTON: Yeah. For the record, one did shut off.

MR. FOX: Okay.

SPECIAL AGENT DALTON: The other one seems to have still full battery.

MR. FOX: Okay.

SPECIAL AGENT DALTON: This one lost its battery

120

life.

MR. FOX:  Okay.

BY MR. FOX:

Q    [31:58] Have you ever stated, since learning that the FBI was investigating the jails, that you resented the FBI investigating the jails at LASD?

A    Let me say this:  "resentment" is not a word that I typically use on anything, including the FBI. Am I -- was I angry?  Yes.  Did I feel that it caused more difficulty than it should have?  Yes.  Do I believe that communication should have been a consideration with me? Yes.  And so these aren't things that need to be argued about at an investigative level. These are things that you argue about at my level. [END 32:54]

Q    Do you

A    And I was doing that.  I was talking to the U.S. Attorney.  And then subsequently I talked to Steve.  And then I pressured Steve in the second meeting, and I said, "Steve, you and I have done a lot of things together. And I don't understand why you did this the way you did. It's not your agents that I'm

Formatted: Highlight

121

angry with.  It's you." Okay?

And so once he got that into his mind, he felt something for it, because we don't succeed    in the criminal justice world of looking for rogue deputies or criminals at large, we don't succeed when we don't work together.  We might win one battle, but if you lose trust with each other, it doesn't help the future battles.

And so his first line of business after we had settled our little top level disputes over this was, "All right.  You do what you do.  I'll do what I do.  We'll just give you all the copies of what we do.  We've got this process with the District Attorney's office.  We've got this process with the U.S. Attorneys' office.  We're through.  There's no disagreement on anything."

Q   Do you recall ever stating to anybody that LASD polices itself?

A   Oh, sure.

Q   The FBI should not police the --

A   The --

Q       should not be --

122

A    Yes.

Q        the FBI should not police LASD?

A    No, that's not true.  The statement I made was      a quote in the newspaper was      the whole of the quote was left off.  But what I was saying is that we have the Office of Independent Review that is a civil rights minded monitor.  We are the most transparent law enforcement agency in the country.

Because of that, meaning these lawyers vet the authenticity of what we do, I had a great rapport with the civil rights group, irrespective of what the ACLU's methods of communication are.  You don't hear me attacking any civil rights organization.  And matter of fact, I have been given many awards by civil rights organizations, and I have a public trust policing model that I worked on for years.

So in this sense, the newspapers are not the place to assess my opinion on anything.  I happen to be an elected official.  No one ran against me in the last campaign.  The Times would love to have a component, and I'm okay with that.

Q    I just want to focus on, you know, my

123

interest, not in the open year elections or in any of that. My focus is just on, again, what we're talking about today. And did you ever -- do you recall ever stating that you didn't believe that the FBI should be investigating LASD?

A   I have never said such a thing. I mean, you know, I don't know any other way to explain this to you.

Q   That's fine. No, I just -- I wanted -- again, sometimes I need to make sure that I've got clear answers.

A   First of all, I don't believe it. You see, you know, this -- the thing that I'm hoping when we depart here is that you understand my character, you know, that -- that my belief is that law enforcement is a noble profession, and that we honor the rules of what we do, but the nature of what we do is very, very risky, even when we are doing everything independently, that we are pure wisdom-driven in what we do.

A lot of it is emotional. A lot of it is, you know, predetermining outcomes. And what I want to do

**Formatted:** Not Strikethrough

124

is keep my organization constitutionally safe and procedurally just as safe.  Even in your office, Mr. Birotte and I have a great rapport.  And then, you know, I've got a great    well, not yours, but, you know, the FBI, I have a great rapport with Bill Lewis, I even had one with Steve.

Where I am in this whole thing, even the U.S. Attorneys' Office has me coming up there to train other police departments on procedural justice and constitutional policing.  I've got documents done. The problem is, I've got people below me that are immature, for lack of a better word, people that don't follow my core values, which are based on the constitution.

And I have all of the recruits recite it by heart.  It's "here," but it's not "here."  See, and that's the problem that I have in the organization.

Q    Do you recall ever threatening to remove task force officers from federal task force based on this investigation?

A    I heard a rumor about that.  And Steve I think and I had a conversation at some far out point.

125

Q    But you never threatened to pull task force officers from federal task forces?

A    Why would I do that?  I mean, you know, the bigger picture is never lost to me.  And I think it is not only a false accusation    I can understand the rumor.  We had one deputy working in the Armenian task force, Armenian organized crime task force.  He didn't like the pace.  Okay?

Now, I can't explain what he likes and doesn't like, but he didn't like the pace and he asked to come back.  Once he came back, this rumor surfaced like a balloon with neon lights on it.  And then Steve and I    I said, "Steve, you know, we don't hate the FBI. You know, I don't hate the FBI.  If my deputies have these attitudes about the FBI, it's wrong.  And I'm happy to correct whatever I can specifically correct. But most of the organization is busy doing what they do, and let's not get too carried away with what we are fearful of. Let's just do what we have always done, and that is help each other do the greater things that we are trained to do."

[START 39:16] BY MS. CARTER:

126

Q    Did you tell Andre Birotte that you had

would remove task force officers from joint FBI/LASD -

-

A    Did I tell Andre Birotte that?

Q    -- task force if there couldn't be a

mutually agreeable resolution to how the investigation

would be run?

A    It's possible.  When I'm angry, I can say

anything.  Not quite anything, but I certainly would

say --

MR. HERSHMAN:  Which meeting is this, by the way?

If it happened.

MS. CARTER:  I'm asking at any time. [END 39:42]

MR. HERSHMAN: Well, it depends, because there is

a meeting that I was excluded from that was an

attorney-client privilege communication meeting.  So

that's -- so I would need to know what meeting it is.

MR. FOX:  I'm confused --

MS. CARTER:  Well, it is --

MR. FOX:  How is it -- how would it be attorney-

client --

MR. HERSHMAN:  Well, I had a conversation with

127

Andre about a meeting with Andre that I wasn't going to be present at.  And I was told that this wouldn't be discussed.  So if that's the meeting --

MR. FOX:  I'm confused about what an attorney-client meeting could be between --

MR. HERSHMAN:  Well --

MR. FOX:  -- you and the attorney's office.

MR. HERSHMAN:  No.  The attorney client relationship would be with Mr. Baca.

MR. FOX:  Yes.

MR. HERSHMAN:  And then I was not present at the meeting.

MR. KIM:  And there was a representation --

MR. HERSHMAN:  Right.  There was a representation in the meeting that nothing would be discussed related to the investigation.

MR. FOX:  Can we take a break right now?

MR. HERSHMAN:  Yes.

MR. FOX:  I would just like to talk to -- if it's okay, I'm missing something here, because we --

MR. HERSHMAN:  Okay.

MR. FOX:  I think we could probably better

128

explain each other at this point. Can we take a couple minute break, Mr. Baca?

MR. BACA: Sure.

MR. FOX: We can go into the next room and

MR. BACA: He can get your thoughts, of course.

MR. FOX: Okay. Okay. Thank you very much.

SPECIAL AGENT DALTON: I'm going to stop the recording.

MR. FOX: Okay.

SPECIAL AGENT DALTON: This is Special Agent Jason Dalton. It's 4:21 on Friday, April 12th, 2013. We're taking a short break, and I'm stopping the recording device.

(Brief recess taken.)

[START 00:00]

SPECIAL AGENT DALTON: This is Special Agent Jason Dalton. It's 4:27 p.m., Friday, April 12, 2013. The same parties are present, the same location, resuming the interview of Leroy Baca.

[START 00:14] MR. FOX: Mr. Baca, I want to show you a document -- my purpose for showing it to you is I want to give you every chance, today, to make sure

129

that the record is clear about what we're talking about.  So, later on, if you've told me one thing and we learn the opposite, I'll give you every chance to tell me what is, what it was.  I'm going to give you a chance to look at a document, Ms. Carter just described for you, or asked you about, any threat that you had, to say that there was -- we take people off the task force, in response to your answer, that you never said that.  You later went back, and said, "I may have done so in anger." I just want to show you your letter to Mr. Birotte, on September 26, 2011. Let me just --

MR. KIM:  I'm sorry.  The date?

BY MR. FOX:

Q    September 26th of 2011.  I'm putting brackets around the portion that I'm showing to you.

MR. BACA: Certainly.

Q    And you'll see there, that you state -- this is a month after that meeting.

A    Yes.

Q    You state, "I am very hopeful that we truly agree upon resolution, but if not, the Sheriff's

130

Department will not be able to continue the participation with the FBI, in many ongoing joint taskforce missions." So at this point in time, your anger, I would assume had subsided, because it had been about a month, since you had learned about this. Yet, you're also, at this point, I'm reading this as telling the FBI, telling the U.S. Attorney, you will not continue to participate in task forces if . . .

A    If we don't reach an understanding that there was a breach of trust with my office, as a leader of the organization, then I feel that there was no reciprocal respect for the difficulty of both agencies. [END 2:10] So this letter, to me, was fixed, based our meetings that we had.  And the one that cleared the air for me, was the one Mr. Martinez had explained himself to me, and I accepted that, and I said, "That's understandable."

Q    When did that happen?

A    We had two meetings, as I mentioned.  It was the second one, and I don't know when that was.

Q    Okay.  And who was present at that meeting?

A    Just me and Mr. Martinez, and Mr. Birotte.

Formatted: Highlight

131

Formatted: Highlight

Q    Are you aware of any meetings that occurred within LASD, in which the executives within LASD told taskforce officers that they would be pulled off the taskforce because of this investigation?

A    I'd never given such direction, and I would be surprised if that occurred at all.  This was private conversation.  See.  [BEGIN 3:13] Let me explain this anger business.  I don't get really angry.  I get more tactical. All right?  And anger is a part of it, but it's not the overriding part of it. [END 3:26]  The idea that the Sheriff's Department cannot be trusted has some validation, if you know what it is.  If we work together in the past and somebody was acting like a knucklehead on the taskforce and wasn't going along with whatever the flow was, I could understand that.  But that was never brought to my attention, even when it occurred.  All of a sudden, there was an abrupt cessation of the investigation.  The FBI pulled out and the U.S. Attorney's Office pulled out, and no one called me, and said, "Let me tell you why we're not doing this anymore."

132

Q    What was communicated to you, was that the FBI and the U.S. Attorney's Office pulled out.  It was not communicated to you that the LASD informed anybody, that "We're going to investigate our own in the wayside.  That your Federal Informant, is now an LASD Informant"?

A    We're talking about the investigation teamwork we were doing seven or eight years ago.

Q    2008, approximately.

A    No.  It was longer than —

Q    It was longer than that?  Okay.

A    It was further back than that. It was a while back.

Q    Okay.  I'm getting a little bit concerned on time, so I'm going to try and hit a bunch of different issues.

A    But I want to clarify some things, because I don't want to leave you with a misunderstanding here. I have to advocate for our partnership, but if the other side doesn't advocate for it, then why do we even have one?

Q    Okay.  So let's —

133

A    [START: 4:56] This is designed, not to get answers to these questions, but to tell Mr. Birotte what are the issues here.  My concerns were not only with Mr. Martinez, it was also with him.  I know we have a pecking order in this national scene of crime fighting, but all of us have to be held accountable for what we do. [5:23]  Now, I'm not the one that's going to hold the FBI accountable, and I'm certainly not going to hold the U.S. Attorney accountable.  But the U.S. Attorney should look at what those points of accountability are within.  So the nature of a partnership is that we tell each other how we can do something better.  The best practices, is what I'm talking about.

Q    Okay.  So just to —

A    So if we can't do best practices, in sensitive matters, then what kind of best practices do we have, when I turn my Deputies over to the FBI, and give the FBI full control over them?

Q    [BEGIN 6:01] This letter was a tactical — and the meeting, it sounds like, beforehand, was a tactical attempt by you to show anger in order to

134

raise the issues --

A    -- to get the compromise, so that we could go forward.

Q    So it was more like a chess match?  It was a . . .

A    That's correct.

Q    To be upset, that's going to make you have to go come to the table?  Is that right?

A    I wanted a full and clear understanding, that we can't afford to have a fight between two agencies.  You know, I didn't start this fight.  Okay?  But let me say this.  I believe in fairness, and I believe that fairness is a very important quality in everything that we do, whether it's with crooks, or whether it's with ourselves.

Q    When you said, just there, "you didn't start this fight," who started the fight?

A    Whoever decided to do all this, and say that you can't trust the Sheriff, even. [END 6:55]

Q    Wait, I'm confused.  Are you talking about the FBI starting the fight? Or are you talking about the person who, before, breached the trust of the FBI?

Formatted: Highlight



135

A    Whoever motivated Mr. Martinez to do it the way it was done, and then get the U.S. Attorney's Office involved, and not consider that there's other ways to do this, is what led to this whole breach. It wasn't done with maliciousness in mind, but it was done with high risk in mind.  Because the investigation was compromised.

Q    Okay.  In your opinion, it was compromised?

A    Am I the only one that feels this way, in the room?

Q    I'm saying, it's your opinion that it was compromised.  It's not Mr. Birotte or Mr. Martinez ever said that the investigation, itself, is compromised. The phone was compromised.

A    Well, that's part of it.  I'm using Mr. Martinez's words.  But, you know, the difficulty is simple.  The guys at the top have to deal with each other a certain way.  I don't fight with FBI agents. I don't fight with supervising agents.  I don't fight with anybody, but I will fight with Congress, and I will fight any level of government that thinks that they can just do anything they want, and never even

**Formatted:** Highlight

136

have to explain it. I'm not asking for a public anything. I'm asking for a mere sense of fair play. And then, if I were told about this, I would be on your side. You would have my green light to do whatever you want to do, as an agency.

Q Mr. Baca —

A I don't think that's unreasonable.

Q Who were your advisors, taking this outside of the attorney client issues. Who were your advisers, during this time, in August/September, 2011?

A I don't have any advisers. What's amazing about that question — I'm glad you asked it. I don't have any friends in the Sheriff's Department. Okay? I don't operate based on advisers in the department, in an unprecedented area. All I know is that we have to investigate the facts and come to some purposeful judgment, and not make any assumptions one way or the other. So we didn't have everything on the table.

Q When you're making your decisions though, whose advice would you go to? If you said, "This is a tough issue. I want to go -- I want to speak to Ms. Carter and Ms. Rhodes, about it." Who is it there,

137

that you would go to, in order to discuss a very difficult issue?

A    No one.

Q    So you would just, on your own, make the decisions?

A    Do you know why?  A simple yes.  The answer to the question is "yes."  Do you know why?  Because I don't trust the bureaucracy.

Q    Okay.  And the buck stops with you ultimately —

A    Well, it does.  You see, I've been the department advocate against Deputies, who we've fired and so forth, when they've tried to get their jobs back with the Civil Service Commission.  I'm not a lawyer, but I've won 145 cases, out of 146.  I don't put up with any nonsense, when I know about it.  So the point then is real simple.  Bureaucracy is always vetted up the chain of command.  By the time it gets to me, it's something a little different than it really is.

Q    Okay. I get that.  Again, we have so much to go through, and so little time at this point.

138

A    Sure.  Sure.

Q    Let me just ask the questions.

A    I'm open.  I can go on.

Q    Okay.  That's fine.  I appreciate that.

[10:24] Outside of the meeting, that you discussed
with -- the Saturday meeting, possibly the day before,
there might have been a meeting on August 19th.  The
meeting with the U.S. Attorney's Office and the
meeting with the FBI, did you have any discussions
with Mr. Tanaka about these issues regarding Anthony
Brown or Leah Marx?

A    More so Anthony Brown.  The whole case, I've
had some discussions with him, of course.

Q    What did you and Mr. Tanaka discuss?

A    The points that were relayed.  Nothing more
than the points that were relayed.

Q    What do you mean "the points that were
relayed"? Meaning Anthony Brown is reporting this, and
you would talk to him about that?  What points?

A    Well, "we found a phone.  The Internal
Criminal Investigations Bureau will handle it all.
Let's only keep this within that framework.  They have

139

the lead." And then circumstances of, "All right.  I'm going to meet with the U.S. Attorney's Office.  We'll go over there, and I'll see what I can accomplish." And, and the general story, at the time, as it emerged.

Q   Who . . . so you were macromanaging this. Who would be the person that was, in your opinion, the closest thing to being the leader that is micromanaging what is happening with the Anthony Brown, Gilbert Michel?

A    That would be Captain Carey.

Q    Captain Carey?  And Captain Carey, at the time, was not housed in same building that you were in. Correct?  He's not at Headquarters?

A    I believe you're correct.  Yes.

Q    Mr. Leavins was.  Correct?

A    I never really knew where he was. But it's possible that he was in the building.

Q    Did you have any discussions with Mr. Leavins, when Mr. Carey was not present?  Do you recall?

A    On occasion, yes.

140

Q    Okay.  About this subject matter.  What do you recall about those conversations?  What were they related to?  Specifically, what Anthony Brown was saying? What Gilbert Michel was saying?  What to do about the FBI? What was it?

A    Specifically what he said, or even Tom -- I don't know, at the moment.  I can't remember.  But it was the updating process. [12:25]

Q    ~~At some point…thank you. I didn't know that those existed so I was trying to figure out how to provide us with shade.~~ [12:37] Other than Mr. Tanaka, did you have conversations with any Assistant Sheriffs about what was happening?

A    Not that I can recall. Because I didn't want this to be gossip in the organization.  You know, undoubtedly, there has been some at the, at the line level.  I didn't want various people involved in this, because then it becomes less professional, in my judgment.

Q    Do you recall a conversation that you may have had with Cecil Rhambo, about what to do about this Federal investigation that was occurring?

141

A    I don't recall such a conversation with him.

Q    Do you recall, I mean, I assume that it's -- well, let me ask this.  Do you recall Mr. Rhambo ever saying something to you, to the effect of, "Don't fuck with the Feds"?

A    Let me say this.  I don't like vulgarity.  Sometimes I'll use it.  I was in the Marine Corps.  But no Assistant Sheriff is going to talk that way to me, and me see that as just some form of internal conversation.  In fact, I think that if you were to assess the environment of my immediate command staff, the Assistant Sheriffs and the Undersheriffs, if anything, they're extremely gentlemanly, and he's one of them.

Q    It would stand out to you, if he made that comment to you?  You would remember it, is that correct?

A    I would certainly respond to it, and therefore would remember it, because it's unacceptable communication to a person at my position.  Now, I'm not better than anybody else.  But I believe that Mr. Rhambo's interactions with me have always been on a

142

respectful level.  So it would surprise me that he said to you, he said, "Don't fuck with the FBI" to me. Then that would shock me that he's saying such a thing. [14:46]

Q    I don't want you to think that any one witness said anything to us.  If certain statements that were made, there would be plenty of witnesses that might tell us certain things.  So I don't want you reading in that one person said one thing, over another person reporting that somebody else said it. So I just want to make you —

——

A    Yes.  I appreciate your point.

Q    [START 15:05] In that letter that you wrote to Mr. Birotte, you discussed Grant Jury Subpoenas. So by that date, September 26, 2011, you knew this was a Grand Jury investigation, because there were Grand Jury Subpoenas that had been issued.  Is that correct?

A    Yes.  And then the next step was to figure out all the protocols between the various agencies.

Q    Okay.  Let's go back.  There were Grand Jury subpoenas, as you wrote in a letter, were dated in

143

late August of 2011, August 24th of 2011.

A    Okay.

Q    When did you become aware of those subpoenas?

A    I'm not sure, but obviously beforehand.

Q    I guess I'm wondering whether it was right before the time that you wrote this letter.  It appears that you already had a conversation with Mr. Birotte about those subpoenas, because it's serving to confirm and thank him for agreeing to hold the responses.

A    Right.

Q    So I'm wondering, did you talk about it at your August 29th meeting, do you think?  Or the first meeting, that you referred to it as?

A    It must have been, obviously before the 24th.

Q    Or after the 24th, August 24th.

A    Or after.  I'm sorry.  The meeting with Mr. Birotte -- it seemed to me, if this was the second meeting -- and I believe it was.  I think when I brought this in -- or it could have been the first. I

144

don't know. It was a starting point of discussion.  It

might have been the first.  I think I may have brought

it in on the first meeting.

Q    Yeah.  I think the best the lawyers in this

room could put it together and obviously disagree with

me, if I'm misstating this.  I believe that we pieced

together that there was an August 29th meeting, which

you referred to as "the first meeting," and a

September 27th meeting, which would have been the day

after this letter.  So would I be correct then that

this -- first of all, is that in any way against your

memory?

A    I think it kind of fits in, in the sequence

of the two meetings.

Q    So based on that, you believe by August

29th, you would have been aware of these subpoenas?

A    It appears that to be the case. [17:11]

MS. CARTER:  The dates on that letter, September

26th, did you bring that letter with you to the second

meeting?  Or did you deliver it to the U.S. Attorney

in some other way?

A    I can't be sure.  But I do recall indicating

145

that these are questions and I don't really expect them to be answered.  Okay?  They bring forth points of concern that he should know about.  See, I don't know what the relationship is between the U.S. Attorney's Office and the FBI, as it pertains to the specifics of the investigation.

BY MS. CARTER:

Q    [BEGIN 18:03] Did you write this letter before or after Leah Marx -- before or after, you found out Leah Marx had been approached, on September 26th?

A    I don't know.  I don't even know when she was approached and when that came about. [18:18]

Q    So you don't recall a letter -- you wrote a letter before or after Mr. Martinez had informed you?

A    This was -- this letter -- let me say this. This letter was not generated in consideration of the investigation specifics and consideration of personalities within the FBI.  This was regarding the whole process of what was occurring and the introduction of the phone, and the idea that things were happening that we're not familiar with.  So the

146

~~point of reference, of motivating this, was not the~~

~~specific incident regarding Leah Marx.~~

~~Q    How was the letter generated?  Did you write~~

~~it yourself?  Did anyone help in the drafting of it?~~

~~A    Well, let's take a look.  Generally, our~~

~~letters have the notations of initials.  I don't see~~

~~the initials here.~~

BY MR. FOX:

Q    [19:29] Do you often write your own

correspondence, or does somebody else write it for

you?

A    It's co-done.  I edit everything and I write

my own particular points.

Q    This one does not appear to have the

initials you normally see if somebody else had typed

it or written it.

A    Right.

Q    Does that mean --

A    There's a lot of my writing in here.

Q    Okay.  So you recognize some of this as

being your writing.  It's certainly not a document you

signed without reading?  Correct?

147

A    That's correct. [END 19:56]

Q    Okay.  I'll take that back from you at this point.

A    Okay.

Q    At some point in time, did you become aware that an ICIB Investigator had approached a Superior Court Judge, to try to order the FBI to disclose information to LASD?

A    That's the first time I've heard such an idea.

Q    All right.  So let me show you now, what's marked as "LASD 234183."  Take a look at that document.

A    Okay.    Is there a date here?  Oh, yeah. September the 7th.

Q    September the 7th, and then you see some handwriting at the top that appears to be dated September the 8th.  Do you see that, on the first page?

A    Yes.

Q    Okay.  Before showing you this document, have you ever seen this document before?

148

A    No.

Q    What is your general impressions of this? What are your impressions of an ICIB Investigator going to a Superior Court Judge and attempting to obtain FBI investigative records; the true identities of uncover agents and investigative agents; and other items that relate to its investigation?

A    My impression of the letter or this Order Request, is that before this kind of document gets brought into play, that our County Counsel or some other form of legal consultation should occur, so that we're doing something that's permissible.

Q    You're not aware of any communications between County Counsel and LASD regarding this Order, Proposed Order and this Statement of Probable Cause of affiant?

A    No.  I think the question was, basically, did I know anything at all?

Q    Were you in communication about this issue?

A    No.

Q    It says at the top, "Denied.  The court has no jurisdiction over any federal agency," and it's

149

signed by a Judge?

A    Yes.

Q    [START 23:02] Was it ever communicated to you that the Superior Courts and LASD had no jurisdiction to investigate or to issue any Orders regarding any Federal agency?

A    Well, I certainly don't believe that the Sheriff's Department has the investigative power over another agency. [END 23:22]  But I think, as you already described, the incident with the phone blurred the lines and so therefore it doesn't surprise me that an Investigator wouldn't know where the lines are.

Q    In this affidavit, it describes how it believes that the FBI was conspiring with the Inmates in Deputy Michel.  It says that the FBI conspired with them.  Does it surprise you that an ICIB Investigator would have called the FBI, the criminal conspirators with Mr. Michel and with the Inmate?

A    Well, if he doesn't know what the permissive laws are, to allow the FBI to do such things, then he certainly should be corrected for what he doesn't know, as I should be corrected, if I don't know that

**Formatted:** Strikethrough

150

as well.

MR. DAHLE: As an Investigator, shouldn't you know that though, sir? I mean, buy/busts and undercover operations take place every day across the country with every agency. Isn't it just Law Enforcement 101 that an agency can conduct undercover operations?

A Well, this is not that. This is that one agency, like a local one, cannot investigate a Federal agency. That's what this is. This isn't about just an investigation.

MR. FOX: I think his point is, though, isn't that calling the FBI conspirators with Gilbert Michel and with the inmates. They cannot be -- I think that What he's saying is, isn't it Criminal Law 101, that a law enforcement agency cannot be a criminal co-conspirator for engaging in its operation?

A Well, let's go back to where he makes the statement. If you can draw me to it, I'll read the rest.

Q Based on the above -- this is on page 3 and 4?

151

A    Yes.

Q    Line 19 and 20.   "Based on the above information, it is apparent that Deputy Gilbert Michel, along with Inmate Brown and the agents of the FBI conspired to smuggle a cellular telephone into a correctional facility.  These criminal actions" — so it does appear that he's communicating to the Judge?

A    Yes.

Q    That it's his belief that the FBI was a criminal co-conspirator with Inmate Brown and Deputy Michel.

A    Well, I think that certainly what he wrote, lead one to believe that he believed that.  That's what I said earlier — not reading this, myself, until now — that you vet these things through a County Counsel source, so that you get on firm ground with whatever these documents, when they enter a court, are sound. And apparently this one was not sound.

Q    [START 26:34] I want to talk timing with you, a little bit. You've got your calendar in front of you.  I'll take that back.  You have, in front of you, your calendar. It shows, if I'm correct --

152

correct me, if I'm wrong -- that you were off from September 8th to September 22nd.

A    Okay.  Let's take a look.  It certainly appears that way. [END 27:10]

Q    All right.  I'll just represent to you certain dates, over the objection of Mr. Hershman.  On September 8th, as you saw, there's the Court Order -- or the Judge breaks down the Proposed Court Order that he has no jurisdiction over the FBI.

A    Yes.

Q    Inmate Brown is rebooked under his true name, and sent to State Prison on September the 12th. This is while you were off.  Are you learning about Inmate Brown being transferred to State Prison, while you were off? Or are you completely not in communication and wouldn't care anyway, about that?

A    Well, back to that earlier point.

Q    I'm not sure.  Maybe I should go back and ask you questions.  [START 27:55] When you're on vacation or off, do you keep in close contact with your office, to make sure that everything's running smoothly and that things you care about are happening?

153

A    Yes.

Q    When you were off during this period of time, were you learning anything about Gilbert Michel or Anthony Brown, while you were taking your personal time off?

A    If there was something significant, yes. There is a connection, wherever I am. [END 28:20]

Q    But you did not    Was it significant enough to tell you    it appears that it wasn't, according to what you just said    that a Judge had denied ICIB's request to get documents from the FBI?

A    As I mentioned, it was not relayed to me.

Q    Was it important enough tell you, significant enough to tell you that they were going to be sending Anthony Brown to State custody, on September 12th?

A    I did not hear that.

Q    Did you learn that when you got back?  Or is that news to you now?

A    Well, at some point, in all situations that we are involved in, that are long-term in prospect, my view is that when you get the whole of this somewhat

154

understood -- let's just say Mr. Brown was then moved back to State Prison, or wherever he is designated to go. That things have pretty well calmed down; that there's no new story to tell about this whole situation.

Q   Do you recall hearing anything about this investigation at all while you were on personal leave?

A   I don't have -- this is a while back.  I'm just saying that they do call when there's things I need to know.  But at the same time, I'll call, if there's things that I want to pursue.  In this case, I don't have a recollection of those type calls, but they could very well of happened.

Q   Just to represent to you, it appears that there is, as you reflected there, a calm period of time, Anthony Brown is put back into State custody.

A   Ah-hum.

Q   Nothing happens with respect to any investigation or approach of the FBI agents.  You get back in the office on September 22nd.  Are you briefed, at some point?  I want to make sure I represent that right.  You're back at the office

155

again. You're back in the office, on September 22nd. Are you briefed, at some point, on what is happening with this Anthony Brown/Gilbert Michel/FBI deal?

A    I'm sure that did happen.  Now, to what extent in the conversations it meant something, in terms of where we are vis-a-vis the FBI.  Much of the agreements, in terms of document production and process agreement, contact persons between agencies and the like, all that had been set in place.  So now, it's a strategy of having documents produced.  Much of that subsequent conversation was making sure that everything was turned over.  The circumstances of the Michel, and the phone, and all this were somewhat of a non —

Q    A nonfactor, at that point?

A        factor, at that point.

Q    It also explains, a little bit, why your letter is dated September 26th, and it related to the August 29th meeting.  Because you were off for two weeks, it appears. Again, I want to give you every opportunity to tell us what happened during that time. It appears that while you're gone, things get a little

156

bit better. Anthony Brown is put back in State custody. The FBI has access to him, if they want to have access to him, at that point. Then you get back and then, four days later, ICIB investigators are at the Leah Marx's house threatening to arrest her.

A    Okay.

Q    Is there some sort of cause and effect, that you can think of, right now, that caused -- based on something that you did -- that causes ICIB to think that it was appropriate to approach Leah Marx and threaten to arrest her?

A    Well, can you tell me what date that was?

Q    That was September 26th.

A    Okay. Right when I came back.

MR. FOX:    The same day you --

Q    You were there on the 22nd.

A    Okay. So I'm out of sequence with time then?

Q    Yes. I'm giving you the time. That's my purpose. On September 22nd, you're back in the office. September 26th --

A    So my earlier testimony was that I thought

157

that things had calmed down during the time while I was gone. The truth is that they had not calmed down, obviously —

Q   I think it did actually.  Because —

A   Oh, did it?

Q      nothing's happened to     Again, I'm testifying.  I'm not trying to —

A   I understand.

Q   They put Anthony Brown in State custody. You no longer have Anthony Brown, while you're gone. There's no approach of the FBI agents.  September 22nd, you come back in the office.

A   Yeah.

Q   September 26th, you write the letter to Mr. Birotte.  September 26th, that same day, your investigators approach Leah Marx and attempt to, threaten to arrest her.

A   All right.  Then that's where you have this next meeting, which is September the 27th.

Q   I want to back up though.  I'm not sure that your attorneys believe it's appropriate that we discuss the September 27th meeting.

158

A    See, that's where it all

Q    Let's focus though on the 22nd to the 26th, first. Then we can talk with your attorneys about whether it's appropriate to talk about the 27th.

A    Okay.

Q    [START 33:32] The 22nd, you get back in the office. The 26th, your letter goes out to Mr. Birotte. The 26th, Leah Marx is approached by ICIB. What communications did you have with ICIB between the 22nd and 26th, that might have caused them to think that that was an appropriate response?

A    None. I didn't come back to work on the 25th, in the office. It's my Sunday day, that I do typically in the community. So Monday is the 26th, which then becomes the first day back. The key to what, the lawyers agreed to here, is that the meeting with Mr. Birotte --

Q    Again, that's going too far in the future. I'm trying to focus on what happens on the 26th. Leah Marx, that's when --

A    That's when I get the call.

Q    I want to focus on actually ICIB. ICIB

159

approaches Leah Marx on September 26th.

A    Yes, I know.  That's why I remember it. Because I wouldn't know what day ICIB talked to Leah Marx, if it weren't for Mr. Martinez's call.

Q    Okay.  Looking at Monday, September 26th, it looks like there was a President of the United States fundraising dinner.  Do you recall whether your conversation with Assistant Director Martinez was before or after that fundraising dinner?  I'm just hoping that's probably an important event that you might remember.

A    Certainly.  If my recollection is simple, I wasn't at home, when he called me.  I was somewhere. This could be the somewhere, where it's indicated on that dinner.  He told me that Ms. Marx was told that she could be the subject of a criminal investigation. At that point, I said, "Don't worry.  I don't want her to feel that somehow this is now on her back, because it isn't, as far as I'm concerned.  So I'll take care of it."  So I did.  You know?  At that point, I circled back.  I made notifications and say, "Don't do this, because it's not appropriate, because we do have

160

a way of dealing with this thing, other than that way." [END 36:03]

Q    Do you know whether Mike Gennaco had met with the FBI and U.S. Attorney's Office before this, in which he may have suggested that LASD was considering arresting Special Agent Marx?

A    I don't know about that, but —

Q    Would that be outside the scope of his OIR responsibilities, wouldn't it?

A    I would think so.  You know, if there were discussions about that, then obviously, it sends some alarms.  In my case, back to my earlier points about the relationship I have with the FBI Directors.  A Director asking me to do something is a very important thing in all this.  I don't really know if I made that point convincible to the audience here.  But I believe it's a very critical point in all of this.

If the FBI wants to investigate the Sheriff's Department and calls me, yes.  If the FBI wants another person on a taskforce, yes.  If the FBI doesn't want to lose taskforce members, yes.  If Ms. Marx, who I'm sure a fine agent, is being put on the

161

hotspot over this thing? I don't think so. Okay. It's a system approach and one agent should not be held more accountable than any other agent. And I'm not going to hold anybody accountable in this thing. So Steve is a guy who I trust, whether he trusts me or not. You see, I don't think people understand that about me. I don't think anybody understands that I don't need to be trusted to trust somebody.

Q Okay. We're focusing on the approach of Leah Marx. Do you agree that it was improper for ICIB to threaten to arrest Leah Marx?

A I think I said, earlier, that it was a part of this investigative process and he wanted to talk to her. When she said, "I'm not going to talk to you. Go," whatever she said. That he, I think, in reaction to that statement, rather than just say, "Okay. Thank you very much." He said what he said. Now, did he plan to say that? I don't know. You'd have to talk to him.

Q So if he had a chance to deliberate on that and say it again, and reflected that whether that was appropriate and say it again, at that point, you

162

believe it would be inappropriate?

A    Well, it was inappropriate, in the sense that she gave no statement.  So how can you go out and arrest somebody?

Q    And you agree, there was no probable cause to arrest her, at that point, correct?

A    To my knowledge, no. I mean…It sounds to me and I have no way of knowing the frame of mind of the Deputy    it's an impulsive reaction to something. I think that's the issue here.

Q    Okay.  I'd like to play for you    and tell me if you can see it.  It's the one that's last part of this movie, or it's a wav file.

MS. RHODES:   It's the wav file.

MR. BACA:   Okay.

MR. FOX:   Can you…I'll…We'll bring it to you.

MR. BACA: Okay.

MR. FOX: Special Agent Dalton can you play it for…

SPECIAL AGENT DALTON: Absolutely I can.

MR. FOX: It's the third one down.

MR. BACA:   Is it sound?

163

MR. FOX:  There should be a sound.  Yes.

MR. BACA:  Is it a video, as well?  Or is it just sound?

MR. FOX:  This is the, this is the audio.

MR. KIM:  Is this a phone call or is it the encounter?

MS. RHODES:  No, no, no.  It's the encounter, which is the last —

MR. FOX:  Yeah.  Oh, it's the last.

MS. RHODES:  No. I'm sorry.  You're right.

SPECIAL AGENT DALTON:  Marx 092611.  Okay. I'm going to play it now.

(Recording is played)

BY MR. FOX:

Q    Is the first time you've heard that?

A    Yes.

Q    What are your thoughts after hearing that?

A    Well, I think that the Deputy had an intent there.

Q    Intent to do what?

A    To conceivably make that arrest.  Because that's what he told Agent Marx.  I thought that was

164

clear.  Is that clear to everybody here?

Q    What if he, instead, went there and decided to tell her a lie, on purpose, and he knew that he wasn't going to arrest her?  What are your thoughts on that?

A    Well, I don't believe that anyone should lie under any circumstances. But I do know that in the scope of investigative strategies, that lies do occur.

Q    Okay.  The fact that he said —

A    Meaning to suspects.

Q    Right.  He said that she was a named suspect in a felony complaint. We're not talking about a normal person, he's talking to.  He's talking to the FBI Agent there. What law enforcement purpose is there, in your mind, to tell an FBI Agent, at that point, that she's a named suspect in a felony?

A    I don't see much value in that, myself.

Q    Is there any?  I'm wondering what that value is.

A    None.  But, you see, the nature of the tape is it speaks for itself.

Q    Okay.  The um…you were not, you at no point

165

in time, were briefed that she would be the named suspect in a felony complaint?  Correct?

A    That's correct.

Q    Were you ever briefed that Mr. Craig there was swearing out a Declaration for an Arrest Warrant for Special Agent Marx?

A    I've never seen a document of that kind, and I wasn't briefed.

Q    Yeah okay.  You were talking about your dialogue between Mr. Martinez -- between you and Mr. Martinez. And there she said, "Contact Mr. Martinez," and he said, "No. He should contact me."  Did you hear that part?

A    I heard that.

Q    What are your thoughts on that?

A    I think that's a little too presumptive, on his part. You know, there's a point where he has to do what he has to do. I think it was appropriate that she did call Mr. Martinez and that Mr. Martinez called me.

Q    Well let me play for you another recording the, which one is the first one.  This is later that day.

166

A    Okay.

Q    I'll represent to you that the male voice is Special Agent Marx's Supervisor.

A    The Supervisor…Ms. Marx's Supervisor?

Q    Ms. Marx's Supervisor.

(Recording is played)

A    This is one of my person's calling?

Q    We can pause for a second. I'll tell you he voices. I'll represent to you who the voices are. The one who says, "The Sheriff knows it," is one of your Investigators.  The one who says, "Look it up," is one of your Investigators.  The one who says, "That's the Undersheriff is aware of it, and you should call the Undersheriff," is one of your Investigators." Okay. We'll continue.

A    Certainly.

(Recording is played)

Q    All right. So few questions there.  First of all, is this the first time you're hearing this recording?

A    Yes.

Q    What are your thoughts on it?

167

A    I don't particularly like the style.  I think that the fact that they say, "I knew about it," is invoking more than what is true.  It seems like the Undersheriff, they invoke as well.  I think that the idea that something can't stand on its face, that it takes this extra little punch to put me into the scenario, and even the Undersheriff into the scenario is troublesome.

Q    Do you know whether the Undersheriff was aware of ICIB's attempts to approach Ms. Marx?

A    I don't.

Q    Have you had any conversations with him about what he knew?

A    No.

Q    Was he involved in any communications with Steve Martinez or Mr. Birotte, afterwards?

A    I have no idea.

Q    I mean, that you were a part of?

A    No.

Q    Okay. The um…so it's not true when she said, that "The Sheriff knows about this."

A    Well, if I'd known about it, there wouldn't

**Formatted:** Highlight

168

be any ambiguity as to the authority, and then Mr. Martinez, himself, would not have been prompted to call me.  And then I would not reverse myself, if I was approving of something, other than the fact that this thing became what it is and you have ample evidence as to how it was presented to Agent Marx.

Q    If the ICIB Investigators -- and I'll tell you, one of them was the same one who applied for the Court Order. Okay? If they went there with the intent to cause the FBI, force the FBI to have to reveal its investigation to LASD, all the undercover stuff they're done, everything that they've done, just like they wanted to do in a court order.

A    Yes.

Q    Would have you found that to be appropriate?

A    Not that way. You know, but I think you can find these things out differently.  You know, the --

Q    You know, you talked, before, about using your anger in a tactical way. Do you consider this to be a tactical way of going about it?

A    This particular method?

Q    Yes.

169

A    I don't consider it tactical. I don't consider it even practical. What I consider it is somebody wants to do something. They think they have the right way to do it. They didn't do it the right way.

Q    [BEGIN 49:18] All right. Then in your conversations with Mr. Martinez that occurred after these phone calls, did you tell -- I think you said, earlier.  Again, I want to give you the chance to explain away anything else, so we're not left with any ambiguities here.  Did you tell Mr. Martinez, not that you were unaware of this and that he would stop it, but that Leah Marx would not be arrested that night?

A    I don't recall the precise words I used. But I told Mr. Martinez that this is not going to happen, and I will take care of it.

Q    It's not going to happen, period?  Or not going to happen that night?

A    It's not going to happen at all.

Q    That's what you told to Mr. Martinez?

A    Right. And I felt that, had I been told that this was part of the current process, I would have

170

said, "Don't do that." [50:10] ~~Okay.~~

~~Q     Do you recall having a phone conversation
with Mr. Birotte that night, as well?~~

~~A     No, I don't.~~

~~Q     You don't recall telling him that she would
not be arrested that night, either?~~

~~A     I don't recall that part. I'm more clear on
Mr. Martinez.~~

~~Q     Can we play the —~~

~~A     I appreciate you playing that to me.~~

~~MS. RHODES:   It's right here.~~

~~MR. FOX:   You know what? Do you mind if we switch
sides?~~

~~SPECIAL AGENT DALTON: Not at all.~~

~~MR. FOX:   I want to stop it at several portions
of time. And put some times in and ask you about
specific comments.~~

~~[51:10] (Recording is played)~~

~~MR. BACA:   Who's this talking?~~

~~MR. FOX:   This is the Fox Anchor for "Good Day
L.A."   And I'll represent to you that this was
September 26th.   The same day you wrote the letter.~~

**Formatted:** Strikethrough

171

The same day that Leah Marx is approached.

A    Okay.

Q    Okay, so do you recall this appearance?

A    No.  But I'm sure it's me.

Q    You saw the picture and you know it's you.  Okay.

(Recording is played.)

Q    Ok so he just asked you if you resented the FBI's intrusion.

A    Yeah, I do. [52:26]  You know…I'm not saying that I can't move on.  I moved on when Mr. Martinez and I settled what was necessary.

Q    Which was the next day?  Is that what you're saying?

A    Right.

Q    It was the next day. So on September 26 of 2011, in this appearance, you were resentful of the FBI's intrusion on LASD?

A    Yes.  Because once Leah was threatened with arrest, it went too far.  On the Sheriff's Department side, it went too far.  If she was sitting right here, I would apologize to her.  But you know, you're

172

talking to a person who runs an organization. I don't

blame you or anybody else for what went on, but I do

blame the leader. Okay.   That's my right to do.   I'm

not violating anybody's laws and I'm not being an

unwilling partner. But I know if it were reversed, I

would not have subjected the FBI to me saying, "I

don't trust them." That is unacceptable to me.   We

have too much to do, we have too much to do then put

prisoners, who are at risk, in a position where they

are trusted more than I am.   I'm not going to accept

that.

Q    So but you were talking about the review

process, the OIR, which you now explained, I think,

that your review process was not working the way you

thought it should have been working.

A    Yes, sir.

Q    Looking back on this, it seems like you're

still trying to justify the fact that     Within the

LASD, we have this internal review process that works

and they should have just allowed that to work.   Is

that what you're saying there?

A    To a degree.   Because, you see, Mr. Gennaco

173

has put people in jail for the very thing that the Civil Rights Unit is attempting to do

Q    While he was an AUSA…

A    with the Deputies in the jail.

Q    While he was in the U.S. Attorney's Office?

A    It's not as though he doesn't know what to do.

Q    Right.

A    And so even if you didn't come to me, and you went to him and asked him to hold this a big secret, it would have been a little more palatable, in terms of process.  You know, I don't want to interfere with the FBI investigation.  I have enough knuckleheads of my own that I've been able to discover, that should be out of the system.  As soon I get to them, they're out.  Okay? So the nature of this mission is not inconsistent with what I want.

Q    But what you're resentful of, though, is the FBI investigating LASD, without informing you of that? Is that correct?

A    Only in the sense of the phone coming in. You know you can do it whatever way you need to.  But

**Formatted:** Highlight

174

this phone somehow doesn't really give me any comfort at all.

Q    But you were talking about OIR there and OIR doesn't --

A    Well, they give me comfort, to a degree. But you see, I trust the OIR, just like --

Q    Do you still?  Despite what you've learned since then, that this was in ineffective review process?

A    You can call it "ineffective," but evidence drives what we do.  Not suspicion and allegations. Allegations help us acquire the evidence.  But you see, I don't operate on the basis of allegations, alone.  I feel that it's more important to have the evidence to support your conclusions and not predetermine the outcomes of anything.

Q    That's a good point.  So predetermine the outcomes of everything.  There's been some stuff written --

A    Of anything.

Q    I know. I get it.  And there's been some stuff written though, some opinions by -- I think it

175

was in CCJV, and an audit done of excessive force investigations that basically said that they were either conducted inappropriately or they were prejudged. So that's your own internal review process, that's judged that way.

A    That's correct.

Q    So again, looking back at it, at this point, do you agree that it was an ineffective review process, for use of force incidents?

A    It could be.  You know?  It's not a matter of anything being perfect.  You know?  No matter which agency you're talking about — and I can assure you that the FBI is not perfect, as I believe any of that —

Q    Absolutely. Have you seen the — I'm not sure if you've seen the monthly or yearly summaries, that you've given us, over the use of force incidents and how they've gone down since 2011?

MR. KIM:  He's presented them to the board.

MR. FOX:  Okay.

MR. BACA:  I have them here, and I have this for you to take —

176

BY MR. FOX:

Q    I would like to discuss this, at some point. But you've seen about —

A    You don't need to discuss it, but you can have it.

Q    Thank you.  We'll take it.  But you've seen that, during the times, '09 to '11, that the OIR process is in place.  You've got the IAB people doing the investigations.  The use of force is through the roof, compared to where it is today, when there's an outside agency investigating and all this stuff has come to light.

A    Today, the used force is up?

Q    No.  '09 '11, off the charts, especially in MCJ and Twin Towers.  Since this has all been brought to light and publicly seen and the FBI and the Federal government have been investigating it, the use of force is way down.  Have you noticed that?

A    Well, it's down for reasons not because of the investigation.  It's down because of the policies and the practices, as well as the things that deal with better supervision and training.  You know, the

177

education based incarceration, where we have 8,000 inmates in school, not one use of force in that environment.  Let me share this with you.  Young deputies are all afraid.  I go to the Academies before they graduate.  Many of them aren't even able to get in a real serious fight.  But the ones that are big enough and been knocked around a little on football teams, they're the ones that have a better confidence level. Most of them are afraid to go to the jail. Then they're afraid to go to patrol.  They have this immaturity about how they should emotionally compose themselves.  So what I did, when I met with the Deputies that use force, 100 uses of force, I played a little trick on them.

I said -- many of these girls are 5'2 and weigh about 110 pounds, and then we've got these guys that are like me, a pencil-neck.  An inmate could kick my butt real easy.  But it has to be a big one, not a medium- sized one.  So the nature of the culture in the jail is "us versus them."  They're the enemy and we're the ones that are the good guys.  Now that could get taken to an extreme.  So in order to change that,

178

you have to put them responsible for the education of
these inmates, because that truly is what a jail
should do.

Q   Okay.  Going back to the investigation's
though.  But you agree that it would be inappropriate
for someone with an IAB or a Supervisor conducting an
investigation of an incident to go into an incident,
and say, "Oh, this inmate's alleging that there was a
use of force, but all inmates lie, therefore" --

A   No, no.  You can't go on that premise.  I
agree with what you said, when it comes to the small
percent of people who want to believe that inmates
aren't worth redemption. I believe they are.

Q   You believe they are?  Also, do you think
that it would be inappropriate for -- if an LASD
employee came forward and said, "This is was happening
wrong in the jails," for the investigation to instead
focus on the whistleblower, instead of the person
who's allegedly --

A   No. I don't believe in that.  I believe that
the -- we do have terrific information coming on
Deputy misconduct.  You know, it isn't as though we're

179

blind to the methods of how to get —

Q    From the Deputies or from —

A    No, from inmates.

Q    From inmates.  Correct.  I'm saying what if other Deputies come forward.

A    The same method that you use, in how you want to do this.  The key here is not to look at one reason for reducing force, but to look at many reasons to — when I wrote the Force Prevention Policy, these Deputies thought they had to use force.  Many of them were running down hallways, when there's a skirmish between another Deputy and an inmate.  There was a whole gang of them.  This is crazy. You can't be doing things like that.  So we have a Commander in there, that's teaching how to take down inmates, without throwing them face first.

Q    This is all after September of 2011, that this has happened?

A    Absolutely.

Q    I want to ask you about this.

A    And before.

Q    Okay.  That wasn't happening before

180

September of 2011.  That was when a lot of force was up, and the Deputies felt they could go and gang up on inmates? Is that correct?

A    Not quite.  Those broad generalizations is what I'm reacting to.  You know, the perspective is simple. Our force was right around 400, three years ago.  We were on a decline the prior couple of years. New York is about 2,700 and they've got 12,000 Supervisors and we have about 6,500 total, and that includes medical staff.  I only have 2,000 Deputies in the system.  The Custody Assistants are about 1,100. So what you're dealing with is too little supervision and then the Supervisors or Sergeants, I need 91 more. I write to the Board.  They don't give me the money, and they're still waiting for the money.  So the nature of the beast is that we were four times less force of Rutgers's Island, and about two times less force than Cook County; and they have less inmates on both system. And I have more inmates.  The more inmates you have, you would think the numbers would go up.  But my numbers of 5,000 more inmates today show that we have less force with more inmates.

181

Q   Today?

A   With less.

Q   What about '09 to '11?

A   Well, those were on the downtrend.  If you look at —

Q   Okay.  I'm just asking you what you're comparing the numbers.  You said you compared —

A   Yes.

Q   This is a discussion that you've had before. I want to focus on —

A   I didn't mean to interrupt that.

(Recording played.)

Q   By this time, certainly you knew September 26, 2011, during this interview, you knew that Anthony Brown truly was an FBI Informant?

A   Yes.

MS. CARTER:  Can I ask a question?

MR. BACA:  Yes, of course.

BY MS. CARTER:

Q   Here, you reference a misdemeanor charge and a conspiracy charge that goes along with that.  The same thing that your Investigator says to Agent Marx,

182

when he goes to confront her.

A    Yes.  Yes.

Q    Can you explain that?  How is it you're
saying it on TV, that morning, the same charges, that
the Investigator is saying later that afternoon?

A    The introducing of a phone and having a
phone in the jail is a State crime.  So the
clarification of today's meeting is is…that it doesn't
matter that it is…that FBI Agents have the authority
to do what they do, in the interest of whatever
they're investigating.  So that is not a contradiction
to what I said and what you said.  The key is, is that
it's a law that we focus on, in the jails, for the
purpose of that bulletin, that I provide you. That it
is an FBI Ammunition Bulletin, but it's not specific
to the law. And so the statements are consistent with
what is fact.  Not just me hypothesizing over this.

Mr. Brown, himself, cannot legally have that
phone.  You can introduce it to him, but if we find it
— we didn't find it by accident, by the way.  He was
being moved to another place in the facility because
of his status.  It was found in a shoe, in a sock, by

183

a Deputy who was trained to search everything, as you move somebody.  So when we found it, we didn't know whose phone it was.

BY MR. FOX:

Q    Who told you how it was found?

A    The deputies that found the phone.

Q    You were there, and the Deputy said to you?

A    No. They relayed it up the chain of command.

Q    Who informed you of that?

A    The people up the chain of command.

Q    Is this Carey, Leavins?  I'm just asking.

A    It could be them.  But the key is, is I'm very clear on how it was found, because I was very critical to those that were sharing with me.  I really want to know the true details as to how it was found, so they gave it to me, in that fashion.

BY MS. CARTER:

Q    So did you have conversations with anyone in the Sheriff's Department, before you went on this television appearance, about charging the FBI Agent?

A    No.  There's no mention of my -- even in the interview, I don't think you played anything that says

184

that I think we ought to go charge the FBI.  But if I said that, I'd like to hear it.

MR FOX:  Well, I'll play more for you, if you unless you have follow up questions?

MS. CARTER:  No.

MR. BACA:  Thank you.

(Recording is played)

BY MR. FOX:

Q    When you said you "had to weigh your options," what options were you weighing?

A    Well, what to do.  You know, I think the trigger was    apparently, that was the very day that Leah was contacted.  Was it not?

Q    That was.

A    Okay.  Once it got to her point of where we were headed    I'm not saying, we, generically, with me in charge.  Because my Investigators are doing what they think is appropriate.  Whether they're right or wrong, that's what they think.  Once Mr. Martinez called me with the problem, to me, it had gone too far. Okay?  It had gone too far on my end.  Whether the FBI wants to just    could not continue to do

185

whatever they do and say, "We have the right to do it.

We're right and we're not looking for best practices.

We're not looking for any form of collaboration" —

which I had none.  Then I say, it's still not worth —

Q    But what options were you —

A    Tormenting an FBI Agent over something that

FBI Agent has no control over.

Q    Specifically, what options were you weighing

though?  You were still weighing your options.

A    What options do I have?  You know?  What

options do I have?

Q    That's what I'm saying.  In the September

26th letter, you referenced taking Task Force Officers

off of the Federal Taskforce.  Is that what you were

referring to?

A    No. I mean I'm looking at options — when

you're being interviewed, and I presume you've never

been on one of these television shows, like that, you

don't give them an answer.  You just say, "I have

options."  Well, what are the options?  The option is

shut down the investigation as much as it is to keep

on marching forward.

186

Q    Right.

A    And I took the option that I thought was best, without information about what was going on with Agent Marx.  But I certainly, in spite of all the rhetoric and the tactics and whatever else that we get into at the high level, an Agent's career is not worth this kind of back and forth with top level people.  I have more regard for the Agent's condition or my own Deputies than I do for my own.

Q    Okay. I'm going to continue to play this.

(Recording is played.)

Q    Ok so she asked you, you don't want the FBI in there so who polices you?

A    I didn't say that.

Q    No.  She said that.  You said, "Well, we police ourselves."

A    What's interesting about that answer is, when you're on a news program, you don't have the time, like we have now.  I have to hit an answer and move on. Because they're ready to ask the next question.  But I believe that transparency is key. We're the only Law Enforcement Agency that has lawyers

187

looking over our shoulders constantly.  Now, you may not like the way they do it, because you don't think they're effective. That's a respected opinion of yours.  I respect your opinion.

Q    I'm going to show you this next part now.

A    Okay.

(Recording is played.)

Q    All right so we just talked about prejudging investigations in cases.  Right there, they're asking you throughout about beatings and that sort of thing. You conclude with, "Inmates attack Deputies" and "inmates don't cooperate" and that sort of thing. This is a month after you learn of the investigation and you learn how extensive the investigation is. You're right there saying, discrediting the inmates, basically.  Looking back on that, was that your attitude at the time?

A    Did they say anything about inmates in that last conversation?

Q    You did. Do you want to hear it again?

A    Did they say anything?

Q    No, they didn't.

188

A    The questioners?

Q    I don't think they did.  They said the inmates were coming to the jail.  They said    we can listen to it again.  But I don't think they said anything about inmates lying or    we'll watch it again.

A    Did I say "inmates lie"?

Q    No.  You said, "if inmates are alleging excessive force, and it's not excessive force, then they're lying."  Aren't they?

A    I didn't say they were lying.  It's interesting

Q    You said that they are incredible earlier, they are inmates, they are, criminals.  It's hard to make these investigations because a lot of them are liars.

A    In all due respect to how we're finishing this interview, if you were to ask, on a nationwide basis, and get it down to here, is within the State of California.  No one is a greater believer in inmate rights than I am.  But you can't just believe everything they say.  We keep on having cases    even

189

the ACLU cases, which you haven't even brought up.  We have found that a number of the inmates who make the allegations recanted them.  Okay?  I don't think we're forcing anybody to recant anything. You know, another number —

Q    Look I just want to say.  I understand that many inmates do lie.  I do understand that many inmates can't be trusted.  We prosecute and we investigate many hardened criminals who we agree, that you have to —

A    I appreciate you asking, as you do, because I don't think you're motive is to not do an excellent interview with questioning me.  I think it's been an excellent interview.  That's my sincere feeling.  But I'm not a person who dismisses inmates who do tell the truth.

Q    Okay.  [1:12:59] Let me ask you about an L.A. Times Article -- and I know you've been quoted in the media a bunch.  But September 29th.  I'll show you the Article, and I've got a question for you about your statement here.  This is September 29th, a printout of an article, that's labeled, entitled,

190

"L.A. County Sheriff Lee Baca Gives Details of the FBI

Sting."  Why don't you take a minute and review that?

     A    This was a September 29th article, which

means we spoke before September 29th.

     Q    Correct. [END 1:14:07] ~~You read it?~~

     ~~A    I'm still going.  Okay.  I read the part~~

~~involving the FBI break.  Yes.~~

     ~~Q    Okay.~~ [1:15:25] So you're quoted with

saying, "We're investigating the crime."  What crime

were you investigating?

     A    The idea that an inmate had a phone, and

then whatever the process was that got him the phone.

     Q    Okay.  So it's Gilbert Michel--

     A    Right.  Because on a positive side, if you

guys can pull it off, the way you did, somebody else

can do the same thing.

     Q    Okay and it said asked if the Sheriffs'

Department was going to seek criminal charges, you

said, "No, I don't think so. It's not worthy of

pursuing, in view of the greater good."  You were

talking about the FBI Agent, at that point?

     A    That's correct.

191

Q    So when you were saying you were investigating the crime -- this interview you're having with the reporter, are they taking it to mean that you're investigating a crime that the FBI Agent committed?  Is that how you're understanding that question?

A    We still try to make a distinction between Mr. Brown and the FBI, and then we have this Deputy Michel, who is part of the problem. Probably the biggest part of the problem, because if he was really the right kind of guy, he would have never acquiesced to whatever Mr. Brown, to convince him that he could do this.

Q    But you didn't say there, that, "We're going to seek criminal charges against Brown and Michel but not against the FBI."  You're saying, "No.  I don't think so. It's not worthy of pursuing, in view of the greater good."  You're relating the question --

A    I'm relating that to the FBI.

Q    Right.  What made you, I guess relate -- to understand that these comments related solely to whether the FBI Agent committed a crime?

192

A    Well, they asked me whether or not we were going to pursue the FBI Agent.  That's when I made that remark.

Q    Got it. Okay.  Then it says, "He dismissed any suggestion that the visit was intended to intimidate the Agent.  The FBI's home visit to his Deputy wrapped up in the sting, Baca argued, involved substantially more intimidating tactics."  That was probably the part, that to me, confused me the most.

A    Let me see where that fits in here.  Where?  Oh, I see.  Okay.  Baca argued the FBI home visit to the deputy wrapped up in the sting, Baca argued was substantiality more intimidating… intimidating tactics . . . you know, first of all, Faturechi doesn't have a tape recorder, and I wish he would, because he tends to reconstruct his stories by memory, which is not a good idea.

Q    Okay.  You don't remember making this comment to him, in other words?

A    I don't even know what it means. [END 1:17:56]

Q    Okay.  Well, let's talk in respect of that?

193

A    In a sense, it says, "The FBI's home visit to his Deputy" —

Q    That's Gilbert Michel.

A    Yeah.  "Wrapped up in the string involved substantially more intimidating tactics."

Q    It seems like you're saying, "It was perfectly fine for ICIB to go out and threaten the arrest of Leah Marx because" —

A    No, I didn't.  Because it says, "seek criminal charges, it's not worth pursuing, in view of the greater good."  We're investigating what occurred as a holistic investigation.  Now, the FBI can't just say, all of a sudden, "We're not a part of that," if we think it is and we're in error, that you have immunities.  You know?

Q    Hold.  I think we're going off on another tangent.

A    Okay.

Q    Let me just focus on this.  He dismissed any suggestion that the visit was intended to intimidate the Agent."  The FBIs home visit to his Deputy, wrapped up in the sting, involved substantially more

194

intimidating tactics."

A    Okay.

Q    So at this point in time, you received a phone call from Steve Martinez saying that your Investigators threatened to arrest Leah Marx.  So you're aware of that already.  And you're saying that --

A    Well, wait a minute.  Remember, this article was written several days before September 29th.  It came out in the morning edition.  Okay?  So when we talked together, I thought it was in the evening, of the 29th --

Q    Of the 26th.

A    Of the 26th.  I'm sorry. So this could have been done even before then.  You know, this is a pretty long story. You don't tend to write these kind of stories --

Q    And this point in time though, he's asking you about the approach of Leah Marx at her home.  From my understanding, from what you said earlier -- and correct me, if I'm wrong --

A    So this had to be after.  He had to

195

interview me after the Leah Marx incident.

Q    Yeah.   And after you've seen Martinez, and he informed about —

A    Correct.

Q    — the approach and maybe after you did some homework and figured out what had happened.

A    Okay.

Q    So you are aware, it appears — and tell me if I'm wrong —

A    Yes.

Q    — at this point in time, that ICIB Agents had gone to Leah Marx's home and had threatened to arrest her. Is that right?

A    That's correct.

Q    When you speak to this reporter again, you're saying that the FBI's visit to the Deputy who committed bribery —

A    Yes.

Q    — was substantially more intimidating?  A substantially more intimidating tactic, then my ICIB Investigators going to Special Agent Marx's home and threatening to arrest her."

196

A   Okay.

Q   Take me through the thought process. I don't get that.

A   All right.  Well, as I look at this and try to reconstruct the story, I believe that when the FBI was continually going into the Deputy's role in this whole thing -- what was reported back to me is that the amount of money that was supposed to be provided for this phone entry, it was reported to me that it would be in the realm of about $20,000.  Okay?
Now, you've got this Deputy on the hook for $2,000-$3,000 as a down payment.  You know, the taps of the phones say a lot of things, back and forth.  I mean, you did a great job in catching the Deputy. Okay?  But then the things that are said to me, are that the Deputy then was approached with the fact that the phone was compromised.  Now it's time for that Deputy to go to work for the FBI.  "You're ours now." So, okay.  That's fair game, but at the same time, it's pretty intimidating to be flipped like that.  I don't think that's wrong --

Q   In fact, you know that that's a very

197

important and useful law enforcement tactic.

A    That's right.  So I'm not quibbling with it.
But you know… it is a fact, if you agree with it.  I
have at least enough information about it.  But it
doesn't matter. What matters is what I said, and that
is that I'm not going to pursue    I'm not going to
allow anyone in my Department to pursue a
criminalization of an FBI Agent process. It's just not
going to happen.

MR.  DAHLE:  But how's that even a point, in your
organization, at this point?  This is after you…your
Investigators have learned they cannot.

A    My Investigators didn't know any of this.
You're talking about today. You know I came in here,
today, and my two colleagues here, will tell you, that
I, myself, with them, argue that the FBI doesn't have
a right to break the law.  Now let me tell you this.
When you do that    even if you have the umbrella of
authority.  You know what Eric Holder went through
when those weapons were sold to the Mexican Cartels.
Let's not play games in here.  You're an FBI Agent.
You know that went you get to the edge, that the heat

198

is going to come down hard, whether it was legal or illegal.  So all I'm trying to do is say to you is that I understand that you had to do what you had to do.  But don't believe, for one minute, that it isn't fraught with risk, because it is.  We have too many people who -- even in my organization -- that think they can do things, because they have some cloak of cover and authority, when in fact, they can't.  In this case --

Q   I get your point about risk, but risk is a different than reality.  Just because something is risky doesn't mean it's illegal.

A   Well, in this case, it doesn't appear like anything illegal was done.  But I'm telling you, the more you get used to that idea, that this is not something that has to have controls, and it has to have some degree of management, you don't ever want to lose a phone in this jail.  That's what I'm saying to you. There was some error in planning, that no one thought of, that that phone could be compromised.  Okay?  So that's okay.  We all have these mistakes.  But it doesn't help anything when it does get

199

compromised.

MR. FOX:  I think he's going back to what you described in the "Fast and the Furious," is a policy issue and some big problems that happened there. You're telling the L.A. Times that there's an investigation of a crime that's occurring and that you're defending your Deputies, by saying, "The Deputies that went to the home of Leah Marx, by saying that the FBI was way more intimidating to my crooked Deputy, then we were to the FBI Agents."

A   You know this, because you can read it.  But the average person reading this is not going to imply what you would imply.

Q   Okay.  But do you agree that that's a fair reading of what you said here?

A   It could be.

Q   Okay. At this point in time, it's a September, late September of 2011.  You were aware that Gilbert Michel was crooked?  Because he --

A   Yeah. He's a guy that was way over his head.

Q   He was crooked.  He committed a crime and he committed bribery as an LASD Deputy.  Correct?

200

A    Yes.

Q    And FBI Agents went to his home.  It seems like you're defending him, here.

A    I mentioned -- is there any name in here?

Q    Yeah.  There is actually. It says Gilbert and --

A    In my quote, is there any name about anybody?

Q    It says --

A    In my quote, when it comes to that point of "substantially more intimidating," do you think -- Let me say this.  Let me ask you this.  Do you think the processes that occasionally are necessary by the FBI are designed to be substantially intimidating?  Don't you think they are?

Q    Oh, absolutely.

A    Okay.  So what are we arguing about?

Q    I guess what I'm trying to figure out is why you're defending -- because it appears to be -- and tell me if you weren't.  But it appears to me that you're defending your tactics, your ICIB tactics of visiting Leah Marx's home and threatening her with

201

arrest.  By saying, "Oh, yeah.  Well" —

A    All right.

Q    Saying, "Oh, yeah.  Well, the FBI was worse. They visited my crooked Deputy and threatened to arrest him."

A    Well, I think you're being a little defensive. But what I'd like to share with you is this. The tougher side of the business is what you and I both understand. Okay?  All I'm saying is, all of these conversations about that phone would have never happened, if we had better communication and we understood what the plans are.  Okay?

I don't need to share any of this with anybody.

And, of course, in this conversation, I'm not going to go back and share with anybody.  It's critical for us to look at ourselves critically, too. Okay? And that's on exception to any agency in America.  None of us are perfect.  But I'm happy that: (1) I put the brakes on whatever passions my Investigators may have; that (2) the requests that I get from the FBI, I honor. Okay?  And (3) there's no evidence of malicious intent on my part to undermine

202

~~the mission of the FBI.  If you want to catch all the~~

~~crooked Deputies I have, in fact, it's helpful because~~

~~I don't have enough budget to do it all myself.~~

Q    [START 1:27:37] Let me ask you a few wrap-up questions on this topic, and then I've a couple of very minor things to ask you on a couple of different topics.  It will not take long at all.  But I just wanted to ask you these wrap up questions.  And I'm going to summarize, basically, what you said today, that I think is correct.  And you tell me if that's true.

A    Okay.

Q    You did not -- you're saying, today, that you did not order Anthony Brown to be hidden to try and stop the FBI from continuing to investigate excessive force?

A    That's correct.

Q    And corruption within the jails.

A    That's correct.

Q    You decided . . . you're saying that you did not decide -- you did not order -- let me strike that. You did not order the investigation of an FBI Agent

203

for performing her duties, and the arrest of an FBI Agent for performing her duties, as an FBI Agent.  Is that correct?

A    I directed an investigation of the whole situation regarding the phone.

Q    But as a suspect or subjects, or targets of the investigation?

A    I did not decide who was subject and who was suspect, and who was what.  There's more people involved than Leah Marx, I'm sure.

Q    Okay you did not direct that then, that investigation then, in order to try and force the FBI and the Federal government to stop its investigation of LASD.  Is that correct?

A    Correct.

BY MS. CARTER:

Q    Did you ever have any conversations before Leah Marx was approached, on September 26th, about arresting or threatening the arrest of an FBI Agent?

A    No.

MR. KIM:  One second.

MR. FOX:  Do you want me to ask it again?

204

MR. KIM:  I kind of missed it.  Can you just say that one more time?

BY MS. CARTER:

Q    Sure before Leah Marx was approached on September 26th, did you ever have any conversations with anyone in the Sheriff's Department about arresting or threatening to arrest an FBI Agent?

A    No. [END 1:29:35]

BY MR. FOX:

Q    All right.  So you mentioned the ACLU and you were referring, a lot of the time, when you were talking about the monitoring the jails to the Rutherford case.  Is that correct?

A    Yes.

Q    You're aware, that with respect to the Rutherford case, sometimes the ALCU and the Federal Judge presiding over the case take a tour of your jails, to make sure that the conditions are what LASD says they are.  Is that correct?

A    Yes.

Q    All right.  Has a document in late October, 2009 been presented to your attention about the moment

205

of a prisoner, in order to avoid scrutiny of LASD?

A    2009?

Q    Yes.    Let me ask you a different question. Are you aware of LASD moving an inmate so that a Federal Judge and ACLU would not encounter him on its tour of their tour of your jails?

A    I'm not aware of that.    No.

Q    You've never heard anything about that?

A    I don't even know why we would even want to do something like that.    But go ahead.

Q    Okay.    Just to make sure I got this right, you're not aware of that ever happening and you've not ever heard of it happening.    Is that correct?

A    Not to my recollection.    You know, a lot of things come my way.    I don't certainly say that can I can remember all of it.

Q    This is not intended to be a gotcha moment. I just wanted to show you a document.    It's Bates stamped COLA 0306.

A    Okay.

Q    I'll just read to you what it says, in the middle portion there?

206

A    Yes.

Q    Do you see under 2(c), Progress Notes?

A    Yes.

Q    It says, "This Inmate has a right ankle fracture suffered during a use of force incident, while on tour with the ACLU and Federal Judge."  Do you see the Judge is all the way, on the left there?

A    Yes.

Q    "The Undersheriff asked he be transferred to LCMC to avoid political fallout during the tour."  This is Doctor's notes.  That's what this document is.  And the Doctor notes, "That I am transferring the Inmate per the Undersheriff's request."

A    Okay.  Well, you know what LCMC means?

Q    Yes.

A    That's the County Medical Center.

Q    I understand.  I can represent to you that this Inmate had already been treated for the right ankle fracture and was already casted, and was feeling relatively fine compared to —

A    I see.

Q    He was not seeking this transfer.

207

A    I see.  Ah hum.

Q    So representing that to you -- first of all, were you aware of this transfer?

A    No.

Q    Or thought of moving this person even occurring?

MR. BACA: No.

Q    What is your reaction, reading it right now?

A    Well, like the idea of avoiding anything, the key to everything is to accept responsibility, good, bad or ugly.  And so a lot of my commentary internally is that we have a creed to be painfully truthful.  It's part of the Deputy's statements, the week before he was killed, when he was adding to his Performance Evaluation what his self-assessment was, and he says, "I endeavor to be painfully honest, and to hopefully make a difference in the lives of people."  That creed means a lot to us.  The core values mean a lot to us.  I'll recite them, so you can get them on record here.

As a leader, in the Los Angeles County Sheriff's Department, I commit myself to not only perform my

208

duty with respect for the dignity of all people, the integrity was right and the fight was wrong, wisdom apply common sense and fairness in all that I do; and the courage to stand against racism, sexism, anti-Semitism and all phobia and bigotry in all its forms."

When you start moving in this direction, you don't want political fallout. You know? I'm the biggest target, here in the County, for whatever criticisms are going to occur, and I accept them.

Q    You've discussed transparency before.

A    Right.

Q    Do you believe this is not transparent, if you move an Inmate?

A    That's right.

Q    You would agree that you shouldn't be concealing an Inmate and his injuries from a Federal Judge?

A    That's right.  It is what it is.  We don't set an example, with this kind of a thing.  It's necessary to deal with the facts truthfully and take the hits, if there's something wrong.

Q    This says that the Undersheriff ordered

209

that. What are your thoughts on that?

A    You know, that's interesting.  Because I would hope that wasn't the case.  But if, in fact, that is the case, then it's wrong.

Q    Just to be clear of the timing.  It says October 30th of 2009.  At that point in time, who was the Undersheriff.

A    That would have been, I think, Mr. Waldie. No doubt about it.

Q    Okay.  Have you known Mr. Waldie to want to want to do anything like this?

A    Not generally.  He's not one that has much over the jails.  We have an Assistant Sheriff that's over the jails.

Q    Who was the Assistant Sheriff over the jails, at that point in time?

A    It could have been Marv Cavanaugh.

Q    Okay.  You said "not generally."  This is not generally speaking.

A    It doesn't go that high.  An Undersheriff is supposed to be you know a nonoperational person, and deals with the higher levels of issues.  But I could

210

find out for you, those names.  But it's definitely Mr. Waldie.

Q    Okay.  Do you know who Mr. Waldie's Aide was at that time?

A    No, I don't.  I could find that out, perhaps.

Q    How do you think that you could find out?

A    Well I'd look, I'd call him.  That would probably be the easiest way to do it.

Q    Were you involved at all, in the tour by the Federal Judge?  I don't know if they meet with you when they're done touring. Or what happens…

A    No.  I wasn't involved.

Q    So you never you met with the Federal Judge presiding over Rutherford?

A    I have, and I know who that Judge is.  It's Judge Dean Pregerson.

Q    Yes.  Do you ever discuss with him, the condition of the jails?

A    Oh, yes.

Q    Okay.  Is this in a Court setting, or an outdoor setting?

211

A   In a Court setting.  Recently, about six or seven months ago.

Q   Okay.  Do you remember in October of 2009, or November ~~tin~~of 2009, whenever you were talking to him in Court?

A   Not in that regard, no.

Q   Okay.  I think I know the answer to this, but let me ask you anyway.  You, after a lot of emotions and tactical anger, since stated publicly, that you would want to cooperate — you'd cooperate with us fully, the federal government's investigation fully.  What caused that change of heart?

A   Mr. Martinez telling me the challenges that he had in making his decision.  He's not a bad guy. The people that are planning — nobody's bad in this. Okay. The objective here, for me, was to have a credible answer.  That's all.  I don't need to know the details and the whys and the wheres.  I consume a lot in this, because it's not easy to investigate Deputies who use force. The way we pretty much weed them out and prosecute them is we get them on tape or we find out they didn't reveal all the force they

212

used.  When they lie in the reports, we fire them for that, as well as excessive force.

So in your book, that I gave you, you'll see, hopefully, some information that'll help you.

Q   Can we have that produced through Jones Day?

A   Some of the materials.  I think it's in the book there.

Q   Yeah. We need that also, and the FBI article.

A   Yeah.  You can keep that, too.

Q   Well, we have a process in place.  So that's what we're trying to honor.

A   Okay.  Fair enough.  There's a need for you to kind of like see how, at my level, things get tracked. Because I can't be involved in every case, you can see that there's these cases here, where there's a substantial number of discharges and the reason for the discharge is here.  So much of this way of getting to your point is that we definitely want to get better at what we do.  I call, repeatedly, for a consistent cost of growth and cost in creativity; but best practices; better policy; better training and to

213

have more resources.

The reason the FBI needs the LAPD and the Sheriff Department is you don't have enough resources. It's the services in the County of Los Angeles, in a Regional setting. And I know it probably may not — I don't tend to want to toot my own horn about anything. But I know I have good people, far more good people then I do people, that are problem people. But when it goes wrong, it's definitely my fault. Because I believe I need to do more all the time. But you see, I had trust in my management staff. I don't have that same trust anymore. You see. When you lose a little of the glow —

Q   You're the guy that can decide who your management staff is. So if you don't have trust in them, why do you keep them there?

A   Because when you look at what they were able to do proactively, you see — you can condemn your staff for what they did or what they fail to do. You see? The theories of management are bounding, in my knowledge. I went through a lot of education process and a lot of experience and put the theory and the

214

practice together. But you don't do pushing around without evidence.  You have to investigate every aspect of what you do.

Q   So the people that you did not trust, then —

A   I don't trust bureaucracy. I said that earlier. Everything translates.  When you have an officer like Leah Marx, and she says to the boss, this. And the boss says to another boss, this.  Then the boss says another — by the time it gets to the guy that's in charge, it's a whole distorted story.

Q   Do you trust your staff now?

A   Yes, of course.

Q   You didn't trust them before.  I'm just trying to get —

A   I don't trust bureaucracy. Let me modify this. My staff is honest and honorable, but the system requires constant accuracy.  And by the time it gets to me, it's less of a story.  People can't remember that way.  So I look at documents.  I say, "If it's not in writing, it doesn't exist."  So I insist more on what is written, so I have a full and comprehensive

215

assessment of what the problem is.

Q    With Anthony Brown, you were just getting oral reports of what he was saying.

A    That's correct.  I don't necessarily fully believe that I am getting what I truly believe is existing.

Q    So why didn't you ask for the transcripts?

A    What transcripts?

Q    Of the interviews.

A    Whose interviews?

Q    Anthony Brown.  Between ICIB and Anthony Brown.

A    Do you think I have time to read stuff like that?

Q    Well, I'm asking you.  Why not key provisions?

A    I have so many things that I read every day. I get in my car and I'm reading reports to the office and then when I go out to all these different functions, I'm reading reports there.  I'm reading them on the way home. I'm reading -- at some point, I have to say, "I can't be a one man store.  I have to

216

be something different."  So what I do is I restructured the whole department.  I got four Assistant Sheriffs. They'll read it, and then they'll report directly to me.  Forget the Undersheriff. It doesn't exist anymore. I cut out that person, because it's a funnel where people want to comfortably go. Now they've got to come to me with the bad news.

Q    So were you, forcing Mr. Tanaka out?  Is that the reason for his retirement?

MR. HERSHMAN:  Well, hold on.  Hold on.  [START 1:42:21] We're going to take a break for a second.

MR. FOX:  Okay. That's fair. Do you want us to leave, or do you want to --

MR. HERSHMAN:  No.  We're going to take a break for one second.

MR. BACA:  Okay.

SPECIAL AGENT DALTON:  This is Special Agent Jason Dalton.  It's 6:09, Friday, April 12, 2013. We're taking a brief recess, and I am stopping the recording devices.  [END 1:42:45]

(Brief recess.)

[BEGIN 0:00:00]

Formatted: Not Strikethrough

Formatted: Not Strikethrough

Formatted: Not Strikethrough

217

SPECIAL AGENT DALTON:  This is Special Agent, Jason Dalton. It's 6:37, Friday, April 12, 2013, and we're resuming the interview of Leroy Baca.

MR. FOX:  Mr. Baca, we discussed a few things while you were not in the room. One of them, that I just want to go over. [LS100064 at 00:19] We're gonna just have a couple of very minor follow-up points.  I won't call them minor -- a couple of follow-up questions.  Then we're, as per our agreements before we came here today, we're going to allow your attorneys here to ask you any questions of course on the recording that they'd like to ask you and I don't know if they have any.  But we met with them earlier and we gave them the opportunity, as we discussed previously.  So, because we don't have any transcripts here, I don't recall -- I'm not sure that anyone here recalls - - whether we asked you -- when you received the call from Steve Martinez about the Leah Marx arrest, you said that you basically put a stop to the thought that they would arrest Leah Marx.  How did you do that?  Who did you communicate within LASD, to make sure that was going to happen?

Formatted: Not Strikethrough

Formatted: Indent: First line:  0.5"

Formatted: Not Strikethrough

218

A    Well, I don't remember exactly.  But the likely person would have been Captain Carey.

Q    And if it wasn't Captain Carey, it would have been Steve Leavins?

A    Most likely if that were the case.  That would be yes.

Q    Okay so this would not have been a situation of going to Paul Tanaka, and saying, "Get this message out."  You would have actually gone to somebody within ICIB?

A    That's to the best of my recollection. But, candidly, I really don't remember exactly who I told this to.

Q    Okay.

A    But you know, it wouldn't be anybody other than those people that you alluded to.

Q    Those three?

A    It could have been even Mr. Tanaka, for that matter.

Q    So it could have been Mr. Carey, Mr. Leavins or Mr. Tanaka.  That's the universe of people who it could be?

219

A    That's the only area I would imagine, in a general sense, that I'd go to for that. [END 1:56]

~~Q    And you discussed how you dislike bureaucracy. You distrust -- I'm sorry. Distrust -- is what I think you said -- bureaucracy. Are there times -- and it sounds like you might have been communicating with the middle management. But are there times that you even go to a below the rank of Lieutenant to talk to people, or a Sergeant to talk to people, if you really want the message to get out there?~~

~~A    Generally, not. Because the organization is too large. You know, I'm just speaking sentiment, in terms of how information gets filtered. And if it's a strong enough urge on my part, that I'd want to validate something, then I would make additional calls into the system at a lower level.~~

~~Q    And the only way to know who is responsible for a lower level -- would you know immediately? Oh, it's this issue and there's some database you can go to and know what it's this person that's handling that issue. Do you know what I'm saying? Would you know~~

220

which Deputy was handling an investigation?  Or would
you know which Sergeant was handling an investigation?
A   Not necessarily.  I think when I speak about
how far down I'd go, it's generally a Captain, or the
Aide of a Division Chief, or my own Aide. I would say,
"Would you check on this and get back to me on it?"
There's a number of paths.

MR. FOX:  [START AT 3:21] All right.  I think
that that's all for me.  Anybody else on our side?
Okay. Brian . . .

[Questioning by Baca's attorney begins]

MR. HERSHMAN:  Yeah.  This is Brian Hershman. I'm
going to ask you a few questions Sheriff Baca, if
that's okay with you?

MR. BACA:  Yes.

MR. HERSHMAN:  You were asked, during the course
of this interview, about an August 26th encounter with
members of ICIB and Leah Marx.  And you were asked --

MR. FOX:  September 26th.

MR. HERSHMAN:  September 26th. Thank you.

BY MR. HERSHMAN:

Q    You were asked if you had a conversation

**Formatted:** Highlight

221

with anyone prior to that encounter about the arrest, or threatened arrest of Ms. Marx.  Am I correct that, to the best of your recollection, now talking about events a year and a half ago, you did not have any such conversation?  Is that correct?

A   Yes.  To the best of my recollection.  It's not something that registered in my memory, today.

Q   And you were asked about a statement of Assistant Sheriff Cecil Rhambo, about words to the effect of, "Don't fuck with the FBI" or something like that.  Is that correct?  Do you remember that?

A   I don't recall Mr. Rhambo saying such a thing to me.  I don't have that recollection, as we speak, today.

Q   You were also asked about a conversation potentially with Lieutenant Thompson where he apologized for letting the FBI meet with Anthony Brown. Do you recall being asked those questions?

A   I recall being asked those questions.

Q   Am I correct that to the best of your recollection, as you sit here, today, sometime later, you don't recall Lieutenant Thompson having said such

222

a thing to you?

A    That is correct.  I don't recall Lieutenant Thompson saying those words to me.

MR. HERSHMAN:  Anything else?

[Questioning by federal government resumes]

MR. FOX:  Anything else? Can I just follow-up? Do you think you would remember, if you ordered the arrest of an FBI Agent?

A    I think that would be significantly memorable.

Q    Okay. Do you think you would remember if you were told that the FBI had been kicked out of an interview and someone was apologizing to you for kicking the FBI out of the interview?

A    Yes. I think that would be memorable, too.

[END 5:40]

MR. FOX:  Anything else?

Okay.  We're going to turn off the tape now.

SPECIAL AGENT DALTON:

This is Special Agent Jason Dalton.  It is 6:43, on Friday, April 12, 2013.  We are concluding the interview with Sheriff Leroy Baca.

Formatted: Not Highlight

Formatted: Indent: First line:  0.5"

223