EILEEN M. DECKER
United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
BRANDON D. FOX (Cal. Bar No. 290409)
Chief, Public Corruption & Civil Rights Section
LIZABETH A. RHODES (Cal. Bar No. 155299)
Chief, General Crimes Section
EDDIE A. JAUREGUI (Cal. Bar No. 297986)
Major Frauds Section
Assistant United States Attorneys
 1500/1200 United States Courthouse
 312 North Spring Street
 Los Angeles, California 90012
 Telephone: (213) 894-0284/3541/4849
 Facsimile: (213) 894-0141
 E-mail: Brandon.Fox@usdoj.gov
   Lizabeth.Rhodes@usdoj.gov
   Eddie.Jauregui@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 16-66(A)-PA |
|---|---|
| Plaintiff, | GOVERNMENT'S RESPONSE TO MOTION OF NON-PARTY JOURNALIST ROBERT FATURECHI TO QUASH THE GOVERNMENT'S SUBPOENA; DECLARATION OF BRANDON D. FOX; EXHIBITS |
| v. | |
| LEROY BACA, | |
| Defendant. | Hearing Date: December 2, 2016<br>Hearing Time: TBD<br>Location: Courtroom of the<br>   Hon. Percy Anderson |

Movant Robert Faturechi seeks an order quashing a trial subpoena served to secure his testimony at trial.  Because the subpoena was issued in good faith and seeks testimony that is relevant to this criminal trial, Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Brandon

D. Fox, Lizabeth A. Rhodes, and Eddie A. Jauregui, asks this Court to deny the motion and order Mr. Faturechi to comply with the subpoena and testify in this matter.

Dated: November 28, 2016            Respectfully submitted,

                                    EILEEN M. DECKER
                                    United States Attorney

                                    LAWRENCE S. MIDDLETON
                                    Assistant United States Attorney
                                    Chief, Criminal Division


                                    */s/ Brandon D. Fox*
                                    BRANDON F. FOX
                                    LIZABETH A. RHODES
                                    EDDIE A. JAUREGUI
                                    Assistant United States Attorneys

                                    Attorneys for Plaintiff
                                    UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

DESCRIPTION                                                                PAGE

TABLE OF AUTHORTIES..............................................ii

MEMORANDUM OF POINTS AND AUTHORITIES..............................1

I.    INTRODUCTION................................................1

II.   STATEMENT OF FACTS..........................................1

      A.    The Charges...........................................1

      B.    Mr. Faturechi's Los Angeles Times Article.............2

      C.    Defendant's Interview with the Federal Government......3

      D.    Mr. Faturechi's Interview with KCRW...................5

      E.    The Trial Subpoena....................................5

III.  ARGUMENT....................................................6

      A.    The Subpoena was Issued in Good Faith and Mr.
            Faturechi's Testimony is Relevant....................11

      B.    The Shoen II Test in Not Helpful to Mr. Faturechi....14

      C.    California's State Shield Law Is Not Applicable......16

      D.    The Court Should Not Issue an Order Limiting Mr.
            Faturechi's Testimony to the Statements Published in
            the September 29, 2011 Article.......................17

IV.   CONCLUSION.................................................18

**TABLE OF AUTHORITIES**

**FEDERAL CASES**                                                                    **PAGE**

Branzburg v. Hayes,
    408 U.S. 665 (1972) ..................................... passim

Cohen v. Cowles Media Co.,
    501 U.S. 663 (1991) .......................................... 7

Farr v. Pitchess,
    522 F.2d 464 (9th Cir. 1975) ................................ 10

In re Grand Jury Proceedings,
    5 F.3d 397 (9th Cir. 1993) ................................. 6, 9

L.A. Mem'l Coliseum Com. v. Nat'l Football League,
    89 F.R.D. 489 (C.D. Cal. 1981) .............................. 16

Lewis v. United States,
    517 F.2d 236 (9th Cir. 1975) ................................. 9

Mark v. Shoen,
    48 F.3d 412 (9th Cir. 1995) ............................. passim

Shoen v. Shoen,
    5 F.3d 1289 (9th Cir. 1993) ............................... 6, 10

United States v. Pretzinger,
    542 F.2d 517 (9th Cir. 1976)................................. 10

United States v. Nixon,
    418 U.S. 683 (1974) .......................................... 6

United States v. Smith,
    135 F.3d 963 (5th Cir. 1998) ................................. 8

United States v. Sterling,
    724 F.3d 482 (4th Cir. 2013) ....................... 7, 8, 9, 10

Univ. of Penn v. EEOC,
    493 U.S. 182 (1990) .......................................... 7


**FEDERAL RULES AND STATUTES:**

Fed. R. Crim. P. 17(a) ......................................... 11

Fed. R. Crim. P. 17(c) ......................................... 11

Fed. R. Evid. 611(b) ........................................... 18

**STATE CONSTITUTION**

Cal. Const. art. I, § 2 ........................................ 17

### <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

**I.   INTRODUCTION**

In late September 2011, Robert Faturechi interviewed defendant Leroy Baca.  (<u>See</u> Fox Decl. Exs. A, B.)  He then wrote an article for the Los Angeles Times about that interview, attributing statements and quotes to defendant.  (Fox Decl. Ex. A.)  On February 11, 2016, Mr. Faturechi participated in a radio interview and again disclosed statements defendant made to him in September 2011.[1]  (Fox Decl. Exs. B, C.)  In both instances, Mr. Faturechi believed it was in the public interest to disclose what defendant said.  But now, Mr. Faturechi seeks to withhold that same information from a criminal trial that he recognizes is "of significant public interest" (Faturechi Mem. at 1:1).  Mr. Faturechi asks this Court to enforce a privilege that simply does not exist; "reporters, like other citizens, [must] respond to relevant questions put to them in the course of a . . . criminal trial."  <u>Branzburg v. Hayes</u>, 408 U.S. 665, 690-91 (1972).  The Court should deny the motion to quash, and order Mr. Faturechi to appear as a witness at trial to testify about the admissions Mr. Faturechi publicly attributed to defendant in late September 2011.

**II.   STATEMENT OF FACTS**

**A.   The Charges**

The Superseding Indictment alleges that defendant conspired to obstruct justice (Count One), obstructed of justice (Count Two), and

---

[1] In his motion, Mr. Faturechi states repeatedly that his February 11, 2016 appearance on the radio program occurred "five years" after his interview of defendant.  (See, e.g., Faturechi Mem. at 2:2, 9:12.)  For reasons that are unclear, Mr. Faturechi has liberally rounded up, given that there is less than a 53-month difference between September 29, 2011 and February 11, 2016.

made false statements to the federal government (Count Three).  The central issues are defendant's involvement in and knowledge of the Los Angeles County Sheriff's Department efforts to obstruct a federal grand jury investigation into abuse and corruption within the Sheriff's Department by: (a) hiding inmate-informant Anthony Brown from the federal government from August 19, 2011 through September 12, 2011; and (b) confronting Special Agent Marx outside of her residence on September 26, 2011, in an attempt to strong-arm the federal government into discontinuing its grand jury investigation. Because the Court is familiar with the facts, the government focuses solely on those facts that are most relevant to Mr. Faturechi's motion.

**B.    Mr. Faturechi's Los Angeles Times Article**

On September 29, 2011, the Los Angeles Times published an article written by Mr. Faturechi called, "L.A. County Sheriff Lee Baca gives details of FBI sting."  (Fox Decl. Ex. A.)  Mr. Faturechi wrote:

> Los Angeles County Sheriff Lee Baca . . . for the first time offered a detailed account of an FBI undercover sting that caught one of his deputies allegedly smuggling a cellphone to an inmate.
>
> In an interview with The Times, Baca revealed that the inmate working as an FBI informant inside Men's Central Jail was using pay phones there to contact agents probing allegations of deputy misconduct. The agents tried to dissuade him from using a jailhouse line, telling him they could be monitored by sheriff's officials. The agents promised to get their informant a cellphone, Baca said, and the inmate volunteered that he knew of a deputy willing to smuggle contraband for cash.
>
> Baca confirmed that federal authorities targeted that deputy in an undercover sting. FBI operatives brought $1,500, Baca said, and the deputy agreed to go through with the deal.

2

Baca said the cellphone was delivered, and the inmate used it to contact his federal handlers and another source whom Baca declined to identify.

Later, when sheriff's officials searched the inmate and found the phone, they also discovered a hand-written note listing names of deputies. Baca said the informant had been gathering the names of deputies thought to have used excessive force against inmates.

Baca suspected the inmate was compiling the list for the FBI.

After the FBI ensnared the deputy who allegedly smuggled the cellphone, agents showed up at his home and tried to "flip him" – get him to work for them as an informant, Baca said. . . .

* * *

Earlier this week, two sheriff's investigators showed up at the home of the lead FBI agent involved in the cellphone sting to question her, Baca said.

"We're investigating a crime," he said. Asked if the Sheriff's Department was going to seek criminal charges, Baca said "No, I don't think so. It's not worthy of pursuing, in view of the greater good." Baca said the agent directed questions to her supervisor. He dismissed any suggestion that the visit was intended to intimidate the agent. The FBI's home visit to his deputy wrapped up in the sting, Baca argued, involved "substantially more intimidating tactics."

(Id.) See also Robert Faturechi, L.A. County Sheriff Lee Baca Gives Details of FBI Sting, LOS ANGELES TIMES, Sept. 29, 2011, available at http://articles.latimes.com/2011/sep/29/local/la-me-baca-jails-20110929.

**C.    Defendant's Interview with the Federal Government**

On April 12, 2013, defendant denied knowing much about the obstructive efforts of those below him during an interview by the federal government.  He claimed he was not involved in any conversation about keeping the FBI and Brown away from each other. He also denied knowing that his deputies were going to approach

3

Special Agent Marx to threaten to charge her, threaten to arrest her, or attempt to question her. Defendant is charged in Count Three with lying during the following exchange:

> Q. . . . . So if I'm understanding you correctly, you did not -- you were not aware that anybody had gone out to Leah Marx's house to threaten to charge her and arrest her, is that correct?
>
> A. When I received that call, that's correct. I was -- I received that call within perhaps an hour or so after that alleged act occurred.
>
> Q. So the call from Mr. Martinez (the Assistant Director in Charge of the FBI) was the first time that you were aware that somebody was going out to Leah Marx's house to threaten to charge and arrest her; is that correct?
>
> A. Yes.
>
> Q. Were you aware when you received that call from Mr. Martinez, even more generally than that, that someone within LASD was going to approach Leah Marx to try to talk to her?
>
> A. I wasn't aware of any of the investigative particulars. But once Mr. Martinez made the call to me, I was aware something occurred.

(Fox Decl. Ex. D at 1-2.)

The government also asked defendant about the quotes Mr. Faturechi attributed to him in the September 29, 2011 Los Angeles Times article. Defendant denied making the statement that the FBI's approach of Gilbert Michel involved "substantially more intimidating tactics" than the Sheriff's Department encounter with SA Marx:

> A. [F]irst of all, Faturechi doesn't have a tape recorder, and I wish he would, because he tends to reconstruct his stories by memory, which is not a good idea.
>
> Q. You don't remember making this comment to him, in other words?
>
> A. I don't even know what it means.

(Id. at 5.)

4

**D.    Mr. Faturechi's Interview with KCRW**

On February 11, 2011, after defendant was charged in an information with lying during the exchange about his knowledge of the Sheriff's Department's approach of Special Agent Marx ahead of time, Mr. Faturechi discussed his September 2011 interview of defendant on KCRW, a local affiliate of National Public Radio.  (Fox Decl. Exs. B, C.) In the radio appearance, Mr. Faturechi contrasted what defendant told the federal government to what he told Mr. Faturechi, stating, "You know, what's interesting is when, when we first broke this story, he actually told me, he acknowledged, that, uh, he was aware and he sent these deputies to, uh, this FBI agent's home."  (Fox Decl., Exs. B and C.)  See also Olney in L.A., Former LA County Sheriff Lee Baca Pleads Guilty, KCRW, February 11, 2016, available at https://www.kcrw.com/news-culture/shows/olney-in-la/former-la-county-sheriff-lee-baca-pleads-guilty. After Mr. Faturechi mentioned that defendant was charged with saying something different to the federal government during its April 12, 2013 interview of him, Mr. Faturechi continued, "But he told me this very clearly at the time." (Id.)

**E.    The Trial Subpoena**

On November 16, 2016, the FBI served a trial subpoena on Mr. Faturechi.  (Fox Decl. Ex. E.)  The subpoena calls solely for Mr. Faturechi's testimony during trial and seeks no documents.  (Id.) The government has made clear to Mr. Faturechi's representatives that the only statements that it seeks to elicit at trial are those that Mr. Faturechi publicly attributed to defendant in his September 29, 2011 article and February 10, 2016 radio interview.  (Fox Decl. ¶ 2.)

**III. ARGUMENT**

"The public . . . has a right to every man's evidence, except for those persons protected by a constitutional, common-law, or statutory privilege." United States v. Nixon, 418 U.S. 683, 710 (U.S. 1974) (internal quotations and citations omitted). "[W]ide access to relevant facts serves the integrity and fairness of the judicial process by promoting the search for the truth." Shoen v. Shoen, 5 F.3d 1289, 1292 (9th Cir. 1993) ("Shoen I"). This is even more important when the issue arises in a criminal investigation or trial.

There simply is no constitutional privilege shielding a journalist from appearing to testify at a criminal trial. The Supreme Court has declared there is "no basis for holding that the public interest in law enforcement and in ensuring effective grand jury proceedings is insufficient to override the . . . burden on news gathering that is said to result from insisting that reporters, like other citizens, respond to relevant questions put to them in the course of a valid grand jury investigation or criminal trial." Branzburg v. Hayes, 408 U.S. 665, 690-91 (1972) (emphases added); In re Grand Jury Proceedings, 5 F.3d 397, 401 (9th Cir. 1993). Thus, the First Amendment does not "grant a newsman a testimonial privilege that other citizens do not enjoy." Branzburg, 408 U.S. at 689. Indeed, the "notion that the First Amendment protects a newsman's agreement to conceal the criminal conduct of his source, or evidence thereof, on the theory that it is better to write about crime than to do something about it" is a concept that "cannot [be] seriously entertain[ed]." Id. at 692.

6

Since deciding Branzburg, the Supreme Court has consistently and repeatedly confirmed its ruling.  See Cohen v. Cowles Media Co., 501 U.S. 663, 669 (1991) ("the First Amendment [does not] relieve a newspaper reporter of the obligation shared by all citizens to respond to a grand jury subpoena and answer questions relevant to a criminal investigation, even though the reporter might be required to reveal a confidential source"); Univ. of Penn, v. EEOC, 493 U.S. 182, 201 (1990) (Branzburg "rejected the notion that under the First Amendment a reporter could not be required to appear or to testify as to information obtained in confidence without a special showing that the reporter's testimony was necessary").  Thus, while reporters (like other citizens) are protected from criminal subpoenas issued in bad faith or for purposes of harassment, see Univ. of Penn. v. EEOC, 493 U.S. at 201 n.8 (citing Branzburg, 408 U.S. at 707), there is no reason for a sweeping exception for reporters on grounds which no other citizen can lawfully rely.

Mr. Faturechi claims the government must meet a heavy burden in order to compel his testimony.  But this is not the case.  In United States v. Sterling, the Fourth Circuit rejected a reporter's argument that the First Amendment creates a "privilege in criminal cases that can be overcome only if the government carries the heavy burden of establishing a compelling interest or need."  724 F.3d 482, 495 (4th Cir. 2013).  The court stated:

> There is no First Amendment testimonial privilege, absolute or qualified, that protects a reporter from being compelled to testify by the prosecution or the defense in criminal proceedings about criminal conduct that the reporter personally witnessed or participated in, absent a showing of bad faith, harassment, or other such non-legitimate motive, even though the reporter promised confidentiality to his source.  In Branzburg v. Hayes, 408 U.S. 665, 92 S. Ct. 2646, 33 L.Ed.2d 626 (1972), the Supreme Court "in

7

no uncertain terms rejected the existence of such a privilege." In re Grand Jury Subpoena, Judith Miller, 438 F.3d 1141, 1146 (D.C. Cir. 2006).

Id. at 492.  See also United States v. Smith, 135 F.3d 963, 968 (5th Cir. 1998).

Mr. Faturechi claims that the government must meet a three-part test that the Ninth Circuit articulated in Shoen v. Shoen, 48 F.3d 412, 416 (9th Cir. 1995) ("Shoen II").  But the Court in Shoen II explicitly stated that the test applied to civil – not criminal – litigants.  Indeed, in quoting the test from Shoen II, Mr. Faturechi left out the Ninth Circuit's crucial limiting words about the test:

> We therefore hold that where information sought is not confidential, a civil litigant is entitled to requested discovery notwithstanding a valid assertion of the journalist's privilege by a nonparty only upon a showing that the requested material is: (1) unavailable despite exhaustion of all reasonable alternative sources; (2) noncumulative; and (3) clearly relevant to an important issue in the case. We note that there must be a showing of actual relevance; a showing of potential relevance will not suffice.

Shoen II, 48 F.3d at 416 (9th Cir. 1995).  That the Shoen II test is not applicable to criminal investigations or trials is clear from Branzburg itself.  The reporter in Branzburg claimed there should be a similar three-part showing before a reporter could be subpoenaed before a grand jury: (1) "that the reporter possesses information relevant to a crime"; (2) "that the information is unavailable from other sources"; and (3) "that the need for the information is sufficiently compelling to override the claimed invasion of First Amendment interests."  Branzburg, 408 U.S. at 680.  "Having so defined the claim, the Court proceeded to unequivocally reject it." Sterling, 724 F.3d at 492 (citing Branzburg, 408 U.S. at 689-90).

Instead, under Branzburg, any balancing test in a criminal investigation or trial simply looks to whether there is a legitimate law enforcement need for the information.  If so, the reporter must comply with the subpoena.  This is true even in cases where, unlike here, the reporter has a strong interest in keeping the information private because the testimony would reveal confidential sources.  As the Ninth Circuit has recognized:

> Justice Powell underscored this point in a separate concurrence [in Branzburg], in which he noted that news gatherers may be entitled to First Amendment protection where the information sought "bear[s] only a remote and tenuous relationship to the subject of the investigation," or where there is "some other reason to believe that [the] testimony implicates confidential source relationships without a legitimate need of law enforcement."

In re Grand Jury Proceedings, 5 F.3d 397, 400 (9th Cir. 1993) (citing Branzburg, 408 U.S. at 710 (Powell, J., concurring)).  Accordingly, "so long as the subpoena is issued in good faith and is based on a legitimate need of law enforcement, the government need not make any special showing to obtain evidence of criminal conduct from a reporter in a criminal proceeding."  Sterling, 724 F.3d at 496; cf. In re Grand Jury Proceedings, 5 F.3d at 401 (only "where a grand jury inquiry is not conducted in good faith, or where the inquiry does not involve a legitimate need of law enforcement, or has only a remote and tenuous relationship to the subject of the investigation" will "the balance of interests" analysis "be controlling"); In re Lewis, 517 F.2d 236 (9th Cir. 1975) (rejecting claim of First Amendment privilege to keep newsgathering documents confidential "without inquiring whether the grand jury's interest in the information sought outweighed Lewis' First Amendment interests in keeping it confidential").  Because the subpoena to Mr. Faturechi was issued in

good faith based on a law enforcement need, Mr. Faturechi "must appear and give testimony just as every other citizen must." Sterling, 724 F.3d at 496.

Mr. Faturechi claims that Shoen I, Farr v. Pitchess, 522 F.2d 464, 467-68 (9th Cir. 1975), and United States v. Pretzinger, 542 F.2d 517 (9th Cir. 1976) support his proposition that the Court should apply the Shoen II balancing test.  Not so.  Shoen I was obviously written before the Ninth Circuit articulated the Shoen II test in civil cases, and in no way spoke to the applicability of the test to criminal cases.  Similarly, the Ninth Circuit decided Farr and Pretzinger twenty years before deciding Shoen II, and neither supports Mr. Faturechi in any way.

In Farr, a reporter filed a Habeas Corpus petition after a state court incarcerated him following an order to show cause – a civil sanction.  This occurred months after the reporter failed to comply with the state court's order to reveal the identity of a source who leaked information that could have prejudiced a criminal defendant during his murder trial.  The Ninth Circuit did not apply a test in dismissing the petition.  It did, however, find the reporter's "subsequent incarceration was not in violation of any federally guaranteed constitutional right."  522 F.2d at 469.  Rather than helping Mr. Faturechi, the holding in Farr shows that Mr. Faturechi has no special standing and should be compelled to testify.

Pretzinger is also unhelpful to Mr. Faturechi.  In that case, the defendant was charged with offenses related to the importation and distribution of controlled substances.  542 F.2d at 520. Defendant sought to compel a reporter to reveal the source of a tip the reporter received that the defendant's arrest was going to take

place.   The defendant wanted to show that the source was a government agent and to argue that it showed the government should have obtained a warrant to search his truck.   Id. at 521.   The Ninth Circuit neither applied a test nor engaged in an analysis similar to Shoen II.   In finding that the district court correctly refused to compel such disclosure, it simply stated that the information sought was immaterial and had no bearing on whether the government should have obtained a warrant.   Id.   In other words, the Ninth Circuit found that the testimony should not have been compelled because it was irrelevant.   This is consistent with the limited inquiry under Branzburg to determine whether disclosure of the information serves a legitimate law enforcement interest.

**A.   The Subpoena was Issued in Good Faith and Mr. Faturechi's Testimony is Relevant**

Mr. Faturechi claims that the trial subpoena, which asks for no documents, is a "fishing expedition."[2]   (Faturechi Mem. at 2-3).   Given the published article, radio interview, and the government's representations, this argument cannot be taken seriously.   The government has explained on multiple occasions (and in Court) what it seeks to elicit from Mr. Faturechi: the statements Mr. Faturechi has already attributed to defendant in writing and on the radio.

---

[2] Mr. Faturechi cites to a number of cases discussing Rule 17(c) subpoenas for documents and the specificity requirement.   (Faturechi Mem. at 10-11.)   The government, however, issued a Rule 17(a) subpoena for his testimony and sought no documents.   All that is required is for a testimonial subpoena to "state the court's name and the title of the proceeding, include the seal of the court, and command the witness to attend and testify at the time and place the subpoena specifies."   Fed. R. Crim. P. 17(a).   Accordingly, Mr. Faturechi's specificity argument is meritless.

Nor can Mr. Faturechi credibly deny the admissibility and relevance of his testimony.[3]  In fact, Mr. Faturechi has admitted how highly probative his testimony is.  On February 10, 2016, after learning defendant had denied knowing that deputies were going to approach Special Agent Marx, Mr. Faturechi called it "interesting" that what defendant told him was the opposite of what defendant had said to the government.  (Fox Decl. Exs. B, C.)  Indeed, while defendant told the federal government he did not know deputies were going to seek to question Special Agent Marx, or "any of the investigative particulars," defendant told Mr. Faturechi "very clearly" that defendant "was aware" of the approach and that "he sent these deputies to" Special Agent Marx's home.  (Id.)  Defendant's statements to Mr. Faturechi about his role in sending deputies to Special Agent Marx's home are highly probative of his involvement in the conspiracy and the obstruction of justice, and directly contradict the false statements he made to the government.

Defendant's statement published in the September 29, 2011 article that Special Agent Marx had directed questions to her supervisor shows that defendant knew what Special Agent Marx said when defendant's co-conspirators threatened her arrest, and suggests he either reviewed the recording (something he denied during the interview with the federal government) or was briefed on it. Further, his statement that the FBI's visit to Michel's home involved

---

[3] Mr. Faturechi questions the relevance of his testimony by pointing to a motion in limine regarding whether the Court should admit certain of defendant's statements to the government under Rule 106.  Mr. Faturechi asserts that in the Rule 106 motion, the government does "not identify . . . allegedly contradictory evidence involving Mr. Faturechi." (Faturechi Mem. at 6:16-17.)  As the Court is aware, the issues in the Rule 106 motion have nothing to do with how the government is going to prove defendant's statements false.

"substantially more intimidating tactics" than the deputies' confrontation of Special Agent Marx is highly probative of defendant's intent, evidencing two motives for the visit: (a) to attempt to intimidate SA Marx; and (b) to retaliate against SA Marx for attempting to convince Michel to cooperate in the federal investigation.  This statement also shows that he agreed with the deputies' actions in approaching Special Agent Marx.  That defendant denied making these statements during the interview only makes Mr. Faturechi's testimony even more relevant.[4]

Other statements by defendant that Mr. Faturechi disclosed in the article show his involvement in the obstruction of justice conspiracy.  Defendant stated that inmate-informant Anthony Brown "had been gathering the names of deputies thought to have used excessive force against inmates" and that defendant "suspected the inmate was compiling the list for the FBI."  (Fox Decl. Ex. A.) These quotes show: (a) defendant was aware that the federal government was conducting a civil rights investigation using the inmate that the Sheriff's Department had hidden; and (b) defendant was receiving information the Sheriff's Department learned from Brown during its interrogations of Brown.  Given that the Sheriff's Department attempted to tamper with Brown during these interrogations and convince him not to cooperate with the federal government,

---

[4] Mr. Faturechi is wrong in claiming that defendant did not deny making the statements comparing the Michel and Special Agent Marx encounters.  In his interview with the government, defendant said he wished Mr. Faturechi would use "a tape recorder," that Mr. Faturechi "tends to reconstruct his stories by memory, which is not a good idea," and that he did not "even know what" the quotes attributed to defendant meant. (Fox Decl. Ex. D at 5.)

13

defendant's knowledge of what was said during these interrogations is probative of his involvement in the conspiracy.

Similarly, defendant's statements published in the article regarding Michel show that defendant was aware the federal government had attempted to convince Michel to cooperate in its investigation. Importantly, the Sheriff's Department learned this information while deputies were tampering with Michel in an effort to convince him not to speak to or cooperate with the federal government.  This again shows defendant received a briefing of what occurred during an interrogation where his Department tampered with a witness.

The subpoena to Mr. Faturechi was issued in good faith.  This is by no means a fishing expedition and Mr. Faturechi's testimony is highly relevant.  The Court should therefore deny defendant's motion to quash and order him to appear and give testimony as a witness at defendant's criminal trial.

**B.    The <u>Shoen II</u> Test in Not Helpful to Mr. Faturechi**

As discussed above, the Ninth Circuit explicitly stated in <u>Shoen II</u> that the three-part test proposed by Mr. Faturechi is only meant for civil cases.  Moreover, the Supreme Court rejected a similar test's applicability to criminal investigations and trials in <u>Branzburg</u>.  Even if this Court were to analyze the issue under the inapplicable <u>Shoen II</u> test, however, the Court should order Mr. Faturechi to testify at trial.

First, the evidence is unavailable to the government despite the government's exhaustion of all reasonable alternative sources.  As far as the government is aware, only defendant and Mr. Faturechi were present for this interview in late September 2011.  The government has conducted dozens of interviews in this investigation, utilized

several grand juries to obtain testimony from scores of witnesses, and participated in four related jury trials.  No one has ever provided the government with information about defendant's interview with Mr. Faturechi.  Despite Mr. Faturechi's contention, the Fifth Amendment is a bar to the government asking defendant about his statements to Mr. Faturechi at trial.  As Mr. Faturechi recognizes, even when defendant did agree to an interview more than three years ago, the government could not ask defendant about statements Mr. Faturechi attributed to defendant in 2016 during his radio appearance.  And there is no reason to believe defendant would admit to making those statements to Mr. Faturechi, given his previous denials to the government about Mr. Faturechi's quotes of him and attack of Mr. Faturechi's practices.

Second, the evidence is not cumulative.  Besides defendant, there were only three other people in the room when defendant discussed sending deputies to Special Agent Marx's home.  Two of those individuals, Paul Tanaka and Steve Leavins, will not be government witnesses at trial.  Neither is cooperating, and this Court discredited them as witnesses at their sentencing hearings. The third individual, William "Tom" Carey, has pled guilty to lying under oath at previous related trials.  Should he testify, it will be pursuant to a cooperation agreement.  There is no doubt that defendant will have a substantial cross-examination of Carey and will claim that he is not a credible witness.  Accordingly, if Carey testifies, Mr. Faturechi's testimony would be important to corroborate Carey.  If Carey does not testify, Mr. Faturechi is likely to be the only witness who states that defendant ordered

15

deputies to approach Special Agent Marx.  In either scenario, Mr. Faturechi's testimony is nowhere close to being cumulative.

Third, as discussed extensively above, Mr. Faturechi's testimony is extremely relevant to important (indeed, central) issues in the case.  His testimony directly contradicts false statements defendant made to the government, and proves defendant's involvement in crucial aspects of the obstction of justice conspiracy.  Therefore, even under the <u>Shoen II</u> test, the Court should order Mr. Faturechi to testify.

**C.   California's State Shield Law Is Not Applicable**

Because no federal authority supports his position, Mr. Faturechi asks this Court to consider the State of California's Constitution, which he claims provides "<u>absolute</u> protection . . . to journalists."[5]  (Faturechi Mem. at 17:18.)  As Mr. Faturechi recognizes, the State of California's Constitution is in no way controlling here.  Mr. Faturechi argues, however, that defendant's status as a California official when he committed the charged conduct provides a policy reason to consider California law. (Mem. at 19-20.).  Mr. Faturechi ignores, however, that there is a greater federal interest in this case, given that this is about defendant's alleged obstruction of a federal investigation into federal offenses,

---

[5] Relying on <u>Los Angeles Memorial Coliseum Commission v. National Football League</u>, 89 F.R.D. 489, 495 (C.D. Cal. 1981), Mr. Faturechi claims that "this Court has recognized" that federal law and California's Shield Law "appear to coincide."  This is extremely misleading.  The case was applying the "shield law" that existed "[p]rior to the passage of" the amendment of California's Constitution, which provided greater protection to journalists.  <u>Id.</u> It was the previous, and more lenient, version of the law that the court considered in that case.  <u>Id.</u>  And its statement that the laws appeared to coincide related to the test that should be applied in civil, not criminal, cases.  <u>Id.</u>

and defendant's alleged lies to the federal government during its investigation.

But California's Shield Law is also unhelpful to Mr. Faturechi because it only relates to disclosure of "source[s]" and "<u>unpublished</u> information." Cal. Const. art. I, § 2 (emphasis added). Accordingly, it is inapplicable given that the government solely seeks Mr. Faturechi's testimony about what he has already publicly disclosed in an article and on the radio. Thus, Mr. Faturechi is not guarding against an intrusion on journalistic principles, such as protecting a confidential source or disclosure of unpublished material. He is simply seeking to be treated differently than any other person who has been subpoenaed for testimony. The law does not support his stance.

**D.    The Court Should Not Issue an Order Limiting Mr. Faturechi's Testimony to the Statements Published in the September 29, 2011 Article**

Finally, Mr. Faturechi appears to ask the Court to distinguish the statements he published in his September 29, 2011 article from statements he made in his radio interview, and to limit questioning as to the former. (Mem. at 20:21-25.) It is unclear whether he is claiming his radio interview was not a "publication" of defendant's statements to him. Mr. Faturechi provides no support for why the statements that he disclosed in the February 11, 2016 radio appearance should be considered "unpublished." As discussed above, the law makes no distinction in published versus unpublished material when it relates to federal criminal investigations and trials. Indeed, Mr. Faturechi has even less of a reason to seek to bar testimony related to his comments about his interview of defendant during the radio appearance. Not only are they extremely relevant to

17

the issues at trial, but by disclosing his interview of defendant to a third-party radio show, Mr. Faturechi has even less of an argument that his interview of defendant should be kept confidential.

To the extent Mr. Faturechi simply made an error and did not mean to distinguish his article from his radio appearance, the government reiterates that it will limit its questioning of Mr. Faturechi to foundational questions and to what Mr. Faturechi has publicly disclosed about his interview of defendant in the Los Angeles Times article and on the radio.  The Court certainly has discretion to limit cross-examination so that it does not go beyond the scope of the direct examination and matters affecting Mr. Faturechi's credibility.  Fed. R. Evid. 611(b).

**IV.   CONCLUSION**

This is not a case where a member of the media seeks to protect confidential sources or unpublished material.  Instead, Mr. Faturechi simply wants to show that he is independent from the government.  He has done that by this filing.  There will be no public confusion or misconception that he is an interested party aligning himself with the government.  The Court should order him to do what any other citizen must: comply with the subpoena and provide relevant testimony at trial.

# DECLARATION

# OF BRANDON FOX

DECLARATION OF BRANDON D. FOX

I, BRANDON D. FOX, declare as follows:

1. I am an Assistant United States Attorney assigned to this case.

2. Over the past several weeks, I have had multiple conversations with representatives of Robert Faturechi, including his current counsel and in-house counsel of the Los Angeles Times. I have repeatedly informed them that the only evidence the government seeks from Mr. Faturechi is testimony relating to statements Mr. Faturechi has publicly attributed to defendant Leroy Baca in a September 29, 2011 Los Angeles Times article and a February 11, 2016 radio appearance.

3. Attached as Exhibit A is a true and accurate copy of the article published by the Los Angeles Times and written by Robert Faturechi on or about September 29, 2011.

4. Exhibit B is a true and accurate copy of a disc that contains a radio interview Mr. Faturechi conducted on or about February 11, 2016 on KCRW, a National Public Radio affiliate. It will be manually lodged with the Court. The interview is also available at: https://www.kcrw.com/news-culture/shows/olney-in-la/former-la-county-sheriff-lee-baca-pleads-guilty.

5. Attached as Exhibit C is a transcript of the relevant portion of that radio appearance.

6. Attached as Exhibit D is a transcript of relevant portions of the federal government's interview of defendant on April 12, 2013.

7. Attached as Exhibit E is a true and accurate copy of the subpoena served on Mr. Faturechi.

8.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration is executed at Los Angeles, California, on November 28, 2016.

BRANDON D. FOX

2