# EXHIBIT D

23

not it can be done.  But if we are not intending to do such a thing, we don't really have an interest to decide whether or not it's proper or improper, legal or illegal.

Q    When did you first hear that somebody within your department had threatened to arrest an FBI agent?

A    When I got the second call from Mr. Martinez.

Q    Okay.  And was this -- I assume it was soon after that agent was approached by someone within your department; is that correct?

A    Yes.

Q    We'll get into the substance of the call. So if I'm understanding you correctly, you did not -- you were not aware that anybody had gone out to Leah Marx's house to threaten to charge her and arrest her, is that correct?

A    When I received that call, that's correct. I was -- I received that call within perhaps an hour or so after that alleged act occurred.

Q    So the call from Mr. Martinez was the first time that you were aware that somebody was going out

Ex. D 000001

24

to Leah Marx's house to threaten to charge and arrest her; is that correct?

A    Yes.

Q    Were you aware when you received that call from Mr. Martinez, even more generally than that, that someone within LASD was going to approach Leah Marx to try to talk to her?

A    I wasn't aware of any of the investigative particulars.  But once Mr. Martinez made the call to me, I was aware something occurred.

Q    Were you aware that anybody within LASD was conducting surveillance of Leah Marx at night outside of her home?

A    No.

Q    Did Mr. -- well, I guess Mr. Martinez would not have known that.  Did somebody within LASD subsequently tell you that?

A    I had asked internally, "Well, what's going on with this process with a threat or even Leah Marx as an individual?"  And then I was given information that the deputies were seeking to question her about the phone.

Ex. D 000002

INTENTIONALLY LEFT BLANK

Ex. D 000003

88

A    We still try to make a distinction between Mr. Brown and the FBI, and then we have this Deputy Michel, who is part of the problem.  Probably the biggest part of the problem, because if he was really the right kind of guy, he would have never acquiesced to whatever Mr. Brown did, to convince him that he could do this.

Q    But you didn't say there, that, "We're going to seek criminal charges against Brown and Michel but not against the FBI."  You're saying, "No.  I don't think so. It's not worthy of pursuing, in view of the greater good."  You're relating their question --

A    I'm relating that to the FBI.

Q    Right.  What made you, I guess relate -- to understand that these comments related solely to whether the FBI Agent committed a crime?

A    Well, they asked me whether or not we were going to pursue the FBI Agent.  That's when I made that remark.

Q    Got it.  Okay.  Then it says, "He dismissed any suggestion that the visit was intended to intimidate the Agent.  The FBI's home visit to his

Ex. D 000004

89

Deputy wrapped up in the sting, Baca argued, involved

substantially more intimidating tactics."  That was

probably the part, that to me, confused me the most.

    A    Let me see where that fits in here.  Where?

Oh, I see.  Okay.  Baca argued the FBI home visit to

the deputy wrapped up in the sting, Baca argued was

substantially more intimidating… intimidating

tactics . . . you know, first of all, Faturechi

doesn't have a tape recorder, and I wish he would,

because he tends to reconstruct his stories by memory,

which is not a good idea.

    Q    Okay.  You don't remember making this

comment to him, in other words?

    A    I don't even know what it means.

              \* \* \* \* \* \*

Ex. D 000005