EILEEN M. DECKER
United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
BRANDON D. FOX (Cal. Bar No. 290409)
Assistant United States Attorney
Chief, Public Corruption and Civil Rights Section
LIZABETH A. RHODES (Cal. Bar No. 155299)
Assistant United States Attorney
Chief, General Crimes Section
EDDIE A. JAUREGUI (Cal. Bar No. 297986)
Assistant United States Attorney
Major Frauds Section
    1500 United States Courthouse
    312 North Spring Street
    Los Angeles, CA 90012
    Telephone: (213) 894-0284/3541/4849
    E-mail:    Brandon.Fox@usdoj.gov
            Lizabeth.Rhodes@usdoj.gov
            Eddie.Jauregui@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 16-66(A)-PA |
|---|---|
| Plaintiff, | GOVERNMENT'S TRIAL MEMORANDUM; EXHIBIT |
| v. | |
| LEROY BACA, | Trial Date:  December 5, 2016 |
| Defendant. | Trial Time:  8:30 a.m. |
| | Location:  Courtroom of the Hon. Percy Anderson |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Brandon D. Fox,

Lizabeth A. Rhodes, and Eddie A. Jauregui, hereby files its Trial Memorandum.

Dated: November 30, 2016          Respectfully submitted,

                                  EILEEN M. DECKER
                                  United States Attorney

                                  LAWRENCE S. MIDDLETON
                                  Assistant United States Attorney
                                  Chief, Criminal Division


                                   */s/ Brandon D. Fox*
                                  BRANDON D. FOX
                                  LIZABETH A. RHODES
                                  EDDIE A. JAUREGUI
                                  Assistant United States Attorneys

                                  Attorneys for Plaintiff
                                  UNITED STATES OF AMERICA

## I.    INTRODUCTION

In August 2011, defendant Leroy Baca, the longtime Sheriff of Los Angeles County, learned that the federal government was investigating his department for civil rights abuses and corruption. Despite having heard first-hand accounts of abuse within the jails, and knowing that deputies were not being held accountable for their misdeeds, defendant tried to force the federal government to back away from its investigation.  Defendant resented the federal government's efforts to enforce the law in "my jails."  Defendant's belief was that the Sheriff's Department should "police ourselves," without any intrusion from the federal government.  Ultimately, he tried to force the federal government's hand by having deputies confront the lead federal agent outside of her home, just before a meeting defendant had scheduled with leaders of the U.S. Attorney's Office and the Federal Bureau of Investigation.  It was defendant's way of showing the drastic measures he was willing to take and the risk the federal government was facing if it had the audacity to continue to investigate his department.

When the government began investigating why deputies had moved and hidden its inmate informant, had tampered with witnesses, and had threatened to arrest an FBI agent who was just doing her lawful duties, some suggested that the orders had come from the executive levels of the Sheriff's Department.  When interviewed by the federal government, defendant lied in order to cover up his involvement, falsely claiming that he did not participate in the obstructive acts in any meaningful way.

As a result of his conduct, defendant is charged in a Superseding Indictment with: (1) conspiring to obstruct justice, in violation of 18 U.S.C. § 371; (2) endeavoring to obstruct justice, in violation of 18 U.S.C. § 1503(a); and (3) willfully making false statements to the federal government, in violation of 18 U.S.C. § 1001(a).

**II.   SCHEDULING MATTERS**

**A.   Witnesses in the Government's Case-in-Chief**

Jury selection will begin on December 5, 2016, at 8:30 a.m.  The government estimates that its case-in-chief will last ten court days. The following individuals are all potential witnesses in the government's case-in-chief:

1.   Robert Olmsted, formerly with the Los Angeles County Sheriff's Department ("LASD")

2.   Peter Eliasberg, American Civil Liberties Union ("ACLU")

3.   Mark Rosenbaum, formerly with the ACLU, now Public Counsel

4.   Chaplain Paulino Juarez Ramirez

5.   Brian Yanagi, LASD

6.   James Sexton, formerly with the LASD

7.   Judy Gerhardt, LASD

8.   Michele Miller, LASD

9.   Robert Bayes, LASD

10.   Jason Dalton, Federal Bureau of Investigation ("FBI")

11.   Mickey Manzo, formerly with the LASD

12.   David Dahle, FBI

13.   Linda Farrar, formerly with the United States Marshal's Service ("USMS")

14.   Yolanda Baines, formerly with the USMS

15.   Tara Adams, formerly with the LASD

16.   Gus Academia, LASD

17.   Michael Bornman, formerly with the LASD

18.   Gilbert Michel, formerly with the LASD

19.   William David Courson, LASD

20.   John Powell, LASD

21.   William "Tom" Carey, formerly with the LASD

22.   John Torribio, Los Angeles County Superior Court

23.   Cecil Rhambo, formerly with the LASD

24.   Leah Tanner, FBI

25.   Pete Angelini, FBI

26.   Andre Birotte, formerly with the U.S. Attorney's Office

27.   Ruben Martinez, formerly with the LASD

28.   Robert Faturechi

**B.    Stipulations**

Based on representations by defense counsel, the government believes the parties will enter into two stipulations: (1) the authenticity of the video recording and transcript of defendant's deposition testimony in an unrelated civil case and (2) the authenticity of phone records.

**C.    Defenses**

Defendant has not provided the government with notice of any defense he intends to use at trial with respect to Counts One and Two.  With respect to Count Three, defendant has indicated that he intends to argue that he did not intend to lie, but instead simply

3

failed to recollect the correct answers to the questions posed to him.

**III. The Indictment**

Defendant is charged in three counts.  Count One charges defendant with conspiring to obstruct justice, in violation of 18 U.S.C. § 371.  Count Two charges defendant with obstruction of justice, in violation of 18 U.S.C. § 1503(a).  Count Three charges defendant with making false statements, in violation of 18 U.S.C. § 1001(a).  A redacted copy of the indictment is attached as Exhibit A.

**IV.   STATEMENT OF FACTS**

    **A.    Defendant Knew of Allegations of Brutality Within LASD Jails**

        1.    <u>Defendant learned about problems from Department Members</u>

From 2006 to 2010, Robert Olmsted oversaw deputies at Men's Central Jail ("MCJ"), first as its Captain (2006-2008) and then as Commander of the "basin" jails.  The problems at MCJ were apparent immediately, as Olmsted observed deputy cliques, problems with excessive force, and the boilerplate documentation of force.  After helping to reduce the problem as Captain, he noticed while Commander that these problems were escalating in 2009 and 2010.  In September 2010, before he retired, Olmsted told defendant that he needed to talk to him about the problems at MCJ.  After retiring in December 2010, Olmsted saw defendant and again said that they needed to talk about force problems in the jails.  Defendant changed the subject and did not follow up with Olmsted until after the conspiracy to obstruct justice had concluded.

## 2.    Outside Entities Make Concerns Public

Olmsted was not the only person that brought jail abuse to defendant's attention.  Civil rights organizations such as the ACLU published findings documenting a culture of violence that was growing within the jails.  The ACLU wrote that some of the most troubling complaints it received from inmates "involved allegations of pervasive physical abuse and violence."  The reports were similar to what Olmsted had reported: certain deputies acted like their own "gang."  Rather than seek to change things, the LASD publicly dismissed the allegations as stretched and strained.

## 3.    Firsthand Accounts of Abuse

### a.    *Baca Learns ACLU Monitor Is Eye-Witness to Abuse*

In January 2011, Ester Lim, an ACLU jail monitor, witnessed two deputies beat an inmate at the Twin Towers Correctional Facility.  The following day, the deputies wrote a report characterizing the inmate as the aggressor, which was contrary to what Ms. Lim witnessed.  Based on their experience with the LASD, the ACLU decided to go to the Court with this information on February 7, 2011.  The very next day, before any internal investigation had occurred, defendant's spokesperson personally and publically questioned the credibility of Ms. Lim's account.  In July 2011, the ACLU informed defendant that it would "continue to cooperate with the FBI and the US Attorney's office in their criminal investigation" into the beating Lim witnessed.

### b.    *Baca Learns Chaplain Is Eye-Witness to Beating*

In February 2009, a chaplain working at MCJ witnessed a violent attack by deputies on an inmate.  Despite writing a report and

5

speaking to the deputies' supervisors, he saw nothing was done.  In July 2011, the chaplain had a meeting with defendant and explained what he had seen.  Defendant responded by saying to the chaplain that LASD reports indicated his account was exaggerated and that the inmate could have sustained his injuries elsewhere.

**B.    The Federal Investigation and Anthony Brown**

In July 2010, the FBI began an investigation into alleged civil rights abuses by members of the LASD within the county jails.  As part of its investigation, the FBI interviewed many inmates who reported widespread civil rights abuses.  Other than speaking with inmates, however, federal investigators had no way of verifying the alleged abuses, as they did not have access to either LASD deputies or documents.  In the summer of 2011, the FBI began to utilize the grand jury as a way to investigate the conduct and acquire this evidence.  Between June 24, 2011 and August 5, 2011, the FBI served four grand jury subpoenas on LASD.

One of the inmates the FBI had interviewed, Anthony Brown, told agents that, in addition to civil rights violations, deputies were offering to smuggle contraband into the jails in exchange for bribes. Brown also told the FBI that he had identified a deputy who was willing to give him a cell phone in exchange for a bribe. Thereafter, the FBI conducted an undercover investigation into those allegations.

The FBI undercover operation ultimately led agents to LASD Deputy Gilbert Michel, who agreed to take a bribe from an undercover agent posing as Brown's associate.  In exchange for the bribe, Michel

agreed to give Brown a cell phone, which he ultimately smuggled into MCJ and gave to Brown.

### C.    The LASD Finds the Phone on Anthony Brown

On August 8, 2011, shortly after Deputy Michel gave Brown the phone, members of the LASD found the phone in Brown's possession.  A detective, Robert Bayes, was assigned to investigate the incident, focusing on Brown's purported crime: possession of a cell phone while in custody, a misdemeanor.  On August 16, 2011, Bayes interviewed Brown.  Brown told Bayes that he had received the cell phone from a deputy, but refused to give Bayes the deputy's name.

Meanwhile, deputies in LASD's Operation Safe Jail Unit ("OSJ") learned that, prior to obtaining the phone, Brown had used LASD's recorded inmate phone system to communicate with an unidentified woman about when he would receive his phone.  These deputies asked an FBI analyst to research the telephone number Brown had called.  The analyst informed an OSJ deputy that the number belonged to an FBI civil rights investigator.

In this way, the FBI also learned that its undercover investigation had been compromised.  Steven Martinez, the Assistant Director in Charge ("ADIC") of the FBI, contacted defendant to inform him that the phone found inside MCJ was part of an FBI undercover investigation.

Immediately after Martinez's call, defendant phoned Undersheriff Paul Tanaka.  Tanaka's aide and defendant's assistant scrambled to organize meetings for the next day with OSJ Lieutenant Greg Thompson, Internal Criminal Investigations Bureau ("ICIB") Captain William "Tom" Carey, and an Internal Affairs Bureau ("IAB") lieutenant.  The

plan was that they would meet first with Tanaka and then with defendant.  From that point on, what had been treated as an ordinary matter within the department suddenly became urgent.

In preparation for the afternoon meeting, on the morning of August 19, 2011, Thompson ordered two deputies, Mickey Manzo and Gerard Smith, to record an interview with Brown so that Thompson could brief the LASD executives.  During the interview, Smith informed Brown that he knew Brown was "working with the Feds."  Smith told Brown that the "Feds" walk around the jails like they own "us." Smith stated, "We cleaned our house the last time," and "this is my house . . . I want to know how long they've been here."  Near the end of the interview, Manzo revealed the reason for the interview:  he just needed to know about the phone calls because of a "meeting with very influential people in our Department."  Smith then filled Manzo in on what the interview had yielded.  Smith said, "The Feds are here, they're doing investigations.  I'm assuming that they've either watched or set up transactions [bribes] . . . on the outside, watched them go down with a deputy and then it [the cellular phone] got brought to him [Brown]."  Brown confirmed that this was accurate.

**D.    The Conspirators Embark on Plan to Obstruct the FBI**

That afternoon, August 19, 2011, the co-conspirators met: Smith, Manzo, Thompson, Carey, Tanaka and defendant.  Thompson briefed the group about what Brown had told Smith and Manzo, specifically that Brown was an informant for the FBI in a civil rights investigation. Defendant, who already knew this because of Steve Martinez's call the night before, told the group that Martinez had called.  Defendant

8

instructed the group that Brown was not going anywhere, despite the fact that he was supposed to be shipped off to state prison.

On August 20, 2011, the co-conspirators met again because defendant wanted to hear the recorded calls between Brown and the FBI.  After the phone calls between Brown and the FBI were played, Tanaka had an outburst: he stood up, slammed his hands on the table, and said numerous times "Fuck the FBI."  Defendant then said Captain Carey and ICIB would take over the investigation and everything would go through Tanaka.  Defendant told ICIB to interview Brown, but said that no one else should see him.

Defendant left the meeting with Undersheriff Tanaka.  Only Tanaka returned.  Tanaka told the group that he had never seen defendant so angry.  He then told the group that it would do what defendant wanted done.  Tanaka repeated that he would be in control, and that the FBI was not to be given access to Anthony Brown.[1]

E.    The LASD Learns About Deputy Michel

On August 21, 2011, Lieutenant Steve Leavins and Deputies Smith and Manzo interviewed Brown again.  Brown, for the first time, disclosed that Deputy Michel had given him the phone.  While Brown exaggerated his relationship with the FBI, and lied about obtaining a previous phone, he truthfully stated that he was supposed to use the phone to report what he saw regarding beatings in the jails to the federal government.

---

[1] It is unsurprising that Baca put Tanaka in charge of this operation. Baca has stated under oath that Tanaka had a unique ability to do whatever Baca wanted done.

**F.    The FBI Gets Through to Brown**

On August 23, 2011, at about 10:40 a.m., FBI agents went to MCJ and were granted a visit with Brown.  Leavins, Smith, and Manzo were not there.  When Leavins arrived at MCJ and was informed that an FBI interview was taking place, he immediately called Carey and had the interview terminated.  An LASD sergeant, Wayne Waterman, abruptly entered the room, told the FBI agents that the interview was "over," and stated that Brown was not to be interviewed.  The FBI, in front of the sergeant, informed Brown that they would be coming back to get him.

Just after 1:00 p.m., Carey, Leavins, Smith, and Manzo began interviewing Brown.  They feigned surprise when Brown told them that the FBI had just been there.  Leavins proceeded to ask Brown whether the FBI was going to call Brown to testify.  After Brown said the FBI had not mentioned Brown needing to testify, Leavins told Brown that his "primary concern" was to keep Brown safe from "all parties involved."  Leavins stated that he did not want Brown to "be misled by anybody."  Leavins informed Brown that Brown would be moved to a station jail that day so that he could have more privileges and so that he would be safe.  While Carey, Leavins, Manzo, and Smith were conducting the interview, Thompson tried to find out how someone let the FBI have access to Brown.  Thompson learned that a note had been posted stating that no one was to see Brown without approval of Thompson or another supervisor, but it had been disregarded.

10

1.   Brown is Moved Within MCJ; Deputies Are Placed Outside His Cell

Later on August 23, 2011, Manzo and Carey walked through MCJ to determine where they could move Brown.  They decided on a medical ward where the Sheriff's Department treated inmates with infectious diseases.  Beginning that day, two OSJ deputies, including Smith and Manzo, stood guard outside of Brown's cell at all times.

2.   Tanaka and Baca Learn the FBI Interviewed Brown

After the interview, Smith, Manzo, Thompson, and Carey reported to co-conspirator Tanaka's office, where a furious Tanaka berated them for letting the FBI meet with Brown contrary to his orders and Thompson's guarantee that it would not happen.  It was in this meeting that the co-conspirators, specifically Carey and Tanaka, discussed moving Brown outside of MCJ to keep him away from the FBI. Brown's safety was not discussed.

After Tanaka harangued Thompson about letting the FBI in, Thompson asked whether "the boss" (defendant) knew that the FBI had interviewed Brown.  Tanaka told Thompson that Thompson would have to be the one to tell defendant.

Thompson went into defendant's office while others waited in the hallway.  After leaving the meeting, Thompson stated that defendant was understanding.

3.   The Policy to Keep the FBI away from Brown

On August 24, Manzo drafted a policy codifying defendant's general orders of August 19th and 20th and Tanaka's specific plan to keep the FBI out.  Two hours later, Thompson sent an email with a draft of that policy to Tanaka's assistant.  The email asked for "the

11

boss' approval" to send the policy to all those working in custody.

The email then detailed the policy:

> Effective immediately and until further notice, all FBI requests for interviews will be approved by Under-Sheriff Tanaka.  If the FBI requests access for any reason to your facility, get the following information:
>
> - Name and Badge or ID Number
> - Place of Assignment - i.e. Special Problems, Robbery Detail, etc.
> - Contact Phone Number and email address.
> - Inmate name and booking number for who they want to interview.
> - Case Number or type of case being investigated.
> - Future date and time they are available to interview
>
> The above information will be documented by the Facility's Mail Control and verified by the Facility's Watch Sergeant and/or Watch Commander.  The information will be forwarded, via email, to Lieutenant Greg Thompson, of Custody Investigative Services Unit, for review.
>
> Lieutenant Thompson will be responsible for notifying the Undersheriff's office and obtaining approval.  Once approved, Lieutenant Thompson will notify the facility and agent of the approved date and time for the interview.

After receiving this email, Tanaka's aide asked Thompson to call him.  After that call, Thompson asked if Tanaka would be satisfied if Thompson removed all references to the "executives."

### 4.    OSJ Sets Up a Guarding Schedule

Meanwhile, Thompson, Smith, and Manzo held a meeting with the OSJ deputies who were to stand guard outside of Brown's cell.  During that meeting, Smith and Manzo explained that the need to guard Brown was a direct result of finding the cell phone and noted that the executives were unhappy.  To emphasize how unhappy the executives were, and to convey the antagonistic way in which the executives viewed the FBI, Manzo quoted Tanaka as saying "fuck the FBI."  After the meeting, those present received a "confidential" email from

Smith, who informed the recipients that they were assigned to a "very important detail" that was "one of the most important investigations" involving the LASD in its history.  These were words that co-conspirators Manzo and Smith heard from Tanaka on August 20 and 23.

<u>5.   A Writ and Further Grand Jury Subpoenas Are Issued</u>

On August 25, 2011, the District Court issued a writ for the testimony of Brown before the federal grand jury on September 7, 2011.  Phone records reflect that the U.S. Marshals Service had two different facsimile transmissions to LASD that morning.

After receiving the writ and additional subpoenas, the coconspirators took further measures to hide Brown from the federal government.  To truly hide Brown so that the federal government could not find him, the LASD had to make Brown disappear from the jail. Additionally, the LASD's electronic files had to reflect that Brown was not in custody and there could be no physical record (called a "records jacket") showing that Brown was in LASD's custody.

At Thompson's request, a lieutenant and three deputies approached employees at MCJ's Inmate Records Center ("IRC") at approximately 1:45 p.m. and asked to have Brown "released" from the jail's computer system.  The deputy and head records clerk assigned to IRC informed the deputies that they needed a court order to do so. They also explained that even if Brown were "released," he would need to be rebooked under an alias, and be electronically fingerprinted using a system called LiveScan.  The deputies insisted that Brown be removed from the system.  The lieutenant informed the clerk that the Captain, the Commander and the Undersheriff all knew what was happening.  When the deputy still balked at the idea, one of the

13

other deputies said to her: "Are you going to say no to Tanaka?"  The deputy's answer was yes.

Ultimately, the head clerk signed out Brown's records jacket and decided to make the computer system reflect that Brown was released. The IRC deputy again explained to the OSJ deputies that they would need to LiveScan Brown under an alias.  Over her protests, the deputies took Brown's physical records jacket and left the inmate records center.  Despite multiple subpoenas and an exhaustive search, the original records jacket and the faxed writ have never been turned over to the United States.

According to LASD's databases, Brown's release occurred at 1:58 p.m. on August 25, 2011.  At 4:30 p.m., Brown was booked under the name "John Rodriguez."  The paperwork contained false information about Brown and reflected that Brown had refused to give his social security number or be fingerprinted.  This was important because if they had fingerprinted Brown or provided his true SSN, the federal government could have tracked Brown even with these new aliases.

Over the next several days, the members of the conspiracy continued to change Brown's name on a regular basis, input false information in the computer system, and claim that that Brown refused to provide fingerprints and his social security number.  Brown's aliases included "John Rodriguez," "Kevin King," and "Chris Johnson."

The LASD took additional measures to interfere with the federal investigation.  On August 25, 2011, Thompson emailed LASD captains and operations lieutenants to inform them of a new policy that "all FBI requests for inmate interviews" would have to be approved.

14

Thompson also wrote that all the interviews would have to take place at MCJ; there could be no interviews at any other locations.

On August 26, Thompson communicated with others about what to do if the FBI showed up at Men's Central Jail with a "possible Court Order" demanding Brown's production to the federal government. Thompson and the others decided that they would accept the court order "if forced," but would not release the inmate. Instead, they would have a county attorney "who is on vacation for a month" review the court order before releasing Brown. Thompson agreed to put a note on Brown's cell door. The captain at Men's Central Jail emailed his lieutenants and sergeants:

> If any federal law enforcement agency comes to MCJ with an inmate removal order, visitation order, or ANY OTHER order of the court you shall:
>
> - Receive the order and advise the federal officer that before you can proceed, you have to submit the order to the Department's legal advisor for review.  DO NOT RELEASE THE INMATE OR ALLOW CONTACT.

(emphasis in original).

The co-conspirators decided that, regardless of Brown's medical condition, they would move him from MCJ to a station jail (one that would not have the authority to allow the federal government to interview Brown, based on the Sheriff's Department's day-old policy). On August 26, 2011, after moving Brown to LASD's San Dimas station jail, LASD sergeants Scott Craig and Maricela Long interviewed Brown again.  When Brown informed Craig and Long that the FBI told him they would come back for him the day they were kicked out of MCJ, Long told Brown that the FBI had not come back for him.

15

**G.    Baca and Others Meet with the United States Attorney**

With Anthony Brown hidden, the LASD began their offensive.  On Monday, August 29, 2011, defendant Baca and a cadre from the LASD and the County met with then-United States Attorney André Birotte and other members of the United States Attorney's Office ("USAO"). Defendant specifically asked that the FBI not be invited.  At that meeting, defendant expressed his displeasure at the investigation. Defendant received no assurances that the investigation would be halted or would include the LASD and thus had to leave the meeting with no promises.

**H.    LASD Tampers with Witnesses**

After receiving no comfort from its meeting with the USAO, on August 30, 2011, Leavins, Craig and Long spoke to Gilbert Michel and several other MCJ deputies.  Tanaka was present at MCJ and received briefings about these interviews.

Michel told the co-conspirators that the FBI had already contacted him and attempted to have Michel cooperate in the federal investigation.  Leavins left the room briefly. When he returned, Leavins told Michel that "it just seems as though you've been to a degree manipulated."  Despite the fact that Michel told Leavins, Craig, and Long that the FBI was trying to get information from him about brutality inside the jails, the LASD officers ordered Michel not to talk to the FBI.  Craig told Michel that the FBI was threatening and manipulating him:

> it pisses me off . . . we're all part of this Department
> and we're one big happy dysfunctional family, and fuckin'
> FBI is gonna come to your house and surprise you at your
> home and invade the sanctity of your home and come here and
> talk a gang load of shit to you and threaten you. . . . And

16

then they are gonna fuckin' manipulate you like you're a puppet?  I don't think so.

After about 90 minutes, Leavins asked whether Michel would mind waiting while he, Craig, and Long went to "discuss some things and figure out what we are going to do next."  The interview of Michel resumed at approximately 10:00 a.m.  When they returned and Michel said that the FBI was planning on charging Michel, Craig responded, "I call it bullshit . . . . I call it threats and they're blackmail and they're . . . it's all bullshit, okay?  I think that's exactly what it is."

That same day, at 1:25 p.m., co-conspirators Leavins, Craig and Long interviewed a deputy, William David Courson, who had given FBI Special Agent Leah Marx some information regarding abuse at Men's Central Jail.  Craig showed complete disregard for any legal process when he said to Courson:

If someone starts threatening you with a subpoena or any other nonsense, I want you to call me right away.

* * *

[a] Federal Grand Jury Subpoena . . . Some nonsense like that starts, you feel they are trying to intimidate you, bully you, blackmail you, coerce you, you call me and I'll call him [Leavins] and we will go from there.

**I.    Brown No Longer Wishes to Cooperate with the FBI**

Brown was brought back to MCJ on September 2, 2011, after acting out at the station jail.  Because he thought the FBI had taken no steps to find him, Brown felt abandoned.  He informed Smith and others that he no longer wanted to cooperate with the FBI.  A week later, on September 9, 2011, Brown asked for a lawyer.  On September 12th, Deputy James Sexton re-booked Brown in LASD's systems under his true name.  The same day, the LASD transported Brown to state prison.

17

**J.   LASD Seeks Superior Court Order to Obtain FBI Records**

On September 8, 2011, Craig sought a Superior Court order that would have purportedly compelled the FBI to turn over its records related to the FBI's investigation of the LASD.  When Craig asked Superior Court Judge John Torribio to sign the order, Judge Torribio informed Craig that he would not grant such an order.  Judge Torribio wrote on the proposed order "Denied - Court has no jurisdiction over any federal agency."

**K.   LASD Threatens to Arrest FBI Special Agent Leah Marx**

Undeterred, the very next day, September 9, 2011, Craig left a voicemail message on an FBI phone he believed belonged to Special Agent Marx.[2]  Craig stated on the message that Special Agent Marx was "named as a suspect" and offered to meet her "as a professional courtesy . . . prior to me signing a declaration in support of an arrest warrant."

Meanwhile, LASD began learning more about the extent of the abuse problems at MCJ.  On September 12, 2011, Craig, Long, and Leavins received an email from Carey that attached a "List of ACLU complaints out of CJ [Men's Central Jail]."  Carey stated that this would "[p]robably lead us, in part, to where/what the Feds are looking at."  Additionally, on September 13, 2011, in an interview with Sergeants Craig and Long, Michel confessed to beating inmates with other deputies.  Leavins emailed Carey, "That idiot michel (sic) is confessing to beating handcuffed inmates with other deputies...... not looking good....they are still interviewing him...will advise."  Carey took this information to Tanaka.

---

[2]   In providing Craig with the telephone number for Special Agent Marx, Brown switched the last two digits of her phone number.

On September 25, 2011, the Los Angeles Times published an article stating that "[f]ederal authorities are investigating allegations of inmate beatings and other misconduct by deputies in Los Angeles County jails, with FBI agents going so far as to sneak a cellphone to an inmate to get reports from inside."  Tanaka forwarded a link to this article and another from the Washington Post to Carey and Leavins.  The Washington Post article stated that the U.S. Department of Justice was "boost[ing] activity to police the police." Leavins responded, "I figured that was the motivation."  Tanaka replied that the article showed the orders to investigate the LASD were coming "from the top" of the Department of Justice.

At about 9:30 a.m. on September 26, 2011, defendant Baca made an appearance on Good Day L.A.  The anchors asked him about "alleged brutality within the jails and the FBI investigating."  Referring to the cell phone in the jail, defendant stated, "well it's illegal. It's a misdemeanor and then there is a conspiracy law that goes along with it."  Another anchor asked defendant, "Do you resent the FBI's intrusion?"  Baca responded "Oh yeah."  Later, a second reporter asked, "Well, if you don't want the FBI in there, then who polices the police?" Defendant answered, "We police ourselves."  Tanaka later sent a link of defendant's Good Day L.A. appearance to Carey, who forwarded it to Craig.

A few hours later, Craig and Long approached Special Agent Marx outside her home and recorded the encounter.  Special Agent Marx told them that she was "not going to make any statements."  Craig then informed Special Agent Marx that she was a "named suspect in a felony complaint" and asked whether she had received his message.  Special

19

Agent Marx said that she had not received his message, but she would pass the information along to the Assistant Director in Charge of the FBI.  Craig then stated that he was "in the process of swearing out a declaration for an arrest warrant" for her.

Shortly thereafter, two FBI officials -- then-Supervisory Special Agent Carlos Narro and Special Agent Teresa Tambubolon -- called Long.  Long recorded the call.  Narro stated that Special Agent Marx, "indicated to me that you guys indicated to her that there's going to be a warrant for her arrest?"  Long responded, "There's going to be."  Narro asked Long, "Does the Sheriff know this?"  Long replied, "The Sheriff knows this, sir."  When Narro asked what the charges would be, Long told him he would "have to speak to the Undersheriff, and that's Mr. Paul Tanaka."  Narro asked, "Do you have any idea when the warrant's going to come out?"  Long responded, "It could be tomorrow, sir.  You're going to have to talk to the Undersheriff."  After the call ended, the recording device captured laughter and Long telling Craig, "They're scared.  They're like, do you know when . . . the warrant . . ."  Craig informed Long, "You're still rolling."  Long then stopped the recording device.

### L.    Baca's Response to the Federal Community in 2011

That evening, when United States Attorney Birotte was notified of the LASD's threatened arrest of Special Agent Marx, he called defendant.  When Birotte questioned defendant about the arrest tactic, Baca did not act surprised or uninformed.  Instead, he demurred and told Birotte that his underlings were only going to go talk to her.

The next day, Birotte, Baca and Martinez met in Birotte's office.  This meeting had been on the books for some time and the purpose was for Birotte to lay to rest any residual issues since the August 29, 2011 meeting.  Of course, in light of the LASD's threats to Special Agent Marx, the meeting took on new significance.  Birotte informed defendant that, despite defendant's wishes, the federal investigation would continue with the FBI working with the USAO and not with the LASD.  Nonetheless, Birotte stated he would like to have the two entities work as partners on other matters.

After this exchange, Birotte opened the floor to defendant, who immediately turned his ire toward Martinez.  Defendant told Martinez, "I'm goddamned Sheriff" and these were "my goddamned jails."  His indignation reached a fever pitch when he suggested that the two organizations, the FBI and the LASD, could "gun up" to settle the matter.  Martinez finally told defendant "enough" and reminded him that it was defendant's deputy who brought the phone into inmate Brown.  The meeting ended and the federal investigation continued, with Los Angeles County bringing in outside counsel and, through them, the LASD beginning to respond to the August subpoenas in October 2011.

**M.   Defendant's Lies to Federal Authorities in 2013**

The federal investigation moved forward, first with subpoenas for documents and later with witnesses called before the grand jury. In April 2013, members of the investigative team interviewed defendant Baca about his knowledge of what had taken place between August and September 2011.  While the LASD had produced voluminous documents, not all of the documents which will be used in this trial

21

had been produced and some of the co-conspirators had not yet been questioned.

During the interview, then-Sheriff Baca was asked about certain known key events in the government's investigation into possible obstruction of justice charges.  Indeed, at the beginning of the interview he was told that the questions would center around the following:

- What was happening in August and September 2011 in terms of Anthony Brown;

- The LASD's response to learning about the FBI's Investigation; and

- The Leah Marx encounter.

He provided false statements on each of those topics, as well as others.

First, defendant said that by August 20, 2011, he had "no clue" that the federal government was conducting a civil rights investigation.  Second, defendant stated that he had no "direct involvement" in any conversation about keeping Anthony Brown and the federal government away from each other.  Third, defendant told the federal government that he was not aware that the FBI was kicked out of the interview of Anthony Brown on August 23, 2011.  He expanded on his denial by stating that he was not later informed that such action had taken place and that Thompson never apologized for allowing the FBI to interview Brown in the jail.  Fourth, defendant Baca said that he had "never said" he did not believe that the FBI should be investigating the LASD.  Fifth, defendant told the federal government that he was not aware that his deputies were going to approach

Special Agent Marx until he later heard about the encounter from the federal government.

## IV. LEGAL AND EVIDENTIARY ISSUES

### A.    Elements of Offenses

#### 1.    Conspiracy – 18 U.S.C. § 371

In order for the defendant to be found guilty of conspiracy, the government must prove beyond a reasonable doubt that: (1) from on or about August 19, 2011 to September 26, 2011, there was an agreement between two or more persons to commit the crime of obstruction of justice; (2) the defendant became a member of the conspiracy knowing its object and intending to help accomplish it; and (3) one of the members of the conspiracy performed at least one overt act for the purpose of carrying out the conspiracy.

#### 2.    Obstruction of the Due Administration of Justice – 18 U.S.C. § 1503(a)

In order for the defendant to be found guilty of obstruction of justice, the government must prove each of the following elements beyond a reasonable doubt: (1) the defendant influenced, obstructed, or impeded, or tried to influence, obstruct, or impede a federal grand jury investigation; and (2) the defendant acted corruptly, with knowledge of a pending federal grand jury investigation.

As used in Section 1503, "corruptly" means that the act was done with the purpose of obstructing the due administration of justice. The government does not need to prove that defendant's conduct had the actual effect of obstruction; however, the government must prove that the defendant's actions would have had the natural and probable effect of interfering with the pending grand jury investigation.

23

The government need not prove that the defendant's sole or even primary intention was to obstruct justice so long as the government proves beyond a reasonable doubt that one of the defendant's intentions was to obstruct justice.  See United States v. Smith, ___ F.3d ___, No. 14-50440, 2016 WL 4137634 at *8-9 (9th Cir. Aug. 4, 2016).  The defendant's intention to obstruct justice must be substantial.  Id.

### 3.    False Statements

In order for the defendant to be found guilty of making false statements, the government must prove each of the following elements beyond a reasonable doubt: (1) the defendant made a false statement in a matter within the jurisdiction of the USAO and FBI; (2) the statement was material to the activities or decisions of the USAO and FBI; that is, it had a natural tendency to influence, or was capable of influencing, the USAO's and FBI's decisions or activities; and (3) defendant acted willfully; that is, deliberately and with knowledge both that the statement was untrue and that his conduct was unlawful.

### B.    Proof of Grand Jury Investigation

The government must establish that the investigation being obstructed was a grand jury investigation.  The government will prove that defendant was aware of the grand jury subpoenas being served on the LASD for records related to deputies under investigation.  The government also intends on establishing that the FBI was acting as an arm of the grand jury and, therefore, any obstruction of the FBI's activities was an obstruction of the grand jury investigation.  To prove that this was a grand jury investigation, Special Agent David Dahle is expected to testify about the subpoenas that were served in

24

the case, his involvement in the grand jury investigation, how the FBI was gathering records with the intention of presenting the relevant records to the grand jury, and how the FBI was conducting interviews for the purposes of determining who would testify before the grand jury and relating the information learned from these interviews to the grand jury.  See United States v. Macari, 453 F.3d 926 (7th Cir. 2006).  If needed, Special Agent Leah Tanner may also address the same issues.

### C.   Defendant's Statements

The government plan on using a number of statements by the defendant, some of which were recorded.  These statements, when admitted by the government are admissible under Rule 801(d)(2).  One of the recorded statements is the federal government's interview of defendant on April 12, 2013.  The government has approximately 50 excerpts of the interview.  In order to allow the jurors to place the statements in context, the government proposes to have Special Agent Jason Dalton, who was present at the interview and made the recording, lay the foundation for all the excerpts the government intends to play.  Special Agent Dalton will also be on the witness stand when some of the excerpts are played.  Thereafter, the government will move to admit and play certain excerpts during the testimony of other witnesses when the statements become relevant.

### D.   Statements Made by Defendant's Co-Conspirators

Statements made in recorded conversations, emails, and other documents, by defendant's co-conspirators are admissible against defendant if in furtherance of the conspiracy.  Fed. R. Evid. 801(d)(2)(E).  Defendant need not be present at the time of the

25

statement for the statement to be admissible.  United States v. Williams, 989 F.2d 1061, 1067 (9th Cir. 1993).  For a statement to be admissible under Rule 801(d)(2)(E), the government must establish by a preponderance of the evidence that (1) there was a conspiracy, (2) defendant and the declarant were participants in the conspiracy, and (3) the statement was made by the declarant during and in furtherance of the conspiracy.  See Bourjaily v. United States, 483 U.S. 171, 175-76 (1987); United States v. Bridgeforth, 441 F.3d 864, 868-69 & n.1 (9th Cir. 2006) (admission of co-conspirator statements does not violate the Confrontation Clause).

The contents of a statement itself may be considered, along with independent evidence, in determining whether there is sufficient proof of the existence of the conspiracy and the involvement of the defendant and the declarant in it.  See Fed. R. Evid. 801(d)(2)(E); Bourjaily, 483 U.S. at 181; United States v. Castaneda, 16 F.3d 1504, 1509 (9th Cir. 1994).  Courts have adopted a broad reading of the "in furtherance of" requirement for admission of co-conspirator statements, and have considered the following categories of statements (among others) as having been made "in furtherance of" a conspiracy: (1) statements to induce enlistment or further participation in the conspiracy, (2) statements to keep a coconspirator abreast of a co-conspirator's activity, (3) statements to prompt further action by co-conspirators, (4) statements related to concealment of the conspiracy, (5) statements seeking to control damage to an ongoing conspiracy, and (6) statements to allay fears of a co-conspirator or to reassure members of the conspiracy's continued

existence.  See United States v. Arias-Villanueva, 998 F.2d 1491, 1502 (9th Cir. 1993).

### E.    Defendant's Expert Disclosure

Defendant has provided the government with notice that he intends to call a witness, Dr. James E. Spar, to testify regarding defendant's cognitive abilities in 2013.  This testimony is the subject of a pending motion.

## V.    CONCLUSION

Defendant owed a duty to the citizens of Los Angeles County to use the Sheriff's Department to enforce the law.  Instead, he devoted its resources to breaking it to try to stop a federal probe of his deputies' misconduct.  The evidence at trial will show that defendant is guilty of conspiring to obstruct justice, endeavoring to obstruct justice, and making false statements.