# Exhibit B to
# Brandon Fox Declaration

# In the Matter of:

## Charles Antuna vs. County of Los Angeles

Videotaped Deposition of Leroy David Baca, Volume I

01/29/2015

Job #: 47566



COURT REPORTERS, INC.

(818)988-1900

A133949

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

CHARLES ANTUNA, ROCIO                )
MARTINEZ, DAVID WATERS, KEVIN        )
HEBERT, ROBERT TUBBS, LOUIS          )
DURAN, ROBERT WHEAT, CASEY           )
DOWLING,                             )
                                     )
        PLAINTIFFS,                  )
                                     )  No. CV14-05600-MWF
   VS.                               )            (PLAx)
                                     )
COUNTY OF LOS ANGELES;               )  (VOLUME I
SHERIFF LEROY BACA; AND DOES 1       )  PAGES 1 - 233)
THROUGH 10, INCLUSIVE,               )
                                     )
        DEFENDANTS.                  )
_____)

VIDEOTAPED DEPOSITION OF LEROY DAVID BACA

THURSDAY, JANUARY 29, 2015

FILE NO. 47566

REPORTED BY:  D'ANNE MOUNGEY, CSR 7872

A133950

## Page 2

VIDEOTAPED DEPOSITION OF LEROY DAVID BACA, TAKEN ON BEHALF OF PLAINTIFFS AT 23002 VICTORY BOULEVARD, CALIFORNIA, COMMENCING AT 10:45 A.M. ON THURSDAY, JANUARY 29, 2015, BEFORE D'ANNE MOUNGEY, CSR 7872.

APPEARANCES OF COUNSEL:

FOR THE PLAINTIFFS:

LAW OFFICES OF GOLDBERG & GAGE
BY:  BRADLEY C. GAGE, ESQ.
23002 VICTORY BOULEVARD
WOODLAND HILLS, CALIFORNIA 91367
(818) 340-9252
BGAGE@GOLDBERGANDGAGE.COM

FOR THE DEFENDANTS:

PETERSON, BRADFORD & BURKWITZ
BY:  GEORGE E. PETERSON, ESQ.
100 NORTH FIRST STREET
SUITE 300
BURBANK, CALIFORNIA 91502
(818) 562-5800
GPETERSON@PB-LLP.COM

## Page 3

I N D E X (CONTINUED):

ALSO PRESENT:

BRIAN HERSHMAN, ESQ.

ESROM JAYASINGHE, VIDEOGRAPHER

KEVIN HEBERT

DAVID WATERS

CHARLES ANTUNA

CASEY DOWLING

ROBERT WHEAT

LOUIS DURAN

## Page 4

I N D E X (CONTINUED):

| WITNESS | EXAMINATION | PAGE |
|---|---|---|
| LEROY DAVID BACA | | |
| | BY MR. GAGE | 8 |

E X H I B I T S

| NO. | PAGE | DESCRIPTION |
|---|---|---|
| 52 | 107 | EMAIL CHAIN, 12-5-13 |
| 53 | 168 | PARTIAL TRANSCRIPT OF BACA, LEROY, VOL. 1, JULY 19, 2013 IN THE MATTER OF PATRICK MAXWELL V. COUNTY OF LOS ANGELES |
| 54 | 224 | "LOS ANGELES TIMES" ARTICLE |

## Page 5

I N D E X (CONTINUED):

QUESTIONS INSTRUCTED TO BE MARKED OR NOT ANSWERED:

| PAGE | LINE |
|---|---|
| 37 | 13 |
| 48 | 5 |
| 48 | 24 |
| 49 | 5 |
| 49 | 14 |
| 50 | 24 |
| 68 | 24 |
| 70 | 3 |
| 181 | 5 |

INFORMATION REQUESTED

(NONE)

A133951

Page 6

WOODLAND HILLS, CALIFORNIA

THURSDAY, JANUARY 29, 2015; 10:45 A.M.

(Prior to the deposition commencing, all counsel stipulated to waive the reporter read-on and read-off pursuant to FRCP Rule 30(5).)

THE VIDEOGRAPHER: We are on the record. This is the deposition of Sheriff Lee Baca, taken on behalf of the plaintiffs in the matter of "Charles Antuna, et al., versus the County of Los Angeles, et al," pending before the United States District Court, Central District of California. Case number CV14-05600-MWF (PLAx)

It is January 29th, 2015. And today we are at 23002 Victory Boulevard in Woodland Hills, California.

My name is Esrom Jayasinghe, a certified legal video specialist and a notary for Verbatim Video, located at 9725 Gladbeck Avenue in Northridge, California.

This is the start of media unit number one. The time now is 10:45.

Page 7

And, counsel, if you kindly state your appearances, please.

MR. GAGE: Good morning. Bradley Gage, Goldberg & Gage, on behalf of the plaintiffs.

MR. PETERSON: George Peterson for defendants.

MR. HERSHMAN: Good morning. Brian Hershman, Jones Day. I'm here to represent the County and Sheriff Baca's interest in connection with the pending criminal investigation involving the sheriff's department.

THE VIDEOGRAPHER: Can I have all present please -- also present, please.

MR. GAGE: Do it in order.

MR. WATERS: David Waters.

MR. HEBERT: Kevin Hebert.

MR. ANTUNA: Chuck Antuna.

MR. WHEAT: Robert Wheat.

MR. DURAN: Louis Duran.

MR. DOWLING: Casey Dowling.

THE VIDEOGRAPHER: Please proceed, Ms. Court Reporter.

///
///
///

Page 8

LEROY DAVID BACA, having been first duly sworn by the reporter, was examined and testified as follows:

EXAMINATION

BY MR. GAGE:

Q   Good morning.

A   Good morning.

Q   You've had your deposition taken many times in the past I know. Just briefly, a deposition is a statement under oath. Carries with it the same obligation to tell the truth as if you are testifying in a court of law. Do you understand that?

A   Yes.

Q   Everything you say today is being taken down by a court reporter. You are being audio taped and videotaped. Do you understand that?

A   Yes.

Q   If you give false testimony in a deposition, just like in a court of law, it could be potentially prosecuted for perjury, which is a felony. You understand that?

A   Yes.

Q   Is there any reason why you cannot give us your best testimony here today, whether it be drugs,

Page 9

medication, health issues, lack of sleep? Anything of that sort? Low blood pressure -- low blood sugar?

Go ahead.

A   No.

Q   If at any time I ask you a question today that you don't understand, don't answer. Just simply tell us you don't understand. Will you do that for us?

A   Yes.

Q   Are you presently working anywhere?

A   No.

Q   What is the last date that you worked anywhere?

A   The last date that I worked was January 30th of 2014 for the Los Angeles County Sheriff's Department.

Q   And then you resigned on that day as the Sheriff of the County of Los Angeles; correct?

A   I retired that day.

Q   And that was before your term was to end; is that true?

A   Yes.

Q   At the time that you retired, you were in the middle of a campaign running for sheriff against Paul Tanaka and others; correct?

MR. PETERSON: Ambiguous and argumentative.

THE WITNESS: I was running for re-election.

A133952

Page 10

BY MR. GAGE:

Q And was one of your opponents in that campaign for sheriff, your re-election bid, Paul Tanaka, the former undersheriff of the County of Los Angeles?

A Not at that time.

If I may. In order to be a candidate, you have to register yourself and that period of registration began on February the 1st.

Q Of 2014?

A Yes.

Q Were you already campaigning for re-election at the time that you retired from the sheriff's department?

MR. PETERSON: Ambiguous.

THE WITNESS: No. I was -- like all candidates, you have a grace period of 18 months before the primary to raise funds. But officially campaigning doesn't begin until the February registration.

BY MR. GAGE:

Q Were you attempting to raise funds before your retirement?

A Yes.

Q And were you aware that Paul Tanaka had announced a candidacy for sheriff before you retired?

A I am aware that Mr. Tanaka was interested in

Page 11

running for sheriff. I'm not aware of his technical or specific expressions as to his running for sheriff.

Q When did you first become aware that Paul Tanaka was interested in running for sheriff?

A I think it was in that period of time that you alluded to in your last question.

Q I'm not clear.

What I'm trying to find out, when you first learned that Paul Tanaka was interested in running for sheriff?

A I'm not sure.

Q Do you know if it was before April of 2013 or after April of 2013?

A Could be either way.

Q How did you first learn that Paul Tanaka was interested in running for sheriff?

A I think it was reported in the newspaper. One of the papers.

Q Would you normally read newspapers about election issues?

A Yes.

Q And what papers did you typically read to keep abreast on the election issues going for sheriff?

A Just the "Los Angeles Times."

Q Would you read "Witness LA" as well?

Page 12

A I've never read "Witness LA." And -- no.

Q Has anybody ever briefed you on "Witness LA"?

A No.

Q I want to ask you some questions about your feelings on certain topics I think are related to this case, so you understand where I'm coming from.

First, do you believe that the United States Constitution is important?

MR. PETERSON: Argumentative, ambiguous.

You can respond.

THE WITNESS: Yes.

BY MR. GAGE:

Q Why do you feel that way?

A Our founding fathers were brilliant in their ability to put together the framework legally for what would become the underpinnings of our government.

Q And were you ever taught that law enforcement had an obligation to comply with constitutional standards?

A Yes.

Q And what did you learn in that regard?

A I learned that constitutional law is part of the overarching body that leads to the amendments of which in turn specify what the things are that are legally required by our government, as well as the

Page 13

functionaries of government, such as law enforcement.

Q And were you taught that if members of law enforcement violate constitutional rights, that could result in a civil rights lawsuit against the entity?

MR. PETERSON: Overbroad, argumentative.

Go ahead.

THE WITNESS: Yes.

BY MR. GAGE:

Q What did you learn with respect to how governmental entities or sheriff could be potentially liable for civil rights claims when there is a constitutional violation?

A Well, the actions of employees within the organization that may or may not be within the framework of the constitution or state law, Federal law, Municipal law, would require some degree of investigation to establish the facts.

So there's a variety of legal mandates that one is taught when they go to Sheriff's Academy and, of course, you could learn these things by going directly into various law firms and learning from attorneys, and over the years through experience with lawsuits.

Q So you've learned over the years that if the sheriff's department violates constitutional rights of individuals, the sheriff's department could have

A133953

Page 14

liability for violation of 42 USC, Section 1983, Civil Rights Law; correct?

A    That's possible.

Q    And do you believe that it would be wrong for law enforcement to intentionally violate a person's constitutional rights?

A    Yes.

Q    Why do you feel that way?

A    Because it's what the law stands for is the rights of individuals under given circumstances.

Q    So would it shock your conscience to learn that members of law enforcement were intentionally violating the constitutional rights of employees of the sheriff's department?

MR. PETERSON:  Argumentative.

THE WITNESS:  It's a case-by-case answer. Accusations are common to any process.  Those accusations are looked into.  The facts will determine an answer to that type of question one side or the other.

BY MR. GAGE:

Q    And if you did an investigation and then you found out that indeed the sheriff's department was intentionally violating the constitutional rights of its employees, would that shock your conscience?

Page 15

MR. PETERSON:  Argumentative and overbroad.

THE WITNESS:  Well, the sheriff's department, as a whole, is ambiguous, but when you get to a specific individual or individuals within the structure, then you can make some specific assessments that can lead to a conclusion.

BY MR. GAGE:

Q    So if you came to a determination that someone high up in management in the sheriff's department was intentionally violating the constitutional rights of the employees, would that shock your conscience?

MR. PETERSON:  Again, argumentative and overbroad.

THE WITNESS:  Absent the facts, I really can't tell you an answer.

BY MR. GAGE:

Q    Certainly you would never personally want to violate the constitutional rights of any of the employees; true?

A    I'm not one who would violate anyone's rights.

Q    Why would you not to want to ever violate a person's constitutional rights?

A    Because I respect all the employees in the

Page 16

sheriff's department, even those who are under investigation.

Q    And you believe that it would be wrong for you personally to violate the constitutional rights of the employees; correct?

A    Yes.

Q    And you believe that it would be despicable for management level employees in the sheriff's department to violate employee's constitutional rights; true?

MR. PETERSON:  Argumentative, overbroad, ambiguous.

THE WITNESS:  I think that our managers within the sheriff's department are well aware of constitutional law as it pertains to employee rights, and they know my opinion on that would be that you honor all constitutional rights the individual employees have.

BY MR. GAGE:

Q    And if they violate that, you think that's despicable conduct, don't you?

MR. PETERSON:  Argumentative, ambiguous and overbroad.

THE WITNESS:  I think it is conduct that is not becoming to the positions that they hold.

///

Page 17

BY MR. GAGE:

Q    Would you agree that protecting everyone's constitutional rights is important for public safety?

A    Yes.

Q    And why do you believe that?

A    I think that the law is clear to those who enforce the law, and they must enforce it within the rules.

Q    So I'm sure that you feel that if law enforcement violates our constitutional rights, then we as a society would suffer losing our protections for freedom, liberty, justice; correct?

MR. PETERSON:  Argumentative, ambiguous.

THE WITNESS:  Yes.

BY MR. GAGE:

Q    And why do you feel that way?

MR. PETERSON:  Same objections.

THE WITNESS:  For the answer I gave a couple questions ago, the same reasons.

BY MR. GAGE:

Q    I'm not sure which one that is.  Just briefly say -- you can just say, because it's important, that's the law, or whatever it is, but I just want to hear it from your words.

A    Okay.  Sure.

A133954

Page 18

Yes, it's important for those of us who enforce the law to follow the law.

Q   And since freedom of speech, association and assembly are part of the First Amendment to the US Constitution, do you believe that that is one of the most important constitutional rights that we have in America?

A   Yes, I do.

Q   And why do you feel that way?

A   Because the Constitution authorizes and protects individuals for freedom of speech prerogative.

Q   And those freedom of speech prerogatives apply to employees of the sheriff's department, to your understanding; correct?

A   Yes.

Q   And was it your understanding when you were the sheriff that retaliating against a person for expressing their First Amendment rights, free speech, association, assembly, political expression, that would break the law?

MR. PETERSON:  Ambiguous.

Go ahead.

THE WITNESS:  Well, it is ambiguous, but it's possible.

///

Page 19

BY MR. GAGE:

Q   Would it violate the department's policies to retaliate against a person for expressing their First Amendment rights?

A   That's also possible.

Q   When you say "it's possible," explain your answer.  Why is it possible?

A   The word "possible" enables that facts must be brought into whatever assertions or allegations are made by a person who claims that their rights are violated.  And I reserve that thought process, as well.  Only facts can determine truthfully if a law has been violated.

Q   So if you found that there were facts that employees were being retaliated against because of their First Amendment political expression, that, then, would be a violation of policy; is that true?

A   Yes.

Q   When you were the sheriff, there was a public information office at the sheriff's department; correct?

A   Yes.  An information office is in the sheriff's department.

Q   That office would monitor articles in the media; true?

A   Yes and no.

Page 20

Q   Okay.  Explain.

A   Well, media is a broad area of information.  There's dozens of media streams throughout Los Angeles County.  I think in order to monitor all that, we would have to have much more resources than what we have today.

So I don't think that we can assume that the information office is going to know every article and every piece of information that's out there.

Q   Were there certain types of articles that would be monitored or certain publications at the public information office monitored on a regular basis that you were aware of?

A   No.

Q   Did you provide any instructions to the public information office at any time as to what you were looking for to have monitored so you could keep up with current news?

A   That had happened in the past by my predecessor, and during my term as well, but at some point it became almost an overwhelming problem for the office to do its work by just monitoring articles, so we stopped doing that.

Q   When did the public information office stop monitoring articles?

Page 21

A   I'm not sure, but it could have been over ten years ago.

Q   Who was the most recent public information officer in the sheriff's department when you were the sheriff?

A   That was Captain Mike Parker.

Q   Is he still in the department, to your knowledge?

A   Yes.

Q   Do you know where he's working now?

A   I don't.  He was promoted to commander and he's in one of the divisions.

Q   You would be briefed on the most important items pertaining to the sheriff's department, wouldn't you, that -- in the media?

MR. PETERSON:  Ambiguous, overbroad.

THE WITNESS:  No.  I read the "Times" every morning.  That's my brief.

BY MR. GAGE:

Q   And, in fact, when you were the sheriff, you would be driven to work each day by a member of the department as your driver; correct?

A   Yes.

Q   And one of those drivers was Robert Tubbs; correct?

Page 22

A    Yes.

Q    And another one of your drivers was Patrick Maxwell; correct?

A    Yes.

Q    And so you would share information with your drivers; correct?

A    Not -- when you say "information," that's ambiguous.

Q    That's a fair objection.  I'll rephrase.

Would you share some of the more personal information about your activities with drivers that you did not share with other members of the department that were the rank of sergeant, lieutenant or below?

A    Not necessarily.  Most of it was on a broader scale of conversation.

Q    What kind of broader scale conversation are you talking about?

A    Where we were going, what I needed to do at that particular juncture of our time together.  Specific to tasks that we were into.

Q    When you were driving to work with your drivers, you would talk to them about various articles that came out about the sheriff's department, wouldn't you?

A    No.  Not that I can recall.

Page 23

Q    But you would read the newspaper with the driver when you were driving to work; correct?

A    The driver would be driving and I would be reading and by the time 20 minutes evolved from home to work, I was through reading.

Q    Did you feel that it was important for you as the sheriff to be able to effectively run the organization by keeping track of the significant news stories that were impacting the sheriff's department?

A    No.  I didn't rely on the newspapers to perform my duties as sheriff.

Q    How would you gather the information so that you could perform your duties as the sheriff and be aware of all the most significant aspects of the sheriff's department?

A    Well, I have an executive staff on the Monday through Friday basis, and then I had my weekly meeting with the executives of the department.  And through those venues, I was able to learn as much as I could.

Q    Yet, did you state publicly that you were out of touch with issues going on in the department?

A    I have said publicly that I was not informed of issues within the department.

Q    What were --

A    Certain issues.

Page 24

Q    What were the major issues that you were not informed of in the department?

A    I think it's known to an extent that some of the accusations of deputies using excessive force in the jail were not brought to my level during the time that such accusations allegedly occurred.

Q    When did you first learn about those accusations?

MR. PETERSON:  Ambiguous.

THE WITNESS:  Well, I -- first of all, there's two parts to the answer.

My own experience when I worked custody as a commander told me that you've got to keep on managing the more critical areas of the jail where inmate violence is more potentially capable of happening.  So I already had that wisdom.

But the nature of specific force reporting processes were things that I relied on my staff to stay on top of.  So when I would go to the jails, I would have this briefing at that point in time, either through the captain or commander or chief.

But when you get into the dialogue vis-à-vis the reports, I didn't examine the reports myself until a later point in time when the problem was becoming very public, and I said, "I want to see the reports."

Page 25

MR. HERSHMAN:  I'm sorry.  I'm going to go on the record here.  We are getting close to an area that I am particularly monitoring, and that is the Federal investigation, which is still under investigation, as well as the indictment of certain individuals for excessive use of force.

I'm not entirely sure where your questions are heading, but to the extent that you're going into that area, I'm going to instruct him not to answer.  We may need to adjourn and reach the magistrate.

MR. GAGE:  I figure if there's ever a question and you want to instruct him not to answer based on, say, Fifth Amendment, you can just instruct him.

MR. HERSHMAN:  Just to be clear, it's not a matter of the Fifth Amendment.  There is an ongoing Federal investigation.  There are interests of both parties involved, as well as the United States Attorney's office that I don't think have been vetted here.

So it would be an issue that would have to be raised with the judge and we have to raise with the US Attorney's office as to whether or not a stay were to be sought.

Now, my understanding of this litigation is

A133956

Page 30

client in the matter in which the interest of the clients potentially conflict."

So I think that's an issue.

MR. HERSHMAN: Okay.

BY MR. GAGE:

Q    My question before the break was simply: When? So I'll restate it for you.

You had said that you became aware of accusations of deputies using excessive force in the jail that were not brought to your level.

All I wanted to know is the date. When did you learn of that?

A    Sometime between 2010, '11, and it was a progressive period of time.

Q    After you learned of that, did that cause you to have any changes in your relationship with Paul Tanaka?

A    At that period of time, no.

Q    At some point did your relationship with Paul Tanaka change?

A    I think that's a personnel matter and I would rather not comment on that.

Q    Well, I'm asking you -- I'm just asking for a "yes" or "no."

Page 31

Did your relationship with him change?

I'm entitled to that.

A    At that period of time, no.

Q    When -- did your relationship with Paul Tanaka ever change between January 1st, 2010 and the present?

A    Yes.

Q    When did it first change?

A    I'm not sure.

Q    Did it change in 2010?

A    No.

Q    Did it change in 2011?

A    I promoted him then.

Q    After you found out about these issues with the jail, did your relationship with Paul Tanaka start to change then?

A    No. There's only one issue that occurred that I thought was important.

Q    What was that?

A    His comments regarding the gray area.

Q    When did you learn about the "gray area" comments?

A    I'm not sure. But during that timeframe that you asked the question in.

Q    Steve Whitmore worked for you when you were

Page 32

the sheriff; correct?

A    Yes.

Q    And what was his job title?

A    He was the press liaison.

Q    And as the press liaison, did he review the "Witness LA" article, to your knowledge?

A    I don't know.

Q    Didn't you have meetings with him regarding what was reported in "Witness LA"?

A    I don't know exactly what was reported in "Witness LA."

Q    You were aware that Steve Whitmore was exploring a potential lawsuit against the sheriff's department, weren't you?

MR. PETERSON: Lacks foundation, calls for speculation.

BY MR. GAGE:

Q    Go ahead.

A    First time I heard that.

Q    Well, you've kept in touch with Steve Whitmore even after you left the department; true?

A    Yes.

Q    You in fact had a conversation with him in March of 2014, remember?

A    No.

Page 33

Q    Remember when you guys got together after you had left the department and he was talking to you about how his job duties were taken away from him by Sheriff Scott?

A    I don't recall that.

Q    Do you recall he was talking to you about the possibility of bringing a lawsuit because he felt he was being retaliated against due to his association with you?

A    I don't recall him ever saying that.

Q    Do you recall him ever talking to you about "Witness LA" articles in the sheriff's department?

A    No.

Q    When you talked about the gray area, what was it about the gray area comment that caused you to have a difference of opinion or a different relationship with Paul Tanaka?

A    Well, it was a very misleading phraseology of how a deputy should work in the field.

Q    And in what way was it a misleading phraseology?

A    It implied you could go one way or the other within the framework of the law. And I think that it could be easily misinterpreted by deputies working the field.

A133958

Page 50

THE WITNESS: I didn't meet with anybody. I have a pretty different life than I did when I was the sheriff.

BY MR. GAGE:

Q    How do you fill your days these days?

MR. PETERSON: I'm sorry? Was that a question?

MR. GAGE: Yeah.

MR. PETERSON: What's the question? Hold on. I didn't hear that.

MR. GAGE: He said he has a different life.

So I want to know what's the main stuff that you're doing these days.

MR. PETERSON: What is the point of that for purposes of this deposition, which we started 45 minutes late to begin with? Why are we doing this?

MR. GAGE: This is not because of my not being here on time.

MR. PETERSON: Yeah, it was. That was the first 15 minutes of waiting for you to pull up in your Porsche. All right. There's no point to this.

MR. GAGE: Sorry you're jealous.

BY MR. GAGE:

Q    Anyways, are you doing anything of a significant work nature now that you've retired from the

Page 51

sheriff's department?

A    Well, I'm not employed. But I do --

MR. PETERSON: Hold on. If you have a privacy interest as to what you do in an unemployed capacity, it's up to you to determine that. This clearly doesn't have a blessed thing to do with this litigation. This is, again, fishing. You can waive your right of privacy, if you wish.

MR. GAGE: Mark that, too, please.

MR. PETERSON: It's up to you.

MR. GAGE: Go ahead.

THE WITNESS: A lot of it is charity work. I'm on boards of non-profits.

BY MR. GAGE:

Q    At some point did you change the organizational structure, as far as what duties Paul Tanaka had as the undersheriff at the sheriff's department?

A    Again, that's a personnel matter and I am not going to comment on personnel matters.

MR. GAGE: Mark that, please.

MR. PETERSON: Well, hold on. I think in this case, that question is appropriate and you can answer that question, whether or not you changed Paul Tanaka's job duties at some point. I think that is a

Page 52

matter to which he is entitled.

THE WITNESS: On advice of my attorney who said it's okay, I'll answer it this way -- and I believe your question was did I at any time change Mr. Tanaka's duties?

MR. PETERSON: That was the question.

THE WITNESS: The answer is yes.

BY MR. GAGE:

Q    When did you change his duties?

A    When the Jail Violence Commission had established that in their view the department would be better served if the undersheriff position was not in charge of operations.

Q    When was that was my question?

MR. PETERSON: I'm sorry. When was which? He's given you --

BY MR. GAGE:

Q    When did you change the duties of Paul Tanaka?

A    When the Jail Violence Commission issued a report recommending that the undersheriff position not be in charge of divisional operations.

Q    I'm looking for a date. Do you know the date?

A    I believe sometime in 2013. I'm not

Page 53

positive, however.

Q    And when you changed his duties, what were those changes?

A    That the assistant sheriffs would be the first step beyond chiefs to deal with operational matters concerning personnel.

Q    Did you change any organizational charts to reflect that change?

A    That was not necessary. The duties were just defined in that fashion.

Q    Did you ever hold any kinds of press conferences on jail reforms?

A    Let me think back on that. There were certain press conferences that occurred on a variety of subjects within the sheriff's department. Some may have involved jail reforms, but I can't tell you specifically which ones.

Q    Did you ever make any comments on jail reforms from Men's Central Jail?

A    Not that I can recall at the moment.

Q    I'm going to show you what's previously been marked as Exhibit 23 in this case. It's an organizational chart.

A    Uh-huh.

Q    Do you recognize that document as being a

A133963

Page 58

Q    So he remained second in charge chain of command and this organization chart reflects that?

A    That's correct.

MR. PETERSON:  Slow down a little bit, please.

BY MR. GAGE:

Q    This chart shows Paul Tanaka remains as the undersheriff second in charge; correct?

A    Second in charge of certain functions, but not the operations below the assistant sheriffs.

In other words, the framework of responsibility is not to bypass these chains of commands and go right into the operational units themselves.

Q    So do the assistant sheriffs report to the undersheriff as of October 3rd, 2012 under this org chart?

A    To both.

Q    Both you and the undersheriff?

A    Uh-huh.

Q    If you go to Exhibit 29, please.

Does this refresh your recollection that you had a press conference commenting on jail reforms on October 3rd, 2012, the same date that this organizational chart was changed in Exhibit 30?

MR. PETERSON:  The question is ambiguous and

Page 59

argumentative as phrased.

You can go ahead.

THE WITNESS:  Well, I don't know when the chart was put together.  Some handwriting suggests something in the way of the 3rd.

But the press conference is the 3rd, according to this notice.  So I can only by virtue of this document assume that we had the press conference.

BY MR. GAGE:

Q    Please turn to Exhibit 31.

Do you recognize the first page of Exhibit 31 as the same organizational chart as we see in Exhibit 30 from October 2012?

A    It appears to be the same chart.

Q    Can you please turn to the third page of Exhibit 31, 31-3, where it says on the top "Paul Tanaka Undersheriff."

A    All right.

Q    Does that document fairly and accurate reflect the duties that Paul Tanaka had as of October 2013 when this organizational chart was changed?

MR. PETERSON:  That document, and just taking that in isolation?

MR. GAGE:  Correct.  31-3.

THE WITNESS:  This particular hybrid of this

Page 60

larger document does not take precedence over the larger document, because it doesn't even show myself in this diagram.

And anything that anyone does of any rank inside the sheriff's department ultimately is going to be found within a structure that reports to me.

And Paul on this particular chart is not cut from my office, and he's certainly not cut from any other form of assistant sheriff position, as this particular chart is void of those other relationships that he has.

MR. HERSHMAN:  When is your time for a lunch break because I need to schedule calls?  It's noon now.

MR. GAGE:  Another hour.

MR. HERSHMAN:  At 1:00 O'clock?

MR. GAGE:  Yeah.

MR. PETERSON:  No.  12:30 is when we'll break at the latest.  You can break before then, but not later.

BY MR. GAGE:

Q    If you look at 31-2 --

MR. HERSHMAN:  So just to be clear that you plan to break -- I have to schedule some calls.

MR. GAGE:  If you guys are leaving then, I won't be able to stop you.

Page 61

MR. PETERSON:  I am taking lunch at 12:30, if not sooner, but no later than that.

BY MR. GAGE:

Q    31-2, does that show what you were primarily overseeing at the time?

MR. PETERSON:  Read the question, please.

BY MR. GAGE:

Q    31-2, does that reflect your duties of oversight in October of 2012?

A    Some of them.

MR. PETERSON:  I'm sorry.  Did you add to the question?

MR. GAGE:  Some of those duties.  Yes.

MR. PETERSON:  Do you understand the question modified?

THE WITNESS:  I do.  I do.

Yeah.  These are specialized units that are essentially what they are described as that would have accountability to my office.

BY MR. GAGE:

Q    Did you learn of the gray area comments before or after meeting with the L.A. County Citizens Commission on Jail Violence?

A    I'm not sure if it was before or after.

Q    If you look at Exhibit Number 19, please.

A133965

Page 62

Do you see that is a document indicating the partial transcript of witness testimony from the CCJV meeting on July 27th, 2012? First page. Right up here, sir (indicating).

A    Okay.

Q    So does this refresh your recollection that you gave testimony to the CCJV on approximately July 27, 2012?

A    It appears to be.

Q    And as of that date, did you have any change in your relationship with Paul Tanaka?

A    As of this date?

Q    Correct.

A    I don't believe so.

Q    Did you ever meet with Todd Rogers to discuss your campaign for sheriff?

A    My campaign?

Q    Yes. Running for sheriff in 2014.

A    I don't consult with my staff about what I do in a political campaign. The only person I've ever spoken to is Paul.

Q    Did you ever discuss running for sheriff with James Hellmold?

A    Me running for sheriff with James Hellmold?

Q    Yes, yes.

Page 63

A    Like I mentioned, I don't discuss my political activities in running for the sheriff's position with the idea in mind that individuals are going to be solicited to support me.

Q    The Administrative Services Division that we saw on Exhibit 30 that the undersheriff was over the commander in charge of the --

MR. PETERSON: Hold on. Let him find the document.

MR. GAGE: Sorry.

BY MR. GAGE:

Q    The commander in charge of the Administrative Services Division at that time in 2012 was Dave Waters; correct?

A    I believe so, yes.

Q    You talked about the gray area that you had a conversation with Paul Tanaka about it. What did you and he discuss?

A    I'm not going to discuss a personnel conversation.

Q    So you're refusing to answer that question; correct?

A    I think it's inappropriate.

Q    I just need to make sure it's clear on the record that you're refusing to answer it.

Page 64

MR. PETERSON: No. He feels precluded from answering it I think is what he's telling you.

BY MR. GAGE:

Q    I'm asking the question: Are you going to tell me what was said between you and Paul Tanaka?

MR. PETERSON: Do you feel you can answer that question or do you feel there's some rule that precludes you?

THE WITNESS: I think I can answer it, but it would be a short answer.

MR. PETERSON: Then answer it.

BY MR. GAGE:

Q    What did you and Paul Tanaka discuss regarding the gray area?

A    I can only say what I said. And I said, "I can't defend it."

Q    What did he tell you?

A    I'm not going to comment on what Mr. Tanaka's view is on this. He understood what I said.

Q    So you're not -- you're refusing to tell us today what Mr. Tanaka said to you about the gray area; is that correct?

A    I can't remember what he said about the gray areas is more appropriate.

Q    Okay. So all that you can recall about your

Page 65

conversation with Paul Tanaka about the gray area is "I cannot defend it"; is that true?

A    That's correct.

Q    And how long did you and Mr. Tanaka talk about the gray area for?

A    Not long.

Q    More than 20 minutes or less than 20 minutes?

A    I can't recall.

Q    Do you know if it was more or less than 40 minutes that you --

A    I can't recall.

Q    Let me finish my question, please.

Do you know if you spoke with Mr. Tanaka about the gray area for more than an hour or less than an hour?

MR. PETERSON: You can respond. If you got an estimate, you can make the estimate.

THE WITNESS: Less than two minutes.

BY MR. GAGE:

Q    So you spent less than two minutes on an issue that was so important to you that it changed a long-term relationship that you had with Paul Tanaka; is that a true statement?

MR. PETERSON: That's argumentative as phrased.

A133966

Page 66

You can respond.

THE WITNESS: It definitely changed the relationship.

BY MR. GAGE:

Q    You spent less than two minutes on that issue that definitely changed your relationship with Paul Tanaka; true?

A    My testimony will confirm that.

Q    So when you say your testimony will confirm that --

A    You're saying what I'm saying and I'm saying what I've already said, and then I'm saying I agree with what you said.

Q    Okay. That's fine.

And from this issue that was so important to you that changed a long-term relationship that you had with Paul Tanaka, the only thing that you can recall said by either of you was, "I can't defend this"; correct?

MR. PETERSON: Do you understand the question?

THE WITNESS: I understand the question.

MR. PETERSON: Then you can respond.

THE WITNESS: Yes.

///

Page 67

BY MR. GAGE:

Q    And how long term of a relationship did you have with Paul Tanaka?

A    Long.

Q    And can you tell us the nature of that relationship?

A    Kind of like father and son.

Q    Extremely close then; correct?

A    Correct.

Q    You thought of yourself as a mentor grooming Paul Tanaka to rise through the ranks; is that accurate?

A    Not thought of. In fact did raise him through the ranks.

Q    You expected he would at some point take your place as the sheriff of LA County Sheriff's Department; correct?

A    That was very possible.

Q    Did you ever have discussions with Paul Tanaka about having him as your heir of parent, in other words, to become the next sheriff after you at some point?

MR. PETERSON: Excuse me. Ambiguous and argumentative as phrased.

BY MR. GAGE:

Q    Go ahead.

Page 68

A    That's possible.

Q    When do you believe you had conversations with Mr. Tanaka regarding him becoming the next sheriff after you?

A    I don't recall.

Q    What do you recall was said between you and Mr. Tanaka about him becoming the next sheriff after you?

A    I don't recall that either.

Q    Don't recall anything at all?

A    Well, you're asking for specific things that occurred over periods of time that to me were not in evidence as having to be acted upon at the time.

Q    I don't understand your answer. Not in evidence to be acted upon, what do you mean?

A    You don't talk about these things in some fashion that allows you to mull over these things. I felt that everything that Paul did was on a high level of great competence, and that's the best way I can express myself.

Q    Why did you feel that way?

A    Because he had a unique talent of doing exactly what I wanted done.

Q    Including in connection with the jails?

MR. PETERSON: Argumentative, lacks

Page 69

foundation and I think this intrudes again on the issue of the current investigations.

BY MR. GAGE:

Q    Just a "yes" or a "no."

MR. PETERSON: Brian --

Read the question back.

MR. HERSHMAN: Let's take a break. Let's talk about that.

MR. GAGE: No. We don't need a break. Just mark that and we'll do it after lunch.

MR. PETERSON: Let's read the question back so when we break you'll have in mind --

MR. GAGE: You'll get a chance to do it at lunch. I'll just go onto something else until then. We'll just mark that. Take a lunch break and just before we leave --

MR. PETERSON: I would like to hear it back.

MR. GAGE: At the lunch break --

MR. PETERSON: I would like to hear it back.

MR. GAGE: I'm withdrawing that.

MR. PETERSON: You don't get any say in this.

MR. GAGE: Sure I do. I'm withdrawing the question.

MR. PETERSON: It's too bad. I'm asking to read it back.

A133967

Page 126

about better qualified.

Experience, in terms of an eligible executive's career, matters to me, where they've been, what they've done. And if you've done an outstanding job in the administrative division, the chances are you're going to be staying there. And that's true of patrol, and that's, to a certain extent, true of detectives, and it's definitely true, to an extent, in custody.

So the wagering of promotions as to where one could occur is not one that's easily decided based on you thinking somehow that taking a person out of detective division and putting them in an administrative division is going to make that a better division. It's not. It's going to be a learning curve that's too large.

So because of the vast size of the sheriff's department, which I take the blame for because my ethos was constant creativity and constant growth. We grew from 14,000 to 18,000 people. It's an organization that must have stability. And I believe that that's why promotions are difficult when it comes from commander to chief.

BY MR. GAGE:

Q    4,000 more people means more job

Page 127

opportunities for promotions, doesn't it?

MR. PETERSON: Argumentative.

THE WITNESS: You would think it would, but that's a higher atmosphere. There's only 12 division chiefs.

BY MR. GAGE:

Q    Did you ever indicate that you were thinking of transferring Dave Waters from Administrative Services to Patrol Area One?

A    I heard some things about that rumor and my feeling about that is why would we want to move Commander Waters during a crisis that he's managing fairly well.

Q    So are you saying yes, you wanted to move him, or no, you did not want to move him?

A    I have never, ever said that Commander Waters should be moved. This is something that I think is spinning around the organization to a certain group of people. That had I wanted him moved, I can assure you, counselor, that I would have moved him.

Q    Because you had the final decision, you can move whatever you -- whoever you wanted; correct?

MR. PETERSON: Argumentative, overbroad.

THE WITNESS: Right.

///

Page 128

BY MR. GAGE:

Q    What were the different factors that you looked for?

Can you kind of give me a bullet point list of those factors you looked for in deciding who would be promoted from commander to chief? What was important to you, in other words?

A    Like I testified earlier, length of service in given prior ranks and assignments and, and to the degree that they've excelled within some of those prior ranks and assignments, and their ability in their current assignment to accept more responsibility.

Q    Any other reasons?

A    Well, those are plenty, but obviously I have put high premium on college degrees as well, but that's not a deal breaker.

Q    With respect to the promotion of LaBerge from commander to chief, how did his length of service compare to the length of service of Dave Waters, to your knowledge?

A    Well, the length of service alone is not the issue. The question is where is the opening in the division. LaBerge was a captain at Santa Clarita station and when he was promoted commander, he stayed within the division.

Page 129

And then, of course, the discussion as to his promotion to chief was predicated on a number of chiefs talking about who the candidates would be most eligible.

So LaBerge knowing the entire division as a commander was selected by his chief to be the replacement and recommended to me.

And in my knowledge of LaBerge's background, particularly when he was a captain at Santa Clarita station, is that he was highly regarded and he did a great job and there didn't seem to be any reason not to promote LaBerge.

MR. GAGE: Move to strike as nonresponsive.

MR. PETERSON: Object to the motion.

BY MR. GAGE:

Q    My question is simple: Who had more length of service, LaBerge or Waters, to your knowledge?

A    LaBerge in the region.

You see, where you work matters more than how much length of service in a rank. It's that -- I don't believe, and of course you know assistant sheriff -- excuse me -- Commander Waters is sitting here. I don't know if he's had any experience in the region that LaBerge is now the chief of.

Q    What region is that?

A    Well, let me see, we changed the numbers

A133982

Page 222

claim by a sergeant in the sheriff's department that he was being bullied by another sergeants and you went on TV and said that he should man up. He carries a gun and he should be able to take care of himself. Do you remember that?

A   I do. I'm not sure if that was a sergeant. I think it may have been a deputy.

But either way, I've had my own conflicts with peers and superiors over my career. And I'll tell you this, sir -- if I can get your attention.

Q   You've got it completely.

MR. PETERSON: Well, it's hard to talk to somebody who is so clearly distracted, as you appear to be.

BY MR. GAGE:

Q   Go ahead.

A   I mean, I appreciate what information is presented to you, but I would rather you listen to my answer.

What's important is this: I have been pushed around a lot in the sheriff's department. Okay? At every level. And you know what, I'm not afraid of anybody. I don't care if it's the Sheriff of Los Angeles County. And if you want to resolve a problem -- we carry guns. We go out in the public and

Page 223

we just do a lot of things, and you've said some things about the excesses.

And I'll tell you, a command level person has got to stand up for what's right. And that doesn't mean that I was always right when I stood up, but I believe that it's important to just do it anyway.

And I would encourage any one of these gentlemen here today to get in my face. You want to get in my face? Get in my face. Tell me what you don't like. I'm not going to beat you up and make you feel like you're not worth listening to. That's leadership.

And so where the difficulty is here is that if you don't talk to the irritant that you have been experiencing, you know, you file lawsuits, you do whatever you got to do.

But the truth of the matter is, I care about what people feel and I care about the things that you're talking about.

MR. GAGE: Move to strike nonresponsive.

BY MR. GAGE:

Q   One of the ways of standing up, you believe, then, is people can file a lawsuit; correct?

A   That's another way.

MR. GAGE: I'll show you a document we will mark as Exhibit Number 54. This is an "LA Times"

Page 224

article, August 15th, 2013. "Former LA County Undersheriff To Run Against Sheriff Lee Baca."

(Whereupon, Plaintiffs' Exhibit 54 was marked for identification by the Court Reporter.)

BY MR. GAGE:

Q   You read the "LA Times" all the time; correct?

A   I did. But I'm not sure if this is in the print or in the off print in the -- they got some kind --

Q   I assure you, this was in the newspaper.

A   Was this in the print section?

Q   Yes.

A   Okay.

Q   This is not the print section, but this was in the "LA Times" newspaper. I happen to remember this article.

A   Okay.

Q   Anyways, August 15th, 2013. This article says:

"Paul Tanaka, former LA County Undersheriff, who was ousted by Sheriff Lee Baca earlier this year announced Thursday that he's challenging his

Page 225

former boss. 'I have decided to declare my candidacy for Sheriff of LA County because the committee members are long overdue for a new direction from their sheriff,' Tanaka said, flanked by current and former department supervisors at a news conference on a hilltop helicopter pad in Griffith Park."

Do you see that?

A   Yes.

Q   So you were aware of this article, weren't you?

A   I believe I'm aware of this article -- it doesn't have a date on it.

Q   It does, actually. August 15th, 2013 near the top, by Seema Metha.

A   Okay. I got it. Yes, I see.

MR. GAGE: M-e-t-h-a, and Seema is S-e-e-m-a.

THE WITNESS: Right.

MR. HERSHMAN: Just for timing purposes, it's 5:20. 5:30 --

MR. GAGE: About ten minutes. I'll finish at 5:30. You said you have to leave. And George has indicated when you have to leave, he's stopping the depo

Personal Court Reporters, Inc.

A134006