Exhibit C to
Brandon Fox Declaration

# In the Matter of:

## Charles Antuna vs. County of Los Angeles

Leroy David Baca, Volume II

04/06/2015

Job #: 52597



COURT REPORTERS, INC.

(818)988-1900

A134009

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

CHARLES ANTUNA, ROCIO        )
MARTINEZ, DAVID WATERS, KEVIN )
HEBERT, ROBERT TUBBS, LOUIS   )
DURAN, ROBERT WHEAT, CASEY    )
DOWLING,                      )
                              )
          PLAINTIFFS,         )
                              )
     VS.                      ) CASE NO. CV14-05600-MWF
                              )              (PLAx)
COUNTY OF LOS ANGELES;        )
SHERIFF LEROY BACA; AND DOES 1)
THROUGH 10, INCLUSIVE,        )
                              ) VOLUME II
          DEFENDANTS.         ) (PAGES 234 - 504)
_____)

VIDEOTAPED DEPOSITION OF LEROY DAVID BACA

MONDAY, APRIL 6, 2015

FILE NO. 52597

REPORTED BY:
        KRISTIN VARGAS
        CSR NO. 11908, RPR

A134010

Page 235

VIDEOTAPED DEPOSITION OF LEROY DAVID BACA, THE WITNESS,

TAKEN ON BEHALF OF THE PLAINTIFFS, AT 23002 VICTORY

BOULEVARD, WOODLAND HILLS, CALIFORNIA, ON MONDAY, APRIL 6,

2015, AT 11:20 A.M., BEFORE KRISTIN VARGAS, CSR NO. 11908,

RPR.


APPEARANCES OF COUNSEL:


FOR THE PLAINTIFFS:

    LAW OFFICES OF GOLDBERG & GAGE
    BY: BRADLEY C. GAGE, ATTORNEY AT LAW
    23002 VICTORY BOULEVARD
    WOODLAND HILLS, CALIFORNIA 91367
    (818)340-9252
    BGAGE@GOLDBERGANDGAGE.COM

FOR THE DEFENDANTS:

    PETERSON, BRADFORD & BURKWITZ
    BY: GEORGE PETERSON, ATTORNEY AT LAW
    100 NORTH FIRST STREET
    SUITE 300
    BURBANK, CALIFORNIA 91502
    (818)562-5800
    GPETERSON@PB-LLP.COM


FOR THE COUNTY OF LOS ANGELES AND LEROY DAVID BACA:

    JONES DAY
    BY: BRIAN HERSHMAN, ATTORNEY AT LAW
    555 SOUTH FLOWER STREET
    FIFTIETH FLOOR
    LOS ANGELES, CALIFORNIA 90071
    (213)489-3939
    BHERSHMAN@JONESDAY.COM

Page 236

ALSO PRESENT:

    ESROM JAYASINGHE, THE VIDEOGRAPHER

    CASEY DOWLING

    ROBERT WHEAT

    DAVID WATERS

    CHARLES ANTUNA

    KEVIN HEBERT

    LOUIS DURAN

    ROBERT TUBBS

Page 237

INDEX

WITNESS

LEROY DAVID BACA


EXAMINATION                          PAGE

  BY MR. GAGE                        241


            EXHIBITS
      (BOUND UNDER SEPARATE COVER)
PLAINTIFFS'

NO. PAGE  DESCRIPTION

100 258  REPORT ON PERFORMANCE EVALUATION, ROBERT TUBBS

101 260  REPORT ON PERFORMANCE EVALUATION, ROBERT TUBBS

102 303  EXCERPT OF DEPOSITION OF LEROY DAVID BACA,

    12/19/2011

103 313  LA COUNTYCITIZENS' COMMISSION ON JAIL VIOLENCE

    MEETING TRANSCRIPT

104 340  ARTICLE ENTITLED "SHERIFF'S DEPARTMENT HIRED

    OFFICERS WITH HISTORIES OF MISCONDUCT"

105 350  ARTICLE ENTITLED "SHERIFF BACA ACCUSED OF

    RETALIATING AGAINST DEPARTMENT OFFICIALS"

106 356  ARTICLE ENTITLED "SHERIFF'S DEPARTMENT HIRING

    SHOULD BE PROBED, COUNTY SUPERVISOR SAYS"

107 369  ARTICLE, TOP WORDING "TOO MUCH MR. NICE GUY: HOW

    LEE BACA LET PAUL TANAKA RUN AMOK IN COUNTY JAILS"

Page 238

      EXHIBITS (CONTINUED)

PLAINTIFFS'

NO.  PAGE     DESCRIPTION

108 391  REPORT OF PERFORMANCE EVALUATION

109 399  PERFORMANCE EVALUATION OF ROBERT WHEAT

110 404  REPORT OF PERFORMANCE EVALUATION OF LOUIS DURAN

111 420  EMAILS

112 455  DFEH PAPERWORK DATED 9/4/2013

113 457  DFEH PAPERWORK DATED 8/29/2013

114 458  DFEH PAPERWORK DATED 8/29/2013

115     (SKIPPED)

116 497  SHERIFF'S DEPARTMENT BROADCAST

            MARKED RECORD

            PAGE  LINE

             411  12

             479  17

A134011

Page 239

WOODLAND HILLS, CALIFORNIA;

MONDAY, APRIL 6, 2015;

11:20 A.M.

-oOo-

(Prior to the deposition commencing, all counsel stipulated to waive the reporter read-on and read-off pursuant to FRCP Rule 30(5).)

THE VIDEOGRAPHER:  Good morning.  We're on the record.  My name is Esrom Jayasinghe with Verbatim Video.

It is Monday April 6, 2015.  This is the continuation of the deposition of Sheriff Lee Baca, recommencing Volume II and Media Unit No. 1 of this session on record at 11:20.

Counsel, if you would kindly state your appearances, please.

MR. GAGE:  Good morning, Bradley Gage of Goldberg & Gage on behalf of the plaintiffs.

I think it's lawyers first or do you want everybody --

THE VIDEOGRAPHER:  Yes, please.

MR. PETERSON:  George Peterson

Page 240

representing defendants.

MR. HERSHMAN:  Good morning.  Brian Hershman.  I'm here to represent the County and Sheriff Baca's interests in connection with the federal Grand Jury representation in which I represent those entities.  I do not represent the County or Sheriff Baca in this litigation.

THE VIDEOGRAPHER:  And all present, please.

ROBERT WHEAT:  Robert Wheat.

CASEY DOWLING:  Casey Dowling.

LOUIS DURAN:  Louis Duran.

DAVID WATERS:  David Waters.

ROBERT TUBBS:  Robert Tubbs.

KEVIN HEBERT:  Kevin Hebert.

THE VIDEOGRAPHER:  You may proceed.

THE REPORTER:  Raise your right hand, please.

THE WITNESS:  (Witness complies.)

THE REPORTER:  Do you solemnly swear that the testimony you are about to give in the case now pending will be the truth, the whole truth and nothing but the truth?

THE WITNESS:  I do.

Page 241

LEROY DAVID BACA,

having been duly sworn,

was examined and testified as follows:

MR. GAGE:  Okay.  So we're starting at 11:20 this morning even though I got here before 10:00 A.M.  Today it was the screw up on George's office that caused the hour-20-minute delay, which is fair --

MR. PETERSON:  Mea culpa.  I confess.

MR. GAGE:  Yes.  So not too long ago, I was late --

MR. PETERSON:  Mea culpa.  Mea culpa.

MR. GAGE:  Not too long ago I was late by an hour on Rogers, and Avi made sure to put that in the record five times.  I'm only going to say it once.

MR. PETERSON:  So this is for Avi's benefit when he reads it?

MR. GAGE:  Exactly.

MR. PETERSON:  Okay.

BY MR. GAGE:

Q   Okay.  You understand that you are testifying today under oath, and that obligation carries with it the same obligation to be truthful

Page 242

as if testifying in a court of law; correct, sir?

A   Yes.

Q   And your testimony today is under penalty of perjury just like in a court of law.  You understand that as well; correct?

A   Yes.

Q   Is there any reason why you cannot give us your best testimony today, either because of lack of sleep, drugs, alcohol, medication, low blood sugar, any other health issues?

A   No.

Q   Okay.  If at any time I ask you a question today that you don't understand, don't answer.  Simply tell us that you don't understand.

Will you do that for us?

A   Yes.

Q   Have you understood everything so far?

A   Yes.

Q   Okay.  You are being audiotaped, videotaped, and the deposition goes into a booklet, which you get a chance to read and review.  You can then make a change or correction if you want to.  But if you do make a change or correction, I or any other attorney can comment on that at the time of trial.

A134012

Page 259

Q   Did you --

A   Generally -- generally, when I work with someone as closely as I did with Sergeant Tubbs, I write a note.  And I see there's a couple of notes here wrote notes, one signed by Larry Waldie, another one signed by Larry Waldie.

But this particular signature may be the signature machine.  It could be mine.  But I -- suffice to say, it represents me.

Q   Okay.

MR. PETERSON:  For the record, Exhibit 100 is from Bates stamp 0078 to 0083.

MR. GAGE:  Correct.

Q   So if it bared your signature stamp, that meant that you were approving the signature just as if you actually signed it; true?

A   Well, it's not exactly as if I read it.  You know, it's someone in the office would say, "Okay, we are going to give the sheriff's stamp on this."

Q   Well, someone authorized by you to put a signature stamp on the evaluation of Bobby Tubbs as reflected in Exhibit 100?

A   Yes.

Q   Okay.  And you understood that, if your

Page 260

signature was being affixed to that document, it indicated that you agreed with the contents of that evaluation; true?

A   Right.  And looking at it now, without going thoroughly through it, I still would agree on my own opinion when we were working together.

Q   Okay.  And now looking at Exhibit 101 --

MR. PETERSON:  Are we done with 100?

MR. GAGE:  Yeah, we'll just keep the pile together.

(Plaintiffs' Exhibit No. 101 was marked for identification.)

BY MR. GAGE:

Q   101 is an evaluation of Robert Tubbs that bears the signature at the bottom of the first page saying, "I concur in and approve this report, Lee Baca 5/11/07."

Do you see that?

A   Yes.

Q   Is that your signature on this document?

A   It is.

Q   And it says, "Robert, thank you.  Lee Baca."

Was that also your signature?

A   Yes.

Page 261

Q   So you reviewed this in its entirely and made sure everything in it was truthful and accurate when you signed this evaluation of -- I guess it was Lieutenant Tubbs at the time; correct?

A   Yes.

MR. PETERSON:  Are you sure it's lieutenant?

MR. GAGE:  Yes.

MR. PETERSON:  It says, "Employee's rank, sergeant."

MR. GAGE:  Go to Page 3, "During this evaluation period, which concluded upon Sergeant Tubbs promotion to Lieutenant."

THE WITNESS:  This would still be a sergeant's --

BY MR. GAGE:

Q   Okay.

A   -- evaluation.

Q   All right.

MR. PETERSON:  And for the record, Exhibit 101 is Bates stamp 0074 through 0077.

MR. GAGE:  Right.

Q   Did you as the sheriff make it clear that nobody makes promotions in the sheriff's department for the rank of captain and above other than

Page 262

yourself?

A   Yes.  I am the final approver of any recommended person for those particular positions.

Q   Did you believe that the evaluations in the sheriff's department all the way until the time that you left, starting in say 2011, were consistently accurate?

A   I believe that's correct.

Q   Okay.  And you expected because they were sheriff's documents the evaluations would be truthful without any exaggeration in them; correct?

A   Yes.

Q   Did you ever learn of any types of exaggerations on being a problem in the evaluations of employees at the ranks of lieutenants and higher in the sheriff's department when you were the sheriff?

A   No, I didn't detect any.

Q   Did you ever learn of Assistant Sheriff Rogers signing any evaluations where he stated that he concurred in and approved the report, but that he did not actually feel the evaluations were true?

A   I know of no such opinion by Assistant Sheriff Rogers.

Q   In fact, if Assistant Sheriff Rogers was

A134017

Page 263

signing documents saying that, "I concur in and approve this report," that he did not feel were completely true or that he felt were exaggerated, that would cause you a concern when you were the sheriff; true?

MR. PETERSON: Overbroad. Argumentative and ambiguous.

You can answer.

THE WITNESS: Any executive that would sign a report or an evaluation that they didn't believe was completely accurate should never sign the evaluation.

BY MR. GAGE:

Q   Have you ever heard of -- I'm just going to give a bunch of names at once. And if you have heard of any of them, just let me know because I think your answer is going to be no to all of them. Have you ever heard of Victor Rampulla or Glen --

MR. PETERSON: Do it one at a time.

BY MR. GAGE:

Q   Ever heard of Victor Rampulla signing any evaluations that were not accurate?

A   I didn't directly supervise Victor Rampulla. I wouldn't know the answer one way or the

Page 264

other.

Q   Ever hear of Glen Dragovich signing any evaluations that were not accurate to your knowledge?

A   I'm sorry I have never supervised Glen Dragovich myself.

Q   So the answer is no?

A   The answer is no.

Q   Ever hear of Cecil Rhambo ever signing any evaluations not accurate?

A   I know of -- I don't supervise the Assistant Sheriff Rhambo as to what he signs --

Q   That's fine. You can just say no. I'm just trying to --

MR. PETERSON: Well, you can also do exactly what you are doing. It's up to you to decide how you wish to respond to the question.

BY MR. GAGE:

Q   Your answer indicates that you had no such knowledge; is that true, as to Cecil Rhambo?

A   It wasn't part of my function --

Q   Okay.

A   -- to decide for the assistant sheriff what they signed and whether or not they were signing something that was accurate or inaccurate.

Page 265

Q   Did you ever learn or become advised that Paul Tanaka ever signed any evaluations that were not accurate?

A   I didn't supervise undersheriff or Assistant Sheriff Paul Tanaka when it came to any of the signatures that he engaged in.

Q   So the answer is no to that as well?

A   The answer is I didn't get involved with reviewing what his signatures were --

Q   So you --

A   -- in terms of evaluations.

Q   So you have no knowledge of any time of Paul Tanaka giving an inaccurate evaluation approval; is that correct?

A   That is correct.

Q   Okay. Did you ever learn of Ted Sexton approving any inaccurate evaluations?

A   Similar answer to the earlier. The nature of the chief's signatures on evaluations was not something that I directly supervised.

Q   So you had no knowledge; is that correct?

A   That's correct.

Q   How about Captain Louis Duran? Did you ever learn of Captain Louis Duran signing any inaccurate evaluations?

Page 266

A   I have no knowledge of Captain Duran's performance evaluation signature authenticity or what the content is.

Q   If the sheriff, yourself, had ever made any types of racial comments about any ethnic group such as Jews, Asians, Hispanics, et cetera, would that violate the policy of equality in the sheriff's department as you understood that policy to exist when you were the sheriff?

A   I understand why you are asking this question. And let me say candidly to you, Bob Rifkin signed a declaration that alluded to such an accusation. And he signed it, that it was never said.

And so part of this process that we're into now is based on massive exaggeration and, quite frankly, dishonesty.

Q   So you are referring to a declaration by Bob Rifkin saying that he had never heard you making a comment about, "The little Jap can keep the Jew money," referring to Mr. Cavanaugh?

A   That's correct. That's a complete fabrication.

Q   Did you ever see a complaint filed by Mr. Rifkin under penalty of perjury with the

A134018

Page 327

the gray area, he had a different interpretation for the gray area, and you thought his interpretation was benign; correct?

A    I don't recall Mr. Tanaka reciting some kind of example of the gray area to the extent that you have stated.

Q    Did you feel that when you spoke with Mr. Tanaka about the gray area and he explained that situation to you, you were satisfied with his explanation that it was not some nefarious statement?

A    No, I wasn't satisfied.

Q    Okay.  Let's look at your statements to the jail commission -- first of all, when you made those statements, you were being truthful and accurate; correct?

A    At the time, to the best of my knowledge.

MR. GAGE:  Okay.  So for the record, this is Exhibit 103.

Q    This is entitled, "Unedited Draft - Partial Transcript of Witness Testimony from CCJV Meeting of July 27, 2012."

And Exhibit 103 has only certain pages of it.  And it's not the whole transcript.

I want to focus your attention on the page

Page 328

marked 284 starting.  And at Line 9, there's a question by Richard Drooyan, D-r-o-o-y-a-n.

MR. HERSHMAN:  Drooyan.

MR. GAGE:  Drooyan, okay.

MR. HERSHMAN:  Drooyan.

MR. GAGE:  Drooyan, thank you.

Q    About the gray area.  And if you look at Lines 20 through 21, you indicated that you felt that the term gray area could lead to more than one interpretation.

Do you see that statement of yours?

A    Can you refer me to that line again, please.

Q    Sure.  Lines 20 to 21.  I have marked my copy if that helps you to see it.

A    Oh, thank you.

Q    The blue (indicating).

A    Okay.

Q    So does that refresh your memory that at least in July of 2012, you thought that the gray area comment was subject to more than one interpretation?

A    That's correct.

Q    And if you look at the Page 285, Lines 8 through 12, you indicated that you spoke with Paul

Page 329

Tanaka.  He had a different meaning for the word gray.  You gave him credit for that.  He wasn't thinking like you were, and your hope was that he had testified to the Commission and explained the whole situation to the Commission's satisfaction "because he certainly explained it to mine."

Do you see that statement of yours?

A    Yes.

Q    So you spoke with Paul Tanaka.  At one point, you had concerns about statement of the gray area.  After you spoke with him, he gave you his understanding of why he used that term, and you were satisfied; true?

A    Yes, I was satisfied at that particular time.

Q    Okay.  And --

MR. PETERSON:  Are we done with this (indicating)?

MR. GAGE:  We are.

MR. PETERSON:  Okay.

BY MR. GAGE:

Q    And you also were aware that Paul Tanaka and various other members of the sheriff's department had tattoos for different stations such as Vikings, Little Devils and things of that sort;

Page 330

correct?

A    Yes.

Q    And you knew that Paul Tanaka had a Viking tattoo at a time when you decided to promote him from lieutenant to captain; true?

A    Yes.

Q    You knew that he had a Viking tattoo at a time when you promoted him from captain to commander; true?

A    Yes.

Q    You knew that Tanaka had a Viking tattoo when you promoted him from commander to chief; correct?

A    I'm not sure then because I had asked him to get it removed.  And I'm not sure at that time whether he had or he hadn't.

Q    So did you think that the tattoo was an important item in deciding whether or not to promote Tanaka up the ranks to chief and higher?

MR. PETERSON:  Ambiguous, argumentative.

You can respond.

THE WITNESS:  No.  I think he -- he understood how I felt.  At the same time, I couldn't tie the tattoo to anything that was negative.

A134034

Page 331

BY MR. GAGE:

Q   Okay.  Well, by the time you were promoting Tanaka to assistant sheriff and sheriff, you were aware of various negative statements about the Vikings that were in the media, weren't you?

MR. PETERSON:  Excuse me.  The question is argumentative.  I think he did not appoint him to sheriff.

MR. GAGE:  To assistant sheriff.  Let me re-ask it.

Q   Was there ever a time when you became aware of anything negative associated with the Viking tattoo?

A   No.  I had not found anything in that respect to that point.

Q   And you felt that the sheriff's department employees had the right to do what they do; if they wanted to wear a tattoo, that was fine; correct?

A   Substantially, yes.  However, I still voiced my opinion that I am not supportive of such tattoos.

Q   And you were asked previously if you were willing to promote individuals even if they had Viking tattoos, and you indicated that you would, you chose not to discriminate; and that's the key to

Page 332

your point of these tattoos; correct?

A   That's correct.

Q   And so you didn't feel that whether a person had a tattoo on their body or not was relevant to whether they could do a job in the sheriff's department getting promoted; correct?

A   That's correct.

Q   So basically, when it came to issues of promoting, transferring, things of that sort, the tattoos were irrelevant to you; true?

A   Yes.

Q   Before the lunch break, we were talking about the Peace Officers' Bill of Rights, and you are familiar with that rule of law; correct?

A   Yes.

Q   And that applies to all sworn employees in the sheriff's department and other law enforcement from the rank of sheriff all the way down through deputy; correct?

A   Yes.

Q   Under the Peace Officers' Bill of Rights, there can be no more than two interrogators at a time when a sworn employee is being questioned about various actions; correct?

A   No.

Page 333

Q   Tell me -- go ahead.

A   No, go ahead.  You ask the next question.

Q   What is your understanding of when there would be a limit of two interrogators maximum under the Peace Officers' Bill of Rights, and when do you believe more than two are allowed?

A   Well, if any employee is being asked a question as to procedure that they may have been involved in, that doesn't constitute an investigation.  It constitutes asking employees questions for information that is needed to be known.

Q   If it was an investigation, then there would be some statement that this needs to be investigated, things like that; correct?

A   Well, if there were an investigation, the pronouncement of the investigators would be you are under investigation based on the authorization that the investigators had received from some source, whether it's a complaint, whether it's some dispute somewhere in the organization that needs to be resolved.

And so the moving force of putting something within the Peace Officers' Bill of Rights has to be that you are accusing them of doing

Page 334

something wrong, or you are investigating an accusation that something was being done wrong.

In this case that you are alluding to now, I don't believe it applied.

Q   Well, so employees were supposed to be told under the Peace Officers' Bill of Rights if they were being investigated and what they were being investigated for -- that was your understanding of the law; correct?

A   Well, they will also be told if they are not being investigated, but need to have an explanation as to what they know.

Q   Under the Peace Officers' Bill of Rights, employees were entitled to tape record any interrogations or questions asked of them by their superiors; correct?

A   If they are under investigation for something they have done wrong, yes.

Q   And if you were transferring an employee because of poor performance, that would indicate something that they have done wrong; correct?

MR. PETERSON:  Wait.  Because of poor -- the question is ambiguous and argumentative as framed.

A134035

Page 351

except to embarrass and humiliate people. There is no relevance to it. There's no --

MR. GAGE: It sure is.

MR. PETERSON: -- probative. No.

MR. GAGE: It is.

MR. PETERSON: It's nothing but trying to demean another human being.

MR. GAGE: Not at all.

MR. PETERSON: That's the kind of thing that causes problems.

MR. GAGE: Well, let's look at this article. We disagree.

MR. PETERSON: It's really a cheap shot. In fact, it's really low.

MR. GAGE: Not at all.

MR. PETERSON: Yeah, it is. You know it is.

MR. GAGE: Not at all.

Q   Did you ever see this article, sir, Exhibit 105?

A   No.

Q   In this article, if you look at the second page, it says near the top, "A representative of Baca said any transfers were driven by the department's needs and the employee's performance.

Page 352

'There is absolutely no retaliation. This is politics at its lowest form. And the facts will bear that out,' said spokesman Steve Whitmore."

Do you see that?

A   Yes.

Q   Did you authorize him to make that statement to the media?

A   I think Mr. Whitmore accurately spoke what he believed, and he accurately represents the department as well as myself.

Q   The next paragraph says, "Baca has previously been accused of retaliating against political adversaries. In 2010, the sheriff's department agreed to pay almost $1 million to Patrick Gomez, who claimed that he was passed up for promotions and targeted for an internal inquiry after he ran against Baca in 2002."

Do you see that?

A   Well, this is a complete fabrication.

Q   Okay. So that's not a true statement in the article?

A   This settlement of $1 million has nothing to do with me because I don't decide who makes lieutenant. It's decided by the lower level middle managers.

Page 353

Q   But he already was a lieutenant. He was going for a promotion to captain, and you are responsible for that.

A   I don't believe he was. His name never surfaced in any of the discussions by any chief or any commander or anybody at the highest level of the organization.

Q   Do you remember asking him -- him coming to you to ask you why he was being passed over for promotion? This is Gomez.

A   He never came to me at all.

Q   Do you recall advising Gomez that he should see new Sheriff Waldie as to the reasons why he was passed over?

A   As I stated earlier, I have not had any conversation with Sergeant Gomez about promotion. And even if he were a lieutenant, I have never had a conversation with him about that.

Q   Did you ever learn that Waldie told Lieutenant Gomez the reason he was not getting promoted is because of lack of loyalty, that he shouldn't have run against you for sheriff?

A   I have never heard of such a thing.

Q   You weren't aware that that was part of the criminal -- of the federal trial?

Page 354

A   Well, you would have to ask Mr. Waldie what he said but...

Q   If you look at the Exhibit 105, continuing on in the same paragraph about the $1 million settlement, it said, "The settlement was reached shortly after a federal jury found the department liable for retaliation in a lawsuit brought by Gomez, who is a retired lieutenant, who is also running against Baca next year."

Do you see that?

A   Yes.

Q   So you weren't aware of this payment of over a million dollars by the sheriff's department, though; is that correct?

A   No, I didn't pay attention to this, nor was I called in for any of the reasons that you are asking me these questions.

Q   Also, there's a quote two more paragraphs down that says, "It is completely outrageous that decorated senior commanders will be reprimanded for using his or her First Amendment right to support a political candidate." That's a quote attributed to Tanaka.

Do you see that?

A   That's part of a political atmosphere that

Page 427

in terms of the flying time.

Q   So captains at Aero Bureau traditionally would receive extra pay if they were flying pilots; is that correct?

A   If they were flying pilots, yes.  But that becomes an issue with what the current captain there is now required to do, and that is to not fly.

Q   Was Louis Duran transferred at all out of Aero Bureau relative to some of the mechanical aspects of helicopter parts?

MR. PETERSON:  Wait a minute.

MR. GAGE:  Let me re-ask it because my voice trailed off.

Q   Was Louis Duran transferred from Aero Bureau at all relative to some of the mechanical aspects of helicopter parts?

MR. PETERSON:  All right.  The question is ambiguous.  You can respond.

THE WITNESS:  No, I don't know.

BY MR. GAGE:

Q   You don't know?

A   Yes, sir.

Q   Was Lieutenant Wheat transferred out of Aero Bureau relative to some of the mechanical aspects of helicopter parts to your knowledge?

Page 428

MR. PETERSON:  Ambiguous.  You can respond.

THE WITNESS:  I don't know that either.

BY MR. GAGE:

Q   And how about Sergeant Dowling?  Was he transferred out of Aero Bureau at all relative to some of the mechanical aspects of helicopter parts?

MR. PETERSON:  Same objection.  Argumentative.  Ambiguous.

You can respond.

THE WITNESS:  I don't know.  I know that investigation was commenced.  What the specificity of the investigation is is up to the investigators to make that conclusion.

BY MR. GAGE:

Q   Did Eli Vera support Tanaka for sheriff at any time to your knowledge?

A   I don't know and I don't care.

Q   Did he ever file any complaints against the department for retaliation with the Fair Employment and Housing -- Department of Fair Employment and Housing?

A   I don't know.

Q   Was Vera a supporter of you for sheriff at any time?

Page 429

A   I don't even know that, if he was a supporter of me for sheriff in the present time.

Q   Okay.

A   I'm now retired so...

Q   Was he a driver of yours?

A   Yes.

Q   And did you ever refer to Vera as one of your sons?

A   I wouldn't go that far assuming that any one of the fine men or women are one of my children because I don't think of people as being children, although my son is my son.  And my daughter is my daughter.

Q   You have an annual sheriff driver luncheon every year; correct?

A   I had, yes.

Q   And one of the recent luncheons, Hellmold stood up at the luncheon and confessed his love for you as a father.

Do you recall that?

A   That's very possible.

Q   And Vera then seconded it in front of everybody at the luncheon.

Do you recall that?

A   That's very possible.

Page 430

Q   And you referred to both Vera and Hellmold as two of your sons at that luncheon.

Do you recall that?

A   I wouldn't say that.  I would say that they are two fine people as I feel that way of all the drivers that I have had.  And they are not just drivers, by the way.  They do other things.

Q   So you feel that Robert Tubbs is like a son of yours as well; he was one of your drivers; is that correct?

MR. PETERSON:  That's argumentative.

THE WITNESS:  I have already stated my position on the idea of me thinking a grown man is my son.  The point is is that all of my drivers are outstanding, and they have qualities that I defend, and they have positions in the organization that I support.

BY MR. GAGE:

Q   Did you in the past think of your relationship with Paul Tanaka as a father/son relationship?

A   I may have thought that at some point, but not relative to the actuality of such a thing.  But Paul Tanaka would never have been anywhere if it wasn't for me.