Exhibit A to

Brandon Fox Declaration

INTERVIEW

OF

LEROY BACA

Friday, April 12, 2013

1

P A R T I C I P A N T S

Interviewee and Representatives

Leroy Baca, Interviewee

Brian Hershman, Attorney for Leroy Baca

Beong Soo Kim, Attorney for Leroy Baca


United States Attorney's Office

Brandon Fox, Assistant United States Attorney

Margaret Carter, Assistant United States Attorney Lizabeth Rhodes,

Assistant United States Attorney


Federal Bureau of Investigation

David Dahle, FBI Special Agent

Jason Dalton, FBI Special Agent

2

<u>TRANSCRIPT OF EXHIBIT 2, EXCERPT 1</u>

SPECIAL AGENT DALTON:  All right.  This is Special Agent Jason Dalton.  It is Friday, April 12th, 2013, at approximately 1:57 p.m.

We are at the Law Offices of Jones Day in Los Angeles, California.

I'm here with Margaret Carter, Lizabeth Rhodes, Brandon Fox, David Dahle, Beong Kim, Brian Hershman, and Leroy Baca.

We are beginning the consensually recorded interview of Leroy Baca.

MR. FOX:    All right.  Mr. Baca, I would like to go over a few things first before we get started in the substance of the interview.  The first thing I want to talk to you about is the letter that we just provided to your attorneys.  I assume that you have it in front of you, or you've seen it?

This is the non-target letter that we talked to your attorneys about, and I just want to go over it with you to make sure that you understand what it is and how a target is defined, because what we -- when we talked to Brian and Beong earlier, they asked us to provide you with a non-target letter.  And I just want to explain what that term means.

A target is somebody who is linked by substantial evidence to a crime, and who, in the prosecutor's judgment, based on the evidence to date, is likely to be charged.  And at this point we are giving you

3

the assurance at this point that you are not a target.

Now, I say this to everybody -- and I think everyone in this room has probably similar analogies to it -- that doesn't mean that your status forever is going to be a non-target.  For example, even if today you told me, "You know what?  I killed JFK," and we go off and we find the gun that you used to kill JFK, that could change your status as a target.

Obviously, we are not looking at the murder of JFK, nor were you involved in that.  I'm just giving you an example.

MR. BACA:  Right.

MR. FOX:    It's an example that I have given to many people. So do you have any questions about this letter or about your status before we begin with the substance of your testimony?

MR. BACA:  No.  Just that I appreciate the letter.

                              *****

4

TRANSCRIPT OF EXHIBIT 2, EXCERPT 2

MR. FOX:    All right.  And let me sort of explain what we have talked to Mr. Kim and Mr. Hershman about.  I'm sure that they've talked to you about it.  We know that we have a limited amount of time here today, and we appreciate you meeting with us.

The substance of what we want to talk to you about is what was happening in August and September of 2011 in terms of Anthony Brown, the LASD's response to learning about the FBI's investigation, eventually the Leah Marx encounter, and we want to limit what we are going to be talking about for the most part to those topics today.

And there may be, on a few occasions, where if we start going off on a tangent I may interrupt you and bring us back to where I want to go, because, again, we have a limited amount of time today.  And I don't mean that to be disrespectful to you.  In fact, I'm trying to be the opposite.  We want to -- we value your time, we value our time, and we want to make sure that if we're given three hours to talk about it today, we cover all of these issues.  And there is a lot to discuss about that.

Any questions before going forward?

MR. BACA:  I don't have any questions.

MR. FOX:    Okay.  The first thing that I think we were interested in talking to you about today is the first time that you learned that -- from Steve Martinez about a phone that had been discovered in the jails by LASD. Can you -- do you recall that

5

conversation, first of all, that you had with him?  I think -- I believe it was a telephone conversation.

MR. BACA:  Yes.

MR. FOX:    Okay.  Can you explain as best you can if you remember the date of that approximately, and if you remember whether you received the phone call or whether he had -- or whether you had called him?  If you could go through that, I'd appreciate it.

MR. BACA:  I don't have the date, but I can get you the date if you need that.

MR. FOX:    How would you find the date?

MR. BACA:  On my notes that I have back in the office perhaps. I don't remember the exact date, but it was in that period of August sometime shortly after the phone was discovered.

MR. FOX:    You mentioned your notes back in the office. Do you have specific notes related to the subject matter that we're talking about today?

MR. BACA:  Only in my calendar.  You know, I'm trying to associate the events in a recollected fashion.  I didn't really take notes that on this date Mr. Martinez called me, and, therefore, I am now recording what Mr. Martinez said.  So I don't have the precise date, but it's in a week framework of activity.

MR. FOX:    All right.  And --

MR. BACA:  It would be like a day or two after we found the phone.  So what I'll do I'll trigger the phone in terms of when that was

6

discovered, and then work a day or two beyond that time period.

*****

TRANSCRIPT OF EXHIBIT 2, EXCERPT 3

MR. FOX:    And we may go through some documents today that might remind you of when that time was.  But after -- well, let's talk about that phone call that you received from him.  What is it that he said to you on that phone call?

MR. BACA:  He called to inform me that an FBI phone had been compromised.

MR. FOX:    And by "compromised," what did you understand him to mean?

MR. BACA:  He really didn't explain much more than that. And then I responded to him, and I think I knew then that that was the connection with the phone that he wanted me to know about.

MR. FOX:    At the time you received that phone call, were you aware that a phone had been found in a prison? In one of your facilities, I should say.

MR. BACA:  Like I mentioned, I believe that there was a phone that was discovered in the jail.  But I don't -- I'm not positive as to whether we knew whether it was an FBI phone or not.  I can't recollect that part of it.

MR. FOX:    Okay.  And one thing that's important for us today is to distinguish between what you believe your - - what you believed LASD knew versus what you knew. And we are going to go over that quite a bit.  So when you say "we knew," were you yourself familiar with the fact, when you received the call from Steve Martinez, that

8

LASD had found a phone on an inmate?

MR. BACA:  That I can't recall.  It was too early in the process.

MR. FOX:    Okay.  So he tells you that a phone has been compromised, but at some point you had the understanding what that meant was that LASD had found a phone on an inmate during this conversation you were having with Mr. Martinez.  Is that correct?

MR. BACA:  I would say that the notion of the phone was the subject of Mr. Martinez's call, and what I can recollect is that there was a phone that was being looked into.

MR. FOX:    But in that conversation when you got off the phone with him, you were aware that the phone had something to do with LASD; correct?

MR. BACA:  That's correct.

MR. FOX:    And you were aware, after you got off the phone with him, that there was an FBI phone that had been compromised somehow by LASD; is that correct?

MR. BACA:  Not at that point.  I mean, I had to inquire back as to, what do we know about this phone, and what are the things that we don't know about this phone.

MR. FOX:    Okay.  Maybe I'm missing something, but if I get a phone call from somebody and they say -- Mr. Kim calls me and he said, "Mr. Fox, there is a Jones Day phone that has been compromised."  I wouldn't immediately suspect that it was in my office or in the U.S. Attorneys' Office.  So it sounds like there is some

9

level of detail there that I'm missing.

As best as you can recall, what did he say to you that made you believe that that phone that he discussed being compromised was within the LASD jail system?

MR. BACA:  He told me it was.

MR. FOX:    Okay.  So what did he say, as best as you can recall?

MR. BACA:  That an FBI phone had been compromised inside the county jail.

MR. FOX:    Did you understand from the conversation that the FBI phone was part of an operation that the FBI had conducted or was conducting?

MR. BACA:  He offered no explanation, and I didn't ask him.

MR. FOX:    All right.  So then you've said that you had to do some research, basically, to figure out what it was that he was talking about.  How did you conduct that research?  What did you do?

MR. BACA:  I asked individuals within the chain of command as to what was the knowledge that we had relative to the phone. What information do we have? It was a very wide open type inquiry.

MR. FOX:    All right.  And so did you tell Mr. Martinez that after you did this research you would get back to him, or how did you end that conversation with Mr. Martinez?

MR. BACA:  There was no request on Mr. Martinez's part, to my recollection, that I needed to get back to him. And all he indicated

10

was that there had been a phone -- to my recollection, a phone compromised.

MR. FOX:    Okay.  So who did you call to do the inquiries?

MR. BACA:  I can't recall whom.  But it was definitely to the executives that are running the jail.  I don't know which one at this point in time that I was asking this information of, but that I wanted a little more knowledge as to what this was about.

MR. FOX:    And when you say "executives," what rank are we talking about?  Are we talking about captains?

MR. BACA:  Talking about the Division Chief and the people who are essentially running the jail.

MR. FOX:    Would this have been Chief Yim at the time, then?

MR. BACA:  No.

MR. FOX:    Who would it have been?  Which Chief?

MR. BACA:  I can't recall if it was Burns or if it was another person, but there was a number of people that I wanted to have some feedback from on this whole matter.

*****

11

TRANSCRIPT OF EXHIBIT 2, EXCERPT 4

MR. FOX:   The Undersheriff, was that somebody that you talked to about this?

MR. BACA:  Yes.

MR. FOX:   After the phone call from Mr. Martinez.  What is it that you said to Mr. Tanaka about the phone call you received from Mr. Martinez?

MR. BACA:  Well, that there was a phone that was compromised in the jail and that we needed to know a little more information about it, what we know.

MR. FOX:   All right.  And in August and September when you get this phone call from Mr. Martinez, you obviously, as a very high-ranking person, law enforcement officer, you're aware of what the FBI does in the crimes it investigates; is that correct?

MR. BACA:  Am I aware of what the FBI does?

MR. FOX:   Well, generally, you're aware that the FBI investigates federal crimes; correct?

MR. BACA:  Yes.

*****

12

TRANSCRIPT OF EXHIBIT 2, EXCERPT 5

MR. FOX:    Okay.  Are you aware that there are federal statutes dealing with civil rights offenses?

MR. BACA:  Yes.  Yes.

MR. FOX:    All right.  And so --

MR. BACA:  And I'm generally aware that that has happened in headquarters U.S. Attorneys' Office with Mr. Tom Perez, who I'm very familiar with and have worked with. But I wasn't aware as much as what had gone on locally.

MR. FOX:    Well, you were around certainly during the Rodney King investigation and trial regarding the LAPD officers that had beaten Rodney King; is that correct?

MR. BACA:  Yes.  Yes.

MR. FOX:    And you were aware that at some point some LAPD officers were charged with beating Rodney King on the federal level, correct?

MR. BACA:  Somewhat, yes.

MR. FOX:    Okay.  I mean, if --

MR. BACA:  It has been a long time for that.

MR. FOX:    Highly publicized, though, and --

MR. BACA:  Yes.

MR. FOX:    -- so you were aware of that.  So, and as part of LASD's training, do you know if people informed deputies about the fact that what -- if they were to commit excessive force on people on

13

the streets, or within the jails, that they could be committing a federal offense?

MR. BACA:  I believe that's correct, that the idea that brutality coming from police will be scrutinized by the Federal Government is appropriate.  But I didn't have any awareness of the local office until this happened.

MR. FOX:    Oh.  In terms of what the U.S. Attorneys' Office and the local FBI did, you did not have --

MR. BACA:  Right.

MR. FOX:    -- an awareness of.  But you knew that generally the Federal Government investigated civil rights offenses.

MR. BACA:  That's correct.

******

14

<u>TRANSCRIPT OF EXHIBIT 2, EXCERPT 6</u>

MR. FOX:    It sounds to me like you are -- it's just a question of degree.  You may not know what the local office does, but you generally are aware of federal statutes and federal enforcement of civil rights laws.

MR. BACA:  Yes.

MR. FOX:    And are you -- is that the same with public corruption, you are generally aware of federal enforcement of public corruption laws?

MR. BACA:  Yes.

MR. FOX:    And you are aware that sometimes that enforcement of public corruption and civil rights laws causes the Federal Government to look at law enforcement's agency employees as well, is that correct?

MR. BACA:  Yes.

******

15

TRANSCRIPT OF EXHIBIT 2, EXCERPT 7

MR. FOX:    All right.  So you start doing this research and start calling around, and how do you find out that a phone had been recovered in MCJ?

MR. BACA:  Well, let me modify your question.  I didn't call around.  I just talked to one person.  I said I needed to know something.

MR. FOX:    And that one person was -- was that --

MR. BACA:  That could have been my aide, it could have been Mr. Tanaka, but I didn't -- I don't just call around.  I need to know information, and then they do the calling around.

MR. FOX:    Got it.  And who would your aide have been at the time?

MR. BACA:  I've had several since then.  I'll have to go back and look in that -- give you that person's name.

MR. FOX:    Okay.  Was it soon after you placed the call either to your aide or to Mr. Tanaka that you learned that a phone had been recovered in MCJ?

MR. BACA:  As I mentioned before, there was information provided that a phone was found on an inmate maybe a day or two before I received the call from Mr. Martinez.

MR. FOX:    Okay.

MR. BACA:  Mr. Martinez confirmed that the phone was an FBI phone.

16

MR. FOX:    And that is when you made the connection?  I thought you just said that you had to do an inquiry of your aide or Mr. Tanaka about to find out?

MR. BACA:  Well, that was after Mr. Martinez's phone call. When he confirmed that it was an FBI phone, that's when I made stronger inquiry into, what are the circumstances?

MR. FOX:    And at some point you made the connection that that phone was the FBI phone, and I guess I'm asking you, how did you make that connection?

MR. BACA:  Mr. Martinez told me that a phone was compromised that the FBI had owned.

MR. FOX:    Maybe I'm missing you, because I think you told us just a little bit ago that you didn't know which phone he was talking about when you had the conversation with him and that you had to call to find out.

MR. BACA:  Well, I testified right now --

MR. FOX:    And, well, it's obviously on the recording, so I'm not trying to say --

MR. BACA:  It's all right.  That there was information a few days before Mr. Martinez's call that there was a phone discovered in the jail.  And in the process of finding out the status of this phone, it wasn't clear to me whose phone it was.

Then, when Mr. Martinez made his call, then it gave me a stronger belief that it might be one and the same phone.

17

MR. FOX:    Okay.  And so you placed a call in order to find out what?

MR. BACA:  I wanted to know what was going on with this phone.

MR. FOX:    Okay.  So you wanted to know the details of that phone at that point.

MR. BACA:  Yes.

MR. FOX:    And you called either your aide or Mr. Tanaka to find out the details of that phone.

MR. BACA:  Yes.  Uh-huh.

MR. FOX:    And then, how did you find out the details of the phone?  Was it that day that you were placing the call, or was it in the coming days that you found out the level of detail you needed?

MR. BACA:  It was in the following days.

MR. FOX:    How did you come to learn more about it? Were there additional phone calls or a meeting set up?

ME. BACA:  What happened is our Internal Criminals Bureau was brought into the case, and Captain Tom Carey and Lieutenant Jim Leavins were the two individuals that were tasked with reporting to me as to what the phone situation was.

MR. FOX:    And was it Steve Leavins, rather than Jim Leavins?

MR. BACA:  Could be Jim Leavins.  I only --

MR. FOX:    But it wasn't Steve Leavins?

18

MR. BACA:  -- know them by their last names, but -

MR. FOX:   Okay.

MR. BACA:  -- give me -- that's what I remember.

******

TRANSCRIPT OF EXHIBIT 2, EXCERPT 8

MR. FOX:    Other than the last week or so that maybe you were aware that we wanted to talk to you and may have been talking to attorneys about this interview, did you become aware of the fact that an FBI agent couldn't be arrested for performing their job?

MR. BACA:  I have never asked that an FBI agent be arrested. I don't know what circumstances even that comes into play in this interview.  I assume you are aware that one of my deputies may have made the comment to an FBI agent about being arrested?

MR. FOX:    And I want to get into that at some point, but I'm trying to focus on your knowledge of the fact that an FBI agent couldn't be arrested by a local law enforcement agency until --

MR. BACA:  I --

MR. FOX:    I'm understanding you to say --

MR. BACA:  I mean, it's a non sequitur.  I don't have a knowledge that we have an interest in arresting an FBI agent.  That to me strikes me as extreme.  What I believe is important is if we were to decide to make that type of a decision, we ought to know whether or not it can be done.  But if we are not intending to do such a thing, we don't really have an interest to decide whether or not it's proper or improper, legal or illegal.

MR. FOX:    When did you first hear that somebody within your department had threatened to arrest an FBI agent?

MR. BACA:  When I got the second call from Mr. Martinez.

20

MR. FOX:    Okay.  And was this -- I assume it was soon after that agent was approached by someone within your department; is that correct?

MR. BACA:  Yes.

MR. FOX:    We'll get into the substance of the call.  So if I'm understanding you correctly, you did not -- you were not aware that anybody had gone out to Leah Marx's house to threaten to charge her and arrest her, is that correct?

MR. BACA:  When I received that call, that's correct.  I was -- I received that call within perhaps an hour or so after that alleged act occurred.

MR. FOX:    So the call from Mr. Martinez was the first time that you were aware that somebody was going out to Leah Marx's house to threaten to charge and arrest her; is that correct?

MR. BACA:  Yes.

MR. FOX:    Were you aware when you received that call from Mr. Martinez, even more generally than that, that someone within LASD was going to approach Leah Marx to try to talk to her?

MR. BACA:  I wasn't aware of any of the investigative particulars.  But once Mr. Martinez made the call to me, I was aware something occurred.

MR. FOX:    Were you aware that anybody within LASD was conducting surveillance of Leah Marx at night outside of her home?

MR. BACA:  No.

21

MR. FOX:    Did Mr. -- well, I guess Mr. Martinez would not have known that.  Did somebody within LASD subsequently tell you that?

MR. BACA:  I had asked internally, "Well, what's going on with this process with a threat or even Leah Marx as an individual?"  And then I was given information that the deputies were seeking to question her about the phone.

MR. FOX:    Who provided you with that information?

MR. BACA:  It had to be either Captain Carey or Jim Leavins, one of the two.

******

22

TRANSCRIPT OF EXHIBIT 2, EXCERPT 9

MR. FOX:    When you began getting engaged in finding out about this phone and did -- do you recall having a meeting?  You mentioned ICIB.  Did you meet with ICIB to discuss --

MR. BACA:  I only met with two people principally during this whole process, some intervening people occasionally, but it was Captain Carey and Jim Leavins.  Because we didn't want this to be scattered around the organization.

MR. FOX:    Do you recall a meeting in which you met with ICIB, IAB, and OSJ to discuss what the plan would be once you learned that an FBI phone was found in MCJ?

MR. BACA:  Are you talking about the Saturday meeting?

MR. FOX:    The famous Saturday meeting.

MR. BACA:  Uh-huh.  Yeah, I remember that meeting in the general sense.

MR. FOX:    Okay.  And can you generally describe approximately when that meeting was?

MR. BACA:  Well, it was a Saturday.  I'd have to check the calendar or, if it's not on my calendar, it was just rather impromptu.  It was -- it could have been even in that same sequence of time that Mr. Martinez had called me about the phone.

                            ******

23

<u>TRANSCRIPT OF EXHIBIT 2, EXCERPT 10</u>

MR. FOX:    You had this meeting with IAB, ICIB, and the Undersheriff, and OSJ.  What is it that you discussed at this meeting, at the Saturday meeting?

MR. BACA:  Well, I think the question is, how do we handle all of this?  You know, what is the -- what do you know, and what do you not know?  And what are we going to do here?  I just wanted to hear from the people that were involved in this to find out a little more as to, how do you handle this unprecedented situation?

                              ******

24

<u>TRANSCRIPT OF EXHIBIT 2, EXCERPT 11</u>

MR. FOX:    At the Saturday meeting, was it presented to you that there were calls between Anthony Brown and the Civil Rights Unit of the FBI?

MR. BACA:  No.

MR. FOX:    Would that have been important for you to know?

MR. BACA: Yeah.  It's part of the whole package.  You know, there is no question that I consider all information regarding any incident of this type -- and this is the only one we've ever had -- that everything should be on the table.

MR. FOX:    Okay.  But why would it have been important for you to know that Mr. Brown was in contact with the Civil Rights Unit of the FBI?  What about that fact makes it important to you?

MR. BACA:  A lot of things, but I don't know exactly what the whole process was at this time in terms of this phone.  You know, it -- I had no clue that this is a civil rights investigation.  And, therefore, I don't have any predetermined perspective on pieces of information.

******

25

<u>TRANSCRIPT OF EXHIBIT 2, EXCERPT 12</u>

MS. CARTER:  Now, you mentioned that this was unprecedented. What was unprecedented?

MR. BACA:  What was unprecedented, in my experience, was that we had a phone in the jail that belonged to the FBI. That's all.

MS. CARTER:  So it wasn't that there was a contraband cell phone in the jail.  What was unprecedented was that it was an FBI cell phone that was found in the jail.  Is that correct?

MR. BACA:  Yes.

******

26

<u>TRANSCRIPT OF EXHIBIT 2, EXCERPT 13</u>

MR. FOX:    What I want to focus on is many internal discussions that you had, and that is what our focus is today.  So the internal discussions you were having, and if you don't know -- if you weren't involved in those discussions, we need to know that.  If you were involved in those discussions, we need to know that.

So I'm asking, what was in your head, your awareness?  Were you aware that Mr. Thompson was tasked with making sure that no FBI agent or outside law enforcement should have contacted --

MR. BACA:  I'm not aware, nor would I instruct a lieutenant to take that position.

****** 

27

TRANSCRIPT OF EXHIBIT 2, EXCERPT 14

MR. FOX: Did you at this Saturday meeting inform people of what Mr. Martinez had said to you on the telephone?

MR. BACA: Let me see, the Saturday meeting. No, you know, Mr. Martinez was giving me a heads up relative to the phone being compromised. By then, everyone knew, because Mr. Brown had already revealed that and we were on the trail of Deputy Michel. We knew pieces of enough of a story that it was satisfactory to me.

******

28

TRANSCRIPT OF EXHIBIT 2, EXCERPT 15

MR. FOX:    Understanding at this point in time that there was a connection between Deputy Michel, the phone, the inmate, and the FBI, you at that point in time must have been aware that the FBI had conducted an operation to see if Deputy Michel had smuggled in a phone in exchange for money.  Is that correct?

MR. BACA:  That was what Mr. Brown was stating, and then Michel himself acknowledged it when he was interviewed.

MR. FOX:    And you were informed of what he said around the time that he was interviewed because this was important to you, is that correct?

MR. BACA:  It was after he was interviewed.  You know, this takes a while to let people do what they have to do when they're doing an investigation.  So I wasn't pressing for any timetables.  But if something significant emerges --

MR. FOX:    If you had a dirty deputy, though, you didn't want him employed by LASD or working in the jails --

MR. BACA:  Right.

MR. FOX:    -- is that correct?

MR. BACA:  That's correct.

MR. FOX:    So you would have wanted action taken if Deputy Michel had admitted to committing bribery, correct?

MR. BACA:  Absolutely.

MR. FOX:    So it would have been important for you to know,

29

as soon as possible, that Deputy Michel had admitted to accepting bribes; correct?

MR. BACA:  Yes.

MR. FOX:    And so do you think that they informed you soon after Deputy Michel admitted to accepting bribes?  Do you think that they told you about that soon after he admitted that conduct?

MR. BACA:  Yes.

MR. FOX:    Okay.  Do you recall who told you that?

MR. BACA:  Well, the principals that I was talking to in the subsequent week or so was Captain Carey.

MR. FOX:    And the subsequent week or so, you mean the subsequent week or so after the Saturday meeting, or after --

MR. BACA:  Well, as this whole thing emerged, once we put our internal criminals investigators on this, then, as information emerged, Captain Carey would call me and tell me.

******

<u>TRANSCRIPT OF EXHIBIT 2, EXCERPT 16</u>

MR. FOX:    So assuming, for the sake of this question, that there was a discussion at that Saturday meeting about how to keep Mr. Brown away from the FBI, were you present for such a discussion?

MR. BACA:  May I say this?  Whether Saturday or ensuing days, or however timeframe you'd want to reference, I am not aware of any direct involvement with any conversation about keeping the FBI and Mr. Brown away from one another.

******

TRANSCRIPT OF EXHIBIT 2, EXCERPT 17

MR. FOX:    It would have been wrong, in your mind, for LASD to keep the FBI away from Anthony Brown --

MR. BACA:  Yes.

MR. FOX:    -- understanding that he was an informant. Is that correct?

MR. BACA:  Yes.

******

TRANSCRIPT OF EXHIBIT 2, EXCERPT 18

MR. FOX:    So I think you said a while ago that after you met and discussed this investigation, whether it was at the Saturday meeting or sometime around then, that you just assumed that Anthony Brown would be interviewed.  Were you briefed on what he was telling the people who were interviewing him?

MR. BACA:  In pieces, yes.

MR. FOX:    And what did -- do you recall him, you know, saying more of what I went through with you, him saying that he was an FBI informant, were you briefed on the fact that he was saying that he was an FBI informant?

MR. BACA:  Well, Mr. Brown doesn't use formal language. But it was a -- that "I'm working with the FBI."

MR. FOX:    When you say that he doesn't use formal language, have you met him?

MR. BACA:  No.

MR. FOX:    Oh, okay.

MR. BACA:  But he -- in his way of expressing things according to what I'm told, was not exactly at the highest level of linguistical skills.

MR. FOX:    Did you ever hear any recordings of any interviews with him?

MR. BACA:  No.

MR. FOX:    Any --

33

MR. BACA:  No.  This is all hearsay to me.

MR. FOX:    I understand.  I'm just trying to figure out what he --

MR. BACA:  I don't have any firsthand communication/contact with Mr. Brown.

MR. FOX:    Do you recall seeing any transcripts, or was it just people reporting to you what he was saying?

MR. BACA:  All people reporting to me.

MR. FOX:    On August 23rd -- Mr. Hershman is going to not like me for this, but I'll tell you --

MR. BACA:  Mr. Hershman?  Oh, that's you.

MR. HERSHMAN:  That's me.

MR. FOX:    That's Brian there.  The FBI came to interview Anthony Brown.

MR. BACA:  Uh-huh.

MR. FOX:    Were you aware that they were kicked out of an interview that they were conducting of Anthony Brown with your jail?

MR. BACA:  No.

MR. FOX:    You were never later informed --

MR. BACA:  No.

MR. FOX:    -- of that?  And so Mr. Thompson never came to you and apologized for allowing the FBI to interview Anthony Brown in the jail?

MR. BACA:  No.

34

MR. FOX:    Do you recall having any meetings with Mr. Thompson about Anthony Brown or the Gilbert Michel investigation?

MR. BACA:  Not that I recall.

MR. FOX:    So the only meetings you recall were meetings involving Mr. Carey and Mr. Leavins --

MR. BACA:  Yes.

MR. FOX:    -- after the Saturday meeting, is that correct?

MR. BACA:  Yes.  We didn't want this to be discussed. At my level, I didn't want it to be discussed by a lot of different players in this.  I wanted to keep the integrity of the chain of command on this one.

******

TRANSCRIPT OF EXHIBIT 2, EXCERPT 19

MR. FOX:    When were you first aware, or when did you first become aware that -- talking -- big picture -- not talking about the attempted arrest of -- or the alleged arrest of Leah Marx, but big picture, when were you aware that some of your people were attempting to investigate the FBI agents for possibly committing crimes?

MR. BACA:  Well, I think within the Internal Criminal Investigations Bureau, they were looking at every aspect of the phone circumstance.  And, you know, I think that we wanted to know why and how and all of the things that are pertinent to any investigation.

******

36

TRANSCRIPT OF EXHIBIT 2, EXCERPT 20

MR. FOX:    Did you have any conversations with anybody within ICIB, or anywhere else before getting the call from Mr. Martinez, in which you were informed that the FBI agents were being treated as suspects or subjects of the investigation?

MR. BACA:  Well, I didn't have any details of any report that you would physically look at that says, you know, here is the charge lines and here are the names of the suspects, and all of this other stuff.  What I assume is they were presuming that they had to do these interviews before they could arrive at a conclusion. So that's really at the point when I got the call.

And I believe that it was appropriate to not have any ambiguity or confusion on that point, and that's when I said to Mr. Martinez, "I'm not interested in the Sheriff's Department prosecuting or causing criminal charges to be contemplated and filed with the District Attorney's Office.  So rest assured, and you can tell Ms. Marx that I am interceding on her behalf if this worries her."

MR. FOX:    That you personally, Sheriff Lee Baca, were interceding on her behalf, or Mr. Martinez was interceding?

MR. BACA:  No, I was.

MR. FOX:    You were.

MR. BACA:  That I will tell the investigators to cease any effort in that respect if they are engaged in building a case, as they say.

MR. FOX:    So what did you do intercede?

37

MR. BACA:  Called Mr. Carey or called somebody and said, "If we're doing this, stop it.  We're not going to cause any problems in that respect for an agent."  The agent is only doing what their bosses want them to do.

MR. FOX:    I think you said that you received this call from Mr. Martinez very soon after Special Agent Marx was approached.

MR. BACA:  The very day, very night --

MR. FOX:    Very day.

MR. BACA:  -- or whenever it occurred.

MR. FOX:    And then it sounds like you interceded immediately after that phone call; is that correct?

MR. BACA:  That's correct.

******

<u>TRANSCRIPT OF EXHIBIT 2, EXCERPT 21</u>

MR. FOX:   Want to take a break?

MR. KIM:   At a convenient time, could we take a break, just for the bathroom?

MR. FOX:   I think that's fine.  I think that now is a fine time to do that.

MR. BACA:  Okay.

MR. FOX:   Yeah.  Stop it for now.  We'll start it again.

SPECIAL AGENT DALTON:  This is Special Agent Jason Dalton.  It is 3:31 p.m., on Friday, April 12th, 2013.  And we are taking a short recess, and I am stopping the recording device.

(Brief recess taken.)

******

TRANSCRIPT OF EXHIBIT 2, EXCERPT 22

SPECIAL AGENT DALTON:  This is Special Agent Jason Dalton.  It is Friday, April 12th, 2013 at 3:40 p.m.

Present are the same parties as previous. This is the office of Jones Day in Los Angeles, California.

Resuming the consensually recorded interview of Leroy Baca.

******

40

TRANSCRIPT OF EXHIBIT 2, EXCERPT 23

MR. FOX:    And with the approach of Gilbert Michel that ICIB did, after ICIB found out that Gilbert Michel admitted to accepting bribes to the FBI and after ICIB found out that the FBI had threatened to arrest Gilbert Michel when they confronted him, at that point in time, you knew what the FBI was investigating, correct? When you were informed what he told ICIB?

MR. BACA:  I don't know if I can say that's absolutely correct. I think that Mr. Brown gave us a much better indication than the Michel introduction of the phone.

MR. FOX:    In other words, the scope was better with Mr. Brown, the fact that it was a bigger investigation.  Is that correct?

MR. BACA:  Correct.

******

41

TRANSCRIPT OF EXHIBIT 2, EXCERPT 24

MR. FOX:    Assuming that ICIB was aware that the FBI was conducting a public corruption investigation of Gilbert Michel to see if he would accept money for committing an official act, smuggling a phone in the jail, do you agree that it would be inappropriate if ICIB was aware of that information to conduct its own investigation of the same subject matter?

MR. BACA:  Well, there -- that could be, but I can't draw that conclusion, because the phone recordings of the inmate were such that he was wanting to talk to the agents on the other side.

MR. FOX:    The FBI agents?

MR. BACA:  Yes.  This is how it's being reported as we are moving along, and that the agent was reporting back to Mr. Brown that "A phone is on its way.  Don't make these calls anymore because the jails are being monitored by the Department."

So it is a logical belief that Mr. Brown's mission at that point was to try and find out who these rogue deputies are that are beating up inmates.  So I think that in the early onset of this, Michel happened to be a vehicle in which to get the phone to Mr. Brown.

******

42

TRANSCRIPT OF EXHIBIT 2, EXCERPT 25

MR. FOX:    So you think it was appropriate certainly for the FBI to approach Gilbert Michel and --

MR. BACA:  Oh, yes.

MR. FOX:    -- get the confession --

MR. BACA:  Yes.

MR. FOX:    -- and prosecute him.  Is that correct?

MR. BACA:  Yes.

******

TRANSCRIPT OF EXHIBIT 2, EXCERPT 26

MR. FOX:    I'm going to show you what's been produced to us as your calendar.

MR. BACA:  Uh-huh.

MR. FOX:    And I would like you to -- I'm not sure if you've seen it in this form ever, but I'd like you to tell me if this is -- this appears to be your calendar.

MR. BACA:  Yes.

MR. FOX:    This is going to be Bates numbers LASD 242794 through 242808.

MR. BACA:  Okay.  Thank you.

MR. FOX:    Just take a brief look at it and see if you recognize these documents.

(Pause.)

MR. BACA:  It looks like my calendar.

MR. FOX:    Okay.  Can I then focus your attention on Saturday, August 20th?

MR. BACA:  Yes.  Okay.

MR. FOX:    You had referred to a 5K run.

MR. BACA:  Yes.

MR. FOX:    Do you see on Saturday, August 20th, it says, "AltaMed 5K race/walk."  Is that the race you think you did not go to because of the Saturday meeting?

MR. BACA:  Yes.

44

MR. FOX:    And then, looking at this calendar, if you look at just the preceding days, maybe start with August 17th and continue to August 19th.  In terms of that phone call you received from Mr. Martinez, I don't know if you remember where you were when you received that phone call, but are there any calendar entries that refresh your memory about when that phone call would have occurred?

MR. BACA:  No.  There's no indication of the call here.  It wasn't scheduled, obviously.  And it was to my cell phone.  So I don't believe I was even near the calendar itself.

MR. FOX:    You had mentioned before that you had notes of the conversation that you had with Mr. Martinez.  I believe you said it was a calendar entry that you would have had.

MR. BACA:  No.  I alluded to saying -- no, there's no notes about our conversation on either of the two, but that there could be something on my calendar that would trigger me to believe --

MR. FOX:    Okay.

MR. BACA:  -- that it happened on this day --

MR. FOX:    Okay.  And if you briefly --

MR. BACA:  -- or a day.

MR. FOX:    -- can you briefly look through this and see if you can see if there is anything that triggers your memory on which day that would have occurred?

MR. BACA:  Uh-huh.

45

(Pause.) I'm not positive.  Okay?  But, as I said, I believe it was -- I believed it was two days before the Saturday meeting and --

MR. FOX:    Two days before the --

MR. BACA:  Yes, because I notice here that there's a 2:00 o'clock to 2:30 meeting with the Undersheriff, Captain Carey, Lieutenant Gallagher, and Lieutenant Thompson.

MR. FOX:    Okay.  And that's the day before the Saturday meeting.

MR. BACA:  Yes.

MR. FOX:    So you think that there was a pre-meeting that we haven't talked about yet, a pre-Saturday meeting?

MR. BACA:  Very likely, very likely.  But I don't recall this particular meeting in content other than assuming -- and this is what it is.  It's not a thing that I'm clear on in my head.  But if Mr. Martinez's call was on a Thursday, of which I want to believe that it was then -- now, we'd have to check his phone to make sure or mine, either way, to make sure that it was actually on that Thursday -- then that would be the reason for this other meeting here, to ferret out what is going on here at this point that Mr. Martinez has alerted us.

MR. FOX:    Do you keep your cell phone records so it's easy to access?

MR. BACA:  I don't keep any records.  That's unfortunate, but --

MS. RHODES: What is your cell phone number?

46

MR. BACA:  Which one?

MR. FOX:    Well, which one did he call you on?  That's probably the best way for us to track it down.

MR. BACA:  It would be area code (323) 829-7184.

******

TRANSCRIPT OF EXHIBIT 2, EXCERPT 27

MR. BACA:  Now, that phone I don't use anymore, but that is the phone that I would have been using at the time.

******

48

TRANSCRIPT OF EXHIBIT 2, EXCERPT 28

MR. FOX:    Okay.  So let me now direct your attention to August 29th in this calendar.

MR. BACA:  Okay.

MR. FOX:    Do you see the 1:32 p.m. entry, "Meet with Andre Birotte, Jr."?

MR. BACA:  Yes.

MR. FOX:    At the Federal Building?

MR. BACA:  Yes.

MR. FOX:    Courthouse?  Is that the meeting that you had with the U.S. Attorneys' Office to discuss initially this investigation?

MR. BACA:  Well, it's one of two.  So if further into the schedule, you see the second meeting after that, then it would be more helpful for me to --

MR. FOX:    Okay.  Well, let's talk about the first meeting that you had.  Was that just with LASD, county counsel, Mike Gennaco, and the U.S. Attorneys' Office? In other words, the FBI was not at this meeting?

MR. BACA:  It's -- that's likely.  I don't recall the FBI's presence at that particular --

MR. FOX:    Okay.

MR. BACA:  -- time, but it could be that Mr. Martinez might have been not in this particular meeting but maybe in a subsequent meeting.

49

MR. FOX:   Let's talk about the first meeting that you recall that you had with Mr. Birotte.  What is it that you -- well, first of all, why did you call the meeting?

MR. BACA:  It was actually Mr. Birotte, I believe, that called it in response to some of the discussion that was being put forth relative to what's going on here. And I can't recall if I called for the meeting or he called for the meeting, but, nonetheless, we set the meeting.

MR. FOX:   Okay.  So you set the meeting.  And you obviously decided who you would bring to the meeting. So how did you decide who would go to the meeting?

MR. BACA:  Okay.  Let me see here.

MR. FOX:   We're focusing on the 29th meeting.

MR. BACA:  Right.

MR. FOX:   But just in -- and we're going to make this clear, Mr. Baca.  You said that you -- this may be the first meeting.  So instead of looking at this calendar entry and saying, "On August 29th, this is what we talked about," I'd rather that you just stick to "In the first meeting that we had, here is what we discussed."  Do you understand what I am saying?

MR. BACA:  Okay. Yeah.

MR. FOX:   If you can't place this for sure as the first meeting, let's just talk about what you recall happening in the first meeting.

MR. BACA:  Okay.  The first meeting was to discuss what's going on here with this investigation.  And I believe Mr. Gennaco was

50

in that meeting and --

MR. FOX:    In what role was he there?

MR. BACA:  Well, he was the former U.S. Attorney of Civil Rights for the U.S. Attorneys' Office.  And he had been involved in the prosecuting of police officers who were in violation of civil rights law. So he is our Office of Independent Review attorney.

******

TRANSCRIPT OF EXHIBIT 2, EXCERPT 29

MR. FOX:    Is it fair to say that you were pretty animated at this meeting or were you talking --

MR. BACA:  No. I was animated, yeah.

******

TRANSCRIPT OF EXHIBIT 2, EXCERPT 30

MR. FOX:    Have you ever stated, since learning that the FBI was investigating the jails, that you resented the FBI investigating the jails at LASD?

MR. BACA:  Let me say this:  "resentment" is not a word that I typically use on anything, including the FBI. Am I -- was I angry? Yes.  Did I feel that it caused more difficulty than it should have? Yes.  Do I believe that communication should have been a consideration with me? Yes.  And so these aren't things that need to be argued about at an investigative level. These are things that you argue about at my level.

******

53

## TRANSCRIPT OF EXHIBIT 2, EXCERPT 31

MR. FOX:    And did you ever -- do you recall ever stating that you didn't believe that the FBI should be investigating LASD?

MR. BACA:  I have never said such a thing.  I mean, you know, I don't know any other way to explain this to you.

******

TRANSCRIPT OF EXHIBIT 2, EXCERPT 32

MS. CARTER: Did you tell Andre Birotte that you had would

remove task force officers from joint FBI/LASD --

MR. BACA:  Did I tell Andre Birotte that?

MS. CARTER: -- task force if there couldn't be a mutually

agreeable resolution to how the investigation would be run?

MR. BACA:  It's possible.  When I'm angry, I can say anything.

Not quite anything, but I certainly would say --

MR. HERSHMAN:  Which meeting is this, by the way? If it

happened.

MS. CARTER:  I'm asking at any time.

******

55

<u>TRANSCRIPT OF EXHIBIT 2, EXCERPT 33</u>

SPECIAL AGENT DALTON:  This is Special Agent Jason Dalton.  It's 4:21 on Friday, April 12th, 2013. We're taking a short break, and I'm stopping the recording device.

(Brief recess taken.)

\*\*\*\*\*\*

56

TRANSCRIPT OF EXHIBIT 2, EXCERPT 34

SPECIAL AGENT DALTON:  This is Special Agent Jason Dalton.  It's 4:27 p.m., Friday, April 12, 2013. The same parties are present, the same location, resuming the interview of Leroy Baca.

MR. FOX:    Mr. Baca, I want to show you a document -- my purpose for showing it to you is I want to give you every chance, today, to make sure that the record is clear about what we're talking about.  So, later on, if you've told me one thing and we learn the opposite, I'll give you every chance to tell me what is, what it was.  I'm going to give you a chance to look at a document, Ms. Carter just described for you, or asked you about, any threat that you had, to say that there was -- we take people off the task force, in response to your answer, that you never said that.  You later went back, and said, "I may have done so in anger." I just want to show you your letter to Mr. Birotte, on September 26, 2011.  Let me just --

MR. KIM:    I'm sorry.  The date?

MR. FOX:    September 26th of 2011.  I'm putting brackets around the portion that I'm showing to you.

MR. BACA:  Certainly.

MR. FOX:    And you'll see there, that you state -- this is a month after that meeting.

MR. BACA:  Yes.

MR. FOX:    You state, "I am very hopeful that we truly agree upon resolution, but if not, the Sheriff's Department will not be able

57

to continue the participation with the FBI, in many ongoing joint taskforce missions." So at this point in time, your anger, I would assume had subsided, because it had been about a month, since you had learned about this. Yet, you're also, at this point, I'm reading this as telling the FBI, telling the U.S. Attorney, you will not continue to participate in task forces if . . .

MR. BACA:  If we don't reach an understanding that there was a breach of trust with my office, as a leader of the organization, then I feel that there was no reciprocal respect for the difficulty of both agencies.

******

<u>TRANSCRIPT OF EXHIBIT 2, EXCERPT 35</u>

MR. BACA:  Let me explain this anger business.  I don't get really angry.  I get more tactical. All right?  And anger is a part of it, but it's not the overriding part of it.

******

<u>TRANSCRIPT OF EXHIBIT 2, EXCERPT 36</u>

MR. FOX:    This letter was a tactical – and the meeting, it sounds like, beforehand, was a tactical attempt by you to show anger in order to raise the issues --

MR. BACA:  -- to get the compromise, so that we could go forward.

MR. FOX:    So it was more like a chess match?  It was a . . .

MR. BACA:  That's correct.

MR. FOX:    To be upset, that's going to make you have to go come to the table?  Is that right?

MR. BACA:  I wanted a full and clear understanding, that we can't afford to have a fight between two agencies.  You know, I didn't start this fight.  Okay?  But let me say this.  I believe in fairness, and I believe that fairness is a very important quality in everything that we do, whether it's with crooks, or whether it's with ourselves.

MR. FOX:    When you said, just there, "you didn't start this fight," who started the fight?

MR. BACA:  Whoever decided to do all this, and say that you can't trust the Sheriff, even.

******

60

TRANSCRIPT OF EXHIBIT 2, EXCERPT 37

MR. FOX:    Outside of the meeting, that you discussed with -- the Saturday meeting, possibly the day before, there might have been a meeting on August 19th.  The meeting with the U.S. Attorney's Office and the meeting with the FBI, did you have any discussions with Mr. Tanaka about these issues regarding Anthony Brown or Leah Marx?

MR. BACA:  More so Anthony Brown.  The whole case, I've had some discussions with him, of course.

MR. FOX:    What did you and Mr. Tanaka discuss?

MR. BACA:  The points that were relayed.  Nothing more than the points that were relayed.

MR. FOX:    What do you mean "the points that were relayed"? Meaning Anthony Brown is reporting this, and you would talk to him about that?  What points?

MR. BACA:  Well, "we found a phone.  The Internal Criminal Investigations Bureau will handle it all.  Let's only keep this within that framework.  They have the lead." And then circumstances of, "All right.  I'm going to meet with the U.S. Attorney's Office.  We'll go over there, and I'll see what I can accomplish." And, and the general story, at the time, as it emerged.

MR. FOX:    Who . . . so you were macromanaging this.  Who would be the person that was, in your opinion, the closest thing to being the leader that is micromanaging what is happening with the

61

Anthony Brown, Gilbert Michel?

MR. BACA:  That would be Captain Carey.

MR. FOX:    Captain Carey?  And Captain Carey, at the time, was not housed in same building that you were in. Correct?  He's not at Headquarters?

MR. BACA:  I believe you're correct.  Yes.

MR. FOX:    Mr. Leavins was.  Correct?

MR. BACA:  I never really knew where he was. But it's possible that he was in the building.

MR. FOX:    Did you have any discussions with Mr. Leavins, when Mr. Carey was not present?  Do you recall?

MR. BACA:  On occasion, yes.

MR. FOX:    Okay.  About this subject matter.  What do you recall about those conversations?  What were they related to? Specifically, what Anthony Brown was saying? What Gilbert Michel was saying?  What to do about the FBI? What was it?

MR. BACA:  Specifically, what he said, or even Tom -- I don't know, at the moment.  I can't remember.  But it was the updating process.

******

62

TRANSCRIPT OF EXHIBIT 2, EXCERPT 38

MR. FOX:    Other than Mr. Tanaka, did you have conversations with any Assistant Sheriffs about what was happening?

MR. BACA:  Not that I can recall. Because I didn't want this to be gossip in the organization.  You know, undoubtedly, there has been some at the, at the line level.  I didn't want various people involved in this, because then it becomes less professional, in my judgment.

MR. FOX:    Do you recall a conversation that you may have had with Cecil Rhambo, about what to do about this Federal investigation that was occurring?

MR. BACA:  I don't recall such a conversation with him.

MR. FOX:    Do you recall, I mean, I assume that it's -- well, let me ask this.  Do you recall Mr. Rhambo ever saying something to you, to the effect of, "Don't fuck with the Feds"?

MR. BACA:  Let me say this.  I don't like vulgarity. Sometimes I'll use it.  I was in the Marine Corps.  But no Assistant Sheriff is going to talk that way to me, and me see that as just some form of internal conversation.  In fact, I think that if you were to assess the environment of my immediate command staff, the Assistant Sheriffs and the Undersheriffs, if anything, they're extremely gentlemanly, and he's one of them.

MR. FOX:    It would stand out to you, if he made that comment to you?  You would remember it, is that correct?

MR. BACA:  I would certainly respond to it, and therefore

63

would remember it, because it's unacceptable communication to a person at my position.  Now, I'm not better than anybody else.  But I believe that Mr. Rhambo's interactions with me have always been on a respectful level.  So it would surprise me that he said to you, he said, "Don't fuck with the FBI" to me.  Then that would shock me that he's saying such a thing.

******

TRANSCRIPT OF EXHIBIT 2, EXCERPT 39

MR. FOX:    In that letter that you wrote to Mr. Birotte, you discussed Grant Jury Subpoenas.  So by that date, September 26, 2011, you knew this was a Grand Jury investigation, because there were Grand Jury Subpoenas that had been issued.  Is that correct?

MR. BACA:  Yes.  And then the next step was to figure out all the protocols between the various agencies.

MR. FOX:    Okay.  Let's go back.  There were Grand Jury subpoenas, as you wrote in a letter, were dated in late August of 2011, August 24th of 2011.

MR. BACA:  Okay.

MR. FOX:    When did you become aware of those subpoenas?

MR. BACA:  I'm not sure, but obviously beforehand.

MR. FOX:    I guess I'm wondering whether it was right before the time that you wrote this letter.  It appears that you already had a conversation with Mr. Birotte about those subpoenas, because it's serving to confirm and thank him for agreeing to hold the responses.

MR. BACA:  Right.

MR. FOX:    So I'm wondering, did you talk about it at your August 29th meeting, do you think?  Or the first meeting, that you referred to it as?

MR. BACA:  It must have been, obviously before the 24th.

MR. FOX:    Or after the 24th, August 24th.

MR. BACA:  Or after.  I'm sorry.  The meeting with Mr. Birotte

65

-- it seemed to me, if this was the second meeting -- and I believe it was. I think when I brought this in -- or it could have been the first. I don't know. It was a starting point of discussion. It might have been the first. I think I may have brought it in on the first meeting.

MR. FOX:    Yeah. I think the best the lawyers in this room could put it together and obviously disagree with me, if I'm misstating this. I believe that we pieced together that there was an August 29th meeting, which you referred to as "the first meeting," and a September 27th meeting, which would have been the day after this letter. So would I be correct then that this -- first of all, is that in any way against your memory?

MR. BACA:  I think it kind of fits in, in the sequence of the two meetings.

MR. FOX:    So based on that, you believe by August 29th, you would have been aware of these subpoenas?

MR. BACA:  It appears that to be the case.

******

66

TRANSCRIPT OF EXHIBIT 2, EXCERPT 40

MS. CARTER:  Did you write this letter before or after Leah Marx -- before or after, you found out Leah Marx had been approached, on September 26th?

MR. BACA:  I don't know.  I don't even know when she was approached and when that came about.

******

67

TRANSCRIPT OF EXHIBIT 2, EXCERPT 41

MR. FOX:    Do you often write your own correspondence, or does somebody else write it for you?

MR. BACA:  It's co-done.  I edit everything and I write my own particular points.

MR. FOX:    This one does not appear to have the initials you normally see if somebody else had typed it or written it.

MR. BACA:  Right.

MR. FOX:    Does that mean --

MR. BACA:  There's a lot of my writing in here.

MR. FOX:    Okay.  So you recognize some of this as being your writing.  It's certainly not a document you signed without reading?  Correct?

MR. BACA:  That's correct.

******

68

<u>TRANSCRIPT OF EXHIBIT 2, EXCERPT 42</u>

MR. FOX:    I want to talk timing with you, a little bit. You've got your calendar in front of you.  I'll take that back.  You have, in front of you, your calendar. It shows, if I'm correct -- correct me, if I'm wrong -- that you were off from September 8th to September 22nd.

MR. BACA:  Okay.  Let's take a look.  It certainly appears that way.

******

69

TRANSCRIPT OF EXHIBIT 2, EXCERPT 43

MR. FOX:    When you're on vacation or off, do you keep in close contact with your office, to make sure that everything's running smoothly and that things you care about are happening?

MR. BACA:  Yes.

MR. FOX:    When you were off during this period of time, were you learning anything about Gilbert Michel or Anthony Brown, while you were taking your personal time off?

MR. BACA:  If there was something significant, yes. There is a connection, wherever I am.

******

TRANSCRIPT OF EXHIBIT 2, EXCERPT 44

MR. FOX:    The 22nd, you get back in the office.  The 26th, your letter goes out to Mr. Birotte.  The 26th, Leah Marx is approached by ICIB.  What communications did you have with ICIB between the 22nd and 26th, that might have caused them to think that that was an appropriate response?

MR. BACA:  None.  I didn't come back to work on the 25th, in the office.  It's my Sunday day, that I do typically in the community. So Monday is the 26th, which then becomes the first day back.  The key to what, the lawyers agreed to here, is that the meeting with Mr. Birotte --

MR. FOX:    Again, that's going too far in the future. I'm trying to focus on what happens on the 26th. Leah Marx, that's when --

MR. BACA:  That's when I get the call.

MR. FOX:    I want to focus on actually ICIB.  ICIB approaches Leah Marx on September 26th.

MR. BACA:  Yes, I know.  That's why I remember it. Because I wouldn't know what day ICIB talked to Leah Marx, if it weren't for Mr. Martinez's call.

MR. FOX:    Okay.  Looking at Monday, September 26th, it looks like there was a President of the United States fundraising dinner.  Do you recall whether your conversation with Assistant Director Martinez was before or after that fundraising dinner?  I'm just hoping that's probably an important event that you might

71

remember.

MR. BACA:  Certainly.  It my recollection is simple, I wasn't at home, when he called me.  I was somewhere. This could be the somewhere, where it's indicated on that dinner.  He told me that Ms. Marx was told that she could be the subject of a criminal investigation. At that point, I said, "Don't worry.  I don't want her to feel that somehow this is now on her back, because it isn't, as far as I'm concerned.  So I'll take care of it."  So I did.  You know?  At that point, I circled back.  I made notifications and say, "Don't do this, because it's not appropriate, because we do have a way of dealing with this thing, other than that way."

******

72

## TRANSCRIPT OF EXHIBIT 2, EXCERPT 45

MR. FOX:    All right. Then in your conversations with Mr. Martinez that occurred after these phone calls, did you tell -- I think you said, earlier.  Again, I want to give you the chance to explain away anything else, so we're not left with any ambiguities here.  Did you tell Mr. Martinez, not that you were unaware of this and that he would stop it, but that Leah Marx would not be arrested that night?

MR. BACA:  I don't recall the precise words I used.  But I told Mr. Martinez that this is not going to happen, and I will take care of it.

MR. FOX:    It's not going to happen, period?  Or not going to happen that night?

MR. BACA:  It's not going to happen at all.

MR. FOX:    That's what you told to Mr. Martinez?

MR. BACA:  Right. And I felt that, had I been told that this was part of the current process, I would have said, "Don't do that."

******

73

TRANSCRIPT OF EXHIBIT 2, EXCERPT 46

MR. FOX:    Let me ask you about an L.A. Times Article -- and I know you've been quoted in the media a bunch.  But September 29th.  I'll show you the Article, and I've got a question for you about your statement here.  This is September 29th, a printout of an article, that's labeled, entitled, "L.A. County Sheriff Lee Baca Gives Details of the FBI Sting."  Why don't you take a minute and review that?

MR. BACA:  This was a September 29th article, which means we spoke before September 29th.

MR. FOX:    Correct.

******

74

TRANSCRIPT OF EXHIBIT 2, EXCERPT 47

MR. FOX:    So you're quoted with saying, "We're investigating the crime." What crime were you investigating?

MR. BACA:  The idea that an inmate had a phone, and then whatever the process was that got him the phone.

MR. FOX:    Okay.  So it's Gilbert Michel--

MR. BACA:  Right.  Because on a positive side, if you guys can pull it off, the way you did, somebody else can do the same thing.

MR. FOX:    Okay and it said asked if the Sheriffs' Department was going to seek criminal charges, you said, "No, I don't think so. It's not worthy of pursuing, in view of the greater good." You were talking about the FBI Agent, at that point?

MR. BACA:  That's correct.

MR. FOX:    So when you were saying you were investigating the crime -- this interview you're having with the reporter, are they taking it to mean that you're investigating a crime that the FBI Agent committed?  Is that how you're understanding that question?

MR. BACA:  We still try to make a distinction between Mr. Brown and the FBI, and then we have this Deputy Michel, who is part of the problem.  Probably the biggest part of the problem, because if he was really the right kind of guy, he would have never acquiesced to whatever Mr. Brown did to convince him that he could do this.

MR. FOX:    But you didn't say there, that, "We're going to seek criminal charges against Brown and Michel but not against the FBI."

75

You're saying, "No. I don't think so. It's not worthy of pursuing, in view of the greater good." You're relating their question --

MR. BACA: I'm relating that to the FBI.

MR. FOX: Right. What made you, I guess relate -- to understand that these comments related solely to whether the FBI Agent committed a crime?

MR. BACA: Well, they asked me whether or not we were going to pursue the FBI Agent. That's when I made that remark.

MR. FOX: Got it. Okay. Then it says, "He dismissed any suggestion that the visit was intended to intimidate the Agent. The FBI's home visit to his Deputy wrapped up in the sting, Baca argued, involved substantially more intimidating tactics." That was probably the part, that to me, confused me the most.

MR. BACA: Let me see where that fits in here. Where? Oh, I see. Okay. Baca argued the FBI home visit to the deputy wrapped up in the sting, Baca argued was substantially more intimidating… intimidating tactics . . . you know, first of all, Faturechi doesn't have a tape recorder, and I wish he would, because he tends to reconstruct his stories by memory, which is not a good idea.

MR. FOX: Okay. You don't remember making this comment to him, in other words?

MR. BACA: I don't even know what it means.

                                    ******

76

TRANSCRIPT OF EXHIBIT 2, EXCERPT 48

MR. FOX:    Let me ask you a few wrap-up questions on this topic, and then I've a couple of very minor things to ask you on a couple of different topics.  It will not take long at all.  But I just wanted to ask you these wrap up questions.  And I'm going to summarize, basically, what you said today, that I think is correct.  And you tell me if that's true.

MR. BACA:  Okay.

MR. FOX:    You did not -- you're saying, today, that you did not order Anthony Brown to be hidden to try and stop the FBI from continuing to investigate excessive force?

MR. BACA:  That's correct.

MR. FOX:    And corruption within the jails.

MR. BACA:  That's correct.

MR. FOX:    You decided . . . you're saying that you did not decide -- you did not order -- let me strike that.  You did not order the investigation of an FBI Agent for performing her duties, and the arrest of an FBI Agent for performing her duties, as an FBI Agent.  Is that correct?

MR. BACA:  I directed an investigation of the whole situation regarding the phone.

MR. FOX:    But as a suspect or subjects, or targets of the investigation?

MR. BACA:  I did not decide who was subject and who was

77

suspect, and who was what.  There's more people involved than Leah Marx, I'm sure.

MR. FOX:    Okay you did not direct that then, that investigation then, in order to try and force the FBI and the Federal government to stop its investigation of LASD.  Is that correct?

MR. BACA:  Correct.

MS. CARTER:  Did you ever have any conversations before Leah Marx was approached, on September 26th, about arresting or threatening the arrest of an FBI Agent?

MR. BACA:  No.

MR. KIM:    One second.

MR. FOX:    Do you want me to ask it again?

MR. KIM:    I kind of missed it.  Can you just say that one more time?

MS. CARTER:  Sure.  Before Leah Marx was approached on September 26th, did you ever have any conversations with anyone in the Sheriff's Department about arresting or threatening to arrest an FBI Agent?

MR. BACA:  No.

******

78

TRANSCRIPT OF EXHIBIT 2, EXCERPT 49

MR. HERSHMAN:  We're going to take a break for a second.

MR. FOX:  Okay. That's fair. Do you want us to leave, or do you want to --

MR. HERSHMAN:  No.  We're going to take a break for one second.

MR. BACA:  Okay.

SPECIAL AGENT DALTON:  This is Special Agent Jason Dalton.  It's 6:09, Friday, April 12, 2013.  We're taking a brief recess, and I am stopping the recording devices.

(Brief recess.)

******

TRANSCRIPT OF EXHIBIT 2, EXCERPT 50

SPECIAL AGENT DALTON:  This is Special Agent, Jason Dalton. It's 6:37, Friday, April 12, 2013, and we're resuming the interview of Leroy Baca.

MR. FOX:  Mr. Baca, we discussed a few things while you were not in the room. One of them, that I just want to go over. We're gonna just have a couple of very minor follow-up points.  I won't call them minor -- a couple of follow-up questions.  Then we're, as per our agreements before we came here today, we're going to allow your attorneys here to ask you any questions of course on the recording that they'd like to ask you and I don't know if they have any.  But we met with them earlier and we gave them the opportunity, as we discussed previously.  So, because we don't have any transcripts here, I don't recall -- I'm not sure that anyone here recalls - - whether we asked you -- when you received the call from Steve Martinez about the Leah Marx arrest, you said that you basically put a stop to the thought that they would arrest Leah Marx.  How did you do that?  Who did you communicate within LASD, to make sure that was going to happen?

MR. BACA:  Well, I don't remember exactly.  But the likely person would have been Captain Carey.

MR. FOX:    And if it wasn't Captain Carey, it would have been Steve Leavins?

MR. BACA:  Most likely if that were the case.  That would be

80

yes.

MR. FOX:    Okay so this would not have been a situation of going to Paul Tanaka, and saying, "Get this message out."  You would have actually gone to somebody within ICIB?

MR. BACA:  That's to the best of my recollection. But, candidly, I really don't remember exactly who I told this to.

MR. FOX:    Okay.

MR. BACA:  But you know, it wouldn't be anybody other than those people that you alluded to.

MR. FOX:    Those three?

MR. BACA:  It could have been even Mr. Tanaka, for that matter.

MR. FOX:    So it could have been Mr. Carey, Mr. Leavins or Mr. Tanaka.  That's the universe of people who it could be?

MR. BACA:  That's the only area I would imagine, in a general sense, that I'd go to for that.

******

TRANSCRIPT OF EXHIBIT 2, EXCERPT 51

MR. FOX:    All right.  I think that that's all for me.  Anybody else on our side? Okay. Brian . . .

MR. HERSHMAN:  Yeah.  This is Brian Hershman. I'm going to ask you a few questions Sheriff Baca, if that's okay with you?

MR. BACA:  Yes.

MR. HERSHMAN:  You were asked, during the course of this interview, about an August 26th encounter with members of ICIB and Leah Marx.  And you were asked --

MR. FOX:  September 26th.

MR. HERSHMAN:  September 26th. Thank you.  You were asked if you had a conversation with anyone prior to that encounter about the arrest, or threatened arrest of Ms. Marx.  Am I correct that, to the best of your recollection, now talking about events a year and a half ago, you did not have any such conversation?  Is that correct?

MR. BACA:  Yes.  To the best of my recollection.  It's not something that registered in my memory, today.

MR. HERSHMAN:  And you were asked about a statement of Assistant Sheriff Cecil Rhambo, about words to the effect of, "Don't fuck with the FBI" or something like that.  Is that correct?  Do you remember that?

MR. BACA:  I don't recall Mr. Rhambo saying such a thing to me.  I don't have that recollection, as we speak, today.

MR. HERSHMAN:  You were also asked about a conversation

82

potentially with Lieutenant Thompson where he apologized for letting the FBI meet with Anthony Brown. Do you recall being asked those questions?

MR. BACA:    I recall being asked those questions.

MR. HERSHMAN:  Am I correct that to the best of your recollection, as you sit here, today, sometime later, you don't recall Lieutenant Thompson having said such a thing to you?

MR. BACA:    That is correct.  I don't recall Lieutenant Thompson saying those words to me.

MR. HERSHMAN:  Anything else?

MR. FOX:    Anything else? Can I just follow-up?  Do you think you would remember, if you ordered the arrest of an FBI Agent?

MR. BACA:  I think that would be significantly memorable.

MR. FOX:    Okay. Do you think you would remember if you were told that the FBI had been kicked out of an interview and someone was apologizing to you for kicking the FBI out of the interview?

MR. BACA:  Yes. I think that would be memorable, too.

MR. FOX:    Anything else?  Okay.  We're going to turn off the tape now.

SPECIAL AGENT DALTON:  This is Special Agent Jason Dalton.  It is 6:43, on Friday, April 12, 2013.  We are concluding the interview with Sheriff Leroy Baca.

83