# Exhibit A to
# Declaration of Eddie A. Jauregui

## JFA Institute

### Conducting Justice and Corrections Research for Effective Policy Making

# Evaluation of
# Education-Based Incarceration Programs
# Los Angeles County Sheriff's Department
# Jail System

Dr. James Austin
Dr. Jerrold D. Green
Robert Harris
Robin Allen

August 2013

# Executive Summary[1]

## Background to the Study

Since its inception, LASD, like most county jails, provided education, substance abuse, and a variety of self help programs for inmates, but these efforts received a significant boost in 2006, when a relatively small but innovative program was initiated at the Los Angeles Sheriff's Department's South jail facility.  Frustrated with a long history of  inmate on inmate and inmate on staff violence, a new concept of jail management was introduced that sought to reduce institutional violence and recidivism.   Today the program, known as Education Based Incarceration (EBI) has grown and matured substantially.  On any given day, there are nearly 4,000 inmates participating in EBI who are actually involved in some 7,500 programs and work assignments.

Given the importance of this initiative and its potential consequences for the LASD and other jail systems, the authors of this report undertook a preliminary evaluation to begin assessing the following aspects of EBI:

1.   What are the number and type of inmates participating in EBI?
2.   How are they selected for EBI?
3.   What types of programs and activities are they participating in?
4.   What has been the impact of EBI on jail violence?

In conducting this study, we relied upon field observations of EBI activities, interviews with a representative sample of EBI participants, and a statistical analysis of EBI and non-EBI participants. We also examined the rates of inmate on inmate assaults occurring at all facilities and those living units that have become dedicated EBI units (known as MERIT program participants).

## Findings

The initial evaluation of EBI and more specifically the MERIT program is generally positive.  Field observations of the program at the various facilities where it has been operational show that the program has fundamentally altered the culture and nature of imprisonment within the LASD. These positive observations are also supported by interviews with a representative sample of inmates who are participants in EBI.  The majority of the representative sample feel that important services are being provided that should help them prepare for their inevitable

---

[1] This study was funded by the Public Welfare Foundation and at the request of Sheriff Leroy Baca. The views and opinions expressed in this report are those of the authors alone. We are grateful for the cooperation of the LASD and in particular the staff and inmates associated with EBI.

1

release from jail which generally occurs within a few weeks or months.

The quantitative analysis shows that about 3,800 inmates are in the EBI program at any given time.  These EBI participants are not some "cherry picked" subgroup of inmates, but contains people convicted of violent and non-violent crimes, long and minimal prior records, and extensive drug abuse histories. What does set them apart is a desire to make amends for their crimes and reduce the chances that they will return to jail.

The statistical analysis, field observations and interviews all point to the same central finding that EBI, and MERIT in particular, provides for a very safe place within a sprawling jail system that has had its full share of violence in the past. The MERIT housing units have significantly lowered assault rates both within their facilities and as compared to the entire jail system (see figure on following page).

The extent to which EBI can reduce recidivism remains unknown.  But it is now possible and desirable to conduct such a study to see if EBI is reducing re-arrest or re-incarcerations.  Such a study would be based on comparing pre and concurrent cohorts of released inmates who are comparable to EBI  and in particular the MERIT graduates. It is the latter group that has received the fullest "dosage" of EBI and probably has the greatest likelihood of showing a positive impact.

## Toward Safer, Smaller and Less Expensive Jails

There are several challenges facing the EBI program that the LASD leadership must address.  First, there is a need to broaden and expand the program to other facilities and housing units. But to do this, additional supervisory and line staff staff are needed to maintain and expand the current program.  We say this in recognition that several of the key LASD staff who developed and nurtured EBI have or will soon retire. If the program is to be fully integrated within the LASD, additional senior staff will need to be recruited so that the program can be expanded.

Related to EBI staffing, it would be preferable to develop a permanent or dedicated EBI staffing pattern rather than the current situation where deputies are rotated in and out of the custody division.  We recognize that there is a value for some deputies to have the experience of custody work even though they are more interested and inclined for patrol or detective work.  But, there is the underlying need to have deputies who develop as professional custody officers and specialize in EBI related activities thus creating a deputy that would be a custody specialist and as part of this, a dedicated EBI specialist. The type of interaction between inmates and staff that is required for EBI to succeed suggests that the development of a professional custody workforce is needed.

Third, EBI should be viewed as a "gateway" or feeder system for inmates who the LASD can then place in alternatives to incarceration programs in either pretrial or sentenced status. This would provide greater incentives to the inmate population to

2

participate in EBI.



This can be done in two ways.  The sentenced inmate population that are EBI participants can be rewarded for participation and completion of various EBI programs with good time credits that will in turn reduce their jail time. This practice would no doubt increase the number of EBI participants.  We are aware that legislation is pending that would allow EBI inmates to receive such credits although the amount of credits may be inadequate.  There is also a pilot program now underway where 40 women sentenced under AB109 are now being supervised in the community under California's Home Confinement law.  This program could be significantly expanded.

For pretrial inmates who have been denied OR or cannot afford bail, a pretrial release program could be established where inmates who complete a 4-6 week EBI program would then be recommended by the LASD for pretrial release. If granted release the LASD EBI community supervision staff in concert with the LASD patrol division would maintain close contact with the EBI pretrial releases.

Even if EBI inmates are denied pretrial release, their participation in EBI could be the basis for a split or reduced sentence if so convicted.

These incentives (opportunity for pretrial release and reduced length of stay) would work to lower the projected jail population which is hovering at approximately

3

18,500 inmates.  Previous projections by the JFA Institute suggest that the current jail population could be reduced by 3,000 inmates. The operational savings that would be realized by expanding the EBI and using it as the feeder system for alternatives to incarceration would be sufficient to provide the necessary funding needed for EBI to expand.  In this manner, EBI can and should be the primary vehicle by which a safer, smaller, and less expensive jail population can be realized.

Propose EBI Flow for Alternatives to Incarceration



# Introduction

By any standard the scale, complexity, and challenges confronting the Los Angeles Sheriff's Department (LASD) jail system are noteworthy and indeed daunting. With an inmate population in excess of 20,000 inmates, the nation's largest jail system operates its own bus system, countless support industries and units, and very large, diverse, and complex custody facilities across and throughout Los Angeles County.

Yet custody is only half of LASD's responsibilities for at the same time it is expected to provide law enforcement services not only to the County itself, but also to a number of contract cities that have chosen to outsource their law enforcement needs to LASD. To have a sense of the complexity and scale of LASD's custody environment, only one part of LASD's myriad responsibilities with more inmates than many small and medium sized countries, one only needs to spend an evening at the Inmate Reception Center in downtown Los Angeles which receives as many as 500 bookings per day, not only from LASD, but also from surrounding police departments, the California Highway Patrol, and other law enforcement agencies throughout this sprawling and very large county whose outer reaches can at times best be accessed by helicopter.

While most law enforcement agencies are characterized by their primary focus on maintaining public order on the streets and in the community, in addition to this responsibility, the men and women of LASD have equal responsibility for maintaining large custody facilities for those awaiting trial, those sentenced to terms now in excess of one year by the courts, and in today's increasingly restricted California state and county fiscal environment to house inmates that were at one time the responsibility of the California Department of Corrections and Rehabilitation (CDCR), but who are increasingly being sentenced to terms of incarceration in already underfunded and understaffed county custody facilities. California Governor Jerry Brown justifies this program, entitled AB 109, below:

5

> *For too long, the state's prison system has been a revolving door for lower-level offenders and parole violators who are released within months—often before they are even transferred out of a reception center. Cycling these offenders through state prisons wastes money, aggravates crowded conditions, thwarts rehabilitation, and impedes local law enforcement supervision." – Governor Edmund G. Brown, Jr.*

What is not said here by Governor Brown is that those inmates eschewed by the state are now the responsibilities of the counties, with Los Angeles County receiving a large number of these lower level offenders and parole violators. The counties affected by this are not receiving specific additional financial support from the State of California for purposes of rehabilitation and treatment.

Although debating the wisdom of AB 109 exceeds the scope of our report, what is clear and incontrovertible is that it has immeasurably expanded the scope of custody responsibilities for LASD while at the same time not bringing with it a concomitant increase in financial resources. Prior to AB109, the LASD jail population had been declining as crime and arrests were also in decline (Figure 1).

6



Figure 1. Recent Trends in Los Angeles Jail Population
January 2010-June 2013

Put plainly, LASD now has responsibility not only for more inmates, but also for people who previously spent some portion of their state prison sentence in the CDCR prison system. As one long time LASD custody Captain opined to us, the always difficult LASD custody environment has grown significantly and potentially more dangerous as a result of the large influx of AB 109 inmates. It takes resources to mitigate risk and the existing resources and management may be lacking.

This "perfect storm" of an influx of new and longer serving inmates, a static and indeed declining budgetary environment, as well as recent revelations about staff on inmate violence within the LASD jail system exhaustively detailed by a Blue Ribbon citizens' committee in its *Report of the Citizens' Commission on Jail Violence,* have placed an enormous burden on the leadership of LASD. Its top leadership has of necessity committed itself to reforming its custody policies, personnel policies as they relate to custody, and indeed its entire 18,000 plus inmate system at precisely the moment that it is addressing an influx of nearly 6,000 new state sentenced

7

inmates within an austere and declining fiscal climate. This unenviable situation has compelled Sheriff Leroy Baca and his senior management staff to think about new ways to address these challenges. It is one element of this new approach, *Education Based Incarceration* (EBI), that is the focal point of our report.

**Education Based Incarceration: Its History and Goals**

The origins of EBI date back to 2010 when it was formally established. One reason for their increased prominence is their very potential attractive return on investment. Custody costs are high and rising. The well-known observation is that it costs more to keep an inmate in a maximum security prison environment than it would cost to send him to an Ivy League school.  This observation not only has validity, but it also resonates deeply with the public.

Further, criminologists since the dawn of modern penology have struggled with the issue of chronically high recidivism. How can society counteract the "revolving door" referred to above by Governor Brown in which the same inmates are being constantly shuffled in and out of the correctional system?

Some time ago, one of the authors of this report attended a focus group for inmates at LASD's Men's Central Jail being convened by a senior department Commander. The Commander asked inmates to share with him their concerns and one younger inmate made reference to the fact that **next time** he is sentenced to the LA County Jail he hopes that the food will be better. This young inmate took it as inevitable, immutable, and absolutely certain that he would ultimately return to jail.  Certainly there is and always have been habitual offenders whom no amount of education, re-socialization, or any special services are likely to help stay out of jail. Yet, there are countless others who could be helped and here it is believed by the current LASD leadership that the return on investment for education programs more than justifies the modest expense devoted to them. Compared to the very costly custody

8

alternatives, classrooms, teachers, pencils, and paper are far cheaper at the price than would be the higher levels of custody resulting from high levels of recidivism.

And although some segment of the public, as well as a significant and less enlightened portion of the law enforcement community itself oppose what they would choose to regard as the *mollycoddling* or *spoiling* of inmates, it is an incontrovertible fact that people with something to lose are less likely to be sent to jail than those with nothing to lose but their freedom. Thus, employment and all that it brings with it including a more stable family environment, possible home ownership, pride about one's own accomplishments, a sense of being a productive member of the community rather than an outsider or even worse one of its victims, all serve as possibly powerful antidotes to recidivism.

A significant motivating factor to LASD's newfound enhanced to EBI was the damning report on jail violence referred to above. One outgrowth of this report was a realization that LASD deputy culture needs to be changed. Although there will always be an adversarial relationship between those being incarcerated and those confining them, such frictions when allowed to mushroom into significant hostility and disrespect are dangerous and costly both to inmates and to staff.  Both inmates and staff live and work in the same jail facilities, and thus a diminution in the tensions that often lead to violence benefits both sides. EBI is certainly not a panacea. Yet a significant commitment to such programs, especially if they are successful, can tamp down the hothouse qualities that can make jails even more unpleasant and dangerous places than they already are even under the best of circumstances.

One focal point of LASD is its commitment to *community based policing.* Sheriff Baca and his staff talk endlessly about this with almost evangelical fervor. Community based policing is a fundamental cornerstone of this very large and complex organization. Cadets are repeatedly instructed in the fine points of community based policing in their academies and indeed the core values which are central to

9

the training and the performance of all LASD deputies which guides the department, at last in an aspirational sense.

*LASD Core Values*

*As a leader in the Los Angeles County Sheriff's Department, I commit myself to honorably perform my duties with respect for the dignity of all people, integrity to do right and fight wrongs, wisdom to apply common sense and fairness in all I do and courage to stand against racism, sexism, anti-Semitism, homophobia and bigotry in all its forms.*

Although there is no specific reference here to inmates, there is a commitment to respecting the "dignity of **all** people," and inmates are people too. Indeed, the modern American jail touches more people than any other component of the correctional system.  For example, approximately 600,000 people are admitted to state prisons in the US.  Compare that number with the estimated 12 million jail bookings each year. The LASD jail books over 400,000 people each year through its various substation and major jail facilities. So, it's important that we strive to maintain the core values expressed by the LASD in its treatment of people who enter the jail system.

The core LASD values cited above are ubiquitous throughout the department. They are printed on the backs of all LASD business cards and generations of cadets repeat them by rote quite regularly. The new challenge for LASD is to apply this code to inmates as well and here, although the jury is still out, EBI appears to be a potentially very powerful instrument to do this. And as we outline below, given LASD's singular focus on community based policing, EBI can be the custody corollary of this as EBI programs by definition bring into the custody world select segments of the public. Traditionally, the community has been kept at arms length from custody issues that in part may help to explain why the problem of violence in the jails went unnoticed for so long. Thus, *community based custody* is viewed as a potential antidote to the problem of recidivism, tension and violence between and among not only inmates themselves, but also between inmates and staff, and finally

10

burden sharing between LASD and the public in the custody realm as both society and law enforcement are the biggest losers in a world of unbridled recidivism. The community does have a role to play in combatting recidivism and involvement in and support for EBI may be the ideal vehicle to achieve this.

As noted above, education programs have always existed throughout the LASD jail system.  According to LASD promotional materials J.B. Loving the Department's first African-American deputy began its first inmate program in 1913. It is safe to assume that until today an array of such programs existed with their impact, scope, size, and funding ebbing and flowing based on contextual political and sociological trends just as they have in all other custody settings elsewhere since the beginning of time. But for a confluence of reasons, EBI programs now enjoy an unparalleled prominence within the Department. These factors include the recent violence in the jails report cited above, the impact of AB 109, and increased awareness in the Department of the value of such programs relative to their comparatively minor costs. In any complex organization, one measure of a program's prominence is its leadership, facilities, budget, and the like. We have repeatedly interacted with the leadership not to mention the rank and file of EBI programs within LASD and it is quite clear that whatever the cause and despite what can be assumed to be an uneven history, these programs currently are at the heart of custody operations within LASD.

Overseen by senior and forceful career deputies of significant accomplishment themselves, EBI is housed within Custody headquarters in downtown Los Angeles in the same complex that houses the Inmate Reception Center, the Twin Towers, and Men's Central Jail. Having spent appreciable time at EBI's offices, not to mention making site visits to its operations at custody facilities throughout the County, we have seen a steady stream of the most senior leaders of the Department spending appreciable time checking in with the EBI leadership at its large and well situated offices. If personnel, budgets, and interest by the very top leadership of the LASD from Sheriff Baca all the way down are considered to be serious metrics of influence,

11

commitment, and concern, then in the case of EBI, one can see instantly that LASD is taking its work here very seriously.

## Overview of the EBI Programs

Although an exhaustive review of all EBI programs far exceeds the scope of our more narrow assessment of the value and impact of the most important of these programs, we do provide below an overview of some of them and subsequently more detailed assessments of those programs where we have focused most of our efforts in terms of interviewing uniformed managers as well as inmate participants and in some instances alumni of these programs who have subsequently been released back into the community.    Before we enumerate and delve into these programs, we reproduce below; in the Department's own words, the six principles that drive EBI.

### SIX PRINCIPLES OF EBI

*I.  Assess and evaluate both educational and trade skills of inmates.*

*II.  Develop a system of educating Los Angeles County jail inmates who inevitably will serve time in the California state prison system that begins and ends with a period of time in Los Angeles County jail facilities.*

*III.  The development and implementation of an automated case management information system.*

*IV.  Strengthen and systematize the partnership with the California Department of Corrections and Rehabilitation (CDCR).*

*V.  Develop a comprehensive curriculum that activates a wide variety of learning programs that are both traditional and non-traditional.*

*VI.  Transform, through science and training, the LASD Custody Operations Division, as well as the State of California's cultural thinking to approve, support, and participate in the principles and practice of Education Based Incarceration.*

As the number and type of inmates in the LASD has risen, the number and array of programs have expanded to serve different types of inmates serving different types

12

of and frequently longer sentences than was the case to date.  As this is being written, the EBI programmatic offerings are being updated and modified to adapt to this changing jail population. What follows is a review of the current array of program offerings.  These are separated into traditional LASD jail programs and those that are unique to EBI.

*Traditional Academic, Vocational, and Jail Enterprise Programs*

A significant portion of EBI consists of an array of rather traditional programs similar to those offered in other custody facilities around the country. These include basic education meant to prepare inmate-students to take the GED examination, more general educational development classes for state-approved high school equivalency certification in what was once called the "3 R's," vocational training programs in such fields as masonry, art education, automotive repair, commercial painting, building maintenance, construction, welding, computer operations, landscaping, culinary arts, and directory assistance operations.

LASD has a large and full service printing facility, as well as wood, sewing, wheel chair repair, signage, bicycle shops as well as providing inmates opportunities to work in plastic bag manufacturing, commercial embroidery, pet grooming, and commercial landscaping. Such programs are but a small representation of programs that are constantly being developed and offered to inmates. Such programs are not for all inmates and demand for slots often outstrip demand but they are an important segment of the broader EBI offerings.

*Cognitive Behavioral Life Skills Therapy Courses*

These 6 to 8 week courses are offered by community volunteers as well as specially trained LASD deputies and custody assistants and are available in every jail facility throughout the County. The format of these courses is primarily interactive with staff and community volunteer facilitators interacting directly, openly, and frequently with great candor with inmate participants.  As the partial list of courses reproduced from LASD materials indicate, the evident goal of such training is to

13

assist inmates in understanding and addressing emotional, interpersonal, and other behavioral factors that, if effectively managed, could halt the revolving door relationship that many inmates have with incarceration. These address not only interactional challenges with others but also basic life skills that impede satisfactory employment, family management, and day to day living skills that most citizens take for granted. As described in LASD material:

*EBI Managed Cognitive Behavioral Therapy Courses*

> ***Changing How We Think:*** *Students learn how our internal thoughts affect our feelings, not external things like people or events. By changing how we think, we can change how we feel and behave.*
>
> ***Domestic Violence:*** *Helps students understand what constitutes an abusive relationship and how to develop the skills necessary to resolve conflicts constructively.*
>
> ***How to Get a Job:*** *Teaches students the basics of conducting a job search, preparing a resume, and participating in a job interview.*
>
> ***Education is a Way of Life:*** *Offers an overview of how to obtain a basic GED and enroll in college courses, as well as how to access resources available to students, including local libraries and other services in their communities.*
>
> ***Substance Abuse Education:*** *This course covers the physiology and psychology of substance abuse, including the effects of drugs and alcohol on the mind and body, and strategies for quitting.*
>
> ***Leadership Training:*** Offers the basics of individual and group leadership, including the importance of values, ethics, and attitudes.
>
> ***Interpersonal Communication:*** Discusses the interpersonal communication process, including verbal and non-verbal language, conflict management, and causes of miscommunication.
>
> ***Conflict Resolution:*** This course focuses on how to manage and resolve interpersonal conflicts, including managing our responses, achieving rapport, taking perspective, and managing emotions.
>
> ***Anger Management:*** Helps students understand how to recognize and control emotions, resolve conflicts, and improve interpersonal relationships.

In addition to community volunteers and LASD staff, these courses include student interns from all levels of higher education in the community. An ancillary benefit of this inclusion is that it familiarizes a key segment of the community with the problems of those incarcerated, both inmates and staff, thus realizing the Department's commitment both to community based policing and to *community based custody*.

*Innovative EBI Programs*

As part of its newfound enhancement and expansion of EBI, LASD has expanded upon existing programs as well as innovated in a fashion that sensitized us to the value of increased attention to and assessment of particular programs. We spent an appreciable amount of time on site visits to these select programs, interviewed repeatedly those responsible for their leadership, design, and execution while at the same time meeting with legions of inmates, sometimes one-on-one, in classroom settings where we interacted with them and their instructors. At other times we met in focus group fashion with larger groups of inmates, at times including as many as 100 inmates both male and female. [2]

## Maximizing Education Reaching Individual Transformation (MERIT)

The MERIT program is regarded by LASD as one of its flagship offerings as well as one of its most innovative within the EBI overall program. It actually predates the formal EBI initiative as it was started in 2006 at the South Facility. Today there are 14 barracks (90 beds per barrack) with a total bed capacity of about 1,260 at the South Facility. At the Twin Tower Correctional Facility, there are 12 pods with a total bed capacity of about 400 beds.

---

[2] We were sensitive to possible attempts by LASD management personnel to control, limit or restrict our access to documentation, to LASD employees, and most significantly to inmates. In every instance our inquiries were met with courtesy, genuine attempts to allow unfettered access to inmates both those whom "management" suggested we talk to, but no less so than to inmates that we would single out at random for further engagement usually beyond the hearing of LASD personnel. LASD is to be commended for its cooperation with our evaluation effort.

15

MERIT typifies the Department's commitment to community-based custody by involving numerous community agencies and individuals that share its commitment to EBI. The program has become well publicized throughout LASD's custody facilities and there is keen competition amongst inmates to be admitted to this program despite its rigor and the high expectations expected of its participants by the LASD officials managing in.

The key attribute of MERIT is not so much the programs and work assignments for the inmates, but rather the requirement that inmates are assigned to specific housing units. In so doing, it is hoped that the positive behavior and attitudes that are developed in the programs and work assignments are reinforced and sustained through staff and inmate interactions. Entry into MERIT and the specialized housing units occurs through three mechanisms:

1. *General population referrals from inmate dorms and inmate request forms;*
2. *Veterans' organizations such as the Veterans Administration, U.S. Vets and Volunteers of America (VOA); and,*
3. *Court orders by the sentencing Superior Court judge*

Perhaps the most noteworthy of the three paths of entry into the program is the third. The fact that the program has become so well known and respected that some 30 judges are sentencing defendants directly into the program is an indication that its architects must be doing something right. Indeed, LASD's EBI leadership has a close working relationship with both the Public Defender and the District Attorney's offices.

It is relatively uncommon that contending parties in the criminal justice program are the same side and thus the prominence and respect earned by the MERIT program within the justice system are especially significant and noteworthy. Given the commitment to the program by the leadership of LASD, as well as the excellent reputation it enjoys with the legal community, the community at-large including the families of inmates, and throughout the inmate populations as well, we decided to focus special attention on this program as part of our evaluation.

16

In general terms the progression of the program is detailed below:

*Potential students are recruited out of the General Population dorms by MERIT Masters students. Those accepted into MERIT Beginnings then take an initial six-week course. The Beginnings course acts as a feeder for the succeeding levels and courses. Students successfully completing Beginnings then proceed to the Life Skills course;*

*Life Skills course, a twelve-week series emphasizing career, commitment and relationships. When students graduate from the Life Skills courses, they become eligible to apply for the Advanced Masters Program;*

*Advanced Masters Program. Candidates are then selected by oral exams. Those not selected for the Masters Program can opt to stay in a MERIT dorm and continue the development of their Exit Plan.*

*Graduates of the Masters Program can then teach students in Beginnings, or return to General Population dorms to teach and/or recruit new entry-level students, while serving the remainder of their sentences.*

*The final stage of the Progression is MERIT Continuum, a post-release group that meets once a week with various community services and faith-based organizations that provide a safety net to these former MERIT students.*

## Field Observations of the MERIT Program

During site visits, extensive tours of the South Facility at the PDC and Twin Towers were conducted.  At both facilities, housing units have been converted into a virtual residential campus where student-inmates live, work, study, and interact together under the supervision of specially trained deputies.  One of the unique units at Twins Towers is a special unit for ex-gang members who have renounced their gang affiliation and others requiring protective custody.

 What follows are excerpts from our field observations at the South facility which today is considered to be the most established component of MERIT.

The first person encountered upon early morning arrival at the facility was a young man dressed in civilian clothes most notably a sweater vest and a tie. Decidedly professorial in demeanor and appearance, we were surprised to learn that we were being met by none other than an LASD Deputy from the

17

MERIT Program at South Facility. The ambience of this facility was decidedly different from that at the numerous LASD and other correctional facilities we were accustomed to visiting over the years.

And as I waited I overheard a conversation in the outer office between two deputies. Apparently one of the inmate-students had lost his glasses and the deputies were discussing what to do about it. In a traditional custody environment the concern with an errant eyeglass lens would be that it might be sharpened and turned into a weapon. Not here.

As the two deputies spoke I heard genuine concern in their voices as they noted that without his glasses the inmate would not be able to see the blackboard and thus to participate fully and meaningfully in class!

Overhearing the conversation, a civilian employee joined in and reported that she had a box of unclaimed eyeglass frames and perhaps these would help. The deputies responded by noting that this was a lens rather than a frame issue and for a solid 10 minutes they discussed ways to ameliorate the problem so this single inmate could attend class with his classmates! It was clear from the outset that the entire focus of the MERIT effort, its culture, and its atmospherics are very different from what one usually encounters in a custody setting.

The attitudes of these veteran custody deputies who can quickly become immune to the problems of inmates whom they can regard with indifference and cynicism, was in fact one of genuine empathy and concern. And as they spoke I realized that their concern and interest was as much about the integrity and effectiveness of the MERIT Program as it was about the problem of a single inmate. These deputies cared deeply about the program of which they are part and in its success lay personal and professional gratification for them as well measured in achievement by their inmate charges.

I soon began a brisk escorted walk around South Facility and was invited to see anything I wished. Inmates freely related to me in large focus group settings where I met dozens of them in different stages of the MERIT Program, as well as in smaller group and in individual meetings.

These and other field observations at Twin Towers suggest that these inmates at this moment and at this time were making a genuine effort to grapple with lives that had long ago gone off the rails. They recognized in their comments to us that they have much to be ashamed of and to regret. But they also hope that a better future exists and that their odds of succeeding, no matter how poor, are statistically better with the help of MERIT.  Put differently, all available research indicates that these

18

inmates were trying to buck the odds which suggest further offending and repeated bouts of incarceration is the norm for this deeply at risk population.  The inmates themselves are well aware of the uphill course of their individual and group struggles.

Although the core curriculum for the program itself is not unlike other self help programs for inmates and others, the atmosphere of the program differs significantly and this can be attributed in large part to conscientious and principled leadership, significant support from LASD's EBI "home office" and its top management, and successful acculturation of LASD sworn deputy staff assigned to the program, a brave new world of treating inmates with respect as "inmate-students."

In the course of our due diligence on the MERIT program one of us visited a 95+ inmate life skills class. Although sitting in very close quarters with one another, several noticeable qualities emerged. First and foremost, inmates did **not** sit together based on race. African-American, Latino, and white inmates were completely integrated and there was no evidence of the racial or ethnic bunching that is so common in most custody facilities where these groups have their own exercise domains, bunking arrangements, and even pay telephone access. The class visited was selected at random and the seating arrangement, non-arrangement in fact, was commonplace and everyday.

The classroom itself was festooned with military flags signaling the type of order, focus, discipline, and self-pride more characteristic of the Marine Corps than a custody facility. Yet even the interior decoration in such classrooms helps to create a feeling and in this case even an *esprit de corps* that characterizes the MERIT program in which pride in participation is part of the tool kit disbursed to its participants. In addition to the military flags there was a generous array of inspirational posters throughout all of the classrooms that were meant to be uplifting and encouraging.

19

When students wish to speak they politely raise their hands and wait to be called upon by their instructor. The instructors themselves appear in their comments neither to condescend to the inmates nor to glorify them (we have all met naïve inmate groupies in our custody related research efforts). There is palpable mutual respect between the inmates and their instructors and the discussion is realistic, practical, and goal oriented. To collect data for this report one of the authors spent some 20 minutes in an open and non-scripted exchange with the inmates. All of the inmates are provided note-taking materials and all of them were taking copious notes.

The term, "rebirth" is frequently used and indeed it is an apt metaphor for what these inmates and their instructors are trying to achieve. In my exchange with the inmates, one of the things I asked is how could they be so optimistic in the face of daunting odds, a weak external job market, a very soft economy, and an external society with little interest in or concern about former offenders. The responses were thoughtful and realistic. They decidedly were not robotic or scripted and many of the inmates even had a wry sense of humor about their dilemmas and their future prospects. Inmates frequently referred to what they termed "our program" and there was a pride in ownership and in participation. There was significant discussion about tattoo removal, having "hope for a better future," "standing on one's own feet," "taking responsibility for one's own actions," having a "shared vision," and the like. Many of them were confident that they would find jobs, deeply cognizant of how far they had come and how far they still had to go, and we encountered no evident hostility to staff, a rare thing in most custody facilities.

One powerful and important tool that is central to the MERIT program is the family support group network. Family members of inmate participants meet amongst themselves in locales scattered around the County. To those of us deeply involved in custody issues it is axiomatic that family members "do time" alongside their inmate spouses, children, parents, and the like. Having family members on the outside deeply familiar with the program in which their loved one is involved inside is a

20

very powerful element of the *community based custody* approach now favored by LASD. One inmate broke down and wept as he recounted the costs born by his family as a result of his regularized incarceration. Apparently deputies involved in the MERIT program have themselves participated in some of the MERIT family support group activities. And some program graduates even keep in touch with MERIT staff after completing the program and being released.

While at South Facility, we observed classes for MERIT participants at all levels ranging from new recruits to Masters and the most elite group called the White Shirts who represent the most accomplished and senior MERIT participants. Visits to MERIT dormitories for inmate-participants at all levels provided a stark contrast to what is seen in traditional custody dormitories occupied by non-MERIT inmates. The dorms are neat and clean; people are not lounging around napping, but instead are reading, writing, and involved in other productive activity. For those long accustomed to inspecting or visiting custody facilities, there are certain atmospheric conditions that one can *feel* almost instantly but that are not always visible to the naked eye.

Inmates grouping themselves off by ethnic, clique, or "political" differences (political here refers not to Republican or Democrat but rather to *prison politics* defined by intra-custody forces and factors generally criminal in intent and execution) were in no way evident in the dorms that were instead beehives of constructive activity. Indeed, a visit to the dorm of the White Shirts, the most senior participants, revealed a setting almost reminiscent of a college dorm rather than a jail. As is usually the case in prison, the better the behavior, the deeper the trust and thus the more privileges for inmates. In the White Shirt dorm the residents have a refrigerator stocked with food which they can eat when they wish, a microwave, a library, computer access, and the like. Misbehavior by one inmate creates problems for the entire group and thus with so much at stake the inmates police themselves quite effectively.

We attended the weekly staff-White Shirt meeting in a cramped meeting room in

MERIT headquarters. There were 20 White Shirts and three Deputies in attendance and the discussion was free wheeling, open, but in no way frivolous. Many of the participants made it clear that although they wished to change throughout their criminal careers they lacked the necessary tools and self-awareness to do so. The inmates spoke passionately and in some cases quite eloquently about "inventing and shaping the program themselves," "discovering self confidence," "holding ourselves to a higher standard," "the love we get from staff (e.g. here they meant LASD deputies!) is important," "the program takes away excuses," "if you don't give back (e.g. become a constructive member of inmate society as a MERIT participant) you're coming back!", and the like. Again, it is important not to forget that these are convicted criminals. And a number of them were awaiting sentencing with some of them anticipating very long stays in state prison. But if they do their time in a more constructive way, can keep at a distance from prison "politics," can eschew violence both against one another as well as against staff then something of value is occurring within the LASD custody system.

Although a great deal more could be written about the MERIT program, it is quite clear that something innovative and important is being accomplished here. All is not smooth sailing however. There is resistance to the program both among some segments of the non-involved inmate population, especially a number of jail gangs who "tax" other inmates and have their own interests and are not afraid to exert pressure on fellow inmates, as well as by some deputies who need to be educated about the value of EBI in contrast to more traditional approaches based on enhanced incarceration and security but little else. EBI is a process not an event. And both the culture of the incarcerated and their keepers need to be changed. Having said that, a good beginning is in place and this program is certainly worth tracking and supporting as it moves forward.

Social Mentoring Academic and Rehabilitative Training (SMART)

As part of our review and assessment of LASD's EBI landscape, we visited this program headquartered at Men's Central Jail in downtown Los Angeles.  SMART is

22

described by LASD as follows:

> *The SMART program is another of EBI's unique flagship programs. Created thirteen years ago at Men's Central Jail, SMART has been and remains a pioneer and an internationally recognized model in dealing with the multiple issues experienced by gay and transgender inmates within the jail system.*
>
> *SMART was originally designed to protect vulnerable gay and transgender men from assaults and victimization by other inmates in the jails. The program then grew, through the creative leadership of its originators and their staff, from a protective segregation instrument into a complete, multidisciplinary educational program.*
>
> *Today, SMART occupies its own section of MCJ, including classrooms, libraries, study areas, offices for career and personal affairs counselors, and other services usually associated with community colleges or universities. The program now has a capacity of 280 students, and consistently operates near full capacity.*
>
> *As human rights for gay and transgender Americans have progressed in recent years, SMART has been gradually increasing its student body to include non-gay inmates who nonetheless suffer from similar risks of assault or violence when placed in the general population. The results of this integration are exceptionally positive.*

We met with the deputy that directs this program that is especially notable as it offers its programs in both English and Spanish. Sitting in on a class, we were able to ask the participants why they participated in the class as well as their impressions of it. Being a much shorter-term program than MERIT, the atmospherics we encountered suggested that inmates signed up for this less due to a deep interest in the topic and more to escape the boredom of day-to-day life in MCJ. Interestingly, the facilitator for that day's session, in Spanish, was a plumber who worked in the jail. Although originally skeptical about this individuals lack of formal training and thus ability to facilitate for the class, it became evident that as an "ordinary" working man and a productive member of society he might be a more appropriate and realistic role model for the average inmate than some sort of professional facilitator or educator who occupies a social plane vastly different from that of the average inmate.

The SMART program is currently trying to broaden its reach and its curriculum. Its focus on gay and transgender inmates makes good sense although there would also be significant value in imparting values of tolerance and understanding to the non-gay/transgender population about this key inmate sub-group. Staff of course would benefit from such training as well as evidenced by LASD's Core Values that are cited earlier in this report.

The facilities assigned to the SMART Program are modest and adequate. It has a dedicated classroom that is attractively painted, well lit, and clean. Adjacent to it are staff offices and other related facilities. LASD has garnered positive attention from the custody and legal community as a result of this program and indeed it is both innovative and well focused. It will be interesting to track its progress as it matures and becomes more deeply institutionalized.

Stop Hate and Respect Everyone (SHARE Tolerance Program)

This program is also focused on Gay and transgender inmates. It tends to be inmate driven and has sponsored such activities and classes as a biggest loser competition (several inmates mentioned that the combination of starchy jail food and inadequate opportunities to exercise make jail a "fattening place!"), math classes that are inmate taught, character matters classes, and the like. Each class is capped at 30 students and the only inmate complaint about the classes is that there are not enough of them. The deputy in charge of this program appears to be deeply respected by his charges who reported to us, with him out of earshot, what a wonderful leader he is. In very cramped quarters, this program seems very popular with its inmate participants. The Beverly Hills Courts directly sentence people to the Share Tolerance Program and the inmates with whom we spoke had a number of very interesting things to say about the program, none especially negative, as well as about "doing time" in a more general sense. An important insight for those deeply familiar with jail and prison culture is that inmates generally prefer to "do," state CDCR time rather than "county time." In state prison there are more programs, inmates have exercise time outside in common yards, and in general prisons are

24

better suited for longer term inmates than are county jails which were designed with shorter term inmates in mind. These factors are important to consider in light of AB 109. LASD is very proud of its accomplishments with Share Tolerance as expressed below:

> *Over the past four years, hundreds of SHARE Tolerance classes have been presented to inmate students in Men's Central Jail. Feedback from students has been enthusiastic, and the program is highly acclaimed for its ability to foster greater insight, understanding, and self-reflection regarding the issues of hate and intolerance in our communities. Many students suggest that all inmates in the Los Angeles County jail system should participate in SHARE Tolerance prior to re-entry into their communities.*
>
> *In light of the proven success of the program, a SHARE Tolerance classroom has been created at Century Regional Detention Facility (CRDF) to accommodate presentation of the program to our female inmate population. Further, the Education Based Incarceration Bureau has planned the expansion of the custody version to include all four facilities within the Pitchess Detention Facility (PDC) complex as well as the Twin Towers Correctional Facility.*

At this stage this inexpensive and innovative program appears to be working well as it occupies a new and badly needed niche within the EBI universe.

Other Programs and Other Populations

In the context of collecting data for this assessment, we visited other programs and also spent considerable amounts of time meeting with female inmates. Suffice it to say that the EBI network is growing in leaps and bounds as LASD works hard to get its arms around an increasingly complex and challenging custody universe. Parenting programs, more programs focused on families, drug and alcohol rehabilitation programs, employment and job training, community transition programs and of course all of the elements of a community based custody program would benefit from more personnel, resources, and inmate as well as staff acculturation. The balance of this report includes some brief personalized individual case studies of former inmates who have gone through some of these EBI programs. It then concludes with an analysis of the impact of EBI focusing on such metrics as jail safety for inmates and staff, the perennial challenge of recidivism, and costs.

## Portraits of MERIT Participants

During the course of the study we conducted over 75 individual interviews with inmates who were actively involved in the MERIT programs.  Both women and men were interviewed to gain a perspective of who these inmates are in terms of their criminal records, family backgrounds, drug and alcohol usage, mental health needs, and the types of programs they were receiving via EBI.  These interviews were conducted at Twin Towers (men and women),  Century Regional Detention Facility (women only), and the PDC South Facility (men only).

Our interviews show that these people come from all walks of life and backgrounds ranging from habitual drug use, gang members, repeat offenders as well as people experiencing their very first time in jail.  Many have lengthy non-violent criminal records while others have been charged and or convicted of assault and robbery.

If there are two common elements it is that they want to change their lives for the better and they want to do their time in a safe and secure environment.  Its fair to say that in our opinion none of these people seemed to pose a threat to other inmates and if released could be safely managed in the community under proper supervision and treatment.   Finally, with very few exceptions, they spoke very highly of the program and staff.  What follows are some specific case studies that illustrate the EBI participants. We have sorted them by categories that reflect their criminal record, current charge  or sentence, and legal status

*Typical Sentenced AB109 Cases*

> Case #1 – Incarcerated Mother
>
> Candace A. is a 26-year-old woman of mixed Hispanic/Native American heritage serving her sentence at CRFD. She was sentenced to a four-year sentence for identity theft and fraud and expects to serve half of this sentence before being released. Candace has been arrested more than 5 times and has been given probation on three occasions. She has never been sentenced to state prison and has no strikes.

Candace is currently involved in the MERIT and ABC programs as well as working with the paint crew. She has been in these programs for 3 months and finds them beneficial and useful. She is critical of others in the program who take it less seriously than does she, but notes that such people are weeded out over time. She chose the ABC program as she wishes to spend more time with her daughter who visits her on a weekly basis. Her family is aware of her involvement in these programs and is supportive of her involvement.

Her primary criticism of the program is the absence of wider ranging parenting classes while the life skills classes should be more intensive and in depth. She believes that her involvement in these programs will help to keep her out of jail in the future.

<u>Case #2 – Anger Management</u>

Mario G. is a 38-year-old Hispanic male at Twin Towers serving a 6-year sentence for selling heroin and meth. He is in the protective custody unit where he is enrolled in a character development class. His security classification is K-8, which may suggest a propensity for violence.

His program activity is 7 hours per week and he has been in the program one month. He has served prison time and completed a 1 year sentence at Corcoran. Mario was recruited to his program by a deputy and likes the program as he believes it "is positive, channels negativity, and hostility." Yet despite his praise for the program, he complains that it cuts into his sleep time despite his being involved only a few hours per week.

When asked about other types of programming he would be interested in, he had few thoughts on this issue and although cooperative and helpful it is clear that the programming available to him may not reflect his genuine needs both in terms of focus and scope.

*Serious Crime - First Time Offenders*

<u>Case #1 – Domestic Affair</u>

Louis is a 52 year-old male who is awaiting trial for attempted murder. He says that he discovered his wife with another man and stabbed him. He has been continuously in custody for over 460 days. His bail is set at $1 million. He has never been arrested before.

Born in the Philippines, he immigrated to this country with his parents many years ago. He earned undergraduate and graduate degrees in business administration. He remains married and has two sons.

Due to his educational background, he has been assigned by EBI staff as a MERIT Teacher – a position he has held for over one year.  He was approached by EBI staff while assigned to Twin Towers to become involved in MERIT as a Teacher which he quickly agreed to do.  He has been disciplinary free since his incarceration began.

During a typical week he teaches other inmates in a variety of classes with special focus on computer skills about 40 hours per week.  His view of the program is very positive.  He feels the curriculum is well organized and that it seeks to drive out the "typical jail mentality" that plagues other housing units.  He also noted that EBI is being opposed by the gangs who are unable to "tax" fellow gang members who renounce their membership to become part of EBI.

In terms of recommendations, he would like to see more consistency in the program policies, as they seem to change on a regular basis in terms of the programs and hours assigned for each program.

Case #2 – Bad Investment

Jenny is a 59 year-old, Asian female who is serving a five-year sentence for grand theft.  She said she was convicted of using her company's funds to pay for an overseas Nigerian embezzlement scheme that she was lured into. She has never been arrested before.  She has been in the jail for about two years and will be released later this year.

Born in Taiwan, she was employed for many years by her previous employer. She is divorced and has a single daughter. Like other women, she was originally assigned to CRDF (Lynwood) and then transferred to the TT EBI program. She is well educated, but speaks broken English.

Since being assigned to EBI, she has quickly completed the computer and education classes which have also helped her with her English. But with less than a year to serve, she has "run out of classes".   She is now taking American bible classes and working with other female inmates who are similarly interested.

She is very positive about the program saying that it provided a safe place to do her sentence.  The education programs have been good and she speaks highly of the instructors.  Her only complaint is the lack of organized religious services to participate in on Sundays.

28

*Habitual Offenders Ready to Quit*

Case #1—Is Rehabilitation Possible After 40 Plus Bookings?

Jerry is a 45 year old African-American male.  He was convicted for possession of a controlled substance.  Jerry has been recidivating since age 18, and has been booked over forty times with twenty plus prison sentences. His latest booking date was July 23, 2012; Jerry is scheduled for release July 13, 2014.

One of the officers encouraged Jerry to participate in the EBI program.  Jerry wants to learn a trade, so that he can do something with his life, so he agreed to participate in the program.  Jerry is thankful that there is no gang politics once you make the decision to participate in the program because the structure of the program is calm.  He says that the program is a learning environment and the *Life Skills* course teaches you how to function in society. Jerry says that the EBI program currently does not offer enough classes and that there is one teacher.  Construction is one of the main classes offered, but Jerry doesn't see himself doing manual labor at this stage in his life.  Jerry is very proud of the certificate he earned from his computer course however. He hopes to be able to use the certificate to get a job because it shows that he has "learned the basics".

Jerry is unmarried and his parents are not around.  Upon his release, he looks forward to reapplying for SSI and entering a structured program for housing. He touted that the After MERIT program will provide further support upon his release.  He says that the EBI program works if you apply it.

Case #2—Getting Ready for Release

Gerald is a 29 year old Hispanic American male of Nicaraguan descent. Gerald has over five bookings and three prior state prison sentences.  Gerald has been detained since May 17, 2012 for sales of methamphetamine.  He will be released with no supervision requirements within three days.

Gerald reports that he did not choose the program, but that he was transferred to this unit by officers.  Gerald is glad that he was transferred because he knows the program will help him upon release because he says that his participation in EBI has enhanced his communication skills including increased sociability, better interaction, and less isolation.

He reports there is not as much tension in the unit as in other units, the inmates are more open, and that inmates share their personal stories which are sometimes touching.  He says that the inmates like the program and the overall sentiment is that everyone wants to be in EBI; however, he says the program needs more facilitators and teachers and more materials and

courses to follow more of a true school format.  He also reports as a side note that the inmates are interested in tattoo removal.

Gerald has parental support and says that his parents have done research on his after care and support.  Gerald hopes the program will help keep him out of jail, but he says ultimately it will be up to him.

*Young and Educated Drug Offenders*

Case # 1 – Need to be A Better Mother

Jayda is a 31 year old black female; she was convicted of transportation of drugs and identity theft and was sentenced to three years in the Los Angeles County Jail system. She has had approximately eight prior jail bookings and has never served a California State Prison sentence.

She was born in the USA and has lived a middle class lifestyle. She reports a four year degree from Columbia University with a major in sociology. She became pregnant at the age of 18 years and consequently has a 12 year-old son. Jayda's soft – spot appears to be her love for her son.  As an example, she has hidden the fact that she is incarcerated from him. Her focus was parenting roles for her son. She claims she has an excellent family support system, her father is caring for the son and the father is passing on the family business to her.

Jayda was immediately assigned to the EBI program as a '"MERIT Master" (EBI Teacher). She teaches aerobics and she substitutes for absent teachers. She provided no excuses for being incarcerated. She said she found use and sales of drugs, exciting, hip and satisfying.

Jayda said, the jail experience coupled with EBI counseling has been a deterrent for her. Interviewers asked what can be done to prevent narcotics use and abuse. She said it was difficult to think of deterring factors, however perhaps counseling by others like her who have had negative life experiences would be the most effective.

Case # 2:  Will Deterrence Plus Counseling Work?

Joe is a 31 year old black male; he was convicted of an undercover purchase of drugs and was sentenced to three and one-half years in the Los Angeles County Jail system. He has had approximately twenty prior jail bookings and has served two prior California State Prison sentences.

Joe was born in the USA and he reports he has achieved University level courses in Business Administration in the State of Ohio. He has lived in Ohio,

Florida, Georgia and most recently here in the Los Angeles area. His mother has moved to Los Angeles and has only lived in the southern California area for approximately one year. Joe's soft – spot appears to be his concern for his mother. As an example, several times he mentioned she was living in the crime-ridden area near the Staples Center.

Joe reports that his current arrest was made through an undercover officer encouraging him to purchase narcotics. It appears education and a job would encourage him to stay out of jail and become a viable factor in the community. He said he selected the EBI program because this is all the Sheriff's Department offered for additional education and he was attracted to the program because he wanted some college training. Joe said the strengths of the EBI program are in classes related to computer skills i.e. typing Excel and Word and programs developing job skills.

Joe said the jail experience coupled with EBI counseling has been a deterrent for him. Interviewers asked what can be done to prevent his future narcotics use and abuse. He said community support and the promise of a job once he is released would be an effective deterrent for him.

## Quantitative Assessment of EBI

The remainder of this report provides a statistical analysis of EBI on two basic levels. First, we provide data on the attributes of people who are currently enrolled in the basic EBI programs as described above. The second level of analysis looks at the rates of significant misconduct for those portions of the LASD jail system that have been designated as EBI facilities and/or dorms.

*Who is In EBI and how do They Compare with other Inmates?*

The current EBI program is not yet fully integrated in the Sheriff's inmate data system. So, in order to conduct quantitative analysis, special data collection is required. For this study and to answer the fundamental question of how many inmates are participating in EBI and their key attributes a complete manual census of the LASD detention population was taken during the first week of April, 2013. This tedious process entailed all of the EBI instructors and staff recording who was enrolled in an EBI class during that specific week. If the same inmate was enrolled in more than one program during that week, he or she was only recorded once but

31

each program was recorded.  Based on this week long survey we were able to ascertain a comprehensive count of the current EBI population.  At the same time we're also able to identify inmates who were not assigned to EBI by comparing the snapshot data files for March 1, 2013 and April 1, 2013 which were provided to us by the LASD.  The resulting number is shown in Table 1 which shows that there are about 3,800 inmates in EBI at any given time.  This number represents 20% of the current LASD detention population.  The table also shows that we were able to match on the vast majority of these cases with the more detailed LASD  snapshot data file.

To further supplement the census survey data, we developed systematic random samples from the 3,492 EBI snapshot population stratified by gender.  The intent here was to get more precise measures of pre and current inmate conduct and program participation information which is not available from the other LASD data systems. The totals were 499 males and 150 females.

**Table 1.**
**Summary Of Jail Populations And Study Samples**

| Populations | N | % |
|---|---|---|
| Total Jail Population as of March 1, 2013 | 18,565 | 100% |
| April Survey of EBI Participants | 3,804 | 20% |
| Matched with LASD Data System | 3,492 | 19% |
| Special EBI Sub-Samples | | |
| Males | 499 | NA |
| Females | 150 | NA |

The first level of comparisons was between the EBI and "other" or non-EBI participants who were participating in EBI when the census was taken.  To create the "other" group we used the March 1, 2013 snapshot file and identified all inmates who were not in the April EBI census. This produced a population of 16,364 inmates who were not identified in the EBI census. Note, that the two samples total 19,800 which is about 1,000 above the typical daily population in the jail.  The over-count is produced by the fact that some of the inmates in the March 1, 2013 data file could

32

not be identified as EBI in April as they had been discharged from the jail before they could participate in EBI.  Also note, that some inmates who are in the "other" group may later become involved in EBI.  But despite these imperfections in establishing a "pure" non EBI group, the two samples provide some useful comparisons between EBI and non-EBI inmates.

Table 2 shows these comparisons on some key demographic attributes. The EBI participants are, compared with non-EBI inmates are disproportionately female, charged with a felony, slightly older and have been in custody for a substantially longer period of time.  The longer period of incarceration and higher number of persons convicted or charged with a felony is related to the fact that many of the EBI inmates have been convicted as an AB109 inmate.

All of these comparisons show that the EBI inmates are not "light-weight" inmates. They are charged or convicted of serious crimes and are classified as medium custody or higher.  There is no racial bias in the selection process although there is a higher proportion of women participating in EBI as compared to the total inmate population.

In terms of program and work activities, the EBI inmates are all involved in some work and/or program assignment.  Of the 3,482, they are involved in a total of 7,151 programs and work assignments (or more than 2 per inmate).  These numbers substantiate the EBI interviews that show that virtually all the EBI inmates are involved in multiple programs and/or work assignments.

33

**Table 2.**

**EBI Inmates Compared To Other Inmates March 1, 2013  Jail Population**

| Demographic | EBI | | Other | |
|---|---|---|---|---|
| | N=3,482 | % | N=15,320 | % |
| Sex | | | | |
| Female | 761 | 22% | 2,009 | 12% |
| Male | 2,721 | 78% | 13,311 | 81% |
| Most Serious Charge Level | | | | |
| Felony | 3,355 | 96% | 13,617 | 83% |
| Misdemeanor | 88 | 3% | 1,090 | 7% |
| Unknown | 39 | 1% | 613 | 4% |
| Race | | | | |
| Black | 1,070 | 31% | 4,896 | 30% |
| Hispanic | 1,547 | 44% | 7,377 | 45% |
| White | 712 | 20% | 2,478 | 15% |
| Other | 153 | 4% | 569 | 3% |
| Facility | | | | |
| CJ | 464 | 13% | 3,802 | 23% |
| CRDF | 418 | 12% | 1,919 | 12% |
| ESTF | 334 | 10% | 1,277 | 8% |
| NCCF | 502 | 14% | 3,419 | 21% |
| NORF | 293 | 8% | 775 | 5% |
| OUTP | 16 | 0% | 160 | 1% |
| SOUF | 902 | 26% | 517 | 3% |
| TTCF | 553 | 16% | 3,437 | 21% |
| Current Age | | | | |
| 25 or younger | 807 | 23% | 4,499 | 27% |
| 26-35 | 975 | 28% | 4,597 | 28% |
| 36-50 | 1,188 | 34% | 4,195 | 26% |
| 50+ | 512 | 15% | 2,029 | 12% |
| Avg. LOS (days) | 483 | | 206 | |

34

**Table 3.**
**EBI Compared To Other Inmates**
**March 1, 2013  by Most Serious Charge**

| Most Serious Charge | EBI | | Other | |
|---|---|---|---|---|
| | N=3,482 | % | N=15,320 | % |
| Murder/Manslaughter | 205 | 6% | 1,447 | 9% |
| Sex | 52 | 1% | 775 | 5% |
| Assault | 160 | 5% | 963 | 6% |
| Robbery | 158 | 5% | 1,014 | 6% |
| Other violent | 341 | 10% | 2,056 | 13% |
| Drug sale | 704 | 20% | 1,668 | 10% |
| Drug possession | 329 | 9% | 1,350 | 8% |
| Burglary | 503 | 14% | 1,637 | 10% |
| Theft | 559 | 16% | 1,778 | 11% |
| Fraud/Forgery | 117 | 3% | 312 | 2% |
| Weapon | 90 | 3% | 476 | 3% |
| Other property | 39 | 1% | 302 | 2% |
| DUI | 79 | 2% | 318 | 2% |
| Parole violator | 48 | 1% | 591 | 4% |
| Other non-violent | 98 | 3% | 633 | 3% |

**Table 4.**
**Classification and Legal Status of the EBI vs. Other Inmates**
**March 1, 2013  Jail Population**

| | EBI | | Others | |
|---|---|---|---|---|
| Class Level | N | % | N | % |
| Minimum | 390 | 11% | 1752 | 11% |
| Medium | 2,973 | 86% | 11857 | 72% |
| Maximum | 129 | 4% | 2486 | 15% |
| Sentence Status | | | | |
| Pretrial | 753 | 22% | 5,568 | 34% |
| Partial Sentenced | 501 | 14% | 3,514 | 21% |
| Sentenced | 2,238 | 64% | 7,282 | 45% |
| AB109/N3 | 1,974 | 57% | 4,031 | 25% |

In terms of the types of programs or work assignments, large percentages participate in life skills, computer science, and MERIT Masters assignments. There are a large number of EBI inmates who have work assignments in the day and then participate in whatever programs can be afforded them in the evening (37%).

**Table 5**
**Total Class Participation EBI Inmates April 2013**

| Programs | N | % |
|---|---|---|
| AA | 229 | 3% |
| Catholic services | 46 | 1% |
| Computer Science | 585 | 8% |
| English as 2nd Language | 46 | 1% |
| GED/Education | 356 | 6% |
| Laundry | 233 | 3% |
| Life skills | 2,558 | 36% |
| MERIT masters | 428 | 6% |
| Work Plus Services | 2,670 | 37% |
| Total | 7,151 | 100% |

Using the smaller sample that allows for a more precise listing of the primary work or program assignment shows the same patterns. However, when broken down by gender, it's clear that the women are more involved in computer science programs and less likely to obtain MERIT Master status.

36

**Table 6.**

**Audit of EBI Inmates Primary Work or Program Assignment By Gender**

|  | Males | | Females | |
|---|---|---|---|---|
| Programs | N | % | N | % |
| AA | 20 | 4% | 1 | 1% |
| Computer Science | 38 | 8% | 64 | 43% |
| English as 2nd Language | 10 | 2% | 0 | 0% |
| GED/Education | 27 | 5% | 10 | 7% |
| Laundry | 35 | 7% | 0 | 0% |
| Fire Camp | 51 | 10% | 0 | 0% |
| Life skills | 160 | 33% | 39 | 26% |
| MERIT Masters | 36 | 7% | 0 | 0% |
| Other | 228 | 46% | 36 | 24% |
| Total | 499 | 100% | 150 | 100% |

Source: LASD EBI Survey data.

## Jail Safety

What can be said about the level of safety within the jail system that can be attributed to EBI. To answer this question we received from the LASD the official number of assaults on staff and inmates that have occurred between 2008 and 2012. These data are linked to specific facilities and housing units and/or facility locations. As shown in Table 7, a total of 9,406 assaults occurred over this five year period. These assaults are then converted to rates per 100 inmate population per year. The overall rate is 10 per 100 inmates. The lowest rates are at the CRDF women's facility, Mira Loma where INS detainees are kept and the South facility where large numbers of EBI inmates are assigned.

Table 8 updates this information by only looking at assaults that occurred in 2012 and removing the numbers for Mira Loma which was in the process of being closed.

37

**Table 7.  Inmate on Inmate Assault Rates 2008-2012 By Facility**

| Facility | Frequency | Percent | Average Daily Population | Rate Per 100 Inmates Per Year |
|---|---|---|---|---|
| **CRDF** | **507** | **5.4** | **1,909** | **5.4** |
| EAST | 935 | 9.9 | 1,656 | 11.2 |
| IRC | 658 | 7 | 371 | 35.4 |
| MCJ | 2,190 | 23.3 | 4,574 | 9.6 |
| **Mira Loma** | **147** | **1.6** | **1,001** | **3.0** |
| NCCF | 2,534 | 26.9 | 3,789 | 13.4 |
| NORTH | 320 | 3.4 | 687 | 9.4 |
| **SOUTH** | **363** | **3.9** | **1,159** | **6.2** |
| TTCF | 1,750 | 18.6 | 3,498 | 10.0 |
| | | | | 0 |
| Total | 9,406 | 100 | 18,644 | 10.0 |

Source: LASD assault data file

**Table 8. Inmate on Inmate Assault Rates 2012
By Facility and Location Type**

| | Assaults | % | ADP | Rate Per 100 Inmates |
|---|---|---|---|---|
| Facility | | | | |
| NORTH | 19 | 0.8% | 507 | 3.7 |
| SOUTH | 99 | 4.3% | 1,396 | 7.1 |
| CRDF | 152 | 6.6% | 2,033 | 7.5 |
| MCJ | 520 | 22.7% | 4,624 | 11.2 |
| TTCF | 479 | 20.9% | 3,719 | 12.9 |
| EAST | 226 | 9.9% | 1,692 | 13.4 |
| NCCF | 663 | 29.0% | 3,744 | 17.7 |
| IRC | 127 | 5.6% | 310 | 41.0 |
| Location | | | | |
| Cells | 15.8% | 361 | NA | NA |
| Dorms | 60.6% | 1,385 | NA | NA |
| Other | 23.6% | 541 | NA | NA |
| | | | | |
| Total | 2,287 | 100.0% | 18,051 | 12.7 |

Source: LASD assault data file

38

The 2012 data shows the same pattern where the low assault rates are occurring at the women's facility, South and the newly opened North facility. So, there is some preliminary evidence that EBI inmates at the South facility have lower misconduct rates than other similarly situated inmates.

This table also shows the location of the inmate on inmate assaults. Not surprising, the vast majority occur in housing units and more specifically in the dorms (61%). The high number of inmate on inmate assaults in the dorms underscores the importance of MERIT where entire dorms are populated by EBI inmates.

A second level of analysis looks at the assaults that are occurring by location. Since the MERIT program seeks to concentrate EBI participants in specific dorms or housing units what can be said about the number of assaults occurring in those units?  Table 9, looks at the assaults that occurred at the South Facility by those inmates assigned to the MERIT Masters and Beginning MERIT barracks.  Here, one can see that the MERIT Master's barracks have extremely low assault rates. The Beginning MERIT barracks have a higher rate but well below inmates at South who are not assigned to MERIT.

The same analysis is done for the Twin Towers facility which also has dedicated MERIT housing units for males and females.  The pattern is similar to the South Facility.  The MERIT housing unites have rates well below the overall rate for the Twin Towers facility although the rates are higher than for the South facility. The higher overall assault rates for Twin Towers is no doubt due to the fact that higher security inmates are assigned to that facility as compared to the South and all female Century Regional facility.

39

**Table 9.  Assault Rates By Facility by Housing Units**

| Facility | Assaults | ADP | Rate Per 100 Inmates |
|---|---|---|---|
| South Facility | | | |
|   MERIT Masters Dorms | 4 | 250 | 1.6 |
|   MERIT Beginnings Dorms | 27 | 900 | 3.0 |
| Total South | 99 | 1396 | 7.1 |
| | | | |
| Twin Towers | | | |
|   Male | | | |
|     MERIT Masters Units | 8 | 96 | 8.3 |
|     MERIT Beginnings Units | 6 | 106 | 5.7 |
|   Female | | | |
|     MERIT Masters Units | 8 | 96 | 8.3 |
|     MERIT Beginnings Units | 8 | 106 | 7.5 |
| Total TTCF | 479 | 3,498 | 13.7 |
| | | | |
| All Facilities | 2,308 | 18,051 | 12.8 |

## Summary

The initial evaluation of the EBI and more specifically MERIT initiative is generally positive.  Field observations of the program at the various facilities where it has been operational show that the program has fundamentally altered the culture and nature of imprisonment within the LASD. These positive observations are also supported by interviews with a representative sample of inmates who are participants in EBI who feel that important services are being provided that should help them prepare for their inevitable release from jail.

The quantitative analysis shows that nearly 4,000 inmates are in the EBI program at any given time.  These EBI participants are not some "cherry picked" subgroup of inmates, but contains people convicted of violent and non-violent crimes, long and minimal prior records, and extensive drug abuse histories. What does set them apart is a desire to make amends for their crimes and reduce the chances that they

40

will return to jail.

The quantitative analysis, field observations and interviews all point to the same central finding that EBI, and MERIT in particular, provides for a very safe place within a sprawling jail system that has had its full share of violence in the past.

The extent to which EBI can reduce recidivism remains unknown.  But it is now possible and desirable to conduct such a study to see if EBI is reducing re-arrest or re-incarcerations.  Such a study would be based on comparing pre and concurrent cohorts of released inmates who are comparable to EBI  and in particular the MERIT graduates. It is the latter group that has received the fullest "dosage" of EBI and probably has the greatest likelihood of showing a positive impact on recidivism and other aspects of their lives.

Finally, EBI seems well positioned to become the primary method for identifying, programming and releasing inmates back to the communities form which they come.   This can occur as follows:

1. Upon admission to the IRC, pretrial inmates can be screened regarding their suitability and interest in EBI.  These inmates can then be assigned to specialized EBI dorms and housing units to begin their designated EBI programs and work assignments.

2. Prior to sentencing, pretrial inmates who have been in the EBI for a four week period and meet the agreed upon criteria for pretrial release could then be brought back to the court with a recommendation for supervised pretrial release (SPR) and/or placement in a community based treatment/residential bed.

3. Inmates who are not recommended or not granted SPR, would continue programming in EBI and being housed in the specialized EBI units.  These inmates will help provide stability to the housing units and a reliable work force for specific job assignments allocated to EBI.

4. At the time of sentencing, the EBI inmate will receive a status report letter prepared by EBI staff for the Judge that would be taken into consideration in terms of setting the most appropriate sentence. It would be assumed that such letters would increase the probability of the inmate receiving either a probation (non AB109) or split sentence (for AB109 cases).

41

5. Those inmates who will remain in custody under a split or full sentence would continue to participate in EBI for the purpose of receiving either the so called "milestone credits" or the two for one conservation/fire camp credits.

6. EBI inmates who are released either in pretrial or sentenced status would remain under the supervision of the EBI's community supervision and placement division. This unit would have access to community treatment and placement beds as well as the application of electronic monitors.

It is estimated that approximately 750 inmates in pretrial status and another 2,250 sentenced inmates could be safely supervised in the community if they are processed through the EBI program. If this could be achieved, then the number of beds required to house the LASD jail population would decline by approximately 3,000 inmates. At least 500 of this reduced population would be females.

The savings of such a program would be significant and would provide sufficient funding for an expanded EBI program. Table 10 illustrates the level of savings that would occur if the LASD population were reduced by a total of 3,000 inmates. In broad terms the averted costs would approach $127 million in operating costs per year. Clearly there would be increases in spending as EBI developed a community based capability that would include several hundred substance abuse, mental health, medical, and basic residency beds. It is beyond the scope of this report to fully estimate these additional costs but they would probably center on three items:

1. EBI post release field staff;

2. Contracted residential and specialized (substance abuse, mental health, and medical treatment beds; and,

3. Electronic Monitoring Bracelets.

With regard to EMB, the general costs for each monitored person is in the $8-$12 range per day. It is expected that as many as 1,500 EBI graduates will be on an EMB at any given time. A standard residential facility placement will be established for EBI as many as 600 EBI graduates. The per diem cost for these non-programmatic beds range from $50 to $60. Additional substance and mental health treatment

42

beds will be develop for those EBI graduates who may require such specialized care. These beds are the most expensive ones to fund and range from $80 to $100 per day.

There would also be the needs to create EBI community supervision officers who would provide regular supervision to the EBI graduates. We would recommend that these officers have caseloads of 50.   Because 50% of their caseload will be in residential, substance abuse, and mental health beds, the need to make weekly would be for only 25 EBI graduates who are residing at their homes and/or with families.  Based on these assumptions, approximately 60 LASD officers plus another five supervisory staff and five administrative support staff would be required.  As shown in Table 11, the estimated annual costs of the recommended EBI community supervision program would approach $50 million per year which is less than half the averted cost figure in Table 10.

While the level of funds required to fully implement this design may not be available in the current budget, there may be sufficient funds to initiate a pilot program like the one that is now being used for female EBI graduates. Under that pilot program 40 women have been placed in residential beds with EMBs with two well established agencies (VOA and Health Right 360). These are females who have been sentenced under AB109 and are placed in the community under P.C. 1203.106 (Home Detention).  If this program can demonstrate its ability to safely manage these EBI graduates in the community there would be further justification to expand its scope.

43

**Table 10.  Estimated Averted Jail Operating Costs by Expanding EBI for Alternatives to Detention**

| Cost Factor | Males | Females | Totals |
|---|---|---|---|
|  |  |  |  |
| Daily Rate* | $118.32 | $104.97 | NA |
|  |  |  |  |
| Pretrial | 600 | 150 | 750 |
| Sentenced – AB109 | 1,900 | 350 | 2,250 |
|  |  |  | 0 |
| Totals | 2,500 | 500 | 3,000 |
| Avoided Jail Costs | $108,040,950 | $19,170,146 | $127,211,096 |

*Source: LASD

**Table 11. Estimated Costs of LASD EBI Community Supervision**

| Alternative | Beds/Slots | Costs Per Day | Total |
|---|---|---|---|
| EMB | 1,500 | $10 | $5,478,750 |
| Residential | 850 | $60 | $18,627,750 |
| Drug Treatment | 500 | $80 | $14,610,000 |
| MH Treatment | 150 | $100 | $5,478,750 |
| Total Contractual | 3,000 |  | $44,195,250 |
| Supervised Field Supervision | 1,500 | $10 | $5,478,750 |
| Grand Totals | 3,000 |  | $49,674,000 |

44