**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION**

**HONORABLE PERCY ANDERSON, U.S. DISTRICT JUDGE**

UNITED STATES OF AMERICA,          )
                                   )
                Plaintiff,         )    Case No.
                                   )
        vs.                        )    CR 16-00066(A)-PA
                                   )
LEROY D. BACA,                     )    PAGES (1 to 148)
                                   )
                Defendant.         )
_____)

**REPORTER'S TRANSCRIPT OF**
**CLOSING ARGUMENTS**
**MONDAY, DECEMBER 19, 2016**
**8:01 A.M.**
**LOS ANGELES, CALIFORNIA**

_____

**MIRANDA ALGORRI, CSR 12743, CRR**
FEDERAL OFFICIAL COURT REPORTER
312 NORTH SPRING STREET, ROOM 435
LOS ANGELES, CALIFORNIA 90012
MIRANDAALGORRI@GMAIL.COM

**UNITED STATES DISTRICT COURT**

**APPEARANCES OF COUNSEL:**

**FOR THE PLAINTIFF:**

    EILEEN M. DECKER
    United States Attorney
    BY:  BRANDON FOX
    BY:  EDDIE A. JAUREGUI
    Assistant United States Attorneys
    United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012


**FOR THE DEFENDANT:**

    MORGAN LEWIS AND BOCKIUS LLP
    BY:  NATHAN J. HOCHMAN
    BY:  BRIANNA ABRAMS
    The Water Garden
    1601 Cloverfield Boulevard
    Suite 2050 North
    Santa Monica, California 90404


    MORGAN LEWIS AND BOCKIUS LLP
    BY:  TINOS DIAMANTATOS
    77 West Wacker Drive
    Chicago, Illinois 60601

**UNITED STATES DISTRICT COURT**

**I N D E X**

**MONDAY, DECEMBER 19, 2016**

**Chronological Index of Witnesses**

Witnesses:_____   Page

(None)

4



**EXHIBITS**


**MONDAY, DECEMBER 19, 2016**


|          |                          | For ID | In EVD |
|----------|--------------------------|--------|--------|
| Exhibit  |                          |        |        |

(None)

**UNITED STATES DISTRICT COURT**

**LOS ANGELES, CALIFORNIA; MONDAY, DECEMBER 19, 2016**

**8:01 A.M.**

**---**

(The following proceedings were held in open court out of the presence of the jury:)

THE CLERK:  Calling item No. 1, CR 16-66A, USA versus Leroy D. Baca.

Counsel, state your appearances.

MR. FOX:  Good morning, Your Honor.

Brandon Fox and Eddie Jauregui on behalf of the United States.  Also with us at counsel table is Special Agent David Dahle with the FBI.

THE COURT:  Good morning.

MR. HOCHMAN:  Good morning, Your Honor.

Nathan Hochman.  I'm joined by Tinos Diamantatos and Brianna Abrams and Leroy Baca who is present, Your Honor.

MR. DIAMANTATOS:  Good morning.

THE COURT:  Good morning.  I believe we're missing one juror.

May I see counsel at sidebar.

(The following proceedings were held at sidebar:)

THE COURT:  I received a note that was addressed to the clerk indicating -- it was from a local news reporter indicating that the parties were contemplating providing

**UNITED STATES DISTRICT COURT**

exhibits to this news reporter that had been received into evidence.

Is that true?

MR. FOX:  I don't know -- this is news to me.

MR. HOCHMAN:  Just the opposite, Your Honor.  A reporter -- I don't know if it's the same one -- asked me if she could get copies from me directly of an admitted exhibit. I said, look, get it from the Court; get it from the court clerk.  If it's admitted, you can do it that way.  If you need to ask the clerk permission, ask the clerk permission.

THE COURT:  Okay.  It attached a letter to me. I'm happy to share the e-mail I got.  It seems to say that we're -- "I don't expect the Court to give me these exhibits, but the parties just wanted to make sure it was okay to give them the exhibits that had been received into evidence."

MR. FOX:  We received an inquiry about the depositions that Mr. Baca has given in the past, and they had inquired -- the media had inquired of the attorney who had taken the deposition.  I said basically we have no dog to fight in this.  If he wants to give them to you, that's fine.  Of course, there are previous exhibits that have been introduced in the previous trials.  That's not something that we can control.

THE COURT:  Okay.  In any event, I'm going to take that up after the trial is over.

**UNITED STATES DISTRICT COURT**

MR. HOCHMAN: That's fine, Your Honor. I think they were looking for the photos of the Gilbert Michel surveillance video. Again, I said, look, if you can get it from the Court, it's a matter of public record, feel free. But I'm not going to hand it to you.

THE COURT: Okay. Well, exhibits aren't filed.

MR. HOCHMAN: Or however you want to deal with it.

THE COURT: We'll deal with it.

Now, have you looked at the redacted Indictment?

MR. HOCHMAN: I believe there was only one issue including Mr. Carey on a meeting with Mr. Thompson where there's a Carey Thompson/Tanaka meeting on September 23rd. I don't believe Manzo testified that Carey was in the meeting. He testified that Thompson was in the meeting. I was just looking at it really quickly. The meeting -- Thompson -- Manzo said Thompson was in the meeting. Just wasn't Carey in the meeting. I don't think it particularly matters unless you're going to argue.

MR. FOX: I wasn't arguing that Carey was in the meeting.

THE COURT: Why don't you guys take that up once we get the arguments taken care of.

MR. HOCHMAN: Okay. All right. Thank you.

THE COURT: Are the estimates that were given

still where we are?  I hope they'd be reduced a little bit.

MR. FOX:  I think mine probably reduced a little bit.  I'm thinking about an hour 15 for my summation, and then we'll see what happens with rebuttal.

MR. HOCHMAN:  Two hours, two hours and 15 minutes, Your Honor.  It just depends how fast I can get through stuff.

THE COURT:  There's a timer out there.  So when you start, I think it will start clicking.  It will go yellow, I think, within five minutes and go red when you're done.

MR. FOX:  Where is the timer?

THE COURT:  It's going to be on that little display.

MR. FOX:  Okay.

MR. HOCHMAN:  Thank you, Your Honor.

MR. FOX:  Your Honor, even though I think I said I reduced it, I would like to still have the hour and a half.

THE COURT:  Hour and a half; two, 15.

MR. HOCHMAN:  Yeah.  I mean, I timed it out, Your Honor, at about two, but I might go a little slower.  So maybe 2, 20.

THE COURT:  All right.  2, 20.

MR. FOX:  About 45 minutes, probably less.  We'll say 45.

THE COURT:  Okay.  So now what we're going to do

is we're going to start.  We'll take a break for about ten minutes.  Jury will go out.  Then Mr. Hochman will conclude his argument.  Then I'm going to give the jury about 20 minutes.  We'll bring them something to eat, and they can gulp it down.  And then we'll have the Government's closing part of this, and then I'll instruct.  From what I know, the jury will go about an hour and a half.  They'll go until 3:30 today.

MR. HOCHMAN:  Okay.

THE COURT:  Okay.  Now, anything else?

MR. FOX:  What's the schedule for the rest of the week going to be assuming they don't come back today?

THE COURT:  8:00 to 3:30.

MR. HOCHMAN:  Do you actually want us in the courthouse, or within 15 minutes would suffice?

THE COURT:  You need to be here the first couple days.  Then we'll see where they are.  If they have questions --

MR. HOCHMAN:  Just get them answered.

MR. FOX:  Thank you.

MR. HOCHMAN:  Thank you, Your Honor.

THE COURT:  Is there any other testimony?

MR. DIAMANTATOS:  We have one stipulation, Your Honor, that we'll begin with, and then we'll rest.

MR. HOCHMAN:  Then I'll indicate that we're going to make a motion.  By that I'll mean a Rule 29 Motion.  And

then Your Honor can take it up at a break or whenever you'd like.

MR. FOX:  Are you going to ask us if we have a rebuttal case or not?

THE COURT:  Do you want to?

MR. FOX:  No.  There's no need for that.

MR. HOCHMAN:  Thank you very much, Your Honor.

THE COURT:  All right.

(The following proceedings were held in open court out of the presence of the jury:)

THE COURT:  Let's bring the jury in.

(The following proceedings were held in open court in the presence of the jury:)

THE COURT:  Good morning, ladies and gentlemen.

All right.  Do you have another witness?

MR. DIAMANTATOS:  Yes, Your Honor.  We request permission to proceed by way of stipulation.

THE COURT:  All right.

MR. DIAMANTATOS:  The parties stipulate and agree to the following:

If called as a witness, FBI Special Agent Leah Tanner would testify that on November 16, 2012, during the course of an FBI interview of James Sexton, Mr. Sexton stated that, in general, the impression Mr. Sexton had was that Undersheriff Paul Tanaka was

in charge of the Anthony Brown investigation and was authorizing everything that occurred after the cell phone was found.

So stipulated?

MR. FOX:  So stipulated.

THE COURT:  Do you have any additional witnesses?

MR. HOCHMAN:  No, Your Honor.  The defense rests.

And at this point the defense would make a motion, Your Honor.

THE COURT:  All right.  Let's go to sidebar.

(The following proceedings were held at sidebar:)

MR. HOCHMAN:  Given the Government indicated it wasn't going to have a rebuttal case, Your Honor, the defense would use its Rule 29 Motion at this point based on the grounds I previously articulated.

THE COURT:  Okay.  Motion is denied.

I think the timer is going to tick.  It's set at 90 minutes.  I'll let you know when you've got about five. Well, you'll be able to see when you've got about five minutes left.  Okay.

MR. FOX:  Thank you.

MR. HOCHMAN:  Thank you, Your Honor.

(The following proceedings were held in open court in the presence of the jury:)

THE COURT:  Does the Government wish to give a

**UNITED STATES DISTRICT COURT**

closing argument?

MR. FOX:  Yes, Your Honor.

An abuse of power in order to obstruct justice. Mr. Baca abused the power given to him by the citizens of Los Angeles County to enforce the law and to bring people to justice.

He abused his power to obstruct justice to ensure that inmates were not going to be given the rights that they needed to receive, to ensure that the dirty deputies within Men's Central Jail and Twin Towers who were committing the abuses on the inmates, who were bringing in drugs, contraband in exchange for bribes, would not be brought to justice.

Forget about the inmates' rights.  Forget about those dirty deputies.  Mr. Baca wanted to ensure that no outside law enforcement agency was going to police the sheriff's department because he was the G.D. sheriff as he's told Mr. Birotte.  These were his G.D. jails, and he was prepared to do whatever it took to keep people out of those jails, to keep outside law enforcement out.

We told you at the beginning of the case that we would prove to you beyond a reasonable doubt that Mr. Baca committed the crimes charged in the Indictment, and we have done that with an overwhelming amount of evidence.  You've heard from witnesses involved in the conspiracy.  You've seen the phone records.  You've seen the e-mails.  You've seen that

**UNITED STATES DISTRICT COURT**

this was dirty from the beginning, that Mr. Baca wanted to use his people, his loyal people in his inner circle to make sure that the Federal Government stayed out of those jails and that those inmates did not receive those rights that they deserved.

He wanted OIR, his internal investigators, to continue to do the job that they had been doing, that ineffective job that you saw, allegations unfounded, ACLU kept out, told there was nothing to see here.  That's what Mr. Baca did from August 19 to September 27th.

I want to take you back to the beginning now to how we started this trial.  We started by showing you that Mr. Baca had notice of the problems going on in the jails.  He was aware of the inmate meetings, of the deputy abuse.  A chaplain, Chaplain Paulino Juarez, a man so affected by the incident he saw that he cried on the stand today seven years later.

He went to Mr. Baca emotional, told him what happened.  Mr. Baca was aware that there was an eyewitness account from a chaplain of deputy abuse.  This was not an inmate who had a violent history complaining of abuse, not an inmate who might lie, might have a motive to lie against deputies.  This wasn't one of those talking about abuse.  This was a chaplain who went into those jails to do good.  He saw abuse.  It affected him, and he raised a concern, fell on deaf ears.

Esther Lim, an ACLU monitor of the jails, you heard that she saw abuse in Twin Towers, an inmate who had been beaten, knocked unconscious on the ground, and at that point Tasered, shocked. She raised concerns with the ACLU, her employer. And because there had been so many years that their complaints had fallen on deaf ears, unfounded accusations when they raised concerns, they held a press conference.

We have an eyewitness account, our own employee, saw this abuse, saw this inmate unconscious being Tasered. And what happened next? Mr. Baca's spokesperson came out and questioned the credibility and integrity of the ACLU monitor of Esther Lim who saw firsthand abuse. Again, this was not an inmate who was raising this concern this time. This was someone whose job it was to make sure that things were going well in the jails, that abuse was not occurring, and she saw a horrible instance of abuse.

A commander, someone inside the organization who twice went to Mr. Baca, said we have a problem with force in the jails. We need to do something about this. 2010, 2011, goes to Mr. Baca, and Mr. Baca ignored the commander. This was Bob Olmsted. Ignored him. This is, remember, a commander. The defense made a big deal out of the 1012A code, commander walking the floors, anybody walking the floors, let's clean up, making sure everything was right. Yet he was able to tell there was too much force in those jails.

15

He dug into the issue.  He looked at the paperwork, saw that there were cookie-cutter reports, knew that there was a problem, and raised those problems.  But Mr. Baca just throughout offered lip service to his core values, to inmates' rights.  Didn't do anything about it.  He didn't want to dig into this issue.

Then you just heard about this I think it was on Friday.  Antelope Valley.  This is not involving the jails.  This was a civil rights violation involving Section 8 housing in Antelope Valley.  Mr. Baca stood in a press conference with Tom Perez and talked about how he was going to cooperate in the federal civil investigation of his deputies in Antelope Valley.  Another instance of civil rights violations within the sheriff's department, but Mr. Baca didn't need to own this one because there hadn't been systemic problems over the course of decades that happened in the jails under his command.

Mr. Baca could not afford a scandal involving the jails because he had so much notice of the problems going on in the jails.  Antelope Valley was easy.  Stand up in a press conference, say I'm going to cooperate fully in the investigation, and the same day begin to obstruct the federal criminal grand jury investigation.  I'll show that to you in a minute.

So let's set the scene even more.  Ineffective internal investigations were going on.  That's how they were

responding to the allegations of inmates' assaults.  They put their Internal Affairs and ICIB on this.  And you saw -- you heard what ICIB was all about.  They weren't trying to get to the root of the problem.  They were trying to tamp the problem down.

You saw in Government Exhibit 53 -- this was the e-mail that Tom Carey forwarded to Sergeant Craig and Sergeant Long saying let's take a look at these old cases to try to figure out what the feds are looking at.  If you look at the attachments, it's all the unfounded accusations where their internal investigators looked at dozens of incidents and found not a single one had merit.  That's who was in charge of these investigations.  That's who Mr. Baca put in charge of these investigations.  And things were going so well for Mr. Baca and the sheriff's department until the feds stepped in.

The defense talked about OIR, the Office of Independent Review, headed by Mike Gennaco and what a great transparent organization that was, part of the sheriff's department.  But you also heard that they had no power.  They could do nothing.  They couldn't recommend discipline -- or they could recommend discipline, but they couldn't discipline any employees.  They couldn't bring criminal charges.  They were toothless, had no investigators.

And you heard, Cecil Rhambo, the assistant sheriff, explain how the lines were blurred between OIR and the

sheriff's department, and that makes sense.  An attorney/client relationship not only between OIR and the sheriff's department but between Mr. Gennaco personally and Mr. Baca.  The lines were blurred.  This was not an independent organization investigating the sheriff's department with teeth where there could be ramifications.

The defense told you in opening statements that Mr. Baca treated all these organizations that wanted to look at the jails like partners.  Mentioned the ACLU specifically.  And then what happened when testimony began?  Two witnesses, one formerly of the ACLU and one currently with the ACLU, said we weren't treated like partners.  They didn't treat us like partners.  They didn't give us full access to the jails.  They started calling our witnesses liars.  We weren't partners.  We had to go to court over and over again to get what we wanted.

That's not how the sheriff's department was treating the ACLU.  That's not how Mr. Baca was treating the ACLU.  He didn't want these organizations causing problems, demanding civil rights to be enforced in his jails.

So what were the obstructed acts when the Federal Grand Jury and the FBI began investigating the Los Angeles County Sheriff's Department?  First, they began to hide the informant, hide Anthony Brown, eventually change his name, move him out of the jail.

Second, tamper with witnesses including

Anthony Brown, convince Anthony Brown that he had been left for dead, go to the deputies that they thought might be cooperating with the Federal Government and tell them that grand jury subpoenas would be B.S., would be blackmail, order them not to speak to the Federal Government, order them not to cooperate, tampered with witnesses.

They then tried to learn of and take over the federal investigation, not only the abuse incidents but also Gilbert Michel, the undercover operation the FBI engaged in. Mr. Baca's letter, which I'll show you later in this closing argument, discusses this specifically that they're going to take over this investigation. The FBI -- think about this. The FBI conducts an undercover operation, proves that a deputy is guilty of bribery, proves that he's taken bribes for taking a cell phone, and the sheriff's department decides, you know what, that's our investigation. Mr. Baca decides that's our investigation.

And then go out and try to intimidate and threaten the FBI agent, the lead FBI agent involved in this investigation of the sheriff's department, the one who has uncovered the abuse and the corruption, the one who did the undercover operation that proved Gilbert Michel was a dirty cop.

Here are the charges that you're going to be considering. Two counts. One is conspiracy to obstruct

justice, and the other one is obstruction of justice.  I referred to Count 2 in opening statements as endeavoring to obstruct justice, and I'll explain why in a minute.  Let me first talk to you about conspiracy and the elements that I expect the Court to instruct you on.

First of all, there has to be an agreement to obstruct justice.  Now, I don't expect the defense to contest whether there was an agreement to obstruct justice.  There were many people involved in this conspiracy, and I think the issue the defense is likely to contest is whether the defendant himself joined this agreement, joined this conspiracy.  I think this is the key issue.

And, third, whether a conspirator performed an overt act.  We don't need to show that Mr. Baca performed one of these acts.  I'll explain what an overt act is.  We just need to prove that one conspirator performed an overt act.

The Indictment that you'll see has things called overt acts listed in them, and what you need to find is that at least one of these was performed in furtherance of the conspiracy, and I don't think there's going to be a dispute with very many of them about whether they occurred.  You heard some of them.  You saw some of them.  I don't think there's a dispute about whether they occurred.

So let's talk about, again, the key issue is whether in Count 1 Mr. Baca joined the conspiracy.  What we

need to prove to you and did prove to you is Mr. Baca knew its goal -- its "object" is what it's called in the jury instruction -- knew that the goal was to obstruct the grand jury investigation, and that he intended to help accomplish that goal.

Importantly, he does not need to know all the details of the conspiracy. So when he's the one that's overseeing everything, that puts Mr. Tanaka in charge and is receiving updates about what's happening, provides the orders, isolate the inmate, investigate, and then is getting all the updates about what is happening, he doesn't need to know whether they're live scanning Mr. Brown. He doesn't need to know the exact name or that they were changing the name of Anthony Brown so long as he was part of the conspiracy. He does not need to know all of the details of the conspiracy.

And think about this. Mickey Manzo, James Sexton, two people who testified on behalf of the Government in this trial, they had minor roles in this conspiracy compared to Mr. Baca. Yet, they were held responsible for the conspiracy. That's just conspiracy law, that you're responsible for the acts of your co-conspirators.

So here's Count 2, the two elements that you're going to have to find in order to find the defendant guilty. First, that the Government proved that the defendant obstructed or tried to obstruct a grand jury investigation. That's why

this is either obstruction or endeavoring to obstruct. Endeavoring basically means tried to, tried to obstruct the grand jury investigation. And second, that he acted corruptly.

Now, what does that mean? What does corruptly mean? It's defined in the jury instructions that I believe Judge Anderson will give you is that he intended to obstruct justice. It's that simple. Did Mr. Baca intend to obstruct justice? And secondly, you'll learn that it does not need to be his sole or primary purpose.

So if, in part, he wanted to keep Anthony Brown away from the dirty deputies who might abuse him -- and by the way, what does that say about his knowledge of how abusive those deputies are that he needs to protect Anthony Brown from one of those deputies? But if he did it in part, if he isolated in part in order to keep him safe and, in part, to try to obstruct the federal investigation and keep the FBI away from Anthony Brown, the U.S. Marshal Service away from Anthony Brown, keep Anthony Brown away from the grand jury, we've met this element.

We also have to prove that Mr. Baca had knowledge of the grand jury investigation. The sheriff's department received so many subpoenas over the years. Started out with the June 2011 subpoena regarding the victim Gabriel Carrillo, someone who had come to the visiting area of Men's Central Jail and had been beaten. So they received a subpoena in June 2011

that related to that.  They received a writ that was going to mandate Brown's testimony before the grand jury, forced the sheriff's department to turn Anthony Brown over to the grand jury, the one that was ignored.

You learned about the subpoenas, the multiple subpoenas that they received on August 24th, and you knew that Mr. Baca knew about those subpoenas because he referenced them not only in his August 29 meeting with the U.S. Attorney's Office but also in the letter that he sent to the U.S. Attorney's Office and gave to Andre Birotte, the September 26 letter that we'll talk about later.

Even outside of his knowledge of the grand jury, if he took obstructive acts in order to get the FBI away, he focuses his attention on the FBI, it's still obstruction of justice if the FBI was acting as an arm of the grand jury.  You heard Special Agent Dahle talk about how closely the FBI was working with the U.S. Attorney's Office and the Federal Grand Jury, how they were operating hand-in-hand over the years, how he was the custodian of records for the grand jury.  He was receiving all of the documents, deciding which documents to present before the grand jury, how they were doing interviews and providing that information to the grand jury.  That shows that they were operating as an arm of the grand jury.

There are three elements for you to consider with respect to this.  First of all, that the FBI undertook the

investigation to supply the information to the grand jury in direct support of the grand jury investigation.  This was the goal of the FBI all along.  Special Agent Dahle talked about this.  Special Agent Leah Marx, Leah Tanner, talked about this, how they undertook the investigation trying to see if they could corroborate some of the information they received from the inmates with plans to go to the grand jury with that information and see if they had enough evidence to indict anybody.  That means that they undertook the investigation for this purpose.

Second, whether they were integrally involved in the investigation.  Again, Special Agent Dahle, Special Agent Marx talked about this.  And, third, whether they undertook the investigation with the intention of presenting evidence to the grand jury.  Again, this was the same thing as the first one.  This was their goal all along.  They were operating hand-in-hand as an arm of the grand jury.

So when Mr. Baca wants the FBI off the case knowing about the grand jury subpoenas -- in fact, he referred to them in his letter September 26 as the FBI subpoenas, showing he saw them as operating hand-in-hand, he saw them as an arm of the grand jury.  When he obstructs the FBI in that context, he's obstructing the grand jury.

Corrupt intent.  Key element of this trial.  We can go over some of the evidence right now that proves to you

on its face that Mr. Baca had corrupt intent.  Cecil Rhambo goes to Mr. Baca before the sergeants approach Special Agent Leah Marx and threaten her arrest, explained to Mr. Baca the FBI didn't commit a crime.  Undercover operations are even what we do, meaning the sheriff's department.  There's nothing illegal about undercover operations.

You probably walked into court the first day of jury selection knowing this concept.  If an undercover operation occurs, it doesn't mean that the law enforcement officers who were engaging in the undercover operation were committing the crime.  It's law enforcement 101 and common sense.  You couldn't do an undercover operation if this was not the case.

So Mr. Rhambo goes to the sheriff who's been working the sheriff's department, I think Mr. Hochman said, for 48 years, had been sheriff for more than a decade, and explains to him something that the sheriff already knew, that Mr. Baca already knew.  There's nothing illegal about an undercover operation.  That's what we do.

Mr. Rhambo had heard that they were going to intimidate an FBI agent.  This is what Mr. Rhambo heard before even walking in that room.  What did he say to Mr. Baca?  "We are the suspects."  That's why they didn't tell us about this undercover operation.  We're the suspects.  They tell us about it, the undercover operation is not going to happen because

we'll know about it.  So they're not going to tell us about this.  That's what Mr. Rhambo said.  "We're the suspects."

"Don't F with the feds."  We have an assistant sheriff going to Mr. Baca, the head of the organization, and using this language with him telling him how important it is not to be messing with a federal investigation.  And he even goes a step further, not just don't mess with the feds, but if you do that, you send the agents out to intimidate her, that's obstruction of justice.

It really doesn't get any better than that.  You have a law enforcement officer advising somebody that, if they do something, it's obstruction of justice, and then Mr. Baca goes ahead and does it anyway.  That's obstruction of justice.  That's exactly what it was when Mr. Baca sent his sergeants out to Special Agent Marx's home on September 26th.  That was obstruction of justice.  Mr. Rhambo was right.  And then he advises him, don't do that.  But Mr. Baca ignores this, and he went ahead and did it anyway.

Moving back to the August time frame, Mr. Tanaka at the August 20th meeting starts screaming and yelling, slams his hands down on the table, and starts saying, "F them." "F the FBI."  Mr. Baca does not calm Mr. Tanaka down.  Mr. Baca doesn't say anything against what Mr. Tanaka was saying.  Instead, he put Mr. Tanaka in charge.  So there's someone in the room who's the highest rank besides Mr. Baca screaming and

yelling, very upset, directing his anger toward the FBI, and Mr. Baca put Mr. Tanaka in charge.  That tells you everything you need to know about Mr. Baca's intent from the beginning.  It was to mess with the FBI.

Then they walk out of the room, have a conversation, just Mr. Baca and Mr. Tanaka, just Mr. Baca's right-hand man and him, two people who share the same feelings and emotions, you heard, from Mr. Rhambo, and Mr. Tanaka walks back in, never seen the sheriff so upset.  I have known him for so many years, and I've never seen him so upset.

The defense told you in opening statement that the way that Mr. Tanaka and Mr. Baca reacted to this incident was very different.  You've heard evidence that that simply was not the case.  Mr. Baca was extremely upset.  You heard that from many people.

Mr. Hannemann, Sheriff Baca's aide, said that -- he said that Mr. Baca during this time seemed upset and angry, and he said Mr. Tanaka was showing the same emotions. Mr. Hannemann knew this was a big deal because he decided not to ask Mr. Baca what he was so upset about.  It was obvious. He had heard about the cell phone, and he decided it was best if he didn't ask Mr. Baca what he was upset about.

Mr. Baca himself goes on *Good Day L.A.* and says that he resented the FBI's intrusion.  Shows his corrupt intent right there.  And then what about his meeting with

Andre Birotte and Steve Martinez on September 27th?  It's the most upset Mr. Birotte had ever seen Mr. Baca.  This was not someone who is acting very differently than Mr. Tanaka.  This is someone who shared in Mr. Tanaka's anger.  They were operating hand-in-hand much like the grand jury and FBI were operating hand-in-hand.  Mr. Baca and Mr. Tanaka were doing the same thing.

I'll take you through the timeline now, go over the evidence that we provided to you that showed he committed these crimes beyond a reasonable doubt.  But when you're looking at this timeline, I want you to remember that this is under inclusive.  Mr. Baca's calendar does not reflect the impromptu meetings.  Mr. Hannemann told you about this.

Mr. Tanaka was meeting with Mr. Baca five times a day during this time period.  You'll see in Exhibit 120 in Mr. Baca's calendar there are few meetings that are on the calendar between him and Mr. Tanaka, not the five times a day during this time period.  And by the way, Mr. Hannemann also told you this was unusual.  It was not five times a day during most of the time.

Mr. Carey, Mr. Leavins, Mr. Thompson, also meeting with Mr. Baca and/or Mr. Tanaka four to six times a week during this time frame.  Again, unusual.  The defense showed you this organizational chart with all these chiefs, captains, commanders, assistant sheriffs.  All these people are

28

out of the picture.  The chain of command is broken during this time period.  It's going from the undersheriff.  In one instance it's with ICIB to the captain.  And with OSJ, it's just going straight to the lieutenant.  These are people meeting with Mr. Baca during this time period in these closed-door sessions.  Secret meetings going on that nobody should know about.

August 18, again, when you want to see Mr. Baca's intent, this is a setup to it.  Mr. Thompson sends an e-mail to Robert Bayes, says on the e-mail "Report to Bayes."  It says, "Anthony Brown is going to be shipped to CDC state facility," on August 18, at 1:31.  Mickey Manzo told you about how they had to jump through all these hoops to get him on the next state bus so he could be shipped to state custody.

There's a problem with this plan that Greg Thompson came up with.  First of all, Mr. Baca was not involved in this at all at this point.  This was Mr. Thompson's idea.  Let's get rid of the problem.  Let's send Anthony Brown to state custody, get him off our hands.  That's not what Mr. Baca wanted.

When he found out -- Mr. Baca found out that evening that this was an FBI phone and that they likely had an inmate informant on their hands, things changed.  He had two five-minute conversations with assistant director in charge of the FBI Steve Martinez on Friday -- I'm sorry -- yeah.

**UNITED STATES DISTRICT COURT**

Thursday, August 19 at 5:40 and then at 5:45.  You will have this exhibit back with you.  You can look at the phone records.

He had two conversations with Mr. Martinez and then immediately called Paul Tanaka at 5:57 p.m., had a nine-minute call to Mr. Tanaka.  He knew at that moment who he wanted to bring into that plan, this conspiracy.  He called Mr. Tanaka, and then they set up meetings the very next day.

Before that meeting that -- they held that meeting, Mr. Thompson told Mr. Manzo and Mr. Smith, get Anthony Brown, the informant, on tape for the executives.  There were only two executives that were closely involved in this, and that was Mr. Baca and Mr. Tanaka.  So when you see executives, plural, executives, you knew that those two were involved in this issue.  So get Brown on tape so we can play it for the executives.  That was for Mr. Baca and Mr. Tanaka.

And then Mr. Manzo and Mr. Smith do get Anthony Brown on tape, and what do they tell him?

(The video commenced playing before the jury.)

MR. FOX:  That meeting was set up for that afternoon, and they were going to be taking information to Mr. Baca and Mr. Tanaka about what they learned from Anthony Brown.

(The video commenced playing before the jury.)

MR. FOX:  So they receive all this information. They learn that Anthony Brown is an informant as they

suspected, and they're taking this information to their supervisors.  They say that later in the recording.  "So if we take this to our supervisor, is that feasible?"  They use the word "feasible," and Anthony Brown says, "Yes, that's feasible."

So Mr. Smith's comments -- Deputy Smith's comments about cleaning your own backyard, dirty house, you want to clean it yourself, that's the same philosophy that Mr. Baca had.  You heard it from Mr. Rhambo, and you heard it from *Good Day L.A.*  We police ourselves, we clean our own backyards.  Gerard Smith knew that.  He said it to Anthony Brown on August 19.  Steve Leavins also said it on August 23rd.  A mantra that they have throughout time.

So that afternoon they did have a meeting, and this is an interesting day on Mr. Baca's calendar.  It says a lot about actually what you heard during this entire time of the trial.  Mr. Baca had a public face.  He also had something he was doing in private that he didn't want people to know about.  9:00 a.m. to 10:30 a.m. he's speaking on that Antelope Valley civil rights issue promising that he's going to cooperate in the civil rights investigation, a civil civil rights investigation, non-criminal one, with the Department of Justice.

Then at 12:00 o'clock he actually goes to lunch with one of those character witnesses who testified for him.

**UNITED STATES DISTRICT COURT**

What we learned in this trial is that his friends liked him. Mr. Baca's friends liked him. Okay. Hopefully all of our friends like us. At 2:00 o'clock, though, he has this meeting where he begins the conspiracy, begins to bring in all of his co-conspirators -- Undersheriff Paul Tanaka, Captain Carey, Greg Thompson. You remember the e-mails that Mr. Thompson also said is it okay if I bring my two deputies? That was Mickey Manzo and Gerard Smith. And Mickey Manzo told you what happened.

Greg Thompson informed Mr. Baca that there's an FBI sting operation. That's what the phone relates to, an FBI sting operation. And that involves a civil rights investigation that the Federal Government is conducting within our jails. And what does Mr. Baca do? Reverses course on what is supposed to be happening with Anthony Brown.

Anthony Brown no longer is going to be shipped on the next available bus to state. Instead, he's going to stay in the sheriff's department's custody. And why is that? If he's sent to state, you heard how the FBI has easy access to him. They can just call, have an appointment, talk to Anthony Brown. The state complies with writs. The state was happy to provide Anthony Brown to the Federal Grand Jury when he was asked for about a year later. But if he's in county custody, Sheriff Baca can ensure the FBI has no access to him, or he thought he could.

That evening after -- afternoon/evening after that meeting, Mr. Baca goes out of that meeting, calls Steve Martinez. Then at 5:07 they actually have a conversation, three-minute conversation. And who does he call right after that? According to the phone records, he calls Mr. Tanaka, again, the guy he brought into this conspiracy right away. And then Mr. Tanaka calls Thompson.

This is the first of a series of phone calls you will see where Mr. Baca is passing information or orders down to Mr. Tanaka, and it's spreading from Mr. Tanaka to all the co-conspirators, and then you see the information passing back up. You see the phone calls with the lower level co-conspirators calling Mr. Tanaka and Mr. Tanaka then calling Mr. Baca. This is the chain of command that they've decided for this conspiracy. Sheriff, undersheriff, lieutenants, captains, sergeants, deputies. You'll see that in the phone charts.

7:22 that evening Mr. Baca calls Mr. Tanaka, and once again, Mr. Tanaka is sending this information down to the other people involved in the conspiracy. Captain Carey from ICIB, Lieutenant Thompson, Lieutenant Leavins. And at 8:07 Mr. Tanaka calls Mr. Baca back right after speaking to these individuals. They weren't talking about the budget. They weren't talking about the Metro police. They weren't talking about different patrol stations. Mr. Tanaka is calling ICIB

and OSJ, the people involved in hiding Anthony Brown at this point.  This was about hiding Anthony Brown.

That night Mr. Rhambo's e-mail, Exhibit 19, Greg Thompson invites him to smoke a cigar with him on the patio, brief him on what happened that day.  Mr. Rhambo wanted to stay as far away from this as possible.  "Paul briefed me. We went to see the sheriff.  I was given a partial briefing.  I don't even want to know."  Cecil Rhambo knows what's right and what's wrong and wanted to stay away from this from the beginning.  He knew this was dirty.

Mr. Baca then holds a Saturday morning meeting. Remember, he showed up in running shorts and a shirt, showed up at this meeting.  Mr. Thompson, again, provided a partial briefing -- excuse me -- a briefing to more people detailing the investigation again.  And Mr. Manzo played the phone calls that showed the FBI had given Anthony Brown a phone.  Here's the phone calls from July 20th, 21st in which Leah Marx is on the phone with Anthony Brown saying he'll have his phone soon. This is when Mr. Tanaka slams his hand down and says "F them." "F the FBI."  And, again, this is when Mr. Baca issued the orders.

First, OSJ was to isolate Brown.  Isolate him. Keep him away from everybody including the FBI.  And ICIB was to investigate how he got the phone.  They knew how he got the phone.  It was clear from the phone call how he had gotten the

phone.  Anthony Brown had said that he had gotten it from a dirty deputy.  So this was very clear.  It's a sting operation. FBI had given a phone to a deputy, and the deputy had given it to Mr. Brown.  It's a bribe undercover investigation.  It was very clear what happened.

Mr. Baca at that point knew what he wanted.  He wanted to start putting the pressure on the FBI.  He decided let's run this investigation through the undersheriff.  I'm going to put him in charge, and the undersheriff will give the information to me.  Mickey Manzo told you this investigation was going to be run from the undersheriff up to Mr. Baca in Mr. Baca's own words.

They then leave the room, have a discussion, the two of them.  Only Mr. Tanaka returns saying I've known the sheriff for a long time, never seen him this upset, and he stated what he wanted done.  And Mr. Baca had stated what he wanted done.  You guys are going to do it for him.

They then put a note on Anthony Brown's door, instructed the deputies no FBI access.  Nobody should have access to Anthony Brown at this time.  Mr. Hochman said in opening and the defense wants you to believe that there was some sort of rift between Mr. Baca and Mr. Tanaka during this time, that Mr. Tanaka had a different agenda.  Well, what did you hear?  What was the evidence?

They had a father/son relationship according to

Mr. Rhambo who has known them both for decades.  Mr. Baca was a mentor to Mr. Tanaka.  Mr. Baca could have picked anyone in the department to be his undersheriff, and even before he selected Mr. Tanaka when he was just his assistant sheriff, he was treating him like his undersheriff.  When Mr. Waldie was still there as the undersheriff, Mr. Baca was going around Mr. Waldie and speaking to Mr. Tanaka about issues.  And then when Mr. Waldie retired, he picked Paul Tanaka to be his undersheriff.

He had known him for years.  He knew what Mr. Tanaka was all about.  Mr. Tanaka, as Mr. Rhambo told you, mirrored Mr. Baca's feelings.  That was generally, but you also know that happened during this time period because they were both so upset about what happened.

The defense has said that Mr. Tanaka acted professionally around Mr. Baca, but there's no evidence he was hiding his feelings at all during this time period.  The "F the FBI," "those MF'ers," those were all comments said around Mr. Baca.  It was not a yes, sir, no, sir, please, please, sir.  This was Mr. Tanaka explaining exactly what he felt.

August 23rd, somebody messes up, allows the FBI to have access to Anthony Brown, starts interviewing Anthony Brown.  After about an hour, a big sergeant walks in the room.  "This interview is over.  Who told you you could have had contact with this inmate?"  Special Agent Marx tells

**UNITED STATES DISTRICT COURT**

Anthony Brown at that point, "We'll be back for you."  There's only one way for the FBI to come back for Anthony Brown and force the sheriff's department to turn him over.  That's with a federal court order.  That's with a writ.  So the sheriff's department at that point knew what that meant.

Mr. Leavins also knew what that meant.  If they're coming back with a court order, that means there's going to be testimony involved.

(The CD commenced playing before the jury.)

MR. FOX:  Shows the co-conspirator's intent related to his testimony.  Hide him, make sure he does not testify.  There's a court order.  It's to bring him over for testimony, and we don't want that to happen.

(The CD commenced playing before the jury.)

MR. FOX:  Once again, we want to clean our own house.  We police the police.  Nobody else needs to police the police because we do that.

Mr. Thompson goes to Paul Tanaka at that point with Mickey Manzo, James Sexton, Steve Leavins.  You let me and the sheriff down.  That's what Mr. Tanaka says after they explain to him that the FBI had been in to see Anthony Brown.  You let me and the sheriff down.  That shows they had the same agenda.  Keep the FBI away from Anthony Brown.  And then what does Mr. Tanaka say?  You, Greg Thompson, you are going to brief the sheriff.

Paul Tanaka doesn't go in the room with him. Paul Tanaka doesn't give instructions on what to tell the sheriff. He's not hiding information from Lee Baca at that point. He's saying, you, Greg Thompson, tell him how you messed up. You tell him what happened. You tell him how you violated his order. And Greg Thompson did that. He went to Leroy Baca, explained to Mr. Mickey Manzo what happened next. I told him the FBI interviewed Brown, and I apologized and dove on my sword.

Does this make any sense if Leroy Baca doesn't understand what the goal of this conspiracy is? He's the head of the organization and the lieutenant is going to him saying, "I'm sorry, boss. I messed up. The FBI saw Anthony Brown." The only way that makes any sense is if Lee Baca knows that the goal is to hide Anthony Brown from the Federal Government.

Otherwise, he'd say, you know, what are you talking about? I don't care if the FBI has access to Anthony Brown. Paul Tanaka would have said -- wouldn't have gone in there and said, Greg Thompson, you go brief the sheriff. He would have gone in there and given him partial information. That's not what happened. Leroy Baca was given full information. The FBI was there. We kicked them out, and I'm sorry. Won't happen again.

They then come up with this policy. But before they do so -- policy is supposed to keep the FBI out -- they

move Anthony Brown to the staph infection ward of Men's Central Jail.  You heard Anthony Brown had medical issues; so they decided a good idea at that point was to send him to the infectious diseases floor where there's MRSA, staph infections.  That's where they sent him.

They had two OSJ guards stand watch over Anthony Brown at that point on 24 hours a day, seven days a week.  Make sure this slipup doesn't happen again.  And they came up with this policy that they sent out to all the custody people.  It says that -- the FBI visits have to be authorized by the sheriff's department.  The policy was issued after it removed references to Mr. Tanaka, it says, or the executives.  Once again, plural.  The executives.

Mr. Baca and Mr. Tanaka did not want their names on this.  They didn't care if others, you know, had their names on it.  Greg Thompson, no big deal.  His name can be on this.  Mickey Manzo, James Sexton, they can be guarding Anthony Brown and get in trouble for it, making sure the FBI doesn't have access.  But we don't want our names on this policy.  We don't want people looking back at us later understanding that we were the ones who were part of this conspiracy, leading this conspiracy.

August 25th Federal Government comes back for Anthony Brown, serves a writ on the sheriff's department through the normal channels, a fax to the Inmate Reception

Center.  And then there's a flurry of phone calls in the next hour.  You can see this from Exhibit 170.  Then Paul Tanaka e-mails Steve Leavins.  Right after -- and I mean right after -- "I spoke with Tom," meaning Tom Carey, Captain Carey of ICIB.  "The sheriff popped in looking for an update.  This case is consuming his entire thought process."

Once again, this was not Paul Tanaka and Leroy talking about the budget.  They've not been talking about the trains and whether their police were handling safety on the trains well.  They weren't talking about the next board of supervisors meeting.  They were talking about this, their obstruction of the Federal Grand Jury investigation.  That's what they were talking about.  This is another unplanned meeting; so it's not reflected in Mr. Baca's calendar.

That afternoon, 1:58 p.m., Anthony Brown is released from the computer system.  His records jacket is taken.  There's now no evidence that he's still in county custody, no evidence.  IRC can't find his record jacket or so the deputies thought, and he's released from the computer system.  So Special Agent Marx looking on the online system can't tell that he's still in county custody.  It shows up as released.  One minute later Mr. Baca calls the U.S. Attorney's Office setting up his meeting with Andre Birotte for now it's safe.  Now it's okay to start engaging with the U.S. Attorney's Office and express your disappointment with the investigation

because no one can tell that we're hiding Anthony Brown.  No one can find him.

The next morning they start thinking about this. Okay, last time the FBI came for Anthony Brown, they knew he was in Men's Central Jail because they met with him there. They've now served this writ, can't find him.  We'd better get him out of MCJ.  We'd better get him out.  What are we going to do if they show up with a possible court order, hand-delivered this time, say we want the inmate?  What are we going to do?

They discuss let's make sure we have a new process where we're going to pass this form to an attorney, something that's never been done before, never been done since. But right now we're going to give it to an attorney to examine, make sure the court order is valid, but let's use the attorney that's on vacation for a month.  Let's slow this down, circle the wagons.  Get our arms around the investigation and get the FBI during this and the U.S. Attorney's Office to back off the grand jury investigation.  That's what this was about.

Then the policy goes out custody-wide -- if any federal law enforcement official comes in with a court order or writ, do not release the inmate or allow contact.  They then decide they need to get Anthony Brown out of MCJ as quickly as possible.

Right after this policy is issued, Tom Carey called Paul Tanaka, and who does Paul Tanaka call right after

that?  Of course, Leroy Baca.  And think about these phone calls.  Of course there aren't going to be a ton of them because most of the time Paul Tanaka and Leroy Baca, they're on the fourth floor together in Monterey Park.  They work feet from each other.  So these are the times they're not together.  Paul Tanaka calling Leroy Baca.  Again, it underestimates the number of times they're communicating.

That afternoon Greg Thompson e-mails Tom Carey, I'm en route from MCJ -- en route from CJ, and Tom Carey says "Where should he meet them?"  Fourth floor conference room.  That's the conference room where they kept meeting where they swept for bugs later.  That's where they're going to be talking about this.

Robert Bayes was invited by Greg Thompson to go to the fourth floor that day in case they needed him.  So he was sitting outside of the executive offices, and he saw Mr. Baca walking up to him and then to his right.  Mr. Tanaka eventually coming out swearing, "Those MF'ers."  Well, this is exactly what Mr. Bayes was describing.  Mr. Hannemann talked about it.  Office of the sheriff is to the right.  Paul Tanaka's office and the executive offices are below.

And Mr. Baca came walking up to Mr. Bayes and then walking down, and Mr. Hannemann told you the only three rooms there are the executive conference rooms and Mr. Tanaka's office.  Mr. Baca was in that room that day whenever

UNITED STATES DISTRICT COURT

Greg Thompson showed up, and they discussed this.  August 26, an hour after that meeting was starting, Anthony Brown moved to San Dimas 30 miles away under Greg Thompson's name in that box in the corner.  Says that it's OSJ/ICIB.  And about the time that Mr. Tanaka is coming out of that meeting swearing that he was in with Mr. Baca, they've now moved him to San Dimas, changed his name, and rebooked him as Kevin King.

That evening after that's done after the booking happens, Mr. Tanaka calls Mr. Baca, and once again, this is not talking about the budget.  This is Mr. Tanaka calling Mr. Baca and then immediately calling Mr. Carey, Mr. Leavins. Mr. Leavins then at that point at 5:57 calls Mr. Baca, the one and only time they break rank, break protocol, and have a lower level co-conspirator call Mr. Baca.  Information wasn't flowing through the chain of command with this one call.

Then right after that Mr. Leavins wants to make sure he is communicating with his chain of command about what just happened because he calls his boss, immediate supervisor Tom Carey.  Lieutenant Leavins calling Tom Carey discussing this conversation with the sheriff.

That evening Mr. Brown is safely in San Dimas custody away from wherever the Federal Government might find him, and this is when the witness tampering continues with Anthony Brown.  They discuss how, after the FBI said that they'd come back for Anthony Brown, the FBI had left him for

**UNITED STATES DISTRICT COURT**

dead because, of course, Anthony Brown doesn't know about the Court order.

(The CD commenced playing before the jury.)

MR. FOX:  Communicating to Anthony Brown that he had been left for dead, they didn't put money on his books, they haven't come back for him.  Anthony Brown has no idea about the court order and believes the FBI doesn't care about him anymore.

(The CD commenced playing before the jury.)

MR. FOX:  The house is still there.  We are the sheriff's department.  We are more powerful.  We can make sure that we are going to be standing no matter what the FBI is trying to do.  No matter whether the FBI is trying to investigate our jails, nothing is going to happen because we control our jails.  That's what that comment means.

August 29 Mr. Baca had the meeting set up with Andre Birotte at the U.S. Attorney's Office, and the night before, Sunday night, series of telephone calls between the co-conspirators.  Mr. Tanaka calling Mr. Carey, Mr. Tanaka calling Leroy Baca all in a span of a few minutes.  Mr. Baca calling Mr. Tanaka back, and Mr. Tanaka, once again, passing information down to Mr. Carey, Mr. Leavins, and then Mr. Baca and Mr. Tanaka speaking again the next morning, and Mr. Tanaka calling Mr. Leavins.

Another meeting that's not on the calendar,

happens the next day.  August 29 Mr. Thompson leaves Men's Central Jail and says in the e-mail, Exhibit 67, he's going to meet with Lee Baca, the sheriff.  There's nothing on his calendar reflecting this.  Another impromptu meeting.

That afternoon Mr. Baca goes to the U.S. Attorney's Office, meets with Andre Birotte and a series of assistant United States attorneys, tells U.S. Attorney's Office, first of all, before that meeting that he didn't want the FBI there.  He wanted to have a conversation without the FBI being present.  And then he voiced his displeasure over the investigation.  He said he wanted the U.S. Attorney's Office to stop working with the FBI and, instead, work with his sheriff's department, the same sheriff's department who had been so ineffective in its internal investigation.  He wanted that to continue.  And he expressed his concerns with the grand jury subpoenas, again, showing his knowledge that this was a Federal Grand Jury investigation.  He was aware of the subpoenas.

After Mr. Baca left, Mr. Gennaco stayed behind and attempted to build bridges.  He told you about that he tried to see if they could work together.  But that was not in the cards in the sheriff's department.  Mr. Tanaka, who was Mr. Baca's eyes and ears, stayed behind.  He knew what the sheriff wanted.  It wasn't building bridges.  It was to tear down any bridges that already existed because that night he and Mr. Baca spoke again, and what happened the very next morning?

They start tampering with witnesses, tampering with their deputies who they thought might be cooperating with the FBI.

First Gilbert Michel. They start this interview at 8:10 a.m. There was about an hour-and-a-half or hour-and-45-minute break in the tape. I'm sorry. They start at 6:30. There's about an hour-and-45-minute break in the tape. They go back on tape, and then they conclude. Before I play that for you, I just want to show you the timing.

There are calls between Mr. Baca and Mr. Tanaka first at 10:56 and then an unavailable call at 11:00 o'clock a.m. right around the time they're breaking with Mr. Michel.

(The CD commenced playing before the jury.)

MR. FOX: Who are they trying to use to get this information? It was Gilbert Michel. FBI built a case on him in order to get information out of Gilbert Michel, make sure he doesn't give it to them.

(The CD commenced playing before the jury.)

MR. FOX: That's Scott Craig ordering, as a sergeant, Deputy Michel not to talk to anybody, and later he says that includes the FBI.

(The CD commenced playing before the jury.)

MR. FOX: Think about that. This is a law enforcement officer trying to stop Gilbert Michel from providing information to a law enforcement agency. This is

outrageous, just absolutely outrageous.  And he goes ahead and does that because he knows he has the authority to do it.

And it's not just the FBI that they're talking about, but they're actually talking about the Federal Grand Jury when they're discussing this with witnesses.  When they meet with David Courson later, what do they talk to him about?

(The CD commenced playing before the jury.)

MR. FOX:  And then he said, "And I'll call him," meaning Lieutenant Leavins, "and we'll go from there" because that's how information was being passed out.  Craig to Leavins, Leavins to Carey to Tanaka to Mr. Baca.

(The CD commenced playing before the jury.)

MR. FOX:  Grand jury subpoenas are now B.S. They're now blackmail.  They're now coercion in the eyes of the sheriff's department.  That means that the grand jury is intruding on their sacred space.

September 2nd there's a bug sweep.  And whether Mr. Baca knew about this or not is actually irrelevant because which offices are being swept?  The ones that are being swept tell you that there are dirty conversations going on in those offices because they didn't want the Federal Government listening in.  It's a large EPC conference room where all of these meetings were happening, the smaller conference room for their smaller meetings, and then the executive offices -- Mr. Baca's office, Mr. Tanaka's office.  They didn't want the

**UNITED STATES DISTRICT COURT**

Federal Government listening in on their communications, their meetings. September 2nd after all these meetings occurred and after future meetings are about to happen when they're having dirty conversations.

September 7th Anthony Brown is supposed to be produced to the Federal Grand Jury. This is the date on the writ that shows the Court has ordered his production before the Federal Grand Jury, and the sheriff's department does not turn him over. He's still in county custody at this point. He's not brought to state until September 12th. But on this date he's not produced anywhere. He stays in county custody.

Same day Lieutenant Thompson sends Tom Carey, Captain Carey, the grand jury request for Anthony Brown's records jacket. They want information. Grand jury wants information. Where is Anthony Brown? Tom Carey sends that -- I'm sorry -- Greg Thompson sends that to Tom Carey. A lot going on that day.

That evening Mr. Tanaka's assistant, Chris Nee, asked for the order, once it's signed the next day, referring to what they were going to present before Judge Torribio, the order they denied. What happened? Phone calls between Mr. Tanaka and Mr. Baca and Mr. Baca and Mr. Tanaka.

September 8th Greg Thompson makes a mistake. He's supposed to keep the executive names off of this policy. He resends it. "Just a reminder to inform your staff all

requests for inmate interviews made by the FBI or any law enforcement officer associated with the FBI must be referred to MCJ jail liaison for approval."

We're focusing at this point with this policy on the FBI. Not any other law enforcement agency unless it's affiliated with the FBI. They'll let anyone else in. It's just the FBI that must stay out, and that's because they didn't want the FBI to be investigating the jails, serving more grand jury subpoenas, trying to interview inmates, talking to deputies. The FBI had to stay out.

But he messed up because he writes on there in the last line, "This has been mandated by department executives and will remain in effect until further notice." Once again, executives in the plural, and he was supposed to keep their names off of this policy as you saw in the previous e-mail that he had with Mr. Tanaka's assistant. Greg Thompson messed up.

Now, when Mr. Baca was out of the country on September the 8th when they presented this denied court order to Judge Torribio, I want you to compare this exhibit, Exhibit 141, with Exhibit 112. "What are the locations of additional cellular telephones currently in use and/or deployed within the confines of the Los Angeles County jail system" on the right-hand side. This is Mr. Baca's letter that he provides to Andre Birotte. "What are the locations of any other additional cellular telephones currently in use, owned,

or deployed by the FBI within the confines of the Los Angeles County jail system?"  This is them working in concert together.  Mr. Baca knew what they were seeking.  Same language, different documents, showing they're working hand-in-hand together.

Also, "Court order sought the disclosure of any and all contraband items given to any Los Angeles County Jail inmates through any means at the direction, consent, or knowledge of the FBI to include a description of the item, the identity of the inmate, and the date, time, and location of the occurrence."  Look on the right-hand side.  "Please disclose any and all items of contraband given to any Los Angeles County Jail inmates through any means including a description of the item, the identity," you get it.  This is the exact same language written in Mr. Baca's letter written in the court order.  They were acting in concert together.  This is a conspiracy.  This is what happens in a conspiracy.

Well, we know that Mr. Baca was out of town from September 8th to September 21st.  What happens during this time?  Well, his anger is not around anymore.  He's no longer around to be upset.  So things actually calm down a little bit.  Anthony Brown was sent to state prison where the FBI is able to interview him.  He was very upset, explained how he thought that they had left him for dead because the sheriff's department had not told him all the steps the FBI took to try

to get Anthony Brown into federal custody.

They also learned on September 13th -- sheriff's department does -- that Gilbert Michel confessed to beating handcuffed inmates with other deputies.  There's a real problem in the jails.  They certainly knew about it then, and they knew that someone that the FBI had in their crosshairs, that the grand jury had in its crosshairs, someone who was going to be cooperating and decided to cooperate knew about civil rights abuses in the jails.

So when Mr. Baca returns, there's at least one meeting that he has with Mr. Tanaka, and there's probably five or so that day.  But on September 22nd at 4:30 p.m. in his calendar, it shows a meeting with Mr. Tanaka his first day back, and he learns this information.

Then on September 24th and 25th, things get more serious.  There were articles written in the newspaper about the federal investigation of not only their jail but also federal enforcement of civil rights laws, generally, that this is a focus now of the Department of Justice.  And Mr. Baca, during this time frame, set up his meeting with Andre Birotte and Steve Martinez, the head of the FBI, for September 27th.

But he wasn't ready to have that meeting yet. Things weren't ripe for him yet.  He needed to do some things for him first.  He went on *Good Day L.A.* the morning of the day before that meeting on September 26, 2011, and had some choice

words.

(The video commenced playing before the jury.)

MR. FOX:  He resents the FBI's intrusion.

(The video commenced playing before the jury.)

MR. FOX:  Still beating the drum.  This FBI undercover investigation was illegal.  Despite Rhambo telling him otherwise, despite knowing otherwise.  It's kind of a ridiculous point for us to discuss because it's so obvious what the FBI did was not illegal.  So obvious.  But he's still trying to say it's illegal.  That's important because of what happens later that day.

(The video commenced playing before the jury.)

MR. FOX:  He has to weigh his options.  What options is he weighing?  He's weighing the FBI committed a crime; right?  That's what he's talking about.  Should we charge the FBI -- some agent with the FBI of committing a crime?  That's what he's talking about there.  What other options is he talking about?

And then this is probably the best question asked in the court.  It's better than any question Mr. Jauregui asked, better than any question I asked, and probably better than any question the defense asked.  The anchor asked Sheriff Baca --

(The video commenced playing before the jury.)

MR. FOX:  If the FBI is not going to be

investigating you, who's going to be investigating you?  We police ourselves.

And then he goes on to talk about the Office of Independent Review, but you've seen that toothless, powerless, understaffed, under budget.  He wanted to continue to police himself.

He then has meetings set up in his calendar with Mr. Tanaka and Mr. Rhambo.  During these meetings, Mr. Tanaka must learn of the *Good Day L.A.* appearance, and Mr. Baca must talk about it because Mr. Tanaka forwards that link to Tom Carey.  Tom Carey forwards the link of Mr. Baca's appearance to Scott Craig, Sergeant Scott Craig.  And at 5:30, before he goes out that day actually, so before 5:30, a sergeant within ICIB -- Mickey Manzo talked about this.  The sergeant with ICIB asks Sergeant Craig, "Are you really going to be doing this?"  And Mr. Craig bowed and said, "I've been so ordered," and walked out the door.  Walked out the door.  I've been so ordered.  And where does he go?  He goes to do this.

(The video commenced playing before the jury.)

MR. FOX:  The goal was not to try to talk to her. The goal was to try to get the FBI's attention.  If they were trying to find out details about the cell phone, first of all, they already had those details.  They already knew it from Gilbert Michel.  They already knew it from Anthony Brown.  If they were trying to find out details, though, about something

bigger than Anthony Brown and the cell phone, Mr. Baca already had a meeting set up the next day with the head of the FBI in Los Angeles and the U.S. Attorney in Los Angeles.  That was the meeting to find out those details.

This was done to put the pressure on the FBI, to intimidate the FBI.  You're going to look at us?  Oh, yeah?  Well, we're going to look at you.  That's what this was all about.  And they got the FBI's attention because Special Agent Marx goes back to work and gives Sergeant Long's card to her supervisor, explains what happens.

(The CD commenced playing before the jury.)

MR. FOX:  "The sheriff knows this, sir."

"She indicated to me that you guys indicated to her that there's going to be a warrant for her arrest."

"The sheriff knows this, sir."

Think about five levels below Mr. Baca using his name, invoking his name, but not having the authority to do so.  What if Mr. Baca didn't know about this and the U.S. Attorney and the assistant director in charge of the FBI called and said, hey, what's going on with this arrest?  What's going on with this threat of arrest, and he knew nothing about it?  You know it would hit the fan, and that didn't happen.  None of that happened.  That's because he was aware of what they were going to do.  He had given them the authority to do that.

(The CD commenced playing before the jury.)

MR. FOX:  They had gotten the FBI's attention. They're scared.  They're concerned that their special agent is going to be charged, that we're going to charge the special agent, and they knew, again, that the U.S. Attorney and the assistant director in charge were going to be reaching out for Mr. Baca.

And Andre Birotte did.  He told you about his conversation.  "I'm getting this call that deputies are out here trying to arrest an agent.  Is that what we're doing here?"  And compare Mr. Baca's response to what happened when Mr. Birotte thought that it was the LAPD out there and called someone he said was Earl Paysinger and said, "Hey, Earl, I hear that your officers are out there threatening to arrest an agent," and Mr. Paysinger is sounding completely confused.  "I don't know what you're talking about."  That's not what happened with Mr. Baca.  He said, "No.  No.  I'm really upset about what's going on, though," and he starts discussing the same issues, starts beating the drum again about how they should be policing themselves and all that garbage.

Then Mr. Birotte, "I just need to know" -- cuts him off, "I just need to know.  Is one of my agents getting arrested tonight or not?"  Mr. Baca, "No.  No.  That's not going to happen."

I talked about a lot of phone charts with you already.  I want to show you one more, September 26th.  He

receives this phone call around 7:30 p.m. that night, and Mr. Baca calls no one after speaking with the U.S. Attorney. If he didn't know about what happened, if he was unaware and all of a sudden he hears that an agent was threatened to be arrested by one of his sergeants, you don't think he'd be calling around to try to figure out what happened? He didn't have to because he knew.

And what about going the opposite way? If the sergeant had inappropriately used his name and thought about it, oh, boy, I'm not really sure if the sheriff knows about this, I'd better tell my supervisors about it, there would be communications going on. Hey, boss, sorry about this, but you might be getting a call from the U.S. Attorney and the assistant director in charge because one of our people threatened to arrest an FBI agent. Sorry about that. Nothing in these records shows any of that happening, and that's because everybody knew that the sheriff wanted this to happen, and it did happen. And when Mr. Baca received a call, it was exactly what he wanted.

He had written a letter, in fact, to the U.S. Attorney that day. He wound up giving it to him on September the 27th. Listed the grand jury subpoena. So it shows, again, that he knew about the grand jury subpoenas, said that it would take a thousand man-hours to respond. Once again, mirroring language from another exhibit you have. In

Mickey Manzo's notebook, he discusses a meeting on August 30th, I believe it was, in which they talk about the grand jury subpoenas and say that it would take 1,000 man-hours to respond written into his notebook which you'll have with you.  Shows the conspiracy.

Mr. Baca writes in the letter that the sheriff's department is going to be investigating crimes by the FBI. They're not backing down.  They're going to be investigating crimes by the FBI.  None occurred, of course.

The sheriff's department was going to be the one that investigated the excessive force by deputies, and he said from January 2009 to the present, same time frame as the grand jury subpoenas.  We're taking over this investigation whether you like it or not.  We have control over our deputies.  We have control over the inmates.  We're going to investigate and knock you guys out.

Also said that the sheriff's department will be investigating Gilbert Michel.  Again, talked about this earlier.  Undercover operation that the FBI performs, has all the audio recordings, has all the video recordings, and yet the sheriff's department will be the one that investigates Gilbert Michel.

Invited the U.S. Attorney to monitor their own investigation and receive regular updates.  Again, passive investigation.  There would be no grand jury involved in this.

This would just be the U.S. Attorney acting like OIR at this point, passively investigating, receiving information as the sheriff's department chose to give it to them and that the U.S. Attorney's Office should instruct the FBI to withdraw the subpoenas. This was the goal. Get the grand jury out; get the FBI out. This was the goal. Asking the U.S. Attorney to stop supporting the FBI and instead support the sheriff's department.

So on September 27th when Andre Birotte told Lee Baca, we're going to continue our investigation, we're going to continue to investigate despite all these things that you're doing, what does Lee Baca say to him? "I'm the GD sheriff. These are my GD jails" or "This is my GD jail" and says to Steve Martinez, "Do you want to gun up in here?"

Now, in opening statements the defense told you that this was all a joke, this was all humor. There was even laughter, I think, in the courtroom when he said it. "Do you want to gun up in here?" But the U.S. Attorney told you about the pressure in that room, things going on in that room. And, in fact, he told you what he understood Mr. Baca to mean. This was not a joke. He understood that comment to mean, you want to go to war? We're going to war. We're going to war. That's what that was about.

The defense told you in the beginning that Mr. Baca did not authorize, condone, agree, or know about

things that were occurring beneath him.  Let's talk about Mr. Faturechi's testimony.  Let's look at that.  On September 28th he interviews Leroy Baca, said he had been hearing things, that he wanted to talk about what had happened.

And remember, Mr. Faturechi filed a motion to quash before coming here.  He didn't want to be here.  He didn't want to testify.  He had his lawyers file a motion to quash the subpoena.  That's what you do when you don't like a subpoena you've received.  You go to court and see if the Court will agree with the relief you want.  Please don't make me comply with the subpoena.  You don't go out tampering with witnesses.  You don't go out threatening to arrest somebody.  You don't go out hiding.  Mr. Faturechi could have hidden.  He didn't do that.  He complied with the court order after the Court ruled that he needed to testify.

And what happened on September 28th?  What did Mr. Baca tell him?  Mr. Baca knew that Mr. Brown was creating a list of deputies to provide to the FBI, and they had that list.  The FBI attempted to flip, meaning ask Mr. Michel to cooperate.  They attempted to flip Mr. Michel at his home.  The LASD investigators went to the FBI agent's home, Mr. Baca had explained to Mr. Faturechi.  And why did they go there?  Well, it's telling, his comment here.  He told Mr. Faturechi that the FBI had employed substantially more intimidating tactics by attempting to flip the dirty deputy who had accepted a bribe.

That was substantially more intimidating than them going out to an FBI agent's home who had done nothing wrong but investigate the sheriff's department.

You could see what was going on, his motive, right there.  He was upset that the FBI tried to convince a deputy to flip and cooperate on the department.  And Mr. Baca informed Mr. Faturechi that he directed the investigators to go there, to go to the FBI agent's home, to go to Special Agent Marx's home.  Shows that he authorized, condoned, knew about it, and agreed to it.

What else did he authorize, condone, agree, or know?  Well, Mr. Manzo told you that he ordered Mr. Brown to be isolated when he learned that FBI agents had made him an informant, that the ICIB was to investigate the phone incident when it was very clear what had already happened.

Mr. Sexton's overtime, you saw that in the exhibits, his overtime was approved in Mr. Baca's name.  May not be his signature, but it has his name on it showing that he had authorized, condoned, and agreed to it.

Mr. Rhambo told you, he's up there on the fourth floor, and he knew this was Mr. Baca's operation.  Mr. Baca was operating on a need-to-know basis.  Mr. Rhambo knew well enough let's stay away from this thing.  This is a hot issue.  Don't know what the sheriff is doing, and I don't want any part of it, but he knew it was the sheriff's operation.

**UNITED STATES DISTRICT COURT**

Mr. Hannemann told you about the secret meetings going on with Mr. Tanaka, Mr. Carey, Mr. Leavins, and Mr. Thompson.  You saw the phone calls with Mr. Tanaka and what happened next.  Maricela Long saying the sheriff knows this, sir, invoking his name which any inferior would not do unless their superior knew about it.

And then Mr. Baca does not order any internal investigations of those who obstructed justice.  If they were disobeying his commands, his orders, you know that he would have done an internal investigation.  Instead, what did he do?  Gave them glowing reviews as we'll look at.

The defense told you that Mr. Baca couldn't have committed this crime because he was open, direct, and transparent about all of his conduct.  First of all, that's not an element of the offense.  We don't have to show he was concealing his conduct.  It just means that you receive more evidence and you can consider his conduct because you have more evidence.

But he was concealing his conduct.  Remove the executives from that FBI policy.  That comes from Mr. Tanaka, but it shows they were trying to keep the executive names off of these policies.  There was the bug sweep so that the FBI -- they could ensure the FBI could not be listening in on what they were doing.

Then this one, I mean, he continues to claim over

the course of a month that the FBI was committing a crime despite all evidence to the contrary.  It's law enforcement 101, as I said.  Everybody knows this.  You all knew this.  I believe the Court will instruct you that a law enforcement officer does not commit a crime simply by engaging in an undercover operation.  Mr. Rhambo said to Mr. Baca it's what we do, we the sheriff's department.  We do this too.

August 29 Mr. Birotte told you that he told Mr. Baca we didn't commit a crime.  Undercovers do this all the time.  And he said a very similar thing on September 27th.  Undercovers do these things.  No question about whether it's legal or not.

Mr. Baca didn't go to Ira Reiner.  He didn't go to Steve Cooley, his character witnesses, prosecutors, head of the D.A.'s office and say, "Is this legal?" because he knew what the answer was.  It, of course, was legal what the FBI had done.  He didn't want the answer.  He didn't go to Mike Gennaco, his personal attorney in OIR, and say, "Is this okay?  Can the FBI do this?"  Because he didn't want to know the answer to that.  He knew the answer.  He didn't want anyone else telling him it.

Maybe the most telling exhibits, the performance reviews of Scott Craig and Tom Carey.  Mr. Craig receives in the year in question an outstanding rating overall for doing this and everything else -- tampering with witnesses,

threatening to arrest an FBI agent who had done nothing wrong. Outstanding overall rating. What else did he get outstanding in? Everything. But also Mr. Baca's core values saying that he was outstanding in exuding Mr. Baca's core values and that he complied with all assigned tasks meaning he followed orders. He did a good job following orders. He did everything that we wanted him to do.

Mr. Baca, of course, could have passed down information to the person reviewing them saying, Craig doesn't get that. But who was reviewing them? Tom Carey, Steve Leavins, Mr. Baca's co-conspirators. That's who gave Scott Craig the review.

If that's not good enough for you, what about the review of Tom Carey whose bureau did this entire operation, ICIB? "Captain Carey's professionalism," it discusses, "and interpersonal skills allowed him to work harmoniously with his subordinates as well as the various executives he reported to on a daily basis." Mr. Carey, this shows, was reporting to Mr. Tanaka and Mr. Baca on a daily basis. And it says he showed outstanding judgment.

This is what Mr. Baca and Mr. Tanaka are saying about Tom Carey. How do you know that? Mr. Tanaka writes a handwritten note. "Tom, thank you for the great work. Paul T." He capped it with an exclamation point. How do you know that Mr. Baca also approved of this? Because his

signature is on the document.  "I concur in and approve this report, Lee Baca, April 27, 2012," reviewing the last year.  He approved of and concurred not only with this report but also of Mr. Carey's, Mr. Craig's, everyone else's performance.

I just want to go over the evidence one more time with you, and then I'll let Mr. Hochman discuss his view of the case.  Mr. Baca knew of the problems in the jail.  You heard from outsiders, insiders all talking to him about the problems that were going on in the jail, how it reached a crescendo right before August of 2011 when he learned of the federal investigation, how Mr. Baca ordered the isolation of the inmate and the investigation, didn't want Anthony Brown to be able to to have access by the FBI and wanted to find out which agent had been involved in this.

The people that were reporting to him then isolated the inmate, carried out his orders.  As I talked to you at the beginning, it doesn't matter whether he knows every detail of the orders, but this is what they did.  This is what they understood his orders to mean if they were going to carry them out.  No FBI visits.  Mr. Brown's name was going to be changed.  Mr. Brown was going to be moved from Men's Central Jail to San Dimas in order to keep the FBI out.  The investigation that he ordered, they decide to tamper with witnesses, conduct surveillance of the FBI agents, and threaten to arrest FBI Special Agent Leah Marx.

64

Now, in this case you've seen that the sheriff knew about this discrete detail.  So even here he knows about the very details.  And with everything else, the secret meetings that were going on, you can infer that he knew about that as well.

Mr. Baca, of course, put Mr. Tanaka in charge of carrying out these orders.  You heard about how close of a relationship they had.  He had dozens of meetings a week with these people.  On his calendar specifically and in the e-mails you've seen, you can at least show he had meetings on August 19th, 20th, 23rd, 26th, and 29th, all key days in this conspiracy.  September 22nd, 25th, and 26th, first day back from being out of town.  25th and 26th right before they confront the special agent.

And you saw the pattern of his phone calls, how the information is going down to Mr. Tanaka, back up to Mr. Baca.  Mr. Rhambo's warning -- Assistant Sheriff Rhambo telling Baca don't do this.  This is obstruction of justice. Again, if he wasn't aware of what was going to be happening, that conversation would have made no sense.

You've heard about Mr. Baca's direct involvement through Andre Birotte and through Mr. Faturechi in which he admitted his conduct.  He admitted that he sent deputies out to Special Agent Marx's home, and his approval of the co-conspirators' actions.  Through all this evidence, we have

presented to you an overwhelming amount of information that shows that Mr. Baca committed the two crimes charged in the Indictment.  This is Mr. Baca's conspiracy.  He brought in all of those to conduct it.  Mr. Baca is guilty of Counts 1 and 2 in the Indictment.

Thank you.

THE COURT:  All right.  Thank you.  Ladies and gentlemen, we're going to take our first break of the day.

Again, I want to remind you, until this trial is over, you're not to discuss this case with anyone including your fellow jurors, members of your family, people involved in the trial, or anyone else, and do not allow others to communicate with you about this case.  This includes discussing the case on the Internet, through various forms of social media, by e-mails, or text messages.  If anyone tries to communicate with you about this case, please let me know about it immediately.

Do not read, watch, or listen to any news reports or other accounts about the trial or anyone associated with it. Do not do any research such as consulting dictionaries, searching the Internet, or using other reference materials, and do not make any investigation about the case on your own.

Finally, you're reminded to keep an open mind until you've heard the arguments of counsel, the instructions of the Court, and the views of your fellow jurors.  If you need

to speak with me, simply give a note to the clerk.

All right. We're going to make this a short break. We're going to come back in ten minutes.

(The following proceedings were held in open court out of the presence of the jury:)

THE COURT: All right. We'll come back in about ten minutes.

(A recess was taken at 9:36 a.m.)

THE COURT: All right. Let's bring the jury in.

I just want to remind everyone. All electronic devices need to be turned off. There's no food or drinks allowed in the courtroom.

(The following proceedings were held in open court in the presence of the jury:)

THE COURT: All right, counsel.

MR. HOCHMAN: Thank you very much, Your Honor.

May it please the Court, counsel, ladies and gentlemen of the jury, in his testimony, former United States Attorney Andre Birotte best captured the essence of this case. He described the sheriff's department and the FBI as two younger brothers, brothers in arms, being involved in a pushing and yelling match in the sandbox. One brother, the FBI, had gone behind the back of the other brother, the sheriff's department, and the leader of the sheriff's department, Sheriff Lee Baca, got understandably upset about it.

Sheriff Baca for six weeks, from August 18 to September 26, 2011, asked the head of the FBI, FBI Assistant Director Steve Martinez for answers to the questions of why he went behind his back to bring a very dangerous cell phone into a jail that the sheriff had day-to-day responsibility over and give it to a violent and dangerous inmate who was serving a 423-year sentence with nothing to lose.

Of even more importance, Sheriff Baca wanted to know how big of problem he was facing, how many deputies were involved? How many inmates? How much contraband? Was it one cell phone? Multiple cell phones? Were there drugs? Who knows what else was going on that the FBI had brought into the jails.

Now, Sheriff Baca's focus was not on civil rights investigations that the FBI was conducting because that investigation was out in the open. The sheriff's department had already received grand jury subpoenas in connection with that investigation, and U.S. Attorney Birotte had told the sheriff to stand down, to stand down on complying with those subpoenas for the time being.

So for six weeks the sheriff could get no answers to his important questions, no cooperation, and was stonewalled by the FBI and the United States Attorney's Office. The sheriff, though, did not keep his search to himself for the answers because he shared it openly, transparently, and

directly with the U.S. Attorney himself, the very person who could bring obstruction of justice charges against him, with the head of the FBI, the very agency that could investigate those obstruction of justice charges, and the general public through a TV interview.

The sheriff had to get to the bottom of the questions as quickly as possible because the safety of the jails and everyone in it that he was responsible for depended on the answers to those questions. When, finally, Sheriff Baca met with U.S. Attorney Birotte and Assistant Director Martinez on September 27 and received the answers to his questions for the first time in six weeks, the anger was over, the pushing and yelling was done, the brothers shook hands and left the room together with an understanding how things were going to proceed in the future.

Now, the Government calls this six-week period in the sandbox conspiracy and obstruction of justice. It is neither. During these six weeks, Sheriff Baca did not conspire, did not obstruct, and did not endeavor to obstruct a Federal Grand Jury investigation. He was not the driving force or, as the Government called him in its opening statement, the heartbeat pumping blood into the body of the conspiracy because, if Sheriff Baca was the heartbeat of this conspiracy, this conspiracy was dead.

Sheriff Baca was not the heartbeat, was not the

leader, was not the driving force of the conspiracy. Undersheriff Paul Tanaka was, unbeknownst to Sheriff Baca at the time, and he is someone who is not on trial before you.

Now, before we enter into a discussion about what the evidence has shown at trial, I would like to go over a few of the rules that the Court will instruct you on how to consider the evidence. As the Court has told you, being a juror is a very important role in our system, a very special role that Americans have fought over to promote for the last 200 years.

In systems around the world -- China, Russia -- if the Government charges you with a crime, you are guilty until you prove yourself innocent. That is what's called in that case the presumption of guilt. We have the presumption of innocence. And in America we decided to do it differently for a good reason because here you are presumed innocent at the beginning of the trial, during the trial, at the end of the trial, all the way into jury deliberations until and unless the Government proves its case beyond a reasonable doubt.

The Government, not the defense, has the burden of proof here, and that burden of proof is beyond a reasonable doubt. And you're going to hear me say that over and over and over again because it is your duty to look at the evidence and say, when you're looking at it over and over and over again, has the Government met its burden of proving beyond a

reasonable doubt every element of every crime because, if the Government has not met its burden of beyond a reasonable doubt to prove every element of every crime, it is your duty to find Sheriff Baca not guilty.

Now, what is that burden, that very high level burden of beyond a reasonable doubt that the Government has to meet? Well, what you're going to hear is that in a criminal case the system requires this highest level of proof because it is a level of proof that is only required in criminal cases. But the much lower burden of proof is something called probable cause. You heard about that burden in this case because that is the very low burden that the grand jury has to meet to indict a case.

Now, remember, the grand jury does not get to hear from defense counsel. The grand jury can hear many secondhand information passed on to it by witnesses, and the grand jury does not have defense counsel cross-examine Government witnesses. And so the burden of proof of probable cause is something vastly different than the burden of proof of beyond a reasonable doubt. The grand jury has probable cause. You, the trial jury, has beyond a reasonable doubt.

Now, since an Indictment is not evidence of anything, the grand jury has this lower burden and, to meet this lower burden, all they have to show is that someone might have committed a crime, not that it was proven beyond a

reasonable doubt, but for the grand jury, it's a "might" cause. For you, the trial jury, it is beyond a reasonable doubt.

Now, in addition to this very relatively low amount of evidence needed to meet probable cause, beyond a reasonable doubt is not something where it's beyond all possible doubt. What is beyond a reasonable doubt? Well, a reasonable doubt is simply a doubt that is based on your reason and your common sense. So if you look at the evidence and, using your reason and your common sense, you have a doubt about whether or not the Government has proved every element of every crime, then the evidence has not convinced you beyond a reasonable doubt. It is your duty then to find that Sheriff Baca is not guilty.

Now, why do I keep saying that the Government has the burden of proof beyond a reasonable doubt? Because the burden that the Government has never shifts to the defense. The issue in this case is not guilt versus innocence. Those are not the findings you need to make. It's guilty versus not guilty. And the significance of that is that the burden always stays with the Government all the way through jury deliberations.

Now, since the burden never shifts, never shifts to the defense at any point, a defendant always has the right not to testify. It's a constitutional right, especially in a case where the Government has completely failed to meet its

burden of proof.  Just like it is your duty not to read the newspaper or go on the Internet about this case, just like it is your duty to return a not guilty verdict if the Government does not meet its burden, so too is it your duty to honor a defendant's constitutional right not to testify, particularly in a case where the Government has completely failed to meet its burden of proof.

So we've covered the very high burden of proof beyond a reasonable doubt and Sheriff Baca's constitutional right not to testify.  But we must also cover one more important rule.  Sheriff Baca is on trial for conspiracy and obstruction of justice, and those are the only two charges that you must consider.  That sounds pretty obvious, but in this case, it's not.

What is not on trial here?  Well, the Government has presented testimony about inmate beatings, excessive force, and false reports that occurred in the Men's Central Jail. There is absolutely no excuse for what happened in the Men's Central Jail, and the individuals who beat up inmates, engaged in excessive force, and filed false reports should be punished.

Well, what do we have in this particular case as to what we know about deputies who beat up inmates and whether or not they were punished?  Well, let's start with Deputy Gilbert Michel who confessed to the Government about

beating up inmates brutally.  If you remember Inmate Bragg, that was his neighbor's -- the person who prosecuted his neighbor's daughter, and you heard what he did to him.  So he confesses that crime to the Government.  And what happens? He's not charged with it.  The only thing he's charged with is bribery.  Not one of those beatings.

We also heard from Deputy David Courson who personally witnessed a beating.  Was he charged?  He wasn't charged at all with the beating.

We also heard from Assistant Sheriff Cecil Rhambo, the No. 3 person in the department who was in charge of custody, in charge of overseeing that Men's Central Jail when those beatings were occurring.  Was he charged?  He wasn't charged.  Was any witness that you heard testify at trial charged with any of these beatings, excessive force, or false reports in connection with it?  Nobody has been charged.

So why did the Government introduce such testimony into this trial if they didn't charge Sheriff Baca with it?  To poison your mind, to poison your mind against Sheriff Baca because they figured out and they were hoping that, if you heard about these horrible things that were going on in Men's Central Jail committed by deputies on the chain of the command but at the very bottom of it, you would want to hold somebody criminally responsible for them even though those charges are not before you.  And that is very important because

the mere fact that Sheriff Baca was the sheriff at the time the beatings occurred does not make him criminally responsible for what went on down below.

Similarly, the mere fact that Sheriff Baca was the sheriff during these six weeks of August through September of 2011 does not make him criminally responsible for what went on down below.  Unless the Government can meet its burden of proof of beyond a reasonable doubt to show that he was the heartbeat, the leader, the driving force, and personally involved, personally involved with the crimes he was charged with -- conspiracy and obstruction -- the mere fact that he was at the top of the chain of command at this time does not mean that he was personally involved or committed these crimes.

Likewise, the mere fact that you may think one way or the other that the policies, programs, and procedures that Sheriff Baca instituted in the jails in response to the ACLU, Chaplain Juarez and others' complaints were either adequate or timely responsive is not an issue that is before you to decide in this trial.

But let's look at the evidence on this issue because it provides you with Sheriff Baca's mindset, his approach to inmates that differed from the get 'em in, get 'em out, us versus them, inmates are the enemy, let's just warehouse them.

Sheriff Baca's responses to the complaints was

completely avoided in the Government's opening statement.  You heard about all the problems, but what you didn't hear was Sheriff Baca's responses.  So let's go through those responses.

Well, the first thing you heard -- one of the things you heard was from Commander Paul Pietrantoni.  And what did you hear about that response that the Government avoided in its opening remarks?  What you heard was that starting in 2009 Commander Pietrantoni was brought in by Sheriff Baca to Men's Central Jail where the ACLU was complaining about excessive force being used by deputies against inmates, and you heard him on the stand, Commander Pietrantoni, say that what he brought was a new way to teach deputies.

And then he taught the deputies in all the classes that were coming up in 2010 until he went on medical leave in 2011.  And what did he teach them?  How to engage in use-of-force reduction in order to control an inmate.  He told you that his technique was to go ahead, and everyone had a plan.  You grab the right arm.  You grab the left arm.  So you don't just rush into an inmate and a confusion goes on and then you have to use too much force -- they use too much force and beatings and inmate abuse occurs.  Commander Pietrantoni was teaching them how to use those wrestling techniques, leverage, how to put your arms on someone so you didn't have to resort to your flashlight, your fist, or your boot in order to control them.

The second thing you heard was Assistant Sheriff Rhambo, again, the No. 3 person in the department -- we heard a lot about Assistant Sheriff Rhambo from Mr. Fox, but he didn't tell you this one part.  Because remember what happened when Chaplain Juarez made his complaints?  Did Chaplain Juarez get shunted off to some deputy or sergeant or lieutenant or captain or commander to make those complaints to?  No. Sheriff Baca took the meeting himself.  And as important, at that meeting was Assistant Sheriff Rhambo.

And when Chaplain Juarez described for them what happened in February of 2009, what was Sheriff Baca's response? He turned to Assistant Sheriff Rhambo and said, "You're going to look into this."  The No. 3 guy in the entire department is going to look into Chaplain Juarez's complaints.

Now, is that the mindset of someone who has -- wants to sweep these complaints under the rug, not address them at all, shunt them off, disregard them?  No.  He personally took the meeting, and he personally put his No. 3 person and that entire department in charge of responding to Chaplain Juarez.

What did we learn about Assistant Sheriff Marv Cavanaugh?  His name came up quickly in the first week, but remember what happens because, before Assistant Sheriff Cecil Rhambo is the No. 3 person over custody, it was Assistant Sheriff Marv Cavanaugh.  Rhambo replaced Cavanaugh in

this position.  And what did we hear Cavanaugh do?  Remember the second ACLU attorney Mark Rosenbaum -- actually, he was the first one who testified.  He was the head of the ACLU's office.  He's the one that got the meeting -- not Peter Eliasberg but Mark Rosenbaum with Sheriff Baca.  And who else was at that meeting?  Assistant Sheriff Marv Cavanaugh.

And what happened?  Mr. Rosenbaum voiced all those complaints about what was going on in the jail.  Sheriff Baca turned to Marv Cavanaugh and said, you, Mr. No. 3 person in charge of custody, you go have meetings with the ACLU, Mr. Rosenbaum and that jail monitor, and find out what's going on.  And what you heard Mr. Rosenbaum talk about, Peter Eliasberg said he wasn't a partner, but Mr. Rosenbaum talked about meeting after meeting after meeting, detailed meetings with agendas and action items afterwards that the ACLU and Assistant Sheriff Marv Cavanaugh attended.

And finally, we have the director of Office of Independent Review Michael Gennaco.  So what did we learn about Michael Gennaco?  Well, we learned that he was one of the most experienced civil rights prosecutors for 30 years as first a prosecutor with the U.S. Department of Justice's civil rights division in Washington, D.C., and you heard he did civil rights cases all over the country.

Then he moves in the 1990s to the U.S. Attorney's Office in Los Angeles where he founds the civil rights section

and is the leading lawyer in the civil rights section.  And then he is contacted to see whether or not he wants to be involved with the Office of Independent Review.  So if you're going to put someone to run the Office of Independent Review and you're not going to listen to them and they're going to be a rubber stamp, the last person in the world you would put is Michael Gennaco.

You heard him testify.  He's one of the more credible people you're going to hear.  He has more civil rights prosecution against the Los Angeles Sheriff's Department when he was a prosecutor than probably anybody in Los Angeles, maybe even anybody in the country.  And that -- when Sheriff Baca in 2001 creates the Office of Independent Review, who gets brought in to head it?  Was it a lackey?  No.  It was Michael Gennaco.

And by the way, why would Sheriff Baca create the Office of Independent Review if he just wants to have the police police the police?  He's already got Internal Affairs. He's already got Internal Criminal Investigations Bureau.  Why bring in Michael Gennaco and create an independent review where Michael Gennaco is not paid by the sheriff's department? Michael Gennaco is paid by the county.

Michael Gennaco says that the Office of Independent Review, when it was set up, was unique, was the first of its kind in the nation.  So it's not like the sheriff had all his other fellow sheriffs having their Office of

Independent Review and he just wanted to join them.  He led the pack in bringing in an independent review.

Now, the Government will say, well, they're not as good as -- they don't have all the access.  They don't have all the lawyers.  But again, compared to anywhere else in the nation, this is the only sheriff's department at the time who even had an Office of Independent Review.  And remember what Michael Gennaco said about it, what made it unique is that it had the ability to look at the investigations as they were happening, actually have realtime access to investigation reports because in most cases the only time anyone ever gets to review it is months or years later.

You also heard what Michael Gennaco said about publishing their findings.  They publish their findings every three months, quarterly reports.  And they would actually publish discipline.  Discipline cases about the sheriff is now being published widely.  You heard even Special Agent Marx read these reports.  They also had annual reports.  So this is who the sheriff has brought in, someone who is going to independently review it and, as the Government failed to point out, publish it for the whole public so they can see what type of discipline is being done in the sheriff's department and, as importantly -- and he said they gave criticism -- what is not going on in the sheriff's department.

Now, what you'll also hear -- and this is very

important -- is a piece of evidence that the Government didn't focus on, and that's Exhibit 600.  And this Exhibit 600, which is the July 19, 2011, letter that Michael Gennaco writes to the District Judge Dean Pregerson.  It is probably the most important document on the issue of the sheriff's responses to the ACLU complaint in the entire case.

If you recall, this is what -- the letter that was involved was written on July 19, 2011, to the U.S. District Judge Dean Pregerson.  And in that letter they discuss -- Mr. Gennaco discussed three different issues that he had been in meetings and negotiations with the sheriff's department and the ACLU over the prior couple of months.  Whether the sheriff's department was amenable to developing specific policies that would prohibit retaliation against inmates who complained to the ACLU -- because if you recall, that was one of the ACLU's big issues -- whether the sheriff's department inmate complaint policy could be improved, and a request by the plaintiffs to develop protocols that would permit the use of laptops by the ACLU when visiting inmates.

As you have a chance to go through this letter, when you're in the jury room, focus on it because what you'll see is that they developed a centralized anti-retaliation policy.  Basically, as you'll read in the letter, what happened is they realized the sheriff's department policy wasn't good enough, and they worked with the ACLU, and they came together

on a policy that everyone agreed to that would deal with any anti-retaliation where basically deputies were retaliating against inmates for complaining, the ACLU -- Mr. Gennaco, sheriff's department came up with a brand new policy. When? July 19, 2011, right before the August, September 2011 issues that we're dealing with.

As you'll see, as we go through these letters, they'll talk about the revisions of the sheriff's department inmate complaint policy, and this is a very good point as well. The roadmap for inmates entering Los Angeles County jails. When an inmate used to enter the jail -- let's say the inmate wanted to make a complaint. Where does he find out how to make a complaint? Maybe ask around. Maybe he can find something on the walls that will tell him.

What Mr. Gennaco, the sheriff's department, and the ACLU did was they came up with a handbook, a handbook for inmates that they would be given when they entered the Men's Central Jail, every inmate. And in that handbook, it actually showed how you make a complaint, if you have any problems with a deputy, to the ACLU and have the anti-retaliation that, if you make that policy in it, that if you make that complaint, you will not be retaliated against. And it was signed by Mr. Gennaco and cc'd to Leroy Baca, the sheriff of L.A. County Sheriff's Department, and Peter Eliasberg, the legal director of the ACLU who was intimately

involved in helping build this policy.

So whether, again, you think these policies were adequate enough, responsive enough, or timely enough to the complaints is not an issue for you to decide.  Actually, it was an issue for the voters to decide because Sheriff Baca was the only elected person in the entire sheriff's department and had to stand for election every four years.  So the voters could hold him responsible for anything that went on in the department.  But you, the trial jury, can only hold him criminally responsible if the Government meets its burden of proving beyond a reasonable doubt that Sheriff Baca personally committed a crime.

So how can you consider this evidence of these responses to the ACLU and Chaplain Juarez's case?  Well, the evidence will show it goes to Sheriff Baca's mindset during the six weeks of August to September of 2011.  And the reason I say this is you need to ask yourself a question.  Was Sheriff Baca's mindset someone who addressed civil rights issues head-on and would not fear an FBI investigation into them, or was he of the mindset that he wanted to sweep everything under the rug and fear an FBI investigation?  Was he someone who would avoid taking a meeting, a personal meeting, with the ACLU or Chaplain Juarez where they're making excessive force and deputy-abuse complaints?  No.  He had, as you heard, an open-door policy, and he personally took those meetings.

Was he someone who would assign either no one or the lowest level deputy to deal with these situations?  No.  He brought in the No. 3 person, the guy who is in charge of custody for the entire sheriff's department to personally address these issues.

Was he someone who would not change the training of deputies when he found out deputies were being poorly trained and didn't know how to use those force-reduction techniques?  They didn't have the wrestling moves or the plan. Would he just avoid it and hope it just cured itself?  No. Sheriff Baca brought in Commander Pietrantoni to teach those deputies how to do it correctly.

Now, whether the Government thinks Sheriff Baca should have done more is not the question.  The question is, given all these responses by Sheriff Baca to the ACLU, Chaplain Juarez, and others' complaints, is Sheriff Baca someone who would fear the FBI looking into the same allegations that the ACLU had been dealing with for decades and the Office of Independent Review had been dealing with for a decade and publishing all their findings in press conferences, public reports, TV interviews, and the website?  And the answer is Sheriff Baca would absolutely not fear the FBI coming in and taking a look and joining the ACLU and joining the Office of Independent Review to take a look at what was going on in the jails.

So to meet its very high burden of proof beyond a reasonable doubt, the Government has to, as I said, prove certain elements of these crimes of conspiracy and obstruction of justice.  And as you look at each one of the elements, remember this.  If they failed to prove even one element in the crime, then you must acquit.  It is your duty to acquit.  They have to prove each and every element in order for you not to find the sheriff not guilty.

Conspiracy, Count 1, the Government described three different elements.  The two parts that we would focus on -- and we'll show you in a moment -- is the Federal Grand Jury investigation which is what has to be obstructed as said in Element No. 1, and Element No. 2, that Sheriff Baca became a member of that conspiracy, basically that he entered into the same agreement to obstruct a Federal Grand Jury investigation.

So what evidence is there beyond a reasonable doubt that Sheriff Baca entered into an agreement to do something against the law which, in this case, is obstruct a Federal Grand Jury investigation into civil rights violations -- and by that I mean the beatings, the excessive force, the cover-up, and public corruption involving bribes of deputies.

Well, in this case, the Government does not get close to meeting that burden of proof of showing that Sheriff Baca entered into such an agreement because, first,

**UNITED STATES DISTRICT COURT**

what I have already explained to you is that Sheriff Baca was very open in having other people, multiple groups, take a look at what was going on inside the jails and had no motive and no intent whatsoever to go ahead and prevent the ACLU, the Office of Independent Review, and for this case, the FBI in looking into what was going on in the jails.  So if he had no problem with the FBI looking into what was going on in the jails, what was his motivation to obstruct them?  The answer is he didn't have such a motivation at all.

Now, second, the Government failed to prove beyond a reasonable doubt that Sheriff Baca had any agenda during the six-week period to obstruct, impede, or influence an FBI investigation because the only agreement that he entered into was this agreement, to protect and keep Anthony Brown safe, and to investigate the cell phone and determine how big a problem it was in his jails because, you must remember, at this point on August 18, when he finds out about the cell phone, he only finds out about the following things from Steve Martinez, the assistant director of the FBI.  He finds out that the cell phone in the jail was an FBI cell phone that has been compromised, he finds out that a deputy is involved, and he finds out that an inmate needs to be protected and kept safe, and he gets the inmate's name of Anthony Brown.

What does he not get at that time?  FBI Director Martinez does not tell him whether or not there's a

**UNITED STATES DISTRICT COURT**

lot of deputies involved.  He doesn't tell him whether there's a lot of inmates involved.  He tells him about one cell phone but won't confirm or deny whether or not there's other cell phones in the jail, whether or not there's drugs in the jail. He won't confirm or deny any aspect of what the FBI has caused and the problems that the FBI has caused in the jails.

So, again, when you're looking at conspiracy, you're going to need to focus on whether or not Sheriff Baca entered into an agreement to obstruct the grand jury's investigation, or the FBI's investigation on behalf of it, into these violations.

Now, with respect to obstruction of justice -- actually, before I get to obstruction of justice, let me focus on one more point of conspiracy because what you'll hear in the instructions is that it is not enough for Sheriff Baca simply to have met with others who may have been involved in the conspiracy, discuss matters of common interest, act in similar ways, or perhaps even help one another.  Let me say that again. It is not enough for the Government to meet its burden of proof that Sheriff Baca simply met with others who may have been involved in the conspiracy, discussed matters of common interest, acted in similar ways, or perhaps help one another.

You will also hear that, merely by associating with one or more persons who are conspirators, Sheriff Baca does not automatically become part of the conspiracy.  And you

will also hear that Sheriff Baca is not a conspirator if he had no knowledge of the conspiracy but happened to act in a way which furthered the object or the purpose of the conspiracy.

What does that all mean?  It means that Sheriff Baca has to personally know about what is going on to obstruct the FBI's investigation.  You would have to look at his motivation.  Did he want to obstruct the investigation? And the mere fact that there are phone calls and meetings that occur but he's not part of it, part of the intent to obstruct the FBI's investigation, the Court will instruct you that that is not enough to convict Sheriff Baca of the conspiracy.

So now let's go to the obstruction of justice. You will hear that there are two elements of the obstruction of justice.  The first one, that you actually have to obstruct or try to obstruct a Federal Grand Jury investigation, and the second is this notion of acting corruptly.  And what the Government didn't tell you is that the intent part of it is that he has to substantially intend to obstruct the investigation.  It's not enough if you find that he just a little bit intended, you know, a medium amount.  It has to be a substantial intent to obstruct the investigation.

First, let's go and look at the first part of this where it says "The Federal Grand Jury investigation" because it's actually -- in this case the evidence will show that a Federal Grand Jury goes ahead and receives two types of

evidence.  They get documents which in this case also includes audiotapes and videotapes, and they get witness statements as well.  And what does that mean about witness statements?  It means that they can bring a live witness into the grand jury to testify, or as you heard, an FBI agent who has interviewed that witness can come in the grand jury and testify and tell you everything that witness has to say word-for-word.  Either one is acceptable.

So let's start first with documents, audiotapes, and videotapes.  What did we hear about the evidence of Sheriff Baca impeding, influencing, or obstructing the grand jury obtaining these documents, audiotapes, and videotapes?  Absolutely nothing.  Absolutely nothing.  Sheriff Baca did not in any way, shape, or form prevent the Federal Grand Jury from getting every document, every audiotape, and every videotape from the Los Angeles Sheriff's Department in connection with the Federal Grand Jury subpoenas.

You heard that U.S. Attorney Andre Birotte originally told him to stand down and not even produce the documents until further notice which he eventually gave.  You heard that Special Agent Dahle testified that they received 500,000 to a million documents, audiotapes, and videotapes from the sheriff's department in connection with the Federal Grand Jury.  You heard three different Los Angeles Sheriff's Department records people come and tell you that they fully

complied and produced on those grand jury subpoenas, everything that was requested of the Los Angeles Sheriff's Department.

Now, the Government is going to be hard-pressed to say that Sheriff Baca somehow obstructed the Federal Grand Jury in getting these documents when it is these very documents that the Government is using to prove obstruction of justice against Sheriff Baca.  What did I just say?  What does it mean?  If you think about it, that if Sheriff Baca was going to obstruct the grand jury investigation, he's the sheriff.  He could have ordered any of those records, custodians, or anybody in the chain of command to delete, destroy, modify, alter the records because, remember, the importance of some of these records is that the only source for them was the sheriff's department.

The Anthony Brown tapes, the Anthony Brown interviews that you heard in Mr. Fox's closing, where did those come from?  The FBI didn't have a tape-recorder there.  The only source of those Anthony Brown tapes was the sheriff's department, and they turned them over.  And now they can be used in an -- the irony.  They can be used in an obstruction of justice case against the sheriff in connection with compliance of a Federal Grand Jury subpoena.

What else do we know that was turned over by the sheriff's department that was unique?  Well, we have the Gilbert Michel tapes with the sheriff's department

investigators, the David Courson tapes. How about that voicemail, the Sergeant Craig voicemail to Agent Marx that's actually the wrong number? We know she didn't record it at the FBI office because it was the wrong number. She didn't even know that he had made that until they got the tape-recording later.

And what else did the sheriff's department produce that was -- for which there was no other source? The September 26 audiotape and videotape of the approach of Leah Marx by the two sheriff's investigators Craig and Long. That very evidence, if you wanted to obstruct an FBI investigation and you thought that was problematic, you get rid of that evidence. It just doesn't exist. And when they say where is it? I'm sorry. The tape -- we could not find it. A magnet ran over it. It's corrupt now. They produced it.

Why did they produce it? Because that is Sheriff Baca's mindset. Cooperate with the FBI. They want to take a look, take a look. You want to see our tapes, our most private tapes? Take a look at that. I don't have anything to hide. Go ahead. If you want to -- then build your whole case on it. Build your whole case on it. I don't have anything to hide. So there's no evidence whatsoever that Sheriff Baca in any way obstructed the grand jury from getting those documents.

So how about the witness statements? Well, Agent Dahle testified that it doesn't matter if a grand jury

hears evidence during its 18-month session on month 1, month 5, month 10, 15, or 18.  It can all be considered equally by the grand jury, and the timing of when you present that evidence does not matter.

He also said that the FBI agent at any point can come into the grand jury and testify about everything every witness has ever told them, and that has equal weight in the grand jury because they can consider secondhand evidence.

So you heard -- and this is also very important. When did the grand jury start receiving evidence in this case? Special Agent Dahle told you it was March 2012.  That's when they started to receive evidence in this case, well after the August and September 2011 alleged obstruction.  What do we know happened by March 2012?

Well, we know that the FBI was already back at Men's Central Jail interviewing witnesses after they had had a couple-month delay in interviewing witnesses between September and the end of the year.  By March 2012 the FBI is back at Men's Central Jail.

What else do we know?  We know that -- remember, this is now March of 2012.  What happens in January of 2012? Gilbert Michel pleads guilty.  Gilbert Michel pleads guilty, and when he pleads guilty, he even does something called waiving an Indictment.  That means he doesn't even need the grand jury to return a charge against him.  He agrees to waive

that whole process and agrees to plead guilty directly to the Court.

And to the extent that the Government makes a big deal about Anthony Brown not showing up on September 7 pursuant to the writ, here's what you need to know about that because the Government -- oh, my God.  There's so much back and forth.  They bring a U.S. Marshal.  They have e-mails flying back.  They have e-mails with the deputies.  They make this a huge deal that Anthony Brown doesn't show up on September 7th to talk to the grand jury.

What do we know first?  Well, first we know that there is absolutely no evidence connecting Sheriff Baca to even knowing that the writ was served and that Anthony Brown didn't show up on it.  Let me say that one again.  Even though you have all this evidence flying around, there's no evidence that shows -- and I mean evidence, not just assumptions, not just guesses, not just speculations and hopes.  Evidence.  Beyond a reasonable doubt.  Remember our standard.  A lot of evidence that shows Sheriff Baca knew that the writ was served and that Anthony Brown wasn't produced on it.

But second, what else do we know about that?  Anthony Brown showing up on September 7th ultimately doesn't matter for the grand jury because the grand jury needs information.  They need the witness statement.  And what you heard is that Anthony Brown had been talking to the FBI since

June 2010.  He had had at least 10 to 15 meetings with the FBI for the first year and then all the conversations he had had with the FBI concerning the Gilbert Michel situation.

So on September 7 Agent Marx could have gone to the grand jury and testified word-for-word, read her reports -- and remember, she told you, every time she meets with him, she writes a detailed report, gives it to her boss for grammatical edits, and then puts it in the file.  She could have taken that whole package of reports, gone to the grand jury on September 7th, and started reading word-for-word everything that Anthony Brown had told her for over a year.  She did not.

Agent Dahle could have gone ahead and done the same thing on September 7th because he was in the August 23rd meeting with Anthony Brown and he said he reviewed all the reports over the prior year.  Did Agent Dahle go in the grand jury on September 7th?  He did not.

What you heard is that on September 15th Agent Marx and Anthony Brown had a meeting.  Now, again, what you're going to hear is that the Government in its opening closing describes this meeting and only gives you half of it.  They only give you half of it.  And what do I mean by that?  They tell you that, when Agent Marx met with Anthony Brown in state prison on September 15, he was very mad, and he said, "You left me.  You left me for dead there."  Then they move on.

What else happens in that conversation that

**UNITED STATES DISTRICT COURT**

94

Agent Marx told you about on the stand?  That he quickly calms down.  He then tells her in the remainder of the meeting everything that had gone on in the Men's Central Jail since they had last met.  Then you hear that Agent Marx said they had meeting after meeting after meeting in state prison until in December 2012 she finally brings him -- writs him down from state prison -- by the way, I didn't say December 2011.  I mean December 2012, almost a year and a half later.

This supposedly incredibly important witness on September 7 that we're all in commotion about she doesn't writ down to testify in front of the grand jury about the Gilbert Michel episode until December 2012.  And remember what happens in January 2012.  Gilbert Michel pleaded guilty to the bribery.  When she brought Anthony Brown down to the grand jury in December 2012 to testify about the Gilbert Michel incident, it was completely unnecessary because he had already pled guilty to the crime that Anthony Brown was talking about.

So since there's no obstruction of justice or any even attempted obstruction of justice with the documents, the audiotapes, the videotapes, or the witness statements by March 2012 when they first start hearing evidence, it is your duty to find that they didn't meet the first element, the first element of this crime of trying to obstruct or obstructing a Federal Grand Jury investigation and that, if they don't meet the first element of the crime, you must find not guilty on

**UNITED STATES DISTRICT COURT**

obstruction of justice.

But let's deal with the second element.  The second element is acted corruptly.  Now, with respect to, again, whether or not Sheriff Baca acted corruptly, the evidence has fallen far short to prove beyond a reasonable doubt that he did because this is a situation where you have to look at Sheriff Baca's actions in this six-week time period because, if someone is going to act corruptly, they're going to act secretly, deceitfully.  They're going to try to hide stuff.  They're going to do the opposite of what Sheriff Baca actually did.

What he actually did is he voiced his thoughts -- good or bad, he voiced his thoughts openly, transparently, and directly to the very prosecutor, the head of the office, who could bring obstruction of justice charges against him; the head of the FBI, not just some agent of the FBI, not even some supervisor of the FBI, the very head of the FBI's 800-member office in Los Angeles.  He tells him directly what he is thinking.  He also tells it to the general public when he has an interview.

And you heard that he had this interview first on August 29 with U.S. Attorney Andre Birotte and then on September 27 with Andre Birotte and Steve Martinez, the FBI director.  And, yes, the sheriff did use strong language during that time.  He was upset because, remember what happens during

this time period, the August 29 meeting, he goes ahead, and he voices the same questions that I posed for you at the beginning.

His questions never change.  That's why those questions, not surprisingly, end up going to Judge Torribio in one document and show up later in his letter because he's saying the same questions over and over again.  Why did you go behind my back?  What's going on in the jail?  How big of a problem do I have?  Because I am the sheriff.  I am responsible for those jails.

The FBI can do an investigation, but day-to-day responsibilities for every deputy in that jail, for every civilian that's working in that jail, for the basically thousands of people who are at the Men's Central Jail, that day-to-day responsibility does not fall on the FBI.  It does not fall on the U.S. Attorney's Office.  It falls on Sheriff Baca, and he needs answers.

And what you heard is, for that entire six-week period, he didn't get answers.  And was he heated in that September 27th meeting?  Again, you heard Andre Birotte describe it, and it was pretty heated.  But what you didn't hear and what the Government didn't even bring to your attention is, again, what happened at the end of the meeting.

Just like we didn't hear what happened at the end of the Anthony Brown interview with Leah Marx on September 15th

in prison, we didn't hear about the end of the meeting with Andre Birotte and Steve Martinez in their closing because what we heard U.S. Attorney Birotte say is the end of the meeting we didn't have Sheriff Baca running off in a huff, but they shook hands, they came to an understanding. The sheriff calmed down because he finally, as U.S. Attorney Birotte said, got an explanation for what had happened, and they then proceeded on in cooperation.

Again, he describes it like brothers in a sandbox. You can use your common experience, whether you have siblings or children or whatnot, and see two brothers pushing and shoving, pushing and yelling. One brother doesn't trust the other and goes behind his back, and the other brother finds out about it and is understandably a bit upset. And he says, what's going on? Can you tell me? That brother says, no, I'm not going to tell you. Well, please. You have to tell me because in this case I'm responsible for an entire jail. No. I'm not going to tell you.

And it repeats over and over, meeting after meeting, stonewalled by everybody. Then finally the older brother -- we'll use Mr. Birotte as the older brother -- kind of gets to make peace with the younger brothers. What happens? They all shake hands and leave as brothers in arms, and that's exactly what happened in this situation.

And again, what you'll find out is that

Sheriff Baca, again, was consistent not just with U.S. Attorney Birotte and the head of the FBI Martinez, but he told the public the same thing.  He even told Sheriff Rhambo, Assistant Sheriff Rhambo, the same thing as well.  And what you'll find out and the way to use some of the evidence in this case is to look, as we enter August and September of 2011, what was Sheriff Baca's character for obeying the law?

You heard five character witnesses.  And why is their testimony important for you to consider?  Well, the testimony is important for you to consider because does he have a character, when we get into this whole FBI six-week period, of obeying the law, or does he have a character for violating the law?  Because clearly, if he has a character for obeying the law, that helps to form your understanding of Sheriff Baca's mindset going into this period.  But if he had a character for not obeying the law, you would evaluate it for that purpose as well.

So who did you hear character evidence from?  You heard it from two former district attorneys of Los Angeles County, Ira Reiner and Steve Cooley.  These are district attorneys that worked with Sheriff Baca collectively for 20 years going all the way back to the 1980s.  And what you heard these people do is they put their reputation on the line.  They testified under oath, and they each said that Sheriff Baca had a character for obeying the law, and Ira Reiner described

it as an excellent character for obeying the law.

You then heard from several other witnesses -- Carl Covitz, a former member of President Reagan's cabinet and State of California Governor Pete Wilson's cabinet.  You heard from Rose Ochi, a former Los Angeles Police Commissioner, someone who worked for the United States Department of Justice dealing with civil rights violations.  And you heard each one of them say that Sheriff Baca had an excellent or very solid character for obeying the law.

Then you heard from John March, and he testified that Sheriff Baca's reputation was for not compromising when it came to following the law.  You'll recall that John March was the father of Deputy David March who was slain in the line of duty on April 29, 2002.  And you'll recall how John March met Sheriff Baca because he met him that night when Sheriff Baca came to the hospital and spent time and hours with John March and his wife as they were dealing with what had just happened with the death of their son.

You heard that he kept in contact with Sheriff Baca because Sheriff Baca gave John March his cell phone number and his home phone number, and you heard that they stayed in contact, and eventually John March worked at the Sheriff's Youth Foundation that was led by Sheriff Baca.

Now, with all these character witnesses, the Government could have asked any questions about any specific

acts in Sheriff Baca's 48-year career outside of this six-week time period of August to September 2011.  So of that whole 48 years, they could have asked questions in any of the 48 years about any specific acts where Sheriff Baca did not obey the law.  The Government asked no such questions.  No such questions.  No such questions about the other 2,494 weeks in Sheriff Baca's career.  Just about those six weeks.

So the evidence has shown that Sheriff Baca has a reputation for following the law and that his mindset on August 18, 2011, the start of this obstruction, was to be open, transparent, and direct with anybody who wanted to actually engage him in a conversation or go ahead and provide him information so that he can deal with the security and safety of his jails.

Now, please recall that on August 19, 2011, something happened.  And the Government tries to minimize this evidence, but you cannot minimize this evidence because the person that Sheriff Baca stood next to at this press conference was Tom Perez, and Tom Perez isn't just your lowly Department of Justice prosecutor.  He's not even someone from the local United States Attorney's Office.  Tom Perez was the assistant Attorney General.  And what that means is you are the head of the U.S. Department of Justice's civil rights division for the entire nation, and that is the individual who is coming out to Los Angeles and having a press conference about civil rights

investigation.

What does it matter if it's a civil civil rights investigation or a criminal civil rights investigation?  It's an investigation into the Antelope Sheriff's Department which is part of the sheriff's department and where they're alleging that they're violating the civil rights laws.

And again, if Sheriff Baca was of the mindset that he's going to obstruct the FBI in investigating civil rights investigations in the same exact time, the last thing he's going to do is cooperate with the head of the Department of Justice's civil rights division and stand next to him in a press conference and announce that he is cooperating with that investigation.  That's his mindset.  You couldn't have got a better and more perfect picture of his mindset during this time period than him standing next to Tom Perez cooperating in a civil rights investigation of the sheriff's department.  That visual that you can picture in your mind gives you Sheriff Baca's mindset at the time.

Now, Sheriff Baca promised that he would make sure that Anthony Brown was safe.  He made that promise to Assistant Director Martinez, and he kept that promise.  But he also had to know that or was focused on the fact that there are very dangerous uses of a cell phone in jail.  Let's go through those.

And the reason that this is important is that

Agent Marx kind of dismisses, oh, you know, a cell phone is not so bad.  Yeah, you could have used it for this, and you could have used it for that.  But what does Agent Marx know?  Does Agent Marx have the experience and training to know what can go wrong with a cell phone in the jail?  Absolutely not.  You heard she's a rookie agent at this time when she gets the investigation.  She has no experience at that point in undercover investigations as the lead agent, no experience in being the lead agent with respect to an investigation of law enforcement or the jails at all.

Now contrast Agent Marx's lack of experience with Sheriff Baca's 48 years of experience dealing with the jails and seeing the potential of what can go wrong when you, the FBI, are inserting a cell phone into the jail because, as you heard, not just -- as you heard not just from one deputy but you heard from multiple deputies, particularly Deputy Bayes, Robert Bayes, that a cell phone is like a weapon in the jail. You can use a cell phone to order hits on witnesses, that you can use a cell phone to plot escapes, and you can use a cell phone to bring drugs into the jail.

And what's interesting is that Leah Marx doesn't appreciate the dangers of a cell phone, but where does Leah Marx, Agent Marx draw the line?  Interestingly enough, for her it was drugs because, if you remember, we had a back-and-forth conversation, and I asked her the question,

"Well, did you introduce drugs into the Men's Central Jail as part of your investigation?"  And do you recall her response?  No.  It was almost an immediate.  "No.  I wouldn't do that."  "Why wouldn't you do that?"  "Well, drugs are very dangerous, and I wouldn't put drugs.  I'm an FBI agent.  I'm not going to put drugs in the jail.  It's very dangerous."

Well, remember all the other testimony.  It's not that Leah Marx couldn't put drugs in the jail because she would fall under the law enforcement exception, and she could theoretically put drugs in the jail.  But that was the line in the sand she would not cross.  She would not put drugs in the jail.

Well, for Sheriff Baca, the cell phone was for Sheriff Baca what drugs were for Leah Marx.  The cell phone was for Sheriff Baca what drugs were for Leah Marx.  That, even if you could theoretically go ahead and put a cell phone in the jail, there is a line in the sand because of all the dangerous uses of the cell phone that Sheriff Baca would not cross, didn't think should be crossed.  Sheriff Baca announces this publicly when he uses the expression "You should not break the law to enforce the law."  Does that mean that you can't theoretically break the law to enforce the law if you're a law enforcement officer?  Sure.  But for Sheriff Baca, this is what it meant, that you shouldn't break the law in certain dangerous situations to enforce the law.

So when you heard that -- in the situation that, for instance, Cecil Rhambo told Sheriff Baca, well, we go ahead and we do this in narcotics investigations out on the street all the time or you heard U.S. Attorney Birotte tell Sheriff Baca, you know, Sheriff, we do this in certain undercover investigations, that wasn't the point because he never wavers from that belief, even hearing it from the assistant sheriff and the U.S. Attorney, because for him it was a line in the sand.  And this is what he was concerned about, the weapon in the jail, ordering hits on witnesses, plotting escapes, bringing drugs and guns into the jail.  This is the FBI creating this situation.

You heard that -- Deputy Bayes say that periodically, maybe once a year, they'll get a cell phone in the jail, but this was the FBI creating this situation, and this is what Sheriff Baca was reacting to.

Now, you heard that, in general, with respect to the FBI's investigation, we don't take issue with the FBI's investigation, in general.  The FBI has plenty -- those 800 agents, they have plenty of agents with decades of experience.  What we take issue is with the FBI investigation of Gilbert Michel that Agent Marx conducted that was absolutely littered with problems.

And what do I mean by that?  Well, you heard that on July 18, 2011, Gilbert Michel finally has the call with

C.J., the undercover FBI agent, to set up the July 20th meeting where -- we'll call that the first bribe transaction. If you recall about the first bribe transaction, Agent Marx is in the airplane. She's got dozens -- over a dozen agents that are surveilling or watching this, and Gilbert Michel takes the $700, takes the cell phone, and the bribe occurs right then and there.

But then what you'll hear -- and the reason this was littered with problems, this investigation -- is, while this is on July 20th, on July 18th and 19th, for the first time in a year, Agent Marx took that phone call from Anthony Brown in the jail that was publicly recorded on the sheriff's line so the sheriff's department could get access to what was said. And she says, because, again, she's a rookie, she says on the phone, first, "The transaction is going to happen," on the 18th. On the 19th she says, "The cell phone is on its way." On the 21st she takes the third call from Anthony Brown on the publicly recorded line, and the third call she says, "You're good." You're good because the cell phone is on the way.

When I say this investigation was littered with problems, she has just connected Anthony Brown to herself because, remember, the phone number he's dialing is her desk phone at the Civil Rights Squad at the FBI office in Westwood. So by taking those phone calls, which she hadn't done for a year, she's now forever connected Anthony Brown to the FBI.

**UNITED STATES DISTRICT COURT**

But if that wasn't bad enough, what happens is she says on the stand, well, I've got to get that phone into the jail because, otherwise, Gilbert Michel could say that the crime wasn't complete.  So on July 26 you'll see she gets the phone into the jail, and Anthony Brown, one of his first calls is to C.J.  And remember, she is viewing these records online virtually as they're happening.  She says she checks in multiple times a day.

So on July 26 she knows the crime is complete. Gilbert Michel can be arrested at that point.  He has no defenses.  But here's where she makes a huge mistake. Anthony Brown calls her with the cell phone.  So if she thought that somehow the sheriff's department wouldn't connect Anthony Brown's use of a public jail phone with her, now she knows that, as soon as they find that cell phone, they're going to connect it immediately to her at her FBI desk, the 310-996-4174 number, which goes directly to Leah Marx in the Civil Rights Squad of the FBI.  And she knows this on July 26.

So does she terminate the operation, terminate the cell phone because it can't be used anymore and, if it's found, Anthony Brown's life could be in danger because you heard from at least two or three witnesses, if an inmate is in jail and found out to be an FBI snitch, that inmate's life is in danger from other inmates and from the deputy they snitched on.  And remember what Anthony Brown's situation is at that

moment in time.  Anthony Brown is going to be in jail for the rest of his life.  So if he's connected as an FBI snitch at this point, he's going to live with that fear and possible harm to his life for the rest of his life.

And Agent Marx, who supposedly cared so much about the safety of Anthony Brown, completely endangers him by not picking up -- terminating it right then and there, getting the cell phone out of the jail, and now she's got enough evidence to convict Gilbert Michel.

But if that wasn't problematic enough, recall what happens the same exact day.  She allows Anthony Brown's cellmate to use the cell phone, and the cellmate makes two calls on that day.  Does she know anything about the cellmate?  No.  Does she know what he's going to use the phone for?  No.  Does she have any ability to listen in on what the phone call is all about?  Absolutely not.  She set none of those provisions in place.  And you heard that the FBI had a system that could have recorded those phone calls if you enter in a pin number and other codes.  She chose not to use that system.  She even chose not to get an e-mail alert when the phone was going to be used.

So she goes ahead and recklessly, carelessly engages in this investigation.  And then if that -- and then, to the extent she needed any more evidence, on August 4th they do the second transaction.  So what happens is -- and why is

this important?  The reason it's important is that on August 18, when Sheriff Baca hears about this, and then 19th and 20th when he's informed about all of these FBI connections to the phone, what he knows is that the FBI has run now a dangerous, reckless, and careless investigation and put a dangerous cell phone in play to an inmate who is serving a life sentence with nothing to lose.

What he also finds out or what you, the jury, has found out is that, rather than take Gilbert Michel down on August 4th, she goes ahead and interviews him on August 24th. Remember, that's the Starbucks meeting that we had much discussion about.  And at that point, if she didn't have enough evidence -- she had the video surveillance on the 20th of July, the photos on August 4th.  She's got all the phone calls between C.J. and Michel.  She knows the phone is in the jail. August 24th what does he do?  He fully confesses to the bribe. Fully confesses to the bribe to her.  What does she do at that point?  Does she arrest him?  No.  She lets him take his gun, his badge, and one more thing that's very important out of that meeting, the knowledge that Anthony Brown has set him up for the FBI.

And remember who Gilbert Michel is. Gilbert Michel is someone who savagely beats inmates.  And Agent Marx has allowed a gentleman who savagely beats inmates to leave with his gun, his badge, and still a deputy, and not

tell the sheriff's department that Gilbert Michel has now been informed on by Anthony Brown and you should make sure that Gilbert Michel doesn't have any access to Anthony Brown on August 24th when she lets him go.

So the Government's response to the reasonable reaction that Sheriff Baca had to this reckless FBI investigation is basically to try and group everybody under him under the "they" principle.  You heard in the closing they used the "they" concept about a dozen times, and in opening they kept referring to Sheriff Baca and everybody else as "they" in order to show that Sheriff Baca should somehow be responsible for what the people were doing down below him for which he had no knowledge, he didn't agree, he didn't condone.

The August 23rd meeting is the perfect example, and the Government basically mischaracterizes what happens because they leave the ending off again.  Remember on that day Lieutenant Thompson has two meetings, one with Undersheriff Tanaka and one with Sheriff Baca, separate meetings.  And this is about the FBI getting to interview Anthony Brown and then having that interview terminated.

This couldn't describe to you better the different agendas because, when Lieutenant Thompson meets with Undersheriff Tanaka, you heard he gets the famous butt-chewing or ass-chewing and gets screamed every profanity under the sun.  When he then meets with Sheriff Baca -- and this is the part

that the Government left out of its closing -- what was Sheriff Baca's reaction?  We're not getting Sheriff Baca's reaction.  What was Sheriff Baca's reaction?  He was understanding.

And why was he understanding and Undersheriff Tanaka was livid?  The reason he was understanding is he didn't have a problem with the FBI going ahead and interviewing someone.  That wasn't an issue for him because the ACLU was raising problems that he dealt with for decades, the OIR, the Office of Independent Review, and now the FBI was investigating.  They knew that the FBI investigation was going on because they're filing grand jury subpoenas.  So it wasn't a big deal.  He's not the "F the FBI" situation at all.  The FBI wants to look, come and look.  I'm going to be meeting and openly telling the director of the FBI much higher than anything like this my exact opinions of what's going on.

And so what you also heard is that -- is with respect to the evidence.  Now, that's an additional point I want to make.  How did we learn about the August 23rd conversation between Lieutenant Thompson, Sheriff Baca, and Undersheriff Tanaka?  Did we hear from Lieutenant Thompson? No.  We heard from Mickey Manzo.  So Mickey Manzo told you what Lieutenant Thompson told him about what undersheriff said in a meeting.  We didn't hear from Undersheriff Tanaka.  We didn't hear from Lieutenant Thompson.

And the Government -- remember, the Government has the burden of proof, and when the Government has the burden of proof, they, not the defense, have to call witnesses before you to tell you what's going on.  Remember, they had the power to writ people out of prison.  You saw that with James Sexton.  You saw that with Gilbert Michel.  They have the power to subpoena in reluctant witnesses.  You saw that with Mr. Faturechi.

And they could have called Undersheriff Paul Tanaka, Captain William Tom Carey, Lieutenant Greg Thompson, Lieutenant Stephen Leavins, Sergeant Scott Craig, Sergeant Maricela Long or Deputy Gerard Smith.  All of these people were the people that you saw on telephone calls, on e-mails, in videos, on audiotapes.  Where are they?  That is a huge example of reasonable doubt.  A huge example of reasonable doubt.

The Government has this very high burden of proof, and they're trying to get around it with these secondhand conversations with e-mails of people they don't call and actually let the defense cross-examine.  They bring the Mickey Manzos of the world in.

So who did you hear from?  You heard from Mickey Manzo.  What do we know about Mickey Manzo?  He speaks to the sheriff on August 19th, 20th, and he doesn't speak to the sheriff again.  They called James Sexton.  How many times

did James Sexton speak to the sheriff during this time period or get an e-mail from him or send him an e-mail?  Zero. Robert Bayes, how many times did Robert Bayes ever see Sheriff Baca?  One time when Sheriff Baca walks by him, shakes his hand and leaves.

That's the nature of the contact and the quality of the evidence that the Government is bringing in this trial. How about Gilbert Michel?  She called him.  How many times did he deal with Sheriff Baca?  Zero.  Cecil Rhambo?  What you heard about Cecil Rhambo is he had a conversation at the end of September, and Cecil Rhambo couldn't remember one way or the other if that conversation occurred before or after the meeting at which the ICIB investigators Long and Craig had with Agent Marx.  He couldn't remember one way or the other.

And you heard with Cecil Rhambo that he has that expression that you shouldn't "F" with the feds.  But again, Sheriff Baca -- what they didn't tell you in their closing is Sheriff Baca's reaction to that.  And Sheriff Baca's reaction was I'm going to go see Andre the next day, and I'll bring it up with Andre.  Thank you for telling me that.  But remember, my line in the sand is you don't break the law to enforce the law, and you don't put a cell phone in the jail that's that dangerous.  But thank you, Assistant Sheriff Rhambo, for your views on this as well.

And how about Michael Hannemann?  What do we know

about Michael Hannemann?  He stands outside the office where meetings go on inside, and he doesn't hear a thing.  He hears voices but is he able to tell you what those voices are saying?  No.  This is the quality of the Government's evidence in front of you, and this quality is a huge example of reasonable doubt.

Now, the Government backs up this lack of witnesses with e-mails, and what do we learn about the e-mails?  Well, there are 57 documents in evidence that have e-mails in them.  There's over 100 e-mails in those 57 documents.  How many e-mails are "to," "from," or "cc'd" to Sheriff Baca?  Two.  Just two.  Again, this is another huge example of reasonable doubt because, if Sheriff Baca was the heartbeat, the leader, the driving force of the conspiracy, as Mr. Fox told you, there would be a huge amount of e-mail traffic involving Sheriff Baca.  And what you heard is that there's two.

How about phone calls?  There's no evidence of what was said during these phone calls.  So the phone call analysis is very deceiving because, the way the Government does it is it puts phone calls between Mr. Tanaka and Mr. Baca and tries to line them up and makes -- and then you heard the Government say in its closing, well, you should assume that they're talking about this situation.  Assume it.  You can assume that they're talking about the cell phone incident and the cover-up when in reality -- I'll give you an example, for instance, of one of these conversations.

They show in Defense Exhibit 637-A on August 25th there's a 6:27 phone call from Tanaka's county-issued cell to Sheriff's Headquarters Bureau.  They say, well, if it went to the Sheriff's Headquarters Bureau and Sheriff Baca is at the Sheriff's Headquarters Bureau, obviously Tanaka must be talking to Baca at 6:27 p.m. on August 25th.

But the reason that this analysis is deceiving -- because obviously you don't know what's being said -- is it turns out for this particular day on August 25th between 6:00 and 8:00 p.m., Sheriff Baca is nowhere to be seen at Sheriff's Headquarters Bureau.  Sheriff Baca is presenting credentials to Commander Margaret Ruiz in Alhambra during this time period. So, again, without putting together the documents, you would think, wow, Mr. Tanaka is having another conversation with Mr. Baca and it must be about this because there's other conversations before and after.  But when you put these two things together, what you see is, no, that's not how it happened.

Now, the Government points to the August 18th and 19th situation on why Anthony Brown wasn't kept at Men's Central Jail to show that Sheriff Baca was involved in isolation.  And this is a classic example of the Government giving you half the story.  Let me explain it.  The way it works is on August 18 you find out that the deputies are thinking of moving Anthony Brown to state prison.  And when

**UNITED STATES DISTRICT COURT**

they're thinking about moving Anthony Brown to state prison, they're thinking, well, we'll make it state prison's problem. In fact, they basically say that. We'll make him the state's problem while we continue to collect certain facts.

But what the Government doesn't focus you on is this sentence, the one right in the middle of the e-mail. "Besides, if he doesn't want to cooperate, there is nothing we can offer him with 400-plus years hanging over his head."

Now, why is that incredibly important to understand this situation? So you have the deputies thinking we're going to send him to the state prison on August 18. You have the e-mail saying, well, he doesn't want to cooperate. There's nothing we can offer him. Well, what happens at 8:08 a.m. the morning of August 19? Anthony Brown starts to cooperate. Anthony Brown engages in that two-hour discussion with Manzo and Smith and tells them that, yeah, a deputy is involved. Remember, this is the famous cheeseburger situation. He won't give him the deputy's name unless they give him a cheeseburger or some cigarettes. That's the August 19 call.

So they get a lot more interview, they get a lot of information during those two hours, but they don't know everything because Anthony Brown has told them it's multiple deputies. Anthony Brown has told them it's drugs and a cell phone. Anthony Brown has a cell phone with pictures of heroin and cocaine in it. So you're figuring you're getting some

information.  Maybe if you get the guy a cheeseburger, he'll give you the deputy's name.  And he doesn't tell them about the FBI at that point.

Then what happens on that afternoon is they brief Sheriff Baca, and Sheriff Baca says, "Keep him.  He started to cooperate.  Let's see what else he can say."  And you find out that on August 21st, 23rd, 24th, 26th, and September 2nd he tells the sheriff's investigators what's going on because, remember, Sheriff Baca is not getting this from the FBI.  He's not getting it from the U.S. Attorney's Office.  But he's got Anthony Brown that can help fill in the details, and that's exactly what happened.

So now ask yourself, is it reasonable for Sheriff Baca to have ordered that Anthony Brown not get on the bus to state prison as long as he's willing to talk and provide us with information?  Absolutely.  But if you only had half the story, as the Government gave you, you would think that Sheriff Baca wants to obstruct the FBI's investigation.

And remember, when you're looking at those phone calls, particularly with Mr. Tanaka and Sheriff Baca, this -- and I show you Defense Exhibit 744.  It shows you all the stuff -- and you'll have that big blowup back in the jury room with you.  It shows you all the stuff that these gentlemen had to deal with on a daily basis.  This is just the inside-the-sheriff's-department situation.

You heard about all the outside-sheriff's-department situation, and it's in his calendar.  He meets with elected leaders.  He's in charge of the law enforcement for 40 cities, 90 unincorporated areas, 58 superior courts, and even the MTA.  You know, he's involved with huge amounts of information, and Undersheriff Tanaka is also equally involved because he's the No. 2 guy for the whole department.  These folks have a lot of things to talk about.  And the cell phone could have been one or not at all, and the problem is we don't know.  And you -- and that is why -- and that is what constitutes a huge example of reasonable doubt.

Now, with respect to the cell phone calls, remember what comes in on Leah Marx's charts that aren't the Government's charts.  So in Leah Marx's charts, the Government wants to connect all these cell phone calls, and then say, aha, Baca.  But when the defense introduced charts that Leah Marx created, what did you learn?  What you learned is that Mr. Tanaka made 60 phone calls to the various investigators that were involved here, that Baca made one.  60 versus 1.  If Sheriff Baca is the heartbeat, the driving force, the leader of this conspiracy, these numbers should be flipped.  It shouldn't be 60 versus 1 for Tanaka.  It should be 60 versus 1 for Baca.

And this, again, like the e-mails and the lack of witnesses, shows you that there is a huge amount of evidence the Government did not bring before you to prove its case

beyond a reasonable doubt.

What did we learn about Robert Faturechi?  What we learned about Robert Faturechi is that on September 28, 2011, there is an interview of Sheriff Baca. Now, what happened -- and this is the important thing with Faturechi when you consider it.  What has happened before September 28th that's in Sheriff Baca's mind when he goes ahead and interviews with him?

First, on September 26 U.S. Attorney Birotte has told him that evening that agents -- an FBI agent has been approached by two investigators.  And what is Sheriff Baca's immediate reaction?  You actually heard or saw it in Mr. Fox's slide.  "No.  No.  She's not going to be arrested." Immediately.  It wasn't sort of a discussion about anything. "No.  No.  She's not going to be arrested."  That's already in Sheriff Baca's mind when he interviews with Robert Faturechi. He knows that the approach has already happened.  Then it's reaffirmed on September 27th when they have a meeting between Sheriff Baca, U.S. Attorney Birotte, and Assistant Director Martinez.

So by the time we get to September 28th, of course Sheriff Baca has known now during those three days about everything that occurred at that particular interview between Leah Marx and the two investigators.  So the fact that he's telling Robert Faturechi that, yeah, an interview happened back

then and, yeah, on September 28, I know about it, this is the quality of the evidence, the quality of the evidence that the Government is presenting to you to go ahead and prove beyond a reasonable doubt that this crime occurred.  They're not calling anybody -- Tanaka, Carey, Leavins, Long, Craig to bring them to the stand and say, yeah, Sheriff Baca knew.

So what else did they do along those lines?  They point to this big phone call between Leah Marx's supervisor that happens the night of September 26 after the approach.  The supervisor's name is Carlos Narro, and the investigator is Maricela Long.  And what I'm going to show you is that the Government in its opening closing presents everything other than the last line, and the last line is the most important of this phone call.  This phone call is one of the best forms of evidence for the defense.

(The CD commenced playing before the jury.)

MR. HOCHMAN:  That last line.  Let's play this thing out.  So Carlos Narro calls Maricela Long and says, "She indicated to me that you guys indicated to her and" -- the "she" is Leah Marx.  "So Leah Marx indicated to me," Carlos Narro, "that you guys indicated to her there's going to be a warrant for her arrest."

Maricela Long, one of those two deputies who is in that video that you saw, said, "There's going to be."

Carlos Narro, "Well, does the sheriff know this?"

Long, "The sheriff knows this, sir."

"Ah, just so you know that the ADIC" -- assistant director in charge, that's Steve Martinez -- "and the U.S. Attorney are in the process of reaching out to him. What -- can I ask you what the charges are going to be?"

Here's what happened.  She goes ahead and says the sheriff knows about this.  Carlos Narro calls her bluff.  He calls her bluff.  He says, "Oh, well, if the sheriff knows about this," the head of the FBI, and the U.S. Attorney, "we're about to call the sheriff."

Now she realizes her bluff has been called because the sheriff never knew about this.  The sheriff was out of the loop.  So rather than say -- if the sheriff was in the loop, she would have said, great, have them call the sheriff. He'll confirm what I just said.  But if the sheriff is out of the loop, what does she immediately have to do?  Direct this and direct that agent to the person that's in the loop, Undersheriff Tanaka.

So she's asked a question what can I ask -- "Can I ask you what the charges are going to be?"  And her answer was, because she just heard that he's going to -- that the head of the FBI and the U.S. Attorney are going to call the sheriff. "Okay.  You're going to have to speak to the undersheriff, and that's a Mr. Paul Tanaka."  The Government left that one line out, and that's the most important line because that shows on

September 26, 2011, Sheriff Baca was out of the loop of the investigators who went out to speak with Leah Marx because, if he was in the loop, it would have been good.  Go ahead and speak to the sheriff.  And remember, at the end of the conversation where she repeats, "Go speak to Undersheriff Tanaka."

This is the best evidence to show that Sheriff Baca was not in the loop.  And so when Andre Birotte called him that night -- and by the way, look at his calendar.  He's at an event with the President of the United States.  When he calls him that night and he takes the phone call and steps out and he says, "No, no, no, she's not going to be arrested," knowing that he's going to be meeting with Andre Birotte and Steve Martinez the next day, that is how Sheriff Baca was out of the loop at the time but had the information from Andre Birotte to answer Robert Faturechi's questions on September 28th.

So how do we know that Undersheriff Tanaka is really running the show?  We know that from various witnesses who testified.  So let's say, first, Michael Hannemann.  Michael Hannemann was the sheriff's executive aide.  How did he say that Undersheriff Tanaka acted in Mr. Baca's presence?  Very politely.  He didn't drop F-bombs.  He didn't throw MF-bombs.  He wasn't screaming and ranting.  Michael Hannemann, who saw in part the dealings between Sheriff Baca and

Undersheriff Tanaka, said that Undersheriff Tanaka acted very politely.

But the best evidence of what Undersheriff Tanaka's agenda comes from is the Government's witness Robert Olmsted, the commander of the Men's Central Jail.  What he says is that Mr. Tanaka, not Sheriff Baca -- excuse me.  That Mr. Tanaka told Robert Olmsted that Mr. Tanaka, not Sheriff Baca, was in charge of promotions. That Mr. Tanaka told Mr. Olmsted that he, Mr. Tanaka, was going to be the next sheriff for 15 years; that you heard that Mr. Tanaka told Robert Olmsted that we have to keep the sheriff in the dark and we have to conspire against the sheriff by having pre-meetings where the sheriff is not present where we can discuss what the agenda should be.

So what you see is that Undersheriff Tanaka has his own separate agenda.  Robert Olmsted described it in spades.  Michael Hannemann told you how he acted in front of the sheriff.  But what you also saw is with respect to the fact -- I left out one more thing, one more thing that we know, and it doesn't actually come from Robert Olmsted.  It comes from James Sexton, and you heard it this morning in the stipulation that James Sexton said that Mr. Tanaka was in charge of the Anthony Brown investigation, not Sheriff Baca.

So what you heard is the Government trying, through e-mails, witnesses, phone calls, anywhere they can,

**UNITED STATES DISTRICT COURT**

throw some spaghetti against the wall to make it stick against Sheriff Baca. But at the end of the day, there is no evidence directly connecting Sheriff Baca to any knowledge, authorization, agreement with complying with a federal writ, with Anthony Brown's name being changed, with Anthony Brown being moved.

And by the way, the Government tries to minimize this by saying Sheriff Baca didn't have to know the details. Well, he didn't have to know exactly which cell number he would be put in if he was part of the conspiracy, but these huge topics, huge topics that are supposedly part of this obstruction, the heart, the heartbeat of the obstruction, there is no evidence that the Government has connecting Sheriff Baca to these huge topics -- the writ, the name change, Anthony Brown being moved, the issuance of the policy with regards to FBI visits, seeking a court order for FBI files, telling deputies not to cooperate, sweeping for FBI listening devices.

In fact, look at that e-mail Exhibit 50. There's no mention of Sheriff Baca anywhere on that e-mail. And by the way, when the Government tries to call "executives" in connection with the FBI policy, call them out on that because, if you look at the only executive who was on the original policy, it was Undersheriff Tanaka. If you then see the Lieutenant Thompson e-mails, it was to take

**UNITED STATES DISTRICT COURT**

Undersheriff Tanaka's name off that e-mail.  At no point does that e-mail say Sheriff Leroy Baca and Undersheriff Tanaka are going to approve FBI visits.  So the Government, just like they used with "they," they want to go ahead and call executives and loop in Sheriff Baca when they have no evidence beyond a reasonable doubt to prove it.

So you have the sweeping for FBI listening devices and the surveillance of FBI agents.  No Baca.

Now, how do we see in one key e-mail how Undersheriff Tanaka manipulated the situation?  This is Exhibit 31.  And what's very telling about Exhibit 31, if you see the part of the statement that I've put in yellow on the screen, the Government put Exhibit 31 in their closing and left out -- completely left out that sentence, the last sentence. The Government focuses on the first part because this is a Tanaka/Leavins e-mail.  It says, "Thanks, Steve.  Right after, and I mean right after, I spoke with Tom this morning.  The sheriff popped in looking for an update.  This case is consuming his entire thought process."

Well, if that's all you knew about the e-mail, you would think Sheriff Baca was doing nothing.  Forget the whole department, forget outside the department, it's consuming his whole thought process.  But now you've got to look at the last sentence.  Providing him with updated tidbits helps to ease his mind.  Updated tidbits.  That's exactly what happened

here is that Undersheriff Tanaka, with his own agenda who wants people loyal around him, who thinks he's going to be sheriff for 15 years or the evidence has shown he's conspiring, conspiring against Sheriff Baca behind his back, the way he's going to ease his mind is by giving him updated tidbits, and that's it.

He can give him updated tidbits on the two things that Sheriff Baca cares about, first, making sure the inmate is safe.  Inmate is safe.  We got it.  He's being protected.  And the second part is we're getting to the bottom of the investigation to find out how big of a problem the FBI caused. What he doesn't need to share is all the stuff you have no evidence of about any active obstruction of justice that occurred in this case.

So as you consider whether the Government has met its very high burden of proof in this case and shown beyond a reasonable doubt on every element of every crime that Sheriff Baca committed these crimes, bear these questions in mind:

Did the Government prove to you beyond a reasonable doubt what those updated tidbits were and what Sheriff Baca actually knew?  The answer is no.

Did the Government prove to you beyond a reasonable doubt that Sheriff Baca had any motivation to obstruct an FBI investigation into the jails?  Absolutely not.

Did the Government prove to you that Sheriff Baca failed to offer responses to the ACLU and Chaplain Juarez through changing policies, changing the use-of-force training, instituting programs that brought the complaints to his attention?  Absolutely not.

Did the Government prove to you that Sheriff Baca, beyond a reasonable doubt, told his subordinates to "F the FBI" at any point in the entire six weeks? Absolutely not.

Did the Government bring you key witnesses, e-mails, phone calls, or recordings to prove beyond a reasonable doubt that Sheriff Baca conspired, agreed or endeavored or tried to obstruct a grand jury investigation? Absolutely not.

Did the Government prove beyond a reasonable doubt that Sheriff Baca was anything other than open, transparent, and direct with the U.S. Attorney, the head of the FBI, and the general public during this entire six-week period? Absolutely not.

Did the Government prove to you that the grand jury investigation that started hearing evidence in March of 2012 was in any way obstructed or intended to be obstructed by anything going on with those subpoenas and the documents that went to the grand jury or getting access to witness information even if it was through the FBI's agents testifying about what

**UNITED STATES DISTRICT COURT**

happened in March 2012 when they started hearing evidence? Absolutely not.

Did the Government prove to you that Sheriff Baca was the heartbeat, the leader, and the driving force behind this conspiracy and obstruction of justice? Not a chance.

So is there reasonable doubt that infects all this entire case? Has the Government failed to meet its high burden of beyond a reasonable doubt? You bet they have.

Now, I'm about to conclude my remarks, and when I conclude my remarks, the Government will get an opportunity to speak to you last because they have the burden of proof. The problem is I won't be able to come up afterwards and respond to what the Government says in its rebuttal remarks.

In order for me to do that, I actually need you, the jury, to think that, as the Government comes up here and gives us rebuttal remarks, what would Mr. Hochman say? Because I'll be seated there, and I can't stand up. What points and what part of the evidence would Mr. Hochman point to to respond to what the Government is saying? What would Mr. Hochman look to, an exhibit, where the Government gives you the first half of the exhibit but doesn't give you the second half of the exhibit?

You, the jury, will have that power. You, the jury, are the ones that we -- that this system has created to consider all the evidence, to consider the witness statements,

the exhibits that will be before you in rendering a verdict. And we are confident that, after considering all the evidence in this case, the only verdict that the evidence compels you to reach is a verdict of not guilty on both counts.

THE COURT:  All right.  Thank you.

Ladies and gentlemen, we're going to take our final break of the day.

Again, I want to remind you, until this trial is over, you're not to discuss this case with anyone including your fellow jurors, members of your family, people involved in the trial, or anyone else, and do not allow others to discuss the case with you.  This includes discussing the case on the Internet, through various forms of social media, by e-mails, or text messages.  If anyone tries to communicate with you about this case, please let me know about it immediately.

Do not read, watch, or listen to any news reports or other accounts about the trial or anyone associated with it.

Do not do any research such as consulting dictionaries, searching the Internet, or using other reference materials, and do not make any investigation on your own about the case.

Finally, you're reminded to keep an open mind until all of the evidence has been received, you've heard the arguments of counsel, the instructions of the Court, and the views of your fellow jurors.

All right.  We'll come back in -- let's make it 15 minutes.

(A recess was taken at 11:32 a.m.)

(The following proceedings were held in open court out of the presence of the jury:)

THE COURT:  Are we ready to proceed?

MR. FOX:  Yes, Your Honor.  May I make sure my technology is working before?

THE COURT:  That's fine.

MR. FOX:  Yes, Your Honor.

THE COURT:  All right.  Let's bring the jury in.

What I plan on doing, once counsel finishes, is to have the jury go out.  We brought in some food for them, have them gulp down their lunch, 20 or 30 minutes, and then I'll instruct.

MR. HOCHMAN:  Your Honor, we have a very brief issue.  Apparently Mr. Fox wants to use a phone.  It's unclear if it's the same phone that the -- that was used.  It's obviously not in evidence.  Whether or not it is or is not is actually irrelevant because I believe it would be improper to try to make the jury think that it's even similar to the phone since it's not in evidence.

MR. FOX:  Your Honor, the phone was described as a flip phone in evidence, and I will represent to you that this is the phone.  The sheriff's department turned it back over to

**UNITED STATES DISTRICT COURT**

us about a month ago.  This is the phone.  I want to use it as demonstrative.  I will not tell the jury this is the phone.  I could just as easily use an iPhone, but that's not a flip phone.  I would just like to use it as a demonstrative to talk about what a phone could do just like Mr. Hochman did.

MR. HOCHMAN:  It's even worse, Your Honor, that it is the phone and --

THE COURT:  Excuse me.

(The following proceedings were held in open court in the presence of the jury:)

THE COURT:  Let me see counsel at sidebar.

(The following proceedings were held at sidebar:)

THE COURT:  Okay.  What do you want to use it for?

MR. FOX:  Just as a demonstrative.  I'm not going to show how it works.  I'm just going to hold it up and say this is a phone.  Mr. Hochman talked about all the things a phone could do.  Let's talk about what it did do.

MR. HOCHMAN:  Again, the fact that it actually is the phone, Your Honor, up until now we've used pictures, generally, talked about the phone, used my hand as the phone.  But to go ahead and use what the jury is going to think potentially is the phone because it actually is the phone I think is improper at this point.

If the Government wanted to introduce it in

evidence, it had it for a month now.  For whatever reason they decided not to move it into evidence through one of the LASD custodians.  So to bring the phone right now, I think, is inappropriate.  He can certainly use his hand or generally use any other type of phone other than the actual flip phone.

THE COURT:  But they don't know that, and nobody is going to tell them that.

The objection is overruled.

MR. HOCHMAN:  Thank you, Your Honor.

(The following proceedings were held in open court in the presence of the jury:)

MR. HOCHMAN:  Your Honor, may we be heard at sidebar one more time?  I apologize.

THE COURT:  All right.

(The following proceedings were held at sidebar:)

MR. FOX:  We might be able to resolve this, the two of us, before we do this.  He was just telling me about a 9th Circuit case.  If he tells me about it --

MR. HOCHMAN:  Your Honor, the issue is, right before Mr. Fox took the stand and the jury came out, he showed me he wanted to use a sheriff's pin.  And I asked Mr. Fox is he going to reference the fact that the defendant in court has been wearing a sheriff's pin?  I think it's *United States versus Schiller* or *Schaffer*, a 1990s case, that says any comment about the defendant and the defendant's demeanor is not

**UNITED STATES DISTRICT COURT**

part of the record is reversible error.

MR. FOX:  Your Honor, I don't need to use it. I've obviously not seen the case.  I doubt what I was going to do would be reversible error, but I will not do it just in case.

MR. HOCHMAN:  Thank you, Your Honor.

(The following proceedings were held in open court in the presence of the jury:)

MR. FOX:  May I proceed, Your Honor?

THE COURT:  Yes, please.

MR. FOX:  You've heard a lot of argument, a lot of testimony.  I'm going to just talk about a very simple proposition to begin.

If Mr. Baca sent deputies out, sergeants out, to Special Agent Marx's home to intimidate her and the FBI knowing that they were involved in a grand jury investigation, he's guilty.  It's that simple.  If that was his goal, he's guilty.

Mr. Baca doesn't get to choose certain things. When it comes to a Federal Grand Jury investigation, a federal investigation, in general, Mr. Baca doesn't get to choose who's investigating him.  He doesn't get to choose the manner, the way they're investigating him, the way they're investigating his department.  It's not his choice.  So no matter how bad or good the investigation is, he can't obstruct it.  It's a very simple proposition.

No man is above the law.  If anybody goes out and obstructs an investigation, they can't later say, but, judge, look how bad this investigation was.  I had to do something about it.  I had to tamper with witnesses.  I had to hide witnesses.  I had to tell the FBI to back off.  You can't do that.

Simple proposition that Cecil Rhambo told Mr. Baca about before Sheriff Baca sent the deputies out to Special Agent Marx's home, and this simple proposition is very telling how the defense responds to it.  In some ways they say, okay, Mr. Baca did know what was going to happen and then in some ways he didn't know what was going to happen.

With Cecil Rhambo, Mr. Hochman just said the conversation with Mr. Baca happened somehow after the deputies went to Special Agent Marx's home.  And then he tells you that Mr. Baca was at a fundraiser for the President of the United States at the time.  It's in his calendar.  You can look at it.  So when would this conversation have occurred?  And then Mr. Rhambo and Mr. Baca are talking, and Mr. Baca says I'm going to go see Andre Birotte about this.  Could not have happened after the approach of Special Agent Marx.

Mr. Rhambo told you that it happened in the evening and Mr. Baca was not at work the evening after the approach, the evening of the approach.  He was somewhere else.  This happened before then.  Mr. Rhambo had heard that the whole

goal was to intimidate an FBI agent, and he told Mr. Baca not to do it, that that would be obstruction of justice. And then I told you earlier today that's exactly what it was.

A lot of the defense has been about fearmongering, about fearmongering. About a phone, what it could do. A simple flip phone. A phone could be used to tamper with witnesses is what Mr. Hochman just told you. The phone wasn't used to tamper with witnesses. Mr. Baca and his co-conspirators tampered with witnesses. Phone is dangerous -- right? -- because it could be used to plot an escape. There's absolutely zero evidence that it was used to plot an escape, but they want you to believe that the possibilities matter. They don't.

To the extent that he was upset that a phone was used in the investigation to bring into the jails, first of all, Cecil Rhambo told you that phones are in the jails all the time, that they find them regularly in the jails. If he was upset because he didn't know what other contraband might be in the jails, a couple things. Cecil Rhambo, Mickey Manzo told you that drugs are in the jail all the time. All the sheriff's department have to do -- they don't have to go out and threaten to arrest an FBI agent to get the information. All they have to do is search the inmates in the cells; right? It's that simple.

You don't check your common sense at the door

when you come into this courtroom.  Mr. Hochman would like you to do that, but you don't.  You're going to go back in that jury room, and you're going to be able to piece things together, look at the evidence, consider what was going on here.

And these phone calls when Mr. Baca is calling Mr. Tanaka, Mr. Tanaka is calling Leavins, Carey right back up all the way back up to Mr. Baca, again, they're not talking about the budget.  There's only one thing going on at this time that there's evidence of that they're talking about, and that's this obstruction of justice conspiracy.

Mr. Hochman talked about Anthony Brown, the 400 years that he was serving.  Once again, whether you agree with it or not, whether you agree with the FBI's use of the informants or not, think about this.  If you're going to be investigating deputies in a jail, who are your informants going to be?  They're going to be inmates in that jail.  And whether Mr. Baca likes it or not, those are the people that are giving you information, and you can't obstruct the investigation even if they're using an inmate who has been sentenced to 400 years.

Who do you think the sheriff's department uses when it starts investigating itself?  The internal investigations that it was rubber stamping?  You'd better believe that, if they're doing things right, they'd be interviewing the inmates; right?  They had to in order to try

to come up with what might be the right result.  But that's actually not what was going on at the time.

Let's see if I remember my exhibit number correctly.  Yeah.  This is the one I told you about in my summation earlier today.  This is Exhibit 53.  And this is the e-mail that Tom Carey passes on to his investigators saying, "Let's check these out, these ACLU allegations out.  Track what the Federal Government is looking at."  Just look.  You'll have this exhibit with you.  The page filled with 19 or 20 complaints, closed, unfounded.  Closed, unfounded.  Closed, unfounded.

This is the reason why this investigation was different to Mr. Baca, why he wanted to obstruct this investigation.  This was years in the making.  Mr. Baca, hearing about problems for decades and doing little to change things.  Whether he wanted to or not is kind of irrelevant.  The fact is he couldn't make it happen.  He didn't make it happen.  Whether he has Mr. Pietrantoni go in and teach wrestling moves in 2009, 2010, the problems still existed in 2011, problems that he owned because he had been sheriff for so long and hadn't solved the problem.

Mr. Hochman was talking about a jury instruction that he's using as a sword.  What he's saying is that there's a jury instruction that applies to you that says you can only consider the charge that he's on trial for which is absolutely

right.  But then he goes on and talks about things that are well outside of the charges, have you try to figure out what his intent was here.  He was a reformer.  He was cooperating.  He was doing this and that.

None of that has to do with the six-week time period and the obstruction of justice of the Federal Grand Jury investigation into corruption and abuse at the jails.  So it doesn't matter if his friends thought he was a good person.  It's irrelevant.  Doesn't matter if his friends thought he was law abiding.  He wasn't including them in his conspiracy.  And do you think he'd really include two former D.A.'s in his conspiracy?  Hey, guess what, we're going to be going out and threatening to arrest an FBI agent to get them to back off of this investigation.  Do you want to join me?  It doesn't make any sense.

So he calls up character witnesses, five different people, his friends.  Doesn't tell you anything about his intent in this investigation.  All it tells you is he didn't go to those people for advice about what he was doing, people that would have told him this is a no-go just like Cecil Rhambo did.

This phone, in some ways it was Pandora's box.  The phone caused all the evils of Men's Central Jail to be aired, to be aired publicly for the first time.  Think about your unique opportunity here.  You heard deputies on the stand

talking about the abuse they engaged in.  Instead of all these unfounded accusations where the deputies did no wrong, they told you that they did wrong, and that was due to the Federal Grand Jury investigation.  It wasn't due to anything that Mr. Baca or his people did.

They were still working in the jails. Gilbert Michel would still be working at the sheriff's department had it not been for the Federal Grand Jury investigation, had it not been for the undercover showing he was a dirty deputy.  He'd still be there.  He'd still be there.

If this was about the safety of Anthony Brown, which is what the defense tried to portray, that all Mr. Baca was interested in was the safety, they could have turned him over to the state right away or the Federal Government and the county had equal access to him.  They didn't do that.  They could have turned him over to the Federal Grand Jury for the purposes of his testimony and then returned -- he would be returned back to where he belonged at that point.

This is them not wanting access -- the FBI to have access to Anthony Brown.  They could have left him if this was about safety in his cell in 1750 where they had a camera trained on his cell door so no deputy, no inmate could go in and out of that cell and disturb him.  Otherwise, they'd be on camera.  This wasn't about safety.  This was about hiding him from the Federal Grand Jury, the U.S. Marshal Service, the FBI.

The August phone calls, the chart, I think it's good for you to go back and spend some time looking at Mr. Baca's calendar and compare to the phone charts.  When you piece it together, you'll see the more complete picture of what was going on here.  We tried to present it to you in our case, but I want you to go back and do it yourself.  Look at what's going on these various days.  August 25th and 26th, that's when -- the day after the writ is served when they release him from the system.  All of this is happening.  Send him to San Dimas.

That's all happening between August 25th and August 26th, and that's when Mr. Baca is at meetings with Greg Thompson, Captain Carey, Undersheriff Tanaka.  That's when the phones are showing, again, things going up and down, communications going up and down.  There's only one thing that they could reasonably be talking about at that time.  And with the number of phone calls -- Mr. Hochman showed you one between Mr. Baca and Mr. Leavins.  You have to ignore the ones, of course, involving Mr. Baca and Tanaka.

But with all those phone calls, how hard would this be with all those meetings to hide information from Leroy Baca at this point?  If you're trying to hide information from somebody, you don't call them.  You don't meet with them.  You just ignore them.  And that wasn't what was happening at this time.

**UNITED STATES DISTRICT COURT**

As much as Mr. Baca tries to run from Undersheriff Tanaka at this point, he can't.  He can't run from him.  This was his guy.  He handpicked him.  He mentored him.  Out of everyone in the department -- I think there was some testimony about 9,000 employees, something like that.  Out of 9,000 employees in the department, that's who Mr. Baca selected.

And it was very clear who Mr. Tanaka was because we talked about it before.  "'F' the FBI."  "Those MF'ers."  And who put him in charge of that operation?  Only one person could do that.  Only one person did do that.  That was Mr. Baca.

So Mr. Hochman will put on the chart about what Mr. Baca may or may not have known.  That ignores all those conversations that were occurring in August and September that he was a part of.

So let me focus right now on the Leah Marx approach.  You've got Cecil Rhambo who goes to the sheriff and says, "Don't do that.  That's obstruction of justice," beforehand.  You have him tell a reporter after hand -- afterward, "I directed them there.  I sent them there."  And you have him not acting confused when he's getting a call from the U.S. Attorney that night of the arrest.  This was not Mr. Baca being briefed afterward, not knowing anything.  If you look at his calendar -- in fact, it's in evidence.

**UNITED STATES DISTRICT COURT**

September 27th, you could look at how jam-packed his day was that day.  He couldn't have gotten all the information that he had gotten to feed the reporter that day.

But think about the great evidence you have.  You have an assistant sheriff telling you that beforehand Mr. Baca was aware that they were going to threaten the arrest of an FBI agent.  You have Mr. Baca himself admitting it to a reporter who did not want to be here testifying.  And you have the U.S. Attorney and, as they pointed out, someone who is a federal judge now telling you that they talked to Mr. Baca about it and he didn't deny his knowledge.  In fact, he responded.  Not that, "I don't know what my people are doing" but, "No, no, no, she's not going to be arrested.  I want to talk about these issues."

That was his goal, get their attention, get them talking, try to convince them to back off.  And if you have any question about whether this was a Federal Grand Jury investigation, look back at those subpoenas.  You've got them starting in July of 2011.  You've got some more issued to the sheriff's department that he references in his letters August 24th of 2011.

The FBI was using grand jury subpoenas, and the U.S. Attorney's Office was using grand jury subpoenas in order to obtain information to provide to the grand jury.  The FBI was acting as an arm of the grand jury.  That's the only

evidence that's been introduced, that they were acting as an arm of the grand jury, and that's enough.

So Leah Marx acting as an arm of the grand jury, just like Special Agent Dahle was, threatened to be arrested, intimidated.  That's enough.  Mr. Baca is guilty of the offenses.

We talked about the instructions of conspiracy. I'll touch on it once more.  Mr. Hochman accuses me of cherry-picking, but he, of course, cherry-picks as well.  It's what attorneys do.  We try to issue spot.  We try to point out maybe weaknesses in a case, but you're ultimately the judge of the facts and how to apply the law to those facts.

And the jury instruction will tell you on conspiracy that, if he willfully joins the conspiracy knowing its purpose and helps advance its purpose, he's guilty of the crime.  He's guilty of it.

He doesn't need to know all of the details about it.  He doesn't need to know that Anthony Brown turned into John Rodriguez, turned into Kevin King, turned into Chris Johnson I think was the next one.  He doesn't need to know that information.  What he needs to know is he told people hide this inmate, keep them away from the FBI, that that was the goal.

Mr. Hochman talked about August 23rd and said that Mickey Manzo was not in the meeting with Mr. Tanaka.

You'll recall that's exactly what Mickey Manzo said.  He was in the meeting with Mr. Tanaka.  He was there when Mr. Tanaka did the butt-chewing to Greg Thompson and to Mickey Manzo.  When he sent Greg Thompson in to see the sheriff, when he said you brief him on this issue and told him -- didn't tell him hold back information.  You brief him on this issue.  And Mr. Tanaka wasn't going to be there to protect any information from getting to Mr. Baca at this meeting.

That tells you all you need to know about how involved Mr. Baca was in this information.  Yes, he was the heartbeat of this conspiracy.  And on that one occasion he may not have shown anger.  He may not have said, "'F' the FBI" like Paul Tanaka did.  But what did he do?  He understood.  That's what Mr. Hochman said.  That's what the witness said.  Mr. Baca understood on August 23rd the information that was being provided to him.  He understood the significance of the FBI meeting with Anthony Brown.  He understood that Greg Thompson was falling on his sword and apologizing to him.  He understood what had happened that day.  Wouldn't make sense -- he would be acting confused.  That's simply it.  He would be acting confused if he didn't know anything about this.

As I make my comments to you, I want you to know that it's always our burden of proof.  We must prove this case beyond a reasonable doubt.  You must be left firmly convinced that Mr. Baca is guilty of the charges.  But you should also

know -- and you've seen it -- the defense has the ability to subpoena witnesses just like we do.  And if Mr. Hochman believed that Greg Thompson, Paul Tanaka, you name the person who wasn't called as a witness had important information to give to you, Mr. Hochman could call that person to the stand.  Something that they have the ability to do.  Again, it's our burden of proof, but he doesn't just have to sit there passively.  He can try to attack our case.  He can call those witnesses to the stand.  He didn't do that.

Maricela Long told you, even though she didn't testify, she told you in that recording, "The sheriff knows this, sir."  And in cherry-picking the facts, Mr. Hochman tries to point out, well, they said, "Call the undersheriff."  That's the way the information was supposed to flow.  Remember, it was supposed to go up to the undersheriff, then to Baca.

But what number did she give the FBI then?  She gave them the 5000 line.  That's Mr. Baca's line.  That's the sheriff's office line.  On the directory it gets back to the sheriff.

Mr. Tanaka was part of this conspiracy.  There's no doubt about that.  No doubt.  But Mr. Baca was too.  And when Maricela Long said, "You have to talk to the undersheriff about that," she was talking about the charges.  You can look at your notes, listen to it again.  She was talking about the charges in the case.  She wasn't talking about the information.

UNITED STATES DISTRICT COURT

And again, look at Mr. Baca's reaction in that instance. Wasn't confused when he heard from the U.S. Attorney. Wasn't confused the next day. Made zero calls. Zero calls came in to him. He made zero calls that day on his way back from the fundraiser. He knew what had happened.

I want to just end on this one point. A lot of this trial, you've heard, "We want to clean our own house," "We police ourselves," "We police the police." And you've heard about the historic role that the Federal Government plays in civil rights cases, how important this function is because law enforcement agencies have not done a great job of policing themselves in the past.

It's important for the Federal Government to be there to police the police, make sure that federal law enforcement agencies are policing the local ones to make sure that the local ones are complying with civil rights because no one is above the law and no man is beneath it. It doesn't matter that a law enforcement officer commits a crime on a lowly inmate who might be serving decades in jail. They have rights too, and that deputy has abused his badge if he's beating an inmate, if he's taking bribes. These people should not be law enforcement officers anymore.

But ultimately there's only one entity that does its job in policing the police, and that's you. It's ultimately your job to decide whether the police officers have

committed misconduct, in this case whether Mr. Baca has obstructed justice. You have heard from insiders in the conspiracy. You've heard from all those people on the outside complaining about the abuse. You've seen these videos. You have enough evidence to be firmly convinced beyond a reasonable doubt that Mr. Baca is guilty of the crimes.

I want to leave you with one more thought. Don't want to leave you without this. Mr. Hochman, again, in trying to use this one jury instruction as a shield tries to say, well, look at what he did in this obstruction of justice investigation. He turned over all of these documents. He didn't obstruct the obstruction of justice investigation. That's not what he's accused of obstructing. It's the civil rights investigation. That's what he's accused of obstructing.

The fact that the county hired a law firm that then produced all these documents to the Federal Government and the Federal Grand Jury that that's what happened here, that doesn't make him innocent of the charges. It in no way shows that he did not have a corrupt intent. What he is being charged with, what you must consider, is whether he obstructed justice with respect to the Federal Grand Jury investigation into the civil rights abuses.

You've heard all this evidence. You've heard our arguments. You should go back now, consider the charges, piece together the evidence, and see what is obvious when you do

that.  And that is that Mr. Baca is guilty of conspiring to obstruct justice and obstruction of justice.  Thank you very much for your time.

(Further proceedings were held and

reported but not included herein.)

CERTIFICATE OF OFFICIAL REPORTER

I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

DATED THIS _19TH_ DAY OF JANUARY, 2017.

/S/ MIRANDA ALGORRI

MIRANDA ALGORRI, CSR NO. 12743, CRR
FEDERAL OFFICIAL COURT REPORTER

**UNITED STATES DISTRICT COURT**