UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

HONORABLE PERCY ANDERSON, U.S. DISTRICT JUDGE

UNITED STATES OF AMERICA,            )
                                     )
            Plaintiff,               )    Case No.
                                     )
      vs.                            )    CR 16-00066(A)-PA
                                     )
LEROY D. BACA,                       )    PAGES (1 to 35)
                                     )
            Defendant.               )
_____)

REPORTER'S TRANSCRIPT OF
TESTIMONY OF WILLIAM COURSON
WEDNESDAY, DECEMBER 14, 2016
8:02 A.M.
LOS ANGELES, CALIFORNIA

_____

MIRANDA ALGORRI, CSR 12743, CRR
FEDERAL OFFICIAL COURT REPORTER
312 NORTH SPRING STREET, ROOM 435
LOS ANGELES, CALIFORNIA 90012
MIRANDAALGORRI@GMAIL.COM

UNITED STATES DISTRICT COURT

**APPEARANCES OF COUNSEL:**


**FOR THE PLAINTIFF:**

    EILEEN M. DECKER
    United States Attorney
    BY:  BRANDON FOX
    BY:  EDDIE A. JAUREGUI
    Assistant United States Attorneys
    United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012


**FOR THE DEFENDANT:**

    MORGAN LEWIS AND BOCKIUS LLP
    BY:  NATHAN J. HOCHMAN
    BY:  BRIANNA ABRAMS
    The Water Garden
    1601 Cloverfield Boulevard
    Suite 2050 North
    Santa Monica, California 90404


    MORGAN LEWIS AND BOCKIUS LLP
    BY:  TINOS DIAMANTATOS
    77 West Wacker Drive
    Chicago, Illinois 60601

**UNITED STATES DISTRICT COURT**

# I N D E X

**WEDNESDAY, DECEMBER 14, 2016**

## Chronological Index of Witnesses

Witnesses: _____    Page

COURSON, William

| | |
|---|---|
| Direct examination by Mr. Jauregui | 8 |
| Cross-examination by Mr. Diamantatos | 20 |
| Redirect examination by Mr. Jauregui | 31 |
| Recross-examination by Mr. Diamantatos | 33 |

**UNITED STATES DISTRICT COURT**

## **EXHIBITS**

**WEDNESDAY, DECEMBER 14, 2016**

| Exhibit | For ID | In EVD |
|---|---|---|

(None)

**LOS ANGELES, CALIFORNIA; WEDNESDAY, DECEMBER 14, 2016**

**8:02 A.M.**

**---**

(The following proceedings were held in

open court out of the presence of the jury:)

THE CLERK:  Calling item No. 1, CR 16-66(A),

USA versus Leroy D. Baca.

Counsel, state your appearances, please.

MR. FOX:  Good morning, Your Honor.

Brandon Fox and Eddie Jauregui on behalf of the

United States.  Special Agent David Dahle will be joining us at

counsel table, but I think he's checking on witnesses right

now.

THE COURT:  Good morning.

MR. HOCHMAN:  Good morning, Your Honor.

Nathan Hochman with Tinos Diamantatos and

Brianna Abrams on behalf of Leroy Baca who is present.

MR. DIAMANTATOS:  Good morning.

THE COURT:  Good morning.

Yesterday there was a spectator who the Court

removed from the courtroom and who the Court intends to remove

from these proceedings through the conclusion of this trial.

It was reported to the Court that that person was making

disparaging comments during a witness' testimony that could be

**UNITED STATES DISTRICT COURT**

overheard by the lawyers and presumably the jury.

This is not the first time that that person has disrupted proceedings in this courtroom.  In fact, it was brought to the Court's attention that she had interrupted proceedings in a related case.

The Court recognizes her right to be present during these proceedings.  However, spectators do have to conform their conduct consistent with the decorum that's required in a courtroom.  And the Court, in balancing her right to be here with the defendant's right to a fair trial and the Court's obligation to maintain the integrity of the judicial process, the Court believes that it warrants or finds that she will not be allowed to be present during the remainder of these proceedings.

All right.  We're ready to proceed?

MR. FOX:  Yes, Your Honor.  It looks like there's a couple extra chairs over here.  I'm not sure if they're going to get in the way of the jury.  If they're fine, I'll leave them.  If they're not fine, I will be happy to move them.

THE COURT:  We will get them.

MR. JAUREGUI:  Your Honor, should we call our first witness to the stand?

THE COURT:  Yes.  If you would.  We'll have the jury brought in.

///

(The following proceedings were held in open court in the presence of the jury:)

THE COURT:  If you'd call your first witness, please.

MR. JAUREGUI:  Your Honor, the United States calls William David Courson.

THE COURT:  I will ask the clerk to swear the witness, please.

THE CLERK:  Please stand and raise your right hand.

Do you solemnly state that the testimony you may give in the cause now pending before this court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  Yes, sir.

THE CLERK:  Would you please state -- please be seated.  State your full name and spell your last name for the record.

THE WITNESS:  William David Courson, C-o-u-r-s-o-n.

THE CLERK:  Thank you.

/// 

/// 

/// 

/// 

**UNITED STATES DISTRICT COURT**

**WILLIAM DAVID COURSON,**

**GOVERNMENT'S WITNESS, SWORN:**

**DIRECT EXAMINATION**

BY MR. JAUREGUI:

Q      Mr. Courson, what do you do for a living?

A      I work for the Los Angeles County Sheriff's Department.

Q      What do you do there?

A      I'm a deputy sheriff.

Q      How long have you been a deputy with the sheriff's department?

A      A little over eight years.  Eight-and-a-half years.

Q      Where within the department do you work now?

A      Men's Central Jail.

Q      When you started at the sheriff's department, did you receive any training?

A      Yes, sir.

Q      Approximately when was that?

A      November 13, '07, I believe.

Q      And who conducted -- what was your -- what did your training consist of?

A      Well, that was Black Monday.  So you had the academy.  Then after graduation, I think it was March 3rd of '08.  Then you have two weeks of Jail Ops.

**UNITED STATES DISTRICT COURT**

Q        What is Jail Ops?

A        Jail operations.  It, I guess, tells you the day-in-day-out, what goes on at the jail, what to expect.

Q        In Jail Ops training, are you taught about rules in MCJ?

A        Yes.

Q        What kind of rules are you taught about -- or are you taught, generally speaking?

A        I guess, like I said, it's just the searching, the waist-chaining, about shanks, drugs, stuff like that, stuff you're going to deal with in custody environment.

Q        Are you taught formal written rules?

A        Yes.

Q        What about unwritten rules?

MR. DIAMANTATOS:  Objection, Your Honor.  Leading.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  I heard an unwritten rule during that time, yes, sir.

Q        BY MR. JAUREGUI:  When you say you heard an unwritten rule, what did you hear?

MR. DIAMANTATOS:  Objection.  Foundation.

THE COURT:  Sustained.

Q        BY MR. JAUREGUI:  When you mentioned an unwritten

rule, where did you hear that?

A          At the academy at STAR Center during Jail Operations.

Q          From whom did you hear this rule?

A          I do not recall who I heard it from.

Q          Do you recall what the rule was?

MR. DIAMANTATOS:  Objection.  Hearsay.

THE COURT:  Overruled.

THE WITNESS:  I'm sorry?

Q          BY MR. JAUREGUI:  Do you recall what the rule was?

A          Yes, sir.

Q          What was it?

A          That, if an inmate fights with a deputy, the inmate goes to the hospital.

Q          And do you have an understanding of what that means?

A          What I thought at the time was, if an inmate fights with a deputy, the inmate was to be hurt bad enough to go to the hospital.

Q          In 2000 -- I'm sorry.

Throughout the course of your career at the sheriff's department, have you worked at MCJ?

A          Yes, sir.

Q          Did there come a time, Mr. Courson, where you

encountered an FBI agent named Leah Marx?

A      Yes, sir.

Q      Approximately when was that?

A      Sometime in 2010.

Q      Do you recall the circumstances under which you met Ms. Marx?

A      She would come and interview inmates at Men's Central Jail.

Q      Do you know, Mr. Courson, why she was conducting interviews at MCJ?

A      She said human trafficking cases was what she worked on.

Q      Did you make -- did you make an effort to get to know Special Agent Marx?

A      Yes, sir.

Q      What did you do?

A      Asked her for her e-mail and phone number.

Q      Why did you do that?

A      I thought she was cute.

Q      Did you want to get to know her personally?

A      Yes.

Q      What happened after you asked Ms. Marx for her e-mail and phone number?

A      I got her e-mail address.

Q      Did you end up contacting Ms. Marx?

**UNITED STATES DISTRICT COURT**

A      Yes, sir.

Q      What happened?

A      I would e-mail.  She would e-mail back.  At some point we got together for a few times, went out for dinner and drinks or lunch.

Q      When you went out with Special Agent Marx, what kinds of things did you discuss?

A      We discussed motorcycles.  We discussed tattoos.  We talked about her dog.  We talked about my work.  Just random stuff most of the time.

Q      What kinds of things did you discuss with Special Agent Marx pertaining to your work?

A      Well, I mentioned the unwritten rule.  I talked about a force that I witnessed but didn't report.  I talked -- some paper she was doing, I gave her our DT manual or use-of-force policy.

Q      What is "DT"?

A      I'm sorry.  Defensive tactics.

Q      I want to ask you some questions about the use of force that you mentioned.

       The incident that you witnessed and didn't report, what was that?

       MR. DIAMANTATOS:  Objection.  Foundation.

       THE COURT:  Sustained.

Q      BY MR. JAUREGUI:  Mr. Courson, approximately when

did this incident occur?

A       Maybe end of 2008, maybe '09.  I don't recall.

Q       Where did it occur?

A       At Men's Central Jail.

Q       What were the circumstances surrounding that incident?

MR. DIAMANTATOS:  Objection.  Foundation.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  During pill call, we were doing -- well, pill call was conducted in the hallway at the time for the general population.

Q       BY MR. JAUREGUI:  What is "pill call"?

A       The nurses pass out pills.

Q       Okay.

A       I noticed an inmate coming back into the module followed by at least one deputy.  Then I heard noise.  I looked over, and they were on the ground.

Q       I'm sorry.  Who was on the ground?

A       The inmate and the deputy.  The deputy was restraining the inmate.

Q       And what happened after that incident occurred?

A       They handcuffed the inmate.  They took him out into the hallway.  Senior deputy, supervising line deputy came into the module, started asking people what did they see.

Q        Did the senior deputies contact you?

A        Yes, sir.

Q        What, if anything, did they ask you?

A        He asked me if I saw anything or what did I see. I told him, "What do you want to hear?"  And he said, "You were upstairs running showers."

Q        And were you actually upstairs running showers?

A        No, sir.

Q        What did you say, if anything, in response to him?

MR. DIAMANTATOS:  Objection.  Hearsay.

THE COURT:  Overruled.

THE WITNESS:  I just said, "Okay."

Q        BY MR. JAUREGUI:  Deputy Courson, are you familiar with the term "drive-bys"?

A        Yes, sir.

Q        Did you discuss in any of your social visits with Special Agent Marx the term "drive-by"?

A        Yes, sir.

Q        What did you tell her about that?

A        I told her it's where -- if there's a force going on and they've put out 415, which is disturbance, which in jail we use it for fights, is occurring at whatever location, everybody would respond.  Well, when you get there, once -- people would just hit the inmate and then leave without doing

paperwork.

Q       On these occasions when you met with Special Agent Marx, Deputy Courson, were you aware that Special Agent Marx was recording these conversations?

A       No, sir.

Q       Did there come a time when you learned that Special Agent Marx was, in fact, recording your conversations?

A       Yes, sir.

Q       Did there come a time when Special Agent Marx was investigating excessive force in the jails?

MR. DIAMANTATOS:  Objection.  Leading, Your Honor.

THE COURT:  It is, but you can answer.

THE WITNESS:  Yes.  I found out.

Q       BY MR. JAUREGUI:  How did you learn that, Deputy Courson?

A       The captain of Men's Central Jail put on a briefing and informed everyone.

Q       What did that captain say?

MR. DIAMANTATOS:  Objection.  Foundation.

THE COURT:  Sustained.

Q       BY MR. JAUREGUI:  Approximately when did that briefing occur?

A       I do not recall.

Q       Do you know, Deputy Courson, what the purpose of

the briefing was?

A    Yes.

Q    What was your understanding of that purpose?

MR. DIAMANTATOS:  Objection.  Foundation.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  He was informing all the personnel at Men's Central Jail of what the FBI was doing there and, if we had any contact with him, to come and speak to him.

Q    BY MR. JAUREGUI:  What did you do in response to that briefing?

A    I approached Captain Ornelas and told him I had contact with Leah Marx.

Q    What happened after that?

A    He told me to come to his office and speak to him in private.

Q    Did you go to Captain Ornelas' office?

A    Yes, sir.

Q    What happened at that meeting?

MR. DIAMANTATOS:  Objection.  Foundation.

THE COURT:  Sustained.

Q    BY MR. JAUREGUI:  After speaking with Captain Ornelas, did you speak with anyone else?

A    Yes, sir.

Q    With whom did you speak?

**UNITED STATES DISTRICT COURT**

A    ICIB, Internal Criminal Investigation Bureau.

Q    Do you remember the name of the individuals with whom you spoke?

A    Yes, sir.

Q    Who?

A    It was Sergeant Craig, Sergeant Long, and Lieutenant Leavins.

Q    And when was that relative to your meeting with Captain Ornelas?

A    Immediately after.

Q    Deputy Courson, I want to direct your attention to exhibit -- I'm sorry.

Your Honor, may I ask the court clerk to present Exhibits 88 and 89 to this witness, please.

If you could just take a look at those exhibits, please, Deputy Courson.  Do you recognize them?

A    Yes, sir.

Q    What is Government Exhibit No. 88?

A    That is a CD of, I guess, the recording of the ICIB interview.

Q    How do you recognize that exhibit?

A    It has my initials and date from yesterday.

Q    And what about Government Exhibit No. 89?  Do you recognize it?

A    Yes, sir.

UNITED STATES DISTRICT COURT

Q        What is it?

A        That's the excerpts from 88.

Q        And have you reviewed the -- is that a transcript?

A        Yes, sir.

Q        Have you reviewed that transcript before?

A        Yes, sir.

Q        And does that transcript accurately reflect the recording in Government Exhibit No. 88?

A        Yes, sir.

MR. JAUREGUI:  Your Honor, I would move for admission of Government Exhibit No. 89 -- No. 88.  Excuse me.

MR. DIAMANTATOS:  No objection, Your Honor.

THE COURT:  It will be received.

MR. JAUREGUI:  And, Your Honor, at this point I'd like to play a few clips from that recording.  The transcript is in the transcript binder at Exhibit No. 89.

THE COURT:  All right.  If everybody would open their binders to tab 89.

MR. JAUREGUI:  Okay.  I'd like to now play the first clip from Government Exhibit No. 88.

(The cd, Exhibit No. 88, commenced playing before the jury.)

MR. JAUREGUI:  Next clip.

///

UNITED STATES DISTRICT COURT

(The cd, Exhibit No. 88, commenced

playing before the jury.)

MR. JAUREGUI:  Next clip.

(The cd, Exhibit No. 88, commenced

playing before the jury.)

MR. JAUREGUI:  And final clip, please.

(The cd, Exhibit No. 88, commenced

playing before the jury.)

Q     BY MR. JAUREGUI:  Now, Deputy Courson, you heard Sergeant Craig say, "If somebody starts threatening you with a subpoena or some other nonsense"; right?

A     Yes, sir.

Q     At any point during your interactions with FBI Special Agent Leah Marx, did the FBI threaten you?

A     No, sir.

Q     At any point during your interactions with the FBI, did the FBI intimidate you?

MR. DIAMANTATOS:  Objection, Your Honor. Improper bolstering.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  No, sir.

Q     BY MR. JAUREGUI:  Bully you?

A     No, sir.

Q     Coerce you?

UNITED STATES DISTRICT COURT

A       No, sir.

Q       Blackmail you?

A       No, sir.

MR. JAUREGUI:  No further questions, Your Honor.

THE COURT:  Cross-examination.

MR. DIAMANTATOS:  Thank you, Your Honor.

May I proceed?

THE COURT:  Yes, please.

**CROSS-EXAMINATION**

BY MR. DIAMANTATOS:

Q       You described an event where you allegedly witnessed a takedown of an inmate, I believe you said, during a pill call; correct?

A       Yes, sir.

Q       Now, according to you, during the pill call incident, you observed two deputies take down an inmate; correct?

A       Yes, sir.

Q       The inmate was not handcuffed; correct?

A       Correct.

Q       Now, you worked with those two deputies that you observed; right?

A       Yes, sir.

Q       Yet you don't remember either of their names; correct?

A       That is correct.

Q       You never provided that information to the Government.

A       Correct.

Q       Never provided that information to anyone at the sheriff's department.

A       Correct.

Q       You can't remember where specifically at Men's Central Jail this pill line incident allegedly occurred; right?

A       Correct.

Q       You can't even remember what year it happened.

A       That is correct.

Q       Now, you also described that, after the pill line incident, one of the two deputies asked you to lie about what happened; correct?

A       No, sir.

Q       Well, he indicated that you shouldn't indicate that you were there to observe the incident; correct?

MR. JAUREGUI:  Objection.  Misstates the testimony.

THE COURT:  Sustained.

Q       BY MR. DIAMANTATOS:  That you were not to fill out a report indicating what you observed.

A       No, sir.

**UNITED STATES DISTRICT COURT**

Q        You don't remember the person's race that told you that?

A        His rank?

Q        Race.  Not rank, sir.

A        No idea, sir.

Q        You don't remember his height?

A        No, sir.

Q        Isn't it true, Mr. Courson, that you never observed how that incident started?

A        That is correct.

Q        And isn't it true that you have no idea whether that use of force was reasonable or unreasonable?

A        That is correct.

Q        You have no idea why it even happened; right?

A        Correct.

Q        Isn't it true, Mr. Courson, that, in your seven plus years as a deputy at Men's Central Jail, you have never observed an unreasonable use of force?

A        Correct.

Q        This morning you talked about your training that you received, I believe you said, in late 2007 through up and including March of 2008; is that correct?

A        Yes, sir.

Q        You testified about receiving certain written documentation; correct?

UNITED STATES DISTRICT COURT

A     Yes, sir.

Q     Defensive tactic manuals?

A     Yes, sir.

Q     Sheriff Baca would come to the training; isn't that correct?

A     Sometimes.  I don't remember seeing him, but sometimes he probably did.

Q     He would come and instruct his deputies on what was expected of them.

Isn't that right, sir?

A     Again, I do not recall if I saw him or not.

Q     You don't recall if Sheriff Baca came and instructed deputies to treat inmates with respect?

MR. JAUREGUI:  Objection.  Foundation.  Relevance.

THE COURT:  Sustained.

Q     BY MR. DIAMANTATOS:  You indicated you were trained in March of 2008; right, Mr. Courson?

A     Correct.

Q     Yet you don't recall if the sheriff of the department came and addressed deputies that were being trained?

MR. JAUREGUI:  Objection.  Asked and answered.

THE COURT:  Sustained.

Q     BY MR. DIAMANTATOS:  Isn't it true, sir, that you actually resent inmates?

MR. JAUREGUI:  Objection.  Argumentative.

THE COURT:  Sustained.

Q       BY MR. DIAMANTATOS:  Well, you deal with inmates as a deputy each day, don't you, sir?

A       Yes, sir.

Q       And inmates receive certain benefits when they're incarcerated.

Isn't that right, sir?

A       Yes, sir.

Q       And you resent the fact that these inmates receive benefits while in prison that they wouldn't ordinarily receive while outside of prison.

Isn't that true, sir?

A       Yes, sir.

Q       And you resent the programs that give these inmates benefits; right?

MR. JAUREGUI:  Objection, Your Honor.  Relevance.

THE COURT:  Sustained.

Q       BY MR. DIAMANTATOS:  Are you aware of who put those programs in place?

MR. JAUREGUI:  Same objection, Your Honor.

THE COURT:  Sustained.

Q       BY MR. DIAMANTATOS:  Now, you indicated that, when you first met Leah Marx, you knew she was a special agent with the FBI; correct?

A       Yes.

Q       The first time you interacted with Ms. Marx was at Men's Central Jail?

A       Yes, sir.

Q       You were a deputy there?

A       Yes, sir.

Q       She's an FBI agent?

A       Yes, sir.

Q       Visiting an inmate in the prison; correct?

A       Correct.

Q       She was there with a fellow FBI agent; correct?

A       Correct.

Q       And that individual was also there to visit an inmate; correct?

A       Correct.

Q       Now, you made a lot of small talk with Ms. Marx before she even passed you her business card with her e-mail; correct?

A       Yes, sir.

Q       You would tell her things like -- refer to your metal flashlight and hitting it into your palm like you use it on inmates; right?

A       Yes, sir.

Q       Are you aware whether or not you've been investigated for using your metal flashlight on inmates?

MR. JAUREGUI:  Objection.  Relevance, Your Honor.

THE COURT:  Overruled.  You can answer that question.

Q    BY MR. DIAMANTATOS:  Are you aware, sir, whether or not you've been investigated for using your metal flashlight on inmates as you claimed to Special Agent Marx that you did?

A    I was.

Q    Are you aware of the results of that investigation?

A    I am.

Q    What were the results?

A    I ended up with 30 days' suspension.

Q    To be clear, who investigated that?

MR. JAUREGUI:  Objection, Your Honor.  Foundation.  Vague.

THE COURT:  Sustained.

Q    BY MR. DIAMANTATOS:  The FBI didn't suspend you from your job for 30 days; isn't that right, sir?

A    Correct.  They did not.

Q    All right.  Now, after observing Special Agent Marx at Men's Central Jail, you indicated to the members of the jury this morning that you wanted to be in contact with her; correct?

A    Correct.

Q    And she slipped you her business card with a

personal e-mail address on the back.

A        Correct.

Q        You began writing e-mails to each other?

A        Correct.

Q        In fact, you exchanged a lot of e-mails; right?

A        Yes, sir.

Q        Special Agent Marx later provided you with her cell phone number; correct?

A        Yes, sir.

Q        You began texting one another.

A        Probably, yes, sir.

Q        You liked her.

A        Yes, sir.

Q        You thought she was attractive.

A        Yes, sir.

Q        You indicated this morning that you started meeting in person; correct?

A        Correct.

Q        Went out a few times.

A        Correct.

Q        For lunch; right?

A        Yes, sir.

Q        Dinner?

A        Yes, sir.

Q        Drinks?

A       Yes, sir.

Q       You flirted with her each of these times that you met with her; correct?

A       Yes, sir.

Q       You indicated this morning that you even chatted about your tattoos; right?

A       Correct.

Q       You even saw the one on her back; correct?

MR. JAUREGUI:  Objection.  Relevance, Your Honor.

THE COURT:  Sustained.

Q       BY MR. DIAMANTATOS:  At one point -- well, you indicated that it turns out she was recording all of these interactions that you had; correct?

A       Yes, sir.

Q       Now, during the course of your meetings with Agent Marx, you told her about falsifying reports and inmate abuse; correct?

A       No, sir.

Q       Well, you indicated that you talked to her about this pill call incident.

A       Yes, sir.

Q       That you talked about the drive-bys that you described; correct?

A       Yes, sir.

Q       All right.  And you indicated to her that you

**UNITED STATES DISTRICT COURT**

didn't fill out reports when you would observe these alleged instances; correct?

A       I only observed that one, sir.

Q       The one you're referring to as the pill call incident?

A       Correct.

Q       Going back for a moment to this unwritten rule training that you described to us, isn't it true you have no recollection of which person at the training told you this unwritten rule?

A       That is correct.  Yes, sir.

Q       Now, you've already indicated to us that, during your seven plus years as a deputy, you've never observed an unreasonable use of force.  You've also never seen an inmate being sent to a hospital as a result of getting in a fight with a deputy.

Isn't that true, sir?

A       Yes, sir.

Q       You understand it's a crime not to report inmate abuse if you observe it?

A       Yes, sir.

MR. JAUREGUI:  Objection.  Relevance, Your Honor.

THE COURT:  The answer will stand.

Next question.

Q       BY MR. DIAMANTATOS:  Now, at some point it became

**UNITED STATES DISTRICT COURT**

apparent to you that Ms. Marx -- Agent Marx was recording your interactions; right?

A        Correct.

Q        We heard the recording this morning about you describing that to individuals with ICIB; right?

A        Correct.

Q        After that point in 2013, you began cooperating with the Government; correct?

A        Correct.

Q        You had meetings with the Government?

A        Yes, sir.

Q        Multiple meetings?

A        Yes, sir.

Q        In fact, you met with the Government and testified for them before the grand jury; right, sir?

A        Yes, sir.

Q        Isn't it true that you admitted to all the lies that you told Special Agent Marx during the meetings that you had with her in 2010?

A        Yes.

Q        And after admitting to the members of the grand jury that you had lied to Special Agent Marx when you met with her in 2010, you, thereafter, testified for the Government in multiple other hearings.

         Isn't that true, sir?

**UNITED STATES DISTRICT COURT**

A       Correct.

Q       Yet, as you sit here today, you've never been charged with lying to an FBI agent; isn't that right?

A       Correct.

Q       In fact, sir, you've never been charged with any crime ever?

A       That's not true.

Q       Well, you've never been charged with any crime related to inmate abuse.

A       Correct.

Q       Falsifying reports?

A       Correct.

Q       Or lying to an agent?

A       Correct.

MR. DIAMANTATOS:  May I have a moment, Your Honor?

THE COURT:  Yes.

MR. DIAMANTATOS:  Nothing further.

MR. JAUREGUI:  Briefly, Your Honor.

**REDIRECT EXAMINATION**

BY MR. JAUREGUI:

Q       Deputy Courson, you testified on cross-examination about having spoken to Special Agent Marx about using your flashlight on inmates?

A       Yes, sir.

**UNITED STATES DISTRICT COURT**

Q        Did you actually use your flashlight on inmates?

A        Once.

Q        And were you suspended -- when were you suspended?

A        Last November 2nd through December 2nd, I believe.

Q        So that would be 2015?

A        Yes, sir.

Q        And do you know why you were suspended, Deputy Courson?

A        Yes, sir.

Q        Why?

A        For telling Agent Marx about the unwritten rule --

MR. DIAMANTATOS:  Objection, Your Honor. Foundation how this witness knows that.

THE COURT:  Overruled.

Q        BY MR. JAUREGUI:  Continue, please.

A        Then it was telling Agent Marx that an inmate does not have to fight or have to swing on the deputy first. All you have to do is perceive that threat, and then you're allowed to defend yourself or fight.  One was telling Agent Marx that I didn't care if inmates killed each other and leading her to believe there was a use of force every single day or every minute of every day or something like that.

Q    Do you know, Deputy Courson, whether you were suspended for causing embarrassment to the department?

A    Yes, sir.  That was mentioned.

Q    And was that in connection with your testimony in other cases?

A    I believe so, but I don't know what their thought process is.

MR. JAUREGUI:  One moment, Your Honor.

Q    Do you know, Deputy Courson, when you were suspended -- do you recognize the defendant in this case?

A    Yes, sir.

Q    Who is he?

A    That's previous Sheriff Lee Baca.

Q    You were suspended in November of 2015.  Was he the sheriff of the department?

A    Yes, sir.

MR. JAUREGUI:  No further questions, Your Honor.

MR. DIAMANTATOS:  Briefly, Your Honor.

May I proceed?

THE COURT:  Yes.

**RECROSS-EXAMINATION**

BY MR. DIAMANTATOS:

Q    Mr. Courson, you indicated that you were suspended in 2015; isn't that right, sir?

A    Yes, sir.

Q        Do you recall when in 2015 you were suspended?

A        November 2nd through December 2nd.

Q        November 2nd through December 2nd, you said?

A        Yes, sir.

Q        Of 2015?

A        I believe so.  Yes, sir.

Q        Isn't it true that Sheriff Baca retired in January of 2014, sir?

A        I don't know when he retired.

        MR. DIAMANTATOS:  Nothing further, Your Honor.

        THE COURT:  All right.  Anything else?

        MR. JAUREGUI:  No, Your Honor.

        THE COURT:  All right.  You may step down.

        Call your next witness.

     (Further proceedings were held and

      reported but not included herein.)

**UNITED STATES DISTRICT COURT**

CERTIFICATE OF OFFICIAL REPORTER

I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

DATED THIS __2ND__ DAY OF FEBRUARY, 2017.

/S/ MIRANDA ALGORRI

MIRANDA ALGORRI, CSR NO. 12743, CRR
FEDERAL OFFICIAL COURT REPORTER

**UNITED STATES DISTRICT COURT**