UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

HONORABLE PERCY ANDERSON, U.S. DISTRICT JUDGE

UNITED STATES OF AMERICA,          )
                                   )
            Plaintiff,             )    Case No.
                                   )
      vs.                          )    CR 16-00066(A)-PA
                                   )
LEROY D. BACA,                     )    PAGES (1 to 40)
                                   )
            Defendant.             )
_____)

REPORTER'S TRANSCRIPT OF
TESTIMONY OF ROBERT BAYES
THURSDAY, DECEMBER 8, 2016
9:01 A.M.
LOS ANGELES, CALIFORNIA

_____

**MIRANDA ALGORRI, CSR 12743, CRR**
FEDERAL OFFICIAL COURT REPORTER
312 NORTH SPRING STREET, ROOM 435
LOS ANGELES, CALIFORNIA 90012
MIRANDAALGORRI@GMAIL.COM

UNITED STATES DISTRICT COURT

**APPEARANCES OF COUNSEL:**

**FOR THE PLAINTIFF:**

        EILEEN M. DECKER
        United States Attorney
        BY:  BRANDON FOX
        BY:  EDDIE A. JAUREGUI
        Assistant United States Attorneys
        United States Courthouse
        312 North Spring Street
        Los Angeles, California 90012


**FOR THE DEFENDANT:**

        MORGAN LEWIS AND BOCKIUS LLP
        BY:  NATHAN J. HOCHMAN
        BY:  BRIANA ABRAMS
        The Water Garden
        1601 Cloverfield Boulevard
        Suite 2050 North
        Santa Monica, California 90404


        MORGAN LEWIS AND BOCKIUS LLP
        BY:  TINOS DIAMANTATOS
        77 West Wacker Drive
        Chicago, Illinois 60601

**UNITED STATES DISTRICT COURT**

3

# I N D E X


## THURSDAY, DECEMBER 13, 2016


## Chronological Index of Witnesses


Witnesses:                                                      Page

BAYES, Robert

    Direct examination by Mr. Jauregui                          5
    Cross-examination by Mr. Hochman                            17

UNITED STATES DISTRICT COURT

4

**EXHIBITS**


**THURSDAY, DECEMBER 13, 2016**


| Exhibit | For ID | In EVD |
| --- | --- | --- |
| 737   Document | 25 | 28 |
| 529   Document | 32 | 34 |
| 528   Document | 32 | 35 |

**UNITED STATES DISTRICT COURT**

**LOS ANGELES, CALIFORNIA; THURSDAY, DECEMBER 13, 2016**

**9:01 A.M.**

**---**

(Further proceedings were held and

reported but not included herein.)

THE COURT:  Call your next witness.

MR. JAUREGUI:  The United States calls Sergeant Robert Bayes.

THE CLERK:  Stand here and raise your right hand.

Do you solemnly state that the testimony you may give in the cause now pending before this court shall be the truth, the whole truth, and nothing but the truth, so help you god?

THE WITNESS:  Yes, I do.

THE CLERK:  Please have a seat.

Would you please state your full name and spell your last name for the record.

THE WITNESS:  Robert Bayes, B-a-y-e-s.

THE CLERK:  Thank you.

**ROBERT BAYES,**

**GOVERNMENT'S WITNESS, SWORN:**

**DIRECT EXAMINATION**

BY MR. JAUREGUI:

Q    Mr. Bayes, what do you do for a living?

**UNITED STATES DISTRICT COURT**

A       I am a sergeant with the Los Angeles County Sheriff's Department.

Q       How long have you worked for the sheriff's department?

A       26 years.

Q       In August of 2011, what was your position or rank within the department?

A       I was a detective working the Jail Investigation Unit.

Q       What is the Jail Investigation Unit?

A       Jail Investigation Unit is one component of four in the Custody Investigative Services Unit, and we were detectives that were assigned cases of criminal matters that happen inside the jail.

Q       And who did you investigate?

A       I investigated primarily inmates.

Q       Who was in charge of the CISU?

A       Lieutenant Greg Thompson.

Q       Did Lieutenant Thompson also oversee the other components that you mentioned that there were four components in CISU?

A       Yes.

Q       Was OSJ one of those components?

A       Yes.

Q       What was OSJ?

UNITED STATES DISTRICT COURT

A      Operation Safe Jail.

Q      In your role as investigator in the Jail Investigations Unit, what did you do generally?

A      We were assigned cases that were generated inside the jails, anything from simple petty theft, vandalism, up to attempted murder.  Once we are assigned those cases, we work those to conclusion, interviewing inmates, interviewing deputy victims or inmate victims, gathering that total to write a report and take it to a city attorney or district attorney for filing purposes.

Q      Did you make charging recommendations?

A      Yes.

Q      Did there come a time, Sergeant Bayes, when you came to be involved in an investigation involving somebody named Anthony Brown?

A      Yes.

Q      And was Anthony Brown an inmate in Men's Central Jail?

A      Yes, he was.

Q      Approximately when was it that you became involved in that investigation?

A      August 8, 2011.

Q      What happened on that day?

A      I received a call when I was inside my office from Sergeant Orpe, O-r-p-e, a Men's Central Jail sergeant,

**UNITED STATES DISTRICT COURT**

that a cell phone had been recovered by deputies working in Anthony Brown's property.

Q       Initially what steps did you take?

A       The deputies brought me the phone to my office. I took down the pertinent information, serial numbers from the cell phone, so I could write a court order to fax that to Sprint Nextel to obtain the information that was on the phone.

Q       Did you interview Anthony Brown?

A       Yes, I did.

Q       Approximately when was that?

A       August 16, 2011.

Q       How was that interview arranged?

A       When I arrived at work on August 16, I read an e-mail from Deputy Colon, C-o-l-o-n, and he had interviewed Anthony Brown the night prior.  Deputy Colon was walking by my office and said he was going to go reinterview Anthony Brown and asked me if I would like to go with him.

Q       And do you know, Sergeant Bayes, where Deputy Colon worked?

A       He was working OSJ or Operation Safe Jail.

Q       Did you participate in the interview with him on the 16th?

A       Yes, I did.

Q       During that interview, Sergeant Bayes, did you come to find out -- what did you find out in that interview,

UNITED STATES DISTRICT COURT

generally?

A        Me and Deputy Colon and Detective Villa-Gomez, V-i-l-l-a-G-o-m-e-z, interviewed Anthony Brown for approximately an hour.  Deputy Colon started the interview, and Anthony Brown didn't seem to be too responsive to him.  And so I took over and let Anthony Brown know that I was handling the cell phone case, and he over the hour opened up and said that a deputy brought in a cell phone to his contact -- Anthony Brown's contact of C.J., and they met on the streets, and C.J. would give him the cell phone and/or narcotics to bring into the jail.  And he paid the deputy $4,000.

Q        Sergeant Bayes, you said earlier you make charging recommendations.  Did you say anything to Anthony Brown about what you would recommend how this case would be charged?

A        Yes, I did.

Q        What did you say?

A        I told Anthony Brown, since he was in custody at that time looking at several life sentences or 400 plus years for armed robbery, I told him that I was not going to file possession of a cell phone due to it was a misdemeanor and the most I could get would be 30 days from the city attorney.

Q        Why did you tell him that?

A        I told him that to see -- relax his mind and maybe that he would free up his talking knowing he wouldn't

have any additional charge on him.

Q        Did you continue to investigate the cell phone incident after that day?

A        Yes.

Q        I want to direct your attention to August 18, 2011.  Did you receive any correspondence from your lieutenant on that day?

A        Yes.

Q        Okay.  In front of you, Sergeant, is a Government exhibit binder, and I want to direct your attention to Government Exhibit No. 14 which is in evidence, I believe.

         Your Honor, this exhibit is in evidence.  I request permission to publish the exhibit.

         THE COURT:  You don't need to ask for permission.

         MR. JAUREGUI:  Thank you, Your Honor.

         Your Honor, we just need a second to connect this.  It wasn't working from counsel's table.  My apologies.

Q        Okay, Sergeant, do you recognize this exhibit?

A        Yes, I do.

Q        What is it?

A        It's an e-mail that was sent from Gregory Thompson, my lieutenant, on Thursday, August 18, 2011, at 1:31 p.m. to myself.

Q        Could you please read the e-mail.

A        "Bob, I had to change plans.  Anthony Brown will

**UNITED STATES DISTRICT COURT**

be shipped to CDC on the next available bus.  Until then, he is in 1750 and no phones, no visits, especially from outside LE without my approval."

Q      Do you know, Sergeant Bayes, when Mr. Thompson says he had to change plans, did you know what his plans were?

A      No, I did not.

Q      The next sentence says, "Anthony Brown will be shipped to CDC."  What is "CDC"?

A      CDC is California Department of Corrections.

Q      Next line says, "Until then, he is in 1750." What is "1750"?

A      1750 is a module where inmates are held in Men's Central Jail.  1750 encompasses the noteworthy or celebrities or high status inmates and are usually in single-man cells.

Q      And the e-mail continues, "And no phones, no visits, especially from outside LE without my approval."  Did you have an understanding of what "LE" meant?

A      Yes.  LE is law enforcement.

Q      Now, Sergeant Bayes, directing your attention to August 23rd, by that date had you written your report on the Anthony Brown cell phone incident?

A      No.

Q      Did anything happen that day to cause you to begin writing your report?

A      My lieutenant, Greg Thompson, called me and notified me that the report will now be written as a conspiracy.

Q      And was that a change from what you had intended to write?

A      Yes.

Q      What did you intend to write?

A      Possession of a cell phone in a jail facility.

Q      And do you know, Sergeant Bayes, whether that crime is a felony or a misdemeanor?

A      Which one, sir?

Q      Possession of a cell phone.

A      That is a misdemeanor.

Q      And conspiracy, do you know whether that crime is a felony or a misdemeanor?

A      That's a felony.

Q      What else, if anything, did Lieutenant Thompson tell you about writing this up as a conspiracy?

A      He gave me two -- well, it's not even names. It's a male and a female voice as conspirators with Anthony Brown.

Q      Did he tell you anything more?

A      No.

Q      Did you start writing on August 23rd?

A      No.

UNITED STATES DISTRICT COURT

Q        By August 26th, had you started writing?

A        Yes.

Q        What happened on August 26th?

A        August 26th I received a call from Lieutenant Greg Thompson, and he sounded as if he was in a hurry or urgent, and he asked me to write the conspiracy report and bring it over to him as soon as possible.

Q        And did you proceed to do that?

A        Yes, I did.

Q        What did you put in that report?

A        I put in what knowledge I had for the investigation including the unknown name of male and female voices, walked over to Twin Towers Correctional Facility where his office was, and gave him my report.

Q        What happened next?

A        He read my report, and he said it was a piece of shit, and he said that "I want you to go next door to Sergeant Gutierrez's office," which was adjacent to him.  And he said, "I will start -- I want you to write a report, and I'm going to send you the information via e-mail.  I want you to cut and paste exactly what I give you," and I did.

Q        And what kind of information was coming to you via e-mail from Lieutenant Thompson?

A        The information that he was sending me was a timeline that apparently he was writing of all the interactions

**UNITED STATES DISTRICT COURT**

they had with Anthony Brown and what they had been doing.

Q        You just said "they."  Who is "they"?

A        That would be Lieutenant Greg Thompson,
Deputy Mickey Manzo, M-a-n-z-o, Deputy Gerard Smith,
G-e-r-a-r-d S-m-i-t-h.

Q        And had you seen this timeline before?

A        I had not.

Q        Did you know what these individuals were doing in
connection with the Anthony Brown cell phone investigation?

A        Just assisting Lieutenant Thompson.

Q        Did you know the details in that timeline?

A        No.

Q        Did he provide you names?

A        Yes.  He actually -- as the conspirators, he gave
me three names that were FBI agents.

Q        What were those names?

A        Dave Dahle, D-a-h-l-e, Leah Marx, and
William Plymptom, P-l-m-p-t-o-m.

Q        What did you do next, Sergeant Bayes?

A        I finished the report, sent it back over --
actually, printed it, gave it to Lieutenant Thompson.  He read
it.  He was satisfied, and he then went to the Sheriff's
Headquarters Bureau to have a meeting with the undersheriff,
ICIB, and others.

Q        Let me backtrack a little bit.

When he gave you the names of the three FBI agents, did you know anything about their involvement in the Anthony Brown cell phone incident?

A        No.

Q        Where was the meeting that Lieutenant Thompson was going to?

A        To the Sheriff's Headquarters Bureau.

Q        Did you accompany him to that -- to Sheriff's Headquarters?

A        Yes.  He asked me to follow in my personal car and go to the meeting or outside the meeting in case he had any questions.

Q        And did you do that?

A        Yes.

Q        Where did you go?

A        I went to the fourth floor Sheriff's Headquarters Bureau and waited in a lobby that's outside the sheriff's office.

Q        And what happened next?

A        While sitting there, I was there about two-and-a-half hours.  During that time period, Sheriff Baca came from my left walking to my right.  He stopped.  I got up. He shook my hand, and he continued to my right and out of view.

Q        And do you -- would you recognize Sheriff Baca if you saw him today, sir?

A        Yes.

Q        Do you see him in the courtroom?

A        Yes.  He's the gentleman on the left second -- or the brown suit.  It looks like gold tie.

MR. HOCHMAN:  So stipulated, Your Honor.

THE COURT:  The record will reflect the witness has identified the defendant.

Q        BY MR. JAUREGUI:  What, Sergeant Bayes, happened after that?

A        To my right appeared to be a meeting room, and the door was closed.  The door flew open, and Undersheriff Tanaka came barging out irate and screaming "Mother fuck.  Fuck.  Shit" and other curse words as he went from my right to his left -- to my left.

Q        Then what happened?

A        Shortly thereafter, Lieutenant Thompson came out and came to me and asked me why I was there.

Q        What did you say?

A        I told him that you had asked me to come here in case you had questions.  He said, "I don't need you" and "Go home."

Q        Did you continue working on the Anthony Brown case after that day?

A        Yes.

Q        Approximately how much longer did you work the

case?

A        Until -- I closed the case on September 1st, 2011.

Q        Why did you do that?

A        I had completed my investigation of the case, and the case was being transferred to ICIB or Internal Criminal Investigation Bureau per Lieutenant Thompson.

Q        Did Lieutenant Thompson ask you to give him your file?

A        Yes.

Q        Did you do that?

A        Yes.

MR. JAUREGUI:  One moment, Your Honor.

No further questions, Your Honor.

THE COURT:  All right.  Cross-examination.

MR. HOCHMAN:  Yes, Your Honor.

**CROSS-EXAMINATION**

BY MR. HOCHMAN:

Q        Sergeant Bayes, let me take you back to that last episode that you just were describing.

If I understand you correctly, August 26, 2011, Lieutenant Thompson asked you to go down to the sheriff's department; correct?

A        Sheriff's Headquarters Bureau, yes.

Q        And you go down there; correct?

A       Yes.

Q       And you go to the fourth floor conference room where he asked you to go?

A       Yes.

Q       And you sit outside the lobby for two-and-a-half hours waiting to be called; is that correct?

A       Correct.

Q       And Lieutenant Thompson is in a meeting with Undersheriff Tanaka; is that correct?

A       Correct.

Q       And at some point you see Sheriff Baca come to you from a different direction, greet you, and shake your hand; is that correct?

A       Correct.

Q       And then Sheriff Baca leaves to the opposite direction he had started; correct?

A       Yes.

Q       And he never enters the meeting with Undersheriff Tanaka and Lieutenant Thompson; correct?

A       I never saw him enter the meeting, no.

Q       And after he's gone, that's when you hear Undersheriff Tanaka come out of the room screaming profanities; is that correct?

A       Correct.

Q       Now, you started -- you said you were with the

UNITED STATES DISTRICT COURT

sheriff's department -- I believe in 2011 it had been 23 years before that; is that correct?

A    Yes.

Q    About 1988?

A    1990.

Q    1990.  And in 1990 -- from 1990 until August, 2011, you had that one encounter on August 26 with Sheriff Baca -- is that correct? -- and then you had -- I'll get to a second encounter in a moment.

A    Yes.

Q    So one encounter is on August 26, and there was a prior encounter, I believe, in 2006 at a sergeant school ceremony that Sheriff Baca spoke at that you attended; correct?

A    That was actually January, 2014.

Q    2014.

Was there also a 2006 encounter that you had with Sheriff Baca?

A    Yes.

Q    So you have then three encounters with Sheriff Baca.  One is in 2006, one is on August 26, 2011, and then one is in 2014; is that correct?

A    Yes.

Q    And aside from those three times where you actually physically met with Sheriff Baca, you never spoke to him on the telephone; is that correct?

UNITED STATES DISTRICT COURT

A       That's correct.

Q       And you never sent or received an e-mail from him; is that correct?

A       Correct.

Q       Now, as part of your duties in the Jail Investigative Unit at Men's Central Jail, you deal with a variety of situations that involve contraband; is that correct?

A       Yes.

Q       And contraband are items that are strictly prohibited at Men's Central Jail; is that correct?

A       Throughout all the jails, yes.

Q       Including Men's Central Jail.

A       Yes.

Q       And that would be drugs.  Drugs are strictly prohibited; is that correct?

A       Yes.

Q       And if you have drugs on your possession, that would actually be a felony, wouldn't it?

A       Yes.

Q       And if you were dealing drugs, that also would be a felony; correct?

A       Yes.

Q       And you said outside food inside the jail would be strictly prohibited; is that correct?

A       Correct.

**UNITED STATES DISTRICT COURT**

Q        Cigarettes would be prohibited?

A        Yes.

Q        And a lighter, you know one of the lighters to light up a cigarette, that would also be strictly prohibited contraband; correct?

A        Yes.

Q        Pornography would be strictly prohibited; is that correct?

A        Yes.

Q        And having a cell phone inside Men's Central Jail would be strictly prohibited; correct?

A        Correct.

Q        That would be contraband, wouldn't it?

A        Yes.

Q        Because when an inmate makes a call from the jail, they do it through something called the inmate telephone monitoring system; correct?

A        Correct.

Q        And that's all ITMS, Inmate Telephone Monitoring System; correct?

A        Correct.

Q        And that system basically records the call as the inmate is making it; correct?

A        Yes.

Q        And it actually registers the phone number that

UNITED STATES DISTRICT COURT

the inmate is calling; is that correct?

A       Yes.

Q       Now, the danger of a cell phone is that it can actually bypass that system; isn't that right?

A       Yes.

Q       And a cell phone can be as dangerous as, like, a weapon; isn't that correct?

A       Yes.

Q       And a cell phone could be used for a variety of things inside a jail.  What would be some of those things a cell phone could be used for?

MR. JAUREGUI:  Your Honor, at this point I would object.  Speculation.  Beyond the scope.

THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  A moment ago, when you said a cell phone can be as dangerous as a weapon, what did you mean?

A       Well, the cell phone in a jail, a person could make phone calls to the outside, gang members to do hits on witnesses of their murder trials.  They could order up narcotics, order up weapons to be brought into the jail, plan escapes.

Q       And a cell phone in a jail situation is a fairly rare occasion -- rare occurrence; isn't that correct?

A       Yes.

Q       In the seven years that you were dealing with the

Men's Central Jail in that capacity, about how often would you find an inmate had a contraband cell phone inside the jail?

A        Maybe once a year.

Q        And in the 23 -- in your entire career, your entire career lasts up to now about 26 years; is that correct?

A        Yes.

Q        How many times had you encountered a situation where the FBI had smuggled a cell phone into Men's Central Jail?

MR. JAUREGUI:  Same objection, Your Honor.

THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  So on August 8, 2011, that's when you find out that Anthony Brown was found with a cell phone; is that correct?

A        Yes.

Q        And that cell phone was found, I believe, inside of a potato chip bag; is that correct?

A        Correct.

Q        I think it was actually inside of a latex glove inside of a Doritos bag if I'm not mistaken.

Am I correct?

A        Yes.

Q        When you also found that cell phone, you went ahead and learned what was inside the cell phone.  In other words, whether or not there were any photos, texts, cell phone

UNITED STATES DISTRICT COURT

calls that had been made; is that correct?

A       Yes.

Q       And with respect to the photos, what type of photos did you learn were on the cell phone?

A       Narcotics.  There was two photos.  One had narcotics and money; the other one had narcotics.

Q       And what kind of narcotics did you see in a photograph of the cell phone?

A       There were various narcotics and one photo that looked like balloons of heroin and baggies of methamphetamine, baggies of -- small baggies of cocaine and marijuana.

Q       And these were the photos of all these type of drugs that were on Anthony Brown's cell phone; correct?

A       Yes.

Q       And with respect to cell phone numbers dialed, you were able to determine that the cell phone had dialed certain numbers?

A       Yes.

Q       Do you recall which numbers or how many numbers had been dialed?

A       There was one number dialed.

Q       Do you know if that number came back to a preprogrammed name in the cell phone?

A       No.

Q       Would it refresh your recollection to see a phone

UNITED STATES DISTRICT COURT

examination record on or about August 8, 2011, of the phone?

A        Yes.

MR. HOCHMAN:  May I have a moment, Your Honor?

THE COURT:  Yes.

MR. HOCHMAN:  Your Honor, may I approach the witness with what has been marked as Defense Exhibit 737?  I'll give a copy to the Government as well.

THE COURT:  Approach the clerk.

MR. HOCHMAN:  I'm sorry.  Approach the clerk. Thank you, Your Honor.

(Marked for identification Exhibit No. 737.)

THE COURT:  Is there a particular page you want to direct him to?

MR. HOCHMAN:  Yes, Your Honor.  If he can look at page 2 of 4, the second page of the exhibit.

THE COURT:  Just read that to yourself, sir.

THE WITNESS:  My memory has been refreshed.

Q        BY MR. HOCHMAN:  Were there certain names that were listed on the cell phone that came back to certain numbers that were recovered from the cell phone?

THE COURT:  Excuse me, counsel.  That wasn't the question that he was refreshed on.

MR. HOCHMAN:  Then, Your Honor, may I try the question again?

THE COURT:  Okay.

MR. HOCHMAN:  Thank you.

Q      I believe the question -- if not, I'll just make this a new question.  In fact, it would probably be easier, Your Honor, just to make it a new question.

With respect to the cell phone, were you aware of any names that were in the cell phone related to particular numbers that were dialed by the cell phone?

A      Yes.

Q      And what was the name that you were -- what was the name that you were aware of?

A      C.J.

Q      And were two calls made to C.J. by the phone that was recovered?

THE COURT:  Excuse me, counsel.  Sorry.  Go ahead.  You can answer that.

THE WITNESS:  Yes.

Q      BY MR. HOCHMAN:  And were text messages --

THE COURT:  Let's go to sidebar.

(The following proceedings were held at sidebar:)

THE COURT:  It appears as though, at least from my vantage point, you're reading from a document that hasn't been offered, and the jury may infer that you're reading from a document that hasn't been offered.  So if you want to ask him questions, that's fine.  But until that document is admitted, I'm not sure you can read from it.

MR. HOCHMAN:  Sure.  This document is an LASD-produced document.  I believe the LASD custodians are the next in line that I was going to authenticate it.  Assuming that the -- if the Government is okay, I would move it for admission now unless they're going to object to the authentication because the LASD custodian is going to authenticate it.

And, Your Honor, I believe I also can have -- I believe the date on this document at the bottom is August 8, 2008, the day that the phone was found.  So I believe this witness will also say he saw this document on or about August 8, 2011.

THE COURT:  You know more than I do.  I don't know what he's going to say.

MR. FOX:  Your Honor, we offered to stipulate to a number of documents, and it was -- the defense did not want to stipulate to the authenticity.  I've told them today that we have no objection to stipulating to the authenticity.

We haven't been able to compare this to what was produced to us.  I would like to have the opportunity to compare to make sure it is a complete document, and I'm not sure if this is the right person to lay that foundation.  If it is and he can lay the foundation, we have no objection, and we won't have an objection in the future if we go back and see this is the document that was produced to us.  I know he's

asking these questions in good faith, but I would still like to do our due diligence and make sure this is the correct document.

MR. HOCHMAN:  And, again, for the record, I received this document not from the sheriffs --

THE COURT:  It doesn't matter, counsel.  If he's the right witness, that's fine.  If you want to stipulate, that's fine.  So stop reading from it.

MR. HOCHMAN:  Thank you, Your Honor.

(The following proceedings were held in open court in the presence of the jury:)

Q    BY MR. HOCHMAN:  Mr. Bayes, did you receive this document on or about August 8, 2011, and towards that -- I would reference you to the bottom right-hand corner of the document.

A    Yes.

MR. HOCHMAN:  Your Honor, I'd move to admit Defense Exhibit 737.

THE COURT:  Any objection?

MR. JAUREGUI:  No, Your Honor.  No objection.

THE COURT:  It will be received.

MR. HOCHMAN:  Thank you, Your Honor.

(Received into evidence Exhibit No. 737.)

MR. HOCHMAN:  I'm going to switch to the ELMO screen, Your Honor.

UNITED STATES DISTRICT COURT

Q        Sergeant Bayes, I'll draw your attention to the second page of the document.  The middle of the document, it has phone numbers on the left.  Do you see that, 213-278-4608?  Do you see that?

A        Yes.

Q        And then the name listed next to it is C.J.?

A        Yes.

Q        It says, "Incoming call."  That would be an incoming call into the cell phone.

Would that be correct?

A        Yes.

Q        And then there is a free -- the second item listed on that page talks about some free message at boostmobile.com.

Do you see that?

A        Yes.

Q        And it references on the far right -- it's a text message, isn't it?

A        Yes.

Q        It says it's actually an incoming text message; is that right?

A        Yes.

Q        It's an incoming text message from Free MSG at boostmobile.com.  It lists an account pin number of 4174; is that correct?

A       Yes.

Q       And then the third item on that chart, again, lists a No. 213-271-4608 for C.J.

Do you see that?

A       Yes.

Q       And that time it is listed as an outgoing call; is that right?

A       Correct.

Q       And then there's actually -- we're now going -- I'm sorry.  Outgoing text.  And there's actually a -- the words of the text that were found; is that correct?

A       Yes.

Q       And the words of the text are, "When you meet due today, can you give him an extra battery charger and earbuds to give to me?  I will find a way to charge myself.  Dude left me with phone but no charger for three days.  No good."

Do you see that?

A       Yes.

Q       And then the fourth message is another text from Free Message at boostmobile.com; is that correct?

A       Yes.

Q       And this was an outgoing text from that phone to the boostmobile.com e-mail address; is that correct?

A       Yes.

Q       And it says, "How do I download albums?"

Do you see that?

A       Yes.

Q       If you can turn to the next page, and this next page talks about phone outgoing call list.  So these are the outgoing calls that were made by the cell phone; is that correct?

A       Yes.

Q       And there appear to be ten outgoing phone calls that were made from August 4th, 2011, to August 8, 2011; is that correct?

A       Yes.

Q       And when you found the phone on August 8, 2011, these were all the calls that you were able to retrieve from the phone calls basically for the prior four days; is that correct?

A       Yes.

Q       And do you -- were you able to retrieve any phone calls before August 4, 2011?

A       No.

Q       So if a phone call had actually been deleted from the phone, would that be one of the reasons why you would not be able to retrieve it, if you know?

A       I would not know why I couldn't retrieve them. It appears that the activity was from 8/4/2011 to 8/8/2011.

Q       Now, at some point did you actually subpoena the

**UNITED STATES DISTRICT COURT**

phone records from Sprint Mobile?

A        Yes.

MR. HOCHMAN:  Your Honor, may I approach the clerk with what's been marked as Defense Exhibit 529?

THE COURT:  Yes.

(Marked for identification Exhibit No. 529.)

MR. HOCHMAN:  I'll give the Government a copy of 529.

THE COURT:  Do you have any other exhibits for this witness?

MR. HOCHMAN:  One more, Your Honor.  It will be Defense Exhibit 528, Your Honor.

May I approach the clerk?

THE COURT:  Yes.

(Marked for identification Exhibit No. 528.)

Q        BY MR. HOCHMAN:  I'd like to start with what's been marked as Defense Exhibit 529.  At some point in your --

MR. JAUREGUI:  Your Honor, we don't know which one is 529.

MR. HOCHMAN:  I'm sorry.

Q        Do you have Defense Exhibit 529 before you?

A        Yes.

Q        And you said that you worked at the Jail Investigations Unit, the Los Angeles County Sheriff's Department Men's Central Jail; is that correct?

A       Correct.

Q       Was it at 441 Bauchet Street, Los Angeles, California 90012 with the phone number of 213-974-0085?

A       Yes.

Q       And do you recognize the fax cover sheet that are part of Defense Exhibit 529?

A       Yes.

Q       What are those fax cover sheets?

A       Fax cover sheet that I would use to send any type of fax transmission.

Q       And would it have been part of your normal investigation of a cell phone to send a request to the company, the cell phone company, that you determined was the provider of the cell service in order to determine what numbers were dialed by the cell phone?

A       Yes.

Q       Did you follow that normal practice in connection with the Anthony Brown cell phone?

A       Yes.

Q       As part of making a request to get the numbers, you actually have to go to the Court first in order to get a court order to then transmit to the cell phone company in order for them to produce the numbers; correct?

A       Yes.

Q       And you did that in this case with Anthony Brown.

You went ahead and got a court order for the phone number and serial number of the Anthony Brown phone; is that correct?

A      Yes.

Q      And you then transmitted, it looks like twice, this court order to the Sprint Nextel Company in order to retrieve the phone records for that phone number; correct?

A      There was two separate court orders, yes, that I faxed to Sprint Nextel.

Q      And at some point -- I'll direct your attention -- actually, if you could look through the rest of Exhibit 529 and confirm whether or not you recognize this as the information in the court orders you faxed to Sprint Nextel on or about August 17, 2001, and August 9, 2011.

A      Yes.

MR. HOCHMAN:  Your Honor, I'd seek to admit and -- move to admit Defense Exhibit 529.

THE COURT:  Any objection?

MR. JAUREGUI:  No objection, Your Honor.

THE COURT:  It will be received.

(Received into evidence Exhibit No. 529.)

Q      BY MR. HOCHMAN:  Now, if you could turn to Defense Exhibit 528.  Do you recognize your name Robert Bayes on Defense Exhibit 528?

A      Yes.

Q      And is that your address, Los Angeles County

UNITED STATES DISTRICT COURT

Sheriff's Department, 441 Bauchet Street, Los Angeles, California?

A    Yes.

Q    And the date on this is 8/12/2011; is that correct?

A    Correct.

Q    And it's from the Sprint subpoena compliance people in connection with the Anthony Brown cell phone number; correct?

A    Correct.

MR. HOCHMAN:  Your Honor, I'd seek to move Defense Exhibit 528 into evidence.

MR. JAUREGUI:  No objection, Your Honor.

THE COURT:  It will be received.

(Received into evidence Exhibit No. 528.)

Q    BY MR. HOCHMAN:  If you just go to the back, I won't publish it at this point.  If you just look at the last couple pages of this exhibit, this exhibit has all the cell phone numbers either going into the phone or going out of the Anthony Brown phone going back from July 26, 2011, all the way to August 8, 2011; is that correct?

A    Correct.

Q    And that's the date range that you requested the Sprint phone company to provide you; is that correct?

A    Yes.

**UNITED STATES DISTRICT COURT**

Q        Now, with respect to the August 16 interview that you had with Anthony Brown, I'd like to go into that for one moment.

If I understood you correctly, Anthony Brown has a cell phone found on August 8; is that correct?

A        Correct.

Q        And that's approximately when you get involved with the investigation; is that correct?

A        Correct.

Q        And then the first time you speak with Anthony Brown is on August 16; is that right?

A        Correct.

Q        And you learn that other deputies had actually spoken to Anthony Brown, I believe, a couple days before you did; is that correct?

A        Yes.

Q        And when you spoke with Anthony Brown, I believe you said that he told you that a deputy had agreed to bring a cell phone and narcotics to him for $4,000; is that correct?

A        Correct.

Q        Did he identify who the deputy was?

A        No.

Q        Did he also talk about the deputy bringing him cigarettes and a lighter?

A        Yes.

**UNITED STATES DISTRICT COURT**

Q        Did he mention anything about not only paying $4,000 for the initial cell phone to be brought to him but $2,000 for each additional package?

A        Yes.

Q        And during your interview with him on August 16, you said he mentioned a gentleman named C.J.; is that correct?

A        Yes.

Q        What did he describe or how did he describe or who did he describe C.J. to be?

A        His contact.

Q        Did he provide you any more information other than C.J. is his contact?

A        No.

Q        Did you ask?

A        Yes.

Q        And by the way, was this a voluntary interview with Anthony Brown?

A        Yes.

Q        So Anthony Brown wasn't in any way being compelled to speak with you during that interview; is that correct?

A        Correct.

Q        And did Anthony Brown tell you that he had had the cell phone on him for about two months?

A        Yes.

**UNITED STATES DISTRICT COURT**

Q        And did Anthony Brown say that multiple deputies were involved with smuggling contraband into the jail for him?

A        Yes.

Q        And did Anthony Brown tell you that the only way he would further cooperate with you is being declassified as a -- something called a K-10; is that correct?

A        Correct.

Q        What is a K-10?

A        K-10 is a high-power inmate that they could be a celebrity, noteworthy, a person that is an escape risk, somebody that is assaultive or high assaultive to inmates and personnel.

Q        So -- and I assume because -- well, let me ask.

Anthony Brown wasn't classified as a K-10 at that point; correct?

A        No.

Q        Anthony Brown was in Men's Central Jail about to serve a 423-year sentence; correct?

A        Yes.

Q        So by asking to be a K-10, he's asking to go from a classification that doesn't apply at all to someone about to serve a 423-year sentence into someone that would be much -- in a much -- what's the word I'm looking for? -- a much less position or less classification as a K-10; is that correct?

A        Yes.  I think I answered there on the K-10

matter, is that for August 16 or --

THE COURT:  Sir, there's no question pending.

Next question.

Q    BY MR. HOCHMAN:  Did you agree -- did you agree with Anthony Brown that you would exchange K-10 status if he gave you more information?

A    No.

MR. HOCHMAN:  No further questions, Your Honor.

THE COURT:  Redirect?

MR. JAUREGUI:  We have no further questions for this witness, Your Honor.

THE COURT:  Sir, you may step down.

(Further proceedings were held and reported but not included herein.)

CERTIFICATE OF OFFICIAL REPORTER

                    I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME

COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR

THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT

PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE

FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN

CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF

THE UNITED STATES.

                              DATED THIS  13TH  DAY OF DECEMBER, 2016.

                              /S/ MIRANDA ALGORRI

                              MIRANDA ALGORRI, CSR NO. 12743, CRR
                              FEDERAL OFFICIAL COURT REPORTER

**UNITED STATES DISTRICT COURT**