**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION**

**HONORABLE PERCY ANDERSON, U.S. DISTRICT JUDGE**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. |
| | ) | |
| vs. | ) | CR 16-00066(A)-PA |
| | ) | |
| LEROY D. BACA, | ) | PAGES (1 to 79) |
| | ) | |
| Defendant. | ) | |
| | ) | |

**REPORTER'S TRANSCRIPT OF**
**TESTIMONY OF ANDRE BIROTTE, JR.**
**THURSDAY, DECEMBER 15, 2016**
**11:39 A.M.**
**LOS ANGELES, CALIFORNIA**

**MIRANDA ALGORRI, CSR 12743, CRR**
FEDERAL OFFICIAL COURT REPORTER
312 NORTH SPRING STREET, ROOM 435
LOS ANGELES, CALIFORNIA 90012
MIRANDAALGORRI@GMAIL.COM

**UNITED STATES DISTRICT COURT**

**APPEARANCES OF COUNSEL:**


**FOR THE PLAINTIFF:**

    EILEEN M. DECKER
    United States Attorney
    BY:  BRANDON FOX
    BY:  EDDIE A. JAUREGUI
    Assistant United States Attorneys
    United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012


**FOR THE DEFENDANT:**

    MORGAN LEWIS AND BOCKIUS LLP
    BY:  NATHAN J. HOCHMAN
    BY:  BRIANA ABRAMS
    The Water Garden
    1601 Cloverfield Boulevard
    Suite 2050 North
    Santa Monica, California 90404


    MORGAN LEWIS AND BOCKIUS LLP
    BY:  TINOS DIAMANTATOS
    77 West Wacker Drive
    Chicago, Illinois 60601

**UNITED STATES DISTRICT COURT**

**I N D E X**


**THURSDAY, DECEMBER 15, 2016**


**Chronological Index of Witnesses**


Witnesses:                                                        Page


BIROTTE, Andre

    Direct examination by Mr. Fox                    6
    Cross-examination by Mr. Hochman                 37
    Redirect examination by Mr. Fox                  73
    Recross-examination by Mr. Hochman               78

**UNITED STATES DISTRICT COURT**

4

## **EXHIBITS**

**THURSDAY, DECEMBER 15, 2016**

| Exhibit | For ID | In EVD |
|---|---|---|
| 112  Baca's letter to Birotte | 22 | 22 |
| 69  Birotte's letter to Baca | 34 | 34 |

**UNITED STATES DISTRICT COURT**

**LOS ANGELES, CALIFORNIA; THURSDAY, DECEMBER 15, 2016**

**11:39 A.M.**

**---**

(Prior proceedings were held and reported but not included herein.)

THE COURT:  Call your next witness.

MR. FOX:  The United States calls Andre Birotte.

THE CLERK:  Stand here for me, please.  Raise your right hand.

Do you solemnly state that the testimony you may give in the cause now pending before this court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

THE CLERK:  Please be seated.

Will you please state your full name and spell your last name for the record.

THE WITNESS:  Yes.  My name is Andre Birotte, Jr. Last name is spelled B-i-r-o-t-t-e.

THE CLERK:  Thank you.

MR. FOX:  May I proceed, Your Honor?

THE COURT:  Yes.

///

///

**UNITED STATES DISTRICT COURT**

**ANDRE BIROTTE, JR.,**

**GOVERNMENT'S WITNESS, SWORN:**

**DIRECT EXAMINATION**

BY MR. FOX:

    Q       What did you do for a living in 2011?

    A       In 2011 I was the United States Attorney for the
Central District of California.

    Q       What does that mean?

    A       United States Attorney is known as the chief
federal law enforcement officer for -- in my case, the
Central District of California which encompasses seven counties
going as far north as San Luis Obispo, down to Orange County,
and all of Inland Empire.  So we handled both criminal and
civil litigation involving the United States.

    Q       For purposes of your testimony today, I'm going
to focus on the criminal work that you did.

    A       All right.

    Q       Are you familiar with the Federal Bureau of
Investigation?

    A       Yes.

    Q       In what ways were you familiar with the FBI in
2011 while you were U.S. Attorney?

    A       I mean, they were one of our many law enforcement
partners and, quite frankly, probably the largest law
enforcement partner that we dealt with in the office.

**UNITED STATES DISTRICT COURT**

Q        You mentioned "law enforcement partners."  Do you also work with the Los Angeles County Sheriff's Department?

A        Yes.

Q        And is there -- in terms of a partnership, is there anything odd about the way that you work with local law enforcement agencies as the U.S. Attorney?

A        No.  Nothing odd about it.  It was sort of expected.  As resources got trunked amongst the various agencies, it was not uncommon, certainly in our district but I would argue nationwide, for law enforcement agencies to pull resources together, form joint task forces to address the issues in the community.

Q        Are there times when the U.S. Attorney's Offices begin Federal Grand Jury investigations of local law enforcement agencies?

A        Yes.

Q        Is that unusual at all?

A        No.  I mean, that -- I mean, one -- if you go back, historically speaking, I mean, the role of the Department of Justice in many instances, particularly going back to the civil rights area, is to investigate issues that local law enforcement, for whatever reason, may not be able to address.

Q        Ordinarily how does that affect your partnership that you have with the local law enforcement agencies if you

**UNITED STATES DISTRICT COURT**

were also investigating them?

A       It shouldn't have an effect.  That's just the reality of the work that we have to do.

Q       I want to go back now to the summer of 2011.

Did you become aware at some point of an investigation involving the Los Angeles County Sheriff's Department in terms of allegations of abuse in the jails?

A       Yes.

Q       Was that part of the scope of your duties that you became aware of it?

A       Absolutely, yes.

Q       Did you authorize an undercover operation to occur with respect to the Los Angeles County Sheriff's Department?

A       I believe I did.  I mean, yes.

Q       At the time the investigation started, when you became aware of it, do you recall what the Federal Grand Jury was looking at?

A       At that time initially the Federal Grand Jury was looking at various allegations of excessive force and use by Los Angeles County sheriff deputies.

Q       Do you generally remember what the undercover operation was about?

A       The undercover operation, if my memory serves me correctly, was to ascertain if any deputies were engaged in any

**UNITED STATES DISTRICT COURT**

type of corruption.

Q       Did you know how that was going to be going about with the undercover operation?

A       I don't have a great memory of it.  I believe they were trying to work -- I think they were utilizing undercover, talking with some deputies to see what kind of information they could gather.  Ultimately it culminated to seeing if a deputy would take a bribe to smuggle contraband into the jail.

Q       Do you recall what that contraband was?

A       It was a cell phone.

Q       At some point in time, did you learn that the sheriff's department had found that cell phone?

A       Yes.

Q       And let me go back.

Did you notify the sheriff's department of that undercover operation when you learned of it?

A       No.

Q       Why not?

A       Because we were investigating the sheriff's department.  I didn't think it was appropriate to notify the agency that we were investigating that we were conducting investigation.

Q       Do you know Leroy Baca?

A       Yes.

Q       How do you know him?

A       I've known Lee a number of years.  I mean, in my prior life, in various jobs, our paths have crossed, and then certainly as the head of the sheriff's department, we had a professional relationship by virtue of that.

Q       Did you notify him about the undercover operation?

A       No.

Q       Why not?

A       Because, again, we didn't think -- we wanted to preserve the integrity of the investigation, didn't think it would be appropriate to notify anyone within the department; so we did not.

Q       After the sheriff's department recovered the cellular phone, did you have a meeting set up with respect to the sheriff's department and Mr. Baca?

A       Yes.

Q       Do you remember, approximately, when this happened?

A       I couldn't tell -- I don't remember, but a meeting did happen with the sheriff's department and our office.

Q       Was that within several days of the sheriff's department learning that the phone was traced to the FBI, or was that within several months?

UNITED STATES DISTRICT COURT

A       I honestly don't remember.  I mean, it was relatively soon thereafter.

Q       I'm going to refer to this as the first meeting for the purposes of your testimony.

A       All right.

Q       Where was this meeting held?

A       It was held in the U.S. Attorney's Office, 312 North Spring.

Q       Do you remember which floor?

A       12th floor.

Q       Where within the 12th floor was it held?

A       It was in what's known as the Daniel Goodman Conference Room.

Q       Who was there?

A       Representatives from the county, the sheriff's department, I think county counsel.  I believe Mike Gennaco, G-e-n-n-a-c-o, from the Office of Independent Review was there. And then there were representatives from my office at the time.

Q       Was the FBI there?

A       No.

Q       Why not?

A       If my memory serves me correctly, I think Lee had expressly said, "I want to meet with you.  I don't want the FBI there.  I want to have a conversation with you all."

Q       I'm going to publish for you Government

Exhibit 120.  I'll represent to you that this is Mr. Baca's calendar from August 29 which is what I'm showing you.

Do you see the entry at 1:30 p.m. on Monday, August 29?

A       Yes, I do.

Q       Do you think that this is the day that you met with Mr. Baca for the first time?

A       That makes sense, yes.

Q       Could you please describe the setup of the room when the meeting was occurring?

A       So the room, it has a big conference room -- table.  You know, for lack of a better term, the county folks were on one side, and the feds, meaning our office, we were on the other side of the table.

Q       What happened at this meeting?

A       I mean, the gist of it was -- I mean, we had expressed sort of his concerns and displeasure about the investigation and why it was going on and why he wasn't notified.  I believe he laid out a series of sort of questions about what was going to happen, us working together or not working together, what was the status going forward.  I think also there was some discussion about trying -- going forward and working with the sheriff's department as the investigation moved forward.

Q       Did you agree to do that?

UNITED STATES DISTRICT COURT

A       No.  I didn't agree to anything at that time.

Q       Why not?

A       I viewed this as more sort of a listening meeting.  I knew he was upset about it.  He voiced his displeasure, and my position was, okay, all right.  Thank you for sharing.  We'll get back to you.

Q       What's Mr. Baca's demeanor during this meeting?

A       I mean, he was -- he was not happy.  You knew he wasn't happy about what had happened but, you know, nothing out of the ordinary.  Nothing unexpected, I should say.

Q       I believe you said that Mr. Tanaka was also there; isn't that right?

A       I think that's right, yes.

Q       Was Mr. Tanaka doing a lot of the talking?

A       No.  I don't think he said anything.  I don't recall him saying anything.

Q       Who was doing most of the talking from that side of the conference room?

A       I think it was mostly Lee.  It was Lee.  Lee, Sheriff Baca, that's Lee.

Q       Within days of that meeting, did you have a conversation with Mr. Baca with respect to grand jury subpoenas?

A       Yes.  And forgive me because I know that was a topic of discussion at the first meeting.  I think because --

between the time of the cell phone getting discovered and the meeting, I think our office had issued a bunch of subpoenas relative to -- of various things.  And I'm fairly certain Lee had expressed his concern about the voluminous nature of the subpoenas and responding to them, and so we had a conversation later about those subpoenas.

Q      Was this on the phone or in person?

A      I think that was on the phone.

Q      Was there anyone else present besides the two of you?

A      No.  I don't believe so.

Q      And what is it that you agreed to at that point?

A      I think -- it was a very brief conversation.  I think I just told Lee, "Look, as it relates to subpoenas, stand down.  Let's figure out what we're going to do here, but stand down," which means don't do anything with respect to the subpoenas.

Q      Does that mean ever?

A      No.  No.  I mean, look, for now let's just stand down and figure out what we're going to do.

Q      Why did you agree to do that?

A      I think it was -- he expressed a concern it was going to take a lot of person hours to comply.  You know, he had raised some issues about sort of what was going on with the investigation, and so I wanted to sort of take a step back and

figure out, okay, what do we really want?  Let's try to get what we want and do it in a way that is the most efficient.  So I said, "Look, just stand down the initial request and let's figure this out."

Q     I want to now direct your attention to approximately a month later.  So we're talking about late September, 2011.  Did you receive an unusual call at some point in late September, 2011, as it related to an FBI agent?

A     Yes, I did.  Yeah.

Q     What was this call?

A     All right.  I was heading home.  I was going to my kids' open house at school.  I got a phone call from, I believe, the chief of the public corruption section Lawrence Middleton.  He said, "Andre, I've got to let you know LAPD officers --" I think he said something along the lines of "LAPD officers are either outside an agent's door or trying to arrest an FBI agent."  And I was like, "What?"  And he's like, "Yeah.  That's what's going on."  I said, "Okay.  Hold on.  Hold on.  Let me call some of my folks from LAPD and find out what's going on."

Q     Let me break that down a little bit.

You mentioned Lawrence Middleton.  You said he was the chief of the public corruption section at the time?

A     Correct.

Q     Did public corruption have another responsibility

**UNITED STATES DISTRICT COURT**

as well?

A       Public corruption and civil rights, yes.  So they were the section that -- in doing the investigation with regard to the sheriff's department.

Q       Now, I believe you said that Mr. Middleton told you it was LAPD, meaning the Los Angeles Police Department, that was outside of an FBI agent's house; is that correct?

A       Yes.  The agency was -- he first said LAPD.

Q       And did you have any previous experience with LAPD in a different role?

A       Yes.  From 2003 to 2010, I was Inspector General for the Los Angeles Police Commission working with the police department extensively; so I had a lot of contacts at the department.

Q       So what did you do after you received this phone call?

A       So then I called -- I believe I called Earl Paysinger who at that time he may have been a deputy chief of South Bureau or assistant chief of operations.  I can't remember.  But Earl and I had a close relationship.  So I called Earl.  I said, "Earl, this is what I'm hearing.  Do you know anything about it?"  He said, "That sounds odd.  Let me get off the phone, figure it out."  I get off the phone with Earl.  Lawrence calls me back and says, "Andre, I'm sorry.  I messed up.  It's LASD."  I was like, "Oh, God.  Okay."

Q       Why did you respond that way when you heard that it was LASD?

A       Because then it made more sense.  I mean, with LAPD, I'm like I don't know why LAPD would be going investigating an agent.  We don't have any cases -- at least I didn't know of any cases involving LAPD.  And so it didn't make sense to me.  And Earl's reaction was similar, sort of confusing.  Earl had a -- he had his post of what was going on, especially with the big investigations.

Q       Why did it make sense to you that an LASD person was outside of the home of an FBI agent?

A       Tensions were -- things were tense, and tensions were building as it relates to LASD and the feds, you know, U.S. Attorney's Office and the FBI more specifically.  So when he said that, I was like, "Oh, God.  Okay."

Q       Now, you said tensions were high between the two agencies.  I'm going to follow up on that in a little bit, but let's first focus on what you did after you learned that it was the sheriff's department that was the one that was -- had approached the FBI agent.

A       Okay.  So I think the sequence -- the timeline may be off.  But I think, after I realized it was the sheriff's department, I don't know if I spoke with the assistant director in charge Steve Martinez or he called -- he might have called at or near that time because I had -- I was aware that FBI

agents had Leah Marx at headquarters or the local headquarters in Westwood, and the only reason why I say that is because at some point I ended up speaking with Lee.

Q      You're referring to Mr. Baca?

A      Yeah.  Mr. Baca.  I'm sorry.

Q      How is it that you were able to contact Mr. Baca that night?

A      I assume I called him on his cell.

Q      How did you know his cell phone number?

A      I mean, I just had -- I don't know if -- I can't remember specifically if he gave me his cell number personally, but by virtue of the fact I was U.S. Attorney, I had a lot of numbers of the head law enforcement agents and local law enforcement in the region.

Q      I'm now going to publish the tenth page of Exhibit 157.

Do you know how your cell phone showed up when you called people?

A      Yes.  It's unavailable.  It blocks out the number.

Q      Can you read what this record shows, September 26 at 7:35 p.m.?

A      You want me to read it out loud?

Q      Yes, please.

A      So "26, September, 7:35 p.m., unavailable.  Baca

county-issued cell," and then it says "22."

Q       Could you please describe this phone call that you had with Mr. Baca?

A       So Mr. Baca and I are on the phone, and again, I don't remember all the specifics.  I just remember something along the lines of, I'm like -- I said something along the line like, "Lee, I'm getting this call that agents are out trying --" I'm sorry -- "deputies are out trying to arrest an agent.  Is this what we're doing here?"  And that's sort of just -- I remember that part.

And Mr. Baca is like, "No.  No.  But I'm really upset about what's going on," and he was going on sort of reciting sort of the same issues he had had at a prior meeting. I said, "Lee, look, like, I just need to know, is one of my agents going to get arrested tonight or not?"  He said, "No. No.  That's not going to happen."  I said, "All right.  I've got to go.  I have to deal with this.  We're going to talk later."  And then, you know, I called, I believe, Steve Martinez, let him know, look, that's not going to happen. She can go home.

Q       I'm going to focus, again, on Mr. Baca's calendar, Government Exhibit 120, and specifically the entry from September 27th.  Do you see this 2:30 entry on September 27th?

A       I do.

Q       And it says, "Meet with U.S. Attorney Andre Birotte and FBI assistant director in charge Steve Martinez."

Did that meeting occur?

A       It did.

Q       Where?

A       That was in my personal office on the 12th floor at the U.S. Attorney's Office.

Q       Who was present?

A       That was just Mr. Baca, Mr. Martinez, and myself.

Q       What was the purpose of that meeting?

A       The purpose of that meeting was -- well, from my perspective, the purpose of the meeting was to bring the folks together and address questions that Mr. Baca had had at the prior meeting.  I seem to recall that he had raised a number of points at the prior meeting, and I actually sort of typed up notes to sort of make sure we could address those specific concerns that he had had, and it was also an opportunity to just let him know that, look, we're going to move forward.

We have this investigation going on.  You know, we're not going to -- we'll do what we can to keep you as informed as we can.  You designate a point of contact with our point of contact, we'll work these things out.  I think I may have said like, look, the stuff you've been raising about the alleged illegality of the operation is just not well-taken.

UNITED STATES DISTRICT COURT

It's just, you know -- that's what cops do.  Undercovers do these things.  There's no question about whether it's legal or not; so we have to agree to disagree on that.

But the reality of it is we have a big district. We have a lot of issues here.  We need to continue to work together, but we're not going to stop doing this investigation.

Q      Okay.  I want to get into more of that conversation, but first I want to look at, if you don't mind, Exhibit 112 which is a book that's probably beneath you.  There are three binders, and it's 112.

A      All right.  I see this letter.

Q      Do you recognize it?

A      Yes.

Q      What is it?

A      It's a letter from Mr. Baca to me raising, it looks like -- he made several requests with respect to subpoenas and some other issues as well.

Q      Is that a true and accurate copy of a letter that Mr. Baca provided to you at the September 27 meeting?

A      I think, yes.  Yes.  I mean, this is the meeting at the beginning he gave me the letter.

MR. FOX:  Your Honor, I move for the admission of Government Exhibit 112.

MR. HOCHMAN:  No objection, Your Honor.

THE COURT:  It will be received.

(Marked for identification and received into evidence Exhibit No. 112.)

MR. FOX:  Now showing it to the jury.

Q     Could you please read the section that I've highlighted?

A     From the top?

Q     You can start with, "Dear Mr. Birotte."

A     All right.  "Dear Mr. Birotte.  This letter will serve to confirm and thank you for agreeing to hold the responses due for various Federal Bureau of Investigation requests seeking voluminous documents concerning employees at the Men's Central Jail of the Los Angeles County Sheriff's Department."

Q     And this agreement, this came in the previous phone call you were telling us about?

A     Yes.

Q     I'm not going to ask you to read all the text I just highlighted at the bottom of the page, but is it fair to say it details some of the grand jury subpoenas that have been issued to the sheriff's department on August 24th and 25th?

A     Yes.

Q     Now, what is this -- it says, "a preservation of records dated August 25th."  What is "a preservation of records"?

A     Just hold on to all records.  Don't delete,

shred.  Just hold everything as it is.

Q      I want to show you the second page.  This may sound strange.  How do you -- I think you said, "Agree to hold the responses."  How would you hold a preservation of records?

A      Just don't do anything with the records.  Just make sure they remain intact.

Q      That's what you were seeking; correct?

A      Correct.

Q      I'm highlighting now on the second page the first full paragraph.  Could you please read this out loud.

A      All right.  "As I indicated at our prior meeting, I am extremely displeased with the conduct of the FBI in causing the introduction of a cell phone into the jail system as illegal, unethical, and irresponsible.  The sheriff's department will be conducting an investigation into the breach of security of the jail system and will be examining inmate Anthony Brown's allegations that he received a cell phone from a deputy who received it from an FBI agent.  The FBI admitted the cell phone was their property after it was discovered during a search of the jail.  The sheriff's department's investigation of this matter will encompass possible violations of California Penal Code Sections 4575 and 4573, conspiracy, entrapment, coercion, and civil rights violations.

"The sheriff's department will also fully investigate allegations regarding excessive force by deputies

UNITED STATES DISTRICT COURT

at the Men's Central Jail during the period from January, 2009, to the present.  The deputy involved with the cell phone has since resigned from the sheriff's department.  The sheriff's department is continuing its investigation of his involvement in this matter."

Q       Now, in this letter, this paragraph you just read, it says a couple times there may have been violations of criminal law.  Do you see that in this paragraph?

A       Yes.

Q       From your perspective, did the FBI violate any law in what it did?

A       Absolutely not.

Q       Why not?

A       We were doing an undercover investigation.  At the risk of sounding -- everybody does this.  Law enforcement agents do this, local law enforcement, federal law enforcement. When you -- when you're investigating crimes, these kind of things happen, and perhaps, more importantly, the deputy took a bribe to bring the cell phone in the jail.  It wasn't like the FBI walked into the jail and dropped this cell phone in.  The deputy committed a crime by introducing the cell phone into the jail.

Q       It discusses how the sheriff's department will fully investigate allegations of excessive force from January, 2009, to the present.  Is that the same time period

that the Federal Grand Jury investigation was supposed to be focusing on incidents?

A       I believe so, yes.

Q       Can you please read the paragraph I've just highlighted?

A       All right.  "The expertise and experience of the sheriff's department in conducting these types of investigations are considerably contrasted by the FBI's actions in this case.  The FBI has no experience in the running of a jail system of such magnitude as the Los Angeles County jails, nor have they completed anywhere near the number of investigations involving matters emanating from within the confines of a jail system.

"Their lack of qualification combined with unethical and illegal actions in this instance demonstrates the need to allow the sheriff's department to conduct its own investigation free from the encumbrance of the FBI's attempt to justify their actions retroactively by now seeking information with an overbroad request for documents."

Q       Let me stop you there for a second.

What did you understand this to mean that Mr. Baca was seeking for you to allow the sheriff's department to conduct its own investigation free from the encumbrance of the FBI?

MR. HOCHMAN:  Objection for this witness

UNITED STATES DISTRICT COURT

commenting on Mr. Baca's state of mind.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  I'm sorry.  Can you repeat the question?

Q    BY MR. FOX:  Sure.  What did you understand this statement to mean that Mr. Baca had written that -- there was a need to allow the sheriff's department to conduct its own investigation free from any encumbrance of the FBI?

MR. HOCHMAN:  Objection.  Relevance as to this witness' understanding.

THE COURT:  Overruled.

THE WITNESS:  Basically back off.  We're going to do it ourselves.

Q    BY MR. FOX:  Can you continue starting with the "given" part, "Given that the FBI's --"

A    "Given that the FBI's sweeping request asked for sensitive personnel information affecting numerous employees, my concern also encompasses knowing what their basis is for this inquiry.

"One request asks for records for all personnel who worked at Men's Central Jail over a three-year period.  This request alone encompasses records of hundreds of employees.  It is estimated that it will take more than 1,000 man-hours to retrieve all of the documents asked for in the

subpoenas.

"It is also estimated that it could take the FBI more than a year to review all of these documents once they are gathered.  Clearly the requests are not focused on issues pertaining to specific allegations concerning excessive use of force but rather are a fishing expedition designed to speculatively seek anything that might be interpreted as an indication of culpability.  Acquisition of documents prior to the sheriff's department's completion of its own investigation will likely taint the fair and truthful completion of a properly-focused investigation."

Q    Let's focus on that last sentence, the statement that he made to you, "Acquisition of documents prior to the sheriff's department's completion of its own investigation will likely taint the fair and truthful completion of a properly-focused investigation."  What did you understand that to mean?

A    Basically we're going to do our investigation first and giving you these documents beforehand might taint their own investigation.

Q    Now highlighting the last partial paragraph on that page, can you please read that?

A    "I am also entitled to know what specific evidence there is, if any, for initiating an investigation into sheriff's department personnel without my knowledge and what

would be the source initiating the FBI's involvement in this matter.  I am at a loss to determine what would justify the taking of illegal actions by the FBI in order to investigate unspecified allegations of excessive use of force.  I also do not understand what was important enough for an investigation of this department to --"

Q       Now showing you the next page, if you can continue to read that paragraph.

A       "-- to proceed while assuming there are no grounds for cooperation by our respective law enforcement agencies.  The FBI's decision to proceed without input or participation by the Los Angeles County Sheriff's Department is not in the best interests of truth or justice, particularly since there is now confirmed information that FBI investigators participated in the sanctioning of criminal acts in furtherance of an investigation by their admission of ownership of the cell phone that was discovered in the jail."

Q       Can you please read this paragraph I've just highlighted?

A       All right.  "A further related issue is the allegation of excessive uses of force at the Twin Towers Correctional Facility made by Esther Lim, ACLU jail monitor.  Ms. Lim claimed that she observed excessive force as described in a declaration filed in court.  That matter was investigated by the sheriff's department at the outset and has

also been investigated by the Office of Independent Review.

"It is my understanding that the FBI has interviewed Ms. Lim as well, but the FBI refuses to share the results of the interview with the sheriff's department investigators who are seeking a complete and thorough review of that matter."

Q       Can you please read this third paragraph.

A       "I invite the U.S. Attorney to participate in the sheriff's department's investigation in this instance by monitoring our progress along with the Office of Independent Review.  The sheriff's department will provide regular updates on the status of the investigation at your request."

Q       Can I stop you there for a second?

What did you understand these two sentences to mean?

A       Basically the sheriff's department was going to continue.  They wanted us to participate in their investigation and that the department would -- the sheriff's department would provide updates to us on the status.

Q       Based on these two sentences, was it going to be active participation or passive participation that he was seeking?

A       I mean, I took it to mean will provide you --

MR. HOCHMAN:  Objection.  Relevance, Your Honor.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  That sentence suggests more passive than active to me.

Q      BY MR. FOX:  Could you please read the third sentence.

A      "I also asked the United States Attorney to instruct the FBI to withdraw their above referenced request for information and documents until the sheriff's department has completed its investigation whereupon the results of the full investigation will be shared.

"Due to the FBI's apparent aforementioned incompetence in investigating alleged civil rights violations concerning force taken by deputy sheriffs, I am requesting the United States Attorney's Office ameliorate support of the FBI's actions and support the sheriff's department's investigation until its conclusion.

"I am very hopeful of a mutually agreeable resolution.  But if not, the sheriff's department will not be able to continue participation with the FBI in many ongoing joint task force missions due to the breach of trust which will undoubtedly take time and much corrective action to heal."

Q      I'm now going to turn to the fifth page of this letter.

Were there attachments to this letter?  Am I showing you one of the attachments?

A       Yes, there were.

Q       Highlighting the fourth bullet point on the fifth page, what does it say?

A       "What are the names of the agents who are conducting the investigation?"

Q       Now showing you the attachment that is labeled "Risk Management," could you please read this paragraph?

A       "What are the locations of any additional cellular telephones currently in use, owned, or deployed by the FBI within the confines of the Los Angeles County jail system?"

Q       Now showing you the paragraph below that, can you please read it?

A       "Please disclose any and all items of contraband given to any Los Angeles County Jail inmate or inmates through any means including a description of the item, the identity of the inmate receiving the item, and the date, time, and location of occurrence."

Q       You were stating earlier the things you said to Mr. Baca at the meeting.  Was there anything else you said to him at that time?

A       At the first meeting or the meeting with the three of us?

Q       This meeting, the September --

A       I mean, just trying to talk to see, okay, what are we going to do to try to dim things down.  I'm not -- I'm

UNITED STATES DISTRICT COURT

not sure I'm understanding your question though.

Q       What, if anything, did Mr. Baca say after you finished your --

A       Oh, okay.  All right.

Stepping back, I think I had sort of points I wanted to raise which were consistent with this letter.  This letter that we just discussed seemed to be sort of a written documentation of some of the issues that he raised at the first meeting.

This meeting, I told him -- I answered some of these questions, you know.  I told him, "Look, at the end of the day, we did not tell you.  That's my decision.  Blame me.  We wanted to keep the integrity of the investigation.  You know there has been all this stuff going around.  We had to investigate it, thought it was best not to inform you.  Blame me."

And I probably went through that, I think, then -- again, I don't remember all the details.  But the meeting, in my opinion, the meeting got -- Mr. Baca and Mr. Martinez, this was their opportunity to sort of talk one-on-one.  And, to be candid, it got heated.

Q       What happened?

A       Mr. Baca was upset.  I mean, the most upset I've ever seen him, you know.  "This was wrong.  Why didn't you tell me?  I'm the GD sheriff," or something along the lines or "This

is my GD jail."  You know, again, I don't have the sequencing down because it was many years ago.  I remember Mr. Baca kept talking about, like, "Your FBI agents committed a crime," and this and that.  And Mr. Martinez is, like, "Your deputy took a bribe.  Knock this off."  It got very heated, very tense.

And at one point Mr. Baca is like, "Do you want to gun up in here?  Is that what you want to do?"  And I think at that point I was like, "Guys, guys, look, enough.  We've got to work together.  None of us are going anywhere.  Let's just knock this -- let's just calm this down."

You know, I kept trying to say, "Lee, blame me. I'm the one who made the call.  So we've got to work together."

Q       Now, you said earlier that tensions were high, and you described in this meeting how tensions were high.

From your perspective, was this a turf war?

A       No.  No.  Not at all.

Q       Why not?

A       I should say, if it was, it was a one-sided turf war.

Q       What do you mean by that?

A       Look, the role of the Federal Government, the role of the Department of Justice, we investigate crimes both at the state and local level.  Going back to history, the feds come in to investigate these types of crimes.  That's the nature of the business.  Does it cause tension?  Yes.  But

that's what we do.

From my perspective, I said, okay, look, I understand.  They're upset.  We'll deal with it.  I never thought it was going to get to this point.  I just didn't.  And so there was anger from, at least my perspective, anger from the sheriff's department side, but I don't -- I didn't view that from the -- certainly our office and certainly from the FBI.  It was just, look, this is what we have to do.

Q       Could you please look at Exhibit 69.  It's going to be in a separate binder.

A       Yes.  I see 69.

Q       What is this?

A       It appears to be a letter signed by me dated October 13, 2011.

Q       Is this a true and accurate copy of a letter that you signed on or about October 13 of 2011?

A       It is.

MR. FOX:  I move for the admission of Government Exhibit 69.

MR. HOCHMAN:  No objection.

THE COURT:  It will be received.

(Marked for identification and received into evidence Exhibit No. 69.)

Q       BY MR. FOX:  I'm not going to have you read anything in this letter.  What I'd like you to do is summarize

what this letter is.

A     All right.  Just give me a moment because this is, I think, the first time I've seen this since it was written.

All right.  So it appears -- this is a letter that I wrote to Mr. Baca indicating, like, look, following up on our recent discussions, the investigation is continuing.  It's ongoing.  I spoke to county counsel who is Andrea Ordin.  She assured me that the department, LASD, would comply with the subpoenas.  Again, just want to work together.  I'll try to keep Mr. Baca in the loop as much as I can.  I think that was the sum and substance of the letter.

Q     Now, I'm showing you a highlighted portion, county counsel Andrea Ordin that you just referenced.  What was her role?

A     At that time she was Los Angeles County Counsel which, I guess, acts as the attorney/advisor for the county and county agencies including, among other agencies, the sheriff's department.

Q     I want to show you -- I'll have you read the second paragraph on the first page.

A     All right.  "As the investigation continues, I look forward to continued cooperation from you, your command staff, and your department, and trust that all steps will be taken to permit the prosecutors and the FBI agents conducting

the investigation free access to the jail and to inmates and
other deputies who may have information necessary to the
investigation and to ensure that nothing impedes or interferes
with the lawful exercise of the agents' and prosecutors' duties
to conduct and complete the investigation.  Again, I will be
sure to bring any issues in this regard to the attention of
both you and Ms. Ordin."

Q       I want to highlight for you -- can you see this
highlight I made under "continued cooperation"?

A       Yes.

Q       What did you mean by this?

A       Look, as U.S. Attorney, one of the
responsibilities is to try to keep everyone -- keep the
children in the sandlot from fighting all the time.  That's
just the nature of the job.  I wanted to just dampen things
down and say, "Look, we all said our piece.  Let's move
forward.  So I'm looking forward to continued cooperation as we
move forward with the investigation."

Q       Did that mean that there had been cooperation
previously?

A       Not necessarily.  I mean, obviously, look, there
was tensions.  There were issues that occurred before, but
again, I'm trying to be kindler, gentler, and make sure we move
forward.

Q       Who do you copy on this letter?

A       The assistant director in charge who is Steven Martinez who was present at the meeting we talked about earlier, Andrea Ordin who was county counsel, and then Brian Hershman who I think still is an attorney at Jones Day that, I believe, at that time had come in to represent the sheriff's department at that time.

Q       Do you know whether the county brought him in or --

A       I'm assuming the --

MR. HOCHMAN:  Objection.  Move to strike.  Lack of foundation.

THE COURT:  Sustained.

MR. FOX:  I have no further questions for this witness.

THE COURT:  Cross.

MR. HOCHMAN:  Yes, Your Honor.

**CROSS-EXAMINATION**

BY MR. HOCHMAN:

Q       Mr. Birotte, I'd just like to get some background before you became the United States Attorney.  You started your legal career as a deputy public defender for the County of Los Angeles?

A       That's correct.

Q       Then in 1995 you became an assistant United States attorney; is that correct?

**UNITED STATES DISTRICT COURT**

A       Yes.

Q       How is an assistant -- here in Los Angeles, by the way?

A       Yes.

Q       How does an assistant United States attorney differ from the U.S. Attorney?

A       They get paid more.  An assistant United States attorney is the line prosecutor responsible for investigating and prosecuting cases on the criminal side.

Q       You were one of those line prosecutors for four years between 1995 and 1999?

A       Yes.

Q       And in the U.S. Attorney's Office, generally, there's probably about 250 or so of these line prosecutors in the office?

A       Yes.  On both the criminal and civil side. Combined total, yes.

Q       And then in 1999 you left the U.S. Attorney's Office as an assistant United States attorney, and you went into private practice; is that correct?

A       Correct.

Q       You were there about two years or so?

A       Approximately.

Q       Then you had the chance to go into the Inspector General's Office which is part of the Los Angeles

Police Commission; is that correct?

A       That's correct.

Q       What were your roles in the Inspector General's Office for the police -- Los Angeles Police Commission?

A       As Inspector General, I guess we were commonly referred to as a, quote/unquote, "watchdog" over the Los Angeles Police Department and also the eyes and ears of the Los Angeles Police Commission.  So we reviewed complaints of misconduct against LAPD officers.  We reviewed any -- all officer-involved shootings involving LAPD officers and other significant uses of force involving LAPD officers.

Q       Basically you're doing independent review of these allegations of -- against police officers?

A       Correct.

Q       Sort of like the Office of Independent Review at the sheriff's department?

A       They were our counterpart, yes.  They had a little different formation, but by and large, yes, they were our counterpart.

Q       You were both -- is it called a deputy Inspector General or assistant Inspector General and the Inspector General as well?

A       Correct.

Q       Which was the title?

A       So I was an assistant Inspector General from 2001

to 2003, and then from 2003 to 2010 I served as
Inspector General.

Q    And in 2010, that is when you became the
United States Attorney for the office you used to be a line
prosecutor for here in Los Angeles; is that correct?

A    Yes.

Q    And you were the United States Attorney until
2014; is that correct?

A    That is correct.

Q    And at that point you became a federal judge.

A    That is correct.

Q    All right.  And your court is actually here in
this courthouse?

A    As of last week, yes.

Q    I'd like to focus you back in 2011.  That would
have been one of the years you were the United States Attorney
for; is that right?

A    Yes.

Q    And, again, you had said that the United States
Attorney is not just Los Angeles County; correct?

A    That's correct.

Q    Like the D.A.'s office for Los Angeles County
would just be Los Angeles County; correct?

A    Correct.

Q    But you had a much bigger responsibility of

**UNITED STATES DISTRICT COURT**

Los Angeles County and then those six surrounding counties, I think you said, from San Luis Obispo down to Orange County and the whole Inland Empire; is that correct?

A       Yes.

Q       At that time in 2011, there was about 250 line prosecutors under you?

A       I think that's right, yes.

Q       And they're working thousands of investigations?

A       Yes.

Q       You didn't personally supervise each one of those investigations; correct?

A       No.

Q       You couldn't.  It would be impossible; correct?

A       That is correct.

Q       You had to delegate responsibilities to those below you to supervise the investigations; isn't that correct?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  Well, you mentioned Lawrence Middleton, the chief of the public corruption and civil rights section; correct?

A       Yes.

Q       He was someone below you sort of in the rankings; is that correct?

A       Correct.

Q       If you're the U.S. Attorney at the top, right below you is the chief assistant?

A       First assistant, chief assistant, yes.

Q       Then for the criminal side, it's the chief of the criminal division?

A       Correct.

Q       Then below that would be the chief of one of these sections; correct?

A       The chief of the various sections, yes.

Q       So Lawrence Middleton is about three rungs lower than you in the organizational chart?

A       Yes.

Q       And then even below Lawrence Middleton, that's where you would have the line assistants doing the investigations; correct?

A       Typically -- well, there may be a deputy chief and then the line assistant.

Q       So there could be one more rung between the line assistant -- it would go line assistant, deputy chief, and then a chief; correct?

        MR. FOX:  Objection.  Relevance.

        THE COURT:  Sustained.  The answer is stricken. The jurors should disregard.

Q       BY MR. HOCHMAN:  Now, the United States Attorney's Office is part of the United States

Department of Justice; is that correct?

A       Yes.

Q       And the head of the United States Department of Justice is the Attorney General; correct?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  In civil rights, there's not only the local United States Attorney's Office that does civil rights prosecution but also a civil rights division in the Department of Justice; is that correct?

A       Yes.

Q       And the FBI has a Washington, D.C., counterpart as well that deals with civil rights violations; is that correct?

A       Yes.

Q       And as part of your job as the United States Attorney, you work with federal, state, and local law enforcement agencies to fight crime; is that correct?

A       Yes.

Q       And I think you said that the FBI would be one of those agencies?

A       That's correct.

Q       The Los Angeles Police Department would be one of those agencies?

A       Yes.

UNITED STATES DISTRICT COURT

Q       And the Los Angeles Sheriff's Department is one -- are one of those agencies?

A       Yes.

Q       You used the analogy about children in a sandbox, but in reality, you're all sort of brothers in arms in fighting crime; correct?

A       That's correct, yes.

Q       You're all partners?

A       All law enforcement partners, yes.

Q       And the United States Attorney's Office also works with numerous federal, state, and local task forces that involve the FBI and the Los Angeles Sheriff's Department; correct?

A       Yes.

Q       And these task forces included fighting terrorism, narcotics crime, narcotics trafficking, gangs, and other types of crimes; correct?

A       Yes.

Q       With respect to the Los Angeles County Sheriff's Department, you worked with Sheriff Baca after you became United States Attorney in March of 2010; is that correct?

A       Yes.

Q       And you know Sheriff Baca.  You can identify him here in court?

A       He's right over there in the suit and pink shirt

UNITED STATES DISTRICT COURT

and nice tie.

MR. HOCHMAN:  Your Honor, may the record reflect that the witness has identified Leroy Baca?

THE COURT:  Yes.

Q       BY MR. HOCHMAN:  When was the first time that you met Sheriff Baca?

A       Well, I couldn't tell you.  I mean, I have to believe it was during my tenure as Inspector General.  So in that 2003, -4, or -5 realm, probably then.

Q       Because he had already been the sheriff as of the end of 1998; correct?

A       Yes.  He had been longtime sheriff.  I don't remember when he began his duties as sheriff, but yes.  A while back.

Q       When you were up for consideration for the United States Attorney position, Sheriff Baca wrote a letter on your behalf; is that correct?

A       He did.

Q       Once you became the United States Attorney, you worked with him starting in March, 2010.

A       Correct.

MR. FOX:  Objection.  Asked and answered.

THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  And you would often communicate with Sheriff Baca considering the numerous matters that you had

and his office had; correct?

A       Yeah.  The big cases.  I mean, you communicate with all the head law enforcement agencies that you're working with, yes.

Q       You would talk to him on the phone; is that correct?

A       Yes.

Q       See him at different places where you would meet together?

A       Yes.

Q       And those were meetings unconnected with anything dealing with this case; correct?

A       Yes.

Q       Now I'd like to focus your attention on August, 2011.  Were you aware that month or were you aware that summer that the FBI had been running an undercover operation in the Men's Central Jail?

A       Yes.

Q       And it was targeting a deputy sheriff in the jail; is that correct?

A       I believe so.  I don't know if the investigation was focusing -- charging specifically one sheriff's deputy, but there was an investigation involving LASD and the jails.

Q       And did you approve the investigation -- strike that.

Case 2:16-cr-00066-PA    Document 313    Filed 03/16/17    Page 47 of 79   Page ID #:6526

47

Did you know that the investigation at its inception was going to have a cell phone as part of it?

A    I honestly don't remember.  I mean, I -- I'm assuming I knew about the investigation.  I can't sit here as I -- and tell you I knew the specifics of it.  I knew when the phone got discovered, but I just don't have a memory of someone sitting there telling me, okay, we're going to do this investigation.  We're using a phone.  I'm not saying it didn't happen.  I just don't have a memory of it.

Q    Well, you approved the undercover operation on August 10, 2011; is that right?

A    That sounds right, yes.

Q    When you approved it on August 10, 2011 --

MR. FOX:  Objection, Your Honor.  We need to have a sidebar, please, Your Honor, on this issue.

THE COURT:  All right.

(The following proceedings were held at sidebar:)

MR. FOX:  Your Honor, this is misleading.  There was a group one proposal that was separate from the cell phone that he approved, and Mr. Hochman knows that.  He received the discovery, and he's suggesting that Mr. Birotte approved of the group one retroactively approving of the cell phone.  He just said the date that the group one letter was, I believe, signed or proposed to Mr. Birotte and he's insinuating that he did not approve of the undercover operation.  So this is misleading and

UNITED STATES DISTRICT COURT

confusing to the jury.

MR. HOCHMAN:  That's actually not where I was going.  Where I was going is that it's August 10, 2011, and I believe he'll say he didn't know that the cell phone had been found in the sheriff's jails on August 8, 2011.  In other words, they did not provide him one of the key pieces of information when he approved this investigation.

MR. FOX:  There's a relevance issue there, Your Honor.  It's irrelevant.  So I move to strike the previous question and answer and this question.

MR. HOCHMAN:  The Government brought in that he approved the operation.  I should be allowed to cross-examine to get some details of what he knew when he approved the operation.  They opened the door.  That's all I'm doing, Your Honor.

MR. FOX:  It's a separate approval, and this is what I'm saying is prejudicial is that he's conflating the two, and there was a separate approval that happened beforehand based on this witness' testimony.  He said he approved of the undercover operation related to the cell phone.  That's different from the August 10 group one that he was prepared to approve that never happened because of the discovery of the cell phone.

MR. HOCHMAN:  He actually approved it.  He didn't "going to approve."  He approved it on August 10.  Again, I'm

asking the witness -- and I didn't -- it is an undercover operation related to the cell phone.  He -- when he approved it, he did not have the information -- key information, I would suggest, that the cell phone had actually been discovered by the sheriff's department, and that's what I'm inquiring is what information he had when the Government opened up the door and said he approved the operation.

THE COURT:  Objection sustained.

(The following proceedings were held in open court in the presence of the jury:)

THE COURT:  All right.  Ladies and gentlemen, the last question and answer is stricken, and the jury should disregard it.

Q     BY MR. HOCHMAN:  Mr. Birotte, you said that you knew that the undercover operation was targeting a deputy Los Angeles sheriff; is that correct?

A     No.  I don't know if -- I'm sorry.  I don't know if I knew the investigation was targeting a deputy or the Los Angeles County Sheriff's Department generally.  I don't remember.

Q     Did you know whether or not it was using inmates as FBI informants?

A     I believe I did.

Q     And did you know which inmates were being used by the FBI?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  Now, the head of the Los Angeles FBI office in August, 2011, was Steve Martinez; is that correct?

A       Correct.

Q       And he is called an assistant director in charge of the office; correct?

A       Correct.

Q       That's different than a special agent in charge; correct?

A       Correct.

Q       Or a line FBI agent like Agent Marx; correct?

A       Correct.

Q       You had met with Assistant Director Martinez many times before August, 2011; is that correct?

A       Yes.

Q       And on August 18 -- I'll direct your attention to August 18, 2011.  Do you recall receiving a call from Assistant Director Martinez around that time informing you that the FBI's cell phone had been discovered in the Men's Central Jail by the sheriff's department?

A       Yes.

Q       And did you speak with Sheriff Baca after that FBI phone was discovered?

A       I assume I -- I think I did, yes.

Q       And did you also speak with Michael Gennaco, the head of the Office of Independent Review, after the FBI's phone was discovered?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  Well, Michael Gennaco, you said, was at that August 29, 2011, meeting at your office where the county people showed up and the people from the U.S. Attorney's Office showed up; correct?

A       Yes.

Q       And at the point of August 29, 2011, was that the first time you had ever seen Mr. Gennaco?

A       Well, in connection with this matter --

Q       No.  In general.

A       No.  I've known Mr. Gennaco for years.

Q       15 years?

A       Probably.  We were both in the U.S. Attorney's Office together.

Q       And you were in the U.S. Attorney's Office 1995 to 1999?

A       Correct.

Q       And when you said -- did you say you also worked -- you mentioned that the Office of Independent Review is the counterpart to the Inspector General's Office when you

headed it; correct?

MR. FOX: Objection. Asked and answered.

THE COURT: Sustained.

Q     BY MR. HOCHMAN: Did you meet Mr. Gennaco as well when you were in the Inspector General's Office?

MR. FOX: Objection. Relevance.

THE COURT: Sustained.

Q     BY MR. HOCHMAN: The meeting at your office on your side included the chief assistant or First Assistant George Cardona, and this was the August 29 meeting?

A     Yes.

Q     Included the chief of the public corruption civil rights section Lawrence Middleton; correct?

A     Yes.

Q     Gentleman named Bruce Riordan, if you recall?

A     Yes. He was my special counsel.

Q     And others on your side as well; is that correct?

A     There were. I just don't have a good memory of who. I think there were.

Q     During that meeting -- that actually wasn't that long of a meeting. Maybe a half hour or so?

A     That sounds right.

Q     And I think you said that Sheriff Baca expressed his concerns about what had happened with the cell phone being introduced by the FBI in the Men's Central Jail; is that

UNITED STATES DISTRICT COURT

correct?

A       Yes.

Q       And he asked you at that time -- you said he asked a bunch of questions during that meeting; correct?

A       Yes.

Q       Is one of the questions that he's asking you as to why the FBI had not consulted with him before they ran an undercover operation into the Men's Central Jail?

A       I think that's one of the questions that he asked.

Q       And you listened very politely during that meeting of Sheriff Baca expressing his concerns; is that correct?

A       Yes.

Q       You called it, I think, a listening meeting on your part?

A       From my part, yes.  I assumed that Lee wanted to vent or express his displeasure, and I just listened.

Q       You didn't provide Sheriff Baca with any information about the scope or the extent of the FBI's investigation in the Men's Central Jail, did you?

A       At that meeting, no.

Q       You didn't provide him with any information what was happening as to whether or not there were other FBI undercover investigations going on at that time in the

Men's Central Jail; is that correct?

A       No, I did not.

Q       You didn't provide him with any information about whether it was one deputy or many deputies that were potentially corrupt in the Men's Central Jail; is that correct?

A       That is correct.

Q       Now, after the meeting was over, did you ever write out a report in which you indicated that you thought that Sheriff Baca had obstructed justice during the meeting?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  Well, did you ever communicate to anyone right after the meeting that you thought that Sheriff Baca had obstructed justice during the meeting?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  Your office prosecutes obstruction of justice cases -- correct? -- at that time?

A       The office did do that, yes.

Q       And you were the head of the office; correct?

A       Correct.

Q       Now, after the meeting with Sheriff Baca, you and others in the U.S. Attorney's Office stayed behind and met with Mr. Gennaco separately; is that correct?

A       At this first meeting?

UNITED STATES DISTRICT COURT

Q       Yes.

A       I think so.

Q       And Mr. Gennaco expressed to you, generally, that the sheriff's department wanted to work with the U.S. Attorney's Office and the FBI; is that correct?

MR. FOX:  Objection.  Irrelevant as to what Mr. Gennaco said.

THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  Well, did Mr. Gennaco suggest an approach during that separate meeting he had with you that you then agreed with and tried to implement thereafter?

A       I think so, yeah.

Q       And that approach was sort of a building bridges between the sheriff's department and the FBI to deal with the rift that had occurred; correct?

A       I think -- that sounds right.  Mr. Gennaco and I knew each other.  So we had that relationship.  And so I think this was an effort to try to sort of get what we needed and, again, try to dampen tensions.

Q       And towards that end at the end of September, you scheduled a meeting with Sheriff Baca and Assistant Director Steve Martinez on September 27 in your office; is that correct?

A       I don't remember if I scheduled a meeting, but we had a meeting on that date.  I don't remember how it came about.

Q       So I'm just -- so you don't know if you scheduled the meeting or Mr. Martinez did or Sheriff Baca did.

A       Yeah.  Correct.  I don't remember if I told my assistant, "Hey, we need to set up a meeting with the sheriff and Mr. Martinez" or if Mr. Martinez called and said, "Let the three of us get together."  I just know we had that meeting that day.

Q       And the point of the meeting, from your perspective, was, again, to try to, as you put it, get these brothers that are arguing amongst each other in the sandlot back together; correct?

A       A couple things.  One, to try to answer some of the questions that Sheriff Baca had and let him know we're going to move forward and let's work together.  So those were sort of the things I was thinking about going into the meeting.

Q       You wanted Sheriff Baca to get a chance to clear the air; correct?

A       Yes.  I mean, he cleared the air earlier, but yes.  In the prior meeting Mr. Martinez was not there.  So this time it was the three of us and just the three of us.  My thought, as professionals, just get in the room, talk this out, figure it out, and then be done with it.

Q       And with respect to that meeting then, your role was sort of like an older brother trying to get the younger brothers together?

A       Look, like I said earlier, my job, one of the responsibilities is to make sure that everyone plays in the sandlot together.  The sheriff's department, the FBI are law enforcement partners.  We need to work together.  So I was trying to do what I could to continue that.

Q       And Sheriff Baca during that meeting -- you said it got heated at the beginning; correct?

A       Yes.  I mean, it got heated.  I don't remember the timeline, but yeah.  It got heated.

Q       And he was very open, direct, and transparent with his feelings in that meeting; correct?

A       That is correct.

Q       At some point he used that expression "gun up"; correct?

A       Yes.

Q       You didn't think that this was some scene from the wild west where people were actually going to pull guns, did you?

A       No.

Q       That's not how the expression was used during the meeting; correct?

A       That's not how I took it, no.

Q       It was sort of, if you're going to not trust us, then we're not going to trust you, and each side is going to have its own guns, and it's not going to work out; correct?

UNITED STATES DISTRICT COURT

A       I took it more like, look, you want to go to war on this, fine.  We'll do that, and then let the chips fall where they may.

Q       And on the flip side, if you want to resolve this, then we'll resolve it.  But one way or the other, we've got to move forward.

A       I mean, look, that part I'll never know.  I just know what was said and his emotions behind it that, look, you want to go to war, we're going to go to war or not.  You make the decision and then move forward.

Q       And during the meeting, Sheriff Baca asked Assistant Director Martinez that question that he had asked in the earlier meeting that you didn't answer which is why?  Why did you not involve me when you did your undercover investigation; correct?

A       I think that question was asked.

Q       At that point Mr. Martinez gave him an answer; isn't that correct?

A       I believe that is correct.

Q       And after Assistant Director Martinez gave him the answer, Sheriff Baca calmed down in the meeting; correct?

        MR. FOX:  Objection.  Relevance.

        THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  Well, did the meeting end with Sheriff Baca leaving in a huff and running out of the room?

**UNITED STATES DISTRICT COURT**

A       No.

Q       Meeting ended with Sheriff Baca shaking your hand; correct?

A       Yes.

Q       And he shook the hand of Assistant Director Martinez; correct?

A       I believe so, yes.

Q       And as you said in your letter on October 13, 2011, the cooperation was occurring at that point or at least the movement toward cooperation was occurring at that point.

Would that be right?

A       I was trying to continue to convey that message, yes.

Q       Now, turning to Exhibit 112 which is the letter that you read many of the portions of -- can we put 112 on the screen, please.  First page.  First paragraph.

MR. HOCHMAN:  Your Honor, this monitor is off.  I don't know if the jury's monitors are off as well.

THE COURT:  No.  They're on.

MR. HOCHMAN:  Thank you, Your Honor.

Q       So, Mr. Birotte, you talked about the concept of holding responses to various subpoenas; correct?

A       Yes.

Q       And by that you meant there is a date on each of

UNITED STATES DISTRICT COURT

the grand jury subpoenas on which you need to comply with and return those documents to the grand jury; is that correct?

A       Correct.

Q       And you, as the U.S. Attorney, were informing Sheriff Baca that, if they didn't have -- that they could have -- actually, they could stand down and they didn't have to produce the documents by the dates on the grand jury subpoenas; is that correct?

A       Correct.

Q       Now, did you -- when you made that statement to Sheriff Baca that he could stand down and not produce the documents on the dates listed on the grand jury subpoenas, did you tell the grand jury that too, that the document production is going to be delayed?

A       No.

Q       Do you know if anyone on your behalf told the grand jury that?

A       I don't know.

MR. HOCHMAN:  And then if you could then put the rest of the page.

Q       In the letter that Sheriff Baca gave you, he referenced the voluminous amount of information that was requested from the subpoenas.

Do you remember that?

A       Yes.

Q        And he referenced, in part, that the subpoena --
and we can focus on the No. 1 here.  The August 24th, 2011,
subpoena was asking for documents and information for all
employees at the Men's Central Jail from January, 2009, to the
present which at that point was September 26, 2011.

A        Okay.  Yes.

Q        And you understood that to be a huge amount of
information that was going to have to be produced by the
sheriff's department in connection with these
Federal Grand Jury subpoenas; correct?

A        Yeah.  We knew we were asking for a lot of
information, yes.

Q        And the subpoena date was September 28, 2011,
when it was due, and you understood that there was no way they
could possibly get all the information within a month.  So
that's why you gave them additional time; is that correct?

A        Right.  And out of respect for Mr. Baca, he said,
"Look, we need more time."  I said, "Okay.  Fine.  You've got
more time."

Q        And that would be true with the other subpoenas
that are identified on page 1 of Exhibit 112; correct?

A        Correct.

Q        Now, again, this letter we're talking about,
Exhibit 112 dated September 26, 2011, this was the letter that
Sheriff Baca gave you at the meeting on September 27, 2011;

**UNITED STATES DISTRICT COURT**

correct?

A       Yes.

Q       Did he give you -- do you recall whether or not he gave it to you at the beginning of the meeting?  At the end of the meeting?  Do you recall which?

A       I think it was -- if my memory is correct -- again, this is a number of years ago.  He gave it to me but in the beginning of the meeting.  Again, I viewed this as sort of this was a verbal -- I'm sorry -- a written documentation of the stuff that he had raised earlier and then some additional stuff.  So it was more like, "Here, Andre.  Here.  This is for you."  I put it down.  I'm not sure -- I'm 99 percent certain I didn't read the letter before we began the meeting.

Q       And, again, this letter is pretty open and transparent and direct about Sheriff Baca's feelings about the investigation; correct?

A       He's expressing his views.

Q       It says here in the first sentence that you read that he was extremely displeased with the conduct of the FBI in causing the introduction of a cell phone into the jail as illegal, unethical, and irresponsible.

        Do you see that?

A       Yes.

Q       That was a point he made in the August 29 meeting as well?

UNITED STATES DISTRICT COURT

A          Yes.  He made that several times.

Q          He also actually made that orally to you in that September 27 meeting with you as well.

A          Yes.

Q          And he says, "The sheriff's department will be conducting an investigation into the breach of security of the jail system and will be examining Inmate Anthony Brown's allegations that he received a cell phone from a deputy who received it from an FBI agent."

Do you see that?

A          Yes.

Q          Now, the sheriff had the ability and the duty to investigate violations in his jail; correct?

A          I'm sorry.  The sheriff's department has the responsibility to investigate violence -- yes.  Theoretically from a 30,000-foot level, yes.  That's what they have a responsibility to do.

Q          Because the sheriff's department has jurisdiction over the jails and -- while your office has jurisdiction over the jails as it pertains to federal crimes; correct?

A          Yes.

Q          And so the sheriff -- if the sheriff has a dirty deputy, for instance, who received a bribe, the sheriff has an obligation to investigate that because they may have also violated state law; is that correct?

64

MR. FOX:  Objection.  Argumentative.

THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  Well, in the letter here it talks about the sheriff's department investigation, and it references California Penal Code sections.

Do you see that?

A       Yes.

Q       Those would be the California Penal Codes that someone like a dirty deputy might violate if they took a bribe in a jail; correct?

A       Yes.

Q       And it says here the sheriff's department will also fully investigate allegations regarding excessive force by deputies in the Men's Central Jail.

Do you see that?

A       Yes.

Q       And the sheriff has the duty to investigate excessive force allegations by deputies in the Men's Central Jail; correct?

A       Yes.  But it's not an exclusive duty.

Q       Very good point.  It's not exclusive because the sheriff can investigate and the Federal Government can investigate at the same time; correct?

A       They can.  That's not wise, but they can.

Q       Well, it's better if they work together; correct?

UNITED STATES DISTRICT COURT

A       Correct.

Q       It's better if the sheriff's department works with the United States Attorney's Office; correct?

A       In most instances.  I mean, again, there are certain investigations that it's just not going to happen.  I mean, we're not -- the U.S. Attorney's Office is not -- generally speaking, is not going to do an investigation of the sheriff's department or any local law enforcement agency with that agency.

Q       Are you aware that the FBI was working with the Los Angeles Sheriff's Department at that time doing a public corruption investigation of a dirty sheriff?

MR. FOX:  Objection to the form of the question and relevance.

MR. HOCHMAN:  I'm sorry.  Let me qualify the end of the question.  A dirty deputy sheriff, Your Honor.

MR. FOX:  Objection to the form of the question and relevance.

THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  You said in your original testimony that you were unaware of any situation involving public corruption of a sheriff's department deputy where the Federal Government was working with the sheriff's department to do an investigation; is that correct?

MR. FOX:  Objection.  Misstates the testimony.

THE COURT:  Sustained.

Q     BY MR. HOCHMAN:  Were you aware at that time --
and that time I'm referring to is the summer of 2011 -- of the
sheriff's department actually working with the FBI in the
investigation of a Los Angeles County deputy sheriff engaged in
criminal activity?

MR. FOX:  Objection.  Relevance, Your Honor.

THE COURT:  Sustained.

Q     BY MR. HOCHMAN:  If you could turn to the next
paragraph, please.

Now, it says in the first sentence, "The
expertise and experience of the sheriff's department in
conducting these types of investigations are considerably
contrasted by the FBI's actions in this case."  The next
sentence is "The FBI has no experience in the running of a jail
system of such magnitude as the Los Angeles County jails, nor
have they completed anywhere near the number of investigations
involving matters emanating within the confines of a jail
system."

Now, you're aware, are you not, that the
sheriff's department does have certain expertise when it comes
to the jails; is that correct?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

Q     BY MR. HOCHMAN:  In working with the FBI, would

UNITED STATES DISTRICT COURT

you -- and comparing the FBI's expertise with the jails and the sheriff's department's expertise with the jails, would you consider the sheriff's department as having more expertise with the jails?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.  Move on.

Q     BY MR. HOCHMAN:  If you focus on the last sentence here, it says, "Acquisition of documents prior to the sheriff's department's completion of its own investigation will likely taint the fair and truthful completion of a properly-focused investigation."

Do you see that?

A     Yes.

Q     So is it your understanding that the sheriff's department -- excuse me -- that Sheriff Baca wanted to do an investigation of the allegations relating to the cell phone?

A     That's what he says in the letter.

Q     And then if you could turn to the next page, third to the bottom paragraph, it starts with "I invite."  Did Sheriff Baca order yourself at the U.S. Attorney's Office during your September 27 meeting with him and tell you what you had to do?

A     No.

Q     He invited you as a United States Attorney to participate in the sheriff's department investigation; is that

correct?

A       That's what the letter says, yes.

Q       And he also, if you go down to sort of halfway down, he requested that the United States Attorney's Office ameliorate support of the FBI's agents and support the sheriff's department investigation until its conclusion.

Do you see that?

A       I do.

Q       If you could go to the next sentence below this, the next paragraph down, towards the end of the letter he writes, "The Cardinal Rule of law --" "The Cardinal Rule of all law enforcement agencies, local or federal, is simple.  One cannot break the law in order to enforce the law?"

Do you see that?

A       Yes.

Q       That's something that Sheriff Baca repeated in the August 29 meeting you had with him and the September 27 meeting you had with him; correct?

A       I don't remember.  I'm not suggesting he didn't, but I just don't have a specific memory of that.

Q       If you can turn to the "Criminal Acts" page that you showed, Mr. Birotte, under the "Criminal Acts" page, again, Sheriff Baca's letter has a number of questions in it.  Can we focus on the first half.

"When did the FBI decide to investigate the

conduct of deputies working the county jails who authorized the investigation?"

"Which office in the FBI was tasked to conduct the investigation?  The names of the agents.  The specific reasons for the investigation and for not notifying his office"; is that correct?

A     Yes.

Q     And you -- if you recall, during the August 29 meeting, these are similar to the types of questions he asked in the August 29 meeting; is that correct?

A     Yes.  In that first meeting, yes.

Q     And you didn't answer any of these questions in the August 29 meeting; correct?

A     Correct.

MR. HOCHMAN:  If we could scroll down to "Risk Management," please.  Highlight the two paragraphs, "What are the locations and the pleas disclosed?"

Q     Sheriff Baca asked in this September 26, 2011, letter, "What are the locations of any additional cellular phones currently in use, owned, or deployed by the FBI within the confines of the Los Angeles County jail system?"

Do you see that?

A     Yes.

Q     And "Please disclose any and all items of contraband given to any Los Angeles County jail inmates through

UNITED STATES DISTRICT COURT

any means including a description of the item, the identity of the inmate receiving the item, and the date, time, and location of the occurrence."  These, again, are questions that Sheriff Baca was even asking as early as the August 29 meeting; is that correct?

A       I believe that's right, yes.  I mean, yes.  I think, in general, he was asking questions about the investigation, yes.

Q       And you didn't provide any answers during that August 29 meeting to these questions; correct?

A       Correct.

Q       With respect to Exhibit 69, that's the October 13, 2011, letter that you wrote to Sheriff Baca.

A       Okay.

Q       All right.  Do you see the middle of the first paragraph it says, "I've spoken with county counsel Andrea Ordin"?

A       I do.

Q       Now, the lawyers for the sheriff's department would be represented by the county counsel Andrea Ordin; correct?

A       Typically, yes.

Q       They also had an outside counsel, a gentleman by the name of Brian Hershman, from the law firm of Jones Day; correct?

A        Correct.

Q        But the documents that are being produced in connection with the Federal Grand Jury subpoena from the Los Angeles County Sheriff's Department come from the Los Angeles County Sheriff's Department; correct?

A        Yes.

Q        They're not Jones Day documents; correct?

A        No.  I mean, you are correct.  They are not Jones Day documents, or they shouldn't be.

Q        Right.  And they're not county counsel documents; correct?  They're Los Angeles County Sheriff's Department documents; correct?

A        Yes.

Q        And the counsel are just sort of the intermediaries between the documents on the left side, county counsel facilitating them to get over to the grand jury on the right-hand part; correct?

A        You're talking about with respect to complying with a grand jury subpoena?

Q        Yes.

A        Oh, I don't know that.  I don't know that.  If what you're asking me is in response to a grand jury subpoena, is it county counsel's job to hand over the documents to the grand jury, or is it LASD's job?  I don't know the answer to that.

**UNITED STATES DISTRICT COURT**

Q        Let me make it a little bit clearer.

The document request went to the Los Angeles County Sheriff's Department to get the documents requested in the subpoena; correct?

A        Correct.

Q        They then gathered all those documents, they being the Los Angeles County Sheriff's Department; correct?

A        Correct.

Q        Then they gave them to their lawyers, the counsel; correct?

MR. FOX:  Objection.  Foundation, Your Honor.

THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  You've in your career, both as a line prosecutor and assistant United States attorney, dealt with many grand jury subpoenas; correct?

A        I have, yes.

Q        And you've dealt with many counsel assisting their clients in complying with grand jury subpoenas; is that correct?

A        I've dealt with counsel in some cases, yeah, the turning over the documents.

Q        And the counsel have to work with the client in order to get the documents; correct?

MR. FOX:  Objection.  Foundation and relevance.

THE COURT:  Sustained.

UNITED STATES DISTRICT COURT

Q        BY MR. HOCHMAN:  Now, in the middle of this letter, you write, "Given this --" actually, "I've spoken with county counsel Andrea Ordin who assured me that your department would comply with these subpoenas as quickly as possible."  And then you write, "Given this assurance and based on your recent comments to the press that you too wish to have your department cooperate fully with the ongoing investigation, I look forward to my attorneys and the FBI working with representatives from your department to ensure a prompt response to these subpoenas."

Do you see that?

A        Yes.

MR. HOCHMAN:  No further questions, Your Honor.

MR. FOX:  May I begin, Your Honor?

THE COURT:  Yes.

MR. FOX:  I'll be brief because I know you have your own jury trial -- civil trial going on downstairs.  I promise I will not be lengthy.

**REDIRECT EXAMINATION**

BY MR. FOX:

Q        Mr. Hochman just ended asking you about Mr. Baca's comments to the press.  Are you aware of some of Mr. Baca's comments to the press beginning at the end of September, 2011, about the grand jury investigation?

MR. HOCHMAN:  Objection, Your Honor.  Beyond the

scope.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  Am I aware of Mr. Baca's comments to the press in that -- in this time period?

Q    BY MR. FOX:  Yeah.  Regarding the federal investigation of his department.

A    I mean, yes.  Yeah.

Q    Generally, at the end of September, 2011, what was he saying to the press?

MR. HOCHMAN:  Objection.  Foundation.

Q    BY MR. FOX:  Are you aware of what he was saying --

MR. HOCHMAN:  Beyond the scope.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  Okay.  So let me just make sure I get the timing correct.  At the end, meaning, by the time -- it was after our meeting?

Q    BY MR. FOX:  Let's take September 26 to September 27 time period first.

A    Well, okay.  It evolved.  Initially there were a lot of comments, generally speaking.  The FBI doesn't know what they're doing.  They're committing a crime.  We're the best people -- we, meaning the sheriff's department.  We should be

investigating ourselves.  There was a whole what I would characterize as sort of an immediate push to get this message out that the FBI doesn't know what they're doing and then that they committed a crime and that we, the sheriff's department -- I created the Office of Independent Review.  No one is better to find that corruption in my department than me.  That message was in the beginning, and then it changed.

Q    Do you know what caused it to change?

A    I don't know.

Q    Now, Mr. Hochman was asking you questions about your experience with the LAPD Inspector General's Office.  Were your duties and your investigations in lieu of federal prosecutions?

A    No.  No.  Not at all.

Q    Mr. Hochman asked you questions about whether an August 29, 2011 -- at that first meeting, whether you attempted to build bridges after that meeting.

Do you recall that?

A    Yes.

Q    Would you consider tampering with witnesses to be building bridges?

MR. HOCHMAN:  Objection.  403.  Beyond the scope and foundation, Your Honor.

THE COURT:  Overruled.

THE WITNESS:  Can you ask the question again?

UNITED STATES DISTRICT COURT

Q       BY MR. FOX:  Yes.  Would you consider tampering with witnesses to be building bridges?

A       Of course not.

Q       Would you consider approaching Special Agent Leah Marx -- I'll ask it a different way.

Would you consider sending sergeants out to approach Special Agent Leah Marx at her home the night before your meeting with Mr. Baca to be building bridges?

MR. HOCHMAN:  Objection.  Relevancy and leading, Your Honor.

THE COURT:  Overruled.

THE WITNESS:  Not at all.

MR. FOX:  Could you please pull up 112-1. Actually, -2, please.

Q       Do you see the portion after 4575 and 4573 which discusses conspiracy, entrapment, coercion, and civil rights violations?

A       Yes.

Q       Are you familiar with what entrapment is?

A       Yes.  A little bit.

Q       What is entrapment?

A       Entrapment is -- how do I articulate it?  In essence, when you basically have convinced someone -- basically made someone commit a crime who otherwise was not predisposed to commit that crime.

Q       In public corruption cases involving bribery, what does that mean?

A       That basically, to be successful in entrapment cases would be to prove that this individual who took the bribe was not otherwise predisposed -- for lack of a better term, was just standing by himself being Mr. or Mrs. Innocent and that law enforcement coerced, cajoled, and forced him into committing this crime.

Q       Mr. Hochman asked you questions about this paragraph about the Cardinal Rule of all law enforcement agencies, local or federal, is simple.  One cannot break the law in order to enforce the law.

Did the Federal Government break the law in its undercover investigation involving Gilbert Michel?

MR. HOCHMAN:  Objection.  Calls for a legal conclusion.

THE COURT:  I think he can probably do that.

MR. FOX:  I'm sorry, Your Honor?

THE COURT:  Overruled.

THE WITNESS:  No.  No.

Q       BY MR. FOX:  And in your August 29 meeting with Mr. Baca, did you give him any reason to believe that the FBI had committed a crime when it conducted its undercover operation?

A       No.  The exact opposite.  I told him, "Look,

Lee --" I'm sorry, Mr. Baca.  But in the meeting I said, "Lee, look --" I think I even said, "You know, we didn't commit a crime.  You know this is what happens.  Undercovers do this all the time.  Your deputy took a bribe.  We can agree to disagree."  I was trying to be respectful.  "I understand your view, but it's wrong.  It's just wrong."

MR. FOX:  No further questions.

**RECROSS-EXAMINATION**

BY MR. HOCHMAN:

Q        In your August 29 and September 27 meetings with Mr. Baca and this issue of the Cardinal Rule and you can't break the law to enforce the law came up, did you believe Sheriff Baca was sincere when he was making these comments to you?

MR. FOX:  Objection.  Foundation.

THE COURT:  Sustained.

MR. HOCHMAN:  No further questions, Your Honor.

THE COURT:  All right.  You may step down.

THE WITNESS:  Thank you.

MR. FOX:  Your Honor, at this time the United States rests.

THE COURT:  All right.

(Further proceedings were held and
    reported but not included herein.)

**UNITED STATES DISTRICT COURT**

CERTIFICATE OF OFFICIAL REPORTER


I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

DATED THIS  16TH  DAY OF DECEMBER, 2016.


/S/ MIRANDA ALGORRI

MIRANDA ALGORRI, CSR NO. 12743, CRR
FEDERAL OFFICIAL COURT REPORTER

**UNITED STATES DISTRICT COURT**