**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION**

**HONORABLE PERCY ANDERSON, U.S. DISTRICT JUDGE**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. |
| | ) | |
| vs. | ) | CR 16-00066(A)-PA |
| | ) | |
| LEROY D. BACA, | ) | PAGES (1 to 77) |
| | ) | |
| Defendant. | ) | |
| | ) | |

**REPORTER'S TRANSCRIPT OF**
**TESTIMONY OF DAVID DAHLE**
**TUESDAY, DECEMBER 13, 2016**
**8:12 A.M.**
**LOS ANGELES, CALIFORNIA**

**MIRANDA ALGORRI, CSR 12743, CRR**
FEDERAL OFFICIAL COURT REPORTER
312 NORTH SPRING STREET, ROOM 435
LOS ANGELES, CALIFORNIA 90012
MIRANDAALGORRI@GMAIL.COM

**UNITED STATES DISTRICT COURT**

**APPEARANCES OF COUNSEL:**

**FOR THE PLAINTIFF:**

        EILEEN M. DECKER
        United States Attorney
        BY:  BRANDON FOX
        BY:  EDDIE A. JAUREGUI
        Assistant United States Attorneys
        United States Courthouse
        312 North Spring Street
        Los Angeles, California 90012


**FOR THE DEFENDANT:**

        MORGAN LEWIS AND BOCKIUS LLP
        BY:  NATHAN J. HOCHMAN
        BY:  BRIANA ABRAMS
        The Water Garden
        1601 Cloverfield Boulevard
        Suite 2050 North
        Santa Monica, California 90404


        MORGAN LEWIS AND BOCKIUS LLP
        BY:  TINOS DIAMANTATOS
        77 West Wacker Drive
        Chicago, Illinois 60601

**UNITED STATES DISTRICT COURT**

# I N D E X


**TUESDAY, DECEMBER 13, 2016**


**Chronological Index of Witnesses**


Witnesses:_____                Page


DAHLE, David

Direct examination by Mr. Fox                    10
Cross-examination by Mr. Hochman                 35
Redirect examination by Mr. Fox                  72
Recross-examination by Mr. Hochman               75


**UNITED STATES DISTRICT COURT**

**EXHIBITS**

**TUESDAY, DECEMBER 13, 2016**

| Exhibit | For ID | In EVD |
| --- | --- | --- |

(None)

**UNITED STATES DISTRICT COURT**

**LOS ANGELES, CALIFORNIA; TUESDAY, DECEMBER 13, 2016**

**8:12 A.M.**

**---**

(The following proceedings were held in open court out of the presence of the jury:)

THE CLERK:  Calling item No. 1, CR 16-66A, USA versus Leroy D. Baca.

Counsel, state your appearances, please.

MR. FOX:  Good morning, Your Honor.

Brandon Fox and Eddie Jauregui on behalf of the United States.  Also with us at counsel table is David Dahle with the FBI.

THE COURT:  Good morning.

MR. HOCHMAN:  Good morning, Your Honor.

Nathan Hochman, Tinos Diamantatos, and Briana Abrams on behalf of Defendant Leroy Baca who is present, Your Honor.

MR. DIAMANTATOS:  Good morning, Your Honor.

THE COURT:  Good morning.

I received information yesterday that Alternate No. 3 had been involved in a bicycle mishap and had been hospitalized.  She had, I guess, suffered some facial injuries.  I inquired whether or not she could continue to serve.  It was relayed to her that the Court had no concerns

about her serving assuming that she felt physically well enough to be here.

So she is here today.  I'm just going to caution her, unless somebody has an objection, caution all the jurors, if they need a break before we take one, just raise their hand and let us know.

MR. HOCHMAN:  Your Honor, does it make any sense to ask her to come out just to inquire of her personally, or do you want to just do it as a group?  I don't obviously know if she's just trying to be a good soldier and be here or if she's in some pain and that pain is going to potentially distract her as she's listening to testimony.

THE COURT:  I think it was made clear to her that -- of course, if she physically was unable to perform, then the Court would entertain, after consulting with the parties, excusing her.  But I'm happy to do it either way.

MR. FOX:  We have no objection to an individual voir dire if you want to inquire of her in front of us to see if she's okay.  I think that's fine.  But, Your Honor, if you'd rather do that at the end of the day -- I just -- I wonder if -- then she'll be informed about how well she was able to listen.  I just hate to have the rest of the jury waiting right now.  It's already 8:15.

Again, Your Honor, the last thing I'd want is a juror potentially distracted because she's in pain.  I think we

can do it very briefly and then lay that issue to rest.  Either way, Your Honor.  I'll defer to the Court.

THE COURT:  I'm going to bring them all in.  I'll just make sure that she and anybody else who isn't feeling well, let us know.  We'll take a break.  "I understand you were involved in an accident.  I want to make sure you're physically up to this.  If you're not, let us know."

MR. HOCHMAN:  Very well, Your Honor.  Thank you.

THE COURT:  All right.  Let's bring the jury in.

MR. FOX:  Your Honor, we are going to ask you to take judicial notice before Special Agent David Dahle's testimony.  He is our first witness today.  This is related to the judicial notice of a grand jury.

THE COURT:  And I assume this is in connection with the document that was filed -- I think it's 162 on the docket.

MR. FOX:  That's correct.  And I have an extra copy if you need one.

MR. HOCHMAN:  And, Your Honor, is it Your Honor's practice for, for instance, Mr. Fox to read the request or read the information in the judicial notice and then ask the Court to take judicial notice of this fact?  That's what we would prefer, Your Honor.

THE COURT:  I think during the last -- I think I actually read this.  I'll read it, and I'm going to instruct

them they may or may not be required to accept these facts as true.

MR. HOCHMAN:  Thank you, Your Honor.

THE COURT:  Okay.  Let's bring the jury in.

(The following proceedings were held in open court in the presence of the jury:)

THE COURT:  Good morning, ladies and gentlemen. I apologize for the late start that we're getting to this morning.

I understand one of the alternates was involved in a mishap over the weekend.  I just wanted to make sure that you're physically feeling okay, and if at any time either you or any other juror feels the need for a break, please raise your hand, and we'll take one.

ALTERNATE JUROR NO. 3:  Thank you.

THE COURT:  All right.  If you'll call your first witness, please.

MR. FOX:  United States calls Special Agent David Dahle.

THE CLERK:  Raise your right hand for me.

Do you solemnly state that the testimony you may give in the cause now pending before this court shall be the truth, the whole truth, and nothing but the truth, so help you god?

THE WITNESS:  Yes.

**UNITED STATES DISTRICT COURT**

THE CLERK:  Please be seated.

State your full name and spell your last name for the record.

THE WITNESS:  David Dahle, last name spelled D-a-h-l-e.

THE CLERK:  Thank you.

MR. FOX:  And, Your Honor, before we get into Special Agent Dahle's testimony, we ask you to take judicial notice of a grand jury.

THE COURT:  All right.  "Ladies and gentlemen, in the federal criminal justice system, grand juries investigate crimes, and absent a stipulation or agreement, all felony crimes must be prosecuted by a grand jury Indictment.

A grand jury investigation is the same thing as a grand jury proceeding.  Grand juries do not have the same function as trial juries.  For example, grand juries are not required to presume defendants innocent and may return an Indictment without considering the same burden of proof as a trial jury.  Grand juries do not hear arguments from defense attorneys and do not necessarily receive the same evidence that is later introduced at trial.

Grand jury Indictments are not evidence against any defendant.  Grand juries are ordered by the district court and are summoned, selected, and impaneled pursuant to federal law.  A grand jury must consist of no less than 16, no more

**UNITED STATES DISTRICT COURT**

than 23 members.  The only people permitted inside the grand jury room are the witnesses under examination, grand jurors, the attorney for the Government, the interpreter, and a court reporter.

The attorney for the Government assists the grand jury in deciding which witnesses to hear from and which subpoenas to issue.  Counsel for witnesses or defendants are not permitted inside the grand jury room.  By law all participants other than witnesses are bound to strict secrecy regarding proceedings before the grand jury.  The term of a normal grand jury is not to exceed 18 months."

Ladies and gentlemen, you may or may not accept these noticed facts as conclusive.

MR. FOX:  May I proceed, Your Honor?

THE COURT:  Yes, please.

**DAVID DAHLE,**

**GOVERNMENT'S WITNESS, SWORN:**

**DIRECT EXAMINATION**

BY MR. FOX:

Q      Special Agent Dahle, what do you do for a living?

A      I'm a special agent with the Federal Bureau of Investigation.

Q      How long have you been with the FBI?

A      A little over seven years.

Q      Are you assigned to a particular squad?

**UNITED STATES DISTRICT COURT**

A      Yes.

Q      Which squad is that?

A      It's a Public Corruption Squad here in Los Angeles.

Q      Are you familiar with the investigation of the Los Angeles County Sheriff's Department for corruption and civil rights abuses in the jails?

A      Yes.

Q      How are you familiar with that investigation?

A      I'm familiar with it because I've been assigned to the case for the last five, almost five-and-a-half years.

Q      Do you remember when, approximately, you were assigned to the case?

A      I was assigned to the case approximately mid August of 2011.

Q      Was the investigation new at the time, or had it already existed?

A      The investigation was open sometime in mid 2010. So when I joined the case, it had been going on a little over a year.

Q      Did you do anything to get up to speed on the investigation?

A      Yes.

Q      What did you do?

A      I started looking at and reading reports written

**UNITED STATES DISTRICT COURT**

by the agents before me, and I spoke to them about things that had happened prior to me joining the case.

Q      What were the general allegations at the time you joined the investigation?

A      The allegations were that sheriff's department deputies in the jails were committing civil rights violations by using excessive force and sometimes charging the inmates that were the victims of the force in order to cover up the use of force.  Other allegations were that deputies were willing to smuggle in contraband in exchange for bribes.

Q      At the time you joined the investigation, were there other FBI agents involved in it?

A      Yes.

Q      Who were they?

A      The original case agents were Special Agent Leah Marx and Special Agent David Lam.

Q      Does Leah Marx have a different last name today?

A      Yes.

Q      What is that?

A      Tanner.

Q      Special Agent Dahle, are you familiar with grand jury subpoenas?

A      Yes.

Q      What are they?

A      The grand jury subpoena is a court order

compelling a person to either produce something or compelling them to come in front of the grand jury and provide testimony.

Q       As part of your role as case agent in this investigation, did you have a special duty as it related to the grand juries?

A       Yes.

Q       What was that?

A       I was appointed to be the custodian of records for this investigation.

Q       What does that mean?

A       It meant that, after we served the subpoena, somebody or some entity would produce something, and I helped catalogue whatever that was.  In this investigation most of it was digital files which we poured through and looked at and organized.

Q       Along with being the custodian of records for the grand jury, have you done anything else to support the grand jury investigation?

A       Yes.

Q       What have you done?

A       Not by myself, but I've participated in numerous interviews of witnesses, victims, sometimes subjects, and sometimes either brought that information to the grand jury or wrote reports about it to disseminate.

Q       Have you done anything to help determine which

incidents the grand jury will investigate?

A        Yes.

Q        What have you done?

A        I've helped participate in discussions with assistant United States attorneys and fellow agents about which -- either excessive use-of-force incidents to further investigate or which possible corruption related offenses to investigate.

Q        Were there times in which you served grand jury subpoenas on either witnesses or entities for documents?

A        Yes.

Q        And what was the purpose of serving these subpoenas?

A        To obtain information relevant to the investigation.

Q        I want to focus on the first part of my question, the subpoenas for witness testimony.

Would they always testify before the grand jury if you subpoenaed them there?

A        Not always.

Q        Okay.  And were there times when you would interview them instead?

A        Yes.  Sometimes a person who is subpoenaed would agree to interview with us outside of the grand jury with an attorney present in lieu of going in front of the grand jury.

Q        What would you do with the information you received during these interviews?

A        Document and sometimes present it to the grand jury.

Q        When would you decide to present it to the grand jury?

A        We decided what to present to the grand jury. Agents in consultation with assistant United States attorneys would make those kind of decisions.

Q        What was the purpose of subpoenaing documents in this investigation?

A        The purpose was to obtain information to sometimes corroborate things we heard about and other times to see if the deputies' accounts -- to look at their accounts to evaluate whether we believe them or not in light of all the other evidence that we had.

Q        What would you do with documents if you felt they were relevant to the grand jury investigation?

A        Present it to them.

Q        Were there times when the grand jury itself would ask for certain documents or certain testimony?

A        Sometimes.

Q        What would you do if the grand juries asked for certain documents or certain testimony?

A        Generally try to get it for them.

**UNITED STATES DISTRICT COURT**

Q        Was there any other law enforcement agency besides the FBI involved in this investigation?

A        The FBI was the organization driving the investigation.  The U.S. Marshal Service wasn't involved in our investigation, but they participated by transporting witnesses who were writ out of jails or prisons.

Q        How many abuse incidents have been part of the Federal Grand Jury investigations over the years?

A        Dozens if not hundreds.

Q        And what years did these abuse incidents that the Federal Grand Juries were looking at to take place?

A        Most of them that we looked at took place between 2009 and 2012.  However, there were some prior to 2009 that we looked at and some after 2012 that we looked at also.

Q        Did the investigation involve particular jails?

A        Yes.

Q        Which jails were those?

A        Men's Central Jail which is a sheriff-controlled custody facility not too far away from here in downtown Los Angeles and Twin Towers which is another sheriff-controlled custody facility across the street from Men's Central Jail.

Q        Were there particular areas of those jails that were the focus of the investigation?

A        Yes.

Q        Which areas were those?

UNITED STATES DISTRICT COURT

A        In Men's Central Jail we focused on floors that were called the 2000 floor and the 3000 floor.  They were floors that generally at that time housed the most violent inmates and/or inmates with other kind of issues that made them a higher level in the jail classification system.  In Twin Towers, we investigated allegations that came out from the floors that housed mental health inmates.

Q        Why was there focus on those areas?

A        Because that's where the majority of the allegations were coming from.

Q        Are there special considerations focusing on the more violent areas of Men's Central Jail?  Are there special considerations with respect to these inmates?

A        Yes.

Q        What are those?

A        In this case those inmates that we were hearing allegations from are victims.  And inmates that have histories of violence or other issues like that, we know in the future, if the case ever goes to trial, they're going to have credibility issues, and it's going to be their word against the word of a law enforcement officer.  So our problem was building a case strong enough to build cases against deputies with those concerns at a future date.

Q        What about any special considerations with inmates with mental illness problems?

A        Similar concerns.

Q        Were you able to determine in many of these investigations whether the incidents that caused the allegations of abuse, whether they were recorded in some fashion?

A        The sheriff's department had video cameras in some locations of those facilities but not -- in the majority of the jail but not in the places where deputies were alleged to have been committing most of the excessive force.

Q        Are you generally aware of the number of grand jury subpoenas that have been issued in these -- in this investigation?

A        Yes.

Q        Approximately how many have there been?

A        Approximately over 80.

Q        Are you familiar with the number of witnesses who have testified before the grand juries?

A        Generally.

Q        Approximately how many have testified?

A        Over 80.

Q        Now, I've used the plural "grand juries."  Have there been more than one grand jury used?

A        Yes.

Q        Why is that?

A        It's been a long investigation, and we have been

investigating several use-of-force investigations this case other incidents involving the sheriff's department.  So there have been several grand juries that have heard evidence.

Q       Approximately when was the first grand jury subpoena issued in this investigation?

A       Approximately July of 2011.

Q       How many documents overall have been obtained using grand jury subpoenas?

A       Somewhere between half a million and a million.

Q       Have you reviewed yourself every single document that's come in?

A       No.  But I've seen the vast majority of them.

Q       I now want to discuss overt versus covert investigations.

Are you familiar with the term "overt investigations"?

A       Yes.

Q       What is an overt investigation?

A       An overt investigation is where the subject who you're investigating may be aware that they're being investigated.

Q       What about a covert investigation?

A       It's the opposite.  It means that your subject is unaware that he's being investigated.

Q       When you joined the investigation in August of

2011, was the investigation covert, or was it overt?

A       When I joined in August, 2011, this investigation had elements of both covert and overt.  It had elements of both kinds of investigations.

Q       What were some of the overt aspects of it?

A       The subpoenas that we had served on the sheriff's department asking for use-of-force reports.  So, generally, the department knew that we were investigating civil rights violations.

Q       What about the covert aspects?

A       The covert aspect included the undercover operation involving Gilbert Michel.

Q       Who was Gilbert Michel?

A       Gilbert Michel was a -- at that time Los Angeles County Sheriff's Department deputy working in Men's Central Jail.

Q       And what was the covert investigation of Deputy Michel?

A       It was an undercover operation to see if Deputy Michel would accept a cash bribe in exchange for smuggling contraband into Men's Central Jail.

Q       How did this fit into the overall investigation of the sheriff's department?

A       It fit in because, like I said earlier, these are really tough cases to make.  Without corroborating the inmate's

allegations, you almost certainly cannot bring charges.  So a decision was made to have an undercover operation to see if a deputy was willing to smuggle something in like the agents had heard from the inmates before and to test that out because we could never go on the word of an inmate alone.

Q     Did it present any opportunities for you, the fact that he did take these bribes?

A     Yes.

Q     What opportunities were those?

A     To see if the case was larger like we had heard about, to see if there were other deputies who may be willing to smuggle things in who are -- or who had committed other excessive use-of-force incidents.

Q     What about specific to Deputy Michel himself? Did it present opportunities for the FBI with respect to Deputy Michel?

A     Yes.

Q     What was that?

A     It gave us the opportunity to confront him with the evidence that had been obtained and to see if he would admit the behavior and provide us with information on stuff he had done that we didn't know about or information on other deputies that he had either participated in with or knew about in some fashion.

Q     Around the time that you joined the

investigation, did you learn that something had happened with the cellular phone?

A       Yes.

Q       What did you learn?

A       Sometime right after I joined the investigation, we learned the cell phone had been found by the sheriff's department.

Q       At that time had the sheriff's department been told that the cellular phone belonged to the FBI?

A       I don't know exactly when I knew; so I can't answer that question.

Q       Have you ever met Anthony Brown?

A       Yes.

Q       Who is Anthony Brown?

A       Anthony Brown is and at that time was an inmate -- at that time he was an inmate in Men's Central Jail waiting to be shipped to state prison.  Currently he's in the custody of the state prison system.

Q       When was the first time that you met Mr. Brown?

A       I met Anthony Brown for the first time August 23rd, 2011.

Q       Why did you go meet with him that day?

A       Because we had heard the cell phone had been found, and then there was -- we wanted to know the circumstances of that.

**UNITED STATES DISTRICT COURT**

Q        You said "we."  Who did you go there with?

A        I went to Men's Central Jail that day with Special Agent Leah Marx and Special Agent Wayne Plympton.

Q        Did you wind up meeting with Mr. Brown that day?

A        Yes.

Q        Where?

A        We met with Anthony Brown in a room in Men's Central Jail on the first floor.

Q        Do you remember the time that you met with him?

A        Approximately 10:40 a.m.

Q        What, generally, did you talk to Mr. Brown about in this interview?

A        The circumstances of how the phone was found.

Q        What, if anything, did he tell you about the phone?

A        He said that, while he was being escorted to another part of the facility, there was a search, and they found the cell phone in a bag of chips.

Q        Did anything unusual happen during your interview of Mr. Brown?

A        Yes.

Q        What happened?

A        About an hour and ten minutes into the interview, the door was flung open.  It had been -- we had the room closed during the interview.  The door was flung open.  A very large

UNITED STATES DISTRICT COURT

male sergeant with the last name Waterman started yelling, "This interview is over.  Who gave you guys permission to interview this inmate?  He's not to be interviewed." Simultaneously several deputies rushed in, grabbed Anthony Brown, and physically escorted him out of the room and down the hall.

Q    What, if anything, did anyone from your side say as this was occurring?

A    Special Agent Marx told Anthony Brown something similar to "We'll be back for you."

Q    What happened next?

A    We exited the room, walked down to the watch commander's office.  Special Agent Plympton used a phone in the office to call someone, and then we were asked to wait for a Captain Carey who is in route.  That's what we were told.

Q    Did you wait?

A    We waited between 5 and 15 minutes.  Agent Marx and I were just outside the glass doors of the entrance of Men's Central Jail.  Special Agent Plympton was just inside of the doors.  After sometime between 5 and 15 minutes, we left. Agent Plympton never received a phone call from anybody.  Even if he had, we weren't able to provide information about our investigation to the sheriff's department because it's secret. So we just decided to leave.

Q    Did you do anything differently with respect to

**UNITED STATES DISTRICT COURT**

your investigation after Mr. Brown was pulled from the interview?

A       Yes.

Q       What did you do?

A       We decided to accelerate what we were planning to do in the future, and we approached Deputy Michel the next day on August 24th.

Q       Was this part of the plan eventually to approach Deputy Michel?

A       It was a part of the original plan to eventually approach him, but we made the determination after that meeting that we needed to do it sooner.

Q       And what was the intent?

A       The intent was to confront him with the evidence that had been gathered during the undercover operation and see if he would basically cooperate with our investigation and provide us with information on things maybe that he had done previously that we didn't know about or give us information on other deputies who were possibly committing the same types of violations.

Q       What date did this occur?

A       August 24th, 2011.

Q       On that date did he agree to cooperate?

A       At the end of that day, it was unclear whether Deputy Michel was going to actually cooperate with our

investigation.  So we left unsure.

Q       I want to ask you about a discrete issue we heard about in this trial.

There's been testimony about a polygraph that was administered on Anthony Brown.  As part of your investigation, have you obtained documents relating to a polygraph that was administered on Anthony Brown?

A       Yes.

Q       Okay.  We heard specifically about his allegations that there were drugs being brought in the jail.  Do you know which date this polygraph occurred?

A       August 24th.

Q       All right.  Now I want to ask you about, going back to your investigation, around that time, after Deputy Michel -- it was unclear whether he was going to cooperate, were there other ways during the investigation that the investigation became overt at that point?

A       Yes.

Q       What ways did it become overt?

A       Right around that time we served grand jury subpoenas on the sheriff's department asking for records and files relating to dozens of sheriff's department employees, deputies, who we had heard allegations about.  There was also a subpoena that asked for records for dozens of inmates who we had heard may have been victims of excessive use of force.

Q        Special Agent Dahle, could you go in your book and look at Exhibit 110, please.  Actually, I can pull this up if it's easier for you.  Let me do that.

This is in evidence as Government Exhibit 110. Just, generally, what is this exhibit?

A        It's a subpoena.

Q        Okay.  If you look at 110, can you just look at the overall exhibit in your book please, Special Agent Dahle?

A        I'm finished.

Q        Okay.  What is Exhibit 110?

A        It is the subpoena that was served on the sheriff's department asking for records for an excessive use-of-force incident regarding an inmate named James Parker.

Q        This is just the first subpoena; right?

A        Yes.

Q        Are there any other subpoenas in that exhibit?

A        (Witness reviewing exhibit.)

There's another subpoena that was served on the sheriff's department related to a use-of-force incident with a visitor to the jail named Gabriel Carrillo.

Q        Let's talk first about Mr. Parker, and then we're going to get into the others.

Do you know who -- whether there were any witnesses to that incident involving Mr. Parker?

MR. HOCHMAN:  Objection.  Relevance.  403.

THE COURT:  Overruled.

THE WITNESS:  Yes, there were.

Q        BY MR. FOX:  Who was the witness to that incident?

A        One of the witnesses was an ACLU jail monitor named Esther Lim.

Q        Let me show you now -- you mentioned a Mr. Carrillo.

A        Yes.

Q        He was the alleged victim in one of these subpoenas; is that correct?

A        Yes.

Q        Okay.  I'm going to now show you the seventh page of this exhibit.

What is this subpoena?

A        This was the subpoena that was served on the sheriff's department regarding the incident involving the visitor Gabriel Carrillo.

Q        We see several deputies' names.  Excluding "P," who were these deputies?

A        Those are deputies who worked in the visiting center that day during the incident.

Q        We see some redactions there where it's white.

A        Yes.

Q        What about "P"?  Who is Robert Bayes as it

UNITED STATES DISTRICT COURT

relates to Mr. Carrillo?

A    At that point Robert Bayes, who you previously heard testimony from, was a deputy who was assigned to the Jail Investigations Unit.  He would receive use-of-force packages and conduct investigation and ultimately decide whether or not to bring those packets to the D.A.'s office to see if the D.A.'s office would charge those cases.

Q    And I'm now showing you -- highlighting for you under paragraph 2.  Is this the name of the alleged victim with this incident?

A    Yes.

Q    Gabriel Carrillo?

A    Yes.

Q    I'm going to show you now Exhibit 33 which is in evidence.  This is an e-mail from somebody named Saif Kutubi, K-u-t-u-b-i, to Greg Thompson with a copy to Judy Gerhardt with the subject "Documents for grand jury subpoena."  Can you please read this e-mail.

A    "Dear, Lieutenant.  Discovery unit received a grand jury subpoena from federal court, and following documents/materials are needed to hand over to the Court ASAP. Lieutenant Judy Gerhardt requested to please arrange to find the requested materials as soon as possible and send to discovery unit for the earliest response to the federal court. Please keep this information confidential.  The requests items

**UNITED STATES DISTRICT COURT**

are as follows: All documents related to the presentation of the Carrillo case for consideration as indicated in the report of Robert Bates, No. 402121, dated February 28, 2011."

Q    As of this time when you were investigating the Carrillo incidents, had anybody involved in that incident been charged with any crimes?

A    Yes.

Q    Who?

A    Gabriel Carrillo was charged with using force against the deputies.

Q    What ultimately happened with that charge?

A    It was dropped.

Q    And who would have charged him with that offense?

A    Ultimately the D.A. relying on the evidence obtained by the sheriff's department charged Gabriel Carrillo before the charges were dropped.

MR. HOCHMAN:  Objection.  Motion to strike as nonresponsive, the second half of the answer.

THE COURT:  Overruled.  The answer will stand.

MR. FOX:  Thank you.

Q    I'm showing you now, Special Agent Dahle, the middle e-mail in Exhibit 31 from Mr. Thompson dated August 26 to Steve Leavins and William Tom Carey forwarding the e-mail. Can you please read what Mr. Thompson wrote.

A    "Steve, Tom, I sent copies of the investigator's

UNITED STATES DISTRICT COURT

package to the discovery unit on August 25th, 2011. The file number is 911-00189-5100-058. Suspect name, Carrillo. I'm not sure if it has anything to do with the current investigations, but read below. Greg."

Q    Now I'm going to go to the twelfth page of Exhibit 110. Actually, move on to the thirteenth which lists a number of people in the subpoena attachment.

Who were these people?

A    Those were inmates who in some way or another were alleged to have either witnessed or been victims of excessive use-of-force incidents.

Q    Now looking at the subpoena that is on -- the attachment which is on page 16. I'll move up a page to show 15.

What is the date of this subpoena?

A    August 24th, 2011.

Q    Is it the same with all of the subpoenas that we've just been reviewing? We'll just say the last couple of subpoenas that we've just reviewed.

A    Yes.

Q    Showing you now the attachment, we see --

MR. HOCHMAN: Which page are you on?

MR. FOX: This is page 16. Excuse me. Page 16.

Q    Could you please read the names of the deputies who you were requesting information from in this subpoena?

A        This subpoena is redacted.  There were several.  But the ones we're seeing on the screen, first one is Justin Bravo, employee No. 524035.  Under G is Gilbert Emmanuel Michel, employee No. 541591.  Next, Q, Angela Marie Caruso, unknown employee number.  At the bottom, X, all deputies with the last name of Gomez and Rodriguez who have worked at the Men's Central Jail at any time between the dates of January, 2009, to the present.

Q        Do you know why the grand jury was seeking information in "X"?

A        Yes.

Q        Why was the grand jury seeking the information in "X"?

A        Because there were several deputies with those last names that work in Men's Central Jail at the time, and when you heard allegations -- some of the allegations didn't include first names.  Deputies didn't wear nametags with their first names on them.  So at that point it was unknown for some of the incidents who those individuals actually were.

Q        We've heard about the person listed in "D" and the one in "G."

What about Angela Caruso listed in "Q"?  Who was she?

A        At that point in time, she was living with Gilbert Michel and assumed to be in some kind of relationship

with him.

Q        And why were you seeking documents relating to her?

A        She was a sheriff's department employee also. She was a deputy.  And her car -- Mr. Michel had used her car during the bribery operations.  So we were unsure what her level of involvement, if any, was with that.

Q        Now showing you page 19 of this exhibit, what is the date of this subpoena?

A        August 24th, 2011.

Q        I'm going to show you the second page.

Without reading it entirely, can you please describe for the grand jury what this subpoena sought?

A        This subpoena generally sought all use-of-force reports between January, 2009, to then present occurring in those facilities.

Q        Why was the grand jury seeking and why were you seeking on behalf of the grand jury reports from 2009 to the present?

A        At that point it looked like there were widespread abuses going on.  And to conduct a thorough pattern practice investigation, we felt it was necessary to get all the documents and compare them to each other to see if some of them looked the same, if they looked cut and pasted, to obtain corroborating information, if any, or just to see generally

what they look like.

Q    You mentioned that on August 24th that it was unclear whether Deputy Michel would agree to cooperate.  What eventually happened to him?

A    He eventually did cooperate a few weeks later. He got an attorney and agreed to cooperate.

Q    Was he indicted by the grand jury at that point?

A    No.

Q    Why not?

A    He agreed to give up his constitutional right to be indicted and agreed to plead guilty to what we call an Information and pled guilty to that.

Q    Are you familiar with whether Anthony Brown was turned over to testify before the Federal Grand Jury in September of 2011?

A    He was not turned over by the sheriff's department to testify in front of the grand jury.

Q    At some point, did Mr. Brown testify before the Federal Grand Jury?

A    He did about a year and a half later.  He was writ out of the prison system to testify.  He appeared in front of the grand jury and provided testimony.

Q    When you say "the prison system," who runs the prisons?

A    The state of California.

**UNITED STATES DISTRICT COURT**

MR. FOX:  One moment.  Nothing further, Your Honor.

THE COURT:  Cross-examination.

MR. HOCHMAN:  Yes, Your Honor.

**CROSS-EXAMINATION**

BY MR. HOCHMAN:

Q     Agent Dahle, you joined the FBI in August of 2009; is that correct?

A     Yes.

Q     So by June, 2010, that would be your first rookie year at the FBI; is that correct?

A     Yes.

Q     And your title is special agent; is that right?

A     Nothing special about it, but that's the title.

Q     That was actually my next question.

Is every agent at FBI a special agent?

A     That's what we're called.

Q     Now, you've been assigned, you said, since 2010, approximately, to the public corruptions squad?

A     Yes.

Q     And how do public corruption cases differ from civil rights cases?

A     Well, here in L.A., there's different squads investigating both.  Public corruption offenses are -- the violations themselves look at people in the public, in the

UNITED STATES DISTRICT COURT

government or local law enforcement to see if they're abusing the trust that's been put to them.  Civil rights doesn't -- it's not contained with law enforcement or politicians.  It may be other violations like human trafficking or other things.

Q       So civil rights violation investigations can involve human trafficking and potentially law enforcement officers violating someone's civil rights; is that correct?

A       Yes.

Q       But public corruption is where you have some type of public official or someone who has the public trust and they take a bribe, for instance; is that right?

A       Generally, yes.

Q       And how many public corruption cases have you participated in the last seven years?

A       It's hard to quantify because some cases I'm intimately involved.  Some cases I just help out on.

Q       So the ones you were intimately involved and help out on, are we talking 50 or more?

A       That's pretty high.  Maybe between 15 and 30.

Q       15 and 30.

And over that seven years, approximately how many witnesses have you interviewed yourself or participated in the interview with?

A       Hundreds.

Q       Hundreds.

**UNITED STATES DISTRICT COURT**

Now, you first said you started working on this investigation involving Anthony Brown in mid August of 2011; is that correct?

A       Yes.

Q       Do you have the precise date?

A       No.

Q       You said in your original testimony that you could remember the precise start time on the August 23rd interview of Anthony Brown; is that correct?

A       That's correct.

Q       And you could remember the precise end time, as you sit here over five years later, the interview of Anthony Brown on August 23rd; is that correct?

A       Well, it's in a report that I wrote.

Q       Is there a report somewhere in your file that would indicate the precise date on which you became part of this investigation?

A       No.

Q       Have you talked to -- you said you talked to other agents in connection with your preparation for understanding what the investigation concerned; correct?

A       Yes.

Q       Did you talk to the other agents before you got here today to find out the precise date that you started this investigation?

A        I don't think anybody documented when I was asked to join the investigation.

Q        Now, when you joined the investigation, Agent Leah Marx was already on the investigation; is that correct?

A        Correct.

Q        And Agent David Lam as well?

A        Correct.

Q        And you are aware that -- I believe you said that investigation started in June of 2010; is that correct?

A        Yes.

Q        And over that time, they had interviewed about 25 different inmates in the Men's Central Jail; is that right?

A        Approximately.

Q        And you've conducted inmate interviews at the Men's Central Jail as well; is that correct?

A        Yes.

Q        In fact, you testified about the one you did on August 23rd of Anthony Brown; correct?

A        Yes.

Q        And you know the processes that involved back then when you would come in to do an inmate interview; is that right?

A        What date are you talking about?

Q        This is in the August -- when you first got on

UNITED STATES DISTRICT COURT

the investigation August of 2011, you were aware of the process by which one could go through the sheriff's department to interview an inmate at the Men's Central Jail; correct?

A        It changed after the Anthony Brown incident.  I can tell you what we did the day we interviewed Anthony Brown.

Q        Let's focus on that if we could.

So the day you come in to interview Anthony Brown, you entered Men's Central Jail; is that correct?

A        Correct.

Q        And then you'd check in with a deputy who is there?

A        Yes.

Q        And you show that deputy your FBI credential; correct?

A        Yes.

Q        And your FBI credential has the FBI badge on it -- is that correct? -- or insignia?

A        It has some sort of insignia.

Q        It has your name; is that correct?

A        Correct.

Q        Now, when you went into the Men's Central Jail that day, you didn't use an alias; correct?

A        No.

Q        And you didn't say you were from some other organization other than the FBI; correct?

**UNITED STATES DISTRICT COURT**

A        Correct.

Q        And you were at that point with Agent Marx; is that correct?

A        Yes.

Q        And you observed her give her FBI badge to the sheriff deputy on that day; correct?

A        Yes.

Q        Same thing with Agent Plympton of the FBI.  He gave his FBI badge and showed it to the deputy upon entering Men's Central Jail; correct?

A        We showed our credentials.  I'm not sure we gave them our badge or showed them the badge.  They're two separate things.

Q        Let's focus on the credential.

         The credential has an FBI insignia on it; correct?

A        If I can look at it, I can tell you for sure.

Q        If you have it with you, certainly.

         THE COURT:  That's fine.

         THE WITNESS:  Yes.

Q        BY MR. HOCHMAN:  And it has your name on it; correct?

A        Yes.

Q        So after you show the deputy -- the Los Angeles sheriff deputy your credentials, then you would actually fill

out a form to indicate which inmate you wanted to speak with; is that correct?

A    With Anthony Brown, I can't remember if we actually filled out a form.

Q    Well, you'd have to identify the inmate to the deputy in order for them to bring that inmate down; correct?

A    We told them who we wanted to interview.

Q    And that day you told them it was Anthony Brown; correct?

A    Yes.

Q    And you would actually have to give them the inmate's booking number in order to find them in the system; is that correct?

A    Yes.

Q    And then after you gave your -- showed your credential, gave the inmate's name and booking number, then you were brought into the jail at that point; is that correct?

A    Yes.

Q    And you were actually put in a room that only the three of you -- and by three, I mean yourself, Agent Marx, and Agent Plympton -- were in; correct?

A    Yes.

Q    And eventually Anthony Brown is brought down to you so you could speak to him; correct?

A    Correct.

UNITED STATES DISTRICT COURT

Q        And then the door is shut behind him, and it's just the four of you in the room -- yourself, the two other FBI agents, and Anthony Brown.

Is that correct?

A        Yes.

Q        And there's no Los Angeles sheriff deputy in that room; correct?

A        There wasn't during that interview.

Q        And that's that interview that lasts -- it starts at 10:40 a.m.; correct?

A        Yes.

Q        And it lasts about an hour and ten minutes; is that correct?

A        Yes.

Q        Now, we'll get back to that interview in a second.  Let me first ask you questions about the grand jury that you testified about.

Now, you've participated in a number of grand jury investigations; is that correct?

A        Yes.

Q        About how many?

A        Ten to 15 approximately.  It's hard -- it depends on how you define it.  I would say 10 to 15.

Q        And a grand jury is made up of 16 to 23 people; is that right?

UNITED STATES DISTRICT COURT

A       Yes.

Q       And a grand jury has a foreperson; is that right?

A       Yes.

Q       And so physically the grand jury meetings take place in a room; is that correct?

A       Yes.

Q       And you have most of the grand juries seated in part of the room in chairs; is that right?

A       Yes.

Q       And then you have -- on the other hand, you've got on the other side a foreperson that's sort of on an elevated platform like his Honor is here in the courtroom; is that correct?

A       Correct.

Q       And then the other people that would be there would be the secretary of the grand jury; is that correct?

A       Yes.

Q       And then eventually there would be a prosecutor who would come in to the grand jury and ask questions or make statements to the grand jury; is that correct?

A       Correct.

Q       And then they'd bring in a witness -- there would be also a witness area for the witness to sit in; is that correct?

A       Yes.

UNITED STATES DISTRICT COURT

Q        And then there would be a court reporter; is that right?

A        Yes.

Q        Now, defense attorneys are not allowed into the grand jury; correct?

A        No.

Q        And grand juries last approximately 18 months or so, but they can be extended; is that right?

A        Generally.

Q        Now, with respect to the evidence of a grand jury, the Government can present evidence to the grand jury on the first week the grand jury meets; is that correct?

A        Anytime.

Q        Anytime.

         They meet on basically a weekly basis -- is that right? -- during the term they're in session?

A        Generally.

Q        And at the end of all the presentation of evidence, they can consider whether or not the evidence is sufficient to return an Indictment; is that correct?

A        Correct.

Q        And the standard that the grand jury uses to return an Indictment is probable cause; is that correct?

A        Correct.

Q        That's a much lower standard than the beyond a

**UNITED STATES DISTRICT COURT**

reasonable doubt standard here in court; is that correct?

A       Of course.

Q       And, again, the defense attorneys are not allowed to present their arguments to the grand jury before an Indictment is returned; is that correct?

A       Correct.

Q       So the grand jury can consider any evidence between, let's say, week one and, let's say, at the end I'll just use week 52.  If they get evidence on weeks 1, 10, 30, 40, and 52, the fact it came in week 1 or week 51 is irrelevant; is that correct?

A       Generally I think you're right.  I mean, I'm not in the grand jury when they're making their decisions, but theoretically you're right.

Q       Thank you.

Now, also, you testified that there's different types of ways to get information to a grand jury.  One you said was subpoenas; is that correct?

A       Correct.

Q       And so the grand jury issues a subpoena, and the FBI serves it; is that right?

A       Yes.

Q       And you talked about 80 or so subpoenas that were served in connection with your investigation of the L.A. Sheriff's Department; is that right?

A        Approximately.

Q        Did Sheriff Baca, to your knowledge, interfere with the service of any one of those 80 subpoenas?

A        How do you mean?

Q        Well, did he take any steps that prevented an FBI agent from physically serving the Los Angeles Sheriff's Department with a subpoena?

A        Himself, he did not interfere physically with the service of any subpoena.

Q        And so -- and then a subpoena -- let me ask you this.

When the grand jury issues a subpoena and, let's say, you're the one to go ahead and serve it, do you actually get the subpoena directly from that foreperson of the grand jury?

A        Generally, no.

Q        Do you consult with the foreperson of the grand jury or any of the grand jurors about that particular subpoena before you serve it?

A        Generally, no.

Q        Well, when you say "generally," we have certain grand jury subpoenas that you looked at which is part of Exhibit 110; is that correct?

A        Correct.

Q        Did you consult with the grand jury, any member

**UNITED STATES DISTRICT COURT**

of the grand jury, before those subpoenas that we looked at a moment ago in Exhibit 110 were served on the Los Angeles Sheriff's Department?

A       With these I don't believe so.

Q       So serving subpoenas is one role.  And as part of serving subpoenas, you said you got documents back from the Los Angeles Sheriff's Department; correct?

A       Correct.

Q       When you got documents, it wasn't just documents.  It was documents.  It was audiotapes, recordings.  It was videotapes.  It was that whole collection of evidence; is that correct?

A       It was a lot of different things.

Q       You mentioned it was 500,000 to a million different documents; correct?

A       Correct.

Q       To be clear, that included audiotapes and videotapes as well; is that right?

A       Correct.

Q       It included a lot of e-mails; is that right?

A       Yes.

Q       And with respect to the audiotapes -- let's focus on the audiotapes for a moment.

You've been here in court the entire time that all the testimony before you has been presented; is that

**UNITED STATES DISTRICT COURT**

correct?

A    Minus the few seconds or minutes that I've had to run outside, yes.

Q    And you've also seen the exhibits that have been admitted in this Court as well.

A    Correct.

Q    So let's focus on a couple of them.

The Anthony Brown records that exist when Anthony Brown is interviewed by a member of the sheriff's department, do you have those in mind?

A    Yes.

Q    I believe there were ones on August 19, 2001; August 21st, 2001; 23rd, 24th, 26th; and September 2nd, 2001.

Is that correct?

A    Yes.

Q    Each one of those recordings you got from the Los Angeles Sheriff's Department in connection with their production on a grand jury subpoena; correct?

A    Correct.

Q    Did you have -- and you didn't have any other source of that recording than getting it from the sheriff's department itself; is that correct?

A    Correct.

Q    So like the FBI didn't have its own recorder in those interviews, so you would have a different source from

getting those particular recordings; correct?

A       Correct.

Q       And then with respect to any recordings, let's say, of a voicemail message, a voicemail message that Sergeant Craig left for Leah Marx, that voicemail message you got pursuant to the sheriff's department producing it in connection with the grand jury subpoena; is that correct?

A       Correct.

Q       And you didn't have another source to get a voicemail message that was left by Sergeant Craig to Leah Marx; is that correct?

A       Correct.

Q       In fact, what happened with that particular voicemail message is that he called the wrong number; isn't that right?

MR. FOX:  Objection.  Beyond the scope.

THE COURT:  Sustained.

BY MR. HOCHMAN:  With respect then to the September 26 audiotape, did you obtain that September 26 audiotape in connection with the compliance from a Federal Grand Jury subpoena?

A       Yes.

Q       And the FBI didn't have an audiotape of the approach of the agents to Leah Marx on its own; correct?

A       No.

Q        So the only source of the audiotape that shows the approach of the Los Angeles Sheriff's Department personnel to Leah Marx at her house was actually from the Los Angeles Sheriff's Department in connection with its production on a grand jury subpoena; correct?

A        Yes.

Q        And you're aware that there was also a videotape of that particular incident that was done by the Los Angeles Sheriff's Department; is that correct?

A        Yes.

Q        Now, the FBI didn't have its own video cameras running at the time to see the Los Angeles Sheriff's Department people approach Leah Marx; is that correct?

A        That's correct.

Q        And so the only source of the videotape of the approach of Leah Marx -- excuse me -- the Los Angeles Sheriff's Department people to Leah Marx on September 26 comes from the Los Angeles Sheriff's Department in connection with their compliance on a grand jury subpoena; is that correct?

A        Correct.

Q        So the dealing with subpoenas is one of the ways that the FBI's involved with the grand jury; correct?

A        Correct.

Q        And another way that you said that the FBI is involved with the grand jury has to do with witnesses appearing

before the grand jury; is that right?

A        Yes.

Q        Because you could actually subpoena someone to testify, physically testify, in front of the grand jury; is that right?

A        Correct.

Q        But a witness does not necessarily have to physically be there to have the witness' information presented to the grand jury; is that correct?

A        Correct.

Q        Because an FBI agent, for example, like yourself can interview someone and then go in front of the grand jury yourself and tell the grand jury everything you heard from that witness; is that correct?

A        Correct.

Q        And the grand jury can then consider that information in deciding whether or not it wants to return an Indictment; correct?

A        They can consider hearsay.

Q        They can consider hearsay.

         Now I want to make sure that -- the word "hearsay," what do you mean by the word "hearsay"?

A        Testimony -- one person testifying to what was told by another person.

Q        Okay.  So secondhand statements the grand jury

can consider; is that correct?

A       Yes.

Q       And so, for instance, yourself, with the August 23rd interview of Anthony Brown, you could have gone in front of the grand jury right after that interview and told the grand jury what you heard Anthony Brown tell you on August 23rd; is that correct?

A       Yes.

Q       Did you do that on August 23rd, by the way?

A       No.  We had other things on our mind.

Q       Did you do that on August 24th, maybe the next day?

A       That was the day we approached Gilbert Michel.

Q       Okay.  Well, how about after that, the 25th then?

A       No.

Q       How about anytime in August?

A       No.

Q       Anytime in September, 2011?

A       No.

Q       Anytime before the end of 2011?

A       No.  At that time Gilbert Michel had agreed to cooperate.

Q       We'll get back to that in a moment if we could.

With respect to -- we then have subpoenas.  We then have witnesses.  And then you can also go ahead and

**UNITED STATES DISTRICT COURT**

produce other types of evidence to the grand jury like the videotapes and the audiotapes and stuff like that; is that correct?

A       Correct.

Q       And so with respect to -- with respect to some of the other types of evidence -- e-mails, for instance, you can present e-mails to the grand jury; is that correct?

A       You can.

Q       And you actually did present the e-mails that you received from the Los Angeles Sheriff's Department to the grand jury in connection with this investigation.

A       I believe so.

Q       And you can also present surveillance logs; is that correct?

A       You can.

Q       And the only source for the surveillance log of a Los Angeles Sheriff's Department surveillance operation group was the Los Angeles Sheriff's Department in connection with the production of the grand jury subpoena; is that correct?

A       They are the ones who surveilled Agent Marx.

Q       And they're the ones who produced that document in connection with the grand jury subpoena; is that correct?

A       Correct.

Q       And they would -- and the only source you had for it was the Los Angeles Sheriff's Department itself; correct?

UNITED STATES DISTRICT COURT

A        Well, they are the ones who did it; so yes.

Q        And so, for instance, the original steno notebook of Sergeant Craig, the only source of the original steno notebook of Sergeant Craig was the Los Angeles Sheriff's Department in connection with its production on a grand jury subpoena; is that correct?

A        Correct.

Q        Mr. Baca's calendar, Sheriff Baca's calendars, the only source to the FBI of Sheriff Baca's calendars was the production by the Los Angeles Sheriff's Department in connection with the Federal Grand Jury subpoena; is that correct?

A        I know we asked for it in the subpoena.  I'm not sure if it was produced -- if there was an agreement or if it was produced in response -- it was produced in response to us asking for it.

Q        And the record jackets for Anthony Brown, John Rodriguez, Kevin King, Chris Johnson, all those Los Angeles Sheriff's Department record jackets for all those various names that were produced by the Los Angeles Sheriff's Department in connection with the Federal Grand Jury subpoena; is that correct?

A        Correct.

Q        Now, after the documents were produced, you were appointed something called a custodian of records for the

documents?

A       Yes.

Q       And that was in approximately November of 2013; is that correct?

A       Yes.

Q       And did you speak in person to anyone in the grand jury to find out which documents they wanted from the Los Angeles Sheriff's Department?

A       No.

Q       Did you speak to anyone from the grand jury to find out which audiotapes they wanted from the Los Angeles Sheriff's Department?

A       No.

Q       Any videotapes?

Did you speak to anyone in the grand jury concerning videotapes that the grand jury wanted in connection with the investigation?

A       Me personally, no.

Q       Are you aware of anyone who spoke to the grand jury and asked them which documents, which videotapes, and which audiotapes they wanted?

A       I was only in there when I was called in there. I'm unaware of what was going on when I wasn't in the grand jury.

Q       Well, you said that you decided which documents

to try to get in connection with the grand jury investigation; is that correct?

A    I, in consultation with the assistant United States attorneys, yes.

Q    And in consultation with the assistant United States attorneys, did you, the United States attorneys, and the grand jury ever get together and decide what type of information the grand jury wanted?

A    I was not in a meeting like that.

Q    So it didn't happen; is that correct?

A    I don't know what happened inside the grand jury when I wasn't in there.

Q    Again, I was focusing on when you were involved.

So when you were involved, you, United States Attorney's Office, and the grand juries, did you ever get together and decide which documents the grand jury wanted?

A    There was never a meeting that we all sat down and decided what they wanted to see.

Q    Did you ever get direction from the grand jury in August and September of 2011, on what documents they wanted to see?

A    You're saying August, 2011?

Q    Yes.  August and September of 2011, did you ever get any direction from the grand jury on what documents they wanted to see?

**UNITED STATES DISTRICT COURT**

A        I don't think the grand jury started to hear evidence until March of 2012.

Q        And let me do it -- let me see if I understand the concept of a -- an FBI grand jury investigation versus an FBI non-grand jury investigation.

You said that the FBI grand jury investigation here started in July, 2011; correct?

A        Yes.

Q        So when Agent Marx is doing her original investigation back in June of 2010, that is a non-grand jury investigation at that point; is that correct?

A        I don't know if that's a correct legal statement.

Q        Well, if the grand jury investigation starts in if July of 2011, then whatever happened before that would be presumably a non-grand jury investigation; is that correct?

A        I don't know if that's accurate.  Just because a subpoena was sent out in July, 2011, I don't know if that makes whatever happened before a non-grand jury investigation.

Q        Well, is every FBI investigation a grand jury investigation?

A        All the ones I've been involved in.

Q        At some point there's a start point for it; is that correct?

A        All the ones I've been involved in have been grand jury investigations from the start.

UNITED STATES DISTRICT COURT

Q       That's because a grand jury subpoena was issued from the start of your investigations?

A       I don't think that is what denotes a grand jury investigation.

Q       What does?

A       I don't know legally what denotes it, but everything I've been involved in has been a grand jury investigation from the start.

Q       But with respect -- so are you aware, based on being an FBI agent for seven years, that the FBI conducts non-grand jury investigations?

A       I've never been a part of one.

Q       But are you aware, having -- you said you've spoken to other agents.  Are you aware that the FBI conducts non-grand jury investigations?

A       I don't know what those would be.  I've never had a conversation about conducting non-grand jury investigations.

Q       Are there certain situations where the FBI will investigate, for example, an inmate's complaint, determine it's not founded, and then end the investigation?

A       Yes.

Q       And would you consider what I just described, assuming, let's say, it happens within a day or two, talked to the inmate, the inmate recants what they said and says it's not true, would you consider that to be grand jury investigation?

UNITED STATES DISTRICT COURT

A        No.

Q        So there are some FBI investigations that are non-grand jury investigations; is that correct?

MR. FOX:  Objection.  Argumentative.

THE COURT:  Sustained.  Next question.

BY MR. HOCHMAN:  Now, you said that you came in mid August, 2011; is that correct?

A        Yes.

Q        That was after the cell phone was discovered on Anthony Brown in the Men's Central Jail; is that correct?

A        Yes.

Q        Did you have any role in selecting Anthony Brown to serve as the FBI informant?

A        No.

Q        Did you have any role in choosing the cell phone as compared to other forms of contraband like cigarettes, lighter, or outside food as the contraband that would be introduced into the Men's Central Jail with Anthony Brown?

A        No.

Q        Did you have any role in the discussions about the dangers of a cell phone before it was put into the Men's Central Jail?

A        No.

Q        Did you have any role in picking Deputy Gilbert Michel as the Los Angeles Sheriff's Department

deputy that was going to be bribed?

A       I don't think "picked" is the right term, but I didn't have anything to do with the undercover operation.

Q       Did you have any role in dealing with C.J., the FBI undercover operative?

A       No.

Q       And all those decisions were made before you entered this investigation and Agent Leah Marx; is that correct?

A       I don't think they were solely Agent Marx's decision, but they were made before I joined the case.

Q       Agent Marx participated in the decisions, to your knowledge, that we've just gone through, the various decisions that I've just asked you questions about; correct?

A       Her and other agents and supervisors and the U.S. Attorney's Office, yes.

Q       And based on -- you said you've been with Public Corruption Squad about seven years or so?

A       Yes.

Q       In your seven years with the Public Corruption Squad, have you ever inserted a cell phone into a jail as part of an undercover operation during that time?

             MR. FOX:  Objection.  Relevance.

             THE COURT:  Sustained.

             BY MR. HOCHMAN:  Now, when you -- you said you

met -- let's go back, if we could, to the August 23rd meeting where you're now speaking with Anthony Brown.

And during that meeting, did Anthony Brown have the opportunity to tell you what had happened from the time that his cell phone was discovered?

A    Yes.

Q    And did he tell you that it had been discovered by the deputies when he was being escorted to the medical wing as part of a routine search of him?

A    Yes.

Q    And that he had hidden it in a potato chips bag that was part of his stuff; is that correct?

A    Correct.

Q    Did he also tell you that he had told the Los Angeles Sheriff's Department investigators, because this is now August 23rd he's speaking to you, that he had had meetings with the Los Angeles Sheriff's Department investigators before August 23rd?

A    I believe he did.

Q    And did he tell you that he had told them that Deputy Michel was the deputy that had brought him the cell phone?

A    Yes.

Q    And did he also tell you that he told them that he was working with the FBI?

**UNITED STATES DISTRICT COURT**

A      Yes.

Q      Did he also tell you that he was involved with drugs?

A      He did.

Q      And he actually mentioned very specific drugs that Deputy Michel was going to bring him into prison; is that correct?

A      He did.

Q      In fact, he said that Deputy Michel would bring him one pound of marijuana at $50 a gram; is that correct?

A      I think that's what he told us.

Q      And he told you that Deputy Michel was going to bring him 28 grams of coke and methamphetamine at $250 a gram; is that right?

A      I think that's what he told us.

Q      He also told you Deputy Michel had brought him drugs on two separate occasions; is that correct?

A      Yes.

Q      He told you that he also faked a heart attack; is that correct?

A      Yes.

Q      And then he told you that he was actually dealing with another deputy that he had taken photographs of, drugs that other deputy had brought him; is that correct?

A      Yes.

**UNITED STATES DISTRICT COURT**

Q       And those drugs included ecstasy, something called Pokemon, and other illegal drugs; is that correct?

A       Correct.

Q       Now, based on your investigation, Anthony Brown was lying to you on August 23rd when he went ahead and told you that he had gotten drugs brought to him by Deputy Michel; is that correct?

A       Yes.

Q       And he was lying to you when he went into the descriptions of marijuana at $50 a gram; is that correct?

A       I believe so.

Q       And he was lying to you when he talked about the 28 grams of coke and meth being $250 a gram?

A       Yes.

Q       And he was lying to you when he said that Deputy Michel brought him the drugs on two separate occasions; is that correct?

A       I believe so.

Q       But you didn't know at the time that -- whether or not he was lying or telling the truth; is that correct?

A       Yes.

Q       And you also -- I think you've heard Anthony Brown on one of the tapes talk about this Deputy Bravo bringing him a cell phone.

        Do you recall hearing that?

**UNITED STATES DISTRICT COURT**

A       Yes.

Q       And the FBI never had Deputy Bravo bring Anthony Brown a cell phone; is that correct?

A       No.

Q       So that was another lie that he told about Deputy Bravo; is that correct?

A       He told a lot of lies.

Q       That was another lie that he told about Deputy Bravo; correct?

A       Correct.

Q       Now, after speaking to Anthony Brown on August 23rd for about that hour and ten minutes, you said the deputies came in and took him away; correct?

A       Yes.

Q       Now, were you and the other FBI agents arrested by the deputies at that moment in time?

A       No.

Q       You laugh.  Was there something funny about my question?

MR. FOX:  Objection, Your Honor.

THE COURT:  Sustained.

BY MR. HOCHMAN:  Were you detained at the time?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  You said that Captain Carey --

UNITED STATES DISTRICT COURT

you were told that Captain Carey wanted to speak with you and he was on his way; is that correct?

A        We were told that.

Q        And you waited, you said, 5 to 10 minutes and then left without speaking with Captain Carey?

A        Somewhere between 5 and 15 minutes we left.

Q        Now, after you left, did you or any of the other agents, Leah Marx or Agent Plympton, to your knowledge, arrange another interview with Anthony Brown between August 23rd, 2011, and September 12, 2011?

A        No.

Q        Now, you had -- you heard evidence, I believe, on an exhibit starting on August 25th, 2011, there was a policy that came down from Undersheriff Tanaka requiring that a jail liaison approve any meeting before the FBI could meet with an inmate; is that correct?

MR. FOX:  Objection.  Beyond the scope.

THE COURT:  Sustained.

BY MR. HOCHMAN:  Well, as part of the documents that you collected as the --

THE COURT:  Let's go to sidebar.

(The following proceedings were held at sidebar:)

THE COURT:  Let's try and stay within the confines of the direct testimony.

MR. HOCHMAN:  Your Honor, what I was trying to

UNITED STATES DISTRICT COURT

establish is that, even though this policy existed, that he wasn't aware of it at the time. So in other words, the sheriff's department passed a policy that they didn't let everyone know about.

THE COURT: Sir, the only thing I can do is rule on the objections.

MR. HOCHMAN: Okay.

THE COURT: So let's try to stay within the scope of what the direct testimony was.

MR. HOCHMAN: Thank you, Your Honor.

(The following proceedings were held in open court in the presence of the jury:)

BY MR. HOCHMAN: So dealing with Gilbert Michel, you said that on August 23rd you spoke with Anthony Brown at Men's Central Jail; correct?

A    Correct.

Q    And then the next day you went ahead and spoke with Gilbert Michel.

Do you recall that?

A    Yes.

Q    That's August 24th. I think it was a Wednesday if I'm not mistaken.

A    That sounds right, but I can't be sure of the date.

Q    And let me understand how that actually worked.

Q    Was it a number of you that showed up to speak -- and by "you," I mean FBI agents -- who showed up on August 24th to speak with Gilbert Michel?

A    There were a number of us.

Q    There was you.  There was Agent Marx; is that correct?

A    Correct.

Q    Agent Lam?

A    Yes.

Q    Agent Plympton?

A    Yes.

Q    What other agents?

A    Special Agent Jason Dalton.

Q    Jason Dalton.  That's five.

Any others?

A    Special Agent Ferrell Binder.

Q    I'm sorry?

A    Ferrell Binder, F-e-r-r-e-l-l B-i-n-d-e-r.

Q    So six.

And then Agent Binder is the sixth; correct?

A    Yes.

Q    And the FBI shows up originally at Gilbert Michel's house after he got off of work that day on August 24th; is that correct?

A    We had been there all day long, but we approached

UNITED STATES DISTRICT COURT

him after he got back from his shift.

Q        That was sometime in the early afternoon?

A        Yes.

Q        And I'll be clear.  Of August 24th of 2011; correct?

A        Correct.

Q        And when you originally approached him, do you know if he was armed?

A        He turned out to be armed.

Q        Did you ask him to secure his weapon in his trunk?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  Well, you ended up speaking to him, you said, on August 24th; is that correct?

A        Other agents spoke to Deputy Michel, yes.

Q        And they spoke to him at a Starbucks nearby?

A        Yes.

Q        For a couple hours.

A        Yes.

Q        And then he was brought back to his girlfriend's apartment which is where you met him originally; is that correct?

A        Correct.

Q        And the agents spoke to him for a couple more

UNITED STATES DISTRICT COURT

hours; is that correct?

A        Correct.

Q        And when the agents spoke to him, the FBI agents spoke to him, either at the Starbucks or his apartment, he confessed, did he not, to receiving bribes in connection with the cell phone?

A        I wouldn't call it a full confession.

Q        Well --

A        He admitted some conduct and wavered on his culpability.

Q        Well, let's start on the stuff he admitted.  He admitted that he had received $1,500 in two different payments from C.J.; is that correct?

A        Are you asking me about my -- I wasn't involved in the conversations with Michel.  I was observing and around.

Q        Again, I'm dealing with your observations and being around and being the case agent who has reviewed the reports as well and spoken to the agents.  That's the information database I'm referring to.

         Is that understood?

A        Yes.

Q        So on August 24th Gilbert Michel admits to receiving two bribes; is that correct?

         MR. FOX:  Objection.  Calls for hearsay.

         THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  Well, when you said before he admitted certain things and didn't admit others, what did he admit?

MR. FOX:  Objection.  Calls for hearsay.

THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  Do you believe that Deputy Michel confessed to the bribe that day?

A        I wouldn't call it a confession.  He said he was trying to run his own sort of operation which negates his mental -- his intent.  So I wouldn't call it a full confession. It was left unclear whether he was going to take full responsibility.

Q        Well, what he was not taking any responsibility for are any inmate beatings; isn't that correct?

MR. FOX:  Objection.  Calls for hearsay.

THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  Well, you were present in the second conversations in which Gilbert Michel was present that occurred back at his girlfriend's house; is that correct?

A        I wasn't present during those conversations. They were with other agents.

Q        Where were you?

A        I was -- I was different places at various times. There was a lot of hours we're talking about.  I was outside talking to supervisors, being the perimeter agent.  I was

**UNITED STATES DISTRICT COURT**

getting relayed information, but I was not the one talking to Gilbert Michel.

Q    At any point during the entire August 24th, 2011, interviews of Gilbert Michel?

A    I may have been present in locations where he was at talking to other agents and may have overheard various things, but I was not the one conducting the interviews.

MR. HOCHMAN:  May I have a moment, Your Honor?

THE COURT:  Yes.

Q    BY MR. HOCHMAN:  Well, at the end of Gilbert Michel's interview, did the FBI arrest him?

A    No.

Q    Had the FBI ever arrested him on July 20, 2011, to your knowledge?

A    No.

Q    Did the FBI ever arrest him on August 4th when the second bribe payment was given to him on that day?

A    No.

Q    At the end of the August 24th interview by the FBI of Gilbert Michel, Gilbert Michel now knows that Anthony Brown has been working with the FBI; correct?

A    I don't know what Gilbert Michel knows at the end of that day.

Q    Well, Gilbert Michel now knows that this was an FBI operation that had been involved in connection with his

receiving these payments; correct?

A    Yes.

Q    Did the FBI take any steps, to your knowledge, that prevented Gilbert Michel from going back to the Men's Central Jail where Anthony Brown was housed?

A    No.

Q    Did the FBI tell Gilbert Michel not to talk to anyone?

MR. FOX:  Objection.  Calls for hearsay.

THE COURT:  Sustained.

Q    BY MR. HOCHMAN:  Were you present at the end of the interview of Gilbert Michel?

A    I don't think so.

MR. HOCHMAN:  No further questions, Your Honor.

THE COURT:  Redirect?

**REDIRECT EXAMINATION**

BY MR. FOX:

Q    Special Agent Dahle, Mr. Hochman asked you a number of questions about documents obtained relating to the obstruction of justice investigation relating to the Los Angeles County Sheriff's Department.  Is that what was being investigated in August of 2011?

MR. HOCHMAN:  Objection.  Misstates what investigation I was referring to.

MR. FOX:  Your Honor, I'll be happy to break it

down.

THE COURT:  All right.

Q       BY MR. FOX:  Mr. Hochman asked you questions about audiotapes of Sergeant Craig.  Were you aware of these audiotapes in August and September of 2011?

A       No.

Q       When did the FBI, the U.S. Attorney's Office, and the Federal Grand Jury begin investigating allegations of obstruction of justice with respect to Anthony Brown and the cell phone?

A       It was not until approximately the middle of 2012.  We didn't have any clue what was going on.

Q       At that time were you dealing directly with the sheriff's department or with counsel hired by the County Board of Supervisors in connection with the grand jury subpoenas?

A       Outside counsel.

Q       Do you remember the name of the law firm?

A       Jones Day.

Q       So when Mr. Hochman was asking you questions about whether you received documents directly from the sheriff's department, who were you receiving documents directly from?

A       Law firm Jones Day.

Q       Mr. Hochman asked you questions about whether grand juries were meeting with you and asking for documents.

**UNITED STATES DISTRICT COURT**

Are you aware of whether the grand juries ever asked for specific documents or items?

A        Yes, they did.

Q        Okay.  Can you give us some examples?

A        They asked us for type of batons that deputies use, I think handcuffs.

Q        With respect to Mr. Carrillo, as we saw in the subpoena earlier, did they ever ask for any items related to that investigation?

Special Agent Dahle, can you remember --

A        I can't remember.

Q        Do you remember an issue relating to somebody's jacket?

A        Yes.  They did ask for a jacket, Los Angeles County Sheriff's Department deputy jacket to be produced.

Q        In gathering all of these documents and all of this information, what was the intent with -- what was your intent with respect to the grand jury?

A        To provide them with relevant --

MR. HOCHMAN:  Objection.  Relevance.  State of mind of witness.

THE COURT:  Sustained.

Q        BY MR. FOX:  You testified about the approach of Gilbert Michel.  Mr. Hochman asked you if August 24th was a

**UNITED STATES DISTRICT COURT**

Wednesday, and you said you couldn't be sure of the date.  Did you mean date or day of the week?

A       The day of the week.  I'm sure it was August 24th, 2011.  I just can't remember the day of the week that it was now without looking it up.

MR. FOX:  Your Honor, I have no further questions for this witness.

MR. HOCHMAN:  Just a few, Your Honor.

**RECROSS-EXAMINATION**

BY MR. HOCHMAN:

Q       When you say "Jones Day produced the documents," Jones Day are the lawyers for the sheriff's department; correct?

A       The department, yes.  They're lawyers for the sheriff's department.

Q       And they're not producing Jones Day documents.  They're producing Los Angeles Sheriff's Department documents, audiotapes, and videotapes; correct?

A       Correct.

Q       You said before, I believe, in your testimony that the grand jury started hearing evidence in March, 2012; is that correct?

MR. FOX:  Objection.  Beyond the scope of cross or redirect.  Excuse me, Your Honor.

THE COURT:  Sustained as to that question.

**UNITED STATES DISTRICT COURT**

Q        BY MR. HOCHMAN:  With respect to redirect,
Mr. Fox asked you certain questions on whether or not the grand
jury had asked for certain things.

Do you recall that?

A        Yes.

Q        Now, the grand jury doesn't start asking for
certain things until approximately March, 2012; is that
correct?

A        That's when the first hearing started, yes.

Q        So the grand jury didn't ask for anything in
August and September of 2011; is that correct?

A        The grand jury members, no.

MR. HOCHMAN:  No further questions.

MR. FOX:  Nothing, Your Honor.

THE COURT:  All right.  You may step down.

(Further proceedings held and reported
but not included herein.)

**UNITED STATES DISTRICT COURT**

CERTIFICATE OF OFFICIAL REPORTER

I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

DATED THIS  14TH  DAY OF DECEMBER, 2016.

/S/ MIRANDA ALGORRI

MIRANDA ALGORRI, CSR NO. 12743, CRR
FEDERAL OFFICIAL COURT REPORTER

**UNITED STATES DISTRICT COURT**