**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION**

**HONORABLE PERCY ANDERSON, U.S. DISTRICT JUDGE**

UNITED STATES OF AMERICA,         )
                                  )
            Plaintiff,            )   Case No.
                                  )
      vs.                         )   CR 16-00066(A)-PA
                                  )
LEROY D. BACA,                    )   PAGES (1 to 67)
                                  )
            Defendant.            )
_____ )

**REPORTER'S TRANSCRIPT OF**
**DEFENSE CLOSING ARGUMENTS**
**MONDAY, DECEMBER 19, 2016**
**9:52 A.M.**
**LOS ANGELES, CALIFORNIA**

**MIRANDA ALGORRI, CSR 12743, CRR**
FEDERAL OFFICIAL COURT REPORTER
312 NORTH SPRING STREET, ROOM 435
LOS ANGELES, CALIFORNIA 90012
MIRANDAALGORRI@GMAIL.COM

**UNITED STATES DISTRICT COURT**

**APPEARANCES OF COUNSEL:**

**FOR THE PLAINTIFF:**

    EILEEN M. DECKER
    United States Attorney
    BY:  BRANDON FOX
    BY:  EDDIE A. JAUREGUI
    Assistant United States Attorneys
    United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012

**FOR THE DEFENDANT:**

    MORGAN LEWIS AND BOCKIUS LLP
    BY:  NATHAN J. HOCHMAN
    BY:  BRIANNA ABRAMS
    The Water Garden
    1601 Cloverfield Boulevard
    Suite 2050 North
    Santa Monica, California 90404

    MORGAN LEWIS AND BOCKIUS LLP
    BY:  TINOS DIAMANTATOS
    77 West Wacker Drive
    Chicago, Illinois 60601

**UNITED STATES DISTRICT COURT**

**I N D E X**


**MONDAY, DECEMBER 19, 2016**


**Chronological Index of Witnesses**


Witnesses:_____    Page_____



(None)


**UNITED STATES DISTRICT COURT**

**EXHIBITS**


**MONDAY, DECEMBER 19, 2016**


|          | For | In  |
|----------|-----|-----|
| Exhibit  | ID  | EVD |


(None)

**UNITED STATES DISTRICT COURT**

**LOS ANGELES, CALIFORNIA; MONDAY, DECEMBER 19, 2016**

**9:52 A.M.**

**---**

(Prior proceedings were held and

reported but not included herein.)

(The following proceedings were held in

open court in the presence of the jury:)

THE COURT:  All right, counsel.

MR. HOCHMAN:  Thank you very much, Your Honor.

May it please the Court, counsel, ladies and gentlemen of the jury, in his testimony, former United States Attorney Andre Birotte best captured the essence of this case. He described the sheriff's department and the FBI as two younger brothers, brothers in arms, being involved in a pushing and yelling match in the sandbox.  One brother, the FBI, had gone behind the back of the other brother, the sheriff's department, and the leader of the sheriff's department, Sheriff Lee Baca, got understandably upset about it.

Sheriff Baca for six weeks, from August 18 to September 26, 2011, asked the head of the FBI, FBI Assistant Director Steve Martinez for answers to the questions of why he went behind his back to bring a very dangerous cell phone into a jail that the sheriff had day-to-day responsibility over and give it to a violent and dangerous inmate who was serving a 423-year sentence with nothing to lose.

**UNITED STATES DISTRICT COURT**

Of even more importance, Sheriff Baca wanted to know how big of problem he was facing, how many deputies were involved?  How many inmates?  How much contraband?  Was it one cell phone?  Multiple cell phones?  Were there drugs?  Who knows what else was going on that the FBI had brought into the jails.

Now, Sheriff Baca's focus was not on civil rights investigations that the FBI was conducting because that investigation was out in the open.  The sheriff's department had already received grand jury subpoenas in connection with that investigation, and U.S. Attorney Birotte had told the sheriff to stand down, to stand down on complying with those subpoenas for the time being.

So for six weeks the sheriff could get no answers to his important questions, no cooperation, and was stonewalled by the FBI and the United States Attorney's Office.  The sheriff, though, did not keep his search to himself for the answers because he shared it openly, transparently, and directly with the U.S. Attorney himself, the very person who could bring obstruction of justice charges against him, with the head of the FBI, the very agency that could investigate those obstruction of justice charges, and the general public through a TV interview.

The sheriff had to get to the bottom of the questions as quickly as possible because the safety of the

jails and everyone in it that he was responsible for depended on the answers to those questions.  When, finally, Sheriff Baca met with U.S. Attorney Birotte and Assistant Director Martinez on September 27 and received the answers to his questions for the first time in six weeks, the anger was over, the pushing and yelling was done, the brothers shook hands and left the room together with an understanding how things were going to proceed in the future.

Now, the Government calls this six-week period in the sandbox conspiracy and obstruction of justice.  It is neither.  During these six weeks, Sheriff Baca did not conspire, did not obstruct, and did not endeavor to obstruct a Federal Grand Jury investigation.  He was not the driving force or, as the Government called him in its opening statement, the heartbeat pumping blood into the body of the conspiracy because, if Sheriff Baca was the heartbeat of this conspiracy, this conspiracy was dead.

Sheriff Baca was not the heartbeat, was not the leader, was not the driving force of the conspiracy.  Undersheriff Paul Tanaka was, unbeknownst to Sheriff Baca at the time, and he is someone who is not on trial before you.

Now, before we enter into a discussion about what the evidence has shown at trial, I would like to go over a few of the rules that the Court will instruct you on how to consider the evidence.  As the Court has told you, being a

**UNITED STATES DISTRICT COURT**

juror is a very important role in our system, a very special role that Americans have fought over to promote for the last 200 years.

In systems around the world -- China, Russia -- if the Government charges you with a crime, you are guilty until you prove yourself innocent. That is what's called in that case the presumption of guilt. We have the presumption of innocence. And in America we decided to do it differently for a good reason because here you are presumed innocent at the beginning of the trial, during the trial, at the end of the trial, all the way into jury deliberations until and unless the Government proves its case beyond a reasonable doubt.

The Government, not the defense, has the burden of proof here, and that burden of proof is beyond a reasonable doubt. And you're going to hear me say that over and over and over again because it is your duty to look at the evidence and say, when you're looking at it over and over and over again, has the Government met its burden of proving beyond a reasonable doubt every element of every crime because, if the Government has not met its burden of beyond a reasonable doubt to prove every element of every crime, it is your duty to find Sheriff Baca not guilty.

Now, what is that burden, that very high level burden of beyond a reasonable doubt that the Government has to meet? Well, what you're going to hear is that in a criminal

case the system requires this highest level of proof because it is a level of proof that is only required in criminal cases. But the much lower burden of proof is something called probable cause. You heard about that burden in this case because that is the very low burden that the grand jury has to meet to indict a case.

Now, remember, the grand jury does not get to hear from defense counsel. The grand jury can hear many secondhand information passed on to it by witnesses, and the grand jury does not have defense counsel cross-examine Government witnesses. And so the burden of proof of probable cause is something vastly different than the burden of proof of beyond a reasonable doubt. The grand jury has probable cause. You, the trial jury, has beyond a reasonable doubt.

Now, since an Indictment is not evidence of anything, the grand jury has this lower burden and, to meet this lower burden, all they have to show is that someone might have committed a crime, not that it was proven beyond a reasonable doubt, but for the grand jury, it's a "might" cause. For you, the trial jury, it is beyond a reasonable doubt.

Now, in addition to this very relatively low amount of evidence needed to meet probable cause, beyond a reasonable doubt is not something where it's beyond all possible doubt. What is beyond a reasonable doubt? Well, a reasonable doubt is simply a doubt that is based on your reason

and your common sense.  So if you look at the evidence and, using your reason and your common sense, you have a doubt about whether or not the Government has proved every element of every crime, then the evidence has not convinced you beyond a reasonable doubt.  It is your duty then to find that Sheriff Baca is not guilty.

Now, why do I keep saying that the Government has the burden of proof beyond a reasonable doubt?  Because the burden that the Government has never shifts to the defense. The issue in this case is not guilt versus innocence.  Those are not the findings you need to make.  It's guilty versus not guilty.  And the significance of that is that the burden always stays with the Government all the way through jury deliberations.

Now, since the burden never shifts, never shifts to the defense at any point, a defendant always has the right not to testify.  It's a constitutional right, especially in a case where the Government has completely failed to meet its burden of proof.  Just like it is your duty not to read the newspaper or go on the Internet about this case, just like it is your duty to return a not guilty verdict if the Government does not meet its burden, so too is it your duty to honor a defendant's constitutional right not to testify, particularly in a case where the Government has completely failed to meet its burden of proof.

So we've covered the very high burden of proof beyond a reasonable doubt and Sheriff Baca's constitutional right not to testify.  But we must also cover one more important rule.  Sheriff Baca is on trial for conspiracy and obstruction of justice, and those are the only two charges that you must consider.  That sounds pretty obvious, but in this case, it's not.

What is not on trial here?  Well, the Government has presented testimony about inmate beatings, excessive force, and false reports that occurred in the Men's Central Jail. There is absolutely no excuse for what happened in the Men's Central Jail, and the individuals who beat up inmates, engaged in excessive force, and filed false reports should be punished.

Well, what do we have in this particular case as to what we know about deputies who beat up inmates and whether or not they were punished?  Well, let's start with Deputy Gilbert Michel who confessed to the Government about beating up inmates brutally.  If you remember Inmate Bragg, that was his neighbor's -- the person who prosecuted his neighbor's daughter, and you heard what he did to him.  So he confesses that crime to the Government.  And what happens? He's not charged with it.  The only thing he's charged with is bribery.  Not one of those beatings.

We also heard from Deputy David Courson who

personally witnessed a beating.  Was he charged?  He wasn't charged at all with the beating.

We also heard from Assistant Sheriff Cecil Rhambo, the No. 3 person in the department who was in charge of custody, in charge of overseeing that Men's Central Jail when those beatings were occurring.  Was he charged?  He wasn't charged.  Was any witness that you heard testify at trial charged with any of these beatings, excessive force, or false reports in connection with it?  Nobody has been charged.

So why did the Government introduce such testimony into this trial if they didn't charge Sheriff Baca with it?  To poison your mind, to poison your mind against Sheriff Baca because they figured out and they were hoping that, if you heard about these horrible things that were going on in Men's Central Jail committed by deputies on the chain of the command but at the very bottom of it, you would want to hold somebody criminally responsible for them even though those charges are not before you.  And that is very important because the mere fact that Sheriff Baca was the sheriff at the time the beatings occurred does not make him criminally responsible for what went on down below.

Similarly, the mere fact that Sheriff Baca was the sheriff during these six weeks of August through September of 2011 does not make him criminally responsible for what went on down below.  Unless the Government can meet its burden of

proof of beyond a reasonable doubt to show that he was the heartbeat, the leader, the driving force, and personally involved, personally involved with the crimes he was charged with -- conspiracy and obstruction -- the mere fact that he was at the top of the chain of command at this time does not mean that he was personally involved or committed these crimes.

Likewise, the mere fact that you may think one way or the other that the policies, programs, and procedures that Sheriff Baca instituted in the jails in response to the ACLU, Chaplain Juarez and others' complaints were either adequate or timely responsive is not an issue that is before you to decide in this trial.

But let's look at the evidence on this issue because it provides you with Sheriff Baca's mindset, his approach to inmates that differed from the get 'em in, get 'em out, us versus them, inmates are the enemy, let's just warehouse them.

Sheriff Baca's responses to the complaints was completely avoided in the Government's opening statement.  You heard about all the problems, but what you didn't hear was Sheriff Baca's responses.  So let's go through those responses.

Well, the first thing you heard -- one of the things you heard was from Commander Paul Pietrantoni.  And what did you hear about that response that the Government avoided in its opening remarks?  What you heard was that starting in 2009

Commander Pietrantoni was brought in by Sheriff Baca to Men's Central Jail where the ACLU was complaining about excessive force being used by deputies against inmates, and you heard him on the stand, Commander Pietrantoni, say that what he brought was a new way to teach deputies.

And then he taught the deputies in all the classes that were coming up in 2010 until he went on medical leave in 2011.  And what did he teach them?  How to engage in use-of-force reduction in order to control an inmate.  He told you that his technique was to go ahead, and everyone had a plan.  You grab the right arm.  You grab the left arm.  So you don't just rush into an inmate and a confusion goes on and then you have to use too much force -- they use too much force and beatings and inmate abuse occurs.  Commander Pietrantoni was teaching them how to use those wrestling techniques, leverage, how to put your arms on someone so you didn't have to resort to your flashlight, your fist, or your boot in order to control them.

The second thing you heard was Assistant Sheriff Rhambo, again, the No. 3 person in the department -- we heard a lot about Assistant Sheriff Rhambo from Mr. Fox, but he didn't tell you this one part.  Because remember what happened when Chaplain Juarez made his complaints?  Did Chaplain Juarez get shunted off to some deputy or sergeant or lieutenant or captain or commander to make those complaints to?  No.

Sheriff Baca took the meeting himself. And as important, at that meeting was Assistant Sheriff Rhambo.

And when Chaplain Juarez described for them what happened in February of 2009, what was Sheriff Baca's response? He turned to Assistant Sheriff Rhambo and said, "You're going to look into this." The No. 3 guy in the entire department is going to look into Chaplain Juarez's complaints.

Now, is that the mindset of someone who has -- wants to sweep these complaints under the rug, not address them at all, shunt them off, disregard them? No. He personally took the meeting, and he personally put his No. 3 person and that entire department in charge of responding to Chaplain Juarez.

What did we learn about Assistant Sheriff Marv Cavanaugh? His name came up quickly in the first week, but remember what happens because, before Assistant Sheriff Cecil Rhambo is the No. 3 person over custody, it was Assistant Sheriff Marv Cavanaugh. Rhambo replaced Cavanaugh in this position. And what did we hear Cavanaugh do? Remember the second ACLU attorney Mark Rosenbaum -- actually, he was the first one who testified. He was the head of the ACLU's office. He's the one that got the meeting -- not Peter Eliasberg but Mark Rosenbaum with Sheriff Baca. And who else was at that meeting? Assistant Sheriff Marv Cavanaugh.

And what happened? Mr. Rosenbaum voiced all

those complaints about what was going on in the jail. Sheriff Baca turned to Marv Cavanaugh and said, you, Mr. No. 3 person in charge of custody, you go have meetings with the ACLU, Mr. Rosenbaum and that jail monitor, and find out what's going on. And what you heard Mr. Rosenbaum talk about, Peter Eliasberg said he wasn't a partner, but Mr. Rosenbaum talked about meeting after meeting after meeting, detailed meetings with agendas and action items afterwards that the ACLU and Assistant Sheriff Marv Cavanaugh attended.

And finally, we have the director of Office of Independent Review Michael Gennaco. So what did we learn about Michael Gennaco? Well, we learned that he was one of the most experienced civil rights prosecutors for 30 years as first a prosecutor with the U.S. Department of Justice's civil rights division in Washington, D.C., and you heard he did civil rights cases all over the country.

Then he moves in the 1990s to the U.S. Attorney's Office in Los Angeles where he founds the civil rights section and is the leading lawyer in the civil rights section. And then he is contacted to see whether or not he wants to be involved with the Office of Independent Review. So if you're going to put someone to run the Office of Independent Review and you're not going to listen to them and they're going to be a rubber stamp, the last person in the world you would put is Michael Gennaco.

You heard him testify.  He's one of the more credible people you're going to hear.  He has more civil rights prosecution against the Los Angeles Sheriff's Department when he was a prosecutor than probably anybody in Los Angeles, maybe even anybody in the country.  And that -- when Sheriff Baca in 2001 creates the Office of Independent Review, who gets brought in to head it?  Was it a lackey?  No.  It was Michael Gennaco.

And by the way, why would Sheriff Baca create the Office of Independent Review if he just wants to have the police police the police?  He's already got Internal Affairs.  He's already got Internal Criminal Investigations Bureau.  Why bring in Michael Gennaco and create an independent review where Michael Gennaco is not paid by the sheriff's department?  Michael Gennaco is paid by the county.

Michael Gennaco says that the Office of Independent Review, when it was set up, was unique, was the first of its kind in the nation.  So it's not like the sheriff had all his other fellow sheriffs having their Office of Independent Review and he just wanted to join them.  He led the pack in bringing in an independent review.

Now, the Government will say, well, they're not as good as -- they don't have all the access.  They don't have all the lawyers.  But again, compared to anywhere else in the nation, this is the only sheriff's department at the time who even had an Office of Independent Review.  And remember what

Michael Gennaco said about it, what made it unique is that it had the ability to look at the investigations as they were happening, actually have realtime access to investigation reports because in most cases the only time anyone ever gets to review it is months or years later.

You also heard what Michael Gennaco said about publishing their findings. They publish their findings every three months, quarterly reports. And they would actually publish discipline. Discipline cases about the sheriff is now being published widely. You heard even Special Agent Marx read these reports. They also had annual reports. So this is who the sheriff has brought in, someone who is going to independently review it and, as the Government failed to point out, publish it for the whole public so they can see what type of discipline is being done in the sheriff's department and, as importantly -- and he said they gave criticism -- what is not going on in the sheriff's department.

Now, what you'll also hear -- and this is very important -- is a piece of evidence that the Government didn't focus on, and that's Exhibit 600. And this Exhibit 600, which is the July 19, 2011, letter that Michael Gennaco writes to the District Judge Dean Pregerson. It is probably the most important document on the issue of the sheriff's responses to the ACLU complaint in the entire case.

If you recall, this is what -- the letter that

was involved was written on July 19, 2011, to the U.S. District Judge Dean Pregerson.  And in that letter they discuss -- Mr. Gennaco discussed three different issues that he had been in meetings and negotiations with the sheriff's department and the ACLU over the prior couple of months.  Whether the sheriff's department was amenable to developing specific policies that would prohibit retaliation against inmates who complained to the ACLU -- because if you recall, that was one of the ACLU's big issues -- whether the sheriff's department inmate complaint policy could be improved, and a request by the plaintiffs to develop protocols that would permit the use of laptops by the ACLU when visiting inmates.

As you have a chance to go through this letter, when you're in the jury room, focus on it because what you'll see is that they developed a centralized anti-retaliation policy.  Basically, as you'll read in the letter, what happened is they realized the sheriff's department policy wasn't good enough, and they worked with the ACLU, and they came together on a policy that everyone agreed to that would deal with any anti-retaliation where basically deputies were retaliating against inmates for complaining, the ACLU -- Mr. Gennaco, sheriff's department came up with a brand new policy.  When? July 19, 2011, right before the August, September 2011 issues that we're dealing with.

As you'll see, as we go through these letters,

they'll talk about the revisions of the sheriff's department inmate complaint policy, and this is a very good point as well. The roadmap for inmates entering Los Angeles County jails. When an inmate used to enter the jail -- let's say the inmate wanted to make a complaint. Where does he find out how to make a complaint? Maybe ask around. Maybe he can find something on the walls that will tell him.

What Mr. Gennaco, the sheriff's department, and the ACLU did was they came up with a handbook, a handbook for inmates that they would be given when they entered the Men's Central Jail, every inmate. And in that handbook, it actually showed how you make a complaint, if you have any problems with a deputy, to the ACLU and have the anti-retaliation that, if you make that policy in it, that if you make that complaint, you will not be retaliated against. And it was signed by Mr. Gennaco and cc'd to Leroy Baca, the sheriff of L.A. County Sheriff's Department, and Peter Eliasberg, the legal director of the ACLU who was intimately involved in helping build this policy.

So whether, again, you think these policies were adequate enough, responsive enough, or timely enough to the complaints is not an issue for you to decide. Actually, it was an issue for the voters to decide because Sheriff Baca was the only elected person in the entire sheriff's department and had to stand for election every four years. So the voters could

hold him responsible for anything that went on in the department. But you, the trial jury, can only hold him criminally responsible if the Government meets its burden of proving beyond a reasonable doubt that Sheriff Baca personally committed a crime.

So how can you consider this evidence of these responses to the ACLU and Chaplain Juarez's case? Well, the evidence will show it goes to Sheriff Baca's mindset during the six weeks of August to September of 2011. And the reason I say this is you need to ask yourself a question. Was Sheriff Baca's mindset someone who addressed civil rights issues head-on and would not fear an FBI investigation into them, or was he of the mindset that he wanted to sweep everything under the rug and fear an FBI investigation? Was he someone who would avoid taking a meeting, a personal meeting, with the ACLU or Chaplain Juarez where they're making excessive force and deputy-abuse complaints? No. He had, as you heard, an open-door policy, and he personally took those meetings.

Was he someone who would assign either no one or the lowest level deputy to deal with these situations? No. He brought in the No. 3 person, the guy who is in charge of custody for the entire sheriff's department to personally address these issues.

Was he someone who would not change the training of deputies when he found out deputies were being poorly

trained and didn't know how to use those force-reduction techniques?  They didn't have the wrestling moves or the plan.  Would he just avoid it and hope it just cured itself?  No.  Sheriff Baca brought in Commander Pietrantoni to teach those deputies how to do it correctly.

Now, whether the Government thinks Sheriff Baca should have done more is not the question.  The question is, given all these responses by Sheriff Baca to the ACLU, Chaplain Juarez, and others' complaints, is Sheriff Baca someone who would fear the FBI looking into the same allegations that the ACLU had been dealing with for decades and the Office of Independent Review had been dealing with for a decade and publishing all their findings in press conferences, public reports, TV interviews, and the website?  And the answer is Sheriff Baca would absolutely not fear the FBI coming in and taking a look and joining the ACLU and joining the Office of Independent Review to take a look at what was going on in the jails.

So to meet its very high burden of proof beyond a reasonable doubt, the Government has to, as I said, prove certain elements of these crimes of conspiracy and obstruction of justice.  And as you look at each one of the elements, remember this.  If they failed to prove even one element in the crime, then you must acquit.  It is your duty to acquit.  They have to prove each and every element in order for you not to

find the sheriff not guilty.

Conspiracy, Count 1, the Government described three different elements. The two parts that we would focus on -- and we'll show you in a moment -- is the Federal Grand Jury investigation which is what has to be obstructed as said in Element No. 1, and Element No. 2, that Sheriff Baca became a member of that conspiracy, basically that he entered into the same agreement to obstruct a Federal Grand Jury investigation.

So what evidence is there beyond a reasonable doubt that Sheriff Baca entered into an agreement to do something against the law which, in this case, is obstruct a Federal Grand Jury investigation into civil rights violations -- and by that I mean the beatings, the excessive force, the cover-up, and public corruption involving bribes of deputies.

Well, in this case, the Government does not get close to meeting that burden of proof of showing that Sheriff Baca entered into such an agreement because, first, what I have already explained to you is that Sheriff Baca was very open in having other people, multiple groups, take a look at what was going on inside the jails and had no motive and no intent whatsoever to go ahead and prevent the ACLU, the Office of Independent Review, and for this case, the FBI in looking into what was going on in the jails. So if he had no problem with the FBI looking into what was going on in the jails, what

was his motivation to obstruct them?  The answer is he didn't have such a motivation at all.

Now, second, the Government failed to prove beyond a reasonable doubt that Sheriff Baca had any agenda during the six-week period to obstruct, impede, or influence an FBI investigation because the only agreement that he entered into was this agreement, to protect and keep Anthony Brown safe, and to investigate the cell phone and determine how big a problem it was in his jails because, you must remember, at this point on August 18, when he finds out about the cell phone, he only finds out about the following things from Steve Martinez, the assistant director of the FBI.  He finds out that the cell phone in the jail was an FBI cell phone that has been compromised, he finds out that a deputy is involved, and he finds out that an inmate needs to be protected and kept safe, and he gets the inmate's name of Anthony Brown.

What does he not get at that time?  FBI Director Martinez does not tell him whether or not there's a lot of deputies involved.  He doesn't tell him whether there's a lot of inmates involved.  He tells him about one cell phone but won't confirm or deny whether or not there's other cell phones in the jail, whether or not there's drugs in the jail. He won't confirm or deny any aspect of what the FBI has caused and the problems that the FBI has caused in the jails.

So, again, when you're looking at conspiracy,

you're going to need to focus on whether or not Sheriff Baca entered into an agreement to obstruct the grand jury's investigation, or the FBI's investigation on behalf of it, into these violations.

Now, with respect to obstruction of justice -- actually, before I get to obstruction of justice, let me focus on one more point of conspiracy because what you'll hear in the instructions is that it is not enough for Sheriff Baca simply to have met with others who may have been involved in the conspiracy, discuss matters of common interest, act in similar ways, or perhaps even help one another. Let me say that again. It is not enough for the Government to meet its burden of proof that Sheriff Baca simply met with others who may have been involved in the conspiracy, discussed matters of common interest, acted in similar ways, or perhaps help one another.

You will also hear that, merely by associating with one or more persons who are conspirators, Sheriff Baca does not automatically become part of the conspiracy. And you will also hear that Sheriff Baca is not a conspirator if he had no knowledge of the conspiracy but happened to act in a way which furthered the object or the purpose of the conspiracy.

What does that all mean? It means that Sheriff Baca has to personally know about what is going on to obstruct the FBI's investigation. You would have to look at his motivation. Did he want to obstruct the investigation?

And the mere fact that there are phone calls and meetings that occur but he's not part of it, part of the intent to obstruct the FBI's investigation, the Court will instruct you that that is not enough to convict Sheriff Baca of the conspiracy.

So now let's go to the obstruction of justice. You will hear that there are two elements of the obstruction of justice. The first one, that you actually have to obstruct or try to obstruct a Federal Grand Jury investigation, and the second is this notion of acting corruptly. And what the Government didn't tell you is that the intent part of it is that he has to substantially intend to obstruct the investigation. It's not enough if you find that he just a little bit intended, you know, a medium amount. It has to be a substantial intent to obstruct the investigation.

First, let's go and look at the first part of this where it says "The Federal Grand Jury investigation" because it's actually -- in this case the evidence will show that a Federal Grand Jury goes ahead and receives two types of evidence. They get documents which in this case also includes audiotapes and videotapes, and they get witness statements as well. And what does that mean about witness statements? It means that they can bring a live witness into the grand jury to testify, or as you heard, an FBI agent who has interviewed that witness can come in the grand jury and testify and tell you everything that witness has to say word-for-word. Either one

is acceptable.

So let's start first with documents, audiotapes, and videotapes. What did we hear about the evidence of Sheriff Baca impeding, influencing, or obstructing the grand jury obtaining these documents, audiotapes, and videotapes? Absolutely nothing. Absolutely nothing. Sheriff Baca did not in any way, shape, or form prevent the Federal Grand Jury from getting every document, every audiotape, and every videotape from the Los Angeles Sheriff's Department in connection with the Federal Grand Jury subpoenas.

You heard that U.S. Attorney Andre Birotte originally told him to stand down and not even produce the documents until further notice which he eventually gave. You heard that Special Agent Dahle testified that they received 500,000 to a million documents, audiotapes, and videotapes from the sheriff's department in connection with the Federal Grand Jury. You heard three different Los Angeles Sheriff's Department records people come and tell you that they fully complied and produced on those grand jury subpoenas, everything that was requested of the Los Angeles Sheriff's Department.

Now, the Government is going to be hard-pressed to say that Sheriff Baca somehow obstructed the Federal Grand Jury in getting these documents when it is these very documents that the Government is using to prove obstruction of justice against Sheriff Baca. What did I just say? What does it mean?

**UNITED STATES DISTRICT COURT**

If you think about it, that if Sheriff Baca was going to obstruct the grand jury investigation, he's the sheriff.  He could have ordered any of those records, custodians, or anybody in the chain of command to delete, destroy, modify, alter the records because, remember, the importance of some of these records is that the only source for them was the sheriff's department.

The Anthony Brown tapes, the Anthony Brown interviews that you heard in Mr. Fox's closing, where did those come from?  The FBI didn't have a tape-recorder there.  The only source of those Anthony Brown tapes was the sheriff's department, and they turned them over.  And now they can be used in an -- the irony.  They can be used in an obstruction of justice case against the sheriff in connection with compliance of a Federal Grand Jury subpoena.

What else do we know that was turned over by the sheriff's department that was unique?  Well, we have the Gilbert Michel tapes with the sheriff's department investigators, the David Courson tapes.  How about that voicemail, the Sergeant Craig voicemail to Agent Marx that's actually the wrong number?  We know she didn't record it at the FBI office because it was the wrong number.  She didn't even know that he had made that until they got the tape-recording later.

And what else did the sheriff's department

produce that was -- for which there was no other source?  The September 26 audiotape and videotape of the approach of Leah Marx by the two sheriff's investigators Craig and Long. That very evidence, if you wanted to obstruct an FBI investigation and you thought that was problematic, you get rid of that evidence.  It just doesn't exist.  And when they say where is it?  I'm sorry.  The tape -- we could not find it.  A magnet ran over it.  It's corrupt now.  They produced it.

Why did they produce it?  Because that is Sheriff Baca's mindset.  Cooperate with the FBI.  They want to take a look, take a look.  You want to see our tapes, our most private tapes?  Take a look at that.  I don't have anything to hide.  Go ahead.  If you want to -- then build your whole case on it.  Build your whole case on it.  I don't have anything to hide.  So there's no evidence whatsoever that Sheriff Baca in any way obstructed the grand jury from getting those documents.

So how about the witness statements?  Well, Agent Dahle testified that it doesn't matter if a grand jury hears evidence during its 18-month session on month 1, month 5, month 10, 15, or 18.  It can all be considered equally by the grand jury, and the timing of when you present that evidence does not matter.

He also said that the FBI agent at any point can come into the grand jury and testify about everything every witness has ever told them, and that has equal weight in the

grand jury because they can consider secondhand evidence.

So you heard -- and this is also very important. When did the grand jury start receiving evidence in this case? Special Agent Dahle told you it was March 2012. That's when they started to receive evidence in this case, well after the August and September 2011 alleged obstruction. What do we know happened by March 2012?

Well, we know that the FBI was already back at Men's Central Jail interviewing witnesses after they had had a couple-month delay in interviewing witnesses between September and the end of the year. By March 2012 the FBI is back at Men's Central Jail.

What else do we know? We know that -- remember, this is now March of 2012. What happens in January of 2012? Gilbert Michel pleads guilty. Gilbert Michel pleads guilty, and when he pleads guilty, he even does something called waiving an Indictment. That means he doesn't even need the grand jury to return a charge against him. He agrees to waive that whole process and agrees to plead guilty directly to the Court.

And to the extent that the Government makes a big deal about Anthony Brown not showing up on September 7 pursuant to the writ, here's what you need to know about that because the Government -- oh, my God. There's so much back and forth. They bring a U.S. Marshal. They have e-mails flying back.

They have e-mails with the deputies.  They make this a huge deal that Anthony Brown doesn't show up on September 7th to talk to the grand jury.

What do we know first?  Well, first we know that there is absolutely no evidence connecting Sheriff Baca to even knowing that the writ was served and that Anthony Brown didn't show up on it.  Let me say that one again.  Even though you have all this evidence flying around, there's no evidence that shows -- and I mean evidence, not just assumptions, not just guesses, not just speculations and hopes.  Evidence.  Beyond a reasonable doubt.  Remember our standard.  A lot of evidence that shows Sheriff Baca knew that the writ was served and that Anthony Brown wasn't produced on it.

But second, what else do we know about that?  Anthony Brown showing up on September 7th ultimately doesn't matter for the grand jury because the grand jury needs information.  They need the witness statement.  And what you heard is that Anthony Brown had been talking to the FBI since June 2010.  He had had at least 10 to 15 meetings with the FBI for the first year and then all the conversations he had had with the FBI concerning the Gilbert Michel situation.

So on September 7 Agent Marx could have gone to the grand jury and testified word-for-word, read her reports -- and remember, she told you, every time she meets with him, she writes a detailed report, gives it to her boss for grammatical

edits, and then puts it in the file.  She could have taken that whole package of reports, gone to the grand jury on September 7th, and started reading word-for-word everything that Anthony Brown had told her for over a year.  She did not.

Agent Dahle could have gone ahead and done the same thing on September 7th because he was in the August 23rd meeting with Anthony Brown and he said he reviewed all the reports over the prior year.  Did Agent Dahle go in the grand jury on September 7th?  He did not.

What you heard is that on September 15th Agent Marx and Anthony Brown had a meeting.  Now, again, what you're going to hear is that the Government in its opening closing describes this meeting and only gives you half of it.  They only give you half of it.  And what do I mean by that?  They tell you that, when Agent Marx met with Anthony Brown in state prison on September 15, he was very mad, and he said, "You left me.  You left me for dead there."  Then they move on.

What else happens in that conversation that Agent Marx told you about on the stand?  That he quickly calms down.  He then tells her in the remainder of the meeting everything that had gone on in the Men's Central Jail since they had last met.  Then you hear that Agent Marx said they had meeting after meeting after meeting in state prison until in December 2012 she finally brings him -- writs him down from state prison -- by the way, I didn't say December 2011.  I mean

December 2012, almost a year and a half later.

This supposedly incredibly important witness on September 7 that we're all in commotion about she doesn't writ down to testify in front of the grand jury about the Gilbert Michel episode until December 2012. And remember what happens in January 2012. Gilbert Michel pleaded guilty to the bribery. When she brought Anthony Brown down to the grand jury in December 2012 to testify about the Gilbert Michel incident, it was completely unnecessary because he had already pled guilty to the crime that Anthony Brown was talking about.

So since there's no obstruction of justice or any even attempted obstruction of justice with the documents, the audiotapes, the videotapes, or the witness statements by March 2012 when they first start hearing evidence, it is your duty to find that they didn't meet the first element, the first element of this crime of trying to obstruct or obstructing a Federal Grand Jury investigation and that, if they don't meet the first element of the crime, you must find not guilty on obstruction of justice.

But let's deal with the second element. The second element is acted corruptly. Now, with respect to, again, whether or not Sheriff Baca acted corruptly, the evidence has fallen far short to prove beyond a reasonable doubt that he did because this is a situation where you have to look at Sheriff Baca's actions in this six-week time period

because, if someone is going to act corruptly, they're going to act secretly, deceitfully.  They're going to try to hide stuff. They're going to do the opposite of what Sheriff Baca actually did.

What he actually did is he voiced his thoughts -- good or bad, he voiced his thoughts openly, transparently, and directly to the very prosecutor, the head of the office, who could bring obstruction of justice charges against him; the head of the FBI, not just some agent of the FBI, not even some supervisor of the FBI, the very head of the FBI's 800-member office in Los Angeles.  He tells him directly what he is thinking.  He also tells it to the general public when he has an interview.

And you heard that he had this interview first on August 29 with U.S. Attorney Andre Birotte and then on September 27 with Andre Birotte and Steve Martinez, the FBI director.  And, yes, the sheriff did use strong language during that time.  He was upset because, remember what happens during this time period, the August 29 meeting, he goes ahead, and he voices the same questions that I posed for you at the beginning.

His questions never change.  That's why those questions, not surprisingly, end up going to Judge Torribio in one document and show up later in his letter because he's saying the same questions over and over again.  Why did you go

behind my back?  What's going on in the jail?  How big of a problem do I have?  Because I am the sheriff.  I am responsible for those jails.

The FBI can do an investigation, but day-to-day responsibilities for every deputy in that jail, for every civilian that's working in that jail, for the basically thousands of people who are at the Men's Central Jail, that day-to-day responsibility does not fall on the FBI.  It does not fall on the U.S. Attorney's Office.  It falls on Sheriff Baca, and he needs answers.

And what you heard is, for that entire six-week period, he didn't get answers.  And was he heated in that September 27th meeting?  Again, you heard Andre Birotte describe it, and it was pretty heated.  But what you didn't hear and what the Government didn't even bring to your attention is, again, what happened at the end of the meeting.

Just like we didn't hear what happened at the end of the Anthony Brown interview with Leah Marx on September 15th in prison, we didn't hear about the end of the meeting with Andre Birotte and Steve Martinez in their closing because what we heard U.S. Attorney Birotte say is the end of the meeting we didn't have Sheriff Baca running off in a huff, but they shook hands, they came to an understanding.  The sheriff calmed down because he finally, as U.S. Attorney Birotte said, got an explanation for what had happened, and they then proceeded on

in cooperation.

Again, he describes it like brothers in a sandbox. You can use your common experience, whether you have siblings or children or whatnot, and see two brothers pushing and shoving, pushing and yelling. One brother doesn't trust the other and goes behind his back, and the other brother finds out about it and is understandably a bit upset. And he says, what's going on? Can you tell me? That brother says, no, I'm not going to tell you. Well, please. You have to tell me because in this case I'm responsible for an entire jail. No. I'm not going to tell you.

And it repeats over and over, meeting after meeting, stonewalled by everybody. Then finally the older brother -- we'll use Mr. Birotte as the older brother -- kind of gets to make peace with the younger brothers. What happens? They all shake hands and leave as brothers in arms, and that's exactly what happened in this situation.

And again, what you'll find out is that Sheriff Baca, again, was consistent not just with U.S. Attorney Birotte and the head of the FBI Martinez, but he told the public the same thing. He even told Sheriff Rhambo, Assistant Sheriff Rhambo, the same thing as well. And what you'll find out and the way to use some of the evidence in this case is to look, as we enter August and September of 2011, what was Sheriff Baca's character for obeying the law?

**UNITED STATES DISTRICT COURT**

You heard five character witnesses.  And why is their testimony important for you to consider?  Well, the testimony is important for you to consider because does he have a character, when we get into this whole FBI six-week period, of obeying the law, or does he have a character for violating the law?  Because clearly, if he has a character for obeying the law, that helps to form your understanding of Sheriff Baca's mindset going into this period.  But if he had a character for not obeying the law, you would evaluate it for that purpose as well.

So who did you hear character evidence from?  You heard it from two former district attorneys of Los Angeles County, Ira Reiner and Steve Cooley.  These are district attorneys that worked with Sheriff Baca collectively for 20 years going all the way back to the 1980s.  And what you heard these people do is they put their reputation on the line.  They testified under oath, and they each said that Sheriff Baca had a character for obeying the law, and Ira Reiner described it as an excellent character for obeying the law.

You then heard from several other witnesses -- Carl Covitz, a former member of President Reagan's cabinet and State of California Governor Pete Wilson's cabinet.  You heard from Rose Ochi, a former Los Angeles Police Commissioner, someone who worked for the United States Department of Justice dealing with civil rights violations.  And you heard each one

of them say that Sheriff Baca had an excellent or very solid character for obeying the law.

Then you heard from John March, and he testified that Sheriff Baca's reputation was for not compromising when it came to following the law. You'll recall that John March was the father of Deputy David March who was slain in the line of duty on April 29, 2002. And you'll recall how John March met Sheriff Baca because he met him that night when Sheriff Baca came to the hospital and spent time and hours with John March and his wife as they were dealing with what had just happened with the death of their son.

You heard that he kept in contact with Sheriff Baca because Sheriff Baca gave John March his cell phone number and his home phone number, and you heard that they stayed in contact, and eventually John March worked at the Sheriff's Youth Foundation that was led by Sheriff Baca.

Now, with all these character witnesses, the Government could have asked any questions about any specific acts in Sheriff Baca's 48-year career outside of this six-week time period of August to September 2011. So of that whole 48 years, they could have asked questions in any of the 48 years about any specific acts where Sheriff Baca did not obey the law. The Government asked no such questions. No such questions. No such questions about the other 2,494 weeks in Sheriff Baca's career. Just about those six weeks.

UNITED STATES DISTRICT COURT

So the evidence has shown that Sheriff Baca has a reputation for following the law and that his mindset on August 18, 2011, the start of this obstruction, was to be open, transparent, and direct with anybody who wanted to actually engage him in a conversation or go ahead and provide him information so that he can deal with the security and safety of his jails.

Now, please recall that on August 19, 2011, something happened. And the Government tries to minimize this evidence, but you cannot minimize this evidence because the person that Sheriff Baca stood next to at this press conference was Tom Perez, and Tom Perez isn't just your lowly Department of Justice prosecutor. He's not even someone from the local United States Attorney's Office. Tom Perez was the assistant Attorney General. And what that means is you are the head of the U.S. Department of Justice's civil rights division for the entire nation, and that is the individual who is coming out to Los Angeles and having a press conference about civil rights investigation.

What does it matter if it's a civil civil rights investigation or a criminal civil rights investigation? It's an investigation into the Antelope Sheriff's Department which is part of the sheriff's department and where they're alleging that they're violating the civil rights laws.

And again, if Sheriff Baca was of the mindset

that he's going to obstruct the FBI in investigating civil rights investigations in the same exact time, the last thing he's going to do is cooperate with the head of the Department of Justice's civil rights division and stand next to him in a press conference and announce that he is cooperating with that investigation. That's his mindset. You couldn't have got a better and more perfect picture of his mindset during this time period than him standing next to Tom Perez cooperating in a civil rights investigation of the sheriff's department. That visual that you can picture in your mind gives you Sheriff Baca's mindset at the time.

Now, Sheriff Baca promised that he would make sure that Anthony Brown was safe. He made that promise to Assistant Director Martinez, and he kept that promise. But he also had to know that or was focused on the fact that there are very dangerous uses of a cell phone in jail. Let's go through those.

And the reason that this is important is that Agent Marx kind of dismisses, oh, you know, a cell phone is not so bad. Yeah, you could have used it for this, and you could have used it for that. But what does Agent Marx know? Does Agent Marx have the experience and training to know what can go wrong with a cell phone in the jail? Absolutely not. You heard she's a rookie agent at this time when she gets the investigation. She has no experience at that point in

undercover investigations as the lead agent, no experience in being the lead agent with respect to an investigation of law enforcement or the jails at all.

Now contrast Agent Marx's lack of experience with Sheriff Baca's 48 years of experience dealing with the jails and seeing the potential of what can go wrong when you, the FBI, are inserting a cell phone into the jail because, as you heard, not just -- as you heard not just from one deputy but you heard from multiple deputies, particularly Deputy Bayes, Robert Bayes, that a cell phone is like a weapon in the jail. You can use a cell phone to order hits on witnesses, that you can use a cell phone to plot escapes, and you can use a cell phone to bring drugs into the jail.

And what's interesting is that Leah Marx doesn't appreciate the dangers of a cell phone, but where does Leah Marx, Agent Marx draw the line?  Interestingly enough, for her it was drugs because, if you remember, we had a back-and-forth conversation, and I asked her the question, "Well, did you introduce drugs into the Men's Central Jail as part of your investigation?"  And do you recall her response?  No.  It was almost an immediate.  "No.  I wouldn't do that."  "Why wouldn't you do that?"  "Well, drugs are very dangerous, and I wouldn't put drugs.  I'm an FBI agent.  I'm not going to put drugs in the jail.  It's very dangerous."

Well, remember all the other testimony.  It's not

that Leah Marx couldn't put drugs in the jail because she would fall under the law enforcement exception, and she could theoretically put drugs in the jail.  But that was the line in the sand she would not cross.  She would not put drugs in the jail.

Well, for Sheriff Baca, the cell phone was for Sheriff Baca what drugs were for Leah Marx.  The cell phone was for Sheriff Baca what drugs were for Leah Marx.  That, even if you could theoretically go ahead and put a cell phone in the jail, there is a line in the sand because of all the dangerous uses of the cell phone that Sheriff Baca would not cross, didn't think should be crossed.  Sheriff Baca announces this publicly when he uses the expression "You should not break the law to enforce the law."  Does that mean that you can't theoretically break the law to enforce the law if you're a law enforcement officer?  Sure.  But for Sheriff Baca, this is what it meant, that you shouldn't break the law in certain dangerous situations to enforce the law.

So when you heard that -- in the situation that, for instance, Cecil Rhambo told Sheriff Baca, well, we go ahead and we do this in narcotics investigations out on the street all the time or you heard U.S. Attorney Birotte tell Sheriff Baca, you know, Sheriff, we do this in certain undercover investigations, that wasn't the point because he never wavers from that belief, even hearing it from the

assistant sheriff and the U.S. Attorney, because for him it was a line in the sand.  And this is what he was concerned about, the weapon in the jail, ordering hits on witnesses, plotting escapes, bringing drugs and guns into the jail.  This is the FBI creating this situation.

You heard that -- Deputy Bayes say that periodically, maybe once a year, they'll get a cell phone in the jail, but this was the FBI creating this situation, and this is what Sheriff Baca was reacting to.

Now, you heard that, in general, with respect to the FBI's investigation, we don't take issue with the FBI's investigation, in general.  The FBI has plenty -- those 800 agents, they have plenty of agents with decades of experience.  What we take issue is with the FBI investigation of Gilbert Michel that Agent Marx conducted that was absolutely littered with problems.

And what do I mean by that?  Well, you heard that on July 18, 2011, Gilbert Michel finally has the call with C.J., the undercover FBI agent, to set up the July 20th meeting where -- we'll call that the first bribe transaction.  If you recall about the first bribe transaction, Agent Marx is in the airplane.  She's got dozens -- over a dozen agents that are surveilling or watching this, and Gilbert Michel takes the $700, takes the cell phone, and the bribe occurs right then and there.

UNITED STATES DISTRICT COURT

But then what you'll hear -- and the reason this was littered with problems, this investigation -- is, while this is on July 20th, on July 18th and 19th, for the first time in a year, Agent Marx took that phone call from Anthony Brown in the jail that was publicly recorded on the sheriff's line so the sheriff's department could get access to what was said. And she says, because, again, she's a rookie, she says on the phone, first, "The transaction is going to happen," on the 18th.  On the 19th she says, "The cell phone is on its way." On the 21st she takes the third call from Anthony Brown on the publicly recorded line, and the third call she says, "You're good."  You're good because the cell phone is on the way.

When I say this investigation was littered with problems, she has just connected Anthony Brown to herself because, remember, the phone number he's dialing is her desk phone at the Civil Rights Squad at the FBI office in Westwood. So by taking those phone calls, which she hadn't done for a year, she's now forever connected Anthony Brown to the FBI.

But if that wasn't bad enough, what happens is she says on the stand, well, I've got to get that phone into the jail because, otherwise, Gilbert Michel could say that the crime wasn't complete.  So on July 26 you'll see she gets the phone into the jail, and Anthony Brown, one of his first calls is to C.J.  And remember, she is viewing these records online virtually as they're happening.  She says she checks in

multiple times a day.

So on July 26 she knows the crime is complete. Gilbert Michel can be arrested at that point. He has no defenses. But here's where she makes a huge mistake. Anthony Brown calls her with the cell phone. So if she thought that somehow the sheriff's department wouldn't connect Anthony Brown's use of a public jail phone with her, now she knows that, as soon as they find that cell phone, they're going to connect it immediately to her at her FBI desk, the 310-996-4174 number, which goes directly to Leah Marx in the Civil Rights Squad of the FBI. And she knows this on July 26.

So does she terminate the operation, terminate the cell phone because it can't be used anymore and, if it's found, Anthony Brown's life could be in danger because you heard from at least two or three witnesses, if an inmate is in jail and found out to be an FBI snitch, that inmate's life is in danger from other inmates and from the deputy they snitched on. And remember what Anthony Brown's situation is at that moment in time. Anthony Brown is going to be in jail for the rest of his life. So if he's connected as an FBI snitch at this point, he's going to live with that fear and possible harm to his life for the rest of his life.

And Agent Marx, who supposedly cared so much about the safety of Anthony Brown, completely endangers him by not picking up -- terminating it right then and there, getting

the cell phone out of the jail, and now she's got enough evidence to convict Gilbert Michel.

But if that wasn't problematic enough, recall what happens the same exact day. She allows Anthony Brown's cellmate to use the cell phone, and the cellmate makes two calls on that day. Does she know anything about the cellmate? No. Does she know what he's going to use the phone for? No. Does she have any ability to listen in on what the phone call is all about? Absolutely not. She set none of those provisions in place. And you heard that the FBI had a system that could have recorded those phone calls if you enter in a pin number and other codes. She chose not to use that system. She even chose not to get an e-mail alert when the phone was going to be used.

So she goes ahead and recklessly, carelessly engages in this investigation. And then if that -- and then, to the extent she needed any more evidence, on August 4th they do the second transaction. So what happens is -- and why is this important? The reason it's important is that on August 18, when Sheriff Baca hears about this, and then 19th and 20th when he's informed about all of these FBI connections to the phone, what he knows is that the FBI has run now a dangerous, reckless, and careless investigation and put a dangerous cell phone in play to an inmate who is serving a life sentence with nothing to lose.

**UNITED STATES DISTRICT COURT**

What he also finds out or what you, the jury, has found out is that, rather than take Gilbert Michel down on August 4th, she goes ahead and interviews him on August 24th. Remember, that's the Starbucks meeting that we had much discussion about. And at that point, if she didn't have enough evidence -- she had the video surveillance on the 20th of July, the photos on August 4th. She's got all the phone calls between C.J. and Michel. She knows the phone is in the jail. August 24th what does he do? He fully confesses to the bribe. Fully confesses to the bribe to her. What does she do at that point? Does she arrest him? No. She lets him take his gun, his badge, and one more thing that's very important out of that meeting, the knowledge that Anthony Brown has set him up for the FBI.

And remember who Gilbert Michel is. Gilbert Michel is someone who savagely beats inmates. And Agent Marx has allowed a gentleman who savagely beats inmates to leave with his gun, his badge, and still a deputy, and not tell the sheriff's department that Gilbert Michel has now been informed on by Anthony Brown and you should make sure that Gilbert Michel doesn't have any access to Anthony Brown on August 24th when she lets him go.

So the Government's response to the reasonable reaction that Sheriff Baca had to this reckless FBI investigation is basically to try and group everybody under him

under the "they" principle.  You heard in the closing they used the "they" concept about a dozen times, and in opening they kept referring to Sheriff Baca and everybody else as "they" in order to show that Sheriff Baca should somehow be responsible for what the people were doing down below him for which he had no knowledge, he didn't agree, he didn't condone.

The August 23rd meeting is the perfect example, and the Government basically mischaracterizes what happens because they leave the ending off again.  Remember on that day Lieutenant Thompson has two meetings, one with Undersheriff Tanaka and one with Sheriff Baca, separate meetings.  And this is about the FBI getting to interview Anthony Brown and then having that interview terminated.

This couldn't describe to you better the different agendas because, when Lieutenant Thompson meets with Undersheriff Tanaka, you heard he gets the famous butt-chewing or ass-chewing and gets screamed every profanity under the sun. When he then meets with Sheriff Baca -- and this is the part that the Government left out of its closing -- what was Sheriff Baca's reaction?  We're not getting Sheriff Baca's reaction.  What was Sheriff Baca's reaction?  He was understanding.

And why was he understanding and Undersheriff Tanaka was livid?  The reason he was understanding is he didn't have a problem with the FBI going ahead and

interviewing someone.  That wasn't an issue for him because the ACLU was raising problems that he dealt with for decades, the OIR, the Office of Independent Review, and now the FBI was investigating.  They knew that the FBI investigation was going on because they're filing grand jury subpoenas.  So it wasn't a big deal.  He's not the "F the FBI" situation at all.  The FBI wants to look, come and look.  I'm going to be meeting and openly telling the director of the FBI much higher than anything like this my exact opinions of what's going on.

And so what you also heard is that -- is with respect to the evidence.  Now, that's an additional point I want to make.  How did we learn about the August 23rd conversation between Lieutenant Thompson, Sheriff Baca, and Undersheriff Tanaka?  Did we hear from Lieutenant Thompson?  No.  We heard from Mickey Manzo.  So Mickey Manzo told you what Lieutenant Thompson told him about what undersheriff said in a meeting.  We didn't hear from Undersheriff Tanaka.  We didn't hear from Lieutenant Thompson.

And the Government -- remember, the Government has the burden of proof, and when the Government has the burden of proof, they, not the defense, have to call witnesses before you to tell you what's going on.  Remember, they had the power to writ people out of prison.  You saw that with James Sexton.  You saw that with Gilbert Michel.  They have the power to subpoena in reluctant witnesses.  You saw that with

Mr. Faturechi.

And they could have called Undersheriff Paul Tanaka, Captain William Tom Carey, Lieutenant Greg Thompson, Lieutenant Stephen Leavins, Sergeant Scott Craig, Sergeant Maricela Long or Deputy Gerard Smith.  All of these people were the people that you saw on telephone calls, on e-mails, in videos, on audiotapes.  Where are they?  That is a huge example of reasonable doubt.  A huge example of reasonable doubt.

The Government has this very high burden of proof, and they're trying to get around it with these secondhand conversations with e-mails of people they don't call and actually let the defense cross-examine.  They bring the Mickey Manzos of the world in.

So who did you hear from?  You heard from Mickey Manzo.  What do we know about Mickey Manzo?  He speaks to the sheriff on August 19th, 20th, and he doesn't speak to the sheriff again.  They called James Sexton.  How many times did James Sexton speak to the sheriff during this time period or get an e-mail from him or send him an e-mail?  Zero.  Robert Bayes, how many times did Robert Bayes ever see Sheriff Baca?  One time when Sheriff Baca walks by him, shakes his hand and leaves.

That's the nature of the contact and the quality of the evidence that the Government is bringing in this trial.

How about Gilbert Michel? She called him. How many times did he deal with Sheriff Baca? Zero. Cecil Rhambo? What you heard about Cecil Rhambo is he had a conversation at the end of September, and Cecil Rhambo couldn't remember one way or the other if that conversation occurred before or after the meeting at which the ICIB investigators Long and Craig had with Agent Marx. He couldn't remember one way or the other.

And you heard with Cecil Rhambo that he has that expression that you shouldn't "F" with the feds. But again, Sheriff Baca -- what they didn't tell you in their closing is Sheriff Baca's reaction to that. And Sheriff Baca's reaction was I'm going to go see Andre the next day, and I'll bring it up with Andre. Thank you for telling me that. But remember, my line in the sand is you don't break the law to enforce the law, and you don't put a cell phone in the jail that's that dangerous. But thank you, Assistant Sheriff Rhambo, for your views on this as well.

And how about Michael Hannemann? What do we know about Michael Hannemann? He stands outside the office where meetings go on inside, and he doesn't hear a thing. He hears voices but is he able to tell you what those voices are saying? No. This is the quality of the Government's evidence in front of you, and this quality is a huge example of reasonable doubt.

Now, the Government backs up this lack of witnesses with e-mails, and what do we learn about the e-mails?

Well, there are 57 documents in evidence that have e-mails in them. There's over 100 e-mails in those 57 documents. How many e-mails are "to," "from," or "cc'd" to Sheriff Baca? Two. Just two. Again, this is another huge example of reasonable doubt because, if Sheriff Baca was the heartbeat, the leader, the driving force of the conspiracy, as Mr. Fox told you, there would be a huge amount of e-mail traffic involving Sheriff Baca. And what you heard is that there's two.

How about phone calls? There's no evidence of what was said during these phone calls. So the phone call analysis is very deceiving because, the way the Government does it is it puts phone calls between Mr. Tanaka and Mr. Baca and tries to line them up and makes -- and then you heard the Government say in its closing, well, you should assume that they're talking about this situation. Assume it. You can assume that they're talking about the cell phone incident and the cover-up when in reality -- I'll give you an example, for instance, of one of these conversations.

They show in Defense Exhibit 637-A on August 25th there's a 6:27 phone call from Tanaka's county-issued cell to Sheriff's Headquarters Bureau. They say, well, if it went to the Sheriff's Headquarters Bureau and Sheriff Baca is at the Sheriff's Headquarters Bureau, obviously Tanaka must be talking to Baca at 6:27 p.m. on August 25th.

But the reason that this analysis is deceiving --

because obviously you don't know what's being said -- is it turns out for this particular day on August 25th between 6:00 and 8:00 p.m., Sheriff Baca is nowhere to be seen at Sheriff's Headquarters Bureau.  Sheriff Baca is presenting credentials to Commander Margaret Ruiz in Alhambra during this time period.  So, again, without putting together the documents, you would think, wow, Mr. Tanaka is having another conversation with Mr. Baca and it must be about this because there's other conversations before and after.  But when you put these two things together, what you see is, no, that's not how it happened.

Now, the Government points to the August 18th and 19th situation on why Anthony Brown wasn't kept at Men's Central Jail to show that Sheriff Baca was involved in isolation.  And this is a classic example of the Government giving you half the story.  Let me explain it.  The way it works is on August 18 you find out that the deputies are thinking of moving Anthony Brown to state prison.  And when they're thinking about moving Anthony Brown to state prison, they're thinking, well, we'll make it state prison's problem.  In fact, they basically say that.  We'll make him the state's problem while we continue to collect certain facts.

But what the Government doesn't focus you on is this sentence, the one right in the middle of the e-mail.  "Besides, if he doesn't want to cooperate, there is nothing we

can offer him with 400-plus years hanging over his head."

Now, why is that incredibly important to understand this situation? So you have the deputies thinking we're going to send him to the state prison on August 18. You have the e-mail saying, well, he doesn't want to cooperate. There's nothing we can offer him. Well, what happens at 8:08 a.m. the morning of August 19? Anthony Brown starts to cooperate. Anthony Brown engages in that two-hour discussion with Manzo and Smith and tells them that, yeah, a deputy is involved. Remember, this is the famous cheeseburger situation. He won't give him the deputy's name unless they give him a cheeseburger or some cigarettes. That's the August 19 call.

So they get a lot more interview, they get a lot of information during those two hours, but they don't know everything because Anthony Brown has told them it's multiple deputies. Anthony Brown has told them it's drugs and a cell phone. Anthony Brown has a cell phone with pictures of heroin and cocaine in it. So you're figuring you're getting some information. Maybe if you get the guy a cheeseburger, he'll give you the deputy's name. And he doesn't tell them about the FBI at that point.

Then what happens on that afternoon is they brief Sheriff Baca, and Sheriff Baca says, "Keep him. He started to cooperate. Let's see what else he can say." And you find out that on August 21st, 23rd, 24th, 26th, and September 2nd he

tells the sheriff's investigators what's going on because, remember, Sheriff Baca is not getting this from the FBI. He's not getting it from the U.S. Attorney's Office. But he's got Anthony Brown that can help fill in the details, and that's exactly what happened.

So now ask yourself, is it reasonable for Sheriff Baca to have ordered that Anthony Brown not get on the bus to state prison as long as he's willing to talk and provide us with information? Absolutely. But if you only had half the story, as the Government gave you, you would think that Sheriff Baca wants to obstruct the FBI's investigation.

And remember, when you're looking at those phone calls, particularly with Mr. Tanaka and Sheriff Baca, this -- and I show you Defense Exhibit 744. It shows you all the stuff -- and you'll have that big blowup back in the jury room with you. It shows you all the stuff that these gentlemen had to deal with on a daily basis. This is just the inside-the-sheriff's-department situation.

You heard about all the outside-sheriff's-department situation, and it's in his calendar. He meets with elected leaders. He's in charge of the law enforcement for 40 cities, 90 unincorporated areas, 58 superior courts, and even the MTA. You know, he's involved with huge amounts of information, and Undersheriff Tanaka is also equally involved because he's the No. 2 guy for the whole

department.  These folks have a lot of things to talk about.  And the cell phone could have been one or not at all, and the problem is we don't know.  And you -- and that is why -- and that is what constitutes a huge example of reasonable doubt.

Now, with respect to the cell phone calls, remember what comes in on Leah Marx's charts that aren't the Government's charts.  So in Leah Marx's charts, the Government wants to connect all these cell phone calls, and then say, aha, Baca.  But when the defense introduced charts that Leah Marx created, what did you learn?  What you learned is that Mr. Tanaka made 60 phone calls to the various investigators that were involved here, that Baca made one.  60 versus 1.  If Sheriff Baca is the heartbeat, the driving force, the leader of this conspiracy, these numbers should be flipped.  It shouldn't be 60 versus 1 for Tanaka.  It should be 60 versus 1 for Baca.

And this, again, like the e-mails and the lack of witnesses, shows you that there is a huge amount of evidence the Government did not bring before you to prove its case beyond a reasonable doubt.

What did we learn about Robert Faturechi?  What we learned about Robert Faturechi is that on September 28, 2011, there is an interview of Sheriff Baca.  Now, what happened -- and this is the important thing with Faturechi when you consider it.  What has happened before September 28th that's in Sheriff Baca's mind when he goes ahead

and interviews with him?

First, on September 26 U.S. Attorney Birotte has told him that evening that agents -- an FBI agent has been approached by two investigators. And what is Sheriff Baca's immediate reaction? You actually heard or saw it in Mr. Fox's slide. "No. No. She's not going to be arrested." Immediately. It wasn't sort of a discussion about anything. "No. No. She's not going to be arrested." That's already in Sheriff Baca's mind when he interviews with Robert Faturechi. He knows that the approach has already happened. Then it's reaffirmed on September 27th when they have a meeting between Sheriff Baca, U.S. Attorney Birotte, and Assistant Director Martinez.

So by the time we get to September 28th, of course Sheriff Baca has known now during those three days about everything that occurred at that particular interview between Leah Marx and the two investigators. So the fact that he's telling Robert Faturechi that, yeah, an interview happened back then and, yeah, on September 28, I know about it, this is the quality of the evidence, the quality of the evidence that the Government is presenting to you to go ahead and prove beyond a reasonable doubt that this crime occurred. They're not calling anybody -- Tanaka, Carey, Leavins, Long, Craig to bring them to the stand and say, yeah, Sheriff Baca knew.

So what else did they do along those lines? They

point to this big phone call between Leah Marx's supervisor that happens the night of September 26 after the approach.  The supervisor's name is Carlos Narro, and the investigator is Maricela Long.  And what I'm going to show you is that the Government in its opening closing presents everything other than the last line, and the last line is the most important of this phone call.  This phone call is one of the best forms of evidence for the defense.

(The CD commenced playing before the jury.)

MR. HOCHMAN:  That last line.  Let's play this thing out.  So Carlos Narro calls Maricela Long and says, "She indicated to me that you guys indicated to her and" -- the "she" is Leah Marx.  "So Leah Marx indicated to me," Carlos Narro, "that you guys indicated to her there's going to be a warrant for her arrest."

Maricela Long, one of those two deputies who is in that video that you saw, said, "There's going to be."

Carlos Narro, "Well, does the sheriff know this?"

Long, "The sheriff knows this, sir."

"Ah, just so you know that the ADIC" -- assistant director in charge, that's Steve Martinez -- "and the U.S. Attorney are in the process of reaching out to him. What -- can I ask you what the charges are going to be?"

Here's what happened.  She goes ahead and says the sheriff knows about this.  Carlos Narro calls her bluff.

He calls her bluff.  He says, "Oh, well, if the sheriff knows about this," the head of the FBI, and the U.S. Attorney, "we're about to call the sheriff."

Now she realizes her bluff has been called because the sheriff never knew about this.  The sheriff was out of the loop.  So rather than say -- if the sheriff was in the loop, she would have said, great, have them call the sheriff.  He'll confirm what I just said.  But if the sheriff is out of the loop, what does she immediately have to do?  Direct this and direct that agent to the person that's in the loop, Undersheriff Tanaka.

So she's asked a question what can I ask -- "Can I ask you what the charges are going to be?"  And her answer was, because she just heard that he's going to -- that the head of the FBI and the U.S. Attorney are going to call the sheriff.  "Okay.  You're going to have to speak to the undersheriff, and that's a Mr. Paul Tanaka."  The Government left that one line out, and that's the most important line because that shows on September 26, 2011, Sheriff Baca was out of the loop of the investigators who went out to speak with Leah Marx because, if he was in the loop, it would have been good.  Go ahead and speak to the sheriff.  And remember, at the end of the conversation where she repeats, "Go speak to Undersheriff Tanaka."

This is the best evidence to show that

Sheriff Baca was not in the loop.  And so when Andre Birotte called him that night -- and by the way, look at his calendar. He's at an event with the President of the United States.  When he calls him that night and he takes the phone call and steps out and he says, "No, no, no, she's not going to be arrested," knowing that he's going to be meeting with Andre Birotte and Steve Martinez the next day, that is how Sheriff Baca was out of the loop at the time but had the information from Andre Birotte to answer Robert Faturechi's questions on September 28th.

So how do we know that Undersheriff Tanaka is really running the show?  We know that from various witnesses who testified.  So let's say, first, Michael Hannemann. Michael Hannemann was the sheriff's executive aide.  How did he say that Undersheriff Tanaka acted in Mr. Baca's presence? Very politely.  He didn't drop F-bombs.  He didn't throw MF-bombs.  He wasn't screaming and ranting.  Michael Hannemann, who saw in part the dealings between Sheriff Baca and Undersheriff Tanaka, said that Undersheriff Tanaka acted very politely.

But the best evidence of what Undersheriff Tanaka's agenda comes from is the Government's witness Robert Olmsted, the commander of the Men's Central Jail.  What he says is that Mr. Tanaka, not Sheriff Baca -- excuse me.  That Mr. Tanaka told Robert Olmsted that

**UNITED STATES DISTRICT COURT**

Mr. Tanaka, not Sheriff Baca, was in charge of promotions. That Mr. Tanaka told Mr. Olmsted that he, Mr. Tanaka, was going to be the next sheriff for 15 years; that you heard that Mr. Tanaka told Robert Olmsted that we have to keep the sheriff in the dark and we have to conspire against the sheriff by having pre-meetings where the sheriff is not present where we can discuss what the agenda should be.

So what you see is that Undersheriff Tanaka has his own separate agenda.  Robert Olmsted described it in spades.  Michael Hannemann told you how he acted in front of the sheriff.  But what you also saw is with respect to the fact -- I left out one more thing, one more thing that we know, and it doesn't actually come from Robert Olmsted.  It comes from James Sexton, and you heard it this morning in the stipulation that James Sexton said that Mr. Tanaka was in charge of the Anthony Brown investigation, not Sheriff Baca.

So what you heard is the Government trying, through e-mails, witnesses, phone calls, anywhere they can, throw some spaghetti against the wall to make it stick against Sheriff Baca.  But at the end of the day, there is no evidence directly connecting Sheriff Baca to any knowledge, authorization, agreement with complying with a federal writ, with Anthony Brown's name being changed, with Anthony Brown being moved.

And by the way, the Government tries to minimize

**UNITED STATES DISTRICT COURT**

this by saying Sheriff Baca didn't have to know the details. Well, he didn't have to know exactly which cell number he would be put in if he was part of the conspiracy, but these huge topics, huge topics that are supposedly part of this obstruction, the heart, the heartbeat of the obstruction, there is no evidence that the Government has connecting Sheriff Baca to these huge topics -- the writ, the name change, Anthony Brown being moved, the issuance of the policy with regards to FBI visits, seeking a court order for FBI files, telling deputies not to cooperate, sweeping for FBI listening devices.

In fact, look at that e-mail Exhibit 50. There's no mention of Sheriff Baca anywhere on that e-mail. And by the way, when the Government tries to call "executives" in connection with the FBI policy, call them out on that because, if you look at the only executive who was on the original policy, it was Undersheriff Tanaka. If you then see the Lieutenant Thompson e-mails, it was to take Undersheriff Tanaka's name off that e-mail. At no point does that e-mail say Sheriff Leroy Baca and Undersheriff Tanaka are going to approve FBI visits. So the Government, just like they used with "they," they want to go ahead and call executives and loop in Sheriff Baca when they have no evidence beyond a reasonable doubt to prove it.

So you have the sweeping for FBI listening

63

devices and the surveillance of FBI agents.  No Baca.

Now, how do we see in one key e-mail how Undersheriff Tanaka manipulated the situation?  This is Exhibit 31.  And what's very telling about Exhibit 31, if you see the part of the statement that I've put in yellow on the screen, the Government put Exhibit 31 in their closing and left out -- completely left out that sentence, the last sentence.  The Government focuses on the first part because this is a Tanaka/Leavins e-mail.  It says, "Thanks, Steve.  Right after, and I mean right after, I spoke with Tom this morning.  The sheriff popped in looking for an update.  This case is consuming his entire thought process."

Well, if that's all you knew about the e-mail, you would think Sheriff Baca was doing nothing.  Forget the whole department, forget outside the department, it's consuming his whole thought process.  But now you've got to look at the last sentence.  Providing him with updated tidbits helps to ease his mind.  Updated tidbits.  That's exactly what happened here is that Undersheriff Tanaka, with his own agenda who wants people loyal around him, who thinks he's going to be sheriff for 15 years or the evidence has shown he's conspiring, conspiring against Sheriff Baca behind his back, the way he's going to ease his mind is by giving him updated tidbits, and that's it.

He can give him updated tidbits on the two things

that Sheriff Baca cares about, first, making sure the inmate is safe. Inmate is safe. We got it. He's being protected. And the second part is we're getting to the bottom of the investigation to find out how big of a problem the FBI caused. What he doesn't need to share is all the stuff you have no evidence of about any active obstruction of justice that occurred in this case.

So as you consider whether the Government has met its very high burden of proof in this case and shown beyond a reasonable doubt on every element of every crime that Sheriff Baca committed these crimes, bear these questions in mind:

Did the Government prove to you beyond a reasonable doubt what those updated tidbits were and what Sheriff Baca actually knew? The answer is no.

Did the Government prove to you beyond a reasonable doubt that Sheriff Baca had any motivation to obstruct an FBI investigation into the jails? Absolutely not.

Did the Government prove to you that Sheriff Baca failed to offer responses to the ACLU and Chaplain Juarez through changing policies, changing the use-of-force training, instituting programs that brought the complaints to his attention? Absolutely not.

Did the Government prove to you that Sheriff Baca, beyond a reasonable doubt, told his subordinates

to "F the FBI" at any point in the entire six weeks?
Absolutely not.

Did the Government bring you key witnesses, e-mails, phone calls, or recordings to prove beyond a reasonable doubt that Sheriff Baca conspired, agreed or endeavored or tried to obstruct a grand jury investigation? Absolutely not.

Did the Government prove beyond a reasonable doubt that Sheriff Baca was anything other than open, transparent, and direct with the U.S. Attorney, the head of the FBI, and the general public during this entire six-week period? Absolutely not.

Did the Government prove to you that the grand jury investigation that started hearing evidence in March of 2012 was in any way obstructed or intended to be obstructed by anything going on with those subpoenas and the documents that went to the grand jury or getting access to witness information even if it was through the FBI's agents testifying about what happened in March 2012 when they started hearing evidence? Absolutely not.

Did the Government prove to you that Sheriff Baca was the heartbeat, the leader, and the driving force behind this conspiracy and obstruction of justice?  Not a chance.

So is there reasonable doubt that infects all this entire case?  Has the Government failed to meet its high

burden of beyond a reasonable doubt?  You bet they have.

Now, I'm about to conclude my remarks, and when I conclude my remarks, the Government will get an opportunity to speak to you last because they have the burden of proof.  The problem is I won't be able to come up afterwards and respond to what the Government says in its rebuttal remarks.

In order for me to do that, I actually need you, the jury, to think that, as the Government comes up here and gives us rebuttal remarks, what would Mr. Hochman say?  Because I'll be seated there, and I can't stand up.  What points and what part of the evidence would Mr. Hochman point to to respond to what the Government is saying?  What would Mr. Hochman look to, an exhibit, where the Government gives you the first half of the exhibit but doesn't give you the second half of the exhibit?

You, the jury, will have that power.  You, the jury, are the ones that we -- that this system has created to consider all the evidence, to consider the witness statements, the exhibits that will be before you in rendering a verdict. And we are confident that, after considering all the evidence in this case, the only verdict that the evidence compels you to reach is a verdict of not guilty on both counts.

THE COURT:  All right.  Thank you.

(Further proceedings were held and

reported but not included herein.)

**UNITED STATES DISTRICT COURT**

CERTIFICATE OF OFFICIAL REPORTER

I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

DATED THIS  24TH  DAY OF JANUARY, 2017S.


/S/ MIRANDA ALGORRI

MIRANDA ALGORRI, CSR NO. 12743, CRR
FEDERAL OFFICIAL COURT REPORTER

**UNITED STATES DISTRICT COURT**