**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION**

**HONORABLE PERCY ANDERSON, U.S. DISTRICT JUDGE**

UNITED STATES OF AMERICA,          )
                                   )
            Plaintiff,             )    Case No.
                                   )
       vs.                         )    CR 16-00066(A)-PA
                                   )
LEROY D. BACA,                     )    PAGES (1 to 42)
                                   )
            Defendant.             )
_____)

**REPORTER'S TRANSCRIPT OF**
**DEFENSE OPENING STATEMENT**
**WEDNESDAY, DECEMBER 7, 2016**
**9:19 A.M.**
**LOS ANGELES, CALIFORNIA**

**MIRANDA ALGORRI, CSR 12743, CRR**
FEDERAL OFFICIAL COURT REPORTER
312 NORTH SPRING STREET, ROOM 435
LOS ANGELES, CALIFORNIA 90012
MIRANDAALGORRI@GMAIL.COM

**UNITED STATES DISTRICT COURT**

2

**APPEARANCES OF COUNSEL:**


**FOR THE PLAINTIFF:**

EILEEN M. DECKER
United States Attorney
BY:  BRANDON FOX
BY:  EDDIE A. JAUREGUI
Assistant United States Attorneys
United States Courthouse
312 North Spring Street
Los Angeles, California 90012


**FOR THE DEFENDANT:**

MORGAN LEWIS AND BOCKIUS LLP
BY:  NATHAN J. HOCHMAN
BY:  BRIANNA ABRAMS
The Water Garden
1601 Cloverfield Boulevard
Suite 2050 North
Santa Monica, California 90404


MORGAN LEWIS AND BOCKIUS LLP
BY:  TINOS DIAMANTATOS
77 West Wacker Drive
Chicago, Illinois 60601


**UNITED STATES DISTRICT COURT**

**I N D E X**


**WEDNESDAY, DECEMBER 7, 2016**


**Chronological Index of Witnesses**


Witnesses:_____    Page____


(None)

**UNITED STATES DISTRICT COURT**

**<u>EXHIBITS</u>**


**WEDNESDAY, DECEMBER 7, 2016**


| Exhibit | For ID | In EVD |
|---|---|---|
| | | |


(None)


**UNITED STATES DISTRICT COURT**

**LOS ANGELES, CALIFORNIA; WEDNESDAY, DECEMBER 7, 2016**

**9:19 A.M.**

**---**

(Prior proceedings were held and reported but not included herein.)

(The following proceedings were held in open court in the presence of the jury:)

THE COURT:  All right.  Thank you.

Does the defense wish to give an opening statement at this time?

MR. HOCHMAN:  Yes, Your Honor.  It's going to take us a few minutes to set up the electronics, Your Honor.

THE COURT:  All right.

MR. HOCHMAN:  May it please the Court, counsel, ladies and gentlemen of the jury.

On August 18, 2011, at around 5:00 p.m. in the afternoon Sheriff Baca received a call on his cell phone from FBI Assistant Director Steve Martinez, the head of the Los Angeles office.  Now, it was not unusual for Assistant Director Martinez to call Sheriff Baca because, as the heads of their organizations, brothers in arms, they were partners in the fight in task force, task forces against narcotic traffickers, terrorists, arms, and gangs.  But this particular phone call, however, was unusual.  It was

**UNITED STATES DISTRICT COURT**

unprecedented.

On this call, Assistant Director Martinez told Sheriff Baca something that he had never told him even once in the entire time they worked together or at any time in sheriff's department history.  Steve Martinez in this phone call told Sheriff Baca that the FBI had smuggled a cell phone into the sheriff's jails as part of an undercover operation, had done so without letting anyone in the sheriff's department or the sheriff know, and now had an inmate that might be in danger and was in need of protection.

Sheriff Baca couldn't believe it.  He couldn't believe it so much so that you will hear Assistant Director Martinez say Martinez had to repeat it several times because, what he couldn't believe and understand is that the FBI itself had smuggled a cell phone into the jail.

This unprecedented act of the FBI involved what you will hear to be an extremely dangerous form of contraband. Now, contraband is something like a cell phone that is strictly prohibited and illegal in a secured jail since a cell phone can be used like a weapon in a jail, because it can be used to plan crimes, arrange to actually kill witnesses, plan escapes, and smuggle drugs into the jail.  The cell phone was given to a violent and dangerous inmate, Anthony Brown, who is working with the FBI and had just received a life sentence of 423 years.

Now, listening to this on Sheriff Baca's cell phone, the evidence will show that Sheriff Baca needed to know how big of problem he had in his jails, how many deputies or inmates were involved, how compromised was the safety in the jail that he was personally responsible for.  You will hear that Assistant Director Martinez would give him no details.  No details.

For the next six weeks, the evidence will show that the FBI stonewalled Sheriff Baca in giving him the information to get to the bottom of what happened with the smuggled cell phone.  Now, Sheriff Baca, you will hear, set a very clear agenda of what he wanted done, protect Anthony Brown and investigate the smuggled cell phone.  You will hear that others went beyond that agenda, and that was wrong.  But the evidence will also show that Sheriff Baca did not know, authorize, agree to, or condone any of those wrongful actions.

The Government talks about "they" over 50 times in their opening, but "they" did not include Sheriff Baca agreeing, condoning, authorizing, or knowing about those wrongful actions.

Now, Sheriff Baca, you will hear, as the evidence in this case will show, had no problem at all with the FBI, the ACLU, or anyone else looking into his jails.  No problem.  He treated them all as partners if their intent was to make the jails better and safer.

Now, this case is not about civil rights violations, deputy beatings, or inmate abuse. It is not. Because while these are all very serious issues, none of them, none of them have been charged in this case. Instead, this case is about whether Sheriff Baca, in the six weeks following that August 18 phone call in 2011, agreed to and obstructed the FBI's investigation into civil rights violations which the evidence will show he did not.

My name is Nathan Hochman, and along with Tinos Diamantatos and Briana Abrams, we have the privilege and responsibility of representing Sheriff Leroy Baca.

You will hear how these six weeks in August and September of 2011 fit within the career of Sheriff Baca. Sheriff Baca is 74 years old. He grew up in East Los Angeles and first served his country in the Marine Corps Reserves as a young man. He then spent the next 48 years of his life, almost five decades, serving the people of Los Angeles County in the Los Angeles County Sheriff's Department including being the elected sheriff, the head of the department, being re-elected three different times, and serving a total of over 15 years as a sheriff of the Los Angeles County Sheriff's Department until he retired in 2014.

You will hear that the focus of the evidence during these six weeks in August and September of 2011 is on one of the seven jails, Men's Central Jail. And the sheriff

was in charge, not just of this one jail, but you will hear that his responsibilities stretch far, far greater than this just one jail.

As a Los Angeles County sheriff, his territory covered over 4,000 square miles from Long Beach to Lancaster, from Pacific Palisades to Pomona, the largest county in the United States with 10 million people in the county, an amount that's more than the population of 40 states in the United States.

He was in charge of the largest jail system in the entire country, a jail system that had a $2.4 billion budget that many -- which is actually greater than many states' entire budgets. He is in charge of 18,000 inmates in seven different custody facilities. The jail has run the largest mental health facility in the entire country. They actually ran the largest homeless facility in the entire county. And the sheriff's department employed 18,000 people -- 9,000 sworn deputies, 9,000 civilians -- in 23 different patrol stations.

Now, you will hear, in addition to all that, the sheriff's department was the law enforcement provider. What that basically means is that certain cities, 40 different cities, didn't have their own police, and they would contract with the sheriff's department to be their police. So the sheriff was in charge of policing 40 different cities, 90 different unincorporated areas, and other service areas

including nine community colleges, 58 superior courts, and the Metropolitan Transit Authority and the Rapid Rail Transit District that dealt with hundreds of thousands of people every day. So all this responsibility was on the sheriff's plate every day, but especially including during those six weeks that will be focused about in the summer of 2011.

Now, you will hear that the -- evidence that the sheriff not only dealt with the incredibly busy activities of the sheriff's department, but he also met throughout the county, throughout those 4,000 square miles, with community organizations, elected leaders, individuals, religious groups, nonprofits. He would even testify in front of the L.A. County Board of Supervisors, and he would even go to Congress to bring more funding back to Los Angeles County for law enforcement if that wasn't enough.

Sheriff Baca, who regularly worked 12- to 14-hour days, six to seven days a week, was a California Region 1 Director of Homeland Security, and that covered Los Angeles and Orange County, and was in charge of 13 million people, and worked with not only the FBI but it also partnered with federal, state, and local agencies.

So for over 48 years, Sheriff Baca worked at the sheriff's department. Those 48 years represent approximately 2,500 weeks. Of those 2,500 weeks, which you will hear about, is that we're just going to focus on six of them between August

and September of 2011.  So 48 years or 2,500 weeks becomes six weeks.  And then how much of the evidence in those six weeks will actually involve Sheriff Baca?  As you will hear, it will be less than three hours of that evidence.  So 48 years will go down to six weeks, will go down to three hours.

Now, how do we get to that August 18, 2011, phone call?  Well, the evidence is going to take you back over a decade when Sheriff Baca came in as sheriff.  You will hear that there was an old school way of dealing with inmates -- warehouse them, get them in, get them out.  Don't give them any skills while they're there because that's not part of our job, and if they come back, they come back.

Well, what you will hear is that, when Sheriff Baca came in, he had a different approach to inmates. From the beginning, he, himself, drafted a statement of core values that was given to every member of the sheriff's department, and that emphasized respecting inmates rather than treating them as the enemy.

The core values stated, "As a leader in the Los Angeles Sheriff's Department, I commit myself to honorably perform my duties with respect for the dignity of all people, integrity to do right and fight wrongs, wisdom to apply common sense and fairness in all I do, and courage to stand against racism, sexism, anti-Semitism, homophobia, and bigotry in all its forms."

**UNITED STATES DISTRICT COURT**

The sheriff also adopted a new mission statement when he came in, and that mission statement highlighted defending the rights of all including the incarcerated.  It stated, "Lead the fight to prevent crime and injustice. Enforce the law fairly and defend the rights of all including the incarcerated.  Partner with the people we serve to secure and promote safety in our communities."

Now, the evidence in this case will show that the core values and mission statements were taught in the sheriff academy to up-and-coming sheriffs.  They were posted in all those 23 patrol stations.  They were posted in the jails.  They were posted online.  They were constantly emphasized by the sheriff when he was talking to the 18,000 members of the sheriff's department and when he gave hundreds of speeches to the public.  The sheriff created policies, procedures, and programs to implement the core values and mission statements throughout the jails.

Now, as part of the defending the rights of all including the incarcerated, the sheriff sought out partners. And you will hear that one of those partners, starting all the way back when he took office in 1998, was the ACLU.  And you will also hear, when the ACLU representatives testify, that the ACLU has been working with the sheriff's department for over 20 years at the time in 1998 when the sheriff came in.  At this point it's over 30 years.

You will hear that the ACLU serves a vital and important role in the jail, a role that Sheriff Baca welcomed. You will hear that what the ACLU had that basically nobody else had was this thing called a monitor, a jailhouse monitor. And what is a monitor? The evidence will show that what a monitor is is an actual person who gets to go inside the jails, gets to talk to any inmate that they want to, gets to go into housing, the actual cell area, not the visiting area but go inside the jail, that they actually have access to the Court and they can report their court findings directly to the federal judge and that they actually issue annual reports to the public, a very unique role that the ACLU was partnering with the sheriff to monitor what was going on in the jails.

But the sheriff did not just rely on the ACLU to monitor the jails and tell him about the interactions between deputies and inmates. He also had at the sheriff's department two different bureaus. The first one is called the Internal Affairs Bureau. The second one is called the Internal Criminal Investigations Bureau. That's the IAB and the ICIB.

And what you'll hear is that the deputies who were employed in these bureaus had a full time job to do one thing, and that was investigate allegations of any deputy doing something wrong. That was these people's full time job.

So the evidence will show that the sheriff was not afraid of having anyone look at those jails. In fact, what

you will hear is that, in addition to the ACLU, in addition to the IAB, the Internal Affairs Bureau, the Internal Criminal Investigations Bureau, the sheriff set up something that was unique, first of its kind in the nation, not just for the L.A. County Sheriff's Department but for any sheriff's department in the entire nation, and it was called the Office of Independent Review.

Now, the Office of Independent Review is, as its name suggests, an office that is independent of the sheriff and provides review sort of like a watchdog organization.  Now, OIR investigated allegations of misconduct by sheriff deputies, and they had something that was unique that made it a unique organization.  They had realtime access to the investigations. What does that mean "realtime access"?  They didn't have to wait until the investigators did the investigation, wrote their reports and months and months later get some reports that they can then maybe look back into.  What they were able to do was get the access as the reports were being written which made OIR a particularly effective independent review of the sheriff's department.

And what you will also hear is that they were actually also able to weigh in on discipline recommendations for deputies that committed wrongful conduct.

Now, who led OIR?  Was OIR, this Office of Independent Review, led by someone who is inexperienced, who

would be a rubber stamp for the sheriff?  No.  The person who led OIR from 2001 to the present is a gentleman named Michael Gennaco.  You will hear him testify in this case.  And who is Michael Gennaco?

Michael Gennaco is a former federal prosecutor who, not only worked for the United States Department of Justice civil rights division, but he was the head civil rights prosecutor for the Los Angeles U.S. Attorney's Office where these two prosecutors work.  He was the head civil rights prosecutor of that office.  That's who was brought in, one of the most accomplished civil rights prosecutors in the nation.

And while he was a prosecutor, Mr. Gennaco brought numerous cases, civil rights cases, against police officers who violated people's civil rights by beating them or using excessive force.  He knows the difference between what is excessive force and what is not, and he has prosecuted before. And now he and five other attorneys are the Office of Independent Review monitoring the sheriff's department.

So he will testify that Sheriff Baca created the OIR and ensured that OIR had sufficient resources to do its job.  And then what you will also hear is that the -- when OIR would actually publish annual reports, many of those reports were actually critical of the sheriff's department.  The sheriff invited the ACLU, OIR, and the public to bring him the good, the bad, and the ugly.

**UNITED STATES DISTRICT COURT**

Now, the evidence will show that the ACLU was working with OIR, the sheriff's department from 2001 to 2009 to address these problems.  But in 2009, '10, '11, the ACLU raised concerns in reports that they publish widely.  You will hear one of the ACLU's directors speak to you, Peter Eliasberg. What he will tell you is that, in addition to the chaplain, in addition to other ACLU people, Mr. Eliasberg published the ACLU's reports widely.  He gave press conferences.  He gave TV and radio interviews.  He went ahead and filed these reports with the Court in order to make sure that the sheriff knew this public information and so did the FBI.

Now, the evidence will show that the sheriff and his department responded with programs, policies, and procedures to deal with the ACLU's complaints of deputy abuse. And what is important to know -- and this is very important -- is that you will not be asked to decide whether the sheriff's programs, policies, and procedures were adequate, sufficient, whether they investigated quickly enough, whether they disciplined enough deputies, whether they could have put in different programs, policies, and procedures to deal with the ACLU's complaints that might have worked better.  Basically whether the sheriff could have done a better job in responding to these issues.

You will not have to decide that, nor are you going to be asked to decide whether the sheriff is responsible

for any particular incident or allegation of excessive force or deputy beating.  These are civil rights charges, and this case has not charged Sheriff Baca with violating any civil rights crimes, not one.  Instead, this case is only about a much different issue of whether or not the Government can prove beyond a reasonable doubt that Sheriff Baca conspired and obstructed a grand jury investigation during this six-week period, and only this six-week period, in August and September of 2011.

Now, as the ACLU is issuing its reports in 2010, you're going to hear that the FBI decides to investigate these allegations.  You will hear that the FBI in Los Angeles has over 800 special agents, many of whom have decades of experience investigating these crimes.  And who does the FBI choose to lead its investigation into this inmate abuse in June, 2010?  You will hear they choose FBI Agent Leah Marx as the lead case agent.

How many years of experience and years had she been at the FBI in June, 2010?  One year.  This was her rookie year.  How many years of prior law enforcement experience had she had at that point?  None.  How many civil rights investigations had she been a case agent for at that point?  None.  And what about experience in the jails?  Did she have any unique experience in the jails so that she would know how basically inmates and deputies worked in the jail?  She had

none.  How about undercover experience?  You heard Mr. Fox talk to you there will be undercover experience.  How many undercover operations had she run at that point?  None.

What you will hear is, instead, the evidence will show that she began her investigation in June 2010 and she started interviewing about 25 inmates over the next year.  And she will testify that each time she interviewed an inmate, she would go down to the Men's Central Jail, she would show her FBI credential, she would then write the inmate's name down on the form, and then the inmate would be brought to her in a room.

She didn't go in with an alias.  She didn't try to hide her name.  She didn't try to hide that she was from the FBI or that she was from the FBI's Civil Rights Squad.  Over and over and over FBI Special Agent Leah Marx is writing her name, showing her ID, and showing the deputies at the jail that the FBI is talking to inmates, many of whom have made complaints against the sheriff's department for abuse.

Now, of the 25 inmates that rookie Agent Marx interviewed over that year, she selected one particular inmate to try to build her civil rights investigation around.  Who did she select?  She selected Anthony Brown.  And who is Anthony Brown?  Well, you will hear that Anthony Brown is a dangerous and violent criminal, that Anthony Brown had a criminal record dating to the 1980's, that Anthony Brown was convicted of a 2005 armed robbery, basically went into a bunch

of banks with a gun and got caught.  And then you will hear in 2009 he did it again.  He went into three different banks in 2009, put his gun up against certain tellers and customers.  And as he will say, he was high on crack cocaine at that time and even fired his gun at one woman barely missing her.

This is who Special Agent Leah Marx, rookie Agent Marx, selected amongst those 25 inmates to build her civil rights case on.  And what happened in the middle of that investigation in June of 2011 before the undercover went -- before Anthony Brown gets his cell phone?  You will find that he is sentenced to 423 years.

You will also hear that Anthony Brown, amongst other things, is a serial liar and, as Agent Marx will describe on the stand, a manipulator.  This is who Agent Marx chose.

So Agent Marx meets with Anthony Brown 10 to 20 times at Men's Central Jail and along the way tells her that there are deputies willing to take bribes in order to bring in stuff.  Well, what kind of stuff?  Again, we're talking about contraband.  And remember, contraband is something that, while on the outside might be particularly fine like food -- outside food on the outside, fine.  You bring outside food or you bring drugs or you bring cigarettes or even pornography or outside food into a secured facility, and it's illegal.  It's strictly prohibited.

So what's the other thing that's also strictly

prohibited?  A cell phone.  And why, again, is a cell phone a problem?  Because what you'll hear and the evidence will show is that, when an inmate wants to make a call to someone on the outside and they're in the jail, they have to use one of the jail's public phones, and those phone calls are recorded.  You can actually hear what's being said.  It's recorded.  You can see what numbers are being dialed.

When an inmate uses a cell phone, they're able to bypass the system.  And if they can bypass the system, you will see that they can and have in the past used a cell phone to plan escapes, to arrange to kill witnesses in their cases, to smuggle drugs into a prison, and to commit new crimes.

Now, you will hear that Anthony Brown told Agent Marx that he knew of one deputy that could be bribed for cigarettes or outside food or a cell phone.  Which one of those three things did Agent Marx pick?  The cigarettes, the outside food, or the cell phone?  Evidence will show she picked the most dangerous thing to introduce into a jail, the cell phone.

But as Agent Marx will testify, she and her supervisors nevertheless decided to test out the cell phone and see what would happen with Anthony Brown, a dangerous and violent criminal who is sentenced to 423 years.

Now, as the evidence will show, Agent Marx's bribe plan was as follows:  What she was going to do is have Anthony Brown lie to what they later determined to be

Deputy Gilbert Michel.  And what was that lie?  The lie was that Anthony Brown, through his bank robberies, had $800,000 stashed on the outside.  And what he wanted was he wanted Deputy Michel to bring him a cell phone.  How much would he pay him?  He would pay $2,000 to bring the cell phone in and $2,000 every time he charged a cell phone and brought it back to him.  He gave him a $20,000 bribe.  And you will hear that Deputy Michel agreed to it.

But how are they going to pay the bribe because obviously Anthony Brown in the jail doesn't have $2,000 or $20,000 for that matter.  Well, what you will hear is Agent Marx cooked up the bribe plan, and the bribe plan was, in essence, that Deputy Michel would go ahead and be contacted by C.J. on the outside, and C.J. would arrange to get him the money and arrange to get him the phone.

Who is C.J.  Well, what Agent Marx did was she had an undercover FBI agent -- and they call him C.J. -- make the contact with Deputy Michel and do that in order to keep the FBI distanced from the cell phone and Anthony Brown in the Men's County Jail because they did not want to connect the FBI to the cell phone because that could endanger Anthony Brown's life if he got it because it would show, if they found the cell phone, that he was an FBI snitch.  And being an FBI snitch in the violent wing of Men's Central Jail was extremely dangerous, as you will hear, because of how the other inmates could treat

**UNITED STATES DISTRICT COURT**

you or the deputies that you're snitching on.

So Agent Marx took two steps to try to distance herself.  She brought C.J. in instead of herself, and she even used a prepaid cell phone that would not be connected with the FBI.  But she made three rookie mistakes that connected the FBI to the cell phone and endangered Anthony Brown's safety.

To understand these mistakes, you have to go back to the month before August and September of 2011 to July 18th because what you're going to hear on July 18th is that Deputy Michel and C.J. finally got together on the phone, and they struck the deal.  We're going to make -- two days later on July 20th I will give you a bribe payment -- they didn't call it a bribe payment -- I will give you cash, and I will also give you the cell phone, and you can bring it to Anthony Brown in the jail.  So that's what's decided on July 18.  They have the meeting on July 20th.

But the evidence will show that on July 18th, 19th, and 21st something happened that did not happen before, the three rookie mistakes of Agent Marx.  What happened is that Anthony Brown in the jail is very anxious.  He wants to get this whole thing going.  So rather than wait until he gets a cell phone, he calls Agent Marx on those publicly recorded jail phones, and he calls her on her desk line at the Civil Rights Squad at the FBI building in Westwood.

Now, for the past year he had made those phone

calls, and she had never actually taken them because she knows that would then connect Anthony Brown, who is making the phone call, with the FBI Civil Rights Squad.  But on July 18th, 19th, and 21st she took the calls.  And what you will hear is that on July 18, for instance, in a recorded call Agent Marx talks to Anthony Brown about the transaction.

You'll hear on July 19th Agent Marx tells him in a recorded call that the sheriff's department is recording, "You will have your phone soon.  Then you can call whoever you need."  Then you'll hear on July 21st, again, Agent Marx talks to Anthony Brown when he calls from the jail on the public phone and assures him that, "You're good.  You're good."  What is Anthony Brown good for?

Well, you'll hear that on July 20th Deputy Michel showed up in a parking lot near the Men's County Jail to do the transaction with C.J.  What you will hear is that C.J. gave Deputy Michel a partial payment of $700 and the cell phone. And how will the evidence show this?  You will see that there were six FBI agents surrounding these two cars.  And where was Agent Marx?  She was in a plane overhead with three other FBI agents taking high quality aerial photos, one of which is on the screen in front of you, that were so good that you could actually see the transaction from thousands of feet above.

The FBI got their man, they got it all on video, and they arrested him for the bribe.  Well, you will hear that

two of these three things occurred.  The FBI got their man, they got it all on video, but they didn't arrest him.  Instead, you will hear that Agent Marx let Deputy Michel go and bring that extremely dangerous cell phone into Men's County Jail to Anthony Brown even though at that point, because of the July 18th, 19th, and 21st phone calls, that phone call could be connected directly to the FBI and put Anthony Brown's safety in danger.  Inmates would know he was an FBI snitch, and deputies could know who was snitching on them.

Why did Agent Marx allow this?  As the evidence will show, Agent Marx believed that the numerous dangers of having a cell phone in the prison was outweighed by the possibility that Anthony Brown would somehow be able to shoot videos or photos of deputy beatings that might just coincidentally occur right in front of his cell by somehow, I don't know, taking his cell phone, sticking it through the bars, and trying to video or photograph what was going on.  That was the plan.

And what safeguards did Agent Marx use to make sure the cell phone wasn't used for some illegal or sinister purpose?  Well, you'll hear Agent Marx testify that the FBI had a system that would allow her, if you plugged in a pin number, to actually hear the call that's being made or the text messages being sent as they were done.  Did she use this system?  No.

**UNITED STATES DISTRICT COURT**

You will hear that she could have set up an online alert so that, every time the phone was used to call or text, she would be alerted through her e-mail. Did she do that? No. Was she -- was she somehow otherwise able to listen to the calls or see the text messages being sent? No. Instead, once the cell phone got into the jail, it did not go as planned. Anthony Brown's cellmate saw Brown with the cell phone, and he says to Anthony Brown, "Hey, I want to use that to call my girlfriend. And if you don't give it to me, I'm going to tell on you."

So Anthony calls C.J., "C.J., can I do this?" C.J. calls Agent Marx, "Agent Marx, can we do this?" Agent Marx says, "Go ahead. Go ahead." Now, had Agent Marx known who the cellmate was at that time? The evidence will show no. Did Agent Marx know what crimes -- remember, they're on the violent wing -- the most violent wing of the Men's Central Jail. Does she know what crimes that particular cellmate was in for? No. Did she take any steps to then trace the calls that the cellmate used the phone for? No. Did she even know if the cellmate had a girlfriend or is calling someone on the outside to do something very sinister with the cell phone? No.

You will hear Agent Marx agree to let this cell phone be used by the cellmate to call the girlfriend without doing any checks whatsoever. You will also hear that, at any

moment in time, she could have just terminated the service for the cell phone so it couldn't be used, and she chose not to do that as well.

Instead, on August 4 you will see that there's a second bribe payment. Again, at this point they have another meeting in another parking lot. C.J. shows up with $800. So now you have a combined $1,500 for the bribe payment, and he gives that money on video, a dozen FBI agents surveilling. Once again, the FBI has got their man twice. They've got it on video twice, and they let him go again. When they let him go again, again, there are no provisions taken to make sure that the cell phone is not being used for a dangerous purpose.

Now, four days later what you heard on August 8 is that the deputies found the cell phone in Anthony Brown's stuff buried inside a glove inside of a Dorritos bag. And Deputy Michel finds out almost immediately that the cell phone has been discovered, and he calls C.J. He says, "C.J., they've got the phone. You have to go get rid of your phone." He's panicked. He's very worried that they now found the cell phone. C.J. calls Agent Marx and tells Agent Marx the cell phone has been discovered on August 8 in the jail.

Now, the evidence will show that the clock is ticking before Anthony Brown is going to be found out to be an FBI snitch. Does Agent Marx go to the jail on August 8 or C.J. go to the jail and warn Anthony Brown that there can be

**UNITED STATES DISTRICT COURT**

possible repercussions or warn anybody in the jail that there could be possible repercussions?  No.  What you'll hear is they discovered the cell phone on August 8, and then from the 8th to the 23rd -- August 8th to the 23rd, at no point from the 8th, 9th, 10th, 11th, 12th, 13th, 14th, 15th, 16th, 17th does Agent Marx or C.J. go to the jail to see how Anthony Brown is doing and let him know that the FBI is there for him.

On the 18th, as you heard, it all comes out it's an FBI phone.  At this point there's no reason not to go to the jail.  But does she go on the 18th?  19th?  20th?  21st?  22nd?  No.  You'll hear that the first time she goes is on August 23rd.

So then let me take you then back to August 18 because August 18 is when FBI Assistant Director Martinez calls Sheriff Baca to tell them about the FBI phone.  What's also important to know is that why was it August 18 that Assistant Director Martinez is calling Sheriff Baca?  Why didn't he call him on August 8th?  What the evidence will show is that Agent Marx didn't even tell her boss, the head of the FBI's office, that the cell phone had been found on August 8th, and he doesn't find out about it until August 18th, ten days later.  She keeps Anthony Brown in the dark.  She keeps the head of her office, Assistant Director Martinez, in the dark.

Now, on the 18th what you'll hear is that Assistant Director Martinez does make this call to Mr. Baca,

and he provides him with the information of two points. The FBI cell phone has been compromised, and we've got to keep Anthony Brown safe. That's it. No more details. Despite years of partnership, despite the fact that they had agents, there's sheriffs and FBI agents on 20 -- over 20 sheriff deputies are on FBI task forces. This is a partnership that had been working together for years. And despite that partnership, Assistant Director Martinez only provides Sheriff Baca with those two details.

What did he not provide him? The evidence will show that Assistant Director Martinez for that six-week period did not tell Sheriff Baca how the phone was smuggled into the jail, whether or not there were other FBI-smuggled cell phones in the jail that could compromise the jail security, whether or not there was other FBI-smuggled contraband. Maybe they were running multiple undercovers that the -- in the sheriff jails that he was personally responsible for the safety of.

Is Assistant Director Martinez assuring him, look, this is the only one? Not at all. Well, how many deputies were involved? You know, at some point Assistant Director Martinez talks about Gilbert Michel, but he won't confirm or deny that there's other deputies that may be involved. How many inmates were involved? Well, they know about Anthony Brown, but is the FBI running multiple undercovers compromising the safety of the jail? How big of

problem was this for Sheriff Baca?

Sheriff Baca -- Assistant Director Martinez would provide him with no answers to these questions. What you will hear is that Sheriff Baca had to begin his own investigation to find out the answers to these questions. And towards that end, he spoke with Undersheriff Paul Tanaka.

Undersheriff Paul Tanaka, as you will hear, was in charge of the day-to-day operations of the sheriff's department, and he was the No. 2 person of the sheriff's department. And the sheriff talked to him on August 18th, and on August 19th they had a briefing meeting with Undersheriff Tanaka and members of the investigative team. And it was decided then at the last meeting to have an August 20th meeting, so a bigger meeting with Sheriff Baca, Undersheriff Tanaka, and the rest of the team. And this is going to be called the Saturday morning meeting because it's on a Saturday morning.

And what you will hear is that at that meeting Sheriff Baca is very explicit as to what his agenda is, and there's two points on it. First, keep Inmate Brown safe, which is what the FBI had requested; and, second, investigate how the cell phone was smuggled into the jail.

Now, you will hear about the relationship between Sheriff Baca and Undersheriff Paul Tanaka. When under -- and what you will hear is that, when Undersheriff Paul Tanaka was

**UNITED STATES DISTRICT COURT**

in Sheriff Baca's presence, he was, "yes, sir," "no, sir," "thank you, sir."  But when Undersheriff Tanaka was outside Sheriff Baca's presence, what you will hear is that he operated his own agenda.  He had people that were loyal to him, not Sheriff Baca, and he often advocated the old school way of dealing with inmates -- warehouse them, get them in, get them out, us versus them -- instead of Sheriff Baca's view that inmates were to be respected and rehabilitated.

Undersheriff Tanaka had not just the first point of the agenda or second point of the agenda, but you will hear that Undersheriff Tanaka added a third point to his agenda, something that Sheriff Baca didn't agree with, authorize, condone, or know about it.  "F the FBI."  That was a third part of Undersheriff Tanaka's agenda, not Sheriff Baca's agenda.

So over 50 times in opening statement Mr. Fox referred to "they" doing something, "they," trying to group everybody together each time because it's "they."  But what you will need to consider is what Sheriff Baca knew, authorized, participated in, agreed to, not what they did because this case is not about "they."  It is about Sheriff Baca.

Now, on August 23rd you will hear how Sheriff Baca's agenda and Paul Tanaka's agenda clashed.  On that day, as you heard, Agent Marx meets with Anthony Brown in the jails.  She finally comes to visit them, and she meets with him for over an hour with two other FBI agents until

**UNITED STATES DISTRICT COURT**

Anthony Brown is taken out of the room by other deputy sheriffs.

Now, when Lieutenant Thompson, Greg Thompson, that was on the Government's chart, one of the sheriff's department investigators found out about this, he went to Paul Tanaka, and he said, "Mr. Tanaka, I'm sorry.  The FBI went ahead and violated your order to keep the FBI away without your permission.  I'm very sorry."  And what you will hear and see in an e-mail is that Lieutenant Thompson had a "butt-chewing," quote/unquote, by Undersheriff Tanaka.  They chewed his butt out apparently and was mad and angry that the FBI had been able to talk to Anthony Brown.

But what you're going to hear also is Sheriff Baca's response because Mr. Fox told you about the incident, but what he didn't tell you, when Lieutenant Thompson went to go ahead and say the same thing to Sheriff Baca, is what Sheriff Baca's response was.  And his response was not angry at all, "Thank you very much," unlike Undersheriff Tanaka's response which was incredibly mad, "F the FBI."  Sheriff Baca's response was -- because his agenda was not to keep the FBI at bay, keep them away, was not angry at all.

Now, as the evidence will show, what Sheriff Baca's agenda was was to be open, transparent, and direct, the opposite of hidden, secretive, and deceptive.  He

had nothing to hide from the FBI or anybody else.  And where do we see that best?  Well, Mr. Fox told you about a meeting on August 29th.  That's a meeting with someone called the United States attorney.

Now, the United States Attorney is their boss, the head of the United States Attorney's Office.  He's not only in charge of Los Angeles County, but he's got all the six counties around it.  They call it the Central District of California.  That's Orange County, Los Angeles County, Riverside and San Bernardino, Ventura, Santa Barbara, and San Luis Obispo.  That's the United States Attorney, and that gentleman who you will hear testify, his name is Andre Birotte.

Now, you will hear that Sheriff Baca scheduled a meeting with Andre Birotte, the very person who had the ability to bring conspiracy and obstruction of justice charges against anyone, and that's who Sheriff Baca meets with in person.  And the evidence will show that the purpose of this meeting, again, was to be open, transparent, and direct with the United States Attorney, and that's exactly what Sheriff Baca did.

He told the United States Attorney, Mr. Fox calls it his displeasure, his anger, about the FBI inserting a very dangerous cell phone into the jail without his participation.  And he proposed in this meeting that the sheriff's department work with the U.S. Attorney's Office and the FBI in conducting their investigations.

Again, they were partners in task forces.  They had been partners for years.  They could partner at this point because there's no more undercover investigation.  And what you'll hear is that Sheriff Baca made these points himself.  He didn't send some underwing, someone underneath him to make these points.  He made them openly, transparently, and directly and said the sheriff's department has the expertise with the jails for decades that the FBI lacks that we can bring into this investigation.

And what did United States Attorney Birotte do?  What was his response?  He listened very politely, and he didn't engage in a dialogue at all.  He didn't provide Sheriff Baca with the answers to any of the questions that Assistant Director Martinez wouldn't answer.  He just sat there very politely listening.  And also, importantly, he didn't raise with Sheriff Baca that the federal investigation was having any problems like with a writ or anything else.  So that meeting then was over.

And what next happens is that the evidence will show that many actions now occur between about August 25th and September 8th.  And all those actions, I ask you to consider whether or not Sheriff Baca knew about them, participated in them, agreed with them, authorized or condoned them because the evidence will show it's not "they" but that Sheriff Baca did not do any of the above.

So for instance, complying with the federal writ, not at all.  The evidence will show Sheriff Baca didn't even know a writ was served, didn't know it was being complied with or not complied with.  That will be the evidence.

Anthony Brown having his name changed.  What will the evidence show about Sheriff Baca's knowledge or agreement with that?  Zero.  How about Anthony Brown being moved from place-to-place?  The evidence will show Sheriff Baca didn't know, authorize, or participate in that in any way.  How about the issuance of that policy regarding the FBI visits?  Again, Sheriff Baca wasn't involved in that policy, wasn't e-mailed on it, wasn't communicated with it at all.  How about seeking that court order for the FBI's files?  Was Sheriff Baca involved with that at all?  No.

How about telling deputies not to cooperate?  Again, Mr. Fox called it "they."  But will the evidence in this case show that Sheriff Baca was in any way involved or knew about deputies being told not to cooperate with the FBI's investigation?  No.  How about sweeping for FBI listening devices?  Absolutely no evidence you will hear that Sheriff Baca was involved with that.

And how about the surveillance of FBI agents ordering that surveillance?  You will hear that Sheriff Baca wasn't involved with that.  In fact, was out of the country at the time.  In fact, the time period that he's out of the

country was right darn smack in the middle of this six weeks. So in the six-week period, he's out of the country on an international business trip.  He's actually the keynote speaker at a counterterrorism conference outside the country between September 8 and September 21st.

Now, on September 22nd when he came back or around there, he has a meeting with the investigators, and Undersheriff Tanaka and the issue of whether or not they should go ahead and interview Agent Marx comes up, and you will hear that Sheriff Baca -- because at that point, again, the FBI had provided no details to him whatsoever about their investigation.  You will hear that Sheriff Baca okayed that interview.

But what's also very important to listen to is that Sheriff Baca at no point told those investigators to threaten to arrest Agent Marx or to arrest her.  He didn't give either one of those directives.  His only directive was to go ahead and interview her because he had gotten no information from the FBI at that point in time.

Now, on September 26, what you will hear is that two things occur.  The first is, as the Government mentioned in their opening, Sheriff Baca appeared on TV on *Good Morning L.A.*, one of the Fox morning shows.  He was actually on the show to promote a charity raising funds for the disease Lupus, and the host asks him, while he's making his

appearance, what about this FBI investigation?  What's going on?

And what you'll hear is that on public TV Sheriff Baca is open, transparent, and direct.  He actually answers the questions.  And what does he say?  He says, well, the FBI lacks experience in the jails.  You'll hear that he says publicly it's illegal to have a cell phone in the jails, which it is.  You will hear that the sheriff has the responsibility to run the jails, and lastly the sheriff was going to meet the next day with the FBI to talk about it.

This wasn't some type of public pressure on the United States Attorney.  You will hear the evidence that you can't pressure United States Attorney Birotte with a public TV appearance.  This is the United States Attorney, the head of the FBI office, and you will hear that they cannot be pressured.  The evidence will show Sheriff Baca going on TV and openly, transparently, and directly stating his view.

Now, what you will also hear is that later that day Sheriff Baca receives a phone call from Assistant Director Martinez.  And what did that phone call say?  That phone call actually wasn't mentioned by Mr. Fox.  He told you -- he showed you that little clip from the video where they approached Leah Marx.  They had the two investigators, the guy going like this approaching Leah Marx.

But what he didn't tell you is that what happens

thereafter is that Assistant Director Martinez calls up Sheriff Baca and says to him directly, "Are you going to arrest Agent Marx?  Two of your agents just threatened to arrest her." Immediately Sheriff Baca responds to him, "No.  That was not the plan.  We are not going to arrest her.  We don't arrest FBI agents."  And learned that those two FBI agents had not just done what he asked them to do which was interview Leah Marx but had gone beyond his orders which was wrong.  And as soon as Sheriff Baca heard about it, he assured Assistant Director Martinez it would not be happening.

Now, on September 27 what you will hear is that Sheriff Baca did have that second meeting with the United States Attorney Birotte, and this time the head of the FBI's office was also at that meeting.  That's the Assistant Director Martinez.  This is the clear-the-air meeting because for six weeks Sheriff Baca has gotten no answers from the FBI, no answers from the U.S. Attorney's Office about how big of problem he has in his jails.

So what happens at this meeting is that you will hear that the sheriff was angry.  And again, the sheriff did not hide his anger.  It's not who he is.  You will hear that. He was open, he was transparent, and he was direct to the United States Attorney, the man who had the capability of bringing charges against him for conspiracy or obstruction of justice and the head of the FBI's office.

**UNITED STATES DISTRICT COURT**

And he said to them words to the effect of what Mr. Fox showed you about "These are my jails, G.D.," and "I'm the G.D. sheriff."  And then he said if you, the FBI, want to gun up -- and by that it means, if you want to go ahead and draw the line in the sand and no longer be a partner with the sheriff's department, all right.  That's not the way I want to deal with it.  I want to be your partner.  I've been your partner for decades.  But you won't trust us.  How are we going to trust you back?

And at that point for the first time in six weeks Assistant Director Martinez tells Sheriff Baca what had happened, why they went into the jails without bringing it to his attention, what the FBI's investigation was.  And at that moment in time, you will hear the air was cleared.

How did that meeting end?  If you had just listened to Mr. Fox's opening, you would think the sheriff took out his gun.  That meeting ended with these gentlemen shaking hands and agreeing to work together going forward in the future.  And the sheriff understood that the U.S. Attorney made it clear there was going to be a federal investigation.  They didn't want the sheriff's department to play an active role other than responding to document requests.  But that was okay because the air had been cleared in the September 27th meeting.

So as you listen to the evidence over the next several weeks, the Government will present you documents,

audio, video, and testimony to prove their case beyond a reasonable doubt because, as the judge has and will instruct you, Sheriff Baca is presumed innocent until the end of this trial and into your jury deliberations, until or unless the Government proves beyond a reasonable doubt that he committed any of the crimes charged.

And when you consider the avalanche of e-mails, for instance, that the Government is going to present, pay very close attention to whether or not Sheriff Baca is on the "to," the "from," or the "cc" or "bcc" line.  Pay close attention because you will find in these avalanche of e-mails that Sheriff Baca is not on any of these e-mails other than the two he receives from Assistant Director Martinez.

Pay also close attention to how many cell phone calls exist between Sheriff Baca and the investigators during these six weeks.  What you will hear is that there are about 60 phone calls between Undersheriff Tanaka, the man with his own agenda, and the investigators.  And then during this entire six weeks, Sheriff Baca calls the investigators two times.

And also pay close attention to what the witnesses are going to say about whether or not Sheriff Baca was at all involved with Anthony Brown being moved around, a federal writ being issued, witnesses being told not to cooperate.  The evidence will consistently show that Sheriff Baca was not involved.

Instead, you will hear that Sheriff Baca was extraordinarily busy. He was working 12- to 14-hour days six to seven days a week with that enormous responsibility that I described before in running the sheriff's department and dealing with the entire responsibilities of being a sheriff.

You will hear that, when Sheriff Baca got involved with the investigation, as he pointed out, he was open, transparent, and direct, the very opposite of secretive, deceptive, and hidden -- the hallmarks of obstruction of justice.

The ACLU was his partner; the U.S. Attorney's Office was his partner; the FBI was his brother in arms. And the Government will fail to prove beyond a reasonable doubt that the sheriff conspired or obstructed a grand jury investigation into civil rights violations as charged in this Indictment.

Accordingly, we will ask you at the end of this case to return the only verdict, the only verdict that will be consistent with the evidence presented, a verdict of not guilty on both counts.

Thank you very much.

THE COURT: All right. Thank you.

Ladies and gentlemen, we're going to take a 15-minute break. Again, I want to remind you, until this trial is over, you're not to discuss this case with anyone including

your fellow jurors, members of your family, people involved in the trial, or anyone else, and do not allow others to discuss the case with you.  This includes discussing the case on the Internet, through blogs, bulletin boards, by e-mails or text messages.

If anyone tries to communicate with you about this case, please let me know about it immediately.  Do not watch, read, or listen to any news reports or other accounts about the trial or anyone associated with it.  Do not do any research such as consulting dictionaries, searching the Internet, or using other reference materials, and do not make any investigation about the case on your own.

Finally, you're reminded to keep an open mind until all of the evidence has been received, you've heard the arguments of counsel, the instructions of the Court, and the views of your fellow jurors.

We'll come back at 25 to the hour.  Thank you very much.

(Further proceedings were held and
reported but not included herein.)

CERTIFICATE OF OFFICIAL REPORTER

I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

DATED THIS  24TH  DAY OF JANUARY, 2016.


/S/ MIRANDA ALGORRI

MIRANDA ALGORRI, CSR NO. 12743, CRR
FEDERAL OFFICIAL COURT REPORTER

**UNITED STATES DISTRICT COURT**