**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION**

**HONORABLE PERCY ANDERSON, U.S. DISTRICT JUDGE**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. |
| | ) | |
| vs. | ) | CR 16-00066(A)-PA |
| | ) | |
| LEROY D. BACA, | ) | PAGES (1 to 30) |
| | ) | |
| Defendant. | ) | |
| | ) | |

**REPORTER'S TRANSCRIPT OF**
**TESTIMONY OF ROBERT FATURECHI**
**WEDNESDAY, DECEMBER 14, 2016**
**10:37 A.M.**
**LOS ANGELES, CALIFORNIA**

**MIRANDA ALGORRI, CSR 12743, CRR**
FEDERAL OFFICIAL COURT REPORTER
312 NORTH SPRING STREET, ROOM 435
LOS ANGELES, CALIFORNIA 90012
MIRANDAALGORRI@GMAIL.COM

**UNITED STATES DISTRICT COURT**

**APPEARANCES OF COUNSEL:**

**FOR THE PLAINTIFF:**

    EILEEN M. DECKER
    United States Attorney
    BY:  BRANDON FOX
    BY:  EDDIE A. JAUREGUI
    Assistant United States Attorneys
    United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012

**FOR THE DEFENDANT:**

    MORGAN LEWIS AND BOCKIUS LLP
    BY:  NATHAN J. HOCHMAN
    BY:  BRIANA ABRAMS
    The Water Garden
    1601 Cloverfield Boulevard
    Suite 2050 North
    Santa Monica, California 90404

    MORGAN LEWIS AND BOCKIUS LLP
    BY:  TINOS DIAMANTATOS
    77 West Wacker Drive
    Chicago, Illinois 60601

**FOR THE WITNESS:**

    DAVIS WRIGHT TREMAINE LLP
    BY:  KELLI SAGER
    865 South Figueroa Street
    Suite 2400
    Los Angeles, California 90017

**UNITED STATES DISTRICT COURT**

# I N D E X

**WEDNESDAY, DECEMBER 14, 2016**

## Chronological Index of Witnesses

Witnesses:_____ Page

FATURECHI, Robert

    Direct examination by Mr. Fox                 6
    Cross-examination by Mr. Hochman        15

**UNITED STATES DISTRICT COURT**

**<u>EXHIBITS</u>**

**WEDNESDAY, DECEMBER 14, 2016**

| Exhibit | For ID | In EVD |
|---|---|---|
| 154   *Los Angeles Times* article | 7 | |

**UNITED STATES DISTRICT COURT**

**LOS ANGELES, CALIFORNIA; WEDNESDAY, DECEMBER 16, 2016**

**10:37 A.M.**

**---**

(Prior proceedings were held and reported but not included herein.)

THE COURT:  Call your next witness.

MR. FOX:  Robert Faturechi, Your Honor.  The United States calls Robert Faturechi.

THE CLERK:  Please stand here for me, please. Raise your right hand.

Do you solemnly state that the testimony you may give in the cause now pending before this court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  Yes.

THE CLERK:  Please be seated.

Will you please state your full name and spell your last name for the record.

THE WITNESS:  Robert Faturechi, F-a-t-u-r-e-c-h-i.

THE CLERK:  Thank you.

MR. FOX:  May I proceed, Your Honor?

THE COURT:  Yes.

///

**UNITED STATES DISTRICT COURT**

**ROBERT FATURECHI,**

**GOVERNMENT'S WITNESS, SWORN:**

**DIRECT EXAMINATION**

BY MR. FOX:

Q    Mr. Faturechi, what do you do for a living?

A    I am a reporter.

Q    Who do you work for?

A    *ProPublica*.

Q    What is *ProPublica*?

A    It is an investigative journalism nonprofit based in New York.

Q    What did you do before working for *ProPublica*?

A    I was a reporter for the *L.A. Times*.

Q    Did you have a particular beat?

A    For most of my time there, my beat was L.A. County Sheriff's Department.

Q    Why are you here today?

A    Because I was subpoenaed.

Q    Did you do anything to try to avoid testifying today?

MR. HOCHMAN:  Objection.  Relevance.

THE COURT:  Sustained.

Q    BY MR. FOX:  Mr. Faturechi, if you don't mind looking in an exhibit binder that contains Exhibit 154 -- there are three of them, one next to you and two on the shelf.  I'm

**UNITED STATES DISTRICT COURT**

not sure which one has 154.  I just want you to look at this for identification purposes.

A        Okay.  154.

(Marked for identification Exhibit No. 154.)

Q        BY MR. FOX:  Do you recognize that?

A        Yes.

Q        What is it?

THE COURT:  Excuse me, one moment.  Let's go to sidebar.

(The following proceedings were held at sidebar:)

THE COURT:  There was an objection.  I think the question was asked did the witness attempt to do anything to avoid testifying, and there was an objection which I sustained. Does the Government want to be heard on that issue?

MR. FOX:  Sure, Your Honor.  I believe that it goes to Mr. Faturechi's state of mind today, whether he's cooperating or not.  I don't know if he's going to be refusing to answer certain questions or not.  And I think that, as he forms his answers to these questions, that it will help the jury understand whether he's telling the truth or not or whether he's being evasive and why he's being evasive.  That's why I believe it's appropriate.

MR. HOCHMAN:  Your Honor, because I didn't know what the answer would be, I didn't know if he would say, look, I got my 1st Amendment lawyer here ready to object which I

think would be inappropriate or -- again, because -- because the variety of answers, some of which could be completely unobjectionable and some would be objectionable, that is the basis for my objection.

THE COURT:  Okay.  I'm going to reverse my ruling and allow him to answer that question.

(The following proceedings were held in open court in the presence of the jury:)

MR. FOX:  May I proceed, Your Honor?

THE COURT:  Yes.

Q       BY MR. FOX:  Mr. Faturechi, what, if anything, did you do to try to avoid testifying here today?

A       Our attorneys worked to quash the subpoena.

Q       I just had you look at Exhibit 154.  I'm not asking to introduce it into evidence.  I just want to know if you recognize that exhibit.

A       Yes.

Q       What is it?

A       A newspaper article.

Q       Who wrote that article?

A       Me.

Q       What is the date of that article?

A       September 29, 2011.

Q       Did you interview -- well, first of all, are you familiar with Leroy Baca?

UNITED STATES DISTRICT COURT

A       Yes.

Q       Did you interview Mr. Baca for purposes of writing that article?

A       Yes.

Q       When did you interview him?

A       September 28, 2011.

Q       Was this in person or on the telephone?

A       In person.

Q       Where did it occur?

A       At the headquarters for the L.A. County Sheriff's Department at the time.

Q       Was anyone else present when you were interviewing Mr. Baca?

A       Can you define "present"?

Q       If I understand you correctly, you were having a conversation with Mr. Baca.  Was anyone in there participating in the conversation?

A       No one else was participating in the conversation.

Q       What was generally the subject matter of the interview?

A       The FBI investigation into inmate abuse and other issues at the L.A. County jails and, you know, the FBI sting, and the response to that.

Q       What, if anything, did Mr. Baca tell you about

UNITED STATES DISTRICT COURT

his knowledge of an inmate who was using pay phones within the Men's Central Jail?

MS. SAGER:  Your Honor, subject to the prior discussion about the objection, the limitation on Mr. Faturechi's testimony.

THE COURT:  All right.  Ladies and gentlemen, the witness has a lawyer here today, Ms. Sager, who may from time to time object.  She's not affiliated with either of the parties here.

MR. FOX:  Your Honor, I believe Ms. Sager wants me to clarify something with this witness, and I'm happy to do that.

THE COURT:  All right.

Q    BY MR. FOX:  Mr. Faturechi, is it your understanding that what I'm trying to elicit from you is what you've published previously and nothing that you have heard that you did not publish?  Is that appropriate?

What I want to hear about this conversation that you had with Mr. Baca is only something that you published in one form or another.

Do you understand that?

A    Yes.  Only published.

Q    And with respect to the question that I just asked you, what, if anything, did Mr. Baca tell you about what the inmate in Men's Central Jail was doing with respect to the

FBI?

A        That he was working as an informant for the FBI.

Q        What, if anything, did Mr. Baca tell you about the informant's use of pay phones at Men's Central Jail?

A        That he had been given a cell phone by his FBI handlers indirectly so that he could communicate with them about what was happening inside.

Q        What, if anything, did Mr. Baca tell you about a list that the informant was creating, compiling?

A        That he was creating a list of deputy names.

Q        What, if anything, did Mr. Baca tell you about what he believed the inmate was doing with that list of deputy names?  Who he was writing it for?

A        The FBI.

Q        What, if anything, did Mr. Baca tell you about what the FBI did with respect to the deputy who had allegedly smuggled in the telephone?

A        I'm sorry.  Can you repeat the question?

Q        Sure.  What, if anything -- let me back up, actually.

Are you familiar with the name Gilbert Michel?

A        Yes.

Q        And did you discuss Gilbert Michel with Mr. Baca?

A        I discussed the deputy at the center of the sting with Sheriff Baca.

UNITED STATES DISTRICT COURT

Q        Okay.  And with respect to that deputy at the center of the sting, what, if anything, did Mr. Baca tell you that the FBI had done with respect to this deputy?

A        That they had tried to flip him upon learning about what was going on in regards to the FBI.

Q        What, if anything, did Mr. Baca tell you about where this flip attempt occurred?

A        Can I review the article?

Q        Would it refresh your recollection as to whether this was published information if you reviewed the article?

A        Yes.  I just want to make sure that it's published information.

MR. FOX:  Your Honor, may I direct the witness to a certain paragraph in that article?

THE COURT:  Yes.

Q        BY MR. FOX:  At the bottom of the first page, the second paragraph up.

A        The second to the last paragraph?

Q        Correct.

THE COURT:  Just read that to yourself, and let us know when you've finished.

THE WITNESS:  The second to the last paragraph has nothing to do with that.

MR. FOX:  Starting, if we're looking to -- do you see a paragraph that starts with "After the FBI"?

UNITED STATES DISTRICT COURT

A        Yes.

Q        Okay.  Can you read that line and the next line to yourself, and please tell me if that refreshes your recollection.

A        Yes.  So it is published that it was at his home.

Q        And we've discussed now on two answers the term "flip."  Do you have an understanding as to what that term means?

A        As we publish that, that term means turning someone into an informant.

Q        Did you speak to Mr. Baca about what the sheriff deputies had done in response to the federal undercover investigation?

A        Yes.

Q        What, if anything, did Mr. Baca tell you about what two investigators had done with respect to the FBI agent involved in the investigation?

A        That they went to her home.

Q        What, if anything, did Mr. Baca tell you about the agent's response when these investigators went to her house?

A        Can you be more specific?

Q        Did Mr. Baca tell you what the FBI agents told the investigators who had gone to her house?

A        She referred them to, you know, her superiors.

UNITED STATES DISTRICT COURT

Q    What, if anything, did Mr. Baca say about whether the encounter with the FBI agent was intended to intimidate her?

A    He said that the way that the FBI did it was substantial.  It involved substantially more intimidating tactics.

Q    With respect to the deputy that the FBI had approached?

A    Yes.  You know, comparing the agent's approach to the deputy versus the deputies' approach to the other agent.

Q    Did Mr. Baca tell you whether he knew ahead of time that the investigators were going to be going out to the FBI agent's home?

A    Yes.

Q    What did he say?

A    That he did.

Q    Did he say whether he had directed this to happen?

A    Yes.

Q    What did he say?

A    That he did.

MR. FOX:  One moment, Your Honor.

I have no further questions for this witness.

THE COURT:  Cross-examination.

MR. HOCHMAN:  Yes, Your Honor.

UNITED STATES DISTRICT COURT

**CROSS-EXAMINATION**

BY MR. HOCHMAN:

Q      Mr. Faturechi, when you were talking at the beginning of your testimony and you said that your attorneys have worked to quash a subpoena, I'm not your attorney; correct?

A      No.

Q      None of Mr. Baca's attorneys are your attorneys; correct?

A      Yes.  Correct.

Q      So I'm not -- let's start over.

I'm not your attorney; correct?

A      You are not my attorney.

Q      None of Mr. Baca's attorneys are your attorney; is that correct?

A      That is correct.

Q      Your attorney is Kelli Sager to the -- in this court to my left; is that correct?

A      Yes.

Q      Is she your personal attorney, or does she represent the *Los Angeles Times*, do you know?

A      You know, I'm not a legal expert.  She represents both of us.

Q      And Mr. -- Sheriff Baca took absolutely no action to prevent you from testifying here today; correct?

A        I'm sorry?

Q        Sheriff Baca took absolutely no action to prevent you from testifying here today; is that correct?

A        That is correct.

Q        And Sheriff Baca's attorneys, myself and the other counsel, took absolutely no action to prevent you from testifying here today; is that correct?

MR. FOX:  Objection.  Foundation.

THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  Are you aware of any of Sheriff Baca's attorneys taking any action to prevent you from --

THE COURT:  That's sustained, counsel.  Move on.

Q        BY MR. HOCHMAN:  Now, with respect to the -- you're testifying here in December of 2016 about your memory of events that happened on September 28th, 2011; is that correct?

A        Yes.

Q        And by the time that you're interviewing Sheriff Baca on September 28, 2011, that's two days after the September 26th, 2011, approach of the sheriff's investigators to Leah Marx at her home; is that correct?

A        I do not recall the date of that approach.

Q        Well, the date of the approach was before September 28; is that correct?

A        Yes.

UNITED STATES DISTRICT COURT

Q        And the day of the approach is after -- excuse me -- is before also -- strike that.

When you spoke to the sheriff on September 28, 2011, he had already had his meeting with U.S. Attorney Andre Birotte; is that correct?

MR. FOX:  Objection.  Foundation.

THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  Didn't you report --

MR. FOX:  Objection, Your Honor.  Foundation.

THE COURT:  Sustained.

MR. FOX:  Calls for hearsay.

Q        BY MR. HOCHMAN:  Do you remember when you wrote your article back in September 29, 2011, referencing a meeting that Sheriff Baca had had with United States Attorney Andre Birotte?

MR. FOX:  Objection.  Foundation.

THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  Did you have any information on September 29, 2011, when your article was published, that Sheriff Baca had met with United States Attorney Birotte?

MR. FOX:  Objection.  Calls for hearsay.

THE COURT:  Let's go to sidebar.

(The following proceedings were held at sidebar:)

MR. FOX:  Your Honor, I don't expect --

THE COURT:  Just one second.

**UNITED STATES DISTRICT COURT**

MR. FOX:  I don't expect this to be a point of contention when that meeting occurred.  My only point is this witness would only know about that meeting through hearsay; so he should not be testifying to it.  We'll ultimately agree that this meeting with the U.S. Attorney and the FBI happened on September 27, but this witness would only know about that through a statement through either Mr. Baca, Mr. Birotte, or somebody else that was aware of that meeting, and that's a hearsay statement.

MR. HOCHMAN:  But, Your Honor, he publishes in the article -- he says in the September 29 article he met with U.S. Attorney Andre Birotte earlier this week to discuss the tensions between the two sides.

THE COURT:  But that doesn't answer the question.

MS. SAGER:  I was going to object, Your Honor, for the same reason that I want to make clear that he's asking about what's being published, not other information the witness has.  He did put it in the article; so he could say that --

THE COURT:  Well, that doesn't answer -- just because he put it in the article doesn't mean what his source was for that.

MS. SAGER:  I understand.

THE COURT:  Okay.  Look, it's not going to be an issue.  They're going to call Birotte.  Birotte will say when the meeting was, and then you'll be able to argue.

UNITED STATES DISTRICT COURT

MR. HOCHMAN:  That's why I just wanted to tie it in with this particular witness because it's not going to be an issue.  If he didn't write it in the article, Your Honor, then I wouldn't bring it up with this witness.  The fact that he had that information --

THE COURT:  Okay.  But you're going to have to establish a foundation as to how he got it, and then I think we'll be kind of in the --

MR. HOCHMAN:  That's what I was trying not to -- I was trying to avoid going into his sources, but I could.

THE COURT:  No.  You're probably not going to be able to.  Look, this really -- you really ought to move on. He's going to object on the foundation.  Unless you can establish a foundation, you're not going to be able to get past this, and it's really needless because we're all in agreement as to when the meeting occurred.

MR. FOX:  And, Your Honor, if I can make a suggestion.  If Mr. Hochman -- Exhibit 120 is Mr. Baca's calendar which is already in evidence and references the meeting.  So Mr. Hochman could put that on and say it happened after September 27 at 1:30, your interview of Mr. Baca.

THE COURT:  Okay.  Let's go.

(The following proceedings were held in open court in the presence of the jury:)

MR. HOCHMAN:  Your Honor, I'd ask that

UNITED STATES DISTRICT COURT

Exhibit 120, which is already admitted into evidence, be published so the witness can look at it as well.

THE COURT:  All right.

Q  BY MR. HOCHMAN:  So I'm referencing you to what's in evidence as Exhibit 120 which is Mr. Baca's calendar.  I'm focusing you on Tuesday, September 27, at a line that's been highlighted from 2:30 to 3:30.

Do you see that?

A  Yes.

Q  Could you read the bold letters starting with the word "meet" down to "Martinez," please.

A  From the word what to -- I see.  "Meet with U.S. Attorney Andre Birotte and FBI assistant director in charge Steve Martinez.  U.S. Attorney's Office, 312 North Spring Street, 12th floor, Los Angeles, 90012.  213-894-7369."

Q  Thank you.  You can take it off the screen.

When you interviewed Sheriff Baca on September 28, did you tape-record that interview?

A  I don't have the article in front of me, again.  The date of the article was September 28th?

Q  Yes.  The article is September 29, 2011.

A  The interview was on September 28th.  What was your question?

Q  Did you tape-record the interview?

**UNITED STATES DISTRICT COURT**

A       No.

Q       Did you videotape the interview?

A       No.

Q       Did you take notes during the interview?

A       Yes.

Q       And then you wrote the article in connection with your interview; is that correct?

A       Yes.

Q       And there's certain parts -- when you write an article, you'll put certain things in quotation marks; is that correct?

A       Yes.

Q       And that's because that's the exact words that were used by the person you were interviewing; is that correct?

A       Yes.

Q       And other times you'll say, for instance, with Sheriff Baca, "Baca said" something -- is that correct? -- but it won't have quotations marks next to it?

A       Yes.

Q       Sometimes you'll say "Baca revealed" something, and there wouldn't be quotation marks; is that right?

A       I don't recall if I used the word "revealed" in that story.

Q       Or "Baca argued" without quotation marks.

A       I don't recall if I used the word "argue."  I

mean, do you want me to look at the article?  I mean, in general, sure, those are the kinds of words that one might use. I'm not sure if I used "argued" or "revealed" in that particular article, but I can look.

Q       We'll get to the specifics in one moment.

The article that you wrote was for the *Los Angeles Times*; correct?

A       Yes.

Q       And it was published on September 29, 2011?

A       Right.  The interview on the 28th, article on the 29th.

Q       And when Mr. Baca met with you, he knew you were going to publish an article; correct?

MR. FOX:  Objection.  Foundation.

THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  Did you tell Mr. Baca that the reason for your interview was so that you could publish an article that included his statements?

MR. FOX:  Objection, Your Honor.  We'll have the issue with Ms. Sager.

THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  What were the -- what did you tell Sheriff Baca in setting up this interview as to why you wanted to interview him?

MR. FOX:  Objection.  Relevance.

**UNITED STATES DISTRICT COURT**

THE COURT:  Sustained.

Q    BY MR. HOCHMAN:  Were you going to keep the interview of Sheriff Baca secret and to yourself?

MS. SAGER:  Your Honor, I don't think that the witness' editorial function is something that --

THE COURT:  Sustained.

Q    BY MR. HOCHMAN:  At the time that you are interviewing Sheriff Baca on September 28th, did you tell him that an article that you were going to write about his statements was going to come out the next day?

MS. SAGER:  Again, Your Honor, this is not published information.  It is going to be hearsay.

THE COURT:  Sustained.  It's beyond the scope.

Q    BY MR. HOCHMAN:  Did Sheriff Baca ever tell you during the interview on September 28, 2011, that everything he was saying to you was off the record and you couldn't use it in your publication?

MS. SAGER:  Objection, Your Honor, as to anything that's not published.

THE COURT:  I'll let that witness answer that question.  The objection is overruled.

THE WITNESS:  Can you repeat the question?

Q    BY MR. HOCHMAN:  Did Sheriff Baca, when you interviewed him on September 28, 2011, tell you that everything he was telling you was off the record and couldn't be

published?

A    Can I speak to my counsel outside the presence of the jury?

THE COURT:  Let's go to sidebar.

(The following proceedings were held at sidebar:)

MS. SAGER:  The difficulty, Your Honor, if we start getting into what --

THE COURT:  I know.

MS. SAGER:  -- was said about a reporter, what was said that's not in the article --

THE COURT:  I know.

MR. FOX:  The point is Mr. Baca was admitting to a source, and I think that that's where we can go with this questioning.  We can get out the information Mr. Hochman wants to be able to argue in his closing, and if he just gets out that he published the name of Baca and there were no misrepresentations to him --

MR. HOCHMAN:  If we can stipulate, Your Honor, that Sheriff Baca knew that this was an on-the-record interview and was going to be published, I'm happy to do that.

MS. SAGER:  Can we be clear that the information in the article -- that he understood that the information in the article was on the record?

MR. HOCHMAN:  I can certainly do it that way, Your Honor.

UNITED STATES DISTRICT COURT

MS. SAGER:  I don't know whether there was any off-the-record stuff.

THE COURT:  Okay.  That's fine.

(The following proceedings were held in open court in the presence of the jury:)

MR. HOCHMAN:  May I proceed, Your Honor?

THE COURT:  Yes.

Q    BY MR. HOCHMAN:  Just focusing on the stuff that was published in your September 29, 2011, article, when you interviewed Sheriff Baca about the statements that occurred -- that were published by you in that article, did Sheriff Baca -- did you communicate to Sheriff Baca that it was -- that it was a -- that these were public statements, not background or off-the-record statements?

A    So I didn't --

Q    I'm sorry.  I missed the question.

You were going to use these statements in a public way as part of your article.  And again, I'm talking about the published statements, not that it was somehow some off-the-record background conversation.  I'm only referring to the published statements.

A    Can I clarify or restate your question as I understand it?

Q    Please.

A    So you're asking if the statements that I

published attributed to him were off the record?

Q    Correct.  Or basically actually that those statements were on the record.  That's the point I'm trying to ask you.

A    Yes.  I only published the statements -- the statements attributed to him in this article were on the record.

Q    And didn't Sheriff Baca tell you that earlier in the week -- and again, I'm talking about the week of September 28th -- to give you reference points, September 26, 2011, was a Monday, and September 28, 2011, was a Wednesday, and the article comes out on September 29, 2011, a Thursday.

Does that sound about accurate?

A    Yes.

Q    All right.  So when you're writing -- when you're speaking with Sheriff Baca, didn't Sheriff Baca tell you that earlier that week, so earlier than September 28, 2011, two sheriff's investigators showed up at the home of the lead FBI agent involved in the cell phone sting to question her?

A    So your question is, during this interview, did he tell me that deputies went to the home of the FBI agent?

Q    Yes.

A    As published in the article, yes.

Q    Did he tell you that, in response to a question

whether or not the sheriff's department was going to seek
criminal charges, Sheriff Baca said, "No, I don't think so.
It's not worthy of pursuing in view of the greater good"?

A       Did he say that?  Is that your question?

Q       Yes.

A       Yes.

Q       And did Sheriff Baca ever say to you that he
instructed any deputies or investigators of the sheriff's
department to threaten or seek charges against the FBI agent
Leah Marx?

MS. SAGER:  Same objection as to unpublished
information.

THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  Did Sheriff Baca tell you during
that September 28, 2011, interview, "My goal is the truth"?

MR. FOX:  Objection, Your Honor.  Irrelevant.
Beyond the scope.  Hearsay.

THE COURT:  Sustained.

THE WITNESS:  Do you mind, Judge, if I open up
the exhibit?  He's referring to things I would like to --

THE COURT:  No.  Just for a moment, we'll leave
it the way it is.  I don't think he's going to be too much
longer.

MR. HOCHMAN:  A few more questions, Your Honor.

Q       Did Sheriff Baca tell you that the FBI agents

tried to dissuade the inmate Anthony Brown from using a jail house line, telling him that they would be monitored by the sheriff's officials?

MR. FOX:  Objection, Your Honor.  Mr. Hochman is referencing something that's not attributed.

THE COURT:  Does somebody have -- did we mark this?

MR. FOX:  I can put it on the screen for our purposes.  Just let me know when that's okay to do.

MR. HOCHMAN:  Your Honor, I'll withdraw the question.

THE COURT:  All right.

Q      BY MR. HOCHMAN:  Did Sheriff Baca tell you during that September 28, 2011, interview that the visit of the two sheriff's investigators to Leah Marx's house was not intended to intimidate the agent?

A      You said "was not"?

Q      So Sheriff Baca told you that the visit by the two sheriff's investigators to Leah Marx's house was not intended to intimidate the agent?

A      He dismissed any suggestion that the intent was to intimidate the agents -- or the agent.

MR. HOCHMAN:  No further questions.

MR. FOX:  Nothing, Your Honor.

THE COURT:  I'm sorry?

**UNITED STATES DISTRICT COURT**

MR. FOX:  I have no further questions.

THE COURT:  All right, sir.  You may step down.

THE WITNESS:  Thank you.

(Further proceedings were held and reported but not included herein.)

30

CERTIFICATE OF OFFICIAL REPORTER

I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

DATED THIS  17TH  DAY OF DECEMBER, 2016.


/S/ MIRANDA ALGORRI
_____
MIRANDA ALGORRI, CSR NO. 12743, CRR
FEDERAL OFFICIAL COURT REPORTER

**UNITED STATES DISTRICT COURT**