UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

HONORABLE PERCY ANDERSON, U.S. DISTRICT JUDGE

UNITED STATES OF AMERICA,          )
                                   )
            Plaintiff,             )    Case No.
                                   )
       vs.                         )    CR 16-00066(A)-PA
                                   )
LEROY D. BACA,                     )    PAGES (1 to 31)
                                   )
            Defendant.             )
_____)

REPORTER'S TRANSCRIPT OF
GOVERNMENT'S OPENING STATEMENT
WEDNESDAY, DECEMBER 7, 2016
8:39 A.M.
LOS ANGELES, CALIFORNIA

_____

MIRANDA ALGORRI, CSR 12743, CRR
FEDERAL OFFICIAL COURT REPORTER
312 NORTH SPRING STREET, ROOM 435
LOS ANGELES, CALIFORNIA 90012
MIRANDAALGORRI@GMAIL.COM

UNITED STATES DISTRICT COURT

**APPEARANCES OF COUNSEL:**


**FOR THE PLAINTIFF:**

        EILEEN M. DECKER
        United States Attorney
        BY:  BRANDON FOX
        BY:  EDDIE A. JAUREGUI
        Assistant United States Attorneys
        United States Courthouse
        312 North Spring Street
        Los Angeles, California 90012


**FOR THE DEFENDANT:**

        MORGAN LEWIS AND BOCKIUS LLP
        BY:  NATHAN J. HOCHMAN
        BY:  BRIANA ABRAMS
        The Water Garden
        1601 Cloverfield Boulevard
        Suite 2050 North
        Santa Monica, California 90404


        MORGAN LEWIS AND BOCKIUS LLP
        BY:  TINOS DIAMANTATOS
        77 West Wacker Drive
        Chicago, Illinois 60601

**UNITED STATES DISTRICT COURT**

# I N D E X

**WEDNESDAY, DECEMBER 7, 2016**

**Chronological Index of Witnesses**

Witnesses:_____   Page

(None)

**UNITED STATES DISTRICT COURT**

**EXHIBITS**


**WEDNESDAY, DECEMBER 7, 2016**


| Exhibit | For ID | In EVD |
|---|---|---|

(None)

**UNITED STATES DISTRICT COURT**

**LOS ANGELES, CALIFORNIA; WEDNESDAY, DECEMBER 7, 2016**

**8:39 A.M.**

**---**

(Further proceedings held and
reported but not included herein.)

THE COURT:  All right.  Does the Government wish to make an opening statement at this time?

MR. FOX:  Yes, Your Honor.  Thank you.

May I proceed, Your Honor?

THE COURT:  Yes, please.

MR. FOX:  An abuse of power in order to obstruct justice.  For more than a decade, the defendant, Leroy Baca, was sheriff of Los Angeles County.  During that time the citizens of Los Angeles County entrusted him with an important power, the power to oversee the law enforcement efforts of the Los Angeles County Sheriff's Department in Los Angeles County. It was his job during that time to investigate criminal acts, make sure his department was enforcing the law, and to bring to light any criminal acts that were occurring.

But in August and September of 2011, when it was his department that was being investigated, when it was his deputies being investigated, when it was the jails that he was supposed to run that were being investigated, Mr. Baca abused that power.  Instead of bringing criminal conduct to light, he

**UNITED STATES DISTRICT COURT**

tried to sweep it under the rug.  He tried to obstruct the federal investigation through concealment, through threats, and through intimidation.  I'll explain to you how that all occurred, but first let me talk about the two charges that he's charged with in the Indictment.

First of all, Mr. Baca is charged with conspiring to obstruct justice, in other words, agreeing with at least one other person to obstruct justice.  And, secondly, he's charged with endeavoring to obstruct justice, trying to obstruct justice.  These are the two charges against Mr. Baca, and these are the charges that you are going to need to decide over the next couple weeks.

During this time, we will present to you an overwhelming amount of evidence that will show you that Mr. Baca was the heartbeat of this conspiracy.  He was the leader of this conspiracy.  He was the driving force behind it. You will hear from witnesses.  You will see e-mails that will prove this to you beyond a reasonable doubt.

Now, let me take you back a little bit and explain to you how we're going to prove this to you.  First of all, you're going to hear about Mr. Baca's knowledge of the beatings that were going on in Men's Central Jail and Twin Towers Correctional Facility.  These are two jails that are located just blocks from here in Downtown Los Angeles. These are two county jails, and the sheriff's department was

supposed to be operating those jails.  That was their duty -- keep the inmates safe, make sure that no contraband got in the jail, make sure that they were being run properly.

Throughout his tenure as sheriff, Mr. Baca heard allegations about deputies abusing inmates in those jails.  This reached a crescendo in the months leading up to him learning about the federal investigation.  It came from many different sources.

First, a chaplain who met with Mr. Baca -- this was in 2011 -- told Mr. Baca about the brutal beating that the chaplain had seen in Men's Central Jail -- an inmate who was handcuffed, an inmate who was shackled, couldn't move his hands or his legs, an inmate who was beaten by two deputies to the point where the inmate was unconscious.  The chaplain told Mr. Baca about what he had seen, met with him personally.  And Mr. Baca turned a blind eye to those allegations, told the chaplain, you know what, my internal investigators already looked at this, and they found the deputies had done nothing wrong, nothing to see here.

That wasn't the only person who announced what they had seen firsthand in the jails.  There was a jail monitor who worked for the ACLU, court-appointed.  A federal court had appointed the ACLU to monitor the jails to make sure that deputies were not committing abuse, to make sure they were not retaliating against inmates who were complaining about

misconduct as had happened over the years.

And a jail monitor doing her job in the Twin Towers Correctional Facility, which is right across the street from Men's Central Jail, was visiting with an inmate, talking to an inmate.  At this time in the visiting room, she looked out the window into the common area, and she saw deputies beat an inmate right in front of her, beat him to the point he was unconscious on the ground, lying on the ground.  And at that point, they Tasered him.  While he was unconscious, Tasered him, shocked him.

This witness, Esther Lim, and the ACLU decided to go public with these allegations, filed these allegations with the Court, went public, went to a press conference, and said what happened.  There was one criminal charge involved in that conduct.  The inmate was charged in that case for being abused.  He was charged with assault himself.  No reforms happened because of that incident.  Nothing to see here.

A commander, someone inside the sheriff's department, went to Mr. Baca on two occasions leading up to the federal investigation.  This commander's job was to oversee what was happening in the jails in this area.  And there were two jails -- actually, one jail in particular he was concerned about, and that was Men's Central Jail.

You'll hear his concerns about what is known as the 3000 floor.  It's the floor where the most violent

**UNITED STATES DISTRICT COURT**

criminals are kept, inmates are kept.  And the deputies on that floor were engaging in a lot of force, excessive force.  The commander saw this, saw the numbers, was concerned about the force, and went to Mr. Baca on two occasions and said, "We need to meet.  I have concerns about the force in MCJ, Men's Central Jail."  And on two occasions, Mr. Baca ignored his request for a meeting, ignored his concerns.  Nothing to see here.

From 2009 to 2011 there were dozens of inmates' allegations about abuse, about retaliation.  Mr. Baca sent his internal investigators to look at these allegations and almost always, almost 100 percent of the time, they came back saying, "Nothing to see here.  The accusations are unfounded.  The deputies did nothing wrong.  Nothing to see here."

But in August and September of 2011, he found out about the federal investigation.  Mr. Baca and his department couldn't deny the allegations because at that point they didn't know what the allegations were.  They just knew that the Federal Government was investigating excessive force and corruption in the jails.  Couldn't discredit the accusers, the whistleblowers, the eyewitnesses because they didn't know who they were.  Who was telling the Federal Government about this conduct?  Was it employees of the sheriff's department?  Was it the ACLU?  Couldn't discredit them because they didn't know who they were.

So Mr. Baca and his department came up with this conspiracy. They decided to conceal an inmate from the Federal Government, hide him, tamper with witnesses, and ultimately confront the agent, threaten to arrest her for conducting an investigation of the sheriff's department and doing nothing more than that. We'll talk about this in more detail, but let me start with what the federal investigation was.

As I mentioned, it was into excessive force. There was one special agent in particular, someone who was newly assigned to the FBI, just became an agent, just started looking at cases, and her supervisor gave her a letter from an inmate. The inmate was detailing all the abuse that was going on in Men's Central Jail, and this special agent -- her name is Special Agent Leah Marx. She has since changed her name to Leah Tanner. So you'll hear her referred to as both names.

Special Agent Marx began looking into these allegations, and the FBI did as well. The entire organization did, learned about dozens of accusations of abuse going on in Men's Central Jail and Twin Towers, began interviewing inmates who were all saying similar things about the abuse by the deputies, also hearing that there was corruption going on in the jails. Deputies were willing to accept bribes to bring contraband into the jails.

FBI believed that these were real and serious

allegations, and they decided to do something about it. They contacted the U.S. Attorney's Office, the FBI did, and jointly began conducting a grand jury investigation issuing subpoenas, trying to see if documents would or would not corroborate the allegations of the inmates. They knew that inmates alone, their testimony would not necessarily be relied on solely by a jury; so they needed more information. They started a grand jury investigation.

Not only that, but the U.S. Attorney's Office and FBI decided that the FBI should conduct an undercover operation to see if the allegations of corruption were legitimate. One inmate, in particular, you're going to hear a lot about in this case, his name is Anthony Brown. Anthony Brown was one of the informants for the FBI. He was one of the people housed on the 3000 floor, the biggest problem area in Men's Central Jail, the biggest problem area in any of the county jails. He was housed there, and he was one of the inmates telling them about the abuse and corruption going on in Men's Central Jail.

He said there was one deputy, in particular, that was willing to accept bribes to bring in contraband. Later on the FBI learned this deputy was named Gilbert Michel. There are going to be a lot of names I'll go through. You'll hear a lot about all these people as we proceed in this trial.

So the FBI decided to conduct an undercover operation to see if Gilbert Michel would accept bribes and

would bring contraband into the jail to Anthony Brown, the informant.  The undercover operation was successful.  Mr. Michel accepted the bribes, thousands of dollars in cash, brought a phone in to Anthony Brown, the informant.  And the FBI had decided in the undercover operation that Anthony Brown would use this phone to have realtime contact with the FBI, to be able to tell the FBI when an abuse incident happened because a lot of information is confined in the jails.  FBI couldn't find out about these incidents until months later, and then they wouldn't even know necessarily who the victims were, who the deputies were that were involved in the abuse.  So they could get realtime information.  "Something just happened.  This inmate was beaten.  Here were the deputies involved."  That was the plan.

But a few days later after that plan was put in place, after Mr. Michel took the bribes and brought the phone to Anthony Brown, the sheriff's department conducted a routine search of Anthony Brown and found this phone in a potato chip bag that Mr. Brown had put it in.  So they found a phone.  Not all that unusual.  And during that time, a routine investigation occurred of Anthony Brown of the phone, just another phone.

But on August 18 something happened.  Mr. Baca received a call from the head of the FBI in Los Angeles -- his name is Steve Martinez.  And the deputies will go through this

a little bit later also -- found out about the connection with the FBI and a Civil Rights Squad, in particular. And at that point, Anthony Brown was moved from Men's Central Jail, 3500 floor, to 1750.

Now, this floor, this area was the most secure floor of Men's Central Jail. It was the one to put all the high profile inmates in, celebrities, informants, high-up people in gangs. This was the place to put them so that they were protected. They had a camera trained on each one of these cells to record who was coming and going from these cells. They knew who was going into those cells. It was on the camera that was there 24 hours a day, an appropriate place to put Anthony Brown at that time.

They then decided to keep Anthony Brown away from anybody else, away from the FBI, away from anybody but the sheriff's department, conducted interviews of Anthony Brown in which he said he was a federal informant, told them that Deputy Michel was the one who had been set up to take the bribes, told them about the beatings. And they kept Anthony Brown in that area where he should have been, 1750.

But on August 23rd, a deputy messed up, allowed the FBI to have contact with Anthony Brown when the sheriff's department had decided the FBI couldn't. The FBI went to visit their own informant, took him into a room, began talking to him. After the sheriff's department found out about that,

Anthony Brown was moved from 1750 to an area of the jail that was reserved for inmates with staph infections, an infectious diseases floor.  And from that point on, he was guarded by two deputies at a time standing outside of his cell to make sure that slipup wouldn't happen again, that the FBI would not have contact with their informant again while he was in county custody.

On August 25th you'll learn that a federal court order, a writ, was faxed to Men's Central Jail demanding the appearance of Anthony Brown to testify in the grand jury.  At that point Anthony Brown couldn't be Anthony Brown anymore. The sheriff's department made up a fake alias for him, John Rodriguez, changed his name, changed his race, left no connection between Anthony Brown and his new alias.

When the sheriff's department, Mr. Baca's department, became concerned that the FBI or the U.S. Marshal Service was going to come and give the writ to them in person, couldn't deny receiving a fax at that point because there they were in person with the writ.  They decided that Men's Central Jail wasn't the place for Anthony Brown, John Rodriguez.  They changed his name, again, and moved him out of Men's Central Jail.  He became Kevin King, again, no connection to Anthony Brown, and they moved him to a station jail 30 miles from Men's Central Jail.  That's the beginning of the obstruction.  You're going to hear a lot about the middle,

but I'm going to glance over that a little now, but I'm going to talk to you about the end.

It culminated with the approach of Special Agent Leah Marx.  They confronted her outside of her house and threatened her arrest for doing nothing more than her job, doing nothing more than investigating the sheriff's department.  They decided that they -- Mr. Baca decided that they would investigate the investigators.  We'll go through this all now in more detail.

Mr. Baca, as I mentioned on August 18, received a phone call from Steve Martinez who was the head of the FBI in Los Angeles.  At that point in time, he contacted his No. 2 in charge Paul Tanaka, a man that Mr. Baca had been grooming for this position, his right-hand man, his trusted advisor, the man who had a unique ability to do whatever it was that Mr. Baca wanted done.

Mr. Tanaka and Mr. Baca then set up meetings for August 19, the next day, with their co-conspirators.  Let me discuss who these people are.  As I mentioned, you're going to hear a lot of names in this case.  I'll discuss them briefly now.

OSJ, you'll hear that acronym, Operation Safe Jails.  Its job was to keep the jails safe.  It was headed up by Greg Thompson.  During this conspiracy, Greg Thompson and his deputies would make sure that Anthony Brown was hidden from

**UNITED STATES DISTRICT COURT**

the FBI, the U.S. Marshal Service, the Federal Grand Jury.  He promised to keep Anthony Brown hidden from the FBI.

And during this time, he brought in his trusted deputies Mickey Manzo, who you will hear from, Gerard Smith, and James Sexton.  Mr. Manzo and Mr. Smith, they did the nuts and bolts of moving Anthony Brown.  They are the ones figuring out which deputies would stand guard over Anthony Brown.  And Deputy James Sexton was one of the people not only standing guard but using the computer system to figure out how they could hide Anthony Brown.  He knew what everybody else in this conspiracy knew, the true purpose of this was to keep all the evils within Men's Central Jail in Men's Central Jail.  He called this operation "Operation Pandora's Box."  That was his pet nickname for the operation because he knew, just like in Greek mythology, if the box was opened, all the evils within would go out to the world.

On the right-hand side, ICIB, the Internal Criminal Investigations Bureau, Mr. Baca tasked them with investigating the investigators.  This was led by Captain William Tom Carey.  You'll hear him primarily referred to as Tom Carey in this case.  He was the captain.  Mr. Baca, as sheriff, was able to select anyone from the rank of captain and above.  He was able to pick who was in each position, and he picked Tom Carey for this position.

Also, within ICIB was Lieutenant Steve Leavins.

**UNITED STATES DISTRICT COURT**

Mr. Leavins was a close aide formerly of Paul Tanaka's, and Mr. Tanaka had placed him in ICIB. And you'll hear that Mr. Carey and Mr. Leavins were reporting directly to Mr. Baca and Mr. Tanaka during this time period as was Greg Thompson on the left-hand side of the screen.

Mr. Carey and Mr. Leavins brought in two sergeants -- Sergeant Scott Craig and Sergeant Maricela Long. They were the ones doing the nuts and bolts with respect to investigating the investigators and tampering with witnesses as I will get into.

So on August 18, this is when Mr. Baca learned of the FBI phone from Steve Martinez. "You have our phone. This is an FBI phone that you've recovered." At the same time, Mickey Manzo and Gerard Smith listened to recorded calls from the inmate's telephone system that the sheriff's department had. Every inmate was able to use the phone and call people. Anthony Brown had used a landline to call the Civil Rights Squad of the FBI, asked for a phone. That's when the deputies realized that this was a civil rights investigation that they had on their hands.

They told their boss Lieutenant Thompson, and the three of them went to Paul Tanaka, went to Sheriff Baca on August 19 and told them what they had learned. Not only did they hear the calls, but Mr. Manzo and Mr. Smith had interviewed Anthony Brown on August 19, and they learned that

Anthony Brown was setting up deputies for corrupt transactions. And they said, "Is it okay if we take this to our boss?"  And Anthony Brown said, "Go ahead, and do that."  They took it to Paul Tanaka and Leroy Baca that Anthony Brown was reporting on abuse.  Anthony Brown was setting up deputies and corrupt transactions.

And Mr. Baca decided at that point that Anthony Brown, who was scheduled to be transferred to state because he had been sentenced for his crimes, sentenced to 400 years in prison, which he was going to serve, would then be kept in sheriff's department custody.  He would not be sent to the state because he did not want to have Anthony Brown leave his control.

That night Mr. Baca met with Cecil Rhambo, an assistant sheriff, who told Mr. Baca just give the Federal Government back their inmate.  Give the feds back their phone.  It was advice that Mr. Baca would ignore, and that's not the only time he ignored Assistant Sheriff Rhambo.

On August 20 they had another meeting.  You'll hear this referred to as the "Saturday meeting."  And during the Saturday meeting, Mr. Baca learned more details about what was going on.  He listened to the phone calls between Anthony Brown and the Civil Rights Squad, about "Where is the phone?"  "You'll have your phone soon."

Mr. Tanaka and Mr. Baca were mad at this meeting.

UNITED STATES DISTRICT COURT

Mr. Baca issued an order, isolate the inmate.  He and Mr. Tanaka were about to leave the room, and he told everybody in that room, "Everything runs through Undersheriff Tanaka. I'm putting Undersheriff Tanaka in charge."  And the two of them, Mr. Baca and Mr. Tanaka, left the room for several minutes.  Only Mr. Tanaka returned, and Mr. Tanaka told the group, "I've never seen the sheriff this mad, never seen him this mad.  We're going to do whatever it is that he wants done."  And Mr. Tanaka at that point discussed what it was that Mr. Baca wanted done.

We're going to keep the FBI out of the jails and away from Anthony Brown.  Mr. Tanaka then discussed a policy that four days later they put into place.  They then put a note on Anthony Brown's door in 1750 saying that he should not be allowed to have access to the FBI or anyone else.

On August 23rd, as I mentioned, the FBI came in not knowing anything about that order.  They met with Anthony Brown.  Deputy had messed up.  And when Mr. Tanaka learned about this from the people you see at the bottom of the screen, Mr. Tanaka was extremely upset, extremely upset. Started ripping into all those people that were telling him this.  "You told me this wouldn't happen.  'F' the FBI, those MF'ers.  You told me this wouldn't happen."

When Mr. Thompson asked Mr. Tanaka whether the sheriff was aware of what had happened with the FBI having

**UNITED STATES DISTRICT COURT**

access to Brown, Mr. Tanaka said, "I'm not going to be the one that tells him that. You're going to have to tell him that." So Mr. Thompson went in to see Mr. Baca, told Mr. Baca what had occurred. FBI got in to see Anthony Brown, coming up with a plan to figure out what to do about this.

"We stopped the interview after about an hour. I'm sorry, Sheriff. I'm sorry." Mr. Thompson would tell Mr. Manzo this later that that conversation occurred. At that point the sheriff's department took additional steps to hide Anthony Brown. That's when they put him in the floor that's relegated to those with staph infections, and that's when they put two guards outside of his jail at all times. They used Greg Thompson's trusted deputy with OSJ to keep guard on Anthony Brown.

On August 24 you'll see the written policy that was put in place. Mickey Manzo e-mailed it to Greg Thompson, word-for-word nearly, with what Paul Tanaka said the policy should be. It basically said that in the future -- starting now, and for the foreseeable future, all FBI interviews would not be conducted unless it had the approval of Paul Tanaka. That's what the initial draft said. Mr. Thompson sent this to Mr. Tanaka's aide and had a conversation with them, sent a confirming e-mail. "On the FBI notice of facility matters, would Mr. Tanaka be satisfied if I remove all reference to him or the executives?" Mr. Baca and Mr. Tanaka knew they

shouldn't be doing what they were doing and wanted the names kept off of everything that was going on.  So the policy that went out did remove all references to any executive.  Doesn't say who is supposed to be doing those approvals, left it to Greg Thompson's crew.

The next day, what the sheriff's department was concerned about, a federal writ came in for Anthony Brown demanding his appearance, his production to the Federal Grand Jury on September 7, 2011, signed by a federal judge.  This was faxed over to the sheriff's department.  Very next day Mr. Carey and Mr. Thompson engaged in e-mails talking about the possibility of the FBI or a marshal coming with that writ in hand demanding the production of that inmate.

Mr. Carey wrote, "Has to be clear that this inmate is not released without approval."  And when the captain of Men's Central Jail asked, "Which attorney are we going to use for this?  Possible court order from the FBI," Mr. Thompson responded showing what the intent was of this conspiracy.  "Probably use the one who is on vacation for a month."  The whole goal here was to stall the investigation, slow it down, let the sheriff's department do what they needed to do to cause the investigation to be stopped during the time when the investigation was stalled.

So this policy goes out, sent from the captain to all of custody.  "The Court order is presented by federal

officers, receive the order, and advise the federal officer that, before you can proceed, you have to submit the order to the department's legal advisor for review.  Do not release the inmate or allow contact."  This was a new policy, never been used before or since with respect to any other inmate.  Just for this case, just so Anthony Brown would not get into federal custody.

That was the day that they moved him out of Men's Central Jail.  They moved him to San Dimas, and they told him that he was abandoned.

(A cd commenced playing before the jury.)

MR. FOX:  "And they haven't come back for you."  The FBI had told Anthony Brown on August 23rd, when they interviewed him, when the sheriff's department pulled him out of the interview, that they'd be back for him.  Anthony Brown told everybody that, told the sheriff's department this.  Anthony Brown didn't know about the writ.  They wanted Anthony Brown to feel as though he was abandoned, left for dead.  And you'll learn that that's exactly what he felt.

Although Mr. Baca and Mr. Tanaka were trying to keep their names off of things, you'll see that they were having meetings with all of the people we've been discussing.  Mr. Baca was meeting frequently with Steve Leavins, Tom Carey, Greg Thompson, Paul Tanaka about these issues.  And in this e-mail that you'll see -- this is Exhibit 31 that we will

**UNITED STATES DISTRICT COURT**

introduce -- Mr. Tanaka tells Steve Leavins, his former trusted advisor, "The sheriff popped in looking for an update.  This case is consuming his entire thought process."

The sheriff's department has a lot of responsibilities.  The sheriff has a lot of responsibilities, but this was his priority during this time.  This is what was consuming his entire thought process.

You'll see also that there were secret meetings that were being held in the fourth floor conference room.  You'll learn that that was the conference room being used by the executives reserved only for the executives.  The two executives that I'm talking about is Sheriff Baca and Paul Tanaka.  Those are the only two allowed to use those conference rooms.  Greg Thompson and William Carey -- Tom Carey were meeting in that fourth floor conference room on key dates.  This is August 26 when Anthony Brown is moved out of Men's Central Jail.

On August 29 Mr. Baca set up a meeting with the U.S. Attorney's Office, spoke to the U.S. Attorney and several others at a meeting, and expressed his displeasure with the investigation, expressed his anger toward the FBI, told the U.S. Attorney's Office how unhappy he was with this investigation.  But nothing changed.  Nothing changed from the U.S. Attorney's Office side, didn't agree to do anything.  So the sheriff's department decided to amp things up even more.

August 30 Mr. Baca's department went to Men's Central Jail, and the key players in this conspiracy went there. Paul Tanaka was at Men's Central Jail, so was Tom Carey, the captain. And during that time, Steve Leavins, Scott Craig, and Maricela Long were tampering with witnesses. They were approaching deputies that they believed were cooperating with the Federal Government and telling them not to talk. You'll hear on one occasion Mr. Craig says, "You understand I'm a sergeant," pulling out his rank. "I'm a sergeant ordering you not to talk to the Federal Government."

They discussed grand jury subpoenas, told people, "Report those grand jury subpoenas to me, and we'll go from there." They didn't want deputies going in front of the grand jury. They didn't want deputies talking at all about what was happening in Men's Central Jail.

On September 2nd, with all these meetings occurring in those executive offices, Mr. Baca's office, Mr. Tanaka's office, and the conference room, they had their offices swept for bugs, listening devices. We're not talking about crawly things. We're talking about listening devices that the FBI uses. They wanted to make sure the FBI wasn't listening in to their secret corrupt conversations. That's what happened on September 2nd.

And on September 8 they decided to change course, try to figure out what is it that the Federal Government is

investigating?  So they sought a court order from a superior court, a state court, asking the state court to order the FBI to turn over all of its records of its investigation of the sheriff's department to the sheriff's department.  You'll hear from the judge in that case who denied the Court order out of hand because the superior court, you'll learn, has no jurisdiction over a federal agency.  The county, the state doesn't have jurisdiction over federal agency.  Doesn't happen. While the Federal Government has jurisdiction to look at crimes by a local agency, the same is not true on the other side.

On September 13 the same deputy, Gilbert Michel, who had taken the bribes, admitted that he and others engaged in brutal beatings within Men's Central Jail.  He told the sheriff's department this.  He discussed how he and others would beat handcuffed inmates within Men's Central Jail. Mr. Carey reported this to Mr. Tanaka.

Now, during this time -- this is an interesting time that I'm sure Mr. Hochman is going to talk about as well. Mr. Baca was out of the country from September 8 to, I think, about the 22nd he was out of the country.  And during this time things calmed down to some degree.  The sheriff's department on September 12 had sent Anthony Brown to state custody to serve his time, and once he was there, the Federal Government interviewed him, talked to Anthony Brown because they finally had access to him.

During that time there wasn't a lot of huge obstruction going on, but they did learn about the inmate abuse by Gilbert Michel.  They also talked about conducting surveillance and began conducting surveillance on the FBI agents involved in the investigation, primarily surveillance of Special Agent Leah Marx.  They found that she had done nothing during this surveillance, found that she walked her dog, even picked up after the dog, nothing to indicate that she had done anything wrong.

Mr. Baca returned, as I said, on September 22nd, and then he came up with a plan, set up a meeting with the Federal Government on the 27th.  But before that he had to implement a plan to increase the pressure on the Federal Government.

His August 29 meeting with the U.S. Attorney's Office was not good enough.  He hadn't played his pieces well enough.  This time he was going to play his pieces the right way.  So he went on television, went on *Good Day L.A.,* said that he resented the FBI's intrusion, said "LASD polices itself."  "We police ourselves" is what he said.  And then he claimed the FBI committed a crime.  He didn't really believe this.  What the FBI had done was conducted undercover investigation, something that happens in law enforcement all the time.  He did mention a meeting that he had set up with the Federal Government, the reason for his plan.  The reason to

increase the pressure was this meeting.

Around the same time, sometime in September, Mr. Baca met with Assistant Sheriff Rhambo, the same guy who had told Mr. Baca to give the feds back their phone, give the feds back their inmate. Mr. Rhambo at this point had heard about a potential approach of an FBI agent, went to Mr. Baca, "what's this I hear about knocking down the door of an FBI agent?" And Mr. Baca said same thing that he said on television. "They committed a crime." Mr. Rhambo said, "This is an undercover operation. There is no crime. They didn't tell us about the investigation because we're subjects of the investigation. They're looking at us. They committed no crime." Mr. Rhambo discussed his experience, said, "I've been on task forces, and in these task forces, we conduct undercover operations and large-time drug dealing, and there's no crime when you set up a drug transaction undercover. This is the same thing." Mr. Baca said, "I'm going to go talk to the U.S. Attorney about that."

On September 26 after that television appearance, Mr. Baca since got Scott Craig out, Maricela Long out to confront the agent. Mr. Craig told Special Agent Marx, "Do you know that you're named in a felony complaint?" It was a lie. She was not. She didn't know that, but she was not. Discussed what they were going to do to arrange for her arrest, intimidation tactic, tried to get the FBI to back down.

Also on September 26 you'll see all this activity that day to try to increase the pressure on U.S. Attorney Andre Birotte and the FBI.  Mr. Baca wrote a letter, pinned a letter to the U.S. Attorney asking him to withdraw the Federal Grand Jury subpoenas that had been issued to the department, asked him to withdraw support for the FBI.  "Don't support the FBI's efforts."  What did Mr. Baca want done instead?  He wanted the U.S. Attorney's Office to work only with Mr. Baca's investigators, the same ones who had whitewashed all those incidents over the years; the same ones that Mr. Baca controlled; the same ones who kept finding that deputies had not committed the abuses they had, in fact, committed; the same ones who always found their allegations against them to be unfounded.

And then during the September 27 meeting, the U.S. Attorney told Leroy Baca, "This investigation is continuing.  We're going to be following the same course.  We're going to continue to investigate the deputy beatings, and we're not involving you in that investigation.  You can't be a partner in it."  So Mr. Baca couldn't do anything else.  He was done.  He turned to the FBI and said, "I'm the goddamn sheriff.  These are my goddamn jails.  And we are prepared to gun-up, if necessary."  Law enforcement on law enforcement, if necessary.

Now, despite Mr. Baca's attempts of intimidation and threats, ultimately he did not entirely get his way.  While

he was able to slow things down, try to circle the wagons while his department tampered with as many witnesses as they could, while they hid Anthony Brown for a while, while they had caused the FBI to stay out of their jails for many months, the investigation would continue.

And you'll hear about some of what the investigation found during this trial today.  Some of those evils from those jails were released.  You'll hear Gilbert Michel, for example, talk about his beatings.  You'll hear him talk about his corruption.

The world will never know the full impact of this obstruction, how many deputies decided not to talk to the Federal Grand Jury as a result of his conduct, how many inmates felt they were left for dead because the FBI stayed out of the jails during that time.  The world will never know.  But Mr. Baca, through concealment, through threats and intimidation, attempt to affect the Federal Grand Jury investigation.  He conspired with his right-hand man Paul Tanaka to do so.

We'll prove to you beyond a reasonable doubt that not only a conspiracy existed, not only that there was conspiracy to obstruct justice, but Mr. Baca was at the top of that conspiracy.  We'll prove to you beyond a reasonable doubt that he was the heartbeat of this conspiracy.  He was the reason why people were doing what they were doing, to follow

the sheriff's orders.  That's what was going on.

He was the one who ultimately was abusing the power that was entrusted to him by the citizens of Los Angeles County because, instead of enforcing the law and bringing criminal conduct to light, he instead was obstructing justice and trying to hide the criminal acts of his co-conspirator -- I'm sorry -- of the deputies in the jails.

And after several days when we present this evidence to you, we will come back up here, and we will ask you to return the only verdict that will be consistent with the evidence in this case, and that's a verdict that Mr. Baca abused his power and that he's guilty of both counts of the Indictment.

Thank you.

(Further proceedings held and reported but not included herein.)

**UNITED STATES DISTRICT COURT**

CERTIFICATE OF OFFICIAL REPORTER

I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

DATED THIS  17TH  DAY OF DECEMBER, 2016.


/S/ MIRANDA ALGORRI

MIRANDA ALGORRI, CSR NO. 12743, CRR
FEDERAL OFFICIAL COURT REPORTER

**UNITED STATES DISTRICT COURT**