UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

HONORABLE PERCY ANDERSON, U.S. DISTRICT JUDGE

UNITED STATES OF AMERICA,          )
                                   )
             Plaintiff,            )    Case No.
                                   )
        vs.                        )    CR 16-00066(A)-PA
                                   )
LEROY D. BACA,                     )    PAGES (1 to 59)
                                   )
             Defendant.            )
_____)

REPORTER'S TRANSCRIPT OF
TESTIMONY OF MICHAEL HANNEMANN
WEDNESDAY, DECEMBER 14, 2016
9:16 A.M.
LOS ANGELES, CALIFORNIA

_____

MIRANDA ALGORRI, CSR 12743, CRR
FEDERAL OFFICIAL COURT REPORTER
312 NORTH SPRING STREET, ROOM 435
LOS ANGELES, CALIFORNIA 90012
MIRANDAALGORRI@GMAIL.COM

UNITED STATES DISTRICT COURT

**APPEARANCES OF COUNSEL:**


**FOR THE PLAINTIFF:**

EILEEN M. DECKER
United States Attorney
BY:  BRANDON FOX
BY:  EDDIE A. JAUREGUI
Assistant United States Attorneys
United States Courthouse
312 North Spring Street
Los Angeles, California 90012


**FOR THE DEFENDANT:**

MORGAN LEWIS AND BOCKIUS LLP
BY:  NATHAN J. HOCHMAN
BY:  BRIANA ABRAMS
The Water Garden
1601 Cloverfield Boulevard
Suite 2050 North
Santa Monica, California 90404


MORGAN LEWIS AND BOCKIUS LLP
BY:  TINOS DIAMANTATOS
77 West Wacker Drive
Chicago, Illinois 60601

**UNITED STATES DISTRICT COURT**

3

# I N D E X

**WEDNESDAY, DECEMBER 14, 2016**

## Chronological Index of Witnesses

Witness:_____   Page

HANNEMANN, Michael

    Direct examination by Mr. Fox                      6
    Cross-examination by Mr. Hochman                  34
    Redirect examination by Mr. Fox                   56

**UNITED STATES DISTRICT COURT**

**EXHIBITS**


**WEDNESDAY, DECEMBER 14, 2016**


| Exhibit | For ID | In EVD |
|---|---|---|
| 66   E-mail from James Lopez 05/05/11 | 9 | 9 |
| 139  Map of SHB 4th Floor | 20 | 20 |

**UNITED STATES DISTRICT COURT**

**LOS ANGELES, CALIFORNIA; WEDNESDAY, DECEMBER 14, 2016**

**9:16 A.M.**

**---**

(The following proceedings were held in open court in the presence of the jury:)

(Prior proceedings were held and reported but not included herein.)

MR. FOX:  Your Honor, the United States calls Mike Hannemann.

THE CLERK:  Please stand here for me, please. Raise your right hand.

Do you solemnly state that the testimony you may give in the cause now pending before this court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

THE CLERK:  Please be seated.

Would you state your full name and spell your last name for the record.

THE WITNESS:  My name is Michael William Hannemann.  Last name is H-a-n-n-e-m-a-n-n.

THE CLERK:  Thank you.

MR. FOX:  May I proceed, Your Honor?

THE COURT:  Yes, please.

**UNITED STATES DISTRICT COURT**

**MICHAEL WILLIAM HANNEMANN,**

**GOVERNMENT'S WITNESS, SWORN:**

**DIRECT EXAMINATION**

BY MR. FOX:

Q       What do you do for a living?

A       I am a lieutenant with the Los Angeles County Sheriff's Department.

Q       How long have you been with the sheriff's department?

A       February will be 28 years.

Q       What do you do currently?

A       I am the detective lieutenant at Compton Station.

Q       What are your duties at Compton?

A       I run all of the detective bureau operations.  I manage our traffic services.  I'm in charge of our secretariat. I'm in charge of our emergency operations center, and I also am the coordinator for the violence reduction network that the city of Compton is involved in.

Q       Was there a time in which you were an executive aide within the sheriff's department?

A       Yes, sir, I was.

Q       When was that?

A       From January, 2011, to May, 2013.

Q       Who were you an aide to during this time?

A       Sheriff Lee Baca.

**UNITED STATES DISTRICT COURT**

Q        I want to show you Exhibit 16 which is in evidence.  I just want to ask you about the person on the "To" line in this e-mail.  It says, "Julie A. Montgomery."  Do you know what role she served?

A        Yes, I do.

Q        What role did she serve in August of 2011?

A        Julie was one of two scheduling secretaries for Sheriff Baca.

Q        Mr. Hannemann, when you were an aide to Mr. Baca, what were your duties?

A        I was kind of a Jack of all trades.  I fielded incoming traffic into the office.  I greeted scheduled visitors.  I answered phone calls.  I opened sheriff's mail.  I assisted the executive assistant commander with going through sheriff's e-mails, and I was also a back-up driver.

Q        Let's focus on the e-mails that you just talked about.  You said you assisted in going through Mr. Baca's e-mails.  What did you mean by that?

A        Sheriff Baca got a very large number of e-mails daily, and it was the commander's job and mine to go through those and let the sheriff know which ones were pertinent for him and then which ones would need to go somewhere else on the department for some type of an action.

Q        What would you do if they were pertinent to Mr. Baca?

**UNITED STATES DISTRICT COURT**

A        I would print them out.  I would give them to the commander, and the commander would place them in a "read" folder for the sheriff to read.

Q        Are you aware during this time whether Mr. Baca himself sent e-mails from his sheriff's department e-mail address?

A        I was never aware of the sheriff sending any e-mails.

Q        I want to now have you look at Exhibit 66 in one of the books that is to your left.  If you look below it, I think it's going to be on a shelf that's below your seat.

A        I'm sorry.  Which one was it again?

Q        No. 66.  There should be three binders.  One should be labeled 1 through 84, I believe.  So it's No. 66 I'm asking you to look at.

A        Okay.  Okay.  I have it.

Q        Do you recognize that document?

A        Yes, I do.

Q        What is it?

A        It is an e-mail correspondence from the commander at the time, James Lopez, who was the executive assistant.

Q        Were you copied on that e-mail?

A        Yes, I was.

Q        Is that a true and accurate copy of the e-mail that you received on that date that's reflected in the e-mail?

**UNITED STATES DISTRICT COURT**

A        It appears to be.

MR. FOX:  Your Honor, I move for the admission of Government Exhibit 66.

MR. HOCHMAN:  Objection.  Relevance, Your Honor.

THE COURT:  Overruled.

MR. FOX:  Your Honor, may I publish the exhibit?

THE COURT:  Yes.

(Marked for identification and received into evidence Exhibit No. 66.)

Q        BY MR. FOX:  Mr. Hannemann, do you see the portion of Exhibit 66 that I've just highlighted on the top of page one?

A        Yes, I do.

Q        Who is James Lopez?

A        He at the time was a commander, and he was the executive assistant in Sheriff Baca's office.

Q        How many assistants and aides did Mr. Baca have at this time?

A        He had a commander who was an executive assistant, and he had a sergeant who was an executive aide.

Q        We see a number of people in the "cc" line, but I want to first ask you about the "To" line.  Are you familiar with this e-mail address?

A        No, I'm not.

Q        What is your understanding about why the e-mail

UNITED STATES DISTRICT COURT

address bcenter11@gmail.com was sent this e-mail?

A        This was routine because the sheriff did not check e-mail, and usually someone that traveled with him would be our point of contact, and we would send it to them.  They would print the e-mail out and give it to the sheriff for his review.

Q        What is the subject line of this e-mail?

A        Sheriff's briefing, Thursday, May 5th, 2011, document for Sheriff Lee Baca.

Q        This lists a number of people in the "cc" line as I just mentioned.  Who was Larry Waldie at the time in May of 2011?

A        He was our undersheriff.

Q        What about Paul Tanaka?

A        He was one of two assistant sheriffs.

Q        Marv Cavanaugh?

A        He was the other assistant sheriff.

Q        What about Chris Nee?

A        Christopher Nee was an executive aide.  I believe he was the executive aide for undersheriff Waldie at the time.

Q        Could you please read the part of the text that I just highlighted?

A        "Good morning, sir.  Yesterday was busy but uneventful.  Assistant Sheriff Tanaka hosted your weekly staff meeting.  All chiefs were in attendance.  Issues relating to

UNITED STATES DISTRICT COURT

the recent media coverage of the department were discussed."

Q        Please read the portion that I've now highlighted.

A        "The Channel 5 News broadcast *Gang Behind the Badge*, both segments have been copied on DVD for your review. I will send them with Mark when he picks you up from San Diego so that you can view them on the laptop if you wish."

Q        Please read the portion I've highlighted now.

A        "Below is a copy of an article in today's *Los Angeles Times,* Faturechi and Blankstein reporting on a lawsuit filed yesterday by the deputies assaulted during the MCJ Christmas party.  And the title is *L.A. County Sheriff's Department Fosters gang-like Activity Among Jail Deputies, Suit Alleges*."

Q        Could you please read the portion that I've highlighted.

A        "That's about it for now, sir.  Hope you are enjoying D.C. and are having a productive trip.  Best."

Q        You mentioned that at this time Mr. Waldie was the undersheriff.  What role did the undersheriff perform in the department?

A        He was the number two person on the department.

Q        And in terms of Mr. Waldie in May of 2011, was he often in the office?

A        It was my experience, when I got there, that

UNITED STATES DISTRICT COURT

Mr. Waldie had some health issues and he was spending a lot of time on an injured status.

Q        Based on your experience, who was filling in for Mr. Waldie during this time?

A        It appeared to be Assistant Sheriff Tanaka.

Q        Why do you say that?

A        Because the sheriff was having dealings with him.

Q        Could you please explain your observations about Mr. Baca's relationship with Mr. Tanaka during this time.

A        I would see Mr. Tanaka come over and request a meeting with the sheriff.  I would periodically see the sheriff leave his office and walk over to the other side of the building where Mr. Tanaka was located.

Mr. Tanaka frequently would come up and tell me that he would like to have a word with the sheriff while the sheriff was in with another meeting.  So when the sheriff completed whatever appointment he had, I would let him know that Mr. Tanaka desired to speak with him.

Q        Was there a time when Mr. Waldie retired?

A        Yes, there was.

Q        And what happened after he retired?

A        Once Mr. Waldie retired, Assistant Sheriff Tanaka became the undersheriff, and Cecil Rhambo, who at the time was a chief, became an assistant sheriff.

Q        Do you remember approximately when that occurred?

**UNITED STATES DISTRICT COURT**

A       I know it was in 2011.  I want to say at least six months into my tenure there, maybe June, July-ish maybe.

Q       Before Mr. Waldie retired, did you notice anything change with respect to his relationship with Mr. Baca?

A       I can't say that it changed from my standpoint because I didn't see the way it was before because, when I came into the office, Mr. Waldie, like I said, was gone most of the time.  But I did notice that I didn't see Mr. Baca dealing with Mr. Tanaka as much as I saw him dealing with Mr. Tanaka.

Q       I think you just said I didn't see him dealing with Mr. Tanaka as much as I saw him dealing with Mr. Tanaka.

A       Let me rephrase it.  I did not see Sheriff Baca dealing with Undersheriff Waldie as much as I saw the sheriff dealing with Assistant Sheriff Tanaka.

Q       I want to direct your attention now to the months after Mr. Tanaka was selected as undersheriff by Mr. Baca.

Did you hear anything about a phone being recovered in Men's Central Jail around that time?

A       Yes, I did.

Q       Did you hear anything about an FBI informant who was an inmate?

A       All later, yes.

Q       Did you notice anything different with respect to Mr. Baca's mood during this time?

MR. HOCHMAN:  Objection as to which exact time

**UNITED STATES DISTRICT COURT**

we're talking about, Your Honor.

THE COURT:  Sustained.

Q       BY MR. FOX:  Mr. Hannemann, you discussed how Mr. Tanaka was selected undersheriff around June or July of 2011.  In the August to September, 2011, time frame, generally, so a couple months after Mr. Tanaka was undersheriff, is that around the time that you heard about this phone?

A       Yes, I believe so.

Q       And during -- and what I was referring right now to this period of time, I'm talking about August, September, 2011, around the time that you heard about the phone.  Did you notice anything different about Mr. Baca's mood during this time?

A       I noticed that he seemed upset.  I don't know, somewhat angry.  It's just he was different than usual.

Q       What about Mr. Tanaka?

A       I would say the same.

Q       Did you ever ask what was going on?

A       Other people.  Not either of those two.

Q       Why didn't you ask Mr. Baca what was going on?

MR. HOCHMAN:  Objection.  Relevancy.  Foundation, Your Honor.

THE COURT:  I'm sorry?

MR. HOCHMAN:  On foundation as well, Your Honor.

THE COURT:  Overruled.

UNITED STATES DISTRICT COURT

You can answer.

THE WITNESS:  I didn't ask either one of them because I personally didn't feel it was my place for a person of my position to ask somebody that high kind of what's going on.

Q    BY MR. FOX:  How were Mr. Baca and Mr. Tanaka conducting meetings during this time?  Was there anything different about it?

A    They were having closed-door meetings, and they were bringing in individuals from custody and Internal Criminal Investigations Bureau.

Q    Approximately how long did this occur?

A    Well, I'd say that initially it was -- it seemed heavy because it was new, and then it kind of tapered off.  But because of a task force that was started, it never completely went away because I was under the impression there were updates as to how this team was working.

Q    I'm going to ask you about a few individuals, and my question is going to be did you see them having meetings with Mr. Baca or Mr. Tanaka during this time.

Let's start with Greg Thompson.  Did you see Mr. Thompson in the executive offices meeting with Mr. Baca or Mr. Tanaka during this time?

A    Yes.

Q    Approximately how frequently?

**UNITED STATES DISTRICT COURT**

A    He was one of the ones that in the beginning was there somewhat frequently, and then it was rare.

Q    What about Steve Leavins?  Are you familiar with Steve Leavins?

A    Yes, I am.

Q    How do you know Steve Leavins?

A    I know Steve from when he was Assistant Sheriff Tanaka's aide, and then I knew him when he was the operations lieutenant at Internal Criminal Investigations Bureau.

Q    What did you notice with respect to Steve Leavins and the executive offices during this time?

MR. HOCHMAN:  Objection.  Vague as to what "executive offices" is.

MR. FOX:  I'll be happy to be more specific, Your Honor.

Q    What did you notice with respect to Steve Leavins and any meetings he was having with Mr. Baca or Mr. Tanaka during this time?

MR. HOCHMAN:  Vague as to "Baca or Tanaka."

THE COURT:  Overruled.

THE WITNESS:  I noticed that Steve Leavins was up meeting with both the sheriff and Mr. Tanaka, and then it wound up evolving into a weekly meeting.

Q    BY MR. FOX:  When you say that he was meeting

UNITED STATES DISTRICT COURT

with both Mr. Baca and Mr. Tanaka, was it always joint --

A       No.

Q       -- meetings?

A       No.

Q       Okay.  What would you notice?

A       I would notice that sometimes he may meet with just the sheriff and sometimes he might meet with just now Undersheriff Tanaka.

Q       Are you familiar with someone named William Tom Carey?

A       Yes.

Q       What about him during this time?  Did you notice that he was having any meetings with either Mr. Baca or Mr. Tanaka during this time?

A       Initially he and Steve Leavins were together.  He at the time was Steve Leavins' captain.  And he was there frequently initially, and then it was, from my observation, it was only Steve Leavins coming up from Internal Criminal Investigations.

Q       Now, with respect to Mr. Carey, was he having meetings always jointly with Mr. Baca or Mr. Tanaka?

A       I believe I remember him meeting with Mr. Tanaka by himself as well.

Q       How often were you seeing Mr. Carey, Mr. Leavins, and Mr. Thompson -- I should say and/or Mr. Thompson meeting

with Mr. Baca or Mr. Tanaka during this time?

MR. HOCHMAN:  Vague, Your Honor, as to "and/or."

THE COURT:  Sustained.

Q    BY MR. FOX:  How often did you see one of these individuals meeting with Mr. Baca or Mr. Tanaka during this time?

A    When this all initially started, I would see them maybe anywhere from four to six times a week.  Then it gradually decreased and then went to, like I said, the one time a week.

MR. FOX:  Your Honor, I'm going to now publish Exhibit 37.

Q    I'd like for you to read the e-mail that's from the bottom here from Gregory L. Thompson to William T. Carey, Friday, August 26, 2011 at 2:13 p.m.  Could you read what's written under "Subject."

A    First I would have to correct you.  It's actually from William T. Carey to Greg Thompson.

Q    Thank you.  I misspoke obviously.

Could you please read what's written under "Subject."

A    And it says "Copy" -- well --

Q    I'm looking at the bottom one.

A    Oh, the bottom one.  Okay.  All right.  My bad.

Q    This portion.

UNITED STATES DISTRICT COURT

A        "En route from CJ."  That's from Greg Thompson to William -- or Tom Carey.  It says "En route from CJ."

Q        Can you please read the top e-mail from Mr. Carey to Mr. Thompson on August 26th, 2011, at 2:18 p.m.

A        Carey's response is, "Copy.  We're in the fourth floor conference room."

Q        Are you familiar with what the fourth floor of Sheriff's Headquarters Bureau was at the time?

A        Yes.

Q        What was it?

A        It was the executive floor.  It housed the sheriff, the undersheriff, the assistant sheriffs, and the chiefs of a couple of the regions and their command staff.

Q        Now I'm going to publish for you what's in evidence as Government Exhibit 67.  I just want you to look at this top e-mail that I've highlighted from Greg Thompson to Mickey Manzo and Paul Yoshinaga, August 29, 2011, at 11:46 a.m. re cell phone in INV.  Could you please read what I've highlighted there.

A        It says, "Paul, I'm carping this morning at MCJ. If you need me, please call 213-4916.  I will be here until 10:30.  Then en route to SHB to meet with you and the sheriff."

Q        Could you please look in the binder that has Exhibit 139 in it.  It's probably the one I asked you to put away a little bit ago.

A        Okay.  I have it.

Q        Do you recognize that?

A        It looks like a variation schematic of the fourth floor.

Q        By fourth floor, you're referring to the fourth floor executive offices in Monterey Park at Sheriff's Headquarters Bureau?

A        Yes.  Sheriff's Headquarters, the Sherman Block Building.

Q        Is it a true and accurate depiction of the way the fourth floor looked in August and September of 2011?

A        It does appear so, yes.

MR. FOX:  Your Honor, I move for the admission of Government Exhibit 139.

MR. HOCHMAN:  No objection, Your Honor.

THE COURT:  It will be received.

(Marked for identification and received
into evidence Exhibit No. 139.)

Q        BY MR. FOX:  I'm going to highlight the area that is in the lower half of this map or this schematic.

Could you please explain to the jury, based on what I've magnified right now, where Mr. Baca's office was during this time.

A        If you look at the far right portion of the highlighted area -- and it's almost in the middle -- you'll see

UNITED STATES DISTRICT COURT

the office of the sheriff in a walkway, the area that leads right off of No. 9 with -- actually, it looks like it says "fourth floor 9" inside the box.  That is the sheriff's office.

Q      Is it what I've just put a red circle around?

A      That is correct.

Q      Where was your office?

A      I had a cubical.  I was just outside.  If you see where it says "Office of the sheriff," you look at the second cubical in, directly above where it says "office" is where I sat.

Q      Do you see my highlighter right now?  Is that where --

A      Yes.

Q      I'm going to put a circle there as well.

And what about Mr. Tanaka's office when he was undersheriff, when he was promoted to undersheriff?  Where was his office at the time?

A      When he became undersheriff, he moved to the undersheriff's office which is bottom center of the page where it says "U/S office."

Q      Have I just circled that now?

A      Yes, you have.

Q      If people were waiting for meetings with Mr. Baca, where would they wait?

A      Referencing my location, if you move to the left,

there's one more cubical, and then there's an open space in front of that.  There was actually a chair and two couches in that portion.  That's where visitors would wait for their appointment.

Q      And is it right here that I'm highlighting right now?

A      Yes.  It's pretty much there.  It actually butted up to the cubical.

Q      And the chairs, were there backs to what in this picture is up?

A      I'm sorry.  Could you say that again?

Q      The backs of the chairs, where were the backs of the chairs facing?

A      Well, there's a couch that was backed up against the front of that cubical, and then there was a little coffee table, and then there was another couch that actually faced inward so you could actually sit at the waiting area and converse.

And then at the top, which up by the wall there was tables with plants on it, and then there was a chair there that actually butted up to the wall as well.  So they all faced inward.

Q      Are you familiar with what's called a large EPC room?

A      Yes.

UNITED STATES DISTRICT COURT

Q        What is EPC, first of all?

A        It stands for Executive Planning Committee.

Q        When you were the aide to Mr. Baca, what would this room be used for?

A        It would regularly be used for the weekly EPC meeting in which the sheriff would address the upper executives of the department so that he could get feedback from them on different events and he could pass on whatever he wanted them to know about and just detailing duties, stuff like that.

Q        Other than the EPC weekly meetings, in August and September of 2011, did you see this -- these conference rooms being used?

A        Yes.

Q        Okay.  And who would use them?

A        Well, referencing the people that were coming up, depending on how many people there were -- typically when the sheriff was having an appointment or meetings with individuals, if he was seeing more than four people, it would move from his office over to the EPC room.

Q        Do you see the EPC room on this diagram?

A        Yes, I do.

Q        Where is it?

A        Bottom left.

Q        Is it the one that has "800SF" written on it?

A        Correct.

Q        I've just highlighted that?

A        Yes, you have.

Q        What about small EPC room?  Are you familiar with that?

A        Yes.  That is the room that's directly to the right next to it.  It says "225" in it.

Q        Are you familiar with what the use of the small EPC room was in August and September of 2011?

A        I was never aware of an actual specific purpose for it.  It seemed like it was just an impromptu location if nothing else was available.

Q        You mentioned before that Mr. Nee was the aide to the undersheriff.  Was that true not only under Mr. Waldie but also under Mr. Tanaka?

A        Yes.  I believe so.

Q        Where was his seat or cubical during this time?

A        If you reference the undersheriff office and your circle, at the very tip of it, that cubical is where the undersheriff's aides sat.

Q        It looks like there are two seats there.  Did he --

A        He sat on the bottom one.  The top one was occupied by a secretary.

Q        Okay.  So it's what I've just highlighted right now?

UNITED STATES DISTRICT COURT

A        That's correct.

Q        And if somebody was waiting for a meeting with Mr. Tanaka, where would they wait?

A        There were, I believe, two chairs that were along the wall.  If you look at the No. 6 after undersheriff and then just move upward past the open door, along that wall to the left, go past that door, keep going up, a little bit more.  And then right in there is where those sheriffs were.

Q        Right here?

A        Yep.

Q        Okay.  I'll do my best to highlight that.

Is that approximately where they were?

A        Approximately, yes.

Q        Okay.  And were their backs up against this wall that it says "office" and then a little bit below that?

A        Correct.

Q        So if they were sitting in the chairs and someone was proceeding to their right, what are the office spaces that they could go to?  So they observe somebody walking past them as they're sitting down to the right, where could that person be going to?

A        They would either be going to the undersheriff's office or EPC.

Q        During the time that you were Mr. Baca's aide, did he keep a calendar?

A       Yes, he did.

Q       Did he do it personally, or did somebody else do it?

A       No.  It was done by his two scheduling secretaries.

Q       And who were they?

A       One was Julie Montgomery, and his primary was Suzie Martin.

Q       You've described a number of meetings.  Do you know whether those would necessarily be on his calendar?

A       Not all of them were.

Q       Why not?

A       Because some of them would be impromptu.  Something may happen, or somebody might get a phone call, and they would need to come over and talk to the sheriff and advise him about it.

Q       We've discussed the number of meetings that some individuals had with Mr. Baca during this August and September, 2011, time frame.  What about Mr. Tanaka?  How frequently did you observe him meeting with Mr. Baca during this time frame?

        MR. HOCHMAN:  Objection.  Asked and answered.

        THE COURT:  Overruled.

        You can answer.

        THE WITNESS:  It varied.  During this time initially it was more often, maybe as many as five times a day.

UNITED STATES DISTRICT COURT

But it was definitely every day for probably two weeks.

Q        BY MR. FOX:  Would these meetings necessarily be referred to in Mr. Baca's calendar?

A        No.

Q        Why not?

A        Because they weren't scheduled ahead of time, and he would be just getting time, or the sheriff would ask for them to come up depending on the situation.  And they wouldn't go through the scheduling process.

Q        Did you ever overhear what they were talking about during these meetings?

A        No.

Q        Why not?

A        Because they would talk out of earshot, and they would be in an office with -- in an office and possibly with the door closed.

Q        Did you ever hear any outbursts from Mr. Baca or Mr. Tanaka during this time?

A        A couple times.

Q        What did you hear?

A        Just a loud voice being raised.

MR. FOX:  One moment, Your Honor.  No further questions from this witness.

THE COURT:  All right.  Ladies and gentlemen, we're going to take our first break of the day.  I guess it's

our first.

Again, I want to remind you, until this trial is over, you're not to discuss this case with anyone including your fellow jurors, members of your family, people involved in the trial, or anyone else.  And do not allow others to discuss the case with you.  This includes discussing the case on the Internet, through chat rooms, blogs, bulletin boards, social media, e-mails or text messages.

If anyone tries to communicate with you about this case or anyone associated with it, please let me know about it immediately.

Do not do any research such as consulting dictionaries, searching the Internet or using other reference materials, and do not make any investigation about the case on your own.

Finally, you're reminded to keep an open mind until all of the evidence has been received, you've heard the arguments of counsel, the instructions of the Court, and the views of your fellow jurors.

If you need to speak with me, simply give a note to the clerk.

We'll come back at 5 after the hour.

(The following proceedings were held in
open court out of the presence of the jury:)

THE COURT:  All right, sir.  You may step down.

MR. FOX:  Your Honor, counsel for Mr. Faturechi is here, and I think that she would just like, before we have the jury come out with the witness on the stand, to be able to ask you about objections.  I don't know if you want to do that when you come back after the break or when.

THE COURT:  Okay.

MR. FOX:  Do you want me to find her?

THE COURT:  If she's not here, we'll do it after the break.

MR. FOX:  Okay.  She was here.  I think she's probably in the witness room right now.

THE COURT:  Okay.

MS. SAGER:  Good morning, Your Honor.

THE COURT:  Good morning.

MS. SAGER:  Kellie Sager for non-party journalist Robert Faturechi.  I always mispronounce his name.

Before the jury came in and he took the stand, I just wanted to raise with the Court, as I had mentioned before, I would appreciate the opportunity to object to questions on his behalf if it delves into areas that go beyond the published information which we think would interfere with his 1st Amendment rights.

I hope that there won't be questions like that, but in the event that one side or the other delves beyond what I understand the Court has ordered, I would like an opportunity

to object.

THE COURT:  That's fine.  We'll find a place where you can sit.  And if you'll -- I'll let you and the lawyers see if you can work out some procedure that everybody can live with.  If not, I'll devise something that allows you to get my attention and then we can hear your objection.

MS. SAGER:  Thank you, Your Honor.  And I'm happy to use whatever language.  I obviously don't want to make a speech in front of the jury.  But to preserve the objection for the record, I would simply say that on 1st Amendment grounds we object, and hopefully that would preserve it and the Court would understand what the purpose is of the objection.

THE COURT:  Okay.  And as I understand it -- well, do you know now if that's going to be the only objection you're going to be making?

MS. SAGER:  Unless somebody is asking for communications with counsel, Your Honor, I don't expect to make any other objections.

THE COURT:  Okay.

MS. SAGER:  If there's hearsay or other things, I'm assume the parties will make any objections they want on other issues, but only privilege would be the subject matter of my objections.

THE COURT:  All right.  So we'll just assume, if you have an objection, that it's on 1st Amendment grounds, and

we'll figure out where you sit.  I'll keep an eye out.  If you just raise your hand, and then we'll take it at sidebar.  If it looks like it's going to be a lot, then we'll adjust.  We'll make some change.

MS. SAGER:  Thank you, Your Honor.  And I can sit here if that would be convenient for the Court and the parties just so that I'm not in anyone's way.

THE COURT:  That's fine.

MR. FOX:  Your Honor, I told Ms. Sager and I told the Court it's only my intention to get out the published information.  I'm not sure if Mr. Hochman has different intentions or if Mr. Diamantatos has different intentions, but that's all I'm going to do.

THE COURT:  Okay.

MS. SAGER:  Is the jury going to be told anything about this witness' testimony and the limits of it or not?

THE COURT:  No.

MS. SAGER:  The only other thing I would raise with the Court is, if there's an open-ended question, I understand that counsel is going to say he's only eliciting information that's published.

If there's an open-ended question, the witness may make that clear as well and not to -- we don't want to talk about what's in the article, but he may feel like he needs to make clear that his answer is published information even if

**UNITED STATES DISTRICT COURT**

there might be other information that he knows that was not published, that he's restricting his answer to the published information, and that's what counsel is eliciting.  I don't know if I said that very articulately.

MR. HOCHMAN:  Your Honor, just to front part of the cross, if you read the article -- well, in reading the article, you'll see that Mr. Faturechi uses quotes on some of the statements, Your Honor, and doesn't have quotes on others and references sources in between.

So whether or not he's actually referring to something that Mr. Baca told him or some source told him and he's interspersing statements that may or may not appear to be associated with Mr. Baca, but when pressed, he would indicate it's not Mr. Baca but some other source, I obviously don't know his answer.  I haven't had a chance to interview him, Your Honor.

But I want to make it clear that I'll certainly be going into that area to determine what is exactly something coming from Mr. Baca and what is something that might have come from some other source.

MR. FOX:  Your Honor, I'm not going to be introducing the article.  So it's just going to be his recollection of the statements Mr. Baca made to him.  So I don't think this is going to be an appropriate area of cross given the article is not coming in.  We can deal with it at the

**UNITED STATES DISTRICT COURT**

time though.

MS. SAGER:  The simplest thing, Your Honor -- and I know that we're trying not to have leading questions from the Government or hearsay coming into the record.

Often asking the reporter if a statement in the article is accurate, then that enables him to answer the question without getting beyond the scope of the article if that's an easy way for the parties to proceed.  He can answer if the statement in the article that is in quote marks is something that Mr. Baca said.  If it's not in quote marks, it may have been paraphrased, and counsel may ask whether that's something that was said.

But to make it as easy as possible for the Court, I would rather not object at all.  I would be happy to not have to object to any questions.  But if the witness is asked is there anything else that you were told by Mr. Baca, that kind of open-ended question is going to cause, in his mind, an inquiry about whether someone is asking him about what's in the article or something that's not in the article.  And that's why we're trying to figure out a way of proceeding that's as least obtrusive and interfering as possible.

THE COURT:  Well, what I understand defense counsel to be saying is that I think he wants to make sure that the statements that he's asked about are statements that were made by Mr. Baca which, I think, is fair.

**UNITED STATES DISTRICT COURT**

And since counsel doesn't intend to introduce the article, I'm not sure we're going to -- I'm not sure we're going to have any issues because I'm going to keep the cross-examination limited to what's raised in the direct.

MS. SAGER:  Thank you, Your Honor.

MR. DIAMANTATOS:  Thank you, Your Honor.

(A recess was taken at 9:56 a.m.)

THE COURT:  All right.  Let's bring the jury in.

(The following proceedings were held in open court in the presence of the jury:)

THE COURT:  All right.  Let's resume.

**CROSS-EXAMINATION**

BY MR. HOCHMAN:

Q    Mr. Hannemann, you were Sheriff Baca's executive aide from approximately January, 2011 to May, 2013; is that correct?

A    That's correct.

Q    But you've been with the department for 28 years since about 1989?

A    Correct.

Q    Now, before you were Sheriff Baca's executive aide, did you go to the sheriff's academy?

A    Yes, I did.

Q    After that, did you go to some jail facility to work as a deputy?

**UNITED STATES DISTRICT COURT**

A        Yes, I did.

Q        Which one was that?

A        It was Pitchess Detention Center south facility.

Q        And after that, did you go to a patrol station?

A        Yes, I did.

Q        Which one was that?

A        I went to Firestone Station first.

Q        And what was the next one?

A        Then I went to Century Station.

Q        Did you go to another patrol station after that or somewhere else?

A        I went to Training Bureau as a use-of-force instructor.

Q        At some point were you promoted to a sergeant?

A        I promoted to sergeant from that unit.

Q        Did you go to another station at that point?

A        I did go to another patrol station.  I went to Lakewood Station.

Q        Did you go to one more station after that?

A        Yes, I did.

Q        What was that?

A        I went to Cerritos Station.

Q        Did you finally end up in narcotics bureau?

A        Yes, I did.  From Cerritos Station I went to Narcotics Bureau.

UNITED STATES DISTRICT COURT

Q    After Narcotics Bureau, that's when you became executive aide to Sheriff Baca; is that correct?

A    That is correct.

Q    Now, when you became the executive aide to Sheriff Baca, you said that you were sort of a jack of all trades; is that correct?

A    Correct.

Q    You were Sheriff Baca's back-up driver.

A    Yes.

Q    And what other types of functions did you function as?

A    I would also author correspondence.  I forgot to mention that before.  The sheriff's office in-took a lot of different types of paperwork.  Some of it required responses. And we also would do certificate proclamations for Eagle Scouts, letters of recognition, things of that nature.  That was some of my primary duties.  I did a lot of that.

Q    You were with the sheriff a lot of time during that time period; correct?

A    On the days when he was in the office, yes.

Q    And you were able to observe the hours that he kept while he was sheriff while you were his executive aide?

A    Yes, I did.

Q    What were they?

A    He typically started at 9:00 o'clock in the

UNITED STATES DISTRICT COURT

morning and would conclude the day somewhere between 9:00 and 11:00 p.m. depending on when the last event would end.

Q       So roughly 12 to 14 hours a day?

A       Yes, sir.

Q       How many days a week?

A       That was the average Monday through Friday. Saturdays and Sundays he had events, but it varied.  It might be a 2- to 4-hour workday or 10- to 14-hour workday.  It kind of depended.  The ones that had the most regularity were Monday through Friday.

Q       As the sheriff's executive aide, you were familiar with the different types of responsibilities he had for what was going on in the sheriff's department; is that correct?

A       Some of them, yes.  I would imagine there was probably some I didn't know.

Q       Well, the sheriff -- I'm focusing on the period from January to September of 2011.

A       Okay.

Q       The sheriff was in charge of patrol stations; is that correct?

                MR. FOX:  Objection to that time frame. Relevance of that time frame.  Your Honor, if I might have one moment with counsel.

                (Counsel confer.)

UNITED STATES DISTRICT COURT

MR. FOX:  Your Honor, I've conferred with counsel.  I'll withdraw the objection to that question.

THE COURT:  All right.

THE WITNESS:  Could you repeat the question?

Q       BY MR. HOCHMAN:  Yes.  The sheriff was in charge of patrol stations throughout the county; correct?

A       Yes, he was.

Q       And that would include the Altadena Station?

A       Yes, it would.

Q       The Crescenta Valley Station?

A       Yes.

Q       The East Los Angeles Station?

A       Yes.

Q       The Lancaster Station?

A       Yes.

Q       The Malibu Lost Hills Station?

A       Yes.

Q       The Palmdale Station?

A       Yes.

Q       The Santa Clarita Valley Station?

A       Yes.

Q       The Temple Station?

A       Yes.

Q       The Avalon Station?

A       Yes.

Q        The Century Station?

A        Yes.

Q        The Carson --

MR. FOX:  Objection, Your Honor.  Relevance at this point.

THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  He was also in charge of certain detective divisions; is that correct?

A        Of detective division, yes.

Q        And there were five different detective divisions; is that correct?

A        There are bureaus within the detective division.

Q        And were there five different bureaus within the detective division?

A        Yes.

Q        And they ranged from homicide to narcotics; correct?

A        Correct.

Q        And there were 23 patrol stations.  I didn't go through all 23, but there are 23 patrol stations at that time; correct?

A        Correct.

Q        And also there was a Homeland Security division that the sheriff was in charge of; is that correct?

A        That is correct.

Q       And that has different bureaus ranging from Emergency Operations Bureau to the Special Enforcement Bureau.

A       That is correct.

Q       And he was also in charge of court services division; is that correct?

A       That is correct.

Q       And that had different bureaus ranging from court services to transportation to civil management; correct?

A       That is correct.

Q       He was also in charge of the custody operations division; is that correct?

A       That is correct.

Q       And that had custody facilities ranging from the Men's Central Jail and Twin Towers to that Pitchess Center that you worked at; correct?

A       Correct.

Q       And he was also in charge of the leadership and training division; is that right?

A       That is correct.

Q       And that ranged from financial programs to the Training Bureau to facilities planning; correct?

A       That is correct.

Q       And he was also in charge of the technical services division; is that correct?

A       That is correct.

UNITED STATES DISTRICT COURT

Q        And that ranged from crime analysis to data systems to scientific services; is that right?

A        Yes.

Q        And he was also in charge of the Internal Affairs Bureau and the Internal Criminal Investigations Bureau; is that correct?

A        That is correct.

Q        Now, in addition to -- and there was approximately 18,000 employees at the sheriff's department during this time?

A        That is correct.

Q        About 9,000 sworn detectives; is that right?

A        Sworn personnel.

Q        And approximately 9,000 civilians or non-sworn personnel?

A        Professional staff, yes.

Q        And professional staff is everything from maintenance to IT and technology and stuff like that; is that correct?

A        That is correct.

Q        Now, in addition to what the sheriff was responsible for inside the sheriff's division, he was also the elected sheriff; is that correct?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

**UNITED STATES DISTRICT COURT**

Q        BY MR. HOCHMAN:  Well, you said that Mr. Tanaka and Sheriff Baca were having meetings; correct?

A        Yes.

Q        And Mr. Tanaka is the No. 2 person in the department; correct?

A        Yes.

Q        So everything that you've just been discussing that the sheriff is in charge of, he's in charge of as well; is that correct?

A        Correct.

Q        And did the sheriff and Mr. Tanaka also have to deal with community organizations out in Los Angeles County?

A        Periodically.

Q        And did they also deal with religious organizations?

        MR. FOX:  Objection.  Relevance.

        THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  Well, you testified that Mr. Tanaka and Sheriff Baca were having certain discussions behind closed doors; correct?

A        Correct.

Q        Do you know if any of those discussions were concerning all this responsibility that Sheriff Baca and Mr. Tanaka shared or anything else?  Do you have any idea what those discussions entailed?

A       Not always.

Q       And these -- and that's because you're not actually in the room when these discussions are taking place, at least the ones we've been talking about?

A       Correct.

Q       Now, with respect to -- I just want to make it clear that, when you're talking about -- we went through a couple examples.  But the sheriff also is in charge of providing law enforcement for superior courts; is that right?

A       That is correct.

Q       And he was also in charge of providing law enforcement for the Metropolitan Transit District; is that correct?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  Now, you said that you were familiar with Mr. Tanaka when you started working for Sheriff Baca as an executive aide; is that correct?

A       I'm not sure how familiar I -- you are trying to imply.  I knew who he was, but we're not somebody that ever worked together.

Q       So did you know that Mr. Tanaka was a CPA, a certified public accountant?

MR. FOX:  Objection to the form of the question.

THE COURT:  Sustained.

UNITED STATES DISTRICT COURT

Q        BY MR. HOCHMAN:  Did you have any information about whether or not Mr. Tanaka was a certified public accountant?

MR. FOX:  Objection to relevance as well.

THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  Did you know whether or not Mr. Tanaka worked on the budget of the Los Angeles County Sheriff's Department?

A        Yes.  I was told he did that when he was a chief.

Q        And do you know if he's also worked on it when he was the assistant sheriff or undersheriff during this time period?

A        I was always under the understanding that, once he initially worked on it as a chief, he kept an eye on it.

Q        And did you observe whether or not your position as the executive aide for Sheriff Baca, whether or not Mr. Tanaka would promote people who were loyal to him?

A        Mr. Tanaka would refer people, and ultimately promotions had to be approved by the sheriff.

Q        And when you say "Mr. Tanaka would refer people," would he refer these people to Sheriff Baca for the final okay?

A        Correct.

Q        Now, when you spoke about e-mails, you talked about Sheriff Baca receiving a lot of e-mails every day; is that correct?

**UNITED STATES DISTRICT COURT**

A        Yes.

Q        And these would be e-mails that you and the commander who was working with you would go through to see which ones would actually go to the sheriff and which ones would go to other parts in the department; is that correct?

A        That is correct.

Q        Now, when the sheriff is actually in the office and Mr. Fox gave you schematics of where the sheriff sat and where the undersheriff sat, did Mr. -- Sheriff Baca actually sit a lot in his office?

A        No, he did not.  The only time he would sit in his office was during a meeting with people.  But to sit in his office and do paperwork, that rarely happened.

Q        Where was he?

A        If you reference the schematic of the office layout --

MR. FOX:  May I ask that that schematic be placed back on the screen if possible, please, Mr. Hochman.

Q        BY MR. HOCHMAN:  So we're going to highlight, again, the -- blow up a little of the same area that Mr. Fox was showing you so that you could just indicate for us where Sheriff Baca would stand when he was in the office?

A        If you reference the area where it says "office of the sheriff" to the lower right section of the highlight and then it's got the circled No. 9, above it are the cubicles.

UNITED STATES DISTRICT COURT

Q        Okay.

A        All but the very last section to the left, those walls that bordered that walkway were actually desks.  It had a desktop flat top.  It was about a foot and a half wide.  So it was basically -- that whole area was standing desks.  And we would put things up there for the sheriff to see.  We kept a copy of the calendar up there.  And that's where his "read" folders were placed, and he would go back and forth between meetings and do his correspondence there.

Q        Did you -- and the sheriff actually would spend a decent amount of time in this sort of standing desk area.  Would that be accurate?

A        When he wasn't obligated with another meeting or an appearance event, yes, that's where he was at probably 90 percent of the time.

Q        Did the sheriff have a computer in his office, if you're aware?

A        He did not.

Q        Was he sort of old school, didn't use computers, you know, wrote out things by hand, stuff like that?

A        Yes, he was.  Yes, he is.

Q        Now, when Mr. Tanaka would meet with Sheriff Baca in your presence, was Mr. Tanaka very respectful toward Sheriff Baca?

A        Yes, he was.

Q        And did you have the occasion to go with Sheriff Baca to the Men's Central Jail during this time period of January to September, 2011?

A        Yes.

Q        What was the reason that you went with Sheriff Baca to the Men's Central Jail during this time period?

A        I don't remember the exact reason for the meeting, but the sheriff was addressing deputies on career survival, doing the right thing, respecting the department. The core values were very big to the sheriff.  He would always stress them.  So it was just -- it was a motivational-type speech visit.

Q        What were the core values?

A        I cannot cite them, but it's a guideline of things that we should aspire to do and how we should be.

Q        And is that something that you would learn as well in the academy?

A        They do now, yes.

Q        And do you know if the core values were actually posted at the jails?

A        Yes, they were.  They're on the walls.

Q        Now, with respect to the Twin Towers, did you ever go with Mr. Baca to the Twin Towers during this time period frame of January to September, 2011?

A        I drove Sheriff Baca there once, yes.

Q        What happened when you got there?

A        We were greeted by supervisory personnel at Twin Towers because the sheriff had received a report --

MR. FOX:  Objection to hearsay, Your Honor.

THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  Are you aware of whether or not the sheriff received an ACLU complaint dealing with the Twin Towers in approximately February of 2011?

A        Yes.

Q        And after he received that complaint -- was that complaint concerning Ms. Esther Lim seeing some inmates being abused at the Twin Towers?

A        I remember the incident but not the name.

Q        Well, did it involve an ACLU person observing abuse of an inmate at Twin Towers?

A        Yes.

Q        And did Sheriff Baca go to the Twin Towers to actually go to the very area where the ACLU person had observed the inmate abuse to see for himself?

A        Yes.

Q        Did you go with him?

A        Yes.

Q        What did you and Sheriff Baca do together when you got there?

MR. FOX:  Objection.  Vague.

UNITED STATES DISTRICT COURT

THE COURT:  Overruled.

Do you understand the question?

THE WITNESS:  Yes, sir.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  The supervisory personnel had told the sheriff that there was an ongoing force investigation, and they pointed out where it had happened.  It was just outside of a dorm room in partial view of the visiting center for that floor.  And the ACLU lawyer had alleged that she saw the entire use of force from the second position in this visiting center.

Q      BY MR. HOCHMAN:  And did you go yourself with Sheriff Baca into the area where the ACLU lawyer was and then on the other side where the actual abuse alleged to have occurred?

A      Yes.

Q      And were you able to make an observation of whether or not the ACLU lawyer was able to observe everything she claimed to have observed?

MR. FOX:  Objection to foundation, Your Honor.

THE COURT:  Sustained.

Q      BY MR. HOCHMAN:  So you were aware -- were you aware of the allegations that the ACLU lawyer made concerning that particular incident?

A      Yes.

Q        And did you place yourself in the section where the ACLU lawyer was when she said she could see the incident to determine whether or not it was possible from that position to see what she claimed?

MR. FOX:  Objection to foundation, Your Honor.

THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  Did you stand in the same spot at the Twin Towers that the ACLU lawyer had claimed to stand in?

MR. FOX:  Objection to foundation, Your Honor.

THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  Did you go to the area where the ACLU lawyer claimed to have been standing when she observed the incident?

MR. FOX:  Objection to foundation, Your Honor.

THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  When you read the ACLU complaint that the ACLU lawyer made, did she specify a particular area in the Twin Towers facility where she was standing when she observed the incident?

A        That's not how I was advised how she -- where she was located.

Q        How were you advised?

MR. FOX:  Objection, Your Honor.  Hearsay.

THE COURT:  Sustained.

UNITED STATES DISTRICT COURT

Q    BY MR. HOCHMAN:  Where did you exactly go when you went to the Twin Towers facility?

A    I went up to the floor where the alleged use of force took place accompanying Sheriff Baca along with the supervision from Twin Towers.  We were walked around in the exterior dayroom behind the dorm patrol officer booth.  We were shown where the use of force took place.

MR. FOX:  Objection.

THE COURT:  Next question.

MR. FOX:  Sorry, Your Honor?

THE COURT:  I was going to say next question.

MR. FOX:  Thank you, Your Honor.

Q    BY MR. HOCHMAN:  Did you at some point go -- walk yourself to a particular location in the visiting room?

A    Yes.

Q    What were you able to see at that point?

A    We could see a good portion of the dayroom area but not all of it.

Q    And are you aware whether or not the ACLU lawyer claimed to see all of that dayroom as opposed to just a portion?

MR. FOX:  Objection to foundation.

THE COURT:  Sustained.

MR. HOCHMAN:  I'll move on, Your Honor.

Q    Now, you said that one of the things that started

to get busy in September of 2011 was that a task force got formed that month; is that correct?

A        Correct.

Q        And that was a task force formed by Sheriff Baca; is that correct?

A        I'm under that understanding, yes.

Q        And that was a task force that looked into the incidents of alleged inmate abuse that the ACLU had been making; is that correct?

A        Correct.

Q        And as part of that task force, they actually had to get all the use-of-force reports for the inmates that had made allegations against the sheriff's department as transmitted by the ACLU; is that correct?

A        Correct.

Q        Now, you said during that time period -- and again, I want to focus sort of on the July to September, 2011, time period.

You saw various people coming and going into the -- Sheriff Baca's office and Mr. Tanaka's office; is that correct?

A        Correct.

Q        Now, let's start with Steve Leavins. Steve Leavins was Mr. Tanaka's former assistant; is that correct?

UNITED STATES DISTRICT COURT

A        Yes.  He was his former aide.

Q        His former aide.  Sort of what you were for Sheriff Baca, Mr. Leavins was for Mr. Tanaka; is that correct?

A        Correct.

Q        And Mr. Leavins would come and speak with Mr. -- go into Mr. Tanaka's office during this time period of August to September, 2011; is that correct?

A        Yes.

Q        And again, when that door was shut, you couldn't actually hear what Mr. Leavins and Mr. Tanaka were discussing; is that correct?

A        That's correct.

Q        And Mr. Thompson, Greg Thompson, Lieutenant Greg Thompson, are you aware that he went back and had dealings with Mr. -- excuse me -- Mr. Tanaka back to the 1980's?

MR. FOX:  Objection to the form of the question.

THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  Are you aware of Lieutenant Thompson's past relationships with Mr. Tanaka before 2011?

A        No.

Q        And you saw Lieutenant Thompson go and meet with Mr. Tanaka in his office during this time period; correct?

A        Correct.

Q    And again, when the door was shut, you don't know what Mr. Thompson is saying to Mr. Tanaka; correct?

A    Correct.

Q    And then you said that as well Lieutenant Thompson and Lieutenant Leavins would also meet with Sheriff Baca; is that correct?

A    Correct.

Q    And then there was even meetings where there was all of them -- Leavins, Thompson, Tanaka, and Baca -- in the same meeting; is that correct?

A    Correct.

Q    And you don't know what they're discussing because the door is shut; correct?

A    Correct.

Q    And also, Mr. Carey -- you described Mr. Carey, Captain Carey, having meetings with Mr. Tanaka as well; is that correct?

A    That's correct.

Q    And again, you don't know what was said in those meetings because the door was shut; is that correct?

A    That's correct.

Q    You talked about Sheriff Baca's calendar.  Do you remember that?

A    Yes.

Q    And with respect to his calendar, you said that

UNITED STATES DISTRICT COURT

the official calendar might not have everything that occurred during Sheriff Baca's day; is that correct?

A      That's correct.

Q      Because Sheriff Baca, again, would have the responsibility for everything we discussed in the department; correct?

A      That's correct.

Q      And he would also have the responsibility for everything outside the department, for instance, meeting with elected leaders; is that correct?

A      Yes.

Q      And he would meet with nonprofit organizations as well; is that right?

MR. FOX:  Objection.  Relevance and cumulative at this point.

THE COURT:  Sustained.

Q      BY MR. HOCHMAN:  Well, a lot of these meetings he's having with these outside organizations also wouldn't always show up on his calendar; is that correct?

A      I'm sorry.  Could you say that again?

Q      A lot of the meetings that Sheriff Baca is having with these outside organizations also wouldn't show up on his calendar; is that correct?

A      No.  It's my understanding that, when someone from the outside was having a meeting with him, it would be

prearranged and it would be scheduled.

Q    And to the extent that there was an impromptu meeting, a meeting that occurred the same day, would it actually get retroactively put on the calendar?

A    Again, if it's an outsider, it would be prescheduled and arranged.  The impromptu's are departmental executives, and they would not be put on the calendar.

Q    Would you actually go with Sheriff Baca when he would go outside the sheriff's department to these type of outside meetings?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

Q    BY MR. HOCHMAN:  And in the August and September, 2011 time period, did you ever hear anyone order any sheriff's department personnel not to cooperate with the FBI?

A    No.

MR. HOCHMAN:  No further questions.

MR. FOX:  Your Honor, may I ask some questions of Mr. Hannemann at this time?

THE COURT:  Yes.

MR. FOX:  Thank you.

**REDIRECT EXAMINATION**

BY MR. FOX:

Q    Mr. Hannemann, Mr. Hochman was asking you questions about all these meetings that were occurring in

Mr. Tanaka's office.  Was Steve Leavins also having meetings in Mr. Baca's office at this time?

A     At times.

Q     That would not be in the standing desk area. That would actually be in his office?

A     Correct.

Q     And generally, when Steve Leavins was meeting with Mr. Baca during this time, would Mr. Baca's door be open or closed?

A     It depended.

Q     What about Greg Thompson?  You mentioned in questioning from Mr. Hochman whether Mr. Thompson met with Mr. Tanaka during this time.  Did he also meet with Mr. Baca during this period of time?

A     I don't remember Lieutenant Thompson meeting with the sheriff by himself.

Q     Who was he meeting with Mr. Baca with?

A     The ones I remember, he was with Steve Leavins, Undersheriff Tanaka, and possibly Captain Carey.

Q     Would these occur in Mr. Baca's office or one of the conference rooms?

A     I think both.

Q     So it would not be by the standing desk area?

A     Never.

Q     Would the doors generally be opened or closed

during these meetings?

A        Those were typically closed.

Q        What about Tom Carey?  Was he also meeting separately with Mr. Baca at this time?

A        No.

Q        Who was he meeting with when he met with Mr. Baca?

A        He would usually have Steve Leavins with him and Assistant Sheriff Tanaka.

Q        Where would they meet?

A        If it was just those four total, it would be in the sheriff's office.  But if there was anybody else, they would go over to the EPC.

MR. FOX:  One moment, Your Honor.  No further questions.

MR. HOCHMAN:  No further questions, Your Honor.

THE COURT:  All right.  You may step down.

(Further proceedings were held and reported but not included herein.)

**UNITED STATES DISTRICT COURT**

CERTIFICATE OF OFFICIAL REPORTER

I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

DATED THIS  17TH  DAY OF DECEMBER, 2016.


/S/ MIRANDA ALGORRI

MIRANDA ALGORRI, CSR NO. 12743, CRR
FEDERAL OFFICIAL COURT REPORTER


**UNITED STATES DISTRICT COURT**