**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION**

**HONORABLE PERCY ANDERSON, U.S. DISTRICT JUDGE**

UNITED STATES OF AMERICA,           )
                                    )
                Plaintiff,          )    Case No.
                                    )
        vs.                         )    CR 16-00066(A)-PA
                                    )
LEROY D. BACA,                      )    PAGES (1 to 34)
                                    )
                Defendant.          )
_____)

**REPORTER'S TRANSCRIPT OF**
**TESTIMONY OF PAULINO JUAREZ–RAMIREZ**
**WEDNESDAY, DECEMBER 7, 2016**
**10:41 A.M.**
**LOS ANGELES, CALIFORNIA**

_____

**MIRANDA ALGORRI, CSR 12743, CRR**
FEDERAL OFFICIAL COURT REPORTER
312 NORTH SPRING STREET, ROOM 435
LOS ANGELES, CALIFORNIA 90012
MIRANDAALGORRI@GMAIL.COM

**UNITED STATES DISTRICT COURT**

**APPEARANCES OF COUNSEL:**

**FOR THE PLAINTIFF:**

    EILEEN M. DECKER
    United States Attorney
    BY:  BRANDON FOX
    BY:  EDDIE A. JAUREGUI
    Assistant United States Attorneys
    United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012

**FOR THE DEFENDANT:**

    MORGAN LEWIS AND BOCKIUS LLP
    BY:  NATHAN J. HOCHMAN
    BY:  BRIANA ABRAMS
    The Water Garden
    1601 Cloverfield Boulevard
    Suite 2050 North
    Santa Monica, California 90404

    MORGAN LEWIS AND BOCKIUS LLP
    BY:  TINOS DIAMANTATOS
    77 West Wacker Drive
    Chicago, Illinois 60601

**UNITED STATES DISTRICT COURT**

## **I N D E X**

**WEDNESDAY, DECEMBER 7, 2016**

## **Chronological Index of Witnesses**

Witnesses:_____    Page

JUAREZ-RAMIREZ, Paulino

    Direct examination by                                            6
    Cross-examination by                                            20

**UNITED STATES DISTRICT COURT**

**EXHIBITS**


**WEDNESDAY, DECEMBER 7, 2016**


| Exhibit | For ID | In EVD |
|---|---|---|

(None)

**UNITED STATES DISTRICT COURT**

**LOS ANGELES, CALIFORNIA; WEDNESDAY, DECEMBER 7, 2016**

**10:41 A.M.**

**---**

(The following proceedings were held in open court in the presence of the jury:)

(Prior proceedings held and reported but not included herein.)

THE COURT:  All right.  Call your first witness, please.

MR. JAUREGUI:  Your Honor, the Government calls Chaplain Paulino Juarez Ramirez.

THE CLERK:  Stand here for me, please.  Raise your right hand.

Do you solemnly state that the testimony you may give in the cause now pending before this court shall be the truth, the whole truth, and nothing but the truth, so help you god?

THE WITNESS:  I do.

THE CLERK:  Please be seated.  Please state your full name and spell your last name for the record.

THE WITNESS:  Paulino Juarez Ramirez.  My last name is Juarez Ramirez, J-u-a-r-e-z.

THE COURT:  If you would speak directly into that microphone.  If you need to adjust it, that's fine.  All right,

**UNITED STATES DISTRICT COURT**

counsel.

MR. JAUREGUI:  Thank you, Your Honor.

**PAULINO JUAREZ RAMIREZ,**

**GOVERNMENT'S WITNESS, SWORN:**

**DIRECT EXAMINATION**

BY MR. JAUREGUI:

Q      May I refer to you as Mr. Juarez?

A      Yes.

Q      Mr. Juarez, what do you do for a living?

A      I am employed by the Archdioceses of Los Angeles.
I am minister.  I am a permanent deacon, and my place of
minister is chaplain at Men's Central Jail.

Q      How long have you been doing that?

A      I has been there for the last 18 years and five
months.  Going to be six months in December.  So 18 years and
six months.

Q      As a jail chaplain, what do you do?

A      Well, usually we attend the operation in the jail
not just for the catholics but for all the inmates.  Some of
them, they are able -- well, we provide services.  We talk
one-on-one, and we counseling them.  Sometimes we try to reach
the embassies when they don't have nobody here in this country.
Some of them come to our office, and some of them, they are in
single cells.  So we go where they are.

Q      And how often do you do this?

A        I do five days a week, regularly from 9:00 to 4:30, 5:00, depends on the circumstances.

Q        Do inmates come to you, or do you go to them?

A        Some of them come to the services for counseling to my office inside the jail.  Some of them, we go to visit them where they are.

Q        And are you allowed to go alone, or are you escorted?

A        No.  Usually I go alone.

Q        When you go to see inmates, where do you see them?

A        In their cells.  They are dorms.  Some of those dorms have four rows.  Each row has different numbers of cells.  So I go one-by-one.

Q        Is there any particular floors that you work?

A        We work everywhere.  Usually I am in the 3000 floor, but I go -- depends on the request.  I can go everywhere.  But usually I stay in 3000 floor, and also I go to 1750 -- sometimes it has been assigned to me.

Q        I want to direct your attention to February 11, 2009.  Do you recall what happened that day, Chaplain?

A        Yes.

Q        What happened?

A        That day I asked permission to go early.

8

Q        When you say you asked permission to go early, what do you mean?

A        I asked to Sergeant Barbosa who was in charge of the floor that day.  It was around 10:30 in the morning.  I asked permission.  I went.  I got into the dorm.  The officer opened for me the first gate, and two more doors with bars.  I walking to 3700 Able row.

Q        And that's on the 3000 floor?

A        Yes, it is.

Q        Okay.  And what happened?

A        I start walking with my little cart with my books.  In the cell No. 3 was Armando Carrillo, an inmate who was there before.  He called me and said, "Hey, Chaplain Paulino," I stop -- I stop, and when I would stop talking -- stop talking, I hear some noise like somebody has been punched and (indicating).  So I -- I walk through the door and --

Q        Chaplain, where were these noises coming from?

A        From -- when you enter into the dorm, there is a little hallway, hallway inside.  And then there are the doors to get into the booth of the deputies, the officers, and you pass through those.  They are doors that are taking you into the rows.  So the officer who opened for me closed the doors after I was in.  So this noise was inside dorm in the front of one of the booths of the officers.  And what I saw, because it

was only right there, but this inmate was beaten up by three officers.

Q        Okay.  Let me stop you there, Chaplain.

First you heard noises.

A        Yes.

Q        Did you walk away from Mr. Carrillo?

A        Yes.

Q        And where did you go?

A        I went to the door, and I stopped there because it was closed.  Through the bars I was looking what was going on there.

Q        What did you see?

A        I see this inmate against the wall and three officers -- one in the middle, one here, and the other here -- punching him.

Q        When you say "one here and the other here," Chaplain --

A        Yes.  On the right, on the left.  And they were -- he was saying, "Please stop.  Please stop."  They continued punching him.

Q        Where were they punching him?

A        In the upper torso here, in the face.  I never see his hand trying to cover or trying to punch back or kick back.  He just was against the wall and receiving all these blows.

**UNITED STATES DISTRICT COURT**

Q        Do you know where his hands were?

A        I didn't see hands.  I didn't see his hands go up.  They were like this here.

Q        Just so the record is clear, Chaplain, when you say they were like this, can you just describe in words where they were?

A        In the waist.  Because usually in that dorm, when they were taking inmates out, they were cuffed to their waist chains.  So I suppose that he was handcuffed to the waist chains and this is why he didn't try to cover himself.

Q        The officers, were they deputies?

A        Yes.

Q        Did you hear them say anything?

A        Yes.  They were saying -- yelling trying, "Stop fighting.  Stop resisting."  And they continued punching him.

Q        Did you see the inmate fighting or resisting?

A        No.  No.

Q        What happened next?

A        Well, he fell, and when he fell on the floor, they start kicking him everywhere.  And I -- I tried to say something.  I can't.  I was -- I was horrified.  I couldn't say nothing.  And they continued saying, "Stop fighting.  Stop resisting."  And one of the officers put his left knee on him, on his back, and he start punching him on the back.

Q        Chaplain, you just put your hand toward your

neck.

A        Yeah.

Q        Were they punching him in his neck?

A        Yes.

Q        What happened next?

A        And then he put back, and then the others start -- continue kicking, the other two.  And then he tried to call again, but then he saw that I was there on the door, and he froze.  Somehow he -- the others noticed that, and they also -- they froze.  One of the officers inside, he was saying "Code 4, code 4" on the sound system.  Two -- the door near to the hallway was opened.  Two deputies came, they look, and they saw the inmate.  They run where he was lying.  He came again, and one of them, he -- with his leg, with his boot, he did three stomps on his spinal cord.  They also, the deputy, the three there, somehow they look where I was, and also they were froze.

Q        Okay.  Did they say anything to you at that point?

A        No silence.

Q        What happened next?

A        And then more deputies came, 20, I don't know.  A lot of them.  One of them, he walked to them.  He opened the two doors with bars and walked up to me and told me, "You have to go."  I said, "Yeah."  So I was walking with my -- I went

**UNITED STATES DISTRICT COURT**

for my cart where it was in front of Carrillo.  So I took the cart back, and I left with my cart.  And I saw like from here to the door he was lying on the floor with a lot of blood.

Q      Okay.  Chaplain, let me stop you.

You just said "From here to the door."  You're pointing to a door.

A      Where he was -- yeah.  Where he was lying where I was passing from here to where he was lying on the floor, the inmate.

Q      Approximately how many feet away were you?

A      I don't know.  15 feet probably.

MR. JAUREGUI:  Your Honor, if the Court could just take notice that Chaplain Juarez is looking at the exit door in the courtroom that's approximately 10 to 15 feet away from the witness stand.

THE COURT:  The Court will take notice.

Q      BY MR. JAUREGUI:  Mr. Juarez, what did you see as -- did you pass the inmate on your way out?

A      Yes.  I saw him lying on the floor with a lot of blood around his head and was no moving at all, silence.

Q      Did you say anything to anyone about this?

A      No.  I passed through them to the officers.  I walked to my office.  Near to the -- like half the way to my office, Sergeant Barbosa was coming, and I told him that some of your guys are in big trouble.

I told him -- I continued walking to my office. There was another chaplain. She saw me. She said, "What happened?" because I was shaking. I really felt worried about what I saw. I told her, "I have to know. I have to know what happened." And I explained.

Q      Now, Chaplain, that day, did you report what happened to anyone in the archdiocese?

A      I called to my director Father George Horan. I leave messages, and he called me back that night because he was out of town.

Q      Did you eventually write a report or a statement about what you saw that day?

A      Yes. He told me that I have to make a report. Yeah. I told him, and I did the report.

Q      When did you write that report?

A      I didn't do immediately, immediately. But the next day I spoke with Sergeant Barbosa around -- with him about this, and I start writing because my -- I was -- that changed my life.

Q      Chaplain, do you remember when you wrote your statement?

A      I wrote it probably the five days, one week later probably. And I -- I give to Sergeant Barbosa a copy.

Q      After that did anybody from the sheriff's department interview you about what you saw?

A      Yes.  Sergeant Barbosa told me that the Internal Affairs were going to interview -- to have interview, and they have -- they want to have a video about my statement about what I saw.

Q      Did they interview you?

A      Yes.

Q      When was that interview?

A      That was probably after the 20th.  I don't remember exactly the date.  It was not immediately.  It was later.

Q      Was it weeks?  Months?  Do you remember?

A      Weeks, yes.

Q      Did you learn that anything happened as a result of your writing that report?

A      Well, after that in the jail really things still. But things it would change was that, when I was passing through where the deputies were, usually they were in numbers, five or six in the 3000 floor.  When I pass, they didn't see on my face, but when I just passed, they were saying like "Fucking rat."

Q      Chaplain, just so that -- I didn't really understand what you said.  Could you repeat that?

A      "Fucking rat."  They called me "Mother fucker." They were -- "This is the mother fucker who --" so I was sometimes walking the rows where I was walking which they don't

supposed to do because they know I was in the row walking, visiting the inmates.  Sometimes I have to jail for 30 minutes, 35 minutes, "Would you open, please?  Would you open, please?" So I feel kind of retaliation because the report.

Q       Let me take you back just briefly, Chaplain.

After your meeting with Internal Affairs, were you told what happened to that inmate?

MR. DIAMANTATOS:  Objection, Judge.  Foundation.

THE COURT:  Sustained.

Q       BY MR. JAUREGUI:  Chaplain, the people that interviewed you from Internal Affairs, did you advise them of what happened in February of 2009, the month before?

A       Yes.

Q       What, if anything, did they say to you?

A       They told me -- they said, "I'm sorry for what you saw.  We are going to investigate, and we are going to let you know what happened."

Q       Did those people let you know what happened?

A       No.

Q       Okay.  I want to take you now to June, 2011, Chaplain.

Did you, again, report what you had seen in February of 2009?

A       Yes.

Q       To whom?

A       Finally we have a meeting with Mr. Michael Gennaco from the Office of Independent Review, and Mr. Walter Katz and Father George Horan, Patricia Bartlett, and myself.  We went to his office.

Q       Where was his office?

A       In Commerce where he was -- his office.

Q       Why did you talk to them?

A       Because violence is still after that.  So nothing was changed.  I told Father George, "Father, somebody have to stop this."  And looks like nothing changed.  So, finally, we have this meeting, and I explained the events and something else also from the other chaplains brought something else.  And he said, okay.  So we are going to be in contact, and we are going to plan meetings regularly to see how we can do something.

Q       Chaplain, did you ever speak to Sheriff Baca about the February 11, 2009, assault?

A       The only time I spoke with him was on July finally because Michael Gennaco, I think he set up the meeting. I don't know really who set up the meeting with former Sheriff Baca.  And we -- we have that meeting.

Q       And that was July of 2011?

A       Yes.

Q       Where was the meeting?

A       It was in his work where he is usually,

Monterey Park.  We were there.  So it was Father George, Patricia Bartlett.  It was sheriff assistant at that time Cecil Rhambo and also was captain at that time.

Q       Why did you speak to Sheriff Baca at that time?

A       Because we really want to explain what happened and what was going there in the jail and to advise him of other things were there happening.

Q       Chaplain, did Sheriff Baca have any papers with him during the meeting?

A       Father was passing to him with a report, and he asked me about what I saw.  I explained.  And he was looking into the folder.  And he asked me for my report, but my report was not in the folder.  So he was reading some of the -- I think the report from the officers.

Q       How do you know that, Chaplain?

A       Because they said that this inmate has received some punch because he didn't want to go back to his cell and also that he was schizophrenic.  This is why the bruises that he have was because he has been run over by a truck before coming into the jail.  So he read one part that said that the chaplain was exaggerating what he saw.  So this is was -- I think it was from the officers.

Q       Did you tell Sheriff Baca what -- let me just step back a second.

        The report was not in the file to your

understanding; correct?

A    Yes.

Q    Did you tell Sheriff Baca what you had seen?

A    Yes.  I -- yes.

Q    And what did you say to him?

A    I explained what I explained here.  I did exactly the same what I saw.

Q    Did you show Sheriff Baca what you saw?

A    Yes.

Q    How did you do that?

A    Well, in -- we were around the table, and also I -- like today I did, I was showing how I saw, where I was.

Q    And, Chaplain, just, again, so we're clear, you just made some motions with your hands.  Can you explain in words what you showed him?

A    Yes.  That the inmate was -- in the beginning he was just punching, and then when he fell, he was kicked in head, in the -- everywhere in his body.

Q    You just said the inmate was punching.  Is that what you meant to say, that the inmate was punching?

A    Yes.  No.  He was -- the officers were punching him.  He never -- he never --

Q    So you demonstrated for Sheriff Baca?

A    Yes.

Q    What did Sheriff Baca say to you in response?

UNITED STATES DISTRICT COURT

A      Well, when he hear that the -- he was punching and kicking, he said that kicks are not allowable in the department.  So then he put that note that that was not allowable in the -- he talked to Cecil Rhambo to write down about that.

Q      How did this meeting end, Chaplain?

A      Well, there were other things from all the other chaplains.  But at the end I think nothing really was -- like was exaggerating.

MR. DIAMANTATOS:  Objection.  Nonresponsive, Your Honor.

THE COURT:  Overruled.

THE WITNESS:  Was exaggerating.  So I think they were diminishing what I saw.

Q      BY MR. JAUREGUI:  After this meeting with Mr. Baca, did you talk to the ACLU?

A      Yes.

Q      Why?

A      Because I didn't see any change after this meeting.  Like this was not taken serious about events.  We really as chaplains, we -- we are there to help to everybody.  And if something is not right, we as chaplains, we have to try to stop what is not right.  And especially if we preach about justice and those things, we are not -- if we don't do nothing, what we are preaching about?  And this is why we try in

different ways because, also, I knew that something -- not something -- inmates were sending complaints already to ACLU.

MR. DIAMANTATOS:  Objection, Your Honor. Narrative.

THE COURT:  Sustained.

MR. JAUREGUI:  Your Honor, can I just have a moment?

THE COURT:  Yes.

MR. JAUREGUI:  No further questions, Your Honor.

THE COURT:  Cross-examination.

MR. DIAMANTATOS:  Thank you, Your Honor.

**CROSS-EXAMINATION**

BY MR. DIAMANTATOS:

Q      Chaplain, if you could describe for us how many chaplains there were during this time period that you're describing in 2011.

A      How many?

Q      During your direct examination you indicated "we."  If we could just explain to the members of the jury how many chaplains there were at the prison at this time.

A      Yes.  The catholics in that time we were Father George, Father Bartlett, myself, Sister Patricia who is assistant chaplain.  Four catholic chaplains.

Q      Were there other denominations?

A      Yes.  There were protestants.  A number -- a big

**UNITED STATES DISTRICT COURT**

number.  They come at different times.  So I can't tell you exactly how many of those chaplains exactly.

Q        The chaplain's role was to provide a service to the inmates; correct?

A        Yes.

Q        You were there to assist them with getting through life inside prison; correct?

A        Yes.

Q        And during your direct examination, you described that chaplains had access to the inmates; correct?

A        Yes.

Q        I think you indicated on direct examination, Chaplain, that you were able to either have the inmates come to you -- correct?

A        Yes.

Q        Is that "yes"?

A        Yes.

Q        -- for one-on-one meetings if you thought that was appropriate; correct?

A        Yes.

Q        And you also described for the members of our jury that you were able to go through the prison and meet with inmates in their dorms.

A        Yes.

Q        That included the 3000 floor; correct?

**UNITED STATES DISTRICT COURT**

A        Yes.

Q        The 4000 floor?

A        Yes.

Q        5000 floor?

A        Yes.

Q        You had full access to the dorms in Men's Central Jail; correct, sir?

A        Yes.

Q        Inmates deserved to be treated with respect; correct?

A        Every person, yes.

Q        The events that you described for the members of our jury on direct examination that occurred in February of 2009, it was your understanding that inmate was not being treated respectfully; correct, sir?

A        Yes.

Q        Now, just to be abundantly clear, Sheriff Baca was not present for that event; correct?

A        Correct.

Q        The officers that you described during your direct examination are not here today in court; is that right, sir?

A        Yes.

Q        Okay.  You indicated on direct examination that there were certain codes played over the radio.  I think you

**UNITED STATES DISTRICT COURT**

indicated code 4 on direct examination.

Did I say that correctly, sir?

A      Yes.

Q      As a chaplain, having access to inmates, would you often hear certain radio calls over various deputies' radios at times?

A      Yes.

Q      Were you ever familiar with something called a code 10?

A      No.

Q      Okay.  Would you ever be present, Chaplain, when either the sheriff was present in the Men's Central Jail and his presence was being announced over the radios to other deputies?

A      I hear when they said, "I need somebody to come, police officer, something, so please come to this," yes.

Q      So it's fair to say that there's communication between deputies over the radio depending on what was going on in the prison?

A      Yes.

Q      And when other higher-ups were present, that could be communicated over the radio?

A      I don't know.

Q      You described for the members of the jury that the troubling 2009 incident, sir, that you witnessed, you

**UNITED STATES DISTRICT COURT**

reported it; correct?

A        Yes.

Q        You indicated during direct examination you spoke with Father Horan; correct?

A        Yes.

Q        It's another chaplain at the Men's Central Jail?

A        Yes.  He's the former director, yes.

Q        And Father Horan was troubled by what you told him; correct?

A        Yes.

Q        He asked you to file the report; correct, sir?

A        (Inaudible.)

         Yes.

Q        If you could just answer audibly for the court reporter.

         And you prepared that report; right?

A        Yes.

Q        You described for the members of the jury on direct examination that you spoke with a gentleman by the name of Mike Gennaco; correct?

A        Correct.

Q        Am I correct that Father Horan arranged that meeting for you with Mike Gennaco?

A        Yes.

Q        And Mr. Gennaco's title was the head of Office of

UNITED STATES DISTRICT COURT

Independent Review at that time in 2011; is that correct?

A    Yes.

Q    Would you agree with me, Chaplain, from deputy, there's other ranks that outrank deputies in the prison system; correct?

A    Correct.

Q    So, for example, if we start with a deputy, above a deputy is a sergeant; is that right, sir?

A    Senior.

Q    So sergeant is more senior than a deputy; correct, sir?

A    No.  It's the CA, then the deputy, senior, then the sergeant.

Q    Okay.  Is a lieutenant --

A    Lieutenant, captain.

Q    Captain is above a lieutenant; correct, sir?

A    Yes.

Q    A commander is above a captain; correct?

A    Yes, sir.

Q    And then there's chiefs who are above the commanders; correct?

A    Correct.

Q    There's an assistant sheriff who's above the chief and all the other ranks we just went through; correct?

A    Correct.

Q        And then there's an undersheriff; correct?

A        Correct.

Q        And then there's the sheriff; is that right, Chaplain?

A        Yes.

Q        And if you -- as a chaplain, you and other chaplains at the prison system were encouraged, if you viewed anything, to report it to the chain of command.

A        Yes.

Q        So you could report it to a deputy, of course, if you saw fit.

A        (Inaudible.)

Q        Is that a "yes," sir?

A        Yes.

Q        Thank you.

Each and every individual that we just described would outrank that deputy; correct?  You could go to a sergeant?

A        Yes.

Q        A lieutenant?

A        Yes.

Q        A captain?

A        Yes.

Q        Commander?

A        Yes.

UNITED STATES DISTRICT COURT

Q       All the way up through the sheriff if you weren't getting the relief you wanted; correct?

A       Yes.

Q       And is it -- so you had a conversation with Mike Gennaco where you described your concerns to him; correct?

A       Correct.

Q       Isn't it true that almost immediately after that meeting you had a meeting directly with Sheriff Baca that Mike Gennaco arranged; correct?

A       One month later.

Q       Isn't it true that Father Horan had a vacation in between that time period, and upon Father Horan's return, that's when you had the meeting with Sheriff Baca?

A       Yes.

Q       So you meet with Sheriff Baca and others; correct?

A       Yes.

Q       Mike Gennaco was there; right?

A       Yes.

Q       Father Horan -- sorry, sir.

A       Yes.  Yes.

Q       Thank you.

        Father Horan is there?

A       Yes.

Q       Other chaplains are there?

A       Yes.

Q       Sergeant Rhambo is there?

A       Yes.

Q       And it's true you did not have to go through all of these intermediary layers to get to this meeting with Sheriff Baca; right?

A       Yeah.

Q       Mike Gennaco made it happen; right?

A       Yeah.  Yeah.

Q       With the help of Father Horan.

        And you, of course, were reporting to Father Horan; correct?

A       Uh-huh.

Q       Is that "yes"?

A       Yes.

Q       Thank you, sir.

        You indicated for the members of our jury that you saw that Sheriff Baca had a file in his hand; correct?

A       Yes.

Q       And he appeared to read through that file; correct?

A       Yes.

Q       Now, to be sure, you, yourself, didn't read through that actual file that the sheriff was holding to know each and every document in that file.

Isn't that right, sir?

A    Yeah.  I never see that.

Q    But you sat patiently and watched the sheriff go through the file; correct?

A    Yes.

Q    You also indicated on direct examination that you showed physically to the sheriff the horrific things that you witnessed back in February of '09; right?

A    Yes.

Q    And he watched you act that out; correct?

A    Yes.

Q    Am I correct that, when Sheriff Baca learned of what you acted out and what he was viewing in that report, he responded with a question saying, "Why wasn't I told of this sooner?"

A    Yeah.  He asked to the -- to the table.

Q    He asked the entire group that was sitting there; correct?

A    Yes.

Q    "Why wasn't I told of this sooner?"

A    (Inaudible.)

Q    Is that "yes"?

A    Yes.

Q    I'm sorry.  The court reporter can't --

THE COURT:  Sir, if you have a problem with the

UNITED STATES DISTRICT COURT

witness, address the Court.  Not the witness.

MR. DIAMANTATOS:  Yes, Your Honor.

THE COURT:  Next question.

Q        BY MR. DIAMANTATOS:  Am I correct, Chaplain, that, also, in response, Sheriff Baca gave an order right then and there; correct?

A        Uh-huh.  Yes.

Q        And the order was to Sergeant Rhambo who was present; correct?

A        Yes.

Q        And he ordered Sergeant Rhambo to address the use-of-force policy right then and there; correct?

A        Yes.

Q        Specifically that deputies should not be using their boots on inmates to subdue any inmates; correct?

A        Correct.

Q        Is it true, Chaplain, that the sheriff within a two-month period had set up a commander's task force to directly deal with inmate abuse?

A        Yes.  After -- after the 2011, yes.

Q        And Sheriff Baca -- the meeting ended; correct?

A        Yes.

Q        Chaplain, am I correct that the chaplains have access to an internal website that exists for employees that work at the MCJ?

**UNITED STATES DISTRICT COURT**

A        Internal, yeah.  But in our office, they remove the Internet from our offices.

Q        You have access to e-mail; correct?

A        E-mail, yes.

Q        And there's an employee directory where, if you want to look up an employee, you can see his or her information and contact information?

A        Yes.

Q        Am I correct that you had access, if you wanted, to e-mail the sheriff after this meeting that you had with him?  You could have sent him an e-mail if you wanted to; correct?

MR. JAUREGUI:  Objection, Your Honor.

THE COURT:  What's the objection?

MR. JAUREGUI:  Scope.

THE COURT:  Sustained.

Q        BY MR. DIAMANTATOS:  Am I correct that you did not have -- make any efforts yourself to contact the sheriff again after the meeting that you had with him that you described?

A        Because we supposed to follow the chain of command.

Q        Sure.

A        And that is the thing.  And we know as a chaplain all this time that usually, when we want, for example, if I -- and this is true.  I go to the captain for something, sometimes

**UNITED STATES DISTRICT COURT**

the sergeant --

MR. DIAMANTATOS:  I'm going to object.
Nonresponsive to the question.

THE COURT:  Overruled.

You can finish your answer.

THE WITNESS:  Yes.  If I go to the captain
immediately, the sergeant get upset because they don't -- we
don't go to them because we don't follow the chain of command.

Q     BY MR. DIAMANTATOS:  The meeting that you had
with Sheriff Baca in July of 2011, the sheriff wasn't upset to
meet with you; right?

A     No.

Q     I'm not asking about the sergeants, the
commanders, the undersheriff.  The sheriff welcomed that
meeting; right?

A     Yeah.

Q     He listened to your concerns.

A     (Inaudible.)

Q     Is that a "yes," sir?

A     Yes.

Q     And in your presence, he commanded somebody to do
something about it; correct?

MR. JAUREGUI:  Asked and answered, Your Honor.
Objection.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  Yeah.

Q    BY MR. DIAMANTATOS:  Father Horan and you worked together; correct?

A    Yes.

Q    You certainly could speak to Father Horan after July of 2011 if something, again, troubled you; isn't that right?

A    Yes.

MR. DIAMANTATOS:  May I have a moment, Your Honor?

THE COURT:  Yes.

MR. DIAMANTATOS:  Nothing further, Your Honor.

THE COURT:  Any redirect?

MR. JAUREGUI:  No redirect, Your Honor.

THE COURT:  All right, sir.  Thank you very much. You may step down.

(Further proceedings held and reported
     but not included herein.)

CERTIFICATE OF OFFICIAL REPORTER

I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

DATED THIS  12TH  DAY OF DECEMBER, 2016.


/S/ MIRANDA ALGORRI

MIRANDA ALGORRI, CSR NO. 12743, CRR
FEDERAL OFFICIAL COURT REPORTER

**UNITED STATES DISTRICT COURT**