**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION**

**HONORABLE PERCY ANDERSON, U.S. DISTRICT JUDGE**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. |
| | ) | |
| vs. | ) | CR 16-00066(A)-PA |
| | ) | |
| LEROY D. BACA, | ) | PAGES (1 to 64) |
| | ) | |
| Defendant. | ) | |
| | ) | |

**REPORTER'S PARTIAL TRANSCRIPT OF**
**TESTIMONY OF MICKEY MANZO**
**THURSDAY, DECEMBER 8, 2016**
**11:22 A.M.**
**LOS ANGELES, CALIFORNIA**

**MIRANDA ALGORRI, CSR 12743, CRR**
FEDERAL OFFICIAL COURT REPORTER
312 NORTH SPRING STREET, ROOM 435
LOS ANGELES, CALIFORNIA 90012
MIRANDAALGORRI@GMAIL.COM

**UNITED STATES DISTRICT COURT**

**APPEARANCES OF COUNSEL:**


**FOR THE PLAINTIFF:**

EILEEN M. DECKER
United States Attorney
BY:  BRANDON FOX
BY:  EDDIE A. JAUREGUI
Assistant United States Attorneys
United States Courthouse
312 North Spring Street
Los Angeles, California 90012


**FOR THE DEFENDANT:**

MORGAN LEWIS AND BOCKIUS LLP
BY:  NATHAN J. HOCHMAN
BY:  BRIANA ABRAMS
The Water Garden
1601 Cloverfield Boulevard
Suite 2050 North
Santa Monica, California 90404


MORGAN LEWIS AND BOCKIUS LLP
BY:  TINOS DIAMANTATOS
77 West Wacker Drive
Chicago, Illinois 60601

**UNITED STATES DISTRICT COURT**

**I N D E X**


**THURSDAY, DECEMBER 8, 2016**


**Chronological Index of Witnesses**


Witnesses:_____        Page


MANZO, Mickey

    Direct examination by Mr. Fox                              6

**UNITED STATES DISTRICT COURT**

**EXHIBITS**

**THURSDAY, DECEMBER 8, 2016**

| Exhibit | | For ID | In EVD |
|---|---|---|---|
| 18 | E-mail from Smith to Manzo 08/19/11 | 11 | 11 |
| 72 | Transcript of Brown interview 08/19/11 | 23 | |
| 71 | Recording of Brown interview 08/19/11 | 24 | 24 |
| 137 | E-mail from Manzo to Smith and Thompson 08/19/11 | 39 | 39 |
| 75 | Transcript of Brown interview 08/21/11 | 42 | |
| 74 | Recording of Brown interview 08/21/11 | 42 | 42 |
| 78 | Transcript of Brown interview 08/23/11 | 59 | |
| 77 | Recording of Brown interview 08/23/11 | 59 | 59 |

**UNITED STATES DISTRICT COURT**

**LOS ANGELES, CALIFORNIA; THURSDAY, DECEMBER 8, 2016**

**11:22 A.M.**

**---**

(The following proceedings were held in open court in the presence of the jury:)

(Prior proceedings held and reported but not included herein.)

THE COURT:  Call your next witness.

MR. FOX:  United States calls Mickey Manzo.

THE CLERK:  Stand here for me, please.  Raise your right hand.

Do you solemnly state that the testimony you may give in the cause now pending before this court shall be the truth, the whole truth, and nothing but the truth, so help you god?

THE WITNESS:  I do.

THE CLERK:  Please be seated.

Please state your full name and spell your last name for the record.

THE WITNESS:  My full name is Mickey Manzo, M-a-n-z-o.

THE CLERK:  Thank you.

MR. FOX:  May I proceed, Your Honor?

THE COURT:  Yes, please.

**MICKEY MANZO,**

**GOVERNMENT'S WITNESS, SWORN:**

**DIRECT EXAMINATION**

BY MR. FOX:

Q    Mr. Manzo, what is it that you do for a living?

A    I currently work at Home Depot.

Q    How long have you done that?

A    A little over a year and a half.

Q    Before working for Home Depot, what did you do for a living?

A    I was a deputy sheriff for Los Angeles County.

Q    How long were you a deputy sheriff for Los Angeles County?

A    About eight years.

Q    Could you please provide us the general time frame when that was?

A    July of 2006 until October of 2014.

Q    Are you still employed or -- what happened that caused you to leave the Los Angeles County Sheriff's Department?

A    I was convicted of obstruction -- conspiracy and obstruction of justice.

Q    What did the charges involve?  What were the allegations against you?

A    Myself along with other co-conspirators basically

obstructed an FBI investigation into the civil rights abuses at Men's Central Jail.

Q        Let's go back to when you first became a deputy sheriff.

What was your first assignment?

A        Men's Central Jail, custody.

Q        And what specifically were you assigned to do at MCJ at the time?

A        I was in charge of modules 36 and 38, the inmates' welfare in those modules.

Q        When you say "36 and 38," is that also known as the 3000 floor, a portion of the 3000 floor?

A        Yes.  That's a portion of it.

Q        Before you began your assignment in Men's Central Jail, what did you have to do to receive training?

A        To get hired by the sheriff's department, I had to go through an academy.  I went through Rio Hondo Police Academy.

Q        In terms of custodial training, did you receive any custody training?  Did you receive any?

A        No.

Q        Who was your sheriff at the time?

A        Sheriff Leroy Baca.

Q        How long did you work on the 3000 floor before your assignment changed?

**UNITED STATES DISTRICT COURT**

A          Roughly two, two-and-a-half years.

Q          What did you -- where did you go at that point?

A          I went to something called OSJ, Operation Safe Jails.

Q          When was this?

A          Initially it was in August of 2008 I went on loan, and then officially full time, I want to say, May of 2009, somewhere around there.

Q          What is OSJ?

A          It stands for Operation Safe Jails, and it's a group of deputies that are in charge of the safety and security and gang intelligence in our jail, in that particular jail.

Q          Now, Mr. Manzo, I want to discuss briefly -- you said that you were convicted of obstruction of justice.  Prior to your conviction, were you ever investigated internally for hiding Anthony Brown by the Los Angeles County Sheriff's Department?

A          Not that I'm aware of.

Q          Were you still working for OSJ in August of 2011?

A          Yes.

Q          Who was your lieutenant at the time?

A          Greg Thompson.

Q          Was there anyone within OSJ who was ranked higher than Greg Thompson?

A          No.

**UNITED STATES DISTRICT COURT**

Q       What was his rank?

A       Lieutenant.

Q       At some point in August of 2011, did you learn that a cellular phone had been found on an inmate?

A       Yes.

Q       How did you become aware of that?

A       I believe the deputy or one of the deputies that did the search that found the cell phone came up to OSJ and talked to one of the OSJ deputies.

Q       Eventually did you learn the name of the inmate who had the cell phone?

A       Yes.

Q       What is that inmate's name?

A       Anthony Brown.

Q       After you learned of the cell phone, did you find that there was a connection between the inmate and any law enforcement agency?

A       Yes.

Q       What did you find out?

A       I don't know how long from when we found it to when we found out it was, but we found that the phone was connected to the civil rights division of the FBI.

Q       How did you find out that information?

A       An OSJ deputy by the name of Noah Kirk was assigned to an FBI task force, and he called that task force

about a number that we couldn't identify on the phone, and they identified it as the civil rights division.

Q      Now, when you said "A number that you couldn't identify in the phone," are we talking about the cell phone at this point or the jail's phone system?

A      The jail's phone system.

Q      How did you identify that number in terms of a number to research?

A      I can't remember if I did it or Deputy Smith did it, but we ran that cell that Anthony Brown was in on the ITMS for phone calls.

Q      You said you ran the cell.  Are we talking about a jail cell or cell phone?

A      I was actually saying the jail cell.  Each jail cell has a pay phone in it.  We ran the number for that cell, that pay phone.

Q      And that was the number that you sent to your Deputy Noah Kirk in order to find out what it was related to?

A      Yes.

Q      When you sent him that cell phone number, did you know it was connected to the FBI?

A      I don't believe so, no.

Q      Showing you Exhibit 18, there should be some books there.  There should be one that is labeled 1 to 18, Exhibits 1 to 18 -- I'm sorry -- 1 to 80 something, and within

there will be Exhibit 18.

Do you recognize that?

A        Yes.

Q        What is it?

A        It is a copy of an e-mail that Deputy Kirk sent to Deputy Smith.  And I asked him to forward it to me.

Q        Is this a true and accurate copy of the e-mail that was forwarded to you?

A        It looks to be, yes.

MR. FOX:  Your Honor, I move for the admission of Government Exhibit 18.

THE COURT:  Any objection?

MR. DIAMANTATOS:  No objection.

THE COURT:  It will be received.

(Marked for identification and received into evidence Exhibit No. 18.)

Q        BY MR. FOX:  Showing you now that e-mail on your monitor, can you see that e-mail?

A        Yes.

Q        What is the date this is forwarded to you?

A        August 19.

Q        We see Gerard Smith in the "from" line.  Who is Gerard Smith?

A        He was an OSJ deputy at the time.

Q        And you said this was a forwarded e-mail; so I'm

**UNITED STATES DISTRICT COURT**

actually going to blow up that lower half so it's easier to see.

Who is Noah Kirk a task force officer with?

A        He was assigned -- I don't know what his task force was called, but it was an FBI joint task force in Pomona.

Q        What was his regular duty when he was not with the task force?

A        OSJ deputy.

Q        When was this e-mail sent?

A        Thursday, August 18.

Q        Okay.  Can you please read after the "Hello, sir" in this text?

A        "Per our conversation, I took the number that was called of the ITMS and forwarded that to Jennifer Naujock. Naujock is the analyst for the FBI task for that I am on. Naujock agreed to do a workup on the number and told me she would contact me when she was done.  A few minutes later Naujock contacted me by and phone and questioned me as to why I wanted information on this number.  I told her that I believed that this number was responsible for assisting to bring cell phone into the jail.

Naujock then informed that the number belonged to the FBI out of West Los Angeles.  She said the number belonged to a civil rights investigator.  Naujock then informed me that she needed to speak with her supervisor before she spoke with

me anymore about the situation.  I agreed and informed her that she should have her supervisor contact Lieutenant Thompson.  I gave her Lieutenant Thompson's phone number to his office, and the call ended.  Kirk."

Q       When you and Mr. Smith received this information, what did you do with it?

A       If I remember correctly, we talked to Lieutenant Thompson.

Q       And was that soon after Mr. Smith had received the original e-mail?

A       Probably.  I don't remember if Noah called and then sent the e-mail or -- but yes.  As soon as we found out, we talked to Lieutenant Thompson.

Q       When you spoke to Mr. Thompson, was it on the phone or in person?

A       I probably called first, and then we walked over.

Q       I'm going to focus on, then, your conversation with Mr. Thompson when you were in person.  You said, we walked over.  Where did you walk to?

A       Well, we were at Men's Central Jail, and his office was at Twin Towers.  We just had to walk across the street.

Q       And when you say "we," who was there besides you?

A       Deputy Smith.

Q       As far as you recall, it sounds like you,

Deputy Smith, and Lieutenant Thompson at this meeting; is that correct?

A     Yes.

Q     What did you talk about when you met with Lieutenant Thompson?

A     Just that the phone was connected with the FBI.

Q     Did Lieutenant Thompson give you any orders, any instructions?

A     Yes.  He wanted us to interview Anthony Brown and put him on tape.

Q     Did he tell you why?

A     Just to lock him into whatever story he was going to tell.

Q     And did you go ahead and do that?

A     We did.

Q     Now, Mr. Manzo, do you have any agreements with the United States currently?

A     Yes.

Q     What is that agreement?

A     That in -- for my cooperation, I would get consideration for time off my sentence.

Q     Are you familiar with the term a Rule 35 motion?

A     Yes.

Q     Have you -- what has the United States told you about a Rule 35 motion?

UNITED STATES DISTRICT COURT

A        That you would consider it.

Q        And what is a Rule 35 motion?

A        The best way to explain it, you would file that on my behalf for cooperating, and you would consider, depending on the information I give, time off my sentence.

Q        Who ultimately decides whether you get time off your sentence?

A        The judge.

Q        Okay.  Have you testified previously in proceedings?

A        Yes.

Q        In the previous proceedings where you've testified, have you received any reward for your testimony?

A        No.

Q        Why did you testify in those previous proceedings?

A        Because I got subpoenaed to.

MR. DIAMANTATOS:  Objection.  Relevance.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  I was subpoenaed to.

Q        BY MR. FOX:  Along with being subpoenaed, did you willingly testify in those proceedings?

A        I did.

Q        Now, going back to August 18 of 2011, you said

that Mr. Thompson ordered you -- Lieutenant Thompson ordered you to speak to Anthony Brown.  Did you go ahead and do that?

A       Yes.

Q       When?

A       I believe it was the next morning, the Friday the 19th.

Q       And when you spoke to Mr. Brown on generally -- I just want to talk general topics, nothing specific -- what is it that you talked about?

A       For the parts that I was there for, he told us that he was working for the FBI as an informant or he was working for the FBI.  I don't think he said the word "informant."  That there was a third party on the street that had facilitated the cell phone into the jail.

Q       Is this a conversation that you recorded or just took notes?

A       We did both.

Q       Why did you record it?

A       Because Lieutenant Thompson wanted us to.

Q       Did Mr. Thompson in the meeting the previous day explain to you why he wanted you to record this?

MR. DIAMANTATOS:  Objection.  Asked and answered.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  Yes.  He wanted to play the tape at

a meeting.

Q    BY MR. FOX:  Did he explain to you who he wanted to play the tape for?

A    The executives.

Q    Did you have an understanding as to who the -- as to who the executives were when he made that statement?

A    Yes.

Q    Who did you understand that to mean?

A    The sheriff and the undersheriff.

Q    Could you please look in that same exhibit book at Exhibit 15.  This is in evidence.  I'm going to publish it, Your Honor.  Could you please read this.

First of all, starting from the "from" line.

A    "From Martinez, Steven M., Steven.Martinez@ic.fbi.gov, sent Thursday, August 18, 2011, at 5:06 p.m. to Baca, Leroy D.  Subject, please call.

"Lee, I have an important and sensitive matter I need to discuss with you.  If you have an opportunity this evening, please call me at 310-883-8539.  Regards, Steven."

Q    And, Mr. Manzo, I'm now going to publish for you Government Exhibit 16 already in evidence.

Mr. Manzo, are you familiar with who Chris Nee is that's listed in the from line and what his role was in August of 2011 within the sheriff's department?

A    Yes.

UNITED STATES DISTRICT COURT

Q        What role did Mr. Nee play in August of 2011 within the sheriff's department?

A        He was Mr. Tanaka's aide.

Q        Are you familiar with who Julie Montgomery was during that time?

A        No.

Q        What is the date that this e-mail was sent and the time, please?

A        Thursday, August 18, 2011, 8:59 p.m.

Q        And what is the subject?

A        "Sheriff's meeting."

Q        Could you please read the text of this e-mail.

A        "Regarding the sheriff's meeting with the undersheriff, Captain Carey, Lieutenant Thompson, and Lieutenant Gallagher at 2:00 p.m., I have reserved the EPC room from 2:00 p.m. to 2:30 p.m."

Q        Are you familiar with the term "EPC room" that is listed in that e-mail?

A        Yes.

Q        What is the EPC room?

A        It is a conference room on the fourth floor of the sheriff's headquarters.

Q        Have you been there before?

A        Yes.

Q        How many times?

**UNITED STATES DISTRICT COURT**

A        Twice.

Q        And when you were there, were there any executives you met with during those times?

A        Yes.

Q        Who were those executives?

A        The sheriff, the undersheriff, Lieutenant Thompson, Captain Carey, Lieutenant Peacock, Lieutenant Leavins, and Lieutenant Chris Nee was there also.

Q        You said the fourth floor Monterey Park.  Is there a name for that building?

A        SHB, Sheriff's Headquarters Bureau.

Q        Who was located on the fourth floor of that building?

A        The executives.  The sheriff and the undersheriff.

Q        And now I'm going to show to you what's in evidence as Government Exhibit 17 starting with the bottom of the first page, and I'll move on to the substance of the e-mail which is on the second page.

Do you see where it says, "From Chris Nee to William T. Carey" and then a couple other names after that?

A        Yes.

Q        Who was William T. Carey?

A        I know him as Tom Carey.  He was the captain of ICIB.

UNITED STATES DISTRICT COURT

Q        Do you know who William Gallagher was?

A        No.

Q        And then Greg Thompson, is that the e-mail address or the way Mr. Thompson's name would show up in e-mails?

A        Yes.

Q        What is the subject of this e-mail?

A        "Meeting."

Q        Publishing the second page now, can you please read what I've highlighted?

A        "Good evening, gentlemen.  Mr. Tanaka would like to meet with you in his office tomorrow at 1330 hours.  If you have any questions, please call me at 323-526-5118, office, or 213-505-0878, cell.  Thank you."

Q        Now going back to the first page of that document, highlighting the third e-mail down that is from August 18, 2011, at 9:02 p.m. from Greg Thompson to Chris Nee, could you please read what Mr. Thompson wrote?

A        "Chris, FYI, I was going to wait until I had more evidence to go at Anthony Brown in an interview as to the source of the phone.  I may have to bump the plan up to tomorrow due the fact he will be on the state bus Saturday night.  At this time I would rather dump him and make him the state's problem while we continue collecting facts to ascertain if my suspicions were correct of we have an employee problem.

Besides, if he doesn't want to cooperate, there is nothing we can offer him with 400 plus years handing over his head.  Could you also provide a computer so I can play the calls and everybody can make their own opinion?  Greg."

Q       I want to ask you a few questions about this e-mail.  It references a state bus.  Are you familiar with that term?

A       Yes.

Q       What is a state bus?

A       A state bus is the bus that takes the inmates that are now prisoners of the state of California from Men's Central Jail to wherever they're going in the state prison system.

Q       Did you have any role in attempting to get Mr. Brown on a state bus that would go out two days later, August 20, 2011?

A       I did, yes.

Q       What was that role?

A       I worked along with Detective Idleberg from jail liaison to get a hold that was placed on Brown removed and then have him placed on the bus.

Q       Now, the sheriff's department's responsibilities with respect to Men's Central Jail were to run that jail; is that correct?

A       That's one, yes.

22

Q        Did the sheriff's department have a responsibility with respect to any state prison in terms of running that prison?

A        No.

Q        Now, this discusses -- and I'm going to show you the next e-mail as well.

Mr. Nee says, "Absolutely.  I will have a laptop available."  Do you recall whether you attended any meetings where there was a laptop and Mr. Thompson played any calls as he referenced in the previous e-mail?

A        Yes.

Q        Okay.  And we'll get into that in a little bit.

Now, reading this top e-mail, what does Mr. Thompson write to Mr. Nee at 10:31 p.m. on August 18?

A        "Thanks, Chris.  Will it be okay to bring two of the OSJ guys working the case?"

Q        Now, I want to ask you now about the Anthony Brown interview that you've discussed, the recording that you did.

Where did you conduct that interview?

A        It was on the 6000 floor of Men's Central Jail in the large interview room.

Q        Can you look now through that exhibit book at Exhibit 71, please.

Do you recognize that exhibit?

**UNITED STATES DISTRICT COURT**

A        I recognize that as a CD.

Q        Yes.  Can you take it out of its sleeve.  I'm sorry.  Is that not the original exhibit?  Let me grab the original exhibit.  71.

And, Mr. Manzo, I'm going to also be asking them to take a look at -- well, we can do this as we go.  We'll do this as we go if that's okay.  Thank you.

Do you recognize that CD?

A        I do, yes.

Q        How do you recognize it?

A        I signed it.

Q        And look at Exhibit 72 from your book, please. Do you recognize Government Exhibit 72?

A        Yes.

Q        Okay.  Now, talking about those two exhibits, is Government Exhibit 71 a true and accurate copy of excerpts from your recording of the interview that you conducted of Anthony Brown?

A        Yes, it is.

Q        And looking at Exhibit 72, is it a fair and accurate transcription of those excerpts of that recording that you conducted of Anthony Brown?

A        Yes.

(Marked for identification Exhibit No. 72.)

Q        BY MR. FOX:  Does it accurately list the

**UNITED STATES DISTRICT COURT**

speakers?

A       Yes.

Q       How do you know that?

A       I listened to it, and I was there.

MR. FOX:  Your Honor, I move for the admission of Government Exhibit 71.

THE COURT:  Any objection?

MR. DIAMANTATOS:  No objection, Your Honor.

THE COURT:  It will be received.

(Marked for identification and received into evidence Exhibit No. 71.)

MR. FOX:  And, Your Honor, we have transcript books we'd like to hand out to the grand jury at this time -- I'm sorry -- to the jury at this time.

THE COURT:  That's fine.

MR. FOX:  Your Honor, can we ask the jury to not flip through it and just go to the exhibit number that we ask them to at the correct time?

THE COURT:  That's fine.  If you just keep those notebooks closed, and we'll let you know what page to open them up to.  Try not to look ahead.  Once the recording is going to play, if you would then close the notebooks.

You're about to hear a recording that has been received into evidence.  A transcript of that recording is being provided to help you identify the speakers and to help

you decide what the speakers say.  Remember, the recording is the evidence, not the transcript.  If you hear something different than what appears in the transcript, what you heard is controlling.  Listen carefully.  The transcript will not be available during your deliberations.

MR. FOX:  And, Your Honor, I'm now going to play the first clip from Government Exhibit 71.

THE COURT:  Is there a page that they can --

MR. FOX:  If they just flip to 72, it's going to be the first page in Exhibit 72.

May I proceed, Your Honor?

THE COURT:  Yes, please.

(The cd, Exhibit No. 71, commenced playing before the jury.)

MR. FOX:  I'm going to play the next clip on that page, the second excerpt in 71.

(The cd, Exhibit No. 71, commenced playing before the jury.)

Q      BY MR. FOX:  Mr. Manzo, we just heard Mr. Smith tell Anthony Brown that he was going to state prison tomorrow. Had you already arranged for his transportation there?

A      Yes.

Q      How difficult was that to do?

A      It wasn't easy.

Q        Why was that?

A        There's a line when you go to state prison, and he wasn't on that -- he wasn't very close.  So we had to bump him up to get him on the list.

MR. FOX:  I'm now going to play the clip that is starting on the transcript at the bottom of page 1.

(The cd, Exhibit No. 71, commenced playing before the jury.)

MR. FOX:  I'm now going to play the clip at the bottom of page 2.

(The cd, Exhibit No. 71, commenced playing before the jury.)

Q        BY MR. FOX:  We heard on page 4 of that transcript Deputy Smith discussing how he was quoting something it sounded like.  What he was quoting at that point?

Let me direct your attention, Mr. Manzo, to refresh your recollection on page 4 about halfway down when we heard Mr. Smith say, "Don't worry.  You'll have your phone soon.  All right.  Okay.  I need to see somebody.  Yeah.  We're working on that on our end?"

A        That was almost an exact transcript of the phone call that we recovered off the ITMS.

Q        And that was the jail landline phone you're discussing?

A        Yes.

Q        A call between who and who at that point?

A        Anthony Brown and at that point we didn't know. We knew it was the FBI, but we didn't know who from the FBI.

Q        Did you know which squad that belonged to?

A        Civil rights division.

MR. FOX:  I'm now going to play the clip that starts on -- about halfway down on page 5.

(The cd, Exhibit No. 71, commenced playing before the jury.)

MR. FOX:  Now playing the clip that begins on the top -- near the top of page 6.

One second, Your Honor.

THE COURT:  Is this a good time to take our recess?

MR. FOX:  Yes.  This is a good time.

THE COURT:  All right.  Ladies and gentlemen, we're going to take our final break of the day.  Again, I want to remind you, until this trial is over, you're not to discuss this case with anyone including your fellow jurors, members of your family, people involved in the trial, or anyone else.  And do not allow others to discuss the case with you.  This includes discussing the case on the Internet, through chat rooms, blogs, bulletin boards, by e-mails or text messages.  If anyone tries to communicate with you about the case, please let me know about it immediately.

**UNITED STATES DISTRICT COURT**

Do not read, watch, or listen to any news reports or other accounts about the trial or anyone associated with it. Do not do any research such as consulting dictionaries, searching the Internet, or using other reference materials. And do not make any investigation about the case on your own.

Finally, you're reminded to keep an open mind until all the evidence has been received, you've heard the arguments of counsel, the instructions of the Court, and the views of your fellows jurors.  If you need to speak with me, simply give a note to the clerk.

We'll come back at a quarter after the hour.

(The following proceedings were held in open court out of the presence of the jury:)

THE COURT:  All right, sir.  You may step down.

All right.  We'll see everybody around 12:15.

(A recess was taken at 11:58 a.m.)

THE COURT:  All right.  Let's bring the jury in.

(The following proceedings were held in open court in the presence of the jury:)

MR. FOX:  May I proceed, Your Honor?

THE COURT:  Yes, please.

Q     BY MR. FOX:  Mr. Manzo, I want to go back to something you said a few minutes ago.  You said in the previous proceedings that you testified voluntarily.  Were you, in fact, compelled to testify in those cases?

A        Yes.

Q        Was that pursuant to a court order?

A        Yes.

Q        Now, let's go back to Exhibit 71 which is reflected in the transcript book on page 7 -- on Exhibit 72, page 6.  I'm going to play that now.

(The cd, Exhibit No. 71, commenced playing before the jury.)

MR. FOX:  Now on page 8 playing the next clip.

(The cd, Exhibit No. 71, commenced playing before the jury.)

MR. FOX:  I'm playing the next clip on the same page.

(The cd, Exhibit No. 71, commenced playing before the jury.)

MR. FOX:  I'm playing the clip that's listed on page 9 of this transcript.

(The cd, Exhibit No. 71, commenced playing before the jury.)

MR. FOX:  Sorry.  I played the same clip.  I'm sorry, Your Honor.  I'm playing the correct one now.

(The cd, Exhibit No. 71, commenced playing before the jury.)

MR. FOX:  Mr. Manzo, there are a few references to C.J. in this transcript on that recording.  At that time do

you know who C.J. was?

A       No.

Q       Why were you asking about somebody named C.J.?

A       Anthony Brown had said that the third party the deputy had met with to get the phone was named C.J.

Q       And we heard you saying that there was going to be a meeting with some very influential people in the department.  Who did you mean by that?

A       The executives.  The sheriff and the undersheriff.

Q       Now, playing for you the last clip listed on the bottom of page 10.

        (The cd, Exhibit No. 71, commenced playing

         before the jury.)

                THE COURT:  All right, ladies and gentlemen.  If you'd close your notebooks, please.

Q       BY MR. FOX:  Mr. Manzo, after you received this information from Mr. Brown on August 19, what did you do with that information?

A       Took it to Lieutenant Thompson.

Q       Who took it to Lieutenant Thompson?

A       I don't remember if we called or we walked over, but Deputy Smith and I.

Q       And was there anybody else that was a party to the conversation when you took this to Lieutenant Thompson?

A      I don't think so.  I don't remember.

Q      Now, in general terms, what is it that you explained to Mr. Thompson?

A      That the reason Anthony Brown had a cell phone was that deputy brought it to him and that it was, in essence, a sting operation by the FBI who were conducting a civil rights investigation.

Q      You've discussed already that there was a meeting set up with the executives that afternoon.  Did that meeting occur?

A      Yes.

Q      And we've seen in e-mails that there was a meeting scheduled at 1:30 with Undersheriff Tanaka and one scheduled at 2:00 o'clock with Sheriff Baca.  Do you recall whether both of those meetings occurred?

A      I only went to the one.  I don't know if the earlier one happened.

Q      When you say "only the one," which one did you go to?

A      The one where the sheriff and the undersheriff were there.

Q      Besides you and the undersheriff and sheriff, who else were present?

A      Deputy Smith, Lieutenant Thompson.  On the Friday that's all I can remember.  There's maybe three other people,

but I don't know who they were.

Q      Where did this meeting take place?

A      In the fourth floor conference room, the EPC conference room.

Q      Do you know what the purpose of the meeting was?

A      To brief the sheriff and the undersheriff on the investigation.

Q      Did that happen?

A      Yes.

Q      Who briefed the sheriff and the undersheriff on the operation?

A      Lieutenant Thompson.

Q      And in general terms, what is it that Lieutenant Thompson told Mr. Baca and Mr. Tanaka?

A      Basically the same, that a cell phone was found and where it was found and that a deputy is alleged to be bringing it in from a third party and that it is linked to the FBI on a sting operation because they're investigating civil rights.

Q      Prior to this meeting, had you seen Mr. Baca before?

A      Yes.

Q      How many times?

A      Three or four.

Q      Do you think you'd recognize him again if you saw

him?

A       Yes.

Q       Could you please look around the courtroom and let me know if you identify him?

A       I do.

MR. HOCHMAN:  So stipulated, Your Honor.

THE COURT:  All right.  The record will reflect the witness has identified the defendant.

Q       BY MR. FOX:  At that meeting, that August 19 meeting in the afternoon, did Mr. Baca say anything?

A       After Lieutenant Thompson's briefing, progress report, it was quiet for a while, and he asked open-ended questions like, "Why are they doing this?  Why didn't they come to us?  We could have helped them," things like that.  But he didn't get answers.  He was kind of talking out loud.

Q       Did Mr. Tanaka say anything?

A       I don't remember him saying anything.  He probably did, but I don't remember what it was.

Q       Did Mr. Baca say anything about any prior conversations he had had with the FBI?

A       Yes.

Q       What did he say?

A       He said that he spoke to someone at the FBI and that they didn't acknowledge the investigation but they asked to see the phone.

Q        Was there a plan with respect to Anthony Brown that anybody came up with at the August 19 meeting?

A        Well, we were going to put him on the state bus, and he would have been gone on the 20th, but we were told not to do that.

Q        Who told you not to do that?

A        The sheriff wanted him to stay in our custody.

Q        How long did that meeting last?

A        Oh, man.  I don't remember.

Q        Okay.  Are we talking about a couple minutes, or are we talking about --

A        No.  It was longer than a couple minutes.  Closer to an hour maybe.

Q        How detailed of a briefing did Mr. Thompson provide to Mr. Baca and Mr. Tanaka?

A        It was pretty detailed without who did what but basically these are the steps we took.

Q        I want to -- actually, I'll publish this Exhibit 19.

         Do you see this e-mail on the lower half of Exhibit 19 that I've published for you?

A        Yes.

Q        Okay.  Can you please read what Mr. Thompson writes -- well, first of all, do you know who Cecil Rhambo is?

A        Yes.

UNITED STATES DISTRICT COURT

Q        Who was Cecil Rhambo at this time?

A        At the time I think he was the assistant sheriff over something.  I don't know exactly what, but I think so.

Q        What about Dennis Burns?

A        He was the chief of custody division.

Q        Did OSJ report to the chief of custody division?

A        Yes.

Q        And what is it that Mr. Thompson writes to Mr. Burns and the Assistant Sheriff Rhambo?

A        "Sir, I met with the sheriff, Mr. Tanaka, Tom Carey, and IIB in regards to the cell phone.  Too much to type.  I'm on the SHB patio waiting to brief you."

Q        Now, highlighting the top e-mail, what does this say from Mr. Rhambo to Mr. Thompson on August 19 at 9:52 p.m.?

A        "Paul briefed me.  We went to see the sheriff.  I was given a partial briefing.  I don't even want to know." Sent from the BlackBerry of Cecil Rhambo, Jr.

Q        You mentioned that you had seen Mr. Baca three or four times before that in your career before that August 19 meeting.  Did you have another meeting with him soon after the August 19 meeting?

A        Yes.  The next day.

Q        And what was the purpose of that meeting?

A        To play the recorded phone calls we recovered.

Q        Which recorded phone calls are you discussing?

**UNITED STATES DISTRICT COURT**

A        The three that Anthony Brown made to the civil rights division of the FBI from his cell.

Q        Now, this was on August 20th.  What day of the week was August 20th?

A        Saturday.

Q        How do you know that?

A        I don't work Saturdays.

Q        Did you work that Saturday?

A        I did.

Q        Where was this meeting held?

A        Same EPC conference room on the fourth floor.

Q        Along with playing the recordings, was there -- let me back up.

Who was present at that meeting?

A        The sheriff, undersheriff, myself, Deputy Smith, Lieutenant Thompson, Captain Carey, Lieutenant Peacock, Lieutenant Leavins, and Lieutenant Krisney.

Q        I'm going to ask some questions about some of those people you talked about.

You've already told us that Nee was Undersheriff Tanaka's aide.  You mentioned a Steve Leavins in there.  Who was Steve Leavins?

A        He was the lieutenant at ICIB.

Q        What about Tom Carey?  Is that -- you mentioned him earlier.  Which entity did he belong to?

A        He was the captain of ICIB.

Q        I believe you said there was a Gallagher there as well; is that right?  I'm sorry.

What happened at this meeting?

A        The same briefing was given to catch up the people that weren't there, and then I played the phone calls.

Q        What happened after you played the phone calls?

A        Mr. Tanaka slammed his hands on the desk and pretty much kind of went off, or he did go off.  He didn't kind of.

Q        When you said he did go off, was this in front of everybody in the room?

A        Yes.

Q        What did he say?

A        Initially he was kind of "What the hell?"  Then "There it is right there.  That's what they're doing.  What are they doing?  You know, fuck them."  Excuse my language.  I apologize.  Things like that.

Q        Is there anything else that you recall him saying?

A        No.

Q        What happened after he said all this?

A        There was general discussion again about what, why.

Q        Let me stop you there.

UNITED STATES DISTRICT COURT

You said there was a general discussion about why. Are you talking about the cell phone itself and why the cell phone was there?

A       No. I'm talking about why the FBI would do that, why they would introduce the phone.

Q       Did Mr. Thompson provide any briefing to anybody in the room?

A       Yes.

Q       What did he say?

A       He went off of a timeline that I had done. He pretty much went straight off the timeline that I had typed up to them. I can't remember exactly what was on it.

Q       What about Mr. Baca? Did he give any briefing to the people in the room about anything?

A       No. I don't remember him giving a briefing. I remember him kind of -- well, he basically told us what we were going to do.

Q       I want you to now look at Exhibit 137. That should be in a different exhibit book than the one you were just looking at.

Have you reviewed that?

A       Yes.

Q       What is it?

A       It is the -- well, it's an e-mail that is also part of my timeline or my timeline. Excuse me.

Q        You mentioned a timeline that Mr. Thompson was going off of on that Saturday meeting.  Is this the timeline you're referring to?

A        Yes.

Q        In substance was this the timeline that was handed out in any way at that start meeting?

A        I don't remember if we handed it out.  I know that there were enough copies to do so.  But I think for some reason I want to say we didn't.  We just had Lieutenant Thompson read off of it.

Q        You said earlier that you read almost word-for-word off this?

A        Pretty close.

MR. FOX:  Your Honor, I move for the admission of Government Exhibit 137.

THE COURT:  Any objection?

MR. DIAMANTATOS:  No objection, Your Honor.

THE COURT:  It will be received.

(Marked for identification and received into evidence Exhibit No. 137.)

Q        BY MR. FOX:  Showing you now the first three entries underneath your timeline.

Do you see that there?

A        Yes.

Q        Generally, what is discussed there?

**UNITED STATES DISTRICT COURT**

A       These are the three calls that we played for the -- at the meeting.

Q       Showing you now the third page of that exhibit, we see two entries -- 8/18 at 0830 hours and 8/18 at 0845 hours.  Generally, what are you discussing in this portion of the timeline?

A       Getting Anthony Brown on the state line bus.

Q       After this briefing was given about this timeline and after Mr. Tanaka had this outburst, what happened next?

A       The sheriff said that Captain Carey, Tom Carey, his shop was going to conduct the investigation.  He was going to run through ICIB.  Everything was supposed to be run through the undersheriff up to the sheriff and that he wanted Anthony Brown isolated and protected.  He wanted to know -- he wanted everything off the cell phone.  He wanted to know what was going on in regards to the FBI investigation.

Q       After he gave those orders, what occurred?

A       He and the undersheriff stepped out.

Q       How long were they gone?

A       I don't remember.

Q       After he and the undersheriff stepped out, what did you do?

A       We stayed there.  Just waited.

Q       What happened next?

A       Mr. Tanaka came back in.

**UNITED STATES DISTRICT COURT**

Q       What, if anything, did Mr. Tanaka say when he came back in?

A       Mr. Tanaka said that he had known the sheriff a long time and he hadn't seen him that upset in that time and that he stated what he wanted done and that you guys are going to do it for him.

Q       Did Mr. Tanaka provide you any more information at that point in time about what to do with Anthony Brown?

A       Yes.  I'm sorry.  Yes.

Q       What did he say?

A       That he wanted final approval on whoever visited him.

Q       Can you please look at Exhibit 74, the original exhibit, which should be, I think, on the witness stand.

Do you recognize it?

A       I do.

Q       What is it?

A       It is a CD of the Brown audio clips from the 21st.

Q       Were you present for an interview of Mr. Brown on the 21st of August?

A       Yes.

Q       At that point in time, was OSJ, you, and Deputy Smith running the interviews anymore?

A       No.

Q      What happened instead?

A      After the meeting on the 20th, Lieutenant Leavins took over as the interviewer.

Q      Is Government Exhibit 74 a true and accurate copy of certain excerpts from that August 21st recording?

A      Yes.

Q      And please look at Government Exhibit 75 which should be in your book.

(Marked for identification Exhibit No. 75.)

MR. FOX:  Your Honor, while he does that, I'd like to move for the admission of Government Exhibit 74.

MR. DIAMANTATOS:  No objection, Your Honor.

THE COURT:  It will be received.

(Marked for identification and received into evidence Exhibit No. 74.)

Q      BY MR. FOX:  Do you recognize what Government Exhibit 75 is?

A      Yes.

Q      What is it?

A      It's a transcript of the clips from Exhibit 74.

Q      Does it truly and accurately depict the speakers and the content of Government Exhibit 74?

A      Yes.

MR. FOX:  I'd like to play portions of -- all of Government Exhibit 74 which are reflected in the jury binders

**UNITED STATES DISTRICT COURT**

under the tab 75.

THE COURT:  All right.  Ladies and gentlemen, if you'll open your notebooks to tab 75, I believe.

Again, you're going to hear recordings that been received into evidence.  The transcript of the recording is being provided to help you identify the speakers and help you decide what the speakers say.  Remember, the recording is the evidence, not the transcript.  If you hear something different from what appears in the transcript, what you heard is controlling.  Listen carefully.  The transcript will not be available during your deliberations.

MR. FOX:  May I proceed, Your Honor?

THE COURT:  Yes, please.

(The cd, Exhibit No. 74, commenced playing before the jury.)

MR. FOX:  I'm playing the clip at the very bottom of that page.

(The cd, Exhibit No. 74, commenced playing before the jury.)

Q     BY MR. FOX:  Mr. Manzo, we just heard Anthony Brown discuss a Deputy Michel.  Did you know at the time who Deputy Michel was?

A     Yes.

Q     How did you know him?

A     I had worked with him off and on.

Q       What was his first name?

A       Gilbert.

Q       What about a Deputy Bravo that he mentions?

A       Yes.

Q       Are you familiar with him?

A       Yes.

Q       How are you familiar with him?

A       I also worked with him.

Q       Do you know of any relationship that he had to any executive?

A       Yes.

Q       What was that relationship?

A       He was the sheriff's nephew.

MR. FOX:  I'm playing you now the clip that's listed on the second page about halfway down.

(The cd, Exhibit No. 74, commenced playing before the jury.)

MR. FOX:  I'm now playing the clip at the top of page 3.

(The cd, Exhibit No. 74, commenced playing before the jury.)

Q       BY MR. FOX:  Mr. Brown in this portion referenced a cell phone that he received in 2009.  During your investigation, did you ever learn whether Mr. Brown actually had a cell phone in 2009?

A       I don't believe he did.

Q       And we heard earlier that he was referring to drugs and other types of contraband that he was bringing in taking away -- let's talk specifically about the drugs.

Did you ever find any information in this investigation that led you to believe that he, in fact, was receiving drugs from the Federal Government?

A       No.

MR. FOX:  Playing now at the bottom of page 3.

(The cd, Exhibit No. 74, commenced playing before the jury.)

MR. FOX:  Now playing the part in the middle of page 4.

(The cd, Exhibit No. 74, commenced playing before the jury.)

MR. FOX:  Now playing a portion at the bottom of that page.

(The cd, Exhibit No. 74, commenced playing before the jury.)

MR. FOX:  Playing the portion now the first third of page 5.

(The cd, Exhibit No. 74, commenced playing before the jury.)

Q       BY MR. FOX:  Was this the first time that you learned that C.J. was an FBI agent?

**UNITED STATES DISTRICT COURT**

A       Yes.

MR. FOX:  Playing now the part at the bottom of page 5.

(The cd, Exhibit No. 74, commenced playing before the jury.)

MR. FOX:  Playing the next part on page 6.

(The cd, Exhibit No. 74, commenced playing before the jury.)

MR. FOX:  Go to the next portion on that page.

(The cd, Exhibit No. 74, commenced playing before the jury.)

Q       BY MR. FOX:  You discussed -- there was a discussion there about 6000.  I believe that's the same room that you said you interviewed Anthony Brown in previously; is that right?

A       Yes.

Q       What is 6000 in Men's Central Jail?

A       It's the hospital.

Q       And the room that you would interview Anthony Brown in, what was it like?  Describe it for us.

A       It was a large room, large enough for a table and four chairs.

MR. FOX:  Now playing for you the clip that is on page 7.

///

(The cd, Exhibit No. 74, commenced playing before the jury.)

MR. FOX:  Your Honor, I'm not going to play any more clips at this time.

THE COURT:  All right.  Ladies and gentlemen, if you'll close your notebooks, please.

Q     BY MR. FOX:  Mr. Manzo, I now want to take you to a couple days later, August 23rd, 2011.  Did anything unusual happen at that time?

A     Yes.  Brown was interviewed by the FBI.

Q     Was this supposed to happen?

A     No.

Q     Why not?

A     There had been, I guess, words -- they had been instructed not to.

Q     When you say "They had been instructed not to," are you referring to deputies within the sheriff's department, or are you referring to the FBI?

A     The deputies that were working the module where Brown was housed had been instructed not to let him out.

Q     How did you find out about it?

A     The interview?

Q     Yes.

A     Deputy Smith and I arrived back from one of the northern jails, and we were told by somebody from jail liaison

that the FBI was currently interviewing Anthony Brown.

Q     What did you do when you found out this information?

A     I called Lieutenant Thompson.

Q     What happened next?

A     About that same time that we found out, Lieutenant Leavins walked into the room, and he also found out.

Q     What happened after Mr. Leavins found out?

A     He called somebody, and the interview was canceled.

Q     Do you know where Mr. Brown had been housed up until this point in time?

A     I want to say 1751G row.

Q     Do you know what 1751G row -- why don't you just describe that location for us.

A     1751G row is the second most secure spot in the entire county, probably.  It is a single-man cell with Plexiglass over the bars and a camera 24/7.

Q     What type of inmates are placed in 1751G row?

A     The only one I remembered, we called him Benji, and he was interesting to say the least.

Q     You say it's the second most secure area in the county jails; is that right?

A     I would say that, yes.

Q     What about in Men's Central Jail?

A        It would be second.

Q        And the camera you discussed, does that -- is that able to record who's coming to the cells and who is leaving the cells?

A        I believe at that time it just showed in the cell.  I'm not a hundred percent sure, but I'm pretty sure it was just in the cell.

Q        I'm now going to show you what's in evidence as Government Exhibit 20.  Showing you the last e-mail listed on that document.

         Do you know who Daniel Fedele was?

A        I believe he was the operations lieutenant at Men's Central Jail.

Q        What is this date and time that this e-mail was sent?

A        Tuesday, August 23rd, 2011, at 2:35 p.m.

Q        What does Mr. Fedele write to Mr. Thompson?

A        It says that he "Personally just looked at the board in 1750.  Right now there is a note on there that no one talks to him without your approval.  I talked to Senior Bonner who said they just changed it.  Prior to the change, the board reflected that no one sees him without your, my, or Lamar's approval.  Lamar says that the A/senior knew of the special handle and ignored it."

Q        What is an A/senior?

A        1750 and 1751 have to have a hard senior at all times because of the inmates.  When there isn't an available hard senior, there is what is called an A/senior who is the deputy that has of the most experience and they throw in there.

Q        What is a "senior"?

A        It is the next rank above deputy but before sergeant.

Q        What happened after Lieutenant Leavins made that phone call to stop the interview with the FBI?

A        Sergeant Waterman interrupted the interview and escorted -- had deputies escort Brown out.

Q        What did you do next?

A        Immediately after, Lieutenant Leavins wanted all the deputies from 17 in the jail liaison office; so I stayed with them for that.

Q        What happened when he brought them all into the jail liaison office?

A        He wanted to know what happened.  He said that they were given orders and what happened, and the A/senior at the time stepped up, to his credit, and said that he screwed up.

Q        Did you go anywhere that day outside of Men's Central Jail?

A        Yes.

Q        Where did you go?

**UNITED STATES DISTRICT COURT**

A       SHB, Sheriff's Headquarters Bureau.

Q       Is that the one in Monterey Park you discussed earlier?

A       Yes.

Q       Where within SHB did you go?

A       Mr. Tanaka's office on the fourth floor.

Q       Who else was present?

A       Deputy Smith, Lieutenant Thompson, and Captain Carey.

Q       I'm now going to show you that same exhibit again, Exhibit 20.  Can you please read this e-mail.

A       "Delayed re a meeting with P.T."

Q       Who sent this e-mail?

A       Lieutenant Thompson.

Q       What happened in this meeting with Mr. Tanaka?

A       The four of us got our asses chewed off.

Q       What do you mean by that?

A       He wanted to know why it happened.  Why did the FBI get in?  He wanted to let us know that we let him down and we let the sheriff down and that, if we couldn't do our job, that he'd find somebody to do it for us.

Q       Did he use any expletives?

A       Just a few.  He basically repeated the same thing he repeated in the meeting that, "Who the fuck do they think they are?  Fuck the FBI," things like that.

UNITED STATES DISTRICT COURT

Q        What happened next?

A        Lieutenant Thompson asked him if the sheriff knew.

Q        What did Mr. Tanaka say?

A        No.  But you're going to tell him.

Q        Was there also a discussion at this meeting about what to do in the future with respect to Mr. Brown?

A        Yes.

Q        Who said what, if you recall?

A        Mr. Tanaka wanted a hundred percent guarantee that it would not happen again.

Q        Was there a plan to take Anthony Brown anywhere that was developed at this meeting?

A        I don't know if it original -- it originated at this that he was going to move out of Men's Central Jail to a station jail.

Q        Was there any discussion about OSJ deputies and changing their roles in terms of whether anybody would be guarding his cell?

A        Yes.

Q        Tell me about that.

A        Mr. Tanaka wanted two deputies, two OSJ deputies -- I think he said "Greg's people" is what he used, the term, to sit on Brown 24/7.

Q        You mentioned earlier that Mr. Tanaka told

UNITED STATES DISTRICT COURT

Mr. Thompson that he would go brief the sheriff.  Did you see anything happen at the conclusion of this meeting?

A        Yes.

Q        What did you see?

A        Lieutenant Thompson went into the sheriff's office.

Q        What did you do during this time?

A        Sat in the lobby.

Q        Actually, I want to go back a little bit.  Was there also a discussion in Mr. Tanaka's office about a change in policy, a written policy that would --

A        Yes.

Q        -- take effect?

         Please describe that.

A        Now, because of the breach, the executives -- excuse me -- the executives wanted, any time an FBI agent or someone from the FBI came in to interview an inmate, they wanted a badge and an ID.  They wanted a case number, and there were a couple other things.  I don't remember them all.

Q        Did Mr. Tanaka go in with Mr. Thompson to Mr. Baca's office?

A        No.

Q        Did Mr. Tanaka provide Mr. Thompson with any information about what not to tell Mr. Baca when he went in?

A        No.

**UNITED STATES DISTRICT COURT**

54

Q    Based on your observations of Mr. Tanaka and Mr. Baca at the meetings you were in, was Mr. Tanaka trying to shield Mr. Baca from any information?

MR. DIAMANTATOS:  Objection, Your Honor.  Calls for speculation.  Foundation as to what Mr. Tanaka --

THE COURT:  You can rephrase the question.

Q    BY MR. FOX:  Did you observe in your interactions with Mr. Tanaka during this time him say anything that indicated to you that he wanted information shielded from Mr. Baca about this operation?

MR. DIAMANTATOS:  Objection.  Vague.

THE COURT:  Overruled.

MR. DIAMANTATOS:  May I be heard at sidebar on this, Your Honor?

THE COURT:  No, you may not.  Sit down.

Go ahead.

THE WITNESS:  No.

Q    BY MR. FOX:  When Mr. Thompson left Mr. Baca's office, did you go anywhere?

A    Yes.  We headed back to Men's Central Jail.

Q    Did you have a discussion with Mr. Thompson at some point about what happened in Mr. Baca's office?

A    Yes.

Q    Who was present for that conversation?

A    Myself, Deputy Smith, and Lieutenant Thompson.

UNITED STATES DISTRICT COURT

Q       Do you remember where this meeting occurred?

A       No.

Q       Was it around the time that you left Mr. Baca's -- that you left the executive offices in Monterey Park?

A       Yes.

Q       And what, if anything, did Mr. Thompson tell you took place in Mr. Baca's office?

A       He said that he briefed him about the breach and that the sheriff was understanding and that his main focus was trying to get -- figure out a way to help Brown understand the 423 years that he's facing.

Q       What, if anything, did -- well, you said "the breach." What, if anything, did Mr. Thompson tell you about what he told Mr. Baca about the breach? In other words, who breached?

A       He let him know that the FBI interviewed Brown.

Q       Did Mr. Thompson tell you whether he informed Mr. Baca whether the meeting was stopped between the FBI and Anthony Brown?

A       Yes, he did.

Q       Did Mr. Thompson tell you anything about whether he had informed Mr. Baca that he had already briefed the undersheriff?

A       I believe he did, yes.

**UNITED STATES DISTRICT COURT**

Q       Did Mr. Thompson say anything to you about whether he apologized to Mr. Baca?

A       He did.

Q       What did he say?

A       He said that he apologized, and basically he dove on the sword.  Those were his words.

MR. FOX:  I'm now going to publish what's in evidence as Government Exhibit 22 and specifically the second page.  Actually, I'm going to start on the top of the previous page.

Do you see what I'm highlighting right here at the very bottom?

A       Yes.

Q       This is an e-mail that carries over to the next page.

Who is this e-mail from?

A       Cecil Rhambo.

Q       Who's it written to?

A       Greg Thompson.

Q       What is the date and time of this e-mail?

A       August -- Tuesday, August 23rd, 2011, at 10:08 p.m.

Q       What does it say?

A       "Hang in there."

Q       Who is this e-mail from on the first page that

I'm highlighting?

A        Greg Thompson.

Q        And what's the date and time?

A        August 23rd, 2011, at 10:12 p.m.

Q        What is it that Mr. Thompson wrote?

A        "I'm good for the butt chewing.  It was the 'You failed me' that hurt me.  The last thing I want to hear from you, him, or the sheriff are those words.  But as always, I learned who to rely on.  Thanks."

Q        Now highlighting the next e-mail up, can you please read who this is from and to?

A        From Cecil Rhambo to Gregory Thompson.

Q        What date and time?

A        Tuesday, August 23rd, 2011, at 10:49 p.m.

Q        What does Mr. Rhambo state?

A        "I think in this instance assumption, which is the mother of all screw-ups, occurred.  Combine that with the sensitive nature of the event, and it becomes a very complex issue to manage.  I hear you.  I'm sensitive to letting him or the sheriff down too.  He still loves you as do I.  Believe me, it hurt him to emote on you that way."

Q        And now I'm highlighting a portion of the e-mail that is right above it at 11:05 p.m. from Mr. Thompson.  What did Mr. Thompson write?

A        "I know.  That's why the act is already

UNITED STATES DISTRICT COURT

forgotten.  I did learn something.  Follow up on every direction, even if your friends assure you they will handle the task.  Just --" I'm sorry.

Q        Go ahead.

A        "Just to let you know, I briefed MCJ p.m. and e.m. supervisors in regards to new FBI and outside LE interviewing procedures, and that revised policy will be following."

Q        Is "LE" an --

MR. DIAMANTATOS:  Objection, Your Honor, to this witness explaining the e-mail that he didn't draft.

MR. FOX:  Your Honor, I'm going to ask him about an acronym and whether he's aware what it means.

THE COURT:  Let's wait for the question.  If you have an objection --

MR. DIAMANTATOS:  Yes, Your Honor.

Q        BY MR. FOX:  Mr. Manzo, are you aware of what the abbreviation "LE" means within the sheriff's department?

A        Yes.

Q        What does it mean?

A        Law enforcement.

Q        I think next to you now should be Exhibit 77.  It should be another CD.

A        Okay.

Q        What is Exhibit 77?

A       It's a CD of recordings from the August 23rd interview.

Q       How do you know that's what it is?

A       I listened to it and signed it.

Q       And look at Exhibit 78 that should be in the book.

(Marked for identification Exhibit No. 78.)

MR. FOX:  While he does that, Your Honor, I'd like to move for the admission of Government Exhibit 77.

MR. DIAMANTATOS:  No objection, Your Honor.

THE COURT:  It will be received.

(Marked for identification and received into evidence Exhibit No. 77.)

Q       BY MR. FOX:  Are you familiar with Government Exhibit 78?

A       Yes.

Q       What is it?

A       Transcript of the CD.

Q       Does it truly and accurately reflect the speakers and what was said on Government Exhibit 77?

A       Yes.

MR. FOX:  Your Honor, I'd like to begin playing Government Exhibit 77 for the jury which is reflected in the jury book in transcript 78.

THE COURT:  All right.  If you'd open your

**UNITED STATES DISTRICT COURT**

notebooks, please.  I believe it's tab 78.

MR. FOX:  Yes, Your Honor.  Thank you.

Playing the first clip.

(The cd, Exhibit No. 78, commenced playing

before the jury.)

Q     BY MR. FOX:  What are those numbers after all the names?

A     After the sheriff's department personnel, those are our employee numbers.  And after Inmate Brown, that's his booking number.

MR. FOX:  Now I'm going to play the second clip.

(The cd, Exhibit No. 78, commenced playing

before the jury.)

Q     I'm going to stop right there and ask you a follow-up question.  This is on page 2.

Mr. Brown just said, "They were just here."
Going into that interview with Anthony Brown, were you already aware that the FBI had been there to interview Mr. Brown?

A     Yes.

MR. FOX:  Continuing.

(The cd, Exhibit No. 78, commenced playing

before the jury.)

MR. FOX:  Now playing the clip on page 7.

(The cd, Exhibit No. 78, commenced playing

before the jury.)

**UNITED STATES DISTRICT COURT**

MR. FOX:  And the top of page 8.

(The cd, Exhibit No. 78, commenced playing before the jury.)

MR. FOX:  The next one on page 8.

(The cd, Exhibit No. 78, commenced playing before the jury.)

MR. FOX:  The bottom of page 8.

(The cd, Exhibit No. 78, commenced playing before the jury.)

MR. FOX:  Another clip at the bottom of page 9.

(The cd, Exhibit No. 78, commenced playing before the jury.)

MR. FOX:  Now the clip on page 10.

(The cd, Exhibit No. 78, commenced playing before the jury.)

MR. FOX:  Your Honor, there's one more clip that I'd like to play.  It's at the bottom of page 13.

(The cd, Exhibit No. 78, commenced playing before the jury.)

THE COURT:  Is this a convenient time to break?

MR. FOX:  Yes, Your Honor.

THE COURT:  All right, ladies and gentlemen.

Again, I want to remind you, until this trial is over, you're not to discuss this case with anyone including your fellow jurors, members of your family, people involved in

the trial, or anyone else.  And do not allow others to discuss the case with you.  This includes discussing the case on the Internet, through chat rooms, blogs, bulletin boards, by e-mails or text messages.  If anyone tries to communicate with you about this case, please let me know about it immediately.

Do not read, watch, or listen to any news reports or any accounts about the trial or anyone associated with it. Do not do any research such as consulting dictionaries, searching the Internet, or using other reference materials, and do not make any investigation about the case on your own.

Finally, you're reminded to keep an open mind until all the evidence has been presented, you've heard the arguments of counsel, the instructions of the Court, and the views of your fellow jurors.  If you need to speak with me, simply give a note to the clerk.

We'll see you tomorrow morning at 8:00 o'clock. Drive safely.

(The following proceedings were held in

open court out of the presence of the jury:)

THE COURT:  All right, sir.  You may step down. Thank you.

Who's going to follow this witness?

MR. FOX:  I've got to move a witness around based on travel restrictions.  I think we may put Linda Farrar on next.  She is F-a-r-r-a-r.  The other witnesses I expect to

**UNITED STATES DISTRICT COURT**

testify tomorrow are Cecil Rhambo, David Dahle, and if we get to him, James Sexton.

And, Your Honor, Mr. Sexton is in custody currently.  I don't know if you've had anybody use the transport yet here, but I just wanted to put that out to the Court.

THE COURT:  Okay.  Anything else?

MR. FOX:  No, Your Honor.

MR. HOCHMAN:  Nothing from the defense, Your Honor.

THE COURT:  All right.  Thank you very much. We'll see everybody tomorrow morning at 8:00 o'clock.

(Proceedings concluded at 1:35 p.m.)

CERTIFICATE OF OFFICIAL REPORTER

I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

DATED THIS  12TH  DAY OF DECEMBER, 2016.

/S/ MIRANDA ALGORRI

MIRANDA ALGORRI, CSR NO. 12743, CRR
FEDERAL OFFICIAL COURT REPORTER

**UNITED STATES DISTRICT COURT**