UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

HONORABLE PERCY ANDERSON, U.S. DISTRICT JUDGE

UNITED STATES OF AMERICA,       )
                                )
            Plaintiff,          )    Case No.
                                )
      vs.                       )    CR 16-00066(A)-PA
                                )
LEROY D. BACA,                  )    PAGES (1 to 115)
                                )
            Defendant.          )
_____ )

REPORTER'S PARTIAL TRANSCRIPT OF
TESTIMONY OF MICKEY MANZO
FRIDAY, DECEMBER 9, 2016
8:03 A.M.
LOS ANGELES, CALIFORNIA

MIRANDA ALGORRI, CSR 12743, CRR
FEDERAL OFFICIAL COURT REPORTER
312 NORTH SPRING STREET, ROOM 435
LOS ANGELES, CALIFORNIA 90012
MIRANDAALGORRI@GMAIL.COM

UNITED STATES DISTRICT COURT

## APPEARANCES OF COUNSEL:

**FOR THE PLAINTIFF:**

EILEEN M. DECKER
United States Attorney
BY:  BRANDON FOX
BY:  EDDIE A. JAUREGUI
Assistant United States Attorneys
United States Courthouse
312 North Spring Street
Los Angeles, California 90012

**FOR THE DEFENDANT:**

MORGAN LEWIS AND BOCKIUS LLP
BY:  NATHAN J. HOCHMAN
BY:  BRIANA ABRAMS
The Water Garden
1601 Cloverfield Boulevard
Suite 2050 North
Santa Monica, California 90404

MORGAN LEWIS AND BOCKIUS LLP
BY:  TINOS DIAMANTATOS
77 West Wacker Drive
Chicago, Illinois 60601

**UNITED STATES DISTRICT COURT**

## I N D E X

### FRIDAY, DECEMBER 9, 2016

### Chronological Index of Witnesses

Witnesses:                                                          Page

MANZO, Mickey

    Direct examination resumed by Mr. Fox              6
    Cross-examination by Mr. Diamantatos               56
    Redirect examination by Mr. Fox                    108
    Recross-examination by Mr. Diamantatos             113
    Further redirect examination by Mr. Fox            114

**UNITED STATES DISTRICT COURT**

4

**EXHIBITS**

**FRIDAY, DECEMBER 9, 2016**

| Exhibit | | For ID | In EVD |
|---|---|---|---|
| 133 | Original calendar book 2011 | 20 | 20 |
| 82 | Transcript of Brown interview 08/24/11 | 29 | |
| 81 | Recording of Brown interview 08/24/11 | 29 | 29 |
| 134 | Daily activities notebook | | 42 |
| 155 | Handwritten letter from Anthony Brown 09/03/11 | 44 | |
| 622 | Document | 61 | |

**UNITED STATES DISTRICT COURT**

**LOS ANGELES, CALIFORNIA; FRIDAY, DECEMBER 9, 2016**

**8:03 A.M.**

**---**

THE CLERK:  Calling item No. 1, USA versus Leroy D. Baca.

Counsel, state your appearances, please.

MR. FOX:  Good morning, Your Honor.

Brandon Fox and Eddie Jauregui on behalf of the United States.  Also with us at counsel table is Special Agent David Dahle with the FBI.

THE COURT:  Good morning.

MR. HOCHMAN:  Your Honor, I apologize.  Mr. Baca has been in the courtroom the last 15 minutes.  He just ran to the restroom.  I will go get him.

Good morning, Your Honor.  Nathan Hochman along with Tinos Diamantatos and Briana Abrams on behalf of the defendant Leroy Baca who is present, Your Honor.

THE COURT:  Good morning.  All right.  Are we ready to proceed?

MR. HOCHMAN:  Yes, Your Honor.

MR. FOX:  Yes, Your Honor.

THE COURT:  I believe all the jurors are here. Let's bring the jurors in.

MR. FOX:  Would you like Mr. Manzo on the stand

**UNITED STATES DISTRICT COURT**

right now?

THE COURT:  That's fine.

(The following proceedings were held in open court in the presence of the jury:)

THE COURT:  Good morning, ladies and gentlemen. All right.  Let's proceed.

**MICKEY MANZO,**

**GOVERNMENT'S WITNESS, PREVIOUSLY SWORN:**

**DIRECT EXAMINATION (RESUMED)**

BY MR. FOX:

Q     Mr. Manzo, did you have a chance to think about all your answers from yesterday after you went home last night?

A     I did, yes.

Q     Is there anything, thinking about your answers, that you wanted to clarify this morning?

A     Yes.

Q     What is that?

A     You had asked if Mr. Tanaka had ever ordered or said if I should keep anything from the sheriff.

Q     And what is it that you remembered after thinking about your testimony?

A     During the -- one of the meetings -- I'm not sure which one -- he explained that he wanted just the -- the main stuff.  We found the phone.  This is how we did it.  He didn't want the ITMS and the technical stuff because he didn't think

that the sheriff would understand that because of the gap between when the sheriff was an investigator and now.

Q       Are you referring to that timeline that you were talking about?

A       Yes.

Q       Okay.  I want to now move on to August 23rd.  We had just listened to the recording about moving around to a station jail.

Do you recall that?

A       Yes.

Q       Was Mr. Brown moved to a station jail on August 23rd?

A       I don't remember the date.  But, yes, he was ultimately moved.

Q       Okay.  I want to focus on right after the FBI had been to see Mr. Brown.  At that point you testified yesterday that he was in 1751G row.

Do you remember that?

A       Yes.

Q       What was the next move for Mr. Brown?

A       He went to 8200.

Q       And what is 8200?

A       I don't know what it is now, but it was the communicable disease ward in the hospital.

Q       And is that whole floor the communicable disease

ward, or is there a specific area for that?

A       It's the 8000 floor, and it's separated by 81, 82, and then 8000.  8000 was diabetics at the time.  81 was wheelchair inmates, and 82 was the communicable diseases.

Q       What types of diseases are you referring to?

A       It's almost entirely staph, MRSA.

Q       Is it also known as MRSA?

A       Yes.

Q       Why was Mr. Brown brought to 8200 at that point in time instead of to a station jail?

A       He had medical issues with getting him out of Men's Central Jail.

Q       And why do medical issues mean that somebody can't go to a station jail?

A       His type of medical -- I don't remember exactly what they were, but he needed to be somewhere where there were nurses 24/7.

Q       What types of -- generally, what types of inmates are housed in the county jails compared to the station jails?

A       Well, the station jails are mostly, with the exception of trustee inmates that work at the station jails, they're mostly just holding cells until they are transported to IRC.  They are not for long-term housing.

Q       Do you know how it was decided that Mr. Brown would be placed in 8200 versus another area of

Men's Central Jail?

A       Yes.

Q       How did that occur?

A       Captain Carey decided that.

Q       How do you know that?

A       I showed him, I think, two or three options of where we could put Brown, and he chose 82.

Q       Along with moving him to Men's Central Jail -- within Men's Central Jail, we heard you discuss yesterday having OSJ people guard him at all times.  Did that start taking place in 8200?

A       Yes.

Q       Please explain what happened at that point.

A       I was ultimately -- myself -- I can't remember who sat with me, but I just sat in the hallway right outside his door.

Q       Was it just you?

A       There was somebody else, but I don't remember who it was.

Q       Typically how was it staffed with deputies outside of his door?  How many deputies were there?

A       Two.

Q       And how long did this occur?

A       For the duration of the assignment, or just sitting on Brown itself?

**UNITED STATES DISTRICT COURT**

Q        How long did it occur that deputies were sitting on Brown while he was in county custody?

A        Until he left.

Q        I'm now going to publish what's in evidence as Government Exhibit 21.  The bottom e-mail on that page, this is from Gregory Thompson, your lieutenant, to a William Gilbert.

Do you know who William Gilbert was at the time?

A        Yes.

Q        What role did he play?

A        He was a jail liaison detective.

Q        And in terms of his reporting, who did he report to?

A        Lieutenant Thompson.

Q        This e-mail is dated August 24, 2011, at 7:56. Can you please read what Mr. Thompson wrote?

A        "In your rounds this morning, could you stroll up to 8200 and ensure our OSJ contingent is outside of Anthony Brown's cell.  We also need to discuss why you were not notified for Brown's visit.  See you around 10:00."

Q        And now I'm going to highlight the top e-mail. This is from Mr. Gilbert to Mr. Thompson.  Can you please write what was said -- read what was written.  Excuse me.

A        Sure.  "Sorry, boss.  I meant to say on my way. We have two OSJ deputies sitting in the hallway by his door. They said Smitty briefed them on the rules and what is expected

of them."

Q       Was there an effort to figure out a schedule of who would be standing guard outside of Mr. Brown's door?

A       Yes.

Q       Who was in charge of that?

A       Deputy Smith and myself.

Q       How did you decide that?

A       We had a meeting.  I don't remember the date.  It was in Hero's Park.  We explained to them what was going on and what we had been ordered to do.  We set up a schedule, and we let them pretty much pick when they were available and what worked for them.

Q       Which deputies did you choose?

A       MCJ, OSJ, IRC OSJ, and a couple jail liaison detectives.

Q       You mentioned Hero's Park.  What was Hero's Park?

A       It's a little tiny open area attached to Men's Central Jail.  It's like a break area for the deputies.

Q       Where is it located?  You said it's outside of Men's Central Jail?

A       Outside the security of Men's Central Jail.

Q       When did this briefing take place?

A       It was midmorning.  I don't remember the date.

Q       Do you recall how soon after that meeting that you had with the executives on August 23rd that you had a

meeting with the OSJ deputies?

A        Shortly after.

Q        And what happened at that meeting?

A        They all -- we all sat down, and Deputy Smith explained to them about the investigation, on all of it but the pertinent details.  We found the phone.  It's connected to the FBI.  Brown is an informant, and now his safety is what we're going to be safeguarding and that he -- we've been ordered by Mr. Tanaka to sit on his cell.

Q        What, if anything, did you tell the deputies at that meeting?

A        I reiterated what Mr. Tanaka said in the meetings we had.

Q        What was that?

A        "Fuck the FBI."

Q        Did you say anything else about what Mr. Tanaka had said?

A        I think I explained to them that he was -- obviously by that statement that he was mad.  I can't remember any -- no.  I can't remember anything else.

Q        I now want to publish for you Exhibit 28.

         Do you recognize this document?  Would it be helpful if I blow it up?

A        I can read it.  I do recognize it, yes.

Q        Okay.  What is it?

A       This is the e-mail that Deputy Smith sent out to the OSJ guys after the meeting with the finalized schedule and kind of their roles they were going to play.

Q       You said "the finalized schedule."

I'll show the bottom third of this e-mail.  What is this?

A       That is the -- that's the schedule for the 24th.

Q       When you say "the schedule," what are you referring to?

A       Who's going to sit on Brown and what time.

Q       What were the directions for the people that were going to be sitting on Mr. Brown?

A       To be outside of his cell and that, if for any reason, if somebody needed to open it, they were the ones to do it, and they would notify Deputy Smith or I, and we would notify Lieutenant Thompson.

Q       What about anybody having any access to Mr. Brown?

A       No access.

Q       Showing the second page at the top third, is this just a continuation of that schedule?

A       Yes.

Q       This shows this is an e-mail from Mr. Smith.  Do you know if Mr. Smith wrote this e-mail?

A       He wrote it.

**UNITED STATES DISTRICT COURT**

Q       How do you know it?

A       I proofread it.

Q       Could you please read the first paragraph in this e-mail?

A       "If you are getting this e-mail, you have been signed up to work this very important detail.  I am in charge of security and scheduling for this detail.  Please don't let me or the unit down.  I have covered the background regarding Anthony Brown, male black, birthday 2/19/68, booking No. 2009547, no local gang affiliation.

"The inmate we are tasked with protecting, for clarification, his cell door 8225 will not be opened without the two OSJ deputies who are assigned to be posted.  If you get a pass for any movement other than medical, call me for approval.  Use your common sense.

"There will be no other movement without the presence of the following people: Undersheriff Tanaka, ICIB Captain Tom Carey, ICIB Lieutenant Leavins, Lieutenant Greg Thompson, Deputy G. Smith, or Deputy M. Manzo."

Q       Can you please read the second paragraph now.

A       "At the beginning of each shift at MCJ, e.m., 2200 to 0600; a.m., 0600 to 1400; p.m., 1400 to 2200, call 1750, extension 40134, and tell the senior deputy your name and employee number and confirm that you have Inmate Brown and that he is alive and log who you talk to in the black book.  I have

**UNITED STATES DISTRICT COURT**

left a black book/calendar with the posted deputies.

"The book will be updated as a movement log.  It is not a Title 15 log.  It's a CYA log.  So please make pertinent brief notes to pass along to your relief.  Examples are meals, nurse, name and time, and/or moved out for interview by Smith at 1030 hours, things of that nature.  If Brown has any requests, both deputies shall be present during any conversation.  To keep yourself free of any controversy, don't talk to him.  Let the approved listed people deal with Brown's issues."

Q       What about this third paragraph?  Can you please read it?

A       "It has been expressed to me several times now that this is one of the most important investigations involving the Los Angeles County Sheriff's Department in its 160-year history.  No joke.  So please do not hesitate to call me first if you need anything."

Q       Mr. Smith wrote in there that it had been expressed to him several times that this was one of the most important investigations involving the Los Angeles County Sheriff's Department in its history.

Did you hear those comments as well?

A       I did, yes.

Q       Who made those comments?

MR. DIAMANTATOS:  Objection.  Foundation.

MR. FOX:  Your Honor, I'm happy to lay a foundation.  Thank you.

THE COURT:  All right.

Q    BY MR. FOX:  Do you know when these comments were made?

A    I do.

Q    Approximately when?

A    The meeting -- I want to say the meeting on the 20th and then again in Mr. Tanaka's office after the FBI interview.

Q    You mentioned that it was during the meeting on the 20th and then in his office.  Were the same people present in those meetings as you've described previously when he made the comment?

A    Yes.

Q    And what is it that -- well, who made this comment?

A    Mr. Tanaka.

Q    What did he say?

A    Exactly what it says.

Q    In terms of this being the most important investigation or one of the most important investigations involving the Los Angeles County Sheriff's Department, from your perspective, any crime that was committed that the sheriff's department was investigating at this point involved

UNITED STATES DISTRICT COURT

what?

A       At this point I still think they were looking into the drug allegations.

Q       Okay.  And what about the cell phone?

A       They were looking in the cell phone too.

Q       And the cell phone is -- is it a felony or misdemeanor to have a phone in jail?

A       It's a misdemeanor.

Q       What about drugs?  Is it rare or -- a rare occurrence that drugs are in jail?

A       No.

MR. DIAMANTATOS:  Objection.  Form.

MR. FOX:  Your Honor, I'll be happy to ask the question again.

THE COURT:  All right.

Q       BY MR. FOX:  Do you have any experience regarding whether drugs come in to the county jails?

A       Yes.

Q       And based on that experience, what is your opinion about whether drugs are frequently in the jail?

MR. DIAMANTATOS:  Objection.  Form.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  Drugs are common in county jail.

Q       BY MR. FOX:  Could you please read this last

18

paragraph on this first page.

A        "There are four 12-hour shifts each day: Midnight to noon, 0600 to 1800, noon to midnight, 1800 to 0600. There will always be two deputies assigned.  However, they have offset start and end times.  Do not leave until properly relieved.  Once again, you all have my number, 909-815-8064, if you do not get relief.  All CARPS are been canceled for you until we have accomplished our mission.  Overtime will only be paid once you have completed your 40.  We must still provide our service to custody division.  Starting next week I will require a straight 12-hour slot before you are eligible for an OT spot."

Q        This mentioned something called "CARPS."  What were CARPS?

A        I don't remember what it actually -- it's an acronym for something.  But in lieu of working your regular assignment, you would fill an open spot at an -- in our case, it was a custody facility.  So we would CARP at CRDF as a line deputy instead of working OSJ.

Q        As a result of this e-mail, what was happening?

A        We were not doing that.  We were not filling that spot.

Q        Why was that?

A        Because we were now filling this spot.

Q        This mentioned a CYA log earlier.  What is a CYA

log?

MR. DIAMANTATOS:  Objection, Your Honor.  Foundation.

MR. FOX:  I'm sorry.  I'm happy to ask the question, Your Honor, if I can withdraw that question and re-ask it.

THE COURT:  That's fine.

Q    BY MR. FOX:  Are you familiar with what a CYA log is?

A    Yes.

Q    What is it?

A    It's not a technical term, but that's just what we called it.  It was a cover-your-ass log.

Q    There should be an Exhibit 133 in front of you.  If not, I might have to ask Mr. Montes Kerr to help.

A    It's right here.

Q    Great.  Can you please look at that and tell me if you recognize it.

A    (Witness reviewed exhibit.)

I do.

Q    What is it?

A    It is our CYA log.

Q    How do you know?

A    I've seen it before prior during the investigation.

**UNITED STATES DISTRICT COURT**

Q        Did you help create it as well?

A        I did.

Q        Can you just look through it and see if it's in substantially the same condition as it was in in August and September of 2011.

A        It looks the same.

MR. FOX:  Your Honor, I move for the admission of Government Exhibit 133.

THE COURT:  Any objection?

MR. DIAMANTATOS:  No objection, Your Honor.

THE COURT:  It will be received.

(Marked for identification and received
into evidence Exhibit No. 133.)

Q        BY MR. FOX:  You said it was in substantially the same condition.  I'm going to ask you something in the bottom right-hand corner.  Did that exist at the time, LASD and some numbers after that?

A        No.

Q        Now I'm showing you the third page of that exhibit.

Just generally, is there anything listed before August 23rd in that CYA log?

A        No.

Q        Why is that?

A        We didn't start the rotation of sitting on him

UNITED STATES DISTRICT COURT

until the 23rd.

Q    You see some names listed here.  It says, "Tuesday, the 23rd, Smith/Manzo."  What did that refer to?

A    The first two people that sat on him were supposed to be Smith and I, but he was dealing with the medical situation for Brown trying to get him cleared to leave.  So it was me and then another deputy.

Q    What about the times listed under there?  Let me clarify that actually.

It says 0200 to 0000.  What did that refer to?

A    Probably the times that we were sitting on him.  But that's -- that doesn't match up.

Q    Well, look at next to it.  You see "Thompson Pearson."

A    Uh-huh.

Q    It says "12:00 a.m. to 8:00 a.m."  What does that refer to?

A    That means that Thompson and Pearson relieved me at midnight.

Q    This says Thompson.  Was that Lieutenant Thompson?

A    No.

Q    Who was it?

A    Matt Thompson.

Q    Who was Matt Thompson?

UNITED STATES DISTRICT COURT

A       Lieutenant Thompson's son.

Q       Can you look at Exhibit 29, please.  I'm going to publish it for you.

This is an e-mail from Mr. Smith to a number of people.  Who are these people that he sent the e-mail to?

A       Most of them are OSJ deputies from either MCJ or IRC.  There's one custody K-9 detective and one -- I don't know if he was a senior at 17 or he was in jail liaison at the time.

Q       This is sent on August 24th at approximately 9:16 p.m.  Can you please read what is written.

A       "I am in the process of making the next week or two of schedules for the Brown detail.  I need to know who is going to be out of town, Vegas conference.  Include dates and/or hours you are unavailable.  If you anticipate being unavailable for any other reason, I need to know that ASAP so I can get this schedule done and you can make some money.  Thank you."

Q       This is an e-mail from Noah Kirk to the same group of people.  Is that the same Deputy Kirk that you referred to as being the task force officer previously?

A       Yes.

Q       What is it that Mr. Kirk wrote?

A       "Just FYI, the extension to the location is 47979, and from the outside it is 213-974-7979."

Q       Are you familiar with that extension?

UNITED STATES DISTRICT COURT

A       Yes.

Q       What was it?

A       It was the nurse's station closest to where Brown was housed.

Q       What floor?

A       8200.

Q       I'm now going to show you and the jury Exhibit 23.  What is this?

A       This is an e-mail that I drafted to Lieutenant Thompson.

Q       Why did you draft this e-mail to Mr. Thompson?

A       He asked me to draft basically -- he had notes on a piece of paper, and he asked me to make it look official.

Q       What were these notes about?

A       How the FBI could gain access to Brown, what they needed to do.

Q       Can you please read what you wrote to Mr. Thompson on August 24th at 9:47 a.m.?

A       "Good morning.  Effective immediately, all FBI requests for interview will be approved by Undersheriff Tanaka. If the FBI requests access for any reason to your facility, get the following information:  Name and badge or ID number; place of assignment, i.e., special problems, robbery detail; contact phone number; inmate who is being interviewed; case number or brief synopsis of case; future date and time they are available

UNITED STATES DISTRICT COURT

to interview.

"The above information will be documented by the facility's main control and verified by the facility's watch sergeant and watch commander.  If any of these questions cannot be answered, they will not be allowed access to your facility. Once all of the information is obtained, a phone call to Undersheriff Tanaka's office will be made.  An e-mail response from Undersheriff Tanaka or someone he designates will be sent to the requesting party with an approval or denial."

Q       You mentioned that this came from Mr. Thompson's notes.  Did you hear anyone else orally state this?

A       Yes.

Q       Approximately when was this?

A       It's -- I don't remember.  I know that it was discussed, I think, in the 20 -- the meeting after the FBI visited Brown.

Q       That was August 23rd?

A       Yes.

Q       And who discussed this policy?

A       Mr. Tanaka.

Q       Was that the only time that Mr. Tanaka dictated the policy to you?

A       I believe it was brought up at one of the meetings, either the Friday or Saturday meeting.

Q       And you're talking about the 18th -- I'm sorry --

**UNITED STATES DISTRICT COURT**

the 19th and 20th; is that correct?

A        Yes.

Q        I'm now going to publish Exhibit 27.  Who's this an e-mail from and to?

A        It's from Greg Thompson to Christopher Nee and Crystal Miranda.

Q        Who is Mr. Nee?

A        At the time he was Mr. Tanaka's aide.

Q        What about Crystal Miranda?  You don't know?

A        I'm not sure.

Q        Could you please read the first two sentences that I've highlighted here that Mr. Thompson wrote on August 24th at 11:27 a.m.?

A        "Chris, Crystal, can I get the boss' approval to put this out custody-wide?  Verbal notification isn't working as well as I thought it would."

Q        And then without reading exactly what's written here, generally, what is this?  And I've highlighted below the first two sentences.

A        It's the e-mail I wrote.

Q        Regarding the new FBI policy?

A        Yes.

Q        Now I'm going to show you the bottom of the first page.  Substance is on the second page.  But who wrote this e-mail?

A    Chris Nee.

Q    To who?

A    Greg Thompson.

Q    At the top of the second page, what did he write?

A    "Greg, can you give me a call at 323-526-5118? Thanks."

Q    Now highlighting the 6:02 p.m. e-mail from Mr. Thompson to Mr. Nee on the 24th, can you please read what Mr. Thompson wrote.

A    "Chris, was Mr. Tanaka going to make the changes on the FBI notice to facility commanders, or will he be satisfied if I remove all reference to him or the executives? If so, I will send it out tomorrow morning."

Q    What did Mr. Nee write at 9:23 p.m.?

A    "He said that you were going to make changes to it."

Q    Now I'm going to publish what's in evidence as Government Exhibit 32.

Do you recognize this e-mail?

A    No.

Q    Do you know if you were copied on this e-mail?

A    I was not.

Q    I'd like you to read the e-mail that was sent from Mr. Thompson to custody captains, custody ops, lieutenants, custody commander, and MCJ jail liaison with the

subject "Inmate interviews."

A     "Effective immediately, all FBI requests for inmate interviews will be approved by MCJ jail liaison.  All FBI requests in person or telephonic shall be referred to MCJ jail liaison.  Once approved, the inmate will be transported to MCJ and made available to the FBI.  MCJ jail liaison shall be the only entity to facilitate FBI interviews inside of our custody facilities."

Q     As far as you're aware, Mr. Manzo, was the FBI ever able to interact with Anthony Brown while he was in county custody after August 23rd, 2011?

A     I don't believe they were, no.

Q     Now publishing Government Exhibit 26 which is in evidence, please look at this, and tell me if you recognize this e-mail.

A     I recognize it.

Q     What is it?

A     An e-mail that I wrote.

Q     About what?

A     Tracking the FBI phone calls.

Q     From where to where?

A     It looks like January 1st of '09 to August 24th of 2011.

Q     I'm sorry.  You said you were tracking every FBI phone call.  How were you able to track these phone calls?

A       Through our ITMS system.

Q       Which is what?

A       Inmate Telephone Monitoring System.

Q       So what did you do to track those calls?

A       Just like any search program, you enter in the parameters, the date, the time if you have it, and then the phone number you're looking for, and it spits out whatever number it's going to spit out.

Q       Why did you do this?

A       Lieutenant Thompson asked me to.

Q       What did you find out when you ran the numbers?

A       I remember there were a lot of phone calls.

Q       We see here that you sent the e-mail on August 24th at 9:31 p.m. to Steve Leavins, Scott Craig, and Maricela Long.  Who were Scott Craig and Maricela Long at the time?

A       They were sergeants assigned to ICIB.

Q       Did they have any involvement with Anthony Brown up to this point?

A       They may have.  I don't remember.

Q       I now want you to look at Exhibit 81 which should be next to you.

A       In the folder?

Q       Yes.  Is there a folder there with 81?

A       I don't know.

**UNITED STATES DISTRICT COURT**

Q    Do you see it?

A    I do, sir.

Q    What is it?

A    It is a CD of the interview that was conducted on the 24th at Temple Station.

Q    How do you know that?

A    I've listened to it, and I signed it, and I wrote "Temple" on it.

Q    These are excerpts of that interview; is that correct?

A    That's correct.

Q    Are they true and accurate excerpts of that interview that was conducted on August 24th?

A    Yes.

Q    I'd like you to look at Government Exhibit 82 and see if you recognize that.

(Marked for identification Exhibit No. 82.)

MR. FOX:  While you look at that, Your Honor, I move for the admission of Government Exhibit 81.

THE COURT:  Any objection?

MR. DIAMANTATOS:  No, Your Honor.  No objection.

THE COURT:  It will be received.

(Marked for identification and received into evidence Exhibit No. 81.)

Q    BY MR. FOX:  Do you recognize that?

A        Yes.

Q        What is it?

A        It is a transcript of the interview from the 24th.

Q        Does that transcript fairly and accurately reflect what was said in those excerpts in Government Exhibit 81 and the speakers in those excerpts?

A        Yes.

Q        How do you know?

A        I was there.  I listened to it on the CD, and I've read the transcript.

MR. FOX:  Your Honor, I'd like to begin playing the excerpts from Government Exhibit 81, and the transcript in 82 is in juror binders.

THE COURT:  All right.  Ladies and gentlemen, if you would open your binders.

And, again, you're about to hear a recording that's been received in evidence.  A transcript of the recording is being provided to help you identify speakers and help you decide what the speakers say.  Remember, the record is the evidence, not the transcript.  If you hear something different from what appears in the transcript, what you heard is controlling.  Listen carefully.  The transcript will not be available during your deliberation.

MR. FOX:  I'm now going to play the first clip

that is reflected on page 1 of the transcript.

(The cd, Exhibit No. 81, commenced playing before the jury.)

MR. FOX:  Playing the second clip on page 2.

(The cd, Exhibit No. 81, commenced playing before the jury.)

MR. FOX:  Now playing the clip listed at the bottom of page 3.

(The cd, Exhibit No. 81, commenced playing before the jury.)

MR. FOX:  Now playing the first clip listed at the top of page 4.

(The cd, Exhibit No. 81, commenced playing before the jury.)

MR. FOX:  And now the clip in the middle of page 4.

(The cd, Exhibit No. 81, commenced playing before the jury.)

MR. FOX:  Your Honor, for now I'm done playing excerpts.

THE COURT:  All right, ladies and gentlemen.  If you'll close your books, please.

Q     BY MR. FOX:  Mr. Manzo, you discussed yesterday that Deputy Bravo is the nephew of Mr. Baca.  At some point did Mr. Brown make any allegations against Mr. Bravo?

UNITED STATES DISTRICT COURT

A        Yes.

Q        What did he say?

MR. DIAMANTATOS:  Objection.  Foundation.

MR. FOX:  I have to lay more foundation, Your Honor.

THE COURT:  All right.

Q        BY MR. FOX:  Who was present when he made these allegations, if you recall?

A        Myself, Deputy Smith, and, I believe, Lieutenant Leavins.

Q        Do you remember when he made these allegations approximately?

A        It was during an interview.  I don't remember the date.

Q        Was it in one of these interviews that -- around the time of these interviews we've been listening to?

A        Yes.

Q        And where did this interview occur?

A        It was either in the 6000 interview room or 7000 interview room.

Q        Is the 7000 interview room also within Men's Central Jail?

A        Yes.

Q        And what is it that Mr. Brown told you about Mr. Bravo?

A      That he got his first phone, one of the two phones he had, from Deputy Bravo.

Q      What did you do with that information?

A      After that interview, I ultimately typed a report.

Q      What happened with that report?

A      When I went to turn it in to Sergeant Craig, because we were probably a week or so after it, we had formed a big task, he asked me to redact Bravo's name from the report.

Q      Did he explain why?

A      No.  Even though I asked.

Q      Did he provide you with any instructions?

A      No.  He just told me that, you know, he didn't agree with it either but it was coming from way above him and to do it, and we had an argument about it for a little while.

Q      Are you aware of any efforts by the sheriff's department to conduct an undercover operation with respect to Mr. Brown?

A      Yes.

Q      When did this occur?

A      I do not remember the date, but it was the same day that we had him polygraphed.

Q      Was Mr. Brown in Men's Central Jail at this point, or was he at a station jail at this point?

A      He was in 8200 at Men's Central Jail.

UNITED STATES DISTRICT COURT

Q        And how do you know that this undercover operation was going to take place?

A        I helped facilitate it.

Q        How did you help facilitate it?

A        We were tasked by Lieutenant Leavins -- Deputy Smith and I were tasked to get a van and bring, I think he said, four sets of triple extra large brown jumpsuits to the SEB parking lot.

Q        Why was that necessary?

A        They were going to dress two of our detectives as inmates and place them in the cell with Brown.

Q        Do you know what the purpose of that undercover operation was?

A        No.

Q        Did you bring those uniforms to that parking lot you were discussing?

A        I did, yes.

Q        What happened once you got there?

A        Lieutenant Leavins was there, and he was talking to the two detectives, and we were just standing by the van waiting for further instructions.  And then Mr. Tanaka and Lieutenant Nee pulled up.

Q        What happened when they pulled up?

A        They got out, shook hands with Lieutenant Leavins, and talked to the detectives for a little

bit.

Q      Could you hear that conversation?

A      No.

Q      Mr. Manzo, having worked in the jails and within Men's Central Jail for the years that you did, are you familiar with what a records jacket is?

A      Yes.

Q      What is a records jacket?

A      It is the personal info, information of an inmate, and also their charges.

Q      Around the same time period in late August of 2011, did Mr. Leavins ask you to do something with respect to Mr. Brown's record jacket?

A      Yes.

Q      What did he -- when did this occur?

A      I don't remember when it occurred.

Q      Do you recall whether Mr. Brown was still in MCJ custody, or had he been transferred to a station jail?

A      No.  I don't recall.

Q      Do you remember how it is that Mr. Leavins communicated information to you?  Were you in person or on the phone?

A      I don't remember.

Q      Would it refresh your recollection about the time period if you reviewed -- well, it's in evidence.  Let me

actually just pull it up.  Publishing Government Exhibit 39.

MR. DIAMANTATOS:  Objection, Your Honor.  Improper refreshing recollection.

MR. FOX:  Your Honor, I'm just publishing an exhibit.

THE COURT:  Overruled.

Q    BY MR. FOX:  Mr. Manzo, do you know who Jason Pearson is?

A    Yes.

Q    He's the sender of this e-mail I just highlighted in Government Exhibit 39.

Who does he send this e-mail to?

A    Greg Thompson, and he copies Michael Rathbun and Gerard Smith.

Q    Where was Mr. Pearson's assignment at that time?

A    He is IRC OSJ.

Q    What is "IRC"?

A    Inmate Reception Center.

Q    Who does Mr. Pearson copy on this e-mail?

A    Michael Rathbun and Gerard Smith.

Q    Who is Michael Rathbun?

A    He was also an IRC OSJ deputy.

Q    What is the subject of this e-mail?

A    "Jacket."

Q    What about the date of this e-mail?

UNITED STATES DISTRICT COURT

A       August 26.

Q       What does this e-mail state?

A       "Sir, Rathbun will be delivering the inmate record jacket for our friend.  It will be slid under your door for your review in the morning.  Jason."

Q       Did your conversation with Mr. Leavins about Mr. Brown's record jacket occur before or after this e-mail?

A       Before.

Q       What did Mr. Leavins tell you?

A       That he wanted Brown's jacket.

Q       Did he tell you why?

A       I don't believe so, no.

Q       What did you do after Mr. Leavins told you that he wanted Mr. Brown's jacket?

A       I called one of the IRC OSJ deputies and asked them if they could grab it for me.

Q       I'm now going to publish Government Exhibit 40.

        Actually, before I do that, I'm going to ask you, did you personally ever see Mr. Brown's record jacket?

A       No.

Q       I'm now going to publish Exhibit 40.

        Are you familiar with this e-mail?

A       Yes.

Q       What is it?

A       It is an e-mail to the OSJ contingent that was

UNITED STATES DISTRICT COURT

sitting on Anthony Brown to let them know that we were no longer at Men's Central Jail, that we were moving to San Dimas Station.

Q       What is the date of this e-mail?

A       August 27.

Q       What are the dates of the schedule that are listed in the e-mail?  You can just go with the range.

A       August 29 of 2011 to September 4, 2011.

Q       Are you familiar with Mr. Brown's aliases that he had during this time?  I'm sorry.  I shouldn't say his aliases.

At some point in time, when he moved to San Dimas, did he keep the name Anthony Brown?

A       No.

Q       What happened?

A       We changed it.

Q       Do you know why?

A       We were ordered to.

Q       Showing you now Government Exhibit 38, this is an e-mail from John Bonner to Greg Thompson.

Do you know who John Bonner was?

A       Yes.  He was either the senior in 17 at the time or he was in jail liaison.  I don't remember.  He was both at one time.

Q       You say "Senior in 17."  Do you mean 1750?

A       Yes.

Q        And the subject says "John Rodriges," R-i-g-e-s. Looks like a misspelling.  Do you know who John Rodriguez was at this time?

A        That was the first name that we changed Anthony Brown from or to.  Excuse me.

Q        I'm going to now publish the second page from that CYA notebook you discussed.

Do you see at the top of the second page it has two names listed?

A        Yes.

Q        We see John Rodriguez listed in handwriting and then a number beneath that.

What is that?

A        That would be his booking number.

Q        Had Anthony Brown been actually released from custody at this point, physically released from custody?

A        No.

Q        Why did he need a new booking number?

A        I don't know how to answer that.  The easiest way to say it is, in order to -- the way it was explained to me, in order to safeguard him from the deputies and the inmates, we were going to change him to John Rodriguez.

Q        Who explained that to you?

A        If I remember correctly, Lieutenant Thompson.

Q        What about Kevin King?  That name is listed

there.  Who is Kevin King?

A    Anthony Brown.

Q    And it listed another number next to him.  What is that?

A    That is his booking number.

Q    What is that barcode there beneath the number?

A    I think this is a copy of the sticker that you would put on a wristband.

Q    Do you have Exhibit 134 in front of you?  Do you recognize it?

A    Yes.

Q    Okay.  Before we get into that, you mentioned safety was explained to you by Mr. Thompson.  At the August 23rd meeting with Mr. Tanaka, you mentioned that it was -- that was when it was decided that you would be putting two OSJ deputies on Mr. Brown and moving him out of 1750.

Did Mr. Tanaka ever discuss safety as the reason for that at that meeting?

A    No.

Q    So what is Exhibit 134?

A    This is my notebook from the task force.

Q    What were you using that notebook for?

A    Writing down anything that came up during meetings, anything like that.

Q    What time period, generally, was this?

**UNITED STATES DISTRICT COURT**

A        Probably from best estimate would be around the 19th.

Q        And I want to have you look at page 10 of that exhibit.  Do you see that?

A        The one that starts out 8/19/11?

Q        Let me -- you're on 134, page 10?

A        I think so.  They don't have page numbers.

MR. FOX:  Your Honor, may I see what Mr. Manzo is looking at there?  I want to make sure he and I are looking at the same document.

THE COURT:  That's fine.

Q        BY MR. FOX:  It's a different page I'd like to show you that Mr. Montes Kerr is putting in front of you.

Do you recognize that?

A        Yes.

Q        Okay.  And without getting into the substance of it, what generally is it?

A        It's the notes I took at a briefing.

MR. FOX:  Your Honor, may I have one moment with counsel?

THE COURT:  Yes.

MR. FOX:  Your Honor, with agreement from counsel, we are only going to be admitting the cover page and the page that I'm going to be publishing to the jury of this exhibit.  This is Exhibit 134.  With your permission I'd like

to admit those two pages and publish the second page.

MR. DIAMANTATOS:  No objection, Your Honor.

THE COURT:  All right.

(Received into evidence two pages of Exhibit No. 134.)

Q       BY MR. FOX:  Mr. Manzo, is this the page you were just referring to?

A       Yes.

Q       Could you please read your notes from that exhibit?

A       "8/31/11, meeting/briefing, 1030 hours.  1,000 man-hours, federal grand jury investigation.  Subpoenas.  One, inmates A through T all records including force/injury, complaints, et cetera, 24 inmates.

"One, deps, deputies, A through W reports use of force, alleges, criminal charges on inmates, disciplinary documentation and e-mails.

"One, all jail personnel, i.e., carpers/transfers.  9/14/11, inmate info subpoena due; 9/21/11, deputy A through W info subpoena due; 9/28/11, jail personnel info subpoena due," at the very bottom.

Q       Mr. Manzo, you discussed how Mr. Brown was brought to San Dimas at some point in late August of 2011.  At some point did he return to Men's Central Jail?

A       Yes.

Q        Why was that?

A        He had an -- I guess an outburst.  That's what we were told.  And that he would -- he was making too much of a stink at San Dimas.  So we had to bring him back.

Q        Do you have Exhibit 86 in front of you?  Do you recognize it?

A        I recognize it as a CD.

Q        Does it have your signature on it?  Okay.  I will then not do this one with you.

Can you look at -- actually, it's already in evidence.  Can you look at Exhibit 87.

MR. HOCHMAN:  Your Honor, I don't believe 87 is in evidence.

MR. FOX:  It's not in evidence.  It's a transcript.

Q        Do you recognize that?

A        Yes.

Q        Have you seen this transcript before?

A        I have.

Q        And do you know whether this transcript fairly and accurately depicts what was said in a September 2nd, 2001, recording?  2011 recording.  Excuse me.

A        It does.

Q        Does it also accurately list the speakers?

A        Yes.

**UNITED STATES DISTRICT COURT**

MR. FOX:  Your Honor, I'd like to now play for the jury Exhibit 86 which is reflected in the jury books under Government Exhibit 87.

THE COURT:  All right.  If you'd open your notebooks, please.  I believe it's tab 87.

(The cd, Exhibit No. 86, commenced playing before the jury.)

Q      BY MR. FOX:  Mr. Manzo, there was some discussion there about legal pads.  I'd like you to look at Government Exhibit 155, please.

(Marked for identification Exhibit No. 155.)

Q      BY MR. FOX:  Do you recognize it?

A      Yes.

Q      What is it?

A      It is a copy of a letter Brown had written to the ICIB.

Q      How do you know that that's a letter that Mr. Brown wrote to ICIB?

A      I saw the original.

Q      How did you see the original?  How did it come into your possession?

A      I think, if I remember correctly, Brown gave it to Deputy Smith.

Q      And what did you do with it once you got it?

A      Gave it to Lieutenant Leavins.

**UNITED STATES DISTRICT COURT**

Q        There are some redactions in that exhibit; is that correct?

A        There look to be, yes.

Q        Other than the redactions where some information is not in there, does that appear to be a true copy of what you received from Mr. Brown?

A        It appears to be, yes.

MR. FOX:  Your Honor, I move for the admission of Government Exhibit 155.

MR. DIAMANTATOS:  No objection, Your Honor.

THE COURT:  It will be received.

(Received into evidence Exhibit No. 155.)

Q        BY MR. FOX:  Before we go through it, I want to ask you, when Mr. Brown was moved back to Men's Central Jail, did he receive a new alias, or did he keep the one he had when he was in San Dimas?

A        I believe we changed it again.

Q        I'm now going to publish what's in evidence as Government Exhibit 43.

Do you see the e-mail I'm highlighting on this page?

A        Yes.

Q        It's written from Gerard Smith to Greg Thompson September 2nd at 9:21 a.m.  Can you please read it.

A        "Sergeant Johnson has made him a K-10 per OSJ and

you.  Updated housing will be 8225.  Inmate new name
Johnson, Chris, No. 2863148, case No. 999999999.  Getting
medical update now.  Go kill something."

Q        What -- that's reference to hunting; is that
right?

A        Yes.

Q        What is that case number?

A        Not one that I know.  I think you have to put
something when you book somebody.  So that's what we chose.

Q        Now showing you what's in evidence as Government
Exhibit 45, is this another schedule of the OSJ deputies who
were supposed to be guarding Mr. Brown?

A        Yes.

Q        And showing you the first page and then the
second page -- I'm sorry.  It looks like there's only one page.

         What is the date range here?

A        September 4 of 2011 to September 10, 2011.

Q        Now showing you what's in evidence as Government
Exhibit 46, what is this?

A        It looks to be a continuation of the schedule.

Q        Until what time -- what date?

A        Saturday, September 17, 2011.

Q        Now I want to publish the first page of
Mr. Brown's letter.  Can you please read what I've highlighted.
Actually, just tell me the date of this letter.  This is 155.

A        September 8, 2011.

Q        If you could please look at the last page of that exhibit in front of you and see if there's a date that's better written than that, a copy that's better, I should say.

A        Last page is signed September 3rd, 2011.

Q        Can you please read the portion I've highlighted here.

A        "I understand that you guys are very, very busy and you have many things to do.  So I will make this letter short as possible."

Q        Having said that, this is a lengthy letter; is that correct?

A        Yes.

Q        Showing you page 14, could you please read what's written.

A        "As a person who knows a little something about the law, I know the evidence that I provided to the FBI means nothing without my testimony and without my testimony being that I am the one who shot the videos, took the pictures, gave them the notes, names of inmates, and deputies involved means nothing.  If I don't testify and after being put in this position by the feds and then hung out to dry, I have no desire to testify for the FBI.

"However, I will cooperate with the following people of LASD: Lieutenant Steve, Captain Tom,

Sergeant Long --" I can't read that one.  It looks like --
"Sergeant Grey, Sergeant Webber, and Sergeant Lopez.  And I
can't forget Lieutenant --" it looks like Tampson, but I'm sure
he meant Thompson.  "And I will testify for LASD only if
needed."

Q      Now showing you the bottom of page 22 of that
letter, can you please read it.

A      "I am not a hostile witness, and I will cooperate
to the fullest in my --" oh, boy.

Q      If you can't make it out, go on.

A      "I believe LASD should handle their own problems,
not FBI or any other agency.  And so no one has to bully me or
take my stuff and legal work to make me cooperate with this
investigation.  But that has happened.  I'm not hostile.  There
is no reason to be hostile with LASD, especially when the
FBI --"

Q      Showing you now the top of the next page.

A      "-- has left me for dead.  However, I am
concerned about my safety."

Q      Can you read this page, page 25, starting with "I
will not."

A      "I will not testify for the FBI, and I don't --"
I can't read that "-- the FBI ever again.  I just want to help
with the investigation and with the requested --" I don't
know "-- fight my case.  End of story.  It is up to LASD, not

**UNITED STATES DISTRICT COURT**

me, how they handle this investigation.  Again, it is not my problem, and that is my position.  Sincerely, Anthony Brown."

Q       Showing you now what is in evidence as Government Exhibit 47.  This is an e-mail from Judy Gerhardt to someone named Patrick Libertone saying "Need document from September 7, 2011."  Can you please read what it says.

A       "Pat, I was referred to you for this.  Please assist ASAP.  Please provide the following: Base files including but not limited to full name, date of birth, social security number, last known address, last known phone number, criminal history, if available, and photos for the following LASD inmate.  Please advise of an ETA for these records.  Brown, Anthony, 2009547.  Please contact Lieutenant Libertone for booking slip."

Q       Showing you now the next e-mail from there from Mr. Libertone to Mr. Thompson.

By the way, did you know who Mr. Libertone was?

A       He was a lieutenant at IRC.

Q       And in this e-mail, it just lists "FYI" to Mr. Thompson.  I'm showing you the top e-mail at 3:45 p.m. on September 7.

What does Mr. Thompson do with this e-mail?

A       He forwards it to Captain Carey.

Q       And what does he write?

A       "FYI, federal request?"

Q        I'm going to show you what's in evidence as Government Exhibit 52.

Who is this e-mail from and to?

A        From Captain Carey to Lieutenant Steve Leavins.

Q        What is the date?

A        September 9, 2011.

Q        What is written in this e-mail from Mr. Carey to Mr. Leavins?

A        "Steve, official request from feds for interview with Brown was made."

Q        At some point, Mr. Manzo, was Mr. Brown transferred to state custody?

A        Yes.

Q        Do you remember approximately when this occurred?

A        If I remember, around September -- early September.

Q        At some point, were you loaned to any other bureau within the sheriff's department?

A        Yes.

Q        What bureau was that?

A        ICIB.

Q        Where was it located?

A        ICIB was located in Commerce.

Q        When were you loaned to ICIB?

A        After the 20th meeting.

**UNITED STATES DISTRICT COURT**

Q        Were there ever any meetings in -- or within ICIB with any executives?

A        Yes.  But after we moved from Commerce to the Sheriff's Headquarters Bureau.

Q        When did that occur?

A        Early September.

Q        Do you ever recall seeing the sheriff there, Mr. Baca there?

A        Yes.

Q        Approximately when?

A        The first full task force briefing we had, I don't remember the date.  It was on a Tuesday.  He came to that one.

Q        Who else was there?

A        All of the -- well, the sergeants that were assigned to the task force at the time because it was still growing, myself, Deputy Smith, Captain Carey, Lieutenant Peacock, Lieutenant Leavins, Undersheriff Tanaka, and then there were some support personnel.

Q        Where within the task force offices did this meeting occur?

A        It was in the task force office that was commandeered.  It was in the basement of Sheriff's Headquarters Bureau.  They called it an EPC conference room.

Q        What occurred -- what type of briefing occurred

after Mr. Baca arrived?

A    Lieutenant Leavins, Sergeant Craig, and Sergeant Long gave a once-over of everything catching all the sergeants up for the cell phone investigation.

Q    Was there any discussion about the jail policy with respect to the FBI at that meeting?

A    I'm not sure.  I don't remember.

Q    Was there any discussion about any communications that had occurred with the FBI with respect to the cell phone previously?

A    Yes.  I was part of the briefing that the sheriff had been in contact with the FBI and they hadn't acknowledged the investigation but they wanted their phone back, or the phone back.  Excuse me.

Q    Mr. Manzo, are you familiar with FBI Special Agent Leah Marx?

A    Yes.

Q    Going back to the end of September, 2011, did you ever see any videos that were taken of Special Agent Marx?

A    I did, yes.

Q    What was that video?

A    It was the video of Sergeant Long and Sergeant Craig talking with Lieutenant Marx -- I'm sorry -- Special Agent Marx.

Q    Was there any audio on it?

UNITED STATES DISTRICT COURT

A        No.

Q        How was it that you were able to see it?

A        Scott Craig played for -- what was his name?  I can't remember the other sergeant's name, but he played it for -- there were a couple sergeants.

Q        And you were there too?

A        I was.

Q        I want to take you back to a couple days before you saw that video.

Did you observe anything unusual with Mr. Craig at that point?

A        I did.

Q        What did you see?

A        He had -- he was leaving the task force office, and the sergeant to my right who sat next to me -- I can't remember his name -- said something to the effect of I don't think this is a good idea.  And Sergeant Craig kind of gave a half bow half curtsy, and he said, "I've been so ordered."  And then he walked out of the room, and I just thought that was odd.

MR. FOX:  One moment, Your Honor.

I have no further questions for this witness at this time.

THE COURT:  All right.  Ladies and gentlemen, we're going to take our first break of the day.  Again, I want

to remind you you're not to discuss this case with anyone including your fellow jurors, members of your family, people involved in the trial, or anyone else, and do not allow others to discuss the case with you.  This includes discussing the case on the Internet, by e-mails or text messages.  If anyone tries to communicate with you about this case, please let me know about it immediately.

Do not watch or read or listen to any news reports or other accounts about the trial or anyone associated with it.  Do not do any research such as consulting dictionaries, searching the Internet, or using other reference materials, and do not make any investigation about the case on your own.

Finally, you're reminded to keep an open mind until all the of the evidence has been received, you've heard the arguments of counsel, the instructions of the Court, and the views of your fellow jurors.  If you need to speak with me, simply give a note to the clerk.  We'll come back at a quarter to the hour.

(The following proceedings were held in open court out of the presence of the jury:)

THE COURT:  All right.  Sir, you may step down.

THE CLERK:  Please be seated.

MR. FOX:  Your Honor, I just wanted to briefly let you know at some point either today or Tuesday we will be

asking you to take judicial notice of what a grand jury is.  We filed this as document 162 on the docket, and happy to provide you with a copy of what we filed right now.  My understanding is that Mr. Hochman may have an objection to it.

MR. HOCHMAN:  Your Honor, I'm reviewing it again today.  I will be able to tell the Court by the next break if we have any objection.

THE COURT:  All right.  Do you anticipate using it before then?

MR. FOX:  No, Your Honor.

THE COURT:  Okay.

(A recess was taken at 9:30 a.m)

(The following proceedings were held in open court out of the presence of the jury:)

MR. HOCHMAN:  Your Honor, I've had a chance to look over the judicial notice.  We would not oppose it.

THE COURT:  Okay.  Do you have a rough idea of how long you're going to be?

MR. DIAMANTATOS:  An hour to an hour and a half at the most, Your Honor.

THE COURT:  Okay.  Who is the next --

MR. FOX:  It's going to be Linda Farrar.  She will be a very short witness.  At that point we may want to call Mr. Sexton if he's here.  If we need some time, we do have another witness we can put on the stand at that point.

UNITED STATES DISTRICT COURT

THE COURT:  I think the plan is they would have him available around 10:30.

MR. FOX:  Your Honor, will you take a break right before we call him?

THE COURT:  Uh-huh.

MR. FOX:  Thank you.  So it will be after Ms. Farrar that we'd like to call Mr. Sexton.

THE COURT:  Okay.  Let's bring the jury in.

(The following proceedings were held in open court in the presence of the jury:)

THE COURT:  All right.  Let's resume.

MR. DIAMANTATOS:  Thank you, Your Honor.

**CROSS-EXAMINATION**

BY MR. DIAMANTATOS:

Q      You testified that you were convicted for conspiracy to obstruct justice of the Government's FBI civil rights investigation to the Men's Central Jail in the summer of 2011; is that right, sir?

A      Yes.

Q      That's a felony; correct?

A      Yes.

Q      You were also convicted of actual obstruction of justice of that same investigation; isn't that right, sir?

A      Yes.

Q      That's also a felony?

**UNITED STATES DISTRICT COURT**

A       Yes.

Q       So you are a twice-convicted felon?

A       Yes.

Q       Once convicted, the next step was your sentencing; correct?

A       Yes.

Q       At that sentencing, you knew, based on your convictions, you were facing a maximum penalty of 15 years imprisonment; correct?

A       Yes.

Q       Five years for the conspiracy?

A       I don't know the breakdown, but that sounds about right.

Q       But you knew it was 15 years that you were facing; correct?

A       Yes.

Q       At that sentencing, the Government recommended that you go to prison for two-and-a-half years; correct?

MR. FOX:  Objection, Your Honor.  Relevance.

THE COURT:  Sustained.

Q       BY MR. DIAMANTATOS:  You were sentenced to two years imprisonment; isn't that right, sir?

A       Yes.

Q       The events that brought you to the witness stand today, you indicated yesterday that the Government may or may

UNITED STATES DISTRICT COURT

not file a Rule 35 motion.

Do you recall that testimony, sir?

A       Yes.

Q       And you explained to the jury that your understanding of the Rule 35, if it's filed, is where the Government would make a motion to the judge; correct?

A       Yes.

Q       Where the judge can consider that motion and potentially reduce your two-year sentence; right?

A       Yes.

Q       Now, you certainly want the Government to make that motion on your behalf; right, sir?

A       Yes.

Q       You're hoping that they will?

A       Yes.

Q       Is that "yes"?

A       Yes.

Q       Because, if they don't make that motion, the sentencing judge cannot change your two-year sentence; correct?

A       Correct.

Q       You don't want to go to jail for two years; isn't that right, Mr. Manzo?

A       I don't want to go to jail at all.  But yes, you're correct.

Q       In fact, the events you were convicted for

UNITED STATES DISTRICT COURT

occurred in 2011; right?

A       Yes.

Q       It's December, 2016, now; right?

A       Yes.

Q       You have not yet served one day in prison; is that correct?

A       Correct.

Q       I want to discuss the August 20 meeting, the Saturday morning meeting you testified about yesterday and this morning.

Okay.  Mr. Manzo, it was a meeting that was brought together at the last minute; right?

A       I don't know.  I knew about it on Friday.  I knew we had to come back on Friday.

Q       So you knew about it on Friday.

Do you recall when on Friday you knew you had to be at a Saturday morning meeting?

A       Probably shortly after because we weren't able to play the recordings on Friday.

Q       So let's take a step back.

August 19 is the Friday; correct?

A       Yes.

Q       You indicated you had a short meeting -- this was the meeting you described for the jury with regard to the recordings -- right? -- a debriefing meeting?

UNITED STATES DISTRICT COURT

A       I think we're mixing up two different things.

Q       Okay.  You had a meeting on August 19 where you gave the down low of what you knew about the investigation at that point; correct?

A       Yes.

Q       What time of the day was that, sir?  Do you recall?

A       No.  After 1:00 o'clock or around 1:00 o'clock maybe.

Q       So based on your recollection, it was in the afternoon; right?

A       Yes.

Q       The Saturday morning meeting happened in the morning; correct?

A       Yes.

Q       So the Saturday morning was set up less than 24 hours' notice; right?

A       Yes.

Q       You indicated that Sheriff Baca was present for the Saturday morning meeting; right, sir?

A       Yes.

Q       Isn't it true that Sheriff Baca left that meeting because he had to go for a preplanned 5K charity run that morning?

A       I don't know.  I don't remember him leaving.

Q        You recall him being in a bright orange shirt and running shorts at that meeting that morning; correct?

A        I remember the shirt, yes.

Q        Okay.  You remember he was wearing shorts too; right?

A        I don't remember if he was wearing shorts or not.

Q        Would a copy of your prior testimony refresh your recollection?

A        Yes.

MR. DIAMANTATOS:  May I have a moment, Your Honor?

THE COURT:  Yes.

MR. DIAMANTATOS:  Permission to approach the clerk, Your Honor.

THE COURT:  Yes.  Let's mark this as defendant's next in order for identification.

MR. DIAMANTATOS:  We've marked it for identification, Your Honor.

THE COURT:  That's fine.  What's the number?

MR. DIAMANTATOS:  We've marked for identification as Exhibit 622.

(Marked for identification Exhibit No. 622.)

Q        BY MR. DIAMANTATOS:  Mr. Manzo, you've been handed what has been previously marked for identification.  I would ask you, sir, to turn to page 29.  Once you're there, let

me know.

A       Okay.

Q       I'm going to ask you to look to lines 20 through 23.

A       (Witness reviewing exhibit.)

Q       It was odd --

THE COURT:  Excuse me, counsel.

Sir, why don't you just read that page to yourself and let us know when you're finished.

THE WITNESS:  (Witness reviewing exhibit.)

Okay.

THE COURT:  If you could close that.  Thank you.

Q       BY MR. DIAMANTATOS:  Is your memory now refreshed with regard to what Sheriff Baca was wearing that morning?

A       Yes.

Q       What was he wearing that morning?

A       Orange shirt and running shorts.

Q       You indicated Sheriff Baca was there for part of that meeting; correct?

A       Yes.

Q       The rest of the individuals who were at that meeting included Undersheriff Tanaka.

A       Yes.

Q       Yourself.

A       Yes.

UNITED STATES DISTRICT COURT

Q        Deputy Smith.

A        Yes.

Q        Lieutenant Thompson.

A        Yes.

Q        Lieutenant Leavins.

A        Yes.

Q        Lieutenant Peacock.

A        Yes.

Q        Captain Carey.

A        Yes.

Q        Those individuals stayed for the duration of the Saturday morning meeting; correct?

A        Yes.

Q        Assistant Sheriff Rhambo was not at that meeting; correct?

A        No.

Q        You testified about certain questions that Sheriff Baca asked when he was present for that meeting.  You indicated that he said, "Why didn't they tell us?"

          Correct?

A        Yes.

Q        Was it your understanding that the "they" Sheriff Baca was referring to was the FBI?

A        Yes.

Q        He also questioned why they couldn't work

together; correct?

A       Yes.

Q       Again, was it your understanding that the "they" Sheriff Baca was referring to was the FBI?

A       Yes.

MR. DIAMANTATOS:  Your Honor, permission to republish Government Exhibit 15.

THE COURT:  It's in evidence.  Go ahead.

MR. DIAMANTATOS:  Yes, Your Honor.  It is in evidence.

Q       Mr. Manzo, I'd like to direct your attention to what has been received in evidence as Government 15.  It's an e-mail you testified about yesterday.  In the top from sent to section, according to Government Exhibit 15, it's from Martinez, Steven; correct?

A       Yes.

Q       It's sent on Thursday, August 18, 2011; correct?

A       Yes.

Q       About six minutes after 5:00 o'clock p.m. according to the exhibit; correct?

A       Yes.

Q       To Baca, Leroy D.; correct?

A       Correct.

Q       The subject line is "Please call."

A       Yes.

UNITED STATES DISTRICT COURT

Q       And the body of the e-mail, there's an indication that it's Lee first name; correct?

A       Correct.

MR. FOX:  Objection.  Relevance.

THE COURT:  The answer will stand.  Next question.

Q       BY MR. DIAMANTATOS:  The e-mail is signed "Regards, Steve"; correct?

A       Correct.

Q       Going back to the Saturday morning meeting, Sheriff Baca, you indicated, gave a few orders right then and there; correct?

A       Yes.

Q       Those orders included that the inmates should be isolated; correct?

A       Correct.

Q       Protected?

A       Correct.

Q       Deputy Manzo, when did you first join the Los Angeles Sheriff's Department?

A       It would be July of 2006.

Q       Okay.  And you were a deputy; correct?

A       Correct.

Q       You've received training.

A       Yes.

UNITED STATES DISTRICT COURT

Q        Part of your duties as a Los Angeles Sheriff's Department deputy is to help maintain the prison; correct?  And by "maintain," I mean keep the inmates safe?

A        Yes.

Q        Keep other brother and sister deputies safe; correct?

A        Correct.

Q        Other people that outrank you safe; correct?

A        Correct.

Q        Any civilian employees that work in that prison system, to keep them safe as well.

A        Correct.

Q        It's true that an inmate, based on your training and experience, that is discovered to be an informant for the Government could be in danger while incarcerated; correct?

A        Correct.

Q        And that's an informant that might be working with local law enforcement; right?

A        Right.

Q        Or federal law enforcement; correct?

A        Correct.

Q        Isn't it true that in slang terms those people are called snitches?

A        Yes.

Q        And an inmate snitch could be in grave danger;

**UNITED STATES DISTRICT COURT**

correct?

        A       Correct.

        Q       Danger -- I'm sorry.  I should have let you
finish.

        A       Correct.

        Q       Danger from other inmates to find out that that
inmate is a snitch; right?

        A       Yes.

        Q       And to the extent that inmate is snitching on
crooked deputies, he or she could be in danger from those
crooked deputies; correct?

        A       Yes.

        Q       Sheriff Baca at the Saturday morning meeting
ordered that Anthony Brown is to be kept isolated and safe.  He
also put Mr. Carey in charge of the investigation; correct?

        A       Yes.

        Q       Sheriff Baca also said that everything should go
through Undersheriff Tanaka; correct?

        A       Correct.

        Q       Now, for the portion of the Saturday morning
meeting that Sheriff Baca was present, you indicated that
Undersheriff Tanaka was upset; correct?

        A       Correct.

        Q       He didn't hide how upset he was.

        A       No.

**UNITED STATES DISTRICT COURT**

Q       You described that he was swearing.

A       Yes.

Q       You indicated that Sheriff Baca stepped out of the meeting and left the meeting; correct?

A       Yes.

Q       And Undersheriff Tanaka had stepped out with Sheriff Baca for a few moments, I think you said, or a few minutes; correct?

A       Yes.

Q       And then Undersheriff Tanaka returned to the meeting; correct?

A       Correct.

Q       When Tanaka came back into the room without Sheriff Baca present, he was still upset?

A       Yes.

Q       You indicated that he kept saying, "F the FBI."

A       Not at that point.

Q       He was mad?

A       He was visibly upset, but he stopped dropping F-bombs.

Q       You were testifying about events that occurred in 2011; right, sir?

A       Yes.

Q       You testified about an August 23rd meeting; correct?

UNITED STATES DISTRICT COURT

A        Yes.

Q        You called this the ass-chewing meeting; is that right?

A        Yes.

MR. DIAMANTATOS:  May I have a moment, Judge?

THE COURT:  Yes.

Q        BY MR. DIAMANTATOS:  You described being present at that ass-chewing meeting; correct?

A        That's correct.

Q        And the person administering that butt chewing was Undersheriff Tanaka; correct?

A        Correct.

Q        He was upset?

A        Yes.

Q        He was really upset?

A        Yes.

Q        He laid into you guys; right?

A        Correct.  Yes.

Q        It was uncomfortable being there?

A        Yes.

Q        You testified that you're aware that Tanaka ordered Mr. Thompson to go apologize; correct?

A        Yes.  Inform the sheriff and apologize, yes.

Q        I think you indicated that a question was posed to Undersheriff Tanaka that, you know, "Does the sheriff know?"

**UNITED STATES DISTRICT COURT**

Right?

A        Lieutenant Thompson asked, "Does the boss know?"

Q        Does the boss know; correct?

A        Correct.

Q        Your understanding of, in that instance, reference to the boss was sheriff; correct?

A        Yes.

Q        Because there were no bigger bosses in the room than Sheriff Baca because Undersheriff Tanaka was sitting right there?

A        Correct.

Q        And Undersheriff Tanaka's response was "No"; correct?

A        Correct.

Q        But you're going to tell him.

A        Correct.

Q        And he continued with the butt chewing; right?

A        Just for a minute.  It was pretty much done at that point.

Q        Isn't it true that Tanaka kept swearing during that meeting as well?

A        Yes.  He was -- yes.

Q        You indicated he kept saying "F the FBI"; right?

A        Yes.  Yes.

Q        And he said it multiple times.

UNITED STATES DISTRICT COURT

A        Yes.  He made his position very clear.

Q        All right.  Now, Mr. Thompson went in to meet with Sheriff Baca; correct?

A        Correct.

Q        You testified that you weren't present inside that room; correct?

A        Correct.  I didn't go in.

Q        So you don't know exactly what was said in that room, of course, because you weren't there.

A        No.  I have no idea.

Q        But you certainly heard about it from Mr. Thompson after the meeting; correct?

A        Yes.

Q        And Mr. Thompson relayed to you what he observed in that room talking to Sheriff Baca about the fact that the FBI had been allowed access to Anthony Brown; correct?

A        Correct.

Q        He said that the sheriff said he understood; correct?

A        Yes.

Q        He wasn't upset with the information.

A        No.

Q        Mr. Thompson didn't say that Sheriff Baca gave him a butt chewing; correct?

A        Correct.

Q       He didn't lay into him; right?

A       No.

Q       He didn't drop any F-bombs with him.

A       No.

Q       He never said, "F the FBI"?

        MR. FOX:  Objection.  Foundation.

        THE COURT:  Sustained.

Q       BY MR. DIAMANTATOS:  Mr. Thompson never indicated that Sheriff Baca was upset with any of that information; correct?

A       Correct.

Q       Let's talk about Men's Central Jail, Mr. Manzo.

        We spoke a little bit earlier that your duties as a deputy is to keep inmates safe; correct?

A       Correct.

Q       And anybody in that prison whether they're employees or inmates; correct?

A       Correct.

Q       Now, you -- it's a difficult job; correct?

A       That is correct.

Q       There's a lot of things on your plate that you need to focus on.

A       Yes.

Q       And you need to do those things well; correct?

A       Correct.

Q        That was part of your training?

A        Yes.

Q        Part of your everyday experience on the job; right?

A        Correct.

Q        You had to honorably perform those duties that were given to you.

A        Correct.

Q        You had to do them with respect and dignity for all people.

A        Correct.

Q        Your fellow employees.

A        Yes.

Q        Civilian or law enforcement, sworn law enforcement; right?

A        Yes.

Q        And that includes respect for inmates; correct?

A        Correct.

Q        You had to apply common sense and fairness to all of your duties; right?

A        Yes.

Q        You had to have courage to stand up against any kind of bigotry in all of --

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

**UNITED STATES DISTRICT COURT**

Q       BY MR. DIAMANTATOS:  Your job duties were described in certain core values; correct?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

Q       BY MR. DIAMANTATOS:  LASD had a mission statement.

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

Q       BY MR. DIAMANTATOS:  Mr. Manzo, you knew your job duties; correct?

A       Correct.

Q       You violated those job duties; right?

A       I don't believe I did.

Q       You were asked earlier this morning by counsel for the Government about cell phones in prison; correct?

A       Yes.

Q       And you indicated that it's a misdemeanor violation; right?

A       Yes.

Q       You would agree cell phones in prison are dangerous; correct, sir?

A       Absolutely.

Q       Absolutely dangerous.

A       Yes.

Q       Particularly working cell phones; right?

A       Yes.

Q       Because, when an inmate is incarcerated, if he or she wants to use a phone, they have access to it; right?

A       Correct, yes.

Q       But they need to use the phone system that is in-house at the particular prison or jail facility; right?

A       Yes.

Q       And that's because those are monitored phone calls?

A       Right.

Q       They're recorded.

A       Yes.

Q       So if somebody wants to investigate those calls, as you did, they could listen to those recordings to monitor what the inmate is discussing with the outside world; correct?

A       Yes.

Q       Make sure they're not trying to do anything they shouldn't be doing during that phone call.

A       Correct.

Q       So a live cell phone that's not monitored could be used for things like plotting escapes.

A       Yes.

Q       Smuggling drugs into the jail.

A       Yes.

Q       Putting hits on witnesses?

A        Yes.

Q        And MCJ is a -- is a jail facility; right?

A        Correct.

Q        And that's a little bit different than an actual prison; correct?

A        Correct.

Q        Explain the difference.

A        The inmates at Men's Central Jail for the most part are awaiting trial.  If you're in a prison, you have been convicted and have moved out of the county into a state facility.

Q        So individuals who are housed at Men's Central Jail, many of them are waiting to go to trial; correct?

A        Yes.

Q        Where witnesses would testify against them potentially.

A        Yes.

Q        I want to jump ahead for a moment to -- you described for the members of the jury that you actively engaged in discussions with Anthony Brown; right?

A        Yes.

Q        And we heard some of those recordings; correct?

A        Yes.

Q        And we're going to get to those.  But I want to

**UNITED STATES DISTRICT COURT**

highlight one point that came up during the course of your investigation of Anthony Brown.  Okay?

A    Okay.

Q    Isn't it true that you learned that Anthony Brown was involved in a situation where he was representing himself; correct?

A    Yes.  He was a pro per.

Q    Pro per.  Right.  So P-r-o P-e-r; right?

A    Yes.

Q    And that means that an individual has exercised his or her own right to represent himself in any particular proceeding; correct?

A    Right.

Q    And Mr. Brown was in a situation where he lost his pro per status; right?

A    Possibly.  I don't remember.

Q    Isn't it true he had blamed a deputy named Maricela for causing him to lose his pro per status and threatened to harm her?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

MR. DIAMANTATOS:  May we be heard at sidebar, Your Honor?

THE COURT:  No.  Next question.

Q    BY MR. DIAMANTATOS:  There's a lot of things you

learned about Anthony Brown when you were investigating him; correct?

A        Correct.

Q        He was a multi-convicted felon.

A        Yes.

Q        His most recent conviction had to do with armed robbery; right?

A        Yes.

Q        He had pulled out a gun.

A        Yes.

Q        Fired it at somebody.

A        I don't remember that part.

Q        He was sentenced to 423 years in prison; correct?

A        Yeah.  I remember that part.

Q        You remember that part.  All right.

He was housed on the 3000 level?

A        Yes.

Q        3000 level is an area of Men's Central Jail that is reserved for dangerous inmates; correct?

A        Yes.  That's correct.

Q        Explain what you mean by that.

A        3000 -- it fluctuated, but for the majority of the time I was at Men's Central Jail, it was the general population on one side, but it was security level 8 which is as high as -- pretty much as high as you can go as far as general

population.  The other side was K-10 inmates which are our highest security level in single-man cells.

Q    And the K-10 high security inmates could be because the person is a celebrity; right?

A    Right.

Q    And they might have extra attention on him or her if they're in the prison facility?

A    That is correct.

Q    So you have to take special precautions as a deputy to house those individuals.

A    Correct.

Q    And the 3000 level inmates, again, heightened scrutiny because of their status within the jail system.

A    Correct.

Q    Now, we heard that Mr. Brown -- we'll get to the investigation and what you were learning about Mr. Brown.

But we heard some testimony this morning with regard to when Anthony Brown was moved from the 3000 level.  Do you recall that, sir?

A    Yes.

Q    And there was indication that he was moved to an area 8200; correct?

A    Yes.

Q    That's the medical area?

A    Yes.

**UNITED STATES DISTRICT COURT**

Q        You indicated that that's where -- well, let me ask you this.

What type of inmates are housed in the 8200 level?

A        8200 is communicable disease.

Q        Okay.  And what type of inmates are housed on the 3000 level?

A        General population --

MR. FOX:  Objection.  Asked and answered.

THE COURT:  Sustained.

Q        BY MR. DIAMANTATOS:  Isn't it true that it is security level 8 on the 3000 level?

A        There are security level 8's on the 3000 level.

Q        And how high on the scale is security level 8?

A        That is as high as you can go without being in a single-man cell.

Q        Now, Mr. Brown, you had indicated, was -- Captain Carey had ordered you to move him to the 8200; correct?

A        Correct.

Q        Now, isn't it true Mr. Brown was not kept with the MRSA patients?

A        He was in his own cell that we had cleaned.

Q        Right.  He was in his own cell; correct?

A        Correct.

Q        You indicated it was a clean cell.

UNITED STATES DISTRICT COURT

A       With a bathtub.

Q       With a bathtub.

A       (Inaudible.)

Q       Is that a "yes," sir?

A       Yes, sir.

Q       So he was kept isolated from other inmates that were on the 8200 level?

A       Correct.

Q       Now, Mr. Brown himself had certain medical conditions; correct?

A       Correct.

Q       There was an issue with -- a cardiovascular issue with him.

A       Correct.

Q       His heart.

If we could take a look, sir, it's in the binder in front of you.  It's been received in evidence.  It's Government Exhibit 133.  Let me know when you're there, sir.

A       I'm ready.

Q       Okay.  Government Exhibit 133 was the CYA book that you described; correct?

A       Correct.

Q       The cover-your-butt book.

A       Yes.

Q       You were shown this morning page 2 of that

exhibit if you could turn in, please.  It's the date entries that start with August 22nd through August 24th.  Let me know when you're there.

A       Okay.

Q       Are you there?  Okay.

If we go to the bottom right-hand corner -- it's also on the screen in front of you, Mr. Manzo.  If we look at the bottom portion of Government Exhibit 133, it says, "Wednesday the 24th."

Do you see that?

A       Yes.

Q       The bottom right-hand corner, there is an entry in handwriting that says "Blood pressure"; correct?

A       Yes.

Q       Isn't it true that, while Mr. Brown was at the 8200 level, he was cared for; correct?

A       Correct.

Q       All of his medical concerns were addressed.

A       Yes.

Q       He was given food?

A       Yes.

Q       Checked on medically?

A       Yes.

Q       Not harmed by any fellow inmates?

A       Correct.

UNITED STATES DISTRICT COURT

Q        Not harmed by any deputies.

A        Correct.

Q        When you began debriefing Mr. Brown, so this was before he got to the 8200 level, it was part of your task to find out what you heard from him; correct?

A        Correct.

Q        You already described what you knew about him as far as his criminal resume; correct?

A        Correct.

Q        We heard a number of recordings yesterday where Mr. Brown is being debriefed, and you were in -- you had participated in many of those interviews; correct?

A        Correct.

Q        The first one was an August 19 recording which, for the record -- it was Government Exhibit 71 was the recording, sir, and then we read along in the transcript which was Government Exhibit 72; correct?

A        Correct.

Q        Now, isn't it true that Anthony Brown, during this meeting and then the few others that we'll get to in a minute, that he said a lot of things to yourself that were not true?

A        Correct.

Q        In fact, if we look at Government Exhibit 72, the transcript of that --

MR. FOX:  Objection, Your Honor.

THE COURT:  Sustained.

Q        BY MR. DIAMANTATOS:  All right.  We heard on the recording that Mr. Brown, when we listened to it, he's challenged by Mr. Smith, when you're present in the room, telling him, "You've given out a couple different versions of stories."

Right?

A        Correct.

Q        And Mr. Brown is responding about -- "The bribe went to a nurse.  That's how the phone got in."

Correct?

A        Correct.

Q        Or it was a deputy who brought the phone in; right?

A        Right.

Q        Your investigation revealed there was never any nurse involved; right?

A        That is correct.

Q        But as you were sitting here in this meeting, you didn't know that?

A        Correct.

Q        Mr. Smith didn't know that either?

A        No, he didn't.

Q        You were trying to gather as much information as

you could from Mr. Brown to investigate.

A    Correct.

Q    Find out what he was saying that was accurate potentially?

A    Correct.

Q    Or not accurate?

A    Correct.

Q    He also made a comment where he was being reluctant to give you the story with regard to the FBI, and he made a reference for "What are you going to give me?  18 months for having dope or cell phone in here?"

Do you recall that exchange?

A    I think Deputy Smith said that.

Q    Well, Deputy Smith said that to him that, you know, "What am I going to do?  Give you 18 months for having dope in here?"

Correct?

A    Correct.

Q    And is it your understanding that the point was he was dealing with an inmate who was serving 423 years?

A    Right.  It didn't matter.

Q    We talked about a cell phone in prison and the dangers it poses.  Drugs in prison also poses significant danger; correct?

A    Yes.

UNITED STATES DISTRICT COURT

Q      And if an inmate was found with drugs, that's a felony?

A      Correct.

Q      Isn't it true, as part of your investigation, there was reason to believe that potentially Mr. Brown had been involved with getting drugs smuggled into the prison; correct?

A      Correct.

Q      You saw certain things that led you to believe that; right?

A      Yes.

MR. FOX:  Objection.  Vague as to time.

THE COURT:  Sustained.

Q      BY MR. DIAMANTATOS:  You did a review of his cell phone; right?

A      Yes.

Q      When did you do that?

A      Probably shortly after it was found.  I don't remember the exact date.  The beginning half of August.

Q      There were a couple pictures on that phone; right?

A      Yes.

Q      Some balloons of heroin?

A      I don't remember if it was heroin.  The balloons I remember.

Q      Little baggies with cocaine?

UNITED STATES DISTRICT COURT

A       Yes.

Q       Pictures of methamphetamine?

A       Yes.  That sounds familiar.

Q       This is information that came to you from the cell phone Mr. Brown had; right?

A       Correct.

Q       Pictures on that phone.

A       Yes.

Q       That at least at that point you knew he somehow bribed somebody to smuggle that into the prison; right?

A       Correct.

Q       Now, Mr. Brown was being challenging of yourself and Mr. Smith in that first recording we heard, that August 19 recording; right?

A       Yeah.  We were feeling each other out, all of us.

Q       You were feeling each other out; right?

A       Yes.

Q       You were feeling him out; correct?

A       Correct.

MR. FOX:  Objection.  Asked and answered.

MR. DIAMANTATOS:  I can ask another question, Your Honor.

Q       He was certainly, as far as you could tell, feeling you and Mr. Smith out?

MR. FOX:  Objection.  Asked and answered.

**UNITED STATES DISTRICT COURT**

THE COURT:  Sustained.

Q    BY MR. DIAMANTATOS:  He said he would talk to you but he would only do so after you gave him some smokes?

A    Yes.

Q    After you gave him a cheeseburger?

A    Yes.

Q    And after he got what he wanted, you would get what you wanted?

A    Yes.

Q    During the course of the interview, yourself and Mr. Smith were providing some information to Mr. Brown about what you knew; correct?

A    Yes.

Q    That you had been in contact with an agent on a recorded line.

A    Yes.

Q    In fact, Mr. Smith had read out, you told us, an almost verbatim transcript of one of those recorded calls that Mr. Brown had; correct?

A    Yes.

Q    Isn't it true, as part of your investigation, you learned -- you testified about this that he had made three recorded phone calls; correct?

A    Correct.

Q    Using the prison inmate system.

A        Yes.

Q        And he was speaking to, at that time, an unknown female voice?

A        Yes.

Q        And it was portions of that call that Mr. Smith was telling Mr. Brown "We've heard the calls."

Right?

A        Yes.

Q        And he quoted it; right?

A        Yes.

Q        And that's a technique, based on your training and experience, to let somebody you're interviewing know I've got the goods on you.  You might as well tell me what's really going on; correct?

A        Correct.

Q        So over time Mr. Brown started telling you more and more; correct?

A        Yes.

Q        And the many lies that he said, you had to parse through what was true and what wasn't.

A        Correct.

Q        We heard a recording from a subsequent interview you were present for, Mr. Manzo, which occurred on August 28 -- I'm sorry.  I misspoke -- August 21st, which, for the record, was received in evidence as Government Exhibit 74.  And we

**UNITED STATES DISTRICT COURT**

listened to that recording, and now there's additional people in the interview with Mr. Brown; right?

A    Yes.

Q    You're there, of course, again?

A    Yes.

Q    Mr. Leavins is there?

A    Yes.

Q    And now Steve Leavins is present for the meeting; correct?

A    Yes.

Q    Isn't it true, Mr. Manzo, that, again, during this interview, yourself, Mr. Smith, and Mr. Leavins are trying to figure out if Mr. Brown had smuggled drugs successfully into the prison?

A    Yes.

Q    Whether there's more than one cell phone; correct?

A    Correct.

Q    Whether he had smuggled cigarettes into the prison?

A    I don't remember that part.

Q    Well, how many deputies he had bribed?

A    Yes.

Q    Because at this point it was known that he had identified Mr. Michel as being the dirty deputy that took the

bribe -- correct?

A       Yes.

Q       -- to get the cell phone, and that you knew about; correct?

A       Correct.

Q       But at this stage of your investigation, you don't know if there are more dirty deputies out there aside from Mr. Michel?

A       Correct.

Q       It was your job to look for those dirty deputies; correct?

A       Not at that point.

Q       You certainly wanted to know if there were more you could report up on; correct?

A       Correct.

Q       Now, Mr. Brown also indicated that this was the second phone that he had received; correct?

A       Yes.

Q       He had talked about receiving a previous phone; right?

A       Correct.

Q       I'm sorry.  I spoke over you.

A       Yes.

Q       And that he indicated that another deputy named Bravo was involved with that; correct?

**UNITED STATES DISTRICT COURT**

A        Correct.

Q        You investigated that; right?

A        I did not.

Q        Wasn't it determined that that was false?

MR. FOX:  Objection, Your Honor.

THE COURT:  Sustained.

MR. DIAMANTATOS:  Opened the door, Judge.

THE COURT:  Sustained.

MR. DIAMANTATOS:  Yes, Your Honor.

Q        The next meeting that we listened to, August 23rd, 2011, which was Government exhibit -- received in evidence as Government Exhibit 77, now you're there again; right, Mr. Manzo?

A        Yes.

Q        Mr. Smith was there again?

A        Yes.

Q        Mr. Leavins is present?

A        Yes.

Q        And now Tom Carey is at this meeting?

A        Correct.

Q        I'm sorry?

A        Correct.

Q        And Mr. Leavins introduces Mr. Carey to Mr. Brown as his boss; right?

A        Correct.

UNITED STATES DISTRICT COURT

Q        And the purpose of this interview was, again, to get as much information from Mr. Brown as possible; right?

A        Correct.

Q        You spoke a moment ago about the three recorded phone calls that you had become aware of during your investigation that were used to confront Mr. Brown with; right?

A        Correct.

Q        You also determined from phone analysis that Mr. Brown had used the phone to contact the FBI number 107 times; correct?

A        I don't remember the number, but I know I did run it.

Q        You prepared a -- well, you did an analysis on No. 310-996-4147; correct?

A        I don't remember the phone number.

Q        You had analyzed the phone that -- well, you did an analysis on Mr. Brown's phone -- right? -- you testified about that yesterday -- to determine what numbers he had been contacting?

A        The jail phone or his cell phone?

Q        His cell phone.  I'm sorry, sir.

A        We did take the cell phone and get it downloaded, yes.

Q        And you downloaded and did an analysis to see from January 1st, 2009, through August 17, 2011, the numbers

UNITED STATES DISTRICT COURT

that the cell phone had been in contact with; correct?

A        No.   That's not correct.

Q        You did the analysis on the prison system phone; right?

A        Yes.

Q        And you were able to determine that the prison system phone had made 107 calls to a number linked to the FBI civil rights division; correct?

A        I don't know if it was 107, but I can do the analysis.

Q        And only three of those calls were actually recorded because there was communication during the call; right?

A        Yes.

Q        That log that you reviewed identifies attempted calls; right?

A        Yes.

Q        So in other words, where somebody dials the number but there's no actually anybody picking up on the other line other than a voicemail?

A        Correct.

Q        Do you recall that number being high in comparison to the three that actually went through?

A        Yes.

Q        More than 50?

UNITED STATES DISTRICT COURT

A        Yes.

Q        More than 100?

A        I would say yes.

Q        There was testimony yesterday about early on in the investigation before that first recording -- I'm sorry -- right after the August 18 recording, the first one where Mr. Brown was set to be on the bus the next morning?

A        Yes.

Q        He was set to go on the bus and be out of your custody; correct?

A        Yes.

Q        And then once you interviewed him, you and Mr. Smith, on the 18th and started gathering information from him, you determined he shouldn't go on that bus; correct?

A        No.

Q        Wasn't he taken off the bus?

A        We put him on the bus, myself and Detective Idleberg, on the list for the next bus.  Excuse me. I didn't physically put him on the bus.

Q        Well, when you determined that Mr. Brown was going to continue to engage in discussions with you and Mr. Smith and any of your bosses, you kept him there; correct?

A        Yes.  He ultimately stayed in my custody.

Q        You testified about an undercover operation this morning involving Mr. Anthony Brown.

Do you recall that?

A      Yes.

Q      That some deputies dressed up to make themselves look like inmates?

A      Yes.  Detectives, yes.

Q      Detective.  Sorry.

And those detectives were going to pose as inmates to try to have a conversation with Mr. Brown; right?

A      Yes.

Q      Where Mr. Brown wouldn't know that they're actually detectives, not just fellow inmates; correct?

A      Correct.

Q      Hoping that something would come of that that Mr. Brown could say something that the detectives could report back on?

A      That sounds accurate.

Q      That never actually occurred; right?

A      The undercover operation?

Q      No.  That Mr. Brown said something to the detectives.

A      I don't believe anything came out of the undercover operation.

Q      That was done in connection with a polygraph test that Mr. Brown was given; correct?

A      Yes.

Q        Mr. Brown failed the polygraph test; correct?

A        He failed -- I believe he failed the drug part of the polygraph test.

Q        That was administered to him on August 30th, 2011?

A        I don't remember the date.

Q        You testified about a letter, September 3rd letter, that we reviewed this morning where Mr. Brown was indicating that he no longer wants to work with the FBI; correct?

A        Correct.

Q        They left him for dead; right?

A        Yes.

Q        And that he wants to continue to work, and he listed the LASD people on there that he wants to continue to work with; correct?

A        Correct.

Q        At that point Mr. Brown knew that he had failed the polygraph test; correct?

A        Yes.

Q        I'm going to go through some of the e-mails that you were shown yesterday and this morning, the first being what's been received in evidence as Exhibit 18, Government Exhibit 18.

         Mr. Manzo, directing your attention to the screen

**UNITED STATES DISTRICT COURT**

in front of you, I'm showing you what has previously been admitted into evidence as Exhibit No. 18.

Do you see that, sir?

A     Yes.

Q     This e-mail was sent from Mr. Smith; right?

A     Yes.

Q     On Friday, August 19; correct?

A     Correct.

Q     To you.

A     Correct.

Q     Nobody cc'd?

A     No.

Q     Sheriff Baca appears nowhere on that e-mail; correct?

A     Correct.

Q     I'm going to show you what's been received in evidence as Government Exhibit 15.  I'm sorry.  Government Exhibit 16.  On the screen I'm showing you what has been received into evidence as Government Exhibit 16.

Once again, this is an e-mail that you testified about; correct?

A     Correct.

Q     The from is from Christopher Nee?

A     Yes.

Q     Again, sent on August 18?

**UNITED STATES DISTRICT COURT**

A        Yes.

Q        To Julie Montgomery; correct?

A        Correct.

Q        Who is Julie Montgomery?

A        I don't know.

Q        You don't know if she's Mr. Tanaka's assistant?

A        No.  I have no idea.

Q        The subject is "Sheriff's meeting"; correct?

A        Correct.

Q        If you look through the -- this e-mail, Mr. Baca is not on the "to," the "from," or the "cc" line; correct?

MR. FOX:  Objection.  Argument.

THE COURT:  Sustained.

Q        BY MR. DIAMANTATOS:  Government Exhibit 17 on the screen in front of you, sir, I'm showing you what has been received in evidence as Government Exhibit 17.  The entire -- this e-mail does not have Mr. Baca --

MR. FOX:  Objection, Your Honor.

THE COURT:  Sustained.

Q        BY MR. DIAMANTATOS:  Mr. Baca did not send the e-mail?

MR. FOX:  Objection, Your Honor.

THE COURT:  Let's go to sidebar.

        (The following proceedings were held at sidebar:)

THE COURT:  Well, we can all see that, and if you

**UNITED STATES DISTRICT COURT**

want to argue that, that's fine.  But it's kind of a waste of time here.  We're trying to get this thing done before Christmas.  So I'm going to sustain those objections.  So let's see if we can move it along.

MR. DIAMANTATOS:  Thank you, Your Honor.

(The following proceedings were held in open court in the presence of the jury:)

MR. DIAMANTATOS:  May I proceed, Your Honor?

THE COURT:  Yes.

Q      BY MR. DIAMANTATOS:  I'm going to show you what has been received into evidence as Government Exhibit 15.  It's in evidence.  It's on the screen in front of you.

This e-mail was sent to Mr. Baca; correct?

MR. FOX:  Same objection, Your Honor.  This is also asked and answered.

MR. DIAMANTATOS:  Just the fact it was sent to Mr. Baca, Your Honor.

MR. FOX:  Again, asked and answered.

THE COURT:  Sustained.

Q      BY MR. DIAMANTATOS:  Mr. Manzo, what is Operation Safe Jails?

A      It is the intelligence unit that is -- for L.A. County, the jail part of L.A. County.

Q      What are the duties of Operation Safe Jails?

A      They're in charge of basically the safety and

security of the facilities and any intelligence that comes out of them.

Q        Okay.  You mentioned intelligence.  What type of intelligence are you trying to gather?

A        It can be anywhere from gang intelligence to notes between inmates -- they call them kites -- those recovered.  We work or they work informants just to make sure that the safety is paramount and that it's being maintained.

Q        Okay.  The kites that you indicated are the communications between inmates in prison, those are something of concern; correct?

A        They can be, yes.

Q        And gangs, it goes without saying there are rival gangs; right?

A        Yes.

Q        And sometimes rival gangs are housed together in a facility; correct?

A        Correct.

Q        That's something that, as a deputy, you want to know about; correct?

A        Correct.

Q        That's part of the function of OSJ?

A        Yes.

Q        Isn't it true that Men's Central Jail, there are gangs on the 3000 floor?

A        Yes.

Q        I want to discuss your testimony with regard to the policy that Mr. Tanaka put forth with regard to FBI coming to interview any inmates.

Do you recall that from this morning, sir?

A        Yes.

Q        There was an indication that -- that was Mr. Tanaka's directive; right?

A        I remember him saying it, yes.

Q        You recall seeing e-mails on there; correct?

A        Yes.

Q        We looked at one this morning.

A        Yes.

Q        And exactly the steps that had to be followed if an FBI agent was going to interview an inmate.

A        Correct.

Q        Isn't it true that, during this time period, there was a policy where everybody had to log in when they would go to see an inmate; correct?

A        That is correct.

Q        It includes law enforcement.

A        Yes.

Q        Even local law enforcement.

A        Yes.

Q        Even federal law enforcement.

A       Yes.

Q       Now, at times the policy was -- law enforcement could just badge in; correct?

A       Correct.

Q       And there were efforts made to make that policy more stringent; right?

A       Correct.

Q       Where -- just not let people badge in but take down their information; correct?

A       Correct.

Q       And this was a policy that not only affected FBI but state agents as well.

A       Yes.

Q       Mr. Tanaka's policy that was set forth didn't say no FBI agents can come into the jail; correct?

A       Correct.

Q       Just that they needed to get the following documentation from them that is listed in this order; correct?

A       Yes.

Q       You were asked this morning if -- we know that Mr. Brown was interviewed by FBI on August 23rd; correct?

A       Yes.

Q       And then that meeting was cut short; right?

A       Yes.

Q       You were asked if the FBI was ever able to have

access to interview Mr. Brown after August 23rd; right?

A       Yes.

Q       And you said, no, they were not.

A       Not that I know of.

Q       Not that you know of; correct?

A       Right.

Q       And you're not aware they made any efforts to interview him again after the 23rd.

A       I'm not aware of any.

Q       Let me show you Government Exhibit 134, please.

        Mr. Manzo, directing your attention to the screen in front of you showing you what's been received in evidence as Government Exhibit 134, do you see that there, sir?

A       Yes.

Q       There's an indication of 1,000 man-hours.  Do you see that?

A       Yes.

Q       What does that mean?

A       I don't remember.

Q       You wrote that note; correct?

A       I did write the note.  Correct.

        MR. DIAMANTATOS:  May I have a moment, Your Honor?

Q       Next to the reference of 1,000 man-hours there's handwriting that you indicate "Fed grand jury INV."  Do you see

UNITED STATES DISTRICT COURT

that?

A       Yes.

Q       What did you mean by that?

A       Federal Grand Jury investigation.

Q       Are the 1,000 man-hours you wrote related to the grand jury investigation?

A       It could have.

Q       And the effort it would take to comply with the grand jury investigation?

A       I don't know.

Q       You knew that you had been receiving subpoenas; correct?

A       I think I found out right here.

Q       In fact, we see those notations on the bottom of Government Exhibit 134 on this particular page; correct?

A       Correct.

Q       There are some indications of when an inmate info subpoena is due?

A       Yes.

Q       The date noted is September 14, 2011; correct?

A       Correct.

Q       Directly below that, Mr. Manzo, you see on September 21st "Deputy A through W info subpoena due"; correct?

A       Correct.

Q       And then another under that on September 28;

correct?

A       Correct.

Q       Having to do with jail personnel.

A       Correct.

Q       Those were what you had listed as certain tasks that needed to be completed; correct?

A       No.  I didn't have any -- I didn't have to do that part.

Q       You discussed having a meeting on September 2nd, and you testified that Sheriff Baca was there; correct?

MR. FOX:  Objection.  Misstates the testimony.

THE COURT:  Sustained.

Q       BY MR. DIAMANTATOS:  You testified that you were at a meeting on September 2nd; correct?

MR. FOX:  Objection.  Misstates the testimony.

THE COURT:  Sustained.

Q       BY MR. DIAMANTATOS:  You learned on September 2nd that Sheriff Baca had been in communication with the FBI?

A       I don't know if I was in a meeting on the 2nd.  I don't remember the date.

Q       Had you learned by September 2nd, Mr. Manzo, that it was your understanding Mr. Baca had been in communications with the FBI; correct?

A       Yes.  I learned that on the 20th.

Q       You indicated that the meeting that you were in,

UNITED STATES DISTRICT COURT

this was Sheriff Baca's first full task force meeting; correct?

A       It's the first one he attended.  It's the first task force we had.  I wouldn't call it his.  He was there.

Q       When did that occur?

A       It was -- I don't know the date.  It was probably early September.  I'm not sure.  We went from five people to a lot of people very quickly.

MR. DIAMANTATOS:  Your Honor, I'm going to move to strike the witness' answer as nonresponsive.  There's no question pending.

THE COURT:  Just one second.

"We went from five people to a lot of people very quickly," that will be stricken.  The jury should disregard.

Q       BY MR. DIAMANTATOS:  You indicated, Mr. Manzo, that the meeting took place in the EPC conference room.

A       That's what I called it.  It's the conference room on the fourth floor.  I'm sorry.  Excuse me.  The basement.  It was the basement.

Q       So this meeting took place in the basement; is that right?

A       Yes.

Q       What does "EPC" stand for?

A       I have no idea.

Q       What was the purpose of the meeting?

A       It was the task force briefing, the first one.

**UNITED STATES DISTRICT COURT**

Q        You described during your testimony references to the most important investigation in LASD history; correct?

A        Correct.

Q        Those references came from Mr. Tanaka, didn't they?

A        Yes.

MR. DIAMANTATOS:  May I have a moment, Your Honor?

THE COURT:  Yes.

MR. DIAMANTATOS:  Your Honor, at this point we have no further questions of the witness.

THE COURT:  Recross.  Or redirect.

**REDIRECT EXAMINATION**

BY MR. FOX:

Q        Mr. Manzo, you were asked on cross-examination if you've served one day in prison yet for your sentence.  Are you scheduled to report at some point?

A        Yes.

Q        When is that?

A        January 9 of 2017.

Q        Do you recall whether you received bond pending appeal in your case?

A        I believe we did, yes.

Q        Okay.  So you being out on bond during this time, that's not a benefit the Government gave you; correct?

A        No.

Q        That's something that the Court ordered; is that right?

A        Yes.

Q        On cross-examination, you were asked about Mr. Baca leaving the Saturday meeting on August 20th.

Do you remember that?

A        Yes.

Q        Who did he leave that meeting with?

A        Undersheriff Tanaka.

Q        Did Mr. Tanaka return?

A        He did.

Q        What did Mr. Tanaka say when he returned?

A        He said that he's known the sheriff a long time and that he's never seen him this upset and that we know what he wants done and we're going to do it for him.

Q        Before Mr. Baca left the room, I believe you indicated that Mr. Tanaka was swearing at that meeting; is that correct?

A        That is correct.

Q        Was he swearing under his breath?

A        No.

Q        Was he swearing loud enough for everybody in the room to hear?

A        Yes.

Q        You were asked questions on cross-examination about placing Mr. Brown in 8200.  Is that a normal place for informants to be placed?

A        No.  I wouldn't say it is.

Q        Are there other areas of the jail -- I'll ask it differently.

Where, generally, are informants kept within Men's Central Jail?

A        It depends on the level of the informant, I guess you could say.

Q        When Mr. -- were there informants on 3000?

A        Yes.

Q        Were there informants in 1750?

A        Yes.

Q        On cross-examination you were asked about things that Mr. Brown was given while he was on 8200.  For example, food.  Is that something that Mr. Brown also received when he was in 1750?

A        Yes.

Q        And medical care, is that something that Mr. Brown also received when he was in 1750?

A        Yes.

Q        He also asked you whether Mr. Brown was harmed by deputies when he was on 8200.  Was he harmed by deputies when he was in 1750?

UNITED STATES DISTRICT COURT

A        No.

Q        Was he harmed by inmates when he was in 1750?

A        No.

Q        What occurrence led Mr. Brown to be moved from 1750 to 8200?

A        The fact that the deputies working in 17 couldn't follow the verbal instructions from Lieutenant Thompson.

Q        What happened?

A        The FBI got to Anthony Brown.

Q        On cross-examination you were asked about Mr. Brown being pulled from the next available bus because he was providing information.

         Do you recall that?

A        Yes.

Q        Why was it that Mr. Brown stayed in county custody during that time?

A        Why did he stay?

Q        Why did you keep him?

A        We were ordered to.

Q        By who?

A        The sheriff.

Q        On cross-examination you were asked about inmates with gang affiliation on 3000.

A        Yes.

Q        Do you recall that?  Did you do background work

on Anthony Brown to determine if he had gang affiliation?

A      Yes.

Q      What did you find out?

A      None.

Q      On cross-examination you were asked about the policy that was put in place on August -- on or about August 24th, 2011, regarding FBI interviews.  On cross you were asked whether these policies generally about law enforcement access applied to any law enforcement agency.

Do you remember those questions?

A      Yes.

Q      I'm showing you now Government Exhibit 27.  Did this policy apply to local law enforcement?

A      No.

Q      Did it apply to any other federal agency?

A      Only --

Q      According to this policy?

A      Only the FBI.

MR. FOX:  One moment, Your Honor.

No further questions.

MR. HOCHMAN:  One moment, Your Honor.

MR. DIAMANTATOS:  Very brief recross, Your Honor.

THE COURT:  All right.

///

///

**UNITED STATES DISTRICT COURT**

**RECROSS-EXAMINATION**

BY MR. DIAMANTATOS:

Q        Mr. Manzo, you indicated that Sheriff Baca had ordered keeping Mr. Brown at Men's Central Jail; correct?

A        Correct.

Q        This was after he got briefed on August -- he, being the sheriff, on August 19; correct?

A        Yes.

Q        That Mr. Brown was willing to talk to the sheriffs; correct?  Sheriff investigators?

A        He was willing to talk to us, yes.

Q        But at that point on the 19th, Mr. Brown had yet to tell you the name or names of dirty deputies; right?

A        Correct.

Q        You were asked about your surrender date, and you indicated that you expect to begin serving your prison sentence on January 9, 2017; correct?

A        Correct.

Q        You expect your testimony in this case to be over today; correct?

A        Correct.

Q        And the Rule 35 motion that the Government may or may not file could be filed at any point before January 9; correct?

A        I honestly don't know.

**UNITED STATES DISTRICT COURT**

Q        Your understanding is that the prosecution can decide if they file it; correct?

A        Yes.

Q        And when they file it.

A        Yes.

MR. DIAMANTATOS:  Nothing further, Your Honor.

MR. FOX:  I have one question if I may.

**FURTHER REDIRECT EXAMINATION**

BY MR. FOX:

Q        Mr. Manzo, do you have any reason to believe you won't be serving your prison sentence after this trial is over?

Let me ask it a different way.

Do you have any reason to believe that any motion on the Government's behalf would cause you not to serve time in prison?

A        No.  I'm going.

MR. FOX:  No further questions.

THE COURT:  All right.  You may step down.

(Further proceedings were held and

reported but not included herein.)

**UNITED STATES DISTRICT COURT**

CERTIFICATE OF OFFICIAL REPORTER

I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

DATED THIS  12TH  DAY OF DECEMBER, 2016.


/S/ MIRANDA ALGORRI

MIRANDA ALGORRI, CSR NO. 12743, CRR
FEDERAL OFFICIAL COURT REPORTER

**UNITED STATES DISTRICT COURT**