**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION**

**HONORABLE PERCY ANDERSON, U.S. DISTRICT JUDGE**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. |
| | ) | |
| vs. | ) | CR 16-00066(A)-PA |
| | ) | |
| LEROY D. BACA, | ) | PAGES (1 to 101) |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**REPORTER'S TRANSCRIPT OF**
**TESTIMONY OF GILBERT MICHEL**
**TUESDAY, DECEMBER 13, 2016**
**10:41 A.M.**
**LOS ANGELES, CALIFORNIA**

**MIRANDA ALGORRI, CSR 12743, CRR**
FEDERAL OFFICIAL COURT REPORTER
312 NORTH SPRING STREET, ROOM 435
LOS ANGELES, CALIFORNIA 90012
MIRANDAALGORRI@GMAIL.COM

**UNITED STATES DISTRICT COURT**

2

**APPEARANCES OF COUNSEL:**

**FOR THE PLAINTIFF:**

        EILEEN M. DECKER
        United States Attorney
        BY:  BRANDON FOX
        BY:  EDDIE A. JAUREGUI
        Assistant United States Attorneys
        United States Courthouse
        312 North Spring Street
        Los Angeles, California 90012


**FOR THE DEFENDANT:**

        MORGAN LEWIS AND BOCKIUS LLP
        BY:  NATHAN J. HOCHMAN
        BY:  BRIANA ABRAMS
        The Water Garden
        1601 Cloverfield Boulevard
        Suite 2050 North
        Santa Monica, California 90404


        MORGAN LEWIS AND BOCKIUS LLP
        BY:  TINOS DIAMANTATOS
        77 West Wacker Drive
        Chicago, Illinois 60601

**UNITED STATES DISTRICT COURT**

# I N D E X

**TUESDAY, DECEMBER 13, 2016**

## Chronological Index of Witnesses

Witnesses:                                                    Page

MICHEL, Gilbert

    Direct examination by Mr. Jauregui            6
    Cross-examination by Mr. Hochman             48
    Redirect examination by Mr. Jauregui         94

**UNITED STATES DISTRICT COURT**

4

**EXHIBITS**

**TUESDAY, DECEMBER 13, 2016**

| Exhibit | | For ID | In EVD |
|---|---|---|---|
| 58 | E-mail Leavins to Carey 09/13/11 | 6 | |
| 59 | E-mail Carey to Nee 09/13/11 | 6 | |
| 92 | Recording of Michel Interview | 27 | 29 |
| 93 | Transcript of Michel Interview | 27 | |
| 636 | Photograph | 66 | 67 |
| 634 | Photograph | 68 | 70 |
| 739 | Photograph | 81 | 82 |
| 185 | Michel Plea | 90 | |

**UNITED STATES DISTRICT COURT**

**LOS ANGELES, CALIFORNIA; TUESDAY, DECEMBER 13, 2016**

**10:41 A.M.**

**---**

(The following proceedings were held in open court in the presence of the jury:)

THE COURT: All right. Ladies and gentlemen, again, I want to remind you that the defendant is not on trial for any conduct, offenses, or allegations of inmate beatings or deputy abuse that are not charged in the Indictment. The only thing you are to determine is whether the defendant is guilty or not guilty in the charges in the Indictment.

I'm going to ask the clerk to swear the witness, please.

THE CLERK: Raise your right hand.

Do you solemnly state that the testimony you may give in the cause now pending before this Court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: Yes.

THE CLERK: Will you please state your full name and spell your last name for the record.

THE WITNESS: Gilbert Emannuel Michel, M-i-c-h-e-l.

THE CLERK: Thank you.

**UNITED STATES DISTRICT COURT**

MR. JAUREGUI:  And, Your Honor, before we get started with Mr. Michel's testimony, the Government moves for the admission of Exhibit Nos. 58 and 59.

MR. HOCHMAN:  No objection, Your Honor.

THE COURT:  All right.  They'll be received.

(Marked for identification and received into evidence Exhibit Nos. 58 and 59.)

**GILBERT MICHEL,**

**GOVERNMENT'S WITNESS, SWORN:**

**DIRECT EXAMINATION**

BY MR. JAUREGUI:

Q     Mr. Michel, were you ever a deputy in the Los Angeles County Sheriff's Department?

A     Yes, sir.

Q     When was that?

A     Between December of 2008 until April of 2011.

Q     And do you know -- did you leave the department on your own, or were you fired, sir?

A     I resigned in lieu of being fired.

Q     I want to start with your becoming a deputy in the sheriff's department.

What type of training did you receive when you became a deputy?

A     Initially I went through the sheriff's academy, which was between December, 2008, until April of 2009.

**UNITED STATES DISTRICT COURT**

Q        And what was your first assignment out of the academy?

A        My first actual assignment was -- I was assigned to Men's Central Jail in Downtown Los Angeles.

Q        Were you assigned to a specific floor?

A        Yes.  Originally I was assigned to the 2000 floor in Men's Central Jail.

Q        While you were on the 2000 floor, did you encounter an inmate named Anthony Brown?

A        Yes, sir.

Q        And did anything unusual happen in your encounter with Anthony Brown at that time?

A        The first time, no, sir.  Just a "hi" and "bye."

Q        After your assignment in 2000, where were you assigned?

A        After 2000, I went to vac relief, which is -- I just went throughout the whole jail just filling in for everyone who had a normal spot.  I would just cover their spot for a day or a couple days.

Q        And is "vac" short for anything?

A        It's short for vacation relief.

Q        While you were assigned to vac relief, did you work on the 3000 floor of Men's Central Jail?

A        Yes, sir.

Q        I want to ask you about your experience on 3000.

**UNITED STATES DISTRICT COURT**

While you were there, did you come into contact with a deputy named Justin Bravo?

A        Yes, sir.

Q        In that time period or at that time, did you witness any unprovoked force by Deputy Bravo?

A        Yes, sir.

Q        What did you see?

A        What happened is I was --

MR. HOCHMAN:  Objection.  Relevance, Your Honor. And prior objections as well incorporated.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  I was actually doing a trade on this particular day.  It was a p.m. shift that I was working. Some inmates had come back from a pill call or visit or -- I don't even know where they were coming back from.  But usually when inmates return back to the module, they would go inside what we called the laundry room.  It's a little empty space where inmates can come and just wait until we have to house them back into the normal housing area.

Well, an inmate had come back, and he was inside of the laundry room, and he was doing pull-ups on top of the -- on the pipes, the exposed plumbing that was in the laundry room.  And inmate -- or CA Winlet had actually saw him doing that, and he went in there and told him to stop doing that

**UNITED STATES DISTRICT COURT**

because he could possibly break the pipes and we would have some problems.

Q      BY MR. JAUREGUI:  Let me stop you really quickly. What is a CA?

A      A CA is a custody assistant.  They help the deputies in the operation of the modules.  Like, they run a module, but they don't do, like, the major paperwork, like if there's a crime that was committed or -- they just do a little bit lesser -- have a little bit lesser responsibilities than the deputies do.

Q      Okay.  Continue.

A      So Winlet goes in and tells the inmate to stop doing the pull ups, and the inmate kind of gave him a little bit of an attitude.  So CA Winlet goes outside into the hallway and brings back Deputy Bravo.

Q      And when Deputy Bravo came back with CA Winlet, what happened?

A      Well, Deputy Bravo tells the inmate to face the wall inside of the laundry room, and he gets the inmate to put his hands behind his back.  When the inmate puts his hands behind his back, Deputy Bravo grabs his hands behind his back, and he slaps him in the -- kind of like in the back of the head area.

You know, he continues to talk to him.  I don't remember exactly the words that he said.  The inmate still --

he's pushed up against the wall, and then Deputy Bravo also strikes him with his fist to the back of his ribcage.  He tells him a couple more things, and then Deputy Bravo actually leaves out of the module.

Q      Did you watch all of this happen?

A      Yes.

Q      Did either Deputy Bravo or CA -- can you please tell me again how you pronounce his name?

A      CA Winlet.

Q      Winlet.  Did they approach you at that point?

A      No.

Q      At some point did you talk to them about what you had seen?

A      Yes.  Later on after everything -- we put all the inmates back that were in the laundry room because other inmates kept coming.  We put them back.  And a little bit -- some time goes by, and actually Deputy Bravo and Deputy Snyder, I believe was his name, they asked to speak with me inside of the rec room.  We also had a rec room at that time -- or there was a rec room.

Q      And did you speak with them?

A      Yes.  I went over and started talking to them, yes.

Q      What did they ask you?

A      Well, first of all, they started off, like,

asking me, like, "Oh, hey, you're new to the floor. Where have you been working? Where have you worked?" They asked me if I was on training. And I had just gotten off training. They asked me if there was -- if I had any family members that lived on the department, which I never told anyone that I had family members on the department. It just kind of -- I don't know if it was a coincidence or what. They were fishing me for answers.

Then after they asked me to --

MR. HOCHMAN: Objection. Calls for a narrative at this point.

MR. JAUREGUI: I can ask another question, Your Honor.

THE COURT: That's fine.

Q     BY MR. JAUREGUI: After they asked you if you were related to anyone on the department, what did they ask you, if anything?

A     Well, after they finished asking me those questions, finally they said, "Hey, did you see anything earlier?" I knew what they were referring to just by their implying that I seen something, and I told them that I didn't -- I didn't know what they were talking about.

Q     And how did they respond when you said you didn't know what they were talking about?

A     They -- they basically just said, like, okay, and

then that was pretty much the end of the conversation.

Q       Did you ever learn, Mr. Michel, that -- if Deputy Bravo was related to anyone else on the department?

A       At the time, no, I did not know that Deputy Bravo was related to anyone.

Q       Did you ever learn that?

A       Yes.

Q       What did you learn?

A       Someone told me that Deputy Bravo --

        MR. HOCHMAN:  Objection.  Calls for hearsay.

        THE COURT:  Overruled.

        You can answer.

        THE WITNESS:  That Deputy Bravo was, in fact, related to Sheriff Baca.

Q       BY MR. JAUREGUI:  At some point after this incident, Mr. Michel, did you receive a permanent assignment?

A       Yes.

Q       Where were you assigned?

A       I eventually was assigned to 3000 floor.

Q       When you got to the 3000 floor, did you encounter Anthony Brown again?

A       Yes.

Q       In the summer of 2011, were you still working on 3000?

A       Yes.

**UNITED STATES DISTRICT COURT**

Q       At that time, did you make an agreement with Anthony Brown?

A       Yes.

Q       What was your agreement?

A       The agreement was that I would bring him in a cell phone and he would pay me for that cell phone.

Q       Did you ultimately acquire a cell phone to bring in to Anthony Brown?

A       Yes.

Q       Who did you contact to get that cell phone?

A       Initially I had brought -- I had brought my personal cell phone into the custody area, and I allowed Anthony Brown to use my cell phone to call his associate on the outside, who was named C.J.

Q       Then what happened?

A       Then I did not get -- we did not talk to C.J. the first time, but later on, a day or two after, I actually got ahold of C.J., and we made arrangements to meet at a location outside of Men's Central Jail.

Q       At that time, did you know C.J.'s true identity?

A       No.

Q       Did you later come to learn who C.J. was?

A       Yes.

Q       Who was C.J.?

MR. HOCHMAN:  Objection.  Foundation.

**UNITED STATES DISTRICT COURT**

THE COURT:  Sustained.

Q    BY MR. JAUREGUI:  At this time, Mr. Michel, did you know that -- let me just ask a different question.

Did you end up meeting C.J.?

A    Yes.

Q    And when did you meet him?

A    I don't remember the exact date.

Q    How long after your phone call?

A    A couple days.

Q    And what happened when you met C.J.?

A    Well, we -- I had called -- we had made contact over the phone.  And when we picked a location to meet and we actually exchanged a cell phone and money -- well, he gave me a cell phone and money, and then I left the location.

Q    Where was this?

A    It was off of the 105 and Vermont, I believe.

Q    Were you alone, or were you with someone else?

A    I was alone.

Q    Whose car were you driving?

A    I was driving my girlfriend's at the time.

Q    What was her name?

A    Angela Caruso.

Q    Did she have any role in the sheriff's department?

A    She was a deputy as well.

UNITED STATES DISTRICT COURT

Q        You said C.J. gave you money; correct?

A        Yes.

Q        How much money did C.J. give you?

A        He gave me $700 cash.

Q        And how did he give you that money?

A        He actually threw it into my vehicle, because my window was down, in a little, like, sunglasses case.

Q        And did you -- were you in your vehicle the entire time?

A        Yes.

Q        Where was C.J.?

A        He was in his vehicle -- he was -- when I met him, he was parked in an east-and-west direction, and I was -- and I pulled up to his driver's side.  So we were parked parallel to each other with our driver's side windows together.

Q        And what did you do when this transaction was completed?

A        I drove home.

Q        And once you got home, what did you do, if anything, with the cell phone that he had given you?

A        Well, at first, I opened it up to see if there was -- if there was a battery and if there was anything inside of the cell phone, like possibly drugs or any, you know, weapons or anything like that.

Q        And why did you do that, Mr. Michel?

**UNITED STATES DISTRICT COURT**

A      Because I didn't want to give Anthony Brown any drugs or any weapons.  And I didn't know what his intentions were besides actually using the phone to contact people on the outside.

Q      What did you do when you took apart the cell phone?

A      So I took it apart and checked it.  Then I put it back.  And then I turned it on to see if it actually worked, if it was functioning.  And it turned on.  And then after that, I actually charged it.

Q      Okay.  Why did you want to make sure that the phone worked?

A      Because I wanted to -- the agreement was for -- between me and Anthony Brown that he would allow me to talk to the people that he was dealing with on the outside through the cell phone.

Q      Did there come a time, Mr. Michel, where you learned that the cell phone was connected with an FBI investigation?

A      Yes.

Q      Did there come a time where you learned that C.J. was an undercover FBI agent?

A      Yes.

Q      At that time of that first transaction, did you know that C.J. was an undercover FBI agent?

UNITED STATES DISTRICT COURT

A        No.

Q        Did you eventually give the phone to Anthony Brown?

A        Yes.

Q        Approximately when was that in relation to the transaction.

A        It was, like, the following week when I went back to work.

Q        How did you get the phone to Anthony Brown?

A        Well, after I had checked the phone, charged it, and made sure that it worked and there was nothing inside of it, I put it inside a rubber glove that we used to use at work. Then I just put it into my backpack.  And when I got to work, I changed out, and I put it in my right -- in my uniform.  I had a little -- like, a flashlight pocket.  I put it inside that pocket and walked up to the 3000 floor -- it was Module 32 and -4 -- and walked straight up to Anthony Brown's cell and placed it -- the cell phone with the glove over it on his bunk.

Q        Why did you put it on his bunk?

A        Because he was actually asleep.  And I woke him up and just placed it on the bunk.

Q        Did there come a time that day when you took the cell phone back from Anthony Brown?

A        Later on that afternoon, after my shift was over, I recovered the cell phone back from him.

UNITED STATES DISTRICT COURT

Q        Why did you do that?

A        Because he needed it to be charged, so I took it home and recharged it again.

Q        This agreement you had with Anthony Brown, who was supposed to provide you with money?

A        C.J. was the one who was -- who gave me the money.

Q        Did you ever meet with C.J. again?

A        Yes.

Q        When was that relative to the first transaction?

A        About a week after the first time that I had given Anthony Brown the cell phone.

Q        Where did you meet him?

A        Off of Los Feliz in Burbank/Glendale area.

Q        Why were you meeting with him again?

A        Because Anthony Brown wanted the cell phone again because he didn't keep the cell phone overnight.  So he wanted to use the cell phone again, so he wanted me to bring it to him.

Q        Why is that relevant to your meeting C.J. again?

A        Because C.J. was going to pay me more money so Anthony Brown could get the phone.

Q        How much money did C.J. give you at the second transaction?

A        $800.

Q       Did you and Anthony Brown discuss a plan where you would get more money than this $800 the second time and $700 the first time?

A       Yes.

Q       What was that discussion?

A       Anthony Brown offered me $20,000 to -- because I was giving him the cell phone.

Q       Did that ever happen, that you received $20,000?

A       Not that I'm aware of, no.

Q       In total, how much money did you receive from C.J.?

A       $1,500.

Q       Mr. Michel, are you aware that at some point deputies found this cell phone on Anthony Brown?

A       Yes.

Q       How did you learn that?

A       Because my -- one of my partners had come into the module and told me that they had found a cell phone.

Q       And how long after you had given Anthony Brown the cell phone did this happen?

A       That morning I gave Anthony Brown the cell phone around 5:40, 5:50, and maybe like a couple hours after that.

Q       What happened when you found out that deputies had found the cell phone?

A       Well, initially my heart, like, dropped to my

UNITED STATES DISTRICT COURT

stomach, and I was just shocked.  After I kind of pulled myself together, I went out to the hallway where all the deputies were at, and they were actually on -- they were, like, touching the cell phone and looking at it and everything.  And I told them that I needed to go to my vehicle to -- I needed to go to my locker to get something.

Q       Why did you do that?

A       Because I was freaking out.  So I wanted to go to make a phone call to C.J. and tell him to get rid of his phone because I did not want the phone that Anthony Brown got caught with to come back to me.

Q       At this point, Mr. Michel, did you know C.J. was an undercover FBI agent?

A       Still I did not know.

Q       Did you call C.J.?

A       Yes, I did.

Q       What happened?

A       I called, and he didn't answer.  I left a message on his -- on the cell phone telling him that my partners had found the cell phone.

Q       After you made that phone call, what did you do?

A       I just went back into -- actually, before I went back into work, my cell phone -- I took the battery out, and I hid it inside of my vehicle.

Q       Why did you do that?

**UNITED STATES DISTRICT COURT**

A        Because I didn't want the phone that they had found in the jail to come -- to be routed to my phone.

Q        What was the next thing that happened, Mr. Michel, with regard to your cell phone?

A        Well, I -- I lost my cell phone.

Q        How did you -- when you say you lost it, do you mean you never found it again?

A        I never found it, yes.

Q        At some point, Mr. Michel, were you contacted by special agents of the FBI?

A        Yes.

Q        Who in the FBI contacted you?

A        Initially it was Agent Dahle, Agent Marx, and Agent Wayne.

Q        Do you remember approximately when that was?

A        I don't remember.  It was weeks after the cell phone had been found, I believe.

Q        What happened when you were approached by these agents?

A        Well, I had just gotten off work.  It was around 2:30, 3:00 o'clock in the afternoon.  I parked my vehicle.  I noticed that two people were approaching me.  So I, you know, get out of my vehicle, and they asked me if I -- if my name was Gilbert Michel.  And I said "yes."  And I thought, you know, that's kind of strange that someone would know my name.

That's when I noticed there was someone actually behind me, and then they started asking me if they could ask me questions and if I would be willing to, like, go up to my -- I lived in an apartment at the time -- up to my apartment and ask more questions.

Q    Did they identify themselves to you as FBI agents?

A    After they asked me my name, yes, they pulled out their credentials, yes.

Q    Did you agree to go up to your apartment to talk to them?

A    No.  At that time, I didn't agree to go up to my apartment, but I had suggested we go somewhere else.

Q    Why did you do that?

A    Because at the time my girlfriend was at my residence, and she had nothing to do with all this stuff that was going on.  So I didn't want her to be involved or talk to her about it.

Q    So did you end up speaking to the FBI agents?

A    Yes.  We actually went to a -- they asked me if there was anyplace that we could speak, like a Starbucks or a restaurant or something like that.  And there happens to be a -- there happened to be a Starbucks up the street.  So that's where we went.

Q    Did you end up speaking with them?

UNITED STATES DISTRICT COURT

A       Yes.

Q       What happened when you sat down to speak with these agents?

A       Well, we get to the Starbucks, and it was pretty small, and there was a lot of people inside.  So we actually went to the back of the Starbucks where it was, like, an outside open area.  They had, like, a binder that was this binder that's up here, and they had a laptop computer.

Agent Marx was sitting across from me, and Agent Wayne was sitting to the left of me.  And they started asking me questions like where I worked, who I worked with.  And as soon as they asked me the questions, that computer, the laptop that they had, it actually, like, popped -- the screen came up, and there was, like -- it looked like video surveillance.  And it was of my girlfriend's at the time car.  And I knew that it was the day of me and Anthony -- me and C.J. exchanging the money and the cell phone.

Q       Did you agree to talk to them about that cell phone incident at that time?

A       At that time, yes.  Well, what also was transpiring at that time is there was agents at my house.  So they were actually talking to Angela, and I did not know about that.  After they were talking to her, she -- because she is a deputy, she actually tried to contact her sergeant, which I guess the FBI did not want that to happen at that time.

UNITED STATES DISTRICT COURT

Q        Let me stop you really quickly, Mr. Michel.

You were at the Starbucks meeting with Special Agent Marx and Agent Plympton, you said?

A        No.  Agent Marx, Agent Dahle was there, and Agent Wayne.

Q        And I believe you testified you were talking with Agent Marx and Agent Wayne; correct?

A        Yes.

Q        Okay.  The agents that were at your house, were these different agents?

A        Yes.

Q        Before we get to your house, did Agent Marx and Agent Wayne, did they inform you that you would be charged with a crime?

A        Yes.

Q        Ultimately did you return back to your apartment?

A        Yes.

Q        Did you continue talking to the agents?

A        Yes.

Q        What happened?

A        Well, we go back to my apartment, and we sit at my dining room table.  Agent Marx was on my left.  I don't remember the agent that was on my right.  He was not at Starbucks.  I'd never seen him before.  And Special Agent Wayne was sitting across from me.

**UNITED STATES DISTRICT COURT**

Then when we sat down, Agent Marx starts asking me questions about -- her questions were about the -- about who I worked with at CJ, Men's Central Jail.  Then almost, like, simultaneously, the agent that was to my right starts asking me questions as well.

I felt like they were just bombarding me.  I got really upset, and I basically told them to charge me with whatever they were going to charge me with and basically leave me alone.

Q       How did the meeting end?

A       Not very good.

Q       Did any agent give you anything before they left?

A       At the very end, Agent Wayne gave me his business card and told me, if I -- if I wanted to -- if I changed my mind and I wanted to speak with them, to give him a call.

Q       After this encounter with the agents, what did you do?

A       The next day I was just freaking out, and I didn't know what to do.  But I did know that I needed to get a lawyer.  So I actually had tried.  I went to try to meet with a lawyer.

Q       And did you eventually hire a lawyer?

A       Yes.

Q       Did you then later contact the FBI?

A       When I had contacted my lawyer, he told me to

call Agent Wayne back and tell him that I had gotten a lawyer and that I was going to speak with him to talk to the agent. But Agent Wayne said -- when I called him, I told him that I had acquired a lawyer.

And at that time, he said that he could no longer speak with me and that my attorney had to call the U.S. Attorney's Office and speak with -- I believe Lawrence Middleton was the U.S. Attorney's name that he gave me.

Q    After this encounter, Mr. Michel, did you continue working at MCJ?

A    Yes.

Q    When was your next shift relative to this FBI interview?

A    I don't remember exactly, but it was, like, days after.

Q    And what happened when you got to work?

A    I had -- I was working days.  I went to the module that I was working at, 36 and -8.  And when I got there, like, a couple minutes I had just sat down and the telephone rings in the module.  So I pick up the phone, and they -- whoever it was -- I think it was the booth on 3000 floor, the main booth -- they told me to 10-19 the captain's office, which means go down to the captain's office.

Q    And did you go to the captain's office?

**UNITED STATES DISTRICT COURT**

A       Yes, I did.

Q       What happened when you got there?

A       Well, as I was walking down the hallway out of the sally port, the main entrance to Men's Central, I'm walking down to the hallway to the captain's office.  Sergeant Long and Sergeant Craig met me in the hallway.

Q       And what happened after they met you in the hallway?

A       Well, they asked me if I was Deputy Michel.  And obviously it was written on my uniform, so I said, "Yes."  And then also at that time Lieutenant Leavins came walking up as well.  And they asked if they could speak with me.  So I said, *Yes.*

They said, "Well, let's go into this office here."  We went into the office, and they started talking to me.

Q       Do you know, Mr. Michel, if that conversation that you had with Sergeant Craig, Sergeant Long, and Lieutenant Leavins, do you know whether that was recorded?

A       Yes.

MR. JAUREGUI:  Your Honor, I'd like to show the witness Government Exhibit Nos. 92 and 93.  And if I can ask the Court clerk to grab those for the original and place them before the witness.

(Exhibit Nos. 92 and 93 for identification.)

UNITED STATES DISTRICT COURT

THE COURT:  That's fine.

MR. JAUREGUI:  Your Honor, I will be referring to the transcript binders during this portion of the testimony.

Q      Mr. Michel, can you please look at Exhibits 92 and 93.

A      Yes, sir.

Q      Do you recognize Exhibit 93?

A      Yes, sir.

Q      What is it?

A      It's a written transcript.

Q      Of what?

A      Of the audio of the meeting with me, Sergeant Craig, Sergeant Long, and Lieutenant Leavins.

Q      Have you seen it before?

A      Yes.

Q      How do you know that?

A      Because I reviewed it on 11/30/16.

Q      What about Exhibit No. 92?

A      Yes.

Q      What is it?

A      At this time, a CD of the audio of the transcript.

Q      And have you listened to that CD before?

A      Yes, sir.

Q      And how do you know that you listened to that CD?

UNITED STATES DISTRICT COURT

A       Because I wrote the date and my initials on it after I had listened to it on 11/30/16.

Q       Is the transcript at Exhibit No. 93, does it accurately reflect the audio recording that's in Government Exhibit No. 92?

A       Yes.

MR. JAUREGUI:  Your Honor, I'd move for the admission of Exhibit No. 92.

MR. HOCHMAN:  No objection, Your Honor.

THE COURT:  It will be received.

(Exhibit 92 received into evidence.)

MR. JAUREGUI:  Your Honor, at this point, I'd like to start playing some excerpts from Exhibit No. 92.

THE COURT:  All right.  Ladies and gentlemen, if you'd open your notebooks.

Again, a transcript of the recording is being provided to help you identify speakers and to help you decide what the speakers say.  Remember, the recording is the evidence, not the transcript.  If you hear something different from what appears in the transcript, what you heard is controlling.  Listen carefully.  The transcript will not be available during your deliberations.

MR. JAUREGUI:  If I can ask AUSA Fox to play the first clip, 92-1.

Your Honor, I believe the Court has already

UNITED STATES DISTRICT COURT

instructed the jury, the transcript binder at Exhibit No. 93.

THE COURT:  If you'd open up your notebooks to Tab 93.

(The CD, Exhibit No. 92, commenced

playing before the jury.)

Q       BY MR. JAUREGUI:  Now, Mr. Michel, did you hear Sergeant Craig at the part of this clip say, "Okay.  Today is August 30th, wow, 2011"?

A       Yes, sir.

Q       Earlier you testified that you believe you left the department in April 2011.

A       Yes, sir.

Q       Were you still employed by the department in August of 2011?

A       Yes, sir.

Q       Do you recall now when you left the department?

A       No.  I mean, it was in 2011.

Q       Would it have been August 30th, 2011?

A       It was -- yes.  It was after.  Yes.

Q       Okay.  During this interview, Sergeant Craig says to you, "Does this guy look familiar to you?"  Do you remember that?

A       Yes.

Q       What was he doing at that time?

A       He was actually showing me a picture, photo on a

piece of paper of Inmate Anthony Brown.

MR. JAUREGUI:  Now if we can play 92-2.

(The CD, Exhibit No. 92, commenced playing before the jury.)

MR. JAUREGUI:  Next clip, 93-3.

(The CD, Exhibit No. 92, commenced playing before the jury.)

MR. JAUREGUI:  92-6.

(The CD, Exhibit No. 92, commenced playing before the jury.)

MR. JAUREGUI:  92-7.

(The CD, Exhibit No. 92, commenced playing before the jury.)

Q       BY MR. JAUREGUI:  Now, Mr. Michel, you referred to something called a kite during this; correct?

A       Yes.

Q       What is a kite?

A       In jails and in prison, they call written notes kites.

MR. JAUREGUI:  92-11, please.

(The CD, Exhibit No. 92, commenced playing before the jury.)

Q       BY MR. JAUREGUI:  Now, Mr. Michel, you referenced a tall female in this clip; correct?

A       Yes.

UNITED STATES DISTRICT COURT

Q        Have you since learned who this female was?

A        Yes.

Q        Who was it?

A        Agent Marx.

Q        You also referenced an older -- a person in his 40's; right?

A        Yes.

Q        Have you since learned who that was?

A        Yes.

Q        Who was that?

A        Agent Wayne.

(The CD, Exhibit No. 92, commenced playing before the jury.)

Q        BY MR. JAUREGUI:  Mr. Michel, at the end of the clip you said something about it being really good; right?

A        Yes.

Q        What were you referring to at that point?

A        The video footage that Agent Marx had brought up on her laptop computer.

Q        And you heard Sergeant Craig say, "Oh, so they employ you now."  Do you remember that?

A        Yes.

Q        Was it your impression, Mr. Michel, that Sergeant Craig was offended at this?

A        He was very offended and, like, very annoyed by

UNITED STATES DISTRICT COURT

that -- the fact that the FBI could determine my fate.

MR. JAUREGUI:  Next clip, 92-13, please.

(The CD, Exhibit No. 92, commenced

playing before the jury.)

Q        BY MR. JAUREGUI:  Mr. Michel, without getting
into the details of it, what is the Christmas party fight that
you referenced?

A        MCJ would have, like, an annual Christmas party
that was like -- it wasn't sanctioned by the department.  It
was just something that they had done on their own.  Two groups
of deputies got into a physical altercation at that party.

MR. JAUREGUI:  92-14, please.

(The CD, Exhibit No. 92, commenced

playing before the jury.)

MR. JAUREGUI:  92-15.

(The CD, Exhibit No. 92, commenced

playing before the jury.)

MR. JAUREGUI:  92-16.

(The CD, Exhibit No. 92, commenced

playing before the jury.)

MR. JAUREGUI:  92-18.

(The CD, Exhibit No. 92, commenced

playing before the jury.)

MR. JAUREGUI:  92-20.

///

**UNITED STATES DISTRICT COURT**

(The CD, Exhibit No. 92, commenced

playing before the jury.)

MR. JAUREGUI:  92-23.

(The CD, Exhibit No. 92, commenced

playing before the jury.)

Q    BY MR. JAUREGUI:  Now, Mr. Michel, on August 24th when the FBI came to your house, did you think they were trying to manipulate you?

A    No, sir.

Q    On the date of this interview, August 30th, 2011, when you spoke to ICIB, what did you begin to think about the FBI?

A    Just that they were conducting a lawful investigation into the sheriff's department.

MR. JAUREGUI:  92-24, please.

(The CD, Exhibit No. 92, commenced

playing before the jury.)

MR. JAUREGUI:  92-25.

(The CD, Exhibit No. 92, commenced

playing before the jury.)

MR. JAUREGUI:  92-26.

(The CD, Exhibit No. 92, commenced

playing before the jury.)

MR. JAUREGUI:  92-27.

///

(The CD, Exhibit No. 92, commenced playing before the jury.)

MR. JAUREGUI:  92-28.

(The CD, Exhibit No. 92, commenced playing before the jury.)

MR. JAUREGUI:  Your Honor, may we have a quick sidebar?

THE COURT:  Yes.

(The following proceedings were held at sidebar:)

MR. JAUREGUI:  Your Honor, there's a woman on the Government side in the audience, blonde.  This was the woman, the same woman who took a photograph we think during the Tanaka trial.  And while we were playing this clip, AUSA Fox and I and others, I'm sure, heard her say, "He's a liar."

THE COURT:  Okay.

(The following proceedings were held in open court in the presence of the jury:)

THE COURT:  All right.  Ladies and gentlemen, I'm going to ask you to step out for a moment.

(The following proceedings were held in open court out of the presence of the jury:)

THE COURT:  All right.  I'm going to ask counsel to join me at sidebar for a moment.

(The following proceedings were held at sidebar:)

THE COURT:  Okay.  Now, which lady is this?

**UNITED STATES DISTRICT COURT**

MR. FOX:  Your Honor, it's the blonde in the second row wearing all white.  And she is the same one, I believe, gave her name as Betty Crocker during the Tanaka trial and took a photograph and then took off so we could not admonish her later.  She's been here many of the days of the proceedings.  She sometimes wears sheriff's department earrings, I've noticed.

THE COURT:  Okay.  So my view at this point is I want to caution people not to -- I'm going to ask the CSO's to excuse her.

MR. HOCHMAN:  We take no position one way or the other, Your Honor.

(The following proceedings were held in open court out of the presence of the jury:)

THE COURT:  All right.  If I could have one of the Court security officers.

(The following proceedings were held at sidebar:)

THE COURT:  There is a blonde lady sitting in the second row.  I would ask you guys to escort her out.

THE COURT SECURITY OFFICER:  Okay.

THE COURT:  All right.

(The following proceedings were held in open court out of the presence of the jury:)

THE COURT:  All right.  I understand there have been some comments made during this witness' testimony.  You're

invited here to watch this trial, not to make comments.  Young lady, you're excused from this trial.  You can't come back.

UNIDENTIFIED AUDIENCE MEMBER:  Okay.

THE COURT:  Okay.  So everybody is welcome, but please remember this is a trial.  You're there to sit and listen.

All right.  Let's get the jury back in.  Let's get the witness back in.

MR. JAUREGUI:  Just so the Court is aware, Your Honor, we have about two minutes, maybe a little more than two minutes left of recordings.

(The following proceedings were held in open court in the presence of the jury:)

THE COURT:  All right. Sir, you can have a seat there.

MR. JAUREGUI:  May I proceed?

THE COURT:  Let's resume.

MR. JAUREGUI:  Next clip.

THE COURT:  What page are we --

MR. JAUREGUI:  We're on page 27 of the transcript, Your Honor, and it's 92-29.

(The CD, Exhibit No. 92, commenced playing before the jury.)

MR. JAUREGUI:  Next clip.

///

(The CD, Exhibit No. 92, commenced
playing before the jury.)

MR. JAUREGUI:  Next clip.

(The CD, Exhibit No. 92, commenced
playing before the jury.)

MR. JAUREGUI:  Last clip.

(The CD, Exhibit No. 92, commenced
playing before the jury.)

THE COURT:  All right.  If you'll close your
notebooks, please.

MR. JAUREGUI:  Your Honor, for planning purposes,
I have under ten minutes of testimony with this witness.  Do we
want to break or just continue at this point?

THE COURT:  Why don't we continue for ten minutes
and then give the jury a break.

Q    BY MR. JAUREGUI:  Now, Mr. Michel, on August 30,
2011, the date of this interview when you admitted to taking a
bribe, were you fired by the sheriff's department that day?

A    No.

Q    Were you asked to resign that day?

A    No.

Q    Were you arrested for admitting to having taken
bribes?

A    No.

Q    And bringing a phone into the jail?

**UNITED STATES DISTRICT COURT**

A        No.

Q        Did your employment change in any way that day --

A        Yes.

Q        -- or after?

How did it change?

A        They took away my deputy rights.  So they took my badge and my gun, but they -- I was still employed as an employee with the sheriff's department.

Q        Did you later have another interview with Sergeants Craig and Long?

A        I had several, yes.

Q        Ultimately did you admit to Sergeants Craig and Long to committing assaults on inmates?

A        Yes.

Q        Do you recall when that interview took place when you made those admissions?

A        It was when I actually resigned.  I believe it was, like, September 13th or 14th of 2011.

Q        Did you tell the sergeants, Craig and Long, that you had committed assaults on inmates with other deputies from the sheriff's department?

A        Yes.

Q        Do you have in mind -- do you recognize the name Bragg, Mr. Michel?

A        Yes.

**UNITED STATES DISTRICT COURT**

Q       Do you have an understanding of what the Bragg incident is?

A       Yes.

Q       What is the Bragg incident?

MR. HOCHMAN:  Objection.  Same relevancy objection as before, Your Honor.

THE COURT:  Overruled.

You may answer.

THE WITNESS:  How the Bragg incident started was I had a neighbor who had a teenage daughter who was abducted and prostituted out.  She was about 14 years old.

One day I had -- it was Halloween, and I had taken my young children to -- in my neighborhood, and she -- when we got to this neighbor's house, she had asked me -- after, you know, they give the candy and everything, she asked me if I was still a deputy, and I said yes.  And so she said -- told me the story about her daughter being abducted and prostituted out.  And so she gave me Mr. Bragg's name.

So when I went back to work the next day, I looked up Mr. Bragg on our AJIS in the sheriff's department computer system for the inmates.  And when I looked him up, Inmate Bragg just so happened to be in the module that I was working in.

Q       BY MR. JAUREGUI:  And did you go to see Inmate Bragg?

**UNITED STATES DISTRICT COURT**

A          Immediately I did not go see Mr. Bragg, but I did tell my partners at the time which were Deputy Aguire, Deputy Ibarra, and Deputy Carvajal.

Q          What happened after you told them?

A          After I told them, Deputy Aguire who was the shot caller in the module, he was like the senior deputy, he was the one who was the most respected in the module, he said that we wouldn't be doing anything to go talk to him or do anything about it because we were busy but he would get back to me later on and we would discuss, you know, what to do to talk to the inmate.

Q          Did you ultimately talk to that inmate?

A          Yes, we did.

Q          What happened?

A          Well, later on that day, Deputy Aguire came up to me and said, "Hey, let's go talk to that inmate that you told us about earlier."  So me, Deputy Aguire go upstairs because he was housed up in the upper floors in the module.  I go, and I cuff the inmate up in his cell.

Deputy Aguire was on the gates there.  They manually open and close with a lever.  So he racks the gate. We pull the inmate out and pull him up into the upstairs shower area.  Deputy Aguire initially starts talking to the inmate who is Mr. Bragg and asking him questions like, "Why is he there? Why was he housed in this special area that he was being housed

**UNITED STATES DISTRICT COURT**

at?"  And he started to lie.  He said that he was there for a parole violation, which he was not there for a parole violation.

Q    And what, if anything, did this group of deputies do in response to that -- this inmate's comments that he was there for a parole violation?

A    As soon as we knew he was lying, Deputy Aguire told him that he was lying because he -- I mean, we actually looked up the information, and we knew that he was lying.  So Deputy Aguire actually struck the inmate with an open hand, slap to the face and head area.

After he did that, the inmate like kind of, like -- kind of fell down a little, and then Deputy Aguire continued to punch the inmate.  After he had punched him a couple times, I don't know exactly how many times, he -- I came up and started asking him why he had done what he had done.

And I started asking him questions about the girls, and he also denied that as well.  And he -- the inmate stated that it wasn't him who had taken the girls.  He said his nephew had done it, and he just took the blame for it.

Q    And what did you do when he said that?

A    Well, I called him a liar, and I punched him in the right stomach/rib area.  And then I also -- when he was laying, like -- because the shower has, like, a curb and then the actual shower so the water doesn't just flow out into the

actual tier.  He went down to the -- to his knees, and I kneed him with my right knee in his back.

After he -- after that, then Deputy Aguire picked him up and pulled him back to the outside of the shower area into the flat, and he -- he hit him a couple times again on his right-hand side.  And then Deputy Ibarra was behind us, and he came up from back and just punched him right in the -- the center of his back.  And that's when the inmate went -- he went down to the ground again.

At some point, I don't remember exactly how, but the inmate gets back up to his feet, and I kick him on the inside of his right thigh area.  The inmate went down to the ground.  After he -- after that happened, basically like told him that, if he was going to continue to lie about the questions that we asked him, that we would basically go back every single day and beat the shit out of him until he started telling the truth.

Q      Did you tell Sergeant Long and Sergeant Craig this story?

A      Yes.

Q      Did you tell Sergeant Craig and Sergeant Long about another incident called the pill call incident?

A      Yes -- no.  I don't remember exactly, but eventually, yes, that story did come out.

Q      Okay.  Did you tell Sergeant Long and

Sergeant Craig that these -- I'm sorry.  And what was that incident?

MR. HOCHMAN:  Same objection of relevancy, Your Honor.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  I'm sorry?

Q    BY MR. JAUREGUI:  The pill call incident that you said eventually came out, what is that?

A    The pill call incident is -- basically I lied on a report saying that an inmate actually assaulted me when I -- the inmate did not assault me.  I went to that inmate, me and my partner at the time, Deputy Castillo, and basically picked a fight with that inmate.

Q    These inmates that were involved in these incidents, were they handcuffed?

A    Some of them were, yes.

Q    Did you tell that to Sergeants Craig and Long?

A    I don't remember.  But I did tell them about the incidents.  So I don't remember exactly what I told them.

Q    Okay.  Mr. Michel, I'm going to direct your attention to Government Exhibit No. 58, and we'll also put it up on the screen.  It's in evidence.

If you can just read this, "From" and "To" and "Date," please.

UNITED STATES DISTRICT COURT

A       Yes, sir.  "From Leavins, Steven E., sent Tuesday, September 13, 2011, at 3:47 p.m.  To Craig, William T.  Subject:  That idiot Michel is confessing to beating handcuffed inmates with other deputies.  Not looking good.  They are still investigating him.  Will advise."

Q       And if you could just look up from that part of the e-mail and then read to the jury William T. Carey's response.

A       It says, "Tell me about it."

Q       I'm directing you --

A       I'm sorry.  The bottom part.  It says, "Wow."

Q       And then the response from Steven Leavins?

A       "Tell me about it."

Q       Was Steven Leavins one of the people that interviewed you about these assaults?

A       No.

Q       And then if we could look at Government Exhibit No. 59 which is also in evidence.  Again, the "From" line, "To" line, and "Date"?

A       It says, "From Carey, William T., sent Tuesday, September 13, 2011, at 4:25 p.m.  To Nee, Christopher P."  And it says, "Chris, the boss in?"

Q       And Government Exhibit 60 which is also in evidence.  And same thing.  "From," "To," "Date" and the content of the e-mail, please?

**UNITED STATES DISTRICT COURT**

A        "From Carey, William T., sent Tuesday, September 13, 2011, at 4:34 p.m., to Nee, Christopher P." "Made contact.  Thank you."

Q        Now, Mr. Michel, after you admitted to beating inmates to Sergeants Craig and Long, were you arrested by the Los Angeles County Sheriff's Department?

A        No, sir.

Q        What happened with regards to your employment after that?

A        Well, that's when they said that I was going to be either fired or I needed to resign, and I resigned right then.

Q        At some point, Mr. Michel, did you decide to cooperate with the FBI and the Federal Government?

A        Yes.

Q        And after you made that decision to cooperate, were you charged with a crime?

A        Yes.

Q        What crime were you charged with?

A        Bribery.

Q        Did you ultimately plead to that crime?

A        Yes.

Q        How did you plead?

A        Guilty.

Q        Have you been sentenced for that crime?

A       Yes, sir.

MR. JAUREGUI:  One moment, Your Honor.

No further questions, Your Honor.

THE COURT:  All right.  Ladies and gentlemen, do you want to take your final break of the day now?

MR. HOCHMAN:  Your Honor, may I ask?  We haven't had a break at counsel's table since 10:20.  Can we take a five-minute break, Your Honor?

THE COURT:  That's fine.

Ladies and gentlemen, I guess we are going to take a break.

Again, I want to remind you, until this trial is over, you're not to discuss this case with anyone, including your fellow jurors, members of your family, people involved in the trial, or anyone else.  And do not allow others to discuss the case with you.  This includes discussing the case on the Internet, by e-mail, text messages.  If anybody tries to communicate with you about this case, please let me know about it immediately.  Do not read, watch, or listen to any news reports or other accounts about the trial or anyone associated with it.  Do not do any research, such as consulting dictionaries, searching the Internet, or using other reference materials.  And do not make any investigation about the case on your own.

If you need to speak with me, simply give a note

UNITED STATES DISTRICT COURT

to the clerk.

All right.  We'll come back in ten minutes.

(The following proceedings were held in open court out of the presence of the jury:)

THE COURT:  All right.  Sir, you can step down if you'd like.  Okay.

MR. HOCHMAN:  Thank you, Your Honor.

(A recess was taken at 12:20 p.m.)

THE COURT:  Let's bring the jury in.

(The following proceedings were held in open court in the presence of the jury:)

THE COURT:  All right, sir.

MR. HOCHMAN:  Thank you very much.

**CROSS-EXAMINATION**

BY MR. HOCHMAN:

Q     Mr. Michel, you were a deputy from December -- deputy Los Angeles County sheriff from approximately December, 2008, until September 13, 2011; is that correct?

A     Yes.

Q     And the first part, I believe you said, when you came in in December 2008, that you spent the next five months or so at the sheriff's academy; is that correct?

A     It was 18 weeks, sir.

Q     I'm sorry?

A     It's 18 weeks.

**UNITED STATES DISTRICT COURT**

Q        18 weeks at the sheriff's academy; is that
correct?

A        Yes, sir.

Q        At the sheriff's academy, they teach you a set of
standards under which you're supposed to conduct your
activities; is that correct?

A        Yes, sir.

Q        They call these the core values?

A        Yes, sir.

Q        And the core values basically said -- or the
standards of which you are to operate as deputy, once you
became a full-time deputy, included honorably performing your
duties; is that correct?

                MR. JAUREGUI:  Objection, Your Honor.

                THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  Did they teach you in the
academy to beat up inmates?

A        No, sir.

                MR. JAUREGUI:  Objection.  Argumentative,
Your Honor.

                THE COURT:  Next question.

Q        BY MR. HOCHMAN:  Did they also instruct you on
the standards from a mission statement of the sheriff's
department?

                MR. JAUREGUI:  Same objection.

**UNITED STATES DISTRICT COURT**

Q        BY MR. HOCHMAN:  Did they also instruct you at the academy that you spent 18 weeks at about the mission statement of the sheriff's department?

MR. JAUREGUI:  Objection.  Relevance.

THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  Now, when you were beating up those inmates, did you ever tell Sheriff Baca that?

A        No, sir.

Q        When you were taking the bribes, did you ever tell Sheriff Baca that?

A        No, sir.

Q        When you were falsifying reports, did you ever tell Sheriff Baca that?

A        No, sir.

Q        Did you ever tell your sergeant that you were beating up inmates?

A        No, sir.

Q        And above a sergeant is a lieutenant; correct?

A        Yes, sir.

Q        Did you ever tell the lieutenant at the time you were beating up inmates that you were beating up inmates?

A        No, sir.

Q        And above a lieutenant is a captain; correct?

A        Yes, sir.

Q        Did you ever tell the captain that you were

**UNITED STATES DISTRICT COURT**

beating up inmates?

A    No, sir.

Q    Taking any bribe?  Did you ever tell the captain you were taking any bribe?

A    No, sir.

Q    And you didn't tell the lieutenant or the sergeant as well; is that correct?

A    Correct, sir.

Q    Above a captain is a commander; correct?

A    Yes, sir.

Q    And did you ever tell the commander that you were beating up inmates, falsifying reports, or taking bribes?

A    No, sir.

Q    And above a commander is a chief; correct?

A    Yes, sir.

Q    Did you ever tell the chief that you were taking bribes, beating up inmates, or falsifying reports?

A    No, sir.

Q    And above the chief is an assistant sheriff; isn't that correct?

A    Yes, sir.

Q    Did you ever tell the assistant sheriff that you were beating up inmates, taking bribes, or falsifying reports?

A    No, sir.

Q    And above the assistant sheriff is the

**UNITED STATES DISTRICT COURT**

undersheriff; is that correct?

A        Undersheriffs at the time, yes, sir.

Q        And you didn't tell the undersheriff that you were beating up inmates, falsifying reports, or taking bribes; correct?

A        No, sir.

Q        Now, do you know what a code "10-12" is?

A        Yes, sir.

Q        What is it?

A        It's a radio code used in -- we used it at Men's Central Jail to notify someone who was coming up to our location.

Q        And what would it be used for, code 10-12?

A        10-12 would be like if a sergeant was coming to the floor or a group of visitors or just anyone coming off of a different floor to our location.

Q        And what would you do if someone like a sergeant or a higher rank was coming to your floor and you issued a 10-12?

A        I don't understand your question.

Q        I'm sorry.

         When you would say -- when a sergeant or above was coming to your floor and people said 10-12 on the radio, what would happen?

A        You have to be very specific.

**UNITED STATES DISTRICT COURT**

Q        Certainly.

If a sergeant or above was coming to your floor --

A        Yes.

Q        -- would you issue a 10-12?  Would people say 10-12 on the radio?

A        Well, see, you're saying would I issue it or would the people on my floor?  So you need to be specific.

Q        Thank you.

Would people on your floor, so that you could hear it in your radio, state 10-12?

A        Yes.

Q        And then what would happen on the floor -- what would the deputies on the floor do in preparation for the sergeant coming to their floor?

A        It depends on what -- it depends on what was going on on the floor.

Q        So, for instance, would people on the floor stop horsing around if they were otherwise horsing around?

A        Yes.

Q        If they had their cell phones on, would they get off their cell phone?

A        Yes.

Q        Because deputies were not allowed to use their cell phones inside the jail; is that correct?

A        Correct.

Q        If they were on the Internet, would they get off the Internet if a sergeant or above was coming to the floor?

A        No.

Q        How about texting?  Would they stop texting if a sergeant or above was coming to the floor?

A        Well, you have to be specific.  You're not saying -- you're not saying on their phone.  You're just saying texting --

Q        Fair enough.

Texting on their cell phone?

A        On their personal cell phones that they weren't supposed to have inside the jail?

Q        Yes.  They would stop doing that, if they were doing it, when a sergeant was coming to the floor or above; correct?

A        Yes.

Q        And when I say sergeant or above, I say sergeant all the way to Sheriff Baca himself.  You understand that?

A        The chain of command, yes, sir.

Q        And if someone was abusing an inmate and the word went out that the sergeant or above was coming to the floor, they would stop abusing the inmate; correct?

MR. JAUREGUI:  Objection.  Calls for speculation.

THE COURT:  Sustained.

UNITED STATES DISTRICT COURT

Q        BY MR. HOCHMAN:  Now, when you would come into the jail, would you actually be searched?

A        No.  Not at the time that I -- when I worked there, no.  I was never searched.  I was never, like, body searched.  If you brought a bag in, they would -- there were some times where they would search your -- the bag.

Q        But that's how you were able to bring your cell phone into the jail is that you would put it on your self and just walk right into the jail; correct?

A        Yes.

Q        Now, at some point -- and this is actually also how you brought the cell phone that eventually went to Anthony Brown, that you just carried it on your self and walked right into the jail; correct?

A        Correct.

Q        Now, at some point in 2009/2010 is when you first met Anthony Brown; is that correct?

A        Correct.

Q        And he was on the 2000 floor?

A        Yes.

Q        And the 2000 floor is where the pro pers were, if you recall that?

A        No, sir, I don't.  There were pro pers all over the jail.  There's not just a specific area for pro pers.  I mean, there are some, but pro pers could have been anywhere in

the jail.

Q    Well, you knew that Anthony Brown was a pro per; correct?

A    No, I did not.

Q    You knew he was charged with armed bank robbery; isn't that right?

A    What time are you talking -- referring to?

Q    When he first came to the jail, 2009/2010.

A    I had no idea what Anthony Brown was even in jail for or if he was a pro per.

Q    Well, didn't you at some point search his belongings and see a lot of paperwork and photos that had photos of guns and drugs in them?

A    Right.  That was in 2011.

Q    I see.

So in 2011 is when you searched his paperwork?

A    Correct.

Q    So you didn't know back in 2009/10 what he was in for, but by 2011 you knew he was there for armed robbery?

MR. JAUREGUI:  Objection.  Relevance, Your Honor.

THE COURT:  Sustained.

Q    BY MR. HOCHMAN:  Well, you mentioned in the tape-recording we listened to searching his large trash bag and seeing a lot of stuff in it; is that correct?

A    Correct.

UNITED STATES DISTRICT COURT

Q        And that stuff you saw was photos of guns, AK-47's, different types of drugs, including cocaine, marijuana, and ecstasy; is that correct?

A        Correct.

Q        And you also believed that Anthony Brown had money on the outside; is that correct?

A        Yes.

Q        And, in fact, Anthony Brown told you that he had about $800,000 stashed away on the outside; is that correct?

A        I don't recall the number amount, but he told me that he had a significant amount of money, yes.

Q        And what do you mean by "significant"?  What do you consider to be "significant"?  Hundreds of thousands of dollars?

A        Maybe.

Q        Maybe, or that is approximately how much he told you?

A        I don't recall the exact amount.

Q        Now, eventually he asked you if you'll bring in cigarettes, a lighter, outside food, and a cell phone; is that correct?

A        Correct.

Q        And you understand -- let's start with cigarettes.  Cigarettes are contraband inside a secured jail; is that correct?

**UNITED STATES DISTRICT COURT**

A        Correct.

Q        Which means that inside the jail you can't give an inmate cigarettes; correct?

A        Correct.

Q        And an inmate can't just, you know, willy-nilly take a pack of cigarettes and start smoking in his cell; correct?

A        Correct.

Q        And the same thing as a lighter, that you can't give an inmate inside a secured jail a lighter; is that correct?

A        Yes, sir.

Q        Same thing with outside food.  You can't bring outside food into an inmate and give the inmate outside food into the jail; is that correct?

A        Yes, sir.

Q        And as well a cell phone.  You can't bring a cell phone and give the cell phone to the inmate inside the jail; is that correct?

A        Correct.

Q        Now, when you said that you gave Anthony Brown the cell phone, you said you did not know what his intentions with the cell phone were; is that correct?

A        I believe I said that it would -- he would be able to contact his people on the outside is what I thought I

said, I think I said.

Q    So did you ever instruct Anthony Brown, when you gave him the cell phone, that he couldn't use it to plot an escape?

A    No.

Q    Did you ever instruct Anthony Brown, when you gave him the cell phone, that he couldn't use it to bring any harm to any witnesses that have been in his case?

MR. JAUREGUI:  Your Honor, objection.  Relevance.

THE COURT:  Sustained.

Q    BY MR. HOCHMAN:  The idea of a cell phone, was that your idea getting Anthony Brown a cell phone in exchange for money, or was that his idea?

A    It was Anthony Brown's idea.

Q    So before Anthony Brown brought up this idea of paying you to bring him a cell phone, you didn't go to him first and say, "Look, I have a great idea.  I can get you a cell phone if you pay me"; correct?

A    Correct.

Q    And when he originally brought up the cell phone idea, giving you money to bring in a cell phone, did you immediately jump on the idea?

A    I don't recall.

Q    Did he have to bring it up a couple times before you eventually agreed to it?

**UNITED STATES DISTRICT COURT**

A       I don't recall.

Q       Now, with respect to the actual deal that was struck, Anthony Brown agreed to get you $2,000 in order to bring the cell phone into the jail for him; is that correct?

A       Yes.  It was something like that, yes.

Q       And then you were going to be paid $2,000 every time you recharged a cell phone and brought it back to him; is that correct?

A       The second time it was $2,300.

Q       $2,300.

And then if you did it enough times, the expectation is it would be $20,000; is that correct?

A       No.

Q       Well, you mentioned in your direct testimony the sum of $20,000.  That was the amount that you anticipated being paid on behalf of Anthony Brown; isn't that correct?

A       No.

Q       Did the number $20,000 ever -- was the number $20,000 ever discussed between you and Anthony Brown?

A       Yes.

Q       What was it in the context of?

A       Anthony -- because I was not going to give him the cell phone anymore.  Anthony Brown suggested that he would pay me $20,000 for the phone -- the cell phone.

Q       So let me see if I understand this.  You brought

in the cell phone once for $2,000; correct?

A    No.

Q    Explain to the jury what exactly the deal was that was struck and how it involved $20,000.

A    Well, okay.  Initially Anthony Brown said it was $2,000.  The FBI -- C.J. that I met with only gave me $700. The second time Anthony Brown told me that it would be $2,300. The FBI agent gave me $800, which is a total of $1,500.

The last time that I gave Anthony Brown the cell phone, I told him that I didn't want anything to do with it anymore because Anthony Brown did not -- he did not leave any information, which he said that I could look at the phone and see any of his contact information, who was he talking to, he would leave that information on the phone.

When I got the phone back, it was totally empty, deleted, no record of any calls, no saved numbers, anything. So at that point, I wasn't going to deal with Anthony Brown anymore.

So he offered me $20,000.  At no time ever, any point that I spoke with Anthony Brown, did I ask Anthony Brown for any amount of money.  No dollar amount.  I never told Anthony Brown to give me one penny or $20,000 ever. Anthony Brown was the one who suggested every single amount of -- every single dollar amount.

Q    All right.  And then with the -- $20,000 was a

**UNITED STATES DISTRICT COURT**

lot to you back in August of 2011; correct?

MR. JAUREGUI:  Objection.  Relevance, Your Honor.

THE COURT:  Sustained.

Q    BY MR. HOCHMAN:  Well, were you in debt back in August 2011?

MR. JAUREGUI:  Same objection, Your Honor.

THE COURT:  Sustained.

Q    BY MR. HOCHMAN:  Did Anthony Brown discuss sending a lot of money to Richard, someone whose name you gave him, in San Pedro?

A    Yes.

Q    And Richard was your father?

A    Correct.

Q    And you gave Anthony Brown your father's address in San Pedro?

A    Correct.

Q    And he was supposed to send Richard a lot of money; is that correct?

A    Yes.

Q    Now, Anthony Brown then put you in touch with what you said was the outside contact of this person C.J. to pay the money; correct?

A    Repeat the question.

Q    Anthony Brown put you in touch with C.J. who would pay you the money; is that correct?

UNITED STATES DISTRICT COURT

A        What money are you talking about?

Q        Money for the cell phone.

A        Are you talking about every time I would give him
the money or every time -- give him the cell phone, or are you
just specifically asking me about $20,000 that was supposed to
be sent to my dad's house?

Q        Let's just go to the first payment.  The first
payment comes about when Anthony Brown tells you that he'll put
you in touch with C.J. in order to get paid for the cell phone.
Do you recall that?

A        Yes.

Q        Okay.  And that was a situation where you were
actually in the jail with Anthony Brown and you gave him your
cell phone; correct?

A        Correct.

Q        And you said that -- you actually let him call
C.J. right in front of you; is that correct?

A        Correct.

Q        And he discussed with C.J. the fact that C.J.
would now get in touch with you in order for you to go ahead
and get the cell phone and the money; is that correct?

MR. JAUREGUI:  Objection.  Misstates the
testimony.

THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  Well, when Anthony Brown is

**UNITED STATES DISTRICT COURT**

speaking to C.J. on the line, after he's done speaking to C.J., does he tell you that C.J. will now meet with you?

MR. JAUREGUI:  Objection.  Vague as to time.

THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  I'll direct your attention to the first and only time, my understanding, that you have a telephone call -- excuse me.

You allowed Mr. Brown to use your personal cell phone.  Was that the one and only time?

A       Yes.

Q       And at that one and only time, Anthony Brown calls C.J.; is that correct?

A       Correct.

Q       After that phone call, does Anthony Brown tell you something?

A       Yes.  We have a conversation.

Q       And that conversation is that you're going to meet with C.J. on the outside.  He'll give you cash, and he'll give you a cell phone to bring to Anthony Brown; is that correct?

A       No.

Q       What was that conversation?

A       Well, you're missing that Anthony Brown never got in contact with C.J.  He -- all he did was -- a recording came on.  So he never even spoke with C.J.  After he hung up the

UNITED STATES DISTRICT COURT

phone, he gave me C.J.'s number.  He wrote it down on a piece of paper, but it was also saved in my phone that he just had called C.J. with.

So after that, me and Anthony Brown were inside the dayroom at Men's Central Jail.  I actually put Anthony Brown back in his cell.  And later on, days later, I actually called the number that was -- that Anthony Brown had given me.  And that's how I got into contact with C.J., who was, in fact, an FBI agent or an informant for the FBI.

Q    And at that time you didn't know that Anthony Brown was working with the FBI as well; is that correct?

A    Correct.

Q    So then when you actually -- you do set up a meeting with C.J. to exchange -- to get the money and the cell phone from him; is that correct?

A    Correct.

Q    And that meeting was about July 20th, 2011; is that correct?

A    It's about that time, yes.  I don't know the exact date, but it's around July or August sometime.  I don't know the exact date.

Q    And when you show up to that meeting, you said you drove in one car and you pulled driver's side to driver's side with C.J.; is that correct?

A        Correct.

Q        And that was in the parking lot by the 105 and Vermont?

A        It was in -- yes.

Q        If you could take a look at what's been marked in front of you as Exhibit 636, marked for identification.

(Exhibit 636 for identification.)

Q        BY MR. HOCHMAN:  I believe there might be some papers that are on the counsel table -- or witness table?

A        There's a 634.

Q        Look below 634, please.

Is 636 a true and accurate picture of your vehicle and C.J.'s vehicle on the day of July 20th, 2011, when you met to get the bribe payment and the cell phone?

A        That's not my vehicle.

Q        Which one is not your vehicle?  When I say "your vehicle," my understanding is you were driving your girlfriend's vehicle at the time; correct?

A        Correct.

Q        So is that a true and correct picture of the vehicle you showed up in, your girlfriend's vehicle, and C.J.'s vehicle on July 20th, 2011, when you got the bribe payment and the cell phone?

A        Yes.

MR. HOCHMAN:  Your Honor, the defense would seek

67

to admit Defense Exhibit 636.

MR. JAUREGUI:  No objection, Your Honor.

THE COURT:  It will be received.

(Exhibit 636 received into evidence.)

MR. HOCHMAN:  I would ask permission to publish.

THE COURT:  That's fine.

Q    BY MR. HOCHMAN:  All right.  We're looking at Defense Exhibit 636.  Which is the vehicle you showed up in?

A    The silver one, the one on the right.

Q    And then the -- and C.J. showed up in which vehicle?

A    Well, he was there in the black vehicle when I pulled up.

Q    That's at the point where I believe you said C.J. threw in a sunglasses case that had money in it?

A    Yes.

Q    And he also gave you the cell phone at that point?

A    Correct.

Q    Now, at that point -- at that point, did the FBI arrest you for getting a bribe from C.J.?

A    No.

Q    And had you actually -- at that moment in time, you had the cell phone on you.  You still hadn't brought it into Men's Central Jail; correct?

UNITED STATES DISTRICT COURT

A        Correct.

Q        And I believe you testified that you received the $700 payment in that first transaction; is that correct?

A        Yes.

Q        And, thereafter, that's when you brought the cell phone into Men's Central Jail; correct?

A        Yes.

Q        And you put it on your body to get through security so that they wouldn't see it; is that correct?

A        Yes.

Q        And then you handed it to Anthony Brown in his bunk; is that right?

A        Yes.

Q        Now, on August 4th, 2011, that's when you get the second bribe payment from C.J.; is that correct?

A        I don't recall the actual date, but there was a second time that I met with C.J., yes.

Q        And that was after the first payment on July 20th and before they found the cell phone on August 8th; is that correct?

A        Yes.

Q        I'll show you what's in front of you that's been marked as Defense Exhibit 634.

        (Exhibit 634 for identification.)

Q        BY MR. HOCHMAN:  Do you have that in front of

you?

A    Yes, sir.

Q    This transaction also takes place in a parking lot; is that correct?

A    Yes.

Q    And this was a Best Buy parking lot, if you recall?

A    I don't recall -- I don't recall if there was a Best Buy there or not.  I just -- yes.  It was in a parking lot.

Q    In Glendale/Burbank area?

A    Yes.

Q    And, again, you went driver's side to driver's side with C.J.; is that correct?

A    Yes.

Q    At that point, he gives you $800; is that right?

A    Yes.

Q    If you could look at Defense Exhibit 634.

Is this an accurate picture of the bribe transaction that occurred in that August, 2011, period with C.J.?

A    Yes.

MR. HOCHMAN:  Your Honor, the defense would seek to admit Defense Exhibit 634.

MR. JAUREGUI:  No objection, Your Honor.

**UNITED STATES DISTRICT COURT**

70

THE COURT:  It will be received.

(Exhibit 634 received into evidence.)

Q        BY MR. HOCHMAN:  Looking at Defense Exhibit 634, which car are you in and which car is C.J. in?

A        I'm in the gray Chevy Silverado.

Q        That's actually a picture of you that we can see. There's one individual who is wearing sunglasses in the picture.  Is that you?

A        Yes.

Q        And C.J. is in the other car?

A        Correct.

Q        Did the FBI arrest you at that moment in time when you got the second bribe payment from C.J.?

A        No.

Q        And you said that not only did C.J. give you $800, but he gave you something called a kite?

A        At some point I was supposed to transfer a kite from C.J. to Anthony Brown or Anthony Brown to C.J.  I don't remember the exact hand-off or what.  But yes, there was a kite involved in this situation, yes.

Q        And did you receive the kite when you got the $800 in the transaction we were just looking at?  It's pictured in Defense Exhibit 634.

A        I don't recall that, but there was -- like I said, there was a kite involved in this whole grand scheme of

things, yes.

Q       And did the kite have numbers on it that were in the tens of thousands of dollars?

A       One of the kites, yes, had high dollar amounts of thousands of dollars, yes.

Q       Reflecting big transactions; correct?

A       Correct.

Q       So the total $1,500 that you received -- by the way, did you ever report that on your tax return?

MR. JAUREGUI:  Objection, Your Honor.

THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  Now, with respect to the remainder of the -- you got $1,500.  What about the remainder of the $2,000 that you were supposed to get?  Did you ever receive the remainder of that $2,000?

A       No, sir.

Q       So then let me take you, then, to August 8, 2011, when the cell phone was found.  I believe you said that you heard about it from one of your partners that day after you had given the cell phone to Anthony Brown; is that correct?

A       Yes.

Q       And once you heard about it, you called C.J.; correct?

A       Not immediately, but yes.  There was -- some time had passed.  And yes, I did.

Q       When you called C.J., you told him, basically, "Destroy the evidence"; is that correct?

MR. JAUREGUI:  Objection, Your Honor.  Misstates the testimony.

THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  When you called C.J., you told him to get rid of his cell phone and all the evidence that was going to connect C.J. to yourself; is that correct?

MR. JAUREGUI:  Same objection, Your Honor.

THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  When you called C.J., what did you tell him?

A       My exact words were to drop his line.  My partners had found the phone.

Q       What did you mean by "drop his line"?

A       Shut the line off, disconnect the line.

Q       That was in order to not connect C.J. to yourself; is that correct?

A       Yes.

Q       And then you, in turn, you said, took your phone out to the car, your personal cell phone?

A       It was -- yes.  It was in my vehicle, yes.

Q       Then that cell phone got lost.

A       Correct.

Q       So from August 8 when the phone was found until

August 24th when the FBI met up with you, you were hoping that no one would ever link the cell phone to yourself; correct?

MR. JAUREGUI:  Objection.  Form.

THE COURT:  Sustained.

Q    BY MR. HOCHMAN:  Well, between that time period when the cell phone was found, you had no information that the FBI had linked you to the cell phone; correct?

A    Can you repeat the question?

Q    When the cell phone was found, you had no information that Anthony Brown was working for the FBI; correct?

A    Correct.

Q    That C.J. was an FBI undercover agent; correct?

A    Correct.

Q    Or that any of your conversations or any of your meetings had been monitored by the FBI; correct?

A    Correct.

Q    But on August 24th, you found out for the first time about the FBI's connection to the cell phone; correct?

A    Correct.

Q    Because it was on that day when you came home from work that the FBI was waiting for you at your apartment; isn't that correct?

A    Correct.

Q    And when they -- when they originally came there,

**UNITED STATES DISTRICT COURT**

they asked you to secure your gun; is that correct?

A    Yes.

Q    And you did.  You put it in your trunk, if I'm not mistaken; is that correct?

A    No.  That is not correct.

Q    Where did you put your gun?

A    Under my driver's side seat.

Q    And then you left your car; is that correct?

A    I locked my vehicle, yes, and then I went with the agents.

Q    You went with the agents to Starbucks; is that right?

A    Correct.

Q    In their car.

A    Correct.

Q    And then you spent about the next two hours or so at Starbucks talking with the agents; is that correct?

A    Yes.

Q    And at some point when you're speaking with Agent Marx, Agent Marx shows you on her laptop video surveillance of that first bribe payment; correct?

A    Correct.

Q    And if you recall the original photograph you looked at -- and this is Defense Exhibit 636 -- this is actually Defense Exhibit 636, what you were being shown by

**UNITED STATES DISTRICT COURT**

Agent Marx on August 24, 2011, at the Starbucks; correct?

A        Something similar to this, yes.

Q        It was actually a video that had this image in it; is that correct?

A        I don't recall the exact -- if it was this exact same picture, but it was something very similar to this on a laptop monitor, yes.

Q        And I believe you said this was like aerial surveillance of what you were looking at -- of the transaction. Excuse me.

A        Correct.

Q        And at the time when you spoke -- originally you spoke at the Starbucks for about two hours -- is that correct? -- with the agents?

A        It was some time.  I don't know the exact time. But yes, there was time spent at Starbucks.

Q        Then they went back to your apartment and spent more time with you that day; is that correct?

A        Correct.

Q        And between those two conversations, it lasted a couple hours; is that correct?

A        It could have been hours, yes.

Q        And in those hours, you acknowledged that was you in the picture who had taken the bribe payments from C.J.; correct?

**UNITED STATES DISTRICT COURT**

A        I don't remember.

Q        Well, didn't you tell them and acknowledge that, yes, you had gone ahead and received the $1,500 from C.J.?

A        Who?  You're asking me anyone -- like, I don't know specifically.  You need to be specific of who asked me that question.

Q        I'm sorry.

During the time you were speaking with any FBI agent that day, August 24th, did you admit to them that you had taken $1,500 from C.J. in exchange for bringing the cell phone to Anthony Brown?

A        I do not recall them ever asking me specifically if I had taken money -- the $1,500.  I don't recall that question that you're asking me.

Q        Didn't they spend a couple hours with you inquiring about the bribe transaction that you had been involved with?

A        Yes.  We discussed it, but we -- we never had a long enough conversation about specifically that, that I -- like we sat down and -- yes.  We did sit down, and we were having conversations.  But specifically that question, I do not ever recall me answering that question.

Q        What do you recall telling them about the bribe transactions?

A        I don't recall any of the specifics about that

conversation because at the time when we really were sitting down and talking, both agents, Mrs. Marx and the other agent that was sitting to the right of me, were both asking me questions at the same time. So I did not, like, answer her and answer him and -- that's where the misunderstanding came about.

I told them to just charge me with whatever they were going to charge me with, and it went -- that meeting went south from there.

Q       So the misunderstanding, though, occurs back at your apartment -- isn't that correct? -- not at Starbucks?

A       Correct.

Q       So at Starbucks when they initially -- that's when they initially show you that photograph or what's on the laptop, which is depicted in Defense Exhibit 636; correct?

A       Correct.

Q       And they're not talking -- the two agents are not talking at the same time at that moment in time at Starbucks.

A       Correct. But at that same time, the other agents were getting phone calls because they were at my residence. And my girlfriend was trying -- at the time was trying to call her sergeant. So it caused -- it caused more chaos and confusion.

So we didn't -- like, yes, they started asking me questions. But all of a sudden, things went south again. So we never -- like, they asked me questions, and we were talking.

At that time, Agent Wayne leaves.  And I'm just sitting there with Mrs. Marx at the table.

Q      So when you're sitting there with Agent Marx at the table, at that point she's discussing with you the bribe transactions; correct?

A      I don't remember specifically because she also had -- we talked about -- we talked about this picture, this Exhibit 636, and deputies that worked with me at Men's Central Jail at the time.

Q      And, again, I'm going to divide this into two. We have the deputies that were with you at Men's Central Jail second, but let's deal with the first thing about this picture.

What did you tell her about the picture?

A      I didn't say anything.

Q      Did she ask you questions in connection with the picture?

A      I don't recall.

Q      Now, at some point during this interview, you found out, again, that -- actually, that the agents were accusing you of lying; isn't that correct?

A      What --

Q      This is now the interview you were having with the agents at Starbucks and your apartment on April 24; is that correct?

MR. JAUREGUI:  Objection, Your Honor.  Vague.

THE COURT:  Sustained.

Q    BY MR. HOCHMAN:  During the several hours you're interviewing with FBI agents on August 24th, at some point the agents, the FBI agents accuse you of lying to them; isn't that correct?

A    Correct.

Q    And they tell you that lying to a federal agent is a crime; is that right?

A    I believe so, yes.

Q    And they tell you that you can cooperate with them and not go to jail or you can not cooperate with them and go to jail; is that right?

A    No.

Q    Well, again, the exact words, if I recall, were that you could lose your job or you could lose your job and go to jail; is that correct?

A    That's correct.

Q    Now, the way that you weren't going to lose your job and go to jail is if you cooperated with the FBI; correct?

MR. JAUREGUI:  Objection.  Calls for speculation, Your Honor.

THE COURT:  Sustained.

Q    BY MR. HOCHMAN:  Your understanding of what it meant to lose your job versus lose your job and go to jail was what?

A       The FBI never promised me anything.  That statement is -- they were making -- my understanding of that statement were one or two things were going to happen.  It wasn't because the FBI was going to do it.  Those were the two options that I had at that point in time.

Q       So what did you have to do to do the second option, which was only lose your job but not go to jail?

MR. JAUREGUI:  Objection.  Calls for speculation.

THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  What was your understanding, as it's being relayed to you, as to those two options, as to what you had to do with the FBI in order not to lose your job and go to jail?

MR. JAUREGUI:  Objection to the form, Your Honor.

THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  You do recall Agent Marx saying to you you have those two options, lose your job or lose your job and go to jail?

A       I don't recall who said it.

Q       That one of the FBI agents said it to you on August 24th during the interview of you; is that correct?

A       Yes.

Q       And what was your understanding of what they meant by what you had to do in order not to lose your job and go to jail?

A        I didn't -- I didn't have any understanding.  I just -- those were options.  It wasn't like I -- like I wasn't -- it didn't mean that I help them and still go to jail and lose my job or I just -- I didn't have an understanding of that.

Q        Well, again, didn't they first tell you that they wanted you to cooperate and that you then had a choice, you could lose your job or lose your job and go to jail?

A        I don't recall.

MR. HOCHMAN:  If we could turn to Exhibit 92, Your Honor, which is the tape-recording, and then 93 is the transcript.

Q        You say at the beginning of that recording -- and now I'm referring to an August 30th recording that you're having with the investigators that we played -- that you were familiar with Anthony Brown.  Do you recall that?

A        Yes.

Q        Can you take a look at the exhibit that's in front of you, which has been marked Defense Exhibit 739.

(Exhibit 739 for identification.)

Q        BY MR. HOCHMAN:  Do you have that in front of you?

A        Yes, sir.

Q        Is that a photograph of Anthony Brown?

A        Yes.

**UNITED STATES DISTRICT COURT**

MR. HOCHMAN:  Defense would move Defense Exhibit 739 into evidence, please.

MR. JAUREGUI:  No objection, Your Honor.

THE COURT:  It will be received.

(Exhibit 739 received into evidence.)

Q    BY MR. HOCHMAN:  Now, this is the inmate Anthony Brown that you gave the cell phone to; is that correct?

A    Correct.

Q    At the time you gave him the cell phone, at that point -- now we're talking 2011 -- you know he's at the Men's Central Jail for armed robbery; correct?

MR. JAUREGUI:  Objection.  Relevance, Your Honor.

THE COURT:  Sustained.

Q    BY MR. HOCHMAN:  Well, at the point you gave him the cell phone, you understand -- do you understand that he's already been sentenced?

MR. JAUREGUI:  Objection.  Relevance, Your Honor.

THE COURT:  Sustained.

Q    BY MR. HOCHMAN:  Do you understand that he's on his way to state prison?

MR. JAUREGUI:  Same objection.

THE COURT:  Same ruling.

Q    BY MR. HOCHMAN:  If I could direct your attention to page 4 of the transcript, which is Exhibit 93.

MR. JAUREGUI:  Your Honor, the transcript is not

UNITED STATES DISTRICT COURT

in evidence.

THE COURT:  It's not.

MR. HOCHMAN:  I'm not seeking to introduce it, Your Honor.

THE COURT:  I don't care.  Sustained.

Next question.

Q     BY MR. HOCHMAN:  In the August 30th tape-recording, you talk about a property bag, a large trash bag, being found by you of Anthony Brown's stuff.  Do you recall that?

A     Yes.

Q     And then you later talk about the fact that -- if I might just have a moment -- the FBI wanted -- in that trash bag, you saw, I think you said a moment ago, photos of drugs; is that correct?

MR. JAUREGUI:  Asked and answered, Your Honor.

THE COURT:  Sustained.

Q     BY MR. HOCHMAN:  But the FBI wanted you, when they met with you on August 24th, to find anyone else who is bringing drugs into Men's Central Jail; is that correct?

A     That's not correct.

Q     Well, didn't you state to the investigators in the August 30th phone call, "They wanted me to find out if anyone else was bringing in drugs or anything"?

A     That was my statement, not from the FBI.

UNITED STATES DISTRICT COURT

Q        When you're saying "they," in the "they wanted me to find out," who did you refer to as the "they"?

A        I was referring to the FBI, but I was the one who made the suggestion that they were probably looking for drugs or any other things that any other deputies were doing.  The FBI did not specifically ever ask me if I knew of anyone who was bringing in drugs or anything into the jail.  That was my comment.

Q        So your comment is that you're telling the sheriff's investigators on August 30th that the FBI had asked you about drugs when the FBI had never asked you about drugs?

A        You're twisting -- you're twisting what I said. The FBI never specifically asked me about drugs.  I made that comment, that the FBI would be interested if someone was bringing in drugs or any other illegal acts that were happening or occurring inside Men's Central Jail where I worked at the time.

Q        Now, you mentioned slightly later in the tape-recording that the agents called their supervisor during the August 24th meeting they had with you.  Do you recall that?

A        Yes.

Q        And that the supervisor got on the phone and said, you know, "You lied to an FBI agent.  That's another crime we're going to charge you with."  Do you recall that?

A        Yes.

Q        And then you also said, "Did the FBI" -- the question was asked of you, "Did the FBI ever tell you not to tell anybody in the Los Angeles Sheriff's Department they contacted you?"

And you told the investigators, yes, that the FBI had told you not to tell anyone else in the sheriff's department that they, the FBI, contacted you; is that correct?

A        Yes.

Q        Now, when the FBI is giving you these two options, lose your job or lose your job and go to jail, the FBI was threatening you, weren't they?

MR. JAUREGUI:  Objection to form of the question. Argumentative.

THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  Did you feel the FBI was threatening you?

A        At the time, no.

Q        Well, you said you were freaking out at that time; is that correct?

A        Yeah.  But not over that question.  I was freaking out over the whole situation that had just occurred.

Q        You told the investigators on August 30th, when they asked you, well, they were threatening me -- actually, they asked you the question, "So when the FBI tells you that they're going to put you in prison, what do you think that they

were doing there?"

And you answered, "Well, they were threatening me."

Was that your belief on August 24th, when the FBI is giving you these options, that they were threatening you?

MR. JAUREGUI:  Objection, again, to the form of the question, Your Honor.

THE COURT:  Do you understand the question?

THE WITNESS:  Kind of, yes.

I mean, you're asking -- I don't remember the feelings that I was feeling at that time specifically, so I couldn't answer yes or no.  But, I mean, I obviously stated that in my testimony.  But I don't remember those feelings that I had at that specific time.

Q       BY MR. HOCHMAN:  Now, at one point in the questioning you are asked about whether or not the FBI could have given the cell phone directly to Anthony Brown.  Do you recall that?

A       Yes.

Q       And the FBI is allowed to conduct unsupervised visits with Anthony Brown -- is that correct? -- to your knowledge?

MR. JAUREGUI:  Objection.  Calls for speculation, Your Honor.

THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  When you were working the Men's Central Jail, you were aware that outside law enforcement could come into the jail and have unsupervised visits with inmates; is that correct?

MR. JAUREGUI:  Objection.  Relevance.

THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  When you say in the question and answer on August 30th, the question was asked of you, "And they have one-on-one visits, unsupervised visits.  Couldn't they have just f'ing handed him a phone?"  Pardon my French.  But "Couldn't they have just handed him a phone?"

And you answered, "Yes."

Do you recall that?

A        Yes.

Q        And do you recall that the -- then do you also recall being asked the question about leverage?  And the question had to do with, "I'm sorry.  The FBI used that leverage to now control you."

And you answered, "Yes, sir."

Do you recall that?

A        Yes.

MR. JAUREGUI:  Your Honor, objection.  Counsel is testifying, reading from the transcript.

THE COURT:  How much longer do you have with this witness?

MR. HOCHMAN:  I'm sorry?

THE COURT:  How much longer do you have with this witness?

MR. HOCHMAN:  Your Honor, probably about ten minutes.

THE COURT:  Okay.

Q    BY MR. HOCHMAN:  Do you recall telling the investigators that the FBI tried to scare you when they met with you on August 24th?

A    I don't remember that.  If it's written in the transcript, then that's --

Q    Now, with respect to the meeting that you then had on September 13th with the investigators, you told them for the first time on September 13th about the beatings that you were involved in; is that correct?

A    Yes.

Q    And you didn't tell them back on the August 30th meeting; is that correct?

A    No.

Q    You told them about the beatings in the August 30th meeting?

A    No.  The first time I ever told them was the time when I met with them in September.

Q    That's what I'm clarifying.

So you told them originally about the bribe

situation and your contact with the FBI in the first meeting on August 30th; correct?

A        That was just the bribe incident, yes.

Q        At that point, they take your gun away; correct?

A        Correct.

Q        They take your badge away?

A        Correct.

Q        And you're put in an administrative role?

A        Correct.

Q        Then September 13th you tell them about the beating incidents that you're aware of; correct?

A        Correct.

Q        And they let you resign in lieu of firing you on that day.

A        Correct.

Q        And when you left that meeting, did the FBI arrest you at that moment in time?

A        No.

Q        Now, you never -- with respect to the agreement that you struck, Mr. Jauregui talked about you entering into a plea agreement with the Government; is that correct?

A        Correct.

Q        And that plea agreement had you plead to a single count; is that right?

A        Yes.  I believe so.

UNITED STATES DISTRICT COURT

Q        And that single count was a single count of bribery; is that correct?

A        Correct.

Q        But you committed two bribes; isn't that right?

A        I took money twice, yes.

Q        And each bribe carries a maximum sentence of ten years in jail; is that correct?

MR. JAUREGUI:  Objection, Your Honor.  Calls for a legal conclusion from the witness.

THE COURT:  Overruled.

You can answer if you know.

THE WITNESS:  I have no idea, sir.

Q        BY MR. HOCHMAN:  You signed a plea agreement, did you not?

A        Yes.

Q        And that plea agreement, you read it over before you signed it?

A        Correct.

Q        Would it refresh your recollection to look at that plea agreement and see what it says about the maximum sentence that you were looking at?

A        Of course.

MR. HOCHMAN:  Can Government Exhibit 185, which I believe is in Volume 3, be placed before the witness?

(Exhibit 185 for identification.)

**UNITED STATES DISTRICT COURT**

Q        BY MR. HOCHMAN:  Do you have Exhibit 185 before you?

A        It's 136 to 200, yes.

Q        I need you to turn to Exhibit 185 if you could. If you could turn to page 8 of Exhibit 185 when you're ready.

A        Okay.

Q        And if you could look at page 8 and read paragraph 11 to yourself.

A        (Witness reviewing exhibit.)

Q        Let me know when you're done.

A        Yes.

Q        Does that refresh your recollection that the crime of bribe, to which you pled guilty to, carries a ten-year maximum sentence?

THE COURT:  If you'd close that, sir.  Just close it.

THE WITNESS:  Well, it doesn't specifically say a maximum of ten years.

Q        BY MR. HOCHMAN:  I'm sorry.  Ten years' imprisonment.

I'd like to restate, Your Honor?

That you were looking at a ten-year imprisonment sentence in connection --

THE COURT:  Sir, I believe the witness -- I believe we're done with that line.  If you have another

question, that's fine.

Q        BY MR. HOCHMAN:  The Government -- you pled to one count of bribery; correct?

A        Correct.

Q        Did you plead to any of the false statements that you made to the FBI?

A        No, sir.

Q        And you haven't been charged with any of those false statements; correct?

A        No, sir.

Q        And you talked about a number of beatings that you either participated in or witnessed.  Do you recall that?

A        Yes, sir.

Q        Let's start with the Bravo beating that you described.  Did you ever plead guilty to being involved with that Bravo beating?

A        No, sir.

Q        Were you ever prosecuted for that Bravo beating? Were there charges filed against you in connection with the Bravo beating?

A        No, sir.

Q        You talked about that Bragg, Inmate Bragg beating.  That was your neighbor giving you the information about the daughter who got sold or who got prostituted.  Do you recall that?

A       Yes, sir.

Q       Did you ever plead guilty in connection to the beating you administered on Inmate Bragg at any point?

A       No, sir.

Q       Did the U.S. Attorney's Office here ever charge you with any violation concerning the beating that you did on Inmate Brown?

A       No, sir.

Q       You talked about that pill box or -- excuse me -- the pill situation where you falsified a report.  Do you recall that?

A       Yes, sir.

Q       Did you ever plead guilty to falsifying a report in connection with an inmate beating?

A       No, sir.

Q       Did the U.S. Attorney's Office here ever charge you with any crimes relating to that pill line inmate beating?

A       No, sir.

Q       You've cooperated with the U.S. Attorney's Office; is that correct?

A       Yes.

Q       Cooperated with the FBI; is that correct?

A       Yes.

Q       You met with them a bunch of times?

A       Yes.

UNITED STATES DISTRICT COURT

Q       And as a result of your cooperation, the U.S. Attorney's Office made a recommendation at your sentencing; is that correct?

A       Yes.

Q       And that recommendation was for probation with four months of home detention; correct?

A       Yes.

Q       And you got six months' imprisonment; is that correct?

A       Yes.

Q       It was His Honor who sentenced you to six months imprisonment?

A       Yes.

Q       And as part of your agreement, you won't be prosecuted for all these offenses; correct?

A       I don't believe so, sir.

MR. HOCHMAN:  No further questions.

THE COURT:  All right.  Any redirect?

MR. JAUREGUI:  Briefly, Your Honor.

**REDIRECT EXAMINATION**

BY MR. JAUREGUI:

Q       Mr. Michel, do you recall when you entered into your plea agreement with the Government?

A       I don't remember.

Q       Do you recall whether that was years ago?  Months

ago?

A       It was years ago.

Q       And Mr. Hochman was asking you about benefits you received and the Government's recommendation.  As part of your plea agreement, were you required to cooperate with the Government?

A       I believe so.

Q       And in connection with your plea agreement, have you testified in other cases?

A       Yes.

Q       Have you testified in more than one case?

A       Yes.

Q       More than two cases?

A       Yes.

Q       Were you prepared to testify in a third case?

A       Yes.

MR. HOCHMAN:  Objection.  Leading.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  Yes.  I was prepared to testify at a third, fourth, fifth, sixth.

Q       BY MR. JAUREGUI:  And, Mr. Michel, when were you sentenced?

A       I was sentenced in July.  I don't remember the exact date.  But in July of 2016.

**UNITED STATES DISTRICT COURT**

Q      Who sentenced you?

A      Judge Anderson.

Q      In your previous trials, did you testify before
Judge Anderson?

A      Yes.

Q      Did you talk about receiving bribes?

A      Yes.

Q      Did you talk about the $20,000?

MR. HOCHMAN:  Objection.  Leading.

THE COURT:  Sustained.

Q      BY MR. JAUREGUI:  Counsel asked you about making
false reports.  Do you recall that?

A      Yes.

Q      Have you testified before about those reports?

A      Yes.

Q      In front of Judge Anderson?

A      Yes.

Q      Have you testified before about beatings?

A      Yes.

Q      Was that before Judge Anderson?

A      Yes.

Q      And you testified that you were sentenced in July
of 2016; correct?

A      Correct.  Yes.

Q      Do you have an understanding about whether or not

**UNITED STATES DISTRICT COURT**

you're receiving benefits for testifying today?

        A        Yes.

        Q        Are you receiving any benefits for testifying today?

        A        No.

                MR. JAUREGUI:  No further questions, Your Honor.

                MR. HOCHMAN:  May I have just one moment, Your Honor?

                THE COURT:  Yes.

                MR. HOCHMAN:  No further questions, Your Honor.

                THE COURT:  All right.  Ladies and gentlemen, we're going to conclude for the day.

                Again, I want to remind you, until this trial is over, you're not to discuss this case with anyone, including your fellow jurors, members of your family, people involved in the trial, or anyone else, and do not allow others to discuss the case with you.  This includes discussing the case on the Internet, chat rooms, through blogs, bulletin boards, by e-mails or text messages.  If anyone tries to communicate with you about this case, please let me know about it immediately.

                Do not read, watch, listen to any news reports or other accounts about the trial or anyone associated with it. Do not do any research, such as consulting dictionaries, searching the Internet, or using other reference materials. And do not make any investigation about the case on your own.

**UNITED STATES DISTRICT COURT**

Finally, you're reminded to keep an open mind until all of the evidence has been received, you've heard the arguments of counsel, the instructions of the Court and the views of your fellow jurors.  If you need to speak with me, simply give a note to the clerk.

We'll resume tomorrow morning at 8:00 a.m. Please leave your notebooks on your chairs.

(The following proceedings were held in open court out of the presence of the jury:)

THE COURT:  All right.  Sir, you may step down.

THE WITNESS:  Thank you, sir.

MR. FOX:  Your Honor, witnesses for tomorrow -- so you're aware, I think we are behind.  I was hoping that we'd rest tomorrow, but I think that's unlikely at this point.  It will be William David Courson, John Torribio, Robert Faturechi, Leah Tanner.  And if we have time at that point, we will call Judge André Birotte.

THE COURT:  Okay.

MR. HOCHMAN:  Your Honor, yesterday we filed a response to the Court's minute order, Docket No. 131, where the Court had indicated it tentatively was going to preclude certain evidence and then deferred ruling on the rest of the motion in limine.  We pointed out various things in our response.

I know the Government hasn't had a chance yet to

respond in writing yet.  I didn't know if the Court wanted to take it up today, tomorrow.  It would be part of the defense case, certainly.

And so if the Government may not finish tomorrow, so we wouldn't be dealing with it until Thursday, but I wanted to just get a sense when the Court wanted to take this issue up.

THE COURT:  I've already taken the issue up.

MR. FOX:  Your Honor, I expect that we will be able to file something in response by 5:00 o'clock today.

THE COURT:  That's fine.

MR. HOCHMAN:  And the reason I asked, Your Honor, is that the Court gave a tentative ruling on one aspect dealing with the Education-based Incarceration Program.  We've now sort of addressed the trial evidence that has come in that we believe makes it relevant.  And then the Court deferred ruling on everything else.

So I wanted to, again, based on the fact we now have trial evidence to reference, reference that evidence to the Court.  And I did it in writing.  Obviously didn't include anything from today, but I did it as of the end of last week, Your Honor.

MR. FOX:  Your Honor, they attached no declarations.  And I just want Your Honor to be aware -- and this will be part of our filing -- we have received zero

**UNITED STATES DISTRICT COURT**

witness statements from them.  So this is not to be sufficient for a proffer about what their evidence is going to be.  And they make conclusory statements that are not supported by the public record, which we will point out as well in our response.

So I think it's premature to take this up, and we will file our response today.

THE COURT:  Okay.  I guess I'll get the Government's response and then see where we are.

MR. HOCHMAN:  Thank you very much, Your Honor.

MR. FOX:  Thank you.

THE COURT:  Okay.  We'll see you tomorrow morning.

MR. FOX:  Your Honor, I'm sorry.  I missed one witness, I was just reminded.  Mike Hannemann is also going to be a witness tomorrow.  He's a very short direct witness, so that's why I forgot about him.  I expect his direct will be about 10 to 15 minutes.

THE COURT:  Okay.  Thank you.

(Proceedings concluded at 1:39 p.m.)

CERTIFICATE OF OFFICIAL REPORTER

I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

DATED THIS  16TH  DAY OF DECEMBER, 2016.


/S/ MIRANDA ALGORRI

MIRANDA ALGORRI, CSR NO. 12743, CRR
FEDERAL OFFICIAL COURT REPORTER

**UNITED STATES DISTRICT COURT**