UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

HONORABLE PERCY ANDERSON, U.S. DISTRICT JUDGE

UNITED STATES OF AMERICA,          )
                                   )
              Plaintiff,           )   Case No.
                                   )
       vs.                         )   CR 16-00066(A)-PA
                                   )
LEROY D. BACA,                     )   PAGES (1 to 21)
                                   )
              Defendant.           )
_____)

REPORTER'S PARTIAL TRANSCRIPT OF
TRIAL TESTIMONY OF ROBERT OLMSTED
WEDNESDAY, DECEMBER 7, 2016
1:17 P.M.
LOS ANGELES, CALIFORNIA

MIRANDA ALGORRI, CSR 12743, CRR
FEDERAL OFFICIAL COURT REPORTER
312 NORTH SPRING STREET, ROOM 435
LOS ANGELES, CALIFORNIA 90012
MIRANDAALGORRI@GMAIL.COM

UNITED STATES DISTRICT COURT

**APPEARANCES OF COUNSEL:**

**FOR THE PLAINTIFF:**

EILEEN M. DECKER
United States Attorney
BY:  BRANDON FOX
BY:  EDDIE A. JAUREGUI
Assistant United States Attorneys
United States Courthouse
312 North Spring Street
Los Angeles, California 90012

**FOR THE DEFENDANT:**

MORGAN LEWIS AND BOCKIUS LLP
BY:  NATHAN J. HOCHMAN
BY:  BRIANA ABRAMS
The Water Garden
1601 Cloverfield Boulevard
Suite 2050 North
Santa Monica, California 90404

MORGAN LEWIS AND BOCKIUS LLP
BY:  TINOS DIAMANTATOS
77 West Wacker Drive
Chicago, Illinois 60601

**UNITED STATES DISTRICT COURT**

3

**I N D E X**


**WEDNESDAY, DECEMBER 7, 2016**


**Chronological Index of Witnesses**



Witnesses:_____    Page


OLMSTED, Robert

    Direct examination by Mr. Fox                                6

**UNITED STATES DISTRICT COURT**

**EXHIBITS**

**WEDNESDAY, DECEMBER 7, 2016**

| Exhibit | For ID | In EVD |
|---------|--------|--------|

(None)

**UNITED STATES DISTRICT COURT**

**LOS ANGELES, CALIFORNIA; WEDNESDAY, DECEMBER 7, 2016**

**1:17 P.M.**

**---**

(Prior proceedings were held and reported but not included herein.)

(The following proceedings were held in open court in the presence of the jury:)

MR. FOX:  United States calls Robert Olmsted.

THE CLERK:  Stand here for me please and raise your right hand.

Do you solemnly state that the testimony you may give in the cause now pending before this court shall be the truth, the whole truth, and nothing but the truth, so help you god?

THE WITNESS:  I do.

THE CLERK:  Please be seated.

Please state your full name and spell your last name for the record.

THE WITNESS:  Robert Olmsted, O-l-m-s-t-e-d.

THE CLERK:  Thank you.

MR. FOX:  May I begin, Your Honor?

THE COURT:  Yes, please.

///

///

**UNITED STATES DISTRICT COURT**

**ROBERT OLMSTED,**

**GOVERNMENT'S WITNESS, SWORN:**

**DIRECT EXAMINATION**

BY MR. FOX:

Q       Mr. Olmsted, what is it that you do for a living?

A       I'm retired.

Q       How long have you been retired?

A       Six years now.

Q       And what did you do before you were retired?

A       I worked for the L.A. County Sheriff's Department for 33 years.

Q       Do you remember when your employment with the sheriff's department ended?

A       It would have been November of '10.

Q       November of 2010?

A       Correct.

Q       When did it begin?

A       January, '78.

Q       Why did you become a deputy?

A       My father was in law enforcement for the sheriff's department.  I saw how much fun he was having, how successful he was.  I liked the idea of doing the same thing myself.  I wanted to follow in my father's footsteps, and I felt it was an honorable profession and still do.

Q       When you retired, what was your rank?

**UNITED STATES DISTRICT COURT**

A        Commander.

Q        What is a commander?

A        Commander is one of the executive members of the sheriff's department.  I can give you the ranking structure if you'd like.

Q        Sure.  Why don't we do that.

So who's at the top?

A        At the top is the sheriff and then undersheriff, two assistant sheriffs.  You have 12, 13 chiefs depending on the time of year, time of day.  They have commanders, captains, lieutenants, sergeants, and deputies.

Q        And, generally, the promotion process, who decides who's promoted to undersheriff?

A        The sheriff himself.

Q        And what I'm referring to -- I just use the present tense, but I'm referring to the time when you were in the sheriff's department just to make that clear.

When you were in the sheriff's department, who decided who would be undersheriff?

A        The sheriff would.

Q        What about assistant sheriff?  Who had the ultimate decisionmaking authority?

A        The sheriff as well.

Q        And who had the ultimate decisionmaking authority to name chiefs?

A       The sheriff would.

Q       What about commanders?

A       The sheriff as well.

Q       How far down did that go?

A       Generally to the captain position.  The sheriff will go ahead and promote captain on up.

Q       Is it a linear progression?  In other words, you said you were commander.  Does that mean you promoted at some point from the rank of captain?

A       Yes.

Q       When did you become captain?

A       Captain, I'm trying to remember now.  Probably in '04, I want to say.  April of '04.

Q       How long were you captain?

A       Two years.  Almost three years.

Q       And then that's when you became commander?

A       Correct.

Q       When you were with the sheriff's department, did you work both in custody and patrol?

A       Yes.

Q       Could you please explain the differences?

A       Custody, we're in charge of the individuals that are mandated to go to court or serve time for misdemeanor type crimes generally.  Patrol, we do recognize patrol protocols as any other police station would -- handle robberies, calls of

service, that type of stuff.

Q    When you were captain, where were you captain?

A    I was the captain of our Commercial Crimes Bureau.  That would be our fraud unit.  And then I was asked to be the captain of Men's Central Jail.

Q    Is Men's Central Jail also referred to as MCJ?

A    Yes.

Q    Where is it located?

A    441 Bauchet Street, Downtown L.A.

Q    Is there a facility across the street from MCJ?

A    Yes.

Q    What is the name of that?

A    Twin Towers Correctional Facility.

Q    When you were at Men's Central Jail as captain, what were your duties?

A    I was in charge of the overall security and safety of the inmates, the employees, all vendors coming into the location, ensuring that we came within budget, handling all protocols and processes we need to help inmates and deputies inside the facility.  Basically the safety and security.

Q    Where was your office at the time?

A    It was in Men's Central Jail outside of custody.

Q    Was there any one higher ranking than you that was located within Men's Central Jail?

A    No.

**UNITED STATES DISTRICT COURT**

Q        And when did you begin as captain of MCJ?

A        It would have been December of '06.

Q        When you began your tenure as captain of Men's Central Jail, did you learn about any pressing issues that you needed to deal with as captain?

A        Yes.

Q        What were those pressing issues?

A        Morale and force issues that were occurring at Men's Central Jail.

Q        When you mention "force issues," what are you referring to?

A        I was advised and did some research to find out that there were a lot of force used in that one particular facility as opposed to others, some of which were very significant uses of force.  So when I arrived, I would walk around and kind of do an assessment to find out exactly how bad the problem really was.

Q        Did anything unusual occur during these times when you were walking around?

A        Absolutely.  I remember my first walk up on to the 3000 floor, which is a one large block area.  I walked up onto the floor, and I was immediately greeted by nine, ten deputies.  They surrounded me almost like a cover wagon configuration.  And the ringleader just looked at me and asked "What are you doing up on my floor?"  And that I felt was not

only inappropriate, uncalled for, but I knew that probably seven or eight of those deputies weren't doing their job at that particular time frame.

Q    How did you know that?

A    They have a silence, and you don't huddle or you don't congregate in a particular area.  There's jobs that need to be done in the jail -- processing the inmates, sending to school, processing medical care, sending them to court.  They all had jobs.  That freeway area where they congregated at probably should have been no more than two people at that particular time.

Q    Do you recall how many ranks below you the person was who said to you, "What are you doing on my floor?"

A    He was a deputy with about two-and-a-half years on.

Q    I think we got to the captain level.  Why don't you take us down below the captain level to deputy.

A    The captain at Men's Central Jail, I have an operations lieutenant which is my right-hand man, person.  You have several lieutenants that work the floors on all the shifts.  You have sergeants that work with and for the lieutenants, and then you've got a large cadre of deputies and custody assistants.

Q    And the custody assistants are below deputies?

A    Correct.

UNITED STATES DISTRICT COURT

Q        You mentioned that one of the issues that you were alerted to that was going on at Men's Central Jail was too much force.  What did you observe when you were captain of Men's Central Jail?

A        I walked around on my first couple days, and I was very -- it was very easy to tell that the deputies were not in uniform.  I walked all the floors and managed by walking around talking to the deputies.

On each floor there's a control booth.  In those control booths, which is an isolated area, I found deputies in every one of the control booths that had broken right hands. So I would ask, "What happened to you?" and inquire.  And they would say, "It was a fight with an inmate.  Fight with an inmate."  One of them said he missed the inmate and broke the wall and hit his hand.  I found it rather unusual to see so many injuries.

I saw deputies that were not in uniform, per se, carrying the right tools to do the job properly.  A lot of the tools were locked up.  So there was a wide range of things that needed to be immediately addressed.

Q        Are you familiar with the term "force packages"?

A        Yes.

Q        What are force packages?

A        Anytime force is used on an inmate, there must be documentation.  Part of the documentation is the deputy would

need to write a report as to what led up to the incident. Any witnesses to that particular incident would have to write a report on their own. A sergeant would be there to review the force packets to ensure that everything is filled out properly and do a summary assessment of the type of force that was used -- it was appropriate, inappropriate, needed training, whatever the case may be. Sergeant's lieutenant would review it. It would go to the operations lieutenant who would review it, and then I would be the last reviewer out of Men's Central Jail.

Q    When you were with the sheriff's department, were there different types of investigations that would come out of a force incident?

A    Absolutely. Some force is completely legitimate. Others were training issues that needed to be addressed. Some were insignificant from a standpoint of didn't rise to a level of a unit investigation or internal criminal investigation. Some did rise to levels of investigations that we had to look at. Some went to our Internal Affairs, and some went to our Internal Criminal which handled the criminal element of any use of force that we saw that rose to that particular level.

Q    You mentioned how ICIB, Internal Criminal, handled the criminal elements. What did IAB, Internal Affairs, handle?

A    They would handle basically the significant uses

of force.  There were two categories when we addressed the force packet, less than significant and significant uses of force.  Significant use of force is basically a head strike to the head, hospitalization, broken bone, that type of thing, a very significant force that might have occurred.  And Internal Affairs would have first right to take a look at that force package to determine if it rose to a level that they wanted to investigate.

Q    During your time as captain and later as commander, do you know who IAB, Internal Affairs, and Internal Criminal reported to?  Did they report to you?

A    No.

Q    Who did they report to?

A    At the time I don't remember.  I think they reported directly to their chief.  It might have gone up one extra level.

Q    Do you know how force packages came into play with the investigations?  So you mentioned force packages.  Do you know how they would be used during the investigations?

A    Sure.  If a force package came to me and I took a look at it and realized training needed to be done, I would indicate that the individual, the deputy involved, would go to a training class and be retrained in a particular incident.  If it was one that led to inappropriate use of force but not criminal and not into an IA level, I would take it and impose

whatever penalty I felt was appropriate at the time frame to recorrect the bad behavior of the deputy.

Q       Did you notice anything unusual with some of the reports that you saw in the force packages?

A       Yeah.  I saw a lot of what we referred to as just boilerplate type protocols.  It was the same verbiage over and over and over again.  When I would read them, it would be, "I took my flashlight, I swung at the inmate, I missed the inmate's shoulder and hit the inmate's head."  A lot of typical boilerplate stuff that, to me, were reds flags.  It immediately stood out that something is wrong, that they're using the same thing.  Every fight, every incident in its entirety is unique in and of itself, and a lot of that was not captured.

Q       Did you do anything to fix some of the issues you just discussed?

A       Absolutely.  A lot of training.  Walked around, managed by walking around and questioned the deputies constantly on what's right, what's wrong.  How do you handle force?  A wide variety of things we would deal with.

THE COURT:  All right, ladies and gentlemen.  I think we're going to call it a day.

Again, I want to remind you, until this trial is over, you're not to discuss this case with anyone including your fellow jurors, members of your family, people involved in the trial or anyone else.  And do not allow others to discuss

the case with you.  This includes discussing the case on the Internet, through blogs, bulletin boards, by e-mails or text messages.  If anyone tries to communicate with you about this case, please let me know about it immediately.

Do not read, watch, or listen to any news reports or other accounts about the trial or anyone associated with it including looking at anything online.  Do not do any research such as consulting dictionaries, searching the Internet, or using other reference materials.  And do not make any investigation about the case on your own.

Finally, you're reminded to keep an open mind until all the evidence has been received, you've heard the arguments of counsel, the instructions of the Court, and the views of your fellow jurors.  If you need to speak with me, simply give a note to the clerk.

We're going to resume tomorrow at 8:00 a.m.  Have a nice day, and drive carefully.  We'll see you tomorrow morning.

Leave your notebooks on your chairs, please.

(The following proceedings were held in open court out of the presence of the jury:)

THE COURT:  All right, sir.  You may step down.

Do you know who is going to follow Mr. Olmsted?

MR. FOX:  Yes, Your Honor.  Robert Bayes.  Then Mickey Manzo, Cecil Rhambo, Judy Gerdhardt, Michele Miller.

What is tomorrow?  The 9th?  Okay.  She can testify tomorrow. And if we get to David Dahle, but I expect Mr. Manzo's testimony is going to be rather lengthy.

THE COURT:  All right.  Anything else?

MR. FOX:  Not from the Government, Your Honor.

MR. HOCHMAN:  Nothing, Your Honor, at this time.

THE COURT:  All right.  I'll see everybody tomorrow morning.

MR. HOCHMAN:  Thank you, Your Honor.

(A pause in the proceedings.)

THE COURT:  The record should reflect that both counsel and the defendant are present.

MR. FOX:  Thank you, Your Honor, for coming back out.

I just had a scheduling issue based on an out-of-town witness and his attorney's schedule.  I was just wondering if Your Honor was planning on having us be dark on Monday or not.  I think right now we are on schedule for what we talked about for the timeline of this case.  So I don't think there's a need to go on Monday, and that's better for the traveling witness and his counsel as well.

I think the way that we're looking at this right now, if you do not go on Monday, we are likely to rest, depending on cross and all of that, Tuesday or Wednesday of next week.

**UNITED STATES DISTRICT COURT**

THE COURT:  Okay.

MR. HOCHMAN:  No objection, Your Honor.  If you would like to not go this coming Monday, we obviously logged in this Monday of this week.  Our case is still on schedule as well depending on where the Government's case is.  So we're indifferent to the Court.  We can go on Monday or not.

THE COURT:  Okay.  How long do you anticipate your case is going to be?

MR. HOCHMAN:  If Mr. Baca testifies, three days. If Mr. Baca doesn't, one to two days.

THE COURT:  Okay.  So assuming for the moment that they rest on Wednesday, you would anticipate that you -- if Mr. Baca did not testify, you would be done by the 16th or Friday.

MR. HOCHMAN:  Yes.  I would anticipate being done by Friday.  That would be correct, Your Honor.

THE COURT:  Okay.  And if Mr. Baca testifies, we might go over to the week of the 19th.

MR. HOCHMAN:  Correct, Your Honor.

THE COURT:  All right.  Now, I, quite frankly, forgot.  How many jurors do we have that have vacation plans the week of the 19th?

MR. HOCHMAN:  I believe that nobody -- well, the 23rd, Your Honor, which is that Friday, I believe we had a couple if I'm not mistaken.  I don't know if it was -- it

wasn't the majority.  I think there was certainly one or more.

THE COURT:  I guess what I'm trying to figure out is if we have anybody that's going to be leaving who has to leave either the 19th or the 20th.

MR. FOX:  I don't think so, Your Honor.  There was one person that we considered that said that she was unavailable on the 20th for I can't remember if it was wedding or anniversary, but she's not one of our 16.

THE COURT:  Okay.  I guess what I would like to do is to make sure that we can get the case to the jury before people start breaking for the holidays.

MR. FOX:  What we can do, Your Honor, if you want to go on Monday and we run out of witnesses, if you would agree to break at that point on Monday, whenever we run out of witnesses, and then the witness who is traveling can testify first thing Tuesday.  And he will be a very short witness. This is Mr. Faturechi who my direct will, I assume, be less than ten minutes with him.  So we could do it that way.

MR. HOCHMAN:  Or, Your Honor, we could go on the 19th, that Monday, so that that way we'd have that full week. Again, if -- you know, unless Mr. Baca testifies or the Government's cross-examination becomes much longer than I anticipate, we should have all the evidence in by that Friday the 16th.  Obviously I don't know yet if Mr. Baca is going to testify, Your Honor.

UNITED STATES DISTRICT COURT

THE COURT:  Okay.  If neither side has any strong feelings, then, fine.  We don't have to go on Monday.  But we ought to leave the 19th as a possibility.

MR. FOX:  Yes, Your Honor.

MR. HOCHMAN:  Yes, Your Honor.

THE COURT:  Okay.

MR. HOCHMAN:  Thank you, Your Honor.

MR. FOX:  Thank you, Your Honor.

(Proceedings concluded at 1:42 p.m.)

**UNITED STATES DISTRICT COURT**

CERTIFICATE OF OFFICIAL REPORTER

I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

DATED THIS  10TH  DAY OF DECEMBER, 2016.


/S/ MIRANDA ALGORRI

MIRANDA ALGORRI, CSR NO. 12743, CRR
FEDERAL OFFICIAL COURT REPORTER

**UNITED STATES DISTRICT COURT**