UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

HONORABLE PERCY ANDERSON, U.S. DISTRICT JUDGE

UNITED STATES OF AMERICA,          )
                                   )
            Plaintiff,             )   Case No.
                                   )
      vs.                          )   CR 16-00066(A)-PA
                                   )
LEROY D. BACA,                     )   PAGES (1 to 45)
                                   )
            Defendant.             )
_____)

REPORTER'S PARTIAL TRANSCRIPT OF
TRIAL TESTIMONY OF ROBERT OLMSTED
THURSDAY, DECEMBER 8, 2016
8:04 A.M.
LOS ANGELES, CALIFORNIA

_____

MIRANDA ALGORRI, CSR 12743, CRR
FEDERAL OFFICIAL COURT REPORTER
312 NORTH SPRING STREET, ROOM 435
LOS ANGELES, CALIFORNIA 90012
MIRANDAALGORRI@GMAIL.COM

UNITED STATES DISTRICT COURT

**APPEARANCES OF COUNSEL:**


**FOR THE PLAINTIFF:**

        EILEEN M. DECKER
        United States Attorney
        BY:  BRANDON FOX
        BY:  EDDIE A. JAUREGUI
        Assistant United States Attorneys
        United States Courthouse
        312 North Spring Street
        Los Angeles, California 90012


**FOR THE DEFENDANT:**

        MORGAN LEWIS AND BOCKIUS LLP
        BY:  NATHAN J. HOCHMAN
        BY:  BRIANA ABRAMS
        The Water Garden
        1601 Cloverfield Boulevard
        Suite 2050 North
        Santa Monica, California 90404


        MORGAN LEWIS AND BOCKIUS LLP
        BY:  TINOS DIAMANTATOS
        77 West Wacker Drive
        Chicago, Illinois 60601

**UNITED STATES DISTRICT COURT**

## I N D E X

**THURSDAY, DECEMBER 8, 2016**

**Chronological Index of Witnesses**

Witnesses:_____    Page

OLMSTED, Robert

    Direct examination resumed by Mr. Fox            8
    Cross-examination by Mr. Diamantatos             22
    Redirect examination by Mr. Fox                 42

**UNITED STATES DISTRICT COURT**

**EXHIBITS**


**THURSDAY, DECEMBER 8, 2016**


| Exhibit | For ID | In EVD |
|---|---|---|
| 601   Document re core values | 25 | |


**UNITED STATES DISTRICT COURT**

**LOS ANGELES, CALIFORNIA; THURSDAY, DECEMBER 8, 2016**

**8:04 A.M.**

**---**

(Prior proceedings were held and reported but not included herein.)

(The following proceedings were held in open court out of the presence of the jury:)

THE CLERK:  Calling item No. 1, CR 16-66(A), USA versus Leroy D. Baca.

Counsel, state your appearances, please.

MR. FOX:  Good morning, Your Honor.

Brandon Fox and Eddie Jauregui on behalf of the United States.  Also with us at counsel table is Special Agent David Dahle of the FBI.

THE COURT:  Good morning.

MR. HOCHMAN:  Good morning, Your Honor.

Nathan Hochman on behalf of Defendant Leroy Baca. I'm joined at counsel table by Tinos Diamantatos and Briana Abrams.

I have one request.  This is the first time today I think the sun has appeared.  When I'm looking at you, Your Honor, I'm getting hit directly with the sun in my eyes. I don't know if there's a way to close the blind at least in a way that -- maybe I'll keep moving -- behind you has certain

**UNITED STATES DISTRICT COURT**

risers and then blank spaces.  If you're in the wrong section, you're completely blinded by the sun, and I couldn't see you. I don't know if you have the ability to control that.  If you do, I'd appreciate it if you could darken it at this point so I can be at counsel table when I'm addressing you.

THE COURT:  All right.

MR. HOCHMAN:  And then the other issue we were going to bring up, Your Honor -- and I discussed this with the Government -- since Mr. Olmsted is another witness that is talking about deputy abuse, we'd ask the Court to read that limiting instruction at the beginning, Your Honor.  I believe you read it before the very first witness.  Yesterday there were a couple witnesses thereafter.  We'd ask that you read it this morning again to the jury.

THE COURT:  What's the Government's position?

MR. FOX:  Your Honor, we don't object.  We'll leave it to your discretion.  The jury has heard it, but I don't think there's any harm in the jury hearing it again.

THE COURT:  That's fine.  I believe all the jurors are here.  We'll see what we can do about lowering the shade.

MR. HOCHMAN:  That's much better, Your Honor. Thank you very much.

THE COURT:  Okay.  Now, if I can just push a button and make everybody disappear.  All right.

MR. HOCHMAN:  I don't think that technology has been invented just yet, Your Honor.

THE COURT:  You'd be surprised what I have up here.

All right.  Let's bring the jury in.

MR. FOX:  Your Honor, do you want Mr. Olmsted in the gallery?

THE COURT:  That's fine.

MR. FOX:  Your Honor, I assume you don't want -- that you would like the public in now rather than waiting until the jury comes in, or what would you prefer?

THE COURT:  The public can come in now.  It's fine.

MR. FOX:  Thank you.

(The following proceedings were held in open court in the presence of the jury:)

THE CLERK:  Calling item No. 1, CR 16-66(A), USA versus Leroy D. Baca.

Counsel, state your appearances.

MR. FOX:  Good morning, Your Honor.

Brandon Fox and Eddie Jauregui on behalf of the United States.  Also with us at counsel table is Special Agent David Dahle of the FBI.

THE COURT:  Good morning.

MR. HOCHMAN:  Good morning, Your Honor.

**UNITED STATES DISTRICT COURT**

Nathan Hochman along with Tinos Diamantatos and Briana Abrams on behalf of Leroy Baca.

MR. DIAMANTATOS:  Good morning, Your Honor.

THE COURT:  Good morning.  Good morning, ladies and gentlemen.  Let's have the witness come forward, please.

THE CLERK:  You are reminded you are still under oath.

THE WITNESS:  Yes.

THE COURT:  All right.  All right, ladies and gentlemen.

Again, I want to remind you that the defendant is not on trial for any conduct, offenses, or allegations of inmate beatings or deputy abuse that are not charged in the Indictment.  You're only to determine whether the defendant is guilty or not guilty of the charges in the Indictment.

**ROBERT OLMSTED,**

**GOVERNMENT'S WITNESS, PREVIOUSLY SWORN:**

**DIRECT EXAMINATION (RESUMED)**

BY MR. FOX:

     Q     Mr. Olmsted, I believe we wrapped up yesterday with you talking about the force packages and the boilerplate language you saw in those packages.  What types of things did you do to try to fix these issues while you were captain at Men's Central Jail?

     A     Several things.  One, managed by walking around,

UNITED STATES DISTRICT COURT

getting to know everybody, talk to them, find out their personalities which is a lot.  I also requested some reports to be drawn up to determine type of forces that were being used, who was doing a lot of the force, why the force was occurring. There's a lot of different protocols and processes that I inquired about.

Q    How long were you captain at Men's Central Jail?

A    16 months.

Q    And then what happened?

A    I got promoted to commander in April of '08.

Q    When you were promoted to commander in April of 2008, how did your duties change?

A    I went from the captain of Men's Central Jail to the commander of overseeing the southern jails which would be Men's Central Jail, Twin Towers Correctional Facility, and Century Regional Detention Facility.

Q    How many captains did you have reporting to you at that point?

A    Three.

Q    Was there one captain assigned to Men's Central Jail after you left Men's Central Jail?

A    Yes.

Q    Who was that?

A    Captain Cruz, Dan Cruz.

Q    Were there any issues brought to your attention

regarding Men's Central Jail after you became commander of Men's Central Jail?

A        Quite a few.

Q        Can you please describe some of those for us in general detail?

A        In general detail, I was getting reports from various people telling me I need to look into incidents of force that transpired that are not true and accurate according to the reports that were written.  I got information that the deputies were being heavy handed again and were allowed to do so.  So again, I dealt a lot with Captain Cruz to try to reconcile the issues as well as generating more reports to try to ascertain exactly what the problems were.

Q        You mentioned earlier force packages and how they played a role in investigations.  When you were commander at Men's Central Jail, did you have a chance to look at force packages or do anything with respect to force packages?

A        Yes.  Force package, as I said yesterday, is a comprehensive review of a force incident with multiple layers in between.  So once I realized that force was being used, in my opinion, heavy handedly, again, with significant force going up dramatically according to the stats that I read, I asked to have a couple of reports authored, one of which I asked the operations lieutenant of Men's Central Jail who was a friend who confided in me, and I said, do me a favor.  Just pull 30

random reports, just random, and take a look at them.

Q       What did you find out?

A       Out of the 30, he said you'll be surprised -- you won't be surprised.  18 of the 30 were out of policy and a variety of processes whether they're minor or significant.  18 of the 30.  I read it.  I concurred.  I gave it to other people to take a look at to ensure we weren't reading too much into this or I was too close to the processes.  And they also concurred that 18 out of the 30 random reports were in violation of departmental policy.

Q       What does that mean, "out of policy"?

A       It means they weren't properly looked at or investigated.  That means the protocols weren't being followed, right questions weren't asked, heavy handedness, again, was being applied.  They didn't follow the rules and protocols of what's been established by the custody policies on use of force.

Q       What did you do with this information?

A       I gave it -- I brought that information over to my boss who was the chief of all of custody.

MR. DIAMANTATOS:  Objection.  Foundation, Your Honor.

MR. FOX:  Your Honor, I can try to lay some foundation if that's okay.

THE COURT:  That's fine.  Go ahead.

**UNITED STATES DISTRICT COURT**

Q       BY MR. FOX:  Approximately when did you bring this to your boss?

A       Probably around June -- May, June, July of '09.

Q       Who did you say that was?

A       Dennis Burns, the chief of custody division.

Q       Did anything change after you brought this information to your chief?

A       No.

Q       So what did you do next?

A       I told him that, if he can't do anything -- let me backtrack.  I said I think the problem, as I see it, is the lack of proper leadership.  And being a new captain on a large scale operation of Men's Central Jail, he needs to be transferred, and we need to bring in a tenured captain to run the place.  I said, that I see as a recommendation.  He said, "I'm not going to do it."  I told him, "If you're not going to do it, then I'm going to have to take these over your head and go to your boss and show him exactly what's going on."

Q       Who was his boss at the time?

A       Marvin Cavanaugh who was the assistant sheriff overseeing custody and courts.

Q       Did you bring this information to Mr. Cavanaugh?

A       Yes, I did.

Q       Approximately when did you do this?

A       About two weeks after, maybe a week and a half

after I met with Chief Burns.

Q      And where did this conversation with Assistant Sheriff Cavanaugh occur?

A      I went to his office with documentation in hand.

Q      What happened when you went to his office with that documentation?

A      We spoke for an hour, hour and 15 minutes.  And he looked up and said, "I can't do anything about this."  I was astounded since he is in charge of custody.  He says, "I agree, but let me see what I can do."

Q      And what happened next?

A      Next thing, about a week after that, I got a phone call from Assistant Sheriff Tanaka.

Q      What was Assistant Sheriff Tanaka's role at that time?

A      At that time he was on the other side of the shop which means he would be handling patrol and detectives.

Q      If he was handling patrol, why would he have been involved in the jails?

A      He shouldn't have, in my opinion.

Q      What happened when Assistant Sheriff Tanaka called you?

A      He seemed astounded, seemed very upset, said a few words to me, said, "Leave my office.  I'll look into it." So I left, and about ten days later I got a phone call to come

UNITED STATES DISTRICT COURT

back to his office.

Q       What happened when you went back to his office?

A       I went back to his office.  He was apologetic.
He said, "I think you might be right.  We looked into it, and
we're going to promote Dan Cruz, and you're going to help get
him promoted."

Q       Did he explain to you why a captain who was
unable to deal with these issues should be promoted?

A       He said he's the only Hispanic available in the
band to get promoted.  He said the other three Hispanics in the
captain band he will not promote.

Q       So what happened?

A       At that time a couple -- I'd say a week or two
later, Mr. Tanaka's aide was assigned as the operations
lieutenant at Men's Central Jail.  It was the game plan that
he, working for Mr. Tanaka and I, overseeing Dan Cruz, together
the two of us would try to mold Dan Cruz into a better captain.

Q       Did that occur?

A       No.

Q       Why not?

A       There were still too many issues going on, too
many fights.  Undermined -- I'm sorry.  A lot of undermining
that was going on behind doors that precluded any oversight
from my standpoint.

Q       What do you mean there was a lot of undermining

that was going on behind closed doors?

MR. DIAMANTATOS:  Objection.  Foundation.

THE COURT:  Overruled.  Go ahead.

THE WITNESS:  There were other -- I developed a cadre of good solid supervisor and deputies at Men's Central Jail, really good people.  They would call me up constantly, let me tell you what's going on, why and how things are happening.

MR. DIAMANTATOS:  Objection.  Foundation.

THE COURT:  Sustained.

Q     BY MR. FOX:  I just want to focus on, when you say "undermine," what did you mean by "undermine"?

A     I would give an order, and it wouldn't be followed by Captain Dan Cruz.

Q     At some point did you take this information to anyone above the assistant sheriff level?

A     Not until after I retired.  I take that back.  I had a personal event that occurred in my life.  I left the department for a period of time and decided it was time to retire.  I came back to an event that occurred in September of '10 where Sheriff Baca attended.  I was --

Q     Let me slow this down a little bit.

You went to this event.  Where was the event?

A     Twin Towers Correctional Facility.

Q     You said it was in September of 2010.  I believe

you're about to reference a conversation that you had.

Was anyone else present in that conversation that you had besides you and Mr. Baca?

A      I don't think so.

Q      Okay.  And what is it that happened during this conversation?

A      He was walking to the event to kind of MC the event.  I said, "Hey, boss, I think I'm going to retire.  I think it's time."  He was concerned, said, "Try to stay on as a reserve if you can."  I then told him, "We have some significant events going on at Men's Central Jail, some force issues and problems that are occurring."  And his next statement to me is, "Who do you think should take your place as commander?"

Q      How did you respond?

A      Well, I anticipated the question, but I was kind of put off or I stepped back a little bit.  I didn't expect that response to come right away.  I expected a response to my particular statement.  So I gave him a recommendation, and then he said, "Okay.  Well, let's go on to the event."

Q      Did you hear from him at any point in time, let's say, between September of 2010 and early December, 2010, about the issues you raised with him?

A      Yes.  I saw Sheriff Baca again.  I remember succinctly it was the last Sunday before Christmas in 2010.

**UNITED STATES DISTRICT COURT**

Q        Before that event that you're talking about and the September 10th event, did you hear from Mr. Baca about the issues you raised with him?

A        No.

Q        By the way, do you think you'd recognize Mr. Baca if you saw him again?

A        Oh, yes.

Q        Can you please look around the courtroom and tell me if you see him?

A        Yes.  He's sitting there.

THE COURT:  The record will reflect the witness has identified the defendant.

MR. FOX:  Thank you.

Q        You just referenced a December event that happened right before Christmas in 2010.  Where was this event?

A        This particular event was the Barker Hangar in Santa Monica.  It was a food drive event that I coordinate every year.

Q        You mentioned that you were near retirement in September of 2010.  Come this event, had you retired?

A        Yes.

Q        What happened at this event?

A        I felt it was necessary to bring up my concerns to Mr. Baca again.  He showed up around 9:00 o'clock as scheduled.  I walked up to greet him since I coordinate the

UNITED STATES DISTRICT COURT

event.  I said, "Boss, we've got some significant problems and force issues going on at Men's Central Jail.  I need to talk to you about this stuff here, and I think it's getting out of hand."  And he said, "We'll talk about it afterwards.  Let's go on with the event."  I said, "Okay."

Q    Did you hear from him in December of 2010 after that event?

A    No.

Q    What about in the next few months?  Did you hear from him, let's say, in the first quarter of 2011?

A    I did receive a phone call.  I don't remember the exact time frame.  I want to say it was June, maybe.

Q    Okay.

A    After I retired.

Q    And up until June of 2011, did you hear from Mr. Baca about any of the force issues?

A    No.

Q    Okay.  Did you meet with Mr. Baca about any of these force issues up until, say, end of September, 2011?

A    Yes.  He asked me to come to his office.  I said, "I need at least one hour to tell you everything that's going on."  And at that particular time, I think I got about ten minutes.

Q    Okay.  When, approximately, did this occur?

A    July maybe.  July of '11.

Q        And during those ten minutes, what is it that you explained to Mr. Baca?

A        I told him there's a -- again, I brought in some documentation.  Don't go anywhere without foundation.  I told him there's force issues that were going on that are out of control.  I said, "You're being undermine by your undersheriff," then.  I think he was the undersheriff at that time, Mr. Tanaka.  I told him there's a lot of -- there's going to be potential lawsuits like crazy if we don't start addressing some of the problems going on in Men's Central Jail.  Things similar to that.

Q        How did he react during that meeting?

A        I remember one particular phrase he said, when I told him, "You were being undermine by Mr. Tanaka," he said, "Yes.  Sometimes I just have to hip check him every once in a while."  And I thought of the hockey metaphor.  I remember that succinctly because I would have used a much more severe hockey metaphor than "hip check."

MR. FOX:  One moment, Your Honor.

No more questions, Your Honor.

THE COURT:  Cross-examination.

MR. HOCHMAN:  Your Honor, can we be heard very briefly at sidebar?

THE COURT:  Yes.

///

UNITED STATES DISTRICT COURT

(The following proceedings were held at sidebar:)

MR. HOCHMAN:  So, Your Honor, they -- they just brought up this meeting July, 2011, with Mr. Olmsted.  He's raising these concerns at that time where apparently it's the first time he's had these ten minutes to raise the concerns in more detail than he's done before.

The response to Olmsted's concerns, in part, was the -- which occurs literally within two months, two, two-and-a-half months, is the commander's management task force.  And the commander's management task force was set up, and part of that revised the use-of-force policy which is something that Mr. Olmsted wanted done.  It addressed the concerns in the jails because the commanders actually went back and revised many of the policies going on in Men's Central Jail.

And, again, the Government, we believe, has opened the door because you have to be able to say or to at least ask the question what was the response to your concerns?  Even if that response didn't occur before September 22nd, it is the response.  They've left the jury thinking that Mr. Baca had no response to it, and he did.

MR. FOX:  Your Honor, this is the second or third time that we've heard that Mr. Baca's response to something was this commander's management task force.  Apparently he -- I don't know the cause.  It keeps moving on us, what was the

reason for setting up this commander's management task force.

Yesterday we heard it was Chaplain Paulino that caused it. Now we're hearing it was Mr. Olmsted. The bottom line is it all happened after September 22nd of 2011. So we're talking about the prior good acts or post good acts of Mr. Baca that don't go to his intent whatsoever.

MR. HOCHMAN: In response to that, it's all of it. Mr. Baca has been told by the chaplain. Mr. Baca is being told by the ACLU. Mr. Baca -- now they've added a third person, Mr. Olmsted. It's contemporaneous, Your Honor. The chaplain talked about a July 26th, 2011, meeting. We just heard this is a July, 2011, meeting. The ACLU has reports throughout 2011.

So to not let the jury understand there's a response from Mr. Baca, even if it took -- it wasn't immediate. It didn't happen the next week. But within two months is a reasonable time frame for someone to set up an entire commander's task force, bring in six different commanders that are dedicated to fixing the problems in Men's Central Jail as well as the other jails. Otherwise, the jury thinks he did nothing, and that's not true.

THE COURT: I'm going to sustain the objection at this point. I'll look at the testimony and think about it a little more. If you need to recall somebody, if I change my mind --

MR. HOCHMAN:  Okay.  So we could not then dismiss Mr. Olmsted.  I believe he's under subpoena.  We didn't have him under subpoena, Your Honor.  So in case we have to recall him in our case, if you could just let him know he's not been dismissed and he will be contacted by the defense, if necessary.  I don't have him under subpoena.

THE COURT:  Do you have him under subpoena?

MR. FOX:  He didn't need a subpoena.  He said he did not need a subpoena.  So we did not subpoena him.  My experience with him is he's a very cooperative person and if he --

THE COURT:  We'll get him back.

MR. HOCHMAN:  Thank you very much.

MR. FOX:  Thank you, Your Honor.

(The following proceedings were held in open court in the presence of the jury:)

MR. DIAMANTATOS:  May I inquire, Your Honor?

THE COURT:  Yes.

**CROSS-EXAMINATION**

BY MR. DIAMANTATOS:

Q    Mr. Olmsted, yesterday on direct examination you described for us the various layers of command that exist.

It's true that a chain of command has to be followed; correct?

A    Correct.

**UNITED STATES DISTRICT COURT**

Q      And the chain of command that you described specifically with regard to force packages any time force was used, one of these packages had to be filled out; correct?

A      Correct.

Q      And you indicated yesterday, Mr. Olmsted, that there's times when force is appropriate; correct?

A      Correct.

Q      And there's times where force, on the other end, is inappropriate; correct?

A      Correct.

Q      Any use of force should be looked into in order to make that determination; is that right, sir?

A      It must be looked into, yes.

Q      And let's focus on the time period that you described for us yesterday, 2006 and beyond to the point of your retirement.

Was there a system in place where a deputy had to fill out a use-of-force package?

A      Yes.

Q      And then that would go to the particular deputy's sergeant; correct?

A      Correct.

Q      The lieutenant, who is in charge of the sergeant and below, would have to look into it as well; correct?

A      Correct.

UNITED STATES DISTRICT COURT

Q       And then the captain, who's above the lieutenant, would maintain oversight of that process and could also look into it; correct?

A       Correct.  And there's an operations lieutenant that collects it all and looks into it as well before they give it to the captain.

Q       So an operations lieutenant can gather all the information at that point and provide it to the captain who oversees that particular use-of-force package.

A       Correct.

Q       Am I correct that the force package should contain materials such as interview of the deputy or deputies involved in that particular --

A       Correct.

Q       Any witnesses that may have witnessed that event?

A       Correct.

Q       And made interviews that were involved?

A       Correct.

Q       And any doctor's notes or medical information stemming as the result of that use-of-force incident?

A       Correct.  They need to cooperate.

Q       When you were promoted in 2006 and you described for us yesterday your various roles with the sheriff's department and earlier this morning we heard about your promotion in 2006, who is it that promoted you, sir?

UNITED STATES DISTRICT COURT

A        I believe I was promoted in 2004, and it was Sheriff Baca that promoted me.

Q        Yet when you were promoted by Sheriff Baca in 2004, there existed a set of core values; correct?

A        Correct.

Q        Are you familiar with the core values?

A        It's been years.  I can probably recite one or two lines in it, but it's been a few years, yes.

MR. DIAMANTATOS:  Your Honor, permission to approach the bench -- the witness.

THE COURT:  What is it that you would like to do?

MR. DIAMANTATOS:  Defense exhibit, Your Honor.

THE COURT:  What's the exhibit?

MR. DIAMANTATOS:  Exhibit 601.

(Marked for identification Exhibit No. 601.)

THE COURT:  Do you have a copy?

MR. DIAMANTATOS:  Yes, Your Honor.

THE COURT:  If you'll provide that to the clerk, please.

MR. DIAMANTATOS:  A copy for opposing counsel as well.

MR. FOX:  Your Honor, I believe this is a different exhibit.  I believe you just said 601, and this is 302 on it.  I think he just said 601.

MR. DIAMANTATOS:  It should be 601.  I will alter

it on the exhibit.

THE COURT:  601 is before the witness.

Q     BY MR. DIAMANTATOS:  Mr. Olmsted, if you could take a moment to review the document that has been handed to you.  Take a moment, and let us know if you recognize it.

A     (Witness reviewed exhibit.)

Yes.  I recognize it.

Q     Are you familiar with the core values that were in place in 2006 and beyond?

A     Yes.

Q     Were they in place before that?

What's your understanding of how long they were in place, this particular set of core values?

A     At least 10, 12 years.

Q     Does this appear to be a true and accurate copy of the core values that were in place?

A     Yes, Your Honor.

MR. DIAMANTATOS:  Your Honor, the defense would move for the admission of Defense Exhibit 601.

MR. FOX:  At this point we have a relevance objection to this.

THE COURT:  Is there anything else you want to cover with him other than this?

MR. DIAMANTATOS:  Yes, Your Honor.

THE COURT:  Why don't you move on to that, and

then we'll take that up.

MR. DIAMANTATOS:  Yes, Your Honor.

Q       Thank you, Mr. Olmsted.

Earlier this morning you described for us interactions with Mr. Tanaka that you had; correct?

A       Correct.

Q       You described for us the -- in 2006 Dan Cruz was your supervisor; correct?

A       No.

Q       Describe for us the force packages you said you looked at, 30 incidents of use-of-force packages.

A       Yes.

Q       You brought those to the attention of your supervisor; correct?

A       Yes.

Q       And then you were told that you didn't seek relief and you went above that person; correct?

A       Correct.

Q       Ultimately it culminated into a conversation with at the time Assistant Sheriff Tanaka?

A       Eventually, yes.

Q       You indicated that the thought would be that Mr. Cruz would be promoted and that you and Mr. Cavanaugh would help Mr. Cruz become successful in his position; correct?

A       No.

UNITED STATES DISTRICT COURT

MR. DIAMANTATOS:  May I have a moment, Judge?

THE COURT:  Yes.

Q        BY MR. DIAMANTATOS:  Isn't it true that, during this time period, Mr. Tanaka had made it clear to you that he was in charge of promotions?

A        Yes.  He did say that.

Q        Isn't it true that he also expressed to you that it was important for him to keep -- to know the people he was promoting?

A        Yes.

Q        And he also indicated to you that he was of the view that he one day would be sheriff and would -- would be sheriff for the next 15 years?

A        He did say that.

Q        Now, as sheriff, Sheriff Baca had a number of subordinates; correct?

A        Correct.

Q        Isn't it true, Mr. Olmsted, that you observed instances where his subordinates would purposely keep him in the dark about things?

A        Yes.

Q        Isn't it true, in your view, they would even conspire to have meetings outside of Sheriff Baca's presence?

A        Yes.

Q        And they would do that before the actual meeting

**UNITED STATES DISTRICT COURT**

with the sheriff; correct?

A        That would be in the EPC meetings, yes. Executive Planning Council.

Q        Describe for us what the Executive Planning Council is, sir.

A        If I remember it correctly, they met every Wednesday, and it was all the chiefs, assistant sheriffs, undersheriff.  They would have a premeeting ahead of time to discuss the issues they were going to bring up to the sheriff. And the subsequent meeting an hour later, the sheriff would then walk in.  And this is the same process that had been in place for -- that I know of when I was working as a sergeant for 25 years when Mr. Baca was a chief as well.

Q        Yesterday you described for the members of the jury when you -- the first time you visited the 3000 floor at Men's Central Jail, that seven or eight deputies surrounded you, and immediately that struck you as bizarre; correct?

A        Yes.  Out of place.

Q        You indicated yesterday, Mr. Olmsted, that one of the reasons that was out of place was because it meant, at a minimum, five or six of those deputies weren't doing their job; right?

A        Correct.

Q        If they're corralling around you to find out why you're there, they're not where they're supposed to be;

correct?

A      Correct.

Q      You had run through for us yesterday a number of different tasks that duties are expected -- that deputies are expected to perform; right?

A      Correct.

Q      What were some of those tasks that you described for us yesterday?

A      Safety and welfare of the inmates, ensure visitors -- family visitors they can meet.  They've got doctor's appointments, court appearances.  They've got education.  They've got chaplain services.  There's a wide variety of things that the inmates need, and that's part of the deputies' jobs.

Q      So there's different tasks that deputies are expected to perform including the safety of the inmates.

You indicated chaplain visits; correct?

A      Correct.

Q      Can you briefly describe for us what you mean by that?

A      Any time they needed to talk to a clergy member or the clergy members would be walking around freely, because we have a large cadre of volunteer clergy members as well as Sunday services, that they would help expedite or escort either the inmate to the clergy member or the clergy member to the

UNITED STATES DISTRICT COURT

inmate.

Q    What about education?

A    Same thing.

Q    What about any medical visits?

A    Absolutely.  Sometimes the medical visits they would get a pass like a hall pass in school, and they would walk down to the clinic themselves.

Q    Are you familiar with -- would the deputies ever behave differently if someone of your rank was around?

A    Absolutely.

Q    Are you familiar with a code 10?

A    I believe it's -- I'm not familiar with code 10, no.

Q    Is there any announcement that deputies would make over the radio to the extent a higher up --

A    It would be a 1012 Charlie.

Q    1012 Charlie.  Sorry.  Thank you.

What does 1012 Charlie mean?

A    That means captain is walking.

Q    And all of the deputies would carry some type of radio on them, or they were supposed to; correct?

A    Correct.  They're supposed to.

Q    To the extent they had that radio on them, they would be able to communicate with one another; correct?

A    Correct.

**UNITED STATES DISTRICT COURT**

Q       One of the communications would be to indicate whenever there was a captain around; correct?

A       That was the informal process for them to, shall I say, let them know the captain is walking.

Q       And would you observe anything, any changes in behavior once that code was announced?

A       No.  Not really.  I'd be greeted at the door maybe.  It's like we knew you were coming, so let me greet you.

Q       And would that apply for all the positions that outrank captain?

A       And below.

Q       And below?

A       Lieutenant, sergeants.

Q       So any time somebody above deputy was going to be walking the central jail, these announcements would typically be made?

A       Generally, yes.  Generally.

Q       Would they be made if Sheriff Baca ever visited Men's Central Jail?

A       Yes.

Q       What about Twin Towers?

A       Yeah.

Q       You described for us a meeting that you had with Sheriff Baca.  Now, around the time that you needed to take some time for personal events in your life, you were able to

UNITED STATES DISTRICT COURT

address that with Sheriff Baca; correct?

A      Yes.  Yes.

Q      And for that reason, you had face-to-face interaction with Sheriff Baca; correct?

A      On the two times that I mentioned, yes.

Q      First -- let's take them in order.

There's an interaction with Sheriff Baca with regard to you needing to take a leave of absence; correct?

A      No.

Q      You did have to take a leave of absence from your position right before your retirement; correct?

A      Yes.

Q      And you described for us that there was an event where you had interaction with Mr. Baca, the first one that you and Mr. Fox described this morning, with regard to you approaching him to ask him to have a discussion about the force that was occurring that was troublesome.

A      Yes.

Q      Can you describe for us what type of event this was?

A      It was the initiation of a barbecue employee break area that was built at Twin Towers Correctional Facility for the welfare of the deputies at no cost to the county.

Q      Approximately how many people were in attendance?

A      Hundred I think.

UNITED STATES DISTRICT COURT

Q       So it's fair to say -- sorry.

So perhaps a hundred people; correct?

A       Correct.

Q       It's more of a social function?

A       Social, and it would be a hundred over a period of like two hours or something coming and going.

Q       So I think you indicated it was a barbecue.  So there was food being served to the guests that were there?

A       Yes.

Q       Any music in the background?

A       I don't recall.

Q       And you indicated that you brought the subject up with Sheriff Baca; correct?

A       Correct.

Q       I think Mr. Fox asked you, after that time period, if there was any follow-up from the -- before then that -- the Christmas meeting that you described, the next meeting, during that time period between the barbecue and the Christmas meeting, if Sheriff Baca ever reached out to you to continue that discussion; correct?

A       He asked me that, and the answer was "No."

Q       The answer was no.

Now, Mr. Olmsted, you certainly know where Sheriff Baca's office was, correct?

A       Sure.

UNITED STATES DISTRICT COURT

Q        Where was that located?

A        At the time Monterey Park.

Q        And you didn't travel to Monterey Park to meet with Sheriff Baca after the barbecue meeting and before the --

A        No.

Q        Did you contact -- you certainly had his desk number; correct?

A        I'm sorry?

Q        You had his desk phone number?

A        Oh, yeah.  Yeah.

Q        His cell phone number?

A        I might have.  Yeah.  I think so.

Q        You knew ways to get into contact with him over the phone?

A        Absolutely.

Q        Isn't it true that Sheriff Baca had pretty much an open-door accessible policy?

A        Yes.  Yes.

Q        I didn't mean to interrupt you, sir.

A        Yes.

Q        So if you wanted to get in touch with him to set up a meeting, you certainly could have done so.

A        Yes.

Q        Now, with regard to the second -- the other event that you described, the Christmas party, how many people were

at that event?

A        Probably a couple hundred.  They're workers.

Q        Okay.  So these are employees that work together, maybe a hundred people?

A        Yeah.  Hundred, hundred and a half, maybe close to 200 workers packaging food baskets.

Q        So, again, food at this event?

A        Yes.

Q        Social event?

A        Yes.

Q        You indicated that you brought up to Sheriff Baca -- you brought up to Sheriff Baca the -- the purpose of that particular party, was it a one-voice event?

A        No.

Q        You brought up, once again, the issue of force, and you wanted to have a conversation with Sheriff Baca about that; correct?

A        Yes.

Q        And he indicated to you, "Not now.  We should have this discussion later"; correct?

A        Yeah.  Later that day.

Q        You indicated on direct examination that Sheriff Baca never followed up with you, according to you; correct?

A        Correct.

Q    Did you ever reach out to Sheriff Baca later that day or any point thereafter?

A    No.  He left, and he was gone.

Q    Isn't it true that Sheriff Baca had suggested to you, Mr. Olmsted, that -- at this point, by the way, you're in retirement; correct?

A    Correct.

Q    Many years of service, and at this point you've retired from the sheriff's department.

A    Correct.

Q    Isn't it true that Sheriff Baca offered to you a post-retirement position or first six-month period where you would come back and serve again as a commander in the jails?

MR. FOX:  Objection, Your Honor.  Motion in limine.

THE COURT:  Sustained.

Q    BY MR. DIAMANTATOS:  On direct examination this morning, you described some type of position that Sheriff Baca offered you.

Is that right, sir?

MR. FOX:  Objection, Your Honor.

THE COURT:  Sustained.

Q    BY MR. DIAMANTATOS:  Now, Mr. Olmsted, you were still -- in 2011, I think you said you retired in September. I'm sorry.  In 2010; correct?

A       November of '10.

Q       And up until that point, you had a supervisory position over the Men's Central Jail; correct?

A       Correct.

Q       You had that supervisory position for a number of years; right?

A       Correct.

Q       You, yourself, sir, have never been charged with any type of offense stemming from the abuses that occurred in that prison; correct?

A       Correct.

Q       There are certain things in the jail system that are considered contraband; is that right?

A       Correct.

Q       What are some of those items, sir?

A       Knives, guns, drugs, stuff like that.

Q       What about cigarettes?

A       Yes.

Q       Inmates are not allowed to have that; correct?

A       Correct.

Q       What about outside food, in other words, food that isn't served as part of the prison system?

A       Yeah.  You're generally correct, yes.

Q       What about cellular phones?

A       Correct.

**UNITED STATES DISTRICT COURT**

Q        Inmates are not allowed to have those; correct?

A        Correct.

Q        Now, there is a phone system in place to the extent inmates do want to make calls to the outside; correct?

A        Yes.

Q        And that's a monitored phone system; right?

A        Yes.

Q        Where there's a clear indication that these calls would be recorded.

A        I'm not sure if that's on all the phones or just designated areas, but we do have that capability.

Q        Isn't it true, Mr. Olmsted, that one of the reasons cellular phones are contraband in the hands of inmates is because it would be unmonitored contact with the outside?

MR. FOX:  Objection.  Beyond the scope.

THE COURT:  Sustained.

MR. DIAMANTATOS:  May I have a moment, Judge?

THE COURT:  Yes.

Q        BY MR. DIAMANTATOS:  The conversation on direct examination that you described having with Sheriff Baca in July of 2010 where you told him you felt he was being undermine by Sheriff Tanaka --

A        Yes.

Q        -- that was your view that Mr. Tanaka was doing things that weren't to the advantage of Mr. Baca; correct?

UNITED STATES DISTRICT COURT

A        Yes.

Q        And you were concerned about that?

A        Yes.

MR. DIAMANTATOS:  May I have a moment, Your Honor?

THE COURT:  Yes.

Q        BY MR. DIAMANTATOS:  Mr. Olmsted, you, again, raised your concerns in July of 2011 with Sheriff Baca including the Tanaka concerns and others.

Are you aware of any response that Sheriff Baca had to the concerns you addressed with him?

MR. FOX:  Objection.  Vague.

THE COURT:  Sustained.

Q        BY MR. DIAMANTATOS:  This meeting in July of 2011, this is one that Sheriff Baca freely took with you?

A        Yes.  He initiated.

Q        He initiated it; correct?

A        Correct.

Q        And you went down and met with him; correct?

A        Right.

Q        In his office?

A        Correct.

Q        As the sheriff, aside from the responsibilities of the facilities, there's other responsibilities that sheriffs have; correct?

**UNITED STATES DISTRICT COURT**

A       Yes.

Q       Let me ask a more specific question.

There's seven facilities as far as where inmates are housed; correct?

A       Jail custody facilities?

Q       Yes.

A       Yes.

Q       So those include the Twin Towers that we've discussed; correct?

A       Correct.

Q       Men's Central Jail.

A       Correct.

Q       And others.

A       Yes.

Q       There is also a policing function as far as what the sheriff is responsible for; correct?

A       Correct.

Q       There's about 23 patrol stations around the time you retired?

A       I believe it was.  I think that's what it was.

Q       And also, the sheriff's department has police functions where there's cities that don't have their own police force, they hire essentially the police department to be their police; correct?

A       Correct.  Contract cities.

Q        And all those fall under the sheriff's umbrella; correct?

A        Correct.

MR. DIAMANTATOS:  No further questions, Your Honor.

THE COURT:  Redirect.

**REDIRECT EXAMINATION**

BY MR. FOX:

Q        Mr. Olmsted, on cross-examination you were asked about the 1012 Charlie announcements where deputies would announce when there was a supervisor on the floor; is that correct?

A        Correct.

Q        Were you still able to observe that there were problems with force in Men's Central Jail despite the 1012 Charlie announcements?

A        Absolutely.

Q        How were you able to do that?

A        There's a -- as I was stating earlier, a good cadre of deputies who knew or observed the wrongdoing but may have been afraid to speak up.  So I was barraged of information daily of various people saying look into this, look into that.

Q        Were you also able to look at paperwork and determine there were problems at Men's Central Jail?

A        Absolutely.

**UNITED STATES DISTRICT COURT**

Q        And you were asked on cross-examination about whether there were premeetings before the group would go meet with Mr. Baca on occasion; is that right?

A        Correct.

Q        Did you keep Mr. Baca in the dark about all of these issues that you talked about today?

A        No.  I was telling everyone up the chain of command that there is an issue.  I love the department, and I needed to protect the deputies and the inmates, and I wanted everybody to know.  That's why I went outside the organization too.

Q        And in 2010 and 2011, let's say, specifically between September 10th and July, 2011, did you tell Mr. Baca about these issues?

A        What were the dates again?

Q        Between September, 2010, and July of 2011, did you tell Mr. Baca about these issues?

A        Yes.  The three incidents that I mentioned, yes.

Q        Now, on cross-examination you were asked whether you've ever been charged with an offense.  Have you ever covered up the abuse that you were aware of in Men's Central Jail?

A        Absolutely not.

Q        Have you ever hid an informant from the Federal Government?

UNITED STATES DISTRICT COURT

A        No.  No.

MR. DIAMANTATOS:  Objection, Your Honor.

THE COURT:  Overruled.

Q        BY MR. FOX:  Have you ever tampered with any witnesses in a federal investigation?

A        No.  Never.

Q        Have you ever sent deputies to a federal agent's house who was attempting to investigate the department?

A        No.

MR. DIAMANTATOS:  Objection, Your Honor.

THE COURT:  Overruled.  You opened the door.

MR. FOX:  Thank you, Your Honor.  No further questions.

THE COURT:  Anything else?

MR. DIAMANTATOS:  No, Your Honor.

(Further proceedings were held and reported but not included herein.)

**UNITED STATES DISTRICT COURT**

CERTIFICATE OF OFFICIAL REPORTER

I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

DATED THIS  10TH  DAY OF DECEMBER, 2016.


/S/ MIRANDA ALGORRI

MIRANDA ALGORRI, CSR NO. 12743, CRR
FEDERAL OFFICIAL COURT REPORTER

**UNITED STATES DISTRICT COURT**