**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION**

**HONORABLE PERCY ANDERSON, U.S. DISTRICT JUDGE**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. |
| | ) | |
| vs. | ) | CR 16-00066(A)-PA |
| | ) | |
| LEROY D. BACA, | ) | PAGES (1 to 23) |
| | ) | |
| Defendant. | ) | |

**REPORTER'S PARTIAL TRANSCRIPT OF**
**TESTIMONY OF CECIL RHAMBO**
**FRIDAY, DECEMBER 9, 2016**
**1:15 P.M.**
**LOS ANGELES, CALIFORNIA**

**MIRANDA ALGORRI, CSR 12743, CRR**
FEDERAL OFFICIAL COURT REPORTER
312 NORTH SPRING STREET, ROOM 435
LOS ANGELES, CALIFORNIA 90012
MIRANDAALGORRI@GMAIL.COM

**UNITED STATES DISTRICT COURT**

**APPEARANCES OF COUNSEL:**

**FOR THE PLAINTIFF:**

    EILEEN M. DECKER
    United States Attorney
    BY:  BRANDON FOX
    BY:  EDDIE A. JAUREGUI
    Assistant United States Attorneys
    United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012

**FOR THE DEFENDANT:**

    MORGAN LEWIS AND BOCKIUS LLP
    BY:  NATHAN J. HOCHMAN
    BY:  BRIANA ABRAMS
    The Water Garden
    1601 Cloverfield Boulevard
    Suite 2050 North
    Santa Monica, California 90404

    MORGAN LEWIS AND BOCKIUS LLP
    BY:  TINOS DIAMANTATOS
    77 West Wacker Drive
    Chicago, Illinois 60601

**UNITED STATES DISTRICT COURT**

# I N D E X

**FRIDAY, DECEMBER 9, 2016**

## Chronological Index of Witnesses

Witnesses:_____    Page

RHAMBO, Cecil

    Direct examination by Mr. Fox                       6
    Cross-examination by Mr. Diamantatos               13

**UNITED STATES DISTRICT COURT**

4

**EXHIBITS**


**FRIDAY, DECEMBER 9, 2016**


|                      | For ID | In EVD |
|----------------------|--------|--------|
| Exhibit              |        |        |
| 684   Document       | 15     |        |


**UNITED STATES DISTRICT COURT**

**LOS ANGELES, CALIFORNIA; FRIDAY, DECEMBER 10, 2016**

**1:15 P.M.**

**---**

(The following proceedings were held in open court in the presence of the jury:)

THE COURT:  Call your next witness.

MR. FOX:  The United States calls Cecil Rhambo.

THE CLERK:  Please raise your right hand.

Do you solemnly state that the testimony you may give in the cause now pending before this court shall be the truth, the whole truth, and nothing but the truth, so help you god?

THE WITNESS:  Yes.

THE CLERK:  Please be seated.

Could you state your full name and spell your last name for the record.

THE WITNESS:  My full name is Cecil Rhambo, R-h-a-m-b-o.

THE CLERK:  Thank you.

MR. FOX:  May I proceed, Your Honor?

THE COURT:  Yes, please.

///

///

///

**UNITED STATES DISTRICT COURT**

**CECIL RHAMBO,**

**GOVERNMENT'S WITNESS, SWORN:**

**DIRECT EXAMINATION**

BY MR. FOX:

Q        Mr. Rhambo, what do you do for a living?

A        Currently I'm the assistant city manager for the city of Carson.

Q        How long have you been doing that?

A        Since July of 2014.

Q        What did you do before that?

A        I worked -- I was employed for Los Angeles County by the L.A. County Sheriff's Department.

Q        For how long?

A        33 years.

Q        What was your title in August and September of 2011?

A        Assistant sheriff.

Q        What were your duties?

A        I was in charge of roughly half the department. I had custody, court services division, all the training in the department and records bureau, crime lab, just -- communications, fleet.

Q        As of August of 2011, how long had you been assistant sheriff?

A        I'm thinking maybe May, June -- maybe three

**UNITED STATES DISTRICT COURT**

months.

Q    What was the position you held before that?

A    I was a division chief in field operations region II.

Q    What happened with the assistant sheriff level that allowed you to receive a promotion?

A    One of -- I believe one of the assistant sheriffs retired.  No.  Actually, the undersheriff retired, and Mr. Tanaka was promoted up, and that left a vacancy.

Q    And you took that vacancy?

A    I took -- I think Mr. Tanaka was in charge of patrol, and I took the vacancy -- Mr. Cavanaugh went to the patrol side, and I took the custody side.

Q    Who selected you to be assistant sheriff?

A    Sheriff Baca.

Q    Who selected the undersheriff?

A    Sheriff Baca.

Q    How long had you known Mr. Tanaka at that point?

A    Since 1983.

Q    What about Mr. Baca?

A    Well, he was in the department since '65.  So we knew of him.  I personally knew him since the mid 90's.

Q    And when you were at the executive levels, would you have an opportunity to interact with both Mr. Baca and Mr. Tanaka?

8

A      Yes.

Q      Could you please describe their relationship as it existed up until September of 2011?

A      The sheriff's relationship with Mr. Tanaka was professional.  Probably a little closer -- almost personal.  I think the sheriff viewed Paul as kind of mentoring him.  Almost father son sort of.

Q      When you were in charge of custody as assistant sheriff, what were your duties?

A      I oversaw the division chief in custody.  As the assistant sheriff, custody was just one part but a very large part of that responsibility.  So, you know, the day-to-day management or administration of custody at that point went through the division chiefs.

Q      Who did you report to?

A      Directly to Mr. Tanaka.

Q      Where was your office located?

A      It was located on the fourth floor in the southwest portion of the building.

Q      When you first became assistant sheriff over custody, can you please describe the relationship between the ACLU and the sheriff's department?

A      It was -- if I'm recalling the time frame, the ACLU was bringing some things to the sheriff's attention, to our department's attention that they were very concerned about.

**UNITED STATES DISTRICT COURT**

So they were raising the flag like, you know, you need to pay attention to some things that are going on.

Q     I'm going to show to you what's in evidence now as Government Exhibit 19.  It will be on your screen.

Do you see this e-mail, Mr. Rhambo?

A     Oh, yes.

Q     Can you please read what Mr. Thompson wrote to you on August 19 at 3:40 p.m.?

A     It says, "Sir, I met with the sheriff, Mr. Tanaka, Tom Carey, and IIB in regards to the cell phone. Too much to type.  I'm on the SHB patio waiting to brief you."

Q     Around this time, did you learn some information about a cell phone that was found in custody?

A     Yes.

Q     What did you -- well, how did you learn it?

A     I can's remember if I heard it from the briefing on the patio or if I heard it just in the discussions.  I don't remember exactly how I heard the --

Q     Please read the e-mail that you wrote to Mr. Thompson at 9:51 p.m.

A     I said, "Paul briefed me.  We went to see the sheriff.  I was given a partial briefing.  I don't even want to know."

Q     At some point in time, however, you learned that that cell phone was linked to the FBI; is that correct?

UNITED STATES DISTRICT COURT

A        Yes.

Q        Did you happen to have a conversation with anybody that was in your chain of command above you at that point?

A        The sheriff and I both spoke briefly one evening, but -- so there was some discussion, you know, when this was happening.

Q        Specifically, as it related to the inmate, did you have any discussions with Mr. Baca about the inmate?

A        I don't know so much about the inmate but more so about the FBI's investigation.

Q        When did this conversation occur as best as you can recall?

A        Sometime shortly after there was the hubbub about the phone and it being -- I don't remember exactly.  Probably August, September.  I don't remember exactly.

Q        Who was present in this meeting that you had with Mr. Baca?

A        It was just the sheriff and I actually in his office.

Q        And what is it that you said -- well, what is it that he said to you or you said to him at that time?

A        Well, so when you're working in the sheriff's office, sometimes the sheriff would be there really late.  So I walked in, and he was real calm, and he was talking about the

UNITED STATES DISTRICT COURT

phone.  And he said, "Hey, you know, they committed a crime by bringing this phone in.  And, you know, I don't know why Martinez or the head of the FBI couldn't just talk to me.  Why couldn't we just have a discussion about this, you know?"

Q      What did you say in response to that?

A      Well, is it okay to use profane language?  So the bottom line is I told him -- so I worked undercover for the feds in the late 80's.  So I told him, "Look, don't 'F' around with the feds."  Don't -- I know there was some talk about something to do with this agent who planted the phone, and I just said, "Don't do that.  Don't do that.  You know, they're not going to cooperate with us.  We're the suspects."

Q      Did you provide Mr. Baca with any advice about what to do with the inmate who was the FBI's informant?

A      I don't recall, but if I did, it would have been, "Give them their phone.  Give them their inmate."

MR. DIAMANTATOS:  Objection, Your Honor.  Speculation.

THE COURT:  Sustained.  The answer is stricken.  The jury should disregard it.

Q      BY MR. FOX:  What else did Mr. Baca say to you in that conversation?

A      I don't remember.  I just know the conversation resolved around why -- you know, the FBI was like our partner, you know, and we could have worked this out and, you know,

bringing the phone in was a crime.  And I had to explain to him, you know, having worked narcotics in that world, I mean, I bought kilos of cocaine from folks.  I would violate the law to enforce the law.  That kind of happens.  And the feds will let thousands of dollars walk on the street.  I mean, it's part of the investigative -- what we do.

Q        Did you have a discussion with Mr. Baca about the special agent who had been involved in that undercover operation and whether the sheriff's department was going to do anything about her?

MR. DIAMANTATOS:  Objection.  Foundation, Your Honor.

THE COURT:  You can answer that question.

THE WITNESS:  Again, if I recall correctly, I mean, if we were talking about it, I kind of knew that they were thinking about intimidating or somehow talking to this agent.

MR. DIAMANTATOS:  Objection, Your Honor.  Nonresponsive to the question.

THE COURT:  Overruled.

THE WITNESS:  Again, I just told him don't -- you know, there's a -- in regular law enforcement, there's the 148 which is obstruction.  You know, I said, "If you do that, that's obstruction of justice.  Don't do that."

Q        BY MR. FOX:  How did he respond to you?

A        "They broke the law."

Q        Did Mr. Baca reference any meetings that he had coming up?

A        He may have, but I don't remember.

MR. FOX:  No further questions at this time, Your Honor.

THE COURT:  Cross-examination?

MR. DIAMANTATOS:  Thank you, Your Honor.

May I proceed?

THE COURT:  Yes.

MR. DIAMANTATOS:  Thank you.

**CROSS–EXAMINATION**

BY MR. DIAMANTATOS:

Q        Assistant Sheriff Rhambo, you indicated that the meeting that you had with Sheriff Baca, as far as when it occurred, you had already heard some discussion of a Special Agent Leah Marx being approached potentially; correct? That was part of the information that you knew of when you had this meeting with Sheriff Baca.

Is that accurate, sir?

A        I had heard some discussion about it.  I didn't know the agent's name or any of that.

Q        Okay.  But you had -- when you had the meeting with Sheriff Baca, you already had the understanding that there was going to be approach of some agent regardless of what her

**UNITED STATES DISTRICT COURT**

name was; correct?

A        Possibly.  Maybe a criminal report written like a criminal complaint written.

Q        And you indicated that the conversation that you had with Sheriff Baca, he was questioning, you know, why didn't the FBI partner with us on this one; correct?

A        Correct.

Q        Is it true, Assistant Sheriff Rhambo, that, over the course of your career, you, in fact, had partnered with federal law enforcement on different matters?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

Q        BY MR. DIAMANTATOS:  Did it shock you that Sheriff Baca wanted to partner with federal law enforcement?

MR. FOX:  Objection, Your Honor.

THE COURT:  Sustained.

Q        BY MR. DIAMANTATOS:  When you told -- you indicated that you gave certain advice to Sheriff Baca as far as "Don't F with the feds."

Correct?

A        Yes.

Q        And you went back and discussed with him your experiences in undercover officer and telling him you don't want to mess with him; correct?

A        Correct.

UNITED STATES DISTRICT COURT

Q        Didn't Sheriff Baca in response say to you that he planned to talk to Andre Birotte?

A        He may have.  I don't recall.

Q        Is there anything that would refresh your memory?

Go ahead, sir.  I didn't mean to speak over you.

A        If I testified earlier that I said that, I don't remember.

Q        I just want what you recall, sir.

Would something refresh your memory about those events?

A        Perhaps a tape-recorded session.  I don't know.

MR. DIAMANTATOS:  May I approach the Court, Your Honor, just to provide to refresh the witness' recollection on this event?

THE COURT:  You want to -- I'm sorry.  You want to come to sidebar?

MR. DIAMANTATOS:  Yes, Your Honor.  Approach the Court to hand an exhibit to the witness to refresh his recollection, Your Honor.

THE COURT:  Yes.  Show it to counsel.  You can provide it to the clerk.

MR. DIAMANTATOS:  Showing opposing counsel what's been marked for identification as Defense Exhibit 684.

(Marked for identification Exhibit No. 684.)

Q        BY MR. DIAMANTATOS:  One moment, sir.  I'm going

to tell you where to look specifically and read to yourself.

Okay.  Sir, just for the record, I'm showing you what has been marked for identification as Defense Exhibit 685.  Please take a moment, sir, to -- 684.  684.  My apologies.  I'm going to ask you to read the bottom of page 41, sir, on to page 42.  Please read it quietly to yourself.  When you're finished, let his Honor know.

A       (Witness reviewing exhibit.)

Okay.

Q       Have you read that --

THE COURT:  Close that, please.

Q       BY MR. DIAMANTATOS:  If you put that to the side, sir.

Is your memory refreshed with regard to how Sheriff Baca responded to you telling them, "Don't mess -- 'F' with the feds"?

A       Yes.

Q       How did he respond?

A       He said that he was going to go talk to Mr. Birotte.

Q       Did you have an understanding of who he was referring to -- I'm sorry.

Did he say Mr. Birotte or --

A       Andre.

Q       So he used the first name?

**UNITED STATES DISTRICT COURT**

A       I believe so, but I don't know.

Q       Do you need to re-refer back to what you read to refresh your memory?

MR. FOX:  Objection, Your Honor.  I'll withdraw the objection.

THE WITNESS:  Well, what I read was that he said Andre Birotte --

THE COURT:  Don't tell us what you read.

MR. DIAMANTATOS:  I'll put another question to the witness, Your Honor.

Q       What was your understanding of who Andre Birotte was?

A       At the time he was the U.S. Attorney in charge on the West Coast.

Q       Okay.  So he was the U.S. Attorney, you said, on the West Coast.  He was the U.S. Attorney for the Central District of California?

A       Yes.

Q       Now, does he still hold that position?

A       I don't believe so.

Q       He's actually on the bench; correct?

A       I guess, yes.

Q       But certainly, at the time Sheriff Baca is telling you this, you understood who he was referring to when he said "Andre Birotte."

**UNITED STATES DISTRICT COURT**

Correct?

A       Yes.

Q       It was your understanding that Sheriff Baca wanted to go talk to Andre Birotte about it; correct?

A       Yes.

MR. DIAMANTATOS:  May I have a moment, Your Honor?

THE COURT:  Yes.

Q       BY MR. DIAMANTATOS:  Assistant Sheriff Rhambo, you did not attend the August 29, 2011, meeting with Sheriff Baca and U.S. Attorney Andre Birotte; correct?

A       Correct.

Q       You did not attend a meeting on September 27 with the sheriff, U.S. Attorney Andre Birotte, and FBI assistant director in charge Steve Martinez.

A       No.

Q       You were not present for a Saturday morning meeting that occurred on August 20th of 2011.

Isn't that true, sir?

A       Yes.  That's true.

MR. DIAMANTATOS:  May I have a moment, Your Honor?

THE COURT:  Yes.

MR. DIAMANTATOS:  Nothing further, Your Honor, at this time.

UNITED STATES DISTRICT COURT

MR. FOX:  Nothing, Your Honor.

THE COURT:  All right.  Sir, you may step down.  Thank you very much.

Ladies and gentlemen, again, I want to remind you, until this trial is over, you're not to discuss this case with anyone including your fellow jurors, members of your family, people involved in the trial, or anyone else.  And do not allow others to discuss the case with you.  This includes discussing the case on the Internet, through bulletin boards, by e-mails or text messages.  If anybody tries to communicate with you about this case, please let me know about it immediately.

Do not watch, read, listen to any news reports or other accounts about the trial or anyone associated with it.  Don't look online.  Don't do any research such as consulting dictionaries, searching the Internet, or using other reference materials.  And do not make any investigation about the case on your own.

Finally, you're reminded to keep an open mind until all the evidence has been presented, you've heard the arguments of counsel, the instructions of the Court, and the views of your fellow jurors.  If you need to speak with me, simply give a note to the clerk.

Now, I'm going to ask that you return to the jury room, and I think -- and we'll have somebody come back and tell

you when you can leave.  But we may need you for another maybe about five minutes.  All right.

So why don't you leave your notebooks on your chairs.  Have a nice weekend.  We won't be in session on Monday.  We're going to resume on Tuesday at 8:00 o'clock.

(The following proceedings were held in open court out of the presence of the jury:)

THE COURT:  All right.  Ask Alternate No. 2 to step in for a moment, please.

MR. FOX:  While we're waiting for him, do you want me to provide you with our Tuesday list?

THE COURT:  Sure.  That's fine.  Wait for a second.

MR. FOX:  I think Mr. Montes Kerr left.

THE COURT:  Okay.

MR. FOX:  Special Agent David Dahle, Tara Adams, Gilbert Michel, William David Courson, Mike Hannemann, and I think that's probably going to do it for the day.  And I think we're still on track for, depending on obviously cross, Wednesday is looking like when we hopefully will rest.

THE COURT:  Okay.

MR. FOX:  And, Your Honor, we do have one special consideration with Special Agent Tanner.  I think I explained to you earlier and you saw a few months ago that she has given birth at this point and she has twins.  They are a couple of

**UNITED STATES DISTRICT COURT**

weeks old.  She will need some special considerations from the witness stand where she will need to take breaks.

THE COURT:  All right.

(The following proceedings were held in open court in the presence of Alternate Juror No. 2:)

THE COURT:  All right, sir.  If you could just have a seat there for a minute, please.

Did you send me a note?

ALTERNATE JUROR NO. 2:  Yes, Your Honor.

They did two implants, one in my upper and one in my lower.  And the one in the lower came up.  So I'm going to Loma Linda on Monday.  So I was wondering, do you think we'll be here in January still?

THE COURT:  No.

ALTERNATE JUROR NO. 2:  Okay.  So I can schedule --

MR. HOCHMAN:  I didn't hear the question he asked.

THE COURT:  He wanted to know if we would still be here in January.

MR. HOCHMAN:  I see.  Thank you.

ALTERNATE JUROR NO. 2:  So I can schedule to redo it on that week, first week of January?

THE COURT:  Sure.  Yeah.

ALTERNATE JUROR NO. 2:  Thank you, Your Honor.

(The following proceedings were held in open court out of the presence of the jury:)

THE COURT:  Okay.  Have a nice weekend.  We'll see everybody Tuesday at 8:00.

MR. HOCHMAN:  Thank you, Your Honor.

MR. FOX:  Thank you, Your Honor.

(Proceedings concluded at 1:40 p.m.)

**UNITED STATES DISTRICT COURT**

CERTIFICATE OF OFFICIAL REPORTER

I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

DATED THIS  10TH  DAY OF DECEMBER, 2016.

/S/ MIRANDA ALGORRI

MIRANDA ALGORRI, CSR NO. 12743, CRR
FEDERAL OFFICIAL COURT REPORTER

**UNITED STATES DISTRICT COURT**