UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

HONORABLE PERCY ANDERSON, U.S. DISTRICT JUDGE

UNITED STATES OF AMERICA,       )
                                )
            Plaintiff,           )   Case No.
                                )
       vs.                      )   CR 16-00066(A)-PA
                                )
LEROY D. BACA,                  )   PAGES (1 to 30)
                                )
            Defendant.          )
_____)

REPORTER'S TRANSCRIPT OF
TESTIMONY OF MARK ROSENBAUM
WEDNESDAY, DECEMBER 7, 2016
11:41 A.M.
LOS ANGELES, CALIFORNIA

MIRANDA ALGORRI, CSR 12743, CRR
FEDERAL OFFICIAL COURT REPORTER
312 NORTH SPRING STREET, ROOM 435
LOS ANGELES, CALIFORNIA 90012
MIRANDAALGORRI@GMAIL.COM

UNITED STATES DISTRICT COURT

**APPEARANCES OF COUNSEL:**


**FOR THE PLAINTIFF:**

    EILEEN M. DECKER
    United States Attorney
    BY:  BRANDON FOX
    BY:  EDDIE A. JAUREGUI
    Assistant United States Attorneys
    United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012


**FOR THE DEFENDANT:**

    MORGAN LEWIS AND BOCKIUS LLP
    BY:  NATHAN J. HOCHMAN
    BY:  BRIANA ABRAMS
    The Water Garden
    1601 Cloverfield Boulevard
    Suite 2050 North
    Santa Monica, California 90404


    MORGAN LEWIS AND BOCKIUS LLP
    BY:  TINOS DIAMANTATOS
    77 West Wacker Drive
    Chicago, Illinois 60601

**UNITED STATES DISTRICT COURT**

# I N D E X

**WEDNESDAY, DECEMBER 7, 2016**

**Chronological Index of Witnesses**

Witnesses:                                                          Page

ROSENBAUM, Mark

    Direct examination by Mr. Fox                          6
    Cross-examination by Mr. Hochman                       18
    Redirect examination by Mr. Fox                        26

**UNITED STATES DISTRICT COURT**

4

**<u>EXHIBITS</u>**


**WEDNESDAY, DECEMBER 7, 2016**


| Exhibit | For ID | In EVD |
|---|---|---|
| 9    ACLU Correspondence Rosenbaum to Baca | 10 | 10 |


**UNITED STATES DISTRICT COURT**

**LOS ANGELES, CALIFORNIA; WEDNESDAY, DECEMBER 7, 2016**

**11:41 A.M.**

**---**

(The following proceedings were held in

open court in the presence of the jury:)

(Further proceedings were held and

reported but not included herein.)

THE COURT:  Call your next witness.

MR. FOX:  Your Honor, the United States calls Mark Rosenbaum.

THE CLERK:  Sir, please stand here and raise your right hand.

Do you solemnly state that the testimony you may give in the cause now pending before this court shall be the truth, the whole truth, and nothing but the truth, so help you god?

THE WITNESS:  Yes, I do.

THE CLERK:  Please have a seat.

Would you state your full name and spell your last name for the record.

THE WITNESS:  I'm Mark D. Rosenbaum, R-o-s-e-n-b-a-u-m.

THE CLERK:  Thank you.

MR. FOX:  Your Honor, may I proceed?

THE COURT:  Yes.

MR. FOX:  Thank you.

**MARK ROSENBAUM,**

**GOVERNMENT'S WITNESS, SWORN:**

**DIRECT EXAMINATION**

BY MR. FOX:

Q      What do you do for a living?

A      I'm an attorney.

Q      Where do you work?

A      I work with Public Counsel here in Los Angeles.

Q      What is Public Counsel?

A      Public Counsel is a public interest civil rights group.  We do direct service work, and we also do impact litigation.  We're the largest pro bono law firm in the United States.  We're affiliated with the Lawyer's Committee for Civil Rights.

Q      How long have you been with the Public Counsel?

A      Around two years, a little bit over two years.

Q      Where did you work before that?

A      Before that I worked at the ACLU of Southern California.

Q      For how long did you work for the ACLU of Southern California?

A      For 40 years.

Q      What were your duties then?

**UNITED STATES DISTRICT COURT**

A       Well, I ran the gamut.  I started as a staff counsel.  Then after a number of years, I became general counsel, and then I ultimately became legal director.  I think that was the order.  I did all manner of civil rights and civil liberties litigation, particularly in the area of race and poverty, education.  But a whole series of cases.

Q       Can you describe what the ACLU is?

A       Well, I hope so.  The ACLU is part of a national organization.  It is concerned with assuring that constitutional values are respected.  It uses a variety of mechanisms to work on that including litigation as well as grassroots organizing, lobbying, legislation.  We look at any number of issues and matters that raise serious constitutional questions with respect to government and sometimes with respect to private parties.

Q       While you were with the ACLU, did it have any responsibilities as it related to the sheriff's department?

A       Yes.  Yes, we did.

Q       What were those responsibilities?

A       In the mid to late 70's, we filed litigation, rather, referred litigation with respect to conditions in the county jail system, particularly Men's Central Jail, but really throughout the jail system.  And as a result of that litigation, an order was issued to correct serious conditions. There were a whole variety of sets of conditions.

My recollection is, in the mid 80's, we became involved in assuring there would be compliance.  We had access to the jails, and on a number of matters what the -- which Judge Gray at the time, Federal Judge Gray, issued his order, our job was to work to ensure that his order was complied with.

Q       You mentioned that this was filed in the 70's, and you referenced the 80's.  For how long of a period of time did this litigation continue?

A       It's still continuing.

Q       Right now are you aware of what the ACLU's duties are with respect to the jails?

A       I can tell you what they were at the time I left.  I don't know for certain what they are currently.

Q       Then let me direct you to the late 2000's.

First of all, what were your duties at the ACLU in the late 2000's?

A       You know, I can't remember if I was legal director or general counsel or both, but I had major supervision responsibilities.  Those responsibilities included working with the individual who had access to the jails.  It was a series of persons who had that responsibility.  But my job was to work with the social worker who went in there, work with her team, and where necessary, go to court to deal with issues that could not be resolved informally.

Q       I want to direct your attention to Exhibit 9.  It

should be, I believe, to your left in the cabinet there, bookshelf there.

A        Okay.  I have that.

Q        What is Exhibit 9?

A        Can I just have a moment to review it, please?

Q        Yes.

A        (Witness reviewing document.)

This was a letter that I signed along with Margaret Winter who worked with the ACLU National Prison Project who was brought in to assist us on the case and Melinda Byrd who had worked at the ACLU in the capacity of working with the jails and then had moved on to disability rights California.

It was a letter that we sent to Sheriff Baca that expressed our concerns.  My recollection is that we also sought to meet with him regarding those concerns about retaliation and abuse of individuals who were in the jails.

Q        Mr. Rosenbaum, is Exhibit 9 a true and accurate copy of the letter that you sent to Mr. Baca at the time?

A        Yes, it certainly is.

MR. FOX:  Your Honor, I move for the admission of Government Exhibit 9.

MR. HOCHMAN:  No objection.

THE COURT:  It will be received.

///

(Marked for identification and received into evidence Exhibit No. 9.)

MR. FOX:  May I publish it, Your Honor?

THE COURT:  Yes.

Q      BY MR. FOX:  Mr. Rosenbaum, can you see what I've put on the screen?

A      I do.

Q      Is this the letter you were just referring to?

A      Yes, it is.

Q      What is the date of this letter?

A      October 28, 2009.

Q      And who is it addressed to?

A      Sheriff Leroy Baca.

Q      I'd like you to read the first paragraph of your letter.

A      We are requesting -- "We are writing to request a personal meeting with you to discuss a series of grave allegations that have come to light through our monitoring of the conditions at Men's Central Jail, MCJ.  We have documented a persistent and increasing number of retaliation incidents when inmates have complained about conditions in the jail. Attached are copies of new declarations from inmates describing acts of retaliation and deputy misconduct as well as some additional declarations that are already under investigation by department staff."

**UNITED STATES DISTRICT COURT**

Q       Twice in that paragraph it refers to declarations.  What are you referring to there?

A       A declaration is a legal document.  It is a document where an individual recites what he or she observes or knows, signs his or her name to it, and it has the force and effect of testimony.  We regularly in this case as well as other cases, we'd speak to individuals who had percipient knowledge -- actual knowledge of circumstances, and then we'd ask them to work to draft declarations that would disclose what they observed or what they knew.

Q       And this discusses in the last line declarations that are already under investigation by the department staff.  Can you please explain what that means?

A       Yes.  We would regularly under -- under the work of Mary Tiedeman, who was the individual who was most in the jails, would collect declarations, and then we would submit those declarations to members of the sheriff's department.  Those declarations would document concerns with respect to compliance with the Court order that you and I discussed a few moments ago.

Q       I'm now highlighting the second paragraph for you.  Can you please read that?

A       Sure.  "These complaints of retaliation came to our attention last year, and since then we have tried to work collaboratively with your department to respond.  The

**UNITED STATES DISTRICT COURT**

department created a system whereby complaints that we report are tracked and investigated by a designated sergeant.  Over the course of about a month, we submitted more than 15 complaints to the department for investigation."

Q    I'm now highlighting the third paragraph.  Can you please read this.

A    Certainly.

"However, our joint efforts have not been adequate to address the problem of retaliation and excessive force which has continued to worsen despite the creation of the reporting process."

Q    I'm going to now highlight the middle portion of the second page.

A    "We request that the department make every effort to ensure that these inmates are not subjected to additional retaliation or injury and that their safety is protected.  We have made this request every time we have submitted declarations regarding deputy misconduct as the inmates who agree to cooperate with us have already been injured and are very fearful of another violent incident.  We note harassment and deputy retaliation has continued and worsened for several of the new people submitting declarations and for at least one person whose statement we provided to the department earlier this year."

Q    Now I ask you to read -- and, by the way, this is

probably pretty clear to everyone, but we've seen some black on the first page and on the second page of this letter. Do you know if this is what's known as redactions?

A        Yes.  Exactly.

Q        The original letter had some text in there.  So this is not how the original document looked; is that right?

A        That's correct.

Q        Please read the last paragraph on the second page.

A        "We would also like to discuss the timing and independence of the investigations into these complaints by Rutherford class members."  Rutherford is the name of the case. That's my language.  "The investigation process is very slow. Many of these investigations have been pending for months without any report back to us on the outcome or the process. If our clients are to have any confidence in the process, prompt results are critical.  The department also assures us that the investigations are very thorough, but we have serious concerns about the impartiality of the investigation in the one case on which we have been --"

Q        And I'll now take you to the top of the next page.

A        "-- briefed -- on the one case we have been briefed in the case" -- and then there's a redaction.  "The department concluded that charges were unfounded after

interviewing the deputy who denied any retaliatory statements. Neither the inmate nor his attorney was interviewed, and there was apparently no assessment of whether the deputy's use of force was excessive.  We would like to discuss whether these investigations can be referred to an independent entity rather than being investigated internally.

"We encourage you to share this letter with your staff and counsel.  It is imperative that we meet promptly.  We are ready to meet at your earliest convenience and await confirmation of a date and time when you are available for a meeting."

Q      On the second page that we just discussed, you questioned the independence of these investigations.  What did you mean by that?

A      We regularly made reports when we had documentation of abuse or retaliation.  That was submitted, as you asked me earlier, to department personnel, but we have no knowledge of what the process was, how determinations were made, who was interviewed, if anyone, what took place.  We consistently got back reports that there was no basis to the claims, but as this letter indicates, we also received information that the people who were involved in the process were not spoken to and that there had been retaliation.

So we urged repeatedly that the process be set up so that outside individuals who had no stake in the outcome

could be involved in making a serious and thorough independent investigation.

Q        Did you have specific entities that you were referring to there or that you were trying to imply that you would go to?

A        I honestly don't recall.  I know we worked with OIR.  I think we worked with -- I'm forgetting the gentleman's name who was involved with the jails, but I can't recall exactly to whom we were making reference.

Q        Did you, during your position with the ACLU, ever have an opportunity to meet with Sheriff Leroy Baca?

A        Yes.

Q        Approximately when did that occur?

A        Sometime shortly after this letter was sent.

Q        And where did this meeting occur?

A        I'm not certain.  I think it was Bauchet.  I think it was near the Men's Central Jail.  It could have been elsewhere, but that's my best recollection.

Q        Do you recall who with your staff attended that meeting with you?

A        I recall at least some of the people who were there.  The executive director of the ACLU Ramona Ripston I recall being present.  I recall that Mary Tiedeman, who, as I said, was the individual who was tasked with the responsibility of being in the jail, she was present.  I don't know if anyone

else was present.

Q    What about on the other side?  Who was there from the sheriff's department?

A    There were a number of persons who were there.  I know Sheriff Baca was present.  I remember Assistant Sheriff Cavanaugh being present.  There were a number of other people that were present at the table.  It was a large table. We had a number of meetings over the years.  And so I would be -- I would be filling in based on that.  I couldn't tell you who else was there, but there were a number of persons there from the department.

Q    You mentioned Mr. Baca --

A    I think the lawyers were there also.  My recollection is that Paul Beach, who was the outside lawyer whom the county utilized in the Rutherford case, was present.

Q    Now, at this one meeting we're talking about, was this a direct result of the letter you sent?

A    That was my understanding, yes.

Q    You mentioned that Mr. Baca was present.  Do you think you'd recognize Sheriff Baca if you saw him again?

A    Yes, I do.

Q    Can you please look around the courtroom and tell me if you identify him if you recognize him?

A    He's at the defense table.  He's got a striped tie.

MR. HOCHMAN:  So stipulated, Your Honor.

THE COURT:  The record will reflect that the witness has identified the defendant.

MR. FOX:  Thank you, Your Honor.

Q    We talked about what the purpose of the meeting was.  What happened at this meeting?

A    My best recollection is that the meeting went an hour or so.  We expressed the concerns that were referred to in the letter that I just reviewed with you.  We talked primarily about abuse and retaliation.  We talked at length about retaliation for individuals who made complaints.

My best recollection is that there were other concerns raised too about overcrowding, sanitation conditions.  My best recollection is there were discussions about the mentally disabled and how they were being treated.

Q    Focusing on the abuse and retaliation though for the purposes of these questions --

A    Okay.

Q    Do you recall what, if anything, Mr. Baca said in response to what was occurring?

A    My recollection is Mr. Baca did all the talking for the department.  He said he wanted to know about the abuses that we reported.  He said that he was concerned about that.  He said that he was going to -- he said he did not want us to go to court on these matters.  The case was still in court.

And he said that he was going to assign Assistant Sheriff Cavanaugh to be his personal eyes and ears -- that's my phrase, but that was how I understood it -- to work with us. And then he asked if there could be a series of meetings where we would regularly brief Assistant Sheriff Cavanaugh as to what we were observing, how we felt things were going.

Q      Did you see any real changes made, any progress in the problems you saw after that meeting?

A      Absolutely not.

MR. FOX:  One moment, Your Honor.

Your Honor, we don't have any more questions for this witness at this time.

THE COURT:  All right.

**CROSS-EXAMINATION**

BY MR. HOCHMAN:

Q      Mr. Rosenbaum, at this point the ACLU has been working with the sheriff's department in connection with the Men's Central Jail for over about 30 years; is that correct?

A      You mean at this point today?

Q      Yes.

A      Yes.  In the late 70's, mid 80's, yes.

Q      And the ACLU has played a vital and important role in connection with the Men's Central Jail, hasn't it?

A      Yes, sir.

Q      And for -- well, since the 1980's, the ACLU has

been able to have a monitor inside the jail; is that correct?

A       I can't speak to the last couple years.  We had an individual who was, in fact, inside the jails who had access to the jails.  That's correct.

Q       And they were a monitor.  Is that a correct sort of description of --

A       Well, it depends what you mean by a monitor.  We certainly were looking for compliance.  You know, I've been in other cases where I work with monitors like the cases involving the police department, and those monitors had complete access to anything that they needed.  That was not our case.  But yes, we were inside the jails.

Q       And that was a jails project coordinator.  I think that was the title of the person?

A       That's correct.

Q       Mary Tiedeman was one of the people who was part of those jails project coordinators; correct?

A       Yes, sir.

Q       Now, the access that the ACLU had to the Men's Central Jail, because of the litigation, was unique; is that correct?

A       No.

Q       Well, was there any other organization that had the same type of access to the Men's Central Jail that the ACLU had, to your knowledge?

**UNITED STATES DISTRICT COURT**

A        Not that I'm aware of.  There would be particular issues like around mental health, and mental health groups might come in.  But in terms of the scope that you're talking about, the ACLU was the only organization that had that access.

Q        And Ms. Tiedeman was a civil rights lawyer?

A        No.  She was a social worker.

Q        Social worker.

And she was able to walk inside the jail and talk to inmates; is that correct?

A        That's correct.

Q        She didn't have to have the inmates meet her in, let's say, a visiting room with bulletproof glass between her and the inmate; is that correct?

A        That's correct.

Q        Nor was she assigned an office at the bottom of Men's Central Jail and the inmates had to come to her at that office at the bottom of Men's Central Jail; is that correct?

A        As far as I'm aware, that's correct.

Q        So she was able to actually go in the housing units where the inmates were housed in order to speak with them; is that correct?

A        When you say "housing units," you mean their actual cells?

Q        Not the actual cells but the area inside of -- the cell area but not the actual cell.

A        That's correct.

Q        And Ms. Tiedeman or the jail projects coordinator, they would get access to use-of-force reports that were generated in connection with Men's Central Jail; is that correct?

A        I think that was a problem.  She would get access to some reports, as I recall.  But in terms of detailed reports themselves on an ongoing and permanent basis, no.  In terms of methodologies that were utilized, we repeatedly requested it. That's clear from this letter as well.  So some.  But we certainly didn't get access to full investigations or full reports on those matters.

Q        Now, she was able to go inside the jail several times a week; is that correct?

A        That is correct.

Q        And she would bring volunteers with her as well to assist her in meeting with the inmates; is that correct?

A        That is correct.  I mean, we had to clear those volunteers so the department knew who was coming in, and we ran checks on those individuals, but she went in with other persons.

Q        So once those persons were checked out, they were able to join her and meet with the inmates as well; correct?

A        That's correct.

Q        And the ACLU projects jail coordinator was then

able to inform the federal judge who was overseeing the litigation of what the jail projects coordinator saw inside the jails; is that correct?

A    What she saw, yes.  That's correct.

Q    Now, with respect to Exhibit 9 that you have which is that October 28 letter --

A    Yes, sir.

Q    Again, it's the October 28, 2009, letter written from you to Sheriff Leroy Baca?

A    Me and two other individuals, yes.

Q    And in that letter, you were basically saying that the joint efforts between the ACLU and the sheriff's department had not been adequate to address the problem of retaliation and excessive force; is that correct?

A    That's right.

Q    And you also point out that the investigation process is very slow; is that correct?

A    That's correct.

Q    And then you said that, in response to this letter, you had a meeting with Sheriff Baca; is that correct?

A    That's correct.

Q    And at that meeting, it wasn't just Sheriff Baca, but you said the assistant sheriff Mark Cavanaugh; is that correct?

A    Marv Cavanaugh.

Q        Marv Cavanaugh, M-a-r-v?

A        Correct.

Q        Assistant Sheriff Cavanaugh, that would be -- in understanding the ranks in the sheriff's department, there's the sheriff, the undersheriff, and then the assistant sheriff; is that correct?

A        I don't know.  That seems to be my experience, but I don't remember exactly what the hierarchy was.  I know that Assistant Sheriff Cavanaugh was high up.

Q        And he was high up in connection with the jail system and the custody system for the sheriff's department; correct?

A        Yes, sir.

Q        You said, in addition to Assistant Sheriff Cavanaugh, there were other Los Angeles Sheriff's Department there as well?

A        That's right.

Q        And the meeting, you said, lasted about an hour?

A        Give or take.

Q        It covered not only deputy abuse of inmates but also overcrowding, sanitation, mentally disabled, and other issues that you raised during the --

A        That was my best recollection.  The focus was retaliation and abuse.  But my recollection is we discussed other issues as well.

**UNITED STATES DISTRICT COURT**

Q        And you discussed Sheriff Baca's response during that meeting; correct?

A        Yes, sir.

Q        And as part of that response, he assigned the assistant sheriff, Marv Cavanaugh, to meet with you thereafter to deal with your concerns; is that correct?

A        That is correct.

Q        And you actually had a meeting with Assistant Marv Cavanaugh; isn't that correct?

A        We had multiple meetings with him.

Q        And when you would have a meeting with Assistant Sheriff Marv Cavanaugh, would it be a spontaneous meeting where you just meet for coffee at Starbucks, or was it more of a planned-out meeting with an actual agenda?

A        There were -- they were all planned-out meetings as I recall.  Agendas would be prepared by Mary Tiedeman, I think, in conjunction -- well, I know in conjunction with Assistant Sheriff Cavanaugh.  The meetings proceeded according to that agenda.  At the end of the agenda, there would be discussion if there was anything else that needed to be raised, but they were formal meetings.

Q        And in these formal meetings that Ms. Tiedeman -- that's the jail projects coordinator; correct?

A        Yes, sir.

Q        Were you at these meetings as well?

A       Yes.  I don't know that I was at each and every one of them.  I remember being in quite a few.

Q       So a formal agenda would be prepared.  Would that agenda list out different issues dealing with retaliation or deputy abuse or those kind of complaints?

A       Absolutely.

Q       And they would be discussed with Assistant Sheriff Marv Cavanaugh at the meeting?

A       That's correct.

Q       Did he have anybody else in the sheriff's department at these meetings?

A       I recall that he would sometimes bring other persons to those meetings.  He may have always brought other persons to those meetings.

Q       At the end of the meeting, would there be sort of an action item understanding of what was to happen in response to the complaints?

A       Yes.  As I recall, on a number of the occasions, there would be a follow-up to make certain that we agreed on what the actual elements were.

Q       And there wasn't just one meeting with Assistant Sheriff Marv Cavanaugh in connection with these complaints; correct?

A       That's right.

Q       You referenced there was actual multiple meetings

with Assistant Sheriff Marv Cavanaugh and potentially other people from the sheriff's department to discuss these complaints?

A    That's correct.

MR. HOCHMAN:  No further questions.

THE COURT:  Any redirect?

MR. FOX:  Yes, Your Honor.

**REDIRECT EXAMINATION**

BY MR. FOX:

Q    On cross-examination, Mr. Rosenbaum, you answered that you were not provided complete access, that that was not the case.  What did you mean by that?

A    We were limited into the areas where we could go. We were not given access to information that we needed in order to actually bring forward all that was necessary.  We repeatedly sought information regarding the conduct of investigation processes that were utilized, methodologies that were utilized, why things were taking too long, who was testifying, and we were routinely denied that.

Q    I believe you said that was different than your experience with other law enforcement agencies; is that correct?

MR. HOCHMAN:  Objection.  Relevancy.

THE COURT:  Overruled.

You can answer.

**UNITED STATES DISTRICT COURT**

Q        BY MR. FOX:  Can you please explain what you meant by that?

A        Sure.  I can give you a couple examples.  I had a --

MR. HOCHMAN:  Objection.  Relevancy again.

THE COURT:  Overruled.

THE WITNESS:  Thank you.  I had a very close relationship with Chief Bratton.  That dealt with the fact that we were parties to the Consent Decree with the United States and the city of Los Angeles in terms of reforming use-of-force protocols that were utilized, racial profiling.  Chief Bratton always made clear that we could come and talk with him.  We had full information.

There was an independent monitor that was assigned to that, the Kroll Group.  We worked with them very closely.  We were real partners.  They wanted to know what was going on, if we had any questions.  I don't ever remember asking a question about methodology or materials.  They would frequently come back and discuss questions in order to make sure we were satisfied.

I also worked closely with Chief Bratton on issues involving homelessness.  We filed litigation --

MR. HOCHMAN:  Objection, Your Honor.  Beyond the scope.  Relevance.

THE COURT:  Overruled.

**UNITED STATES DISTRICT COURT**

You can answer.

THE WITNESS:  We filed litigation regarding police practices in skid row toward the homeless, and I remember having multiple meetings with Chief Bratton, with Jerry Chaleff who was --

MR. HOCHMAN:  Objection, Your Honor.  Relevance.  Beyond the scope.

THE COURT:  Overruled, counsel.

Go ahead.

THE WITNESS:  Jerry Chaleff who was his designated person.  I would on occasion receive phone calls from them.  There was complete transparency, and, in fact, a settlement was worked out in that case which resulted from a desire to have full open candid discussions and sharing of information about those matters.  I don't ever remember being denied access to any information.

Q    BY MR. FOX:  Now, Mr. Hochman asked you about Exhibit 9 and did you inform the Court of some of the problems that were addressed in your letter.  You were talking about the federal court there; is that correct?

A    That's correct.

Q    And from 2009 until, say, 2011, even informing the federal court of what was going on, were the issues that you were seeing getting better?

A    No.  No.  We actually had -- on occasion had to

go to court and have litigation when they could not be resolved informally.  Severe overcrowding is one example of that. Treatment of individuals who had mental health issues was another.  Matters got worse, not better.

MR. FOX:  No more questions.

THE COURT:  Anything else?

MR. HOCHMAN:  Nothing further, Your Honor.

THE COURT:  You may step down.

(Further proceedings were held and reported but not included herein.)

CERTIFICATE OF OFFICIAL REPORTER

I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

DATED THIS  12TH  DAY OF DECEMBER, 2016.


/S/ MIRANDA ALGORRI

MIRANDA ALGORRI, CSR NO. 12743, CRR
FEDERAL OFFICIAL COURT REPORTER

**UNITED STATES DISTRICT COURT**