UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

HONORABLE PERCY ANDERSON, U.S. DISTRICT JUDGE

UNITED STATES OF AMERICA,       )
                                )
            Plaintiff,          )    Case No.
                                )
      vs.                       )    CR 16-00066(A)-PA
                                )
LEROY D. BACA,                  )    PAGES (1 to 76)
                                )
            Defendant.          )
_____)

REPORTER'S PARTIAL TRANSCRIPT OF
TESTIMONY OF JAMES SEXTON
FRIDAY, DECEMBER 9, 2016
11:30 A.M.
LOS ANGELES, CALIFORNIA

MIRANDA ALGORRI, CSR 12743, CRR
FEDERAL OFFICIAL COURT REPORTER
312 NORTH SPRING STREET, ROOM 435
LOS ANGELES, CALIFORNIA 90012
MIRANDAALGORRI@GMAIL.COM

UNITED STATES DISTRICT COURT

2

**APPEARANCES OF COUNSEL:**


**FOR THE PLAINTIFF:**

    EILEEN M. DECKER
    United States Attorney
    BY:  BRANDON FOX
    BY:  EDDIE A. JAUREGUI
    Assistant United States Attorneys
    United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012


**FOR THE DEFENDANT:**

    MORGAN LEWIS AND BOCKIUS LLP
    BY:  NATHAN J. HOCHMAN
    BY:  BRIANA ABRAMS
    The Water Garden
    1601 Cloverfield Boulevard
    Suite 2050 North
    Santa Monica, California 90404


    MORGAN LEWIS AND BOCKIUS LLP
    BY:  TINOS DIAMANTATOS
    77 West Wacker Drive
    Chicago, Illinois 60601

**UNITED STATES DISTRICT COURT**

**I N D E X**

**FRIDAY, DECEMBER 9, 2016**

**Chronological Index of Witnesses**

Witnesses:                                                          Page

SEXTON, James

Direct examination by Mr. Fox                        6
Cross-examination by Mr. Diamantatos                 48
Redirect examination by Mr. Fox                      70
Recross-examination by Mr. Diamantatos               72

**UNITED STATES DISTRICT COURT**

**EXHIBITS**


**FRIDAY, DECEMBER 9, 2016**


| Exhibit | For ID | In EVD |
|---|---|---|
| 115   James Sexton Green Slips | 23 | 23 |


**UNITED STATES DISTRICT COURT**

**LOS ANGELES, CALIFORNIA; FRIDAY, DECEMBER 9, 2016**

**11:30 A.M.**

**---**

(Prior proceedings were held and

reported but not included herein.)

(The following proceedings were held in

open court in the presence of the jury:)

THE COURT:  All right.  If you'd call your next witness, please.

MR. FOX:  The United States calls James Sexton.

THE CLERK:  Please raise your right hand.

Do you solemnly state that the testimony you may give in the cause now pending before this court shall be the truth, the whole truth, and nothing but the truth, so help you god?

THE WITNESS:  Yes, sir.

THE CLERK:  Will you please state your full name for the record.

THE WITNESS:  James McAbee Sexton.

THE CLERK:  Sexton is spelled?

THE WITNESS:  S-e-x-t-o-n.

THE CLERK:  Thank you.

MR. FOX:  May I proceed, Your Honor?

THE COURT:  Yes, please.

**UNITED STATES DISTRICT COURT**

**JAMES MCABEE SEXTON,**

**GOVERNMENT'S WITNESS, SWORN:**

**DIRECT EXAMINATION**

BY MR. FOX:

Q     Mr. Sexton, have you been employed by the Los Angeles County Sheriff's Department?

A     Yes, sir.

Q     When was that?

A     From February of 2008 until 2014.

Q     Mr. Sexton, could you pull the microphone closer to you.

A     Yes.  Can you hear me, sir?

Q     Yes.  Thank you.

Can you say those dates again?

A     Yes, sir.  From February of 2008 until 2014, sir.

Q     How did your employment end?

A     I was terminated, sir.

Q     For what reason?

A     I was convicted for obstruction of justice.

Q     Why are you here today?

A     Sir, I have been writted out by the Court from Talladega Federal Prison Camp.

Q     What is a writ?

A     It's an order of the Court, sir, to appear before.

**UNITED STATES DISTRICT COURT**

Q      Are you receiving any benefits for testifying here today?

A      No, sir.

Q      Have you been made any promises?

A      No, sir.

Q      Do you have any expectations?

A      No, sir.

Q      I want to direct your attention to August of 2011.  What unit within the sheriff's department were you working in?

A      I was assigned to Operation Safe Jails, sir.

Q      What is Operation Safe Jails?

A      It is a custody investigative unit that has responsibilities for developing human informants in an effort to provide safety and security to the Los Angeles County jail system and to assist with investigations throughout the County of Los Angeles Sheriff's Department.

Q      Who was in charge of OSJ?

A      My lieutenant at the time was Lieutenant Greg Thompson, sir.

Q      Did you have a specific responsibility within OSJ?

A      Yes, sir.

Q      What was that?

A      I was assigned to the Inmate Reception Center.

Q        What is the Inmate Reception Center?

A        Inmate Reception Center is also known as IRC.  It is the first point of contact that inmates come -- let me back up.  It's the first point of contact that inmates touch in the L.A. County jail system proper.  It's where we conduct the -- we conduct the operations to classify inmates and house them within the greater Los Angeles County jail system.

Q        Does IRC play any role with respect to court documents coming in for inmates?

A        Yes, sir.  There's another side of IRC that receives the paperwork and pushes it through the civilian personnel where they process court assignments, court dates, release dates, et cetera.

Q        Does IRC have any responsibilities regarding writs?

A        Yes, sir.

Q        What responsibilities are those?  And I'm speaking in the present tense, but I'm really talking about the time period of August and September of 2011.

A        Yes, sir.  I was on the enforcement and tactical side and secure side.  But my understanding at the time was that they would receive writs, process them on the civilian side, and that would, in turn, dictate orders for us to provide inmates to the courts at the time, sir.

Q        In August of 2011, did you learn anything with

UNITED STATES DISTRICT COURT

respect to a cellular phone that was found in jail custody?

A        Yes, sir.

Q        What did you learn?

A        I was -- in the beginning of August, I was in Washington D.C. for training.  I received several phone calls that a cell phone had been discovered in Men's Central Jail 3000.  I was ordered to return early from that trip.  It was a training trip.  My partner and I left Washington, D.C. and returned to Los Angeles County.

Q        Who was your partner?

A        Jason Pearson, sir.

Q        When you returned, did you learn anything more about the cellular phone?

A        I started to receive context about where it was discovered, the inmate it was discovered on.  And at a point in time, I learned potentially who the owner was of that cell phone, sir.

Q        When you say "who the owner was," what are you referring to?

A        The person that either purchased the phone or made efforts to provide the phone to that inmate's facilitator and contacts to the outside.

Q        At some point in time, did you learn that the phone was traced back somehow to the FBI?

A        Yes, sir.

Q      How did you learn this?

A      OSJ at the time was about 30 deputies broken up into the north team and the south team.  One of my partners assigned to the south division, if you will, and in Men's Central Jail -- his name is Noah Kirk -- explained to me that his contacts at the FBI had traced the phone back to the FBI itself.

Q      Did you have a meeting with any deputies regarding what to do with this information?

A      There were several meetings about this information, sir.

Q      Let me direct your attention to the first one specifically.  Did you have any meetings with deputies Manzo and Smith?

A      Yes.

Q      Let's talk about your first one.

A      Yes, sir.

Q      Where was this meeting held?

A      It was in the middle of August, and it was -- again, I had just returned from this trip.  The first of several meetings was held at Men's Central Jail.  I believe the address is 441 Bauchet Street, and it was on the 3000 floor in the Men's Central Jail, OSJ office.

Q      Who else was present?

A      The majority of the Men's Central Jail OSJ team.

Q    And what was said at this meeting?

A    I was asked to come over from the Inmate Reception Center, and I was briefed on how the phone was recovered, the inmate that had the phone, and again, who potentially was the owner of the phone and circumstances of how the phone was placed with that inmate and why it was in the jail.

Q    At that meeting, did people discuss that it was an FBI phone?

A    Yes, sir.

Q    And who was providing the briefing?

A    Kirk -- again, Deputy Kirk was assigned to a task force -- he was a task force liaison officer for Operation Safe Jails.  He had the ability to contact FBI analysts.  He provided an FBI analyst the cell phone serial number, I believe.  He showed me an e-mail between himself and the analyst.  Deputy Kirk, Deputy Manzo, and Deputy Smith briefed me the phone potentially was owned by -- was owned by the FBI and a specific squad within the FBI.

Q    Which squad was that?

A    The civil rights division.

Q    What was the tone of this conversation?

A    Serious.  It had a tone of -- the beginning of a confrontation between the sheriff's department and the FBI.

Q    Was there anything significant, in your mind,

UNITED STATES DISTRICT COURT

about hearing that the phone might be traced to the civil rights squad of the FBI?

A        Yes.

Q        What was that significance?

A        Civil rights squad are the people that investigate law enforcement officers and their actions, sir.

Q        What was the result of that meeting?  Were there any directions given?

A        Yes, sir.  I was asked to think about how to develop framework for name changes of informants.  It's something that I had done in the past, I had experience with. And they said -- they being the Deputy Smith and Deputy Manzo who identified themselves as the representation of my unit commander -- they would be having a handle on the investigation.  They asked me to start providing recommendations to potentially remove a particular inmate out of the system and make name changes for him.

Q        You just referred to their, your unit commander. Is that the same person you referred to earlier?

A        Yes.  Lieutenant Greg Thompson, sir.

Q        Did you have a follow-up meeting?

A        Yes, I did, sir.

Q        When was that?

A        It was within 24 to 48 hours, sir.  I believe it was closer to 24 hours, and it was held at his office in

**UNITED STATES DISTRICT COURT**

Twin Towers.

Q       Who all was present there?

A       Deputy Smith, Deputy Manzo, and Lieutenant Greg Thompson, sir.

Q       What happened at that meeting?

A       Lieutenant Thompson briefed me on the development of where the investigation was at the time.  He told me that I had to cooperate and collaborate with Deputy Manzo and Deputy Smith and support any request they had at that time regarding this particular inmate.  Pretty much shifted my priorities completely into supporting their operation.

Q       Did Mr. Thompson indicate in any way what the purpose was of changing this inmate's name?

A       He provided two or three scenarios that they believed at the time, and Deputy Manzo was making remarks out of the side of his mouth trying to be sarcastic.

Q       Let's focus first then on what Mr. Thompson was saying.

What was Mr. Thompson saying about the reasons for changing Mr. Brown's name?

A       Well, first off, he reiterated the cell phone is dangerous in a correctional facility.  I think that's pretty well understood, sir.  We're trying to get to the bottom of how one was recovered inside the secure area of the Men's Central Jail.

**UNITED STATES DISTRICT COURT**

He made query that we were trying to figure out who was involved, the extent of -- extent of the usage of that particular cell phone by not only the inmate that had it but the inmates around him particularly, and then they really wanted to know who provided that inmate that cell phone.

Q     But in terms of changing the name of the inmate, what was the purpose of changing the name that was expressed to you at that meeting by Mr. Thompson?

A     It was inferred through Deputy Manzo that we were changing it to --

MR. DIAMANTATOS:  Objection.  Objection, Your Honor.

MR. FOX:  Your Honor, I'll ask a different question that I think will elicit the response.

Q     Mr. Sexton, you had referred earlier to Mr. Manzo making sarcastic remarks.  What were those remarks?

A     While the lieutenant was providing three possible scenarios of why the cell phone was in the jail, one of them was potentially a corrupt FBI agent.

Q     And what did Mr. Manzo say?

A     Mr. Manzo was removing the "corrupt" and just basically stating that the FBI was investigating the Los Angeles County Sheriff's Department.

Q     Was there any statement about Mr. Brown being protected from deputies and that was the reason for the

**UNITED STATES DISTRICT COURT**

protection that he was being given?

A       I wasn't really briefed on Mr. Brown's safety concerns.  I didn't -- even in this meeting, I had not known much about Anthony Brown.

Q       Do you know why Mr. Thompson had you be part of that meeting?

A       Yes, sir.

Q       What was that?

MR. DIAMANTATOS:  Objection.  Form.

THE COURT:  Sustained.

Q       BY MR. FOX:  Based on your experience working in IRC and knowing Mr. Thompson, do you have an opinion about why Mr. Thompson brought you into that meeting?

MR. DIAMANTATOS:  Objection.  Form.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  One of my functions as a deputy sheriff at the Inmate Reception Center OSJ team was to work on a high value transport team.  It was called an HVT team.  That team was responsible for dealing with sensitive inmates that often required their name to be changed in the L.A. County database known as AJIS.  It's the Automated Jail Information System.

Q       Did you attend a next meeting regarding this inmate after the one that you just had with Mr. Thompson?

UNITED STATES DISTRICT COURT

A        Yes, sir.

Q        Where was this?

A        This is the meeting at Hero's Park.  Hero's Park is an outside -- it's an outside gathering area or meeting area at Men's Central Jail.  It has several picnic tables, a barbecue pit.  It's called Hero's Park.  It's a memorial of deputy sheriffs that had fallen that were previously assigned at Men's Central Jail.

Q        When did this meeting occur?

A        The following Wednesday from when I got back.  So August 20th, August 21st, sir.

Q        Showing you what's in evidence as Government Exhibit 28, can you see that in front of you?

A        Yes, sir.

Q        What does this e-mail relate to?

A        This is the background regarding Anthony Brown. I would call it a warning letter.  Basically it's the preamble to an operation that myself and other teammates were about to start.

Q        In relation to the meeting you had at Hero's Park, do you recall when you received -- when you received this e-mail?

A        Yes, sir.  This says this is from -- I recognize this to be an L.A. County Outlook e-mail, and it says Wednesday, August 24th, 2011, at 11:17 p.m.

Q    In relation to your meeting in Hero's Park regarding this operation, was this e-mail sent days later, hours later, or do you know?

A    The meeting was late in the afternoon, early evening.  I remember the sun setting.  So this is two to three hours later.

Q    And let's talk about that Hero's Park meeting. Who was providing the information in that meeting?

A    Lieutenant Greg Thompson, Deputy Gerard Smith, and Deputy Mickey Manzo, sir.

Q    Let's talk about what was said by those three individuals.  Can you please provide us with that information?

A    That's the first time I got information on Anthony Brown and the totality of where the investigation stood.  At that point we were told that Anthony Brown was going to be removed from Men's Central Jail.  We were told that two other divisions were going to be joining our division, custody division, and that we were to collaborate and cooperate with detective division, patrol division, and other members of our own division and custody, and that we would be treated with respect, that we'd be treated as equals which is not a norm for custody deputies at that time, and that we would be operating outside of Men's Central Jail at other locations in the county.

Q    Did anyone at that meeting explain why this was happening?

UNITED STATES DISTRICT COURT

A        They were still briefing other potential theories of how the phone got in, but I would say a week later they, they being my unit commander and the two deputies responsible for the investigation, were indicating that the FBI had brought the phone -- or I apologize.  The FBI had coordinated the smuggling of a cell phone in and that we were removing Anthony Brown from Men's Central Jail so that we could -- when I say "we," I apologize.  I should be more precise with my collective pronouns.  But that the sheriff's department was looking into the extent of Anthony Brown's cooperation with the FBI.

Q        Along -- you've already discussed how you were going to be using your knowledge to help change his name and move him.  Were you going to be having another role in Mr. Brown -- with respect to Mr. Brown?

Maybe I'll ask a different question.

We just saw a bunch of deputies listed in that e-mail I just showed to you.

A        Yes, sir.  Can I --

Q        Let me put it up there again.

Was there a role that you and these other deputies were supposed to have with respect to Mr. Brown?

A        Yes, sir.  We were custody deputies at that time.  So Anthony Brown was a high security inmate.  He was a K-10 at that time.  That required security detail.  And we were told

UNITED STATES DISTRICT COURT

that we would be shifted to 12-hour shifts which is a -- it's a -- it's a different structure for our days.  Normally we work either four 10-hour shifts throughout the week to make a 40-hour week or five eights to make a 40-hour week.  When you are shifted onto 12's, that's a -- that's generally done when there's an emergency in the sheriff's department.

Q      Did any of the people providing the briefing explain to you where this idea came from to move Mr. Brown?

A      Yes, sir.  They were speak -- the Los Angeles County Sheriff's Department is a paramilitary organization, and they often refer to "the big bosses."

Q      What did "the big bosses" mean?

A      There are big bosses and little bosses.  Little bosses are your sergeants and lieutenants.  Big bosses are captains and above.

Q      What did the people who were providing the briefing explain to you about the big bosses?

A      Deputy Smith -- Deputy Smith and Deputy Manzo said this was coming all the way from the top and that this is -- at this time there was no overtime in the department.  It would have been tough to shift our schedules into 12's on short notice.  So they were speaking as if they had spoken directly to someone above, an assistant sheriff and above.

MR. DIAMANTATOS:  Objection, Your Honor.  The answer is nonresponsive.  Speculation.

THE COURT:  Sustained.  Ask another question.

Q      BY MR. FOX:  Mr. Sexton, when you said "from the top," who did you hear -- you heard "from the top," who did you understand that to mean?

A      Deputy Smith and Deputy Manzo had said they had briefed Sheriff Baca and Undersheriff Tanaka.

Q      What, if anything, did Mr. Manzo state about what happened in that meeting with Mr. Baca?

A      Manzo was excited it was his first time to brief the sheriff.  So he spoke a lot of Sheriff Baca's mannerisms.  He described him putting his hands or putting his face in his hands and potentially -- or I apologize.

MR. DIAMANTATOS:  Objection, Your Honor.  Nonresponsive to the question.

THE COURT:  Overruled.  You can continue.

THE WITNESS:  I recall him making a statement -- I recall Deputy Manzo making a statement about what Sheriff Baca said to Lieutenant Thompson.

Q      BY MR. FOX:  What was that statement?

A      "How are we going to fix this, Greg?"

Q      Showing you this last paragraph in the e-mail, how was it that it was going to be decided who was going to be assisting with the guarding of Brown on any given shift?  You mentioned a number of shifts, and there were a bunch of deputies here.  How was it going to be divided who was going to

UNITED STATES DISTRICT COURT

21

be sitting on Brown on an individual shift?

A        I believe you're asking how were we assigned to each shift?

Q        Correct.  Did you sign up voluntarily for it or did -- go ahead.

A        You're often told to do things in the sheriff's department, sir.  The senior deputies, which were Deputy Manzo, Deputy Smith, coordinated with guys that had more time on all the way down, and the shifts were assigned based on seniority and availability.

Q        This paragraph discusses overtime.  What was going on with overtime in the department at this point in time?

A        It was nonexistent, sir.

Q        So was there a discussion at this Hero's Park meeting about how overtime was going to be paid in this instance?

A        Yes, sir.  First off, we were working carps.  So we didn't have to carp anymore.  And that was exciting for us at that time.  And, second, we were told that there was a budget item created -- basically this operation was funded out of headquarters -- for us to receive paid overtime.  Normally at this time, if we ever got overtime, we would receive what's called "saved time."  But this was paid overtime.

Q        Did you, in fact, receive overtime for your duties around the end of August and early September of 2011?

A       Yes, sir.

Q       I'm going to now publish for you 115.

Do you see this in front of you?

A       Yes, sir.

Q       What is it?

A       This is our weekly timecard that myself and our -- myself and my teammates would fill out and then we would provide to our sergeant to sign and approve.

Q       I'm showing you now the bottom left-hand corner.

Whose signature is this?

A       That's --

MR. HOCHMAN:  May I have a moment with counsel?

(Counsel confer.)

MR. FOX:  Your Honor, we've had a little -- probably our technology.  Let me provide a hard copy to the witness.

Q       You should have 115 in front of you in one of the binders.

A       Yes, sir.

Q       Just to make sure we're all on the same page here, what is 115?

A       Sir, I'm looking at what we would call the green slip.  It's basically a receipt that you worked overtime, sir.

Q       Do you recognize this document?

A       Yes, sir.

**UNITED STATES DISTRICT COURT**

Q        And whose green slip is this?

A        This is mine, sir.

Q        Is this a true and accurate copy of the green slip that you had at the time?  Is this a true and accurate copy of your green slip from August of 2011?

A        Yes, sir.

MR. FOX:  Your Honor, I move for the admission of Government Exhibit 115.

MR. HOCHMAN:  I think counsel meant green slips, plural, because there's more than one in this exhibit.  Or are you just referring to the first page?

(Counsel confer.)

Q        BY MR. FOX:  Can you look through all of Exhibit 115 then and tell me if these are true and accurate copies of all of the green slips that you had in August and September of 2011?

A        Yes, sir.

MR. FOX:  Your Honor, I move for the admission now of Government Exhibit 115.

MR. HOCHMAN:  No objection, Your Honor.

THE COURT:  It will be received.

MR. FOX:  Thank you, Your Honor.

(Marked for identification and received into evidence Exhibit No. 115.)

Q        BY MR. FOX:  Who needs to sign these slips for

**UNITED STATES DISTRICT COURT**

24

you to get paid?

A        It's a series of supervisors, sir.

Q        Who's listed at the bottom left of the supervisor preapproving overtime?

A        My unit commander Greg Thompson and my sheriff at the time Lee Baca.

Q        Can you tell whether that's the same handwriting for both names?

MR. DIAMANTATOS:  Objection, Your Honor.  I'll withdraw the objection, Judge.

Q        BY MR. FOX:  Is this the same writing that appears for Mr. Thompson and Mr. Baca?

A        Yes, sir.

Q        Looking at the following pages, is that the only time that Mr. Baca's name is on these documents?

MR. DIAMANTATOS:  Objection, Your Honor.

Q        Is Mr. Baca's name on any of the other documents that are in Exhibit 115?

A        That is the only time that is depicted, sir.

MR. FOX:  Your Honor, may I have a moment to --

THE COURT:  Yes.

Q        BY MR. FOX:  Mr. Sexton, I want to now have you look at Exhibit 124 in your binder.

A        Stand by, sir.

Q        What is that?

A       This is a Los Angeles County Sheriff's Department inmate total movement history.

Q       What is this type of document?  How is it used by the sheriff's department?

A       It is a -- it's a record of the individual movements for a particular inmate, sir.

Q       And showing you now on the screen this blowup, who is this inmate movement for?

A       I see on the paper Anthony Brown, yes, sir.

Q       Okay.

A       Anthony Brown, sir.

Q       I want you now to focus on August 18, 2011, at 10:46 a.m.  Does it show where Mr. Brown was being housed at that time?

A       The facility is Men's Central Jail which is depicted by "CJ," and the module is 3500.

Q       According to this document, was Mr. Brown moved at 1:00 o'clock p.m. that date?

A       Yes.

Q       Where was he moved to?

A       1750.

Q       And then I want you to look a few lines above that.  Does it show that anything changed with his custodial status after that date?

A       Yes.  On August 25th it says he's released.

UNITED STATES DISTRICT COURT

Q        Let's talk about 1750.  In here it says 1751G. Do you see that?

A        Yes, sir.

Q        Can you please describe this area of Men's Central Jail.

A        Do you want me to explain the finite 1751G or -- I'm kind of lost in the --

Q        Sure.  Let's go with 1751G.

A        1751G is a very specific housing assignment within Men's Central Jail for VIP inmates, by that, extended media, celebrities, or gravely mentally ill.

Q        In your duties working at IRC near the end of August, 2011, did you hear anything about the U.S. Marshals Service as it related to Anthony Brown?

A        I heard one deputy assigned to --

MR. DIAMANTATOS:  Objection.  Foundation, Your Honor, and hearsay.

MR. FOX:  I will provide the foundation, Your Honor.

THE COURT:  All right.

Q        BY MR. FOX:  Approximately when in -- August of 2011, can you provide us with any more details of that with respect to the date?

A        I apologize, Mr. Fox.  Which date, sir?

Q        We're talking about this conversation where you

UNITED STATES DISTRICT COURT

heard something about the U.S. Marshals Service and Mr. Brown?

A       Yes, sir.

Q       So you said it was in late August of 2011.  Is that the best you can do, or can you narrow it down a little bit?

A       Around August 20th, sir, I was assigned -- I was assigned to OSJ.  Throughout my duties and working on items to support Deputy Smith and Deputy Manzo, I found myself at IRC main control which is where outside agencies contact the Los Angeles County jail system to receive information about inmates.

Q       And specific to the U.S. Marshals Service and Mr. Brown, who did you hear this information from?

A       I heard it from an IRC deputy assigned to IRC main, Deputy Sherry Panzone.

Q       Where were you when you received this information?

A       I was in her presence at her work assignment.

Q       What is it that she said to you?

MR. DIAMANTATOS:  Objection.  Hearsay.

THE COURT:  Let me see counsel at sidebar.

(The following proceedings were held at sidebar:)

MR. FOX:  Your Honor, it's their normal duties to process writs.  So this information will have an effect on the listener.  He then provides that information.  That is the

purpose of the statement.

MR. DIAMANTATOS:  It is being offered for its truth and would be hearsay that, in fact, he was transferred.

MR. FOX:  That he was transferred is not the portion.

MR. HOCHMAN:  Maybe we can get a proffer from Mr. Fox as to what he's trying to elicit to see whether or not it's hearsay or not hearsay.

THE COURT:  Maybe we could, but I don't really need it.  The objection is overruled.

(The following proceedings were held in open court in the presence of the jury:)

MR. FOX:  May I continue, Your Honor?

THE COURT:  Yes.

Q      BY MR. FOX:  What is it she said to you?

A      She asked me a question.  A series of questions. I apologize.

Q      What were those questions?

A      She asked me if I knew an inmate by the name of Anthony Brown.

Q      What did you tell her?

A      Yes.

Q      What else did she ask you?

A      She asked me would there be any reason that the U.S. Marshals is calling to ask about him.

Q       Did you respond to that?

A       I did, but I didn't give her any specifics.  I just said I need to let my bosses know they called.  I asked her if she had any information about the inquiries they asked.

Q       Did she provide you with any additional information?

A       She did not have any.  It was broad at that time, sir.

Q       What did you do with that information?

A       I immediately told Lieutenant Greg Thompson in person that the U.S. Marshals had called looking for Anthony Brown specifically.

Q       Why did you do that?

A       We were beginning to receive directions from our big bosses on down to not use the phones or e-mail to talk about Anthony Brown.

Q       When you took this information to Mr. Thompson, what happened?

A       He took it under advisement, sir.  It wasn't up for discussion.  He thanked me for my time and asked me to continue on.

Q       Did anything change with respect to Mr. Brown after you provided this information to Mr. Thompson?

A       A few days later he moved from 1751 to other places.

Q        What places were those?

A        The first time I came in contact with Anthony Brown would have been at San Dimas Station, but I was briefed he was at Temple Station, other places that we used to move sensitive inmates or high valued inmates.

Q        How was this decision to move him to San Dimas and possibly other stations communicated to you?

A        In person and on my cell phone.

Q        By who?

A        Deputy Gerard Smith, Deputy Mickey Manzo.

Q        What did they say to you?

A        You're talking about several days together, sir. So I was briefed to not respond, as we would say it, to 450 Bauchet Street which is my normal work assignment.  And I was directed to other places in the county.

Q        Did they tell you who these orders were coming from?

A        Yes, sir.

Q        Who did they state they were coming from?

A        They would routinely say, "All the way from the top," sir.

Q        Can you tell us how -- well, were you part of this plan to move Mr. Brown and to change his name?

A        Yes, sir.

Q        What did you do specifically?

A        I was asked several questions about the tolerances of the AJIS, the Automated Jail Information System, the constraints, and to provide recommendations for entering new data into the computer system.

Q        Mr. Sexton, just so it's clear, you and I have not spoken in a few years; is that correct?

A        Yes, sir.

Q        I want to now show you, again, Government Exhibit 124.  You mentioned that this showed that Mr. Brown was released, according to this document, on August 25th, 2011. Was he, in fact, released from sheriff's department custody that day?

A        Not to my knowledge, sir.

Q        Did you -- well, when you say "not to your knowledge," do you know whether he was in county custody after that date?

A        I don't think that we put Anthony Brown on the street that day, sir.

Q        I'd like you now to look at Government Exhibit 125.

A        Yes, sir.

Q        Do you recognize that document?

A        Yes, sir.

Q        What is it?

A        It's a xerox of a records jacket at the IRC, sir.

**UNITED STATES DISTRICT COURT**

Q        Whose record jacket is this?

A        I'm reading here John Rodriguez, sir.

Q        I'm now going to publish Exhibit 125 which is in evidence.

You mentioned that this was the booking record for John Rodriguez.  Who was John Rodriguez at this point?

A        Anthony Brown, sir.

Q        I want to now show you the fourth page of that exhibit.

What descent does it say Mr. Brown -- or Mr. Rodriguez was?

A        Hispanic.

Q        Was Anthony Brown Hispanic?

A        No, sir.

Q        What race was Anthony Brown?

A        Male black, sir.

Q        Do you see on the right-hand portion after CCB there is a prisoner signature when booked?

A        Yes, sir.

Q        What does it state?

A        "Refused."

Q        Do you know why it stated refused?

A        I did not fill out this form, sir.  But generally when we --

MR. DIAMANTATOS:  Objection.  Foundation.

UNITED STATES DISTRICT COURT

Nonresponsive to the question, Your Honor.

THE COURT:  Sustained.

Q        BY MR. FOX:  Mr. Sexton, generally, when you book inmates, do you seek their signature?

A        Yes, sir.

Q        What about their social security number?

A        Yes, sir.

Q        Do you know why receiving fingerprints, by the way, are important in these documents?

A        Yes, sir.

Q        Why is that?

A        When a fingerprint is retrieved from one of these documents, it assigns -- first off, the fingerprints are verified.  When a fingerprint is verified to a previous historical record, it will assign any new monikers or aliases or names to the original verified ID.

Q        So if somebody was using an alias, what would happen if they were fingerprinted?

A        That alias would be attached to the previous verified ID.

Q        Can you see on your screen now the fifth page of this exhibit?  It says "Refused."

A        Yes, sir.

Q        What is usually placed in this portion?

A        That would be the left -- I'm sorry.  This is

**UNITED STATES DISTRICT COURT**

right four fingers when booked and then when released.

Q        Now I want to show you Government Exhibit 126.

Can you look at that and tell me if you recognize it.

A        Yes, sir.

Q        It should be in front of you as well.

What is this?

A        This is the custody portal printout of -- again, the nomenclature of the department, we would say "horsepower." But that's their booking number, last name, first name, gender, et cetera.

Q        What does this state here on the portion under "Arrest"?

A        This is the arrest charge and then the arrest date, the time he was arrested, the agency he was arrested, where he was booked, when he was booked, and the last location.

Q        What does it state in terms of when he was booked and when he was arrested?

A        Arrest date of August 25th, 2011; a book date of August 25th, 2011, at 1705 at Temple Station.

Q        Do you see the arrest time says 1703 and the book time says 1705?

A        Yes.

Q        Does it typically take -- or during that time, did it typically take two minutes to book somebody after

arrest?

A        No, sir.

Q        Why not?

A        There's a lot to that process.  It's complicated.

Q        Can you please explain some of the parts of that process?

A        Mental evaluation, health evaluation, ID verification, gang classification.  Generally it takes 4 to 12 hours depending on any special circumstances for a particular inmate.

Q        What if somebody is arrested on the street?

A        You have to transport them to the station and then from the station to IRC.  It takes a little bit more. Especially on a felony too.  People are field cited for misdemeanors and things, but robbery.

Q        All right.  Let's look at the second page under actual release date.  It says 8/26/11.  What is the release time?

A        Release time of 2029 which is 8:29, sir.

Q        What did it state for the reason for the release?

A        It says, "Ordered for release."

Q        Now, I'm going to show you Government Exhibit 127 which is in evidence.

         What is this document?

A        It is the same document you showed me earlier.

**UNITED STATES DISTRICT COURT**

It's inmate total movement history.

Q      You said it was like the one I showed you for Anthony Brown.  Which inmate is this?

A      This is John Rodriguez.

Q      What does it show occurred on August 25th at 5:10 p.m.?

A      It says he's at booking front.

Q      And where does it say that John Rodriguez is housed from 6:17 p.m. until 8:25 p.m.?

A      1750, sir.

Q      What does it show happens to Mr. Rodriguez at 8:29 p.m.?

A      It says he's released, sir.

Q      I want to now show you Government Exhibit 128. Do you recognize this document?

A      Stand by, sir.

Q      It should be right in front of you, Mr. Sexton.

A      Yes, sir.

Q      What is this document?

A      We call it a nine line, sir.  It's a booking and property record.

Q      Did we see a similar document for John Rodriguez?

A      Yes, sir.

Q      Who is this one for?

A      Kevin King.

**UNITED STATES DISTRICT COURT**

Q       Who is Kevin King?

A       Anthony Brown, sir.

Q       Could you please read what's in the jail custody record box on the right-hand side?

A       "Felony ICIB OSJ Lieutenant Thompson" and then "CTTCF."

Q       Does it state the city where this booking occurred or -- I'm sorry.

Does it list the address of Kevin King right underneath his name?

A       Transient, sir.  I apologize.

Q       What about city?

A       San Dimas.

Q       What about his race?

A       It has him as a male black on this one, sir.

Q       What is listed for his charge?

A       We have 11350 Health & Safety Code, possession of cocaine.

Q       Do you know if Anthony Brown was possessing cocaine at that point?

A       No, sir.  He wasn't.

Q       Are you familiar with the name Chris Johnson as it relates to this case?

A       Yes, sir.

Q       Who was Chris Johnson?  Who was Chris Johnson?

UNITED STATES DISTRICT COURT

A       He's an NFL wide receiver.

Q       And how does that name relate to this case?

A       It was probably some OSJ deputy's fantasy football pick that they decided would be --

MR. DIAMANTATOS:  Objection, Your Honor.

MR. FOX:  Let me ask a different question, Your Honor, please.

THE COURT:  All right.

Q       BY MR. FOX:  Was this another alias of Anthony Brown?

A       Yes, sir.

Q       Showing you now Government Exhibit 128, page 3, and now 129.

What is this document, Mr. Sexton?

A       It's an Inmate Information Center custody portal printout, sir.

Q       What generally does this show, this information show?

A       Referred to as horsepower.  Again, it's booking number, last name, first name.

Q       I'm going to show the arrest information for Mr. Johnson from this page.  What does it list his arrest date?

A       Here we have September 2nd, 2011, date booked September 2nd, 2011.

Q       What about the arrest time and the time booked?

**UNITED STATES DISTRICT COURT**

A        Arrest time is 9:20 in the morning.  Time booked is 9:21 in the morning.

Q        What's listed as the booking location?

A        San Dimas Station.

Q        How about the agency description?

A        It was 8,000 which is what's used for court returnee out of state prison.

Q        Do you see to the right of that it says, "Other states."  Do you know what that meant?

A        At that point they're telling the computer it could have been an extradition or hold for another agency.

Q        Mr. Sexton, what does this show for the release?

A        An actual release date of September 12, 2011, at the time of 1329 for reason other.  Custody of agency not listed.

Q        Do you know why Anthony Brown -- do you know why this shows a release of Chris Johnson on September 12 of 2011?

A        Yes, sir.

Q        What happened on that date?

A        His name was changed back to Anthony Brown, and he was being prepared to go to Lancaster State Prison.

Q        When you say "his name was changed," who changed his name back?

A        I participated in that, sir.

Q        Why did you do that?

**UNITED STATES DISTRICT COURT**

40

A        I was ordered to do it, sir.

Q        By who?

A        Lieutenant Greg Thompson, sir.

Q        Showing you now Government Exhibit 131, is this the same form you were discussing with John Rodriguez and Chris Johnson?

A        Yes, sir.

Q        Who is this one for?

A        Sir, this is for Anthony Brown.

Q        What does it show for Mr. Brown's arrest?

A        Court returnee, court-ordered returnee.  Arrest date of 9/12/2011, arrest time of 1256.  Agency is IRC.  The date booked 1300.

Q        What does it show for Mr. Brown's release?

A        Custody release, release agency of LAN LASD, Lancaster.

Q        Do you know why Mr. Brown was released to state custody in Lancaster that day?

A        Yes, sir.  When sensitive inmates are moved out of the Los Angeles County Jail, they are often placed at Lancaster State Prison.

Q        Do you know why the sheriff's department decided to send him to state custody that day?

A        I was told that they were done with their investigation --

MR. DIAMANTATOS:  Objection.  Objection, Your Honor.

MR. FOX:  I will provide the proper foundation, Your Honor, if that's okay.

THE COURT:  All right.

Q    BY MR. FOX:  Who told you -- who described for you why Mr. Brown was going to be released to state prison?

A    Deputy Manzo and Deputy Smith, along with Deputy Noah Kirk transported him with myself.

Q    So you were driving with them.

A    Well, prior to moving any sensitive or high value inmate, there is a briefing and an ops order.  And I was briefed at detectives out of ICIB, detectives out of Internal Affairs, detectives out of custody.  So pretty much detectives from both my division and other divisions were done interviewing him and had received all the information they needed, and it was my responsibility along with Deputy Manzo, Deputy Smith, and Deputy Kirk to return him to state prison.

Q    Showing you now what's in evidence as Government Exhibit 54, what is this e-mail that I'm highlighting for you at the bottom of the page?

A    Yes, sir.  It's an e-mail from myself on Monday, September 12, 2011, to Deputy Smith.  I'm cc'ing Deputy Manzo, Lieutenant Thompson, and Detective Gilbert regarding Operation Pandora's Box.

Q        Why did you call this Operation Pandora's Box?

A        I was referring to a Greek mythology story, sir.

Q        What is that about?

A        It's about one of the children of the greater Greek gods that was told not to open Pandora's box.  She did.  There was evil and suffering released on the world, and the bug of hope came last.

Q        Could you please read the first sentence of this e-mail.

A        "Gents, I am going to handle booking our friend back under his true alias."

Q        Continue, please.

A        "Can you please shoot me the URC case information he was originally charged under.  I am going to try to reinstate his old booking number as we speak.  I am 97 at the nurse's station until further notice.  J.S."

Q        What did "97" mean?

A        LASD radio code for on scene.

Q        Were you able to book Mr. Brown under his same booking number?

A        Not his original booking number, sir.

Q        What did you do?

A        I had to work with Deputy Smith and Deputy Manzo.  They weren't there personally, but they were directing me on e-mail and phone.  I had to coordinate with the greater -- now

I'm working with several units, sir.  So I had to facilitate the civilian personnel at IRC who had the passwords to work with the metadata, and I had to receive that from the detectives and Manzo.  And the computer would not accept his old booking number because it was missing -- it said it was released.  So you can't regenerate a released booking number. So we had to -- I was directed to generate a new booking number for Anthony Brown who was sentenced to 450 years.

Q      Showing you now the top e-mail listed in this exhibit, what is this?

A      It's an LASD Outlook e-mail from myself on Monday, September 12, 2011, to IRC Sergeant Sean Geske at the time.  He was the watch commander.  And I have cc'd my unit commander Lieutenant Thompson and my senior deputy in charge of this operation Gerard Smith.

Q      Can you please read what you wrote?

A      Yes, sir.  "Sergeant Geske is the WC," watch commander, "and is assisting us with our inmate. Captain Antuna wanted to be notified when there was movement of this inmate out of custody.  Sergeant will advise when and what.  Need to prep him for movement to state."

Q      Now, showing you Government Exhibit 55 in evidence.  Can you please read the e-mail that I've highlighted in the middle of the page from you to Mr. Smith on September 12th at 11:51 a.m.?

A        Yes, sir.  "Boss, on the phone with the head clerk in document control.  They're onboard, but they need the jacket regardless for court case, in his judgment, in order to get him released out of the system properly.  I am going to book him under his old booking number as court returnee and re-Live Scan him at IRC ASAP.  By the time you return downtown with the jacket, we should be ready for the next phase.  In route to IRC shortly.  J.S."

Q        What is Live Scan?

A        Live Scan is a digital capture of an arrestee's fingerprints.

Q        Do you know who that is shared with?

A        Yes, sir.

Q        Who?

A        DOJ.

Q        The Department of Justice?

A        Yes, sir.

Q        Are you talking about United States Department of Justice or California Department of Justice?

A        United States Department of Justice is the primary, sir.  There's several others attached.

Q        And this is an e-mail from someone named Eliel Teixeira; is that correct?

A        Yes, sir.

Q        E-l-i-e-l T-e-i-x-e-i-r-a?

UNITED STATES DISTRICT COURT

A        Yes, sir.

Q        Who is that?

A        That is an assigned position to IRC known as the head clerk, but it is the sworn deputy that fills that.  So Deputy Teixeira was the head clerk at that time, and I was working with him because he had the proper passwords to create this new booking number for an inmate that had been sentenced to 450 years.

Q        Could you please read what he wrote to you.

A        Yes, sir.  "James, no need to pull a new booking number.  Please use 2863148.  We are changing the info on this booking number to Anthony Brown."

Q        Now I'm going to publish for you Government Exhibit 56.  There's a lot of information on this e-mail at the bottom that I'm actually going to ask you about.

But just, generally, can you please explain what all this information in the second e-mail is?

A        That's the raw data -- raw metadata that makes the nice forms for the inmate information.

Q        And can you see the subject line of that e-mail?

A        Yes, sir.

Q        What does it say?

A        Brown, Anthony, and his booking number.

Q        And now I'm highlighting for you the e-mail you sent at 6:28 p.m. on September 12.

**UNITED STATES DISTRICT COURT**

A       Yes, sir.

Q       What did you write?

A       I'm writing about Anthony Brown.  I said, "Sir, per IRC's request, Inmate Brown is an in-custody release to CDCR," which is the California Department of Corrections and Rehabilitation.  "If you have any questions, please contact OSJ Lieutenant Thompson.  Respectfully, Deputy Sexton."

Q       Now showing you Government Exhibit 57, what was this document?

A       This was an e-mail that I received from my LASD e-mail Outlook from Gerard Smith thanking me -- thanking myself and others for our participation in the security detail.

Q       Can you please read what Mr. Smith wrote to you and others?

A       Yes, sir.  Starting at the top, "Over the past few weeks we have helped --" I apologize.  "Over the past few weeks, you have helped out tremendously with safeguarding of Inmate Brown.  You have done so without asking too many questions and prying into the investigation at hand. Inmate Brown was transferred to Lancaster State Prison last night.  So that part of the investigation is over.

"However, this investigation is and will continue to be a time-consuming affair.  I am both proud and thankful to have each and every one of you to rely on in a time of need. Your dedication and professionalism is and will continue to be

UNITED STATES DISTRICT COURT

needed.  There will continue to be times during this investigation when I will need your help.  I am confident that I will be able to call on any of you in a time of need.  Once again, thank you.

"Always remember we are a unit.  We were picked by people who want to see us succeed and grow.  I believe we will all have similar goals for our unit.  So if someone is lacking in a particular area, we must all work together to help them succeed.  If we work together, we will always succeed.  If you need anything, give me a call.  Thanks, Smitty."

Q    Mr. Sexton, you stated in the beginning of your testimony that you've been convicted of obstruction of justice. What did those charges relate to?

A    Inmate Anthony Brown, sir.

Q    What specifically?

A    My participation in the augmenting and manipulating of inmate database and transporting him to Lancaster State Prison.

Q    Mr. Sexton, when did your involvement in this conspiracy end?

A    September, sir.

Q    Okay.  Of 2011?

A    Yes, sir.

Q    I want you to now look at Government Exhibit 118 that is in evidence.

A        You said 118, sir?

Q        Yes, sir.  It should be right before you.

A        Yes, sir.

Q        What is this document?

A        Hold on.

That is my report on performance evaluation.

Q        For what time period?

A        2010 to 2011.

Q        What rating did you receive over that time period?

A        An outstanding.

MR. FOX:  One moment, Your Honor.

I don't have any further questions for this witness at this time.

THE COURT:  All right.  Cross-examination.

MR. DIAMANTATOS:  Yes, Your Honor.

Just one moment, Your Honor.  May I proceed, Your Honor?

THE COURT:  Yes.

**CROSS-EXAMINATION**

BY MR. DIAMANTATOS:

Q        Mr. Sexton, Mr. Fox asked you if you had spoken to him recently, and you indicated you have not; correct?

A        I have not seen Mr. Fox since my trial, sir.

Q        You indicated that you haven't seen Mr. Fox for

years; correct?

A    That is correct, sir.

Q    But as little as three days ago, you did meet with one of Mr. Fox's colleagues and FBI agents; correct?

A    Yes, sir.

Q    And that was for the purpose of going over your testimony for today; correct?

A    Yes, sir.

Q    You met with him?

A    Yes, sir.

Q    Discussed the nature of your testimony.

A    Yes, sir.

Q    Provided them information?

A    Yes, sir.

Q    So you have met with the Government?

A    I have, sir.

Q    This wasn't the first meeting you've had with the Government; correct?

A    I apologize, sir.  In 2016?  In my lifetime?

Q    Well, the meeting that occurred three days ago, Mr. Sexton, that's not the first time you've met with the Government; correct?

A    That's the first time I met with the Government in 2016, sir.  Yes, it is.

Q    Okay.  After the events that you described -- and

we'll go through them in a moment.

You began meeting with agents of the Federal Government, Mr. Fox's team -- correct? -- after 2011?

A       I met with FBI agents starting in 2012, yes, sir.

Q       So in 2012 which is after the events that we described; correct?

A       It's after -- I apologize, sir.

Q       After the events that you described in your testimony today, Mr. Sexton?

A       Of Anthony Brown, yes, sir.

Q       You began meeting with agents?

A       In 2012, yes, sir.

Q       And you continued to meet with agents in 2012; correct?

A       Yes, sir.

Q       You met with them how many times?

A       In 2012 I met with them 15 to 20 times, sir.

Q       15 to 20 times?

A       Yes, sir.

Q       That's an estimate?

A       That's the best I can provide, sir.

Q       You met with them in person?

A       That includes several phone calls, personal meetings, and meetings at the FBI headquarters, sir.

Q       So the estimate that you provided included the

face-to-face meetings as well as phone calls?

A       Yes, sir.  It did, sir.

Q       And during those meetings, Mr. Sexton, you were providing the Government with information about its civil rights investigation; correct?

A       Among other things, yes, sir.

Q       You indicated a moment ago that you were convicted; correct?

A       Yes, sir.  I am, sir.

Q       You testified that you were convicted of obstruction of justice; right?

A       Yes, sir.

Q       Stemming from the FBI's investigation into alleged civil rights violations in the summer and fall of 2011; correct?

A       Yes, sir.

Q       You were also convicted of actual obstruction of that same investigation; right?

A       I'm convicted of one count of obstruction, sir.

Q       Correct.  Of obstruction; correct?

A       Obstruction of justice, yes, sir.

Q       And you were sentenced?

A       Yes, sir.

Q       You were sentenced to serve a year and a half in prison; isn't that right, Mr. Sexton?

**UNITED STATES DISTRICT COURT**

A       Yes, sir.

Q       And you testified that you expect to see -- to receive no benefit from the Government; right?

A       I have a hard time seeing how this is going to benefit me, sir.

Q       But you certainly, over the course of 2012 through and including today, met with the Government a number of times; right?

A       Yes, sir.

Q       Answered their questions?

A       For the most part, yes, sir.

Q       Provided information to them?

A       Yes, sir.

Q       And you're testifying today in the Government's case; correct?

A       I have been writted out by the Court, sir.  I am a federal inmate in my fourth month of an 18-month sentence. I'm not in charge of my own decisions.  My travel agent told me to be here, and I'm here, sir.

MR. DIAMANTATOS:  Judge, I'm going to object as nonresponsive to the question I asked whether he was called by the Government as a witness.

THE COURT:  Next question.

Q       BY MR. DIAMANTATOS:  The meeting that you had with the agents three days ago on December 6 to go over your

testimony, that happened at 300 North Los Angeles Street?

A    Sir, I'm a federal inmate serving in a security housing unit.  I was walked through several tunnels.  I do not know where I was.

Q    You had a meeting with the Government face-to-face?

A    Yes, sir.  I did, sir.

Q    Not in a prison facility.

A    Yes, sir.

Q    Your attorney was present?

A    Yes, sir.

Q    Mr. Thomas O'Brien?

A    Yes, sir.

Q    He's a former United States attorney; correct?

A    Yes, sir.  He is, sir.

Q    Present in court here today watching you testify; correct?

A    Yes, sir.

Q    I'm sorry.  I spoke over you.

A    Yes, sir.  He is, sir.

Q    This morning you told us about how you first learned information with regard to a cell phone being linked that an inmate had and was discovered; correct?  That Mr. Brown's cell phone was discovered; correct?

A    Yes, sir.

**UNITED STATES DISTRICT COURT**

Q        And that once that phone was discussed, analysis was performed that turned out linking that phone to FBI; correct?

A        Yes, sir.

Q        You indicated it was known to be linked to the FBI civil rights division; right?

A        Yes, sir.

Q        You explained to the members of the jury that the way that Los Angeles Sheriff's Department was able to make that connection was through the assistance of task force officer Noah Kirk; correct?

A        Yes, sir.

Q        What is a task force officer?

A        It's a TLO, task force liaison officer, sir. Generally they are deputy sheriffs and at times supervisors or detectives that are assigned to various Federal Government agencies to help them perform their functions.

Q        All right.  So a task force liaison officer or TLO for short is employed by Los Angeles Sheriff's Department; correct?

A        Yes, sir.

Q        They have a dual duty as far as working with a federal agency?

A        Yes, sir.

Q        Isn't it true that the Los Angeles Sheriff's

UNITED STATES DISTRICT COURT

Department had a number of TLO's during this time period in 2011?

MR. FOX:  Objection.  Beyond the scope and relevance.

THE COURT:  Sustained.

MR. DIAMANTATOS:  Judge, may I be heard?

THE COURT:  No.

MR. DIAMANTATOS:  To avoid recalling the witness, Your Honor?

THE COURT:  Next question.

Q    BY MR. DIAMANTATOS:  But Mr. Kirk certainly in his role as a task force liaison officer had partnered with the FBI; correct?

A    Yes, sir.

Q    He had partnered with federal agencies; correct?

A    Yes, sir.

Q    And he was able to -- he was uniquely situated for LASD to have communication with him about what he knew; correct?

A    Yes, sir.

Q    And the TLO's didn't begin in 2011; correct?

MR. FOX:  Objection.  Relevance.  Beyond the scope.

THE COURT:  Sustained.

Q    BY MR. DIAMANTATOS:  You indicated that, when you

**UNITED STATES DISTRICT COURT**

were first -- you had a meeting in the middle of August that you described with Mr. Manzo and Mr. Smith and the TLO Kirk, and you learned some general information; correct?  That the phone was owned by the FBI?

A        I think it's pretty specific, sir, that I was told that it was an FBI phone and, not only within the FBI, it was a squadron within the FBI, sir.

Q        The civil rights squadron; correct?

A        Yes.  But that's a very specific description. That's the difference between homicide detectives and vice. It's a very, very specific declination, sir.

Q        Mr. Sexton, you were told specific information; right?

A        Yes, sir.

Q        You knew that a phone had been discovered.

A        Yes, sir.

Q        You were told this; correct?

A        Yes, sir.

Q        That that phone was linked to the civil rights squad of the FBI; correct?

A        Yes, sir.

Q        The next meeting that you described, Mr. Smith and Mr. Manzo and Mr. Thompson told you that they were trying to get to the bottom of it; right?

A        Yes, sir.

**UNITED STATES DISTRICT COURT**

57

Q       Now, the meetings that you described, the first one Sheriff Baca was not there; correct?

A       No, sir.

Q       Sheriff Baca was not at the second meeting that you described?

A       No, sir.

Q       He wasn't at any meeting that you participated in.

A       No, sir.

Q       You indicated, when you said that they were trying to get to the bottom of the phone, Mr. Thompson talked about three different scenarios of how that phone got in the jail; correct?

A       Yes, sir.

Q       What were those three scenarios?

A       One was a preacher or priest, one was a nurse, and one was a corrupt FBI agent.

Q       It was your understanding it was one of those scenarios they were trying to get to the bottom of, which one of those scenarios was the case?

A       Absolutely.  Yes, sir.

Q       You testified about -- one moment.

        Let's go through the first scenario.  What was your understanding of the preacher scenario?

A       I had no information on that, sir.

Q        What was your understanding of the second scenario, the teacher {sic} scenario?

A        I was given no information on that.

Q        What about the third?  Were you given any information on that?

A        Yes, sir.  I saw an e-mail from Deputy Noah Kirk that a phone was recovered and identified as an FBI phone to the civil rights squad.

Q        You didn't know at that point, Mr. Sexton, any information that the FBI had been gathering or was attempting to gather for Mr. Brown; correct?

A        No, sir.  I didn't.

Q        Were you given any information about Mr. Brown and his background?

A        Yes, sir, I was.

Q        What were you told about him?

A        I was told that Anthony Brown was sentenced to 450 years for several bank robberies.  I was told that he was charming, charismatic, manipulative, a liar, and dangerous.

Q        And to be clear, Mr. Sexton, the August 20th meeting that you discussed this morning or this afternoon during your testimony, you were not present for that August 20th meeting; correct?

A        I apologize.

Q        A meeting that you described where Mr. --

Sheriff Baca was present on a Saturday morning meeting, that was relayed to you secondhand; correct?

A      It was relayed to me by Deputy Smith and Deputy Manzo, sir.

Q      So you yourself were not present?

A      I was not at that meeting, sir.

Q      You had to rely on their recollection that occurred?

A      You have to have trust in your partners.

Q      You trusted them; right?

A      At that time, yes, sir.

Q      They told you what happened.  You listened.

A      That was the genesis of my orders, yes, sir.

Q      You testified with regard to the role that you served to change Mr. Brown's inmate name; correct?

A      Yes, sir.

Q      And you did that.

A      Yes, sir.

Q      You did that a number of times.

A      I was one of several deputies that did it, and I did it -- one is enough, but I did it two or three times.

Q      Just to be clear, there are times where that task is performed for a completely legitimate purpose?

A      Absolutely, sir.  I had done it about a hundred times prior to.

Q        Why would you have to do it in those hundred times that you described?

A        We were often protecting human sources.  We're making moves to protect people that are involved in high profile cases, et cetera, et cetera, sir.

Q        What is the et cetera, et cetera?  What are some other examples?

A        I didn't always participate in these, but homicide or special victims units would do it for cooperators.

Q        You indicated that -- one moment, Your Honor.

When you indicated "protect human sources," that means to protect individuals that are providing information; correct?

A        Yes, sir.

Q        Mr. Sexton, I want to direct your attention to an exhibit you were shown.  It has been received in evidence as Government Exhibit 54.  It should appear on the screen in front of you in a moment.

Sir, does that appear on the screen in front of you?

A        Yes, sir.

Q        You were asked questions about this e-mail.  The subject line, we see, is "Operation Pandora's Box"; correct?

A        Yes, sir.

Q        You indicated for the members of the jury the

UNITED STATES DISTRICT COURT

61

reference to Greek mythology; right?

A      Yes, sir.

Q      You came up with that name?

A      Yes, sir.

Q      You drafted the original e-mail that had that in the subject line; right?

A      Yes, sir.

Q      I want to direct your attention to Government Exhibit 55.  I'm sorry.  56.  I'm going to show you what's been received in evidence as Government Exhibit 56.  I'm going to ask to highlight the top half portion of that exhibit.

Does that appear in front of you, Mr. Sexton, on the screen?

A      Yes, sir.

Q      This particular e-mail is from you; correct?

A      Yes, sir.

Q      It's sent on Monday, September 12, 2011, according to the e-mail; correct?

A      Yes, sir.

Q      And you are addressing this to Raymond Cardenas?

A      Yes, sir.

Q      Who is Raymond Cardenas?

A      At that time, sir, he was assigned to watch commander spot for the Inmate Reception Center.

Q      The cc line includes Gregory Thompson; correct?

UNITED STATES DISTRICT COURT

A       Yes, sir.

Q       David Gutierrez who is a sergeant according to the e-mail?

A       Yes, sir.

Q       William Gilbert?

A       Yes, sir.

Q       Eliel Teixeira?  I'm sure I'm mispronouncing that.

A       Teixeira.

Q       He's on the e-mail in the cc line?

A       Yes, sir.

Q       Paterno Giovanni?

A       Yes, sir.

Q       Jason Pearson?

A       Yes, sir.

Q       Mickey Manzo?

A       Yes, sir.

Q       Gerard Smith?

A       Yes, sir.

Q       And the subject line in this one is Anthony Brown; correct?

A       Correct.

Q       And it includes a booking number?

A       Correct.

Q       You didn't use the term "Pandora's box" on this

**UNITED STATES DISTRICT COURT**

e-mail, did you?

A        I did not, sir.

Q        When you met with the FBI in 2012 and discussed the events that bring you to the stand today, isn't it true you told the FBI that Tanaka was running the show?

MR. FOX:  Objection, Your Honor.  Hearsay.

THE COURT:  Let's go to sidebar.

(The following proceedings were held at sidebar:)

MR. FOX:  Your Honor, my objection is that it's clearly hearsay.  Mr. Diamantatos is not using it for non-hearsay purposes such as a prior inconsistent statement. He has not said that Tanaka was not running the show or Baca was running the show.  So it is absolutely hearsay.

MR. DIAMANTATOS:  My response, Your Honor, is that this witness has made that statement, and I can confront him with the fact that Mr. Tanaka has made the statement.  Now, the fact that he made it to FBI, it doesn't matter.  It's a statement that he's made in the past.

THE COURT:  What are you offering it for?

MR. HOCHMAN:  Well, he --

THE COURT:  Excuse me, counsel.  It's one lawyer.

Go ahead.

MR. DIAMANTATOS:  During his direct examination he talked about bosses and reference to bosses.

THE COURT:  Uh-huh.

UNITED STATES DISTRICT COURT

MR. DIAMANTATOS:  I can certainly go back into the questioning, Your Honor, and highlight the fact that, during his direct examination, he described the higher ups, and he said from lieutenant on up.  I think that is probative to --

THE COURT:  That statement is not inconsistent with that, is it?

MR. DIAMANTATOS:  Well, highlighting the fact it is Mr. Tanaka that was running the show of the higher ups during that time period when he's asked about it by the FBI.

MR. HOCHMAN:  May I have a brief moment, Your Honor?

THE COURT:  That's fine.

(Counsel confer.)

MR. DIAMANTATOS:  Your Honor, I can go back in with a better series of questions to lay the proper foundation.

THE COURT:  Okay.

(The following proceedings were held in open court in the presence of the jury:)

MR. DIAMANTATOS:  May I proceed, Your Honor?

THE COURT:  Yes.

Q      BY MR. DIAMANTATOS:  Mr. Sexton, you testified earlier today references to "big bosses."

Do you remember that?

A      Yes, sir.

Q      And you indicated that you and others would refer

to the big bosses; right?

A       Yes, sir.

Q       And you told us that that was a reference to the higher ups; right?

A       Yes, sir.

Q       People from lieutenant, I think you said, all the way up.

A       Captain and above is the big boss, sir.

Q       Captain and above.

Who would that include, sir?

A       The big bosses?

Q       Yes.

A       I'll go from the top to captain.  That would be the sheriff, the undersheriff, the assistant sheriffs, the chiefs, commanders, and then captain.

Q       So big bosses would include -- and let's make sure we have the numbers right.

Sheriff is one person; correct?

A       Yes.

Q       Undersheriff is one person?

A       Yes.

Q       Assistant sheriff are two individuals?

A       At that time, yes, sir.

Q       How about chiefs?  How many chiefs were there?

A       I believe there were 12 chiefs at that time.

Maybe 8.  I know it's 8 or 12.

Q       So 8 to 12 during this time period?

A       Yes, sir.

Q       Based on your recollection?

A       Yes, sir.

Q       How many commanders were there?

A       Could be anywhere from 35 to 60.  The department got bigger very quickly after this.

Q       What about captains?

A       I don't know, sir.  A lot.

MR. FOX:  Objection.  Relevance.

MR. DIAMANTATOS:  Your Honor, he referred to big bosses during his direct examination.

THE WITNESS:  Around a hundred, sir.

THE COURT:  Excuse me.

Objection sustained.  Let's move it on.  The answer is stricken.  The jury should disregard it.

Next question.

Q       BY MR. DIAMANTATOS:  It was your understanding in August of 2011 that the big bosses were involved; correct?

A       Yes, sir.  Based on experience, yes, sir.

Q       And you met with the FBI in November of -- I'm sorry, sir.

Isn't it true that Mr. Tanaka was running the show?

MR. FOX:  Objection.  Vague.

THE COURT:  Sustained.

Q        BY MR. DIAMANTATOS:  In reference to the August through September, 2011, conspiracy that you described earlier in your testimony, isn't it true that it was your understanding that Mr. Tanaka was running the show?

A        That's my optic perspective, sir.

Q        Sir, isn't it true that Mr. Tanaka, based on -- you observed in August and September of 2011, it was your understanding that Mr. Tanaka was running the show?

A        No, sir.

Q        Isn't it true that you made that statement to the FBI when you met with them November 19 of 2012?

A        I said Mr. Tanaka was one of two people that could authorize the sheriff's department to coordinate three divisions in the L.A. County Sheriff's Department to move Inmate Anthony Brown.

Q        You told the FBI that Mr. Tanaka was in charge, didn't you?

A        I told them he was one of the people in charge that could coordinate three divisions to move Inmate Anthony Brown.

Q        Isn't it true that you told the FBI that Mr. Sexton -- I'm sorry.

You told the FBI that Mr. Tanaka was in charge of

the Brown investigation?

A    Sir, I need to refresh my memory on that.  Again, I made it very clear to the FBI over 15 to 20 meetings that there were three divisions in the L.A. County Sheriff's Department moving Inmate Anthony Brown, and that leaves it to one of two people, sir.  That's above an assistant sheriff.

Q    It was your impression that Mr. Tanaka was authorizing everything that had occurred.

A    It was my impression that the people above assistant sheriff were aligned that this was okay.  Mr. Tanaka was never fired or removed for using resources at that level.

Q    Isn't it true that you thought Sheriff Baca and Mr. Tanaka were not on good terms?

MR. FOX:  Objection, Your Honor.  Vague as to time.

THE COURT:  Sustained.

Q    BY MR. DIAMANTATOS:  From -- you testified about the name change to Mr. Brown.  You never spoke with Sheriff Baca about those name changes; correct?

A    Never directly, sir.

Q    Well, or indirectly; correct?

A    Sir, we're a paramilitary organization.

Q    Did you ever send him an e-mail?

A    No, sir.  But I received --

Q    Did you ever receive an e-mail from him?

**UNITED STATES DISTRICT COURT**

THE COURT:  Let him finish his answer, counsel.

MR. DIAMANTATOS:  Yes, Your Honor.

THE COURT:  You asked the question.

THE WITNESS:  Sir, I received e-mails from my unit commander who was operating under the authority of executives in the L.A. County Sheriff's Department, and he represented that he was in a meeting with Sheriff Baca and Undersheriff Tanaka and that these orders were approved by them.

Q    BY MR. DIAMANTATOS:  But you weren't present for that meeting, were you, Mr. Sexton?

A    No, sir.  Because I was 25 years old and a junior deputy.

Q    So you were not present, right?

A    Yes, sir --

MR. FOX:  Objection asked and answered.

THE COURT:  Sustained.

Q    BY MR. DIAMANTATOS:  You had to rely on what was told to you?

A    Yes, sir.  And you have to trust your supervisors and partners that where they're getting this information from is valid.

Q    But you had no personal firsthand knowledge if that information was true and valid; right?

MR. FOX:  Objection.  Asked and answered.

UNITED STATES DISTRICT COURT

THE COURT:  Sustained.

Q       BY MR. DIAMANTATOS:  In August through September of 2011, you were not personally present for any meetings when Sheriff Baca was present?

A       That is correct, sir.

MR. DIAMANTATOS:  May I have a moment, Your Honor?

THE COURT:  Yes.

MR. DIAMANTATOS:  Nothing further, Your Honor.

THE COURT:  Redirect?

**REDIRECT EXAMINATION**

BY MR. FOX:

Q       Mr. Sexton, you were asked on cross-examination about a number of meetings that you had with the Federal Government in 2012.  Do you remember when you were charged in this case?

A       I was indicted in December of 2013, sir.

Q       Since December, 2013, until Wednesday when you met with somebody from the Federal Government, had you had any conversations with the Federal Government about any of this?

A       Absolutely not, sir.

Q       Did you receive any benefits for providing information to the Federal Government in 2012?

A       No, sir.  I went to prison in August of 2016, sir.

UNITED STATES DISTRICT COURT

Q      But in -- in terms of -- in 2012, that specific information you were providing to the Government, did you receive any time off your sentence?

A      No, sir.

Q      Any charging consideration?

A      None, sir.

Q      Mr. Diamantatos asked you about the three different scenarios that Mr. Thompson provided.  One of that was we're looking into a corrupt FBI agent?

A      Yes, sir.

Q      Was it your understanding that, based on what Mr. Manzo was saying at that meeting, that they were looking into a corrupt FBI agent?

MR. DIAMANTATOS:  Objection, Your Honor.

THE COURT:  Overruled.

THE WITNESS:  At the time, sir, when we were discussing the scenarios, I was approaching it like I would approach any investigation.  I had information.  The most -- the scenario that I had the most information about, sir, was the one that I saw the e-mail where there was, first and foremost, the FBI involved.  Secondly, the civil rights squad was involved.

Q      BY MR. FOX:  So how did that form, in your opinion, the fact the civil rights squad was involved?

A      I quickly ruled out the preacher and the nurse,

sir.

Q        I want to now ask you about that e-mail with Mr. Cardenas that you changed the subject line from "Operation Pandora's Box" to "Anthony Brown."

Do you recall that?

A        Yes, sir.

Q        Was Mr. Cardenas one of your co-conspirators in this --

A        No, sir.  And the reason I changed the subject line was because there are a lot of people on that e-mail.  This operation was very -- it was expansive.  It included a lot of divisions and personnel in the department.  I was showing respect to Lieutenant Cardenas at the time, and I was being more formal.  You saw -- in the signature line you saw "Respectfully, James Sexton," no initials.

MR. FOX:  No further questions.

THE COURT:  Anything else?

MR. DIAMANTATOS:  Very briefly.  Thank you, Your Honor.

**RECROSS-EXAMINATION**

BY MR. DIAMANTATOS:

Q        Mr. Sexton, isn't it true that Mr. Thompson never referred to this as Operation Pandora's Box?

MR. FOX:  Objection.  Beyond the scope.

THE COURT:  Sustained.

Q        BY MR. DIAMANTATOS:  Mr. Leavins never referred to it as that; correct?

MR. FOX:  Objection.

THE COURT:  Sustained.  Counsel, unless you have something new, you're beyond the scope.

Q        BY MR. DIAMANTATOS:  During the meetings that you were asked about with the Government before you were charged, you recall that; correct?

A        I recall most of them, yes, sir.

Q        You were hoping the Government would view you favorably for doing that; correct?

A        No, sir.

Q        You were meeting with them out of your own just to meet with them?

A        I was meeting with them because I was trying to participate in change of the Los Angeles County Sheriff's Department.

Q        And you had several meetings with them; correct?

A        I had -- in totality I had 38, sir.

MR. DIAMANTATOS:  Nothing further, Your Honor.

MR. FOX:  Nothing, Your Honor.

THE COURT:  All right.  Ladies and gentlemen, we're going to take a short break.  Again, I want to remind you, until this trial is over, you're not to discuss this case with anyone including your fellow jurors, members of your

family, people involved in the trial, or anyone else.  And do not allow others to discuss the case with you.  This includes discussing the case on the Internet, by e-mails or text messages, or any form of social media.  If anyone tries to communicate with you about this case, please let me know about it immediately.

Do not read, watch, or listen to any news reports or other accounts about the trial or anyone associated with it. Do not do any research such as consulting dictionaries, searching the Internet or using other reference materials, and do not make any investigation about the case on your own.

Finally, you're reminded to keep an open mind until all the evidence has been received, you've heard the arguments of counsel, the instructions of the Court, and the views of your fellow jurors.  If you need to speak with me, simply give a note to the clerk.

We'll come back in ten minutes.

(The following proceedings were held in open court out of the presence of the jury:)

THE COURT:  Let me see counsel at sidebar.

(The following proceedings were held at sidebar:)

THE COURT:  Okay.  Who's next?

MR. FOX:  It is Cecil Rhambo.

THE COURT:  Okay.  And how long do you expect him?

MR. FOX:  I think his direct is under 30 minutes. It might be even less than that.  It may be 20 minutes.  I think it's worth getting him on the stand.

THE COURT:  Okay.  I have a note from one of the jurors.  I believe it's Alternate No. 2.  It reads "Need to talk to the judge.  Thank you."

So get them back in here.  We'll get Rhambo on the stand.  We're going to quit at 1:30.  I know the reporter has something she's got to do.  So we're going to quit right at 1:30.  I'll send the jury out.  We'll bring him in and leave them here until we get some idea what this is about.

He was coming in this morning and said, "Judge, can I ask you a question?"  I let him in.  And I said, "Write a note."

MR. FOX:  Thank you, Your Honor.

MR. HOCHMAN:  Thank you, Your Honor.

MR. FOX:  You want the witness on the stand?

THE COURT:  Yes, please.

(Further proceedings were held and
reported but not included herein.)

**UNITED STATES DISTRICT COURT**

CERTIFICATE OF OFFICIAL REPORTER

I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

DATED THIS  11TH  DAY OF DECEMBER, 2016.


/S/ MIRANDA ALGORRI

MIRANDA ALGORRI, CSR NO. 12743, CRR
FEDERAL OFFICIAL COURT REPORTER

**UNITED STATES DISTRICT COURT**