UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE PERCY ANDERSON, U.S. DISTRICT JUDGE

UNITED STATES OF AMERICA, Plaintiff, vs. LEROY D. BACA, Defendant.

Case No. CR 16-00066(A)-PA

PAGES (1 to 95)

REPORTER'S TRANSCRIPT OF TESTIMONY OF LEAH TANNER
WEDNESDAY, DECEMBER 14, 2016
11:10 A.M.
LOS ANGELES, CALIFORNIA

MIRANDA ALGORRI, CSR 12743, CRR
FEDERAL OFFICIAL COURT REPORTER
312 NORTH SPRING STREET, ROOM 435
LOS ANGELES, CALIFORNIA 90012
MIRANDAALGORRI@GMAIL.COM

**APPEARANCES OF COUNSEL:**

**FOR THE PLAINTIFF:**

EILEEN M. DECKER
United States Attorney
BY: BRANDON FOX
BY: EDDIE A. JAUREGUI
Assistant United States Attorneys
United States Courthouse
312 North Spring Street
Los Angeles, California 90012

**FOR THE DEFENDANT:**

MORGAN LEWIS AND BOCKIUS LLP
BY: NATHAN J. HOCHMAN
BY: BRIANA ABRAMS
The Water Garden
1601 Cloverfield Boulevard
Suite 2050 North
Santa Monica, California 90404

MORGAN LEWIS AND BOCKIUS LLP
BY: TINOS DIAMANTATOS
77 West Wacker Drive
Chicago, Illinois 60601

# I N D E X

**WEDNESDAY, DECEMBER 14, 2016**

## Chronological Index of Witnesses


| Witnesses: | Page |
|---|---|
| TANNER, Leah | |
| Direct examination by Mr. Fox | 6 |

**EXHIBITS**

**WEDNESDAY, DECEMBER 14, 2016**

| Exhibit | | For ID | In EVD |
|---|---|---|---|
| 157 | Baca phone summary | 32 | 34 |
| 170 | Tanaka phone summary | 33 | 34 |
| 172 | Phone summary for select days | 33 | 34 |
| 132 | Inmate Information Center record for Anthony Brown | 50 | 50 |
| 102 | Baca appearance on FOX Good Day LA | 73 | 73 |
| 99 | Synched audio and video of approach of Leah Marx | 76 | 77 |
| 100 | Recording of phone call from Carlos Narro to Maricela Long | 76 | |

**LOS ANGELES, CALIFORNIA; WEDNESDAY, DECEMBER 14, 2016**

**11:10 A.M.**

**---**

(The following proceedings were held in open court in the presence of the jury:)

(Prior proceedings held and reported but not included herein.)

MR. FOX: United States calls Special Agent Leah Tanner.

THE CLERK: Stand here for me, please. Raise your right hand.

Do you solemnly state that the testimony you may give in the cause now pending before this court shall be the truth, the whole truth, and nothing but the truth, so help you god?

THE WITNESS: I do.

THE CLERK: Please be seated.

Would you please state your full name and spell your last name for the record.

THE WITNESS: Leah Tanner, T-a-n-n-e-r.

THE CLERK: Thank you.

MR. FOX: May I proceed, Your Honor?

THE COURT: Yes.

///

**LEAH TANNER,**

**GOVERNMENT'S WITNESS, SWORN:**

**DIRECT EXAMINATION**

BY MR. FOX:

Q What do you do for a living?

A I'm a special agent with the FBI.

Q How long have you been a special agent with the FBI?

A Approximately seven-and-a-half years.

Q Are you assigned to a particular squad?

A Yes.

Q What squad is that?

A Public Corruption Squad.

Q What are your duties on the squad?

A I'm responsible for investigating public corruption offenses in Los Angeles region.

Q Can you give some examples of public corruption offenses?

A Sure. Some of the things we investigate would be mail fraud, wire fraud, bribery, other types of public corruption offenses involving public officials.

Q How long have you been on the squad?

A Approximately five-and-a-half years.

Q What did you do before that?

A I worked on a civil rights squad.

Q What were your responsibilities when you were working on the civil rights squad?

A We were tasked with investigating various civil rights offenses that are federal crimes. So hate crimes, human trafficking, and then Color of Law.

Q What are Color of Law offenses?

A Color of Law offenses are when an individual under the authority of, say, law enforcement, under the authority of their badge, their job, violates the civil rights of an individual.

Q Did there come a time when you were working on the civil rights squad that you were assigned to an investigation involving the Los Angeles County Sheriff's Department?

A Yes.

Q When was that?

A Approximately June of 2010.

Q How long had you been an agent at that point?

A Approximately one year.

Q How was it that you were initially assigned this task?

A My supervisor came to me with a letter from an inmate who was housed at the county jail and asked if I wanted to follow up on the contents of the letter.

Q Now, the supervisor, was he assigned to a

particular squad?

A Yes.

Q What squad was that?

A He was the supervisor for the civil rights squad.

Q Do you know how long he had been an FBI agent at that point?

A Somewhere between 15 and 20 years.

Q What was in that letter that he provided to you?

A It was a letter from an inmate that alleged deputies within the county jail were assaulting inmates for no reason and causing significant injuries such as broken bones, knocking out teeth, things like that.

Q What did you do once you received this letter?

A I was able to locate the inmate, and he was still housed at county jail. So along with another agent from the squad, I went down and interviewed the inmate.

Q Over time, did your investigation expand in any way?

A Yes.

Q In what way?

A After interviewing the initial inmate and talking to him, I received additional names and information on other inmates who alleged similar things. And so I began to interview additional inmates and get information from them about what they were alleging was occurring in the jails.

Q Was there a pattern to the allegations?
A Yes.
Q What was that pattern?
A The inmates were -- despite being on different floors and having, you know, different accounts of actual incidents, the description of what was occurring was similar which was deputies were assaulting inmates for no reason and then lying on the reports in order to falsely charge the inmates with a crime they didn't commit.
Q In the beginning, how were you investigating these incidents?
A It was in a covert way. We were just trying to gather information from the inmates and in a way that wouldn't tip off the sheriff's department that we were looking into these things.
Q How were you doing that?
A It was not very easy. It was pretty much just interviewing inmates and doing anything that we could with phone records and other types of outside investigation that wouldn't involve the sheriff's department.
Q So these interviews were occurring in the jails?
A Yes.
Q Which jail specifically?
A We went to two jails. Twin Towers, but primarily the interviews were at Men's Central Jail.

Q Were there occasions when you were asked why you wanted -- why you were there?

A Every once in a while it would just be small talk with the deputies. They would ask why, and I would -- we would usually just say we were trying to get information from an inmate. But I also told a couple of deputies that I was working a human trafficking case.

Q Why did you tell them that?

A We did not want to tip our hand that we were investigating civil rights offenses in the jails. So I just told them that we were investigating a human trafficking case given that I did investigate human trafficking at the time as well.

Q At the beginning, how many agents were involved in your investigation?

A Primarily it was two. There was myself and Special Agent Lam, but a lot of times, if there wasn't someone available or if Agent Lam wasn't available, I would take another agent from the squad. And then, in addition to that, with my supervisor and other individuals at the U.S. Attorney's Office.

Q When you went to the jails, would you go alone?

A Never.

Q Why?

A In general, we try to have two agents on every

interview with individuals. Just having two people there is helpful. But especially in the jails, we would never go and interview an inmate by ourselves in the jail.

Q Why?

A Just for safety reasons as well as to make sure that there's always two agents there to verify what the inmate said or didn't say.

Q What would you do with the information you received from the inmates you were interviewing?

A It would be written in a report. It would be documented to outline everything the inmate told us, the day, all that type of information so we could go back and review it.

Q Who would write the reports?

A Either myself or the other agent that was in the room for that interview.

Q What would happen to these reports that you wrote?

A After we drafted them, we would send them to my supervisor. He would read them, make any grammar corrections that he felt were appropriate, and then he would approve them, and they would go into the case file.

Q Are you familiar with a deputy named William David Courson?

A Yes.

Q Did you engage in any covert work with respect to

Mr. Courson?

A I did.

Q Before we get into what that covert work was, why don't you explain why you did this with Mr. Courson specifically.

A When I would go to the jails, the inmate interview rooms were on the 6000 floor which is just an area. It's not a specific -- it's not like sixth floor. It's just a floor. Mr. Courson worked right outside the interview rooms and would periodically strike up conversations with me while we were waiting for an inmate to come down. One of the times he was talking, he, off the cuff, made a statement to me about how he got into an altercation with an inmate and used his flashlight on the inmate and when he did not need to use the flashlight.

Q And what happened with Mr. Courson over time? Did he ever ask you for anything?

A He asked me to meet up outside of work.

Q When he asked you that, what did you do?

A I initially said no. I don't even know if I said no. I just kind of ignored it. But then after that I went and spoke to my supervisor and explained to him what Deputy Courson had said about hitting the inmate with the flashlight. And given that that's what we were investigating, my supervisor asked if I would be willing to meet up with Deputy Courson and

wear a wire so I could record what he was saying.

Q Where would you meet him generally?

A Usually at a restaurant.

Q Would you have any alcoholic beverages?

A Never.

Q Would he?

A I think one time he might have had one drink.

Q And how many times, approximately, did you meet with him in a covert fashion?

A I think it was three or four.

Q In terms of your first meeting with him, did he provide you with any information that corroborated some of the allegations you were receiving from inmates?

A Yes.

Q What did he tell you?

MR. HOCHMAN: Objection. Foundation as to the date of this meeting, Your Honor.

MR. FOX: Your Honor, I'm happy to ask the questions. Thank you.

Q Special Agent Marx, your first meeting with Mr. Courson, was it around August of 2010?

A Yes.

Q And where did it occur?

A I believe the first meeting was at Century City Mall at a restaurant there.

Q Was anyone else present during your conversation with Mr. Courson?

A There was a surveillance team that was at the restaurant to make sure that there was somebody watching the whole interaction. But in terms of having someone sitting there with us in the conversation, no. It was just the two of us.

Q What, if anything, did Mr. Courson say at this first meeting that corroborated the allegations you were receiving from inmates?

A There were a couple things, but some of the things that stood out were -- one of his statements was, when discussing a deputy being involved in an altercation with an inmate, he stated that, if you --

MR. HOCHMAN: Objection. Hearsay.

THE COURT: Overruled.

You can answer.

THE WITNESS: He basically said, if you write it, it happened, meaning, if a deputy wrote that an inmate swung at him, then that's what happened even if it didn't happen.

Q BY MR. FOX: On your second meeting with Mr. Courson, did that also occur around the time of the end of August, 2010?

A Yes.

Q And in this meeting, did he provide you with

additional information about maybe unwritten rules that were going on?

A Yes.

Q What, if anything, did he say about an unwritten rule?

A So one of the unwritten rules in the jails was that, if an inmate --

MR. HOCHMAN: Objection. Nonresponsive.

THE COURT: Overruled. You can answer.

THE WITNESS: One of the unwritten rules was, if an inmate did get into an altercation with the deputy, that the inmate would always go to the hospital, meaning the injuries would be so significant that it would require the inmate to go to the hospital, and that was just an unwritten rule no matter what the inmate was doing.

Q BY MR. FOX: Was your next meeting with Mr. Courson about a month later?

A I think it was about a month, yes.

Q Do you remember where that meeting occurred?

A I want to say that one was at B.J.'s Restaurant if I'm not mistaken.

Q Was anyone else present besides you and he?

A Another surveillance team. Every single meeting there was either a team or at least one other agent watching.

Q What, if anything, did Mr. Courson say to you at

that point about the inmates and whether they deserved what happened to them?

A He told me that most of the inmates did not deserve what happened to them in the jails at the hands of the deputies.

Q What, if anything, did Mr. Courson's statements to you do to your investigation? What effect did they have on the investigation?

A Well, at that point we only had statements from inmates which is always an issue because you always have to question the credibility of individuals in that situation. But he was corroborating a significant amount of what the inmates were telling us in the interviews.

Q Why not then go at that point and approach Special Agent Courson -- I'm sorry -- Deputy Courson and ask him to cooperate in the investigation?

A There was a couple reasons. One of the main reasons is that, if I had approached him and asked him to cooperate and he said no, I would have completely outed our investigation at that point. We felt it was really important to continue to investigate prior to anyone knowing that we were investigating so that we could get additional evidence. But, also, the fact that at that point in time, you know, Deputy Courson had made statements that he had engaged in the very conduct that we were investigating.

Q Did you continue to interview inmates during this time?

A Yes.

Q Did you encounter at some point one named Anthony Brown?

A Yes.

Q What is it -- well, how do you know -- how did you come to meet Anthony Brown?

A Anytime we would interview an inmate, it was typical that that inmate would then tell us you should go speak to this inmate or this inmate also has information. And so during the interview of one inmate, they mentioned that we should speak to this individual named Anthony Brown.

Q Where was he located when you were interviewing him?

A He was housed on the 2000 floor.

Q What did the 2000 floor mean to you?

A The 2000 and 3000 floor were both floors that we had been focusing a lot of our attention on based on the interviews with inmates and what Deputy Courson had told me in terms of what goes on in the jails. And so knowing that he was housed on the 2000 floor, we definitely wanted to interview him.

Q Did you eventually sign him up as an informant?

A Yes.

Q When?

A I think it was September of 2010.

Q Why Anthony Brown?

A Anthony Brown had the access we needed. He was housed on a floor that a lot of the incidents had occurred on as well as he had a lot of medical issues and, therefore, was out of his cell quite a bit to go down to the clinic or just to, you know, leave for medical treatments. So it allowed him to walk around and see more things on the floors than a typical inmate who was in his cell a lot.

Q What does it mean to be an FBI informant?

A It's a formal process that we go through in order to sign some -- we call it sign someone up as an informant. And we approach someone that has access to the information we're looking for and asks whether or not they would be willing to work for us and gather information on our behalf. They're given source numbers so that their name is protected.

Q What are some of the things you are required to do before you sign somebody up as an informant?

A In any case you usually talk to your supervisor, just explain to them who the person is and whether or not the supervisor agrees that this would be an appropriate person as a source. You run a criminal history check on the individual, and then you run checks within the FBI system to determine whether or not they either are already a source or were a

source in the past.

Q At the time you signed him up as a source, then you were aware that Mr. Brown had an extensive criminal history?

A Yes.

Q Why sign him up as a source then?

A It would be impossible to have an inmate source who doesn't have a criminal history. The most important thing in this situation was not that we had someone with a clean criminal history. It was that we had someone with access who could tell us what was going on, and he had the access on the 2000 floor.

Q Did you decide on your own to sign Mr. Brown up as an informant?

A No.

Q Who did you discuss this with?

A I discussed it with other members of my squad as well as my supervisor. But, in general, in order to sign an individual up as a source, it requires multiple levels of approval from management and the FBI.

Q In 2010 alone -- let's just stick to 2010 -- approximately how many inmates had you interviewed at that point?

A I'm sorry. What time frame?

Q 2010.

A A couple dozen probably at that point.

Q At some point did you stop going to the jails?

A Yes.

Q When is that?

A I believe it was the end of 2010, maybe early 2011.

Q Why did you stop going to the jails at that point?

A It was becoming too obvious that I was going to the jails frequently, and I could only keep up my cover story for so long that I was interviewing about human trafficking or other types of cases. So in order to not draw too much suspicion on myself or the inmates, I decided to stop physically going to the jail myself.

Q Were you able to continue your investigation in any way after stopping?

A Yes.

Q What did you do?

A I reached -- I spoke to my supervisor, and we agreed that we would actually introduce an undercover to start going to the jails to meet with Anthony Brown to continue gathering information.

Q Did the undercover go by an undercover name?

A Yes.

Q What was that name?

A C.J.

Q Now, I'm going to ask you about the covert operation in a second involving C.J. But first, based on your experience, are there any inherent difficulties in civil rights investigations involving jails?

A Yes.

Q What are those difficulties?

A One of the main ones is access, of course, that we are not able to go into the jails, you know, without individuals being aware that we're there because we have to sign in, show our ID's, things like that. But the other thing is inmates, again, are witnesses where you have a lot of questionable credibility. And so in order to get corroborating info, you have to have more than just an inmate saying something is happening.

Q So what did you decide to do in order to try to get more information in order to see if federal crimes were occurring in the jails?

A Based on the information we had received from Anthony Brown as well as other inmates, we decided to engage in an undercover operation.

Q Eventually -- well, let's just talk about that undercover operation.

What was the general plan for the undercover operation?

A The general plan was that the allegations we had received about deputies being willing to smuggle in contraband in exchange for cash, we were going to set up C.J., our undercover agent on the outside of the jails, to attempt to meet with a deputy who had agreed to accept a bribe and smuggle in contraband.

Q Now, you said "we" there. Was it just you and Special Agent Lam who decided this?

A No.

Q Who was part of the decision-making process with this undercover operation?

A There was a significant amount of people. Discussions included the -- my supervisor, executive management in the FBI, the headquarters unit in Washington, D.C., as well as the U.S. Attorney's Office.

Q Are you familiar with the term "otherwise illegal acts"?

A Yes.

Q What are "otherwise illegal acts"?

A It's when an individual, if they were to engage in a specific behavior that's against the law on their own, it would be illegal. But if we're asking at the direction of the FBI for an investigation, we're asking someone to do something, then it's not illegal. It's authorized.

Q Did you obtain the necessary approvals to engage

in those undercover operations?

A Yes.

Q Were those locally or --

A It was -- I'm sorry.

Q Go ahead.

A It was both. It was locally through executive management in the L.A. office as well as Washington D.C. in our FBI Public Corruptions Civil Rights Unit in D.C.

Q Special Agent Tanner, did you ever take a phone call from Anthony Brown while you were sitting at your desk?

A I did.

Q Why did you answer the phone call?

A It was after the undercover agent had provided Gilbert Michel with the phone and the cash, or it was either right before they were about to meet or right after they met, and I knew Anthony Brown was getting very anxious because he knew something was about to happen. And I wanted him to calm down and, one, to stop calling me and, also, to understand that things were moving and the operation would happen soon. And so I answered the phone to tell him that.

Q Was anyone in your presence when you answered the phone?

A My supervisor.

Q Did you answer the phone on your own, or did somebody tell you to answer the phone?

A At first I wasn't going to answer it, and my supervisor said, "Go ahead." So I did.

Q How was Anthony Brown as an informant?

A Difficult.

Q In what ways?

A He was very anxious. He always wanted to know what was going on. Even if it had nothing to do with him, he just always felt like he needed to know what was happening, who said what. In order to get him to calm down, it took a lot of just talking to him and explaining to him there were things we couldn't tell him about the investigation, but he was just very anxious.

Q If he was difficult, why use him?

A He had the access and was also willing to work with us which, again, not everyone is willing to be an informant, especially with law enforcement. It's not something that everyone wants to do, and he was willing to do that.

Q Approximately when did this first undercover meeting occur between C.J. and the deputy?

A It was the end of July of 2011.

Q At the time did you know who the deputy was?

A No.

Q Did you eventually learn who it was?

A Yes.

Q Who was the deputy?

A Gilbert Michel.

Q Please describe the undercover operation that occurred at the end of July of 2011.

A C.J. got in contact with Gilbert Michel, and they agreed to meet in a parking lot. The agreement was that he -- C.J. would provide half of the cash bribe along with the cell phone to the deputy, and once the phone was delivered, then he would receive the remaining cash at a separate meeting.

Q How many agents were participating in the undercover events at this time?

A There was a ground surveillance team which had probably five, six, seven agents who were watching the exchange. A couple agents on the squad were watching from far back as well as an air surveillance -- an airplane that was able to get video of the exchange.

Q Was it recorded?

A Yes.

Q Where were you?

A I was in the airplane.

Q In order to do an undercover operation, is there any sort of written plan that you need to come up with?

A Yes.

Q Did you do that here?

A Yes.

Q What happens with your written plan?

A It goes through the approval process with management. So once I draft it, it goes to my supervisor. He makes any changes or additions that he feels necessary, and then from there it goes to additional levels of approval. In addition, it's almost a -- I don't know if you call it a dual track. You also go to the D.C. group of supervisors to get their approval on the same operation.

Q What was the result of that first undercover operation?

A Gilbert Michel accepted the bribe and took the cell phone from the undercover agent.

Q Why not arrest him on the spot?

A At that point in time, we did not know 100 percent that he was going to take the phone in. And if he had just taken the cash and walked away and never brought the phone in, that wouldn't have met the statute for a federal crime. So it wouldn't have been something we could have charged anyway.

Q Were there other reasons?

A At that point in time, for all we knew, Gilbert Michel could have told the sheriff's department that he had someone who was trying to bribe him and was actually doing his own -- I don't want to say his own operation but was actually taking the cash and going to the sheriff's department and saying here's the case. Go ahead, C.J.

Q Was there a second meeting?

A Yes.

Q When, approximately, did this occur?

A Early August of 2011.

Q What was the purpose of this second meeting?

A The second meeting was to give the remaining cash to Gilbert Michel as well as a kite, which is a note basically, to Gilbert Michel.

Q Did you come up with an operations plan for this undercover event?

A Yes.

Q Did it receive the same approvals as your other one?

A Yes.

Q What happened with the undercover operation on that date?

A Gilbert Michel took the additional cash and the kite from C.J. and left.

Q Why not arrest him then?

A At that point, even though we knew the cell phone had been introduced into the jail at that point, we still had no way to learn whether or not Michel had, in fact, notified the sheriff's department that this was going on. In addition, we believed we needed more information to solidify our case in order to charge him; so we didn't want to arrest him and not

have enough in order for the charges to stick.

Q Did you have a plan with respect to this undercover operation as to what Anthony Brown would be doing with the cell phone if he received it?

A Yes.

Q What was that plan?

A It was primarily to contact the undercover agent so that he could text him. Texting was more likely than phone calls just because it's more difficult to hide a phone if you're on it. But to text the undercover agent various information, deputy names if there were altercations that occurred. And there was also a small camera on the flip phone that, if he were in his cell and had a view of something that had happened, he could take a picture.

Q Why couldn't you just go back to the jails and find out this information from Anthony Brown?

A Again, I was trying to stay away at that point to not draw more attention to the fact that I was constantly visiting Anthony Brown. And so it just allowed -- at this point, it allowed C.J., our undercover agent, to continue to get information without it being obvious that Anthony Brown was providing us information.

Q Were you aware of some of the risks of a cell phone in jail?

A Yes.

Q Why take those risks?

A There are risks, but at this point in time, the allegations we had received were pretty significant including, you know, the significant injuries on these inmates as well as inmates being charged for not even doing anything. But then also the allegations that deputies were smuggling in contraband, and not just Gilbert Michel, but we had allegations of additional deputies. So we felt it was worth the risk to determine whether or not there was more stuff going on.

Q Now, you've talked about things that you learned during your interviews of inmates. Did you also take into account other things that were in the public light regarding allegations in the jails?

A Yes.

Q What were those?

A Prior to or around the time that I started to investigate, I learned that there were a lot of outside agencies that had made allegations of significant inmate abuse for many years. So it wasn't just the inmates claiming it was happening. I had learned that multiple outside nonprofits or other government entities even were alleging this was going on.

Q Did you do anything with the phone to try to track how it was being used?

A Yes.

Q What did you do?

A So the phone was set up that I could log onto like an online system and look at phone calls that were made. I couldn't get content, but I was able to see almost like a phone log. So if a phone call was made, I would see the phone number that was called, or if a text message was sent or received, I could see the numbers that were going back and forth. And I also had the ability to terminate the service immediately online if I needed to.

Q How often did you check it?

A Every day.

Q Did you learn at some point that Anthony Brown had used that phone in a way that it was not intended to be used?

A Yes.

Q What did you learn?

A It was actually prior to it even happening. Anthony Brown reached out to the undercover agent and told him, when Gilbert Michel gave him the phone for the day, that his cellmate -- Anthony Brown's cellmate had seen the phone and said, "I want to call my girlfriend." So Anthony Brown was getting nervous and asked the undercover agent is it okay if he calls his girlfriend on it because, if I tell him no, basically it won't end well. So he asked the undercover agent for permission.

The undercover agent called me, and we discussed

it and agreed, for Anthony Brown's safety, that he would, in fact, let the cellmate call his girlfriend. But the undercover agent advised listen to the entire call or review any text message before he sends it.

Q At some point did you learn that the cell phone had been recovered by the sheriff's department?

A Yes.

Q How did you learn this information?

A The day that it -- actually, I believe right around the moment it was found, Gilbert Michel called the undercover agent and frantically told him to drop, meaning drop his number, meaning get rid of your phone number because they found the phone.

Q Did you tell the sheriff's department that this was an FBI phone on August the 8th after it was recovered?

A No. Once the undercover called me, I went and immediately notified my supervisor and terminated the service on the phone.

Q Why didn't you then tell the sheriff's department that the phone was connected to the FBI?

A At that point we had no reason that our investigation was actually compromised because the cell phone itself was not linked to the FBI. It was paid for in cash. So we believed it was possible for us to continue our investigation without actually notifying the sheriff's

department.

Q Did you personally go to Men's Central Jail to meet with Anthony Brown right after the phone was recovered?

A No.

Q Did you send anybody there?

A Yes.

Q Who did you send there?

A In order to, again, not be too obvious in showing up to the jail, especially right after this had happened, I reached out to one of our gang agents and asked if he would be willing to go down and meet with Anthony Brown just to check in and make sure everything was okay.

Q Did he agree to do that?

A He did.

Q Without getting into the substance of what he reported back to you, do you know whether he was able to meet with Anthony Brown?

A He was not.

Q I want you to look in the exhibit books. There should be one that has Exhibits 157 through 172 in it. Can you look at that book. I'd like you to look through Exhibit 157.

(Marked for identification Exhibit No. 157.)

Q BY MR. FOX: Please tell me if you recognize it.

A (Witness reviewing exhibit.)

It's a summary sheet -- a summary spreadsheet of phone records.

Q For who?

A Lee Baca.

Q How was that sheet created?

A The bureau -- the FBI subpoenaed phone records for Lee Baca's county-issued cell phone. Once we received those records, I took the records and put them into a spreadsheet and then analyzed them, meaning, instead of just having phone numbers, I was able to determine who the numbers belonged to and then put it into a spreadsheet for a specific period of time so it would be easier to determine who Mr. Baca was speaking to.

Q Could you please also look at Exhibit 170.

A Okay.

(Marked for identification Exhibit No. 170.)

Q BY MR. FOX: Do you recognize that?

A Yes.

Q What is it?

A It's a phone summary sheet that I created for Paul Tanaka's county-issued cell phone.

Q What about Exhibit 172?

(Marked for identification Exhibit No. 172.)

THE WITNESS: This is, again, a phone summary spreadsheet that I created that is with -- for specific days,

and it includes multiple individuals from the sheriff's department as well as some additional people that were called, and it's specific to certain days between August 18 and September 26th.

Q BY MR. FOX: Are Exhibits 157, 170, and 172 accurate summaries of documents that you compiled using voluminous records?

A Yes.

MR. FOX: Your Honor, I move for the admission of Exhibits 157, 170, and 172.

MR. HOCHMAN: No objection.

THE COURT: It will be received.

(Received into evidence Exhibit Nos. 157, 170 and 172.)

MR. FOX: I'm now going to publish Exhibit No. 15.

THE COURT: Is this a convenient time for us to take our final break?

MR. FOX: Yes, Your Honor.

THE COURT: All right. Ladies and gentlemen, we're going to take our final break of the day. Again, I want to remind you you're not to discuss this case with anyone including your fellow jurors, members of your family, people involved in the trial, or anyone else. And do not allow others to discuss the case with you. This includes discussing the

case on the Internet, bulletin boards, various social media, by e-mails, text messages. If anyone tries to communicate with you about this case, please let me know about it immediately.

Do not read, watch, or listen to any news reports or other accounts about the trial or anyone associated with it. Do not do any research such as consulting dictionaries, consulting the Internet, or using other reference materials, and do not make any investigation about the case on your own.

Finally, you're reminded to keep an open mind until all of the evidence has been received, you've heard the arguments of counsel, the instructions of the Court, and the views of your fellow jurors. If you need to speak with me, simply give a note to the clerk.

We'll come back at 12:00 o'clock.

(The following proceedings were held in open court out of the presence of the jury:)

THE COURT: You may step down.

MR. FOX: Your Honor, may I ask Special Agent Tanner one question about her schedule?

Okay. Thank you, Your Honor. Nothing further. I just wanted to make sure with her special services if she needed more time. She's okay.

THE COURT: All right. I was going to ask you. Do we need to take another break?

MR. FOX: I don't think so. I think this is

going to be good enough. If we're just going until 1:30, I think that will be good enough.

THE COURT: All right.

MR. FOX: Thank you.

(A recess was taken at 11:46 a.m.)

THE COURT: Let's bring the jury in.

(The following proceedings were held in open court in the presence of the jury:)

MR. FOX: May I continue, Your Honor?

THE COURT: Yes, please.

Q BY MR. FOX: Special Agent Tanner, I probably should have asked this in the beginning.

In August and September of 2011, did you have a different last name?

A I did.

Q What was your last name then?

A Marx.

Q Now, showing you what we left with which is Government Exhibit 15, this is an e-mail from Steve Martinez to Leroy Baca saying, "Please call." Who was Steve Martinez at this time?

A He was the assistant director in charge of the FBI Los Angeles office.

Q What time is the next e-mail sent on August 18?

A 5:06 p.m.

Q What does it state?

A "Lee, I have an important and sensitive matter I need to discuss with you. If you have an opportunity this evening, please call me at 310-883-8539. Regards, Steve."

Q I'm now going to publish what's in evidence as Government Exhibit 157. What is this chart again?

A This is the summary of Lee Baca's county-issued cell phone.

Q I'm going to highlight for you certain times from August 18 at 5:40 to August 18 at 5:57 p.m. Could you please tell the jury -- obviously the left column is the date.

What do you base the time on?

A On the phone records it would be the time that the call is made. Either the incoming call is -- comes through or when the individual -- so in this case, Lee Baca -- made an outgoing call.

Q You say "when the person made the call." Is the person listed on the left the one making the call?

A Correct.

Q And the one on the right receiving the call?

A Correct.

Q What about the ones we see on the far right column?

A That's the duration. I believe it's either rounded up or rounded down depending on -- in the phone

records, they either round it up or down depending, if it was a minute, 1, it might just say one minute. If it was a minute 59, it would say two minutes.

Q So that's in minutes on the right-hand side?

A Yes.

Q What do your records show occurred at 5:40 p.m. on August 18?

A Lee Baca called Steve Martinez's cell phone, and they talk for five minutes.

Q What happened next on the call?

A There's a second call at 5:45. Same thing. Lee Baca calls Steve Martinez's cell phone, and they speak for five minutes.

Q Other than the voicemail call we see at 5:50, what do we see at 5:49 and 5:55?

A At 5:49 Lee Baca calls the executive secretary, and at 5:55 he calls the main line like the sheriff's office main line.

Q What happens at 5:57 p.m.?

A Paul Tanaka calls Lee Baca's cell, and they speak for nine minutes.

Q I'll now show you Government Exhibit 120. Do you recognize this document?

A Yes.

Q What is it?

A It's a copy of Lee Baca's calendar.

Q How did you obtain his calendar?

A It was in response to a Federal Grand Jury subpoena that we served on the sheriff's department.

Q Do you see an entry for 2:00 o'clock p.m. on August 19?

A Yes.

Q What does it state at that time?

A "Meet with U/S," which means undersheriff, "Tanaka, Captain Tom Carey, Lieutenant Liam Gallagher, and Lieutenant Greg Thompson here or EPC."

Q I'm now going to go back to your summary chart of Mr. Baca's cell phone records and ask you about this entry starting with 3:45 p.m. on August 19.

What happened at that time?

A At 3:45 Lee Baca called the FBI Westwood office.

Q And what does 5:07 reflect?

A That Steve Martinez called Lee Baca's cell phone, and they spoke for three minutes.

Q I'm going to show you the entry right below that as well now.

What happened at 5:09 p.m.?

A Lee Baca called Paul Tanaka's cell phone right after speaking to Steve Martinez, and they spoke for ten minutes.

Q Now I'm going to show you Exhibit 170.

What was this chart again?

A This is a summary chart of Paul Tanaka's county-issued cell phone.

Q And the second page of that chart starting with 5:09 p.m., is this the same call that you just referenced that showed up on Mr. Baca's cell phone chart?

A Yes.

Q The 5:09.

What happened at 5:23?

A Paul Tanaka called Greg Thompson's county-issued cell, and they spoke for seven minutes.

Q And now starting from 7:22, I'm now highlighting from there to the end of the page. What happened at 7:22?

A Lee Baca called Paul Tanaka, and they spoke for four minutes.

Q You see a series of calls between Mr. Tanaka and various people. Can you read who those people were at 7:25 p.m.?

A At 7:25 it was Tom Carey.

Q 7:27?

A Jim Ritenour.

Q Do you know who Jim Ritenour was at the time?

A He was the captain of the Major Crimes Bureau.

Q What about 7:32?

A Tom Carey's county-issued cell.

Q And 7:37?

A Is Greg Thompson's cell phone.

Q Showing you the third page of that exhibit, first three entries. We'll go first six entries.

What happens at 7:55?

A Paul Tanaka speaks to Steve Leavins for six minutes.

Q And then 8:04?

A Tom Carey calls Paul Tanaka's cell phone for four minutes.

Q And 8:07?

A Paul Tanaka calls Lee Baca's cell phone, and they speak for three minutes.

Q You mentioned that you did not go see Anthony Brown initially. Did there come a point in time in which you did decide to go see Anthony Brown?

A Yes.

Q When was that?

A After we had learned that the sheriff's department had linked the phone to the FBI, I wanted to go to the jails and speak to Anthony Brown. So on August 23rd, 2011, I went to the jails.

Q Who did you go there with?

A I went with Special Agent David Dahle and

Special Agent Wayne Plympton.

Q Did you meet with Mr. Brown that day?

A Yes.

Q What was the process?

A Same as always. We went to the jails, showed our credentials, gave our driver's license to a deputy in the sally port which they keep with them, and we signed in, put our names down, our agency, phone number, and then let them know the inmate that we wanted to speak to. We then went and checked in with the watch commander and let him know that we were there for an interview, and we were told to go ahead and proceed to the interview rooms.

Q Approximately what time did you meet with Mr. Brown?

A It was a little before 11:00 a.m.

Q Did anything unusual happen during your meeting with Mr. Brown?

A Yes.

Q What happened?

A Approximately an hour after we started the interview with Anthony Brown, there was pounding on the door, and a very large sergeant was standing at the door with other deputies and screamed at us that the interview was over and grabbed Anthony Brown and ripped him out of the room.

Q What, if anything, did you say to Mr. Brown as he

was being taken out of the room?

A Something to the effect of "Don't worry. We'll get you out of here. Don't worry. We'll be back." Something to that effect.

Q I'm now going to show you your summary chart 172. What is this chart again?

A This is a date-specific chart. So I took the phone records of multiple individuals and put them into one chart that was specific to one day.

Q And I want to highlight for you the calls -- actually, I'm not going to call these out.

Approximately how many calls were there between 10:40 a.m. and the approximate time in which you were told that you could interview Anthony Brown?

A There were five calls.

Q And that's over about an hour period of time?

A Yes. Approximately.

Q And then what about for the next, we'll say, hour to start with on this page? How many calls are there actually -- it's only half an hour. How many calls approximately are there in the next half hour?

A It looks about close to 20.

Q And how did you create this chart? Who's reflected on there?

A It would be specific individuals that came up

during the investigation. So Greg Thompson, Steve Leavins, Tom Carey, Gerard Smith, Cecil Rhambo, various individuals that for various reasons came up during the investigation as important to add their involvement.

Q Approximately how many calls are there between 12:20 and 2:20?

A Approximately 15.

Q And what do you see starting at 2:20 to 5:02?

A There's a large break between the phone calls between all those individuals for approximately two-and-a-half hours.

Q Focusing on the 2:18 p.m. call that I'm highlighting right now, who is that a call from and to?

A It's a call from Tom Carey to Christopher Nee's desk.

Q Do you know who -- do you know who Christopher Nee was at the time?

A Yes.

Q What was his role?

A He was the aide to Undersheriff Paul Tanaka.

Q You mentioned that you told Anthony Brown that you'd be back to get him or something to that effect. Did you try to do that?

A Yes.

Q What did you try to do?

A After we -- the interview was interrupted and we were kicked out of the jails, I contacted the U.S. Attorney's Office and spoke to them about what we could do in order to get Anthony Brown out to secure his testimony. And so the discussion was had with our management and the U.S. Attorney's Office that we would seek a federal writ for Anthony Brown to bring him into federal custody to testify in front of the grand jury.

Q Why did you want him to testify before a grand jury at that point?

A At that time, since we were kicked out of the jails, we wanted to make sure that we could lock in Anthony Brown's testimony. We had no idea what was happening to him, what was being said to him, and we wanted to make sure that we could get his statements about what occurred with Gilbert Michel. So if we were able to charge Gilbert Michel with a federal violation, we needed to lock in Anthony Brown's testimony.

Q You mentioned Gilbert Michel. Did you do anything with respect to Gilbert Michel on August 23rd?

A Yes.

Q What did you do?

A We kind of had to speed up the process because of what happened at the jails that day. We met that evening as a team and agreed that we -- despite not being ready to do so, we

were going to put together a quick plan and going and approach Gilbert Michel the next day and let him know that we had evidence that he had committed a crime.

Q And what happened with that approach?

A On the 24th of August, we did go to Gilbert Michel's apartment and met him as he was returning from work and notified him or asked if he would be willing to speak to us. He agreed. At that time we notified him that we had evidence that he may have committed a crime.

Q Did you have an operations plan with respect to that?

A I believe so, yes.

Q How many agents approximately joined you?

A I believe there was six maybe. Five or six agents.

Q Okay. I'm now going to publish the eighth page of 172. What does this page show?

A This is a summary chart of multiple individuals, phone records that were compiled for August 25th, 2011.

Q And we see bold in two different spots. What is the bold?

A What I did was in bold I added times of significant -- I don't know if you would call it events but significant facts. So when the Marshals Service faxed the warrant to the LASD warrants and detainers, I put that in bold

the time we knew the fax went through.

Q Approximately how many calls occur between the time that the first fax transmittal goes through and the next hour, let's say?

A There's five calls.

Q And then after the second fax transmittal goes through, let's pick the next hour starting at 10:37. Approximately how many calls are there during the next hour?

A I would say probably 12, 14.

Q And the first three involve Mr. Tanaka; is that right?

A Correct.

Q Who is the 10:47 a.m. call to?

A Tom Carey.

Q What about the one right before that?

A Greg Thompson.

Q Now I'm going to publish for you Exhibit 31. This is an e-mail from Steve Leavins to Paul Tanaka on August 25th at 11:45 a.m. What is written in this e-mail?

A "Boss, I did not have much to report last night. We have an undercover operation today. I will call you tonight with an update."

Q How does Mr. Tanaka respond to this e-mail at 11:47 a.m.?

A "Thanks, Steve. Right after, and I mean right

after, I spoke with Tom this morning. The sheriff popped in looking for an update. This case is consuming his entire thought process. Providing him with updated tidbits helps to ease his mind."

Q Going back to the eighth page of 172 -- actually, I'm going to move to the ninth page of 172. You have something else in bold there. What is that at 1:58?

A "Anthony Brown being released from the LASD computer system."

Q Actually, I'm going to highlight the call right before 1:58 and the two after. What happens at 1:43 p.m.?

A Greg Thompson calls Chuck Antuna's desk line.

Q Do you know what role Mr. Antuna performed on August 25th, 2011?

A I believe he was the captain at IRC.

Q What is "IRC"?

A Inmate Reception Center. That's where inmates both check in when they're arrested, but also that's where they keep all of the inmate records and files and various things for inmates as well as where they receive writs.

Q And what happened at 1:59 p.m.?

A Lee Baca called the United States Attorney's Office and spoke to someone for 12 minutes.

Q What about the 2:00 o'clock call?

A Greg Thompson called Chris Nee's desk line for

four minutes.

Q Now, this is on August 25th. I want to turn your attention to August 26th of 2011.

Did you do anything personally to determine whether you could find Anthony Brown after you were told that you couldn't interview him anymore on August 23rd?

A Initially I was able to locate him just like always on the 23rd, 24th when I provided necessary information to the U.S. Attorney's Office for the writ. On the 26th, however, when I logged onto the inmate locator to find Anthony Brown on there, it showed that he was released.

Q This inmate locator, what is it?

A It's a website that is available to the public. Anyone can go on it. It's on the sheriff's department's website. And you can go on the website, type in information like, I believe it's DOB, date of birth, and inmate name, and it will tell you where an inmate is located. So which jail facility they're located at, not specific cell information or anything. Just what jail facility.

Q When you saw on August 26th that Mr. Brown had been released, according to the inmate locator system, what did you do?

A I immediately printed off the form because -- the screenshot from the page because it didn't make any sense knowing that Anthony Brown had been convicted and sentenced to

state prison. It would not make sense that he was released from custody.

Q Can you look in the exhibit book at Exhibit 132, please.

A Okay.

(Marked for identification Exhibit No. 132.)

Q BY MR. FOX: Do you recognize that document?

A I do.

Q What is it?

A It's a screenshot that I printed off on August 26th, 2011, from the inmate locator page.

Q Is it in substantially the same condition as it was when you printed it off?

A Yes.

MR. FOX: Your Honor, I move for the admission of Government Exhibit 132.

MR. HOCHMAN: No objection, Your Honor.

THE COURT: It will be received.

(Received into evidence Exhibit No. 132.)

MR. FOX: Now publishing it to the jury.

Q What does this show, the top portion that I've highlighted?

A It shows that it's a printout for Anthony Brown with his booking number and date of birth identifying information.

Q Now I'm showing you what's written under "Release."

First of all, let's talk about that word "Release." That doesn't look like it's a computer printout. So what is that?

A I wrote on it.

Q Does it generally say "Release" and you wrote over it?

A It does.

Q When did you write over it?

A Probably while I was nervous and writing after I printed it off. I tend to do it also. I guess I didn't think anything of it at the time and just wrote over it.

Q What does this show occurred, according to this document, on August 25th, 2011, at 1:58 p.m.?

A It shows that Anthony Brown was released from custody at 1:58 p.m. on August 25th, 2011.

Q What is the release agency listed?

A "Other."

Q What is the reason for the release listed?

A "Custody release."

Q Now I'm going to go to the 12th page of Exhibit 172. What is this page?

A This is the compilation of all of the phone records of various individuals for August 26, 2011.

A I'm going to show you now the first two -- all the entries up to 10:42 a.m.

Let's start with 9:15 a.m. What happens at that time?

A Tom Carey calls Paul Tanaka's desk line for 15 minutes.

Q And, generally, are there a number of calls after that between Mr. Leavins, Mr. Thompson, and Mr. Carey?

A Yes.

Q And last one shows Leavins to Craig; is that correct?

A Correct.

Q Who did you know -- well, do you know now who Mr. Craig was at the time?

A Yes.

Q What role did he perform?

A He was the sergeant for the Internal Criminal Investigations Bureau.

Q Now, you have 10:42 e-mails begin between Thompson and Carey. I'm going to show you now Exhibit 35. Are these the e-mails you're referring to?

A Yes.

Q And these are the ones that discuss that MCJ will accept, if forced, but they will have county attorneys review it with the court order; is that correct?

A Correct.

Q And what time do these e-mails end in this string of e-mails?

A At 10:50 a.m.

Q I'm now going to show you Exhibit 36.

What time does this federal law enforcement agency policy come out from Ralph Ornelas?

A At 10:53 a.m.

Q Now taking you back to Exhibit 172, page 13, do you see the area I'm highlighting?

A Yes.

Q What happens about 15 minutes later?

A There are phone calls back and forth between Steve Leavins, Tom Carey, Paul Tanaka, and Lee Baca.

Q Let's focus on 11:21 a.m. What happens then?

A Paul Tanaka called Lee Baca for two minutes.

Q What happened next?

A At that point Tom Carey called Paul Tanaka's cell phone.

Q Now publishing Exhibit 37. What time is this e-mail?

A 2:18 p.m.

Q That discusses the fourth floor conference room; is that correct?

A Correct.

Q And I'm now showing you the sixth page from Government Exhibit 128.

Do you recognize this document?

A Yes.

Q What is it?

A It's a document we received in response to a Federal Grand Jury subpoena on the sheriff's department.

Q What does it reflect?

A It's a booking of property record for an arrestee Kevin King, but it was actually Anthony Brown.

Q Does this -- according to this document, the date and time, how long after that e-mail we just saw that Thompson was en route from CJ and Carey said that they're in the fourth floor conference room, how long after that is Mr. Brown booked as Kevin King?

A He was booked at 3:30. So an hour'ish.

Q Going back to 172, page 13, is that reflected in this chart that you have?

A Yes.

Q What entry?

A Where it says, "Kevin King arrested in San Dimas."

Q And, generally, what is occurring according to phone calls from 2:05 to 3:09 on that date?

A It is Gerard Smith who is one of the OSJ deputies

was calling Steve Leavins, Greg Thompson, Mickey Manzo, and Scott Craig.

Q What happens after Kevin King is arrested in San Dimas, according to documents?

A Tom Carey and Greg Thompson make phone calls to Sergeant Craig, Sergeant Long, and Gerard Smith.

Q Now I'm going to move to the next page of this document. Starting at 5:20, it shows "unavailable" to the Baca county-issued cell. Generally what does it mean if you put "unavailable" down?

A It means that on the phone records, whoever called -- whoever called Lee Baca on that call had a blocked number.

Q How long did this call at 5:20 last?

A 11 minutes.

Q That's not unusual for law enforcement for there to be a blocked number; is that right?

A Yes. In general the sheriff's department phone numbers primarily came up as unavailable which is why I had to kind of piece together some of the records.

Q What happened in the next phone call?

A Paul Tanaka called Lee Baca's cell phone.

Q What about after that? What's the 5:48 -- let's say the first call, Tanaka to who?

A Tom Carey.

Q And then 5:49 and 5:50?

A Paul Tanaka is calling Steve Leavins.

Q 5:55?

A Tom Carey is calling Paul Tanaka.

Q And 5:56?

A Steve Leavins is calling Tom Carey.

Q I'm going to now highlight 5:57. What does that show?

A Steve Leavins is calling Lee Baca's county-issued cell.

Q What happens after that?

A At that point Steve Leavins calls Tom Carey and back and forth between Tom Carey and Steve Leavins for the next few minutes.

MR. FOX: Your Honor, I now would like to play Exhibit 83 which is in evidence. I'm so sorry. 84 which is in evidence and reflected in the jury's transcript book under 85.

THE COURT: All right. If everybody wants to open their tabs. I'm sorry. You want -- the transcript is which tab?

MR. FOX: Is 85. The excerpts are on 84.

THE COURT: Okay.

MR. FOX: May I begin, Your Honor?

THE COURT: Yes, please.

///

(The cd, Exhibit No. 84, commenced playing before the jury.)

MR. FOX: Playing the next one.

(The cd, Exhibit No. 84, commenced playing before the jury.)

MR. FOX: Now playing the next clip.

(The cd, Exhibit No. 84, commenced playing before the jury.)

Q BY MR. FOX: Do you know who the supervisors were of Sergeant Craig, Sergeant Long, and the Sergeant Webber we just heard from?

A Yes. It was Steve Leavins and Tom Carey.

Q Now I'm going to show you the fifth page of 170. This is the Paul Tanaka chart; is that correct?

A Correct.

Q I'm going to highlight, first of all, August 28th starting at 7:36. What occurs at 7:36 p.m. on August 28?

A Paul Tanaka called Tom Carey for 22 minutes.

Q What happened next?

A Paul Tanaka then called Lee Baca for three minutes.

Q And the next call?

A Lee Baca called Paul Tanaka, and they spoke for 12 minutes.

Q What are the next two calls?

A Paul Tanaka calls Tom Carey and Steve Leavins.
Q What happens next?
A Tom Carey calls Paul Tanaka back.
Q Now I want to focus on the 29th at 9:03 a.m. and 9:07 a.m. What does your chart reflect?
A Lee Baca calling Paul Tanaka for two minutes, and then Paul Tanaka calling Steve Leavins for two minutes.
Q This is at what time?
A 9:03 followed by a phone call from Paul Tanaka at 9:07.
Q Now highlighting an e-mail that says that Thompson is en route to SHB to meet with the sheriff and two others, what time -- this is -- excuse me. This is Exhibit 67. What time is this e-mail?
A 11:46 a.m.
Q I want to show you the fourth page of Mr. Baca's calendar in evidence as Exhibit 120. What day of the week does it show August 29th is?
A A Monday.
Q We were just looking at phone calls on the 28th; so that would have been a Sunday?
A Correct.
Q So let's focus on his calendar. Does it show he has any meetings with anybody at 1:30 p.m. on August 29th?
A Yes.

Q Who is that?

A Andre Birotte.

Q Showing you the fourth page of 157 now. This is Mr. Baca's summary chart. Showing you at 6:20 and 6:25 p.m., what does this show?

A There's an exchange of calls between Lee Baca and Paul Tanaka.

Q Special Agent Tanner, at this point you're familiar with the interviews that ICIB does of Deputy Michel and Courson on the morning of August 30th; is that correct?

A Yes.

Q I now want to show you page 5 of Exhibit 157. What does it show occurs on August 30th at 10:56 a.m. and 11:00 a.m.?

A Lee Baca makes a call to Paul Tanaka, and then shortly after, Lee Baca receives an unavailable call for 13 minutes.

Q I'm going to now publish Exhibit 50 in evidence. Do you see this e-mail that I've highlighted September 7, 2011, at 7:17 p.m.?

A Yes.

Q This is from John Powell to Steve Leavins?

A Yes.

Q Do you know what role John Powell played in the sheriff's department in September of 2011?

A Yes.

Q What role was that?

A He was a sergeant that was assigned to basically a tech squad at the sheriff's department.

Q And this e-mail that he sends to Mr. Leavins, it reflects some things that occurred on what date?

A September 2nd.

Q Could you please read what he wrote occurred on September 2nd, the first two lines?

A On September 2nd, Brian DeRuyter and I conducted a technical surveillance counter measures, TSCM, security inspection on the fourth floor of SHB and the basement area at your direction. The operation used the following technical equipment.

Q I want to ask you some questions about some of the terms you just read.

Are you familiar with the term "technical surveillance counter measure"?

A Yes.

Q What do you know that to be?

A In layman's terms, it's basically sweeping for bugs. So looking to determine whether or not there are recording devices in a certain area. So using technical equipment to determine if there's anything in a specific area.

Q This states it occurred on the fourth floor of

SHB?

A Yes.

Q Do you know what "SHB" was?

A Yes.

Q What was it?

A Sheriff's Headquarters Bureau.

Q And the fourth floor housed who?

A It was executive management. So the sheriff and undersheriff.

Q In the basement area, do you know what was located in the basement area of SHB at that time?

A At that time that's where Steve Leavins, Maricela Long, and Scott Craig were working.

Q Now highlighting on the second page what looks like the second full paragraph, can you please read what is stated here?

A "The inspection was then conducted utilizing the above equipment to locate any RF, radio frequency, transmitters, hidden cameras, or other concealed surveillance equipment. Additionally, a visual and physical search was conducted for anomalies consistent with the installation of these type devices."

Q Did you have any bugs installed in SHB at the time?

A We did not.

Q It lists a room here. What does it state?

A The large EPC conference room.

Q It also lists another place searched, what I've highlighted here. What does it say?

A "The small EPC conference room."

Q On page 3, does it list another place that was searched?

A The executive offices.

Q Does this e-mail state the conclusion of Mr. Powell?

A Yes.

Q What does it state?

A "At the time of this operation, no surveillance devices were detected."

Q I want to now move ahead a few days and move to September 7th of 2011. Was that the date that Mr. Brown was supposed to be turned over to the Federal Grand Jury?

A Yes.

Q Was he turned over?

A No.

Q Now publishing Exhibit 47.

At some point in time, did you request information via subpoena relating to Brown?

A Yes.

Q And I'm going to highlight the top e-mail. What

time is this e-mail that states, "FYI, federal request?" from Mr. Thompson to Mr. Carey sent, according to this document?

A It's at 3:45 p.m.

Q Now moving on to Exhibit 48. It's referencing, after a document gets signed, they're looking for a copy for Mr. Tanaka.

What time does this e-mail string end?

A At 5:30 p.m.

Q Now I'm going to the summary chart of Mr. Tanaka's cell phone on page 6. What occurs --

MR. HOCHMAN: Hold on, please.

MR. FOX: Sure.

MR. HOCHMAN: What exhibit?

MR. FOX: 170, page 6.

Q What occurs at 5:56 p.m., according to your chart, on September the 7th?

A Paul Tanaka calls Lee Baca's cell.

Q What about at 5:59 p.m. on that date?

A Lee Baca calls Paul Tanaka.

Q Showing you now Exhibit 51, Special Agent Tanner, is this e-mail, according to the documents, sent a day after Mr. Brown was supposed to be turned over to the grand jury?

A Yes.

Q Who sends this e-mail?

A Greg Thompson.

Q To who?

A All the custody captains, custody commanders, and then with cc to Assistant Sheriff Cecil Rhambo, Dennis Burns who is in charge of custody, Alex Yim in charge of custody, and Richard Barrintes.

Q What is the subject of this e-mail?

A "FBI requests for inmate interviews."

Q What does it state?

A "Just a reminder to inform your staff that all requests for inmate interviews made by the FBI or any LE officer associated with the FBI must be referred to MCJ jail liaison for approval. After approval, jail liaison will arrange for the inmate to be transported to MCJ where the interview may occur. No explanation is necessary as MCJ jail liaison and/or myself will provide the FBI with any information they are entitled to. This has been mandated by department executives and will remain in effect until further notice."

Q Now I'm going to show you what's in evidence as Government Exhibit 52. This is an e-mail from Mr. Carey to Mr. Leavins at 4:41 p.m. on September the 9th.

What is it that Mr. Carey wrote in this e-mail?

A "Steve, official request from feds for interview with Brown was made."

Q Are you aware of any requests from the Federal Government to interview Mr. Brown at this time?

A Yes.

Q What happened?

A After he was not produced to the grand jury, my supervisor reached out to Mike Gennaco with the Office of Independent Review and asked if we could have access to Anthony Brown.

Q Who was your supervisor?

A Carlos Narro.

Q Were you able to interview Anthony Brown while he was in county custody?

A No.

Q Special Agent Tanner, based on your investigation, you're aware of the denied court order that occurred on September the 8th, 2011; is that correct?

A Yes.

Q I'm now going to play what's in evidence as Government Exhibit 94. This is reflected in the jury binders in transcript 95.

May I proceed, Your Honor?

THE COURT: Just one second. Okay.

(The cd, Exhibit No. 94, commenced playing before the jury.)

Q BY MR. FOX: Special Agent Tanner, did you call Mr. Craig back that day?

A No.

Q Why not?

A I never received that message. He called the wrong number.

Q So how did you obtain this recording?

A It was in response to a Federal Grand Jury subpoena we served on the sheriff's department.

Q How do you know that he called the wrong number?

A In there he says the number he's calling. In addition to it -- when he calls the mailbox, it says it's extension 4147, and my number was 4174.

Q I'm now going to publish for you Mr. Baca's calendar on page 7, 8, and 9 of 120. 7, 8, and 9.

What does his calendar show for these dates between September the 9th and September the 21st?

A It shows "Personal."

Q When you received phone records for Mr. Baca during this time, showing you now 157, page 8, we see under "chart" a bunch of unavailable numbers during this time. Why is that?

A At that time the phone records showed that the cell phone was roaming out of the country, and so numbers were not showing up when there was incoming calls out of the country. It was just roaming. And so I wasn't able to determine who was calling on those incoming numbers during that time period.

Q I want to direct your attention to three days after Mr. Craig left you that message. Publishing Government Exhibit 53. This is an e-mail from Mike Gennaco to William T. Carey on September the 1st, 2011, at 12:48 p.m. Now, this is dated September the 1st.

I'm actually going to next refer to the one that's above it which is September 12th. But for the time being, please read the subject and then what's written below the subject line.

A It's a forward "Retaliation allegations list. Tom, this is the current complete list of ACLU complaints regarding retaliation. It may be duplicative of what I had delivered to you earlier today. Mike."

Q This is an e-mail from Mr. Carey to who?

A Scott Craig and Maricela Long with a cc to Steve Leavins.

Q What date?

A On September 12, 2011.

Q What time?

A 9:43 a.m.

Q What does he write?

A "List of ACLU complaints out of CJ. Probably lead us in part to where/what the feds are looking at."

Q I'm not going to publish it for the jury, but if you could -- maybe I will since you don't have it in front of

you. It will be quicker this way.

The attachments showing you page 4 as an example, what generally did these attachments show from this e-mail?

A It shows the disposition of the sheriff's department investigation into these various allegations of deputy assaulting inmates, and it shows the majority of them were closed and unfounded.

Q What date does it show that these complaints occurred overall?

A In general, it was in 2009.

Q And what dates does it show the review was completed?

A It was, for a lot of these, not until mid to late 2010.

Q At some point did you learn that Mr. Brown was no longer in county custody?

A Yes.

Q Approximately when did you learn that?

A I believe it was the -- September 13th, maybe even 14th of 2011.

Q How did you learn that?

A I believe my supervisor had contact with someone in the sheriff's department. I believe it might have actually been Mike Gennaco. And they were -- they informed us that Anthony Brown was no longer in their custody. And so I

contacted the state corrections and asked if -- to find out where he was.

Q What did you find out?

A He was at Lancaster State Prison.

Q What did you do after finding out he was at Lancaster State Prison?

A I immediately called the state prison and requested to set up an interview so I can go meet with Anthony Brown.

Q Did you do that?

A Yes.

Q Approximately when did you meet with him?

A I believe it was September 15th of 2011.

Q And without initially getting into the substance of your communications with him, what was his general demeanor when you met with him?

A He was incredibly angry at me.

Q Why?

A He believed that I left him for dead in sheriff's department custody because, at the time that I was kicked out of the interview with him to the time that I had spoken to him, it had been approximately three weeks. And he believed I had just left him for dead, and he was incredibly angry.

Q Did you decide at that point -- at that time to writ him over to the Federal Grand Jury?

A Not at that time.

Q Why not?

A At that point in time, he was out of the sheriff's department custody. So I wasn't as concerned with rushing him in to lock in his testimony. I was actually able to speak to him. In addition to that, around that same time, Gilbert Michel had retained an attorney and was beginning discussions with the U.S. Attorney's Office to potentially cooperate with our investigation.

Q Now I'm going to show you from Exhibit 120, page 12, of Mr. Baca's calendar. Actually, I'm going to go back one page first. So this is page 11.

Showing you an entry on the 22nd at 4:30, what does this show?

A "Meet with Tanaka."

Q At some point -- well, obviously your investigation became overt after you approached Mr. Michel. Was there any media coverage of your investigation at some point in time?

A Yes.

Q I'm going to publish now Exhibit 61. Can you please read the "from" line in what I've just highlighted for you?

A MManzo7@yahoo.com.

Q What is the date of this e-mail?

A September 24, 2011.

Q At what time?

A At 10:32.

Q What is the subject?

A "FBI probing reports of beatings in L.A. County jails."

Q Where is this article published? What publication?

A The *L.A. Times*.

Q By who?

A Robert Faturechi.

Q And showing you now the top of this e-mail, does Mr. Manzo forward that e-mail on to anybody?

A Yes.

Q Who?

A Scott Craig, Maricela Long, Steve Leavins, and Gerard Smith.

Q What date and time?

A Same date, September 24th, 2011, at 10:33 p.m.

Q What does he write?

A "FYI."

Q Now sending you -- showing you Exhibit 62, what is Exhibit 62?

A It is a link to an *L.A. Times* story from Paul Tanaka to Steve Leavins and Tom Carey.

Q What is the subject line?

A "FBI investigating reports of beatings in Los Angeles County jails."

Q What is the date?

A September 25th, 2011.

Q At what time?

A 9:20 a.m.

Q Is this a link to the *L.A. Times*?

A Yes.

Q Now showing you Exhibit 63 which is in evidence; what is this that I've highlighted?

A It's an e-mail from Paul Tanaka to Steve Leavins and Tom Carey.

Q What's the subject?

A "Justice Department boosts activity to police the police."

Q What's the date and time?

A September 25th, 2011, at 9:26 a.m.

Q What is the publication?

A It's the *Washington Post*.

Q Highlighting now the e-mail above that, this is from Steve Leavins to Paul Tanaka on September 25th at 9:34 a.m.

What does Mr. Leavins write in this e-mail?

A "I figured that was the motivation, especially

when Holder had to approve the *L.A. Times* grand jury subpoena."

Q What does Mr. Tanaka write back at 10:33 a.m.?

A "This certainly clarifies where the," quote, "'orders' into investigating the local law enforcement agencies are coming from, the top."

Q I'm going to show the 12th page of Mr. Baca's calendar on Exhibit 120, specifically the first entry of the day there.

What does this show?

A "Live interview with Fox 11 regarding Lupus race for life."

MR. FOX: Your Honor, I'm going to move now pursuant to 902.11 for the admission of Government Exhibit 102.

MR. HOCHMAN: No objection, Your Honor.

THE COURT: It will be received.

(Marked for identification and received into evidence Exhibit No. 102.)

MR. FOX: Your Honor, I'm going to play it for the jury at this time.

(The video, Exhibit No. 102, commenced playing before the jury.)

Q BY MR. FOX: Special Agent Tanner, Mr. Baca referenced a meeting that he had set up the next day. I'm going to go back to Exhibit 120, page 12, and ask you about Tuesday, September 27th at 2:30 p.m.

What does this reflect?

A "Meet with U.S. Attorney Andre Birotte and FBI assistant director in charge Steve Martinez."

Q Let's go back to September 26th. There is a 10:00 o'clock and a 12:00 o'clock entry that I want to ask you about.

Can you please read what's listed for September 26th at 10:00 o'clock a.m.?

A "Weekly briefing with undersheriff and assistant sheriffs."

Q What about the 12:00 o'clock meeting?

A "Meet with Undersheriff Tanaka, Assistant Sheriff Rhambo, Chief Yim and Chief Burns."

Q Are you familiar with the roles that Assistant Sheriff Rhambo, Chief Yim, and Chief Burns played at the time?

A Yes.

Q Can you please describe them?

A Assistant Sheriff Rhambo was the assistant sheriff over custody, and Chief Yim and Chief Burns were the chiefs of various components of the custody operations.

Q Now I'm going to show you what's in evidence as Government Exhibit 64. What is this e-mail?

A It's from Paul Tanaka to Tom Carey on September 26th, 2011, at 1:25 p.m. It's a forwarded e-mail of a link to Sheriff Baca on *Good Day L.A.*

Q What's the subject?

A "Sheriff Lee Baca on GDLA, *Good Day L.A.*"

Q I'm now going to show you the top e-mail.

By the way, a lot of these e-mails have a name David Royston at the top. Do you know why his name is at the top of a lot of these e-mails?

A David Royston was a sergeant with the sheriff's department who was in charge of, when we issued subpoenas on the sheriff's department, to turn over documents. David Royston was in charge of gathering all of those documents. And so when he would gather e-mails from individuals, they would come up with his name on the very top when he printed them off to produce them to the FBI.

Q It doesn't mean he received them at the time. It's that he produced them later; is that correct?

A Correct.

Q Let's talk about this e-mail. This is September 26, 2011, at 12:09 p.m. This is an e-mail from Mr. Carey to Mr. Craig.

What is he doing at this point?

A That's 2:09, not 12:09.

Q Sorry.

A He's forwarding the e-mail to Scott Craig, the link to the Sheriff Baca interview on *Good Day L.A.*

Q Anything unusual occur to you about three hours

later?

A Yes.

Q What happened?

A I was returning home from work, and when I was walking to the door of my apartment, there were two individuals standing outside my apartment. I could see their guns, at least the gun on one individual and badge was showing. And so I knew they were sheriff's department employees.

Q And what happened during that encounter?

A When I walked up to them, they asked if I was Leah Marx. I said, yes. And they proceeded to tell me that they were in the process of swearing out an arrest warrant for me.

Q Can you please look at Exhibit 99. It's actually one of the original exhibits. As long as you're doing that, would you mind grabbing 100 as well, please.

(Marked for identification Exhibit Nos. 99 and 100.)

Q BY MR. FOX: Do you recognize Exhibit 99?

A 99, yes.

Q What is it?

A It's a synched video of -- and audio of Sergeant Craig and Sergeant Long approaching me at my apartment.

Q What do you mean it's synched?

A When we subpoenaed the documents from the

sheriff's department, there were two separate files. One was an audio file of what occurred, and one was a video file. And so in order to play them as one, they were synched so that the audio and the video went together by the U.S. Attorney's Office.

MR. FOX: Your Honor, I move for the admission of Government Exhibit 99.

THE COURT: Any objection?

MR. HOCHMAN: No objection, Your Honor.

THE COURT: It will be received.

(Received into evidence Exhibit No. 99.)

MR. FOX: I'd like to play that for the jury now.

THE COURT: All right.

(The video, Exhibit No. 99, commenced playing before the jury.)

Q BY MR. FOX: Special Agent Tanner, what did you understand Mr. Craig to mean when he said, "We can either do this," and he raised his arms?

A That they could arrest me right in front of my apartment in front of everybody.

Q Now, I want to show you what's in evidence as Government Exhibit 65. Who is this an e-mail from and to?

A It's from Scott Craig to Steve Leavins.

Q What is the date and time?

A September 26, 2011, at 6:39 p.m.

Q Now, in reference to what we just saw, the 6:39 p.m., how far later is it?

A It was approximately an hour.

Q Are you familiar with this file name?

A Yes.

Q What is it?

MR. HOCHMAN: Objection. Foundation.

MR. FOX: Happy to lay it, Your Honor.

THE COURT: All right.

Q BY MR. FOX: In terms of the documents that were produced to the Federal Grand Jury in response to the Federal Grand Jury subpoena, did you obtain a file with this name on it?

A Yes.

Q What was on it?

A It was the audio recording of the sheriff's department approaching me outside my apartment.

Q What does it state under this message that is sent with the following link file or link attachments?

MR. HOCHMAN: Objection. Who has served the Federal Grand Jury from which she received it, Your Honor? Vague as to the foundation.

MR. FOX: I can certainly ask that question, Your Honor.

THE COURT: All right.

Q BY MR. FOX: Who did you receive this file from?

A We subpoenaed the sheriff's department, and they provided the document in response to the Federal Grand Jury subpoena.

Q Now, you said a few times that you subpoenaed the sheriff's department. When you were obtaining documents, say, after October of 2011, were you subpoenaing Sheriff Baca?

A No.

Q Who would you provide grand jury subpoenas to?

A They would actually go to an attorney because, at that point in time, the county had hired a law firm to actually handle all of the subpoena requests. So nothing was actually being served necessarily on the sheriff's department employees. It was actually being served on an attorney law firm.

Q What was that law firm's name?

A Jones Day.

Q And you said the county hired this law firm; is that correct?

A Correct.

Q When you received documents from the sheriff's department, did you receive them directly from the sheriff's department generally?

A They would come from -- again, from the law firm. They would gather the documents, and then they would go through the law firm and then provide them to the FBI.

Q Were there times when you would go on-site to help search for documents as well that you had subpoenaed?

A Yes.

Q And, generally, would the law firm accompany you or not be there?

A They were -- I believe they were there almost -- actually, I believe they were there every single time.

Q So this was sending the file -- the recording of your video from Craig to Leavins about an hour after the incident; is that right?

A Yes.

Q What did you do after this happened?

A After they were standing outside my apartment, I went inside and immediately called my supervisor, and he advised I needed to immediately return to the office.

Q Who was your supervisor at the time?

A Carlos Narro.

Q What did you do?

A I returned to the FBI office and went inside to meet with executive management.

Q Did you give anything to your supervisor?

A I did.

Q What did you give him?

A I gave him the business cards that the two sergeants that were outside my house provided to me. I gave

them to my supervisor.

Q Now, Special Agent Tanner, do you recognize what's in front of you as Government Exhibit 100?

A Yes.

Q What is it?

A It's an audio recording of a phone call between my supervisor at the time, Carlos Narro, and members of the sheriff's department.

Q What's 101?

A It's a transcript of that phone call.

MR. FOX: Your Honor, I'd like to play this for the jury. It's in their jury binder at 101, and the exhibit I want to play is 100. It's already in evidence.

THE COURT: If everybody would open their binders to tab 101.

(The cd, Exhibit No. 100, commenced playing before the jury.)

Q BY MR. FOX: Special Agent Tanner, we heard a number referred to there ending in 5000. Are you familiar with that number?

A Yes.

Q What is that number?

A On the rosters we receive from the sheriff's department, it's listed as Sheriff Baca's number. It seems to be a general number that you call when you're reaching out to

the sheriff's department, but it specifically says "Office of the Sheriff."

Q Going back to the meeting that you attended with your executive management on September 26 of 2011, did you have a conversation at some point with your assistant director in charge, Steve Martinez, about the future of the investigation?

A Yes.

Q What did you talk about?

A After I was -- we went through various things in the office, and then Mr. Martinez asked to meet with me, sent me down, and asked whether or not I wanted to stay on the investigation given what had happened, and I told him I absolutely did.

Q Why?

A At that point I had put a significant amount of work into the --

MR. HOCHMAN: Objection. Relevance as to why.

THE COURT: Overruled.

You can answer.

THE WITNESS: I had put a significant amount of work into the investigation. I felt I had built very good rapport with a lot of the inmates and a lot of individuals along the way. I had a very decent knowledge of things within the jails and the way things worked, and I felt that was very important in the investigation. I also felt like I was not

going to let someone intimidate me and get me to stop working a case that I felt was important.

Q BY MR. FOX: Was that the only discussion you had with your supervisors about whether you would remain on the case?

A No.

Q Approximately how many others have you had?

A There were at least a few other conversations with executive management as well as the U.S. Attorney's Office to make sure that there was not going to be a conflict with me staying on the case as a case agent.

Q Over what period of time did this occur?

A I would say at least a few months, probably longer, over the course of the investigation.

Q Did this encounter with Mr. Craig and Ms. Long effect your investigation at all?

A Yes.

Q In what ways?

A Initially I wasn't able to go back to the jails. I had major concerns about showing back up to a sheriff's-run facility and being in a position where I was unable to really control anything because I was in a locked sheriff custody facility.

But it also impacted the fact that, not going back, there were inmates that I agreed to go back and talk to.

And because I wasn't able to go back there, I damaged the rapport with them, and they didn't want to meet with me anymore because they believed I wasn't being truthful with them.

Q What about others involved in the investigation, other agents? Did they go back right away?

A I believe the soonest that anyone related to the case went back was not for three to four months.

Q Now, I want to publish for you Government Exhibit 172, page 22. This is a summary chart for which day?

A This is September 26th, 2011, the date that the sergeants were at my home.

Q Let's just look at the four calls before the bolded line there.

Do you know who Rubin Martinez was at the time?

A Yes.

Q Who was he?

A He was the sergeant that was in charge of the surveillance team that was outside videotaping.

Q What about Shaughenssy? Do you know who Shaughenssy is?

A He was also part of the surveillance team.

Q What occurs in the four phone calls after 5:31 p.m.?

A There's phone calls between Carey and Leavins, Sergeant Long and Rubin Martinez, and then Scott Craig and

Carey and Leavins.

Q Let's look at 5:45 to 6:26. What do we see here?

A Multiple calls between Steve Leavins and Scott Craig along with Tom Carey and Scott Craig, and then Lee Baca calling the sheriff's main line, the sheriff's office.

Q What about -- I'm highlighting the bullet first. This is the time that's reflected in that recording that we just heard of the phone call.

A Yes.

Q What happens at the same time?

A Paul Tanaka calls Steve Leavins' cell phone.

Q Showing you now the 7:35 call, what does this reflect?

A An unavailable number calls Lee Baca's cell phone, and they speak for 22 minutes.

Q Are you familiar with whether calls from the U.S. Attorney's Office cell phones show up as unavailable on cell phones?

A They do.

Q Now showing you page 10 of Exhibit 157, Mr. Baca's chart, are there any other calls that occur besides the ones you just described, the one-minute call to the sheriff's office main line and the 7:35 unavailable call from Mr. Baca's cell phone around this time?

A No. The last call he -- he receives a call at

7:35 and then does not make any outgoing calls until the next day.

Q Now I'm going to show you page 10 of the same exhibit. Yeah. Page 10 at 1:02 p.m. What does this show that I've highlighted?

A It's a phone call from Robert Faturechi to Lee Baca's cell phone.

Q And what about on September 29 at 8:12 a.m.?

A There's a 10-minute -- 12-minute call between Lee Baca and Robert Faturechi.

Q Special Agent Tanner, I now want to show you Exhibit 119 which is in evidence. Do you recognize this document?

A Yes.

Q What is it?

A It's a yearly performance evaluation for Scott Craig who was a sergeant in the sheriff's department.

Q You said he was a sergeant in the sheriff's department. Do you know him for some other reason?

A He's the individual that was outside my apartment on the 26th.

Q What are the dates in this performance review?

A July of 2011 to July of 2012.

Q Who does it show rated Mr. Craig during this period of time?

A Steve Leavins and Tom Carey.

Q And below it there's something that says, "I concur and approve this report." Do you recognize this name?

A Roberta Abner.

Q Do you know who Roberta Abner was in October of 2012?

A She was in charge of Internal Criminal Investigations Bureau and Internal Affairs.

Q What is the rating that Mr. Craig received for the time period?

A Outstanding.

Q Now I'm going to show you the third page of this exhibit. I'm just going to ask you about one of them.

There's different categories here that Mr. Craig is rated on; is that correct?

A Correct.

Q They all show that he's outstanding; right?

A Right.

Q Let me just ask you about the first one.

What does it show for what I've just highlighted?

A That he received an outstanding marking for exudes the department's core values.

Q Those are Mr. Baca's core values?

A Correct.

Q Now I'm going to highlight a section under

assignment of work, and I'm going to in yellow just highlight the part I would like you to read. Can you please read the portion that I've just highlighted?

A "On larger cases requiring multiple investigators and when assigned as the," quote, "'lead investigator,' Sergeant Craig displayed the ability to ensure compliance to all assigned tasks."

Q I have one last document to show you, Special Agent Tanner.

Highlighting and now zooming in on the top portion of this document, do you recognize this document in evidence as 184?

A Yes.

Q What is this document?

A It's a performance review for Tom Carey.

Q During what period of time?

A From April of 2011 to April of 2012.

Q What does it show that Mr. Carey's position was at the time?

A He was a captain.

Q Of what department, division, and unit?

A ICIB.

Q Now I want to show you the second page of 184. Can you please read this paragraph.

A "Captain Carey's professionalism and his

interpersonal skills allowed him to work harmoniously with his subordinates as well as the various executives he reported to on a daily basis. His duties required him to be familiar with every aspect and function of the bureau and ensure each of his investigators completed their investigations in a timely, objective, and thorough manner. Captain Carey continue continually demonstrated outstanding judgment that enabled the bureau to achieve goals that would not have been possible without his superior leadership. He embraced new challenges and provided ethical guidance for his subordinates."

Q Now I want to highlight a handwritten portion at the bottom of the document. Can you read this?

A "Tom, thanks for your great work. Paul T."

Q Do you know who in Mr. Carey's chain of command had the first name Paul and the last name starting with T.?

A Paul Tanaka.

Q I want to take you back now to the first page of this exhibit. Does it show who evaluated Mr. Carey?

A Paul Tanaka.

Q What's the date?

A April 26, 2012.

Q And what is his rank?

A Undersheriff.

Q Could you please review or -- I'm sorry -- read under where it says print typed name, job title. Read starting

with the word -- I'm sorry. Starting with the "I concur."

A "I concur in and approve this report."

Q Whose signature is that?

A Lee Baca's.

Q What's the date?

A April 27, 2012.

MR. FOX: One moment, Your Honor.

I have no further questions of this witness at this time.

THE COURT: All right. Ladies and gentlemen, I think we've done about all we can do today.

Again, I want to remind you, until this trial is over, you're not to discuss this case with anyone, including your fellow jurors, members of your family, people involved in the trial, or anyone else. And do not allow others to discuss the case with you. This includes discussing the case on the Internet, in chat rooms, blogs, bulletin boards, any form of social media, by e-mails or text messages. If anyone tries to communicate with you about this case, please let me know about it immediately.

Do not read, watch, or listen to any news reports or other accounts about the trial or anyone associated with it. Do not do any research such as consulting dictionaries, searching the Internet, or using other reference materials, and do not make any investigation about the case on your own.

Finally, you're reminded to keep an open mind until all the evidence has been received, you've heard the arguments of counsel, the instructions of the Court, and your views of your fellow jurors.

I'm sure many of you are wondering whether or not we will be in session on Monday, and we will be.

All right. Thank you very much.

We're going to resume tomorrow at 8:00 a.m.

(The following proceedings were held in open court out of the presence of the jury:)

THE COURT: You may step down.

MR. FOX: Your Honor, may I ask her about scheduling for the morning whether it will be a problem?

THE COURT: Who's going to follow Agent Tanner?

MR. FOX: Judge Birotte will. He has a jury trial right now. It's a civil jury. I believe he starts his trial times at 8:30. He said he will be flexible. I think, if we can break after we're done with this witness -- and I'm guessing it's going to be around break time anyway -- I'll be happy to pop down in his courtroom so he can see that we need him.

THE COURT: Okay. Who follows that?

MR. FOX: We may at that point rest, Your Honor. We will be looking at the transcripts of the recording of Mr. Baca's interview to see if we're going to be introducing

that or not. I think at this point it's unlikely, but we just want to compare that to what has been introduced into evidence already to see if there's anything we're missing. And I will let Mr. Hochman know tonight whether we're -- well, probably in the next two hours whether we're going to have Special Agent Dalton testify to that or not or whether we're just going to rest.

THE COURT: All right. And who do you -- are you going to put on a case?

MR. HOCHMAN: Yes, Your Honor.

THE COURT: Okay. And who are you calling?

MR. HOCHMAN: Your Honor, in light of Special Agent Marx's testimony, we're going to evaluate who we're going to call in what order tonight, Your Honor, and I will let the Government know tonight who that will be.

MR. FOX: Your Honor, as I mentioned before, we don't have any witness statements. And we've been very transparent with the defense every day providing in our trial brief and providing them all the time with the order of witnesses that we received. If we hear that we're going to find out tonight who their witnesses are and we don't know anything about what they're going to say, it puts us in an incredibly difficult --

THE COURT: That's all right.

That's not acceptable. So when are you going to

know?

MR. HOCHMAN: It's 1:30. I'll know by 4:00 o'clock today.

THE COURT: Make it 3:00. Let them know by 3:00 o'clock.

MR. HOCHMAN: I will, Your Honor.

THE COURT: And notify my clerk.

MR. HOCHMAN: I will.

THE COURT: Then every day thereafter, you'll have to let them know who the witnesses are and the order in which they're going to be called.

MR. HOCHMAN: Yes, Your Honor.

THE COURT: Okay. Anything else?

MR. FOX: No, Your Honor.

MR. HOCHMAN: Your Honor, again, depending on which witnesses we call, the issue that we have raised and the Government has responded to -- and obviously we can respond to the Government's response --

THE COURT: I don't need any further responses to the Government's responses. This was already a motion in limine that was fully briefed. You even filed another document. They filed. I don't need any more briefing.

MR. HOCHMAN: Very good, Your Honor.

THE COURT: Now, I can -- if you want to come back this afternoon, I can rule on it, or we can rule on it

tomorrow.

MR. HOCHMAN: If we can rule on it tomorrow, Your Honor, that would be great, since I have to get to the Government that information by 3:00 o'clock today.

THE COURT: Okay. Anything else?

MR. FOX: No, Your Honor.

THE COURT: Okay. Thank you.

MR. HOCHMAN: Thank you, Your Honor.

(Proceedings concluded at 1:30 p.m.)

CERTIFICATE OF OFFICIAL REPORTER

I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

DATED THIS 14TH DAY OF DECEMBER, 2016.

/S/ MIRANDA ALGORRI

MIRANDA ALGORRI, CSR NO. 12743, CRR
FEDERAL OFFICIAL COURT REPORTER