# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

### HONORABLE PERCY ANDERSON, U.S. DISTRICT JUDGE

UNITED STATES OF AMERICA,      )
                               )
            Plaintiff,         )   Case No.
                               )
      vs.                      )   CR 16-00066(A)-PA
                               )
LEROY D. BACA,                 )   PAGES (1 to 144)
                               )
            Defendant.         )
_____)

REPORTER'S PARTIAL TRANSCRIPT OF
TESTIMONY OF LEAH TANNER
THURSDAY, DECEMBER 15, 2016
8:08 A.M.
LOS ANGELES, CALIFORNIA

MIRANDA ALGORRI, CSR 12743, CRR
FEDERAL OFFICIAL COURT REPORTER
312 NORTH SPRING STREET, ROOM 435
LOS ANGELES, CALIFORNIA 90012
MIRANDAALGORRI@GMAIL.COM

UNITED STATES DISTRICT COURT

**APPEARANCES OF COUNSEL:**

**FOR THE PLAINTIFF:**

    EILEEN M. DECKER
    United States Attorney
    BY:  BRANDON FOX
    BY:  EDDIE A. JAUREGUI
    Assistant United States Attorneys
    United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012

**FOR THE DEFENDANT:**

    MORGAN LEWIS AND BOCKIUS LLP
    BY:  NATHAN J. HOCHMAN
    BY:  BRIANA ABRAMS
    The Water Garden
    1601 Cloverfield Boulevard
    Suite 2050 North
    Santa Monica, California 90404

    MORGAN LEWIS AND BOCKIUS LLP
    BY:  TINOS DIAMANTATOS
    77 West Wacker Drive
    Chicago, Illinois 60601

**UNITED STATES DISTRICT COURT**

# I N D E X

## THURSDAY, DECEMBER 15, 2016

## Chronological Index of Witnesses

Witnesses: _____    Page

TANNER, Leah

    Cross-examination by                         7
    Redirect examination by                      134
    Recross-examination by                       140

UNITED STATES DISTRICT COURT

**EXHIBITS**

**THURSDAY, DECEMBER 15, 2016**

| Exhibit | For ID | In EVD |
|---|---|---|
| 637  Summary Chart | 124 | |
| 639  Summary Chart | 125 | |
| 638  Summary Chart | 126 | 127 |

**UNITED STATES DISTRICT COURT**

**LOS ANGELES, CALIFORNIA; THURSDAY, DECEMBER 15, 2016**

**8:08 A.M.**

**---**

(The following proceedings were held in open court out of the presence of the jury:)

THE CLERK:  Calling item No. 1, CR 16-66(A), USA versus Leroy D. Baca.

Counsel, state your appearances, please.

MR. FOX:  Good morning, Your Honor.

Brandon Fox and Eddie Jauregui on behalf of the United States.  Also with us at counsel table is Special Agent David Dahle from the FBI.

MR. DIAMANTATOS:  Your Honor, good morning.

Tinos Diamantatos, and Nathan Hochman should be entering the doors any second, Your Honor.  I'm joined at counsel table with Briana Abrams and the defendant Leroy Baca who is present.

THE COURT:  Good morning.

MR. HOCHMAN:  Good morning, Your Honor.

THE COURT:  Good morning.

I received a list.  Is this a complete list of witnesses who the defense anticipates calling in its case?

MR. HOCHMAN:  Today, Your Honor.  I thought that's what the Court had asked for was the witnesses that we

were going to call today.  I was going to inform the Government, as they have done with me, at the close of each day which was who we would call for the next day.

THE COURT:  Well, the Court would like to have a list of who you're going to call in your case.

MR. HOCHMAN:  Your Honor, we provided the Court with an extensive list at the very beginning.

THE COURT:  I want a real list.

MR. HOCHMAN:  I will get you that list, Your Honor.

THE COURT:  Thank you.

Okay.  The witness --

MR. FOX:  She's here.  Would you like her on the stand?

THE COURT:  Yes.  Let's bring her in.

MR. HOCHMAN:  Did Your Honor want to take up that matter we took up -- it doesn't pertain to this particular witness.  Actually, it doesn't pertain to either of the witnesses in the Government's case.  So we can take it up at the close of the Government's case if you'd like, Your Honor.

THE COURT:  Okay.  Let's bring the jury in.

(The following proceedings were held in open court in the presence of the jury:)

THE COURT:  Good morning, ladies and gentlemen.

All right.  Let's proceed.

**UNITED STATES DISTRICT COURT**

MR. HOCHMAN:  Thank you, Your Honor.

**LEAH TANNER,**

**GOVERNMENT'S WITNESS, PREVIOUSLY SWORN:**

**CROSS-EXAMINATION**

BY MR. HOCHMAN:

Q       Agent Marx, you opened an investigation into Los Angeles County Sheriff's Department deputy misconduct in June of 2010; is that correct?

A       Correct.

Q       And if I recall, you did that after receiving a letter from an inmate that had been given to you by your supervisor alleging that deputies had been assaulting inmates and covering up their assaults; is that correct?

A       It wasn't just from the letter.  It was after doing multiple interviews that we determined that there was sufficient evidence to be able to open an investigation.

Q       And when you opened that investigation in June of 2010, you had been a special agent with the FBI for approximately one year; correct?

A       Correct.

Q       It was your rookie year; is that right?

A       If you want to call it that.

Q       And before you were a special agent, you had never worked for any law enforcement agency; is that correct?

A       Correct.

**UNITED STATES DISTRICT COURT**

Q        Now, of that one-year period that you had been a special agent, four months of it was spent at the FBI's training academy in Quantico, Virginia; correct?

A        Correct.

Q        You were assigned -- your first assignment upon coming to the Los Angeles office was the civil rights squad; is that right?

A        Yes.

Q        So then you had only been with the civil rights squad about eight months at the time you received that inmate letter in June, 2010; is that correct?

        MR. FOX:  Objection.  Relevance, Your Honor.

        THE COURT:  You can answer that question.

        THE WITNESS:  I believe it was ten months because I got to Los Angeles in September of 2009.  So I believe that's ten, nine, ten months.

Q        BY MR. HOCHMAN:  And you said you were assigned to the civil rights squad; is that correct?

A        Yes.

Q        You weren't the only person on that squad; right?

A        No.

Q        How many agents were on that squad?

A        At the time I arrived, I believe seven, maybe eight.

Q        And were you the most junior of those agents?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

Q     BY MR. HOCHMAN:  And beyond the civil rights squad, there is an entire Los Angeles FBI office; is that correct?

A     Yes.

Q     And there's about 800 agents in that Los Angeles office?

A     Yes.  That includes offices as far as Santa Barbara, Santa Maria area, and stuff.  But yes.  800 in the Los Angeles field office.

Q     When you received that inmate letter, June, 2010, how many jails had you investigated at that point?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

Q     BY MR. HOCHMAN:  Well, as part of your training, did you work in any jails?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

Q     BY MR. HOCHMAN:  When you were doing due diligence concerning the Los Angeles County Sheriff's Department jails, did you have any comparison in your own life history with any jails that you had investigated?

MR. FOX:  Objection to relevance.

THE COURT:  Sustained.

UNITED STATES DISTRICT COURT

Q        BY MR. HOCHMAN:  How many undercover operations had you participated in by June, 2010?

A        This was the first one.

Q        And how many times had you actually been inside the Los Angeles County Sheriff's Department jails before June, 2010?

A        I had not been prior to that time.

Q        Now, you wanted to make sure you conducted a thorough investigation in connection with that inmate letter; correct?

A        Yes.

Q        And did you get an organization chart of the Los Angeles County Sheriff's Department in June, 2010, to see how it was put together?

A        I don't really understand your question.

Q        Do you understand what an organization chart is where it sort of lists everyone from the sheriff all the way down to a deputy?

A        I understand what an organizational chart is.  I don't understand what you mean by whether or not I looked at an organizational chart in relation to the jails.  Is that what you're asking?

Q        In relation to the jails, yes.

A        I had researched plenty on the sheriff's department during that time.  Whether or not I looked at a

specific organizational chart for the jails, I don't believe so.

Q        Well, did you know that the sheriff's department had something called an Internal Criminal Investigations Bureau during the first year of your investigation?

MR. FOX:  Objection to the form of the question.

THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  At any point before you do the bribe transaction in July, 2011, did you know that the sheriff's bureau had an Internal Criminal Investigations Bureau?

A        I knew that the sheriff's department had internal investigations.  I don't know that I knew specifically there was an internal criminal investigations and an Internal Affairs, but I knew that they had an internal investigative body that would look into deputy misconduct.

Q        Did you know who ran the internal investigative body as of the summer of 2011 at the sheriff's department?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  Did you contact any people in, let's say, July, 2011, as you're doing the first bribe transaction, that was part of this Internal Affairs organization inside the sheriff's department?

A        No.  We intentionally did not.

**UNITED STATES DISTRICT COURT**

Q        Did you later learn that the person who ran
Internal Criminal Investigations Bureau was
Captain William Tom Carey?

A        I did learn that later, yes.

Q        And starting in 2015, did Tom Carey cooperate
with your investigation?

MR. FOX:  Objection.  Relevance.  Improper,
Your Honor.

THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  Well, did you ever have a chance
to meet William Tom Carey as of 2011?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  When doing your research about
the Los Angeles Sheriff's Department, did you come to learn
that in the -- between June, 2010, and July, 2011, that it had
an Office of Independent Review?

A        I did know that, yes.

Q        You did know that?

A        Yes.

Q        Did you contact the head of the Office of
Independent Review, Michael Gennaco, any time between
June, 2010, and June, 2011?

A        Again, we intentionally did not.

Q        Did you ever read their annual reports of what

was going on in the Men's County Jail between June, 2010, and June, 2011?

A      That's actually one of the reasons why we continued on with our investigation, based on some of the reports that they had written.

Q      Now, the FBI periodically issues enforcement bulletins for its agents; is that correct?

A      I'm not sure what you mean by "enforcement bulletins."  They have law enforcement bulletins.  I'm not sure if that's the same thing that you're discussing.

Q      Yes.  The FBI periodically issues FBI law enforcement bulletins for its agents; is that correct?

A      Yes.

Q      And they publish these bulletins to provide information on law enforcement techniques to the agents; is that correct?

A      Yes.

Q      Now, in July, 2010, did you read an FBI enforcement bulletin entitled "Cell Phones as Prison Contraband"?

A      No.

Q      At any time between July, 2010, and July of 2011, when you do the first bribe transaction, did you read an FBI law enforcement bulletin entitled "Cell Phones as Prison Contraband"?

14

A       No.

Q       Are you aware, though, that a cell phone -- are you aware in that time period of June, 2010, to July, 2011, that a cell phone could be used to plot escapes in a jail?

A       I knew that it could be.

Q       And you also knew that a cell phone could be used to arrange a hit on witnesses; correct?

A       It could be.

Q       And a cell phone could be used to threaten or intimidate witnesses?

A       It could be.

Q       And a cell phone could be used to conduct gang activity inside of a secured jail?

A       It could.

Q       And a cell phone could be used to smuggle drugs inside a jail?

A       It could be.

Q       And the reason a cell phone could be used for all these purposes is it's not a monitored phone call that's happening as the phones used inside the jail?

A       That's true.  But phones in the jail are not monitored realtime; so they could also be used for the same purposes.

Q       Well, you are aware, when an inmate makes a call from one of the phone calls -- public phone calls in these jail

cells, that that phone call will be monitored and recorded by the sheriff's department?

A        It's recorded.  It's not monitored realtime is what I was told.

Q        But a cell phone call inside the jail is never recorded by the sheriff's department, to your knowledge; is that right?

A        Correct.

Q        Now, to determine the validity of these inmate complaints, you went with another agent at all times to the Men's County Jail to interview inmates; correct?

A        Correct.

Q        Did you go in an undercover capacity?  And by that, I mean did you get a fake credential and say you were from some other agency other than the Federal Bureau of Investigation?

A        No.

Q        Did you take any steps, as you were going through the entryway, to hide the fact you were with the FBI?

A        No.

Q        And your partner was an FBI agent as well?

A        Correct.

Q        And did you see your partner take any steps to hide the fact that your partner was an FBI agent?

A        No.

**UNITED STATES DISTRICT COURT**

Q        And if I understand what you said in your
testimony before, when you would enter the Men's Central Jail,
you would provide your credential to the deputy who was
present; is that correct?

A        We would show it to them.  They would not keep
it.  They kept our driver's license, but they did not keep our
credentials.  They just reviewed them, looked at them, and
verified that they were, in fact, who we say we were.

Q        And the credential had an FBI insignia to
indicate you were an FBI agent?

A        Yes.

Q        And it had your name which, I believe, at the
time was Leah Marx?

A        Correct.

Q        And then the driver's license would have an
address on it for yourself?

A        Mine has a P.O. Box.

Q        P.O. Box.

         Then you would sign a register that would put
your name, telephone number, and the inmate that you wanted to
speak with; is that correct?

A        Yes.  I can't remember at the time if we actually
wrote down the inmate's name or we just provided that verbally
to the deputy.  But either way, we signed in with our name and
credential number and things like that.

UNITED STATES DISTRICT COURT

Q        So name, telephone, credential number; is that correct?

A        I believe so, yes.

Q        And then -- and in order to get the correct inmate, you'd also have to provide them with an inmate booking number; is that correct?

A        Correct.

Q        Now, the number of inmates you interviewed, I think you said, were dozens in this time period from June, 2010, to June, 2011; is that correct?

A        Quite a few, yes.

Q        Was it dozens?

A        I believe so, yes.

Q        And many of the inmates who you had interviewed or you interviewed in this time period between June, 2010, and July, 2011, these were inmates who had filed complaints against the sheriff's department; correct?

A        Not all of them.  Some of them may have; some of them have not.

Q        Have some of them also filed complaints with the ACLU against the sheriff's department?

A        Again, some did; some did not.

Q        Now, as an FBI agent, you can't just go into the jails, walk through the doors, go to a cell of an inmate, pull the inmate out, put him in a room, and start speaking with him;

correct?

A       Correct.

Q       You actually have to go through the sheriff's process, as you've just described, in order to have the inmate brought down to you; is that correct?

A       Yes.

Q       And that's because the sheriff's department is in charge of the jails; isn't that right?

A       Yes.

Q       And the sheriff's department being in charge of the jails gets to set the rules for the jails; correct?

MR. FOX:  Objection.  Argumentative.  Relevance.

THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  Well, the sheriff's department determines when inmates can be interviewed; correct?

A       I don't know if that's accurate.  I don't know that they can restrict an interview just based on the fact that they feel like restricting an interview of an inmate between law enforcement officers.

Q       I'm actually talking about the timing.  In other words, are you allowed to go in 24 hours a day to interview with an inmate, or are there certain time periods that you can?

A       In the past there's been plenty of times where you've been able to go off hours as long as you coordinate it with them.  I think now there's a change in policy that there

UNITED STATES DISTRICT COURT

may be specific hours, but I know that other agents as well have gone in after hours plenty of times.

Q        Now, when you have the inmate brought down to you, I think it's the 6000 room that you actually speak with the inmate; is that correct?

A        It's the 6000 floor.

Q        6000 floor.  There's a room inside that floor; is that correct?

A        There's a few rooms.

Q        These are interview rooms for agents?

A        Yes.

Q        Now, these rooms differ than, for instance, when a visitor from the general public wants to speak with an inmate; correct?

A        Correct.

Q        And because a visitor doesn't get to -- a visitor has to go through a different process in order to speak with an inmate; is that correct?

A        Correct.

Q        And a visitor will have that glass partition between them and the inmate when they're speaking with them; is that correct?

A        Yes.

Q        And they would have to speak with one of those phones where they have a phone and the inmate has a phone in

order to speak with each other; is that correct?

A       Yes.

Q       But you -- when you come in as a law enforcement agent, you can get -- you get put in one of these rooms on the 6000 floor; is that correct?

A       Yes.

Q       And when you get put in the room, the inmate at some point is brought down to you by the sheriff deputies?

A       Yes.

Q       Then they leave the room; is that correct?

A       Yes.

Q       And you close the door?

A       Yes.

Q       So you're now having a visit with that inmate in which no sheriff's department deputies are present; is that correct?

A       Correct.

Q       And in this -- basically -- in this type of meeting where you're there, the inmate is there, but the sheriff's deputies are not there, are you able to actually give an inmate any items at that point?

A       I don't know what you mean by "items."  Like if I have a piece of paper for him to read or look at, absolutely.

Q       And if the inmate brought down papers, they could hand them to you to look at; is that correct?

A       Correct.

Q       Now, if an inmate -- if you wanted to give an inmate at that point -- well, when you came into that room, does the sheriff's department take your cell phone away?

A       There's signs all over the place saying that you cannot take your cell phone into the secured area of the jails.

Q       When you enter the jails, in order to go into that room, are you searched?

A       No.

Q       So if you wanted at that point to give an inmate -- if you had your cell phone on you -- and periodically, did you carry your cell phone into one of those inmate rooms?

A       I did not.

Q       Do you know if Mr. Plympton ever carried his cell phone at any point?

A       He did not.  We locked them in the boxes as we were told to do every time.

Q       And with respect to -- if you had wanted to, for instance, give Anthony Brown a camera, a small little camera embedded in a cross that he could wear as a necklace, you could have done that; correct?

A       I could have.

Q       And, in fact, you contemplated, did you not, actually giving Anthony Brown a necklace with a cross on it

that would have a camera embedded in it in order for him to photograph what was going on that he could see in the Men's Central Jail; correct?

A    It's partially correct.  We were not going to give him the actual necklace.  There was inmates in the jail that were allowed to make these rope-type necklaces that were allowed by the sheriff's department.  Anthony Brown told us that, and we were looking into whether or not we could have our tech crew outfit that actual necklace that he got from the jails and put a camera in it so that it would be something that he could video things in there.

So we were not going to provide the necklace. That was coming from the jail.  We were going to attempt to put a camera in it and see if that was possible.

Q    Now, did -- when you would enter that room, did any of the sheriff's deputies on any of the occasions that you were speaking with inmates tell you that there were certain questions that were off limits that you couldn't ask the inmates?

A    No.

Q    So you had complete freedom while you were in the room with the inmate to ask the inmate any question that you wanted; correct?

A    Correct.

Q    And I think you said yesterday that you would

document everything that the inmates were telling you on those -- on the forms that the FBI has; is that correct?

A        Correct.

Q        Those are -- they go by the name of Form 302; is that correct?

A        Correct.

Q        And then you said you would then give the Form 302 to your supervisor who might do some grammatical edits; is that correct?

A        If needed, yes.

Q        And then it would go into your case file; is that correct?

A        Correct.

Q        And as -- you were the case agent during this time of June, 2010, let's say, all the way through September, 2011, for the case involving Anthony Brown; is that correct?

A        It wasn't a case involving Anthony Brown.  It was a case on the sheriff's department.  He was part of it; so I'm not sure if you were referencing something other than that.

Q        No.  The case on the sheriff's department, you were the case agent; correct?

A        Correct.

Q        You were the lead case agent; correct?

A        Yes.

Q        Now, you said that, when you interviewed the first inmate back in June of 2010 or thereabouts, they provided you with the names of at least five to seven other inmates that also had allegations against the sheriff's department; is that correct?

A        No.  The letter that the inmate wrote had a list of inmates with booking numbers that the inmate originally sent.  I don't know if, when we interviewed him, he gave us those same names.  He may have just told us generally what was going on.  We had the names from the letter.

Q        And when you talked about the dozens of inmates that you, thereafter, interviewed -- I just want to be clear -- at no point did anyone in the sheriff's department tell you that, when you were interviewing those inmates who had allegations of misconduct against the sheriff's department, that there were certain questions that were off limits?

MR. FOX:  Objection.  Asked and answered.

THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  Well, when you said before that, for one inmate interview, a sheriff's department deputy did not curtail your questions, I just want to be clear that that occurred every time you spoke with an inmate between June, 2010, and July, 2011.

MR. FOX:  Objection.  Misstates the testimony.

THE COURT:  Sustained.

UNITED STATES DISTRICT COURT

Q        BY MR. HOCHMAN:  Did any Los Angeles County

Sheriff's Department deputy curtail any of your interviews with

any of the inmates between June, 2010, and June, 2011?

MR. FOX:  Objection.  Asked and answered.

THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  Now, when you were conducting

this investigation between June, 2010, and July, 2011, was this

a private Leah Marx investigation?

A        I have absolutely no idea what that means.

Q        Well, you weren't doing it for your own personal

reasons, doing this investigation; correct?

A        Again, I'm not sure what you mean by that.  I

work for the FBI, and we conduct investigations.  It was -- I

was the lead case agent.  I don't know what you mean by "for my

own reasons."  I'm not sure I understand.

Q        Well, it's -- when you conduct an FBI -- not

every FBI investigation is a grand jury investigation; is that

correct?

A        That's correct.

Q        And when you opened up this particular FBI

investigation, it didn't open up as a grand jury investigation;

is that correct?

A        Not initially.  Within a matter of probably a

month or two, it had.

Q        And in what way did it become a grand jury

investigation?

A    As soon as we got to the point where the investigation was opened and we determined that there was a need to start to issue Federal Grand Jury subpoenas and other things like that, that is when a grand jury is opened to start investigating.

Q    And so the first grand jury subpoena that was actually issued, though, was about a year later in July, 2011; is that correct?

A    No.

Q    There were other grand jury subpoenas that were issued?

A    There was a significant amount of grand jury subpoenas issued early on for phone records, bank records, other types of documents that we requested very early on in the investigation prior to the Gilbert Michel portion coming into play.

Q    Was this your first grand jury investigation?

A    No.

Q    How many others had you done?

A    At that point, one on the state side and then a human trafficking case on the federal side.

Q    So by that point, this is your third grand jury investigation; is that correct?

A    Second federal and then one on the state side.

UNITED STATES DISTRICT COURT

Q        And you understand that an FBI agent who speaks to a witness can go in front of the grand jury and provide word-for-word everything that that witness said to them in order to convey that information to the grand jury; is that correct?

A        Yes.

Q        And that's because the grand jury can consider hearsay and doesn't need the actual person who gave you that information to appear before the grand jury in order to have that information given to the grand jury; is that correct?

A        Correct.

Q        Now, between June, 2010, and July, 2011, you had the chance to meet Anthony Brown; correct?

A        Yes.

Q        Did you ever go to the grand jury at any point between June, 2010, and July, 2011, and provide the grand jury with any statements that Anthony Brown had given you?

A        I'm not sure what the point of that would be.  We were still working on our investigation.  So I don't know what statements I would have brought forward to the grand jury to present.  At that point we weren't bringing forward any charges.  And so I don't know what we would have brought forth any testimony at that point for.

Q        Well, you had spoken -- between June, 2010, and July, 2011, you had spoken to Anthony Brown yourself dozens of

UNITED STATES DISTRICT COURT

times; is that correct?

A        It wasn't dozens at that point.

Q        10 to 20 times?

A        It was probably 10, maybe 15.

Q        Let's just focus on those ten.

Did you document each one of those ten conversations with Anthony Brown?

A        Yes.

Q        That was that FBI 302 we talked about a moment ago?

A        Initially was a 302.  Once he officially became an informant, it's a separate form number, but it's the same type of thing.  It's a report about what he told us.

Q        So focusing on those ten times that you spoke with Anthony Brown between June, 2010, and July, 2011, did you ever go in front of a grand jury during that time and relay to the grand jury any of those ten conversations?

A        Again, there wouldn't have been a reason to at that point because we were still investigating.  There's nothing to bring forward to just say this individual told me these things and not to have any additional information to provide the grand jury in terms of what we were investigating.

Q        Did you ever go before the grand jury between June, 2010, and July, 2011, and relay to them any of the Anthony Brown statements?

UNITED STATES DISTRICT COURT

A       Nope.

Q       Now, during these ten statements, Anthony Brown is telling you about different allegations of deputy abuse against inmates; is that correct?

A       Some of them were just piecemeal-type information.  I saw an incident on this day.  I don't know anyone involved, but it was in this area.  But, in general, yes, he was providing us that type of information regularly.

Q       Well, some of the information was piecemeal, and some was very specific as to which floor, approximately which day, descriptions of the deputies involved; is that correct?

A       Correct.  But usually not enough information to have the full name of a deputy, full name of an inmate, things like that.  So it was very piecemeal at that point.

Q       Now, you mentioned that Anthony Brown transitioned from just someone that you were interviewing into an informant at some point; is that correct?

A       Yes.

Q       And do you refer to informants as "confidential human sources"?

A       That's an FBI term.  But, yes, it's confidential human sources is what the FBI calls it, but it's an informant.  That's basically what it is.

Q       I think the acronym is CHS; is that correct?

A       Correct.

Q       You said you actually have different reports that you file with confidential human sources as opposed to just an ordinary person that you're interviewing; is that correct?

A       It's just a technicality.  It's a different program that the bureau uses for sources.  It's the same thing. You're documenting what the individual told you, but it's the exact same thing.  It's just a different form number.

Q       Well, in the CHS report, you don't actually put down the person's name -- is that correct? -- that you're speaking with?

A       Correct.  Because at that point it goes into their source file.  So you don't list their name because it's going into their personal source file.

Q       So Anthony Brown got a unique FBI CHS number; is that correct?

A       Correct.

Q       And that way you could track Anthony Brown through that CHS number in your files; correct?

A       It's not so much tracking.  It's just everything that he provided us would go into his specific source file number.

Q       And you took his -- you used the source number, that CHS number, instead of his name to -- for what reason? Why do you actually need to do that?

A       It's usually done in an attempt to at least

initially protect the identity of the person giving us the information.  And so eventually the name may come out, but at least at that time during the investigation he was just a number and not a name.

Q     Now, had you signed up between June, 2010, and July, 2011, other confidential human sources besides Anthony Brown?

A     No.

Q     Now, when you signed someone up, I believe you gave admonishments; is that correct?

A     Correct.

Q     Now, the admonishment is an instruction from you on what they can do when they work for you as a confidential human source; correct?

A     Correct.

Q     Some of the admonishments include following your instructions; correct?

A     Yes.

Q     The admonishments will include don't lie to us; correct?

A     Correct.

Q     Be truthful.

A     Yes.

Q     And Anthony Brown agreed to follow your instructions, not lie to you, and be truthful; is that correct?

A        Correct.

Q        And you -- before, though, you signed him up as a confidential human source, an informant, you went ahead and checked him out, didn't you?

A        Ran a criminal history check, checked our files to determine if he had already been a source or had a pending FBI investigation on him or anything like that.

Q        And that's because you wanted to actually see if he had some type of background that would show that he can be trustworthy, honest, and reliable; is that correct?

A        That's part of it, but it's required that we do that for every source, even if it's a CEO of a company.  It's just a requirement.  But, yes, it's also to determine whether or not there's anything we can find that shows he's not being truthful.

Q        Well, in this particular case, when you're running an undercover operation with Anthony Brown as part of it, his ability to follow your orders is crucial or else the undercover operation can blow up; is that correct?

A        It's important, but at the same time, it's not the only factor that comes into play with a source or an undercover investigation.

Q        Now, you said that one of the things you do is check the FBI's files in order to determine whether or not Anthony Brown had been a confidential human source, an

informant, before; isn't that correct?

A        Yes.

Q        And you actually found out that back in 1989 he had worked with the New York FBI office; is that correct?

A        All we were able to determine is that he took a plea deal for a case many, many years ago and that he had provided information.  We determined that he was not officially signed up as an informant.  It was just an informal plea deal, provided information type of situation.

Q        And that was a plea deal where he agreed to plead guilty to fraud; correct?

A        I believe it was the fraud charge.

Q        And did you look into that fraud to see what Anthony Brown had lied about at the time you signed him up as an informant in 2010?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  Now, you also found out through Anthony Brown's criminal history that he had a violent criminal history; is that correct?

A        He had some pending charges for armed robbery at that time.

Q        Well, you knew that in -- and that time is 2010 that you just referred to; is that correct?

A        Yes.

UNITED STATES DISTRICT COURT

34

Q      Well, you knew in 2005 from his criminal history that he had been convicted on three counts of using a gun to commit a robbery and received a five-year sentence; is that correct?

A      Off the top of my head right now, I can't tell you the exact charge, but I did review his criminal history at the time, and I believe that was the -- that was the charge.  I can't remember specific right this moment.

Q      So it wasn't just in 2010 he was facing charges dealing with armed bank robbery.  He had actually already been convicted years before of essentially the same crimes; correct?

A      I believe so, yes.

Q      Now, with respect to the charges that he was facing, you were aware that one of those charges involved three robberies between July 10, 2009, and August 3rd, 2009, of banks where he used a gun; correct?

A      All we knew was the pending charges against him at that time.  We didn't know the specifics of the case.

Q      Well, did you know that the pending charges against him at that time included 13 counts of armed bank robbery?

A      I knew that -- I believe there was 12, I thought.  Either way, we knew that there were pending charges, multiple pending charges for armed robbery.  Correct.

Q      I stand corrected.  12 counts of armed bank

UNITED STATES DISTRICT COURT

robbery and one count of assault with a deadly weapon using a gun; is that correct?

A    I don't recall the assault with a deadly weapon, but again, I don't have the criminal history in front of me. That was five years ago that I reviewed it.  I'm not sure about that one.

Q    And did you review the probation report in connection with the 2009 charges with respect to the threat to the community section?

MR. FOX:  Objection.  Cumulative and relevance.

THE COURT:  Sustained.

Q    BY MR. HOCHMAN:  Now, Anthony Brown would write you letters from prison in addition to speaking with you; is that correct?

A    During what time period?

Q    June, 2010, to July, 2011.

A    I don't believe he wrote, like, letters that were sent to the office during that time.  What he would do is, knowing that we would be coming to visit him periodically prior to the undercover getting involved, he would write down things that would happen during the week.  So he would document on Monday this deputy was in the hallway and punched this inmate on the side of the face for no reason on this date at this time.  So it was almost like a log of what was going on.

I believe later on he sent letters, but I don't

think during that time period -- I think it was just -- he would write them and then hand them to us as like a log of what occurred.

Q        And when you say "hand it to you," those would be those unsupervised meetings you're having at the Men's Central Jail with just Anthony Brown; is that correct?

A        Correct.

Q        You said at one point C.J., an undercover FBI agent, was -- started meeting with Anthony Brown in your place; is that correct?

A        Correct.

Q        Approximately when did that start happening?

A        I don't remember the exact date.  I want to say it was early 2011 when he started going to the jail as a visitor, and we stopped going to visit Anthony Brown on the -- as law enforcement officers.

Q        When you were -- and did -- and did Anthony Brown give C.J. information like he had given you during your visits?

A        It was a little more difficult because he was on the phones between glass in the visitor section.  So he kind of had to be a little less obvious talking about deputies since there were deputies walking around in the visiting area.  So he would try to tell C.J. information such as a deputy name and then maybe talk about something else that seemed like it was casual conversation and then go back to try to get more

information.  So it was definitely not the same as when we were meeting with him, but they attempted to exchange information as best they could.

Q        Now, did you have something set up in your computer so that, when there was a court event for Anthony Brown, you would be notified of it?

A        No.

Q        Did you find out that Anthony Brown was convicted of the charges that he was facing, these armed bank robbery charges, in June of 2011?

A        I don't know if I knew immediately, but I believe I found out very soon after that he was convicted at that point.

Q        And that was he was sentenced to 423 years in prison?

A        I don't know if I knew about the time period at that point, the sentence, but I knew that he had been convicted.  I found out sometime soon after about the amount of time he had received.

Q        So you might not have found out on June 27, 2011, the date on which he was sentenced, but soon thereafter you would have found out?

A        At some point soon after, yes.

Q        And, again, the first bribe transaction took place on July 20, 2011; correct?

UNITED STATES DISTRICT COURT

A        I can't remember the exact date.  I thought it was the 24th, but it was late July of 2011.

Q        You've been the case agent on this -- on this case since June, 2010; is that correct?

A        Correct.

Q        And you have access to the whole case file; isn't that correct?

A        I do.

Q        You have access to the reports that actually have the date on which the first bribe transaction took place; is that right?

A        Yes.

Q        And did you -- and you've had a chance over the last six years to review those reports to determine that date in July; correct?

A        Yes.

Q        And that date in July is July 20th, isn't it?

A        Again, Gilbert Michel pled guilty.  So at this point, the specific dates are not something I keep in my head. I'm off by four days potentially.  But late July is what I recall is when the first interaction took place.

Q        Did you review anything from the case file, any reports prior to testifying today?

A        I did.  Not specific -- again, Gilbert Michel took responsibility and pled guilty; so I was not focused on

**UNITED STATES DISTRICT COURT**

specific dates of that transaction, as well as being on maternity leave the last month.  So I've had a little bit limited access to those.

Q      Did you have a chance to speak with Mr. Fox over this last weekend before you testified here?

A      I did.

Q      Did you have a chance to spend hours with Mr. Fox going over your testimony before you testified, starting yesterday?

A      I would not say hours.  We went over my testimony, but it was not hours.

Q      Was it at least two hours?

A      Possibly.

Q      Now, when you were dealing with Gilbert -- excuse me -- with Anthony Brown, Anthony Brown wanted certain things from you; isn't that correct?

A      I'm not sure what you're referencing.

Q      Well, Anthony Brown wanted money to pay for phonecards so that he could make public phone calls; correct?

A      That's not actually accurate.

Q      Tell the jury what is accurate.

A      He did not come to us and say, "I want money to make public phone calls."  He explained to us that, in order to make phone calls from the jail phones, it's either a collect call or the person you're calling has to pay for it.  So if

he's trying to make a call to either C.J. or he was trying to call the office, despite us not wanting him to, he would have to have a phonecard in order to do that.  So when he told us that, we agreed to put some money on his books in order to allow him to purchase those phonecards as well as some food for his cell.

Q       So can you explain what that means, to put money on an inmate's books?

A       Inmates are not allowed to have cash in the jails, and so they all have almost an account -- it's kind of like a bank account.  But they can only purchase certain things within the jail, so snack foods, phonecards.  That's pretty much it, toiletries.  That's pretty much it.

So there's only certain things they can purchase, and it has to be purchased through the jail.  So they can't just go online and buy things.  It has to be jail-approved things through a very specific vendor, and they have to have money on their account in order to purchase those things.

Q       So the FBI is putting money -- transferring money onto the sheriff's department's computer so that Anthony Brown can make purchases while he's in the jail; is that correct?

MR. FOX:  Objection.  Asked and answered.

THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  Now, you gave Anthony Brown money on his books, not just to purchase phonecards for

himself; is that correct?

A        Correct.

Q        In fact, you gave Anthony Brown money on his books in order to purchase phonecards for people called shot-callers inside the Men's Central Jail; is that correct?

A        Correct.

Q        And a shot-caller is an inmate; isn't that correct?

A        Yes.

Q        And when we're talking about the 2000 and 3000 floors of Men's Central Jail, these are violent inmates; isn't that correct?

A        They can be.

Q        In fact, when you were interviewing these inmates from the 2000 and 3000 floor, you always wanted to have another agent with you for your safety; is that correct?

A        I always do an interview, no matter who it is, with a second agent.

Q        And in the particular case of interviewing inmates from the 2000 and 3000 floor, you wanted to have another agent with you to make sure you were safe; correct?

A        It was not specific to the 2000, 3000 floor.  It could be an inmate who is in there for drunk driving, and I would want a second agent in the interview room with me at all times.

Q        Well, you knew that the people you were interviewing from the 2000 and 3000 floor had violent criminal histories; correct?

A        Some did; some did not.

Q        And when you're giving -- and you were the one who authorized Anthony Brown to pass out these phonecards to these shot-callers; correct?

MR. FOX:  Objection.  Relevance and cumulative.

THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  What is a shot-caller?

MR. FOX:  Objection.  Asked and answered.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  Shot-caller is an individual who the deputies select for usually a module or a floor, and it's someone that they allow out of their cell frequently.  And so the deputies pick someone.  They allow them out of their cell more often, and that person is supposed to keep the inmates on that tier, I guess you could say, in-line.  So the deputies are the ones that select those inmates.

Q        BY MR. HOCHMAN:  But the shot-callers can be gang members; is that correct?

A        They can be.

Q        And did you monitor how the phone calls were made with these phonecards that Anthony Brown was giving to the gang

UNITED STATES DISTRICT COURT

shot-callers?

A    Again, those were the phonecards that were used on the recorded lines in the jail; so anybody could have reviewed those calls.  As you mentioned before, they were monitored, recorded jail lines.

Q    Did you monitor any of the phone calls that were being made with the phonecards that Anthony Brown gave to gang shot-callers?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

Q    BY MR. HOCHMAN:  Now, in addition to putting money on Anthony Brown's books for phonecards, Anthony Brown wanted other things from you, like a TV, earphones, transcripts for his case; is that correct?

A    That was after he left the county jail.  They're not allowed to have those items in county jail.

Q    When Anthony Brown and you were speaking, you determined that Anthony Brown lied to you during the June, 2010, to July, 2011, time frame; is that correct?

A    There were a few things we could not verify as truthful or not and other things we believed he was not being truthful about.

Q    Well, during that time frame -- I'll expand the time frame all the way through August, 2011 -- Anthony Brown said to you that he had brought a cell phone in, not just from

Deputy Michel, but from Deputy Bravo; is that correct?

A    He did.

Q    And that's a lie because you never gave Anthony Brown or arranged to have a cell phone brought in from Deputy Bravo to Anthony Brown; is that correct?

A    That's actually not possible to determine if that's a lie or not because it is possible that Deputy Bravo did bring in a cell phone, and Deputy Bravo was an individual we were looking at as someone who was engaging in illegal behavior.

Q    It's possible, but you have no evidence of it; correct?

A    Correct.  So I wouldn't say he lied if I can't verify yes or no.

Q    Well, how about this.  When Anthony Brown said that Deputy Michel gave him marijuana, ecstasy, heroin, cocaine, and methamphetamine, that was a lie; correct?

A    We later determined that was a lie.

Q    Because you never gave -- the FBI never gave marijuana, ecstasy, heroin, cocaine, and methamphetamine to Deputy Michel to bring to Anthony Brown; is that correct?

A    Correct.

Q    Why not?

A    We would never insert drugs into a custody facility.  At that point in time, we would not even contemplate

inserting, say, fake contraband, fake drugs or anything.  So there was nothing like that we engaged in.

Q        And that's because drugs are very dangerous and illegal inside of a secured jail facility; correct?

A        They could be, yes.

Q        Now, Anthony Brown was also a manipulator; isn't that correct?

A        He could be.

Q        Could be or was?

A        He could be.

Q        Why do you qualify?

A        Because there was plenty of information that he provided that was not helpful to him and actually put him in a bad position as an inmate to provide us that information, and yet there was some information he provided us that was more beneficial to him to tell us or to give us information.  So I wouldn't call him a hundred percent that all he did was manipulate when he put himself out there plenty for the bureau in order to determine whether or not all these allegations were true or not.

Q        Now, in January, 2012, I think you said a moment before that Gilbert Michel pled guilty to the crime of bribery; correct?

A        Correct.

Q        So after January, 2012, you didn't need

UNITED STATES DISTRICT COURT

Anthony Brown to testify in front of a grand jury about Gilbert Michel's bribe; correct?

A    At that point in time in January of 12, no.  We did not need specific to the bribe payment.  It doesn't mean we didn't want his information on what occurred and what he had knowledge of.  But in terms of the information specific to charge and convict Michel, that's correct.  We did not need his testimony.

Q    Yet you writted out Anthony Brown in December of 2012 to testify in front of the grand jury; is that correct?

A    Correct.

Q    And he was testifying in front of the grand jury based on the Gilbert Michel bribe transaction; correct?

A    Correct.

Q    Testified for about 45 minutes in December of 2012 about the Gilbert Michel bribe transaction; is that correct?

A    I don't know how long he testified for, but yes, he testified specific about what went on with that interaction.

Q    Now, I just used the term "writ."  When you writ someone out of -- in this case it was state prison to the Federal Grand Jury; correct?

A    Correct.

Q    Does the FBI serve the writ?

A    No.

UNITED STATES DISTRICT COURT

Q      Does the FBI transport the prisoner back and forth from the prison to the grand jury and then back to the prison?

A      Usually we don't.  We have before, but in this situation we did not.

Q      Because usually -- or in this situation, it was U.S. Marshal Service that would transfer Anthony Brown in connection with a writ to the grand jury and then, when he was done with his grand jury, bring him back to the state prison; is that correct?

A      Correct.

Q      Now, a writ to testify before a grand jury does not include an FBI interview as part of it; is that correct?

A      I mean, we are absolutely allowed to speak to the individual before, after, even if they're writted over.  It's not something that, because they're writ over for their grand jury testimony, that we're allowed to speak to them.  So frequently we will bring them over and speak to them prior to them ever testifying.

Q      Wait a minute.

The writ, though, is a writ to testify in front of the grand jury on a specific date and a specific time; is that correct?

A      Correct.

Q      And the U.S. Marshal Service has to bring them

UNITED STATES DISTRICT COURT

over to testify in front of the grand jury that specific date and that specific time; correct?

A    Correct.  But oftentimes they'll bring them over two, three hours before the grand jury time just because they have other inmates to transport, and in those situations, we'll frequently talk to the inmate prior to going into grand jury.

Q    So you would talk to them the two to three hours beforehand, and then after they're done with the grand jury, they get brought back to where they came from; correct?

A    Correct.

Q    Let's focus for a moment, if we could, on William David Courson.

May I have a moment, Your Honor?

I believe you testified that you first met Deputy Courson when you started to go to the jails in June, 2010; is that correct?

A    I don't know if I met him immediately in June of 2010, but I met him soon after I started going to the jails because he worked right outside the law enforcement interview rooms.

Q    And in your first meeting with him, you lied to him about what you were doing there; is that correct?

MR. FOX:  I'll withdraw.

THE WITNESS:  Yes.

Q    BY MR. HOCHMAN:  You lied to him each time you

UNITED STATES DISTRICT COURT

saw him about what you were doing; is that correct?

A    I don't think that's accurate.  I didn't tell him every time we were there why we were there.  It didn't come up.  It was something that maybe once or twice he would ask a question, but typically he wouldn't ask why I was there.

Q    And you knew he was interested in you for more than a professional relationship; isn't that correct?

A    Yes.

Q    And you took advantage of that because you wanted to leverage his interest in order to get information from him?

MR. FOX:  Objection.  Argumentative.

THE COURT:  Sustained.

Q    BY MR. HOCHMAN:  Well, you did not tell him at the time that you were an FBI agent investigating allegations of deputy misconduct at the Los Angeles County jails; is that correct?

A    Correct.

Q    And you wanted to get information from him about any potential deputy misconduct; is that correct?

A    Including himself since he made the statement to me about potentially engaging in excessive force.  So yes.

Q    And you went out to dinner with him; is that correct?

A    I don't know if it was dinner.  We met there one of the evenings at a restaurant.  I don't know if it was

specific to dinner because I don't think I ate anything.

Q       When you were giving him questions about why you wanted information, like, for a report, that was a lie; is that correct?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  Well, you went out for dinner and drinks with him on separate occasions?

A       I did not have anything to drink.

Q       He had something to drink; is that correct?

A       I believe the first time he had one drink.

Q       And then you went out to lunch as well with him; is that correct?

A       Correct.

Q       And every time you're going out with him, you're never sharing with him the fact that you're wearing a body recorder; is that correct?

A       That would defeat the purpose of wearing a body wire if I told him I was wearing one.

Q       Every time you went out with him, you did not tell him that you were wearing a body recorder; is that correct?

A       That's correct.

Q       And David Courson describes in the interview that he had with the L.A. County Sheriff's Department that you were

playing him.  Were you playing him?

A       The first time I met him, he told me he was engaged.  So I wasn't exactly concerned about whether or not an individual who was engaged and had asked me out was being played.

Q       So you don't think he has any credibility?

MR. FOX:  Objection, Your Honor.

THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  Now, you got a Defense Tactical Manual from him of the Los Angeles County Sheriff's Department that was not available to the public; isn't that correct?

A       Correct.

Q       What did you tell him to get that report from him?

A       I told him that I was writing a paper for my Ph.D course and I was hoping that he could give me a copy of that so I could use it for my report or for my paper.

Q       And that was a lie; right?

MR. FOX:  Objection, Your Honor.  Argumentative.

THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  Now, each one of those meetings that you had with Deputy Courson, were they tape-recorded?

A       Yes.  I believe one of them the recorder failed, and so it was not recorded, and I just wrote a report for it, I believe.

Q        And those recordings would go into your case file?

A        Correct.

Q        And the case file would eventually go over to the U.S. Attorney's Office?

A        Yes.

Q        And the -- those recordings were made so that you could preserve the evidence in case you ever needed it for trial; correct?

A        Correct.

Q        At any point -- while you were dealing with Deputy Courson, he admitted to witnessing an inmate being beaten and falsifying a report about it; correct?

A        I don't believe that's correct.  He did not falsify a report.  I believe he saw something happen, and a sergeant told him to pretend like you weren't on the floor so he didn't have to write a report.

Q        Did you ever arrest Deputy Courson for any of the statements that he had made to you?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  I'll take you back to June, 2011.  So fast forward from June, 2010.  Now if you can have June, 2011, in your mind.

At that point -- and, actually, June, 2011, up

**UNITED STATES DISTRICT COURT**

through July, 2011, as well.  You said that you learned about Anthony Brown's 423-year sentence shortly after it happened; correct?

A       Yes.

Q       Which meant, to your understanding, that Anthony Brown was going to spend the rest of his life in state prison; correct?

A       Yes.

Q       And you -- at that point you had spoken to dozens of inmates; correct?

A       Yes.

Q       But you chose Anthony Brown amongst those dozens of inmates to be involved in the undercover bribe operation of Gilbert Michel; is that correct?

A       It's not always choosing.  What happens is, when an individual is giving you information -- he's the individual that said deputies had approached him, knowing that he was charged with bank robbery, and they believed he had a lot of cash on the outside.  So he's the one that deputies went to saying we'll bring in something in exchange for cash.  Not all the inmates had that ability or had that access to the deputies.

Q       You said not all the inmates had that ability, but some did; correct?

A       No other ones had the specific access saying

"This deputy approached me and offered this."  They just said -- they would give general information, "We know that deputies are bringing in contraband in exchange for bribes."  None of them were saying, "This deputy approached me and agreed to do it."  Anthony Brown did.

Q   And one of the reasons you said that you thought Anthony Brown was a good idea to give a cell phone to is because he had access to medical facilities; is that correct?

A   No.  That's not what I said.

Q   Well, Anthony Brown had a medical condition; correct?

A   Multiple, yes.

Q   Multiple.

A heart condition?

A   Correct.

Q   And as part of the treatment in the Men's Central Jail for his condition, he was allowed to go back and forth to the medical facilities at the Men's Central Jail; correct?

A   Correct.

Q   He would be escorted, of course, by the deputies; is that right?

A   No.

Q   He could just wander the halls himself?

A   Yes.

Q   Were you aware that at times Anthony Brown would

be searched going in and out of the medical facilities?

A       He never told us of a time when he was searched prior to the phone being found.

Q       Did you separately investigate whether or not an inmate would be searched going in and out of the medical facilities at Men's Central Jail at this time?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  Now, you knew at the time when you had Anthony Brown become your informant in this Gilbert Michel investigation that, if it was found out that Anthony Brown was working for the FBI, he would be in danger with other inmates; correct?

A       It's possible that, if other inmates found out, that they may retaliate against him.  But at that point in time, we had talked with him about that risk, and he still wanted to proceed and work with us.

Q       And you knew also that, if it was found out that he was snitching on behalf of the FBI on a particular deputy, that he could be at risk from that deputy that he snitched on; correct?

A       It's possible.  I think that would be pretty risky for a deputy to go after an FBI informant, but -- if they knew that.  But at the same time, we had also discussed that with Anthony Brown, and he wanted to proceed and help us.

Q       Did you ever discuss with Anthony Brown that, if he proceeded and helped you, that you would put him in a witness protection program so no one could ever find out he had been an FBI informant?

A       All we did was explain to him that, wherever he was housed, whatever state prison, we would make sure we note the prison that he was, in fact, informing on law enforcement officers so that they would give him added protection within the custody facility because that's what's required in state facilities.

Q       Did you ever tell Anthony Brown he would be put in a witness protection program?

A       Not specifically witness protection.

Q       Now, when C.J. is coming to visit Anthony Brown, he's coming in an undercover capacity; correct?

A       Correct.

Q       He's not going through the law enforcement line. He's going through the general public situation; correct?

A       Correct.

Q       And did you instruct or discuss with C.J. that he was not to identify himself as an FBI agent when he entered the Men's Central Jail?

A       Correct.  Because that would be the point of being undercover.

Q       And if you're aware, did law enforcement have to

**UNITED STATES DISTRICT COURT**

identify themselves as law enforcement when they entered the Men's Central Jail?

A        If you went through the non-visitor area, then, yes, because there's no other way you would be able to get into that area if you weren't a law enforcement or sheriff's department employee.  If you're in the visitor area, I don't think there's any requirement at that area.

Q        But you don't know one way or the other.

A        I don't.

Q        Now, you said you came up with an operational plan to deal with the bribe transactions of Gilbert Michel; correct?

A        Correct.

Q        And that operational plan was to have Anthony Brown tell Gilbert Michel that he would be willing to pay him money in exchange for Gilbert Michel bringing the cell phone into the jail for Anthony Brown; is that correct?

A        It didn't exactly work out that way because we had already had information from Anthony Brown that Gilbert Michel had already approached him and offered to do it. So it was more giving Anthony Brown the authority to, in fact, say, yes, I will pay you cash through my buddy on the outside.

Q        And did you instruct Anthony Brown how much cash he was supposed to offer Gilbert Michel?

A        I believe C.J., again, through kind of the code

**UNITED STATES DISTRICT COURT**

system tried to explain to him how much we were going to offer Gilbert Michel, and so I believe he had a general idea.  Now, whether or not that was conveyed accurately through their little code system, I'm not sure.

Q     And, again, going back to the operational plan, at some point then Gilbert Michel was supposed to contact C.J. on the outside; correct?

A     Correct.

Q     And Gilbert Michel would get C.J.'s phone number from Anthony Brown; is that correct?

A     Correct.

Q     And then Gilbert Michel would set up a meeting with C.J. in order to do the exchange of money for the cell phone; correct?

A     Correct.

Q     And at that point you would also surveil and video record that meeting.  That was the operational plan?

A     Correct.

Q     And that was the operational plan that was approved by your supervisors, you said?

A     Yes.

Q     That was the operational plan that was sent to Washington, D.C., for approval as well?

A     There's two different things.  There's the approvals from Washington, D.C., and then an operations plan

for the actual event itself.  They're two separate things.

Washington, D.C., just approved the general plan and bribe

payment.  The operations plan was specific to the date, the

time, the location, who's going to be watching from the

surveillance team, things like that.

Q    So wait a minute.

So Washington, D.C., doesn't approve the

operational plan.  They just approve the general idea of having

an undercover operation with Gilbert Michel.

A    It's a little more specific.  They're approving

the actual bribe payment, the phone, the phone going in, the

whole premise of the case.  It's just the operations plan is

specific details of that day, meaning the individuals that are

going to be on the surveillance team, the time we're going to

meet, the location we're going to meet at.

Q    So you -- did the operational plan include a

plan B in case the cell phone was discovered inside the

Men's Central Jail?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

Q    BY MR. HOCHMAN:  Did you have any part of your

plan that anticipated what would happen if the cell phone was

discovered inside the Men's Central Jail?

A    No.

Q    Did you have any part of your plan that

anticipated what would happen when Gilbert -- excuse me -- when Anthony Brown eventually went to state prison?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  Well, you knew, at some point after Anthony Brown was sentenced to the 423-year sentence, that he was going to be going to state prison; correct?

A       Correct.

Q       And at the point that he's going to state prison, you knew that he would have all his stuff searched; correct?

A       I don't know specifically.  I know generally they would search individuals before going to prison.  So it wasn't necessarily something very specifically focused on, but I know they were searched prior to going to prison.

Q       And at that point, if Anthony Brown had the cell phone on him, it would be discovered; correct?

A       Could be.

Q       When you came up with your original operational plan, was any part of that plan dealing with what would happen if the cell phone was discovered on his way to state prison?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  Now, Anthony Brown actually got the cell phone from Gilbert Michel on July 26, 2011; is that correct?

A        I believe so, yes.

Q        At the time that Anthony Brown gets the cell phone, you can track online when the cell phone is being used; is that correct?

A        Correct.

Q        You said you checked daily; correct?

A        Correct.

Q        How often each day?

A        It depended on the day.  There were some times where I would have it up all day long.  While I was on my computer, I would have the website up in the background.  There were some days where it would only be a couple times a day depending on what I was doing that day.

Q        And when you say "a couple times a day," one to three times?

A        Depended on the day.

Q        And did you work seven days a week?

A        At this time, yes.

Q        So when you say it was on your computer, were you actually physically in the office on your computer seven days a week at this time?

A        No.  But I could also access it from my phone. So if I wasn't in the office, I could go to my phone and pull it up and get the same website that I had at the office.  But when I was in the office for long periods of time, I would

**UNITED STATES DISTRICT COURT**

frequently just have it up in the background as I was doing other things.

Q    What times of day were you in the office at that point around July 26 to August 8th of 2011?

A    I would not be able to tell you specifics.  I worked nearly seven days a week for months during that time period.  So I would say anywhere from 7:00, 8:00 a.m. in the morning until the evening, and then frequently at night I would check it from my own phone.  I can't give you specifics on the times I worked five years ago.

Q    So we'll do as broad a capacity as we can.  Let's say 7:00 a.m. to midnight.  Would that be accurate that you might have checked the phone during this time period of July 26, 2011, until August 8, 2011?

A    It could have been anywhere during that time.

Q    So the time period in my example from midnight to 7:00 a.m., Anthony Brown could have made unlimited number of calls and texts during that time and you wouldn't know it until you next checked the phone first thing in the morning; is that correct?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

Q    BY MR. HOCHMAN:  Well, you put in this monitoring ability in order to minimize any risks of a cell phone being in the secured facility; correct?

UNITED STATES DISTRICT COURT

A       Correct.

Q       And there were no risks that were minimized during that time period when you're not looking at your screen either on your computer or your cell phone between, in my example, midnight and 7:00 a.m.; is that correct?

A       You're assuming he had the phone 24 hours a day. He did not.  He only had the phone when Gilbert Michel was working.  So there were plenty of time periods I wouldn't have had to check the phone because he didn't even have it on him. But, yes, there were going to be periods of time that I wouldn't see the phone call until a couple hours later.

Q       And it could be a phone call or a text.

I want to be clear that this phone also had the ability to text; is that correct?

A       Correct.

Q       And the phone also had the ability to access the Internet?

A       It was a flip phone.  So technically, yes, but I don't believe most of the websites worked.  This was back in 2011.

Q       You don't believe that most of the websites could be -- like Yahoo or Google could be accessed from the Internet with that flip phone?

A       From that flip phone -- I don't know if you've ever had a flip phone, but flip phones did not really work for

accessing the Internet at the time.  So when you would try to access the Internet, a lot of websites would not come up.  Some of them would give you error messages.

So could he technically access the Internet?  Yes.  Do I believe it was something easy and that he could do?  No.

Q     Now, when you're looking at the online screen to see who Anthony Brown is calling, if he gets a call from an unlisted number, it will show as unavailable or something along those lines; correct?

A     I don't believe there was any.  So I don't know how it would have shown up.  There may have been, but I don't recall there being unavailable numbers that showed up.

Q     If he were to receive something from an unavailable number, you wouldn't be able to know what number called him when you're just looking at the online record; correct?

A     Again, I wouldn't know if it showed up as unavailable or if somebody blocked their call.  I don't know how that would have shown up since I don't believe it happened.

Q     Did you set an e-mail alert that would alert you anytime Anthony Brown made a telephone call or sent a text from that phone between July 26, 2011, and August 8, 2011, when it was found?

A     No.

Q        Now, the FBI had technology back then that would have allowed you to listen into every call that Anthony Brown made and see every text he sent as it was actually occurring; correct?

A        We had a system available, but it would not have worked the same way as a regular cell phone.

Q        Well, it would have required Anthony Brown to input a PIN number before he made a phone call or sent a text; is that correct?

A        There's actually a multistep process, and it's not just a PIN number.  It's dialing certain numbers and various things.  So it wouldn't have worked like a regular cell phone, which is why we did not do that.

Q        Well, let's break that down.

You said Anthony Brown would have to dial a number before he actually made the phone call or sent the text in order to activate this system that would have allowed you to listen in to every single phone call and see every single text message as they were being sent; is that correct?

A        It is not realtime.  It would record the call. The system would record it, or it would document the text, and I would get notification after the fact that it was -- a phone call was made.  Here's the recording of that phone call.  So it would not have been a realtime wiretap situation.

Q        Well, it would have been fairly immediately after

UNITED STATES DISTRICT COURT

it occurred; correct?

A        Sometimes a few hours later is when we'll actually get the recording sent to us.

Q        But then that recording -- but without that system in place, you had no ability at all to determine what was being said on the phone calls that Anthony Brown was making and the content of any text messages he was sending or receiving; correct?

A        Correct.

Q        Now, if Anthony -- if you saw online that Anthony Brown was using the cell phone for some other purpose than he was authorized, you could terminate the service at that point; correct?

A        Yes.

Q        And if Anthony Brown was following your orders -- I think you talked about this otherwise illegal concept -- that he would get protection from being prosecuted for any crimes he might be committing at your direction; correct?

A        Correct.

Q        And if Anthony Brown does not follow your orders, then he doesn't get that protection; correct?

MR. FOX:  Objection.  Calls for a legal conclusion.

THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  Now, you never gave

**UNITED STATES DISTRICT COURT**

Anthony Brown permission to do drug deals for marijuana, cocaine, methamphetamine, heroin, and ecstasy while he was at Men's Central Jail; correct?

A    No.

Q    So he could be prosecuted for those crimes; correct?

A    As we discussed earlier, we do not believe those to be true.  So we wouldn't prosecute someone for doing something that -- not doing something even though they claim they did.

Q    Did you happen to see, as part of your investigation, the two photos that were recovered from Anthony Brown's cell phone that showed marijuana, baggies of cocaine, balloons of heroin, ecstasy, and methamphetamine?

A    I obviously from my cell phone photo could not tell you what specifically was in there.  It looked like they were drugs on the photo, but we received a different story about what that was and couldn't verify either way.

Q    Well, if Anthony Brown was photographing drugs as part of a drug deal in the Men's Central Jail, he was not following your orders; correct?

A    If that's what he was doing, that's correct.

Q    Now, before Anthony Brown received the cell phone on July 26, I believe you took a number of steps to make sure that the cell phone could not be connected to the FBI; is that

**UNITED STATES DISTRICT COURT**

correct?

A      Correct.

Q      You had -- the cell phone itself was a prepaid cell phone; so there would be no record of the FBI actually purchasing the cell phone that went to Anthony Brown; correct?

A      Correct.

Q      And I believe you said you had stopped visiting Anthony Brown in jail to make sure that the FBI wouldn't be connected directly with him; is that correct?

A      It wasn't specific to the phone being connected, but, in general, that we didn't want to continue to associate with him like that in the jails.

Q      And that's why you brought C.J. in because C.J. was posing as one of Anthony Brown's friends, not an undercover agent or not an FBI agent when he went to visit Anthony Brown; correct?

A      Correct.

Q      And C.J. wasn't even from the Los Angeles office. You brought him in all the way from the San Diego office; is that correct?

            MR. FOX:  Objection.  Relevance.

            THE COURT:  Sustained.

Q      BY MR. HOCHMAN:  Now, before you gave the cell phone to C.J. to then give to Gilbert Michel, you checked that cell phone yourself; is that correct?

**UNITED STATES DISTRICT COURT**

A    I don't know what you mean by "check it." It was in a package at the store, and I opened it up and, you know, put in C.J.'s number into the address book, things like that.

Q    And that was C.J.'s number that Anthony Brown was to call from the cell phone?

A    Correct.

Q    Did you put in any other numbers?

A    I think that was the only one I put in.

Q    You didn't put your number in, did you?

A    No.

Q    Now, you're aware that C.J. and Gilbert Michel agreed to do the bribe transaction on July 18, and they basically said they would do the transaction two days later on July 20; is that correct?

A    They had a phone call, and then set it up for a few days after that. So the initial phone call, and then, yes, a few days later they agreed to meet after he finished work.

Q    Now, on July 18th, 2011, when that agreement was set up to do the deal days later, Anthony Brown called you at your desk phone in the FBI's office in Westwood in the Civil Rights Squad; correct?

A    Correct.

Q    And for -- Anthony Brown called you on one of the public jail phones at that time; is that correct?

A    Correct.

Q       And for over a year at that point, since you had started dealing with Anthony Brown going back to the summer of 2010, when Anthony Brown would call you on one of those public jail phones, he would identify his name as the inmate calling, and then you would hang up; correct?

A       A lot of times it was voicemails.  I didn't actually pick up the phone.  It was a voicemail, and he would say his name in the collect call -- you have a telephone call from, and he would say his name, and then it would hang up because it was a voicemail.

Q       When you say -- but there were some times where it wasn't a voicemail and you received the call directly at your desk that you hung up; correct?

A       Correct.

Q       And the reason you hung up is you knew that those calls were being monitored -- excuse me -- recorded by the sheriff's department; correct?

A       It was kind of twofold.  One, because they're recorded and, two, because our office does not want us to accept collect calls.  So I wasn't about to start accepting jail calls on my desk phone.  But it was primarily the recording and then not accepting collect calls on my desk line.

Q       Well, you gave Anthony Brown -- you put money on the books so Anthony Brown could have phonecards in order to use the phone; correct?

**UNITED STATES DISTRICT COURT**

A        Not to call me.

Q        So when Anthony Brown called you during that time period of June, 2010, let's say, all the way up until June of 2011, he was not following your instructions?

A        That's actually not accurate at all.  What we had was a system with him.  He would call, say his name.  At the time when we were still going down to the jail, we knew that meant he needed to talk to us about something, and we would go down to the jail.  So there was no need for him to call and talk to us.  That was kind of our code system.  He would call, say his name.  We would go down and visit him.

Q        All right.  And approximately, he made between June, 2010, and July, 2011, about 100 of those calls where he would just say his name and otherwise hang up; correct?

A        I have no idea how many times he called.

Q        Would it refresh your recollection to look at an analysis done by Mickey Manzo of how many times Anthony Brown called you before August 8, 2011, from the jail phone to your number at 310-996-4174?

A        No.

Q        You're aware who Mickey Manzo is?

A        Yes.

Q        Who is he?

A        He's an OSJ deputy -- was an OSJ deputy.

Q        You're aware he did an analysis of the phone

calls that Anthony Brown made to various people?

A       I'm aware that he has an e-mail saying, "Here's what I found."

Q       And are you aware that he found over 100 phone calls that were made to you from January 1st, 2009, until August 17, 2011?  And by "to you," I mean to the number 310-996-4174.

A       I can't tell you where he got that number or where the information is from.  If that's what the e-mail says, that's his account of what occurred, but I could not verify the authenticity of what he's recording.

Q       Does that sound approximately accurate?

A       I don't know.

Q       Was it at least dozens?

A       I don't know.

THE COURT:  All right, ladies and gentlemen. We're going to take our first break of the day.

Again, I want to remind you, until this trial is over, you're not to discuss this case with anyone, including your fellow jurors, members of your family, people involved with the trial, or anyone else, and do not allow others to discuss the case with you.  That includes discussing the case on the Internet, through bulletin boards, various forms of social media, e-mails or text messages.  If anyone approaches you and tries to talk with you about this case, please let me

know about it immediately.

Do not read, watch, listen to any news reports or other accounts about the trial or anyone associated with it. Do not do any research, such as consulting dictionaries, searching the Internet, or using other reference materials. And do not make any investigation about the case on your own.

Finally, you're reminded to keep an open mind until all the evidence has been received, you've heard the arguments of counsel, the instructions of the Court, and the views of your fellow jurors.  If you need to speak with me, simply give a note to the clerk.

We'll come back at a quarter until the hour.

(The following proceedings were held in

open court out of the presence of the jury:)

THE COURT:  You may step down.

MR. FOX:  Your Honor, may I just ask how long she needs at this point?

Thank you, Your Honor.

THE COURT:  How long do you expect to be with this witness?

MR. HOCHMAN:  Your Honor, again, to the extent that the -- I've got to ask a question more than once because -- I'm trying to pace the witness --

THE COURT:  The question is how long do you expect to be with this witness?

MR. HOCHMAN:  Two more hours, Your Honor.  I'll try to make it as short as I can, Your Honor.

THE COURT:  There are limits.

MR. HOCHMAN:  This is --

THE COURT:  There are limits.

MR. HOCHMAN:  Absolutely, Your Honor.

(A recess was taken at 9:34 a.m.)

(The following proceedings were held in open court out of the presence of the jury:)

THE COURT:  Have you spoken with the witness as to the timing of the breaks that she needs?

MR. FOX:  I spoke to her on the way off of the stand.  She told me that she thought a 15-minute break right now would be okay.  I did not know at the time that it would be another two hours.

Mr. Hochman told me during the break he was fine with me speaking to her, which I think she went down to a different space to be with her children.  I have not had the opportunity to do that yet.  If you would like me to step outside, I can talk to her about it, or you can talk to her about it if you bring her inside.

MR. HOCHMAN:  I'm okay if the Government wants to talk to her about the scheduling, Your Honor.  I'm fine with that.

THE COURT:  Either way.

**UNITED STATES DISTRICT COURT**

MR. FOX:  Let me step outside.

Your Honor, Special Agent Tanner informs me she's going to need another break in about an hour and 15 minutes, and she believes 20 minutes will be the length of time she needs at that point if we're still going on cross.

THE COURT:  All right.  Let's bring the jury in.

(The following proceedings were held in open court in the presence of the jury:)

THE COURT:  Let's resume.

MR. HOCHMAN:  Thank you, Your Honor.

Q     Agent Tanner, when we left off, we were on July 18, 2011, and I was asking you questions about receiving a phone call from Anthony Brown that day on one of the public jail phones.

Do you recall that?

A     Yes.

Q     And that was a phone call you knew would be recorded by the sheriff's department; correct?

A     Correct.

Q     And that's the first time that you actually took a phone call from Anthony Brown in the entire year you've been working with him and spoke to him on that call; correct?

A     Yes.

Q     I'd like to direct your attention to Exhibit 67 if I could.  Exhibit 67, which is in evidence -- do you have

UNITED STATES DISTRICT COURT

that before you?

A        Yes.

Q        Exhibit 67, which is in evidence, has a transcription of the phone call that you had with Anthony Brown on 7/18/2011; correct?

A        It's a transcription of a call.  I can't verify its accuracy.

Q        I will put the first page of Exhibit 67 on the screen.

Could you read the date there that's about midway down on the first page?

A        July 18, 2011.

Q        And then it says "O.R."  If you could read what it says for the first line of the call.

A        "This is Global Tell.  Your call may be monitored or recorded.  You have a collect call from."

Q        And then the next line is "A.B."  That's Anthony Brown; is that correct?

A        Correct.

Q        And is the name "Anthony Brown" then stated by the person who is listed as A.B.?

A        Yes.

Q        What is the line that follows that?

A        "An inmate in Men's Central Jail.  To hear the maximum cost of this call, press 9.  If you wish to accept and

UNITED STATES DISTRICT COURT

pay for this call, dial zero now.  Your call is being
connected.  Thank you."

Q       And that's when Anthony Brown and you have a
conversation after that message; correct?

A       Correct.

Q       Because that means you accepted the phone call;
correct?

A       Correct.

Q       If you could go down a little, it says "U.F."
"U.F." is unidentified female; is that correct?

A       Yes.

Q       That was you; correct?

A       Yes.

Q       If you can do where it says "U.F.," and I've
highlighted it three lines on the bottom.

A       "We got all the info.  We are working on our
end."

Q       And what does Anthony Brown answer?

A       "Okay."

Q       And what do you say?

A       "Um, do you know when you are moving?"

Q       Turn the page, please.  Keep reading from the
first three lines on the top.

A       "No, I don't know.  But, um -- I don't know when
I'm moving, but it could be any day.  But I, um, gave dude the

number, and he called."

Q        And then you responded to Anthony Brown.

A        "Yeah.  Yeah.  He is not calling us back now.  He called a couple of times, and we wanted to go, and he's not calling back now."

Q        And what does Anthony Brown say?

A        "Yeah.  I seen him yesterday."

Q        And then if you can go down a little farther to the highlight under "unidentified female," which is you, can you just read the highlighted line?

A        "Yeah.  Tell him to call.  He is ready.  He's got everything.  We are good to go."

Q        And this conversation is two days before the first bribe transaction is going to take place; correct?

A        Correct.

Q        If you can turn, then, to the next page.

This reflects a phone call on July 19, 2011, the very next day with Anthony Brown; correct?

A        Again, I'm only verifying what's in this e-mail. I cannot tell you this is an accurate transcription of the call, but yes, there obviously is another call.

Q        Well, you recall receiving a phone call from Anthony Brown the very next day from the public jail phone; correct?

A        I recall one phone, but obviously there was two.

UNITED STATES DISTRICT COURT

Q    And, again, this would have been a call that you would have accepted; correct?

A    If there's a conversation, then, yes, I would have had to accept the charges for the collect call.

Q    Knowing it was being recorded by the sheriff's department; correct?

A    Yes.

Q    So if I could show you and have you focus about the middle of that page, what is the date?

A    July 19, 2011.

Q    And the first part, again, is that automated message about it being Global Tell.  "The call may be monitored or recorded, and you're receiving a collect call from Anthony Brown."

Do you see that?

A    Yes.

Q    If you can go to the highlighted lines about -- towards the bottom.  Again, it says "U.F.," unidentified female.  That's you?

A    Yes.

Q    And what do you say?

A    "We are good to go."

Q    And then what does Anthony Brown answer?

A    "Um, and everything is good to go here.  So just checking in to let you know."

Q       If you can turn the page and start at the top with the unidentified female, who is you.

A       "Well, you get a phone soon."

Q       And what does Anthony Brown answer?

A       "Huh?"

Q       And what do you answer at that point?

A       "You will be having your phone soon, and then you can call who you need."

Q       And this is the day before the bribe transaction took place on July 20th; correct?

A       Yes.

Q       Now, you said you recalled one or two phone calls with Anthony Brown, but isn't it true you had a third phone call with Anthony Brown on July 21st, the day after the bribe transaction took place?

A       Obviously it's on here.  So -- I don't recall a phone call after the fact, but, again, it's on here.

Q       If you could look about midway down and tell the jury, when it says "Call 3," what the date is?

A       July 21st, 2011.

Q       If you could read the highlighted portion starting with "unidentified female," which is you.

A       "You're good.  You're good."

Q       And what does Anthony Brown answer?

A       "I'm good?"

UNITED STATES DISTRICT COURT

Q        And what do you answer?

A        "Yep."

Q        Now, when you're talking about "You're good, you're good," by that you meant that the first bribe had occurred and the cell phone was on its way to Anthony Brown; is that correct?

A        Just reading, "You're good, you're good," I have no idea the context of it.

Q        Well, by July 21st -- the bribe had occurred on July 20th, and the cell phone was on its way to Anthony Brown; is that correct?

A        At that time I didn't know if it was on the way. I assumed it was.  Again, I can't say that the "You're good, you're good" is specific to that without reading the whole thing and having more context.

Q        And that's because C.J. had met up with Gilbert Michel in that parking lot on July 20th; correct?

A        Yes.

Q        And I believe you told me that there was approximately six surveillance agents that were surrounding the parking lot; is that correct?

A        They were in the area.  They weren't necessarily all in the parking lot.  They were in the area so that, when he left, we'd be able to follow him.

Q        And you had members of your own team that were in

the area as well?

A       From the squad?

Q       Yes.

A       Yes.

Q       How many?

A       I think there was only two, maybe three.

Q       So that's approximately nine that were on the ground; is that correct?

A       I would say approximately, yes.

Q       And you and three other agents are up in a plane watching the transaction?

A       There were two agents that are pilots and one that's not an agent, but he's in charge of running the camera in the plane.

Q       And the camera -- you're presumably thousands of feet up so you can't be detected from the ground; correct?

A       Correct.

Q       And this camera has sufficient enough resolution and quality in order to film what is going on down below; is that correct?

A       Correct.

Q       And it videotaped the entire Gilbert Michel, C.J. exchange; is that correct?

A       Yes.

Q       I'll show you what's in evidence as Defense

UNITED STATES DISTRICT COURT

Exhibit 636, and that is a still photograph that shows Gilbert Michel meeting with C.J. on July 20th, 2011; correct?

A        Again, I assume so based on, you know, what I remember.  But I can't say that this photo that you have is a hundred percent for sure from our video because I did not review it.

Q        And C.J. is in the black car; is that correct?

A        C.J. was in a black Jeep.

Q        Black Jeep.

And there's a black Jeep pictured in Exhibit 636?

A        That's what it looks like.

Q        And Gilbert Michel was in a white or silver car that appears next to the black car; correct?

A        That looks like the car he was in, yes.

Q        And this was your view of the transaction because you're up in the plane; correct?

A        Correct.

Q        Now, during that transaction, that's where C.J. gave Deputy Michel the first bribe payment of $700; is that correct?

A        Yes.

Q        So by the end of that bribe payment, you had approximately -- well, you had a number of agents that were on the ground that had personally observed the payment; correct?

A        I don't know if everyone that was on the ground

was able to see the payment because they could have been three blocks away waiting to follow his car when he left.  So I can't tell you how many people actually saw it on the ground level.

Q       Well, there was some; correct?

A       I don't know if anyone on the ground level actually saw the payment.

Q       All right.  You're up in the plane with the videotape of the transaction; correct?

A       Correct.

Q       And C.J. had actually recorded all his conversations with Deputy Michel leading up to the bribe transaction; correct?

A       Correct.

Q       And you had those recordings?

A       At the time I don't know if I actually physically had them in my possession.  I might have just gotten a summary from the undercover agent about what was said.  We may not have had the actual disk of the conversations by that point.

Q       Well, you or C.J. had those recordings; correct?

A       Again, he might not have had the disks that were downloaded from the recording, but he obviously knew what was said to him on the phone.

Q       And at that moment in time, you could have arrested Deputy Michel; correct?

MR. FOX:  Objection.  Relevance.

**UNITED STATES DISTRICT COURT**

THE COURT:  Sustained.

Q    BY MR. HOCHMAN:  I believe the Government asked you the question in your direct testimony that you could have arrested Deputy Michel at that time; is that correct?

MR. FOX:  Objection, Your Honor.  Misstates the testimony.

THE COURT:  Sustained.

Q    BY MR. HOCHMAN:  Did you arrest Gilbert Michel at that time?

A    No.

Q    And the reason you didn't arrest him was that you wanted him to bring the cell phone into the jail so that he wouldn't have any defense that somehow he had done this transaction not to bring the cell phone into the jail; is that correct?

A    It's actually not the case.  It's not that he would have a defense.  If he did not bring a cell phone in, that would not have been a federal crime to meet someone on the outside and stiff him for money.  So to say that we wouldn't have been able -- we wouldn't have been able to charge him if he hadn't brought the phone in.

Q    So once he brings the phone into the jail, you can charge him; correct?

A    We still had to do additional investigation to shore up our case and make sure we were bringing a solid case

with charges.

Q    But then it's a crime at least when he brings in the cell phone into the jail?

A    You have to look at the elements of a crime, and you have to determine whether or not -- for a bribe charge, there's certain elements that need to be met.  At that point we weren't a hundred percent sure we had met every element of that crime at that time; so we still had additional investigation to do.

Q    Well, you had the ability to allow him to bring the cell phone into the jail, have Anthony Brown make one phone call on that cell phone to C.J., and then terminate the service of the cell phone; correct?

A    Could I have done that?

Q    Yes.

A    Yes.

Q    And at that point the cell phone would no longer be live and be able to be used by anybody in the jail; correct?

A    That's correct.

Q    So all the dangers that you talked about about having a live cell phone in the jail couldn't be realized if you terminated the service; correct?

A    If that was the only purpose for the cell phone going in, then yes, but that wasn't the only purpose. Therefore, that wouldn't have been the plan to terminate

**UNITED STATES DISTRICT COURT**

service immediately.

Q    Now, when you first had -- and I assume that, as soon as the cell phone went to Gilbert Michel and you knew it was on the way to Anthony Brown, you were monitoring those cell records that you talked about online; correct?

A    I don't know if I looked on there at that time because the cell phone was not in Anthony Brown's hands.

Q    Well, when -- July 26th, 2011, is when you realized that Anthony Brown was making phone calls on the cell phone; correct?

A    When he reached out to the undercover agent, yes.

Q    And that's because the undercover agent then reached out to you?

A    Correct.

Q    And that's when you would have started monitoring online, as you said, on a daily basis; correct?

A    Correct.

Q    You're aware, aren't you, that the call immediately after -- well, did Anthony Brown -- you said before -- I apologize.

You said before that you had taken precautions to make sure that the cell phone wasn't connected with the FBI; correct?

A    Correct.

Q    Did Anthony Brown, after he called C.J. on

July 26, call you at your FBI desk number?

A    I believe he did.  I don't remember if it was immediately following, but it was soon after he called to let me know that he had the phone.

Q    And so -- I'll show you what's in evidence as Defense Exhibit 528.  If you could turn to Defense Exhibit 528 or look on the screen, if you would, this is the cell phone record for the Anthony Brown cell phone; correct?

A    Yes.  That's what it looks like.

Q    And I'll direct your attention to some of the highlighted numbers here.  Let's start with the 213-278-4608.  That is C.J.'s number; is that correct?

A    I don't remember offhand what the number was for the undercover agent at the time, but I believe that was his number, but I'm not a hundred percent positive.

Q    I can show you an exhibit that would list his number if that would help refresh your recollection.

A    It would not.

Q    Well, do you believe that number to be, as you sit there today, 213-841-4407, to be C.J.'s number?

A    You actually just said a 278 number.

Q    I misspoke.  213-278-4608.

A    Just based on the interaction on the phones, I would say that's C.J.'s number because that's the back-and-forth between Anthony Brown's cell phone and C.J.'s

cell phone.

Q    Could you look very quickly at Defense Exhibit 737 that's in evidence.

A    I don't have --

Q    I'll put it up on the screen.

Do you see where it says "C.J.," and you see there's a phone number next to it?

A    I can't see.

Q    It will hopefully come into focus.

A    Yes.

Q    And you see it's 213-278-4608?

A    Yes.

Q    All right.

THE COURT:  What exhibit number was that?

MR. HOCHMAN:  213 --

MR. FOX:  No.

MR. HOCHMAN:  That was Exhibit 737.  To the extent it's not in evidence, I'll move it into evidence. Defense Exhibit 737.

MR. FOX:  No objection, Your Honor.

THE COURT:  All right.

Q    BY MR. HOCHMAN:  All right.  Back to Exhibit 528.

So on 7/26/2011 at 8:37 in the morning, that is when Anthony Brown is calling C.J. on his cell phone that he has in the Men's Central Jail; correct?

A        Just looking at this, given that it's the first one on there, I would assume that's the call saying, yes, I have the cell.  But based on this, I can't tell you specifically that was that conversation without the recording.

Q        If you look at the phone record, which is Exhibit 528, immediately thereafter -- relatively immediately thereafter, about six minutes later, he calls you, 310-996-4174, on August 26th.

Do you see that?

A        Yes.

Q        And he speaks to you for 65 seconds.

A        That could have been a voicemail as well.  I can't recall right at this moment whether or not I got a voicemail or if I actually picked up the phone and he said "I have the phone."  It could have been a voicemail.

Q        But you knew at that exact moment because you're monitoring it online; correct?

A        At that moment was I monitoring online?  I can't tell you whether or not I had the website up at that very second, no.

Q        Sometime that day on July 26, 2011, you monitored the online access for the phone; correct?

A        Correct.

Q        And you would have seen that Anthony Brown has just called you and forever linked that cell phone to your

number at the FBI office; correct?

A        Correct.

Q        Did you terminate the service when you found out on July 26, 2011, that Anthony Brown had violated your order and linked his cell phone to your phone number?

A        I don't know what you mean "violated the order."

Q        Well, you told me before you gave him an instruction not to call you at your desk; correct?

A        Correct.

Q        And Anthony Brown has now violated that instruction or order by calling you with his cell phone directly to your desk number; correct?

A        I would not say he violated an order.  Again, he was anxious and did things sometimes that I wish he wouldn't have, but I would not say he violated an order by calling my desk phone.

Q        He didn't follow your instruction.

A        Correct.

Q        And in not following your instruction, he linked his cell phone to you; correct?

A        Correct.

Q        And you knew that because on that date you reviewed the phone records; correct?

A        I probably knew that prior to even looking on the website because I either answered the call or received the

UNITED STATES DISTRICT COURT

voicemail -- listened to the voicemail, I should say.

Q       And you knew at some point, if the cell phone was found, that they would be able to get the phone records to determine what numbers the cell phone had called?

MR. FOX:  Objection.  Relevance and cumulative.

THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  One of the instructions for Anthony Brown was to just call C.J. -- correct? -- with his cell phone?

A       Correct.

Q       There's a number here that is a dial-in number. Were you able to determine what this 713-981-0098 number was?

A       That's a jail phone.

Q       And that's a jail phone calling Anthony Brown?

A       That's what it looks like.

Q       And the numbers above it dealing with what appears to be Anthony Brown's number, calling Anthony Brown's number -- and again, I'm referring to page 1 of 6 for the phone record in Exhibit 528 where you have sort of, it looks like, Anthony Brown calling Anthony Brown -- what exactly is that?

A       There was a lot of text messages that came from the phone company when we set up the account.  So they would come through and say, you know, you set up the account online linked to this number or here's a special deal for Boost Mobile.  So that's the only thing I can think of that was

going through at that time.

I obviously didn't have the phone in my hand to verify that, but those were coming through prior to the phone ever being given to C.J.  I was getting these almost junk text messages to the phone asking me to renew service, things like that.

Q     Now, at some point you testified that Anthony Brown reached out to C.J. because Anthony Brown's cellmate wanted to use the phone; correct?

A     Correct.

Q     You and C.J. had a discussion about this, about whether or not to permit it; right?

A     Yes.

Q     Did you go back to Washington, D.C., to get any approvals for --

MR. FOX:  Objection.  Relevance, Your Honor.

THE COURT:  Sustained.

Q     BY MR. HOCHMAN:  And you and C.J. discussed it and agreed that Anthony Brown could allow his cellmate to use the phone one time in order to call his girlfriend; is that correct?

A     I don't know if it was specific to say "this one time."  I think it was basically an admonishment that we did not want Anthony Brown to be in danger with his cellmate by saying, "No, you can't touch my phone."  So he did give him

**UNITED STATES DISTRICT COURT**

permission to use it, and we just advised him, listen to the call and review any text message to make sure there's nothing going on that shouldn't be.

Q    And Anthony Brown was supposed to allow this to happen one time?

A    I don't think it was discussed as a "This is the only time you're allowed to do this."

Q    How many times was Anthony Brown instructed to allow his cellmate to use the phone?

A    I don't think it was discussed.

Q    At the time did you know who the cellmate was?

A    No.

Q    Did you know if the cellmate was in -- Anthony Brown was on the 3000 floor at that time; correct?

A    I don't know if I knew where he was housed at that time because, again, I wasn't going to see him.  So I didn't know if he was on the 3000 floor at that point.

Q    When you were seeing him, was he on the 3000 floor?

A    No.

Q    He was on the 2000 floor?

A    Correct.

Q    Did you speak to C.J. and find out from C.J. where Anthony Brown was housed when C.J. was speaking with him?

A    I don't think so.

UNITED STATES DISTRICT COURT

Q        Was Gilbert Michel on the 3000 floor?

A        He was sometimes, and other times he would rotate around.

Q        In July of 2011, he was on the 3000 floor; correct?

A        I think primarily, yes.

Q        Now, did you do any investigation of the girlfriend, the cellmate's girlfriend, before you authorized Anthony Brown or -- excuse me -- C.J. sent the message to Anthony Brown that the cellmate could use a cell phone?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  Did you check out the phone number that you saw on the phone records to determine what -- who actually the phone number came back to that had been used by the cellmate?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  I'd like to show you, if we can keep going with Exhibit 528, toward the bottom -- this is Exhibit 528, page 1 of 6.  I'll show you numbers that are here. There are two numbers.  There's 323-337-6640 dialed twice.  You can see it's 37 and 39 seconds each.

A        Yes.

Q        Were those numbers, to your knowledge, as you're

UNITED STATES DISTRICT COURT

reviewing it on July 26, 2011, for Anthony Brown's cellmate -- cellmate's girlfriend?

A       At this point in time, this many years later, I can't tell you specifically that that number right there is the one that I remember searching and doing research on.  But based on these phone records, yes, that would appear to be that phone call that was made, the two phone calls that were made to the girlfriend.

Q       You just said a moment ago "searching and doing research on."  You didn't do any searching and research on these numbers at the time they were being made; correct?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  When did you do the searching and researching?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  I will show you what is 2 of 6 of Exhibit 528.  I will zoom in just for a touch.

All right.  You see some more numbers there on 726, and I point you to a different 323 number that is being dialed.  It's 674-9948.

Do you see that?

A       Yes.

Q       Whose number is that?

A       It could have been the girlfriend's number as well.  I don't know.

Q       Do you know if the cellmate had more than one girlfriend?

A       He did.

Q       Do you know if he actually had a wife?

A       I believe the girlfriend called herself his wife, but they were not actually married.

Q       Did you know that at the time on July 26, 2011, or did you find out at some point later?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  We've just been talking about phone calls on 7/26/2011.  I want to point you to page 4 of 6 of this Exhibit 528.  There's a 115-second phone call made to that 323-337-6640 number on August 3rd, 2011.

Do you see that?

A       Yes.

Q       Did you see that at the time it was happening on August 3rd, 2011?

A       It would not have been at the time, no.

Q       Well, you said you daily monitored the phone records; correct?

A       It would be after the fact.  It's not going to show up until the phone call is finished.  It would not show up

at the time.

Q        After the phone call was made on August 3rd, 2011, that's when you would have seen it; correct?

A        Correct.

Q        And, again, you might not have seen it.  It was made at 6:39 p.m.  Unless you were looking at it at nighttime, you wouldn't have seen it until the following morning; correct?

A        It depends.

Q        If you will look at page 5 of 6 of this exhibit at the very bottom, you see even more phone calls are being made -- one to the 323-337-6640 number and one to the 323-674-9948 number.  The first one for 207 seconds, the second for 291 seconds, again, on August 3rd, 2011.

         Do you see that?

A        Yes.

Q        Did C.J. give Anthony Brown permission to let his cellmate use the phone on August 3rd, 2011, as well as July 26, 2011?

A        Like I said, I do not believe -- the initial time when Anthony Brown asked C.J. if he can use it this one time and one time only, I do not believe that was the discussion they had.  He just basically told him, if your cellmate is calling his girlfriend, you need to monitor and listen to what he's saying -- or text messages.

Q        And you have no idea -- you weren't able to

monitor the phone at that point in time to see what the cellmate is saying to whoever he is calling; correct?

A    Correct.

Q    Now, in addition to -- well, when Gilbert Michel brings the cell phone into the jail, I believe what you said is that you wanted Anthony Brown to use the cell phone to contact C.J. about anything he was seeing concerning potential deputy misconduct in the jail; is that correct?

A    Correct.

Q    And then you also said that the cell phone had video or photographic capability, a camera in it, so that Anthony Brown can presumably stick the camera in front of him and photograph or videotape any deputy misconduct that was occurring in front of him through his cell bars; is that right?

A    I think you're overexaggerating.  There's views from the cells.  You would not have to hold the phone out with your arm out and be obvious about it.  It's entirely possible that you could have a view from your cell, be able to conceal it behind the cell bars, and take a photo of something happening.  So he would not have to be on top of something or with his arm outstretched looking obvious in doing it.

Q    But you said that one of the advantages of Anthony Brown is he got to move around outside the cell; correct?

A    Correct.

**UNITED STATES DISTRICT COURT**

Q    So your anticipation was that he was going to be walking by some deputy abuse, pull out the camera real quick, flip it open, because it's a flip phone, and then quickly videotape what was going on; is that correct?

A    Again, I think you're overexaggerating the fact that I'm not expecting him to do anything that would make it obvious that he's doing it.  If he had the opportunity and something was there, then, yes, of course we wanted him to do it.  But it was not something we expected, every time he saw something or every time something was going on, that he would be there with a video camera videoing it.  It's just something that, if it occurred or if he was able to do it discreetly, then we were going to ask him to do that.

Q    Well, instead of giving Anthony Brown a live cell phone that could make these calls and texts and also has a camera capability, you could have gone ahead and just had secret recording devices installed inside the Men's Jail which could have obtained that information for you; is that correct?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

Q    BY MR. HOCHMAN:  Well, you had a source inside the sheriff's department's technical operations detail, didn't you?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

**UNITED STATES DISTRICT COURT**

Q        BY MR. HOCHMAN:  Can you turn to Exhibit 50, please.

MR. FOX:  Objection, Your Honor.  May we have a sidebar?

THE COURT:  Yes.

(The following proceedings were held at sidebar:)

MR. FOX:  Your Honor, I believe that Mr. Hochman is going to go exactly where he was going before.  I think he's going to try to have Special Agent Tanner say that this person, John Powell -- let me back up.  I don't think the court reporter heard me.

I believe where Mr. Hochman is going with this is he's going to try to have Special Agent Tanner say that this person, John Powell, was a source for the FBI.  It's irrelevant that he's a source, and it's outing a former source and with no relevance.  I don't think that it's appropriate for him to do that.

MR. HOCHMAN:  Three responses, Your Honor. Number one, John Powell was outed as a source in the Tanaka trial when he testified, which is where I'm getting all the information from.  So it's a publicly -- he's already been publicly outed.

Second, I didn't bring up Exhibit 50 with this witness.  Mr. Fox did.  He didn't have to go into Exhibit 50, but he made it ripe within the scope of the cross-examination

**UNITED STATES DISTRICT COURT**

because he brought it in.  And they went through everywhere --
they went through this whole exhibit with her to deal with the
sweeping for the bugs.  That's this exhibit, Your Honor.

MR. FOX:  Your Honor, my point is it's irrelevant
that he's a source.  He's not testifying right now.  It's
irrelevant.  If Mr. Hochman's questions relate to this document
and not the fact that he's a source, I probably don't have
objections to it.  Question about the fact that he's a source
or was a source is irrelevant.  It was relevant in Tanaka
because he was testifying.  He hasn't testified in this case.

MR. HOCHMAN:  Again, part of our whole defense,
Your Honor, is there were other things that she could have done
other than use a cell phone to get this information.

THE COURT:  That's the defense?

MR. HOCHMAN:  Well, no.  But it's part of the
attack on her credibility, Your Honor.  And, again, if she
hadn't opened the door -- what I'll ask is -- she went into
John Powell, sergeant of the technical operations detail.  I
think it's fair to say, "Have you ever met him before?  How do
you know him?" which is basically where I was going to go with
this exhibit away from the -- at least at a minimum that
they've known -- the FBI has been working with him since 2001.
I think that's at least relevant to show her connection in that
she knows something about him and she personally interviewed
him --

**UNITED STATES DISTRICT COURT**

THE COURT:  If you want to get into what he covered in this document, that's fine.  But Mr. Powell is out.

And let me just say this.  You really need to focus on what you think is important here because I'm not going to sit here for a deposition for two hours, and at some point, I'm going to cut you off.

MR. HOCHMAN:  Your Honor, I'll move it along.

(The following proceedings were held in open court in the presence of the jury:)

Q     BY MR. HOCHMAN:  You have an Exhibit 50 in front of you?

A     Yes.

Q     Exhibit 50, I believe, is an exhibit you testified in your direct testimony regarding sweeping the bugs.

Do you recall that?

A     Yes.

Q     I'll put the first page of that exhibit on the screen.

I believe you testified about communications in an e-mail of a gentleman named John P. Powell to Stephen Leavins; correct?

A     Yes.

Q     And John P. Powell is someone, if you can look at the third page of the exhibit, he's a sergeant with the technical ops detail, Los Angeles County Sheriff.

UNITED STATES DISTRICT COURT

Do you see that?

A       Yes.

Q       And did he -- and this e-mail, which is dated September 7, 2011, describes, I think you said, different sweeping for bugs, that it happened in the large conference room -- large EPC conference room, small EPC conference room, and the executive offices; correct?

A       Yes.

Q       And John Powell provided you before --

MR. FOX:  Objection, Your Honor.

Q       BY MR. HOCHMAN:  September 7?

MR. FOX:  Objection.  Sorry, Your Honor.

THE COURT:  We'll come back to this.  Next question.

Q       MR. HOCHMAN:  Okay.  August 4th you have a second bribe; correct?

A       Yes.

Q       And I'll show you what is Exhibit 634.  Is that a photograph of a second bribe payment that Gilbert Michel received from C.J.?

A       That's what it appears to be, yes.

Q       And, again, this was being surveilled by FBI agents.  And were you in the plane this time?

A       No.

Q       You were on the ground?

A       I stayed back just because I wasn't sure if Gilbert Michel had ever seen me in the jail.  So I didn't want to be anywhere near the area in case he saw me.

Q       This was the $800 payment?

A       Yes.

Q       At that point the cell phone was already in the jail; correct?

A       Correct.

Q       Did you arrest Gilbert Michel at that point?

A       No.

Q       Now, August 8, 2011, you find out that the cell phone has been discovered by the L.A. County Sheriff's Department; correct?

A       Yes.

Q       And between August 8th and August 23rd, you yourself never went to visit Anthony Brown in the Men's Central Jail; is that correct?

A       Correct.

Q       And on August 18, 2011, you heard or you learned that the FBI had notified the sheriff's department that the phone that had been discovered was an FBI phone; correct?

A       Correct.

Q       And once it was out, that that information was out on August 18, you could have visited -- there was no -- there was no problem in connecting the FBI to the cell phone --

**UNITED STATES DISTRICT COURT**

correct? -- after August 18?

A        I don't understand the question.

Q        In other words, one of the reasons that you didn't visit Anthony Brown before the FBI told the sheriff's department about the cell phone is you didn't want to connect yourself to Anthony Brown during that period; correct?

A        It was, I guess, technically, yeah.  I mean, he was already connected to me in some way.  We didn't think the phone was connected to the FBI in general which is why we weren't concerned with it going in.

Q        That's why you sent someone from the gang unit to try to talk to Anthony Brown between the August 8 and August 18 period; correct?

A        Correct.

Q        But after August 18, when the phone was outed, any day until August 23rd, you could have come and spoke with Anthony Brown; correct?

A        I was out of state visiting family; so as soon as I got back is when I went.

Q        Now, between August 8 and August 18, you did not personally inform Steve Martinez, the assistant director in charge of the FBI's office, about the fact that the cell phone had been found; correct?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

UNITED STATES DISTRICT COURT

Q      BY MR. HOCHMAN:  Well, you know Steve Martinez because Mr. Fox showed you an e-mail on August 18 notifying Sheriff Baca on August 18 that the cell phone had been found and it was an FBI cell phone; correct?

A      Correct.

Q      Did you notify Steve Martinez before August 18 personally, yourself, that the FBI's cell phone had been found?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

Q      BY MR. FOX:  When you visited Anthony Brown on August 23rd, 2011, you said that you were able to talk to him for about an hour or so; is that correct?

A      Yes.

Q      And after you talked to him for about an hour, that's when the meeting got interrupted and he was taken away by sheriff's deputies; correct?

A      Correct.

Q      Did you, thereafter, you, yourself, ever make another request for you to visit with Anthony Brown between August 23rd and September 12, 2011?

A      We issued the federal -- or sought the federal writ.  So there was absolutely no reason for us to try to go back after what had happened.

Q      Did you ever make a request to the sheriff's department for you personally to interview Anthony Brown

**UNITED STATES DISTRICT COURT**

between August 23rd and September 12, 2011?

A        I don't know if you mean me personally making a phone call to executive management of the sheriff's department. No, I did not.

Q        Or anyone at the sheriff's department.

A        No, I did not.

Q        Did anyone in your Civil Rights Squad make such a phone call to the sheriff's department to set up an interview with Anthony Brown between September -- let's say, August 23rd until -- or at least September 12, 2011?

A        They did reach out to the Office of Independent Review prior to that when he didn't show up at the grand jury.

Q        Now, when Anthony Brown -- you testified about certain orders that were put in place restricting the FBI's access to -- restricting or requiring an approval before any FBI agent got to speak to an inmate.

         Do you recall those?

A        Yes.

Q        Around August 26, I believe, the e-mail shows.

A        I think that's the time.

Q        The time between August 23rd and September 12th, 2011, you didn't know that that particular order was in place; correct?

A        I did.

Q        I'm sorry?

A       I did.

Q       You did know?

A       Yes.

Q       And that's because you tried to go down to the jail and meet with Anthony Brown and you were somehow restricted in doing it?

A       It's actually because I had multiple agents calling me very angry because they tried to go for their cases to go and interview inmates and they were angry because they were being turned away and they were blaming me for that.  So I got angry phone calls as a result.  So I learned from them that was exactly what was in place.

Q       Now, September 12th you found out that Anthony Brown got transferred to the Lancaster State Prison; is that correct?

A       I don't know if it was on the 12th or 13th but somewhere around that time.

Q       Then you set up a meeting with Anthony Brown on the 13th; is that correct?

A       Correct.

Q       You said Anthony Brown started off the meeting very mad at you; is that right?

A       Very much so.

Q       He thought you had left him and abandoned him; correct?

A        Yes.

Q        And that was the beginning part of the meeting.
The rest of the meeting, did Anthony Brown calm down and
provide you with the information of what had happened to him in
the sheriff's department?

A        Yes.

Q        And he provided you, in fact, with even
additional information about things that he had observed in the
sheriff's department; is that correct?

A        Just, in general, he told us what had happened
and anything else that had occurred during that time period
that we hadn't been able to talk to him.

Q        And did you go ahead and writ Anthony Brown out
on September 13, 2011, so he could testify right away to the
grand jury within a week, let's say?

A        No.

Q        Did you do that?

         How about by the end of September, 2011?

A        No.

Q        How about by the end of the year, 2011?

A        No.

Q        And then you kept in contact with Anthony Brown
between September 15th, 2011, all the way until he spoke to the
grand jury in December, 2012; is that correct?

A        Yes.

UNITED STATES DISTRICT COURT

Q        He would send you letters at that point?

A        Sometimes.

Q        And he would request things in those letters?

A        Sometimes.

Q        And sometimes you would provide some of the things; is that correct?

A        Sometimes.

Q        And that's when he's requesting a TV, earbuds, and a lot of hip hop music; is that correct?

A        He requested some of the same type of system as the jail system.  Anything that was allowed in the prison system, if we could get some of those things for him.

Q        August 24th, 2011, you meet with Gilbert Michel; correct?

A        Yes.

Q        And that was you and probably about another three or four or five FBI agents at that time?

A        Something like that, yes.

Q        You meet with him initially at the -- at his apartment; is that correct?

A        We were waiting for him at his apartment when he returned home from work.  We met him in the parking lot and asked if he would be willing to speak to us.  When he said "yes," we went to a Starbucks.

Q        You spent about two hours or so at the Starbucks

UNITED STATES DISTRICT COURT

with him?

A        I don't know how long we spent there.

Q        Did you have the videotape from the video surveillance that we saw a still photo of to show him during that Starbucks meeting?

A        Yes.

Q        And did you have a binder with him that had other photographs in it?

A        The binder was kind of just for show.  It was a binder that had a lot of documents in it just to show him that we had a lot of evidence.  Some of it was just criminal background checks of him or his girlfriend.  It wasn't necessarily all photos from the operation.

Q        And you asked him questions both about the bribe transaction, and then you asked him questions as well as to whether or not he had engaged in any sort of deputy beatings; correct?

A        I think it was not just whether he had engaged in but if he knew anything or could tell us any information about what was going on.

Q        With respect to the bribe transaction, he owned up to that; correct?

A        Pretty much, yeah.

Q        And then with respect to all the other misconduct, he basically told you he knew nothing; correct?

UNITED STATES DISTRICT COURT

A        He said he just didn't have any information to provide.

Q        And that was a lie; correct?

A        Yes.

Q        Because he actually had information.  He just wasn't sharing it with you then?

A        Correct.

Q        And you told him then right there in the meeting that lying to the FBI is a federal crime; correct?

A        Yes.

Q        And then you actually brought your supervisor, Carlos Narro, on the phone who told him the same thing; correct?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  So at the end of the meeting -- this is now sort of late afternoon on August 24th -- you have all this videotape and surveillance evidence of Gilbert Michel taking bribes; correct?

A        Yes.

Q        You also know that he's brought the cell phone in to the jail, and the cell phone has been used; correct?

A        Yes.

Q        In fact, he's had to take the cell phone and recharge it and give it back to Anthony Brown on multiple

occasions; correct?

A       I believe so.  I wouldn't know.

Q       And he had taken two bribes, actually, at that point; is that correct?

A       Yes.

Q       You know that he still was a deputy sheriff at that moment in time; correct?

A       Yes.

Q       He had a gun; he had a badge.

        Correct?

A       I would assume so, yes.

Q       And at the end of that meeting, did you let him go?  In other words, did you arrest him at the end of the meeting?

A       We did not.

Q       Focusing your attention on Government Exhibit 15 -- I'm going to go through just a few Government exhibits that Mr. Fox showed you.  All right.

        Government Exhibit 15, this is the Steve Martinez e-mail.  Do you see that?

A       Yes.

Q       On August 18, 2011.  Do you see that?

A       Yes.

Q       Were you party to the conversation that Steve Martinez had with Sheriff Baca that day?

A        No.

Q        Did you ever at any point speak with Sheriff Baca?

A        No.

Q        Did you ever e-mail him or text him?

A        No.

Q        Are you aware of any other e-mail from Steve Martinez to Sheriff Baca before August 18, 2011, on the subject of the cell phone?

A        I would have no idea if they e-mailed prior to based on the content of this e-mail.

I would assume this is the first one given the way he basically explains he has something to discuss.

Q        And this e-mail comes from the Los Angeles County Sheriff's Department records because, on the bottom right-hand corner, do you see "LASD" with a number next to it?

A        Yes.

Q        So this e-mail doesn't come from the FBI's internal server records; correct?

A        I believe we actually had both from the FBI as well as from the sheriff's department, but, yes, that copy right there is from the sheriff's department.

Q        If you could turn to Exhibit 120, so focusing on Exhibit 120, that's Sheriff Baca's calendar.  Do you see that?

A        Yes.

UNITED STATES DISTRICT COURT

Q        And in going through all the records and -- you did a phone record analysis; is that correct?

A        Yes.

Q        Did you also happen to do sort of an event analysis to determine whether or not this calendar had all the events of Sheriff Baca that are listed on a particular day?

A        I'm not sure I understand your question.  I would have no way of knowing every event he went to to compare it to this calendar if that's what you're asking.

Q        I think I am because you had done some type of analysis on phone calls, and I was wonder if you had done a similar analysis with respect to events.

A        Again, I'm not sure what you're asking in terms of analysis on the event.  Did I do additional research to find out if there's events not on the calendar?

Q        Yes.

A        No.

Q        If you could turn to Exhibit 31.  Exhibit 31, this is an e-mail that you discussed in your direct testimony from Paul Tanaka to Stephen Leavins.

Do you see that?

A        Yes.

Q        It says, "Thanks, Steve.  Right after, and I mean right after, I spoke with Tom this morning.  The sheriff popped in looking for an update.  This case is consuming his entire

UNITED STATES DISTRICT COURT

thought process."

Do you see that?

A       Yes.

Q       Can you see the next line?

A       "Providing him with updated tidbits helps to ease his mind."

Q       Do you know what an "updated tidbit" is as referenced in this e-mail?

A       I didn't write the e-mail; so I can't tell you what Paul Tanaka meant by that.

Q       If you could turn to Exhibit 35, Exhibit 35 is a discussion dealing with whether or not the county attorneys are going to have to review certain orders.

Do you recall that?

A       Yes.

Q       Discussions between William Carey and Greg Thompson, do you see that?

A       Primarily.  And then also Ralph Ornelas.

Q       Just for clarification, Sheriff Baca is no where on this particular e-mail; is that correct?

A       Correct.

Q       If you could turn to Exhibit 36, Exhibit 36 is the continuation of that e-mail, and that too does not reflect that Sheriff Baca is anywhere on this e-mail.

MR. FOX:  Objection, Your Honor.  Cumulative to

Mr. Yanagi's testimony.

THE COURT:  Sustained.

Q    BY MR. HOCHMAN:  If you could turn to Exhibit 128 -- actually, if you have Exhibit 128 in front of you, I will reference it generally.

This is the Kevin King documents; is that correct?

A    I'm not there yet.

Q    And these are the records dealing with Kevin King, I believe.

A    Yes.

Q    And, again, are there any indications on these records that this information was communicated to Sheriff Baca?

MR. FOX:  Objection.  Argumentative and cumulative.

THE COURT:  Sustained.

Q    BY MR. HOCHMAN:  I'd like to turn your attention to Exhibit 100.  Exhibit 100 was a recording that we listened to involving your supervisor, Carlos Narro, calling Sergeant Long.

Do you recall that?

A    Yes.

Q    And Exhibit 101, I believe, was the transcript for that.

Do you recall that?

**UNITED STATES DISTRICT COURT**

A        Yes.

Q        Now, in that recording, Mr. Narro asks, "Does the sheriff know this?"

Do you see that?

A        Yes.

Q        And what he is referencing, I believe, to be that there is going to be a warrant issued for your arrest; is that correct?

A        Correct.

Q        And Sergeant Long says, "The sheriff knows this, sir."

Do you see that?

A        Yes.

Q        Do you know whether or not Sergeant Long knew at that point that Sheriff Baca actually knew that the agents were going to come out and threaten to arrest you?

MR. FOX:  Objection.  Speculation.  Foundation. Hearsay.

THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  Well, did you ever -- were you party to the phone call, listening in on maybe when Mr. Narro is calling the agent at that time?

MR. FOX:  Objection.  Argumentative.

THE COURT:  You can answer it "yes" or "no."

THE WITNESS:  You said call that agent; so I'm

not sure what you mean.

Q     BY MR. HOCHMAN:  Your supervisor is Carlos Narro; correct?

A     Right.  But you said "To call the agent."  Yes. You said call the agent.

Q     I misspoke.

Your supervisor, Carlos Narro, on September 26 is making a phone call to Sergeant Long; correct?

A     Correct.

Q     And on that phone call, she says words to the effect of "The sheriff knows this, sir."

Do you see that?

A     Yes.

Q     Do you understand that?

A     Yes.

Q     My question was, were you listening in on that phone call on Carlos Narro's end of it to have an understanding -- let me leave it at that.

Were you listening in on the phone call on Carlos Narro's end of it?

A     No.

Q     And did you speak to Sergeant Long that day after she had come to your apartment on September 26 and spoke with you?

A     Absolutely not.

**UNITED STATES DISTRICT COURT**

Q        I'm going to turn to Exhibits 157, 170, and 172, your summary charts.  Let me know when you have those in front of you.

A        Okay.

Q        Starting with 157, 157 was the summary chart in which you looked at Sheriff Baca's phone calls.

Do you recall that?

A        Yes.

Q        If I show you the first page of that, 157, this is where you identified on August 18 that Sheriff Baca had a phone call with Steve Martinez and then spoke with Paul Tanaka thereafter; correct?

A        Correct.

Q        And on August 19, the second page, August 19 you identified a Sheriff Baca phone call to FBI Westwood.  Is that where your FBI office is located?

A        Correct.

Q        Then Steve Martinez spoke with Sheriff Baca on August 19; is that correct?

A        Yes.

Q        And Sheriff Baca then, thereafter, spoke with Paul Tanaka; is that correct?

A        Correct.

Q        And you're aware that they had a meeting, that being Sheriff Baca called Tanaka and others, on August 19;

UNITED STATES DISTRICT COURT

correct?

A        That's what the schedule says.

Q        That's what the schedule says.

And as just a general idea about these cell phone records, when you say "duration" and it says "1," for instance, that phone call could have lasted one second or all the way up to one minute; correct?

A        Correct.

Q        And still say "1"?

A        Correct.

Q        Same thing for each of the numbers.  So if it says "3," that phone call could have lasted 3 minutes exactly or up to, what, 3, 59, it would still say 3?

A        I believe so.  The Verizon phone records only show full numbers, but I would assume that's the case that 3 minutes and 59 seconds would show up the same way as 3 minutes and 1 second.

Q        Okay.  If we could focus on Exhibit 170 now. Exhibit 170 was your analysis of all Paul Tanaka's phone calls; correct?

A        Correct.

Q        Then for Exhibit 172, you put it all together, and you put it all together between Sheriff Baca, Undersheriff Tanaka, and then you made it in reference to certain dates in this case; is that correct?

A    Yes.  There's also other individuals on it --
Tom Carey, Steve Leavins, the OSJ deputies.

Q    Just to be clear then, let's just go through them briefly.

Sheriff Baca, Undersheriff Tanaka; correct?

A    Correct.

Q    Steve Leavins?

A    Yes.

Q    Tom Carey?

A    Yes.

Q    Greg Thompson.

A    Yes.

Q    Mickey Manzo.

A    Yes.

Q    Christopher Nee.

A    Yes.

Q    Tom Carey.

A    Yes.

Q    Anyone else?

A    I believe Gerard Smith, Cecil Rhambo.

Q    Cecil Rhambo.

Do we also have Sergeant Long?

A    Yes.  And Scott Craig.

Q    So basically all the investigators that were involved in connection with the cell phone; correct?

A       All of the employees involved in the cell phone investigation plus some desk lines that may be relevant, aides to some of the assistant sheriffs, undersheriff, things like that.

Q       Now, you also did an analysis, did you not, summary analysis, just the phone calls between Sheriff Baca and Undersheriff Tanaka; is that correct?

A       Yes.

Q       I'm going to present to you what will be marked as Defense Exhibit 637.

(Marked for identification Exhibit No. 637.)

MR. HOCHMAN:  May I approach the court clerk, Your Honor?

THE COURT:  Yes.

Q       BY MR. HOCHMAN:  Defense Exhibit 637, a summary chart that you prepared of the phone calls in the time period of August 18, 2011, to September 26, 2011, between Sheriff Baca and Undersheriff Tanaka?

A       Given that I am not the one that put this forward with the Government, I can't tell you a hundred percent that this is my full chart because I don't know if you did any altering to it or anything.  All I can tell you is it looks similar to the one I did, but I can't tell you based on just this that this is the one I did.

MR. HOCHMAN:  Your Honor, I'd offer as a

**UNITED STATES DISTRICT COURT**

summary -- and would this chart be a summary of voluminous records?

A    Again, I can't tell you that -- unless this is the one that I wrote and I actually had it to turn over, I can't tell you that this one that you have and gave to me is the exact same as mine.

MR. HOCHMAN:  May I have a moment, Your Honor, with counsel?

(Counsel confer.)

MR. HOCHMAN:  I'm going to defer on this particular exhibit, Defense Exhibit 637, Your Honor, and present the witness with what will be marked for identification as Defense Exhibit 639, Your Honor.

(Marked for identification Exhibit No. 639.)

MR. HOCHMAN:  If I might have a moment.

May I approach the clerk, Your Honor?

THE COURT:  Yes.

Q    BY MR. HOCHMAN:  Do you have what is marked as Defense Exhibit 639 in front of you?

A    Yes.

Q    And is this a summary chart that reflects the calls between Paul Tanaka, Messrs. Carey, Leavins, Thompson, Craig, Manzo, Smith, Sexton, and Ms. Long?

A    It looks like the one I did.  Again, I can't tell you that a hundred percent this is mine just based on you

giving me this right now.

Q    And the time period is August 18, 2011, to September 26, 2011?

A    That's what it says, yes.

MR. HOCHMAN:  The defense would seek to admit Defense Exhibit 639 as a summary chart, Your Honor.

MR. FOX:  Your Honor, may I have a moment with counsel again, please?

THE COURT:  Yes.

(Counsel confer.)

MR. HOCHMAN:  Your Honor, I'll defer the request for admission at this moment.

Q    Approximately -- there are approximately 60 entries on this chart of calls between Mr. Tanaka and all those other individuals that I specified?

A    Approximately, yes.

MR. HOCHMAN:  I'd like to show you what will be marked for identification as Defense Exhibit 638.  I'm sorry, Your Honor.

May I approach the clerk?

THE COURT:  Yes.

(Marked for identification Exhibit No. 638.)

Q    BY MR. HOCHMAN:  Defense Exhibit 638 is another summary chart that has a comparison or has the number of -- identifies the calls between Sheriff Baca and Messrs. Carey,

Leavins, Thompson, Craig, Long, Manzo, Smith, and Sexton between August 18, 2011, and November -- September 26, 2011; is that correct?

A       Yes.

Q       And you prepared this chart?

A       Yes.

MR. HOCHMAN:  Your Honor, I would seek to admit Defense Exhibit 638.

MR. FOX:  No objection.

THE COURT:  It will be received.

(Received into evidence Exhibit No. 638.)

MR. HOCHMAN:  Permission to publish.

THE COURT:  Yes.

Q       BY MR. HOCHMAN:  Agent Marx, in preparing this chart, you went through all the cell phone records for Sheriff Baca, Messrs. Carey, Leavins, Thompson, Craig, Long, Manzo, Smith, and Sexton between August 18, 2011, and September 16, 2011; is that correct?

A       Only cell phones.  This doesn't include desk phones unless a cell phone called a desk phone.  So in terms of records for these individuals, it's strictly cell phones I've reviewed.

Q       But those are the exact records you used to compile those other charts we've been talking about -- Exhibits 157, 170, 172 -- correct?

**UNITED STATES DISTRICT COURT**

A        Yes.

Q        And after all that review, how many phone calls did you find between any of those individuals -- Mr. Carey all the way down to Sexton -- and Sheriff Baca during this August 18 to September 26, 2011, time period?

A        The ones that were identified and not unavailable or unknown that I wouldn't have a way to know who was calling Sheriff Baca, it's one call with Steve Leavins and Lee Baca on August 26.

Q        And I think you said with Mr. Tanaka there were 60 phone calls, and with Mr. Baca there's just this one; correct?

A        Again, I can't say there was only one.  I can tell you that I can identify.  The "unknowns" and "unavailables," there could be many more.  On this just being able to identify it, yes, there's only one.

Q        And by the way, unknown and unavailable, that's anybody with an unlisted number; correct?

A        Could be.

Q        That's not just restricted to the FBI or U.S. Attorney's Office.  It could be anyone in Los Angeles County who has an unlisted number; correct?

A        Could be.

Q        For that matter, it could be anyone in the United States that has an unlisted number if it's calling into

UNITED STATES DISTRICT COURT

the cell phones; correct?

     A     It could be.

          MR. HOCHMAN:  No further questions.

          THE COURT:  All right.  Ladies and gentlemen,
we're going to take a break.  Again, I want to remind you
you're not to discuss this case with anyone including your
fellow jurors, members of your family, people involved in the
trial, or anyone else, and do not allow others to discuss the
case with you.  This includes discussing the case on the
Internet, various forms of social media, by e-mails, or text
messages.  If anyone tries to communicate with you about this
case, please let me know about it immediately.

          Do not read, watch, or listen to any news reports
or other accounts about the trial or anyone associated with it.
Do not do any research such as consulting dictionaries,
searching the Internet, or using other reference materials.  Do
not make any investigation about the case on your own.

          Finally, you're reminded to keep an open mind
until all of the evidence has been received, you've heard the
arguments of counsel, the instructions of the Court, and the
views of your fellow jurors.

          If you need to speak with me, simply give a note
to the clerk.

          We'll come back at 20 after the hour.

///

(The following proceedings were held in open court out of the presence of the jury:)

THE COURT:  You may step down.

Is there anything else we need to take up at this time?

MR. HOCHMAN:  Very briefly, Your Honor.

You deferred ruling on one question that I asked in connection with Exhibit 50.  That's Mr. Powell.  The information I sought to elicit, which I believe the witness would have confirmed, is that that e-mail is dated September 7, 2011, when they did the bug sweep.  But in reality, Mr. Powell informed her ahead of time that they were going to do the bug sweep.

Now, it's for the reasons that I identified before and are part of the public record in the Tanaka trial as to why Mr. Powell is providing that information to Ms. Marx, but I believe it's relevant for that purpose, Your Honor.

MR. FOX:  And, Your Honor we don't believe it's relevant whatsoever.  He just says it's relevant without explaining why.  There's nothing to respond to because he hasn't explained how it's relevant whatsoever.

MR. HOCHMAN:  Your Honor, I explained it at sidebar.  I can explain it again since it is a matter of -- it's already out there publicly.

Mr. Powell was a confidential human source for

the FBI going back to 2001.  He had the ability to install secret recording devices anywhere within the sheriff's department if the FBI had requested.

As I pointed out, we talked about, you know, cameras and different options that Special Agent Marx has.  One of the options was to ask Mr. Powell to install secret recording devices which wouldn't have had any of the dangers of a cell phone obviously because you can't use it to communicate with.  She had that option.  She didn't avail herself of that option.

It was a four-question additional cross-examination, Your Honor.  So obviously very, very brief. But that's what I was seeking, Your Honor.

MR. FOX:  Your Honor, two things on that.  First of all, it's irrelevant whether Mr. Baca liked or disliked the way the FBI and the Federal Grand Jury went about its investigation.  He can't obstruct an investigation even if he doesn't like how it went about.  Even if it's dangerous and it's a Federal Grand Jury investigation, he can't obstruct it. So it's irrelevant to this case.

Secondly, as Your Honor knows, in order to install an audio listening device, there needs to be a Court that orders that to happen based on probable cause, based on necessity, based on a lot of things.  You can't just put a device in just because somebody says that you have the ability

to -- someone who is within the organization says that he has the ability to have access to that area.

So, again, I would say this is irrelevant. There's certainly a 403 problem as well.

MR. HOCHMAN:  And a very brief response to that, Your Honor, is Sheriff Baca's state of mind, whether or not he was intending to obstruct justice or obstruct an FBI civil rights investigation or he was just very upset that the FBI had used a cell phone technique to do an undercover when so many other techniques existed that wouldn't have created the dangers in the jails, I believe that is relevant both for his motivation and his intent.

THE COURT:  I don't think that's very helpful to that argument.

MR. FOX:  And, Your Honor, if I may point out, this was with respect to Mr. Baca's office, Mr. Baca's conference room, Mr. Tanaka's office, and Mr. Tanaka's conference room.  This had nothing to do with the violence -- installing a camera to capture violence within the jails.  So this is not going to his state of mind whatsoever.

MR. HOCHMAN:  And the Government didn't connect up that Mr. Powell or any of this surveillance evidence ever reached Mr. Baca.  So the Government has introduced sort of this orphan evidence that existed but in no way is going to at all connect it to Mr. Baca's knowledge that it was actually

**UNITED STATES DISTRICT COURT**

ordered, approved by Mr. Baca or even known of.

And we were trying to elicit that, since they brought out this evidence, that the FBI had a direct connection into the sheriff's department in order to, again, explain why Mr. Baca is quite upset at the FBI that they could have done everything but use a cell phone but chose not to.

THE COURT:  Okay.  Thank you.

MR. FOX:  Thank you, Your Honor.

(A recess was taken at 11:06 a.m.)

MR. FOX:  Your Honor, during break, I went downstairs to check on our next witness, and he saw me, nodded to me, and went to sidebar with counsel.  So I assume he's going to be up here in just a couple minutes.  This is Judge Andre Birotte.  So I don't see him now.  I expect that he'll be up here in a couple minutes.  My redirect of Special Agent Tanner will only be a couple minutes.  He's here now.  I have the signal.  It's going to be smooth sailing.  Never mind.

THE COURT:  Okay.  As to the issue that was raised when we left, I don't find that this line of questioning that counsel wanted to get into is relevant.  Even assuming there is some probative value, that probative value is substantially outweighed by the danger of confusion of the issues and misleading the jury, undue delay, and a waste of time.

Okay.  Let's bring the jury in.

(The following proceedings were held in open court in the presence of the jury:)

MR. FOX:  May I begin, Your Honor?

THE COURT:  Yes.

**REDIRECT EXAMINATION**

BY MR. FOX:

Q    Special Agent Tanner, Mr. Hochman was asking you questions about whether cell phones could be used to plot escapes.  Have you uncovered any evidence that Anthony Brown was using that cell phone to plot an escape?

A    No.

Q    Mr. Hochman was asking you questions about whether cell phones could be used to put a hit out on a witness.  Have you uncovered any evidence that Anthony Brown used that phone to put a hit out for a witness?

A    No.

Q    What about to threaten or intimidate witnesses?  Any evidence he did any of that with his cell phone?

A    No.

Q    Mr. Hochman asked you about gang ties and how a cell phone could be used with respect to gangs.  Based on your background of Mr. Brown, did he have any gang ties?

A    He did not.

Q    Mr. Hochman asked you if you were case agent up

to September, 2011.  Do you continue to be one of the case agents on this case?

A        Yes.

Q        Mr. Hochman asked you about your investigation becoming a grand jury investigation through the use of subpoenas and then, when you provided that information to grand juries.  When you undertook this investigation and started to issue grand jury subpoenas, what was your intention with the information you were receiving with respect to that grand jury?

A        Once we requested those subpoenas, we would eventually go back and return that information to the grand jury and explain what we had received and whether or not there would be any potential Indictments or charges as a result of our investigation.

Q        And with respect to Mr. Michel, was it your intention to go to the grand jury for any reason with respect to Mr. Michel in July -- as of July and August of 2011?

         Actually, that's a bad question.  Let me ask it differently.

         With the evidence you were obtaining with respect to Mr. Michel in July and August of 2011, was it your intention to ultimately go before the grand jury with respect to Michel?

A        Yes.  Eventually.

Q        And why was that?

A        Because, in order to bring either an Indictment

**UNITED STATES DISTRICT COURT**

136

or any type of charge against Gilbert Michel, we would bring that information to the grand jury, and they would determine whether or not to bring charges on Gilbert Michel.

Q     And with respect to the investigation as a whole, you were talking about the dozens of allegations you were receiving regarding abuse.  What were you doing with that information before you were deciding whether to present that specific incident to the grand jury?

A     Most of the information we had to vet and determine whether or not there was anything there.  Sometimes we -- again, we wouldn't have complete information.  So we spent a lot of time trying to match up, you know, partial information from multiple inmates and put it together to determine if we had enough information to bring forward any civil rights charges on the deputies.

Q     Mr. Hochman asked you several questions about whether you lied to the sheriff's department when you were visiting the jails and doing other things.  As part of your investigations, is that something that you are allowed to do when you are conducting an undercover operation and covert operation?

A     Yes.

Q     And why were you saying things that weren't true at the time?

A     At the time I did not want to alert the sheriff's

UNITED STATES DISTRICT COURT

department that we were investigating them.  And so just telling a deputy that I was investigating human trafficking, that sort of thing, would just avoid the possibility that they would know that we're actually looking into the very deputies that we were there talking to every time we went to the jail.

Q     Mr. Hochman showed you some phone charts and, before doing so, asked you about unknown calls that might have come in on a given cell phone.  Based on your review of those charts that he provided to you, were there unknown calls that were coming in to Mr. Brown?

A     No.

Q     And Mr. Hochman asked you about several calls or texts that occurred right when Mr. Brown got the phone when he was in MCJ.  You discussed at that point how it was the phone system that was, you think, calling or texting him back; is that right?  Can you explain that?

A     So it was -- when I initially set up the phone, I noticed that I would get text messages or just random messages sent to the phone that would be from Boost Mobile, and it would either say "Thanks for setting up your service" or "We have a special deal for you," almost like junk mail that would come to an e-mail.  So knowing that they were coming from, you know, 800 numbers or 888 numbers, that appears to be what is on those records.

Q     And if Mr. Brown wanted to use a phone to call

into the new cell phone he received, how would that call from his cell show up on the cell phone?

A      It would show up as a jail call.

Q      Mr. Hochman asked you questions about Government exhibit -- well, he asked you questions about Anthony Brown and the writ.  I'm going to bring up that writ.

MR. HOCHMAN:  Which exhibit?

MR. FOX:  113.

Q      What was the date that Anthony Brown was supposed to be produced to the Federal Grand Jury according to this writ?

A      September 7, 2011.

Q      Showing you now Exhibit 52 which is in evidence, e-mail reads, from Carey to Leavins, "Steve, official request from feds for interview with Brown was made."  What was the date of this e-mail?

A      September 9, 2011.

Q      Mr. Hochman asked you questions about why you didn't writ Anthony Brown over once he was in the state system. Can you explain why you did not do that?

A      At the time we were able to speak to him, and we had at that point the ability to go and speak with him whenever we wanted through the state prison system because they were not restricting our visits with him.  And so at that time we didn't have to rush to get his statement because we were able to speak

to him.

In addition, around the exact same time is when Gilbert Michel retained an attorney, and at that point his attorney started conversations with the United States Attorney's Office to possibly cooperate with our investigation.

Q     Mr. Hochman asked you questions about you approaching Mr. Michel in the evening of August 24, 2011.

Do you recall those questions?

A     Yes.

Q     I'll show you now Government Exhibit 30 in evidence.

When is this an e-mail from?

A     August 25th, 2011.

Q     Is that the morning after you approached Mr. Michel?

A     Yes.

Q     And what does Mr. Martinez write to Mr. Baca's e-mail account with the subject MCJ?

A     "Lee, I'd like to provide an update on the matter I spoke with you about a few days ago.  Please give me a call or a good time/number to call you.  Regards, Steve."

Q     Could you please read the "from" line in this top e-mail I've highlighted?

A     Kevin Goran on behalf of Leroy Baca.

Q     Who is this to?

A        Chris Nee.

Q        What does it say?

A        "Chris, earlier today Esther told me to refer all FBI inquiries to Mr. Tanaka.  So here you go."

Q        Mr. Hochman asked you about the Exhibit 638, the Defense Exhibit 638, that showed one call between Mr. Leavins' cell phone and Mr. Baca's cell phone.

Do you recall that?

A        Yes.

Q        Did that chart include any calls between Mr. Tanaka and Mr. Baca?

A        No.

MR. FOX:  No further questions, Your Honor.

MR. HOCHMAN:  Briefly, Your Honor.

Can you put Exhibit 113 back up.

**RECROSS-EXAMINATION**

BY MR. HOCHMAN:

Q        Agent Marx, we're putting Exhibit 113 back up. It is the writ.  If we could highlight the -- sort of the -- starting with "The Court" all the way to the bottom.

Special Agent Marx, this is a writ to bring Anthony Brown to testify in front of the grand jury; is that correct?

A        Yes.

Q        And Anthony Brown -- and the grand jury wants to

**UNITED STATES DISTRICT COURT**

hear what Anthony Brown has to say on September 7, 2011, at 9:30 a.m.; is that correct?

A        Yes.

Q        The grand jury doesn't necessarily want to lock him down.  They just want to hear what he has to say; correct?

A        Correct.

Q        And you could have shown up on that day, September 7, 2011, and tell them everything that Anthony Brown had told you for over a year at that point; is that correct?

MR. FOX:  Objection.  Beyond the scope.

THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  Did you show up on September 7, 2011, to the grand jury to testify?

A        No.  The writ is for Anthony Brown to testify, not me.

Q        Well, you don't need a writ to show up in a Los Angeles Federal Grand Jury to testify; is that correct?

MR. FOX:  Objection.  Beyond the scope.

THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  Did you testify on that day in front of the grand jury?

MR. FOX:  Objection.  Asked and answered and beyond the scope.

THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  Now, you said that you had no

evidence that Anthony Brown had any gang ties; is that correct?

A       Correct.

Q       Did you have any evidence, one way or the other, as to whether or not his cellmate who had access to the phone had gang ties?

MR. FOX:  Objection.  Beyond the scope.

THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  You said that you lied to the sheriff's department because you didn't want to alert the sheriff's department that you were doing civil rights investigations by telling them that you were a civil rights investigator from the FBI; correct?

A       No.  It was -- I was fine telling him I investigated civil rights.  I wasn't going to tell them that I was there to investigate deputies assaulting inmates when I was in the jail with the deputies that we were investigating.

Q       Well, members of your squad were in the jails at the time that grand jury subpoenas came out in July of 2011 asking for information about deputy abuse of inmates; correct?

A       I don't understand your question.  My squad mates were in the jail at the time?

Q       Well, you said you didn't want to be in the jail -- in the Men's Central Jail identifying that you're doing civil rights investigations at the time -- for the very people you're investigating; correct?

A        I do not understand what you're asking me.

Q        Let me break it down now.

You had -- you lied, for instance, to Deputy Courson about the fact you were an FBI civil rights investigator because you didn't want to alert him that you were doing civil rights investigations into the jail; correct?

A        That's absolutely not true.  Human trafficking is a civil rights violation.  So, therefore, it wasn't that I was lying about being a civil rights investigator.  I did not tell him that I was there investigating the sheriff's department which is two totally separate things.

Q        But in July, 2011, you're aware that a grand jury subpoena came out asking for records of civil rights violations in the Men's Central Jail or relating to deputy abuse; correct?

A        It was one specific incident.  Not all of the incidents we were investigating.  One specific incident that had been in the media.

Q        But one specific incident relating to deputy abuse in the Men's Central Jail; correct?

A        Correct.

Q        That was the overt part of your case; isn't that right?

A        The one small part, yes.

MR. HOCHMAN:  No further questions.

MR. FOX:  Nothing, Your Honor.

**UNITED STATES DISTRICT COURT**

THE COURT:  You may step down.

(Further proceedings held and reported

but not included herein.)

**UNITED STATES DISTRICT COURT**

CERTIFICATE OF OFFICIAL REPORTER

I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

DATED THIS  15TH  DAY OF DECEMBER, 2016.


/S/ MIRANDA ALGORRI

MIRANDA ALGORRI, CSR NO. 12743, CRR
FEDERAL OFFICIAL COURT REPORTER

**UNITED STATES DISTRICT COURT**