Nathan J. Hochman, SBN 139137
Brianna Leigh Abrams, SBN 239474
MORGAN, LEWIS & BOCKIUS LLP
The Water Garden
Suite 2050 North
1601 Cloverfield Boulevard
Santa Monica, CA  90404-4082
Tel:    +1.310.255.9025
Fax:    +1.310.907.2025
e-mail: nathan.hochman@morganlewis.com
e-mail: brianna.abrams@morganlewis.com


Attorneys for Defendant
LEROY BACA

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>LEROY BACA,<br><br>Defendant. | Case No. CR 16-66(A) - PA<br><br>DEFENDANT LEROY BACA'S SENTENCING POSITION; DECLARATION OF NATHAN J. HOCHMAN; EXHIBITS<br><br>[PUBLIC VERSION]<br><br>Hearing Date: May 12, 2017<br>Hearing Time: 8:30 a.m.<br>Courtroom: Hon. Percy Anderson |

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

i                                                    CR 16-66(A) - PA

DB2/ 31386432.1

Defendant LEROY BACA, by and through his counsel of record, hereby respectfully submits his sentencing position in this matter.

This sentencing position paper is based upon the attached memorandum of points and authorities, the Declaration of Nathan J. Hochman In Support of Defendant Leroy Baca's Sentencing Position and Exhibits attached thereto, the files and records in this case, and such further evidence and argument as the Court may permit at the hearing in this matter.

Respectfully submitted,

Dated:       April 24, 2017            MORGAN, LEWIS & BOCKIUS LLP


By /s/ Nathan J. Hochman
   Nathan Hochman
   Brianna Abrams
   Attorneys for Defendant
   LEROY BACA

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 31386432.1

ii                              CR 16-66(A) - PA

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ..................................................................................................1

II.   ANALYSIS OF SENTENCING FACTORS ........................................................2

    A.    History and Characteristics of the Defendant  (§ 3553(a)(1)) ..............4

        1.    Personal Background ..................................................................5

            a.    Mr. Baca Worked Hard to Serve His Country and Community ..................................................................5

            b.    Mr. Baca's Commitment to Inmates' Education Shows His Dedication to Improving Lives ....................8

            c.    Mr. Baca is Dedicated to Disadvantaged Youth ............10

            d.    Mr. Baca United People to Strengthen and Protect Communities ........................................................11

            e.    Mr. Baca Served the Homeless and Less Fortunate.......13

            f.    Mr. Baca Worked to Ensure Better Lives for Deputy Sheriffs..................................................................13

        2.    Mr. Baca's Alzheimer's Diagnosis And Related Medical Needs Warrant a Probation Only Sentence ............................15

            a.    Mr. Baca Suffers From A Progressive, Incurable Disease Which Will Severely Worsen Over Time.........16

            b.    Mr. Baca is Unlikely to Receive Medically Appropriate Prescription Medications and Treatments in Prison.......................................................21

            c.    Mr. Baca Would Not Receive the Care and Monitoring in Prison That He Receives at Home ..........23

            d.    Mr. Baca Would Have a Difficult Time Adapting to a Prison Setting Due to his Cognitive Impairments.......24

            e.    The Stress of Prison Could Exacerbate Mr. Baca's Medical Condition ........................................................25

        3.    Mr. Baca's Age and Infirmity Render Him Vulnerable to Victimization, Abuse, and Adjustment Problems in Prison and Make Prison an Inappropriate and Unduly Harsh Punishment ..................................................................27

            a.    Mr. Baca is Vulnerable to Victimization as an Older Adult with Alzheimer's Disease .........................27

            b.    Mr. Baca is Vulnerable to Victimization as a Well-Known Law  Enforcement Officer "Embroiled" in a High-Profile Scandal ........................................................28

        4.    Mr. Baca's Age and Medical Condition Warrants a Lower Sentence ........................................................................30

        5.    Mr. Baca Should Remain in His Family's Care ......................33

        6.    Mr. Baca Poses No Threat of Recidivism ...............................35

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

CR 16-66(A) - PA

DB2/ 31386432.1

B. Nature and Circumstances of the Offense ......................................... 36

C. The Need for the Sentence Imposed to: ............................................... 41

    1. Reflect the seriousness of the offense, promote respect for the law and provide just punishment ........................................ 41

    2. Afford adequate deterrence to criminal conduct ...................... 42

    3. Protect the public from future crimes of the defendant ........... 42

D. The Need to Avoid Unwarranted Sentence Disparities (§ 3553(a)(6)) ................................................................................. 42

III. CONCLUSION ....................................................................................... 46

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 31386432.1

CR 16-66(A) - PA

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*by Whitfield v. United States*,
  543 U.S. 209 (2005) ........................................................................16, 31

*Gall v. United States*,
  552 U.S. 38 (2007) ..........................................................................3, 4, 42

*Kimbrough v. United States*,
  552 U.S. 85 (2007) ..........................................................................3, 45

*Koon v. United States*,
  518 U.S. 81 (1996) ..........................................................................3, 29, 30

*Pepper v. United States*,
  562 U.S. 476 (2011) ........................................................................4, 5, 7

*Rita v. United States*,
  551 U.S. 338 (2007) ........................................................................4, 5

*Simon v. United States*,
  361 F. Supp. 2d 35 (E.D.N.Y. 2005)................................................25

*United States v. Autery*,
  555 F.3d 864 (11th Cir. 2009)........................................................5, 35

*United States v. Baron*,
  914 F. Supp. 660 (D. Mass. 1995)..................................................15, 21, 30, 31

*United States v. Chase*,
  560 F.3d 828 (8th Cir. 2009)..........................................................30

*United States v. Cooper*,
  394 F.3d 172 (3d Cir. 2005) ...........................................................5

*United States v. Coughlin*,
  2008 WL 313099 (W.D. Ark. 2008) ...............................................23, 26

*United States v. Edwards*,
  595 F.3d 1004 (9th Cir. 2010)........................................................16, 24

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

CR 16-66(A) - PA

DB2/ 31386432.1

*United States v. Heldeman*,
402 F.3d 220 (1st Cir. 2005) ........................................................................16, 24

*United States v. Hernandez*,
302 F. Appx. 699 (9th Cir. 2008) ........................................................................35

*United States v. Hildebrand*,
152 F.3d 756 (8th Cir. 1998)........................................................................16, 30

*United States v. Lara*,
905 F.2d 599 (2d Cir. 1990) ...............................................................27, 28, 30

*United States v. Lavallee*,
439 F. 3d 670 (10th Cir. 2006) ...................................................................29, 30

*United States v. Long*,
977 F.2d 1264 (8th Cir. 1992).....................................................................27, 28

*United States v. Maltese*,
1993 WL 222350 (N.D. Ill. 1993)........................................................................15

*United States v. Marsh*,
820 F. Supp. 2d 320 (E.D.N.Y. 2011)................................................................16

*United States v. Martin*,
363 F.3d 25 (1st Cir. 2004) ................................................................................26

*United States v. Rioux*,
97 F.3d 648 (2d Cir. 1996) ...................................................................4, 15, 16

*United States v. Ruiz*,
No. 04-CR-1146-03-RWS, 2006 WL 1311982 (S.D.N.Y. May 10,
2006) ...................................................................................................................35

*United States v. Seiber*,
2005 WL 1801614 (E.D. Tenn. 2005)...........................................................30, 31

*United States v. Takai*,
941 F. 2d 738 (9th Cir. 1991) ............................................................................14

*United States v. Tanaka et al*,
No. 15-cr-00255-PA (C.D. Cal June 06, 2016), Dkt. No. 169 16:13-
18 ........................................................................................................................45

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 31386432.1

iv                                                                    CR 16-66(A) - PA

*United States v. White*,
506 F.3d 635 (8th Cir. 2007) ...............................................................................15

*United States v. Willis*,
322 F. Supp. 2d 76 (D. Mass. 2004).....................................................................31

**STATUTES**

18 U.S.C. § 3551.................................................................................................passim

18 U.S.C. §§ 3582(c)(1)(A) and 4205(g) ........................................................20, 21

Pub. L. No. 98-473, §239, 98 Stat. 1987, 3039 (1984) ....................................35, 36

U.S.S.G. § 5H1.1 ..............................................................................................15, 30

U.S.S.G. § 5H1.4 ...................................................................................................15

U.S.S.G. § 5K2.0 .....................................................................................................4

**OTHER AUTHORITIES**

Bureau of Prisons Program Statement No. 5050.49, CN-1
Compassionate Release/Reduction in Sentence: Procedures for
Implementation of 18 U.S.C. §§ 3582(c)(1)(A) and 4205(g) ......................20, 21

Christopher J. Mumola, *Medical Causes of Death in State Prisons,
2001-2004*, U.S. Department of Justice, Office of Justice Programs,
Bureau of Justice Statistics, Data Brief NCJ216340..........................................32

B. Jaye Anno *et al.*, U.S. Dep't of Justice, *Correctional Health Care:
Addressing the Needs of Elderly, Chronically ill, and Terminally Ill
Inmates* (2004) ...........................................................................................26, 27, 31

David Weisburd, *et al.*, *Specific Deterrence in a Sample of Offenders
Convicted of White Collar Crimes* .....................................................................35

*Human Rights Watch, Old Behind Bars: The Aging Prison Population
in the United States*, at 59 (Jan. 2012), available at
https://www.hrw.org/sites/default/files/reports/usprisons0112webw
cover_0_0.pdf ................................................................................................27, 28

Mike Mitka, *Aging Prisoners Stressing the Health Care System*, Vol.
292, No. 4, Journal of the American Medical Association (July
2004) ...............................................................................................................32, 33

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

v                    CR 16-66(A) - PA

DB2/ 31386432.1

U.S. Dept. of Justice, Federal Bureau of Prisons, *Program Statement 6031.03* (Aug. 23, 2012) ..................................................................................32

Ronald H. Aday, *Aging in Prison: A Case Study of New Elderly Offenders, International Journal of Offender Therapy and Comparative Criminology* ..............................................................................31

Stages of Alzheimer's, http://www.alz.org/alzheimers_disease_stages_of_alzheimers.asp ....................20

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

CR 16-66(A) - PA

DB2/ 31386432.1

## DEFENDANT'S SENTENCING POSITION

### I.   INTRODUCTION

Leroy Baca dedicated his heart, his soul, and his life to serving the people of Los Angeles County for almost 50 years. During his decades of service, as attested to by the over 200 letters submitted on his behalf from people from all walks of life, Mr. Baca implemented visionary, positive changes in the way the Los Angeles Sheriff's Department ("LASD") operated and interacted with inmates and with the community at large.  From instituting ground-breaking education and rehabilitation programs that transformed the lives of inmates to bringing significant resources to the LASD that greatly expanded its ability to protect the public, Mr. Baca served his community for almost half a century faithfully, tirelessly, and with respect and dignity toward every person he encountered.

This extraordinary record of public service must be accounted for in determining the sentence Mr. Baca should receive in light of the jury's verdict that he transgressed the law for six weeks in August-September 2011 and again for four answers to over 400 questions during the April 12, 2013 voluntary interview with the government.

Similarly, the Court must balance Mr. Baca's seriously deteriorating mental health condition along with the dangers he faces in prison based on his age and former position as LASD Sheriff in fashioning a sentence that is sufficient but not greater than necessary to achieve the aims of sentencing.  As the Court is well aware, Mr. Baca suffers from Alzheimer's disease, an incurable, progressive and ultimately terminal condition.  As the attached April 2017 reports from noted Alzheimer's experts Drs. Helena Chui and Douglas Galasko highlight, Mr. Baca's condition has progressed and worsened from mild cognitive impairment to the stage of mild dementia.  This diagnosis is a sentence of its own. It is a sentence that will leave him a mere shell of his former self and one that will rob him of the memories

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

1                                    CR 16-66(A) - PA

DB2/ 31386432.1

of his life.  Ultimately, he won't remember the decades he devoted to his community or the people whose lives he helped change for the better, not to mention the names or memories of his friends and family.  Mr. Baca needs consistent monitoring, prescription medications, and any treatment available that may stall or slow the progression of this degenerative disease.  No one contends he is a threat or danger to the community.  He will not offend again.  All considerations support a probation sentence with conditions of home confinement and community service. To sentence Mr. Baca to a sentence of imprisonment that does not afford him the chance to receive appropriate medical attention for his Alzheimer's disease and subjects him to the harsh cruelty of the prison system not designed to address his medical condition is to sentence him to a **cognitive death sentence** since his body may still be able to function but his mind will have lost all capacity for meaningful cognition by the time he emerges from prison.

In sentencing Mr. Baca, the Court must weigh any aggravating aspects of Mr. Baca's crimes against " the profoundly positive impact [he] has had on the public throughout his career" Letter of R. Parris, attached as Exhibit E to the Declaration of Nathan J. Hochman In Support of Defendant Leroy Baca's Sentencing Position ("Ex. E"), p. 403 as well as the requirement to provide Mr. Baca with medical care in the "most effective manner" (18 U.S.C. § 3553(a)(2)(D))  To achieve this balance, Mr. Baca respectfully requests that the Court impose a probation sentence with home confinement and community service, thereby permitting him to receive appropriate medical care in the most effective manner and contribute directly through community service to make amends for the crimes of which he was convicted.

## II.    ANALYSIS OF SENTENCING FACTORS

The Court must impose a sentence consistent with the mandate of 18 U.S.C. § 3553(a).  The Sentencing Guidelines are only a starting point, one of many factors to be weighed when selecting a disposition that is sufficient but not greater than

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

CR 16-66(A) - PA

DB2/ 31386432.1

necessary to satisfy the purposes and goals set forth in 18 U.S.C. §3553(a). *Gall v. United States*, 552 U.S. 38, 49-50 (2007) (guideline range should not be presumed to be reasonable); *Kimbrough v. United States*, 552 U.S. 85, 90 (2007) (guidelines only "one factor among several courts must consider in determining an appropriate sentence"). Additionally, the Court is no longer hemmed in by the traditional departure analysis. Rather, the primary objective for this, as any, sentencing is to "make an individualized assessment based on the facts presented." *Gall*, 552 U.S. at 50. As Justice Kennedy observed even pre-*Booker*, "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique case study in human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996).

The "overarching provision" of 18 U.S.C. § 3553(a) is, of course, to impose a sentence *sufficient, but not greater than necessary*, to meet the goals of sentencing established by Congress. *Kimbrough*, 552 U.S. at 101. Those statutory goals include "to reflect the seriousness of the offense," "to promote respect for the law," "to provide just punishment for the offense," "to afford adequate deterrence to criminal conduct," and "to protect the public from further crimes of the defendant." *Id.*; *see* 18 U.S.C. § 3553(a). The statute further provides that, in determining the appropriate sentence, the court should consider a number of factors, including "the nature and circumstances of the offense," "the history and characteristics of the defendant," "the sentencing range established" by the Guidelines, "any pertinent policy statement" issued by the Sentencing Commission pursuant to its statutory authority, and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." *Id.* "In sum, while the statute still requires a court to give respectful consideration to the Guidelines, *Booker* permits the court to tailor the sentence in light of other statutory concerns as well." *Kimbrough*, 552 U.S. at 101 (internal quotations and

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 31386432.1

3

CR 16-66(A) - PA

citations omitted).  If a sentence other than imprisonment would be sufficient to meet the statutory goals of sentencing, then the Court *must* impose such an alternative because imprisonment would be a "greater than necessary" sentence.  18 U.S.C. § 3553(a).

In his concurring opinion in *Rita v. United States*, 551 U.S. 338, 367 (2007), Justice Stevens wrote:  "I trust that those judges who have treated the Guidelines as virtually mandatory during the post-Booker interregnum will now recognize that the Guidelines are truly advisory."  The decisions in *Kimbrough* and *Gall* have reinforced Justice Stevens' remark and the authority of district courts to fashion the sort of sentence that fits the crime and the individual(.

### A.   <u>History and Characteristics of the Defendant  (§ 3553(a)(1))</u>

The requirement that courts consider the "history and circumstances" of each defendant reflects the "federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." 18 U.S.C. § 3553(a)(1); *Gall*, 552 U.S. at 52 (citations omitted).  The Supreme Court has emphasized that "the fullest information possible concerning the defendant's life and characteristics" is "[h]ighly relevant — if not essential — to [the] selection of an appropriate sentence." *Pepper v. United States*, 562 U.S. 476, 488 (2011) (internal citations omitted).  Considering the widest information available "ensures that the punishment will suit not merely the offense but the individual defendant." *Id.*  (internal citations omitted).

In "extraordinary" cases, civic deeds, charitable contributions, public service and similar prior good works are highly relevant to sentencing and may even be the grounds for a downward departure.  U.S.S.G. § 5K2.0; *see United States v. Rioux*, 97 F.3d 648, 663 (2d Cir. 1996) ("the district court may downwardly depart when a number of factors that, when considered individually, would not permit a downward departure, combine to create a situation that differs significantly from

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 31386432.1

4

CR 16-66(A) - PA

the heartland cases") (internal citations omitted).  Acts of a "personal nature" are "exceptional" and may be the basis for leniency or departure from the Guidelines. *United States v. Cooper*, 394 F.3d 172, 178 (3d Cir. 2005) (affirming downward departure for defendant who did not merely donate money, but "took it upon himself to mentor" youth).

**This is an "extraordinary" case.**  Mr. Baca's long and well-documented history of integrity, "visionary" service, and "compassion and kindness" for his community is "essential" to his sentencing.  *See id.*; *Pepper*, 562 U.S. at 488 (the defendant's life and characteristics are "essential" to sentencing); Letter from J. Lim, Ex. E, pgs. 342-43; Letter from L. Mattice, Ex. E, pgs. 359-60 ("Lee Baca is also one of the most visionary law enforcement executives in the world.").  Mr. Baca is a self-made man with a long and successful history in law enforcement and public service.  *See United States v. Autery*, 555 F.3d 864, 874 (11th Cir. 2009) (a defendant's law enforcement service may "constitute a mitigating factor in sentencing because a former law enforcement officer has shown at some point in his past that he can lead an honorable and responsible life"); Letter from D. Fernandez, Ex. E, pgs. 265-66 ("Lee is a man of the people, he came from similar circumstances, educated himself, was diligent in life and now made it his life's mission to teach others how they can do the same while also serving to protect them.").  "If anyone deserves the benefit of the doubt for all the contributions he has made to our community; it would be Lee."  Letter from M. Roos, Ex. E, pgs. 422-23.

1.    Personal Background

a.    Mr. Baca Worked Hard to Serve His Country and Community

Mr. Baca's "compassion for the poor and less fortunate grew out of his own humble beginnings." Letter from J. Lim, Ex. E, pgs. 342-43.  Mr. Baca was raised by his grandparents who were also caring for a mentally handicapped relative

because his mother, a Mexican immigrant, was unable to support him. He received his Associates Degree from East Los Angeles College, and in 1965, Mr. Baca was granted his lifelong wish when he was hired as a deputy sheriff for Los Angeles County at the age of twenty-three. At this time, he was simultaneously serving in the United States Marine Corps Reserves where he served for six years. Over the course of the next thirty-three years he continued to move up the ranks of the LASD. He worked long days and nights as a deputy sheriff, and simultaneously pursued higher education eventually receiving a doctorate in public administration from the University of Southern California.

Mr. Baca began his elected term as Sheriff in 1998, which allowed him to implement various programs to further his vision for the LASD. Many of these programs sought to reach the poor and disenfranchised, protect the "safety of our community and rehabilitate [] those who were incarcerated." Letter from M. Fellhauer, Ex. E, p. 264; *see, e.g*., Letter from H. Englander, Ex. E, p. 252 ("He was committed to changing the cycle of crime that infects young people in too many communities:"); Letter from M. Roos, Ex. E, pgs. 422-23 ("I had never met a law enforcement official with the empathy for those on and beyond the margin . . . constantly trying to create positive avenues for self-improvement and mainstream society.").

Throughout his career, Mr. Baca has taken pride in reaching out to the community for the betterment, and protection, of the public and inmates alike. Letter from P. Pietrantoni, Ex. E, pgs. 407-08 ("I worked for Mr. Baca [as a Deputy Sheriff] for 10 years prior to his becoming the Sheriff of Los Angeles County, and could not have dealt with a more compassionate, caring individual."). "[T]o exercise true justice, this mistake must be tempered with the profoundly positive impact Mr. Baca has had on the public throughout his career." Letter from R. Parris, Ex. E, p. 403. Mr. Baca has a unique and "extraordinary" history of public service, community protection, and compassion toward the less fortunate, all of

which support the sufficiency of a probation only sentence. *See Pepper*, 562 U.S. at 488 ("the punishment will suit not merely the offense but the individual defendant").

During his term as Sheriff, Mr. Baca was integral in establishing numerous significant programs focused on improving the safety of the community. For example, after the 9-11 attacks, "Sheriff Baca led joint forces of elected city officials, public administrators, school districts, colleges, police chiefs and fire chiefs in an unprecedented collaborative approach ultimately named the Los Angeles Regional Interoperable Communication System (LA-RICS)" which was designed to "assure dependable wireless communication at emergencies and in routine public safety/homeland security operations." Letter from P. M. Freeman, attached as Exhibit F to the Declaration of Nathan J. Hochman In Support of Defendant Leroy Baca's Sentencing Position ("Ex. F"), pgs. 519-20. "Sheriff Baca's on-going efforts, combined with others, achieved subsequent funding of more than $450 million." *Id.* As another example, Mr. Baca "secured nearly 20 million dollars from the County and City of Los Angeles to complete the construction and fixturization of the [Forensic Science Center ('Crime Lab')]" at California State University at Los Angeles in 2007. Letter from Robert M. Hertzberg, Ex. F, pgs. 524-25. "The Crime Lab has received the highest International accreditation and is responsible for eliminating a historical back log of untested sexual assault evidence kits, which served to solve a long list of crimes in Los Angeles County." *Id.* "The Crime Lab. . . took a consistent and herculean effort to fund and construct and I can say with certainty that the Crime Lab would have never been established without the extraordinary, day to day, effort of Sheriff Baca." *Id.*

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 31386432.1

7

CR 16-66(A) - PA

b.    Mr. Baca's Commitment to Inmates' Education Shows
His Dedication to Improving Lives

Mr. Baca was a "fervent advocate for education programs in our jails." Letter from D. Knabe, Ex. E, p. 325. He is motivated by his "obvious dedication to improving the lives of those who live on society's margins" and sought "to reduce recidivism and aid offenders in adapting to society and becoming productive citizens." Letter from A. Normore, Ex. E, pgs. 394-98. The LASD's Education Based Incarceration ("EBI") programs that were created under his leadership are a testament to his "sincere concern for people, regardless of their race, religion, gender, sexual orientation and economic status." Letter of W. Fujioka, Ex. E, pgs. 273-74. "[H]is dedication to the rehabilitation of inmates [was] refreshing and highly innovative." Letter from B. Choate, Ex. E, p. 217.

One former inmate writes that the program turned him "from being someone who had no dreams or goals, into someone who spent his days talking about [his] dreams and goals with deputies." Letter of C. Saul, Ex. E, pgs. 432-35. Inmates became teachers within the program, allowing other inmates to learn from them even where the program was not popular with other deputies. *Id.* ("His decision was not popular with some deputies as they did not believe in inmates changing their ways. This was never Mr. Baca's belief."). "Many inmate's views of the LASD changed because . . . [t]hey saw a man who supported us, and believed in us." *Id.* Another former inmate writes that through the EBI programs he "learned the kind of self-esteem [he] never found on the streets." Letter from S. Rogers, Ex. E, pgs. 419-21. He "learned to set goals and live for a purpose, and more than anything that helping people is the right thing to do." *Id.* "Lee Baca didn't just teach us that, he modeled it for us." *Id.* Another former inmate writes that "[i]f it were not for Sheriff Lee Baca's insight and vision in creating the EBI and Merit program, which focused on values, attitudes and positive thinking I would not be

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 31386432.1

8

CR 16-66(A) - PA

the person I am today." Letter from C. Quincey, Ex. E, pgs. 412-14. "Sheriff Lee Baca realized our future depended on undoing our past." *Id*.

The EBI program is a "model of how rehabilitation through incarceration should work." Letter from H. Erwin, Ex. E, p. 256. It "has graduated thousands of inmates from the LA County Jails with high school diplomas and certificates that helped future employers hire ex-offenders" and resulted in a record reduction of crime in Los Angeles. Letter from Gov. A. Schwarzenegger, Ex. E, pgs. 443-44; Letter from R. Cheng, Ex. E, p. 210-11 ("I have personally seen inmates . . . express how much they appreciate the programs we've provided and how they were able to complete their High School Education" and beyond); Letter from J. Sullivan, Ex. E, p. 471 ("Without Lee's support I would not have a guiding light to show me what it looks like to be a good man, friend, family member and business man."). Mr. Baca attended most of the inmate graduations and often spoke on the importance of education and its link to lowering recidivism and improving public safety. Mr. Baca's programs "demand that we serve with integrity so that the inmates could live a life with dignity both inside and outside of incarceration." *Id*. Mr. Baca's "care and regard extended way beyond his deputies, to the people in his custody and to the community he swore to serve." Letter from J. McNeil, Ex. E, p. 367.

Mr. Baca "changed the way we incarcerate . . . creating a safer jail for inmates and the deputies." Letter from J. Moriarity, Ex. E, pgs. 374-76. Mr. Baca's "positive and profound results" harken from Mr. Baca's "commitment to changing lives." Letter of J. Smith, Ex. E, p. 464; Letter from S. Rogers, Ex. E, pgs. 419-21 ("it's important to me to tell you how much Mr. Baca and his transformative justice programs have done for me and countless others"). Mr. Baca humbly requests that the Court consider them. *See* 18 U.S.C. § 3553(a)(1).

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 31386432.1

9

CR 16-66(A) - PA

c.      Mr. Baca is Dedicated to Disadvantaged Youth

Mr. Baca's involvement in the Sheriff's Youth Foundation to improve the lives of disadvantaged youth was "truly a labor of love" for him.  Letter from B. Corbell, Ex. E, p. 224 ("I saw how real his care [is] for these young people").  The Sheriffs Youth Foundation serves 2,500 at-risk youth at seventeen locations with after-school programs designed as an alternative to the street or gang affiliations the youth may otherwise participate.  Letter from J.P. Guerin, Ex. E, pgs. 284-85.  He actively sought participation by the community, committing much of his own time and effort to the programs and their funding.  Even from a law enforcement perspective, it was "clear [] that Mr. Baca was more interested in the education of young men and women than he was to incarcerate them when they went afoul of the law."  Letter from P. Pietrantoni, Ex. E, pgs. 407-08 (recounting how Mr. Baca directed him to get a constant count of student attendance and sent Deputy Sheriffs to the homes of truant students to get them back in school).  "[U]nder his leadership, thousands of youth who would have otherwise gone astray were instead directed to living productive and meaningful lives."  Letter from D. Shaby, Ex. E, pgs: 450-51.

Mr. Baca personally took interest in the lives of young people in crisis who could have ended up in the criminal justice system.  As one former disadvantaged youth writes, over twenty years ago Mr. Baca "literally showed up at my doorstep and introduced himself to me" after hearing about a troubled youth with "potential for change" from a community organizer.  Letter from R. Hernandez, Ex. E, pgs. 302-04.  "I was just a young kid with nothing to offer in return.  He was not being paid and this was not part of his job." *Id.*  Mr. Baca's continued "guidance." helped that "troubled kid" graduate from college, become a high school teacher and a business owner, *Id.*, Mr. Baca "continued to remain involved in [his] life coming to the school as the Sheriff . . . and speaking to [his] students on a regular basis.  No cameras or reporters, just [him] and the students." *Id.*

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 31386432.1

10

CR 16-66(A) - PA

Mr. Baca has been involved with multiple youth programs, including a job fair to promote interest in law enforcement, serving on the Board of Homeboy Industries, which seeks an alternative life for former gang members, working with the East Los Angeles Boys Club, instituting elementary school tutoring and volunteering for the Metropolitan YMCA Board of Directors.  Letter from J. O'Connell, Ex. E, pgs. 401-02 (Mr. Baca had a "passion for the kids"); Letter from G. Shouse, Ex. E, pgs. 457-58 ("The young boys were kept out of gangs by association with individuals like Lee Baca . . . who openly voiced their concern for these young men.").  "Literacy programs have been a priority for the Sheriff keeping kids out of gangs and on a trajectory toward higher education." Letter from C. Darian, Ex. E, pgs. 236-37.  Mr. Baca has helped "turn around the lives of many young people, and as a result of his guidance they have turned into good citizens and successful men." Letter from K. Thompson, Ex. E, p. 478.  "[A]n all inclusive look at the man, including over 45 years of service to Los Angeles County and thousands of young lives touched, for the good" supports a probation sentence. Letter from J. March, Ex. E, p. 361.

### d. Mr. Baca United People to Strengthen and Protect Communities

Mr. Baca was "unique and unprecedented in the way he reached out to various ethnic groups, nationalities, and races in an inclusive and welcoming way." Letter from S. Cooley, Ex. E, pgs. 222-23; Letter from Pres. V. Fox, Ex. E, pgs. 268-69 (Mr. Baca visited Mexico to train police when "no other law enforcement agency from the United States lent a hand in a time of need").  He brought "together people of different faiths, cultures and political affiliations to better understand our need as a society to coexist and for tolerance."  Letter from W. Ru, Ex. E, pgs. 425-26.

He saw the "importance of the relationship between law enforcement and the faith-based communities."  Letter from J. Moriarity, Ex. E, pgs. 374-76.  Mr. Baca

showed "great courage in his insistence in embracing all faiths." Letter from Rabbi D. Wolpe, Ex. E, p. 504.  He founded the LA County Sheriff's Clergy Council, which brought together over 4,000 community and faith, leaders throughout Los Angeles in a forum where he spoke monthly for the past ten years "to use the religious community to raise communication and combat crime in LA County." Letter from J. Glass, Ex. E, p. 279.  Mr. Baca, along with the hundreds of opinion leaders in the faith community, helped "steer young men and women from entering gangs, selling drugs or dealing in human trafficking." Letter from B. Adams, Ex. E, pgs. 131-32.  The Council effectively introduced the idea of "faith and justice" to clergy and community leaders such that they could work together with law enforcement.  Letter from K. Coulson, Ex. E, p, 225.

Following the attacks on 9/11, Mr. Baca organized inter-faith services to unite Christians, Muslims and Jews to signal that "we are all God's children, that we are all in this together and that we had to stand united." Letter from Gov. G. Davis, Ex. E, p. 238 (Governor Davis and Mr. Baca attended more than thirty services together to help unite the faiths).  Mr. Baca "brought people together from all different walks of life." Letter from K. McCarthy, Ex. E, p. 366; Letter from A, Friedman, Ex. E, pgs. 271-72 ("he has worked tirelessly throughout the years in inter-faith programs, bringing Christian[s], Jews and Muslims together").  The Clergy Council was highly diverse and "willingly worked together to improve the community." Letter from R. Dowell, Ex. E, pgs. 246-47.

Mr. Baca's "most valuable and unique contribution to the community has been his highly-visible substantive efforts to participate in multiple interfaith and interracial dialogues during the past several decades." Letter from J. Epstein, Ex. E, pgs. 253-54.  "[T]here is unanimity in the recognition that the Sheriff genuinely cared about everyone with whom he came into contact" Letter from B. Melekian, Ex. E, pgs. 369-70; Letter from E. Stein, Ex D, pgs. 469-70 ("He put thousands of

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 31386432.1

12

CR 16-66(A) - PA

volunteer hours to inspire people to come together under the name of peace."). Mr. Baca's valiant efforts toward uniting the community merit consideration.

### e. Mr. Baca Served the Homeless and Less Fortunate

Mr. Baca is a "devoted humanitarian, working relentlessly to help the homeless and less fortunate," Letter from M. Bostic, Ex. E, pgs. 182-83. "He was the first in local law enforcement to develop a plan for the homeless." Letter from S. Whitmore, Ex. E, pgs. 498-99. Under his leadership, the LASD implemented an outreach program offering social services to the homeless. *See* Letter from A. Curry, Ex. E, pgs. 227-33. Mr. Baca developed training programs to improve how law enforcement could improve their treatment of the homeless. Letter of J. Santoro, Ex. E; pgs. 430-31. He created the first homeless summit in Los Angeles and was applauded for his "innovative and groundbreaking efforts to get the homeless into suitable housing and respectable jobs." Letter from S. Whitmore, Ex. E,, pgs. 498-99; Letter from S. Chiang, Ex, D, p. 216 ("Many people called Baca a social worker with a badge.").

"His instinct is to treat a homeless man with compassion and dignity." Letter from H. DeNero, Ex. E; pgs. 240-43 (recounting a story where Mr. Baca put his arm around a homeless man to gracefully direct him from an encounter with local police), Mr. Baca's work towards improving the lives of the homeless in Los Angeles is one more way in which he has shown his "morality and commitment to making a difference in the community." Letter from E. Chiang, Ex. E, p. 215.

### f. Mr. Baca Worked to Ensure Better Lives for Deputy Sheriffs

Mr. Baca's vision of inclusion and betterment for society also extended to the Deputy Sheriffs in LASD. "Lee Baca was absolutely committed to making a difference in the lives of young people everywhere, including young law enforcement officers." Letter from B. Melekian, Ex. E, pgs. 369-70. Mr. Baca worked "to promote a better sense of respect and tolerance for fellow officers

regardless of faith, color, ethnicity or gender." Letter from G. Moss, Ex. E, pgs. 378-79. Mr. Baca instituted the Los Angeles County Sheriff's Department University ("LASDU") to help employees earn college and graduate degrees at lower rates of tuition. LASDU is a consortium of colleges and universities that is designed to "give working adults the highest quality and most convenient, educational experiences." Letter from J. Moriarity, Ex. E, pgs. 374-76. LASDU was part of Mr. Baca's vision for a more "humane law enforcement agency." Letter from R. Weintraub, Ex. E, pgs. 496-97. LASDU has graduated well over one thousand employees with Master's, Bachelor's and Associate's degrees.

"In the 15 years he served as Sheriff, and in all his years as a deputy before that, the events giving rise to the charges in this case are an anomaly, and truly not indicative of his service and career." Letter from C. Trutanich, Ex. E, pgs. 482-83; *see United States v. Takai*, 941 F. 2d 738, 743 (9th Cir. 1991) (the court may consider an "aberrant" act by a defendant). Mr. Baca is "one of the most dedicated and effective leaders Los Angeles County has been fortunate to have." Letter from C. Covitz, Ex. E, p. 226. "He worked to eliminate barriers between his department and the community they are charged with serving." Letter from R. Dowell, Ex. E, pgs. 246-47. "[Sheriff] Baca was an extraordinary public servant and will always be an extraordinary human being." Letter from P. Pietrantoni, Ex. E, pgs. 407-08. "No one will know how many lives were saved because of this wise and genuine man." Letter from M. Khan, Ex. E, pgs. 322-24; Letter from I. Haque, Ex. E, p. 292 ("I know of no one who isn't grateful for the community service rendered by Mr. Baca.").

Mr. Baca humbly appeals to the Court to consider his, "history and characteristics" as exhibited by his years of contributions to the homeless, disenfranchised, youth, inmate population, Deputy Sheriffs and civilian staff "who will always consider him a hero and a man of honor," regardless of the organization's failures. Letter from R. Weintraub, Ex. E, pgs. 496-97. The Court

must balance any criminal actions committed by Mr. Baca against his decades of positive contributions and "his life as a workaholic on behalf of the 10 million people in the County of L.A." Letter of J. Moriarity, Ex. E, pgs. 374-76.  "He deserves to be judged as a 'whole' person, for all of his contributions to the community and to the common good." Letter from R. Hertzberg, Ex, D, pgs. 305-06.  This consideration unquestionably supports a probation sentence.  *See Rioux*, 97 F.3d at 663 (granting downward departure for "extraordinary" prior good works and civil, charitable, and public service).

> 2.    Mr. Baca's Alzheimer's Diagnosis And Related Medical Needs Warrant a Probation Only Sentence

The Court's consideration of an individual's medical needs, age and deteriorating health is implicit in determining the minimally sufficient sentence for a defendant.  *See* 18 U.S.C. § 3553(a)(1); 18 U.S.C. § 3553(a)(2)(D) (the court shall consider the need for the sentence imposed **to provide the defendant with needed "medical care . . . in the most effective manner"**); *United States v. White*, 506 F.3d 635, 644 (8th Cir. 2007) (emphasis added) (the "mandate" to consider a defendant's history and characteristics "includes consideration of a defendant's age and medical condition"); *United States v. Baron*, 914 F. Supp. 660, 662 (D. Mass. 1995) ("At the same time as the guidelines discourage age and infirmity departure, the language of this section invites the district court to give the matter serious consideration.").

Probationary sentences, or home confinement, are appropriate where they "would be equally efficient and less costly than incarceration." *United States v. Maltese*, 1993 WL 222350 at *10 (N.D. Ill. 1993); U.S.S.G. § 5H1.1 ("Age may be a reason to depart downward in a case in which the defendant is elderly and infirm and where a form of punishment . . . might be equally efficient as and less costly than incarceration."); U.S.S.G. § 5H1.4 ("in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than,

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 31386432.1

15

CR 16-66(A) - PA

imprisonment"). Even where the Bureau of Prisons ("BOP") is capable of caring for a defendant, courts consider the burden of the cost of a defendant's "medical care on [] taxpayers" in satisfying the "requirement of providing needed care in the most effective manner." *United States v. Edwards*, 595 F.3d 1004, 1011 (9th Cir. 2010) (affirming sentence below guideline range because, while "Bureau of Prisons was capable of providing" appropriate medical care, probation allowed for the "needed care in the most effective manner").

Further, a court may offer leniency or impose a sentence below the guideline range as a result of "an extraordinary physical impairment." *Rioux*, 97 F.3d at 663. Such conditions include stable conditions that need monitoring, have complications, require blood tests and need prescription medicines. *Id.* (affirming a ten-point downward departure where defendant's kidney disease was stable but he required blood tests, prescription medicines, and had complications as a result of medications); *see* 18 U.S.C. § 3553(a)(1); *United States v. Heldeman*, 402 F.3d 220, 224 (1st Cir. 2005) (remanding for resentencing in light of 72 year old defendant's age and "unstable" medical condition that needed monitoring); *United States v. Hildebrand*, 152 F.3d 756, 767 (8th Cir. 1998), *abrogated on other grounds by Whitfield v. United States*, 543 U.S. 209 (2005) (affirming downward departure of probationary sentence where the district court found life-threatening health conditions through the government argued there was no extraordinary infirmary); *United States v. Marsh*, 820 F. Supp. 2d 320, 387-88 (E.D.N.Y. 2011) (imposing sentence with drastic downward departure for 52 year old defendant with ailments needing prescription medications, in part, because "the defendant's many health problems . . . make it harder for him to serve a prison term").

a. Mr. Baca Suffers From A Progressive, Incurable Disease Which Will Severely Worsen Over Time

Mr. Baca has been diagnosed with Alzheimer's disease and suffers from memory loss and various cognitive deficits, which are continually progressing.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 31386432.1

16

CR 16-66(A) - PA

April 15, 2017 Report of Dr. Helena Chang Chui, M.D. regarding Defendant Leroy Baca, attached as Exhibit A to the Declaration of Nathan J. Hochman In Support of Defendant Leroy Baca's Sentencing Position ("2017 Chui Report, Ex. A"). Dr. Chui, one of the leading Alzheimer's experts in Southern California, with more than 35 years' experience, has been the Chair of the University of Southern California Keck School of Medicine's Department of Neurology for the past 13 years and the Director of the federally funded USC Alzheimer Disease Research Center for the past 10 years. She has seen Mr. Baca since 2015 and reviewed his neuropsychological testing done from May 2014 to March 30, 2017, his CT scans of head in April 2014, his MRI scans of the brain from May 2014 to May 2016, his FDG PET scans from August 2014 to March 31, 2017, and his levels of beta-amyloid, tau and p-tau in the cerebrospinal fluid in 2016. After reviewing all the scientific tests performed, including those recently administered in March 30-31, 2017, Dr. Chui has diagnosed Mr. Baca as follows:

Redacted

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 31386432.1

CR 16-66(A) - PA

Redacted

*Id.* Dr. Chui notes that in contrast to people with just mild cognitive impairment, individuals with dementia become "disoriented to date and time, cannot remember new information, cannot remember people's names, and have difficulty learning new routines and solving problems.  They depend on others to help with instrumental activities of daily living."  *Id.*  As the disease progresses, individuals with dementia are more likely to become "anxious, depressed, paranoid, irritable, emotionally labile, argumentative and sometimes aggressive.  Eventually, as dementia progresses, persons become disoriented to time and place, and have increasing difficulty reasoning and performing personal activities of daily living, such as dressing, toileting, and eating."  *Id*.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 31386432.1

18

CR 16-66(A) - PA

Dr. Douglas Galasko, a Board Certified Neurologist, also reviewed Mr. Baca's medical records. Dr. Galasko has served as the Director of the UCSD Alzheimer's Disease Research Center and has conducted clinical Alzheimer's research for over 25 years. Upon review of Mr. Baca's medical records and diagnostic testing, Dr. Galasko concluded that Mr. Baca's "degree of impairment is sufficient . . . to warrant a diagnosis at this time of mild dementia." April 17, 2017 Report of Dr. Douglas Galasko regarding Defendant Leroy Baca, attached as Exhibit C to the Declaration of Nathan J. Hochman In Support of Defendant Leroy Baca's Sentencing Position. ( "Galasko Report, Ex. C"). Dr. Galasko has diagnosed Mr. Baca as follows:

Redacted

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 31386432.1

19

CR 16-66(A) - PA

Redacted

"The symptoms of Alzheimer's worsen over time, although the rate at which the disease progresses varies" depending on the individual.  Stages of Alzheimer's, alz.org, http://www.alz.org/alzheimers_disease_stages_of_alzheimers.asp (last visited April 18, 2017).  The average life span of an individual suffering from Alzheimer's disease is four to eight years after diagnosis. *Id*.   Redacted

2017 Chui Report, Ex. A.  The Department of Justice specifically contemplates sentence reductions and compassionate release for defendants suffering from Alzheimer's disease. *See* Bureau of Prisons Program

Statement No. 5050.49, CN-1, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582(c)(1)(A) and 4205(g), at 3 (March 25, 2015), available at https://www.bop.gov/policy/progstat/5050_049_CN-1.pdf  (The BOP's review of requests based on medical circumstances should include "any cognitive deficits of the inmate, [including] . . . Alzheimer's disease").  The BOP guidance reflects the serious effects that incarceration may have on individuals with impairments resulting from Alzheimer's disease.  *See Baron*, 914 F. Supp. at 665 (granting an 8 level downward departure where defendant would risk rapid deterioration in a prison setting due to his medical condition).  Mr. Baca respectfully requests that the Court consider his medical condition in imposing a sentence that provides for his medical needs and care "in the most effective manner." 18 U.S.C. § 3553(a)(2)(D).

b.      Mr. Baca is Unlikely to Receive Medically Appropriate Prescription Medications and Treatments in Prison

Mr. Baca is unlikely to receive "medically appropriate" care in prison.  Declaration of Phillip S. Wise, Assistant Director (Retired), Federal Bureau of Prisons, attached as Exhibit D to the Declaration of Nathan J. Hochman In Support of Defendant Leroy Baca's Sentencing Position. ("Wise Decl., Ex. D") ¶ 7 ("some activities used by therapists to maintain cognitive functioning . . . may be viewed as medically appropriate, but not medically necessary; and thereby denied").  The BOP seeks to approve "medically necessary" care; however, care that is deemed "medically acceptable" and is not a life-saving measure is "far less likely to be approved." *Id* at Attachment 2, p. 19.  The "limited scope of care [available through the BOP] applies to medications, as well as evaluations and interventions, and represents a more limited scope than is available to him in the community." Wise Decl., Ex. D ¶ 7.                Redacted

July 15, 2016

Report of Dr. Helena Chang Chui, M.D. regarding Defendant Leroy Baca, attached

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 31386432.1

CR 16-66(A) - PA

as Exhibit B to the Declaration of Nathan J. Hochman In Support of Defendant Leroy Baca's Sentencing Position ("2016 Chui Report, Ex. B").  The constraints of care in prison, however, have the potential to increase the progression of his disease. *Id*.

Redacted

Chui Report, Ex. A. However, "[n]one of the five medications approved by the FDA for the treatment of Alzheimer's Disease are available through the BOP national formulary." Wise Decl., Ex. D ¶ 7.  Mr. Baca would need to request authorization for a non-formulary prescription approval though the BOP Medical Director, which may not authorize the continuation of his prescription medications if they are deemed merely "medically acceptable" treatments.  *Id*. at ¶ 10. Similarly, Mr. Baca is unlikely to have access to treatments and activities used by therapists to maintain cognitive functioning that are not considered "medically necessary" or lifesaving. *Id*. at ¶7.                     Redacted

Galasko Report, Ex. C.              Redacted

*Id.*

Redacted

Even in a chronic care facility, it is highly unlikely that Mr. Baca would meet the exercise or activity goals

associated with a treatment plan that could minimize the effects of Alzheimer's disease.  Wise Decl., Ex. D ¶ 16.

Mr. Baca is eligible for a clinical study for a new medication at the USC Alzheimer's Disease Research Center, of which Dr. Chui is the Director.  2016 Chui Report, Ex. B ( Redacted ).  T Redacted

*Id*.  Mr. Baca hopes to have the opportunity to participate in this study that could change the course of this currently incurable disease.  A prison sentence, however, all but forecloses that opportunity.  Wise Decl., Ex. D ¶ 9 ("participation in such studies is rarely allowed").

At best, a prison sentence would place Mr. Baca in grave danger of not receiving the medically appropriate care for his disease.  *Id*.  At worst, medically, a prison sentence hastens his deterioration of cognitive deficits and dementia associated with Alzheimer's disease and prevents him from receiving medication that could change the course of his progression.  2017 Chui Report, Ex. A.  Any society "would deride a legal system that imposed a sentence that threatened the life of the defendant unnecessarily." *United States v. Coughlin*, 2008 WL 313099 at *4 (W.D. Ark. 2008).  In this case, a sentence of imprisonment is essentially a cognitive death sentence given the progression of Mr. Baca's Alzheimer's disease.

c.     Mr. Baca Would Not Receive the Care and Monitoring in Prison That He Receives at Home

Mr. Baca is assisted and monitored by his devoted family, including daily assistance from his wife, Carol Baca ("Mrs. Baca").  Letter from C. Baca, Ex. E, pgs. 147-61.  Mrs. Baca is able to reach out to medical specialists when necessary, seek medications, and closely monitor the progression of Mr. Baca's symptoms.  *Id*. It was Mrs. Baca who first recognized Mr. Baca's memory loss and sought medical attention for him as a result.  *Id*.  She notes changes in his behavior and arranges for medical evaluations by specialists when needed.  *Id*.  In prison, significant changes

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 31386432.1

23

CR 16-66(A) - PA

and behavior may only be noted "by staff with periodic interaction or with medical staff who may evaluate him on a frequency as low as once per year." Wise Decl., Ex. D ¶ 8.

The BOP typically has medical specialists available, however, "individual access to those clinicians is limited by an administrative policy that requires multiple levels of review." *Id.* Access to clinicians continues to decline because BOP practices have recently reduced the number of inmates who have access to medical specialists. *Id.*                                Redacted

                                                                                    Mrs. Baca often makes the appointments when necessary and assists in his day-to-day treatments. Letter from C. Baca, Ex. E, pgs. 147-61.

Mr. Baca's medical condition needs constant monitoring.  Redacted

A prison setting simply cannot offer the monitoring and assistance necessary to provide the most "effective" medical care for Mr. Baca's Alzheimer's disease. *See Heldeman*, 402 F.3d at 224 (remanding for resentencing in light of 72 year old defendant's age and "unstable" medical condition that needed monitoring); *Edwards*, 595 F.3d at 1011 (considering the burden of "medical care on [] taxpayers" in satisfying the "requirement of providing needed care in the most effective manner").

> d.    Mr. Baca Would Have a Difficult Time Adapting to a Prison Setting Due to his Cognitive Impairments

Mr. Baca would have a difficult time adapting to prison because prison is "highly structured with a great many rules" that are not intuitive and are rigidly enforced. Wise Decl., Ex. D¶ 6. Inmates must quickly learn the rules and abide by them as there is "little tolerance" for those who fall outside of the structure. *Id.*

Redacted

2017

Chui. Report, Ex. A.  Mr. Baca is also likely to be lost in a prison setting because housing areas and cubicles are all very similar, and "for an individual with memory impairment, finding his cubicle can be challenging."  Wise Decl., Ex. D ¶ 6.  His "wander[ing] into living areas" of other inmates could put him "at risk of injury" from other inmates.  *Id*.  He is also likely to be subject to a multitude of institutional remands as a result of his losses, none of which would facilitate him learning the rules, and may lead to frustration and increased stress accelerating his cognitive and mental decline. *Id.*.                    Redacted

2017 Chui Report, Ex. A.

The difficulty Mr. Baca would suffer in adapting to prison, along with his need for medications, care and monitoring, renders incarceration a "greater burden on the federal prison system, and incarceration a greater burden on the defendant." *Simon v. United States*, 361 F. Supp. 2d 35, 42-43 (E.D.N.Y. 2005).

      e.      The Stress of Prison Could Exacerbate Mr. Baca's Medical Condition

Redacted

Even common "stressors" inherent in a prison setting may exacerbate Mr. Baca's symptoms associated with Alzheimer's disease. *Id*.; Wise Decl., Ex: D ¶ 14.  Risks to Mr. Baca's condition include inactivity, poor nutrition, sleep disturbance, and a lack of social interaction.  *Id.*.  "[N]oise is incessant," the lights are constantly on and overcrowding often leads to multiple persons (strangers) in a cubicle leaving little space for the inmates.  Wise Decl., Ex. D at Attachment 3.  Moreover, social interaction is limited, particularly for older inmates that may be at risk in a general population.  *Id*.

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 31386432.1

25

CR 16-66(A) - PA

The prevalent problems related to older inmates in prison, regardless of their medical condition, "accelerate their aging processes to an average of 11.5 years older than their chronological ages after age 50." B. Jaye Anno et al., U.S. Dep't of Justice, *Correctional Health Care: Addressing the Needs of Elderly, Chronically ill, and Terminally Ill Inmates* at pg. 9 (2004). Limited social interaction, lack of sleep and overcrowding in living quarters could only serve to exacerbate Mr. Baca's symptoms of confusion, memory loss and dementia. *Id.* ("Ordinary cognitive impairments of age aside, decreased sensory acuity, muscle mass loss, intolerance of adverse environmental conditions, dietary intolerance, and general vulnerability precipitate collateral emotional and mental health problems.").

Redacted

Galasko Report, Ex. C.

Mr. Baca should not be sentenced to a quick deterioration of his condition in prison when an alternative sentence is available that provides him with the means to receive medical care in "the most effective manner." *See Coughlin*, 2008 WL 313099 at *4 (imposing a probationary sentence where defendant's condition was "progressive and likely to deteriorate" in prison). The BOP "would be unable to adequately meet [Mr. Baca's] medical needs," and imprisonment poses a threat to shortening his life. *United States v. Martin*, 363 F.3d 25, 49 (1st Cir. 2004) ("A court may find such an extraordinary impairment when imprisonment would threaten or shorten a defendant's life or when the Bureau of Prisons would be unable to adequately meet the defendant's medical needs."). On this basis, the Court should impose a probationary sentence.

3.     Mr. Baca's Age and Infirmity Render Him Vulnerable to Victimization, Abuse, and Adjustment Problems in Prison and Make Prison an Inappropriate and Unduly Harsh Punishment

"If incarcerated, Mr. Baca will be at increased risk for assault, abuse, threats, and intimidation in a general population setting." Wise Decl., Ex. D ¶ 11. Not only is he an older adult suffering from Alzheimer's disease, but he is also the former Sheriff of the largest Sheriff's Department in the United States. The risk of victimization to a seventy-four year old man with Alzheimer's disease is high, however, when that risk is coupled with the vulnerability associated with being a well-known law enforcement officer in prison the results can be devastating and deserve the utmost consideration. *Id.* ("Three factors that increase his vulnerability include his former long-term occupation in law enforcement as the Sheriff of a major jurisdiction, his advanced age, and his memory deficits.").

a.     Mr. Baca is Vulnerable to Victimization as an Older Adult with Alzheimer's Disease

Age and "physical impairment that results in extreme vulnerability" is a legitimate basis to forego a prison sentence. *United States v. Long*, 977 F.2d 1264, 1278 (8th Cir. 1992). A court should consider personal characteristics of a defendant, which make "him particularly vulnerable to in-prison victimization" because assaults against vulnerable prisoners "make prison life especially dangerous for such individuals." *United States v. Lara*, 905 F.2d 599, 605 (2d Cir. 1990) (affirming significant downward departure because defendant had a "particular vulnerability due to his immature appearance, sexual orientation and fragility"). "               Redacted

                                                 2017 Chui Report, Ex. A.                Redacted

2016 Chui Report, Ex. B. They are "easy prey" for abuse. *See Human Rights Watch, Old Behind Bars: The Aging Prison Population in the United States*, at 59 (Jan. 2012), available at

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

CR 16-66(A) - PA

DB2/ 31386432.1

https://www.hrw.org/sites/default/files/reports/usprisons0112webwcover_0_0.pdf (the aging population face a high "vulnerability to abuse and predation" in prison); *see* B. Jaye Anno et al.., U.S. Dep't of Justice, *Correctional Health Care: Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates* at pg. 10 (2004).

Mr. Baca has a "particular vulnerability" to assault as a result of his age and health — and former career — that would "make prison life especially dangerous." *See Lara*, 905 F.2d at 605; *Long*, 977 F.2d at 1278 (relying on doctor's reports stating that defendant would be vulnerable to victimization in prison to impose a sentence that excluded prison time); 2017 Chui Report, Ex. A.    Redacted

2017 Chui Report, Ex. A; *see* Human Rights Watch, *Old Behind Bars: The Aging Prison Population in the United States*, at 59 (Jan. 2012), available at https://www.hrw.org/sites/default/files/reports/usprisons0112webwcover_0_0.pdf. Mr. Baca's "particular vulnerabilities" for victimization may surface through something as simple as inadvertently wondering into the living area of another prisoner because he cannot recognize his own living area.  Wise Decl., Ex. D ¶ 6. Thus, in prison, Mr. Baca is extraordinarily vulnerable at every turn.

> b.    Mr. Baca is Vulnerable to Victimization as a Well-Known Law Enforcement Officer "Embroiled" in a High-Profile Scandal

Mr. Baca's well-known history and career is yet another, and perhaps an even more severe, "particular vulnerability" for victimization in prison, making prison life "especially dangerous." *Lara*, 905 F. 2d at 605.  Mr. Baca was the Sheriff of Los Angeles County – the largest metropolitan Sheriff's Department in the country – for sixteen years.  During that time he reinvented prison education, united races and religions, reduced the crime rate in Los Angeles, and implemented successful youth programs.  He was also enmeshed in high-profile, widely-

publicized prison abuse scandals, regardless of his involvement in the events leading to the scandals.  Mr. Baca is highly vulnerable to prison abuse "because of the very public nature of his work." Wise Decl., Ex. D ¶ 11 ("Mr. Baca's vulnerability is increased over that of a member of his staff').

Over the last decade, news coverage about police brutality scandals plaguing the LASD has been widespread in all forms of media –TV, radio, print, and social media.  There have been multiple convictions of former deputies in cases "Related" to those scandals, including the resulting charges and convictions for deputies' obstruction of the FBI investigation.  The cases have been covered by countless news outlets, including ABC News, CNN, Fox, LA Times, Daily News, Washington Post, and KTLA.  People, including convicted criminals in federal prison, are familiar with Mr. Baca and the allegations relating to the LASD.

In *Koon v. United States*, 518 U.S. 81 (1996), the Supreme Court affirmed a decision basing a downward departure on the defendant police officers' high susceptibility to abuse in prison.  The police officers were convicted of abusing a suspect (Rodney King) during an arrest.  *Id*.  The Court found that "[t]he extraordinary notoriety and national media coverage of [the] case, coupled with the defendants' status as police officers, make [the defendants] unusually susceptible to prison abuse (citations omitted)."  *Id*. at 111-12.  The Court recognized that the defendants were extremely vulnerable to prison abuse because of the "widespread publicity and emotional outrage . . . surround[ing] [the] case from the outset." *Id* at 112 (citations omitted).  Defendants were "particularly likely to be targets of abuse during their incarceration" and a reduced sentence was warranted as a result.  *Id*.

Following *Koon*, the court in *United States v. Lavallee*, 439 F. 3d 670 (10th Cir. 2006) granted a downward departure for police officers convicted in a large-scale investigation into a conspiracy to abuse inmates because of their "susceptibility to abuse in prison."  *Id.* at 678.  Defendants were former prison guards convicted of depriving inmates of their constitutional rights through beatings

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 31386432.1

29

CR 16-66(A) - PA

and assaults.  The Court found that a downward departure was warranted because the case "was part of a vast investigation, spanning several years, [] involv[ing] not only the abuse of inmates by correctional officers but also the conspiracy to abuse inmates," which was well-known among inmates.  *Id*. at 708.

Like the defendants in *Koon*, Mr. Baca is also "unusually susceptible to prison abuse" as a result of the "extraordinary notoriety and the national media coverage" of his case and the "Related cases" involving the LASD.  *See Koon*, 518 U.S. at 111.  He "was part of a vast investigation, spanning several years, [] involv[ing] not only the abuse of inmates by correctional officers but also the conspiracy to abuse inmates" causing "emotional outrage" and notoriety, which make him susceptible to abuse in prison.  *Id*.; *Lavallee*, 439 F.3d at 78.  This "particular vulnerability" stemming directly from his former career, the widespread notoriety of his case and the "Related Cases" make prison "especially dangerous." *Lara*, 905 F.2d at 605.  When this particular vulnerability is coupled with the vulnerabilities inherent in his age and symptoms of his illness, "incarceration simply makes no sense." *Baron*, 914 F. Supp. at 665 ("Some offenders would be destroyed by a term in prison.") (citations omitted).

4.      Mr. Baca's Age and Medical Condition Warrants a Lower Sentence

The guidelines specifically authorize downward departures based on age. *See* USSG § 5H1.1 ("Age may be a reason to depart downward in a case in which the defendant is elderly and infirm and where a form of punishment such as home confinement might be equally efficient and less costly than incarceration."); *see also, e.g., United States v. Chase*, 560 F.3d 828 (8th Cir. 2009) (defendant's advanced age, health, and employment history could support downward variance even if it did not support formal departure); *Hildebrand*, 152 F.3d 756 (affirming downward departure for 70-year-old defendant with health conditions from range of 51-63 months to probation with six months of home confinement), *abrogated on*

*other grounds, Whitfield v. United States*, 543 U.S. 209 (2005); *United States v. Seiber*, 2005 WL 1801614, at *4 (E.D. Tenn. 2005) (probation imposed in case involving advisory guidelines of 97-121 months for 69-year-old defendant in poor health); *United States v. Willis*, 322 F. Supp. 2d 76 (D. Mass. 2004) (downward departure from a level 17 to a level 10 and a sentence of probation with six months home confinement warranted for defendant due to his age of 69 years and various physical ailments); *Baron*, 914 F. Supp. at 662-665 (granting downward departure from range of 27-33 months to probation and home detention for a 76-year-old defendant with medical problems that could be made worse by incarceration).

Research shows a remarkable distinction between inmates who age within a prison system and those who are new elderly offenders. "[N]ew elderly offenders' initial reaction to incarceration later in life was often characterized by family conflict, depression, thoughts of suicide, and a fear of dying in prison." Ronald H. Aday, *Aging in Prison: A Case Study of New Elderly Offenders, International Journal of Offender Therapy and Comparative Criminology*, Spring 1994, Vol. 38, No. 1. Similarly, the Department of Justice has found that "[m]anagement problems with elderly inmates . . . are intensified in the prison setting and include: vulnerability to abuse and predation, difficulty in establishing social relationships with younger inmates, [and] need for special physical accommodations in a relatively inflexible physical environment." Correctional Health Care, *Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates*, U.S. Dept. of Justice National Institute of Corrections at 9-10 (2004). This report notes that first time offenders are "easy prey for more experienced predatory inmates" and that this is particularly true for the elderly. *Id.* at 10. "Elderly" is defined throughout the report as age 50 or older; clearly, the vulnerabilities of a 74-year-old would be significantly higher.

By policy, the BOP provides all medically necessary care, but medically appropriate care that may improve quality of life but is not considered by BOP to be

"necessary" is provided only if approved by a committee based on factors including the availability of resources. U.S. Dept. of Justice, Federal Bureau of Prisons, *Program Statement 6031.03* at 5-6 (Aug. 23, 2012). Older persons in frail health and those with mental health problems face special challenges in a prison environment. The mortality rates for an elderly inmate who is incarcerated for the first time are markedly high. The United States Department of Justice, Office of Justice Programs, Bureau of Justice Statistics conducted research relating to medical causes of death in state prisons from 2001 to 2004. This research paints a dismal picture of the mortality rate for an elderly inmate, especially one who enters the prison environment at an advanced age versus an inmate who is incarcerated at a younger age and ages within the prison environment. "Mortality rates rose dramatically with age. The death rate of inmates age 55 and older (1973 per 100,000) was over 3 times higher than that of inmates age 45-54 (566 per 100,000), and 11 times higher than those age 35-44 (177 per 100,000). Inmates age 45 or older comprise 14% of State prisoners from 2001 to 2004, but accounted for 67% of all inmate deaths over the same period." Christopher J. Mumola, *Medical Causes of Death in State Prisons, 2001-2004*, U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, Data Brief NCJ216340 at 2 (Jan. 2007). "Among older inmates, the mortality rate of those age 65 or older was particularly high. Though these elderly inmates made up 1% of prisoners, they accounted for 15% of prisoners deaths. The mortality rate of elderly prisoners was nearly 3 times higher than that of inmates age 55-64. . . . A majority (59%) of the elderly State prisoners who died during this period were 55 or older when admitted, and 85% were at least 45 years old at time of admission." *Id.*

Moreover, imprisonment is likely to severely diminish Mr. Baca's remaining physical life expectancy and will certainly destroy his cognitive life expectancy. "Research points to a trend of 'accelerated aging' in prison, *i.e.*, that a prisoner's physiological age is, on average, seven to 10 years older than his or her

chronological age." Mike Mitka, *Aging Prisoners Stressing the Health Care System*, Vol. 292, No. 4, Journal of the American Medical Association (July 2004). "International studies point to an acceleration of biological age for prisoners, with prisoners having a physical age approximately ten years older than their community counterparts." National Health Committee (New Zealand), Review of Research On The Effects of Imprisonment on the Health of Inmates and their Families. In Mr. Baca's case, the effect of age acceleration would make his physiological age between 81 and 84 years old.

In light of these factors and Mr. Baca's advanced age and medical condition, imprisonment is an inappropriate and unduly harsh punishment, and a departure and/or variance from the guideline range is warranted.

### 5.    Mr. Baca Should Remain in His Family's Care

As a result of Mr. Baca's increased vulnerability in prison, the "BOP will likely take steps to address that vulnerability, including placing him in a facility substantially distant from his home." Wise Decl., Ex. D ¶ 11. He would likely be placed in administrative detention to assess "the level of threat he may encounter," and then moved to various facilities throughout a prison sentence as his identity becomes known to the general population. *Id.* While these measures would be implemented to help protect him from victimization, they would serve to tear him away from contact with his family and support network at a time when he needs them most. *Id.*

A sentence which takes him from his family makes re-acclamation to their care at home more difficult following a prison sentence. If placed in custody, Mr. Baca would be returned to his family's care with increased cognitive deficits making any adjustment back to their care difficult, if not impossible, as compared to leaving him in his family's care during a period of probation. Mr. Baca's need for palliative care following his sentence, a burden his family is willing to shoulder, supports the imposition of a probationary sentence. Leaving him in his family's

care allows him to receive the "most effective" care for his serious illness, both during the sentence and after it.

Custodial time would also cruelly diminish the precious time he has left with his family. Mr. Baca has been a "great provider and protector" for his family. Letter of D. Baca, Ex. E, p. 162. He is a devoted husband, the father of adult twins, the step-father of two adult children and the grandfather of four. Mr. Baca assists in college tuition payments for his older grandson and will assist in payments for the: other grandchildren to attend college as well. "[H]e is upright and good and an aspirational example for a son." *Id*. His stepchildren laud his integrity as a husband to their mother; kindness to them, and dedication to his community. Letter of B. Chiang, Ex. E, pgs. 213-14 ("he has always been very generous and kind to not only me, but everyone I've seen him interact with"); Letter of E. Chiang, Ex. E, p. 215 ("Lee Baca has shown integrity as a husband to my mother; as a stepfather to me and my brother, as a mentor to today's youth, and as a Los Angeles County Sheriff'). He is even close to his ex-wife to whom he was married for thirty years. Letter of J. Baca, Ex. E, p. 163 ("I am proud we are good friends and as a family we love him.").

No one is more devoted to Mr. Baca than his wife. She is grateful for his support, love and generosity – "Lee always give[s], he doesn't like to take." Letter of C. Baca, Ex. E, pgs. 147-61. She has served as a constant aid to him through his memory loss and medical issues over the last few years, and she remains willing to dedicate her life to his care. *Id*. She is distraught by his diagnosis of Alzheimer's, and her biggest worry is that she will not be able to care for him. *Id*. ("I am stressed out arid worried constantly that I might get sick too. Then, who could take care of this great man?"). She only hopes that he will be permitted to stay with her so that she can keep him in her care to ensure that he continues to get all medically appropriate treatments available. As she expresses, "the more I know him, the more I love him and can't live without him." *Id*.

Mr. Baca requests to be placed on probation where he can be properly cared for in the loving environment that he has spent a lifetime building.  Mr. Baca sincerely appreciates the Court's consideration of his commitment to his family, and the commitment his family is now willing to make for his care.

### 6.    Mr. Baca Poses No Threat of Recidivism

Mr. Baca spent the entirety of his career attempting to reduce recidivism in Los Angeles County.  The Court now must consider the risk of him engaging in future criminal conduct.  *See* 18 U.S.C. § 3553(a)(2)(B-C) (factoring in need for "adequate deterrence to criminal conduct" and public protection from further crimes by the defendant).  The Court's sentencing consideration should "ensure that prison resources are, first and foremost, reserved for those violent and serious criminal offenders who pose the most dangerous threat to society."  Pub. L. No. 98-473, §239, 98 Stat. 1987, 3039 (1984) (note to 18 U.S.C. § 3551).  Mr. Baca falls in a class of individuals unlikely to offend again even without consideration for his unique history of public safety and law enforcement.  *See United States v. Ruiz*, No. 04-CR-1146-03-RWS, 2006 WL 1311982, at *4 (S.D.N.Y. May 10, 2006) (discussing that defendants over the age of forty "exhibit markedly lower rates of recidivism in comparison to younger defendants"); *see also* David Weisburd, et al., *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology 587 (1995) (finding that prison and probation sentences have the same deterrent effect for white collar offenders).

Mr. Baca's crime is an "aberration" in an otherwise extraordinary life of community service and integrity; which the Court may consider in determining the "reasonableness of his sentence."  *United States v. Hernandez*, 302 F. Appx. 699, 700 (9th Cir. 2008); *see* Letter from C. Quincey, Ex. E, pgs. 412-14 ("[Mr. Baca] helped me realize it's not what we do occasionally that makes us who we are: it's what we do consistently.").  Mr. Baca's life has been unquestionably dedicated to the protection of society and the prevention of crime.  *See Autery*, 555 F.3d at 874

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 31386432.1

35

CR 16-66(A) - PA

(relying on various attributes that "increase[] the likelihood that [the defendant] can again become a productive non-threatening member of free society, thus making more severe punishment less appropriate").  Although he no longer serves in a position that permits him to directly reduce crime in the community, his commitment to doing so is no less.

Mr. Baca has a demonstrated record of rehabilitating those that have committed crimes and now he must work to rehabilitate himself.  One thing is certain in this rehabilitation — his life's work, character, failing health and advanced age foreclose any possible need to incarcerate him to reduce the risk that he will offend again.  Mr. Baca poses absolutely no "threat to society" and society is better served with him actively engaged within it in any way possible.  Pub. L. No. 98-473, §239, 98 Stat. 1987, 3039 (1984) (note to 18 U.S.C. § 3551).

### B.   Nature and Circumstances of the Offense

Mr. Baca was convicted of conspiring to obstruct justice, endeavoring to obstruct justice, and making a false statement related to such obstruction.  While, by virtue of his position, the "buck" ultimately stopped with Mr. Baca as the acting Sheriff at the time the obstructive acts took place, the evidence at trial, though enough to convict Mr. Baca, showed that Mr. Baca had a more peripheral role in the obstructive acts than his co-conspirators—particularly Undersheriff Tanaka.  Presentence Investigation Report (Revised) Dkt. No. 353 ("PSR") ¶ 90.  Though much of the focus of the Government's case was on proving that Mr. Baca either approved of or acquiesced in the obstructive acts, there was little evidence presented that Mr. Baca actually directed any of his co-conspirators to carry out any of the acts and there was no evidence that Mr. Baca carried out any of the obstructive acts himself.  Indeed, the Government argued that Mr. Baca "issued orders that, taken literally, may not have been corrupt, but were carried out in an obstructive manner by his subordinates and without his objection."  Government's Position re: Sentencing of Defendant Leroy Baca, dated June 20, 2016, Dkt. No. 32

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 31386432.1

36

CR 16-66(A) - PA

("2016 Gov't. Baca Sent. Position") at 1:8-10.

From the very beginning, there was a stark contrast between the attitude of Mr. Baca about the FBI's investigation and that of his co-conspirators. At the August 19 and 20, 2011 meetings where the co-conspirators were originally briefed about the FBI's introduction of the cell phone into the jail, Mr. Baca's statements that "he wanted the Sheriff's Department to investigate how the phone was brought into the jail and to keep the inmate secure in its custody" were in stark contrast to the "F the FBI" statements made by Undersheriff Mr. Tanaka.

When the FBI interviewed Mr. Brown on August 23, 2011, Mr. Tanaka again responded to such news with what Mr. Thompson described as a "butt chewing" full of profanity directed at Mr. Thompson and the FBI. Contrarily, "according to Thompson, defendant Baca showed understanding and was not upset. Baca's measured tone was in sharp contrast to Tanaka's reaction to learning the same news just minutes earlier." 2016 Gov't. Baca Sent. Position at 3:25-27.

Additionally, while the Government presented evidence at trial that Deputy Manzo and Sergeant Thompson created a policy to keep the FBI out of the County jails absent approval from Mr. Tanaka, and argued that this policy was the product of Mr. Baca's orders at the August 20, 2011 meeting to isolate and protect Mr. Brown, the evidence showed that Mr. Tanaka took a significantly greater role in directing and dictating this policy. Indeed, as the Government has acknowledged, "Tanaka had Thompson change the policy to remove his[Tanaka's] name from it" and "the investigation has revealed no documents or witnesses connecting this policy to defendant Baca." 2016 Gov't. Baca Sent. Position at 4:5-7.

Further, while much of the Government's case was focused on the issuance of a federal writ for Mr. Brown and the movement of Brown and related name changes to keep Brown from being writted out to the grand jury, little to no evidence was presented that demonstrated that Mr. Baca was aware of the obstructive effect of this conduct. The Government's pre-trial statement that

"despite the extensive investigation and multiple trials, the evidence has not revealed whether defendant Baca was aware of the Sheriff's Department movement of Brown, his name changes, or the federal writ" continues to hold true. 2016 Gov't. Baca Sent. Position at 5:18-21. While evidence was presented that Tom Carey informed Mr. Baca that he wanted to move Mr. Brown and change his name "for his safety," Mr. Carey also testified that Mr. Baca was not aware that Mr. Brown was not going to be Livescan fingerprinted—the key feature that made moving Mr. Brown and changing his name obstructive, and distinguished this instance from the fairly routine procedure of moving a high profile inmate and changing his name for his safety.

Additionally, while evidence was presented that on August 30, 2011 Lieutenant Leavins, Sergeant Craig, Sergeant Long, and Mr. Tanaka went to Men's Central Jail and engaged in witness tampering while interviewing Gilbert Michel and William David Courson, no evidence was presented that Mr. Baca was aware of any of this witness tampering. *See* 2016 Gov't. Baca Sent. Position at 6:5-20 ("The extensive investigation and multiple trials have revealed no evidence that suggests defendant Baca was ever aware of this witness tampering.").

Next, while evidence was presented that on September 8, 2011, Sergeant Craig "sought a Superior Court order that purportedly would have compelled the FBI to turn over its records related to the FBI's investigation of the Sheriff's Department," which was ultimately denied, no evidence was presented that Mr. Baca directed or even knew of this failed attempt to obtain the court order. *See* 2016 Gov't. Baca Sent. Position at 6:23-7:7. ("The investigation has revealed no evidence that defendant Baca was aware of the failed attempt to obtain this court order. Indeed, Baca was on his way out of the country when this occurred. He would not return to work for two weeks."). In fact, as pointed out by the Government, Mr. Baca was out of the country during this time and for close to two weeks of the 6 week period he was charged with obstructing justice. *Id.* This can

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 31386432.1

38

CR 16-66(A) - PA

be contrasted with the evidence presented as to Mr. Tanaka that: "Tanaka's aide asked Leavins, 'After the document gets signed . . . , would you please make a copy for Mr. Tanaka?' Leavins responded, 'You got it.'" 2016 Gov't. Baca Sent. Position at 6:26-28.

Finally, the evidence presented regarding the approach and threatened arrest of FBI Special Agent Leah Marx by Sergeant Craig and Sergeant Long on September 26th, 2011, one of the key obstructive acts, further demonstrates that Mr. Baca's role in the alleged obstruction was peripheral. While evidence was presented that Lieutenant Leavins, Captain Carey, and Undersheriff Tanaka met with Mr. Baca to inform him that ICIB wished to approach Agent Marx to "interview" her, there was no evidence that Mr. Baca directed or approved of Sergeant Craig's threat to arrest or charge Agent Marx. In fact, Captain Carey testified that threatening or charging Agent Marx was never discussed at the meeting with Mr. Baca and that Mr. Baca directed him not to put handcuffs on her. Further, directly following the threatened arrest of Agent Marx by Scott Craig, then U.S. Attorney Andre Birotte Jr. called Mr. Baca to ask whether or not Agent Marx was going to be arrested. As the Government noted before, Mr. Baca "provided his personal assurance that Special Agent Marx would not be arrested." 2016 Gov't. Baca Sent. Position at 8:23-24. The following day, Mr. Baca met with U.S. Attorney Birotte and FBI Assistant Direct in Charge Steve Martinez to clear the air, and after this meeting, the period of obstruction ended and cooperation proceeded.

In the second trial, the Government argued that Mr. Baca endeavored to obstruct justice in two primary ways: hiding Mr. Brown and intimidating the FBI. While endeavoring to commit such a crime is sufficient to be guilty of it, the reality is that Mr. Baca never caused actual obstruction of the FBI investigation in either respect. As to first alleged obstructive act of hiding Mr. Brown, no actual obstruction of the FBI's grand jury investigation actually occurred since the FBI case agents never sought to speak with Mr. Brown from the time they left him on

August 23, 2011 to the time he was released to state custody on September 12, 2011.  They never knew during that time that Mr. Brown had his named changed several times and was moved around and out of the Men's Central Jail without being LiveScanned and never knew there was a new policy in place requiring Mr. Tanaka's approval before they could interview Mr. Brown or before he would be turned over in connection with a federal writ.  By the time an official request was made to interview Mr. Brown on approximately September 9, 2011 (after Mr. Baca was overseas), he was soon thereafter released to state custody on September 12, 2011 where Agent Marx could interview him.  On September 15, 2011, well before the end of the alleged period of obstruction, Agent Marx did indeed interview Mr. Brown in state custody.  By the end of that interview, he was again in full cooperation mode with the FBI, providing them with all the information about his time in LASD custody and readily available to be presented to the grand jury. Thus, any alleged obstructive acts in "hiding Mr. Brown" did not result in any actual obstruction of the FBI's grand jury investigation.

Similarly, the only act taken by the LASD to intimidate the FBI of which the FBI was aware at the time was the one-minute encounter between Sgts. Craig and Long and Agent Marx on September 26th at 5:31 p.m. in which Sgts. Craig and Long threatened to arrest and charge Agent Marx -- without Mr. Baca's authorization or knowledge.[1]  By 8:00 p.m. that night, however, Mr. Baca had given U.S. Attorney Birotte his unqualified assurance that Agent Marx would not be arrested or charged with a crime.  Mr. Baca met with ADIC Martinez and U.S. Attorney Birotte the next day and by the end of that meeting had cleared the air and

[1] Agent Marx never knew that Sgt. Craig had left her a voicemail message threatening her arrest (since he left it on the wrong number) nor did Agent Marx know that LASD had been surveilling her (which was done covertly) or that LASD had sought a court order for the FBI files (which was turned down).  Since she did not know of any of these actions, they manifestly could not have intimidated her or anyone at the FBI.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 31386432.1

40                                    CR 16-66(A) - PA

pledged his cooperation with the federal investigation.  Within weeks, outside counsel was brought in to supervise the grand jury document production and witness testimony.  The fact that Agent Marx or her fellow agents chose not to come back into the jails to interview inmates for a number of months is a choice they had the right to make but it was not caused by any actions of Mr. Baca; indeed, his actions provided explicit assurances that nothing untoward would occur to the agents, removing any apprehension that they might have had from the one-minute Craig/Long/Marx encounter.

Accordingly, while the Court may find that Mr. Baca was involved, as the Government stated, in the endeavor to obstruct justice by hiding Mr. Brown and intimidating the FBI, the evidence does not warrant a finding that Mr. Baca was involved in the actual obstruction of justice.

### C.   The Need for the Sentence Imposed to:

   1.   Reflect the seriousness of the offense, promote respect for the law and provide just punishment

Mr. Baca does not dispute that obstructing justice or making false statements are serious offenses.  However, Mr. Baca has already paid, and will continue to pay, a substantial price for any transgression he committed.  Mr. Baca's reputation is destroyed; his legacy replaced with a criminal conviction.  He also faces significant financial penalties that will further drain his retirement fund, which he originally thought would help pay for the expensive healthcare and caretaker costs associated with his debilitating disease.

What more must be done to punish Mr. Baca apart from financial ruin, tarnishing his life's work, and destruction of his reputation?  At what point does the government's demand that this 74-year old public servant and first-time offender be sent to prison for years become vindictive retribution divorced from fairness and justice?

The Supreme Court has recognized that a sentence of probation is itself

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 31386432.1

41

CR 16-66(A) - PA

punishment. *See* Gall, 552 U.S. at 44 (recognizing that "probation, rather than 'an act of leniency,' is a 'substantial restriction of freedom'" (quoting district judge)). If sentenced to probation, Mr. Baca will be "subject to several standard conditions that substantially restrict [his] liberty." *Id.* at 48.  These restrictions may include being required to report regularly to his probation officer, permit unannounced visits to his home, refrain from associating with any person convicted of a felony, and restrictions on his ability to vote and travel.  And, of course, barring reversal on appeal, Mr. Baca will forever be a convicted felon, stripped of many of his rights and subject to the social disgrace that comes with that status.  In light of this and the severe financial and other penalties visited on Mr. Baca, a sentence of imprisonment is not necessary to provide punishment for his offenses of conviction.

> 2.      Afford adequate deterrence to criminal conduct

The sentence imposed by the Court should also be sufficient, but not greater than necessary, to adequately deter criminal conduct.  18 U.S.C. § 3553(a)(2)(B). Unquestionably, the goal of specific deterrence has already been met in this case. The investigation and prosecution and the prospect of a prison sentence have already brought about extreme shame and strain on him.  He has suffered public reproval and had an unblemished record tarnished as a result of being charged and convicted in this case

> 3.      Protect the public from future crimes of the defendant

Mr. Baca has no prior arrests or convictions.  There is absolutely no basis to suggest that his incarceration is necessary to protect the public.

**D.      The Need to Avoid Unwarranted Sentence Disparities (§ 3553(a)(6))**

The Court has imposed the following sentences in the related cases:

- Deputy James Sexton – 4 months
- Deputy Gilbert Michel – 6 months
- Deputy Gerard Smith – 21 months

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 31386432.1

42

CR 16-66(A) - PA

- Deputy Mickey Manzo – 24 months
- Sergeant Maricela Long – 24 months
- Sergeant Scott Craig – 33 months
- Lieutenant Gregory Thompson – 37 months
- Lieutenant Stephen Leavins – 41 months
- Captain Tom Carey – not sentenced yet
- Undersheriff Paul Tanaka – 60 months

As discussed in detail above, Mr. Baca's involvement, and knowledge of the obstruction of justice role in the obstructive acts was significantly different and in many ways substantially less than any of his alleged co-conspirators. Mr. Baca's consistent focus during the six weeks of August-September 2011 was to keep Mr. Brown safe and get to the bottom of the cell phone investigation. 2016 Gov't. Baca Sent. Position at 32, 3:6-8 ("Baca stated [during the August 19 and 20, 2011 meetings] that he wanted the Sheriff's Department to investigate how the phone was brought into the jail and to keep the inmate secure and in its custody.")

"F the FBI" was never a stated or unstated goal of Mr. Baca unlike for many of his alleged co-conspirators. For instance, unlike many of the alleged co-conspirators who knew that Mr. Brown was not being LiveScanned to disconnect his aliases from his true name and make it more difficult for the FBI to find him in the system, Mr. Baca did not authorize or know that this failure to Livescan had occurred. Unlike many of his alleged co-conspirators who ordered other deputies not to cooperate with the FBI or knew that this had happened, Mr. Baca did not authorize or know that such an order had been given. Unlike many of his alleged co-conspirators who tried to obtain a court order to obtain records from the FBI, who searched LASD offices for bugs, who issued policies concerning turning over Mr. Brown pursuant to a court order, or who ordered the surveillance of FBI agents, Mr. Baca neither authorized nor knew that such actions had been taken. Unlike

other alleged co-conspirators who threatened to arrest and charge Agent Marx to try to intimidate her, Mr. Baca neither authorized nor knew that these threats had been made in a voicemail message or in person (and once he did, he immediately ensured that they would not be carried out).

As such, § 3553(a)(6)  favors a sentence for Mr. Baca that is lower than that of his alleged co-conspirators who were integrally involved in the obstruction.  This is particularly true with respect to the sentence given to the leader of the conspiracy to obstruct justice, Mr. Tanaka.

The need for a substantially lesser sentence for Mr. Baca than Mr. Tanaka is evidenced by the Government's own statements during Mr. Tanaka's 2016 sentencing comparing Mr. Baca's and Mr. Tanaka's culpability in the offense:

> [Mr, Tanaka] was the most culpable of any co-conspirator, given that he: (a) helped foster the culture that led to these civil rights problems in the jails; (b) was in charge of the obstructive operation; (c) set the tone of the operation early and repeatedly with his "F**k the FBI" statements; and (d) was involved in all aspects of the obstruction.
>
> . . .
>
> First, having presided over four trials regarding this conduct, this Court is aware that there are major differences in the quantity and quality of evidence against Baca as compared to [Mr. Tanaka]. Some examples:
>
> - [Mr. Tanaka's] conduct as an executive fostered the culture of abuse and misconduct. Baca did not make statements similar to defendant's instructions to work in the "gray area" or his threat to "make cases" on captains who reported deputies to Internal Affairs.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 31386432.1

44

CR 16-66(A) - PA

- During the obstructive conduct, phone records show the coconspirators were in touch with [Mr. Tanaka] much more frequently than they were with Baca.

- Emails show the co-conspirators corresponded with [Mr. Tanaka] and [Mr. Tanaka's] aide, and not with Baca or Baca's aide.

- [Mr. Tanaka] was extremely angry when the FBI was able to interview Anthony Brown. When Baca was told this occurred, he did not act concerned.

- [Mr. Tanaka] was present at Men's Central Jail when his coconspirators tampered with witnesses; Baca was not there and there has been no evidence that shows Baca was told what happened.

- [Mr. Tanaka] directed this operation and is the most culpable.

Second, the Court is aware of the issues raised in Baca's PSR. These issues place him in a very different position than the others involved in this offense.

Government's Position Re: Sentencing of Defendant Paul Tanaka, *United States v. Tanaka et al*, No. 15-cr-00255-PA (C.D. Cal June 06, 2016), Dkt. No. 169 ("Tanaka Sent.") 16:13-18; 16:24-17:21.

Further, unlike Mr. Tanaka, the Government compellingly pointed out that Mr. Baca did not "attempt[] to assist his co-conspirators, while at the same time concealing his conduct, by minimizing his knowledge and conduct in three trials that occurred in 2014" or "attempt[] to further obstruct justice by testifying falsely at his own trial." *Id.* at 15:6-9. Also unlike Mr. Tanaka, Mr. Baca did not help "foster the culture that led to the federal investigation" and indeed, as the Court is

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 31386432.1

45

CR 16-66(A) - PA

aware, took numerous steps to combat that culture. *Id.* at 13:14.

Of equal significance, none of Mr. Baca's alleged co-conspirators has the extraordinary record of almost five decades of public service to the community and the pantheon of accomplishments and positive changes Mr. Baca has brought to the LASD and those he has served. Nor do any of Mr. Baca's alleged co-conspirators have Mr. Baca's Alzheimer's disease that will significantly and deleteriously affect Mr. Baca's ability to function in a prison setting and receive necessary medical care in the most effective manner.

Thus, pursuant to § 3553(a)(6), Mr. Baca's alleged co-conspirators are not similarly situated to him either in terms of their involvement in the offenses charged, their personal history of civic and charitable efforts, nor in their medical condition. Accordingly, since they are not similarly situated to Mr. Baca, Mr. Baca's sentence should be adjusted downward accordingly to account for the mitigating circumstances unique to Mr. Baca's sentencing.

## III. **CONCLUSION**

In determining a sentence that is sufficient but not greater than necessary to accomplish the goals of sentencing, a probation sentence with home detention and community service achieves the proper balancing among the aggravating and mitigating factors. On the one hand, the Court must consider an individual with one of this country's most exceptional public service careers spanning over almost 50 years, an individual who suffers from the incurable and rapidly progressing and debilitating mental health disease of Alzheimer's, and an individual for whom prison will not allow him to obtain medical care in the most effective manner and will subject him to especially harsh treatment due to his medical condition as well to his age and former position as LASD Sheriff. On the other hand, the Court must weigh the aggravating factors of the offenses that while serious did not meaningfully result in the actual obstruction of the FBI's grand jury investigation and in which Mr. Baca's actual involvement was significantly less than his alleged

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 31386432.1

46

CR 16-66(A) - PA

co-conspirators.  Mr. Baca respectfully submits that a probation with home detention and community service sentence would achieve that proper balance, permit Mr. Baca to receive the most effective medical care, and allow him "to continue his journey doing what he does best: Serving people."  Letter of S. Whitmore, Ex. E, pgs. 498-99.

Dated:        April 24, 2017                    MORGAN, LEWIS & BOCKIUS LLP


By /s/ Nathan J. Hochman
   Nathan Hochman
   Brianna Abrams
   Attorneys for Defendant
   LEROY BACA

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 31386432.1

47                                        CR 16-66(A) - PA