Nathan J. Hochman, SBN 139137
Brianna Leigh Abrams, SBN 239474
MORGAN, LEWIS & BOCKIUS LLP
The Water Garden
Suite 2050 North
1601 Cloverfield Boulevard
Santa Monica, CA  90404-4082
Tel:    +1.310.255.9025
Fax:    +1.310.907.2025
e-mail: nathan.hochman@morganlewis.com
e-mail: brianna.abrams@morganlewis.com


Attorneys for Defendant
LEROY BACA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CR 16-66(A) - PA |
| Plaintiff, | DEFENDANT LEROY BACA'S OBJECTIONS TO PRESENTENCE REPORT |
| vs. | |
| LEROY BACA, | UNDER SEAL |
| Defendant. | Hearing Date: May 12, 2017<br>Hearing Time: 8:30 a.m.<br>Courtroom: Hon. Percy Anderson |

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

i                                            CR 16-66(A) - PA

Defendant LEROY BACA, by and through his counsel of record, hereby respectfully submits his objections to the Presentence Report in this matter.

These objections as stated herein are based the evidence presented during Mr. Baca's two trials in this matter, the files and records in this case, and such further evidence and argument as the Court may permit at the hearing in this matter.

Respectfully submitted,

Dated:          April 24, 2017                    MORGAN, LEWIS & BOCKIUS LLP


By /s/ Nathan J. Hochman
    Nathan Hochman
    Brianna Abrams
    Attorneys for Defendant
    LEROY BACA

# DEFENDANT'S OBJECTIONS TO PRESENTENCE REPORT

On April 14, 2017, the Probation Officer issued the Presentence Report ("PSR") . At a general level, Defendant Leroy Baca objects to the Offense Conduct and Offense Level Computation sections (and related sections) of the PSR by incorporating by reference all his prior objections and motions in the pre-trial and trial proceedings in this case. At a more specific level, Mr. Baca objects to the following paragraphs as specified below.

## Offense Conduct

Mr. Baca requests that the following paragraphs be amended and modified as follows to reflect accurately the facts that occurred at Mr. Baca's trial in order to properly determine his sentence under 18 U.S.C. § 3553(a). The changes are red-lined and italicized next to the wording currently contained in the PSR paragraphs identified below.

## Paragraph 31:

31.    At the time of the instant matter, Baca was aware of prior allegations of brutality within the jails. In approximately 2010, Robert Olmsted, who oversaw deputies the MCJ and later served as a Commander within the jail system, attempted to speak with Baca about the excessive use of force within the jails. The ACLU also published findings documenting a culture of violence within the jails. Baca was also aware of an ACLU monitor and a chaplain who witnessed separate incidences of deputies beating inmates; in each instance, Baca or his representatives ~~failed to address the beatings and suggested that the witnesses exaggerated their reports or lacked credibility~~ *met with the ACLU representatives and the chaplain and attempted to address the issues raised.*

## Paragraph 34

34.    On August 18, 2011, after realizing the FBI's undercover operation had been compromised, Steven Martinez (Martinez), the FBI Assistant Director in Charge

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 31380049.1

2

CR 16-66(A) - PA

(ADIC), called Baca to inform him that Inmate Brown's receipt of a telephone was part of an undercover FBI investigation into civil rights violations and corruption at the county jails *and asked him to keep Inmate Brown safe. Martinez provided Baca with no further details of the FBI investigation at that time.* Immediately after speaking with Martinez, Baca called Tanaka and arranged a meeting for the following day.

**Paragraph 35**

35.    On August 19, 2011, in preparation for the upcoming meeting, Thompson ordered Manzo and Smith to interview Inmate Brown. During the interview, Smith told Inmate Brown that they knew he was working with the "feds." Manzo added that they needed to know about the phone calls because of a "meeting with very influential people in our Department..." Inmate Brown confirmed that the "feds" were doing investigations and set up a bribe so that a cell phone was delivered to him. *Inmate Brown would not provide the name of the deputy or deputies involved in bringing him a cell phone at that time but said he would do so if provided with a cheeseburger, soda, fries and cigarettes.*

**Paragraph 36**

36.    Later that day, Baca met with Smith, Manzo, Thompson, Tanaka and Carey. Thompson informed the group that Smith and Manzo had learned that Inmate Brown was an FBI informant for a civil rights investigation. Baca told the group about the ADIC's call and stated that Inmate Brown was not going anywhere, despite the fact that he was supposed to be sent to state prison, *in light of the fact that Inmate Brown had indicated that he was willing to cooperate with the LASD and provide the deputies' names who had smuggled him a cell phone into the jail.*

**Paragraph 37**

37.    On August 20, 2011, Smith, Manzo, Thompson, Baca, Tanaka, and Carey met again and were joined by Leavins *and others*. The phone calls between Inmate Brown and the FBI were played at the meeting *and the photos of narcotics (heroin,*

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 31380049.1

3

CR 16-66(A) - PA

*cocaine, methamphetamine, ecstasy, and marijuana) found on the cell phone were discussed*. During the meeting, Tanaka ~~stood up abruptly,~~ slammed his hands on the table, and said "F--k the FBI" numerous times. Baca said that Carey and ICIB would take over the investigation and everything would go through Tanaka. Baca also told ICIB to interview Brown, ~~*but said that no one else should see him*~~.  Baca and Tanaka then left the meeting. Tanaka returned to the meeting alone and stated that he had never seen Baca so angry. Tanaka reiterated that he was in control and that the FBI was not to be given access to Inmate Brown *without his permission*. Tanaka also stated that this was one of the most important investigations in the history of the LACSD.

**Paragraph 42**

42.    After the interview, Smith, Manzo, Thompson and Carey met with Tanaka, who expressed his displeasure *through screaming profanities including "F--k the FBI" about the fact* that the FBI had been able to meet with Inmate Brown. Carey and Tanaka also discussed moving Brown to keep him away from the FBI. Thompson asked whether Baca knew that the FBI had interviewed Brown. Tanaka stated that Thompson would have to tell Baca. Thompson subsequently informed Baca about the FBI interview and stated that he would take measures to ensure that it would not happen again. Afterwards, he told the other conspirators that Baca was *calm, compassionate and* understanding.

**Paragraph 44**

44.    On August 24, 2011, Manzo drafted a policy regarding Tanaka's August 20th directive that the FBI was not to have access to Inmate Brown.  Among other things, the policy stated that if the FBI requested an interview, information had to be obtained from the requesting agent(s) and forwarded to Thomson, who would contact Tanaka for approval. Manzo emailed the policy to Tanaka's assistant. Tanaka requested that references to himself or LASD executives be removed from

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 31380049.1

4

CR 16-66(A) - PA

the draft policy. *Baca was never shown this policy before or after it was implemented.*

**Paragraph 46**

46.     On August 25, 2011, the United States District Court issued a writ for Inmate Brown's testimony before a federal grand jury on September 7, 2011. The writ was faxed to the LASD. *Baca never knew this writ was issued or received by LASD.* After ~~receiving~~ the writ *was sent to LASD*, the conspirators attempted to hide Inmate Brown by making him "disappear" from the jail. To do so, they needed to change electronic files to reflect that Inmate Brown was no longer in their custody and make sure there was no physical record (called a records jacket) showing that Inmate Brown was in their custody.

**Paragraph 48**

48.     Less than three hours later, Inmate Brown was rebooked under an alias. The paperwork contained false information and stated that Inmate Brown had refused to give his Social Security number (SSN) or be fingerprinted. *Baca was never told nor made aware that Inmate Brown was not fingerprinted or that his social security number was not provided in connection with his new aliases.* Over the next few days, Inmate Brown's name was changed in the computer system on a regular basis and false information was entered into the computer system about him. There were a total of three aliases that pertained to Inmate Brown during this period, including John Rodriguez, Kevin King, and Chris Johnson. False records jackets were created for Inmate Brown under each of these aliases. *Baca never knew or was told that records jackets for Inmate Brown's aliases did not contain Inmate Brown's actual fingerprints and social security number.*

**Paragraph 49**

49.     On August 25, 2011, Thompson informed LASD captains and operations lieutenants that all FBI requests for inmate interviews had to be approved and would take place at MCJ. *Agent Marx or her co-case agents never made a request*

*to the LASD from the time they left the jail on August 23, 2011 to September 12, 2011 (when Inmate Brown was released to state prison) to interview Inmate Brown.*

**Paragraph 50**

50.    On August 26, 2011, Thompson communicated with others about what might happen if the FBI showed up at MCJ with a "possible Court Order" demanding Inmate Brown's production to the federal government. Thompson and the others decided that they should accept the court order if they were "forced" to, but would not release Inmate Brown. Instead, they would have a county attorney "who is on vacation for a month" review the court order before releasing Inmate Brown. Thompson agreed to put a note on Inmate Brown's cell door. The MCJ captain emailed his lieutenants and sergeants the following: "If any federal law enforcement agency comes to MCJ with an inmate removal order, visitation order, or ANY OTHER order of the court you shall receive the order and advise the federal officer that before you can proceed, you have to submit the order to the Department's legal advisor for review. DO NOT RELEASE THE INMATE OR ALLOW CONTACT." *Thompson and Carey never knew at the time that a federal writ had actually been issued for Inmate Brown's attendance in front of a federal grand jury on September 7, 2011.*

**Paragraph 51, footnote 6:**

Both Carey and Thompson testified that Carey told Baca that Brown was being moved to the San Dimas Station *for his safety* and that his name would be changed *for his safety.  They did not tell Baca that Inmate Brown's fingerprints and social security number were not going to be provided in connection with his new aliases.*

**Paragraph 52**

52.    On August 29, 2011, Baca and other LASD employees met with then-United States Attorney Andre Birotte, Jr. (Birotte) and other members of the United States Attorney's Office (USAO). Baca specifically asked that the FBI not be invited. At that meeting, Baca expressed his displeasure at the investigation*, said that he*

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 31380049.1

6

CR 16-66(A) - PA

*believed the FBI had committed a crime, and asked for LASD to join the federal investigation. Birotte listened to Baca as part of this "listening meeting" but did not respond to Baca's concerns or issues at that time. Baca* ~~and~~ received no assurances that the investigation would be halted or would include the LASD. *Birotte told Baca at this meeting (or shortly before) that the LASD could "stand down" for the time being in responding to federal grand jury subpoenas issued to the LASD in August 2011 requesting LASD documentation related to the federal civil rights investigation.*

**Paragraph 53**

53.    On August 30, 2011, Leavins, Craig and Long interviewed Michel and other MCJ deputies. Tanaka was present at MCJ and received briefings about the interviews. After Michel stated that the FBI had contacted him and attempted to have him cooperate in the federal investigation, he was ordered by Leavins, Craig, and Long not to talk to the FBI. Michel informed Leavins, Craig, and Long that the FBI was planning to charge him. *Baca never authorized or was informed of this order not to cooperate with the FBI that was given to Michel and any other MCJ deputy.*

**Paragraph 55**

55.    On September 8, 2011, Craig sought an order from a Los Angeles County Superior Court judge to compel the FBI to turn over its records related to their ongoing investigation. The order also sought information such as the true identities of the FBI agents. The judge refused to sign the order, noting that the superior court had no jurisdiction over any federal agency. *Baca never authorized or knew about Craig seeking this court order or its denial.*

**Paragraph 56**

56.    On September 9, 2011, Craig left a voicemail message on an FBI phone that he believed belonged to SA Marx. Craig stated that SA Marx was "named as a suspect" and offered to meet her "as a professional courtesy...prior to me signing a

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 31380049.1

7

CR 16-66(A) - PA

declaration in support of an arrest warrant." *Baca never authorized or knew that Craig left this voicemail message to SA Marx, nor did Carey.*

**Paragraph 57**

57.    On September 12, 2011, Craig, Long, and Leavins received an email from Carey that attached a list of ACLU complaints out of MCJ. Carey stated that this would probably lead them, in part, to what the "feds" were looking at. In addition, on September 13, 2011, Craig and Long interviewed Michel, who confessed to beating inmates with other deputies. Leavins then emailed Carey, stating, "That idiot [Michel is confessing to beating handcuffed inmates with other deputies...not looking good...they are still interviewing him...will advise." Carey took this information to Tanaka. *Baca, who was out of the country on business from September 8-21, 2011, never knew about Michel's confession at the time.*

**Paragraph 59**

59.    On September 26, 2011, Baca made an appearance on the television show "Good Day L.A." The anchors asked him about "alleged brutality within the jails and the FBI investigating." Referring to the cell phone in the jail, Baca stated, "well it's illegal. It's a misdemeanor and then there is a conspiracy law that goes along with it." Another anchor asked defendant, "Do you resent the FBI's intrusion?" Baca responded "Oh yeah." Later, a second reporter asked, "Well, if you don't want the FBI in there, then who polices the police?" Defendant answered, "We police ourselves *with the help of OIR [the Office of Independent Review].*" Tanaka later sent a link of defendant's Good Day L.A. appearance to Carey, who forwarded it to Craig.

**Paragraph 60**

60.    On September 26, 2011, Carey and Leavins told Baca that they wanted to approach SA Marx outside of her home *to interview her since she had not responded to a voicemail message previously left for her for an interview*. [7]  Baca approved of the plan, but told them "don't put handcuffs on her. *At no point was*

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 31380049.1

CR 16-66(A) - PA

*Baca told that any LASD investigators were going to threaten to arrest or charge SA Marx or lie to her by saying that she was a named suspect in a felony complaint.*

**Paragraph 60, footnote 7**

Carey testified about this meeting at Baca's trial. *Carey did not know at this time that Craig's voicemail to SA Marx had stated that she was a named suspect and that he was swearing out a declaration for her arrest.*

**Paragraph 61**

61.     On the evening of September 26, 2011 *at approximately 5:31 p.m.,* Craig and Long approached SA Marx outside her home *for approximately one minute* and recorded the encounter. SA Marx told them that she was not going to make any statements. Craig stated that SA Marx was a "named suspect in a felony complaint" and asked whether she had received his phone message. She said that she had not received the phone message, but that she would pass the information along to the ADIC. Craig stated he was "in the process of swearing out a declaration for an arrest warrant" for her.

**Paragraph 61, footnote 8**

According to SA Marx, on the day she was threatened with arrest, she did not go home due to concern that the LACSD would arrive at her home and arrest her. ~~For two or three months after that, SA Marx woke up several times a night, thinking she'd heard a noise, and searched her home for signs that someone was trying to gain entry. She also remained on "high alert" and constantly surveyed her surroundings in fear of either being arrested or for signs of being followed or watched by LACSD employees.~~ *[Agent Marx never testified to any of the foregoing sentence.  Agent Marx also never made any effort to return to the LASD jails for a number of months, despite having the assurance of Baca that she would not be arrested.]*

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 31380049.1

9

CR 16-66(A) - PA

**Paragraph 62**

62.    Shortly thereafter, then Supervisory SA Carlos Narro (Narro) and SA Teresa Tambubolon (Tambubolon) called Long, who recorded the call. Narro asked Long if there was going to be warrant for SA Marx' address. Long responded, "There's going to be." Narro asked, "Does the Sheriff know this?" Long replied, "The Sheriff knows this, sir." When Narro asked what the charges were, Long told him to speak to Tanaka. Narro asked, "Do you have any idea when the warrant's going to come out?" Long replied, "It could be tomorrow, sir. You're going to have to talk to the Undersheriff." After the call ended, the recording device captured laughter and Long telling Craig, "They're scared. They're like, do you know when...the warrant..." After Craig stated, "You're still rolling," Long stopped recording. *Baca never authorized Craig and Long to threaten to arrest or charge SA Marx nor knew they were going to make such statements to her at or before the time they did.*

**Paragraph 63**

63.    That evening, United States Attorney Birotte was notified of the LASD's threatened arrest of Special Agent Marx and called Baca *at approximately 7:35 p.m. and spoke with him for 22 minutes.* When Birotte questioned Baca about the arrest tactic, Baca did not act surprised ~~*or uninformed*~~. *Baca* ~~Instead, he~~ *immediately told Birotte without qualification that such an arrest was not going to happen.* ~~demurred and told Birotte that his underlings were only going to go talk to her.~~

**Paragraph 64**

64.    The next day, *September 27, 2011*, Baca~~*, Tanaka, Carey and others*~~ met with Birotte and Martinez (the FBI ADIC) in Birotte's office. The meeting had been scheduled for some time to address any residual issues since the August 29, 2011 meeting. During the meeting, Birotte informed Baca that despite Baca's wishes, the federal investigation would continue with the FBI working with the USAO and not the LASD. Birotte added that he would like to have the two entities work as

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 31380049.1

CR 16-66(A) - PA

partners on other matters. When it was Baca's turn to speak, Baca told Martinez, "I'm goddamned Sheriff" and these were "my goddamned jails." Baca angrily suggested that the FBI and the LASD could "gun up" to settle the matter. Martinez finally told defendant "enough" and reminded him that it was Baca's deputy who brought the phone to Inmate Brown. *Martinez answered Baca's questions about the FBI investigation and why Baca was not informed about the investigation prior to August 18th. Baca, Birotte and Martinez left the meeting shaking hands with a pledge for cooperation.*

**Paragraph 65**

65.    The federal investigation continued and Los Angeles County hired outside counsel. Through them, the LASD began responding to the August 2011 subpoenas in October 2011, *producing hundreds of thousands of pages of documents, audiotapes, videotapes, and notes. Baca never took any steps to obstruct the production of any documents by the LASD pursuant to federal grand jury subpoenas.*

**Paragraph 66**

66.    On April 12, 2013, Baca was interviewed by members of the USAO and FBI about his involvement in the above-described matters *for over four and a half hours and asked between 400-500 questions as part of a voluntary interview given after receiving a non-target letter.* During the interview, Baca made the following false statements: *[Baca objects to any of the five statements being described directly or indirectly as knowingly false or material].*

**Offense Level Computation**

Mr. Baca objects to the offense level computation based on the government failing to prove that he committed the crimes charged beyond a reasonable doubt and failing to prove each of the offense level enhancements by a preponderance of the evidence.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 31380049.1

11

CR 16-66(A) - PA

**Physical Condition**

Redacted

**Mental and Emotional Health**

Redacted

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 31380049.1

CR 16-66(A) - PA

Redacted

**<u>Financial Condition: Ability to Pay</u>**

Redacted

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 31380049.1

CR 16-66(A) - PA

To the extent that Mr. Baca is sentenced to custody, Mr. Baca respectfully requests that the Court order no fine or a minimal fine.

Dated:          April 24, 2017                    MORGAN, LEWIS & BOCKIUS LLP


By /s/ Nathan J. Hochman
Nathan Hochman
Brianna Abrams
Attorneys for Defendant
LEROY BACA

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 31380049.1

14                              CR 16-66(A) - PA