Nathan J. Hochman, Bar No. 139137
Brianna Leigh Abrams, SBN 239474
MORGAN, LEWIS & BOCKIUS LLP
The Water Garden
Suite 2050 North
1601 Cloverfield Boulevard
Santa Monica, CA  90404-4082
Tel:     +1.310.255.9025
Fax:     +1.310.907.2025
e-mail:  nathan.hochman@morganlewis.com
e-mail: brianna.abrams@morganlewis.com

Attorneys for Defendant
LEROY BACA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>LEROY BACA,<br><br>Defendant. | Case No. CR 16-66(A) - PA<br><br><br>DEFENDANT LEROY BACA'S SUPPLEMENTAL SENTENCING POSITION -- BAIL PENDING APPEAL<br><br>Hearing Date: May 12, 2017<br>Hearing Time: 8:30 a.m.<br>Courtroom:  Hon. Percy Anderson |

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SANTA MONICA

DB2/ 31443118.2

CR 16-66(A) - PA

Defendant Leroy Baca, by and through his attorneys of record, hereby submits his supplemental sentencing position requesting bail pending appeal under the Bail Reform Act, 18 U.S.C. § 3143(b)(1), should the Court sentence Mr. Baca to a term of imprisonment. Mr. Baca qualifies for bail pending appeal since he does not pose a danger to the community or is a flight risk; Mr. Baca's appeal is not brought for the purposes of delay; and the appeal raises a substantial, non-frivolous question of law or fact of the type likely to result in reversal or an order for a new trial.

Respectfully submitted,

Dated:    May 10, 2017                    MORGAN, LEWIS & BOCKIUS LLP


By  */s/ Nathan J. Hochman*
    Nathan J. Hochman
    Attorneys for Defendant
    LEROY BACA

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SANTA MONICA

2                          CR 16-66(A) - PA

DB2/ 31443118.2

**TABLE OF CONTENTS**

Page

I.     INTRODUCTION ............................................................................................. 1

II.    PROCEDURAL AND FACTUAL HISTORY ................................................. 3

       A.    The Court Rejected Mr. Baca's Plea Agreement ...................................... 3

       B.    Mr. Baca Withdrew his Plea and Proceeds to Trial ................................. 3

       C.    Retrial and Mr. Baca Convicted ............................................................... 6

             1.    The Court Excluded Evidence Admitted in the Prior Trial ............... 7

             2.    The Court Excluded Evidence Regarding Alzheimer's Impact on Mr. Baca's Ability to Remember Events 20 Months before the April 12, 2013 Interview ............................................................... 8

             3.    The Government's Motive Theory in the Second Trial, Like in the First Trial, Focused on Mr. Baca's  Purported Belief that the "Police Should Police Themselves" Motivating Him to Obstruct the FBI's Civil Rights  Investigation of the LASD ........................................... 9

III.   ARGUMENT ................................................................................................... 10

       A.    Legal Standard ........................................................................................ 10

       B.    Mr. Baca Is Not Likely To Flee And Does Not Pose A Danger To The Community .............................................................................................. 12

       C.    There Are Substantial, Non-Frivolous Questions Of Law And Fact Likely To Result In Reversal Or A New Trial ................................................... 12

             1.    The Court Erroneously Excluded Evidence Relating to Mr. Baca's Cooperation with AAG Perez and DOJ Civil Rights Division's Contemporaneous Civil Rights Investigation of the LASD in August 2011 ................................................................................. 15

             2.    The Court Erroneously Excluded Evidence Relating to OIR  .................. 17

             3.    The Court Erroneously Excluded Evidence on Mr. Baca's Direct Responses to Excessive Force Issues in the Jails .................................. 19

             4.    The Court Erred in Excluding Certain Statements Made During the April 12, 2013 Interview ......................................................... 20

             5.    The Court Erroneously Precluded Evidence of Mr. Baca's Alzheimer's Disease ......................................................................... 21

                   a.    The Court's Improper Exclusion of Evidence of Mr. Baca's Alzheimer's Diagnosis Dictates a Reversal on Appeal As to Counts 1 and 2 as well as Count 3  ............................................. 22

                   b.    The Court Erred by Excluding Evidence of Mr. Baca's Alzheimer's Disease When the Government Opened the Door by Introducing 2015 Statements by Mr. Baca After He Was Diagnosed in May 2014 ......................................................... 23

       D.    Mr. Baca Has Presented A Substantial Question on Appeal As To the Materiality Of The False Statements In Count 3 Likely To Result In Reversal Or A New Trial ......................................................................... 24

IV.    CONCLUSION ............................................................................................... 26

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
PHILADELPHIA

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Brown v. Borg*,
   951 F.2d 1011 (9th Cir. 1991)........................................................................................14

*Edwards v. Domingo*,
   No. 1:11-CV-00689-JLT, 2014 WL 108530 (E.D. Cal. Jan. 9, 2014)...................................14

*Herzog v. United States*,
   75 S.Ct. 349 (1955) ..................................................................................................10, 11

*United States v. Beltran*,
   136 F. App'x 59 (9th Cir. 2005) .......................................................................................25

*United States v. Collicott*,
   92 F.3d 973 (9th Cir. 1996), *as amended* (Oct. 21, 1996) .......................................................24

*United States v. Crenshaw*,
   698 F.2d 1060 (9th Cir. 1983)....................................................................................14, 18

*United States v. Evans*,
   728 F.3d 953 (9th Cir. 2013)......................................................................................13, 24

*United States v. Garcia*,
   340 F.3d 1013 (9th Cir. 2003).................................................................................2, 10,11

*United States v. Gaudin*,
   515 U.S. 506 (1995) ......................................................................................................25

*United States v. Haischer*,
   780 F.3d 1277 (9th Cir. 2015).........................................................................................13

*United States v. Halbert*,
   640 F.2d 1000 (9th Cir. 1981)......................................................................................2, 13

*United States v. Handy*,
   761 F.2d 1279 (9th Cir. 1985)..................................................................................1, 10,11

*United States v. Kaplan*,
   832 F. 2d 676 (1st Cir. 1987).........................................................................................24

*United States v. Kwiat*,
   817 F.2d 440 (7th Cir. 1987)..........................................................................................25

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SANTA MONICA

CR 16-66(A) - PA

*United States v. Miller*,
    753 F.2d 19 (3d Cir. 1985)..................................................................................................11, 13

*United States v. Mousavi*,
    378 F. App'x 667 (9th Cir. 2010) .................................................................................... 25-26

*United States v. Paguio*,
    114 F.3d 928 (9th Cir. 1997)..........................................................................................................15

*United States v. Peterson*,
    538 F.3d 1064 (9th Cir. 2008)........................................................................................................25

*U.S. v. Rodrigues*,
    159 F.3d 439 (9th Cir. 1998).............................................................................................................2

*United States v. Sandoval-Mendoza*,
    472 F.3d 645 (9th Cir. 2006) .......................................................................................................22

*United States v. Stever*,
    603 F.3d 747 (9th Cir. 2010)........................................................................................... passim

*United States v. Talkington*,
    589 F.2d 415 (9th Cir. 1978)........................................................................................................257

*United States v. Thompson*,
    37 F.3d 450 (9th Cir. 1994)............................................................................................................15

*United States v. Whitman*,
    771 F.2d 1348 (9th Cir.1985)....................................................................................................14, 18

**STATUTES**

18 U.S.C. § 371 .....................................................................................................................35

18 U.S.C. § 1001 ...........................................................................................................3,4, 5, 25

18 U.S.C. § 1503 ...................................................................................................................3

Bail Reform Act, 18 U.S.C. § 3143(b)................................................................................ passim

**OTHER AUTHORITIES**

Fifth Amendment .............................................................................................................13, 14

Sixth Amendment ...............................................................................................................13

Fed. R. Evid. Rule 106......................................................................................................20

Fed. R. Evid. Rule 401 ......................................................................................................16

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SANTA MONICA

iii                                                      CR 16-66(A) - PA

Fed. R. Evid. Rule 403 ...............................................................................................16, 18, 22

Fed. R. Evid. Rule 801(d)(2)(A) .........................................................................................24

Fed. R. Evid. Rule 806 ...........................................................................................................24

S. Rep. No. 1277, 93d Cong., 2d Sess. (1974).......................................................................24

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SANTA MONICA

CR 16-66(A) - PA

## I.    <u>INTRODUCTION</u>

Defendant Leroy Baca intends to appeal his conviction and sentence.  If the Court sentences Mr. Baca to a term of imprisonment, then under the Bail Reform Act, 18 U.S.C. § 3143(b)(1), the Court "shall order" bail for Mr. Baca pending appeal provided the following conditions are met:

1.    Mr. Baca is not likely to flee;

2.    Mr. Baca does not pose a danger to the safety of any other person or the community if released; and

3.    The appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in reversal or an order for a new trial.

Mr. Baca meets all three conditions and thus respectfully requests that he "shall" be released on bail pending appeal.  First, the evidence is clear and convincing that Mr. Baca is not likely to flee.  He has attended every court appearance since February 2016 through two trials over 15 months and is in full compliance with his bond conditions and Pretrial Services supervision.

Second, the evidence is clear and convincing that Mr. Baca does not pose a danger to the safety of any other person or the community if released.  Mr. Baca has no criminal history, was a member of the Los Angeles County Sheriff's Department for over 48 years and its Sheriff for over 15 years, and poses no danger to anyone in the community if released.

Third, Mr. Baca's appeal will not be for the purpose of delay and will raise a "substantial question" of law and fact "likely to result in reversal or an order for a new trial." A "substantial question" is one that is "fairly debatable." *United States v. Handy*, 761 F.2d 1279, 1283 (9th Cir. 1985).  "The question may be 'substantial' even though the judge…hearing the application for bail would affirm on the merits of the appeal." *Id*. at 1281.  A "substantial question" is "one of more substance than would be necessary to a finding that it was not frivolous." *Id*. at 1279.

The part of the standard "likely to result in reversal or an order for a new trial" defines the "type of question that must be presented" and not the level of the question's merit. *Id*.  Whether an appellate issue is likely to result in a reversal or new trial "concerns only the **type of question**

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SANTA MONICA

CR 16-66(A) - PA

DB2/ 31443118.2

that meets the requirement; it does not involve assessing the likelihood that a reversal will occur in the particular case." *United States v. Garcia*, 340 F.3d 1013, 1020 n. 5 (9th Cir. 2003) (emphasis in original). To obtain bail pending appeal, Mr. Baca "need not…present an appeal that will likely be successful, only a non-frivolous issue that, if decided in the defendant's favor, would likely result in reversal" or a new trial. *Id*.

Thus, to satisfy § 3143(b)(1)(B),  Mr. Baca must first show that his appellate issue is not frivolous. Then, he must demonstrate not that he is likely to win that issue or even has a reasonable likelihood of success to win the issue, but only that if he wins, he likely will get a new trial or have his convictions reversed.

The substantial, non-frivolous issues that Mr. Baca will present on appeal of the type that will likely result in  a reversal of his convictions or a new trial include, but are not limited to, the following:[1]

- the erroneous exclusion of evidence relating to Mr. Baca's cooperation with the DOJ Civil Rights Division's investigation of the LASD during the same time period as the charged conspiracy;

- the erroneous exclusion of evidence relating to Mr. Baca's establishment, support of and cooperation with OIR as an independent policing body;

- the erroneous exclusion of evidence about Mr. Baca's direct responses to excessive the force issues in the jails, including improved deputy training on the proper use of force, instituting the Commanders Management Task Force

[1] Additional substantial, non-frivolous questions for appeal of the type likely to result in reversal or a new trial include, but are not limited to, the following: (1) the denial of the disqualification of Judge Anderson motion for bias (Dkt. No. 116); (2) the denial of the defense's jury instruction on obstruction of justice (*compare* Dkt. No. 265 (proposed jury instructions) with Dkt. 301 (jury instructions)) which if given would have resulted in a judgment of acquittal on Counts 1 and 2; (3) the cumulative error resulting from the Court permitting the prosecutor in his rebuttal to unfairly impugn the integrity of Mr. Hochman during rebuttal arguments and not taking appropriate corrective action, *see e.g., U.S. v. Rodrigues*, 159 F.3d 439, 451 (9th Cir. 1998); and (4) the Court impermissibly allowing the Government to use the coconspirators' convictions as substantive evidence of guilt in the prosecutor's rebuttal closing argument and failing to give an adequate curative instruction. *See United States v. Halbert*, 640 F.2d 1000, 1004-07 (9th Cir. 1981).

("CMTF") and promulgating Education Based Incarceration ("EBI") programming in the jails;

- the erroneous exclusion of Mr. Baca's statements made during the April 12, 2013 interview of Mr. Baca offered to show Mr. Baca's state of mind and provide context for the jury;

- the erroneous exclusion of evidence of Mr. Baca's Alzheimer's disease; and

- the absence of any evidence of materiality with regard to the charged false statements showing how they were capable of influencing the FBI's and U.S. Attorney's Office's investigations or decisions as of April 12, 2013.

Since Mr. Baca meets all three parts of the bail pending appeal test, Mr. Baca respectfully requests that the Court "shall" grant him bail pending appeal under § 3143(b)(1).

## II.    PROCEDURAL AND FACTUAL HISTORY

### A.    The Court Rejected Mr. Baca's Plea Agreement

On February 10, 2016, Mr. Baca was arraigned and released on bond.  Mr. Baca has remained on that bond since that date for over 15 months through two trials and has been fully compliant with all of the bond's conditions and Pretrial Services supervision. That same day, Mr. Baca pled guilty to an Information charging him with making false statements, in violation of 18 U.S.C. § 1001.  (Dkt. 15.)  The plea was part of a binding plea agreement that bound the Court to sentence Mr. Baca within the offense's guidelines range of 0-6 months' imprisonment. *Id.*  On July 18, 2016, the Court rejected the parties' binding plea agreement.  (Dkt. 62.)

### B.    Mr. Baca Withdrew His Plea and Proceeds to Trial

On August 1, 2016, Mr. Baca withdrew his guilty plea as a result of the Court's decision to reject the binding plea agreement.  (Dkt. 68.)  On August 5, 2016, the grand jury returned a first superseding indictment that charged Mr. Baca with three counts: conspiracy to obstruct justice, in violation of 18 U.S.C. § 371 (Count One); obstruction of justice, in violation of 18 U.S.C. § 1503 (Count Two); and making false statements, in violation of 18 U.S.C. § 1001 (Count Three). Mr. Baca pled not guilty to all three counts. (Dkt. 70.)

On September 26, 2016, Mr. Baca filed a motion to disqualify Judge Percy Anderson

citing concerns over bias, along with motions for a change of venue and to recuse Government prosecutor Brandon Fox.   (Dkts. 107, 104, and 108)  On October 13, 2016, the disqualification motion was considered by Judge Otis D. Wright II and denied.   (Dkt. 116.)  The venue and prosecutorial recusal motions were denied on October 31, 2016. (Dkt. 131.)

Also on September 26, 2016, the Government filed motions *in limine* to preclude the defense from offering evidence of what the Government characterized as Mr. Baca's "good works" and "remedial measures" which it argued included, among other things, Mr. Baca's establishment of the EBI programs in the jails and Mr. Baca's creation of the CMTF initiative to address use of force issues in the jails.   (Dkt. 103.)  The Court initially deferred ruling on these motions but ultimately held the evidence to be inadmissible at trial, thus precluding the defense from calling a number of proffered witnesses prepared to testify about these programs.  (Dkt. 205.)

On November 7, 2016, the Government filed a motion to bar the testimony of defense expert Dr. James Spar, one of the country's leading experts on Alzheimer's disease, concerning the impact of Mr. Baca's Alzheimer's disease on his ability to remember events in August-September 2011 (that form the basis of the false statement charge) when he was interviewed by the Government approximately 20 months later on April 12, 2013 ("Alzheimer Preclusion Motion").  The Government argued that this testimony did not meet the *Daubert* standard and that it would be unduly prejudicial under Rule 403.  (Dkt. 134.)  On November 22, 2016, the Court held a hearing on that motion.  The Court took the matter under submission at that time.

On December 1, 2016, in considering the Alzheimer Preclusion Motion, the Court expressed its view that "at least some of Dr. Spar's opinions concerning the conduct that took place in 2013 [i.e., the alleged false statements in Count Three] may be admissible and that the Government's objections go more to the weight then the admissibility of those opinions." *See* Transcript of Proceedings, *U.S. v. Baca*, No. 16-CR-66(A) – PA, Dec. 1, 2016, at 29:12-15. However, the Court held that such evidence was irrelevant for the first two counts and unduly prejudicial as to those counts.  The Court inexplicably found that a limiting instruction, which the Court intended to use to address the unfair prejudice to Mr. Baca from the graphic descriptions of

inmate beatings for which he was not on trial, would not similarly work regarding the potential prejudice to the Government from the Alzheimer's testimony. To remedy this situation, the Court suggested that Counts 1 and 2 be severed from Count 3.

On December 2, 2016, the Friday before the trial was set to begin on Monday, December 5, 2016, the Government followed the Court's suggestion and filed a motion to sever Counts 1 and 2 from Count 3 ("Severance Motion"). During a December 2, 2016 telephonic status conference on the Severance Motion, the Court granted the Severance Motion and ordered that Count 3 be severed to avoid any prejudice that may result as to the first two counts from the introduction of evidence relating to Mr. Baca's Alzheimer's disease. (Dkt. 190.) This was the only basis given by the Court to justify the severance. Stated differently, **if the Court were going to preclude the Alzheimer's testimony entirely for every count, there was absolutely no basis to grant the Government's Severance Motion**.

On or about December 3, 2016, the parties met and conferred in person and the Government agreed that it would not introduce certain statements made by Mr. Baca in a 2015 deposition for an unrelated civil matter of *Antuna v. County of Los Angeles*, CV. No. 15-5600-MWF (C.D. Cal.) ("*Antuna*") after the defense argued that such statements would open the door to evidence regarding Mr. Baca's cognitive impairment if offered at trial. The Government honored this agreement at the first trial.

Beginning on December 5, 2016 and for over two weeks thereafter, a severed trial was held on Counts 1 and 2. Twenty-one witnesses testified for the Government. These witnesses included 13 current and former Los Angeles Sheriff's Department ("LASD") employees of varying ranks, two of which had been previously convicted as coconspirators of Mr. Baca in the charged obstruction; two representatives from the American Civil Liberties Union ("ACLU"); a representative from the U. S. Marshall's Office; a state court judge; the former United States Attorney for the Central District of California; two FBI Special Agents; and a New York-based reporter who was compelled to testify. On the other hand, 8 witnesses testified for the defense. These witnesses included Michael Gennaco, a former federal civil rights prosecutor and head of the Office of Independent Review ("OIR"); Cecil Rhambo, the former LASD Assistant Sheriff

responsible for custody operations at the time of the charged crimes; Paul Pietrantoni, a former LASD Commander who trained deputies on proper use of force in the jails; and five character witnesses.

Through these defense witnesses and the cross-examinations of the Government witnesses, the defense offered evidence to rebut the Government's central motive theory that Mr. Baca wanted to obstruct the FBI investigation into the civil rights abuses in the jails because he believed the LASD should police itself, and not the FBI or U.S. Department of Justice. The rebuttal evidence to the Government's motive theory included, but was not limited to, showing that: 1) Mr. Baca established, supported, and worked with OIR as a means of independently policing the LASD prior to and during the period of the charged obstruction; 2) Mr. Baca took a number of measures to reduce excessive force and deputy abuse of inmates including bringing Commander Paul Pietrantoni to teach classes to deputies in the jails on the proper use of force; 3) at the time of the charged obstruction, Mr. Baca was cooperating with another federal civil rights investigation into the LASD, led by Assistant Attorney General Tom Perez ("AAG Perez"), the head of the U.S. Department of Justice's Civil Rights Division, who held a joint press conference with Mr. Baca on August 19, 2011; and 4) Mr. Baca did not interfere with the production to the grand jury of hundreds of thousands of LASD documents, audiotapes and videotapes, including those used against him at trial. After hearing all the evidence, the jury was unable to reach a unanimous verdict, and the Court declared a mistrial after it found the jury to be hopelessly deadlocked. Subsequent surveying of jury members revealed that the jury was split 11 to 1 in favor of a not guilty verdict acquitting Mr. Baca.

## C.    Retrial and Mr. Baca Convicted

Despite the lopsided result in the previous trial, the Government decided to pursue the charges of conspiracy and obstruction of justice against Mr. Baca in a retrial. On January 10, 2017, a hearing was held on which counts the next trial was going to involve. (Dkt. 233.) The Government represented to the Court that it wanted to try all three counts together in flat contradiction to its prior representations in its Severance Motion. The Government proclaimed that it was willing to accept any spillover prejudice that may result from the introduction of

testimony relating to Mr. Baca's Alzheimer's disease.  The Court agreed to de-sever and rejoin the three counts given the Government's representation that it would no longer be arguing prejudice from the joint trial of all counts.  *Id*.  At no point in this hearing did the Court indicate that it was going to preclude the Alzheimer's expert testimony from going forward on Count 3.

### 1.    The Court Excluded Evidence Admitted in the Prior Trial

On February 13, 2017, the Court held a hearing on a number of motions that had been previously filed by the parties.  (Dkt. 268.)  Pertinent to this bail pending appeal motion, the Court granted the Government's motion to exclude evidence of additional alleged "good acts."  In addition to its prior rulings precluding evidence of certain "good acts" like Mr. Baca's EBI program (which lowered deputy abuse of inmates in the jails before and during the charged period of obstruction), the Court granted the Government's motion barring Mr. Baca from presenting evidence that: 1) Mr. Baca established and supported OIR since 2001 as an independent reviewing organization to help police the LASD -- *evidence permitted by the Court in the first trial* to rebut the Government's theory of Mr. Baca not wanting outside review of the LASD's actions in the jails; 2) Mr. Baca established the CMTF to address excessive force and deputy abuse of inmates issues in the jail; 3) Mr. Baca brought in Commander Pietrantoni in 2010-11 to teach proper use of force classes to deputies in the jails in response to excessive force incidents -- *evidence permitted by the Court in the first trial* to rebut the Government's charge of widespread deputy abuse of inmates in the jails; 4) Mr. Baca did not interfere with the production of hundreds of thousands of documents pursuant to grand jury subpoenas, some of which would ultimately be used against him at trial -- *evidence permitted by the Court in the first trial* to rebut the obstruction charges in Counts One and Two of obstructing a federal grand jury's investigation into federal civil rights violations in the LASD jails; and 5) during the same exact time period of the charged obstruction, Mr. Baca was cooperating with another federal civil rights investigation led by Assistant Attorney General Perez into the LASD -- *evidence permitted by the Court in the first trial* to rebut the Government's motive theory that Mr. Baca did not want to work with the federal government in addressing LASD civil rights violations.

In addition to these rulings, the Court held that Mr. Baca could not introduce a significant

number of answers he gave during the 4.5-hour April 12, 2013 Government interview that the defense argued provided context and completeness for the four charged false statements and demonstrated Mr. Baca's state of mind at the time in giving the alleged false answers.

2. <u>The Court Excluded Evidence Regarding Alzheimer's Impact on Mr. Baca's Ability to Remember Events 20 Months before the April 12, 2013 Interview</u>

With respect to its ruling on the Alzheimer Preclusion Motion, the Court did not rule on November 22, 2016 when it was first presented and argued nor on December 2, 2016 when the Court severed the counts based on its stated intention to admit the Alzheimer's expert testimony on Count Three. Nor did the Court rule on the motion at the January 10, 2017 hearing nor at the February 13, 2017 hearing.

On February 17, 2017, the Friday before the second trial commenced, **without any further briefing, hearings, new evidence or new law**, the Court excluded the testimony of Dr. Spar that it had under submission since November 2016 and whose admission the Court had used as its sole basis to justify the initial severance of the case. (Dkt. 267.) The Court held that there was not sufficient scientific evidence to link Mr. Baca's current diagnosis to the charge in Count 3. The Court largely based this ruling by weighing the proffered evidence and by finding that such evidence was speculative as it pertained to the alleged false statements that were made in April 2013 prior to Mr. Baca's diagnosis in May 2014. The Court's order was silent as to the admissibility of such evidence as it related to events or statements that post-dated Mr. Baca's May 2014 Alzheimer's diagnosis (e.g., Mr. Baca's January 2015 statements during the *Antuna* deposition).

On February 22, 2017, the Government filed a motion to preclude the defense from offering evidence that Mr. Baca was suffering from the early stages of Alzheimer's disease at the time he made video recorded statements in the 2015 *Antuna* deposition. (Dkt. 272.) The Government intended to present these video recordings as part of its opening statement and as part of its case-in-chief. The 2015 recordings related to Mr. Baca's **memory** of his relationship with Paul Tanaka, an alleged coconspirator, and events prior to his January 2014 retirement from the LASD. The defense had previously informed the Government that it believed this would

open the door to evidence regarding Mr. Baca's Alzheimer's condition at the time he made the 2015 statements; the defense also reminded the Government that it had agreed not to present such evidence during the first trial in exchange for the defense not presenting the Alzheimer's evidence at trial.  In the second trial, the Government no longer agreed to honor its prior agreement. The defense was given less than two days to respond to this motion and, minutes before the Government's opening argument, the Court ruled that the Government could play a number of segments from the *Antuna* deposition without opening the door to evidence regarding Mr. Baca's mental state at the time.

> 3. The Government's Motive Theory in the Second Trial, Like in the First Trial, Focused on Mr. Baca's  Purported Belief that the "Police Should Police Themselves" Motivating Him to Obstruct the FBI's Civil Rights Investigation of the LASD

Beginning on February 22, 2017 and continuing for approximately three weeks thereafter, a second trial was held on the three counts.  At this trial, 16 witnesses testified for the Government, including 10 current and former LASD employees of varying ranks, four of whom had been charged and/or convicted as coconspirators of Mr. Baca in the charged obstruction; four FBI Special Agents; a state court judge; the former U.S. Attorney for the Central District of California and now federal judge; and the same New York-based reporter who was again compelled to testify. This testimony was presented over 10 trial days. Restricted by the Court's rulings, the defense presented just one witness, Mr. Gennaco, whose entire testimony lasted roughly two hours and was severely limited by the Court's rulings.

Throughout this second trial, the Government advanced the same theory as it did at the first trial that Mr. Baca's motive to obstruct the investigation was his belief that the "police should police themselves" to the exclusion of all other policing bodies, i.e., the FBI and U.S. Department of Justice ("DOJ").  The primary evidence for this theory emanated from statements made by Mr. Baca during a September 26, 2011 interview he gave on a television program called Good Day LA where, in response to a question by the interviewer about who polices the police, Mr. Baca responded, in part, "the police police themselves."  This clip was played for the jury during trial and used to support the Government's motive theory.  Under this motive theory, the

Government argued that Mr. Baca obstructed justice to hide the abuses from the federal government that were happening in the jails. Further, the Government directly and repeatedly connected Mr. Baca's 2013 false statements with the 2011 obstruction of justice actions, arguing that Mr. Baca was motivated to lie to the FBI in his April 12, 2013 interview to cover up his role in the alleged 2011 obstruction.  After deliberating for approximately two days, the jury returned a verdict of guilty on Counts 1-3.

## III.    ARGUMENT

### A.    Legal Standard

A defendant is entitled to remain out of custody during the pendency of his appeal if certain conditions are met. More specifically, for a defendant to receive bail pending appeal, the court must find:

> (A)   by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released under section 3142(b) or (c) of [Title 18]; and
>
> (B)   that the appeal is not for the purposes of delay and raises a  substantial question of law or fact likely to result in (i) reversal, (ii) an order for a new trial, (iii) a sentence that does        not include a term of imprisonment, or (iv) a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process.

18 U.S.C. § 3143(b)(1)(A)-(B). If the court makes such findings, the court "shall order the release of the person in accordance with section 3142(b) or (c)" of Title 18 pending appeal. *Id.*

At first glance, "it might appear that a strong appeal is a threshold requirement" under § 3143(b)(1)(B).  *United States v. Garcia*, 340 F.3d 1013, 1020 n. 5 (9th Cir. 2003). The Ninth Circuit, however, has clarified that the "substantial question" and "likely to result in reversal" factors of § 3143(b)(1)(B) invite answers to discrete questions.  "Substantial" defines "the level of merit required in the question raised on appeal[.]"  *United States v. Handy*, 761 F.2d at 1281.  A substantial question "is one that is fairly debatable." *Id.* at 1283.  "The question may be 'substantial' even though the judge…hearing the application for bail would affirm on the merits of the appeal." *Id.* at 1281 (citing *D'Aquino v. United States*, 180 F.2d 271, 272 (9th Cir. 1950)).

The United States Supreme Court in *Herzog v. United States*, 75 S.Ct. 349 (1955), on which *Handy* relied, explained that "the first consideration" in deciding whether a question is

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SANTA MONICA

10                                         CR 16-66(A) - PA

substantial "is the soundness of the errors alleged." *Herzog*, 75 S.Ct. at 351. The *Herzog* court continued:

> Are [the questions] likely to command the respect of the appellate judges? It is not enough that I am unimpressed. I must decide whether there is a school of thought, a philosophical view, a technical argument, an analogy, an appeal to precedent or to reason commanding respect that might possibly prevail.

*Id.* In short, "a 'substantial question' is one of more substance than would be necessary to a finding that it was not frivolous." *Handy*, 761 F.2d at 1283.

"Likely to result in reversal," "defines the **type** of question that must be presented," and not the level of the question's merit. *Id.* (emphasis added). Whether an appellate issue is likely to result in a reversal or new trial, then, "concerns only the **type of question** that meets the requirement; it does not involve assessing the likelihood that a reversal will occur in the particular case." *Garcia*, 340 F.3d at 1020 n. 5 (emphasis in original). A defendant, in other words, "need not…present an appeal that will likely be successful, only a non-frivolous issue that, if decided in the defendant's favor, would likely result in reversal" or a new trial. *Id.* In so holding, the Ninth Circuit adopted the Third Circuit's reasoning in *United States v. Miller*, 753 F.2d 19 (3d Cir. 1985). *See Handy*, 761 F.2d at 1280. The *Miller* court wrote:

> [T]he phrase "likely to result in reversal or an order for a new trial" cannot reasonably be construed to require the district court to predict the probability of reversal. The federal courts are not to be put in the position of "bookmakers" who trade on the probability of ultimate outcome. Instead, that language must be read as going to the significance of the substantial issue to the ultimate disposition of the appeal.

*Miller*, 753 F.2d at 23.

Put simply, "a defendant need not show a likelihood of success on appeal; a defendant who *does* show such likelihood goes well beyond the threshold requirement." *Garcia*, 340 F.3d at 1020 n. 5 (emphasis in original). To satisfy § 3143(b)(1)(B), then, Mr. Baca must first show that his appellate issue is not frivolous. He does not need to show that he has a reasonable likelihood of winning that issue, only that if he wins, he likely will get a new trial or have his conviction reversed.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SANTA MONICA

11                                                                CR 16-66(A) - PA

**B.**     **Mr. Baca Does Not Pose A Flight Risk Or A  Danger To The Community**

Mr. Baca meets the first two parts of the three-part bail pending appeal test under § 3143(b)(1) since the evidence is clear and convincing that if given bail pending appeal, Mr. Baca is not likely to flee or pose a danger to the community.  He has shown up for every court appearance as ordered for over 15 months, met all conditions of his bond through two trials, and fully complied with Pretrial Services supervision.  He has no criminal record or record of being a danger to the safety of the community; on the contrary, he worked for over 48 years at the LASD promoting the safety of the community.  Accordingly, it should be undisputed that Mr. Baca has met these first two parts of the bail pending appeal test.

**C.**     **There Are Substantial, Non-Frivolous Questions Of Law And Fact Likely To Result In Reversal Or A New Trial.**

With respect to the third part of the bail pending appeal test, Mr. Baca's appeal is not for the purpose of delay and will present numerous substantial, non-frivolous questions of law and fact of the type that will likely result in reversal or a new trial.  Such substantial, non-frivolous questions include, but are not limited to, the following:

- the erroneous exclusion of evidence relating to Mr. Baca's cooperation with the DOJ Civil Rights Division's investigation of the LASD during the same time period as the charged conspiracy;

- the erroneous exclusion of evidence relating to Mr. Baca's establishment, support of and cooperation with OIR as an independent policing body;

- the erroneous exclusion of evidence about Mr. Baca's direct responses to excessive  force issues in the jails, including improved deputy training on the proper use of force, instituting the CMTF, and promulgating EBI programming;

- the erroneous exclusion of Mr. Baca's statements made during the April 12, 2013 interview  offered to show Mr. Baca's state of mind and provide context for the jury;

- the erroneous exclusion of evidence of Mr. Baca's Alzheimer's disease; and

- the absence of evidence of materiality with regard to the charged false statements

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
SANTA MONICA

showing how they were capable of influencing the FBI's and U.S. Attorney's Office's investigations or decisions as of April 12, 2013.

In committing significant evidentiary errors by excluding key exculpatory evidence, the Court violated Mr. Baca's constitutional right to present a defense. "Whether grounded in the Sixth Amendment's guarantee of compulsory process or in the more general Fifth Amendment guarantee of due process, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *United States v. Stever*, 603 F.3d 747, 755 (9th Cir. 2010). "This right includes, at a minimum, . . . the right to put before a jury evidence that might influence the determination of guilt." *Id*. Accordingly, the Ninth Circuit has "ma[de] clear that the erroneous exclusion of important evidence will often rise to the level of a constitutional violation." *Id.* at 756.

In *Stever*, the Ninth Circuit analyzed a district court's erroneous exclusion of relevant evidence and noted that in determining whether the erroneous exclusion of evidence rises to the level of a constitutional violation, "[s]ome limited guidance may also be had by analogy to cases that assess the constitutional implications of the exclusion of relevant evidence pursuant to the *correct* application of an evidentiary rule." *Id.* at 755-56. In such cases, courts apply the "so-called *Miller* factors" to "balanc[e] the interest of a state in enforcing its evidentiary rules against the interest of defendants in presenting relevant evidence in their defense." *Id* .at 756. These courts consider:

> (1) the probative value of the evidence on the central issue;
> (2) its reliability;
> (3) whether it is capable of evaluation by the trier of fact;
> (4) whether it is the sole evidence on the issue or merely cumulative; and
> (5) whether it constitutes a major part of the attempted defense.

*Id.* (quoting *Miller v. Stagner*, 757 F.2d 988, 994 (9th Cir. 1985)); *see also United States v. Haischer*, 780 F.3d 1277, 1284 (9th Cir. 2015). Since *Stever*, courts have found due process violations when the evidentiary error excludes: "(1) the main piece of evidence, (2) for the defendant's main defense, to (3) a critical element of the government's case." *United States v. Evans*, 728 F.3d 953, 967 (9th Cir. 2013).

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SANTA MONICA

13                                                    CR 16-66(A) - PA

The Ninth Circuit has "found constitutional error where a district court erroneously excluded evidence intended to refute the prosecution's theory of motive." *Stever,* 603 F.3d at 755 (citing *United States v. Whitman*, 771 F.2d 1348, 1351 (9th Cir. 1985)).  Motive is material evidence that a jury may properly consider in deciding whether the defendant committed the crime charged. *Brown v. Borg*, 951 F.2d 1011, 1016 (9th Cir. 1991).  "Motive, or lack of motive, is always relevant in a criminal prosecution." *Edwards v. Domingo*, 2014 WL 108530, at 11 (E.D. Cal. Jan. 9, 2014).  While courts have discretion to admit or deny motive evidence, once the Government introduces evidence from which a jury can reasonably infer a defendant's motive, the defendant has a constitutional right under both the Fifth Amendment due process clause and the Sixth Amendment confrontation clause to rebut such evidence.  To deny a defendant this right is reversible error. *Whitman*, 771 F.2d at 1351 (**reversing and remanding** for a new trial and holding that while "[t]he district court was free to exclude evidence of appellant's motive, . . . once the government produced evidence from which the jury could reasonably infer . . . motive, appellant had the right to rebut this evidence"); *United States v. Crenshaw*, 698 F.2d 1060, 1066 (9th Cir. 1983) (**reversing** lower court and holding that while evidence of the defendant planning a robbery offered as proof of defendant's motive to pilot a getaway plane may have been irrelevant at the start of trial, once the government raised the issue, the defendant should have been permitted to rebut it).

Here, as discussed below, entire categories of evidence were excluded erroneously.  Such errors, whether viewed individually or cumulatively, not only merit reversal under the standards regarding erroneous evidentiary rulings, but also violate Mr. Baca's constitutional right to present a defense and to rebut the Government's motive theory.  For purposes of this bail pending appeal motion, the significance of these errors and constitutional violations is that they present substantial, non-frivolous questions of the type that are likely to lead to a reversal or new trial under § 3143(b)(1), **not** that such errors and violations at this point meet any higher standard of being more likely than not to obtain, or reasonably likely to succeed in obtaining, a reversal or new trial.

As an initial overview, the significance of the Court's evidentiary exclusions and

constitutional violation is underscored by the complete contrast in results between the two trials— from an 11-to-1 verdict for not guilty resulting in a mistrial in the first trial to a guilty verdict in the second trial.  The Ninth Circuit has found, on multiple occasions, that when considering whether the erroneous exclusion of evidence is harmless, the fact that the evidence in question was admitted in a prior trial that resulted in a mistrial and then erroneously excluded from a subsequent trial that resulted in a conviction is a clear indication that such error was not harmless. *See, e.g., United States v. Paguio*, 114 F.3d 928, 935 (9th Cir. 1997) (reversing district court's ruling of excluding portion of a key statement and holding,"[w]e cannot characterize the error as harmless, because the hung jury at the first trial persuades us that the case was close and might have turned on this [issue]"); *United States v. Thompson*, 37 F.3d 450, 454 (9th Cir. 1994) (finding that the fact there was a hung jury in the first trial but a conviction in the second was persuasive evidence that the district court's erroneous exclusion of certain evidence affected the verdict).  Here, as described herein, numerous key evidence central to Mr. Baca's defense was admitted in the first trial leading to an 11-1 split for not guilty but excluded entirely in the second trial, militating strongly in favor of the conclusion that such evidence's exclusion was not harmless.

1.    The Court Erroneously Excluded Evidence Relating to Mr. Baca's Cooperation with AAG Perez and DOJ Civil Rights Division's Contemporaneous Civil Rights Investigation of the LASD in August 2011

Through its February 13, 2017 ruling, the Court erroneously precluded Mr. Baca from offering highly relevant and probative evidence that during the August-September 2011 period of the alleged obstruction, Mr. Baca was cooperating with another federal civil rights investigation of the LASD being conducted by the federal authorities, namely, DOJ Civil Rights Division.  The Court precluded such evidence on the grounds that such evidence was irrelevant and more prejudicial than probative. The fact that Mr. Baca was cooperating with a DOJ Civil Rights Division's federal civil rights investigation of the LASD at the same exact time of the alleged obstruction directly rebuts the Government's theory that Mr. Baca believed that only the LASD should police itself concerning civil rights violations.  In fact, evidence of Mr. Baca's cooperation with that other contemporaneous DOJ civil rights investigation of LASD and the head of the DOJ

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SANTA MONICA

15                                    CR 16-66(A) - PA

Civil Rights Division, AAG Perez, is compellingly probative of Mr. Baca's intent and motive to cooperate with--not obstruct--federal civil rights investigations of the LASD.

More specifically, Mr. Baca's cooperation with the DOJ's Civil Rights Division was acknowledged on August 19, 2011 (the day after the alleged period of obstruction began), at a Los Angeles press conference he attended with Michael Gennaco and the head of the DOJ Civil Rights Division, AAG Perez. At that conference, AAG Perez praised Mr. Baca for his cooperation with DOJ's civil rights investigation. The fact that this federal civil rights investigation was only at that point civil, not criminal, and focused on civil rights violations involving racial discrimination rather than civil rights violations involving excessive force, only goes to the weight of such evidence, not its relevancy under Rule 401. Such extremely probative and relevant evidence was admitted in the first trial to rebut the Government's argument that Mr. Baca did not want to partner with the DOJ (which includes the FBI and U.S. Attorney's Office are part of) in civil rights investigations involving the LASD; there was no basis to exclude it in the second trial as irrelevant or somehow unduly prejudicial under Rule 403. This is particularly true since the Court allowed the Government to play an excerpt of the April 12, 2013 interview where Mr. Baca referenced AAG Perez but did not allow Mr. Baca to connect that reference to his cooperation with AAG Perez and the DOJ Civil Rights Division's investigation of the LASD occurring in August 2011 in order to demonstrate the falsity of the Government's motive theory. *See*, *e.g.*, Trial Exhibit 120 (Court redacted Mr. Baca's calendar after its admission into evidence unredacted by deleting reference to meeting and press conference between AAG Perez and Mr. Baca on August 19, 2011).

Further, applying *Stever*, exclusion of this crucial evidence violates Mr. Baca's constitutional right to present a defense. As discussed above, this evidence of Mr. Baca's willingness to cooperate with a federal civil rights investigation into the LASD was highly probative of Mr. Baca's lack of guilt, as the central issue in the case was Mr. Baca's alleged obstruction of another contemporaneous federal civil rights investigation. The evidence was well documented through calendar entries and press releases and thus its reliability was not in question. There was nothing about the evidence that would cause the jury difficulty in its

evaluation. Because the Court precluded all evidence regarding Mr. Baca's cooperation with this DOJ Civil Rights Division investigation, the evidence precluded constituted the sole evidence on the issue and was not cumulative. Finally, as evidenced by the arguments made by Mr. Baca in the first trial highlighting Mr. Baca's cooperation with a contemporaneous federal civil rights investigation of the LASD to rebut the Government's motive theory, the excluded evidence constituted a major part of Mr. Baca's attempted defense.

### 2.    The Court Erroneously Excluded Evidence Relating to OIR

The Court also erred in excluding evidence that Mr. Baca established, supported and worked with OIR as an independent policing body to oversee and critique the operations of LASD from its inception in 2001 through the charged obstruction in 2011. The Court held that such evidence was irrelevant and unduly prejudicial. Throughout both trials, the Government advanced the theory that Mr. Baca's motive to obstruct the grand jury investigation into civil rights violations in the jails was based on his belief that LASD "should police itself" to the exclusion of other independent policing organizations. Evidence regarding Mr. Baca's role in establishing OIR and ensuring that it had sufficient resources and cooperation from the LASD to do its job would have directly rebutted this theory. However, Mr. Baca was precluded from offering such evidence and Mr. Gennaco's testimony was largely restricted to his involvement in two meetings with the U.S. Attorney's Office. Indeed, Mr. Gennaco was not even permitted to testify to OIR's and the LASD's efforts during the summer of 2011 to address inmates' complaints about LASD retaliation, though the Court admitted a highly prejudicial document (Trial Exhibit 53) that made it appear that the LASD had improperly determined 18 out of 19 such complaints as unfounded. While Mr. Gennaco was allowed to testify in a limited fashion to foundational evidence regarding his background and give a general overview of OIR, the defense was precluded from delving into the key facts admitted in the first trial that connected Mr. Baca with OIR's and Mr. Gennaco's efforts to independently review and critique the LASD with respect to any civil rights violations in the jails; such evidence would have demonstrated Mr. Baca's lack of motive to obstruct another outside organization, namely, the FBI, investigating such violations. The defense was even severely limited by the Court in closing argument in

addressing admitted testimony of Mr. Gennaco's background as a long-time, experienced federal civil rights prosecutor.

Through its rulings, the Court precluded Mr. Baca from presenting any evidence or argument in the second trial, unlike in the first trial, that: 1) Mr. Baca established OIR in 2001 and supported it significantly through the years, including during the charged obstruction of justice period, to serve as an independent oversight body for the LASD, thus explaining why Mr. Baca was willing to rely on OIR to effectively conduct independent oversight of LASD; 2) Mr. Baca selected Mr. Gennaco because of his extensive history as a federal civil rights prosecutor, and he, in turn, brought in five experienced civil rights lawyers to work with him at OIR; 3) OIR issued quarterly and annual reports, held press conferences, and wrote letters to the court supervising the LASD jails critiquing the LASD, including its handling of deputy abuse and retaliation claims; and 4) Mr. Gennaco had long-standing relationships with several of the key decision makers in the U.S. Attorney's Office including Andre Birotte, Jr., and Lawrence Middleton, as well as AAG Tom Perez and served as an intermediary between Mr. Baca and the federal prosecutors during the charged obstruction of justice period. This evidence would have, directly rebutted the Government's theory, as it did in the first trial, that Mr. Baca was not open to independent oversight of the LASD and was thereby motivated to obstruct the grand jury investigation. To the extent that the Government argued that OIR was ineffective as an independent body reviewing the LASD, such argument went to the weight, not the admissibility, of such probative and relevant evidence. Similarly, none of the concerns under Rule 403 justified the exclusion of such significantly probative and relevant evidence. As such, Mr. Baca was deprived of his constitutional due process right to rebut the Government's motive evidence, which constitutes reversible error. *See Whitman,* 771 F.2d at 1351 ("once the government produced evidence from which the jury could reasonably infer . . . motive, appellant had the right to rebut this evidence"); *Crenshaw*, 698 F.2d at 1066.

Additionally, each of the factors considered by *Stever* weigh in favor of a finding that the Court's exclusion of the evidence relating to OIR violated Mr. Baca's constitutional right to present a defense. The probative value was significant given that the evidence directly rebutted

the Government's motive theory that Mr. Baca believed the police should police themselves. The evidence was reliable and able to be evaluated by the jury as it concerned objective facts regarding Mr. Baca's involvement in establishing and working with OIR, the role of OIR in independently monitoring the LASD, and Mr. Gennaco's relevant background. The evidence precluded was not cumulative as it was the sole evidence regarding Mr. Baca's role in establishing OIR and his reliance on OIR for over a decade as an independent oversight body of the LASD. Finally, the evidence was a major part of Mr. Baca's defense as evidenced by the fact that Mr. Gennaco was the defense's *only* witness in the second trial.

3.    The Court Erroneously Excluded Evidence of Mr. Baca's Direct Responses to Excessive Force Issues in the Jails

The Court further erred in excluding various forms of evidence that showed Mr. Baca's direct responses to excessive force issues in the jails to rebut the Government's motive theory. As the Government contended, the focus of the grand jury investigation centered on allegations of "widespread" deputy abuse of inmates in the jails. This fact was squarely put before the jury in the first and second trials through the testimony of various witnesses including multiple FBI agents. For example, Special Agent Tanner described in graphic detail in both trials numerous abuses that inmates and an LASD deputy reported to her including brutal beatings conducted and covered up by LASD deputies.

In the first trial, the Court permitted some testimony as to Mr. Baca's responses to the "widespread" inmate abuse by, for example, permitting the testimony of Mr. Gennaco regarding the newly adopted LASD anti-retaliation measures in the summer of 2011 and the testimony of Commander Pietrantoni detailing the improved deputy training in 2010-11 on the proper use of force in the jails. The Court refused to allow any testimony in that first trial about the EBI programs Mr. Baca implemented that reduced deputy abuse of inmates or the work of the CMTF in revising use of force policies and procedures. In the second trial, the Court banished all of Mr. Baca's responses, even those permitted in the first trial. Nevertheless, the Court permitted the Government to introduce in the second trial evidence and argument that the deputy abuse and inmate beatings were "widespread" in the jails and Mr. Baca was the head of the organization in

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SANTA MONICA

19                                                    CR 16-66(A) - PA

charge of and responsible for the actions of those below him involved in that "widespread" abuse.[2]  The jury was left with the highly distorted and extremely prejudicial impression that Mr. Baca took no actions before, during or after August-September 2011 to address this "widespread" deputy abuse of inmates in the organization that he led for over 15 years, when, in fact, he took numerous actions to deal with such abuse.  In fact, that highly distorted view fed the Government's motive theory since the jury could easily infer that someone who took no action to address widespread abuse for which he was responsible would want to hide such abuse from outside law enforcement agencies and obstruct their investigation into it.  On the other hand, someone addressing that abuse through numerous programs, policies and personnel would have no motive to hide the abuse and responses to it from outside authorities.

The Court's exclusion of this key evidence central to Mr. Baca's defense to the Government's motive theory further violated his constitutional right to present his defense.

### 4.    The Court Erred in Excluding Certain Statements Made During the April 12, 2013 Interview

The Court committed reversible error by excluding certain of Mr. Baca's statements in the April 2013 interview that the defense sought to introduce.  By excluding these statements, the Court's ruling allowed the jury to be misled as to Mr. Baca's state of mind in making the alleged false statements, distorted the record, and violated Rule 106's rule of completeness and rules governing the state of mind exception to the hearsay rule.  The excluded statements were part of prior answers and qualifications to ambiguous, and sometimes hypothetical, questions, all of which occurred contemporaneously during the 4.5-hour interview.  As argued at trial and in pleadings, these statements were not inadmissible hearsay since they were not offered to prove the truth of matters asserted but to show Mr. Baca's state of mind and to give necessary context to

---

[2] Though the Government did not introduce evidence in the second trial (as it did in the first trial) from ACLU and other witnesses that showed that Mr. Baca was directly aware of deputy abuse of inmates, this lack of direct "notice" evidence did not change the Government's motive theory between the two trials.  The Government's theory remained consistent that Mr. Baca did not want the FBI to investigate the alleged "widespread" deputy abuse of inmates in an organization that he led and was responsible for and therefore obstructed that investigation. Evidence of Mr. Baca's responses to that alleged "widespread" abuse to rebut the Government's motive theory was just as highly relevant in the second trial as it was in the first trial.

the statements. *See e.g.*, Dkt. No. 146.

### 5.    The Court Erroneously Precluded Evidence of Mr. Baca's Alzheimer's Disease

The Court committed reversible error by excluding the highly relevant testimony of defense expert Dr. Spar regarding the effect of Mr. Baca's Alzheimer's disease on the four allegedly false statements he made during the April 12, 2013 interview.

There was no question Dr. Spar's credentials qualified him to offer such testimony.  Dr. Spar is one of the nation's leading experts on Alzheimer's disease and other mental illnesses affecting the elderly, is a Professor of Clinical Psychiatry in the Department of Psychiatry and Biobehavioral Sciences at the David Geffen School of Medicine at UCLA, and has spent his 38-year career devoted mainly to clinical and training program administration, teaching, and research in the evaluation and treatment of elderly patients with mental illness.  Based on his extensive background, training, research and experience with Alzheimer's and his review of the medical literature concerning Alzheimer's as well as Mr. Baca's medical records, the relevant facts of this case, and the transcript of the April 12, 2013 Government interview of Mr. Baca, Dr. Spar was prepared to testify to a reasonable medical certainty based on valid reasoning and methodology that:

(i) Mr. Baca was either in the pre-clinical stage (which can occur 10 years or more before the onset of clinical symptoms) or the mild cognitive impairment  stage of Alzheimer's during his April 12, 2013 Government interview; and

(ii) In either stage, Mr. Baca's Alzheimer's increased the probability that during his April 12, 2013 Government interview, memory impairment affected his answers to questions about events and conversations that occurred 20 months earlier in August-September 2011.

After severing the first trial, finding the Alzheimer's evidence relevant to the false statement count but not relevant to the other counts, the Court recombined the counts for the second trial after the Government represented to the Court that it understood and was willing to accept the potential prejudice it may face should the Alzheimer's evidence be presented in a combined trial.  Despite this representation, on the eve of the second trial, the Court held that the

Alzheimer's evidence should be precluded.  The Court found that there was not sufficient scientific evidence to link Mr. Baca's current diagnosis to the charge in Count 3.  This ruling was largely based on the Court's view that such evidence was speculative as it pertained to events that occurred or statements that were made prior to defendant's diagnosis.  This ruling, however, ignored established scientific evidence that symptoms of this progressive disease can date back as far as 10 years prior to diagnosis.  The Court improperly exceeded its role as the gatekeeper and ruled as to the *weight* of the evidence, which should have been left to the jury.  *See e.g. United States v. Sandoval-Mendoza*, 472 F.3d 645, 655-56 (9th Cir. 2006)(**reversing** district court's exclusion of medical expert opinion under FRE 702 and FRE 403 and holding that district court erred when it concluded that "the proposed medical expert opinion testimony was unreliable because it did not conclusively prove. . . lack of predisposition [for Defendant's entrapment defense]" because "medical knowledge is often uncertain.").  Accordingly, the Court erred in precluding this highly relevant evidence, especially in light of procedural history of the case and the Court's previous findings regarding the relevancy of the evidence as to Count 3.

>          a.    The Court's Improper Exclusion of Evidence of Mr. Baca's Alzheimer's Diagnosis Dictates a Reversal on Appeal As to Counts 1 and 2 as well as Count 3

In the second trial, the Government repeatedly tied the Count 3 false statements with the Count 1 and 2 conspiracy and obstruction of justice counts by arguing that Mr. Baca committed the obstruction and then lied to cover it up.  In other words, the Government contested that Mr. Baca's false statements about the actions constituting the obstruction of justice demonstrated his "consciousness of guilt" for those actions.  Accordingly, since the evidence of whether Mr. Baca knowingly made false statements was directly connected to all counts, by precluding Mr. Baca's ability to show that he did not knowingly make any false statement based on his Alzheimer's disease's effect on his memory, the preclusion of such evidence warrants reversal on all three counts.

Moreover, the Court's decision to preclude Mr. Baca from offering evidence as to his Alzheimer's condition directly violated his constitutional right to present a defense to the three counts.  Applying the factors considered in *Stever*, there should be no question that this evidence

was: 1) extremely probative in that it offered direct evidence that showed that Mr. Baca did not have the intent to lie during the April 12, 2013 interview; 2) reliable in that it would have been confirmed by the testimony of expert witnesses; 3) capable of evaluation by the jury, particularly with the assistance of these experts;[3] 4) not cumulative, as all evidence of Mr. Baca's condition was excluded by the Court; 5) a major, if not the most important, part of Mr. Baca's attempted defense to knowingly making the false statements in that if proven, the evidence regarding Mr. Baca's Alzheimer's disease at the time would have negated his intent to make a false statement during the Government interview.

> b.    The Court Erred by Excluding Evidence of Mr. Baca's Alzheimer's Disease When the Government Opened the Door by Introducing 2015 Statements by Mr. Baca After He Was Diagnosed in May 2014

The Court further erred by excluding evidence relating to Mr. Baca's Alzheimer's condition after the Government opened the door to such evidence by offering statements that Mr. Baca made in a 2015 civil deposition in *Antuna*.  These statements went to the heart of the Government's argument for all three counts that Mr. Baca relied on Mr. Tanaka to carry out his allegedly obstructive orders.  Specifically, the Government offered video recordings in which Mr. Baca: "[(1)] characterized his relationship with his coconspirator and former undersheriff Paul Tanaka as extremely close (like 'father and son'); and [(2)] stated that former undersheriff Tanaka had a 'unique talent of doing exactly what I wanted done." (Dkt. 272, p. 4)  Each of these statements that the Government introduced pertained to Mr. Baca's memory of events years before the 2015 deposition occurred.

Because the Court allowed these statements to be presented to the jury, it committed reversible error by not allowing Mr. Baca to present evidence bearing on his mental health condition, memory and state of mind at the time of the deposition – including his undisputed 2014 diagnosis of mild cognitive impairment affecting his memory as a result of his Alzheimer's disease.  Given that these statements were admitted as statements by a party-opponent, Mr. Baca

---

[3] In evaluating this prong, the Ninth Circuit in *Stever* stated that "[i]t is beyond dispute that proper expert testimony is capable of evaluation by a jury." *Stever*, 603 F.3d at 757.

had a clear right to attack the credibility of his statements by showing that, because of his Alzheimer's condition, his ability to recall information was impaired and he was more susceptible to conditions such as fatigue that would further impair his ability to answer questions in a deposition that spanned the course of two days. "The credibility of a witness can always be attacked by showing that his capacity to observe, remember, or narrate is impaired." *United States v. Kaplan*, 832 F. 2d 676, 684-85 (1st Cir. 1987); *United States v. Collicott*, 92 F.3d 973, 981, n. 5 (9th Cir. 1996), *as amended* (Oct. 21, 1996) (The methods of impeaching a witness include ". . . (4) attacking the perception or memory of the witness . . .").

Moreover, "because the credibility of [a] party-opponent is always subject to an attack," once the statement of a party opponent has been admitted into evidence, the party opponent's "credibility may be attacked, and then supported, by any evidence that would be admissible for those purposes if the [party opponent] had testified as a witness." Fed. R. Evid. 806, S. Rep. No. 1277, 93d Cong., 2d Sess. (1974), ("The committee considered it unnecessary to include statements contained in Rule 801(d)(2)(A) and (B)-the statement by the party-opponent himself . . . because the credibility of the party-opponent is always subject to an attack on his credibility."). Accordingly, the Court erred by not allowing Mr. Baca to attack the credibility of the 2015 *Antuna* statements by presenting undisputed scientific evidence that his memory and ability to answer questions were impaired at the time.

### D. Mr. Baca Will Present A Substantial, Non-Frivolous Question on Appeal As To the Materiality Of The False Statements In Count 3 Likely To Result In Reversal Or A New Trial

In addition to the substantial, non-frivolous questions on appeal relating to erroneous evidentiary rulings and constitutional violations, there are substantial, non-frivolous questions as to the legal sufficiency of the charged false statements in Count 3. More specifically, the Government presented insufficient evidence of materiality to sustain Count 3.

Despite calling four FBI agents and the U.S. Attorney as witnesses, the Government failed to present *any* evidence about the capability of Mr. Baca's allegedly false statements to influence the FBI's and U.S. Attorney's Office's investigations or decisions as of April 12, 2013 or

thereafter. **Shockingly, the Government failed to ask any of the four FBI agents or the U.S. Attorney one question about the potential effects any of Mr. Baca's four alleged statements may have had on their investigations or decisions as of April 12, 2013.**  As such, there is a substantial issue on appeal as to whether the Court erred in denying Mr. Baca's Rule 29 motion for judgment of acquittal of Count 3.  Count 3 charged Mr. Baca with making a false statement in violation of 18 U.S.C. § 1001(a)(2). The Government needed to show that Mr. Baca willfully made a false statement in a matter within the jurisdiction of the FBI or the U.S. Attorney's Office that was material to their activities or decisions. A false statement is material if it "has a natural tendency to influence, or was capable of influencing, the decision of the decision-making body." *United States v. Peterson*, 538 F.3d 1064, 1072 (9th Cir. 2008) (citing *United States v. Gaudin*, 515 U.S. 506, 509 (1995)). The materiality of a misstatement depends on "the effect that is reasonably anticipated at the time the statement is made, not on how things turn out." *United States v. Kwiat*, 817 F.2d 440, 445 (7th Cir. 1987).  In deciding whether a statement is "material," the tribunal must determine two questions of purely historical fact: "What statement was made?" and "What decision was the agency trying to make?" *Gaudin*, 515 U.S. at 512. The ultimate question is then, "Was the statement material to the decision?" *Id*.

Here, there is a substantial, non-frivolous question for appeal likely to result in reversal or a new trial since the Government elicited **<u>no</u>** evidence detailing what specific decisions of the FBI or U.S. Attorney's Office Mr. Baca's statements could have influenced as of April 12, 2013. Without such evidence, no rational juror could have found beyond a reasonable doubt that the materiality element of the charge was satisfied; as such, the conviction on this count will be reversed on appeal.  *See, e.g., United States v. Talkington*, 589 F.2d 415 (9th Cir. 1978) (**reversing** district court and holding that the evidence on the issue of the materiality of the statements was insufficient to sustain the conviction as three of the five false statements charged were not materially false); *United States v. Beltran*, 136 F. App'x 59, 61 (9th Cir. 2005)(**reversing** defendant's conviction finding that false statement to Customs Agent was immaterial as a matter of law because of lack of evidence that statement was capable of influencing the agent's decision-making process); *United States v. Mousavi*, 378 F. App'x 667

(9th Cir. 2010) (**reversing** defendant's false statements conviction in a case before Judge Percy Anderson based on finding that defendant's statements to Special Agent's regarding his military affiliation were immaterial  because the "[a]gents provided no testimony about the scope of their investigations into [defendant] or the relevance of his statements to that investigation" and "the jury thus had no evidence regarding what decision ... the agency [was] trying to make.").

## IV.    CONCLUSION

Based on the reasons above, Mr. Baca respectfully submits that he satisfies all three prongs of 18 U.S.C. § 3143(b)(1) and thus the Court shall granted bail pending appeal under the Bail Reform Act.

Dated: May 10, 2017                                   MORGAN, LEWIS & BOCKIUS LLP


By /s/ *Nathan J. Hochman*
Nathan J. Hochman
Attorneys for Defendant Baca

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SANTA MONICA