# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF DOCUMENT DISCREPANCIES

FILED
CLERK, U.S. DISTRICT COURT

MAY 1 2 2017

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

To: ☑ U.S. District Judge / ☐ U.S. Magistrate Judge PERCY ANDERSON

From: V.R. VALLERY_____, Deputy Clerk    Date Received: MAY 1, 2017

Case No.: CR 16-66-PA; CR 15-255-PA; CR 13-819-PA    Case Title: U.S.A. V. Baca; U.S.A. v. Tanaka; U.S.A. v. Thompson, et al.

Document Entitled: DECLARATION OF ANTHONY BROWN, SR.

Upon the submission of the attached document(s), it was noted that the following discrepancies exist:

☐ Local Rule 5-4.1      Documents must be filed electronically
☐ Local Rule 6-1        Written notice of motion lacking or timeliness of notice incorrect
☐ Local Rule 7-19.1     Notice to other parties of ex parte application lacking
☐ Local Rule 7.1-1      No Certification of Interested Parties and/or no copies
☐ Local Rule 11-3.1     Document not legible
☐ Local Rule 11-3.8     Lacking name, address, phone, facsimile numbers, and e-mail address
☐ Local Rule 11-4.1     No copy provided for judge
☐ Local Rule 11-6       Memorandum/brief exceeds 25 pages
☐ Local Rule 11-8       Memorandum/brief exceeding 10 pages shall contain table of contents
☐ Local Rule 15-1       Proposed amended pleading not under separate cover
☐ Local Rule 16-7       Pretrial conference order not signed by all counsel
☐ Local Rule 19-1       Complaint/Petition includes more than 10 Does or fictitiously named parties
☐ Local Rule 56-1       Statement of uncontroverted facts and/or proposed judgment lacking
☐ Local Rule 56-2       Statement of genuine disputes of material fact lacking
☐ Local Rule 83-2.5     No letters to the judge
☐ Fed. R. Civ. P. 5     No proof of service attached to document(s)
☑ Other:    Filer is not a party to the above cases.

**Please refer to the Court's website at www.cacd.uscourts.gov for Local Rules, General Orders, and applicable forms.**

### ORDER OF THE JUDGE/MAGISTRATE JUDGE

IT IS HEREBY ORDERED:

☐   The document is to be filed and processed. The filing date is ORDERED to be the date the document was stamped "received but not filed" with the Clerk. Counsel* is advised that any further failure to comply with the Local Rules may lead to penalties pursuant to Local Rule 83-7.

_____                    _____
Date                                       U.S. District Judge / U.S. Magistrate Judge

☑   The document is **NOT** to be filed, but instead **REJECTED**, and is ORDERED returned to counsel.* Counsel* shall immediately notify, in writing, all parties previously served with the attached documents that said documents have **not** been filed with the Court.

_____5/12/17_____                          _____
Date                                       U.S. District Judge / U.S. Magistrate Judge

* The term "counsel" as used herein also includes any pro se party. See Local Rule 1-3.

COPY 1 -ORIGINAL-OFFICE      COPY 2 -JUDGE      COPY 3 -SIGNED & RETURNED TO FILER      COPY 4 -FILER RECEIPT

CV-104A (06/13)                    NOTICE OF DOCUMENT DISCREPANCIES

Anthony Brown Sr.

P.O. Box 931 /01-112

Imperial, Ca 92251

In Pro-Per

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

DECLARATION OF INMATE AB
KNOWN AS FBI INFORMANT
ANTHONY BROWN SR. - RE:
CASE # CR 13 00819, # CR 15 0255
AND CASE # CR 16 0066

CASE NO: CR 16-0066 - PA
CR 15-0255 - PA
CR. 13-0089 PA

DECLARATION OF ANTHONY BROWN SR.
W/ EXHIBITS 1 THROUGH 10 ATTACHED

I, ANTHONY BROWN SR., DECLARE AND STATE AS FOLLOWS:

1. I MAKE THIS DECLARATION OF MY OWN PERSONAL KNOWLEDGE, AND, IF CALLED TO TESTIFY TO THE FACTS BELOW, COULD AND WOULD DO SO COMPETENTLY UNDER OATH.

2. I WAS AT THE CENTER OF THE FOLLOWING LOS ANGELES COUNTY SHERIFF'S DEPARTMENT INDICTMENTS FILED BY THE UNITED STATES OF AMERICA: CR 13-00819, (THOMPSON, ET AL.,), CR 15-0255 (TANAKA AND CAREY), AND CR 16-0066 (LERO, D. BACA), GILBERT MICHEL

1.

CASE NO. UNKNOWN AT THIS TIME.

3. IN TOTAL 11 LASD OFFICIALS WERE INDICTED AND CONVICTED RE: MY ROLE IN THE FBI INVESTIGATION INTO THE LOS ANGELES COUNTY JAIL.

4. EACH OF THE ABOVE MENTIONED INDICTMENT #'s REFERRED TO ME AS INMATE AB.

5. IN INDICTMENT CASE NO. 13 CR-00819 PAGE 3: 25-28 SPECIFICALLY, EXPLAINS THAT INMATE AB WAS A COOPERATING WITNESS IN THE (FBI) INVESTIGATION OF ALLEGED FEDERAL CIVIL RIGHTS AND PUBLIC CORRUPTION VIOLATIONS COMMITTED AND BEING COMMITTED BY LASD DEPUTIES.

6. PAGE 4: 5-11 OF INDICTMENT CASE NO. 13 CR-00819 SPECIFICALLY, EXPLAINS THAT INMATE AB WAS ASSISTING IN A COVERT PUBLIC CORRUPTION INVESTIGATION OF LASD DEPUTY GILBERT MICHEL ... INMATE AB WAS PROVIDING INFORMATION ABOUT ALLEGED FEDERAL CIVIL RIGHTS OFFENSES BEING COMMITTED BY LASD DEPUTIES WHO WERE ALLEGEDLY ABUSING INMATES.

7. I WAS GOOD ENOUGH TO BE RECRUITED BY THE FBI TO DO THEIR DIRTY WORK RE: THE FBI INVESTIGATION INTO THE LOS ANGELES COUNTY JAIL AS A FBI INFORMANT GATHERING EVIDENCE.

8. THE FBI/USAO DID NOT FEEL I WAS GOOD ENOUGH TO RECEIVE JUSTICE FOR THE QUESTIONABLE MISCONDUT OF LASD AND LAPD WHICH LED TO MY WRONGFUL CONVICTION. DURING THE TIME I WAS UNDER THE FBI WATCH AS AN FBI INFORMANT.

2.

ASSISTANT UNITED STATES ATTORNEYS ("AUSA") BRANDON D. FOX & LIZABETH A. RHODES OF THE UNITED STATES ATTORNEY'S OFFICE ("USAO") WERE EAGER TO TO INDICT THE LASD DEPUTIES THAT WERE INVOLVED IN LOS ANGELES SHERIFF'S DEPARTMENT "OPERATION PANDORA'S BOX" IN WHICH LASD DEPUTIES KIDNAPPED AND HID ME (FBI INFORMANT ANTHONY BROWN SR.)

9. IN 2012 I, ANTHONY BROWN SR. PRESENTED TO AUSA BRANDON FOX AND LIZABETH A. RHODES EVIDENCE OF LAPD / LASD QUESTIONABLE MISCONDUCT THAT WAS USED TO OBTAIN MY WRONGFUL CONVICTION WHILE I WAS AN FBI INFORMANT WHO WAS UNDER THE WATCH OF FBI AGENTS.

10. AUSA BRANDON FOX, AND AUSA LIZABETH A. RHODES REFUSED TO STEP IN AND INVESTIGATE THE QUESTIONABLE MISCONDUCT OF LAPD / LASD EVEN AFTER VIEWING SAID EVIDENCE.

11. MY JOB ASSISTING THE FBI WITH THEIR INVESTIGATION INTO THE LOS ANGELES COUNTY JAIL AS AN FBI INFORMANT WAS TO GATHER INFORMATION / EVIDENCE ABOUT THE CORRUPT LASD DEPUTIES AND REPORT MY FINDINGS TO THE FBI. WHILE DOING SO I ALSO REPORTED THE QUESTIONABLE MISCONDUCT OF LAPD DETECTIVE VERONICA CONRADO AND LASD DEPUTY KELLY C. MARCHELLO TO THE FBI / USAO, WHICH LED TO MY WRONGFUL CONVICTION!

12. THE FBI, USAO WERE AFTER CORRUPT COPS LAPD DETECTIVE CONRADO AND LASD DEPUTY MARCHELLO

3.

WERE CORRUPT COPS WHO WERE UNAWARE OF THE FBI INVESTIGATION INTO THE LOS ANGELES ("L.A.") COUNTY JAIL AND UNAWARE THAT I WAS A COVERT FBI INFORMANT ASSISTING THE FBI WITH THEIR INVESTIGATION. I PROVIDED EVIDENCE OF BOTH LAPD DETECTIVE CONRADO AND LASD DEPUTY MARCHELLO CORRUPTION TO THE FBI / AUSA BRANDON FOX AND AUSA LIZABETH RHODES.

13. AUSA BRANDON FOX AND AUSA LIZABETH RHODES ONLY WENT AFTER LOS ANGELES SHERIFF'S DEPUTIES RE: LASD OPERATION PANDORA'S BOX AND TOTALLY IGNORED THE QUESTIONABLE MISCONDUCT OF LAPD DETECTIVE CONRADO AND LASD DEPUTY MARCHELLO WHO BOTH WERE CORRUPT WORKING FOR LASD AND LAPD WHEN THEY COMMITTED THE QUESTIONABLE MISCONDUCT UPON ME. WHILE I WAS UNDER THE FBI WATCH AS AN FBI INFORMANT.

14. ATTACHED AS EXHIBIT 1 IS THE UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA REPORT AND RECOMMENDATION ISSUED FEBRUARY 21, 2017 AND ACCEPTED MARCH 29, 2017. REGARDING LAPD DETECTIVE VERONICA CONRADO/LASD DEPUTIES.

15. IN 2012 WHEN I PROVIDED CLEAR EVIDENCE OF LAPD DETECTIVE CONRADO AND LASD DEPUTY MARCHELLO'S QUESTIONABLE MISCONDUCT WHICH LED TO MY WRONGFUL CONVICTION. AUSA BRANDON FOX, AUSA LIZABETH RODES AND FBI SPECIAL

4.

AGENT LEAH MARX ALL BLEW ME OFF BY TELLING ME THEY CAN'T GET INVOLVE.

16. IN JUNE OF 2015 AUSA BRANDON FOX, AUSA LIZABETH RHODES AND THE FBI STEPPED IN AS PART OF THERE WIDE RANGING INVESTIGATION INTO ABUSE AND CORRUPTION INSIDE L.A. COUNTY JAILS TO HELP MR. GABRIEL CARRILLO AND MR. CARRILLO'S WEALTHY ATTORNEY MR. RON KAYE SAID AUSA INDICTED AND ULTIMATELY CONVICTED THE LASO DEPUTIES INVOLVED. EXHIBITS 4, 5, AND 6

17. THE FBI INTERVIEWED LASO DEPUTY WOMACK BASED ON MR. RON KAYE (CARRILLO'S ATTORNEY) WHO ASKED AUSA BRANDON FOX / AUSA LIZABETH RHODES TO STEP IN SEE EXHIBIT-6 PAGE 2, WHEN LOS ANGELES DISTRICT ATTORNEY'S REFUSED TO CHARGE LASO DEPUTIES.

18. BRANDON FOX AND LIZABETH RHODES ARE THE SAME ASSISTANT UNITED STATES ATTORNEY'S WHO REFUSED TO HAVE THE FBI INTERVIEW LASO DEPUTY MARCHELLO AND LAPD DETECTIVE CONRADO ESP. AFTER SEEING THE EVIDENCE I PRESENTED OF MARCHELLO AND CONRADO'S POLICE / LAW ENFORCEMENT MISCONDUCT THAT VIOLATED MY CIVIL AND CONSTITUTIONAL RIGHTS WHICH RESULTED IN MY WRONGFUL CONVICTION.

19. THE EVIDENCE I PRESENTED TO AUSA BRANDON FOX, LIZABETH RHODES AND THE FBI WAS WAY MORE POWERFUL THAN THE SELF SERVING

5.

PHOTO TAKENS BY MR. CARRILLO'S WIFE

20. IT'S VERY CLEAR THAT BECAUSE I AM A BLACK MAN I WAS DISCRIMINATED AGAINST BY THE UNITED STATES ATTORNEY'S OFFICE. ESP. WHEN YOU ADD THE FACT THAT WITHOUT ME (ANTHONY BROWN SR ) THERE WOULD NOT BE ANY OF THE FOLLOWING INDICTMENTS / CONVICTIONS OF CASES CR 13-00819, CR 15-00255, AND CR 16-0066 THE USAO (MR FOX AND MS RHODES) AND THE FBI ( LEAH TANNER (NEE MARX) ) HAS SHOWN EQUAL PROTECTION OF THE LAW DON'T APPLY TO A BLACK MAN IN AMERICA.

21. IN 2010 I WAS RECRUITED BY AND ASSITED THE FBI WITH THEIR INVESTIGATION INTO THE LOS ANGELES, COUNTY JAIL, AS AN COVERT FBI INFORMANT. EXHIBIT-2 PAGE 4: 5-11

22. IN 2011 (AUGUST) LASD KIDNAPPED, CHANGED MY NAME TO HIDE ME FROM THE FBI, USAO AND THE U.S. MARSHAL. WHILE AT THE SAME TIME LASD INTERROGATED ME TO FIND OUT WHAT I KNEW AND WHAT I HAD TOLD THE FBI. WHILE NOT PROVIDING PROPER MEDICAL TREATMENT TO ME. EXHIBIT-2

23. ON SEPTEMBER 12, 2011 LASD GAVE MY REAL NAME BACK TO ME AND DROVE ME TO LANCASTER STATE PRISON AND THE FOLLOWING OCCURRED

6.

24. FROM 2011 THROUGH APRIL 23, 2014 THE FBI CAME TO LANCASTER AND CENTINELA STATE PRISON TO OBTAIN THE INFORMATION / DEBRIEF ME ABOUT WHAT HAPPEN WHEN LASD KIDNAPPED / HID ME ETC. EXHIBIT -3 WHICH EVENTUALLY LED TO THE INDICTMENTS AND CONVICTIONS OF GILBERT MICHEL AND THE TEN (10) OTHER LASD OFFICIALS RE: "OPERATION PANDORA'S BOX"

25. PRIOR TO LASD DEPUTIES KIDNAPPING/HIDING ME FROM THE FBI. I WOULD MEET WITH FBI AGENTS LEAH MARX AND DAIVD # 1. I WOULD EXPLAIN TO THE FBI THAT LASD DEPUTIES WERE TAKING BRIBES BRINGING IN DRUGS FOR MONEY ETC.

26. IN LATE JUNE 2011 I WAS INSTRUCTED BY FBI SPECIAL AGENT LEAH MARX TO SEE/FIND OUT IF LASD DEPUTIES WOULD TAKE A BRIBE.

27. IN JULY 2011 LASD DEPUTY GILBERT MICHEL ACCEPTED THE BRIBE FROM ME. I THEN GAVE DEPUTY MICHEL THE PHONE NUMBER THAT FBI AGENT LEAH MARX HAD SET UP AND PROVIDED TO ME IN CASE A DEPUTY WOULD ACCEPT A BRIBE FROM ME. THE PHONE NUMBER PROVIDED BY FBI AGENT MARX WENT TO UNDERCOVER FBI AGENT AGENT KNOWN TO ME AS CJ POSING AS MY HOMEY.

28. LASD DEPUTY MICHEL CALL THE PHONE # I PROVIDED TO HIM AND MET WITH UNDERCOVER

7.

FBI AGENT C.J. AND WAS PROVIDED PAYMENT AND A CELL PHONE TO BRING TO ME.

29. ON ANOTHER MEETING WITH UNDERCOVER FBI AGENT C.J LASD DEPUTY MICHEL WAS PROVIDED PAYMENT AND A NOTE TO BRING TO ME.

30. LASD DEPUTY MICHEL MADE A COMPLAINT TO ME BECAUSE UNDERCOVER FBI AGENT C.J WAS NOT PROVIDING DEPUTY MICHEL WITH THE FEE THAT WAS AGREED UPON BY DEPUTY MICHEL AND I.

31. AT THAT POINT LASD DEPUTY MICHEL AND I CUT A DEAL IN WHICH, IF I GAVE HIM $20,000.00 HE WOULD BRING ME ANY AND EVERYTHING.

32. AS A GOOD FAITH ACT DEPUTY MICHEL BOUGHT ME CONTRABAND IN THE FORM OF BOXES OF CIGARETTES, LIGHTERS AND A SMALL AMOUNT OF DRUGS (METH & WEED) I THEN TOLD DEPUTY MICHEL IN ORDER FOR ME TO SEND HIM $20,000.00 I WILL NEED FOR HIM (MICHEL) TO GIVE ME AN ADDRESS SO THAT HE CAN GET THE PAYMENT OF $20,000.00.

33. LASD DEPUTY MICHEL CAME TO ME AND GAVE ME AN ADDRESS TO SEND THE $20,000.00 AT WHICH POINT I USED THE CELL PHONE THAT UNDERCOVER FBI AGENT C.J HAD PREVIOUSLY GIVEN TO DEPUTY MICHEL TO BRING TO ME. I CALLED AND TEXTED C.J TO GIVE HIM THE ADDRESS DEPUTY MICHEL HAD GAVE ME TO SEND THE MONEY ($20,000) TO.

34. THE MORNING OF AUGUST 8, 2011 DEPUTY MICHEL WAS KINDA UP-SET BECAUSE HE HAD NOT

YET RECEIVED THE $20,000.00 AND DEPUTY MICHEL WAS UP-SET THAT CJ NEVER GAVE HIM THE RIGHT AMOUNT MONEY EACH TIME THEY MET.

35. DEPUTY MICHEL GAVE ME THE PHONE AND THE NOTE THAT HE HAD PICKED UP FROM UNDERCOVER FBI AGENT CJ. PRIOR TO 8-8-2011.

36. DEPUTY MICHEL EXPLAINED TO ME BECAUSE HE WAS NOT GETTING WHAT HE AND I AGREED UPON IT WAS NOT WORTH IT TO DO BUSINESS WITH ME.

37. DEPUTY MICHEL KNEW I WAS GOING TO LCMC (LOS ANGELES COUNTY MEDICAL CENTER) THAT MORNING SO BECAUSE HE WAS UP-SET HE LEFT THE PHONE WITH ME (KNOWING I WAS GOING TO LCMC) AND TIPPED OFF THE OTHER LASD DEPUTIES TO SEARCH MY BAGS AT WHICH POINT THE DEPUTIES FOUND THE PHONE AND CONTRABAND.

38. AFTER MY TWO (2) DAY STAY AT LCMC I RETURNED TO L.A. COUNTY JAIL ON AUGUST 10, 2011.

39. ON AUGUST 23, 2011 I HAD A SHORT VISIT WITH FBI AGENT LEAH MARX AND TWO (2) OTHER FBI AGENTS WHO WERE WITH FBI AGENT MARX. THE VISIT WAS INTERUPPTED BY AN LASD SGT. WHO SNATCHED ME OUT THE VISIT BY SAYING/YELLING " THIS VISIT IS OVER ! ".

40. ON AUGUST 25, 2011 LASD MADE ME DISAPPEAR BY KIDNAPPING / HIDING ME FROM THE FBI, U.S. MARSHALS AND THE GRAND JURY WHILE CHANGING MY NAME AND BOOKING # EVERY FEW DAYS.

41. ON 9-12-2011 LASO GAVE ME MY REAL NAME BACK AND DROPPED ME OFF AT LANCASTER STATE PRISON SOON AFTER, FBI AGENT, LEAH MARX AND HER PARTNER CAME TO LANCASTER STATE PRISON AND STARTED THE DEBRIEFING PROCESS WITH ME, UNTILL I LEFT LANCASTER.

42. I WAS MOVED TO CENTINELA STATE PRISON IN JANUARY 2012 AND FROM FEBRUARY 23, 2012 THROUGH APRIL 23, 2014 THE FBI VISITED AND DEBRIEFED ME RE: LASO "OPERATION PANDORA'S BOX" EXHIBIT-3 WHICH LED TO THE INDICTMENTS / CONVICTIONS OF THE LASO OFFICIALS.

43. PRIOR TO MY CRIMINAL TRIAL AND DURING THE DEBRIEFING PROCESS (LATE 2011 THROUGH 4-23-14) I WOULD EXPLAIN TO FBI AGENT LEAH MARX AND HER PARTNERS THAT LAPD DETECTIVE CONRADO, ALONG WITH THE LASO DEPUTY MARCHELLO, THE JUDGE AND D.A. WERE COMMITTING QUESTIONABLE MISCONDUCT TO OBTAIN MY CONVICTION. DUE TO THE FACT THE EVIDENCE THAT WAS COLLECTED AND EVALUATED BY LAPD S.I.D DID NOT CONNECT OR POINT TO ME AS THE SUSPECT OF CASE NO. BA360070.

44. FBI SPECIAL AGENT LEAH MARX / HER PARTNERS AT THE TIME WOULD ALWAYS REVIEW THE EVIDENCE OF THE LAPD LEAD DETECTIVE (CONRADO) AND WOULD THEN TELL ME TO FOCUS ON THE FBI INVESTIGATION INTO THE LOS ANGELES COUNTY JAIL.

45. DESPITE FBI SPECIAL AGENT LEAH MARX TELLING ME TO STAY FOCUS ON THE FBI

INVESTIGATION INTO THE L.A. COUNTY JAIL, BUT EVERY TIME I MET WITH FBI AGENT MARX AND HER PARTNER I WOULD SHOW THEM (FBI) EVIDENCE OF DETECTIVE CONRADO'S AND DEPUTY MARCHELLO'S QUESTIONABLE MISCONDUCT THAT THEY USED TO OBTAIN MY WRONGFUL CONVICTION.

46. DURING THE TIME THE FBI WERE COMING TO STATE PRISON TO DEBRIEF ME RE: LASD. I EXPLAINED TO FBI AGENT LEAH MARX AND HER PARTNER THE DEAL MADE BY LASD DEPUTY MICHEL AND I, REGARDING THE $20,000.00.

47. I ALSO EXPLAINED TO FBI AGENT LEAH MARX. LASD DEPUTY MICHEL BOUGHT ME DRUGS AND CONTRABAND INTO THE L.A. COUNTY JAIL THAT THE FBI DID NOT KNOW ABOUT OR DID NOT AUTHORIZE.

48. THE FBI CONFIRMED THE FACT THEY DID NOT GIVE DEPUTY MICHEL DRUGS OR CONTRABAND TO GIVE TO ME. THE FBI ONLY GAVE DEPUTY MICHEL A PHONE ON ONE VISIT WITH CJ AND A NOTE ON ANOTHER VISIT.

49. IN 2012 I PERSONALLY MET WITH AUSA LIZABETH RHODES, AUSA BRANDON FOX, FBI SPECIAL AGENT LEAH MARX AND AGENT MARX'S PARTNER. I WAS ASKED QUESTIONS AND I ANSWERED THE QUESTIONS.

50. I TESTIFIED IN FRONT OF THE U.S. GRAND JURY HOWEVER, THE USAO WOULD NOT ALLOW ME

11.

TO ANSWER SOME OF THE QUESTIONS ASKED BY THE U.S. GRAND JURY. THE USAO PROSECUTORS TOLD THE U.S. GRAND JURY THAT THE FBI WOULD ANSWER CERTAIN QUESTIONS (SEE GRAND JURY TRANSCRIPTS)

51. I LATER LEARNED THAT AUSA, BRANDON FOX AND AUSA, LIZABETH RHODES BELIEVED THAT I WAS LYING OR EXAGGERATING AND THE USAO TOLD THE MEDIA THE FOLLOWING:

" JAIL INFORMANT'S CREDIBILITY COMPLICATES WORK OF FEDERAL PROSECUTOR'S " - SEE EXHIBIT-10

52. THE SAME REPORTER (ROBERT FATURECHI) THAT WROTE THE LA TIMES ARTICLE EXHIBIT-10 IS THE SAME GUY WHO TESTIFIED FOR AUSA, BRANDON FOX AT LEROY BACA FIRST TRIAL THAT ENDED IN A MISTRIAL 11 TO 1 NOT GUILTY.

53. AUSA BRANDON FOX AND AUSA LIZABETH RHODES DETERMINED ALL OF A SUDDEN THAT I WAS THE LIAR AND THE EXAGGERATOR AFTER I TOLD THE FBI / USAO ABOUT LASD DEPUTY MICHEL BRINGING ME DRUGS AND CONTRABAND DUE TO THE FACT AUSA, BRANDON FOX / AUSA, LIZABETH RHODES WANTED TO USE LASD DEPUTY MICHEL AS THEIR STAR WITNESS. SO THE AUGUST 27, 2012 L.A. TIMES ARTICLE CAME OUT EXHIBIT-10 I WAS KICKED TO THE CURB BY THE USAO AND THE FBI. LASD DEPUTY MICHEL BECAME AUSA

BRANDON FOX AND AUSA LIZABETH RHODES STAR WITNESS IN THE TRIALS OF LASD "OPERATION PANDORA'S BOX".

54. LASD DEPUTY GILBERT MICHEL WAS A DIRTY COP WHO WOULD DO ANYTHING FOR MONEY AND DID NOT KNOW ANYTHING ABOUT LASD OPERATION PANDORA'S BOX. BECAUSE WHEN I LEARNED THAT DEPUTY MICHEL TOLD THE LASD DEPUTIES TO SEARCH MY BAGS AND THEY FOUND THE PHONE AND THE CONTRABAND. I TOLD LASD IT WAS DEPUTY MICHEL WHO BOUGHT ME THE PHONE/CONTRABAND AND DEPUTY MICHEL WAS NO LONGER IN THE PICTURE.

55. THEREFORE, DEPUTY MICHEL DON'T KNOW WHAT HAPPEN RE LASD "OPERATION PANDORA'S BOX". BECAUSE LASD HAD RELIEFED HIM OF DUTY.

56. NONE OF THE DEFENDANTS OF LASD "OPERATION PANDORA'S BOX". WERE WILLING TO TESTIFY FOR THE USAO PROSECTORS EXCEPT DIRT BAG LASD DEPUTY GILBERT MICHEL AND SO I BECAME THE USAO AND THE FBI CAUSALITY OF WAR. DUE TO THE FACT I AM A BLACK AND HAD NO LAWYER TO REPRESENT MY INTREST/PROTECT MY RIGHTS.

57. DESPITE MY ROLE ASSISTING THE FBI WITH THEIR INVESTIGATION INTO THE L.A. COUNTY JAIL THE USAO (MR. FOX, MS RHODES AND U.S ATTY. DECKER) IGNORED MY LETTERS FOR HELP RE: THE CORRUPTION

13

AND MISCONDUCT OF LASD AND LAPD RE: MY CASE WHICH LED TO MY WRONGFUL CONVICTION.

58. WE ALL KNOW THAT WITHOUT ANTHONY BROUSSE (ME) THERE WOULD NOT BE NO CASE NO. CR 13-00819, CR 15-00255, CR 16-0066 AND THE GILBERT MICHEL CASE.

59. I NEVER ASKED THE USAO AND THE FBI TO DO ME ANY FAVORS. I ONLY ASKED AUSA BRANDON FOX, LIZABETH RHODES, UNITED STATES ATTORNEY, DECKER AND THE FBI AGENT, LEAH TAWNER (nee MARX) FOR JUSTICE RE: THE MISCONDUCT, AND CORRUPTION OF LASD & LAPD WHICH HAPPEN TO ME WHILE I WAS ASSISTING THE FBI WITH THEIR INVESTIGATION INTO THE L.A. COUNTY JAIL. PLUS I PRESENTED THEM ALL, WITH EVIDENCE OF LASD, LAPD QUESTIONABLE MISCONDUCT.

60. THE USAO AND THE FBI BOTH BLEW ME OFF AS IF I HAD NO PART IN LASD "OPERATION PANDORA'S BOX" IN WHICH THEY (FBI/USAO) TAKE FULL CREDIT FOR. AND THEY REFUSE TO HELP OR BELIEVE ME. DESPITE SEEING THE EVIDENCE OF LASD / LAPD QUESTIONABLE MISCONDUCT.

61. THE FEDERAL JUDGES OF THE UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA REPORT AND RECOMMENDATION EXHIBIT-1 IS THE VERY SAME EVIDENCE THAT I PERSONALLY PRESENTED TO AUSA BRANDON FOX, LIZABETH RHODES THAT IS EVIDENCE OF CORRUPTION AND

14.

QUESTIONABLE MISCONDUCT OF LAPD AND LASD RE: MY CASE.

62. INSTEAD THE USAO DECIDED THAT I WAS EXAGGERATING ABOUT LASD DEPUTY GILBERT MICHEL BRINGING ME DRUGS AND CONTRABAND INTO THE L.A. COUNTY JAIL. BECAUSE IF TRUE, LASD DEPUTY MICHEL CREDIBILITY WOULD BE NO GOOD AND HE WOULD NOT BE ABLE TO BE THE AUSA BRANDON FOX, LIZABETH RHODES STAR WITNESS.

63. AUSA BRANDON FOX DID NOT WANT ME TO TESTIFY BECAUSE MR. FOX KNEW MY TESTIMONY WOULD BE OPPOSITE OF LASD DEPUTY MICHEL.

64. INFACT FBI AGENT LEAH MARX CAME TO CENTINELA STATE PRISON ON APRIL 23, 2014 AND TOLD ME I WAS GOING TO COURT EXHIBIT-3 BUT INSTEAD I WAS TAKEN TO THE SANTA ANA CITY JAIL / SAN BERNARDINO JAIL / CHINO STATE PRISON UNTILL THE TRIAL WAS OVER.

65. THE FBI/USAO HID ME DURING THE FIRST TRIAL SO THAT THE DEFENDANTS ATTORNEYS WOULD NOT GET TO ME.

66. ON 8-24-2014 I WROTE A LETTER TO THE HONORABLE PERCY ANDERSON EXPLAINING THE FEDS WERE HIDING ME TO KEEP ME FROM THE DEFENSE ATTORNEY AND TO KEEP ME FROM TESTIFYING. (LETTER AVAILABLE UPON REQUEST) AUSA BRANDON FOX TOLD THE DEFENDANTS ATTORNEY THAT:

15.

"ANTHONY BROWN IS NO VICTIM"

67. YET AUSA BRANDON FOX, AUSA LIZABETH RHODES AND THE USAO REFERRED TO ME (ANTHONY BROWN) AS INMATE AB IN EVERY SINGLE ONE OF THE FOLLOWING INDICTMENTS:
1. CASE NO. CR 13-0089 (THOMPSON et al)
2. CASE NO CR 15-0025S (TANAKA AND CAREY)
3. CASE NO CR          (GILBERT MICHEL)
4. CASE NO CR 13-0089 (JAMES SEXTON)
AND; 5. CASE NO CR 16-0066 (LEROY D. BACA)

68. IF ANTHONY BROWN (ME) IS NO VICTIM THEN THE USAO SHOULD HAVE NEVER FILED CHARGES AND INDICTED THE ABOVE MENTIONED PEOPLE RE: THE ABOVE MENTIONED CASE NUMBERS.

69. BASED ON THE ACTIONS OF AUSA BRANDON FOX, AUSA LIZABETH RHODES, U.S. ATTY DECKER AND FBI SPECIAL AGENT LEAH TANNER (nee MARX) THE UNITED STATES ATTORNEY'S OFFICE AND THE FBI CLEARLY DISCRIMINATED AGAINST ME FOR THE FOLLOWING REASONS.

70. BECAUSE I AM A BLACK MALE WHO WAS AT THE CENTER OF THE LARGEST LAW ENFORCEMENT CORRUPTION SCANDAL IN LOS ANGELES HISTORY AND A BLACK MAN IS NOT SUPPOSE TO BE THE CAUSE OF THE INDICTMENTS, CONVICTIONS OF NON-BLACK SHERIFF, UNDERSHERIFF, CAPTAINS, SERGEANTS, LIEUTENANTS AND DEPUTIES OF THE LOS ANGELES SHERIFF'S DEPARTMENT.

16.

71. THE USAO/FBI DID HELP A NON-BLACK MAN NAMED GABRIEL CARRILLO. BUT, REFUSED TO STEP IN AND HELP ME BECAUSE I AM A BLACK MAN. ESP. WHEN I PROVIDED EVIDENCE OF THE QUESTIONABLE MISCONDUCT OF LASO & LAPD WHICH LED TO MY WRONGFUL CONVICTION WHILE I WAS ASSISTING MY COUNTRY / THE FBI WITH THEIR INVESTIGATION INTO THE L.A. COUNTY JAIL. NOT TO MENTION THE FBI CAME TO ME FOR ASSISTANCE. I DID NOT GO TO THE FBI.

72. EXHIBIT-4, EXHIBIT-5, AND EXHIBIT-6 IS EVIDENCE THAT THE USAO AND THE FBI STEPPED IN AS PART OF THEIR WIDE RANGING INVESTIGATION INTO ABUSE AND CORRUPTION INSIDE LOS ANGELES COUNTY JAIL IN 2013 AND 2015 AFTER TELLING ME IN 2012 THEY DIDN'T WANT TO GET INVOLVE.

73. JUST LIKE GABRIEL CARRILLO I WAS CHARGED BUT NOT CONVICTED. THE FBI/USAO STEPPED IN FOR MR. CARRILLO. BUT, NOT FOR THE BLACK MAN THE FBI RECRUITED TO ASSIST IN THEIR INVESTIGATION INTO THE L.A. COUNTY JAIL.

74. THE USAO/FBI LET THE SAME PERSON THEY INDICTED AND CONVICTED WHO WAS ONE OF THE DEFENDANTS (JAMES SEXTON) WHO KIDNAPPED/HID ME FROM THE FBI OUT OF

17.

PRISON BY FILING A RULE 35 MOTION. EXHIBIT-7

75. AUSA BRANDON FOX & AUSA LIZABETH RHODES ARGUMENT IN THEIR RULE 35 MOTION WERE THAT JAMES SEXTON PROVIDED:

SIGNIFICANCE AND USEFULNESS OF ASSISTANCE TRUTHFULNESS, COMPLETENESS AND RELIABILITY OF INFORMATION AND RISK OF DANGER RESULTING FROM ASSISTANCE   SEE EXHIBIT-7

76. JAMES SEXTON RESPONSE TO AUSA LIZ RHODES AND AUSA BRANDON FOX RULE 35 MOTION WAS THE "GREAT RISKS" POSED TO SEXTONS PERSONAL SAFETY   SEE EXHIBIT-8

77. AUSA BRANDON FOX AND LIZ RHODES INDICTED AND CONVICTED JAMES SEXTON AND THE OTHER TEN (10) LASO OFFICIALS FOR BREAKING THE LAW THEN THEY (USAO) TURNED AROUND AND SHOWED HIM FAVORITISM BY FILING A RULE 35 MOTION DUE TO THE FACT SEXTON IS NOT A BLACK MAN   SEE EXHIBIT-7 PAGE 4-9.

78. I ANTHONY BROWN SR WAS ATTACKED A NUMBER OF TIMES IN PRISON AND MY LIFE IS IN DANGER EVERY SINGLE DAY! BECAUSE I AM LABLED AS A FBI INFORMANT FOR ASSISTING THE FBI   SEE EXHIBIT-9. HOWEVER AUSA BRANDON FOX, AUSA LIZ RHODES OF THE USAO REFUSE TO HELP ME BECAUSE I AM A BLACK MAN.

18.

79. I EVEN CONTACTED AUSA BRANDON FOX AND ASKED HIM TO GET A COURT ORDER FOR ME TO BE HOUSED SINGLE CELL FOR MY SAFETY. AGAIN AUSA BRANDON FOX IGNORED MY LETTERS BECAUSE I AM BLACK.

80. I WAS TOLD THE USAO DIDN'T WANT TO GET INVOLVE WITH MY CASE BECAUSE IT WOULD LOOK LIKE THE USAO / FBI WAS DOING A FAVOR FOR A FAVOR BY STEPING IN RE: THE CORRUPTION AND QUESTIONABLE MISCONDUCT IN MY CASE.

81. ALL I SEEN SINCE THE START OF THE FOLLOWING CASES: CR 13-00819, CR 15-00 255, CR 16-0066 AND THE GILBERT MICHEL CASE WERE FAVORS FOR FAVORS FOR THE DEFENDANTS TO TESTIFY AGAINST ONE ANOTHER IN EXCHANGE FOR LIGHTER OR NO SENTENCE. AT ALL. AND EVERY ONE OF THE DEFENDANTS ARE NOT BLACK INCLUDING MR. GABRIEL CARRILLO.

82. AUSA BRANDON FOX, AUSA LIZ RHODES REFUSED TO GIVE ME A LAWYER BECAUSE I DID NOT HAVE A FEDERAL CASE. HOWEVER, I WAS UNDER THE FEDERAL GOVERNMENT WATCH AS AN COVERT FBI INFORMANT WHEN THE QUESTIONABLE MISCONDUCT AND CORRUPTION OF LASD AND LAPD OCCURRED.

19.

83. IT IS CLEAR THE QUESTIONABLE MISCONDUCT OF LASD AND LAPD WHICH LED TO MY WRONGFUL CONVICTION HAPPENED WHILE I WAS ALREADY ASSISTING THE FBI AS A FBI INFORMANT.

84. I WAS UNDER THE WATCH OF THE FBI AS AN FBI INFORMANT ASSISTING IN A COVERT PUBLIC CORRUPTION INVESTIGATION ABOUT ALLEGED FEDERAL CIVIL RIGHTS OFFENSES BEING COMMITTED BY EMPLOYEES OF LASD WORKING AT MCJ WHO WERE ALLEGEDLY ABUSING INMATES SEE [ CR 13-00819 PAGE 4:5-11 ] NOL'S MARKED AS EXHIBIT-2

85. IN LIGHT OF THE REPORT AND RECOMMENDATION OF THE UNITED STATES DISTRICT CORT, CENTRAL DISTRICT OF CALIFORNIA DATED FEBRUARY 21, 2017 AND THE ORDER DATED MARCH 29, 2017 EXHIBIT-1 ACCEPTING THE REPORT AND RECOMMENDATION. IT IS CLEAR THAT THE EVIDENCE THAT I PRESENTED TO AUSA LIZABETH RHODES AND AUSA BRANDON FOX IN THE YEAR 2012 WAS EVIDENCE OF LASD AND LAPD CORRUPTION / QUESTIONABLE MISCONDUCT WHICH LED TO MY WRONGFUL CONVICTION WHILE I WAS ASSISTING THE FBI WITH THEIR INVESTIGATION INTO THE L.A. COUNTY JAIL

86. SO FOR AUSA BRANDON FOX, THE USAO AND THE FBI TO STAND BY AND DO NOTHING WHILE GIVING THE DEFENDANTS SWEETHEART DEALS

BECAUSE THE DEFENDANTS ARE NOT BLACK MEN AND WOMEN IS A VERY CLEAR SIGN OF RACIAL DISCRIMINATION AGAINST ANTHONY BROWN BY AUSA BRANDON FOX, AUSA LIZABETH RHODES U.S. ATTORNEY DECKER ESP. BECAUSE WITHOUT ANTHONY BROWN (ME MYSELF AND I) THERE WOULD NOT BE LASD "OPERATION PANDORA'S BOX" AND NO CASES CR 13-00819, CR 15-00255, THE GILBERT MICHEL CASE AND CR 16-0066.

87. WHAT PUZZLES ME, IS THAT, IF I WAS SUCH AN EXAGGERATOR, A LIAR, OR MY CREDIBILITY COMPLICATES WORK OF FEDERAL PROSECUTORS IN 2012 EXHIBIT-10 WHY DID THE FBI KEEP COMING TO SEE ME TO OBTAIN MY EXAGGERATING, NON-CREDIBLE INFORMATION IN 2013, AND 2014 PLEASE SEE EXHIBIT-3 FURTHER, THE FBI/USAO THEN HID ME DURING THE FIRST THREE (3) TRIAL OF

1. JAMES SEXTON, CR 13-00819
2. THOMPSON et al, CR 13-00819
3. JAMES SEXTON, CR 13-00819

SO THE DEFENDANT'S LAWYERS WOULD NOT TALK TO ME.

88. I KNOW THAT I PROVIDED THE FOLLOWING TO THE FBI: SIGNIFICANCE AND USEFULNESS OF ASSISTANCE, TRUTHFULNESS, COMPLETENESS AND RELIABILITY OF INFORMATION WHICH CAUSED, RISK OF DANGER RESULTING FROM ASSISTANCE TO THE FBI. EXHIBIT-9 MY LIFE IS IN DANGER EVERY DAY IN PRISON FOR ASSISTING THE FBI RE: LASD SCANDAL.

21.

89. PUT SIMPLY, WITHOUT MY ROLE IN THE FBI INVESTIGATION INTO THE LOS ANGELES COUNTY JAIL. THEN NO INDICTMENTS AND CONVICTIONS OF THE TEN (10) LASD OFFICIALS REGARDING LOS ANGELES SHERIFF'S DEPARTMENT "OPERATION PANDORA'S BOX"

90. ALSO PUT SIMPLY, I PROVIDED EVIDENCE TO AUSA LIZABETH RHODES, AUSA BRANDON FOX, FBI SPECIAL AGENT LEAH TANNER (nee MARX) ABOUT THE CORRUPTION AND THE QUESTIONABLE MISCONDUCT COMMITTED UPON ME BY LASD DEPUTY KELLY, C. MARCHELLO #503663 AND LAPD DETECTIVE VERONIKA CONRADO #26755 ETC. DURING THE TIME I WAS ASSISTING THE FBI WITH THEIR INVESTIGATION INTO THE L.A. COUNTY JAIL.

91. I WAS RECRUITED BY AND ASSISTED THE FBI IN 2010 THROUGH 2014 WITH THEIR INVESTIGATION INTO THE L.A. COUNTY JAIL. WHICH MEANS THAT I WAS UNDER THE WATCH OF THE FEDERAL GOVERNMENT FROM 2010 THROUGH 2014. EXHIBIT-3

92. THE FBI AND THE UNITED STATES ATTORNEY'S OFFICE SHOULD HAVE STEPPED IN AS PART OF THEIR WIDE RANGING INVESTIGATION INTO ABUSE AND CORRUPTION INSIDE L.A. COUNTY JAILS. AS THE FBI AND USAO DID FOR GABRIEL CARRILLO EXHIBIT-6 EXHIBIT-5 AND EXHIBIT-4 BUT THE FBI/USAO DID NOT DO SO, FOR THE FBI HAND PICKED FBI INFORMANT. BECAUSE THEY DISCRIMINATED AGAINST ME BECAUSE I AM A BLACK MAN

22.

93. AUSA BRANDON FOX, AUSA LIZABETH RHODES / USAO USED INMATE AB AKA ANTHONY BROWN (ME) IN EVERY INDICTMENT THEY FILED RE: LASD "OPERATION PANDORA'S BOX" WHICH LED TO THE FOLLOWING INDICTMENTS AND CONVICTIONS OF:

1. LASD LT. GREGORY THOMPSON
2. LASD LT. STEPHEN LEAVINS
3. LASD SGT. MARICELLA LONG
4. LASD SGT. SCOTT CRAIG
5. LASD DEP. MICKEY MANZO
6. LASD DEP. GERARD SMITH
7. LASD DEP. JAMES SEXTON
8. LASD DEP. GILBERT MICHEL
9. LASD CAPT. WILLIAM CAREY
10. LASD UNDERSHERIFF, PAUL TANAKA    AND;
11. LASD SHERIFF, LEROY D. BACA

AND HAD MY CREDIBILITY COMPLICATED WORK OF FEDERAL PROSECUTORS (MR. FOX, MS RHODES, ETC.) THE USAO WOULD HAVE NEVER EVER USED INMATE AB (ANTHONY BROWN) AS THE BASIS TO INDICT THE ABOVE LISTED DEFENDANTS. ESP. IF THE USAO BELIEVED MY CREDIBILITY COMPLICATED WORK OF FEDERAL PROSECUTORS, INDICTMENT CASE NO. CR 13-00819 WAS FILED NOVEMBER 20, 2013 @ 2:42 PM EXHIBIT-2   15 MONTHS AFTER THE L.A. TIMES WROTE " JAIL INFORMANT'S CREDIBILITY COMPLICATES WORK OF FEDERAL PROSECUTORS" SEE EXHIBIT-10

23.

94. I DID NOT EVER LIE TO THE FBI AND I DID NOT TESTIFY OTHER THAN MY BRIEF U.S. GRAND JURY TESTIMONY. THEREFORE, THE USAO CAN'T USE THE EXCUSE THAT I LIED ON THE STAND AS THE REASON FOR NOT HELPING ME KNOWING THAT I WAS THE VICTIM OF LAPD DET. CONRADO AND LASD DEPUTY MARCHELLO'S MALICIOUS QUESTIONABLE MISCONDUCT AND CORRUPTION

95. FOR THE USAO/FBI OR ANYONE TO SAY I WAS EXAGGERATING OR THAT I WAS LYING ABOUT WHAT OCCURRED RE: THE FBI INVESTIGATION INTO THE L.A. COUNTY JAIL. IS A WEAK EXCUSE TO NOT PROVIDE HELP TO ME REGARDING MY ROLE. REASON BEING, NO ONE EXCEPT ME AND THE CORRUPT LASD DEPUTIES WERE THERE. AND SO, IT BECOMES MY WORD AGAINST THE CORRUPT LASD DEPUTIES IN WHICH MOST OF THEM WERE INDICTED. FOR LYING TO THE FBI [ 18 U.S.C § 1001: MAKING FALSE STATEMENTS ], [ 18 U.S.C § 1623 MAKING FALSE DECLARATIONS ] AND THEN CONVICTED. SO FAR, THE RESULTS SPEAK FOR ITSELF.

96. THE ONLY EXPLANATION FOR THE USAO/AUSA BRANDON FOX, AND LIZABETH RHODES DID NOT AND WOULD NOT HELP ME AFTER SEEING THE SAME EVIDENCE THAT THE UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA FEDERAL JUDGES SAW AND TALKED ABOUT IN THE REPORT AND RECOMMENDATION DATED FEBRUARY 21, 2017 AND

24.

THE ORDER DATED MARCH 29, 2017 RE: LAPD DETECTIVE VERONICA CONRADO AND LASO DEPUTIES EXHIBIT-1. IS DUE TO THE USAO / AUSA BRANDON FOX AND AUSA LIZABETH RHODES RACIAL DISCRIMINATION AGAINST ME BECAUSE A BLACK MAN (INMATE AB AKA ANTHONY BROWN) WAS NOT SUPPOSE TO BE THE PERSON TO SET OFF A CHAIN OF EVENTS WHICH LED TO THE INDICTMENTS AND CONVICTIONS OF THE ELEVEN (11) LASO OFFICIALS.

97. AUSA BRANDON FOX TOLD THE DEFENDANTS ATTORNEYS AND EVERY ATTORNEY WHO TRYED TO SPEAK FOR ME AND PROTECT MY RIGHTS THAT: " ANTHONY BROWN IS NO VICTIM " IF THATS THE CASE THE USAO SHOULD HAVE NEVER GONE AFTER THE LASO OFFICIALS RE: CASE NUMBERS CR-13-00819, CR 15 00255, AND CR 16-0066 NOR SHOULD THE USAO REFERRED TO INMATE AB IN THE ABOVE MENTIONED CASE NUMBER.

98. SINCE I AM NOT THE VICTIM THERE IS NO WAY THE TEN (10) LASO OFFICIALS PLUS DEPUTY MICHEL SHOULD HAVE BEEN CONVICTED.

99. I KNOW LASO DEPUTY MICHEL TOOK A BRIBE FROM ME AND BOUGHT A CELLPHONE AND A NOTE TO ME INSIDE THE L.A. COUNTY JAIL. THE ACTUAL TRANSACTION OF LASO DEPUTY MICHEL AND UNDERCOVER FBI AGENT

25.

KNOWN AS CJ WAS UNDER SURVEILLANCE OF THE FBI

100. I KNOW LASO DEPUTY MICHEL TOOK ANOTHER BRIBE FROM ME AND BOUGHT CONTRABAND AND DRUGS TO ME FOR A PROMISE OF $20,000.00. WHEN LASO DEPUTY MICHEL GAVE ME THE ADDRESS TO SEND THE $20,000.00. I THEN CALLED UNDERCOVER FBI AGENT C.J. AND GAVE C.J. THE ADDRESS THAT LASO DEPUTY MICHEL GAVE ME TO SEND THE $20,000.00

101. I KNOW LASO OFFICIALS KIDNAPPED/HID ME / CHANGED MY NAME AND DID NOT PROVIDE ME WITH MEDICAL ATTENTION WHEN THEY WERE HIDING ME AFTER LEARNING I WAS ASSISTING THE FBI AS AN FBI INFORMANT.

102. THE PROSECUTORS OF SAID CASE NUMBERS HAS MANIPULATED THE ACTUAL FACTS SO THAT THEY COULD USE LASO DEPUTY MICHEL AS THE PROSECUTIONS WITNESS AGAINST THE NOW CONVICTED LASO OFFICALS. LASO DEPUTY GILBERT MICHEL IS A BIG FAT LIAR AND THE USAO / FBI KNOWS MICHEL IS A LIAR. THEREFORE, THE USAO AND THE FBI KEPT ME OUT OF THE PICTURE BY SAYING I WAS EXAGGERATING / LYING ABOUT DEPUTY MICHEL BRINGING ME DRUGS, SO THAT MY TESTIMONY WOULD NOT CONTRADICT LASO DEPUTY MICHEL TESTIMONY. EXAMPLE

WHEN AUSA BRANDON FOX ASK DEPTY MICHEL THE FOLLOWING DURING TRIAL:

" AT ANY TIME DID YOU PROVIDE ANTHONY BROWN WITH DRUGS OR WEAPONS ? "

" NO " MICHEL REPLIED.

103. AUSA BRANDON FOX SHOULD HAVE ASKED MICHEL. " AT ANY TIME DID YOU PROVIDE ANTHONY BROWN WITH BOXES OF CIGARETTES, LIGHTERS, A NOTE AND A CELLPHONE      ( THE ANSWER IS YES )

104. AUSA BRANDON FOX SHOULD HAVE THEN ASKED: " OTHER THAN THE CELLPHONE AND THE NOTE THAT UNDERCOVER FBI AGENT C.J. PROVIDED TO YOU TO TAKE TO ANTHONY BROWN DID C.J. GIVE YOU ANY OTHER ITEM TO GIVE TO ANTHONY BROWN ? "            ( THE ANSWER IS NO )

105. AUSA BRANDON FOX NEXT QUESTION SHOULD HAVE BEEN: " HOW DID ANTHONY BROWN GET BOXES OF CIGARETTES, LIGHTERS, ETC.    IF C.J. DIDNT GIVE YOU THOSE ITEMS TO GIVE TO ANTHONY BROWN ? " ( THE ANSWER MICHEL GAVE IT TO ME )

106. THE NEXT QUESTION SHOULD HAVE BEEN: " DID YOU BRING ANTHONY BROWN DRUGS ? " ( AND IF MICHEL ANSWERED NO) MR. FOX SHOULD HAVE ASKED MICHEL: " YOU BOUGHT HIM CIGARETTES, A LIGHTER, A NOTE, A CELLPHONE WHY NOT DRUGS "

107. THE $ 20,000 00 DEAL MICHEL AND I MADE WAS FOR ANY AND EVERYTHING THIS BRIBE WAS

27.

DONE AFTER I HAD THE CELLPHONE ALREADY THAT IS HOW I WAS ABLE TO CALL C.J AND GIVE HIM THE ADDRESS TO LASD DEPTY MICHEL FATHER'S HOUSE THE PLACE I WAS SUPPOSE TO SEND THE $20,000.00 FOR THE DRUGS ETC.

I DECLARE UNDER PENALTY OF PERJURY PURSUANT TO THE LAWS OF THE UNITED STATES OF AMERICA AND THE STATE OF CALIFORNIA THAT THE FOREGOING IS TRUE AND CORRECT. EXECUTED ON APRIL 19, 2017 AT IMPERIAL, CALIFORNIA

ANTHONY BROWN, DECLARANT

I RESPECTFULLY REQUEST THAT THIS COURT STEP IN AND CORRECT THE WRONG THAT WAS COMMITTED

28.

Case 2:16-cr-00066-PA Document 375 Filed 05/12/17 Page 31 of 169 Page ID #:8595





NEWS

# LOVE & SPIES: PAUL TANAKA CORRUPTION TRIAL PLAYS OUT LIKE A SOAP OPERA



Testimony during the corruption trial of former Los Angeles County Undersheriff Paul Tanaka played out like a soap opera.

   EMBED

 By Miriam Hernandez and Lisa Bartley

Thursday, March 31, 2016

DOWNTOWN LOS ANGELES (KABC) -- To Los Angeles County Sheriff's Deputy Gilbert Michel, it sounded like easy money. Smuggle a cellphone, cigarettes and food into jail inmate Anthony Brown. In return? Michel could cash in. Brown told the deputy he'd pay up $20,000.

What Michel didn't know? Brown, a convicted armed robber, was also an FBI informant. And Michel had just stepped into the FBI's trap - a sting cooked up to root out deputies taking bribes inside Men's Central Jail.

Michel, now facing up to 10 years in prison for accepting that bribe, took the witness stand Thursday in the federal corruption trial of Paul Tanaka.

Tanaka, the conspiracy

"Anthony E

address."

Michel never got the promised $20,000 payday. Instead, he collected $1500 in two meetings with Brown's "friend" on the outside. Brown called that friend "CJ", but "CJ" was in fact an undercover FBI agent who came to their clandestine meetings wired up with multiple hidden cameras.

"He handed me the cell phone in a plastic bag," Michel told the jury. "He gave me the money inside a sunglass case and just threw it in my window."

Co-lead FBI Agent on the case Leah Marx described the scene that played out like something from a movie. The FBI had a plane circling overhead, ready to catch Deputy Michel in the act.

"The airplane was videotaping the interaction from above," Marx told jurors, explaining that their recording actually captured "the hand-to-hand exchange."

Michel was nervous, telling jurors he took side streets all the way from South L.A. to his home in Santa Clarita, afraid "CJ" or someone else could be on his trail. He took the phone apart; afraid it might contain drugs or some kind of weapon.

Ultimately, Michel smuggled the contraband phone into the jail hidden inside a rubber glove and tossed it onto inmate Anthony Brown's jail cell bunk. Michel testified that he'd charge the phone at night for Brown, returning it to the inmate day after day.

"At any time did you provide Anthony Brown with drugs or weapons?" prosecutor Brandon Fox asked Michel.

"No," Michel replied.

## Origins of the FBI investigation

Special Agent Leah Marx explained to jurors Thursday how the FBI's wide-ranging investigation into the jails began in the summer of 2010 with a letter from an inmate.

Marx's supervisor directed her to "look into it." Soon, she was put in touch with inmate Anthony Brown, a career criminal then awaiting trial for holding up a string of banks and fast-food joints in Downtown Los Angeles.

Brown was signed up as an FBI informant within a month.

The idea to get a phone into the jail was two-fold: Brown could provide real-time updates by using the phone to call FBI agents with inside information from behind bars, and if "something happened, Brown could take a photo with the phone."

Marx admitted that, yes - giving a contraband cell phone to an inmate was risky, but the operation was approved by FBI supervisors both in L.A. and by the higher-ups in Washington, D.C.

"Police corruption is something we take incredibly seriously," said Marx, telling jurors they carefully weighed the risks and got the green-light to go ahead.

## BUSTED: Contraband cellphone discovered inside bag of potato chips

Brown's secret cell phone was discovered in early August of 2011 during a routine search of his belongings, stashed inside a bag of potato chips. The revelation set off a chain of events that eventually led to the criminal convictions of seven deputy sheriffs for obstruction of justice. Two others, including former Sheriff Leroy Baca himself, have taken plea deals in exchange for reduced sentences.

Michel knew he was in deep trouble when he got a radio call early one morning just after he arrived for his shift at Men's Central Jail. He soon found himself in a room being grilled by three investigators from the LASD's Internal Criminal Investigations Bureau - or ICIB.

Michel confessed right away, and within minutes asked the investigators if they were "aware that the FBI is involved in this already?"

Michel explained that FBI agents had, at that point, already confronted Michel for taking the bribe and smuggling the phone into inmate Brown.

LASD investigators feigned ignorance of the FBI's involvement, and in audio recordings played for the jury on Thursday, ordered Michel to not talk to the FBI.

Sgt. Scott Craig: "Okay, and while we're on that subject, um, Sergeant Long and I, and our Lieutenant, I'm, I'm ordering you not to discuss this with anyone period."

Deputy Gilbert Michel: "Yes, sir."

Sgt. Scott Craig: "That's your girlfriend, that's the FBI, that's anyone, OK?"

Deputy Gilbert Michel: "Yes, sir."

In that same recorded interview, the investigators tell Deputy Michel that the FBI is lying to him, threatening and blackmailing him.

Sgt. Scott Craig: "I call bull----, I call bull----. That's what I call. Not from... I'm not saying what you're telling us is, I call their threats and their blackmail and their... it's all bull---, OK?"

Deputy Gilbert Michel: "Another thing that..."

Sgt. Scott Craig: "Because you don't know, because they're trying to scare you."

Prosecutors say that's witness tampering - and part of the larger scheme to obstruct the FBI's investigation. The issue at this trial? How involved was Paul Tanaka?

### What did Tanaka know and when did he know it?

The prosecution team has introduced evidence and testimony throughout this trial that suggests Tanaka was deeply involved in the scheme that became known as "Operation Pandora's Box." Phone records displayed to jurors Thursday show a flurry of calls between Tanaka and his co-conspirators at key points during the events of August and September of 2011.

Special Agent Marx created a "phone summary" chart that shows a spike in calls between Tanaka, his aide Christopher Nee, Lt. Greg Thompson and Cpt. Tom Carey after then-Sheriff Leroy Baca was first notified by the FBI that the phone was part of a federal civil rights investigation; after an interview the FBI conducted with Brown on August 23rd; after a federal writ for Brown was faxed to the LASD; after Brown's records were falsified to show he'd been "released," and after LASD Sergeants threatened to arrest Agent Marx outside her home.

Prosecutors played a video for jurors that showed that confrontation between the two LASD Sergeants and Agent Marx on the evening of September 26th, 2011.

Sgt. Scott Craig: "Did you know that you are a named suspect in a felony complaint?"

Later that night, the two LASD Sergeants received a frantic phone call from an FBI supervisor who asked the investigators what charges they planned to file against Marx.

Sgt. Maricela Long: "OK, you're going to have to speak to the Undersheriff, and that's Mr. Paul Tanaka."

Prosecutors also showed jurors the federal writ - or court order - served on the LASD that required the department to turn Anthony Brown over to federal marshals.

"Did the LASD ever turn Anthony Brown over to the federal government?" prosecutor Brandon Fox asked Special Agent Marx.

"No," she replied.

Case 2:16-cr-00066-PA   Document 375   Filed 05/12/17   Page 34 of 169   Page ID #:8598

"Did the LASD ever allow the federal government to interview Anthony Brown?" Fox asked.

"No." she replied again.

In fact, Anthony Brown turned against the FBI after spending weeks hidden away in various locations. He'd been booked under a series of fake names, his fingerprints and social security number wiped from the LASD computer system. Special Agent Marx testified that despite their best efforts, the FBI and the US Marshals Service simply couldn't find Brown. He'd vanished.

"The FBI has left me for dead," Brown wrote in a handwritten letter shown to jurors on Thursday. Brown wrote to LASD investigators that he no longer wanted to cooperate with the FBI.

### The Defense

Defense attorneys for Paul Tanaka are expected to begin presenting their case on Friday. In opening arguments, defense attorney Jerome Haig told jurors this was a legitimate, lawful investigation. Haig says Tanaka was simply following orders from the very top - then-Sheriff Leroy Baca - who'd tasked Tanaka with protecting inmate Brown and investigating how the contraband cell phone got into their jail.

Tanaka himself is expected to take the witness stand on Friday.

Got a tip? Email ABC7 Investigative Producer Lisa.Bartley@abc.com.

**Related Topics:**

news    los angeles county sheriff's department    trial    court case    corruption    jail    FBI    Downtown LA    Los Angeles

 

(Copyright ©2016 KABC-TV. All Rights Reserved.)

# YOU MIGHT ALSO LIKE



How To: Remove Dark Under Eye Circles
Beverly Hills MD



Business Owners: Are You Prepared for the IoT Revolution?
WSJ Custom Studios



12 Chic Bob Haircuts for Women Over 40
Weekly Women



This Lake Holds Something Far More Dangerous Than Jaws
OZY

Her Revealing Dress Dropped Jaws At The CMT Music Awards
StyleBistro



10 Albums Every Baby Boomer Has Loved
AARP

# FROM AROUND THE WEB

Love the House, But Is the Area Good? 4 Ways to Check out Your Future Neighborhood (SoFi)

# MORE FROM ABC7

Nurse surrenders license over photo of patient's genitals

3/30/2017    Case 2:16-cr-00066-PA    Document 375    Filed 05/12/17    Page 36 of 169    Page ID
THE RETRIAL OF LEE BACA: How LA County's Popular Sheriff Came to be Convicted |
#:8600

**witness**L*ft*

---

### Jack Dawson

Lonestar, I was waiting for you to show up today. You can only tweet 140 characters, so again, stop showing your ignorance. Sheesh... read the article right on your burner phone.

I have two jokes I want to share with you:

1.) Q: What starts with a V and ends with a 3, but will never see the free World?
A: Anthony Brown CDC# V79273; the government used you too brother.

2.) Q: Who has fresh eyes and is tone deaf to the law enforcement needs in America?
A: Trick question – both Sheriff McDonnell and ALADS

https://www.youtube.com/watch?v=ta5nW-gtpvg

You guys may laugh this off, but Kimmel makes a really serious point that pertains to all of this. There were not just 10 folks involved in Pandora's Box..... A lot of folks in that chain of command either lied or couldn't recall, but they are still on the department. There is still a failed perspective and mentality in our department. The plague still remains much like AB will remain in prison.

Anthony, I mean Lonestar: even if they give 25, 50, or 75 % off your sentence. You will not get out of jail. Enjoy that chain gang life. I just shot you $25 bucks for the laughs.

The remaining "convicted felons" check in on Monday sans Manzo I believe. Meanwhile the kid did his bid and is moving on with life like you are supposed to.

Roll Tide Mr. Sexton. You said something a lot of people get paid to, but always elect to remain silent.

Reply

---

### Still Laughing

March 17, 2017 at 11:51 am

Hey Jack.....LMAO at the funny but true "Kimmel" episode Regarding ALADS the best thing they can do to change some thing is to open up the Board of Directors election to



witness*LA*

Why wouldn't they use an actual undercover agent or a trained informant to enter MCJ on a petty arrest, who could quickly gain trustee status and a wide range of mobility on work assignments inside the jail complex?

It may not make a bit of difference at this point, but consider the possibility:

That informant Anthony Brown had to be authorized at the highest level(Attorney General Holder and FBI Director Mueller).
An investigation of civil rights abuses inside L.A. County Jail
by informant A. Brown is a cover story.

The cell phone is supposed to get discovered.
Anthony Brown is the sting.
The trap was crafted and baited to catch Tanaka.
Baca played an essential role in the operation, under coercion to force his cooperation.
And at the end, they turned the tables on Baca and closed him out.

Reply



### jim hitchcock

March 18, 2017 at 4:52 am

Maybe the greatest screen name I ever read on WLA. Well done.

Reply



### Bandwagon

March 17, 2017 at 11:44 am

No Talent: We (you know the boys and girls in uniform who put it on the line every night) are extremely grateful to Celeste (WLA) for exposing the corruption which existed (and still exists) within the Los Angeles County Sheriff's Department. Now put on your big boy pants and do something nice for your country. Go join the military/law enforcement/peace corp......something where you can "put it on the line". Then you might have a little credibility that comes with knowledge and self sacrifice......plz take your older brother (CF) with you! Thanks Peace out

Reply



done.

Reply



### Oh Well

NAILED IT......Spot on!

Reply

---

### allisonbee tokalas

Either Anthony Brown was an extremely poorly handled informant operation
or Brown is the sting and the smuggled cell phone is supposed to get discovered.

Who told Brown to hide the smuggled cell phone inside his bag of smuggled Doritos?

Because LASD doesn't purchase premium brand chips like Doritos for the inmate lunch sacs and
Commissary Services doesn't offer Doritos on the list of low quality junk food available for order by or purchase as gift baskets to the jail inmates.

The FBI love Anthony Brown because he can't answer any questions about his instructions from them.
As a life sentence convict in custody of the California Prison Authority, Brown's ability to make contact to the outside and our ability to communicate to him on the inside can be restricted to the point of non-existence.

The Anthony Brown operation was designed with two distinct goals.

1. Stop the inmate abuse by deputies inside MCJ by closing out Paul Tanaka.

2. Provide a visceral and vibrant defense for AG Holder and Director Mueller against any attempt by civil plaintiffs to include them as defendants in legal action against LASD and Sheriff Baca for injuries sustained while held in custody at MCJ.

Reply

---



## PHONE PATTERNS

**Another of the prosecution's most powerful pieces of evidence,** according to the jurors, was a labor-intensive series of phone call charts that FBI investigators put together for the trial. The charts tracked all phone activity between Mr. Tanaka and some of the main department members involved in the alleged obstruction activities—namely former Lt. Greg Thompson, former Lt. Steve Leavins, former Cpt. Tom Carey and others—during the crucial time period of August 18 through September 26, 2011. The charts also showed any phone activity between the former sheriff, Lee Baca, and the same department members during that same period.

**The phone records were impressive, said jurors.** Not only did they show relatively constant contact between the alleged co-conspirators. (Thompson, Leavins, and five others have already been convicted for obstruction of justice, with their cases on appeal. Carey, who was originally Tanaka's co-defendant, took a plea deal last year, but he has yet to be sentenced. And, of course, Lee Baca pleaded guilty to lying to federal officials about his roll in events, although his deal will not be finalized until he is sentenced in May.)

**According to the charts, the calls, along with flurries of emails,** clustered around various significant events in the obstruction plan, such as the launch of the name-changing strategy to obscure the whereabouts of informant Brown, the confrontation with FBI agent Leah Marx in front of her apartment and, tellingly, August 23, after Marx and two of her FBI agent colleagues managed to get into the jail unimpeded to visit their informant, against Tanaka's wishes. After the rash of phone calls, the hide-the-ball plan kicked in that same

# EXHIBIT 1

MIME-Version:1.0 From:cacd_ecfmail@cacd.uscourts.gov To:ecfnef@cacd.uscourts.gov Message-Id:<23054637@cacd.uscourts.gov>Subject:Activity in Case 2:13-cv-02620-PSG-PJW Anthony Brown Sr v. Veronica Conrado et al Report and Recommendation (Issued) Content-Type: text/html

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

## UNITED STATES DISTRICT COURT for the CENTRAL DISTRICT OF CALIFORNIA

**Notice of Electronic Filing**
The following transaction was entered on 2/22/2017 at 11:54 AM PST and filed on 2/21/2017

| | |
|---|---|
| **Case Name:** | Anthony Brown Sr v. Veronica Conrado et al |
| **Case Number:** | 2:13-cv-02620-PSG-PJW |
| **Filer:** | |
| **Document Number:** | 116 |

**Docket Text:**
**REPORT AND RECOMMENDATION issued by Magistrate Judge Patrick J. Walsh. Re NOTICE OF MOTION AND MOTION for Summary Judgment [99] Objections to R&R due by 3/15/2017. (sbou)**

**2:13-cv-02620-PSG-PJW Notice has been electronically mailed to:**
Ariana Rose McGinness Gebauer     armgebauer@gmail.com
Catherine Mason Mathers     cmathers@counsel.lacounty.gov
Wendy C Shapero     atty.pluorders@lacity.org, wendy.shapero@lacity.org
Elizabeth L Greenwood     elizabeth.greenwood@lacity.org, atty.pluorders@lacity.org, kelly.heaton@lacity.org
Elizabeth Anne Mitchell     atty.pluorders@lacity.org, elizabeth.mitchell@lacity.org
Cory M Brente     melinda.crowe@lacity.org, atty.pluorders@lacity.org, cory.brente@lacity.org
**2:13-cv-02620-PSG-PJW Notice has been delivered by First Class U. S. Mail or by other means BY THE FILER to :**
Anthony Brown
CDC V-79273
D1 - 146
Centinela State Prison
P O Box 931
Imperial CA 92251

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| ANTHONY BROWN, SR., | ) | CASE NO. CV 13-2620-PSG (PJW) |
| Plaintiff, | ) ) | REPORT AND RECOMMENDATION RE: DEFENDANTS' MOTION FOR SUMMARY |
| v. | ) ) | JUDGMENT (DOC. NO. 99) |
| VERONICA CONRADO, et al., | ) ) | |
| Defendants. | ) ) ) | |

This Report and Recommendation is submitted to the Hon. Philip S. Gutierrez, United States District Judge, pursuant to 28 U.S.C. § 636 and General Order 05-07 of the United States District Court for the Central District of California. For the reasons discussed below, it is recommended that Defendants Veronica Conrado and Juan Guerra's motion for summary judgment be denied.

I.

SUMMARY OF FACTS AND PROCEEDINGS

From August 2009 until September 2011, Plaintiff was a pre-trial detainee in the custody of the Los Angeles County Sheriff's Department, awaiting trial in a criminal case. Until May 2011, he was representing himself. (First Amended Complaint ("FAC") at ¶¶ 2-5.) On April 15, 2011, the Los Angeles County Superior Court ordered all

discovery closed in his case. (FAC at ¶ 9.) Notwithstanding that order, on April 19, 2011, Defendants, Los Angeles Police Department detectives Conrado and Guerra, came to the jail where Plaintiff was being held to gather a DNA sample from him. (FAC at ¶¶ 6, 10.) Plaintiff was called out of his cell at approximately 10:15 a.m. for what he was told was an attorney visit. (FAC at ¶ 13.) He was brought to Defendants Conrado and Guerra and several Los Angeles County Sheriff deputies. (FAC at ¶ 14.) Conrado told Plaintiff that she had a court order to collect a DNA sample from him. (FAC at ¶ 15.) Plaintiff asked to see the order; Conrado refused to show it to him. (FAC at ¶¶ 17-18.) Instead, she signaled to the deputies, who grabbed Plaintiff, put him in a "chicken wing hold," and pushed his face against a wall. (FAC at ¶¶ 19-21.) The deputies then turned Plaintiff's head to the side and forced his mouth open so that Conrado could swab the inside of his mouth with Q-tips. (FAC at ¶¶ 19-21.) Defendant Guerra was watching and did not intervene. (FAC at ¶ 22.)

When Conrado finished, she threw a property receipt on the floor, documenting that she had taken a DNA sample. Guerra then simulated a gun with his hand and pointed it at Plaintiff, pretending that he was shooting him. (FAC at ¶ 24.) Conrado booked the DNA sample into evidence at around 1:00 p.m. that day. (FAC at ¶ 25; FAC at Exh. B.)

Plaintiff claims that Defendants were not authorized to collect his DNA sample when they did. He points out that a minute order from the Los Angeles County Superior Court purportedly authorizing the taking of the sample was not filed until 1:30 p.m., three hours after Conrado took the sample. (FAC at ¶¶ 27-29; FAC at Exh. C.) He also points out that, when he wrote to the clerk's office requesting a copy of the order, he was informed that no orders had been signed in his

2

case that day.  (FAC at ¶ 36; FAC at Exh. I.)  He further explains that the presiding judge had always faxed him a copy of the orders in his case because Plaintiff was representing himself and that he never received a copy of the order.  (FAC at ¶ 11.)  Plaintiff notes that, even if Defendants had obtained a court order before taking his DNA sample, that order would have been in violation of the court's previous (April 15, 2011) order prohibiting further discovery.[1]  (FAC at ¶¶ 28-29.)

II.

DISCUSSION

Plaintiff contends that Defendant Conrado violated his Fourth Amendment right against unreasonable searches and seizures when she took a DNA sample from him without a court order.  He argues, alternatively, that, even if she had a court order, she still violated his rights because she used unreasonable and unnecessary force to obtain the sample.  He contends that Guerra violated his rights when he failed to intervene to prevent Conrado and the others from forcing him to comply.

Defendants move for summary judgment, arguing that there was a court order and that Conrado reasonably relied on it and the Deputy District Attorney's representation regarding the lawfulness of the order when she obtained the DNA sample.  She and Guerra also argue that, assuming that the deputies who helped her obtain the sample used too much force, Conrado and Guerra were not required to intervene to stop them because the deputies did not work for the Los Angeles Police

---

[1]  A minute order from April 15, 2011, reflects that the judge had determined that discovery was "now complete."  (Doc. No. 105 at p. 10.)

3

Department and Conrado and Guerra did not have custody or control of Plaintiff. For the following reasons, Defendants' motion for summary judgment is denied.

A.    Standard of Review

Under Federal Rule of Civil Procedure 56(a), summary judgment is warranted if the moving party can establish that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A "genuine issue" exists if there is a sufficient evidentiary basis upon which a reasonable jury could find for the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A factual dispute is "material" if it might affect the outcome of the suit under governing law. *Id.* at 248. The Court views the inferences it draws from the underlying facts in a light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the moving party satisfies that burden, the opposing party must submit evidence showing a genuine issue of material fact. *Matsushita*, 475 U.S. at 587. Summary judgment is also warranted when the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

4

B.    Defendant Conrado is not Entitled to Summary Judgment on Plaintiff's Fourth Amendment Claim

1.    The Excessive Force Claim

Plaintiff alleges that Defendant Conrado and the deputies who assisted her in obtaining his DNA used excessive force, in violation of the Fourth Amendment to the United States Constitution. (FAC at ¶ 39.) Conrado counters that, even assuming that the force was excessive, it was the deputies who applied it, not Conrado, and she cannot be held liable for what they did. This argument is rejected.

According to Plaintiff, the deputies lured him out of his cell at Conrado's behest by telling him that there was an attorney at the jail who wanted to speak with him. Conrado and Guerra were waiting outside and Conrado told Plaintiff that she had an order authorizing her to obtain a DNA sample from him. Plaintiff asked Conrado to see the order. In response, Conrado "turned and signaled" the deputies who immediately grabbed him, pushed him up against a wall, placed him in a control hold, forced his head to the side, and forced his mouth open so that Conrado could obtain the sample. (FAC at ¶¶ 19-21.) Accepting this version of events and the reasonable inferences that can be drawn from it, the deputies use of force was at Conrado's direction and she can be held liable for it. *See Preschooler II v. Clark Cnty. Sch. Bd. of Trs.*, 479 F.3d 1175, 1183 (9th Cir. 2007) (quoting *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978)) ("The requisite causal connection may be established when an official sets in motion a 'series of acts by others which the actor knows or reasonably should know would cause others to inflict' constitutional harms.").

5

Conrado argues that she is entitled to summary judgment because Plaintiff cannot prove that her signal to the deputies caused them to attack him. Again, the Court disagrees. Though Plaintiff has not presented any direct proof that that is what the signal was intended to communicate, the circumstantial evidence certainly supports such a conclusion in that, without a word, based solely on her signal, the deputies pounced on Plaintiff and forced him into a position where Conrado could accomplish her mission, i.e., to obtain a DNA sample from Plaintiff.

Conrado also contends that she is entitled to summary judgment because Plaintiff was not in her custody at the time of the assault and, therefore, she had no control over him or the deputies who assaulted him. The evidence completely undermines this argument. The order Conrado obtained authorizing her to collect the DNA sample provided that Plaintiff would be in the "immediate and actual control and custody and presence of said LAPD" when the sample was collected. (Doc. No. 13.) Further, and more practically, Conrado had the power to enter the county jail, persuade the deputies to go to Plaintiff's cell and bring him to her, and, on her signal, get the deputies to attack him and forcibly open his mouth so that she could swab the inside of his mouth. Thus, contrary to Conrado's argument, the evidence establishes that she had control over Plaintiff and the deputies at the time of the assault. For this reason, her argument that she is entitled to summary judgment because she did not have control is rejected.

2.    The Court Order

Plaintiff alleges that Conrado obtained the DNA sample without an order. Conrado argues that there was an order and that she reasonably

6

relied on it and the advice of the Deputy District Attorney in her case when she obtained the sample.  This argument is also rejected.

Even assuming that there was a court order at the time Conrado took the DNA sample, the order did not authorize her to direct the deputies to assault Plaintiff to obtain the sample where, as here, he was not resisting and had merely asked to see a copy of the order. Further, there are a lot of questions swirling around the court order that cannot be resolved on summary judgment.  To begin with, though an order has been produced, the question of where it came from and when it was issued is in dispute.  Conrado claims that the Deputy District Attorney obtained it, but she has not presented the application for the order or a declaration from the Deputy District Attorney explaining what happened.  And, as Plaintiff points out, when Conrado prepared a report memorializing her collection of the DNA sample, she explained that she obtained the order and made no reference to the deputy district attorney.  This is consistent with a letter Plaintiff has submitted from a judge of the Superior Court in which he concludes that "it seems that the order was requested by [] Conrado."  (Exh. K to Plaintiff's Request for Judicial Notice.)

Though Plaintiff and Defendants appear to agree that Conrado took the DNA sample at about 10:15 on April 19, 2011, a minute order from the Superior Court docket provides that the order was filed at 1:30. Adding further confusion to the issue is the fact that, when Plaintiff wrote to the Superior Court and requested a copy of all orders entered on the day the order was purportedly entered, the court wrote back that there were no orders entered that day.

Plaintiff further points out that two different versions of the same order exist.  The certified order lodged by Conrado's counsel has

7

the name "CRAIG E. VEALS" stamped under the judge's signature (Doc. No. 13), while the order handed to him by Deputy District Attorney Ashvanian during a hearing on May 13, 2011 (FAC at Exh. F) does not.

Circumstantial evidence also supports Plaintiff's contention that the sample was taken without an order. To begin with, when Plaintiff asked Conrado to see the order at the jail, an obviously fairly reasonable and innocuous request, Conrado did not show it to him. Instead, she directed the deputies to assault Plaintiff. Clearly, had Conrado had an order in her hand, it would seem to be a simple task to show it to him and, presumably, eliminate the need for the deputies to use force on Plaintiff. Finally, Plaintiff points out that the DNA evidence was never used in his trial. He suspects that that is because the prosecutor determined that there was no order when the sample was obtained.

In the end, there are many more questions than answers on the issue of the order. For that reason, Conrado is not entitled to summary judgment on Plaintiff's excessive force claims.[2]

B.    Detective Guerra is not Entitled to Summary Judgment

Detective Guerra contends that he is entitled to summary judgment because he merely accompanied Conrado to the jail and watched as she and the deputies obtained the DNA swab. He argues that he did not have custody or control over Plaintiff and had no obligation to

---

[2] Defendants mention qualified immunity in their "Standard of Review" section of the brief but do not discuss it anywhere else in their brief. Defendants' mention of the words "qualified immunity" is not enough to raise the issue and it is denied on that ground. Had they raised the issue in detail, the Court would have denied it anyway because it was clearly established in 2011 that police officers could not direct another police officer to assault a detainee merely because he asked to see a copy of a court order.

8

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

ANTHONY BROWN, SR.,

           Plaintiff,

    v.

VERONICA CONRADO, et al.,

           Defendants.

Case No. CV 13-2620-PSG (PJW)

ORDER ACCEPTING REPORT AND
ADOPTING FINDINGS, CONCLUSIONS,
AND RECOMMENDATIONS OF UNITED
STATES MAGISTRATE JUDGE

Pursuant to 28 U.S.C. § 636, the Court has reviewed the motion for summary judgment, the records on file herein, and the Report and Recommendation of the United States Magistrate Judge. The time for filing objections to the Report and Recommendation has expired and no objections have been filed. The Court accepts the findings and recommendations of the Magistrate Judge and adopts them as its own findings and conclusions.

IT IS THEREFORE ORDERED that Defendants Conrado and Guerra's motion for summary judgment is denied.

DATED:     March 29, 2017               .

PHILIP S. GUTIERREZ
UNITED STATES DISTRICT JUDGE

C:\Users\imartine\AppData\Local\Temp\notesC7A056\Order accept r&r re Ds' msj.wpd

intervene when the deputies assaulted him because they worked for a different agency. Though a closer call, the Court finds that Defendant Guerra is not entitled to summary judgment, either.

Generally speaking, police officers are obligated to intervene when another police officer is violating a suspect's constitutional rights. *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000) (citing *United States v. Koon*, 34 F.3d 1416, 1447 n.25 (9th Cir. 1994), *rev'd on other grounds*, 518 U.S. 81 (1996)). The facts as set out by Plaintiff and the inferences that can be drawn from them establish that Guerra was working with Conrado when he accompanied her from the courthouse to the jail. According to Plaintiff's version of events, Conrado directed the deputies to assault him when he failed to immediately comply with her command for a DNA sample. Thus, it was Conrado who was ultimately responsible for the assault and, even under Guerra's interpretation of the law—one in which this Court does not necessarily agree—he should have stopped her from instigating it or intervened when the deputies complied with Conrado's direction to assault Plaintiff. For these reasons, Guerra is not entitled to summary judgment.

III.

RECOMMENDATION

For these reasons, IT IS RECOMMENDED that the Court issue an Order (1) accepting this Report and Recommendation, and (2) denying Defendant Conrado's and Guerra's motion for summary judgment.

DATED:   February 21, 2017

*Patrick J. Walsh*
PATRICK J. WALSH
UNITED STATES MAGISTRATE JUDGE

S:\PJW\Cases-Civil Rights\BROWN 13-2620\DS motion for summary judgment.wpd

9

Case: 2:13cv2620   Doc: 116

Anthony  Brown Sr CDCV-79273
Centinela State Prison
P O Box 931
Imperial, CA 92251

# EXHIBIT 2

FILED

2013 NOV 20 PM 2: 42

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

June 2012 Grand Jury

UNITED STATES OF AMERICA,               )   CR No. CR 13 00819
                                         )
              Plaintiff,                 )   I N D I C T M E N T
                                         )
         v.                              )   [18 U.S.C. § 371: Conspiracy;
                                         )   18 U.S.C. § 1503(a): Obstruction
GREGORY THOMPSON,                        )   of Justice; 18 U.S.C. § 1001:
STEPHEN LEAVINS,                         )   False Statements]
GERARD SMITH, - Bill Ginap              )
MICKEY MANZO,                            )
JAMES SEXTON,                            )
SCOTT CRAIG, and - Michael Stone        )                    13-573-6W
MARICELLA LONG, AN                      )
                                         )                  13-574 - GHK
              Defendants.                )
                                         )
                                         )

The Grand Jury charges:

                    INTRODUCTORY ALLEGATIONS

    At all times relevant to this Indictment:

    1.   The Los Angeles County Sheriff's Department ("LASD")
was a local law enforcement agency within the Central District
of California.  Among other things, the LASD was responsible for
managing the Los Angeles County Jails, including the Los Angeles
County Men's Central Jail ("MCJ") and the Los Angeles County

//

Twin Towers Correctional Facility ("TTCF"), both of which were located in the City of Los Angeles.

2.    The LASD operated computer databases that, among other things, tracked the location of inmates housed in the Los Angeles County Jails and shared the location of those inmates with law enforcement agencies, including federal law enforcement agencies (the "LASD computer databases").

3.    Federal grand juries investigated allegations of violations of federal criminal law in secret proceedings. Federal grand juries issued grand jury subpoenas to obtain documents and testimony from witnesses.

4.    The Federal Bureau of Investigation ("FBI") was a federal law enforcement agency that investigated allegations of violations of federal criminal laws, including those allegedly committed by employees of local law enforcement agencies such as the LASD.  Some of these investigations included allegations of: (a) civil rights abuses, such as deputies using excessive force on inmates in jails; and (b) public corruption offenses, such as deputies smuggling contraband into jails in exchange for bribes. The FBI often conducted investigations in a covert manner so that the subjects of the investigations would be unaware of the existence, manner, and extent of the investigations. Additionally, the FBI often acted as an arm of federal grand juries by, among other things, serving grand jury subpoenas, obtaining evidence to be presented to the grand jury, and interviewing witnesses to alleged crimes being investigated by the grand jury.

//

2

5. Federal grand juries obtained the testimony of inmates held in local jails through Writs of Habeas Corpus, which were federal court orders signed by federal district court judges.

6. The United States Marshals Service ("USMS") was a federal law enforcement agency that, among other duties, helped federal grand juries obtain the testimony of inmates located at local jails. The USMS served Writs of Habeas Corpus on entities operating local jails, including the LASD, and arranged for the transportation of inmates scheduled to testify before federal grand juries.

7. Defendant GREGORY THOMPSON ("THOMPSON") was an LASD lieutenant who oversaw its Operation Safe Jails Program and its Jail Investigations Unit, which was tasked with conducting investigations within the Los Angeles County Jails.

8. Defendants GERARD SMITH ("SMITH"), MICKEY MANZO ("MANZO"), and JAMES SEXTON ("SEXTON") were LASD deputies assigned to the Operation Safe Jails Program.

9. Defendant STEPHEN LEAVINS ("LEAVINS") was an LASD lieutenant within its Internal Criminal Investigations Bureau, which was tasked with investigating allegations of local crimes committed by the LASD's personnel.

10. Defendants SCOTT CRAIG ("CRAIG") and MARICELLA LONG ("LONG") were LASD sergeants within the Internal Criminal Investigations Bureau.

11. Inmate AB was an inmate in the custody of the LASD at the MCJ who was a cooperating witness in the investigation of alleged federal civil rights and public corruption violations committed and being committed by employees of the LASD working

3

at the Los Angeles County Jails. The investigation concerned the alleged use of excessive force by LASD deputies against inmates within the MCJ and TTCF and the alleged smuggling of contraband by LASD deputies into the MCJ and TTCF in exchange for bribes (the "Federal Investigation"). Specifically, Inmate AB was assisting in a covert public corruption investigation of LASD Deputy Gilbert Michel ("Deputy Michel"), who worked at the MCJ. Additionally, Inmate AB was providing information about alleged federal civil rights offenses being committed by employees of the LASD working at the MCJ who were allegedly abusing inmates.

12. Special Agent LM and Special Agent DL were Special Agents with the FBI. Special Agent LM and Special Agent DL were among the FBI agents participating in the Federal Investigation.

13. As part of the Federal Investigation, the FBI conducted an undercover operation to determine whether Deputy Michel would accept a bribe to provide Inmate AB with a cellular phone. In or about late July 2011, Deputy Michel accepted a bribe and provided Inmate AB with a cellular phone. On or about August 8, 2011, the LASD discovered that Inmate AB had in Inmate AB's possession the cellular phone that Deputy Michel had smuggled into the MCJ in return for a bribe.

14. By no later than in or about August 2011, defendants THOMPSON, LEAVINS, SMITH, MANZO, SEXTON, CRAIG, and LONG were aware that the FBI and a federal grand jury were conducting an investigation of the LASD's employees within the Los Angeles County Jails and that Inmate AB was an informant assisting in the Federal Investigation.

4

15.    On or about August 25, 2011, a federal judge ordered Inmate AB's appearance as a witness before a federal grand jury as part of the Federal Investigation.  The USMS served this order on the LASD on or about August 25, 2011.

16.    By no later than on or about September 8, 2011, defendants LEAVINS, CRAIG, and LONG were aware that FBI Special Agents could neither be arrested nor prosecuted for violations of state or local laws for acts engaged in while carrying out their duties as federal agents.

17.    By no later than on or about September 26, 2011, defendants LEAVINS, CRAIG, and LONG were aware that there was no probable cause to believe that Special Agent LM had acted outside of her authority as an FBI Special Agent by introducing a cellular phone to Inmate AB through Deputy Michel in an undercover operation designed to determine whether Deputy Michel would smuggle contraband into the MCJ in return for a bribe.

18.    These Introductory Allegations are hereby incorporated into each count of this Indictment as though set forth fully therein.

5

COUNT ONE

[18 U.S.C. § 371]

A.    OBJECT OF THE CONSPIRACY

Beginning no later than on or about August 18, 2011, and continuing through on or about October 3, 2011, in Los Angeles County, within the Central District of California, defendants GREGORY THOMPSON, STEPHEN LEAVINS, GERARD SMITH, MICKEY MANZO, JAMES SEXTON, SCOTT CRAIG, and MARICELLA LONG, together with others known and unknown to the Grand Jury, knowingly conspired to corruptly influence, obstruct, and impede, and endeavor to influence, obstruct, and impede, the due administration of justice, in violation of Title 18, United States Code, Section 1503(a).

B.    MEANS BY WHICH THE OBJECT OF THE CONSPIRACY WAS TO BE ACCOMPLISHED

The object of the conspiracy was to be accomplished in substance as follows:

1.    Defendants THOMPSON, LEAVINS, SMITH, MANZO, and SEXTON would attempt to prevent the FBI from interviewing or contacting Inmate AB knowing that Inmate AB was being utilized by the FBI to investigate illegal acts allegedly being committed by LASD personnel at the MCJ.

2.    Defendants THOMPSON, LEAVINS, SMITH, MANZO, and SEXTON would move Inmate AB from the MCJ to other locations to hide him from the FBI, the USMS, and the federal grand jury.

3.    Defendants THOMPSON, LEAVINS, SMITH, MANZO, and SEXTON would impede any attempt by the FBI and the USMS to find Inmate AB through record searches, including by:

6

a. Obtaining Inmate AB's physical file, called a "records jacket," from the LASD's records center so the records center would have no physical record showing that Inmate AB was in the LASD's custody.

b. Making false entries into the LASD computer databases to make it appear as though Inmate AB had been released from the LASD's custody when, in fact, Inmate AB remained hidden in the LASD's custody.

c. Re-booking Inmate AB in the LASD computer databases under false names, with fictitious booking information, and without fingerprinting Inmate AB, so that Inmate AB's true name would not be connected to this fictitious booking information.

4. Defendants LEAVINS, SMITH, CRAIG, and LONG would conduct interviews of Inmate AB and various employees of the LASD to attempt to determine the manner and extent of the Federal Investigation.

5. Defendants LEAVINS, CRAIG, and LONG would attempt to convince potential witnesses and informants not to cooperate with the Federal Investigation, including by:

a. Informing and suggesting to individuals, including Deputy Michel, that the FBI was and would be lying to them, manipulating them, blackmailing them, and threatening them; and

b. Suggesting to Inmate AB that the FBI had abandoned him by informing Inmate AB that the FBI had not come back for him.

//

7

6. Defendants LEAVINS, CRAIG, and LONG would attempt to compel the FBI to disclose the manner and extent of the Federal Investigation, including by attempting to obtain a court order from a California Superior Court in the County of Los Angeles seeking to compel the FBI to provide the LASD with, among other things:

(a) Investigative records, reports, and notes of all investigations involving the Los Angeles County Jail system since August 5, 2009; and

(b) The true identity of any agents and the current assignment of those involved in any investigation involving the Los Angeles County Jail system since August 5, 2009.

7. After the California Superior Court in the County of Los Angeles denied this proposed court order, defendants CRAIG and LONG would attempt to intimidate Special Agent LM and to coerce Special Agent LM into providing details concerning the Federal Investigation by confronting her outside of her home and falsely informing her that defendant CRAIG was in the process of swearing out a declaration for a warrant for her arrest.

8. Defendant LONG would falsely inform Special Agent LM's supervisor that there was going to be a warrant issued for Special Agent LM's arrest.

C. OVERT ACTS

In furtherance of the conspiracy and to accomplish the object of the conspiracy, defendants THOMPSON, LEAVINS, SMITH, MANZO, SEXTON, CRAIG, and LONG, and others known and unknown to the Grand Jury, committed various overt acts within the Central

//

District of California, including but not limited to the following:

1.    On or about August 18, 2011, defendant THOMPSON instructed an employee of the LASD to prohibit "outside" law enforcement from meeting with Inmate AB.

2.    On or about August 23, 2011, after learning that the FBI had interviewed Inmate AB at the MCJ and that the LASD had terminated the interview, defendant LEAVINS informed Inmate AB that he would be moved to a different location.

3.    On or about August 23, 2011, defendant THOMPSON asked a deputy assigned to the MCJ's medical ward whether there was an open cell toward the back of the medical ward.

4.    On or about August 23, 2011, defendants SMITH and MANZO moved Inmate AB to a cell in the MCJ's medical ward.

5.    On or about August 23, 2011, defendants SMITH and MANZO stood guard outside of Inmate AB's cell in the medical ward.

6.    On or about August 24, 2011, defendants THOMPSON, SMITH, and MANZO held a meeting with LASD deputies who were to be assigned to stand guard outside of Inmate AB's cell at all times.

7.    On or about August 24, 2011, defendant THOMPSON directed LASD Deputy A to obtain Inmate AB's records jacket.

8.    On or about August 25, 2011, defendant THOMPSON sent an email to LASD employees stating that the FBI would need approval before interviewing any inmate in LASD custody.

9.    On or about August 25, 2011, defendant THOMPSON caused LASD employees to use intimidation to convince the LASD's

9

records center employees to create false entries in the LASD computer databases to show that Inmate AB had been released from the custody of the LASD when, in fact, Inmate AB remained in the LASD's custody.

10. On or about August 25, 2011, defendants THOMPSON, SMITH, MANZO, and SEXTON caused Inmate AB to be booked in the LASD computer databases under the name "John Rodriguez" and with fictitious information, including a false race, a fake date of birth, and with the false statements asserting that Inmate AB had refused to provide his social security number and fingerprints.

11. On or about August 25, 2011, defendants THOMPSON, LEAVINS, SMITH, and MANZO caused Inmate AB to be moved from the MCJ to the LASD's San Dimas station.

12. On or about August 26, 2011, defendant THOMPSON caused a high ranking employee of the LASD's MCJ to instruct MCJ lieutenants and sergeants that:

> If any federal law enforcement agency comes to MCJ with an inmate removal order, visitation order, or ANY OTHER order of the court you shall receive the order and advise the federal officer that before you can proceed, you have to submit the order to the Department's legal advisor for review. DO NOT RELEASE THE INMATE OR ALLOW CONTACT.

13. On or about August 26, 2011, defendants THOMPSON, SMITH, MANZO, and SEXTON caused the LASD computer databases to falsely show that "John Rodriguez" had been released pursuant to a court order.

14. On or about August 26, 2011, defendant LONG informed Inmate AB that the FBI had not "come back for" Inmate AB.

//

10

15.  On or about August 26, 2011, defendant SEXTON stood guard outside of Inmate AB's cell at the LASD's San Dimas station.

16.  In or about late August 2011, defendant SMITH told LASD Deputy A that the FBI was on its way to take custody of Inmate AB and directed LASD Deputy A to physically stop the FBI from taking custody of Inmate AB.

17.  On or about August 30, 2011, defendants LEAVINS and CRAIG informed Deputy Michel that the FBI was manipulating, blackmailing, and threatening him in an attempt to convince Michel to be a witness in the Federal Investigation.

18.  On or about September 2, 2011, defendants CRAIG and LONG caused the LASD to conduct surveillance of Deputy Michel to determine whether the FBI was following him.

19.  On or about September 2, 2011, defendants THOMPSON, SMITH, and MANZO caused Inmate AB to be booked in the LASD computer databases under the name "Chris Johnson" and with fictitious information, including false statements asserting that Inmate AB refused to provide his social security number and fingerprints.

20.  On or about September 8, 2011, defendant CRAIG presented a proposed court order to a California Superior Court judge in Los Angeles County in an attempt to compel the FBI to disclose information related to the Federal Investigation.

21.  On or about September 13, 2011, defendants CRAIG and LONG caused the LASD to conduct surveillance of Special Agent LM.

//

11

22. On or about September 14, 2011, defendants CRAIG and LONG caused the LASD to conduct surveillance of Special Agent LM.

23. On or about September 23, 2011, defendants CRAIG and LONG caused the LASD to conduct surveillance of Special Agent LM.

24. On or about September 26, 2011, defendants CRAIG and LONG confronted Special Agent LM outside of her residence and falsely informed her that:

(a) Special Agent LM was a named suspect in a felony complaint; and

(b) Defendant CRAIG was in the process of swearing out a declaration for a warrant for the arrest of Special Agent LM.

25. On or about September 26, 2011, defendant LONG falsely informed Special Agent LM's supervisor at the FBI that there was going to be a warrant issued for Special Agent LM's arrest and that the arrest warrant could be issued as soon as the next day.

26. On or about September 28, 2011, defendants CRAIG and LONG caused the LASD to conduct surveillance of Special Agent LM.

27. On or about September 28, 2011, defendants CRAIG and LONG caused the LASD to conduct surveillance of Special Agent DL.

28. On or about September 29, 2011, defendants CRAIG and LONG caused the LASD to conduct surveillance of Special Agent DL.

COUNT TWO

[18 U.S.C. § 1503(a)]

From on or about August 25, 2011, to on or about September 12, 2011, defendants GREGORY THOMPSON, GERARD SMITH, MICKEY MANZO, and JAMES SEXTON corruptly endeavored to influence, obstruct, and impede the due administration of justice by: (a) attempting to prevent the FBI from interviewing Inmate AB; and (b) hiding Inmate AB from the FBI, USMS, and the federal grand jury.

13

COUNT THREE

[18 U.S.C. § 1503(a)]

From on or about August 25, 2011, to on or about September 26, 2011, in Los Angeles County, within the Central District of California, defendant STEPHEN LEAVINS corruptly endeavored to influence, obstruct, and impede the due administration of justice by: (a) hiding Inmate AB from the FBI, USMS, and the federal grand jury; (b) convincing and attempting to convince witnesses and potential witnesses not to cooperate with the FBI; and (c) authorizing and directing LASD Sergeants Scott Craig and Maricella Long to approach Special Agent LM outside of her home in an attempt to cause the FBI to disclose the nature and extent of the Federal Investigation.

14

COUNT FOUR

[18 U.S.C. § 1503(a)]

From on or about August 25, 2011, to on or about October 3, 2011, in Los Angeles County, within the Central District of California, defendants SCOTT CRAIG and MARICELLA LONG corruptly endeavored to influence, obstruct, and impede the due administration of justice by: (a) convincing and attempting to convince witnesses and potential witnesses not to cooperate with the FBI; (b) approaching Special Agent LM outside of her home and threatening to arrest her; and (c) informing Special Agent LM's supervisor that there was going to be a warrant issued for Special Agent LM's arrest and that the arrest warrant could be issued as soon as the next day.

15

COUNT FIVE

[18 U.S.C. § 1001(a)(2)]

On or about September 26, 2011; in Los Angeles County, within the Central District of California, in a matter within the jurisdiction of the executive branch of the government of the United States, namely, the FBI and the United States Attorney's Office for the Central District of California, defendant SCOTT CRAIG knowingly and willfully made the following materially false and fictitious statements and representations to Special Agent LM:

1.    Defendant CRAIG falsely stated that Special Agent LM was a named suspect in a felony complaint.  In fact, as defendant CRAIG knew, Special Agent LM was not a named suspect in a felony complaint; and

2.    Defendant CRAIG falsely stated that he was in the process of swearing out a declaration for a warrant for Special Agent LM's arrest.  In fact, as defendant CRAIG knew, he was not in the process of swearing out a declaration for a warrant for Special Agent LM's arrest.

16

COUNT SIX

[18 U.S.C. § 1001(a)(2)]

On or about September 26, 2011, in Los Angeles County, within the Central District of California, in a matter within the jurisdiction of the executive branch of the government of the United States, namely, the FBI and the United States Attorney's Office for the Central District of California, defendant MARICELLA LONG knowingly and willfully made the following materially false and fictitious statements and representations to the FBI:

1.    Defendant LONG falsely stated that there was going to be a warrant issued for Special Agent LM's arrest.  In fact, as defendant LONG knew, there was not going to be a warrant issued for Special Agent LM's arrest; and

2.    Defendant LONG falsely stated that a warrant for Special Agent LM's arrest could be issued as soon as the next

//
//
//
//
//
//
//
//
//
//
//
//

day.   In fact, as defendant LONG knew, no warrant for Special Agent LM's arrest would be issued on September 27, 2011.

                                             A TRUE BILL


                                             _____
                                             Foreperson


ANDRÉ BIROTTE JR.
United States Attorney

ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division

LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Public Corruption & Civil Rights Section

BRANDON D. FOX
LIZABETH A. RHODES
MARGARET L. CARTER
Assistant United States Attorneys
Public Corruption and Civil Rights Section

18

# EXHIBIT 3

STATE OF CALIFORNIA —    DEPARTMENT OF CORRECTIONS AND REHABILITATION                                EDMUND G. BROWN, GOVERNOR

**DIVISION OF ADULT OPERATIONS**
**CENTINELA STATE PRISON**

2302 Brown Road, P.O. Box 731
Imperial, CA 92251



May 11, 2016

Brown, Anthony
CDCR # V79273
Centinela State Prison
D1-112L

RE: Request for Public Records

Mr. Brown:

This letter is in response to your request for public records dated May 3, 2016 and received by my office on May 4, 2016. You requested the following documents:

"A list of all dates, times and names of every law enforcement person(s) from every outside law enforcement agency that came to visit Inmate Anthony Brown CDCR # V-79273 esp. the FBI", while housed at Centinela State Prison, between "January 2012 through October 2012" and "February 21, 2013 through April 29, 2014".

The California Department of Corrections and Rehabilitation (CDCR) reviewed your request, pursuant to the California Public Records Act (PRA). A copy of the requested document is included in this correspondence.  You provided a Trust Account Withdrawal Order in the amount of $.12 for a total of one page.

Should you have any questions regarding this matter, I may be contacted via a CDCR 22 Inmate/Parolee Request for Interview, Item or Service.

N. TELLES
Public Records Act Coordinator
Centinela State Prison

INMATE BROWN, CDCR # V79273:   PUBLIC RECORDS ACT (PRA) REQUEST

REQUESTED INFORMATION:

"A list of all dates, times and names of every law enforcement person(s) from every outside law enforcement agency that came to visit Inmate Anthony Brown CDCR # V-79273 esp. the FBI", while housed at Centinela State Prison, between "January 2012 through October 2012" and "February 21, 2013 through April 29, 2014".

| Visit Date | Time | Agency | Officer/Agent Name(s) |
|---|---|---|---|
| 2/23/12 | 1330 Hours | FBI | Leah Marx, Badge # 22956<br>Jason Dalton, Badge # 24255 |
| 8/2/12 | 1030 Hours | FBI | Leah Marx, Badge # 22956<br>Jason Dalton, Badge # 24255 |
| 9/20/12 | 1100 Hours | FBI | Leah Marx, Badge # 22956<br>Jason Dalton, Badge # 24255 |
| 9/12/13 | 1030 Hours | FBI | Leah Marx, Badge # 22956<br>Jason Dalton, Badge # 24255 |
| 2/18/14 | 1100 Hours | FBI | David Dahle, Badge # 23138<br>Jason Dalton, Badge # 24255 |
| 4/23/14 | 1030 Hours | FBI | Leah Marx, Badge # 22956<br>Jason Dalton, Badge # 24255 |

N. TELLES
Public Records Act Coordinator
Centinela State Prison

Case 2:16-cr-00066-PA   Document 375   Filed 05/12/17   Page 75 of 169   Page ID
#:8639

STATE OF CALIFORNIA —    DEPARTMENT OF CORRECTIONS AND REHABILITATION                    EDMUND G. BROWN, GOVERNOR

**DIVISION OF ADULT OPERATIONS**
**CENTINELA STATE PRISON**

2302 Brown Road, P.O. Box 731
Imperial, CA 92251



May 5, 2016

Brown, Anthony
CDCR # V79273
Centinela State Prison
D1-112L

RE: Request for Public Records

Mr. Brown:

This letter is in response to your request for public records dated May 3, 2016 and received by my office on May 4, 2016.  You requested the following documents:

"A list of all dates, times and names of every law enforcement person(s) from every outside law enforcement agency that came to visit Inmate Anthony Brown CDCR # V-79273 esp. the FBI".

The California Department of Corrections and Rehabilitation (CDCR) reviewed your request, pursuant to the California Public Records Act (PRA), and will produce the documents once the payment of duplication fees has been received.  The CDCR charges 12 cents per page for copies made in response to public records requests. The total duplication fee for this request is $.12 for 1 page.  Be advised, Centinela (CEN) State Prison does not have the authority to waive the PRA fee.  Please complete an Inmate Trust Account form and return your request, along with the signed/completed Trust Account form, to the Litigations Office.

You are further advised that CEN cannot provide records for other institutions.  Any PRA requests pertaining to other institutions will have to be processed through those institutions.

Should you have any questions regarding this matter, I may be contacted via a CDCR 22 Inmate/Parolee Request for Interview, Item or Service.

N. TELLES
Public Records Act Coordinator
Centinela State Prison

# EXHIBIT 4

FILED

2013 AUG 15 PM 1:27

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY:_____

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

September 2011 Grand Jury

CR13-0574

| UNITED STATES OF AMERICA, | ) | CR No. |
| | ) | |
| Plaintiff, | ). | I N D I C T M E N T |
| | ) | |
| v. | ) | [18 U.S.C. § 241: Conspiracy Against Rights; 18 U.S.C. § 242: Deprivation of Rights Under Color of Law] |
| | ) | |
| ERIC GONZALEZ, | ) | |
| SUSSIE AYALA, | ) | |
| FERNANDO LUVIANO, | ) | |
| PANTAMITR ZUNGGEEMOGE, and | ) | |
| NOEL WOMACK, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

The Grand Jury charges:

INTRODUCTORY ALLEGATIONS

At all times relevant to this Indictment:

1.     The Los Angeles County Sheriff's Department ("LASD") was a law enforcement agency within the Central District of California.  Among other things, the LASD was responsible for managing the Los Angeles County Jails.  In addition, the LASD operated visiting centers, where individuals were allowed to visit those incarcerated in the Los Angeles County Jails.

approximately August 5, 2010, when Visitor LF was released because no charges were filed against him.

### Use of Force on Visitor GC

6. On or about February 26, 2011, defendant ZUNGGEEMOGE detained and handcuffed Visitor GT on suspicion of possessing a cell phone in the visiting center of the MCJ.

7. On or about February 26, 2011, defendant ZUNGGEEMOGE led Visitor GT to the deputy break room, which had no windows and was inaccessible to the public.

8. On or about February 26, 2011, defendant GONZALEZ instructed defendant ZUNGGEEMOGE to arrest Visitor GC, who was an associate of Visitor GT.

9. On or about February 26, 2011, defendant ZUNGGEEMOGE then handcuffed Visitor GC and led him to the deputy break room where Visitor GT was detained.

10. On or about February 26, 2011, after entering the deputy break room, defendant ZUNGGEEMOGE pushed Visitor GC against the refrigerator, causing a cut on Visitor GC's face.

11. On or about February 26, 2011, defendant ZUNGGEEMOGE shoved Visitor GC's hands, which were handcuffed, behind Visitor GC's back, upwards towards Visitor GC's shoulder blades, which caused Visitor GC pain.

12. On or about February 26, 2011, defendant AYALA guarded Visitor GC and Visitor GT in the deputy break room.

13. On or about February 26, 2011, defendant AYALA radioed other deputies and informed them that Visitor GC had stated that he would be able to defend himself against the deputy sheriffs were he not in handcuffs.

COUNT THREE

[18 U.S.C. § 242]

On or about February 26, 2011, in Los Angeles County, within the Central District of California, defendants ERIC GONZALEZ, PANTAMITR ZUNGGEEMOGE, SUSSIE AYALA, NOEL WOMACK, and FERNANDO LUVIANO, then sworn law enforcement officers employed by the Los Angeles County Sheriff's Department, while acting under color of law, assaulted Visitor GC, which resulted in bodily injury to Visitor GC, and thereby willfully deprived Visitor GC of the right secured and protected by the Constitution and laws of the United States to be free from unreasonable searches and seizures, which includes the right to be free from the use of unreasonable force.

COUNT SIX

[18 U.S.C. § 242]

On or about June 6, 2011, in Los Angeles County, within the Central District of California, defendant NOEL WOMACK, then a sworn law enforcement officer and deputy sheriff employed by the Los Angeles County Sheriff's Department, while acting under color of law, unlawfully arrested and searched Visitor EF, and thereby willfully deprived Visitor EF of the right secured and protected by the Constitution and laws of the United States to be free from unreasonable searches and seizures.

A TRUE BILL

/S/

_____
Foreperson

ANDRÉ BIROTTE, JR.
United States Attorney

ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division

LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Public Corruption and Civil Rights Section

LIZABETH RHODES
BRANDON FOX
MARGARET CARTER
Assistant United States Attorneys
Public Corruption and Civil Rights Section

15

FILED

2015 FEB -4 PM 4:36

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

October 2014 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ERIC GONZALEZ,<br>SUSSIE AYALA,<br>FERNANDO LUVIANO, and<br>NOEL WOMACK,<br><br>Defendants. | CR No. 13-0574(B)-GHK<br><br>F I R S T<br>S U P E R S E D I N G<br>I N D I C T M E N T<br><br>[18 U.S.C. § 241: Conspiracy<br>Against Rights; 18 U.S.C. § 242:<br>Deprivation of Rights Under Color<br>of Law; 18 U.S.C. § 1519:<br>Falsification of Records;<br>18 U.S.C. § 2(a): Aiding and<br>Abetting] |

The Grand Jury charges:

INTRODUCTORY ALLEGATIONS

At all times relevant to this First Superseding Indictment:

1.    The Los Angeles County Sheriff's Department ("LASD") was a law enforcement agency within the Central District of California. Among other things, the LASD was responsible for managing the Los Angeles County Jails.  In addition, the LASD operated visiting centers, where individuals were allowed to visit those incarcerated in the Los Angeles County Jails.

COUNT THREE

[18 U.S.C. § 242]

On or about February 26, 2011, in Los Angeles County, within the Central District of California, defendants GONZALEZ, AYALA, WOMACK, and LUVIANO, and co-conspirator Zunggeemoge, then sworn law enforcement officers employed by the Los Angeles County Sheriff's Department, while acting under color of law, assaulted Visitor GC, which resulted in bodily injury to Visitor GC, and thereby willfully deprived Visitor GC of the right secured and protected by the Constitution and laws of the United States to be free from unreasonable searches and seizures, which includes the right to be free from the use of unreasonable force.

COUNT SIX

[18 U.S.C. § 242]

On or about June 6, 2011, in Los Angeles County, within the Central District of California, defendant WOMACK, then a sworn law enforcement officer and deputy sheriff employed by the Los Angeles County Sheriff's Department, while acting under color of law, unlawfully arrested and searched Visitor EF, and thereby willfully deprived Visitor EF of the right secured and protected by the Constitution and laws of the United States to be free from unreasonable searches and seizures.

A TRUE BILL

/s/
Foreperson

STEPHANIE YONEKURA
Acting United States Attorney

ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division

LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Public Corruption and
Civil Rights Section

LIZABETH RHODES
BRANDON FOX
MARGARET CARTER
Assistant United States Attorney
Public Corruption and Civil
Rights Section

15

Case 2:16-cr-00066-PA    Document 375    Filed 05/12/17    Page 86 of 169    Page ID
#:8650

6/4/2015                                    Deputies change stories on jail visitor's beating, court records show

# Deputies change stories on jail visitor's beating, court records show

By JOEL RUBIN

MAY 31, 2015, 8:45 PM

he sheriff's deputies all told the same story.

A man visiting his brother in Los Angeles County Jail, they said, fought with them in a waiting area and had to be restrained. The five deputies involved in the struggle adamantly denied the man's allegations that he had been handcuffed and then beaten.

Their account remained unchanged under scrutiny from internal sheriff's investigators, the district attorney's office and the man's defense lawyers. No one wavered even when federal authorities obtained an indictment accusing them of assault and civil rights violations.

But two of the deputies have now changed their stories.

With their trial set to open later this month, both have struck deals with prosecutors that require them to plead guilty to criminal charges and, if called on, to testify against their former colleagues, court records show.

Under the terms of the agreement he signed last week, Deputy Noel Womack gave prosecutors a new version of the violent 2011 encounter in a windowless, secluded room in the Men's Central Jail facility. Deputies, he said, beat the jail visitor even though the man was handcuffed and not resisting as he was held on the floor, according to a copy of the agreement reviewed by The Times.

Womack has agreed to plead guilty to a felony charge that he lied to FBI agents during an interview last month when he told them he did not know if the visitor was handcuffed, the agreement said. He admitted to lying again when he told the agents his supervisor had ordered him to punch the man and a third time when he said the strikes he inflicted on the man had been necessary, the agreement said.

The second deputy, Pantamitr Zunggeemoge, entered a guilty plea earlier this year, court records show. The agreement between prosecutors and Zunggeemoge, who faced several allegations of abuse and dishonesty, was sealed by U.S. District Judge George H. King, keeping its details secret.

But a court filing by another defendant last month said that Zunggeemoge, too, has told prosecutors that the visitor was handcuffed during the incident. In his statement to prosecutors, the filing said, Zunggeemoge said deputies had concocted a story that only one of the man's hands was cuffed to justify their use of force. The filing also said that Zunggeemoge has agreed to cooperate fully and testify for the government if prosecutors call him as a witness.

Though cutting deals to avoid lengthy sentences is a staple of the justice system, the prosecution's ability to extract guilty pleas in this case is striking because expectations of solidarity run deep among law enforcement officers. In their plea agreement with Womack, prosecutors said Womack's actions highlight the pressures deputies are under to put up a united front.

"Womack continued to lie because he had learned that once a deputy sheriff writes about an incident in a report, the deputy sheriff has to stick to that version of events, even if they are lies, from that point forward," prosecutors wrote. "Womack understood that he was never supposed to go against his partners."

Womack's agreement requires him to resign from the L.A. County Sheriff's Department, and he will be banned from working in law enforcement. Prosecutors, for their part, will recommend to the judge that Womack receive no time in prison, according to his plea agreement. The judge could opt to disregard the suggestion and sentence Womack to as many as five years in prison, court documents show.

With Zunggeemoge's agreement sealed, what recommendation, if any, prosecutors will make on his behalf is not known. His attorney and Assistant U.S. Atty. Brandon Fox declined to comment.

The plea agreements mark the first time in the last two decades that a sheriff's deputy has been convicted in federal court of crimes related to excessive force, a spokesman for the U.S. Attorney's office said. Last year, the office secured convictions against seven sheriff's officials accused of obstructing the FBI's investigation into claims of brutality by deputies in the jail.

The guilty pleas have scrambled the makeup of the approaching brutality trial, which is scheduled to begin June 16. In securing the deputies' help, prosecutors scored a potentially potent advantage in their effort either to extract more guilty pleas or convict the three remaining defendants at trial. Without the firsthand accounts from the deputies, the case would rest heavily on the ability of the beaten man and other alleged victims to convince jurors of what happened.

But Joseph Avrahamy, an attorney representing one of the other defendants, Sgt. Eric Gonzalez, a supervisor at the jail visitor center on the day of the incident, said the about-face by Womack and Zunggeemoge are transparent bids to protect themselves at the expense of the others.

"They are going to have serious credibility issues," Avrahamy said of the pair. "They have been very

consistent throughout in their accounts of what happened and now, suddenly, they're changing their stories. I think a jury will be able to see right through that. There was never a motivation for them to lie before. Now there is."

Along with Womack, Zunggeemoge and Gonzalez, the grand jury indictment accuses deputies Sussie Ayala and Fernando Luviano of civil rights abuses. Gonzalez, Ayala and Luviano have pleaded not guilty.

Luviano's attorney, Bernard Rosen, acknowledged that the decision of the two deputies to cooperate with prosecutors poses potential problems. But he downplayed the significance of what they might testify to on the witness stand, saying their new accounts of the incident "support much" of what Luviano contends occurred. Rosen declined to elaborate.

"Any time the government tells a jury they've got more than one witness, it makes things more difficult," Rosen said. "My client insists he'll be going to trial and is confident he'll be exonerated.... Some people look forward to their day in court. Others don't."

The allegations against the group stem from several encounters with visitors to the Sheriff's Department's main jail facility in 2010 and 2011. In each of the episodes, some or all of the deputies are accused of detaining people without legitimate reasons and, in all but one of the incidents, assaulting them in a room deputies used during work breaks.

Prosecutors portrayed Gonzalez in the indictment as a ringleader who "would maintain, perpetuate and foster an atmosphere and environment ... that encouraged and tolerated abuses of the law by deputies."

The case centers on the altercation in late February 2011 with Gabriel Carrillo. Carrillo, who had come to jail to visit his brother, was detained with his girlfriend after Zunggeemoge became suspicious that the woman was carrying a cellphone in violation of jail rules.

Carrillo said something combative that angered one of the deputies, which led to the beating, according to prosecutors' account. Based on the deputies' reports and their testimony in court proceedings, the Los Angeles County district attorney's office pursued a criminal case against Carrillo on charges of assaulting law enforcement officers.

Days before the trial, the district attorney suddenly dropped the charges. Carrillo's attorney found evidence he said showed that Carrillo had suffered injuries on both his wrists consistent with being handcuffed during the struggle. The county later paid Carrillo $1.2 million to settle a civil lawsuit.

In the statement he gave prosecutors as part of his plea deal, Womack said he copied another deputy's report of the incident involving Carrillo to make sure his account was in line with the

others. He added that he watched as Gonzalez later laid out all the deputies' reports on a table to compare them and "ensure their consistency."

joel.rubin@latimes.com

Copyright © 2015. Los Angeles Times

# EXHIBIT 5

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

        Plaintiff,

        v.

NOEL WOMACK,

        Defendant.

CR No. 13-574(C)-GHK

S E C O N D
S U P E R S E D I N G
I N F O R M A T I O N

[18 U.S.C. § 1001: Making False Statements]

The United States Attorney charges:

INTRODUCTORY ALLEGATIONS

At all times relevant to this Second Superseding Information:

1.    The Los Angeles County Sheriff's Department ("LASD") was a law enforcement agency within the Central District of California. Among other things, the LASD was responsible for managing the Los Angeles County Jails.  In addition, the LASD operated visiting centers, where individuals were allowed to visit those incarcerated in the Los Angeles County Jails.

2.    The Los Angeles County Men's Central Jail ("MCJ") was one of the Los Angeles County Jails and was staffed by LASD personnel, including deputy sheriffs.  Deputy sheriffs were responsible for

LAR:gm

EXHIBIT A

helping to maintain order and for providing security within the MCJ and its visiting center.

3.    Defendant NOEL WOMACK ("WOMACK") was an LASD deputy sheriff assigned to work at the MCJ's visiting center.

4.    Pantamitr Zunggeemoge ("Zunggeemoge") was an LASD deputy sheriff assigned to work at the MCJ's visiting center.

5.    Eric Gonzalez ("Gonzalez") was an LASD sergeant who supervised deputies working at the visiting center of the MCJ, including defendant WOMACK.

6.    Sussie Ayala ("Ayala") was an LASD deputy sheriff assigned to work at the MCJ's visiting center.

7.    Deputy A was an LASD deputy sheriff assigned to work at the MCJ's visiting center.

8.    Fernando Luviano ("Luviano") was an LASD deputy sheriff assigned to work at the MCJ, including at its visiting center, on or about February 26, 2011.

9.    Visitors generally could not be in the same room as MCJ inmates.  Instead, visitors could see MCJ inmates through a glass separator and could speak to MCJ inmates by using a telephone. Visitors, therefore, could not touch MCJ inmates.

10.    On or about February 26, 2011, defendant WOMACK, Zunggeemoge, Gonzalez, Ayala, Luviano, and Deputy A were involved an incident in which they used force on and caused injuries to Visitor GC.

11.    These introductory allegations are hereby incorporated by reference into the following count of this Second Superseding Information.

[18 U.S.C. § 1001]

On or about May 11, 2015, in Los Angeles County, within the Central District of California, in a matter within the jurisdiction of the executive branch of the government of the United States, namely, the Federal Bureau of Investigation (the "FBI"), defendant WOMACK knowingly and willfully made the following materially false and fictitious statements and representations to the FBI:

1. Defendant WOMACK falsely stated that he did not know whether Visitor GC was handcuffed when he struck Visitor GC. In fact, as defendant WOMACK knew and had observed, Visitor GC was handcuffed before and when defendant WOMACK struck Visitor GC.

2. Defendant WOMACK falsely stated that Gonzalez directed defendant Womack to strike Visitor GC. As defendant WOMACK knew, Gonzalez did not direct defendant WOMACK to strike Visitor GC.

3. Defendant WOMACK falsely stated that his use of force on Visitor GC was justified. As defendant WOMACK knew, defendant WOMACK used excessive force on Visitor GC.

STEPHANIE YONEKURA
Acting United States Attorney

ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division

LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Public Corruption & Civil
Rights Section

LIZABETH ANN RHODES
BRANDON D. FOX
Assistant United States Attorneys
Public Corruption & Civil Rights
Section

3

<u>EXHIBIT B</u>

<u>FACTUAL BASIS</u>

From approximately March 2006 to December 2013, defendant Womack was a Deputy Sherriff with the Los Angeles County Sherriff's Department ("LASD").  In February 2011, defendant was working at the Men's Central Jail ("MCJ") Visiting Center under Sergeant Eric Gonzalez.  Prior to February 26, 2011, Gonzalez told the deputies who worked at Visiting Center, including defendant Womack, that he was preparing them for patrol, and as part of that preparation they should "snatch up" and arrest anyone they thought looked suspicious or was, in any way, disrespecting a deputy regardless of whether the deputy had probable cause to arrest the individual.  There were times that Gonzalez instructed defendant Womack and other Visiting Center deputies to detain visitors based on nothing more than their appearance.

On February 26, 2011, while working at MCJ Visiting, defendant heard Gonzalez on the radio indicating there were deputies involved in a fight in visiting front.  As defendant Womack was in visiting front, he looked around, but did not see anything.  Defendant Womack then saw LASD Deputy A head to the break room, and Womack headed toward the break room as well.

As he opened the door to the break room, defendant Womack saw Deputies Fernando Luviano and Pantamitr Zunggeemoge on the ground on top of a man, later identified as Visitor GC.  Defendant Womack immediately got on the ground and grabbed one of Visitor GC's legs. At that time, defendant Womack saw that Visitor GC was handcuffed with both hands behind his back and that there was a significant amount of blood on the floor, which defendant Womack believed to be

Victim GC's.  Defendant Womack continued to hold on to Visitor GC's leg as Visitor GC made involuntary flutter kicks in response to the punches of Luviano and Zunggeemoge.  Defendant Womack heard Luviano yell "stop spitting" and, in response, defendant Womack unnecessarily punched Visitor GC approximately five times in the leg.  The punches were retaliation and intended to inflict pain and were made because defendant Womack thought he could get away with such action based on Luviano's statement "stop spitting."  Moreover, as soon as defendant Womack saw that Visitor GC was handcuffed, he knew, based on his prior interactions with Gonzalez and his MCJ experience generally, that Gonzalez and the other deputies would participate in a cover-up.

After defendant Womack's punches, Visitor GC stopped moving and defendant Womack got on his feet.  At that time defendant Womack noticed a scratch on his hand.  Later, defendant Womack along with Luviano and Deputy Ayala went to a health center to be treated for exposure to blood.  They returned to the Visiting Center later that afternoon.

**Defendant Womack's False Report**

Upon his return to the Visiting Center, defendant Womack knew that he could not write his report based on what he had actually seen (that Visitor GC was handcuffed the entire time) and what he had done (used excessive force by unnecessarily punching Visitor GC).  Defendant Womack knew that he would have to write the report as if Visitor GC was not handcuffed.  Defendant Womack asked Deputy A, who had not gone to the hospital for treatment to blood exposure, for Deputy A's report so that defendant Womack could write a report that was consistent with the false story the deputies would be documenting regarding the incident.  Thereafter, defendant Womack copied Deputy

A's report, including all of the statements that deputy Womack knew to be false.

Womack's report included the following false statements:

1.   The statement "Deputy Zunggeemoge and Deputy Luviano were attempting to gain control of [Visitor GC] in order to handcuff him" was false as defendant Womack knew, as soon as he grabbed [Visitor GC's] legs, that Visitor GC was already handcuffed and the punches that Zunggeemege and Luviano were inflicting, and the punches defendant Womack would later inflict, were all perpetrated on a handcuffed man.

2.   The statement "[Visitor GC] was kicking his legs violently] was false as Visitor GC, handcuffed and face down on the ground, could not kick violently.  Instead, Visitor GC was making what appeared to be involuntary flutter kicks in response to the beating he was receiving at the hands of deputy sheriffs.

Defendant Womack then gave his false report to Gonzalez, who had been in the break room before defendant Womack entered and stayed there during the entire assault.  Defendant Womack watched as Gonzalez compared defendant Womack's report to Deputy A's report to make sure they were consistent.  Later, defendant Womack watched as Gonzalez lined up the incident report and all the supplemental reports on the counter and compared each of them to the others to ensure their consistency.

**Defendant Womack's False Testimony**

Defendant Womack also falsely testified in a manner consistent with his report at the preliminary hearing in People v. [Visitor GC], which was held on or about April 14, 2011.  Defendant Womack knew that the purpose of this hearing was so that a Los Angeles County

Superior Court Judge could determine whether there was probable cause for Visitor GC to stand trial.  Defendant Womack testified falsely that near the end of the assault, that deputies handcuffed Visitor GC after the incident when, in fact, defendant Womack knew Visitor GC had been handcuffed the entire time.

**Defendant Womack's Lies During an Interview with LASD's Criminal Investigators**

On September 29, 2011, defendant Womack was interviewed by the Internal Criminal Investigations Bureau of LASD.  At that time, defendant Womack falsely stated that after he hit Visitor GC in the leg, Visitor GC was "able to be handcuffed."  When asked, whether the use of force was concluded once Visitor GC was handcuffed, defendant Womack falsely replied "Yes it was."  In fact, as defendant Womack knew, all the force defendant Womack observed occurred while Visitor GC was handcuffed.  Defendant Womack also falsely stated that he had not seen any excessive force, his force was justified, and there was nothing inappropriate that happened with regards to this event.

**Defendant Womack's Lies During an Interview with LASD's Internal Affairs Bureau**

On December 5, 2012, defendant Womack also gave a statement to the LASD Internal Affairs Bureau ("IAB").  In that interview, defendant Womack lied to IAB, maintaining that Visitor GC was not handcuffed during the incident.  Defendant Womack continued to lie because he had learned that once a deputy sheriff writes about an incident in a report, the deputy sheriff has to stick to that version of events, even if they are lies, from that point forward.  Moreover, defendant Womack understood that he was never supposed to go against his partners.

**Defendant Womack's Lies During an Interview with the FBI**

On May 11, 2015, defendant Womack agreed to be interviewed by Federal Bureau of Investigation ("FBI") Special Agents at the U.S. Attorney's Office. Defendant Womack knew that it was a crime to lie to federal agents. Despite this knowledge, defendant Womack falsely stated, among other things, that he did not know whether Visitor GC was handcuffed when he struck Visitor GC, that Gonzalez directed defendant Womack to strike Visitor GC, and that defendant Womack's use of force on Visitor GC was justified. As defendant Womack knew, he had observed that Visitor GC was handcuffed before defendant Womack struck him, Gonzalez did not direct defendant Womack to strike Visitor GC, and defendant Womack used excessive force on Visitor GC.

# EXHIBIT 6



## INVESTIGATIONS
# EXCLUSIVE: JAIL BEATING VICTIM SPEAKS OUT TO EYEWITNESS NEWS



Gabriel Carrillo, a man who was beaten by L.A. County sheriff's deputies, speaks out about the ordeal for the first time since the deputies were convicted.

f Share    |  8+1    Tweet    EMBED

 By Miriam Hernandez and Lisa Bartley

Tuesday, August 04, 2015 02:02PM

LOS ANGELES (KABC) -- Gabriel Carrillo prayed to God for help. He imagined his young daughter growing up without a father. She was just a baby in 2011 when Carrillo was facing up to 14 years in prison for a crime he did not commit.

"I was more worried for my family than myself," Carrillo tells Eyewitness News in an exclusive interview. "My second daughter never would've been born. I would have lost my first child due to me being in the prison system. She would've grown up without a father. My wife would've been by herself."

Carrillo was beaten to a pulp by a group of Los Angeles County Sheriff's Department deputies inside the Men's Central Jail. He was a visitor, not an inmate. Carrillo and his then-girlfriend, now-wife brought their cellphones into the jail's visitor center, which is a misdemeanor violation of the law.

Carrillo was handcuffed, taken into a break room and savagely beaten. Carrillo admits to "mouthing off" to the deputies, but says he never fought back. He was face down on the floor and both hands were handcuffed behind his back.

"I think the point that scared me the most was when they said they were going to hogtie me," says Carrillo. "At that point then that's when I believed I had a chance of dying in there."

Two LASD deputies and one former LASD sergeant were convicted in June of beating Carrillo and then falsifying reports to

cover-up their actions. Sussie Ayala, Fernando Luviano and Eric Gonzalez will be sentenced in early November and could face up to 40 years in prison.

Two other former deputies "flipped" for the prosecution and testified against their former colleagues at trial, admitting the beating was unjustified and that both of Carrillo's hands were cuffed. Pantamitr Zunggeemoge and Noel Womack will get reduced sentences and possibly no jail time in exchange for their cooperation.

It's been a long, strange trip through the criminal justice system for Carrillo. Soon after the beating, the young father faced criminal charges on suspicion of attacking the deputies.

"I would clench inside, they're lying... all they're doing is lying," Carrillo recalls of the deputies' testimony against him at a preliminary hearing.

"This was a perfect storm of lies," says Carrillo's attorney, Ron Kaye.

Initially, it was the word of Gabriel and Grace Carrillo against that of seven deputies who all stuck to the same story. Kaye, however, believed Gabriel and agreed to take the case, which he calls the "most egregious abuse of the system" he's ever seen.

"This case has cost millions and millions of dollars because these deputies felt they were above the law," says Kaye.

He notes that dozens of people, mostly paid with tax dollars, were involved in three different cases, including multiple judges, prosecutors, defense attorneys, court reporters, FBI agents, and probation and sheriff's department officials.

Carrillo himself won nearly $1.2 million in a civil settlement with Los Angeles County last year, a hard won victory after nearly going to prison himself.

The Los Angeles County District Attorney's Office filed charges against Carrillo, but ultimately dismissed the case one week before he would have gone on trial in the fall of 2011.

Prosecutors may have been persuaded by a photograph taken by Grace after the beating that showed bruising all the way around both of Carrillo's wrists - evidence that both wrists were cuffed during the struggle.

Kaye applauds the District Attorney's Office for dropping the charges against Carrillo, but finds fault with their decision to not file charges against the deputies involved in the beating and cover-up.

"So, what's wrong with the DA's office? I hope this case, if any, would inspire them to probe further and to look at the testimony and the statements of criminal defendants and give them some credence," says Kaye.

Peter Eliasberg, legal director of the ACLU of Southern California, says the way the district attorney's office handled Carrillo's case is troubling - the bogus charges against Carrillo and the failure to file criminal charges against the deputies.

Eliasberg says the office should have also been "aware that there was a significant number of sworn statements by inmates stating that Deputy Luviano had used unjustified or excessive force against them and then attempted to cover them up. If the prosecutor was not aware of that information, he or she should have been."

The ACLU has been sounding the alarm for years about inmate abuse and problem deputies inside the jails. Luviano is named in a slew of inmate declarations collected by the ACLU that point to him as an aggressor in many alleged uses of force.

The district attorney's office provided Eyewitness News with a "declination memo" that explains why they chose not to file charges against the deputies in 2012. That memo refers to the force used against Carrillo as "reasonably necessary to subdue Carrillo" and says the "deputies acted appropriately."

A spokesperson for the office declined to provide any additional comment when contacted by Eyewitness News on Monday.

After the district attorney declined to charge the deputies, the FBI and the U.S. Attorney's Office stepped in as part of their wide ranging investigation into abuse and corruption inside L.A. County jails. The deputies were ultimately convicted on federal charges.

Gonzalez, Ayala and Luviano have all filed motions asking for a new trial. Luviano, meanwhile, has not satisfied the conditions of his bond. If he fails to prove compliance by end of Tuesday, he's been ordered to surrender to the U.S. Marshals Service.

Carrillo and Kaye both hope recent changes within the LASD are a positive sign. There are now working cameras inside the deputy break room where Carrillo was beaten and throughout Men's Central Jail.

"We are in a different day. The sheriff's department has changed. There's a new sheriff. The Citizens' Commission has come out, the U.S. Attorney's Office and the FBI are prosecuting," says Kaye. "But in those days the deputies could act with impunity."

The Carrillos now live outside L.A. County. They are the picture of domestic bliss with three young daughters, a home with enough room for the girls to run around and a new puppy. Gabriel works as a machine operator for Coca-Cola. Grace is overjoyed that this four-year ordeal is finally behind them.

"I'm very happy, happy because he's out here with us. My daughters are able to have their father. Our daughters, we can look forward to our lives now. We can move on," says Grace.

Got a tip? Email Investigative Producer Lisa.Bartley@abc.com

**Related Topics:**

news    court case    court    beating    los angeles county sheriff's department    investigations    Los Angeles County

 | 8+1 | 🔁 Tweet

(Copyright ©2015 KABC-TV. All Rights Reserved.)

# YOU MIGHT ALSO LIKE



**Ever Googled Yourself? A Popular Website Reveals More**
Instant Checkmate



**25 Celebrities That You Forgot Committed Horrible Crimes**
LifeDaily



**23 Unheard-Of Dog Breeds That Are Freaking Adorable**
PetBreeds



**Dog Abandoned in Man's Backyard With Heartbreaking**
Pet360



**Dubai Is Awesome, but Never Do These 12 Things over There.**
Destination Tips



**Theses Pictures Of Dogs Trying To Hide Will Crack You Up**
TheWebs.Best

# FROM AROUND THE WEB

Disturbing Photos of The Most Evil Men In History as Children
(iDistracted.net)

Have You Ever Seen Ronda Rousey Outside The UFC Octagon?
(ThePostGame)

# MORE FROM ABC7

Human remains, skull found in yard of Valinda home

Chase suspect crashes stolen box truck into freeway barrier

Lost Purple Heart found in dump returned to WWII veteran's family

# EXHIBIT 7

EILEEN M. DECKER
United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
BRANDON D. FOX (Cal. Bar No. 290409)
Assistant United States Attorney
Chief, Public Corruption & Civil Rights Section
LIZABETH A. RHODES (Cal. Bar No. 155299)
Assistant United States Attorney
Chief, General Crimes Section
    1500/1200 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone:  (213) 894-0284/3541
    Facsimile:  (213) 894-0141
    E-mail:    Brandon.Fox@usdoj.gov
           Lizabeth.Rhodes@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>           v.<br><br>JAMES SEXTON,<br><br>        Defendant. | No. CR 13-819-PA<br><br>GOVERNMENT'S RULE 35 MOTION<br><br>Hearing Date: TBD<br>Hearing Time: TBD<br>Location:    Courtroom of the<br>           Hon. Percy Anderson |

    Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Brandon D. Fox and Lizabeth Ann Rhodes, hereby moves under Federal Rule of Criminal Procedure 35(b) to reduce the sentence of defendant James Sexton.

    This motion is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

1

Dated: January 10, 2017         Respectfully submitted,

EILEEN M. DECKER
United States Attorney

LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division


_____/s/_____
Brandon D. Fox
Lizabeth Ann Rhodes
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION AND STATEMENT OF FACTS

The government moves to reduce defendant James Sexton's sentence under Federal Rule of Criminal Procedure 35(b)(2)(B).[1]  Defendant was one of the original witnesses who provided the government with details of the obstruction of justice conspiracy that has resulted in the convictions of nine individuals.  After testifying in the grand jury about the conspiracy, defendant elected to plead not guilty and proceed to trial.  In September 2014, defendant was convicted after a jury trial of conspiring to obstruct justice and of obstruction of justice.  In December 2014, this Court sentenced defendant to 18 months in custody.  Defendant's conviction and sentence was affirmed in August 2016.  After this decision, defendant surrendered to serve his sentence.

In December 2016, defendant testified on behalf of the government in United States v. Baca, No. 16-0066(A)-PA.  Prior to this testimony, defendant met with the government and provided information consistent with his grand jury testimony.  Since the Court declared the mistrial in Baca, defendant has met with the government, including trial counsel, on one additional occasion and has agreed to testify truthfully in the retrial of Baca, set for February 21, 2016.

---

[1] Defendant's counsel has asked for a hearing on the afternoon of January 12, 2017.  Defense counsel has represented to the government that defendant wishes to provide allocution to the Court (he did not do so at his sentencing hearing in December 2014) and so defense counsel may supplement the record at the hearing.

The government asks the Court to use its discretion to reduce defendant's sentence from 18 months to one-year and one-day.[2]  The government files this motion now because, based on representations made by defense counsel, defendant may not receive benefits if the Court grants the motion and reduces defendant's sentence post-trial.

## II. ARGUMENT

### A. The Court Should Reduce Defendant's Sentence Because He Has Provided Substantial Assistance to the Government

Rule 35(b)(1) allows the Court to reduce a defendant's sentence if "the defendant, after sentencing, provided substantial assistance in investigating or prosecuting another person."  The government files this motion because of defendant's willingness to prepare and testify truthfully in the Baca trial.  The Court may reduce defendant's sentence under Rule 35(b)(2)(B) because defendant's substantial assistance involved "information provided by the defendant to the government within one year of sentencing, but which did not become useful to the government until more than one year after sentencing."  Defendant provided the information to the government prior to his sentencing, but it did not become useful to the government until the Baca trial in December 2016.  The factors applied in evaluating substantial assistance under USSG § 5K1.1 support such a reduction here.

#### 1. Significance and Usefulness of Assistance

Defendant's cooperation was significant and useful.  He provided details to the jury about the hiding of Anthony Brown after the

---

[2] The government also asks the Court to order defendant, as a term of his supervised release, to testify truthfully in the Baca matter.

Case 2:13-cr-00819-PA   Document 888   Filed 01/10/17   Page 5 of 6   Page ID #:15452

Inmate Reception Center was receiving phone calls from the U.S. Marshals' Service, which was seeking to obtain Brown pursuant to a federal writ.   Defendant explained how the operation involved four different divisions of the Los Angeles County Sheriff's Department, and how that could have only been approved by the Sheriff or Undersheriff.   Defendant was one of only two individuals involved in the conspiracy to agree to testify voluntarily at this trial.   While defendant did not have any meetings with Baca during the time of the obstruction, his testimony was useful and the government believes it will continue to be useful.

With that being said, the government also recognizes that defendant's testimony would have been more valuable had he agreed to cooperate and testify in previous trials.   He decided, however, to proceed to trial and was therefore unavailable to the government in the prosecution of his six co-defendants in this matter.

    2.   Truthfulness, Completeness, and Reliability of Information

The government believes that the information provided by defendant has been truthful.   His testimony in the grand jury was corroborated by other witnesses and LASD records.   His testimony has been consistent throughout the years.

    3.   Nature and Extent of Assistance

Defendant's assistance has not been extraordinary.   He participated in several interviews with the federal government and testified in the grand jury.   Because of his initial refusal to accept responsibility, the federal government could not use him as a witness in previous trials.   Nonetheless, the government believes

3

that his testimony has been beneficial and will continue to assist the government in obtaining justice.

### 4.   Risk of Danger Resulting from Assistance

While there have been no specific threats, his cooperation has caused defendant to be subjected to much harsher housing conditions. Based on representations from defense counsel, defendant was placed in special housing after the Court issued the writ for his testimony. Instead of serving his time a federal prison camp, defendant has been placed in isolation for the past ten weeks.

### 5.   Timeliness of Assistance

Defendant's agreement to cooperate was timely pursuant to Rule 35.  Defendant's cooperation has allowed the government to use his testimony in the Baca trial.

### B.   Calculation of Recommended Reduction in Sentence

The Court sentenced defendant to the equivalent of the low-end of an offense level of 15.  By reducing defendant's sentence to one-year and one-day, the Court is effectively reducing defendant's offense level by two or three levels, which the government believes is appropriate given defendant's level of cooperation, the conditions he has suffered as a result of his cooperation, and the utility of his testimony.

## III. CONCLUSION

The government respectfully requests that this Court grant the government's motion for a Rule 35 sentencing reduction, set a hearing date (defense counsel has asked for the afternoon of January 12, 2017), and ultimately re-sentence defendant to one-year and one-day in custody.

4

## PROOF OF SERVICE BY UNITED STATES MAIL

I, ANTHONY BROWN SR , am over the age of eighteen years, a resident and prisoner of the State of California with a present mailing address of: CENTINELA STATE PRISON, 2302 Brown Rd., Imperial, CA 92251.

On APRIL 27, 2017 , I served the following document(s): LETTER TO LASD INTERNAL AFFAIRS BUREAU LETTER TO FBI SPECIAL AGENT LEAH TANNER (nee MARX), AND DECLARATION OF ANTHONY BROWN W/ EXHIBITS 1-10 ATTACHED LETTER TO ACTING U.S. ATTY BROWN/U.S. ATTY. W/ EXHIBITS ATTACHED by placing the document(s) in a sealed envelope(s), with First Class postage having been placed thereon. Delivered the envelope(s) to a Correctional Officer who then signed & dated the back of the envelope and s/he then deposited such envelope(s) in the prisons internal legal mail system for processing and delivery to the United States Postal Service, for delivery to the addressee(s):

- UNITED STATES DISTRICT JUDGES : PERCY ANDERSON, GEORGE H. KING, AND CHIEF JUDGE VIRGINIA A. PHILLIPS, 312 N. SPRING ST., #G-8 LOS ANGELES, CA 90012

- UNITED STATES ATTORNEY'S OFFICE, CENTRAL DISTRICT OF CALIFORNIA ATTN: ACTING U.S. ATTY. SANDRA R. BROWN / U.S. ATTY. 312 N. SPRING ST. SUITE 1200, LOS ANGELES, CA 90012

- U.S. DEPARTMENT OF JUSTICE, FEDERAL BUREAU OF INVESTIGATION ATTN: AGENT IN CHARGE - 11000 WILSHIRE BLVD. LOS ANGELES, CA 90024

- NAACP LOS ANGELES P.O. BOX 56408 LOS ANGELES, CA
- ACLU ATTN: PETER ELIASBERG 1313 WEST 8TH STREET LOS ANGELES, CA 90017
- SOCIAL MEDIA AND LOCAL MEDIA OF LOS ANGELES

I declare that there has been regular U.S. mail pick-up by the Correctional Officers at the prison where I posted the envelope(s) and regular communication by mail between the place of mailing and the place(s) so addressed.

I declare under penalty of perjury under the laws of the State of California and the United States that the forgoing is true and correct and the this declaration was executed on APRIL 27, 2017 , at Imperial County, in Imperial, California.

_____
Declarant

NOTE: Pursuant to the holdings in Houston v. Lack (1988) 487 U.S. 266, 108 S.Ct. 2379, 101 L.Ed.2d 245; and, In re Jordan (1992) 4 Cal.4th 116, 13 Cal.Rptr.2d 878, 840 P.2d 983, (inmate legal documents are deemed filed on the date they are delivered to prison staff for processing and mailing via the institutions internal legal mail procedures).

# EXHIBIT 8

THOMAS P. O'BRIEN (SB# 166369)
thomasobrien@paulhastings.com
PAUL HASTINGS LLP
515 South Flower Street
Twenty-Fifth Floor
Los Angeles, CA 90071-2228
Telephone: 1(213) 683-6000
Facsimile: 1(213) 627-0705

Attorneys for Defendant
JAMES SEXTON

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | NO. CR 13-819-PA |
|---|---|
| Plaintiff, | **DEFENDANT JAMES SEXTON'S RESPONSE TO RULE 35 MOTION** |
| vs. | |
| GREGORY THOMPSON, et al., | Judge: Hon. Percy Anderson |
| Defendant. | Date: January 12, 2016 |
| | Time: 1:30 p.m. |

## RESPONSE TO RULE 35 MOTION

In view of the (i) "substantial assistance" provided in connection with the prosecution of former Los Angeles County Sheriff Leroy D. Baca ("Baca"), *United States v. Baca*, Case No. 2:16-cr-0066-PA (the "Baca Prosecution"), and (ii) the "great risk[s]" posed to his personal safety by his testimony and incarceration, former Los Angeles County Deputy Sheriff James Sexton ("Sexton") joins and responds to the United States Attorney's Office for the Central District of California's ("USAO" or the "Government") motion to reduce Sexton's 18-month prison sentence, pursuant to Fed. R. Crim. P. 35 ("Rule 35"). (ECF No. 888.) *See U.S. v. Tadio*, 663 F.3d 1042, 1044 (9th Cir. 2011).

I.      **Factual Background.**

a) Procedural Posture and the "Substantial Assistance" Provided by Sexton.

On or about December 15, 2014, the Court sentenced Sexton to 18-months imprisonment in view of his conviction for conspiracy (18 U.S.C. § 371) and obstruction of justice (18 U.S.C. § 1503(a)) in *United States v. Thompson, et al.*, Case No. 2:13-cr-00819-PA. The Court determined Sexton's total offense level to be 18 and his criminal history category to be 1, resulting in a guideline sentencing range from 27- to 33-months of imprisonment. (ECF No. 834.) The Court sentenced him to 18-months of incarceration, granting this variance in light of Sexton's long history of service to the public and his community. (*Id.*)

After the United States Court of Appeals for the Ninth Circuit affirmed the judgment against Sexton, Sexton declined to join his co-defendants in seeking *en banc* review (*see* Unopposed Motion for Expedited Issuance of the Mandate, *U.S. v. Sexton*, Appeal No. 14-50583 (9th Cir. Aug. 24, 2016), ECF No. 59); instead, he acknowledged responsibility for his wrongdoing and self-surrendered to the Bureau of Prisons ("BOP") on or about August 31, 2016. (*See* Declaration of James Sexton

-1-      SEXTON RESPONSE TO RULE 35 MOTION

LEGAL_US_W # 88233868.4

("Sexton Decl.") at ¶ 1.)[1]  The BOP determined Sexton to be a minimum security risk and assigned him to FPC - Talladega to serve his sentence. (*Id.* at ¶ 5.)

While serving his sentence, Sexton has provided "substantial assistance" to the Government in its investigation and prosecution of Baca, as is the standard under Rule 35. "Extraordinary" assistance is not required. Fed. R. Crim. P. 35. Besides his detailed grand jury testimony in 2012, Sexton provided a lengthy attorney proffer regarding the information known to him in 2016. Sexton spent hours in meetings with federal agents and AUSA Staples providing in depth information regarding Operation Pandora's Box, as well as information regarding subsequent meetings Sexton had with former Sheriff Baca. During Baca's trial, Sexton testified for several hours in a calm, respectful, and eloquent manner and provided numerous details regarding the hiding of inmate Anthony Brown and Baca's role in that scheme. Sexton also authenticated and described numerous exhibits, including emails from himself and others implicating the former Sheriff. Sexton held up strongly during cross-examination, further assisting the government in the prosecution of Baca. Finally, following the mistrial in the Baca case, Sexton again met with federal agents and the USAO to further discuss his knowledge of Baca's involvement and expressed his willingness to take the stand in any new proceedings against the former Sheriff.

Despite Sexton's cooperation, and the BOP's determination that a minimum security facility was necessary and appropriate under the circumstances, Sexton has served the majority of his prison time in medium and maximum security facilities—and even in the Secure Housing Unit ("SHU"), depriving him of contact with his family and the outside world. (*Id.* at ¶¶ 1-5, 7-10.) Sexton is currently housed at Santa Ana City Jail in the Secure Housing Unit. (*Id.* at ¶ 12.)

---

[1] Due to the logistical complications of Sexton's incarceration, the concurrently filed Declaration is not yet signed. We anticipate that Sexton will sign the same prior to the hearing scheduled for January 12.

-2-     SEXTON RESPONSE TO RULE 35 MOTION

b) The "Great Risks" Posed to Sexton's Personal Safety.

While at FPC - Talladega, Sexton took advantage of all of the opportunities for rehabilitation provided to him, including enrolling in classes available at the prison camp. However, to testify in the Baca Prosecution, Sexton has spent the majority of his incarceration in secure transport, in temporary custody in higher security facilities, and/or in the SHU. (*Id.* at ¶¶ 1-5, 7-10.) Contrary to the Government's assertions in its motion, while in transit and while housed in these higher security facilities, Sexton has been subject to harassment and threats of physical harm due to his law enforcement background. (*Id.* at 16.) Multiple inmates have threatened Sexton and indicated that they know his background. Inmates have spit in his food. Inmates already facing more than 60 years of prison have threatened his physical safety.

Further, at MDC - Los Angeles and other facilities, Sexton has been forced to be housed in the SHU because he is well known to a number of former gang-member inmates who would do him harm because of his involvement in Operation Safe Jails ("OSJ") as a Sheriff's Deputy.

In sum, Sexton has availed himself of all available rehabilitation options, has sacrificed what few privileges he had as a minimum security inmate, and has put his personal safety and wellbeing at risk to assist the Government in the Baca Prosecution.

## II.    Legal Bases for a Reduction in Sentence.

The Court sentenced Sexton on or about December 15, 2014. Because the Rule 35 motion was filed more than one year after sentencing, any relief under Rule 35 would be through Rule 35(b)(2). Both subsections (B) and (C) of Rule 35(b)(2) are applicable here.

Rule 35(b)(2)(B) permits a reduction of sentence when a defendant offers substantial assistance by providing "information . . . to the government within one year of sentencing, but which did not become useful to the government until more

-3-    SEXTON RESPONSE TO RULE 35 MOTION

than one year after sentencing[.]" Fed. R. Crim. P. 35(b)(2)(B). "In evaluating whether the defendant has provided substantial assistance, the court may consider the defendant's presentence assistance." Fed. R. Crim. P. 35(b)(3). Courts within the Ninth Circuit have regularly found that defendants are eligible for sentencing reductions when they provide assistance in criminal prosecutions that occur well more than one year after sentencing. *See, e.g.*, *U.S. v. Laguantan*, No. CRIM. 07-00301 HG, 2013 WL 3455766, at *1 (D. Haw. July 8, 2013) ("Defendant cooperated with the United States in the preparation for the trial of Reynaldo Agudo . . . and testified at trial on May 7, 2013" after being sentenced in 2008.); *U.S. v. Ruiz*, No. CRIM. 07-00301 HG, 2013 WL 3760649, at *1 (D. Haw. Jul. 16, 2013) (granting a reduction in sentence pursuant to Rule 35 where "[t]he Government believed [the defendant's] testimony [more than five years after sentencing] substantially assisted in the successful prosecution of Javier"); *U.S. v. Montoto*, No. 12-CR-002937-LAB, 2015 WL 7272219, at *1 (S.D. Cal. Nov. 17, 2015) (reducing the defendant's sentence for substantial assistance almost three years after sentencing). Notably, in a factually analogous case, where a criminal defendant cooperated pre-sentencing and then provided credible trial testimony "at great risk to his own personal safety" more than one year after sentencing, the Ninth Circuit affirmed a reduction in sentence made pursuant to Rule 35(b)(2)(B). *See U.S. v. Tadio*, 663 F.3d 1042, 1044 (9th Cir. 2011).

Sexton has done just that. He provided truthful testimony to the Grand Jury that led to his indictment and the indictment of several officials within the Sheriff's Department. Information provided by Sexton and others led to the Baca Prosecution.[2] And even after charges were filed against Baca, approximately 14 months after Sexton had been sentenced, Sexton continued to provide assistance,

---

[2] The Baca Prosecution was commenced more than one year after Sexton's sentencing, but Sexton's cooperation still qualifies as "substantial assistance" pursuant to Rule 35(b)(2)(B) and authority interpreting the same.

-4-    SEXTON RESPONSE TO RULE 35 MOTION

LEGAL_US_W # 88233868.4

including an attorney proffer, meetings with the Government, and testifying in open court against Baca.

Further, as the Government has acknowledged, Sexton remained steadfast in his cooperation despite the great risk to his personal safety from those who would do him harm within the various detention facilities in which he has been housed. As such, Sexton is eligible for a sentence reduction.

In addition, Rule 34(b)(2)(C) allows for a reduction of sentence when a defendant provides substantial assistance to the Government "the usefulness of which could not reasonably have been anticipated by the defendant until more than one year after sentencing and which was promptly provided to the government after its usefulness was reasonably apparent to the defendant." Here, Sexton's assistance in the Baca Prosecution could not have been reasonably anticipated until more than one year after Sexton's sentencing, as the Government did not seek Sexton's cooperation against Baca until more than one year after sentencing.

Once the Government decided to indict and proceed with the Baca Prosecution, Sexton provided an attorney proffer, cooperated with the USAO, and ultimately provided detailed and truthful testimony at trial. That testimony was pivotal to the Government's case against Baca. And, Sexton offered the same without any promises or guarantees from the Government. Thus, Sexton is eligible for a reduction in sentence pursuant to Rule 35(b)(2)(C).

In summary, Sexton's cooperation satisfies—and likely exceeds—the "substantial assistance" standard. Perhaps no other witness was so integral to the Government's case. Sexton provided this assistance at great personal risk and with no promise of reward. In many respects, Sexton could have decided to be uncooperative or less helpful, without the Government having much recourse against him. He did the opposite. Sexton was forthright about his and others' criminal conduct and did as much as he was able to help the Government in its prosecution against the former Sheriff.

-5-        SEXTON RESPONSE TO RULE 35 MOTION

LEGAL_US_W # 88233868.4

We understand that it is the policy of the USAO to request up to a 6-level reduction in the total offense score for "substantial assistance" provided in connection with a prosecution such as the instant case. Although Sexton's original offense level was determined to be an 18, the Court granted a variance at sentencing and imposed an 18-month sentence, which is consistent with the low end of a total offense level of 15. With that as a starting point, we request that the Court reduce Sexton's offense level to a 9, which would correspond with a recommendation of 4- to 10-months of imprisonment. As he has served more than 4 months in conditions much harsher than those likely envisioned by the Court and the Government, Sexton hereby requests that his sentence be reduced to time served.

**III.   Conclusion.**

For the foregoing reasons, Sexton respectfully requests that the Court GRANT the Government's motion to reduce his sentence pursuant to Rule 35 and reduce his sentence to time served.

Respectfully Submitted,

DATED:  January 11, 2017                THOMAS P. O'BRIEN
                                        PAUL HASTINGS LLP


                                        By: /s/ Thomas P. O'Brien
                                            THOMAS P. O'BRIEN

                                        Attorneys for Defendant
                                        James Sexton

-6-      SEXTON RESPONSE TO RULE 35 MOTION

LEGAL_US_W # 88233868.4

THOMAS P. O'BRIEN (SB# 166369)
thomasobrien@paulhastings.com
PAUL HASTINGS LLP
515 South Flower Street
Twenty-Fifth Floor
Los Angeles, CA 90071-2228
Telephone: 1(213) 683-6000
Facsimile: 1(213) 627-0705

Attorneys for Defendant
JAMES SEXTON

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | NO. CR 13-819-PA |
| Plaintiff, | **DECLARATION OF DEFENDANT JAMES SEXTON IN SUPPORT OF RESPONSE TO RULE 35 MOTION** |
| vs. | |
| GREGORY THOMPSON, et al., | Judge:   Hon. Percy Anderson |
| Defendant. | Date:   January 12, 2016<br>Time:   1:30 p.m. |

# <u>DECLARATION OF JAMES SEXTON</u>

I, James Sexton, declare as follows:

1.      On or about August 31, 2016, I surrendered myself to the Montgomery County (Alabama) Jail.  I was housed in isolation under maximum security conditions. I stayed at this facility while the Department of Justice, Bureau of Federal Prisons, determined my final assignment.

2.      On or about September 13, 2016, I was transferred to the Montgomery City (Alabama) Jail.  I was housed there under maximum security conditions in a segregation unit.  I was transferred to this facility while the Bureau of Federal Prisons determined my final assignment.

3.      On or about September 16, 2016, I was transferred to Lee County (Alabama) Jail.  I was housed there under maximum security conditions.  I was transferred to this facility while the Bureau of Federal Prisons determined my final assignment.

4.      On or about September 19, 2016, I was transferred to US Penitentiary ("USP") Atlanta (Georgia), a medium security US penitentiary with an adjacent minimum security camp.  I was not designated to the camp but instead housed under maximum security conditions with USP inmates.  I was transferred to this facility while the Bureau of Federal Prisons determined my final assignment.

5.      On or about October 3, 2016, I was transferred to Federal Prison Camp ("FPC") Talladega (Alabama), a minimum security camp.  This was to be my final destination as designated by the Federal Bureau of Prisons, and pursuant to my particular conditions (sentence, background, etc).

6.      On or about October 20, 2016, the United States Attorney's Office for the Central District of California ("USAO") filed an application for a Writ of Habeas Corpus Ad Testificandum to require my presence at the United States

-1-      SEXTON DECLARATION IN SUPPORT OF RESPONSE TO RULE 35 MOTION

Courthouse in Los Angeles (California), on December 6, 2016 in order to testify against my former superior, former Los Angeles County Sheriff Leroy Baca.

7.    On or about November 3, 2016, I was transferred from the minimum security camp to the secured housing unit ("SHU") at Federal Correctional Institution ("FCI") Talladega (Alabama).  There I was housed under maximum security conditions.

8.    On or about November 15, 2016, I was transported under special conditions from FCI Talladega (Alabama) to USP Atlanta (Georgia).  There I was housed under maximum security conditions.

9.    On or about November 17, 2016, I was transferred to Federal Transfer Center ("FTC") Oklahoma City (Oklahoma), a federal transfer facility.  I was assigned to the Administrative Maximum Unit ("ADX"), the highest level of security.  There I was held in isolation.

10.    On or about December 1, 2016, I was transferred to the Metropolitan Detention Center ("MDC"), Los Angeles (California).  Since arriving I have been assigned to the SHU and housed under maximum security conditions.

11.    On December 9, 2016, I provided truthful testimony under oath in the case of *U.S. v. Baca.*

12.    On December 13, 2016, I was transferred to the Santa Ana City Jail, a contract housing facility with the Federal Bureau of Prisons. I am assigned to the SHU.

13.    While housed at the minimum security camp at FCI Talladega - my final destination pursuant to my Bureau of Federal Prisons assignment, I (along with every other federal inmate) was entitled to the following accommodations:

    a.  18 hours of visitors per week plus 6 hours on every Federal holiday;

    b.  300 to 400 minutes of phone access per month;

    c.  Broad computer usage; and

-2-    SEXTON DECLARATION IN SUPPORT OF RESPONSE TO RULE 35 MOTION

d. Commissary, including hygiene products and cell cleaning supplies.

14. Since being transferred out of FCI Talladega I have not been able to see my wife despite numerous requests. Many facilities require a 20-day background check before visitors are approved. The multiple transfers have effectively kept me from having visits from my wife and family.

15. Since being transferred out of FCI Talladega, I have been denied on one (1) occasion a legal phone call which I understand is normally permitted.

16. While being housed under maximum security conditions, I have been personally harassed with physical threats and altercations to include the following locations:

    a. Two (2) incidents at UPS Atlanta (Georgia);

    b. One (1) incident at FCI Talladega (Alabama);

    c. One (1) incident at FTC Oklahoma City (Oklahoma) by two (2) USP inmates each facing in excess of 60 years;

    d. One (1) suicide attempt in my presence at FTC Oklahoma City (Oklahoma); and

    e. Multiple incidents during transit.

17. I have personal knowledge of the facts set forth above, and, if called as a witness, I could and would competently testify to the facts set forth herein.

Executed this ____ day of January, 2017, at _____, California.

*ANTHONY BROWN SR HAS BEEN ATTACKED IN PRISON A MANY NUMBER OF TIMES FOR BEING A FBI INFORMANT RE LASD*

James Sexton

*SEE EXHIBIT _9*

-3-

SEXTON DECLARATION IN SUPPORT OF
RESPONSE TO RULE 35 MOTION

# EXHIBIT 9

State of California                                                                DEPARTMENT OF CORRECTIONS
ADMINISTRATIVE SEGREGATION UNIT PLACEMENT NOTICE
CDC 114-D (Rev 10/98)

| DISTRIBUTION: | |
|---|---|
| WHITE-CENTRAL FILE | CANARY-WARDEN |
| BLUE-INMATE (2ND COPY) | PINK-HEALTH CARE MGR |
| GREEN-ASU | GOLDENROD-INMATE (1ST COPY) |

| INMATE'S NAME | BROWN | CDC NUMBER |
|---|---|---|
| | | V79273 |

## REASON(S) FOR PLACEMENT *(PART A)*

[X] PRESENTS AN IMMEDIATE THREAT TO THE SAFETY OF SELF OR OTHERS

[ ] JEOPARDIZES INTEGRITY OF AN INVESTIGATION OF ALLEGED SERIOUS MISCONDUCT OR CRIMINAL ACTIVITY

[X] ENDANGERS INSTITUTION SECURITY     [ ] UPON RELEASE FROM SEGREGATION, NO BED AVAILABLE IN GENERAL POPULATION

DESCRIPTION OF CIRCUMSTANCES WHICH SUPPORT THE REASON(S) FOR PLACEMENT:

On Thursday, February 21, 2013, you arrived at Centinela State Prison (CEN) via San Bernardino Sheriff as **OUT-TO-COURT-RETURN (OTC/RTN)** ASU status inmate. You were originally placed in ASU on 9/13/2012, at approximately 1456 HOURS due to being a victim of a Battery which was committed by Inmates Wooten, AK4634, A2-217U, Rogers, F70662, A2-236U, Cruz, AL1432, A3-238U, and Ferguson, AL6693, A3-249U, on Facility "A" yard. Staff responded with no force. Therefore your presence within the General Population is deemed a threat to safety and security of the Institution. Based on the aforementioned, you are being rehoused in AdSeg pending ICC review housing/program needs. As a result of this placement your privileges, custody level, credit earnings status, and visiting privileges are subject to change. This placement is ordered by K. Daubach, Watch Commander Third Watch.

[ ] CONTINUED ON ATTACHED PAGE (CHECK IF ADDITIONAL)   [ ]   IF CONFIDENTIAL INFORMATION USED, DATE OF DISCLOSURE   /   /

| DATE OF ASU PLACEMENT | SEGREGATION AUTHORITY'S PRINTED NAME | SIGNATURE | | TITLE |
|---|---|---|---|---|
| February 21, 2013 | K. DAUBACH | | | LIEUTENANT |

| DATE NOTICE SERVED | TIME SERVED | PRINTED NAME OF STAFF SERVING ASU PLACEMENT NOTICE | SIGNATURE | STAFF'S TITLE |
|---|---|---|---|---|
| February 21, 2013 | 1430HRS | R. Estrada | | OFFICER |

[ ] INMATE REFUSED TO SIGN     INMATE SIGNATURE     CDC NUMBER   V-79273

## ADMINISTRATIVE REVIEW *(PART B)*
*The following to be completed during the initial administrative review by Captain of higher by the first working day following placement*

| STAFF ASSISTANT (SA) | | INVESTIGATIVE EMPLOYEE (I.E.) | |
|---|---|---|---|
| STAFF ASSISTANT'S NAME | TITLE | INVESTIGATIVE EMPLOYEE'S NAME | TITLE |
| | | | |

### IS THIS INMATE

| | | |
|---|---|---|
| LITERATE? | [ ] YES [ ] NO | EVIDENCE COLLECTION BY I.E. UNNECESSARY [ ] YES [ ] NO |
| FLUENT IN ENGLISH? | [ ] YES [ ] NO | DECLINED ANY INVESTIGATIVE EMPLOYEE [ ] YES [ ] NO |
| ABLE TO COMPREHEND ISSUES? | [ ] YES [ ] NO | ASU PLACEMENT IS FOR DISCIPLINARY REASONS [ ] YES [ ] NO |
| FREE OF MENTAL HEALTH SERVICES DELIVERY SYSTEM NEEDS? | [ ] YES [ ] NO | DECLINED 1ST INVESTIGATIVE EMPLOYEE [ ] YES [ ] NO |
| DECLINING FIRST STAFF ASSISTANT ASSIGNED? | [ ] YES [ ] NO | ASSIGNED |

Any "NO" requires SA assignment          Any "NO" may require I.E. assignment

[ ] NOT ASSIGNED                          [ ] NOT ASSIGNED

### INMATE WAIVERS

[ ] INMATE WAIVES OR DECLINES INTERVIEW WITH ADMINISTRATIVE REVIEWER     [ ] INMATE WAIVES RIGHT TO 72 HOURS PREPARATION TIME

[ ] NO WITNESSES REQUESTED BY INMATE     INMATES SIGNATURE     DATE:

### WITNESSES REQUESTED FOR HEARING

| WITNESS NAME | TITLE/CDC NUMBER | WITNESS NAME | TITLE/CDC NUMBER |
|---|---|---|---|
| | | | |
| WITNESS NAME | TITLE/CDC NUMBER | WITNESS NAME | TITLE/CDC NUMBER |
| | | | |

**DECISION:** [ ] RELEASE TO UNIT/FACILITY _____   [ ] RETAIN PENDING ICC REVIEW   [ ] DOUBLE CELL   [ ] SINGLE CELL PENDING ICC
REASON FOR DECISION:

| ADMINISTRATIVE REVIEWER'S PRINTED NAME | TITLE: | DATE OF REVIEW: | TIME: | ADMINISTRATIVE REVIEW'S SIGNATURE |
|---|---|---|---|---|
| CORRECTIONAL ADMINISTRATOR'S PRINTED NAME (if necessary) | | CORRECTIONAL ADMINISTRATOR'S PRINTED NAME (if necessary) | | DATE OF REVIEW |

See Chronological Classification Review document (CDC 128-G) for specific hearing information

# EXHIBIT 10

Advertisement

# Los Angeles Times

## Jail informant's credibility complicates work of federal prosecutors

*Anthony Brown, the FBI informant who reported on abuse within L.A. County jails, is serving 423 years to life for armed robbery and has a history of making unfounded allegations about police.*

August 27, 2012 | By Jack Leonard and Robert Faturechi, Los Angeles Times

Email      Share     1    ·    **Tweet**   0      Recommend   22

For months, Anthony Brown fooled his jailers into believing that he was just another prisoner inside Men's Central Jail.

In fact, the 45-year-old armed robber was working for the FBI on a highly sensitive investigation of the Los Angeles County jails. He took down the names of sheriff's deputies who he alleged were dirty. He reported tales of violent abuse of inmates at the hands of jailers. He even ensnared a deputy in a phone smuggling scheme that resulted in a criminal conviction.



Anthony Brown, center, in a 2009 videotaped interrogation with LAPD, was... (LAPD)

Advertisement

Belkin Hi-Speed USB 2.0 Cable (10 ...
~~$8.49~~ $4.54

**Ralph Lauren® Women**

Shop the Official Site for Ralph Lauren Apparel, Accessories & More.

www.RalphLauren.com

### FROM THE ARCHIVES

Los Angeles County sheriff may shut part of Men's Central...

*March 21, 2012*

Deputy who pleaded guilty to bribery is cooperating with FBI

*January 18. 2012*

Toughest inmates guarded by some of least-experienced...

*November 3. 2011*

Brown gave FBI agents what they couldn't have gotten on their own: an insider's view of a jail system beset with allegations of excessive force and other deputy misconduct.

But the same knack for duplicity that made Brown a successful informant could complicate the larger case federal prosecutors are building on alleged abuses inside the nation's largest jail system.

Until now, little has been known about the informant. But The Times confirmed his identity and spoke to him at length at Centinela state prison in Imperial County, where he's serving 423 years to life for armed robbery.

L.A. County jail probe includes claim that deputies beat...
*October 20, 2011*

FBI probing reports of beatings in L.A. County jails
*September 25, 2011*

---

## MORE STORIES ABOUT

Fbi

Men's Central Jail

Jail System

Interviews and court records reviewed by The Times paint a complex portrait of the inmate who set off the recent upheaval inside the Sheriff's Department — a bank robber and crack cocaine addict who has a history of lying and making dubious allegations against law enforcement.    *WHAT HISTORY ?*

Brown's credibility speaks to the larger challenges the FBI faces in its investigation of jail abuses. As with any jailhouse probe, inmates inherently play a central role, but few come without baggage.

To prove crimes by deputies, experts say federal authorities will need to substantiate their charges independently — and it appears they're trying.

Federal investigators, who declined to comment for this story, have secured recordings, internal documents and interviews with multiple officials from within the sheriff's own ranks, persuading some to cooperate in their widening probe. It's not clear what role, if any, Brown will play in any future indictments.

Parts of Brown's story were impossible to substantiate and seemed unlikely. Still, some of his allegations can be corroborated.

His claim that he successfully manipulated a jailer to smuggle him a cellphone has already resulted in that deputy pleading guilty to bribery. And a source with knowledge of the FBI's probe confirmed that federal authorities were investigating another of Brown's allegations — that after his cover was blown, sheriff's officials attempted to hide him from his FBI handlers by moving him from jail to jail under multiple aliases.

Court records show Brown, a New Yorker, told police that before he turned to crime he had worked in the entertainment industry, including a stint at Def Jam Recordings operating "right under" co-founder Russell Simmons. (A company representative, however, found no record of Brown as an employee or contractor.) Brown says he came to California in 2004 as a sound engineer for singer Beyonce's nationwide tour. But eventually he began using crack cocaine, traversing Los Angeles by bicycle, high and looking for places to rob.

By 2005, he was charged and convicted in three bank robberies and sent to prison. Though he confessed, he later changed his story, alleging he was innocent and accusing a detective of committing perjury at his trial. His allegations were dismissed.

## Public Arrest Records

1. Enter a Name & Search for Free! 2. View Background Check Instantly.
background.checkpeople.com

He was released in 2009. In his interview with The Times, Brown said it was then that he was approached by the FBI and asked to work as an informant, a role he says he had performed for federal authorities decades earlier on an unrelated investigation in New York.

This time, he said, agents wanted him to go behind bars on a phony gun charge and catalog instances of deputy misconduct. He would not elaborate on how the FBI had chosen him.

An FBI spokeswoman declined to comment for this story, and The Times was unable to corroborate exactly how and when he became an informant. Sources familiar with the case as well as the attorney for the deputy who pleaded guilty to bribery this year confirm Brown was the informant.

Brown did end up back behind bars later in 2009, not on the phony charge, but for another series of armed robberies. He detailed the crimes in a recorded interrogation but then denied the crimes in court, accusing a detective of allowing him to smoke crack in return for a false confession.

During his court case, Brown, who is black, also accused his attorney of using a racial slur against him, but he later wrote to a judge admitting the attorney never used the term. Court records show that another judge determined that Brown made other false complaints, ultimately telling him: "I don't believe a word you have to say."

Brown was incarcerated at Men's Central Jail, where he began working for the FBI.

In his interview with The Times, Brown alleges that he delivered notes about corrupt and brutal deputies

2/3

during weekly visits with his FBI handler.

**Resize Pictures on Mac**

Reduce File Size up to 5 Times. Download JPEG Mini for OS X Free!

www.jpegmini.com/Mac

1 | 2 | Next

Email      Share          †       **Tweet** 0      Recommend  22

FEATURED





Skechers lawsuit: How to get your piece of the $40-million payout

New California health insurance rates unveiled

How to find your lost or stolen iPhone 5

MORE:

Ellen DeGeneres and Portia de Rossi buy Montecito mansion

Top 10 cars: best gas mileage, lowest sticker price

The FDA warns against using quinine for leg cramps

---

**Los Angeles Times**  Copyright 2013 Los Angeles Times

Index by Keyword | Index by Date | Privacy Policy | Terms of Service

Case 2:16-cr-00066-PA    Document 375    Filed 05/12/17    Page 131 of 169    Page ID #:8695

- Valid XHTML
- XFN

# OPERATION PANDORA'S BOX: Will Hiding a Federal Informant Result in Criminal Indictments for Members of the Los Angeles Sheriff's Department?

July 23rd, 2013 by    Celeste Fremon



## PROLOGUE

*For 18 days in the summer of 2011, members of the Los Angeles Sheriff's Department reportedly went to elaborate lengths to hide a federal informant from the FBI, an operation that those involved say was approved at the highest levels, including by former-Undersheriff Paul Tanaka, then the department's powerful second in command, and by Los Angeles Sheriff Lee Baca himself. Despite a grand jury convened to investigate the matter, and a lengthy and ongoing probe by the FBI, Baca and his spokespeople still maintain that the informant was hidden for his own safety.*

*(The sheriff's main spokesman, Steve Whitmore will be interviewed by the FBI on the matter early next week.)*

*However, those department members who actually did the hiding say that the official line is untrue, that even back in 2011 when they were in the midst of "Operation Pandora's Box," as they came to call it, they knew without question that what they were doing was illegal.*

*This is the inside story of that operation.*

## THE INFORMANT

**In the summer of 2011, Anthony Brown, 44, was a convicted armed bank robber** languishing in Los Angeles County's Men's Central Jail, while he waited to be transferred to the California state prison at Lancaster, his first stop in a very long stay behind bars. As it turned out, however, in addition to being a jail inmate, Brown was something else: a carefully cultivated informant for the FBI.

**At the time, the feds were—and still are—investigating charges** of widespread brutality, abuse and corruption inside the Los Angeles County jails, which are run by the LA County Sheriff's Department. As a part of the investigation, Brown was

Case 2:16-cr-00066-PA    Document 375    Filed 05/12/17    Page 133 of 169    Page ID
#:8697

WitnessLA.com » Blog Archive » OPERATION PANDORA'S BOX: Will Hiding a F ... Page 1 ...

However, one night during the first few days of the operation, an OSJ deputy happened to have few moments alone in Brown's cell during the period when the informant was briefly seeing a nurse. Out of curiosity, the deputy stepped over to Brown's stacks of papers and legal pads, and glanced through some of the 20-some pages of handwritten notes that Brown had evidently been keeping. The team member reportedly saw three or four names of jail deputies whom Brown listed as having gotten him cocaine. There were also names of deputies who Brown indicated owed him money in return for some kind of favor. According to a source, Brown wrote about most of these transactions in pages and pages of highly detailed prose, in which he itemized every nuance of the various alleged exchanges.

The OSJ deputy had only a few minutes in the cell, thus could only skim Brown's approximately 25 pages of longhand. But. the impression he came away with, he said, was that, if what Brown wrote was true, the informant had information that could implicate a number of MCJ deputies in criminal acts.


## SO, DID THE FBI TRY TO GET HIM BACK?

Sheriff's department spokespeople have maintained that, at no point did the FBI come looking for their informant. The LASD also maintains that several calls to the feds about Brown got no reply. WLA was not able to determine the truth of the latter statement, but we do have some information about the former.

While, indeed, sources tell us that, to their knowledge the FBI did not come knocking on the front door of Men's Central Jail and demand to see Anthony Brown. But according to several sources, about a week into Operation Pandora, the US Marshalls knocked on the door in the FBIs stead. "A woman who works at IRC called and told us that they'd just gotten a call on the law enforcement line from a US Marshall who said the marshalls had a removal order, which is a court order, to collect an inmate named Anthony Brown," said a source. ("IRC" is the jail system's inmate reception center). According to members of Operation Pandora, "she told the marshal's 'I'm sorry sir but there's was no one by that name in our system."

The marshal reportedly replied, "That's bullshit," or words to that effect.

Another OSJ source confirmed the report that marshals had come knocking and added that, on two separate occasions when he was on guard detail for Brown, once at MCJ, a second time at San Dimas, he got a call from Gerard Smith who said that he and his partner should be prepared for the arrival of some US Marshals who had a removal order for Brown.

"Do *not* let him take the inmate," Smith reportedly told the two deputies.

The OSJ deputy on duty was a bit taken aback. "I wasn't sure how exactly I was supposed to stop some armed federal marshals," he said.

It turned out to be a moot point as, in both cases, the marshals never arrived.

"The whole time everyone was terrified of leaks," said another OSJ deputy—meaning the kind of leak, he explained, that might allow the FBI to swoop in and grab Brown.

By the evening of September 11, the Leavins team was finished with Brown. The following day, Brown was transferred to the California State Prison at Lancaster.

In order to make the transfer possible, the Pandora team had to perform one more act of digital sorcery. Brown's ghost inmate self was "released, and Brown was booked into Men's Central Jail as a brand new inmate under his old booking number, which was attached to his old case number. Then the real Brown was live scanned, and voila! Anthony Brown was digitally rematerialized. Minutes later, a deputy informed AIJIS that inmate Brown was being transferred out of county jail to the custody of the state.

Four of the Operation Pandora's Box team members, Mickey Manzo, Gerard Smith, James Sexton, and Noah Kirk, piled into a two-car convoy, and personally drove Brown to the California State Prison at Lancaster on Monday night.

And that was that.

The next morning, Deputy Smith sent out the following email to the Pandora team.

*Sept 13.*

*Over the past few weeks you have helped out tremendously, with the safeguarding of inmate Anthony Brown. You*

ANTHONY BROWN SR.

CDCR # V-79273

P.O. BOX 931/DI-112

IMPERIAL, CA 92251


APRIL 19, 2017


FBI SPECIAL AGENT

LEAH TANNER #22956

11000 WILSHIRE BLVD

LOS ANGELES, CA 90024


HELLO S.A. TANNER


UNLIKE SOME PEOPLE, I GIVE CREDIT TO THOSE WHO DESERVE IT. AND RIGHT NOW YOU DESERVE CREDIT FOR WHAT I AM ABOUT TO SHARE WITH YOU. WHICH IS NOW MARKED AND ATTACHED TO THIS LETTER AS EXHIBIT-1 (U.S. DISTRICT CORT R&R DATED 2-21-2017)

I REMEMBER THE 1ST TIME I SAW YOU AND I WAS VERY UPSET BECAUSE AUSA BRANDON FOX WOULD NOT GET ME A LAWYER IN 2012 AS YOU HAD SUGGESTED TO HELP ME WITH THE CORRUPTION & QUESTIONABLE MISCONDUCT COMMITTED IN MY CASE WHILE I WAS ASSISTING THE FBI AS AN FBI INFORMANT, DURING THE FBI INVESTIGATION INTO THE L.A. COUNTY JAIL.

1.

SO WHEN YOU TOLD ME IN 2012 THAT YOU KNOW I COULD EXPOSE THE LAPD & LASD CORRUPTION/MISCONDUCT RE; MY CASE ON MY OWN. I DIDN'T KNOW IT AT THAT TIME THAT BRANDON FOX AND THE USAO HAD NO INTENTIONS OF EVER HELPING ME.

I'M GUESSING THAT YOU KNEW S.A. MARX (TANNER) THAT THE USAO WERE NEVER GOING TO HELP ME. AND MAYBE THAT WAS THE REASON YOU LOOKED ME IN THE EYES AND TOLD ME " I KNOW YOU COULD EXPOSE LASD & LAPD CORRUPTION/MISCONDUCT RE: YOUR CASE."

THOSE WORDS ("I KNOW YOU COULD DO IT") YOU SAID TO ME S.A. TANNER STUCK WITH ME AND SO, I AM HERE, TO LET YOU KNOW I DID IT! S.A. TANNER PLEASE SEE: UNITED STATES DISTRICT COURT DOCUMENTS DATED FEBRUARY, 21, 2017 EXHIBIT-1 & MARCH 29, 2017

ALTHOUGH AUSA BRANDON FOX AND LIZ RHODES, U.S ATTY DECKER WOULD NOT HELP OR BELIEVE ME. AND U.S. ATTY. BRANDON FOX TOLD OTHER LAWYERS WHO WANTED TO HELP ME THE FOLLOWING: " ANTHONY BROWN IS NOT A VICTIM" — HOWEVER, AUSA BRANDON FOX USED ME / MY NAME AS THE FOUNDATION TO BRING CHARGES AGAINST THE TEN (10) INDICTED NOW CONVICTED LASD OFFICALS RE: LASD OPERATION PANDORA'S BOX.

THEN AUSA BRANDON FOX AND THE FBI HELPED MR.

GABRIEL CARRILLO AT THE BEHEST OF HIS WEALTHY CIVIL ATTORNEY RON KAYE. AND MR FOX AND THE FBI LEFT ME TO ROT. ANYWAY THAT'S ANOTHER LEGAL MATTER TO BE DEALT WITH AT A LATER TIME.

SO, THE FEDERAL JUDGES OF THE U.S. DISTRICT COURT DID BELIEVE ME AND THE EVIDENCE THAT WAS PRESENTED WHICH SHOWED THE CORRUPTION AND THE QUESTIONABLE MISCONDUCT OF LAPD & LASD. ETC. RE: MY CASE (BA360070) THE SAME EXACT EVIDENCE THAT YOU, BRANDON FOX & LIZ RHODES SAW WITH YALL OWN EYES.

S.A. TANNER I KNOW YOU UNDERSTOOD VERY CLEARLY THAT I WAS FIGHTING FOR ALL THE L.A. COUNTY JAIL INMATES WHO NEVER THOUGHT THEY COULD WIN, CAUSE BEFORE THE INMATES COULD BEGAN TO FIGHT THE LASD DEPUTIES. LASD TOLD THE INMATES IT WAS THE END.

I ASSISTED THE FBI AND YOU TO REVERSE THE CURSE THE L.A. COUNTY JAIL INMATES WERE LIVING IN AT THE L.A. COUNTY JAIL AND YOU KNEW THIS S.A. TANNER BECAUSE I EXPLAINED TO YOU THAT I WOULD ASSIST YOU/FBI FOR THOSE REASONS ONLY. I NEVER ASKED YOU FOR ANYTHING TO BE A FBI INFORMANT AND DO ALL THE DIRTY WORK AND RISK MY LIFE FOR YOUR/FBI INVESTIGATION INTO THE L.A. COUNTY JAIL.

3.

AND STILL, YOU ALLOWED BRANDON FOX, LIZ RHODES AND THE USAO TO SAY I WAS NOT A VICTIM.

CAN YOU ANSWER THIS QUESTION SPECIAL AGENT LEAH TANNER - IF I'M NOT THE VICTIM WHO IS THE VICTIM ? - IS IT LOS ANGELES SHERIFF'S DEPUTIES JAMES SEXTON, GILBERT MICHEL, MICKEY MANZO, GERARD SMITH, SGT. MARCIELLA LONG, SGT. SCOTT CRAIG, LT. GREGORY THOMPSON, LT. STEPHEN LEAVINS, CAPTAIN WILLIAM CAREY, UNDERSHERIFF PAUL TANAKA AND LASD SHERIFF LEROY D. BACA ARE THEY THE FUCKING VICTIMS ? OR IS AUSA BRANDON FOX & LIZ RHODES THE VICTIMS BECAUSE THE ABOVE LISTED DEPUTIES GOT CAUGHT BETRAYING THEIR BADGES ?

ARE THEY THE VICTIMS BECAUSE YOUR HAND PICKED A BLACK MAN, CONVICTED FELON, FBI INFORMANT BY THE NAME OF ANTHONY BROWN SR. (THAT WOULD BE ME) WHO EXPOSED THEIR UPSTANDING NON-BLACK ASSES! OR DID I MAKE THEM DO WHAT THEY DID TO ME WHICH IS BREAK THE LAW ???

THE FACT THAT NONE OF THE ABOVE LISTED LASD OFFICIALS ARE BLACK AND THE FACT I AM BLACK AUSA BRANDON FOX, YOU S.A. TANNER, AND LIZ RHODES / USAO, FBI TWISTED THIS WHOLE SITUATION AND MADE ME THE BAD GUY BECAUSE

4.

AUSA BRANDON FOX DIDNT WANT THE WORLD TO KNOW HIS STAR WITNESS GILBERT MICHEL BOUGHT ME DRUGS INTO THE L.A. COUNTY JAIL. ALL OF A SUDDEN YOU ALL TURNED YALL BACK ON ME.

I DIDNT WORK FOR BRANDON FOX, LIZ RHODES OR THE USAO. I WAS RECRUITED BY & ASSISTED YOU SPECIAL AGENT LEAH TANNER (nee MARX). AND FOR YOU NOT TO INVESTIGATE THE CORRUPTION AND QUESTIONABLE MISCONDUCT COMMITTED BY LAPD & LASD UPON ME RE: MY CRIMINAL CASE (BA360070) WHILE I WAS UNDER YOUR/FBI WATCH IS A CLEAR GOD-DAM SIGN OF DISCRIMINATION AMONG OTHER THINGS BY YOU AUSA BRANDON FOX, LIZ RHODES/USAO. ESP IN LIGHT OF THE FACT THE FBI AND USAO STEPPED IN AS PART OF YALL WIDE RANGING INVESTIGATION INTO ABUSE AND CORRUPTION INSIDE THE L.A. COUNTY JAILS

SO, TO HELP MR. GABRIEL CARRILLO AND REFUSE TO STEP IN FOR THE BLACK MAN YOU HAND PICKED AND RECRUITED TO ASSIST IN YOUR/FBI INVESTIGATION IN WHICH I WAS AT THE CENTER OF LASD CORRUPTION SCANDAL WHICH NETTED TEN (10) CONVICTIONS IS A VERY, VERY CLEAR SIGN THAT YOU/FBI, THE USAO REFUSED TO

5.

TO STEP IN AND HELP ME AFTER ME SHOWING YALL THE EVIDENCE. DUE TO YALL DISCRIMINATION AGAINST ME. AND BRANDON FOX WANTED ALL THE CREDIT AS IF HE WAS IN THE L.A. COUNTY AS AN COVERT FBI INFORMANT. I DONT THINK AUSA BRANDON FOX WOULD HAVE LAST 10 MINUTES INSIDE L.A. COUNTY JAIL AS AN FBI COVERT INFORMANT THAT'S WHY HE GAVE YOU THE GREEN LIGHT TO RECRUIT ME.

THE FBI/USAO GAVE ALL THOSE NON-BLACK CROOKED COPS SLAPS ON THE HAND DEALS FOR THE BETRAYAL OF THEIR BADGES. WHILE YOU & AUSA BRANDON FOX/USAO MADE ME THE BAD GUY.

SPECIAL AGENT TANNER, ALL I ASKED YOU & THE USAO TO DO SINCE 2011 WAS TO STEP IN AND INVESTIGATE THE CORRUPTION/QUESTIONABLE MISCONDUCT OF LASD DEPUTY MARCHELLO AND LAPD DETECTIVE CONRADO WHICH LEO TO MY WRONGFUL CONVICTION, WHILE UNDER YOUR WATCH FBI SPECIAL AGENT LEAH TANNER (nee MARX).

NOW IT DONT LOOK GOOD THAT IN 2012 I DID SHOW YOU, AUSA BRANDON FOX, AND LIZ RHODES OF THE USAO EVIDENCE OF THE CORRUPTION AND QUESTIONABLE MISCONDUCT COMMITTED BY LAPD DET. CONRADO (LEAD DETECTIVE OF MY CASE)

6.

AND LASD DEPUTY BAILIFF MARCHELLO AND YOU ALL FAIL TO ACT ON THE EVIDENCE I PRESENTED CAUSE I WAS A BLACK MAN

NOW THE REPORT AND RECOMMENDATION BY THE FEDERAL JUDGES OF THE UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA SHOW THE CORRUPTION AND QUESTIONABLE MISCONDUCT OF LAPD & LASD RE: MY WRONGFUL CONVICTION SEE EXHIBIT-1 DATED FEBRUARY 21, 2017.

S.A. TANNER EVIDENCE SPEAKS WAY LOUDER THAN WORDS AND THEORIES.

ALTHOUGH I HAD TO SEARCH REAL HARD TO FIND FORGIVENESS. I FORGIVE YOU SPECIAL AGENT LEAH TANNER (nee MARX) FOR YOUR ABANDONMENT OF ME ESP AFTER YOU HAND PICKED ME TO ASSIST IN YOUR/FBI INVESTIGATION INTO THE L.A. COUNTY JAIL. WHICH TO DATE NETTED 10 CONVICTIONS.

EVERYBODY WANTS TO BOX ME IN MEANING: YOU, AUSA BRANDON FOX & LIZ RHODES USAO/FBI, THE MEDIA, LAPD, LASD AND L.A. DISTRICT ATTY OFFICE A SEA FULL OF SHARKS AND ALL ABOVE SMELL MY BLOOD AND THEY ALL PAINT THEIR OWN PICTURES AND THEY SKETCH ME IN.

7.

SPECIAL AGENT LEAH TANNER. I HEAR ALL THE LIES AND THE CRITICISM ABOUT ME LOUD & CLEAR THAT IS HOW I KNOW THE TIME IS NEAR. AND I BECOME ALIVE IN THE TIME OF FEAR AND I DONT HAVE TIME TO SPARE. POST LASD OPERATION PANDORA'S BOX I CRIED MY EYES OUT DAYS UPON DAYS. SUCH A HEAVY BURDEN PLACED UPON ME (423 YEARS) FOR NOTHING EXCEPT CORRUPTION & QUESTIONABLE MISCONDUCT TO OBTAIN MY WRONGFUL CONVICTION BY CROOKED LAPD & LASD COPS UNDER THE WATCH OF THE FBI/USAO BUT BECAUSE I'M NOT WHITE I GETS NO LOVE OR JUSTICE.

IN THE END S.A. TANNER YOU & I KNOW IF YOU & DAVID #1 DIDNT RECRUIT ME TO BE AN FBI INFORMANT AND ASSIST THE FBI WITH THEIR INVESTIGATION INTO THE L.A. COUNTY JAIL. THERE WOULD NOT BE LASD OPERATION PANDORA'S BOX.

NO ANTHONY BROWN SR = NONE OF THE FOLLOWING CASES:
1. CASE NO CR          (GILBERT MICHEL)
2. CASE NO CR-13-00819 (THOMPSON et al)
3. CASE NO CR-15-00855 (TANAKA & CAREY)
4. CASE NO CR-13-00819 (JAMES SEXTON)
5. CASE NO CR-16-0066 (LEROY D. BACA)

8.

AND THE 10 INDICTMENTS AND CONVICTIONS. BUT, YOU CHOOSE TO LEAVE ME FOR DEAD. AS IF I GOT ON THE STAND IN PUT YOU & BRANDON FOX CASES IN JEOPARDY.

BOTTOM LINE. NO ME, NO BIGGEST LAW ENFORCEMENT CORRUPTION SCANDAL IN LOS ANGELES HISTORY (EVEN BIGGER THAN RAMPART) I AM SURE THE USAO/FBI WAS NOT IN THAT L.A. COUNTY JAIL COLLECTING EVIDENCE FOR THE FBI. I'M SURE IT WAS ME MYSELF & I. COLLECTING EVIDENCE FOR SPECIAL AGENT LEAH MARX (TANNER) OF THE FBI. AND YOU LEFT MY BLACK ASS FOR DEAD LIKE YOU & AUSA BRANDON FOX DID IT ALL WITHOUT MY HELP.

IS THIS THE THANKS I GET. IF SO THANKS YOU BUT NO THANKS.

ANYWAY I WILL SAY, THANK YOU FBI SPECIAL AGENT LEAH TANNER (nee MARX) BECAUSE NO MATTER WHAT. I TRUSTED YOU AND BELIEVED YOU WOULD DO THE RIGHT THING. I WAS WRONG AND YOU HUNG ME OUT TO DRY (I KNOW YOU HAD TO LISTEN TO BRANDON FOX)

I ALWAYS KNEW SINCE A LITTLE BOY, THAT

9.

WHAT IS DONE IN THE DARK. SHALL ONE DAY COME TO LIGHT. SO YOU & BRANDON FOX MIGHT WANT TO PUT ON YALL SHADES CAUSE THE SUN IS ABOUT TO SHINE ON ME BRIGHTER THAN EVER. THAT'S A GIVEN!

SO WITHOUT YOU TELLING ME " I KNOW YOU CAN DO IT" I WOULD STILL BE WAITING FOR HELP FROM BRANDON FOX & THE USAO FOR THE MAJOR ROLE I PLAYED RE: THE BIGGEST LAW ENFORCEMENT CORRUPTION SCANDAL IN L.A. HISTORY. WHICH WOULD HAVE NEVER HAPPENED BECAUSE I AM BLACK AND ALL THE CROOKED DEPUTIES WERE NOT.

WE ALL KNOW THAT NO ANTHONY BROWN SR NO CASES RE: LASD OPERATION PANDORA'S BOX AND NO TRIAL OF LEE BACA AND WITH THAT SAID    PEACE

CC: FILE

RESPECTFULLY SUBMITTED YOUR FBI INFORMANT

ANTHONY BROWN SR

10

# EXHIBIT 1

MIME-Version:1.0 From:cacd_ecfmail@cacd.uscourts.gov To:ecfnef@cacd.uscourts.gov Message-Id:<23054637@cacd.uscourts.gov>Subject:Activity in Case 2:13-cv-02620-PSG-PJW Anthony Brown Sr v. Veronica Conrado et al Report and Recommendation (Issued) Content-Type: text/html

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

### UNITED STATES DISTRICT COURT for the CENTRAL DISTRICT OF CALIFORNIA

**Notice of Electronic Filing**
The following transaction was entered on 2/22/2017 at 11:54 AM PST and filed on 2/21/2017

| | |
|---|---|
| **Case Name:** | Anthony Brown Sr v. Veronica Conrado et al |
| **Case Number:** | 2:13-cv-02620-PSG-PJW |
| **Filer:** | |
| **Document Number:** | 116 |

**Docket Text:**
**REPORT AND RECOMMENDATION issued by Magistrate Judge Patrick J. Walsh. Re NOTICE OF MOTION AND MOTION for Summary Judgment [99] Objections to R&R due by 3/15/2017. (sbou)**

**2:13-cv-02620-PSG-PJW Notice has been electronically mailed to:**
Ariana Rose McGinness Gebauer    armgebauer@gmail.com
Catherine Mason Mathers    cmathers@counsel.lacounty.gov
Wendy C Shapero    atty.pluorders@lacity.org, wendy.shapero@lacity.org
Elizabeth L Greenwood    elizabeth.greenwood@lacity.org, atty.pluorders@lacity.org, kelly.heaton@lacity.org
Elizabeth Anne Mitchell    atty.pluorders@lacity.org, elizabeth.mitchell@lacity.org
Cory M Brente    melinda.crowe@lacity.org, atty.pluorders@lacity.org, cory.brente@lacity.org
**2:13-cv-02620-PSG-PJW Notice has been delivered by First Class U. S. Mail or by other means BY THE FILER to :**
Anthony Brown
CDC V-79273
D1 - 146
Centinela State Prison
P O Box 931
Imperial CA 92251

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

ANTHONY BROWN, SR.,

                    Plaintiff,

        v.

VERONICA CONRADO, et al.,

                    Defendants.

CASE NO. CV 13-2620-PSG (PJW)

REPORT AND RECOMMENDATION RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOC. NO. 99)

This Report and Recommendation is submitted to the Hon. Philip S. Gutierrez, United States District Judge, pursuant to 28 U.S.C. § 636 and General Order 05-07 of the United States District Court for the Central District of California. For the reasons discussed below, it is recommended that Defendants Veronica Conrado and Juan Guerra's motion for summary judgment be denied.

I.

SUMMARY OF FACTS AND PROCEEDINGS

From August 2009 until September 2011, Plaintiff was a pre-trial detainee in the custody of the Los Angeles County Sheriff's Department, awaiting trial in a criminal case. Until May 2011, he was representing himself. (First Amended Complaint ("FAC") at ¶¶ 2-5.) On April 15, 2011, the Los Angeles County Superior Court ordered all

discovery closed in his case.  (FAC at ¶ 9.)  Notwithstanding that order, on April 19, 2011, Defendants, Los Angeles Police Department detectives Conrado and Guerra, came to the jail where Plaintiff was being held to gather a DNA sample from him.  (FAC at ¶¶ 6, 10.)  Plaintiff was called out of his cell at approximately 10:15 a.m. for what he was told was an attorney visit.  (FAC at ¶ 13.)  He was brought to Defendants Conrado and Guerra and several Los Angeles County Sheriff deputies.  (FAC at ¶ 14.)  Conrado told Plaintiff that she had a court order to collect a DNA sample from him.  (FAC at ¶ 15.)  Plaintiff asked to see the order; Conrado refused to show it to him.  (FAC at ¶¶ 17-18.)  Instead, she signaled to the deputies, who grabbed Plaintiff, put him in a "chicken wing hold," and pushed his face against a wall.  (FAC at ¶¶ 19-21.)  The deputies then turned Plaintiff's head to the side and forced his mouth open so that Conrado could swab the inside of his mouth with Q-tips.  (FAC at ¶¶ 19-21.)  Defendant Guerra was watching and did not intervene.  (FAC at ¶ 22.)

When Conrado finished, she threw a property receipt on the floor, documenting that she had taken a DNA sample.  Guerra then simulated a gun with his hand and pointed it at Plaintiff, pretending that he was shooting him.  (FAC at ¶ 24.)  Conrado booked the DNA sample into evidence at around 1:00 p.m. that day.  (FAC at ¶ 25; FAC at Exh. B.)

Plaintiff claims that Defendants were not authorized to collect his DNA sample when they did.  He points out that a minute order from the Los Angeles County Superior Court purportedly authorizing the taking of the sample was not filed until 1:30 p.m., three hours after Conrado took the sample.  (FAC at ¶¶ 27-29; FAC at Exh. C.)  He also points out that, when he wrote to the clerk's office requesting a copy of the order, he was informed that no orders had been signed in his

case that day. (FAC at ¶ 36; FAC at Exh. I.) He further explains that the presiding judge had always faxed him a copy of the orders in his case because Plaintiff was representing himself and that he never received a copy of the order. (FAC at ¶ 11.) Plaintiff notes that, even if Defendants had obtained a court order before taking his DNA sample, that order would have been in violation of the court's previous (April 15, 2011) order prohibiting further discovery.[1] (FAC at ¶¶ 28-29.)

## II.

### DISCUSSION

Plaintiff contends that Defendant Conrado violated his Fourth Amendment right against unreasonable searches and seizures when she took a DNA sample from him without a court order. He argues, alternatively, that, even if she had a court order, she still violated his rights because she used unreasonable and unnecessary force to obtain the sample. He contends that Guerra violated his rights when he failed to intervene to prevent Conrado and the others from forcing him to comply.

Defendants move for summary judgment, arguing that there was a court order and that Conrado reasonably relied on it and the Deputy District Attorney's representation regarding the lawfulness of the order when she obtained the DNA sample. She and Guerra also argue that, assuming that the deputies who helped her obtain the sample used too much force, Conrado and Guerra were not required to intervene to stop them because the deputies did not work for the Los Angeles Police

---

[1] A minute order from April 15, 2011, reflects that the judge had determined that discovery was "now complete." (Doc. No. 105 at p. 10.)

Department and Conrado and Guerra did not have custody or control of Plaintiff. For the following reasons, Defendants' motion for summary judgment is denied.

A.    Standard of Review

Under Federal Rule of Civil Procedure 56(a), summary judgment is warranted if the moving party can establish that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A "genuine issue" exists if there is a sufficient evidentiary basis upon which a reasonable jury could find for the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A factual dispute is "material" if it might affect the outcome of the suit under governing law. *Id.* at 248. The Court views the inferences it draws from the underlying facts in a light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the moving party satisfies that burden, the opposing party must submit evidence showing a genuine issue of material fact. *Matsushita*, 475 U.S. at 587. Summary judgment is also warranted when the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

4

B.    Defendant Conrado is not Entitled to Summary Judgment on Plaintiff's Fourth Amendment Claim

1.    The Excessive Force Claim

Plaintiff alleges that Defendant Conrado and the deputies who assisted her in obtaining his DNA used excessive force, in violation of the Fourth Amendment to the United States Constitution.  (FAC at ¶ 39.)  Conrado counters that, even assuming that the force was excessive, it was the deputies who applied it, not Conrado, and she cannot be held liable for what they did.  This argument is rejected.

According to Plaintiff, the deputies lured him out of his cell at Conrado's behest by telling him that there was an attorney at the jail who wanted to speak with him.  Conrado and Guerra were waiting outside and Conrado told Plaintiff that she had an order authorizing her to obtain a DNA sample from him.  Plaintiff asked Conrado to see the order.  In response, Conrado "turned and signaled" the deputies who immediately grabbed him, pushed him up against a wall, placed him in a control hold, forced his head to the side, and forced his mouth open so that Conrado could obtain the sample.  (FAC at ¶¶ 19-21.) Accepting this version of events and the reasonable inferences that can be drawn from it, the deputies use of force was at Conrado's direction and she can be held liable for it.  *See Preschooler II v. Clark Cnty. Sch. Bd. of Trs.*, 479 F.3d 1175, 1183 (9th Cir. 2007) (quoting *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978)) ("The requisite causal connection may be established when an official sets in motion a 'series of acts by others which the actor knows or reasonably should know would cause others to inflict' constitutional harms.").

5

Conrado argues that she is entitled to summary judgment because Plaintiff cannot prove that her signal to the deputies caused them to attack him. Again, the Court disagrees. Though Plaintiff has not presented any direct proof that that is what the signal was intended to communicate, the circumstantial evidence certainly supports such a conclusion in that, without a word, based solely on her signal, the deputies pounced on Plaintiff and forced him into a position where Conrado could accomplish her mission, i.e., to obtain a DNA sample from Plaintiff.

Conrado also contends that she is entitled to summary judgment because Plaintiff was not in her custody at the time of the assault and, therefore, she had no control over him or the deputies who assaulted him. The evidence completely undermines this argument. The order Conrado obtained authorizing her to collect the DNA sample provided that Plaintiff would be in the "immediate and actual control and custody and presence of said LAPD" when the sample was collected. (Doc. No. 13.) Further, and more practically, Conrado had the power to enter the county jail, persuade the deputies to go to Plaintiff's cell and bring him to her, and, on her signal, get the deputies to attack him and forcibly open his mouth so that she could swab the inside of his mouth. Thus, contrary to Conrado's argument, the evidence establishes that she had control over Plaintiff and the deputies at the time of the assault. For this reason, her argument that she is entitled to summary judgment because she did not have control is rejected.

2.    The Court Order

Plaintiff alleges that Conrado obtained the DNA sample without an order. Conrado argues that there was an order and that she reasonably

relied on it and the advice of the Deputy District Attorney in her case when she obtained the sample.  This argument is also rejected.

Even assuming that there was a court order at the time Conrado took the DNA sample, the order did not authorize her to direct the deputies to assault Plaintiff to obtain the sample where, as here, he was not resisting and had merely asked to see a copy of the order. Further, there are a lot of questions swirling around the court order that cannot be resolved on summary judgment.  To begin with, though an order has been produced, the question of where it came from and when it was issued is in dispute.  Conrado claims that the Deputy District Attorney obtained it, but she has not presented the application for the order or a declaration from the Deputy District Attorney explaining what happened.  And, as Plaintiff points out, when Conrado prepared a report memorializing her collection of the DNA sample, she explained that she obtained the order and made no reference to the deputy district attorney.  This is consistent with a letter Plaintiff has submitted from a judge of the Superior Court in which he concludes that "it seems that the order was requested by [] Conrado."  (Exh. K to Plaintiff's Request for Judicial Notice.)

Though Plaintiff and Defendants appear to agree that Conrado took the DNA sample at about 10:15 on April 19, 2011, a minute order from the Superior Court docket provides that the order was filed at 1:30. Adding further confusion to the issue is the fact that, when Plaintiff wrote to the Superior Court and requested a copy of all orders entered on the day the order was purportedly entered, the court wrote back that there were no orders entered that day.

Plaintiff further points out that two different versions of the same order exist.  The certified order lodged by Conrado's counsel has

7

the name "CRAIG E. VEALS" stamped under the judge's signature (Doc. No. 13), while the order handed to him by Deputy District Attorney Ashvanian during a hearing on May 13, 2011 (FAC at Exh. F) does not.

Circumstantial evidence also supports Plaintiff's contention that the sample was taken without an order. To begin with, when Plaintiff asked Conrado to see the order at the jail, an obviously fairly reasonable and innocuous request, Conrado did not show it to him. Instead, she directed the deputies to assault Plaintiff. Clearly, had Conrado had an order in her hand, it would seem to be a simple task to show it to him and, presumably, eliminate the need for the deputies to use force on Plaintiff. Finally, Plaintiff points out that the DNA evidence was never used in his trial. He suspects that that is because the prosecutor determined that there was no order when the sample was obtained.

In the end, there are many more questions than answers on the issue of the order. For that reason, Conrado is not entitled to summary judgment on Plaintiff's excessive force claims.[2]

B.    Detective Guerra is not Entitled to Summary Judgment

Detective Guerra contends that he is entitled to summary judgment because he merely accompanied Conrado to the jail and watched as she and the deputies obtained the DNA swab. He argues that he did not have custody or control over Plaintiff and had no obligation to

---

[2]    Defendants mention qualified immunity in their "Standard of Review" section of the brief but do not discuss it anywhere else in their brief. Defendants' mention of the words "qualified immunity" is not enough to raise the issue and it is denied on that ground. Had they raised the issue in detail, the Court would have denied it anyway because it was clearly established in 2011 that police officers could not direct another police officer to assault a detainee merely because he asked to see a copy of a court order.

8

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

ANTHONY BROWN, SR.,

               Plaintiff,

     v.

VERONICA CONRADO, et al.,

               Defendants.

)
)
)
)
)
)
)
)
)
)
)
)

Case No. CV 13-2620-PSG (PJW)

ORDER ACCEPTING REPORT AND ADOPTING FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE

Pursuant to 28 U.S.C. § 636, the Court has reviewed the motion for summary judgment, the records on file herein, and the Report and Recommendation of the United States Magistrate Judge. The time for filing objections to the Report and Recommendation has expired and no objections have been filed. The Court accepts the findings and recommendations of the Magistrate Judge and adopts them as its own findings and conclusions.

IT IS THEREFORE ORDERED that Defendants Conrado and Guerra's motion for summary judgment is denied.

DATED:     March 29, 2017

                                               
PHILIP S. GUTIERREZ
UNITED STATES DISTRICT JUDGE

C:\Users\imartine\AppData\Local\Temp\notesC7A056\Order accept r&r re Ds' msj.wpd

intervene when the deputies assaulted him because they worked for a different agency. Though a closer call, the Court finds that Defendant Guerra is not entitled to summary judgment, either.

Generally speaking, police officers are obligated to intervene when another police officer is violating a suspect's constitutional rights. *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000) (citing *United States v. Koon*, 34 F.3d 1416, 1447 n.25 (9th Cir. 1994), *rev'd on other grounds*, 518 U.S. 81 (1996)). The facts as set out by Plaintiff and the inferences that can be drawn from them establish that Guerra was working with Conrado when he accompanied her from the courthouse to the jail. According to Plaintiff's version of events, Conrado directed the deputies to assault him when he failed to immediately comply with her command for a DNA sample. Thus, it was Conrado who was ultimately responsible for the assault and, even under Guerra's interpretation of the law--one in which this Court does not necessarily agree--he should have stopped her from instigating it or intervened when the deputies complied with Conrado's direction to assault Plaintiff. For these reasons, Guerra is not entitled to summary judgment.

III.

RECOMMENDATION

For these reasons, IT IS RECOMMENDED that the Court issue an Order (1) accepting this Report and Recommendation, and (2) denying Defendant Conrado's and Guerra's motion for summary judgment.

DATED:     February $\partial l$, 2017

PATRICK J. WALSH
UNITED STATES MAGISTRATE JUDGE

S:\PJW\Cases-Civil Rights\BROWN 13-2620\DS motion for summary judgment.wpd

9

Case: 2:13cv2620   Doc: 116

Anthony  Brown Sr CDCV-79273
Centinela State Prison
P O Box 931
Imperial, CA 92251

12/27/2016                          Exclusive: FBI informant in Baca trial has 'no regrets' | abc7.com



NEWS
# EXCLUSIVE: FBI INFORMANT IN BACA TRIAL HAS 'NO REGRETS'

EMBED </>    MORE NEWS VIDEOS ▸

Inmate-turned-FBI-informant Anthony Brown told Eyewitness News in an exclusive interview he has no regrets being labeled a "snitch" in former Sheriff Lee Baca's trial. (KABC)

 By Miriam Hernandez and Lisa Bartley

Tuesday, December 20, 2016 08:47PM

LOS ANGELES (KABC) -- "No, I don't have no regrets," inmate-turned-FBI-informant Anthony Brown told Eyewitness News in an exclusive interview from state prison.

Brown's role in the FBI's covert investigation of the Los Angeles County jails undoubtedly put him at risk for retaliation. He'll forever be labeled a "snitch."

It was Brown's information from behind bars that helped launch the FBI's undercover operation inside Men's Central Jail in the summer of 2011. The target? A corrupt deputy willing to accept a bribe.

"I did what the FBI directed me to do - which is gather evidence of the corrupt LASD deputies. And the FBI did what the FBI does - which is catch them, turn them and flip them like pancakes," Brown said.

So far, nine former LASD officials, including former Undersheriff Paul Tanaka, have either pleaded guilty or been sentenced to prison in connection with the scheme to block a federal investigation into inmate abuse and corruption inside the jails. Tanaka, sentenced to a five-year term, has been ordered to surrender to prison next month.

"Someone had to do it, why not me?" Brown said about his work with the feds.

Brown spoke out exclusively to Eyewitness News again as the federal corruption trial of former Los Angeles County Sheriff was wrapping up. Jurors have

now deliberated for about 11 hours without reaching a verdict.

On Tuesday, jurors sent six notes to the judge. Their requests ranged from read-backs of testimony from three prosecution witnesses -- to clarification on a key legal issue.

In one note, jurors asked, essentially -- was it legal for the sheriff's department to approach FBI Agent Leah Marx? The note added that jurors were confused by a jury instruction that said local law enforcement does have the authority to investigate violations of state law by a federal agent, but they cannot use that authority to obstruct justice.

Judge Percy Anderson called the jury into the courtroom to tell them that they - the jurors -- must determine if Baca's intent was obstruction.

"Intent is and was always the toughest part of the case," said former federal prosecutor Miriam Krinsky who has been following the case. "The facts have never been in dispute -- rather the key has always been why Baca did what he did and to what extent he was part of the obstruction activities."

Brown, who was now serving 423 years to life for armed robbery, said he has frequent contact in state prison with inmates newly arrived from Men's Central Jail.

"They say it's changed a lot," Brown said. "The deputies... not aggressive, I mean, that's enough for me right there because it was really bad."

From prison, Brown has high praise for the FBI and the U.S. Attorney's Office, saying they are the "real heroes and deserve the praise," for "standing up" to misconduct in local law enforcement.

"Their integrity and courage would not allow them to turn a blind eye to misconduct committed by LASD deputies," he said.

The episode was life-changing for Brown. His cover as an informant was blown in August of 2011 when jail guards found Brown's contraband cellphone stashed in a bag of Dorito's during a routine search.

Brown's phone calls from jail were traced by LASD investigators to a civil rights squad of the FBI - a squad that investigates potential corruption in local law enforcement. Soon after, Brown's name was changed in the LASD computer system, he was moved repeatedly, and discouraged from further cooperating with the FBI.

"The whole ordeal of assisting the FBI was a living hell," Brown told Eyewitness News. "I knew at any time I could be killed -- disappear without a trace -- if the LASD deputies found out I was assisting the FBI by reporting corrupt deputies."

Baca's defense is, in part, that the former sheriff had promised the FBI to protect Brown at a time the two agencies were at a standoff.

Brown, however, rejects the idea that the LASD's actions were meant to protect him.

"That's a straight, flat-out lie," Brown said. "They weren't trying protect me, they were hiding me and they let me know."

"They told me what they was doing. 'You're not going to see the FBI right now, we're just going to put you over here,'" Brown explained.

Brown, who is appealing his armed robbery convictions, told Eyewitness News he is gratified that corrupt deputies are behind bars too.

"I think it was worth it," Brown said. "I think they got what they deserve and maybe people will learn from it. Maybe other deputies will learn from it, maybe they won't. Who knows?"

Jurors weighing the fate of Baca will resume their deliberations on Wednesday morning at 8 a.m.

*Got a tip? Email ABC7 investigative producer Lisa.Bartley@abc.com*

**Related Topics:**

news    lee baca    los angeles county sheriff's department    corruption    trial    jail    investigations    Los Angeles    Los Angeles County

(Copyright ©2016 KABC-TV. All Rights Reserved.)

# SPONSORED CONTENT

12/27/2016                    FBI agent threatened with arrest testifies in ex-Sheriff Lee Baca corruption trial | abc7.com



NEWS

# FBI AGENT THREATENED WITH ARREST TESTIFIES IN EX-SHERIFF LEE BACA CORRUPTION TRIAL



EMBED </> | MORE NEWS VIDEOS ▶

FBI Special Agent Leah Marx told a rapt jury about the pivotal moment now-convicted LASD Deputy Gilbert Michel accepted a cash bribe to smuggle a contraband cellphone into jail for inmate Anthony Brown. (KABC)

 By Miriam Hernandez and Lisa Bartley

Wednesday, December 14, 2016

LOS ANGELES (KABC) -- FBI Special Agent Leah Marx told a rapt jury about the pivotal moment now-convicted LASD Deputy Gilbert Michel accepted a cash bribe to smuggle a contraband cellphone into jail for inmate Anthony Brown.

FBI surveillance teams watched the illegal exchange from the ground and from the air.

"I was in the airplane," Marx testified of the bribery sting that unfolded in summer 2011 as part of a covert FBI investigation into Los Angeles County jails.

It was the beginning of the end for Michel's career in law enforcement - and set off a chain of events that led the L.A. County Sheriff's Department into a years-long scandal.

Nine former LASD officials have been convicted or pleaded guilty so far on charges related to the obstruction of an FBI investigation into brutality and corruption inside the jails.

Former LASD Sheriff Leroy Baca is the highest-ranking official to stand trial. The 74-year-old has pleaded not guilty.

Marx told jurors about the FBI sting orchestrated inside Men's Central Jail that summer. Their federal investigation initially focused on disturbing accounts

of deputy-on-inmate brutality.

But the FBI needed corroboration -- more than just the word of jail inmates. Marx recruited an inmate to be their secret informant and feed them information from behind bars.

Inmate Brown was selected because he had "access" to areas of the jail where abuse reports had spiked, and he was "willing" to inform on law enforcement.

The investigation expanded over time from inmate abuse to possible corruption by jail deputies. FBI agents wanted to see if Michel would accept a bribe to smuggle a cellphone to Brown. The FBI's undercover operation was blown within weeks when the contraband cellphone was found during a routine search in August 2011.

Marx testified that she and two other FBI agents went to see Brown at Men's Central Jail after the phone was discovered, but their interview ended abruptly - and loudly.

"There was a pounding at the door," Marx said. "(A) very large sergeant grabbed Anthony Brown and dragged him out."

As Brown was being hauled away, Marx told the inmate, "don't worry, we'll get you out of here. We'll be back."

Soon after, Brown vanished from the LASD computer system. Marx testified that federal agents quickly issued a writ - or court order -- to get Brown out of LASD custody. Brown, however, could not be found and was never turned over to the FBI by the department.

Marx testified about phone records showing a flurry of phone calls shortly after that writ was faxed to the LASD. Marx also showed the jury summaries of Baca's phone calls during key time periods to and from LASD officials already convicted in the case, including former Undersheriff Paul Tanaka.

Tanaka was convicted in April and later sentenced to five years in federal prison for his role in obstructing the FBI investigation. The former undersheriff had hoped to remain free on bail while his appeal was heard. But on Wednesday, the appeals court ordered him to surrender to prison.

Late Wednesday, Tanaka agreed to turn himself into prison by Jan. 16, 2017. He's expected to serve his sentence at a minimum security federal prison camp in Florence, Colorado.

On direct examination by prosecutor Brandon Fox Wednesday, Marx described how two LASD sergeants, one with a gun visible, confronted her outside her home and threatened her with arrest.

Shortly after the encounter, Marx's FBI supervisor called the LASD to find out what was going on - was the LASD really going to arrest an FBI agent?

Prosecutor Fox played a phone recording between FBI supervisor Carlos Narro and LASD Sgt. Maricela Long for the jury.

NARRO: *"She indicated to me that you guys indicated to her that there's going to be a warrant for her arrest?"*

LONG: *"There's going to be."*

NARRO: *"Does the sheriff know this?"*

LONG: *"The sheriff knows this, sir."*

Did the LASD know they were exceeding their authority by launching a competing investigation? The FBI was investigating the LASD, but did the LASD have the right to turn around and investigate the FBI for arranging for that contraband cellphone to be smuggled into their jail?

Superior Court Judge John Torribio testified Wednesday about the "unusual" request he received from the LASD that summer. LASD Sgt. Scott Craig wanted Torribio to sign a court order forcing the FBI to turn over their investigative files.

"I said - I can't sign this," Torribio testified. "We do not have any jurisdiction over a federal agency."

"I was telling him, you can't do this," Torribio told the jury, adding that it was the only time in his 27 years on the bench he'd been asked for such an order.

On cross-examination, Torribio testified that he did not know if Craig ever communicated this information to Baca.

Former L.A. Times reporter Robert Faturechi also testified Wednesday after he was subpoenaed by prosecutors to talk about an interview he conducted with Baca in late September 2011.

"My beat was the Los Angeles County Sheriff's Department," Faturechi told the jury, adding that word was spreading that summer about the FBI investigation and - crucially - the LASD's response to it.

Faturechi testified in court against his will - with an attorney hired by the L.A. Times standing by to object if questions from attorneys veered into information that was not published in any story.

"Subpoenaing journalists is a threat to media independence," Faturechi said in a statement issued by the L.A. Times. "Our attorneys fought back to ensure...I would reveal absolutely nothing about anonymous sources or confidential materials."

Faturechi told jurors that Baca told him in an on-the-record interview that he'd "directed" the LASD sergeants to confront Marx outside her home in late September 2011.

According to Faturechi's testimony and article, Sheriff Baca described the encounter as involving less "intimidating tactics" than the FBI's approach of Michel.

On cross-examination, Faturechi testified that Baca "dismissed any suggestion" that their intent was to "intimidate" Marx.

Marx will face cross-examination on Thursday. Prosecutors are expected to call one final witness, former U.S. Attorney Andre Birotte, before resting their case.

Birotte, now a federal judge, is expected to tell the jury about a tongue-lashing he received from Baca the day after LASD sergeants confronted Marx.

According to court documents, Baca told Birotte and FBI Assistant-Director-In-Charge Steve Martinez - "I'm the goddamn sheriff and these are my goddamned jails."

Got a tip? Email ABC7 Investigative Producer Lisa.Bartley@abc.com.

**Related Topics:**

news    corruption    jail    lee baca    los angeles county sheriff's department    FBI    court case    Los Angeles    Los Angeles County    Downtown LA

  

(Copyright ©2016 KABC-TV. All Rights Reserved.)

## SPONSORED CONTENT



How To: Get Rid of Dark Under Eye Circles [Watch]
Health Headlines



A Card Is Now Offering a $150 Cash Rewards Bonus and 1.5% Back On Everything
NextAdvisor



How 2 Boston Grads Are Disrupting a $19 Billion Industry
EverQuote



Low Testosterone Symptoms and Treatments
Yahoo Search



Here Are Our Top 10 Cars for 2016
Kelley Blue Book



Dogs Would Love It If You Took This Quick Challenge
Blue Buffalo

## SPONSORED CONTENT

The 2017 IKEA Catalog Is Filled With Genius Ideas (IKEA)

How Pasta is Supposed to Be: Giovanni Rana (Dine with Rana)

4 Holiday Traditions For Your Family To Try This Season (New York Life on AARP)

9 Genius Ways to Eat Healthy Even on the Go (Larissa's Kitchen)

Ready for a Metabolism Boost? Here's How to Get It Done (Larissa's Kitchen)

Don't Turn Off Your Computer Without Doing This... (Web Life Advice)

## MORE FROM ABC7

Steve Kerr not concerned with Steph Curry's slump, but he 'can make better decisions'

4 Home Depot workers fired for helping track down suspected shoplifter

Rain possible for New Year's weekend

Trump's Doctor: 'If Something Happens to Him, Then It Happens to Him'

72 Dead in Siberia After Drinking Counterfeit Alcohol

'Meant to be': 3-year-old boy's joyful adoption photo goes viral

💬 LOAD COMMENTS

## PROOF OF SERVICE BY UNITED STATES MAIL

I, _____, am over the age of eighteen years, a
resident and prisoner of the State of California with a present mailing
address of: CENTINELA STATE PRISON, 2302 Brown Rd., Imperial, CA 92251.

On _____, I served the following document(s):

_____

by placing the document(s) in a sealed envelope(s), with First Class
postage having been placed thereon. Delivered the envelope(s) to a
Correctional Officer who then signed & dated the back of the envelope
and s/he then deposited such envelope(s) in the prisons internal legal
mail system for processing and delivery to the United States Postal
Service, for delivery to the addressee(s):

I declare that there has been regular U.S. mail pick-up by the
Correctional Officers at the prison where I posted the envelope(s) and
regular communication by mail between the place of mailing and the
place(s) so addressed.

I declare under penalty of perjury under the laws of the State of
California and the United States that the forgoing is true and correct
and the this declaration was executed on _____,
at Imperial County, in Imperial, California.

_____
Declarant

NOTE: Pursuant to the holdings in Houston v. Lack (1988) 487 U.S. 266,
108 S.Ct. 2379, 101 L.Ed.2d 245; and, In re Jordan (1992) 4 Cal.4th
116, 13 Cal.Rptr.2d 878, 840 P.2d 983, (inmate legal documents are
deemed filed on the date they are delivered to prison staff for
processing and mailing via the institutions internal legal mail
procedures).

ANTHONY BROWN SR.

CDCR # V-79273

P.O. Box 931 / D1-112

IMPERIAL, CA 92251

APRIL 19, 2017

LOS ANGELES COUNTY SHERIFF'S

DEPARTMENT - INTERNAL AFFAIRS

BUREAU

4900 S. EASTERN AVENUE, STE 100

COMMERCE, CA 90040

TO: INTERNAL AFFAIRS BUREAU, COMMANDER

ON APRIL 11, 2017 I RECEIVED A LETTER FROM THE OFFICE OF THE SHERIFF, COUNTY OF LOS ANGELES HALL OF JUSTICE DATED APRIL 03, 2017, WHICH EXPLAINED THAT A COMPLAINT DATED NOVEMBER 16, 2015, DOCUMENTED ON WATCH COMMANDER'S SERVICE COMMENT REPORT # 242157 HAS BEEN RECEIVED (503 DAYS POST THE 11-16-2015 DATE) AND IS BEING INVESTIGATED BY SERGEANT STEVEN WYATT, SIGNED BY CAPTAIN AGUSTIN DEL VALLE OF MEN'S CENTRAL JAIL.

PAGE 2 OF SAID LETTER, IS THE LOS ANGELES COUNTY SHERIFF'S DEPT. WATCH COMMANDER'S SERVICE COMMENT REPORT # 242157 RECEIVING BUR/STD/FAC: IAB - REPORT DATE: 11-16-15 - TIME 12:07 SC #: 2390125 - WATCH COMMANDER (PERSON COMPLETING REPORT) RICHARD MARTINEZ # 248060. LETTER MARKED AS (EXHIBIT-1)

1

524 DAYS AGO ON OCTOBER 26, 2015 LASO INTERNAL AFFAIRS BUREAU SGT. DENNIS WATTERS AND SGT. DELICIA HERNANDEZ CAME TO CENTINELA STATE PRISON TO TALK ABOUT MY COMPLAINT RE: LASO DEPUTY BAILIFF KELLY C. MARCHELLO #503663. AT WHICH TIME I WAS ASKED BY IAB IF THE FBI WAS GOING TO INVESTIGATE THIS COMPLAINT.

I EXPLAINED TO IAB HERNANDEZ & WATTERS FOR 3 HRS OR MORE ABOUT WHAT HAPPEN WITH LASO DEPUTY BAILIFF KELLY C. MARCHELLO AND I PROVIDED DOCUMENTARY EVIDENCE TO SUPPORT MY COMPLAINT, PLUS THE VISIT WAS RECORDED BY BOTH IAB SGT. HERNANDEZ AND SGT. WATTERS.

AFTER THAT VISIT/INTERVIEW. I SENT A LETTER TO SGT. WATTERS AND SGT. HERNANDEZ ON 11-02-2015 (AVAILABLE UPON REQUEST)

ON 12-08-2015 I RECEIVED A LETTER DATED 12-01-15 FROM THE OFFICE OF THE SHERIFF, COUNTY OF LOS ANGELES, HALL OF JUSTICE, WHICH EXPLAINED THAT MY COMPLAINT (#242158) AGAINST LASO DEPUTY BAILIFF K. MARCHELLO #503663 IS BEING INVESTIGATED BY LIEUTENANT, CRUZ SOLIS OF CLARA SHORTRIDGE FOLTZ COURTHOUSE SIGNED BY LAWRENCE E. DEL MESE, CAPTAIN COURT SERVICES CENTRAL BUREAU NOW MARKED (EXHIBIT-2)

2.

SO ON 12-14-2015 I SENT A LETTER TO THE OFFICE OF THE SHERIFF, COUNTY OF LOS ANGELES TO THE ATTN: OF CAPTAIN LAWRENCE E. DEL MESE AND LT. CRUZ SOLIS DATED 12-09-2015. A COPY OF THE LETTER WAS SENT TO LASO IAB SGT. WATTERS AND SGT. HERNANDEZ. PLEASE SEE CENTINELA STATE PRISON LEGAL MAIL LOG. NOW MARKED AS (EXHIBIT-3) (LETTER AVAILABLE UPON REQUEST)

JANUARY 28, 2016 I MAILED A LETTER AND COPIES OF THE RELEVENT L.A. COUNTY SHERIFF'S DEPARTMENT REMOVAL ORDERS FOR IN-CUSTODY DEFENDANT ANTHONY BROWN BKG. NO. 2009547 TO IAB SGT. WATTERS AND SGT HERNANDEZ ALSO SENT TO LT. CRUZ SOLIS / CAPT. LAWRENCE E. DEL MESE OF COURT SERVICES CENTRAL BUREAU.

THE L.A. COUNTY SHERIFF'S DEPARTMENT REMOVAL ORDERS IN WHICH I OBTAINED THROUGH SUBPOENA ISSUED FROM THE UNITED STATES DISTRICT COURT, ARE EVIDENCE THAT LASO DEPUTY KELLY C. MARCHELLO #503663 DID NOT SEND A REMOVAL ORDER TO L.A. COUNTY JAIL IRC COURTLINE ON 5-19-2011 FOR I/M BROWN TO APPEAR IN COURT ON MAY 20, 2011. THEN LASO DEPUTY BAILIFF KELLY C. MARCHELLO LIED TO THE COURT ABOUT I/M BROWN REFUSING TO COME TO COURT TO COVER-UP THE FACT NO REMOVAL ORDER WAS SENT TO L.A. COUNTY JAIL IRC COURTLINE. THE L.A. COUNTY SHERIFFS DEPT. REMOVAL ORDERS WERE SENT DIRECTLY BY L.A. COUNTY SHERIFF'S DEPT. IRC RECORDS ON 01/22/2016 PER

THE SUBPOENA ISSUED FROM THE U.S. DISTRICT COURT. (EXHIBITS 3 AND 4) SAID L.A. COUNTY SHERIFFS DEPT. REMOVAL ORDERS SENT TO LASD IAB & LASD COURT SERVICES ARE LASD OWN EVIDENCE THAT NO LASD DEPTY, BAILIFF INCLUDING LASD DEPTY BAILIFF KELLY C. MARCHELLO #503663 COMPLETED AND SENT A LASD REMOVAL ORDER ON 5-19-2011 TO L.A. COUNTY JAIL IRC COURTLINE FOR I/M BROWN BKG-NO 2009547 TO APPEAR IN COURT ON 5-20-2011.

DESPITE ME EXPLAINING AND SENDING THE SUBPOENAED LOS ANGELES COUNTY SHERIFF'S DEPARTMENT REMOVAL ORDERS FOR IN-CUSTODY INMATE/DEFENDANT ANTHONY BROWN BKG NO. 2009547 / LETTER DATED JANUARY 25, 2016 (EXHIBIT-4) ALONG WITH COPIES OF THE ACTUAL L.A.C. REMOVAL ORDERS FROM LASD IRC.

ON MARCH 17, 2016 I RECEIVED A LETTER DATED MARCH 14, 2016 FROM OFFICE OF THE SHERIFF, COUNTY OF LOS ANGELES HALL OF JUSTICE WHICH EXPLAINED: " AFTER REVIEWING THE RESULTS AND CONSIDERING THE FACTS DEVELOPED IN THIS INVESTIGATION, WE WERE UNABLE TO CONFIRM ANY IMPROPER ACTIONS OCCURRED" NOW MARKED (EXHIBIT-5)

WHEN I RECEIVED THAT LETTER IT WAS DISCUSSED THE ONLY WAY THAT LASO CAPTAIN LAWRENCE E. DEL MESE, AND LIEUTENANT CRUZ SOLIS, OF CLARA

4.

SHORTRIDGE FOLTZ COURTHOUSE, COURT SERVICES BUREAU WERE UNABLE TO CONFRIM ANY IMPROPER ACTIONS OCCURRED BY LASD DEPUTY BAILIFF KELLY C. MARCHELLO #503663 - IN THE FACE OF ALL THE OVERWHELMING EVIDENCE, THAT WAS SENT TO THEM AND SUBPOENAED FROM LOS ANGELES COUNTY CUSTODIAN OF RECORDS, LASD LEGAL DEPT, LASD IRC RECORDS AND SUPERIOR COURT RECORDS. THE FOLLOWING HAD TO OCCUR:

1. LASD CAPTAIN LAWRENCE E. DEL MESE, Lt. CRUZ SOLIS, UNDER THE WATCH OF SHERIFF JIM McDONNELL. ALL FAIL TO TAKE NOTICE OF THEIR OWN DOCUMENTS AND FAIL TO INVESTIGATE ONE OF THEIR OWN [LASD DEPUTY BAILIFF MARCHELLO # 503663] DUE TO THE FACT DEPUTY KELLY C. MARCHELLO IS A COLLEAGUE. LASD OWN DOCUMENTS THAT WERE SUBPOENAED FIVE (5) YEARS AFTER THE FACT LEAVES NO ROOM FOR ERROR. AND/OR;

2. LASD CAPTAIN LAWRENCE E DEL MESE, LT. CRUZ SOLIS, UNDER THE WATCH OF SHERIFF JIM McDONNELL TOOK PART IN A COVER-UP TO PROTECT LASD DEPUTY BAILIFF KELLY C. MARCHELLO # 503663.

PUT SIMPLY, THE DOCUMENTS SENT TO LASD CAPT. LAWRENCE E. DEL MESE, AND LT. CRUZ SOLIS UNDER THE WATCH OF SHERIFF JIM McDONNELL WERE OBTAINED THROUGH SUBPOENA ISSUED BY THE

5.