UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

HONORABLE PERCY ANDERSON, U.S. DISTRICT JUDGE

- - -

UNITED STATES OF AMERICA,              )
                                       )
                     PLAINTIFF,        )
                                       )
             vs.                       ) No. CR16-66(A)-PA
                                       )
LEROY BACA,                            )
                                       )
                     DEFENDANT.        )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

LOS ANGELES, CALIFORNIA

MONDAY, FEBRUARY 13, 2017

3:08 P.M.

_____

CINDY L. NIRENBERG, CSR 5059, FCRR
U.S. Official Court Reporter
350 W. 1st Street, #4455
Los Angeles, CA 90012
*www.msfedreporter.com*

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

APPEARANCES OF COUNSEL:


FOR THE PLAINTIFF:
                         OFFICE OF THE UNITED STATES ATTORNEY
                         BY: BRANDON FOX,
                             ASSISTANT U.S. ATTORNEY
                             EDDIE A. JAUREGUI,
                             ASSISTANT U.S. ATTORNEY
                             LIZABETH A. RHODES,
                             ASSISTANT U.S. ATTORNEY
                         312 NORTH SPRING STREET
                         13TH FLOOR
                         LOS ANGELES, CA 90012
                         213-894-2434










FOR THE DEFENDANT:
                         MORGAN LEWIS & BOCKIUS
                         BY: NATHAN J. HOCHMAN, ATTORNEY AT LAW
                             BRIANNA L. ABRAMS, ATTORNEY AT LAW
                         THE WATER GARDEN
                         1601 CLOVERFIELD BOULEVARD
                         SUITE 2050 NORTH
                         SANTA MONICA, CA 90404
                         310-255-9025




ALSO PRESENT:
                         LEAH TANNER, FBI SPECIAL AGENT

I N D E X

*PAGE*

DISCUSSION HELD AT SIDEBAR                    4

LOS ANGELES, CALIFORNIA; MONDAY, FEBRUARY 13, 2017

3:08 P.M.

- - - - -

THE CLERK:  Calling item Number 5, CR16-66(A), United States of America versus Leroy D. Baca.

Counsel, please step forward and state your appearances.

MR. FOX:  Good afternoon, Your Honor.  Brandon Fox, Lizabeth Rhodes and Eddie Jauregui on behalf of the United States.

THE COURT:  Good afternoon.

MR. HOCHMAN:  Good afternoon, Your Honor.  Nathan Hochman and Brianna Abrams with defendant Leroy Baca, who is present, Your Honor.

THE COURT:  Good afternoon.

I'd like to see counsel at sidebar for a moment.

*(The following proceedings were held at sidebar.)*

/

/

/

/

/

/

/

/

/

/

/

/

/

/

/

/

/

/

/

/

*(The following proceedings were held in open court.)*

THE COURT:  Now, according to my notes, the last order that we had for excludable time took us up to January 10th of 2017, and I assume, based when we were last here, that there'd be no problem in drafting either a stipulation or an agreed-upon order extending excludable time from January 10th up to the present of the start of the next trial.

Has anything differed?

MR. FOX:  No, Your Honor.  I think we were just waiting to find out when jury selection was going to start so we could enter into a stipulation.  I don't think the defense has any issue with that sort of stipulation.

MR. HOCHMAN:  That is correct, Your Honor.

THE COURT:  All right.  What is the government's current estimate to put on its case?

MR. FOX:  Your Honor, I think no more than eight days.  I think we can get it done within eight days.

THE COURT:  And does the defense have a current estimate?

MR. HOCHMAN:  Yes, Your Honor.  Two to four days, depending on whether or not the defendant testifies.

THE COURT:  As to the start of the trial, what I currently plan to do is to have some 240 to 250 potential jurors summoned, and we will start jury selection either on Tuesday the 21st or Wednesday the 22nd.  And I will know when we're going to start probably by Wednesday of this week.

If there are no -- depending on the number of trials that are going to take place, if there are going to be a number of trials that are taking place in other courtrooms, then we'll probably start on Wednesday.

If there are no other trials that are going to take place that week, then we'll start on Tuesday.  And I'll let the parties know that on Wednesday.  We should know that Wednesday afternoon at the latest.

And what I anticipate we'll be doing is doing sort of an orientation similar to what we did the last time in the ceremonial courtroom, and we'll use two groups of about -- have a jury pool come in of about 120 to 125 potential jurors, and

then we'll have an additional group come in about that same number.

I'm anticipating that that will give us a sufficient number of jurors from which to start the jury selection.

In addition, we'll go ahead and have those jurors who do not believe that they could be with us for the length of the trial to fill out the hardship questionnaires.

I'll give you some time to look those over to see if there are any that merit any further questioning, but I anticipate we'd have enough jurors.  If we bring in around somewhere between 200 and 250, we should have enough jurors to start jury selection.

We will then begin an examination of the individual jurors for cause.

The Court is going to use an anonymous jury.  The Court finds that that is warranted in this case for the jury to perform its fact-finding function.

Given the media attention that this trial has generated, it seems to me that an anonymous jury will protect the jurors and the integrity of the process and lessen the chances that jurors would be contacted during the course of the trial, and it will prevent them from being exposed to publicity seekers.

Also, the Court finds that given the expressions by jurors in some of the prior trials, an anonymous jury is

warranted in this case.

And I'll also instruct the jury that it's commonplace, at least for this Court, to use that practice and that the use of an anonymous jury has nothing to do with the guilt or innocence of the defendant.

MR. HOCHMAN: Your Honor, may I just note for the record and renew the objection to the anonymous jury and incorporate by reference the prior arguments I made in this regard?

THE COURT: That's fine.

MR. HOCHMAN: Thank you.

MR. FOX: And, Your Honor, I believe you entered an order with fact findings before and I'm assuming you're incorporating that into this ruling today?

THE COURT: I am, and I will issue some additional findings.

MR. FOX: Thank you.

THE COURT: I noticed -- I believe the Court has provided the parties with a copy of the criminal case questionnaire that we used the last time. If you have any comments about that questionnaire, I can either take those now or we can set aside some time prior to the start of jury selection to review those comments.

MR. FOX: Your Honor, I think that the parties have worked well before in proposing voir dire questions, and I

think depending on some of your rulings today that it may affect what our voir dire questions that we propose will be.

So if it's okay, Your Honor, I'd like to be able to spend some time with the defense and discuss the potential voir dire questions as it relates to that form and then come back here at a different time.

MR. HOCHMAN:  That's fine, Your Honor.  Assuming it's fine with the Court, it's fine with the defense, Your Honor.

THE COURT:  All right.  When do you anticipate being in a position to submit those?

MR. FOX:  We need to have a meet and confer on jury instructions as well because we proposed some new ones, so I believe that if we can do that over the next couple days and then maybe come back Thursday -- Wednesday afternoon or Thursday, we should be fine.

MR. HOCHMAN:  And we may or may not need a hearing, Your Honor.  If we could perhaps have a joint e-mail to your court clerk if we're in agreement, and then the Court can decide, perhaps, if it wants to actually have a hearing on it before the trial starts.

MR. FOX:  That's fine, Your Honor.

THE COURT:  All right.  All right.  The government has filed a motion -- two motions in limine, one concerning the Sheriff's lapel pin and another on good deeds.

Do you wish to be heard on those?

MR. FOX:  Your Honor, just briefly.

Just on the lapel pin, he continues to wear it to court.  It is his way of communicating with the jury, and in trial, there's only one way for him to communicate with the jury, and -- well, two ways.  One is through his counsel or the other one is to go on the stand and testify.

It's not proper for him to sit there and communicate with the jury, especially in light of the fact that his counsel objected and claimed it would be prosecutorial misconduct if we commented on it in argument, and also in light of his supporters being in court wearing the same pins, calling a witness to the stand who is wearing the same pin.

So we believe that it's a way that he is improperly inserting testimony into this without being subject to cross-examination, and we think Your Honor has certainly the ability to control what happens in the courtroom, and we believe that it's well within your discretion and appropriate for you to order him not to wear the lapel pin at trial.

THE COURT:  All right.

MR. HOCHMAN:  Your Honor, on the law that deals with this subject, the cases have focused on the defendants having the right to a fair trial, as well as the public and the government as well.

The issues in the cases in which this has come up have been normally when the defense is complaining about the

prosecutor or people in the gallery wearing certain pins.

In other words, in a case involving sexual assault, one of the cases had members of the gallery wearing actually either -- T-shirts, I believe, that had the victim's face on it, and the Court said that that was prejudicial to the defendant getting a fair trial.

The courts have actually looked at a prosecutor wearing a lapel pin with the US flag in it and did not find that as impinging on a fair trial, and to the extent that it did find one instance where it did, it was right at the Persian Gulf situation when the US was about to go to war, and they found in those circumstances that that could be sending an impermissible message.

If Sheriff Baca was not on trial for being Sheriff Baca, if this was, for instance, a commercial dispute and the fact that he was sheriff would never come up in the case, then certainly one could see that him trying to establish some advantage by introducing the notion that he was sheriff at one point could be perceived as skewing the trial.  But here the entire reason why he is on trial is because he was the Sheriff of the Los Angeles County Sheriff's Department.

The government actually in its own motion doesn't know which way to ascribe how a jury is going to perceive the pin.  Are they going to perceive it that it reaffirms the fact that he's Sheriff Baca and the fact that he is Sheriff Baca is

exactly why the government thinks he's guilty of these crimes or is it somehow communicating -- and this is the message I'm not exactly sure, although the government thinks it inflames the sympathies of the jurors -- based on no evidence, by the way, but that somehow him wearing this pin -- obviously, he was Sheriff Baca.  The whole case is about him being Sheriff Baca.  He wears a pin because he has always worn a pin.  He wore a pin when he was sheriff.  He's worn it every day that he goes out, Your Honor.  He has worn it at every hearing in here whether the jury was in the court or not in the court.

It's not something that he is in any way trying to do unique to this trial or that would establish that he is Sheriff Baca in a way that this trial is not going to be completely about.

Your Honor, I -- you know, people wear insignias or they wear rings.  I wear a class ring that -- you know, I've been wearing for -- since I graduated college, Your Honor.  It doesn't necessarily mean that I'm still a student at that college, that somehow the college is unified around me.  It just means that I wear the ring because I hold a -- I was part of the university way back when.

Sheriff Baca, again, is wearing a lapel pin that, you know, from -- my eyes aren't that great.  I'm probably about eight feet from him.  You can somewhat make out it's gold.  Whether or not it actually has stars, it -- my vision is not

great.

The jury is going to be at least 20 to 30 feet away from him, and to ascribe some type of power of this particular lapel pin that it communicates favorable testimony that somehow says he's, I don't know, somehow unified with the current sheriff's department, I don't -- the government writes that, but I can't see how it would communicate that.

Inflames the sympathies of the jury?  Well, the whole trial is about him being Sheriff Baca, so there's nothing particularly inflammatory about him saying he was Sheriff Baca and part of the Los Angeles County Sheriff's Department for 48 years, which are the facts that the government witnesses are going to present repeatedly.

So, again, to the extent that the legal standard dealing with this is one dealing with a fair trial and the situations in which a Court has excluded a particular witness or a defendant wearing something has been where it's been an inflammatory situation.

I do not believe a one-inch lapel pin that Sheriff Baca has been wearing -- it will be, if anything, cumulative of all of the evidence that he is the sheriff -- in any way prejudices certainly his rights to a fair trial or the government's right to a fair trial.

THE COURT:  All right.

MR. FOX:  If I may just briefly respond.

It's very clear.  I'm sitting 15 feet away from Mr. Baca, and my middle-aged, unaided eyes can tell that that is a sheriff's star.  I'm right next to the jury box.  And there will be younger eyes certainly in that jury box.  It's clear what it is.

Still to this day, despite the litigation, despite us raising this in previous hearings, Mr. Hochman has not offered one legitimate reason for him to be wearing that lapel pin.  He doesn't have a First Amendment right to do that.  He has no right to try to testify in front of the jury, and that's exactly what he's trying to do.

Thank you, Your Honor.

THE COURT:  All right.  Reviewing the papers here, I don't find the defendant's provided any reason why it's necessary to wear that pin, and whatever slight interest the defendant may have in wearing the lapel pin in the presence of the jurors is outweighed by the potential prejudice the government may suffer from the jury's exposure to that lapel pin, and, therefore, the Court in the exercise of its discretion and under its inherent authority and consistent with the Federal Rules of Evidence Rule 403, the Court orders the defendant not to wear that lapel pin in the presence of the jury in the upcoming trial.

And that also covers -- I think in this new courtroom there were occasions where the defendant and the jurors may

come into contact -- in the lunchroom, for example -- so that includes wearing it there as well.

All right. And I believe the government has also renewed its motion in limine to preclude the defendant from introducing evidence or argument of the defendant's good works or remedial measures.

MR. FOX: Yes, Your Honor.

This is very simple. We tried to raise it before and the defense said, well, it's not very clear what is going to come in as evidence, and I think Your Honor rightfully waited and decided let's see how the trial looks.

It puts us in a difficult position in front of a jury, objecting when what we think is prejudicial evidence is being asked about by the defense both in cross-examination and then in their case-in-chief. So we think it's very appropriate for you to deal with these issues now when it's very clear what the issues are.

We are going to be arguing, as we did before, that Mr. Baca believed that the sheriff's department should police itself and that the federal government and the federal grand jury should not be looking at them.

If you look at the items that we detail as being impermissible by the defense, not one of them is probative of his intent and not one of them rebuts our theory of his motive here.

We have agreed that we will not introduce the notice evidence that he was aware of the issues within the jail in our case-in-chief, and as a result, Mr. Hochman doesn't need to elicit these issues from witnesses because there's nothing to rebut on that issue.

So unless Your Honor has questions about any specific category, I'll be happy to wait until Mr. Hochman's response to reply to that.

THE COURT:  All right.  Mr. Hochman.

MR. HOCHMAN:  Your Honor, with respect to the evidence that we anticipate coming in dealing with the issues of inmate beatings, while it is true that the government apparently is not going to be introducing some evidence of it, they are going to be introducing other evidence of it.

So, for instance, they anticipate introducing the evidence coming in from Special Agent Leah Tanner that she interviewed somewhere between 20 and 25 different inmates, all of whom were complaining of inmate beatings and various civil rights violations.

They're going to introduce similar evidence through Special Agent David Dahle.  They're going to be introducing evidence through former Deputy Sheriff Gilbert Michel about his beating of inmates.  They're going to be introducing evidence from former -- or current -- former or current Deputy Courson in which he apparently is also going to testify about his

viewing inappropriate situations of civil rights violations in the jails.

So when the government says that this trial will effectively be stripped of this type of evidence, thereby then saying that the Sheriff should not be able to then say what he is doing in connection with these inmate beatings, I believe the jury would then get a very one-sided picture that you have all these inmate beatings going on.  He's the sheriff of the department in which all these inmate beatings is going on and he somehow, some way has taken absolutely no steps to address it.

So I think with respect -- if the government were to cleanse its whole case of inmate beatings and they wouldn't have any of the other individuals testifying about inmate beatings and all we were dealing with was the situation of a cell phone and nothing more, that would be a different situation, Your Honor.

But to the extent they are going to, through at least four witnesses and maybe more, repeatedly bring up to the jury the highly inflammatory and highly prejudicial testimony -- if Your Honor recalls for instance with Gilbert Michel, when he talks about the way he kicked and stomped on and beat a particular inmate in graphic terms, this is highly emotionally charged testimony the jury can't possibly put out of its mind even though the Court gave the appropriate limiting

instruction.

And so we're faced with, you know, a very distorted record if we can't introduce some of the contemporaneous steps that Sheriff Baca was engaging in to actually deal with these inmate beatings.

So that sort of is an opening response to their notion that they're changing the calculations here. They're not really changing it in terms of the very highly prejudicial evidence they intend to introduce for a very limited purpose, because, again, what they have told me is the reason Agent Tanner is going to testify about getting 20 to 25 interviews of inmates dealing with civil rights violations is to show why she was in the jails in the first place, and how she then came across Anthony Brown who then turned her on to this public corruption investigation of Gilbert Michel and somehow they need this highly prejudicial side of their testimony dealing with inmate beatings and abuse to then set the -- to contextualize why she's in the jail to begin with and presumably also explain why certain grand jury subpoenas are sent to the Los Angeles Sheriff's Department during that summer.

Again, if the government wants to cleanse its case of that and just focus on the cell phone and whether or not Sheriff Baca participated in a conspiracy to somehow obstruct the investigation into that cell phone and into Anthony Brown,

then that would be a different trial than the government is proposing.

So with the trial that they're proposing -- and then they also -- the other thing that they -- that the evidence is going to show as slightly different than Mr. Fox represents is this.

What he says is that Sheriff Baca says on more than one occasion, "The police should police themselves," and they're trying to say that is the sheriff's intent, that is his motivation, that is why he doesn't want the FBI around, because the sheriff's department can police itself.

What he always says, whether it was the interview he had in April of 2013 or the Good Day LA tape -- taped interview he had on September 26 of 2011 is that, "Yes, the police should police itself, but we also have the Office of Independent Review which has civil rights lawyers that assist us in doing so."

That is both in the Good Day LA tape and it is in the interview back on April 12, 2013.

So his concept of the police policing themselves is not just, for instance, the Internal Affairs Bureau, the Internal Criminal Investigations Bureau, but also the Office of Independent Review, which he set up back in 2001. He helped create it. He helped establish it.

You heard from Mr. Gennaco on the stand -- and they

brought in Mr. Gennaco, not just --

THE COURT:  How's that -- how's that like if I -- you know, I didn't run red lights in 2001 but then I ran a red light in 2010?

MR. HOCHMAN:  Well, I think, Your Honor, what it shows -- I don't exactly know the analogy as it pertains here, but to the extent that Mr. Gennaco is actually involved in the exact time frame, the exact events that we're dealing with in August and September of 2011, he is very involved, Your Honor. He's at the key meetings.  He's having conversations with Mr. Baca.  He's dealing with all the different players, whether it's the FBI, the US Attorney's office, the other people that are involved with the jails, the federal judge, Judge Pregerson.

You know, again, to the extent that the Office of Independent Review is a very important part, then I think the jury needs to know that, well, did the --

THE COURT:  It was established ten years prior to the alleged conspiracy.

MR. HOCHMAN:  Well, I think the question is can the -- what is the significance of testimony that it was established ten years before in 2001 as opposed to just was established in 2011, I think that's where we need to provide the context for the Office of Independent Review's actions, Your Honor, and why Sheriff Baca could rely on them that --

they didn't just get established, Your Honor.  They have a ten-year track history of working with the sheriff's department, getting to know the sheriff's department, its processes, its reviews.

Imagine if he was saying in the Good Day LA interview on September 26, 2011, "We police ourselves and we rely on the Office of Independent Review and it was set up two weeks before."  Then the government would come in and say, "It's set up two weeks before.  Of course he can't rely on it.  It's not been up and running.  It's not run by civil rights lawyers.  It has no track history.  It has nothing.  You shouldn't be able to rely on it."

On the other hand, if it's set up ten years before and it has a track history of working with the sheriffs, publishing public reports that are critical of the sheriff's department, doing its realtime review -- now, the government might not think it does much or -- and that sort of goes to the weight of the argument, Your Honor, but to say that the Office of Independent -- did not have a starting time for how long this Office of Independent Review that this very sheriff set up was in place as of 2011 could let the jury think it was just set up, Your Honor, and then that would obviously impact his statement that he thought that the police could police itself with the assistance of the Office of Independent Review if it only existed for two weeks versus ten years.

So I think that that starting point for the Office of Independent Review is very important and -- you know, again because it establishes this track history that goes directly to his intent and the motivation that the government is ascribing to him with respect to this particular crime.

Other aspects, Your Honor, of things that the government is asking to preclude.  They're asking to preclude the steps that the sheriff took in 2009, -10, all the way through June of 2011, which is when Commander Pietrantoni went on a sick leave, Your Honor.

He, as you recall, gave training classes at the Men's Central Jail in connection with use-of-force reduction and different techniques to do that.

Again, to the extent that they're going to say that inmate beatings are going on in Men's Central Jail and they're going to have repeated testimony of that, the steps that the sheriff took at the same time -- because their evidence, Your Honor, goes from at least June 2010, when Special Agent Tanner is doing her first interviews, all the way through our time period of August, September, 2011.

Commander Pietrantoni overlaps most of that time period, Your Honor, in the classes he has given to deal with the allegations that Special Agent Tanner is going to testify about, as well as Special Agent Dahle, as well as Gilbert Michel, as well as Deputy Courson.

So, again, if the government is going to cleanse its entire case, I would agree that there are the -- you know, the probative value of Sheriff Baca's use of a very skilled instructor to teach deputies how to minimize force without resorting to kicking, using their batons, their flashlights, punching and using these other techniques to do it, if the government were to strip its case of that, then that would reduce the probative value.

Since they're going to have it in repeatedly, this contemporaneous action to deal exactly with the force issues -- this isn't any sort of any -- the connection is absolute. Excessive force is going to be proposed. The sheriff is showing how excessive force is going to be reduced.

And, again, it comes in through one witness -- the testimony lasted I believe about 15 minutes -- in a trial that's going to take well over two weeks.

The issue, Your Honor -- the government is trying to preclude -- and on this one, I'm somewhat more perplexed on how and why they're doing it, but they're trying to preclude something that happened in the middle of the conspiracy.

They're saying that the obstruction count, Your Honor, is that Sheriff Baca obstructed a grand jury investigation looking into civil rights violations between August 18th and September 26.

And then they say in their jury instructions that the

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

grand jury investigation is being carried out by the FBI, the US Attorney's office, which are two parts of the United States Department of Justice.

On August 19th, Your Honor -- so the timing is right during the conspiracy -- August 19th, 2011, Sheriff Baca is at a press conference with the head of the Civil Rights Division from the United States Department of Justice doing a civil rights investigation of the sheriff's department.

Now, it's not the Men's Central Jail, Your Honor, but it is the Los Angeles County Sheriff's Department. It is involving Sheriff Baca. It is involving civil rights violations.

And, again, to the extent that they try to distinguish civil civil rights violations from criminal civil rights violations, the United States Department of Justice Civil Rights Division prosecutes them both. And on many occasions, a case will start out --

THE COURT: Doesn't this deal with Section 8 Housing?

MR. HOCHMAN: It dealt with racial discrimination in connection with people -- with sheriffs who are allegedly discriminating against people based on -- who lived in Section 8 Housing. But it was a racial discrimination case, Your Honor.

THE COURT: Okay.

MR. HOCHMAN: So it wasn't a -- it was a civil rights

violation, Your Honor.  That happened to be the topic.  Instead of a jail, it dealt with situations involving Section 8 Housing.

But the important part, Your Honor, is that Sheriff Baca -- again, what Mr. Fox just said is that Sheriff Baca's motivation is that only the police should police themselves, in other words, only the Los Angeles County Sheriff's Department should deal with all civil rights violations, including those out in Lancaster dealing with racial discrimination applying to Section 8 Housing people.

And that couldn't be farther from the truth in this exact time period that he's willing to partner, because that would be the evidence, with the Civil Rights Division of the very United States Department of Justice that they're accusing him of not wanting to partner with.

You just heard Mr. Fox say that their theory is that he did not want to partner, did not want to work with the United States Department of Justice --

THE COURT:  You know, I was actually here for the last trial, so I've heard all this before.

MR. HOCHMAN:  Correct, but in the last trial, Your Honor, the government did not seek to strike that testimony.  They --

THE COURT:  If they had, they probably had a pretty good shot at getting it stricken because I don't find it

relevant at all to these accusations.

MR. HOCHMAN:  Well, again, Your Honor, I'm trying to -- you know, the accusation is that Sheriff Baca obstructed a civil rights investigation conducted by the federal government.  At the very same time, he's cooperating and not obstructing with a civil rights investigation being conducted by the federal government.

So, again, it might go to the weight of the evidence. Mr. Fox might say, "Well, ladies and gentlemen of the jury, it's a different -- it's a civil civil rights investigation. It involves Section 8 Housing and not the Men's Central Jail," but you couldn't have a much closer aligned set of facts.

In fact, when the government points out under 404(b), for instance, the various factors, it meets every one of those factors.

The evidence will be concrete.  It's not like we have to -- what we're dealing with are hearsay or insinuations. It's actual evidence.  A press conference actually occurs on August 19.  It's not remote in time, Your Honor.  It's exactly at the same exact time.

It certainly goes to an element of the offense: Intent and motivation.  And the government ascribes, as you heard, the very motivation that he -- that the sheriff's department wants to police itself.  Well, here it's not policing itself.  It's not going ahead and just saying, "Civil

Rights Division, we can police ourselves.  We don't want you around.  We can deal with the Section 8 civil rights violations," "We want you there.  We're willing to cooperate with you."  So it couldn't more precisely meet the factors.

And, obviously, it's very probative evidence.  It couldn't meet those factors that the government itself lays out for 404(b) better than if -- I mean, the only thing potentially missing is if somehow the Civil Rights Division from Washington, DC, was conducting a civil civil rights violation of some other Twin Towers or Men's Central Jail as opposed to the Lancaster station that it was focused on -- Lancaster/Palmdale.

So, again, Your Honor, I believe under the government's test that it set forth -- legal test that it set forth to the Court, it meets every single element in connection with -- in connection with the 404(b) test.

Your Honor, the other aspects of the government's motion in limine include two other parts, Your Honor.  One is the --

THE COURT:  And I don't -- really don't -- unless you have something new to say that isn't in the papers, I really don't need to hear it again because I've read the papers.

MR. HOCHMAN:  Yes, Your Honor.

May I have a moment, Your Honor?

THE COURT:  Yes.

MR. HOCHMAN:  Your Honor, I think the only part that I don't think I brought out -- again, because the government -- I didn't have a chance to reply to the government's reply -- is the timing aspect of this.

And, again, if Your Honor is already cognizant of it because of the other arguments I've made, please let me know and I won't go further, but the brief argument on this is that with the first trial, we were dealing with a concrete time period, August 18th to September 26, 2011.  That's the end of the obstruction of justice.  Here we're dealing with -- we're adding an additional charge that goes all the way to April 12th, 2013.

So why -- so part of the motivation, part of the intent evidence that the government is going to have to show for why Sheriff Baca allegedly lied during that interview is that he was presumably either covering up or minimizing his role back in -- you know, in the obstruction from 2011.

I believe that since we're dealing with that time frame of what he was then thinking on April 12th, 2013, as opposed to September 26 of 2011 allows the additional evidence that the Court struck, in part, because it occurred after September 26, 2011.

And in that regard, I'm referring to the Commander's Management Task Force which started in October of 2011 and the EBI program, the Education-based Incarceration, which also -- a

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

large part of that occurred starting in October 2011 in response to the situations that had gone on in the jail that are in the August and September 2011 time frame.

So the reason I bring up this, Your Honor, is that to the extent that part of the Court's rationale in striking those two things, the EBI program and the Commander's Management Task Force was because they postdated the crimes charged in the first trial. We don't have that here in the second trial.

Unless the Court has any further questions.

THE COURT: No.

MR. FOX: Your Honor, Mr. Hochman questions the relevance of the evidence of the beatings, and at the same time he argued extensively throughout trial that the FBI made many mistakes, that they made rookie mistakes, that they conducted a dangerous operation, and that they shouldn't have done it. And the evidence that there were serious beatings going on directly rebuts that evidence and explains why the FBI took the steps that they did.

So that evidence is relevant not to show Mr. Baca's knowledge of the beatings but to show why the FBI took the steps that they did.

With Mr. Michel, we're happy to scale back. And, in fact, Ms. Rhodes and I were just discussing scaling back the specifics of his beatings. If the defense isn't going to go into the specifics of those beatings, we are happy to just

generally explain that he was involved in beatings and that he had partners who were involved in beatings as well.

We don't need to get into him kicking, stomping, anything like that.  If the defense isn't going to be getting into it, we don't have to front it.

With respect to OIR, Your Honor has it exactly right. It was started up in 2001 and the Board of Supervisors, I believe, actually implemented it.

So Mr. Baca is trying to take credit for something that the Board of Supervisors was at least equally, if not more involved in, but it's so remote in time.

What Mr. Hochman really wants to get out of it is exactly what is going to be coming out of it anyway from his statements on Good Day LA and his statements in the interview that we conducted of Mr. Baca in April 2013.  He discusses OIR, what it is and that there are civil rights lawyers already there.  That's the only purpose for getting out this evidence.

Mr. Hochman is trying to see a slightly open door and blow it wide open by trying to get in all of this stuff regarding Judge Pregerson, the ACLU, conversations that Mr. Gennaco had with Mr. Baca.  It's just his showing what kind of a waste of time it's going to be and the jury confusion that will result.

And this is not a case about whether the sheriff's department should have been allowed to police themselves.

That's not for the jury to decide; congress has decided that.

There are laws in place that say the sheriff's department, just like any law enforcement agency, is not allowed to police itself, that the FBI and the Department of Justice have every right to investigate these type of issues, an important right to investigate these types of issues, especially when you're dealing with systemic problems like we've seen.

With respect to Mr. Pietrantoni, Mr. Hochman wants to say look at all these great things that Mr. Baca did, and the only way for us to rebut that is to show that Mr. Baca has been held liable in civil cases, including a report I just saw over the weekend, for hundreds of thousand of dollars for a pattern and practice in systemic violations that he did nothing to fix.

Juries have found that, and we don't want to be going down this rabbit hole of trying to decide was this enough that he was doing, was it not enough.  It's not what this trial is about or should be about.  It's going to be a 403 issue throughout.

With respect to Mr. Baca standing at a press conference with Mr. Perez and saying that he was going to be cooperating with the Department of Justice in a civil civil rights investigation, that's all their evidence was, lip service, that he just stood up there and said, "I'm cooperating with this."

404(b) requires there to be acts, not just statements.  To the extent it's just a statement, it's hearsay and it's not admissible.  It's a hearsay statement.  There are no acts that Mr. Hochman proposes showing that Mr. Baca engaged in to cooperate, so it is just inadmissible evidence.

That also, as we've pointed out, was not a grand jury investigation, it was not a criminal investigation, so it is not in line, as Mr. Hochman would like you to believe.

And, finally, with respect to the Commander's Management Task Force and education-based initiatives, again, this happens after the conspiracy has ended.  It does not rebut the motive, does not rebut the intent.  It is not in line with his intent at all and has nothing to do with whether he was intending to obstruct a grand jury investigation.

The fact that he lied about his role in April 2013 has nothing to do with whether the conspiracy ended and the acts that he took between the end of the conspiracy and his false statements to us.

Unless Your Honor has any questions, thank you.

THE COURT:  No, I don't.

MR. FOX:  And, Your Honor, it's just been pointed out to me that Mr. Baca also has cuff links with stars on them, and to the extent that he's wearing them during trial, it will be the same issue.  We ask that you preclude him from wearing those.

MR. HOCHMAN:  Your Honor, may I respond briefly to the points raised by counsel?

THE COURT:  No.

All right.  This is a motion brought by the government to preclude the defense from introducing evidence that he had an associate teach wrestling moves to deputies in 2009 and 2010; implemented an Office of Independent Review more than a decade before the federal investigation; created a task force to review force incidents after the conspiracy to obstruct justice ended; began a program, the Education-based Incarceration designed to provide schooling to inmates; cooperated with other federal investigations, including a Department of Justice investigation into the sheriff's department's violating of civil rights of Section 8 Housing occupants; and did not instruct anyone to obstruct an investigation once the County had hired an outside law firm to respond to the federal grand jury subpoena.

In this trial, the government does not plan on introducing evidence that the defendant had notice of civil rights abuses in the jails in its case-in-chief.

Much of this challenged evidence is, therefore, not relevant to rebut a theory that the defendant intended to obstruct a grand jury investigation in this case because he had notice of civil rights violations and did little or nothing to address them.

This evidence is also not relevant because efforts to curtail excessive force resulting from deputies attempting to extricate uncooperative inmates from their cells or to provide educational opportunities in the asserted hope that these opportunities might reduce confrontations between deputies and inmates has nothing to do with the types of unprovoked and retaliatory violence committed by deputies that were the subjects of the grand jury's investigation.

Situations where deputies may have needed to use some force but resorted to using excessive force have little, if anything, to do with situations where no force was justified in the first instance.

The defendant's role in the creation of the Office of Independent Review some ten years prior to the alleged conspiracy is not relevant to the obstruction of justice he is alleged to have participated in.

That the defendant may have cooperated with the civil investigation he was informed of and provided with an opportunity to partner in has little, if any, relevance to rebut the government's theory that he viewed an undercover federal investigation as a personal affront and a threat to his authority and his control of the sheriff's department.

Even if minimally relevant, this evidence is not admissible under the Federal Rules of Evidence under 404(b) and 405 because it's evidence of other acts used for the purposes

of establishing the defendant's good character.

Finally, the Court sustains the government's Rule 403 objection to all of this evidence.

The evidence has minimally probative value, is substantially outweighed by the danger of prejudice, confusing the issues, misleading the jury, undue delay and a waste of time, and the Court, therefore, grants the motion -- the government's motion in limine.

Now, I think that deals with the motions that were pending.

When do the parties anticipate providing the Court with jury instructions?

MR. HOCHMAN:  Thursday, Your Honor.

I think we're going to meet and confer as well with the voir dire, and by Thursday we should have the jury instructions.  Other than probably one or two that would deal with Counts One and Two, the new jury instructions will be the Count Three jury instructions, Your Honor.

MR. FOX:  Your Honor, I believe we submitted jury instructions already on all three counts, but we had additional -- we have decided we're going to try to alter some of the jury instructions.  I sent that to the defense I think a week ago or so.  So we need to have a discussion with them about the additional jury instructions, but I think that we already have jury instructions on Count Three.  Regardless,

we'll meet and confer on it.

Can I ask Your Honor if we can provide those -- I think if we meet and confer on Wednesday, we can file them by Thursday for sure, and I don't think there are going to be very many additional jury instructions.  Will that work?

THE COURT:  That's fine.

Let me see if I understand.  Are there disputed instructions as to Counts One and Two?

MR. FOX:  We don't know yet because we proposed additional instructions to the defense about a week ago and we have not received a response.

MR. HOCHMAN:  Yeah, we're working on the response, Your Honor.  We're going to meet and confer in the next day or two and have it together to give to you on Thursday, Your Honor.

To the extent we can't work out language amongst us, we'll propose them as disputed.  To the extent we can, we'll propose it as agreed upon.

THE COURT:  Are there any other disputed instructions other than as to Counts One and Two?

MR. HOCHMAN:  If you recall, Your Honor, we had maintained and we still maintain that obstruction of justice issue.  We'll have that again as far as the instruction, although, then we'll have the backup instruction that if we don't agree with our obstruction of justice language, then

we'll have agreed-to other language in the alternative, Your Honor.

MR. FOX:  Your Honor, I have a vague recollection of the bribery instruction that they proposed.  I'm not sure if that's what Mr. Hochman is referring to.

MR. HOCHMAN:  That's correct, Your Honor.

THE COURT:  Okay.  And other than that --

MR. HOCHMAN:  Other than that, the only thing that -- one of the things we were waiting for, Your Honor, is in the -- if you recall, with respect to that April 2013 interview, we had filed a joint motion in limine dealing with adding certain additional parts.  I think we identified ten different parts under Rule 106.

At the time Your Honor looked at it, you said there may have been a couple that you were thinking about and you'd let us know.  I think we're still in the you'd-let-us-know period.

THE COURT:  Okay.  I'm going to take care of that in a moment.

MR. HOCHMAN:  Okay.

MR. FOX:  Yes, Your Honor. And along with that, the Dr. Spar issue is also another one that is still pending.

The government was also interested in finding out from Your Honor if we need to file a trial memo, given that you've heard this case once before, and we filed the trial memo

when the counts were joined previously.  We are happy to provide you with a trial memo, but it may just be a waste of paper.  If you want one, we will provide it to you.

THE COURT:  No.  If you've already provided it, I don't think I need it.

MR. FOX:  Okay.  And then the other issue is with respect to witness statements.

We have provided to you witness statements already. For the most part, the only new witness statements came out during trial.  We have met with some witnesses in the past couple of weeks, and we can provide you with additional witness statements of what's new or we can provide you with everything again, whatever you would prefer.

THE COURT:  I think I'll just need the new ones.  Let me confirm that if I need anything additional, I'll send out an order.

MR. FOX:  Thank you, Your Honor.

THE COURT:  Okay.  As to the joint motion under 106, I've reviewed that, and to the extent that the defense wanted to supplement what the government intended to play, to the extent the defense wants to supplement, that motion is denied, and the government will be free to play the recordings that it shows without supplementing those with the defense's suggested supplements.

Yes.

MR. HOCHMAN:  And I think, again, whittling down that list of ten to just a few, there were situations, Your Honor, where the government provided an answer without a question -- that was one example -- and provided a situation where they provided half the answer and didn't provide the rest of the answer.

Even if we don't include additional questions and answers that follow a particular question and answer the government wants, I'd ask the Court to at least consider those limited situations where the government is cutting off an answer mid answer or didn't include a question unless the government has certain -- has already rectified the situation where they put an answer down without the question that it was answering.

THE COURT:  Okay.

MS. RHODES:  Your Honor, Mr. Hochman is not precise in his language, but there is one instance where the question is -- that the government does not wish to elicit is, "Do you" -- and Mr. Baca then goes off on something that is exculpatory.

There is also a statement by Mr. Baca which becomes completely exculpatory and is not following the last question, so I don't think there's anything that needs to be further added.

THE COURT:  I think Mr. Hochman had raised these

issues before in the motion and the Court has ruled.

As to Dr. Spar, in reviewing the government's motion, the Court uncovered some Ninth Circuit cases which I think are instructive on this issue. I want to take another look at those cases and do some further research.

The parties are -- the parties can call the clerk on Friday morning, and we'll give -- the clerk will be able to tell you the Court's ruling on that motion, and then at our next appearance, I'll either provide a written opinion for the reasons for the motion -- for the ruling on the motion or I'll state those on the record.

MR. HOCHMAN: And does the Court -- I think we had started drafting -- or I don't even know. I think we might have filed a limiting instruction that the Court had asked us about. To the extent -- a limine instruction would be how the jury is to consider Dr. Spar's testimony only for Count Three and not for Counts One and Two.

I think -- Mr. Fox, do you recall us drafting it? I don't know if we actually filed it with the Court.

MR. FOX: We filed it, Your Honor. I think you approved it even.

THE COURT: I have it.

MR. HOCHMAN: Okay. Thank you.

MR. FOX: There's only one other minor issue that we'd like to bring up.

Case 2:16-cr-00066-PA    Document 401    Filed 08/10/17    Page 41 of 43    Page ID #:9058

Your court reporter listened to a lot of arguments and a lot of statements during the trial.  At the conclusion of the trial, we believe that while we were at sidebar -- oh, it was in open court -- that there was a mistake in her transcripts.  And I can provide it -- and I'll show it to Mr. Hochman if you like, and I'll provide it to you.

Basically, she wrote down that you said that you found that there were "terribly" complex issues in this trial, and we think what you said -- our notes reflected what you said was that there were "not terribly" complex issues in this trial.  It's on page 25, lines 18 to 20.

And whether Your Honor misspoke, which I don't think you did, because our notes both reflected that you said "not terribly" complex or whether she got it wrong, I'm just concerned that the record now shows that you said something that I don't think you meant or didn't, in fact, say.

THE COURT:  If that's what the record says, then either I misspoke or the reporter got it wrong because the issues were not terribly complex in this prior case, and that's what the Court -- that's what I thought I said, and it's certainly what I intended to say, and I don't think anybody disagrees with that.

Okay.  Anything else?

MR. FOX:  No, Your Honor.  Thank you.

MR. HOCHMAN:  What time would you like us to come --

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

you'll let us know, obviously, if we're going to start Tuesday or Wednesday.  It would be an 8:30 start as we've done before, Your Honor?

THE COURT:  It will.

MR. HOCHMAN:  And the start will be in the ceremonial courtroom as we did before, Your Honor?

THE COURT:  Correct.

MR. HOCHMAN:  Very good.  Nothing further, Your Honor.

THE COURT:  Thank you very much.

*(Proceedings concluded 4:07 P.M.)*

--oOo--

CERTIFICATE

I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Date: MAY 22, 2017

/s/  Cindy L. Nirenberg, CSR No. 5059

Official Court Reporter

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA