UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE PERCY ANDERSON, U.S. DISTRICT JUDGE

- - -

UNITED STATES OF AMERICA,　　　　　 )
　　　　　　　　　　　　　　　　　　　 )
　　　　　　　　　 PLAINTIFF,　　 )
　　　　　　　　　　　　　　　　　　　 )
　　　　　　 vs.　　　　　　　　　 ) No. CR16-66(A)-PA
　　　　　　　　　　　　　　　　　　　 )
LEROY BACA,　　　　　　　　　　　　 )
　　　　　　　　　　　　　　　　　　　 )
　　　　　　　　　 DEFENDANT.　　 )
_____)

REPORTER'S TRANSCRIPT OF SENTENCING

LOS ANGELES, CALIFORNIA

FRIDAY, MAY 12, 2017

8:37 A.M.

_____

CINDY L. NIRENBERG, CSR 5059, FCRR
U.S. Official Court Reporter
350 W. 1st Street, #4455
Los Angeles, CA 90012
*www.msfedreporter.com*

APPEARANCES OF COUNSEL:

FOR THE PLAINTIFF:
                    OFFICE OF THE UNITED STATES ATTORNEY
                    BY: BRANDON FOX,
                        ASSISTANT U.S. ATTORNEY
                        EDDIE A. JAUREGUI,
                        ASSISTANT U.S. ATTORNEY
                        LIZABETH A. RHODES,
                        ASSISTANT U.S. ATTORNEY
                    312 NORTH SPRING STREET
                    13TH FLOOR
                    LOS ANGELES, CA 90012
                    213-894-2434

FOR THE DEFENDANT:
                    MORGAN LEWIS & BOCKIUS
                    BY: NATHAN J. HOCHMAN, ATTORNEY AT LAW
                        BRIANNA L. ABRAMS, ATTORNEY AT LAW
                    THE WATER GARDEN
                    1601 CLOVERFIELD BOULEVARD
                    SUITE 2050 NORTH
                    SANTA MONICA, CA 90404
                    310-255-9025

ALSO PRESENT:
                    LEAH TANNER, FBI SPECIAL AGENT

I N D E X

|                                          | PAGE |
| ---------------------------------------- | ---- |
| RULINGS BY THE COURT                      | 6    |
| MR. HOCHMAN                               | 11   |
| MR. FOX                                   | 38   |
| PRONOUNCEMENT OF SENTENCE BY THE COURT     | 53   |
| DISCUSSION HELD AT SIDEBAR (SEALED)        | 57   |

LOS ANGELES, CALIFORNIA; FRIDAY, MAY 12, 2017

8:37 A.M.

- - - - -

THE CLERK:  Calling item Number 1, CR16-66(A)-PA, USA versus Leroy Baca.

Counsel, state your appearances for the record.

MR. FOX:  Good morning, Your Honor.  Brandon Fox, Lizabeth Rhoads and Eddie Jauregui on behalf of the United States.

THE COURT:  Good morning.

MR. HOCHMAN:  Good morning, Your Honor.  Nathan Hochman and Brianna Abrams on behalf of defendant Leroy Baca, who is present, Your Honor.

THE COURT:  Good morning.

MR. HOCHMAN:  Good morning.

THE COURT:  All right.  Please be seated.

All right.  This matter is before the Court for the pronouncement of judgment and the imposition of sentence.

Is there any reason why judgment and sentence should not be imposed at this time?

MR. FOX:  No, Your Honor.

MR. HOCHMAN:  No, Your Honor.

THE COURT:  The Court provided the parties notice of conditions of supervised release and/or probation that it is contemplating imposing in this case.

Did each side receive those?

MR. FOX:  Yes, Your Honor.

MR. HOCHMAN:  Yes, Your Honor.

THE COURT:  Any objections to any of those conditions?

MR. FOX:  No, Your Honor.

MR. HOCHMAN:  No, Your Honor.

THE COURT:  Was the Pre-sentence Report timely disclosed to both parties?

MR. FOX:  Yes, Your Honor.

MR. HOCHMAN:  Yes, Your Honor.

THE COURT:  Actually, I don't believe it was.

MR. FOX:  Your Honor, the original Pre-sentence Report was disclosed on April 8th of 2016.  This was the revised version, so we believe that it was timely disclosed.

THE COURT:  Well, I think out of an abundance of caution, since the Revised Pre-sentence Report dealt with new counts, came up with a new guideline calculation, I believe the defendant's entitled to 35 days from receipt of the Revised Pre-sentence Report before he is sentenced.

MR. HOCHMAN:  Your Honor, we're willing to proceed today.  We've had a chance to review the report, respond with objections to the report, prepare a sentencing position for the Court.

THE COURT:  All right.  So the defendant's willing to

waive time?

MR. HOCHMAN:  Yes, Your Honor.

THE COURT:  Is the government willing to waive time?

MR. FOX:  Yes, Your Honor.

THE COURT:  The Court has received, read and considered the Pre-sentence Report, the Revised Pre-sentence Report, an addendum to the Pre-sentence Report, a second addendum, the parties' sentencing memoranda, as well as letters received on behalf of the defendant.

Apart from any issues raised in your sentencing memoranda, which the Court will address shortly, is the Pre-sentence Report factually accurate?  Do you have any objections, corrections or additions?

MR. FOX:  Nothing from the government, Your Honor.

MR. HOCHMAN:  Nothing beyond what's been submitted, Your Honor.

THE COURT:  All right.  I'm going to address objections that were provided by the defense.

I believe there was an objection to paragraph 31. The Court has reviewed that and that objection is overruled.

There was also an objection to paragraph 34.  The Court believes that that proposed language will not affect the calculation of the guidelines, and to the extent it's offered in mitigation, the Court has considered it in formulating its sentence in this case.

There was also an objection to paragraph 35. The Court finds that that proposed addition will not affect the calculation of the guidelines nor will it affect the sentence in this case.

There was an objection to paragraph 36, and that objection is overruled.

There was also an objection to paragraph 37. To the extent the defense wanted to insert the language "without his permission" pertaining to Mr. Tanaka's instruction, the Court will direct that that addition be added. The other proposed change is overruled.

As to paragraph 42, the Court finds that that proposed change will play no role in the calculation of the guidelines. To the extent it's offered in mitigation, the Court has considered it. The government has argued that -- the language, "It's okay. It's a chess game," that will be added to the Pre-sentence Report to paragraph 42.

There was also an objection to paragraphs 44, 46 and 48. The suggested additions to paragraphs 44, 46 and 48 are immaterial to calculating the guideline range; however, the Court will consider them to the extent they're offered in mitigation in arriving at a sentence in this case.

The suggested revision to paragraph 49 is overruled. There is sufficient evidence to support the language in the Pre-sentence Report.

Paragraph 50, the Court finds that that language is immaterial.  There was an objection to paragraph 50, and there was a suggested addition, and the Court finds that this additional language is immaterial to the calculation of the guidelines and is irrelevant as to the sentence in this case.

There was also an objection to paragraph 51, Footnote 6.  The Court finds that those proposed additions are immaterial to the calculation of the guidelines.  To the extent they're offered in mitigation, the Court will consider those additions in determining an appropriate sentence in this case.

There was an objection to paragraph 52.  These additions are immaterial to the calculation of the guidelines. And to the extent they are offered in mitigation, the Court will consider them in formulating its sentence.

There was an objection to paragraphs 53, 55, 56 and 57.  The Court again finds that they are immaterial to the calculation of the guidelines.  And to the extent they're offered in mitigation, the Court will consider those arguments.

There was an objection to paragraph 59.  The Court finds that that addition is immaterial to the calculation of the guidelines.  To the extent it's offered in mitigation, the Court will consider that argument.

There was also an objection to paragraph 60, Footnote 7, and paragraph 61.  Again, the Court finds that those suggested revisions are immaterial to the calculation of

the guidelines.  To the extent it's offered in mitigation, the Court will consider them in formulating its sentence, and that includes Footnote 7, as well as paragraph 61.

I believe there was also an objection to Footnote 8, which I believe is contained in paragraph 61.  The Court finds that that's immaterial to the calculation of the guidelines.

Let me -- yeah, I'm not going to strike it.  I think the probation department can talk to her and she can state her views, so I'm going to deny that objection -- overrule that objection.

Paragraph 62, the Court finds it's immaterial to the calculation of the guidelines.  And to the extent it's offered in mitigation, the Court will consider it in formulating its sentence.

There was also an objection to paragraph 63.  The Court finds that these objections are immaterial to the calculations of the guidelines.  And to the extent it's offered in mitigation, the Court will consider it in formulating its sentence.

The same ruling with respect to paragraph 64 and paragraph 65.

As to paragraph 66, that objection is overruled.

The defendant has also objected to the offense-level computation.  The Court finds that there is no factual or legal basis given for that objection and, therefore, those objections

are overruled.

Paragraph 126, the Court finds that these proposed changes are immaterial to the calculation of the guidelines.

To the extent these are arguments in mitigation, the Court will consider them in formulating its sentence, and these suggestions are also located elsewhere in the Pre-sentence Report.

As to paragraph 128, that objection is overruled.

As to paragraphs 130 and 131, the Court finds that they're immaterial to the calculations of the guidelines and they have been considered by the Court in other submissions offered by the defense.

There was also an objection to the financial condition.  The Court finds that that does not affect the calculation of the guidelines.  To the extent that's an argument in mitigation governing the defendant's ability to pay a fine, it will be considered by the Court.

Now, has the defendant and both counsel read the Pre-sentence Report, the addenda to the Pre-sentence Report?

MR. HOCHMAN:  Yes, Your Honor.

MR. FOX:  Yes, Your Honor.

THE COURT:  And although the guidelines are not mandatory but advisory, has the probation office correctly analyzed and applied the guidelines in this case?

MR. FOX:  Yes, Your Honor.

MR. HOCHMAN:  Based on the facts that the probation officer laid out, yes, Your Honor.  Obviously, we contest the facts, but yes.

THE COURT:  All right.  Does counsel for the defense wish to be heard?

MR. HOCHMAN:  Yes, Your Honor.

Your Honor, from 1987 until 2005, this Court, like every Court, was under some severe restrictions on what could happen during a sentencing.  The sentencing guidelines were not guidelines; they were actually mandates.

In fact, the former chief judge of this district, Terry Hatter, used to always refer to them as the "so-called guidelines" because they were actually not guidelines to a Court; they actually told the Court what it had to do.

So in a situation like that, if the guideline range was 51 months, with very few exceptions, the Court was mandated to sentence within the sentencing guideline range.

Starting in the year 2000 with the cases of Booker and Kimbrough, Gall, Rita, the Court freed the shackles of district courts from applying in a mechanical way the sentencing guidelines and the Court gave advice to courts on how to balance the factors that congress had laid out under 18 USC Section 3553(a), and it basically told the courts that the courts had to engage and look at the person as an individual.  It had to look at every case as a unique case

study in the human failings that sometimes mitigate and sometimes magnify the crime and punishment that should ensue.

Basically, it asks the courts to look at the good and the bad to see what the offense was, but, as importantly, the person who committed the offense, and to balance those and other factors in order to fashion a sentence that was sufficient but not greater than necessary to accomplish the aims of sentencing.

Judge Rakoff in United States versus Allison in some way stated this balancing in a very articulate way.

He said:

"If a man is to receive credit for the good he has done and his immediate misconduct assessed in the context of his overall life, it should be at the time of his sentencing when his very future hangs in the balance.

"The elementary principle of weighing the good with the bad, which is basic to all great religious, moral philosophies and systems of justice was plainly part of what congress had in mind when it directed courts to consider as a necessary sentencing factor the history and characteristics of a defendant."

In United States versus -- or Pepper versus United States, the Supreme Court added that, "Punishment must not merely suit the offense but it must also suit the individual

defendant."

So who is Leroy Baca, Your Honor?  Is he someone who came into his position having a gilded life, not having to basically work for it, given it on a silver spoon and then enjoyed whatever benefit that preceded him thereafter?

Absolutely not.

As the Court is aware, Mr. Baca grew up in East Los Angeles.  His parents didn't raise him, his grandparents did.  He spends his formative years caring for a developmentally disabled uncle who was actually his roommate.

He graduated high school, he graduated college, and two things then dominated Mr. Baca's life:  The pursuit of public service, Your Honor, and the pursuit of education, and where they could cross over at the pursuit of both.

On the pursuit of public service, at the age of 23 in the year of 1965, Mr. Baca joined the Los Angeles County Sheriff's Department.  I was two years old at the time.

And for the next almost 48 years, Mr. Baca served the people of the County of Los Angeles with distinction, with honor, with effectiveness, with his heart, his soul and all his might, Your Honor.

As you have heard repeatedly, Mr. Baca worked 12- to 14-hour days, six to seven days a week to serve the people of Los Angeles.

He also served in the Marine Corps Reserves for six

years.

Public service is what this man's entire life has been about.

And education as well, Your Honor.  Not only did he get his own education, rising actually while he was in the sheriff's department to get a doctorate in public administration when he was 52 years old, but education is what he emphasized when he was sheriff to two groups of people, Your Honor:  To the deputies that served under him -- setting up the Los Angeles County Sheriff's Department University, which has since gradated thousands of deputies with master's degrees, bachelor's degrees, associate degrees, because he viewed the importance of education; if someone was educated, they would understand and be able to appreciate the rights and responsibilities they had to other people -- and inmates, Your Honor.

Sheriff Baca did something that none of his predecessors had done before, that no one actually forced him to do, that he was under no mandate from the county to do, which was to educate inmates.

And why is that?  Because he viewed that the power of education had a rehabilitative aspect on inmates.  That is probably the best and only solution to make sure that they didn't come back again and become recidivists.

So he instituted, starting in approximately 2006,

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

which Your Honor is aware of, a whole broad base of programs under the umbrella of Education-based Incarceration.

Originally, it was a pilot program to see if it would work, to see if actually inmates, if you took the time and the effort and spent the resources to educate them, if that would make any difference to the inmates, to the deputies or to the system at all.

And what he found, which was not surprising for him but surprising for other people in the department, is that it worked, that if you actually gave inmates some hope in their life, that they could emerge from prison or a jail facility with a set of skills, that they would actually work hard while they were in the jail rather than causing trouble, having something to look forward to, and then when they got out they would have something to actually do rather than return to a life of crime.

Thousands of people, thousands of inmates -- and Your Honor has received numerous letters from these inmates -- benefited from Sheriff Baca's visionary vision -- visionary ideas in this respect, ideas that had been lauded by not just the inmates, but by everyone's who looked at them, from clergy who looked at them and dealt with these inmates who have come out, from people from Homeboy Industries who have received these inmates and seen that these inmates are the motivated ones who want to do something with their lives and not return.

One of the interesting letters Your Honor has received was from a gentleman named Cameron Saul.  Cameron Saul in some ways was a typical inmate who went through this situation.  He had been in the Los Angeles County jails not once, not twice, but three times, Your Honor.

His life, as he put it, was set out for a life of crime.  It's all he knew how to do.  In fact, he is one of the inmates who actually wrote a declaration that the ACL submitted as part of its packets of declarations because he was -- he is a gay inmate who suffered abuse, in particular while being a gay inmate in the jails.

But something else happened with Cameron Saul that, again, would not have happened but for Sheriff Baca's ideas and programs dealing with education.

What happened is that Cameron Saul met two deputies who were in charge of Education-based Incarceration for gay inmates because there was a problem integrating the gay inmates and the straight inmates in particular classes, so Sheriff Baca set up a program, put two deputies in charge that focused on the gay inmates, Your Honor, and all of a sudden, Mr. Cameron -- Mr. Cameron Saul, as he relays in his letter to you, says, "I'll go ahead and take a look at it," and participates in one program and then a second program.  And these are programs teaching him there is some value to his life, there is a reason that he can actually exist beyond a

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

life of crime and starting to give him the skills.

He gets to the point, Your Honor, where he starts teaching the class in the jails. It gives him, as he said, someone who is prone to fights, someone who is prone to causing trouble in jail, something to wake up to in the morning and do productively.

He credits that 100 percent to Sheriff Baca, who he had direct contact with at the time and who encouraged him to actually go forward and gave him the resources to set up a classroom in the jails to teach these same programs he was learning.

He then left the jails, Your Honor, and today is dealing with rehab programs and has been successful the last five years staying out of prison.

Again, that is just one example, Your Honor, of the multitudes that Sheriff Baca has helped through his visionary and revolutionary leadership of the Los Angeles County Sheriff's Department.

Other examples, Your Honor, are youth. Sheriff Baca focused on youth, particularly at-risk youth, that he saw throughout the county because these are the youths that would join the gangs that eventually were getting to the Los Angeles County jails and then eventually going back into the gang environment, having no tools, and returning back to the jails.

So he set up the Sheriff's Youth Foundation,

Your Honor, that has to date helped over 2500 at-risk kids and, again, been praised not just by politicians, Your Honor, but by the people who went through the program, saying that but for that program, but for Sheriff Baca setting up such a program that was concerned about giving gang members -- potential gang members something else to do, after-school activities, education, mentorship, they, too, would be gang members spending time in the Los Angeles County jails.

Homeless.  Sheriff Baca in some ways didn't have to care about the homeless.  He could just warehouse them in the Los Angeles County jails and send them out when their time was done.  That had been done before.  That sort of warehouse 'em, get 'em in, get 'em out attitude preceded Sheriff Baca for generations of sheriffs, Your Honor.

But for Sheriff Baca, like with inmates and education, like with youth, he decided that there was an alternative path, so he invested resources -- his own personal time and resources, as well as his sheriff's department's resources, in dealing with the homeless outside of the jails, trying to bring together organizations, including the sheriff's department, to give the homeless services, medical services, education services, social services, and deal with them outside the jails so that they never enter inside the jails.

Again, the sheriff didn't have to do this, Your Honor.  There was no mandate from the county or even the

people that said, "Sheriff Baca, care for the homeless outside the jails."

As we know, the Los Angeles County jails are the largest facility for the homeless in the entire county and, arguably, probably in the entire state.  So Sheriff Baca's goal was to actually reduce that population by reducing it on the outside and making sure they never got into the jail system.

Dealings with multiple ethnicities, multiple races, multiple belief systems and faith-based belief systems.  Post 9/11, Your Honor -- in fact, this observation comes from Connie Rice, a civil rights activist, someone who butted heads often with the sheriff's department and their treatment of inmates, but as the Court saw in her recent letter to the Court -- and, by the way, the fact that she would write a letter on Sheriff Baca's behalf knowing that he is here for being sentenced in an obstruction of justice case, a false statement case, knowing that she has butted heads with the sheriff's department often over the years, she submitted the letter to your court to point out two important observations that she had.

First, it was the observation of Sheriff Baca rolling up his sleeves and getting dirty trying to keep gang members out of the system to begin with and deal with them once they're in the inmate system.  She found that extraordinary.

And the second, which she found absolutely extraordinary, unprecedented in the United States, was Sheriff

Baca's response to the Muslim community post-9/11.  Because if we can recall, after 9/11 the Muslim community in Los Angeles and elsewhere was being targeted by every other community.

If you were a Muslim, you were being linked in with what happened on 9/11 and there was hate, discrimination. There was actions being taken against Muslims, and Sheriff Baca stood up and wanted to be counted.

And what he did alone amongst law enforcement is he brought the -- he went out to the Muslim community.  He went out to the mosques.  He said, "You are part of Los Angeles.  I stand with you."

He then brought Christian leaders, Jewish leaders, leaders from other faiths together with the Muslim community to say, "We all stand together."  He led that effort, as Connie Rice has pointed out, in a way that was unprecedented in Los Angeles and, she says, unprecedented in the country.

Again, he didn't have to do it, Your Honor.  There was no mandate saying that Sheriff Baca had to do this, yet he did it.  It's a testimony to who he was, his commitment to the people and his broader vision on how Los Angeles better operates, united rather than divided.

Sheriff Baca also on the safety aspect of it, Your Honor, created two things that letter writers have pointed out that really in some ways revolutionized, you know, the practice of law enforcement here in Los Angeles.

One is the Los Angeles -- it's the Regional Crime Lab, Your Honor.  Before the Regional Crime Lab was set up, Sheriff Baca played an absolute instrumental role in bringing people together and, as importantly, going out and getting the funding -- you know, the testing of sex kits -- the testing of rape kits.  The testing that was going on in the average case was either weeks, months or, in some cases, years behind.

But through the advent of his efforts with the Regional Crime Lab, all that testing got cleared up, Your Honor.  They invested $20 million in new technology.  And because of Sheriff Baca's efforts, the safety of the law enforcement, the safety of the people who benefit from these investigations grew immensely.

Also the Regional Interagency Communication Facility was a facility, Your Honor, that's post-9/11.  It was designed to deal with all the different communities within Los Angeles County and make it so that they could communicate in the event of an emergency.  Post-9/11 they found out that Los Angeles County was missing this very key component -- Los Angeles and Orange County.

Sheriff Baca goes to Washington on this one, working with elected leaders.  Originally, they got 154 million; eventually, they got 450 million.

And everybody that the Court has heard from on this lauds Sheriff Baca's daily efforts to make sure that Los

Angeles County and Orange County, because they worked together in this respect, got the money to build one of the cutting-edge communication centers for all of law enforcement, Your Honor, so when there, God forbid, is the next emergency, they will be able to communicate in a way they weren't able to communicate beforehand.

So with respect, then, to -- we have the education for inmates, Your Honor, we have youth programs, we have gang programs, we have reach out to the clergy, we have dealing with the homeless, we have educating deputy sheriffs through the Los Angeles County Sheriff's University.  Again, this is in some ways the mark of the man.

And it's not just the political letters of over 240 letters that Sheriff Baca has received.

The government has taken issue that some of these are from politicians that Sheriff Baca did favors for and now there's payback, to which there's two responses.

Number 1, when any political leader writes a letter in this situation, they're putting their own reputation on the line because they're writing it for someone who's been convicted of a crime.

In fact, if anything, if a political leader is looking out for their own self-interest, the last thing they'd want to do is be linked with someone who has been convicted of a crime, yet each one of these people stood up for Sheriff

Baca, whether it was former elected district attorneys of Los

Angeles, whether it was former fire -- fire chiefs of Los

Angeles, state legislators, federal legislators, they've all

stood up, and they said, "Look, we'll put our reputations on

the line because Sheriff Baca, even though he's been convicted

of this crime, led a lifetime of service that's incredibly

effective and useful to this community."

And equally important, as I've mentioned, is not just

those political letters, Your Honor -- and, again, on those

political letters, Sheriff Baca can do nothing for them at this

point.  He can't offer them any benefit at this point.  They're

doing it because they want the Court to have this

information -- but as important are the letters from the

pastors, the reverends, the priests, the rabbis, the imams, the

individuals that Sheriff Baca has gone out when the cameras

weren't on, you know, when no one else would know about it and

done something to help these lives.

And I have never read more letters where someone said

that, "Sheriff Baca individually -- or any person individually

changed my life in a positive direction."

So that's the body of who Sheriff Baca is,

Your Honor, as he comes before you to be sentenced, what they

were talking about in Adelson of weighing the good and the bad,

of sort of having that lifetime deposits in the bank of good

conduct, of good character, to be drawn upon right now at the

time when you need it, which is the time of your sentencing.

So with respect to the history and the characteristics of the defendant, Your Honor, I would submit that Sheriff Baca stands towards the top of any individual defendant that Your Honor has sentenced with a demonstrated life history, now at the age of 74, of commitment to the public good and to public service.

So when we look at some of the other factors, Your Honor, on the balancing test, obviously one of the other factors here is the medical factor, because, as the Court is aware, under 3553(a)(2)(D), the Court must fashion a sentence with the need to provide medical care -- and the words that congress used were "in the most effective manner."  It didn't use "in a sufficient manner."  It didn't use "in an OK or adequate manner."  It said "in the most effective manner." These were the words chosen by congress.

And in looking through the various declarations and reports that Your Honor has received, what is undisputed, Your Honor?  What is undisputed is that, sadly, Mr. Baca, at the age of 74 about to be 75, suffers from the Alzheimer's disease, diagnosed originally in May 2014 with a determination that it is a progressive, incurable disease that will eventually kill him, Your Honor.

And as we understand, first it will kill him cognitively.  In other words, he will not be able to function

in any meaningful cognitive sense that one believes that one functions as a human being.  And then eventually it will kill him physically, Your Honor.

Now, the government has raised a number of comments and responses to Dr. Chui's most recent report, Your Honor, because what she determined in the most recent report is that his -- that Sheriff Baca has entered the third stage of Alzheimer's.

The Court recalls the first stage is a pre-clinical stage that can last up to ten years.  The second stage is mild cognitive impairment, and the third stage is a stage of dementia.

Within the third stage, Your Honor, as you are aware, there are five levels.  There's mild, there's moderate, there's severe, there's profound, and then there's terminal, Your Honor.

Dr. Chui and then having her results reviewed by Dr. Galasko, someone who runs the University of California at San Diego Alzheimer's Clinic for the last ten years have determined that he is basically in the first stage of dementia, the mild dementia stage.

What that affects, Your Honor, is your ability to do what's called instrumental activities of daily life.  It's not brushing your teeth or dressing or using the restroom facilities at this point, Your Honor.  It's the more complex

financial transactions.  It's remembering people's names.  It's remembering dates, appointments, following instructions on a more complicated level.

And, by the way, Your Honor, Dr. Chui is here in court, and she can respond if the Court has any questions with respect to her report to the Court or any diagnosis, because what we can draw from that diagnosis, Your Honor, and from that report is the following, that if Sheriff Baca is incarcerated and placed in a facility, several things are going to happen. He has three major strikes against him, Your Honor.  One is the Alzheimer's -- and we can deal with that, and I'll explain that in a moment -- second is his age.

And, Your Honor, we produced to the Court several references to government studies as to what happens to people who are considered elderly in the prison system.  By the way, elderly is defined as 50 or older in the prison system.

And what you find out is that not only does it age you both cognitively and physically, as studied by the US government, but older people, particularly people in their 70s, are taken advantage of routinely by other inmates and are, as they describe it, much more vulnerable in a prison setting than, obviously, younger people were.  That is just one of the strikes against Sheriff Baca.

The second strike is that he will be one of the highest-ranking law enforcement officers ever in the prison

system.  And as pointed out by many different letter writers, that alone will create enormous vulnerability for him, and he will have to be protected against those vulnerabilities wherever he goes, because unlike, for instance, Deputy Sexton, who Your Honor heard from, who was actually allowed to be at a minimum facility and when he actually went into a higher-level facility, he was put in isolation.  And he is just a deputy, Your Honor, and he was a deputy for a number of years.

Sheriff Baca has 48 years as a career in law enforcement.  The number of individuals who will know about his case when he goes in the prison system presumably is quite high.

So he will have, then, two strikes against him.  One is age and one is former profession.

And now the third strike, the Alzheimer's, because as the Alzheimer's condition progresses, which it absolutely will, Your Honor, what will eventually happen is that he can't follow simple instructions and now have two different effects, as pointed out by Dr. Chui and Dr. Galasko.

One will be on the people -- the guards that are dealing with him.  Because he's not able to follow their instructions, they will eventually think that there's some attitude there, even if they know that he's suffering from a mental ailment, because he just won't be able to get to a meal on time, to say -- you know, to answer their questions in a

timely manner.  And they will -- and the frustration level and the potential response level from the guards can be something that is pointed out by the experts as very problematic.

The other aspect, Your Honor, are the inmates.

Sheriff Baca, if he's unable to understand where his cell is or go into someone else's cell or violate their space or not respond to them, will be extremely vulnerable to other inmates.

Also, for instance, if another inmate wants to take advantage of Sheriff Baca and it becomes a swearing contest, who are the guards going to believe, an inmate or someone who has a documented case of being unable to remember clearly?

His vulnerabilities in prison escalate if he only had Alzheimer's, but when you couple that with his age and former law enforcement background, the chance of his vulnerabilities being actually very severe in prison goes up immensely.

And then when we're dealing with the most effective manner to deal with his Alzheimer's, we have the declarations that have been submitted by Philip Wise on the one hand and Mr. Pelton on the other.

Philip Wise, who used to run the Bureau of Prisons' Health Designation Section for the entire country, talks about the fact that an inmate like Sheriff Baca with those three strikes against him -- age, his prior law enforcement background and Alzheimer's -- cannot be kept in the most

effective manner as far as dealing with his medical situation.

And by that I mean the following, both on medications and the supervision.

On the medications, he says that 25 out of 300 patients have been able to get the non-formulary medicine that Mr. Baca receives on a daily basis that doesn't reverse his Alzheimer's but helps him deal with some of the symptoms.  So the likelihood that Mr. Baca will fall in that under 10 percent category and how long it will take to get there remains to be seen.

Also, Mr. Pelton said we're dealing with a situation of saying that the Bureau of Prisons could accommodate Mr. Baca's situation for up to six months of imprisonment.  He says that twice in his declaration.  Up to six months' imprisonment, Your Honor.  Whereas Mr. Wise basically says, "Look, Mr. Baca's condition is not going to be cared for in the most effective manner if he is in the Bureau of Prisons."  Full stop.  He can't get the daily treatment he is going to need. He can't get the supervision.  Eventually, he needs the ability to be told where to go, how to go, what to do.  At that point, Your Honor, the Bureau of Prisons is not situated and accommodated to deal with those situations.

In fact, the Bureau of Prisons' Compassionate Release Bulletin that came out recently, Your Honor, put Alzheimer's disease as one of the diseases that should be taken into

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

account in deciding whether a defendant gets compassionate release who has already been sentenced to incarceration.

So, Your Honor, we have that triple problem that is going to exist in prison if Sheriff Baca goes to prison for any considerable length.

So then you have, Your Honor -- on the one hand of the weighing scale, you have Sheriff Baca's exceptional life of public service and good for the community. You also have on that part of the scale the medical, age and prior law enforcement calculus to not have him go to prison.

So what is on the other end of the scale, the scale I am sure Mr. Fox and the government will point to, dealing with the nature of the offense, the need to promote justice, the need to promote specific and general deterrence, Your Honor?

May I have a moment?

So let's look at it. Let's look at the nature of the offense, Your Honor.

The government has pointed to five things that Sheriff Baca did in connection with the obstruction, the endeavor to obstruct justice and conspire to do it and the false statements.

And if you go through each one -- and that's part of the objections that the Court just went through that you indicated in many of them you would take into mitigation in dealing with the sentence, though it doesn't affect the

guidelines, but let's go through each one.

The first one is hide the inmate.

Again, with respect to hide the inmate, Your Honor, the inmate was hidden, to the extent we use that word, from August 25th to September 12th.  In that time period, his name was changed and his location was moved.  But what was told to Sheriff Baca?  That his name was changed, his location was moved, and it was done for his safety.

And what you heard is that is a 100-percent true statement unless you knew one more thing, that also, as he was being moved and his names were being changed, he wasn't being Live Scanned so that his fingerprints weren't being put into the system so that one identity could connect to the next, could connect to the next.

The problem is neither Captain Carey nor Mr. Baca were being told that he wasn't being Life Scanned, Your Honor.

But let's deal with the hide-the-inmate impact, because even if we say that that was an endeavor situation, what actual impact did it have on the overall FBI's grand jury investigation?

I would submit none, Your Honor, because by September 15th, before the conspiracy was even over, you had the situation where the FBI agent was able to talk to Anthony Brown in state prison, get a full download of everything that had gone on and then could have put Anthony Brown in the grand

jury -- or relayed that information, even though he had been hidden for those days, to the grand jury and they would have all the information they need from Anthony Brown.

In fact, as Your Honor is aware, Mr. Brown wasn't even called before the grand jury until December 2012 and the grand jury didn't even start taking evidence until March 2012 as well.

So even though the jury did not have to find actual obstruction, it was enough for them to find endeavor to obstruct. Part of what the Court needs to factor in is whether or not this actually resulted in anything as far as the nature of offense, because this offense could have been either one.

It could be endeavor or it could be actual obstruction, and the harm caused by it -- what the Court referred to in the last sentence is the non-monetary harm needs to be looked at to see what the nonmonetary harm was for hiding the inmate for those, effectively, two weeks. And the answer to that, as it pertains to the grand jury's investigation, was not.

With respect to the federal writ not being complied with, again, all the evidence -- and the government confirms this in their prior sentencing pleading, is that Sheriff Baca had absolutely no knowledge that a federal writ had been issued. When he met with the US Attorney's office on August 29th, they never brought up a writ. At no point, in any way,

shape or form, was he aware that a writ had been issued and not complied with.

Third, tampering with witnesses, Your Honor.  Again, the government's evidence and the government's statements is that Sheriff Baca had no knowledge that either Gilbert Michel or Mr. Courson were told not to cooperate with the FBI's investigation.  Such is not true for other people down below in this conspiracy.  But the evidence, according to the government, is such that there is no evidence that Sheriff Baca was aware that any of these two individuals were told not to cooperate with the FBI.

Altering documents.  Well, we can even broaden that. Alter and modify, delete, destroy documents.

With respect to altering documents, I think what we're talking about is the documents dealing with changing Anthony Brown's name throughout the whole process of his name change.  Again, there's no evidence that Sheriff Baca knew that the name was being changed in a way that wouldn't link it to the original name.

With respect to delete, destroy, all the other factors of documents, typically, when you read the cases in obstruction of justice, this is what you find.  You find an individual who rips up, shreds, physically changes a document and does it in a way to obstruct a grand jury's investigation.

The government has conceded many times that Sheriff

Baca in no way, shape or form altered, destroyed, modified in any way, shape or form the documents that went to the grand jury.  And we heard that there's 500,000 to a million pages of documents that went from the sheriff's department to the grand jury, including the very audio tapes, videotapes and notes that they used to convict everyone.

So if ever there was a high motivation to try and obstruct a grand jury, it would be to destroy the key evidence that would ultimately be used to convict you.  None of that was done by Sheriff Baca.

So how about the last part of it, which was intimidating an FBI agent?  Here's what we know on that. There's absolutely no information that Sheriff Baca knew --

THE COURT:  You are aware that I sat through this four or five times?

MR. HOCHMAN:  Yes, Your Honor.

THE COURT:  Oh, okay.  Go ahead.

MR. HOCHMAN:  Well, yes, Your Honor, but I don't think you've sat through it from Sheriff Baca's perspective.

THE COURT:  Twice.

MR. HOCHMAN:  Yes, Your Honor.

To sum up on this point, the harm from any action that Sheriff Baca was aware of or authorized to the federal grand jury investigation on the two things that a federal grand jury receives, either documents or witness testimony, is

absent, Your Honor.

It doesn't mean that there wasn't, as the jury found, potentially an endeavor to obstruct justice, but when balancing the harms between a situation that actually obstructed justice versus one where there was an attempt to obstruct justice but ultimately didn't, I would submit that in that situation, the balance tips less so in favor of imprisonment than if there had been actual obstruction as well.

And the reason I focused on it, Your Honor, is Your Honor had focused on it in the last sentencing for Sheriff Baca, the substantial non-monetary harm, so I wanted to focus on it and it hadn't been focused at that point.

One of the things that the Court has remarked on is that the FBI was kept out of the jails for a number of months.

Well, again, Sheriff Baca told, on September 26 between 7:35 and 8:00 p.m., the US Attorney that nobody was going to be arrested. There was nothing thereafter that prevented the FBI from coming in -- and they had the sheriff's assurance and then they'd meet the next day on September 27th and have that assurance reestablished, or at least codified, in a personal meeting between the head of the FBI and Sheriff Baca that nothing's going to happen to any FBI agent that comes in the jail.

And as you recall, the FBI chose not to go in the jail. They also chose to begin the grand jury investigation on

March 2012.

So I would argue that no effective obstruction of justice actually occurred.  There's not one witness that has ever been said that could have gone to grand jury that didn't.  There's not one document that I'm aware of that Sheriff Baca in any way prevented from reaching the grand jury investigation.

One of the last factors I'll focus on, Your Honor, is disparate sentences, because one of the points that Your Honor made at the last sentencing is that you have sentenced other defendants to prison and that a six-month period of prison being advocated by the government at that time did not take into account other sentences that you had given out, to which I will respond as follows.

First, there is no evidence.  In fact, the evidence is just the opposite, according to the government, that Sheriff Baca was involved in any of the beatings of inmates, in any of the -- fostering the culture of beatings of inmates or was even charged with any civil rights violations.

The government in its sentencing pleadings in the Tanaka case and the original case here lays out all of the steps of Paul Tanaka, Your Honor, who they directly ascribe as managing the day-to-day operations of both the obstruction, fostering the culture of us versus them and that whole gray-line aspect that he went out and preached.

There's no evidence that Sheriff Baca adopted any of

those attitudes, spread those attitudes.  In fact, when he went out and preached, he preached the core values, Your Honor.

To the extent that Sheriff Baca is responsible for something, he is certainly responsible for hiring Paul Tanaka and not monitoring adequately what Paul Tanaka was saying to other people.

But I wanted to point out the difference between, for instance, Paul Tanaka and Sheriff Baca is a difference that the government points out repeatedly throughout their papers in trapping Paul Tanaka and Sheriff Baca.

And, again, as the Court is aware, with respect to the actions that were taken that the actions that the government -- that Sheriff Baca took, the best way to actually look at that, Your Honor, is to recall what the government said at the last sentencing, that as of, you know, July 2016, the government's investigation had been going on for approximately five years at that point, and the most readily proveable offense against Sheriff Baca at that time, they said, was a false statement case.  That's it, Your Honor.

And the reason they said is that the quality and the quantity of the evidence -- that was their words -- against Sheriff Baca was far, far different than it was against any other individual.

That still remains true today, Your Honor, the words that the government said to this Court back in July of 2016.

So where does that ultimately leave us, Your Honor?

You have a very difficult decision because on the one hand you have a unique public servant for whom there's a documented trail of evidence that goes back 48 years that shows that he was really one of the good guys, really tried his absolute best and was successful in changing thousands of people's lives for the better.  You're not going to have that that often, Your Honor, before you.

You also have someone who in this later stage of his life, both for his age, his former profession and his medical condition will truly suffer in prison in a way others wouldn't.

And then you have the nature of offense, and we've dealt with the balancing of the nature of the offense.

And I would suggest, Your Honor, when you do this balancing between these two, that a sentence of probation or at least a sentence of minimal imprisonment, Your Honor, would be a sentence that would balance these two competing interests, Your Honor, and be sufficient but not greater than necessary to achieve the aims of sentencing.

THE COURT:  Thank you.

MR. FOX:  Your Honor, if everything that was just said was true, we would have no crime, no homeless problem, no mentally ill, no uneducated people in Los Angeles County.

Mr. Baca was sheriff over Los Angeles County for I think it was close to 15 years and he only dealt with some of

these issues, according to the presentation we just heard, after the obstruction of justice scheme.

The Education Based Incarceration came after the obstruction of justice scheme.  We briefed that before.  These were problems, of course, that had been going on for decades, the lack of education of inmates, mentally ill.

I will point out to Your Honor that there is an agreement in place that you are aware of between the county, the sheriff's department and the federal government to treat the mentally ill and the homeless better because their rights were being violated under Mr. Baca's reign.

So now there's an agreement.  There's an independent monitor who is going to make sure that their rights are, in fact, not violated.

We heard a lot about the harm and there being no harm, but there has been a ton of harm.  We will certainly never know the impact of the entire obstruction of justice conspiracy because we don't know how that affected everybody in the department, how that affected potentially documents the grand jury never received, how that affected people who might have otherwise come forward within the department but based on what was going on in the department and the atmosphere there decided it was not in their interest to come forward, deputies told not to cooperate.

And FBI agents, while the presentation was that

Mr. Baca provided assurances that they wouldn't be arrested if they came back to the jails, he then said the next day to the US Attorney, "I'm the goddam sheriff.  These are my goddam jails."  That's the atmosphere that Mr. Baca was creating.

There certainly is a lot of mitigation here, but if you look at overall what has happened, today hopefully ends the shameful era, the shameful era that Mr. Baca had over the department, especially for the last few years that he was sheriff.

It lasted at least six years where the obstruction of justice was going on, his lies were occurring, the most persuasive abuses in the jails were happening.  Those were under his last years in the sheriff's department.

As we've discussed many times, he was at the top of one of the largest law enforcement agencies in the country and he abused the power that was entrusted to him.  He hurt so many people along the way.

When he lied to us, when he lied to the federal government, he effectively was throwing those people he directed under the bus and making them held accountable for actions that he, in fact, had a part of.

By claiming the lack of knowledge of any of that, it led the government, of course, to believe that there were no orders from Mr. Baca, that he wasn't aware of what was going on.

So the deputies were harmed by this.  The taxpayers have been harmed by this.  Over this time, we heard about the overtime that the deputies who were hiding Anthony Brown were authorized to be paid, how much they were, in fact, paid.

But it goes on from there.  Los Angeles County has paid millions of dollars annually in judgments against the sheriff's department and the county for actions that were taken by deputies under Mr. Baca's reign in the jails when inmates' rights were being violated.  Those are harms that Mr. Baca through negligence, willfulness caused.

And when I mention "willfulness," Your Honor, there was a civil judgment.  A jury found Mr. Baca civilly liable for willfully violating an inmate's rights.

So when we talk about -- when we hear about everything good that Mr. Baca did for inmates, a civil jury has found him liable for wilfully violating an inmate's rights, and Mr. Baca was ordered to pay and agreed to pay $100,000.

The people that Mr. Baca used in this conspiracy were those who were tasked with rooting out the corruption and the crimes going on in the department, and he used those people to obstruct a federal grand jury investigation.

The defense talked about Mr. Baca's honor, his integrity, his distinction.  Those are all things that are just not true.

The way he acted in the obstruction of justice and

the lies was entirely dishonorable, showed a lack of integrity, showed a lack of effectiveness as a leader.

We recognize that there is mitigation here, which is why we recommend a 24-month sentence, but if you take away Alzheimer's disease, he'd be looking at a far worse sentence for a recommendation from the government.

His guideline range is 41 to 51.  You've sentenced people up to 60 months in this case, and the only reason why the government is asking you to go below the guidelines is based on his diagnosis.

The BOP can treat him; you've seen the declaration. And Mr. Hochman, of course, knows that the six-month limit in that declaration was because that previous agreement is what it was attached to, and that was an agreement for zero to six months.  The Bureau of Prisons can treat him.

And Mr. Hochman's right.  There is compassionate release.  That can be considered in the future by the Bureau of Prisons if his condition worsens worse than it appears that it will at this point.

So we've also heard how his reputation is now ruined and that is punishment enough.  We also hear about how people -- his friends that stood by him, politicians that stood by him.  People wrote over 200 letters and have stood by him. So his reputation is not ruined.  As we sit here right now, he still has the same friends, he still has the same family.  He's

won awards.  Both after the obstruction of justice conspiracy and after he pled guilty in February of 2016 he's won awards. So the reputation argument should have no effect at all.

Your Honor, I want to discuss the fine component as well because according to the PSR, he has substantial assets. He also is going to be making a substantial amount of money monthly from the taxpayers of Los Angeles County.

And I think an important component to this, if Your Honor is going to go below the guidelines, go below what other people have received, is to impose an additional fine that is more significant than you've imposed in the past on other defendants.

He has the ability to pay, and it will be harming no one but Mr. Baca by fining him to a significant amount of money.  So that's one thing that the government would ask you to do.

As I mentioned, Your Honor, Mr. Baca has lost very little.  The defense has talked about all of this in mitigation but everything can be turned around.

As I mentioned, all the people that he said that Mr. Baca has helped, he's hurt many other people.  All the good that he did, he was paid to do that good.  He was paid to be a law enforcement officer.  He was paid to have policies that would help Los Angeles County.  So that was his job, and it should not be used as further mitigation in sentencing him

below the guideline range.

The government ultimately believes that 24 months balances everything.  This is a complex sentencing.  I agree with Mr. Hochman when he says this is a difficult sentencing.  It puts you in a very difficult position because there is a lot of bad that Mr. Baca did.  The crimes are certainly bad, the seriousness of his conduct is horrible, and the reputation of the Los Angeles County Sheriff's Department has been destroyed for years because of his actions.

Hopefully, they are starting to rebuild that reputation, but it will take several years for the public to trust the sheriff's department again.

So I think that Your Honor should recognize all of that in sentencing him, and, again, we believe that 24 months is appropriate.

THE COURT:  Thank you.

Is the government aware of whether there are any victims who wish to address the Court?

MR. FOX:  There are not, Your Honor.

THE COURT:  Does the defendant wish to be heard?

MR. HOCHMAN:  May I have a moment, Your Honor?

Does the Court want to hear from Dr. Chui who is present --

THE COURT:  No.

MR. HOCHMAN:  -- who can respond to any issues?

THE COURT: No. I've reviewed all of the reports.

MR. HOCHMAN: May I have a moment, Your Honor?

*(Counsel and defendant confer off the record.)*

MR. HOCHMAN: Your Honor, Mr. Baca does not choose to allocute.

THE COURT: All right. The Court adopts the factual findings in the guideline application set forth in the Pre-sentence Report, finds that the advisory guidelines establish a total offense level of 22, a total criminal history category of I, which results in an advisory sentencing guideline range of 41 to 51 months of incarceration.

The Court recognizes its discretion to depart in this case based on various factors cited by the defense, either individually or in combination; however, the Court elects not to exercise its discretion and depart from the guidelines.

Does either counsel wish to be heard on the mathematical calculation of the guidelines?

MR. FOX: No, Your Honor.

MR. HOCHMAN: Not on the math, Your Honor.

THE COURT: All right. I'm going to take a five-minute recess, and then I'll turn to the 3553 factors.

*(Recess taken 9:43 to 9:50 A.M.)*

THE COURT: All right. The Court will turn to the 3553 factors.

This is a sad day for our community. The man who for

15 years was one of the most powerful law enforcement officials in the entire country has now been convicted by a jury of conspiring to obstruct justice, obstructing justice and making a false statement to federal investigators.

Mr. Baca's fall from such heights is tragic for many reasons.

First, Mr. Baca rose to prominence from humble origins.  His parents divorced when he was just 11-months old, and he was raised by his grandparents in East Los Angeles.

Second, there is the good that Mr. Baca accomplished in his time as sheriff, including the educational programs he championed.

Third, Mr. Baca's criminal conduct is so at odds with the public image he carefully cultivated and the core values he professed of honor, respect, integrity, wisdom, fairness and the courage to stand against bigotry.

Fourth, there are the lives of not just the members of his beloved sheriff's department that have been ruined by conspiring with him, but those of the many inmates that were his responsibility who were brutalized by deputies, who, like Mr. Baca, did not live up to those core values.

And, finally, there is Mr. Baca's struggle with his cognitive impairments.

In his sentencing position, Mr. Baca seeks a sentence consisting of probation, a period of home detention and

community service.  In support of that sentence, Mr. Baca attempts to minimize his role in the conspiracy, to obstruct the federal government's investigation and to civil rights abuses that were occurring in the jails Mr. Baca ran, and to shift the blame primarily to former undersheriff Paul Tanaka.

The Court has already sentenced Mr. Tanaka to 60 months in prison.  The Court is not persuaded by Mr. Baca's efforts to avoid responsibility for his own actions and the actions of those he commanded.

Mr. Baca, for instance, made the decision to delay the informant's transfer from the custody of the sheriff's department to the state.  Mr. Baca angrily threatened to end the county's participation in joint task forces with federal law enforcement in an attempt to derail the federal investigation into what he called "his jails."

There was also substantial evidence that Mr. Baca pestered his subordinates for updates on the sheriff's department's investigation, an investigation that tampered with witnesses, to prevent those witnesses from cooperating with the federal investigation, and it was Mr. Baca who directed his deputies to do everything but put handcuffs on Agent Tanner when they went to her home and threatened her arrest.

It was also Mr. Baca who promoted Mr. Tanaka to undersheriff and who put Mr. Tanaka in charge of the day-to-day running of the entire sheriff's department.

Mr. Tanaka was not some rogue deputy.  As Mr. Baca himself has said, he quickly promoted Mr. Tanaka through the ranks because, in his own words, "Mr. Tanaka had a unique talent of doing exactly what I wanted."

Mr. Baca, you knew exactly what type of person Mr. Tanaka was.  The Court has heard testimony from those who tried to warn you not just about Mr. Tanaka but also about abusive deputies and about civil rights violations at the jails, and although you sometimes said the right things in response to those warnings, you all too rarely did the right things.  Instead, you were all too happy to let people like Mr. Tanaka do your dirty work for you.

It's sort of like one of those old B movies or television shows.  You seemed to have your own version of a good-cop, bad-cop routine.  This allowed you to make your public appearances, say popular things and keep your hands clean, but it does not make you any less culpable.

While there is little risk that you will reoffend, you refuse to accept responsibility for your conduct and your teams' conduct to shield dirty deputies from the consequences of their crimes.

Now, it's easy to blame the FBI or others for your plight, but you placed yourself in this position.  The evidence showed that you were in on the plan to obstruct the grand jury investigation into corruption and abuse from that fateful

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Saturday morning meeting when you ratified your deputies' ill-advised efforts to intimidate an FBI agent conducting an authorized and lawful investigation.

You had opportunity after opportunity to put a stop to these misguided and clumsy efforts to shield these corrupt deputies, and there comes a time when you have to accept responsibility and accountability.

Your refusal to do so stands in sharp contrast to your professed tenets of public service, sacrifice and selflessness.

Attempting to shift the blame also does not repair the lasting damage you've caused our community and to the sheriff's department.  At a time when faith in our public institutions is eroding and citizens are questioning the actions of law enforcement agencies, you endeavored to obstruct justice and shield dirty deputies from the consequences of their actions.  By obstructing justice, you prevented a full accounting of the failures that occurred under your leadership.

You did this to burnish your own legacy, your reelection chances and to preserve your authority all at the expense of the public's trust in the vital work performed by the sheriff's department to protect the people of this county and to uphold the constitution.

Your unquestioned loyalty to the department is not something to be proud of when that loyalty is perverted to

protect corrupt and abusive deputies and the inflated reputations of those executives you commanded.

Your actions embarrass the thousands of men and women who put their lives on the line every day, who take seriously their solemn oath to protect our community and who serve with honor. Your actions were a gross abuse of the public trust placed in you by the community and undermined public confidences in law enforcement generally.

The Court hopes that if and when other elected officials are faced with decisions similar to those you faced, they will not look the other way or obstruct a lawful investigation, that they will recognize that blind obedience to a corrupt culture has serious consequences, that they will adhere to the rule of law above their personal aspirations, that they will simply do what is right.

The Court acknowledges Mr. Baca's lengthy career in public service and the considerable amount of good that he accomplished during his tenure with the sheriff's department and his time as sheriff. At many times and in many ways, Mr. Baca lived up to the core values he espoused.

He still has many supporters in the community, a number of whom have written letters in support of him.

The Court has also considered Mr. Baca's Alzheimer's disease diagnosis. In his sentencing position, Mr. Baca calls the diagnosis a sentence of its own.

As awful as Alzheimer's is, it is not a criminal penalty.  To suggest that it is insults the more than 5 million people in the United States currently suffering from the disease.  Those millions of people and their families have not obstructed justice.  The Court has not punished them.  They receive no benefit from their Alzheimer's diagnosis.

As Mr. Baca's sentencing position acknowledges, the rate at which the disease progresses varies depending on the individual.

As Mr. Baca's counsel also knows, the Bureau of Prisons has procedures for seeking compassionate release and a reduction of sentence.  And although his diagnosis does differentiate him from his co-conspirators and the Court has factored Mr. Baca's medical condition into the sentence it intends to impose, Alzheimer's disease is not a get-out-of-jail card.

In rejecting the parties' plea agreement, the Court said that a maximum six-month sentence they originally agreed to would trivialize the seriousness of the offense, the defendant's lack of respect for the rule of law, the need to promote respect for the law, the need for a just punishment, general deterrence and to avoid unwarranted sentencing disparities given the sentences that the Court has given to this defendant's subordinates.

The government has suggested a 24-month sentence.

The probation department in its confidential sentencing recommendation has suggested Mr. Baca receive a 60-month sentence.

If not for your cognitive impairments that will eventually develop into Alzheimer's disease and the significant commitment to public service you exhibited throughout your career, you'd receive the same sentence that Mr. Tanaka received because you are at least as culpable.

Indeed, if not for your decisions and actions, it is unlikely that any of these events would have occurred. In the end, that is your legacy.

This was a series of serious offenses. The defendant's decisions and actions were conscious and volitional that repeatedly occurred over a period of time. He knew what he was doing was wrong and had no problem using his office to further his own agenda.

And while it's likely that he will be personally deterred, a custodial sentence is an important step in restoring the public's confidence in our criminal justice system at a time when many are questioning it, as well as our institutions, and it will send a strong message of general deterrence to our elected officials, the law enforcement and our community that no person, no matter how powerful, no matter his or her title, is above the law, that there are serious consequences when you choose to ignore and obstruct the law

that you've sworn to uphold.

The Court, therefore, concludes that a sentence of 36 months of imprisonment, one year of supervised release, a $300 special assessment and a fine of $7,500 is sufficient but not greater than necessary to meet the statutory goals of sentencing, to promote respect for the law, as well as general deterrence, and the Court finds that it is a just punishment that accounts for this defendant's conduct.

Does either party have any objections that were not previously addressed?

MR. FOX:  No, Your Honor.

MR. HOCHMAN:  Just the objections that were previously stated, Your Honor.

THE COURT:  All right.  Is there any legal reason why sentence should not be imposed at this time?

MR. FOX:  No, Your Honor.

MR. HOCHMAN:  No, Your Honor.

THE COURT:  It's ordered that the defendant shall pay to the United States a special assessment of $300, which is due immediately.  Any unpaid balance shall be due during the period of imprisonment at a rate of not less than $25 per quarter pursuant to the Bureau of Prisons' Inmate Financial Responsibility Program.

It's ordered that the defendant shall pay the United States a total fine of $7,500 consisting of the following:

Count One, a fine of $2,500; Count Two, a fine of $2,500; and Count Three, a fine of $2,500.

The total fine shall bear interest as provided by law.  The fine shall be paid in full immediately.

The defendant shall comply with General Order 01-05.

Pursuant to the Sentencing Reform Act, it's the judgment of the Court that the defendant is hereby committed on Counts One, Two and Three to the custody of the Bureau of Prisons for a term of 36 months.  This term consists of 36 months on each of Counts One, Two and Three to be served concurrently.

Upon release from imprisonment, the defendant shall be placed on supervised release for a term of one year under the following terms and conditions, and that term will be imposed concurrently on each of the counts:

The defendant shall comply with the rules and regulations of the United States Probation Office, General Order 05-02 and General Order 01-05, including the three special conditions delineated in General Order 01-05;

During the period of community service the defendant shall pay the special assessment and fine in accordance with the judgment's orders pertaining to such payment;

The defendant shall cooperate in the collection of a DNA sample.  The defendant -- shall cooperate in the collection of a DNA sample;

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

The defendant shall apply all monies received from income tax refunds to any outstanding court-ordered financial obligation.  In addition, the defendant shall pay all monies received from lottery winnings, inheritances, judgments and any anticipated or unexpected financial gains to any outstanding court-ordered financial obligation.

The Court recommends that the Bureau of Prisons conduct a mental health evaluation of the defendant and provide all necessary treatment.

The drug testing condition mandated by statute is suspended based upon the Court's determination that the defendant poses a low risk of future substance abuse.

Sir, you have the right of appeal from the judgment and sentence within 14 days from today's date.  The failure to appeal within that 14-day period will constitute a waiver of your right to appeal.

You're also advised that you're entitled to the assistance of counsel when taking an appeal, and if you're unable to afford a lawyer, one will be provided to you.  If you're unable to afford the filing fee, the clerk of the court will be directed to accept the Notice of Appeal without such a fee.

Is there any objection to providing the defendant with a self-surrender date?

MR. FOX:  No, Your Honor.

THE COURT:  Does the defendant wish a self-surrender date?

MR. HOCHMAN:  Yes, Your Honor.  We would ask, if possible, for July 25th, Your Honor.

I think that gives the Bureau of Prisons -- in this case, they might have additional time needed to figure out proper designation.

THE COURT:  Any objection?

MR. FOX:  No, Your Honor.

THE COURT:  All right.  It's ordered that the defendant shall surrender himself to the institution designated by the Bureau of Prisons on or before noon on July 25th of 2017.

In the absence of such a designation, the defendant shall report on or before that date and time to the United States Marshal's Office located in the Roybal Federal Building.

Mr. Baca, your conditions of release will continue in effect until your self-surrender.  If you violate any of the conditions of your release, that could result in your immediate incarceration.

The defendant's -- what is the defendant's bond?

MR. HOCHMAN:  It was an unsecured bond.  I don't remember the amount, Your Honor.

MR. FOX:  That's correct, Your Honor.  I think it was a minimal amount, if I recall correctly.

THE COURT:  All right.  The defendant's bond will be exonerated upon his self-surrender.

Do either of the parties wish to have the Court make any recommendations to the Bureau of Prisons?

MR. HOCHMAN:  Yes, Your Honor, to the federal prison camp at either Taft, California, or Sheridan, Oregon.

The  Bureau of Prisons might not put -- Taft being preferred, but to the extent that the Bureau of Prisons wants him out of California, we would ask for Sheridan, Oregon.

THE COURT:  Let me see counsel at sidebar.

*(Proceedings held at sidebar under seal.)*

/

/

/

/

/

/

/

/

/

/

/

/

/

/

/

/

/

/

*(The following proceedings were held in open court.)*

THE COURT:  All right.  The Court is going to make a recommendation that Mr. Baca serve his term of imprisonment --

Is it Sheridan?

MR. HOCHMAN:  Yes, Your Honor.  Sheridan, Oregon, or Terminal Island, California.

THE COURT:  -- or Terminal Island.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

All right.  Is there anything else?

MR. FOX:  Nothing from the government, Your Honor.

MR. HOCHMAN:  No, Your Honor.  Nothing further from the defense, Your Honor.

THE COURT:  All right.  Thank you very much.

*(Proceedings concluded 10:23 A.M.)*

--oOo--

CERTIFICATE

I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Date: MAY 24, 2017

/s/  Cindy L. Nirenberg, CSR No. 5059

Official Court Reporter

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA