UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE PERCY ANDERSON

UNITED STATES DISTRICT JUDGE PRESIDING

- - -

| | |
|---|---|
| United States of America,<br>              PLAINTIFF,<br><br>VS.<br><br>Leroy Baca,<br>              DEFENDANT, | )<br>)<br>)<br>)  NO. CR 16-66 PA<br>)<br>)<br>)<br>) |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL - DAY TEN

VOLUME I OF II

LOS ANGELES, CALIFORNIA

TUESDAY, MARCH 7, 2017

_____

KATIE E. THIBODEAUX, CSR 9858
U.S. Official Court Reporter
312 North Spring Street, #436
Los Angeles, California 90012

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

APPEARANCES OF COUNSEL:

FOR THE GOVERNMENT:

BRANDON D. FOX
-and- EDDIE JAUREGUI
-and- LIZABETH RHODES
AUSA - Office of the US Attorney
312 North Spring Street 12th Floor
Los Angeles, CA 90012

FOR DEFENDANT:

MORGAN LEWIS AND BOCKIUS LLP
BY:  NATHAN J. HOCHMAN
-and- BRIANNA ABRAMS
1601 Cloverfield Boulevard
Suite 2050 North
Santa Monica, CA  90404

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

I N D E X

WITNESS NAME                                         PAGE

LEAH TANNER

      Direct Examination by Mr. Fox (Cont'd)   1880

      Cross-Examination by Mr. Hochman         1904

| EXHIBIT | I.D. | IN EVID. |
|---|---|---|
| 67, 501, 503 | 1903 | 1903 |
| 527 | 1969 | 1969 |
| 525 | 1985 | 1986 |

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES, CALIFORNIA; TUESDAY, MARCH 7, 2017

8:00 A.M.

- - - - -

(The following proceedings were held in open court outside the presence of the jury:)

THE CLERK:  Item 1, CR 16-66A-PA, United States of America versus Leroy Baca.  Counsel, please state your appearances.

MR. FOX:  Good morning, your Honor.  Brandon Fox, Lizabeth Rhodes and Eddie Jauregui on behalf of the United States.  Also with us at counsel table is Special Agent Lea Tanner, with the FBI.

She is the witness on direct, your Honor.  Do you want us to have her step out while we go through anything or do you want her here?

THE COURT:  I think it is fine.  Unless there is something that pertains to her.

MR. HOCHMAN:  I don't think so, your Honor.

THE COURT:  I'm sorry.

MR. HOCHMAN:  Nathan Hochman and Brianna Abrams on behalf of defendant Leroy Baca, who is present, your Honor.

I don't believe anything we would discuss now is pertaining to her testimony or in any negative way

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

pertaining to her testimony.  So I have no problem if she stays, your Honor.

THE COURT:  All right.

MR. HOCHMAN:  Your Honor, may I be heard briefly at sidebar?

THE COURT:  All right.

(From 8:02 to 8:06, the proceedings, Pages 1879 to 1880, were conducted under seal.)

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

(The following proceedings were resumed in open court:)

THE COURT:  All right.  Let's bring the jury in.

MR. FOX:  Would you like the witness on the stand?

THE COURT:  That is fine.

(The following proceedings were held in the presence of the jury:)

MR. FOX:  May I proceed, your Honor.

THE COURT:  Yes, please.

DIRECT EXAMINATION (Cont'd)

BY MR. FOX:

Q    Special Agent Tanner, just one housekeeping thing before we continue your testimony.  Have you had a chance to review what is in evidence as Government Exhibit 100 and compare it to Government Exhibit 101?

A    Yes.

Q    Is Government Exhibit 101 a true and correct transcript of what is contained in Government Exhibit 100, including the speakers?

A    Yes.

Q    We I believe last stopped on August 26th.  I want to pick up today on August 29th.  August 29th.

And showing you Government Exhibit 172, what are we looking at at the top here?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

A    It is a kind of a summary chart that I did that included both phone records, and it was from Lee Baca's calendar for August 29th, 2011.

Q    Where does this first entry, "1:30, Meet with Andre Birotte," come from?

A    Mr. Baca's calendar.

Q    I mean -- show the fourth page of Government Exhibit 120.  Is this what you were referring to?

A    Yes.

Q    And what is at 312 North Spring Street on the 12th floor in Los Angeles?

A    That is the office for the United States Attorney, Andre -- well, at the time it was Andre Birotte.

MR. FOX:  Your Honor, I am putting on the calendar on August 29th a magnet that says "Baca meeting at USAO."

Q    Now, Special Agent Tanner, going back to Page 6 of Government Exhibit 172, what happens that evening?

A    There are two calls, one from Mr. Baca to Mr. Tanaka at 6:20, and then a follow-up call at 6:25 from Mr. Tanaka to Mr. Baca.

Q    On August 29th?

MR. FOX:  Your Honor, I am putting a magnet up that says "Baca Tanaka calls."

Q    Now, Special Agent Tanner, according to your summary chart, what occurs the very next morning?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

A    August 30th is the morning when Lieutenant Leavins,
Sergeant Scott Craig and Sergeant Maricela Long did the
interview of Gilbert Michel in Men's Central Jail.

Q    I now want to put on the PowerPoint that is
Exhibit 226.  You can look at the August 30th calls.

What happens first?

A    Mr. Tanaka called Mr. Baca's driver at 10:14 a.m.

Q    When is this in relation to the Gilbert Michel
interview by ICIB?

A    There were not two interviews with Gilbert Michel,
but Gilbert Michel was interviewed early on.  They took a
break, and then he was interviewed again.  It was right
after they began interviewing him the second -- the
second portion of that after taking a long break in
between.

MR. FOX:  And then can we flip to the next --

Q    What happens next?

A    At 10:56 Mr. Baca called Mr. Tanaka.

Q    Now, the previous call, the 10:14 call, how many
minutes was it?

A    It was three minutes.

Q    What about this one?

A    This was one minute.

MR. FOX:  Your Honor, I am putting on the calendar
on August 30th "Baca/Tanaka call."

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Q      Let's go to the next entry, please.  What happens next?

A      Mr. Tanaka calls his voicemail.

Q      And after that?

A      Mr. Baca receives an unavailable call one minute later.

Q      How soon does that happen after Mr. Tanaka checks his voicemail?

A      One minute.

Q      How long is that unavailable call to Mr. Baca's phone?

A      It is 13 minutes.

Q      And what happens next?

A      At that point, from -- at 3:43 Mr. Carey calls Mr. Baca's driver.

Q      When is this in relation to the interview that was conducted by David William Courson by ICIB?

A      Mr. Courson was interviewed at approximately 1, 1:15, and it lasted for approximately 20, 30 minutes. And so it finished at about 1:45 p.m., and then the call was approximately two hours later.

Q      Now, looking at your summary chart on August 30th, I think you said approximately what time that interview of Mr. Courson began.  According to your summary chart, what time did it begin?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

A    1:25.

Q    I now want to go to Exhibit 48 that is in evidence. This is from September 7th, 2011, at 4:59 p.m., an e-mail from Mr. Tanaka to Steve Leavins saying, "As soon as the document gets signed tomorrow, will you please make a copy for Mr. Tanaka."

Looking at the calendar, what happens the next day?

A    That is when Sergeant Craig went to Judge Torribio to try and get the court order signed.

Q    Now I want to look at -- well, what time is this e-mail?

A    It is at 4:59 p.m.

Q    Were there any phone calls approximately an hour later?

Let me go to Exhibit 156 which is in evidence. What is this chart again?

A    This is a chart I made that includes calls between Paul Tanaka and then either Mr. Baca, his driver or his aide.

Q    What do we see, as I said, about an hour after that e-mail about after the document gets signed tomorrow, "Would you please make a copy for Mr. Tanaka"?

A    There is two phone calls.  One call at five to 6 from Mr. Tanaka to Mr. Baca and then a few minutes later

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

there is a call from Mr. Baca to Mr. Tanaka.

MR. FOX:  Your Honor, I am putting on the calendar under September 7th, "Baca/Tanaka calls."

Q    I am going to show you Mr. Baca's calendar again. This is Page 7 from Exhibit 120.  What does Mr. Baca's calendar show starting on September the 8th?

A    It shows "Personal."

Q    Showing the next page.  How long does Mr. Baca's calendar reflect no entries generally other than personal?

A    Until September 21st, I believe.

Q    And on September 21st, while it still says "Personal," what does it say?

A    That at 8:30 to 9 that Undersheriff Tanaka to chair the sheriff's staff meeting in the EPC conference room.

Q    Looking at Page 11, does September 22nd reflect a personal day for Mr. Baca?

A    No.

MR. FOX:  All right.  Your Honor, I am going to now play clip 42 from Exhibit 2, which will be reflected in the jury's Exhibit 3 binder just past the 42 tab.

May I proceed, your Honor?

THE COURT:  Yes, please.

(Audio played.)

MR. FOX:  Your Honor, I am going to place on the

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

calendar starting on September 8th, "Baca out," and then arrows reflecting the time that he was out.

Q    Special Agent Tanner, I am now going to play in that same -- reflected in that same transcript book clip number 43.

(Audio played.)

Q    BY MR. FOX:  Special Agent Tanner, I want to show you now Government's Exhibit 211, Page 2, and two calls that occurred while Mr. Baca is out of the office that happen on September the 12th.

What does your chart here reflect?

A    That there are two calls on September 12th at 10:53 and 1:32.  One is from Lieutenant Leavins to Mr. Baca's driver.  And at 1:32 it is from Mr. Carey to Mr. Baca's driver.

Q    How long is the call between Mr. Leavins and Mr. Baca's driver?

A    Two minutes.

MR. FOX:  I am going to be putting on the calendar now under September 12th, "Carey/Leavins call driver."

Q    What happens on September the 12th?

A    That is the day that Anthony Brown was rebooked under his real name and transferred to state prison.

Q    Special Agent Tanner, in your investigation attempting to obtain phone records, were you able to

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

determine many of the phone calls that Mr. Baca either --

well, Mr. Baca had while he was -- while he had his

personal days?

A      No.

Q      And showing you the chart that you made for

Mr. Baca's county cell.  Why weren't you able to do that?

A      The way that phone records showed for that time

period, because he was overseas it showed on a separate

phone record and it was roaming and international, and so

the calls were showing up much differently than they

would on regular phone records.

And the majority of the calls were either

unavailable or it was just showing almost like he was

calling himself, which is not really what it was.  It was

more showing unavailable or they didn't have the number

that was calling him when he was roaming overseas.

Q      Special Agent Tanner, I am going to show you now

Government Exhibit 197, Page 15.  Is this an example of

what Mr. Baca's phone records looked like when he was in

the country?

A      Yes.

Q      And then looking at now Page 16, is this what you

are referring to about how it looks when he is out of the

country, if we pull up some records that are easier

to see?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

A      Yes.  So a lot of them are unavailable, but there are some throughout this time period that also showed -- even though it was an incoming call, it was showing that it was his phone number that was calling.

So whether that was a voicemail call, I don't know.  It just wasn't -- there just wasn't any number available on a lot of the calls during the September 8th through September 21st time period that I could identify, aside from a handful.

Q      And we see just on what I have pulled up here on September the 9th at 2:45, what does it show on this?

A      That is Mr. Baca's cell phone, and so it is calling voicemail.

Q      Then if you could look down at September 9th at 9:44 p.m., do you recognize that 5000 number?

A      Yes.

Q      What is it?

A      That is the main line to the sheriff's office.

Q      Is that reflected on your chart?  Let me go back.

A      I believe so.  Yes.

Q      Now, you mentioned that on Mr. Baca's calendar on September 22nd, it doesn't show that he has got a personal day that day.  I want to focus you on an entry that is at 4:30 to 5:00 o'clock p.m. on September 22nd.

What does this reflect?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

A    At 4:30 p.m. to 5:00 p.m. is "Meet with Tanaka."

MR. FOX:  Your Honor, I am putting on the calendar on September 22nd, "Baca meets Tanaka."

Q    Now, I am showing you, Special Agent Tanner, on the same page, September 23rd, what is reflected on September 23rd at 3:30?

A    From 3:30 p.m. to 4:00 p.m. is, "Meet with Assistant Sheriff Rhambo."

Q    Special Agent Tanner, have you had an opportunity to look at Mr. Baca's calendar from August 18th to September 26th of 2011 to see if there are any other entries in which Mr. Baca's calendar reflects a meeting only with Assistant Sheriff Rhambo?

A    Yes.

Q    According to Mr. Baca's calendar, were there any other meetings that Mr. Rhambo had alone with Mr. Baca?

A    No.  This is the only meeting that was listed.

Q    And does this calendar -- strike that.

MR. FOX:  I am going to put on the calendar, your Honor, on September 23rd, "Baca meets Rhambo."

MR. HOCHMAN:  Objection, your Honor, to the extent that it identifies it only on the calendar.  If he wants to qualify --

THE COURT:  Let's go to sidebar.

(From 8:27 to 8:34, the proceedings, Pages 1892 to

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1896, were conducted under seal.)

(The following proceedings were resumed in the presence of the jury:)

THE COURT:  Ladies and gentlemen, certain charts and summaries are being shown to you in order to help explain the facts disclosed by the books, records, documents and testimony which are evidence in the case.

They are not themselves evidence or proof of any facts.  If they do not correctly reflect the facts or figures shown by the evidence in the case, you should disregard these charts and summaries and determine the facts from the underlying evidence.

MR. FOX:  And now, your Honor, I am going to put on September the 23rd "Baca meets Rhambo" with the exhibit from the calendar listed on there.

Q    Special Agent Tanner, just like with the phone records, you don't know what was discussed at this meeting; correct?

A    No.

Q    And with respect to Mr. Rhambo's testimony in court, if it was a different date besides September 23rd, you wouldn't know when that occurred because it is not reflected in the calendar; is that correct?

A    Correct.

Q    I am now just going to show the very beginning of Mr. Baca's appearance on Good Day LA, which is -- well,

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

let me just show his calendar first.

According to Page 12, what time was Mr. Baca scheduled to be at the interview for Good Day LA?

A      From 8:30 to 9 in the morning.

Q      Does it have a parenthesis after 9:00 o'clock?

A      8:45.

Q      And looking at 10 it 2, and like I said, I will just show the very beginning of it, what time is reflected on the screen shot here?

A      9:37.

Q      Showing you now Mr. Carey's phone records at 196, Exhibit 196, Page 29.  Other than Mr. Baca's Good Day LA appearance, what happened on 26th?

A      That is the day that Mr. Craig and Ms. Long threatened to arrest me at my apartment.

Q      And showing you this page on Government Exhibit 196, Page 29, where does this exhibit show Mr. Carey is from 10:15 to 1:20 p.m., when he is using his phone?

A      In Monterey Park and Alhambra.

Q      And then at 1:57 to 2:44, where does it appear that Mr. Carey is, according to these phone records, when he is using his phone?

A      Monterey Park.

Q      Looking at Mr. Baca's phone records on page 19 --

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

this is Exhibit 197, Page 19 -- did Mr. Baca use his

phone, according to these records, at any point between

9:35 and 2:00 o'clock p.m.?

A    No.

Q    So according to these records, is there any way to

track where he was during that time period?

A    No.

Q    Going back to his calendar, Page 12, does

Mr. Baca's calendar reflect where he might have been,

say, at 10:00 o'clock a.m. after that Good Day LA

appearance?

A    Yes.

Q    Where does it show?

A    At 10:00 o'clock it is undersheriff's office, and

then a few meetings -- two meetings after that are both

set here, in reference to where the meetings are located.

Q    Then we see a 2:00 to 4:00 o'clock meeting on

500 West Temple Street; is that correct?

A    Yes.

Q    I am going to play now in Government Exhibit 2,

which is reflected in the jury's Exhibit 3 binder clip

number 44.

         (Audio played.)

Q    BY MR. FOX:  Special Agent Tanner, I want to ask you

about specific statements that Mr. Baca made in that

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

clip.  First of all, he said that he did not come back to work until the 26th.

Showing you again Exhibit 120, Page 11, which day does it show that he came back?

A    September 22nd.

MR. HOCHMAN:  Objection.  Misstates the actual fact on the calendar.

THE COURT:  Overruled.

Q    BY MR. FOX:  And there was a discussion in that clip about a fundraising dinner for the president of the United States.  Is that what I am showing right now on Page 12 from his calendar at 4:30 to 6:30, and then from 6:30 to 7:00 o'clock?

A    Yes.

Q    And then there is another entry that shows another event from 5:00 o'clock to 6:30 in Los Angeles; is that correct?

A    Yes.

Q    Where does it show that the president of the United States fundraising dinner was?

A    In West Hollywood.

Q    Did you do anything to determine whether Mr. Baca was at that presidential fundraising dinner 4:30 to 7:00 o'clock p.m.?

A    Yes.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Q     What did you do?

A     I looked at his phone records to look at the location and see if he had any incoming or outgoing calls during that time so that it would identify his location of where he was from that 4:30 to 7:00 time period.

Q     Showing you now Page 19 of Exhibit 197, you are saying that you looked at this record; is that correct?

A     Correct.

Q     And focusing on the first call that we see here starting at 3:58, in the middle of the page.  Do you see that?

A     Yes.

Q     Where does it show that he is?

A     In Los Angeles.

Q     And what time was the time when the sergeants confronted you?

A     5:31 p.m.

Q     What time was it approximately when you made it back to Westwood after they confronted you?

A     It was approximately 30 to maybe 45 minutes later.

Q     So we are talking about what time?

A     Approximately 6:00, 6:15 at the latest.

Q     Is that when you spoke to your assistant director in charge?

A     Yes.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Q    According to Mr. Baca's phone records, where was he around the time that you went back to Westwood and spoke to Mr. Martinez?

A    Monterey Park.

Q    From what times to what times?

A    For both the 5:57 call and the 6:07 call, and then Alhambra, which is directly next to Monterey Park, until 6:37 p.m.

Q    Then we see a 7:35 call, San Marino.  Do you know where Mr. Baca -- without getting into the specific address, do you know where Mr. Baca lived at the time?

A    Yes.

Q    Where?

A    In San Marino.

Q    Showing you now Exhibit 194, Page 15.  Are these the records for Mr. Baca's backup driver?

A    Yes.

Q    Did you look at Mr. Baca's backup driver to see where the backup driver was on the same date?

A    Yes.

Q    This is 194, Page 15.  Why did you do that?

A    Because I knew that if Mr. Baca was going anywhere, he was being driven by a department member, and so it would -- if I didn't have anything on his records, I can also look at the driver's records to see if I can

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

determine where he was based on the driver's records

because he would have been the driver.

Q     Did you look at the regular driver's records?

A     Yes.

Q     And what did they show you?

A     They show forwarded call, which means that whether it was the backup driver or the regular driver -- anytime it was showing forwarded calls that means it was the other person, the other driver that was on duty at that time.

Q     And what does this show for September the 26th, where the backup driver was starting at 4:18 p.m.?

A     Monterey Park and Alhambra.

MR. FOX:  Now going to play from the transcript reflected in Exhibit 3, clip number 20 from Exhibit 2.

(Audio played.)

MR. FOX:  Now, I am going to place as a demonstrative exhibit -- I think it is Exhibit No. 231. Yes.  Exhibit 231.

Q     Special Agent Tanner, we heard on that clip Mr. Baca say a couple of things.  First, that he would intercede -- interceded immediately and contacted the investigators.  Who were the investigators that approached you on September 26th?

MR. HOCHMAN:  Objection.  Misstates the second

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

part of contact, investigators that approached her.

THE COURT:  Overruled.  You can answer.

THE WITNESS:  It was Scott Craig and Maricela Long.

Q    BY MR. FOX:  Showing you Mr. Baca's records during and after the time of the confrontation that Ms. Long and Mr. Craig had with you outside of your apartment,

Does Government Exhibit 197, Mr. Baca's phone records, reflect any calls between Mr. Baca and Ms. Long or Mr. Craig during this time?

A    No.

Q    Based on your review of the phone records, did Mr. Baca ever have any contact with Ms. Long or Mr. Craig on his cellular phone to their cellular phones?

A    No.

Q    And Mr. Baca in that clip also stated that he would call Mr. Carey or call somebody.  Let's start with Mr. -- well, let's start with Mr. Leavins, actually.

Mr. Baca's phone records, do they reflect any calls with Mr. Leavins on September 26th after you were confronted?

A    No.

Q    How about with Mr. Carey?

A    No.

Q    Special Agent Tanner, are you familiar with how

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

calls from the U.S. Attorney's Office cell phone appear on phone records?

A    Yes.

Q    How do they appear?

A    They either show up as restricted or unavailable.

Q    And we see here -- highlight it a little bit better -- see the 22-minute call at 7:35 p.m.?

A    Yes.

Q    What does the phone record reflect occurred at this time?

A    That there is an incoming call from an unavailable number and they speak for 22 minutes.

Q    After this call, according to Mr. Baca's phone records, did he make any other calls, use the cellular phone in any other way after 7:35 p.m. on September 26th?

A    No.

MR. FOX:  One moment, your Honor.

(Counsel confer.)

MR. FOX:  Your Honor, I have no further questions for this witness at this time.

THE COURT:  All right.  Cross-examination?

MR. HOCHMAN:  Yes, your Honor.

(Pause in proceedings.)

MR. HOCHMAN:  May I proceed?

THE COURT:  Yes.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

MR. HOCHMAN:  Thank you.

We will begin by moving into evidence Government's Exhibits 67 and Defendant's Exhibits 501 and 503, your Honor.

MR. FOX:  No objection.

MR. HOCHMAN:  Let me qualify, excuse me.  501 in its entirety.  503 other than the last page, your Honor.

MR. FOX:  Yes.  I have seen these documents, and as Mr. Hochman represents we have no objection to the admission of the exhibits in the form that he suggests.

THE COURT:  They will be received.

MR. HOCHMAN:  Thank you, your Honor.

CROSS-EXAMINATION

BY MR. HOCHMAN:

Q    Agent Tanner, you joined the FBI in April of 2009; is that correct?

A    Yes.

Q    And you spent the first five months at the FBI's training academy and started in the Los Angeles field office in September of 2009; is that correct?

A    Yes.

Q    Now, Mr. Fox asked you whether or not you were currently in your rookie year and you said you were not; correct?

A    He just asked if I was a rookie agent.  That is it.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

And I am not.

Q    Right, because you are in approximately your eighth year at this point; is that correct?

A    Correct.

Q    But you were in your rookie year in the Los Angeles FBI office when you were assigned the sheriff's department investigation in June, 2010; correct?

A    Rookie is your term.  We don't describe new agents as rookies.  They are agents.  And so I don't know what -- when you are saying I was a rookie agent, that is your term, not ours.

Q    Did you understand what that term meant when Mr. Fox used it in his questioning?

A    He was asking if I was a rookie agent and I said no.

Q    Do you understand what the term rookie agent means?

A    I understand how you are asking it.  I am telling you we don't use the term rookie agent.

Q    You were in your first year in the Los Angeles field office when you received the June, 2010 request to investigate an inmate letter from your boss?

A    Yes.

Q    And in that first year that you were in the office, the Los Angeles field office, did you teach any classes on civil rights enforcement?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

A     I had done some training on civil rights, yes, at that point.

Q     Did you teach some classes on civil rights enforcement during that year?

A     I don't -- yes, I did teach individuals on civil rights violations during that year.

Q     Did you participate in any civil rights trials in that first year?

A     No.

Q     Did you participate in any prosecutions of any law enforcement officers in that first year?

A     No.

Q     Did you take any classes or receive any training in that first year on how the Los Angeles County sheriff's jails worked?

         MR. FOX:  Objection.  Relevance.

         THE COURT:  Sustained.

Q     BY MR. HOCHMAN:  Now, prior to working for the FBI you had never worked for a law enforcement agency; correct?

A     Correct.

Q     Had you ever worked in a jail or prison?

         MR. FOX:  Objection relevance.

         THE COURT:  Sustained.

Q     BY MR. HOCHMAN:  You were first assigned to the

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

civil rights squad when you were assigned in Los Angeles in September of 2009; is that correct?

A    Yes.

Q    How many people were in the civil rights squad at that time?

A    I believe six or seven.

Q    And they were all -- I'm sorry?

A    Possibly eight.

Q    And they were all special agents?

A    Yes.

Q    And again, the name special agent, that is the designation given to every FBI agent; correct?

A    Absolutely.

Q    Now, you said that you had a supervisor in the civil rights squad; is that right?

A    Yes.

Q    And I think you said your supervisor had a supervisor as well?

A    It is not just specific to the civil rights squad. Every squad has a supervisor, and then there is multiple levels of supervisors above each squad supervisor.

Q    So just so I am clear, say between you and the assistant director in charge of the LA office, how many levels are there?

A    There are my supervisor, his supervisor, that

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

supervisor's supervisor, and then the assistant director in charge.  So three to four levels.

Q      Three to four levels?

A      Yes.

Q      And are there any other squads in Los Angeles besides the civil rights squad?

A      Any other squads at all?

Q      Yes.

A      Yes.

Q      Is there like a public corruption squad as well?

A      Correct.

Q      And a bunch of other squads covering the whole -- I think that you said you had one agent that you asked from a gang squad; is that correct?

A      Yes.

Q      In total there is about 800 special agents in the LA field office?

        MR. FOX:  Objection.  Relevance.

        THE COURT:  Sustained.

Q    BY MR. HOCHMAN:  Now, in June 2010 you said your supervisor gave you a letter from an inmate at the Los Angeles County jails alleging deputy misconduct and asked you to look into it; is that correct?

A      Correct.

Q      And after doing some initial investigation, you

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

opened up an investigation on the sheriff's department;
is that correct?

A     Correct.

Q     Was this the first civil rights investigation of a
law enforcement officer that you were the lead case
agent for?

A     Yes.

Q     And as part of looking into this, did you interview
that inmate who sent the initial letter?

A     Yes.

Q     Was that interview at the Men's Central Jail?

A     Yes.

Q     Now, prior to this interview, this first interview,
had you ever visited the Men's Central Jail before?

A     I don't believe at that point I had.

Q     Did you also interview other inmates at the Men's
Central Jail who made similar allegations?

A     Yes.

Q     In addition to interviewing these inmates, you also
researched the sheriff's department in order to
understand how it ran the jails; correct?

A     I wouldn't say how it ran the jails.  I did a
significant amount of research to determine if there was
prior allegations or other things involving the sheriff's
department.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Q     Well, you wanted to make sure that you did research and obtained information so that you could conduct as thorough an investigation as possible; is that correct?

A     I guess you are speaking very broadly.  I absolutely did a lot of background investigation in addition to interviewing witnesses, but I guess I am not sure what you are referring to in terms of what specifically I was researching.

Q     Well, sure.  Your background investigation you were doing in order to do as thorough an investigation as possible; is that correct?  That was the purpose of the background investigation?

A     Yes.

Q     And as part of it, you learned how the sheriff's department was structured from a deputy to a sergeant, lieutenant, captain, commander, chief, assistant sheriff, undersheriff, all the way to the sheriff; is that correct?

A     I wouldn't say that that was something I focused on initially.  It is something I learned as I was investigating through sheriff's department witnesses that I interviewed.

Q     And you were investigating -- and since you were investigating deputy misconduct, you learned that there were two bureaus inside the sheriff's department that

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

looked into deputy misconduct, the Internal Affairs Bureau and the Internal Criminal Investigations Bureau; correct?

MR. FOX: Objection. Irrelevant and cumulative.

THE COURT: Sustained.

Q   BY MR. HOCHMAN: Did you contact anyone at the Internal Criminal Investigations Bureau after you spoke with the initial inmate who made the allegation about deputy misconduct?

MR. FOX: Objection. Irrelevant and cumulative.

THE COURT: Sustained.

Q   BY MR. HOCHMAN: Did you speak with anyone in the Internal Affairs Bureau after the initial -- you received the initial complaint from that inmate?

MR. FOX: Same objection, your Honor.

THE COURT: Same ruling.

Q   BY MR. HOCHMAN: Did you know that the Internal Criminal Investigations Bureau, ICIB, had worked with the federal government on occasions --

MR. FOX: Objection, your Honor.

THE COURT: Sustained. Let's go to sidebar.

(From 9:02 to 9:03, the Proceedings, Page 1914, were conducted under seal.)

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

(The following proceedings were held in the

presence of the jury:)

MR. HOCHMAN:  May I proceed, your Honor.

THE COURT:  Yes.

Q    BY MR. HOCHMAN:  Now, when you wanted to interview
an inmate at the Men's Central Jail, you couldn't just go
down into the jail, walk in, and go right up to the
inmate's jail cell and start talking to the inmate; is
that correct?

A    No.

Q    You had to go through a process with the sheriff's
department in order to visit an inmate because the
sheriff's department ran the jails; correct?

A    I don't know that it is specifically because they
ran the jails.  It is that we followed the procedure that
we were asked to follow.

Q    And the procedure that you were asked to follow was
by the sheriff's department; correct?

A    Yes.

Q    Because the sheriff's department ran the jails?

MR. FOX:  Objection.  Asked and answered and
argumentative.

THE COURT:  It is argumentative.  Next question.

Q    BY MR. HOCHMAN:  Well, the inmate was in the custody
of the sheriff's department at the time that you were

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

seeking to speak with him; correct?

A     Yes.

Q     And the sheriff's department had a -- had one process for when outside law enforcement wanted to speak with an inmate and a separate one visitors like when friends and family wanted to speak with an inmate; is that correct?

A     Yes.

Q     And you went through the law enforcement process; is that correct?

A     Yes.

Q     And for instance CJ, when he was posing as Anthony Brown's friend, he went through the visitor process; correct?

A     Correct, because he was undercover.  He wouldn't go through law enforcement.

Q     Now, when CJ went to visit Anthony Brown in the visitor's process, there is a general visitation room with a glass divider between him and Anthony Brown; correct?

A     It wasn't a general room.  It was a whole row of glass partitions and everyone just sat directly next to each other.  He didn't have a separate room.  It was multiple people would be in the same room together.

Q     It wasn't private, and there was a glass divider

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

between CJ and Anthony Brown; correct?

A    Correct.

Q    And they would speak through phones on the call; correct?

A    Yes.

Q    Now, when you went ahead were and visiting inmates, you went through you said the law enforcement process; correct?

A    Yes.

Q    And you had to -- the sheriff's department required you, I believe you testified, to show your FBI credential and give your California driver's license; correct?

A    Yes.

Q    And they required you to give the name of the inmate you wanted to speak with and write down his booking number as well; is that correct?

A    I can't remember if we did it when we initially walked in or if it was once we walked to the interview room we would just tell the deputies that were standing there that this is the inmate we would like to have brought down.

Q    And these were the requirements that the sheriff's department had in order for you to meet with the inmate; correct?

A    I wouldn't say requirements.  That is just the

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

process we always went through. I don't know -- at the time especially I didn't know what their requirements were. I just know that is what we always did to get the inmate brought down.

Q I will phrase it slightly differently. This is the information the sheriff's department asked you to provide in order to speak with the inmate; correct?

A Yes.

Q And the sheriff's department determined where in the jail you got to speak with the inmate; is that correct?

A Generally, but we spoke to inmates more than just the interview rooms. So I would say it was sometimes on a case by case basis.

If they didn't have open rooms, they would let us go in other areas that weren't law enforcement rooms.

Q Right. They would let you go to different areas, but you couldn't tell them I want to speak to an inmate in a particular room; correct?

A I probably could have. I just never did.

Q And the sheriff's department tried to work with you in arranging a private room for you to actually speak with these inmates; correct?

A Prior to them becoming aware of us meeting them, they let us come in, just like any other law enforcement

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

agency.

Q    In a private room; correct?

A    In a private room.

Q    And that private room, instead of having a glass divider and wall phones, it had a table and chairs so you could speak openly with the inmate; correct?

A    Correct.

Q    And the sheriff's department allowed you to bring in documents to show the inmate; is that correct?

A    If we needed to, we would bring in notebooks and things.

Q    And the inmate could bring you documents and show you documents in your interview with them; correct?

A    If they wanted to.  It usually didn't happen, but they could.

Q    The sheriff's department didn't search you before you entered those rooms; correct?

A    No.

Q    And when you were in the room the sheriff's department never told you that you could or could not ask an inmate a certain question; correct?

A    No.

Q    And the sheriff's department gave you complete freedom to ask the inmates whatever questions you wanted, even about deputy misconduct; correct?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

MR. FOX:  Objection.  Vague as to time.

THE COURT:  Sustained.

Q    BY MR. HOCHMAN:  Well, it was the first year, June 2010 to July 2011, when you are having these interviews with these inmates; correct?

A    Correct.

Q    And approximately how many inmates are you speaking with during that year timeframe?

A    At that point -- I believe dozens at that point.

Q    And again, when the inmate was in the private room with you, did the FBI have custody over the inmate in that private room?

A    I don't understand what you mean.

Q    Well, when the inmate was in the private room with you, the sheriff's deputies weren't in that room; correct?

A    Correct.

Q    Did you have custody over the inmate at that period of time?

A    Again, I still don't understand what you mean by that.  We didn't have custody over an inmate.  We sat with an inmate and interviewed them, and when they were done, they walked back to their cell.

Q    When you said they walked back to your cell [sic], at times they would actually walk back to their cell and

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

at times the sheriff's department would come and get them?

A    Ninety-five percent of the time inmates were general population, which means they could walk around the jails on their own.  There was no escort.  There were no deputies walking them to and from the interviews.

Q    Right.  Because they were at all times in the custody of the sheriff's department, not the FBI; correct?

A    They were in sheriff's department custody, I guess, if that is what you are asking.

Q    Now, when you would speak with these inmates over that one-year period from June 2010 to June 2011, I believe you prepared reports of those interviews; correct?

A    Yes.

Q    And they were on that form 302 that you talked about?

A    Yes.

Q    And you tried to be as accurate as possible in writing down the notes or typing out the notes of those interviews; correct?

A    Yes.

Q    And then you would take those FBI 302 reports and you would put them in your case file; is that correct?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

A    Yes.

Q    Did you actually record the interviews that you were having with the inmates between June, 2010, and June, 2011?

A    Do you mean audio record?

Q    Yes.

A    No.

Q    Why not?

A    It just is not something that we do.  We don't audio record every interview, especially if there is two agents present.  Both agents will document what is being said and write it in the report.

Q    But the most accurate way to have all the information that the inmate provided you during the interview would be an audio recording; is that correct?

        MR. FOX:  Objection.  Relevance.

        THE COURT:  Sustained.

Q    BY MR. HOCHMAN:  Now, among the things that the inmates were telling you were deputies that were engaged in excessive force; correct?

A    Yes.

Q    And deputies that were retaliating against inmates for making complaints about the deputies; correct?

A    Yes.

Q    Showing you Exhibit 53.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

MR. HOCHMAN:  Mr. Fox, if we can put Exhibit 53

before -- or whatever is.

(Pause in proceedings.)

Q    BY MR. HOCHMAN:  Do you have Exhibit 53?  It is in

the Volume I of the -- there we go.

If we could scroll to the second or third

page, please.  Next page, please.  And then rotate it.

So Exhibit 53 are alleged retaliation

complaints made by a number of inmates at the Men's

Central Jail.  Do you see that?

A    Yes.

Q    And these are complaints that came in.  It says the

chart was updated 8/24/2011?

A    Yes.

Q    Are those some of the complaints from inmates that

you were investigating as part of your FBI investigation

of the sheriff's department?

A    Are you saying these specific inmates?

Q    These specific inmates, yes, if you know.

A    I would have to go back and look at all of my

reports.  We interviewed hundreds and so just by looking

at this right now I couldn't say for certain whether

these five individuals, we interviewed any of them.

Q    Now, to the extent that these five individuals show

up on declarations included in ACLU supplemental motion,

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

is it most likely that these individuals would have been part of your investigation?

A     Like I said, I would have to review all of my reports to figure out if I interviewed any of these five individuals.

Q     Are there any individuals who made allegations that went to the sheriff's department about retaliation that you didn't look into?

A     I'm sorry.  I don't understand what you are asking me.

Q     Certainly.  If they made these allegations to the sheriff's department and ended up on this list, is it most likely that you would have looked into these allegations?

A     They are two totally separate things that you are asking about.  We investigated information that came to us or that we found in another way.  We weren't doing things specifically because someone said I told the sheriff's department.  We would interview an inmate. They would tell us what happened.  Sometimes they would tell us go interview this person, go interview another person.

So they are two exclusive things.  You are trying to combine the two, and they are not -- our investigation was what we were finding and what we were

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

investigating.  Had nothing do with anything the

sheriff's department may have.

Q    Well, again, these from an ACLU supplemental

motion.  You would have been able to get information from

sources outside the sheriff's department in order to

figure out which inmates are alleging retaliation;

correct?

A    Are you asking whether I read the ACLU

declarations?

Q    Yes.  I am asking actually this question, was that

you were able to get information outside the sheriff's

department to determine which inmates were alleging

retaliation; is that correct?

A    I am asking if you are referencing the ACLU,

because when you say other sources or other information,

that is really broad.  So I am just clarifying to say are

you asking if I read the ACLU declarations.

Q    More specifically, yes.

A    I did.  They didn't come out until well after our

investigation was underway.

Q    Okay.  So as part of your investigation, you did

review the ACLU declarations that would have contained

the information on this page that we are looking at in

Exhibit 53; is that correct?

A    Again, you are taking two totally separate things

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

and trying to combine them as one.  If I read the ACLU declarations, that doesn't mean I can tell you I looked into these five things that the sheriff's department has listed on the form.  They are to two totally different things.

So I can't tell you based on reviewing ACLU declarations that that is the same thing as reviewing these five inmates because it says they wrote an ACLU declaration.

They are two totally different things.

Q    Do you recall receiving any ACLU declarations of retaliation that you didn't look into?

A    Yes.

Q    How many?

A    I couldn't tell you.  There were a lot of allegations that were made that after first glance and going through them that we determined we were going to focus on other ones that we had more solid evidence on. So there were some that we would read and not do follow-up on.

Q    And those are because there wasn't solid evidence for those?

A    It was because at the time we had to focus on the ones that we did have solid evidence on.  There was only three of us working on the case and we had hundreds of

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

allegations and we had to focus on the ones that had the most solid evidence.

Q    And the ones that you did focus on had the least solid evidence; is that correct?

A    No.

MR. FOX:  Objection.

MR. HOCHMAN:  I will withdraw the question, your Honor.

Q    You did not start out your investigation as a grand jury investigation; is that correct?

A    Within about a month, it had become a grand jury investigation.

Q    You did not start out your investigation as a grand jury investigation; is that correct?

A    It can't start out as a grand jury investigation, so no.

Q    Well, when you say no, I asked you if that was a correct statement.  So it is a correct statement that you did not start out your investigation as a grand jury investigation?

A    No, because we cannot.

Q    When you say no, again, my question is -- well, I will ask it differently.  Did you start out your investigation as a grand jury investigation.  "Yes" or "no."

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

THE COURT:  If you have an issue with the witness, address the Court, not the witness.

MR. HOCHMAN:  I'm sorry.  I thought --

THE COURT:  It is not TV.  Next question.

Q    BY MR. HOCHMAN:  Now, you understand -- but you said after about a month it became a grand jury investigation; is that correct?

A    Yes.

Q    And you understand that an FBI agent who speaks with a witness can go in front of a grand jury and provide word for word everything that a witness said to them in order to convey that information to the grand jury; is that correct?

A    Yes.

Q    And that is because the grand jury can consider hearsay and doesn't need the actual person who gave you the information to appear before the grand jury in order to have that information given to the grand jury; correct?

A    Correct.

Q    Now, when you were speaking with the inmates from June 2010 to July 2011 at the Men's Central Jail, did you ever tell the deputies who you were seeing at that time coming in and out of the jail that you were there to investigate sheriff's department deputy misconduct?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

A     No.  As I already stated, that was the whole point, is we did not want them to know that we were investigating them.

Q     You wanted to keep that fact hidden from them; correct?

A     I wouldn't say hidden.  That is what we do in investigations is we do not tell the subjects that we are investigating them.

Q     So you wanted to keep that fact secret from them; correct?

A     We wanted to conduct our investigation and we did not want them to know.

Q     Which -- so, one of the deputies that you met during this time was William David Courson; is that correct?

A     It is Deputy Courson.

Q     William David Courson; that is correct?

A     Yes.

Q     I believe you testified that you first met with Deputy Courson when you started to go to the jails in the summer of 2010; correct?

A     Correct.

Q     And in your first meeting with him, you lied about what you were doing at the Men's Central Jail; is that correct?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

MR. FOX:  Objection.  Misleading.

THE COURT:  Sustained.

Q    BY MR. HOCHMAN:  In your first meeting with him, did you tell him that you were investigating deputy misconduct?

A    I did not, but the way you word it is my first meeting with him.  It was just a casual conversation.  It went a meeting, per se, with him.  But no, I did not tell him that we were investigating deputy misconduct.

Q    So you lied to him and told him you were investigating human trafficking cases; is that correct?

MR. FOX:  Objection.  Misleading and argumentative.

THE COURT:  Sustained.

Q    BY MR. HOCHMAN:  Did you tell him the truth?

A    I told him I was investigating civil rights charges, including human trafficking, so that is not a lie.

Q    And were you investigating at that point human trafficking as it occurred in the sheriff's department?

A    No.  But civil rights includes excessive force, and I would also say civil rights, so I was not lying.

Q    So the part about human trafficking, though, that was not true?

A    That was a cover; correct.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Q    And you used the word cover.  You mean that it wasn't true; correct?

A    You are trying to take something and be very misleading with the word.  I was not lying in order to deceive somebody.  I was basically not admitting that we were investigating the sheriff's department, and I don't believe it is a fair question to ask whether I was lying to someone about that.

Q    You were trying to deceive Deputy Courson, though, about why you were there?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

Q    BY MR. HOCHMAN:  Now, Deputy Courson never caught on to the fact that you were there to investigate deputy misconduct; is that correct?

A    Well, he did at some point.

Q    At the time period that you are having these four or so meetings with him, he didn't catch on to the fact that you were there to investigate deputy misconduct; correct?

A    I don't believe so, no.

Q    And I believe Mr. Fox played you a tape recording of Deputy Courson's interview with the sheriff's department, and in that interview he said he was played by you.  Was that an accurate statement by Deputy

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Courson?

A    Absolutely not.

Q    You told him you wanted to be friends with him; correct?

A    I did not tell him I wanted to be friends with him.

Q    You gave him the impression through your actions that you wanted to be friends with him; correct?

A    I would say that in general he believed that we were friends.

Q    And you knew he wanted to have a romantic relationship with you; correct?

A    Yes.  And I was very clear from the very moment I met him that I was not interested in a romantic relationship.

Q    You exchanged e-mails with him?

A    Yes.

     MR. FOX:  Objection.  Your Honor, this is all irrelevant.

     THE COURT:  Sustained.

Q    BY MR. HOCHMAN:  Do you recall when Mr. Fox asked you the question on direct testimony whether or not you exchanged e-mails with him?

A    Yes.

Q    Did you exchange e-mails with him?

A    Yes.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Q    How many?

A    Quite a few.  He used to e-mail frequently while he was at work.  And so I wouldn't even be able to tell you how many.

Q    And I believe Mr. Fox asked you the various locations that you met with Deputy Courson at; is that correct?

A    Yes.

Q    That included a restaurant in Century City, a cafe in Westwood or Brentwood in a bar or a pub; is that correct?

A    Yes.

Q    And in each of these locations, you were trying to get Mr. Courson's trust so that he openly tells you about what is going on in the jails; is that correct?

A    I wouldn't say it is fair to say I was trying to gain his trust.  I was just trying to get information because he had, again, revealed that he was engaging in the very behavior that we were investigating, so I was trying to get information.

I was not -- I would not say I was trying to gain his trust.

Q    Well, you knew you couldn't get information from him about what is going on in the jails if you told him that you were there investigating sheriffs' misconduct in

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

the jails; correct?

A     Absolutely not true.

Q     Did you, in all these meetings that you had in the cafe and the restaurant, the bar or the pub, ever tell him at any point now that you were there investigating deputy misconduct in the jails?

A     You were asking whether I could.  I absolutely could have done that.  And he could have cooperated.  It was too big of a risk to take so I didn't.  That is not to say that I couldn't have and that he wouldn't have. They are two different things.

Q     But you didn't?

A     I did not.

Q     And the reason you didn't tell him is you wanted to gain his trust in order for him to give you information about the jails; correct?

A     Not true.

Q     You asked him to get you a confidential sheriff's department manual on defensive tactics; correct?

A     It was not confidential is my understanding.  I asked him to provide me with the manual.  That is it.

Q     Was that a manual that you could get yourself if you hadn't gotten it from Deputy Courson?

A     Absolutely.

Q     And did you get the manual, the Defensive Tactics

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Manual, yourself before asking for it from Deputy Courson?

A     No.

Q     And you told Deputy Courson a fib, something that wasn't true about why you needed this Defensive Tactics Manual; correct?

      MR. FOX:  Objection.  Your Honor.  May we have a sidebar, please.

      THE COURT:  Yes.

      (From 9:23 to 9:26, the proceedings, Pages 1936 to 1938, were conducted under seal.)

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

(The following proceedings were held in the presence of the jury:)

THE COURT:  Ladies and gentlemen, we are going to take our first break of the day.  Again, I want to remind you until this case is over, you are not to discuss this case with anyone including your fellow jurors, members of your family, people involved in the trial or anyone else.

Nor are you allowed to permit others to approach you or try to talk with you about this case.  If anyone approaches you and tries to talk with you about this case, please let me know about it immediately.  Do not read or listen to any news reports or other accounts about the trial.

Finally you are reminded to keep an open mind until all the evidence has been received, you have heard the arguments of counsel, the instructions of the Court and the views of your fellow jurors.

If you need to speak with me, simply give a note to the clerk.

We will come back at quarter till the hour.

(The following proceedings were held outside the presence of the jury:)

THE COURT:  All right.  We will see everybody in about 15 minutes.

(Recess from 9:28 to 9:45 a.m.)

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

(The following proceedings were held outside the presence of the jury:)

THE COURT:  All right.  Let me see counsel at sidebar.

(From 9:48 to 9:50, the proceedings, Pages 1941 to 1942, were conducted under seal.)

(The following proceedings were held outside the presence of the jury:)

THE COURT:  All right.  Let's bring the jury in.

(The following proceedings were held in the presence of the jury:)

THE COURT:  All right.  Let's resume.

MR. HOCHMAN:  Thank you, your Honor.

Q    Special Agent Tanner, if you recall in your direct testimony with Mr. Fox, he asked you some questions about what Deputy Courson told you about what was going on in the jail.  Do you recall that?

A    Yes.

Q    Now, isn't it true that Deputy Courson told you that he himself had never seen an inmate being sent to a hospital as a result of a fight with a deputy?

A    I believe that is what he said.  Yes.

Q    And didn't he also tell you that he himself had never observed an unreasonable use of force by a deputy against an inmate?

A    He did.  But he admitted to using unreasonable force, so I don't know that the two coincide.

Q    Was Deputy Courson ever prosecuted for any of the incidents that he told about in the jails?

MR. FOX: Objection.  Relevance.

THE COURT:  Sustained.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Q    BY MR. HOCHMAN:  Did you ever arrest Deputy Courson for anything he told you about going on in the jails?

MR. FOX:  Objection of him relevance.

THE COURT:  Sustained.

Q    BY MR. HOCHMAN:  Part of your investigation involved deputies using excessive force; correct?

A    Yes.

Q    And had Deputy Courson admitted to you that he used excessive -- or participated in the use of force on one occasion?

A    He admitted to using a flashlight on an inmate when he did not have to.

Q    And that would be excessive force?

A    We would have to look at the entire incident.

Q    Because there are occasions where a deputy could use their flashlight on an inmate that wouldn't be excessive force?

A    I guess it completely depends on the situation, whether or not it would be justified.  If you are asking me personally or if you're asking about the sheriff's department.

Q    I think you have answered the question.  I will move on to the next question.

When did you first meet Anthony Brown in person in Men's Central Jail?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

A      I believe it was in end of August, maybe early September of 2010.

Q      And from that period until when did you actually meet with Anthony Brown in the Men's Central Jail?

A      I believe I stopped meeting with him, it was either the end of 2010 or very early in 2011.

Q      And how many times in that period from, I guess it would be late August of 2010 until potentially early 2011, did you meet with Anthony Brown at the Men's Central Jail?

A      I don't know the exact number.  I would say at least ten probably.

Q      And each time you met with him would you write up one of those reports that would report what Anthony Brown told you as to what was going on in the jail?

A      Yes.  There was -- once he was signed up as an informant, there is a different form number that we used. But in general it is the same thing as a 302.  It is just a different form number because he is an informant at that point.

Q      Let me ask you, when he is an informant is that actually a process you have to go through to making a particular inmate an informant for the FBI?

A      It is not a particular inmate.  It is any informant.  It could be CEO of a company.  Any informant

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

there is a process we go through.

Q     Was Anthony Brown the only informant that you had at this point in time in connection with your investigation of the sheriff's department?

A     At what period of time are you asking?

Q     Well, let's say, June, 2000, to July, 2011.

A     No.

Q     How about June, 2010 till when you stopped seeing Anthony Brown at the beginning of 2011?

A     There was a little bit of crossover with another source that I had at the time.

Q     You had one other source?

A     At least one, yes.

Q     Approximately how many sources did you have?

A     Well, there was a few individuals that were signed up as informants.  They were not inmates, but that signed up as sources right around the same time period that you are asking, so I can't remember exactly.

Q     And was Anthony Brown the only inmate who you had as an informant from June, 2010 to July 2011?

A     Yes.

Q     And when you signed someone up as an informant, you give them a unique informant number; is that correct?

A     Correct.

Q     So in all of your reports, you wouldn't write

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Anthony Brown.  You would actually write that unique number on your reports; correct?

A    Correct.

Q    And that was to protect their identity?

A    Yes.

Q    And Anthony Brown also sent or gave you many letters that he would write about deputy misconduct in the jails; is that correct?

A    I don't think letters is a good word to use.  He would write down almost like a daily log, I guess is the best way to describe it, where he would say, you know, on Tuesday, X, Y, J, 2010, this happened on this floor at 4:35 p.m.  This deputy said this or I saw this.

     So it wasn't a letter.  It was a log of what was going on.

Q    And he would give you these logs when you would meet with him at the Men's Central Jail?

A    Yes.

Q    And then you could actually take those logs out of the Men's Central Jail and put them in your case file; is that correct?

A    Yes.

Q    Did you ever go to the grand jury between June, 2000, and July 2011 and tell the grand jury all the stuff -- all the information that Anthony Brown had

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

provided to you either in person or in these logs?

A      No.

Q      Now, when you signed an informant up, you have to give that informant something called an admonition; is that correct?

A      Yes.

Q      What is an admonition?

A      Well, we call it admonishments, but I am assuming that's what you mean.

Q      What is an admonishment?

A      There are multiple admonitions that we gave to every single source, no matter.  Again, if they are an inmate or if they are a CEO of a company.  And then there is additional admonishments that we give that are specific to the person that we have as an informant.

So the four ones that are given to everyone were given to Anthony Brown.

Q      And those included following your instructions; is that correct?

A      Yes.

Q      And not lying to you; correct?

A      Correct.

Q      What happens if someone violates one of these admonishments?

A      Well, it happens all the time with all informants,

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

so usually we talk to them and explain to them the importance of being truthful or whatever the issue was, and then depending on what the issue was, we may go to our supervisor or even the U.S. Attorney's office, explain what occurred and get their approvals to continue working with that informant.

Q    Because it is very important for an informant to be truthful with you; correct?

A    Yes.

Q    Because, in part, let's say with an undercover investigation, if you base the undercover investigation on the informant, it is very important for that informant to be reliable and honest; is that correct?

A    We would never base an undercover operation on solely one informant's information.

Q    Well, when you are doing an undercover operation in the jails, for instance, that involves a bribe transaction in which the informant is dealing with the deputy, it is very important that that informant be reliable and trustworthy, or else they could blow your whole investigation; correct?

A    The information that we are using for that -- you know, to do that operation, it is important for that information to be truthful.  Yes.

Q    Or else it could blow your whole operation;

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

correct?

A     I don't know that the two coincide.

Q     Well, if the informant were, for instance, to tell the deputies inside the jail about your undercover investigation before it happens, that would blow your whole investigation; correct?

A     True, but that has nothing to do with truthfulness.

Q     Well, that has to do with following instructions; correct?

A     Yes.  But that has nothing to do with truthfulness, which is what you asked.

Q     But you were give an instruction to an informant not to inform the targets of the investigation about the investigation; correct?

A     I am sure we told them that, but that was an obvious thing that he wouldn't tell them.

Q     Now, with respect to confidential informants, and in particular with Anthony Brown, before you would sign them up at a confidential informant you would go ahead and check out his criminal background is what I believe you told Mr. Fox; is that correct?

A     Yes.

Q     And that is because you want to see what type of criminal background they have; correct?

A     Not necessarily.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Q      You want to see whether or not they could be truthful, trustworthy and honest; isn't that correct?

A      That is not the purpose of the criminal history check.

Q      And you did do a criminal background check for Mr. Anthony Brown; is that correct?

A      Yes, it is required.

Q      And you found out that in 2005, he was convicted for a series of armed bank robberies; isn't that correct?

A      I believe so.  Yes.

Q      I believe it was three armed bank robberies at that time; isn't that right?

A      Without having the criminal history in front of me, I couldn't tell you the number.

Q      You have reviewed criminal histories as part of your case file; correct?

A      I have not reviewed his criminal history since 2010 so I couldn't tell you without it in front of me the very specific numbers or exact charges.  If you have it and you want me to review it, I am happy to do so.

Q      Well, we will see how much at this point you remember.  With respect to his criminal history, in 2009 he was charged with 12 different armed bank robberies; isn't that correct?

A      It wasn't 12.  The way you are explaining it I

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

don't think is accurate.  Twelve counts is different than 12 separate incidents.  And so --

Q      Twelve different charges --

A      Correct.

Q      -- of armed bank robbery; correct?

A      Correct.

Q      And in fact, one of the charges was assault, an additional charge was assault with a deadly weapon when his gun was shot at a particular witness and missed him.

            MR. FOX:  Objection.  Relevance.  Cumulative.

            THE COURT:  Sustained.

Q    BY MR. HOCHMAN:  And you also looked into whether or not Anthony Brown used any narcotics; is that correct?

A      No.

Q      Wasn't it true that Anthony Brown was high on crack cocaine when he was charged with these 12 armed bank robbery charges?

            MR. FOX:  Objection.  Foundation.  Relevance.

            THE COURT:  Sustained.

Q    BY MR. HOCHMAN:  Now, with respect to Anthony Brown, when you started to deal with him over the next year, you found out that Anthony Brown was a manipulator; correct?

A      About some things he was manipulative.  Not everything.

Q      And Anthony Brown was also a serial liar; isn't

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

that correct?

A    I don't know what your definition of a serial liar is.  There were some things he was not truthful about and there were a lot of things he was truthful about, so I don't know what your definition of serial liar is.

Q    Anthony Brown told you a lot of lies; isn't that correct?

A    He told some.

Q    For instance, Anthony Brown said at that the FBI -- the FBI provided Deputy Bravo with a cell phone that Deputy Bravo then provided to Anthony Brown.  That is not true; correct?

A    Correct.

Q    Because the FBI never provided it Deputy Bravo with a cell phone to give to Anthony Brown; correct?

A    Correct.

Q    And Anthony Brown also said that Deputy Gilbert Michel had given him various narcotics like marijuana, Ecstasy, heroin, cocaine and methamphetamine.  And that was a lie as well; correct?

A    Well, based on the information we have, we don't believe that happened; correct.

Q    Well, did you during the undercover operation give Deputy Michel marijuana, Ecstasy, heroin, cocaine and methamphetamine to -- as part of a bribe transaction to

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

give to Anthony Brown inside the Men's Central Jail?

A    Your question was whether Deputy Michel did it.  I can't tell you after he met with the undercover agent if he had done something.  I am saying our investigation, we did not believe he had done that, but we never provided any narcotics ever to Gilbert Michel.

Q    Why not?

A    Because it was something we chose not to do.

Q    It was something you could have done but you chose not to use narcotics as the form of contraband for the undercover investigation; is that correct?

A    We chose not to.

Q    Why not?

A    It was a discussion that we had with the United States Attorney's Office, and after discussion we decided we weren't going to do that.

Q    Because that is a line that you didn't want to cross; correct?

        MR. FOX:  Objection.  Relevance.

        THE COURT:  Sustained.

Q    BY MR. HOCHMAN:  Well, you understood the drugs are very dangerous inside of a jail; is that correct?

        MR. FOX:  Objection.  Relevance.

        THE COURT:  Sustained.

Q    BY MR. HOCHMAN:  Now, another Anthony Brown lie is

when he said that CJ, the undercover, gave a nurse drugs to give to Anthony Brown; isn't that correct?

MR. FOX:  Objection.  Foundation.  Vague as to time.

THE COURT:  Sustained as to the foundation.

Q    BY MR. HOCHMAN:  Well, did the FBI through CJ -- you are familiar with who CJ is; correct?

A    Yes.

Q    Did CJ ever give drugs to a nurse inside the sheriff's department in order to give them to Anthony Brown?

A    The undercover agent never gave narcotics to anyone.

Q    So when Anthony Brown is telling the sheriff's department investigators that a nurse gave him narcotics, that would be a lie; correct?

MR. FOX:  Objection.  Foundation.

THE COURT:  Sustained.

Q    BY MR. HOCHMAN:  Have you reviewed the reports that the LASD did in Los Angeles Sheriff's Department in connection with this investigation of the Anthony Brown situation?

A    Yes.

Q    And you are aware that in one of those reports --

MR. FOX:  Objection.  Hearsay.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

THE COURT:  Sustained.

Q    BY MR. HOCHMAN:  Now, when Anthony Brown said that he sent you videos and photos of inmate beatings, that was not true as well; correct?

MR. FOX:  Objection.  Vague as to time and foundation.

MR. HOCHMAN:  I will lay a foundation, your Honor.

THE COURT:  All right.

Q    BY MR. HOCHMAN:  You recall that you were shown a letter that Anthony Brown wrote.  I believe it is Exhibit 115 or 110, but it was a letter that Anthony Brown wrote on September 3rd, 2011.

Do you recall that?

A    Yes.

Q    And in that letter Anthony Brown wrote that he had given the FBI videos and photos of what I believe were the inmate beatings.

Do you recall that?

A    He wrote something to that effect in the letter.

Q    Did Anthony Brown ever send you videos or photos of inmate beatings?

A    No.

Q    So when he made that statement in that letter on September 3rd, 2011, that statement was a lie; correct?

A    In terms of what he wrote in that letter that he

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

wrote to the sheriff's department, he was not truthful, but he actually told me why did he that.

Q    We will get to that in a second.  Let me focus for a moment on things that you gave Anthony Brown.  And by you, I mean you as an FBI agent, obviously, not you personally.

Between July, 2010, and July 2011, did you provide any money to Anthony Brown's accounts at the Men's Central Jail?

A    Yes.

Q    Approximately how much money did you provide?

A    I could not tell you during that time period how much.

Q    Would it be approximately a thousand dollars?

A    I don't believe it was that much, but, again, I would have to look back.  It was seven years ago.  I would have to look at the actual documents we filled out to get the approvals for the money to be able to tell you the exact amounts.

Q    And these documents are in your case file; correct?

A    Correct.

Q    And your case file is available to you even today; isn't that right?

A    Yes.

Q    So with respect to the money that you gave Anthony

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Brown, it was hundreds of dollars at least; correct?

A    At first it was a few hundred dollars for phone cards.  Yes.

Q    And that was actually my next question.  The money was to be used to purchase phone cards, in part to make phone calls to yourself; is that correct?

A    No.

Q    What was the purpose of the phone cards for which the money was given?

A    It was two-fold.  The first one was to be able to call CJ even just to notify him, hey, come down and see me.  Something like that.  But then there was also for him to use the phone cards as a way to get out of his cell more often because there were inmates on each floor who kind of -- they call them shot callers that ran the floor, and the deputies allowed them to be out of their cells all the time.  And so when he cosied up to those inmates, he was allowed to be out of his cell more often and then he was out to see more of the things going on.

Q    And some of those inmate shot callers were gang members; correct?

A    The deputies selected them to be the shot callers for the floor.  I don't know the backgrounds of all of them, but some of them were gang members.

Q    So if I understand you correctly, you are giving

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Anthony Brown money on his account to buy phone cards in order to give those phone cards to shot callers, some of whom are gang members; correct?

A    That the deputies selected to be out of their cells frequently and run the floor.  Yes.

Q    Now, with respect to other things that you gave Anthony Brown, at some point in your dealings with Anthony Brown -- now I am going to expand the timeframe to when he went to state prison -- did you also give Anthony Brown thousands of dollars of money?

A    No.

Q    Did you give him about a little over a thousand dollars of money?

A    We did not give him any money.

Q    Did you provide money on his account in the -- over a thousand dollars during the entire time you are dealing with Anthony Brown?

A    Yes.

Q    And did you also give Anthony Brown things, like a TV, earphones and transcripts for his case?

A    We did not get transcripts.  What we did was we put money on his books.  When he went to state prison, he was able to use that money to purchase some of the things that they allow in state prison, head phones, some music, a small TV, things like that.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Q      Now, with respect to the undercover investigation, you are aware that Anthony Brown was convicted of those 12 armed bank robberies at the end of June of 2011; is that correct?

A      Again, your question is saying 12 bank robberies, and that is not accurate, so no.

Q      You are aware that Anthony Brown was convicted of 12 charges of armed bank robbery at the end of June, 2011; is that correct?

A      Yes.

Q      And he was sentenced to 423 years of imprisonment; correct?

A      Correct.

Q      It is a life sentence; correct?

A      Obviously.

Q      And you know that Anthony Brown now being sentenced to a life sentence, at that point in time he has nothing to lose; correct?

        MR. FOX:  Objection.

        THE WITNESS:  He is appealing his case.

        THE COURT:  Excuse me.

        MR. FOX:  Objection.  Argumentative.

        THE COURT:  Sustained.  The answer is stricken. The jury should disregard it.

Q      BY MR. HOCHMAN:  Now, it was after that sentence was

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

handed down that you arranged the first undercover

operation using Anthony Brown as the inmate in connection

with the bribe transaction of Gilbert Michel which

occurred on July 20th; correct?

A      That is not entirely accurate.  We had already

begun prior to his conviction planning the undercover and

getting everything moving on that.  It wasn't until the

actual bribe exchange did occur after he was convicted.

But everything was in motion for months before.

Q      Well, after the sentencing, you didn't stop at that

point using Anthony Brown now that you knew he was

sentenced to 423 years; correct?

A      No.

Q      When you say no, is that correct or incorrect?

A      No, we did not stop using him.

Q      And at the time you know that he has been sentenced

to this 423-year sentence, you knew that at any point,

the sheriff's department could transport him to state

prison; is that correct?

A      Correct.

Q      Now, you spoke about an operational plan that you

put together in order to do the undercover operation;

correct?

A      Yes.

Q      And I believe you said that part of the operational

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

plan you got approval or -- you got approval for the operational plan locally and nationally; is that correct?

A      You are combining two statements.  The operational plan is separate from the undercover, basically like application, I guess you could call it.

They are two separate things.  An operations plan is specific to an occurrence that one day, and outlines the actual exchange of cash.

The undercover operation was a totally separate document, and that is what was approved and signed off on at headquarters.

Q      Let me focus then on the undercover.  What did you call it, undercover operation?

A      Yes.

Q      The undercover operation paper that you submitted a report -- it would be a report?

A      It is just a plan, a document.  Whatever you want to call it.

Q      We will call it the undercover operation plan. What did the undercover operation plan call for if Anthony Brown got transported to state prison as to what was to happen with the cell phone?

A      That was not outlined in the plan.

Q      And what did they outline in the plan, if anything, as to what would happen if the cell phone was actually

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

discovered on Anthony Brown while he was at the Men's Central Jail?

A     That was actually not a huge concern because we knew that from prior experience the sheriff's department had found phones before, and it hasn't been a big deal. So it wasn't something we were concerned about putting in the plan.

Q     Did you know -- well, the FBI, had it -- were you aware of whether or not the sheriff's department had ever found an FBI cell phone in the prison before?

A     I couldn't tell you.  Other than our operation, I don't know of one, but it doesn't mean that there wasn't one.

Q     Well, you knew at the time of your undercover operation plan that if Anthony Brown was found out to be a snitch for the FBI that his life could be in danger from both inmates and the deputies he snitched on; correct?

A     I wouldn't say his life would be in danger.  I would say that we knew that there were risks when both inmates and deputies would find out that he is an informant.

Q     Well, you heard the testimony of --

        MR. FOX:  Objection, your Honor.  Calls for the witness to comment on somebody else's testimony.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

MR. HOCHMAN:  I will withdraw the question.

Q     Did you have experience at that point in time using inmates as part of undercover operations at that point in time?

A     No.

Q     And was this your first undercover operation involving law enforcement in the jail?

A     Yes.

Q     Now, with respect to trying to understand what the undercover operation plan was -- let me see if I can state it and tell me if I am stating it correctly -- that Anthony Brown was to tell Gilbert Michel that he had a certain amount of cash on the outside; is that correct?

A     I don't know if that was the basis of it.

Q     Well, what was Anthony Brown supposed to tell Gilbert Michel as to how this transaction was to take place?

A     We were not involved in the specifics about how he was going to discuss everything with Gilbert Michel. What we had known at that point, that deputies had approached him and offered to bring in contraband in exchange for cash.  And at that point, we knew based on what Anthony Brown was telling us that it was because deputies believed he had all of this cash stashed on the on the outside, which is why he had the ability to pay

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

them cash for doing this.

We didn't necessarily have that written into our plan.  That was something that he had already told us.

Q    And based on your investigation, did Anthony Brown have all this cash from his armed bank robberies on the outside?

A    I have no idea if there was any cash.

Q    And then Anthony Brown would then tell Gilbert Michel to contact CJ; is that correct?

A    Correct.

Q    And then CJ and Gilbert Michel would then set up the day in which the money would be exchanged for the cell phone; is that correct?

A    Correct.

Q    And the exchange between Gilbert Michel and CJ, that was all recorded; correct?

A    Correct.

Q    And those recordings were put in your case file?

A    Yes.

Q    And at that point, just so I am clear, how much cash was initially discussed as to what CJ was going to pay Anthony Brown?

A    I believe they discussed $1,500.  We ended up splitting that into two transactions, but I believe they

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

initially discussed 1,500 total.

Q    Now, in choosing or selecting the cell phone as the form of contraband, isn't it true that Anthony Brown told CJ that Gilbert Michel was willing to smuggle in either cigarettes, outside food or cell phone?

A    I believe it was all of those three.  It wasn't necessarily separating them out as one or the other.  It was all three.

Q    And your undercover operation picked the cell phone; is that correct?

A    Correct.

Q    And at the time you were aware of the dangers that a cell phone could be used for if it was put in a jail facility; is that correct?

A    We knew there were dangers, yes.

Q    And those dangers included planning escapes; is that correct?

A    It could be.

Q    Included arranging hits on witnesses?

A    It could be.

Q    It included threatening or intimidating witnesses?

A    Could be.

Q    And it included conducting gang activity inside the jail; is that correct?

A    It could be.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Q     And it included potentially smuggling drugs inside of a jail?

A     It could be.  Again, all those things could also be done on the jail phones as well.

Q     Now, the jail phones, though, you understood to be recorded phones; correct?

A     Correct, but not monitored.

Q     And the cell phone was neither monitored nor recorded; correct?

A     Correct.

Q     Now, at the time -- this is now July, 2011 -- had you consulted with an FBI law enforcement bulletin entitled Cell Phones as Prison Contraband that was published in July of 2010?

A     No.

Q     Did you do any research in the FBI's database to find out about the dangers of how a cell phone could be used in a jail?

A     I did discuss with executive management and other individuals with significant experience.  I don't know what other research you mean.

Q     Now, when you said -- or when I gave you that list of dangers and you kept saying it could be, at the time that you set up the undercover operation on July 20th, 2011, you didn't know one way or the other whether or not

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

these dangers were actually going to occur when the cell phone got into the jail; is that correct?

A    In any operation you don't know whether or not something dangerous could occur.

Q    Now, the dangers actually didn't get realized during the time from July 26, when the cell phone was put in the jail, until the time it was found on August 8th, 2011; correct?

A    None of them ever came to.

Q    But, again, you didn't know that ahead of time; correct?

A    Again, with any operation you never, ever have an idea if something may go differently than you planned, and so that is why you have to minimize risk as much as you can.

Q    Now, the operation that then happens occurs -- the first undercover bribe transaction occurs on July 20th, if I am not mistaken; is that correct?

A    Yes.

Q    But before that happened, I believe you testified when Mr. Fox asked you the questions that you had received two phone calls from Anthony Brown on the public jail phone; correct?

A    Yes.

        MR. HOCHMAN:  Your Honor, I would ask Mr. Fox to

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

play -- the Exhibit 195 is the first clip.  And before that, your Honor, Exhibit 67, your Honor, which is now in evidence, has a transcript of Exhibit 195.  And I would ask that these transcripts, or Exhibit 67, a copy may be passed out to the jurors so they could follow along as Exhibit 195 is being played, your Honor.

THE COURT:  Any objection?

MR. FOX:  No, your Honor.

THE COURT:  That is fine.

MR. HOCHMAN:  May I approach the jury, your Honor -- or your court clerk?

THE COURT:  Approach the clerk.

MR. HOCHMAN:  Thank you, your Honor.

If we may play the first clip from Exhibit 195, which is the July 18th, 2011, call, starting on Page 1 of Exhibit 67.

(Audio played.)

MR. HOCHMAN:  Let me stop you right there.

Q    You had received -- before July 18th, 2011, you had received dozens of phone calls like this from Anthony Brown in the preceding year; is that correct?

A    Yes.

MR. HOCHMAN:  If we could continue on, please.

(Audio played.)

Q    BY MR. HOCHMAN:  Now, in all the times before

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

July 18, 2011, you didn't accept the phone call; correct?

A      Correct.

Q      Because you knew that the phone call was going to be recorded by the sheriff's department because they said right there in the message it was going to be monitored or recorded; correct?

A      That was part of the reason.

MR. HOCHMAN:  We can continue on, please.

(Audio played.)

Q      BY MR. HOCHMAN:  When you are talking about being ready to roll, you are talking about the undercover transaction with Gilbert Michel; is that correct?

A      Correct.

Q      And when Mr. Brown is talking about his boy, he is referring to CJ; is that correct?

A      Yes.

Q      And when it says UF in the transcript, or unidentified female, that is you?

A      Correct.

MR. HOCHMAN:  Please continue.

(Audio played.)

Q      BY MR. HOCHMAN:  Now, the AB in Exhibit 67, the transcript, that was Anthony Brown; correct?

A      Yes.

Q      And you had a chance, then, to speak to Anthony

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Brown the next day, on July 19th; is that correct?

A    Yes.

Q    Again, that was a phone call that Anthony Brown was making from the public jail phone; correct?

A    Correct.

Q    And you knew it was going to be recorded if you answered it and spoke with him; correct?

A    Yes.

MR. HOCHMAN:  If we could play the second call now, and we are referring to Page 3 of Exhibit 67.

(Audio played.)

Q    BY MR. HOCHMAN:  When Anthony Brown is talking about getting his message, he was in touch with CJ at this time; is that correct?

A    Correct.

Q    And he would pass messages to CJ in order to have them passed to you; is that correct?

A    Yes.

MR. HOCHMAN:  Please continue.

(Audio played.)

Q    BY MR. HOCHMAN:  Now, when you said you would be having your phone soon and you can call who you need, the phone you are referring to is the cell phone that Gilbert Michel was going to be bringing him; correct?

A    Yes.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Q     And then you had a third call with Anthony Brown on a public jail phone on July 21, 2011; is that correct?

A     Yes.

Q     And you knew that call was going to be recorded by the sheriff's department; correct?

A     Yes.

MR. HOCHMAN:  Will you play the next clip, please.

(Audio played.)

Q     BY MR. HOCHMAN:  Now, the reason that you said you are good, you are good, is because on -- this was July 21 is the phone call -- on July 20th, you were aware that Gilbert Michel had taken the cell phone in exchange for the bribe payment; correct?

A     Correct.

Q     And you were letting Anthony Brown basically know that the cell phone was on its way; correct?

A     It wasn't necessarily that it was on its way.  It was that it had occurred and from that point we were just waiting to see what happened.

Q     Now, you knew, then, by July 21, that the sheriff's department, if they ever investigated this cell phone and investigated Anthony Brown's records of who he called from his jail cell, that they would lead directly to you with three recorded conversations; correct?

A     It wasn't something I thought about.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Q     Now, on July 20th is when the actual transaction occurs; correct?

A     Yes.

Q     And I believe when you were answering Mr. Fox's questions, you said that there were approximately six surveillance agents in the parking lot where Gilbert Michel was going to meet with CJ; is that correct?

A     Not necessarily in the parking lot.  There were a few agents in the parking lot, but otherwise the agents were farther away, just so that they could follow Gilbert Michel after he took the bribe.

Q     And I believe you said that members of your squad were also there; correct?

A     Yes.

Q     So grand total on the ground you had about ten FBI agents; is that right?

A     I don't think there was that many.  I include some of the agents in the squad on the surveillance.  So I wouldn't say it wasn't that many on the ground.

Q     Six to eight?

A     Maybe.

Q     And then you said that you and two other agents, three other agents were up in a plane videotaping the bribe transaction down below; is that correct?

A     Not entirely.  There is two agents that are pilots,

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

and there are required to always be two pilots, and a third individual is not an agent but he was running the camera.

Q    Now, you were able to take videotape of the bribe transaction happening down below; is that correct?

A    Yes.

MR. HOCHMAN:  May we have -- I will just ask my co-counsel.

THE COURT:  Ladies and gentlemen, I am going to ask you to turn those transcripts over until we need them again.

(Pause in proceedings.)

MR. HOCHMAN:  Sorry, your Honor.  This will just take one second.

Your Honor, I would like to show the witness what has been marked for identification as Defense Exhibit 527, if I might approach your court clerk.

THE COURT:  Yes.

Q    BY MR. HOCHMAN:  Showing you what has been marked for identification as Defense Exhibit 527.  Do you have that before you?

A    Yes.

Q    Is that a fair and accurate photograph of the bribe transaction that happened between Gilbert Michel and CJ, or at least the photograph from up above, from the plane

looking down on that transaction on July 20th, 2011?

A     I would have to mirror it up with the video.  I can say that this looks similar, but I can't tell you that a hundred percent this is the same thing without comparing it to the video.

MR. HOCHMAN:  The government would move into evidence Defense Exhibit 527, your Honor.

THE COURT:  I believe the defense is moving it. So any objection?

MR. FOX:  One moment, your Honor.

(Counsel confer.)

MR. FOX:  No objection, your Honor.

MR. HOCHMAN:  May I publish, your Honor.

THE COURT:  Yes.

MR. HOCHMAN:  Thank you.

Q     Now, you have Defense Exhibit 527 on the monitor before you.  CJ's car is which car in the photograph?

A     Again, if you just want me to assume that this is a hundred percent from the video?

Q     Yes.

A     Then I can tell you that that looks like the Jeep that CJ was driving.

Q     That would be the black car in the video?

A     Correct.

Q     Excuse me, in the photograph?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

A    Correct.

Q    And Gilbert Michel's car would be the white car in the photograph; is that correct?

A    Correct.

Q    And that is the transaction where CJ gave Gilbert Michel $700; is that correct?

A    I believe the first one -- the first meeting was 700.

Q    And at some point Gilbert Michel drives away from this transaction?

A    Yes.

Q    And I recall that you also said that CJ had video and audio recording equipment in his car as well at that time; is that correct?

A    I believe it was both video and audio in the dash vent.

Q    Now, after this transaction occurs, was Gilbert Michel arrested?

A    No.

Q    And after, by the way, you had those three phone calls with Anthony Brown, did you contact the sheriff's department and tell them that Gilbert Michel had accepted a bribe transaction?

A    Absolutely not.

Q    So and the reason that you didn't arrest Gilbert

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Michel at that point, at least in part, is that Gilbert Michel hasn't brought the phone into the jail; is that correct?

A    That was only one part of the reason.

Q    And the way to verify whether or not Gilbert Michel brought the phone into the jail was to see whether or not Anthony Brown made a phone call to either you or CJ once he had the phone; correct?

A    Yes.

Q    Now, at some point did you find out that Anthony Brown did get a cell phone?

A    Yes.

Q    That was on July 26, 2011, about six days later; correct?

A    Correct.

Q    And at that moment in time, did you arrest Gilbert Michel now that the cell phone was in the jail?

A    No.  As I stated, that was only part of the reason we hadn't at that point.  So, no, we did not.

Q    Well, part of the other reason that you said, I believe, was that Anthony Brown could use the cell phone for various purposes once it was in the jail; correct?

A    That was another part, but there was also other additional reasons we did not arrest him at that time.

Q    And one of the purposes that you arranged with

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Anthony Brown to use the cell phone for was to take videos or photos of deputy misconduct that was going to happen in front of him?

A     I don't think the way you are phrasing it is accurate.  There are plenty of times, the way the jails and the bars in the jails are positioned, you can actually be in your jail cell and see down the row that is not right next to you or right on top of you and still see something that is going on 50 feet down the row.  So to say right in front of him is not accurate.

Q     So the example you gave, he would have to surreptitiously or secretly take the cell phone, sort of angle it through the bars as something is going on down the row, and then put it back quickly before anyone saw him; is that correct?

A     Absolutely not.

Q     Did CJ ever give him instructions on how he was to take video and photographs with the cell phone?

A     No.  I think it is self-explanatory.

Q     And part of the reason that you wanted to get videos or photographs -- well, you wanted to get videos or photographs, if you could, of any inmate misconduct going on in the jails; correct?

A     You said inmate misconduct.

Q     Excuse me, deputy misconduct going on in the jail?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

A      Correct.

Q      And you had discussed giving Anthony Brown a camera embedded in a cross that he could then wear on a necklace he had; is that correct?

A      Not entirely true.

Q      What part is not correct?

A      He did not have the necklace.  What he explained to us is that there are these corded-type necklaces that inmates made in the jail that the sheriff's department allowed inmates to wear.  And he told us that some of them are large, large enough that we could see if we could insert something into it like a camera.

So we spoke to our tech agents and asked them whether or not it would be possible to outfit this necklace-type thing with a camera, and we determined it just wouldn't work.

Q      Well, but it was one of the options that you were discussing; correct?

A      Right.  Until we determined it wouldn't work.

Q      And why did you determine it wouldn't work?

A      The capabilities of the cameras and the way we would be able to get the information as well as hiding a camera that small in this necklace, it just would not have worked logistically.

Q      I would like to talk for a moment -- you had a

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

discussion with Mr. Fox about certain safeguards that you took in connection with the cell phone.

Do you recall that discussion?

A     Yes.

Q     And the safeguard that you took was that you -- you had the ability to terminate service online whenever you wanted; correct?

A     Correct.

Q     And you had the ability to see online basically the phone records as the phone records were being generated from the phone calls; correct?

A     Correct.

Q     Now, when you see a phone record you don't know what Anthony Brown is discussing, actually the content of the phone call, by just seeing the numbers that are being dialed; correct?

A     Well, we did any time he reached out to CJ, of course, because those are were all documented and recorded, but in terms of what was shown on the website, correct, it was just the phone numbers.

Q     And if Anthony Brown sends a text you wouldn't see the actual writing in the text at the time that you are monitoring the phone record; correct?

A     Again, only if it was to CJ.

Q     And if it was to somebody else, you wouldn't be

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

able to see that content; correct?

A       Correct.

Q       And you weren't monitoring these phone records 24/7; is that correct?

A       No.

Q       You would monitor them basically during your waking hours, I would assume; correct?

A       Throughout the day and in the evenings, yes.

Q       But once you were asleep, you didn't work with someone else to monitor it when you were asleep; correct?

A       Correct.

Q       And did you ever set up an online alert that would notify you immediately every time the phone was either used to make a phone call or text message was sent?

A       That didn't exist, so, no.

Q       And you did have the capability of having Anthony Brown put in a series of numbers in order to then allow you to hear what was actually being said on a phone call or sent in a text; correct?

A       Are you referencing the FBI system?

Q       Yes.

A       We had a system set up that would allow, if you dialed certain numbers, had pin codes and it was a whole system set up, that if he chose to, he could have those recorded.  But you could still use the phone and have it

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

function normally without doing that.

Q     But you never had CJ give Anthony Brown those steps that he had to take and the numbers he had to dial in order to allow you to have the cell phone, excuse me, the telephone conversations recorded and the text messages recorded as well; correct?

A     No.  We intentionally did that.

Q     You intentionally did not give Anthony Brown that information so that he could put in information into the cell phone before each call that would allow you to see what was actually being said in a call or in the text message; correct?

A     I don't think the way you phrase it is accurate. We never set up this system on the phone.  So it wasn't that it was set up and we didn't give it to Anthony Brown.  We intentionally chose not to do that in case Gilbert Michel tried to check out the phone before bringing it to Anthony Brown.  It would have tipped him off that there was something up with the phone.

Q     Well, you could have told -- CJ could have told Anthony Brown the numbers he had to dial so that you wouldn't have to have it as a number already on the phone; isn't that correct?

A     I don't understand your question.

Q     In other words, you are saying that in order to

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

activate the system, before you make a phone call, you have to punch in a certain number series of numbers; correct?

A    It is a -- you have to call into a number like a telephone call.

Q    Right.  And Anthony Brown would have to have the number to call into; correct?

A    Correct.

Q    And Anthony Brown was never given that number; correct?

A    The system was not set up on the phone so there would be nothing to give him.

Q    But you could have set it up; correct?

A    We could have.  We chose intentionally not to.

Q    And you had no other way of monitoring what was actually being said on each phone call and what was actually being sent in each text; isn't that correct?

A    Again, unless it was to CJ, no.

Q    The cell phone also had Internet capabilities; is that correct?

A    Yes.

Q    Now, with respect to the calls themselves, I will show you what has been marked, what will be marked as Defense Exhibit 528.

     MR. HOCHMAN:  Actually, strike that.  It would be

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Defense Exhibit 501, your Honor.  I believe it is in evidence.

If I might present it to the court clerk, your Honor?

THE COURT:  Yes.

MR. HOCHMAN:  Thank you.

THE COURT:  Let me see that, please.

MR. HOCHMAN:  May I also present another copy, your Honor.

THE COURT:  That is fine.

Q    BY MR. HOCHMAN:Showing you what is in evidence as Defense Exhibit 501, and I would like to refer you to page -- it is the page that says 1 of 6.  Do you see that, slightly out of order?  The bottom page number is LASD080724?

A    Yes.

Q    Now, these are call records from Anthony Brown's cell phone; is that correct?

A    Yes.

Q    And I will direct your attention to July 26.  This is the first day that Anthony Brown got the cell phone, if you recall; is that correct?

A    Yes.

Q    Now, do you see CJ's number?  Did you happen to know CJ's number, and see it on Exhibit 501, Page 1 of 6?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

A    Yes.

Q    What number is it?

A    I believe it is the (213)278-4608.

Q    And that would be the number I have highlighted; is that correct.

Q    And that was a 50 second call that occurred on July 26, 2011?

A    Uh-huh.  Yes.

Q    Right after that, you see a phone call, (310)996-4174.  Do you see that?

A    Yes.

Q    And that was, again, also on July 26 for about 65 seconds.  Do you see that?

A    Yes.

Q    That was your number; correct?

A    Correct.

Q    And, at that point in time -- now, had you instructed Anthony Brown not to call your number with the cell phone that he was going to be given?

A    Yes.

Q    And that was in order to make sure that the cell phone was not directly linked to you or the FBI; correct?

A    It was two-fold.  In general, we just wanted all of his communication to go through the undercover agent.

Q    And what was the second reason?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

A     What you stated, that we didn't want it linked to the FBI.

Q     And the reason you didn't want it linked to the FBI is that if the cell phone was ever discovered, they would be able to get the phone records and quickly find out that the Anthony Brown cell phone was linked directly to the FBI; correct?

A     No.

Q     Wouldn't they be able to quickly find out if they saw this record on Page 1 of 6 that this cell phone had called your number at the FBI?

A     Could they have gotten the records?  Yes.  But I had no reason to believe they were going to get the records based on previous investigation.

Q     And I believe you also said that Anthony Brown went ahead and contacted CJ about having his cell mate use the phone as well; is that correct?

A     He called to ask permission.

Q     And do you know when he called to ask permission?

A     It was early on.  I can't remember the date.

Q     Was it the first day that he actually got the cell phone?

A     I believe so.  Yes.

Q     And did CJ then have a conversation with you if you recall?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

A      Yes.

Q      And you then agreed that he could go go ahead and use the -- excuse me.  The two of you agreed that Anthony Brown could then have his cell mate use the cell phone; is that correct?

A      Yes.

Q      Now, at some point, do you know if CJ went ahead and then communicated back to Anthony Brown the answer to his question on whether or not he could do this?

A      I believe that he, after we agreed to it, he told me that he was going to reach out to Anthony Brown and let him know that we would agree to it.

Q      And he would have to reach out to Anthony Brown before Anthony Brown's cell mate got to use the phone; correct?

A      I would assume so, yes.

Q      Well, if you look down this chart, you will see that there is a 323 number here that was dialed.

       Do you see that?

A      Yes.

Q      That was the girlfriend that you checked out of the cell mate; correct?

A      Yes.

Q      And there is no indication that Anthony Brown had any contact with CJ between the first phone call and the

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

time his cell mate is now using the phone; is that correct?

A       That is incorrect.  There is multiple.  Sorry. Didn't mean to touch the screen.  There is at least eight communications prior to that.

Q       All those refer to zero durations as far as seconds go; is that correct?

A       Those are text messages.

Q       Did you actually review those text messages at some point?

A       At the very time they were happening, the undercover agent was just sending them or sending me the general information or telling me the general information but I didn't have access to the phone to actually review them.  So it was just him generally telling me back and forth what was going on.

Q       So at the time that you are giving permission for the cell mate to use the phone, do you know who the cell mate is?

A       No.

Q       Do you know what -- do you know that he is on the 3000 floor with violent offenders; correct?

A       Not everyone on the 3000 floor is a violent offender.

Q       Most of them are; correct?

A       Some.

Q       And did you know what the cell mate was being charged with?

A       No.

Q       Did you know who the girlfriend was that the cell mate wanted to contact?

A       No.

Q       Did you know even if the cell mate had a girlfriend?

A       No.

Q       And you hadn't checked out the number at the time that you allowed this to happen to determine whether or not it was the girlfriend of the cell mate; correct?

A       I wouldn't have had the ability to do so.

Q       The cell mate actually made several calls over the next several days to his girlfriend; isn't that correct?

A       I believe there is additional calls on there, but most of them are very short.  So they are only 30 seconds.

Q       Well, you said at some point you actually checked out the number being dialed by the cell mate; is that correct?

A       Yes.

Q       When was that?

A       Soon after it showed up, I ran searches, database

searches on the number.

Q     And what did it show you?

A     It showed that the number came back to an individual.  I traced the address and that address linked to an individual, a male that we believed was the cell mate but still had no confirmation at that time.

Q     And, at that point, you found out that the cell mate was in jail for attempted murder; correct?

A     No.  We didn't have the cell mate's information entirely at that point.  There was multiple people listed at the address that the phone came back to, and so we didn't know entirely who the cell mate was.  There was multiple people we believed it could be, but we didn't have any information.

Q     Well, then, at some point later, while Anthony Brown has the phone, you found out that the cell mate was in for attempted murder; correct?

A     No.

Q     At some point after the phone was discovered, did you find out the cell mate was in for -- in jail for attempted murder?

A     No.

Q     Have you ever -- actually, I will withdraw the question.

       Now, after July 26, when you have now

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

confirmed that Anthony Brown has the cell phone because he has called you and CJ, at that point, do you arrest Gilbert Michel?

A    As I already stated, no.

Q    In fact, you went ahead and did another bribe transaction with Gilbert Michel; is that correct?

A    Correct.

Q    And that was also -- that was actually in a different parking lot; is that correct?

A    Yes.

Q    And I think you said the same sort of surveillance of five or more agents occurred; is that correct?

A    I believe so, yes.

Q    The plane was overhead taking pictures as well?

A    Yes.

Q    And there was someone taking pictures from the ground; is that right?

A    Correct.

MR. HOCHMAN:  May I approach the witness with what has been marked as Defense Exhibit 525, your Honor?

THE COURT:  Yes.

MR. HOCHMAN:  Thank you.

THE COURT:  Just give it to the clerk, please.

MR. HOCHMAN:  Yes.

Q    BY MR. HOCHMAN: Is Defense Exhibit -- is Defense

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Exhibit 525 a fair and accurate copy of a photograph of the August 4th, 2011 bribe transaction between CJ and Deputy Michel.

A       It appears to be one of the photos that was taken.

MR. HOCHMAN:  I move into evidence Defense Exhibit 525, your Honor.[]

THE COURT:  Any objection?

MR. FOX:  No objection, your Honor.

THE COURT:  Will be received.

Q    BY MR. HOCHMAN: Now, Defense Exhibit 525 is a black car pictured and a gray sort of a truck pictured.

Do you see that?

A       Yes.

Q       Which one was CJ in?

A       In the black jeep.

Q       And which one was Gilbert Michel in?

A       The truck.

Q       And this was the second part of the payment of the $1500 bribe transaction; correct?

A       Yes.

Q       So this payment was $800; is that right?

A       Yes.  I believe that was 800.

Q       And you actually saw CJ, or CJ actually did give Gilbert Michel that money; is that correct?

A       Yes.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Q    Did you arrest Gilbert Michel at this time?

A    No.

Q    Now, in August 8th, 2011, you found out that the cell phone that had been given to Anthony Brown had been discovered by the Los Angeles County Sheriff's Department; is that correct?

A    Yes.

Q    And, at that point, you know that -- I believe you said you already had those three recorded phone calls with Anthony Brown on the public jail system; correct?

A    Correct.

Q    And you knew as well that Anthony Brown had actually used the cell phone at that point to call you at your desk line at the FBI; isn't that correct?

A    Yes.

Q    And did you believe at that point that Anthony Brown's safety and life could be in danger because the sheriff's department would be able to connect, through these phone calls that you had had with Anthony Brown, the cell phone to him?

A    No.

Q    Did you notify assistant director, the head of your office, Steve Martinez on August 8th that the cell phone had been discovered?

A    I didn't personally.  It was passed through my

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

supervisor on up through the chain of command.

Q    But do you know if Steve Martinez was actually notified one way or the other?

A    I believe he was.

Q    On August 8th?

A    After the phone was found, I believe he was notified.  Yes.

Q    Do you know when?

A    I immediately told my supervisor the moment the call came from the undercover agent, and my supervisor was walking out of his office telling me he is going to tell management.

Q    And, then, at that moment in time, on August 8th, 2011, do you arrange for witness protection for Anthony Brown?

A    No.

Q    Now, you said that you sent -- and, you, yourself, on August 8th, 2011, you don't go to Men's Central Jail to try to speak with Anthony Brown; correct?

A    No.  That is why we sent another agent to check on him.

Q    And CJ doesn't go to the visitor section to try and speak with Anthony Brown on August 8th; correct?

A    No.

Q    In fact, CJ is never sent thereafter to speak with

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Anthony Brown all the way till the end when he leaves Men's Central Jail on September 12th; correct?

A     CJ never went and saw him in the prison if that is what you are asking.  No.

Q     Well, from August 8th until September 12th, CJ never saw Anthony Brown; correct?

A     In the visitor center is what you are asking?

Q     In the visitor center or anywhere in Men's Central Jail?

A     Correct.

Q     And you said that you didn't go on August 8th.  Did you go on the 9th or the 10th?

A     No.

Q     Now, on August 11th, I think you said you sent an agent from one of your gang squads; is that correct?

A     Yes.

Q     You are aware, aren't you, that Anthony Brown has a health condition; correct?

A     Yes.

Q     I think a heart condition amongst other conditions; correct?

A     Correct.

Q     And on August 11th, he was being seen in the medical ward for his heart condition; correct?

A     I don't know.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Q     Well, the reason that the agent who you sent down couldn't see Anthony Brown on that day is that he was in the medical ward; isn't that correct?

A     He just was turned away, and all I remember is him saying he wasn't able to see him.

Q     Well, and the reason -- and did you look into where Anthony Brown was that day to determine if he was at the medical ward receiving treatment on the day that you sent an agent to go to see him?

A     I would have absolutely no way of looking that up so I don't know how I would have done that.

Q     As part of your investigation, did you get records that would show whether or not Anthony Brown was in the medical ward, like those inmate transport records, that shows that Anthony Brown was in the medical ward on August 11th when you sent an agent to see him?

A     No.

Q     No, you didn't get the records?

A     I did not look to see if he was in the medical ward on August 11.

Q     Now, the first time I believe you said you saw Anthony Brown was that August 23rd meeting; correct?

A     Correct.

Q     And the last time you had personally seen Anthony Brown was about roughly eight months before that;

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

correct?

A      Probably.  Yes.

Q      And on that meeting, I believe you said you went with two other FBI agents, David Dahle and Wayne Plympton; is that correct?

A      Correct.

Q      Now, at that meeting that you were having with Anthony Brown lasted about an hour; is that correct?

A      Yes.

Q      And Anthony Brown, on August 23rd, told you about all the conversations he had had with the sheriff's department investigators up until that time; correct?

A      In a general sense.  I don't know that we were able to delve into a ton of specifics, but he generally told us that he had had some conversations with investigators.

Q      But you made it clear, for instance, that he had told them about Gilbert Michel and the FBI's undercover operation; correct?

A      I would have to look back at my report to see if he specifically mentioned talking about the FBI undercover, but I know that he had told us that he had, in fact, told them about about Gilbert Michel at that point.

Q      So you knew at that time that the sheriff's department knew that this was an FBI undercover operation; correct?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

A      I knew a few days prior to that.

Q      And you knew whether it was that day or a few days prior to that, that Anthony Brown being an FBI snitch was known to the sheriff's department; correct?

A      I don't know what you mean by known.  They had known about him since the time he had been in their custody.  So I don't know what you mean by known to them.

Q      Well, you talked about things being overt and covert, secret and out in the open.  By August 23rd, it was out in the open that Anthony Brown was working with the FBI; correct?

A      Correct.

Q      And Anthony Brown also told you on that August 23rd conversation about drugs that he said to the sheriff's department that Gilbert Michel had smuggled to him; correct?

A      I believe he mentioned that.  I don't think he went into detail, but I think he mentioned that.

Q      And, again, on that statement on August 23rd about the FBI giving Gilbert Michel drugs, that is not true; correct?

A      That the FBI gave Gilbert Michel drugs?

Q      Yes.

A      I don't believe he said that we gave Gilbert Michel drugs.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Q     Well, then, he said that Gilbert Michel had supplied him drugs; correct?

A     Correct.  But they are two different things, though.

Q     And with respect to the Gilbert Michel supplying him drugs, you understood that to be not true; correct?

A     At that moment, we didn't know, but we knew soon after.  We had reason to believe that that was not true.

Q     Now, after that meeting, that meeting was interrupted I believe you testified on direct; correct?

A     I would say interrupted is not the correct term. We were kicked out.

Q     All right.  When you were kicked out, you were told to wait because a captain wanted to speak with you; is that correct?

A     We were not told to wait.  We were asked to wait and we did for a short amount of time when nobody called or came, we decided to leave.

Q     And that was about five to ten minutes -- is that correct -- after you were asked to wait; is that correct? It was five to ten minutes after we had left the watch commander's office.  We were in the watch commander's office for quite a while at that point.  And at that point, we told them they we would wait in the lobby.  And we waited about 10 to 15 minutes in the lobby, and then

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

we left.

Q      You left your business cards; is that correct?

A      Correct.

Q      With the sheriff's department at that point in time?

A      Yes.

Q      And now it is August 23rd, 20011.  Are you aware that someone working with Captain Carey reached out to either you, Agent Dahle or Agent Plympton on August 23rd or soon thereafter?

A      We never received a call that I am aware of.

Q      Never received a voicemail message from anyone working with Captain Carey?

A      No.

Q      Now, from August 23rd to September 12th, 2011, did you, yourself, ever contact anyone at the sheriff's department to request a meeting with Anthony Brown?

A      No.

Q      After the meeting that you had with Anthony Brown, I believe you said that you contacted Lawrence Middleton at the U.S. Attorney's office about requesting a writ; is that correct?

A      Yes.

Q      Now, you understood that a writ was a court order that would have the sheriff's department bring Anthony

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Brown to the grand jury at a specific date and specific time; correct?

A    Not correct.

MR. HOCHMAN:  May we show Exhibit 113, please.

THE WITNESS:  I can clarify.  The sheriff's department does not bring in Anthony Brown.  He is to be released to the marshal's custody.  The marshals are the ones that bring Anthony Brown in front of the grand jury.

Q    BY MR. HOCHMAN: But the sheriff's department have to deliver Anthony Brown to the marshals at a certain date, and a certain time; is that correct?

A    They don't deliver him.  The marshals go and they pick him up.

MR. HOCHMAN:  Can we show Exhibit 113.  If we could go to the second page.  And just focus on the writing in the middle, please.

Q    Now, you see here that the commander of the Men's Central Jail is directed to produce and deliver the named detainee Anthony Brown to the federal grand jury on the 13th floor at 312 North Spring Street on September 7, 2011 at 9:30 a.m..

Do you see that?

A    Yes.

Q    That is what the writ that you were seeking was going to do which is have the sheriff's department, the

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

commander, deliver Anthony Brown at a certain day and certain time to the grand jury; correct?

A       The document says deliver.  I am telling you the actual procedure is that the marshals are the ones that pick up the inmate, bring them to their appearance and bring them wherever they need to go.

Q       Now, the date here is September 7th, 2011; correct?

A       Correct.

Q       And you were asking for this on about August 23rd or 24th; correct?

A       When I reached out to Lawrence Middleton?  Yes.

Q       Did you know that he was then going to request Anthony Brown be sent over to the grand jury on September 7th?

A       Yes.

Q       Now, I think you said that on August 26, you ran Anthony Brown in the computer and you saw that there was a custody release; is that correct?

A       Yes.

Q       Did you yourself call the sheriff's department to find out where Anthony Brown was?

A       No.

Q       And did you -- on September 7th, Anthony Brown wasn't brought to the grand jury; is that correct?

A       He was not.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Q    Did you call the sheriff's department on September 7th to find out where Anthony Brown was?

A    It was after he did not show up that I spoke to my supervisor, and he started the process to find out what had happened.

Q    Did you happen to call the sheriff's department on September 7 to find out where Anthony Brown was?

A    I spoke to my supervisor who went to do it.  I was not at that level that they wanted me to be reaching out. So I spoke to my supervisor, and he, in turn, started to try and figure out what was going on.

Q    Just so I understand your answer, you didn't call, you, yourself, call anyone at the sheriff's department to find out where Anthony Brown was; is that correct?

A    I personally did not, but my supervisor did.

Q    Did you go into the grand jury on September 7th and provide them with the information of all the statements that Anthony Brown had given you from August, September of 2010 all the way through August 23rd of 2011 so that the grand jury would have that information as part of their investigation.

Did you do that on September 7th?

A    No.

Q    Now, you were aware that Gilbert Michel ended up pleading guilty; correct?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

A       Yes.

Q       And he plead guilty in January, 2012; is that right?

A       Yes.

Q       And he plead guilty to one count of bribery; is that correct?

A       Yes.  I believe it was one count.

Q       So after January, 2012, you didn't need Anthony Brown to testify in front of the grand jury about Gilbert Michel's bribe transaction; is that correct?

A       That is not true.

Q       Well, once he has been charged -- and, actually, Gilbert Michel plead guilty in January 2012 as well; correct?

A       You just said that, yes.

Q       I'm sorry.  So once he has plead guilty to a crime, you don't need Anthony Brown to go into the grand jury and testify about what happened for that crime; correct?

A       That is not true.

Q       Now, on September 12th, I believe you testified Anthony Brown is released or transferred I should say from the Men's Central Jail to Lancaster State Prison; is that correct?

A       Yes.

Q       How do you find out about that?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

A      Around that time, I believe it was September 13th, I received a call or I spoke to my supervisor at the time, and he told me that he found out through, I believe it was Mike []Janaco that Anthony Brown had been transferred to state prison.

Q      Who was Mike Janaco?

A      He was one of the county attorneys.

Q      Was he the head of the Office of Independent Review?

A      He was one of the attorneys with the Office of Independent Review.

Q      Had you ever spoken to Mike Janaco at all from the time you got the investigation, June, 2010, till this September, 2013 time period?

        MR. FOX:  Objection.  Relevance.

        THE COURT:  Sustained.

Q      BY MR. HOCHMAN: Did you then go ahead and have a meeting with Anthony Brown in the state prison?

A      Yes.

Q      How did you go about setting up that meeting?

A      Same way we always did.  With the prison.  We contacted the investigations unit at the jail and told them we wanted to interview an inmate, and they asked when we wanted to come.  And they set it up.

Q      So with the jail, excuse me, you actually had to

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

call in advance in order to set up a meeting with a prisoner; is that correct?

A    Yes.  State prison is much different than county jail.

Q    And you actually had that meeting with Anthony Brown; correct?

A    Yes.

Q    And you had to go through the same sort of stuff of giving your ID, your credential, signing in, putting Anthony Brown's name, number, stuff like that before you had the meeting with Anthony Brown; correct?

A    It is not exactly the same procedure, but, in some ways, it is similar.  We had to show our identification. We don't sign who we are there to see.  They already know in the investigations unit who we are there for.

Q    And is it something you can do on the same day, or did you have to schedule it a day ahead of time?

A    It depends.  We have gone to state prisons on the same day before, but, usually, you have to do it the day before.

Q    And when you spoke with Anthony Brown, that was September 15th, 2011; is that correct?

A    Correct.

Q    Initially, Anthony Brown was upset at you; correct?

A    Very.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Q    But he relatively quickly calmed down; is that correct?

A    It was not relatively quickly.

Q    Well, how long were you there?

A    Hours.

Q    And would you say after an hour he calmed down?

A    It probably took longer than that.

Q    Two hours?

A    Probably.

Q    But by the end of the meeting, let's say the last hour of the meeting, Anthony Brown was providing with you the information like he had done all the way back since August of 2010; correct?

A    Yes.

Q    And he provided you information about what happened while he was in the sheriff's department custody from, you know, the time they found the cell phone on August 8th, 2011 all the way until he was released or transferred on September 12th, 2011; is that correct?

A    Yes.

Q    And he actually even provided with you more information about other incidents that he had observed during that timeframe of deputy misconduct; correct?

A    Yes.

Q    Now, you, actually, then, spoke with Anthony Brown

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

at the state prison many times thereafter in 2011 and 2012; correct?

A    Yes.

Q    Anthony Brown also sent you letters, actually, this time, from state prison to your FBI office; correct?

A    Yes.

Q    And in December, 2012, you arranged with Anthony Brown to be writted down to the grand jury and to testify in front of the grand jury; is that correct?

A    I didn't arrange with Anthony Brown.

Q    You were aware that Anthony Brown was writted out of state custody in order to testify in front of the federal grand jury in December of 2012; correct?

A    Yes.

Q    And he was testifying in the federal grand jury based on the Gilbert Michel bribe transaction?

A    That, in addition to the circumstances surrounding that which is what we were investigating at the time was the obstruction.

Q    He testified for about 45 minutes; correct?

A    I don't know the time.

Q    A little less than an hour if you recall?

A    I don't.

Q    And with respect to -- with respect to Anthony Brown, I think you had said that you provided him money

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

that he could then buy things; is that correct?

A     Yes.

Q     And that was all the way through 2012; is that correct?

A     Yes.

Q     Now, I would like to direct your attention to Gilbert Michel, if I might.  And I will focus now, when last we left off, there had been the bribe transaction on August 4th.  Do you recall that?

A     Yes.

Q     Now, I am going to fast forward to August 24th.  Do you have that date in mind?

A     Yes.

Q     On August 24th, you arranged to go ahead and speak with Gilbert Michel; is that correct?

A     Yes.

Q     And I believe you and other agents showed up at Gilbert Michel's apartment and waited for him to come back from work; is that correct?

A     Correct.

Q     How many other agents did you have with you at that time?

A     There were three of us that waited for him specifically.  There were other agents waiting out of sight to speak to his girlfriend.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Q      How many other agents were those?

A      Maybe three.

Q      So when Gilbert Michel shows up, do you ask him to secure his weapon in the car?

A      Yes.

Q      And, then, you don't speak with him initially at the apartment, you actually go to a Starbucks; is that correct?

A      Yes.  He didn't want us to go upstairs because his girlfriend was upstairs, and he wanted do it separate so that she didn't hear.

Q      And when you went to the Starbucks, you spoke to Gilbert Michel for a couple of hours there; correct?

A      I don't believe it was a few hours.

Q      How long was it?

A      I don't recall.

Q      More than an hour?

A      Probably, but I don't recall the exact amount of time.

Q      And I believe Gilbert Michel said on the recording that you had your laptop with you; correct?

A      Yes.

Q      And that is when you showed him the video of the bribe transaction which we showed a still photograph of; correct?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

A      We showed the video, but, yes.

Q      And you were showing -- and you also had a binder of documents with you as well?

A      Yes.

Q      And you are showing the video to him and you have the binder of documents with you, in order to show Gilbert Michel that you had the evidence that he committed a bribe transaction in connection with that cell phone; correct?

A      We were there to tell him that we believed he had committed a crime and we wanted his cooperation.

Q      And Gilbert Michel -- and in order to do that, you started to describe some of the details of the bribe transaction to make sure he understood that you had the evidence against him; correct?

A      I guess, generally, yes.  We explained that we knew all of the things so that he was aware that phone calls and different things that we had that evidence against him.

Q      And Gilbert Michel relatively quickly confessed to the bribe transaction; correct?

A      I wouldn't say confessed as much as he just kind of said, you got me.  But I don't know that I would say confession is appropriate because he didn't lay out, I don't think, every single thing at that point, but he did

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

say, kind of, you got me.

Q    And after he said, you got me, you asked him questions about whether or not he was -- he had participated in any type of inmate beatings -- correct -- or generally more deputy misconduct; is that correct?

A    Yes.

Q    And he denied at that point in time engaging in that additional deputy misconduct; correct?

A    Yes.

Q    And that was a lie?  It was a lie that Gilbert Michel told you at that point in time; correct?

A    Yes.

Q    Gilbert Michel was never charged with that lie to the FBI; is that correct?

          MR. FOX:  Objection.  Relevance.

          THE COURT:  Sustained.

Q    BY MR. HOCHMAN: Well, you said that the -- that Gilbert Michel had plead guilty to one bribe transaction. Are you aware of whether or not he plead guilty to this false statement to the FBI?

          MR. FOX:  Objection.  Relevance.

          THE COURT:  Sustained.

Q    BY MR. HOCHMAN: So after you speak to Gilbert Michel in the Starbucks, then you go back to his apartment; correct?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

A    Yes.

Q    And you speak to him and his girlfriend in the apartment at that point; correct?

A    I did not speak to his girlfriend.  Another group of agents was speaking to his girlfriend.

Q    And you were there for another hour or two; is that correct?

A    I don't think it was two hours.  Again, I don't remember the exact amount of time.

Q    And, at some point, do you actually give or are you aware that the girlfriend was given a grand jury subpoena to testify?

A    At some point, yes, she was given a subpoena.

Q    But then she was told by the end of the meeting she was told she didn't have to appear on the subpoena; correct?

A    I believe we actually took it back and said, you know, we are actually not going to call you in front of the grand jury.

Q    Now, did you consult with anyone in the grand jury before you took back the grand jury subpoena?

A    No.

Q    And did you say to Gilbert Michel words to the effect that you have two options, you either lose your job or you lose your job and go to prison?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

A      It wasn't worded that way.

Q      How did you word it?

A      That, given what we knew, it was I think a fairly strong assumption that he would not keep his job with the sheriff's department after having engaged in criminal activity.  So we basically told him that he is obviously going to lose his job no matter what, and it is probably more beneficial for him to cooperate with our investigation so that we can potentially help him on his side once he is charged.

Q      What does that mean, potentially help him?

A      It means that if he plead guilty and took responsibility for his actions, that we could then -- and, we, meaning the U.S. Attorney's office -- could make sentencing recommendations for him.

Q      Do you know if he plead guilty to the false statement he made to you?

MR. FOX:  Objection, your Honor.

THE COURT:  Let's go to sidebar.

(From 11:24 to 11:26, the proceedings, Pages 2015 to 2016, were conducted under seal.)

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

(The following proceedings were held in the presence of the jury:)

MR. HOCHMAN:  May I proceed, your Honor?

THE COURT:  Yes.

Q    BY MR. HOCHMAN: Mr. Michel says in his interview with the sheriff's department, they were threatening me, they being the FBI.

(Counsel confer.)

MR. FOX:  One moment, your Honor.

MR. HOCHMAN:  I was referring, your Honor, just for counsel's benefit, to Exhibit 92, the transaction, the recording of the interview between Mr. Michel and the sheriff's department investigators, reference on Page 15 of the transcript for counsel's benefit, your Honor.

Q    When Mr. Michel says in that interview, they, being the FBI, were threatening me, was that accurate?

A    You are taking that completely out of context.

Q    When Mr. Michel was asked the question, so when the FBI tells you that they are going to put you in prison, what do you think they were doing there.  And he answers, well, they were threatening me.

Was that an accurate statement by Mr. Michel?

A    Again, I think you are trying to take two different things.  You are taking after the sheriff's department investigators had repeatedly told him that we were

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

manipulating him and his response and what actually occurred. And so I don't think I can actually accurately answer that question.

Q     Were you threatening Gilbert Michel on August 24th, 2011 --

A     No.

Q     -- with going to, potentially going to prison?

A     No.

Q     Now, at some point, you tell Gilbert Michel towards the end of the interview that you believed he was lying to you; correct?

A     We believed he was not giving us all the information that he had.

Q     Well, when Gilbert Michel says that you are saying they are lying, or, excuse me, that they were accusing him of lying, was that an accurate statement?

A     It was specific to a statement that we had asked him about a phone call with CJ that he was talking about. It wasn't over all that he was lying. It was a specific statement we had asked him, and he waited a really long time and then said he didn't know or didn't do something. And we told him we didn't believe that was truthful.

Q     Did you say to Gilbert Michel on August 24th, you know you lied to an FBI agent, that is another crime we were going to charge you with?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

A       Did I say that?

Q       You or any of the FBI agents in your presence during that August 24th interview?

A       I don't believe it was worded that way, no.

Q       How was it worded?

A       In general, if we believe someone is not being truthful with us, we will frequently admonish them in an interview and remind them that lying to the FBI during the course of an investigation is a crime and that if we believe he is doing that, that we have the ability to charge them.

Q       Were you trying to -- Gilbert Michel is asked the questions that acknowledges that you were trying to manipulate him during that interview.  Were you trying to manipulate Gilbert Michel?

A       No.

Q       But you were trying to convince him to cooperate in connection with your investigation; correct?

A       We were trying to let him know that we had evidence he committed a crime and it was to his benefit to cooperate with our investigation.

Q       In order to convince him to cooperate with your investigation; correct?

A       To ask for his cooperation.

Q       And he didn't give you his cooperation by the end

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

of the interview; correct?

A      It wasn't until two weeks later.

Q      And at the end of the interview, did you arrest him?

A      No.

Q      Did you take his gun away from him?

A      No.

Q      Did you notify the sheriff's department that Gilbert Michel had now been told about your FBI investigation and that Anthony Brown was the informant in that investigation?

A      No.

Q      I am going to take you to September 8th, 2011.  I believe you heard about a voicemail message that Sergeant Craig left on a phone number.  I think it was played for you during your testimony.

       Do you recall that?

A      It was not September 8th.

Q      September 9th, actually, 2011; that's correct?

A      Correct.

Q      And you never received that voicemail message; is that correct?

A      I did not.

Q      Did you ever know that you were under surveillance by the Los Angeles Sheriff's Department at any point in

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

September of 2011?

A   No.

Q   So let's take it to September -- well, also, with respect to, actually, let's just take it right to September 26.  On September 26, you had the encounter we talked about with Sergeants Craig and Long; correct?

A   Yes.

Q   And that encounter was at 5:31 p.m.?

A   Correct.

Q   Lasted about a minute?

A   Approximately two minutes.

Q   I'm sorry?

A   One or two minutes.  I didn't time it.

Q   Have you ever actually timed that particular encounter any time prior to today?

A   No.

MR. HOCHMAN:  May we show -- and just make sure I get the right number -- Government's Exhibit -- well, let me do this before I show it.

Q   You are aware that that encounter -- you were aware after the investigation and the records came back from the sheriff's department pursuant to the grand jury subpoenas that there was a videotape made of that encounter of you; correct?

A   I learned that well after the fact, yes.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Q    And you also learned there was a separate audiotape of the agents who were mic'd; correct?

A    They were deputies.

Q    Deputies, actually, the investigators; correct?

A    The sergeants.  Yes.

Q    And the synching of the videotape and the audiotape where you put them together, is that something that you did?

A    We did separately.  I don't know if the sheriff's department also did that, but we did it separately.

Q    So the exhibit that we have here which is Exhibit 99, that is a synced video of the audio and the video from September 26.  That is the one that you created; correct?

A    I did not create it.

Q    That is the one that the federal government created; correct?

A    Correct.

Q    And you don't know whether or not there was a synced version that the sheriff's department had; correct?

A    I had no idea.

        MR. HOCHMAN:  So if we may show Government's Exhibit 96, and publish that at this point if I might ask Mr. Fox.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

(Counsel confer.)

Q    BY MR. HOCHMAN: Actually, as we start it, Agent Tanner, do you have a watch with a second hand on it by any chance?

A    I could.

Q    If you could time this video as we are watching it, please.

MR. FOX:  May I have a moment with counsel.

THE COURT:  Yes.

(Counsel confer.)

MR. HOCHMAN:  If we may play the video, please.

(Video played.)

Q    BY MR. HOCHMAN: And if could you start timing it from the point --

THE COURT:  Counsel, if you want to time it, why don't you time it.

MR. HOCHMAN:  I'm sorry, your Honor.

(Video played.)

MR. HOCHMAN:  I will start right now.

(Video played.)

MR. HOCHMAN:  That is fine.  Thank you.

Q    Now, after this encounter --

(Counsel confer.)

Q    BY MR. HOCHMAN: Was that approximately a minute?

A    A minute or two, yes.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Q     Thank you.  And when I say it, I am referring to the encounter you had on September 26; correct.  You understand that; correct?

A     Yes.

Q     Now, after that encounter, I think you said you went to the FBI office; correct?

A     Well, I immediately called my supervisor first and was told to come back to the FBI office.

Q     And you went to the FBI office; correct?

A     Yes.

Q     And you spoke to the head of the office, Steve Martinez?

A     Yes.

Q     And Steve Martinez then spoke to Andre Birotte of the U.S. Attorney, if you recall.

A     All I know is that after I spoke to him, he told me that he was speaking to Mr. Birotte and that they were handling it.  I wasn't privy to those conversations.

Q     And were you informed by Steve Martinez around 8:00 o'clock that night that he had spoken to Andre Birotte who in turn had spoken to Sheriff Baca?

A     I don't recall specifically if he said he spoke to Andre Birotte who spoke to Mr. Baca or if he said he spoke to Mr. Baca.  In general, it was conveyed to me that someone had made contact with Mr. Baca.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Q      Was it also conveyed to you that you are not going to be arrested or that Mr. Baca had assured that you were not going to be arrested or charged with a crime?

A      Actually, what he said is that evening or right then.  He did not -- he qualified it that I would not be arrested right then or that evening.  That is what I was told that night.

Q      That is what you were being told by Steve Martinez?

A      I was told that that was the words that Mr. Baca used.

Q      And Steve Martinez is telling you this?

A      I don't know if it was from Steve Martinez.  That is what was conveyed to me in the meeting with multiple people from executive management that evening.

Q      Were you ever arrested or charged with any crime by the sheriff's department?

A      No.

          MR. HOCHMAN:  Your Honor, if it is possible, I will take the second break right now?

          THE COURT:  Ladies and gentlemen, we will take our final break of the day.

               Again, I want to remind you until this trial is over, you are not to discuss this case with anyone including your fellow jurors, members of your family, people involved in the trial or anyone else, nor are you

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

permitted to allow others to discuss the case with you.

If anybody approaches you and tries to talk with you about this case, please let me know about it immediately.  Do not read or listen to any news reports or other accounts about the trial.

Finally, you are reminded to keep an open mind until all the evidence has been received, you have heard the arguments of counsel, the instructions of the court and the views of your fellow jurors.  If you need to speak with me, simply give a note to the clerk.  We will come back at 5 minutes to the hour.

(The following proceedings were held outside the presence of the jury:)

THE COURT:  You may step down.

How much longer do you intend to be with this witness?

MR. HOCHMAN:  Your Honor, the majority of what I have left to do is to go through the agent's charts, those summary charts with the telephone calls and the events.  So, you know, I am hoping I can get done with that in 45 minutes to an hour, your Honor, just depends on how quickly I can ask the question and get an answer and whether or not there is objections or sidebars.

(Recess from 11:42 to 11:55 a.m.)

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

CERTIFICATE

I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Date:  March 7, 2017


 /s/ Katie Thibodeaux, CSR No. 9858, RPR, CRR

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**MR. FOX: [59]**  1877/9 1881/3 1881/7 1882/13 1882/21 1883/15 1883/23 1886/1 1886/18 1886/24 1887/18 1890/1 1890/18 1897/11 1903/13 1903/16 1905/16 1905/18 1906/4 1906/7 1908/15 1908/22 1910/17 1913/3 1913/9 1913/14 1913/19 1915/20 1919/25 1922/15 1927/5 1929/25 1930/11 1931/10 1932/16 1935/6 1942/23 1943/2 1951/9 1951/17 1953/18 1953/22 1954/2 1954/16 1954/24 1955/4 1959/18 1959/21 1962/23 1968/7 1974/9 1974/11 1991/7 2004/14 2011/14 2011/20 2013/17 2017/8 2023/7

**MR. HOCHMAN: [52]**  1877/18 1877/20 1878/3 1890/20 1900/5 1903/24 1905/21 1905/23 1905/25 1906/5 1906/11 1915/2 1922/25 1927/6 1928/2 1942/6 1955/6 1962/25 1967/24 1968/9 1968/12 1968/17 1968/22 1969/7 1969/19 1970/8 1970/18 1971/6 1973/6 1973/12 1974/5 1974/12 1974/14 1982/24 1983/5 1983/7 1990/18 1990/21 1990/23 1991/4 2000/3 2000/13 2017/2 2017/9 2021/16 2022/22 2023/10 2023/16 2023/18 2023/20 2025/17 2026/16

**THE CLERK: [1]**  1877/6
**THE COURT: [73]**
**THE WITNESS: [3]**  1904/2 1959/19 2000/4

**$**

**$1,500 [1]**  1964/24
**$1500 [1]**  1991/19
**$700 [1]**  1975/6
**$800 [1]**  1991/21

**—**

**-and [3]**  1875/4 1875/5 1875/11

**/**

**/s [1]**  2027/12

**1**

**1,500 [1]**  1965/1
**10 [2]**  1898/7 1998/25
**100 [2]**  1881/15 1881/20
**101 [2]**  1881/16 1881/18
**10:00 o'clock [2]**  1899/10 1899/14
**10:14 [1]**  1883/19
**10:14 a.m [1]**  1883/7
**10:15 to [1]**  1898/18
**10:53 and [1]**  1887/13
**10:56 [1]**  1883/18
**10th [1]**  1994/12
**11 [3]**  1886/16 1900/3 1995/20
**110 [1]**  1955/11
**113 [2]**  2000/4 2000/14
**115 [1]**  1955/11
**11:24 [1]**  2013/20
**11:26 [1]**  2013/20
**11:42 [1]**  2026/24

**11:55 [1]**  2026/24
**11th [3]**  1994/14 1994/23 1995/16
**12 [10]**  1898/2 1899/8 1900/12 1950/23 1950/25 1951/2 1951/16 1959/3 1959/5 1959/8
**120 [3]**  1882/8 1886/5 1900/3
**12th [11]**  1875/6 1882/10 1887/10 1887/12 1887/20 1887/21 1994/2 1994/5 1999/15 2003/20 2006/19
**13 [1]**  1884/12
**13th [2]**  2000/20 2004/1
**15 [6]**  1888/18 1902/15 1902/21 1939/24 1998/25 2017/13
**156 [1]**  1885/16
**15th [1]**  2005/22
**16 [1]**  1888/22
**16-66 [1]**  1874/8
**16-66A-PA [1]**  1877/7
**1601 [1]**  1875/11
**172 [2]**  1881/24 1882/17
**18 [1]**  1969/1
**1879 [1]**  1878/7
**1880 [2]**  1876/5 1878/8
**1892 [1]**  1890/25
**1896 [1]**  1891/1
**18th [3]**  1890/10 1968/15 1968/19
**19 [3]**  1898/25 1899/1 1901/6
**1903 [2]**  1876/9 1876/9
**1904 [1]**  1876/6
**1914 [1]**  1913/22
**1936 [1]**  1935/10
**1938 [1]**  1935/11
**194 [2]**  1902/15 1902/21
**1941 [1]**  1940/5
**1942 [1]**  1940/6
**195 [4]**  1968/1 1968/3 1968/6 1968/15
**196 [3]**  1898/11 1898/12 1898/17
**1969 [2]**  1876/10 1876/10
**197 [4]**  1888/18 1899/1 1901/6 1904/8
**1985 [1]**  1876/11
**1986 [1]**  1876/11
**19th [1]**  1970/1
**1:15 [1]**  1884/19
**1:20 p.m [1]**  1898/18
**1:25 [1]**  1885/1
**1:30 [1]**  1882/4
**1:32 [2]**  1887/13 1887/14
**1:45 p.m [1]**  1884/20
**1:57 to [1]**  1898/21

**2**

**20 [2]**  1884/19 1903/15
**2000 [2]**  1945/6 1946/24
**20011 [1]**  1999/7
**2005 [1]**  1950/8
**2009 [4]**  1906/15 1906/20 1909/2 1950/22
**2010 [20]**  1907/7 1907/20 1910/20 1920/4 1921/13 1922/3 1928/22 1929/21 1944/2 1944/6 1944/8 1945/8 1945/20 1946/12 1950/17 1956/7 1966/14 2002/19 2004/13 2006/13
**2011 [45]**  1882/3 1885/3 1890/11 1920/4 1921/13 1922/4 1923/13 1928/22 1944/6 1944/9 1945/6 1945/9 1945/20 1946/24 1955/12 1955/24 1956/7 1959/3 1959/9 1966/11 1966/25 1967/8

1968/15 1968/19 1969/1 1969/17 1974/4 1984/3 1984/7 1991/2 1992/3 1993/14 1993/18 1999/15 2000/21 2001/7 2002/19 2005/22 2006/18 2006/19 2007/1 2018/5 2020/13 2020/19 2021/1
**2012 [7]**  2003/2 2003/8 2003/13 2007/2 2007/7 2007/13 2008/3
**2013 [1]**  2004/14
**2015 [1]**  2013/20
**2016 [1]**  2013/21
**2017 [3]**  1874/17 1877/1 2027/10
**2050 [1]**  1875/12
**20th [6]**  1960/4 1966/24 1967/17 1971/11 1972/1 1974/1
**21 [3]**  1971/2 1971/10 1971/20
**211 [1]**  1887/8
**213 [1]**  1984/3
**21st [3]**  1886/11 1886/12 1889/8
**22 [1]**  1905/12
**22-minute [1]**  1905/7
**226 [1]**  1883/5
**22nd [5]**  1886/16 1889/22 1889/24 1890/3 1900/5
**231 [2]**  1903/18 1903/19
**23rd [15]**  1890/5 1890/6 1890/20 1897/13 1897/20 1995/22 1996/10 1997/9 1997/13 1997/19 1999/7 1999/9 1999/15 2001/9 2002/19
**24/7 [1]**  1980/4
**24th [6]**  2001/10 2008/11 2008/14 2018/4 2018/23 2019/3
**26 [11]**  1967/6 1976/13 1983/20 1984/7 1984/12 1989/25 2001/16 2021/5 2021/5 2022/13 2024/2
**26th [8]**  1881/22 1890/11 1898/13 1900/2 1903/11 1903/24 1904/20 1905/15
**278-4608 [1]**  1984/3
**28 [1]**  2027/4
**29 [2]**  1898/12 1898/17
**29th [5]**  1881/23 1881/23 1882/3 1882/15 1882/21
**2:00 o'clock [1]**  1899/3
**2:00 to [1]**  1899/17
**2:44 [1]**  1898/21
**2:45 [1]**  1889/11

**3**

**30 [3]**  1884/19 1901/20 1988/18
**3000 [2]**  1987/22 1987/23
**302 [3]**  1921/17 1921/24 1944/18
**30th [4]**  1883/1 1883/5 1883/25 1884/22
**310 [1]**  1984/10
**312 [4]**  1874/22 1875/6 1882/10 2000/20
**323 [1]**  1986/18
**3:30 [1]**  1890/6
**3:30 p.m [1]**  1890/7
**3:43 Mr. Carey [1]**  1884/14
**3:58 [1]**  1901/10
**3rd [2]**  1955/12 1955/24

**4**

**4174 [1]**  1984/10

## 4

**42 [2]** 1886/20 1886/21
**423 [2]** 1959/11 1960/12
**423-year [1]** 1960/17
**43 [1]** 1887/5
**436 [1]** 1874/22
**44 [1]** 1899/22
**45 [3]** 1901/20 2007/20
2026/21
**4608 [1]** 1984/3
**48 [1]** 1885/2
**4:00 o'clock [1]** 1899/17
**4:00 p.m [1]** 1890/7
**4:18 p.m [1]** 1903/12
**4:30 [3]** 1889/24 1900/12
1900/23
**4:30 p.m [1]** 1890/1
**4:30 to [1]** 1901/5
**4:35 p.m [1]** 1946/13
**4:59 p.m [2]** 1885/3 1885/13
**4th [2]** 1991/2 2008/9

## 5

**50 [2]** 1977/9 1984/6
**500 West [1]** 1899/18
**5000 [1]** 1889/15
**501 [6]** 1876/9 1906/3 1906/6
1983/1 1983/12 1983/25
**503 [3]** 1876/9 1906/4 1906/7
**525 [5]** 1876/11 1990/20
1991/1 1991/6 1991/10
**527 [5]** 1876/10 1973/17
1973/20 1974/7 1974/16
**528 [1]** 1982/24
**53 [5]** 1922/25 1923/1 1923/4
1923/8 1925/24
**5:00 o'clock [2]** 1889/24
1900/16
**5:00 p.m [1]** 1890/1
**5:31 p.m [2]** 1901/17 2021/8
**5:57 call [1]** 1902/6

## 6

**65 [1]** 1984/12
**66 [1]** 1874/8
**67 [7]** 1876/9 1906/3 1968/2
1968/4 1968/16 1969/22
1970/10
**6:00 [1]** 1901/22
**6:07 [1]** 1902/6
**6:15 at [1]** 1901/22
**6:20 [1]** 1882/19
**6:25 from [1]** 1882/20
**6:30 [2]** 1900/12 1900/13
**6:30 in [1]** 1900/16
**6:37 p.m [1]** 1902/8

## 7

**700 [1]** 1975/8
**753 [1]** 2027/4
**7:00 o'clock [2]** 1900/13
1900/24
**7:00 time [1]** 1901/5
**7:35 [1]** 1902/9
**7:35 p.m [2]** 1905/7 1905/15
**7th [8]** 1885/3 1886/3 2001/7
2001/14 2001/23 2002/2
2002/16 2002/22

## 8

**8/24/2011 [1]** 1923/13
**800 [2]** 1910/16 1991/22
**8:00 [1]** 1877/2
**8:00 o'clock [1]** 2024/20
**8:02 [1]** 1878/7
**8:06 [1]** 1878/7
**8:27 [1]** 1890/25
**8:30 [2]** 1886/14 1898/4

**8:34 [1]** 1890/25
**8:43 [1]** 1898/6
**8th [15]** 1886/6 1887/1
1889/7 1967/7 1992/3 1992/23
1993/5 1993/13 1993/18
1993/23 1994/5 1994/11
2006/18 2020/13 2020/18

## 9

**90012 [2]** 1874/22 1875/6
**90404 [1]** 1875/12
**92 [1]** 2017/11
**96 [1]** 2022/24
**9858 [2]** 1874/21 2027/12
**99 [1]** 2022/12
**996-4174 [1]** 1984/10
**9:00 o'clock [1]** 1898/5
**9:02 [1]** 1913/22
**9:03 [1]** 1913/22
**9:23 [1]** 1935/10
**9:26 [1]** 1935/10
**9:28 [1]** 1939/25
**9:30 a.m [1]** 2000/21
**9:35 and [1]** 1899/3
**9:37 [1]** 1898/10
**9:44 p.m [1]** 1889/15
**9:45 [1]** 1939/25
**9:48 [1]** 1940/5
**9:50 [1]** 1940/5
**9th [4]** 1889/11 1889/14
1994/12 2020/19

## A

**a lie [1]** 1930/18
**a.m [6]** 1877/2 1883/7
1899/10 1939/25 2000/21
2026/24
**AB [1]** 1969/22
**ability [5]** 1963/25 1979/6
1979/9 1988/14 2019/10
**able [16]** 1887/25 1888/6
1925/4 1925/11 1933/3
1956/18 1957/10 1958/23
1973/4 1978/22 1980/1 1985/5
1985/9 1992/18 1995/5
1996/13
**about [90]**
**above [3]** 1909/21 1973/25
2027/7
**above-entitled [1]** 2027/7
**ABRAMS [2]** 1875/11 1877/21
**absolutely [9]** 1909/13
1912/5 1932/2 1934/2 1934/7
1934/24 1975/24 1977/16
1995/10
**academy [1]** 1906/19
**accept [1]** 1969/1
**accepted [1]** 1975/22
**access [1]** 1987/14
**according [9]** 1882/24
1884/24 1890/15 1898/2
1898/22 1899/2 1899/5 1902/1
1905/13
**account [2]** 1958/1 1958/15
**accounts [3]** 1939/12 1956/8
2026/5
**accurate [14]** 1921/20
1922/13 1931/25 1951/1
1959/6 1960/5 1973/23 1977/5
1977/10 1981/13 1991/1
2017/16 2017/22 2018/16
**accurately [1]** 2018/2
**accusing [1]** 2018/15
**acknowledges [1]** 2019/13
**ACLU [10]** 1923/25 1925/3
1925/8 1925/14 1925/17
1925/22 1926/1 1926/6 1926/8
1926/11

**actions [2]** 1932/6 2013/13
**activate [1]** 1982/9
**activity [2]** 1965/23 2013/6
**actual [8]** 1900/6 1928/16
1956/17 1960/8 1961/8 1972/1
1979/22 2001/4
**actually [51]** 1904/18
1918/22 1920/25 1922/2
1925/10 1944/3 1944/22
1946/1 1946/19 1956/2 1957/4
1961/25 1962/3 1967/1 1967/5
1977/7 1979/14 1980/18
1981/11 1982/16 1982/17
1982/25 1985/21 1987/9
1987/14 1988/15 1988/20
1989/23 1990/8 1991/23
1991/23 1992/13 1993/2
2003/12 2004/25 2005/5
2006/21 2006/25 2007/4
2009/7 2012/10 2012/17
2012/18 2018/1 2018/2
2020/19 2021/4 2021/14
2022/4 2023/2 2025/4
**addition [3]** 1911/19 1912/6
2007/17
**additional [5]** 1947/14
1951/8 1976/24 1988/17
2011/8
**address [5]** 1902/11 1928/2
1989/4 1989/4 1989/11
**admission [1]** 1906/10
**admitted [3]** 1942/20 1943/8
1943/11
**admitting [1]** 1931/5
**admonish [1]** 2019/7
**admonishment [1]** 1947/10
**admonishments [3]** 1947/8
1947/14 1947/24
**admonition [2]** 1947/4 1947/7
**admonitions [1]** 1947/11
**advance [1]** 2005/1
**Affairs [2]** 1913/1 1913/13
**after [51]** 1883/13 1883/14
1884/4 1884/7 1885/21
1885/22 1898/5 1899/10
1899/15 1901/19 1904/6
1904/20 1905/13 1905/15
1910/25 1913/7 1913/13
1925/19 1926/16 1928/6
1953/3 1953/15 1959/25
1960/8 1960/10 1972/11
1975/17 1975/20 1984/9
1986/10 1988/25 1989/19
1989/25 1993/6 1998/8 1998/9
1998/20 1998/21 1999/19
2002/3 2003/8 2006/6 2011/2
2011/23 2013/5 2017/24
2021/21 2021/25 2023/22
2024/5 2024/16
**again [28]** 1883/12 1885/17
1886/4 1900/3 1909/11
1920/10 1920/20 1925/3
1925/25 1927/22 1933/18
1939/4 1947/12 1956/15
1959/5 1966/3 1967/10
1967/12 1970/3 1973/11
1974/18 1979/24 1982/18
1984/12 1997/19 2012/8
2017/23 2025/22
**against [4]** 1922/22 1942/19
2010/15 2010/18
**agency [2]** 1908/19 1919/1
**agent [42]** 1877/13 1881/13
1882/16 1882/24 1887/3
1887/7 1887/24 1888/17
1890/4 1890/9 1897/15
1899/24 1903/20 1904/25
1906/15 1906/25 1907/10
1907/14 1907/16 1907/18

**A**

**agent... [22]**   1909/11
1909/12 1910/13 1911/6
1928/9 1942/8 1953/3 1954/12
1956/5 1973/2 1984/24
1987/12 1993/10 1993/20
1994/15 1995/1 1995/9
1995/16 1999/9 1999/9
2018/24 2023/2
**agent for [1]**   1911/6
**agent's [1]**   2026/18
**agents [24]**   1907/8 1907/9
1909/9 1910/16 1922/11
1922/11 1972/6 1972/9 1972/9
1972/16 1972/18 1972/22
1972/23 1972/25 1978/13
1990/12 1996/4 2008/17
2008/21 2008/24 2009/1
2012/5 2019/2 2022/2
**ago [1]**   1956/16
**agree [1]**   1986/12
**agreed [3]**   1986/2 1986/3
1986/10
**ahead [10]**   1917/6 1949/19
1967/10 1985/16 1986/2
1986/7 1990/5 2004/17
2005/17 2008/14
**aide [1]**   1885/20
**alert [1]**   1980/12
**Alhambra [3]**   1898/20 1902/7
1903/13
**all [54]**   1878/3 1878/6
1881/3 1886/19 1900/1
1905/21 1909/7 1909/9 1910/7
1912/17 1921/7 1922/13
1923/20 1924/3 1932/17
1934/3 1939/15 1939/23
1940/3 1942/3 1942/6 1945/25
1946/24 1946/25 1947/25
1947/25 1955/8 1957/17
1957/23 1963/24 1964/6
1964/17 1965/6 1965/8 1966/3
1968/25 1979/18 1984/23
1987/6 1994/1 1995/4 1996/11
1998/13 2002/17 2002/19
2004/12 2006/12 2006/18
2008/3 2010/17 2018/12
2018/19 2024/16 2026/7
**allegation [1]**   1913/8
**allegations [7]**   1911/17
1911/24 1924/6 1924/11
1924/14 1926/16 1927/1
**alleged [1]**   1923/8
**alleging [3]**   1910/22 1925/6
1925/12
**allow [6]**   1958/24 1980/17
1980/22 1981/4 1981/10
2026/1
**allowed [6]**   1919/8 1939/8
1957/16 1957/18 1978/10
1988/12
**almost [2]**   1888/13 1946/10
**alone [1]**   1890/16
**along [1]**   1968/5
**already [7]**   1929/1 1960/5
1964/3 1981/22 1990/4 1992/9
2005/14
**also [31]**   1877/12 1889/2
1902/25 1904/16 1911/16
1911/19 1930/22 1942/17
1946/6 1951/12 1951/25
1952/17 1957/12 1958/9
1958/19 1966/3 1972/13
1975/12 1976/23 1982/19
1983/8 1984/12 1985/15
1990/8 1997/13 2007/4 2010/2
2021/3 2022/1 2022/10 2025/1
**always [4]**   1918/1 1918/3

1973/1 2004/21
**am [40]**   1882/14 1882/22
1883/24 1885/12 1886/4
1886/19 1886/25 1887/3
1887/19 1888/17 1890/2
1890/4 1890/19 1897/12
1897/24 1899/20 1900/11
1903/17 1907/1 1907/17
1909/22 1912/6 1925/10
1925/14 1925/16 1947/8
1949/15 1950/20 1953/4
1958/8 1963/11 1964/21
1967/18 1973/9 1999/11
2001/3 2008/11 2020/13
2024/1 2026/20
**America [2]**   1874/6 1877/8
**among [1]**   1922/18
**amongst [1]**   1994/20
**amount [5]**   1911/23 1963/13
1998/17 2009/18 2012/9
**amounts [1]**   1956/19
**ANDERSON [1]**   1874/3
**Andre [6]**   1882/4 1882/13
1882/13 2024/14 2024/20
2024/23
**ANGELES [18]**   1874/16 1874/22
1875/6 1877/1 1882/11
1900/16 1901/14 1906/19
1907/5 1907/19 1907/24
1908/14 1909/1 1910/5
1910/22 1954/20 1992/5
2020/25
**angle [1]**   1977/13
**another [13]**   1900/15 1900/15
1924/17 1924/21 1945/10
1953/25 1976/23 1983/8
1990/5 1993/20 2012/4 2012/6
2018/24
**answer [6]**   1904/2 1959/23
1986/8 2002/12 2018/3
2026/22
**answered [3]**   1915/21 1943/22
1970/7
**answering [1]**   1972/4
**answers [1]**   2017/20
**Anthony [157]**
**any [55]**   1877/25 1885/14
1889/6 1890/11 1890/15
1897/8 1899/2 1899/5 1901/3
1904/9 1904/13 1904/19
1905/14 1905/15 1907/24
1908/7 1908/10 1908/10
1908/13 1908/13 1910/5
1910/7 1918/25 1923/23
1924/4 1924/6 1926/11 1934/5
1939/12 1942/22 1944/24
1944/25 1951/13 1953/6
1956/8 1958/14 1960/17
1964/8 1966/16 1967/3
1967/12 1968/7 1974/9
1977/22 1979/17 1986/25
1989/14 1991/7 2011/4 2019/2
2020/25 2021/15 2023/4
2025/15 2026/4
**anybody [1]**   2026/2
**anyone [13]**   1913/6 1913/12
1939/6 1939/7 1939/10
1954/13 1977/14 1999/12
1999/16 2002/13 2012/20
2025/23 2025/25
**anything [7]**   1877/16 1877/24
1900/22 1902/24 1925/1
1943/2 1961/24
**anytime [1]**   1903/7
**anywhere [2]**   1902/22 1994/8
**apartment [6]**   1898/15 1904/7
2008/18 2009/7 2011/24
2012/3
**appealing [1]**   1959/20

**appear [5]**   1898/21 1905/1
1905/4 1928/17 2027/15
**appearance [4]**   1897/25
1898/13 1899/11 2001/5
**appearances [2]**   1875/1
1877/9
**appears [1]**   1991/4
**application [1]**   1961/5
**approach [5]**   1939/9 1968/10
1968/12 1973/17 1990/19
**approached [3]**   1903/24
1904/1 1963/21
**approaches [2]**   1939/10
2026/2
**appropriate [1]**   2010/24
**approval [2]**   1961/1 1961/1
**approvals [2]**   1948/5 1956/18
**approved [1]**   1961/10
**approximately [16]**   1884/18
1884/19 1884/21 1884/23
1885/14 1901/18 1901/20
1901/22 1907/2 1920/7
1945/14 1956/11 1956/14
1972/5 2021/11 2023/24
**April [1]**   1906/15
**are [129]**
**areas [2]**   1918/16 1918/17
**aren't [1]**   1994/17
**argumentative [4]**   1915/22
1915/23 1930/13 1959/22
**arguments [2]**   1939/16 2026/8
**armed [8]**   1950/9 1950/11
1950/23 1951/5 1951/16
1959/3 1959/8 1964/6
**around [5]**   1902/2 1921/4
1945/17 2004/1 2024/19
**arrange [2]**   1993/14 2007/10
**arranged [4]**   1960/1 1976/25
2007/7 2008/14
**arranging [2]**   1918/22
1965/19
**arrest [8]**   1898/15 1943/1
1975/25 1976/16 1976/24
1990/2 1992/1 2020/3
**arrested [5]**   1975/18 2025/2
2025/3 2025/6 2025/15
**arrows [1]**   1887/2
**as [92]**
**aside [1]**   1889/9
**ask [16]**   1899/24 1919/20
1919/24 1927/23 1931/7
1944/21 1967/25 1968/4
1973/7 1973/10 1985/18
1985/19 2009/3 2019/24
2022/24 2026/22
**asked [25]**   1906/22 1906/25
1910/13 1910/22 1915/16
1915/17 1915/21 1918/6
1927/17 1932/20 1933/5
1934/18 1934/21 1942/9
1949/11 1967/21 1978/13
1998/16 1998/20 2004/23
2011/2 2017/18 2018/17
2018/20 2019/12
**asking [18]**   1907/14 1907/17
1921/11 1924/10 1924/16
1925/8 1925/10 1925/14
1925/17 1934/7 1935/1
1943/19 1943/20 1945/5
1945/18 1994/4 1994/7 2001/9
**asking me [1]**   1924/10
**asleep [2]**   1980/9 1980/10
**assault [2]**   1951/7 1951/8
**assigned [3]**   1907/6 1908/25
1909/1
**assistant [7]**   1890/8 1890/13
1901/23 1909/23 1910/1
1912/16 1992/22
**assume [3]**   1974/18 1980/7

## A

**assume... [1]**  1986/16
**assuming [1]**  1947/8
**assumption [1]**  2013/4
**assured [1]**  2025/2
**attempted [3]**  1989/8 1989/17 1989/21
**attempting [1]**  1887/25
**attention [2]**  1983/20 2008/6
**Attorney [3]**  1875/5 1882/12 2024/15
**Attorney's [5]**  1905/1 1948/4 1953/15 1999/21 2013/14
**attorneys [2]**  2004/7 2004/10
**audio [17]**  1886/24 1887/6 1899/23 1903/16 1922/5 1922/10 1922/15 1968/17 1968/24 1969/9 1969/21 1970/11 1970/20 1971/8 1975/13 1975/15 2022/12
**audiotape [2]**  2022/1 2022/6
**August [47]**  1881/22 1881/23 1881/23 1882/3 1882/15 1882/21 1883/1 1883/5 1883/25 1884/22 1890/10 1944/1 1944/8 1967/7 1991/2 1992/3 1992/23 1993/5 1993/13 1993/18 1993/23 1994/5 1994/11 1994/14 1994/23 1995/16 1995/20 1995/22 1996/10 1997/9 1997/13 1997/19 1999/7 1999/9 1999/15 2001/9 2001/16 2002/18 2002/19 2006/13 2006/18 2008/9 2008/11 2008/14 2018/4 2018/23 2019/3
**August 11 [1]**  1995/20
**August 11th [3]**  1994/14 1994/23 1995/16
**August 18th [1]**  1890/10
**August 23rd [7]**  1995/22 1996/10 1997/9 1997/13 1997/19 1999/15 2001/9
**August 24th [3]**  2008/14 2018/4 2018/23
**August 26 [1]**  2001/16
**August 26th [1]**  1881/22
**August 29th [5]**  1881/23 1881/23 1882/3 1882/15 1882/21
**August 30th [3]**  1883/1 1883/5 1884/22
**August 4th [2]**  1991/2 2008/9
**August 8th [9]**  1967/7 1992/3 1992/23 1993/5 1993/18 1993/23 1994/5 1994/11 2006/18
**AUSA [1]**  1875/5
**available [2]**  1889/7 1956/22
**aware [17]**  1918/24 1954/24 1959/2 1959/7 1962/9 1965/12 1971/11 1994/17 1999/7 1999/11 2002/24 2007/11 2010/17 2011/19 2012/11 2021/20 2021/20
**away [4]**  1972/10 1975/9 1995/4 2020/6

## B

**Baca [40]**  1874/9 1877/8 1877/22 1882/15 1882/18 1882/20 1882/23 1883/18 1883/25 1884/5 1885/19 1885/25 1886/1 1886/3 1886/17 1887/1 1887/9 1888/1 1888/2 1890/3 1890/16 1890/20 1897/13 1898/2

1899/1 1899/25 1900/22 1902/1 1902/17 1902/22 1903/21 1903/21 1904/13 1904/16 2024/21 2024/23 2024/24 2024/25 2025/2 2025/9
**Baca's [29]**  1882/2 1882/6 1883/7 1884/10 1884/15 1886/4 1886/5 1886/8 1887/14 1887/15 1887/17 1888/6 1888/19 1889/12 1889/21 1890/10 1890/12 1890/15 1897/25 1898/12 1898/25 1899/9 1902/1 1902/16 1902/18 1904/5 1904/8 1904/19 1905/13
**Baca/Tanaka [2]**  1883/25 1886/3
**back [27]**  1882/16 1889/19 1899/8 1900/1 1900/4 1901/19 1902/2 1920/23 1920/24 1920/25 1923/20 1939/20 1956/16 1977/14 1986/8 1987/15 1989/3 1989/11 1996/19 2006/12 2008/19 2011/24 2012/17 2012/21 2021/21 2024/8 2026/11
**background [6]**  1912/5 1912/9 1912/12 1949/20 1949/24 1950/5
**backgrounds [1]**  1957/23
**backup [5]**  1902/16 1902/18 1902/19 1903/7 1903/12
**bank [9]**  1950/9 1950/11 1950/23 1951/5 1951/16 1959/3 1959/5 1959/8 1964/6
**bar [2]**  1933/10 1934/4
**bars [2]**  1977/6 1977/13
**base [2]**  1948/11 1948/14
**based [8]**  1903/1 1904/12 1926/6 1952/21 1963/22 1964/5 1985/14 2007/16
**basically [6]**  1931/5 1961/4 1971/15 1979/9 1980/6 2013/6
**basis [2]**  1918/14 1963/14
**be [82]**
**beatings [4]**  1955/3 1955/17 1955/21 2011/4
**became [1]**  1928/6
**because [38]**  1888/8 1897/21 1902/22 1903/2 1907/2 1915/12 1915/14 1915/20 1916/15 1921/7 1924/18 1925/15 1926/8 1926/21 1926/23 1927/21 1928/15 1933/18 1943/15 1944/19 1948/7 1948/10 1949/23 1952/14 1953/8 1953/17 1957/14 1962/3 1963/23 1969/3 1969/4 1971/10 1979/18 1990/1 1992/17 1998/14 2009/9 2010/24
**become [1]**  1927/11
**becoming [1]**  1918/24
**been [20]**  1899/9 1903/2 1924/1 1925/4 1939/15 1960/16 1962/5 1973/16 1973/19 1982/23 1990/20 1992/4 1992/4 1992/24 1997/6 2003/12 2004/4 2008/8 2020/9 2026/7
**before [28]**  1881/14 1911/14 1919/16 1923/2 1928/17 1935/1 1949/5 1949/18 1960/9 1962/5 1962/10 1967/20 1968/1 1968/19 1968/25 1973/21 1974/17 1977/14 1981/10 1981/17 1982/1 1986/14 1995/25 2005/10

2005/19 2005/20 2012/21 2013/9
**began [2]**  1883/13 1884/24
**begin [2]**  1884/25 1906/2
**beginning [3]**  1897/24 1898/8 1945/9
**begun [1]**  1960/6
**behalf [2]**  1877/11 1877/22
**behavior [1]**  1933/19
**being [23]**  1897/4 1902/23 1922/12 1942/14 1948/2 1959/16 1968/6 1969/10 1979/10 1979/15 1980/18 1981/11 1982/16 1982/17 1988/2 1988/21 1994/23 1997/3 1997/8 2017/7 2017/15 2019/6 2025/8
**believe [69]**  1877/24 1881/22 1886/11 1889/20 1909/6 1911/15 1917/11 1920/9 1921/14 1929/19 1931/7 1931/21 1931/22 1933/5 1942/16 1944/1 1944/5 1949/20 1950/10 1950/11 1952/22 1953/5 1955/10 1955/16 1956/15 1960/25 1964/24 1964/25 1965/6 1967/20 1972/4 1972/12 1974/8 1975/7 1975/15 1976/21 1983/1 1984/3 1985/13 1985/15 1985/23 1986/10 1988/17 1990/13 1991/22 1992/8 1992/16 1993/4 1993/6 1995/21 1996/3 1997/17 1997/24 1998/8 1998/10 1999/20 2003/7 2003/20 2004/1 2004/3 2008/17 2009/14 2009/20 2012/17 2018/22 2019/4 2019/6 2019/10 2020/14
**believed [7]**  1932/8 1963/24 1989/5 1989/13 2010/10 2018/10 2018/12
**below [2]**  1972/24 1973/5
**beneficial [1]**  2013/8
**benefit [3]**  2017/11 2017/14 2019/2
**besides [2]**  1897/20 1910/6
**best [1]**  1946/11
**better [1]**  1905/7
**between [16]**  1883/15 1885/18 1887/16 1899/2 1904/9 1909/22 1916/19 1917/1 1922/3 1946/23 1956/7 1964/16 1973/24 1986/25 1991/2 2017/12
**big [2]**  1934/9 1962/5
**binder [4]**  1886/21 1899/21 2010/2 2010/6
**Birotte [6]**  1882/5 1882/13 2024/14 2024/17 2024/21 2024/23
**bit [2]**  1905/6 1945/10
**black [3]**  1974/23 1991/10 1991/15
**blow [3]**  1948/20 1948/25 1949/5
**BOCKIUS [1]**  1875/10
**book [1]**  1887/4
**booking [1]**  1917/16
**books [2]**  1897/5 1958/22
**boss [1]**  1907/21
**both [7]**  1882/2 1899/15 1902/6 1922/11 1962/17 1962/20 1975/15
**bottom [1]**  1983/14
**Boulevard [1]**  1875/11
**boy [1]**  1969/14
**BRANDON [2]**  1875/4 1877/10

**B**

**Bravo [3]** 1952/10 1952/11 1952/14
**break [5]** 1883/12 1883/14 1939/4 2025/19 2025/21
**Brentwood [1]** 1933/10
**BRIANNA [2]** 1875/11 1877/21
**bribe [22]** 1948/17 1952/25 1960/3 1960/8 1967/17 1971/13 1972/11 1972/24 1973/4 1973/23 1975/23 1990/5 1991/2 1991/19 2003/10 2007/16 2008/8 2009/24 2010/8 2010/13 2010/21 2011/18
**bribery [1]** 2003/5
**briefly [1]** 1878/4
**bring [11]** 1881/3 1919/8 1919/10 1919/12 1942/3 1963/21 1999/25 2000/6 2000/8 2001/5 2001/6
**bringing [2]** 1970/24 1981/18
**broad [1]** 1925/16
**broadly [1]** 1912/4
**brought [5]** 1917/21 1918/4 1976/2 1976/6 2001/24
**Brown [151]**
**Brown's [7]** 1916/13 1956/8 1971/22 1983/17 1986/14 1992/17 2005/10
**bulletin [1]** 1966/12
**bunch [1]** 1910/12
**Bureau [5]** 1913/2 1913/2 1913/7 1913/13 1913/18
**bureaus [1]** 1912/25
**business [1]** 1999/2
**buy [2]** 1958/1 2008/1

**C**

**CA [2]** 1875/6 1875/12
**cafe [2]** 1933/9 1934/4
**calendar [26]** 1882/3 1882/6 1882/14 1883/24 1885/7 1886/2 1886/4 1886/6 1886/9 1887/1 1887/19 1889/21 1890/2 1890/10 1890/12 1890/15 1890/18 1890/19 1890/22 1897/14 1897/22 1898/1 1899/8 1899/9 1900/7 1900/12
**CALIFORNIA [5]** 1874/2 1874/16 1874/22 1877/1 1917/12
**call [69]** 1882/19 1883/19 1883/19 1883/25 1884/5 1884/10 1884/20 1885/24 1886/1 1887/16 1887/20 1889/3 1889/5 1901/9 1902/6 1902/6 1902/9 1903/6 1904/17 1904/17 1905/7 1905/11 1905/13 1917/3 1947/8 1957/11 1957/15 1961/5 1961/13 1961/18 1961/19 1961/20 1968/15 1969/1 1969/3 1970/3 1970/9 1970/22 1971/1 1971/4 1971/11 1976/7 1979/15 1980/14 1980/18 1981/10 1981/11 1982/1 1982/4 1982/5 1982/7 1982/16 1983/17 1984/6 1984/9 1984/18 1986/25 1992/13 1993/10 1999/11 2001/20 2002/1 2002/6 2002/12 2002/13 2004/2 2005/1 2012/18 2018/18
**called [10]** 1883/7 1883/18 1947/4 1971/22 1985/11 1985/18 1985/19 1990/2

**callers [4]** 1957/15 1957/20 1957/24 1957/25
**calling [4]** 1888/14 1888/16 1889/4 1889/12
**calls [34]** 1882/18 1882/23 1883/5 1884/3 1884/14 1885/14 1885/18 1885/24 1886/3 1887/8 1887/12 1888/1 1888/10 1888/12 1889/7 1901/3 1903/8 1904/9 1904/20 1905/1 1905/14 1957/6 1962/24 1967/22 1968/20 1975/21 1979/11 1982/22 1988/15 1988/17 1992/9 1992/19 2010/17 2026/19
**calmed [2]** 2006/1 2006/6
**came [9]** 1900/4 1923/12 1924/16 1967/9 1989/3 1989/11 1993/10 1998/18 2021/21
**camera [5]** 1973/3 1978/2 1978/12 1978/15 1978/23
**cameras [1]** 1978/21
**can [23]** 1883/5 1883/16 1902/24 1902/25 1904/2 1923/1 1926/2 1928/10 1928/15 1963/10 1967/15 1969/8 1970/22 1974/2 1974/21 1977/6 2000/5 2000/14 2005/16 2013/9 2018/2 2026/20 2026/22
**can't [7]** 1917/17 1926/6 1927/15 1945/18 1953/3 1974/3 1985/20
**cannot [1]** 1927/21
**capabilities [2]** 1978/21 1982/19
**capability [1]** 1980/16
**captain [4]** 1912/16 1998/14 1999/8 1999/13
**car [8]** 1974/17 1974/17 1974/23 1975/2 1975/2 1975/13 1991/11 2009/4
**cards [7]** 1957/3 1957/5 1957/8 1957/13 1958/1 1958/2 1999/2
**Carey [9]** 1884/14 1887/14 1887/20 1898/18 1898/22 1904/17 1904/23 1999/8 1999/13
**Carey's [1]** 1898/11
**Carey/Leavins [1]** 1887/20
**case [22]** 1897/6 1897/9 1911/5 1918/14 1918/14 1921/25 1926/25 1939/5 1939/6 1939/9 1939/11 1946/20 1950/16 1956/20 1956/22 1958/20 1959/20 1964/19 1981/16 2025/23 2026/1 2026/3
**cases [1]** 1930/11
**cash [8]** 1961/8 1963/13 1963/22 1963/24 1964/1 1964/6 1964/8 1964/22
**casual [1]** 1930/7
**catch [1]** 1931/18
**caught [1]** 1931/13
**cell [75]**
**cells [2]** 1957/17 1958/4
**cellular [3]** 1904/14 1904/14 1905/14
**center [2]** 1994/7 1994/8
**CENTRAL [22]** 1874/2 1883/3 1911/11 1911/14 1911/17 1915/6 1923/10 1928/22 1929/24 1943/25 1944/4 1944/10 1946/17 1946/20 1953/1 1956/9 1962/2 1993/18

1994/2 1994/8 2000/18 2001/22
**Century [1]** 1933/9
**CEO [2]** 1944/25 1947/13
**certain [11]** 1897/3 1919/21 1923/22 1963/13 1979/1 1980/23 1982/2 2000/10 2000/11 2001/1 2001/2
**Certainly [1]** 1924/11
**CERTIFICATE [1]** 2027/1
**certify [1]** 2027/4
**chain [1]** 1993/1
**chair [1]** 1886/14
**chairs [1]** 1919/5
**chance [3]** 1881/14 1969/25 2023/4
**charge [6]** 1901/24 1909/23 1910/2 1951/8 2018/25 2019/11
**charged [8]** 1950/23 1951/16 1988/3 2003/12 2011/13 2013/10 2025/3 2025/15
**charges [6]** 1930/17 1950/19 1951/3 1951/7 1951/17 1959/8
**chart [11]** 1882/1 1882/25 1884/22 1884/24 1885/17 1885/18 1887/11 1888/5 1889/19 1923/13 1986/17
**charts [4]** 1897/3 1897/10 2026/18 2026/19
**check [5]** 1949/20 1950/4 1950/5 1981/17 1993/20
**checked [3]** 1986/21 1988/11 1988/20
**checks [1]** 1884/7
**chief [1]** 1912/16
**choosing [1]** 1965/2
**chose [6]** 1953/8 1953/9 1953/12 1980/24 1981/16 1982/14
**cigarettes [1]** 1965/5
**circumstances [1]** 2007/17
**City [1]** 1933/9
**civil [14]** 1907/25 1908/1 1908/3 1908/5 1908/7 1909/1 1909/4 1909/15 1909/19 1910/6 1911/4 1930/16 1930/21 1930/22
**CJ [42]** 1916/12 1916/17 1917/1 1954/1 1954/6 1954/7 1954/9 1957/11 1964/10 1964/12 1964/16 1964/22 1965/4 1969/15 1970/13 1970/16 1972/7 1973/24 1974/22 1975/5 1975/12 1976/7 1977/17 1979/17 1979/24 1981/2 1981/20 1982/18 1985/16 1985/24 1986/7 1986/25 1990/2 1991/2 1991/14 1991/23 1991/23 1993/22 1993/25 1994/3 1994/5 2018/18
**CJ's [3]** 1974/17 1983/24 1983/25
**clarify [1]** 2000/5
**clarifying [1]** 1925/16
**classes [3]** 1907/24 1908/3 1908/13
**clear [4]** 1909/22 1932/12 1964/21 1996/16
**clerk [7]** 1939/19 1968/11 1968/12 1973/17 1983/3 1990/23 2026/10
**clip [11]** 1886/20 1887/4 1899/21 1900/1 1900/9 1903/15 1903/20 1904/16 1968/1 1968/14 1971/7
**Cloverfield [1]** 1875/11
**co [1]** 1973/8

# C

**co-counsel [1]**   1973/8
**cocaine [3]**   1951/16 1952/19 1952/24
**Code [1]**   2027/5
**codes [1]**   1980/23
**coincide [2]**   1942/21 1949/2
**combine [2]**   1924/24 1926/1
**combining [1]**   1961/3
**come [11]**   1882/5 1900/1 1918/25 1921/1 1925/19 1939/20 1957/11 2004/24 2008/18 2024/8 2026/11
**coming [1]**   1928/24
**command [1]**   1993/1
**commander [3]**   1912/16 2000/17 2001/1
**commander's [2]**   1998/22 1998/22
**comment [1]**   1962/25
**committed [3]**   2010/8 2010/11 2019/20
**communicated [1]**   1986/8
**communication [1]**   1984/24
**communications [1]**   1987/5
**company [2]**   1944/25 1947/13
**compare [1]**   1881/16
**comparing [1]**   1974/4
**complaint [1]**   1913/14
**complaints [4]**   1922/23 1923/9 1923/12 1923/15
**complete [1]**   1919/23
**completely [2]**   1943/18 2017/17
**computer [1]**   2001/17
**concern [1]**   1962/3
**concerned [1]**   1962/6
**condition [3]**   1994/18 1994/20 1994/24
**conditions [1]**   1994/20
**conduct [2]**   1912/2 1929/11
**conducted [7]**   1878/8 1884/17 1891/1 1913/23 1935/11 1940/6 2013/21
**conducting [1]**   1965/23
**confer [6]**   1905/18 1974/11 2017/8 2023/1 2023/10 2023/23
**conference [2]**   1886/15 2027/9
**confessed [2]**   2010/20 2010/22
**confession [1]**   2010/24
**confidential [4]**   1934/18 1934/20 1949/17 1949/19
**confirmation [1]**   1989/6
**confirmed [1]**   1990/1
**conformance [1]**   2027/8
**confrontation [1]**   1904/6
**confronted [3]**   1901/16 1901/19 1904/21
**connect [1]**   1992/18
**connection [6]**   1945/3 1954/21 1960/2 1979/2 2010/8 2019/18
**consider [1]**   1928/15
**consult [1]**   2012/20
**consulted [1]**   1966/12
**Cont'd [2]**   1876/5 1881/11
**contact [9]**   1904/1 1904/13 1913/6 1964/10 1975/21 1986/25 1988/6 1999/16 2024/25
**contacted [4]**   1903/22 1985/16 1999/20 2004/22
**contained [2]**   1881/19 1925/22
**content [2]**   1979/14 1980/1

**context [1]**   2017/17
**continue [6]**   1948/4 1948/5 1968/23 1969/20 1970/19
**contraband [4]**   1953/10 1963/21 1965/3 1966/13
**conversation [3]**   1930/7 1985/24 1997/14
**conversations [5]**   1971/24 1981/5 1996/11 1996/15 2024/18
**convey [1]**   1928/12
**conveyed [3]**   2024/24 2025/1 2025/13
**convicted [4]**   1950/8 1959/2 1959/7 1960/8
**conviction [1]**   1960/6
**convince [2]**   2019/17 2019/22
**cooperate [4]**   2013/8 2019/17 2019/21 2019/22
**cooperated [1]**   1934/8
**cooperation [3]**   2010/11 2019/24 2019/25
**copy [5]**   1885/6 1885/23 1968/4 1983/8 1991/1
**corded [1]**   1978/8
**corded-type [1]**   1978/8
**correct [398]**
**correctly [3]**   1897/8 1957/25 1963/11
**corruption [1]**   1910/10
**cosied [1]**   1957/17
**could [65]**   1889/8 1889/14 1912/2 1918/20 1919/6 1919/12 1919/15 1919/20 1919/20 1921/4 1923/6 1934/7 1934/8 1934/8 1934/22 1943/15 1944/25 1946/19 1948/20 1948/25 1950/1 1953/9 1956/12 1960/18 1961/5 1962/16 1965/13 1965/18 1965/20 1965/22 1965/25 1966/3 1966/3 1966/17 1966/23 1967/4 1968/5 1968/23 1970/9 1972/10 1976/21 1977/22 1978/3 1978/11 1978/12 1980/24 1980/25 1981/9 1981/20 1981/20 1982/13 1982/14 1985/12 1986/2 1986/4 1986/9 1989/13 1992/17 2000/15 2008/1 2013/13 2013/14 2023/5 2023/6 2023/13
**couldn't [10]**   1915/6 1918/18 1923/22 1926/15 1933/23 1934/10 1950/14 1950/18 1962/11 1995/2
**counsel [15]**   1875/1 1877/8 1877/12 1905/18 1939/16 1940/3 1973/8 1974/11 2017/8 2023/1 2023/8 2023/10 2023/15 2023/23 2026/8
**counsel's [2]**   2017/11 2017/14
**count [2]**   2003/5 2003/7
**country [2]**   1888/20 1888/24
**counts [1]**   1951/1
**county [6]**   1888/6 1908/14 1910/22 1992/5 2004/7 2005/3
**couple [2]**   1903/21 2009/13
**course [2]**   1979/18 2019/9
**Courson [19]**   1884/17 1884/18 1884/24 1929/14 1929/16 1929/17 1929/20 1931/9 1931/13 1932/1 1933/6 1934/23 1935/2 1935/4 1942/10 1942/13 1942/22 1943/1 1943/8

**Courson's [2]**   1931/23 1933/14
**court [13]**   1874/1 1874/21 1877/5 1881/2 1885/10 1897/20 1928/2 1939/16 1968/11 1973/17 1983/3 1999/24 2026/8
**cover [2]**   1930/25 1931/1
**covering [1]**   1910/12
**covert [1]**   1997/9
**CR [2]**   1874/8 1877/7
**crack [1]**   1951/15
**Craig [9]**   1883/2 1885/9 1898/14 1904/3 1904/7 1904/10 1904/13 2020/15 2021/6
**create [1]**   2022/15
**created [2]**   2022/13 2022/17
**credential [2]**   1917/11 2005/9
**crime [8]**   2003/16 2003/18 2010/11 2018/24 2019/9 2019/20 2025/3 2025/15
**criminal [12]**   1913/2 1913/7 1913/18 1949/20 1949/24 1950/3 1950/5 1950/13 1950/15 1950/17 1950/22 2013/5
**cross [5]**   1876/6 1905/21 1906/13 1953/18 1978/3
**Cross-Examination [3]**   1876/6 1905/21 1906/13
**crossover [1]**   1945/10
**CRR [1]**   2027/12
**CSR [2]**   1874/21 2027/12
**cumulative [3]**   1913/4 1913/10 1951/10
**currently [1]**   1906/23
**custody [11]**   1915/24 1920/11 1920/18 1920/21 1921/8 1921/10 1997/7 2000/7 2001/18 2006/16 2007/12

# D

**Dahle [2]**   1996/4 1999/9
**daily [1]**   1946/10
**danger [3]**   1962/16 1962/19 1992/17
**dangerous [2]**   1953/22 1967/4
**dangers [7]**   1965/12 1965/15 1965/16 1966/17 1966/23 1967/1 1967/5
**dash [1]**   1975/15
**database [2]**   1966/16 1988/25
**date [8]**   1897/20 1902/19 1985/20 2000/1 2000/10 2001/7 2008/12 2027/10
**David [4]**   1884/17 1929/14 1929/17 1996/4
**day [29]**   1874/14 1885/8 1886/17 1887/22 1889/23 1889/23 1897/25 1898/3 1898/12 1898/14 1899/10 1900/4 1939/4 1961/7 1964/13 1970/1 1980/8 1983/21 1985/21 1995/2 1995/7 1995/8 1997/2 2001/1 2005/16 2005/17 2005/19 2005/19 2025/21
**days [5]**   1888/3 1976/13 1988/16 1997/1 1997/2
**deadly [1]**   1951/8
**deal [2]**   1951/21 1962/5
**dealing [2]**   1948/18 1958/16
**dealings [1]**   1958/7
**deceive [2]**   1931/5 1931/9
**December [2]**   2007/7 2007/13
**decided [2]**   1953/15 1998/18
**declaration [1]**   1926/9

**D**

**declarations [7]**  1923/25 1925/9 1925/17 1925/22 1926/2 1926/7 1926/11
**defendant [3]**  1874/9 1875/9 1877/22
**Defendant's [1]**  1906/3
**defense [13]**  1973/16 1973/20 1974/7 1974/8 1974/16 1982/24 1983/1 1983/12 1990/20 1990/25 1990/25 1991/5 1991/10
**defensive [3]**  1934/19 1934/25 1935/5
**definition [2]**  1952/2 1952/5
**deliver [5]**  2000/10 2000/12 2000/18 2001/1 2001/3
**delve [1]**  1996/14
**demonstrative [1]**  1903/18
**denied [1]**  2011/7
**department [80]**
**depending [1]**  1948/3
**depends [3]**  1943/18 2005/18 2026/21
**deputies [19]**  1917/19 1920/15 1921/6 1922/19 1922/22 1922/23 1928/23 1929/13 1943/6 1949/4 1957/16 1957/22 1958/4 1962/17 1962/21 1963/20 1963/24 2022/3 2022/4
**deputy [45]**  1910/22 1912/15 1912/24 1913/1 1913/9 1919/25 1928/25 1929/16 1929/20 1930/4 1930/9 1931/9 1931/13 1931/14 1931/19 1931/23 1931/25 1933/6 1934/6 1934/23 1935/1 1935/4 1942/10 1942/13 1942/15 1942/18 1942/22 1943/1 1943/8 1943/15 1946/7 1946/13 1948/19 1952/10 1952/11 1952/14 1952/17 1952/24 1953/2 1977/2 1977/25 1991/3 2006/23 2011/5 2011/8
**describe [3]**  1907/8 1946/11 2010/13
**designation [1]**  1909/12
**desk [1]**  1992/14
**detail [1]**  1997/18
**details [1]**  2010/13
**detainee [1]**  2000/19
**determine [9]**  1888/1 1897/10 1900/22 1903/1 1911/23 1925/12 1978/20 1988/12 1995/7
**determined [4]**  1918/9 1926/17 1978/15 1978/19
**dial [2]**  1981/3 1981/21
**dialed [4]**  1979/16 1980/23 1986/18 1988/21
**did [157]**
**didn't [50]**  1888/15 1902/24 1916/23 1918/2 1918/15 1919/14 1919/16 1920/21 1924/8 1925/19 1926/12 1931/18 1934/9 1934/12 1934/14 1942/17 1953/17 1960/10 1964/2 1966/25 1967/5 1967/10 1969/1 1975/25 1980/9 1980/15 1981/15 1985/1 1985/3 1987/4 1987/14 1989/9 1989/12 1989/13 1992/25 1994/11 1995/18 1998/7 2002/12 2003/8 2007/10 2009/9 2009/11 2010/24 2012/15

2018/21 2018/21 2018/22 2019/22 2021/19
**different [10]**  1897/20 1918/17 1926/4 1926/10 1934/11 1944/17 1944/19 1950/23 1951/1 1951/3 1990/9 1998/3 2005/3 2010/18 2017/23
**differently [4]**  1888/10 1918/5 1927/23 1967/13
**dinner [3]**  1900/10 1900/20 1900/23
**direct [8]**  1876/5 1877/14 1881/11 1932/21 1942/8 1983/20 1998/10 2008/6
**directed [1]**  2000/18
**directly [5]**  1902/7 1916/22 1971/23 1984/22 1985/6
**director [4]**  1901/23 1909/23 1910/1 1992/22
**disclosed [1]**  1897/5
**discovered [5]**  1962/1 1985/4 1989/19 1992/5 1992/24
**discuss [6]**  1877/24 1939/5 1963/19 1966/19 2025/23 2026/1
**discussed [5]**  1897/16 1964/22 1964/24 1965/1 1978/2
**discussing [2]**  1978/18 1979/14
**discussion [5]**  1900/9 1953/14 1953/15 1979/1 1979/3
**disregard [2]**  1897/10 1959/24
**DISTRICT [3]**  1874/1 1874/2 1874/4
**divider [3]**  1916/19 1916/25 1919/5
**DIVISION [1]**  1874/2
**do [82]**
**document [6]**  1885/5 1885/22 1922/11 1961/10 1961/17 2001/3
**documented [1]**  1979/18
**documents [9]**  1897/6 1906/8 1919/9 1919/12 1919/13 1956/17 1956/20 2010/3 2010/6
**does [23]**  1882/4 1884/7 1886/5 1886/8 1886/13 1886/16 1887/11 1889/11 1889/25 1890/18 1898/5 1898/17 1898/21 1899/8 1899/13 1900/4 1900/19 1901/13 1903/11 1904/8 1905/9 2000/6 2013/11
**doesn't [5]**  1889/22 1926/2 1928/16 1962/12 1993/22
**doing [9]**  1910/25 1912/10 1924/17 1929/24 1948/16 1964/1 1981/1 2017/20 2019/10
**dollars [6]**  1956/14 1957/1 1957/2 1958/10 1958/13 1958/16
**don't [64]**  1877/19 1877/24 1889/5 1897/16 1907/8 1907/9 1907/18 1908/5 1911/15 1915/14 1918/1 1920/13 1920/20 1922/9 1924/9 1931/6 1931/21 1942/21 1944/11 1946/9 1949/2 1951/1 1952/2 1952/5 1952/21 1956/15 1957/23 1962/12 1963/14 1966/20 1967/3 1972/17 1977/4 1979/13 1981/13 1981/24 1993/18 1994/25

1995/11 1996/13 1997/5 1999/14 1999/17 1999/24 2000/12 2003/17 2005/14 2007/21 2007/23 2009/6 2009/14 2009/16 2009/18 2010/23 2010/25 2012/8 2012/8 2018/2 2019/4 2022/9 2022/19 2023/16 2024/22 2025/12
**done [10]**  1908/1 1920/23 1934/8 1953/4 1953/5 1953/9 1966/4 1995/11 2006/12 2026/20
**down [21]**  1889/14 1915/7 1917/15 1917/21 1918/4 1921/21 1946/10 1957/11 1960/1 1972/24 1973/5 1974/1 1977/7 1977/9 1977/13 1986/7 1995/1 2006/1 2006/6 2007/8 2026/14
**dozens [2]**  1920/9 1968/20
**driven [1]**  1902/23
**driver [15]**  1883/7 1884/15 1885/19 1887/14 1887/15 1887/17 1887/20 1902/16 1902/18 1902/19 1903/2 1903/7 1903/7 1903/9 1903/12
**driver's [4]**  1902/25 1903/1 1903/3 1917/12
**drives [1]**  1975/9
**driving [1]**  1974/22
**drugs [10]**  1953/21 1954/1 1954/9 1966/1 1997/14 1997/20 1997/22 1997/25 1998/2 1998/6
**durations [1]**  1987/6
**during [20]**  1889/7 1899/6 1901/4 1904/5 1904/10 1908/4 1908/6 1920/8 1922/14 1929/14 1952/23 1956/12 1958/16 1967/6 1980/6 2006/23 2019/3 2019/8 2019/14 2020/16
**duty [1]**  1903/9

**E**

**e-mail [4]**  1885/3 1885/12 1885/22 1933/2
**e-mails [3]**  1932/15 1932/22 1932/24
**each [8]**  1909/21 1916/23 1933/13 1944/13 1957/14 1981/10 1982/16 1982/17
**early [5]**  1883/11 1944/1 1944/6 1944/8 1985/20
**earphones [1]**  1958/20
**easier [1]**  1888/24
**Ecstasy [2]**  1952/19 1952/24
**EDDIE [2]**  1875/4 1877/11
**effect [2]**  1955/19 2012/24
**eight [4]**  1909/8 1972/20 1987/5 1995/25
**eight communications [1]**  1987/5
**eight months [1]**  1995/25
**eighth [1]**  1907/2
**either [11]**  1885/19 1888/1 1888/12 1905/5 1944/5 1947/1 1965/4 1976/7 1980/13 1999/9 2012/24
**else [6]**  1939/7 1948/20 1948/25 1979/25 1980/10 2025/25
**else's [1]**  1962/25
**embedded [1]**  1978/3
**encounter [8]**  2021/5 2021/8 2021/15 2021/20 2021/24 2023/22 2024/2 2024/5
**end [10]**  1944/1 1944/6

**E**

**end... [8]**  1959/3 1959/8 1994/1 2006/10 2012/14 2018/10 2019/25 2020/3
**ended [3]**  1924/12 1964/24 2002/24
**enforcement [13]**  1907/25 1908/4 1908/11 1908/19 1911/5 1916/4 1916/9 1916/16 1917/7 1918/16 1918/25 1963/7 1966/12
**engaged [2]**  1922/19 2013/5
**engaging [2]**  1933/18 2011/7
**enough [1]**  1978/11
**entered [1]**  1919/17
**entire [2]**  1943/14 1958/16
**entirely [5]**  1960/5 1972/25 1978/5 1989/10 1989/12
**entirety [1]**  1906/7
**entitled [2]**  1966/13 2027/7
**entries [2]**  1886/9 1890/12
**entry [4]**  1882/4 1884/1 1889/23 1900/15
**EPC [1]**  1886/15
**equipment [1]**  1975/13
**escapes [1]**  1965/16
**escort [1]**  1921/5
**especially [2]**  1918/2 1922/10
**even [8]**  1889/3 1919/25 1933/3 1948/4 1956/22 1957/11 1988/8 2006/21
**evening [4]**  1882/17 2025/4 2025/6 2025/14
**evenings [1]**  1980/8
**event [1]**  1900/16
**events [1]**  2026/20
**ever [24]**  1904/13 1908/22 1911/14 1928/23 1934/4 1942/22 1943/1 1946/23 1953/6 1954/9 1955/20 1962/9 1967/9 1967/12 1971/21 1977/17 1980/12 1985/4 1989/23 1999/16 2004/12 2020/24 2021/14 2025/15
**every [6]**  1909/12 1909/20 1922/10 1947/12 1980/13 2010/25
**everybody [1]**  1939/23
**everyone [3]**  1916/22 1947/17 1987/23
**everyone just [1]**  1916/22
**everyone on [1]**  1987/23
**everyone were [1]**  1947/17
**everything [5]**  1928/11 1951/24 1960/7 1960/9 1963/19
**EVID [1]**  1876/8
**evidence [24]**  1881/15 1885/2 1885/16 1897/6 1897/7 1897/9 1897/11 1906/2 1926/18 1926/21 1926/24 1927/2 1927/4 1939/15 1968/3 1974/7 1983/2 1983/11 1991/5 2010/7 2010/15 2010/18 2019/19 2026/7
**exact [5]**  1944/11 1950/19 1956/19 2009/18 2012/9
**exactly [2]**  1945/18 2005/12
**examination [5]**  1876/5 1876/6 1881/11 1905/21 1906/13
**example [2]**  1888/18 1977/11
**excessive [6]**  1922/20 1930/21 1943/6 1943/9 1943/13 1943/17
**exchange [6]**  1932/24 1960/8 1961/8 1963/22 1964/16

1971/12
**exchanged [3]**  1933/15 1932/23 1963/23
**exclusive [1]**  1924/23
**excuse [8]**  1906/6 1959/21 1974/25 1977/25 1981/4 1986/3 2004/25 2018/15
**executive [2]**  1966/19 2025/14
**exhibit [67]**  1876/8 1881/15 1881/16 1881/18 1881/19 1881/24 1882/8 1882/17 1883/5 1885/2 1885/16 1886/5 1886/20 1886/21 1887/8 1888/18 1897/14 1898/12 1898/17 1898/17 1899/1 1899/20 1899/21 1900/3 1901/6 1902/15 1903/15 1903/15 1903/18 1903/18 1903/19 1904/8 1922/25 1923/1 1923/4 1923/8 1925/24 1955/11 1968/1 1968/2 1968/3 1968/4 1968/6 1968/15 1968/16 1969/22 1970/10 1973/17 1973/20 1974/7 1974/16 1982/24 1983/1 1983/12 1983/25 1990/20 1990/25 1991/1 1991/5 1991/10 2000/4 2000/14 2017/11 2021/18 2022/11 2022/11 2022/24
**Exhibit 115 [1]**  1955/11
**Exhibit 195 [1]**  1968/15
**Exhibit 196 [1]**  1898/17
**Exhibit 226 [1]**  1883/5
**exhibits [3]**  1906/3 1906/3 1906/10
**exist [1]**  1980/15
**expand [1]**  1958/8
**experience [3]**  1962/4 1963/2 1966/20
**explain [3]**  1897/5 1948/1 1948/5
**explained [2]**  1978/7 2010/16
**explaining [1]**  1950/25
**explanatory [1]**  1977/19
**extent [2]**  1890/21 1923/24

**F**

**facility [1]**  1965/14
**fact [10]**  1900/7 1929/4 1929/9 1931/14 1931/19 1951/7 1990/5 1993/25 1996/21 2021/25
**facts [4]**  1897/5 1897/8 1897/8 1897/11
**fair [4]**  1931/7 1933/16 1973/23 1991/1
**fairly [1]**  2013/3
**false [2]**  2011/20 2013/16
**familiar [2]**  1904/25 1954/7
**family [3]**  1916/6 1939/7 2025/24
**far [1]**  1987/6
**farther [1]**  1972/10
**fast [1]**  2008/11
**FBI [50]**  1877/13 1906/15 1907/6 1908/18 1909/12 1917/11 1920/11 1921/8 1921/24 1923/16 1928/9 1944/23 1952/9 1952/10 1952/14 1954/6 1955/16 1956/5 1962/8 1962/10 1962/16 1966/12 1972/15 1980/20 1984/22 1985/2 1985/3 1985/7 1985/11 1992/14 1996/4 1996/20 1996/24 1997/3 1997/11 1997/20 1997/22 2007/5

2011/14 2011/20 2017/7 2017/16 2017/19 2018/4 2019/2 2019/8 2020/9 2024/6 2024/8 2024/9
**FBI's [3]**  1906/18 1966/16 1996/17
**federal [5]**  1913/19 2000/19 2007/13 2007/15 2022/16
**feet [1]**  1977/9
**fellow [4]**  1939/6 1939/17 2025/24 2026/9
**female [1]**  1969/18
**few [9]**  1885/25 1899/15 1933/2 1945/15 1957/2 1972/9 1997/1 1997/2 2009/14
**fib [1]**  1935/4
**field [4]**  1906/19 1907/20 1907/24 1910/17
**fight [1]**  1942/15
**figure [3]**  1924/4 1925/6 2002/11
**figures [1]**  1897/9
**file [6]**  1921/25 1946/20 1950/16 1956/20 1956/22 1964/19
**filled [1]**  1956/17
**final [1]**  2025/21
**Finally [2]**  1939/14 2026/6
**find [12]**  1962/21 1966/17 1976/10 1985/5 1985/9 1989/20 2001/21 2002/2 2002/4 2002/7 2002/14 2003/25
**finding [1]**  1924/25
**fine [5]**  1877/17 1881/5 1968/9 1983/10 2023/21
**finished [1]**  1884/20
**first [37]**  1882/4 1883/6 1898/1 1900/1 1901/9 1903/21 1906/18 1907/19 1907/23 1908/8 1908/11 1908/14 1908/25 1911/4 1911/13 1920/3 1926/16 1929/19 1929/23 1930/3 1930/6 1939/4 1943/24 1957/2 1957/10 1960/1 1963/6 1967/17 1968/1 1968/14 1975/7 1975/7 1983/21 1985/21 1986/25 1995/21 2024/7
**five [11]**  1885/24 1906/18 1921/3 1923/23 1923/24 1924/5 1926/3 1926/8 1990/12 1998/19 1998/21
**five individuals [3]**  1923/23 1923/24 1924/5
**five inmates [1]**  1926/8
**five months [1]**  1906/18
**five or [1]**  1990/12
**five things [1]**  1926/3
**five to [2]**  1998/19 1998/21
**flashlight [2]**  1943/11 1943/16
**flip [1]**  1883/16
**floor [10]**  1875/6 1882/11 1946/12 1957/14 1957/16 1957/23 1958/5 1987/22 1987/23 2000/20
**focus [9]**  1889/23 1926/18 1926/23 1927/1 1927/3 1956/3 1961/12 2000/15 2008/7
**focused [1]**  1912/19
**focusing [1]**  1901/9
**fold [2]**  1957/10 1984/23
**follow [6]**  1882/19 1915/16 1915/17 1926/20 1968/5 1972/10
**follow-up [2]**  1882/19 1926/20
**followed [1]**  1915/15

**F**

**following [14]** 1877/5 1881/1 1881/6 1897/1 1915/1 1939/1 1939/21 1940/1 1942/1 1942/4 1947/18 1949/8 2017/1 2026/12
**food [1]** 1965/5
**force [8]** 1922/20 1930/21 1942/18 1942/21 1943/6 1943/9 1943/13 1943/17
**foregoing [1]** 2027/5
**form [7]** 1906/10 1921/17 1926/4 1944/17 1944/19 1953/10 1965/3
**format [1]** 2027/8
**forth [1]** 1987/16
**forward [1]** 2008/11
**forwarded [2]** 1903/6 1903/8
**found [13]** 1924/17 1950/8 1951/22 1962/5 1962/10 1962/15 1967/7 1989/7 1989/16 1992/3 1993/6 2004/3 2006/17
**foundation [6]** 1951/18 1954/3 1954/5 1954/17 1955/6 1955/7
**four [4]** 1910/2 1910/3 1931/18 1947/16
**four levels [1]** 1910/2
**four or [1]** 1931/18
**fourth [1]** 1882/7
**FOX [16]** 1875/4 1876/5 1877/10 1887/7 1906/22 1907/13 1923/1 1931/22 1932/20 1933/5 1942/9 1949/21 1967/21 1967/25 1979/1 2022/25
**Fox's [1]** 1972/4
**freedom [1]** 1919/24
**frequently [3]** 1933/2 1958/5 2019/7
**friend [1]** 1916/13
**friends [5]** 1916/6 1932/3 1932/5 1932/7 1932/9
**front [10]** 1928/10 1950/13 1950/18 1977/3 1977/10 2000/8 2003/9 2007/9 2007/12 2012/18
**function [1]** 1981/1
**fundraising [3]** 1900/10 1900/20 1900/23
**further [1]** 1905/19

**G**

**gain [3]** 1933/17 1933/22 1934/15
**gang [6]** 1910/14 1957/20 1957/24 1958/3 1965/23 1994/15
**gave [17]** 1910/21 1919/23 1928/16 1932/6 1946/6 1947/11 1954/1 1954/12 1954/15 1956/4 1956/25 1958/6 1966/22 1975/5 1977/11 1997/22 1997/24
**general [11]** 1916/18 1916/21 1921/4 1932/8 1944/18 1984/23 1987/13 1987/13 1996/13 2019/6 2024/24
**generally [6]** 1886/9 1918/12 1987/15 1996/14 2010/16 2011/5
**generated [1]** 1979/10
**gentlemen [4]** 1897/3 1939/3 1973/9 2025/20
**get [29]** 1885/10 1918/3 1921/1 1925/4 1925/11 1933/14 1933/17 1933/20

1933/23 1934/18 1934/22 1934/25 1948/9 1956/13 1956/18 1957/23 1958/21 1967/5 1976/11 1977/20 1977/21 1978/22 1985/5 1985/13 1995/12 1995/18 2021/18 2026/20 2026/22
**gets [2]** 1885/5 1885/22
**getting [3]** 1902/10 1960/7 1970/13
**Gilbert [68]** 1883/3 1883/8 1883/10 1883/11 1952/17 1953/6 1960/3 1963/12 1963/16 1963/19 1964/9 1964/12 1964/16 1965/4 1969/12 1970/23 1971/12 1972/6 1972/10 1973/24 1975/2 1975/5 1975/9 1975/17 1975/22 1975/25 1976/1 1976/5 1976/16 1981/17 1990/3 1990/6 1991/16 1991/24 1992/1 1996/17 1996/22 1997/15 1997/20 1997/22 1997/24 1998/1 1998/5 2002/24 2003/9 2003/13 2007/16 2008/7 2008/15 2008/18 2009/3 2009/13 2009/20 2010/7 2010/12 2010/20 2011/10 2011/13 2011/18 2011/23 2012/23 2018/4 2018/9 2018/14 2018/23 2019/12 2019/15 2020/9
**girlfriend [11]** 1986/21 1988/5 1988/9 1988/13 1988/16 2008/25 2009/10 2012/2 2012/4 2012/5 2012/11
**give [30]** 1917/12 1917/14 1934/15 1939/18 1945/23 1946/16 1947/4 1947/14 1949/12 1952/15 1952/23 1953/1 1954/2 1954/9 1954/10 1958/2 1958/9 1958/12 1958/14 1958/19 1977/17 1981/2 1981/8 1981/15 1982/12 1990/23 1991/23 2012/10 2019/25 2026/10
**given [14]** 1909/12 1928/18 1947/16 1947/17 1952/18 1955/16 1957/9 1982/9 1984/19 1992/4 2002/18 2012/11 2012/13 2013/3
**giving [6]** 1957/25 1978/2 1987/17 1997/20 2005/9 2018/12
**glance [1]** 1926/16
**glass [4]** 1916/19 1916/22 1916/25 1919/4
**go [49]** 1877/15 1884/1 1885/2 1885/16 1889/19 1890/24 1913/21 1915/6 1915/7 1915/11 1916/15 1918/16 1918/17 1923/5 1923/20 1924/21 1924/21 1928/10 1929/20 1944/22 1945/1 1946/23 1948/3 1949/19 1967/13 1984/24 1986/2 1986/2 1987/7 1993/18 1993/22 1994/11 1994/12 1995/9 2000/12 2000/15 2001/6 2002/16 2003/17 2004/17 2004/20 2005/8 2008/14 2009/7 2009/9 2011/24 2012/25 2013/19 2026/18
**going [60]** 1882/16 1886/4 1886/19 1886/25 1887/3 1887/19 1888/17 1890/19 1897/12 1897/24 1899/8

1899/20 1902/22 1903/14 1903/17 1926/17 1926/17 1933/15 1933/24 1939/3 1942/10 1943/2 1944/15 1946/15 1953/16 1957/19 1958/8 1963/19 1964/22 1967/1 1969/3 1969/5 1970/6 1970/24 1971/4 1972/7 1973/9 1977/2 1977/9 1977/13 1977/23 1977/25 1984/19 1985/13 1986/11 1987/16 1993/11 2000/25 2001/12 2002/11 2008/11 2012/18 2013/7 2017/19 2018/7 2018/7 2018/25 2020/13 2025/1 2025/3
**gone [1]** 2005/18
**good [8]** 1877/10 1897/25 1898/3 1898/12 1899/10 1946/9 1971/10 1971/10
**got [13]** 1889/22 1918/10 1961/1 1961/1 1961/21 1967/2 1983/21 1985/21 1986/14 2004/13 2010/23 2011/1 2011/2
**gotten [2]** 1934/23 1985/12
**government [15]** 1875/3 1881/15 1881/16 1881/18 1881/19 1881/24 1882/7 1882/17 1888/18 1898/16 1899/20 1904/8 1913/19 1974/6 2022/16
**Government's [4]** 1887/8 1906/3 2021/18 2022/23
**grand [34]** 1927/9 1927/11 1927/13 1927/15 1927/19 1927/24 1928/6 1928/10 1928/12 1928/15 1928/17 1928/18 1946/23 1946/24 1972/15 2000/1 2000/8 2000/19 2001/2 2001/13 2001/24 2002/16 2002/20 2003/9 2003/17 2007/8 2007/9 2007/13 2007/15 2012/11 2012/19 2012/20 2012/21 2021/22
**gray [1]** 1991/11
**ground [3]** 1972/15 1972/19 1990/17
**group [1]** 2012/4
**guess [8]** 1912/4 1912/6 1921/10 1943/18 1944/7 1946/10 1961/5 2010/16
**guilty [9]** 2002/25 2003/2 2003/5 2003/13 2003/16 2011/18 2011/19 2013/12 2013/16
**gun [2]** 1951/9 2020/6

**H**

**had [145]**
**hadn't [3]** 1934/23 1976/19 1988/11
**hand [1]** 2023/3
**handed [1]** 1960/1
**handful [1]** 1889/9
**handling [1]** 2024/18
**happen [9]** 1884/7 1887/10 1919/14 1961/22 1961/25 1977/3 1983/24 1988/12 2002/6
**happened [10]** 1898/13 1924/20 1946/12 1952/22 1967/20 1971/19 1973/24 2002/5 2003/18 2006/15
**happening [2]** 1973/5 1987/11
**happens [11]** 1882/17 1883/6 1883/17 1884/1 1884/13 1885/7 1887/21 1947/23

## H

happens... [3]  1947/25
 1949/5 1967/16
happy [1]  1950/20
has [21]  1889/22 1909/20
 1926/3 1939/15 1949/7 1949/8
 1949/10 1959/17 1960/16
 1968/3 1973/16 1973/19
 1982/23 1989/16 1990/1
 1990/2 1990/20 1994/17
 2003/12 2003/16 2026/7
hasn't [2]  1962/5 1976/2
have [119]
having [10]  1919/4 1920/4
 1922/3 1931/17 1950/13
 1970/22 1980/16 1985/16
 1996/7 2013/5
he [233]
head [4]  1958/24 1992/22
 2004/8 2024/11
headquarters [1]  1961/11
health [1]  1994/18
hear [2]  1980/18 2009/11
heard [6]  1878/4 1903/20
 1939/15 1962/23 2020/14
 2026/7
hearsay [2]  1928/16 1954/25
heart [2]  1994/20 1994/24
held [11]  1877/5 1881/6
 1915/1 1939/1 1939/21 1940/1
 1942/1 1942/4 2017/1 2026/12
 2027/6
help [3]  1897/4 2013/9
 2013/11
her [6]  1877/15 1877/16
 1877/18 1877/25 1878/1
 1904/1
here [12]  1877/16 1881/25
 1887/11 1889/10 1898/9
 1899/16 1901/9 1905/6
 1986/18 2000/17 2001/7
 2022/11
hereby [1]  2027/4
heroin [2]  1952/19 1952/24
hey [1]  1957/11
hidden [2]  1929/4 1929/6
hiding [1]  1978/22
high [1]  1951/15
highlight [1]  1905/6
highlighted [1]  1984/4
him [101]
himself [3]  1888/14 1942/14
 1942/17
his [68]  1884/3 1884/8
 1885/19 1885/20 1887/23
 1888/2 1889/4 1898/1 1898/19
 1898/23 1899/1 1899/8
 1900/12 1901/2 1901/4
 1902/24 1904/14 1907/13
 1909/25 1917/15 1933/17
 1933/22 1934/15 1949/20
 1950/17 1950/22 1951/9
 1957/13 1957/18 1958/1
 1958/15 1958/20 1958/22
 1959/20 1960/6 1962/16
 1962/19 1964/6 1969/14
 1970/13 1971/23 1975/13
 1984/24 1985/16 1986/4
 1986/9 1987/1 1988/16
 1993/11 1994/24 2008/25
 2009/4 2009/9 2010/11
 2011/24 2012/2 2012/4 2012/5
 2013/4 2013/7 2013/9 2013/13
 2017/5 2018/1 2019/20
 2019/24 2019/25 2020/6
his aide [1]  1885/20
histories [1]  1950/15
history [4]  1950/3 1950/13

1950/17 1950/22
hits [1]  1965/19
HOCHMAN [10]  1875/10 1876/6
 1877/21 1906/9 1908/18
 1970/12 1973/19
Hollywood [1]  1900/21
honest [2]  1948/13 1950/2
Honor [61]  1877/10 1877/14
 1877/19 1877/23 1878/2
 1878/4 1881/8 1882/14
 1882/22 1883/24 1886/2
 1886/19 1886/22 1886/25
 1890/2 1890/20 1890/21
 1897/12 1905/17 1905/19
 1905/22 1906/4 1906/7
 1906/12 1913/15 1913/20
 1915/3 1927/8 1932/17 1935/7
 1942/7 1955/7 1962/24
 1967/25 1968/2 1968/2 1968/6
 1968/8 1968/11 1968/13
 1973/13 1973/15 1974/7
 1974/10 1974/12 1974/13
 1983/1 1983/4 1983/9 1990/20
 1991/6 1991/8 2013/18 2017/3
 2017/9 2017/10 2017/14
 2023/17 2025/18 2026/17
 2026/21
HONORABLE [1]  1874/3
hoping [1]  2026/20
hospital [1]  1942/15
hour [11]  1885/14 1885/21
 1939/20 1996/8 2006/6
 2006/11 2007/22 2009/17
 2012/6 2026/11 2026/21
hours [7]  1884/21 1980/7
 2006/5 2006/8 2009/13
 2009/14 2012/8
housekeeping [1]  1881/13
how [42]  1883/19 1884/7
 1884/10 1886/8 1887/16
 1888/23 1904/23 1904/25
 1905/4 1907/17 1908/14
 1909/4 1909/23 1911/21
 1911/22 1912/14 1920/7
 1926/14 1933/1 1933/4 1944/7
 1945/8 1945/14 1950/21
 1956/11 1956/13 1963/16
 1963/18 1964/21 1966/17
 1977/17 1995/11 2003/25
 2004/20 2006/4 2008/21
 2009/1 2009/15 2013/2 2019/5
 2026/15 2026/22
how much [1]  1956/13
huge [1]  1962/3
huh [1]  1984/8
human [4]  1930/11 1930/17
 1930/19 1930/23
hundred [3]  1957/2 1974/4
 1974/19
hundreds [3]  1923/21 1926/25
 1957/1

## I

I'm [7]  1877/20 1909/7
 1924/9 1928/3 2003/16
 2021/12 2023/17
I.D [1]  1876/8
ICIB [3]  1883/9 1884/17
 1913/18
ID [1]  2005/9
idea [3]  1964/8 1967/13
 2022/22
identification [3]  1973/16
 1973/20 2005/13
identifies [1]  1890/22
identify [2]  1889/8 1901/4
identity [1]  1946/4
II [1]  1874/15
immediately [6]  1903/22

1939/11 1980/13 1993/9
 2021/7 2026/4
importance [1]  1948/2
important [4]  1948/7 1948/12
 1948/19 1948/23
impression [1]  1932/6
imprisonment [1]  1959/11
incident [1]  1943/14
incidents [3]  1942/23 1951/2
 2006/22
include [1]  1972/17
included [9]  1882/2 1923/25
 1933/9 1947/18 1965/16
 1965/19 1965/21 1965/23
 1966/1
includes [2]  1885/18 1930/21
including [4]  1881/20
 1930/17 1939/6 2025/24
incoming [3]  1889/3 1901/3
 1905/11
incorrect [2]  1960/14 1987/3
Independent [2]  2004/8
 2004/11
indication [1]  1986/24
individual [3]  1973/2 1989/4
 1989/5
individuals [8]  1908/5
 1923/3 1923/24 1924/1
 1924/5 1924/6 1945/15
 1966/20
inform [1]  1949/13
informant [24]  1944/17
 1944/19 1944/21 1944/23
 1944/25 1944/25 1945/2
 1945/20 1945/22 1945/23
 1947/3 1947/4 1947/15 1948/6
 1948/7 1948/12 1948/12
 1948/18 1948/19 1949/3
 1949/12 1949/19 1962/22
 2020/10
informant's [1]  1948/15
informants [3]  1945/16
 1947/25 1949/17
information [33]  1912/2
 1918/6 1922/14 1924/16
 1925/4 1925/11 1925/15
 1925/23 1928/12 1928/17
 1928/18 1933/17 1933/20
 1933/23 1934/15 1946/25
 1948/15 1948/22 1948/24
 1952/21 1978/22 1981/9
 1981/9 1987/13 1987/13
 1989/9 1989/14 2002/17
 2002/20 2006/12 2006/15
 2006/22 2018/13
informed [1]  2024/19
initial [5]  1910/25 1911/9
 1913/8 1913/13 1913/14
initially [6]  1912/20
 1917/17 1964/22 1965/1
 2005/24 2009/6
inmate [49]  1907/21 1910/21
 1911/9 1913/8 1913/14 1915/6
 1915/8 1915/12 1915/24
 1916/5 1916/6 1917/15
 1917/20 1917/23 1918/4
 1918/7 1918/10 1918/18
 1919/6 1919/9 1919/12
 1919/21 1920/10 1920/11
 1920/14 1920/18 1920/21
 1920/22 1922/14 1924/19
 1942/14 1942/19 1943/11
 1943/16 1944/23 1944/24
 1945/19 1947/13 1955/3
 1955/17 1955/21 1957/20
 1960/2 1977/22 1977/24
 1995/14 2001/5 2004/23
 2011/4
inmate's [1]  1915/8

**I**

**inmates [29]**   1911/16 1911/19
 1917/6 1918/12 1918/23
 1919/24 1920/5 1920/7 1921/3
 1921/12 1922/3 1922/19
 1922/22 1923/9 1923/15
 1923/18 1923/19 1925/6
 1925/12 1926/8 1928/21
 1945/16 1957/14 1957/18
 1962/17 1962/21 1963/3
 1978/9 1978/10
**insert [1]**   1978/12
**inside [7]**   1912/25 1949/4
 1953/1 1953/22 1954/9
 1965/23 1966/1
**instance [5]**   1916/12 1948/17
 1949/3 1952/9 1996/16
**instead [1]**   1919/4
**instructed [1]**   1984/18
**instruction [1]**   1949/12
**instructions [5]**   1939/16
 1947/18 1949/8 1977/17
 2026/8
**intend [1]**   2026/15
**intentionally [4]**   1981/7
 1981/8 1981/16 1982/14
**intercede [1]**   1903/22
**interceded [1]**   1903/22
**interested [1]**   1932/13
**Internal [5]**   1913/1 1913/2
 1913/7 1913/13 1913/17
**international [1]**   1888/9
**Internet [1]**   1982/19
**interrupted [2]**   1998/10
 1998/11
**interview [31]**   1883/3 1883/9
 1884/16 1884/23 1898/3
 1911/8 1911/11 1911/13
 1911/13 1911/16 1915/5
 1917/18 1918/13 1919/13
 1922/10 1922/15 1924/19
 1924/21 1924/21 1931/23
 1931/24 2004/23 2017/5
 2017/12 2017/15 2018/10
 2019/3 2019/8 2019/14 2020/1
 2020/3
**interviewed [8]**   1883/11
 1883/12 1884/18 1912/22
 1920/22 1923/21 1923/23
 1924/4
**interviewing [3]**   1883/13
 1911/19 1912/6
**interviews [6]**   1883/10
 1920/5 1921/6 1921/14
 1921/22 1922/2
**intimidating [1]**   1965/21
**investigate [4]**   1907/21
 1928/25 1931/14 1931/19
**investigated [3]**   1924/16
 1971/21 1971/22
**investigating [17]**   1912/21
 1912/23 1912/24 1923/16
 1925/1 1929/3 1929/8 1930/4
 1930/9 1930/11 1930/16
 1930/19 1931/6 1933/19
 1933/25 1934/5 2007/18
**investigation [53]**   1887/24
 1907/7 1910/25 1911/1 1911/4
 1912/3 1912/5 1912/9 1912/10
 1912/12 1923/16 1924/2
 1924/25 1925/20 1925/21
 1927/9 1927/10 1927/12
 1927/13 1927/14 1927/15
 1927/19 1927/20 1927/24
 1927/24 1928/6 1929/11
 1943/5 1945/4 1948/11
 1948/11 1948/21 1949/5
 1949/6 1949/13 1949/14

 1953/4 1953/11 1954/21
 1954/24 1964/5 1969/20
 1995/17 1996/11 2004/13
 2013/9 2019/9 2019/18
 2019/21 2019/23 2020/10
 2020/11 2021/21
**investigations [6]**   1913/2
 1913/7 1913/18 1929/7
 2004/22 2005/15
**investigators [9]**   1903/23
 1903/23 1904/1 1954/15
 1996/12 1996/15 2017/13
 2017/25 2022/4
**involved [4]**   1939/7 1943/5
 1963/18 2025/25
**involves [1]**   1948/17
**involving [2]**   1911/24 1963/7
**irrelevant [3]**   1913/4
 1913/10 1932/18
**is [402]**
**isn't [15]**   1942/13 1950/2
 1950/9 1950/12 1950/24
 1951/25 1952/6 1954/2
 1956/23 1965/3 1981/23
 1982/17 1988/16 1992/14
 1995/3
**issue [3]**   1928/1 1948/2
 1948/3
**it [306]**
**Item [1]**   1877/7
**its [3]**   1906/7 1971/16
 1971/17

**J**

**jail [56]**   1883/3 1908/22
 1911/11 1911/14 1911/17
 1915/6 1915/7 1915/8 1918/10
 1923/10 1928/22 1928/24
 1929/24 1942/11 1943/25
 1944/4 1944/10 1944/15
 1946/17 1946/20 1949/4
 1953/1 1953/22 1956/9 1962/2
 1963/7 1965/13 1965/24
 1966/2 1966/4 1966/5 1966/18
 1967/2 1967/7 1967/23 1970/4
 1971/2 1971/23 1976/2 1976/6
 1976/17 1976/22 1977/7
 1977/25 1978/9 1989/8
 1989/20 1992/10 1993/18
 1994/2 1994/9 2000/18
 2003/22 2004/22 2004/25
 2005/4
**jails [21]**   1908/15 1910/22
 1911/21 1911/22 1915/13
 1915/15 1915/20 1921/5
 1929/20 1933/15 1933/24
 1934/1 1934/6 1934/16
 1942/23 1943/2 1946/8
 1948/17 1977/5 1977/6
 1977/23
**Janaco [3]**   2004/4 2004/6
 2004/12
**January [3]**   2003/2 2003/8
 2003/13
**January 2012 [1]**   2003/13
**JAUREGUI [2]**   1875/4 1877/11
**jeep [2]**   1974/21 1991/15
**job [4]**   2012/25 2012/25
 2013/4 2013/7
**joined [1]**   1906/15
**JUDGE [2]**   1874/4 1885/9
**Judicial [1]**   2027/9
**July [28]**   1920/4 1928/22
 1945/6 1945/20 1946/24
 1956/7 1956/7 1960/4 1966/11
 1966/14 1966/24 1967/6
 1967/17 1968/15 1968/19
 1969/1 1970/1 1971/2 1971/10
 1971/11 1971/20 1972/1

 1974/1 1976/13 1983/20
 1984/7 1984/12 1989/25
**July 18 [1]**   1969/1
**July 18th [2]**   1968/15
 1968/19
**July 19th [1]**   1970/1
**July 2011 [5]**   1920/4 1928/22
 1945/20 1946/24 1956/7
**July 20th [6]**   1960/4 1966/24
 1967/17 1971/11 1972/1
 1974/1
**July 21 [3]**   1971/2 1971/10
 1971/20
**July 26 [6]**   1967/6 1976/13
 1983/20 1984/7 1984/12
 1989/25
**June [16]**   1907/7 1907/20
 1910/20 1920/4 1921/13
 1921/13 1922/3 1922/4
 1928/22 1945/6 1945/8
 1945/20 1946/23 1959/3
 1959/8 2004/13
**June 2010 [4]**   1910/20 1920/4
 1921/13 1928/22
**June 2011 [1]**   1921/13
**jurors [5]**   1939/6 1939/17
 1968/5 2025/24 2026/9
**jury [49]**   1874/14 1877/6
 1881/3 1881/7 1897/2 1915/2
 1927/10 1927/11 1927/14
 1927/15 1927/19 1927/24
 1928/6 1928/10 1928/13
 1928/15 1928/17 1928/18
 1939/2 1939/22 1940/2 1942/2
 1942/3 1942/5 1946/23
 1946/24 1959/24 1968/10
 2000/1 2000/8 2000/19 2001/2
 2001/13 2001/24 2002/16
 2002/20 2003/17 2003/17
 2007/8 2007/9 2007/13
 2007/15 2012/11 2012/19
 2012/20 2012/21 2017/2
 2021/22 2026/13
**jury's [2]**   1886/21 1899/21
**just [52]**   1881/13 1886/21
 1888/13 1889/6 1889/6
 1889/10 1897/15 1897/24
 1898/1 1898/8 1906/25
 1909/19 1909/22 1915/6
 1916/22 1917/19 1917/25
 1918/3 1918/12 1918/20
 1918/25 1922/9 1923/21
 1925/16 1930/7 1933/17
 1944/18 1957/11 1961/17
 1964/21 1971/18 1972/10
 1973/7 1973/13 1974/18
 1978/16 1978/23 1979/15
 1979/20 1984/23 1987/12
 1987/15 1990/23 1995/4
 2000/15 2002/12 2003/15
 2010/22 2017/10 2021/4
 2021/17 2026/21
**justified [1]**   1943/19

**K**

**KATIE [2]**   1874/21 2027/12
**keep [5]**   1929/4 1929/9
 1939/14 2013/4 2026/6
**kept [1]**   1966/23
**kicked [2]**   1998/12 1998/13
**kind [4]**   1882/1 1957/15
 2010/22 2011/1
**knew [22]**   1902/22 1932/10
 1933/23 1960/11 1960/17
 1962/4 1962/14 1962/20
 1963/22 1965/15 1969/3
 1970/6 1971/4 1971/20
 1992/12 1996/23 1996/24
 1997/1 1997/2 1998/7 2010/16

**K**

knew... [1]   2013/3
know [72]
known [5]   1963/20 1997/4 1997/5 1997/6 1997/7

**L**

LA [6]   1897/25 1898/3 1898/12 1899/10 1909/23 1910/17
Ladies [4]   1897/3 1939/3 1973/9 2025/20
Lancaster [1]   2003/22
laptop [1]   2009/21
large [2]   1978/11 1978/11
LASD [1]   1954/20
LASD080724 [1]   1983/15
last [5]   1881/22 1906/7 1995/24 2006/10 2008/8
lasted [3]   1884/19 1996/8 2021/10
late [1]   1944/8
later [8]   1884/6 1884/21 1885/15 1885/25 1901/20 1976/13 1989/15 2020/2
latest [1]   1901/22
law [11]   1908/10 1908/19 1911/5 1916/4 1916/9 1916/16 1917/7 1918/16 1918/25 1963/7 1966/12
Lawrence [2]   1999/20 2001/11
lay [2]   1955/7 2010/24
Lea [1]   1877/13
lead [2]   1911/5 1971/23
LEAH [1]   1876/4
learned [5]   1912/14 1912/20 1912/24 2021/25 2022/1
least [7]   1927/3 1944/12 1945/13 1957/1 1973/25 1976/1 1987/4
leave [1]   1998/18
leaves [1]   1994/1
Leavins [7]   1883/1 1885/4 1887/13 1887/16 1887/20 1904/18 1904/20
Lee [1]   1882/2
left [6]   1998/21 1999/1 1999/2 2008/8 2020/15 2026/18
Leroy [3]   1874/9 1877/8 1877/22
less [1]   2007/22
let [19]   1885/16 1889/19 1898/1 1906/6 1918/15 1918/17 1918/25 1939/11 1940/3 1944/21 1956/3 1961/12 1963/10 1968/18 1983/7 1986/12 2019/19 2021/18 2026/3
let's [14]   1881/3 1884/1 1890/24 1904/17 1904/18 1913/21 1942/3 1942/6 1945/6 1948/10 2006/10 2013/19 2021/3 2021/4
letter [10]   1907/21 1910/21 1911/9 1946/14 1955/10 1955/11 1955/15 1955/19 1955/23 1955/25
letters [3]   1946/7 1946/9 2007/4
letting [1]   1971/15
level [1]   2002/9
levels [4]   1909/21 1909/24 1910/2 1910/3
LEWIS [1]   1875/10
liar [3]   1951/25 1952/2 1952/5
license [1]   1917/12

lie [8]   1930/18 1952/20 1953/22 1954/10 1953/24 2011/10 2011/20 2011/13
lied [3]   1929/23 1930/10 2018/24
lies [1]   1952/6
lieutenant [3]   1883/1 1887/13 1912/16
life [5]   1959/14 1959/17 1962/16 1962/19 1992/17
like [27]   1881/4 1888/13 1888/19 1897/15 1898/7 1910/10 1916/5 1917/20 1918/25 1924/3 1946/10 1952/18 1957/12 1958/19 1958/25 1961/4 1968/20 1973/15 1974/21 1978/12 1978/25 1982/4 1983/12 1995/14 2005/10 2006/12 2008/6
likely [2]   1924/1 1924/13
line [3]   1889/18 1953/17 1992/14
linked [5]   1984/22 1985/1 1985/3 1985/6 1989/4
list [2]   1924/12 1966/22
listed [4]   1890/17 1897/14 1926/4 1989/10
listen [2]   1939/12 2026/4
little [4]   1905/6 1945/10 1958/12 2007/22
lived [1]   1902/11
LIZABETH [2]   1875/5 1877/11
LLP [1]   1875/10
lobby [2]   1998/24 1998/25
locally [1]   1961/2
located [1]   1899/16
location [2]   1901/3 1901/4
locations [2]   1933/6 1933/13
log [2]   1946/10 1946/14
logistically [1]   1978/24
logs [3]   1946/16 1946/19 1947/1
long [14]   1883/2 1883/14 1884/10 1886/8 1887/16 1898/14 1904/4 1904/6 1904/9 1904/13 2006/4 2009/15 2018/20 2021/6
longer [2]   2006/7 2026/15
look [19]   1883/5 1885/11 1889/14 1890/10 1901/2 1902/18 1902/25 1903/3 1910/23 1923/20 1924/8 1926/12 1943/14 1956/16 1956/17 1986/17 1995/6 1995/19 1996/19
looked [7]   1888/19 1901/2 1901/7 1913/1 1924/13 1926/2 1951/12
looking [12]   1881/25 1884/22 1885/7 1886/16 1888/22 1898/7 1898/25 1911/8 1923/21 1925/23 1974/1 1995/10
looks [3]   1888/23 1974/3 1974/21
LOS [18]   1874/16 1874/22 1875/6 1877/1 1882/11 1900/16 1901/14 1906/19 1907/5 1907/19 1907/24 1908/14 1909/1 1910/5 1910/21 1954/20 1992/5 2020/25
lose [4]   1959/18 2012/24 2012/25 2013/7
lot [10]   1889/1 1889/7 1912/5 1926/15 1952/4 1952/6 1972/6 1972/8 1972/9 1990/9
lying [9]   1930/22 1931/4

1931/7 1947/21 2018/10 2018/15 2018/16 2018/19 2019/8

**M**

made [18]   1885/18 1888/5 1899/25 1901/18 1911/17 1913/8 1923/9 1924/6 1924/11 1926/16 1955/23 1976/7 1978/9 1988/15 1996/16 2013/17 2021/23 2024/25
magnet [2]   1882/15 1882/22
mail [4]   1885/3 1885/12 1885/22 1933/2
mails [3]   1932/15 1932/22 1932/24
main [1]   1889/18
majority [2]   1888/12 2026/17
make [11]   1885/5 1885/23 1905/14 1912/1 1957/5 1980/14 1982/1 1984/21 2010/14 2013/14 2021/17
making [3]   1922/23 1944/22 1970/4
male [1]   1989/5
management [3]   1966/19 1993/12 2025/14
manipulate [2]   2019/14 2019/15
manipulating [1]   2018/1
manipulative [1]   1951/23
manipulator [1]   1951/22
manual [6]   1934/19 1934/21 1934/22 1934/25 1935/1 1935/6
many [16]   1883/19 1888/1 1909/4 1909/23 1920/7 1926/14 1933/1 1933/4 1944/7 1945/14 1946/6 1972/17 1972/19 2007/1 2008/21 2009/1
MARCH [3]   1874/17 1877/1 2027/10
Maricela [2]   1883/2 1904/3
marijuana [2]   1952/18 1952/24
Marino [2]   1902/9 1902/14
marked [5]   1973/16 1973/19 1982/23 1982/23 1990/20
marshal's [1]   2000/7
marshals [4]   2000/7 2000/10 2000/12 2001/4
Martinez [9]   1902/3 1992/23 1993/2 2024/12 2024/14 2024/19 2025/8 2025/11 2025/12
mate [18]   1985/16 1986/4 1986/14 1986/22 1987/1 1987/18 1987/19 1988/2 1988/6 1988/8 1988/13 1988/15 1988/21 1989/6 1989/8 1989/12 1989/16 1989/20
mate's [1]   1989/9
matter [3]   1947/12 2013/7 2027/7
may [23]   1878/4 1881/8 1886/22 1905/24 1915/3 1925/2 1935/7 1948/3 1967/13 1968/4 1968/10 1968/14 1973/7 1974/13 1983/8 1990/19 2000/4 2017/3 2021/17 2022/23 2023/8 2023/11 2026/14
maybe [4]   1901/20 1944/1 1972/21 2009/2
me [51]   1885/16 1889/19 1898/1 1898/15 1906/6 1906/6 1924/10 1934/21 1939/11

**M**

**me... [42]**  1939/18 1940/3
 1943/20 1944/21 1950/13
 1950/18 1950/20 1956/2
 1956/3 1957/12 1959/21
 1961/12 1963/10 1963/11
 1968/18 1974/18 1974/25
 1977/25 1981/4 1983/7 1986/3
 1986/11 1987/12 1987/13
 1987/15 1993/11 2002/9
 2004/3 2004/25 2010/23
 2011/1 2011/2 2017/6 2017/16
 2017/21 2018/15 2021/19
 2024/16 2024/24 2025/13
 2026/3 2026/10
**mean [14]**  1882/7 1920/13
 1920/20 1922/5 1926/2 1931/1
 1947/9 1956/5 1962/12
 1966/21 1987/4 1997/5 1997/7
 2013/11
**meaning [1]**  2013/14
**means [5]**  1903/6 1903/8
 1907/16 1921/4 2013/12
**meant [1]**  1907/12
**medical [6]**  1994/24 1995/3
 1995/8 1995/14 1995/15
 1995/19
**meet [9]**  1882/4 1890/1
 1890/7 1917/23 1943/24
 1944/4 1944/9 1946/17 1972/7
**meeting [29]**  1882/15 1886/15
 1890/12 1890/17 1897/17
 1899/17 1918/24 1929/23
 1930/3 1930/7 1930/8 1944/5
 1975/7 1995/22 1996/3 1996/7
 1998/9 1998/9 1999/17
 1999/19 2004/18 2004/20
 2005/1 2005/5 2005/11
 2006/10 2006/11 2012/14
 2025/13
**meetings [6]**  1890/16 1899/15
 1899/15 1899/16 1931/18
 1934/3
**meets [3]**  1890/3 1890/20
 1897/13
**member [1]**  1902/23
**members [6]**  1939/6 1957/21
 1957/24 1958/3 1972/12
 2025/24
**Men's [21]**  1883/3 1911/11
 1911/14 1911/16 1915/6
 1923/9 1928/22 1929/24
 1943/25 1944/4 1944/9
 1946/17 1946/20 1953/1
 1956/9 1962/1 1993/18 1994/2
 1994/8 2000/17 2003/22
**mentioned [4]**  1889/21
 1996/20 1997/17 1997/18
**message [7]**  1969/5 1970/13
 1980/14 1981/12 1999/12
 2020/14 2020/21
**messages [4]**  1970/16 1981/5
 1987/8 1987/9
**met [6]**  1929/13 1929/19
 1932/13 1933/6 1944/13
 1953/3
**methamphetamine [2]**  1952/19
 1952/25
**mic'd [1]**  2022/2
**Michel [73]**
**Michel's [3]**  1975/2 2003/10
 2008/18
**middle [2]**  1901/10 2000/16
**Middleton [2]**  1999/20
 2001/11
**might [5]**  1899/9 1973/17
 1983/3 2008/7 2022/24
**Mike [3]**  2004/4 2004/6

2004/12
**mind [3]**  1939/14 2043/12
 2026/6
**minimize [1]**  1967/14
**minute [7]**  1883/23 1884/5
 1884/9 1905/7 2021/10
 2023/24 2023/25
**minutes [17]**  1883/20 1883/21
 1884/12 1884/19 1885/25
 1887/18 1901/20 1905/12
 1939/24 1998/19 1998/21
 1998/25 2007/20 2021/11
 2021/13 2026/11 2026/21
**mirror [1]**  1974/2
**misconduct [20]**  1910/22
 1912/24 1913/1 1913/9
 1919/25 1928/25 1930/5
 1930/9 1931/15 1931/20
 1933/25 1934/6 1946/7 1977/2
 1977/22 1977/24 1977/25
 2006/23 2011/5 2011/8
**misleading [3]**  1930/1
 1930/12 1931/4
**missed [1]**  1951/9
**Misstates [2]**  1900/6 1903/25
**mistaken [1]**  1967/18
**moment [11]**  1905/17 1932/12
 1956/4 1974/10 1976/16
 1978/25 1993/9 1993/13
 1998/7 2017/9 2023/8
**money [16]**  1956/8 1956/11
 1956/18 1956/25 1957/4
 1957/9 1958/1 1958/10
 1958/13 1958/14 1958/15
 1958/22 1958/23 1964/13
 1991/24 2007/25
**Monica [1]**  1875/12
**monitor [3]**  1974/16 1980/6
 1980/10
**monitored [3]**  1966/7 1966/8
 1969/5
**monitoring [3]**  1979/23
 1980/3 1982/15
**Monterey [5]**  1898/20 1898/24
 1902/4 1902/7 1903/13
**month [2]**  1927/11 1928/6
**months [3]**  1906/18 1960/9
 1995/25
**more [12]**  1888/15 1918/12
 1925/18 1926/18 1957/14
 1957/18 1957/19 1990/12
 2006/21 2009/17 2011/5
 2013/8
**MORGAN [1]**  1875/10
**morning [4]**  1877/10 1882/25
 1883/1 1898/4
**most [6]**  1922/13 1924/1
 1924/13 1927/2 1987/25
 1988/18
**motion [3]**  1923/25 1925/4
 1960/9
**move [3]**  1943/23 1974/6
 1991/5
**moving [3]**  1906/2 1960/7
 1974/8
**Mr [7]**  1876/5 1876/6 1887/7
 1904/17 1908/18 1970/12
 1973/19
**Mr. [109]**
**Mr. Anthony [1]**  1950/6
**Mr. Baca [28]**  1882/18
 1882/20 1883/18 1884/5
 1885/19 1885/25 1886/1
 1886/17 1887/9 1888/1 1888/2
 1890/16 1898/2 1899/1
 1899/25 1900/22 1902/10
 1902/11 1902/22 1903/21
 1904/9 1904/13 1904/16
 2024/23 2024/24 2024/25

2025/2 2025/9
**Mr. Baca's [28]**  1882/16
 1883/7 1884/10 1884/15
 1886/4 1886/5 1886/8 1887/14
 1887/15 1887/17 1888/6
 1888/19 1889/12 1889/21
 1890/10 1890/12 1890/15
 1897/25 1898/12 1898/25
 1899/9 1902/1 1902/16
 1902/18 1904/5 1904/8
 1904/19 1905/13
**Mr. Birotte [1]**  2024/17
**Mr. Brown [1]**  1969/14
**Mr. Carey [5]**  1887/14
 1898/18 1898/22 1904/17
 1904/23
**Mr. Carey's [1]**  1898/11
**Mr. Courson [2]**  1884/18
 1884/24
**Mr. Courson's [1]**  1933/14
**Mr. Craig [4]**  1898/14 1904/7
 1904/10 1904/13
**Mr. Fox [12]**  1906/22 1907/13
 1923/1 1931/22 1932/20
 1933/5 1942/9 1949/21
 1967/21 1967/25 1979/1
 2022/25
**Mr. Fox's [1]**  1972/4
**Mr. Hochman [1]**  1906/9
**Mr. Leavins [3]**  1887/16
 1904/18 1904/20
**Mr. Martinez [1]**  1902/3
**Mr. Michel [5]**  2017/5
 2017/12 2017/15 2017/18
 2017/22
**Mr. Rhambo [1]**  1890/16
**Mr. Rhambo's [1]**  1897/19
**Mr. Tanaka [11]**  1882/19
 1882/20 1883/7 1883/18
 1884/3 1884/7 1885/4 1885/6
 1885/23 1885/25 1886/1
**Ms. [4]**  1898/14 1904/6
 1904/9 1904/13
**Ms. Long [4]**  1898/14 1904/6
 1904/9 1904/13
**much [10]**  1888/10 1950/21
 1956/11 1956/13 1956/15
 1964/21 1967/14 2005/3
 2010/22 2026/15
**multiple [7]**  1909/20 1916/24
 1947/11 1987/3 1989/10
 1989/13 2025/13
**murder [3]**  1989/8 1989/17
 1989/21
**music [1]**  1958/24
**my [19]**  1898/15 1909/25
 1923/20 1924/3 1927/22
 1930/6 1934/20 1957/4 1973/7
 1992/25 1993/9 1993/10
 1996/19 2002/3 2002/8
 2002/10 2002/15 2004/2
 2024/7

**N**

**name [5]**  1876/3 1887/23
 1909/11 1917/14 2005/10
**named [1]**  2000/18
**narcotics [6]**  1951/13
 1952/18 1953/6 1953/10
 1954/12 1954/15
**NATHAN [2]**  1875/10 1877/21
**nationally [1]**  1961/2
**necessarily [5]**  1949/25
 1964/2 1965/7 1971/17 1972/8
**necklace [4]**  1978/3 1978/7
 1978/15 1978/23
**necklace-type [1]**  1978/15
**necklaces [1]**  1978/8
**need [8]**  1928/16 1939/18

## N

**need... [6]**   1970/22 1973/10 2001/6 2003/8 2003/17 2026/9
**needed [2]**   1919/10 1935/5
**negative [1]**   1877/25
**neither [1]**   1966/8
**never [21]**   1908/19 1918/20 1919/20 1931/13 1942/14 1942/18 1948/14 1952/14 1953/5 1954/12 1967/12 1981/2 1981/14 1982/9 1993/25 1994/3 1994/6 1999/11 1999/12 2011/13 2020/21
**new [1]**   1907/8
**news [2]**   1939/12 2026/4
**next [20]**   1882/25 1883/16 1883/17 1884/1 1884/2 1884/13 1885/8 1886/8 1902/7 1915/23 1916/22 1923/7 1928/4 1943/23 1951/21 1957/4 1970/1 1971/7 1977/8 1988/16
**next day [1]**   1885/8
**night [2]**   2024/20 2025/7
**Ninety [1]**   1921/3
**Ninety-five percent [1]**   1921/3
**no [104]**
**nobody [1]**   1998/17
**None [1]**   1967/9
**normally [1]**   1981/1
**North [5]**   1874/22 1875/6 1875/12 1882/10 2000/20
**not [143]**
**note [2]**   1939/19 2026/10
**notebooks [1]**   1919/10
**notes [2]**   1921/21 1921/21
**nothing [5]**   1925/1 1949/7 1949/10 1959/17 1982/12
**notified [2]**   1993/3 1993/7
**notify [4]**   1957/11 1980/13 1992/22 2020/8
**now [110]**
**number [37]**   1887/5 1888/15 1889/4 1889/6 1889/15 1899/22 1903/15 1905/12 1917/16 1923/9 1944/11 1944/17 1944/19 1945/23 1946/2 1950/14 1981/22 1982/2 1982/4 1982/7 1982/9 1983/14 1983/24 1983/25 1984/2 1984/4 1984/15 1984/18 1985/11 1986/18 1988/11 1988/21 1989/1 1989/3 2005/10 2020/15 2021/18
**numbers [8]**   1950/19 1979/15 1979/20 1980/17 1980/23 1981/3 1981/21 1982/2
**nurse [3]**   1954/1 1954/9 1954/15

## O

**o'clock [10]**   1889/24 1898/5 1899/3 1899/10 1899/14 1899/17 1900/13 1900/16 1900/24 2024/20
**objection [43]**   1890/21 1900/6 1903/25 1906/5 1906/9 1908/16 1908/23 1910/18 1913/4 1913/10 1913/15 1913/20 1915/21 1920/1 1922/16 1927/6 1930/1 1930/12 1931/11 1932/17 1935/7 1942/24 1943/3 1951/10 1951/18 1953/19 1953/23 1954/3 1954/17

**objections [43]** 1954/25 1955/5 1959/19 1959/25 1962/24 1968/17 1974/9 1982/21 1991/7 1991/8 2004/15 2011/15 2011/21 2013/18
**objections [1]**   2026/23
**observed [2]**   1942/18 2006/22
**obstruction [1]**   2007/19
**obtain [1]**   1887/25
**obtained [1]**   1912/2
**obvious [1]**   1949/16
**obviously [3]**   1956/5 1959/15 2013/6
**occasion [1]**   1943/10
**occasions [2]**   1913/19 1943/15
**occur [3]**   1960/8 1967/1 1967/4
**occurred [10]**   1887/9 1897/21 1905/9 1930/20 1948/5 1960/4 1971/18 1984/6 1990/12 2018/2
**occurrence [1]**   1961/7
**occurs [5]**   1882/25 1967/16 1967/17 1972/2 1975/17
**off [3]**   1961/11 1981/19 2008/8
**offender [1]**   1987/24
**offenders [1]**   1987/22
**offered [1]**   1963/21
**office [28]**   1875/5 1882/12 1887/9 1889/18 1899/14 1905/1 1906/20 1907/6 1907/20 1907/23 1907/24 1909/23 1910/17 1948/4 1953/15 1992/23 1993/11 1998/22 1998/23 1999/21 2004/8 2004/10 2007/5 2013/14 2024/6 2024/8 2024/9 2024/11
**officer [1]**   1911/5
**officers [1]**   1908/11
**Official [1]**   1874/21
**often [2]**   1957/14 1957/18
**Okay [1]**   1925/21
**once [8]**   1917/18 1944/16 1976/7 1976/22 1980/9 2003/12 2003/16 2013/10
**one [49]**   1881/13 1882/18 1883/22 1883/23 1884/5 1884/9 1885/24 1887/13 1905/17 1910/13 1916/4 1916/5 1921/13 1926/1 1929/13 1943/10 1944/14 1945/12 1945/13 1947/23 1948/15 1951/7 1954/24 1957/10 1961/7 1962/12 1962/13 1965/7 1966/25 1973/14 1974/10 1975/7 1976/4 1976/25 1978/17 1991/4 1991/14 1991/16 1993/3 1994/15 2003/5 2003/7 2004/7 2004/10 2011/18 2017/9 2021/13 2022/13 2022/16
**one agent [1]**   1910/13
**one bribe [1]**   2011/18
**One call [1]**   1885/24
**one count [2]**   2003/5 2003/7
**one day [1]**   1961/7
**one from [1]**   1882/18
**one housekeeping [1]**   1881/13
**one informant's [1]**   1948/15
**one minute [3]**   1883/23 1884/5 1884/9
**One moment [3]**   1905/17 1974/10 2017/9
**one occasion [1]**   1943/10
**one of [11]**   1929/13 1944/14

**others [43]** 1947/23 1951/7 1954/24 1957/25 1958/17 1987/17 1991/16 1994/15 2004/7 2004/10
**one or [2]**   1965/7 2021/13
**one other [1]**   1945/12
**one part [1]**   1976/4
**one process [1]**   1916/4
**one that [2]**   2022/13 2022/16
**one visitors [1]**   1916/5
**one was [3]**   1957/10 1991/14 1991/16
**one way [2]**   1966/25 1993/3
**one-year [1]**   1921/13
**ones [7]**   1926/18 1926/24 1927/1 1927/3 1947/16 2000/8 2001/4
**online [3]**   1979/6 1979/9 1980/12
**only [10]**   1890/13 1890/17 1890/22 1926/24 1945/2 1945/19 1976/4 1976/18 1979/24 1988/18
**open [7]**   1877/5 1881/1 1918/15 1939/14 1997/9 1997/10 2026/6
**opened [1]**   1911/1
**openly [2]**   1919/6 1933/14
**operation [23]**   1948/14 1948/16 1948/23 1948/25 1952/23 1960/2 1960/22 1961/9 1961/13 1961/15 1961/19 1961/20 1962/11 1962/15 1963/6 1963/10 1965/9 1966/24 1967/3 1967/12 1967/16 1996/18 1996/25
**operational [4]**   1960/21 1960/25 1961/2 1961/3
**operations [2]**   1961/6 1963/3
**opportunity [1]**   1890/9
**options [2]**   1978/17 2012/24
**order [27]**   1885/10 1897/4 1911/20 1912/10 1915/12 1917/23 1918/7 1925/5 1928/12 1928/17 1931/4 1934/15 1954/10 1958/2 1960/22 1970/16 1980/17 1981/4 1981/25 1983/14 1984/21 1999/24 2005/1 2007/12 2010/6 2010/12 2019/22
**other [43]**   1886/9 1890/11 1890/16 1898/12 1903/9 1903/9 1905/14 1905/15 1906/7 1910/5 1910/7 1910/12 1911/16 1911/24 1916/23 1918/16 1918/25 1925/15 1925/15 1926/18 1939/12 1945/12 1958/6 1962/11 1965/7 1966/19 1966/21 1966/25 1972/22 1972/23 1976/20 1976/23 1981/25 1982/15 1993/3 1994/20 1996/4 2006/22 2008/17 2008/21 2008/24 2009/1 2026/5
**others [2]**   1939/8 2026/1
**otherwise [1]**   1972/9
**our [13]**   1924/24 1925/19 1929/11 1939/4 1948/4 1953/4 1962/11 1964/3 1978/13 2005/13 2013/8 2019/21 2025/20
**ours [1]**   1907/11
**out [65]**   1877/15 1887/1 1887/2 1887/9 1888/23 1921/21 1924/4 1925/6 1925/19 1927/9 1927/13 1927/15 1927/19 1927/23

**O**

**out... [51]**  1928/24 1946/19
1949/20 1950/8 1951/22
1956/17 1957/13 1957/16
1957/18 1957/19 1958/4
1962/15 1962/21 1965/7
1966/17 1968/5 1976/10
1979/17 1981/17 1983/14
1985/5 1985/9 1986/11
1986/13 1986/21 1988/11
1988/21 1989/7 1989/16
1989/20 1992/3 1993/11
1997/9 1997/10 1998/12
1998/13 1999/8 2001/11
2001/21 2002/2 2002/4 2002/7
2002/9 2002/11 2002/14
2003/25 2004/3 2007/11
2008/24 2010/24 2017/17
**outfit [1]**  1978/14
**outgoing [1]**  1901/3
**outline [1]**  1961/24
**outlined [1]**  1961/23
**outlines [1]**  1961/8
**outside [13]**  1877/6 1904/7
1916/4 1925/5 1925/11
1939/21 1940/1 1942/1
1963/13 1963/25 1964/7
1965/5 2026/12
**over [13]**  1920/11 1920/18
1920/21 1921/12 1939/5
1951/21 1958/12 1958/15
1973/10 1988/15 2001/13
2018/19 2025/23
**overhead [1]**  1990/14
**Overruled [2]**  1900/8 1904/2
**overseas [2]**  1888/8 1888/16
**overt [1]**  1997/8
**own [1]**  1921/5

**P**

**p.m [19]**  1884/20 1885/3
1885/13 1889/15 1889/24
1890/1 1890/1 1890/7 1890/7
1898/18 1899/3 1900/24
1901/17 1902/8 1903/12
1905/7 1905/15 1946/13
2021/8
**PA [2]**  1874/8 1877/7
**page [38]**  1876/3 1882/7
1882/16 1886/5 1886/8
1886/16 1887/8 1888/18
1888/22 1890/5 1898/2
1898/12 1898/16 1898/17
1898/25 1899/1 1899/8 1900/3
1900/12 1901/6 1901/10
1902/15 1902/21 1906/7
1913/22 1923/7 1923/7
1925/23 1968/16 1970/10
1983/13 1983/13 1983/14
1983/25 1985/10 2000/15
2017/13 2027/7
**Page 11 [1]**  1900/3
**Pages [5]**  1878/7 1890/25
1935/10 1940/5 2013/20
**paper [1]**  1961/15
**parenthesis [1]**  1898/5
**Park [5]**  1898/20 1898/24
1902/4 1902/7 1903/13
**parking [4]**  1972/6 1972/8
1972/9 1990/9
**part [25]**  1904/1 1911/8
1912/14 1923/16 1924/2
1925/21 1930/23 1943/5
1948/10 1950/15 1952/25
1957/5 1960/25 1963/3 1969/7
1976/1 1976/4 1976/18
1976/20 1976/23 1977/20
1978/6 1991/18 1995/12

2002/20
**participate [2]**  1943/7
1908/10
**participated [2]**  1943/9
2011/4
**particular [6]**  1918/19
1944/23 1944/24 1949/18
1951/9 2021/14
**partitions [1]**  1916/22
**pass [1]**  1970/16
**passed [3]**  1968/5 1970/17
1992/25
**past [1]**  1886/21
**Paul [1]**  1885/19
**Pause [3]**  1905/23 1923/3
1973/12
**pay [2]**  1963/25 1964/23
**payment [3]**  1971/13 1991/18
1991/21
**people [7]**  1909/4 1916/24
1939/7 1989/10 1989/13
2025/14 2025/25
**per [1]**  1930/8
**percent [3]**  1921/3 1974/4
1974/19
**PERCY [1]**  1874/3
**period [14]**  1888/8 1889/2
1889/8 1899/6 1901/5 1920/18
1921/13 1931/17 1944/3
1944/7 1945/5 1945/17
1956/12 2004/14
**permission [3]**  1985/18
1985/19 1987/17
**permit [1]**  1939/8
**permitted [1]**  2026/1
**person [7]**  1903/9 1924/21
1924/22 1928/16 1943/25
1947/1 1947/15
**personal [6]**  1886/7 1886/10
1886/13 1886/17 1888/3
1889/23
**personally [5]**  1943/20
1956/6 1992/25 1995/24
2002/15
**pertaining [2]**  1877/25
1878/1
**pertains [1]**  1877/18
**phone [133]**
**phones [9]**  1904/14 1917/3
1919/5 1958/24 1962/5 1966/4
1966/5 1966/6 1966/13
**photograph [7]**  1973/23
1973/25 1974/17 1974/25
1975/3 1991/1 2009/24
**photographs [3]**  1977/18
1977/21 1977/22
**photos [5]**  1955/3 1955/16
1955/20 1977/2 1991/4
**phrase [2]**  1918/5 1981/13
**phrasing [1]**  1977/4
**pick [3]**  1881/23 2000/13
2001/5
**picked [1]**  1965/9
**pictured [2]**  1991/11 1991/11
**pictures [2]**  1990/14 1990/16
**pilots [2]**  1972/25 1973/1
**pin [1]**  1980/23
**place [3]**  1886/25 1903/17
1963/17
**PLAINTIFF [1]**  1874/7
**plan [14]**  1960/21 1961/1
1961/2 1961/4 1961/7 1961/17
1961/19 1961/20 1961/23
1961/24 1962/7 1962/15
1963/10 1964/3
**plane [3]**  1972/23 1973/25
1990/14
**planned [1]**  1967/13
**planning [2]**  1960/6 1965/16

**play [9]**  1886/20 1887/3
1895/20 1903/14 1968/2
1968/14 1970/9 1971/7
2023/11
**played [18]**  1886/24 1887/6
1899/23 1903/16 1931/22
1931/24 1968/6 1968/17
1968/24 1969/9 1969/21
1970/11 1970/20 1971/8
2020/15 2023/12 2023/18
2023/20
**plead [8]**  2003/2 2003/5
2003/13 2003/16 2011/18
2011/19 2013/12 2013/16
**pleading [1]**  2002/25
**please [22]**  1877/8 1881/9
1884/1 1885/5 1885/23
1886/23 1923/7 1923/7 1935/8
1939/11 1968/23 1969/8
1969/20 1970/19 1971/7
1983/7 1990/23 2000/4
2000/16 2023/7 2023/11
2026/3
**plenty [1]**  1977/5
**Plympton [2]**  1996/5 1999/9
**point [54]**  1884/14 1899/2
1907/3 1908/2 1911/15 1920/9
1920/9 1929/1 1930/19
1931/16 1934/5 1944/20
1945/3 1950/21 1958/7
1959/17 1960/11 1960/17
1963/2 1963/3 1963/20
1963/22 1964/21 1971/18
1975/9 1976/1 1976/10
1976/19 1984/17 1986/7
1987/10 1988/20 1989/7
1989/10 1989/15 1989/19
1990/2 1992/8 1992/13
1992/16 1996/22 1998/23
1998/24 1999/4 2010/25
2011/7 2011/11 2012/3
2012/10 2012/13 2018/9
2020/25 2022/24 2023/14
**population [1]**  1921/4
**portion [1]**  1883/14
**posing [1]**  1916/12
**positioned [1]**  1977/6
**possible [5]**  1912/3 1912/11
1921/20 1978/14 2025/18
**Possibly [1]**  1909/8
**potentially [5]**  1944/8
1966/1 2013/9 2013/11 2018/7
**PowerPoint [1]**  1883/4
**preceding [1]**  1968/21
**prepared [1]**  1921/14
**presence [12]**  1877/6 1881/7
1897/2 1915/2 1939/2 1939/22
1940/2 1942/2 1942/5 2017/2
2019/2 2026/13
**present [4]**  1877/22 1922/11
1983/3 1983/8
**president [2]**  1900/10
1900/19
**presidential [1]**  1900/23
**PRESIDING [1]**  1874/4
**previous [2]**  1883/19 1985/14
**prior [10]**  1908/18 1911/13
1911/24 1918/24 1960/6
1962/4 1987/5 1997/1 1997/3
2021/15
**prison [20]**  1887/23 1908/22
1958/9 1958/22 1958/24
1960/19 1961/21 1962/10
1966/13 1994/3 2003/22
2004/5 2004/18 2004/21
2005/3 2007/1 2007/5 2012/25
2017/19 2018/7
**prisoner [1]**  2005/2
**prisons [1]**  2005/18

**P**

**private [8]**   1916/25 1918/22
 1919/2 1919/3 1919/4 1920/10
 1920/12 1920/14
**privy [1]**   2024/18
**probably [7]**   1918/20 1944/12
 1996/2 2006/7 2006/9 2009/18
 2013/7
**problem [1]**   1878/1
**procedure [4]**   1915/15
 1915/17 2001/4 2005/12
**proceed [5]**   1881/8 1886/22
 1905/24 1915/3 2017/3
**proceedings [23]**   1874/13
 1877/5 1878/7 1881/1 1881/6
 1890/25 1897/1 1905/23
 1913/22 1915/1 1923/3
 1935/10 1939/1 1939/21
 1940/1 1940/5 1942/1 1942/4
 1973/12 2013/20 2017/1
 2026/12 2027/6
**process [10]**   1915/11 1916/4
 1916/9 1916/13 1916/18
 1917/7 1918/1 1944/22 1945/1
 2002/4
**produce [1]**   2000/18
**proof [1]**   1897/7
**prosecuted [1]**   1942/22
**prosecutions [1]**   1908/10
**protect [1]**   1946/4
**protection [1]**   1993/14
**provide [7]**   1918/6 1928/11
 1934/21 1956/8 1956/11
 1958/15 2002/17
**provided [9]**   1922/14 1947/1
 1952/10 1952/11 1952/14
 1953/5 2006/15 2006/21
 2007/25
**providing [1]**   2006/11
**pub [2]**   1933/10 1934/4
**public [5]**   1910/10 1967/22
 1970/4 1971/2 1992/10
**publish [2]**   1974/13 2022/24
**published [1]**   1966/14
**pull [1]**   1888/24
**pulled [1]**   1889/10
**punch [1]**   1982/2
**purchase [2]**   1957/5 1958/23
**purpose [3]**   1912/11 1950/3
 1957/8
**purposes [2]**   1976/22 1976/25
**pursuant [2]**   2021/22 2027/4
**put [16]**   1883/4 1890/19
 1897/12 1921/25 1923/1
 1946/20 1958/21 1960/22
 1964/19 1965/13 1967/6
 1977/14 1980/17 1981/9
 2017/19 2022/7
**putting [8]**   1882/14 1882/22
 1883/24 1886/2 1887/19
 1890/2 1962/6 2005/9

**Q**

**qualified [1]**   2025/5
**qualify [2]**   1890/23 1906/6
**quarter [1]**   1939/20
**question [20]**   1915/23
 1919/21 1925/10 1927/7
 1927/22 1928/4 1931/7
 1932/21 1943/22 1943/23
 1953/2 1957/4 1959/5 1963/1
 1981/24 1986/9 1989/24
 2017/18 2018/3 2026/22
**questioning [1]**   1907/13
**questions [7]**   1905/19
 1919/24 1942/9 1967/21
 1972/5 2011/3 2019/13
**quickly [7]**   1977/14 1985/5

 1985/9 2006/1 2006/3 2010/20
 2026/22 2026/22/2 1998/23
**quite [4]**   1996/2/2 1998/23

**R**

**ran [8]**   1911/21 1911/22
 1915/13 1915/15 1915/20
 1957/15 1988/25 2001/16
**reach [2]**   1986/11 1986/13
**reached [3]**   1979/17 1999/8
 2001/11
**reaching [1]**   2002/9
**read [6]**   1925/8 1925/17
 1926/1 1926/19 1939/12
 2026/4
**ready [1]**   1969/11
**real [1]**   1887/23
**realized [1]**   1967/5
**really [3]**   1888/14 1925/16
 2018/20
**reason [14]**   1934/14 1969/7
 1971/9 1975/25 1976/4
 1976/18 1976/20 1977/20
 1984/25 1985/3 1985/13
 1995/1 1995/6 1998/8
**reasons [1]**   1976/24
**rebooked [1]**   1887/22
**recall [18]**   1926/11 1932/20
 1942/8 1942/11 1955/9
 1955/13 1955/18 1975/12
 1979/3 1983/22 1985/25
 2007/22 2008/9 2009/16
 2009/18 2020/17 2024/15
 2024/22
**receive [1]**   1908/13
**received [13]**   1906/11
 1907/20 1913/13 1939/15
 1967/22 1968/19 1968/20
 1991/9 1999/11 1999/12
 2004/2 2020/21 2026/7
**receives [1]**   1884/5
**receiving [2]**   1926/11 1995/8
**Recess [2]**   1939/25 2026/24
**recognize [1]**   1889/15
**recommendations [1]**   2013/15
**record [9]**   1888/9 1901/7
 1905/9 1922/2 1922/5 1922/10
 1979/13 1979/23 1985/10
**recorded [13]**   1964/17 1966/6
 1966/9 1969/4 1969/6 1970/6
 1971/4 1971/24 1979/19
 1980/25 1981/5 1981/6 1992/9
**recording [5]**   1922/15
 1931/22 1975/13 2009/20
 2017/12
**recordings [1]**   1964/19
**records [38]**   1882/2 1887/25
 1888/7 1888/11 1888/19
 1888/24 1897/5 1897/16
 1898/11 1898/22 1898/25
 1899/2 1899/5 1901/2 1902/1
 1902/16 1902/24 1902/25
 1903/1 1903/3 1904/5 1904/9
 1904/12 1904/19 1905/2
 1905/14 1971/22 1979/10
 1979/10 1980/3 1983/17
 1985/5 1985/12 1985/14
 1995/12 1995/14 1995/18
 2021/21
**refer [2]**   1983/12 1987/6
**reference [2]**   1899/16
 2017/13
**referencing [2]**   1925/14
 1980/20
**referring [8]**   1882/8 1888/23
 1912/7 1969/15 1970/10
 1970/23 2017/10 2024/1
**reflect [9]**   1886/9 1886/16
 1887/11 1889/25 1897/8

 1899/9 1904/9 1904/19 1905/9
**reflected [8]**   1886/20 1887/4
 1889/19 1890/5 1897/22
 1898/9 1899/21 1903/15
**reflecting [1]**   1887/2
**reflects [1]**   1890/12
**regular [3]**   1888/11 1903/3
 1903/7
**regulations [1]**   2027/8
**relation [2]**   1883/8 1884/16
**relationship [2]**   1932/11
 1932/14
**relatively [3]**   2006/1 2006/3
 2010/20
**release [1]**   2001/18
**released [3]**   2000/7 2003/21
 2006/18
**relevance [14]**   1908/16
 1908/23 1910/18 1922/16
 1931/11 1942/24 1943/3
 1951/10 1951/18 1953/19
 1953/23 2004/15 2011/15
 2011/21
**reliable [2]**   1948/13 1948/20
**remember [6]**   1917/17 1945/18
 1950/22 1985/20 1995/4
 2012/9
**remind [3]**   1939/4 2019/8
 2025/22
**reminded [2]**   1939/14 2026/6
**repeatedly [1]**   2017/25
**report [5]**   1922/12 1944/14
 1961/16 1961/16 1996/19
**reported [1]**   2027/6
**Reporter [1]**   1874/21
**REPORTER'S [1]**   1874/13
**reports [11]**   1921/14 1921/24
 1923/21 1924/4 1939/12
 1944/14 1945/25 1946/2
 1954/19 1954/24 2026/4
**represents [1]**   1906/9
**request [3]**   1907/20 1999/17
 2001/12
**requesting [1]**   1999/21
**required [4]**   1917/10 1917/14
 1950/7 1973/1
**requirements [3]**   1917/22
 1917/25 1918/2
**research [4]**   1911/23 1912/1
 1966/16 1966/21
**researched [1]**   1911/20
**researching [1]**   1912/8
**respect [13]**   1897/19 1949/17
 1950/22 1951/20 1956/25
 1958/6 1959/1 1963/9 1982/22
 1998/5 2007/24 2007/24
 2021/4
**response [1]**   2018/1
**responsibility [1]**   2013/13
**restaurant [2]**   1933/9 1934/4
**restricted [1]**   1905/5
**result [1]**   1942/15
**resume [1]**   1942/6
**resumed [2]**   1881/1 1897/1
**retaliating [1]**   1922/22
**retaliation [5]**   1923/8
 1924/7 1925/6 1925/13
 1926/12
**revealed [1]**   1933/18
**review [9]**   1881/15 1904/12
 1924/3 1925/22 1950/20
 1987/9 1987/14 2004/9
 2004/11
**reviewed [3]**   1950/15 1950/17
 1954/19
**reviewing [2]**   1926/6 1926/7
**Rhambo [5]**   1890/8 1890/13
 1890/16 1890/20 1897/13
**Rhambo's [1]**   1897/19

**R**

**RHODES [2]**  1875/5 1877/11
**right [40]**  1878/3 1878/6 1881/3 1883/12 1886/19 1900/11 1905/21 1907/2 1909/15 1915/7 1918/17 1921/7 1923/22 1939/23 1940/3 1942/3 1942/6 1945/17 1950/12 1955/8 1956/23 1968/18 1969/5 1972/16 1977/8 1977/8 1977/10 1978/19 1982/6 1984/9 1990/17 1991/21 1998/13 2003/3 2021/4 2021/18 2023/19 2025/4 2025/6 2025/19
**rights [14]**  1907/25 1908/1 1908/3 1908/6 1908/7 1909/1 1909/4 1909/15 1909/19 1910/6 1911/4 1930/16 1930/21 1930/22
**risk [2]**  1934/9 1967/14
**risks [1]**  1962/20
**roaming [2]**  1888/9 1888/16
**robberies [6]**  1950/9 1950/11 1950/23 1959/3 1959/5 1964/6
**robbery [3]**  1951/5 1951/17 1959/8
**roll [1]**  1969/11
**romantic [2]**  1932/10 1932/13
**rookie [8]**  1906/23 1906/25 1907/5 1907/8 1907/10 1907/14 1907/16 1907/18
**rookies [1]**  1907/9
**room [16]**  1886/15 1916/18 1916/21 1916/23 1916/24 1917/19 1918/19 1918/22 1919/2 1919/3 1919/4 1919/19 1920/10 1920/12 1920/14 1920/15
**rooms [4]**  1918/13 1918/15 1918/16 1919/17
**rotate [1]**  1923/7
**roughly [1]**  1995/25
**row [4]**  1916/21 1977/7 1977/9 1977/14
**RPR [1]**  2027/12
**ruling [1]**  1913/16
**run [1]**  1958/5
**running [1]**  1973/2

**S**

**safeguard [1]**  1979/5
**safeguards [1]**  1979/1
**safety [1]**  1992/17
**said [64]**  1884/23 1885/21 1898/7 1900/1 1906/23 1907/15 1909/14 1909/17 1910/13 1910/20 1917/7 1920/24 1922/12 1924/3 1924/18 1928/5 1928/11 1931/24 1942/16 1946/13 1952/9 1952/17 1954/1 1955/2 1960/25 1966/22 1969/4 1970/21 1971/9 1972/5 1972/12 1972/22 1975/12 1976/20 1977/24 1980/18 1981/11 1982/16 1985/15 1988/20 1990/11 1992/9 1993/17 1994/11 1994/14 1995/21 1996/3 1997/14 1997/24 1998/1 1999/20 2001/16 2003/15 2007/25 2009/20 2010/23 2011/2 2011/17 2012/17 2018/21 2024/5 2024/22 2024/23 2025/4
**said no [1]**  1907/15

**same [17]**  1887/4 1887/4 1890/9 1902/19 1908/15 1913/16 1924/14 1926/7 1944/18 1945/17 1974/4 1990/11 2004/21 2005/8 2005/12 2005/16 2005/19
**San [2]**  1902/9 1902/14
**Santa [1]**  1875/12
**sat [2]**  1916/22 1920/21
**saw [8]**  1946/13 1977/14 1985/10 1991/23 1994/3 1994/6 1995/21 2001/17
**say [41]**  1886/13 1899/10 1903/21 1909/22 1911/22 1912/19 1917/25 1918/13 1923/22 1925/15 1925/16 1927/17 1927/22 1929/6 1930/22 1932/8 1933/16 1933/16 1933/21 1934/10 1944/11 1945/6 1946/11 1948/10 1960/14 1962/19 1962/20 1972/19 1974/3 1977/10 1998/11 2003/21 2006/6 2006/10 2010/22 2010/23 2011/1 2012/23 2018/23 2019/1 2024/1
**saying [10]**  1885/4 1901/7 1907/10 1923/18 1953/4 1959/5 1966/23 1981/25 1995/5 2018/14
**says [11]**  1882/15 1882/23 1886/12 1923/12 1926/8 1969/17 1983/13 2001/3 2017/5 2017/15 2018/14
**schedule [1]**  2005/17
**scheduled [1]**  1898/3
**Scott [2]**  1883/2 1904/3
**screen [2]**  1898/9 1987/4
**scroll [1]**  1923/6
**se [1]**  1930/8
**seal [6]**  1878/8 1891/1 1913/23 1935/11 1940/6 2013/21
**search [1]**  1919/16
**searches [2]**  1988/25 1989/1
**second [13]**  1883/13 1883/14 1903/25 1923/6 1956/3 1970/9 1973/14 1984/6 1984/25 1991/18 2000/15 2023/3 2025/19
**seconds [3]**  1984/13 1987/6 1988/19
**secret [2]**  1929/9 1997/9
**secretly [1]**  1977/12
**section [2]**  1993/22 2027/4
**secure [1]**  2009/4
**see [51]**  1885/21 1888/25 1889/10 1890/11 1899/17 1901/3 1901/9 1901/10 1902/9 1902/18 1902/25 1905/6 1905/7 1923/10 1939/23 1940/3 1949/23 1950/1 1950/21 1957/11 1957/19 1963/10 1971/19 1976/6 1977/7 1977/9 1978/11 1979/9 1979/13 1979/21 1980/1 1981/10 1983/7 1983/13 1983/24 1983/25 1984/9 1984/10 1984/13 1986/17 1986/19 1991/12 1995/2 1995/5 1995/9 1995/16 1995/19 1996/19 2000/17 2000/22 2005/14
**seeing [3]**  1928/23 1945/8 1979/15
**seeking [2]**  1916/1 2000/24
**seen [4]**  1906/8 1942/14 1994/23 1995/24
**selected [2]**  1957/22 1958/4

**selecting [1]**  1965/2
**self [1]**  1977/19
**self-explanatory [1]**  1977/19
**send [1]**  1955/20
**sending [2]**  1987/12 1987/12
**sends [1]**  1979/21
**sense [1]**  1996/13
**sent [16]**  1911/9 1942/14 1946/6 1955/3 1980/14 1980/19 1982/17 1993/17 1993/20 1993/25 1994/14 1995/1 1995/8 1995/16 2001/13 2007/4
**sentence [4]**  1959/14 1959/17 1959/25 1960/17
**sentenced [4]**  1959/11 1959/16 1960/12 1960/16
**sentencing [2]**  1960/10 2013/15
**separate [11]**  1888/8 1916/5 1916/23 1924/15 1925/25 1951/2 1961/4 1961/6 1961/10 2009/10 2022/1
**separately [2]**  2022/9 2022/10
**separating [1]**  1965/7
**September [60]**  1885/3 1886/3 1886/6 1886/11 1886/12 1886/16 1887/1 1887/10 1887/12 1887/20 1887/21 1889/7 1889/8 1889/11 1889/14 1889/22 1889/24 1890/3 1890/5 1890/6 1890/11 1890/20 1897/13 1897/20 1900/5 1903/11 1903/24 1904/20 1905/15 1906/20 1909/2 1944/2 1955/12 1955/24 1994/2 1994/5 1999/15 2000/20 2001/7 2001/14 2001/23 2002/2 2002/7 2002/16 2002/18 2002/22 2003/20 2004/1 2004/14 2005/22 2006/19 2020/13 2020/18 2020/19 2021/1 2021/3 2021/5 2021/5 2022/13 2024/2
**September 12th [4]**  1887/12 1887/20 1994/5 1999/15
**September 15th [1]**  2005/22
**September 21st [3]**  1886/11 1886/12 1889/8
**September 22nd [5]**  1886/16 1889/22 1889/24 1890/3 1900/5
**September 23rd [3]**  1890/6 1890/20 1897/20
**September 26 [2]**  2021/5 2024/2
**September 26th [4]**  1890/11 1903/24 1904/20 1905/15
**September 3rd [1]**  1955/24
**September 7 [2]**  2000/20 2002/7
**September 7th [6]**  1885/3 1886/3 2001/14 2002/2 2002/16 2002/22
**September 8th [4]**  1887/1 1889/7 2020/13 2020/18
**September 9th [2]**  1889/14 2020/19
**sergeant [5]**  1883/2 1883/2 1885/9 1912/15 2020/14
**sergeants [3]**  1901/15 2021/6 2022/5
**serial [3]**  1951/25 1952/2 1952/5
**series [3]**  1950/9 1980/17 1982/2
**service [1]**  1979/6

**S**

**set [12]**  1899/16 1964/12 1966/24 1980/12 1980/22 1980/24 1981/14 1981/15 1982/11 1982/13 2004/24 2005/1
**setting [1]**  2004/20
**seven [2]**  1909/6 1956/16
**seven years [1]**  1956/16
**several [2]**  1988/15 1988/16
**she [7]**  1877/14 1878/1 2009/11 2012/13 2012/14 2012/14 2012/15
**sheriff [5]**  1890/8 1890/13 1912/16 1912/17 2024/21
**sheriff's [83]**
**sheriffs' [1]**  1933/25
**short [2]**  1988/18 1998/17
**shot [6]**  1898/9 1951/9 1957/15 1957/20 1957/22 1958/2
**should [3]**  1897/9 1959/24 2003/21
**show [35]**  1882/7 1886/4 1886/6 1887/7 1888/17 1889/11 1889/22 1897/24 1898/1 1898/8 1898/17 1899/13 1900/4 1900/19 1901/13 1903/5 1903/6 1903/11 1905/5 1917/11 1919/9 1919/12 1923/24 1973/15 1982/23 1989/2 1995/13 2000/4 2000/14 2002/3 2005/13 2010/6 2021/17 2021/19 2022/23
**showed [9]**  1888/7 1888/8 1889/2 1988/25 1989/3 2008/17 2009/23 2009/24 2010/1
**showing [21]**  1881/24 1886/8 1888/5 1888/10 1888/13 1888/15 1889/3 1890/4 1898/11 1898/16 1900/3 1900/11 1901/6 1902/15 1903/8 1904/5 1922/25 1973/19 1983/11 2010/2 2010/5
**shown [4]**  1897/4 1897/9 1955/9 1979/19
**shows [4]**  1886/7 1900/15 1995/15 2009/3
**sic [1]**  1920/24
**side [1]**  2013/10
**sidebar [6]**  1878/5 1890/24 1913/21 1935/8 1940/4 2013/19
**sidebars [1]**  2026/23
**sight [1]**  2008/25
**sign [2]**  1949/18 2005/14
**signed [9]**  1885/5 1885/10 1885/22 1944/16 1945/15 1945/16 1945/22 1947/3 1961/11
**significant [2]**  1911/23 1966/20
**signing [1]**  2005/9
**similar [3]**  1911/17 1974/3 2005/13
**simply [2]**  1939/18 2026/10
**since [4]**  1912/23 1950/17 1997/6 2006/12
**single [2]**  1947/12 2010/25
**situation [2]**  1943/18 1954/22
**six [4]**  1909/6 1972/6 1972/20 1976/13
**six days [1]**  1976/13
**six or [1]**  1909/6

**six surveillance [1]**  1972/6
**six to [1]**  1972/20
**slightly [1]**  1918/5 1983/14
**small [2]**  1958/25 1978/23
**smuggle [1]**  1965/4
**smuggled [1]**  1997/15
**smuggling [1]**  1966/1
**snitch [2]**  1962/16 1997/3
**snitched [1]**  1962/17
**so [105]**
**solely [1]**  1948/15
**solid [5]**  1926/18 1926/21 1926/24 1927/2 1927/4
**some [34]**  1888/24 1889/2 1908/1 1908/3 1910/25 1923/15 1926/19 1931/16 1942/9 1951/23 1952/3 1952/8 1957/20 1957/24 1958/2 1958/7 1958/23 1958/24 1972/17 1975/9 1976/10 1978/10 1986/7 1987/9 1988/1 1988/20 1989/15 1989/19 1996/15 2005/12 2010/13 2012/10 2012/13 2018/9
**somebody [4]**  1904/17 1931/5 1962/25 1979/25
**someone [9]**  1924/18 1931/8 1945/22 1947/23 1980/10 1990/16 1999/8 2019/6 2024/25
**something [24]**  1877/18 1912/19 1912/20 1922/9 1931/3 1935/4 1947/4 1953/4 1953/8 1953/9 1955/19 1957/12 1962/6 1964/3 1967/4 1967/13 1971/25 1977/9 1977/13 1978/12 1981/19 2005/16 2018/21 2022/7
**sometimes [2]**  1918/13 1924/20
**soon [6]**  1884/7 1885/4 1970/22 1988/25 1998/7 1999/10
**sorry [9]**  1877/20 1909/7 1924/9 1928/3 1973/13 1987/3 2003/16 2021/12 2023/17
**sort [4]**  1977/12 1990/11 1991/11 2005/8
**source [3]**  1945/11 1945/12 1947/12
**sources [4]**  1925/5 1925/15 1945/14 1945/17
**speak [26]**  1905/12 1913/12 1916/1 1916/5 1916/6 1917/3 1917/15 1918/7 1918/10 1918/18 1918/22 1919/6 1921/12 1939/18 1969/25 1993/19 1993/23 1993/25 1998/14 2008/14 2008/25 2009/6 2011/23 2012/2 2012/4 2026/10
**speakers [1]**  1881/20
**speaking [5]**  1912/4 1920/7 1928/21 2012/5 2024/17
**speaks [1]**  1928/9
**special [18]**  1877/12 1881/13 1882/16 1882/24 1887/3 1887/7 1887/24 1888/17 1890/4 1890/9 1897/15 1899/24 1903/20 1904/25 1909/9 1909/11 1910/16 1942/8
**specific [12]**  1899/25 1902/10 1909/19 1923/18 1923/22 1947/15 1950/19 1961/7 2000/1 2000/1 2018/17 2018/19
**specifically [7]**  1912/8 1915/14 1924/18 1925/18

1996/20 2008/24 2024/22
**specifics [2]**  1969/18 1996/14
**spent [1]**  1906/18
**splitting [1]**  1964/25
**spoke [20]**  1901/23 1902/2 1913/7 1918/12 1960/21 1970/7 1978/13 2002/3 2002/8 2002/10 2004/2 2005/21 2006/25 2009/12 2024/11 2024/14 2024/16 2024/22 2024/23 2024/24
**spoken [3]**  2004/12 2024/20 2024/21
**Spring [4]**  1874/22 1875/6 1882/10 2000/20
**squad [11]**  1909/1 1909/4 1909/15 1909/19 1909/20 1909/21 1910/6 1910/10 1910/14 1972/12 1972/18
**squads [4]**  1910/5 1910/7 1910/12 1994/15
**staff [1]**  1886/15
**stand [1]**  1881/4
**standing [1]**  1917/19
**Starbucks [3]**  2009/7 2009/12 2011/24
**start [11]**  1904/17 1904/18 1915/8 1927/9 1927/13 1927/15 1927/19 1927/23 2023/2 2023/13 2023/19
**started [6]**  1906/19 1929/20 1951/21 2002/4 2002/10 2010/13
**starting [5]**  1886/6 1887/1 1901/10 1903/12 1968/15
**stashed [1]**  1963/24
**state [16]**  1877/8 1887/23 1958/9 1958/22 1958/24 1960/18 1961/21 1963/11 2003/22 2004/5 2004/18 2005/3 2005/18 2007/1 2007/5 2007/12
**stated [5]**  1904/16 1929/1 1976/18 1985/1 1990/4
**statement [12]**  1927/18 1927/18 1931/25 1955/23 1955/24 1997/19 2011/20 2013/17 2017/22 2018/16 2018/17 2018/20
**statements [3]**  1899/25 1961/3 2002/17
**STATES [11]**  1874/1 1874/4 1874/6 1877/7 1877/12 1882/12 1900/11 1900/20 1953/15 2027/5 2027/9
**stating [1]**  1963/11
**stays [1]**  1878/2
**stenographically [1]**  2027/6
**step [2]**  1877/15 2026/14
**steps [1]**  1981/2
**Steve [9]**  1885/4 1992/23 1993/2 2024/11 2024/14 2024/19 2025/8 2025/11 2025/12
**still [6]**  1886/12 1920/20 1977/8 1980/25 1989/6 2009/24
**stop [3]**  1960/10 1960/15 1968/18
**stopped [3]**  1881/22 1944/5 1945/8
**Street [5]**  1874/22 1875/6 1882/10 1899/18 2000/20
**stricken [1]**  1959/23
**strike [2]**  1890/18 1982/25
**strong [1]**  2013/4
**structured [1]**  1912/15
**stuff [3]**  1946/25 2005/8

**S**

stuff... [1]   2005/10
subjects [1]   1929/7
submitted [1]   1961/15
subpoena [4]   2012/11 2012/13
 2012/15 2012/21
subpoenas [1]   2021/23
suggests [1]   1906/10
Suite [1]   1875/12
summaries [2]   1897/4 1897/10
summary [5]   1882/1 1882/25
 1884/22 1884/24 2026/19
summer [1]   1929/21
supervisor [19]   1909/14
 1909/17 1909/18 1909/20
 1909/21 1909/25 1909/25
 1910/1 1910/21 1948/4 1993/1
 1993/9 1993/10 2002/4 2002/8
 2002/10 2002/15 2004/2
 2024/7
supervisor's [1]   1910/1
supervisors [1]   1909/21
supplemental [2]   1923/25
 1925/3
supplied [1]   1998/2
supplying [1]   1998/5
supposed [1]   1963/15
sure [7]   1912/1 1912/7
 1912/9 1949/15 1984/21
 2010/14 2021/17
surreptitiously [1]   1977/12
surrounding [1]   2007/17
surveillance [4]   1972/6
 1972/18 1990/11 2020/24
Sustained [25]   1908/17
 1908/24 1910/19 1913/5
 1913/11 1913/21 1920/2
 1922/17 1930/2 1930/14
 1931/12 1932/19 1942/25
 1943/4 1951/11 1951/19
 1953/20 1953/24 1954/5
 1954/18 1955/1 1959/23
 2004/16 2011/16 2011/22
synced [2]   2022/12 2022/20
synching [1]   2022/6
system [7]   1980/20 1980/22
 1980/24 1981/14 1982/1
 1982/11 1992/10

**T**

tab [1]   1886/21
table [2]   1877/12 1919/5
tactics [3]   1934/19 1934/25
 1935/5
take [20]   1908/13 1921/24
 1931/3 1934/9 1939/4 1946/19
 1963/16 1973/4 1973/14
 1977/1 1977/12 1977/18
 1981/3 2017/23 2020/6
 2020/13 2021/3 2021/4
 2025/19 2025/20
taken [2]   1971/12 1991/4
taking [6]   1883/14 1925/25
 1990/14 1990/16 2017/17
 2017/24
talk [5]   1939/9 1939/10
 1948/1 1978/25 2026/2
talked [3]   1921/17 1997/8
 2021/6
talking [8]   1901/21 1915/8
 1969/10 1969/11 1969/14
 1970/12 1996/20 2018/18
Tanaka [18]   1882/19 1882/20
 1882/23 1883/7 1883/18
 1883/25 1884/3 1884/7 1885/4
 1885/6 1885/19 1885/23
 1885/25 1886/1 1886/3
 1886/14 1890/1 1890/3

TANNER [18]   1876/4 1877/13
 1881/13 1882/19 1882/24
 1887/3 1887/12 1887/24
 1888/17 1890/4 1890/9
 1897/15 1899/24 1903/20
 1904/25 1906/15 1942/8
 2023/3
tape [1]   1931/22
targets [1]   1949/13
teach [3]   1907/24 1908/3
 1908/5
tech [1]   1978/13
telephone [3]   1981/5 1982/5
 2026/19
tell [36]   1917/19 1918/18
 1924/20 1924/21 1926/2
 1926/6 1926/15 1928/23
 1929/7 1930/4 1930/8 1930/15
 1932/5 1933/3 1934/4 1934/14
 1942/17 1946/24 1949/3
 1949/16 1950/14 1950/18
 1953/3 1956/12 1956/18
 1962/11 1963/11 1963/12
 1963/15 1964/9 1974/3
 1974/21 1975/22 1993/12
 2010/10 2018/9
telling [9]   1907/17 1922/19
 1954/14 1963/23 1987/13
 1987/15 1993/11 2001/3
 2025/11
tells [2]   1933/14 2017/19
Temple [1]   1899/18
ten [5]   1874/14 1944/12
 1972/15 1998/19 1998/21
ten FBI [1]   1972/15
ten minutes [2]   1998/19
 1998/21
ten probably [1]   1944/12
term [6]   1907/8 1907/11
 1907/12 1907/16 1907/18
 1998/11
terminate [1]   1979/6
terms [3]   1912/7 1955/25
 1979/19
testified [6]   1917/11
 1929/19 1967/20 1998/10
 2003/20 2007/20
testify [5]   2003/9 2003/18
 2007/8 2007/12 2012/12
testifying [1]   2007/15
testimony [10]   1877/25
 1878/1 1881/14 1897/6
 1897/19 1932/21 1942/9
 1962/23 1962/25 2020/16
text [9]   1979/21 1979/22
 1980/14 1980/19 1981/5
 1981/11 1982/17 1987/8
 1987/9
than [12]   1886/9 1888/10
 1898/12 1906/7 1918/12
 1951/1 1962/11 1967/13
 2005/3 2006/7 2007/22
 2009/17
Thank [9]   1906/1 1906/12
 1942/7 1968/13 1974/15
 1983/6 1990/22 2023/21
 2024/1
that [908]
that's [2]   1947/9 2020/19
their [13]   1904/14 1918/2
 1920/23 1920/25 1921/5
 1943/16 1946/4 1948/5
 1957/16 1958/4 1997/6 2001/5
 2002/21
them [57]   1889/1 1918/18
 1918/24 1918/24 1919/13
 1920/22 1921/2 1921/6
 1921/25 1923/23 1926/1
 1926/17 1928/12 1929/2

 1929/3 1929/4 1929/8 1929/9
 1932/24 1945/23 1946/20
 1948/1 1948/1 1949/15
 1949/16 1949/19 1954/10
 1957/15 1957/16 1957/22
 1957/24 1957/24 1964/1
 1965/7 1967/9 1970/17
 1973/10 1975/22 1978/11
 1978/13 1980/6 1987/12
 1987/15 1987/25 1988/18
 1996/17 1996/22 1997/7
 1998/24 2001/5 2001/6
 2002/17 2004/23 2019/7
 2019/8 2019/11 2022/7
themselves [2]   1897/7
 1982/22
then [60]   1882/19 1883/12
 1883/16 1884/20 1885/19
 1885/25 1887/1 1888/22
 1889/14 1898/21 1899/15
 1899/17 1900/12 1900/15
 1902/6 1902/9 1909/20 1910/1
 1921/24 1923/7 1946/19
 1947/13 1948/3 1952/11
 1957/12 1957/19 1961/12
 1964/9 1964/9 1964/12
 1964/12 1967/16 1969/25
 1971/1 1971/20 1972/22
 1974/21 1977/14 1978/3
 1980/17 1985/24 1986/2
 1986/4 1986/8 1989/15
 1993/13 1998/1 1998/25
 2001/12 2004/17 2006/25
 2008/1 2009/6 2011/24
 2012/14 2013/13 2018/21
 2024/14 2025/5 2025/6
there [95]
thereafter [3]   1993/25
 1999/10 2007/1
these [38]   1897/10 1898/22
 1899/2 1899/5 1902/15 1906/8
 1911/19 1917/22 1918/23
 1920/4 1920/5 1921/12
 1923/12 1923/18 1923/19
 1923/23 1923/24 1924/1
 1924/4 1924/11 1924/13
 1925/3 1926/3 1926/8 1931/17
 1933/1 1934/3 1946/16
 1947/1 1947/23 1951/16
 1956/20 1967/1 1968/4 1978/8
 1980/3 1983/17 1992/19
they [90]
THIBODEAUX [2]   1874/21
 2027/12
thing [7]   1881/13 1926/7
 1944/18 1949/16 1974/4
 1978/15 2010/25
things [29]   1903/21 1911/24
 1919/11 1922/18 1924/15
 1924/18 1924/23 1925/25
 1926/3 1926/5 1926/10
 1934/11 1951/23 1952/3
 1952/4 1956/4 1957/19 1958/6
 1958/19 1958/23 1958/25
 1961/6 1966/3 1997/8 1998/3
 2008/1 2010/17 2010/18
 2017/24
think [28]   1877/17 1877/19
 1884/23 1903/18 1909/17
 1910/13 1943/22 1946/9
 1951/1 1972/17 1977/4
 1977/19 1981/13 1990/11
 1994/14 1994/20 1997/17
 1997/19 2001/16 2007/25
 2010/25 2012/8 2013/3
 2017/20 2017/23 2018/2
 2020/15 2024/5
third [3]   1923/6 1971/1
 1973/2

**T**

**this [100]**
**thorough [2]**   1912/3 1912/10
**those [32]**   1919/17 1921/14
1921/21 1921/24 1923/15
1926/21 1926/22 1944/14
1946/19 1947/18 1954/24
1957/17 1957/20 1958/2
1959/2 1964/19 1965/6
1965/16 1966/3 1973/10
1975/20 1979/18 1980/24
1981/2 1987/6 1987/8 1987/9
1992/9 1995/14 2009/1
2024/18 2026/19
**though [5]**   1889/3 1930/23
1931/9 1966/5 1998/4
**thought [2]**   1928/3 1971/25
**thousand [3]**   1956/14 1958/12
1958/16
**thousands [1]**   1958/10
**threatened [1]**   1898/15
**threatening [5]**   1965/21
2017/6 2017/16 2017/21
2018/4
**three [13]**   1883/21 1910/2
1910/3 1926/25 1950/11
1965/6 1965/8 1971/24
1972/23 1975/20 1992/9
2008/23 2009/2
**three armed [1]**   1950/11
**three minutes [1]**   1883/21
**three of [2]**   1926/25 2008/23
**three other [1]**   1972/23
**three phone [1]**   1975/20
**three recorded [2]**   1971/24
1992/9
**through [25]**   1877/15 1889/8
1912/21 1915/11 1916/9
1916/13 1916/16 1917/3
1917/7 1918/1 1926/17 1932/6
1944/22 1945/1 1954/6
1977/13 1984/24 1992/18
1992/25 1993/1 2002/19
2004/3 2005/8 2008/3 2026/18
**throughout [2]**   1889/2 1980/8
**till [4]**   1939/20 1945/8
1994/1 2004/13
**time [102]**
**timed [1]**   2021/14
**timeframe [3]**   1920/8 1958/8
2006/23
**times [9]**   1902/5 1902/5
1920/25 1921/1 1921/7 1944/7
1968/25 1977/5 2007/1
**timing [1]**   2023/13
**tipped [1]**   1981/18
**Title [1]**   2027/4
**to see [1]**   1888/25
**today [3]**   1881/23 1956/22
2021/15
**together [3]**   1916/24 1960/22
2022/7
**told [47]**   1919/20 1924/18
1930/10 1930/16 1932/3
1933/24 1935/4 1942/10
1942/13 1942/23 1943/2
1944/15 1949/15 1949/21
1952/6 1952/8 1956/2 1964/4
1965/3 1978/10 1981/20
1981/20 1986/10 1993/9
1996/10 1996/14 1996/17
1996/21 1996/21 1997/13
1998/13 1998/16 1998/24
2004/3 2004/22 2011/11
2012/14 2012/15 2013/6
2017/25 2018/22 2020/9
2024/8 2024/16 2025/7 2025/8
2025/9

**told us [1]**   1964/4
**tomorrow [2]**   1946/9
1946/25 1885/1 1895/22
**ton [1]**   1984/4
**too [1]**   1934/9
**took [8]**   1883/11 1972/11
1979/2 1979/5 2006/7 2012/17
2012/21 2013/12
**top [2]**   1881/25 1977/8
**Torribio [1]**   1885/9
**total [3]**   1910/16 1965/1
1972/15
**totally [5]**   1924/15 1925/25
1926/4 1926/10 1961/9
**touch [2]**   1970/13 1987/4
**towards [1]**   2018/9
**traced [1]**   1989/4
**track [1]**   1899/6
**trafficking [4]**   1930/11
1930/17 1930/20 1930/23
**training [3]**   1906/19 1908/1
1908/13
**transaction [27]**   1948/18
1952/25 1960/3 1963/16
1967/17 1969/12 1972/1
1972/24 1973/5 1973/24
1974/1 1975/5 1975/10
1975/17 1975/23 1990/6
1991/2 1991/19 2003/10
2007/16 2008/8 2009/24
2010/8 2010/14 2010/21
2011/18 2017/11
**transactions [1]**   1964/25
**transcript [10]**   1874/13
1881/19 1887/4 1903/14
1968/3 1969/17 1969/23
2017/14 2027/6 2027/7
**transcripts [4]**   1958/20
1958/21 1968/4 1973/10
**transferred [4]**   1887/23
2003/21 2004/5 2006/19
**transport [2]**   1960/18
1995/14
**transported [1]**   1961/21
**treatment [1]**   1995/8
**trial [6]**   1874/14 1939/7
1939/13 2025/22 2025/25
2026/5
**trials [1]**   1908/7
**tried [3]**   1918/21 1921/20
1981/17
**tries [2]**   1939/10 2026/2
**truck [2]**   1991/11 1991/17
**true [19]**   1881/18 1930/24
1931/2 1934/2 1934/17 1935/5
1942/13 1949/7 1951/15
1952/12 1955/4 1965/3 1978/5
1997/20 1998/6 1998/8
2003/11 2003/19 2027/5
**trust [4]**   1933/14 1933/17
1933/22 1934/15
**trustworthy [2]**   1948/20
1950/2
**truth [1]**   1930/15
**truthful [9]**   1948/2 1948/8
1948/24 1950/2 1952/3 1952/4
1956/1 2018/22 2019/7
**truthfulness [2]**   1949/7
1949/10
**try [5]**   1885/10 1939/9
1993/19 1993/22 2002/11
**trying [16]**   1924/24 1926/1
1931/3 1931/9 1933/13
1933/16 1933/17 1933/20
1933/21 1963/9 2017/23
2019/12 2019/13 2019/14
2019/17 2019/19
**TUESDAY [3]**   1874/17 1877/1
1946/12
**turn [3]**   1973/10 2002/10

2024/21
**turned [2]**   1957/4
**TV [3]**   1928/4 1958/20
1958/25
**Twelve [2]**   1951/1 1951/3
**two [40]**   1882/18 1883/10
1884/21 1885/24 1887/8
1887/12 1887/18 1899/15
1912/25 1922/11 1924/15
1924/23 1924/24 1925/25
1926/4 1926/10 1934/11
1942/21 1949/2 1957/10
1961/3 1961/6 1964/25
1967/22 1972/22 1972/25
1973/1 1984/23 1986/3 1996/4
1998/3 2006/8 2012/6 2012/8
2012/24 2017/23 2020/2
2021/11 2021/13 2023/25
**two agents [2]**   1922/11
1972/25
**two bureaus [1]**   1912/25
**two calls [3]**   1882/18 1887/8
1887/12
**two coincide [2]**   1942/21
1949/2
**two different [3]**   1934/11
1998/3 2017/23
**two exclusive [1]**   1924/23
**two hours [3]**   1884/21 2006/8
2012/8
**two interviews [1]**   1883/10
**two meetings [1]**   1899/15
**two minutes [3]**   1887/18
2021/11 2021/13
**two of [1]**   1986/3
**two options [1]**   2012/24
**two other [2]**   1972/22 1996/4
**two phone [2]**   1885/24
1967/22
**two pilots [1]**   1973/1
**two separate [1]**   1961/6
**two statements [1]**   1961/3
**two totally [4]**   1924/15
1925/25 1926/4 1926/10
**two transactions [1]**   1964/25
**two weeks [1]**   2020/2
**two-fold [2]**   1957/10 1984/23
**type [4]**   1949/23 1978/8
1978/15 2011/4
**typing [1]**   1921/21

**U**

**U.S [6]**   1874/21 1905/1
1948/4 1999/21 2013/14
2024/15
**UF [1]**   1969/17
**Uh [1]**   1984/8
**Uh-huh [1]**   1984/8
**unavailable [7]**   1884/5
1884/10 1888/13 1888/15
1889/1 1905/5 1905/11
**under [10]**   1878/8 1886/3
1887/20 1887/23 1891/1
1913/23 1935/11 1940/6
2013/21 2020/24
**undercover [36]**   1916/15
1948/10 1948/11 1948/14
1948/16 1949/4 1952/23
1953/3 1953/11 1954/1
1954/12 1959/1 1960/1 1960/6
1960/22 1961/4 1961/9
1961/12 1961/13 1961/15
1961/19 1961/20 1962/14
1963/3 1963/6 1963/10 1965/9
1966/24 1967/17 1969/11
1984/24 1987/12 1993/10
1996/17 1996/20 1996/24
**underlying [1]**   1897/11
**undersheriff [2]**   1886/14

**U**

undersheriff... [1]  1912/17
undersheriff's [1]  1899/14
understand [14]  1907/12
 1907/16 1907/17 1911/21
 1920/13 1920/20 1924/9
 1928/5 1928/9 1957/25 1963/9
 1981/24 2002/12 2024/3
understanding [1]  1934/20
understood [5]  1953/21
 1966/5 1998/6 1999/24
 2010/14
underway [1]  1925/20
unidentified [1]  1969/18
unique [2]  1945/23 1946/1
unit [2]  2004/22 2005/15
UNITED [11]  1874/1 1874/4
 1874/6 1877/7 1877/12
 1882/12 1900/11 1900/19
 1953/14 2027/5 2027/9
unless [2]  1877/17 1982/18
unreasonable [2]  1942/18
 1942/20
until [18]  1886/11 1900/2
 1902/7 1925/19 1939/5
 1939/15 1944/3 1944/8 1960/7
 1967/7 1973/10 1978/19
 1994/5 1996/12 2006/18
 2020/2 2025/22 2026/7
up [47]  1881/23 1882/19
 1882/22 1888/10 1888/24
 1889/10 1905/5 1911/1 1915/7
 1923/25 1924/12 1926/20
 1944/13 1944/16 1945/16
 1945/17 1945/22 1947/3
 1949/19 1957/17 1964/12
 1964/24 1966/24 1972/23
 1973/25 1974/2 1980/12
 1980/22 1980/24 1981/14
 1981/15 1981/19 1982/11
 1982/13 1988/25 1993/1
 1995/10 1996/12 2000/13
 2001/5 2002/3 2002/24
 2004/20 2004/24 2005/1
 2008/17 2009/3
updated [1]  1923/13
upset [1]  2005/24
upstairs [2]  2009/9 2009/10
us [20]  1875/5 1877/12
 1877/15 1918/16 1918/24
 1918/25 1924/17 1924/20
 1924/21 1926/25 1963/23
 1964/4 1978/8 1978/10
 1996/15 1996/21 2008/23
 2009/9 2018/12 2019/7
USAO [1]  1882/15
use [18]  1899/1 1905/14
 1907/18 1942/18 1943/9
 1943/16 1946/9 1953/10
 1957/13 1958/23 1976/21
 1977/1 1980/25 1985/16
 1986/3 1986/4 1986/14
 1987/18
used [12]  1907/13 1931/1
 1933/2 1943/8 1944/17
 1951/13 1957/5 1965/13
 1966/18 1980/14 1992/13
 2025/10
using [11]  1898/18 1898/23
 1942/20 1943/6 1943/11
 1948/22 1960/2 1960/11
 1960/15 1963/2 1987/1
usually [3]  1919/14 1948/1
 2005/19

**V**

Vague [3]  1920/1 1954/3
 1955/5

various [3]  1933/5 1952/18
 1976/22
vent [1]  1976/16
verify [1]  1976/5
version [1]  2022/20
versus [1]  1877/8
very [17]  1882/25 1897/24
 1898/8 1912/4 1931/3 1932/12
 1932/12 1933/19 1944/6
 1948/7 1948/12 1948/19
 1950/18 1953/22 1987/11
 1988/18 2005/25
video [17]  1974/2 1974/5
 1974/19 1974/23 1975/12
 1975/15 1977/18 2009/23
 2010/1 2010/5 2022/12
 2022/12 2023/6 2023/11
 2023/12 2023/18 2023/20
videos [6]  1955/3 1955/16
 1955/20 1977/2 1977/21
 1977/21
videotape [3]  1973/4 2021/23
 2022/6
videotaping [1]  1972/23
views [2]  1939/17 2026/9
violates [1]  1947/23
violations [1]  1908/6
violent [2]  1987/22 1987/23
visit [2]  1915/12 1916/17
visitation [1]  1916/18
visited [1]  1911/14
visiting [1]  1917/6
visitor [4]  1916/13 1993/22
 1994/7 1994/8
visitor's [1]  1916/18
visitors [1]  1916/5
voicemail [7]  1884/3 1884/8
 1889/5 1889/13 1999/12
 2020/14 2020/21
VOLUME [2]  1874/15 1923/5

**W**

wait [5]  1998/14 1998/16
 1998/16 1998/20 1998/24
waited [4]  1998/25 2008/18
 2008/23 2018/20
waiting [2]  1971/19 2008/24
waking [1]  1980/6
walk [3]  1915/7 1920/25
 1921/4
walked [4]  1917/18 1917/18
 1920/23 1920/24
walking [2]  1921/6 1993/11
wall [1]  1919/5
want [24]  1877/15 1877/16
 1881/22 1883/4 1885/2
 1885/11 1887/7 1889/23
 1899/24 1918/18 1929/2
 1929/12 1939/4 1949/23
 1950/1 1950/20 1953/17
 1961/17 1974/18 1985/1
 1985/3 2009/9 2023/15
 2025/22
wanted [26]  1912/1 1915/5
 1916/4 1916/6 1917/15
 1919/14 1919/24 1929/4
 1929/9 1929/11 1932/3 1932/5
 1932/7 1932/10 1934/14
 1977/20 1977/21 1979/7
 1984/23 1988/6 1998/14
 2002/9 2004/23 2004/24
 2009/10 2010/11
wants [1]  1890/22
ward [6]  1994/24 1995/3
 1995/8 1995/14 1995/15
 1995/19
was [391]
was 700 [1]  1975/8
wasn't [24]  1889/6 1889/6

1916/21 1916/25 1926/21
1935/5 1948/11
1950/25 1951/15 1960/7
1962/6 1962/13 1965/6
1971/17 1971/25 1972/19
1981/14 1995/5 2001/24
2013/1 2018/19 2020/2
2024/18
wasn't one [1]  1962/13
watch [3]  1998/21 1998/22
 2023/3
watching [1]  2023/6
way [31]  1877/25 1888/7
 1899/5 1905/15 1912/17
 1922/13 1924/17 1930/6
 1946/11 1950/25 1957/13
 1966/25 1971/16 1971/17
 1975/20 1976/5 1977/4 1977/5
 1978/21 1981/13 1982/15
 1993/3 1994/1 1995/10
 2002/19 2004/21 2006/12
 2006/18 2008/3 2013/1 2019/4
Wayne [1]  1996/4
ways [1]  2005/13
we [216]
weapon [2]  1951/8 2009/4
wear [2]  1978/3 1978/10
website [1]  1979/19
weeks [1]  2020/2
well [69]  1882/13 1885/11
 1888/2 1897/25 1904/18
 1909/18 1910/10 1912/1
 1912/9 1915/24 1917/16
 1920/3 1920/14 1925/3
 1925/19 1927/17 1927/22
 1931/16 1933/23 1945/6
 1945/15 1947/8 1947/25
 1948/16 1949/3 1949/8
 1950/21 1952/20 1952/21
 1952/23 1953/21 1954/6
 1955/4 1960/10 1962/8
 1962/14 1962/23 1963/15
 1966/4 1975/13 1976/20
 1977/21 1978/17 1978/22
 1979/17 1981/6 1981/20
 1985/17 1986/17 1988/20
 1989/15 1990/14 1992/12
 1994/5 1995/1 1995/6 1997/8
 1998/1 2003/12 2003/13
 2006/4 2010/3 2011/17
 2017/21 2018/14 2021/3
 2021/18 2021/25 2024/7
went [22]  1885/9 1902/2
 1916/9 1916/13 1916/17
 1917/6 1917/7 1918/1 1924/7
 1930/8 1958/9 1958/22
 1985/15 1986/7 1990/5 1994/3
 1996/3 1997/17 2002/8
 2009/12 2024/6 2024/9
were [171]
weren't [6]  1888/6 1918/16
 1920/15 1924/17 1953/16
 1980/3
West [2]  1899/18 1900/21
WESTERN [1]  1874/2
Westwood [3]  1901/19 1902/2
 1933/10
what [139]
whatever [4]  1919/24 1923/2
 1948/2 1961/17
when [93]
whenever [1]  1979/6
where [28]  1882/4 1898/17
 1898/21 1899/6 1899/9
 1899/13 1899/16 1900/19
 1901/5 1901/13 1902/1
 1902/10 1902/11 1902/13
 1902/19 1903/1 1903/12
 1918/9 1943/15 1946/11

## W

**where... [8]** 1972/6 1975/5 1995/6 2001/21 2002/2 2002/7 2002/14 2022/7
**wherever [1]** 2001/6
**whether [27]** 1889/5 1900/22 1903/6 1906/22 1923/22 1925/8 1931/7 1932/21 1934/7 1943/19 1950/1 1951/12 1953/2 1962/9 1966/25 1967/3 1976/5 1976/6 1978/14 1986/9 1988/12 1995/13 1997/2 2011/3 2011/19 2022/19 2026/23
**which [29]** 1885/16 1886/20 1888/14 1890/12 1897/6 1897/25 1899/21 1900/3 1902/7 1903/6 1921/4 1925/6 1925/12 1929/13 1948/18 1949/11 1957/8 1960/3 1963/25 1964/13 1968/2 1968/15 1974/17 1991/14 1991/16 2000/25 2007/18 2009/24 2022/11
**while [10]** 1877/15 1886/12 1887/9 1888/2 1888/2 1933/2 1962/1 1989/15 1998/23 2006/16
**white [1]** 1975/2
**who [25]** 1877/22 1903/23 1911/9 1911/17 1913/8 1924/6 1928/9 1928/16 1928/23 1945/19 1954/7 1957/15 1970/22 1971/22 1987/18 1988/5 1989/12 1995/1 2002/8 2004/6 2005/14 2005/15 2022/2 2024/21 2024/23
**whole [7]** 1910/12 1916/21 1929/1 1948/21 1948/25 1949/6 1980/23
**whom [1]** 1958/3
**why [13]** 1888/6 1902/21 1922/8 1931/10 1935/5 1953/7 1953/13 1956/2 1963/25 1967/14 1978/20 1993/20 2023/15
**will [32]** 1885/5 1886/20 1898/7 1906/2 1906/11 1918/5 1922/11 1927/7 1927/23 1939/20 1939/23 1943/22 1950/21 1955/7 1956/3 1961/19 1963/1 1971/7 1973/7 1973/13 1982/22 1982/23 1983/20 1986/17 1989/23 1991/9 2008/7 2019/7 2023/19 2025/19 2025/20 2026/10
**William [3]** 1884/17 1929/14 1929/17
**willing [1]** 1965/4
**withdraw [3]** 1927/7 1963/1 1989/23
**Within [1]** 1927/11
**without [5]** 1902/10 1950/13 1950/18 1974/4 1981/1
**witness [14]** 1876/3 1877/14 1881/4 1905/20 1928/1 1928/2 1928/10 1928/11 1951/9 1962/25 1973/15 1990/19 1993/14 2026/16
**witnesses [4]** 1912/6 1912/21 1965/19 1965/21
**word [7]** 1928/11 1928/11 1930/6 1931/1 1931/4 1946/9 2013/2
**worded [3]** 2013/1 2019/4 2019/5
**words [3]** 1981/25 2012/23 2025/9

**work [8]** 1900/2 1918/21 1935/22 1978/16 1978/19 1978/20 2007/17 2008/19
**worked [5]** 1908/15 1908/19 1908/22 1913/18 1978/24
**working [6]** 1908/18 1926/25 1948/6 1997/10 1999/8 1999/13
**would [109]**
**wouldn't [23]** 1897/21 1911/22 1912/19 1916/15 1917/25 1929/6 1933/3 1933/16 1934/10 1943/16 1945/25 1949/16 1962/19 1972/19 1978/16 1978/19 1978/20 1979/21 1979/25 1981/22 1985/9 1988/14 2010/22
**writ [3]** 1999/21 1999/24 2000/24
**write [7]** 1917/15 1922/12 1944/13 1945/25 1946/1 1946/7 1946/10
**writing [3]** 1921/21 1979/22 2000/16
**writted [2]** 2007/8 2007/11
**written [1]** 1964/2
**wrote [7]** 1926/8 1955/10 1955/12 1955/15 1955/19 1955/25 1956/1

## Y

**year [16]** 1906/23 1907/3 1907/5 1907/19 1907/23 1908/4 1908/6 1908/8 1908/11 1908/14 1920/3 1920/8 1921/13 1951/21 1960/17 1968/21
**years [3]** 1956/16 1959/11 1960/12
**yes [212]**
**you [807]**
**you're [1]** 1943/20
**your [156]**
**yourself [7]** 1934/22 1935/1 1957/6 1993/17 1999/16 2001/20 2002/13

## Z

**zero [1]** 1987/6
**zero durations [1]** 1987/6