UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

HONORABLE PERCY ANDERSON, U.S. DISTRICT JUDGE

- - -

UNITED STATES OF AMERICA,      )
                               )
              PLAINTIFF,       )
                               )
     vs.                       ) No. CR16-66(A)-PA
                               )
LEROY BACA,                    )
                               )
              DEFENDANT.       )
_____)

REPORTER'S TRANSCRIPT OF JURY TRIAL

DAY 2, VOLUME II of II

PAGES 299-426

LOS ANGELES, CALIFORNIA

THURSDAY, FEBRUARY 23, 2017

1:32 P.M.

_____

CINDY L. NIRENBERG, CSR 5059, FCRR
U.S. Official Court Reporter
350 W. 1st Street, #4455
Los Angeles, CA 90012
*www.msfedreporter.com*

APPEARANCES OF COUNSEL:


FOR THE PLAINTIFF:
                         OFFICE OF THE UNITED STATES ATTORNEY
                         BY: BRANDON FOX,
                             ASSISTANT U.S. ATTORNEY
                             EDDIE A. JAUREGUI,
                             ASSISTANT U.S. ATTORNEY
                             LIZABETH A. RHODES,
                             ASSISTANT U.S. ATTORNEY
                         312 NORTH SPRING STREET
                         13TH FLOOR
                         LOS ANGELES, CA 90012
                         213-894-2434


FOR THE DEFENDANT:
                         MORGAN LEWIS & BOCKIUS
                         BY: NATHAN J. HOCHMAN, ATTORNEY AT LAW
                             BRIANNA L. ABRAMS, ATTORNEY AT LAW
                         THE WATER GARDEN
                         1601 CLOVERFIELD BOULEVARD
                         SUITE 2050 NORTH
                         SANTA MONICA, CA 90404
                         310-255-9025


ALSO PRESENT:
                         LEAH TANNER, FBI SPECIAL AGENT

I N D E X

DISCUSSION HELD OUTSIDE PRESENCE OF JURY   302

JURY VOIR DIRE RESUMED                       303

DISCUSSION HELD AT SIDEBAR                   373

DISCUSSION HELD AT SIDEBAR                   383

DISCUSSION HELD AT SIDEBAR                   413

DISCUSSION HELD AT SIDEBAR                   421

DISCUSSION HELD OUTSIDE PRESENCE OF JURY   422

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES, CALIFORNIA; THURSDAY, FEBRUARY 23, 2017

1:32 P.M.

- - - - -

*(The following was heard outside the presence of the prospective jurors.)*

THE COURT:  Okay.  Couple of quick housekeeping matters.

We have one prospective juror who has -- whose husband is having a medical procedure tomorrow and needs to leave here tomorrow by 10:00 a.m.  I do not believe that we have seen that person as of yet.  They'll be up fairly quickly this afternoon.

MR. FOX:  Mr. Hochman, do you want to just let that person go?

MR. HOCHMAN:  Yeah.  I'm sorry, Your Honor.  Did you say we had or had not seen that person?

THE COURT:  We have not seen them.

MR. HOCHMAN:  Oh, then we have no problem letting that person go, Your Honor.

MR. FOX:  Same with the government, Your Honor.

THE COURT:  Okay.

MR. FOX:  Do you know the Juror Number?

THE COURT:  Yeah.  Just a minute.

I believe it's 57849.

And I believe there's one other juror who's over in

9-B, who I don't think we've seen, and who indicated that they thought they could be here.  And I think in looking at their calendar, they have concluded that they cannot be here for the --

Is this the person that can't be there for the entire two weeks or is this the person that has a vacation planned or has to be somewhere on March 8th?

(The Court and clerk confer off the record.)

THE COURT:  All right.  We'll have to figure out who that person is and what their status is, and we'll do that at the first break.

Okay.  Are we ready to resume?

MR. FOX:  Yes, Your Honor.

MR. HOCHMAN:  Yes, Your Honor.

THE COURT:  Okay.

(Prospective juror enters the courtroom.)

THE COURT:  Good afternoon.  Could you give us the last five digits of your badge number, please.

PROSPECTIVE JUROR:  38095.

THE COURT:  And have you had occasion to talk to any other jurors about this case?

PROSPECTIVE JUROR:  No.

THE COURT:  Have you heard anything or read anything about this case, including in the last 48 hours?

PROSPECTIVE JUROR:  No.

THE COURT:  Have you had a chance to look at the Criminal Case Questionnaire?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Do you have any yes answers to any of those questions?

PROSPECTIVE JUROR:  Yes, to three of them.

THE COURT:  Okay.  Can you give me the numbers, please.

PROSPECTIVE JUROR:  Number 15, Number 21, and Number 33.

THE COURT:  Let's start with Number 15.

PROSPECTIVE JUROR:  Okay.  Would you like me to just elaborate?

THE COURT:  Yeah, if you could just elaborate on your answer.

PROSPECTIVE JUROR:  So in this case, it's not so much that I have feelings regarding this.  I believe it would be difficult to put aside or affect my ability as an impartial juror.  Mainly, that I have very strong feelings regarding any sort of police misconduct which is proven to such extent that I felt it would be not entirely honest to not at least make mention of it.

THE COURT:  Okay.  But you don't believe those feelings would interfere with your ability to be fair and impartial?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

PROSPECTIVE JUROR:  No.

THE COURT:  Okay.

PROSPECTIVE JUROR:  I do not believe that it is at this time proven that the defendant has engaged in any police misconduct, so --

THE COURT:  So do you think that you can be fair and impartial to both the defendant and the government?

PROSPECTIVE JUROR:  I do.

THE COURT:  What about Question 21?

PROSPECTIVE JUROR:  21 I believe pertains to membership in the ACLU, the American Civil Liberties Union.  I am aware that my mother at least was for many years a card-carrying member.  I am not certain that she still is.  I am not and never have been a card-carrying member or donated to it.

THE COURT:  Okay.  There may be witnesses who may have some affiliation with the ACLU.  Are you going to be able to judge their testimony the same way you would that of any other witness?

PROSPECTIVE JUROR:  Yes.

THE COURT:  And Question 33?

PROSPECTIVE JUROR:  So therein, yes, I believe that everyone, including prisoners, should maintain -- or retain their civil rights, save for those of their rights which the law specifically allows to be taken away, such as the right to

vote or the right to sit on a jury trial.

THE COURT: Okay. Do you think you can be fair and impartial to both sides in this case?

PROSPECTIVE JUROR: I believe so. I'm not sure entirely how it's relevant, but --

THE COURT: You're not sure what's relevant?

PROSPECTIVE JUROR: Well, my knowledge of this case is such that -- from what you said yesterday, the defendant is accused of having in some way interfered with a man's civil rights while he was imprisoned. I believe that, yes, I can be fair and impartial in the same way that I do not know if that is the case. If this man has been involved in that in any way, I believe that that is what is to be proven before the Court.

THE COURT: That's right. There's an indictment that charges the defendant with conspiring to obstruct justice, obstruction of justice and making false statements, and those are simply the charges that have been brought by the government. There's a presumption of innocence.

PROSPECTIVE JUROR: Yes.

THE COURT: It will be the task of the jury to determine whether the government has proven the case beyond a reasonable doubt.

PROSPECTIVE JUROR: Yes, then I believe I am fully capable of being fair and impartial.

THE COURT: Okay. Any additional questions?

MR. HOCHMAN:  May I have a moment, Your Honor?

THE COURT:  Yes.

MR. FOX:  None from the government, Your Honor.

MR. HOCHMAN:  Just briefly, Your Honor.  Just if we could inquire as to the prospective juror's -- the basis or the source of the strong feelings of police misconduct.

PROSPECTIVE JUROR:  It is my belief that as an officer of the law, someone who sets out to protect and to serve, as is the motto, there is a promise implicit to the people that you will do so, that you will not act in a manner unbefitting of that service and that someone who does so deserves to be punished to the fullest extent of the law.  It is a betrayal which is itself worse than many other crimes to violate that.

THE COURT:  Anything else?

MR. HOCHMAN:  No, Your Honor.

THE COURT:  All right.  Pass for cause?

MR. FOX:  Yes, Your Honor.

MR. HOCHMAN:  Yes, Your Honor.

THE COURT:  All right.  Sir, you can return to Courtroom 9-B and await further instructions.

Again, I caution you not to discuss this case with your fellow jurors.  Do not discuss what we talked about with your fellow jurors.

PROSPECTIVE JUROR:  Thank you.

(Prospective juror enters the courtroom.)

THE COURT:  Good afternoon.

PROSPECTIVE JUROR:  Good afternoon.

THE COURT:  If you could give us the last five digits of your badge number, please.

PROSPECTIVE JUROR:  38589.

THE COURT:  And have you had any discussions with any other jurors about this case?

PROSPECTIVE JUROR:  I have not.

THE COURT:  And have you either read or heard anything about this case, including in the last 48 hours?

PROSPECTIVE JUROR:  No, I've not.

THE COURT:  Have you had a chance to look at --

PROSPECTIVE JUROR:  Oh, I'm sorry.  Including the last 48 hours.  I heard something about the case in the media probably a few months ago, but other than --

THE COURT:  Okay.  We'll get to that.

PROSPECTIVE JUROR:  Okay.

THE COURT:  But other than a few months ago, you haven't heard anything?

PROSPECTIVE JUROR:  No.

THE COURT:  Have you had a chance to look at the Criminal Case Questionnaire?

PROSPECTIVE JUROR:  Yes, I have.

THE COURT:  Do you have any yes or affirmative

responses to any of those questions?

PROSPECTIVE JUROR:  Yes, I do.

THE COURT:  Okay.  Can you give me the numbers.

PROSPECTIVE JUROR:  Number 1, Number 2, Number 4, Number 10, possibly 15, Number 19, Number 20, Number 26, Number 33 and possibly Number 37.

THE COURT:  Why don't we start with Number 1.

PROSPECTIVE JUROR:  Oh, yes.  I have a cousin that was arrested.

THE COURT:  Okay.  And what were they arrested for?

PROSPECTIVE JUROR:  I don't know exactly, but I believe attempted murder.

THE COURT:  And when was that?

PROSPECTIVE JUROR:  It's been -- probably 2001, 2002.

THE COURT:  And do you know what police agency was involved?

PROSPECTIVE JUROR:  I do not.  I believe it was in Arkansas, though.

THE COURT:  Do you know what the results were of those charges?  Was he convicted?

PROSPECTIVE JUROR:  He is currently doing time in prison.  Outside of that, I don't know.

THE COURT:  Are you particularly close to that relative?

PROSPECTIVE JUROR:  Not particularly.  I haven't

spoken with him in years.

THE COURT:  And what about Question 2.

PROSPECTIVE JUROR:  Question Number 2, yes.  A cousin of mine was hijacked and robbed.  Outside of that, nothing else.

THE COURT:  Okay.  When was that?

PROSPECTIVE JUROR:  Probably over ten years ago.

THE COURT:  And where did that take place?

PROSPECTIVE JUROR:  In Los Angeles.

THE COURT:  Were the police called?

PROSPECTIVE JUROR:  I don't know.

THE COURT:  So you don't have any knowledge of --

PROSPECTIVE JUROR:  No knowledge of details.  Other than that, no.

THE COURT:  Okay.  And what about Question 4?

PROSPECTIVE JUROR:  Number 4, yes.  I have an aunt, my mother's sister, who works with the district attorney's office across the street.

THE COURT:  Do you know what she does for the district attorney?

PROSPECTIVE JUROR:  She's a supervisor witness coordinator.

THE COURT:  And how long has she been with the district attorney's office?

PROSPECTIVE JUROR:  Probably 20 years or 20

years-plus.

THE COURT:  Do you ever talk to her about what she does for the district attorney's office?

PROSPECTIVE JUROR:  Not so much what she does because I know, so, no.

THE COURT:  Anything about that relationship that causes you to have any concerns about your ability to be fair and impartial to both sides in this case?

PROSPECTIVE JUROR:  No.  I would say no.

THE COURT:  And Question 10?

PROSPECTIVE JUROR:  I have a friend who works as a police officer but not in Los Angeles.

THE COURT:  But not --

PROSPECTIVE JUROR:  Not in Los Angeles.

THE COURT:  Okay.  And what police agency does that person work for.

PROSPECTIVE JUROR:  He's in Virginia.

THE COURT:  Anything about that relationship that would cause you to have any concerns about your ability to be fair and impartial to both sides in this case?

PROSPECTIVE JUROR:  No.  No.

THE COURT:  There may be law enforcement officers --

PROSPECTIVE JUROR:  I'm sorry.  Before I make that affirmative, let me think about that a little bit more.

No, I think I can make a fair judgment, so --

THE COURT: There may be law enforcement officers who may be witnesses in this case. Are you going to be able to put aside your friendship and judge their credibility the same way you would that of any other witness.

PROSPECTIVE JUROR: I believe I can.

THE COURT: Any doubt in your mind?

PROSPECTIVE JUROR: Yes. And I say it because I think it depends on what's presented to me that may have an effect. Right now, I don't foresee or know any of the details about the case to be able to say if I won't, but I don't know what's going to be presented. And I'm saying that to say that maybe something that, you know, touches me personally that I may have an issue at the time, but right now I can't foresee that.

THE COURT: But going into this situation, are you going to favor the testimony of a law enforcement officer more than you would --

PROSPECTIVE JUROR: Oh, then I would say no.

THE COURT: -- a layperson as a result of your friendship?

PROSPECTIVE JUROR: I would say no.

THE COURT: Any doubt in your mind?

PROSPECTIVE JUROR: Right now, I say no, but, again, I won't be sure until -- I'm trying to be as honest as possible.

THE COURT:  That's fine.  I appreciate that.

Well, jurors have to -- one of the things that jurors have to do is decide the credibility of witnesses and how much weight to give any particular witness' testimony, and people -- and that's why people can use their own background, their experience to make that judgment.  What we're trying to avoid is having somebody have a bias that they bring into the courtroom and they base their decision about a witness's credibility or believability on --

PROSPECTIVE JUROR:  On that bias.

THE COURT:  -- on some outside factor, something other than what they've heard here in court.

PROSPECTIVE JUROR:  Okay.

THE COURT:  Can you commit to both sides that you're going to judge witnesses' credibility and their believability based on what you hear here in court?

PROSPECTIVE JUROR:  Presented that way, yes, I would say yes.

THE COURT:  And what about Question 15?

PROSPECTIVE JUROR:  I said that was a maybe.  I didn't read the question fully so I would say no.

THE COURT:  And Question 19?

PROSPECTIVE JUROR:  Yeah, I work for the Department of Children and Family Services as an assistant investigator, and I do go to jails and prisons in just trying to interview

those -- our clients, and so, yeah, I have heard, you know, stories and things like that. But this question doesn't say will it make it difficult for me to make a judgment. That's why I said yes to that one.

THE COURT: Okay. But you can put aside what you may have heard and decide this case based on the evidence that you hear here in court?

PROSPECTIVE JUROR: Yes.

THE COURT: And Question 20?

PROSPECTIVE JUROR: Question 20, yes, I have an uncle who does -- is head of security for Walt Disney, so he worked with LAPD. So he's trained and worked with LAPD and for Disney as well. And I also have a friend who is a doctor of behavioral health, and I have had conversations with her about her work.

THE COURT: And then Question 26?

PROSPECTIVE JUROR: Yes, my father in probably -- in '95 I think was arrested and was sent to -- went to Los Angeles County Jail.

THE COURT: And what was that arrest for?

PROSPECTIVE JUROR: That was for DUI.

THE COURT: And do you know what police agency was involved in that arrest?

PROSPECTIVE JUROR: I don't know for sure, but I believe that was the station on Venice or San Vicente.

THE COURT:  Would that have been the Los Angeles Police Department or the sheriff's department?

PROSPECTIVE JUROR:  Police department.

THE COURT:  Is there anything about the way that your father's case was handled that causes you to have concerns about your ability to be fair and impartial to both sides?

PROSPECTIVE JUROR:  No.

THE COURT:  And what about Question 33?

PROSPECTIVE JUROR:  No, I do believe that people who have been convicted of crimes still should have their constitutional rights, yeah.

THE COURT:  And Question 37?

PROSPECTIVE JUROR:  Oh, this one, I just -- possibly to this because, again, I don't know all of the facts of the case yet.  So will I be able to do that without reservation, I guess based on the way you explained it for the other question, I would say no -- I would say yes, I will be able to.

THE COURT:  Okay.  What I really want to know is do you foresee having any difficulty following the Court's instructions?

PROSPECTIVE JUROR:  No.

THE COURT:  And can you follow the Court's instructions whether you personally approve or disapprove of them?

PROSPECTIVE JUROR:  I can follow the instructions,

yes.  Yes, I can.

THE COURT:  And you had indicated earlier that you may have heard something about this case a month or so ago. What did you hear?

PROSPECTIVE JUROR:  It was -- I think it was longer than a month or so ago, but I don't remember.  I just remember hearing it in the news because the sheriff's department is next door to children's court in Monterey Park, so it just kind of -- it was a red flag for me, but I don't remember the details.  Before you mentioned it yesterday, I didn't know what the charges were.

THE COURT:  Okay.  So your office is in Monterey Park?

PROSPECTIVE JUROR:  My office is in Los Angeles on Vermont, but I work with children's court so I'm there often.

THE COURT:  Okay.  In Monterey Park?

PROSPECTIVE JUROR:  In Monterey Park.

THE COURT:  Have you ever been to the sheriff's -- do you know if there is a sheriff's office in Monterey Park?

PROSPECTIVE JUROR:  There is.

THE COURT:  Have you been there?

PROSPECTIVE JUROR:  I have been there.

THE COURT:  As part of your job, did you have any interactions with deputies at the Los Angeles County Sheriff's Department?

PROSPECTIVE JUROR:  I have had some, yes.

THE COURT:  Anything about those interactions that cause you to have concerns about your ability to be fair and impartial to both sides?

PROSPECTIVE JUROR:  No.

THE COURT:  Any additional questions?

MR. HOCHMAN:  Yes, Your Honor.  With respect to your answer to Question 19 --

THE COURT:  Please address the Court if you have a question.

MR. HOCHMAN:  Oh, I'm sorry.

THE COURT:  What's the question you'd like to have asked?

MR. HOCHMAN:  The question dealing with the juror's answer to Question Number 19, he indicated he had heard some stories about the jails, and I would just ask the Court to inquire as to what those stories were.

THE COURT:  What sort of stories have you heard?

PROSPECTIVE JUROR:  I've heard there's -- crime happens inside the jails with the guards.  I've heard that they allow -- some of the drugs and cell phones that are used inside, they're responsible for that.  It's all hearsay, obviously, for me.  I don't know anybody personally who has told me, "I was the one who did X, Y, Z."

THE COURT:  Okay.  Can you put aside those stories

and judge the evidence in this case based on what you hear here?

PROSPECTIVE JUROR:  Yes, I believe so.

THE COURT:  Okay.  Anything else?

MR. FOX:  No, Your Honor.

THE COURT:  Anything else from the defense?

MR. HOCHMAN:  May I just haven one more moment, Your Honor?

THE COURT:  Yes.

MR. HOCHMAN:  No further questions, Your Honor.

THE COURT:  All right.  Sir, you can return to Courtroom 9-B and await further instructions.  And, again, I will caution you not to have any discussions with your fellow jurors, nor should you discuss what we talked about in here with your fellow jurors.

*(Prospective juror enters the courtroom.)*

THE COURT:  Good afternoon.

PROSPECTIVE JUROR:  Good afternoon.

THE COURT:  Could you give us the last five digits of your badge number, please.

PROSPECTIVE JUROR:  39167.

THE COURT:  Have you discussed this case with any of your fellow jurors?

PROSPECTIVE JUROR:  No, sir.

THE COURT:  Have you heard anything or read anything

about this case, including within the last 48 hours?

PROSPECTIVE JUROR:  No.  Certainly, not within the past 48 hours.

THE COURT:  Okay.  Have you had a chance to look at the Criminal Case Questionnaire?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Do have you any yes responses to any of those questions?

PROSPECTIVE JUROR:  Not -- yes.  Some, yes.

THE COURT:  Okay.  Could you give me those numbers, please.

PROSPECTIVE JUROR:  Yes.  I mean, there are a few that are soft yeses, I would say.

7 would be the first one.

Do you want me to just list all of them off?

THE COURT:  Yeah, if you could just give me the entire list.

PROSPECTIVE JUROR:  Okay.  10, 11, 12, 13, 15, 21, 22, 33, 36, and that's it.

THE COURT:  Okay.  Why don't we start with 7.

PROSPECTIVE JUROR:  Okay.

THE COURT:  If you could just elaborate on your response to Question 7.

PROSPECTIVE JUROR:  Yeah, I mean, I just felt I should mark that just as a response to kind of just taking in

all of the news that's been going on over the past few years. Just with all of the videos and shooting and whatnot, it's hard to not have a response to that, yeah.

THE COURT:  Anything that you've heard on the news during the last few years, does that concern you in any way about your ability to be fair and impartial to both sides?

PROSPECTIVE JUROR:  Not in regards to this question, no.

THE COURT:  Okay.  What about Question 10?  Can you tell us a little bit about that.

PROSPECTIVE JUROR:  Yes.  My father was an elected constable in Kentucky for a number of years during my youth, so as part of that, he was basically serving with police officers doing various -- you know, I wasn't given a briefing on what he was doing, but -- you know.

THE COURT:  Anything about the work that he did or your relationship with him that causes you to have any concerns about your ability to be fair and impartial to both sides?

PROSPECTIVE JUROR:  Not really.  If anything, just a deeper understanding of law enforcement, as they would frequently come over to our house for holidays and whatnot, so just getting to know them, yeah.

THE COURT:  Are you going to be able to judge the credibility of a law enforcement officer the same way you would that of any other witness?

PROSPECTIVE JUROR:  I believe so, yes.

THE COURT:  And what about Question 11?

PROSPECTIVE JUROR:  My dad has definitely made donations to the FOP, so, yeah.

THE COURT:  And Question 12?

PROSPECTIVE JUROR:  As part of what my dad was doing, he frequently went on with ride-alongs specifically with a lot of police officers.

THE COURT:  And Question 13?

PROSPECTIVE JUROR:  This was more just -- my brother and myself were stopped once in Kentucky.  We were driving and ended up -- we had a bunch of luggage and stuff with us.  We had been away for a weekend.  He's hearing impaired.  I guess the police officer thought he was under the influence of some sort of narcotic or something, so had us get out of the car, stand, you know, 50-feet separated or whatever and patted us down and searched all of the stuff that was in our vehicle, so that was an unpleasant and not -- the officer could certainly have been better about how he went about it, but all in all, it ended with a speeding ticket and nothing more than that, but --

THE COURT:  Can you put aside that experience and judge -- and be fair and impartial to both sides in this case?

PROSPECTIVE JUROR:  I would say so, yes.

THE COURT:  Question 15.

PROSPECTIVE JUROR:  Just, again, kind of back to the

first question just being aware of what's been going on over the past couple of years, all the videos that have been surfacing.  It's hard not to have strong opinions on that.

THE COURT:  Would you have any difficulty putting aside those feelings or opinions that you formulated such that it would be difficult for you to be fair and impartial to both sides in this case?

PROSPECTIVE JUROR:  I don't think it would be an issue.

THE COURT:  And Question 21?

PROSPECTIVE JUROR:  Yes.  Both my and my wife have made donations to the ACLU as well as the Southern Poverty Law Center.

THE COURT:  Okay.  There may be witnesses who may be affiliated with the ACLU who may be witnesses in this case.

Are you going to be able to judge their credibility the same way you would that of any other witness?

PROSPECTIVE JUROR:  I believe so, yes.

THE COURT:  And Question 22?

PROSPECTIVE JUROR:  Just in general, I've read up a lot on just the criminal justice system in the past between various classes and whatnot, and I do have strong feelings that there needs to be a lot of reform there.

THE COURT:  Okay.  Based on the reading that you've done, do you have any concerns about your ability to follow the

Court's instructions as to the law that applies in this case?

PROSPECTIVE JUROR:  No, Your Honor.

THE COURT:  And Question 33?

PROSPECTIVE JUROR:  Yeah.  I mean, just that I believe inmates should be treated as people.

THE COURT:  And Question 36?

PROSPECTIVE JUROR:  Yeah, just referencing my father having been a constable and received whatever training went along with that.

THE COURT:  Aside from what you've read recently, have you read anything having to do either with the Los Angeles County Sheriff's Department or the Men's Central Jail or the Twin Towers facility?

PROSPECTIVE JUROR:  If I have read anything in the past, I don't remember anything specifically.

THE COURT:  Okay.  Any additional questions?

MR. FOX:  Nothing from the government, Your Honor.

THE COURT:  Okay.

MR. HOCHMAN:  Your Honor, it's a follow-up on questions 7 and 15.  You asked about what he read and whether or not it had any specificity to the Los Angeles County Jail.  Also, if you would inquire as to whether or not he saw videos or news stories visually with respect to either the Men's Central Jail or the Twin Towers.

THE COURT:  Okay.  Have you seen any videos or news

stories that you recall?

PROSPECTIVE JUROR:  Not with the LA in particular, just, you know, the different shootings that have been around.

THE COURT:  Okay.  Anything else?

MR. HOCHMAN:  No, Your Honor.

THE COURT:  All right.  Sir, you can return to Courtroom 9-B.  Again, I just want to caution you not to discuss this case with your fellow jurors, and please don't discuss anything that we discussed in here.

PROSPECTIVE JUROR:  Certainly.  Thank you, Your Honor.

THE COURT:  Thank you.

*(Prospective juror enters the courtroom.)*

THE COURT:  Could you give us the last five digits of your badge number, please.

PROSPECTIVE JUROR:  Sure.  39719.

THE COURT:  Have you had any discussion with your fellow jurors about this case in the last couple days?

PROSPECTIVE JUROR:  None at all.

THE COURT:  Have you either seen, read or heard anything about this case, including in the last 48 hours?

PROSPECTIVE JUROR:  Not in the last 48 hours, no.

THE COURT:  Have you had a chance to look at the Criminal Case Questionnaire?

PROSPECTIVE JUROR:  This one?  Yes.

THE COURT:  Do you have any yes responses to any of those questions?

PROSPECTIVE JUROR:  I do.

THE COURT:  Okay.  Can you give us the numbers, please.

PROSPECTIVE JUROR:  Sure.  I answered yes to Number 2.

THE COURT:  Okay.  Any others?

PROSPECTIVE JUROR:  Yes.

THE COURT:  You can just give me all of them and we'll discuss them individually.

PROSPECTIVE JUROR:  Number 12, 17, 19 and 46.

THE COURT:  Why don't we start with Question 2.  If you could just elaborate on your answer.

PROSPECTIVE JUROR:  Yes.  I put yes because my mother and my little brother at the time, they were mugged -- they were robbed.  You know, they were walking down the street.  They were -- my mom's purse was taken, my social security card, things were -- happened to be in her purse, so -- she was mugged.

THE COURT:  When was this?

PROSPECTIVE JUROR:  This was a while ago.  More than five years ago, I would say.

THE COURT:  And where did it occur?

PROSPECTIVE JUROR:  In Rialto, City of Rialto.

THE COURT: Anything about that experience that causes you to have concerns about your ability to be fair and impartial to both sides?

PROSPECTIVE JUROR: No, I don't think so. It didn't personally happen to me, although it was my family.

THE COURT: Were the police called?

PROSPECTIVE JUROR: I don't know if they were called to the site, but I know that they filled out reports and they did speak to police.

THE COURT: Okay. Do you know which police agency they talked to?

PROSPECTIVE JUROR: I would assume Rialto PD, but I don't know which one or who.

THE COURT: Okay. Do you have any concerns about the way your mother's case was handled?

PROSPECTIVE JUROR: I personally don't know, so I can't answer yes or no. It was just kind of left at that.

THE COURT: Okay. And what about Question 12?

PROSPECTIVE JUROR: Number 12, I put yes. I'm a teacher, so --

Like I was saying, I'm a teacher so I have had contact with -- I put down, like, demonstrations, police officers coming onto campus, giving assemblies, things like that.

THE COURT: Okay. And what about Question 17?

PROSPECTIVE JUROR:  I put yes because I had -- before I was called, I had heard of the case.  I had seen it on the news, read online.

THE COURT:  Okay.  And is there anything in particular that you recall from seeing it either online or on the news?

PROSPECTIVE JUROR:  Not in particular, just the little blurbs they give on the news about the different charges and what the case was about.

THE COURT:  Are you going to be able to put aside whatever you might have heard or whatever you recall hearing and decide this case based solely on the evidence that you hear here in court?

PROSPECTIVE JUROR:  I think I can.

THE COURT:  Okay.  Is there any doubt in your mind?

PROSPECTIVE JUROR:  I don't know.  I don't think so. I mean, I have watched the news -- I mean, I watch the news all the time, so -- I don't know.  I think I can, though.

THE COURT:  One of the things that's important to both sides is to have jurors who can decide this case based entirely on what they hear here in court and to have jurors who can leave -- whatever they may have heard on the news, they can leave that outside and decide the case based on the witness testimony and based on the exhibits that are actually received into evidence.  Can you do that?

PROSPECTIVE JUROR:  I think so.  I mean, I have to be honest.  I do -- I had heard a lot about the case, and I have seen it on television.

THE COURT:  Okay.  Well, you know, a lot of people have seen things on television --

PROSPECTIVE JUROR:  Right.

THE COURT:  -- and there's nothing wrong with that.

What's important, though, is that people are able to put those things aside and make their decision not based on what they heard on television, but based on the testimony and the documents that they actually see here in court.

PROSPECTIVE JUROR:  Then, yes, I can.

THE COURT:  Okay.  So you can commit to both sides that you are going to be fair and impartial?

PROSPECTIVE JUROR:  Yes, I can.

THE COURT:  And Question 19?

PROSPECTIVE JUROR:  It was related in my mind to Number 17 that I had heard about it and knew something about it.

THE COURT:  And you don't -- as you sit here now, you don't recall any specifics about what you heard?

PROSPECTIVE JUROR:  No.  I mean, just general knowledge of what had happened.

THE COURT:  Okay.  And that general knowledge, is that consistent with the charges that I told you about?

PROSPECTIVE JUROR:  I had heard of the charges before your announcement, yes.

THE COURT:  Had you heard anything else --

PROSPECTIVE JUROR:  I knew --

THE COURT:  -- that you recall?

PROSPECTIVE JUROR:  I knew who he was and his position, charges.  One of the names stood out to me from the list that you had read of the people involved with the case.

THE COURT:  Okay.  And as you sit here right now, you think you can put aside what you've heard and decide the case based solely on the evidence you hear here in court?

PROSPECTIVE JUROR:  Yes, I can.

THE COURT:  Okay.  And Question 46?

PROSPECTIVE JUROR:  I put down yes because not only am I a full-time teacher, I'm also a grad student at night, and so I would need to access things like the web, and sometimes I go on teacher blogs and things like that for my classes.  One of my classes is part hybrid so I have no choice.  I have to check-in online, so I just erred on the side of caution.

THE COURT:  Okay.  Well, what that really means is is we want to have jurors avoid reading anything about the case online.

PROSPECTIVE JUROR:  Okay.

THE COURT:  Can you do that?

PROSPECTIVE JUROR:  Yes, I can avoid the case.

THE COURT: Okay. Any additional questions?

MR. FOX: Nothing from the government, Your Honor.

MR. HOCHMAN: Nothing from the defense, Your Honor.

THE COURT: All right. Thank you.

You can return to Courtroom 9-B. And we want to caution you, again, not to have any discussions with your fellow jurors about the case or about anything we talked about.

PROSPECTIVE JUROR: Okay. Thank you. Do you need this?

*(Prospective juror exits the courtroom.)*

THE COURT: All right. The juror who has a calendar conflict is 98891, so I'll excuse that juror at the end of the day.

MR. FOX: Yeah, last on the list, too, so it's unlikely we would get to her. That's the one with the medical appointment tomorrow or that's the --

THE COURT: No. I believe this is the one who checked her calendar and can't be here for two-and-a-half weeks.

MR. FOX: Thank you, Your Honor.

THE COURT: Now, the person with the doctor's appointment, are they still next door?

THE CLERK: Yes.

THE COURT: Okay. Let's bring them in, because it's after 2:00 now. I think they have an appointment at 3:00.

THE CLERK:  Tomorrow.

THE COURT:  Oh, it's for tomorrow.

MR. FOX:  Your Honor, I think we agreed to excuse that person anyway.  The husband with the medical appointment tomorrow?

THE COURT:  I think this is another one.

MR. FOX:  Oh.

(The Court and clerk confer off the record.)

THE COURT:  And then the other person with the medical appointment, that's for tomorrow with her husband, and we're going to excuse that person.

And do we have that number?

THE CLERK:  Yes.

THE COURT:  Somebody can just remind me at the end of the day.

(Prospective juror enters the courtroom.)

THE COURT:  Hi.  Can you give us the last five digits of your badge number, please.

PROSPECTIVE JUROR:  41194.

THE COURT:  Have you had occasion to have any discussions with any of your fellow jurors about this case over the last couple of days?

PROSPECTIVE JUROR:  No.

THE COURT:  And have you had occasion at all to look online about this case in the last couple days?

PROSPECTIVE JUROR:  No.

THE COURT:  Have you heard or read anything about the case?

PROSPECTIVE JUROR:  In the last couple days?  No.

THE COURT:  Have you had a chance to look at the Criminal Case Questionnaire?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Okay.  And do you have any yes answers to any of those questions?

PROSPECTIVE JUROR:  I only have one.

THE COURT:  Okay.  And which number?

PROSPECTIVE JUROR:  Number 2.

THE COURT:  Okay.  Have you heard anything about this case -- putting aside the last couple of days, have you heard anything about this case?

PROSPECTIVE JUROR:  Just in passing.  I haven't really -- too much about it.

THE COURT:  Okay.  Do you remember specifically what you heard?

PROSPECTIVE JUROR:  Not really.

THE COURT:  Okay.  And were there any of the names that you recall?

PROSPECTIVE JUROR:  Lee Baca is the only name.

THE COURT:  Okay.  Other than that, you don't have any specific recollection of anything that you heard?

PROSPECTIVE JUROR:  No.

THE COURT:  And Question 2, if you can elaborate on that.

PROSPECTIVE JUROR:  It asks if I have ever been a victim of a crime, and the answer is yes.  I was in an armed robbery, a suspect came in, held me at gunpoint, had me on the floor and then robbed the store that I was working at.  And then I had to, after that, go down to Parker Center and ID him in a line-up and then had to go to trial, and, thank goodness, they found him guilty.  That was it.

THE COURT:  When was that?

PROSPECTIVE JUROR:  Oh, it's been about 24 years ago.

THE COURT:  Okay.  And I take it the Los Angeles Police Department responded to that?

PROSPECTIVE JUROR:  It was actually a local -- I live in Glendora, and that's where it was at.

THE COURT:  Any concerns about the way that case was handled?

PROSPECTIVE JUROR:  No.

THE COURT:  And what you recall about this case, was that on the news?  Radio?  Something you read?

PROSPECTIVE JUROR:  All the above.

THE COURT:  Okay.  And as you sit here today, you don't have any specific recollections of what you might have heard?

PROSPECTIVE JUROR:  No.

THE COURT:  Okay.  Any additional questions?

MR. HOCHMAN:  No, Your Honor.

MR. FOX:  Your Honor, just further inquiry about the armed robbery given the nature of the informant in this case, please.

THE COURT:  Okay.  The store that you were working at was a retail sales --

PROSPECTIVE JUROR:  Yes.

THE COURT:  What was the name of the store?

PROSPECTIVE JUROR:  It was a little yogurt store.

THE COURT:  There may be testimony from an informant in this case who may have had a prior conviction, for example, for robbery.  Are you going to be able to put aside what happened to you and judge their testimony based on what you hear and see here in court --

PROSPECTIVE JUROR:  Yes.

THE COURT:  -- and based on following the Court's instructions?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Are you going to have any difficulty putting aside what happened to you?

PROSPECTIVE JUROR:  No.

THE COURT:  You can be fair and impartial to both sides?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Anything else?

MR. FOX:  No, Your Honor.

MR. HOCHMAN:  No, Your Honor.

THE COURT:  Okay.  You can go back to Courtroom 9-B.

And, again, I'd caution you not to discuss the case with your fellow jurors.

PROSPECTIVE JUROR:  Okay.

THE COURT:  And please don't discuss anything that we talked about with your fellow jurors.

PROSPECTIVE JUROR:  Okay.

(Prospective juror enters the courtroom.)

THE COURT:  Good afternoon.  Can you give us the last five digits of your badge number, please.

PROSPECTIVE JUROR:  It's 41326.

THE COURT:  Okay.  And if you could just hold that microphone up.

Have you talked to any of your fellow jurors about this case?

PROSPECTIVE JUROR:  No.

THE COURT:  Have you either read or heard anything about this case, including within the last 48 hours?

PROSPECTIVE JUROR:  No.

THE COURT:  Have you had a chance to look at the Criminal Case Questionnaire?

PROSPECTIVE JUROR:  Is it this one (indicating)?

THE COURT:  Yes.

PROSPECTIVE JUROR:  Yes.

THE COURT:  Do you have any yes answers to any of those questions?

PROSPECTIVE JUROR:  I think it was two of them.

THE COURT:  Okay.  Can you give me the numbers to those questions.

PROSPECTIVE JUROR:  It was for 2, 15 and 31.

THE COURT:  I'm sorry.  So it was 2, 15.  Any others?

PROSPECTIVE JUROR:  And 31.

THE COURT:  And 31.  Okay.  Why don't we start with Question Number 2.  You can tell us a little bit about that.

PROSPECTIVE JUROR:  I have -- I've been assaulted before out on the streets multiple times.

THE COURT:  Okay.

PROSPECTIVE JUROR:  And there wasn't really anything anyone could do because the -- they wouldn't know where to start to search for the person that did it.

THE COURT:  Okay.  When was this?

PROSPECTIVE JUROR:  A few years back.

THE COURT:  And did you contact the police?

PROSPECTIVE JUROR:  The first two times, yeah, but there wasn't really much they could do.

THE COURT:  Okay.  Do you remember what police agency

was involved?

PROSPECTIVE JUROR:  Not sure.

THE COURT:  Okay.  Where did this take place?

PROSPECTIVE JUROR:  In Pico Rivera.

THE COURT:  Okay.  Do you have any concerns about the way those cases were handled by the police?

PROSPECTIVE JUROR:  Not really.

THE COURT:  And how many times did this happen to you?

PROSPECTIVE JUROR:  I believe it was about four times.

THE COURT:  Okay.  On the first two times, they couldn't do anything about it.  What about the last two?

PROSPECTIVE JUROR:  I just didn't do anything about it.  I didn't contact anyone.

THE COURT:  Okay.  And all of this occurred in Pico Rivera?

PROSPECTIVE JUROR:  Yeah.

THE COURT:  And what about Question 15?

PROSPECTIVE JUROR:  Yeah, about the excessive force and civil rights violations.

THE COURT:  Um-hmm.

PROSPECTIVE JUROR:  Well, all I have to add to that is that I seen it happen and like, it really does happen.

That's all I have to say for that.

THE COURT:  Okay.  When you saw that happen, can you tell me a little bit about what you saw.

PROSPECTIVE JUROR:  When people aren't resisting and they still use, like, excessive force.

THE COURT:  And you've witnessed that?

PROSPECTIVE JUROR:  Um-hmm, a few times.

THE COURT:  Okay.  Where were you when you witnessed it?

PROSPECTIVE JUROR:  It was -- I was getting out of school.

THE COURT:  Okay.  And what city was that in?

PROSPECTIVE JUROR:  It's still in Pico -- Pico Rivera.

THE COURT:  And do you recall what police agency was involved in those incidents?

PROSPECTIVE JUROR:  I don't know.  I just -- I just passed by.  I didn't want to get involved in it.

THE COURT:  Okay.  Do you recall what color uniform they had on?

PROSPECTIVE JUROR:  It was like -- like a navy blue, I think, like a dark -- really dark blue.

THE COURT:  Okay.  In this case -- there may be evidence of abuse in this case by law enforcement officers. Are you going to be able to put aside what you've seen and judge this case based just on what you hear and see here in

court?

PROSPECTIVE JUROR:  To be honest, I'm not really sure.

THE COURT:  Okay.  So you'd have some difficulty putting aside what you've seen?

PROSPECTIVE JUROR:  Well, depending on the situation of the case.

THE COURT:  Well, one of the things we want to do is we want to get jurors who can decide -- make their decision about this case based on the witness's testimony and the documents that are to be received into evidence.  And we know that everybody has different life experiences that they bring to that task.

What we're trying to avoid is somebody coming in with a bias before they've seen or heard any testimony.  And so what we're asking people to do is to put aside things they might have seen out in the street and make their decision about the guilt or innocence of this defendant based on the testimony that's actually received here in court and the documents that are actually received in court.

Would you be able to do that or you would have difficulty based on what you've seen?

PROSPECTIVE JUROR:  I might have some difficulties.

THE COURT:  Okay.  I'm going to excuse this witness -- or this prospective juror.

All right.  Sir, you're excused.  You may return to the jury assembly room on the 1st floor.

PROSPECTIVE JUROR:  Okay.

THE COURT:  And you can tell them you've been excused.

PROSPECTIVE JUROR:  Okay.

*(Prospective juror enters the courtroom.)*

THE COURT:  Good afternoon.

PROSPECTIVE JUROR:  How you doing?

THE COURT:  Can you give us the last five digits of your badge number, please.

PROSPECTIVE JUROR:  It is 43236, Your Honor.

THE COURT:  All right.  Thank you.

Have you had discussions about this case with your fellow jurors in the last couple days?

PROSPECTIVE JUROR:  No, Your Honor.

THE COURT:  And have you seen or heard or read anything about this case, including within the last 48 hours?

PROSPECTIVE JUROR:  No, Your Honor.

THE COURT:  Have you had a chance to look at the Criminal Case Questionnaire?

PROSPECTIVE JUROR:  Yes, I did, Your Honor.

THE COURT:  Do you have any yes responses to any of those questions?

PROSPECTIVE JUROR:  Yes, I do, Your Honor.

THE COURT: Okay. Can you give me those numbers, please.

PROSPECTIVE JUROR: Number 1, Number 26 and Number 36, Your Honor.

THE COURT: Okay. Let's talk about Number 1. Can you tell us a little bit about that?

PROSPECTIVE JUROR: It's my older brother.

THE COURT: Okay. Was he arrested at some point?

PROSPECTIVE JUROR: Yes, Your Honor.

THE COURT: Okay. And what was he arrested for?

PROSPECTIVE JUROR: I'm not too sure, but I just wrote yes because -- I'm not sure if he was for a criminal offense or not, but I know he was arrested, Your Honor.

THE COURT: Do you recall what police agency was involved with that?

PROSPECTIVE JUROR: The LAPD, Your Honor.

THE COURT: And when was that?

PROSPECTIVE JUROR: Many years ago. I'm not sure exactly.

THE COURT: Do you have any concerns about the way his case was handled?

PROSPECTIVE JUROR: No.

THE COURT: Do you recall what the results were at all?

PROSPECTIVE JUROR: I think it was brought down to a

misdemeanor.

THE COURT:  Okay.  And you can put that aside and be fair and impartial to both sides in this case?

PROSPECTIVE JUROR:  Yes, Your Honor.

THE COURT:  And Question 26?

PROSPECTIVE JUROR:  Yes, Your Honor.

THE COURT:  Can you tell us a little bit about that.

PROSPECTIVE JUROR:  That's also relating to my older brother and -- Your Honor.

THE COURT:  Was he detained in the Los Angeles County Jails?

PROSPECTIVE JUROR:  Yes.  I believe the Twin Towers, Your Honor.

THE COURT:  And, again, when was that?

PROSPECTIVE JUROR:  I can't give you an exact date, Your Honor, but many years ago.

THE COURT:  Did you ever visit him while he was incarcerated?

PROSPECTIVE JUROR:  No, Your Honor.

THE COURT:  Did you ever have discussions with him about the conditions there or what he saw while he was there?

PROSPECTIVE JUROR:  No.  I rarely talked to him at that moment, Your Honor.

THE COURT:  And what about Question 36?

PROSPECTIVE JUROR:  36, Your Honor, I'm currently in

the Army Reserves, and then I did serve active duty time in the US Army, Your Honor.

THE COURT:  Okay.  What did you do in the Army?

PROSPECTIVE JUROR:  I fixed electronics, Your Honor.

THE COURT:  Okay.  Do you have any concerns about your ability to be a fair and impartial juror in this case?

PROSPECTIVE JUROR:  No, Your Honor.

THE COURT:  And you haven't seen, heard or read anything about this case?

PROSPECTIVE JUROR:  Way back when, when it I think first started, but ever since then, I have not read anything, Your Honor.

THE COURT:  And what did you recall seeing or hearing?

PROSPECTIVE JUROR:  What I recall, Your Honor, is just general information about the mistreatment of, I guess, inmates, and that's about all, Your Honor.

THE COURT:  Okay.  Do you have any specific recollection of any specifics that you might have heard?

PROSPECTIVE JUROR:  No.  No, Your Honor.

THE COURT:  And you can put that aside and judge this case based on the evidence that you see and hear here in court?

PROSPECTIVE JUROR:  Yes, Your Honor.

THE COURT:  Okay.  Any additional questions?

MR. FOX:  Nothing from the government, Your Honor.

MR. HOCHMAN:  Nothing from the defense, Your Honor.

THE COURT:  All right.  Sir, you may return to Courtroom 9-B.

PROSPECTIVE JUROR:  Yes, Your Honor.

THE COURT:  Please don't discuss this case with any of your fellow jurors, and please don't discuss what we talked about with your fellow jurors.

PROSPECTIVE JUROR:  Yes, Your Honor.

THE COURT:  Thank you.

*(Prospective juror enters the courtroom.)*

THE COURT:  Would you take that microphone and can you give us the last five digits of your badge number, please.

PROSPECTIVE JUROR:  43541.

THE COURT:  During the last 48 hours, have you heard or read anything about this case?

PROSPECTIVE JUROR:  No.

THE COURT:  Have you had any discussions with your fellow jurors or overheard them talking about this case?

PROSPECTIVE JUROR:  No, sir.

THE COURT:  Have you had a chance to look at the Criminal Case Questionnaire?

PROSPECTIVE JUROR:  Yes, sir.

THE COURT:  Do you have any yes -- or do you have any yes answers to any of those questions?

PROSPECTIVE JUROR:  Yes, sir.

THE COURT:  Okay.  Can you give me those numbers.

PROSPECTIVE JUROR:  1, 2, 4, 10, 11, 12, 13, 21, 26, 31, 36.  That is all.

THE COURT:  Okay.  Why don't we start with Question 1.

PROSPECTIVE JUROR:  Okay.

THE COURT:  Can you elaborate on that?

PROSPECTIVE JUROR:  Yes.  I was arrested for domestic violence and it basically ended up being a misdemeanor domestic violence.

THE COURT:  Okay.  When was that?

PROSPECTIVE JUROR:  2007.

THE COURT:  Okay.  And do you recall what police agency was involved?

PROSPECTIVE JUROR:  No, but just because I was -- I wasn't arrested at that time.  I just got a letter in the mail and had to come to court.

THE COURT:  Okay.  Anything about that experience that causes you to have any concerns about your ability to be fair and impartial to both sides in this case?

PROSPECTIVE JUROR:  No.

THE COURT:  Do you have any concerns about the way your case was handled?

PROSPECTIVE JUROR:  No.

THE COURT:  And Question 2, can you tell us a little

bit about that.

PROSPECTIVE JUROR:  Yes.  I had a friend in high school that was -- had a battery rape.  She was -- she was beat up and raped.

THE COURT:  What city was that?  Where was that?

PROSPECTIVE JUROR:  We went to school in Lynwood.

THE COURT:  Were the police called in this case?

PROSPECTIVE JUROR:  Yes.  It was the sheriffs.

THE COURT:  And roughly how long ago was that?

PROSPECTIVE JUROR:  That was in 1983, roughly.

THE COURT:  Any concerns about the way her case was handled?

PROSPECTIVE JUROR:  No.

THE COURT:  And what about Question 4?

PROSPECTIVE JUROR:  Yes.  I -- well, I have a sister-in-law, but -- that's a lawyer, but it's -- she's in Tennessee.

THE COURT:  Do you know what type of law she practices?

PROSPECTIVE JUROR:  No, because she's changed several times, so, no.

THE COURT:  Do you ever talk to her about the work she does?

PROSPECTIVE JUROR:  No.

THE COURT:  And what about Question 10?

PROSPECTIVE JUROR:  That's a yes.  I, myself, as a LEA for county environmental health, and I have several friends that are sheriffs and police as well.

THE COURT:  The friends that you have as sheriffs, do you know where they work?

PROSPECTIVE JUROR:  Yes.

THE COURT:  And where do they work?

PROSPECTIVE JUROR:  One in Compton.  The other, I believe he's in East LA.

THE COURT:  Have you ever had discussions with them about LA County Jail, Twin Towers, Men's Central Jail?

PROSPECTIVE JUROR:  Not in any detail, no.

THE COURT:  Okay.  There may be law enforcement officers who may be witnesses in this case.  Are you going to be able to judge their credibility and their believability in the same way you would that of any other witness?

PROSPECTIVE JUROR:  Yes, I believe so.

THE COURT:  And Question 11?

PROSPECTIVE JUROR:  My dad.  My dad used to -- it was the -- I think it was LA City police, he would give an annual donation-type thing.

THE COURT:  Okay.  And Question 12?

PROSPECTIVE JUROR:  Again, that would be myself.  I have done several joint task force with sheriffs.

THE COURT:  Okay.  What was the purpose of the task

force?

PROSPECTIVE JUROR:  We were -- they were in Lancaster, and so it was meth labs that we were dealing with.

THE COURT:  Okay.  When was the last time you did that?

PROSPECTIVE JUROR:  That was -- that was probably 15 years ago.

THE COURT:  And Question 13?

PROSPECTIVE JUROR:  That would be yes.  Again, myself, in high school, basically was held at gunpoint by Lynwood sheriffs, and -- but then they let me and a few of my friends let go and said it was a routine stop.

THE COURT:  Okay.  Would you be able to put that aside and judge this case based just on the evidence that you hear here in court?

PROSPECTIVE JUROR:  Yes.  It was several years ago.

THE COURT:  And Question 21?

PROSPECTIVE JUROR:  Again, yes, my dad, the contributions to the NAACP.

THE COURT:  And what about Question 26?

PROSPECTIVE JUROR:  26.  Well, yes, again, that was me for my case.

THE COURT:  Okay.  So you actually spent some time in one of the County facilities?

PROSPECTIVE JUROR:  Actually, it was just in the

Lancaster jail.

THE COURT:  Okay.

PROSPECTIVE JUROR:  So I never had to come down to downtown or anything.

THE COURT:  Okay.  And Question 31?

PROSPECTIVE JUROR:  Yes, I do think that suspects should be told they're being investigated.

THE COURT:  And what do you do for a living?

PROSPECTIVE JUROR:  Work LA County, LEA, for environmental health section of Los Angeles County.

THE COURT:  You understand that the police sometimes use undercover officers and informants?

PROSPECTIVE JUROR:  Yes.

THE COURT:  And do you have an issue with the use of either undercover agents or informants by the police?

PROSPECTIVE JUROR:  No, I don't.

THE COURT:  And Question 36?

PROSPECTIVE JUROR:  Just with reference to myself again, so I'm an LEA officer.

THE COURT:  So with regard to the domestic violence issue years ago, you can put that aside and be fair and impartial to both sides in this case?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Any additional questions?

MR. HOCHMAN:  Yes, Your Honor.  If you could inquire

what an LEA is.

PROSPECTIVE JUROR:  Oh, legal enforcement agent.  We are not peace officers, but we enforce the laws.

MR. HOCHMAN:  All right.  And then if you could also inquire, Your Honor, with the -- follow up on Question 13, when the prospective juror was held at gunpoint by Lynwood sheriffs, what were the circumstances surrounding that.

THE COURT:  Okay.

PROSPECTIVE JUROR:  Me and -- it was four of us in a car.  We were leaving football practice.  We had on football uniforms.  Basically, we were -- I was in the back.  We were driving, crossing the Fernwood railroad tracks and stopped at gunpoint, told to get out the car, lay on the ground.

THE COURT:  Okay.  Anything from the government?

MR. FOX:  Your Honor, yes.  If you wouldn't mind following up on Question 31.

Obviously, this potential juror has law enforcement experience and does raids where -- I think he said they raid some meth labs and things like that so, and I believe it's undercover.  So I guess the follow-up is when does he believe suspects in criminal investigations should be told they are being investigated.  Just a little follow-up there, please.

THE COURT:  Fine.  Question 31.

PROSPECTIVE JUROR:  When you say when should they be told --

THE COURT:  Well, the question was asked do you believe suspects in criminal investigations should be told they're being investigated, and so -- and you answered, I guess, yes.

PROSPECTIVE JUROR:  Yes.  Well, my thought is that if at any point that they're contacted by law enforcement, I feel that they should be -- they should know why they're being -- you know, why the law has been enforced against them.  So I guess at that point, that's when they should know that they're being investigated, you know.

THE COURT:  In other words, if a law enforcement officer stops them --

PROSPECTIVE JUROR:  Correct.

THE COURT:  -- the officer should tell them why?

PROSPECTIVE JUROR:  Yes, sir.

THE COURT:  Okay.  As opposed to if it's an undercover narcotics investigation --

PROSPECTIVE JUROR:  Well, no, no.  Because if it's undercover, then that's just it.  It's undercover.  They're not going to have any knowledge and no way for them to have any knowledge, I don't believe.

THE COURT:  Okay.

MR. FOX:  He's answered the question.  Thank you, Your Honor.  No more questions.

THE COURT:  Okay.  Anything else?

MR. HOCHMAN:  No, Your Honor.

MR. FOX:  Nothing.

THE COURT:  Okay.  You can return to Courtroom 9-B. And please don't discuss this case with your fellow jurors, and please don't discuss anything that we've talked about with your fellow jurors.

PROSPECTIVE JUROR:  Yes, sir.

THE COURT:  Thank you.

*(Prospective juror enters the courtroom.)*

THE COURT:  Good afternoon.

PROSPECTIVE JUROR:  Hi.

THE COURT:  Would you give us the last five digits of your badge number, please.

PROSPECTIVE JUROR:  Sure.  It's 44861.

THE COURT:  Okay.  And have you had any occasion in the last couple days to discuss this case with your fellow jurors?

PROSPECTIVE JUROR:  No, I have not.

THE COURT:  Have you heard anything or read anything about this case in the last 48 hours?

PROSPECTIVE JUROR:  No, I have not.

THE COURT:  Putting aside the last 48 hours, have you read or heard anything about this case?

PROSPECTIVE JUROR:  I heard a few weeks, months ago that he was being tried for something.  I just really never

paid attention.

THE COURT:  Okay.  Do you remember anything of the specifics at all of what you heard?

PROSPECTIVE JUROR:  No.

THE COURT:  Have you had occasion to look at the Criminal Case Questionnaire?

PROSPECTIVE JUROR:  Yes.

THE COURT:  And do you have any yes responses to any of those questions?

PROSPECTIVE JUROR:  I do.

THE COURT:  Okay.  Can you give me the numbers, please.

PROSPECTIVE JUROR:  Number 1, 2, 10, 13, 20, 27, 36.

THE COURT:  Okay.  Why don't we start with Number 1.

PROSPECTIVE JUROR:  Sure.  It was for drug trafficking.

THE COURT:  Okay.  And did that pertain to you or someone else?

PROSPECTIVE JUROR:  No, it was my cousin.

THE COURT:  Okay.  And when was that?

PROSPECTIVE JUROR:  It was over ten years ago.  It was two family members.

THE COURT:  Okay.  Do you recall what police agency was involved?

PROSPECTIVE JUROR:  No, I don't.

THE COURT:  Were you particularly close to these two family members?

PROSPECTIVE JUROR:  No.

THE COURT:  Do you know what the ultimate disposition was?

PROSPECTIVE JUROR:  I know they served a couple years in prison.

THE COURT:  Okay.  Did you ever visit them while they were serving their time?

PROSPECTIVE JUROR:  No, I didn't.

THE COURT:  And where was -- where was that when that occurred?  What city were they at?

PROSPECTIVE JUROR:  I'm not sure.

THE COURT:  Okay.  And what about Question 2?

PROSPECTIVE JUROR:  2, well, it was for my cousins as well, the drug trafficking case.

THE COURT:  Okay.  Question 2 says, "Have you or any member of your family ever been a victim of a crime?"

PROSPECTIVE JUROR:  Oh, no.  I misread it.  Sorry.

THE COURT:  That's okay.

So did you have a response to Question 2?

PROSPECTIVE JUROR:  It's a no.

THE COURT:  Okay.  And what about 10.

PROSPECTIVE JUROR:  Yes.  My cousin is a sheriff for LA County.

THE COURT:  Okay.  And where does that person work?

PROSPECTIVE JUROR:  I believe he works, like, in the Montebello.  You know, honestly I don't know.  He's just a sheriff.

THE COURT:  Okay.  How long has he been working for the sheriff's department?  Do you know?

PROSPECTIVE JUROR:  About a year or two.

THE COURT:  Okay.  And are you close to that cousin?

PROSPECTIVE JUROR:  No.

THE COURT:  And Question 13.

PROSPECTIVE JUROR:  For 13, it was just my mom.

There was one, say, street vendor in front of her home, and a law enforcement official came and took whatever they had -- whatever they were selling.  And they went to my mom's lawn and they dumped everything in her trash can without even asking to go in.  That's about it.

THE COURT:  Can you put that aside and be fair and impartial to both sides in this case?

PROSPECTIVE JUROR:  Yes.

THE COURT:  And Question 20?

PROSPECTIVE JUROR:  That would just be my cousin who's a sheriff.

THE COURT:  Okay.  And 27?

PROSPECTIVE JUROR:  I just think that when people are recorded, they should just be told.

THE COURT:  Okay.  Sometimes police use either informants or undercover agents and they may be wearing a wire.

Do you have an issue with the police using either informants or undercover agents who are recording conversations?

PROSPECTIVE JUROR:  I mean, if there's a reason for them to do that, then I would say that's fine.

THE COURT:  Okay.  And so you're --

PROSPECTIVE JUROR:  I guess -- I guess where I'm coming from is because my background is in human resources, so, you know, we always let employees know whether or not we are going to be recording them.

THE COURT:  Sure.

PROSPECTIVE JUROR:  It might be different with law enforcement.

THE COURT:  Okay.  And what about 36?

PROSPECTIVE JUROR:  Yeah, my cousin who is a sheriff.

THE COURT:  Any additional questions?

MR. HOCHMAN:  Just briefly, Your Honor.  With respect to the cousin who is a sheriff, whether or not the cousin ever served in the Los Angeles County Jail system and were there any discussions about it.

THE COURT:  Do you know if your cousin ever worked in either the Twin Towers facility or the Men's Central Jail?

PROSPECTIVE JUROR:  I think he did.

THE COURT: Okay. Did you ever have any discussions with him about when he worked in the jails?

PROSPECTIVE JUROR: If we did, I don't remember. I mean, yeah. I'm sorry.

THE COURT: That's okay. Did you ever have any discussions with that cousin about the work that he does?

PROSPECTIVE JUROR: No, not really.

THE COURT: Okay. Anything else?

MR. FOX: No, Your Honor.

MR. HOCHMAN: No, Your Honor.

THE COURT: All right. You can return to the courtroom 9-B. Please don't discuss this case with your fellow jurors, and please don't discuss anything that we talked about with your fellow jurors. Thank you.

(Prospective juror exits the courtroom.)

THE COURT: Just wait one second.

(Prospective juror enters the courtroom.)

THE COURT: Good afternoon.

PROSPECTIVE JUROR: Good afternoon, Your Honor.

THE COURT: Could you give us the last five digits of your badge number, please.

PROSPECTIVE JUROR: 45161.

THE COURT: And during the last couple days, have you had any occasions to discuss this case with your fellow jurors?

PROSPECTIVE JUROR: No.

THE COURT:  Have you either read or heard anything about this case during the last 48 hours?

PROSPECTIVE JUROR:  No.

THE COURT:  Have you had a chance to look at the Criminal Case Questionnaire?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Do you have any yes responses to any of those questions?

PROSPECTIVE JUROR:  Only the one about military training.  My husband served in the Army about 48 years ago.

THE COURT:  Do you know what he did in the military?

PROSPECTIVE JUROR:  He served in Vietnam.  He was in the air -- I don't know.

THE COURT:  Okay.

PROSPECTIVE JUROR:  Before I met him.

THE COURT:  Have you heard or read anything about this case?

PROSPECTIVE JUROR:  So -- not any of the evidence or anything else.  I'm aware of Mr. Baca being charged, and that's pretty much it.  Last year was an election year, so I didn't listen too much to the local news.  I was more into the national and the world news.

THE COURT:  Okay.  Do you have any recollection of any specifics that you've heard about the case?

PROSPECTIVE JUROR:  Only in that one question where

it says what he's charged with.  I haven't heard any specifics at all.

THE COURT:  And can you put aside anything that you might have heard and decide this case based only on the evidence?

PROSPECTIVE JUROR:  Absolutely, yes.

THE COURT:  Anything additional?

MR. FOX:  Nothing from the government.

MR. HOCHMAN:  Nothing from the defense, Your Honor.

THE COURT:  All right.  If you could return to Courtroom 9-B.  And, again, please do not discuss the case with your fellow jurors, and don't discuss anything that we've talked about with your fellow jurors.

PROSPECTIVE JUROR:  Will do.  Thank you.

THE COURT:  Thank you.

PROSPECTIVE JUROR:  Thank you.

THE COURT:  And let's let her out, and let's just hold on a minute.

Okay.  We're going to take a short break.  Why don't we try and limit it to 15 minutes.

And my count now is 32, and I think officially the number is 36.  We may want to put in a couple of extra just in the off chance that there's a problem.

MR. FOX:  Yes, Your Honor.  We'd recommend 40 just in case something happens, especially since there might be an

overnight before we're done with the jury.  So something could happen in the next 12 hours or 15 hours.

THE COURT:  That's fine.

MR. HOCHMAN:  Agreed, Your Honor.

THE COURT:  Okay.  We'll see everybody in about 15 minutes.

THE CLERK:  All rise.  This court is now in recess.

*(Recess taken 3:02 to 3:16 P.M.)*

THE COURT:  Just a couple of housekeeping matters.

It's fine.  We'll go ahead and select 40 people.

My present plan is to then read off additional five or ten numbers, so on the off chance that we would lose some people overnight for -- unexpectedly, if need be, we could bring those people in and qualify them for cause.

If we don't need them, then we can let those people go in the morning -- let those five or ten go in the morning and then start with jury -- commence with the jury selection.

MR. FOX:  And, Your Honor, the plan for the schedule tomorrow, will we go until 5:00 or are we going to go to 1:30 tomorrow?

THE COURT:  I'm inclined to go until 5:00 tomorrow. And right now my current thinking is to probably go on Monday and we'd go from 8:00 to 1:30 on Monday unless somebody's got a real problem.

MR. FOX:  That's fine with the government.

MR. HOCHMAN:  The only problem I had, Your Honor, is actually tomorrow, if there's a way to end at about 4 o'clock as opposed to 5 o'clock because I set up a multi-counsel meeting with the anticipation we'd probably only be going to 1:30 and set it up at 4 o'clock so I'd have enough buffer.  If that's possible.

THE COURT:  Okay.  Well, let's see how we're doing.

MR. HOCHMAN:  I mean, if I have to move the meeting, I'll just tell them I won't be there, but if I can keep it, that would be appreciated, Your Honor.

THE COURT:  Okay.  And do you have estimates for your opening statements?

MR. FOX:  I think that ours will be about 90 minutes.

THE COURT:  Okay.

MR. HOCHMAN:  Approximately the same, Your Honor.

THE COURT:  Okay.

MR. HOCHMAN:  We'll try and come in a little under that, but approximately that.

THE COURT:  Okay.  Anything else?

MR. FOX:  We may have just missed this juror.  I'm just trying to, for my own records, figure out if we already struck him or her, but 44673 was not called in order, so --

THE COURT:  I believe that juror is absent.

MR. FOX:  Thank you.

So should we consider that juror stricken at this

point?

THE COURT:  Yes.

Okay.  Let's bring the next one in and we'll resume.

(Prospective juror enters the courtroom.)

THE COURT:  Good afternoon.  Would you give us the last five digits of your badge number, please.

PROSPECTIVE JUROR:  47161.

THE COURT:  And in the last couple days, have you had occasion to talk to any of your fellow jurors about this case?

PROSPECTIVE JUROR:  No.

THE COURT:  And have you either heard or read anything about this case, including within the last 48 hours?

PROSPECTIVE JUROR:  Only what I heard you talk about, and I had heard something when it happened, but nothing since then.

THE COURT:  Okay.  Have you had a chance to look at the Criminal Case Questionnaire?

PROSPECTIVE JUROR:  This (indicating)?

THE COURT:  Yes.

PROSPECTIVE JUROR:  Yes.

THE COURT:  And do you have any yes answers to any of those questions?

PROSPECTIVE JUROR:  I have a really close friend who is an LAPD officer.

THE COURT:  Can you first give me the numbers.

PROSPECTIVE JUROR:  Oh, sorry.  Question 10.

THE COURT:  Okay.

PROSPECTIVE JUROR:  So I have a close friend who is an LAPD officer, and another one, who is like a brother, but he's in Forth Worth Police Department, Texas.

THE COURT:  Okay.

PROSPECTIVE JUROR:  Number 11, my mother gives to the police department charitably.

THE COURT:  Is there a particular police department that she gives to?

PROSPECTIVE JUROR:  No.  It's -- I can't remember which one.  I just remember she gives -- I do her taxes.  I can't remember which one it is.

THE COURT:  Okay.

PROSPECTIVE JUROR:  And I -- on Number 12, I have gone on a ride-along with the officer in Forth Worth, and it was in Forth Worth.

THE COURT:  Okay.

PROSPECTIVE JUROR:  Number 17, I did hear about this, probably briefly heard about it, so it was in my mind when I came in and I recognized what it was.

THE COURT:  Can you tell us what you heard?

PROSPECTIVE JUROR:  Just like a cover-up, and it's -- it's vague because it just kind of went in one ear and out the other.

THE COURT:  Okay.  And how did you hear about it? Was it something you read?  Something you heard on TV?

PROSPECTIVE JUROR:  Just -- yeah.  It wouldn't have been me watching the news, because I don't.  It would have been my mother or my friends talking about it, and I live in Santa Clarita which is all sheriffs, and, so --

THE COURT:  Okay --

PROSPECTIVE JUROR:  Predominant.

THE COURT:  But you don't recall anything specific that you heard?

PROSPECTIVE JUROR:  No.

THE COURT:  And would you have any difficulty putting aside anything that you heard in deciding this case based on the evidence that you hear here in the courtroom?

PROSPECTIVE JUROR:  The only thing I wonder, and I don't know either way, is just corruption in law enforcement, so my thoughts on that.  But if there's evidence for or against, I could go based on that.

THE COURT:  Okay.  Do you have opinions or feelings about corruption in law enforcement?

PROSPECTIVE JUROR:  I just -- if there's nothing based in fact, it's just subjective sheriff's department and just in general the people that -- it's like a good boys club. It's, you know, I pat your back, you pat mine.  That's what we see, so --

THE COURT:  Okay.  Can you put aside that feeling and judge this case based solely on the evidence you hear here in court?

PROSPECTIVE JUROR:  I think I could.  I understand I have that.

THE COURT:  Okay.  Do you have any doubts in your mind about your ability to do that?

PROSPECTIVE JUROR:  It would be based on the evidence.  It would have to be based on the evidence.

THE COURT:  What would have to be based on the evidence?

PROSPECTIVE JUROR:  Well, I'd have to base it on the evidence.  I'd have to put it aside.  I could probably do that.

THE COURT:  Well, one of the things that we need each of the prospective jurors to do is to be able to commit to deciding this case based on the testimony that they hear here in this courtroom and based on the documents that are actually received into evidence.  And so can you commit to doing that?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Is there any doubt?

PROSPECTIVE JUROR:  I'll go based on the evidence.

THE COURT:  Okay.  Any other yes responses to any of the other questions?

PROSPECTIVE JUROR:  There was one.  Number 46, I don't really pay attention to the news, so -- but I am an IT

worker, so it will be -- I'll have to do some work after hours so it will be hard to stay away from internet or research tools or -- but I won't be looking for news.

THE COURT:  Okay.  Well, one of the things that we want people to do and what that question really gets to is we want to have people avoid going onto the internet to read blogs about the case or to read anything about the case.

PROSPECTIVE JUROR:  Yeah, that I won't do.

THE COURT:  Okay.  Any other yes responses to any of the other questions?

PROSPECTIVE JUROR:  No.

THE COURT:  Did you have a family member or anyone close to you that was in law enforcement?

PROSPECTIVE JUROR:  Not a family member, no.

THE COURT:  Okay.  That was just --

PROSPECTIVE JUROR:  Grandfather, but I don't even know the man.

THE COURT:  You had a friend, though, that was in law enforcement?

PROSPECTIVE JUROR:  Yeah.  Two close friends, yeah.

THE COURT:  Okay.  And one was in a department in Texas?

PROSPECTIVE JUROR:  Yeah, Forth Worth.

THE COURT:  Okay.  And the other one was where?

PROSPECTIVE JUROR:  LAPD.

THE COURT:  And do you know what they do with LAPD?

PROSPECTIVE JUROR:  Just traffic now.  She's doing a desk job because she got injured.

THE COURT:  Okay.  Any additional questions?

MR. FOX:  Yes, Your Honor.  The prospective juror mentioned, I believe, that she was with her mother and just would like to know age of her mother, whether she cares for her mother, those type of issues.

PROSPECTIVE JUROR:  My mother is 82, and she's pretty independent still.  So unless something happens to her, I'm not taking care of her.  I am watching for her, but, yes.

MR. FOX:  Thank you, Your Honor.  Nothing else.

MR. HOCHMAN:  And just brief follow up on Question 17.  The prospective juror indicated she lived in Santa Clarita where -- she said that's where a lot of sheriffs live, and as a follow-up on that and Question 10 on whether or not any of the sheriffs she lives in Santa Clarita with are close personal friends.

PROSPECTIVE JUROR:  No.  And it wasn't a reference to them living there, it was in reference to the whole town is sheriffs.  There is no LAPD out there as a -- all of the officers are sheriffs, but I don't know anyone close there that's a sheriff.

THE COURT:  Okay.  Anything else?

MR. FOX:  Not from the government.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

MR. HOCHMAN:  Nothing from the defense, Your Honor.

THE COURT:  All right.  You can return to Courtroom 9-B, and I want to caution you not to discuss this case with your fellow jurors or anything that we've talked about.

(Prospective juror exits the courtroom.)

THE COURT:  I assume everybody passed for cause on this?

MR. FOX:  Yes, Your Honor.

MR. HOCHMAN:  Yes, Your Honor.

(Prospective juror enters the courtroom.)

THE COURT:  Good afternoon.

PROSPECTIVE JUROR:  Good afternoon.

THE COURT:  Could you give us the last five digits of your badge number.

PROSPECTIVE JUROR:  48037.

THE COURT:  And have you discussed this case with your fellow jurors in the last couple days?

PROSPECTIVE JUROR:  No.

THE COURT:  Have you read or heard anything about this case in the last 48 hours?

PROSPECTIVE JUROR:  No.

THE COURT:  Have you had a chance to look at the Criminal Case Questionnaire?

PROSPECTIVE JUROR:  Yes, I did.

THE COURT:  Do you have any yes responses to any of

those questions?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Can you give me the numbers.

PROSPECTIVE JUROR:  Do you need the numbers?

THE COURT:  Yeah, if you would give me all the numbers.

PROSPECTIVE JUROR:  Okay.

*(Phone ringing.)*

PROSPECTIVE JUROR:  I remind myself.  That's a reminder.  Okay.  Sorry for that.

THE COURT:  That's okay.

PROSPECTIVE JUROR:  Number 31.

THE COURT:  I'm sorry.  Which number?

PROSPECTIVE JUROR:  31.

THE COURT:  31.  Okay.  Any others?

PROSPECTIVE JUROR:  32.

THE COURT:  Okay.

PROSPECTIVE JUROR:  And that's the two question I answer yes.  And on Number 39, I am a little concerned about my language ability for understanding the other people's -- you know, I may able [sic] to express myself because I've been working a little bit in the states, but sometimes to listen, especially some attorney may speak very fast, I may not able to understanding all of that because that's not my mother language.

THE COURT:  Right.

PROSPECTIVE JUROR:  So that's a little concern, so I didn't answer here.

THE COURT:  Okay.  Let's talk about Number 31.

PROSPECTIVE JUROR:  Number 31?

THE COURT:  Uh-huh.

PROSPECTIVE JUROR:  Okay.  What --

THE COURT:  Can you elaborate on your answer to that question?  Question 31, I assumed you answered yes to.

PROSPECTIVE JUROR:  (Reading).

I do believe they have the right to know.

THE COURT:  Okay.

PROSPECTIVE JUROR:  And they need to prove.  You know, if they feel they are not guilty, they -- so they have the chance to prove themself.  That's how I feel.

THE COURT:  Okay.  Law enforcement sometimes are able to use informants or undercover agents, and do you know what an informant or an undercover agent is?

PROSPECTIVE JUROR:  Undercover, yes, I understand that.

THE COURT:  Do you have any objection to law enforcement using undercover agents or informants?

PROSPECTIVE JUROR:  Do I have what?

THE COURT:  Do you have any strong feelings --

PROSPECTIVE JUROR:  Strong feelings.

THE COURT:  -- about the government's use of informants or undercover agents?

PROSPECTIVE JUROR:  I don't -- I think as long as they are willing to accept this challenge to be their job as undercover, and that should be fine, if they are not being forced to do that.

THE COURT:  Okay.  And if the Court were to instruct you that law enforcement agents may use informants and undercover agents, do you have any reservations about following the Court's instruction?

PROSPECTIVE JUROR:  You mean if the Court agree to use that?

THE COURT:  If the Court instructed the jury -- if you were sitting on the jury and the Court instructed the jury that it was permissible for the government to use an informant or an undercover agent, would you be able to follow that instruction?

PROSPECTIVE JUROR:  Me?  I don't know.

THE COURT:  Do you understand the question?

PROSPECTIVE JUROR:  Yes, I know, but I think -- I need to think about it for a while and then I can give answer.  But if you need answer right now, I don't think I will make decision at this moment.

THE COURT:  Okay.  Let's talk about 32.

PROSPECTIVE JUROR:  My answer -- oh, sorry.  I gave

you wrong.  My answer yes is on 33, not the 32.  Sorry.

THE COURT:  Okay.  And can you tell me about your response to Question 33?

PROSPECTIVE JUROR:  I think everyone has the right -- the basic right.  Everyone is equal.

THE COURT:  Okay.  What do you do for a living?

PROSPECTIVE JUROR:  I retired three years ago, but before that I working for a company, import some textile item from Asia.

THE COURT:  Okay.  And what did you do for the company?

PROSPECTIVE JUROR:  I'm the director for the import department.

THE COURT:  Okay.

PROSPECTIVE JUROR:  But -- even my English is not very good, but that's my position.

THE COURT:  Okay.  And how many employees did the company have?

PROSPECTIVE JUROR:  I think at that time about 140 -- 140.

THE COURT:  And where was the company located?

PROSPECTIVE JUROR:  They moved to downtown recently I think after I retired.  It was in the -- it was near I think at that -- in which city?  It's Alameda Street but I forgot the city.

THE COURT:  Were you able to read and understand each of these questions?

PROSPECTIVE JUROR:  Yes.

THE COURT:  And were you able to follow along when I described what this case was about?

PROSPECTIVE JUROR:  Yes.  When you -- yes, I understand what you described, yes.

THE COURT:  And when you indicated that sometimes you might have difficulty with a lawyer who is talking fast, have you experienced that kind of difficulty before?

PROSPECTIVE JUROR:  I never been choosing [sic] as a jury, okay, but I watching TV.  They speak very fast.  And without subtitle, I'm not really able to follow what they are questioning and their testimony.  So this is really my great concern, and especially English not my mother language.  I retired, so I don't have chance to improve this ability like when I'm working.  So this is my concern.

THE COURT:  Okay.

PROSPECTIVE JUROR:  I don't want to make wrong judgment.

THE COURT:  Okay.  Let me see counsel at sidebar.

*(Proceedings held at sidebar under seal 3:38 to 3:38 P.M.)*

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*(The following proceedings were held in open court.)*

THE COURT:  Because of the concern you've expressed about English as your first language, we're going to excuse you.  And you can go down to the 1st floor, and tell her that you've been excused.

PROSPECTIVE JUROR:  1st floor?  Okay.  Go down?

THE COURT:  Um-hmm.

PROSPECTIVE JUROR:  Okay.

THE COURT:  Do have any belongings that you left in the other courtroom?

PROSPECTIVE JUROR:  No.

THE COURT:  Okay.  So you can go out that front door and just take the -- make a left turn and you can take the elevator down to the 1st floor --

PROSPECTIVE JUROR:  Okay.

THE COURT:  -- to the jury assembly room.

PROSPECTIVE JUROR:  Okay.  Thank you so much.

THE COURT:  Thank you.

*(Prospective juror enters the courtroom.)*

THE COURT:  Good afternoon.

PROSPECTIVE JUROR:  Good afternoon.

THE COURT:  Could you give me the last five digits of

your badge number.

PROSPECTIVE JUROR:  49829.

THE COURT:  And have you discussed this case with any of your fellow jurors in the last couple days?

PROSPECTIVE JUROR:  No.

THE COURT:  Have you read or heard anything about this case during the last 48 hours?

PROSPECTIVE JUROR:  No.

THE COURT:  Have you had a chance to look at the Criminal Case Questionnaire?

PROSPECTIVE JUROR:  The questionnaire?  Yes, I looked at it.

THE COURT:  Do you have any yes responses to any of those questions?

PROSPECTIVE JUROR:  No, no yes responses.

THE COURT:  Okay.  Have you heard -- putting aside the last 48 hours, have you heard anything about this case?

PROSPECTIVE JUROR:  Not really.  I usually wait until about 15 minutes after the news comes on to watch it so I don't hear all that.

THE COURT:  Okay.  All right.  Well, thank you very much.  And you can return to Courtroom 9-B.

PROSPECTIVE JUROR:  Okay.

THE COURT:  And then we will -- I'm going to ask that you not discuss this case with your fellow jurors.

PROSPECTIVE JUROR:  Okay.

THE COURT:  And please don't discuss anything that we talked about.

PROSPECTIVE JUROR:  Okay.

THE COURT:  All right.  Thank you so much.

PROSPECTIVE JUROR:  That was easy, fast.

*(Prospective juror enters the courtroom.)*

THE COURT:  Good afternoon.

PROSPECTIVE JUROR:  Good afternoon.

THE COURT:  Can you give me the last five digits of your juror badge number, please.

PROSPECTIVE JUROR:  Sure.  It's 50493.

THE COURT:  Okay.  During the last couple days, have you had occasion to discuss this case with any of your fellow jurors?

PROSPECTIVE JUROR:  No.

THE COURT:  Have you heard anyone express an opinion about the case in the last two days?

PROSPECTIVE JUROR:  No.

THE COURT:  Have you read or heard anything about the case?

PROSPECTIVE JUROR:  I've heard through just watching the news and -- you know.

THE COURT:  Have you heard or read anything in the last 48 hours?

PROSPECTIVE JUROR:  Driving in this morning just on the radio that they're selecting a jury.

THE COURT:  Okay.

PROSPECTIVE JUROR:  Yeah.

THE COURT:  Did you hear anything else?

PROSPECTIVE JUROR:  That was it.

THE COURT:  Okay.  And other than the fact that they were selecting a jury, did you hear anything else?

PROSPECTIVE JUROR:  No.

THE COURT:  Have you had a chance to look at the Criminal Case Questionnaire?

PROSPECTIVE JUROR:  Yes.

THE COURT:  And do you have any yes responses to any of those questions?

PROSPECTIVE JUROR:  I do.

THE COURT:  Okay.  Can you give me the numbers?

PROSPECTIVE JUROR:  Sure.  Let's see.  I have a yes for Question 13 --

THE COURT:  Okay.

PROSPECTIVE JUROR:  -- and 15, 26, 35 and 39.

THE COURT:  Why don't we start with Number 13.

PROSPECTIVE JUROR:  Okay.

THE COURT:  Okay.  Could you elaborate on your answer to 13?

PROSPECTIVE JUROR:  Unfortunately, my sister was

recently taken in -- arrested, and she had an unpleasant experience with the sheriffs in the jail.

THE COURT:  Okay.  When did this happen?

PROSPECTIVE JUROR:  This must have happened -- it was early part of January sometime.  I don't remember exactly the date, but --

THE COURT:  And do you know what police agency arrested her?

PROSPECTIVE JUROR:  It was in the Antelope Valley, the -- the Antelope Valley courthouse or --

THE COURT:  Okay.  And do you recall was she actually incarcerated for a period of time?

PROSPECTIVE JUROR:  Well, she was supposed to be on an ankle monitor, but she got taken in for three days, and that was kind of like a -- according to what she told me it was that they didn't listen to what she -- because she had a paper from the judge, and they kind of just kept her there and didn't really listen to her or -- I mean, I have never been in this process, so I don't know how long it takes for that process to take place.

THE COURT:  Right.

PROSPECTIVE JUROR:   Yeah.

THE COURT:  Are you going to be able to put what happened to your sister aside and judge this case based just on the evidence?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Can you be fair and impartial to both sides --

PROSPECTIVE JUROR:  Yes.

THE COURT:  -- in this case despite what happened to your sister?

PROSPECTIVE JUROR:  Yes, um-hmm.

THE COURT:  And what about Question 15?

PROSPECTIVE JUROR:  15, well, I just kind of answered it based on 13, you know, just because of the bad experience --

THE COURT:  Right.

PROSPECTIVE JUROR:  -- being that she's my sister and she shared that with me.

THE COURT:  Okay.

PROSPECTIVE JUROR:  Yeah.

THE COURT:  And do you think -- again, do you think you can put that aside and be fair and impartial --

PROSPECTIVE JUROR:  Yes.

THE COURT:  -- to both sides in this case?

And what about Question 26?

PROSPECTIVE JUROR:  26, well, it's because of my sister, my immediate family.

THE COURT:  Okay.  When she was detained, was she detained in the Los Angeles County Jail?

PROSPECTIVE JUROR:  She was transported to the

Lynwood Women's Detention Center from Lancaster.

THE COURT:  Okay.  And did she discuss with you what she saw or how she was treated in the jails?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Okay.  And what did she tell you?

PROSPECTIVE JUROR:  You know, part of it was because she was frustrated because of the whole process, you know, how long it took, being that the judge told us she was going to be out the same day, and it was just the process.

THE COURT:  Right.

PROSPECTIVE JUROR:  But it actually took longer.  So she shared that they kept her, like, in isolation to herself, for all that period of time.  And that's what she shared.  I mean, I wasn't there, so -- you know, and things like that.

THE COURT:  Okay.  And what about Question 35?

PROSPECTIVE JUROR:  35, just to be perfectly honest -- I mean, I think in terms of his age, you know, I do have -- I would still have -- you know, would be impartial or be fair, but I think just the fact of his age could affect me and --

THE COURT:  And how would his age affect you?

PROSPECTIVE JUROR:  Just -- just the way I feel about his -- in terms of kind of having empathy for his age.

THE COURT:  So his age might be a benefit to you?

PROSPECTIVE JUROR:  A benefit?

THE COURT:  Yeah, you might look upon him more favorably or look on the evidence more favorably because of his age?

PROSPECTIVE JUROR:  Not necessarily.  I mean, I am just answering honestly.

THE COURT:  That's fine.  I appreciate that.

PROSPECTIVE JUROR:  Um-hmm.

THE COURT:  So would you have difficulty putting aside his age?

PROSPECTIVE JUROR:  I think once -- I'm sorry.  Once it comes down to the facts and once I look at the evidence, I think, you know, I'll make a fair judgment on what needs to be done.

THE COURT:  Okay.  Without knowing any of the facts, would you look upon the fact of his age favorably?

PROSPECTIVE JUROR:  No.

THE COURT:  Do you think that his age would affect your ability to be a fair and impartial juror?

PROSPECTIVE JUROR:  Not after I look at the facts and I look at what has taken place.

I think once I learn about the thorough understanding -- and have a better understanding of what the allegations or accusations are, then I can -- that wouldn't be a factor.

THE COURT:  Okay.  Well, tell me when you answered

yes to that question, what did you mean by that answer?

PROSPECTIVE JUROR:  Just the way I felt when I was answering the question.  I felt, you know -- I mean, I have parents.  You know, they're older, so just thinking of them going through the jail system or being incarcerated, if that was to be the case, I just -- you know, at that age and that kind of thing.  But I do understand that, you know, there's the other side, too.  So -- I don't have an understanding of the case fully, so I can't make a judgment call on -- or a fair judgment on what has taken place.

THE COURT:  Okay.  So can you put aside the fact of a person's age in deciding the facts in the case?

PROSPECTIVE JUROR:  Yes.

THE COURT:  And I think we all -- you know, everybody can feel empathy toward their parents and, you know, as they get on in years, but here the Court's going to instruct you that sympathy shouldn't be a consideration in reaching a decision.

PROSPECTIVE JUROR:  Right.

THE COURT:  And so can you follow the Court's instructions and not consider sympathy or a person's age, they're either too youthful or too young or too old, in deciding the facts in the case?

PROSPECTIVE JUROR:  Yes.

THE COURT:  All right.  Anything additional?

MR. FOX:  Yes.  Yes, one that we probably, if you don't mind, Your Honor, if we could discuss at sidebar.

THE COURT:  All right.

*(Proceedings held at sidebar under seal 3:52 to 3:54 P.M.)*

*(The following proceedings were held in open court.)*

THE COURT:  What crime was your sister accused of?

PROSPECTIVE JUROR:  She was accused of forgery and theft.

THE COURT:  And if the Court were to instruct you that punishment is -- punishment is a matter for the Court to decide and not for the jurors, would you be able to follow that instruction?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Would you be able to put aside a consideration of age in determining the guilt or innocence of the defendant?

PROSPECTIVE JUROR:  Yes.

THE COURT:  You also had a response to Question 39.

PROSPECTIVE JUROR:  Oh, yes.  That's because English is my second language, and although I've had schooling -- I have a master's degree, I still have sometime difficulty understanding certain, you know, language.  And when I was going through grad school, I had to, you know, read it ten

times to be able to understand it thoroughly.

So that could be a factor in me -- I mean, I don't know -- I have never served on a jury, so I don't know what it entails, and so I just wanted to mention that.

THE COURT:  Okay.  There are going to be documents that the jury is going to have to read.  They're going to be documents that are going to be read to the jury, and I believe all of those documents are in English.

What do you do for a living?

PROSPECTIVE JUROR:  I work at Cal State Northridge. I'm an academic adviser.

THE COURT:  Do you have any concerns about your ability to understand English that concerns you about serving as a juror in this case?

PROSPECTIVE JUROR:  I don't have -- I mean, a serious concern.  I just wanted to bring that up and say that sometimes when I'm reading certain, maybe passages or whatnot, I might have just to look up words or what have you.

THE COURT:  Okay.  Did you have any trouble understanding the questionnaire?

PROSPECTIVE JUROR:  No.

THE COURT:  Okay.  All right.  Anything else?

MR. FOX:  Not from the government, Your Honor.

MR. HOCHMAN:  No, Your Honor.

THE COURT:  All right.  You can return to the

Courtroom 9-B.  And I want to caution you not to discuss this case with any of your fellow jurors or discuss anything that we talked about.

PROSPECTIVE JUROR:  Okay.  Thank you.

*(Prospective juror enters the courtroom.)*

THE COURT:  Good afternoon.

PROSPECTIVE JUROR:  Good afternoon.

THE COURT:  Could you give us the last five digits of your badge number.

PROSPECTIVE JUROR:  51194.

THE COURT:  Have you talked about this case with any of your fellow jurors in the last couple days?

PROSPECTIVE JUROR:  No.

THE COURT:  Have you either read or heard anything about this case in the last 48 hours?

PROSPECTIVE JUROR:  No.

THE COURT:  And putting aside the last 48 hours, have you read or heard anything about this case?

PROSPECTIVE JUROR:  Originally, when he was all over the news and stuff, but that was a long time ago.

THE COURT:  Okay.  Do you recall what you read or heard?

PROSPECTIVE JUROR:  Not really.

THE COURT:  Okay.  Have you had a chance to look at the Criminal Case Questionnaire?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Do you have any yes responses to any of those questions?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Okay.  Can you give me the numbers?

PROSPECTIVE JUROR:  Number 1, Number 2.  I think that's it.

THE COURT:  So it was Number 1, Number 2.  And that was it?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Okay.  Let's try Number 1.  Can you elaborate on your answer to Number 1?

PROSPECTIVE JUROR:  Oh, my nephew -- I forget how old he was.  He was picked up and they found in his car cocaine, about 10 pounds.

THE COURT:  Okay.

PROSPECTIVE JUROR:  And they put him away for about ten years.

THE COURT:  Okay.  When was this?

PROSPECTIVE JUROR:  About 13 years ago.

THE COURT:  Okay.  And do you recall what police agency was involved?

PROSPECTIVE JUROR:  Not really.

THE COURT:  Okay.  Was your nephew incarcerated at a local facility?

PROSPECTIVE JUROR:  You know, his family kept it very private.  I'm not sure.  I think he was around here somewhere.

THE COURT:  Okay.  But you don't know any of the details?

PROSPECTIVE JUROR:  I do not know the details.

THE COURT:  Okay.  Do you have any concerns about the way his case was handled?

PROSPECTIVE JUROR:  Yeah.  Yes.

THE COURT:  What are some of those concerns?

PROSPECTIVE JUROR:  I mean, you know, he had the stuff in his car, so --

THE COURT:  Do you have any complaints about the way the police handled his case?

PROSPECTIVE JUROR:  He had a girlfriend that was 12 years older than him with a record, and she walked, and he would have done anything for attention.  Aside from that, he had no record and somehow he ended up in jail for ten years.  I don't know a lot of details about the thing, but --

THE COURT:  Would you have any difficulty putting aside what happened to your nephew in deciding the facts in this case?

PROSPECTIVE JUROR:  Sure.  I think so.

THE COURT:  I guess the question is can you put aside what happened to your nephew and be fair and impartial to both sides in this case?

PROSPECTIVE JUROR:  I think so.

THE COURT:  Do you have any doubts?

PROSPECTIVE JUROR:  I -- I think so.  I -- you know.  Not really.  I'm pretty sure I can put that aside.  I mean, you know, this is a different case.

THE COURT:  Tell me about Question Number 2.

PROSPECTIVE JUROR:  Oh, that happened to me.

THE COURT:  Okay.

PROSPECTIVE JUROR:  But it was more mental than anything.  He was --

THE COURT:  Tell me what happened.

PROSPECTIVE JUROR:  I allowed a gentleman under my roof.  He was a little odd.  He was asking some ladies for -- you know, if he could say in their houses in my church, and I at that time was working graveyard shift so I was hardly ever home, so I said, "Okay.  You can stay at my place.  It will be safer."  He turned out to be bipolar schizophrenic, and he hit me upside the head with a hatchet.

THE COURT:  Okay.  And did you call the police?

PROSPECTIVE JUROR:  Yes.  Well, actually the police were called for me.  It happened in a tool shop.  They were very good, took me to the hospital, had me fill out all kinds of forms.  I pressed charges, yeah.

THE COURT:  Do you have any concerns about the way that case was handled?

PROSPECTIVE JUROR:  Not at all.

THE COURT:  Have you had any discussions with your nephew about how his case was handled?

PROSPECTIVE JUROR:  No.

THE COURT:  Can you commit to both parties in this case that you're going to be fair and impartial and that you're going to set aside what happened to your nephew in deciding the facts in this case?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Any additional questions?

MR. FOX:  Yes, Your Honor.  We'd just like to know from the prospective juror which law enforcement agency responded to his victimization.

THE COURT:  Okay.  Do you recall what police agency was involved when you were assaulted?

PROSPECTIVE JUROR:  I was in Pasadena or -- I was at the Huntington Hospital, and the police came in there.  I'm not sure.  I think it was just the regular police department.

THE COURT:  Would you say it was the Pasadena Police?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Anything else?

MR. FOX:  Nothing from us, Your Honor.

MR. HOCHMAN:  Just one moment, Your Honor.

Your Honor, just follow-up into one of the prospective juror's answers, when you asked him if he had

doubts, and then he said, "I think so," but then you asked him subsequent questions that seemed to change that answer. If we can go back perhaps to the original question on doubts to see if the answer is any different.

THE COURT: Do you have any doubts about your ability to put aside what happened to your nephew in deciding the facts in this case?

PROSPECTIVE JUROR: No.

THE COURT: And I think I asked you this before, but you can commit to both sides to being fair and impartial?

PROSPECTIVE JUROR: Yes.

MR. FOX: Your Honor, I missed something from my notes, also. The prospective juror said that he heard about the case when it was originally all over the news and it was a long time ago, and just to explore that a little bit, please.

THE COURT: Okay. Do you recall anything that you heard on the news about this case?

MR. FOX: Okay. I remember seeing his face a lot on the news. I remember that had to do with the sheriff's department. I remember that it had to do with his treatment of inmates. That's about it. I really don't have any details that I remember.

THE COURT: Can you put aside what you -- what you do recall and decide this case based just on the evidence that you hear here in this courtroom?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

THE WITNESS:  Yes.

MR. FOX:  Nothing else, Your Honor.

MR. HOCHMAN:  Nothing else, Your Honor.

THE COURT:  All right.  Sir, you can return next door, Courtroom 9-B.  And please don't discuss this case with your fellow jurors or anything that we've talked about with your fellow jurors.

PROSPECTIVE JUROR:  Okay.

(Prospective juror exits the courtroom.)

THE COURT:  Does anybody have any objection -- well, we have a juror who, I guess, is getting anxious and wants to leave if they're not going to be called back today.

So we could either tell -- we can either ignore it or we could tell the jurors that have been -- that we've seen today that they can leave and come back tomorrow morning at 8:30.

MR. FOX:  That note is from a juror that we've seen today?

THE COURT:  Yes.

MR. FOX:  And, Your Honor, by our count we're at 36, do you think if we make it through four in the next 20 minutes, that we'll proceed into the next round of questioning?

Are we going to put them in the box at that point?  That's my only question.

THE COURT:  Yeah, I'm happy to do -- I'm happy to do

it either way.  If you want to -- if we can -- if we stop at 4:30, you want to put them in the box and go until 5:00, that's fine with me.

MR. FOX:  Yeah, Your Honor, our preference is to just plow ahead and if we can get them into the box at 4:30 and start questioning them, I think that that's a good thing.

THE COURT:  Okay.

MR. HOCHMAN:  Either way, Your Honor.  I mean, is this particular juror -- do they have to -- is there a medical appointment that they have to attend or --

THE COURT:  No.  He's complained twice about the fact that he's already seen the judge and does not want to continue to wait if he won't be called again today.

MR. HOCHMAN:  Is there a chance to know which juror number and find out who is making these complaints?

THE CLERK:  That's Juror Number 0 --

THE COURT:  Don't get too helpful.

I don't see really anything to be served by announcing who that is at this point.

I do know that it's been sort of a long day for all these people, and while I'm more than willing to stay here as long as we need to, I can understand being couped up all day, so --

MR. HOCHMAN:  We're amenable to allowing the jury to go -- the jurors who have already been vetted, to go at this

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

point, Your Honor, but we'll defer to the Court.

MR. FOX:  Whatever Your Honor wants.

THE COURT:  Do we have the randomized list?

All right.  Let's go until -- you can just let them know that at -- hopefully by 4:30 -- by 4:30, you know, I'll come over and talk to them or they'll all be brought over here. And somebody should do that privately, not in front of the other jurors.

Okay.  Let's bring the next person in.

*(Prospective juror enters the courtroom.)*

THE COURT:  Can you give us the last five digits of your badge number, please.

PROSPECTIVE JUROR:  51592.

THE COURT:  Okay.  And have you talked with any of your fellow jurors about this case in the last two days?

PROSPECTIVE JUROR:  No.

THE COURT:  And have you read or heard anything about the case in the last 48 hours?

PROSPECTIVE JUROR:  No.

THE COURT:  Have you had a chance to look at the Criminal Case Questionnaire?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Do you have any yes responses to any of those questions?

PROSPECTIVE JUROR:  I do.

THE COURT:  Okay.  Can you give me those numbers, please.

PROSPECTIVE JUROR:  17, 19, 21, 24, 33.

THE COURT:  Why don't we start with 17.

PROSPECTIVE JUROR:  Hang on.  One more page.  Don't know if there is anything on it.  No, that's all.

THE COURT:  There's something you've seen and heard about the case?

PROSPECTIVE JUROR:  It's been in the news over the last years, so I think I -- as a newspaper reader, I have exposure.

THE COURT:  And do you recall what you've seen and heard?

PROSPECTIVE JUROR:  I remember the gist of the charges of misconduct in the jails, the first trial ended in mistrial, if I'm remembering right, and then there is a retrial being staged.

THE COURT:  And would you have any difficulty putting aside what you've read or what you've heard and deciding this case based on the evidence that you hear here in court?

PROSPECTIVE JUROR:  No.

THE COURT:  Do you think you could be fair and impartial to both sides in this case?

PROSPECTIVE JUROR:  I think so.

THE COURT:  Any doubt in your mind?

PROSPECTIVE JUROR:  No.

THE COURT:  And you understand that even though there may or may not have been a prior case, that this is a different case and may involve some different charge, different witnesses?

PROSPECTIVE JUROR:  Yes.

THE COURT:  And what about Question 19?

PROSPECTIVE JUROR:  It's the same answer as 17.

THE COURT:  All right.  And 21?

PROSPECTIVE JUROR:  My husband and I support the ACLU.

THE COURT:  There may be witnesses in this case from the ACLU.  Are you going to be able to judge their credibility the same way you would that of any other witnesses?

PROSPECTIVE JUROR:  Yes.

THE COURT:  And 24.

PROSPECTIVE JUROR:  I went to a women's college.

THE COURT:  Wish I had.

24.

PROSPECTIVE JUROR:  Yeah, 24 is "club or an organization that limits membership on gender."  Women's college.

THE COURT:  Okay.  And 33?

PROSPECTIVE JUROR:  My starting supposition is that everyone, including people convicted, should have their

constitutional and civil rights.

THE COURT:  Okay.  Can you commit to both sides to be fair and impartial in this case?

PROSPECTIVE JUROR:  Yeah.

THE COURT:  Okay.  Anything additional?

MR. FOX:  Nothing from the government.

MR. HOCHMAN:  Nothing, Your Honor.  Thank you.

THE COURT:  Okay.  You can return to the Courtroom 9-B.

PROSPECTIVE JUROR:  Thank you.

THE COURT:  And please do not discuss this case with your fellow jurors.

PROSPECTIVE JUROR:  I will not.

*(Prospective juror enters the courtroom.)*

THE COURT:  Can you give us the last five digits of your badge number, please.

PROSPECTIVE JUROR:  51614.

THE COURT:  Have you had occasion to discuss this case with any of your fellow jurors over the last two days?

PROSPECTIVE JUROR:  No.

THE COURT:  Have you read or heard anything about this case in the last 48 hours?

PROSPECTIVE JUROR:  Not at all.

THE COURT:  Have you had a chance to look at the Criminal Case Questionnaire?

PROSPECTIVE JUROR:  Yes.

THE COURT:  And do you have any yes or affirmative responses to any of those questions?

PROSPECTIVE JUROR:  Well, yes, the second one.

THE COURT:  Okay.

PROSPECTIVE JUROR:  Just my mother.  I know my mother has -- like, she tells the stories.  Like, when she was in college, I think someone had -- like, I think her car was stolen or something.  That's pretty much it.  Not much else, really.

THE COURT:  Okay.  Any other yes or affirmative answers to any of the other questions?

PROSPECTIVE JUROR:  No.

THE COURT:  Okay.  Anything additional?

MR. FOX:  Your Honor, just an inquiry on 17, informative inquiry, please.

THE COURT:  Have you heard, read anything about this case at all?

PROSPECTIVE JUROR:  Not at all.

THE COURT:  Okay.  Anything else?

MR. FOX:  Nothing else, Your Honor.

MR. HOCHMAN:  Nothing else, Your Honor.

THE COURT:  Okay.  Sir, if you could return to Courtroom 9-B.  And, again, I want to remind you not to discuss this case with any of your fellow jurors.

PROSPECTIVE JUROR:  Yes, Your Honor.

THE COURT:  Thank you.

*(Prospective juror exits the courtroom.)*

THE COURT:  All right.  Bring him in here.

*(Prospective juror enters the courtroom.)*

THE COURT:  Is there something I can help you with, sir?

PROSPECTIVE JUROR:  Yes, sir.  I -- I'm in theater. I don't need this.

There's an atmosphere in the room in which all the other jurors are waiting -- prospective jurors, in which we feel like -- I'm just going to speak for myself.  I won't speak for anybody else.

THE COURT:  Yeah, why don't you try and speak for yourself.

PROSPECTIVE JUROR:  I shall.

THE COURT:  Let me try and speak for you -- I mean for myself.

This isn't helping the process.  And I understand that everybody is frustrated with the time that it's taking, but we hope to have everybody back over here in the next five or ten minutes.  And the time that we're taking to actually talk with you is delaying that process.

It's a process.  And we hope to -- we certainly are going to conclude the major portion of this process today, if

that helps you.

PROSPECTIVE JUROR:  It helps me.  We'll see.  I'm not optimistic, but we'll see.

All right.  I apologize to one and all for the -- any time that this single citizen might have taken just to find out an answer.

Thank you.

THE COURT:  Well, if you had --

PROSPECTIVE JUROR:  I'm sorry.  I won't take up any more of your time.

THE COURT:  Well, sir.  Excuse me.

PROSPECTIVE JUROR:  I mean, obviously, you were dismissing me, so --

THE COURT:  I'm sorry?

PROSPECTIVE JUROR:  I said it felt like you were dismissing me.

THE COURT:  Well, the note that I received, there was no clear question.  If there was a question --

PROSPECTIVE JUROR:  The question was -- if you want me to be that specific.  The question is if you're not going to see any of the other individuals who have already seen you for the rest of the day -- I mean, we've been here -- I've been -- I saw you yesterday, and I've just been sitting here for lo these many hours, as have others.  If you're not going to continue with the actual voir dire with these folks --

THE COURT: We are.

PROSPECTIVE JUROR: Okay. Well, okay. There are still quite a few people out there waiting to actually go through the individual thing.

THE COURT: I know there are quite a few people.

PROSPECTIVE JUROR: And we all thought that 5 o'clock is going to be the end zone, so --

THE COURT: Well, we are going to see some additional people and we're going to move forward with this process today.

PROSPECTIVE JUROR: Okay. Thank you.

THE COURT: Thank you.

*(Prospective juror enters the courtroom.)*

THE COURT: Can you give us the last five digits of your badge number, please.

PROSPECTIVE JUROR: 51813.

THE COURT: And have you had occasion to discuss this case with any of your fellow jurors today?

PROSPECTIVE JUROR: No, Your Honor.

THE COURT: Okay. And have you read or heard anything about this case in the last 48 hours?

PROSPECTIVE JUROR: No, Your Honor.

THE COURT: Okay. Have you heard or read anything about this case at all?

PROSPECTIVE JUROR: Yes.

THE COURT: Okay. And what have you read?

PROSPECTIVE JUROR:  I think a couple months back, I remember seeing a VICE News piece.

THE COURT:  Okay.  And you said --

PROSPECTIVE JUROR:  VICE.  V-i-c-e.

THE COURT:  Okay.  And do you recall what you specifically heard?

PROSPECTIVE JUROR:  I only remembered it when you brought back up the charges.

THE COURT:  Okay.  Have you had a chance to look at the Criminal Case Questionnaire?

PROSPECTIVE JUROR:  Yes.  This one (indicating)?

THE COURT:  Um-hmm.

PROSPECTIVE JUROR:  Yes, sir.

THE COURT:  Do have you any yes or affirmative responses to any of those questions?

PROSPECTIVE JUROR:  I have three.

THE COURT:  Okay.  Could you give me those numbers.

PROSPECTIVE JUROR:  17.

THE COURT:  Okay.

PROSPECTIVE JUROR:  19 and 21.

THE COURT:  And can you tell us about Question 17?

PROSPECTIVE JUROR:  Yeah, it was the VICE News.

THE COURT:  And you don't recall specifically anything that was said?

PROSPECTIVE JUROR:  I remember it was animated.

THE COURT:  Okay.  And what about 19?

PROSPECTIVE JUROR:  Same thing.

THE COURT:  And 21?

PROSPECTIVE JUROR:  I give to the ACLU.

THE COURT:  There may be ACLU witnesses that may testify in this case.  Can you judge their testimony the same way you would that of any other witness?

PROSPECTIVE JUROR:  Yes, sir.

THE COURT:  Okay.  Anything additional?

MR. HOCHMAN:  Just brief follow up on 21, how long she's been giving to the ACLU.

THE COURT:  Okay.

PROSPECTIVE JUROR:  Since our new president got elected.

THE COURT:  Okay.  Anything else?

MR. FOX:  Nothing from the government.

THE COURT:  Okay.  If you could return to 9-B.  And if you would not discuss this case with your fellow jurors.

*(Prospective juror exits the courtroom.)*

MR. FOX:  Your Honor, may I have one minute with Mr. Hochman?

THE COURT:  Yes.

*(Counsel confer off the record.)*

*(Prospective juror enters the courtroom.)*

MR. FOX:  Thank you, Your Honor.

THE COURT: Can you give us the last five digits of your badge number.

PROSPECTIVE JUROR: 53504.

THE COURT: And have you heard or read anything about this case in the last 48 hours?

PROSPECTIVE JUROR: No.

THE COURT: Have you had any discussions with your fellow jurors about the case?

PROSPECTIVE JUROR: No.

THE COURT: And have you heard anything about this case at all?

PROSPECTIVE JUROR: Yes.

THE COURT: Okay. And what have you heard?

PROSPECTIVE JUROR: Just the surface. Nothing too in depth.

THE COURT: When you say "the surface," what do you mean?

PROSPECTIVE JUROR: I was watching the news, and I didn't tune in to watch the whole -- the whole story, but I am aware of what the trial is about and that it got dismissed the first time around because of the hung jury.

THE COURT: Okay. Would you have any difficulty putting aside what you heard or the fact that there was a hung jury in the other trial?

PROSPECTIVE JUROR: I don't think so.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

THE COURT:  Okay.  Could you decide this case based on the evidence that you see and hear here in court?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Is there any doubt in your mind that you can put aside the fact that there was a hung jury in the prior case?

PROSPECTIVE JUROR:  Yes.

THE COURT:  So you'd have some difficulty putting that -- there's some doubt that you'd be able to put that out of your mind?

PROSPECTIVE JUROR:  Not so much because of the hung jury, but maybe because I might be a little biased towards law enforcement.

THE COURT:  Okay.  All right.  We're going to excuse you.  And you can return to the jury assembly room on the 1st floor.

PROSPECTIVE JUROR:  Thank you.

*(Prospective juror exits the courtroom.)*

THE COURT:  I think we are at 39 is my count.  Let's see if we can get one more, and then let's put 12 in the box.

*(Prospective juror enters the courtroom.)*

THE COURT:  Good afternoon.

PROSPECTIVE JUROR:  Good afternoon.

THE COURT:  Could you give us the last five digits of your badge number, please.

PROSPECTIVE JUROR:  53575.

THE COURT:  Okay.  Have you had occasion to discuss anything about this case with your fellow jurors during the last two days?

PROSPECTIVE JUROR:  No, sir.

THE COURT:  Have you heard or read anything about this case during the last two days?

PROSPECTIVE JUROR:  No, sir.

THE COURT:  Have you at any point heard or read anything about this case?

PROSPECTIVE JUROR:  Yes, sir.

THE COURT:  Okay.  And what have you heard?

PROSPECTIVE JUROR:  That the defendant was charged with obstructing justice in some sort of way.

THE COURT:  Can you put aside what you've heard in and decide this case based on the evidence that you hear and see here in court?

PROSPECTIVE JUROR:  Yes, sir.

THE COURT:  Any doubt in your mind?

PROSPECTIVE JUROR:  No, sir.

THE COURT:  Have you had a chance to look at the Criminal Case Questionnaire?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Do you have any yes responses to any of those questions?

PROSPECTIVE JUROR:  I do.

THE COURT:  Okay.  Can you give me the numbers, please.

PROSPECTIVE JUROR:  Can I get my glasses?

THE COURT:  Sure.

PROSPECTIVE JUROR:  Question 1, 2, 10, 13, 17, 19, 26, 33, 36.  That's it.

THE COURT:  Okay.  What about Question Number 1?  Can you expand on your answer to that?

Do you want to discuss it at sidebar?

PROSPECTIVE JUROR:  No.  My brother-in-law worked at a liquor store.  And the liquor store, the people that would come in would bring stolen checks and he would cash them.  And they found out because the person that was stealing the checks were stealing them from the post office, and so they charged my brother-in-law with cashing the checks, and they made him do, like, six months.

They convicted him of cashing the checks knowing that -- he said he didn't know that they were stolen, but they felt like he did and needed to pay -- do some time for his involvement, so he had to do six months of weekends.

THE COURT:  Okay.  And was -- do you know if that was in state or federal court?

PROSPECTIVE JUROR:  I'm not sure.  It was so -- more than 30 years ago.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

THE COURT: Oh, okay. And do you know where he ended up serving those weekends, in what facility?

PROSPECTIVE JUROR: I believe it was -- I can't say.

THE COURT: And what about Question 2?

PROSPECTIVE JUROR: Well, he was convicted of the crime, so --

THE COURT: And Question 2 wants to know whether you or any member of your family or close friends were a victim of a crime.

PROSPECTIVE JUROR: Oh, victim of a crime. Oh, I read that wrong. Well, yeah, yeah. My best friend was murdered, yeah.

THE COURT: And when was that?

PROSPECTIVE JUROR: That was 1990, July 5th, 1990.

THE COURT: And do you know what police agency investigated that?

PROSPECTIVE JUROR: 77th.

THE COURT: So that's LAPD?

PROSPECTIVE JUROR: Um-hmm.

THE COURT: Do you have any concerns about the way that case was handled?

PROSPECTIVE JUROR: No.

THE COURT: And what about Question 13? Ever been on a ride-along?

PROSPECTIVE JUROR: This is kind of weird. Question

13, I don't know why I asked my husband this.  It was a few weeks ago.  I didn't even ask him.  Let me take that back.  I didn't ask him.  I don't know how we got engaged in the conversation, but he tells me that he was at the county building on Imperial, and he had been there over two hours, and the young lady that he was with was waiting for him outside, and so he opened the door and told the young lady that it was going to be a little while.

And so he said that the sheriff told him to close the door, and he said he did.  He said and then the sheriff told him, "You know what?  Come here."  So he said he went over to the sheriff, and the sheriff said to him, "Since you want to open the door, I think you should leave," and so he said, "I'm not leaving."

And he said the sheriff pulled out his baton -- baton and swung it at him, and he said he hit the sheriff.  And then other sheriffs came and tackled him to the ground, and he said that the area where they were, kind of -- a ruckus kind of started with the other people that were there in the county building.

So he said he was tackled by three sheriffs, and the sheriffs took him into a room, and one particular one gut-punched him six times to the point that he urinated on hisself.  And he said the sheriff asked him, "What's your name," and he said -- he told him he didn't know his name.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

And he said then the sheriff took his head and bammed it on the -- and I don't know why we had this conversation two weeks ago.  Honestly, I don't know why.

THE COURT:  Um-hmm.

PROSPECTIVE JUROR:  And so, anyway, long to the short, he said that they went to the doctor -- they took him in an ambulance and took him to the hospital, and that the doctor asked him what happened.  He was bleeding, he was full of urine, and he told the doctor.  And the doctor -- he asked the doctor to give him a report -- a copy of the report, and the doctor did, and so they arrested him.

And I said to him -- because he said that they -- he was going to file a lawsuit against them and the public defender told him that, "You had a good case to do that, according to what the doctor had put on the paperwork," he says, "But they can drag this thing out in court."

He said the bail was at $250,000, and he didn't have that -- the money to bail hisself out or family didn't have the money to bail him out, so he just ended up dropping the case and served 25 days.

THE COURT:  Okay.  And when did this occur?

PROSPECTIVE JUROR:  This happened in 1992, he said.  So I said to him -- I said, "So tell me this," because we have a son and we've been married for 19 years and so -- we weren't married at this time and I didn't know him.  I said, "Tell me

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

what could you have done different to have a different outcome," and he said, "I could have left."

I said, "So do you think that you would tell your son to respond the way you did or would you leave -- you'd tell him to leave?"  He said, "I'd tell him to leave."

THE COURT:  Let me ask you.  Can you put aside what -- the incident involving your husband and decide this case based solely on the evidence that you hear and see here in court?

PROSPECTIVE JUROR:  Absolutely.

THE COURT:  Can you commit to being fair and impartial to both sides?

PROSPECTIVE JUROR:  Yes, I can.

THE COURT:  Okay.  And Question 17?

Is this what we talked about earlier, what you saw and heard about this case?

PROSPECTIVE JUROR:  Um-hmm, yes.

THE COURT:  Do you think you can put that aside and be fair and impartial to both sides in this case?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Okay.  And Question 19?

Is that the same thing?

PROSPECTIVE JUROR:  Um-hmm, yes.

THE COURT:  And Question 26, do you know anybody who has been detained in the Los Angeles County Jails?

PROSPECTIVE JUROR:  Other than that my husband.

THE COURT:  Okay.  Did you and your husband ever talk about anything -- how he was treated in the jails or what he saw in the jails?

PROSPECTIVE JUROR:  We did.  We did.  We talked about that, um-hmm.

THE COURT:  Okay.  And what did he tell you?

PROSPECTIVE JUROR:  That there was some good officers and some bad officers, and that was pretty much it.

THE COURT:  Okay.  And what about 33?

PROSPECTIVE JUROR:  Yes.  I do feel that regardless of your crime, you still have your Constitutional rights.  Yes, I feel that way.

THE COURT:  And what about 36?

PROSPECTIVE JUROR:  I have friends that are police officers.

THE COURT:  Okay.  And what police agencies are they with?

PROSPECTIVE JUROR:  LAPD.

THE COURT:  There may be police officers or law enforcement agents who may testify in this case.  Are you going to be able to judge their credibility the same way you would that of any other witness?

PROSPECTIVE JUROR:  Absolutely.

THE COURT:  Okay.  And Question 10 I think you also

answered --

PROSPECTIVE JUROR:  10?

THE COURT:  Do you have any friends that are federal law enforcement agents, officers?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Okay.

PROSPECTIVE JUROR:  They're friends, close friends.

THE COURT:  Any additional questions?

MR. HOCHMAN:  Your Honor, may we be heard at sidebar?

THE COURT:  Yes.

*(Proceedings held at sidebar under seal 4:46 to 4:47 P.M.)*

*(The following proceedings were held in open court.)*

THE COURT:  There may be testimony in this case concerning physical abuse by deputies with the Los Angeles County Sheriff's Department.

Are you going to be able to put aside what happened to your husband and decide this case based on the evidence that you see and hear here in court?

PROSPECTIVE JUROR:  Absolutely.

THE COURT:  And do you think that you can be fair and impartial despite what happened to your husband?

PROSPECTIVE JUROR:  Yes, sir.

THE COURT:  Anything else?

MR. FOX:  Nothing from the government, Your Honor.

MR. HOCHMAN:  No, Your Honor.

THE COURT:  Okay.  You can return over to Courtroom 9-B.

PROSPECTIVE JUROR:  Do I leave this here?

THE COURT:  Yeah, just leave that there.  Thank you.

*(Prospective juror exits the courtroom.)*

THE COURT:  I think we have reached that number of 40.  It's ten minutes to 5:00.  What I would propose that we do is have all the jurors come over here, that we confirm those jurors -- those 40 numbers, that we either take volunteers for another five to ten or we'll just take them in the numerical order, another five or so, and then tell the rest of those jurors that they're excused that we haven't talked to.

MR. HOCHMAN:  I would take the numerical order, Your Honor, rather than volunteers.

THE COURT:  Okay.

MR. FOX:  We agree, Your Honor.

THE COURT:  Okay.

MR. FOX:  And the only other issue that I wanted to raise is Mr. Hochman -- and I had a very brief discussion, but 8289, the juror who was agitated that we've already screened, I don't think it's of any benefit to have him on the jury.  Given

the way he was disrespectful and agitated, I don't think that's a good way to start this process.

MR. HOCHMAN:  The only caveat, Your Honor, is that I hadn't talked to my client before I spoke to Mr. Fox, so --

THE COURT:  Okay.  You want to talk --

MR. HOCHMAN:  -- if I can speak to my client and I then can confer with Mr. Fox on this.

MR. FOX:  And if they agree to strike him, we just may want to have a couple of additional ones that are in the holding pattern.  Instead of having five, maybe seven of them.

THE COURT:  Okay.  You want to take a minute and talk to your client?

MR. HOCHMAN:  Yes.  May I?  Thank you, Your Honor.

(Counsel and defendant confer off the record.)

MR. HOCHMAN:  Your Honor, we'd be willing to move to excuse that juror, if the government wanted to join us.

MR. FOX:  Yes, Your Honor.

THE COURT:  Okay.  So -- all right.  Do we want to bring him over and excuse him or do we just want to bring everybody -- why don't we just bring everybody over, and then we'll talk to whoever we need to talk to.

MR. FOX:  Yes, Your Honor.

THE COURT:  And I've got the next -- I've got two people out here.  I guess we'll include them in that seven.

MR. HOCHMAN:  Yes, Your Honor.  I think that makes

sense.

THE COURT:  Okay.

MR. FOX:  Thank you.

*(The Court and clerk confer off the record.)*

THE COURT:  Why don't we do this over there in 9-B. It might be a little easier.

*(Proceedings paused and moved to another courtroom.)*

THE COURT:  All right.  Good afternoon.

We have made some progress, and we are going to be able to dismiss a number of you today.  And so the first thing we're going to do is we're going to read the names -- the numbers of approximately 39 people who have been -- who we've reviewed and those 39 people will need to be here tomorrow morning at 8:30.

And then we're going to read about seven additional numbers and those people will also need to be here, and then the rest of you will be excused with the thanks of the Court.

And, again, I want to apologize for the time that this has taken.

And then tomorrow we'll be able to complete our jury selection, and we should have it -- the jury and the alternates picked by -- I'm hoping by noon tomorrow.

So the first thing we'll do is we'll call the 39 or so numbers, and those people will need to return tomorrow.

Those are basically the people that we have seen next

door, and you should be here tomorrow morning at 8:30.

Okay.  If we could have -- if you could start reading those.  Once your name is called, if you want to leave, that's fine.

Again, I want to remind you 39, plus the seven numbers that are going to be called, you're not to discuss this case with anyone, including your fellow jurors, members of your family, people involved in the trial or anyone else.  You're not permitted to allow others to approach you and try to talk with you about this case.  If you're approached and anybody tries to talk with you about this case, please let me know about it immediately.

Don't watch, read or listen to any news accounts or commentaries about the case.  Don't do any research, such as consulting dictionaries, searching the internet or using other reference materials and do not attempt to make any investigation about the case on your own.

So don't Google anything.  If you get a newspaper in the morning, you might want to have your partner, wife, husband, spouse, take the newspaper and hide it.  There is a lot of media coverage associated with the case.  If you watch the news, you might want to turn it off.  There probably isn't anything too good on the news anyway.

Okay.  So we're going to go ahead and read those numbers.  Once your number is called, you're excused and we

will see you tomorrow.

THE CLERK:  Juror Number 1342.

THE COURT:  Okay.  So, sir, you can leave and we will see you tomorrow, 8:30.

THE CLERK:  3269.

THE COURT:  And for anybody who's coming back tomorrow morning, come to Courtroom 9-A, which is next door.

THE CLERK:  Juror Number 3951.

4505.

5630.

7261.

7418.

7611.

PROSPECTIVE JUROR:  Me?

THE COURT:  You're excused for today to return tomorrow morning at 8:30 a.m.

THE CLERK:  10084.

12270.

12869.

13461.

13461.

14778.

25793.

28983.

30528.

30528.

31070.

32391.

32647.

34612.

37215.

37490.

37490.

38095.

38589.

39167.

39719.

41194.

43236.

43541.

44861.

45191.  Excuse me.  45161.

47161.

49829.

50493.

51194.

51592.

51614.

51813.

53575.

54663.

55367.

56785.

57649.

59832.

60556.

60556.

61053.

62299.

62299.

62774.

And 62806.

THE COURT:  All right.  And if the rest of you can hold on for two minutes.  Let me see counsel at sidebar.

*(Proceedings held at sidebar under seal 5:22 to 5:52 P.M.)*

*(The following proceedings were held in open court.)*

THE COURT:  All right.  Ladies and gentlemen, I want to thank you for your service.  We really couldn't do this without you.  We really appreciate it.

Thank you very much for your service.  You're excused.  And, again, thank you very much.

If you could leave your badges on one of the tables here, that will be great.

PROSPECTIVE JUROR:  And questionnaires?

THE COURT:  And if you could leave your questionnaires as well.

Thank you very much.

*(The following was heard outside the presence of the prospective jurors.)*

THE COURT:  There is the one issue concerning the brief I believe the government filed I believe last night.

Have you received a copy of that brief?

MR. HOCHMAN:  Yes, Your Honor.  I got it this morning.  In the breaks, I've tried to work on the issues.  I have got to go back to Santa Monica now in traffic to see if I can put something together in writing.  I'll get something to you, Your Honor.  I might have to supplement it, if it's not something I can get done tonight.

THE COURT:  Okay.  Well, as I understood it, the parties desired to have a ruling prior to the opening statements, and I would anticipate that those opening statements would start tomorrow.  So you can -- get us whatever you can, and then I would assume that we would try to rule on that before we get the -- before the jury is finally selected,

so --

MR. HOCHMAN:  And, Your Honor.  I would note that the -- while the government wants to introduce --

PROSPECTIVE JUROR:  Excuse me, I'm sorry.  My badge, I left my validation for my parking.  Sorry.

Sorry.  Sorry.  I apologize.

MR. HOCHMAN:  The concepts that the government wants to introduce that they would get through the deposition will also come in through one of their witnesses, Mr. Rhambo, that being the nature that the sheriff believed he had a father/son relationship with Mr. Tanaka and statements to that light.

I assume that the government could certainly in opening -- if we can't get you everything tomorrow, I expected the government to mention that that is evidence that will come in during the trial, that Mr. Baca viewed Mr. Tanaka in a father/son capacity.

I think what we are talking about -- and I didn't understand the government to actually want to play the deposition during the opening --

Are you intending to do that?

MR. FOX:  Yes, Your Honor.

MR. HOCHMAN:  Then that's the issue, Your Honor.

I will -- because the concept would come in through a different witness.  But if they wanted to actually play a piece of evidence for the jury, obviously, we would need a ruling.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

THE COURT:  Okay.

MR. FOX:  And, Your Honor, if our paralegal didn't deliver it, we will certainly do it first thing tomorrow, that we attach transcripts.  But we actually have the exhibits in disk form in case you wanted to review the clips that we're talking about.

THE COURT:  Okay.

MR. HOCHMAN:  And I'd also, just to get a sense -- because it looks like we might be putting on witnesses tomorrow -- who the government's first witnesses would be.

MR. FOX:  Yes, Your Honor, the three witnesses that -- let me just confer and make sure I'm right before I spout off.

*(Counsel confer off the record.)*

MR. FOX:  The four, in some order, Jason Dalton, Brian Yanagi, Kevin Brown, and if we get to him, Mickey Manzo.

THE COURT:  Okay.  I -- well, you're a lot more optimistic than I am with giving the estimates of those opening statements, but we'll see.

Okay.  Anything else?

MR. FOX:  No, Your Honor.  Thank you.

MR. HOCHMAN:  No, Your Honor.

THE COURT:  Okay.

MR. FOX:  Do we have a schedule for tomorrow?  Are we going to go to at least 4:00 or are we going to 5:00?

THE COURT:  Well, we are certainly going to go at least until 4:00.  I just don't -- well, I think, to me, it's incumbent upon us to get this thing tried as soon as possible, so I'm really reticent to not take advantage of all the time we have with the jury.

And given the length of the estimated opening statements, I guess I'd be inclined to try to go until 5:00 tomorrow.  So it will depend on how the morning goes, but at least right now, given what we think the estimates are, my -- I'm inclined to go until -- until 5:00.  I hope that doesn't inconvenience anybody too much.

MR. HOCHMAN:  I'll deal with it, Your Honor.  And then is the Court definitely going to go on Monday?

THE COURT:  Right now that's the plan.  Unless some of the jurors have a real problem, the plan would be to go on Monday until 1:30.

MR. HOCHMAN:  Very good, Your Honor.  Thank you.

MR. FOX:  Thank you.

THE CLERK:  This court now stands adjourned.

*(Evening recess taken 5:21 P.M.)*

--oOo--

CERTIFICATE


I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.


Date: AUGUST 2, 2017


_____

Cindy L. Nirenberg, CSR No. 5059

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA