UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

HONORABLE PERCY ANDERSON, U.S. DISTRICT JUDGE

- - -

UNITED STATES OF AMERICA,  )
                              )
             PLAINTIFF,  )
                              )
        vs.  ) No. CR16-66(A)-PA
                              )
LEROY BACA,  )
                              )
           DEFENDANT.  )
_____)

REPORTER'S TRANSCRIPT OF JURY TRIAL

DAY 3, VOLUME II of II

PAGES 517-669

LOS ANGELES, CALIFORNIA

FRIDAY, FEBRUARY 24, 2017

12:49 P.M.

_____

CINDY L. NIRENBERG, CSR 5059, FCRR
U.S. Official Court Reporter
350 W. 1st Street, #4455
Los Angeles, CA 90012
*www.msfedreporter.com*

APPEARANCES OF COUNSEL:


FOR THE PLAINTIFF:
                      OFFICE OF THE UNITED STATES ATTORNEY
                      BY: BRANDON FOX,
                          ASSISTANT U.S. ATTORNEY
                          EDDIE A. JAUREGUI,
                          ASSISTANT U.S. ATTORNEY
                          LIZABETH A. RHODES,
                          ASSISTANT U.S. ATTORNEY
                      312 NORTH SPRING STREET
                      13TH FLOOR
                      LOS ANGELES, CA 90012
                      213-894-2434










FOR THE DEFENDANT:
                      MORGAN LEWIS & BOCKIUS
                      BY: NATHAN J. HOCHMAN, ATTORNEY AT LAW
                          BRIANNA L. ABRAMS, ATTORNEY AT LAW
                      THE WATER GARDEN
                      1601 CLOVERFIELD BOULEVARD
                      SUITE 2050 NORTH
                      SANTA MONICA, CA 90404
                      310-255-9025




ALSO PRESENT:
                      LEAH TANNER, FBI SPECIAL AGENT




UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

                                    I N D E X


GOVERNMENT'S WITNESSES:                        PAGE

KEVIN BROWN

    DIRECT BY MS. RHODES                        637

    CROSS BY MR. HOCHMAN                        646


BRIAN YANAGI

    DIRECT BY MR. JAUREGUI                      655

    CROSS BY MR. HOCHMAN                        657


FURTHER PROCEEDINGS

DISCUSSION HELD OUTSIDE PRESENCE OF JURY  521

PRELIMINARY INSTRUCTIONS BY THE COURT     523

OPENING STATEMENT BY MR. FOX              533

DISCUSSION HELD OUTSIDE PRESENCE OF JURY  584

DISCUSSION HELD OUTSIDE PRESENCE OF JURY  584

OPENING STATEMENT BY MR. HOCHMAN          585

DISCUSSION HELD OUTSIDE PRESENCE OF JURY  635

DISCUSSION HELD OUTSIDE PRESENCE OF JURY  636

DISCUSSION HELD OUTSIDE PRESENCE OF JURY  662

E X H I B I T S

| *GOVERNMENT'S EXHIBITS* | *MARKED* | *ADMITTED* |
|---|---|---|
| 15-17 | | 657 |
| 27 | | 657 |
| 31-32 | | 657 |
| 41 | | 657 |
| 48 | | 657 |
| 50-51 | | 657 |
| 65 | | 657 |
| 139 | | 644 |

LOS ANGELES, CALIFORNIA; FRIDAY, FEBRUARY 24, 2017

12:49 P.M.

- - - - -

*(The following was heard outside the presence of the jury.)*

THE CLERK:  Item 1, CR16-66(A)-PA, United States of America versus Leroy Baca.

Counsel, please state your appearances.

MR. FOX:  Good afternoon, Your Honor.  Brandon Fox, Elizabeth Rhodes and Eddie Jauregui on behalf of the United States.  Also with us is Special Agent Leah Tanner with the FBI.

THE COURT:  Good afternoon.

MR. HOCHMAN:  Good afternoon, Your Honor.  Nathan Hochman and Brianna Abrams present with Leroy Baca.

THE COURT:  Good afternoon.

Okay.  As to the juror who was concerned about whether his employer was going to grant him some additional days for his jury service, and we've heard back from them and they'll grant him an additional five days, which should cover him, and I'll let him know that.

All right.  I believe we also had an issue about two deposition excerpts that the government wanted to play in its opening statement.

I've had an opportunity to review the government's

papers, as well as the defense papers.  At least for purposes of the opening statement, the Court finds that playing those two excerpts doesn't open the door, and so the government will be permitted to play those statements in its opening.

Before those are played or anything else is played, I'd like to discuss that with the parties during the actual trial.

MR. FOX:  Yes, Your Honor.  And I think that we will not play that until earliest Monday.

THE COURT:  Okay.  All right.  Are we ready to proceed?

MR. FOX:  Yes, Your Honor.

We did have a few issues we need to raise with respect to Mr. Hochman's slides, but we could do that during a break between our opening and their opening if you were planning a break at that point.  I don't think it's anything that will take more than a couple of minutes.

THE COURT:  Okay.  All right.  Let's bring the jury in.

As I understand it you need about 90 minutes?

MR. FOX:  That's correct, Your Honor.

THE COURT:  And the defense needs about 90 minutes?

MR. HOCHMAN:  Approximately that, yes.

THE COURT:  All right.

*(Jury in at 12:54 P.M.)*

THE COURT:  Ladies and gentlemen, you're now the jury in this case, and I want to take a few minutes to tell you something about your duties as jurors and to give you some instructions.

These are preliminary instructions.  At the end of the trial, I will give you more detailed instructions.  Those instructions will control your deliberations.  You should not take anything I may say or do during the trial as indicating what I think of the evidence or what your verdict should be.

This is a criminal case brought by the United States government.  The government charges the defendant with conspiring to obstruct justice, obstruction of justice and making false statements to a government agency or department.

The charges against the defendant are contained in the indictment.  The indictment is simply a description of the charges made by the government against the defendant.  It is not evidence of anything.  The defendant has pleaded not guilty to the charges and is presumed innocent unless and until the government proves the defendant guilty beyond a reasonable doubt.

In addition, the defendant has the right to remain silent and never has to prove innocence or to present any evidence.

In order to help you follow the evidence, I will now give you a brief summary of the elements of the crimes which

the government must prove beyond a reasonable doubt to make its case.

In order for the defendant to be found guilty of conspiring to obstruct justice, the government must prove each of the following elements beyond a reasonable doubt:

First, beginning on or about August 18, 2011, and continuing through on or about September 26, 2011, there was an agreement between two or more persons to commit the crime of obstruction of justice;

Second, the defendant became a member of the conspiracy knowing of its objects and intending to help accomplish it; and,

Third, one of the members of the conspiracy performed at least one overt act for the purpose of carrying out the conspiracy, with all of you agreeing on a particular overt act that you find was committed.

A conspiracy is a kind of criminal partnership, an agreement of two or more persons to commit one or more crimes. The crime of conspiracy is the agreement to do something unlawful.  It does not matter whether the crime agreed upon was committed.

For a conspiracy to have existed, it is not necessary that the conspirators made a formal agreement or that they agreed on every detail of the conspiracy.  It is not enough, however, that they simply met, discussed matters of common

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

interest, acted in similar ways or perhaps helped one another. You must find that there was a plan to commit the crime of obstruction of justice.

One becomes a member of a conspiracy by willfully participating in the unlawful plan with the intent to advance or further some object or purpose of the conspiracy, even though the person does not have full knowledge of all the details of the conspiracy.

Furthermore, one who willfully joins an existing conspiracy is as responsible for it as the originators.

On the other hand, one who has no knowledge of a conspiracy but happens to act in a way which furthers the purpose of the conspiracy does not thereby become a conspirator.

Similarly, a person does not become a conspirator merely by associating with one or more persons who are conspirators nor merely by knowing that a conspiracy exists.

An overt act does not itself have to be unlawful. A lawful act may be an element of a conspiracy if it was done for the purpose of carrying out the conspiracy.

The government is not required to prove that the defendant personally did one of the overt acts.

In order for a defendant to be found guilty of obstruction of justice, the government must prove each of the following elements beyond a reasonable doubt:

First, the defendant influenced, obstructed or impeded or tried to influence, obstruct or impede a federal grand jury investigation; and,

Second, the defendant acted corruptly with knowledge of an impending grand jury investigation.

Corrupt means that the act must be done with the purpose of obstructing the due administration of justice.

The government does not need to prove that the defendant's conduct and the actual effect of obstruction, however, the government must prove that the defendant's actions would have had the natural probable effect of interfering with a pending grand jury investigation.

In order for the defendant to be found guilty of making false statements to a government agency or department, the government must prove each of the following elements beyond a reasonable doubt with regard to at least one of the statements charged as follows, with all of you agreeing as to which particular statement meets all of these elements:

First, the defendant made a false statement in a matter within the jurisdiction of the Federal Bureau of Investigation or the United States Attorney's office;

Second, the defendant acted willfully, that is, the defendant acted deliberately and with knowledge both that the statement was untrue and that his conduct was unlawful; and,

Third, the statement was material to the activities

or decisions of the Federal Bureau of Investigation or the United States Attorney's office, that is, it had a natural tendency to influence or was capable of influencing the agency's decisions or activities.

These instructions are preliminary, and the instructions I will give at the end of the case will control.

The evidence you are to consider in deciding what the facts are consists of the sworn testimony of any witness; the exhibits which are to be received into evidence, and any facts to which all the lawyers stipulate.

The following things are not evidence and you must not consider them as evidence in deciding the facts of this case:  Statements and arguments of the attorneys; questions and objections of the attorneys; testimony that I instruct you to disregard; and anything you may see or hear when court is not in session, even if what you see or hear is from a witness.

Some evidence is admitted for a limited purpose only. When I instruct you that an item of evidence has been admitted for a limited purpose, you must consider it only for that limited purpose and for no other.

Evidence may be direct or circumstantial.  Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did.

Circumstantial evidence is indirect evidence, that is, it is proof of one or more facts from which one can find

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

another fact.

For example, if you wake up in the morning and see that the sidewalk is wet, you may find from that fact that it rained during the night, however, other evidence such as a turned on garden hose may explain the water on the sidewalk; therefore, before you decide that a fact has been proven by circumstantial evidence, you must consider all the evidence in light of reason, experience and common sense.

You are to consider both direct and circumstantial evidence.  The law permits you to give equal weight to both, but it is for you to decide how much weight to give any evidence.

There are Rules of Evidence which control what can be received into evidence.  When a lawyer asks a question or offers an exhibit into evidence and a lawyer on the other side thinks that it is not permitted by the Rules of Evidence, that lawyer may object.

If I overrule the objection, the question may be answered or the exhibit received.  If I sustain the objection, the question cannot be answered and the exhibit cannot be received.

Whenever I sustain an objection to a question, you must ignore the question and must not guess at what the answer would have been.

Sometimes I may order that evidence be stricken from

the record and that you disregard or ignore the evidence.  That means that when you're deciding the case, you must not consider evidence which I told you to disregard.

In deciding the facts of this case, you may have to decide which testimony to believe and which testimony not to believe.  You may believe everything a witness says or part of it or none of it.

In considering the testimony of any witness, you may take into account the opportunity and ability of the witness to see or hear or know the things testified to, the witness's memory, the witness's manner while testifying, the witness's interest in the outcome of the case and any bias or prejudice, whether other evidence contradicted the witness's testimony, the reasonableness of the witness's testimony in light of all the evidence, and any other factors that bear on believability.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify.

I will now say a few words about your conduct as jurors.

First, keep an open mind throughout the trial and do not decide what the verdict should be until you and your fellow jurors have completed your deliberations at the end of the case.

Second, because you must decide this case based only on the evidence received in the case and on my instructions as

to the law that applies, you must not be exposed to any other information about the case or to the issues it involves during the course of your jury duty.  Thus, until the end of the case, or unless I tell you otherwise, do not communicate with anyone in any way and do not let anyone else communicate with you in any way about the merits of the case or anything to do with it. This includes discussing the case in person, in writing, by phone, or electronic means, via email, text messaging or any internet chat room, blog, website, or other feature.

This applies to communicating with your fellow jurors until I give you the case for your deliberations.  And it applies to communicating with everyone else, including your family members, your employer, the media or press and people involved in the trial, although you may notify your family and your employer that you've been seated as a juror in the case. But if you're asked or approached in any way about your jury service or anything about this case, you must respond that you've been ordered not to discuss the matter and to report that contact to the Court.

Because you will receive all of the evidence and legal instruction you properly may consider to return a verdict, do not read, watch or listen to any news or media accounts or commentary about the case or anything to do with it.  Do not do any research, such as consulting dictionaries, searching the internet or using other reference materials and

do not make any investigation or in any other way try to learn about the case on your own.  The law requires these restrictions to ensure the parties have a fair trial based on the same evidence that each party has had an opportunity to address.

A juror who violates these restrictions jeopardizes the fairness of these proceedings.  If any juror is exposed to any outside information, please notify the Court immediately.

At the end of the trial, you'll have to make your decision based on what you recall of the evidence.  You will not have a written transcript of the trial.  I urge you to pay close attention to the testimony as it is given.

If you wish, you may take notes to help you remember what witnesses said.  If you do take notes, please keep them to yourself until you and your fellow jurors go into the jury room to decide the case.  Do not let note taking distract you so that you do not hear other answers by witnesses.  When you leave, your notes should be left in the courtroom.

Whether or not you take notes, you should rely on your own memory of what was said.  Notes are only to assist your memory.  You should not be overly influenced by the notes.

The next phase of the trial will now begin.

First, each side may make an opening statement.  An opening statement is not evidence.  It is simply an outline to help you understand what that party expects the evidence will

show.  A party is not required to make an opening statement. The government will then present evidence, and counsel for the defendant may cross-examine.  Then the defendant may present evidence and counsel for the government may cross-examine.

After the evidence has been presented, the attorneys will make closing arguments, and I'll instruct you on the law that applies to the case.  After that, you will go to the jury room to deliberate on your verdict.

From time to time during the trial, it may become necessary for me to talk with the attorneys outside the hearing of the jury either by having a conference at the bench when the jury is present in the courtroom or by calling a recess.

Most often these conferences will involve a determination as to whether evidence is admissible under the Rules of Evidence.  It is appropriate to take these matters up outside the presence of the jury.

Should I conclude that a long discussion is necessary, I may excuse you from the courtroom.  We will, of course, do what we can to keep the number and length of these conferences to an absolute minimum.

I may not always grant an attorney's request for a conference.  Do not consider my granting or denying a request for a conference as any indication of my opinion of the case or what your verdict should be.

All right.  Does the government wish to give an

opening statement at this time?

MR. FOX:  Yes, Your Honor.  Thank you.

May I proceed, Your Honor?

THE COURT:  Yes, please.

MR. FOX:  An abuse of power in order to obstruct justice and lies to conceal his crime.

In 2011 Leroy Baca was the Sheriff of Los Angeles County, entrusted with the great power of overseeing the sheriff's department's law enforcement efforts to root out crime and to bring criminal conduct to light.  But in August and September of 2011, when an outside, independent federal grand jury was investigating his department, was investigating his deputies working in what Mr. Baca perceived to be his jails, Mr. Baca abused his power.  Instead of bringing criminal conduct to light, Mr. Baca tried to conceal it through lies, through intimidation, through retaliation.

Mr. Baca and his co-conspirators committed obstruction of justice in three main ways.

First of all, Mr. Baca and his co-conspirators, other members of the sheriff's department, hid a federal informant who was an inmate at Men's Central Jail, a jail that Mr. Baca's deputies ran, a jail that housed inmates generally awaiting trial who hadn't been found guilty or not guilty yet.  Mr. Baca hid a federal informant who was reporting on abuses and corruption within the sheriff's department.

Second, Mr. Baca and his co-conspirators tampered with witnesses, tried to convince witnesses not to cooperate in the federal investigation; and, third, Mr. Baca and his co-conspirators tried to intimidate and retaliate against those, including an FBI special agent, who were reporting on abuses and investigating his department through a sham investigation that Mr. Baca created.

As a result of his conduct, Mr. Baca is charged in three counts in the indictment.  His Honor just explained them to you.

The first one is a conspiracy to obstruct justice. In other words, Mr. Baca agreed with at least one other person to obstruct justice.  In this case we will prove to you that there were many others.  I'll talk about this board more (indicating).

These are Mr. Baca's co-conspirators (indicating). All you have to find in Count One is that he agreed with another person to obstruct a grand jury investigation.

Second, Mr. Baca is charged with himself obstructing justice, attempting or trying to obstruct justice.  Doesn't require an agreement with another person.  It just means that Mr. Baca himself intended -- attempted to obstruct justice; and, third, Mr. Baca is charged with lying about his role in the conspiracy, his knowledge of what was going on when he was interviewed by the federal government in April of 2013.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Let me start with the conspiracy and obstruction of justice charges. The evidence on these substantially overlaps, so I'm going to spend some time talking about them, and at the end of my presentation, I'll focus more on the lies.

You'll learn that this conspiracy was very broad. The scale was great. It involved the coordination of several divisions within the sheriff's department, and because of the number of divisions involved in this obstruction of justice, there were only two people who could authorize the actions, and that was Mr. Baca and someone you'll learn was his right-hand man, his undersheriff, Paul Tanaka.

It involved many different ranks within the sheriff's department. You'll learn about low-level deputies, more senior deputies, lieutenants, a captain, sergeants, and, ultimately, Mr. Baca and his undersheriff.

And it involved a long duration of time. This wasn't a one-afternoon, one-day, one-week event. This occurred over a full six-week period of time from August 19th to September 26th of 2011.

Mr. Baca ran the conspiracy much like he ran the sheriff's department. While he was at the top of it, he put one man in charge of dealing with the day-to-day operations of the conspiracy, just like he did with the sheriff's department, and that was Paul Tanaka, his undersheriff.

That Mr. Baca would select Paul Tanaka as his

undersheriff was not a surprise.  You'll learn about the relationship that they formed over the years.  Out of tens of thousands of employees, Mr. Baca told Paul Tanaka he was going to be undersheriff and made him undersheriff.

He was the one person that selected the undersheriff, Mr. Baca was, and he picked Paul Tanaka.  That's because they had what Mr. Baca has referred to as a father-son like relationship.  Mr. Baca groomed Mr. Tanaka through the ranks, was a mentor to Mr. Tanaka.  And you'll hear Mr. Baca in his own words describe that relationship.

*(Playing of videotape.)*

MR. FOX:  And these are statements that Mr. Baca gave under oath years after the conspiracy was brought to light, years after Mr. Tanaka and his other co-conspirators' actions were brought to light.

But Mr. Baca put Mr. Tanaka in charge of the conspiracy for one very good reason:  Because Mr. Baca, according to Mr. Tanaka -- I'm sorry, Mr. Tanaka, according to Mr. Baca, had a unique talent for carrying out the vision of Mr. Baca, the unique talent to do exactly what it was that Mr. Baca wanted him to do.

Take a listen.

*(Playing of videotape.)*

MR. FOX:  The evidence will show that in addition to putting Mr. Tanaka in charge, Mr. Baca himself was very much

involved in this conspiracy.

Mr. Baca was the initial person who authorized the conduct of his co-conspirators.  Mr. Baca then monitored that conduct, kept tabs on it, received updates on what was going on in the obstruction of justice and, ultimately, he condoned the behavior of his co-conspirators.

Mr. Baca viewed this as a chess match.  You'll learn in his own words this was a chess match for Mr. Baca.  He was trying to move pieces in order to force the federal government to back down and stop its federal grand jury investigation.

You'll learn during the course of this trial about the historic role that the federal government plays with respect to local law enforcement agencies and local governments.  It's one where the federal government has historically been an independent outside agency that ensures that local governments and local law enforcement agencies are protecting the constitutional rights of everybody, of all individuals, and that's because all individuals are entitled to constitutional rights.  That's people that are in their house, on the street and even in jails.

Everybody is free from unnecessary excessive force committed by members of law enforcement, and that was the federal government's role coming in on the outside and making sure that everybody's rights were enforced.

And in 2010 the FBI Civil Rights Squad received a

letter from an inmate.  A supervisor on the Civil Rights Squad read the letter, learned that an inmate at Men's Central Jail -- again, run by Mr. Baca's department -- was complaining about abuses.  He was complaining that deputies were committing excessive force.

So the supervisor on the squad provided that letter to Special Agent Leah -- Marx at the time.  As you heard earlier, her name is now Leah Tanner.  She's been married, and she's now Leah Tanner.  I'll refer to her in much of opening as Leah Marx.

He provided that letter to Leah Marx, and she began to investigate the allegations in the letter.

She went to Men's Central Jail, ultimately went to Twin Towers, another facility across the street from Men's Central Jail -- also run by Mr. Baca's sheriff's department, also holding people who generally were awaiting trial -- and she learned about widespread abuse -- allegations of widespread abuse, inmates talking about additional acts of brutality, inmates talking about additional deputies.  Every time she went, she learned more.

She also learned about corruption going on in those facilities, the deputies willing to take bribes, to smuggle in contraband to the inmates, money for contraband going on in the jails.

It got so outrageous that one of the times that

Special Agent Marx went with another agent to Men's Central Jail, a deputy who had no idea what the FBI was investigating because the FBI was keeping it a secret, bragged to Special Agent Marx -- bragged to her and said that he had just hit an inmate with a large metal flashlight -- just recently had done that -- and then he asked her out, asked for her phone number after that.

The FBI knew that this was going to be a very difficult investigation.  One of the reasons why was that there were few cameras installed in Men's Central Jail or Twin Towers, and the areas where a lot of this abuse was going on -- the allegations of abuse were in areas that didn't have cameras, because the deputies certainly knew where they were.

So the FBI could not corroborate the allegations or disprove the allegations of the inmates.  All they had at that point was the inmates' word.

The FBI had to conduct these interviews at Men's Central Jail, also Twin Towers across the street, where the very deputies that they were investigating were located.

And if those deputies learned about their investigation, then those deputies could take steps to prevent the investigation from succeeding, cover their tracks, come up with a story that they could get straight, tamper with evidence.  So the FBI kept this information tight, didn't tell anyone in the sheriff's department about its investigation.

The FBI also knew that it could not rely in these prosecutions solely on inmates, because when it came to a law enforcement officer that might be charged with a crime and all you've got are inmates with lengthy criminal histories and violence in their backgrounds, that will be very difficult to prove beyond a reasonable doubt to a jury.

So the FBI needed corroboration, needed to find out if there were outsiders who also saw this brutality, if there was ever any other evidence that could prove or disprove these allegations.

Also, many of these incidents occurred in what you'll hear referred to as the 2000 and 3000 Floor at Men's Central Jail. That's where many of the violent offenders were located.

But as I said in the beginning, they also had civil rights, they also had constitutional rights, and they just happened to be housed in an area where there were violent offenders, violent deputies who were watching over them. These would be more difficult to prove because of all of the violence in the background of these inmates, so the FBI needed more corroboration.

Also, the records. In order to figure out which deputies were engaged in this conduct, which inmates had been abused -- or allegedly abused, they were all in county custody. None of this was public about which incident happened when, so the FBI had a very difficult time on its hands.

The FBI went over to the US Attorney's office and briefed the US Attorney's office on their initial findings, and together, the US Attorney's office and the FBI opened up a grand jury investigation, a federal grand jury investigation that would allow agents and prosecutors to issue grand jury subpoenas on behalf of that grand jury, receive documents, compile those documents, analyze them and present information ultimately to the grand jury.

The FBI also knew that it was important to take risks in this investigation, and the FBI decided to engage in undercover operations, covertly record deputies and see if they would admit to abuse or corruption.

One of those deputies was Deputy William David Courson.  You'll hear from him in this trial.  Deputy Courson was the one who bragged about hitting an inmate with the flashlight to Special Agent Marx and then asked her out.

When Special Agent Marx took that information to her supervisor, the supervisor saw it as an opportunity, said: "Why don't we covertly record this person.  Why don't we conduct an undercover investigation.  Pretend to be his friend.  Don't lead him on.  Pretend to be his friend.  Go out to lunch with him, go out to dinner with him and record your conversations.  See if he will admit some of the abuse that was happening at Men's Central Jail."

And so Special Agent Marx did that.

On one of their first encounters, Deputy Courson explained what he learned to be the unwritten rule of Men's Central Jail.  When he trained to become a custodial deputy, he was in a room filled with new deputies that were about to enter Men's Central Jail, and the person training him said that there was an unwritten rule, and that's if an inmate laid a hand, a finger on a deputy, that the deputies were supposed to respond with so much force that they would need to send that inmate to the hospital to be treated for the injuries.

Deputy Courson in these recordings also explained -- of course he didn't know he was being recorded -- he also explained that his supervisor one of his days on the job had directed him to lie, how he walked in and saw a deputy engaged in the use of force with an inmate, and how his supervisor came to him and said, "Did you see that?  No, you didn't," and told him to claim he was on a different floor, that he was not a witness to what happened and told him not to write a report about the incident.

Deputy Courson also explained to Special Agent Marx what he called and what the sheriff's department called drive-bys, where inmates were on the ground, restrained, deputies on top of them, not a risk to anyone, under control, and deputies would come up and kick that inmate.  Deputies not involved in the force would just walk right up, kick the inmate, walk away.  Drive-by kicks, not report the force that

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

they were using.

So the FBI had some corroboration for what the inmates were saying, corroboration that this was a widespread problem.

But David Courson, the deputy, did not provide any specifics.  He couldn't tell Special Agent Marx which deputies were involved in this, did not tell her which inmates were the ones who suffered the abuse, so the FBI needed to look elsewhere.

As I mentioned, the FBI was interviewing inmates as well.  One of those inmates you'll hear a lot about is named Anthony Brown.  And Mr. Brown is probably the poster boy for why this was going to be a difficult investigation.

He was one of the ones located in the 2000 Floor where a lot of this abuse was allegedly occurring.

Mr. Brown himself had, and does have, a serious criminal history:  Robberies, gun offenses, ultimately sentenced in 2011 to 400 years in jail where he will remain for the rest of his life.  But he was also reporting to the FBI on abuses and corruption going on by the deputies in Men's Central Jail.

He mentioned in particular one deputy who was willing to smuggle in contraband in exchange for bribes, Deputy Gilbert Michel.  And Anthony Brown agreed to become an informant, help the FBI out in an undercover investigation.

The FBI authorized Anthony Brown to talk to Gilbert Michel about bribes, whether he'd be willing to smuggle in a cell phone in exchange for money.  And we're not talking about what you probably have, iPhone 7s.  We're talking about a flip phone, not with -- without all the apps that you currently have on the phone, an old school 2011 flip phone.

Gilbert Michel met on the outside with an undercover agent posing as Anthony Brown's associate.  Gilbert Michel, it turns out, was willing to bring in that phone in exchange for bribes.

The FBI, before engaging in this undercover operation, was very concerned about leaks because, of course, if Mr. Michel found out about the undercover operation, he wouldn't engage in the crime.

If the sheriff's department found out about it, it could get back to Gilbert Michel, and that could cause a risk for the agents as well -- not only the operation, but the agents conducting the undercover operation could be at risk.

So the FBI decided, in consultation with the US Attorney's office, to keep this tight, not inform the sheriff's department, not inform Mr. Baca about the undercover operation.

The FBI took some precautions.  They decided that there are some risks with having a phone in jail:  "So what we're going to do is monitor that phone."

Special Agent Marx set up the phone so that she could

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

tell who Anthony Brown, if he received the phone, would be calling, who he'd be texting.  And if he used the phone in any unauthorized manner, she'd shut it off, made sure that she had that ability.

The operation was a success.  Gilbert Michel took the money, took the phone, brought the phone to Anthony Brown.

And Anthony Brown was supposed to be using this phone to contact the undercover agent, tell him about abuses going on in the jail, tell him when the FBI should come back and interview inmates, which ones to interview, which deputies were engaged in the conduct, because there was no other way for the FBI to find out about who was involved in the crime and who the inmates were who had been beaten and when to come back.

Also, the phone was going to be able to help the FBI corroborate Anthony Brown's -- the information he was providing -- was Deputy Michel corrupt, and if so, he'd be prosecuted -- federally prosecuted -- and gave the opportunity to have the FBI approach him and say:  "If you cooperate with this investigation, tell us about the abuses, tell us about the corruption, we'll provide you with some leniency so we can root out the civil rights violations going on in those jails."

A problem occurred almost right away, right when that phone got in, because Mr. Brown had a cellmate, and the cellmate saw that Anthony Brown had the phone, asked to use it.

You'll learn that that cellmate had two girlfriends,

and he asked Anthony Brown if he could contact his girlfriends.

Anthony Brown reached out to the undercover agent to find out, "What should I do," and they discussed what would happen if he didn't allow the cellmate to use the phone, the fact that the whole operation would be blown, the FBI would have to reveal its investigation to the sheriff's department and Anthony Brown himself could be at risk.

So the FBI authorized Anthony Brown to let his cellmate use that phone to call his two girlfriends.  And you'll learn that he did so, contacted his girlfriends via text messaging on the phone a handful of times over the two weeks that that phone was in Anthony Brown's custody.

Other than that, Special Agent Marx kept checking online what's going on with his phone and learning that Anthony Brown was using it just to contact her and just to contact the undercover agent.

But on August 8th something happened that is really the reason why we're here today.  On August 8th that phone was discovered by the sheriff's department, and for the next several days, a routine investigation occurred.  And that's because of what happened.  There didn't seem to be anything all that unusual.

Anthony Brown was going to have a medical procedure. He was going to have a stent placed in an artery because he had health problems -- heart problems.  And on his way, they

discovered the phone in a Doritos bag that he had.  There was no link to a deputy, no link to anybody.  The phone's found, and the sheriff's department placed Anthony Brown in 3500, one of those problem floors but one of those areas he should have been:  A violent offender, long criminal history, just found with a cell phone.  So they put him in 3500.  It's the third floor of Men's Central Jail.

Began interviewing Anthony Brown, and his story evolved.  First, he told the sheriff's department that a nurse had given him the phone.  The sheriff's department continued to just conduct a routine investigation.

Next, he said that a deputy brought the phone but he kept the FBI's role a secret.  The investigation maintained in its routine fashion, and Mr. Brown was kept in 3500 safe, secure, well taken care of.

Let me back up now for a second and tell you about all these people on this poster (indicating).

On the left-hand side is OSJ, Operation Safe Jail. Their job ordinarily was to keep the jails safe, find out information, find out intelligence, keep the jails safe.

Headed up by Lieutenant Greg Thompson (indicating). He was the leader of OSJ.  He was the one who had deputies under him.

He had several levels between him and Undersheriff Tanaka and Sheriff Baca, but you'll learn from August to

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

September of 2011 with this operation, he was briefing these two (indicating), not anybody in between.  It was their job in this conspiracy to begin hiding Anthony Brown, and I'll get to that in a second.

On the right-hand side, ICIB, the Internal Criminal Investigations Bureau.  It was their job to root out the criminal conduct -- part of the sheriff's department, root out criminal conduct of sheriff's deputies.  That was their exclusive authority, exclusive jurisdiction.

If someone within the sheriff's department committed a crime, they could look at that department member and try to see if he should be prosecuted.  They did not look at outside agencies unless they were asked to do so, didn't look at any other law enforcement agencies, had no jurisdiction to look at the FBI or any federal law enforcement agency.

Captain Carey was the head of ICIB.  He was the one that was leading up this unit, and he was also reporting directly to Mr. Baca and Mr. Tanaka.

Underneath him, Lieutenant Steve Leavins, Scott Craig and Maricela Long (indicating), two sergeants.

I'll talk about them as we go, but let me explain how the course changed on August 18th with the stolen -- and Anthony Brown and with all of these people.

On August 18, 2011, OSJ learned that the phone was tied to the FBI, that the inmate was tied to the FBI.  They

learned that before Anthony Brown got the phone, he was on the jail's telephone system, the sheriff's department telephone system, a recorded line, and he called Special Agent Marx with the FBI.

The sheriff's department was able to trace that call back to the Civil Rights Squad of the FBI and immediately knew there was a problem on their hands.

Lieutenant Thompson decided:  "Let's get Anthony Brown off our hands.  Let's ship him off to the State.  Let's make him the State's problem."

Well, the county jails are detention facilities for those who have not been sentenced yet.  The State houses people like Anthony Brown who are post sentence at that point, who had already been sentenced.

They ship Anthony Brown.  The plan was to ship him on the next available bus, and Mickey Manzo scrambled to get him on the bus two days from August 18, 2011.

Greg Thompson ordered that Anthony Brown be moved to 1750.  You'll learn that 1750 is one of the most secure areas of Men's Central Jail.  It houses people like Anthony Brown, who are informants, who need to be protected, who need to be taken care of, kept safe, and that's where they put Anthony Brown, and that's where Anthony Brown should have been at that point in time.

But that evening, the head of the FBI in Los Angeles

named Steve Martinez, also referred to as Assistant Director in Charge Martinez, had two phone calls with Leroy Baca, and told Mr. Baca about the cell phone, said to Mr. Baca: "You have our phone. You have our informant. We want the phone back, and we want to speak to our informant."

Mr. Baca also immediately called around for Paul Tanaka, had a call with him minutes later, and the two of them began setting up a meeting for the next day to find out more information, a meeting for August 19th.

But before that meeting occurred, Lieutenant Thompson in OSJ wanted more information from Anthony Brown, wanted to take another run at Anthony Brown to see if he would corroborate what they believed to be happening, that he was an informant on civil rights violations committed by Mr. Baca's deputies.

Anthony Brown in that interview with Mickey Manzo and Gerard Smith admitted: "Yes, I'm working with the FBI, and I'm working on abuse and corruption -- reporting on abuse and corruption going on with the deputies."

Gerard Smith and Mickey Manzo knew they had the meeting with Mr. Baca set for that afternoon, and they summarized -- Gerard Smith summarized the information that Mr. Brown had just given them, information that Mickey Manzo and Gerard Smith were going to take back to the executives.

*(Playing of videotape.)*

MR. FOX:  "The feds are here.  They've been here longer than a month, longer than that, setting up transactions on the outside."  This was a problem for the sheriff's department.

Mickey Manzo and Gerard Smith took this information to their lieutenant, and the three of them had a meeting with Mr. Baca and Mr. Tanaka at sheriff's headquarters, in Monterey Park at the time, fourth floor.

And at that meeting OSJ provided Mr. Baca with a briefing:  "Anthony Brown's an FBI informant.  He's part of a civil rights investigation being conducted by the federal government.  He's making allegations of force."

At that point Mr. Baca made a decision to overrule Lieutenant Thompson.

At this point Anthony Brown was scheduled to be sent out by OSJ to State the next day, but that meant there was equal access to Anthony Brown.

The FBI and the sheriffs, neither one of them, ran the State facility, so each one could have access to any inmate that was there.

Mr. Baca overruled Mr. Thompson and said:  "Anthony Brown is to remain in our custody.  He's to remain in our custody.  He's not going anywhere."

Mr. Baca set up a meeting for the next day, Saturday August 20th.  You'll hear this referred to as the "Saturday

meeting."  Mr. Baca brought a bunch of more people in.  In addition to OSJ, ICIB was there.  This group was there (indicating).  Also Internal Affairs Mr. Baca brought in and another bureau called Major Crimes Bureau.

Same briefing happened at the beginning.  Well, first of all, Mr. Baca told everybody something, same thing he had told the group the day before, and that's about this phone call with Steve Martinez, the head of the FBI in Los Angeles.

Told them about how Mr. Martinez had admitted it was an FBI phone, how Mr. Martinez had asked for that phone back and how Mr. Baca decided:  "We're not giving him the phone back.  We're going to keep the phone, just like the inmate."

So at the beginning of August 20th, Mr. Baca gave that briefing as well about his phone call, and then he was told once again what he already knew.  The whole group was told this.  "Anthony Brown is an FBI informant, it's part of a civil rights investigation, and he's making allegations of force by deputies."

At that point, OSJ played the calls between Special Agent Marx and Anthony Brown that had been recorded on their system before Anthony Brown got the cell phone.

Mr. Baca, Mr. Tanaka got upset -- Mr. Tanaka especially, slamming his hand on the table and yelling "F the FBI."

Mr. Baca then issued some orders, set this all in

motion, talking about the FBI and how he's an informant.  And Mr. Baca said:  "We're going to isolate the inmate, isolate Anthony Brown.  Keep him in our custody.  Keep him away from anybody.  Isolate him, and then we're going to criminally investigate the situation."

More on that in a bit.  I'm going to focus this part of this on what happened with Anthony Brown.

Mr. Baca then put Mr. Tanaka in charge of the overall operation, the same one who had just shot up and said "F the FBI."  Mr. Tanaka was going to be in charge, according to Mr. Baca.

And then the two of them, Mr. Baca and the man who knew exactly what it was that Mr. Baca wanted done, Mr. Tanaka, left the room.  Mr. Tanaka returned alone.

Mr. Tanaka explained to the group that was left, "I've known the sheriff for a number of years," and he had, "and I've never seen him so angry, never seen him so mad.  You heard the Sheriff.  We're going to do exactly what he wants done."

Anthony Brown stayed in sheriff's department custody. He stayed in 1750.  He stayed secure, safe, well taken care of in that cell that's for inmates like Anthony Brown.  But on August 23rd, things changed once again, and that's because Mr. Baca's order was violated.

On August 23rd, the FBI, having no idea that Mr. Baca

had issued this order, went to go visit the informant, hadn't heard from him, knew the phone had been found but wanted to make sure is he okay, is he safe.

So Special Agent Marx and two other FBI agents went to Men's Central Jail to interview Anthony Brown.  A deputy who had no idea about Mr. Baca's orders actually let them see Anthony Brown.  There was a note on Anthony Brown's door that said "Don't allow access," but this deputy either didn't read or wasn't aware of the note, allowed the FBI to interview Anthony Brown.

And as soon as OSJ and ICIB found out about this, Mr. Thompson and Mr. Leavins had the interview stopped, sent in a six-foot five, 300-pound sergeant who barked out that the interview was over, no one was to interview this inmate and asked who authorized that interview.

As the sergeant and his deputies pulled Anthony Brown out of the room, Special Agent Marx told Anthony Brown:  "Don't worry.  We'll be back for you."

And there was only one way to come back for Anthony Brown and ensure that he had to be turned over to the federal government and that was by getting a federal court order.

You'll hear it referred to as a writ, a federal writ issued by a Court that orders the production of a local inmate to the federal government.  Get to that in a little bit, too.

But, first, Mr. Thompson, Mr. Leavins, Mr. Carey had

something to deal with. They had to brief the executives. So Mr. Thompson, Mr. Carey and Mr. Leavins, Mickey Manzo headed over to Monterey Park, the fourth floor of sheriff's headquarters, and briefed Paul Tanaka. Told him what happened. "FBI was here." Paul Tanaka was mad. "F the FBI" once again. "F the FBI. I thought I was going to be notified."

Mr. Thompson asked whether the Sheriff was aware of what had happened. And not only was Paul Tanaka angry, he was also scared, said: "No, he doesn't know, but you're going to be the one that briefs him. I'm not going to brief him."

So Greg Thompson and Tom Carey walked over to the Sheriff's office. Mr. Carey got there a little bit after Mr. Thompson did. Mr. Thompson told Mr. Baca about what happened: "FBI got in to see Anthony Brown."

Mr. Baca said, once again: "I thought we were going to be notified."

Mr. Thompson explained what they were going to do to make sure it wouldn't happen again, apologized to Mr. Baca, fell on the sword, "I'm sorry," explained to him that the FBI had been kicked out and he was sorry for the whole thing happening.

Mr. Baca told Mr. Thompson that this was a chess match: "Don't worry about it. I understand. This is a chess match."

And then the sheriff's department played the first

piece:  Moved Anthony Brown to 8200, away from the incredibly secure portion of Men's Central Jail and up to an infectious diseases ward, a place where inmates with staph infections, MRSA, are placed.

Anthony Brown was two weeks removed from a medical procedure where he had a stent placed in an artery.  The sheriff's department moved him to 8200, to that ward.

Not only did the sheriff's department move his location but they had two OSJ deputies guard him at all times from that point on, 24/7 for the rest of the time that Anthony Brown was in County custody.  The FBI knew he had been in 1750. The FBI had access to 1750.  The sheriff's department had to move him to make sure that Mr. Baca's orders were not violated again.

On August 25th the federal government did come back with a writ.  A federal judge ordered Anthony Brown to be turned over to the federal government to testify before the grand jury.  He needed to be produced by September 7th of 2011.

US Marshals Service, which part of their duties is to serve writs, faxed the writ over to the sheriff's department Inmate Reception Center.  It's just an area that receives documents like writs.  It takes care of the computer files, keeps all the physical files of the inmates also in this area. It's a clerk's office.

US Marshals Service served the writ, also made some

phone calls to see where Anthony Brown was.  Couple hours later, though, poof, Mr. Brown disappeared.  Gone.  Not physically, but OSJ sent two deputies -- Mr. Thompson sent two deputies to the Inmate Reception Center to force Mr. Brown's release from the computer system to make it look like -- alter the computer system so it would look like Mr. Brown was no longer in the custody of the County, no longer in the sheriff's department system.  Gone.

And OSJ took the physical file that was located there of Anthony Brown so that anybody looking through the physical files couldn't find him anymore.  He was gone from the computer, gone from the files.  Anthony Brown was gone according to anyone who wanted to be looking for him.

A few hours later, OSJ changed Anthony Brown's name to John Rodriguez.  It's not a name, not an alias of his.  This was a new race that he had, according to the records.  John Rodriguez was Hispanic.  Anthony Brown was African American. New race.  No fingerprints.  No social security number.  No trace to Anthony Brown.  No one looking at John Rodriguez's file would know that that was Anthony Brown.

And just one minute after Anthony Brown was released from the computer system, Mr. Baca decided to play his next chess piece.  He called the US Attorney's office, the current US Attorney at the time -- I'm sorry, the US Attorney at the time, named André Birotte, and asked for a meeting four days

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

from then when Mr. Baca was going to be making some demands. I'll talk about that in a little bit.

You'll see an e-mail from the guy who knew Mr. Baca the best, the one that Mr. Baca groomed throughout the sheriff's department, Paul Tanaka, on the same day that all of this is happening, explaining how the whole operation was consuming Mr. Baca's thought process, and providing him with updated tidbits helps ease his mind.

And you'll learn that Mr. Baca wasn't just being provided with tidbits, he was being provided with a whole lot of information, learning about the name changes, the movement, ordering the isolation of Anthony Brown and other things.

On August 26th, ICIB and OSJ once again engaged in communications:  "What are we going to do if somebody comes with a court order in hand -- a federal order in hand and demands the production of Anthony Brown?  Forget about the fax -- forget about the service via fax.  What if an agent -- a federal agent actually comes to Men's Central Jail with that order and demands Anthony Brown?"  You'll see this in an e-mail.

The two, Mr. Thompson and Mr. Carey, discussed how they're going to have a policy sent out.  And you'll see the policy.  Captain Ornelas from Men's Central Jail issued a policy at their request:  "Do not release the inmate.  If a federal agent comes with a court order, do not release the

inmate. Don't worry about what the court order says. Do not allow contact. Don't let the federal agent have access to this inmate." At that point Mr. Brown was further isolated.

The evidence will show that, of course, the FBI knew that Anthony Brown was at Men's Central Jail; that's where he was last located. So the sheriff's department decided to get him out, to send him to a station jail.

First, OSJ and ICIB had a meeting with Mr. Baca, Mr. Tanaka at sheriff's headquarters, same spot, fourth floor in Monterey Park. Explained to him what was going to be happening, and Mr. Baca approved the name changes and the movement.

John Rodriguez was released, Anthony Brown's alias. He's gone now, too, and Mr. Brown became a new name, Kevin King, two links that needed to be put together in order to find Anthony Brown.

And that evening Anthony Brown was moved to San Dimas, a sleepy jail that really didn't have the same security levels at Men's Central Jail, not a secure place like Men's Central Jail was, not even close to 1750, but that's where Kevin King/Anthony Brown, was kept for the next week or so.

On September 2nd, Anthony Brown had decided he had enough of this. ICIB has been telling Anthony Brown he had been left for dead; FBI hadn't come back for him.

Anthony Brown knew nothing about the writ, so he

decided he was not going to be cooperating with the federal investigation anymore, thinking that the FBI left him for dead. What Anthony Brown wrote in a letter that you'll see is that he would only cooperate with the sheriff's department and that was only if the sheriff's department wanted to cooperate with him.

On September 2nd, he acted up in San Dimas, and Kevin King, his new alias, was released from the computer system. The computer system is altered again.  Anthony Brown became a new name, Chris Johnson, his third alias, third link that would have to be put together, and he was moved back to Men's Central Jail and to the infectious diseases floor.

If this was about anything but keeping him from the FBI, this move wouldn't make any sense.  He was reporting on abuses of deputies in Men's Central Jail.  They put him back in that facility.  Could have sent him to Lancaster State Prison where he belonged, they kept him in that facility.

On September 7th, the day he was supposed to be produced to the federal grand jury, to the federal government, he was not.  The sheriff's department kept Anthony Brown in Men's Central Jail under the name Chris Johnson.

You'll see right after that, the federal government asked -- through Mr. Baca's head of something called the Office of Independent Review, asked to interview Anthony Brown. Didn't let him.  Anthony Brown was not interviewed while he was in sheriff's department's custody.

Mr. Baca left the office September the 8th, went overseas for a couple of weeks.  And things calmed down, you'll learn.  Things eased up.  The obstruction of justice operation had a little delay while Mr. Baca was out.

Chris Johnson was released from the computer system, Anthony Brown's third alias.  Anthony Brown became Anthony Brown again, booked under his real name, real date of birth, everything.

And he was actually released this time, actually released from sheriff's department custody, heading over to Lancaster State Prison where the FBI and the sheriff's department had equal access to him.

You'll learn that as soon as the FBI found out about where he was, Special Agent Marx went to interview Mr. Brown. He was incredibly upset, angry, thought that the FBI had left him for dead.

After a long time, though, Special Agent Marx was able to get him to calm down, told him about the things she had done to try to find him, and he agreed to continue to assist in the investigation.

As I mentioned, there are multiple parts to this conspiracy.  I just covered the Anthony Brown part.  I now want to cover some other areas that are involved in the conspiracy in which Mr. Baca and his co-conspirators were trying to shut down the federal investigation.

Mr. Baca ordered, as I mentioned, at the Saturday meeting -- ordered a criminal investigation of what was occurring.  Everyone, including Mr. Baca in that meeting, you'll learn, understood his order to mean criminally investigate the FBI because that was the only entity at the August 20th meeting they knew had introduced that phone.

And he said this to ICIB:  "Put ICIB in charge."  But there were warning signs from the beginning.  While the federal government has an historic role investigating local law enforcement officers, there's something in the US constitution called the Supremacy Clause, and it doesn't allow the local government -- local law enforcement agencies to have the same involvement in federal law enforcement agencies.

Sheriff's department doesn't have jurisdiction. ICIB, you will learn, had no jurisdiction to investigate federal law enforcement officers.  Never had done it before, didn't do it since, wasn't in their mission statement, but Mr. Baca ordered in this one case for it to happen, something called the Supremacy Clause that doesn't allow for it.

Also, basic Law Enforcement 101, no crime had occurred.  This was a law enforcement operation.

When a law enforcement officer, whether he or she be federal, state, local, engages in an undercover operation, that law enforcement officer doesn't commit a crime.  Many of you -- or all of you may have known that coming in today.

Also, there were additional warning signs. Assistant Sheriff Rhambo, Number 3 in the department, not on this co-conspirator chart, not a co-conspirator, he heard about what was going on, heard about what was happening, that Mr. Baca had ordered the criminal investigation of the FBI, and he went to Sheriff Baca and gave him some warnings.

"Mr. Baca," he said, "undercovers are what we do. It's what law enforcement officers do. The sheriff's department conducts undercover operations. There's nothing wrong with it."

And Mr. Rhambo said: "I know you're upset with the FBI not telling you about this operation, but we're the suspects. They're not going to be telling us about this undercover operation because we're the suspects."

Mr. Rhambo warned Mr. Baca: "Don't F with the FBI."

You'll learn that these are words that Mr. Rhambo didn't use with the sheriff often, but he did here because he wanted to emphasize the point. He wanted Mr. Baca to know that he was treading on thin ice.

And then Mr. Rhambo said: "If you do this, that's obstruction of justice."

Mr. Rhambo provided Mr. Baca with these warnings, but Mr. Baca chose to ignore it. Mr. Rhambo told Mr. Baca to give the FBI back its phone, give the FBI back its inmate. Mr. Baca wasn't going to let that happen.

Four days later, you'll see some e-mails regarding a new policy going on in the department to keep the FBI out of the jails.  FBI had had access to Anthony Brown.  "Let's not let them have access to any other inmate in our facilities."

You'll see this policy, this e-mail we'll show you during trial, applied only to the FBI, only to the FBI.  "All FBI inmate interviews must be approved.  The interviews will only be at Men's Central Jail."  So when they shipped Anthony Brown out to San Dimas, couldn't interview him.

And you'll see the e-mails between Greg Thompson and Mr. Tanaka's aide in which they discuss taking the executives off of this policy to make sure there's no link between the executives and this policy.

I mentioned the phone call that Mr. Baca had with the US Attorney four days before a meeting was set up between them. Mr. Brown at this point had been isolated, as Mr. Baca had ordered.  He was sent to San Dimas, further isolated.  Mr. Baca had played those chess pieces.  So Mr. Baca had the meeting at the US Attorney's office and issued some demands.

First of all, he began beating a drum:  "The FBI committed a crime.  FBI committed a crime.  FBI is incompetent."  That's what Mr. Baca told the US Attorney.

Mr. Baca asked Mr. Birotte, the US Attorney, to shut down the federal investigation, but Mr. Baca left with no promises, no agreements, left with nothing.  The federal

investigation was to continue.

And you'll see phone records that showed that night Mr. Baca called Mr. Tanaka at 6:20 and 6:25 p.m.

Mr. Tanaka had a very important place to be the next day with no concessions, and that was Men's Central Jail, Men's Central Jail where those deputies were who were under investigation by the FBI.

The sheriff's department ICIB decided to identify those deputies who were in contact with the FBI and do something about it.  So the sheriff's department identified a handful of deputies, including Deputy Michel and Deputy Courson, the two involved in the undercover operation, and began tampering with those deputies, telling the deputies that the FBI was manipulating them, blackmailing them, coercing them, ordered them not to talk to the FBI and said that the federal grand jury subpoenas would be threats, nonsense and coercion.

I'm going to play four clips for you now.  The first voice you're going to hear is Steve Leavins' voice, and then you're going to hear Gilbert Michel's voice.

Steve Leavins telling Gilbert Michel what this investigation's all about.

(Playing of audio tape.)

MR. FOX:  It was not about a cellular phone.  This was about the sheriff's department being concerned with the FBI

using Gilbert Michel to take down deputies.

Next voice you're going to hear is going to be Scott Craig talking to Gilbert Michel and telling him how upset he was with the situation.

*(Playing of videotape.)*

MR. FOX:  So deputies Sergeant Craig, Lieutenant Leavins and Maricela Long also spoke to William David Courson, as I mentioned, and discussed grand jury subpoenas and what to do if Mr. Courson received a grand jury subpoena.

*(Playing of videotape.)*

MR. FOX:  And in case Mr. Courson wasn't aware of which kind of grand jury subpoena he's talking about.

*(Playing of videotape.)*

MR. FOX:  "You call me," Scott Craig, "I'll call him," Steve Leavins, "and we'll go from there."

Paul Tanaka was at Men's Central Jail that day.  Paul Tanaka was receiving briefings about what was going on with their interviews of these deputies.

And you'll see a phone call that Paul Tanaka places to Leroy Baca that day.  It's only a one-minute phone call, but then there's an unavailable number calling Mr. Baca right afterwards and it's a longer call.

September 2nd, ICIB became concerned about what if the FBI is listening in on everything that we're doing, all of this obstruction of justice that we're doing, everything that's

going on at sheriff's headquarters bureau, so they conducted what's known as a bug sweep.  Listening devices, called bugs, they were concerned were installed by the FBI at sheriff's headquarters.

So you'll see that the one and only time in ICIB's history they oversaw a bug sweep to see if -- you know, this is the entity that is supposed to root out crime.  They're making sure that nobody is watching them.

Mr. Baca's office is one of the offices swept for bugs.  Mr. Tanaka's office, also swept for bugs -- where all of these conversations are occurring in Mr. Baca and Mr. Tanaka's offices -- and the executive conference rooms where Mr. Baca is receiving the updates about Anthony Brown and the federal investigation.

Also, ICIB had its own offices swept.  They were doing a lot of the dirty work for the executives, for Mr. Baca, and they wanted to make sure that their offices also did not have listening devices installed by the FBI in them.

You'll see the e-mail in which this is discussed, which areas were being swept for bugs.

On September the 8th, ICIB decided to apply for a court order, with the approval of the executives, trying to seek the FBI's investigative records of the sheriff's department.  Went to state court and said to a state court judge:  "Order the FBI to turn over the records, all

investigative records of the sheriff's department.  Tell us who the agents are, their identities, including the undercover agents, their assignments.  Identify for us -- force the FBI to identify for us all the other informants in the jails."

You'll remember I mentioned the Supremacy Clause.  The state court judge was aware of it.  John Torribio denied the order stating the Court has no jurisdiction over any federal agency.  "You can't have the records that you are seeking," he told the sheriff's department.

As Mr. Baca was heading out of town, another policy reminder went out:  "All FBI inmate interviews must be approved.  Interviews will only occur at Men's Central Jail."

But this time Greg Thompson made a mistake.  He knew to keep the executives' names off the last time.  This time he actually did reference the executives.

Mr. Thompson said in this e-mail this policy was mandated by the department executives, keeping the FBI out of the jails.

As I said over the next 14 days, 13 days, little happened.  Mr. Baca out of the country, not a whole lot happens in this obstruction of justice conspiracy.  But when he came back, boy, wait til you see this.

He returns September 22nd, and you'll hear during a lot of this time he was having meetings with all his co-conspirators -- with many of his co-conspirators that are

not reflected on the calendar.

On September 22nd he had a pre-arranged meeting with Paul Tanaka at 4:30.  So you know on this occasion he did meet with Paul Tanaka.  That was a Friday that he came back.

Over the weekend, two news agencies wrote reports on the federal governments' civil rights investigations.  First, the LA Times discussed this investigation of deputy abuse and corruption in the jails, the fact that the FBI was looking at the sheriff's department so.  The heat was on.

Next, the Washington Post wrote an article about the administration's efforts and emphasis on civil rights violations by local law enforcement agencies.  So Mr. Baca needed to do something about this.

On the Monday that he got back from the weekend, he went on television and beat the drum again, stated that he resented the FBI's intrusion, continued to claim that the FBI committed a crime, and said that the sheriff's department polices itself, mentioned a meeting that he had set with the federal government the next day.  This was going to be with US Attorney André Birotte and the assistant director in charge, Steve Martinez.

He was asked:  "Do you resent the FBI's intrusion?"

     (Playing of videotape.)

MR. FOX:  He then said what the FBI did, the undercover operation, was criminal.

*(Playing of videotape.)*

MR. FOX:  Forget about the Supremacy Clause, forget about the fact that undercovers do not commit crimes by committing undercover operations.

Mr. Baca then started to talk about what this really was about, that he runs the jails and he needs to be respected, his authority, his power needs to be respected.

*(Playing of videotape.)*

MR. FOX:  And finally:  "We police ourselves."

*(Playing of videotape.)*

MR. FOX:  He then went on and talked about the Office of Independent Review, an entity within the County that couldn't bring charges against anybody, couldn't bring prosecutions, but that was a way that they police themselves is what he said.

Around the same time Mr. Baca had a meeting with some of his co-conspirators.  Met with Paul Tanaka, met with Tom Carey, met with Steve Leavins, and he approved a confrontation that was going to occur, approved sending sergeants out to Special Agent Marx's home.  Outside of her home, broad daylight, approved confronting her outside of her home.

And Mr. Baca provided only one piece of guidance. The man who was banging the drum about the FBI committing a crime said:  "Just don't put cuffs on her.  Anything else, fair game.  Just don't put cuffs on her."

Same day, Mr. Baca wrote a letter to the US Attorney beating the same drum.  Sheriff's department is going to be investigating crimes committed by the FBI, talking about the same undercover operation and how Mr. Baca continued to claim that it was criminal.

Sheriff's department was going to be investigating the FBI using the entity that wasn't supposed to be investigating the FBI.

The sheriff's department was going to be taking over the federal investigation, according to Mr. Baca's letter. "We're going to investigate the excessive force by the deputies."  And you'll see the dates in there match the dates in grand jury subpoenas for incidents that the grand jury had subpoenaed to find out about.

The sheriff's department was even going to take over the investigation the FBI had conducted of Gilbert Michel, the undercover operation that was on videotape, on recording, full confession to the FBI.  The sheriff's department was going to take that over as well, according to Mr. Baca.

Mr. Baca asked the US Attorney:  "Withdraw the grand jury subpoenas and stop supporting the FBI."

Instead, what he wrote was that the sheriff's department would conduct its own investigation of its own conduct and report back as needed, let the US Attorney know about what they found.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

You'll see that Mr. Baca's letter, which he has admitted contains his writing in it, also contained almost word-for-word writing in the denied court order of the Superior Court judge when he denied the information that the sheriff's department was seeking.  You'll have a chance to look at this later.  It's not that important right now.  It just has similar language in it.

And then that evening, his sergeants in ICIB went out to Special Agent Marx's home, told her that she was the named suspect in a felony complaint.

There was no document filed.  There was no charge against her.  There was no complaint on file.

The sergeant told her that he was in the process of swearing out an arrest warrant for her, told her that, "What we're going to do to arrange for your arrest is this," and he raised his hands as if to say, "We'll do it right out here in front of your neighbors and friends in broad daylight."

Special Agent Marx had no idea she was being recorded, no idea she was being videotaped, and she professionally asked the sergeants to contact her assistant director in charge, Steve Martinez, who had spoken to Mr. Baca six weeks beforehand.

*(Playing of videotape.)*

MR. FOX:  Special Agent Marx returned to the FBI's offices in Westwood here in Los Angeles, gave the card of

Sergeant Long to her supervisor, and then Special Agent Marx met with the assistant director in charge of the FBI, Steve Martinez, explained what happened.  And her supervisor reached out to Maricela Long, and Ms. Long, as soon as she received the call, began recording their conversation.

        (Playing of audio tape.)

        MR. FOX:  "The sheriffs knows this, sir."  That's what Maricela Long said.  She had the authority of Mr. Baca.

        At the end of their conversation, Maricela Long, who was recording this conversation, forgot that she was, and you'll hear what she said at the end of it.

        (Playing of audio tape.)

        MR. FOX:  "You're still rolling," laughter, "They're scared."

        Oops.  This is what it was about.  It was about intimidating, retaliating against the FBI.  It was not about a real investigation.  This was a sham investigation.

        As I mentioned, Mr. Baca had a meeting with the US Attorney's office and the FBI scheduled for the next day.

        Mr. Baca gave André Birotte, the US Attorney, that letter that he had written the day beforehand with all of the demands in it, saying that they were going to investigate the FBI, that they were going to take over the entire federal investigation, including of Gilbert Michel, that the US Attorney should withdraw the grand jury subpoenas, that the

US Attorney's office should stop supporting the FBI.

André Birotte told Mr. Baca:  "We're continuing with the investigation.  No matter what you do or what you say, we're continuing this investigation.  Too important not to."

Mr. Baca then turned to Steve Martinez, head of the FBI, and said:  "I'm the God damn Sheriff.  This is my God damn jail.  Do you wanna gun-up in here?"

You'll hear -- André Birotte in his testimony will tell you that he understood this last comment to mean:  "Do you want to go to war?  I'm going to go to war with you.  Let's start a war if you're really going to continue this investigation."

Mr. Baca around this time also had a meeting where he watched the videotape of the encounter with Special Agent Marx.  And you'll hear that his response was:  "It's the best laugh that I've had in a while."  That encounter with Special Agent Marx was the best laugh he'd had in a while.

Mr. Baca then later, after knowing everything that happened out there in front of Special Agent Marx's home, everything that happened, spoke with a reporter for the LA Times named Robert Faturechi and said that he sent the deputies.  He directed the deputies to go to Special Agent Marx's home.  He condoned their behavior after watching it and admitted that he sent them there.

You'll also be able to see what Mr. Baca has and has

not done since that time.  He didn't punish any fellow co-conspirators.  No one was investigated for any of their conduct.  Mr. Baca didn't cause anyone to be disciplined or investigated.

And you'll see the reviews that everybody received for that time period.  All of the co-conspirators that you'll see the reviews of received very good or outstanding reviews.

The only one not reviewed during that time -- you'll see that the government subpoenaed the records and only received -- of all of their reviews that the sheriff's department either did not have or did not turn over, Paul Tanaka's review for that period of time.

Mr. Baca was then interviewed April of 2013.  At some point the federal government began investigating, you know, what happened.  What really happened there with Anthony Brown? Was this all one big conspiracy or were there different individuals doing different things?  What was happening?  How high up did this go?

So on April 12th of 2013, the federal government set up a meeting with Mr. Baca through his attorneys, scheduled it in advance of time, set up at a time convenient to Mr. Baca.

He had two attorneys present.  It was conducted at his attorney's office to keep it as quiet as possible.  And Mr. Baca was told that the evidence obtained so far meant that Mr. Baca wasn't currently a target, meaning he wasn't someone

at that point in the prosecutor's judgment could be charged

with the obstruction, but that could change as the evidence

develops.

Mr. Baca was also informed of the subject matters of

the interview in advance.  What is this interview going to be

about?  Nothing was going to be a surprise to him.  It's going

to be about Anthony Brown, he was told.

Mr. Baca was told that it was going to be about the

sheriff's department response to learning of the federal

investigation and that this was going to be about the encounter

outside of Special Agent Marx's home, and Mr. Baca lied about

each one of those categories.

Mr. Baca is charged with that false statement count.

There's four lies in there.  I'm going to play you

the clips that encompass those lies.

First, lie Number 1.  Mr. Baca claims he didn't know

by that Saturday meeting.  Despite being briefed, the evidence

will show, two times at that point that this was a federal

civil rights investigation, Mr. Baca claimed in the interview

he didn't know it was one.

*(Playing of audio tape.)*

MR. FOX:  And that's because Mr. Baca knew on August

20th that this was a civil rights investigation.

The evidence will show none of the moves of Anthony

Brown made sense, none of the efforts to keep the FBI out of

the jails made sense.  It would show that that was obstruction of justice otherwise.

Lie Number 2.  Mr. Baca claimed that he was not involved in any conversation about keeping the FBI away from Anthony Brown.

(Playing of audio tape.)

MR. FOX:  And the evidence will show that on that August 20th meeting, when he said, "Isolate Anthony Brown," everybody knew that that was:  "Keep the FBI away from Anthony Brown."

Now, the August 23rd meeting when Mr. Thompson and Mr. Carey went into his office and discussed the fact that the FBI had just been there, had just been kicked out, he had a conversation with them at that point about keeping the FBI and Mr. Brown away from one another.

Lie Number 3.  Mr. Baca claims he was not aware and he was not informed the FBI was not allowed to continue that interview of Anthony Brown on August 23rd.

(Playing of audio tape.)

MR. FOX:  You'll hear not only an eyewitness account of what happened in Mr. Baca's office on August 23rd in which Mr. Thompson briefed him, told him the FBI had been kicked out and apologized to him, but Mr. Thompson also left that room and told Mickey Manzo about the discussion he had just had with Mr. Baca and told Mr. Manzo right away of what happened in

Mr. Baca's office.

Final lie.  Mr. Baca claimed that he was not aware that his sergeants were going to be going out to confront Special Agent Marx, to even approach her.

*(Playing of audio tape.)*

MR. FOX:  Mr. Baca was saying that he received a phone call from the assistant director in charge of the FBI after the confrontation, after the approach, and that was the first time that he learned that his sergeants, his department, was going to be doing anything with respect to Special Agent Marx.

And he continued to make the same statement later.

*(Playing of audio tape.)*

MR. FOX:  Over the course of the next couple of weeks we're going to prove these three charges to you beyond a reasonable doubt with a bunch of different evidence, overwhelming amount.

First of all, you're going to hear from witnesses, including Mr. Baca's fellow co-conspirators, some of the same people involved in the same actions that Mr. Baca was involved in, same people that were updating Mr. Baca, receiving his orders, same conduct that he condoned later.

Each one had their own role.  Each one had their own knowledge, just like Mr. Baca.  Not everybody knew exactly what everybody was going to be doing, but there was an overall

agreement to obstruct justice.

Despite your expectations, you will not be hearing from Paul Tanaka.  I don't believe that either side is going to call Paul Tanaka to the stand, but you will hear from many of his other co-conspirators.

You'll also hear from one of Mr. Baca's drivers and an aide of Mr. Baca who will tell you about secret meetings that were occurring during this time between Mr. Baca and his fellow co-conspirators, meetings that they weren't allowed to be a part of, how Mr. Baca was angrier than usual during this time, had more meetings with Mr. Tanaka than usual during this time, had more meetings with Mr. Carey, Mr. Leavins and Mr. Thompson during this time.

You'll hear from Assistant Sheriff Cecil Rhambo, the one who warned Mr. Baca that what he was doing was obstruction of justice, cautioned him, told him just to give up the phone, just to give up the inmate, give him back to the federal government.  He'll tell about those warnings.  He'll tell you about that conversation.

You'll also hear from the Superior Court Judge John Torribio who will tell you why he denied that court order seeking the FBI's records about its investigation of the sheriff's department.

You'll hear from Special Agent Leah Marx, Leah Tanner, who will tell you about the investigation she was

conducting with the FBI with several other agents about the abuses and corruption that were going on in the jails, about the confrontation that happened outside of her home that night, about the threats made to her and her response to them.

You'll also hear from former US Attorney André Birotte who will tell you about that conversation with Mr. Baca in his office on September 27th, the day after Special Agent Marx was confronted, in which Mr. Baca said he was the GD Sheriff, this was his GD jail and he was ready to gun up.

You'll see some e-mails between some of the co-conspirators.

You'll learn that Mr. Baca himself didn't e-mail, didn't have a computer.  He had aides.  He had people for that.  And they weren't part of the conspiracy, so you won't see any e-mails from Mr. Baca that were in furtherance of the conspiracy, but you'll also see some e-mails that related to Mr. Baca, talks about how this whole thing was consuming his entire thought process, and they needed to continue to provide him with updated information, including tidbits.

You'll see the documents that the sheriff's department kept, the fabricated documents with false information in them showing Mr. Brown's name changes and movement throughout these weeks.

You'll hear the recordings of witness tampering.

ICIB, as a general rule, recorded their conversations

no matter what they were doing, so they recorded these conversations in which they witness-tampered as part of what they did, never thinking that it would be turned over to the federal government at some point via a grand jury subpoena or played in open court before a jury.

You'll also have a chance to see phone records that will show that Mr. Baca was in contact with Mr. Tanaka.  They worked feet apart.  You'll see a schematic that they worked feet apart in their offices, but yet they were on the phone with each other routinely throughout this time period.

Mr. Baca also had contact with Mr. Carey and Mr. Leavins through Mr. Baca's drivers.  If they needed to reach him, they could call his drivers.

Also, calls directly to Mr. Baca.  Not many of them between these people, because for the most part you'll see that Mr. Baca would call Mr. Tanaka, and much like this chart (indicating), the information would flow down and then back up. Mr. Tanaka [sic] would only make a call to Tanaka, and from there the information would go.

You'll have a chance to see Mr. Baca's full television appearance on Good Day LA on September 26 in which he continued to claim that the undercover operation was a crime and that these were his jails and his authority needs to be respected.

And you'll have a chance to review Mr. Baca's letter

when he makes all the demands, talks about how they were going to take over the investigation.

And you'll also have a chance to see the recordings of the Leah Marx encounter, the Carlos Narro phone call to supervisor Sergeant Long.

You'll also have a chance to listen to about an hour's worth of his interview that the federal government conducted. It was about a four-hour interview -- there were breaks in between -- and the relevant, admissible portions of this recording will be played for you.

Mr. Baca, among other things, will say that he knew that it would be wrong to hide Anthony Brown from the federal government, and that he was angry, and it's because he used his anger in a tactical fashion in order to get what he wanted. He used his anger tactically.

You'll also have a chance to hear his lies once again and the context of the lies and hear how they go against the other evidence in the case and they were false.

The evidence overall will prove to you beyond a reasonable doubt that Mr. Baca is guilty of the charges. He authorized the actions of his co-conspirators. He monitored what was going on, received updates. He condoned their behavior and, ultimately, when confronted about it, with attorneys present, he lied about his conduct.

At the conclusion of the case, my colleagues and I

will come back up here.  I'll ask you to consider all this evidence and to return the only verdict that will be consistent with this evidence, and that is a verdict of guilty as to all three counts in the indictment against Mr. Baca.

Thank you very much.

THE COURT:  All right.  Thank you.

Ladies and gentlemen, we're going to take about a ten-minute break.

Again, I want to remind you that until this trial is over, you're not to discuss this case with anyone, including your fellow jurors, members of your family, people involved in the trial or anyone else.  And do not allow others to discuss the case with you.  That includes discussing the case over the internet through blogs, bulletin boards, via e-mails, text messages.  If anyone tries to communicate with you about this case, please let me know about it immediately.

Do not watch, read or listen to any news reports or other accounts about the trial or anyone associated with it.

Do not do any research, such as consulting dictionaries, searching the internet or using other reference materials, and do not make any investigation about the case on your own.

Finally, you are reminded to keep an open mind until all of the evidence has been presented, you've heard the arguments of counsel, the instructions of the Court, and the

views of your fellow jurors.

If you need to speak to me, simply give the note to the clerk.

And let me just advise Juror Number 12, we did talk with your employer and they've consented to give you some additional time.

All right.  We'll come back in about ten minutes.

*(Jury out at 2:34 P.M.)*

*(The following was heard outside the presence of the jury.)*

THE COURT:  Okay.  We will see everybody in about ten minutes.

*(Recess taken 2:41 to 2:47 P.M.)*

*(The following was heard outside the presence of the jury.)*

THE COURT:  Is there anything we need to take up before the jurors come in?

MR. FOX:  No.  The parties worked it out, I believe, Your Honor.

MR. HOCHMAN:  Yes, Your Honor.

THE COURT:  Okay.  Let's bring the jury in.

*(Jury in at 2:49 P.M.)*

THE COURT:  Does the defense wish to give an opening statement at this time?

MR. HOCHMAN:  Yes, Your Honor.

THE COURT:  All right.

MR. HOCHMAN:  Thank you very much.

May it please the Court, counsel, ladies and gentlemen of the jury.

On August 18, 2011, around 5:00 p.m. in the afternoon, Sheriff Lee Baca received a call on his cell phone from the head of the Los Angeles FBI office, Steve Martinez.

Now, it was not unusual for Assistant Director Martinez to call Sheriff Baca, because as heads of their organizations, brothers in arms, they worked on task forces together dealing with narcotics trafficking, gangs, armed career criminals and terrorists, indeed.  In fact, Assistant Director Martinez regularly spoke with Sheriff Baca.  But this particular phone call was unusual.

It was actually unprecedented because on this call, Assistant Director Martinez told Sheriff Baca something that had never occurred in the entire time they had worked together, in fact, had never occurred in sheriff's department history, that the FBI had smuggled a cell phone into the sheriff's jails as part of an undercover operation, did so without letting anyone, including the sheriff know about it, and now had an inmate that might be in danger and in need of protection.

Sheriff Baca couldn't believe it.  In fact, he had to have an Assistant Director Martinez repeat several times that it was the FBI itself that had smuggled the cell phone into the

jails.

Now, this unprecedented act of the FBI involved what you will hear to be an extremely dangerous form of contraband.

Now, contraband is something that is strictly illegal and prohibited in a jail in a secured facility.  And this contraband was a cell phone, because as you will learn in this trial, a cell phone in a jail can be used like a weapon.  It can be used to plot escapes.  It can be used to kill and intimidate witnesses.  It can even be used to smuggle drugs into the jail.

The cell phone was given to a violent and dangerous inmate, Anthony Brown, who was working with the FBI and who was sentenced to 423 years of imprisonment, a life sentence, for a series of violent, armed bank robberies.

Now, listening to this on his cell phone, the evidence will show that Sheriff Baca needed to know immediately how many deputies were involved, how many inmates involved, what type of contraband, drugs, cell phone had been brought into his jail because Sheriff Baca was personally responsible for the safety and the security of the 4,000 people and inmates that were in that jail.  He, not the FBI, had the responsibility on his shoulders for their safety and security 24 hours a day, seven days a week.

He needed to know immediately whether or not the FBI had smuggled an additional cell phone, had smuggled drugs into

the jail.  He basically needed to know how big a problem he had in the jails that he was responsible for, yet Assistant Director Martinez would give him no answers in that phone call.

In fact, for the next six weeks, the FBI stonewalled Sheriff Baca, giving him no information necessary to do his job.  So he had to get to the bottom of the smuggled cell phone without their help.

Now, Sheriff Baca set a clear and straightforward agenda for what he wanted to get done.  First, protect Anthony Brown, which is what Assistant Director Martinez asked him to do because the FBI had put Anthony Brown's life in danger, and, second, investigate the smuggled cell phone.

Now, carrying out that agenda was not an abuse of power.  In fact, it's exactly what you would want the Sheriff of Los Angeles County who is entrusted with ensuring the safety and the security of the people in the jail, to do.

Now, you will hear that others went beyond that agenda, and that was wrong, but the evidence will show that Sheriff Baca did not authorize, condone, agree with, or approve any of those wrongful actions.

In fact, what the evidence will show -- the evidence -- is that Sheriff Baca had no problem with the FBI, independent watchdog groups or anyone else looking into what was happening in the jails.  He treated all of them as his partners if they were there to make the jails better and safer.

Now, this case is not about civil rights violations or inmate abuse.  While these are all very serious issues, none of them have been charged in this case.  Instead, this case is about two things that the government will have to prove beyond a reasonable doubt:  First, whether Sheriff Baca, in a six-week period starting with that August 18th cell phone call, agreed to and obstructed the FBI's investigation into civil rights violations, and, second, whether Sheriff Baca, almost two years later in April 2013 -- because these events occurred in August and September of 2011, so almost two years later on April 12th, 2013 -- when he gave a voluntary, four-and-a-half-hour interview with the government answered six out of over 600 questions falsely.

As this trial will show, the government's evidence will fall terribly short of meeting their burden of proving each of those crimes beyond a reasonable doubt.

Now, my name is Nathan Hochman, and I along with Brianna Abrams have the privilege and responsibility of representing Sheriff Lee Baca in this case.

Now, you will hear how those six weeks in August and September of 2001 and that one day of April 12, 2013, fit within the career of Sheriff Baca.

Sheriff Baca is currently 74 years old.  He grew up in East Los Angeles and first served this country in the Marine Corps Reserves as a young man.

He then spent the next 48 years, almost five decades of his life, serving the people of the County of Los Angeles in the Los Angeles County Sheriff's Department, including being the elected sheriff, the head of the department, starting in 1998, being reelected three times thereafter, and serving for a total of 15 years as the elected sheriff until he retired in January of 2014.

While you will hear that the focus of the evidence in this case in August and September of 2011 is on one of the sheriff's seven jails that he was in charge of -- that's the Men's Central Jail -- you will hear that Sheriff Baca was responsible on a daily basis for far, far more than this one jail.

As the Los Angeles County Sheriff, his territory covered over 4,000 square miles with a population of 10 million people, greater than the population of many states, actually.

He was in charge of the largest jail system in the country, a jail system that had a $2.4 billion budget.  It had 18,000 inmates in seven custody facilities.  It ran the largest mental health facility in the entire county.  It actually ran the largest homeless facility in the entire county.  There were 18,000 employees that Sheriff Baca was in charge of on a daily basis, and there were 23 different patrol stations scattered throughout the entire county.

Now, in addition to all that, the sheriff's

department was run in an organization card that you have in front of you.

You'll see that each one of these little blocks -- and you'll have a chance when the evidence is presented to you to see it in greater detail -- but every one of these represents a different unit, bureau or a part of an organization or a jail that fell under Sheriff Baca's responsibility.

So when we say Sheriff Baca was extremely busy during the six weeks of August and September of 2011 all the way through April 2013, this is the type of responsibility he had.

So not only did he have the entire responsibility for the sheriff's department and he had the entire responsibility for the county, but within the county, the sheriff's department actually does the local law enforcement and the patrol services for 40 cities.  In fact, they also do the patrol services for 90 unincorporated areas.

Other services they provide involve patrol for community colleges, superior courts, the MTA -- when the hundreds of thousands of people ride the MTA, the sheriff's department is in charge of the law enforcement for the MTA. This is an enormous responsibility, well beyond just the events of the Anthony Brown cell phone that Mr. Fox talked about, and this is what is on the plate of Sheriff Baca every day.

And when he talks to his Number 2 person who runs the

day-to-day operations of this entire massive operation, they're not just talking about what happened with an Anthony Brown cell phone incident, they are talking about what we are describing and what the evidence will show that the sheriff's department was involved with.

Now, with respect to the two different counts that we're going to have here, Counts One and Count Two, what you will find out is that in addition to what the sheriff was involved with, he actually worked 12- to 14-hour days, six to seven days a week, and not only did he have the internal responsibility, but he also had an external responsibility. He would actually meet with community leaders, religious groups, nonprofits. He would testify in front of the Los Angeles County Board of Supervisors and even went to Congress in Washington DC to bring more funds back for local law enforcement.

Now, for over 48 years, Sheriff Baca worked for the sheriff's department, and as you will hear, Counts One and Two involve six weeks of that 48 years from August and September of 2011. And then when you actually hear the evidence, not the statements of counsel, but the evidence, you'll hear that of the six weeks, there's about three hours of activity that Sheriff Baca was involved with. That's it.

So his 48 years is going to get measured down to six weeks and then to three hours as it pertains to Count One and

Count Two.

Now, with respect to Count Three, you will hear that on that one day, April 12, 2013, Sheriff Baca gave a voluntary interview to the government in which they gave him something called a nontarget letter that said he was not a target of their investigation.

On that day, he answered over 600 questions. And of the 600 questions, you will find out that the government charged him with four false answers.

So, again, of his 48 years on the entire -- working for the Los Angeles County Sheriff's Department, it will get reduced down to one day for Count Three of the 48 years.

And of the one day of April 12, 2013, that, too, will get reduced down to a four-and-a-half-hour interview, and the four-and-a-half-hour interview will get reduced down to four answers. And the total combined time of those four answers that his 48 years will be reduced down to is 45 seconds.

Forty-five seconds is what you will be asked to measure Sheriff Baca's answers against. Forty-five seconds.

Now, the evidence will take you back over a decade, because we will start on the August 18, 2011, call, but to understand the circumstances behind it, you have to go back over a decade to when Sheriff Baca first took elected office in December, 1998. Because when he came in, you'll hear that there was an old school way of doing stuff: Bring 'em in,

bring 'em out, warehouse those inmates, treat them like the enemy.

But when Sheriff Baca came in, you will find out that he adopted a new idea of not treating inmates like the enemy.

MR. FOX:  Objection, Your Honor.

THE COURT:  Sustained.

MR. HOCHMAN:  Since there were thousands of deputies working for the sheriff's department in its jails and thousands of inmates going through those jails every year, how did Sheriff Baca monitor and deal with the problems that may have arose in the jail system?

Well, you'll hear that Sheriff Baca used investigators both inside his department and outside of his department.  Inside the department, there were two different bureaus that Sheriff Baca relied on:  The Internal Affairs Bureau, which investigated deputy misconduct that was in some ways a little less serious, it could result in a suspension, reprimand, perhaps a firing, and then he had the Internal Criminal Investigations Bureau.

This was a completely separate bureau within the department that investigated more serious deputy misconduct that could actually result in criminal charges being filed against deputies.

Now, what you'll hear about these two bureaus is that they each combined had dozens of full-time, experienced

investigators working for them.  And these full-time, experienced investigators would go ahead and draft reports, do their investigations, and then present those reports to the district attorney's office for evaluation on whether or not they should be prosecuted.  But you'll also hear that Sheriff Baca relied on another organization called the Office of Independent Review or OIR.

Now, OIR is, as its name suggests, an independent review of the sheriff's department organization, basically a watchdog organization.

OIR received its funding from the county, not the sheriff's department, and it investigated allegations of deputy misconduct in addition to the Internal Affairs Bureau and the Internal Criminal Investigations Bureau.

What you'll hear that is very unique about OIR is that it had something called realtime access to the investigations.  What that meant and which made it unique in the entire country is that it didn't have to wait months or sometimes years for the investigations to be complete before they got involved.  OIR could get involved as the investigation was happening.

And what you'll hear that was also unique is that OIR could make discipline recommendations to the sheriff's department, basically have this independent group make a discipline recommendation on how any type of deputy misconduct

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

should be handled.

What you'll also hear that made OIR particularly effective is who ran it, OIR, the Office of Independent Review.

The gentleman who will testify in this case who ran the Office of Independent Review was Michael Gennaco.

And who is Michael Gennaco?  Michael Gennaco is a nationally recognized federal civil rights prosecutor.  He's someone who actually worked originally at the US -- excuse me.  He worked originally back in DC.  You will hear that he worked for the United States Department of Justice, Civil Rights Division.

May I have a moment, Your Honor?

THE COURT:  Yes.

MR. HOCHMAN:  Well, apparently Mr. Gennaco sparks a little controversy in the electronics.

So let's go back and figure out who he is because you're actually going to hear him testify to yourselves to find out what OIR was all about.

So they don't bring in some -- some inept prosecutor who would be a rubber stamp for the sheriff's department, they bring in Michael Gennaco.

And what exactly happens when Michael Gennaco comes in?  What he does is he has five additional civil rights attorneys that are working in his organization.  He publishes annual reports of his activities.  So, in other words, this

independent watchdog group is publishing reports to the public of what they're finding inside the sheriff's department, and they take these published reports, and not only does he just reveal the investigations, but you will hear Mr. Gennaco testify that he also puts public criticisms of the sheriff's department in those reports.

So what that -- so the sheriff is relying both internally on the Internal Affairs Bureau, on the Internal Criminal Investigations Bureau, and then externally on OIR and other watchdog organizations and the public, because Sheriff Baca, as you will hear, had an open door policy both internally and externally.  If you wanted to see the sheriff, you could set up a meeting and he would see you.

Now, what is this case not about?  What this case is not about is civil rights violations, civil rights crimes, because none of these crimes have been charged against Sheriff Baca.

And why is that important here?  Because you are going to hear that Sheriff Baca was willing to hear about the good, the bad and the ugly.  And there is going to be some ugly, as Mr. Fox described, that you're going to hear from the stand.  You're going to hear government witnesses say to you -- testify to you that they engaged in deputy -- inmate beatings and deputy abuse.  You'll hear that.

Well, what you're also going to find out is that no

civil rights crimes have been charged against Sheriff Baca in this case, that these deputies who did these horrific acts, horrific, never told Sheriff Baca that they were doing it at the time, and he is not charged in this case with any of those civil rights crimes, not one. But the people who did do these beatings, you will hear, got sweetheart plea deals from the government to testify in this trial against Sheriff Baca.

Instead, what the government has charged Sheriff Baca with, and what they will have to prove beyond a reasonable doubt, is a much different issue: As to whether or not Sheriff Baca conspired and obstructed a grand jury investigation looking into potential civil rights violations during that August and September of 2011 time frame, and then whether or not he lied about it 20 months later in April of 2013.

So when did this investigation begin? Well, what you're going to hear is that it began back in June of 2010. And in June 2010, as Mr. Fox mentioned, the FBI received an allegation that there was inmate abuse going on in the jails, and the FBI at that time had over 600 -- excuse me, 800 special agents with decades of experience that they could have chosen from to follow up on this investigation. But who did they choose? They chose, as you heard, FBI Special Agent Leah Marx, now known as Leah Tanner.

But what was the problem with choosing Leah Tanner, as the evidence will show? Well, how many years at the FBI had

she had at the time she received these allegations?  One year.  This was actually her rookie year.

How many prior law enforcement years had she spent gaining experience to do this important investigation?  None.

How many civil rights cases had she run at that point as the lead agent?  None.

How much experience had she had in the jails at that point?  Had she ever been a jailer?  Had she ever worked for a sheriff's department and worked in the jails and done custody?

How many years of experience did she have at that point?  None.

And you've heard about this undercover investigation, how important running a good undercover investigation is.  Well, how many years of experience and how much experience had Leah Marx had at this point when she is entrusted with running this undercover investigation?  None.

Instead, what you will hear is that Leah Marx engaged in this investigation and she started it on June 2010, and at that point she spoke to 25 inmates over the next year.  And of those 25 inmates that rookie Agent Marx interviewed, she decided to pick one of those inmates to base her whole civil rights investigation around.  And who did Leah Marx pick?  She picked Anthony Brown.

And why is it important to understand a little bit about Anthony Brown?  Because it sets the tone and the frame

for when the cell phone is discovered, because what you'll hear about Anthony Brown is that he was a highly dangerous and violent criminal.

Sure, there are highly dangerous and violent criminals that might have been on the 2000 and 3000 floor, but they needed to be vetted, because what you'll find out is that this particular violent and dangerous criminal had a criminal record going back to the 1980s, that he engaged in a 2005 series, actually, of armed bank robberies that led to a conviction, that he was in jail at that point for a series of 2009 armed bank robberies where, as the evidence showed in those cases, he was high on crack cocaine, he actually fired a gun that narrowly missed one of the bank customers, and as importantly for everything else, as Special Agent Marx knew, Anthony Brown was a serial liar and, as she will testify, a master manipulator.

That's who she picked. That is who rookie Agent Marx picked.

And one of the facts we need to know about Anthony Brown as this undercover investigation is going -- the undercover begins on July 2011. On June 2011 Anthony Brown gets convicted and sentenced to 423 years in prison, which means he is going to spend the rest of his life in prison and at that point has nothing to lose.

So this is who Agent Marx bases her case around. And

during the next year she is actually going to meet with Anthony Brown for 10 or 20 times at the Men's Central Jail, and along the way he tells her that there are certain deputies that are willing to take a bribe -- a cash bribe if you bring them contraband.

Now, what is contraband?  We talked about it a moment ago, but contraband is something that, again, is strictly prohibited inside a jail facility which otherwise might be legal outside of a jail facility.

Cigarettes are contraband, pornography is contraband, drugs clearly are contraband, and a cell phone is contraband.

Why is a cell phone contraband?  Because what you will hear many deputies testify is that a cell phone in a jail can be used as a weapon.

Now, how can a cell phone be used as a weapon?  Here's how, as the evidence will show.

When an inmate in a jail wants to call someone on the outside, they have to use a public jail phone.  And that public jail phone call is recorded by the sheriff's department and they're able to access that recording.  They can find out the phone numbers that are being dialed.

But what happens when you use a cell phone?  It bypasses that system and, as you will hear deputies and the government's witnesses testify, that a cell phone can be used -- has many extremely dangerous uses in a jail.  It can be

used to plot escapes.  And, yes, this little phone can be used to plot escapes (indicating).

It can actually be used to kill witnesses, because as you heard, many of the inmates who are in Men's Central Jail are awaiting trials, and especially on that floor, trials in which they could go to jail for the rest of their life.  So it can be used to put hits on witnesses.

It can also be used to bring drugs into the facility.

That's why a cell phone is an extremely dangerous form of contraband and can be used as a weapon inside of a jail.

So what you'll hear is that when Anthony Brown and Agent Marx are having a discussion on which type of contraband to use, Anthony Brown says, "Well, the deputy I have been talking to could take some outside food, he's willing to bring me cigarettes for money, or he's willing to bring me a cell phone."

And you will hear that rookie Agent Marx picked the most dangerous form of contraband, the cell phone, in order to bring that inside the jail and use for the bribe transaction.

Now, what you'll hear is that with respect to that cell phone, the other part of the cell phone is not just merely bringing the cell phone in but who they gave it to.

And they gave it at that point to Anthony Brown in a way that had never been done before.  They had never actually

brought a cell phone into the sheriff's jail, or for that matter any other jail, because it was such a dangerous form of contraband.

And what you will find out, again, with Anthony Brown is that he had 423 years and nothing to lose.

Now, as the evidence will show, the bribe plan was cooked up like this. You had Anthony Brown saying, "I've got this deputy who I can exchange this cell phone for money." Who is that deputy? The evidence will show it turns out to be this deputy, Gilbert Michel.

And how did Anthony Brown convince Gilbert Michel to go ahead and do this bribe for a cell phone plot?

Well, what Anthony Brown and Agent Marx decided is that Anthony Brown would tell Gilbert Michel a lie. He would say basically that in doing those armed bank robberies, he had stashed away about $800,000 on the outside, and that he was willing to go ahead and pay Gilbert Michel $2,000 if he brought him the cell phone into the jail and two additional thousand dollars every time he took the cell phone back, charged it and returned it.

In fact, you will have Gilbert Michel testify that he expected to get up to $20,000 for participating in this bribe transaction.

And how was Anthony Brown going to get the payments now to Gilbert Michel? Because, obviously, Anthony Brown

didn't have thousands of dollars of cash in the jail.  What he did, working with Agent Marx, is they brought in -- the FBI brought in a different person that was going to contact Deputy Michel on the outside.

And who is this other person, this mysterious other person?  Another undercover agent, and he's going to go by the name of CJ.

Now, CJ, the undercover agent, was brought in by FBI Agent Marx in order to make sure that the FBI was not connected to Anthony Brown or the cell phone.

Let me say that again.  Agent Marx wanted to make sure that the FBI was not going to be connected to Anthony Brown.

And why is that important?  Because what the evidence will show is that if Anthony Brown is found out to be an FBI informant, or as they call it there, an FBI snitch, Anthony Brown's very life could be in danger from retaliation by inmates or the deputies he's snitching on.  So it was very important to distance Anthony Brown and that cell phone from the FBI.

Now, a problem occurred, and what that problem was is that even though they arranged this transaction, certain rookie mistakes came up that forever connected Anthony Brown and the cell phone to the FBI.

What were these rookie mistakes?  Well, on July 18,

what you'll hear is that Deputy Michel finally reaches CJ and they agree to do the deal, that first payment -- you know, the cash for the cell phone, and they're going to do it two days later on July 20th.

But on July 18th, what you'll hear -- and so July 18th, 19th and the 21st -- is that Agent Marx made rookie mistakes, because what was happening is that Anthony Brown in the Men's Central Jail, he knows this is going to happen, he's getting anxious. "When's my phone going to come in? When's my phone going to come in?" And instead of being patient, he calls Agent Marx on the public jail phone, the one that's recorded.

Now, for over a year, every time Anthony Brown had called Agent Marx on that public jail recorded phone call, she never took the call, but what happened on July 18th, 19th -- remember the 20th is when the transaction occurs -- and the 21st is that Agent Marx took the call each day, forever connecting the FBI to Anthony Brown and the cell phone.

You'll hear on July 18th, in a recorded call, Agent Marx talked to Anthony Brown about the transaction. You will hear on July 19th, in a recorded call, she told him: "You will have your phone soon. Then you can call whoever you need."

And then you'll hear on July 21st in a recorded call, she assured him that: "You're good. You're good."

Well, what was Anthony Brown good for?

Well, you'll hear that on July 20th, on that day Deputy Michel actually did show up for the meeting with CJ in which the cash was exchanged for the cell phone.

You'll hear that CJ only gave him a partial payment of $700.  Actually, they are only going to get $1500, but he gave him the first $700 in cash that day.

And how is the evidence going to show that this happened?

Because you will hear that there were six FBI agents surrounding the parking lot watching and videotaping this transaction.

And where was Agent Marx at that time?  Was she one of the six or hiding behind the building or behind the bushes?  No.  Agent Marx and three other FBI agents were high overhead, thousands of feet overhead in an airplane with high quality video surveillance equipment videotaping this entire transaction.

And then you'll see that at the end of it what happened is that the FBI got their man.  They got it all on video and they arrested him for the bribe.

Well, actually only two out of those three things happened.  The FBI got their man, they got it on video, but they didn't arrest him for the bribe.

Instead, what you're going to hear is that Agent Marx let Deputy Michel go and bring the extremely dangerous cell

phone into the jail even though that cell phone at that point, as Agent Marx knew, could be directly traced back to the FBI, and if found and connected, could put Anthony Brown's life in danger for the entire time he would be in prison, which was the rest of his life.

Now, once the cell phone got to Anthony Brown, the situation only got worse because one of the -- one of the phone calls that Anthony Brown made with a cell phone, like this (indicating), was directly to Agent Marx, forever connecting the cell phone to Agent Marx at her desk in Westwood, California, the FBI desk.

Now, did Agent Marx at that point just terminate this, figuring, "Look, we've got the cell phone in the jail. We got Gilbert Michel on tape. He took the cash. We can call it a day? Because now Anthony Brown's life can be in danger. He's made these public calls, and he's now just used the phone call to call me directly." No, she doesn't do any of that.

Instead, what happens is that she -- she lets the cell phone stay in the jail, hoping that Anthony Brown can use this cell phone to video record or photograph inmate abuse that's going on there, deputy beatings.

Imagine that he's going to just stick it through the bar windows in his cell just as coincidentally there'll be some deputy abuse in front of him, or maybe he'll be, I don't know, walking down the hallways and shoot it behind his back and

somehow not be detected.  That's the great plan of Agent Marx, to allow a live and dangerous cell phone to stay active inside the jail.

Now, the fact that this particular cell phone didn't actually result in any of the dangers happening has nothing to do with the potential for the dangers that could happen, as the evidence will show.

So what safeguards did Agent Marx put in place?

The government talked about that she put in some type of safeguards.  But did she actually go ahead and use a system that the FBI had that you can put a pin code in and actually hear when someone is making phone calls in realtime, and if they send a text, see that text in realtime?  No, she didn't use that system.

Did she set up an on-line alert so that she could be notified when a call is being made or a text is being sent?  No, she didn't use that safeguard.

Was she somehow otherwise able to listen to the phone calls being made to make sure they were being used for a proper purpose or see the texts as they were being sent?  She didn't do that either.  The safeguards were nonexistent.

Instead, once the phone landed in the jail, as Mr. Fox alluded to, problems began to grow, and that first problem was Anthony Brown's cellmate, who was awaiting trial for attempted murder.

And he saw Anthony Brown using the phone, and he said:  "Hey, I want to use that phone to call my girlfriends or I'm going to get you in trouble."

So Anthony Brown calls CJ.  They confer with Agent Marx, and they say, "Okay.  We'll let the cellmate use the phone to make unmonitored phone calls to the girlfriend."  But did Agent Marx -- rookie Agent Marx, investigate who the cellmate was to see how dangerous a person he might have been?  No.  She had no idea who the cellmate was.

Did she go ahead and actually trace the phone calls that the cellmate made to find out if he actually called his girlfriend or maybe he was arranging hits on witnesses or whatnot?  No.  She never actually traced those phone calls at all.

Did she determine in any way what the cellmate was actually using the phone for?  No.

Did she terminate the service and say, "Look, this is just too dangerous.  We've already got the bribe transaction.  It's on video.  We're good.  We're not going to take these additional extremely dangerous risks"?  Not at all.  And you will hear that she could have terminated the service like that (indicating).

Instead, on August 4 she goes back to the well, and she wants to go ahead and complete that bribe transaction with CJ.  She again sets up a dozen surveillance agents.  CJ meets

with Deputy Michel.  CJ hands him another $800.  Deputy Michel says, "Thanks.  I'll bring the phone back to Anthony Brown." They get it on video.  They got their man.  But, again, instead of arresting him, she lets him go again.

And as you will hear, she allows the cell phone to stay alive and active with all the potential for the dangerous and sinister uses it can be used for.

Well, four days later on August 8 of 2011, the deputies actually found the cell phone in Anthony Brown's stuff buried inside of a Doritos bag.

Now, Deputy Michel immediately found out that this had happened, and he calls CJ and tells CJ, "Well, you got to get rid of your phone," and CJ goes ahead and tells Agent Marx, "Look, we have a problem here.  They have found our phone inside the Men's Central Jail."

Now -- and, remember, if you find the FBI phone in the Men's Central Jail on Anthony Brown and Anthony Brown gets known as an FBI snitch, his life is in danger for inmates and the deputies he's snitching on, including at this point Gilbert Michel.

So does Agent Marx quickly arrange for witness protection of Anthony Brown to secure his safety?  No.

Does Agent Marx go to the jail herself on August 8th or send CJ to see Anthony Brown to warn him and let him know that, "You're okay.  We'll protect you"?  No.

Instead, what you'll hear is that on August 8th, when the cell phone is discovered, for the next 15 days, Agent Marx does not go to the jail, CJ does not go to the jail to see how Anthony Brown's doing and make him understand that he's not going to be abandoned by the FBI.

Only on August 23 -- and, remember, that's five days after that August 18th phone call with Steve Martinez and Sheriff Baca.  Only on August 23rd does Agent Marx finally go see Anthony Brown at Men's Central Jail to see how he's doing.

But the evidence will show that not only did Agent Marx keep Anthony Brown in the dark about the FBI's involvement with respect to the FBI's interest in helping out Anthony Brown, she also kept one more person -- it's very important -- in the dark, and that one more person is the head of her office, Assistant Director Steve Martinez, because between August 8th and August 18th, you will hear that Agent Marx didn't even tell the head of her office that the cell phone had been discovered inside the Men's Central Jail, which is why Steve Martinez doesn't call Sheriff Baca on August 8th when it's discovered or August 11th or 13th or the 17th.

Only on August 18th is when Sheriff Baca gets contacted by Steve Martinez because that's when he was contacted by Agent Marx and told about the cell phone.

So then that takes us to the August 18th cell phone call.  And at that call, as we said, FBI Assistant Director

Martinez called Sheriff Baca to tell him that the FBI phone -- the FBI cell phone had been compromised inside the jail and importantly he needed to keep Anthony Brown safe.

Why did he need to keep Anthony Brown safe? Because Assistant Director Martinez knew at that time that Anthony Brown's life could be endangered by the activities that the FBI had taken.

Now, the problem with getting this information from Assistant Director Martinez was that that was all he told him. That was it. He didn't tell him about any of the other stuff that you needed to know about when your jails are compromised and you're responsible for them -- you're responsible for the safety and the security of the thousands of people inside the jails. You just had the FBI director tell you that there's a cell phone that's been introduced in the jail. You got to keep this inmate safe -- and provides you no other detail about their investigation, didn't provide you detail of how that cell phone was smuggled into the jail.

In other words, what wasn't working in the jail that allowed this stuff to be smuggled in? Were there other cell phones that the FBI had planted in the jail? How about other contraband like drugs? Were drugs in the jail? How many deputies were involved?

Because, remember, they don't even tell it was Deputy Michel at the beginning. How many inmates were involved? I

mean, you could have drugs and cell phones scattered now throughout the jails.  We don't know and the FBI is not telling Sheriff Baca how big of a problem he was facing.  They're getting no answers from the FBI.

So without answers from the FBI, Sheriff Baca has to do what he's entrusted in doing.  He has to do what he has a duty to do, what he has a responsibility to investigate because it is a state crime if a deputy is corrupt.  It is a state crime if there's stuff going on in the jails, if drugs are in the jail.  That's not just a federal crime, that's a state crime.

If there's a corrupt deputy, that's a state crime.  If there's cell phones in the jail, state crimes.  If there's contraband in the jail, that could be crimes, too, not crimes that the FBI is going to investigate months or years later, but crimes that Sheriff Baca has to investigate right then and there because, again, the FBI is not in charge of the safety and the security of all the inmates and the people working in the jails; that's Sheriff Baca.

So what you're going to hear is that on August 18th, first, that Sheriff Baca does have a call with Undersheriff Tanaka, the Number 2 person in his department.  And the reason he is talking to the Number 2 person is that this is an important investigation.  How big a problem are we facing in the jails?  It's a very important investigation.

And you'll hear that Undersheriff Tanaka sets up the briefing for him on August 19 and they have a briefing that day.

And what you're going to hear that the government didn't mention in its opening is that Anthony Brown gets interviewed on August 18th and he says that there's a deputy involved -- no.  Actually, first he says there's a nurse involved.  Then eventually he gets to a deputy involved.

And then on August 19th, they talk a little bit about it in the morning; there's another deputy involved.

And they say, "Well, will you tell us what the name of the deputy is?"  And he says, "Well, if you give me a cheeseburger and some cigarettes, I'll tell you the guy's name."

And they didn't have a cheeseburger and cigarettes on them on the morning of August 19th, but the afternoon of August 19th is when you'll see this briefing occurs with Undersheriff Tanaka, with Mr. Manzo and others.

And they tell him, "Look, he's talking to us and he's going to tell us, hopefully, the name of the deputy.  Shall we send him on to state prison?"

And Sheriff Baca, you will hear, gives an order and says, "No.  Hold on to him.  Keep talking to him, and see if he starts giving us more information as to who that deputy was." And he actually did.  In the subsequent interview, he

identified Gilbert Michel and provided, actually, even more information about what the FBI had supposedly done inside the jail.

Now, what you'll hear after this briefing is that they set up a bigger meeting that's going to happen on August 20th. That's that Saturday morning meeting.

And what's going to happen there is that -- Sheriff Baca was actually scheduled to run a 5K charity event that day, and he shows up in the meeting in a tracksuit and says: "Okay. Here's the deal. I'm going to lay out a very simple agenda for you folks, and the agenda is twofold. I want to keep Anthony Brown safe because the FBI director has told me that we need to keep him safe and we got to keep him safe. He's our responsibility. And since there's inmates who might think he's a snitch now and since he's snitched on some or more deputies, we got to keep him safe. And then we got to investigate how the cell phone was smuggled into the jail" -- because, again, the FBI is not assisting in this investigation and they need to determine how big a problem they're facing.

You will hear at this point that the problem that they were facing had a lot of different components. And you'll actually hear the deputies who were in charge of the investigation -- because you had Undersheriff Tanaka in charge of the overall investigation and then Captain Tom Carey, the head of this Internal Criminal Investigations Bureau, who is in

charge with running the direct investigation.

So what information on August 20th and the days that followed were they starting to get from both Anthony Brown interviews -- and you'll hear that he was interviewed at least four to six times during this time period -- and the other parts of their investigation?

Well, again, they found out originally it might have been a nurse that smuggled the cell phone in.  And they investigated the nurse and they thought, ah, probably not a nurse, so maybe it's a deputy.  Well, that seems somewhat likely, but they didn't know which deputy, or maybe -- Anthony Brown later tell them there's a second deputy or maybe a third deputy.  And then, obviously, we've got at least one inmate, but Anthony Brown talks about other inmates that are involved. How many other inmates?  Who knows?

And then, you know, we have one cell phone.  Anthony Brown talks about a second cell phone, and there could be a third or more cell phones.

And as importantly, on the cell phone what they find when they actually download the photos from the cell phone -- and you will hear this evidence -- is that Anthony Brown had taken pictures of baggies of cocaine, balloons of heroin, methamphetamine and extasy.  Those are photos on the FBI's cell phone that was found on Anthony Brown.

So when we're describing how big a problem the

sheriff is facing, this is, in part, what the problem looks like that he has to deal with right then and there.

He can't wait for weeks, months or years to figure out how to deal with this problem, and the FBI is not assisting him in figuring out this problem at all.

Now, Sheriff Baca, as you heard, put Undersheriff Tanaka in charge of the investigation. And as Mr. Fox alluded to, you will hear about the relationship between Sheriff Baca and Undersheriff Tanaka.

And Sheriff Baca did view Undersheriff Tanaka in sort of a father/son relationship, but, unfortunately, the evidence will show, Undersheriff Tanaka did not share the same loyalty to Sheriff Baca, because when Undersheriff Tanaka is in Sheriff Baca's presence, the evidence will show he was, "Yes, sir. No, sir," but outside of Sheriff Baca's presence, you will hear that Undersheriff Tanaka operated his own agenda.

He installed people throughout the sheriff's department that were loyal to him and not Sheriff Baca, that he told people -- and he boasted to people how he was going to be the next sheriff and how he advocated the old school view that the inmates were the enemy to be warehoused and dealt with, not the way Sheriff Baca approached inmates.

So, again, what you're going to hear is that Sheriff Baca believed and had the impression that when Undersheriff Tanaka was carrying out his orders exactly the way he did,

those were the lawful orders.  Those were the proper and legitimate and responsible orders.

What he didn't appreciate is that Undersheriff Tanaka had this separate agenda.  What he also didn't appreciate is that Undersheriff Tanaka was controlling the flow of information to him in a way that kept away information not consistent with Sheriff Baca's agenda.

Mr. Fox alluded to this e-mail you'll see.  And the important part of this e-mail will be the "updated tidbits" part of this e-mail, that when Paul Tanaka is talking to one of the investigators, Steve Leavins, he said:  "I am providing him with updated tidbits to ease his mind."  "Updated tidbits."

He's channeling the flow of information to Sheriff Baca.  And why?  Because Undersheriff Tanaka had a third element to the agenda.  It wasn't just keep Anthony Brown safe and it wasn't just investigate how the cell phone got smuggled into the jail, it was "F the FBI."

That was Undersheriff Tanaka's agenda and not Sheriff Baca's agenda, because what you'll hear is that Sheriff Baca viewed the FBI as his partner, as someone he had worked with in the past, was working on numerous task forces with fighting crime and intended to work with in the future.  Undersheriff Tanaka, though, had a different agenda.

Now, on August 23rd, you're going to hear that these two agendas clashed because -- recall what happens on that day.

Leah Marx, Special Agent Marx, finally goes to see Anthony Brown in the jail with two other FBI agents, and that one-hour interview is cut short when Anthony Brown is escorted out of the office.

And then that Lieutenant Greg Thompson finds out about it and says, "Oh, God.  The FBI got to talk to Leah Marx" -- excuse me.  "Anthony Brown got to talk to the FBI."

And so Lieutenant Thompson then goes to Undersheriff Tanaka.  So let's start the clash of agendas right there, because when Lieutenant Thompson tells Undersheriff Tanaka that the FBI got in to see Anthony Brown, what was the reaction?  The reaction was -- well, you will see in an e-mail -- a butt chewing.  He actually uses those words, a butt chewing, because Undersheriff Tanaka screamed -- screamed at Lieutenant Thompson.  He basically cursed him out.  He was dropping "F" bombs and "F the FBI" all over the place because he couldn't believe that the FBI got to see Anthony Brown.

And he says to Lieutenant Thompson and Captain Carey: "You guys will tell the sheriff."

And the part that you didn't hear, when Mr. Fox was telling you, is what Sheriff Baca's response was when they told him that the FBI got to see Anthony Brown.  He wasn't upset at all.  He received the information calmly.  He was understanding because keeping the FBI away from Anthony Brown was not part of Sheriff Baca's agenda, which is why when he found out that they

got to speak with Anthony Brown, he wasn't upset at all.

Now, what you will all find out is that the FBI -- excuse me, that Sheriff Baca had an agenda, and that agenda was based on two different words:  Being open and being direct.

And the way you get to see that in its most illustrative way is what happens on August 29th, because Mr. Fox alluded that on August 29th there's a meeting with the United States Attorney, André Birotte.  And the reason that that's important is who André Birotte was at the time.

The United States Attorney is the head of the US Attorney's office, not just these assistant US Attorneys (indicating), but there's one United States Attorney, presidential appointment, Senate confirmed.  And they're not only in charge of Los Angeles County, but the entire Central District of California, which includes six other counties around Los Angeles County.

And Sheriff Baca set up a meeting with the United States Attorney Birotte, a gentleman who could actually be in charge of charging him with obstruction of justice, charging him with conspiracy.  And he sets up this meeting with André Birotte because he wants to tell him what he thinks is going on here.

And what you'll hear is that he was very open and very direct during that meeting.  And in that meeting he basically says to André Birotte:  "Look, the FBI doesn't have

the experience with the jails.  The sheriff's department does," that, "We both have jurisdiction over these jails and we should work together or at least you should allow us to be part of your investigation."

And he's going over and over this with André Birotte, being open and direct.  He says -- then he says:  "Look, we are investigating these criminal violations."

Does André Birotte stop him at that point and say: "Look, these are not criminal investigations.  What are you talking about," or, "no, you don't have jurisdiction over your own jails."  Nothing.

What you're going to hear is that André Birotte and the four to six prosecutors he was with sat there very politely, sat there silently, listened to what Sheriff Baca had to say, and he couldn't have been more open about everything Mr. Fox was talking about.  All those thoughts that he thinks are obstruction, he tells André Birotte that's what he's thinking.

And Sheriff Baca then leaves that meeting, and at no point does André Birotte tell him:  "Look, we're having problems dealing with getting access to Anthony Brown.  We're having problems with our federal investigation."  None of that.

So Sheriff Baca leaves that August 29th meeting again with no answers to the question that he has to answer; how big a problem.  No answers from the FBI, no answers from the US

Attorney's office.

Now, what you're going to hear is that after that August 29th meeting, there's stuff that occurs in the end of August all the way to the beginning of September that are actions that are not right. They are wrongful actions.

And those wrongful actions, Sheriff Baca was not involved with, did not participate in, did not authorize, condone, agree to or accept in any way.

And that's what the evidence will show.

So let's say -- Mr. Fox spent some time on this federal writ, but when you hear the evidence of the federal writ, listen to see whether or not any of it says Sheriff Baca knew or was involved with it, because you are going to find out that Sheriff Baca wasn't involved with the federal writ.

You've heard about this issuance of a policy with regard to FBI visits. See if you hear any evidence from any witness at all that says Sheriff Baca was involved with that.

How about the seeking of the court order that you saw Mr. Fox put up on the screen for you earlier about the FBI files? What you're going to see is that Sheriff Baca was not involved with that, did not participate, wasn't even informed about it at the time, played absolutely no role.

How about telling deputies not to cooperate? When you hear those tapes -- and you will hear tapes -- in fact, you heard part of those tapes in Mr. Fox's opening -- ask yourself

and listen for who's going to say that Sheriff Baca knew that anyone was telling the witness not to cooperate.  You will find that no witness, no document will say that for you.

How about the bugs, sweeping for listening devices? It sounds pretty bad until you find out when the evidence comes in -- you'll see the evidence -- that Sheriff Baca wasn't involved, knew about, authorized this at all.

And how about the surveillance of FBI agents?  Again, you're going to find no involvement whatsoever involving Sheriff Baca because what Sheriff Baca was -- during most of that time period when a lot of this is happening, he was on an international trip and was out of the country at that time.

Now, what happens is he comes back and his first full day of work was basically on that Monday, September 26.  And when he returned on that day, as you saw, Sheriff Baca goes on TV, that Good Day LA program.

And what happens on that Good Day LA program?  He is actually on the program to speak about running in a running event to raise funds for the disease Lupus to fight the disease Lupus.  But the hosts of the program say, "Well, what about the cell phone and what about the FBI?  What's going on with that?"

And what you'll hear -- and please listen to the words of the tape -- is that Sheriff Baca, again, like he was with Mr. Martinez, like he was with Mr. Birotte, was open and direct and shared all his thoughts, good, bad or indifferent,

with the entire viewing public.

This wasn't obstructive conduct that's hidden, secretive, deceptive.  It couldn't be more open and transparent.

The very statements that are said that Mr. Fox played for you that he thinks are obstruction, he's telling the world that he thinks that the FBI has made a mistake, that the FBI was involved in this situation, that there are crimes that were being -- occurring in the jail.

And what he says is that "Look, the police, along with the Office of Independent Review, are capable of policing themselves."  He didn't say that the FBI couldn't police us. He said that, "We should be part of that process."  And he says it openly, he says it directly, and he says it to everyone.

Now, as you're also going to hear on that day -- and this is a very important piece of evidence that will come in -- is that after the Good Day LA interview, there's a meeting in Undersheriff Tanaka's office.  Sheriff Baca is there, Undersheriff Tanaka's there and two of the investigators are there.

And, remember, up until this point, so September 26th, we're six weeks into this.  They don't have answers to their questions.  The FBI is not cooperating at all.  The United States Attorney's office is not cooperating at all, but they find out that Agent Marx is one of the investigators

that's been involved in this -- in the FBI investigation.

And the investigators ask Sheriff Baca, "Can we go out and interview her?"  And Sheriff Baca, as you will hear the evidence come in, says "Yes."  He okays the interview, but he said:  "Don't put cuffs on her.  Do not threaten to arrest her or charge her, but if you want to interview her and see if she's going to answer your questions, go ahead.  I tried with Mr. Martinez.  I tried with Mr. Birotte.  Perhaps Agent Marx will answer the questions."

Well, what we find out later is that United States Attorney Birotte calls Sheriff Baca that night and he says: "Look, I just found out that two of your investigators had gone out to Agent Marx's house and threatened to arrest and charge her."

And Sheriff Baca immediately says:  "She will not be arrested.  She will not be charged," because Sheriff Baca had never given that order to arrest or to charge her.

In fact, you will hear from Captain Carey who was at that meeting that no such order was ever given by Sheriff Baca to arrest or charge Leah Marx.  These investigators did it on their own.  And when Sheriff Baca found out about it, he immediately told United States Attorney Birotte:  "It will not happen.  Full stop."

Well, the next day Sheriff Baca had already set up a meeting with US Attorney Birotte and this time Assistant

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

Director Martinez in the US Attorney's office -- US Attorney Birotte's office.

And that meeting, that was a heated meeting. Sheriff Baca was understandably upset, understandably upset. For six weeks he's trying to get to the bottom of a very big problem in his jails that only is growing and has no end in sight.

And there's one -- or, actually, two people that could help answer the questions, the FBI and the US Attorney's office, and they're not talking to him.

So he gets to this meeting with US Attorney Birotte, the very man who could charge him with conspiracy and obstruction of justice, and Assistant Director Martinez, the head of the FBI's office, and he's upset. The meeting starts out heated. He says to them: "Look, I'm the God damn sheriff and these are my God damn jails." He says that. And he's upset. He's venting.

And as you will hear US Attorney Birotte when he testifies, he views the FBI and the sheriff's department as basically brothers in arms, that these are people that are having, you know, a clash; you know, they're angry at each other, almost like, as he will describe it, I believe, two brothers playing in a sand box and having a -- you know, a bit of a tussle, literally a fight, inside of a sand box, because at the end, they all have a much bigger purpose, which is to fight crime, but they've had this sort of very large

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

miscommunication, and Sheriff Baca wants to clear the air.  And sometimes you say stuff to clear the air, and he did.

And he says to the FBI director -- he says:  "Look, look, if the FBI is going to gun-up" -- and by that, I think what you'll hear US Attorney Birotte say -- "Look, if you are going to go to war with us, we're going to have to respond, and that makes no sense because we're partners.  That makes no sense."

So what happens then?  FBI assistant director for the first time says to Sheriff Baca why this undercover occurred without telling Sheriff Baca about it first and what's involved and what's involved in the investigation.

They cleared the air finally on September 27th.  And after that meeting, they all shook hands and they left and they had an understanding and a protocol on how to go on forward.

Now, the clear-the-air-meeting on September 27th is the end of the conspiracy and the obstruction of justice of Counts One and Two.

The Count Three, false statement, that occurs, after they're open and direct, on April 12, 2013, and that's almost 20 months later.

So what happened during that 20-month period between August and September of 2011 and April of 2013?

What you're going to hear is that the government's investigation obtained thousands of documents, audio tapes,

videotapes and interviews that the FBI was doing during that time.

They interviewed deputies, sergeants, lieutenants, captains, chiefs, commanders, assistant sheriffs and undersheriffs during that time.

And they eventually get to the April 2013 meeting. And on that day, they asked the sheriff if he would be willing to sit for a voluntary interview, and he agreed. He didn't have to agree, but he agreed to sit for a voluntary interview. He wasn't forced to do it.

They asked him -- well, you know, he says -- they said, "Can we have three hours?" And the agreement for that meeting was supposed to be three hours; he gave them over four and a half hours.

They said, "Look --" you know, did the government say -- provide him with the questions or the documents it was going to show him ahead of time? Mr. Fox talked about giving these general topics ahead of time, but how about the actual questions so he could try to refresh his memory or documents so he could refresh his memory and getting those ahead of time? Sheriff Baca didn't get any questions or documents before the interview.

Well, how about after the interview? Because you'll hear the interview was recorded. Did they give him a copy of the recording or a transcript and say: "Could you please

review it and make sure it's accurate, and if there's anything that's inaccurate, just let us know."  No, he had no chance to review after the interview any of the answers that he had given.

So what happens?  He's given a nontarget letter at the beginning of the interview that basically says that he's not a target of the investigation.  So they're going to have a discussion, and that's basically what it was, a four-and-a-half-hour discussion where Sheriff Baca was going to be asked by three federal prosecutors and two FBI agents over 600 questions during that four-and-a-half-hour interview.

And out of those over 600 questions, the government has alleged that four constituted false answers.  Put differently, the government has not alleged that 99 percent of the answers that he gave were false.  The government has not alleged that 99 percent of the answers that Sheriff Baca gave during the four-and-a-half-hour interview were false.

The evidence will show that the four answers lasted a grand total of about 45 seconds, and that is what you'll be asked to measure Sheriff Baca's 48-year career on this false statement against is 45 seconds.

So what is his motivation to lie for 45 seconds out of a four-and-a-half-hour interview for four questions -- four answers out of over 600?

The evidence will show that Sheriff Baca had no

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

motivation to lie, no motivation to hide, no motivation to conceal what had happened 20 months before in August and September of 2011 but to explain it to the best of his memory of what happened 20 months before.

Now, you're going to hear the government needs to prove beyond a reasonable doubt that not only are Sheriff Baca's answers false, but that he knowingly lied.  An honest mistake, a failure of memory or a true answer is not a knowingly false statement.

So in deciding this question, you will have to look at Sheriff Baca himself and what his situation was generally at that time, the interview itself and the answers that he gave, to determine whether or not the government has met its burden of proof.  And you will see that they have completely failed to meet their burden of proof on this Count Three.

So let's start with Sheriff Baca.

He was 71 years old at the time and asked in every question about his memory 20 months before.  He's 71 years old at the time, and he's asked memory questions of what happened 20 months before.

And those four answers -- excuse me.  The four answers to the four questions all basically start with did Sheriff Baca remember on August 20th that the FBI -- on that day that the FBI was conducting a civil rights investigation, on that day of August 20th was he directly involved in

conversations about keeping Anthony Brown away, on that day -- on the day of August 23rd whether or not Sheriff Baca remembered that the FBI agents were not allowed to continue their interview of Anthony Brown, and on September 26 whether Sheriff Baca remembered whether or not the investigators had approached Leah Marx to threaten to arrest and arrest her.

Now, why did I add that extra little part?  Because what you'll hear in the questions -- and this is where a true answer shows that you haven't knowingly given a false answer -- is that if the government's evidence shows that the investigators were sent to talk to Leah Marx, not to threaten to arrest her, not to threaten to charge her, but to interview her and that was it, that was all Sheriff Baca said, then the answer he gave to those questions was true.

And then with respect to the more general question, "Did you send them there -- did you know that they were being sent there for any purpose," he says, "I didn't know of the investigative particulars."  Pay attention to those two words, "investigative particulars."  What do they mean?

Well, you can look in the rest of the interview and the evidence that you will have about that interview on whether or not Mr. Fox asked any questions of Sheriff Baca on what "investigative particulars" mean, and you will find out that he did not.

So what will happen with respect to this is that

you're going to find that Sheriff Baca's -- that the situation that existed between August and September of 2011, then you have basically 20 months that goes by.  But what's important -- when I said to focus on what Sheriff Baca is going through -- is what's going on, as you will hear, in Sheriff Baca's sheriff's career for 20 months; he's having thousands of conversations, hundreds of meetings.

Remember, he's in charge of the largest jail system in the country, one of the largest sheriff's departments in the entire country as well.  18,000 employees, 18,000 inmates.  He's dealing with all that stuff that I showed you on an organization chart, and that's what's occurring between the 20 months between August and September of 2011 and April of 2013.  He's working 12 to 14 hours a day, six to seven days a week.

And that's the information that is -- that he's dealt with between the time he is asked a question on April 12th as he is now recalling very specifics of conversations that the government didn't allow him to refresh his memory for before the interview but expects him to get correct.  And, again, 99 percent of the answers that Sheriff Baca gave have not been charged as false.

And as you listen to the wording of these particular interviews, pay attention to the wording of the questions -- I gave you one example with the investigative particulars -- and see if you find any definition of that that would show that

somehow Sheriff Baca is lying about it.

But also focus on what is played and what is not played, because as Mr. Fox told you in the opening, the government is going to choose to play for you -- and only the government can make this choice -- one out of the -- one hour out of the four and a half hours of the entire tape.

So there's a four-and-a-half-hour conversation that the government is going to give you a tidbit of; not all of it, just a tidbit. And when you see certain parts that they play for you, ask yourself this, "If I see an answer without the question, what's the question? If I see an answer that the agents" --

THE COURT: Sir, this is not a closing argument. It's an opening statement.

MR. HOCHMAN: Thank you, Your Honor.

So as you listen to all of the evidence that is going to come over the next weeks, the government has indicated to you it's going to come in many forms, e-mails, phone, documents, audio, witness statements, so let's focus on just a couple of these.

Let's start with the e-mails.

You are going to see in the beginning part of this case an avalanche of e-mails, and what I would ask you to pay particular attention to is whether or not Sheriff Baca's name is on the "to," the "from," or the "cc" line of any of these

e-mails, whether or not any of these e-mails actually say "Sheriff Baca" or "Baca" on them to give any indication that Sheriff Baca knew, participated, authorized, agreed or condoned any of the information in the e-mails.

What you're going to find is that there are two out of those over hundreds of e-mails, and those are the ones from Steve Martinez to Sheriff Baca. Otherwise, you are not going to see a connection to Sheriff Baca.

How about phone records? I asked you to pay -- Mr. Fox indicated there will be a lot of phone records in this case, so I ask you to pay close attention to what the government is going to say about the phone records.

In other words, if they say that there was a phone call between one of the investigators and another investigator or an investigator and Sheriff Baca, what did they say? See if the evidence answers that question for you as to what was actually said on that phone call or is it just the mere fact that some phone call occurred?

When you hear phone calls between Sheriff Baca and Undersheriff Tanaka, remember, as you're considering those phone calls, all the stuff in the entire department that Undersheriff Tanaka, as the day-to-day operations guy, is responsible for.

The government would have it that the only thing they ever talked about in a cell phone conversation was the Anthony

Brown investigation.  Let's see what the evidence says, and pay close attention as to whether or not the government can fill in the blank as to what they're actually talking about during a particular phone call.  Because what you are going to hear is that Paul Tanaka, who is the heartbeat and the leader and the driving force of this conspiracy, that he spoke to the investigators 60 times in six weeks and at most you're going to hear that Sheriff Baca had less than six calls with those investigators.

So when Sheriff Baca got involved with this investigation -- and what you're going to hear is that his approach was open, not secretive.  It was direct, not hidden or deceptive.  That is his approach.

With the US Attorney's office and the FBI, he did not view them as enemies but brothers in arms.  He did not abuse his power but properly and responsibly took care of the safety and security of the hundreds of people -- excuse me, not the hundreds, the thousands of people in the jails that he was responsible for and who entrusted their safety and security to him.

So after all this evidence comes in, we will come back to you at the end of this case and we're going to ask you for the only verdict that the evidence in this case commands because the government will have failed to meet their burden of proof and, therefore, require a not guilty verdict on all

counts.

THE COURT:  All right.  Thank you.

Ladies and gentlemen, we're going to take another short break.  Let's make it about ten minutes.

Again, I want to caution you not to discuss this case with anyone, including members of your family, your fellow jurors or anyone else, nor are you permitted to allow others to approach you and try to talk with you about this case.

Don't read or listen to any news reports or other accounts about the trial.

And we'll come back in -- let's make it 20 after the hour.

THE CLERK:  All rise.

*(Jury out at 4:10 P.M.)*

*(The following was heard outside the presence of the jury.)*

THE COURT:  Who is your first witness?

MR. FOX:  It's going to be Kevin Brown.

THE COURT:  Okay.  And how long do you expect to be with --

MR. FOX:  I think probably 20 minutes on both direct and cross is my guess, and then we will have the records custodian for the e-mails, Brian Yanagi.  And if we still have time, we're prepared to have another witness, Jason Dalton, on the stand.  I don't think we will finish his testimony today.

THE COURT: Was there a motion in limine filed in this case?

MR. FOX: On the OIR , Your Honor?

THE COURT: Yes.

MR. FOX: Yes.

THE COURT: Oh, that's what I thought, too.

So I suspect I won't be hearing anything else about the OIR or Mr. Gennaco unless it's raised with the Court, because if I do, there's going to be a price to pay.

MR. HOCHMAN: Your Hon- --

THE CLERK: This court now stands in recess.

*(Recess taken 4:12 to 4:21 P.M.)*

*(The following was heard outside the presence of the jury.)*

MS. RHODES: Your Honor, would you like the witness on the stand or --

THE COURT: Well, let's wait until the defendant gets back.

All right. Let's bring the jury in.

*(Jury in at 4:22 P.M.)*

THE COURT: All right. Ladies and gentlemen, you should have notebooks. And just make sure that your number where you're seated at is on the cover of your notebooks to make sure they don't get mixed up.

All right. Would the government call its first

witness, please.

MS. RHODES:  Yes, Your Honor.  The United States calls Kevin Brown.

THE CLERK:  Please raise your right hand.

Do you solemnly swear that the testimony you shall give in the cause now before this Court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

THE CLERK:  Please be seated.

Please state your full name.

THE WITNESS:  Kevin Brown.  K-e-v-i-n.  B-r-o-w-n.

THE COURT:  All right.  Counsel.

KEVIN BROWN,

having been first duly sworn,

testified as follows:

DIRECT EXAMINATION

BY MS. RHODES:

Q.   Mr. Brown, what do you currently do for the Los Angeles County Sheriff's Department?

A.   I'm a sergeant for the L.A. County Sheriff's Department assigned to our SWAT team.

Q.   And how long have you worked for the Los Angeles County Sheriff's Department?

A.   Going on 18 years.

Q.   I'd like to take you back to the summer of 2001.  What was

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

your position within the sheriff's department at that time?

A.   At that time I was assigned to the executive office of the sheriff assigned as a backup driver.

Q.   And did you have a typical schedule as the backup driver?

A.   Yes, I did.

Q.   What was it?

A.   Typical schedule was my day would start midday Thursday and work through the end of Sunday.

Q.   And so was there another driver that worked Monday through midday Thursday?

A.   Yes, there was.

Q.   Who was that?

A.   That was Jack Demello.

Q.   Did you two change as needed?

A.   Yes, we did.

Q.   When you were the backup driver, did you have a county-issued cell phone?

A.   Yes.

Q.   And what was the number to that cell phone?

A.   The number at that time was a (323) phone number, 829-7181.

Q.   I'm sorry.  Seven- --

A.   7181.

Q.   Thanks.

        Now, would you arrange it with Mr. Demello, the other

driver, so that the person who was actually with Mr. Baca would get calls for Mr. Baca?

A.   Yes.

Q.   And how would you do that?

A.   By utilizing call forwarding.

Q.   And while you were Mr. Baca's driver, did you make and receive phone calls for Mr. Baca?

A.   Yes.

Q.   Did you make and receive phone calls to Undersheriff Paul Tanaka for Mr. Baca?

A.   Yes.

Q.   And did Mr. Baca sometimes call your number to speak to Mr. Baca?

A.   Yes.

Q.   Did Mr. Tanaka ever call you just to talk to you?

A.   No.

Q.   How about Captain Carey?  Did he call just to talk to you?

A.   No.

Q.   So if he called your phone, who was it a phone call for?

A.   It would be for at the time Sheriff Baca.

Q.   When you were Sheriff Baca's driver, where did he usually sit?

A.   In the front seat next to me.

Q.   Now, in the summer of 2011, do you recall overhearing a call Mr. Baca received from the head of the FBI in Los Angeles?

A.   Yes.

Q.   What did you overhear?

MR. HOCHMAN:  Objection.  Foundation.

THE COURT:  Sustained.

BY MS. RHODES:

Q.   When you were Mr. Baca's driver, was he in the car in the front seat when he received a call from the head of the FBI in Los Angeles?

A.   Yes.

Q.   And did you overhear at least Mr. Baca's portion of that call?

A.   Yes.

Q.   What did you overhear?

MR. HOCHMAN:  Objection.  Foundation as to date and time.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  The basic conversation was that the FBI was able to somehow get one of our deputies to bring a phone into the jail which in turn made its way to an inmate, who in turn, after a jail search was conducted, our deputies recovered that phone from that person.

BY MS. RHODES:

Q.   And did Mr. -- did the head of the FBI indicate anything about what he wanted done with the phone?

A.   That they wanted the phone back.

MR. HOCHMAN:  Objection.  Foundation as to whether or not the witness could actually hear what was going on.

THE COURT:  Overruled.  The answer will stand.

BY MS. RHODES:

Q.   And did you hear the head of the FBI Los Angeles or Mr. Baca say anything about what the FBI wanted with regards to the inmate?

A.   Not exactly.  Some of -- I'll just leave it at that.  Not exactly.

Q.   Did you hear anything about what the FBI wanted done with regards to the inmate?

A.   That particular day, no, but down the line, yes.

Q.   Okay.  When was down the line?

A.   Maybe a week after the incident.

Q.   Okay.  After the first call?

A.   Yes.

Q.   And what did you hear at that time?

A.   That they wanted to speak with the inmate.

Q.   After that first call that you overheard while you were driving Sheriff Baca and he was in the front seat, did Mr. Baca ask you to do anything?

A.   Yes.

Q.   What?

A.   Make a phone call.

Q.   To whom?

A.   To Mr. Tanaka.

Q.   And what was Mr. Tanaka's position at that time?

A.   At that time he was the undersheriff of the sheriff's department.

Q.   Could you overhear any of the conversation between Mr. Tanaka and Mr. Baca -- let me ask you this.  Did Mr. Baca connect with Undersheriff Tanaka?

A.   Yes, he did.

Q.   And could you overhear any of their conversation?

A.   I could hear their conversation.

Q.   And what did you hear?

A.   I can't recall the details of their conversation, but I can tell you it was about the incident that was presented before us.

Q.   And did they agree to do anything?

A.   To have a meeting.

Q.   Now, during this time when you were Mr. Baca's driver, did Mr. Baca use e-mail?

A.   No, he did not.

Q.   And I'd like you to -- well, let me ask you this.  When you were Mr. Baca's driver, was there an office location or a desk location that you could report to when you were not driving?

A.   Yes.

Q.    And where was that?

A.    That would be the very first desk you would come to once you entered the sheriff's office.

Q.    And when you say the sheriff's office, is there an office building or is there a headquarters building?

A.    Yes, there's a headquarters building.

Q.    Where is that?

A.    That's located in Monterey Park on Romona boulevard.

Q.    All right.  I'd ask you to look at Exhibit 139, which I believe is in a folder in front of you.

A.    Yes.

Q.    And do you recognize that document?

A.    Yes, I do.

Q.    What is it?

A.    It's a schematic floor plan of the fourth floor of the sheriff's building at that time.

Q.    Okay.  And does it have -- can you see where your desk was on that?

A.    Yes, I can.

          MS. RHODES:  Your Honor, at this time I'd move to admit Exhibit 139.

          THE COURT:  Any objection?

          MR. HOCHMAN:  No objection, Your Honor.

          THE COURT:  All right.  It will be received.

     *(Government's Exhibit 139 admitted into evidence.)*

MS. RHODES:  And if I could then publish it for the jury.

THE COURT:  That's fine.

BY MS. RHODES:

Q.   While we're waiting for that to go on --

(The exhibit was displayed on the screen.)

BY MS. RHODES:

Q.   Now, does this show the sheriff's office?

A.   Yes, it does.

Q.   And can you -- is that in the -- is that where I'm pointing right now (indicating) in the -- on the right corner?

MR. HOCHMAN:  Objection.  Leading.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  Yes, it is.

BY MS. RHODES:

Q.   Can you tell me where your desk was on this?

A.   By looking at this, where it says "Office of the sheriff," it would be the desk that's to the left of the "O" on the page here.

Q.   Okay.  So office of the sheriff, desk to the left.  Is my pen near it (indicating)?

A.   That is it, exactly where the pen is.

Q.   Okay.  And I will take a circle and mark that.

That's where your desk was?

A.    That's correct.

Q.    And what is this middle portion right here (indicating)?

A.    That's the hallway where the elevators are.

Q.    Now, were you always at your desk when -- if Mr. Baca did not have somewhere to go, did you remain at your desk at all times?

A.    No.

Q.    What else did you do?

A.    Got the car washed, got the car gassed up, went to the dry cleaners, mingled with people throughout the building.

Q.    Nonetheless, when you were at your desk after this phone call that you overheard between the head of the FBI for Los Angeles and Mr. Baca, in the ensuing weeks, did you see certain people come more frequently to Sheriff Baca's office?

A.    Yes.

Q.    Who did you see?

A.    Mr. Tanaka, Mr. Carey, Mr. Leavins.

Q.    Now, were you able to overhear any meetings between Mr. Tanaka and Mr. Baca?

A.    No.

Q.    Why not?

A.    Those were all closed-door meetings.

Q.    Were you able to hear any meetings between Mr. Carey or Mr. Leavins and Mr. Baca?

A.    No.

Q.    Again, why not?

A.    For the same reason.  Those were all closed-door meetings that I wasn't privy to.

Q.    And at that time, those weeks after the phone call between Mr. Baca and the head of FBI Los Angeles, did you notice any change in Mr. Baca's behavior?

A.    I would say he was concerned about -- about this incident, but on average, he was the same as he usually was.

Q.    Did he do anything differently when he took phone calls when he was around you?

A.    At times, yes.

Q.    What?

A.    Depending on the nature of the call, he would step away just to have a private conversation.

        MS. RHODES:  May I have one moment, Your Honor?

        THE COURT:  Yes.

        MS. RHODES:  Nothing further.

        THE COURT:  All right.  Cross-examination.

        MR. HOCHMAN:  Yes, Your Honor.

                    CROSS-EXAMINATION

BY MR. HOCHMAN:

Q.    Sir, with respect to your background, before you worked for the office of the sheriff, where did you work in the sheriff's department?

A.    Prior -- just prior to working in the sheriff's office?

Q.    Yes.

A.    I was a field training officer in patrol.

Q.    And before that?

A.    I was a detective working in Narcotics Bureau out of Compton station.

Q.    Did you ever work on any task forces?

A.    Yes.

Q.    Which task forces?

A.    I worked on two particular task forces, a Compton murder gang task force and also the Florencia gang task force.

Q.    And did those task forces involve you working with federal agents as well as sheriff's employees?

A.    I personally didn't, but I knew they were somewhere part of that task force.

Q.    And now with respect to -- starting at the end of your testimony, when you said that Sheriff Baca would step away and have private conversations, you have no knowledge of what was being discussed in those private discussions, correct?

A.    That's correct.

Q.    And when you said that he had closed-door meetings with Captain Carey and Lieutenant Leavins, you had no information as to what was discussed during those closed-door meetings; is that correct?

A.    That's correct.

Q.    And when he had a closed-door meeting with Undersheriff

Tanaka at the time, you have no information about what was discussed during that closed-door meeting as well; is that correct?

A.    That's correct.

Q.    Now, you said that Sheriff Baca doesn't use e-mail; is that correct?

A.    That's correct.

Q.    But Sheriff Baca has an e-mail address; isn't that right?

A.    That is correct.

Q.    And people send him e-mails on that e-mail address; is that right?

MS. RHODES:  Objection.  Calls for speculation.

THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.    You're aware that Sheriff Baca -- you're aware that Sheriff Baca has an e-mail address, correct?

A.    Yes, I am aware of that.

Q.    And if people want to send Sheriff Baca an e-mail, how do they do that?

MS. RHODES:  Objection.  Calls for speculation.

THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.    Do you know how people can send Sheriff Baca an e-mail?

A.    Yes.

Q.    How would they do it?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

A.    Send it to his e-mail address.

Q.    Now, you said that Sheriff Baca used to sit in the front seat with you while you were driving him; is that correct?

A.    Yes, sir.

Q.    And did Sheriff Baca have his own cell phone?

A.    Yes, he did.

Q.    And when he was sitting in the front seat with you, would he use his cell phone to call people throughout the driving that you did with him?

A.    Yes, he would.

Q.    And did he -- was he mostly on the cell phone when you were driving him during the day?

A.    No.

Q.    If he wasn't on the cell phone, what was he doing?

A.    Reading the newspaper.

Q.    And did he also read briefing materials that were presented to him?

A.    Yes.

Q.    And as far as the time when you would drive Sheriff Baca, how early in the morning would you usually pick him up?

        MS. RHODES:  Objection.  Foundation.

        THE COURT:  Overruled.

        You can answer.

        THE WITNESS:  The times would vary, but it could be anywhere from 7:00 a.m. to 9:00 a.m.

BY MR. HOCHMAN:

Q.   And approximately what time at night would you drop him off?

A.   Anywhere from 7:00 p.m. to 10:00, 11 o'clock at night.

Q.   So it was roughly a 12- or 14-hour day?

A.   Yes.

Q.   And did he maintain that schedule six to seven days a week?

A.   Yes, he did.

Q.   Now, when Sheriff Baca was speaking on the phone, you could hear his part of the conversation; is that correct?

A.   Yes.

Q.   But you couldn't hear the person he was speaking with that was in the -- that he was speaking with through the phone, correct?

A.   I could not hear that person.

Q.   So to the extent that you heard Sheriff Baca make any statements, those are the statements that you would have knowledge of, correct?

A.   That is correct.

Q.   You wouldn't have knowledge of what the person who was speaking to him in the phone was saying, correct?

A.   Correct.

Q.   Now, I think you said that you didn't know Undersheriff Tanaka that well; is that correct?

A.   That is correct.

Q.   And you didn't know Captain Carey that well; is that correct?

A.   That is correct.

Q.   Did you know Steve Leavins?

A.   Yes.

Q.   How did you know Steve Leavins?

A.   Steve Leavins -- the Florencia task force that I worked in I believe it was 2005, he was at the time the homicide -- one of the homicide investigators on that that worked in what we called at the time the wire room where we were listening to phone calls.

Q.   And how long did you work with Steve Leavins in that capacity?

A.   The entire time of that task force.

Q.   And how long was that for?

A.   It was approximately 11 months.

Q.   And did you see Steve Leavins after that task force?

A.   I might have seen him twice over the years.

Q.   Would you keep in contact with him after that task force was over?

A.   No.

Q.   Did you consider him a friend?

A.   No one without -- I'm sorry.  Can you repeat the question?

Q.   Did you consider him a friend?

A.    I would say yes, as far as work goes.

Q.    So to focus you back on the phone call that I think you testified about -- that Sheriff Baca had with the head of the FBI; is that correct?

A.    Yes.

Q.    Would that be a phone call that was received in your phone, if you recall?

A.    I don't recall which phone it came to.

Q.    But you recall Sheriff Baca speaking to the head of the FBI?

A.    Yes.

Q.    Did you know who the head of the FBI was at that time?

A.    I do not.

Q.    And when you say you didn't know him, you didn't know his name either?

A.    I did not know his name.

Q.    So when the phone call comes in, do you remember when that phone call would have occurred where Sheriff Baca was speaking to the head of the FBI?

A.    No.

Q.    Do you know what time of day?

A.    I know it was daytime.

Q.    And do you know where you were at that time?

A.    Other than being in the car, location-wise, I don't know where we were at that particular time.

Q.   And, again, you couldn't hear what the person who's the head of the FBI is saying on the phone to Sheriff Baca at the time; is that correct?

A.   That's correct.

Q.   And that would be true every time that person who was the head of the FBI was calling Sheriff Baca in your presence; is that correct?

A.   That's correct.

        MR. HOCHMAN:  May I have one more moment, Your Honor?

        THE COURT:  Yes.

BY MR. HOCHMAN:

Q.   And when you were driving Sheriff Baca, did you just drive him around the sheriff's department location in Monterey -- Monterey Park?

A.   No.

Q.   Where else would you drive him throughout the county?

A.   Probably every nook and cranny of the county.

Q.   And you mean throughout the entire Los Angeles County, the 4,000 square miles or so?

A.   Within LA County and sometimes outside of LA County.

Q.   And would you be driving him to places where he would speak with people?

A.   Yes.

Q.   Community organizations?

A.   Yes.

MS. RHODES:  Objection.  Beyond the scope.

THE COURT:  Sustained.

The answer is stricken and the jury should disregard it.

Next question.

MR. HOCHMAN:  Yes, Your Honor.

BY MR. HOCHMAN:

Q.   Did you ever drive Sheriff Baca to an event where the president of the United States was present?

A.   I don't recall ever attending that.

Q.   And would that be something that you would remember?

A.   Yes.

Q.   And were you the driver for Sheriff Baca on the day -- on September 26, 2011, when he went to the Good Day LA interview?

A.   Yes.

Q.   And later that day -- were you the driver for him that entire day?

A.   I would imagine I would have been.

MR. HOCHMAN:  No further questions, Your Honor.

THE COURT:  All right.  Anything else?

MS. RHODES:  Nothing, Your Honor.  Thank you.

THE COURT:  All right.  Thank you.  You may step down.

Call your next witness.

MR. JAUREGUI:  Your Honor, United States calls Brian

Yanagi to the stand.

THE CLERK:  Please raise your right hand.

Do you solemnly swear that the testimony you shall give in the cause now before this Court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

THE CLERK:  Please be seated.

Please state your full name for the record.

THE WITNESS:  Brian Yanagi.

THE COURT:  And could you spell your last name, please.

THE WITNESS:  Certainly.  It's Y-a-n-a-g-i.

BRIAN YANAGI,

having been first duly sworn,

testified as follows:

DIRECT EXAMINATION

BY MR. JAUREGUI:

Q.   Good afternoon, Mr. Yanagi.

A.   Good afternoon.

Q.   Sir, are you a lieutenant in the Data Systems Bureau of the Los Angeles County Sheriff's Department?

A.   Yes, I am.

Q.   And are you testifying here today as the custodian of records?

A.   Yes, I am.

Q.    I'm going to direct your attention to 11 documents.

In the exhibit binder in front of you -- or to your left, there, it's Volume I of the government's exhibits.

A.    Okay.

Q.    Okay.  And those documents, I'll give them to you in groups.  The first three are 15 to 17.

A.    Okay.

Q.    27, 31 and 32.

A.    I'm sorry.  27, 31, correct?

Q.    Correct.  And 32.

Number 41 is next.

A.    Okay.

Q.    48, 50 *and 51.*

Q.    And the last one is 65.

A.    Okay.

Q.    And, Mr. Yanagi, the only question I have for you about these documents are whether these are true and accurate copies of e-mails that existed in the sheriff's department e-mail system at the time those e-mails were sent and received?

A.    Yes, they were.

MR. JAUREGUI:  No further questions.

THE COURT:  All right.

MR. JAUREGUI:  Excuse me.  Your Honor, I would move to admit those documents, and they are 15-17, 27, 31-32, 41, 48, 50-51 and 65.

THE COURT:  Any objection?

MR. HOCHMAN:  No, Your Honor.

THE COURT:  All right.  They will be received.

*(Government's Exhibits 15-17 admitted into evidence.)*

*(Government's Exhibit 27 admitted into evidence.)*

*(Government's Exhibits 31-32 admitted into evidence.)*

*(Government's Exhibit 41 admitted into evidence.)*

*(Government's Exhibit 48 admitted into evidence.)*

*(Government's Exhibits 50-51 admitted into evidence.)*

*(Government's Exhibit 65 admitted into evidence.)*

MR. HOCHMAN:  Your Honor, may I publish Exhibit 15, please?

*(The exhibit was displayed on the screen.)*

CROSS-EXAMINATION

BY MR. HOCHMAN:

Q.   Mr. Yanagi, I'm showing you Exhibit 15.

A.   Yes, sir.

Q.   Do you see the "to" line, "Leroy D. Baca"?

A.   Yes.

Q.   Or, actually, it says "Baca," comma, "Leroy D."?

A.   Correct, sir.

Q.   Is that Sheriff Baca's at the time's e-mail address?

A.   I guess that would be his -- his name on the account.

The e-mail address would be a different -- a different set of characters.  I think it would be something

like the first initial of his first name, the middle initial, and then for some people it's their full, complete last name @lasd.org.  So this wouldn't be his e-mail address, however it would represent his e-mail account.

Q.   I see.  And then if I may focus -- and this is an e-mail from Steven Martinez, the assistant director in charge of the FBI; is that correct?

A.   It appears so.  I'm not sure who the individual is, but it does say "Steven Martinez."

Q.   And I'll direct your attention to the bottom right-hand corner of this document.

Do you see it says "LASD," and then there is an under slash [sic], and then there's a number "230199"?

What does that number represent?  What does that designation represent?

A.   It is not a designation that is -- was on, let's say, our e-mail system, but I think it's --

THE COURT:  Do you know what it is?

THE WITNESS:  No, I don't.

THE COURT:  That's fine.

Next question.

BY MR. HOCHMAN:

Q.   I direct your attention to Exhibit 16.

*(The exhibit was displayed on the screen.)*

///

BY MR. HOCHMAN:

Q.   With respect to Exhibit 16, do you see in the "To" line,
it says "Julie A." -- or "Montgomery, Julie A."?

A.   Yes, sir.

Q.   Do you know who Julie A. Montgomery is?

A.   I do not.

Q.   Did you have any familiarity with the people that worked
at the office of the sheriff in the summer of 2011?

A.   Possibly.  I can't recall who those persons were, but I
may have.

Q.   I'm sorry?

A.   I cannot recall who those persons were at that time, but,
you know, I do know a lot of people in the department, so I may
have known them.

Q.   Did you know the names of any of the Sheriff Baca's
schedulers at that time?

A.   No.

Q.   And how -- with respect to the documents that you
testified about, where did you get those documents from?

A.   Our e-mail archive.

Q.   And how do the e-mail archives work?

         MR. JAUREGUI:  Objection, Your Honor.  Beyond the
scope, and relevance.

         THE COURT:  Sustained.

///

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

BY MR. HOCHMAN:

Q.   Well, when you went into the e-mail archives -- when did you go into the e-mail archives to retrieve these documents?

A.   I can't say for each particular document.  We get requests from counsel or the court to produce documents or to put a legal hold on a document, which we would then do.  When an e-mail is extracted, we produce it for the requester, so I can't say for certain when these e-mails were searched for, requested or produced.

Q.   So with respect to your connection to, let's say, Exhibit 15, how -- when did you actually obtain that document?

THE COURT:  That's been asked and answered.  He doesn't know.  Next question.

BY MR. HOCHMAN:

Q.   So what were you able to verify on Exhibit 15?

A.   That it is an e-mail that came from our system.

Q.   I see.  So Exhibit 15, the e-mail part of Exhibit 15 came from your system; is that correct?

A.   Correct.

Q.   But you don't understand where that designation on Exhibit 15 on the bottom right-hand corner that started "LASD" came from; is that correct?

A.   That's correct.

Q.   That was not in your e-mail system when you went back to retrieve it; is that correct?

A.   Correct.

          MR. HOCHMAN:  No further questions, Your Honor.

          THE COURT:  All right.  Anything else?

          MR. JAUREGUI:  No, Your Honor.

          THE COURT:  All right.  Thank you, sir, you may step down.

          Ladies and gentlemen, we're going to go ahead and break for the day.

          Again, I want to remind you until this trial is over you're not to discuss this case with anyone, including your fellow jurors, members of your family, people involved in the trial or anyone else, and do not allow others to discuss the case with you.

          This includes discussing the case in internet chat rooms, through blogs, bulletin boards, by e-mails, text messages.  If anyone approaches you or tries to talk with you about the case, please let me know about it immediately.

          There is some media coverage about this case, so please do not read, watch or listen to the news reports or other accounts about the trial or anyone associated with it.

          Don't do any research, such as consulting dictionaries searching the internet or using other reference materials, and do not make any investigation about the case on your own.

          Finally, you are reminded to keep an open mind until

all of the evidence has been presented, you've heard the arguments of counsel, the instruction of the Court and the views of your fellow jurors.

If you need to speak with me, simply give a note to the clerk.

I believe one of the jurors may have inquired as to whether or not there's an alternate exit out of the building. If any of you are interested in that, we can arrange to have you go out through an alternate exit, if you like.  And just let us know and we'll provide you with a way to exit the building.

All right.  Thank you very much.

We're going to resume on Monday at 8:00 a.m.  We'll go from 8:00 a.m. to 1:30.  If you're not used to coming downtown, please give yourself enough time to get here so that you are here by 8:00.

If you are running late -- and which I hope you won't be, because if you're late, we can't start until all of you are here.

All right.  Have a nice weekend, and we'll see you all Monday at 8 o'clock.

Please leave your notebooks on your chairs.

THE CLERK:  All rise.

*(Jury out at 4:57 P.M.)*

*(The following was heard outside the presence of the*

*jury.)*

THE COURT:  Okay.  Is there anything we need to take up?

MR. FOX:  I don't think so, Your Honor.

MR. HOCHMAN:  Just very briefly, Your Honor.

I apologize if I went beyond the Court's parameters on the OIR issue, but I want to make sure I understand where those are, because I want to explain to the Court, if I could, where I think it's going to come up even in the government's case that OIR is part of the case.

Couple different ways, Your Honor.

Mr. Gennaco is actually at a number of the key meetings that are involved here.  He's at the August 29th meeting.  He deals with the phone call that the government is talking about that has the federal request.  He helps set up the September 27th meeting.  He's at a side meeting on August 29th as well with the US Attorney's office.

The sheriff in two or three different respects -- one actually a statement in the interview itself, the April 12, 2013, interview -- refers specifically to Mr. Gennaco and the Office of Independent Review.

Also, if you recall, in the Good Day LA interview, when he's talking about the police can police themselves, immediately thereafter he says, "And we work with the Office of Independent Review and its lawyers."

So Mr. Gennaco and the Office of Independent Review are -- are interwoven within the evidence in the six-week period that we're going to be focused on for the conspiracy and the obstruction of justice.

And, again, to the extent that the sheriff is relying on someone like a Mr. Gennaco, the fact that he's an experienced prosecutor versus not an experienced prosecutor, the fact that the Office of Independent Review was not just created in the summer of 2011 but at least -- not saying Mr. Baca created it, which is where I knew that the limit was, but that it existed for ten years.  It was county created.

That's what I thought -- and, again, if I mistakenly thought that, I apologize -- that basically excising Mr. Baca's connection from the Office of Independent Review's formation, its dealings and all of that sort of stuff basically up until the summer of 2011 is where I thought the line was.

But the fact that it existed for ten years at that point and was run by Mr. Gennaco, who's going to testify, and, obviously, his credibility then becomes at issue, so what he's done in his life becomes important for the jury to hear.  It's part of his credibility.

So I want to make sure --

THE COURT:  Whose credibility?

MR. HOCHMAN:  Mr. Gennaco's and whether or not his testimony should be believed when, you know -- when he's

participating in these various events and speaking with the sheriff.

You know, is he someone who has no background in civil rights enforcement or is he someone that has a large background in it?

That's why I -- I apologize if I -- I tried to -- and that's -- between the two openings, the one from the first trial and this one, I excised all of the Sheriff Baca contributions, shall we say, to creating OIR, funding it, supporting it, resources -- I mean, I took all that out because I understood that's where the Court was going in the motion in limine.

If there is more, I just want to know where the line is so I don't cross it, Your Honor.

THE COURT:  Okay.

MR. FOX:  Your Honor, if I may respond on a couple of issues there.

First of all, the motion in limine dealt with good works generally.  It called out I think it was eight separate categories of what that might be.  And we asked in I think the last paragraph to have Mr. Hochman raise any issue with respect to any good work that he wanted to get in outside the presence of the jury so we didn't have to stand up and object and we still hear what Mr. Hochman says and the jury is tainted by that.

So that's Number 1.

Number 2, I agree with Mr. Hochman that some context of OIR is fine because OIR is going to be referenced, but to take it to the extreme, like he already has is not appropriate. And it's like the children's book, *If You Give A Mouse A Cookie*, you give him the little scrap and then all of a sudden he wants everything that comes with it in order to taint the jury.

And even what he says to you shows the prejudice. He just said that Mr. Baca relied upon Mr. Gennaco. Not in this case, not in this obstruction. He didn't rely on him at all, and now the jury is going to think, if Mr. Hochman is able to bring this out, that he was receiving advice from Mr. Gennaco.

The last thing I'll say on this is Mr. Hochman said Mr. Gennaco was involved in a number of meetings, and then if you parse his words and make sure that you understand what he said, it's one meeting that he was involved in, and there's going to be no dispute about what occurred at that meeting. So this is not relevant. We're going way beyond what could potentially be relevant.

And I'd just ask, again, that if Mr. Hochman is going to be going into community events, OIR, anything like that, it's raised with the Court outside the presence of the jury.

THE COURT: Well, if Mr. Gennaco was at a meeting, that's fine, but I don't see what the confusion -- I don't see

what the confusion is.

If he was at a meeting and he's got something relevant to say about what transpired at a meeting, that's fine, but to go into what OIR is and what Mr. Baca relied upon, I'm at a loss.

But, again, if you think you're at the line, then you just need to raise that, and we'll resolve it.

MR. HOCHMAN:  Yes, Your Honor.  And, again, I thought I had excised what the Court was concerned with.  If I didn't, I apologize.

THE COURT:  It's all right.

MR. HOCHMAN:  Again, it'll come up -- as I said, in the Good Day LA interview, they talk about OIR.

In the interview -- the April 12, 2013 interview, Mr. Gennaco's name is raised directly by Mr. Baca and OIR.

So I think what we're talking about -- maybe I'll work more with Counsel as to what he was referring to as context and what he thinks is appropriate, and hopefully we can come to an understanding so we don't have the issue come up again before the Court.

THE COURT:  That's fine.  If there's a question, just raise it in advance, and we'll get it worked out.

MR. HOCHMAN:  All right.  Thank you, Your Honor.

THE COURT:  Okay.  Anything else?

MR. FOX:  No, Your Honor.

MR. HOCHMAN:  No, Your Honor.

THE COURT:  Okay.  Have a nice weekend.  We'll see everybody on Monday at 8:00.

*(Evening recess taken 5:05 P.M.)*

--oOo--

CERTIFICATE

I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Date: AUGUST 3, 2017

/s/  Cindy L. Nirenberg, CSR No. 5059

Official Court Reporter

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA