UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

HONORABLE PERCY ANDERSON, U.S. DISTRICT JUDGE

- - -

UNITED STATES OF AMERICA,           )
                                    )
                    PLAINTIFF,      )
                                    )
          vs.                       ) No. CR16-66(A)-PA
                                    )
LEROY BACA,                         )
                                    )
                    DEFENDANT.      )
_____)

REPORTER'S TRANSCRIPT OF JURY TRIAL

DAY 4, VOLUME II of II

PAGES 670-851

LOS ANGELES, CALIFORNIA

MONDAY, FEBRUARY 27, 2017

8:02 A.M.

_____

CINDY L. NIRENBERG, CSR 5059, FCRR
U.S. Official Court Reporter
350 W. 1st Street, #4455
Los Angeles, CA 90012
*www.msfedreporter.com*

APPEARANCES OF COUNSEL:


FOR THE PLAINTIFF:
                    OFFICE OF THE UNITED STATES ATTORNEY
                    BY: BRANDON FOX,
                        ASSISTANT U.S. ATTORNEY
                        EDDIE A. JAUREGUI,
                        ASSISTANT U.S. ATTORNEY
                        LIZABETH A. RHODES,
                        ASSISTANT U.S. ATTORNEY
                    312 NORTH SPRING STREET
                    13TH FLOOR
                    LOS ANGELES, CA 90012
                    213-894-2434


FOR THE DEFENDANT:
                    MORGAN LEWIS & BOCKIUS
                    BY: NATHAN J. HOCHMAN, ATTORNEY AT LAW
                        BRIANNA L. ABRAMS, ATTORNEY AT LAW
                    THE WATER GARDEN
                    1601 CLOVERFIELD BOULEVARD
                    SUITE 2050 NORTH
                    SANTA MONICA, CA 90404
                    310-255-9025


ALSO PRESENT:
                    LEAH TANNER, FBI SPECIAL AGENT

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

I N D E X


GOVERNMENT'S WITNESSES:                         PAGE

JASON DALTON

   DIRECT BY MR. FOX                           686

   CROSS BY MR. HOCHMAN                        716

   REDIRECT BY MR. FOX                         769

   RECROSS BY MR. HOCHMAN                      777


MICKEY MANZO

   DIRECT BY MR. FOX                           783


FURTHER PROCEEDINGS

DISCUSSION HELD OUTSIDE PRESENCE OF JURY  674

DISCUSSION HELD AT SIDEBAR                 712

DISCUSSION HELD AT SIDEBAR                 734

DISCUSSION HELD OUTSIDE PRESENCE OF JURY  742

DISCUSSION HELD OUTSIDE PRESENCE OF JURY  746

DISCUSSION HELD AT SIDEBAR                 753

DISCUSSION HELD AT SIDEBAR                 780

DISCUSSION HELD OUTSIDE PRESENCE OF JURY  806

DISCUSSION HELD OUTSIDE PRESENCE OF JURY  845

E X H I B I T S

| GOVERNMENT'S EXHIBITS | MARKED | ADMITTED |
|---|---|---|
| 2-1 to 2-7 | | 699 |
| 2-9 to 2-10 | | 699 |
| 2-21 to 2-22 | | 699 |
| 2-26 to 2-27 | | 699 |
| 2-33 | | 699 |
| 2-11 | | 813 |
| 18 | | 789 |
| 23 | | 829 |
| 28 | | 840 |
| 71 | | 798 |
| 74 | | 818 |
| 77 | | 834 |
| 102, 116, 119-122, 124 | | 685 |
| 111 | | 692 |
| 112 | | 710 |
| 120 | | 701 |
| 124, 142-152, 164-169, 171, 173-180 | | 685 |
| 184, 189, 194, 196-197, 209 | | 685 |
| 195 | | 810 |
| 214-218 | | 836 |
| 219-225 | | 796 |

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES, CALIFORNIA; MONDAY, FEBRUARY 27, 2017

8:02 A.M.

- - - - -

*(The following was heard outside the presence of the jury.)*

THE CLERK:  Item 1, CR16-66(A)-PA, United States of America versus Leroy Baca.

Counsel, please state your appearances.

MR. FOX:  Good morning, Your Honor.  Brandon Fox, Lizabeth Rhodes and Eddie Jauregui on behalf of the United States.  Also with us at counsel table is Special Agent Leah Tanner of the FBI.

THE COURT:  Good morning.

MR. HOCHMAN:  Good morning.  Nathan Hochman and Brianna Abrams on behalf of defendant Leroy Baca, who is present, Your Honor.

THE COURT:  Good morning.

MR. HOCHMAN:  Good morning.

THE COURT:  All right.  We had a couple of motions in limine that were apparently filed yesterday.  One has to do with the cross-examination of Mr. Rhambo.  And as I understand it, Mr. Rhambo may have given his opinion as to this defendant's intent to obstruct justice to a newspaper reporter, and as I understand it, the defense wants to cross-examine Mr. Rhambo concerning that opinion?

MR. HOCHMAN:  That's incorrect, Your Honor.

THE COURT:  Okay.

MR. HOCHMAN:  Had Mr. Jauregui actually asked me, I would have told him that we weren't intending to use that clip against Mr. Rhambo.  We certainly will ask Mr. Rhambo about facts, whether or not Sheriff Baca ever told him he was going to obstruct justice at the August, September -- September 2011 time period.

THE COURT:  Why isn't that hearsay?

MR. HOCHMAN:  Well, again, it depends on whether or not the government gets into a conversation.

THE COURT:  I don't care what it depends on.  It's hearsay.  So don't elicit Mr. Baca's statements unless you come to sidebar so we can decide that.

MR. HOCHMAN:  Just so I understand, Your Honor, there will be a conversation --

THE COURT:  There is no -- I'm not here to explain these rulings.  They're very clear.  So we have anymore instances where you violate this Court's order, there will be a price to pay, and I guarantee you you won't like it.

MR. HOCHMAN:  I understand, Your Honor.

THE COURT:  Now, so I guess we're not going to have anybody eliciting Mr. Rhambo's opinion as to this defendant or any other defendant's intent.

There's also a motion to exclude questions -- I guess

they were asked by Mr. Baca's attorney during the interview.

MR. FOX:  Yes, Your Honor.  It's not just Mr. Baca's attorney but also the government questions that are not going to be part of the clips that we play.

Mr. Hochman told us he wants to elicit both our questions that are not part of those clips and Mr. Baca's attorney's questions without eliciting the statements because he can't under Rule 106 and under the hearsay rules.  We don't think there is any relevance to the questions.

THE COURT:  Okay.

MR. HOCHMAN:  A couple of different issues that are raised here.  There are a couple instances, Your Honor, where they are playing in the excerpt -- they have 47 excerpts from the interview that the government has chosen to play.

Two of the excerpts, Your Honor, they play what is clearly just the answer of Mr. Baca as a separate stand-alone excerpt but no question that he is answering.

So I told Mr. Fox that I would -- what I propose to do was to ask whoever the -- I think it's Agent Dalton who will be testifying to this -- Agent Dalton on this particular excerpt.  We show the excerpt.  There's an answer.  What was the question that was being answered?

And I don't believe that is -- the question in this case -- in that situation, Your Honor, is not inadmissible hearsay.  It's clearly relevant to set the answer up as to what

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

question is being answered, and I believe that would be within the bounds of what we're talking about.

Another instance, Your Honor, is that if you recall when the government originally submitted its excerpts to you that you ruled on, it actually included as an excerpt the questions that were asked by Mr. Baca's counsel at the very end of the interview.  It was one of the government's excerpts that the Court considered in ruling that no additional information beyond those excerpts was going to come in.

Then when I got the government's exhibit list, I went through it all and I noticed that they had redacted a few of the excerpts, and one of the excerpts that they had given to the Court before, but now they don't intend to play, is the excerpt at the very end of the tape where Mr. Fox says that as part of the ground rules of the interview, he had agreed with defense counsel that defense counsel could ask certain questions.

Defense counsel then asked I think three or four questions, Your Honor.  Mr. Baca gave answers.

And that was part of the ground rules of the interview, as Mr. Fox makes clear in the actual excerpts they used to have that Your Honor was originally presented by the government as being played in this trial but now they pulled back on.

So what I was explaining to Mr. Fox is that to the

extent that there's a ground rule reference in their excerpts to the notion that this would be allowed, that I was just going to ask the question, "Did, in fact, defense counsel, pursuant to the ground rules of the interview, ask Mr. Baca certain questions at the end of the interview?"

And then -- I am assuming that the agent testifying would say, "Yes," because it was, again, originally one of the excerpts the government had intended to play but now they don't intend to play it, Your Honor.

So I think that's what Mr. -- what I told Mr. Fox I intended to do ahead of time. And I did it ahead of time, Your Honor, to avoid a problem when the agent is on the stand so that we could address this beforehand.

MR. FOX: Mr. Hochman did not tell me this ground rule thing was part of what he was looking to do. What he told me was he was looking to have the defense attorney's questions come out.

Regardless, none of this is relevant. The questions aren't relevant.

Even if there were ground rules set up, which there were, that allowed his attorneys to ask questions at the end, that didn't mean they would be admissible at a later trial.

So it's not like we had some agreement where if Mr. Baca is ultimately charged, we will play these excerpts and that was agreed to.

There is absolutely no relevance to this, and it's Mr. Hochman trying to get out a lack of recollection rather than a false statement so he can tell the jury that that was really what was going through Mr. Baca's mind rather than the lie that he told during that interview.

MR. HOCHMAN:  And, again, Mr. Fox is correct that what we're trying to give the jury is Mr. Baca's mindset during the interview and whether or not he was knowingly making false statements to the government with the motivation to lie, conceal and hide, as the government said in its opening statement, or whether or not he answers -- by the way, it's the same exact area, it's the same exact questions that the government is actually introducing as evidence and whether or not Mr. Baca at that interview, as far as his mens rea goes, intended to lie to the government or intended to try to answer their questions to the best of his memory, which, by the way, is his answer, Your Honor, to the three questions that we -- that repeat, in essence, or go back into the three areas that the government has alleged are false statements.

MR. FOX:  And, Your Honor, two brief things.  One is these questions come after a half-hour break when he meets with his counsel and then they steer this more toward a recollection issue.  Again, there's no relevance to it.

But, secondly, I didn't address Mr. Hochman's statements about there were answers with no questions that are

a part of those clips.  There's one of the clips that has a question and we will be happy to work with Mr. Hochman to add that question and include more of that answer.  I believe that's clip 35.

So we will meet and confer with Mr. Hochman at the end of the day, and we have no objection to including that question and answer.

There is only one other clip that contains an answer but no question, and that's because there was no question.  I had asked Mr. Baca -- or somebody had asked Mr. Baca what his phone number was, and he answered that, and then Mr. Hirschman asked, "That's not" -- basically, that number is not going to be published anywhere.

And then Mr. Baca said, "I don't use that phone anymore."  So we took out the portion talking about whether this phone number was going to be going anywhere and just played the excerpt that results to Mr. Baca saying he doesn't use that phone number anymore.  So there is no relevant question.  None of this, as I said before, is relevant.

MR. HOCHMAN:  And a very brief response to that, Your Honor.

There's also -- I think one or two of the 47 clips has Mr. Baca's answer in it, and what the government has done for those particular answers is that they redacted the -- they had the question, then they had the answer, but they only put

in the middle section of the answer without any indication that it's the middle section of the answer.

In other words, there's an answer that -- there's sentences before the answer, there's sentences after the answer, but they have, in essence, clipped the middle of the answer and cut off the answer, and so -- I know I cannot go into the content of Mr. Baca's statement, but I believe that the jury should be entitled to know that that particular answer, there was a beginning to it, which is all the question I would ask is, "Was there -- did Mr. Baca make any statements before this answer," and, "Were there any -- did Mr. Baca have additional comments before the next question," just so that the jury understands --

THE COURT:  Didn't you raise this as part of the motion?

MR. FOX:  Yes, Your Honor, he did.

THE COURT:  And I've ruled on it, so we're not going to revisit it.

MR. HOCHMAN:  Your Honor, what you've ruled on is that I can't bring in the content because the content is the hearsay.

THE COURT:  Sir, my ruling is that they're going to play the excerpts that they have chosen to play.  This issue was raised, it's been ruled on, and no, you cannot ask this witness in front of the jury whether there was something before

and something after.

MR. FOX:  And Your Honor, just so you know, we're going through the clips, and we don't think that there's any instance of what Mr. Hochman was talking about where there is a question and then it picks up midway through Mr. Baca's answer.

We are now through the first 26.  We looked at this yesterday and didn't see any.

So if Mr. Hochman wants to raise something with us, we're happy to discuss it, but as you mentioned, you've ruled and I don't see why we're going into this again.

THE COURT:  So, Mr. Hochman, if there is something that they have overlooked or that wasn't raised, that's fine.  Why don't you talk to them and show them exactly what you're talking about.

MR. HOCHMAN:  I will, Your Honor.

And then with respect to the issue of -- again, counsel's questions, the ground rules for the interview, I think I can get in, Your Honor, that there were ground rules for the interview.  Mr. Fox says that on the record.  I would ask the Court -- I should be able to get into -- obviously, it's a request, but I think that's fair because it's a ground rule that they went into at the beginning of the interview that dealt with the interview.

THE COURT:  Well, counsel's questions are not evidence in this case, so any questions that counsel wants --

has asked, they're out, and Mr. Baca's responses to those questions are out.

If Mr. Baca wants to share with the jury his motivation, he can get on the stand and testify, otherwise, it's out, and therefore, these ground rules, they're irrelevant and they're out.

Now -- and by the way, you know, when you mentioned during your argument that the government didn't give him an opportunity to review this transcript, that's improper.  It's not a deposition.

MR. HOCHMAN:  Your Honor, there's a clip that you're going to hear that the government is going to introduce where they say actually, "Later on, we'll give you a chance -- that if you" -- you know, in essence, if you have said one thing and you meant the opposite, we'll give you that opportunity to cure it.

MR. FOX:  And Your Honor, that's not what's said, first of all.  What I said to him -- because there were a number of times where he said things inconsistent with documents we had, and I said, "I want to give you every opportunity during this interview to clear up anything that you have to say.  So if I have it in front of me and it's inconsistent with what you have, I'm going to confront you with it."  That's what I said.

I didn't say that we would then have an open-ended,

you know, discussion that could last months or years -- because Mr. Baca has never -- besides, of course, February 10 of 2016, never recanted any statement that he made and then he had since withdrawn any recantation that might have been.

THE COURT:  Okay.  We've got all the jurors here.  I hope the Court's rulings are clear.

Let's bring the jury in.

*(Jury in at 8:18 A.M.)*

THE COURT:  Good morning, ladies and gentlemen.

All right.  If the government would call its next witness, please.

MR. JAUREGUI:  Yes, Your Honor.  Before we call our first witness, we'd like to move some documents into evidence under Rule 902(11).

THE COURT:  All right.

MR. JAUREGUI:  There are a number of documents, Your Honor.  All of these documents are copies of records that meet the requirements of Rule 806(a) through (c).

The government has given the defense notice of our intent to offer these records, and they were previously made available for inspection.

Those records are Exhibits Number 102, 116, 119 through 122, 124, 142 to 152, 164 to 169, 171, 173 to 180, 184, 189, 194, 196 and 197 and Exhibit Number 209.

All of those records were accompanied by a

declaration of business records by custodians of records,

Your Honor, and we would move those exhibits into evidence, and

we would offer those exhibits.

THE COURT:  All right.  It's -- after 122, what's the

next?

MR. JAUREGUI:  124, Your Honor.

THE COURT:  And after 124?

MR. JAUREGUI:  142 to 152.

THE COURT:  All right.  Any objection?

MR. HOCHMAN:  No, on the basis of the admissibility

that counsel has stated, Your Honor.

THE COURT:  All right.  They'll be received.

MR. JAUREGUI:  Thank you, Your Honor.

*(Government's Exhibits 102, 116, 119-122, 124, 142-152,*

*164-169, 171, 173-180, 184, 189, 194, 196, 197, 209*

*admitted into evidence.)*

MR. FOX:  United States calls Jason Dalton.

THE CLERK:  Please raise your right hand.

Do you solemnly swear that the testimony you shall

give in the cause now before this Court shall be the truth, the

whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

THE CLERK:  Please be seated.

Please state your full name and spell your last name

for the record.

THE WITNESS:  My name is Jason Dalton, D-a-l-t-o-n.

MR. FOX:  May I proceed, Your Honor?

THE COURT:  Yes, please.

JASON DALTON,

having been first duly sworn,

testified as follows:

DIRECT EXAMINATION

BY MR. FOX:

Q.    What do you do for a living?

A.    I'm a special agent with the Federal Bureau of
Investigation.

Q.    How long have you been a special agent with the FBI?

A.    Approximately six years.

Q.    Are you assigned to a particular squad?

A.    Yes.

Q.    What squad is that?

A.    PC-1 is the public corruption squad in Los Angeles.

Q.    What are your duties?

A.    I investigate public corruption and civil rights offenses.

Q.    What are public corruption and civil rights offenses?

A.    They're federal offenses pertaining to certain enumerated
public corruption and civil rights crimes.

Q.    Okay.  What's an example of a public corruption crime?

A.    Bribery.

Q.    And what about a civil rights offense?  What's an example?

A.    Abuse under color of authority, for example.

Q.    At some point in time, were you assigned to a grand jury investigation involving civil rights and public corruption offenses by members of the Los Angeles County Sheriff's Department?

A.    Yes.

Q.    When did that occur?

A.    In August of 2011.

Q.    Had the investigation already been in existence?

A.    Yes.

Q.    How long had it been in existence?

A.    Since approximately June 2010.

Q.    Who was the lead agent working the case when you were assigned?

A.    Special agent Leah Marx.  She now goes by Tanner.

Q.    At some point, did you begin investigating whether the grand jury investigation into the sheriff's department's abuse and corruption was being obstructed?

A.    Yes.

Q.    When did that occur, approximately?

A.    Approximately, the summer of 2012.

Q.    And without getting into the details of who said what, why did you expand this investigation?

A.    We received information from -- witness information seemed to indicate that the sheriff's department had participated in

obstruction of justice towards some of our investigations.

Q.   And what generally did this investigation relate to, the obstruction of justice?

A.   It related to the sheriff's department hiding a federal informant and intimidating witnesses.

Q.   At some point in time, did you participate in an interview with Leroy Baca?

A.   Yes.

Q.   Approximately when did this occur?

A.   April of 2013.

Q.   Do you think you would recognize Mr. Baca again if you saw him?

A.   Absolutely.

Q.   Can you please look around the courtroom and tell me if you see him?

A.   Yes.

Q.   Where is he?

A.   He's sitting at counsel table to my left.  He's wearing a dark suit, an orange and gray striped tie, and an orange handkerchief in his pocket.

        MR. HOCHMAN:  So stipulated, Your Honor.

        THE COURT:  All right.

BY MR. FOX:

Q.   Where did this interview occur?

A.   It occurred at the law offices of Jones Day in downtown

A.    Jones Day represented Mr. Baca at the time.

Q.    Did Jones Day -- that's a law firm?

A.    Correct.

Q.    Did Jones Day represent any other individuals or entities in the investigation?

A.    Yes.  Jones Day represented the county of Los Angeles, the Los Angeles County Sheriff's Department, and Los Angeles County sheriff's deputies that were ranked captain and above.

Q.    Were there partners assigned to the case for Jones Day?

A.    Yes.

Q.    Who were the partners that were assigned to the case?

A.    An attorney named Beong Kim and an attorney named Brian Hershman.

Q.    With the interview of Mr. Baca, were they present?

A.    Yes.

Q.    Where within Jones Day did this interview occur?

A.    It occurred in a conference room in their law offices.

Q.    Who was present in that conference room?

A.    From the FBI, I was present and special agent David Dahle was present.

    From the United States Attorney's Office, you were present; Lizabeth Rhodes was present; Maggie Carter was present.

    And representing Baca, Brian Hershman and Beong Kim was both present.  And then Mr. Baca was also present.

Q. Do you remember the time of day that this occurred?

A. Yes.

Q. What time?

A. Approximately 2 o'clock p.m.

Q. How did you pick the time and date of the interview?

A. That was negotiated between the attorneys, the United States Attorney's Office and Mr. Baca's attorneys.

Q. Was there an amount of time allocated to the interview?

A. Yes.

Q. How much?

A. Approximately three hours.

Q. Did the interview wind up going longer than that?

A. Yes, it did.

Q. Is that something that, during the interview, Mr. Baca and his attorneys agreed to?

A. Yes.

Q. How long did the interview wind up taking from start to finish?

A. Approximately four hours, 45 minutes total.

Q. Does that mean that that -- there was four hours and 45 minutes of talking?

A. No.

Q. Why not?

A. There was three breaks that were taken throughout the interview for a certain period of time, so the interview took a

total of four hours, 45 minutes, although those breaks, the recorder was turned off and no questions were being asked of Mr. Baca.

Q.   Before the interview, did the federal government provide Mr. Baca and his counsel with anything?

A.   I'm sorry.  Could you ask that question again?

Q.   Sure.  Before the interview, did Mr. Baca receive anything from the federal government?

A.   Yes.

Q.   What was that?

A.   He received a nontarget letter.

Q.   You should have binders to your left on the bookshelf there.  Could you look at Exhibit 111, please.

A.   Okay.

Q.   Do you recognize Exhibit 111?

A.   Yes.

Q.   What is it?

A.   This is a copy of the nontarget letter that was provided to Mr. Baca through his attorneys.

Q.   Is it a true and accurate copy of that letter?

A.   Yes.

        MR. FOX:  Your Honor, I would move for the admission of Government Exhibit 111.

        MR. HOCHMAN:  No objection.

        THE COURT:  It will be received.

*(Government's Exhibit 111 admitted into evidence.)*

MR. FOX:  I'm going to show it to the jury.

*(The exhibit was displayed on the screen.)*

BY MR. FOX:

Q.   Special Agent Dalton, who is the letter addressed to?

A.   It's addressed to Beong Kim at the law offices of Jones Day.

Q.   And there's an address listed there.  Is that the same address where the interview occurred?

A.   Yes.

Q.   What's the date of this letter?

A.   April 10th, 2013.

Q.   Can you please read the portion I've highlighted.

A.   Sure.

"Re: Leroy Baca.  Dear Mr. Kim.  You have inquired whether this office would provide your client, Leroy Baca, with a nontarget letter in connection with the investigation of alleged civil rights and obstruction of justice violations within the Los Angeles County Sheriff's Department.

"As you are aware, in the context of a criminal investigation, a target is a person who is linked by substantial evidence to the commission of a crime and who, in the prosecutor's judgment, is likely to be charged.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

"This will confirm that this office does not
presently view Mr. Baca as a target of its
investigation of the Los Angeles County Sheriff's
Department.  This assessment is based on the
information we have obtained to date, of course, and,
therefore, could change in the event that new and
different information regarding Mr. Baca comes to our
attention."

Q.   Did this mean that Mr. Baca was not a subject of the
investigation?

MR. HOCHMAN:  Objection.  Leading.

THE COURT:  Overruled.  You can answer.

THE WITNESS:  No.

BY MR. FOX:

Q.   And did this mean that Mr. Baca could never be a target?

A.   No.

Q.   Did this mean that Mr. Baca could never be charged?

MR. HOCHMAN:  Objection.  Leading.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  No.

BY MR. FOX:

Q.   You mentioned that this interview occurred on April 12th
of 2013.  Did anything happen with respect to the
representation that Mr. Baca was a target before the interview?

A.    I'm sorry.  Could you ask that again?

Q.    Sure.  You mentioned that the interview occurred on April 12th of 2013.

A.    Correct.

Q.    Before the interview, did anything about the meeting become public?

A.    Yes.

Q.    What became public?

A.    An article was published in the LA Times.  It described generally the FBI's obstruction of justice investigation and it indicated -- well, Baca was quoted in the article as saying that he was not a target of the FBI's investigation.

Q.    Was this something that was discussed during the interview of Mr. Baca on April 12th, 2013?

A.    Yes, it was.

Q.    And what, if anything, did Mr. Baca say about it?

A.    Mr. Baca acknowledged that the leak had come from his side, meaning the sheriff's department, and he apologized for the leak.

Q.    Now, why was this interview at Mr. Baca's attorney's offices?

A.    Multiple reasons.  One, that was something that was addressed between the parties.

It was also at his attorney's offices instead of the typical place where we did the interviews, which would have

been at the United States Attorney's Office out of the concern that Mr. Baca had that if he was seen entering the United States Attorney's Office by press or some outside party, that could lead to speculation about his involvement -- or involvement in the case.

Q.   Special Agent Dalton, did you record this interview?

A.   Yes.

Q.   How did you record it?

A.   I recorded using two audio recording devices.

Q.   Why two?

A.   From time to time, audio recording devices fail, so to make sure that the entire interview was recorded, I used two, using one as a backup.

Q.   You mentioned that this interview occurred in a conference room.  Where were you seated?

A.   We were -- the whole group was seated at a large oval-shaped conference table.  I was sitting immediately to Mr. Baca's right-hand side.

Q.   And where was everybody else sitting?

A.   Next to me were the United States Attorneys present, so you were next to me, Liz Rhodes and Maggie Carter were all to my right.  David Dahle was sitting kind of across from me, and to Mr. Baca's left, Brian Hershman and Beong Kim.

Q.   Were there refreshments available?  Did Jones Day make refreshments available?

MR. HOCHMAN:  Objection.  Relevancy.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  Yes.

BY MR. FOX:

Q.  What types?

A.  Water, soda --

MR. HOCHMAN:  Objection.  Relevancy.

THE COURT:  Overruled.  You can answer.

THE WITNESS:  Water, soda, coffee.

BY MR. FOX:

Q.  Did Mr. Baca have any of these?

A.  Yes.

Q.  What did he have?

A.  He drank coffee.

Q.  Throughout this meeting, what was Mr. Baca's demeanor?

A.  It was very normal.  I mean, he sat up straight.  He looked at the people asking questions, responded, made good eye contact to everyone in the room, kind of looked around as he was speaking.  Just very normal.

Q.  Was this a voluntary interview?

A.  Yes.

Q.  What does that mean?

A.  The interview itself was something that Mr. Baca through his attorneys had consented to, and he was free to discontinue

the interview at any given point in time.

MR. FOX:  Your Honor, may I have this witness provided with the original Exhibit Number 2, please.

THE COURT:  Yes.

BY MR. FOX:

Q.  Special Agent Dalton, if you could also pull out the binder that says "Exhibit 3" on it and take a look at that.

It should also be on the bookshelf.

BY MR. FOX:

Q.  Do you recognize Exhibits 2 and 3?

A.  Yes.

Q.  What are they?

A.  Exhibit 2 is a CD -- a DVD containing the audio recording of the Baca interview.  And Exhibit 3 is a transcript of that recording.

Q.  Is Exhibit 2 a true and accurate copy of certain excerpts from the interview of Mr. Baca?

A.  Yes.

Q.  And does Exhibit 3 truly and accurately reflect what was said and who said what during those excerpts?

A.  Yes.

MR. FOX:  Your Honor, at this point in time, I move for the admission of certain excerpts from Exhibit 2.  Those are Exhibit 2, Excerpts 1, 2, 3, 4, 5, 6, 7, 9, 10, 21, 22, 26, 27, and 33.

THE COURT: Any objection?

MR. HOCHMAN: Just the foundation question for how this particular witness knows that Exhibit 2 is part of the overall interview, Your Honor.

MR. FOX: Your Honor, I'm happy to ask those questions.

THE COURT: All right.

BY MR. FOX:

Q. Special Agent Dalton, you were present during the interview?

A. Yes.

Q. And you listened to that disk?

A. Yes.

Q. How do you know you listened to that disk?

A. I -- after listening to the disk, I put my initials on the disk, and I just looked and saw my initials are there. This is the disk I listened to.

Q. And you put your initials on that disk in the last week or so?

A. Yes.

MR. FOX: Your Honor, I again move for the admission of those excerpts from Exhibit 2.

THE COURT: Any objection?

MR. HOCHMAN: No objection, Your Honor.

THE COURT: They will be received.

*(Government's Exhibit 2-1 to 2-7 admitted into evidence.)*

*(Government's Exhibit 2-9 to 2-10 admitted into evidence.)*

*(Government's Exhibit 2-21 to 2-22 admitted into evidence.)*

*(Government's Exhibit 2-26 to 2-27 admitted into evidence.)*

*(Government's Exhibit 2-33 admitted into evidence.)*

MR. FOX:  Now going to play the -- oh, Your Honor, we have Exhibit Books for the jury that we'd like to pass out.

THE COURT:  All right.

Ladies and gentlemen, keep those notebooks closed for just a moment.

You are about to listen to a tape-recording that has been received in evidence.  Please listen to the recording carefully.  Each of you has been given a transcript of the recording to help you identify speakers and as a guide to help you listen to the recording.

However, bear in mind that the recording is the evidence, not the transcript.  If you hear something different from what appears in the transcript, what you heard is controlling.  After the recording has been played, the transcript will be taken from you.

MR. FOX:  Your Honor, each of the clips that I'm going to play have a tab in front of them.  The first one I'm going to play is excerpt 1.  So if the jury turns --

THE COURT:  Okay.

MR. FOX:  -- to the first tab.

THE COURT:  Okay.

MR. FOX:  May I proceed, Your Honor?

THE COURT:  Yes, please.

(Playing of audiotape.)

BY MR. FOX:

Q.   Special Agent Dalton, was Mr. Baca provided with the subject matter of the interview?

A.   Yes.

MR. FOX:  I'm now going to play, Your Honor -- and if I could have the jury flip to the second excerpt under the second tab.

(Playing of audiotape.)

BY MR. FOX:

Q.   Special Agent Dalton, there is reference to a calendar in this clip that Mr. Baca makes.  At some point in time before this interview, did the federal government obtain from the sheriff's department Mr. Baca's calendar?

A.   Yes.

Q.   I'd like you to flip in your Exhibit Book to Exhibit 120, please.

Do you recognize that?

A.   Yes.

Q.   What is it?

A.    It's a copy of that calendar -- of Mr. Baca's calendar.

Q.    Is it a true and accurate copy of the portion of the calendar that the federal government received from the sheriff's department?

A.    Yes.

Q.    And did the federal government ask Mr. Baca about his calendar during the excerpts throughout the interview that we're going to hear?

A.    Yes.

        MR. FOX:  Your Honor, I move for the admission of Government Exhibit 120.

        MR. HOCHMAN:  No objection.

        THE COURT:  It will be received.

    (Government's Exhibit 120 admitted into evidence.)

BY MR. FOX:

Q.    In that same clip, Special Agent Dalton, Mr. Baca -- or there was reference made to Mr. Martinez, Steve Martinez.  Who was Steve Martinez?

A.    Steve Martinez was the assistant director in charge of the LA FBI field office.

Q.    I'm now going to play excerpt 3 from that interview.

    (Playing of audiotape.)

BY MR. FOX:

Q.    We just heard Mr. Baca reference a Chief Burns.  Who was Chief Burns?

A.    Chief Burns was the chief over the custody division at LASD.

Q.    Who was undersheriff at the time, August of 2011?

A.    That was Paul Tanaka.

        MR. FOX:  I'm now going to play Clip 4.

        *(Playing of audiotape.)*

        MR. FOX:  Playing Clip 5.

        *(Playing of audiotape.)*

        MR. FOX:  Now going to play Clip 6.

        *(Playing of audio tape.)*

        MR. FOX:  Now playing Clip 7.

        *(Playing of audiotape.)*

BY MR. FOX:

Q.    Special Agent Dalton, was it unusual to you that Mr. Baca got Mr. Leavins' first name wrong?

A.    No.

        MR. HOCHMAN:  Objection.  Foundation.  Calls for speculation.

        THE COURT:  Sustained.

        MR. HOCHMAN:  Move to strike the answer, Your Honor.

        THE COURT:  The answer is stricken.

        The jury should disregard it.

BY MR. FOX:

Q.    Special Agent Dalton, how many names were discussed in the interview overall?

A.    Approximately 20.

Q.    And with a vast majority of those, did Mr. Baca get them right or wrong?

A.    Got them right.

Q.    Now we're going to skipping Clip 8 for now.  I am not going to be playing that with you.  So if you could turn now to Clip 9.

     *(Playing of audiotape.)*

          MR. FOX:  Now playing the next clip, clip Number 10.

     *(Playing of audiotape.)     (Playing of audiotape.)*

Q.    Special Agent Dalton, again I'm going to skip and not play certain excerpts through you.  But going to exhibit -- excerpt 26.

          Can you turn to that tab.

          THE COURT:  And, ladies and gentlemen, please only read those transcripts that are actually played.  So don't try to skip ahead or skip to the next one.

          MR. FOX:  Now playing excerpt 26.

     *(Playing of audiotape.)*

          MR. FOX:  I'm going to stop it right there for a second.

BY MR. FOX:

Q.    Special Agent Dalton, the LASD242794 through 242808.  What is that?

A.    Those are the -- those are Bates numbers.

Q.    What are Bates numbers?

A.    Bates numbers are numbers that were put on documents that were produced to the federal government through the Jones Day, the LASD attorneys, and they mark the sequential number of the document that was produced.

Q.    So this one was produced around 250,000 documents up until that point; is that right?

A.    That's correct.

Q.    Did these all relate to the obstruction investigation?

        MR. HOCHMAN:  Objection.  Foundation.

        THE COURT:  Sustained.

BY MR. FOX:

Q.    Do you know whether these related simply to the obstruction investigation?

A.    Yes.

Q.    Did they?

A.    No.  The lion's share of the documents that were produced to the federal government in this case, in this Bates range, were dealing with the civil rights offenses that the FBI was investigating.

        MR. FOX:  I'm going to continue to play that.

    *(Playing of audiotape.)*

        MR. FOX:  I'm now going to play the next clip, Clip 27.

    *(Playing of audiotape.)*

BY MR. FOX:

Q.   Special Agent Dalton, I want to publish the calendar, Exhibit 120.

          (The exhibit was displayed on the screen.)

BY MR. FOX:

Q.   Is this Mr. Baca's calendar?

A.   Yes.

Q.   And there was discussion about an AltaMed 5K race.  Where is that listed on his calendar?

A.   The very -- after it says "Saturday, August 20th," the first line, the 7:00 to 9:00 a.m. block, it has "8:30 start, AltaMed 5K race/walk."

Q.   In that clip and in a previous clip, he referred to calls that he had with Mr. Martinez on a Thursday, two days before this meeting.  Do you recall that?

A.   Yes.

          MR. FOX:  I'm now going to publish what's in evidence as Government Exhibit 197.

          Well, let me publish the first page first.

          (The exhibit was displayed on the screen.)

BY MR. FOX:

Q.   What is this exhibit?

A.   That is a declaration of the custodian of records for the cell phone records for Mr. Baca's cell phone.

Q.   You mentioned that the interview was April of 2013.  What

is the date of this declaration?

A.   January 14, 2014.

Q.   And what is the declaration attached to?

A.   It's attached to the Verizon cell phone records for Mr. Baca's cell phone, the number that he provided to us at that interview.

Q.   Now showing you the seventh page and specifically on August 18th, the bottom part of this page.

Do you see what I have blown up there (indicating)?

A.   Yes.

Q.   Are you familiar with the number that is listed next to 5:40 p.m. on August 18thth?  It's (310)883-8539?

A.   Yes.

Q.   What is that number?

A.   That is the number that's the cell phone number for the assistant director in charge, Steven Martinez, at that time, the LA FBI assistant director in charge.

Q.   Do cell phone records like these show when a call is outgoing versus incoming?

A.   Yes.

Q.   And for this call, the 5:40 p.m. call, was this a call that was outgoing or incoming?

A.   I don't know if I can see it on this portion.

Q.   Well, do you see the 5:57 p.m. on the very right after nine?  What does it say there?

A.    "Incoming CL."

Q.    Okay.  So if it doesn't say that, what type of call is it?

            MR. HOCHMAN:  Objection.  Foundation.

BY MR. FOX:

Q.    Are you aware --

A.    Yes.

Q.    Based on your experience with the FBI and your training with phone records, are you aware of whether that reflects an incoming or outgoing call?

A.    Honestly, I'm not a hundred percent aware.

Q.    So the 5:40 and 5:45 calls are to the same number.  And who is that to -- I'm sorry.  Who is that between?

A.    Steven Martinez and Mr. Baca's cell phone.

Q.    And at 5:49 p.m., are you familiar with the number 323-526-5005?

A.    Yes.

Q.    What is that number?

A.    That's an LASD hard line that's affiliated with Mr. Baca's assistant.

Q.    What about the 5:55 p.m. call?  Are you familiar with the number 323-526-5000?

A.    Yes.

Q.    What is that?

A.    That is an LASD hard line that is affiliated with the office of the sheriff.

Q.   Mr. Baca, along with saying that he talked to his aide or called his aide, he mentioned Paul Tanaka.  Are you familiar with the number that's affiliated with the 5:57 call, (323)829-0657?

A.   Yes.

Q.   What is it?

A.   That is the cell phone for then-undersheriff Paul Tanaka.

Q.   How long was this call?

A.   Nine minutes.

Q.   And is that what I'm highlighting here?  The "nine" reflects that it's nine minutes?

A.   Correct.

Q.   Special Agent Dalton, I want to show you now Government's Exhibit 227 and 228 for demonstrative purposes only.

     First, 227.

     Right here, Special Agent.  Do you recognize this?

A.   Yes.

Q.   What is it?

A.   That is a calendar for August of 2011.

Q.   And does it accurately reflect the days of the week and the calendar in August of 2011?

A.   Yes, it does.

Q.   And now, 228.

Q.   What is this (indicating)?

A.   That's a calendar for September of 2011.

Q.   Does it accurately reflect the days of the week and the
days of September 2011?

A.   Yes.

     MR. FOX:  Your Honor, may I use these exhibits for
demonstrative purposes, please?

     THE COURT:  Yes.

BY MR. FOX:

Q.   And showing you this magnet that says "Baca" and then an
arrow and "FBI" (indicating), what day did the call between
Mr. Baca and Mr. Martinez occur?

A.   On August 18th, 2011.

Q.   And do you see this says "Baca-Tanaka calls" on it
(indicating)?

     MR. FOX:  Never mind, Your Honor.  Withdraw that.

BY MR. FOX:

Q.   Special Agent Dalton, I want to ask you about another
document that is in a clip that we're going to play later in
this trial.

     But Exhibit 112 -- can you look at Exhibit 112,
please.

A.   Okay.

Q.   What is Exhibit 112?

A.   This is a letter that was drafted by Mr. Baca and
addressed to André Birotte.

Q.   Is it a true and accurate copy of the letter that the

federal government asked Mr. Baca about in that interview?

A.    Yes.

MR. FOX:  Your Honor, I move for the admission of Government Exhibit 112.

THE COURT:  Any objection?

MR. HOCHMAN:  No, on that basis, Your Honor.

THE COURT:  It will be received.

*(Government's Exhibit 112 admitted into evidence.)*

BY MR. FOX:

Q.    And then I just want you to authenticate if you could.

MR. FOX:  I'm not trying to admit this.

BY MR. FOX:

Q.    Exhibit 154, please.

A.    Okay.

Q.    What is Exhibit 154?

A.    This is an LA Times article that was shown to Mr. Baca during the interview.

Q.    What is the date of that article?

A.    September 29, 2011.

Q.    And is that in substantially similar condition to the article that was presented to Mr. Baca on April 23rd, 2013, during this interview?

A.    On April 12th.

Q.    Twelfth.  Excuse me.

A.    And yes.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

MR. FOX:  Again, I'm not trying to admit that at this point, Your Honor.

BY MR. FOX:

Q.   Special Agent Dalton, I now want you to look at original exhibits --

MR. FOX:  Your Honor, if we could have him look at original Exhibits 5 and 7, please.

THE COURT:  All right.

THE WITNESS:  Okay.

BY MR. FOX:

Q.   Do you recognize those?

A.   Yes.

Q.   What are they?

A.   These are disks that contain the audio and video of a 2015 deposition of Mr. Baca.

Q.   Is that in an unrelated civil lawsuit?

A.   That's correct.

Q.   How did you obtain those documents -- those disks?

A.   These disks were provided to us by the attorney that represented the plaintiff in the lawsuit.

MR. FOX:  Your Honor, I move for the admission of Government's Exhibits 5 and 7, the specific clips that are on there.

MR. HOCHMAN:  Your Honor, objection.  Foundation, relevancy, and motion in limine.

THE COURT:   Let's go to sidebar for a moment.

*(Proceedings held at sidebar under seal 9:17 to 9:22 A.M.)*

*(The following proceedings were held in open court.)*

MR. FOX:  Your Honor, with that, I tender this witness for cross-examination.

THE COURT:  All right.

MR. HOCHMAN:  May I proceed, Your Honor?

THE COURT:  Yes, please.

///

MR. HOCHMAN:  Thank you very much.

CROSS-EXAMINATION

BY MR. HOCHMAN:

Q.   Special Agent Dalton, you've been with the FBI since approximately when?

A.   December 2010.

Q.   And just to make sure I understand, when your designation is special agent, is every FBI agent designated as a special agent?

A.   I believe so.

Q.   And when you joined in December 2010, were you -- did you go to the Los Angeles field office of the FBI?

A.   Yes.

Q.   And in the Los Angeles field office, there's approximately 800 special agents?

A.   Approximately.

Q.   And you said that at some point between December 10th and, I believe, August 2011 is when you got involved in this investigation; is that correct?

A.   I got involved in this investigation in August of 2011.

Q.   So after the undercover operation involving Gilbert Michel had already gone down in June 2011; is that correct?

A.   That's correct.

Q.   And you got involved after the cell phone was found on Anthony Brown inside the Men's Central Jail?

A.   I became involved in August 2011, which is approximately around that same time.

Q.   And as part of getting involved, the lead case agent at the time was Agent Leah Marx; is that correct?

A.   That's correct.

Q.   And you had a chance to have discussions with Agent Marx as to what had been going on over the prior year in the investigation; is that correct?

A.   Yes.

Q.   And part of what had been going on -- I think we were talking about a moment ago -- was this undercover operation against a Los Angeles County sheriff's detective Gilbert Michel; is that correct?

A.   That was part of -- yes, that was part of the investigation, correct.

Q.   And that undercover operation involved Agent Marx using an inmate inside the Men's Central Jail as an informant; is that correct?

         MR. FOX:  Your Honor, objection.  Beyond the scope.

         THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.   What did you understand the undercover operation to involve?

         MR. FOX:  Objection, Your Honor.  Beyond the scope.

         THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.   Now, you said that -- when you got involved, actually, in August 2011, what did you do in connection with the investigation?

A.   Initially, I reviewed the FBI case file to date.  Then I assisted as needed with Ms. Marx.

Q.   I see.  And when did you -- did you actually ever go into the Men's Central Jail?

A.   Yes.

Q.   Approximately when was that?

A.   I first interviewed inmates in conjunction with this case in -- I believe, in a state jail.  I think my first entry into Men's Central Jail occurred in approximately December of 2011.

Q.   And were you interviewing inmates in December of 2011 or starting in December 2011, the Men's Central Jail?

A.   In conjunction with this case, yes.

Q.   And you said "state prison."  Did you also interview inmates in state prison?

A.   That's correct.

Q.   Was one of them Anthony Brown?

A.   No.

Q.   And then you said that -- and then with respect to your involvement in the investigation, part of that involvement involved obtaining documents from the Los Angeles County Sheriff's Department through a grand jury subpoena; is that

correct?

A.    That's correct.

Q.    And I believe you referenced Exhibit 120, which was Sheriff Baca's calendar, as one of the documents that was obtained from the sheriff's department through a grand jury subpoena, correct?

A.    Yeah.  I mean, that was obtained sometime after I first joined, but, yes, that was one of the documents that we obtained through the investigation.

Q.    And you obtained that document before the April 12, 2013, interview of Sheriff Baca; is that correct?

A.    Yes, that's correct.

Q.    And I think you referenced it had a number in the 200,000's.  Those would be page numbers of documents that were produced by the Los Angeles County Sheriff's Department to the federal government pursuant to a grand jury subpoena, correct?

A.    For the most part.  Some -- if a disk was produced by the sheriff's department, that would get a single Bates number as well, but, yes, it's -- each Bates number represents an item, maybe a page number, maybe a disk, something to that effect.

Q.    And those documents included e-mails from the sheriff's department; is that correct?

A.    To be honest with you, I'm not certain if you're asking as of the -- as of a certain date.  What proceeded, I don't know, but, yes, at some point in time we received e-mails according

to our investigation.

Q.    And you received audiotapes as well?

A.    Yes.

Q.    And you received videotape?

A.    Yes.

Q.    And you received logs and notes from investigators?

A.    Throughout the investigation, yes.

Q.    Now, with respect to -- so then -- then you said starting at around the summer of 2012 is when you began to focus on the obstruction investigation; is that correct?

A.    Around summer of 2012, correct.

Q.    And from the summer of 2012 until April 12th, 2013, did you have the opportunity to interview people at the Los Angeles County Sheriff's Department?

A.    Some, yes.

Q.    And did some of those people involve sheriff's department deputies?

A.    Yes.

Q.    Sergeants?

A.    To be honest with you, I can't specifically recall exactly who was interviewed when, but, yes, I believe sergeants were interviewed in that time frame.

Q.    Lieutenants?

A.    I would have a hard time recalling specifically who was recalled -- who was interviewed when, but we interviewed

personnel from the sheriff's department in that time frame.

Q.    Okay.  And I just want to get an idea of the types of personnel, because you're familiar with the structure -- the organizational structure of the Los Angeles County Sheriff's Department from deputy all the way to sheriff; is that correct?

A.    Yes, I am.

Q.    And just briefly, that structure starts at the bottom with a deputy; is that correct?

         MR. FOX:  Objection.  Beyond the scope.

         THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.    Well, in the interviews that you conducted, you said you spoke with deputies, sergeants, and lieutenants.  The position above a lieutenant is a captain that you would have spoken with, correct?

         MR. FOX:  Objection.  Beyond the scope.

         THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.    Now, when the FBI speaks with a witness in their investigation, do you prepare a written report?

A.    Yes.

Q.    And is that written report put on a form called a "302"?

A.    That's correct.

Q.    And they call these reports "302 reports," correct?

A.    Yes.  The written report of an interview is called a

"302."  That's correct.

Q.   And those reports are prepared soon after the interview of a particular witness, correct?

A.   Typically, they are.

Q.   And the idea behind those reports is that you want to memorialize -- you want to put down in writing what you've heard during the conversation in order to preserve that type of information, correct?

A.   It depends.  If the interview is conducted without the use of recording equipment, then the purpose of a 302 is to document a summary of what the witness told us.

If the interview was audio-recorded, for example, then the 302 will describe basically the circumstances around the recording, but because it's recorded there's no need for us to put a summary of the conversation because it's been recorded.

Q.   And particularly for the ones that aren't recorded, you need -- those reports that you prepare need to be accurate, correct?

A.   All the reports need to be accurate.

Q.   Because sometime later, maybe weeks, months or years later, someone might need to actually look at that report and understand what happened that day, correct?

A.   Again, in the case of audio recordings, it's a little bit different because the audio recording contains a recording of

the interactions, so it's evident from the audio recording what occurred there.

So for those, those are more administrative in nature, you know, just kind of marking that a recording occurred on this date and so on.

Q.   But for the ones that don't involve an audio recording, that are just a summary of the witness's statement, that written report is the only memorialization of what the witness said on that particular date; is that correct?

MR. FOX:  Objection.  Relevance.  Beyond the scope.

THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.   Now, you were aware that on August 18, 2011, is when assistant director of the FBI's Los Angeles office, Steve Martinez, called Sheriff Baca in connection with the cell phone that was discovered; is that correct?

MR. FOX:  Objection.  Misstates the evidence. Misstates the testimony.

THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.   Are you aware that Sheriff Baca and assistant director in charge of the FBI's Los Angeles office, Steve Martinez, had conversations at approximately 5:40 in the afternoon on August 18th, 2011, concerning a cell phone -- FBI cell phone that had been found in the Men's Central Jail?

A.    Yes.

Q.    Now, between August 18th, 2011, and April 12th, 2013, there were approximately over 600 days, correct?

A.    I've never counted.  I mean, I'll -- between -- which dates are you asking?

Q.    August 18, 2011 --

A.    Yes.

Q.    -- and April 12th, 2013.  Approximately 600 days?

A.    It's approximately a year and a half.

Q.    Year and a half.  A little over 18 months?

A.    So -- yeah.

Q.    And at the time of the April 12, 2013, interview of Sheriff Baca, he was 71 years old at that time; is that correct?

A.    Correct.

Q.    And he was the sheriff of Los Angeles County at the time of that interview; isn't that correct?

A.    Yes.  Mr. Baca was the sheriff at that time.

Q.    And are you familiar with the duties and responsibilities of Sheriff Baca at that time as it pertained to the sheriff's department?

A.    In a general sense, yes.

Q.    What were you generally -- what did you generally understand those duties and responsibilities to be?

A.    He was the highest-ranking officer in that department.

Q.    Did you understand what that department covered?

A.    The area?

Q.    The area.

A.    Yes.

Q.    What was that?

A.    It was the Los Angeles County area.

Q.    And did you understand how many divisions within the sheriff's department he was in charge of?

        MR. FOX:  Objection.  Relevance.  Beyond the scope.

        THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.    Now, you said that Mr. Baca agreed to a voluntary interview on that day of April 12, 2013; is that correct?

A.    Yes.

Q.    He wasn't compelled by any grand jury subpoena to give the interview that day; is that right?

A.    No.

Q.    And you said he could have stopped the interview at any time?

A.    That's correct.

Q.    But he didn't stop the interview from the time it started until the time it ended, correct?

A.    There was -- we took breaks throughout the interview.

Q.    And I think you said that the total interview time was about four hours and 45 minutes; is that right?

A.   That's correct.

Q.   The interview started at 1:57 p.m. that day and ended at 6:43 p.m. that day?

A.   That's correct.

Q.   And of the four hours and 45 minutes, you estimate probably, what, 45 minutes of combined breaks; is that about right?

A.   That's a good approximation.

Q.   So then there was about four hours of questions and answers that occurred that day between the government and Sheriff Baca; is that right?

A.   Yes.

Q.   And the interview, I think you said, was originally set to last three hours; is that correct?

A.   The parties discussed a three-hour interview.

Q.   But Sheriff Baca didn't stop at the three-hour mark, correct?

A.   Sheriff Baca and his attorneys agreed to continue the interview a little bit.

Q.   Another hour and a half, correct?

A.   Approximately, yes.

Q.   Now, you said that the government had three federal prosecutors at that meeting; is that correct?

A.   There were three United States Attorneys present for the meeting, correct.

Q.   Mr. Fox, who is right here at counsel table (indicating);
is that right?

A.   Mr. Fox was present, yes.

Q.   Ms. Rhodes, who is also at counsel table?

A.   Ms. Rhodes was also present, yes.

Q.   And then there was an additional assistant United States
Attorney named Margaret Carter.  Was she there?

A.   Yes.

Q.   In addition to the three assistant United States
Attorneys, there were two FBI agents there, yourself and Agent
Dahle; is that right?

A.   That's right.

Q.   Now, the interview, I think you said, did not occur in a
courtroom; is that right?

A.   No, the interview occurred in a conference room at the law
offices of Jones Day.

Q.   And in that conference room, there was no judge, right?

A.   No.

Q.   There was no court reporter?

        MR. FOX:  Objection, Your Honor.  Relevance.

        THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.   Was there a court reporter taking down the statements that
day?

        MR. FOX:  Objection.  Relevance.

THE COURT: Sustained.

BY MR. HOCHMAN:

Q. Well, the conference room was a much more informal setting than, let's say, having it in a courtroom, correct?

A. Versus a courtroom?

Q. Yes.

A. The conference room was more informal, yes.

Q. It was even a more informal setting than having it at the US Attorney's office, correct?

A. I would say the two probably would be equally formal.

Q. Now, was Mr. Baca at any point put under oath during this interview?

A. No.

Q. Was he ever told that his statements were going to be given under penalty of perjury?

A. He wasn't specifically told his statements would be given under penalty of perjury, no.

Q. Was he told at any point during the interview that if he gave a knowingly false statement, he could be subject to criminal penalties?

A. He was admonished at the beginning of the interview but wasn't specifically told that he would be subject to criminal penalties if he lied.

Q. And you participated in many interviews with many witnesses, correct?

A.    Yes.

Q.    And is it a standard technique that these witnesses are informed at the beginning that if they do give a knowingly false statement, they could be subject to criminal penalties?

A.    I wouldn't say it's standard, no.

Q.    But it happens often?

A.    In instances where the interviewee may not be aware that it's a problem to give -- to lie to an FBI agent, we sometimes admonish them of that, yes.

Q.    Well, you gave admonishments, didn't you, to other people from the Los Angeles County Sheriff's Department, deputies, sergeants or above, that if during their interview they lied, they could be subject to criminal penalties, correct?

A.    In some cases, yes.

Q.    And, clearly, people who are law enforcement officers would understand that you can't lie to a federal agent, correct?

A.    An officer should know that, yes.

Q.    And in this informal setting that you're having with Sheriff Baca, did anyone discuss with him what would happen if he lied at all?

A.    I'm sorry.  Could you repeat that question?

Q.    In this informal discussion that the government is having with Sheriff Baca, did anyone discuss with him what would happen if any one of his statements during the interview turned

out to be a lie?

A.    Although the setting was less formal than a courtroom, I wouldn't call the interview an informal discussion.

Q.    Okay.  Well, during the interview that was happening in a conference room at a law office, did anyone discuss with Sheriff Baca what would happen if any one of his answers during the ensuing hours of interview turned out to be erroneous?

A.    The criminal penalties for lying to an FBI agent were not specifically discussed with him, no.

Q.    Now, during this four-and-a-half-hour interview, Mr. Baca was asked over 550 questions; is that correct?

A.    It depends how you count a question.  For example, if he was asked if he wants coffee or something like that, I don't know if you would count that as a question.  So depending on how you count the questions, between 4- or 500 questions, approximately, he was asked.

Q.    So at least 400 questions?

A.    Again, you know, yes, at least 400 questions.

Q.    And when I say "400 questions," 400 substantive questions, not questions about "Do you want a cup of coffee?" but questions relating to the topics that Mr. Baca was there to answer; is that correct?

A.    Approximately.

Q.    Would it actually be over 500 of those substantive questions?

A.    Again, I didn't go and count each individual one, so I'm approximating for you, so 4- to 500 would be probably be a good approximation of how many substantive questions he was asked.

Q.    And all those questions -- most of those questions were asked by the government; is that correct?

A.    That's correct.

Q.    And almost all of those questions were asked by Mr. Fox; isn't that correct?

A.    That's correct.

Q.    Now, prior to your testimony today, did you meet with Mr. Fox to go over your testimony?

A.    Yes.

Q.    How many times?

A.    Two.

Q.    And when you met with Mr. Fox, did he go over many of the questions that he asked you during your testimony here today?

A.    Yes.

Q.    And did he also show you documents ahead of time that he was going to show you on the stand today?

A.    Yes.

Q.    And that was during each of those two meetings?

A.    Yes.

Q.    And the purpose of asking you the questions ahead of time was that you could then refresh your memory as to what was being asked by the question to make sure your answer was as

accurate as possible; is that correct?

A.   I think it was to make it as smooth a process as possible so I'm not spending time thinking while I'm here.

Q.   Well, again, in order to also refresh your memory because this incident of April 12, 2013, took place almost four years ago, correct?

A.   I feel like my memory is sufficiently refreshed without the preparation, but it did make things more smoothly.

Q.   And the same thing with showing you the documents that he was going to show you today.  Showing you those documents ahead of time, that also helps refresh your memory about the documents, correct?

A.   Again, I had a good memory of the documents without prepping with him, but seeing them again did make it less surprising when he put it on the screen during my testimony.

Q.   And when you say you have a good memory of the documents, that's because you had access to all these documents since approximately -- at least the ones Mr. Fox has showed you, since approximately 2013, correct?

A.   I had access to -- the documents that he showed me I had access as of the time they were received by the federal government.

Q.   And you've read -- excuse me.

You've heard the entire audio recording of the four-and-a-half-hour interview -- the four-hour-and-45-minute

interview?

A.   Yes, I did.

Q.   How many times?

A.   At least twice.

Q.   Twice since 2013?

A.   Maybe two or three times since 2013.

Q.   And you've had a chance to look at the transcript while you were listening to that entire audio recording in order to make sure that the transcript was accurate for the entire audio recording; is that correct?

A.   That's correct.  I checked the transcript to make sure it was accurate.

Q.   And there was a transcript prepared of the entire audio recording; is that correct?

A.   Yes, there was.

Q.   Do you have Exhibit 1 before you?

A.   Yes.

Q.   And Exhibit 1 is an audio recording of the entire four-hours-and-45-minute interview; is that correct?

A.   Yes.

Q.   And you've initialed that exhibit as well?

A.   I have not.

Q.   But have you had a chance to listen to that exhibit before you came here today?

A.   I listened to the entire audio interview, yes.

Q.    And is it accurate based -- is the audio interview that you listened to that's in Exhibit 1 accurate as to what was said on April 12th, 2013, during the interview of Sheriff Baca?

A.    The audio -- the whole audio of the interview that I listened to was accurate.

        MR. HOCHMAN:  Your Honor, for the record, the defense would move in Government Exhibit 1.

        MR. FOX:  Objection, Your Honor.

        And may we have a sidebar, please.

        THE COURT:  Yes.

    *(Proceedings held at sidebar under seal 9:45 to 9:45 A.M.)*

    *(The following proceedings were held in open court.)*

        THE COURT:  All right.  That objection is sustained.

BY MR. HOCHMAN:

Q.    Now, with respect to the audio recording that was made

that day, was there also a video recording made that day?

A.    No.

Q.    But the FBI had the ability, if it wanted to, to make a video recording of the interview if it so chose?

A.    Yes, the FBI has video recording equipment.

Q.    And a video recording would show Mr. Baca's body language -- you know, whether or not he was, as you said, looking straight ahead or looking down, slumping in his chair, alert, sitting straight up, the different types of body language you would see on a video recording that you don't hear in an audio recording; is that correct?

A.    A video recording would show Mr. Baca as he's answering questions, yes.

Q.    And as you sit here today, do you remember all Sheriff Baca's body language as he's answering any particular question?

A.    I remember Mr. Baca's body language during the interview. I couldn't specifically tell you exactly where he was facing at any given point in time, but throughout the entire interview, he was sitting up straight, addressing the crowd.  He wasn't slunched [sic] over or anything like that to my recollection at any point in the interview.

But, no, I don't remember any specific hand motion to correlate with a specific statement.

Q.    And a video recording would have shown that particular body language as it pertained to each question asked, correct?

A.   Yes.

Q.   And the FBI actually does video recordings of certain activities during an investigation; is that correct?

A.   The FBI for interviews will do it -- like I said before, it does a written account or an audio-only recording.

Video is used in very specific circumstances.  For example, if an operation is taking place, it's going to be a drug transaction, that might be videotaped.

The only interviews that I can think of that are videotaped by the FBI are when, specifically, if an identity is going to be an issue, the person you're interviewing you don't necessarily know who they are, or for a custodial interrogation if the person is being interviewed postarrest in a jail setting and they're being interviewed post-Miranda, that will be video-recorded, but that's more the exception than the rule.

Q.   You would agree, though, that a video recording would be a more accurate record of Sheriff Baca's body language during April 12th, 2013, than your general memory of that; is that correct?

MR. FOX:  Objection.  Argument.

THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.   Well, the FBI used a video camera in connection with the Deputy Michel bribe transaction on two occasions; is that correct?

A.   For the undercover operation, it's my understanding that the transaction between Michel and the undercover was videotaped, yes.

Q.   Now, Mr. Fox played you a number of excerpts from Exhibit 2; is that correct?

A.   Yes.

Q.   And you've had a chance to review all the excerpts in Exhibit 2; is that right?

A.   That's correct.

Q.   And how many total excerpts are there in Exhibit 2?

A.   I want to say 51.  It's an approximation.  If I look at the binder, that might refresh my recollection.

Q.   And of the excerpts that are in Exhibit 2, have you had a chance to then correlate -- or listen to those audio excerpts while you were reviewing Exhibit 3's transcript of those excerpts?

A.   Yes.

Q.   And is the transcript of the 51 excerpts -- are there 51 excerpts transcribed in Exhibit 3?

A.   May I refer to the document?

Q.   Yes, please.

A.   Thank you.

     Yes, 51.

Q.   And you've had a chance to listen to the excerpted audio portions while you were reviewing -- of Exhibit 2 while you

were reviewing the transcripts in Exhibit 3 to check their accuracy; is that correct?

A.    That's correct.  I listened to each excerpt, and while I was listening to the excerpt, I read the corresponding transcript.

Q.    And they're accurate; is that correct?  The excerpts are accurate transcriptions in Exhibit 3 of what's on Exhibit 2?

A.    To the best of my understanding, yes.

Q.    Mr. Fox showed you to begin with Exhibit 111.  That's that nontarget letter.  Now, may you turn to that, please?

        MR. HOCHMAN:  May we put Exhibit 111 on?

    *(The exhibit was displayed on the screen.)*

BY MR. HOCHMAN:

Q.    And Exhibit 111 is the nontarget letter.

        Do you have that before you?

A.    Yes, I do.

        MR. HOCHMAN:  And if we could focus on the first paragraph.

BY MR. HOCHMAN:

Q.    In this first paragraph, you see the first sentence.  It says, "You have inquired whether this office would provide your client, Leroy Baca, with a nontarget letter," and then it says, "in connection with the investigation of the alleged civil rights and obstruction of justice violations within the Los Angeles County Sheriff's Department."

Do you see that?

A.    Yes.

Q.    So this nontarget letter applies to the investigation that was going on, not just any statements that were going to be given to Sheriff Baca in a particular interview; is that correct?

A.    I'm sorry.  Could you ask that question again?

Q.    Certainly.

The words here says "a nontarget letter in connection with the investigation."  So this nontarget letter covered Sheriff Baca in connection with that entire investigation, not just in connection with any statements he might give during an April 12th, 2013, interview; is that correct?

A.    The second part is incorrect.  He wasn't given a nontarget letter indicating that he wouldn't be a target of an investigation if he lied to us.  The nontarget letter was saying that --

MR. HOCHMAN:  Objection.  Motion to strike as nonresponsive.

THE COURT:  Wait until he's finished.  Overruled.

Go ahead.

THE WITNESS:  The nontarget letter was referring to the investigation, the evidence that we had to date.  But if -- again, for example, if he had made a false statement or we learned additional evidence subsequent to the interview, this

letter doesn't preclude him from being a target of the investigation at that point.

BY MR. HOCHMAN:

Q.    And one of those examples would be if you learned that -- I think Mr. Fox put it if Sheriff Baca shot JFK, that this letter did not cover Sheriff Baca -- any evidence that you would develop of Sheriff Baca shooting JFK; is that correct?

A.    I think the point of Mr. Fox's analogy there was to say that if we later obtained evidence that Mr. Baca was involved in a crime, that this nontarget letter wouldn't preclude us from prosecuting him based on that later discovered evidence.

Q.    And the one and only example Mr. Fox gave of later discovered evidence is whether or not Sheriff Baca shot JFK; is that correct?

A.    I don't think you're summarizing it right.

      Again, he -- Mr. Fox explained the definition of "target" to Mr. Baca.  Thereafter, he used an analogy to help Mr. Baca understand what the current nature of target meant, not that we would -- that the shooting of JFK was used as an analogy.  It wasn't used as a specific example of what we would or would not charge him with.

Q.    Again, the only analogy that Mr. Fox used was, "You know what?  I killed JFK," that that would be the only analogy that Mr. Fox used during the entire excerpt, which is Excerpt 2.1, correct?

MR. FOX:  Objection.  Asked and answered.

THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.   Now, with respect to Exhibit 2.1, if we could turn to that.

And if you could turn to Exhibit 3.1 in the transcript as well.

Now, I notice that in excerpt 2.1, like with every excerpt, it ends with five asterisks.

Do you see that?

THE COURT:  Ladies and gentlemen, we're going to take our first break of the morning.

Again, I want to remind you, until this trial is over, you're not to discuss this case with anyone, including your fellow jurors, members of your family, people involved in the trial or anyone else, nor are you allowed to permit others to discuss the case with you.

If anybody approaches you and tries to talk with you about this case, please let me know about it.  Do not read, listen to any news reports of the trial.  You are reminded to keep an open mind until all of the evidence has been received, you've heard the arguments of counsel, the instructions of the Court and the views of your fellow jurors.

If you need to speak with me, simply give a note to the clerk.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

We're going to come back at 15 after the hour.

THE CLERK:  All rise.

*(Jury out at 9:56 A.M.)*

*(The following was heard outside the presence of the jury.)*

THE COURT:  All right.  Sir, you may step down.

THE WITNESS:  Thank you.

THE COURT:  Where's this question going about the --

MR. HOCHMAN:  Oh, see, Your Honor, the way that the government plays its excerpt -- in part, because Mr. Fox is very good on the computer and you can hear click, click, click, click, click, it makes it seem like there's no gaps between the excerpts, in other words, that one literally flows from the next, and it looks like it's a continuous conversation.

And what I'm going to point out with the witness is that there are gaps between the excerpted -- sometimes the gaps are seconds, sometimes there are a couple of minutes, sometimes there are over 20 minutes in between excerpts.

So I want the jury to understand that they're literally hearing excerpts that have been picked from throughout an over four-and-a-half hour interview as opposed to being left with the impression that this is the first hour of the interview and then there was three-and-half hours after that, you know, that's not being played.

And that's what I wanted to elicit from the witness

is the -- sort of that the -- the fact that there are asterisks doesn't mean that the next one follows immediately afterwards. In many cases, there's minutes or many minutes in between.

MR. FOX:  Your Honor, this is cumulative, certainly.

Any probative value is vastly outweighed by any confusion of the issues.

And, you know, Mr. Hochman is just trying to do what he has already done, which is say that the government selected certain excerpts, and he is going over this territory once again.

If there was anything misleading in what we did, you would have allowed him to get in other statements, and there's nothing misleading that we did.

So Mr. Hochman is just, again, trying to go at the same point that he's been going at that is irrelevant and he's trying to make the jury wonder what is not in this transcript.

And as Your Honor mentioned, if Mr. Baca wanted to get on the stand and explain what was going on during that time, he's welcome to do that but he can't get in statements that are hearsay statements that are not contained in this exhibit.

THE COURT:  Doesn't that leave -- just like when you asked that question about -- that we had all the discussion about, doesn't that leave the impression with the jury that something untoward happened here?

MR. HOCHMAN:  It's not untoward, Your Honor.

THE COURT:  No, it's not.

MR. HOCHMAN:  It's not.  It's not untoward.

What it is is that the government has -- and again, the point of the asterisk question, Your Honor, is because of the way Mr. Fox has played these clips -- he played 1 through 10 in order.  You would think literally that that's the amount of time it took to make all the statements 1 through 10, but it didn't.

And I'm not asking -- I'm staying far away from asking about questions.  I'm staying far away from asking answers.  I am just identifying in general terms that there are gaps -- you know, time gaps between the conclusion of one excerpt and the beginning of another.  And that's as far, given the Court's ruling, as I intended to go, Your Honor.

Just so the jury isn't left with the completely misleading impression that this stuff occurred, you know -- and the first hour is the first hour.

THE COURT:  Oh, I think the jury knows that the entire interview lasted some four hours, and I don't think they will be under the impression that they listened to four hours of testimony.

MR. HOCHMAN:  But they don't know where the clips play out.

And I think, again, since part of our discussion --

which, again, I think is, you know, fair argument that if you have -- if you're giving an answer three-and-half hours into it -- into an interview versus at the first ten minutes, the likelihood is that you're going to be probably a little tired three-and-a-half hours into it than you would be at the beginning.

And, you know, the witness -- and Mr. Fox elicited questions about Sheriff Baca, his demeanor -- physical demeanor before I ever did.  He opened the door on that.  I followed in and got, you know, some information about it, but at the end of the day if the jury hears that a particular false statement -- remember, there's only four here -- occurs at the two-hour mark or three-and-a-half hour mark, that's a completely different situation than it occurred in the first ten minutes, Your Honor.

MR. FOX:  And, Your Honor --

THE COURT:  A lie is a lie -- whether it occurred one minute, first hour, the third hour, the fourth hour, a lie is still a lie.  It's just like when you argued in your opening statement that, "Gee, just look at the -- you're going to judge this guy about five minutes of his entire career, his entire life?"  You decided to go out and kill your wife after 50 years marriage -- yeah, it happened during five seconds -- it's still a crime.  And I'll rule on it when I get back.

MR. HOCHMAN:  Thank you, Your Honor.

THE CLERK:  This Court now stands in recess.

*(Recess taken 10:01 to 10:17 A.M.)*

*(The following was heard outside the presence of the jury.)*

MR. JAUREGUI:  Your Honor, one member of our tag team just took a bathroom break and hopefully will be back shortly.

MR. FOX:  Thank you, Your Honor.

THE COURT:  What's the question you want to ask this witness?

MR. HOCHMAN:  So, Your Honor, I was relating it to the asterisks because the jury have seen the asterisks at the end of every excerpt.

THE COURT:  You mean the transcripts?

MR. HOCHMAN:  Yes.

THE COURT:  Which are not in evidence.

MR. HOCHMAN:  Correct, but I could -- even if I don't relate it to the asterisks, I can just say simply, "Sir, that -- the excerpts that we've gone over that you've testified about, they weren't done sequentially, in other words, one didn't immediately follow the other, there was at times a less than a minute gap between them, at times more than 20 minute gaps between them; is that correct?"

And I could ask it that way and not relate it to the transcript, Your Honor, or the asterisks or anything like that.

MR. FOX:  And, Your Honor, once again, this is

irrelevant.  He's gone over this many times.  It's a waste of time.  It's misleading because there are times where the breaks are going to cause the gaps, and he's going to insinuate that because there was a 28-minute break, that -- if the clips were 40 minutes apart, that the government has left out 40 minutes of the recording, and it's going to make it seem like we're hiding the ball, which we obviously are not doing.

MR. HOCHMAN:  And the cure to that, Your Honor, is just to have the agent say, "Well, this one was sequential, this one was" -- the government can cure that problem very easily with the agent just to make sure that the jury is not being misled, that there was something particular to it.

I just -- I mean, I don't know how otherwise -- unless the Court were to instruct them that these excerpts are not sequential, because I haven't been able to make that argument.  I've certainly -- the jury has no idea whether or not these are all sequential or not.

MR. FOX:  I'm not sure what he means by "sequential." If there's a Clip 2, that came after Clip 1.  So I'm not sure what he means by "sequential."  I think what he's trying to point out is that there may have been a gap in time, which is showing why this is a waste of time.  We've gone over this, and to the extent we need to cure something, it's again showing what a waste of time this is because we have to cure something that's irrelevant and is going to confuse the jury.

MR. HOCHMAN:  Again, I don't mean sequential in terms of number, Your Honor, obviously.  I mean in terms of time.  At the end of one and the beginning of the other was immediate, as opposed to there being a gap.  Because right now, the way Mr. Fox played 1 through 10 very quickly, if I was a juror, I would think that they all went together.

THE COURT:  Well, thank God, you're not, so the objection is sustained.

MR. FOX:  Thank you, Your Honor.

Would you like us to get the witness back on the stand?

THE COURT:  Yeah.  Let's go.

All right.  Let's bring the jury in.

MR. FOX:  Your Honor, I notice some of the books are still open, so if you could instruct them to please close them.

Thank you.

*(Jury in at 10:21 A.M.)*

THE COURT:  All right.  Ladies and gentlemen, I ask that you close your binders.

MR. HOCHMAN:  May I proceed, Your Honor?

THE COURT:  Yes.

MR. HOCHMAN:  Thank you, Your Honor.

BY MR. HOCHMAN:

Q.   Agent Dalton, I would like to turn your attention to Excerpt 2.2, and this is the excerpt where Mr. Fox first asked

something about the -- it says the first thing that I think we were interested in talking about was the original Steve Martinez-Sheriff Baca call.

Do you have that in mind?

A.    Yes.

Q.    And then when Mr. Fox asked Sheriff Baca if he could, as best he can, remember the date of that call, Mr. Baca indicates "I don't have the date."

Do you recall that?

MR. FOX:  Objection, Your Honor.  If Mr. Hochman wants to play it, he can, but he's reading from the transcript, which is not evidence.

THE COURT:  Sustained.

MR. HOCHMAN:  Well, may we play Excerpt 2.2, please.

May the jury be able to follow in the transcript of Excerpt 2.2, Your Honor?

THE COURT:  Yes.  If you'd open that to -- I believe it's tab 2.

*(Playing of audio tape.)*

MR. HOCHMAN:  Can I stop there, please.

BY MR. HOCHMAN:

Q.    Sheriff Baca mentions his calendar in connection with trying to figure out the date for this phone call.

Do you recall that?

A.    Yes.

Q.   Now, at that moment in time, you had Sheriff Baca's calendar in the room with you that you could have showed him in response to his reference to his calendar; is that correct?

A.   He was shown his calendar.

Q.   But he wasn't shown it right then in connection with Excerpt 2.2; is that correct?

          MR. FOX:  Objection.  Relevance.

          THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.   Wasn't Sheriff Baca shown his calendar in connection with Excerpt 2.26?

          MR. FOX:  Objection.  Relevance.

          THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.   We'll get to 2.26.

          MR. HOCHMAN:  Actually, could we turn to Excerpt 2.26 and play Excerpt 2.26, please.

          Actually, you know what?  Because of the way the tape works, let's continue with 2.2 and then we'll turn to 2.6.

          Continue on, please.

          *(Playing of audio tape.)*

BY MR. HOCHMAN:

Q.   So what Sheriff Baca is saying is that he believed that the conversation with Special Agent Martinez, his first conversation, occurred a day or two after they found the phone;

is that correct?

MR. FOX: Objection. Argumentative.

THE COURT: Sustained.

BY MR. HOCHMAN:

Q.   Well, when to your knowledge, based on your investigation, did the sheriff's department find the phone on Anthony Brown? What date?

A.   I don't recall the exact date.

Q.   Was it approximately August 8th of 2011?

MR. FOX: Objection, Your Honor. Form of the question.

THE COURT: Sustained.

BY MR. HOCHMAN:

Q.   Do you recall -- had the phone been found at the point at which you joined the investigation?

A.   I couldn't tell you.

Q.   You've had access to the FBI's records since you joined the investigation August 2011; is that correct?

A.   Yes.

Q.   And at some point you reviewed records that would have had the date on which the phone was found by the Los Angeles Sheriff's Department?

A.   Yes.

Q.   And as you sit here today, do you have any memory of the date on which it was found?

A.    You're asking me the date that the LASD deputy in the jail first found the phone on Anthony Brown?

Q.    Yes.

A.    I don't recall.  I mean, it could have been around the August 8th time frame.  I think some point after that, they connected the phone to the FBI.

Q.    Well, when the sheriff -- excuse me.

In connection with this Excerpt 2.2 -- let me ask it this way.

Did you know going into this interview that Sheriff Baca and Special Agent Martinez spoke on August 18?

A.    Going into this interview, yes, we were aware of the date that the phone conversation between -- actually, let me back up a bit.

I don't know if we knew the exact date.  I think we could have tracked that.  We probably knew the exact date.

Q.    Okay.  Because you would have had access to assistant director in charge Steve Martinez's phone records, correct?

A.    Correct.

Q.    And so when Sheriff Baca states, "it would be like a day or two after we found the phone," and they found the phone approximately August 8th, he's mistaken, is he not, on his memory as to when the Martinez conversation occurred because it would have occurred on August 9th or 10th, and you knew it was August 18th, correct?

MR. FOX:  Objection, Your Honor.  Argumentative.

THE COURT:  Sustained.

MR. FOX:  Thank you.

BY MR. HOCHMAN:

Q.   If you could turn to Exhibit 2.3.

MR. HOCHMAN:  And if we could play just the beginning of 2.3.

THE COURT:  Okay.  Let's go to sidebar.

*(Proceedings held at sidebar under seal 10:31 to 10:35 A.M.)*

*(The following proceedings were held in open court.)*

BY MR. HOCHMAN:

Q.   If you could switch to Exhibit 2.5.

MR. HOCHMAN:   And if we could play the beginning of 2.5, please.

*(Playing of audiotape.)*

MR. HOCHMAN:   Could we stop there for a second.

BY MR. HOCHMAN:

Q.   So agent Dalton, you said you were a member of the public corruption squad here in Los Angeles, is that right?

A.   That's correct.

Q.   Now, what exactly is public corruption as opposed to civil rights squad?

A.   Sure.   Public corruption focuses on -- in LA, actually public corruption is broken down to two sub-squads, but it focuses on political figures or federal employees who are engaged in acts of corruption, bribery in exchange for official acts.

Q.   And would it also focus -- would public corruption also focus on deputy sheriffs who took bribes?

A.   Yes, it would.

Q.   And so when there's an investigation of a deputy sheriff

who took a bribe, that's a public corruption investigation; is

that correct?

A.    That's correct.

Q.    Now, a civil rights investigation is something different

than a public corruption investigation, correct?

A.    That's correct.

Q.    Because a civil rights investigation in the context of the

sheriff's department would be an investigation looking into

excessive force by deputies against inmates; is that correct?

A.    That's an example of a civil rights investigation, yes.

Q.    And there's a separate civil rights squad that deals with

that; is that correct?

A.    Yes, there is.

Q.    But you were on the public corruption squad when you were

brought on in August of 2011 in connection with this Anthony

Brown investigation; is that right?

A.    Yes.  In August of 2011, although there's two separate

squads that handle those things, sometimes there's a crossover.

For example, if a deputy takes a bribe and beats an inmate,

that would be both public corruption and civil rights.  Some of

those instances one squad or the other would take the lead on

the case.  In this case, that was my squad, PC-1.

Q.    Okay.  And now the FBI is generally part of the United

States Department of Justice; is that correct?

A.    That's correct.

Q.   And it has its main headquarters in Washington, DC?

A.   That's correct.

Q.   And one of its local offices is here in Los Angeles, correct?

A.   The -- yes, the FBI has an office here in Los Angeles that serves the greater LA area, and the FBI's headquarters is located in DC.

Q.   And the United States Attorney's Office is also here in Los Angeles -- is also part of the United States Department of Justice; is that correct?

A.   Correct.

Q.   And, like the FBI, it has its main headquarters in Washington, DC, as well?

A.   That's correct.

Q.   And the head of the Los Angeles office of the US Attorney's office is someone by the title of the United States attorney; is that correct?

A.   The United States attorney is the head of the United States Attorney's Office here in LA?  Is that what your question was?

Q.   Yes.

A.   Yes.

Q.   And back in September of 2011, the United States attorney was André Birotte; is that right?

A.   Yes.

Q.   And when it comes to civil rights investigations, there is

both a local US Attorney's office that investigates civil

rights investigations -- or, excuse me, it does civil rights

investigations, correct?

A.   With respect to civil rights investigations from the

United States attorney's standpoint, there are local United

States attorneys that prosecute civil rights offenses.

Q.   And then back in Washington, DC, there's also a national

civil rights division as part of the US Department of Justice;

is that correct?

        MR. FOX:   Objection.   Beyond the scope.   Waste of

time.

        THE COURT:   Sustained.

        MR. HOCHMAN:   We can continue on with Exhibit 2.5.

    *(Playing of audiotape.)*

        MR. HOCHMAN:   We can stop right there.

BY MR. HOCHMAN:

Q.   Now, Mr. Tom Perez was the head of the US Department of

Justice's civil rights division as referenced by Mr. Baca here

in Exhibit 2.5; is that correct?

        MR. FOX:   Objection.   Relevance and motion in limine,

Your Honor.

        THE COURT:   Sustained.

BY MR. HOCHMAN:

Q.   I'd like to turn your attention to Exhibit 120, please.

MR. HOCHMAN:  And if we could put 120 on the screen, please.

*(The exhibit was displayed on the screen.)*

MR. HOCHMAN:  And if you could focus on Friday, August 19th, please.

MR. FOX:  Objection, Your Honor.  Same issue.

MR. HOCHMAN:  You know what, Your Honor?  I'll withdraw it.  I'll withdraw the question.

THE COURT:  Yes.

MR. HOCHMAN:  If we could turn to Excerpt 2.6, please.

BY MR. HOCHMAN:

Q.  And in Excerpt 2.6, generally, there was a discussion about Mr. Baca's understanding of federal enforcement of public corruption laws.  Do you recall that?

A.  I'm sorry.  Could you ask the question again?

Q.  Certainly.  In Exhibit 2.6, there is a questioning dealing with Sheriff Baca's general understanding of the federal enforcement of public corruption laws.  Do you recall that?

A.  Yes.

Q.  And do you recall that Sheriff Baca said he understood that there was federal enforcement of public corruption laws and civil rights laws as well.

A.  That he was aware that there was -- yes.

Q.  So did -- one of his issues was that he didn't understand

whether or not they were investigated locally?

A.    That's correct.

Q.    And if you could turn to Exhibit 2.7.  And in Exhibit 2.7, Sheriff Baca again is trying to remember --

          MR. FOX:  Objection to the form of the question, Your Honor.

          THE COURT:  Sustained.

          And, ladies and gentlemen, please close your notebooks.

          MR. HOCHMAN:  May we play Exhibit 2.7, Your Honor?

          THE COURT:  Yes.

          MR. HOCHMAN:  Thank you.

     *(Playing of audiotape.)*

          THE COURT:  If you want to open them now to follow along, that's fine.

     *(Playing of audiotape.)*

          MR. HOCHMAN:  If we could stop there.

BY MR. HOCHMAN:

Q.    Was Sheriff Baca's statement that there was information provided that a phone on an inmate -- that "a phone was found on an inmate maybe a day or two before I received the call from Mr. Martinez" -- was Sheriff Baca's statement there mistaken as to the date?

A.    A day or two before the call from Mr. Martinez, the sheriff's department had connected the cell phone to the civil

rights division of the FBI.

Q.   I understand, but they're talking about the call from Mr. Martinez and when the phone was actually found, not that it was connected to the FBI.

So was Sheriff Baca's statement mistaken that they found the phone a day or two before the phone call with Mr. Martinez?

A.   They found the phone probably about a week before that, and then they connected to the FBI a day or two before the call from Mr. Martinez.

Q.   So Sheriff Baca's memory in connection with this statement was mistaken; isn't that right?

MR. FOX:  Objection.  Argumentative.  Form of the question.

THE COURT:  Sustained.

MR. HOCHMAN:  If we could skip down to towards the end of this tape if that's possible.

MR. FOX:  I can't do that.

BY MR. HOCHMAN:

Q.   Do you recall at the end of this excerpt tape there was a discussion as to how Sheriff Baca came to learn more about the investigation, and he referenced a Captain Tom Carey and Lieutenant Jim Leavins?  Do you recall that?

A.   Yes.

Q.   And, based on your knowledge of the investigation, was

there a lieutenant named Jim Leavins in the sheriff's department that was involved in any way with the Anthony Brown investigation?

A.    Lieutenant Leavins' first name was Steve.

Q.    And Mr. Fox actually corrects Sheriff Baca at that point and says, "And was it Steve Leavins rather than Jim Leavins?"

Do you recall that?

A.    Mr. Fox says something to that effect, yes.

Q.    And Mr. Baca continues with it could be Jim Leavins, but that he only knows them by their last names.

Do you recall that?

A.    Yes.  Mr. Baca says that he generally knows people by their last names.

Q.    And are you aware after that, in Excerpt 2.8, that Mr. Baca keeps --

MR. FOX:  Objection, Your Honor.  This is not in evidence at this point in time.

THE COURT:  Sustained.

MR. HOCHMAN:  Sorry.  2.9.

BY MR. HOCHMAN:

Q.    With respect to 2.9, which I believe is in evidence, Your Honor, are you aware that Mr. Baca continues to refer to Mr. Leavins as "Jim Leavins" even after he's been corrected by Mr. Fox?

A.    He refers to Mr. Leavins as "Jim Leavins" -- excuse me,

Lieutenant Leavins as "Jim Leavins," correct.

MR. HOCHMAN:  If we could continue playing the tape for 2.7, Your Honor.

(Playing of audiotape.)

MR. HOCHMAN:  And may we continue on with Exhibit 2.10.

(Playing of audiotape.)

BY MR. HOCHMAN:

Q.   Agent Dalton, what was your understanding of the words "unprecedented situation."  What was unprecedented about the situation?

A.   It's my understanding that the unprecedented nature of the situation was that the cell phone that was discovered in the jail was connected to the FBI civil rights.

Q.   And what made that unprecedented?

MR. FOX:  Objection to the form of the question and relevance.

THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.   Well, when you use that as your definition of what was unprecedented, why was that unprecedented?

MR. FOX:  Objection.  Your Honor, that was not his definition.  That was his understanding.

MR. HOCHMAN:  I'm sorry, Your Honor.  May I withdraw that question and clarify?

THE COURT:  Okay.

BY MR. HOCHMAN:

Q.   What was your understanding -- why was that your understanding that the unprecedented nature of the situation was that the FBI had brought in a cell phone in the Men's Central Jail?

A.   Just based on the context of the statement.

Q.   All right.  And then if we can switch to 2.26.

MR. HOCHMAN:  And just play the beginning of 2.26, please.

(Playing of audiotape.)

MR. HOCHMAN:  And if you could stop there.

BY MR. HOCHMAN:

Q.   And is this the point at which -- is this the first point at which you showed Sheriff Baca his calendar as referenced in Exhibit 2.26 during the interview?

A.   I'm sorry.  Could you reframe me to the section we're on?

Q.   I'm sorry.  2.26, which was transcript 3.26.

When I say "2.26," I mean Exhibit 2, Excerpt 26, which I think is tab 26 in the Exhibit 3.

A.   I apologize.

Q.   And we focus on the first couple of lines that we just played.

And my question was was this the first time during the interview, as referenced in 2.26, that you showed Sheriff

Baca his calendar?

A.    That's my understanding, yes.

Q.    And is this roughly about two hours into the interview?

A.    I couldn't tell you just based on what I have in front of me.

Q.    What would be able to -- what type of -- what would you need in order to determine when you showed Sheriff Baca his calendar during the interview?

A.    To give you the time, the time marker of one, I would have to, I guess, listen to the whole thing and see where that time marker is.  I don't, as I sit here right now, recall exactly where in the scheme of the interview this particular excerpt took place.

Q.    Given that the interview is about four hours and 45 minutes long, would it be around the middle part of the interview it took place?

A.    I think that's a good approximation.  Approximately midway through.  The interview was four hours, so approximately two hours in.

        MR. HOCHMAN:  And if we can play a little bit more, please.

    (Playing of audiotape.)

        MR. HOCHMAN:  You can stop it there.

BY MR. HOCHMAN:

Q.    All right.  So at this point, Mr. Baca brings up for the

first time in the conversation that you're having with him that day the fact that there was actually an August 19th, meeting; is that correct?

A.    I think --

Q.    Which they describe as a pre-meeting before the August 20th meeting.

A.    Right.  I think he references the pre-meeting at some point previously, and then when he sees it in his calendar, he's like -- he associates that with what he referenced previously.

Q.    Okay.  So when Mr. Fox asked, "So you think that there was a pre-meeting that we haven't talked about yet, a pre-Saturday meeting," had this not been discussed at this point in time?

A.    That's a good point.  Yeah, based on that context, I suppose it wasn't discussed yet at that point.

Q.    When Sheriff Baca volunteers this meeting, are you able to then look at his calendar and see the notation he's referring to on August 19th for his calendar?

A.    I think in this statement, he's referring to the notation in his calendar.

Q.    Yes.

        MR. HOCHMAN:  So if we could put Exhibit 120 up for the witness, Your Honor, and highlight August 19th.

    *(The exhibit was displayed on the screen.)*

///

BY MR. HOCHMAN:

Q.   So you see for August 19th, there is a 2:00 to 2:30 p.m. "meet with U/S" -- "U/S" is, by the way, "undersheriff"; is that correct?

A.   Yes.

Q.   "Tanaka, Captain Tom Carey" -- Captain Tom Carey was the head of the Internal Criminal Investigations Bureau; is that correct?

A.   That's correct.

Q.   "Lieutenant Liam Gallagher."  Do you know what his position was at the sheriff's department?

A.   I believe it was major crimes.

Q.   And "Lieutenant Greg Thompson."  Do you know what his position was at the sheriff's department at that time?

A.   Yes.  Lieutenant Greg Thompson was in charge of, among other things, Operation Safe Jails, OSJ.

Q.   And so this is the August 19th meeting that Sheriff Baca is discussing -- doesn't remember all the content of, but brings up at this point in time, correct?

        MR. FOX:  Objection to the form of the question. Argumentative.

        THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.   This is the August 19th meeting referenced in the calendar, Exhibit 120, that Sheriff Baca is bringing to the

attention of Mr. Fox; is that correct?

A.   During the interview, when he reviews his calendar, he points to that meeting and discusses that a meeting took place on that day, August 19th, based presumably on the calendar.

Q.   Very good.

MR. HOCHMAN:  I have no further questions, Your Honor.

THE COURT:  Redirect?

MR. FOX:  Yes, Your Honor.

REDIRECT EXAMINATION

BY MR. FOX:

Q.   Special Agent Dalton, Mr. Hochman asked you questions about what would cause Mr. Baca to potentially be charged, and he related it to a statement about JFK.

Did this letter discuss what could change Mr. Baca's status?

A.   Yes.

Q.   We've highlighted something on Exhibit 111.

(The exhibit was displayed on the screen.)

BY MR. FOX:

Q.   Could you read from this assessment.

A.   Absolutely.

"This assessment is based on the information we have obtained to date, of course, and, therefore, could change in the event that new and different information regarding Mr. Baca

comes to our attention."

Q.   And what investigation was this based on?  The new information that could come to the attention.

A.   If new information pertaining to the obstruction of justice case came to our attention.

Q.   Mr. Hochman asked you questions about whether Mr. Baca was shown documents ahead of time.

Do you recall those questions?

A.   Yes.

Q.   Whether the federal government shared with Mr. Baca these documents well before the interview?

A.   Yes.

Q.   Did his attorneys have access to the documents that were shown to him during this interview?

A.   Absolutely.

Q.   How so?

A.   Well, the documents were initially provided to us through their attorneys, so we got the documents from LASD through the attorneys that were representing Mr. Baca at that interview.

Q.   And in terms of the number of documents that the federal government asked Mr. Baca about, are we talking about hundreds of documents or a smaller set than that?

A.   It was a couple, not hundreds for sure.  Several.

Q.   Mr. Hochman asked you questions about whether you and I met before this to go over your testimony.

One of the reasons why we met to go over your testimony is so that you could listen to the disks and view the transcripts so you didn't have to do that in front of the jury?

MR. HOCHMAN:  Objection.  Leading.

THE COURT:  Sustained.

BY MR. FOX:

Q.   Special Agent Dalton, was there a purpose with respect to the disks and the transcripts for why we met ahead of time?

A.   Absolutely.

Q.   What was that?

A.   In order to -- for me to verify the contents of the disks of the transcript of the exhibits that I was going to confirm the existence of here in court, on the accuracy of.  I reviewed those documents.  I reviewed the audio cassettes, initialed the CD, as I did in the case of the exhibit.

I did all those things in preparation to testify here today.

Q.   And is this something standard for attorneys and witnesses to do?

MR. HOCHMAN:  Objection.  Foundation.

BY MR. FOX:

Q.   In preparation for trial?

MR. FOX:  I'll be happy to withdraw and ask it again.

BY MR. FOX:

Q.   Special Agent Dalton, Mr. Hochman asked you about your

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

experience as a special agent with the FBI, and, specifically, that, as it relates to public corruption, he also asked you questions about whether the public corruption squad works on civil rights investigations.

Approximately how many -- without getting into the details, approximately how many civil rights investigations have you worked on as a special agent?

A.   From an investigation standpoint, a lot.  A lot of investigations.  Dozens.  If that's what you're asking, how many investigations, dozens.

Q.   Even though that's civil rights and you're on a public corruption squad?

A.   That's correct.

Q.   And have you been involved in -- approximately how many trials have you been involved in of either civil rights investigations or obstruction of justice investigations as it relates to civil rights?

A.   Approximately ten.

Q.   Mr. Hochman asked you, among other things, whether you informed Mr. Baca that it would be a crime to lie to the federal government at that interview.  Why didn't you advise him that it's a crime to lie?

A.   Several reasons.  First, Mr. Baca's status as the lead law enforcement individual at the sheriff's department and his long-standing history as a sheriff made it seem obvious that he

was aware that he couldn't give false statements to investigators during an interview.

Additionally, the sheriff's department themselves has several policies dealing with and prohibiting deputies from giving false statements to investigators.

So, between the two, it seemed obvious he was aware of that fact.

Q.   And do those false statement policies also relate to investigations by the federal government?

A.   Yes, they do.

MR. FOX:  And if I can have Special Agent Tanner pull up Exhibit 116, which is in evidence, page 12.

*(The exhibit was displayed on the screen.)*

BY MR. FOX:

Q.   Special Agent Dalton, are these the sheriff's department's policies that are in evidence?

A.   Yes, they are.

MR. FOX:  And pull up if you can, Special Agent Tanner, that first one that you see.  That's the 40.70.

BY MR. FOX:

Q.   Special Agent Dalton, can you read this policy?

A.   Sure.

"False statements.  Members shall not make false statements when questioned, interviewed, or in reports submitted."

MR. FOX:  And, Special Agent Tanner, if you can now highlight the policy that's beneath that.  So double-click on the one that's highlighted.

Thank you.

BY MR. FOX:

Q.   And, Special Agent Dalton, this -- I'm going to ask you to read a portion of the one that we just pulled up.  This is 40.76, Obstructing an Investigation.

MR. HOCHMAN:  Objection, Your Honor.  Beyond the scope of cross-examination.

THE COURT:  Overruled.

BY MR. FOX:

Q.   Special Agent Dalton, I want you to read, please, the third paragraph starting with "any employee."

A.   Sure.

"Any employee who knowingly gives false evidence, withholds evidence, or interferes in any way during such an investigation, or requests or encourages another to do so, shall be deemed to have obstructed the investigation."

Q.   Could you please read the following paragraph.

A.   Sure.

"For purposes of this section, investigation shall include, but is not limited to, any criminal, civil, or administrative investigation, review, inquiry,

inquest, hearing, trial, or similar activity

conducted by representatives of this department or

any other governmental agency."

MR. FOX:  Now, if we could turn to the next page,

Special Agent Tanner.

And can you please highlight that policy.

BY MR. FOX:

Q.   I would just like you to read the first two sentences of

this policy, which is 40.85, Cooperation During Criminal

Investigation.

A.   Sure.

"Members have a duty to cooperate with investigators

of the department or from other law enforcement

agencies who are conducting a criminal investigation.

They shall make full, complete, and truthful

statements except when such statements would violate

the member's right against self-incrimination, or

when such statements might compromise another

criminal investigation about which the member has

knowledge."

MR. FOX:  Okay.  I'll now go to -- actually, just

press Escape, please.

BY MR. FOX:

Q.   Special Agent Dalton, Mr. Hochman asked you questions

about the fact that this interview was audio-recorded and not

video-recorded.  Based on your investigation of the sheriff's department, are you aware of how ICIB conducts its interviews?

A.   Yes.

Q.   And how it records its interviews?

A.   Yes.

Q.   And, generally, when identification is not at issue -- so if we're talking about someone who's well known, let's say, an employee of the sheriff's department that ICIB has interviewed, are you aware of how they record those interviews?

A.   Yes, I am.

Q.   How does the sheriff's department's Internal Criminal Investigations Bureau record its interviews?

A.   They use audio-only recording devices.

Q.   Mr. Hochman asked you questions about Mr. Baca referring to a Jim Leavins instead of Steve Leavins.

          Do you recall those questions?

A.   Yes.

Q.   Did Mr. Baca himself provide an explanation as to why he didn't know Mr. Leavins' first name?

A.   Yes.

Q.   What did he say?

A.   He said that he knows people in the organization by their last names.

Q.   Did Mr. Baca correctly identify Mr. Leavins as a lieutenant?

A.    Yes, he did.

Q.    Mr. Hochman played you a couple of portions of clips in which Mr. Baca states that he had notes in his calendar.

        Do you recall those portions?

A.    Yes.

Q.    Now, the federal government -- we saw Exhibit 120 is Mr. Baca's calendar.  Did the federal government ever receive any notes that Mr. Baca had in his calendar?

A.    Aside from the --

        MR. HOCHMAN:  Objection.  Assumes facts not in evidence.

        THE COURT:  Sustained.

        MR. FOX:  One moment, Your Honor.

        No further questions, Your Honor.

        MR. HOCHMAN:  Briefly, Your Honor.

                    RECROSS-EXAMINATION

BY MR. HOCHMAN:

Q.    Exhibit 116 were the policies and ethics of the Los Angeles sheriff's department at the time Sheriff Baca was the sheriff; is that correct?

A.    Yes.

Q.    So these were the policies and statements dealing with cooperation with other law enforcement, correct?

A.    Yes.

Q.    Dealing with making any false statements in connection

with an investigation; is that correct?

A.    Making false statements in connection with an investigation by the sheriffs or other law enforcement, correct.

Q.    And these are statements that Sheriff Baca fully endorsed while he was sheriff at that time; isn't that correct?

MR. FOX:  Objection.  Argumentative and form of the question.

THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.    Do you have any information -- well, the -- these policies and procedures came right from the sheriff's department at the time; is that correct?

A.    Those were the policies and procedures in place at the sheriff's department at that time.

Q.    And Sheriff Baca, to your knowledge based on your investigation, was the highest authority in the sheriff's department at the time these policies and procedures came down, correct?

MR. FOX:  Objection.  Argumentative and foundation.

THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.    Mr. Fox asked you questions about the fact that Sheriff Baca's attorneys may have had access to certain records before the interview; is that correct?

A.    Yes.

Q.    And we talked about there being over 250,000 pages of documents that had been produced by the sheriff's department to the government in connection with grand jury subpoenas, correct?

A.    The majority of which had to do with use of force, but that is correct.  There was a large number of documents that were produced.

Q.    And amongst those 250,000 documents that were produced, are you aware of whether or not you or anybody from the government pointed Sheriff Baca or his attorneys to the particular pages amongst the 250,000 that were going to be discussed on April 12, 2013, before the interview?

A.    The documents that were discussed in the interview were items that had come specifically from Sheriff Baca, his calendar, a letter that he had written, an article that he was quoted in.

Q.    So you didn't identify those documents amongst the 250,000 ahead of time so Sheriff Baca could refresh his memory ahead of time and review them before the interview; is that correct?

A.    He -- I think the answer to your question is no.

          I'm sorry.  If you could ask it again.  I wasn't clear on what you were asking me.

Q.    Sure.  You said that there were certain documents that you addressed and presented to Sheriff Baca during the interview.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

You never directed his attorney that, amongst the 250,000 pages, those would be the documents you would focus on during the interview, correct?

A.   I don't believe we did, no.

MR. HOCHMAN:  No further questions, Your Honor.

MR. FOX:  No further questions, Your Honor.

THE COURT:  All right.  You may step down.  Thank you.

Call your next witness.

MR. HOCHMAN:  Your Honor, if possible, we'd like the Court not to release --

MR. FOX:  Objection, Your Honor.  I think this should be done at sidebar, please.

THE COURT:  That's fine.

*(Proceedings held at sidebar under seal 11:15 to*

*11:18 A.M.)*

*(The following proceedings were held in open court.)*

MR. FOX:  United States calls Mickey Manzo.

THE CLERK:  Please raise your right hand.

Do you solemnly swear that the testimony you shall give in the cause now before this Court shall be the truth, the

whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

THE CLERK:  Please be seated.

Please state your full name and spell your last name for the record.

THE WITNESS:  My full name is Mickey Manzo, M-a-n-z-o.

MICKEY MANZO,

having been first duly sworn,

testified as follows:

DIRECT EXAMINATION

BY MR. FOX:

Q.   Mr. Manzo, what do you do for a living?

A.   I am currently unemployed.

Q.   How long have you been unemployed?

A.   Two months.

Q.   What did you do before you became unemployed?

A.   I worked at Home Depot.

Q.   How long did you work for Home Depot?

A.   A year and a half.

Q.   And what did you do before that?

A.   I was a deputy sheriff for Los Angeles County.

Q.   How old are you now?

A.   Thirty-seven.

Q.   How long were you employed by the sheriff's department?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

A.   Roughly eight, eight and a half years.

Q.   What happened that caused you to leave the sheriff's department?

A.   I was convicted of a felony and terminated.

Q.   What was that felony that you were convicted of?

A.   Conspiracy and obstruction of justice.

Q.   What were the general allegations against you?

A.   That myself and my co-conspirators obstructed a FBI investigation.

Q.   How old were you when this occurred?

A.   Oh, math.  31, 32.

Q.   Now, let's go back to when you first began your employment with the sheriff's department.  Where did you first start out?

A.   Men's Central Jail.

Q.   What is Men's Central Jail?

A.   It's the largest jail in -- and oldest in the United States.

Q.   Where is it located?

A.   Right down the street in Los Angeles.

Q.   Who runs the jail?

A.   The sheriff's department.

Q.   And where were you first stationed in Men's Central Jail?

A.   As a trainee, I was stationed in 36- and -8-.  Those are modules, 3600 and 3800, and I split my time between there and 3200 and 3400.

Q.    You mentioned some floors starting with three:  3600,
3800, 3200.  Generally, where are these locations in Men's
Central Jail?

A.    They would be on the old side on the 3000 floor.

Q.    What is the 3000 floor?

A.    It is --

Q.    Well, in terms of stories.  Is there a specific story?

A.    Yeah, it's the third floor on the old side.

Q.    How long did you work on the 3000 floor until your duties
changed?

A.    Roughly two, two and a half years.

Q.    And what happened then?

A.    I went on loan in September of 2008 to Operation Safe
Jails.

Q.    How long did you work for Operation Safe Jails?

A.    On loan for about six months, and then a month later I was
hired full-time and I did it for three, four years.

Q.    What is Operation Safe Jails?

A.    Operation Safe Jails -- we call it OSJ -- is -- it's a
gang unit that is in charge of the intelligence and safety of
the inmates and its employees.

Q.    Were you still working for OSJ in August of 2011?

A.    Yes.

Q.    Who was your lieutenant at the time?

A.    Lieutenant Greg Thompson.

Q.   Was there anyone within OSJ who was higher ranked than Lieutenant Thompson?

A.   No.  He was the unit commander.

Q.   In August of 2011, did you become aware that a phone was found on an inmate at Men's Central Jail?

A.   Yes.

Q.   Do you recall approximately when this occurred?

A.   I know it was probably midmorning when we found out.

Q.   Do you recall which day, approximately?

A.   Beginning of August.

Q.   How did you become aware that a phone was found on an inmate?

A.   One of the deputies that conducted the search that found the phone came up to the OSJ office.

Q.   Did you eventually learn the name of the inmate who the phone was found on?

A.   Yes.

Q.   What was his name?

A.   Anthony Brown.

Q.   And after you learned about the cell phone, did you take some investigative steps to determine whether there was any connection between Mr. Brown and a law enforcement agency?

A.   Eventually, yes.

Q.   What did you find out?

A.   That Mr. Brown had contacted the FBI through the phone in

his cell.

Q.    Now, you say "the phone in his cell."  That's different than the cell phone he had?

A.    Yes.

Q.    What do you mean by "phone in his cell"?

A.    Every cell that's a general population cell at Men's Central Jail has a pay phone in it.  You can't pay with money, but you have an access code and you can enter it and that's how he called the FBI.

Q.    These phones that inmates use from their jail cells, are they ordinarily monitored live?

A.    Not ordinarily, no.

Q.    What's done with them?

A.    They are -- all the calls are pooled, and you can research whatever calls you want for up to, I want to say, it was 90 days at the time.

Q.    So what did you find out once you had access to his jail phone?

A.    That he was in contact with somebody.  We didn't actually know it was the FBI at the time, but we did -- that they were talking -- discussing about getting him a phone.

Q.    At some point you said you did connect it to the FBI.  How did you connect the phone call that Mr. Brown had made to the FBI?

A.    Using the number he called, we had Deputy Kirk -- he was

also in OSJ -- Noah Kirk -- run that number, the number he was calling, through his FBI analyst on his task force, and she was the one that identified it as the phone number belonging to the FBI.

Q.   Did she identify it as a particular squad with the FBI?

A.   Yes.

Q.   What squad was that?

A.   The civil rights division of the FBI.

Q.   I want you to open your binder.  There is a bookshelf that is below you to the left and, specifically, Exhibit 18.

THE COURT:  And I'm going to ask that the juror close that binder that's open.

THE WITNESS:  Eighteen?

BY MR. FOX:

Q.   Yes, please.

A.   Okay.

Q.   Do you recognize it?

A.   Yes.

Q.   What is Exhibit 18?

A.   Exhibit 18 is an e-mail from deputy Smith to myself regarding Noah Kirk identifying the number.

Q.   Is that a true and accurate copy of the e-mail that you and Mr. Smith sent and received on that date?

A.   Yes.

MR. FOX:  Your Honor, I move for the admission of

Government Exhibit 18.

MR. HOCHMAN:  No objection.

THE COURT:  It will be received.

*(Government's Exhibit 18 admitted into evidence.)*

MR. FOX:  And if we can display it, please.

*(The exhibit was displayed on the screen.)*

BY MR. FOX:

Q.    Who is this e-mail from?

A.    Noah Kirk.

Q.    And when is it sent?

A.    Thursday, August 18th of 2011.

Q.    At what time?

A.    8:37 p.m.

Q.    Could you please read the e-mail.

A.         "Hello, sir.  Per our conversation, I took the
number that was called of the ITMS and forwarded
that to Jennifer Naujock.  Naujock is the analyst
for the FBI task force that I'm on.  Naujock
agreed to do a work-up on the number and told me
she would contact me when she was done.
          "A few minutes later, Naujock contacted me by -- and
phone and questioned me as to why I wanted
information on this phone number.  I told her that I
believed that this number was responsible for
assisting to bring cell phone into the jail.  Naujock

then informed that the number belonged to the FBI out of West Los Angeles.  She said the number belonged to a civil rights investigator.

"Naujock then informed me that she needed to speak with her supervisor before she spoke with me anymore about the situation.  I agreed and informed her that she should have her supervisor contact Lieutenant Thompson.  I gave her Lieutenant Thompson's phone number to his office and the call was ended.  Kirk."

Q.   Who is Gerard Smith?

A.   He was a deputy in OSJ, my partner.

Q.   The information that's contained in this e-mail that's dated 8:37 p.m., were you already aware of this information when you received this e-mail?

A.   Yes.

Q.   How so?

A.   I read the e-mail off of Smith's computer.

Q.   After you read this e-mail off of your partner's computer, what did you do?

A.   I called Lieutenant Thompson.

Q.   Why?

A.   To let him know what we had found.

Q.   And after you called Lieutenant Thompson, what did you do?

     Well, did you speak to him in substance in the call or did you --

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

A.    No, this was probably -- I called him and then we walked over to his office.

Q.    And what did you say to him when you walked over?

A.    Exactly what Kirk had told Smith and myself.

Q.    Did Lieutenant Thompson tell you to do anything?

A.    Yes.

Q.    What did he tell you to do?

A.    He told us that he wanted us to get Brown -- the inmate Anthony Brown, on a -- tape recorded.

Q.    Did he explain why?

A.    Yes.

Q.    What did he say?

A.    That he was going to eventually have to brief the executives and he wanted the tape.

Q.    What was your understanding as to who he meant by "executives"?

A.    The sheriff and the undersheriff.

Q.    Do you know whether there was a meeting set up for the next day with Mr. Baca?

A.    There was.

Q.    How do you know that?

A.    I went to it.

        MR. FOX:  I'd like to publish what's in evidence as Government Exhibit 16.

        (The exhibit was displayed on the screen.)

BY MR. FOX:

Q.    Mr. Manzo, do you know who Chris Nee was at the time?

A.    Yes.  He was Mr. Tanaka's aide.

Q.    You said he was Mr. Tanaka's aide?

A.    Yes.

Q.    What is the date and time of this e-mail?

A.    Thursday August 18th, 2011, at 8:59 p.m.

Q.    What's the subject?

A.    "Sheriff's meeting."

Q.    And do you know who Julie Montgomery was at the time?

A.    No.

Q.    What does Mr. Nee write in this e-mail?

A.    "Regarding the sheriff's meeting with the undersheriff, Captain Carey, Lieutenant Thompson, and Lieutenant Gallagher at 2:00 p.m., I have reserved the EPC room from 2:00 p.m. to 2:30 p.m."

Q.    Do you know what the EPC room is?

A.    Yes.

Q.    What is the EPC room?

A.    I don't know what the "EPC" stands for, but it is a conference room on the fourth floor outside -- near Mr. Tanaka's office.

Q.    And showing you Exhibit 139 --

        (The exhibit was displayed on the screen.)

            MR. FOX:  One moment, please.

BY MR. FOX:

Q.   Mr. Manzo, can you see the EPC conference room in this photo?  The schematic?

A.   Yes.

Q.   Where?

A.   It's not labeled, but it has the "800 SF" on the bottom left.

Q.   Mr. Manzo, I've got a magnet that's labeled "OSJ civil rights," and I'm going to place that on the calendar for August 18th.

That's the date you learned that Anthony Brown was connected to the FBI civil rights?

A.   On the 18th?

Q.   Yes.

A.   Yes.

MR. FOX:  Okay.  If you can now go to Exhibit 17, please.

*(The exhibit was displayed on the screen.)*

MR. FOX:  And what I'd like to highlight here is just the top one from Mr. Thompson to Mr. Nee at 10:31 p.m.

BY MR. FOX:

Q.   What did Mr. Thompson write to Mr. Tanaka's aide at 10:31 p.m. on August 18th?

A.   "Thanks, Chris.  Will it be okay to bring two of the OSJ guys working the case?"

Q.   Who were the two OSJ guys working the case?

A.   Myself and Deputy Smith.

MR. FOX:  Oh, actually, could you pull out magnet, too?  Sorry.  317.

BY MR. FOX:

Q.   Could you please read, Mr. Manzo, this e-mail that's timed 9:02 on August 18 from Mr. Thompson to Mr. Nee.

A.   "Chris, FYI.  I was going to wait until I had more evidence to go at Anthony Brown in an interview as to the source of the phone.  I may have to bump the plan up to tomorrow due to the fact that he will be on the state bus Saturday night.  At this time, I would rather dump him and make him the state's problem while we continue collecting facts to ascertain if my suspicions were correct -- if we have an employee problem.  Besides, if he doesn't want to cooperate, there's nothing we can offer him with his 400-plus years hanging over his head.  Could you also provide a computer so I can play the calls and everybody can make their own opinion.  Greg."

Q.   I would like to ask you a few questions about that e-mail.

First of all, it says that "Mr. Brown will be on the state bus Saturday night."

Did Mr. Thompson provide you with any instructions on

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

what to do with Anthony Brown after you learned that Mr. Brown was connected to the FBI civil rights squad?

A.   Yes.   He ordered me to put him on the state line.

Q.   So what did you do to make that happen?

A.   I contacted Detective Idleberg and had him make the call to the state line for me because he had a relationship with them.   He knew how to do it, and he was placed on the state line.

Q.   As of August 18th, what was the date that Mr. Brown was supposed to be going to state?

A.   The 20th.

MR. FOX:   Now placing on the calendar a magnet that says "Brown to state" on August the 18th.

BY MR. FOX:

Q.   Where was Mr. Brown housed as of August 18th?

A.   1751 G Row.

Q.   What is 1751 G Row?

A.   It would be considered probably the second most secure place in Men's Central Jail.

Q.   Mr. Manzo, I'm now going to put on the calendar "Brown to 1750" on August 18th.

Can you please describe 1751 G for the jury.

A.   To access 1751 G Row, you have to go through three gates, and the cells are solid with drilled holes in them and there's a trace lot and there's a camera 24/7.   It's about as secure as

it gets.

Q.   You mentioned the sheriff's department runs the Men's Central Jail.  Does the sheriff's department have any responsibility as it relates to the state facility where you'd be sending Mr. Brown on Saturday?

A.   No.

Q.   Who runs the state facility?

A.   The state.

Q.   Mr. Manzo, you should have a binder that has Exhibits 219 through 225.  Do you recognize those exhibits?

A.   They appear to be pictures of 1751 G Row.

Q.   Are they -- as far as you can tell, are they authentic in terms of what 1751 G looked like in August of 2011?

A.   Yes.

MR. FOX:  Your Honor, I move for the admission of Government's Exhibit 219 through 225.

MR. HOCHMAN:  May I have a moment, Your Honor?

No objection, Your Honor.

THE COURT:  All right.  They will be received.

*(Government's Exhibits 219-225 admitted into evidence.)*

BY MR. FOX:

Q.   Now, going back to the instructions you received from Lieutenant Thompson about getting Anthony Brown on tape, did you record an interview of Anthony Brown?

A.   Yes.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Q.   When?

A.   Friday morning.

Q.   Was that August 19th?

A.   Yes.

Q.   How did you record it?  Was it audio- or video-recorded?

A.   Audio.

Q.   Where did the interview take place?

A.   In the large interview room on the 6000 floor of Men's Central Jail.

Q.   Who else was present?

A.   Deputy Smith and Anthony Brown.

Q.   Without getting into the substance of what you talked about, what were the general subject matters that you discussed with Anthony Brown that day?

A.   The cell phone and how he got it, what he was in jail for, his history.  We were trying to build a rapport building up to the story about the cell phone.

         MR. FOX:  Your Honor, I'd like this witness to be able to look at the original Exhibit 71, please.

         THE COURT:  All right.

BY MR. FOX:

Q.   Do you recognize that?

A.   Yes.

Q.   And if you could also look at 72 in your binder.

         Do you recognize Government's Exhibits 71 and 72?

A.   Yes.

Q.   What are they?

A.   Seventy-one is a CD with the interview that I conducted with Deputy Smith on the 19th, and 72 is a transcript of that interview -- or clips of that interview.

Q.   And does 71 contain true and accurate excerpts of the interview that you conducted of Anthony Brown on August 19th of 2011?

A.   Yes.

Q.   Does 72 accurately reflect the speakers and what was said on Exhibit 71?

A.   Yes.

Q.   How do you know that?

A.   Well, I listened to the clips, signed it, and dated it and then I followed up by following along with the transcript that you provided.

MR. FOX:   Your Honor, I move for the admission of Government Exhibit 71.

MR. HOCHMAN:   No objection, Your Honor.

THE COURT:   All right.   It will be received.

(Government's Exhibit 71 admitted into evidence.)

MR. FOX:   And, Your Honor, we have transcript binders for these clips that are a different binder than what we previously provided to the jury.

THE COURT:   Why don't we collect the prior binders.

MR. FOX:  And, Your Honor, there will be a couple of portions from that binder that we do play with this witness.

THE COURT:  I understand.

MR. FOX:  Okay.

THE COURT:  All right.  Does everybody have a binder?

MR. FOX:  Yes, Your Honor.  We are going to be playing now 71, Clip 1.

THE COURT:  Again, ladies and gentlemen, you are about to listen to a recording that's been received into evidence.  Please listen to it carefully.  You've been given a transcript of the recording to help you identify the speakers and to use as a guide to help you listen to the tape.

However, bear in mind that the tape-recording is the evidence, not the transcript.  If you hear something different from what appears in the transcript, what you heard is controlling.  After the tape has been played, those transcripts will be collected.

MR. FOX:  And, Your Honor, this is reflected in the transcript that is under tab 72 for the jury.  And we will begin with 71-1.

*(Playing of audiotape.)*

MR. FOX:  Now if we can play 71-2.

*(Playing of audiotape.)*

BY MR. FOX:

Q.   What versions had Mr. Brown given out at this point?

A.    He said, one, that a nurse had given him the phone and --

I don't remember the second one.

            MR. FOX:  Okay.  If you can play the next clip.

        (Playing of audiotape.)

BY MR. FOX:

Q.    At that the point in time, did you know who CJ was?

A.    No.

            MR. FOX:  Now if we can play the next clip.

        (Playing of audiotape.)

BY MR. FOX:

Q.    We just heard Gerard Smith say something, "Don't worry.

You'll have your phone soon."

            What was he referencing?

A.    One of the phone calls that we got off the ITMS system.

Q.    What is the ITMS system?

A.    Inmate Telephone Monitoring System.

Q.    And that was the call between Mr. Brown and the FBI?

A.    Yes.

Q.    At that point when you were interviewing Anthony Brown,

did you know which squad that's call-tracked to?

A.    Yes.

Q.    And which squad was that?

A.    The civil rights division.

            MR. FOX:  If we can now play the next clip.

        (Playing of audiotape.)

MR. FOX:  You can play the next one.

*(Playing of audiotape.)*

BY MR. FOX:

Q.   Mr. Manzo, we heard a reference to a "Bayes" there by Mr. Brown.  Who was Bayes?

A.   He was a JIU detective that initially had the cell phone case.

Q.   What is JIU?

A.   Jail Investigative Unit.  They are the detectives.

Q.   Who was their lieutenant at the time?

A.   Greg Thompson.

Q.   Who ordinarily investigated allegations that deputies were engaged in misconduct within the sheriff's department -- criminal misconduct within the sheriff's department?

A.   The ICIB.

Q.   Why were you conducting this interview of Anthony Brown then?

A.   Because I was ordered to.

MR. FOX:  If we can play the next clip.

*(Playing of audiotape.)*

MR. FOX:  Next one, please.  Yes, 19.

*(Playing of audiotape.)*

MR. FOX:  Now, if we can play the next one, which is 20.

*(Playing of audiotape.)*

BY MR. FOX:

Q.   We heard earlier in that clip, Mr. Smith ask again about a CJ.   Why were the two of you asking Mr. Brown about a CJ?

A.   He was the middleman between the deputy and Brown that helped get the phone.

Q.   We also heard you discuss a meeting with some very influential people in the department.  What did you mean by that?

A.   That we were going to brief the executives, the sheriff and the undersheriff.

         MR. FOX:  We can now play 71-21.

    (Playing of audiotape.)

BY MR. FOX:

Q.   What did you do with the information that Mr. Brown provided to you that the FBI had been there longer than a month and had been setting up transactions?

A.   We briefed Lieutenant Thompson.

Q.   Where did you brief him?

A.   His office.

Q.   What are some of the things that you told Mr. Thompson?

A.   Everything that Brown said.  We didn't hold anything back.

Q.   You mentioned that there was a meeting that you had scheduled with Mr. Baca that afternoon.  Did you, in fact, attend a meeting with him that day?

A.   Yes.

Q.    Where?

A.    Sheriff's headquarters bureau.

Q.    Where within sheriff's headquarters bureau?

A.    The EPC conference room.

Q.    That's the same one with the 800-square-foot marker?

A.    Yes.

Q.    Who else was there?

A.    Deputy Smith, the sheriff, the undersheriff, Lieutenant Thompson, Captain Carey, I think -- there's a few more, but I don't remember who they were.

Q.    Where -- in what town or city is this located?

A.    Monterey Park.

Q.    Do you know what the purpose of the meeting was?

A.    To brief the executives on what we found.

Q.    And did that happen?

A.    Yes.

Q.    Who briefed Mr. Baca?

A.    Lieutenant Thompson.

Q.    In general terms, what did Mr. Thompson tell Mr. Baca?

A.    That the cell phone was found and that, through our investigation, we connected it -- the inmate to the FBI civil rights division and that he is claiming that the phone came from a deputy and that they were using it to further their investigation.

Q.    Did Mr. Thompson say anything about which squad in the FBI

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

this was connected to?

A.   Yes, the civil rights division.

Q.   And did Mr. Thompson brief Mr. Baca about what kind of allegations Mr. Brown was making?

A.   Yes.

Q.   What did he say?

A.   Unnecessary force.

Q.   How detailed of a briefing did Mr. Thompson provide to Mr. Baca?

A.   It was fairly detailed.

Q.   We saw in an e-mail before that there was supposed to be recorded phone calls, recordings played to the executives with a laptop.  Did that happen?

A.   It did not.

Q.   Why not?

A.   We couldn't get the phone calls from the computer onto a CD.

Q.   At that meeting, did Mr. Baca discuss any conversation that he'd had with the FBI related to this?

A.   Yes.

Q.   What did he say?

A.   He said that he had spoken with the FBI.  They did not acknowledge any investigation, but they wanted to see the phone.

Q.   Did Mr. Baca state what was going to happen with the

phone?

A.    He wasn't giving it up.  He was, "We're keeping it."

Q.    You mentioned before that Anthony Brown was supposed to be put on the next bus to state, which at this point would have been the next day.  Did anything happen to change that?

A.    Yes.

Q.    What happened?

A.    The sheriff ordered us to keep him, not send him to state prison.

Q.    How long did that meeting last?

A.    Maybe a little over an hour.

Q.    Over time, how many meetings did you have with Mr. Baca?

A.    Two.

Q.    Do you think you'd recognize him again if you saw him?

A.    Yes.

Q.    Can you please look around the courtroom and tell me if you see him.

A.    I see him.

Q.    Could you please describe --

       MR. HOCHMAN:  So stipulated, Your Honor.

       THE COURT:  All right.  The record will reflect the witness has identified the defendant.

       Is this a convenient time for us to take our final break?

       MR. FOX:  Yes, Your Honor.

THE COURT: All right. Ladies and gentlemen, we're going to take our final break of the day.

Again, I want to remind you until this trial is over, you are not to discuss this case with anyone, including your fellow jurors, members of your family, people involved in the trial or anyone else, nor are you allowed to permit others to discuss the case with you.

If anyone approaches you and tries to talk with you about this case, please let me know about it immediately. Do not read or listen to any news reports or other reports about the trial or anyone associated with it.

Finally, you are reminded to keep an open mind until all of the evidence has been received, you've heard the arguments of counsel, the instructions of the Court, and the views of your fellow jurors.

If you need to speak with me, simply give a note to the clerk.

We'll come back at 20 after the hour.

THE CLERK: All rise.

*(Jury out at 12:03 P.M.)*

*(The following was heard outside the presence of the jury.)*

THE COURT: All right. Sir, you may step down.

Is there anything else we need to take up?

MR. FOX: No, Your Honor.

MR. HOCHMAN:  No, Your Honor.

THE COURT:  All right.

(Recess taken 12:04 to 12:22 P.M.)

THE COURT:  All right.  If we could bring the jury in, please.

(Jury in at 12:24 P.M.)

MR. FOX:  May I proceed, Your Honor?

THE COURT:  Yes, please.

BY MR. FOX:

Q.   Mr. Manzo, I'm going to put on the calendar two magnets. One says "Baca briefed" and one says "Baca - Brown stays" on August 19th.

I now want to direct your attention to the next day.

Did you have any additional meetings with Mr. Baca?

A.   Yes.

Q.   When?

A.   Midmorning on the 20th, Saturday.

Q.   How do you know it was a Saturday?

A.   Because I didn't work Saturdays.

Q.   Where was this meeting held?

A.   Same place, the EPC conference room.

MR. FOX:  So if we can show Exhibit 139.

(The exhibit was displayed on the screen.)

BY MR. FOX:

Q.   Once again, in that bottom-left area when it's blown up,

that shows the 800-square-foot room?

A.    Yes.

Q.    Who was present at this meeting on this Saturday?

A.    The sheriff, the undersheriff, myself, Deputy Smith, Lieutenant Thompson, Lieutenant Chris Nee, Captain Carey, Lieutenant Peacock, Lieutenant Leavins.  I think that's it.

Q.    That's a lot of names, so let's get into entities.  What entities were there that day?

A.    The sheriff and the undersheriff were the executives. Captain Carey, Lieutenant Peacock, and Lieutenant Leavins were ICIB.  Myself, Deputy Smith, and Lieutenant Thompson were OSJ, and Lieutenant Nee was just Lieutenant Nee.

Q.    What was the purpose of this meeting?

A.    To play the phone calls.

Q.    Do you know whether IAB was present, Internal Affairs?

A.    They might have been, but I didn't know who it was.

Q.    And when you say "to play the phone calls," what phone calls are you referring to?

A.    The one that Deputy Smith mentioned in the interview of Brown.  There were three of them.

Q.    You're talking about the ones between the FBI and Anthony Brown from the jail line?

A.    Yes.

Q.    What happened at this meeting?

A.    Lieutenant Thompson gave the -- almost the same briefing

he did the day before, to catch everybody up to speed because some of them weren't present, and then we played the phone calls for everybody.

Q.   So go over, please, what it is in general terms that Mr. Thompson said.

A.   That a cell phone was located on this date on this inmate. Through the course of our investigation, we connected the inmate and the cell phone to the FBI.  The inmate is saying that he is an informant for the FBI and that they are conducting a civil rights investigation into our jails.

          MR. FOX:  Now putting a magnet on that says "Baca briefing" on Saturday.

BY MR. FOX:

Q.   Mr. Manzo, did Mr. Baca provide any information?

A.   He reiterated that he had spoken with the FBI and that they were not acknowledging an investigation, but they'd like to see the phone.

Q.   And what did he say about that?  Did he say whether he was going to be giving the phone to the FBI?

A.   No, he didn't -- we weren't going to be giving it to the FBI.

Q.   So you mentioned these phone calls that were recorded that you wanted to play.  Were you able to play them at that meeting?

A.   Yes.

Q.   Okay.  And if you could look at Exhibit 195.

Original exhibit, please, 195.

A.   195.

Q.   Do you recognize that?

A.   Yes.

Q.   What is it?

A.   This is a CD containing the clips of the ITMS phone calls.

Q.   Those are the ones between Mr. Brown and the FBI?

A.   Yes.

Q.   And how do you know that contains the clips?

A.   I listened to them and then I dated it three times and then I initialed it.

Q.   Does it truly and accurately reflect those phone calls that you listened to after you discovered that Mr. Brown was in contact with the FBI?

A.   Yes.

MR. FOX:  Your Honor, I move for the admission of Government Exhibit 195.

THE COURT:  Any objection?

MR. HOCHMAN:  No objection, Your Honor.

THE COURT:  It will be received.

*(Government's Exhibit 195 admitted into evidence.)*

BY MR. FOX:

Q.   Before we play this for the jury, why don't you please identify who the voices are that they're going to hear.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

A.    It will be Anthony Brown and Special Agent Tanner.

Q.    Did you know at the time when you were playing these recordings that it was Special Agent Tanner that Mr. Brown was speaking to?

A.    No.

Q.    What did you know at that time?

A.    That it was just a female.

Q.    Affiliated with whom?

A.    The FBI.

        MR. FOX:  Your Honor, I'm going to now play the first clip from 195.  There is no transcript with this.

        *(Playing of audiotape.)*

BY MR. FOX:

Q.    Mr. Manzo, the calls that we're playing, are these the ones that Mr. Smith quoted in your interview of Anthony Brown on August 19th?

A.    Yes.

        MR. FOX:  I'm going to now play the second call from 195.

        *(Playing of audiotape.)*

        MR. FOX:  And now, Special Agent Tanner, if you would play the third call.

        *(Playing of audiotape.)*

BY MR. FOX:

Q.    Mr. Manzo, what happened after you played these recorded

calls for the executives?

A.    Mr. Tanaka slammed his hands on the table and basically said, "There it is right there," pointing at the speaker. "Those mother fuckers.  Fuck the FBI."

Q.    Was Mr. Baca present when Mr. Tanaka said these words?

A.    He was, yes.

          MR. FOX:  Your Honor, I'd like to hand out Exhibit 3, the transcript again, and play a clip for the jury.

          THE COURT:  All right.

          MR. FOX:  And while we do that, I'm just going to show this to Mr. Hochman.

          THE COURT:  Okay.

BY MR. FOX:

Q.    Mr. Manzo, you said at the Saturday morning that you informed Mr. Baca that Mr. Brown was an FBI informant.  Was that the same information you provided to him the day before on the 19th?

A.    Yes.

Q.    Mr. Manzo, while the jury is receiving the transcripts, if you could find Exhibit 3, which should be in a binder on its own.

          MR. FOX:  And, Your Honor, I move for the admission of Clip 11 from Exhibit 2.

          THE COURT:  Any objection?

          MR. HOCHMAN:  No objection.

THE COURT:  It will be received.

*(Government's Exhibit 2-11 admitted into evidence.)*

MR. FOX:  And if we could have the jury turn to tab 11, please.

BY MR. FOX:

Q.   Mr. Manzo, what we're going to be playing is a portion of an interview you were not a part of on April 12, 2013, interview between the federal government and Mr. Baca.

*(Playing of audiotape.)*

MR. FOX:  Your Honor, if the jury can close their binders, please.

THE COURT:  Would you close those, please.

BY MR. FOX:

Q.   Mr. Manzo, we heard Mr. Baca state that it was not presented to him at the Saturday meeting that there were calls between Anthony Brown and the civil rights unit of the FBI. Was that statement accurate?

A.   No.

Q.   Why not?

A.   Because I played him the calls, and he was briefed that it was a civil rights investigation.

Q.   Were those the calls we just heard?

A.   Yes.

Q.   And you also heard him say that he had no clue that this was a civil rights investigation.  Is that accurate?

A.   No.

Q.   Why not?

A.   He was briefed by Lieutenant Thompson that it was, in fact, a civil rights investigation.

Q.   After Mr. Tanaka slammed his hands on the table and said the words that you said he said, what, if anything, did Mr. Baca say?

A.   He talked -- asked a lot of open-ended questions in the beginning.  "What are they doing?  Why are they doing this?"  And nobody had answers.  We just kind of let him -- maybe that was his thought process, and then he gave out orders.

Q.   What were those orders?

A.   Anthony Brown was to stay in our custody.  He was to be isolated and protected.  He wanted everything off the phone, and he wanted to know what the hell was going on.

Q.   After Mr. Baca gave those orders, what happened?

A.   He decided that Captain Carey, Internal Criminal Investigative Bureau, would be in charge of the investigation.  I think he said "Tom's shop" was the quote that he used, and then he put -- said everything would be run through Undersheriff Tanaka, and that was it.

       MR. FOX:  Now putting a magnet on August 20th.  It says in quotes "Isolate and investigate."

BY MR. FOX:

Q.   Mr. Manzo, after Mr. Baca provided these orders and put

Mr. Carey's shop in charge, what happened?

MR. FOX:  And we're going to pull up 139.

*(The exhibit was displayed on the screen.)*

BY MR. FOX:

Q.    Go ahead.

A.    The sheriff and undersheriff stepped out for a little bit and then only the undersheriff came back.

Q.    Approximately how long did this meeting last before Mr. Baca left?

A.    Forty-five minutes to an hour.

Q.    And how long were Mr. Baca and Mr. Tanaka gone?

A.    Maybe 10 minutes.

Q.    What did you do while they were out of the conference room?

A.    Just mingled around, introduced myself, because I didn't know Captain Carey and the ICIB.

Q.    What happened next?

A.    Tanaka came back in and took his place back at the table.

Q.    What, if anything, did Mr. Tanaka say?

A.    Mr. Tanaka said that he has known -- he said "that man" but he was referring to the sheriff -- for I don't remember how many years, but it was a long time and that he had never seen him that mad and that we know what he wants us to do and, "You're going to do it", and that was the close of the meeting.

Q.    Did Mr. Tanaka provide any other orders about Anthony

Brown, whether anyone was able to talk to him?

A.    Oh, yes.

Q.    What did he say?

A.    That nobody could talk to him and if anybody requested it that he would be the one to give the okay.

Q.    At some point, you mentioned when you were at OSJ initially, you were there on loan.  Around this time now, August 20th of 2011, were you put on loan to anyone else?

A.    Yes.  We went on loan to ICIB.

Q.    I want to turn your attention now to August 21st.

      Were you present for an interview of Anthony Brown on August 21st?

A.    Yes.

Q.    At this point in time, were you and Mr. Smith the chief people interviewing Mr. Brown?

A.    No, we were not.

Q.    Why not?

A.    It was now a criminal investigation and if deputies were involved, myself and Deputy Smith were deputies.  We couldn't investigate deputies.  It had to be a rank above, so we did the kind of pass-off.  Deputy Smith and I introduced Anthony Brown to Lieutenant Leavins.

Q.    Do you have Exhibit 74 in front of you, the original exhibit?

A.    The original?

Q. Yes. And also Exhibit 75, which should be in the binder.

A. No, I do not have 74.

71, 72, 73.

Q. And do you have 75 in front of you as well?

A. The original or --

Q. What's that?

A. The original?

Q. No, just in the binder is fine.

Do you recognize Government's Exhibit 74 and 75?

A. Yes.

Q. What are they?

A. Seventy-four is a CD with the interview we did, and 75 is the transcript.

Q. How do you know that's a CD of the interview that you did?

A. I listened to it and then I signed it and dated it.

Q. And is that the interview from August 21st?

A. It is.

Q. Is it a true and accurate copy of clips from that interview?

A. It is, yes.

Q. And does Government's Exhibit 75 truly and accurately reflect who said what and what was said on the excerpts from Exhibit 74?

A. Yes.

MR. FOX: I move for the admission of Government

Exhibit 74.

THE COURT:  Any objection?

MR. HOCHMAN:  No objection, Your Honor.

THE COURT:  It will be received.

*(Government's Exhibit 74 admitted into evidence.)*

MR. FOX:  And now, Your Honor, if the jury can take their binders and flip to tab 75, please.  This is in the one that's not the Mr. Baca interview.

If we can play the first clip, please.

*(Playing of audiotape.)*

MR. FOX:  And now the second clip.

*(Playing of audiotape.)*

MR. FOX:  Play the next one, which should be four.

*(Playing of audiotape.)*

BY MR. FOX:

Q.   Mr. Brown just mentioned two names of deputies that he said were bringing him things.

Did you know Deputy Michel before he provided you his name?

Before Mr. Brown provided you the name Deputy Michel, did you know who Deputy Michel was?

A.   Yes, I knew who he was.

Q.   How did you know?

A.   I worked with him.

Q.   What is his first name?

A.    Gilbert.

Q.    I just put on the calendar something that said "Brown: Michel."

      Mr. Brown also made reference to a Deputy Bravo.  Did you know a Deputy Bravo?

A.    Yes.

Q.    How did you know him?

A.    I worked with him also.

Q.    What was his first name?

A.    Justin.

Q.    Do you know if he had any relationship to any executive?

A.    Yes.

Q.    What was that?

A.    He was the sheriff's nephew.

Q.    Okay.  Now we're going to play Clip 6, please.

      *(Playing of audiotape.)*

          MR. FOX:  If we can play the next clip, Clip 7.

      *(Playing of audiotape.)*

          MR. FOX:  All right, Clip 10 now.

      *(Playing of audiotape.)*

          MR. FOX:  Clip 11.

      *(Playing of audiotape.)*

          MR. FOX:  Now Clip 12.

      *(Playing of audiotape.)*

          MR. FOX:  Clip 13 now, please.

*(Playing of audiotape.)*

BY MR. FOX:

Q.   Mr. Manzo, is that the first time that Mr. Brown told you that CJ was an FBI agent?

A.   Yes.

MR. FOX:   If we can play Clip 14 now.

*(Playing of audiotape.)*

MR. FOX:   Clip 15 now, please.

*(Playing of audio tape.)*

MR. FOX:   Clip 16, please.

*(Playing of audiotape.)*

BY MR. FOX:

Q.   Mr. Manzo, Mr. Brown referenced the 6000 floor.   What was the 6000 floor?

A.   The medical hospital.

MR. FOX:   And if we could play 17 now.

*(Playing of audio tape.)*

MR. FOX:   Your Honor, if you could instruct the jury to close their books, please.

THE COURT:   I'd ask that you please close your books, please.   Thank you.

BY MR. FOX:

Q.   Mr. Manzo, that interview was August 21st.   Did anything unusual happen two days later on August 23rd?

A.   Yes.

Q.   What happened?

A.   The FBI interviewed Anthony Brown.

Q.   Why was this unusual if the FBI had done it already many times before August 18th?

A.   Because on the 20th at the meeting, we were told that nobody could have access to Anthony Brown without Tanaka's approval.

Q.   How did you find out the FBI had been there to interview Anthony Brown?

A.   I don't remember the detective's name, but a detective from jail liaison let me know.

Q.   What did you do when you found out that information?

A.   I called Lieutenant Thompson.

Q.   Why?

A.   To let him know.

Q.   And what happened next?

A.   Lieutenant Leavins showed up.

Q.   And what happened when Lieutenant Leavins went to Men's Central Jail?

A.   He ordered the interview to be stopped.

Q.   Where was Mr. Brown being housed at this time?

A.   1751.

Q.   Did you go anywhere outside of Men's Central Jail that day after you learned about the FBI being there?

A.   Yes.

Q.    Where did you go?

A.    Sheriff's headquarters bureau.

Q.    Why?

A.    To meet with the undersheriff.

Q.    And that's Mr. Tanaka?

A.    Yes.

Q.    Did you meet with him?

A.    Yes.

Q.    Where?

A.    In his office.

        MR. FOX:  If we can pull up 139, please.

        *(The exhibit was displayed on the screen.)*

        MR. FOX:  Highlighting the same portion.

BY MR. FOX:

Q.    Where in here is Mr. Tanaka's office?

A.    On the very bottom on the right, "U/S office."

Q.    Let's see if I can make a "T" there.

        Is that what you're referring to?

A.    Yes.

Q.    Who was present in your meeting with Mr. Tanaka?

A.    Lieutenant Thompson, Captain Carey, myself, Deputy Smith,
and, obviously, Mr. Tanaka.

Q.    What happened at the meeting?

A.    We got destroyed.

Q.    Let's -- before we get into the substance of it, by -- I'm

going to actually clear this.

And if you can tell me where you were in Mr. Tanaka's office when this meeting was occurring.

A.   On the far right, the -- it looks like a La-Z-Boy.  That would be where I was sitting.

Q.   Right there (indicating)?

A.   Yeah, in that chair right there.

Q.   I'm going to try and do an "M."

A.   Okay.

Q.   Is that right?

A.   Yes.

Q.   Where was Mr. Smith?

A.   On the couch.  At the very top, yeah.

Q.   Putting an "S" there.  Not a very good one, but it's an "S."

What about Mr. Tanaka?

A.   Behind the desk.

Q.   With this one chair right here (indicating)?

A.   Yes.

Q.   What about Captain Carey?

A.   He was on the -- it would be -- looking at it, he would be on the left-hand side right under the "S" with that little square.

Q.   What about Mr. Thompson?

A.   He would be right next to him on the right.

Q.   Because he has the same last initial as Mr. Tanaka, I'm going to put a "G" for his first name.  Is that okay?

A.   Yes.

Q.   Not a very good "G," but it's the best I can do right now.

You mentioned that you were destroyed at this meeting.  What do you mean?

A.   We -- Lieutenant Thompson had to let him know that the FBI was able to talk to Brown despite orders against that, and it didn't go well.

Q.   What did Mr. Tanaka say?

A.   That we let him down and we let the sheriff down and he continued to use the "F" word and yell at us for a while.  He said, "Fuck the FBI" a couple times and just let us know that we'd screwed up.

Q.   Was there any discussion about what to do in the future to make sure this wouldn't happen?

A.   Yes.

Q.   What was said?

A.   He wanted to put two people, ultimately OSJ people, outside of Brown's cell 24 hours a day, seven days a week.

Q.   Was there any discussion about whether Mr. Baca was aware that the FBI had been to see Anthony Brown that day?

A.   Yes, there was.

Q.   Who said what?

A.   Lieutenant Thompson asked Undersheriff Tanaka, "Does the

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

boss know?"

And Mr. Tanaka said, "No, but you're going to go tell him."

Q. What happened next?

A. After that, that is when we talked about the OSJ deputies, and then that was over. We stepped outside.

Q. When you say "we stepped outside," who did?

A. All of us together.

Q. And where did you go?

A. It looks different, but there's a --

Q. Let me see if we can capture a bigger portion of this so you might be able to have some context.

MR. FOX: If you can grab it from the elevators.

Thank you.

THE WITNESS: I think that worked.

There's a big blank spot right in the middle with nothing, no offices or anything. Right there was a lounge area kind of with a table and some couches.

BY MR. FOX:

Q. Are we talking about to the right of where it says "office," and that's the only word that's said in a room?

Do you see where I'm talking about on the left-hand side?

A. Yes.

Q. So is it about right there?

A.    Perfect.

Q.    And who stayed there?

A.    Myself and Deputy Smith.

Q.    So I'm going to put your initials there.

      Where did Mr. Thompson go?

A.    To the sheriff's office.

Q.    Where was Mr. Baca's office at the time?

A.    The far right one.

Q.    Is that right (indicating)?

A.    Yes.

Q.    You said Mr. Thompson walked into his office?

A.    Yes.

Q.    What about Mr. Carey?

A.    I don't remember him going in there.

Q.    How long was Mr. Thompson in Mr. Baca's office?

A.    Oh, I don't -- longer than 20 minutes, but I couldn't --

Q.    Did you wait there the whole time?

A.    Yes.

Q.    What happened when Mr. Thompson left the office?

A.    He walked out and he said, "You guys ready?"

      And we said, "Yeah.  How'd it go?"

      And he said, "It's fine.  The sheriff was
compassionate about it.  He said it's a chess match and we have
our orders.  Let's go."

Q.    Why did you speak to Mr. Thompson about what happened in

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Mr. Baca's office?

A.    Because I thought I was going to get fired.

Q.    Did Mr. Thompson say anything about what he had told Mr. Baca had occurred with the FBI and Anthony Brown?

A.    Yes.

Q.    What did he say?

A.    He said that he had let the sheriff know that pretty much against his orders the FBI was allowed in to see Anthony Brown.

Q.    Did Mr. Thompson tell you whether he informed Mr. Baca that the interview was stopped?

A.    He did, yes.

Q.    Did Mr. Thompson tell you anything about whether he told Mr. Baca he had discussed this information with any other executive?

        MR. HOCHMAN:  Objection.  Leading, Your Honor.

        THE COURT:  Sustained.

BY MR. FOX:

Q.    What else do you recall Mr. Thompson telling you about what he mentioned to Mr. Baca?

A.    That's pretty much it, but he also reiterated that we had already briefed the undersheriff.  That's about it.

Q.    Did Mr. Thompson provide anything to you after his meeting with Mr. Baca?

A.    Not right after but shortly after.

Q.    What did he provide to you?

A.   A note, a handwritten note.

Q.   Do you know whose handwriting it was?

A.   I -- no.

Q.   And what did he say, if anything, when he provided you the note?

A.   He asked me to -- I think he said, "Do your thing and make it, you know, readable," I think.  Something to that effect.

Q.   What did you understand that to mean?

A.   He wanted me to take the note and make it into something that he could distribute to captains, anybody he wanted to.

Q.   So what did you do?

A.   I did just what he asked.

Q.   What did you do?

A.   I took the note and made a policy out of it.

Q.   And if you can look at your exhibit binder, Exhibit 23, please.

        MR. FOX:  Mr. Manzo, while you're doing that, I'm putting on the calendar "FBI interviews Brown" on the 23rd, and one that says "Baca briefed."

BY MR. FOX:

Q.   Okay.  Do you recognize Exhibit 23?

A.   Yes.

Q.   What is it?

A.   This is what the handwritten note turned into.  It's a e-mail that I sent to Greg with what he asked for.

Q.   By "Greg" you mean Mr. Thompson?

A.   Yes.

Q.   And where did the language from that come from?

A.   The note.

Q.   Is that a true and accurate copy of the e-mail that you sent to Mr. Thompson that encapsulated the note that he had provided to you after he left Mr. Baca's office?

A.   Yes.

     MR. FOX:  Your Honor, I move for the admission of Government Exhibit 23.

     MR. HOCHMAN:  No objection, Your Honor.

     THE COURT:  It will be received.

     *(Government's Exhibit 23 admitted into evidence.)*

     *(The exhibit was displayed on the screen.)*

     MR. FOX:  Can you please publish it.

     So it's larger, would you mind -- we don't need the "Deputy Manzo" at the bottom of this, the ID.  Thank you.

BY MR. FOX:

Q.   Mr. Manzo, this is the e-mail, Exhibit 23, dated August 24th at 9:47 a.m. from you to Mr. Thompson.

     Could you please read this.

A.   "Good morning.  Effectively immediately, all FBI
          requests for interview will be approved by
          Undersheriff Tanaka.  If the FBI requests access
          for any reason to your facility, get the following

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

information:  name and badge or ID number; place of assignment, i.e., special problems, robbery detail, et cetera; contact phone number; inmate who is being interviewed; case number or brief synopsis of case; future date and time they are available to interview.

"The above information will be documented by the facilities main control and verified by the facilities watch sergeant and watch commander.  If any of these questions cannot be answered, they will not be allowed access to your facility.

"Once all of the information is obtained, a phone call to Undersheriff Tanaka's office will be made.

"An e-mail response from Undersheriff Tanaka or someone he designates will be sent to the requesting party with an approval or denial."

MR. FOX:  I am now going to ask Special Agent Tanner to publish Exhibit 27 and the second page of that exhibit. It's already in evidence.

*(The exhibit was displayed on the screen.)*

BY MR. FOX:

Q.   Mr. Manzo, we've highlighted this e-mail at 11:27 a.m. on August 24th from Greg Thompson to Mr. Tanaka's aide and also someone named Crystal Miranda.

Do you know who Crystal Miranda was?

A.   The name sounds familiar, but no.

Q.   Could you please read what this says.

A.   "Chris -- Crystal, can I get the boss's approval to put this out custody-wide?  Verbal notification isn't working as well as I thought it would."

Q.   And then, without reading it again, does this basically mirror what you sent to Mr. Thompson?

A.   Yes.

          MR. FOX:  Let's now show the 6:02 p.m. e-mail from that same exhibit.  It starts at the bottom of the first page and continues to the top of the second page.

BY MR. FOX:

Q.   Okay.  First of all, what's written at 11:39 a.m. by Mr. Nee to Mr. Thompson?

A.   "Greg, can you give me a call at (323)526-5118.  Thanks."

Q.   And then what does Mr. Thompson write at 6:02 p.m.?

A.   "Chris, was Mr. Tanaka going to make the changes on the FBI notice to facility commanders or will he be satisfied if I remove all reference to him or the executives?  If so, I will send out tomorrow morning."

          MR. FOX:  And now, Special Agent Tanner, if you can publish 9:23.

BY MR. FOX:

Q.   What does Mr. Nee write?

A.   "He said that you were going to make changes to it."

MR. FOX:  I'm now putting on August 24th on the calendar a statement "No reference to executives."

BY MR. FOX:

Q.   Now, Mr. Manzo, if you could look at Exhibit 32, which should be in evidence already.

     (The exhibit was displayed on the screen.)

BY MR. FOX:

Q.   Mr. Manzo, what is this e-mail?

A.   This is an e-mail from Lieutenant Thompson to custody captains, lieutenants, and commanders, also the jail liaison, letting them know -- did you want me to read it?

Q.   Yeah, go ahead and read it.

A.        "Effective immediately, all FBI requests for
          inmate interviews will be approved by MCJ Jail
          Liaison.  All FBI requests, in person or
          telephonic, shall be referred to MCJ Jail Liaison.
          Once approved, the inmate will be transported to MCJ
          and made available to the FBI.  MCJ Jail Liaison
          shall be the only entity to facilitate FBI interviews
          inside of our custody facilities.  MCJ Jail Liaison,
          Men's Central Jail, 441 Bauchet Street, Los Angeles,
          California 90012.
          Any questions, please call me.  Greg."

Q.   Mr. Manzo, your initial draft contained a reference to an executive.  Who was that?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Your initial draft of this policy contained a reference to an executive.  Who was that?

A.    The sheriff and the undersheriff.

Q.    Okay.  And then this one -- do you want to look back at the --

MR. FOX:  Actually, let's pull that up.  This is 23.

*(The exhibit was displayed on the screen.)*

BY MR. FOX:

Q.    Read this again and please let us know which executive this makes reference to.

A.    "If any of these questions cannot be answered" --

Q.    Mr. Manzo, you can just read it to yourself.

A.    (Witness reading.)

The undersheriff.

Q.    Okay.  And did Mr. Thompson's policy that he sent out to custody contain any reference to Mr. Tanaka?

A.    No.

MR. FOX:  Putting on the screen -- or on the calendar "No FBI policy" on August 25th.

BY MR. FOX:

Q.    I want to take you back to August 23rd for a second.

After you had that discussion in Mr. Tanaka's office and all of you left sheriff's headquarters, did you conduct any interviews of anybody?

A.    Yes.

Q.   Okay.  Who?

A.   Anthony Brown.

Q.   Can you please look at original Exhibit 77 and in your binder, 78.  Do you recognize it?

A.   Yes.

Q.   What is 77?

A.   A CD with clips from the interview that we conducted on the 23rd.

Q.   Of who?

A.   Anthony Brown.

Q.   And does Exhibit 78 accurately reflect what was spoken on those clips and who said what on those clips?

A.   Yes.

Q.   How do you know that Exhibit 77 contains those clips?

A.   I listened to it and then I signed it and dated it.

          MR. FOX:  Your Honor, I move for the admission of Government Exhibit 77.

          MR. HOCHMAN:  No objection, Your Honor.

          THE COURT:  It will be received.

     *(Government's Exhibit 77 admitted into evidence.)*

          MR. FOX:  We're not going to play it for the jury with this witness at this time.  I'm going to move on with Mr. Manzo now.

BY MR. FOX:

Q.   You mentioned in Mr. Tanaka's office that you discussed

having two OSJ deputies guard him at that point.  Did that happen?

A.    Yes.

Q.    And did you do anything else to change Mr. Brown's housing situation?

A.    Yes.

Q.    What did you do?

A.    I showed Captain Carey three different housing locations, and he chose 8200 as the best place to house Brown.

Q.    What was 8200?

A.    The communicable disease ward.

Q.    What does that mean?

A.    It was mostly used for MRSA staph infections.

Q.    And if you could look in your book at Exhibits 214 to 218, please.  Let me know if you recognize those exhibits.

A.    Okay.

Q.    Do you recognize those?

A.    Yes.

Q.    What are they?

A.    That is the cell that Anthony Brown was held in.

Q.    Does -- do those pictures truly and accurately reflect the way the cell looked when Anthony Brown was housed there?

A.    I remember there being a bathtub when I looked at it, but it is the same cell.

          MR. FOX:  Your Honor, I move for the admission, with

that caveat, of Government's Exhibit 214 to 218.

MR. HOCHMAN:  May I have a moment with Counsel, Your Honor?

THE COURT:  Yes.

*(Counsel confer off the record.)*

BY MR. FOX:

Q.  Mr. Manzo, along with the bathtub, were there beds that are depicted in the picture?  Were those beds there?

A.  I can't be sure of those exact ones, but, yes, there was.

Q.  And the ones that are shown in the picture seem to be bare, meaning there's no mattress.  Anthony Brown had a mattress where he was sleeping; is that correct?

A.  Yes.

MR. FOX:  Again, with those caveats, I move for the admission of Government's Exhibit 214 to 218.

MR. HOCHMAN:  No objection with those caveats, Your Honor.

THE COURT:  It will be received.

*(Government's Exhibits 214-218 admitted into evidence.)*

BY MR. FOX:

Q.  Who decided -- well, sorry.

You mentioned that there were going to be OSJ deputies guard Mr. Brown at all times after the FBI interviewed him.  Typically, how many deputies from OSJ were there guarding him at a time?

A.   Two.

Q.   How long were the shifts for each deputy?

A.   Twelve hours, I believe.

Q.   And how many days or weeks did this occur where OSJ deputies were guarding Anthony Brown?

A.   So the 23rd until, I would say, a month maybe.

Q.   Was there an effort to figure out a schedule of who would be standing guard outside of Mr. Brown's door?

A.   Yes.

Q.   Who was in charge of that?

A.   Myself and Deputy Smith.

Q.   How did you and Mr. Smith decide who would be standing guard outside of his door?

A.   Initially, we just threw names in, and then eventually we decided to let people, for their convenience, to pick when they worked.

Q.   Which deputies were going to be standing guard outside of his cell?

A.   Men's Central Jail, OSJ, Twin Towers, and IRC OSJ.

Q.   When you say "Twin Towers," that was also OSJ?

A.   IRC OSJ.

Q.   Does IRC stand for the "Inmate Reception Center"?

A.   Yes.

Q.   And you said "Twin Towers" but didn't say "OSJ."  Were the Twin Towers deputies also supposed to be OSJ?

A.   Yes.

Q.   Are you familiar with something called "Heroes Park"?

A.   Yes.

Q.   What is Heroes Park?

A.   It is a kind of pseudo park right outside of custody from Men's Central Jail where deputies go eat or there's a basketball court to just kind of -- to get out of the jail.

Q.   Did you have a meeting with anybody at Heroes Park around this time?

A.   Yes.

Q.   Who did you meet with?

A.   Deputy Smith and then the people that we were going to ask to sit on Anthony Brown.

Q.   Approximately how many people attended this meeting?

A.   Fifteen to 20 maybe.

Q.   What happened at the meeting?

A.   Deputy Smith gave an overview because we couldn't say -- we couldn't tell the deputies everything because ICIB didn't want that, so we gave kind of an overview.  They knew most of it but we kept some of the stuff out.  But they got the overview of what happened and what we were required to do and that it was approved by the executives for us to sit on him 24/7.

Q.   What, if anything, did you discuss as it related to Mr. Brown's connection to the FBI?

A.   Oh, we let them know that Brown was an informant for the FBI.

Q.   And did you say anything about what any executive had told you about the FBI?

A.   Yes.

Q.   What did you say?

A.   I repeated what Mr. Tanaka said, "Fuck the FBI."

Q.   I'd like you to look at Government Exhibit 28 in your binder, please.  It's not in evidence yet.

Are you there?

A.   Yes.

Q.   Do you recognize it?

A.   I do.

Q.   What is it?

A.   It is an e-mail that Deputy Smith sent out to the people that attended -- well, most of the people that attended the meeting.

Q.   How do you know that Mr. Smith sent that out?

A.   I read it before he sent it.

Q.   Does that truly and accurately reflect what Mr. Smith wrote in the e-mail?

A.   Yes.

MR. FOX:  Your Honor, I move for the admission of Government Exhibit 28.

MR. HOCHMAN:  No objection, Your Honor.

THE COURT:  It will be received.

*(Government's Exhibit 28 admitted into evidence.)*

MR. FOX:  You can now publish it, please.  Just the first page.

*(The exhibit was displayed on the screen.)*

MR. FOX:  And why don't we highlight from the "from" line all the way through the first paragraph, please.

BY MR. FOX:

Q.   Who were some of the people receiving the e-mail in the "to" line?  Without naming them, who, generally, were they?

A.   They are all OSJ deputies.

Q.   And what about the "cc" line?

A.   A lieutenant and a sergeant.

Q.   What was the subject?

A.   "Confidential."

Q.   Could you please read the first paragraph.

A.       "If you're getting this e-mail, you have been signed up to work this very important detail.  I am in charge of security and scheduling for this detail.  Please don't let me or the unit down.  I have covered the background regarding Anthony Brown: male, black; 2/19/68; 2009547; no local gang affiliation -- the inmate we are tasked with protecting.

         "For clarification, his cell door 8225 will not be

opened without the two OSJ deputies who are assigned to be posted.  If you get a pass for any movement other than medical, call me for approval.  Use your common sense.  There will be no other movement without the presence of the following people: Undersheriff Tanaka, ICIB Captain Tom Carey, ICIB Lieutenant Leavins, Lieutenant Greg Thompson, Deputy Gerard Smith, or Deputy Manzo."

MR. FOX:  If you can now please highlight the next two paragraphs, please.

BY MR. FOX:

Q.   Could you please read the next two paragraphs.

A.       "At the beginning of each shift at MCJ, early mornings 2200 to 0600, AM 0600 to 1400, PM 1400 to 2200, call 1750, extension 40134, and tell the senior deputy your name and employee number and confirm that you have inmate Brown and that he is alive and log who you talked to in the black book.  "I have left a black book calendar with the posted deputies.  The book will be updated as a movement log.  It is not a Title 15 log.  It's a CYA log, so please make pertinent brief notes to pass along to your relief."

Q.   Let me stop you.  What is a Title 15 log?

A.   It's a giant -- well, now it's on the computer, but it

used to be a giant blue log where you had each module, where you would keep track of showers and feeding times and mail and everything that is mandated by the state that inmates get.

Q.    What do you mean by -- I'm sorry.  It's written by Mr. Smith.

Did you know what he meant by a "CYA log"?

A.    Yes.

Q.    What did he mean?

A.    A "cover your ass" log.

Q.    Okay.  Can you please continue.

A.    Sure.  Where was I?

"Examples are meals, nurse, name and date and time and/or move -- name and time -- excuse me -- and are moved out for interview by Smith at 1030 hours, things of that nature.  If Brown has any requests, both deputies shall be present during any conversation.  To keep yourself free of any controversy, don't talk to him.  Let the approved above-listed people deal with Brown's issues.

"It has been expressed to me several times now that this is one of the most important investigations involving the Los Angeles County Sheriff's Department in its 160-year history.  No joke.  So please don't hesitate to call me first if you need anything."

Q.    It says in that last paragraph that it's been expressed to

Mr. Smith several times that "this is one of the most important investigations involving the Los Angeles County Sheriff's Department in its 160-year history."

Q.   Were you with Mr. Smith when he heard this comment?

A.   Yes.

Q.   And it says it happened several times.  Were you with him more than once?

A.   Twice.

Q.   Who made these statements?

A.   Mr. Tanaka.

Q.   When?

A.   On the meeting -- the 20th meeting, and then the 23rd in his office.

MR. FOX:  Putting on the 23rd -- August 23rd calendar, "Brown guarded" and "Brown to 8000."

BY MR. FOX:

Q.   As far as you are aware, Mr. Manzo, was the FBI ever able to interact with Mr. Brown after these procedures were put in place?

A.   I don't believe so, no.

Q.   During your experience within the sheriff's department, did you know of another instance where a law enforcement agency was singled out to go through special procedures?

A.   No.

Q.   Along with moving Anthony Brown and standing guard over him, did the sheriff's department do anything else to keep the FBI away from Anthony Brown?

A.   They changed his name.

Q.   How many times?

A.   Four.

Q.   Do you recall what the names were?

A.   John Rodriguez, Kevin King, Chris Johnson.  I can't remember the last one.

Q.   So at least those three.

Was Mr. Brown also moved anywhere besides 8200?

A.   Yes, he was --

Q.   I'm sorry.  Where was he moved?

A.   Eventually, he was moved to San Dimas station.

Q.   I would like you now --

MR. FOX:  Your Honor?

THE COURT:  Yes, this is a good time.

MR. FOX:  It's a perfect time.  Thank you.

THE COURT:  Again, ladies and gentlemen, until this trial is over, I want to remind you're not to discuss this case with anyone, including your fellow jurors, members of your family, people involved in the trial or anyone else, nor are you allowed to let others discuss the case with you.  If anyone approaches and you tries to talk with you about this case, please let me know about it immediately.

Do not read any news stories or articles or listen to any radio or television reports about the case or about anyone that has anything to do with it.

Do not do any research, such as consulting dictionaries, searching the internet and using other reference materials, and do not make any investigation about the case on your own.

If you need to communicate with me, simply give a note to the clerk. And, finally, do not make up your mind about what your verdict should be until after you've gone to the jury room to decide the case and you and your fellow jurors have discussed the evidence.

All right. We're going to resume tomorrow morning at 8:00 a.m.

Everybody please try and be on time because we can't start until all of you are here.

Thank you very much. If you'd just leave your notebooks on your chairs and leave the binders.

THE CLERK: All rise.

*(Jury out at 1:31 P.M.)*

*(The following was heard outside the presence of the jury.)*

THE COURT: All right, sir. You may step down.

Okay. Anything else?

MR. HOCHMAN: Very briefly, Your Honor.

I just wanted to know what the Court's policy is on a demonstrative aid that's sort of a rolling demonstrative aid.

In other words -- it's actually fairly heavy.  With this one, if you recall, we had one of the little stickers, the "Baca FBI" sticker, that was put on by Special Agent Dalton.

Mr. Manzo hasn't identified it, but it was left on the demonstrative aid and now we've added sort of Mr. Manzo's stickers to this demonstrative aid.  My understanding was that each witness with a demonstrative aid is a fresh start.

In essence, if Mr. Manzo identifies that phone call, then it can be on the Manzo demonstrative aid, but if he doesn't, then it should be off the Manzo's demonstrative aid, and the ones that deal with Mr. Manzo should be on it for the duration of Mr. Manzo's testimony and on and on for whatever additional witnesses they want to use this for to populate it.

I just wanted to make sure I understood the Court's policy on this, and if the Court has some different idea or different policy, I just would like to know it because I don't want to object, as I told Mr. Fox, because I don't know what the Court's policy is on it.

MR. FOX:  And, Your Honor, we believe that it's an aid for the jury to keep track of the evidence, so we -- I mean, if people look at the "Baca FBI," for example, that comes from phone records that are in evidence, and I think are not at all controverted.  So I think that it would be helpful to the

jury to continue to see this timeline as we go along to understand when things were happening, and so we would appreciate it if we could assist the jury by continuing to use this demonstrative with the magnets on them as we continue to advance with additional witnesses.

THE COURT:  Do you have an objection, Mr. Hochman?

MR. HOCHMAN:  Yes, Your Honor.

My objection would be each witness can have whatever -- whatever magnets pertain to that particular witness that they have testimony that identifies, but if they don't have testimony that identifies a particular magnet, that magnet should be removed until the witness does properly have testimony that relates to that particular magnet.

THE COURT:  Let me see if I understand this.

So if, say, Witness 1 gets up and he gets two magnets up there, and then another witness comes up and he gets three, you want the first two that were put up there by the earlier witness to come off?  Is that it?

MR. HOCHMAN:  Yes, Your Honor, unless the next witness identifies those two as well.  Otherwise -- this is not, obviously, an exhibit, Your Honor.  It's a demonstrative aid for a particular witness, not a demonstrative aid for their entire case.

THE COURT:  Well, I guess I don't -- it seems to me whether you do it now or later, there'd be something wrong if

they wanted to use a demonstrative aid to create a timeline based on a witness's testimony that covered all the witnesses.

Would he be able to do that?

MR. HOCHMAN:  What I certainly expect is in closing argument, which is effectively what will be the combined timeline, is that the argument combines all of the witnesses' testimonies into whatever timeline they want to argue to the jury.

This is basically a continuing argument of their timeline, Your Honor, to the extent they're allowed to go and additionally add from one witness to another witness to another without having each witness independently reestablish the magnets for their testimony.

In other words, it's not -- this is a proper demonstrative aid for closing argument, Your Honor, but we're not at closing argument, we're at a situation with each witness having unique testimony, and if they want to add to it, the witness has to have some fact that they've testified to that justifies the magnet.

THE COURT:  Okay.  So your objection is is that they're using it cumulatively with each witness --

MR. HOCHMAN:  Yes.

THE COURT:  -- and they should only be able to use it with a given witness as to whatever that witness can establish?

MR. HOCHMAN:  Yes, Your Honor, that's correct.

MR. FOX:  And, Your Honor, we think that this will help the jury.  It will be a very good aid to the jury as they see different witnesses because they're going to be hearing about many of the same dates, a few different times, and we don't have, unfortunately, witnesses that will only testify about August 19th and then the next one talks about August 20th.

There are going to be many times that we're going forward in time and then backward in time, and this will help the jury understand what is going on during all of this period of time, this six weeks.

The terms that we've used are very neutral.  There's not -- Mr. Hochman says it's argumentative.  There's nothing argumentative about this.  And if there was a magnet that had some argument on there, Mr. Hochman could object to that individual magnet.  But, again, I think this is a good aid to the jury and -- by the way, if he does object to it, we will be happy to work with him about different language.

THE COURT:  Okay.  I'll rule on it before the jury comes -- before we have the jury back tomorrow.

MR. FOX:  Thank you.

MR. HOCHMAN:  Thank you.

Nothing further from the defense, Your Honor.

Nothing further from the defense, Your Honor.

THE COURT:  Okay.  As I understand it tomorrow,

there's going to be a number of potential jurors brought in for some other case, so -- and we want to start at 8:00.  I wish I had known that before this jury left, but -- so if you're trying to get in just, let the court -- come up to the front, let the Court Security Officer know that you're here for this case, and they'll try to take whatever steps they can to get you in so that we can start on time.

MR. HOCHMAN:  Yes, Your Honor.

THE COURT:  Okay.

*(Evening recess taken 1:38 P.M.)*

--oOo--

CERTIFICATE


I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.


Date: AUGUST 5, 2017


/s/  Cindy L. Nirenberg, CSR No. 5059

Official Court Reporter