UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

HONORABLE PERCY ANDERSON, U.S. DISTRICT JUDGE

- - -

UNITED STATES OF AMERICA,    )
                             )
            PLAINTIFF,       )
                             )
        vs.                  ) No. CR16-66(A)-PA
                             )
LEROY BACA,                  )
                             )
            DEFENDANT.       )
_____)

REPORTER'S TRANSCRIPT OF JURY TRIAL

DAY 5, VOLUME II of II

PAGES 917-1073

LOS ANGELES, CALIFORNIA

TUESDAY, FEBRUARY 28, 2017

9:41 A.M.

_____

CINDY L. NIRENBERG, CSR 5059, FCRR
U.S. Official Court Reporter
350 W. 1st Street, #4455
Los Angeles, CA 90012
*www.msfedreporter.com*

APPEARANCES OF COUNSEL:


FOR THE PLAINTIFF:
                    OFFICE OF THE UNITED STATES ATTORNEY
                    BY: BRANDON FOX,
                        ASSISTANT U.S. ATTORNEY
                        EDDIE A. JAUREGUI,
                        ASSISTANT U.S. ATTORNEY
                        LIZABETH A. RHODES,
                        ASSISTANT U.S. ATTORNEY
                    312 NORTH SPRING STREET
                    13TH FLOOR
                    LOS ANGELES, CA 90012
                    213-894-2434










FOR THE DEFENDANT:
                    MORGAN LEWIS & BOCKIUS
                    BY: NATHAN J. HOCHMAN, ATTORNEY AT LAW
                        BRIANNA L. ABRAMS, ATTORNEY AT LAW
                    THE WATER GARDEN
                    1601 CLOVERFIELD BOULEVARD
                    SUITE 2050 NORTH
                    SANTA MONICA, CA 90404
                    310-255-9025




ALSO PRESENT:
                    LEAH TANNER, FBI SPECIAL AGENT

                              I N D E X


*GOVERNMENT'S WITNESSES:*                    *PAGE*

MICKEY MANZO

    CROSS BY MR. HOCHMAN (RESUMED)         925

    REDIRECT BY MR. FOX                    970

    RECROSS BY MR. HOCHMAN                 981

    FURTHER RECROSS BY MR. FOX             987

    FURTHER RECROSS BY MR. HOCHMAN         990


GREGORY LEE THOMPSON

    DIRECT BY MS. RHODES                   996

    CROSS BY MR. HOCHMAN                   1042


*FURTHER PROCEEDINGS*

DISCUSSION HELD OUTSIDE PRESENCE OF JURY  921

DISCUSSION HELD AT SIDEBAR                921

DISCUSSION HELD OUTSIDE PRESENCE OF JURY  993

DISCUSSION HELD OUTSIDE PRESENCE OF JURY  994

DISCUSSION HELD AT SIDEBAR                1022

DISCUSSION HELD AT SIDEBAR                1026

DISCUSSION HELD AT SIDEBAR                1064

DISCUSSION HELD AT SIDEBAR                1069

DISCUSSION HELD OUTSIDE PRESENCE OF JURY 1071


UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

E X H I B I T S

| GOVERNMENT'S EXHIBITS | MARKED | ADMITTED |
|---|---|---|
| 14 | | 1002 |
| 22 | | 1031 |
| 42 | | 1039 |
| 229 | 1004 | |
| 230 | 1042 | |

| DEFENDANT'S EXHIBITS | MARKED | ADMITTED |
|---|---|---|
| 670 | 935 | |
| 534 | 944 | |

LOS ANGELES, CALIFORNIA; TUESDAY, FEBRUARY 28, 2017

9:41 A.M.

- - - -

*(The following was heard outside the presence of the jury.)*

THE COURT:  Let me see counsel at sidebar.

*(Proceedings held at sidebar under seal 9:41 to 9:47 A.M.)*

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*(The following proceedings were held in open court.)*

THE COURT:  All right.  Let's bring the jury in.

*(Jury in at 9:48 A.M.)*

THE COURT:  All right.  Ladies and gentlemen, you've heard testimony that after having been charged, Mickey Manzo pled not guilty and was subsequently found guilty by a jury. There is no rule or procedure for a defendant who has exercised his constitutional right to trial by jury and is found guilty to then change his plea to guilty.  No inference of any kind is to be drawn for a witness not changing his plea to guilty after having been found guilty by a jury.  You're not to consider that fact or draw any inference in evaluating the witness's testimony.

*///*

MICKEY MANZO,

having been previously duly sworn,

testified further as follows:

CROSS-EXAMINATION

(RESUMED)

BY MR. HOCHMAN:

Q.    Mr. Manzo, I'd like to go back and understand your training and experience.

You first joined the sheriff's department in 2006; is that correct?

A.    Yes.

Q.    And you worked in the jails for basically the majority of your career?

A.    That's correct.

Q.    And your career was until what year?

A.    Well, I was arrested in December of 2013, so it effectively ended there.  I was relieved of duty.  But I did not get terminated until October of the following year.

Q.    So let's focus on those seven years between 2006 and 2013.

You worked in the Men's Central Jail?

A.    I did, yes.

Q.    And you worked as part of Operation Safe Jails, you said?

A.    Yes.

Q.    You dealt with, what, thousands of inmates over those seven years?

A.    Easily, yes.

Q.    And as part of Operation Safe Jails, were you involved in some type of intelligence gathering within Men's Central Jail?

A.    Yes.

Q.    What was that about?

A.    It varied.  Some was from the ITMS phone system; some were from inmate informants, deputy informants; the notes passed between inmates, we call them "kites."  They are about this big (indicating).  Just stuff we found.

Q.    Did you also deal with gangs in the jail?

A.    Absolutely, yes.

Q.    And when you were dealing with all these inmates and these gangs and this type of information, you also said you worked on the 3000 floor?

A.    I did, yes.

Q.    Did the 3000 floor house some of the most dangerous and violent inmates at Men's Central Jail?

A.    Yes.

Q.    And was it based on all this experience dealing with all these thousands of inmates over that seven years that you said that a cell phone could be used as a weapon in the jail?

A.    Yes.

Q.    And a cell phone could be dangerous and violent inside of a jail?

        MR. FOX:  Objection.  Asked and answered.

THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.   So going back to where we left off, on August 19, 2011, you and Deputy Smith had that interview with Anthony Brown; is that correct?

A.   That is correct.

Q.   That's that two-hour interview we were discussing a moment ago?

A.   Yes.

Q.   And during that two-hour interview, was there -- well, you recall having subsequent interviews with Anthony Brown on August 21st?  I think there's one on August 23rd, the 24th, and eventually another one on September 2nd; is that correct?

A.   Correct.

Q.   Now, on the August 21st -- so the first one is on the 19th and let's focus then on the 21st and thereon.

From the August 21st interviews to the remaining of the interviews that you had with him, that's where Anthony Brown is describing in graphic detail excessive-force complaints he has against deputies; is that correct?

A.   Yes, that's correct.

Q.   But he doesn't do that on the August 19th interview -- that's the first one -- is that correct?

A.   That is correct.

Q.   So after you have this interview with Anthony Brown on

August 19, then he -- then you participate in a briefing session for Sheriff Baca and Undersheriff Tanaka over at the sheriff's headquarters building; is that correct?

A.    Correct.

Q.    And that's later in the afternoon of August 19th, after you've had this interview with Anthony Brown, correct?

A.    Correct.

Q.    And at that interview -- excuse me, at that debriefing session, that is where Lieutenant Thompson describes the fact that the cell phone was found, correct?

A.    Correct.

Q.    And he describes where it was found and he describes that it's been linked to the civil rights squad of the FBI; is that right?

A.    That's correct.

Q.    And he also talks about information that you had gathered during your August 19 interview of Anthony Brown; is that right?

A.    Correct.

Q.    Now, Sheriff Baca, when he's -- during this meeting, he's not swearing, is he?

A.    No.

Q.    He's not saying "F the FBI" or words like that during this August 19th meeting, is he?

A.    No.

Q.    And he didn't say those words in the August 20th meeting; is that correct?

A.    That is correct.

Q.    I mean, that would be something that you would remember, if Sheriff Baca was saying "F the FBI" in these meetings, correct?

A.    Yes, I would remember that.

Q.    And he didn't say it, correct?

A.    He did not.

Q.    And going first to the August 19th meeting, Sheriff Baca asked a bunch of open-ended questions like, "Why are they doing this?  Why didn't they come to us?  We could have helped them," things like that; is that correct?

A.    I don't remember if that's the 19th or the 20th meeting, but he did say that.  Those words came out of his mouth.

Q.    Whether it was either the August 19th or August 20th meeting; is that correct?

A.    I'm not sure which one, but one of those two days he did say that.

Q.    And the "they" is the FBI?

When he says, "Why are they doing this?  Why didn't they come to us?  We could have helped them," he's referring to the FBI, correct?

A.    Yes.

Q.    And he's referring it in connection with this cell phone

that's been found?

A.    Yes.

Q.    And -- and Sheriff Baca, at that August 19th meeting, mentioned that he had spoken with someone at the FBI, but they didn't acknowledge the investigation, correct?

A.    Correct.

Q.    Now, also then -- switching, then, to the August 20th meeting, that's where Lieutenant Thompson gave another briefing; is that correct?

A.    Correct.

Q.    And he also provided a timeline of the events up until that time; is that correct?

A.    I know he had enough timelines to give out.  I don't know if he ended up giving them out or not.  I don't remember if he gave them out or not.

Q.    I see.

        MR. HOCHMAN:  Let me place Government's Exhibit 137, which is in one of the notebooks, before the witness, Your Honor.

BY MR. HOCHMAN:

Q.    And is Government's Exhibit 137 a true and accurate copy of the timeline that you helped prepare that listed the events from July 18, 2011, through August 17, 2011?

A.    August 18th, but yes.

Q.    I'm sorry.  August 18, 2011.

A.    Yes.

Q.    Is that correct?

A.    It is.

        MR. HOCHMAN:  The defense would move into evidence Government's Exhibit 137, please.

        THE COURT:  Any objection?

        MR. FOX:  Your Honor, we object on -- at this point based on relevancy grounds.

        THE COURT:  We'll come back to this.  I'm going to provisionally sustain the objection.  We'll come back to it.

BY MR. HOCHMAN:

Q.    And just to add one more question with respect to Exhibit 137, is this -- does this contain the information that Lieutenant Thompson relayed to the meeting and the participants in the meeting on August 20, 2011?

A.    Yes.

Q.    So during that meeting, Lieutenant Thompson never mentioned at that meeting that during your conversation on August 19th with Anthony Brown, that Anthony Brown had discussed excessive force and various types of graphic descriptions of excessive force by deputies, and now I'm talking about the August 20th meeting; is that correct?

A.    I don't remember.

Q.    Well, the only interview you had with Anthony Brown before the August 20th meeting was the August 19th interview, correct?

A.    Correct.

Q.    And Lieutenant Thompson didn't have any separate interviews, to your knowledge, with Anthony Brown, correct?

A.    No, he didn't.

Q.    So the only people who had interviewed Anthony Brown from the sheriff's department at that moment in time prior to the August 20th -- on, excuse me, August 19th were you and Deputy Smith, correct?

A.    He was interviewed by Detective Bayes, and I don't remember the other detective's name.

Q.    And I think it was Detective Colon.

A.    That sounds right.

Q.    And with Detective Colon and Detective Bayes, Anthony Brown was pitching the, "The nurse brought me the cell phone" story, correct?

A.    I believe so, yes.

Q.    And he wasn't talking about excessive force with Deputies Bayes or Colon, correct?

A.    No, he was not.

Q.    Now, at that August 20th meeting, I believe you said Sheriff Baca put Captain Carey from Internal Criminal Investigations Bureau in charge of the investigation, correct?

A.    Correct.

Q.    And that everything was supposed to be run through Undersheriff Tanaka --

A.    Correct.

Q.    -- is that correct?

A.    Correct.

Q.    And prior to that, Sheriff Baca had instructed you not to put Anthony Brown on the state bus on Saturday, correct?

A.    Correct.

Q.    Because Anthony Brown had started cooperating, but hadn't actually given the information about which deputies were involved that he said he would if you gave him a cheeseburger, correct?

        MR. FOX:  Objection.  Speculation as to Mr. Baca's mindset.

        THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.    Well, when you were hearing Sheriff Baca talk on August 19th and instruct you not to put Anthony Brown on the bus, Sheriff Baca had been informed at that point that Anthony Brown was cooperating, but he hadn't provided the names of the deputies that were involved with him, correct?

A.    Correct.

Q.    And that he would do so if you got him a cheeseburger and some cigarettes, a soda, and fries, correct?

A.    Correct.

Q.    Now, at some point -- and when Sheriff Baca shows up for this Saturday meeting, he's wearing a track suit, correct?

A.   Yes, he was in running clothes.

Q.   Because he was supposed to do a 5K run that morning, if you recall.

A.   I don't recall that.

Q.   And Sheriff Baca stayed around for the entire meeting, didn't he?

A.   Minus the last ten minutes maybe.

Q.   Well, Sheriff Baca never stepped out with Mr. Tanaka during the Saturday meeting; isn't that correct?

A.   I'm getting them confused.

Q.   Well, let's see if we can slow it down.

     We have one meeting on August 19th and you're there, Sheriff Baca's there, Undersheriff Tanaka is there, Deputy Smith is there, correct?

A.   Correct.

Q.   Lieutenant Thompson is there?

A.   Correct.

Q.   Anyone else?

A.   I think there were others, but I don't remember their names.

Q.   Okay.  And did Sheriff Baca step out of that meeting with Undersheriff Tanaka at any point and then Undersheriff Tanaka returned to that meeting?

A.   It happened.  He did step out with the sheriff.  I don't know -- I can't remember which day it was.

Q.    So it actually could have been the Friday meeting where Undersheriff Tanaka and Sheriff Baca stepped out and Undersheriff Tanaka came back in?

A.    No.  It would have been the Saturday meeting.

Q.    Are you sure?

A.    Yes.

MR. HOCHMAN:  May I have a moment, Your Honor?

THE COURT:  Yes.

MR. HOCHMAN:  May I present Defense Exhibit 670 to the government, Your Honor.

THE COURT:  Yes.

(Defendant's Exhibit 670 marked for identification.)

MR. HOCHMAN:  With the Court's permission, I'd like to read from page 31, question and answer in connection with a sworn proceeding.

THE COURT:  I'm sorry.  What's the page and line number?

MR. HOCHMAN:  It's lines 11 down to 22 on page 31 of a sworn proceeding on March 29, 2016.

THE COURT:  All right.  Any objection?

MR. FOX:  Your Honor, just that I think that we should read to 32, line 5.

THE COURT:  Okay.  If somebody can give me a copy, please.

MR. HOCHMAN:  May I approach, Your Honor?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

THE COURT:  Yes.

Yeah, go to the next page down to line 5.

MR. HOCHMAN:  Yes, Your Honor.

"Question:"  -- and these are questions being asked of Mr. Manzo -- "did Mr. Baca stay around for the rest of the meeting?

"Answer by Mr. Manzo:  For the Saturday meeting, yes.

"Question:  At some point in time, did he and Mr. Tanaka leave the conference room?

"Answer:  Not on Saturday, no.

"Question:  Was there a previous meeting where he and Mr. Tanaka left the conference room?

"Answer:  Friday.

"Question:  At the Friday meeting, okay.  What happened after they left the conference room at the Friday meeting?

"Answer:  Everybody just waited until Mr. Tanaka came back in.

"Question:  And what happened after Mr. Tanaka came back in at the Friday meeting?

"Answer:  Mr. Tanaka explained that he had known the sheriff for a long time -- I can't remember the number -- the exact number of years he said, and that he'd never seen him that visually upset and this was going to be a huge investigation and that he didn't

want us -- he wanted everybody to -- you know, to be

on the same page and get this done for the sheriff."

BY MR. HOCHMAN:

Q.   Now, at the Friday -- excuse me.  At the Saturday meeting, you said that you played certain ITMS calls for Sheriff Baca and the people assembled; is that correct?

A.   Yes.

Q.   And at that meeting, you also said that Undersheriff Tanaka swore a lot; is that correct?

A.   That is correct.

Q.   In fact, Undersheriff Tanaka, on the August 23rd meeting, which we'll get to in a moment, uses a lot of words like "fuck" and words like that; is that correct?

A.   That is correct.

Q.   And Sheriff Tanaka [sic] doesn't, is that correct, in your presence?

A.   Sheriff Baca does not.

Q.   I'm sorry.  Sheriff Baca does not, correct?

A.   No.

Q.   Now, Undersheriff Tanaka, in that August 20th meeting, was the one who said that he wanted final approval on whoever visited Anthony Brown going forward; is that correct?

A.   I don't remember if he said that or not.  It ended up that way, but I don't remember if he was the one that said it.  I can't remember.

Q.   In dealing with civil rights investigations, what is the difference between a public corruption investigation and a civil rights investigation, to your knowledge?

MR. FOX:   Objection.   Foundation.

THE COURT:   Sustained.

BY MR. HOCHMAN:

Q.   You've said the words "civil rights investigations" in your testimony.

What do you understand civil rights investigations to entail?

A.   Civil rights investigations entail the violation of anyone's civil rights.

Q.   Like a deputy engaging in excessive force, that's a civil rights violation; is that correct?

A.   Correct.

Q.   But if a deputy receives a bribe, that's a public corruption violation, correct?

A.   That would make sense, yeah.

Q.   And a deputy receiving a bribe is not a civil rights violation, correct?

A.   Correct.

Q.   And the focus of the August 20th meeting was on the cell phone and all the problems that it had caused, correct?

A.   Correct.

Q.   Now, on August 21st, you had that second meeting with

Anthony Brown; is that correct?

A.    Yes.

Q.    And that's the one that you're there; Deputy Smith, your partner, is there; and now we have Lieutenant Steve Leavins from Internal Criminal Investigation Bureau, as well, correct?

A.    Correct.

Q.    And during that meeting, Anthony Brown claims -- well, actually finally uses the name Deputy Michel as the deputy that brought him that cell phone, correct?

A.    Correct.

Q.    And before August 21st, you didn't know it was Deputy Michel; is that correct?

A.    That is correct.

Q.    And Deputy Michel's first name is Gilbert?

A.    It is, yes.

Q.    And Anthony Brown also claims that Deputy Michel not only brought him a cell phone, but brought him marijuana, methamphetamine, cocaine, and heroin on five or six occasions, correct?

A.    I don't remember the drugs, but, yes, he did say that he was brought drugs.

Q.    By Deputy Michel?

A.    Yes.

Q.    On approximately five or six occasions?

A.    That sounds about right.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

Q.   And that Anthony Brown told you that he would disseminate the drugs throughout the module and receive inmate store items as compensation for the drugs; is that correct?

A.   Yes.

Q.   And that -- he told you at that point that he had paid $4,000 to Deputy Michel for the phone and $2,000 every time he got drugs from Deputy Michel, correct?

A.   I don't remember the monetary amount he put on it, but yes.

Q.   But it was in the thousands of dollars, correct?

A.   Yes.

Q.   And Anthony Brown actually provided you the first name of Deputy Michel's father and the location where his father lived and saying that Deputy Michel had asked him to send a $20,000 cashier's check to his father for payment; is that correct?

A.   That is correct.

Q.   And were you able to check out whether or not Anthony Brown correctly identified the address for Deputy Michel's father?

A.   I believe he did, yes.

Q.   And then Anthony Brown also talks about other inmates who were actively attempting to cultivate deputies under orders from the FBI; is that correct?

A.   I don't remember that.

Q.   Well, Anthony Brown also talks about the FBI visiting him

in court many times; is that correct?

A.    That is correct, yes.

Q.    And Anthony Brown talks about a cell phone that he got in 2009 from a Deputy Bravo; is that correct?

A.    Yes.

Q.    So at the end of this August 21st meeting, you have some more information about which deputies are involved with Anthony Brown, but you don't know if you have all the deputies involved with Anthony Brown; is that correct?

A.    That's fair, yes.

Q.    And at this point in time, you also don't know whether or not Anthony Brown is telling you the truth about Deputy Michel, correct?

A.    That is correct.

Q.    About Deputy Bravo, correct?

A.    Correct.

Q.    About whether or not any of these deputies also brought in narcotics in addition to a cell phone; is that correct?

A.    That would be correct, yes.

Q.    And you've heard that there's other inmates that could possibly be involved; is that correct?

A.    Yes.

Q.    So, again, you don't know -- you don't know how big a problem you're facing at this point in connection with your investigation; is that right?

A.   It wasn't my investigation, but you're correct.

Q.   In connection with the sheriff's department investigation; is that correct?

A.   Correct.

Q.   Now, on August 23rd, you were told that the FBI had been able to speak with Anthony Brown that day for about an hour; is that correct?

A.   I was told that they were interviewing as we walked in.

Q.   So -- I'm sorry.  As you walked in to where, you were told that they were interviewing Anthony Brown?

A.   Jail liaison office.  It's outside security of Men's Central Jail.

Q.   So when you walked in, that interview was still going on?

A.   That is correct.

Q.   And which room was it going on in?

A.   I don't -- they said 6000, but it was in the big 6000 floor, the big interview room.

Q.   And is that the room where outside law enforcement agents get to interview inmates inside of Men's Central Jail?

A.   Yes.

Q.   And is that the room also that -- now, when those interviews occur, does the sheriff's department monitor those interviews?

A.   No.

Q.   Those are private interviews, correct?

A.    Yes.

Q.    So when you came in, this private interview was taking place between the FBI and Anthony Brown, correct?

A.    Correct.

Q.    But -- and you tell, if I recall, Lieutenant Leavins about this interview; is that right?

A.    I called Lieutenant Thompson.

Q.    Lieutenant Thompson.

      But at some point, Lieutenant Leavins comes by?

A.    Yeah.  He was right behind us.

Q.    And Lieutenant Leavins is the one who orders that this interview be stopped; is that correct?

A.    That is correct.

Q.    Now, the FBI agents that were there, they were asked to wait until Captain Carey arrived; is that correct?

A.    I have no idea.

Q.    Well, the FBI agents left their business cards behind.

      Are you aware of that?

A.    Yes.

Q.    And the business cards -- or at least -- and there were three FBI agents.

      Does that number sound approximately right?

A.    Yes.

Q.    And one of the three agents was Special Agent Marx; is that correct?

A.   I don't remember.

Q.   Would it refresh your recollection to see an e-mail around this time period that listed the agents that were present at that time?

A.   Yes.

        MR. HOCHMAN:  May I have a moment, Your Honor?

        May I approach the witness with what will be marked for identification as Defense Exhibit 534, Your Honor?

        THE COURT:  Approach the clerk.

        MR. HOCHMAN:  I'm sorry.  Approach the clerk.

    (Defendant's Exhibit 534 marked for identification.)

BY MR. HOCHMAN:

Q.   If you could take a look at Defense Exhibit 534 and see whether or not that refreshes your recollection as to which three FBI agents had their business cards left behind on August 23rd.

A.   It does.

Q.   And was one of the agents Agent Leah Marx?

A.   Yes.

Q.   And was one of the agents David Dahle?

A.   Yes.

Q.   And was one of the agents Wayne Plympton?

A.   Yes.

Q.   Now, when you arrived at this area, did you see these agents waiting around at any point for anyone to arrive?

A.    No.

Q.    They were already gone by the time you arrived?

A.    They were in the interview when I arrived.

Q.    And then did you see them actually exit the interview room at any point?

A.    No.

Q.    Now, with respect to what then happens, Lieutenant Thompson finds out that the FBI has been able to interview Anthony Brown, correct?

A.    Yes.

Q.    And Lieutenant Thompson told you something to the effect that he was going to have to fall on his sword in front of the big boss; isn't that correct?

A.    That's correct.

Q.    And you understood "the big boss" to be Mr. Tanaka, correct?

A.    Correct.

Q.    And I'd like to then ask you a couple of other questions about your answers from yesterday.

        MR. HOCHMAN:  May we have Exhibit 27.  If you could turn to Exhibit 27.  And if I might ask Agent Marx if she could put that on the screen, please.

        *(The exhibit was displayed on the screen.)*

        MR. HOCHMAN:  And if we can focus on the 6:02 August 24th e-mail at the bottom.

Actually, I'm sorry.  Can we start on the second page of this document and then focus on just the -- from the "Good morning" line.

BY MR. HOCHMAN:

Q.    All right.  I'm taking you back to August 24th, and if you recall, at this point Lieutenant Thompson is giving you a draft of some ideas that he wants to engage in from -- in preparing a memo from, correct?

A.    Correct.

Q.    And you prepare this memo on an FBI policy for interviews, correct?

A.    Correct.

Q.    And then you give this memo to Lieutenant Thompson, who then puts it in a more formalized draft; isn't that correct?

A.    Correct.

Q.    And Exhibit 27, the second page, is the draft memo, as it started out, that was going to go out that says, "Effective immediately and until further notice, all FBI requests for interviews will be approved by Undersheriff Tanaka."

Do you see that?

A.    Yes.

Q.    Now, at some point, Lieutenant Thompson contacts Christopher Nee to find out if Undersheriff Tanaka is okay with this; is that correct?

A.    Yes.

Q.   And then if we could turn to the first page and focus on the 6:02 p.m. e-mail.

So in this e-mail, it says, "Chris, Was Mr. Tanaka going to make the changes on the FBI notice to facility commanders or will he be satisfied if I remove all reference to him or the executives?"

Do you see the plural, "executives"?

A.   Yes.

Q.   "If so, I will send out tomorrow morning."

Now, when Mr. Fox asked you about this section of Exhibit 27 and he asked you what you understood "executives" to mean, you said the executives were Sheriff Baca and Undersheriff Tanaka, correct?

A.   Correct.

Q.   But then you corrected yourself when Mr. Fox showed you Exhibit 23.

MR. HOCHMAN:  If we can now show Exhibit 23.

(The exhibit was displayed on the screen.)

MR. HOCHMAN:  And focus on the "Good morning" until the end.

BY MR. HOCHMAN:

Q.   Mr. Fox then showed you Exhibit 23 and you had a chance to review that to see if Sheriff Baca's name was anywhere on the memo that you had prepared, and you concluded that Sheriff Baca's name was not, correct?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

A.    Correct.

Q.    So when you said originally that the executives was both Sheriff Baca and Undersheriff Tanaka, you were mistaken, correct?

A.    No.   The term "executives" refers to the sheriff and the undersheriff.

Q.    But as it was referring to, in that particular example, removing the executives' name, do you see any executive on this Exhibit 23 other than Undersheriff Tanaka?

A.    No.

            MR. FOX:  Object to the form of the question.

            THE COURT:  Sustained.  The answer is stricken.  The jury should disregard it.

BY MR. HOCHMAN:

Q.    On Exhibit 23, is there any other executive listed on Exhibit 23 other than Undersheriff Tanaka?

A.    No.

Q.    So when we talked a moment ago about your understanding of removing executives' names, the only executive that is listed on this particular memo was Undersheriff Tanaka, correct?

            MR. FOX:  Objection.  Asked and answered three times.

            THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.    Now, Mr. Fox asked you a question about what time period the OSJ guards who were assigned to guard Anthony Brown, from

what date did they start and to what date did they end.

Do you recall that question?

A.   I do, yes.

Q.   And you said that they started on August 23rd and that it lasted for about a month, correct?

A.   Yes, that's about right.

Q.   But isn't it true that it didn't last for about a month because Anthony Brown got transferred to state prison on September 12, 2011?

A.   I don't remember the exact date, but that sounds about right.

Q.   So when you said it lasted a month, you were about ten days off, correct?

A.   Yes.

Q.   Now, going back to this August 23rd meeting, the first meeting on August 23rd is between yourself, Deputy Smith, Lieutenant Thompson, and Captain Carey with Mr. Tanaka, correct?

A.   Correct.

Q.   And at that meeting, that's where I think you described it as getting destroyed, correct?

A.   Yes.

Q.   Would you consider that to be a butt-chewing meeting?

A.   Absolutely.

Q.   And that's where Undersheriff Tanaka said repeatedly

"F the FBI," along with a lot of other profanities; is that correct?

A.   Correct.

Q.   And at the end of that meeting, Undersheriff Tanaka was asked -- or told Lieutenant Thompson that he had to brief Sheriff Tanaka [sic] because Sheriff Tanaka [sic] did not know that the FBI at that point had spoken with Anthony Brown; is that correct?

        MR. FOX:  Objection to the form of the question.  I believe he means Mr. Baca, rather than Mr. Tanaka.

        MR. HOCHMAN:  Let me rephrase, Your Honor, if I might.

        THE COURT:  All right.

BY MR. HOCHMAN:

Q.   At the end of the meeting with Undersheriff Tanaka, Undersheriff Tanaka told Lieutenant Thompson that he had to go brief the sheriff, correct?

A.   Correct.

Q.   And, again, the meeting that you had just had with Undersheriff Tanaka was a very heated meeting, correct?

        MR. FOX:  Objection.  Asked and answered.

        THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.   And Undersheriff Tanaka told Lieutenant Thompson that Sheriff Baca did not know about the meeting between the FBI and

Anthony Brown at that point, correct?

A.    Correct.

Q.    All right.  Then you actually don't go into the meeting with Lieutenant Thompson and Captain Carey and Sheriff Baca, correct?

A.    No, I don't go in.

Q.    You sit outside that meeting and can't hear what's going on inside the meeting, correct?

A.    Correct.

Q.    So whatever information you have about that meeting comes afterwards, when Lieutenant Thompson tells you about that meeting; is that correct?

A.    That's correct.

Q.    And Lieutenant Thompson tells you that when he briefed Sheriff Baca, he told him that the FBI was able to get in to interview Anthony Brown, correct?

A.    Correct.

Q.    And he told you that the interview was terminated at the request of Lieutenant Leavins, correct?

A.    Correct.

Q.    And that the FBI was asked to remain in the jail but they left?

A.    On the last one, I don't know if he said Lieutenant Leavins.  He just said that the interview was terminated.

Q.    Okay.  And Lieutenant Leavins -- excuse me, Lieutenant

Thompson told you that he had said to Sheriff Baca that the FBI was asked to remain in the jail but they left.

A.   I don't remember that.

Q.   Would it refresh your memory if you reviewed an interview report of an interview you had with the government back in December of 2016?

A.   Yes.

MR. HOCHMAN:  May I have a moment, Your Honor?

May I approach the clerk, Your Honor?

THE COURT:  Yes.

BY MR. HOCHMAN:

Q.   And I will direct your attention to the last paragraph on the first page of that exhibit.  It's Exhibit 671.

A.   Okay.

Q.   So Lieutenant Thompson told you after that interview with Sheriff Baca -- excuse me, meeting with Sheriff Baca had happened, that he had said that the FBI was asked to remain in the jail but they left, correct?

A.   Correct.

Q.   And that the -- Undersheriff Tanaka had been briefed already and now Lieutenant Thompson was briefing Sheriff Baca, correct?

A.   Correct.

Q.   And Lieutenant Thompson told you that he apologized and he awaited Sheriff Baca's response, correct?

A.    Correct.

Q.    And Sheriff Baca's response was compassionate and understanding; is that correct?

A.    Yes.

Q.    Sheriff Baca didn't say "F the FBI," according to what Lieutenant Thompson was telling you?

        MR. FOX:  Objection, Your Honor.  Foundation.

        THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.    Did Lieutenant Thompson ever tell you, when he was describing his conversation with Sheriff Baca, that Sheriff Baca had said anything along the lines of "F the FBI"?

A.    No.

Q.    Did Lieutenant Thompson tell you that Sheriff Baca had used other profanity other than "F the FBI" during his meeting with Lieutenant Thompson?

A.    No.

Q.    And did Lieutenant -- but Lieutenant Thompson, I think -- let me say it differently.

        Lieutenant Thompson never told you that he had any discussions about something involving a chess match during his meeting with Sheriff Baca on August 23rd; isn't that correct?

A.    He did, but not directly after.  It was a couple days later.

Q.    So a couple days later, Lieutenant Thompson told you -- or

added one additional word or words to what he had relayed to you right afterwards; is that correct?

A.   No.  He recounted the whole encounter, because I asked him again because I thought I was going to get fired.

Q.   So you asked him -- so just so I get the sequence, he's first telling you immediately after the meeting with Sheriff Baca what Sheriff Baca told him, correct?

A.   Correct.

Q.   And in that meeting, he doesn't bring up the notion of a chess match, correct?

A.   Not that I remember, no.

Q.   And then how long thereafter did you have this next conversation with Lieutenant Thompson?

A.   Not very long.  A day, maybe two.  Because I ended up sending him an e-mail also.

Q.   You sent him an e-mail that had the word "chess match" in it?

A.   No, about -- apologizing for messing up and --

Q.   And where were you when you had this second conversation with Lieutenant Thompson?

A.   Probably Heroes Park.

Q.   Was this all part of the Heroes Park meeting?

A.   No.  He would go down there and smoke cigars, and I probably met -- I met him down there probably.

Q.   Was anyone else with you that overheard Lieutenant

Thompson adding this one additional phrase of a chess match being discovered -- or being discussed during the August 23rd meeting between Lieutenant Thompson and Sheriff Baca?

A.    Deputy Smith might have been there.  I'm not sure.

Q.    When you spoke with the government on December 1, 2016, did you ever mention that there was this second conversation with Lieutenant Thompson and yourself in which the word "chess match" was discussed?

A.    No.

Q.    You had a chance to meet with the government on February 16th, about a week or two ago, in preparation for your testimony here today.

      Do you recall that?

A.    Yes.

Q.    Did you ever mention to the government at that point that there was a second meeting with Lieutenant Thompson in Heroes Park in which Lieutenant Thompson added the phrase "chess match" to what he and Sheriff Baca discussed on August 23rd?

A.    No.

Q.    When you testified in front of the grand jury back in 2014, did you ever tell the grand jury that Lieutenant Thompson and you had this additional meeting two days later in Heroes Park and he added the phrase "chess match" to what he said he discussed with Sheriff Baca on August 23, 2011?

A.    I don't believe so.

Q.   Now, you said that soon thereafter, after this August 23rd meeting, you received an order from Undersheriff Tanaka to change the policy dealing with the FBI, correct?

A.   I received my order from Lieutenant Thompson.

Q.   And Lieutenant Thompson received it from Undersheriff Tanaka, is that correct, to your knowledge?

A.   I believe so.

Q.   Well, isn't one of the things that Undersheriff Tanaka screamed at you during the August 23rd meeting is that he wanted to make sure that the FBI did not have access to Anthony Brown without his permission?

A.   Yes, he did scream that.

Q.   And that he wanted to actually have two OSJ deputies assigned to Anthony Brown 24/7?

A.   Yes.  He didn't scream it, but, yes, we talked about that.

Q.   And you understood that once it came out that Anthony Brown was an FBI informant, that Anthony Brown might have issues involving his physical safety amongst the other inmates that he was being housed with, correct?

A.   Correct.

Q.   And you've dealt, you said, with thousands of inmates over a seven-year time period and you understand that an informant for law enforcement can face retribution from other inmates, correct?

A.   Correct.

Q.   And you also understand that if an informant for the FBI has been providing information about deputies, that that informant's safety and security could be imperiled by the deputies that he would be snitching on; is that correct?

A.   Yes, that's correct.

Q.   So that Anthony Brown is then moved into different jails throughout Men's Central Jail; is that correct?  When I say "jail," jail cells throughout the Men's Central Jail; is that correct?

A.   Yes.

Q.   And you said that one of the jail cells was on the 8200 floor; is that correct?

A.   Yes.

Q.   That was the floor dealing with infectious diseases; is that right?

A.   Yes.

Q.   Now, Captain Carey chose that location amongst the three or so you showed him; is that right?

A.   Correct.

Q.   Did you put Anthony Brown in a cell with someone with an infectious disease?

A.   No.

Q.   What precautions did you take to make sure that Anthony Brown's health and safety would be okay in the cell that you chose on the 8200 level?

A.    He didn't have any other roommates as far as inmates next to him, it was in the corner, and we had the trustees clean the cell before we put him in there and get him new everything.

Q.    And you believed that you were abiding by Anthony Brown's Title 15 rights to have a healthy environment; isn't that correct?

A.    Yes.

Q.    And also Anthony Brown up there -- he had a medical condition, didn't Anthony Brown?

A.    Yes.  If I remember, it was something with his heart.

Q.    And there would be medical facilities available to Anthony Brown on the 8200 floor; isn't that correct?

A.    Correct.

Q.    And then with respect to the cell itself, did Lieutenant Thompson ever tell you that he had concerns that if he was left in a cell where inmates could put their arms through, that Anthony Brown could be in danger?

A.    I don't remember him saying that, but that's a reasonable assumption to me.

Q.    So one of the advantages of the cell on the 8200 level is that it actually had a -- more of a steel door than bars so no one could put their hands through to get to Anthony Brown on that level, correct?

A.    Correct.  It had a solid steel door.

Q.    And have you been involved with situations where an inmate

was in danger and had to have their name changed?

A.   I've never personally been involved, no.

Q.   Are you aware as part of your investigation and your experience in the jails that this has happened?

A.   Yes.

Q.   And when an inmate, you know, whose safety might be in danger because they would be an informant needs to have their name changed, it can be changed to an alias, correct, some name other than their own?

A.   Correct.

Q.   And that is something that gets done periodically for inmates who have been labeled informants in the system, correct?

A.   Correct.

Q.   And periodically, inmates who are informants and whose safety is in jeopardy, they need to actually get moved out of the Men's Central Jail if there could be a danger to them in the Men's Central Jail; is that correct?

A.   That's correct.

Q.   And in particular, Deputy Michel was a deputy in the Men's Central Jail; is that right?

A.   Correct.

Q.   And Deputy Bravo was a deputy in the Men's Central Jail; is that right?

A.   Correct.

Q.    And so if Deputy -- and to the extent that there was -- there was even, at that point in your investigation, unknown deputies that Anthony Brown might have had dealings with, correct?

A.    Correct.

Q.    Now I'll take you to the Heroes Park meeting on August 24th, if you recall that.

A.    Um-hmm.

Q.    And at that meeting, Lieutenant Thompson -- or, actually, was it you and Deputy Smith who gives the briefing to the people assembled?

A.    It was, yes.

Q.    And the idea was that these were the people who were going to -- you said there was about 15 or 20 people there; is that right?

A.    That's about right.

Q.    And these are the people who are going to guard Anthony Brown for the amount of days he would be in sheriff's department custody; is that correct?

A.    Correct.

Q.    Until further authorized; is that right?

A.    Correct.

Q.    And at that point, you are still looking into drug allegations involving Anthony Brown; is that right?

A.    We were just with Anthony Brown.  We weren't looking into

anything, myself.

Q.   Now, between the times of August 23rd and the time that Anthony Brown leaves sheriff's department custody on September 12, were you ever aware of the FBI requesting an interview with Anthony Brown?

A.   No.

Q.   You talked about an undercover operation that you were involved with as it pertained to Anthony Brown.

Do you recall that?

MR. FOX:   Objection.   Not his testimony and beyond the scope.

THE COURT:   Sustained.

BY MR. HOCHMAN:

Q.   Well, as part of your investigation, did you take additional steps to determine if Anthony Brown was telling the truth?

A.   It wasn't my investigation, but he was given a polygraph.

Q.   He was given a polygraph.

And what did the polygraph show as it pertained to -- when you say "polygraph," a polygraph is a lie detector test?

A.   Correct.

Q.   And he was given that lie detector test approximately the end of August of 2011?

A.   That's about right, yes.

Q.   And was Anthony Brown asked questions about whether or not

he had received cell phones from deputies?

A.    Yes.

Q.    And did he pass that part of the polygraph test?

A.    Yes.

Q.    And was Anthony Brown asked questions on whether or not he had received a cell phone from Deputy Michel?  I mean, excuse me, not cell phone -- excuse me -- that he had received narcotics from Deputy Michel.

A.    I believe he was, yes.

Q.    And is that the part of the polygraph that he did not pass?

A.    Yes.

Q.    And you found out about that in approximately the end of August of 2011?

A.    Yes.

Q.    And once you found out about that, didn't that create more questions for you as to who had brought Anthony Brown the narcotics if it wasn't Deputy Michel?

A.    It wasn't -- I was just in charge of transporting Brown. I was like his babysitter.  The investigation was Lieutenant Leavins.  That would have been his concern.

Q.    I see.  So Lieutenant Leavins, by the end of August, was leading the investigation?

A.    He took over on the 21st, roughly.

Q.    And did you participate in the investigation after the

21st?

A.   Only to take care of Anthony Brown and then anything that he would ask me to do.

Q.   Well, are you aware -- did you participate in any type of other situation to determine whether or not Anthony Brown was telling the truth, besides a lie detector test?

        MR. FOX:  Objection.  Vague.

        THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.   Were you involved with an operation -- an undercover operation that tried to have deputies go in undercover into Anthony Brown's cell?

A.   Yes.

Q.   And was that also at the end of August of 2011?

A.   Yes.

Q.   And you helped get the clothing actually that those undercover deputies were going to wear when they went into Anthony Brown's cell; is that correct?

A.   Correct.

Q.   And did the -- I will call that an undercover operation. Did that undercover operation result one way or the other in determining whether or not Anthony Brown was telling the truth, to your knowledge?

A.   To my knowledge, it didn't -- it was a waste of time.

Q.   Now, at some point, you said you got switched from OSJ,

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Operation Safe Jails, to work on an Internal Criminal Investigation Bureau task force, correct?

A.    Correct.

Q.    And I believe that we looked at an Exhibit 134 that had notes that you took that said the meeting -- the first meeting was on August 31st of 2011; is that correct?

A.    Yes.

Q.    Now, with respect to that meeting, you talk about something called a thousand man hours.

Do you recall that?

A.    I recall reading it, yes.

Q.    What is a thousand --

MR. HOCHMAN:  Actually, if we could put on Exhibit 134, Your Honor.

If I may ask Agent Marx to put that on the screen, please -- Agent Tanner, excuse me.  And if you could turn to -- thank you, and highlight that first section.

*(The exhibit was displayed on the screen.)*

BY MR. HOCHMAN:

Q.    We have Exhibit 134 on the screen and this is the briefing that you had on August 31, 2011, which is this task force, correct?

A.    Correct.

Q.    And how many people do you recall being at this initial briefing?

A.    A lot.

Q.    A rough number?

A.    Maybe 15 to 20, off the top of my head, I think --

Q.    15 to --

A.    -- or more.

Q.    15 to 20 at the initial briefing; is that right?

A.    Yeah, I don't remember.

Q.    And then it expanded over time, you said, the number of people involved --

A.    It kept --

Q.    -- with this?

A.    It kept -- as more things came up, it kept growing.  We'd add two -- a team of new sergeants and then it was -- it got to the point where it was ginormous.

Q.    When you say "ginormous," how many people is "ginormous"?

A.    I would say at its biggest, we probably had 10 to 15 two-team -- two teams of sergeants, if that makes any sense at all.

Q.    10 to 15, two teams of sergeants.  So that's somewhere between, what, 20 and 30 different sergeants?

A.    Plus six people from OSJ, I think -- five or six; two analysts -- three analysts; two or three other just focused on computer stuff.  It was -- well, the big room that used to be big got really crowded really fast.

Q.    I see.  So the numbers probably exceeded 40 within the

month?

A.    Yeah, it was growing pretty fast, yes, sir.

Q.    And so -- and then if I'm looking at these -- and this is the one -- the meeting that Sheriff Baca attends, this initial meeting where he is present when the task force is first assembled?

A.    Yes.

Q.    And this is the task force that Sheriff Baca asked to be assembled?

A.    I'm not sure if he did or not.

Q.    And this task force, then, it talks about a thousand man hours.

        Do you see that?

A.    Yes.

Q.    What does that mean?

A.    I have no idea.

Q.    And it's a reference to the federal grand jury investigation.

        Perhaps was a thousand man hours to deal with answering the various requests from the federal grand jury investigation?  Would that be a fair interpretation?

A.    That's fair.

Q.    And then you see the word "subpoenas."

        There is sort of a list of different subpoenas that follow below the word "subpoenas."

Do you see that?

A.    Yes.

Q.    And those were the different subpoenas that the sheriff's department had received at that point in time; is that correct?

A.    Correct.

Q.    And the task force's job was to help comply with those subpoenas, correct?

A.    I didn't understand it to be that.

Q.    What was the task force's job?

A.    We were --

        MR. FOX:  Objection, Your Honor.  This goes to a motion in limine.

        THE COURT:  Sustained.  We'll come back.

BY MR. HOCHMAN:

Q.    Well, what did you do in connection with the task force?

A.    For the task force, I was one of the guys that did the computer -- I would locate inmates for them.

Q.    What type of inmates?

A.    Any of them that were involved in the declaration the ACLU sent to us.

Q.    Okay.  And in locating inmates, would that be within the sheriff's custody facilities?

A.    It was nationwide.

Q.    I see.  Nationwide.

        So -- and these are situations dealing with certain

complaints of excessive force; is that correct?

A.   That's correct.

Q.   Now, at some point you said that Sergeant Craig played for you a video of an encounter he had with Leah Marx; is that correct?

A.   I don't know if it was Sergeant Craig, but I saw the video.

Q.   You saw the video.

And would you have seen the video in the sheriff's headquarters building in that basement area where you had moved?

A.   Yes.

Q.   And just so -- I meant to ask you about that a second ago.

When the task force was first set up, it wasn't set up in the -- were you in the sheriff's headquarters building at that point?

A.   At the very, very beginning?

Q.   Yes.

A.   No.

Q.   It actually moved to the sheriff's headquarters building; is that correct?

A.   That's correct.

Q.   It moved down to the basement?

A.   Correct.

Q.   And on the fourth floor is where Sheriff Baca was?

A.    Yes.

Q.    And then with respect to the video that you saw played, you saw -- the video had no audio at that point when you were watching it, correct?

A.    Correct.

Q.    Now, Undersheriff Tanaka -- I believe that you said that Undersheriff Tanaka was the one that Sheriff Baca put in overall control of the investigation; is that correct?

A.    Correct.

Q.    And then Lieutenant -- are you aware that Lieutenant Thompson and Undersheriff Tanaka were close personal friends?

A.    I knew they were friends, yes.

Q.    Were you aware that Lieutenant Leavins used to be Undersheriff Tanaka's aide?

A.    I did know that, yes.

Q.    And were you aware that Undersheriff Tanaka was not giving Sheriff Baca all the information about the investigation?

A.    I don't think I knew that.

Q.    Well, didn't Undersheriff Tanaka order you to keep certain things from Sheriff Baca, like the details of the investigation?

A.    It was more of the technical details, like the ITMS system and things like that.

Q.    So Undersheriff Tanaka told you to keep the ITMS and technical stuff away from Sheriff Baca; is that correct?

A.   That's how I understood it, yes.

Q.   And that's because of the gap between when the sheriff was an investigator and now?

A.   Just the technology moves so fast that that's why.  That's the way I understood it, anyways.

Q.   And Undersheriff Tanaka just wanted you to explain what he called the main stuff to Sheriff Baca; is that correct?

A.   Yes, that's fair.

          MR. HOCHMAN:  No further questions.

          THE COURT:  Redirect?

          MR. HOCHMAN:  And thank you, Agent Tanner.

          MR. FOX:  May I proceed, Your Honor?

          THE COURT:  Yes.

                    REDIRECT EXAMINATION

BY MR. FOX:

Q.   Mr. Manzo, let's start right there with what Mr. Hochman was asking you about.  He asked you questions about whether Undersheriff Tanaka was having you keep anything from Mr. Baca.

          Did Mr. Tanaka ever instruct you or anyone else when you were around to keep facts from Mr. Baca?

A.   No.

Q.   Did he instruct you or anyone else when you were around to keep any substance of what was going on from Mr. Baca?

          MR. HOCHMAN:  Objection.  Leading.

          THE COURT:  Well, you can answer that question.

THE WITNESS:  Can you ask me again, please?  I'm sorry.

BY MR. FOX:

Q.   Sure.  Did Mr. Tanaka ask you or anyone else when you were around to keep any substance from Mr. Baca?

MR. HOCHMAN:  Objection.  Leading.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  No.

BY MR. FOX:

Q.   Mr. Hochman asked you a number of questions about your conviction and your sentence.

Do you recall those questions?

A.   Yes.

Q.   And he mentioned that the government recommended something lower than the statutory maximum for you after you were convicted by a jury.

Do you recall that?

A.   I do, yes.

Q.   Are you familiar with something called the Sentencing Guidelines?

A.   I've heard the term, yes.

Q.   Okay.  What are they?

A.   Depending on the crime, you are assigned a number, basically, and whatever the numbers of your crimes come to --

add up to is where you will find your sentence on a chart, I assume, somewhere.

Q.   And does that take into account your offense and your criminal history?

A.   It does.

Q.   Do you recall whether your sentencing guidelines were far less than your statutory maximum?

A.   I don't remember.

Q.   Do you recall whether -- well, Mr. Hochman asked you questions about any benefits that you have received.

When you were sentenced after your jury trial, did the government ask for you to receive any benefits based on any cooperation you had provided at that point?

A.   No.

Q.   Had you provided any cooperation at that point?

A.   No.

Q.   Approximately when did you testify before the grand jury?

A.   Oh, man.  Was that -- December of '15, I think.

Q.   And when was this in relation to your conviction?

A.   A year and a half later.

Q.   Before you testified before the grand jury, did you meet with the government?

A.   No.

Q.   Before you walked in to the grand jury, were you provided by the government with any of the documents that the government

attorneys were going to show you in the grand jury?

A.    No.

Q.    Before you testified in the grand jury, did the government provide you with the questions that it was going to ask you in the grand jury?

A.    No.

Q.    Did any grand jury member provide you with any questions that they were going to ask you in the grand jury?

A.    No.

Q.    During your testimony today, have you told the truth or have you lied?

A.    Told the truth.

Q.    Is that both to my questions and Mr. Hochman's questions?

A.    Yes.

Q.    Did Mr. Hochman provide you with any of the questions he was going to ask you before you testified today?

A.    No, he did not.

Q.    Did Mr. Hochman provide you with any documents that he was going to show you before you testified today?

A.    No.

Q.    Now, when you testified before the grand jury, were you expecting to receive any benefits for that testimony?

A.    No.

Q.    Why not?

A.    We were still -- I hadn't been approached to help and we

were still fighting our case as far as our appeal was concerned.

Q.    When you testified in the grand jury, did you discuss the August 19th and August 20th meetings that you told this jury about with respect to Mr. Baca?

A.    Did I discuss them?  I did, yes.

Q.    Did you testify in the grand jury about the August 23rd meeting that you had with Mr. Tanaka in the grand jury?

A.    Yes.

Q.    Did you testify about Mr. Tanaka's directions to Mr. Thompson and what to do with the sheriff at the August 23rd meeting when you testified before the grand jury?

A.    Yes.

Q.    Mr. Hochman asked you questions about the possibility of a cell phone plotting an escape, putting a hit out on witnesses, and the contraband that can be brought in based on cell phones.

        Do you recall those questions?

A.    I do, yes.

Q.    Could those things happen on the ITMS system, as well?

A.    Yes.

Q.    And how long were the ITMS calls preserved?

A.    If I remember correctly, it was 90 days, and I believe you could actually go to the ITMS where -- I think it was by homicide in Commerce and pull up later days.  I've never done it, though.

Q.    And are you familiar with whether inmates talk in code
ever?

A.    Absolutely.

Q.    Do they do that on the ITMS system?

A.    Yes.

Q.    And what does that mean if you're trying to figure out
what it is that they're talking about on the phone?

A.    You have to decipher the code.

Q.    Is that always possible to do?

A.    No.

Q.    I think you discussed how inmates could use calling cards,
is that right, to access the ITMS system?

A.    They have a -- if I remember, it's a calling card and a
PIN number.

Q.    Do you know whether inmates, based on your experience in
the Men's Central Jail, whether inmates shared calling cards
and the PIN numbers?

A.    They did, yes.

Q.    And what did that mean for when you were trying to go back
and determine who was in contact with people on the outside?

A.    It made it more difficult.

Q.    Mr. Hochman discussed the immunity that you received for
your testimony in the grand jury and at previous -- a previous
proceeding in April of last year.

        Had you already been prosecuted for the conduct that

you testified about?

          MR. HOCHMAN:  Objection.  Asked and answered.

          THE COURT:  Overruled.

          You can answer.

          THE WITNESS:  I'm sorry.  One more time.

BY MR. FOX:

Q.    Had you already been prosecuted for the conduct that you
testified about when you received immunity?

A.    When I testified in the grand jury?

Q.    Yes, and at the proceeding in April of last year.

A.    Yes.

Q.    And did that immunity that you received do anything to
overturn your conviction?

A.    No.

Q.    Mr. Hochman before the break asked you to review the
entire transcript of your August 19th interview of Anthony
Brown.

          Do you recall that?

A.    I do.

Q.    I don't recall him then asking you the follow-up question.

          MR. HOCHMAN:  Objection.  Argumentative.

          MR. FOX:  Your Honor, I'll withdraw.

BY MR. FOX:

Q.    Mr. Manzo, did you, in fact, review this transcript?

A.    I skimmed it as best I could.

Q.   And did you have an opportunity to see whether Mr. Brown told you that -- about beatings that were going on in Men's Central Jail?

A.   There were inferences that I -- when I was skimming.

Q.   And since you were only able to skim, can I direct you to certain pages to see if it would refresh your recollection.

A.   Yes.

Q.   So we're looking at Defense Exhibit 535.

     Looking at the bottom of page 72, first of all, do you see the last paragraph of page 72?

A.   Yes.

Q.   Just read that to yourself and let me know if that refreshes your recollection as to whether Mr. Brown discussed the beatings in Men's Central Jail with you.

A.   Okay.

Q.   Does that refresh your recollection?

A.   It does.

Q.   And did he discuss that with you?

A.   Yes.

Q.   Now, if I can direct your attention to page 65, middle to the bottom, and then the top of page 66.

A.   (Witness reading.)

Q.   You mentioned before inferences as you were refreshing your recollection earlier.

     Was this one of the inferences that you were

mentioning?

A.    Yes.

Q.    What specifically was it?  What did you infer from that portion that you read?

A.    Even though Deputy Smith and Brown are talking in kind of innuendos and cliche, it's apparent they're talking about an investigation.

Q.    And we heard in the clip yesterday the reference to Twin Towers and the feds being everywhere.

      At that point in time, were you aware whether the FBI had been interviewing inmates in Men's Central Jail and Twin Towers?

A.    I don't remember.

Q.    Why is it that you understood that the civil rights -- why is it that you understood as of August 19th that the FBI was conducting a civil rights investigation of the sheriff's department after you interviewed Anthony Brown?

A.    Well, we had the phone that he was using and then the phone -- the number from his cell where he was calling the civil rights division, his inferences in the interview.  The civil rights division of the FBI investigates civil rights violations.

Q.    Mr. Hochman asked you whether it was routine to change inmates' names who were cooperating.

      Let me actually grab the calendars.

I'm displaying the August of 2011 calendar.

When was it that you understood Anthony Brown was an FBI informant?

A.    The 19th.

Q.    Was Mr. Brown's name changed on August 19th?

A.    No.

Q.    Mr. Hochman asked you questions about whether Mr. Brown provided graphic details of the beatings on August 20th -- 21st, excuse me.

Do you recall that?

A.    Yes.

Q.    Was Mr. Brown's name changed by the sheriff's department on August 21st?

A.    No.

Q.    Mr. Hoffman asked you whether it was usual for inmates who were cooperating to be moved, as well.

Do you recall those questions?

A.    Yes.

MR. HOCHMAN:  Objection.  Misstates the question.

THE COURT:  Overruled.

BY MR. FOX:

Q.    Do you recall those questions?

A.    Yes.

Q.    And was Anthony Brown moved out of Men's Central Jail on August 19th?

A.   No.

Q.   Was he moved from 1750 on August 19th?

A.   No.

Q.   Was he moved from 1750 on August 21st?

A.   No.

Q.   What happened that caused Mr. Brown to be moved from 1750 to 8200?

A.   He was interviewed by the FBI.

Q.   Mr. Hochman asked you questions about inmates shanking other inmates who might be cooperating.  I believe it was questions related to that.

Can you please describe 1751 G, where Mr. Brown was being housed until August 23rd, for the jury.

A.   It's a single-man cell with a solid sheet of metal over it with holes drilled in it.  It's got a tray slot, the actual -- that comes toward the deputy that you enter -- anything that you put in goes toward you, so nobody -- he can't reach under. It's as secure as you can get.

Q.   And when we discussed earlier the questions that Mr. Hochman was asking you about the graphic detail that Mr. Brown was providing, on August 21st, I believe he asked you about whether that was the date that Mr. Brown told you that Gilbert Michel and Deputy Bravo were deputies who Mr. Brown was reporting on.

That's this date, right (indicating)?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

A.    Correct.

MR. FOX:  One moment, Your Honor.

No further questions.

THE COURT:  Anything else?

MR. HOCHMAN:  Yes, Your Honor.

RECROSS-EXAMINATION

BY MR. HOCHMAN:

Q.    Mr. Manzo, you testified that your grand jury appearance was on December 2015; is that right?

A.    I'm guessing.  It was a guess.  I don't really -- I know -- that's about right.

Q.    You said about a year and a half after?

A.    About, maybe.

Q.    And a year and a half after your conviction; is that correct?

A.    Yes.

Q.    So your conviction was in roughly the summer of 2014?

A.    I think it was July, yes.

Q.    So a year and a half later would take you to pretty much the end of 2015; isn't that correct?

A.    Yes.

Q.    Isn't it true that you testified in front of the grand jury on November 19, 2014, about a year before you just indicated you testified in front of the grand jury?

A.    Okay.  If that's what you say.  I don't know the date,

but --

Q.   Does that sound approximately accurate?

A.   Yeah, if that's what it was.  If you're saying that, then yes.

Q.   Don't take my word for it.  Would it refresh your recollection to see a copy of your grand jury transcript?

A.   Sure.  Yes.

MR. HOCHMAN:  May I present to the court clerk, Your Honor, Defense Exhibit 669?

THE COURT:  That's fine.

MR. HOCHMAN:  Your Honor, I believe the parties will stipulate that Mr. Manzo testified in front of the grand jury on November 19, 2014.

THE COURT:  All right.

BY MR. HOCHMAN:

Q.   Now, the only times that you've met with the government were in advance of your testimony against Sheriff Baca, correct?

A.   Correct.

Q.   And you said you met two times in connection with your testimony against Sheriff Baca; is that right?

MR. FOX:  Objection, Your Honor.  This is one we need a sidebar for, please.

MR. HOCHMAN:  Your Honor, I'll withdraw the question.

THE COURT:  All right.

BY MR. HOCHMAN:

Q.   Well, in the times that you met with the government dealing with your testimony today against Sheriff Baca, it's at those points that the government told you the questions that they wanted to ask you during your testimony, correct?

A.   Correct.

Q.   And it's at those times when you're going to testify against Sheriff Baca that the government presented you with the documents it was going to ask you about when you testified, correct?

A.   Correct.

Q.   Because when you were testifying -- I'll leave it at that.

Now, when you testified in front of the grand jury, Mr. Fox asked you if you talked about the August 19th and 20th meetings, correct?

A.   Correct.

Q.   And whether or not you talked about the August 23rd meeting, as well?

A.   Correct.

Q.   And at no point during your entire grand jury testimony do you bring up the notion that Sheriff Baca told Lieutenant Thompson anything about a chess match, correct?

A.   That's correct.

Q.   Mr. Fox asked you questions about the difference between a cell phone and the ITMS system.

Do you recall that?

A.   Yes.

Q.   And he asked you whether or not on the ITMS system people -- inmates could also plot escapes, put hits on witnesses, and engage in bringing drugs or crime -- drugs or guns into the jails.

Do you recall that?

A.   I do.

Q.   Now, when someone makes a call, though, on the ITMS system, as we heard in Exhibit 195, it tells both parties, both the inmate making the call and the person receiving the call, that the call is about to be recorded, correct?

A.   Correct.

Q.   And a cell phone doesn't have that type of announcement at the beginning that the call is about to be recorded, correct?

A.   Correct.

Q.   And the ITMS system will then record the actual phone call, correct?

A.   Yes.

Q.   But a cell phone is not going to record the conversation, correct?

A.   Correct.

Q.   And the sheriffs can later obtain the recordings from those conversations, correct, on the ITMS system?

A.   Correct.

Q.   But the sheriffs couldn't obtain the recording on a cell phone because no recordings were made, correct?

A.   Correct.

Q.   And also the phone numbers, you can also get the phone numbers that are called off the ITMS system linked to a particular public jail cell phone that was used, correct, a public phone that was used in a cell?

A.   Yes.

Q.   And you can actually figure out which public phone pertains to which inmate, depending on when the inmate was in a particular cell, correct?

A.   Correct.

Q.   But you can't do that with a cell phone; is that right?

A.   That is correct.

Q.   And that's why a cell phone is particularly dangerous in a secured facility, correct?

A.   Correct.

Q.   Now, when Mr. Fox asked you about that August 19th meeting that you had with Anthony Brown, he pointed you to one word, the word "deputy," that was in one part of the transcript that you refreshed your recollection with.

Do you recall that?

A.   Okay.  Yes.

Q.   And other than that one reference to the word "deputies," do you recall any other reference during that entire August

19th meeting, that two-hour meeting, where Anthony Brown used the word "deputies"?

MR. FOX:  "Deputies"?

MR. HOCHMAN:  "Deputies."  I'm -- did I say "deputies"?  Excuse me.  Where he used the word "beatings."  I got the -- actually the wrong word.  Let me back up, if I could.

BY MR. HOCHMAN:

Q.   Mr. Fox asked you about whether or not you had heard the word "beatings" during the August 19th phone call, correct?

A.   Correct.

Q.   And you identified one time in two hours where you heard the word "beatings," correct?

A.   Yes, that's correct.

Q.   And that was the only time in a two-hour meeting with Anthony Brown that he used the word "beatings," correct, to the best of your knowledge?

A.   To the best of my knowledge, yes.

Q.   Yet, in all the meetings you had afterwards from August 21st thereon, he used the word "beatings" quite often, correct?

A.   That's fair.  Correct.

Q.   And provided a lot of graphic description of those beatings, correct?

A.   Yes.

Q.   You said with respect to your information about linking

the cell phone to a civil rights investigation, that you had the information that it came back to the civil rights squad at the FBI office, correct?

A.    Correct.

Q.    And that -- we talked before about the difference between a civil rights investigation and a public corruption investigation, correct?

A.    Correct.

Q.    And the investigation that you were doing on August 19th, where you were looking at a deputy or deputies involved with bribes and smuggling in either cell phones or narcotics, that's a public corruption investigation, correct?

            THE COURT:  Beyond the scope and that's been asked and answered.  Next question.

            MR. HOCHMAN:  No further questions, Your Honor.

            MR. FOX:  Your Honor, I just have a few.

                    FURTHER RECROSS-EXAMINATION

BY MR. FOX:

Q.    Mr. Manzo, Mr. Hochman asked you about the number of interviews that you were a part of with respect to Anthony Brown in which he detailed beatings that you were a part of.

A.    Okay.

Q.    Did one of those occur on August 21st?

A.    Yes.

Q.    And then was the other one on August 23rd?

A.   Yes.

Q.   Were you a part of any other interview of Anthony Brown in which he detailed beatings after August 23rd for the sheriff's department?

A.   I'm not sure.

Q.   Okay.  So you don't recall any after August 23rd?

A.   No.

Q.   And Mr. Brown remained in sheriff's department custody well after August 23rd?

A.   Yes.

Q.   Mr. Hochman asked you questions about meeting with the government before your testimony here today.

     Is the substance of your testimony based on what you said in the grand jury?

A.   Yes.

Q.   Mr. Hochman asked you questions about the ITMS system and linking each phone to a particular cell.

     Do you recall those questions?

A.   Yes.

Q.   Are there dorms where multiple inmates are in a cell?

A.   Yes.

Q.   And are you able to link the calls there to a particular inmate?

A.   You can.  It takes time.

Q.   Okay.  One particular call?

A.    You'd have to get lucky.

Q.    Okay.  And was there something with pro per inmates, as well, having access to phones?

A.    Yes.

Q.    Okay.  What are pro per inmates?

        MR. HOCHMAN:  Objection.  Beyond the scope of recross.

        MR. FOX:  Your Honor, I can lay more foundation here to the extent that it will --

        THE COURT:  All right.

BY MR. FOX:

Q.    Was Anthony Brown a pro per inmate?

A.    Yes.

Q.    And because of that, did he have access to additional phones other than the one that was in his cell?

        MR. HOCHMAN:  Objection.  Calls for speculation. Lack of foundation.

        MR. FOX:  I can provide that, Your Honor, I believe.

        THE COURT:  All right.

BY MR. FOX:

Q.    Do you know whether Anthony Brown had access to other phones because he was a pro per inmate?

A.    Yes.

Q.    Can you please explain?

A.    Pro per -- what a pro per is or how he had access?

Q.   Why don't you do both, please.

A.   A pro per inmate is one who is choosing to represent himself in court.  He will be allowed certain privileges because he is now a de facto lawyer for himself, and he is entitled to go to what we used to call the law library at Men's Central Jail.

In the library, he's got a computer that is almost like a legal computer, and he also has access to a phone to contact his -- they used to call them runners, like a legal adviser.

MR. FOX:  Nothing further, Your Honor.

MR. HOCHMAN:  Very briefly, Your Honor.

FURTHER RECROSS-EXAMINATION

BY MR. HOCHMAN:

Q.   Mr. Manzo, I was just a bit confused.  Mr. Fox asked you whether or not you recalled, after -- being part of any interview with Anthony Brown after August 23rd and your answer was "no."

And what I want to clarify, does that mean, no, that you didn't recall being part of any interview after August 23rd, or, no, you actually do recall whether or not you were part of it and, in fact, you were not part of it?  Which -- what did your answer "no" mean?

A.   I meant I don't remember.  I don't remember to the beatings question.  He asked me if he brought up beatings after

the 23rd.  I don't remember if that was mentioned.

Q.   Okay.  I think actually his question was whether or not you were part of any interview at all with Anthony Brown after August 23rd, whether you recalled that, and your answer was "no."

And, again, I'm just trying to understand if it's "no" because you don't recall it at all or "no" because you do recall it and you weren't part of any interview after August 23rd?

MR. FOX:  Objection to the form of the question, Your Honor.

THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.   What did your answer "no" mean to Mr. Fox's question?

A.   I took him -- I don't -- I guess I would have to know what you mean by "involved in," because I used to take him there, to wherever he wanted to go, wherever he was being interviewed. Sometimes I'd drive him to Temple, and I would sit there.

Q.   Were you actually present during the interview after August 23rd with Anthony Brown, to your recollection?

A.   I believe I was, yes.

Q.   And which interview was that?

A.   This was -- we did one or two at San Dimas Station.

Q.   And any others?

A.   I'm trying to remember.  That's all I can recall right

now.

MR. HOCHMAN:  No further questions, Your Honor.

MR. FOX:  Nothing, Your Honor.

THE COURT:  Was this the first time that a cell phone had been recovered in the Men's Central Jail in possession of an inmate?

THE WITNESS:  No.  No, Your Honor.

THE COURT:  Okay.  Thank you.

MR. HOCHMAN:  May I ask a follow-up to that question, Your Honor?

THE COURT:  No, sir.  Thank you.

Call your next witness.

MR. FOX:  Your Honor, as we call our next witness, we need a three- or four-minute recess so we can take care of some business with the Court.

THE COURT:  All right.  Ladies and gentlemen, we're going to take our final break of the day.

Again, I want to remind you, until this trial is over, you're not to discuss this case with anyone, including your fellow jurors, members of your family, people involved in the trial, or anyone else, nor are you permitted to allow others to discuss the case with you.

If anybody approaches you and tries to talk with you about this case, please let me know about it immediately.

Do not read or listen to any news reports or other

accounts about the trial.

Finally, you are reminded to keep an open mind until all of the evidence has been received, you've heard the arguments of counsel, the instructions of the Court, and the views of your fellow jurors.  If you need to speak with me, simply give a note to the clerk.

All right.  We'll come back at 35 after the hour.

THE CLERK:  All rise.

*(Jury out at 11:20 A.M.)*

*(The following was heard outside the presence of the jury.)*

MR. FOX:  Your Honor, our next witness is Greg Thompson.  He is somebody who we need to provide with an order of immunity.  We are applying for an order of immunity for Mr. Thompson for his testimony, and so he needs to be admonished before his testimony that he is compelled to testify, I believe.  I think it's worth bringing him in and seeing if he needs any orders from the Court.

THE COURT:  All right.  Does he have a lawyer?

MR. FOX:  He does.

Should we bring him in right now?

THE COURT:  That's fine.

MS. RHODES:  And, Your Honor, with the Court's permission, I will approach the court clerk --

THE COURT:  Okay.

MS. RHODES:  -- with the ex parte application and the proposed order.

THE COURT:  Mr. Thompson, I understand your lawyer is here with you.

THE WITNESS:  Yes, sir; that's correct.

THE COURT:  I've been provided with an ex parte application for an order compelling the testimony of Mr. Thompson.  I've not a chance to look at it but I'm going to do that now.

Assuming that I sign this order granting immunity for his testimony, is there going to be any further issues about Mr. Thompson testifying?

ATTORNEY:  No, sir.

THE COURT:  Anything additional?

MR. FOX:  No, Your Honor.

THE COURT:  All right.  I'll take a look at this over the break and we're going to come back at 35 after the hour or thereabouts.

MR. FOX:  Would you like Mr. Thompson in the courtroom when you come back?

THE COURT:  Yeah, if you could, please.

THE WITNESS:  Yes, sir.

*(Recess taken 11:23 to 11:38 A.M.)*

*(The following was heard outside the presence of the jury.)*

THE CLERK:  All rise.

MR. HOCHMAN:  I think Mr. Baca stepped out briefly. If I could go get him.

THE COURT:  That's fine.

All right.  I have reviewed the government's ex parte application for an order compelling the testimony of Mr. Thompson and I have signed the proposed order.  I'm going to ask the clerk to file it.

Now, before we have the jury come in, do we need to have another sidebar to discuss this theory about people having -- people being able to plead guilty after they have been convicted at trial?

MR. HOCHMAN:  No, Your Honor.  The only time that this will come up is, as I mentioned, with Captain Carey, who actually hasn't been sentenced at this point, Your Honor.

THE COURT:  Well, you make sure we talk about that before this comes up.

MR. HOCHMAN:  Certainly, Your Honor.

THE COURT:  Okay.  Let's bring the jury in.

By the way, there is to be no food, beverages of any kind brought into this courtroom.  So if you have any, whether they're opened or not, you need to take them outside.

(Jury in at 11:42 A.M.)

THE COURT:  All right.  Call your next witness, please.

MS. RHODES:  United States calls Greg Thompson.

THE CLERK:  Please raise your right hand.

Do you solemnly swear that the testimony you shall give in the cause now before this Court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  Yes, ma'am.

THE CLERK:  Please be seated.

Please state your full name and spell your last name for the record.

THE WITNESS:  Gregory Lee Thompson, T-H-O-M-P-S-O-N.

MS. RHODES:  May I proceed, Your Honor?

THE COURT:  Yes, please.

GREGORY LEE THOMPSON,

having been first duly sworn,

testified as follows:

DIRECT EXAMINATION

BY MS. RHODES:

Q.   Mr. Thompson, in 2011, what did you do for a living?

A.   I was employed by the Los Angeles County Sheriff's Department.

Q.   As what?

A.   At that time, I was a lieutenant.

Q.   And were you a lieutenant over a certain unit or units?

A.   Yes, ma'am, I was.

Q.   What?

A.    Custody Investigative Services Unit.

Q.    And what did that -- did that include the OSJ?

A.    That's the initials for Operation Safe Jails, yes, ma'am.

Q.    And you were the unit commander over OSJ?

A.    Yes, ma'am.

Q.    By that time, that is, 2011, how long had you been employed by the sheriff's department?

A.    At least -- close to 30 years, ma'am, or more.

Q.    And when did you leave the sheriff's department?

A.    2013.

Q.    How old are you now?

A.    Fifty-seven.

Q.    And after you left the sheriff's department in 2013 -- what -- do you remember the month?

A.    I think it was September, ma'am, was the official date.

Q.    After you left the sheriff's department, were you charged with two felonies?

A.    By the U.S. government, yes, ma'am.

Q.    And were you later convicted by a jury of those felonies?

A.    Yes, ma'am.

Q.    What were they?

A.    I think obstruction and conspiracy.

Q.    Conspiracy to -- was it to obstruct justice?

A.    That's probably it, yes, ma'am.

Q.    And did the events supporting your conviction include the

hiding of Anthony Brown?

A.    I'm not sure of the question, ma'am.  I'm sorry.

Q.    Was there testimony at your trial regarding the hiding of Anthony Brown?

A.    Oh, yes, ma'am, there was.

Q.    Are you testifying here today voluntarily?

A.    I received a subpoena.

Q.    And in addition to receiving a subpoena, did you -- is there another order pursuant to which you are testifying?

A.    An order, ma'am?  I know the judge authorized something and it was some kind of order.

Q.    Have you been granted some immunity for testifying here today?

A.    Oh, I believe so, yes, ma'am.

Q.    And what do you understand that to mean?

A.    I can't be charged with any other crimes, but I'm supposed to tell the truth because perjury is not included in that.

Q.    Okay.  Does that immunity in any way affect your conviction?

A.    I don't think so, ma'am.

Q.    And are you receiving any benefits for your testimony here today?

A.    Not that I know of, ma'am.

Q.    Did the government meet and prepare you for your testimony?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

A.    No, ma'am.

Q.    Taking you back to August 2011, did OSJ also include Deputies Mickey Manzo and James Sexton, among others?

A.    Yes, ma'am.

Q.    In August 2011, did you learn that a cell phone had been found in Men's Central Jail?

A.    Yes, ma'am.

Q.    And did you later learn that Mr. Brown had been calling an FBI civil rights investigator on the inmate telephone monitoring system or ITMS?

A.    There might be some clarification I can provide you on that, because that's not entirely correct.

Q.    Did you receive an e-mail --

MS. RHODES:  And may I have Exhibit --

THE CLERK:  May I explain, ma'am?

BY MS. RHODES:

Q.    Well, let me just -- did you learn that Anthony Brown had been in touch with the civil rights unit of the FBI?

A.    Yes, ma'am.

Q.    Okay.  And when did you learn that?

A.    I'd have to look at a calendar for the exact date, but it was in August.

MS. RHODES:  Your Honor, with the Court's permission, may I put the calendar up?

THE COURT:  Yes.

BY MS. RHODES:

Q.   When did you learn that?

A.   I believe it was August 18th, ma'am.

Q.   And who told you that?

A.   I think it was Noah Kirk.

Q.   Did you brief anyone up your chain-of-command about the fact that a cell phone had been connected to the -- cell phone found on an inmate had been connected to the FBI?

A.   Yes, ma'am.  On that same date, I specifically remember briefing my commander, Eric Parra, and Chief Dennis Burns.

Q.   And those were in your direct chain-of-command --

A.   Yes, ma'am.

Q.   -- those two individuals?

Where were you when you briefed them?

A.   I believe on the eighth floor of Twin Towers in either one of their offices.

Q.   What is Twin Towers?

A.   It's a correc- -- it's a custody facility, ma'am.  I'm sorry.

Q.   Is that different than sheriff's headquarters?

A.   Yes, ma'am.

Q.   And is Twin Towers in a different city than sheriff's headquarters?

A.   I believe so, ma'am.

Q.   What city is sheriff's -- was sheriff's headquarters in in

2011?

A.   At that time, it was in Monterey Park, I believe.

Q.   And where is Twin Towers?

A.   City of Los Angeles.

Q.   Now, when you briefed them, did you make a recommendation to them?

A.   Yes, ma'am.

Q.   What was that recommendation?

A.   Put Mr. Brown on a bus and ship him to state prison, because he was eligible, and contain him in MCJ's High Power, 1700.

Q.   Did you get permission to do that?

A.   Yes, ma'am.

Q.   I'd like you to turn -- you should have binders in front of you or -- Exhibit 14, is that in front of you?

A.   Ma'am, I have files here.  Yes, that would be the top file.

Q.   Could you look at it, please?

A.   Yes, ma'am.

Q.   Do you recognize it?

A.   Yes, ma'am, I do.

Q.   What is it?

A.   I believe it's an e-mail that I sent to Detective Bayes.

Q.   And is that a true and correct copy of what you sent?

A.   As far as I can remember, yes, ma'am.

MS. RHODES:  Your Honor, at this point, I move to admit Exhibit 14.

THE COURT:  Any objection?

MR. HOCHMAN:  No objection, Your Honor.

THE COURT:  All right.  It will be received.

*(Government's Exhibit 14 admitted into evidence.)*

MS. RHODES:  And if I could have it published, please.

*(The exhibit was displayed on the screen.)*

MS. RHODES:  And if I could have the top part.  Thank you.

BY MS. RHODES:

Q.   Mr. Thompson, can you either see that on your computer screen or the document in front of you?

A.   Both of them, ma'am.

Q.   Okay.  Would you please read the "From" line, the "Sent" time, the "To" line?

A.   Yes, ma'am.

"From:  Thompson, Gregory L.; Sent:  Thursday, August 18, 2011, 1:31 p.m., To:  Bayes, Roberto E."

Q.   And is that Mr. Bayes that you had referred to previously?

A.   Yes, ma'am.

Q.   Could you now please read the content of the e-mail, starting with "Bob."

A.   "Bob.  I had to change plans.  Anthony Brown will be

shipped to CDC on the next available bus.  Until then he is in 1750 and no phones, no visits, especially from outside LE, without my approval."

Q.    Okay.  I'd like to talk to you briefly about this e-mail.

What is "CDC"?

A.    California Department of Corrections.

Q.    So is that the same as state?  You previously said you wanted to have him shipped to state, I think.

A.    Oh, I thought I said state prison, ma'am.  I'm sorry.

Q.    Okay.  Is "CDC" state prison?

A.    CDC is the overall -- it's Department of Corrections. State prison is obviously a facility run by CDC.

Q.    Okay.  Until then, he is 1750.

What is 1750 -- or what was 1750 in 2011?

A.    It was called High Power.  It was where high-security inmates were housed.

Q.    And so was it a secure portion of the jail?

A.    Well, technically the jail is supposed to be secure all over, ma'am, but it's more secure than other -- other modules inside the jail.

Q.    And then near the end, it says, "No visits, especially from outside LE...."

What is "LE" in that sentence?

A.    Law enforcement, ma'am.

Q.    Now, why is it that you recommended to Mr. Burns and that

you wanted to have Mr. Brown go to state prison?

A.   I'm drawing a blank, ma'am.  I'm --

Q.   Would it --

A.   Do you have anything else that would refresh my memory?

MS. RHODES:  Your Honor, with the Court's permission, I would like to mark as Exhibit 229 and show it to the witness.

THE COURT:  All right.

*(Government's Exhibit 229 marked for identification.)*

MS. RHODES:  And if I can approach the court clerk for both the Court's copy and the witness's copy.

THE COURT:  That's fine.

BY MS. RHODES:

Q.   Mr. Thompson, do you have Exhibit 229 in front of you?

A.   Yes, ma'am, I do.

Q.   Could you please turn to page 23?

A.   Okay to remove the rubber band and open it up?

Q.   And, Mr. Thompson, before you do that, I'm sorry, what is this, Exhibit 229?

A.   Can I look at the cover again, ma'am?

Q.   Is it a transcript?

A.   Yes, ma'am, it is.

Q.   Is it a transcript of your testimony in front of a federal grand jury?

A.   I wouldn't know without reading the whole thing, ma'am, but I'll assume it is if you gave it to me.

Q.   And can you look at the first page, the third line down?

A.   First page, third line down, is Los Angeles County -- or Los Angeles, California.  Third line down is blank, ma'am, or am I reading -- page 2?

Q.   What does it say at the very top?

A.   I'm sorry, ma'am.  That was page 1.  I apologize.

Q.   What does it say at the very top?

A.   "Federal Grand Jury."

Q.   And is there a date on this?

A.   Yes, ma'am.  It looks like Wednesday, December 17, 2014.

Q.   Okay.  Now, if you could turn to page 23, please.

A.   Yes, ma'am.

Q.   Starting at line 19.

A.   To how far, ma'am?

Q.   To 24/20 and see if that refreshes your recollection.

A.   To lines --

Q.   To page 24, line 20.

A.   Thank you, ma'am.

     Okay, ma'am.  I'm sorry.

Q.   So does that refresh your recollection as to why you wanted to send him to state prison on the next bus?

A.   A little bit, yes, ma'am.

Q.   Why?

A.   Why --

Q.   Why did you want to send him to state prison on the next

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

bus?

A.   I'm sorry, ma'am.  There was some information that came in that was -- in here it says daunting, but basically there was information that a nurse had smuggled him the phone and maybe some narcotics or some other contraband, and then there was a phone call that -- the information Mr. -- I'm sorry -- that Deputy Kirk relayed to me about a female caller to Mr. Brown on one of his telephone conversations that said he was going to receive a phone.

Q.   But why did you want to send him to state prison on the next bus?

A.   Oh, I'm sorry, ma'am.  I figured it was the safest place he could be.

Q.   And if Mr. Brown were in state prison, would he be outside of sheriff's custody?

A.   Yes, ma'am, he would be.

Q.   And would that mean that anyone from the sheriff's department who sought to do something bad could not get to him?

        MR. HOCHMAN:  Objection.  Leading.

        THE COURT:  You can answer.

        THE WITNESS:  Yes, ma'am.

BY MS. RHODES:

Q.   Was Mr. Brown shipped -- this e-mail, Exhibit 14, is dated August 18th, correct?

A.   Yes, ma'am.

Q. Was Mr. Brown shipped out on the next available bus to state custody?

A. No, ma'am.

Q. Why not?

A. I was ordered not to send him.

Q. Where were you when you were given these orders?

A. Sheriff's headquarters.

Q. Do you specifically know where in sheriff's headquarters?

A. Fourth floor, I think, one of the -- excuse me. I'm at a loss for words, but one of the larger meeting rooms. I'm sorry.

Q. Okay. Who else was present?

A. On the 19th?

Q. When you were given the order.

A. Oh, take me a few seconds here. Let's see. There was Sheriff Baca; Assistant Sheriff Tanaka; Captain James Ritenour; I believe his aide, Sergeant -- or Lieutenant Grubb; Captain Carey; Lieutenant Peacock; Lieutenant Liam Gallagher; Deputy Manzo; Deputy Smith; and Mr. Gennaco and Mr. Yoshinaga; and Lieutenant Chris Nee was going in and out of the room at different times.

Q. And what date was that meeting on?

A. I believe it was on the 19th of August, ma'am.

Q. Who ran that meeting?

A. Sheriff Baca.

Q.    And you said you were given an order.  Who gave the order?

A.    Sheriff Baca.

Q.    What was the order?

A.    I briefed him about what my plans were, to have Mr. Brown shipped out, and he said, "No, don't do that."

Q.    And do you recall how Mr. Baca gave the order in terms of his tone?

A.    When he gave that order, ma'am?

Q.    Yes.

A.    It was stern.

Q.    And what did you take from Mr. Baca's tone about the order?

A.    Don't ship Mr. Brown.

Q.    What about whether anyone else should have access to Mr. Brown?

A.    That came up during the time also, ma'am.

Q.    During that 19th meeting?

A.    Yes, ma'am.

Q.    What came up?

A.    Basically, if anybody was to have access to Mr. Brown, he was supposed to go through Assistant Sheriff Tanaka to receive permission.

Q.    So the person who wanted access would have to go through Assistant Sheriff Tanaka?

A.    Would have to get his approval.  Not necessarily have to

talk to him personally, but would have to get the approval.

Q.    And who gave that order?

A.    Sheriff Baca.

Q.    You indicated that you told Sheriff Baca that you wanted to put Mr. Brown on the next bus on the 19th; is that correct?

A.    Yes, ma'am.

Q.    At that meeting, did Messrs. Smith and Manzo also brief him?

A.    They did most of the briefing, ma'am.  I kind of augmented them, since they had talked to Mr. Brown out of my presence.

Q.    And was Mr. Baca there when Mr. Manzo and Mr. Smith gave the briefing about what Mr. Brown had said?

A.    Yes, ma'am.

Q.    What did they tell Mr. Baca about what Mr. Brown had said?

A.    I don't remember the exact words, ma'am, just the general intent of the conversation.

Q.    Would it assist you -- or what was the general intent?

A.    Basically, they had a conversation with Mr. Brown and they were relaying their conversation with Mr. Brown.

Q.    And what about that conversation?

A.    The only thing I remember -- or distinctly off that conversation is a comment Mr. Brown made to Smith and Mr. Manzo.

Q.    What was that comment about?

A.    Basically, he kind of dared them that, "How do you know

I'm not an FBI agent?"

Q.   And did Messrs. Smith and Manzo tell Mr. Baca that Mr. Brown was talking about anything going on in the jails?

A.   There was a briefing about that, yes, ma'am.

Q.   What going on in the jails?

A.   I don't remember the specifics, ma'am.

Q.   Would it assist you to turn to page 70 of your grand jury testimony?

A.   Probably would, ma'am.

Q.   Can you do so, please?

A.   What lines would you like me to start at, ma'am?

Q.   Probably 22 through page 71.

A.   Okay, ma'am.

Q.   I'm sorry.  I'm sorry.  Page 70, line 11 to line 15.

A.   Do you want me to disregard what I've already read, ma'am?

Q.   Review that and see if it refreshes your recollection.

A.   Do you want me to disregard what I already read?

         THE COURT:  Just start on line 11, read it to yourself.

         THE WITNESS:  Thank you, Your Honor.

         Yes, ma'am.

BY MS. RHODES:

Q.   Does that help you remember what Mr. Manzo and Mr. Smith briefed Mr. Baca about?

A.   Yes, ma'am.

Q.   What?

A.   Basically, that Mr. Brown was reporting some kind of jail abuses.

Q.   And who was he reporting that to?

A.   Supposedly to the government, I think the FBI.

Q.   The federal government?

A.   Yes, ma'am.

Q.   I'd like to turn your attention now to August 23, 2011. That's a couple of days after the meeting -- the 19th meeting at headquarters.

At that time, did you -- on that date, did you learn that the FBI was interviewing Anthony Brown?

A.   Yes, ma'am, I did.

Q.   Where were you when you learned that?

A.   Somewhere in the Temecula, California area.

Q.   So not at the jail?

A.   No, ma'am.

Q.   And were you -- where exactly were you in terms of were you at -- in a home?  In a -- walking?

A.   No, I was actually in the passenger seat of my wife's convertible.

Q.   Who called -- so did you get this information on the telephone?

A.   On my cell phone, yes, ma'am.

Q.   Who called?

A.    I couldn't hear the name exactly, ma'am.

Q.    What did you learn?

A.    Basically, I was asked if I had given permission for the FBI to interview Mr. Brown.

Q.    What did you say?

A.    "No."

Q.    Did you do anything after you got that call and relayed that you had not given permission?

A.    Yes, ma'am.

Q.    What did you do?

A.    First thing I tried to call was Captain Carey of the sheriff's department.

Q.    Why?

A.    His unit was doing the investigation of the information that Mr. Brown -- or the allegations that Mr. Brown had made.

Q.    Was Mr. Carey in that chain-of-command -- your chain-of-command that you previously spoke about?

A.    After the meeting on the 19th, ma'am, I was -- pretty much everybody that was in the chain-of-command was at that meeting.

      Well, I take that back.  I'm sorry.

      Basically, at the meeting on the 19th and the 20th, Captain Carey was -- unit was giving the assignment to investigate Mr. Brown's allegations.

Q.    Who gave him that assignment?

A.    Sheriff Baca.

Q.    And does that -- did that put Captain Carey in your chain-of-command?

A.    Yes, ma'am.

Q.    Who did -- within this time frame, who was Captain Carey then supposed to report to?

A.    I'm assuming either the --

MR. HOCHMAN:  Objection.  Move to strike as speculation.

THE COURT:  Sustained.

Don't assume.  If you know the answer, just answer the question; if you don't, just say you don't know.

THE WITNESS:  Yes, Your Honor.

Undersheriff Tanaka and Sheriff Baca.

BY MS. RHODES:

Q.    And who did Mr. Tanaka report to?

A.    Sheriff Baca.

Q.    Did you and Mr. Carey speak on August 23, 2011?

A.    On August 23rd?

Q.    Yes.

A.    Eventually, yes, ma'am.

Q.    And what was said in that conversation with Mr. Carey?

A.    I only remember the one back at the Men's Central Jail.

Q.    Okay.  Well, did you talk to Mr. Carey about the fact that FBI agents --

A.    Oh, I'm sorry, ma'am.  We're back to the phone call.  Yes,

ma'am.

Q.   What did you tell Mr. Carey?

A.   I asked him if he had approved that the FBI could interview Anthony Brown.

Q.   Why did you ask him that?

A.   Because I didn't authorize it.

Q.   And was he another person who could potentially authorize it?

A.   I would assume so, ma'am, since he was in charge of the investigation ultimately.

         MR. HOCHMAN:  Objection.  Move to strike.

         THE COURT:  The answer is stricken.  The jury should disregard it.

BY MS. RHODES:

Q.   After you spoke to Mr. Carey, what did you do?

A.   I called Men's Central Jail.

Q.   Why?

A.   Under the directions of Captain Carey.

Q.   Who did you speak to there?

A.   One of the deputies in the operations office.

Q.   And you don't remember the name?

A.   No, ma'am.

Q.   And later that day, did you receive a call from anyone at the sheriff's department executive level about the interview of -- the FBI interview of Anthony Brown?

A.   Yes, ma'am.

Q.   Who called -- did you call someone or did they call you?

A.   Kind of went back and forth, but I initially got the call from Mr. Tanaka.

Q.   And what was the first call about?

A.   With Mr. Tanaka?

Q.   Yes.

A.   He -- not exactly sure, ma'am.  I think that he was asking me about what happened down there.

Q.   When you say "down there," what --

A.   I'm sorry.  How the FBI got in to talk to Mr. Brown without his approval or his knowledge.

Q.   And what was Mr. Tanaka's tone?

A.   Very stern.

Q.   Did he yell?

A.   Sounded like it.

Q.   How did the call end?

A.   I think I had put the phone down on my seat, because I was driving my car at the time.

Q.   Okay.  And then you said there were several.  Did you then call Mr. Tanaka back?

A.   I think I lost him one time before that and I called him back, ma'am.

Q.   Okay.  So how did the conversation, whether it was one call or multiple calls, end?

A.    I'm not sure what you mean, ma'am.  Did it end on a good note or a bad note?  Is that what you're getting at?

Q.    No.  Did you agree to do something at the end of the call?

A.    I'm drawing a blank right now, ma'am.  Is there something I can refresh my memory on?

Q.    Would it help you to turn to your grand jury transcript at page 148 --

A.    Yes, ma'am.

Q.    -- lines 8 through 12?

A.    Thank you, ma'am.  Yes.

Q.    And now do you remember how that conversation ended?

A.    Oh, I did then, ma'am.  I just didn't understand the question.  The end of the thing was I told him I would be in his office.

Q.    And how did he respond?

A.    Short.

Q.    So what did you do after this phone call with Mr. Tanaka?  Did you go immediately to sheriff's headquarters?

A.    No, ma'am.  I went to Men's Central Jail first.

Q.    About what time?

A.    I know it was afternoon, ma'am, but I'm not sure exactly what time it was.

Q.    And what did you do at Men's Central Jail?

A.    Questioned to see basically what had occurred, who had authorized the interview of Mr. Brown without notifying

Mr. Tanaka's office, just the general facts of what occurred.

Q.   And did you get business cards of anyone while you were asking what had happened?

A.   I got copies of them, yes, ma'am.

Q.   Copies of business cards of whom?

A.   The FBI agents that were there.

Q.   Do you recall how many?

A.   I believe three.

Q.   Did you then later meet with Mr. Tanaka that day?

A.   Yes, ma'am.

Q.   Where?

A.   Sheriff's headquarters in his office.

Q.   And did you go with anyone to sheriff's headquarters?

A.   Deputy Manzo and Deputy Smith may have went over with me to sheriff's headquarters.

Q.   Okay.  What happened when you got to Mr. Tanaka's office?

A.   I remember going into Mr. Tanaka's office and talking to him.

Q.   Okay.  And where is Mr. Tanaka's office?

A.   On the fourth floor of then sheriff's headquarters, 4700 -- I forget -- in Monterey Park.

Q.   And when you went into Mr. Tanaka's office, what happened?

A.   We had -- well, he had a discussion with me.

Q.   And when you say "discussion," can you remember anything that he said?

A.   Not right now, ma'am, not in particular.  I kind of blocked it out.  He was doing all the talking and -- at that point.

Q.   Was he upset?

A.   Seemed to be.

Q.   Okay.  And what was your understanding as to why Mr. Tanaka was upset?

A.   Because somebody got in to talk -- or interview Mr. Brown without authorization.

Q.   And was he upset as to what that would mean for him at all?

A.   I know he didn't want to tell the sheriff.

Q.   Okay.  How do you know that?

A.   Because he directed me to go tell the sheriff.

Q.   So what did you do after he directed you to go tell the sheriff?

A.   I turned around and marched to the sheriff's office.

Q.   Did you speak to Mr. Baca?

A.   Yes, ma'am, I did.

Q.   Where?

A.   In his office.

Q.   Was the door shut?

A.   Yes, ma'am, it was.

Q.   When you started the meeting, who else was present?

A.   Just Sheriff Baca and myself.

Q.   And what happened in that meeting between you and Defendant Baca?

A.   I explained to Sheriff Baca that FBI agents had gotten in and talked to Anthony Brown.

Q.   And did you inform him how that had happened?

A.   I tried to explain it, yes, ma'am.

Q.   Okay.  What did Mr. Baca say to you?

A.   Something to the effect, "I thought we had some precautions to minimize that."

Q.   And did he indicate who was supposed to be notified before anyone saw Mr. Brown?

A.   I don't think -- I don't remember at that meeting, ma'am. Maybe, but I don't remember specifically.  I just remember on the 19th definitely that he said before Mr. Brown was interviewed, that Mr. Tanaka was supposed to be informed and approved of the actual interview.

Q.   You don't remember what Mr. Baca said on the 23rd?

A.   Not specifically, ma'am, no.

Q.   Would it refresh your recollection to turn to your grand jury testimony at page 155?

A.   I'm sure it would, ma'am.

Q.   And if you could look at lines 7 through 19, please.

A.   Yes, ma'am.

Q.   Does that refresh your recollection?

A.   Yes, ma'am.

Q.    What did the sheriff say to you?

A.    During the conversation when I was trying to explain to him or as I -- as Captain Carey came into the --

Q.    Well, let's start first with during the conversation as you were trying to explain to him.

A.    He was basically saying that he was under the understanding that nobody was supposed to get to see Mr. Brown without being first approved by Mr. Tanaka.

Q.    And who had made that order?

A.    Originally, on the 19th, Sheriff Baca had made that order.

Q.    At some point, did the meeting get interrupted by something?

A.    After I -- the sheriff and I were talking about that, the sheriff sat down, made a comment, and about the same time Captain Carey burst into his office.

Q.    What was the comment that Mr. Baca made?

A.    "It's okay.  It's a chess game."

        MS. RHODES:  May I have one moment, Your Honor?

        THE COURT:  Yes.

BY MS. RHODES:

Q.    And I am going to put down on this board Mr. Baca's comment about the chess game.

        That was on August 23rd?

A.    Yes, ma'am.

Q.    And after that, did anyone come -- else come into the

office?

A.   Yes, ma'am.  Captain Carey burst into the office.

Q.   At that point, did you -- what did you do?

A.   I was dismissed and told to close the door behind me as I left.

Q.   You were dismissed by whom?

A.   The sheriff and Captain Carey.

Q.   And where did you go?

A.   Back to Mr. Tanaka's office.

Q.   Why did you do that?

A.   To tell him that I had informed the sheriff.

Q.   And what was Mr. Tanaka's reaction?

A.   A little relieved.

Q.   Did he say anything?

A.   Don't remember offhand, ma'am.

Q.   Did you leave sheriff's headquarters after that?

A.   Eventually, yes, ma'am, I think so.

     No, eventually -- I don't know how soon after the meeting I left, but I did leave sheriff's headquarters after that meeting.

Q.   And where did you go?

A.   Back to Men's Central Jail.

Q.   Did you go with Messrs. Smith and Manzo?

A.   Yes, ma'am.

Q.   Did you talk to them about what had happened in your

meeting with Mr. Baca?

A.   Probably.

Q.   Where were you when that conversation occurred?

A.   Probably in a county vehicle.

Q.   And what did you say to them?

A.   I may have given them a rehash.  I don't remember exactly what I said to them, ma'am.

Q.   Was the -- did Mr. Baca display any emotion when you were talking to him?

A.   No.  He was pretty business-like.

          MS. RHODES:  Your Honor, with the Court's permission, I'd like to read from Exhibit 229, 167 -- page 167, lines 13 through 14.

          MR. HOCHMAN:  May I be heard at sidebar, Your Honor?

          THE COURT:  Yes.

     *(Proceedings held at sidebar under seal 12:19 to 12:22.)*

*(The following proceedings were held in open court.)*

MS. RHODES:  And, Your Honor, I'd like to read from the grand jury testimony starting at page 166, lines 24, through 167, lines -- line 15.

THE COURT:  All right.

MS. RHODES:  (Reading)

"Question:  And did you tell them that you had received direction from the sheriff?

"Answer:  I think the questions were more did you get the same -- excuse my language -- ass chewing that you got from Mr. -- that you just got from Mr. Tanaka?

"Question:  And how did you respond?

"Answer:  Sheriff was a little calmer.

"Question:  But did you tell them that you had been given directions and now you were clear on what you had to do?

"Answer:  The directions?

"Question:  Did you say that?

"Answer:  No, ma'am, I wasn't.  Sheriff -- I'm trying to remember.  Did the sheriff give me any directions other than -- I'm getting confused now.  Talked to the sheriff, said how they got in.  He was upset.  I don't know if I'm missing something."

BY MS. RHODES:

Q.   I think you said you returned to Men's Central Jail where your office was?

A.   No, ma'am.  I went back to Men's Central Jail, but my office was actually in Twin Towers.

Q.   But on the 23rd you did go back to Men's Central Jail?

A.   Yes, ma'am, I did.

Q.   And when you returned to Men's Central Jail, did you speak to anyone regarding Anthony Brown?

A.   Yes, ma'am.

Q.   Who?

A.   Right offhand, I remember Captain Carey and Lieutenant Leavins.

Q.   And what did you speak to them about?

A.   They wanted to move Mr. Brown out of 1750.

Q.   Did they want any guards on him?

A.   Yes, ma'am.

Q.   Did they tell you where they would get those guards from?

A.   They were going to steal them from my unit.

Q.   And when you say steal them from your unit --

A.   I'm sorry, ma'am.  They were going to procure them from my unit.  They were going to use the OSJ deputies to provide 24-hour security on Mr. Brown.

Q.   Now, to provide 24-hour security for Mr. Brown, would that require overtime?

A.   It could.

Q.   And did you discuss what would happen with regard to overtime with either Lieutenant Leavins or Mr. Carey?

A.   Yes, ma'am.

Q.   What?  What did you say?

A.   For me to field my deputies for the minimum amount of time that I believed and for them to do -- provide the security detail, it would require overtime.

Q.   And what, if anything, did Mr. Leavins say back?

A.   Said it was authorized.

Q.   Did he say who authorized it?

A.   I believe he said Mr. Tanaka authorized it.

          MS. RHODES:  Your Honor, at this point I'd like to read from the grand jury transcript, 162, lines 11 through 20.

          THE COURT:  All right.  Let me see counsel at sidebar.

     *(Proceedings held at sidebar under seal 12:27 to 12:32 P.M.)*



UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*(The following proceedings were held in open court.)*

THE COURT:  Ladies and gentlemen, grand jury testimony is the sworn testimony of a witness taken before a trial.  The witness is placed under oath to tell the truth. The questions and answers are recorded into a transcript, which sets forth all of the questions asked and the answers given.

The grand jury testimony of Gregory Thompson has been presented to you.  The testimony is entitled to the same consideration and is to be judged, insofar as possible, in the same way as testimony given in court.  Do not place any significance on the behavior or tone of voice of any person

reading the questions or answers.  You should consider the testimony in the same way as if it had been given here in court.

All right.  You can read starting at line 8 on page 162, going over to page 163 at line 3.

MS. RHODES:  Thank you, Your Honor.

"Question:  By August 23rd, had anyone told you that this was something that either Mr. Baca or Mr. Tanaka had asked for or approved?

"Answer:  Yes, because when I had the discussion with Lieutenant Leavins, he was asking for more hours than I could give him off my deputies.  So I said, 'It's going to require some overtime,' and he said, 'That's okay.  It's been approved by the executives.'

"Question:  And I know I asked you about the executives earlier and who they might be.  In other words, who were the executives in the sheriff's department?

"Answer:  My first one is always Mr. Baca.  Second one would be Mr. Tanaka.

"Question:  Are there any other people that were referred to as executives in the sheriff's department besides those two?

"Answer:  Yes, a lot of them are, but now I'm remembering on this one.  The context of our

conversation at that -- I'm just leaving the meeting of sheriff's headquarters.  I surmised it was one of the two when he said 'executives.'"

BY MS. RHODES:

Q.   Mr. Thompson, in front of you I believe you have Exhibit 22.

A.   One second, ma'am.

Yes, ma'am.

Q.   Could you look at that and let me know if you recognize it?

A.   Yes, ma'am.

Q.   What is it?

A.   Appears to be an e-mail that -- chain between Assistant Sheriff Rhambo and myself.

Q.   And is it a fair and accurate copy of an e-mail that you received?

A.   As best as I can remember, yes, ma'am.

MS. RHODES:  Your Honor, at this time I would move to admit Exhibit 22.

MR. HOCHMAN:  No objection.

THE COURT:  It will be received.

*(Government's Exhibit 22 admitted into evidence.)*

MS. RHODES:  And if we could publish it starting at the bottom --

///

BY MS. RHODES:

Q.    Is it two pages, Mr. Thompson?

A.    Yes, ma'am, it is.

      *(The exhibit was displayed on the screen.)*

      MS. RHODES:  If we could start at the bottom of the first page and on to the second page.

      Yes.  Can you just pull up that -- where it starts at 10:08 p.m.?

      THE WITNESS:  Where you're highlighting, ma'am, or --

BY MS. RHODES:

Q.    Yes.  This says, "Sent:  August 23, 2011, 10:08 p.m."

      On the first page, does it say who it's from?

A.    On the first page of Exhibit 22, at the very top, it says, "From:  Rhambo, Cecil."

Q.    So -- but the message at 10:08 p.m., does it say who that's from?

      You can look on your screen.  It might be more easy.

A.    Yeah.  There is a "Sent, From" -- at 10:08, it says, "Sent Tuesday to Thompson, Gregory."

Q.    Right.  So sent from Mr. Rhambo to you?

A.    Oh, I'm sorry, ma'am.  Up above on the page before that it says from Mr. Rhambo, yes.

Q.    So this was an e-mail sent from Mr. Rhambo to you; is that right?

A.    Correct, ma'am.

Q.   And what does it say?

A.   Starting under that narrative under the "Hang" -- of the 10:08, ma'am?

Q.   Yes.  What was Mr. Rhambo's message to you?  Can you read that?

A.   Oh, just the one line, ma'am.  I'm sorry.  "Hang in there."

Q.   And did you respond to this at 10:12 p.m.?

A.   I think I did, ma'am.

Q.   Can you please read your response?

A.   Yes, ma'am.

        Just the narrative?

Q.   Yes, please.

A.   "I'm good for the butt chewing.  It was the 'you failed me' that hurt me.  The last thing I wanted to hear from you, him, or the sheriff are those words.  But as always, I learned who to rely on.  Thanks."

Q.   Who told you that you had failed him?

A.   I don't recall if it was Mr. Tanaka or Mr. Baca, ma'am.

Q.   And what was your understanding of what the failing was?

A.   I had -- oh, the failing was the FBI got in to -- or got to interview Mr. Brown without getting authorization.

Q.   And that was against a direct order that the FBI was allowed to interview?

A.   It was a procedure that was supposed to be put in place

and followed, if that answers your question, ma'am.

Q.   Now, at the top of this e-mail or near the top, it says, "Just to let you know."

MS. RHODES:   So if you could --

BY MS. RHODES:

Q.   On August 23rd at 11:05 p.m., you write back, and can you read the second paragraph?

A.   Where it starts with, "Just..."?

Q.   Yes, please.

A.   Thank you, ma'am.

"Just to let you know, I briefed the MCJ PM and EM supervisors in regards to the new FBI and outside law enforcement interviewing procedures and that revised policy would be following."

Q.   Okay.  So let me take you to -- what does -- what is "PM supervisor"?

A.   Oh, that would be the shift from -- usually, it's from 1400 or 2 o'clock in the afternoon or 3 o'clock to 10 o'clock or 11 o'clock.

Q.   And "EM"?

A.   Would be the early morning shift, which would be from usually around 10 o'clock or 11 o'clock to the following morning at 5 -- 6 o'clock or 7 o'clock.

Q.   So did you conduct the briefings on August 23, 2011?

A.   The briefings of who, ma'am?

Q.    Of the MCJ PM and EM supervisors.

A.    The way I caught them is I caught the outgoing PM supervisors and the incoming early morning supervisors in the watch commander's office at CJ.

Q.    And when you say you briefed them, what did you brief them on?

A.    Basically, that Mr. Brown -- on the 23rd.  I'm sorry, ma'am.  Is there something that I can refer to to refresh my memory?  I'm not exactly sure what was said at that time.

Q.    Did you brief them on Sheriff Baca's order?

A.    Oh, yes, ma'am.

Q.    And what was that?

A.    Basically, Mr. Brown wasn't supposed to be interviewed unless Mr. Tanaka approved it.

Q.    Now I'd like you to look at Exhibit 32, please, which is in evidence, I believe.

MS. RHODES:  And if I could have that published.

(The exhibit was displayed on the screen.)

BY MS. RHODES:

Q.    Can you read the top, Mr. Thompson, starting with "From"?

A.    "From:  Thompson, Gregory L.; Sent:  Thursday, August 25, 2011, 12:45 p.m.; To:  Custody Captains; Custody OPS Lieutenants; cc:  Custody Commander, MCJ Jail Liaison; Subject:  Inmate Interviews."

Q.    And what did you write in the substance of this e-mail to

custody captains and custody OPS lieutenants?

A.   Generalized, ma'am, or would you like me to read it?

Q.   Please read it.

A.   Thank you, ma'am.

"Effective immediately, all FBI requests for inmate interviews will be approved by MCJ jail liaison.  All FBI requests, in person or telephonic, shall be referred to the MCJ jail liaison.  Once approved, the inmate will be transported to MCJ and made available to the FBI.  MCJ jail liaison shall be the only entity to facilitate FBI interviews inside of our custody facilities.  MCJ jail liaison," semicolon -- or colon, I'm sorry.

Q.   Now, what was this e-mail based on?

A.   The -- during the meeting on the 19th or 20th, Sheriff Baca gave some -- I think it was five different things he wanted vetted, I guess, for a better choice of words, for an FBI interview.

Q.   And originally, did you take the first draft at this e-mail or did you give it to someone else?

A.   I don't remember if the first draft of -- there was a draft before this one, if I remember right, ma'am.

Q.   And who -- did someone send to you what could be the first draft?

A.   Do you have it, ma'am, and I could verify it?

Q.   Do you recall if Mr. Manzo --

A.   It could have been, ma'am, but I'm not absolutely sure.

Q.   Now, I'd like to direct your attention to August 26, 2011. It's a few days after you went to sheriff's headquarters and a day after you sent this out.

Did you have a meeting with Mr. Baca and others at sheriff's headquarters on that day?

A.   I'm sorry, ma'am.  For clarification, you did say August 26th?

Q.   August 26th.

A.   Yes, ma'am, I did.

Q.   Okay.  And where was that meeting?

A.   Sheriff's headquarters.

Q.   Do you know specifically where in sheriff's headquarters?

A.   It was in the same meeting room that we had the meeting on the 19th and 20th.

Q.   And what floor is that on?

A.   The fourth floor, ma'am.

Q.   And did you take anything with you to that meeting?

A.   Yes, ma'am, I did.

Q.   What did you take?

A.   I took the case file for the Anthony Brown investigation that Detective Bayes had started for when the phone was found on Anthony Brown.

Q.   And was Mr. Carey present at that meeting?

A.   Yes, ma'am.

Q.   Was Mr. Baca present at that meeting?

A.   Yes, ma'am.

Q.   And was Mr. Tanaka present?

A.   Yes, ma'am.

Q.   Did you give -- did you do anything with the case file that you took?

A.   I gave it either to Captain Carey or Lieutenant Leavins.

Q.   Did Mr. Carey say anything at that meeting about Anthony Brown and where he should be housed?

A.   I remember something distinctive, yes, ma'am.

Q.   What?

A.   Basically, I don't remember if he asked permission or was telling the sheriff that he wanted to move Anthony Brown for his safety to San Dimas Station.

Q.   And did you stay until the end of the meeting?

A.   I don't think so, ma'am, but I don't remember exactly. It's been a few years.

Q.   Now, I'd like to direct your attention to August 30th, near the end of the month.  And I'd like you -- I believe in front of you, you have Exhibit 42.

A.   Yes, ma'am.

Q.   And can you see if you -- can you look at it and tell me if you recognize it?

A.   Vaguely remember it, yes, ma'am.

Q.   And what is it?

A.   It's an e-mail from me to Deputy Noah Kirk.

Q.   And is it an e-mail string, so there's more than one e-mail?

A.   I believe there is, ma'am.

Q.   And is it a true and accurate copy of your e-mails?

A.   As far as I can remember sitting here, yes, ma'am.

         MS. RHODES:  Your Honor, I'd move to admit Exhibit 42.

         MR. HOCHMAN:  No objection, Your Honor.

         THE COURT:  It will be received.

    *(Government's Exhibit 42 admitted into evidence.)*

         MS. RHODES:  And I would like to publish it, starting with the second e-mail at 8:27 p.m.

    *(The exhibit was displayed on the screen.)*

         THE WITNESS:  That would actually be the first e-mail, but --

BY MS. RHODES:

Q.   You're right.

         Now, can you please read this e-mail to custody captains and custody OPS lieutenants, starting with the subject?

A.   "Subject:  Sheriff's deputies assigned to FBI task force. Captains, if you have personnel assigned to any FBI task force, please notify them to me and have them contact me ASAP.  I am having a meeting with all of those involved in any such task

forces tomorrow, 8/31/11, at sheriff's headquarters in the" --
I believe it's "the basement conference room [sic].  It's very
important that we have all personnel attend.  Greg Thompson."

Q.   Did you talk to anyone at sheriff's headquarters prior to
sending out this e-mail?

A.   Yes, ma'am.

Q.   Who?

A.   I believe it was Lieutenant Nee.

Q.   And who -- what was Lieutenant Nee's position at that
time?

A.   He was the aide to Mr. Tanaka.

Q.   When was it that you spoke to Lieutenant Nee?

A.   I don't recall.

     If you have something to refresh my memory, that
would really help, ma'am.

Q.   Was it prior to the time that you sent out this e-mail?

A.   I would assume so, yes, ma'am.

Q.   What did Mr. Nee tell you?

A.   I don't recall the exact conversation, ma'am.

Q.   Did he tell you who wanted -- who was going to actually
hold the meeting?

A.   I believe so, ma'am.

Q.   What did he say?

A.   As I sit here now, ma'am, I think it was Mr. Tanaka, but
I'm not absolutely sure.

It would help if I had something to refresh my memory.

Q.   Did Mr. Nee tell you why Mr. Tanaka was going to be meeting with FBI task force officers?

A.   I think it was because he had some direction from the sheriff -- with Sheriff Baca.

Q.   Okay.  And did he say anything further about what Mr. Baca's reason for having this meeting was?

A.   I'm not sure of the exact words, ma'am, but when -- the best of my recollection right now is it was basically to review the relationship between the task force, the sheriff's department, and the FBI.

Q.   Did he tell you about the sheriff's belief as to whether they should continue a relationship or they should be pulled?

A.   I don't remember exactly, ma'am.  Like I said, it was a while ago, but it was something to do with that.

Q.   With whether they should be pulled?

A.   There's a possibility, yes.

        MS. RHODES:  May I have one moment, Your Honor?

        THE COURT:  Yes.

BY MS. RHODES:

Q.   You indicated that you can't remember exactly what Mr. Nee said to you; is that correct?

        MR. HOCHMAN:  Objection.  Misstates the testimony.

        THE COURT:  Overruled.

MS. RHODES:  Your Honor, I'd like to mark as Exhibit 230 the grand jury testimony of Mr. Thompson on January 14, 2015.

And with the Court's permission, I'd like to hand two copies, one for the Court and one for the witness.

*(Government's Exhibit 230 marked for identification.)*

BY MS. RHODES:

Q.   Mr. Thompson, if you could look at Exhibit 230, page 140, starting at line 24, through 141, line 8, and tell me if that refreshes your recollection.

A.   Thank you, ma'am.  Yes, that helps tremendously.

Q.   So what did Mr. Nee tell you about this meeting?

A.   Basically, the sheriff was thinking of pulling sheriff's resources away from the FBI task force and that Mr. Tanaka had been basically stuck with doing a meeting and to discuss it with the deputies to see what their purpose was in those task force.

MS. RHODES:  Nothing further, Your Honor.

THE COURT:  All right.  Cross-examination?

MR. HOCHMAN:  May I proceed, Your Honor?

THE COURT:  Yes.

MR. HOCHMAN:  Thank you.

CROSS-EXAMINATION

BY MR. HOCHMAN:

Q.   Mr. Thompson, you talked about chain-of-command when you

were at the sheriff's department. And I'll focus on the August/September 2011 period.

Do you recall that?

A. Yes, sir.

Q. And so I understand what the chain of the command was at that time, at the lowest level of the chain-of-command would be a deputy in the sheriff's department; is that correct?

A. For sworn personnel, yes, sir.

Q. Yes. And above a deputy is a sergeant?

A. Correct.

Q. And above a sergeant is a lieutenant; is that correct?

A. Correct.

Q. And you were a lieutenant at this time period; is that correct?

A. That's correct, sir.

Q. Now, above a lieutenant is a captain; is that correct?

A. Correct.

Q. And above a captain is something called a commander; is that right?

A. Yes, sir.

Q. And above a commander is a chief?

A. Yes, sir.

Q. And above a chief would be the assistant sheriff?

A. Correct.

Q. And above the assistant sheriff is the undersheriff?

A.   At that time, yes, sir.

Q.   And then, ultimately, the sheriff is on the top of that chart; is that correct?

A.   Correct.

Q.   Now, with respect to your being here today, you were charged in, I believe, December 2013 with two counts, correct?

A.   I believe so, sir.

Q.   And those are felony counts?

A.   Yes, sir.

Q.   And one was conspiracy to obstruct justice; is that correct?

A.   I believe so.

Q.   And that count carried a maximum of five years' imprisonment, correct?

A.   I think so, sir.

Q.   And the second count was obstruction of justice; isn't that correct?

A.   Yes.

Q.   And that count carried a ten-year maximum sentence of imprisonment, correct?

A.   I believe so, sir.

Q.   And those were charges related to the August/September 2011 FBI investigation, correct?

A.   Yes, sir.

Q.   And you were convicted, were you not, in 2014 of those

charges; is that correct?

A.    Yes, sir.

Q.    And you were looking at that time at 15 years of a maximum sentence; is that right?

A.    I believe so, sir.

Q.    And you received approximately a three-year sentence; is that right?

A.    Yes, sir.

Q.    And then you appealed that sentence; is that correct?

A.    That's correct.

Q.    And as we sit here today, you haven't served a day of that three-year sentence; is that correct?

A.    That's correct.

Q.    And the government spoke to you, we know now, twice in the grand jury; is that correct?

A.    Well, they subpoenaed me to the grand jury and interviewed me, yes, sir.

Q.    And when they subpoenaed you to the grand jury, you didn't go there voluntarily; is that correct?

A.    I went there voluntarily, but I sought an immunity order.

Q.    And the government was able to get you an immunity order in order for you to testify in each of the grand jury appearances; is that correct?

A.    Yes, they gave me one, yes.

Q.    And without that grand jury -- excuse me.  Without that

immunity order, you wouldn't have testified; is that correct?

A.    Not unless I was told to by a judge or somebody, but, no, I didn't plan on it.

Q.    And for your testimony here today, again the government has gotten an immunity order for you from the Court; is that correct?

A.    Yes, sir.

Q.    Now, an immunity order is not something that your lawyer could get for you, is that correct, from the Court?

A.    I'm not sure about that, sir.

Q.    Well, did your lawyer get you an immunity order for you to testify before the grand jury today -- excuse me, before?

A.    I got it -- I believe I got an immunity order, sir.

Q.    But the order came from the government, not your attorney, is what I'm asking.

A.    Oh, I'm sorry, sir.  Yes, sir.  Yes.

        MS. RHODES:  Objection.  Misstates who the order came from.

        THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.    The government sought that order from the Court, not your attorney; is that correct?

A.    I believe so.

Q.    And the same is true for today; is that correct?

A.    Yes.

Q.   Now, I will take you back to the meeting that you had and I'll focus on the meeting on August 20th.

Actually, let's focus first -- yes, on August 20th.

You're aware, when the meeting on August 20th occurred, that this was a meeting with Sheriff Baca; is that correct?

A.   Yes, sir.

Q.   Undersheriff Tanaka?

A.   Let me go one -- you're talking about the meeting on the 19th or the 20th, sir?

Q.   Let's start with the -- well, we'll actually start with the Saturday meeting, if you recall the Saturday meeting.

A.   Okay.  Yes, sir.

Q.   And that was with Undersheriff -- actually, I'm sorry.

Let's start with the August 19th meeting in order to go chronologically.

When you met on August 19th, that was after Mickey Manzo and his partner, Smith, had had a chance to interview with Anthony Brown; is that correct?

A.   Actually, sir, I directed them to interview Anthony Brown.

Q.   And they told you about that interview, correct?

A.   They told me a little bit, but I really wasn't paying attention because we were driving over to sheriff's headquarters at the time, sir.

Q.   Now, before that interview, did you believe that Anthony

Brown should go to state prison?

A.   Yes, sir.

Q.   And as part of the reason that you believed that Anthony Brown should go to state prison is that you didn't believe he was going to cooperate with the sheriff's department if he was ever interviewed; is that correct?

A.   I don't think so, sir.

Q.   If you could look at Exhibit 17.

     MR. HOCHMAN:  And with the Court's permission, may I publish 17 again?

     MR. FOX:  Were you asking us to do that?

     MR. HOCHMAN:  I'm just asking the Court first, and then if I might ask Agent Tanner to put it on the screen, Your Honor.

     THE COURT:  It's already in evidence.  You don't need to ask.

     MR. HOCHMAN:  Thank you, Your Honor.

     And if we could focus on the 9:02 p.m.

BY MR. HOCHMAN:

Q.   So, Mr. Thompson, I'm focusing you on an e-mail that you wrote on August 18, 2011, at 9:02 p.m.

     Do you see that?

A.   I'm reading it right now, sir.  I'm sorry.

Q.   And can you just take a moment to read it and just let me know when you're finished reading it.

A.    (Witness reading.)

        Okay.  I've read it, sir.

Q.    And if you see the line in the middle, it says, "Besides, if he doesn't want to cooperate, there's nothing we can offer him with 400-plus years hanging over -- handing [sic] over his head."

        Do you see that?

A.    Yes, sir.

Q.    Now, the idea at that point is that Anthony Brown wasn't going to cooperate, at least you didn't believe he was going to cooperate, in connection with a sheriff's department investigation; is that correct?

A.    No.  It was more that we had nothing --

        MS. RHODES:  Objection.  Misstates the evidence.

        THE COURT:  Excuse me, sir.  If she stands up and says something, just wait until she finishes.

        MS. RHODES:  Misstates testimony.

        MR. HOCHMAN:  Let me rephrase the question.

        THE COURT:  All right.

BY MR. HOCHMAN:

Q.    Mr. Brown, up until that point, had not identified who gave him the cell phone; is that correct?

A.    Mr. Brown said a lot of things, sir.

Q.    Well, he had not identified any names of any individuals who had given him the cell phone at that point; is that

correct?

A.    Well, no, that's not actually correct, sir.

He gave a name of a nurse before that, but when it came up he gave the story about a deputy, he did not give the name of the deputy.

Q.    So the question, then, was whether or not Mr. Brown would cooperate and provide the name of the deputy to the investigators at some point; isn't that correct?

A.    We didn't have any incentive to make him cooperate, if that answers the question, sir.

Q.    Right.  So on August 18th, you didn't know if, when he was next interviewed, if he would actually provide that name; is that correct?

A.    Oh, that's true, yes, sir.

Q.    Now, August 19th comes, 8:00 a.m. in the morning, Mickey Manzo and Smith have a two-hour interview with Anthony Brown, correct?

A.    I believe so, sir.

Q.    And he actually says that he is willing to cooperate, but he wants a cheeseburger, soda, fries, and some cigarettes, correct?

A.    That sounds correct, yes, sir.

Q.    And it's that afternoon that you're meeting with Sheriff Baca, Undersheriff Tanaka, and the other individuals you've talked about, correct?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

A.    Yes, sir.

Q.    And it's that afternoon that you actually brief Sheriff Baca -- or Mickey Manzo and Smith brief Sheriff Baca, that Anthony Brown is willing to cooperate, hasn't done so yet to identify the name, but wants a cigarette, soda, fries, and a cheeseburger, correct?

A.    That sounds correct, yes, sir.

Q.    And it's at that point that Sheriff Baca says, "Don't put him on the state bus, keep him, continue interviewing him"; is that correct?

A.    Not us specifically, sir, but there was -- he ordered an investigation to continue, yes.

Q.    And part of the investigation would be continuing to talk to Anthony Brown to see if he would actually give the name of the deputy, correct?

A.    I believe so, yes, sir.

Q.    Now, let's switch to the August 20th meeting.

At that point in time, based on what you had learned from the investigation being conducted by the deputies for which you are the supervisor of, they still didn't have the deputies' names that Anthony Brown had dealt with, correct?

A.    Correct.

Q.    In fact, they didn't even know how many deputies, whether it was one, two, three, or more, correct?

A.    Correct.

Q.   And they didn't know how many inmates besides Anthony Brown was involved with this, correct?

A.   Correct.

Q.   And they didn't know how much contraband -- and by "contraband," I mean cell phones or different types of drugs -- were involved in the Anthony Brown situation, correct?

A.   Anthony Brown mentioned cell phones, drugs, yes.

Q.   But by August 20th, you didn't know how many cell phones or how much drugs had come into the Men's Central Jail; is that correct?

A.   Not that I recall a specific number, no, sir.

Q.   So you don't -- you know it was more than one, you just don't know how many; is that --

A.   Correct.

Q.   So you didn't know, basically, how big a problem was being faced in the Men's Central Jail at that point in time, correct?

A.   Correct.

Q.   And do you recall the sheriff talking about his conversation that he had with the FBI assistant director in charge, Steve Martinez?

A.   Yes, sir.

Q.   And did he indicate to you -- did the sheriff say that Martinez would not provide him any details of the investigation?

A.   I specifically remember that the sheriff said Mr. Martinez

called him up and wanted his phone back.

Q.   And did Sheriff Baca indicate that Mr. Martinez had provided him any details of the investigation or it was just that he wanted the phone back?

A.   That's all I remember, sir, is he wanted his phone back.

Q.   And after that meeting -- and I'll take you to August 23rd.  That is when the FBI had the ability -- or had the interview with Anthony Brown.

     Do you recall that?

A.   That was reported to me, yes, sir.

Q.   And were you actually there while the FBI was present at the Men's Central Jail?

A.   No, sir.

Q.   But you were able to get the business cards that had been left behind?

A.   By the agents, yes, sir.

Q.   What did you do with the business cards?

A.   I made copies of them and I eventually turned them over to Mr. Tanaka.

Q.   And did you also give a copy to Captain Carey, if you recall?

A.   Probably.

Q.   Because at that point, Captain Carey was in charge of the investigation?

A.   His unit was, and specifically Lieutenant Leavins was in

charge of the actual investigation, if that makes sense.

Q.   Yes.  So, basically, Undersheriff Tanaka was in charge of the overall investigation and Captain Carey at ICIB was running the investigation; is that correct?

A.   Captain Carey's unit, consisting of Lieutenant Leavins, was doing the investigation.  So Captain Carey would be supervising Lieutenant Leavins and Mr. Tanaka would probably be supervising Captain Carey and the sheriff would be supervising Mr. Tanaka.  That's the way it should be.

Q.   And let me focus on a couple of the relationships here, if I might.

Lieutenant Steve Leavins was the former aide of Undersheriff Tanaka; is that correct?

A.   Yes, sir.

Q.   And with respect to yourself -- and if I might get just a little background.  You said you were serving for 30 years, approximately, by 2011?

A.   Yes, sir.

Q.   Had you ever served in any stations or in any type of units with Undersheriff Tanaka before 2011?

A.   Not when he was the undersheriff, but I had served with him in other assignments, yes.

Q.   What were those other assignments?

A.   He was a supervisor at Lynwood Station of mine and then he was the unit commander for Asian crimes.

Q.   You said he was a supervisor for -- what was the first one?

A.   Lynwood Station.

Q.   Lynwood Station.

     And approximately when was that?

A.   I was there from 1982 to '93 or '94.  I don't remember exact dates when he was there.

Q.   Do you remember approximately how long he was there for?

A.   Couple years, I believe.

Q.   And when you say he was your supervisor, what was his rank at the time and what was yours?

A.   He was a sergeant; I was a deputy.

Q.   So he was one rank above you?

A.   Yes, sir.

Q.   And would you have dealings with him during those couple years on a regular basis?

A.   Depends on how the shift came apart -- I mean, or came about.  We had different days off, I'm sure, and different shifts over the time period there, but, yeah, we came across each other.

Q.   And did you begin to develop a friendship with him at that point?

A.   I guess you could say that.

Q.   And what was the next time that you served together?

A.   Is when the sheriff made him the unit commander over Asian

Crime Task Force.

Q.  When was that?

A.  I don't -- the task force was basically from '88, '89 -- no, I'm sorry.  Excuse me.  Dating myself.  From '98, '99 to 2002.

Q.  And what was your position on that task force and what was Mr. Tanaka's position?

A.  I was an investigator; he was the unit commander.

Q.  And for how long did you serve together on that task force, approximately?

A.  Well, he was remote.  His office was downtown, so we actually had -- a lieutenant was their direct supervisor.

Q.  Okay.  But did you have interactions with him on that task force?

A.  Occasionally.

Q.  Which years would you have had interactions with him?

A.  Somewhere between '88 and 2002, when the unit was established and before it closed.

Q.  And did you continue your friendship with him while you were on that task force, as well?

A.  I greeted him and said hello.  We might have made small talk.

Q.  And did you -- after that task force, did you continue to periodically see Mr. Tanaka?

A.  Not unless it was business related.

Q.   Did you ever smoke any cigars with Mr. Tanaka?

A.   Later on, sir.

Q.   When was that?

A.   Oh, probably not until 2010.

Q.   And where would you smoke the cigars starting in 2010?

A.   Different places.

Q.   Places around the sheriff's headquarters bureau?

A.   There was a patio on the back that you could smoke on it.

Q.   And you would smoke cigars with Mr. Tanaka on that patio at the back of the sheriff's headquarters bureau?

A.   Not just him, sir.  There were usually other people there.

Q.   Was Cecil Rhambo also there?

A.   Sometimes.

Q.   And he was the assistant sheriff in August/September 2011?

A.   Oh, yes.  2011, yes, sir, he was.

Q.   And in addition to smoking cigars with Mr. Tanaka, did you engage in any other interactions with Mr. Tanaka outside of work?

A.   Outside of work?

Q.   Yes.

A.   Not until later on, sir.

Q.   When was that?

A.   I attended one of his fundraisers when Mr. Tanaka was running for political office.

Q.   And when was that, please?

A.    I think it was when he was running for sheriff.

Q.    And is that when he was running for sheriff against Sheriff Baca?

A.    I believe so.

Q.    And how much -- did you actually contribute to Mr. Tanaka's campaign?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.    So focusing you on the August 23rd date, I believe you said that you got brought down -- or you came down to see Undersheriff Tanaka at the time that -- or, excuse me, after the FBI had been able to speak with Anthony Brown; is that correct?

A.    Yes, sir.

Q.    And Ms. Rhodes asked you what you remembered about the meeting with Undersheriff Tanaka on August 23rd, and you basically said you blocked it out.

A.    Blocked it out?

Q.    Those were your words, weren't they, that you pretty much blocked it out?

A.    Oh, I think you were referring to when he was -- the conversation on the telephone, sir, when I was responding.  I thought that's what --

Q.    Well, then let me back it up and make sure we understand

which one we're talking about.

When you're in his presence on August 23rd in his office --

A.   Oh, I'm sorry, sir.

Q.   -- you were asked the question, "Do you remember what was said in the meeting," and you said, "Look, I pretty much have blocked it out"?

A.   I stand corrected, yes, sir.  There were two times.  It was -- like I said, one was on the phone where I kind of blocked out, it was a little loud, and then when it was in his office, yes, sir.

Q.   And when you say you "blocked it out," does that mean you don't remember anything about the meeting?

A.   No, that just means when people start to yell at me and they're kind of inconsistent, I just wait for them to calm down, so I just kind of block them out.

Q.   And Undersheriff Tanaka yelled at you a lot during that meeting; isn't that correct?

A.   He yelled, yes, sir.

Q.   And he used a lot of "F" words and "MF" words and a lot of different profanity during that meeting; isn't that correct?

A.   He may have, sir.

Q.   And didn't he say, you know, that he was extremely upset about what had happened with the FBI being able to speak with Anthony Brown?

A.   Yeah, I guess so.  Yes, sir.

Q.   And wasn't he the one that then ordered that there would now be two Operation Safe Jails deputies assigned to Anthony Brown 24/7?

A.   No, sir.  I remember it was Lieutenant Leavins or Captain Carey that brought that to my attention.

Q.   When?

A.   Sometime after the meeting.  I want to say it was back at Men's Central Jail.

Q.   So at no point do you hear Undersheriff Tanaka tell you during that August 23rd meeting that you're present for with him that he's telling you to put two OSJ deputies on Anthony Brown 24/7?

A.   I don't recall him saying that, sir, but it's been five years.  I could be wrong.

Q.   Now, at that meeting, there's you, Mickey Manzo, Mr. Smith, and Captain Carey; is that correct?

A.   Well, there's some difference in the belief, sir.  I believe I was in the initial meeting with Mr. Tanaka by myself.

Q.   And at some point, did Mickey Manzo and Mr. Smith come into the meeting or were they never in the meeting?

A.   Not that I recall, sir.

Q.   Do you recall Captain Carey being in the meeting with you and Undersheriff Tanaka?

A.   No, sir.  I remember first seeing Captain Carey on that

afternoon is when he burst into the sheriff's office.

Q.   So before he burst into the -- Sheriff Baca's office, you didn't see him in Undersheriff Tanaka's office with you; is that correct?

A.   Correct, sir.

Q.   And then you go into Sheriff Baca's office after Undersheriff Tanaka's office, correct?

A.   Yes, sir.

Q.   And Sheriff Baca, he didn't use the profanity that Undersheriff Tanaka had used concerning the FBI being able to see Anthony Brown, correct?

A.   Not at that meeting, no, sir.

Q.   And he didn't go ahead and -- actually, he was compassionate and understanding to you during that meeting; wasn't that true?

A.   He didn't yell at me, sir.  That's what I remember now.

Q.   Sheriff Baca yelled at you?

A.   No, he did not yell at me.

Q.   He did not yell at you.

And he basically told you that he wanted to -- you, as part of OSJ, to get to the bottom of the investigation and find out what was happening with the cell phone; is that correct?

A.   On the 23rd, sir?

Q.   Yes.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

A.   No.   That responsibility had already been handed over to ICIB on the 20th.

Q.   Well, wasn't Captain Carey in the room with you at the same time that you're having this discussion with Sheriff Baca?

A.   No.   Captain Carey burst in the room and then I was dismissed.

Q.   So you have -- so when Captain Carey is speaking with Sheriff Baca -- excuse me.

So you didn't hear any discussion between Captain Carey and Sheriff Baca at that meeting on August 23rd?

A.   You know, the thing I remember is when Captain Carey burst in the room, he said, "It's my fault," and then I was dismissed.

Q.   So when you say "burst into the room," what exactly does that mean?  Did he not knock?

A.   No, sir.  He came right through the closed door.

Q.   And did he open it -- I mean, was it one of these you take the handle and you open the door wide open and you kind of run in?  Is that what you mean by "burst"?

A.   Open the door, walked right in instead of -- like I would do if I was invading someone's privacy, knock, gently push open the door, and stick my nose in there.  No, he pushed the door open and walked right into the room.

Q.   And when he pushed the door and walked right into the room, what did he say?

A.   Within a second or two, he said, "It's my fault."

Q.   And what did that mean?  What was your understanding of what that meant?

A.   I have no idea.

Q.   I mean, in other words, what was his fault?  What was the "it"?

A.   I'm sorry, sir, you would probably have to ask him on that.

Q.   Did he elaborate at all when he said, "It was my fault"?  Did he say anything beyond that?

A.   I was dismissed from the room after that, sir.

Q.   Did Sheriff Baca respond to anything -- to the "It's my fault" comment before you left the room?

A.   No, sir.

Q.   Now, Sheriff Baca -- what else do you recall about what -- strike that.

        One of the things you said that you recall about Sheriff Baca talking to you on this August 23rd meeting is that he described something as a chess match; is that correct?

A.   Not described, sir.  He was kind of -- we were talking about the -- I was explaining to him how -- trying to explain to him how the FBI got in to talk to Mr. Brown, and he was -- to the thing, "I thought we had some precautions in there and it was supposed to be authorized by Mr. Tanaka?"

        And I said, "Well, that got bypassed and somebody

didn't follow the directions."

And then he just kind of sat down and made that comment.

Q.   And you recall that comment as you sit here today six years after it was made?

A.   Yeah.  It was kind of bizarre.

Q.   And you said that Sheriff Baca had a business-like demeanor, as well, while he was addressing you?

A.   Yeah.  Yes, sir.

Q.   And when you left the meeting, you had a chance to speak with Mr. Manzo and Mr. Smith on your way back to the sheriff's -- excuse me, on your way back to Men's Central Jail, correct?

A.   I'm sure I did, yeah.

Q.   And you relayed to Mr. Manzo and Smith what Sheriff Baca had told you because they weren't in the meeting with you and Sheriff Baca, correct?

A.    I may have, sir.  I don't have any direct recollection of it, though.

Q.   Do you have any direct recollection of telling Mickey Manzo about a chess game comment that Mr. Baca -- Sheriff Baca had made?

THE COURT:  Let's go to sidebar.

*(Proceedings held at sidebar under seal 1:18 to 1:18 P.M.)*

(The following proceedings were held in open court.)

BY MR. HOCHMAN:

Q.   I'd like you to focus on Exhibit 22.

        MR. HOCHMAN:  May Agent Tanner please put Exhibit 22 up?

        THE WITNESS:  Yes, sir.

BY MR. HOCHMAN:

Q.   And this is the e-mail that you and Cecil Rhambo are exchanging back and forth.

        Do you remember that?

(The exhibit was displayed on the screen.)

        THE WITNESS:  Vaguely, sir, yes.

BY MR. HOCHMAN:

Q.   And with respect to this e-mail, this is involved -- Undersheriff Tanaka had asked you to formalize a policy to make sure -- a written policy to make sure that the FBI would not be able to speak with Anthony Brown without Undersheriff Tanaka's permission; isn't that correct?

A.   I'm sorry, sir, one more time.  I was listening to you and reading at the same time.  I apologize.

Q.   That's okay.

You had the August 23rd meeting with Undersheriff Tanaka and he asked you to formalize a policy, a written policy, that could then be distributed dealing with the FBI's visitation of Anthony Brown and making sure it wouldn't happen without his permission or approval; isn't that correct?

A.   No, sir.  It was more of a formalizing the things that the sheriff wanted that he mentioned in the meeting on the 19th.

At the meeting, nobody was actually designated to put that policy in there; it was just basically that Mr. Brown wasn't supposed to be talked to without the approval.

But the sheriff had some vetting, I guess, for a better choice of words -- I'm having a loss of them -- he had about five conditions on there, but it was never given to anybody as a duty to complete until the 23rd, after the FBI got to see Mr. Brown, and then it became my duty to get that procedure in place.

Q.   After your meeting with Undersheriff Tanaka on August 23rd, didn't you hand Mickey Manzo a piece of paper that had the -- from yourself that had sort of the points that you wanted Mickey Manzo to draft into a policy?

A.   I believe they were the points that I transcribed from the meeting that the sheriff wanted.

Q.   In the meeting that the sheriff wanted?

A.   Yes.

Q.   So in addition to the comments that you've testified, when

you had the meeting with the sheriff on August 23rd, is that when he actually gave you a five-point plan?

A.   No.   I think that came up on the 20th.   He was giving different things about things that -- before the FBI or somebody came in for an investigat- -- or to interview, it was basically agency they work for, their credentials, phone number.

There is an e-mail on it that gives the exact things, but that's what I'm remembering now.

Q.   And, again, the sequence is the sheriff does this -- gives this five-point plan on August 20th, you write it down, but you don't give it to Mickey Manzo until August 23rd?

A.   It wasn't assigned to me to do.   I was just jotting things -- and I definitely remember it was Mr. Manzo that wrote them down for me, but there's a conflict there.

MR. HOCHMAN:   Well, if we could turn to Exhibit 23.

And publish Exhibit 23, Agent Tanner, please.

*(The exhibit was displayed on the screen.)*

BY MR. HOCHMAN:

Q.   Do you recall this e-mail that you received from Mickey Manzo on August 24 that laid down the various points of a visitation policy between the FBI and Anthony Brown?

A.   These are the points I was talking about, sir, yes.

Q.   And these are the points that you asked Mickey Manzo to put into an e-mail -- excuse me, a draft policy for yourself,

correct?

A.   Yes.  I don't remember if he actually had them originally or I had them, but I asked him to formalize it, yes.

Q.   And it makes it clear that the approval has to be by Undersheriff Tanaka for any FBI visits; isn't that correct?

A.   And get the following information, yes, sir.

Q.   Okay.  And then you took off Undersheriff Tanaka's name from this memo before it went out; isn't that correct?

A.   I believe so, sir.

Q.   And you did that after discussions with Undersheriff Tanaka?

A.   I specifically remember talking to Lieutenant Nee.  It might have been Lieutenant -- or, I mean, Mr. Tanaka also.

         MR. HOCHMAN:  May I have a moment, Your Honor?

         THE COURT:  Yes.

BY MR. HOCHMAN:

Q.   When Anthony Brown -- are you aware that Anthony Brown at some point got moved to the 8200 hospital floor?

A.   Yes, sir.

Q.   And did you believe that it would be a good idea to move Anthony Brown to that hospital floor?

A.   Yes, sir.

Q.   And why was that?

A.   Well, it was Lieutenant Leavins or Captain Carey that wanted him moved out of the 1750.  The hospital is a better

location.  It's more -- it's actually more secure than the 1750 is.

Q.   And did the hospital location have any particular relevance for Anthony Brown's condition, health condition?

A.   He was on meds at the time, sir, so it actually made it easier with him being up there and closer access to medical facilities.

Q.   And at some point --

        MR. HOCHMAN:  Actually, no further questions, Your Honor.

        THE COURT:  All right.  Any redirect?

        MS. RHODES:  Nothing, Your Honor.

        THE COURT:  All right.  Sir, you may step down.

        THE WITNESS:  Thank you, Your Honor.

        THE COURT:  Thank you.

        May I see counsel at sidebar, please.

    *(Proceedings held at sidebar under seal 1:26 to 1:27 P.M.)*

*(The following proceedings were held in open court.)*

THE COURT:  All right.  Ladies and gentlemen, I think we're going to call it a day.

Again, I want to remind you you're not to discuss this case with anyone, including your fellow jurors, members of

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

your family, people involved in the trial, or anyone else, nor are you to allow others to discuss the case with you.  If anybody approaches you and tries to talk with you about this case, please let me know about it immediately.

Do not read any news stories or articles or listen to any radio or television reports about the case or about anyone who has anything to do with it.

Do not do any research, such as consulting dictionaries, searching the internet, or using other reference materials, and do not make any investigation about the case on your own.

If you need to communicate with me, simply give a note to the clerk.

And do not make up your mind about what your verdict should be until after you go into the jury room to decide the case and you and your fellow jurors have discussed the evidence.  Keep an open mind until then.

All right.  We're going to resume tomorrow morning at 8:00 a.m.  Thank you very much.  We'll see everybody tomorrow morning.

THE CLERK:  All rise.

THE COURT:  Please leave your notebooks on the chairs.

*(Jury out at 1:28 P.M.)*

*(The following was heard outside the presence of the*

*jury.)*

THE COURT: All right. Anything else we need to take up?

MR. FOX: No, Your Honor.

MR. HOCHMAN: No, Your Honor.

THE COURT: All right. Thank you very much.

*(Evening recess taken at 1:29 p.m.)*

--oOo--

CERTIFICATE


I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.


Date: AUGUST 10, 2017




/s/  Cindy L. Nirenberg, CSR No. 5059

Official Court Reporter