UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

HONORABLE PERCY ANDERSON, U.S. DISTRICT JUDGE

- - -

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| vs. | ) | No. CR16-66(A)-PA |
| | ) | |
| LEROY BACA, | ) | |
| | ) | |
| DEFENDANT. | ) | |

REPORTER'S TRANSCRIPT OF JURY TRIAL

DAY 6, VOLUME I of II

PAGES 1074-1223

LOS ANGELES, CALIFORNIA

WEDNESDAY, MARCH 1, 2017

8:02 A.M.

_____

CINDY L. NIRENBERG, CSR 5059, FCRR
U.S. Official Court Reporter
350 W. 1st Street, #4455
Los Angeles, CA 90012
*www.msfedreporter.com*

APPEARANCES OF COUNSEL:


FOR THE PLAINTIFF:
                        OFFICE OF THE UNITED STATES ATTORNEY
                        BY: BRANDON FOX,
                            ASSISTANT U.S. ATTORNEY
                            EDDIE A. JAUREGUI,
                            ASSISTANT U.S. ATTORNEY
                            LIZABETH A. RHODES,
                            ASSISTANT U.S. ATTORNEY
                        312 NORTH SPRING STREET
                        13TH FLOOR
                        LOS ANGELES, CA 90012
                        213-894-2434


FOR THE DEFENDANT:
                        MORGAN LEWIS & BOCKIUS
                        BY: NATHAN J. HOCHMAN, ATTORNEY AT LAW
                            BRIANNA L. ABRAMS, ATTORNEY AT LAW
                        THE WATER GARDEN
                        1601 CLOVERFIELD BOULEVARD
                        SUITE 2050 NORTH
                        SANTA MONICA, CA 90404
                        310-255-9025


ALSO PRESENT:
                        LEAH TANNER, FBI SPECIAL AGENT

I N D E X

GOVERNMENT'S WITNESSES:                          PAGE

DAVID DAHLE

    DIRECT BY MR. JAUREGUI                    1094

    CROSS BY MR. HOCHMAN                      1127

    REDIRECT BY MR. JAUREGUI                  1165


JAMES SEXTON

    DIRECT BY MS. RHODES                      1169


FURTHER PROCEEDINGS

DISCUSSION HELD OUTSIDE PRESENCE OF JURY 1078

DISCUSSION HELD AT SIDEBAR                 1135

DISCUSSION HELD AT SIDEBAR                 1142

DISCUSSION HELD AT SIDEBAR                 1153

DISCUSSION HELD OUTSIDE PRESENCE OF JURY 1161

DISCUSSION HELD OUTSIDE PRESENCE OF JURY 1165

DISCUSSION HELD AT SIDEBAR                 1167

DISCUSSION HELD OUTSIDE PRESENCE OF JURY 1222

E X H I B I T S

*GOVERNMENT'S EXHIBITS*          *MARKED*          *ADMITTED*

15                                                  1192

108                                                 1173

110                                                 1114

113                                                 1091

125-131                                             1201

162-163                                             1092

198-208                                             1212

LOS ANGELES, CALIFORNIA; WEDNESDAY, MARCH 1, 2017

8:02 A.M.

- - - - -

*(The following was heard outside the presence of the jury.)*

THE CLERK:  Item 1, CR 16-66(A)-PA, United States of America versus Leroy Baca.

Counsel, please state your appearances.

MR. FOX:  Good morning, Your Honor.  Brandon Fox, Lizabeth Rhodes, and Eddie Jauregui on behalf of the United States.  Also with us at counsel table is FBI Special Agent Leah Tanner.

THE COURT:  Good morning.

MR. HOCHMAN:  Good morning, Your Honor.  Nathan Hochman on behalf of Sheriff Lee Baca, who is present, and I'm also joined by Brianna Abrams, Your Honor.

THE COURT:  Good morning.

We're waiting for a couple of jurors.

I have a question I'd like to ask the government.  Is a negligent investigation or a negligent agent a defense to an obstruction of justice charge?

MR. FOX:  You're saying if the FBI had a sloppy investigation, would that be a defense to obstruction of justice?  No, of course not.

THE COURT:  And is there any evidence that the

government is using that came about as a result of this cell phone?  In other words, there were no conversations that were captured on the cell phone?

MR. FOX:  There were none.  It just depends on whether we're talking about directly or indirectly.  Gilbert Michel's testimony is certainly something that we are going to be using and a lot of the obstruction, of course, happened because they found the cell phone and --

THE COURT:  Oh, I understand -- I understand that, but it's not the typical case where you have, "We intercepted some conversations on that cell phone and now we're trying to use those conversations."

MR. FOX:  Yes, Your Honor, that's correct, and I think there are other things, as well, for example, that Mr. Baca -- there's going to be no evidence he knew about, a rookie agent, things like that.

THE COURT:  Well, that was going to be my -- that was going to be my next question.

A lot of this stuff, is there any evidence that the conspirators knew that she was a rookie agent --

MR. FOX:  Not that I'm aware of.

THE COURT:  -- or that she was running the investigation?

MR. FOX:  They did some investigation into Special Agent Marx at the time and learned that she was not from the

area, she had been in Hawaii, she worked for Mothers Against Drunk Drivers there, and that she was relatively new to the area. That's really all that they had. So they may have suspected that she was young and didn't have much experience, but that doesn't mean that they knew she was a rookie agent and had never conducted any undercover activity.

THE COURT: I take it they didn't have any evidence that she was running the investigation?

MR. FOX: I don't know that they did. They knew that she was one of the three people -- they knew she was on the phone calls with Anthony Brown at some point. They knew she was one of the three people that went to Men's Central Jail on August 23rd. They knew that she was one of the people that went to Gilbert Michel's home on August 24th.

Other than that, I don't know how else they connected her experience to this investigation.

MR. HOCHMAN: And, Your Honor, I would add a few other points.

She was -- the government will introduce evidence that they surveilled Agent Marx and she was the one that was approached, as well, so clearly they knew that Agent Marx was directly connected with the cell phone.

THE COURT: So what?

MR. HOCHMAN: I'm sorry?

THE COURT: So what? Because a lot of these points

that you're trying to make with this jury -- you know, you learned -- there is no evidence that the conspirators knew any of that at the time of this conspiracy.  These are things that were learned after the fact.

MR. HOCHMAN:  Again, Mr. Fox is correct in what they knew at the time, Your Honor, that she was a young agent, that she had -- her only prior experience was --

THE COURT:  So what?  Why is that relevant to an obstruction charge?  Why --

MR. HOCHMAN:  It's actually -- I'm sorry, Your Honor. I didn't mean to cut you off.

THE COURT:  Why is it relevant to an obstruction charge?

MR. HOCHMAN:  The reason it's relevant is it goes to the intent -- the corrupt intent aspect of Sheriff Baca.

THE COURT:  How does it go -- if he wants to get on the stand and state that "I knew she was a rookie at the time," fine.  But there is no factual predicate to support any of that.

MR. HOCHMAN:  I think where it goes, Your Honor, is to the reaction to having the FBI introduce a very dangerous form --

THE COURT:  No, sir.  Huh-uh.  No, it doesn't.

Unless you've got some evidence that they knew these things at the time, it's irrelevant.  It's all after the fact,

probably -- well, it's all after the fact and that does not make it relevant.

MR. HOCHMAN:  Well, again, Your Honor, when we're dealing with after the fact, since the charges now extend all the way to April 12, 2013, it could also go to Sheriff Baca's understanding as he's answering questions as it pertains to the questions that are at issue here.

MR. FOX:  Your Honor, there are no questions that we posed and no answers that he gives about Special Agent Tanner's experience, about how he was concerned that young agents were working the case.  There's nothing in the excerpts that we're playing and I don't think there's anything in the entire transcript.

THE COURT:  As far as I know, whether it was the greatest investigation of all time or the poorest is not relevant to an obstruction charge.  And if you've got some cases that suggest that it is, I'd like to see them.

MR. HOCHMAN:  All right.  Your Honor, I will endeavor to get you those cases.

THE COURT:  Please do.

And, you know, at some point you mentioned the FBI stonewalled the sheriff's department.  Since when does an under- -- somebody -- an agency running an undercover operation have to disclose their investigation?

MR. HOCHMAN:  Well, Your Honor, again, part of that

was an undercover investigation, part of it was not.

In fact, what the government argues is that there's two aspects of the investigation:  One is the public corruption, which was an undercover; the other is a civil rights investigation, which they're serving subpoenas to the sheriff's department.

So it's what they've called the overt part of their investigation, not the covert.

THE COURT:  At the time the call was made from Mr. Martinez -- and you told this jury that Mr. Martinez and the FBI stonewalled him, they didn't have any obligation to tell him anything.

MR. FOX:  Your Honor, if I may add also, the -- Special Agent Tanner will testify about the William David Courson covert action that they took, and that did relate to civil rights.

MR. HOCHMAN:  And, again, Your Honor, the subpoenas start coming in in June and July, even before the Martinez phone call, and this will be in the government's evidence.  So there is an overt part of the investigation, as well as a covert part of the investigation.

And, again, the FBI could have, if it wanted to, worked with the sheriff's department --

THE COURT:  And they made a decision that they didn't want to.

MR. HOCHMAN:  Your Honor, we would argue -- what we would argue is that the -- in the -- actually, the US Attorney's office meeting on August 29th, when the sheriff actually directly asked the US Attorney's office to work with the sheriff's department, and Mr. Birotte does not agree to do so at the meeting.  He actually doesn't respond to the sheriff.

That would be a very direct form of evidence where the sheriff laid it on the table as to the fact that he wanted the sheriff's department to work with the US Attorney's office and at that point he, again, gets provided with no feedback and no response, Your Honor.

MR. FOX:  Your Honor, we think it goes back to the same issue, that there was no requirement to work with the sheriff's department, no requirement to notify the sheriff's department.

The subpoenas in June and July were discrete subpoenas on specific incidents, and the FBI did not disclose and the grand jury did not disclose in those subpoenas the wide-ranging investigation that there was.

MR. HOCHMAN:  But by August 24th, which is before the August 29th meeting with Mr. Birotte, they did disclose the wide-ranging subpoenas, Your Honor.

So, again, you know, the federal government, the US Attorney's office, which is one of the entities that's involved, obviously, with the obstruction, there is no -- let

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

me just answer the Court's question in maybe a different way.

There is no requirement that they do so, but they had worked together before.  Mr. Baca had --

THE COURT:  There's no basis for you to tell this jury that the government stonewalled your client.

MR. HOCHMAN:  Well, to the extent, then, I can say that the government provided -- both the FBI and the US Attorney's office provided no answers to Sheriff Baca's questions or entreaties as to what their investigation involved and whether or not they would work with him in connection with that investigation during that six-week period.

If the word "stonewalled" is too --

THE COURT:  What do you think it is?

MR. HOCHMAN:  I think it's a strong word that describes what I just said, Your Honor.

THE COURT:  Yeah, I think it is --

MR. HOCHMAN:  It is a strong word.

THE COURT:  -- and it might warrant an instruction from the Court that the government was under no obligation to disclose anything.

MR. HOCHMAN:  But to the extent they actually had in the past disclosed information about its investigations -- in fact, worked with the sheriff's department at the same exact time, Your Honor, on a public corruption investigation -- as the Court, I'm sure, is aware, at the exact time that this is

all happening, Captain Carey, who I believe will be a witness, is working with Liz Rhodes involving a sheriff's department captain of a station where they caught this captain on a wiretap involved in a --

THE COURT:  Sir, it has nothing to do with the issue that we're discussing.

MR. HOCHMAN:  But, again, it shows a practice.  Even though there's not a requirement, Your Honor, there was a --

THE COURT:  Excuse me, Mr. Hochman.  Did you hear what I said?

MR. HOCHMAN:  I did, Your Honor.

THE COURT:  Okay.

MR. FOX:  Your Honor, Mr. Hochman raised on cross-examination of Mr. Manzo and Mr. Thompson yesterday the fact that they haven't reported to serve their sentences yet, and I believe the jury might be left with a misleading impression that that's a benefit that the government gave them.

And as Your Honor is aware, the Ninth Circuit decided they would be out on bond pending appeal.  We opposed the motion before you and before the Ninth Circuit.  We lost that. The Ninth Circuit, since they've decided the appeal, they found that all of the defendants may still be out on bond while the Supreme Court is going to decide cert on their appeal to the Supreme Court, and a few of the defendants, including Mr. Manzo and Mr. Thompson, have agreed to report notwithstanding that.

THE COURT:  Uh-huh.

MR. FOX:  We have agreed since that time to extend the dates that Mr. Manzo and Mr. Thompson are going to report, but they have no real obligation to do so because they can still be out on bond pending the Supreme Court's ruling still.

So we are proposing an instruction that you would provide to the jury to clear up any misleading aspects of that testimony, and I can read it to you, Your Honor, if you'd like. I also have it written down, but we think that that would be a good thing to provide to them while Mr. Manzo and Mr. Thompson's testimony is still fresh in their minds.

THE COURT:  All right.  What's the instruction?

MR. FOX:  Mr. Hochman proposed some language at the end on a Post-it note.

Would you like me to hand both to you?

THE COURT:  That's fine.

MR. HOCHMAN:  Your Honor, may I ask Mr. Fox a question?

THE COURT:  Yes.

    (Counsel confer off the record.)

THE COURT:  Well, as far as this Post-It note, the government doesn't make a decision about when they're to report.

MR. HOCHMAN:  Your Honor, that's correct.

And, again, it could be worded slightly differently,

but the government did agree -- which it didn't have to do, it could have opposed their request to continue the surrender date, they could have taken no position with the Court -- it actually went ahead and agreed with it.

So I think that the agreement with the defendants to move the Court to continue the self-surrender date might be the better way to express it, but clearly there is something that the government agreed to on their behalf.  And that was what I was trying to convey in the Post-It note.

MR. FOX:  And, Your Honor, talking with the group here on our side, we were thinking if you just added to Mr. Hochman's language, "The government agreed and the Court ordered," just add in that it was the Court's order and it wasn't the government's agreement that caused that to happen.

THE COURT:  All right.  "The government has agreed and the Court ordered Mr. Manzo and Mr. Thompson to surrender to the Bureau of Prisons on a date after their testimony in this case."

MR. HOCHMAN:  Yes, Your Honor.

I mean, generally we don't believe that the instruction is necessary, as Mr. Fox was able to develop in both direct and redirect -- or I think it was actually -- well, Mr. Fox and Ms. Rhodes on the two different witnesses, the fact that they were out on bond on appeal or they had been on a -- part of the reason for the lack of service of their sentence

had to do with their appeal.  I think that's already in the evidence.

I think if the Court thinks there's a gap in the evidence beyond what they were able to develop, we would oppose it for the record.

MR. FOX:  Your Honor, I think there is a gap, because Mr. Hochman brought out that their appeal was decided, I believe, in August is what he got out of the witness, and that means that they have been out on bond since August.  But, again, that's not the government's decision or a benefit that we conferred upon them.

MR. HOCHMAN:  And I just -- I don't recall them putting a date on when their appeal was decided, Your Honor.  That's the only difference I have with the government.

THE COURT:  Let's bring the jury in, please.

MR. FOX:  And, Your Honor, we're going to start with a stipulation, just so you're aware.  It's a testimonial stipulation.

THE COURT:  Okay.

MR. JAUREGUI:  Your Honor, may I just make sure I don't have something up here?

THE COURT:  That's fine.

Who's the witness this morning?

MR. FOX:  First witness is going to be Special Agent David Dahle, followed by James Sexton.

*(Jury in at 8:20 A.M.)*

THE COURT:  Good morning, ladies and gentlemen.

You heard testimony that Mickey Manzo and Greg Thompson have been sentenced for their crimes but have not yet served any portion of their sentences.

The Court of Appeals determined that Mr. Manzo and Mr. Thompson could be out on bond pending their appeal.  This was not a decision made by the United States Attorney's office or the Federal Bureau of Investigation.

Now that their appeals have concluded, Mr. Manzo and Mr. Thompson have been ordered to report to prison to begin serving their sentences later this month.  The government has agreed and the Court ordered that Mr. Manzo and Mr. Thompson surrender to the Bureau of Prisons on a date after their testimony in this case.

All right.  Would you call your first witness, please.

MR. JAUREGUI:  Yes, Your Honor.  Before we do that, I would like to read in some stipulations and move in some evidence.

THE COURT:  All right.

MR. JAUREGUI:  And with the Court's permission, I'm going to be reading off of an electronic device.

THE COURT:  All right.

MR. JAUREGUI:  Your Honor, the parties have reached a

stipulation this morning, a testimonial stipulation, that reads as follows:

"If called to testify, Yolanda Baines would testify that she was employed by the US Marshals Service in August of 2011.

"On August 25, 2011, she faxed Government Exhibit Number 113, which is a writ for Anthony Brown's testimony before a federal grand jury, to the Los Angeles County Sheriff's Department.  She also called the sheriff's department looking for Anthony Brown. Ms. Baines had no discussions with Mr. Baca about the writ or Anthony Brown."

MR. HOCHMAN:  So stipulated, Your Honor.

THE COURT:  All right.  Ladies and gentlemen, the parties have agreed what Yolanda Baines' testimony would be if called as a witness.  You should consider that testimony the same way as if it had been given here in court.

MR. JAUREGUI:  And, Your Honor, at this time, I would also move to admit under Rule 902 Government Exhibit Number 113.

THE COURT:  Any objection?

MR. HOCHMAN:  No objection, Your Honor.

THE COURT:  All right.  It will be received.

*(Government's Exhibit 113 admitted into evidence.)*

*///*

MR. JAUREGUI:  And pursuant to Rule 902.11, I would seek to move Government Exhibits Number 162 and 163.

MR. HOCHMAN:  One moment, Your Honor.

No objection, Your Honor.

THE COURT:  All right.  They will be received.

*(Government's Exhibits 162-163 admitted into evidence.)*

MR. JAUREGUI:  And, Your Honor, the last thing before we call our witness is Government Exhibit Number 107, which is a stipulation that the parties had reached regarding these phone records, which are Exhibits Number 162 and 163.  And with the Court's permission, I'd like to read that stipulation.

THE COURT:  All right.

MR. JAUREGUI:  (Reading.)

"If called to testify, custodians of records for AT&T and Verizon Wireless would state Government Exhibits 162 through 169 and 171 are true and correct copies of records that were:  A, created by a person with knowledge of the facts or were made from information transmitted by a person with knowledge of facts -- of the facts," excuse me;

"B, made at or near the time of the acts or events appearing within them; C, part of the regular practice of AT&T and Verizon Wireless; and, D, kept in the course of the regularly conducted activity of AT&T and Verizon Wireless.

"Government Exhibit Number 162 contains phone records of (213)894-3881 and (213)894-7998, which were two numbers assigned to the facsimile machines used by the United States Marshals Service in Los Angeles.

"Government Exhibit Number 163 contains phone records for (213)217-4973, which was a number assigned to a facsimile machine used by the Los Angeles County Sheriff's Department Inmate Reception Center.

"So stipulated and agreed."

THE COURT:  All right.  Ladies and gentlemen, the parties have agreed what the custodian of records for AT&T and Verizon Wireless' testimony would be if called as witnesses. You should consider that testimony -- their testimony in the same way as if it had been given here in court.

MR. JAUREGUI:  And lastly, Your Honor, with agreement from counsel, I'm going to place this magnet on our calendar that says "Writ" on August 25th (indicating).

Okay.  Your Honor, the United States calls David Dahle to the stand.

THE COURT:  All right.

THE CLERK:  Please raise your right hand.

Do you solemnly swear that the testimony you shall give in the cause now before this Court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

THE CLERK:  Please be seated.

Please state your full name and spell your last name for the record.

THE WITNESS:  My name is David Dahle.  My last name is spelled D-A-H-L-E.

DAVID DAHLE,

having been first duly sworn,

testified as follows:

DIRECT EXAMINATION

BY MR. JAUREGUI:

Q.   Mr. Dahle, what do you do for a living?

A.   I'm a special agent with the Federal Bureau of Investigation.

Q.   How long have you been with the FBI?

A.   Since two-thousand- -- August of 2009.

Q.   And are you assigned to a particular squad within the FBI?

A.   Yes.

Q.   What squad is that?

A.   I'm assigned to a squad called Public Corruption 1.  It's one of two public corruption squads in Los Angeles' main office.

Q.   And what does the public corruption squad do?

A.   We investigate public corruption violations, which means that we investigate public officials, usually politicians or any other public official, for federal violations such as

bribery or other corruption-related activities.

Q.   Are you familiar with the federal investigation of the Los Angeles County Sheriff's Department for corruption and civil rights abuses in the jails?

A.   Yes.

Q.   How are you familiar with that investigation?

A.   I'm familiar with that because I was assigned to the investigation in approximately middle of August 2011, a little over a year after the investigation was opened.

Q.   And at that time that you joined the investigation, were other FBI agents involved?

A.   Yes.

Q.   Who was involved?

A.   When I was assigned, the agents who were already on the case were Special Agent Leah Tanner, who at that time was Special Agent Leah Marx, and Special Agent David Lam.

Q.   Besides the FBI, were other law enforcement agencies involved in this investigation at any point during the investigation?

A.   The United States Marshals Service served writs to obtain inmates from either county custody or state custody and would bring them in front of a federal grand jury for us, but they weren't involved in the actual investigation itself.

Q.   What, if anything, did you do to familiarize yourself with the investigation when you joined, Agent Dahle?

A.   When I joined the case, I spoke to the agents who were already on the case and I read reports of the things that they had done.

Q.   Generally, what were the allegations against the sheriff's department that the FBI was investigating?

A.   The allegations were that deputies in mainly two of the county jails controlled by the sheriff's department here -- one of them is called Men's Central Jail, the other is called Twin Towers.  They're both jails here in downtown Los Angeles.  The allegations were that deputies who worked in those jails were assaulting inmates and then, in order to cover up those assaults, would then charge the inmates with assaulting them.  That was some of it.

         The other allegations were that deputies were smuggling in contraband in exchange for bribes.

Q.   And where were these allegations coming from?

A.   Mainly inmates.

Q.   How were they coming to the FBI?

A.   They would come in various forms.  Sometimes we'd get complaints from inmates by letter; sometimes it was a family member on their behalf.  Or when you'd speak to an inmate, they would say, "Well, this other inmate also has information.  They may have witnessed something similar or the same thing."

         And we'd interview people and then just go from there, logically interview other people who may have had the

information also.

Q.   Agent Dahle, you mentioned Men's Central Jail and Twin Towers.

What is Men's Central Jail, starting first with that?

What kind of jail is that?

A.   Men's Central Jail, like I said, is close by here in downtown LA.  It's controlled by the sheriff's department. It's staffed by deputies and they house inmates who could be both awaiting trial for charges that they had been arrested on or have been convicted and are waiting to be sent to state prison.  So it housed a mixture of people.

Q.   And what kind of crimes -- what is the range of crimes, I guess, that people in Men's Central Jail are accused of having committed or have been convicted of committing?

A.   It could range anything from, you know, a person being arrested for a DUI all the way up to the most serious crimes.

Q.   And what about Twin Towers?

A.   Same thing is my understanding.

Q.   Did the federal investigation focus on any particular floors within these jails?

A.   Yes.

Q.   Starting with MCJ, what was the focus of the investigation?

A.   In Men's Central Jail, we heard allegations mainly about two different floors, what was called the 2000 floor and the

3000 floor.  They were in different parts of the jail.

Those floors housed inmates who were a higher level of security, and that meant that they could either be in there for a serious crime or it could mean that they were in there because there was something notable about them, like they were family members of law enforcement or a celebrity or some other reason that would bump them up to a higher security level.

Q.    And what about in Twin Towers?

A.    In Twin Towers, we mainly heard -- allegations were coming from the mental -- the floors that housed inmates with mental health issues.

Q.    When you joined the investigation in -- did you say mid August 2011; is that right, Agent Dahle?

A.    Approximately.  I don't remember the exact date, but it was sometime in the middle of August 2011.

Q.    Had any federal grand jury subpoenas been issued?

A.    Yes.

Q.    Approximately how many at that time?

A.    At that time, there were a few.

Q.    And what is a federal grand jury subpoena, Agent Dahle?

A.    A federal grand jury subpoena is -- it's a court order compelling a person or an entity to produce something -- it could be documents, it could be other things -- or it could compel them to come in front of the grand jury to testify about something that they know.

Q.   And at that time, to whom were the subpoenas that had been issued directed?

A.   To the sheriff's department.

Q.   Any other entities?

A.   There may have been some for phone records, but it was mainly -- the ones that I saw when I first started were mainly to the sheriff's department.

Q.   Generally, what did these federal grand jury subpoenas seek?

A.   Generally, they sought documentation about specific use of force incidents that the FBI had been alerted to.  There was two very -- there was a couple of specific incidents that became known.

Q.   In your role as case agent, did you have any special duties as it pertained to the grand jury?

A.   Yes.

Q.   And what were those?

A.   The grand jury eventually appointed me to be the custodian of records.

Q.   And what is a custodian of records?

A.   Custodian of records is a person who gets what people produce in response to subpoenas.  I looked at what was returned to us, I organized it and cataloged it, and ultimately made a return to the grand jury.

Q.   Did you do anything else to support the grand jury?

A.    Yes.

Q.    What did you do?

A.    I was one of the case agents on the case.  There were three of us, myself, Special Agent Marx or Special Agent Tanner, there was Special Agent Dalton, and we were the ones driving the case.

And as the case agents on the case, we were an arm of the grand jury, which means that we would interview people, we would subpoena things, we would take logical investigative steps, with the ultimate goal of providing information to the grand jury.

Q.    And, Agent Dahle, over time did you work with more than one grand jury?

A.    Yes.

Q.    Why was that?

A.    This was a long case.  It went from 2010 all the way up until 2016.  Grand juries usually only sit for about a year, and because of that we either had to get a grand jury to extend itself or when the year would be up, another grand jury would take its place and we would just keep going with grand -- and we had multiple grand juries going at the same time.

Q.    As these allegations were coming in, Agent Dahle, what did you do to determine which allegations the grand jury and the federal government would investigate?

A.    We would look at the stuff that was returned to us in

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

subpoenas and the information that we gathered from witnesses.

All the case agents on the case would sit down with the Assistant United States Attorneys and everybody was involved, look at the evidence and see which incidents were the strongest ones and which ones were the ones we thought we could ultimately prove in court, and we focused on those, even though it was -- we had a lot of allegations, but we had to focus on the strongest ones, and that's what we ultimately decided to do.

Q.   Did you continue to serve grand jury subpoenas on behalf of the grand jury as the investigation continued?

A.   Yes.

Q.   Why did you do that?

A.   Because every time that -- during a case, you get information as the case goes along and sometimes it causes you to think, well, maybe I can corroborate what this person has told me.

So when that would happen, we would try to subpoena something to either disprove or prove a fact or allegation, and that just kept happening throughout the case.

Q.   Agent Dahle, were there any special considerations that you took -- that you had in mind as you were investigating these allegations?

A.   Yes.

Q.   And what were those?

A.    And this is something that is specific pretty much to civil rights cases involving law enforcement.  It's that in these types of cases, the people making the allegations, the victims, were inmates.  That's different than almost any of the other violations that we investigate.

And inmates could be in jail for a whole host of reasons.  Sometimes they're in jail for serious or violent crimes, and we knew that ultimately they would be looked at as untrustworthy maybe, and they're making allegations against people in law enforcement, who could be seen as trustworthy.

And so we knew that if we were going to successfully bring a case against a law enforcement officer, we needed to have strong corroborative evidence in addition to what the inmates were alleging.  So it made it challenging.

Q.    What would you do with the information you were receiving in response to these grand jury subpoenas?

A.    We were analyzing it, piecing it together, and trying to figure out what we could prove or not prove as it related to the allegations that we had.

Q.    And, ultimately, what were you going to do with that information?

A.    Ultimately, the goal of every investigation is to bring it to the grand jury and present the evidence to them and see if you can secure an indictment.

Q.    And in this investigation that was focusing on the jails

for abuse and corruption, when was the first time that you took information to the grand jury in a hearing, in a proceeding?

A.    It was sometime in 2012.

Q.    And why -- what explained the lapse in time?

A.    This is not unusual.  We subpoenaed a vast amount of information in this case, mainly from the sheriff's department, and we got back hundreds of thousands of documents, videotapes, audio recordings, a bunch of other material, and we had material from other places.

So it took a long time to actually go through the material and see what we had and actually piece it together in order to figure out what we ultimately were going to charge in the case.

So there was a lag time just because of the amount of stuff that we got back.

Q.    And were there times, Agent Dahle, where the grand jury itself would ask for certain documents or certain testimony from witnesses?

A.    That happened.

Q.    And what would you do -- what would you do if the grand jury asked for certain documents or certain testimony?

A.    If we could get it, we'd get it for them.

Q.    And, Agent Dahle, over the course of the investigation, how many abuse incidents had been investigated by you and the federal government?

A.    Dozens, if not hundreds.

Q.    And what years did these incidents cover?

A.    We focused -- remember, this investigation opened in 2010. We focused on the years of 2009 and 2012 as the investigation went forward, so it was mainly those three years.

Q.    Now, Agent Dahle, you spoke about some of the challenges of investigating complaints from inmates against officers.

Did you have any -- and you also talked about getting video.  Were there any difficulties in getting video evidence in connection with these kinds of complaints?

A.    Yes.

Q.    What were those?

A.    The sheriff's department, at the time when we were investigating, did not have cameras in all the areas of the jail.  There were a few, but they were not placed in the areas that we kept hearing inmates were getting beaten at, so there was no recordings of most of the allegations that we had heard about.  So it made it, like I said earlier, challenging to try to corroborate what we were hearing.

Q.    And, Agent Dahle, just so we're clear, you talked about receiving -- I believe you said hundreds of thousands of documents.

Were those hundreds of thousands of documents or hundreds of thousands of pages of documents?

A.    I'm sorry.  Pages.  Pages.  There was thousands of

documents, hundreds of thousands of pages.

Q.   And when you say "hundreds of thousands of pages," would that be up until, say, today or were you getting those hundreds of thousands of documents in 2011?

A.   Well, we got a huge amount of documents in 2011 right -- like at the start, there was a huge dump of material.

And then as we were going along, we kept subpoenaing things and adding to the numbers and then just kept going.

Q.   That dump, would that have been in August 2011 or after?

A.   No.  It was some months after.

Q.   And what about witnesses?  Approximately how many witnesses were brought before the grand jury over the course of the corruption and abuse investigation, that aspect of the investigation?

A.   Approximately 80.

Q.   Okay.  Agent Dahle, I want to switch topics and talk about overt versus covert investigations.

Are you familiar with those terms?

A.   Yes.

Q.   What is an overt investigation?

A.   An overt investigation is one where the person that you're investigating may know that you're investigating them.

Q.   And what is a covert investigation?

A.   It's the opposite.  It's when the person that you're investigating doesn't know that they're being investigated.

Q.    This investigation, did it involve one or both of those types of investigations?

A.    It involved elements of both.

Q.    Let's talk about the overt aspects.  What were the overt aspects of the investigation?

A.    The overt aspects of the investigation when I joined was that there was a few subpoenas that had been served, like I told you, before I had joined the case asking for documents about a couple specific instances.  Not the world that we knew of; the subpoenas just asked for documents related to a few incidents.

Q.    And, Agent Dahle, if you don't mind bringing the microphone a little bit closer to you, please.

A.    I'm sorry.

Q.    And so you said that was when you joined the investigation, correct?

A.    Yes.

Q.    Okay.  And what about the covert aspects when you joined the investigation?

A.    The covert aspects when I joined the investigation had been that at the time, Special Agent Marx had met with a sheriff's deputy, who was unaware that he was being recorded and surveilled by the FBI when he was meeting with Special Agent Marx, and the undercover operation involving Anthony Brown and former Deputy Gilbert Michel.

Q.   Okay.  Who was Anthony Brown?

A.   Anthony Brown was an inmate in Men's Central Jail at the time in 2011.

Q.   And who was Gilbert Michel?

A.   At that time, Gilbert Michel was a sheriff's deputy assigned to Men's Central Jail.

Q.   And what was the operation?  Why don't you start by telling us when this took place.

A.   The operation took place in late July/early August 2011.

Q.   And what was it?

A.   It was an operation designed to either prove or disprove whether -- Anthony Brown's allegations that Deputy Gilbert Michel would take a bribe in exchange for bringing in contraband.  It was designed to test that.

Q.   And how did you do that?

A.   An undercover FBI agent with the fake name or alias "CJ" pretended to be Anthony Brown's friend outside of the jail.

     Anthony Brown told Deputy Gilbert Michel, "My friend CJ will pay you money if you bring in a phone for me."

     Deputy Gilbert Michel agreed to do it.  He met with CJ.  The whole thing was audio and videotaped.  Undercover FBI agent gave Deputy Gilbert Michel the phone and the money and Gilbert Michel brought the phone in and gave it to Anthony Brown.

Q.   And how did this operation, Agent Dahle, fit into the

federal -- the larger federal investigation into the jails?

A.   It fit in because, one, it proved that there were at least some deputies who would smuggle in contraband in exchange for bribes, like the agents had been hearing, and it provided an opportunity to expand the investigation and test whether the excessive use of force incident allegations were true or not.

Q.   How did it do that?

A.   It gave us the opportunity to confront Deputy Michel with the fact that he had taken a bribe and see if he would be willing to cooperate with our investigation and provide information on things that he had either done himself or things that he had witnessed other deputies do and to either corroborate or not what the inmates had been telling us.

Q.   I believe you testified that the phone actually made it into the jail, correct, Agent Dahle?

A.   Yes.  Deputy Gilbert Michel brought the phone into the jail and gave it to Anthony Brown.

Q.   At some point after you joined the investigation, did you learn that something happened with that cell phone?

A.   Shortly after I joined the case, we learned that the cell phone had been found by the sheriff's department.

Q.   And at that point, had you ever met Anthony Brown?

A.   No.

Q.   Did you meet Anthony Brown after the phone was found by the sheriff's department?

A.    Yes.

Q.    And when was that?

A.    August 23, 2011.

Q.    What were the circumstances under which you met him?

A.    Myself, Special Agent Marx, now Tanner, and Special Agent Wayne Plympton went to Men's Central Jail and interviewed Anthony Brown in the morning.

Q.    I'm sorry.  I may have missed the date.  What date was that?

A.    August 23, 2011.

Q.    And why were you going there to meet him?

A.    We heard the phone had been found and we wanted to learn the circumstances of how that happened and what the sheriff's department may or may not know.

Q.    Approximately what time did that interview with Anthony Brown start?

A.    Approximately 10:40.

Q.    How is it that you remember that, Agent Dahle?

A.    Shortly after what happened that day, I went back and wrote a report about it and I noted the times that we were there.

Q.    Okay.  When you say something happened, what happened?

A.    We started interviewing Anthony Brown in a very small room that the door was shut, so it was just myself, Agent Marx, and Agent Plympton and Anthony Brown.

About an hour and ten minutes into the interview, the door flung open.  A very large sergeant with the last name Waterman came in and started shouting, "The interview's over.  Who told you you could interview this inmate?  He's not to be interviewed."

A bunch of deputies rushed in, grabbed Anthony Brown, ripped him out of the room, and started taking him down the hallway, and we sat there stunned.

Q.   What did you do after that?

A.   Agent Marx told Anthony Brown as he was being dragged away, "We'll be back for you."

I gathered -- I don't know, after a couple seconds we stood up, we watched Anthony Brown go down the hallway, and then we went to the watch commander's office.

Q.   Why did you do that?

A.   Because we were confused about what was going on and we wanted to have Special Agent Plympton use a phone to call our supervisors, because we didn't have our cell phones inside the jail.

Q.   And -- well, what happened after Special Agent Plympton -- did he use the phone to call your supervisor?

A.   He used the phone and made some phone calls.

Q.   And where were you at that time?

A.   I was in the watch commander's office.

Q.   What happened after that?

A.   One of the -- a lieutenant asked us who gave us permission to interview Anthony Brown and asked us if it was a Lieutenant -- at that time I thought he said Thomas, but I think he meant Lieutenant Thompson.

Q.   And what did you say in response?

A.   I said, "No, we didn't talk to anybody named Lieutenant Thomas or Thompson," because we followed the normal procedures at that point of interviewing any inmate.  We had checked in and told them, "Hey, we want to interview Anthony Brown," and they said, "Okay."

They brought Anthony Brown down to the room.  So we didn't even realize there was anything going on.

Q.   So did you leave after that?

A.   Yeah, we left.  We left.

As we were leaving, we were told that there was a captain who wanted to talk to us and we said, "Okay."

And we went outside of the custody part of the jail and waited just the outside the lobby for five to ten minutes.

No one ever called, so we just left after that.

Q.   Now, Agent Dahle, did this event on August 23, 2011, did this change in any way your investigation?

A.   Yes.

Q.   How so?

A.   Well, it was obvious the sheriff's department knew something and they -- how they reacted when we were talking to

Anthony Brown gave us concern about whether the investigation was going to be influenced or anything.

So on that afternoon, we came back as a group. We made the decision to approach Deputy Gilbert Michel the next day, earlier than we had wanted to, and we planned for that and then did meet Gilbert Michel on August 24th.

Q.   Now, Agent Dahle, at this time, August 24th, Gilbert Michel had already accepted money to take the phone into the jail, correct?

A.   Yes.

Q.   So why hadn't -- well, let me just ask this. You said you approached him on August 24th. What happened when you approached Gilbert Michel on August 24th?

A.   We approached Gilbert -- we were at his -- he lived in an apartment. We waited for him to come back from work. And when he came back from work, myself, Special Agent Marx, and Special Agent Plympton approached him, asked him whether he would be willing to talk. He said yes.

We -- he suggested we go to a Starbucks nearby, because he lived at that time with his girlfriend named Angela Caruso in the apartment. He didn't want her to know what was going on. She was also a sheriff's deputy, so we decided, okay, we'll go and talk at a Starbucks.

Q.   And, Agent Dahle, did you personally speak with Gilbert Michel when he met with you at the Starbucks?

A.    Not about what he had done, just, you know, how do we get there, where are we going.

But once we got to Starbucks, Special Agent Marx and Special Agent Plympton were the ones interviewing him about the undercover operation and about things going on in the jail, while I kind of stood back and watched what was going on like on the perimeter.

Q.    And how did this interaction with Gilbert Michel on August 24, 2011, how did that end, if you know?

A.    Well, we didn't think it ended well because it was -- it was unclear whether he was going to cooperate with us.  It wasn't -- we weren't sure that was going to happen.

Q.    And after that event -- let me ask it this way.  Did that fact, the fact that you weren't sure if he was going to cooperate, did that affect your investigation in any way?

A.    Yes.

Q.    Agent Dahle, if I could direct your attention to Exhibit Number 110, which is going to be in the binder books next to you on the left.

Are you there, Agent Dahle?

A.    Yes.

Q.    Do you recognize this exhibit?

A.    Yes.

Q.    What is it?

A.    It's a series of subpoenas that were served on the

sheriff's department from June to August 2011.

Q.    And how are you familiar with those subpoenas?

A.    Because as a case agent on the case, I would review stuff that was produced in response to subpoenas and I've seen documents that have been provided to us because of these subpoenas.

Q.    And are these true and accurate copies of those grand jury subpoenas issued in connection with this investigation?

A.    They're true copies.  Some of the subpoenas have information that have been redacted out of them, but they were copies of subpoenas that were served on the sheriff's department.

            MR. JAUREGUI:  Okay.  Your Honor, I would move to admit Government's Exhibit Number 110, please.

            MR. HOCHMAN:  No objection.

            THE COURT:  It will be received.

        *(Government's Exhibit 110 admitted into evidence.)*

            MR. JAUREGUI:  Now, if I can ask Special Agent Marx to please publish 110.

        *(The exhibit was displayed on the screen.)*

            MR. JAUREGUI:  And if I can direct you to page 12, please, Agent Tanner.

BY MR. JAUREGUI:

Q.    Now, Agent Dahle, what are we looking at here on page 12 of this exhibit?

A.    You are looking at a grand jury subpoena that was issued August 24, 2011, to the sheriff's department.

Q.    And this was the same day that you met with Gilbert Michel?

A.    Yes.

        MR. JAUREGUI:  Okay.  Next page, please, Agent Tanner.

BY MR. JAUREGUI:

Q.    What is this subpoena asking for, Agent Dahle?

A.    It's asking for information pertaining to the individuals listed, A through T.

        And those individuals at the time were mostly current inmates at either MCJ or Twin Towers.  You can tell from C and G -- I'm sorry, I didn't mean to mark the thing -- but if you look at those, it said "California Department of Corrections number."  I think that meant that at the time that they were in state custody, but had been in sheriff's department custody prior.

Q.    And directing your attention to letter N, do you see that?

A.    Yes.

Q.    What is the inmate listed in letter N?

A.    Anthony Brown.

        MR. JAUREGUI:  And, Agent Tanner, if I can ask you to go to page 15 of this exhibit.

///

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

BY MR. JAUREGUI:

Q.   And, Agent Dahle, is this another grand jury subpoena issued on August 24th, 2011?

A.   Yes.

Q.   Also to the sheriff's department?

A.   Yes.

MR. JAUREGUI:  And if we could go to the next page.

BY MR. JAUREGUI:

Q.   What is this subpoena asking for?

A.   This subpoena, A through X was a list of sheriff's department employees, deputies who worked in the jails, that we had heard allegations about either of doing things or maybe possibly witnessing things.

Q.   Who is the officer listed in G?

A.   Gilbert Michel.

Q.   And who, if you know, is the person listed in Q?

A.   Q, Angela Marie Caruso, was Gilbert Michel's girlfriend at the time and who we actually also interviewed on August 24, 2011, on the day that we interviewed Gilbert Michel.

Q.   And was she also an employee of the sheriff's department?

A.   Yes.

Q.   And letter D, do you see the name under letter D?

A.   Yes.

Q.   Who is that?

A.   Justin Bravo.

Q.   Do you know, Agent Dahle, who Justin Bravo is?

A.   Yes.

Q.   And in relation to the defendant, do you know who he is?

A.   He's Mr. Baca's nephew.

Q.   Directing your attention to page 19 of this exhibit --

        MR. JAUREGUI:  Please.

BY MR. JAUREGUI:

Q.   -- is this yet another subpoena issued on August 24, 2011?

A.   Can we go back to that last page really quick?

Q.   Sure.  Page 16.

A.   I just want to clear something up about X.

Q.   Go ahead, Agent Dahle.

A.   The reason why that we asked for all deputies --

        MR. HOCHMAN:  Objection.  No question pending on X.

BY MR. JAUREGUI:

Q.   Agent Dahle, Number X asks for all deputies with the last name of Gomez and Rodriguez who have worked at MCJ at any time between the dates of January 29th to the present.  The present would be August 24, 2011.

        Why were you asking for that information?

A.   Because we heard a lot of allegations about deputies with those last names, and since deputies didn't typically wear name tags that had their first name on it, we had no clue who those people would be.

        So at the time we were mostly working with, like,

last names, and it was very hard to marry up an allegation to a specific deputy.

Q.   Agent Dahle, earlier you said that some of these subpoenas had been redacted.  Are there redactions, as far as you can tell, on this page, page 16?

A.   Yes.  The original subpoena had names of deputies all the way from A through W.

Q.   Okay.  Now going back to page -- why don't we just skip ahead to page 20.

And, Agent Dahle, this is the page that followed that last grand jury subpoena that we looked at before we flipped back, right?

A.   Yes.

Q.   Okay.  And this was the subpoena also issued on August 24, 2011?

A.   Yes.

Q.   What is this subpoena seeking?

A.   Basically, a large number of documents related to use of force incidents and employees who had been working there from January 2009 all the way until August 24, 2011.

Q.   And just so that -- if we take a look at the --

MR. JAUREGUI:  Can we go to the first page of this exhibit, please.

BY MR. JAUREGUI:

Q.   Earlier, Agent Dahle, you mentioned that there were some

subpoenas issued before you came on to the investigation; is that right?

A.   Yes.

Q.   So I'm looking at page 1.  Would that be one of those subpoenas?

A.   Yes.

Q.   And what was this subpoena seeking?

A.   This subpoena sought --

Q.   Page 2.

A.   This subpoena sought records for one specific incident involving a couple deputies and one inmate.

Q.   And what about the next subpoena?

        MR. JAUREGUI:  If we go to page 3 and 4.

        THE WITNESS:  This was another subpoena seeking information still about that one incident involving the two deputies and one inmate.

BY MR. JAUREGUI:

Q.   And there were other subpoenas issued prior to your joining the case, correct?

A.    I think there was another subpoena asking about materials related to a second incident involving a few deputies and one -- and one person.

Q.   Now, Agent Dahle -- do you know, Agent Dahle, after August 24th, did you have occasion to speak again with Gilbert Michel?

A.    Yes.

Q.    And approximately when would that have been?

A.    He spoke to us -- not myself specifically, but he came in and interviewed with agents in September 2011.

Q.    Okay.  Do you know -- I'm not going to ask you about those conversations if you were not there, Agent Dahle, but do you know what ultimately happened with Gilbert Michel and the bribery -- his involvement with bribery?

A.    Yes.  So shortly after we approached him on August 24th, he retained an attorney, who got in touch with the United States Attorney's office, and ultimately Gilbert Michel came in, decided to cooperate, admitted his conduct, and pled guilty to taking the bribe.

Q.    Now, we've been talking about the time period of July to September of 2011.

Did there come a time, Agent Dahle, where the federal grand jury investigation expanded beyond the abuse and corruption allegations in the jail?

A.    Yes.

Q.    When was that?

A.    It happened in two different ways, and really it's connected to this last subpoena that we looked at looking -- asking for all the use of force reports.

And the way it happened was after we got back that vast collection of documents, we started organizing things and

piecing them together and looking at the similarities or dissimilarities in the use of force incidents that had occurred.

So the goal was to do a pattern and practice investigation, which means that the allegations were that the deputies were doing this on purpose.  We looked at the reports to see if we could see if it was obvious that -- one of the ways of investigating these types of crimes is to look at the language in the reports.  If there's, you know, language that it looks like it's copied or it looks similar involving two different people, but involving the same deputies, it's suspicious.

And so what we did was we looked at a large number of these reports, tried to figure out the incidents that looked suspicious to us, and go from there with our interviews and subpoenaing more documents.

That was going on with relation to the excessive use of force allegations.  That was one track.

Simultaneously, we started investigating what had been going on with Anthony Brown on a parallel track.

Q.    Okay.  Now, let me stop you there.

What happened to cause you to find out -- and we'll discuss what you mean by what happened with Anthony Brown, but what happened to cause that parallel track that you just talked about?

A.    Well, we obviously had suspicions of things that were going on with Anthony Brown just because of the way the sheriff's department was acting, but it wasn't until later in 2012 that we actually interviewed sheriff's deputies, specifically --

Q.    Okay.  And after you interviewed sheriff's deputies, Agent Dahle, is that when you started this parallel track that you were talking about?

A.    Yes.

Q.    And what is that parallel track?

A.    The parallel track was in addition to investigating the excessive use of force allegations, we started investigating what the sheriff's department had done in relation to Anthony Brown and our investigation.

Q.    And would that be -- okay.

      And did you then start to seek documents from the sheriff's department in connection with that aspect?

A.    Yes.

Q.    And when you talked about the hundreds of thousands of pages, would those documents also be included in those hundreds of thousands of pages?

A.    Yes.

Q.    In response to subpoenas that you issued, did you get e-mails, Agent Dahle, from individuals within the sheriff's department?

A.    Yes.

Q.    And did you seek e-mails for individuals up to the rank of sheriff?

A.    Yes.

Q.    Did you obtain, as part of your investigation, e-mails from the defendant's e-mail account?

A.    Just -- not that many.

Q.    And when you say "not that many," what kind of volume are you talking about?

A.    Much, much lower than everybody else's that was involved in the -- what we're here for.

Q.    Did you subpoena things like notes and agenda items, records, things like that?

A.    Yes.

Q.    Agent Dahle, did you receive from the August and September 2011 time period any agendas belonging to the defendant?

A.    No.

Q.    Did you receive any notes of meetings in August of 2011 relating to Anthony Brown?

A.    No.

Q.    Now, based on your -- as these documents were coming in, Agent Dahle, did you personally review them?

A.    Yes.

Q.    And did you review all of the hundreds of thousands of pages or some of them?

A.    I haven't reviewed every single document, but I've reviewed almost all of them, which is hundreds of thousands.

Q.    And based on your review of those records, Agent Dahle, are you aware of when was the last substantive interview of Anthony Brown that the sheriff's department conducted?

A.    Yes.

Q.    And when was that?

A.    August 29, 2011.

Q.    And based on that same review of documents, Agent Dahle, are you aware of whether Anthony Brown was polygraphed by the sheriff's department?

A.    Yes.

Q.    And when did that occur?

A.    It occurred either the 24th or 25th of August, 2011.

Q.    Now, Agent Dahle, did there come a time where you had an opportunity to interview the defendant in connection with that second parallel track that you were talking about, the what happened to Anthony Brown track?

A.    Yes.  April 2013.

Q.    And where did that interview take place, Agent Dahle?

A.    It took place at a law firm called Jones Day.  It's a law firm here in downtown Los Angeles.

Q.    And why were you seeking to interview the defendant?

A.    Because --

        MR. HOCHMAN:  Objection.  Irrelevant.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  Because he had information that may have been relevant to the investigation.

BY MR. JAUREGUI:

Q.  Was the defendant represented at that interview?

A.  Yes.

Q.  And do you recall how many lawyers he had present?

A.  There were two Jones Day attorneys representing Mr. Baca.

Q.  Do you recall their names?

A.  Yes.

Q.  What were they?

A.  One attorney's name was Beong Kim; the other one was Brian Hershman.

Q.  Do you know, Agent Dahle, if those attorneys represented other entities at that time?

A.  They represented Los Angeles County and they represented captains and above from the sheriff's department.

Q.  The interview took place in April 2013, you said?

A.  Yes.

Q.  Was there an amount of time allocated to the interview, Agent Dahle?

A.  Yes.

Q.  And what was that?

A.  Supposed to be approximately three hours.

Q.    Did the interview end up going longer than three hours?

A.    Yes.

Q.    How long did the interview go?

A.    Approximately four hours.

Q.    And is that something that the defendant and his lawyers agreed to or how did it get extended to four hours?

A.    Yes.  As the interview was progressing, the defendant and his attorneys agreed to keep going.

Q.    Do you know, Agent Dahle, why the interview took place at Jones Day?

A.    That was the agreed-upon location between his attorneys and the United States Attorney's office.

Q.    And, Agent Dahle, did the government provide anything to the defendant prior to this interview?

A.    No.

Q.    Where were you sitting during the course of this interview, Agent Dahle?

A.    Across the table from Mr. Baca.

Q.    And did you have an opportunity to observe him during that interview?

A.    Yes.

Q.    What was his demeanor like?

A.    He was engaged in the conversations and he was alert.

Q.    And was this a voluntary interview, Agent Dahle?

A.    Yes.

MR. JAUREGUI:  May I have a moment, Your Honor?

THE COURT:  Yes.

MR. JAUREGUI:  No further questions for this witness, Your Honor.

THE COURT:  All right.

MR. HOCHMAN:  May I proceed, Your Honor?

THE COURT:  Yes, please.

CROSS-EXAMINATION

BY MR. HOCHMAN:

Q.   Agent Dahle, you said that you first joined the FBI in 2009; is that correct?

A.   Correct.

Q.   And when the investigation began, what we will call this Anthony Brown investigation, that was roughly the summer of 2010; is that correct?

A.   It wasn't the Anthony Brown investigation; it was investigation into allegations that deputies were abusing inmates.

Q.   Sheriff's department investigation?

A.   It was the investigation into deputies in the jails, yes. It began in 2010.

Q.   Right.  About a year -- within a year of your starting at the FBI; is that correct?

A.   Yes.  That was one year later.

Q.   And then about a year after that is when you actually

joined the investigation in August of 2011; is that correct?

A.   Correct.

Q.   And you said, I believe, that when you joined the investigation, you spoke to the agents who were already on the investigation; is that correct?

A.   Yes.

Q.   And that was Agent Marx, now known as Agent Tanner; is that correct?

A.   Correct.

Q.   And then you also reviewed the reports of the investigation that had happened over the prior year; is that correct?

A.   Yes.

Q.   And you did that in order to familiarize yourself with what had gone on in the investigation during that year that preceded your entry into the case; is that correct?

A.   Yes.

Q.   Now, what was the -- you said it was about middle of August of 2011.  What was the precise date that you actually joined the investigation?

A.   I can't tell you the precise date.  I just know sometime in the middle of August.

Q.   Well, you gave us, for instance, a precise time with the August 23rd case -- excuse me, meeting that you had with Anthony Brown.  I think you said it was 10:40 a.m.

Do you remember that?

A.   Yes.

Q.   And I believe you were able to review a report that you wrote that day that had the time on it; is that correct?

A.   Yes.

Q.   Did you review a report before you came here today that would have shown what day in August 2011 you joined this investigation?

A.   We don't write reports about the day we join investigations.  It's just a waste of paper.

Q.   Well, when was the first time you actually wrote a report about the investigation?

A.   It was the report that I wrote about Anthony -- the interview of Anthony Brown on August 23rd.

Q.   And then working off of that date, about how long had you been on the investigation at that point?

A.   A week, few weeks.

Q.   Well, you know, for instance, that the cell phone was found on August 8th of 2011; is that correct?

A.   Yes.

Q.   So did you join the investigation after or before the cell phone was found?

A.   I believe it was after.

Q.   So sometime, then, between August 8th and August 21st, correct?

A.   Yes.

Q.   Now, you said that you were part of the public corruption squad; is that right?

A.   Yes.

Q.   And the public corruption squad investigates bribery of public officials and, in this case, for instance, a deputy sheriff; is that correct?

A.   Yes.

Q.   And that's different than the civil rights squad, correct?

A.   Yes.

Q.   Because the civil rights -- a civil rights investigation is an investigation when a deputy would use excessive force against an inmate; is that correct?

A.   That's an example.

Q.   And that's different than a deputy accepting a bribe, which is the public corruption aspects that you in the public corruption squad would investigate, correct?

A.   In LA, there's two different squads.  In other places, it's all the same squad.

So, yeah, whether it's my squad or another squad, the FBI as an entity investigates both civil rights and public corruption.

Q.   So if I understand correctly, there was a civil rights investigation going on as it pertained to excessive force by deputies; is that correct?

A.   Correct.

Q.   And there was also a public corruption investigation going on as to whether deputies were accepting bribes in exchange for bringing contraband into the jails; is that correct?

A.   The case started on a civil rights squad and migrated to the public corruption squad.

Q.   Because the bribe part of it is a public corruption investigation, correct?

A.   Yes.

Q.   Now, with respect -- with respect to the Anthony Brown investigation, you said that you had the opportunity to be involved with the grand jury process; is that correct?

A.   Correct.

Q.   And involved in the grand jury process, I believe you said there's a couple different things that you would be involved with.

     Grand jury subpoenas for documents; is that correct?

A.   Correct.

Q.   And grand jury subpoenas for witnesses; would that be right, as well?

A.   Yes.

Q.   Let me start with the grand jury aspect of documents.

     Were you involved in actually serving grand jury subpoenas to the Los Angeles County Sheriff's Department?

A.   Some of them, yes.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Q.   And when a subpoena is served to the Los Angeles County Sheriff's Department, you mentioned that it had a huge amount of information to comply with, correct?

A.   Yes.

Q.   And sometimes that could take weeks or months in order to gather all that information and then produce it to the grand jury; is that right?

A.   I don't know their timetable.  I know what we asked for and I know when we got it back.  I'm not sure if they could have gotten it to us quicker or longer or what, but we got documents from the sheriff's department at some point.

Q.   Now, when you say you were dealing with the grand jury, I also want to make sure I understand what a grand jury is.

     A federal grand jury is 16 to 23 people; is that right?

A.   Typically.

Q.   And the grand jury has a foreperson; is that right?

A.   Yes.

Q.   And the grand jury would have a secretary; is that correct?

A.   Yes.

Q.   And the grand jury actually physically meets in a room approximately once a week; is that right?

A.   Yes.

Q.   And when the grand jury meets in the room, that's where

they can receive documentation as part of their grand jury

investigation, correct?

A.    They could.

Q.    And the grand jury can also hear witnesses during these

weekly meetings; is that right?

A.    They can.

Q.    And there would be a court reporter in the grand jury room

taking down the notes; would that be accurate?

A.    Yes.

Q.    And the prosecutors, Mr. Fox and the prosecution table,

they're allowed into the grand jury room to ask a witness

questions; is that correct?

A.    Yes.

Q.    But defense attorneys are not allowed into the grand jury

room to ask any questions; is that correct?

A.    That is.

Q.    Now, when a grand jury receives evidence, it has a certain

term that it lasts; is that right?

A.    Typically, one year.

Q.    Typically, one year, but it can be up to 18 months; is

that correct?

A.    I believe so.

Q.    And when a grand jury receives information, they can

receive information on the first day -- or let's say it's the

first week that they're in grand jury session, correct?

A.    They can, but that's not typical.

Q.    And they can also receive it, let's say, at the six-month point?  They can receive information at that point?

A.    They can.

Q.    And all along that time, as well?

A.    Yes.

Q.    And any week along those 18 -- or 12 to 18 months, correct?

A.    Yes.

Q.    And if they receive the information on the first week versus receiving it, let's say, on the 25th or 50th week, it's still the same information they're receiving in order to consider whether or not to return an indictment; is that correct?

A.    It's -- I don't know how -- I don't know -- that's a weird hypothetical.  They can consider what's presented to them at any time.

Q.    Right, at any time.

        So, in other words, if they got the information on week 2 or week 20, they can consider it in deciding whether or not to return an indictment, let's say, on week 21?

A.    Yes.

        MR. JAUREGUI:  Your Honor, I object to relevance and 403 and move to strike.

        THE COURT:  Sustained.  The answer is stricken.

The jury should disregard it.

BY MR. HOCHMAN:

Q.    Well, a grand jury can consider hearsay; is that correct?

THE COURT:  Let's go to sidebar.

*(Proceedings held at sidebar under seal 9:21 A.M.)*

(*The following proceedings were held in open court.*)

BY MR. HOCHMAN:

Q.   Now, a grand jury can consider hearsay evidence; is that correct?

A.   That's correct.

Q.   And by "hearsay," I mean that -- well, actually, what do you understand "hearsay evidence" to mean?

A.   Hearsay is testifying to what somebody else told you.

Q.   So, in other words, if you wanted to go ahead and present information about what Anthony Brown had told the FBI during the times that it spoke -- the times that he spoke with the FBI, you, yourself, or another FBI agent could go in front of the grand jury and tell the grand jury what he had said to you, correct?

A.   Yes.

Q.   And you could say that word for word?  In other words, literally every word that he said to you, you could say to the grand jury, "This is what Anthony Brown told me"; is that correct?

A.   You can.

Q.   And you can do that at any point that the grand jury is in session during that 12- to 18-month period, correct?

A.   Yes.

Q.   Did you at any point go into the grand jury and tell the grand jury what Anthony Brown had told the FBI from approximately the summer of 2010 through 2011?

A.   No.

Q.   Now, you said with respect to subpoenas, subpoenas for documents, that you got approximately hundreds of thousands of pages of documents from the sheriff's department, correct?

A.   Correct.

Q.   And over the course of the investigation, did you get over a half a million pages of documents from the sheriff's department?

A.   It was definitely over a half a million pages.  In total, whether it's from the sheriff's department, I don't know specifically, but I think it's probably true.

Q.   And that was based on the 80 or so subpoenas that were served in connection with this grand jury investigation?

A.   Yes.

Q.   And with respect to those subpoenas, how does it exactly work?  It's a grand jury subpoena.  Do you actually go to the grand jury each time you want to ask -- serve a subpoena and ask them what they want, or how does it work?

A.   I mean, that's one way it could happen, or we just consult

with the United States Attorney's office on what to ask for in a subpoena and we do it on behalf of the grand jury.

Q.   And do you know at that point in the process if the United States Attorney's office consults with the grand jury first before the subpoena is issued?

A.   That's possible.

Q.   Does it usually happen that way?

        MR. JAUREGUI:  Objection, Your Honor.  Calls for speculation.

        THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.   Now, with respect to the documents you got back from the sheriff's department, I believe you said that the grand jury started to hear evidence in 2012; is that correct?

A.   Yes.

Q.   And would it be approximately March 2012 that they started to hear evidence?

A.   Yes.

Q.   And then they started to hear -- and that evidence then started to include, in the summer of 2012, evidence dealing with the obstruction of justice investigation; is that correct?

A.   Yes.

Q.   And you said that you had a chance to interview, starting in the summer of 2012, many people in the sheriff's department; is that correct?

A.    Some people.

Q.    That included sheriff's deputies?

A.    Yes.

Q.    Sergeants?

A.    Eventually.

Q.    Lieutenants?

A.    Eventually.

Q.    Captains?

A.    Yes.

Q.    Chiefs?

A.    Eventually -- I mean, your -- the timetable is much longer than that, but, yes, we eventually interviewed all -- people all the way up the ranks starting in the summer of 2012.

Q.    And with respect to the documents that are being presented to the grand jury, you said you got e-mails from the sheriff's department that were presented to the grand jury, correct?

A.    Yes.

Q.    And you also got audiotapes of the Anthony Brown tape-recorded sessions that he had with the sheriff's department investigators; is that correct?

A.    Eventually we got them, yes.

Q.    And which -- and when you got those audiotapes of the Anthony Brown interviews, was that the only source?  And by that, I mean was the sheriff's department the only source of those audiotapes, to your knowledge?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

MR. JAUREGUI:  Objection, Your Honor.  Motion in limine.

THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.   Did the FBI have a tape recorder going during any of the Anthony Brown interviews that occurred in August of 2011?

A.   No.

Q.   And you said that the last Anthony Brown interview of which you were aware of was what date?

A.   Can you be more precise in that question?

Q.   Sure.  The prosecutor asked you when was the last time you were aware of when Anthony Brown was interviewed by the sheriff's department.

MR. JAUREGUI:  Objection.  Misstates my question.

THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.   When was the last time you were aware that Anthony Brown was interviewed by the sheriff's department?

A.   It depends by what you mean -- how do you define "interview"?  That's the problem.

Q.   How about a tape-recorded interview?

A.   How are you defining "interview"?

Q.   Where he was asked questions by the sheriff's department and he provided answers in a tape-recorded session.

A.   The last substantive interview, which is what I testified

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

to before, was August 29th.

The last time he was talked to on tape, I believe, was September 2nd.

Q.   I see.  Now, with respect to documents that you received, I believe counsel asked you a question about Sheriff Baca's e-mails.

Are you aware of that?

A.   Yes.

Q.   Are you aware of Sheriff Baca taking any steps to prevent his e-mails from being produced to the federal grand jury?

A.   I mean, you're asking me to speculate about what he may or may not have done.  I don't know.

Q.   You don't have any evidence that Sheriff Baca took any steps to prevent any of his e-mails from being produced to the grand jury; is that correct?

A.   I don't have any evidence.

Q.   And you don't have any evidence that Sheriff Baca took any steps to prevent his notes from being produced to the grand jury; is that correct?

A.   I don't have any evidence.

Q.   Now, in addition to the Anthony Brown tape recordings that were presented to the grand jury from the Los Angeles Sheriff's Department, were there also tape-recorded interviews of a deputy named William David Courson that was presented to the grand jury that you're aware of?

A.    Yes.

Q.    And did the FBI have a tape recorder going during the interview of William David Courson by the sheriff's department investigators?

        MR. JAUREGUI:  Objection, Your Honor.  It's motion in limine again.

        THE COURT:  Let's go to sidebar.

    *(Proceedings held at sidebar under seal 9:31 A.M.)*

(The following proceedings were held in open court.)

BY MR. HOCHMAN:

Q.    Agent Dahle, when William David Courson is being interviewed by the sheriff's department, was the FBI present for that meeting?

A.    We didn't know it was happening, so we weren't there.

Q.    And when the -- Gilbert Michel is being interviewed by the sheriff's department, was the FBI present for that meeting?

A.    Same answer.  We didn't know it was happening, so we weren't there.

Q.    But you later received the audiotapes of the sheriff's department interview of Gilbert Michel as part of the federal grand jury production by the sheriff's department; is that correct?

A.    Much later.

Q.    And with respect to a voice mail that was left by a Sergeant Craig to Agent Marx, was -- did the FBI, to your knowledge, record that voice mail when it was left?

A.    Not to my knowledge.

Q.   And with respect to the approach of sheriff's department

investigators to Leah Marx -- excuse me, Agent Marx on

September 26, did the FBI record that approach?

A.   That would be silly.  Why would we record approach of our

own agent that we didn't even know about?

Q.   So the answer is no, you didn't record it?

A.   Of course.

Q.   But you got the recording -- the audio recording of that

as part of the sheriff's department production for grand jury

records, correct?

A.   Yes.

Q.   And you got even a separate video recording of that

approach from the sheriff's department pursuant to the grand

jury records?

A.   Yes, we did.

Q.   You also got surveillance logs that were done of Agent

Marx by Los Angeles Sheriff's Department investigators; is that

correct?

A.   Yes.

Q.   And the FBI did not participate in the surveillance of

Agent Marx; is that correct?

A.   We didn't surveil our own agent for the sheriff's

department.

Q.   And you also received original notebooks from Sergeant

Craig as part of the sheriff's department production; is that

right?

A.    Yes.

Q.    And you received Mr. Baca's calendar as part of the sheriff's department production?

A.    Yes.

Q.    And you received record jackets for Anthony Brown, John Rodriguez, Kevin King, and Chris Johnson from the sheriff's department as part of their production?

A.    Yes.

Q.    Now, with respect to -- going back to when you got involved in this investigation, I believe you found out that it was -- Anthony Brown was the inmate who was involved in connection with the undercover investigation; is that correct?

A.    Yes.

Q.    Did you have any role in picking Anthony Brown as that undercover informant?

A.    No.  I wasn't assigned to the case yet.

Q.    And were you aware that Anthony Brown had a long, dangerous, and violent criminal history?

        MR. JAUREGUI:  Objection, Your Honor.

        THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.    You were aware, though, that the contraband that was used in connection with the Gilbert Michel investigation was a cell phone; is that correct?

A.    I am aware.

Q.    Had you ever used a cell phone in any of your undercover investigations at that point in time?

        THE COURT:  The Court --

        MR. JAUREGUI:  Objection.

        THE COURT:  -- sustains its own objection.

        Next question.

BY MR. HOCHMAN:

Q.    Now, when you went ahead and met with Anthony Brown, that was August 23rd, correct?

A.    Yes.

Q.    And at that meeting with Anthony Brown, Anthony Brown had the opportunity to tell you about what had happened since the cell phone had been found on August 8th, correct?

A.    Yes.

Q.    And Anthony Brown actually described to you the meetings that he had had with sheriff's department investigators throughout August 8th, when he spoke with them on August 15th and 16th, and when he was interviewed on August 19th and 21st by the sheriff's department investigators; is that correct?

A.    Yes.

Q.    And he told you that they found that -- his cell phone in a potato chips bag as part of his stuff, correct?

A.    Yes.

Q.    And he told you that they found it at the point in which

he was being escorted to the medical wing as part of a routine search of him, correct?

A.    Yes.

Q.    And he also told you that he had told the sheriff's department investigators -- and now we're talking about -- it's August 23rd, when he's meeting with you -- that he had told the sheriff's department investigators that Deputy Michel was the deputy who had brought him the cell phone; is that correct?

A.    I believe that's true.

Q.    And did he also tell you that he told the sheriff's department investigators that he was working -- "he" being Anthony Brown -- that Anthony Brown was working with the FBI?

A.    I believe that's true.

Q.    And did he also tell you that he was involved with various types of drugs at that point?

        MR. JAUREGUI:  Your Honor, at this point I'm going to object as hearsay.

        THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.    Generally speaking, did you have a discussion with Anthony Brown concerning drugs that he received from Gilbert Michel?

A.    He told us generally.

Q.    And he told you generally about being involved with cocaine and methamphetamine and receiving that from Gilbert Michel?

MR. JAUREGUI:  Your Honor, same objection to this line of questioning.

THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.   Did he tell you about the photographs --

THE COURT:  That's sustained, too.

BY MR. HOCHMAN:

Q.   Did Anthony Brown at any point ask you during the meeting whether or not he could participate in a narcotics transaction with Gilbert Michel?

THE COURT:  That is sustained, as well.  Move on.

BY MR. HOCHMAN:

Q.   When you left that meeting, did you believe that Anthony Brown had been telling you the truth during the meeting?

MR. JAUREGUI:  Your Honor, relevance.

THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.   Did you continue to use Anthony Brown in an undercover capacity or any capacity after the August 23rd meeting?

A.   He was interviewed multiple times after that in order to obtain information.

Q.   When was the first interview?

MR. JAUREGUI:  Vague.

THE WITNESS:  What interview?

///

BY MR. HOCHMAN:

Q.    When you say he was interviewed multiple times to obtain information, who was he interviewed by?

A.    Agents.

Q.    And would that be Agent Marx?

A.    Yeah, I mean, what time are we talking about?

Q.    September 15, 2011, Lancaster State Prison.  Was he interviewed by Agent Marx at that point?

A.    Yes.

Q.    And was he interviewed by Agent Marx many times thereafter, September 15, 2011?

A.    He was interviewed -- I wouldn't say many, but he was interviewed other times by different agents at different state prison locations around California.

Q.    And was he eventually brought by the government to testify in front of the federal grand jury in December 2012?

A.    Yes.

Q.    Now, you said that as a result of your discussions with Anthony Brown, you had to accelerate the time frame in which you were dealing with Gilbert Michel; is that correct?

A.    Yes.

Q.    And what did Anthony Brown tell you that led you to need to accelerate that time frame?

          MR. JAUREGUI:  Objection, Your Honor.  Hearsay.

          THE COURT:  Sustained.

BY MR. HOCHMAN:

Q. Well, what was the basis for your accelerating the time frame with Anthony -- with Gilbert Michel's investigation?

A. Part of it was the reaction that we received when they ripped Anthony Brown out of the interview.

Q. Was there anything Anthony Brown told you that led to you accelerating your time frame?

A. The sheriff's department may know that we were looking into Deputy Michel.

Q. Now, the next day you said you actually went ahead and confronted Gilbert Michel; is that correct?

A. Yes.

Q. And earlier that day, you and a number of agents went out to his apartment to wait for him to come back to the apartment; is that correct?

A. Yes.

Q. How many agents did you have at that point?

A. I think there was six of us total.

Q. And were you all in the parking lot waiting for him to come back on that day to his apartment?

A. We were in the vicinity.

Q. And when he eventually comes to the apartment, how many agents greet him?

A. Three of us.

Q. Which ones?

A.    Myself, Special Agent Marx, and Special Agent Plympton.

Q.    And the plan -- what was the plan that you had ahead of time in dealing with Gilbert Michel during this meeting on August 24th?

A.    The general plan was to show him the videotape of him taking the bribe and other evidence that we had against him and see, one, if he would admit it, and, two, if he would agree to cooperate with our investigation and give us information about other deputies doing similar corruption violations or excessive use of force violations.

Q.    When you say "show him the videotape of him taking the bribe," had the bribe transaction actually been videotaped by the FBI?

A.    Yes.

Q.    And there was actually two bribe transactions, one on July 20th of 2011 and one on August 4th of 2011.

      Were you going to show him the videotape from both transactions?

A.    He was definitely shown videotapes.  I wasn't sitting at the table with him, so I can't tell you which one or if they showed both.  But he was shown videotapes of at least one of those transactions.

Q.    And in addition, you said in planning for this that you were also going to confront him with other evidence.

      What's that other evidence?

A.    That -- the knowledge of what he was doing was -- I mean little details that would corroborate the fact that we knew what he had done.

Q.    Like which little details?

A.    You're asking -- I mean, this is all theoretical.  I wasn't at the table.  I mean, these are what we discussed prior.

Q.    Yes.  I'm asking you about what you discussed prior.

        MR. JAUREGUI:  Objection to hearsay, Your Honor.

        THE COURT:  It is hearsay and it is irrelevant.  Next question.  The objection is sustained.

BY MR. HOCHMAN:

Q.    So then when Gilbert Michel shows up that day, you, Agent Marx, and another agent confront him in the parking lot; is that correct?

        MR. JAUREGUI:  Objection.  Asked and answered, Your Honor.

        THE COURT:  Let's go to sidebar.

    *(Proceedings held at sidebar under seal 9:45 A.M.)*

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*(The following proceedings were held in open court.)*

BY MR. HOCHMAN:

Q.   You said during your direct testimony that Gilbert Michel and the agents went to a Starbucks; is that correct?

A.   Yes.

Q.   How long were you at the Starbucks -- excuse me.

How long were the agents at the Starbucks with Gilbert Michel on that day of August 24?

A.   Couple hours.

Q.   And after that couple hours, did you go back to Gilbert Michel's apartment at that point?

A.   Yes.

Q.   Did the interviews continue with Gilbert Michel and the FBI agents at his apartment?

A.   Yes.  Angela Caruso was also at the apartment.

Q.    And how long did those interviews last, approximately?

A.    A few more hours.

Q.    And after these hours of discussions with Gilbert Michel,
did he agree to cooperate with your investigation?

A.    No.

Q.    Was he arrested by the FBI at that point?

A.    No.

Q.    With respect, you said, to Angela Caruso, she was also a
sheriff's department deputy; is that right?

A.    Yes.

Q.    And was she given a grand jury subpoena to testify during
your meeting with her?

        MR. JAUREGUI:  Objection.  Relevance, Your Honor.

        THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.    Did you arrest Angela Caruso at that time?

        MR. JAUREGUI:  Objection, Your Honor.

        THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.    Now, after the August 23rd interview that you had with
Anthony Brown that got cut short, did you or Agent Marx or
Agent Plympton ever arrange to have another interview at the
Men's Central Jail with Anthony Brown before he was released on
September 12, 2011?

A.    No.

Q.   And you had -- I believe you said that when the interview got canceled, someone told you that a Captain Carey was going to come by and wanted to speak with you?

A.   Yes.

Q.   And I think you said that you waited five or ten minutes, but then left before speaking with Captain Carey?

A.   They told us someone was going to give us a phone call and we waited for a phone call and no one ever called, so --

Q.   Did you, Agent Marx, or Agent Plympton ever contact Captain Carey to inquire as to whether or not you could have an additional interview with Anthony Brown at Men's Central Jail?

A.   It was pretty clear that they didn't want us interviewing Anthony Brown, so, no, we didn't do that.

Q.   If I may show you Exhibit 113.

       MR. HOCHMAN:  And may I ask Agent Tanner to put it on the screen.

   *(The exhibit was displayed on the screen.)*

BY MR. HOCHMAN:

Q.   You talked about your knowledge that US Marshals Service served writs to obtain inmates in connection with the investigation; is that correct?

A.   That's correct.

Q.   And Exhibit 113 is an example of one of those writs for Anthony Brown.

       Do you see that?

A.    Yes.

Q.    Now, a writ basically orders the sheriff's department to produce Anthony Brown on a certain day; is that correct?

A.    Yes.

Q.    And the writ in Exhibit 113 says the sheriff's department has to produce Anthony Brown on September 7, 2011.

Do you see that?

A.    Yes.

Q.    Do you know if Anthony Brown was produced by the sheriff's department on September 7, 2011, to the federal grand jury?

A.    He was not.

Q.    Did you take -- did you contact anyone when Anthony Brown was not produced on September 7, 2011, at the sheriff's department to find out where he was?

A.    I did not.

Q.    Do you know if Agent Marx contacted anyone to find out where Anthony Brown was?

A.    No.

Q.    And after a witness is produced pursuant to the writ, then the witness would go back to where they came from; isn't that correct?

A.    Typically.

MR. HOCHMAN:    That's fine.    Thank you for Exhibit 113.

///

BY MR. HOCHMAN:

Q.   I think you testified that you were familiar with the type of inmates on the 2000 and 3000 floor of Men's Central Jail that were involved in your investigation.

A.   I am familiar with them generally at that time.

Q.   And, generally, what types of inmates are housed on those floors?

A.   Well, like I said earlier, they are people with higher security classifications, which could mean that they've committed serious crimes or it could mean that they're just a person, for whatever reason, needs higher security because they're related to law enforcement, they're somebody who's well known, like a celebrity.

Q.   But the higher-security inmates that you were dealing with as part of your investigation, were they celebrities?

A.   We interviewed people considered celebrities.

Q.   Were the bulk of the people that you interviewed considered dangerous and violent inmates that were housed on 2000 and 3000 floor?

A.   Yes.

        MR. HOCHMAN:  May I have one moment, Your Honor?

        THE COURT:  Yes.

BY MR. HOCHMAN:

Q.   You said that one of the reasons that you wanted to get -- well, that one of the types of investigative tools that would

have been useful in your investigation is videotaped evidence;
is that correct?

A.   Had there been videotapes of what was occurring in this
case, that would have been very helpful.

Q.   All right.  Did you have any people within the sheriff's
department that could have assisted you in putting cameras in
various parts of the jail facility, on let's say the 2000 or
3000 floor?

          MR. JAUREGUI:  Objection.  Relevance, Your Honor.

          THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.   You talked about being at the April 12, 2013, interview of
Sheriff Baca.

          Do you recall that?

A.   Yes.

Q.   And were you there for the entire time?

A.   Almost.

Q.   And that interview was audio recorded, correct?

A.   Yes.

Q.   But it wasn't video recorded; is that right?

A.   That's correct.

Q.   And as you sit here today, can you remember Sheriff Baca's
body language, his physical demeanor, during each and every
question that he was answering during that interview?

A.   Each and every question?

Q.    Yes.

A.    I don't remember the body language of each and every question that I ask anybody.

Q.    But if you had a videotape recording of it, the video would be able to relay that type of information per question, correct?

A.    Yeah, I suppose so.

Q.    And with respect to that -- I think you said it was a four-hour interview; is that correct?

A.    Approximately.

Q.    It was actually a 4 hour and 45 minute interview with about 45 minutes of breaks interspersed, correct?

A.    There were breaks.  I can't tell you how long the breaks were, but that sounds about right.

Q.    And have you reviewed a full audio recording of that interview?

A.    I have.

Q.    When was the last time you did that?

A.    It's been a while.

Q.    I'm sorry?

A.    It's been a while.

Q.    How long is a while?

A.    Couple months.

Q.    Now, you said that with respect to Gilbert Michel -- the counsel asked you what happened to Gilbert Michel and you said

at some point he pled guilty after he decided to cooperate; is that correct?

A.    Yes.

Q.    Now, the first meeting that Gilbert Michel has with the government when he's deciding to cooperate was on September 28, 2011; is that correct?

A.    I think that's the first time he came in to provide information.  His attorneys had been in constant communication with the United States Attorney's office prior to that.

Q.    And Gilbert Michel ultimately agrees to plead guilty; is that correct?

A.    Yes.

Q.    He agrees to plead guilty to the bribe transaction; is that right?

A.    Yes.

Q.    And he pleads guilty in January of 2012; is that correct?

A.    Yes.

Q.    And thereafter, he is sentenced; is that right?

A.    Sometime later, yes.

Q.    And he received a six-month sentence; is that correct?

A.    I believe so.

        MR. HOCHMAN:  No further questions, Your Honor.

        THE COURT:  Ladies and gentlemen, we're going to take our first break of the day.

        Again, I want to remind you until this trial is over,

you're not to discuss this case with anyone, including your fellow jurors, members of your family, people involved in the trial, nor are you allowed to permit others to discuss the case with you.  If anyone approaches you and tries to talk with you about this case, please let me know about it immediately.

Do not read any news stories or articles or listen to any radio or television reports about the case or about anyone who has anything to do with it.

Do not do any research, such as consulting dictionaries, searching the internet, or using other reference materials, and do not make any investigation about the case on your own.

If you need to communicate with me, simply give a note to the clerk.

We're going to come back at quarter after the hour.

THE CLERK:  All rise.

(Jury out at 9:57 A.M.)

(The following was heard outside the presence of the jury.)

THE COURT:  All right, sir.  You may step down.

Is there anything else we need to take up?

MR. HOCHMAN:  Just timing-wise, Your Honor, was the Court going to read the judicial notice at this point?

THE COURT:  No.  I think unless -- if they don't have any redirect and you don't have any recross, then I'll read it,

but I assume we'll finish with the witness.

MR. HOCHMAN:  I'm sorry, Your Honor.  Implicit in my question -- I didn't make it explicit -- was at the conclusion of the witness.

THE COURT:  Well, I guess I didn't understand your question.  I took you literally.

MR. FOX:  Your Honor, there is one thing that we could either address now or later.  It's not urgent.

On Mr. Baca's calendar, which is in evidence as Exhibit 120, I've made redactions to Mr. Baca's meeting and press conference with Tom Perez.

Earlier in this trial, despite the motion in limine, I believe Mr. Hochman was going to be talking about that meeting.

Given the motion in limine, I think it's best to redact that information so that it's not argued and doesn't go back to the jury.

MR. HOCHMAN:  And, Your Honor, the government, as you know, could have chosen any excerpt or no excerpts from Mr. Baca's interview.  They chose an excerpt that identified Tom Perez in connection with one of Mr. Baca's answers dealing with his knowledge of civil rights investigations, which is one of the false statements at issue.

I think we're entitled to have an explanation as to who Tom Perez is.

Certainly, we are going to stay away from the Court's motion in limine ruling that deals with the fact that there was a press conference that involved a separate and Antelope Valley civil rights investigation and Mr. Baca's cooperation with it, but since the government has played this excerpt for the jury at this point and it has Tom Perez's name in it, having some identifiers about Tom Perez, that there is a connection between Tom Perez and Sheriff Baca I believe is important.

And to the extent that the excerpt that the -- on the calendar merely says -- I'm paraphrasing -- that there was either a meeting or a conference with Assistant Attorney General Tom Perez at a certain date, Your Honor, I believe that's what it shows on August 19th.

And, obviously, that's within our time period, so it's relevant to both Sheriff Baca's answers and our time period.

MR. FOX:  This is what I was talking about earlier where Mr. Hochman takes an inch and he goes way further than that.

What the quote is from Mr. Baca -- it's from Excerpt 5 from Exhibit 2 -- Mr. Baca himself, when I ask him, "Are you aware that there are federal statutes dealing with civil rights offenses," says that he is "generally aware that that has happened in headquarters US Attorney's office with Mr. Tom Perez, who I am very familiar with and have worked

with."  There's no explanation that's needed, Your Honor.

MR. HOCHMAN:  And, again, who Tom Perez is, I think that part is relevant, Your Honor.  In other words, we can -- and the fact that he shows up in Mr. Baca's calendar establishes and corroborates what Mr. Baca is saying as far as his familiarity with someone involved with the civil rights division and what he knows about civil rights laws.

MR. FOX:  Mr. Hochman keeps talking about Tom Perez and not explaining any relevance to any of the charges here.

MR. HOCHMAN:  I didn't choose the clip, Your Honor, they did.

THE COURT:  Are you two finished now?

MR. HOCHMAN:  I'm sorry?

THE COURT:  Are you two finished?

MR. HOCHMAN:  Yes, Your Honor.

THE COURT:  Okay.

THE CLERK:  This court now stands in recess.

*(Recess taken 10:01 to 10:17 A.M.)*

*(The following was heard outside the presence of the jury.)*

THE COURT:  All right.  Let's bring the jury in.

*(Jury in at 10:20 A.M.)*

THE COURT:  All right.  Redirect.

MR. JAUREGUI:  Briefly, Your Honor.

*///*

REDIRECT EXAMINATION

BY MR. JAUREGUI:

Q.   Agent Dahle, Mr. Hochman asked you about civil rights investigations and public corruption investigations.  The investigation into the jails that you were involved in, was that one investigation encompassing both?

A.   Yes.

Q.   And you were assigned to the overall investigation?

A.   Yes.

Q.   And Mr. Hochman talked to you about records received from the sheriff's department.  Do you -- did you ever receive in response to any grand jury subpoenas or requests the original case file or records jacket for Anthony Brown?

A.   No.

Q.   And did the sheriff's department ever produce to you or the federal government the original copy of the writ that was served to the sheriff's department for Anthony Brown?

A.   No.

Q.   And when the -- we looked at the August 24, 2011, subpoena for Anthony Brown.  Do you recall that?

A.   Yes.

Q.   And then a broader subpoena that you -- that had to do with jail personnel?

A.   Yes.

Q.   When you asked for records relating to Anthony Brown, did

you receive the records jackets for all the aliases used by the sheriff's department for Anthony Brown?

A.   Not originally.

Q.   Did you have to ask specifically for the records jackets for John Rodriguez?

A.   Yes.

Q.   Kevin King?

A.   Yes.

Q.   And Chris Johnson?

A.   Yes.

MR. JAUREGUI:  Nothing further, Your Honor.

MR. HOCHMAN:  Nothing further, Your Honor.

THE COURT:  All right.  You may step down.  Call your next witness.

MS. RHODES:  The United States calls James Sexton.

THE COURT:  Before the witness comes in, let see me see Counsel at sidebar.

*(Proceedings held at sidebar under seal 10:23 A.M.)*

*(The following proceedings were held in open court.)*

THE COURT:  Ladies and gentlemen, in the federal criminal justice system, grand juries investigate crimes and absent a stipulation or agreement, all felony crimes must be prosecuted by a federal grand jury indictment.

A grand jury investigation is the same thing as a grand jury proceeding.  Grand juries do not have the same function as trial juries.  For example, grand juries are not required to presume defendants innocent and may return an indictment without considering the same burden of proof as a trial jury.

Grand juries do not hear arguments from defense attorneys and do not necessarily receive the same evidence that is later introduced at trial.  Grand jury indictments are not evidence against any defendant.  Grand juries are ordered by the district court --

(Phone ringing.)

All electronic devices must be turned off.

Grand juries are ordered by the district court and are summoned, selected, and impaneled pursuant to federal law.

A grand jury must consist of no less than 16, no more than 23 members.  The only people permitted inside the grand jury room are the witnesses under examination, grand jurors, the attorney for the government, an interpreter, if needed, and a court reporter.  The attorney for the government assists the grand jury in deciding which witnesses to hear from and which subpoenas to issue.

Counsel for the witness or defendants are not permitted inside the grand jury.  By law, all participants other than witnesses are bound to strict secrecy regarding proceedings before the grand jury.  The term of the normal grand jury is not to exceed 18 months.

Ladies and gentlemen, you may or may not accept these noticed facts as conclusive.

All right.  If you would call your next witness.

MS. RHODES:  Yes, Your Honor.  The United States calls James Sexton.

THE CLERK:  Please raise your right hand.

Do you solemnly swear that the testimony you shall give in the cause now before this Court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  Yes, ma'am.

THE CLERK:  Please be seated.

Please state your full name and spell your last name for the record.

THE WITNESS:  Yes, ma'am.  James McAbee Sexton, S-E-X-T-O-N.

MS. RHODES:  May I proceed, Your Honor?

THE COURT:  Yes.

JAMES SEXTON,

having been first duly sworn,

testified as follows:

DIRECT EXAMINATION

BY MS. RHODES:

Q.   Mr. Sexton, were you ever employed by the Los Angeles County Sheriff's Department?

A.   Yes, ma'am.

Q.   When?

A.   Between February of 2008 to January of 2014.

Q.   And prior to that, what did you do?  Prior to joining the sheriff's department, what did you do?

A.   I was a deputy sheriff assigned to Operation Safe Jails.

Q.   Prior to joining the sheriff's department, what did you do?

A.   I was a student, ma'am.

Q.   Now, how old were you when you joined the Los Angeles

County Sheriff's Department?

A.    I was 23, ma'am.

Q.    You said you stopped working for the sheriff's department in 2014; is that right?

A.    Yes, ma'am.

Q.    Why did you stop?

A.    I was indicted and convicted for obstruction of justice.

Q.    And were you convicted of obstruction of justice and a separate crime as well?

A.    Yes, ma'am.

Q.    What was that other crime?

A.    Conspiracy.

Q.    What did those charges relate to in your case?

A.    They related to the operation known as Operation Pandora's Box.

Q.    And what was that about?

A.    It was an operation where we were ordered to change the name of a federal informant by the name of Anthony Brown and secure him in an off-site location in San Dimas station.

Q.    After your conviction, at some point did you begin serving time in a federal prison?

A.    Yes, ma'am.

Q.    And during your incarceration, did you testify in any proceedings?

A.    Yes, ma'am.

Q.    How did you get here when you testified?

        MR. HOCHMAN:  Objection.  Relevancy.

        THE COURT:  Sustained.  We'll come back to it.

BY MS. RHODES:

Q.    At any time when you testified in a prior proceeding, did you have an agreement with the government?

A.    No, ma'am.

Q.    After your testimony, did the government file any motions with regard to your sentence?

A.    Yes, ma'am.

Q.    Who ultimately decided that motion?

A.    The motion was ruled on by Judge Percy Anderson.

Q.    And as a result of the Court's order, was your sentence reduced?

A.    Yes, ma'am.

Q.    And are you currently subject to some limitations?

A.    Yes, ma'am.

Q.    What are they?

A.    I am currently on house arrest, and I remain on probation for another year after that.

Q.    Now, I think you -- you said earlier you became part of Operation Safe Jails when you were at the sheriff's department; is that correct?

A.    Yes, ma'am, in 2009.

Q.    Is that the same -- and did you stay there through at

least the end of 2011?

A.    Yes, ma'am.

Q.    Was that the same unit as Mickey Manzo?

A.    Yes, ma'am.

Q.    Who was the unit commander?

A.    Lieutenant Gregory Thompson.

Q.    When you worked Operation Safe Jails, did you have to wear the sheriff's department uniform?

A.    Yes, ma'am.

Q.    The tan and green or did you wear something different?

A.    As part of my -- as part of being in a specialized unit, I was allowed the opportunity to wear several uniforms.  One of them included the gang enforcement officer uniform, which was green jackets, blue jeans.

Q.    I'd like to show you Exhibit 108, which I believe is in the binder next to you on your left side.

A.    There's several binders, ma'am.  I apologize.

Q.    108, I think, is in Volume II.

A.    Yes, ma'am.

Q.    Do you have that in front of you?

A.    Yes, ma'am.

Q.    Do you recognize it?

A.    Yes, ma'am.

Q.    What is it?

A.    It is a -- a sheet of paper depicting the County of Los

Angeles Sheriff's Department organization chart.

Q.   And is it a fair and accurate depiction of the County of Los Angeles Sheriff's Department organizational chart in August and September of 2011?

A.   Yes, ma'am.

          MS. RHODES:  Your Honor, I move to admit Exhibit 108.

          MR. HOCHMAN:  No objection, Your Honor.

          THE COURT:  It will be received.

     *(Government's Exhibit 108 admitted into evidence.)*

          MS. RHODES:  And if I could have Special Agent Tanner publish that.

BY MS. RHODES:

Q.   Mr. Sexton, does that show where the Operation Safe Jails would be?

A.   It's not labeled OSJ, ma'am, but it is the unit that we served.

          MS. RHODES:  If I may have just a moment, Your Honor.

     *(The exhibit was displayed on the screen.)*

BY MS. RHODES:

Q.   Is this the document that was identified as Exhibit 108?

A.   Yes, ma'am.

Q.   And can you tell me where Operation Safe Jails would fall?

A.   I'll go by division.

          Under Custody Operations Division, at the very bottom, OSJ was a unit within the Custody Investigations

Services.

Q.   That's here (indicating)?

A.   Yes, ma'am.

Q.   And I'm putting a circle on it.

     And Operation Safe Jails was part of that; is that right?

A.   Yes, ma'am.

Q.   Now, what is Operation Safe Jails?

A.   Operation Safe Jails was a unit under Custody Investigations Services unit that mandate and scope of work was to develop human sources from inmates within the jail.

     We also performed secondary functions for the department known as "high body transports" where we would transport noteworthy inmates to and from court and around the California correctional system that included state prisons.

Q.   So you cultivated sources within the jail.  Is that part of the OSJ mandate?

A.   Yes, ma'am.

Q.   And that's what you did as a deputy in -- including 2011?

A.   Yes, ma'am.

Q.   Did you sometimes cultivate sources who had violent criminal histories?

A.   Absolutely, ma'am.

Q.   Why?

A.   The county jail is -- has the highest population density

of criminally-minded individuals.  Unfortunately, most people that were in LA county jail, a -- a high percentage of them were criminal street gang members as well as violent.

Q.   And when you cultivated a source with a violent criminal history, why would you cultivate such a source?  To do what?

MR. HOCHMAN:  Objection.  Relevancy.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  In our line of work, we needed individuals that had access and placement to ongoing criminal conspiracies within prison gangs, street gangs, and drug trafficking organizations.

BY MS. RHODES:

Q.   When you worked at OSJ, where, specifically, did you work?

A.   I was assigned to a six-man unit serving OSJ at the Inmate Reception Center, also known as IRC.

Q.   And what is IRC?

A.   IRC is the point of entry and a point of exit for all inmates coming and going from the County of Los Angeles jail system.

Q.   And does IRC play a role in court documents coming in for inmates?

A.   Yes, ma'am.

Q.   What about writs?

A.   Yes, ma'am.

Q.    What is a writ?

A.    A writ is the federal government's version of requesting a body for court.

Q.    And what are IRC's responsibilities with regard to writs?

A.    IRC's responsibility not only to federal writs but to all court orders is to serve the Court, ma'am, to make sure that the inmates are available and transported to those judicial proceedings.

Q.    And where is IRC, the Inmate Reception Center, in relationship to Men's Central Jail or MCJ?

A.    Yes, ma'am.  We call it the "downtown campus."  IRC is at 450 Bauchet Street.  It is connected to Men's Central Jail by a -- a secure catwalk, but it's directly across the street.

Q.    And that's in the city -- which city?

A.    Los Angeles, ma'am.

Q.    All right.  I'd like to address your attention to August 2011.

      At some point in that month, did you learn that a cellular telephone had been found on an inmate in Men's Central Jail?

A.    Yes, ma'am.

Q.    How did you learn about that?

A.    I was in Washington, DC, for training with a partner for OSJ, and I received a phone call from two of my partners in OSJ that asked me to return home from training -- asked both my

partner and I to return home from training to assist --

Q.   Go ahead.

A.   -- to assist with an investigation about a noteworthy inmate who was found to be in possession of a cell phone.

Q.   When you got -- who was your partner?

A.   The one that called me, ma'am, or the one --

Q.   The one you were with.  I'm sorry.

A.   I was with Deputy Jason Pearson in Washington, DC, at that time.

Q.   When you got back to Los Angeles, did you learn any additional information about the inmate or the phone?

A.   Yes, ma'am.  Upon our return, I was directed to come to the Men's Central Jail OSJ office, and I was briefed about the details of the inmate and the cell phone itself.

Q.   So when you went to the Men's Central Jail OSJ office, who was there?

A.   OSJ is split into two teams, the north and south team. Because I was at the Men's Central Jail office, there were several members from the MCJ OSJ team that included, I believe, on that date, Noah Kirk, Mickey Manzo, Sterling Haley, Gerard Smith, Detective Scale, Calvin Wayne.

Q.   And do you know approximately what date that was that you had this first meeting at the OSJ MCJ office?

A.   I believe it was Monday or Tuesday.  It was around August 21st, 22nd, yeah.

Q.    And what happened at that meeting?

A.    I -- I entered the Men's Central Jail office.  Noah Kirk -- he sits in the -- the back corner of the office, and he briefed me that he was in possession of an e-mail from an FBI analyst.

Frequently, when we do find cellular devices in the jail, we would contact the FBI.  He had corresponded with this FBI analyst, who communicated to him that the cell phone we were in possession of -- that "we" being the sheriff's department -- was an FBI cell phone.

Q.    And did the analyst -- did Mr. Kirk tell you about anything that he had learned about Anthony Brown making calls on the inmate telephone monitoring system or ITMS?

A.    I was briefed that there were phone calls.  I did not get a lot of granular detail at that time about the phone calls.

Q.    Did you learn at some point that Anthony Brown had called a certain entity on the ITMS phones?

A.    Yes, ma'am.

Q.    What entity was that?

MR. HOCHMAN:  Objection.  Foundation.

THE COURT:  Sustained.

BY MS. RHODES:

Q.    At this meeting, did you learn that Anthony Brown had made phone calls on the ITMS system to a certain entity?

A.    The ITMS system, ma'am -- I apologize, I'm not trying to

correct, but the ITMS is a monitoring system that deputy sheriffs use to monitor inmate phone calls. I was made aware that Anthony Brown had used the monitored inmate phone system and that those calls were aggregated and they made attempts to identify the caller -- or the person on the other end of that phone call.

Q. And did -- at this meeting, did Noah Kirk tell you that he had spoken to an analyst about where those phone calls had gone from Anthony Brown?

A. Yes -- yes, ma'am.

Q. What did you learn about where Anthony Brown's phone calls had gone?

A. I had learned that Anthony Brown was reaching out to a female that we believed -- or, I'm sorry, that the sheriff's department and OSJ believed was an FBI agent.

Q. And did you -- did Noah Kirk tell you what unit in the FBI the agent was affiliated with?

A. I did not know what unit that FBI agent was based on. Based on the phone calls, what made -- what I was briefed on that made me aware of the particular unit was the owner of the cell phone that Noah Kirk had briefed me on.

Q. And what unit? What did Noah Kirk say about the unit regarding the owner of the cell phone?

A. The analyst that Noah Kirk was corresponding with on e-mail reported that that cell phone belonged to the civil

rights squad of the FBI.

Q.   And was it important to you to learn that Mr. Brown was in contact with the civil rights unit of the FBI?

A.   Yes, ma'am.

Q.   What about that fact, that Anthony Brown was in contact with the civil rights unit at the FBI, was important to you?

A.   It is not -- it's not out of the norm for inmates to contact squads or personnel at the FBI.  This is the first time that I had seen an inmate contact this unit.  That unit is responsible for investigating police officers and color of authority violations.

Q.   And so based on that, what was the tone of the conversation in the MCJ OSJ office?

A.   Folks within that office were unnerved.  There were comments that were changing the sentiment and the disposition of our unit towards a -- a hostile or adversary position towards the FBI.

Q.   Now, after this meeting, did you later have a meeting with Greg Thompson and others where you discussed Anthony Brown's housing location?

A.   Yes, ma'am.

Q.   When was that meeting?

A.   It was after this briefing.

Q.   And where did that meeting -- directly after?

A.   Yes, ma'am.

Q.   And where was that -- where did that meeting take place?

A.   That happened in Greg Thompson's office, ma'am.

Q.   Who was there?

A.   Gerard Smith and Mickey Manzo.

Q.   So Gerard Smith, Mickey Manzo, Greg Thompson, and you?

A.   Yes, ma'am.

Q.   What was said at that meeting?

          MR. HOCHMAN:  Objection.  Foundation as to time.

          THE COURT:  Sustained.

BY MS. RHODES:

Q.   Was it on the same day as the meeting that you had in the
MCJ OSJ office?

A.   I believe so.  Yes, ma'am.

Q.   And after the meeting in the OSJ office of MCJ, did you,
Mickey Manzo, Gerard Smith, and Greg Thompson go to his office?

A.   Yes, ma'am.

Q.   And at that point did you meet?

A.   I was ordered to respond to my -- my unit commander's
office to have a discussion about Anthony Brown.

Q.   And your unit commander was?

A.   Greg Thompson.

Q.   What did Mr. Thompson say at that meeting?

A.   Because of my responsibilities at IRC and the operations
that I had participated --

          MR. HOCHMAN:  Objection.  Nonresponsive.

THE COURT:  Go ahead and finish your answer.

THE WITNESS:  Yes, sir.

Because I was responsible for transporting high-value -- high-value targets and I had to interact with the databases that were in charge of --

MR. HOCHMAN:  Objection.  Nonresponsive to what Mr. Thompson told him.

THE COURT:  All right.  I think the question was what did Mr. Thompson say.

THE WITNESS:  Mr. Thompson -- I'm sorry, Lieutenant Thompson asked me what was needed to change information in the databases, which are known as the automated jail information system, to change Anthony Brown's name and to remove him from Men's Central Jail.

BY MS. RHODES:

Q.   And did you have an understanding as to why Lieutenant Thompson had picked you out to ask you that?

A.   Yes, ma'am.

Q.   What was your understanding?

MR. HOCHMAN:  Objection.  Calls for speculation. Foundation.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  Lieutenant Thompson asked me about how to circumvent safeguards in the computer database because I had

participated in operations beforehand that required that when we transport inmates in and out of the County of Los Angeles jail from Pelican Bay or other sensitive sites.

Q.   Now -- and did you indicate that you believed you could help him with what he was asking?

A.   Yes, ma'am.

THE COURT:  When you said they wanted you to change Anthony Brown's name and to remove him from Men's Central Jail, was that literally remove him from the jail or what did that -- what did that mean?

THE WITNESS:  Sir, I -- I took him at -- at face value.  I took it to be that we were -- we were going to remove Anthony Brown from the physical facility of Men's Central Jail, sir.

THE COURT:  Okay.

BY MS. RHODES:

Q.   Now, at some point after this meeting, did you learn that the FBI had interviewed Anthony Brown?

A.   I don't understand the -- the timeline of that question. I apologize.

Q.   You met with Greg Thompson, you believe, around the 21st was your testimony; is that right?

A.   Yes, ma'am.

Q.   At some point after that, did you learn that the FBI had actually interviewed Anthony Brown?

A.    Late in August, September, ma'am, when we were guarding Anthony Brown at San Dimas station, it was conveyed to me that Anthony Brown --

MR. HOCHMAN:  Objection.  Foundation.

MS. RHODES:  Well, let me ask -- let me see if I can backtrack, Your Honor.

BY MS. RHODES:

Q.    What did Mr. Thompson usually wear to work?

A.    We were a specialized unit, ma'am, so we were allowed to wear green jackets and blue jeans for -- for day-to-day operations.

Q.    And -- I'm sorry.  And at some point in August, did you see Mr. Thompson wearing a suit?

A.    Yes, ma'am.

Q.    Did you talk to him about why he was in a suit?

A.    Yes, ma'am.

Q.    Where were you when you spoke to him?

A.    We were outside of Twin Towers Correctional Facility in what we call the "executive parking lot."  It's a small parking lot at the front of the building, and there's a glass two-story staircase that -- that we nicknamed "the bubble," and I spoke with him in the executive parking lot by the bubble.

Q.    And was it significant in your memory that he was wearing a suit?

A.    Yes, ma'am.

Q.   Why?

A.   Lieutenant Thompson never wears a suit.  I've worked for him for several years and had never seen him in a suit.

Q.   And on this day that you spoke to Lieutenant Thompson and he was in a suit, were there other things that happened later in that day?

A.   Yes.

Q.   What?

A.   Yes, ma'am.  We had -- we had a meeting later on that day that we referred to as the "Heroes Park meeting."  It's a meeting spot for South OSJ, and we were given instructions about inmate Anthony Brown.

Q.   Do you know what day the Heroes Park meeting was?

A.   It was a Wednesday late in August.  I believe it was August 24.

Q.   So the same day as the Heroes Park meeting, you saw Mr. Thompson in a suit and you spoke to him?

A.   Yes, ma'am.

Q.   And did he indicate why he was wearing a suit?

A.   He said that he had been to EPC and just had his ass chewed out by the undersheriff and the sheriff.

Q.   Did he say why?

A.   It was regarding -- yes, ma'am, he did.

Q.   What did he say?

A.   That it was regarding inmate Anthony Brown.

Q.   At that time -- when you say "EPC," what is that?

A.   I -- I believe it's the executive planning committee is what it stands for.

Q.   And at that time in 2010, where was sheriff's headquarters?

A.   It was in Monterey Park, ma'am.

Q.   And was Mr. Baca's office in sheriff's headquarters?

A.   Yes, ma'am.  It's on the fourth floor.

Q.   I'd like you to look at Exhibit 167, which is already in evidence and turn to the page with Bates number ending in 87018.

A.   The number again, ma'am?

Q.   Sure.  87018.  It's the tenth page.

A.   I apologize.  The exhibit number.  160 --

Q.   Oh, I'm sorry.  The exhibit is 167.

A.   Yes, ma'am.

Q.   It's front of you, actually --

A.   Okay.

Q.   -- because it's already been admitted in evidence.

     Okay.  So you have that page in front of you I think, and I'd ask Special Agent Tanner to highlight the call at 9:37 a.m.  Or make it larger.

     *(The exhibit was displayed on the screen.)*

BY MS. RHODES:

Q.   Do you see this call at 9:37 a.m.?

A.   Yes, ma'am.

Q.   What do the phone records indicate about where it originated?

A.   The origination is Monterey P, California, which is Monterey Park, California.

Q.   And that's where the sheriff's office was, correct?

A.   Yes, ma'am.

Q.   Now, later that day you indicated you had a meeting about Anthony Brown at Heroes Park.  What is Heroes Park?

A.   Heroes Park is a memorial set up to -- set up for individuals who have served the department that started at Men's Central Jail.  It's also an alumni area as well.

Q.   And at this meeting, who was there?

A.   At this particular meeting, the majority of OSJ South team -- we're divided north and south again.  Greg Thompson, Sergeant Dave Gutierrez, detectives from the JIU, pretty much anybody that was going to be involved with inmate Anthony Brown.

Q.   What happened at the meeting -- what time of day was the meeting?  I'm sorry.

A.   It was -- it was late in the evening.  I just remembered the sun setting, so in August it was, you know, sometime around 8:00, 8:30.

Q.   And what happened at the meeting?

A.   We were briefed about the cell phone being discovered.  We

were briefed about inmate Anthony Brown himself, his mannerisms, his characteristics.  We were asked to prepare ourselves to go on what's called "12 and 12s," 12-hour schedules, and to get ready to -- to be ordered to go to an off-site facility to secure Anthony Brown.

Q.    And was the connection between Anthony Brown and the FBI civil rights unit discussed?

A.    Yes, ma'am.

Q.    When you say you were briefed about Anthony Brown, was it discussed that deputies had smuggled contraband into him?

A.    There were -- ma'am, we -- we were still in the middle of an investigation and in the preliminary parts of that investigation, so it was hard to understand with precision how the phone got in.  It was clear that someone in the sheriff's department had smuggled the phone into the jail.

What was unclear at the time was was it a deputy, was it a nurse, was it a chaplain.  Anthony Brown had given several contradictory statements, and we were working through those statements at that time.

Q.    Did Mr. Manzo and Mr. Smith conduct the meeting?

A.    They were -- they were the principals of the meeting, yes, ma'am.

Q.    And did they indicate who they had met with with the information that they had?

A.    Yes, ma'am.

Q.    Who?

A.    Sheriff Leroy Baca, Undersheriff Paul Tanaka, Captain Tom Carey, and other supervisors.

Q.    Now, you talked about a schedule.  Was overtime discussed?

A.    Yes, ma'am.

Q.    And what was said at that meeting?

A.    That we would be receiving overtime.

Q.    Now, outside of this particular operation, the guarding of Anthony Brown, what was the state of overtime in the Los Angeles County Sheriff's Department at that time?

          MR. HOCHMAN:  Objection.  Foundation.

          THE COURT:  Sustained.

BY MS. RHODES:

Q.    Based on your experience working for the Los Angeles County Sheriff's Department as a deputy, up until and including the summer of 2011, were you able to obtain overtime?

A.    The economy was failing at that time --

          MR. HOCHMAN:  Objection.  Nonresponsive.

          THE COURT:  During that period, were you able to obtain overtime?

          THE WITNESS:  I had not received overtime for almost 18 months at that time.

BY MS. RHODES:

Q.    Now, were you part -- after the Heroes Park meeting, were you part of an additional discussion about overtime with the

subset of the people at the Heroes Park meeting?

A.   Yes, ma'am.

Q.   Where was that?

A.   The Men's Central Jail OSJ office.

Q.   And who was there in that meeting?

A.   Gerard Smith, Mickey Manzo, and Sterling Haley, Noah Kirk.

Q.   What happened at that meeting?

A.   We were -- we were directed to table any ongoing investigations we had at that time and then to give our availability to be on 12-hour shifts for a set period of time that I believe was approximately two weeks is what they were asking for at that time.

Q.   Did anyone ask about overtime being authorized?

A.   My sergeant -- on the way to that office, that meeting, Sergeant Dave Gutierrez asked Lieutenant Greg Thompson, "Who has authorized this overtime?"

Q.   And did Mr. Thompson respond?

A.   Yes.

Q.   What did Mr. Thompson say to Sergeant Gutierrez at that time?

A.   That -- per department orders, that this overtime was being authorized all the way from -- all the way from the top.

Q.   And did he say why?

A.   He said it's one of the fourth floor's highest priorities. That was one of the things discussed.

Q.   And, again, the fourth floor included the office of whom?

A.   Undersheriff Tanaka and Sheriff Leroy Baca.

Q.   Did you, in fact, get paid overtime for guarding Anthony Brown?

A.   Yes, ma'am.  Several times.

Q.   I would like you to turn to Exhibit 115 that's in your binder.

Do you have 115 in front of you?

A.   Yes, ma'am.

Q.   Do you recognize it?

A.   I do, ma'am.

Q.   What is it?

A.   We refer to this as a -- a "greenie."  It's a -- it's a copied -- it's a copy of a Los Angeles County Sheriff's Department overtime receipt or slip.

Q.   And do the pages in Exhibit 115 fairly and accurately reflect the overtime that you put in for in August and September 2011?

A.   Yes, ma'am.

MS. RHODES:  Your Honor, I at this time move for the admission of Exhibit 115.

MR. HOCHMAN:  Your Honor, I'd object to parts of this, Your Honor.

THE COURT:  What's the evidentiary objection?

MR. HOCHMAN:  Lack of foundation as to the signatures

on the document, Your Honor.

THE COURT:  Overruled.  It will be received.

*(Government's Exhibit 15 admitted into evidence.)*

MS. RHODES:  And I'd ask that Exhibit 115 be published for the jury.

*(The exhibit was displayed on the screen.)*

MS. RHODES:  If we could just blow up the -- the portion --

BY MS. RHODES:

Q.   Now, Mr. Sexton, at the top, it says your name; is that correct?

A.   Yes, ma'am.

Q.   Under "unit of assignment," what does it say?

A.   It says CU/ADM.

Q.   Do you know what unit that was?

A.   Yes, ma'am.  That's my unit.  That's the -- the shorthand for custody investigation.

Q.   And next to that, it has a number for "Outside/OT/ORG" number?  Do you see that?

A.   Yes, ma'am.

Q.   What's that?

A.   That is the number that designates the -- one of the account controls for overtime budgeting.  When this number is filled out, that means that my unit of assignment was not going to be charged for the overtime.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Q.    And do you -- based on your understanding, what is that?

A.    That is the number that designates the -- one of the account controls for overtime budgeting.

When this number is filled out, that means that my unit of assignment was not going to be charged for the overtime.

Q.    And do you -- based on your understanding of having worked with the sheriff's department, do you know where these overtime slips had to go?

A.    Yes, ma'am.

Q.    Where?

MR. HOCHMAN:  Objection.  Foundation.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  They had to -- they had to go to a division that was responsible for pay and leave.  I'm sorry. They had to go to a unit that was responsible for pay and leave.

BY MS. RHODES:

Q.    And, again, showing you Exhibit 108 -- Exhibit 108.

Exhibit 108.  Where is that unit on Exhibit 108?

*(The exhibit was displayed on the screen.)*

THE WITNESS:  It's hard for me to read the screen, ma'am.  I'm going to refer to this.

///

BY MS. RHODES:

Q.   Let me see if I can make it a little larger.

Where's that unit on Exhibit 108?

A.   Pay and leave, I believe, comes under Administrative Services Division, ma'am.

Q.   So that's this division over here which I'm now circling (indicating)?

A.   Yes, ma'am.

Q.   Who was in charge of both the Administrative Services Division and Custody and Investigative Services Division that was your division?

A.   The chain-of-command there is very extensive, ma'am.

Q.   Who was in charge of -- who was in charge of both those units?  Who were the people in charge of both those units?

A.   Ultimately, both Sheriff Baca and Mr. Tanaka at the time.

Q.   And was there anyone else who was in charge of both of those units?

A.   No, ma'am.

Q.   Now, are there official records that show where Anthony Brown was housed at different times?

A.   Yes, ma'am.

Q.   I'd like you to turn to Exhibit 124 that has already been admitted in evidence -- into evidence.

MS. RHODES:  And if we could have that on the screen.

*(The exhibit was displayed on the screen.)*

BY MS. RHODES:

Q.   What does this show?

A.   This is a printout of a computer system we use to monitor the inmate total movement history.

MS. RHODES:  Okay.  If I could have Special Agent Tanner start at August 18 at 10:46 a.m. and go up from there.

BY MS. RHODES:

Q.   On August 18 at 10:46 a.m., where was Anthony Brown?

A.   This document reflects that he was at Men's Central Jail 3500-C-10.

Q.   And then on August 18 at 1:00 p.m., where did he move?

A.   Men's Central Jail 1750.

Q.   What is 1750?

A.   1750 is the highest security setting that the Los Angeles County Jail has to offer.

Q.   Can you please turn to your Exhibit Book Number 3 and look at Exhibits 219 through 222 -- 223, which I believe are already in evidence.

MS. RHODES:  And if I could have -- because they're already in evidence, if I could have Agent Tanner put Exhibit 219 on the screen for you, please.

*(The exhibit was displayed on the screen.)*

BY MS. RHODES:

Q.   Do you see it in front of you?

A.   Yes, ma'am.

Q.    What is it?

A.    This is a -- a close-up shot of a cell within Men's Central Jail.  It's a -- it's a single man cell, so I'm going to assume, this is -- well, I'm not going to assume.  I know this is a -- what we call "K-10 housing."

       Based on what I'm seeing on the door, I believe this to be a cell inside of 1700.

Q.    Okay.  And could you turn to Exhibit 220 -- or Agent Tanner will put it up on the screen.

       *(The exhibit was displayed on the screen.)*

BY MS. RHODES:

Q.    What does Exhibit 220 depict?

A.    This depicts a profile of a row of cells within a specific module or as they call them in 1750, a "row."

Q.    Okay.  What are the things that protrude out?

A.    There's a lot going on in the door there.

       If you're looking at cell 6 there, that is where an inmate would be ordered to -- to cuff up or uncuff.

       The second -- the second item protruding from the cell door is a secure slot where items would be placed through the door, including meals, mail, medical, anything needed.

Q.    And turning to 221 --

       MS. RHODES:  If Agent Tanner could --

       *(The exhibit was displayed on the screen.)*

*///*

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

BY MS. RHODES:

Q.   Can you look at Exhibit 221 and describe what kind of doors there are here?

A.   They're called "racks," ma'am.  They slide back and forth, but that's -- there are a lot of security features on the door that you don't see in every door in every module within any jail.

Q.   And what are some of the security features?

A.   For instance, we're looking at door 6.  You can see that that tray slot is open, but then you can see a padlock, so that is a redundancy.  You can see another padlock on the sheet metal -- the silver sheet metal protruding out.

     Again, a redundancy for -- for how you secure passing things through.

     If you look at door number 7, that's an orange jumpsuit that's given to -- to inmates in that housing module. It's how they pass clothing, bedding, meds, food, everything through that door.

Q.   And so when you say "redundancy," is that to make it more secure?

A.   Inmates that are assigned to housing units such as this are very experienced --

     MR. HOCHMAN:  Objection.  Nonresponsive.

     MS. RHODES:  I can ask again, Your Honor.

     THE COURT:  All right.

BY MS. RHODES:

Q.   Does the -- do these precautions make this unit very secure?

A.   Yes, ma'am.  It's the most secure housing setting that any inmate can be in.

Q.   And I'd like to ask Agent Tanner to put up 222.

     *(The exhibit was displayed on the screen.)*

          MS. RHODES:  And 223.

     *(The exhibit was displayed on the screen.)*

BY MS. RHODES:

Q.   On Exhibit 223, on the opposite side of the cells, what are we seeing?

A.   You are in 1751 G Row.  You are seeing TVs and the one-way glass.

Q.   And what is pointed at the cells in 1751 G?

A.   It's tough to see it in this picture, but at this time in the Men's Central Jail, this was one of the few rows in the County Jail that had a camera pointed at every cell monitoring every inmate for 24 hours a day.

          MS. RHODES:  Okay.  I'd like to go back to Exhibit 124 (indicating).

          MS. RHODES:  And, again, from August 18 at 1:19 p.m. on up, if we could have that highlighted -- or 1:19 p.m. -- make larger.

*///*

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

BY MS. RHODES:

Q.   Where was Anthony Brown?

A.   This document reflects at 1:19 p.m. he was assigned to Men's Central Jail 1751 G row, cell 3.

MS. RHODES:  Now, I'd like to have Agent Tanner make it larger up at August 24 through -- through the end of -- through the beginning of that document.

BY MS. RHODES:

Q.   On August 24, it indicates --

MS. RHODES:  I'm sorry.  Can you go to August 23rd.

BY MS. RHODES:

Q.   On August 23rd and August 24th, does the document indicate where Anthony Brown was being housed?

A.   Yes, ma'am.  It depicts not only where he was housed, but it depicts movements as well.

Q.   And on August 25, 2011, at 1:58 p.m., what does it show happened to Anthony Brown?

A.   It shows that he has been released from Men's Central Jail.

MS. RHODES:  Your Honor, with the Court's permission, I'd like to put up the calendars.

THE COURT:  All right.

MS. RHODES:  So on August 25 at 2011, I'm going to put up a magnet "Brown released" (indicating).

///

BY MS. RHODES:

Q.   Mr. Sexton, I'd like you to look at Exhibits 125 through 130 -- through 131, please, and tell me if you recognize those documents?

A.   You said through 131, ma'am?

Q.   Yes, please.

     And have you had a chance to review them?

A.   Yes, ma'am.

Q.   Generally, what are those documents?

A.   These are copies of what we would call "inmate jackets" and corresponding printouts of inmate movements from the LASD custody web portal, which is where that information is stored and -- and depicted for the end user.

Q.   And based on your knowledge of what happened in August and September of 2011, are these records that relate to Anthony Brown?

A.   Yes, ma'am.

     MS. RHODES:  Your Honor, at this time, I'd move to admit Exhibits 125 through 131.

     MR. HOCHMAN:  Objection.  Lack of foundation from this witness, Your Honor.

     MS. RHODES:  Your Honor, I can --

BY MS. RHODES:

Q.   Were you involved in the movement of Anthony Brown?

A.   Yes, ma'am.

Q.   Were you involved in making sure that records were created to allow for that movement of Anthony Brown?

A.   Yes, ma'am.

MS. RHODES:  At this time, Your Honor, I'd move to admit Exhibits 125 --

BY MS. RHODES:

Q.   Do Exhibits 125 through 131 capture -- or some of the records that were made in order to move Anthony Brown?

A.   Yes, ma'am.

MS. RHODES:  At this time, Your Honor, I'd move to admit Exhibits 125 through 131.

MR. HOCHMAN:  Objection.  Foundation as to any of the writing on any of the documents, Your Honor.

THE COURT:  Overruled.  They will be received.

*(Government's Exhibits 125-131 admitted into evidence.)*

BY MS. RHODES:

Q.   Now, before I get to those documents, after the Heroes Park meeting on August 24, did you hear that any federal agency in addition to the FBI was interested in Anthony Brown's whereabouts?

A.   Yes, ma'am.

Q.   Where were you when -- where were you when you heard that?

A.   I was outside of my office and in a secure part of the Inmate Reception Center known as IRC main control.

Q.   And who were you with, if anyone?

A.    I was with the deputies assigned to IRC main control, one of them being Deputy Sheri Panzone.

Q.    And what did you -- who did you learn was interested in Anthony Brown?  Which agency?

A.    Deputy --

          MR. HOCHMAN:  Objection.  Foundation as to time, Your Honor.

          THE COURT:  Do you recall when this was?

          THE WITNESS:  It was after -- after my meeting with Greg Thompson in his office and before the Heroes Park meeting, so I would believe it was around Tuesday morning at that point.

BY MS. RHODES:

Q.    And what did you learn?

A.    I was in IRC main control when Deputy Panzone received a phone call, and upon hanging up, she says, "Do you know anything about inmate Anthony Brown?"

          And I said, "I'm aware of him."

          She said, "Why would the US Marshals be calling looking for him?"

Q.    Did you have an understanding about why the US Marshals would be calling and looking for Anthony Brown?

A.    I speculated at the time.

          MR. HOCHMAN:  Objection.  Move to strike.

          THE COURT:  Overruled.

          You can answer.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

THE WITNESS:  I speculated at the time, but I did have instructions from Greg Thompson that if anybody inquired about inmate Anthony Brown, to report to him directly.

BY MS. RHODES:

Q.   What did you think at the time that it meant to have a phone call from the US Marshals service?

MR. HOCHMAN:  Objection.  Relevancy and -- relevancy, Your Honor.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  The US Marshals are responsible for transporting federal inmates to federal court.

BY MS. RHODES:

Q.   Now, since you had instructions to go to Mr. Thompson, did you go to him with that?

A.   Yes, ma'am, directly.

Q.   And what did you do with the information that you had received from IRC?

A.   I walked from IRC main control directly to his office where I reported to him verbally that the United States Marshals had just called the law enforcement line of the Inmate Reception Center inquiring about inmate Anthony Brown.

Q.   And what, if anything, did he say?

A.   He said he took it -- he took it under advisement, ma'am.

Q.   Now, I'd like to show you Exhibit 125 -- or have -- have

it published for the jury.

*(The exhibit was displayed on the screen.)*

BY MS. RHODES:

Q.   And what is this?

A.   This is a photocopy of a inmate jacket.

Q.   And what's an inmate jacket?

A.   A jacket is the physical record of everything that transpires with an inmate from arrest to release.

Q.   Within that, I'd like to go to page 4 and have that published.

        MS. RHODES:  And if we could just blow up --

BY MS. RHODES:

Q.   What are we seeing at the sort of bottom two-thirds of this?

A.   This is part of every inmate jacket, ma'am.  It's referred to as a "nine line."  This is the booking slip that is filled out for every arrest.

Q.   Now, who -- what is the name of the arrestee?

A.   On this particular document, John Rodriguez.

Q.   And what is the date and the time of the arrest?

        MS. RHODES:  If I could have Agent Tanner --

        THE WITNESS:  I apologize, ma'am.  I see it.

        It says that he has been arrested on August 25 of 2011 and that he was booked at 1630.

///

BY MS. RHODES:

Q.   Did you have an understanding of who John Rodriguez was?

A.   Yes, ma'am.

Q.   Who?

A.   Anthony Brown.

MS. RHODES:  With the Court's permission, I will put a magnet stating "Rodriguez" on August 25th (indicating).

BY MS. RHODES:

Q.   Now, if we could go up two lines under -- or the first four lines.  Are those identifying information?

A.   Yes, ma'am.

Q.   And according to this, what was -- what were the identifiers for -- for John Rodriguez?

A.   We referred to this as a -- a person's horsepower.  It gives you their booking number, last name, first name, address, the city that that address is within, and then descent, hair, height, weight.

Q.   And was Anthony Brown -- did Anthony Brown live at 5606 Noel Drive in Temple City?

A.   Anthony Brown was convicted and sentenced to over 400 years, so he resided in correctional facilities.

Q.   Was he Hispanic?

A.   No, ma'am.

Q.   Was this his correct height and weight?

A.   No, ma'am, to the best of my ability.

Q.    I'd like to now go down to the bottom portion where it says "refused" on several lines.

Do you see that?

A.    Yes, ma'am.

Q.    For Social Security number, it says "refused," and for prisoner's signature, it says "refused."

Do you see that?

A.    Yes, ma'am.

Q.    Do you have an understanding of why that was done?

A.    Anthony Brown wasn't given the option to sign, nor was his Social Security number requested.

Q.    And why is that?

A.    Those are -- those numbers, if put into the system, map that arrest with DOJ files.

Q.    So it would identify him as Anthony Brown?

A.    In this case, a signature is arbitrary, but if you had put any Social Security number in there, it would have -- it would have attached that Social Security number with that person who has that Social Security number.

So they did not put Anthony Brown's Social Security number in there because it would have attached John Rodriguez as a moniker, and if they had falsified a Social Security number, it would have given a criminal history or -- or raised a mismatch to the person that -- that has that Social Security number.

MS. RHODES:  I'd like to go to the next page of this document.

BY MS. RHODES:

Q.    And can you tell us what this page actually is?

A.    Yes, ma'am.  This is the back.  Nine lines are two-sided. This is the back.

Q.    And on the back of this card or this sheet, what is supposed to go there?

A.    Fingerprints, when booked, and then if and when you're released.

Q.    What does this say in terms of fingerprints?

A.    "Refused."

Q.    Was Anthony Brown given a choice as to whether or not he would be fingerprinted?

A.    No, ma'am.

Q.    Why not?

A.    When you fingerprint an individual, they are entered into the -- the LiveScan machine or scanned at IRC to prove your identity and to see if you have any remaining wants or warrants.

Q.    So Anthony Brown's fingerprints, if printed, would come back to Anthony Brown, not John Rodriguez.  Is that what you're saying?

A.    At some point, yes, ma'am.

Q.    And is that the reason that no fingerprints were taken?

A.   Yes, ma'am.

Q.   Turning your attention to Exhibit 126.

     (The exhibit was displayed on the screen.)

BY MS. RHODES:

Q.   Now, what is this document?

A.   This is a printout of the LASD custody information portal.
This is -- this is the computer's manifestation of what was --
what was entered into the computer based off the information on
the nine line.

Q.   And in this, on the second page, does it have when John
Rodriguez was released?

A.   Yes, ma'am.

Q.   What is that date?

A.   That date is August 26, 2011, at 8:29 p.m.  The release
reason is order for release based out of the court.

Q.   And did any court order John Rodriguez to be released?

A.   No, ma'am.

Q.   Turning to Exhibit 127, does that show the same thing?

     (The exhibit was displayed on the screen.)

          THE WITNESS:  Yes, ma'am.

          MS. RHODES:  And with the Court's permission, I'll
put a magnet on August 26 reflecting the entry at the top of
Exhibit 127 for the release of John Rodriguez (indicating).

BY MS. RHODES:

Q.   Was Anthony Brown released from custody at that time?  Did

you let him out on the street?

A.   No, ma'am.

Q.   Now, turning to Exhibit 128 -- if we can pull that up.

What does this show?

*(The exhibit was displayed on the screen.)*

THE WITNESS:  This is the copy of an investigative folder.

MS. RHODES:  Okay.  And if we can go to the second page.

BY MS. RHODES:

Q.   What -- what is this?

A.   This is a bar code that would be used for -- for an inmate wristband.  If depicts the name Kevin King.

Q.   And the third page?

A.   Handwriting depicting another inmate name of Chris Johnson with another booking number.

Q.   And continuing?

A.   A phone number, Dora Meeks.

MS. RHODES:  If you can go to the 128.

The next page after that.  Yes.

BY MS. RHODES:

Q.   What does this show?

A.   This is again another separate what we would call "nine line," so a booking form filled out for every body that is arrested and brought to a jail in the County of Los Angeles.

Q.   And who does this one say the arrestee is?

A.   Kevin King, ma'am.

Q.   Do you -- and who is the -- under the jail custody record, what does it say?

A.   It says "felony" and then it says "ICIB," which stands for Internal Criminal Investigation Bureau/OSJ Lieutenant Thompson CTTCF.

Q.   In terms of the booking time and date, what does it say?

A.   It says that he -- well, going back to the date and time arrested, 8/26/2011 at 1530, which is 3:30, and then time booked is illegible to me.

Q.   Do you have an understanding of who Kevin King was?

A.   Yes, ma'am.

Q.   And who was Kevin King?

A.   It was another moniker for Anthony Brown.

        MS. RHODES:  At this point, Your Honor, I'd like to place on the calendar a magnet saying "King booked on 8/26/11" (indicating).

BY MS. RHODES:

Q.   And does the next page -- is that the back of the card that we talked about with John Rodriguez?

A.   Yes, ma'am.

Q.   Are there any fingerprints here?

A.   None.

Q.   Is that for the same reason?

A.    Yes, ma'am.

Q.    Now, did you participate in guarding Anthony Brown in --
with regard to any of the names that he used?

A.    Yes, ma'am.

Q.    And where did you guard Anthony Brown?

A.    I first sat on Anthony Brown at San Dimas station and then
following locations at Men's Central Jail 8000, and then I
ultimately transported him to Lancaster State Prison.

Q.    I'd like to focus your attention on the San Dimas station.

        Can you look at Exhibits 198 through 208, please.

A.    Stand by, ma'am.

        I first sat on Anthony Brown at San Dimas station and
then following locations at Men's Central Jail 8000, and then I
ultimately transported him to Lancaster State Prison.

Q.    I'd like to focus your attention on the San Dimas station.

        Can you look at Exhibits 198 through 208, please.

A.    Stand by, ma'am.

Q.    Do you have them?

A.    Yes, ma'am.

Q.    What do they show, generally?

A.    Pictures of San Dimas station, ma'am.

Q.    Okay.  Are they fair and accurate depictions of what San
Dimas station looked like in 2011?

A.    Yes, ma'am.

///

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

MS. RHODES:  Your Honor, at this time I move to admit Exhibits 198 through 208.

THE COURT:  Any objection?

MR. HOCHMAN:  No objection, Your Honor.

THE COURT:  They will be received.

*(Government's Exhibits 198-208 admitted into evidence.)*

BY MS. RHODES:

Q.   And when did you first start guarding Anthony Brown at San Dimas station?

A.   Sometime after the Heroes Park meeting.  I'd say -- it's tough for me to recall, but I believe it was 72 hours afterwards.

Q.   Looking at Exhibit 128 again, where does it say that Kevin King was booked?

MS. RHODES:  If we can just have 128.

*(The exhibit was displayed on the screen.)*

BY MS. RHODES:

Q.   So looking at Exhibit 128, the top portion, where does it say Kevin King was booked?

A.   At -- at San Dimas station.

Q.   And the date?

A.   August 26.

MS. RHODES:  With the Court's permission, I will put up this magnet.  Showing it to counsel (indicating).

///

BY MS. RHODES:

Q.   Okay.  Looking at Exhibit 198.

          MS. RHODES:  And publishing that for the jury.

BY MS. RHODES:

Q.   What is that --

          MS. RHODES:  May I have just one moment, Your Honor?

          THE COURT:  Yes.

BY MS. RHODES:

Q.   While the computer is restarting, did Anthony Brown stay at San Dimas station under the name of Kevin King and then have his name changed?

A.   Yes, ma'am.

Q.   Can you look at Exhibit 129.

A.   Yes, ma'am.

Q.   And is that another alias for Anthony Brown?

          (The exhibit was displayed on the screen.)

          THE WITNESS:  Yes.

BY MS. RHODES:

Q.   And what is that alias?

A.   Chris Johnson.

Q.   Going back to -- I believe we can now pull up Exhibit 198.

          (The exhibit was displayed on the screen.)

BY MS. RHODES:

Q.   And what does this show?

A.   This is the outside of San Dimas station, the public

entrance, ma'am.

Q. Is the San Dimas station usually and typically a jail? Is that its primary function?

MR. HOCHMAN: Objection. Foundation.

THE COURT: Sustained.

BY MS. RHODES:

Q. When you guarded Anthony Brown there, was it a jail?

A. It is a patrol station that has a jail, but it does not fall under Title 15 guidelines where you can house --

MR. HOCHMAN: Objection. Nonresponsive at this point.

THE COURT: Overruled.

You can answer. You can finish your answer.

THE WITNESS: It's meant to temporarily hold recent arrests and then have them transported downtown to the downtown campus and other facilities within the LA County Jail system.

BY MS. RHODES:

Q. And by the "downtown campus," you mean Men's Central Jail or Twin Towers?

A. They would come through the Inmate Reception Center, be classified based on mental health, health needs, sexual orientation, and their propensity for violence.

Q. Now, if you look at 199, what does this show?

*(The exhibit was displayed on the screen.)*

THE WITNESS: This is the inside of San Dimas

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

station, one of the holding tanks.

BY MS. RHODES:

Q.    And was Anthony Brown -- when you guarded Anthony Brown,
where was he?  And I think, Mr. Sexton, if you to the right of
your screen and touch it, do you see a pen?

A.    I do.

Q.    Well, can you -- does this picture depict where Anthony
Brown was guarded?

A.    Yes, ma'am.

Q.    Where was Anthony Brown?

A.    In a -- he was in this cell (indicating).

Q.    And does it -- since you were guarding him, does this
picture, Exhibit 199, show where you were when you were
guarding him?

A.    Yes, ma'am.

Q.    And can you again use the pen to do that?

A.    We were there (indicating).

Q.    So the X on the door?

A.    Yes, ma'am.

Q.    Showing you Exhibit 200.

    (The exhibit was displayed on the screen.)

BY MS. RHODES:

Q.    What is Exhibit 200?

A.    This is a picture depicting the inside of the room that we
used as a deputy station during our operation with Anthony

Brown.

Q.    So it's where you were where you -- when you were guarding Anthony Brown?

A.    Yes, ma'am.

Q.    And if you were inside this room that's depicted in Exhibit 200, could you actually see Anthony Brown at that time?

A.    Not from the positions that we were using in there.

Q.    Exhibit 201.  Can you tell us what this shows.

        (The exhibit was displayed on the screen.)

        THE WITNESS:  Yes, ma'am.

BY MS. RHODES:

Q.    What --

A.    This is a profile of the inside of where Anthony Brown was housed relation to where we were using a deputy station and the fire exit that we were using to transport Anthony Brown to and from his interviews.

        MS. RHODES:  And Exhibit 202.

        (The exhibit was displayed on the screen.)

        THE WITNESS:  This is the other side of the fire exit that we were using to access the jail, and this is the high-traffic area for deputy and civilian personnel.

BY MS. RHODES:

Q.    And if you continue through those doors, where do you get?

A.    You enter into a -- a courtyard, ma'am.

Q.    Can you look at Exhibit 203.

(The exhibit was displayed on the screen.)

BY MS. RHODES:

Q.    What is that?

A.    This is the other side of the -- the double doors that you just depicted, and this is outside in the courtyard.

Q.    And Exhibit 204.

(The exhibit was displayed on the screen.)

BY MS. RHODES:

Q.    What is that?

A.    This is deeper into the courtyard, and this is where we took Anthony Brown for cigarette breaks.

Q.    Were you given any instructions with regard to how to deal -- how to handle Anthony Brown while you were guarding him at San Dimas station?

A.    Yes, ma'am.

Q.    And what were those instructions?

A.    To keep him happy.  He requested fast food and to smoke cigarettes.  So we had a standing order to take him out twice a shift for cigarettes and feed him fast food once a shift.

Q.    And were you told -- was he restrained the same way an inmate would be restrained --

A.    No.

Q.    -- in Men's Central Jail?

A.    No, ma'am.

Q.    Were inmates at Men's Central Jail allowed outside that

frequently?

A.   They were allowed outside, not that frequently.

Q.   And by "outside" at Men's Central Jail, what does that mean?

A.   Anthony Brown was a K-10 inmate.  If and when he was allowed to go outside, he would be placed in what was called a "bird cage."  It's generally a 10 by 10 recreational container so that they don't fight or escape.

Q.   And were you told anything about the restraint of Anthony Brown at San Dimas?

A.   That we were to use judgment but to use the minimal amount of restraints necessary to keep him from effecting an escape.

Q.   Were you told why you were doing all of those things?

A.   To keep him happy.

Q.   And why did you want -- were you told why you wanted Anthony Brown happy?

A.   Anthony Brown was --

        MR. HOCHMAN:  Objection.  Foundation.

        THE COURT:  Sustained.

        THE WITNESS:  Through my supervisors and --

        THE COURT:  Wait for a question, please.

BY MS. RHODES:

Q.   It was sustained.

        Did you speak to any supervisors about why you wanted to keep Anthony Brown happy?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

A.   Lieutenant Thompson, Gerard Smith, and Mickey Manzo explained to me that detectives --

MR. HOCHMAN:  Objection.  Nonresponsive at this point.

THE COURT:  Next question.

BY MS. RHODES:

Q.   Where were you when you were told the reason for keeping Anthony Brown happy?

A.   I was at San Dimas station.

Q.   And when was that approximately?

A.   My first shift there, I was told that detectives would come pull him out and that they wanted him to have a good attitude.

Q.   And did you have any understanding at that time and place as to why detectives -- detectives were pulling him out?

A.   Anthony Brown told me that they were --

MR. HOCHMAN:  Objection.  Foundation.  Hearsay. Nonresponsive.

THE COURT:  Sustained.

BY MS. RHODES:

Q.   Did you have any understanding from your supervisors, Mr. Manzo, or Mr. Smith as to what was happening to Anthony Brown?

A.   Yes.

Q.   And when did you get that understanding?

A.   While I was at San Dimas station.

Q.   And what was that understanding?

A.   That they were trying to interview Anthony Brown to better understand who he was working with and how he got a cell phone.

MS. RHODES:  I'd like now to go to Exhibit 205.

(The exhibit was displayed on the screen.)

BY MS. RHODES:

Q.   What does this show?

A.   That is a pedestrian gate at the far side of the courtyard.

Q.   And at the far side of the courtyard still in San Dimas station?

A.   Yes, ma'am.

Q.   Now, the picture is obviously two-dimensional.  Can you describe what this gate -- and, again, I'll ask you to draw a circle around what you mean by "gate" -- what the gate is in three dimension.

A.   You want me to identify the gate on the picture?

Q.   Yes, please.

A.   That's the pedestrian gate that we are discussing (indicating).

Q.   Can you describe the gate further?

A.   Yes, ma'am.  It's -- it's much like a pedestrian gate that people would have at their homes.  This one's for -- obviously for a sheriff's station so it's made of sheet metal, but

everybody's pretty familiar with -- with their pedestrian gates in LA.  It's not taller than -- than most people.  It has a simple latch or lock, and it allows access to the street that's on the other side or the front of this building.

Q.    What about the horizontal lines on that gate?

A.    Those are for it to maintain its structural integrity.  If this was a compound or courtyard intended to secure inmates, that would be nonexistent.

Q.    Why is that?

A.    There are only flat surfaces in inmate rec yards so that it's not easy to scale a wall.

Q.    And then going to Exhibit 206.

(The exhibit was displayed on the screen.)

THE COURT:  All right.  Ladies and gentlemen, we're going to take our final break of the day.

Again, I want to remind you until this trial is over you're not to discuss this case with anyone, including your fellow jurors, members of your family, people involved in the trial, or with anyone else, nor are you permitted to allow others to discuss this case with you.  If anybody approaches and you tries to talk with you about this case, please let me know about it immediately.

Do not read or listen to any news reports or other accounts about the trial.

Finally, you are reminded to keep an open mind until

all of the evidence has been received.  You've heard the arguments of counsel, the instructions of the Court, and the views of your fellow jurors.

We'll come back at noon.

THE CLERK:  All rise.

*(Jury out at 11:45 A.M.)*

*(The following was heard outside the presence of the jury.)*

THE COURT:  All right, sir.  You may step down.

All right.  We'll see everybody at noon.

*(Recess taken 11:46.)*

--oOo--

CERTIFICATE

I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Date: AUGUST 10, 2017

/s/  Cindy L. Nirenberg, CSR No. 5059

Official Court Reporter

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA