UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

HONORABLE PERCY ANDERSON, U.S. DISTRICT JUDGE

- - -

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) |
| vs. | ) No. CR16-66(A)-PA |
| | ) |
| LEROY BACA, | ) |
| | ) |
| DEFENDANT. | ) |

REPORTER'S TRANSCRIPT OF JURY TRIAL

DAY 7, VOLUME II of II

PAGES 1424-1483

LOS ANGELES, CALIFORNIA

THURSDAY, MARCH 2, 2017

12:01 P.M.

_____

CINDY L. NIRENBERG, CSR 5059, FCRR
U.S. Official Court Reporter
350 W. 1st Street, #4455
Los Angeles, CA 90012
*www.msfedreporter.com*

APPEARANCES OF COUNSEL:


FOR THE PLAINTIFF:
                    OFFICE OF THE UNITED STATES ATTORNEY
                    BY: BRANDON FOX,
                        ASSISTANT U.S. ATTORNEY
                        EDDIE A. JAUREGUI,
                        ASSISTANT U.S. ATTORNEY
                        LIZABETH A. RHODES,
                        ASSISTANT U.S. ATTORNEY
                    312 NORTH SPRING STREET
                    13TH FLOOR
                    LOS ANGELES, CA 90012
                    213-894-2434


FOR THE DEFENDANT:
                    MORGAN LEWIS & BOCKIUS
                    BY: NATHAN J. HOCHMAN, ATTORNEY AT LAW
                        BRIANNA L. ABRAMS, ATTORNEY AT LAW
                    THE WATER GARDEN
                    1601 CLOVERFIELD BOULEVARD
                    SUITE 2050 NORTH
                    SANTA MONICA, CA 90404
                    310-255-9025


ALSO PRESENT:
                    LEAH TANNER, FBI SPECIAL AGENT

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

I N D E X

*GOVERNMENT'S WITNESSES:*                          *PAGE*

WILLIAM CAREY

   DIRECT BY MR. FOX (RESUMED)                1429

*FURTHER PROCEEDINGS*

DISCUSSION HELD OUTSIDE PRESENCE OF JURY 1428

DISCUSSION HELD AT SIDEBAR                    1476

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

E X H I B I T S

| GOVERNMENT'S EXHIBITS | MARKED | ADMITTED |
|---|---|---|
| 34-36 | | 1430 |
| 47 | | 1455 |
| 52 | | 1455 |
| 53 | | 1454 |
| 58 | | 1459 |
| 59-60 | | 1461 |
| 63 | | 1466 |
| 64 | | 1472 |
| 84 | | 1438 |
| 99 | | 1478 |
| 140-141 | | 1450 |

LOS ANGELES, CALIFORNIA; THURSDAY, MARCH 2, 2017

12:01 P.M.

- - - - -

*(The following was heard outside the presence of the jury.)*

THE COURT:  All right.  Let's bring the jury in.

MR. FOX:  Your Honor, I just wanted to clarify one thing.  Mr. Hochman objected yesterday to -- or maybe the day before about the deposition on authenticity grounds as well as other things.  We discussed it.  And just to clear it up for the record, he's not objecting anymore on authenticity grounds.  His objections simply relate to the Dr. Spar issue.

MR. HOCHMAN:  I think I made that clear, Your Honor, that I've reviewed the certified transcripts at this point.

THE COURT:  I recall you mentioning that you had seen the certified transcripts.

MR. HOCHMAN:  Yes, Your Honor, that's correct.

MR. FOX:  Would you like the witness to take the stand?

THE COURT:  Yes, please.

*(Jury in at 12:04 p.m.)*

MR. FOX:  May I proceed, Your Honor?

THE COURT:  Yes.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

WILLIAM CAREY,

having been previously duly sworn,

testified further as follows:

DIRECT EXAMINATION

(RESUMED)

BY MR. FOX:

Q.   Mr. Carey, I left off asking you to take a look at your exhibit books, Exhibits 34, 35 and 36.  Can you please do that.

Do you recognize those exhibits?

A.   Yes, sir.

Q.   What are they?

A.   E-mail exchanges between me, Thompson, Captain Ralph Ornelas, who is captain at Men's Central Jail.

Q.   Can I stop you for a second.  It's hard to hear you.

A.   I'm sorry.

Q.   Thank you.  Go ahead.

A.   It's a series of e-mails between myself, Thompson and Ralph Ornelas, who was the captain of Men's Central Jail.

Q.   Are those true and accurate copies of e-mails that you sent and received from the time period referenced in those e-mails?

A.   Yes, sir.

MR. FOX:  I move for the admission of Government's Exhibits 34, 35 and 36.

MR. HOCHMAN:  No objection.

THE COURT:  They will be received.

*(Government's Exhibits 34-36 admitted into evidence.)*

MR. FOX:  And Special Agent Tanner, can you please pull up Exhibit 34, specifically the bottom e-mail.

*(The exhibit was displayed on the screen.)*

BY MR. FOX:

Q.   Mr. Carey, can you please explain just generally what these e-mails are about before we get into the substance of them?

A.   It's a writ for Anthony Brown.  It me to the sheriff's department, how it would be handled.

Q.   Can you please read the e-mail from Mr. Thompson to you on August 26, 2011, at 10:42 a.m.

A.   No subject.  "Handled.  MCJ will accept if forced, but will advise that County Council" -- excuse me, "but will advise that county attorneys have to review it.  Is this acceptable?"

MR. FOX:  If we could now show the next e-mail up.

BY MR. FOX:

Q   Can you please read the e-mail that you wrote to Mr. Thompson at 10:44 a.m. that day.

A.   No subject.  "Yes.  Has to be very clear he is not released without approval."

Q.   Who was the "he" you were referring to?

A.   Anthony Brown.

Q.   And what was the approval you were referring to?

A.    The executive approval, Undersheriff Tanaka and Sheriff Baca.

MR. FOX:    Can you now show the e-mail that's right above that.

BY MR. FOX:

Q.    Go ahead and read this e-mail one minute later from Mr. Thompson to you and Ralph Ornelas.

Before you do that, actually, can you please explain to the jury who Ralph Ornelas was at the time.

A.    August 2011, Ralph Ornelas was the captain at Men's Central Jail.

Q.    Go ahead and read this e-mail.

A.    "Yes.  Captain Ornelas is briefing his watch WCs," which is watch commanders, "and following up with an e-mail to each. Greg."

Q.    Why were you sending e-mails around regarding a federal writ?

A.    Had to be crystal clear how it was going to be handled.

Q.    Did you know at the time that the US Government had already obtained a federal writ?

A.    No, sir.

MR. FOX:    Now, if you'd read the e-mail up.

BY MR. FOX:

Q.    Go ahead and read this e-mail from you to Mr. Thompson two minutes later, at 10:47 a.m.

A.    "Perhaps a note on cell door.  I'll call Ralph as well."

Q.    Who was the "Ralph" you were referring to?

A.    Captain Ralph Ornelas.

        MR. FOX:  All right.  And now the top e-mail.

BY MR. FOX:

Q.    Go ahead.

A.    From Lieutenant Thompson to me.  "Will do when I brief my guys."

Q.    Did you know what he was referring to when he briefed his guys -- when he would brief his guys?

A.    That a note would be placed on the cell door of Anthony Brown.

Q.    Which people did you understand Mr. Thompson to be briefing?

A.    His guys were the OSJ deputies.

        MR. FOX::  And now if we can look at Government's Exhibit 35.

        *(The exhibit was displayed on the screen.)*

        MR. FOX:  And specifically the e-mail from Mr. Ornelas to Mr. Thompson at the same time, 10:47 a.m.

BY MR. FOX:

Q.    Go ahead and read this.

A.    "Greg, what attorney are we going to use to review possible court order from FBI?  Thank you, Ralph."

Q.    And if you can read now the top e-mail, which is at 10:50

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

a.m., three minutes later.  This is an e-mail from Mr. Thompson to Mr. Ornelas and you.

A.   "Tom's handle.  Probably the one who is on vacation for a month."

MR. FOX::  Now if we could look at Exhibit 36.

(The exhibit was displayed on the screen.)

MR. FOX:  And the bottom e-mail.

BY MR. FOX:

Q.   It's an e-mail from Mr. Ornelas to MCJ lieutenants and MCJ sergeants, with a copy to Mr. Thompson.

What is the subject?

A.   "Court order presented by federal officers."

Q.   And please read the substance of this e-mail.

A.   "Watch commanders and watch sergeants, if any federal law enforcement agency comes to MCJ with an inmate removal order, visitation order or any other order of the Court, you shall:

"Bullet 1.  Receive the order and advise the federal officer that before you can proceed, you have to submit the order to the department's legal advisor for review.  Do not release the inmate or allow contact;

"Bullet 2.  Take complete contact information from the federal officer and advise him or her that you will advise when the inmate is available;

"Bullet 3. Immediately contact Captain Ornelas or Lieutenant Fedele for any further instructions."

Q.    Now, this e-mail discusses how -- this relates to if a federal law enforcement agency comes to MCJ with an inmate removal order or any other order.

Do you know whether that was ordinarily how writs were served on the department?

A.    I don't believe they were served this way.

MR. FOX::    I'm placing on the calendar on August 26 an entry that says "Writ e-mails."

BY MR. FOX:

Q.    What was the purpose of this policy, Mr. Carey?

A.    If -- Inmate Brown was not going to be released if an order came in without these steps being taken.

Q.    It says, "Do not release the inmate or allow contact."

What about the contact?

A.    Goes back to what I've been saying, no contact without approval.

Q.    And who's that approval by?

A.    Undersheriff Tanaka, Sheriff Baca.

Q.    Mr. Carey, during this time period, did you become aware that sheriff's department's records were changed to show that Mr. Brown was released from the computer system?

A.    At some point I was aware of that.

Q.    How did you find out?

A.    I couldn't tell you, sir.

Q.    Would it have been someone within ICIB or OSJ?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

A.   Most likely, yes.

Q.   Do you know why the computer systems were altered so that it showed that Mr. Brown was released?

MR. HOCHMAN:  Objection.  Foundation, Your Honor.

THE COURT:  Sustained.

BY MR. FOX:

Q.   Mr. Carey, did you have any discussions with any executive about moving Anthony Brown outside of Men's Central Jail?

A.   Yes.

Q.   When?

A.   There were discussions prior to August 26, but August 26 is the day that I remember being in Mr. Tanaka's office telling him we were going to move him, "him" being Anthony Brown.

MR. FOX:  Let's pull up 139 again, please.

*(The exhibit was displayed on the screen.)*

MR. FOX:  And if you can highlight the same area.

BY MR. FOX:

Q.   You mentioned that there was a meeting in Mr. Tanaka's office on August 26.  Is this the same office where you held the August 23rd meeting with Mr. Tanaka?

A.   Yes, sir.

Q.   Who was present in this August 26 meeting?

A.   Undersheriff Tanaka, Lieutenant Leavins, myself and Sheriff Baca.

Q.   Now, you say Mr. Baca was present, are you sure that he

was present?

A.    I'm fairly certain.

Q.    What happened at this meeting?

A.    We told them that -- "we" being Lieutenant Leavins and myself -- that we had obtained the medical clearance to move Anthony Brown out of Men's Central Jail to San Dimas station and that we would be changing his name.

Q.    What are the reasons why you decided to move Anthony Brown to San Dimas on that date?

A.    That particular date, I believe, that day or the day before, is when we got the medical clearance, but we were -- from August 23rd, when the FBI had their interview interrupted, there was a more pressing -- it became more of an issue to move him.

Q.    Why?

A.    To prevent anyone specifically -- so the FBI contact wasn't duplicated.

Q.    And you mentioned the name change.  What was the purpose of the name change?

A.    If anyone -- and you can run an inmate on a computer and find out where they're housed.  If anyone was looking for him, they would have no idea where he was.

Q.    And by "anyone," who do you mean?

A.    Well, anyone, but specifically it would have prevented the FBI from knowing where the informant was.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

MR. FOX:: I should have done this during the break, but, Your Honor, I would like the witness presented with Government's Exhibit 84, please, the original exhibit.

THE COURT: All right.

MS. RHODES: It's up there.

MR. FOX: Oh, it's up there?

Ms. Rhodes took care of me, it looks like.

Thank you.

BY MR. FOX:

Q. Do you recognize Government's Exhibit 84?

A. Yes.

Q. Can you also look at Government's Exhibit 85. That's in your binder.

A. Yes, sir.

Q. What are Government's Exhibits 84 and 85?

A. Government's Exhibit 84 is a CD that's titled, "Baca 2017." I initialed it and dated -- put a date on it.

Q. Do you know what is contained on that exhibit?

A. I'm not certain, no.

Q. Did you listen to anything when you initialed that exhibit?

A. Yes.

Q. What did you listen to?

A. The content of the CD.

Q. Okay. And does the contents of the CD contain what's

reflected in the transcript?

A.    Yes, sir.

         MR. FOX:  Your Honor, I move for the admission of Government Exhibit 84.

         MR. HOCHMAN:  No objection, Your Honor.

         THE COURT:  It will be received.

    *(Government's Exhibit 84 admitted into evidence.)*

BY MR. FOX:

Q.    And, Mr. Carey, does Government Exhibit 85 truly and accurately reflect what is said on Government Exhibit 84 and the speakers?

A.    Yes.

         MR. FOX:  Your Honor, I'd like to have the jury look at the transcript binder, which is not the Exhibit 3 binder, but the separate binder, and flip to tab 85, please.

         And if Special Agent Tanner can now play the first clip from 84.

    *(Playing of audiotape.)*

         MR. FOX:  And now the eighth clip from that exhibit.

    *(Playing of audiotape.)*

BY MR. FOX:

Q.    We see in this transcript -- or we heard on the recording Maricela Long and Scott Craig talking.  Who were they?

A.    They were the lead investigators on the Anthony Brown investigation.

Q.    From which entity?

A.    Sergeants assigned to ICIB.

Q.    And there was a discussion about a "new David."  You had previously mentioned FBI Special Agent David Lam who had visited Anthony Brown.  Do you know who the "new David" was that he was referring to?

A.    I believe it was agent David Dahle.

        MR. FOX:  If we can play that last clip, which would be Clip 12, please.

        *(Playing of audiotape.)*

        MR. FOX:  If we can have the jury, Your Honor, close their binders.

BY MR. FOX:

Q.    Mr. Carey, you can do that, too.

        Mr. Carey, I want to direct your attention to three days later.

A.    Sorry.

Q.    I want to direct your attention to three days later, August 29.  Did you attend a meeting that day?

A.    I did.

Q.    Where was the meeting?

A.    At the federal building.  I believe its address is on Spring Street.

Q.    Was there an office within the federal building that you went to?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

A.    My recollection was it was a conference room.

Q.    And within what office space?

A.    The US Attorney's office.

Q.    Who was present at the meeting?

A.    Several representatives from the US Attorney's Office. Names that I remember were Mr. Birotte, Mr. Middleton. And there were others from the US Attorney's Office. On the other side of the table was representatives from the sheriff's department.

Q.    Who were those representatives from the sheriff's department?

A.    Sheriff Baca, Undersheriff Tanaka. There was a county attorney there that -- it was either Mike Gennaco or Paul Yoshinaga. Lieutenant Leavins and myself were the names I remember.

Q.    You mentioned a Mr. Birotte and a Mr. Middleton. Do you know what roles they served within the US Attorney's Office at the time?

A.    At the time, I believe Mr. Birotte was the head of the Central District US Attorney's Office and Mr. Middleton was the lead -- the supervisor in the civil rights division.

Q.    What happened at this meeting?

A.    The sheriff voiced his displeasure over the Anthony Brown cell phone incident.

Q.    What did he say?

A.    Pretty much said that the FBI was incompetent to investigate this type of thing, it was his jail.  And if I am not mistaken, he asked to be included in the investigation.

Q.    Did he say anything about whether he believed the FBI committed a crime?

A.    I believe he did, yes.

Q.    What did he say?

A.    That the FBI had committed a crime.

Q.    What was your reaction to Mr. Baca's comments?

A.    I -- I had a lot of internal emotions.  On one hand, I felt that it could have been handled a lot better with a little bit finesse or diplomacy, but on the other hand, I felt kind of empowered that we were going to continue our investigation because the sheriff of LA was speaking.

Q.    What do you mean by "continue" your investigation?

A.    Well, we were conducting the investigation into the Anthony Brown -- how, when, what -- cell phone.

Q.    Why did Mr. Baca's comments make you believe that you should continue that investigation?

A.    He never said that we would cease doing it.  It was kind of like he was -- I don't want to say giving them an ultimatum, but, you know, "It's my jail."

Q.    And by you continuing your investigation into Anthony Brown and the phone, who were the subjects of your investigation at that point?

A.    The FBI.

MR. FOX::  If I can now have the jury open up Exhibit 3, that book, tab 28.

And if we can play Clip 28 from Exhibit 2, please.

*(Playing of audiotape.)*

MR. FOX::  Okay.  Now play the next tab, Clip 29.

*(Playing of audiotape.)*

BY MR. FOX:

Q.    You mentioned, Mr. Carey --

MR. FOX::  And if the jury, Your Honor, can close the binders.

BY MR. FOX:

Q.    You mentioned a few minutes ago that one of the things that Mr. Baca said at the meeting was that he wanted the sheriff's department to be able -- well, to be part of the case, is what I think you said?

A.    That's my recollection.  To be part of the investigation.

Q.    Did the US Attorney at that time invite the sheriff's department to join the federal investigation?

A.    No, sir.

Q.    What, if anything, did ICIB do the next morning, on August 30th?

A.    Conducted a series of interviews at Men's Central Jail.

Q.    What was the purpose of those interviews?

A.    We were contacting employees, I believe the names that

Anthony Brown had provided, that might be involved in this conduct or had contact with the FBI.

Q.    Where were you that day?

A.    I was at -- for part of those interviews, I was at Men's Central Jail.

Q.    Was any executive with you that day?

A.    Yes, sir.

Q.    Who was that?

A.    Undersheriff Tanaka.

Q.    Did you and Mr. Tanaka receive any briefings about what was occurring during the interviews of the deputies?

A.    I did.

Q.    Was Mr. Tanaka there when you received the briefings as well?

A.    Some of them, I believe, but I wasn't -- I mean, I wasn't like joined at the hip with him at Central Jail that day.

Q.    Was Gilbert Michel one of the deputies that ICIB interviewed on August 30th?

A.    My recollection is he was, yes.

Q.    Do you know if, later that day, Mr. Michel was given a polygraph just like Mr. Brown was?

A.    It was around that date, yes.

Q.    How do you know that?

A.    I was advised by one of the investigators assigned to the case.

Q.    Were you told what the results were?

A.    Yes.

Q.    What were the results?

        MR. HOCHMAN:  Objection.  Hearsay.

        THE COURT:  Overruled.

        THE WITNESS:  That Gilbert Michel was being truthful
on certain aspects of the examination.

BY MR. FOX:

Q.    What aspects -- well, you said "certain aspects."  Did it
show that he was being deceptive on any aspects?

A.    No.  He was truthful on the topics that were asked of him.

Q.    Do you know whether he was asked about whether he brought
drugs into Men's Central Jail for Anthony Brown?

A.    Yes.

Q.    And what did he say?

A.    He said he did not.

Q.    What did the results show?

A.    That Gilbert Michel was being truthful.

Q.    What did you believe at that point as to whether the FBI
had been bringing in drugs?

A.    It was less likely that they were involved in that.

Q.    When you say "less likely," what was your evidence at that
point?

A.    Nothing.  Based on what I said earlier, Anthony Brown -- I
mean, it was just continually -- as time went on, every

investigative step that we attempted to prove or disprove the insertion of narcotics, we were coming up with nothing.

Q.   Did you do anything else to determine whether there was any more contraband inserted into the County Jails that was connected to the FBI?

A.   Yes.

Q.   What did you do?

A.   I actually ordered a sweep or a sweeping, a search, looking for contraband, cell phones or narcotics, that were brought in.

Q.   Where did you order the search to occur?

A.   Every jail in LA County.

Q.   Approximately when did you have this done?

A.   I want to say it was the first few days of September, but I couldn't be exact.

Q.   What did you find out?

A.   Nothing.  Nothing was discovered.

Q.   Any phones connected to the FBI?

A.   No, sir.

Q.   Any narcotics?

A.   No, sir.

Q.   So what did that make you believe?

A.   Again, that less likely -- the scale kept going down, that is.  We were coming up with nothing to indicate the FBI was bringing narcotics into the jail.

MR. FOX:  I'm placing "jail swept" as a magnet over the first couple of days of September.

BY MR. FOX:

Q.    Mr. Carey, you last mentioned a meeting with Mr. Baca on August 26.  Did you continue to update Mr. Baca on what was going on in your operation after August 26?

A.    Yes.

Q.    In what ways?

A.    Through briefings or -- from myself or Lieutenant Leavins or Undersheriff Tanaka.

Q.    You mentioned earlier that your briefings would occur either in his office or Mr. Tanaka's office, and you had the previous briefing in the executive conference rooms.  Are you aware of what bugs are, as they are referred to by law enforcement?

A.    Yes, sir.

Q.    What are bugs?

A.    Electronic listening device.

Q.    Are you aware of whether the sheriff's department conducted a bug sweep in early September 2011?

A.    Yes, sir.

Q.    How did you become aware of that?

A.    Lieutenant Leavins advised me prior to conducting the sweep.

Q.    So your lieutenant, Mr. Leavins, told you about it?

A.    Yes.

Q.    Why was there a bug sweep?

A.    My recollection is that he had a discussion with Undersheriff Tanaka and thought that the FBI might have put in -- inserted listening devices into the executive offices and conference room.

        MR. FOX:  Your Honor, I'd like to publish what's in evidence as Government's Exhibit 50.

     (The exhibit was displayed on the screen.)

        MR. FOX:  And, if you can, highlight the bottom e-mail at 7:17 p.m. on September the 7th, please.

BY MR. FOX:

Q.    Mr. Carey, this is an e-mail from someone named John Powell.  Do you know who John Powell was?

A.    I know of him, yes.

Q.    What was he doing at the time in the sheriff's department?

A.    He was assigned -- his rank was sergeant.  He was assigned to the unit that did all the technical stuff; listening devices, cameras and stuff like that.

Q.    Is this something that ICIB normally did, sweep executive offices for bugs?

A.    First and only time I ever heard of it.

Q.    And who is this e-mail to that we've highlighted?

A.    From Sergeant Powell to Lieutenant Leavins and cc to Tracee Allen.

Q.   Do you see, under the substance of the e-mail, it says, "Steve" and it starts with the word "On"?

A.   Yes, sir.

Q.   I would just like you to please read the first sentence of this e-mail.

A.   "On September 2, Brian Deruyter and I conducted a technical surveillance countermeasures," acronym "(TSCM) security inspection on the fourth floor of SHB and the basement area at your direction."

Q.   What was on the fourth floor of SHB?

A.   Sheriff Baca's office, Undersheriff Tanaka's office, and the sheriffs' executive conference room.

Q.   What about the basement of SHB at the time?

A.   That's where the investigators assigned to ICIB were housed.

Q.   If you can look at the second page now, there's a part that starts "The inspection was then conducted utilizing."

        MR. FOX:   There you go.

        And if you can just continue to "Large EPC conference room."

        THE WITNESS:   "The inspection was then conducted utilizing the above equipment to locate any active RF," radio frequency, "transmitters, hidden cameras or other concealed surveillance equipment.  Additionally, a visual and physical search was conducted for anomalies consistent with the

installation of these type devices.

"Findings:  Point of potential compromise."

BY MR. FOX:

Q.   What does the next line say?

A.   "Large EPC conference room."

MR. FOX:  Now, Special Agent Tanner, if you can highlight the bottom about fifth of this, starting with the word "Small."  Just the one line.

BY MR. FOX:

Q.   Does this e-mail list another room that was swept?

A.   Yes, sir.

Q.   What does this say?

A.   "Small EPC conference room."

MR. FOX:  And then if we could go to the third page, please.  And do you see the indent there that starts "Executive"?  Okay.

BY MR. FOX:

Q.   Can you please read what it says in this highlighted portion.

A.   "Executive offices.  As directed, an examination of two fourth-floor offices revealed some of the same points of compromise as explained above; however, nothing of specific interest was detected."

MR. FOX:  Placing on September the 2nd a magnet that says "Baca no bugs"

BY MR. FOX:

Q.    Mr. Carey, I think it's in a separate binder that you have up there, but I'd like you to look at Exhibits 140 and 141.

No, it's going to be in a binder that's on a bookshelf that's to your left and beneath you.

Do you recognize Exhibits 140 and 141?

A.    Yes, sir.

Q.    What are they?

A.    It's -- the statement of probable cause from Sergeant Scott Craig is Exhibit 140.

141 is an order that was directed towards the Court asking for certain items of information.

Q.    Are those true and accurate copies of documents that ICIB produced and received in September of 2011?

A.    Yes, sir.

MR. FOX:  Your Honor, I move for the admission of Government's Exhibit 140 and 141.

MR. HOCHMAN:  No objection.

THE COURT:  They will be received.

*(Government's Exhibits 140-141 admitted into evidence.)*

MR. FOX:  If we can just look at 140, please.

*(The exhibit was displayed on the screen.)*

BY MR. FOX:

Q.    You mentioned a probable cause application -- a statement of probable cause.  What is a statement of probable cause?

A.    It's a written document stating the investigators --
identifying the investigator, what his qualifications are,
backgrounds, assignments.

Q.    What's the intent of writing a statement of probable
cause?

A.    My understanding so the judge knows who the author is or
the purpose and the background.

Q.    Is it to obtain a warrant?

A.    Yes, sir.

Q.    And specifically with Exhibit 140, what was the purpose of
this statement of probable cause?

A.    Sergeant Craig was writing an order for requested items to
the Court.

Q.    Were you aware of this statement of probable cause and the
court order that was sought before Mr. Craig applied for it?

A.    Yes, sir.

Q.    What was the purpose of it?

A.    To ascertain if Superior Court would authorize the federal
government to release what had been inserted, who was involved
in the FBI investigation.

Q.    You said "Superior Court."  Is that a -- what type of
entity is the Superior Court?

A.    State court.

Q.    And what were you trying to obtain with this probable
cause affidavit from the federal government?

A.    Information related to the FBI investigation; who, what, where, why.

Q.    Did Mr. Craig put anything in his probable cause application claiming that there was an FBI agent who was acting outside of her capacity with respect to these allegations?

A.    Can you give me one second?

Can you restate your question, please.

Q.    Sure.

Did Mr. Craig put anything in his statement of probable cause in which he claimed that someone within the FBI was acting outside of their capacity as an FBI agent?

A    No, sir.

Q.    I'm sorry.  I heard a cough.  I couldn't hear your answer.

A.    No, sir.

Q.    Did Mr. Craig put anything in his statement of probable cause that asserted that the FBI was bringing narcotics into Men's Central Jail?

A.    No, sir.

Q.    Did you believe the FBI was bringing narcotics into Men's Central Jail at the time?

A.    September 7th?

Q.    Is that the time of the --

A.    Or first week -- highly unlikely is how I would describe -- very highly unlikely.

Q.    What evidence did you have at that point?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

A.    Other than Anthony Brown saying that Gilbert Michel was meeting with undercover and when Gilbert Michel was coming back, but we had nothing.  Every investigative step, we came up with nothing.

Q.    What happened with the sheriff's department's attempt to obtain a court order?

A.    It was denied.

Q.    And when the Court denied the order, what did that tell you?

A.    That they would not -- they weren't in a position -- they didn't have jurisdiction over the federal court.

Q.    Over the federal court or federal agency?

A.    Federal agency.

Q.    Do you know the dates that the court order was denied?  If you can look at 141 to refresh your memory, that's fine.

A.    I believe it was September 7th -- September 8th.  It was written on the 7th, denied on the 8th.

Q.    Mr. Carey, you can close that book for now.

       I'd like you to now look in the other book, the one that contains the first volume, at Exhibit 53.

A.    Okay.

Q.    What is Exhibit 53?

A.    It's an e-mail chain that I'm involved in.

       MR. FOX:  Your Honor, before I get into that e-mail, I am putting on the calendar under September the 8th "court

denies order."

BY MR. FOX:

Q.    So you said that that's an e-mail.  What is the date of that e-mail?

A.    September 12.

Q.    Is that a true and accurate copy of an e-mail that you received or sent on or about that date?

A.    September 12th was one of the dates, but --

Q.    There's a string of e-mails beneath it, but September 12th is the top date; is that correct?

A.    Yes, sir.

Q.    Is that a true and accurate copy of the e-mail that you sent to Mr. Craig and Ms. Long on September 12, 2011?

A.    Yes, sir.

        MR. FOX:  Your Honor, I move for the admission of Government's Exhibit 53.

        MR. HOCHMAN:  Objection.  Relevancy, 403, Your Honor.

        THE COURT:  Objection is overruled.  It will be received.

    (Government's Exhibit 53 admitted into evidence.)

        MR. FOX:  Your Honor, actually, before I get into that exhibit and show it to the jury --

BY MR. FOX:

Q.    Mr. Carey, I'd also like you to look at Government's Exhibit 47, 49 and 52, please.  Actually, just make it --

MR. FOX:  One moment, Your Honor.

Sorry.

BY MR. FOX:

Q    47 and 52, please.

A.   Yes, sir.

Q.   Are those true and accurate copies of e-mails that you either sent or received on or about the dates reflected in those e-mails?

A.   Yes, sir.

MR. FOX:  I move for the admission, Your Honor, of Government's Exhibit 47 and 52.

MR. HOCHMAN:  No objection, Your Honor.

THE COURT:  They will be received.

*(Government's Exhibit 47 admitted into evidence.)*

*(Government's Exhibit 52 admitted into evidence.)*

MR. FOX::  If we can show the jury Exhibit 47, please.

*(The exhibit was displayed on the screen.)*

MR. FOX:  Can you please highlight the bottom one.

BY MR. FOX:

Q.   Mr. Carey, you received this e-mail eventually, as it was forwarded to you, it appears from the e-mail.  We see this is an e-mail from Judy Gerhardt to Patrick Libertone on September the 7th at 3:34 p.m.  And the subject says, "Need document."

Who was Judy Gerhardt at the time?

A.   She was the unit -- she's a lieutenant, but oversaw the discovery unit, the unit that provided records, sheriff's records.

Q.   And you mentioned her earlier in your testimony; is that right?

A.   Yes.

Q.   How did you reference her?  What had she done for you?

A.   She was receiving the grand jury subpoenas from the US Attorney's office.

Q.   And I think you mentioned that she would give them to you then?

A.   Yes.

Q.   Can you please read starting with the word "I was" -- the words "I was."

A.   "I was referred to you for this.  Please assist ASAP. Please provide the following:  Base files, including, but not limited to:  Full name, date of birth, Social Security number, last known address, last known phone number, criminal history (if available) and photos for the following LASD inmate. Please advise of an ETA for these records."

         And it's associated to Anthony Brown, with his booking number.

         "Please contact Lieutenant Libertone for booking slip."

         MR. FOX:  If we can now show this witness the top two

e-mails.

BY MR. FOX:

Q.   After Mr. Libertone forwards this e-mail to Mr. Thompson, what does Mr. Thompson do?

A.   Sends me an e-mail.

Q.   At what time?

A.   Seven minutes after the Libertone e-mail.  Thompson sent it to me at 3:45.

Q.   What did Mr. Thompson write in the e-mail to you?

A.   "FYI federal request?"

        MR. FOX::  Now, Special Agent Tanner, can you publish Government's Exhibit 52.

    *(The exhibit was displayed on the screen.)*

        MR. FOX:  Can you please highlight that.

BY MR. FOX:

Q.   Mr. Carey, this is an e-mail dated, from you to Mr. Leavins, September 9, 2011, at 4:41 p.m.

        Can you please read what this says.

A.   "Steve, official request from feds for interview with Brown was made."

        MR. FOX::  Now if we can go to Exhibit 53, please, which was just introduced into evidence.

    *(The exhibit was displayed on the screen.)*

        MR. FOX:  All right.  Let's show Mr. Carey, please, the e-mail from -- well, just the top e-mail is fine.

BY MR. FOX:

Q.    Mr. Carey, can you just describe for the jury -- before reading this portion of the e-mail, describe for the jury what is forwarded -- what you forwarded to Mr. Craig and Ms. Long in this e-mail string.  You can look at the original exhibit, if you would like.  It's Exhibit 53.

A.    What I sent him?

Q.    Yes.

A.    It was a list of complaints that the ACLU had filed pertaining to complaints out of Central Jail.

Q.    What types of complaints?

A.    I believe I was inappropriate force, assault.

Q.    This says, "complaints out of CJ" and you referred to it as "Central Jail."  Is that the same thing as Men's Central Jail?

A.    Yes.

Q.    Could you please read what you wrote to Mr. Craig and Ms. Long, with a copy to Mr. Leavins.

A.    "List of ACLU complaints out of CJ will probably lead us in part to where/what the feds are looking at.  Tom Carey."

Q.    Why did you want to find out where/what the feds were looking at?

A.    Well, we -- September 12th -- I mean, we were investigating allegations made by -- we were kind of investigating what the FBI was investigating.

Q.    Directing your attention to the next day, September 13, did anything unusual occur with respect to Gilbert Michel?

Would it help to refresh your memory with an e-mail?

A.    Yes.

Q.    Why don't you look at Exhibit 58, please.

Does that refresh your recollection?

A.    Yes, sir.

Q.    As long as we are on Exhibit 58, why don't I just ask you, is that a true and accurate copy of a string of e-mails you sent and received on the date reflected in the e-mail?

A.    Yes, sir.

MR. FOX:  Your Honor, I move for the admission of Government's Exhibit 58.

MR. HOCHMAN:  No objection, Your Honor.

THE COURT:  It will be received.

*(Government's Exhibit 58 admitted into evidence.)*

BY MR. FOX:

Q.    What happened on September 13th with respcet to Gilbert Michel?

A.    He was interviewed by ICIB investigators.

Q.    Did you learn from ICIB investigators what Gilbert Michel said?

A.    Yes.

Q.    What did he say?

A.    He admitted to beating up inmates with other deputies.

MR. FOX:  Special Agent Tanner, can you please publish Government's Exhibit 58.

*(The exhibit was displayed on the screen.)*

MR. FOX:  And the bottom e-mail at 3:47 p.m.

BY MR. FOX:

Q.   What does Mr. Leavins write to you at 3:47 p.m. on September the 13th?

A.   "That idiot Michel is confessing to beating handcuffed inmates with other deputies.  Not looking good.  They are still interviewing him.  Will advise."

MR. FOX:  Your Honor, I'm putting on the calendar for September 13 "Michel confesses."

BY MR. FOX:

Q.   And, Mr. Carey, I'd like you to look at Exhibits 59 and 60 in your binder.

Do you recognize those exhibits?

A.   I do.

Q.   Are those true and accurate copies of exhibits that you sent on the dates reflected in the e-mails?

A.   Yes, sir.

MR. FOX:  Your Honor, I move for the admission of Government's Exhibit 59 and 60.

MR. HOCHMAN:  No objection, Your Honor.

THE COURT:  They will be received.

*(Government's Exhibits 59-60 admitted into evidence.)*

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

MR. FOX:  If we can show 59 to the jury.

*(The exhibit was displayed on the screen.)*

MR. FOX:  Highlight the text, please.

BY MR. FOX:

Q.   Mr. Carey, this is an e-mail that you wrote to Mr. Tanaka's aide, is that correct --

A    Yes, sir.

Q    -- Chris Nee, at 4:25 p.m.?

When is this in relation to you learning about the information regarding Gilbert Michel?

A.   Shortly after.

Q.   And what did you write to Mr. Nee?

A.   "Chris, the boss in?"

Q.   Who were you referring to as "the boss"?

A.   That would have been Undersheriff Tanaka.

Q.   And if you could look at Exhibit 60 as we publish it.

*(The exhibit was displayed on the screen.)*

BY MR. FOX:

Q.   When is this sent in comparison to the last e-mail?

A.   It was nine minutes later and advising Lieutenant Nee that I had made contact with Tanaka.  "Thank you."

Q.   What was the purpose of making contact with Mr. Tanaka?

A.   My recollection was to advise him of what Gilbert Michel had said.

Q.   Was Gilbert Michel's confession about beating handcuffed

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

inmates important to you?

A.    Yes.

Q.    Why?

A.    Well, it corroborated what Anthony Brown was saying, that we had a deputy sheriff that was assaulting inmates.

Q.    Did you do anything to track Mr. Michel's movements after this time?

A.    Yes.

Q.    What did you do?

A.    My unit put a GPS -- it's an acronym for a tracking device -- on his car.

Q.    What was the purpose of it?

A.    To see who he was meeting with or meeting with the FBI.

Q.    Why was that important?

A.    Again, to see who he was meeting with other than -- it was a -- it was suggested to me that the investigators want to do it, place the device on his car.  I okayed it, but -- to see how frequently he was meeting with the FBI.

Q.    What did you learn?

A.    Other than meeting with the FBI, I don't believe -- I think we found out that he came to the federal building once.  That was it.

Q.    What did you believe, based on the information you received that he came to the federal building and he was meeting with the FBI?

MR. HOCHMAN:  Objection.  Misstates the testimony.

THE COURT:  Do you understand the question?

THE WITNESS:  Not really, sir.

BY MR. FOX:

Q.   Okay.  You said, I believe, that the tracking device showed that Mr. Michel was meeting with the FBI; is that correct?

A.   He went to the federal building.

Q.   Okay.  What did you believe when you learned that Mr. Michel had gone to the federal building?

A.   That he was cooperating with either the FBI or US Attorney's Office or both.

Q.   In addition to the GPS device that was installed on Mr. Michel's car, did ICIB conduct surveillance of anyone else around this time?

A.   Yes.

Q.   Who?

A.   Agent Marx and Agent Lam.

Q.   Why did you conduct surveillance on Special Agent Marx and Special Agent Lam?

A.   Investigators wanted to see what deputies they might be having contact with.

Q.   Did you think that Special Agent Marx had committed a crime at the time?

A.   No.

Q.    What about Special Agent Lam?

A.    At the time of the Lam surveillance, I didn't -- I wasn't aware of that until several months, if not a year or two later. I was aware of Marx.

Q.    We will just focus on the surveillance of Special Agent Marx.

        Why didn't you believe she had committed a crime at that point?

A.    Why did I believe or not believe?

Q.    Why did you not believe it?

A.    There was nothing to indicate that she had.

Q.    Mr. Carey, do law enforcement officers commit a crime solely by conducting an undercover operation?

A.    No, sir.

        MR. HOCHMAN:  Objection.  Foundation.  Calls for a legal conclusion.  Move to strike.

        THE COURT:  Overruled.

BY MR. FOX:

Q.    Sorry.

        Do they commit a crime by -- solely by conducting an undercover operation?

A.    No, sir.

Q.    Other than this instance, did ICIB, as far as you are aware, ever investigate a law enforcement officer solely for conducting an undercover operation?

A.    No, sir.

Q.    What did you learn from the surveillance of Special Agent Marx?

A.    What was conveyed to me was roughly what time she left for work, got home --

        MR. HOCHMAN:   Objection.   Hearsay at this point, Your Honor.

        MR. FOX:   Your Honor, I can clean up when he learned it.

BY MR. FOX:

Q.    When did you learn what the result of the surveillance was?

A.    That -- after the surveillance had been conducted.

Q.    Around the time?

A.    Yes, sir.

Q.    What did you learn from the reports to you about the surveillance?

A.    Nothing.   Again, other than what time she departed, arrived home, walked her dog.

Q.    Did the surveillance provide any evidence to you that she was committing a crime?

A.    No, sir, none.

Q.    I'd like you to now look at Exhibits 62 and 63 in your binder.  Do you recognize Exhibits 62 and 63?

A.    Yes, sir.

Q.   What are they?

A.   62 is an e-mail from Undersheriff Tanaka to myself and Lieutenant Leavins, and it's a link to an LA Times story.

Q.   What about 63?

A.   It's an article from the Washington Post related to the justice department's investigation of a police department.  And that's sent from Tanaka to myself and Leavins.

Q.   Are these true and accurate copies of e-mails you sent and received on or about the dates that are reflected in the e-mails?

A.   Yes, sir.

      MR. FOX:  Your Honor, I move for the admission of Government's Exhibit 62 and 63.

      MR. HOCHMAN:  With respect to 62, no objection, Your Honor.

      With respect to 63, the first two parts of the e-mail -- no objection to the third e-mail on the exhibit, Your Honor.

      MR. FOX:  And, Your Honor, again, we will redact the top two e-mails on Government's Exhibit 63 overnight.  And we ask you to provisionally admit Government's Exhibit 63, the remainder of the e-mail.

      THE COURT:  All right.  They will be admitted.

      *(Government's Exhibit 63 admitted into evidence.)*

///

MR. FOX:  And if we can show Mr. Carey Government's Exhibit 62, please.

*(The exhibit was displayed on the screen.)*

BY MR. FOX:

Q.   Mr. Carey, what did Mr. Tanaka forward to you on September 25 of 2011 at 9:20 a.m.?

A.   A link to an LA Times article regarding the FBI's investigation of beatings in LA County jails.

Q.   And now showing you just the portion that's the beginning of the third e-mail in Exhibit 63 from Mr. Tanaka to you and Mr. Leavins at 9:26 a.m. on September 25.

What is the subject of this e-mail?

A.   "Justice Department boosts activity to police the police."

Q.   What is the publication that wrote this article?

A.   Washington Post.

Q.   What did these articles that were forwarded to you generally tell you?

A.   That the Department of Justice was investigating -- the civil rights section was investigating local -- state-level law enforcement.

Q.   Why was that significant to you?

A.   Because that appeared to be what was occurring -- well, not "appearing."  It was what was occurring in LA County.

MR. FOX:  Your Honor, I'd like to move into evidence Government's Exhibit 102 under 902(11) certification.

Oh, it's already in.  I'm sorry.  We moved it in already.

BY MR. FOX:

Q.   Mr. Carey, Government's Exhibit 102 is an appearance that Mr. Baca made on Good Day LA on September 26, 2011.  Have you ever seen that?

A.   Yes.

Q.   When did you see it?

A.   That day, September 26, was the first time.

MR. FOX:  I'd like to now play Government's Exhibit 102.

*(Playing of videotape.)*

BY MR. FOX:

Q.   Mr. Carey, we heard Mr. Baca say in that clip, "Oh, yeah," when asked if he resented the FBI's intrusion.  Was that consistent with your interactions with him during this time period?

A.   Yes, sir.

Q.   And we heard Mr. Baca state about the cell phone, "It's illegal, it's a misdemeanor, and there's a conspiracy law that goes with it."

When you watched that, what did you understand Mr. Baca to mean?

A.   That the intrusion -- the insertion of the phone into Men's Central Jail was a crime.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Q.    Was it?

A.    No.

Q.    We heard Mr. Baca say that he had to weigh his options.
What did you understand that to mean?

A.    That we would -- "we," meaning the sheriff's department, "we," meaning ICIB, would continue our investigation or possibly the option of joining in or taking over the investigation.

MR. FOX:    Putting on the calendar on September 26, "Baca GDLA," for Good Day LA.

BY MR. FOX:

Q.    Mr. Carey, did you have any meetings with Mr. Baca on or about this date?

A.    The --

Q.    September 26 of 2011?

A.    Yes.

Q.    Who was present for that meeting?

A.    Lieutenant Leavins, Undersheriff Tanaka and Sheriff Baca.

Q.    Where was the meeting?

A.    In Undersheriff Tanaka's office.

MR. FOX:    If we can pull up 139 again.

*(The exhibit was displayed on the screen.)*

BY MR. FOX:

Q.    Do you recall where people were within Mr. Tanaka's office?

A.   Undersheriff Tanaka was behind his desk.

Q    I'm going to put a "T" (indicating).

Is that where he was, where the single chair is?

A.   Yes.

Q.   And where you were?

A.   Lieutenant Leavins and myself were in front of the desk. I don't know the furniture arrangement at the time, but we were in front of his desk.

Q.   Do you know who was on each side?

A.   No.

Q.   I'm just going to put you, just for the purposes of this, on the left side with a "C" and Mr. Leavins on the right side with a "L" (indicating).

Q.   Where was Mr. Baca?

A.   He would have been -- my recollection was he was standing in front of the door, but back more, closer towards Tanaka's desk.

Q.   Why don't you -- I think you can do this yourself if you tap on the upper right of your screen.

Why don't you please place a "B" where you recall Mr. Baca.

A.   Looks like an "8," but that's my version of a "B."

Q.   What happened at this meeting?

A.   We told -- "we," being Lieutenant Leavins and myself, informed the sheriff that we were going to go to Agent Marx's

house.

Q.    What was the purpose of going to Special Agent Marx's house?

A.    To attempt an interview.

Q.    Was that the purpose?

A.    It was -- it was consistent with everything that was going on at that time.  It was to send a message.

Q.    What message were you hoping to send?

A.    You went to the home of our deputies, we can go to the home of your FBI agent.  And the message was of displeasure.

Q.    Did you think that Special Agent Marx was going to speak to the sheriff's department?

A.    No, sir.

Q.    Why not?

A.    Previous attempts.  I mean, she wouldn't talk.  There was no indication that she would on September 26.

Q.    What, if anything, did Mr. Baca say about the plan?

A.    He was okay with it.  He didn't tell us not to do it.  His advice to us was to not put handcuffs on her.

Q.    What did you understand that to mean, don't put handcuffs on her?

A.    Send a message, but don't arrest.

Q.    Why did you understand that to be his message?

A.    Well, based on his attitude from the -- that same day from the Good Day LA appearance.  And I also, on that same day, read

a letter or a memo that was drafted from his office to the US Attorney's Office that was -- he wasn't happy.

Q.    I'd like you to look in your book at Exhibit 64, please.

        MR. FOX:  Your Honor, while he does that, I'm going to put on the calendar a magnet that says "Baca no handcuffs" on September 26.

BY MR. FOX:

Q.    Do you recognize Exhibit 64?

A.    I do.

Q.    What is it?

A.    It's an e-mail that I sent to Sergeant Craig.

Q.    Is it a true and accurate copy of an e-mail that you sent to Mr. Craig on or about the date reflected on the document?

A.    Yes.

        MR. FOX:  Your Honor, I move for the admission of Government's Exhibit 64.

        MR. HOCHMAN:  No objection, Your Honor.

        THE COURT:  It will be received.

    (Government's Exhibit 64 admitted into evidence.)

        MR. FOX:  If we can publish it, please, to the jury.

    (The exhibit was displayed on the screen.)

        MR. FOX:  And let me clear that from the screen.

        And, Special Agent, if you could highlight under the initial message first.

        Yes.  Thank you.

BY MR. FOX:

Q.   This is a message from pktanaka@lasd.org to Carey, William T. on September 26 at 1:25 p.m.

What is the subject of this, Mr. Carey?

A.   "Sheriff Lee Baca on Good Day LA."

Q.   Are you familiar with what that link is that's in the body of the e-mail?

A.   Yes.

Q.   What is it?

A.   It's the -- what we just saw on the screen, the --

Q.   The link to the video of Mr. Baca on Good Day LA?

A.   Yes, sir.

MR. FOX:   If we can show the top e-mail now.

BY MR. FOX:

Q    Why did you forward that link to Mr. Craig?

A.   Craig was the lead investigator on this case.

Q.   So -- but why send him an e-mail of Mr. Baca's appearance on Good Day LA?

A.   Let him know that -- what the sheriff had said.

Q.   Why was that important for Mr. Craig to know?

MR. HOCHMAN:   Objection.   Foundation.   Improper question.

THE COURT:   You can rephrase the question.

BY MR. FOX:

Q.   Why did you feel it was important to let Mr. Craig know

what Mr. Baca said on Good Day LA?

A.   Because after watching that, I personally felt empowered or emboldened with the investigation we were doing and to let Sergeant Craig know the sheriff's opinion -- or position.

Q.   Do you know whether Mr. Craig approached Special Agent Marx that day?

A.   Yes.

Q.   How do you know that?

A.   Either -- somebody from the investigative team called me after the contact.

MR. HOCHMAN:  Objection.  Hearsay at this point, Your Honor.  Move to strike.

MR. FOX:  I can lay more foundation, Your Honor.

THE COURT:  That's fine.

BY MR. FOX:

Q.   Mr. Carey, you mentioned that someone on the investigative team may have told you about it.  Did you also --

MR. HOCHMAN:  Objection.  Restating a hearsay statement, Your Honor.  Move to strike the question.

MR. FOX:  I will withdraw it and I'll rephrase.

BY MR. FOX:

Q.   Mr. Carey, did you hear from either Mr. Leavins or Mr. Craig that the approach had happened?

A.   Yes.

Q.   And did you also see a recording of that confrontation

around that time?

A.    Did I see it?

Q.    Yeah, did you have a chance to review a recording of that conversation -- I'm sorry, the confrontation between your investigators and Special Agent Marx around that time?

A.    I believe I saw and heard it the following day.

Q.    Can you please look at Exhibit 99.

MR. FOX:  Well, I'm sorry.  This should be an original exhibit.  I apologize.

BY MR. FOX:

Q.    Do you recognize that exhibit?

A.    Can I open it?  I don't see my initials on it.

Q.    Then I will do it with a different witness.  That's perfectly fine.

A.    Sir, I -- turning it upside down, I can see my handwriting on it, so --

Q.    Thought I messed up.

What is that exhibit?

A.    It's a CD of the -- I believe it's the Marx approach.

Q.    Is this a synced version of the audio and video from the confrontation of Special Agent Marx that you reviewed the day after it happened?

A.    Yes.

Q.    Is it a true and accurate copy of that?

A.    Yes.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

MR. FOX:  Your Honor, I move for the admission of Government's Exhibit 99.

MR. HOCHMAN:  Objection, Your Honor.  Foundation as to when the synced video itself was created.

THE COURT:  Let's go to sidebar.

*(Proceedings held at sidebar under seal 1:21 P.M.)*

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

(*The following proceedings were held in open court.*)

MR. FOX:  Your Honor, may we play Government's Exhibit 99.

THE COURT:  Yes.

(*Playing of videotape.*)

MR. FOX::  And, now, Your Honor, I'd like the jury to pull out their Exhibit Book 3.  And clip 8 is what I'm going to play.  So it's right behind tab 8.

Right behind tab 8.

Your Honor, it looks like one of the books does not have the transcript.  May the jurors share this one?

THE COURT:  That's fine.

MR. FOX:  Okay.  If we can play that please, Special Agent Tanner.

(*Playing of audiotape.*)

BY MR. FOX:

Q.   Mr. Carey, was -- Mr. Baca's statement that he was not aware of the approach of Special Agent Marx before it occurred, was that statement accurate?

MR. HOCHMAN:  Objection.  Misstates the testimony. He never said that.

THE COURT:  No speaking objections.

MR. HOCHMAN:  I'm sorry, Your Honor.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  Is your question was he aware prior to going to her house?

BY MR. FOX:

Q.   Yes.

A.   Absolutely he was aware.

Q.   Would you have had your sergeants approach Special Agent Marx outside her home to confront her without Mr. Baca's approval?

A.   No, sir.

Q.   Why not?

A.   Like I said, earlier this morning, everything we did -- I knew that this was not a comfortable investigation, pitting two agencies against each other, and that everything we did -- my guys from ICIB, we made executive notification so it was approved and nothing would have come back on us.

MR. FOX:  If we can have the jury turn to 44 -- tab 44 in that same book, please, Exhibit 3 book.

(Playing of audiotape.)

MR. FOX:  And, Your Honor, I'm going to put on the calendar on September 26 "Marx approached."

MR. FOX:  And recognizing the time, Your Honor, if you want to take a break now, that's --

THE COURT: All right. Ladies and gentlemen, again I want to remind you until this trial is over, you are not to discuss this case with anyone, including your fellow jurors, members of your family, people involved in the trial or anyone else, nor are you allowed to permit others to discuss the case with you.

If anyone approaches you and tries to talk with you about this case, please let me know about it immediately.

Do not read any news stories or articles or listen to any radio or television reports about the case or about anyone who has anything to do with it.

Do not do any research, such as consulting dictionaries, searching the internet or using other reference materials. And do not make any investigation about the case on your own.

If you need to communicate with me, simply give a note to the clerk. And do not make up your mind about what your verdict should be until after you've gone into the jury room to decide the case and you and your fellow jurors have discussed the evidence. Keep an open mind until then.

All right. We will resume tomorrow morning at 8 o'clock.

THE CLERK: All rise.

(Jury out at 1:35 P.M.)

(The following was heard outside the presence of the

*jury.)*

THE COURT:  All right, sir.  You may step down.

MR. HOCHMAN:  Your Honor, we would ask -- I forgot to at the time move in Defense Exhibit 518, which is the big chart, Your Honor.  It's a chart that the witness actually -- Cecil Rhambo --

THE COURT:  It was admitted for demonstrative purposes.

MR. HOCHMAN:  There were two charts I was dealing with, Your Honor.

The second one, which is the triangle pyramid chart, we introduced for demonstrative purposes.  The first one I believe is a blow-up of Government's Exhibit 108.

The problem with Government's Exhibit 108, when you look at it, Your Honor, is that most of the words on it are blurred.  I don't know why they copied it in a way that made most of the wording blurred.  It's hard to see.

The Defense Exhibit 518 is a readable version that now Mr. Rhambo has actually marked up.  So it becomes, in some ways, evidence itself.  So we move in Defense Exhibit 518, please.

MR. FOX:  Your Honor, I believe that this will unfairly emphasize the one exhibit because it is a blow-up.  It will be the largest (indicating) exhibit in that room.

THE COURT:  It was admitted for demonstrative

purposes only.  That's how it was explained to me, at least that's what I recall.

So if there's nothing else, I will see everybody tomorrow morning at 8 o'clock.

MR. HOCHMAN:  Yes, Your Honor.

*(Evening recess taken 1:37 p.m.)*

--oOo--

CERTIFICATE

I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Date: AUGUST 10, 2017

/s/  Cindy L. Nirenberg, CSR No. 5059

Official Court Reporter