UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

HONORABLE PERCY ANDERSON, U.S. DISTRICT JUDGE

- - -

UNITED STATES OF AMERICA,                )
                                         )
                    PLAINTIFF,           )
                                         )
          vs.                            ) No. CR16-66(A)-PA
                                         )
LEROY BACA,                              )
                                         )
                    DEFENDANT.           )
_____)

REPORTER'S TRANSCRIPT OF JURY TRIAL

DAY 8, VOLUME II of II

PAGES 1558-1699

LOS ANGELES, CALIFORNIA

FRIDAY, MARCH 3, 2017

9:56 A.M.

_____

CINDY L. NIRENBERG, CSR 5059, FCRR
U.S. Official Court Reporter
350 W. 1st Street, #4455
Los Angeles, CA 90012
*www.msfedreporter.com*

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

APPEARANCES OF COUNSEL:


FOR THE PLAINTIFF:
                    OFFICE OF THE UNITED STATES ATTORNEY
                    BY: BRANDON FOX,
                        ASSISTANT U.S. ATTORNEY
                        EDDIE A. JAUREGUI,
                        ASSISTANT U.S. ATTORNEY
                        LIZABETH A. RHODES,
                        ASSISTANT U.S. ATTORNEY
                    312 NORTH SPRING STREET
                    13TH FLOOR
                    LOS ANGELES, CA 90012
                    213-894-2434


FOR THE DEFENDANT:
                    MORGAN LEWIS & BOCKIUS
                    BY: NATHAN J. HOCHMAN, ATTORNEY AT LAW
                        BRIANNA L. ABRAMS, ATTORNEY AT LAW
                    THE WATER GARDEN
                    1601 CLOVERFIELD BOULEVARD
                    SUITE 2050 NORTH
                    SANTA MONICA, CA 90404
                    310-255-9025


ALSO PRESENT:
                    LEAH TANNER, FBI SPECIAL AGENT

I N D E X

GOVERNMENT'S WITNESSES:                              PAGE

WILLIAM CAREY

   CROSS BY MR. HOCHMAN (RESUMED)          1562

   REDIRECT BY MR. FOX                     1665

   RECROSS BY MR. HOCHMAN                  1685


ROBERT FATURECHI

   DIRECT BY MR. FOX                       1689




FURTHER PROCEEDINGS

DISCUSSION HELD OUTSIDE PRESENCE OF JURY 1562

DISCUSSION HELD AT SIDEBAR                 1570

DISCUSSION HELD AT SIDEBAR                 1571

DISCUSSION HELD AT SIDEBAR                 1605

DISCUSSION HELD AT SIDEBAR                 1615

DISCUSSION HELD AT SIDEBAR                 1624

DISCUSSION HELD OUTSIDE PRESENCE OF JURY 1644

DISCUSSION HELD OUTSIDE PRESENCE OF JURY 1646

DISCUSSION HELD AT SIDEBAR                 1695

DISCUSSION HELD OUTSIDE PRESENCE OF JURY 1696

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

E X H I B I T S

(None.)

LOS ANGELES, CALIFORNIA; FRIDAY, MARCH 3, 2017

9:56 A.M.

- - - - -

*(The following was heard outside the presence of the jury.)*

THE COURT:  All right.  If we could have the witness come forward, please, and if we could bring in the jury.

*(Jury in at 9:59 p.m.)*

THE COURT:  All right.  Let's resume.

MR. HOCHMAN:  Thank you very much, Your Honor.

WILLIAM CAREY,

having been previously duly sworn,

testified further as follows:

CROSS-EXAMINATION

(RESUMED)

BY MR. HOCHMAN:

Q.   Mr. Carey, ICIB and the sheriff's department in general have the responsibility for the safety and the security of all the inmates and all the sheriff's department employees within the jail; is that correct?

A.   Yes, sir.

Q.   And that's a responsibility they have 24 hours a day, 7 days a week, correct?

A.   Yes, sir.

Q.   And as part of what ICIB does is it investigates the

criminal allegations against particular sheriff's department employees; is that correct?

A. Yes, sir.

Q. And part of the reason that it does that is that if it finds substance to those allegations, it can refer those cases to the district attorney's office for criminal prosecution; is that right?

A. Yes.

Q. And if there's substance to the allegations, the sheriff's department can take action, like firing a particular deputy or, in essence, forcing them to resign; is that correct?

A. Yes.

Q. That's not something that the FBI can do, fire a deputy; is that correct?

MR. FOX: Objection. Argumentative.

THE COURT: Sustained.

BY MR. HOCHMAN:

Q. Well, to your knowledge, who has the power to fire a deputy -- a sheriff's department deputy?

A. Sheriff's department.

Q. And part of the reason for ICIB to investigate, let's say, the bribery of a deputy or the insertion of a cell phone and drugs into a secured facility like a jail is to find out whether -- where the flaws were that allowed that particular form of contraband to enter the jail; is that correct?

A.    I didn't quite understand.

Q.    Well, sure.  Once you find out how the contraband entered the jail, you can fix whatever allowed the contraband to enter the jail.  If it was a security breach or something like that, you can learn what the breach is and then fix it for the future; is that correct?

A.    Yes, sir.

Q.    And that's important to ensure the safety and security of the jail facility; is that correct?

A.    Yes, sir.

Q.    And you can also then improve training and supervision to make sure that whatever you found that was the flaw in the system doesn't occur again, correct?

A.    Yes, sir.

Q.    Now, when you're having this discussion on August 20, 2011, about what to do with the Anthony Brown cell phone, did you have the policy manual in the room at that time, Exhibit 116?

A.    No, sir.

Q.    Now, there's seven volumes, are there not, of policy manuals with over 1500 pages in them that deal with the sheriff's department, correct?

A.    I just know that it was large.  How many volumes, I couldn't tell you.

Q.    Over a thousand pages?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

A.    Yes.

Q.    And the government, I believe, in Exhibit 116 showed you Volume III, which has nine chapters in it, correct?

A.    I don't know, sir.

        MR. HOCHMAN:  All right.  If we could turn to Exhibit 116, first page, Your Honor.  I'd please ask Special Agent Tanner if she could put it on the screen.

        *(The exhibit was displayed on the screen.)*

        MR. HOCHMAN:  Will you turn to the first page of that.

BY MR. HOCHMAN:

Q.    Do you see where it says "Volume III, Chapter 1"?

A.    Yes.

Q.    And then if you just scroll through the exhibit yourself, if you have it in front of you -- do you have Exhibit 116?

        It goes through a few of the policies that are in Volume III of the sheriff's department policy manuals; is that correct?

A.    Sir, these exhibits don't go up to -- 87.

Q.    If you recall, the ones that you saw -- we'll just refer to the ones that you've already seen -- those are a few of the policy statements of the thousands of pages of the policy manuals for the sheriff's department policy, correct?

A.    Yes, sir.

Q.    Now, how often did you review the policy manual back in

August and September of 2011?

A.    Very little.

Q.    Did you actually review it at all in connection -- in connection with making any decisions on your investigation, if you recall?

A.    On this Anthony Brown investigation?

Q.    Yes, at the time.

A.    I don't know that I've looked at department policy related to this -- as it related to Anthony Brown.

Q.    Yes.  Now, the objective to go ahead and get to the bottom of the cell phone situation, the objective or the order that Sheriff Baca gave you was a completely legitimate order, correct?

        MR. FOX:  Objection, Your Honor.  Calls for a legal conclusion.

        THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.    Did you believe --

        THE COURT:  Excuse me.

        MR. HOCHMAN:  Oh, I'm sorry.

        THE COURT:  The answer is stricken.  The jury should disregard it.

BY MR. HOCHMAN:

Q.    Did you believe that the objective that the sheriff gave you of getting to the bottom of the Anthony Brown investigation

was a legitimate order?

A.    Yes.

Q.    Now, during the August 20th meeting, I believe you said that the sheriff's demeanor was calm; is that correct?

A.    Yes.

Q.    He wasn't screaming at all?

A.    No.

Q.    And then at some point, I think we talked about whether or not he left the meeting before the end of it, but do you recall that it was Mr. Tanaka, when Sheriff -- after Sheriff Baca left the meeting, then came back into the meeting and ordered that no one was to see Anthony Brown without Mr. Tanaka's permission?

A.    Sir, if I'm not mistaken, I think I previously testified I don't remember executive leading the meeting.

Q.    Well, do you remember Undersheriff Tanaka saying to the gathering that no one was to see Anthony Brown without Undersheriff Tanaka's permission?

A.    I don't remember that, sir.

Q.    Do you remember that -- isn't it true that the only permission needed to see Anthony Brown was Undersheriff Tanaka's permission?

A.    No, sir.

MR. HOCHMAN:  Your Honor, I'd like to -- may I direct counsel to a particular page and line number, Your Honor?

THE COURT:  Yes.

BY MR. HOCHMAN:

Q.   And just to be clear, isn't it true that the only approval you needed to have Anthony Brown interviewed outside of ICIB by the FBI was the approval of Undersheriff Tanaka and not Sheriff Baca?

A.   No, sir.

MR. HOCHMAN:  I'd like to read, Your Honor, from lines 5 through 14 on page 887.

MR. FOX:  Objection.  Improper impeachment.

THE COURT:  Somebody have a copy of --

MR. HOCHMAN:  Yes, Your Honor.  May I approach the clerk?

THE COURT:  Yes.

What's the page?

MR. HOCHMAN:  The page is 887, Your Honor, lines 5 through 11.  And.

Your Honor, may I set up the question slightly differently -- withdraw the prior question and then set it up slightly differently, Your Honor?  I think I understand --

THE COURT:  If you want to withdraw that question, that's fine.

MR. HOCHMAN:  Yes.

BY MR. HOCHMAN:

Q.   At some point, you found out that FBI agents had been

interviewing Anthony Brown, correct?

A.   What date are we talking?

Q.   August 23rd.

A.   Yes, sir.

Q.   And the specific orders that you had was that nobody was to interview Anthony Brown outside of ICIB without the approval of Undersheriff Tanaka only, correct, not Sheriff Baca?

A.   That's not correct.

        MR. HOCHMAN:  All right.  Then it's lines 5 through 11, Your Honor, of 887.

        MR. FOX:  Objection.  Objection again.  Misleading and improper impeachment.

        THE COURT:  Objection sustained.

BY MR. HOCHMAN:

Q.   Well, Mr. Carey, focusing on that August 23rd interview, did it concern you at the time that FBI agents had been interviewing Anthony Brown?

        MR. FOX:  Objection.  Asked and answered.

        THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.   When you spoke with Undersheriff Tanaka that day on August 23rd, did Undersheriff Tanaka tell you that nobody was to interview Anthony Brown without his approval?

A.   I don't remember -- no, not that I remember.

        MR. HOCHMAN:  Now I would like to focus counsel on

page 889.  That would be lines 10 through 16.

THE COURT:  Let's go to sidebar.

*(Proceedings held at sidebar under seal 10:10 A.M.)*

*(The following proceedings were held in open court.)*

MR. HOCHMAN:  May I proceed, Your Honor?

THE COURT:  Yes.

BY MR. HOCHMAN:

Q.  Mr. Carey, would it refresh your recollection to see the

trial transcript from the second James Sexton trial and the questions and answers on this particular issue?

A.   Yes.

MR. HOCHMAN:  May I approach the witness, Your Honor -- approach the court clerk, Your Honor?

THE COURT:  Yes.

Okay.  Is there a particular page you want him to take a look at?

MR. HOCHMAN:  Yes.  Page 889, lines 10 through, I believe, 15 or 16, Your Honor.

THE COURT:  All right.  If you'd just read that to yourself.

MR. HOCHMAN:  Your Honor, may I retrieve the transcript?  It's the only copy left I have.

THE COURT:  Yeah, that's fine.  You can give that back to him.

Have you finished looking at it?

THE WITNESS:  Yes, sir.

THE COURT:  Okay.

MR. HOCHMAN:  And, Your Honor, I'd also --

THE COURT:  Just one second, please.  Let's go to sidebar for a second.

And don't walk through the well.

*(Proceedings held at sidebar under seal 10:14 A.M.)*

*(The following proceedings were held in open court.)*

BY MR. HOCHMAN:

Q.   Mr. Carey, once ICIB was assigned this investigation, what steps did you take to carry it out and get to the bottom of the Anthony Brown cell phone?

A.   The first thing we did was review any documents or reports that were generated prior to our being involved in it, conducted interviews.

Q.   And what was the purpose of conducting interviews?

A.   Obtain information.

Q.   And as far as who you're interviewing, you are going to try to interview deputies; is that correct?

A.   I don't remember who the initial people being interviewed were.

Q.   But as part of the people -- the set of people that you would identify to be interviewed in connection with your investigation, you would interview, for instance, Anthony

Brown, correct?

A.   Yes, sir.

Q.   And you did interview Anthony Brown many times; is that right?

A.   Yes, sir.

Q.   And you would try to interview the deputies that Anthony Brown provided information about, correct?

A.   Yes.

Q.   And then you would try to interview people who had information that could assist your investigation; is that correct?

A.   Yes, sir.

Q.   And you would try to obtain documents that would help corroborate and support or refute Anthony Brown's allegations, correct?

A.   Yes.

Q.   In order to, again, determine whether or not -- or how many deputies were involved, how many inmates involved, how much contraband is involved, and how big a problem you have, correct?

        MR. FOX:  Objection.  Compound.

        THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.   In order to determine how many deputies are involved; is that correct?

A.    Yes.

Q.    How many inmates are involved, correct?

A.    Yes.

Q.    How much contraband is involved?

A.    Yes, sir.

Q.    And how big a problem you have, correct?

A.    Correct.

Q.    Now, we've talked about this FBI -- this policy dealing with the FBI having access to Anthony Brown.  Do you recall that?

      Do you recall when you were speaking in your original trial testimony with Mr. Fox that you discussed a policy dealing with the FBI's having access to Anthony Brown?  Do you recall that?

A.    I didn't -- I looked at it as an order, not a policy.

Q.    I'm sorry.  As an order.

      Well, with respect to the order that you are referencing, isn't it true that the order did not prohibit the FBI from speaking with Anthony Brown; it only said that if the FBI wanted to speak with Anthony Brown, they had to get at least Undersheriff Tanaka's permission, correct?

A.    Yes, sir.

Q.    And if they got Undersheriff Tanaka's permission, the FBI could speak with Anthony Brown, correct?

A.    I can't speak on behalf of Undersheriff Tanaka.

Q.   No, but your understanding is that's how it worked; if they got Undersheriff Tanaka's permission, then the FBI could speak with Anthony Brown, correct?

A.   I looked -- the way I looked at it was somehow we -- the department, ICIB, would get resolution on it.

Q.   Well, again, I'm just trying to understand the order that you testified about.  It said the FBI can speak with Anthony Brown if it gets Undersheriff Tanaka's permission, correct?

A.   Yes.

Q.   Okay.  And the FBI -- in general, with respect to the jails, when outside law enforcement wants to speak with an inmate, the sheriff's department determines where that can happen, correct, where within the jail facility it can happen; is that correct?

A.   Yes.

Q.   And it can determine the timing of it, when during the day it would happen; is that correct?

A.   Yes.

Q.   And it can require the agents to give certain identification before they speak with a particular inmate; is that correct?

A.   Yes.

Q.   And as part of the sheriff's department control over the jail, it can even ask the agents which inmate they want to speak with; is that correct?

MR. FOX:  Objection.  Calls for a legal conclusion.

THE COURT:  I'm going to sustain the objection on foundation at this point.

BY MR. HOCHMAN:

Q.   You were familiar with the policies that the sheriff's department had in giving access to outside law enforcement to inmates, correct?

A.   Yes.

Q.   And it's part of those policies that the sheriff's department could ask the outside law enforcement to identify which inmate they want to speak with before they come and speak with them, correct?

A.   Yes.

Q.   And that's because the sheriff's department was -- had the responsibility for the safety and the security of the jails, correct?

MR. FOX:  Objection.  Asked and answered. Cumulative.

THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.   Now, with respect to the investigation that you then undertake, you were asked by Mr. Fox how many in-person or telephone calls you had with Mr. Baca, and I believe your initial answer was "several."

Do you recall that?

A.    State your question again, please.

Q.    Certainly.

      You were asked by Mr. Fox between August 18th and September 26, 2011, how many in-person or -- in-person meetings or telephone calls you had with Sheriff Baca during that time, and I believe your initial answer was "several."

      Do you recall that?

A.    Yes.

Q.    And then Mr. Fox asked you a follow-up question.  He said, "Can you -- was it five or more?"  And then you said, "Yes."

      Do you recall that?

A.    Yes.

Q.    And then eventually you said it was a dozen.

      Do you recall that?

A.    Correct.

Q.    Now, with Mr. Tanaka you said you had much more frequent contact, both in-person meetings and telephone calls with Mr. Tanaka, correct?

A.    Yes, sir.

Q.    How much -- if you had, let's say, approximately a dozen contacts between August 18th and September 26th in person or on the telephone with Sheriff Baca, how many more would you have had with Undersheriff Tanaka?

A.    I would say at least three times as many.

Q.    And that was because he was your direct supervisor in the

chain-of-command, correct?

A.    Yes, sir.

Q.    And he was the individual through whom you were to funnel information in this case; is that correct?

A.    Yes.

Q.    Now, when you would give information to Undersheriff Tanaka, you don't know what information he, in turn, was giving to Sheriff Baca, correct?

A.    Correct.

Q.    And prior to the FBI agents coming to visit Anthony Brown on August 23rd, you started thinking about actually moving Anthony Brown out of the Men's Central Jail; is that correct?

A.    Before what date, sir?

Q.    Before August 23rd, when the FBI agents come to speak with Anthony Brown in Men's Central Jail -- so I'm focusing on the time period before that -- you started having conversations and thoughts about moving Anthony Brown out of Men's Central Jail, correct?

A.    Yes, sir.

Q.    And that was for his safety and security; is it correct?

A.    Yes.

Q.    And on August 23rd, that's when you found out that the FBI agents had come by Men's Central Jail and had the opportunity to speak with Anthony Brown, remember?  Is that correct?

A.    Say your question again, please.

Q.    It was August 23rd -- now I'm going to focus you on that date -- I believe you said you were eating lunch and you had to throw away your lunch when you found out that the FBI agents had come to speak with Anthony Brown.

A.    Correct.

Q.    And you told Lieutenant Thompson -- Lieutenant Thompson is the one who called you to let you know that information, correct?

A.    Yes, sir.

Q.    And you told Lieutenant Thompson to ask the FBI agents if they would stay and you would be there within 20 minutes or so; is that correct?

A.    Yes, sir.

Q.    Why did you want to have the agents stay so you could speak with them at that time?

A.    I wanted to ask them what contraband other than the phone that was recovered from Anthony Brown had been inserted into the jail.

Q.    And why did you want to ask the agents that question?

A.    They were connected to the phone that was recovered and they were just -- they were there interviewing him.

Q.    And would that help answer some of the questions that you had as part of your investigation?

A.    Yes, sir.

Q.    Now, when you -- I believe you said that as you were on

your way to the Men's Central Jail, you got another phone call from Lieutenant Thompson, correct?

A.   Yes, sir.

Q.   And he told you that the agents hadn't stuck around and waited for you, they had left; is that correct?

A.   Yes.

Q.   Now, when you got to the Men's Central Jail and you saw Lieutenant Thompson, did you get the business cards that the agents had left?

A.   I don't remember that.

Q.   Well, do you remember getting the -- whether it was the business card or the information from it -- in other words, the name of the actual -- let me ask it this way.

Did you learn who the actual FBI agents were who had visited Anthony Brown on August 23rd?

A.   Yes.

Q.   And did you get their phone numbers, as well as their names?

A.   My recollection is I got the names from Anthony Brown during the interview that I sat in on.

Q.   Well, didn't you get either the business cards themselves or the information from the business cards on August 23rd?

A.   I don't remember business cards, sir.

Q.   Well, did you get the information from the business cards as to the actual first and last name of each one of the agents

and their phone number?

A.   Sir, I don't remember business cards being involved on the 23rd.

Q.   Put aside the business card itself.  Did someone provide you with the information of the name of each of the agents and their phone number on August 23rd?

A.   I don't remember phone numbers.

Q.   Well, isn't it true that you left phone messages for Agent Marx, but you did not receive a call back?

A.   I personally?

Q.   Yes.

A.   I don't remember that.

Q.   So it may have happened; is that correct?

A.   I don't believe it happened.

Q.   Do you recall speaking with Mr. Fox, Ms. Rhodes, and Special Agent Dahle on that December 28, 2012, meeting, in which you told them that you left phone messages for Agent Marx but you did not receive a call back?

A.   That was incorrect.

Q.   That was incorrect?

A.   Yes.  I did not personally attempt to call on the -- whatever date it was.

Q.   When you say "incorrect," so you made a false statement to the government during that interview with respect to your leaving phone messages for Agent Marx but not receiving a call

back?

A.    It was not a false statement, no.  Somebody from my unit left a message and when that FBI 302 was written, it said the I.  But somehow it was conveyed that it was me.  I knew that somebody -- an investigator from my unit attempted to call.  It's accurate.

Q.    I see.  Which investigator was that, if you recall now?

A.    I believe it was Sergeant Craig.

Q.    And never got a call back from the FBI; is that correct?

A.    Yes.

Q.    At any time after August 23, 2011, until September 12, 2011, did you receive a phone call from Agent Marx, Agent Dahle, or any FBI agent to -- in order to arrange an interview to meet with Anthony Brown at the Men's Central Jail?

A.    No, sir.

Q.    And I shouldn't limit it to the Men's Central Jail.  At anywhere within the Los Angeles County Sheriff's Department operations.

A.    As it pertained to Anthony Brown?

Q.    Yes.

A.    No, sir.

Q.    Now, I think you said that you had a -- you arrived at the Men's Central Jail, you found out the FBI agents weren't there, then you, yourself, participated in an interview of Anthony Brown; is that correct?

A.    Yes.

Q.    And during that interview is where you learn additional information about Anthony Brown's allegations for deputy misconduct and deputies who had brought him cell phones and drugs into the Men's Central Jail; is that correct?

A.    Yes.

Q.    And Anthony Brown told you the father's name of Gilbert Michel at that point; isn't that correct?

        MR. FOX:    Objection.    Are we talking the 23rd?

        MR. HOCHMAN:    Approximately the 23rd.

        MR. FOX:    One moment.

        MR. HOCHMAN:    You know what, I'll restate, if I might.

    (Counsel confer off the record.)

BY MR. HOCHMAN:

Q.    At that point, by August 23rd, had Anthony Brown told you or an investigator that you were working with the actual name of the deputy who brought him one of the cell phones?

A.    I don't remember the exact date that we were aware that it was Deputy Gilbert Michel.

Q.    Did Anthony Brown also provide you with Gilbert Michel's father's name and the location in San Pedro where his father lived?

A.    I remember the address on 2nd Street, not the name.

Q.    And that was actually an accurate address, when you

checked it out, for Gilbert Michel's father, correct?

A.   My best recollection, yes, it was.

Q.   And so I want to go through the other parts of Anthony Brown's allegations that were truthful.

He said he was working with the FBI, and he was; is that correct?

A.   Yes, sir.

Q.   He said that the FBI -- Gilbert Michel had brought him a cell phone, and that's correct, as well, correct?

A.   Yes.

Q.   He said that -- he gave the name of Gilbert Michel's father and that checked out, as well; is that right?

A.   I didn't testify to that.  I remember the address, not the name of Gilbert Michel's father.

Q.   The address checked out, as well, correct?

A.   Yes.

Q.   He said that deputies were involved in excessive force, and Gilbert Michel confessed to that; is that correct?

A.   I believe that's incorrect.

Q.   Didn't Gilbert Michel confess to excessive force?

A.   On August 23rd?

Q.   No, no, no.  I'm sorry.  At any point.

A.   Yes.

Q.   And, again, I'm just going through what Anthony Brown said that ended up proving to be true.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

Now, the stuff that -- and Anthony Brown said that he had received narcotics in the jail and he had a cell phone with photos of the narcotics in the jail, correct?

A.    Yes.

Q.    Now, the parts that aren't true or that you had to investigate at the time, which you didn't -- there were other parts of his story that he gave that you had to investigate to see if they were true, correct?

A.    Yes.

Q.    So, for instance, he gave the name of Deputy Bravo working with the FBI and bringing in a cell phone.

You had to investigate that; is that correct?

A.    Yes.

Q.    He gave you the name of a nurse and said the nurse had brought him cell phones and drugs, and you had to investigate that, as well; is that correct?

A.    Yes.

Q.    He also supplied you with information that Gilbert Michel had smuggled in narcotics; is that correct?

A.    Yes.

Q.    And you had to investigate that, as well?

A.    Correct.

Q.    So you were trying -- so you had a huge number of leads, shall we say, as part of your investigation that over the next couple of weeks starting on August 20th, you're trying to track

down and figure out which ones are true and which ones are not

true; is that correct?

A.   Yes, sir.

Q.   So after you speak to Anthony Brown on August 23rd, that's

when you go with Lieutenant Thompson to go see Undersheriff

Tanaka; is that correct?

A.   Yes.

Q.   And at that August 23rd meeting with Undersheriff

Tanaka -- that was in his office; is that correct?

A.   Yes, sir.

Q.   And you were there, correct?

A.   Yes.

Q.   Undersheriff Tanaka was there?

A.   Yes.

Q.   Lieutenant Thompson was there?

A.   Correct.

Q.   And do you recall if Lieutenant Leavins was there?

A.   I don't remember Lieutenant Leavins.

Q.   Was anybody else there?

A.   My recollection is Thompson, myself, and Undersheriff

Tanaka.

Q.   And it's at that meeting, I believe you said, that

Undersheriff Tanaka used a lot of profanity; is that correct?

A.   Yes.

Q.   He was screaming mad about what had happened with the FBI

speaking with Anthony Brown; is that correct?

A.   Yes, sir.

Q.   He used the "F" word, the "MF" word, and a lot of those words, correct?

A.   Lot of profanity, yes.

Q.   And used the "F the FBI" more than once; is that correct?

A.   Yes.

Q.   And at the end of that meeting -- and he actually -- during that meeting, he said that he wanted to make sure the FBI wasn't going to get access to Anthony Brown without his permission, correct?

A.   I don't remember that specifically.

Q.   Well, he -- he told Lieutenant Thompson and yourself that he was going to put two OSJ guards on Anthony Brown 24/7 at that point; is that correct?

A.   I don't remember it like that.

Q.   When did that directive come down from Undersheriff Tanaka that there would be two OSJ deputies assigned to Anthony Brown 24/7?

A.   It very well could have been August 23rd, but it very well could have been Lieutenant Thompson.  It came out of that meeting that OSJ would guard him.  Whether it was Tanaka, Thompson, I couldn't tell you.

Q.   I see.  So it came out of that August 23rd meeting in Undersheriff Tanaka's office, correct?

A.    Yes, sir.

Q.    And just to be clear, Sheriff Baca was not in Undersheriff Tanaka's office at that time, correct?

A.    Yes, that's correct.

Q.    So then after that meeting, I believe you said that Undersheriff Tanaka said to Lieutenant Thompson that he had to go tell the sheriff what had happened; is that correct?

A.    Yes.

Q.    Because the sheriff didn't know at that point what had happened, correct?

A.    Correct.

Q.    Now, do you go with, at that point, Lieutenant Thompson into Sheriff Baca's office for -- in order to have Lieutenant Thompson -- excuse me -- tell Sheriff Baca what had happened?

A.    I went in at some point.  Whether it was initially -- I was not there for the whole interaction between Thompson and Sheriff Baca.  I either went in the door with Thompson or I came in mid meeting.  But I was there for part of it, not all of it.

Q.    Okay.  And when you came in, did you burst in without knocking and just open the door, you know, without knocking?

A.    I don't remember how I made entrance.

Q.    Would you ever go ahead and burst into the sheriff's office without knocking?

A.    I can't think of a reason that I'd burst into the sheriff

of LA County's office, no.

Q.   And do you recall ever bursting into the sheriff's office without knocking?

A.   If he was expecting me and the door was closed, I'd walk in.

Q.   Well, was he expecting you at that August 23rd meeting?

          MR. FOX:  Objection.  Foundation.  Speculation.

          THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.   Now, when you got into the meeting with Lieutenant Thompson, did you hear Lieutenant Thompson apologize to Sheriff Baca for having the FBI have access to Anthony Brown?

A.   His wording -- I know that he apologized.  Whether --

Q.   And that happened in your presence?  That's why I was --

A.   He accepted responsibility.

Q.   And was Sheriff Baca -- did he start putting "F" bombs and all that profanity and screaming at that point?

A.   No, sir.

Q.   Was he basically compassionate and understanding when Lieutenant Thompson was giving him the information?

A.   My recollection is calm.

Q.   He was calm.

          And when -- did he at that point start shouting "F the FBI"?

A.   No, sir.

Q.   Did he say anything about a chess match or anything like that?

A.   I don't remember the dialogue.

Q.   Because that was, what -- at this point we're in February of -- March of 2017, so that was approximately, you know, five and a half years ago, correct?

A.   Correct.

Q.   And after that meeting on August 23rd, you continue your investigation; is that right?

A.   Yes, sir.

Q.   And you said that one of the things that you did was you actually polygraphed Anthony Brown; is that correct?

A.   Not on the 23rd, but yes.

Q.   Subsequent to the 23rd, correct?

A.   Yes, sir.

Q.   And the reason to polygraph Anthony Brown is, again, to try to figure out which one of the many allegations he's making are truthful and which ones are not truthful, correct?

A.   Yes.

Q.   And Anthony Brown didn't pass part of that polygraph; is that right?

A.   Yes.

Q.   I'm sorry?

A.   That's correct.

Q.   And the part he didn't pass is when the questions were

asked, "Did Gilbert Michel smuggle you drugs into the prison -- or into the jail"; is that correct?

A.    I remember that being -- he showed deception.

Q.    Well, if he had been asked the question -- do you remember whether or not he was asked the question whether or not Gilbert Michel gave him a cell phone?

A.    My recollection is he was asked that.

Q.    And he passed that part of the polygraph, correct?

A.    Correct.

Q.    And the part he didn't pass was that Gilbert Michel had smuggled him the narcotics, correct?

A.    That's my recollection, yes.

Q.    But at that point in time -- by not passing the polygraph as to Gilbert Michel being the deputy who smuggled him the narcotics, did that open up even more questions for you as to how Anthony Brown got the narcotics -- got the narcotics on his cell phone in prison?

        MR. FOX:    Objection to the form of the question.

        THE COURT:    Sustained.

BY MR. HOCHMAN:

Q.    What was the impact of finding out that Anthony Brown did not pass the part of the polygraph about Gilbert Michel bringing him the drugs in the jail?  What was the impact to your investigation?

A.    It -- the way I would describe it, it was one less thing

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

proving that narcotics were coming in to Anthony Brown.

Q.    Well, you know Anthony Brown got narcotics at some point because you had the photographs on his cell phone of the narcotics, correct?

MR. FOX:  Objection to the form of the question.

THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.    As part of your investigation, you reviewed those photographs on Anthony Brown's cell phone, correct?

A.    Yes.

Q.    And did you determine that those photographs were of narcotics?  Correct?

A.    They were photographs depicting narcotics.

Q.    So you can eliminate Gilbert Michel as a possible suspect in bringing in the narcotics from the polygraph, correct?

A.    I don't understand your question.

Q.    In other words, did you think that Anthony Brown was growing the marijuana or going to a lab inside the jail to make the narcotics while he was in the jail?

A.    Sir, at that point we had pictures on his cell phone.  We didn't have actual narcotics.

Q.    Well, did you -- Anthony Brown would have had to have gotten -- if Anthony Brown got narcotics that ended up on his cell phone, they would have had to have been from someone outside the jail; is that correct?

A.    I couldn't -- there's several scenarios.

Q.    What scenarios are those?

A.    I mean, if he actually had narcotics inside the jail or if the narcotics came from the outside.

Q.    Well, again, he had to get those narcotics inside the jail from someone on the outside; is that correct?

        MR. FOX:  Objection.  Assuming facts not in evidence.

        THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.    Now, at some point, I believe you also said that you swept the jails in the end of August of 2011 to determine if there was contraband in the jails; is that correct?

A.    Yes, sir.

Q.    Now, by the end of August 2011, that was a couple weeks after the FBI's cell phone had been found inside the Men's Central Jail; is that correct?

A.    Roughly three weeks, yes.

Q.    And that was also after the FBI had interviewed Anthony Brown on August 23rd; is that correct?

A.    Yes, sir.

Q.    And you learned on your interview of Anthony Brown on August 23rd that Anthony Brown had told the FBI that day about the fact that the sheriff's department had found the cell phone and he had told the sheriff's department about Gilbert Michel, correct?

A.    I don't remember that.

Q.    Well, didn't you ask Anthony Brown on August 23rd what he had just been speaking about to the FBI?

A.    Yes.

Q.    And didn't Anthony Brown tell you that what he was telling the FBI was all about the sheriff's department investigation and the fact that he had revealed to the sheriff's department the name of the deputy that had smuggled him the phone and the fact that he was working with the FBI?

A.    He said all that.  Whether it was on the 23rd -- there were several interviews with Anthony Brown which dating those, sir, I couldn't tell you.

Q.    Well, he certainly said all of that before the end of August, when you were doing this sweep for contraband in the jails; is that correct?

A.    Yes.

Q.    Now, at some point, you testified that you were concerned that there might be a writ issued by the federal government; is that correct?

A.    Yes, sir.

Q.    Explain again what a writ is.

A.    It's a court order asking that a body be produced to the requesting agencies --

Q.    And --

A.    -- is how I define it.

Q.   I'm sorry, I cut you off.

A.   Is how I would define it.

Q.   And a writ asks for a particular body, let's say Anthony Brown, to be produced at a certain day and a certain time and a certain location; is that correct?

A.   Yes.

Q.   And then after the person, let's say Anthony Brown, goes ahead and is delivered, then they are returned back to the sheriff's department once they're done testifying; would that be correct?

A.   I couldn't tell you.

         MR. HOCHMAN:  May Exhibit 113 be shown to the witness?  If I might please ask Special Agent Tanner to put on 113.

     *(The exhibit was displayed on the screen.)*

BY MR. HOCHMAN:

Q.   If you could look at Government's Exhibit 113, which is an order on an application of writ for habeas corpus for Anthony Brown, and look at this page --

         MR. HOCHMAN:  And if we can scroll to the next page, as well.

BY MR. HOCHMAN:

Q.   Do you see this two-page document?

A.   Yes.

Q.   Did you see this two-page document, this writ, in August

or September of 2011?

A.    No, sir.

Q.    Did you learn about this writ months or years later?

A.    I never knew -- there was a lot of confusion on this.
I've never seen this.  This is actually the first time I've
seen this.

Q.    And with respect to this document --

        MR. HOCHMAN:  If we can go back to the first page of
it, please.

BY MR. HOCHMAN:

Q.    -- this is asking that Anthony Brown be brought to a
federal grand jury on September 7, 2011, at 9:30 a.m.

        Do you see that?

A.    Yes, sir.

        MR. HOCHMAN:  And if you could again scroll to the
second page, please.

BY MR. HOCHMAN:

Q.    And it lists, actually, on the second page the exact
location where he's to be brought, which is the 13th floor, I
believe it's on Spring Street in Los Angeles, on September 7,
2011, at 9:30 a.m.

        Do you see that?

A.    Yes, sir.

Q.    And it was sent to the Men's Central Jail.

        Do you see that?

A.    Yes.

Q.    Now, if -- and Anthony Brown, by the way, on September 7, 2011, was at the Men's Central Jail, correct?

A.    I don't want to say -- I mean, my recollection is that between the 7th and 9th or 12th of September.

Q.    Didn't Anthony Brown get moved back on September 2nd from San Dimas, as we reviewed in the documents yesterday?

A.    Yes.

Q.    So Anthony Brown is at the Men's Central Jail on September 7, correct, 2011?

A.    I couldn't tell you, sir.

Q.    Well, when he was brought back from San Dimas, he was brought back to the Men's Central Jail, correct?

A.    That's my recollection, yes.

Q.    And that's when he went, I think, on the 8000 floor, the medical floor?

A.    That's not my recollection.

Q.    Which floor did Anthony Brown go to when he came back, if you recall?

A.    I don't know.

Q.    At some point, did Anthony Brown go to the 8000 floor?

A.    My recollection, Anthony Brown went to the 8000 floor on August 23rd before he was moved to San Dimas.

Q.    And did you actually choose the location for Anthony Brown to go to on the 8000 floor?

A.    I was part of that decision, yes.

Q.    Didn't Mickey Manzo show you three different locations in the Men's Central Jail for Anthony Brown to go to and you chose the one on the 8000 floor?

A.    I remember -- I wasn't familiar with Men's Central Jail, the layout.  I never worked there.

       I know that after interviewing Anthony Brown, we went on a tour, if you will, of the jail to see which would be suitable for what we were looking to do.

Q.    And on that tour, you ended up at the 8000 floor, the medical floor, and you thought that was a suitable location for Anthony Brown, correct?

A.    Yes, sir.

Q.    And you knew that in that floor that they also had inmates with infectious diseases; is that correct?

A.    My recollection was a medical floor.  Infectious disease, I don't remember that.

Q.    Were you trying to somehow endanger Anthony Brown's health by putting him on a floor with people with infectious diseases?

A.    No, sir.

Q.    Why not?

A.    One, I didn't know that there was infectious diseases there, but I wouldn't put him on a floor where he is going to get sick.

Q.    In fact, you wanted to make sure he was being kept safe

and secure; isn't that correct?

A.   My focus then was to put him up there so that we could conduct an undercover operation.

Q.   And he got put in his own cell up there; is that correct?

A.   Initially, it was a single-man -- he was by himself, yes.

Q.   And if you recall, that cell was cleaned before he was ever put in it; is that correct?

A.   I don't remember that, sir.

Q.   And did you actually conduct an undercover operation with Anthony Brown?

A.   Yes.

Q.   What was the purpose of that?

A.   To see what information he would provide us.

Q.   And that was after August 23rd; is that correct?

A.   It might have been.  I don't remember the -- yes.

Q.   And as part of that undercover operation, did deputies go in and pose to be inmates in Anthony Brown's cell?

A.   Yes, sir.

Q.   Did they gain any useful information from that effort?

A.   No.

Q.   Now, at some point, you said that you had a chance to go to the United States Attorney's office; is that correct?

A.   Yes, sir.

Q.   Now, when you went to the United States Attorney's office, who invited you to go?

A.    I don't --

        MR. FOX:  Objection.

A.    -- remember.

        MR. FOX:  Vague as to time.

        THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.    Was that on August 29, 2011?

A.    Yes.

Q.    And at that point, who invited you to attend, if you recall?

A.    I don't know.

Q.    And I believe you testified that Sheriff Baca was at that meeting?

A.    Yes, sir.

Q.    Undersheriff Tanaka was there, as well?

A.    Yes.

Q.    And then yourself.

        Was Lieutenant Leavins there?

A.    Yes.

Q.    Anyone else from the -- actually, was Mr. Michael Gennaco there, as well?

A.    I remember a department attorney was there.  Whether it was Gennaco or the other one, I -- there was a department attorney.

Q.    And who is Michael Gennaco, by the way?

A.   He was the supervisor in charge -- overseeing the Office of Independent Review.

Q.   And what is the Office of Independent Review?

        MR. FOX:  Objection.  Cumulative.

        THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.   And so on the US Attorney's side, there was US Attorney Birotte, André Birotte?

A.   Yes.

Q.   Lawrence Middleton, who is the head of the civil rights section; is that correct?

A.   That's correct.

Q.   And there were some other Assistant US Attorneys on the US Attorney side, as well; is that correct?

A.   Yes, sir.

Q.   Now, I believe you said that Sheriff Baca -- did Sheriff Baca do most of the talking as far as the sheriff's side of the conversation went?

A.   Yes.

Q.   And was his demeanor calm during that discussion that he's having with the US Attorney's office?

A.   He was -- I want to say calm -- firm.  Displeased.

Q.   I'm sorry?

A.   I would say firm and displeased.

Q.   Firm and displeased.

And I think you said one of the things that he was displeased with was how the FBI had conducted its investigation; is that correct?

A.    Yes.

Q.    And in what way was he displeased with how the FBI conducted its investigation?

MR. FOX:  Objection.  Hearsay.

THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.    What do you mean by "displeased"?

MR. FOX:  Objection.  Calls for hearsay.

THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.    I believe you also said that Sheriff Baca requested that the sheriff's department be able to join the US Attorney in the FBI's investigation; is that correct?

A.    Yes.

Q.    And I believe you also said that Sheriff Baca said that he believed that the FBI had committed a crime; is that right?

A.    Yes.

Q.    Did you believe at that time -- and I'll focus you on August 29, 2011 -- that the FBI had committed a crime?

A.    I -- on the 29th, after the investigative steps that we took, I didn't believe it as much as I did on August 20th.

Q.    So you believed it a little or some is probably a

better -- when you say you didn't believe it as much, what do you mean?

A.   Like I said, the investigative steps we took to prove or disprove the allegations of Anthony Brown, nothing was provided.  I mean, nothing was indicating that those allegations were true other than the cell phone, as far as the narcotics.

Q.   As far as narcotics go.

But, again, did you believe that the FBI -- did you, in part, believe that the FBI had committed a crime as of August 29, 2011?

A.   I didn't look at it that way, sir.

I was -- it appeared less likely on the 29th of August than it did on August 20th.

Q.   But you still hadn't ruled out at that point that the FBI had committed a crime as of August 29, 2011, correct?

MR. FOX:  Objection, Your Honor.  Misleading.  And I think we need a definition of what he means by "crime," what we're talking about.

MR. HOCHMAN:  I can back up, Your Honor, and ask that question.

BY MR. HOCHMAN:

Q.   What do you mean by "crime"?

MR. FOX:  Your Honor, Mr. Hochman is asking that question.  It's not the witness's term.

MR. HOCHMAN:  May I withdraw that question and try another one, Your Honor?

THE COURT:  All right.

BY MR. HOCHMAN:

Q.   When you say it was less likely on August 29, 2011, that the FBI was committing a crime, what crime were you referring to?

A.   The insertion of narcotics.

MR. FOX:  And objection, Your Honor.  I think we need a sidebar, please.

THE COURT:  All right.

*(Proceedings held at sidebar under seal 10:57 A.M.)*

*(The following proceedings were held in open court.)*

BY MR. HOCHMAN:

Q.   So, Mr. Carey, as part of your investigation, I believe you said that you wanted to obtain any documents possible that could corroborate or refute the allegations from Anthony Brown and others that you were getting at that time, correct?

A.   Yes.

Q.   And one of the ways you can get documents is by seeking a court order; is that right?

A.   Yes, sir.

Q.   And you were aware that Sergeant Craig sought a court order in connection with the investigation; is that correct?

A.   Yes, sir.

Q.   And explain to the jury what a court order means.  When you seek a court order for documents, what exactly does that mean?

A.   Asking a judge of a court to tell another agency to turn over documents.

Q.   And that's in lieu of just going to the -- you know, to the agency and just opening their door, running in, and taking the documents.  You seek to get them with a court order from a judge; is that correct?

A.   Yes, sir.

Q.   Is that something that you normally do in your

investigations if you want to get documents from a person or an entity?

A.   Yes.

Q.   And that's in order to make sure that a judge reviews the probable cause, which is the evidence that you have to make sure that it's more likely that the documents are part of a criminal case; is that right?

A.   Yes, sir.

          MR. HOCHMAN:  May we show -- may I ask Special Agent Tanner to place Government's Exhibit 140 on the screen.

     *(The exhibit was displayed on the screen.)*

BY MR. HOCHMAN:

Q.   As we're placing 140 on the screen, Sergeant Craig told you before he went to get a court order that he was going to get a court order, correct?

A.   I believe I directed him to.

Q.   You directed him to get the court order; is that correct?

A.   Yes.

Q.   And this was a court order for the FBI's documents; is that correct?

A.   Yes.

Q.   And that's because you believed that the FBI had documents that would be useful for your investigation; is that correct?

A.   Yes.

Q.   And rather than just burst into the FBI's office and take

the documents, you went to a judge to get this court order, correct?

A.    Yes.

Q.    Now, in getting a court order, you actually have to put down in writing all the facts on why you think you're entitled to the court order; is that correct?

A.    Yes.

Q.    And that's this thing called a "Statement of Probable Cause of Affiant Sergeant Scott A. Craig," which is the first page of Exhibit 140.

     Do you have that?  Do you see that before you?

A.    Yes, sir.

Q.    And in that, Sergeant Craig has to lay out first his qualifications; is that correct?

A.    Yes, sir.

     MR. HOCHMAN:  And if we could highlight the writing that starts with, "My name is Scott Craig...," to the end.

BY MR. HOCHMAN:

Q.    And on the first page of Exhibit 140, he lays out his qualifications about being a sergeant in the Los Angeles County Sheriff's Department for 23 years, his current assignment, and the hundreds of cases that he's investigated; is that correct?

A.    Yes, sir.

     MR. HOCHMAN:  If you can turn to the second page, please, and highlight the writing from "my training" to the

end.

BY MR. HOCHMAN:

Q.   Now, on the second page, he also lays out some additional training he has; is that correct?

A.   Yes, sir.

Q.   And then starting about the middle of the second page, he starts to describe the evidence that has been gathered by him in connection with the Anthony Brown cell phone investigation; is that correct?

A.   Yes, sir.

Q.   And he talks about on August 8, 2011, that in Men's Central Jail a cell phone was found on the person of Anthony Brown; is that correct?

A.   Yes, sir.

Q.   And says that it's a violation of state law, a misdemeanor violation, to have a cell phone inside the prison; is that correct?

A.   Yes.

Q.   Now, by the way, it's a felony violation for a deputy to smuggle in a cell phone into the prison; is that correct?

A.   Under what conditions?

Q.   Under the deputy getting a bribe.

A.   Yes.

Q.   And it would also be a felony for a deputy smuggling in narcotics into the jail, correct?

A.    Yes.

Q.    And those would be things -- those would be the types of felonies that ICIB would investigate, correct?

A.    Yes.

Q.    So then Sergeant Craig goes ahead and starts to describe the origin of the cell phone and says that the origin of the cell phone comes back to the FBI.

      Do you see that?

A.    Yes.

      MR. HOCHMAN:  If you can turn to the third page and highlight the writing from "investigation" to the end.

BY MR. HOCHMAN:

Q.    Sergeant Craig also lays out the telephone calls that had been recorded from the inmate telephone monitoring system and provides that information to the judge.

      Do you see that?

A.    Yes, sir.

Q.    And he talks about an unidentified female being heard telling Anthony Brown that he will be getting the phone soon and, in another call, an unidentified male telling Anthony Brown not to call him using inmate pay phones because the phone calls are recorded.

      Do you see that?

A.    Yes, sir.

Q.    Then Sergeant Craig lays out further parts of his

investigation in which he talks about Anthony Brown disclosing

that he was a confidential informant of the FBI.

Do you see that?

A.    Yes.

Q.    And he also says that he had a handler named CJ who was an

undercover FBI agent and that CJ and Anthony Brown had

basically worked to have Deputy Michel bring in the cell phone.

A.    Yes.

Q.    And he said that Deputy Michel admitted with -- excuse me,

that Deputy Michel admitted in a meeting with CJ to being paid

$700 to bring the cell phone into the Men's Central Jail.

Do you see that?

A.    Yes, sir.

Q.    Now, when Anthony Brown, by the way, was talking to you on

August 23rd, do you recall him saying that he had a lot of

money stashed on the outside?

A.    He said that.  Whether it was on the 23rd, I couldn't tell

you.

Q.    And was it approximately $8 million that he said he had

stashed on the outside?

A.    Yes.

Q.    In fact, he said he had $2 million stashed on the outside

for every hundred years of time he had gotten; is that correct?

A.    That's correct, sir.

Q.    And since he got over 400 years, that's how he came up

with the $8 million figure; is that correct?

A.    Yes, sir.

Q.    And did that also provide a concern for you when Anthony Brown was telling you this information about him having a cell phone in the jail?

A.    Yes.

Q.    And how do those two things relate?

A.    He had a reason to not want to be in jail.

Q.    And he had the resources if he could get outside?

A.    If what he was saying was true, yes.

Q.    So at the bottom of page 3 on Exhibit 40 -- 140, it says, "Based on the above information, it is apparent that Deputy Gilbert Michel, along with Inmate Brown and agents of the FBI, conspired to smuggle a cellular telephone into a correctional" --

      MR. HOCHMAN:  If we can go to the next page, please, and then highlight just the writing, please.

BY MR. HOCHMAN:

Q.    -- "correctional facility."

      Now, you had a chance to review Sergeant Craig's statement of probable cause before it was submitted, correct?

A.    No.

Q.    You knew that Sergeant Craig was going to be asking to search the FBI's office, though, correct?

A.    He was asking for documents.  I don't remember searching

an office.

Q.    Asking for documents from the FBI; is that correct?

A.    Yes.

Q.    And in order to establish a connection that the FBI was part of a crime, there was going to be an allegation in the statement of probable cause alleging that the FBI committed a crime -- or participated in a commission of a crime; is that correct?

A.    Can you ask your question again, please?

Q.    Certainly.

       In order to get an order from a Court to allow your investigators to go to the FBI and obtain documents from them, the order -- the statement of probable cause was going to have to include an allegation -- or a statement that the FBI had conspired with Gilbert Michel and Anthony Brown to commit a crime; is that correct?

A.    Yes.

Q.    Now, at the time --

       MR. FOX:  Your Honor, I'm renewing my request that I made at sidebar.

       THE COURT:  Yes.  Let's come to sidebar.

       *(Proceedings held at sidebar under seal 11:10 A.M.)*

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*(The following proceedings were held in open court.)*

THE COURT:  Ladies and gentlemen, you've heard evidence about a federal informant who was involved in the government's investigation in this case.  You've also heard that the federal government used an undercover FBI agent in its investigation.

Law enforcement officials may use informants and undercover agents in order to investigate criminal activities.  Further, as a matter of law, when an undercover investigation involves the use of informants and undercover agents, neither the law enforcement officers conducting the operation, nor the informants assisting in the investigation, become co-conspirators with the target of the undercover activity.

As applied to this case, neither Special Agent Leah Marx, now Tanner, the undercover agent CJ, nor Anthony Brown became co-conspirators with Gilbert Michel by virtue of conducting an undercover operation to see if Gilbert Michel would accept a bribe in exchange for smuggling a cellular phone inside of Men's Central Jail.

You've heard testimony about whether or not federal agents violated California Penal Code Sections involving the possession of narcotics or a cellular phone in a custody facility.  These California Penal Code Sections require the possession or introduction of contraband to be unauthorized in

order for crimes to occur.

If Anthony Brown possessed any contraband, including a cellular phone, at the direction of the FBI, such possession or introduction of contraband would be authorized and no violation of these California penal codes would have occurred.

MR. HOCHMAN:  Thank you, Your Honor.

BY MR. HOCHMAN:

Q.   When --

MR. HOCHMAN:  May I proceed?

THE COURT:  Yes.

MR. HOCHMAN:  Thank you.

BY MR. HOCHMAN:

Q.   When you knew that Sergeant Craig was going to apply for this statement -- or submit a statement of probable cause and apply for this order to get records and documents from the FBI, what did you understand that he was going to say was the probable cause to do it?

A.   You mentioned Anthony Brown and that incident?

Q.   Yes.

A.   Anthony Brown and the circumstances surrounding him.

Q.   But how does that justify getting records from the FBI?

A.   The way I looked at it, we were -- he wrote his statement of probable cause and it was a judge's decision to approve it or disprove it.

Q.   So you knew at the time, rightly or wrongly, that he was

going to have to put some statement in that connected the FBI

to the crime in order to get the records.

A.    Yes.

        MR. HOCHMAN:  May we put back Exhibit 140, that

fourth page, please?  May I ask Special Agent Tanner to do

that, please.

    *(The exhibit was displayed on the screen.)*

        MR. HOCHMAN:  And highlight just the text on the

page.  Thank you very much.

BY MR. HOCHMAN:

Q.    All right.  And as part of the statement of probable

cause, it states at the top of page 4 that "these criminal

actions pose a direct and immediate threat to the overall

security of both inmates and staff within the Los Angeles

County Jail system."

        Was that an accurate statement that Sergeant Craig

wrote?

A.    Yes.

Q.    And it says:

        "Furthermore, allowing unfettered access to a

        cellular telephone provides a means of unmonitored

        communication to any incarcerated suspect.  This act

        not only provides inmates with a means to further

        their criminal enterprises, but also allows them to

        intimidate, threaten, or harm victims and witnesses

in pending court cases."

Is that also an accurate statement that Sergeant Craig submitted to the judge?

A.    Yes, sir.

Q.    "And this type of witness intimidation has occurred in the past and is the reason the ITMS was implemented, thus allowing investigators to detect this activity and stop it."

Was that also an accurate statement that Sergeant Craig provided to the judge?

A.    Yes, sir.

Q.    Now, ultimately the judge makes the decision on whether or not to agree with this order and allow the sheriff's department to go ahead and get these FBI records or not; is that correct?

A.    Yes, sir.

Q.    And that was your understanding, as well, at the time, correct -- your understanding that the judge would make the decision, correct?

A.    Yes.

Q.    And the judge actually denied the order; isn't that right?

A.    Yes, sir.

MR. HOCHMAN:    May we put Exhibit 141 -- may I ask Special Agent Tanner to put Exhibit 141 on the screen, please.

(The exhibit was displayed on the screen.)

BY MR. HOCHMAN:

Q.    Now, Exhibit 141 is the judge denying this order; is that

correct?

A.    Yes, sir.

Q.    Now, when you submitted the order, did you believe the judge was going to approve it?

        MR. FOX:  Objection.  Misstates the testimony.

        THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.    When you knew Sergeant Craig was going to submit a statement of probable cause in order to get this order, did you believe that the judge would approve it?

A.    Yes.

Q.    Because you believed that the statements that Sergeant Craig was going to be making were accurate; is that correct?

        MR. FOX:  Objection, Your Honor.  Misstates the testimony.

        THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.    Why did you believe the judge would approve it?

A.    Based on the way it was worded, I --

Q.    And when you say "the way it was worded," did you actually see the wording before it was submitted to the Court?

A.    No.

Q.    So what do you mean as to what your reason was to believe that the judge would approve this order?

A.    Well, part of that document, the affidavit, the --

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Sergeant Craig's qualifications, I had known.

I mean, I don't want to say that document was cut and paste, but I knew that he was a long-time, experienced investigator, so -- and I knew what he was going to be asking for.

Q.   And you thought that he would be providing the judge with enough information to justify -- in order to get the FBI's records?

THE COURT:  Excuse me.  Let's go to sidebar.

*(Proceedings held at sidebar under seal 11:21 A.M.)*

*(The following proceedings were held in open court.)*

MR. HOCHMAN:  May I proceed, Your Honor?

THE COURT:  Yes.

///

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

BY MR. HOCHMAN:

Q.    On Exhibit 141, you see that there's this handwriting that the judge denied the request for the order.

        Do you see that?

A.    Yes, sir.

Q.    And the judge indicated that he has no jurisdiction over any federal agency, and he signs it on September 8, 2011.

        Do you see that?

A.    Yes, sir.

Q.    Now, at that point, I believe in your testimony you said it made it less likely to believe that the FBI was engaged in any crimes at that point, in your opinion, correct?

A.    Yes.

Q.    But, again, you still had some belief that the FBI, as of -- still as of September 8, 2011, was engaged in crimes, it just was less likely?

A.    Yes.

Q.    And in this order -- did you communicate to Undersheriff Tanaka that the Court had denied the request for the order?

A.    Yes.

Q.    You never told Sheriff Baca directly that the Court had denied the request for the order, correct?

A.    My recollection, I told Tanaka.

Q.    And with respect to that writ that we looked at a moment ago, which is Exhibit 113, since you never saw the writ at the

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

time, you never told Sheriff Baca about the writ; is that

correct?

   MR. FOX:  Objection.  Argumentative.  Irrelevant.

   THE COURT:  Sustained.

   MR. HOCHMAN:  Thank you.  You don't need to display

this any more.

BY MR. HOCHMAN:

Q.   Now, with respect to Anthony Brown, I believe you said

that there was a conversation that was had about moving Anthony

Brown and changing his name.

   Do you recall that?

A.   Yes.

Q.   And let's start with the moving Anthony Brown part.

   I believe in the August 23rd discussion that you were

present for with Anthony Brown, you used the expression "Camp

Snoopy."

   Do you remember that?

A.   Yes.

Q.   And the idea -- let me ask it in a more general fashion.

   When you're dealing with informants, do you generally

try to engage them in friendly discussion, get them comfortable

with you?

A.   Yes, sir.

Q.   What's the purpose of doing that?

A.   So they'll work with us.

Q.    And that's a completely legitimate purpose, correct?

          MR. FOX:  Objection.  Legal conclusion.

          THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.    Well, based on your training and experience, is that one of the investigative techniques that you use?

A.    Yes, sir.

Q.    And also providing them with certain benefits, like giving them cigarettes or fast food, those would be other techniques that you use, not just with Anthony Brown but with informants in general; is that correct?

A.    Yes.

Q.    And moving them to friendlier environments, that could also be an additional benefit that one would give to an informant in order to incentivize them to cooperate with you; is that correct?

A.    Yes, sir.

Q.    So when Anthony Brown is being moved over -- from Men's Central Jail to San Dimas, there's a number of reasons to do that; is that correct?

A.    Yes.

Q.    One reason is to create this friendlier environment so that Anthony Brown will continue to cooperate with your investigation; is that correct?

A.    Yes, sir.

Q.   Another reason is for the safety and security of Anthony Brown; is that correct?

A.   Yes, sir.

Q.   Because that would actually take him out of the facility in which he has provided information against deputies in that very facility, correct?

A.   Yes, sir.

Q.   And at that point, I think Anthony Brown told you on August 23rd that he had told the FBI about 50 or so incidents of excessive force by deputies; is that correct?

A.   Yes.

Q.   So that could potentially mean that there's 50 deputies that could want to harm Anthony Brown because he had snitched on them, correct?

A.   Yes.

Q.   And also you said that there was an issue with him being known as an FBI snitch in the Men's Central Jail; is that correct -- or snitch in general.  I shouldn't say FBI snitch. A snitch in general; is that correct?

A.   I think my words were law enforcement informant.

Q.   Law enforcement informant.

     So moving him to San Dimas helped get him away from the deputies he might have snitched on and the inmates who might know he's a snitch; is that correct?

A.   Yes, sir.

Q.    Now, when you had a discussion, I think, about this -- and then also let's talk for a moment about changing his name.

I believe you said that you knew that his name was going to get changed twice; is that correct?

A.    That's not entirely accurate.  I knew at some -- over the course of this investigation, I was aware that his name had been changed twice.  When he was initially moved, I knew that his name was changed.

Q.    So does that mean three times?

A.    No.  What I mean by that -- when we moved him and changed his name, there was no pre-set number that I was aware of as far as how many times his name was going to be changed.

Q.    And did you know how the name was going to get changed in the system?

A.    No, sir.

Q.    Did you know how LiveScan got inputted into the system at that time?

A.    No.

Q.    And so -- and the reason to change Anthony Brown's name -- well, with respect to other informants that had been providing information inside the jail, you were aware that it was a normal procedure to change their names to help protect them and ensure their safety and security; is that correct?

A.    I knew that it was done, yes.

Q.    And it was done many times.  It's not just something that

was done rarely, it would be done many times when necessary; is that correct?

A.   Yes.

Q.   And this would be a situation when it would be necessary because of all the information Anthony Brown had provided, correct?

A.   In part, yes.

Q.   So, now, with respect to the discussions that you had with Undersheriff Tanaka, I believe you talked about a meeting around August 25th or 26th.

Do you recall that meeting?

A.   Yes, sir.

Q.   And you were present, correct?

A.   Yes.

Q.   Undersheriff Tanaka was present?

A.   Yes.

Q.   Lieutenant Leavins was present?

A.   Yes, sir.

Q.   And you think, but you're not sure, that Sheriff Baca was present; is that correct?

A.   I'm fairly certain Sheriff Baca was there on the 26th.

Q.   And at that meeting, you tell the people who are assembled that Anthony Brown's name is going to need to get changed; is that correct?

A.   Yes, sir.

Q.    And that he's also going to get moved; is that correct?

A.    Yes.

Q.    And you tell the people, including if Sheriff Baca's there, that it's going to be done for his safety; is that correct?

A.    Yes.

Q.    And then after Anthony Brown is moved at that point, I think you said at some point Gilbert Michel is actually interviewed; is that correct?

A.    Yes.

Q.    And that was September 13, 2011; is that right?

A.    There were two interviews with Michel.  One was on -- the 13th I think was the final one.

Q.    And it was at the first interview -- I think that was August 30, 2011; does that sound right?

A.    That does sound right.

Q.    Now, on that interview, Gilbert Michel admits to bringing the cell phone to Anthony Brown; is that correct?

A.    I believe so, yes.

Q.    And at that point, Gilbert Michel's gun is taken away from him; is that correct?

A.    I don't know at what point his gun was taken away from him.

Q.    Well, he's assigned outside the Men's Central Jail at the end of his interview, correct?

A.   I don't remember those specifics.  I knew it occurred.

When, I couldn't tell you.

Q.   What do you remember about where Gilbert Michel was

assigned after his interview where he admitted to taking a

bribe and bringing a cell phone to Anthony Brown?

A.   I don't remember where he was assigned.  I have no

recollection of that.

Q.   Do you remember if he was assigned outside the Men's

Central Jail at that time?

        MR. FOX:  Objection.  Asked and answered.

        THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.   Well, on September -- but Gilbert Michel didn't admit to

any beatings on August 30, 2011; is that correct?

A.   I don't know the date that he admitted to the beatings,

whether it was the 30th or the 13th.

Q.   Well, Anthony Brown is not in Men's Central Jail on

August 30th; is that correct?

A.   That's correct, yes.

Q.   And on the 13th, you do recall that Gilbert Michel

admitted to beatings on that occasion; is that correct?

A.   Again, sir, which interview he admitted to that, whether

it was the 30th of August or the 13th of September, I don't

know.  It was one of those two that he admitted to the

beatings.

Q.   Well, remember you saw an e-mail from Lieutenant Leavins that talked about Michel's confessing to the beatings?

Do you recall that?

A.   Yes, sir.

Q.   That was September 13, 2011?

A.   Again, sir, if you want to put the e-mail in front of me, I will verify it.  I know he said it at one of the two.

MR. HOCHMAN:  May I have a moment, Your Honor?

THE COURT:  Yes.

MR. HOCHMAN:  May 58 be placed on the monitor by Special Agent Tanner?

*(The exhibit was displayed on the screen.)*

MR. HOCHMAN:  And if we could highlight the bottom e-mail.

BY MR. HOCHMAN:

Q.   Do you see the bottom e-mail on Exhibit 58?

A.   Yes, sir.

Q.   Dated September 13, 2011?

A.   Yes.

Q.   Does that e-mail -- in viewing that e-mail, do you see that Gilbert Michel confessed for the first time -- strike that.

You've had a chance now to read this e-mail?

A.   Yes, sir.

Q.   Did Gilbert Michel confess for the first time on

September 13 to beating inmates?

A.   He confesses on the 13th to beating inmates.  I don't remember if that was the first time.

Q.   And that was Gilbert Michel's last day with the Los Angeles County Sheriff's Department; is that correct?

A.   That's my recollection, yes.

Q.   Because Gilbert Michel, rather than being fired, resigned that day, correct?

A.   Yes.

Q.   And after the court order was denied, did Sergeant Craig tell you that he was going to try and reach out directly to the FBI agents or did you ask Sergeant Craig to reach out directly to the FBI agents?

A.   I know there was an attempt.  Who initiated it, I couldn't tell you if it was me telling Craig that or Craig did that on his own, but I know there was an attempt.

Q.   And that was after the court denied the order; is that correct?

A.   It was around that same time frame.

Q.   And did Sergeant Craig -- did you actually have that discussion with Sergeant Craig about reaching out to FBI Agent Leah Marx?

A.   He had told me that he left a phone message.

Q.   And did he tell you that he had threatened to arrest or charge Leah Marx in that phone message?

A.    No, sir.

Q.    Would you have approved him threatening to arrest or charging Leah Marx at that point?

A.    No, sir.

Q.    Why not?

A.    I don't know that we had enough evidence.  Like I said earlier, all of our investigative steps other than the phone being in the jail, which Assistant Director Martinez was aware of, I felt that part was sanctioned.  But other than the words of Anthony Brown, we were coming up with goose eggs, nothing.

Q.    Now, with respect to that voice mail message, did you ever have a chance to listen to that voice mail message at that time?

A.    At that time, no.

Q.    And did Sergeant Craig tell you that he had left a voice mail message where he threatened the arrest of Leah Marx?

        MR. FOX:  Objection.  Asked and answered.

        THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.    Taking it forward just a bit, in around September 12th or 13th, I think you said surveillance gets ordered of Special Agent Marx.

        Do you remember that?

A.    Yes.

Q.    That's ICIB surveillance?

A.    Yes, sir.

Q.    Because ICIB actually has a surveillance team as part of it?

A.    Yes, sir.

Q.    And did you tell Sheriff Baca that you were ordering surveillance on Agent Marx at that point?

A.    No, sir.

Q.    And you are aware that Sheriff Baca is out of the country between September 8th and September 21st of 2011, correct?

A.    I was not.  I mean, I didn't track the --

Q.    I'm sorry?

A.    I did not track the sheriff's whereabouts.

Q.    But you knew he was out of the -- did you know he was out of the office during the September 8th to the 21st time period?

A.    As I sit here today, I don't know what the sheriff's calendar was back five and a half years ago.  I might have known that he wasn't available, but as I sit here today, I couldn't tell you that he was in a foreign country in September of 2011.

Q.    And so I think also you said that -- in response to one of Mr. Fox's question that a bug sweep occurred around the same time period, September 8th of 2011.

        Do you recall that?

        MR. FOX:  Objection.  Misstates the testimony.

        THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.    When did the bug sweep occur?

A.    My recollection is sometime in September.

Q.    And I believe when we were -- I used the expression "bug sweep."  That's where they sweep for listening devices in the sheriff and the undersheriff's offices.

       Do you recall that?

A.    Yes, sir.

Q.    Did you get an order from Sheriff Baca to do this bug sweep?

A.    No, sir.

Q.    Did you tell Sheriff Baca the results of the bug sweep?

A.    No, sir.

Q.    Now, on September 26th, I believe you testified that you had a meeting with Sheriff Baca.

       Do you recall that?

A.    Yes.

Q.    Was that meeting in the morning?

A.    No, sir.

Q.    When was that meeting?

A.    It was in the afternoon.

Q.    Approximately when?

A.    I couldn't tell you a precise time.

Q.    Sometime between noon and 6:00 p.m.?

A.    I couldn't tell you a precise time.

Q.   How long did that meeting last?

A.   It was relatively short, just a few minutes.

Q.   And who was present?

A.   Myself, Lieutenant Leavins, Undersheriff Tanaka, and Sheriff Baca.

Q.   Now, at that meeting, you told -- actually, were you doing the presenting in that meeting or was it Lieutenant Leavins or both of you, if you recall?

A.   Both of us.  Mostly Leavins.

Q.   And at that meeting, you told Sheriff Baca and Undersheriff Tanaka that you wanted to have ICIB investigators go out and interview Special Agent Marx; is that correct?

A.   Yes, sir.

Q.   And part of the reasons for that, I think you said, was that a voice mail message -- excuse me, a message had been left for her before and she had not responded, correct?

A.   Yes.

Q.   Did you know that the -- and that's the voice mail message that we were talking about a moment ago involving Sergeant Craig, correct?

A.   Yes, sir.

Q.   Did you know that Sergeant Craig had actually called the wrong phone number for Special Agent Marx?

A.   On September 26th?

Q.   No.  Did you know -- yeah, I'm sorry.  Did you know on

September 26 that before September 26, when Sergeant Craig had called Special Agent Marx, he actually called the wrong phone number?  Did you know that?

A.    No.

Q.    You just knew that Sergeant Craig had attempted to contact Special Agent Marx for an interview, correct?

A.    Yes, sir.

Q.    And at that point, Sheriff Baca says to you that he's okay with the ICIB investigators going to interview Special Agent Marx, correct?

A.    We presented our plan to him and he did not say no or object or tell us not to do that.

Q.    And the plan was to interview her, correct?

A.    Yes.

Q.    The plan was not to threaten to arrest her, correct?

A.    Yes.

Q.    The plan was not to threaten to charge her, correct?

A.    Correct.

Q.    And, in fact, Sheriff Baca said to you he didn't want to put -- "You can go ahead and do it," or words to that effect, "but don't put handcuffs on her"; isn't that correct?

A.    Yes, sir.

Q.    Meaning don't threaten to arrest her and don't threaten to charge her, correct?

            MR. FOX:  Objection.  Argumentative.

THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.   Did you understand, "Don't put handcuffs on her," to mean that the ICIB investigators were not to threaten to arrest or to charge Leah Marx when they went out to interview her?

A.   I took it for what the words were, don't put handcuffs on her.

Q.   Now, when the ICIB investigators -- that would be Sergeant Craig and Long -- go out to interview Special Agent Marx that day, were you there?

A.   No, sir.

Q.   Were you aware that your ICIB surveillance team was doing surveillance of that particular encounter?

A.   I know they were recording it.

Q.   Video recording it; is that correct?

A.   Yes.

Q.   And the video recording didn't have any audio component as part of it; is that correct?

A.   Yes.

Q.   And did you also know that Sergeant Craig and Long were going to be mic'd so that they could go ahead and have an audio recording made of their encounter with Special Agent Marx?

A.   Correct.

Q.   And what was the purpose of -- we'll start with the video recording.  What was the purpose of the video recording by the

surveillance team?

A.   So we would have an accurate depiction of what occurred.

Q.   And why was that important?

A.   In case of allegations.

Q.   Allegations of what?

A.   Unknown.

Q.   And why was it important for the ICIB investigators, Sergeants Craig and Long, to be mic'd when they approached her?

A.   In case she did talk and gave a statement, it would be recorded.

Q.   And when they went out, you had no information at the point at which they go out that they were going to threaten to arrest or threaten to charge her with a crime; is that correct?

A.   That's correct.

Q.   And after they go out, do you find out that evening that that's exactly what they had done, which is threaten to arrest and threaten to charge her with a crime?

A.   I don't remember that, sir.

Q.   Well, at some point you do find out that that happened; is that correct?

A.   Yes.

Q.   Was that the same -- was that that same night or was it the next day or sometime in the future after that?

A.   I believe the information I received that night of the 26th was she was -- "She didn't talk to us."

Q.   She didn't talk to you at all; is that correct?

A.   I mean, obviously, she talked, "I'm not going to talk to you."  She didn't give a statement.

Q.   And that was one of the possibilities that you knew could happen when the ICIB investigators were going out to try to interview her; is that correct?

A.   Yes, sir.

Q.   That she would just say, "Look, I can't talk to you," and the interview would essentially end at that point; is that correct?

A.   Yes.

Q.   And I think you said that you had a chance to see -- well, the next day, September 27th, you were in the sheriff's headquarter building basement; is that correct?

A.   Yes, sir.

Q.   When?

A.   I don't know what time it was.  It was obviously during business hours.

Q.   Do you remember if it was the morning, the sort of before noon, or the afternoon, the afternoon period?

A.   I couldn't tell you.

Q.   And how long were you there for?

A.   I don't know, sir.

Q.   What were you there for?  What were you doing there at that time?

A.   My office was not at sheriff's headquarters building, but I had approximately 75 employees there that I was -- they were part of my unit, so I would be there frequently.

Q.   And when you had a chance -- and you said, I believe, you had a chance to see the video at that point; is that correct?

A.   Yes.

Q.   And when you saw the video, who showed it to you?

A.   My recollection is it was either Sergeant Craig or Steve Leavins.  Could have been both of them.

Q.   And I see that -- when the government showed you Exhibit -- I think it was 99, which is a synced video between audio and video, that's not what you were viewing that day; is that correct?

A.   I believe I saw the video and I heard the audio.

Q.   Well, do you recall speaking with the government on January 25, 2017?

A.   Specifically that date, no.

Q.   Well, do you recall a meeting in January of this year that you had with Mr. Fox, Special Agent Dahle, and your attorney present?

A.   Yes.

Q.   And do you recall saying at that meeting that you saw the video of the approach the day after it occurred?

A.   Yes.

Q.   You didn't mention anything about hearing an audio during

that meeting; is that correct?

A.    I don't remember if I mentioned audio.

THE COURT:  All right.  Ladies and gentlemen, we're going to take our final break of the day.

Again, I want to remind you until this trial is over, you're not to discuss this case with anyone, including your fellow jurors, members of your family, people involved in the trial, or anyone else, nor are you allowed to permit others to discuss the case with you.  If anyone approaches you and tries to talk with you about this case, please let me know about it immediately.

Do not read or listen to any news reports or other accounts about the trial.

Finally, you are reminded to keep an open mind until all of the evidence has been received, you've heard the arguments of counsel, the instructions of the Court, and the views of your fellow jurors.

If you need to speak with me, simply give a note to the clerk.

We'll come back at noon.

THE CLERK:  All rise.

*(Jury out at 11:47 A.M.)*

*(The following was heard outside the presence of the jury.)*

THE COURT:  All right, sir, you may step down.

How much longer are you going to be with this witness?

MR. HOCHMAN:  I'm sorry?

THE COURT:  How much longer are you going to be with this witness?

MR. HOCHMAN:  I'd say somewhere around 45 minutes, Your Honor.  Just -- it depends on how fast we go and if -- it just depends on how fast we go, Your Honor.

THE COURT:  I'm sorry?

MR. HOCHMAN:  It just depends on how fast the question and answer goes.

THE COURT:  Um-hmm.  Okay.

MR. FOX:  Your Honor, Mr. Faturechi is here and he is from out of town, and I would just appreciate having -- his direct and cross should not be more than ten minutes, I would assume.

I would like the opportunity to present it to the jury today because he's got plans to go back to New York, I think, after today, and it would -- I think that we should be able to get through it, but hearing 45 more minutes when we've already been going for three hours -- actually, four hours, I think -- I'm sorry, it will be four hours at that point -- that seems pretty extreme.

MR. HOCHMAN:  Other than the -- the direct was actually over four hours, Your Honor, and I'll do the best I

can to speed along.

If the government wants to have Mr. Faturechi go before its redirect and any potential recross, we can do that, Your Honor, in order to just make sure it gets in today.

MR. FOX:  We'll see the time.  Hopefully we don't need to do that, but if we have to go a little bit past 1:30, I'd just appreciate if we can do that possibly.

THE COURT:  Okay.  Okay.

*(Recess taken from 11:50 a.m. to 11:58 a.m.)*

*(The following was heard outside the presence of the jury.)*

MR. HOCHMAN:  I'm just trying to work something out so we don't have to go to sidebar.

Might I have another moment, Your Honor?

THE COURT:  That's fine.

MR. FOX:  Your Honor, do you want the witness in here or not in here at this point?

THE COURT:  Yeah, if he could just step out for a second.

MR. FOX:  The witness has stepped out and Mr. Baca is back in, Your Honor.

THE COURT:  Okay.  You know, I'm not going to try and dictate how lawyers try their cases, but, you know, a good cross-examination, you get in and out.  It's not a civil deposition and you don't have to repeat, basically, everything

that he said on direct.  But at some point, we're going to have to move this thing along.

MR. HOCHMAN:  Yes, Your Honor.

THE COURT:  This last question about he didn't mention anything about the listening to the audio, come on.

MR. HOCHMAN:  Your Honor, that's actually a --

THE COURT:  Yeah, right.

MR. HOCHMAN:  -- an important point.

THE COURT:  Yeah, I'm sure it is.  That's -- well, in my view, that's not going to be the key -- that's not the key to this case.  But, you know, like I said, you do want you want, but at some point there comes a time you got to move it along.

So let's get the witness in, let's get the jury in.

*(Jury in at 12:02 P.M.)*

THE COURT:  All right.  Let's go.

MR. HOCHMAN:  Thank you, Your Honor.

BY MR. HOCHMAN:

Q.   Mr. Carey, in the summer of 2011, you were working a case with the US Attorney's office here in Los Angeles and the Drug Enforcement Administration involving allegations of public corruption by a sheriff's department captain; is that correct?

A.   Yes.

Q.   You talked about on August 30th that Gilbert Michel was interviewed.

Do you remember that?

A.    Yes.

Q.    Do you also know that a deputy named William David Courson was interviewed on August 30th, as well?

A.    I knew that through trial preparation.

Q.    You didn't know it at the time, "at the time" being in August/September of 2011?

A.    No, sir.

Q.    Did you ever order Lieutenant Leavins, Sergeants Craig or Long, to tell deputies not to cooperate with the federal government?

A.    No, sir.

Q.    When you say "no, sir," does that mean -- is that correct that you did not order them to tell deputies not to cooperate with the government?  Is that correct?

A.    I told -- I did not tell them not -- I did not tell them that, no.

Q.    If you could just state what it is you did not tell them or did not order them.

A.    I did not tell investigators to tell sheriff employees not to cooperate with the FBI.

MR. HOCHMAN:  If Exhibit 113 could be placed back on the monitor, Your Honor, by Special Agent Tanner, please.

*(The exhibit was displayed on the screen.)*

*///*

BY MR. HOCHMAN:

Q.   I want to -- do you see this is the writ we're putting back on the monitor?

MR. HOCHMAN:  If we could go to the second page.

BY MR. HOCHMAN:

Q.   Do you see that this writ --

MR. HOCHMAN:  If you could just highlight the very top block, the top little corner in the upper left-hand corner.

BY MR. HOCHMAN:

Q.   Do you see this writ was applied for by Lawrence Middleton?  Do you see that on the writ, Exhibit 113?

A.   Yes, sir.

Q.   Now, Lawrence Middleton was at that August 29th meeting where Sheriff Baca, Undersheriff Tanaka, you, Lieutenant Leavins were meeting with the United States Attorney; is that correct?

A.   Yes, sir.

Q.   Did Lawrence Middleton ever mention anything during that August 29th meeting that the writ had not been honored by the sheriff's department?

A.   I don't recall that.

Q.   Did anyone on the US Attorney's side bring up the fact that they -- that the sheriff's department was in some way hindering them speaking with Anthony Brown?

A.   No, sir.

Q.   Isn't what happened at the August 29th meeting is that when Sheriff Baca got done finishing, the US Attorney and the people on his side politely listened to him, but did not engage in a dialogue?

A.   That's my recollection of that meeting, yes.

MR. HOCHMAN:  If we could turn to Exhibit 53 and ask Agent Tanner to put that on the screen, please.

BY MR. HOCHMAN:

Q.   Now, Exhibit 53 --

MR. HOCHMAN:  If we could focus just on the bottom e-mail, please.

BY MR. HOCHMAN:

Q.   Exhibit 53 is a series of e-mails between Michael Gennaco and people in the sheriff's department, correct?

A.   Yes, sir.

Q.   As well as a gentleman named Walter Katz.

Do you see that?

A.   Yes.

Q.   Who is Walter Katz?

A.   Walter Katz was an attorney in the Office of Independent Review.

Q.   I see.  And these are -- this e-mail correspondence deals with something called a retaliation allegations list; is that correct?

A.   Yes.

Q.   And if you could actually pull out Exhibit 53 from the
book in front of you.

Do you have Exhibit 53 in front of you?

A.   Yes, sir.

Q.   Now, what is a retaliation complaints list?

A.   There was a group of inmates that reported they were, for
the most part, being assaulted by deputy personnel, and for
reporting deputies, they were being retaliated against.

Q.   And were you working with the Office of Independent Review
in the beginning and throughout September, starting in the
beginning of September, to deal with the allegations that were
made on this list?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.   Well, if you look at the third and fourth and fifth pages,
there's something called an executive summary.

MR. HOCHMAN:  If we could scroll down about three
pages on this exhibit, please.

MR. FOX:  So you're asking for page 4?

MR. HOCHMAN:  Page 4, please.

MR. FOX:  53?

MR. HOCHMAN:  Of Exhibit 53, yes.

BY MR. HOCHMAN:

Q.   And it's somewhat sideways, but do you see something

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

called an executive summary of the alleged retaliation complaints?

A.    Yes.

Q.    These were the cases that ICIB was working on in September of 2011; is that correct?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.    What is this executive summary?

A.    It was a list --

THE COURT:  Excuse me, sir.

MR. FOX:  Your Honor, to clear it up, I think that we should read the updated line so we can see which date it is. This is misleading.

MR. HOCHMAN:  It's the Government's exhibit, Your Honor.

MR. FOX:  Your Honor, the Government's exhibit is not misleading; it's the questioning that is saying what's being worked and when is misleading.

MR. HOCHMAN:  I'll withdraw the last question, Your Honor, and try a different one if I might.

THE COURT:  All right.

BY MR. HOCHMAN:

Q.    In September of 2011, was ICIB working on the allegations contained in Exhibit 53?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.   Why did members of ICIB get a copy of this executive

summary connected with these e-mails in September of 2011?

A.   Can I refer back to the first page of the e-mails?

Q.   Certainly.

THE COURT:  Go ahead.

BY MR. HOCHMAN:

Q.   And I'll direct your attention to the September 1, 2011,

12:48 p.m. e-mail from Michael Gennaco to yourself.

A.   Okay.

Q.   So why did ICIB get a copy of this executive summary at

that point?

A.   I don't remember.

Q.   I think you said that ICIB investigators in September of

2011 were working on cases involving excessive force by

deputies; is that correct?

A.   Yes, sir.

Q.   And retaliation against inmates, as well?

A.   Yes.

Q.   Did that include the cases listed in Exhibit 53?

A.   My recollection, some of them.  I don't know that ICIB

investigated all of these.  I believe it's a list from custody

division what they investigated.  I couldn't tell you.

Q.   And you were working with the Office of Independent Review

on this, as well?

          MR. FOX:  Objection.  Relevance.

          THE COURT:  Sustained.

          MR. HOCHMAN:  May Exhibit 52 be placed on the monitor

by Agent Tanner?

          And might we highlight the top part of this.

BY MR. HOCHMAN:

Q.   In your direct, Mr. Fox showed you Government's Exhibit

52, which is a September 9, 2011, e-mail that you sent from

yourself to Mr. Leavins.

          Do you see that?

A.   Yes, sir.

Q.   And it says, "Steve:  Official request from feds for

interview with Brown was made."

          Do you see that?

A.   Yes.

Q.   What was the official request?

A.   I don't know.

Q.   You don't know -- I mean, you don't know -- well, let me

break it down.

          Who made the official request, if you know that?

A.   I do not know.

Q.   Do you know if it came from the FBI?

A.   I don't know that, sir.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Q.   Could it have come from the US Attorney's office?

A.   I have no idea where that came from.

Q.   Do you know if there was a response from Lieutenant Leavins to your e-mail?

A.   Response from what?

Q.   Do you know if there was a response from Lieutenant Leavins to your e-mail, which is Exhibit 52?

A.   I don't know.

Q.   All right.  If we could go back to that morning or the day of September 27th.

MR. HOCHMAN:  Thank you for taking it off the screen.

BY MR. HOCHMAN:

Q.   I believe you said that you can't recall what time of day you were in the sheriff's headquarters building's basement; is that correct?

A.   That's correct.

Q.   And it's either Lieutenant Leavins or Sergeant Craig you're speaking with, right?

A.   Could have been both of them.

Q.   And they say at that point that Sheriff Baca had already been shown the video; is that correct?

A.   Yes.

Q.   And that after being shown the video, it was the best laugh he had had in months or something to the -- words to that effect?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

A.    Yes, I was informed that was his response.

Q.    And you weren't there when Sheriff Baca saw the video; is that correct?

A.    That's correct.

Q.    So this is just what you're being informed by either Lieutenant Leavins or Sergeant Craig?

A.    Yes.

Q.    And you can't remember which one of the two it was?

A.    No, I can't.

            MR. HOCHMAN:  Your Honor, I'd like to, at this point, refer to a number of the tape-recordings in Exhibit 2.

            So if the jurors have their Exhibit 3, I will refer to those and we'll play certain of the recordings, if I might.

            MR. FOX:  If we may have the number first before the jury opens their book so we know --

            MR. HOCHMAN:  Yes.  It would be Exhibit 2.13, which translates into transcript 3.13, Your Honor.

            MR. FOX:  And, Your Honor, we have no -- if Mr. Hochman is playing this, is what I'm understanding --

            MR. HOCHMAN:  Yes.

            MR. FOX:  -- then we have no objection to that.

            MR. HOCHMAN:  So we'll start with excerpt 2.13, which is in Exhibit 3, and then Tab 13.

            And if we might play that when Special Agent Tanner is ready.

(*Playing of audiotape.*)

BY MR. HOCHMAN:

Q.   Now, Mr. Fox asked the question -- or he says, "So I'm asking what was in your head, your awareness."  This is April 12, 2013.

Do you know -- or did you have any discussions with Sheriff Baca on April 12, 2013, to understand what was in his head or his awareness?

MR. FOX:  Objection.  Argument.  Irrelevant.

THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.   Did you have any discussions with Sheriff Baca on April 12, 2013?

MR. FOX:  Objection.  Argumentative.  Irrelevant.

THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.   Are you familiar with how good Sheriff Baca's memory was on April 12, 2013?

MR. FOX:  Objection.  Foundation.  Speculation. Irrelevant.

THE COURT:  Sustained.

MR. HOCHMAN:  Now, will you turn to selection -- excerpt 2.18, Your Honor.

Actually, Your Honor, I'm sorry.  I got the wrong number here.  2.19.

If we can play it when you're ready.

(Playing of audiotape.)

BY MR. HOCHMAN:

Q.   Is that an accurate statement that Sheriff Baca makes, that the Internal Criminal Investigations Bureau was looking at every aspect of the phone circumstance?

A.   What was the date on that, sir?

Q.   Well, he's speaking on April 12, 2013, about the investigation that's happening in August/September 2011.

So is it an accurate statement that in August/September 2011, Internal Criminal Investigations Bureau was looking at every aspect of the phone circumstance?

A.   Yes.

Q.   And is it also an accurate statement that you wanted to know why and how and all the things that are pertinent to the investigation?  Is that accurate, as well?

A.   Yes.

MR. HOCHMAN:  Yeah, now if we can turn back to 2.18, please.

(Playing of audiotape.)

MR. HOCHMAN:  Please stop right there.

Thank you.

BY MR. HOCHMAN:

Q.   Do you see the question -- or you heard the question that was asked were you briefed on what he was telling the people

who were interviewing him, and Mr. Baca's answer was, "In pieces, yes"?

Do you recall hearing that just now?

A.   Yes.

MR. HOCHMAN:  Can we put Exhibit 31 before the witness.

Special Agent Tanner, would you mind putting it on the screen?

MR. FOX:  Let me just make sure Mr. Hochman is aware of something.

*(Counsel confer off the record.)*

MR. HOCHMAN:  31, please.

*(The exhibit was displayed on the screen.)*

MR. HOCHMAN:  And if we could highlight just the first e-mail.

BY MR. HOCHMAN:

Q.   Do you see this Exhibit 31, a Paul Tanaka to Steven Leavins e-mail?

A.   Yes.

Q.   If you could read the last sentence on the first e-mail starting with the word, "Providing...."

A.   From Leavins to Tanaka --

Q.   Yes --

A.   -- the last e-mail?

Q.   -- just the sentence that starts with the word,

"Providing...."  Please read that sentence, please.

A.    "Providing him with updated tidbits helps to ease his mind."

          MR. HOCHMAN:  Thank you.  You can take it off the screen.

          If we could turn to Exhibit 2.24 and play that, please.

          *(Playing of audiotape.)*

BY MR. HOCHMAN:

Q.    Mr. Carey, was it an accurate statement that Mr. Brown's mission at that point in time, back in this August and September of 2011 period, was to try and find out who these rogue deputies are that are beating up inmates?

A.    State your question again, please.

Q.    Was that an accurate statement that Sheriff Baca made in the interview that Mr. Brown's mission at that point, referring to the August/September 2011 period, was to try and find out who these rogue deputies are that are beating up inmates?

          MR. FOX:  Objection as to -- are we talking about the -- I'm sorry, Your Honor.

     *(Counsel confer off the record.)*

          MR. FOX:  Objection to foundation and speculation. Relevance.

          THE COURT:  Sustained.

*///*

BY MR. HOCHMAN:

Q.   Well, is it true that ICIB's mission at this point in time was to try and find out if there were any rogue deputies that were beating up inmates?

MR. FOX:  Objection.  Asked and answered. Cumulative.

THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.   And were you -- generally, did you -- did ICIB conduct investigations -- well, strike that.

MR. HOCHMAN:  Actually, Your Honor, let's turn, if we could, to 2.29.  Actually, strike -- make it 2 -- we'll speed along, Your Honor, and go to 2.44.

(Playing of audiotape.)

MR. HOCHMAN:  And if we can continue on to 2.45.

(Playing of audiotape.)

BY MR. HOCHMAN:

Q.   Now, Mr. Baca -- you never told Mr. Baca or Mr. Leavins told Mr. Baca before the interview that Special Agent Marx was going to be threatened to be arrested or threatened with charges, correct?

MR. FOX:  Objection to the form of the question and asked and answered.

One minute.

(Counsel confer off the record.)

MR. HOCHMAN:  May I restate, Your Honor?  I think I stated it improperly.

BY MR. HOCHMAN:

Q.   Before the September 26, 2011, encounter between the ICIB investigators and Special Agent Marx, when you were having a discussion with Sheriff Baca as to what was going to occur, you never told Sheriff Baca that the agents were going to threaten to arrest or threaten to charge Special Agent Marx; is that correct?

MR. FOX:  Objection.  Asked and answered.

THE COURT:  It has been.  Sustained.

BY MR. HOCHMAN:

Q.   So when Sheriff Baca felt -- says that, "Had I been told that this was part of the current process" -- and by "that," he means the threaten to arrest --

MR. FOX:  Objection, Your Honor.  Move to strike the attorney's question.

THE COURT:  Sustained.

MR. HOCHMAN:  Now we turn to 2.8, Your Honor.

And if we may play it when you're ready.

(Playing of audiotape.)

BY MR. HOCHMAN:

Q.   I'd like to focus on those words, "investigative particulars."

Did you tell or did Lieutenant Leavins tell Sheriff

Baca on that September 26th meeting before the ICIB

investigators approached Special Agent Marx what questions the

ICIB investigators were going to ask her?

A.    No, sir.

Q.    Did you tell Sheriff Baca or did Lieutenant Leavins tell

Sheriff Baca whether or not they were going to show her

anything when they had the encounter?

A.    No, sir.

Q.    Did you tell Sheriff Baca what actual time during the day

they were going to approach her?

        MR. FOX:  Objection to relevance, Your Honor.

        THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.    During the -- with respect to an investigation,

investigation has different details or particulars; is that

correct?

A.    Yes.

Q.    And amongst those particulars include which agents are

going to be doing the interviewing; is that correct?

A.    Agents or deputies?

Q.    Or deputies.  Investigators.

        MR. FOX:  I'm going to object to relevance again,

Your Honor.

        MR. HOCHMAN:  I just have two or three more

questions, Your Honor.

MR. FOX:  It doesn't mean they're --

THE COURT:  That's fine.  That objection is sustained.

BY MR. HOCHMAN:

Q.   Did you tell Sheriff Baca or did Lieutenant Leavins tell Sheriff Baca in the meeting you had with him before the ICIB investigators approached Leah Marx on September 26th whether or not there was going to be video surveillance or have an investigator mic'd?

A.   I don't remember that.

Q.   When you say you don't remember, you mean you don't recall one way or the other if you had that discussion or you didn't provide that information to Sheriff Baca?

A.   I can tell you what my best recollection is.  I mean --

Q.   All right.  What was your best recollection?

A.   That it would have been included in our briefing with him that it was going to be videotaped and audiotaped.

Q.   Did you also give him a briefing as to whether or not they were going to present any documents to Special Agent Marx at that time?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

MR. HOCHMAN:  May I have a moment, Your Honor?

THE COURT:  Yes.

MR. HOCHMAN:  No further questions.

THE COURT:  Redirect?

MR. FOX:  May I proceed, Your Honor?

THE COURT:  Yes.

REDIRECT EXAMINATION

BY MR. FOX:

Q.   Mr. Carey, Mr. Hochman asked you a number of questions about whether Anthony Brown lied or told you the truth in the interviews that ICIB conducted of him.

Do you recall that?

A.   Yes.

Q.   And is it your experience with people who are good liars that they tell the truth in part and lie in part?

A.   Yes.

Q.   Mr. Hochman asked you questions about whether Mr. Baca was accurate in some of what he told the federal government in the April of 2013 interview.

Do you recall that?

A.   Yes, sir.

Q.   Was Mr. Baca -- did he provide accurate statements in the portions that were played yesterday?

MR. HOCHMAN:  Objection.  Asked and answered. Argumentative, Your Honor.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  The recording that said he was not

aware that we went out to Agent Marx's house was -- I am 1,000 percent positive. I was there. I remember -- I remember that meeting.

MR. HOCHMAN: Objection. Misstates the evidence in the case, Your Honor. Assumes facts not in evidence. Move to strike.

THE COURT: Overruled.

BY MR. FOX:

Q. Mr. Hochman asked you questions about the portion of the recording when Mr. Baca said that he wasn't aware of any of the investigative particulars -- I'm sorry, make sure I've got that right -- any of the investigative particulars.

What of the investigative particulars with respect to Special Agent Marx on September 26th was he aware of?

A. That we were going to approach her house.

MR. HOCHMAN: Objection to the form of the question, Your Honor. Foundation.

THE COURT: Overruled.

THE WITNESS: That we were going to go to her house.

BY MR. FOX:

Q. And why was that important?

A. We -- well, in my opinion, we were stepping on the toes of the FBI by showing up at her house, and if it was going to occur, it was not going to occur without the sheriff's okay.

Q. Now, you mentioned that you've done a number of

investigations, ICIB did, of other law enforcement agencies when they requested you to investigate them.

If a law enforcement official in one of those investigations was deemed to be solely a witness and not a subject of the investigation, where would you interview them?

MR. HOCHMAN:  Objection.  Beyond the scope of the cross.

THE COURT:  Overruled.

THE WITNESS:  Generally, at a place of convenience for them.

BY MR. FOX:

Q.   Would you -- what we saw with Special Agent Marx is that your sergeants showed up without scheduling the interview ahead of time; is that correct?

A.   Yes, sir.

Q.   Is that ordinarily how it would be done if a law enforcement officer was viewed as a witness and not as a subject or target of the investigation?

MR. HOCHMAN:  Objection.  Assumes facts not in evidence.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  In the number of cases that I've investigated, I've had -- either investigated in or supervised, maybe two that come to mind where we had to unexpectedly show

up for a witness.

But most times when we interview a witness, it's with advance notification and, again, to -- somewhat on their terms.

BY MR. FOX:

Q.   Mr. Hochman asked you questions about the comment about putting handcuffs on her, "Don't put handcuffs on her."

Did you ordinarily have a discussion with Mr. Baca about whether to put handcuffs on witnesses you were interviewing?

MR. HOCHMAN:  Objection.  Argumentative.  Beyond the scope.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  Never.

BY MR. FOX:

Q.   Now, I think Mr. Hochman asked you questions about handcuffs -- about -- well, actually I'll get back to this.

I want to now take you to Exhibit 53, which Mr. Hochman asked you questions about.

    (The exhibit was displayed on the screen.)

BY MR. FOX:

Q.   And he asked you why on --

MR. FOX:  Let's go to page 4, if you can, Special Agent Tanner.  And if you'd rotate that page, please.

BY MR. FOX:

Q.   What is the date that it says this document was updated in

the upper right-hand corner below "Duane Harris, Captain"?

A.    March 18, 2011.

Q.    And what we see beneath that is something -- with most, if not all of these, it says, "Closed, unfounded."

      Are you aware of what that means?

A.    Yes.

Q.    What does that mean?

A.    "Unfounded" means that there was no verification that the allegation or incident occurred -- could be proven.

Q.    Based on whose investigation?

A.    Men's Central Jail's.

Q.    Within the sheriff's department?

A.    Yes.

Q.    And if we look at the third column -- so we have "Inmate Name," we have "Booking Number," we have "Date Complaint Received," and then we have "Date Review Completed."

      What does that represent?

A.    "Date Complaint Received" is what it says, that the allegation or complaint was made on that date.

      Again, "Date Review Completed," when that investigation was concluded.

Q.    So by the time you're getting this list, the sheriff's department's already completed its review; is that correct?

A.    That's what it appears, yes.

Q.    Let's go back to the first page, if we can.

What do you write about -- well, just read for the jury what you write here.

A.    "List of ACLU complaints out of CJ.  Probably lead us in part to where/what the feds are looking at."

Q.    Mr. Hochman asked you questions about meeting with the federal government in March of 2016.

Do you recall those questions about your meetings with the federal government in March of 2016?

A.    Yes.

Q.    Mr. Carey, those meetings related to your potential testimony in a separate trial unrelated to this defendant, correct?

A.    Yes.

Q.    Mr. Carey, Mr. Hochman asked you questions about whether, in the meetings with the federal government, you had to have your recollection refreshed by seeing certain documents.

Do you recall that?

A.    Yes.

Q.    Did you have to have your recollection refreshed to recall the orders that Mr. Baca provided to you in August of two-thousand- -- August 20th of 2011?

MR. HOCHMAN:  Objection.  Leading, Your Honor.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  I did not.

BY MR. FOX:

Q.   Why not?

A.   I thought about them for five years -- five-plus years.

Q.   I won't focus on every meeting, but let's talk about September 26th.

Did you have to have your recollection refreshed by looking at documents to recall that you told Mr. Baca ahead of time that your sergeants were going to be going out to confront Special Agent Marx?

A.   No, I did not.

Q.   Why not?

A.   That's something I've thought about literally thousands of times, that, you know, he was on TV in the day -- in the morning, and he was -- like I said, I knew we were stepping on toes and we weren't going to step on those toes without his blessing, and we told him, and then for him to deny it --

MR. HOCHMAN:  Objection.  Motion to strike the last part as assuming facts not in evidence, Your Honor.

THE COURT:  The part "we told him and then for him to deny it" is stricken.  The jury should disregard it.

BY MR. FOX:

Q.   Mr. Carey, I'm putting up the August calendar.

Mr. Hochman asked you a number of questions about whether cell phones are dangerous.

Do you recall those questions?

A.   Yes, sir.

Q.   Were you aware that cell phones were dangerous before August 18th of 2011?

A.   Yes.

Q.   Did you move Anthony Brown to San Dimas that day?

A.   No, sir.

Q.   Were you aware that snitches could be in danger in jail, in Men's Central Jail, before August 18th of 2011?

A.   I was fully aware.

Q.   Does MCJ have places to put snitches who might be in danger?

A.   Yes.

Q.   And when you're referring to "snitches," you were talking about inmates who might be reporting on deputy abuse, as well, correct?

A.   Yes, sir.

Q.   And going back to Exhibit 53, page 4 --

         MR. FOX:  If you can rotate the page again.

BY MR. FOX:

Q.   -- you didn't do anything in August -- well, while you were captain of ICIB in 2010 and up until August 18th of 2011, did you do anything to ensure the safety and security of these inmates who were alleging abuse?

         MR. HOCHMAN:  Objection.  Beyond the scope.  403, Your Honor.  Argumentative, as well.

THE COURT: Just one second. Overruled.

You can answer.

THE WITNESS: State your question again, please.

BY MR. FOX:

Q. Sure. It looks like these inmates made complaints in 2009 and the complaints had been concluded in 2010, according to the internal investigation.

Are you -- well, did you do anything before August 18th of 2011 to ensure the safety and security of these inmates who were alleging retaliation?

A. I am not aware of any extra security precautions, no.

Q. When you took Anthony Brown to San Dimas -- when you had him taken to San Dimas on August 26th of 2011 -- do you recall that?

A. Yes, sir.

Q. -- were any of these inmates sent to San Dimas?

MR. HOCHMAN: Objection. Relevancy -- relevancy, Your Honor.

THE COURT: Sustained.

MR. FOX: I'm just going to add one more magnet that I -- August 26th. This is the "Brown in San Dimas." Excuse me for not doing this before.

Oh, we already had it. Duplicate one.

BY MR. FOX:

Q. Mr. Hochman asked you questions about your investigation

and trying to determine, in part, how the phone had gotten in the jails.

Do you recall those questions?

A.   Yes, sir.

Q.   And he asked you questions about whether the sheriff's -- whether your responsibility was trying to fix any leak that could have occurred that allowed the phone to get in the jail, something to that effect.

Do you recall that?

MR. HOCHMAN:   Objection.   Misstates the question, Your Honor -- misstates the prior testimony.

THE COURT:   Do you understand the question?

THE WITNESS:   No.

BY MR. FOX:

Q.   Okay.   I'll try to do better.   I can't remember the exact question, but he asked you, in part, whether you were going to be trying to conduct this investigation to see whether -- how the phone got in there and whether the facility could be more secure.

Do you recall that?

A.   Yes.

Q.   Was that ICIB's function?

A.   No.

Q.   Had you ever worked in Men's Central Jail?

A.   No, sir.

Q.   Mr. Hochman asked you questions about the number of meetings you had with Mr. Tanaka compared to the ones you had with Mr. Baca.

Do you remember those questions?

A.   Yes.

Q.   Were there times where you would brief Mr. Tanaka first and he would take you anywhere?

A.   Yes.

Q.   Where would he take you?

A.   Sometimes we would walk into the sheriff's office; sometimes the sheriff, after advising Undersheriff Tanaka, he'd call and have Mr. Baca come to his office.

Q.   Would Mr. Tanaka say, "Keep any information from Mr. Baca"?

A.   No.

Q.   And on Government Exhibit 51, please, Mr. Hochman had you read one --

MR. FOX:  I'm sorry, that's not it.

53, I think.  53, please.

BY MR. FOX:

Q.   Mr. Hochman had you read --

MR. FOX:  No.  I'm sorry.  Escape.

*(The exhibit was displayed on the screen.)*

BY MR. FOX:

Q.   Mr. Hochman had you read the last sentence of this e-mail.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

He had you read the part that says, "Providing him with updated tidbits helps to ease his mind."

Could you please read the prior sentence and that sentence?

A.   "Thanks, Steve.  Right after, and I mean right after I spoke with Tom this morning, the sheriff popped in looking for an update.  This case is consuming his entire thought process. Providing him with updated tidbits helps to ease his mind."

MR. FOX:  If we could put 52.

(The exhibit was displayed on the screen.)

BY MR. FOX:

Q.   We're now seeing the e-mail that you wrote to Mr. Leavins saying, "Official request from feds for interview with Brown was made."

Did you do anything to allow the federal government to interview Anthony Brown while he was in sheriff's department custody after September 9th of 2011?

A.   No, sir.

MR. FOX:  If we could put up 113, please, the writ.

(The exhibit was displayed on the screen.)

BY MR. FOX:

Q.   And I want to focus on the first line of the real text.

MR. FOX:  Right there.  Thank you.

BY MR. FOX:

Q.   Mr. Hochman asked you questions about whether this writ

asked for Mr. Brown.

What does this writ say in the first -- actually, the fourth word?

A.   "Orders."

Q.   Mr. Hochman asked you questions about Anthony Brown going back to Men's Central Jail on September 2nd of 2011.

Do you recall those questions?

A.   Yes.

Q.   Was he booked under the name Anthony Brown on September 2nd of 2011?

A.   My recollection, he was.

Q.   Let's --

(Counsel confer off the record.)

BY MR. FOX:

Q.   Special Agent Tanner, if -- Mr. Hochman asked you questions about Mr. Brown being moved to 8000 on August 23rd and you referenced an undercover operation.

A.   Yes, sir.

Q.   Was that the only reason why Anthony Brown was moved on August 23rd of 2011?

A.   No, sir.

Q.   What was the other reason?

A.   To prevent anyone, specifically the FBI, from having contact with him.

Q.   And Mr. Hochman asked you about Anthony Brown being moved

to San Dimas on August 26th and whether that was done for his

safety and security.

Were those the only reasons why Anthony Brown was

moved from Men's Central Jail on August 26th?

A.    No.

Q.    What was the other reason?

A.    To prevent anyone, specifically the FBI, from having

contact with him.

MR. FOX:  Now if we can put up Exhibit 140, please.

BY MR. FOX:

Q.    This is the statement of probable cause that Scott Craig

makes.

*(The exhibit was displayed on the screen.)*

BY MR. FOX:

Q.    How many pages total is this statement?

A.    Four.

Q.    And how many deal with Mr. Craig's experience in

comparison to the facts?

A.    Can you ask the question --

Q.    Sure.  Let me page down for you.

So the first page deals entirely with Mr. Craig's

experience, correct?

A.    Yes, sir.

Q.    And the second page, first paragraph, talks about

Mr. Craig's experience, correct?

A.   Yes.

Q.   The first time that Mr. Craig discusses anything related to this investigation is on the bottom of page 2; is that correct?

A.   Yes, sir.

Q.   And it says down here, "Investigators spoke with the Federal Bureau of Investigation Crime Analyst Jennifer Naujock, who informed them the cellular telephone was owned and controlled by the FBI."

I want to now look at Exhibit 18.

(The exhibit was displayed on the screen.)

MR. FOX:  If we could highlight this e-mail from Noah Kirk to Gerard Smith related to Ms. Naujock.

BY MR. FOX:

Q.   Do you see the first line here, it says, "I took the number that was called of the ITMS and forwarded that to Jennifer Naujock"?

A.   Yes.

Q.   That's not a number that was coming from the cellular phone, is it?

A.   No.

Q.   It's a number that was coming from the ITMS system?

A.   Yes.

Q.   So if we go back to 140, page 2 --

(The exhibit was displayed on the screen.)

BY MR. FOX:

Q.   -- was that statement by Mr. Craig not true?

A.   That's not true.

Q.   And in this statement of probable cause, Mr. Hochman asked you a number of questions about narcotics.

Is there anything in this statement of probable cause that discusses any allegations claiming that the FBI was bringing in narcotics?

A.   No, sir.

Q.   Mr. Hochman asked you questions about how to develop a rapport with an informant, correct?

A.   Yes.

Q.   And how providing the informant with benefits can make it more likely that they cooperate with you, correct?

A.   Yes, sir.

Q.   What about not having access to an informant?  What does that cause?

A.   What does it cause?

Q.   Yes.

A.   Interference, obstruction, lost evidence.

Q.   Well, what if -- Mr. Hochman asked you about changing Anthony Brown's name and whether that was done for his safety and security.

Was there another reason why that was done?

A.   Yes.

Q.    Why?

A.    To make it impossible or nearly impossible for anyone --

Q.    And going --

A.    -- to --

Q.    I'm sorry.  Go ahead.

A.    Anyone that would be looking for him.  And the only people that would have been looking for him from the outside would have been the FBI.

Q.    You discussed trustees earlier and Mr. Hochman discussed snitches with you.

        Remember the discussion on snitches?

A.    Yes.

Q.    Trustees are also people that provide more information to deputies working in the jails; is that correct?

        MR. HOCHMAN:  Objection.  Beyond the cross.

        THE COURT:  All right.  Overruled.

BY MR. FOX:

Q.    Trustees also provide information to deputies within the jails, correct?

A.    Yeah.  A lot of times, that's why they're trustees.

Q.    And trustees, are they given more or less freedom to roam about the jails?

A.    More.

        MR. FOX:  Can we please put 129 on the screen.

///

BY MR. FOX:

Q.   Do you know who Chris Johnson was?

A.   Yes.

Q.   Who was Chris Johnson?

A.   Anthony Brown.

Q.   And just to show you the bottom -- we're actually going to show you 130, Mr. Carey.

     And does 130 reflect that Chris Johnson was the name that was used for Anthony Brown --

     MR. FOX:  If we can go to the next page and the third page.

BY MR. FOX:

Q.   -- on September 2nd of 2011?

A.   Can you go back to the previous page?

Q.   See the name "Chris Johnson" below the booking number?

A.   Right.

Q.   It shows that Chris Johnson was released on September 12th; is that correct?

     MR. HOCHMAN:  Are you asking him to read the exhibit or his independent memory -- Your Honor?

     MR. FOX:  Your Honor, I said "it," so if I can rephrase it to make it clear.

BY MR. FOX:

Q.   Mr. Carey, does this exhibit reflect that Mr. Johnson was released on September 12, 2011?

A.    It does, yes.

Q.    And if we look to the last page of this exhibit, page 4 --
or 3, does it show that he was booked in Men's Central Jail on
September 2, 2011?

A.    Yes.

Q.    Mr. Hochman asked you questions about Gilbert Michel being
out of Men's Central Jail by September 2, 2011, and he also
discussed with you the 50 or more allegations that Anthony
Brown was making about deputies.

        Had those deputies all been removed from Men's
Central Jail by September 2, 2011?

A.    No.

Q.    Mr. Hochman asked you about why Scott Craig shouldn't have
left a voice mail threatening to arrest Special Agent Marx on
September 9, 2011, and you said there wasn't enough evidence.

        Do you recall that?

A.    Yes.

Q.    Did you have enough evidence to threaten to arrest her by
September 26th of 2011?

A.    If we didn't have enough on the 7th, we did not develop
anything in between, no.

Q.    Then why not discipline him or give him something other
than an outstanding rating, given what he did on September 26th
of 2011?

A.    I didn't see a need.  I mean, hours earlier he sees a

video of the sheriff on TV saying -- making accusations against the FBI and, "We're going to get to the bottom of it," and I think the actions of Craig were consistent with the sheriff's orders.

Q.   Now, handcuffs themselves, when you handcuff someone, is that a threatened arrest or is that an actual arrest?

A.   I don't think I understand your question, sir.

Q.   Okay.  If -- let's say that right now somebody was going to put handcuffs on Special Agent Tanner, a law enforcement officer was going to do that.  Is that a threatened arrest or is that an arrest?

        MR. HOCHMAN:  Objection, Your Honor.  Argumentative.

        THE COURT:  Overruled.

        THE WITNESS:  An arrest.

BY MR. FOX:

Q.   Mr. Hochman asked you questions about whether you saw the video only or listened to the audio, as well.

        Do you recall those questions?

A.   Yes.

Q.   Which did you do?

A.   Saw the video and listened to the audio.

Q.   Let's just focus solely on the video for this question.

        When you saw the video, do you remember if that was first or second?  Did you see the video first or the audio first?

A.   I don't remember.

Q.   Okay.  Let's just focus on the video.

As you reviewed that video, was there anything on there that caused you to laugh?

A.   No.

Q.   Mr. Hochman --

MR. FOX:  One second.

No further questions, Your Honor.

MR. HOCHMAN:  May I proceed, Your Honor?

THE COURT:  Yes.

RECROSS-EXAMINATION

BY MR. HOCHMAN:

Q.   When Sheriff Baca said, "Don't put handcuffs on her," he wasn't referring specifically to put the actual manacles on Special Agent Marx, correct?

MR. FOX:  Objection.  Foundation.  Speculation. Argumentative.

THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.   Did Sheriff Baca ever order, during your meeting with him on September 26, that Special Agent Marx be arrested, threatened with arrest, or threatened to be charged?

A.   No, sir.

Q.   Did Sheriff Baca -- you said that you didn't think the video was funny, correct?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

A.   Correct.

Q.   Sheriff Baca took his job very seriously, as well; isn't that correct?

MR. FOX:  Objection.  Argumentative.

THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.   Do you have any -- on September 26 -- or September 27, 2011, are you aware at that time that Sheriff Baca took his job very seriously?

MR. FOX:  Objection.  Argumentative.  Relevance.

THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.   With respect to Exhibit 53, which is that executive summary that we've seen with information of inmates on it -- do you have that in mind?

A.   Yes.

Q.   -- those were investigations, those closed or unfounded investigations, that were done at the unit level at Men's Central Jail, correct?

A.   Yes.

Q.   And the whole reason that that list was going to ICIB was for ICIB to go over those investigations and see if they were properly done; isn't that correct?

A.   Yes.

Q.   Mr. Fox asked you that you did not take any steps to allow

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

the FBI to speak with Anthony Brown while he was in sheriff's custody, correct?

A.    Ask your question again, please.

Q.    Mr. Fox asked you that you did not take any steps to allow the FBI to have access to Anthony Brown when he was in sheriff's custody, correct?

A.    Yes.

Q.    But to your knowledge, the FBI never asked to actually speak with Anthony Brown while he was in sheriff's custody, is that correct, after August 23rd?

MR. FOX:  Objection.

Well, I will withdraw the objection.

BY MR. HOCHMAN:

Q.    You may answer.

A.    The only attempt was that September 7th e-mail asking --

Q.    You mean the September 9th e-mail?

A.    The one asking where the feds wanted to interview him.

Q.    But you don't know if that came from the FBI, correct?

A.    That's correct.

Q.    And other than that, there was no phone calls or e-mails or anything that you're aware of where the FBI was asking to speak with Anthony Brown while he was in sheriff's custody, correct?

A.    Yes.

Q.    And, lastly, Mr. Fox showed you that statement of probable

cause that Sergeant Craig wrote.

Do you recall that?

A.   Yes.

Q.   He focused on that e-mail, Exhibit 18, the one from -- dealing with Jennifer Naujock of the FBI.

Do you recall that?

A.   Yes.

Q.   Do you recall, though, on Exhibit 18, none of the "To," "From," or "ccs" was Sergeant Craig?

Would you like to see that e-mail very quickly?

A.   Was there a question?

MR. HOCHMAN:  May we put --

THE COURT:  That's a good point.

MR. HOCHMAN:  I'm sorry.  Can we put Exhibit 18 on for the witness?

*(The exhibit was displayed on the screen.)*

BY MR. HOCHMAN:

Q.   If you could look at Exhibit 18, none of the "To," "Froms," or "ccs" are to Sergeant Craig, the gentleman who wrote the statement of probable cause on September 7th, correct?

A.   That's correct.

MR. HOCHMAN:  No further questions.

MR. FOX:  Nothing, Your Honor.

THE COURT:  All right.  You may step down.

THE WITNESS:  Thanks, Your Honor.

THE COURT:  Call your next witness.

MR. FOX:  The government calls Robert Faturechi.

THE CLERK:  Please raise your right hand.

Do you solemnly swear that the testimony you shall give in the cause now before this Court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  Yes.

THE CLERK:  Please be seated.

Please state your full name and spell your last name for the record.

THE WITNESS:  Robert Faturechi, F-A-T-U-R-E-C-H-I.

MR. FOX:  May I proceed, Your Honor?

THE COURT:  Yes.

ROBERT FATURECHI,

having been first duly sworn,

testified as follows:

DIRECT EXAMINATION

BY MR. FOX:

Q.   Mr. Faturechi, what do you do for a living?

A.   I'm a reporter.

Q.   When you say you're a reporter, who do you work for?

A.   ProPublica.

Q.   I'll take a second and let you pour your water.

A.   I poured it.

Q.    Okay.  You say you work for ProPublica.  What is ProPublica?

A.    It's an investigative journalism nonprofit.

Q.    Can you do me a favor and pull the microphone a little bit closer to you?

A.    Yeah.  It's an investigative journalism nonprofit.

Q.    How long have you worked for ProPublica?

A.    About two years.

Q.    What did you do before that?

A.    I was a reporter for the LA Times.

Q.    And do you have a specific beat in August and September of 2011?

A.    Yes.  I covered the L.A. County Sheriff's Department.

Q.    Why are you here today?

A.    Because I was subpoenaed.

Q.    Did you do anything --

        THE COURT:  Keep your voice up just a little bit, please.

        THE WITNESS:  Sure.

BY MR. FOX:

Q.    Did you do anything to try to not testify?

A.    Our attorneys, you know, fought to quash the subpoena.

Q.    And I think everyone probably saw me pulling the chair over.  Is your attorney to my right (indicating)?

A.    Yes.

Q.   In responding to your motion to quash the subpoena, did the US Attorney's office represent to the Court that it was only going to be seeking statements that you've published in your newspaper articles or on the radio?

A.   Yes, only published materials.

Q.   And you understand that my questions to you today are only eliciting -- attempting to elicit anything that you've published; is that correct?

A.   Yes.

Q.   I want you to please look at Exhibit 154, which is in one of those exhibit books.

A.   Okay.  Got it.

Q.   What is it?

A.   A newspaper article.

Q.   Who wrote that newspaper article?

A.   Me.

Q.   What is the date of the article?

A.   September 29, 2011.

Q.   Did you interview Mr. Baca before writing this article?

A.   Yes.

Q.   When did you interview him?

A.   The day before.

Q.   And, Mr. Faturechi, I'm not moving that into evidence, but just let me know if looking at that document will refresh your recollection about whether something is published at any point

through my questioning.  Okay?

I'm sorry.  You said that you did interview him the day before it was published?

A.   Yes.

Q.   And where did you interview him?

A.   At the headquarters for the L.A. County Sheriff's Department at the time.

Q.   Did anyone else participate in the conversation you had with Mr. Baca for that interview?

A.   No.

Q.   What was the subject matter of your interview of Mr. Baca?

A.   The FBI sting.

Q.   And what do you mean by "the FBI sting"?  What do you mean by "sting"?

A.   Are you asking me to define the word "sting"?

Q.   Yes, please.

A.   You know, an operation that's done undercover, you know, as part of an investigation.

Q.   And when you said "the FBI sting," was there a particular sting that you're referring to?

A.   Yes.

Q.   And what is that?

If I can make it easier for you, are you talking about the FBI sting involving the sheriff's department?

A.   Yes.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Q.    Did you speak with Mr. Baca at that time about what two
investigators within his department had done in response to the
FBI agent involved in the investigation?

A.    Yes.

Q.    And what did he say?

A.    Can you be more specific?

Q.    Sure.  Did he tell you what two sheriff's investigators
had done in response to the FBI sting?

A.    Yes.  He said that they went to the home of the FBI agent
involved.

Q.    Did Mr. Baca tell you what the FBI agent did when his
investigators confronted the agent at her home?

A.    Yes.

Q.    What did he say?

A.    She referred the investigators to her supervisors.

Q.    Did Mr. Baca tell you whether he knew that his
investigators would go to the agent's home to confront her?

A.    Can you repeat the question?

Q.    Did Mr. Baca tell you whether he knew beforehand that his
investigators would go to the agent's home to question her?

A.    Yes.

Q.    What did he say?

A.    That he did.

Q.    And what do you mean by "he did"?

A.    That he did know.

Q.   Did he say -- you said that he did know.  Did he say how he knew?

A.   I don't understand the question.

Q.   Did he inform you whether he provided any directions or orders to those investigators?

MR. HOCHMAN:  Objection.  Leading, Your Honor.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  Can you repeat the question?

BY MR. FOX:

Q.   Did Mr. Baca tell you whether he provided any directions or orders to the investigators?

A.   That he had.

Q.   And what did he say about what those orders were?

A.   Can you be more specific?

Q.   Sure.  Did he say whether he sent the investigators to her home?

A.   Yes.

Q.   What did he say?

A.   That he had.

MR. FOX:  One moment.

BY MR. FOX:

Q.   Just so I'm clear, was that that he -- Mr. Baca had told you that he had sent investigators to the agent's home?

A.   Yes.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

MR. FOX:  Your Honor, I'm putting on our calendar -- actually, I can do it when this witness is off, but we'll put on the calendar "Baca talks to the LA Times" on September 28th.

No further questions, Your Honor.

MR. HOCHMAN:  Can I have a moment, Your Honor?

THE COURT:  Yes.

MR. HOCHMAN:  No questions, Your Honor.

THE COURT:  All right.  Sir, you may step down.

THE WITNESS:  Thank you.

MR. FOX:  Your Honor, may we have a quick sidebar?

THE COURT:  Yes.

*(Proceedings held at sidebar under seal 1:20 P.M.)*

*(The following proceedings were held in open court.)*

THE COURT:  All right.  Ladies and gentlemen, I think we're going to end for the day.

Again, I want to remind you until this trial's over you are not to discuss this case with anyone, including your fellow jurors, members of your family, the people involved in the trial, or anyone else, nor are you allowed to permit others to discuss the case with you.  If anyone approaches you and

tries to talk with you about this case, please let me know about it immediately.

Do not read, watch, or listen to any news stories or articles or any radio or television reports about the case or about anyone who has anything to do with it.

Do not do any research, such as consulting dictionaries, searching the internet, or using other reference materials, and do not make any investigation about the case on your own.

If you need to communicate with me, simply give a note to the clerk.

And do not make up your mind about what your verdict should be until after you've gone into the jury room to decide the case and you and your fellow jurors have discussed the evidence.  Keep an open mind until then.

We're going to resume on Monday at 8 o'clock.  Thank you very much.

THE CLERK:  All rise.

*(Jury out at 1:22 P.M.)*

*(The following was heard outside the presence of the jury.)*

THE COURT:  All right.  Is there anything we need to take up?

MR. FOX:  No.  Just so you are aware, we are on track to, I think, rest no later than the end of the day Tuesday.  We

may be able to rest before then, but we're hoping at the very latest by end of the day Tuesday.

THE COURT:  Okay.  So I guess we'll have a better idea on Monday how your case is proceeding.

And if the defense is going to put on a case, I would assume that you'll have -- depending on how things go on Monday, you'll either have people here Tuesday and/or Wednesday.

MR. HOCHMAN:  Yes, Your Honor.  I'll talk to the government.  If they think their case is going to finish on Monday early, I'll have people Monday.  Obviously, I'd just as soon not inconvenience them if the government is pretty confident --

THE COURT:  I don't think Monday is the issue.  I think it may be Tuesday.

MR. HOCHMAN:  All right, Your Honor, I'll make sure my folks are ready on Tuesday.

Your Honor, I wanted to -- and I don't know if I was clear at the sidebar, but I wanted to make sure I am at least on the record.

The limiting instruction that you gave, I'd like to go on the record, object to it.  It's something that I've objected to before.  I don't know if that objection sort of rolled into that instruction, as well, but for the record, I'd like to have objected to -- or object to it, Your Honor.

MR. FOX:  Your Honor, Mr. Hochman did not object to it before you gave the instruction.  I don't know what he's referring to in terms of objecting to it before.  He was given the opportunity to object and did not object to it.

THE COURT:  Yeah, I read it to you.  You know, that's like playing golf and hitting one, you know, out of bounds and then taking a Mulligan.  If you've got an objection, you need to make it.  That's why I read it to you before I read it and, you know --

MR. HOCHMAN:  Appreciate it, Your Honor.

THE COURT:  -- you're much too experienced to --

All right.  Everybody have a nice weekend and we will see everybody on Monday.

*(Evening recess taken at 1:26 p.m.)*

--oOo--

CERTIFICATE


I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.


Date: AUGUST 11, 2017


                    /s/  Cindy L. Nirenberg, CSR No. 5059

                              Official Court Reporter

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA