UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE PERCY ANDERSON, U.S. DISTRICT JUDGE

- - -

UNITED STATES OF AMERICA,          )
                                   )
                PLAINTIFF,         )
                                   )
        vs.                        ) No. CR16-66(A)-PA
                                   )
LEROY BACA,                        )
                                   )
                DEFENDANT.         )
_____)

REPORTER'S TRANSCRIPT OF JURY TRIAL

DAY 9

PAGES 1670-1873

LOS ANGELES, CALIFORNIA

MONDAY, MARCH 6, 2017

8:04 A.M.

_____

CINDY L. NIRENBERG, CSR 5059, FCRR
U.S. Official Court Reporter
350 W. 1st Street, #4455
Los Angeles, CA 90012
*www.msfedreporter.com*

APPEARANCES OF COUNSEL:


FOR THE PLAINTIFF:
                        OFFICE OF THE UNITED STATES ATTORNEY
                        BY: BRANDON FOX,
                            ASSISTANT U.S. ATTORNEY
                            EDDIE A. JAUREGUI,
                            ASSISTANT U.S. ATTORNEY
                            LIZABETH A. RHODES,
                            ASSISTANT U.S. ATTORNEY
                        312 NORTH SPRING STREET
                        13TH FLOOR
                        LOS ANGELES, CA 90012
                        213-894-2434


FOR THE DEFENDANT:
                        MORGAN LEWIS & BOCKIUS
                        BY: NATHAN J. HOCHMAN, ATTORNEY AT LAW
                            BRIANNA L. ABRAMS, ATTORNEY AT LAW
                        THE WATER GARDEN
                        1601 CLOVERFIELD BOULEVARD
                        SUITE 2050 NORTH
                        SANTA MONICA, CA 90404
                        310-255-9025


ALSO PRESENT:
                        LEAH TANNER, FBI SPECIAL AGENT

I N D E X

*GOVERNMENT'S WITNESSES:*                    *PAGE*

MICHAEL HANNEMANN

    DIRECT BY MR. JAUREGUI              1680

    CROSS BY MR. HOCHMAN                1693

    REDIRECT BY MR. JAUREGUI            1708

    RECROSS BY MR. HOCHMAN              1708


JOHN TORRIBIO

    DIRECT BY MR. JAUREGUI              1713

    CROSS BY MR. HOCHMAN                1720


LEAH TANNER

    DIRECT BY MR. FOX                   1726


*FURTHER PROCEEDINGS*

DISCUSSION HELD OUTSIDE PRESENCE OF JURY 1674

DISCUSSION HELD AT SIDEBAR              1710

DISCUSSION HELD AT SIDEBAR              1727

DISCUSSION HELD OUTSIDE PRESENCE OF JURY 1727

DISCUSSION HELD AT SIDEBAR              1749

DISCUSSION HELD AT SIDEBAR              1807

DISCUSSION HELD OUTSIDE PRESENCE OF JURY 1819

DISCUSSION HELD AT SIDEBAR              1826

DISCUSSION HELD OUTSIDE PRESENCE OF JURY 1865

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

E X H I B I T S

| GOVERNMENT'S EXHIBITS | MARKED | ADMITTED |
|---|---|---|
| 2 | | 1726 |
| 88 | | 1679 |
| 92 | | 1679 |
| 94 | | 1829 |
| 96-97 | | 1679 |
| 99 | | 1831 |
| 100 | | 1679 |
| 132 | | 1790 |
| 156-158 | | 1838 |
| 170 | | 1838 |
| 172 | | 1838 |
| 181 | | 1838 |
| 210 | | 1836 |
| 211-212 | | 1838 |

| DEFENDANT'S EXHIBITS | MARKED | ADMITTED |
|---|---|---|
| 540 | | 1679 |

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES, CALIFORNIA; MONDAY, MARCH 6, 2017

8:04 A.M.

- - - - -

*(The following was heard outside the presence of the jury.)*

THE CLERK:  Item 1, CR 16-66(A)-PA, USA versus Leroy Baca.

Counsel, please state your appearances.

MR. FOX:  Good morning, Your Honor.  Brandon Fox and Lizabeth Rhodes on behalf of the United States.  Mr. Jauregui is walking in right now, Eddie Jauregui, on behalf of the United States.  Also with us at counsel table is Special Agent Leah Tanner of the FBI.

THE COURT:  Good morning.

MR. HOCHMAN:  Good morning, Your Honor.  Nathan Hochman and Brianna Abrams on behalf of defendant, Leroy Baca, who is present.

THE COURT:  Good morning.

I think as we were leaving Friday, there was an objection tendered to some evidence that had been admitted earlier in the trial.  And I think the record wasn't exactly clear how the Court disposed of that attempt to offer a late objection.  And the Court ruled that that objection had been waived because it wasn't timely.

And, you know, one of the reasons that we insist upon

timely objections is to provide the Court -- or one of the purposes for timely objections is to provide the Court with an opportunity to take corrective action.  So to the extent the record is not clear, that objection was overruled because it was not timely.

I think we're missing one juror.

*(The Court and clerk confer off the record.)*

THE COURT:  I believe the juror that's missing is Alternate 2, so we'll see -- we'll wait a few minutes to see if their -- their status is clarified.  The parties provided a limiting instruction.  And one of the problems I have with this limiting instruction -- and this goes to the beating -- that the defendant is not on trial for any conduct, defenses or allegations of inmate beatings or deputy abuse that are not charged in the indictment.

Well, I don't think there's any beatings that are charged in the indictment, for one thing.  The only thing you are to determine is whether the defendant is guilty or not guilty of the charges in the indictment.  That is correct insofar as it goes, but there may be -- for example, the jury can consider those beatings as it relates to these charges.

For example, in the Thompson case, the Ninth Circuit held that those beatings were relevant to show why the government did what it did.  In other words, it may meet that allegation that this was just some sort of agency feud between

two governmental entities.  So I think we probably need to add something to this instruction.

MR. FOX:  And, Your Honor, at this point, I don't think we're going to be calling Gilbert Michel or William David Courson.  So I'm not sure if Mr. Hochman is still asking the Court to read that instruction at this point to the jury.

MR. HOCHMAN:  Yeah, I think, Your Honor, to the extent -- that's correct.  My understanding is that they're actually not going to call those two witnesses in this trial who would have otherwise testified to fairly graphic beatings.

I think to the extent that Special Agent Tanner's testimony deals with it in a very general level, in other words, she spoke to a bunch of inmates, they gave her the allegations and that's why she did her investigation, I think that, based on the US versus Thompson case, would be testimony that would be relevant to establish, as Your Honor has mentioned, why she did her investigation.

And to the extent that she doesn't go beyond that and get into gory details of each beating -- and I don't anticipate she will, but that would be a situation, Your Honor, where I think we would need to revisit a limiting instruction at that point.

THE COURT:  Okay.

MR. FOX:  Your Honor, I've provided to your clerk something that the parties have -- or that I have sent to

Mr. Hochman.  He sent me his response this morning, but I was up in court, so I didn't receive it.  It's two supplementary proposed instructions.

I will file this once I have Mr. Hochman instructions -- or objections, excuse me.  I will file it tonight, but it may come up in Special Agent Marx's testimony that Mr. Hochman cross-examines her on many of her decisions that she made and the FBI made throughout the investigation.

So it may be appropriate to read something similar to Proposed Instruction No. 1 to the jury that I've just provided to you and I will file tonight.

THE COURT:  Okay.  I believe Alternate No. 2 has arrived.

Who is your first witness?

MR. HOCHMAN:  Does Your Honor -- I don't know -- we have a response in writing that we prepared for the instruction, Your Honor.  If Your Honor's not going to give it during Agent Tanner's testimony, then no argument is needed at this point, but if you are inclined to do it, I'd like to respond.

THE COURT:  Who's the first witness this morning?

MR. JAUREGUI:  It's Mike Hannemann, Your Honor.

THE COURT:  So I guess we don't need to decide this issue --

MR. FOX:  I believe that Special Agent Tanner will

not be crossed, if at all, today until we've had two breaks.

So I think that's -- there is plenty of time to discuss this.

THE COURT:  Mr. Hochman, is there any reason to go into this if we are going to have time?

MR. HOCHMAN:  No, Your Honor.  We can certainly -- I just wanted to make sure I got heard before the Court made a decision on giving it or not giving it.

THE COURT:  Okay.

All right.  Let's bring the jury in.

Who is going to follow Mr. Hannemann?

MR. FOX:  Judge John Torribio.  And then it will be Special Agent Tanner.

(Jury in at 8:13 A.M.)

THE COURT:  Good morning, ladies and gentlemen.

THE JURY:  Good morning.

THE COURT:  All right.  If you'd call your next witness, please.

MR. FOX:  Yes, Your Honor, before Mike Hannemann takes the stand, the parties have reached a stipulation as to the authenticity of the following exhibits, specifically Exhibits 88, 92, 100, 96, 97, 501, 503 and 540, that these are authentic records of the sheriff's department that were turned over pursuant to grand jury subpoenas.

And with respect to Government's Exhibits 88, 92, 100, 96 and 97 and Defense Exhibit 540, the parties move to

have those exhibits placed in evidence, Your Honor.

MR. HOCHMAN:  No objection, Your Honor.

THE COURT:  All right.  They will be received.

Ladies and gentlemen, the parties have agreed to certain facts that have been stated to you.  You should therefore treat these facts as having been proved.

*(Government's Exhibit 88 admitted into evidence.)*

*(Government's Exhibit 92 admitted into evidence.)*

*(Government's Exhibit 100 admitted into evidence.)*

*(Government's Exhibits 96-97 admitted into evidence.)*

*(Defendant's Exhibit 540 admitted into evidence.)*

MR. JAUREGUI:  Your Honor, the United States calls Mike Hannemann.

THE CLERK:  Please raise your right hand.

Do you solemnly swear that the testimony you shall give in the cause now before this Court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

THE CLERK:  Please be seated.

Please state your full name and spell your last name for the record.

THE WITNESS:  My name is Michael William Hannemann. My last name is H-A-N-N-E-M-A-N-N.

MR. JAUREGUI:  May I proceed, Your Honor?

THE COURT:  Yes.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

MICHAEL HANNEMANN,

having been first duly sworn,

testified as follows:

DIRECT EXAMINATION

BY MR. JAUREGUI:

Q.   Mr. Hannemann, how are you employed?

A.   I am a lieutenant with the Los Angeles County Sheriff's Department.

Q.   And how long have you been with the sheriff's department?

A.   Just over 28 years.

Q.   And where do you work now?

A.   I am the detective bureau lieutenant at Compton sheriff's station in the City of Compton.

Q.   Was there a time, Lieutenant Hannemann, where you served as an executive aide within the sheriff's department?

A.   Yes, there was.

Q.   When was that?

A.   It was from January 2011 through May 2013.

Q.   And who were you an aide to?

A.   I was the executive aide to Sheriff Baca.

Q.   Where was your office located?

A.   I worked in a cubicle outside the sheriff's office in our headquarters building in Monterey Park.

Q.   Did you work on a specific floor?

A.   Yes.  It was on the fourth floor.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

Q.   And what were your duties as an aide to the defendant, Mr. Baca?

A.   It was a pretty lengthy list.  I would greet and receive all incoming visitors that were part of the sheriff's calendar. I would deal with people that were trying to come in and see the sheriff unannounced.  I would answer phone calls that were coming into the sheriff's office.  I would receive and go through all the incoming mail to the sheriff and direct it to where it needed to go accordingly.

I would assist the executive assistant, who was a commander, with the sheriff's e-mails.  I would prepare proclamations and certificates for different department members as well as community people.  And I would also assist with sheriff's department correspondence that was going out of the sheriff's office.

Q.   Focusing on the e-mails, Lieutenant Hannemann, when you said you would go through the e-mails, what would you do exactly?

A.   The sheriff himself, he did not read the e-mails.  He didn't access e-mails at all.  That was up to the commander and myself to do.

We would read through all of the incoming e-mails and delete the spam ones, because there was a large number of them. And then any of the things that needed to be actioned, we would forward it to the appropriate area of the sheriff's department.

And areas that needed to be addressed to the sheriff, I would give those to the commander, and if he deemed appropriate, they would go into the sheriff's read file.

Q.   And you said the defendant did not access e-mail; is that right?

A.   I'm sorry.  Say again.

Q.   I think you used the word "access" e-mail, that he did not access e-mail?

A.   Correct.

Q.   Would that mean that he didn't send e-mails himself?

A.   I never saw him send any e-mails, and he did not have a computer in his office.

Q.   And, Lieutenant Hannemann, shifting focus a little bit, in your time as an aide to Mr. Baca, were you aware -- or do you know if he stayed apprised of the news?

A.   Yes, he did.

Q.   And how did he do that?

A.   Well, one of the ways was that it was a requirement that the driver would have the current copy -- that day's copy of the LA Times on the dash of the car so when we picked up the sheriff, he would be able to have that.

       And then part of our office duties was we received copies of that.  And if there was information pertaining to the sheriff's department, the executive assistant, the commander, would cut that out and place that in the read file for him as

well.

Q.   And do you know, Lieutenant Hannemann, if Mr. Baca took steps to keep track of newspaper articles pertaining to the sheriff's department?

A.   I'm not sure if he -- like a folder or something like that?

Q.   No.  No.

I believe you testified that you would cut out articles relating to the sheriff's department?

A.   Right.

Q.   And what would you do with those?

A.   As I previously said, they would be put into the sheriff's read file.

Q.   Okay.  Maybe I -- I apologize.

Now, directing your attention, please, to Exhibit No. 162 [sic], which is in evidence.  And, Mr. Hannemann, you can just focus on your screen.  I am going to ask Agent Tanner to please put it up.

MR. JAUREGUI:  62, please.  62.

(The exhibit was displayed on the screen.)

BY MR. JAUREGUI:

Q.   And, Mr. Hannemann, can you please read the date and subject line of this e-mail, please.

A.   This e-mail was on September 25th, 2011, at 9:20 a.m. and 39 seconds.  And the subject line reads, "FBI investigating

reports of beatings in Los Angeles County jails - LA Times.com."

MR. JAUREGUI:  And I'm just going to put these calendars up, Your Honor.

And I'm going to put the magnet that says "Newspaper reports" on September 25th.

BY MR. JAUREGUI:

Q.   Now, Lieutenant Hannemann, when you initially started as the sheriff's aide, who -- when did you initially start?  You said January 2011?

A.   That's correct.

Q.   And who was the undersheriff at that time?

A.   The undersheriff was Undersheriff Waldie.

Q.   And what role does the undersheriff play in the department?

A.   The undersheriff is the Number 2 person in the department. It would be like basically our vice president.

Q.   And focusing on the months after you became the aide, was there a time where Mr. Waldie was -- or what did you notice about Mr. Waldie's time in the office?

A.   When I came to work in the sheriff's office, Mr. Waldie was out with some kind of illness.

Q.   Who was filling in, if anyone, for Mr. Waldie while he was out?

A.   It appeared to be Assistant Sheriff Tanaka.

Q.    Why do you say "It appeared to be Assistant Sheriff Tanaka"?

A.    Just through the actions and what I and we in the office would see.  The sheriff was dealing with Mr. Tanaka regularly.

Q.    And was there a time when Mr. Waldie retired?

A.    Yes, there was.

Q.    Approximately when was that?

A.    I am going to say probably about six months after my arrival there.

Q.    And what happened after he retired?

A.    Mr. Tanaka was promoted to undersheriff.

Q.    Who promoted him to undersheriff?

A.    The sheriff.

Q.    Before he retired -- before Mr. Waldie retired, did you notice anything change with respect to the relationship between Mr. Waldie and Mr. Baca?

A.    When Mr. Waldie came back from being out on his illness, I didn't see the sheriff deal with Mr. Waldie hardly at all. Most of his dealings were always with Mr. Tanaka.

Q.    Directing your attention now to the August 2011 time period, did you hear anything around that time, Mr. Hannemann, about a cell phone being found in Men's Central Jail?

A.    Yes, I did.

Q.    And in this same time period, we're talking about August 2011, did you notice anything different about Mr. Baca's mood?

A.    He seemed agitated, upset.

Q.    And what about Mr. Tanaka?  Did you have opportunities to observe him?

A.    Yes, I did.

Q.    And what about his mood?

A.    It was the same; it was agitated.

Q.    And did you ever ask about any -- what was happening, why the changes were occurring?

A.    I asked other people, but neither of the previously mentioned.

Q.    Why not?

A.    I was a sergeant and they were an undersheriff and the sheriff, and it wasn't my place to confront them about something like that.

Q.    Did you notice anything about how Mr. Baca and Mr. Tanaka were conducting meetings in this August -- in the, let's say, August and September 2011 time period?

A.    During this time period, there were frequent meetings.

Q.    And did you notice anything different about those meetings, how they were being conducted?

A.    The frequency was irregular, and it was usually the same people.

Q.    Who were those people, Lieutenant Hannemann?

A.    It was the sheriff, Undersheriff Tanaka, Captain Carey, Lieutenant Leavins and Lieutenant Thompson.

Q.   And did you know Lieutenant Leavins and Captain Carey to be from ICIB?

A.   Correct.

Q.   What about Lieutenant Thompson; where was he from?

A.   He worked in the jail investigations unit in custody.

Q.   How -- let's focus first on Greg Thompson.

How frequently was he coming to these fourth-floor meetings with Mr. Baca or Mr. Tanaka?

A.   I don't remember exactly, but I think he was here -- or I should say he was present in those meetings --

MR. HOCHMAN:  Objection.  Calls for speculation at this point.

THE COURT:  Just tell us what you do, in fact, remember, if anything.

THE WITNESS:  I remember him being there more than once, but I can't say exactly how many.

BY MR. JAUREGUI:

Q.   Would he meet with Mr. Baca alone?

A.   No.

Q.   Would he meet with Mr. Baca and Mr. Tanaka together?

A.   Correct.

Q.   What about Captain Carey?

A.   That would be the same.

Q.   How frequently was he coming up?

A.   He was there regularly the first week, and then his visits

tapered off.

Q.    What about Lieutenant Leavins, Mr. Hannemann?

A.    Mr. Leavins was there more than the others.

Q.    And how regularly was that?

A.    In the first week, I would say he was there every day.

Q.    And after that?

A.    Probably half of the next week and then weekly.

Q.    And where were these meetings taking place?

A.    They would take place either in the sheriff's office or in the executive planning committee room, which is the conference room.

Q.    When would they take place in the sheriff's office?

A.    It wasn't a predetermined time.  It just depended on whether there was too many people or -- the sheriff felt there was too many people to be in the sheriff's office or if he just preferred to go down into the conference hall.

Q.    Lieutenant Hannemann, I am publishing what's in evidence already as Exhibit No. 139.

    (The exhibit was displayed on the screen.)

BY MR. JAUREGUI:

Q.    Could you just point out for the jury where was the sheriff's office.  And maybe you can use the words "office of the sheriff" as your reference point.

A.    Well, using the words "office of the sheriff" and then it's got the circled number 9 next to it, if you continue to

the right, you can see that door leading to that lower right-hand corner office that I believe is --

Q.   I am circling that.  Is that --

A.   449, is that what this is?

Q.   Is it what I just circled?

A.   Yes.  Where you circled, that is the sheriff's office.

Q.   And where would you sit?

A.   I was in the second cubicle just outside the door right above where it says "office" and "office of the sheriff."

Q.   Is that it (indicating)?

A.   Where you circled, yes.

Q.   And where was the office of the undersheriff?

A.   If you look in the center at the bottom, where it says, "U/S office" is the undersheriff's office.

Q.   Okay.  And the meetings that -- you said sometimes they would occur in Mr. Baca's office and sometimes in the conference room?

A.   Correct.

Q.   Where is the conference room?

A.   It is to the left of the undersheriff's office, where it says, "800 SF" in the middle of what is a table.

Q.   And did this conference room have a name?

A.   It was just called the EPC room, or the executive planning committee room.

Q.   Did you have an opportunity to observe meetings involving

all of these individuals, meaning Leavins, Carey, Thompson,

Tanaka and Mr. Baca?

A.    Yes, but not the meetings themselves.

Q.    And generally where did those meetings take place?

A.    That many people usually were in the EPC room.

Q.    Mr. Hannemann, did Mr. Baca keep a calendar?

A.    Yes, he did.

Q.    And did he personally do it or did someone else do it?

A.    Someone else did it.

Q.    And who kept his calendar?

A.    The primary person that was responsible for the sheriff's

calendar was one of our professional staff named Suzie Martin.

Q.    And was there anyone else who kept it?

A.    Her assistant was Julie Montgomery.

Q.    The meetings that you were describing between Mr. Thompson

and Mr. Baca, Mr. Carey and Mr. Baca, and Mr. Leavins and

Mr. Baca, would those meetings be recorded in the sheriff's

calendar?

A.    The way these came up, they did not make it to the

calendar.

Q.    And when you say "the way these came up," what do you mean

by that?

A.    Because they were brought together right before they

happened rather than being prescheduled.

Q.    What about meetings between Mr. Tanaka and Mr. Baca around

the time that the cell phone was found?  Did you notice anything change about the number of meetings that Mr. Baca and Mr. Tanaka had?

A.    Mr. Tanaka was meeting with the sheriff frequently.

Q.    And were these meetings open-door or closed-door meetings?

A.    They were closed-door.

Q.    What about the other meetings involving Carey, Thompson and Leavins and Tanaka, were those open-door meetings or closed-door meetings?

A.    I saw only closed doors.

        MR. JAUREGUI:  And I'm just going to put these magnets that say "Closed meetings" on the side of the calendar here (indicating), if I can get them to stick.

BY MR. JAUREGUI:

Q.    And were -- these meetings with Mr. Tanaka, would those be on the sheriff's calendar?

A.    No, they wouldn't.

Q.    Why is that?

A.    Because frequently Mr. Tanaka would come over and ask for time with the sheriff, and he would just be fit in.

Q.    Because these were closed-door meetings, did you have an opportunity to hear what they were talking about, Mr. Hannemann?

A.    No.

Q.    Did you hear anything -- at the times that they were

meeting in August and September of 2011, did you hear anything when you were outside in this area, in your cubicle area?

A.   I just heard loud outbursts of a voice.

Q.   And whose voice was it that you were hearing?

A.   It was the sheriff's.

MR. JAUREGUI:  One moment, Your Honor.

BY MR. JAUREGUI:

Q.   Just a couple other questions, Mr. Hannemann.

You talked about a read file.  Would you explain to the jury what a read file is.

A.   Like e-mails and other mail correspondence that would come in -- the sheriff kept a very tight calendar, so he didn't have time to just be handed letters or e-mails arbitrarily throughout the day.  So a system that had been devised long before I got there was the read file.

He had a green folder and a red folder.  The green was routine-type correspondence information, and the red was priorities.  And based on the nature of whatever needed to be brought to the sheriff's attention was put into one of those folders by the commander.

Q.   And then you also mentioned that the defendant was meeting frequently with Mr. Tanaka, and, again, during this August/September time period.

What did you mean by "frequently"?  How often were they meeting?

A.   In the first week, Mr. Tanaka was meeting with the sheriff every day and more than one time a day.

Q.   Approximately how many times a day?

A.   I'd say up to as many as five initially.

MR. JAUREGUI:  No further questions, Your Honor.

THE COURT:  All right.

Cross-examination.

MR. HOCHMAN:  May I proceed, Your Honor?

THE COURT:  Yes, please.

CROSS-EXAMINATION

BY MR. HOCHMAN:

Q.   Mr. Hannemann, you were the sheriff's executive aide from January 2011 to May 2013; is that correct?

A.   Yes, sir.

Q.   And you say you were with the department 28 years up to about this point?

A.   Yes, sir.

Q.   Now, before you were the sheriff's aide, what were the different positions that you had in the sheriff's department?

A.   Prior to coming to this sheriff's office, I was a sergeant in narcotics bureau.

Q.   And before that?

A.   And before that, I was a sergeant at two different patrol stations.  Before that, I was a use-of-force instructor in our training bureau.  And before that, I was a patrol deputy and

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

training officer.  And before that, I was a custody deputy.

Q.    Now, as a sheriff's aide, you spent a lot of time with the sheriff; is that correct?

A.    That's correct.

Q.    Both inside the sheriff's headquarters building and outside the sheriff's headquarters building, correct?

A.    That's correct.

Q.    You would travel when the sheriff would go to different places in the county; is that correct?

A.    At times, yes.

Q.    And he would meet with community organizations and religious groups; is that right?

        MR. JAUREGUI:  Objection.  Relevance.

        THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.    Well, part of the duties that you had were responding to community organizations or religious groups that wanted to have dealings with the sheriff; is that correct?

        MR. JAUREGUI:  Objection.  Relevance.

        THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.    Well, you said that one of your duties dealt with receiving and greeting incoming visitors to the sheriff's office; is that correct?

A.    That's correct.

Q.   Did that include members of community organizations and
religious organizations as well?

MR. JAUREGUI:  Same objection, Your Honor.

THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.   And you also said that you prepared certificates for
community people; is that correct?

A.   That's correct.

Q.   And that would be in connection with different community
organizations?

MR. JAUREGUI:  Objection, Your Honor.  Relevance.

THE COURT:  You can answer that one question.

THE WITNESS:  Yes, at times.

BY MR. HOCHMAN:

Q.   Now, the sheriff's department had 18,000 employees,
correct?

A.   Correct.

Q.   And you were familiar with the different parts of the
sheriff's department while you were the executive aide for
Sheriff Baca?

A.   Yes.  I learned most of it, yes.

MR. HOCHMAN:  Can we put Government's Exhibit 108, if
I may ask Special Agent Tanner --

(Counsel confer off the record.)

MR. FOX:  I can put it up for you, though.  108?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

MR. HOCHMAN:  Actually, we will use the big chart instead.

May I have a moment, Your Honor?

May I approach the court clerk, Your Honor?

THE COURT:  Yes.

MR. HOCHMAN:  Thank you, Your Honor.

And if I might just set up the easel.

Thank you very much.

BY MR. HOCHMAN:

Q.    And you see Defense Exhibit 518 before you?

A.    Yes, sir.

Q.    Is that a fair and accurate representation of the organization chart in August and September of 2011 of the sheriff's department?

A.    I believe so.

Q.    Now, the sheriff is at the very top of the department, correct?

A.    That is correct.

Q.    And that was Sheriff Lee Baca?

A.    That's correct.

Q.    And underneath him was the undersheriff, is that correct, who you described as sort of a vice president?

A.    Correct.

Q.    Now, the sheriff and the undersheriff are basically in charge of everything below them on that chart; is that correct?

A.    That is correct.

Q.    And that includes, for instance, the administrative services division that controls the budget, correct?

A.    That's correct.

Q.    And the budget for the sheriff's department was about 2.4 billion?

            MR. JAUREGUI:  Objection, Your Honor.  Relevance and foundation.

            THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.    Do you know approximately what the budget was for the sheriff's department at that time?

            MR. JAUREGUI:  Objection, Your Honor.  Relevance.

            THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.    Now, the sheriff's department was in charge of the 23 different -- excuse me.

            The sheriff and the undersheriff were in charge of the 23 different patrol stations spread throughout the county; is that correct?

A.    That's correct.

Q.    And they were also in charge of all the detective divisions ranging from narcotics, homicide, major crimes, and special victims, correct?

A.    Correct.

Q.   And they were also in charge, the sheriff and the

undersheriff, of all the divisions within the Homeland Security

division that ranged from emergency operations to community

colleges; is that correct?

A.   That's correct.

Q.   And then they were also in charge of the technical

services division, and that was all of the technical parts of

the sheriff's department; is that correct?

         MR. JAUREGUI:  Objection, Your Honor.  Relevance at

this point, and cumulative.

         THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.   Well, they are in charge of the jail system; isn't that

correct?

A.   Correct.

Q.   And there was actually not just one jail, the Men's

Central Jail, but seven jails spread throughout the county; is

that correct?

A.   Yes.

Q.   And then there was additional detention centers as part of

the jail system; is that right?

A.   Yeah, each one of the sheriff stations.

Q.   And the sheriff and the undersheriff were responsible

every day for all the stuff -- all the stuff that you've talked

about dealing with the sheriff's department, correct?

A.    Correct.

Q.    And issues would come up regarding these various aspects
of the sheriff's department every day, correct?

A.    Correct.

Q.    And Undersheriff Tanaka and Sheriff Baca would then have
to deal with all the issues that occurred, dealing with all
these different parts of the sheriff's department, when they
came up on a particular day, correct?

A.    Correct.

Q.    And they would periodically meet behind closed doors to do
that; isn't that correct?

A.    Correct.

Q.    And you couldn't hear what was going on in those
closed-door meetings, correct?

A.    That's correct.

Q.    So you don't know whether or not, in a particular
closed-door meeting, they are dealing with all the stuff that's
involved in running the sheriff's department or dealing with a
particular aspect of a cell phone investigation, correct?

A.    Correct.

Q.    Now, you mentioned that -- you talked about a Lieutenant
Steve Leavins; isn't that correct?

A.    Yes.

Q.    Now, Lieutenant Steve Leavins was Undersheriff Tanaka's
aide, correct?

A.   At one time.

Q.   In fact, he was in the same position for Undersheriff Tanaka that you were for Sheriff Baca, the executive aide; is that correct?

A.   That's correct.

Q.   And you said that you saw in the first week -- and by the way, when you say "the first week," that was the first week that the cell phone was discovered; is that correct?

A.   That's correct.

       MR. JAUREGUI:  Objection.  Vague, Your Honor.  Move to strike.

       THE COURT:  Sustained.  The answer is stricken.  The jury should disregard it.

BY MR. HOCHMAN:

Q.   What did you mean, "the first week"?

A.   That time frame when we started to notice -- or I actually started to notice the agitated state of our executives.

Q.   Now, was that around the time that the FBI notified Sheriff Baca that the cell phone was an FBI cell phone, if you know?

A.   I don't know.

Q.   I'm sorry?

A.   I don't know.

Q.   Well, would it be approximately the middle of August -- would that be an approximate figure [sic] as to where these

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

meetings in the first week occurred?

A.   Yes.

Q.   Now, you said that, with respect to Mr. Carey, for instance, the meetings after the first week tapered off, correct?

A.   Correct.

Q.   And with respect to Mr. Thompson, the meetings after the first week tapered off as well; is that correct?

A.   That's correct.

Q.   And with respect to Mr. Leavins, the meetings with him tapered off as well; is that correct?

        MR. JAUREGUI:  Objection, Your Honor.  Vague.

        THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.   Now, when you were dealing with Undersheriff Tanaka and Sheriff Baca, you said that they would have many different types of conversations, correct?

A.   Yes.

Q.   And did part of those conversations involve Undersheriff Tanaka making recommendations to Sheriff Baca for who he should promote?

A.   It appeared that way.

Q.   And did you also have -- you say you talked about Sheriff Baca's e-mails, correct?

A.   Correct.

Q.   And you said Sheriff Baca didn't have a computer in his
office, correct?

A.   Correct.

Q.   He was more old school, he would actually write things
down by hand and give them to yourself, as one of his aides; is
that correct?

A.   That is correct.

Q.   But if someone wanted to contact Sheriff Baca through
e-mail, he had an e-mail address, correct?

A.   Yes, he did.

Q.   And those e-mails would go to the executive aides, like
yourself, or the commander, who was another executive aide; is
that correct?

A.   That's correct.

Q.   And then you would prepare, I think you said, a read file,
a file -- a read pile, a pile of stuff for the sheriff to read
of the e-mails being received; is that correct?

A.   Yes.  We would print out the e-mail and put it in the
file.

Q.   Now, you're familiar with the sheriff's general schedule
in August and September of 2011; is that correct?

A.   Vaguely.

Q.   Because you were talking about different meetings that
were happening in August and September of 2011, correct?

A.   Correct.

Q.    Is it correct that the sheriff was out of the country

between September 8th -- approximately between September 8th

and September 21st of 2011?

A.    I don't remember the exact time frame.

Q.    Well, was it -- well, approximately, in September of 2011,

was the sheriff out of the country?

A.    I don't remember exactly.

Q.    What do you remember?

A.    I remember him going to Israel sometime that summer, but I

don't remember the exact time frame.

Q.    Do you know if he also went to Spain?

A.    That I don't recall.

Q.    And was that for business?

A.    Yes.

Q.    Now, with respect to -- I think you talked about the floor

plan.  Do you recall when -- the prosecutor showed you the

Exhibit 139 -- 139, which was the different floor plans; was

that correct?

A.    Correct.

Q.    Now, when the sheriff was meeting with people inside of

his office, you couldn't hear what was being said, correct?

A.    Correct.

Q.    Whether that was with Mr. Carey, Mr. Tanaka, Mr. Leavins,

or Mr. Thompson, correct?

A.    Correct.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Q.   And when the people -- when various people are meeting in Undersheriff Tanaka's office, again, you couldn't hear what was actually being said; is that correct?

A.   Correct.

Q.   Now, would Sheriff Baca periodically have closed-door meetings with other people in the department?

A.   Yes.

Q.   Would he have closed-door meetings, for instance, if someone from the -- outside the department came to meet with him?

A.   Sometimes.

Q.   And during those meetings, you also couldn't hear what was being said; is that correct?

A.   Correct.

Q.   Now, the sheriff's number -- the sheriff had a number, the last four numbers of which was 5000; is that correct?

A.   That was the main line to the sheriff's office.

Q.   And if someone wanted to reach the sheriff, they could reach him through the 5000 number; is that correct?

A.   Eventually, yes.

Q.   And if someone wanted to reach the undersheriff and they called the 5000 number, would they eventually be able to reach the undersheriff?

A.   Eventually, yes.

Q.   How is that?

A.   Because it would come to us, and then we would transfer it
over to the undersheriff's secretary.

Q.   Now, you said that you were familiar with certain meetings
that happened in the EPC room, that room that was in the corner
of Government's Exhibit 139, correct?

A.   Correct.

Q.   Are you aware that certain meetings would happen every
week on a weekly basis amongst the chiefs, the assistant
sheriffs, the undersheriff, and the sheriff called the EPC
meetings, correct?

A.   Yes.

Q.   And then before these EPC meetings, there would be
pre-meetings that would be led by the undersheriff; is that
correct?

A.   That is correct.

Q.   And Sheriff Baca wouldn't be at the pre-meetings, correct?

A.   That's correct.

        MR. JAUREGUI:  Objection, Your Honor.  Relevance.

        THE COURT:  Sustained.

        MR. HOCHMAN:  May I have a moment, Your Honor?

        THE COURT:  Yes.

BY MR. HOCHMAN:

Q.   Now, Mr. Hannemann, when the sheriff would be meeting with
people in the sheriff's department, would he usually be in the
sheriff's uniform, or would he be wearing a business suit?

MR. JAUREGUI:  Objection, Your Honor.  Relevance.

THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.   Are you aware of when the -- if the sheriff ever came into the office wearing a tracksuit?

A.   The only time I ever saw the sheriff come in in a tracksuit was after he finished doing a charity run that morning -- or excuse me, the officer's memorial run.

Q.   Did you ever see the sheriff come in in a tracksuit on September -- excuse me.

Were you in the office on Saturday morning August 20 at that -- of 2011?

A.   I don't believe so.

Q.   Would it have been unusual -- does the sheriff normally where a tracksuit to work?

MR. JAUREGUI:  Objection, Your Honor.  Relevance and asked and answered.

THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.   Well, does the sheriff -- the sheriff meets with individuals -- does he meet with individuals wearing his full uniform or a business suit during the meetings that you've testified about?

MR. JAUREGUI:  Objection, Your Honor.  Relevance.

THE COURT:  Sustained.

MR. HOCHMAN:  May I have a moment with counsel?

THE COURT:  Yes.

*(Counsel confer off the record.)*

MR. HOCHMAN:  If we could show the beginning of Exhibit 102, Your Honor, to the witness.

And if we can put that on the screen.  If I may ask Special Agent Tanner to put that on the screen.

MR. FOX:  We'll see if it's working now.  I replugged it in.

MR. HOCHMAN:  And if we may play the beginning part of it, the first couple of seconds, Your Honor.

*(Playing of videotape.)*

BY MR. HOCHMAN:

Q.   I am showing you the sheriff's appearance on Good Day LA on September 26, 2011.

Is this how the sheriff generally appeared when he met with the public during August and September of 2011?

MR. JAUREGUI:  Objection.  Relevance, Your Honor.

THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.   Was the sheriff the only elected person in the sheriff's department, if you know?

A.   Yes.

Q.   And while you worked with the sheriff from January of 2011 to May of 2013, would you say that the sheriff took his job of

being the sheriff seriously?

          MR. JAUREGUI:  Objection, Your Honor.

          THE COURT:  Sustained.

          MR. HOCHMAN:  No further questions.

                    REDIRECT EXAMINATION

BY MR. JAUREGUI:

Q.    Mr. Hannemann, Mr. Hochman asked you whether the sheriff

and the undersheriff were the only two people in charge of all

of those divisions.

          Do you remember that?  On that chart?

A.    Yes.

Q.    Was Captain Carey in charge of all those divisions?

A.    No.

Q.    Was Lieutenant Thompson in charge of all those divisions?

A.    No.

Q.    Was Lieutenant Leavins in charge of all those divisions?

A.    No.

          MR. JAUREGUI:  No further questions.

          MR. HOCHMAN:  Very briefly, Your Honor.

                    RECROSS-EXAMINATION

BY MR. HOCHMAN:

Q.    Captain Carey and Lieutenant Leavins were both part of

ICIB, Internal Criminal Investigations Bureau; is that correct?

A.    Yes.

Q.    And ICIB was carrying out investigations in September of

2011; is that correct?

A.   I believe so.

Q.   And do you know if they were meeting with Sheriff Baca concerning those investigations that they were carrying out in September of 2011?

MR. JAUREGUI:  Objection, Your Honor.  Relevance and foundation.

THE COURT:  Sustained.

MR. HOCHMAN:  No further questions.

MR. JAUREGUI:  Nothing further, Your Honor.

THE COURT:  Sir, do you recall if Mr. Leavins in August of 2011 was the aide to Undersheriff Tanaka at that time?

THE WITNESS:  Yes.  Prior to him becoming the Lieutenant at ICIB, he was --

THE COURT:  No, not prior to.  In August of 2011, was Mr. Leavins the aide to Mr. Tanaka?

THE WITNESS:  Yes.

THE COURT:  Do you know who Mr. Nee is?

THE WITNESS:  Captain Chris Nee?

THE COURT:  Um-hmm.

THE WITNESS:  Yes.

THE COURT:  Was he the aide to Mr. Tanaka --

THE WITNESS:  Yes, he was.

THE COURT:  -- in August of 2011?

THE WITNESS:  I believe so.

THE COURT:  Did he have two aides in 2011, in August of 2011?

THE WITNESS:  Yeah, I believe it was that time period where Lieutenant Leavins promoted to lieutenant and left -- and I believe Chris Nee came in behind him.

THE COURT:  Okay.  Just so that I am clear, the first aide was Mr. Leavins.

THE WITNESS:  I believe so.

THE COURT:  Okay.  And then the aide became Mr. Nee?

THE WITNESS:  I believe so.

THE COURT:  Okay.  And when was Mr. Nee the aide -- when did Mr. Nee become the aide, if you know?

THE WITNESS:  Now I'm not -- thinking about it, I am not 100 percent exactly sure.  But I know he was his aide, but I don't remember the exact date.

MR. FOX:  Your Honor, if you might allow me to step in, I might be able to clear this up.  Is that okay?

THE COURT:  That's fine.

MR. HOCHMAN:  Your Honor, may I be heard at sidebar?

THE COURT:  Yep.

*(Proceedings held at sidebar under seal 8:57 A.M.)*

*(The following proceedings were held in open court.)*

THE COURT:  All right.  Anything further?

MR. JAUREGUI:  No, Your Honor.

THE COURT:  All right.  You may step down.

Call your next witness.

MR. JAUREGUI:  United States calls John Torribio.

THE CLERK:  Please raise your right hand.

Do you solemnly swear that the testimony you shall give in the cause now before this Court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

THE CLERK:  Please be seated.

Please state your full name and spell your last name for the record.

THE WITNESS:  John Albert Torribio, T-O-R-R-I-B-I-O.

MR. JAUREGUI:  May I proceed, Your Honor?

THE COURT:  Yes.

JOHN TORRIBIO,

having been first duly sworn,

testified as follows:

DIRECT EXAMINATION

BY MR. JAUREGUI:

Q.   Mr. Torribio, please tell us what you do for a living.

A.   I am a judge with the Los Angeles Superior Court.

Q.   What is the Los Angeles Superior Court?

A.   It is the state court for the County of Los Angeles.  It

goes from Lancaster to Long Beach and Malibu to Pomona.

Q.   How long have you been a superior court judge?

A.   Twenty-seven years.

Q.   What did you do before that?

A.   Private practice and a public defender.

Q.   What types of cases do you handle now?

A.   At the present time, I am what's called an open court, whatever they send me, but I still do about 60 percent criminal.

Q.   In addition to cases, do you handle requests from law enforcement agencies that are not part of a charged case?

A.   Yes.

Q.   What kinds of things do you handle?

A.   I handle ex parte orders, search warrants, ping orders, orders to release evidence, orders to release evidence for purposes of criminal investigations.

Q.   What is a search warrant?

A.   A search warrant is the right of a law enforcement agency to go into a person's residence, business, car to search for evidence.

Q.   And are search warrants obtained sometimes to search businesses or other entities?

A.   Yes.

Q.   And how many search warrants might you handle in a given week?

A.    Well, search warrants, ping orders, everything, between 50 and 75.

Q.    Directing your attention now to September of 2011.

At that time, did you know a sheriff's department sergeant named Scott Craig?

A.    Yes.

Q.    How did you know him?

A.    He would come to me for search warrants.

Q.    And do you recall him bringing you an unusual request in September of 2011?

A.    Yes.

Q.    What was that request?

A.    It was a request to search or -- or an order to turn over documents held by the FBI.

Q.    Can you describe for the jury, Mr. Torribio, how he brought that request to you.

A.    He just brought in a document, said, "I have a search warrant I'd like you to look at."  Very typical type of situation.  I read the search warrant.

Q.    Okay.  I want to turn your attention now to Exhibits 140 and 141.  And they should be in a binder next to you, Mr. Torribio.

A.    I am looking at 141.

Q.    Okay.  And what are those documents?

A.    This is the order for investigative records.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

MR. JAUREGUI:  And I'm going to publish 141, which is already in evidence.

*(The exhibit was displayed on the screen.)*

BY MR. JAUREGUI:

Q.   Okay.  What are we looking at here, sir?

A.   This is the actual order that I would sign if I thought there was probable cause, though this was an unusual way to do it.

*(Phone ringing.)*

BY MR. JAUREGUI:

Q.   Sorry, Mr. Torribio, I'm just waiting for --

Okay.  And who comes up with the language on this order?

A.   This is presented to me by the investigating agency.

Q.   In this case, the investigating agency was the sheriff's department?

A.   Yes.

Q.   And what is being asked for here?

MR. JAUREGUI:  Maybe I can just ask Special Agent Tanner to blow up the part that says, "Good cause having been shown" on the bottom half.

THE WITNESS:  Do you want me to read the whole thing?

BY MR. JAUREGUI:

Q.   Yes, sir.

A.   "Good cause having been shown, so order that the Federal

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Bureau of Investigation provide" -- thank you.

"Good cause having been shown, so order that the Federal Bureau of Investigation provide:

"1) any and all investigative reports, records, office correspondence and/or notes;

"2) investigating agents' (described herein) true identities and current assignments;

"3) locations of additional cellular telephones currently in use and/or deployed within the confines of the Los Angeles County jail system and the identities of those persons possessing said cellular phones;

"4) disclosure of any and all contraband items given to any Los Angeles County inmate, or inmates, through any means, at the direction, consent or knowledge of the FBI to include a description of the item, the identity of the inmate, and the date, time and location of occurrence, relative to any and all investigations, past or present, occurring within the confines of the Los Angeles County jail system from August 5, 2009, to present."

Q.   Now, Mr. Torribio, in addition to this proposed order, Sergeant Craig gave you another document -- did Sergeant Craig give you another document?

A.   Well, he gave me the probable cause statement, which is

necessary for this document to even be considered by the Court.

Q.   When Sergeant Craig gave you this document and the probable cause statement, what did you do with them?

A.   Well, I first read the probable cause statement.  That's the first thing I do.

Q.   And what happened when you read it?

A.   I said to Sergeant Craig, "We don't have the jurisdiction to do this."

Q.   What, if anything, did he say to you in response to that?

A.   Nothing.

          MR. HOCHMAN:  Objection.  Hearsay.  Move to strike.

          THE COURT:  Overruled.

BY MR. JAUREGUI:

Q.   Do you recall any other comments you made to him at that time?

A.   I said that the state court does not have jurisdiction over the federal government and I can't sign this order, words -- I don't remember the exact words, but that's the gist of the conversation.

          MR. JAUREGUI:  And, Agent Tanner, can I ask you to please blow up the handwritten portion of this document that we are looking at.

BY MR. JAUREGUI:

Q.   Mr. Torribio, is this your writing?

A.   Yes.

Q.    Could you please read for the jury what it says there.

A.    "Denied.  Court has no jurisdiction over any federal agency.  John A. Torribio, September 8, 2011."

Q.    Why did you write this?

A.    I wanted to write it to let them know that I had formally rejected it, not on the merits, but on the fact -- I didn't even reach the merits -- that we have no jurisdiction, we have no right to -- the state has no right over the federal government.  It is a supreme agency or government of the land.

Q.    Did Mr. Craig give you any indication that the Court would have jurisdiction over -- I'm sorry.

      Did you give Mr. Craig any indication that the Court would have jurisdiction over a criminal case of an FBI agent within the scope of her authorized duties?

A.    The exact opposite.  We would have no -- I emphasized we have no jurisdiction.

Q.    Did Mr. Craig indicate to you in any way that he was going to be seeking an affidavit -- an order for the arrest of an FBI agent?

A.    No.

      MR. JAUREGUI:  One moment, Your Honor.

      Nothing further, Your Honor.

      THE COURT:  Cross-examination.

CROSS-EXAMINATION

BY MR. HOCHMAN:

Q.   Mr. Torribio, you said that you have decades of experience in the state criminal courts; is that correct?

A.   Yes, sir.

Q.   And with respect to that, I think you said that you had dealt with a number of search warrants over the years; is that correct?

A.   Yes, sir.

Q.   Now, what Sergeant Craig was asking you for, this court order he was asking you for, was not a search warrant of the FBI's offices, correct?

A.   No, but it was the same as.

Q.   Well, it was an order that, had you signed it, would have ordered the FBI to produce documents, correct, to the LA County Sheriff's Department?

A.   Yes.

Q.   It wouldn't have allowed Sergeant Craig to go into the FBI's offices and execute a search warrant of their offices, correct?

A.   Correct.

Q.   And in order to -- I think you said in order to get one of these court orders to order the FBI to turn over their records, Sergeant Craig had to present you with a written statement of probable cause; is that correct?

A.    Yes, sir.

Q.    Let me break that down in a couple ways.

      What is probable cause?

A.    Probable cause is a reasonable suspicion that a crime might have been committed and that the person or entity whose premises you are asking to search might have relevant evidence.

Q.    And is that different than beyond a reasonable doubt?

A.    Oh, absolutely.  It's the lowest burden in the law.

Q.    And, again, it's --

A.    Excuse me.

Q.    When you say "the lowest burden in the law," what do you mean?

A.    Well, there are four basic burdens of law.  I don't --

      MR. JAUREGUI:  Objection, Your Honor.  Relevance.

      THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.    But it's the lowest burden of law.  Would you put the highest burden of law at beyond a reasonable doubt?

      MR. JAUREGUI:  Objection, Your Honor.  Relevance and asked and answered.

      THE COURT:  Sustained.

      If you see him stand up, please wait until he finishes talking.

      Next question.

///

BY MR. HOCHMAN:

Q.   Now, with respect to the fact that they have to submit to you a written statement of cause, why do they?

Why does Sergeant Craig have to submit to you a written statement of probable cause in order to get this court order?

A.   It's required by the law, by the United States Constitution.  There shall be no search warrant issued without probable cause.

Q.   Again -- and this isn't a search warrant, but it's the same concept for an order asking the FBI to turn over records, correct?

A.   I would say it's identical.

Q.   Well -- but, again, you are not just authorizing the FBI to go -- excuse me --

A.   No, I said that.  I didn't authorize them to enter the premises of any federal agency.  If I signed this, it wouldn't authorize that.

Q.   Now, is the idea behind them presenting you first with this written statement of probable cause that you could then consider the evidence they have for their request?

A.   I have no idea.

MR. JAUREGUI:  Objection, Your Honor.  Relevance.

THE COURT:  Sustained.

///

BY MR. HOCHMAN:

Q.   What is the purpose for a sergeant of the sheriff's department to submit to you a written statement of probable cause in connection with this order?

A.   I have no idea.

        MR. JAUREGUI:  Objection, Your Honor.  Relevance and form.

        THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.   Before granting an order, do you have to see the probable cause that the sergeant would have to determine whether or not you can issue the order?

A.   Absolutely.  It's a prerequisite.

Q.   And as part of that probable cause, is it important for the officer to identify their experience and training?

A.   It may or may not be.  The real issue is whether or not there's elements that would lead a reasonable judge to believe that a crime may have been committed and that the person or entity may have relevant information.

Q.   Now, the statement of probable cause, is that something that would be public -- a publicly filed document at some point?

        MR. JAUREGUI:  Objection, Your Honor.  Relevance.

        THE COURT:  Sustained.

///

BY MR. HOCHMAN:

Q.   When the statement of probable cause is submitted to you, you said you considered it before deciding whether or not to issue the order; is that correct?

A.   Yes.

Q.   And you ultimately did not issue the order; is that right?

A.   Correct.

Q.   But you didn't -- you said you didn't reach the merits of the -- of the statement -- excuse me, the merits of probable cause; is that correct?

A.   Correct.

Q.   What does that mean?

A.   That means I didn't -- I read the search warrant, realized what they were asking for and said to myself, "I can't sign this.  I don't have jurisdiction."

Q.   But when you said --

A.   I said that to myself, not to them, as I'm reading it.

Q.   Right.

        But when you say you didn't reach the merits of that, what does that mean?

A.   Well, it means, for example, if somebody comes before me with a lawsuit and they can't prove they properly served the other party so the other party has notice of the hearing, I can't hold a hearing.

Q.   I see.

But you didn't evaluate the statements as to whether or not they were accurate inside the statement of probable cause, you just determined you didn't have jurisdiction at all; is that correct?

MR. JAUREGUI:  Objection, Your Honor.  Misleading.  Relevance.  Asked and answered.

THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.   Now, with respect to everything you testified about in your dealings with this statement of probable cause and the court order, did you have any communications at the time, August and September of 2011, in any form, in-person meetings, telephone calls, e-mail, texts or whatever, with Sheriff Lee Baca?

A.   No.

MR. HOCHMAN:  No further questions.

MR. JAUREGUI:  Nothing further, Your Honor.

THE COURT:  All right.  You may step down.

THE WITNESS:  Thank you.

MR. FOX:  The United States calls Special Agent Leah Tanner.

THE CLERK:  Please raise your right hand.

Do you solemnly swear that the testimony you shall give in the cause now before this Court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

THE CLERK:  Please be seated.

Please state your full name and spell your last name for the record.

THE WITNESS:  Leah Tanner, T-A-N-N-E-R.

MR. FOX:  Your Honor, before I begin examining this witness, I move to admit what's previously been authenticated and identified as Government's Exhibits 2, Clips 15, 20, 23, 42 and 43.

MR. HOCHMAN:  I would object based on prior objections, Your Honor, before the Court.  And on that basis, I would submit.

THE COURT:  One moment.

Those objections are overruled.

*(Government's Exhibit 2 admitted into evidence.)*

LEAH TANNER,

having been first duly sworn,

testified as follows:

DIRECT EXAMINATION

BY MR. FOX:

Q.   Special Agent Tanner, are you a rookie agent?

A.   No.

MR. HOCHMAN:  I'm sorry, Your Honor.  May we have just a very brief sidebar for one second before we begin?

THE COURT:  Yes.

*(Proceedings held at sidebar under seal 9:18 A.M.)*

*(The following proceedings were held in open court.)*

THE COURT:  Ladies and gentlemen, we are going to take our first break of the morning.

Again, I want to remind you, until this trial is over, you are not to discuss this case with anyone, including your fellow jurors, members of your family, people involved in the trial or anyone else, nor are you allowed to permit others to discuss the case with you.  If anybody approaches you and tries to talk with you about this case, please let me know about it immediately.

Do not read or listen to any news reports or other accounts about the trial.  Finally, you are reminded to keep an open mind until all of the evidence has been received, you've heard the arguments of counsel, the instructions of the Court, and the views of your fellow jurors.  If you need to speak with me, simply give a note to the clerk.

We will come back at 25 til the hour.

THE CLERK:  All rise.

*(Jury out at 9:19 A.M.)*

*(The following was heard outside the presence of the*

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*jury.)*

THE COURT:  Who is the witness that follows this one?

MR. FOX:  It's Terri Tampubolon, Special Agent Terri Tampubolon.

THE COURT:  Okay.

*(Recess taken 9:20 to 9:34 A.M.)*

THE COURT:  All right.  Let's bring the jury in.

MR. HOCHMAN:  If I might raise one quick issue.

THE COURT:  Yes.

MR. HOCHMAN:  So this morning the government gave me a demonstrative aid, which is Government's Exhibit 226, which is a series of lines between -- and apparently telephone calls between Sheriff Baca, Undersheriff Tanaka, Lieutenant Thompson, Deputy Manzo, Captain Carey, a Tanaka aide, his office secretary and Martinez for five different -- separate dates involved in this case.

They then tell me that this isn't actually the demonstrative aid that they are going to show Special Agent Tanner that looks like the flat version on the paper, that there is actually an electronic version of the demonstrative aid that has different things clicking in and clicking out. They just showed it to me at the break, the actual demonstrative aid they want to show.

I have quickly been able to look at other parts of the case to see if it's accurate, but I don't know for certain

that it is, Your Honor, and I believe I'd be prejudiced at this point having to respond to this demonstrative aid, which I don't have in the electronic form they are going to use it, and just got this morning even the paper form of it, which apparently in paper form they are not going to be showing the witness.

Your Honor, it's -- you know, it would be -- I won't be able to -- fully be able to cross-examine on it without actually studying it a bit. And I don't have time to study it while she will be on the stand, Your Honor.

So I would ask the Court to preclude the use of the electronic -- if they want to use the paperwork one that they just gave me, I can quickly look at that.

And even that, I don't know if it's accurate because I have to compare it to all of the underlying records to see if it's accurate, as I have done with Special Agent Tanner's up until now. They gave me seven different charts that she has done, I think.

I had a chance to then look back at the telephone records and the other stuff that she cites to see whether or not it's accurate or not accurate. This demonstrative aid they just gave me this morning, could have given to me at any point to have me check it out. And I don't even have the electronic version of it at this point.

So I would ask the government be precluded from using

this demonstrative aid with Special Agent Tanner.  They have at least seven summary charts, Your Honor, that they can use with her, including apparently Exhibit 172, which actually lists -- and I may show it to the court.  It actually lists very plainly a time, event in an exhibit that I have had a chance to go through, expected that that is what she would be testifying to.

And apparently this is just a much more complicated -- the government is representing it's a more complicated electronic demonstrative aid of a summary chart that she's already going to be testifying to.

So on that basis, I would ask the Court to preclude the use of this demonstrative aid with Special Agent Tanner. It's also enormously cumulative beyond all the seven summary charts.

THE COURT:  So --

MR. FOX:  Can I unpack that a little bit, Your Honor?

Mr. Hochman has just admitted that the government's summary charts he's had a chance to go through.

The Exhibit 226, which will be used for demonstrative purposes only, is a graphic depiction of what is occurring in Government's Exhibit 172.

So Mr. Hochman, as I have told him, can compare the information in that paper to what he's already said he's gone through and decide it is accurate, I believe.

MR. HOCHMAN:  No, just gone through.

MR. FOX:  Just gone through and hasnt had a chance to determine whether it's accurate in 172.

All of the information is on the paper form that Mr. Hochman has.  And I took him through the charts right now graphically to see how the PowerPoint is going to work as the calls come in and out.  But all the information is on his paper form, so he has all the information.

This is just going to be used for demonstrative purposes only, and it accurately represents, as the agent will say, Government's Exhibit 172.  It will be an aid to her testimony.  It will not go back to the jury.

And the other thing I would point out, Your Honor, is, it's not like Mr. Hochman is giving us his demonstrative exhibits days, weeks in advance; we are getting them at the time that he is using it.

MR. HOCHMAN:  The only two demonstrative exhibits, Your Honor, they have had since December.

MR. FOX:  And we got them the very day he used them.

THE COURT:  Okay.  The PowerPoint presentation -- is that a printout of the PowerPoint presentation?

MR. FOX:  Yes.  So the slide -- that's a completed version of the slide.  It looks complex when you look at it because all of the information is there, but I can put it on the screen so you can see what it looks like.

THE COURT:  So he has -- the paper copy that he has

is the slide version, is the -- are the slides that make up the PowerPoint presentation?

MR. FOX:  Yes, Your Honor.

As Mr. Hochman said, all of the events are on the sheet that we gave him.

In the PowerPoint version, some of the events come in and out so graphically they will disappear and then appear.  He has the version where they are -- all appeared on there so he can see that all the information is accurate.

THE COURT:  Okay.  And the PowerPoint presentation is made up of -- was it 172?

MR. FOX:  That's correct, Your Honor.  And it's five days that are reflected in 172, I believe -- actually, four days that are reflected in 172.

THE COURT:  Okay.

MR. HOCHMAN:  And, again, the Court has made it clear that we need to exchange PowerPoint -- demonstrative aids, Your Honor, especially one this complicated.  It's one thing to show a pyramid chart, which I did --

THE COURT:  I'm going to bring the jury in now because I'm --

MR. HOCHMAN:  Okay, Your Honor.

THE COURT:  Okay.  So let's bring the jury in.  And I think I've probably heard enough to conclude that there really isn't any prejudice.  You have the slides.  You had 172.  The

jury will be instructed if it doesn't -- they can't consider it.  It's only as good as the underlying evidence.

MR. HOCHMAN:  And, again, just for the record, Your Honor, I got the slides at about five minutes to 8:00 this morning.

THE COURT:  That's fine.  I understand that.  But the evidence that makes up the slides I think you've had.

MR. FOX:  I expect her testimony to be lengthy as well, so I believe Mr. Hochman will have a chance to cross-examine her tomorrow as well.

THE COURT:  And how long do you expect to be with her?

MR. FOX:  I think it's going to be at least three hours because we're playing some of the recordings from Michel and Courson with her rather than calling them as witnesses.  I am guessing that's it's going to be maybe even closer to four hours.

THE COURT:  Okay.

MR. FOX:  And, Your Honor, we're going to read in a stipulation about Mr. Leavins that we reached during the break before we begin Special Agent Tanner's testimony.

THE COURT:  All right.

(Jury in at 9:42 A.M.)

MR. FOX:  Your Honor, may I read a stipulation the parties have reached?

THE COURT:  Yes.

MR. FOX:  (Reading.)

"The parties have stipulated that Paul Tanaka became undersheriff in approximately June of 2011.  Prior to becoming undersheriff, one of Mr. Tanaka's aides in early 2011, when he was assistant sheriff, was Steve Leavins.  Mr. Leavins was no longer Mr. Tanaka's aide when Mr. Tanaka was undersheriff.  In August and September of 2011, Chris Nee was Paul Tanaka's aide, and Steve Leavins was lieutenant with ICIB.

MR. HOCHMAN:  So stipulated, Your Honor.

THE COURT:  All right.  The parties have agreed to certain facts that have been stated to you.  You should, therefore, treat these facts as having been proved.

MR. FOX:  May I proceed with my inquiry?

THE COURT:  Yes.

BY MR. FOX:

Q.   Special Agent Tanner, are you a rookie agent?

A.   No.

Q.   How long have you been an agent?

A.   Eight years.

Q.   And what types of cases have you worked on?

A.   Various public corruption investigations, bribery investigations, money laundering, human trafficking, hate crimes and excessive use of force.

Q.   Have you worked on both civil rights investigations and public corruption investigations?

A.   Yes.

Q.   What are examples of civil rights investigations?

A.   Civil rights investigations cover excessive use of force by law enforcement officers, hate crimes, human trafficking.

Q.   What are some examples of public corruption investigations?

A.   Anytime a public official abuses their authority, so whether that's bribery, obstruction of justice, other types of offenses that fall under anyone who's an elected official.

Q.   Do investigations of civil rights offenses and public corruption offenses occasionally overlap?

A.   Yes.

Q.   How so?

A.   Frequently, when you have a case on a law enforcement officer that may be an excessive use of force, oftentimes they can cross over into public corruption charges or offenses, which would also fall under the public corruption squad in our office.

Q.   Without getting into specifics, how many prosecutions of law enforcement officers have you been involved in?

A.   Dozens.

Q.   And without getting into specifics, what types of cases have these prosecutions involved?

A.   Excessive use of force, obstruction of justice, false statements, and falsifying reports.

Q.   Over your career and without getting into specifics, how many trials have you been involved in?

A.   Over ten.

Q.   Have you taught any courses?

A.   Yes.

Q.   What types of courses?

A.   I've taught law enforcement officers, both state and federal law enforcement officers, and prosecutors on various types of civil rights and public corruption cases and investigations.

Q.   When did you become a special agent with the FBI?

A.   In April of 2009.

Q.   What type of training did you have to go through in order to become a special agent with the FBI?

A.   I spent five months at a live-in academy in Quantico, Virginia.

Q.   And what are you taught as it relates to this case in Quantico?

A.   You are taught various -- at Quantico, you are taught various investigative techniques, how to build an investigation, the types of things that we are allowed to do and the authorizations that are required to do those various things.

Q.    Are you familiar with the types of approvals that are necessary in conducting investigations?

A.    Yes.

Q.    Can you please describe them for the jury.

When you are dealing with undercovers, what is necessary?

A.    Depending on the type of undercover operation -- at a minimum, you need multiple levels of approval above you in order to engage in an undercover operation, but for the purposes of a public corruption undercover investigation, you usually need additional approvals, including FBI headquarters approval, in addition to the local LA office approvals.

Q.    And in terms of signing someone up as an informant, are you required to get any approvals to sign someone up as an informant?

A.    Yes.

Q.    What types of approvals do you need to do that?

A.    Once the paperwork is filled out by the agent, it goes to the supervisor.  And if the supervisor agrees and signs off on it, it then goes to the supervisor's supervisor, who signs off and agrees to open that person as an informant.

Q.    When did you come to Los Angeles to work as a special agent?

A.    In September of 2009.

Q.    Were you assigned to a particular squad in September of

2009?

A.    Yes.

Q.    What squad was that?

A.    The civil rights squad.

Q.    And what were your duties with the civil rights squad?

A.    I was responsible for investigating one of the three civil rights crimes that the federal government investigates, which is excessive use of force, hate crimes, and human trafficking.

Q.    How long did you spend on the civil rights squad?

A.    Approximately two years.

Q.    What happened then?

A.    At two years, the investigation into the sheriff's department had grown.  And the case was kind of becoming a joint civil rights/public corruption investigation and so the case, for resource purposes, was transferred to the public corruption squad.  And the supervisor asked that I transfer to the squad so that I could continue working on the sheriff's department investigation.

Q.    When were you initially assigned the investigation involving the sheriff's department?

A.    In June of 2010.

Q.    How long had you been an FBI agent at that point?

A.    A little over a year.

Q.    How long was your supervisor with the FBI at the time you were assigned the investigation?

A.    Somewhere between 15 and 20 years.

Q.    How were you assigned the investigation?

A.    My supervisor came to me and gave me a letter that had been from an inmate and told me to go ahead and follow up on the allegations in the letter from the inmate.

Q.    What were some of the general allegations in the inmate's letter?

A.    The inmate was alleging that certain groups of deputies on certain floors in the jail were using excessive force on inmates for no reason and causing significant injuries to the inmates.

Q.    Special Agent Tanner, what did you do to investigate the allegations in the letter?

A.    I identified who the inmate was, booking number and where he was located.  And he was at Men's Central Jail, so, along with another agent from my squad, went to Men's Central Jail to interview the inmate.

Q.    After you interviewed the inmate, did you document what he told you in any way?

A.    Yes.

Q.    What did you do?

A.    I wrote what in the agency we refer to as a 302.  And it's just a -- basically a report of what -- whoever we interviewed told us.  It's just a form number, a 302.

Q.    Is that a -- well, who sees the reports when you write

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

them?

A.    After the two agents that were present at the interview read it, review it, make sure everything is accurate and included, it's passed along to my supervisor, who then approves it.

Q.    Did that happen with the first inmate you interviewed?

A.    Yes.

Q.    Over time what happened with your investigation?

A.    It very quickly started to expand from just the one initial inmate that we interviewed and his account of what was going on to multiple inmates with multiple accounts of what was occurring in the jails.

Q.    Was there any pattern to the allegations you were hearing about?

A.    Yes.

Q.    What was that pattern?

A.    It was -- despite the incidents themselves maybe being different on different floors, potentially with different deputies, overall, the inmates were alleging the same type of thing, which was, inmates were being assaulted for no reason, sometimes even when they were handcuffed.  The deputies would then gather together in a group and then falsify a report and, in turn, charge the inmate with a crime, even though the inmate hadn't done anything.

Q.    How were you documenting these allegations?

A.    Anytime we would interview an inmate, it would be documented in a 302.

Q.    And who would look at those reports?

A.    My supervisor.

Q.    Where were your interviews of inmates occurring?

A.    At the very beginning, they were all at Men's Central Jail.  And as things progressed in the investigation, if we determined that an inmate may have been transferred to state prison, we would actually go to the state prison and interview the inmates there.

Q.    Did you tell the sheriff's department that you were investigating allegations of excessive force in Men's Central Jail at the time?

A.    No.

Q.    Why not?

A.    Excessive-use-of-force allegations are incredibly difficult cases to investigate.  And in order to build an investigation, it's usually better that the individuals who are the subjects are unaware so that you can continue to gather evidence before they're aware that you're actually investigating them for the crimes.

Q.    Would the deputies that you were encountering at Men's Central Jail or Twin Towers ask you why you were there?

A.    Occasionally, but not all the time.

Q.    When they would ask you why you were there, what would you

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

tell them?

A.    I would usually give a general response.  Either I would just say I'm working a criminal investigation, or I would just say I was investigating human trafficking or another type of civil rights offense.

Q.    Why would you say that?

A.    Because I did not want any of the deputies to know why we were actually there, which is to interview inmates about deputy abuse.

Q.    Special Agent Tanner, did you ever go to the jails alone to interview inmates?

A.    Never.

Q.    Why not?

A.    Two reasons.  The main reason is just for safety.  I would never put myself in a room by myself with an inmate.  But, also, in nearly every interview that we do, for both on civil rights and public corruption, we like to have two agents present just so that there's always two people that can verify the information that was provided by the person we interviewed.

Q.    Initially, who would accompany you to Men's Central Jail?

A.    Initially, it was Special Agent David Lam or another person on my squad that was available for the day that could go with.

Q.    Do you remember the names of other agents who have accompanied you over time when you've gone to Men's Central

Jail to interview inmates?

A.    Yes.

Q.    Who are they?

A.    Special Agent David Dahle, Wayne Plympton, Tamara McKen, Efren Delgado.  There is probably more, but in general those are some of the people.

Q.    Now, in your investigation, how closely have you worked with the US Attorney's office in Los Angeles?

A.    Very close.

Q.    Have you ever briefed the US Attorney on your investigation?

A.    Yes.

Q.    When was the first time that you briefed the US Attorney on your investigation?

A.    I believe it was the later part of 2010, is -- I believe it was somewhere between October and December of 2010.

Q.    Who was the US Attorney at the time that you briefed him?

A.    André Birotte.

Q.    And I'm going to ask you about Gilbert Michel in a second and the undercover operation there, but first I want to ask you about whether you engaged in any other covert work with any other deputy as part of your investigation early on.

A.    Yes.

Q.    What was that?

A.    One of the times that I went to Men's Central Jail to

interview an inmate -- this was early in July of 2010 -- there was a deputy who worked outside the law enforcement interview rooms. And while we were waiting for an inmate to be brought down to interview, the deputy made kind of an off-the-cuff comment to me about how -- the first comment he made was that supervisors allow deputies to gather together after an incident to get their stories straight. And then another time soon after that he told me that he had used his flashlight, which was this long metal flashlight, on an inmate and he -- when he didn't have to.

Q. And what happened after he made these comments to you?

A. He asked me out.

Q. Did you know at the time whether he had been involved in many force incidents?

A. At that time, I had no idea.

Q. What was his name?

A. William David Courson.

Q. After he asked you out, did you agree at that point to go out with him?

A. No.

Q. Why not?

A. I, in general, wasn't interested in going out with him, but also because we were there for an investigation, it didn't even cross my mind at that point.

Q. So what did you do?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

A.    I went back to my office when that happened and actually told my supervisor what had happened that day.  And given the information that that deputy had mentioned to me, my supervisor had asked me whether I would be willing to actually meet up with that deputy and wear a wire, given that he had just admitted to some of the very conduct that we were investigating.

Q.    What did you say?

A.    I agreed to do it.

Q.    So what happened?

A.    I -- the next -- I don't know if it was the next time or maybe two times later.  The next time I saw him at the jails, I had a business card, and on the back I wrote an e-mail.  And it was an e-mail I had set up specifically for him to e-mail back and forth with me, and he e-mailed me soon after.

Q.    How many times did he e-mail you over time?

A.    A lot.  I couldn't even put a number on it.

Q.    Did you ever inform him whether you were interested in him in any way?

A.    I was very clear that I was not interested in any type of relationship.

Q.    Did you have things that you would tell him about why you wouldn't be able to meet up with him?

A.    Yes.

Q.    What would you say?

A.   I would typically use either work as an excuse -- I was also getting my Ph.D. at the time, and so I told him I was very busy with homework and writing papers and things like that.

Q.   Were there times when you agreed to meet him?

A.   Yes.

Q.   What were the circumstances of those meetings?

A.   I believe the first time -- because he had asked to meet up a few times, and then I finally just said, okay, let's meet up at this place after I finished work for the day.  And so he agreed.

Q.   Why did you want to meet him?

A.   Based on the information he had initially told me without -- before I was actually wearing a recording device, I wanted to determine whether or not he was going to give me additional information about either his behavior or behavior of other deputies in the jails.

Q.   You mentioned before you wore a recording device.  At each meeting that you had with him, did you wear a recording device?

A.   Yes.

Q.   Why?

A.   It was important to capture what he was telling me.  I also wanted to make sure it was very clear that I was not doing anything inappropriate or saying anything inappropriate when I was talking to him.

Q.   Now, in these operations when you would meet

Mr. Courson -- first of all, let me ask you, how many times did that happen?

A.    Four times.

Q.    And when you were engaging in these covert operations with respect to Mr. Courson, would any other agent be close to the scene?

A.    Yes.

Q.    How so?

A.    At all times, for all four meetings, there was at least one agent that would sit within close proximity so that they could either overhear or be visually able to see me so that if anything happened or if I said something that was kind of a code word that I needed help or anything like that, they were there.  But it was also to make sure that there was always somebody watching to verify that nothing had gone on.

Q.    When was the first time that you recorded one of these meetings with Mr. Courson?

A.    It was in August of 2010.

Q.    And where did it occur?

A.    It was at a restaurant in Century City.

Q.    What, if anything, did Mr. Courson say to you about what was going on in Men's Central Jail?

A.    He had told me --

          MR. HOCHMAN:  Objection.  Calls for hearsay.

          THE COURT:  Overruled.

THE WITNESS:  He had generally told me about some of the things that had occurred, including one time when he went to a floor -- and it was either a senior deputy or a sergeant.

He had arrived on the floor as an incident had either just finished or was finishing up.  And the senior or the sergeant went over to him and said, "You weren't here," which is -- he was explaining to me that it was basically to say, "I don't want you to write a report about what you saw, so just say you were on another floor."

He also told me that, in general, the -- what deputies would say was, "If you wrote it, it happened."  So even if something hadn't occurred with an inmate, if you write it in your report, then that's what happened.

MR. HOCHMAN:  Objection.  Nonresponsive at this point.  Motion to strike as hearsay.

THE COURT:  Overruled.  The answer will stand.

BY MR. FOX:

Q.  Special Agent Tanner, were you familiar with the term drive-bys before that first meeting with Mr. Courson as used by the sheriff's department?

A.  No.

Q.  Did Mr. Courson say anything about the term "drive-bys"?

A.  Yes.

Q.  What, if anything, did Mr. Courson tell you about drive-bys?

MR. HOCHMAN:  Objection, Your Honor.  Hearsay.

May I be heard at sidebar on this?

THE COURT:  Yes.

*(Proceedings held at sidebar under seal 10:l04 A.M.)*

*(The following proceedings were held in open court.)*

THE COURT:  Ladies and gentlemen, the statements attributed to Mr. Courson are being offered for their effect upon the listener.

BY MR. FOX:

Q.   Special Agent Tanner, I believe that I was asking you about drive-bys.

What, if anything, did Mr. Courson tell you about drive-bys?

MR. HOCHMAN:  And, Your Honor, I will object for the record based on our discussions here.

THE COURT:  All right.

BY MR. FOX:

Q.   Go ahead.

A.   He told me that "drive-bys" were a term used by deputies in the jail that referred to when there was a force incident with an inmate and it was either finished or the incident was done and the inmate was on the ground, and deputies would walk by and either kick or punch and then just keep walking.  So they wouldn't fill out a report or write that they were participating in the incident at all, and they referred to those as drive-bys.

Q.   Did that have an effect on you and the investigations, those statements?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

A.    Very much so.

Q.    How so?

A.    It was corroborating a lot of the things that the inmates were telling us.  And that was one of the biggest hurdles we had in this investigation at the beginning, was to determine whether or not the allegations the inmates were making were truthful or not.  And this was one way to corroborate from a deputy himself that this was, in fact, going on.

Q.    Did you have a second meeting with Mr. Courson in or about August of 2010?

A.    Yes.

Q.    Where did this occur?

A.    I believe the second meeting was at a local -- like a little cafe in either Brentwood or Westwood.

Q.    Did you wear a recording device to this meeting as well?

A.    Yes.

Q.    Did you have an agent conducting surveillance of this meeting as well?

A.    Yes.

Q.    What, if anything, did Mr. Courson tell you at the second meeting?

A.    At the second meeting, he told me about an unwritten rule that --

        MR. HOCHMAN:  Objection, Your Honor, based on the same discussion we had.

THE COURT:  Objection is overruled.

Again, ladies and gentlemen, these statements attributed to Mr. Courson are being admitted for the effect on the investigation and on the effect of Special Agent Tanner.

THE WITNESS:  The unwritten rule was that he was trained, when he was going into the jails to work as a deputy, that if an inmate resisted a deputy in any way, that the deputies would respond with enough force to send the inmate to the hospital even if they could restrain the inmate with less force.

BY MR. FOX:

Q.   And did that have an effect on you and the investigation?

A.   Yes.

Q.   In what way?

A.   Again, it was corroborating the fact that deputies were using force when either it wasn't necessary or responding to an inmate with force when they used more than necessary and that's what was causing significant injuries on these inmates, like broken bones and things like that.

Q.   Did you have another meeting with him the next month, in September of 2010?

A.   Yes.

Q.   And where did this meeting occur?

A.   I believe that one was at a local bar, pub-type place.

Q.   Did you record this meeting?

A.    Yes.

Q.    Was there an agent on surveillance at that meeting as well?

A.    There were multiple agents there.

Q.    And what, if anything, did Mr. Courson tell you at this meeting?

A.    A lot of the same things that he had already told me were discussed at that meeting, kind of corroborating the things that he had already said the previous month when we had met.

Q.    You had mentioned e-mails earlier.

Were you trying to obtain any information by e-mailing Mr. Courson?

A.    Yes.

Q.    And which e-mail account were you using?

A.    I set up a specific Yahoo e-mail account just for communications with Deputy Courson so that they would be maintained and printed off and put into the case file.

Q.    And what type of information were you asking for in your e-mails to Mr. Courson?

A.    When he would e-mail me back and forth about different things, I would try and strike up a conversation about something that may have happened during his day so that I could try and get information about maybe the name of a deputy or an incident that an inmate had told us about and -- trying to see if I could get more information out of him, as well as -- I

believe one of the times I asked for a copy of their

use-of-force manual -- or their defensive tactics manual.

Q.    Did you explain to Mr. Courson why you were interested in

this information?

A.    Yes.

Q.    What did you say?

A.    I told him I was pursuing my Ph.D., which I was.  But I

told him I was writing a paper specific to comparing, I think,

like use of force between departments, or something like that,

and that it would be helpful if I had the manual from the

sheriff's department.

Q.    What, if anything, did your interactions with Mr. Courson,

including these e-mail communications, tell you about his

usefulness as a -- to continue a covert operation with him?

A.    It was difficult because I couldn't just flat out ask

questions such as what happened to this inmate, what's this

deputy's first name, basically questions that would have helped

me to further the investigation.  And so it became very

apparent that I wasn't going to be able to continue in a covert

fashion to get information that way that would have been useful

long term.

Q.    Could you tell in your communications with Mr. Courson

whether he was one of the deputies engaging in brutality in

Men's Central Jail?

A.    The more I met with him, the more it became apparent that

he really was not -- the one time that he mentioned hitting an inmate with a flashlight when he didn't have to --

MR. HOCHMAN: Objection. Same objection, Your Honor, to the discussions.

THE COURT: Overruled.

You can answer.

THE WITNESS: It seemed to be that was pretty much the only time, that he told me, at least, that he was engaged in and actually started to make statements later on that he would not lie for another deputy even when they would ask him to do so.

BY MR. FOX:

Q. So what did you decide to do with respect to Mr. Courson?

A. At that point, I started to taper off communication, so that way I would gradually just no longer have contact with him.

Q. Why not just approach Mr. Courson and ask him to cooperate with you?

A. It would have been really risky at that point. I still wanted to keep the investigation covert. I did not want the sheriff's department to know that I was looking into this matter at that time. And if I had approached him and asked him to cooperate with my investigation and he said, no, he could have turned around and told everyone in the sheriff's department what we were doing there. And that was too big of a

risk.  I couldn't take that risk.

Q.  Do you recall where Mr. Courson was assigned at the time you were dealing with him back in 2010 and 2011?

A.  Primarily, yes.

Q.  Where was he assigned?

A.  He generally worked the front sally port area, which is where staff members come in and out of the jails.  And he also worked in the area outside of the law enforcement interview room, so outside the clinic of Men's Central Jail.

Q.  What did that mean to you in terms of whether his information was limited or not?

A.  It meant that he didn't regularly work on the two floors, the 2000 and 3000 floor, which were the two floors that we had the most information and allegations of what was occurring.  So he didn't really have the access to get the information that I was looking for.

Q.  At some point, did you encounter an inmate named Anthony Brown?

A.  Yes.

Q.  How do you know Anthony Brown?

A.  Very early on in the investigation, I interviewed an inmate that mentioned there was another inmate in the jail named Anthony Brown who might have information that could help us out in the investigation.  And so soon after, I conducted an interview with Anthony Brown.

Q.    Where was he housed initially when you were speaking with him?

A.    He was in the 2500 module.

Q.    What was the 2500 module at the time?

A.    That was pro per, which meant he was representing himself in his criminal case -- his pending criminal case.

Q.    Was there something specific -- well, you mentioned the 2000 and 3000 floors, and that that's where a lot of the allegations were occurring.  What types of criminal history did those inmates have, generally?

A.    It could range.  Because the 2000 floor held, again, those pro per inmates, and they could be anyone -- or any type of crime that -- if you want to represent yourself.  But a lot of the inmates on 2000 and 3000 floor had fairly significant and extensive criminal histories, and they were put on those floors that were supposedly more security, especially the 3000 floor.

Q.    Given their criminal histories with many of the inmates on the 2000 and 3000 floors, why did you look at investigating those incidents?

A.    Well, the first reason is, whether someone has a criminal history or not, everyone in the United States is afforded their civil rights.  But more importantly, the deputies that were engaging in this behavior, the allegations were not only that they were committing excessive force, but they were, in turn, falsifying reports in order to cover up their behavior and then

actually submitting this to the District Attorney to charge these inmates with additional crimes that the inmates hadn't committed.

And knowing that these deputies only spend a few years in the jail and then actually go out to work patrol in communities, I found it very concerning that deputies who were falsifying reports and things like that and putting charges for no reason on inmates, that they were then going to be going and working out in the communities.

Q.   Ultimately, what did you do with Anthony Brown after he was providing you with information?

A.   After meeting with him maybe a few times, I determined that he had the access to the information and was willing to continue providing information.  So I asked him whether or not he would be willing to be an informant for us.

Q.   What were you hoping to accomplish by signing him up as an informant?

A.   It was a way for us to have one individual that could regularly provide us information and someone that we could kind of go to -- if we heard about an incident or something that happened, we could task him with trying to find out maybe the inmate's name, the deputies involved, things like that.  It was kind of a person that we could go to on the inside.

Q.   Were you familiar with Anthony Brown's criminal history when you signed him up as an informant?

A.    Yes.

Q.    So why did you sign him up, given that he had a lengthy criminal history?

A.    Well, any inmate informant is going to have a criminal history.  That's why they are there as an inmate.  But someone's criminal history is not going to preclude them from being an informant.  In fact, most informants have some sort of baggage.

But more importantly, he had the access to the information we were seeking.  It wouldn't help me to sign up an informant with a very short criminal history that had no access to the information that we were looking for because I couldn't do anything with that information.

Q.    When you signed Anthony Brown up as an informant, had he been sentenced to his 400 years in prison?

A.    No.

Q.    When was he sentenced?

A.    Not for almost a year after, I believe.

Q.    What steps did you take to sign Anthony Brown up as an informant?

A.    The same thing that we do with other -- any other informant is we run their criminal history, we run searches in our FBI database to determine if they have any pending FBI cases or if there's anything else in our system about this person.  And then from there, I go to my supervisor with that

information and seek his approval.  If he approves it, it goes to his supervisor, who then approves it.

Q.   Did Anthony Brown become an informant?

A.   Yes.

Q.   And did these people approve of him becoming an informant?

A.   Yes.

Q.   After Anthony Brown became an informant, at some point did you stop going to Men's Central Jail to see him?

A.   Yes.

Q.   Why?

A.   At that point, we had been -- myself and other agents had been going to the jail somewhat regularly to talk to both Anthony Brown and other inmates.  And it became fairly obvious that if we continued to go there, my story of just working human trafficking or a criminal case, it wasn't going to fly too much longer and they would start to wonder why we were there.  And so at some point, the decision was made that we would stop going to the jails to not draw too much attention and have an undercover agent step in.

Q.   This undercover agent, was he a rookie agent?

A.   No.

Q.   How long had this undercover agent been with the Bureau?

A.   I believe at that point about 15 to 20 years.

Q.   What name was the undercover agent using in dealing with Anthony Brown?

A.    CJ.

Q.    Was there a particular reason why you chose this undercover agent to work this case?

A.    Yes.

Q.    What was that reason?

A.    This agent was on a squad that investigated civil rights and public corruption offenses, which is what he regularly did. But he had also done a significant amount of undercover operations involving corrupt law enforcement, and so he had a lot of experience as an undercover in that role.

Q.    I want to now talk about the Gilbert Michel undercover operation.

      Who gave you the information that led to you conducting the undercover operation of Gilbert Michel?

A.    Anthony Brown.

Q.    After Mr. Brown provided you with the information -- well, first I should probably ask, what was that information?

A.    He had told us, during one of our meetings early on, that deputies -- in addition to the force incidents we were looking at, that deputies were also going to inmates and telling them that they would bring in contraband in exchange for cash bribes.  And they believed that Anthony Brown, because he was in there for robbery -- that he actually had a lot of cash on the outside.  So deputies were going to him thinking he had the cash to, in fact, pay these bribes.

Q.   And at some point, did he identify a specific deputy?

A.   Yes.

Q.   At that point, did he tell you it was Gilbert Michel?

A.   We did not know because at that point, we were not going to the jails to meet with him.

     We just knew that at that point, a deputy.  We did not know the first name, and until the meeting we didn't know the last name of the deputy.

Q.   After Mr. Brown provided you this information that there was a deputy who was willing to take money, did you speak to anybody about the best way of going about the operation?

A.   Yes.

Q.   Who did you speak with?

A.   I spoke to my supervisor, as well as the undercover coordinator in our office, who is separate from the undercover agent -- he had been doing the job for a long time -- as well as the undercover agent, who had extensive experience.

Q.   Why did you engage in the undercover operation with Gilbert Michel?

A.   It was -- it was a way for us to determine, one, whether or not the information Anthony Brown was providing was accurate, but it was also to determine whether or not deputies were, in fact, engaging in corrupt activities like taking bribes in exchange for bringing in contraband.

Q.   What steps did you take to get approvals to engage in that

operation?

A.   It was a two-part approval process.  Any time we are doing a public corruption investigation and we're paying a bribe, we have to get approval from the FBI headquarters.  So I had to write up a proposal basically saying, "This is what we're going to do with the phone, the bribe payment," and it had -- I had to get the approval from FBI headquarters, and then locally in LA, I had to get the approval of multiple levels of executive management to proceed with the operation.

Q.   Did you engage with the US Attorney's office, as well?

A.   Yes.  It's a requirement in any undercover operation that the US Attorney's office also agrees to the operation itself.

Q.   What was the plan?  What was the operation?

A.   The plan was to have CJ, our undercover agent, pose as a friend of Anthony Brown and have Anthony Brown tell the deputy that he had a friend on the outside who had access to his cash and would pay him a cash bribe in exchange for bringing a cell phone into the jail for Anthony Brown.

Q.   Why was the operation involving bringing Anthony Brown a cell phone?

A.   Are you asking why a cell phone?

Q.   Yeah, why a cell phone?

A.   It was twofold, because -- the first being that that's one of the things that inmates had alleged deputies were agreeing to smuggle in in exchange for bribes, but also we wanted

Anthony Brown to have access to call the undercover agent

without it being recorded on the jail phones so that he would

be able to call the undercover agent at any time and tell

him -- and report to him what was going on.

Q.    Now, just to clear this up, did the undercover operation

in any way involve narcotics?

A.    Never.

Q.    And did CJ ever provide -- well, were these meetings with

CJ recorded --

A.    Yes.

Q.    -- between CJ and Gilbert Michel?

      Based on those recordings, did CJ ever discuss

narcotics with Gilbert Michel?

A.    No.

Q.    What was the plan for the phone once it got inside the

jail, if it did?

A.    Once it got in, the plan was to have Anthony Brown first

confirm with the undercover agent that he did, in fact, get the

phone, but then it was to use the phone to regularly

communicate with the undercover agent things that were going

on.  So whether it was the name of a deputy that maybe

approached him to bring in contraband or if it were an incident

that had just occurred on the floor, to send that information

such as the deputies involved, the inmate involved, things like

that, to either text or call the undercover agent with that

information.

Q.    Why would that information be important for the undercover

to receive?

A.    It would allow us realtime access to Anthony Brown to be

able to get the information without having to go to the jail

repeatedly to get that information and out our investigation.

Q.    Did you ever take Mr. Brown's calls from Men's Central

Jail when he was using the sheriff's department's inmate

telephone monitoring system or ITMS?

A.    Yes.

Q.    Why did you answer the phone?

A.    I usually did not, but at that time he was getting very

anxious and we were right at the -- about to meet up with

Gilbert Michel and the undercover agent to have the exchange,

and I wanted to make sure that he knew it was about to happen

so that he was aware.

        And so when I usually would ignore those phone calls,

I did answer them because my supervisor said go ahead and do

that.

Q.    You said that he was anxious.  What was Mr. Brown's

housing status at that point?

A.    He had been -- just been sentenced to state prison, and so

he knew that he was about to be shipped off to state prison.

Q.    How was Anthony Brown as an informant overall?

A.    Difficult.

Q.   What do you mean by that?

A.   He was anxious all the time.  He always -- he wanted to always have contact with us.  He wanted to always tell us -- any little bit of information he had, he wanted to tell us at all times.

And so it became difficult.  If we weren't able to speak to him for a few days or even a week, he would get very anxious that he had information and he couldn't talk to us, and so it became difficult to sometimes get him to just relax and wait until we were able to talk to him.

Q.   If he was difficult and anxious, why use him?

A.   Multiple reasons.  He had the access to the information; he was willing to provide it to us.  And that's not always a common thing, for inmates to be willing to be an informant, and he was willing to do that and he was providing us regular information.

Q.   And the information he was providing you with respect to Deputy Gilbert Michel, did that turn out to be accurate?

A.   Yes.

Q.   How do you know?

A.   Because we conducted the undercover operation and Gilbert Michel accepted the bribe payment and brought the phone into the jail.

Q.   When was the first undercover meeting with Gilbert Michel?  When did that occur?

A.    On July 20, 2011.

Q.    What were the circumstances of that meeting?

A.    There was some phone calls exchanged between CJ and Gilbert Michel and they agreed upon a location to meet up, and we had surveillance on the ground, as well as in the airplane, to record the incident, and they met up to exchange the cash and cell phone.

Q.    Where were you?

A.    I was in the airplane.

Q.    Why were you in the airplane instead of on the ground conducting surveillance?

A.    Because I had been in the jails quite a few times at that point, I had no idea who Gilbert Michel was or if I had ever seen him, even if it was just in passing in the jails.  And so to avoid the possibility that I was anywhere near the exchange of cash between the undercover agent and Gilbert Michel, I wanted to be out of sight just in case he did recognize me. And so I was able to be in the plane to watch the exchange but then not be seen by Gilbert Michel.

Q.    Approximately how many agents were involved in this first undercover operation?

A.    There was two pilots that are agents in the plane, someone operating the camera, and then I would say probably somewhere between five to ten surveillance agents on the ground.

Q.    You said someone had a camera.  Where was that camera?

A.    It was on the air- -- on the airplane.

Q.    Was the encounter between Mr. Michel and CJ recorded in any way besides with that camera?

A.    Yes.

Q.    How was it recorded?

A.    The car that we had that CJ was driving had a camera and I believe also audio in the vent system of the car so that if -- if Gilbert Michel were to get into the car with the undercover agent, it would record what happened in the front two seats.

Q.    You've described some of the paperwork that's required within the FBI for undercover operations.

      What did you have to do for this undercover operation?

A.    There was significant approvals from FBI headquarters for the bribe payment, as well as the actual overall operation with the bribe, and then locally in Los Angeles, multiple levels of approval above me to engage in the actual bribe exchange.

Q.    Before engaging in the operation -- are you familiar with the term "operational plan"?

A.    Yes.

Q.    What is it?

A.    Any time we're engaging in any type of operation, if it's undercover, if it's an arrest, anything like that, we are required to write a plan, which just details what we're going to do, the day, the time, just so that we have a written plan

of what's going to occur so our supervisors can then approve what the plan is for the day.

Q.   What was the results of the undercover operation on July 20th of 2011?

A.   CJ met with Gilbert Michel and Gilbert Michel accepted the bribe payment and the phone.

Q.   Why not arrest Gilbert Michel right then and there?

A.   At that point, he hadn't brought the phone in, so technically, you know, at that point, he had just taken money from someone.  We had no idea if he had told the sheriff's department about what had occurred.  At that point, we really didn't have any additional information.

Q.   What do you mean, "told the sheriff's department about what had occurred"?  What do you mean by that?

A.   For all we knew at that point, when Anthony Brown told us that a deputy had approached him about this, we had no idea to know whether or not Gilbert Michel was actually working with the sheriff's department in terms of meeting someone on the outside and then trying to -- almost like their own operation. At that point, we just had no idea.

Q.   Was there a second meeting between Gilbert Michel and CJ?

A.   Yes.

Q.   Approximately when did this occur?

A.   August 4, 2011.

Q.   What was the purpose of the second meeting?

A.   At the first meeting -- it was either in a phone call before or the actual meeting itself, the agreement between our undercover agent and Gilbert Michel was that he would give him half of the cash bribe when he initially gave him the phone, and once we had confirmation that the phone had, in fact, gotten to Anthony Brown, that he would give him the remaining bribe payment, which is what the August 4th meeting was for, he paid the remaining cash.

Q.   How had you gotten confirmation that Anthony Brown received the phone from Gilbert Michel?

A.   He -- I believe the first was a text message to the undercover agent that Anthony Brown just had touchdown, which was his code that he received the phone.

Q.   Did you record the second meeting between Gilbert Michel and CJ?

A.   Yes.

Q.   In what way?

A.   It was the same situation as the first one, with aerial surveillance and recording devices.

Q.   Did you write an operations plan before engaging in that covert activity?

A.   Yes.

Q.   And what happened at the second meeting?

A.   He -- Gilbert Michel and the undercover agent met, and the undercover agent gave the additional cash bribe to Gilbert

Michel and he accepted.

Q.   Why not arrest Gilbert Michel right then?

A.   At that point, again, we were still building our case with Michel -- Gilbert Michel.  We also wanted to continue to follow Gilbert Michel, delve into his finances at that point to determine whether or not he was doing additional things with other inmates that we weren't aware of, and also to see who he was associating with.

      And at that point, we had just realized who he was within the one or two weeks, and so we had a lot of background work to continue to figure out what more he may be involved in aside from what we already knew.

Q.   What about the phone?  By August 4th, had you received any information that was helpful in your investigation besides just knowing that Gilbert Michel had brought it in?

A.   At that point, it was general things that the -- that Anthony Brown would send to the undercover agent, but in general, Anthony Brown hadn't -- didn't have the phone every day.  He would only have it periodically when Gilbert Michel was working, because Gilbert Michel would --

      MR. HOCHMAN:  Objection.  Foundation.  Move to strike.

      THE COURT:  Sustained.

      The answer is stricken.  The jury should disregard it.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

BY MR. FOX:

Q.   Special Agent Tanner, would Mr. Brown communicate with CJ
and you?

A.   At that time, I believe he called my desk phone one or two
times when he first got the phone, but otherwise his
communications were with the undercover agent.

Q.   Were you aware of the risks of putting in a cell phone in
a jail?

A.   Yes.

Q.   Why take them?

A.   Well, we knew that there were risks with a cell phone.  We
also had admonished fairly significantly Anthony Brown about
how the phone was to be used and he did, in fact, follow that.

     But also the allegations that deputies were accepting
bribes was not just this one deputy, it was allegations of
additional, and it was something we felt was very important for
us to look into and determine how many deputies were involved.

Q.   Did you do anything to try to track the calls or text
messages that he was making?

A.   Yes.

Q.   What did you do?

A.   The phone that was brought in to Anthony Brown, I set it
up so that I could look on-line.  It was kind of an on-line
system where I could see every time either a phone call was
made, received, or a text was sent or received.  And so I

couldn't see content, but I could see almost like a running toll record any time I logged in to the account.

Q.   How often did you check?

A.   Every day.

Q.   Did you learn at some point that Anthony Brown had concerns with his cellmate and the phone?

A.   Yes.

Q.   What did you learn?

A.   Anthony Brown reached out to the undercover agent because the cellmate had seen Anthony Brown with the phone and he was worried that if he didn't allow his cellmate to use the phone, that the cellmate would turn him in and tell deputies that he had a phone on him.

Q.   What would that do to your investigation?

A.   It would make the investigation overt at that point, which we were not ready for, and I also didn't want to put Anthony Brown in a position to have to tell his cellmate that he couldn't use the phone, because that wouldn't be something that would be logical if an inmate had a phone, that he wouldn't let his cellmate use it.

Q.   So what happened?

A.   The undercover agent and I spoke, and after a long discussion, we agreed that Anthony Brown would let the cellmate use the phone to call his girlfriend, but Anthony Brown had to monitor what was being said and then if there was anything

nefarious going on, that he would tell the undercover agent right away.

Q.   What did you see on the phone records you were reviewing with respect to any calls that were not to the FBI?

A.   That it would have -- there were, I believe, two different numbers that were called after Anthony Brown had asked for permission for his cellmate to use the phone.

Q.   Were you later able to determine who those people were that were being called?

A.   Yes.

Q.   Who were they?

         MR. HOCHMAN:  Objection.  Foundation as to when.

         MR. FOX:  I will be happy to ask that question, Your Honor.

         THE COURT:  All right.

BY MR. FOX:

Q.   When did you learn that information?

A.   When I looked on the system and found the number that was called, I was able to run it through our databases and determine that it was a number linked to a previous address of the cell- -- or of the cellmate's girlfriend or wife, girlfriend.

Q.   And at some point, did you learn that the phone had been recovered by the sheriff's department?

A.   Yes.

Q.   When did you learn that?

A.   On August 8th, the undercover agent called and told me that Gilbert Michel just called him and was concerned because the sheriff's department had just found a phone on Anthony Brown.

Q.   Did you tell the sheriff's department on August 8th that a phone -- that that phone was the FBI's phone?

A.   No.

Q.   Why not?

A.   After we found out the phone was found, I spoke to my supervisor and we both agreed that the phone was not linked to the FBI as a phone itself.  It wasn't under an FBI contract, it was just paid for in cash.

And so given that our investigation technically wasn't overt and so since the phone was no longer in service, we weren't concerned about the phone anymore, and so we agreed that we were not going to tell the sheriff's department and we were just going to continue with our investigation.

MR. FOX:  Your Honor, I'm putting on the calendar on August the 8th, "FBI phone found."

BY MR. FOX:

Q.   After you learned that the phone was found on August the 8th, did you go meet with Anthony Brown?

A.   No.

Q.   Why not?

A.    Again, at that point, we still believed our investigation was covert and we'd be able to continue on without the sheriff's department knowing that we were involved, and so I -- instead of going down myself, I asked another agent to just go and check on him.

Q.    Was that agent on your squad?

A.    No.

Q.    What squad was that agent on?

A.    He worked on a gang squad.

Q.    And what, if anything, did the agent report back to you?

        MR. HOCHMAN:  Objection.  Hearsay.

        THE COURT:  Overruled.

        You can answer.

        THE WITNESS:  The agent had gone down to the jail to try and see Anthony Brown and he was turned away.

BY MR. FOX:

Q.    I want to move ahead now to August 23rd.

        What, if anything, did you do with respect to Anthony Brown on August 23rd?

A.    At that point, a few days earlier, we knew that at that point our assistant director in charge had notified the sheriff's department that it was our phone, and so on the 23rd we went to the jails in order to talk to Anthony Brown about what had happened.

Q.    Do you know why Steve Martinez on the 18th reached out to

the sheriff's department to let Mr. Baca know that it was an FBI phone?

A.   I believe it was either the day before or that day was when we found out from the FBI analyst that the sheriff's department reached out saying they found an FBI number linked to our inmate.

And so at that point, assistant director in charge Steve Martinez reached out to the sheriff's department because now we knew that the sheriff's department was aware that we were involved.

Q.   Where were you on August 18th of 2011 when this happened?

A.   I was out of state.

Q.   Why did you wait until August 23rd to go see Mr. Brown?

A.   I wasn't back in the state until then.

Q.   What was your purpose of going there?

A.   It was, again, twofold.  One, I wanted to make sure he knew that we were aware of everything that had just happened, but also to find out what had happened on his side from the time the phone had been found until the 23rd.

Q.   Who did you go there with?

A.   Special Agent David Dahle and Special Agent Wayne Plympton.

Q.   We've heard Anthony Brown in a recording refer to Special Agent Plympton as "director."

A.   Yes.

Q.    Was there a difference in experience level between you, Mr. Dahle, and Mr. Plympton?

A.    Mr. Plympton had probably 15 years experience at that point and he was in his mid-40s, and so he was just a special agent, but I'm assuming that --

        MR. HOCHMAN:  Objection.  Move to strike after the word "assume."

        MR. FOX:  I don't think there was a word after "assume," Your Honor, but I'll move on.

        MR. HOCHMAN:  Strike the word "assuming" part. Excuse me, Your Honor.

        MR. FOX:  I'll move on, Your Honor.

        THE COURT:  All right.

BY MR. FOX:

Q.    Did you meet with Mr. Brown?

A.    Yes.

Q.    Where?

A.    Same interview rooms on 6000 floor at Men's Central Jail.

Q.    What is the 6000 floor?

A.    It's an area of the jail that houses both the Men's Central Jail clinic for the inmates, as well as there's a few interview rooms that law enforcement can use when they're interviewing inmates.

Q.    Are you familiar with the process the sheriff's department used when you would check in to see an inmate prior to

August 23rd of 2011?

A.    Yes.

Q.    And what was that process at the time?

A.    When I arrived at the jail, I would show my FBI credentials at like a front booth, basically.  They would check them, verify that I was, in fact, law enforcement.

They would buzz us through a first secure door, followed by we would go to a sallyport and at that point we would again have to show our FBI credentials, give them our driver's license, which they would keep with them, and then sign a form that we signed our names, our agency, contact number, things like that, all written down on a piece of paper they had.

Q.    What's a sallyport?

A.    It's a -- where there's two sliding gates on either side and you walk -- they open one gate, you walk through, they close it so that you're in the middle, and then they open the second gate.

It's made so that if an inmate were to, say, run into the sallyport, the other gate isn't open so there's no way they could get out, because both gates are never open at the same time.

Q.    You have now described the process that you used before August 23rd of 2011 to see inmates.

What was your process to see Anthony Brown on

August 23, 2011?

A.    Same thing we'd always done.  I showed my FBI credentials and gave them my driver's license, which they kept in the booth, signed the form.  They buzzed us through.

        We checked in with the watch commander, which is another thing we always did, to just let him know that we were there for an interview, and they said, "Okay, go ahead," and told us to go to the interview room.

Q.    At that point on August 23rd, were you aware of any requirement to seek anyone's authority before interviewing Anthony Brown?

A.    No.

Q.    Approximately what time did you meet with Anthony Brown?

A.    It was 10:40.

Q.    And what happened?

A.    After talking to him for approximately an hour and he was telling us things that were going on, there was a pounding on the door of the interview room and there was a very large sergeant yelling, "This interview is over.  This interview's over."  And they grabbed Anthony Brown and pulled him out of the room.

Q.    What happened at that point?

A.    Well, at first, all of us just stared at each other, because we had absolutely no idea what was going on or why that happened.

And the sergeant was kind of yelling at us trying to ask us who authorized us and, again, we had no idea what was going on, so we just kind of said, "We checked in with the watch commander.  We're not sure what you mean by 'authorized.'"

And at that point, they had started to take Anthony Brown away, and so right before they had pulled him completely away, I just told him, "Don't worry.  We'll be back for you."

Q.   What did you do at that point?

A.   The three of us went to the watch commander's office because, again, we had no idea what was going on, and they -- they asked us who had authorized us to be there.

Q.   What did you tell them?

A.   No one.  At that point, again, we never, ever needed authorization to go in as long as we followed the procedures, which we did, and so we told them we didn't get authorization, and that was kind of it.

Q.   Did anyone ask you to wait at Men's Central Jail that day?

A.   Yes.

Q.   What was said and who said it?

A.   We were in the watch commander's office and a lieutenant had asked us to wait there for -- I don't know if he said the name, but he just said a captain.

And we had tried making some phone calls from the desk line in the watch commander's office to our supervisors to

let them know something was going on.  They didn't answer, and so we said we were going to wait outside in the lobby instead of in the secured area of the jail.

Q.   Did you receive a phone call from anybody within the sheriff's department that day?

A.   No.

Q.   Did you receive a phone call from anybody that week from the sheriff's department?

A.   No.

Q.   What about the next week?

A.   No.

Q.   You mentioned that you told Anthony Brown something to the effect that you would be back to get him; is that right?

A.   Yes.

Q.   And that was when he was being pulled out of the interview room?

A.   Yes.

Q.   Did you do anything to try to go back to get Anthony Brown?

A.   Yes.

Q.   What did you do?

A.   I called the United States Attorney's office after we were kicked out and I explained what happened and talked it over with one of the prosecutors there, and we agreed that we would seek a federal writ to have him brought over to federal custody

to testify in front of the grand jury.

Q.    Who was the prosecutor?

A.    Lawrence Middleton.

Q.    What role did he have at the time?

A.    He was the chief of the public corruption civil rights section at the US Attorney's office at the time.

Q.    Why did you want Anthony Brown at that point?

A.    At that time, we hadn't finished our interview with him to find out everything that had gone on or all the information he had at that point, so we wanted to get him in front of the grand jury to finish answering a lot of those questions.

But also, given the events that had occurred, we wanted to make sure that we got him in and lock him in to his testimony into the grand jury before -- since we no longer had access to him.

MR. FOX:  I'm now going to publish what's in evidence as Government's Exhibit 113.

*(The exhibit was displayed on the screen.)*

BY MR. FOX:

Q.    Special Agent Tanner, do you recognize this document?

A.    Yes.

Q.    What is it?

A.    It's a federal writ.

Q.    For who?

A.    Anthony Brown.

Q.    Does this document state when Anthony Brown is to be produced to the federal grand jury?

A.    Yes.

Q.    When?

A.    September 7, 2009.

Q.    Is that what I've just highlighted there?

A.    Yes.

Q.    And what is the date of this order?

A.    August 25, 2011.

Q.    I now want to show you Government's Exhibit 163.

      *(The exhibit was displayed on the screen.)*

BY MR. FOX:

Q.    And do you know -- this is in evidence as the phone line for the Inmate Reception Center within the sheriff's department; is that correct?

A.    Yes.

Q.    I want to show you on August 25th -- this is actually the fax machine; is that right?

A.    Correct.

Q.    I want to show you on August 25th entries -- what does the entry at 1:05 show?

A.    That it is a fax from a number that belonged to the Marshals Service going -- a fax going to the Los Angeles Sheriff's Department, warrants and detainer section.

          MR. HOCHMAN:   There would be an objection,

foundation, for that knowledge, Your Honor.  I'll move to strike.

MR. FOX:  I'll be happy to lay the foundation, Your Honor.

BY MR. FOX:

Q.   Special Agent Tanner, as part of your investigation, did you become familiar with phone numbers, including those of the United States Marshals Service, used to serve writs?

A.   Yes.

Q.   And what is that number?

A.   There were two numbers that primarily were used, and one of them is the number that you have highlighted, the 894-3881, and the other number was 894-7998.

Q.   You just mentioned the other number is -7998.  I'm highlighting now entry 111.

Is that that second number with the fax machine for the US Marshals Service that I'm showing there?

A.   Yes.

Q.   And what does this record indicate?

A.   It shows that a fax was sent at 9:40 a.m. from a number used by the Marshals Service to Los Angeles Sheriff's Department warrants and detainer section.

MR. HOCHMAN:  Objection.  Foundation for the latter part of that answer, Your Honor.  Move to strike the latter part of that answer.

MR. FOX:  Your Honor, I can again lay the foundation here.

THE COURT:  All right.

BY MR. FOX:

Q.   Special Agent Tanner, did you become familiar, as part of the investigation, with the phone number for the warrants and detainer section for the sheriff's department?

A.   Yes.

Q.   And what was that number?

A.   (213)217-4973.

Q.   Special Agent Tanner, did you do anything personally to see where Anthony Brown was after you obtained that writ?

A.   Yes.

Q.   What did you do?

A.   There's an inmate locator system that's available to the general public through the sheriff's department website, and I was able to, just like anyone in the public, enter in his name and information and it pulls up just general information, like the facility he's housed at, the jail he's at, pending court dates, things like that.

Q.   I'd like you to look in your binder at Government Exhibit 132, please.

A.   All right.

Q.   Do you recognize that?

A.   Yes.

Q.   What is it?

A.   It's a -- basically, a screen shot of that inmate locator that I printed off back in August of 2011.

Q.   Is that a true and accurate copy of the screen shot that you printed off that was requesting the location for Anthony Brown from the inmate locator system from the sheriff's department?

A.   Yes.

        MR. FOX:  Your Honor, I move for the admission of Government Exhibit 132.

        MR. HOCHMAN:  No objection, Your Honor.

        THE COURT:  It will be received.

   (Government's Exhibit 132 admitted into evidence.)

   (The exhibit was displayed on the screen.)

BY MR. FOX:

Q.   Special Agent Tanner, I'm showing you now the printout that you just described.

        Who printed this document?

A.   I did.

Q.   And what date did you look for Anthony Brown and print this document?

A.   On August 26, 2011.

Q.   How do you know that?

A.   On the bottom right corner, it has the date that I pulled it up on the computer.  But also on the top, right above where

it says "Search for Another Inmate" and "Back to the Search Result," it shows where -- generally the time that I searched it.

Q.   Is that what I've just pulled up here?

It shows August 26, 2011, at 10:18 Pacific standard time?

A.   Yes.

Q.   And I'm showing now the next couple of lines.  It says "Anthony Brown" and a booking number.

Was that the booking number for Anthony Brown at the time you were dealing with him when he was an informant?

A.   Yes.

Q.   And is all that information regarding date of birth and the rest accurate?

A.   With the exception of the date of birth.  They have it one month off in there, but otherwise, yes, it's accurate.

Q.   I'm now highlighting what says "Court" and "Release" on this page.

I'd like you to focus on the second part that says "Release."  It doesn't look like it's a computer printout.  Can you explain why the release looks the way it does?

A.   I was doodling on it and wrote over the word "Release" with a pen.

Q.   All right.  So what does it show for Anthony Brown's release?

A.   It shows that he was released on August 25, 2011, at 1:58

p.m.

Q.   Does it say the reason for the release?

A.   It says "CUST."

Q.   And what about the description?

A.   "Custody release."

Q.   "Release Agency"?

A.   Is "Other."

Q.   What did you do after seeing that Anthony Brown had been

released according to that document?

A.   Well, knowing that he had been sentenced, I had absolutely

no idea how he could possibly be released from jail, so I

thought maybe there was a chance that the information on there

was just wrong and that he was actually in state prison.

And so I started to search around and call a few

contacts that I had at the state prisons to see if they could

search to see if Anthony Brown had been moved to state prison.

Q.   What did you find out?

A.   They could not find him in state prison databases.

Q.   Now, Special Agent Tanner, I'd like you to look at 155,

Government Exhibit 155.  This is in evidence as a letter

Anthony Brown wrote to the sheriff's department.

A.   Okay.

Q.   Do you recognize the handwriting in that document?

A.   Yes.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Q.    Whose handwriting is it?

A.    It's Anthony Brown.

Q.    How do you know that?

A.    Because he wrote a lot of letters when he was in jail.

Q.    I'm going to now publish for you just a couple portions of it.

        (The exhibit was displayed on the screen.)

BY MR. FOX:

Q.    The date isn't written on there very well, but can you tell what the date is on this document?

A.    September 3, 2011.

Q.    And who does Anthony Brown write this to?

A.    Lieutenant Steve and Captain Tom, Sergeant Long, and Sergeant Grey.

Q.    Are you familiar with a Lieutenant Steve as it relates to all the facts we're talking about here?

A.    Yes.

Q.    Who is that?

A.    Steve Leavins.

Q.    What was his role at the time?

A.    He was a lieutenant at ICIB.

Q.    What about a Captain Tom?

A.    Captain Tom Carey.

Q.    What was his role at the time?

A.    He was a captain at internal criminal investigations.

Q.    What about Sergeant Long?  Are you familiar with a Sergeant Long as it relates to this investigation?

A.    Yes.

Q.    Who is Sergeant Long?

A.    Sergeant Maricela Long also worked for ICIB.

Q.    And then it says "Sergeant Grey."  Are you familiar with a Sergeant Grey?

A.    Not Grey, but there was a Sergeant Craig.

Q.    And who was Sergeant Craig?

A.    He was on ICIB, as well, a sergeant there.

Q.    Now I'm going to show the fifth page of that exhibit.  I'd like you to read, if you could, the portion that I've highlighted on page 5 of this exhibit.

A.    "Lieutenant and Captain, I have cooperated to the fullest and I will continue to cooperate since I've been left for dead by the feds after gathering evidence for two years."

Q.    I'm now going to move on to the 14th page of that exhibit.

      Now, highlighting the middle paragraph, could you please read this paragraph?

A.          "As a person who knows a little something about
            the law, I know the evidence that I provided to
            the FBI means nothing without my testimony and
            without my testimony, being that I am the one who
            shot the videos, took the pictures, gave them the
            notes, names of inmates and deputies involved,

means nothing if I don't testify.  And after being put in this position by the feds and then hung out to dry, I have no desire to testify for the FBI.  However, I will cooperate with the following people of LASD:  Lieutenant Steve, Captain Tom, Sergeant Long, and Sergeant Grey, Sergeant Webber and Sergeant Lopez, and I can't forget Lieutenant Thompson, and I will testify for LASD only if needed."

Q.   Going back to Exhibit 113, you mentioned that Anthony Brown was scheduled to be produced or ordered to be produced to the federal grand jury on September 7th.

Was he produced to the grand jury on September 7th?

A.   No.

MR. FOX:  I'm putting on -- I'm going to pull up the calendar for September 2011 and place on it for September 7th "Brown not produced."

BY MR. FOX:

Q.   Special Agent Tanner, had you been able to locate Anthony Brown by September 7th?

A.   No.

Q.   What steps had you taken to try to locate him in addition to the writ?

A.   Aside from the writ, I would regularly search the inmate locator system that I had access to to see if maybe he would

show up at some point, and I continued to see the same thing, that it showed he was released.

I would frequently check the state system, again thinking maybe he had been transferred to state prison and just wasn't there yet, and again nothing was coming up. And so at that point, I continued to just have absolutely no idea where he was.

Q. I'm going to show you now what's in evidence as Government Exhibit 51.

*(The exhibit was displayed on the screen.)*

BY MR. FOX:

Q. Who is this an e-mail from?

A. It's from Greg Thompson.

Q. Who is it to?

A. The custody captains and custody commander.

Q. And what is the date of the e-mail?

A. Thursday, September 8, 2011.

Q. What does this state?

A. "Just a" --

Q. Let's start with "Subject."

A. "FBI requests for inmate interviews."

Q. And now please go on to the text.

A.       "Just a reminder to inform your staff that all
         requests for inmate interviews made by the FBI or
         any LE officer associated with the FBI must be

referred to MCJ jail liaison for approval. After approval, jail liaison will arrange for the inmate to be transported to MCJ, where the interview may occur. No explanation is necessary as MCJ jail liaison and/or myself will provide the FBI with any information they are entitled to. This has been mandated by department executives and will remain in effect until further notice."

MR. FOX: One moment, Your Honor.

BY MR. FOX:

Q. Special Agent Tanner, I now want you to look at your screen, what's in evidence as Government Exhibit 52.

*(The exhibit was displayed on the screen.)*

BY MR. FOX:

Q. Who is this from?

A. William Carey.

Q. And who is it to?

A. Steve Leavins.

Q. This is dated September 9th of 2011 and it states, "Steve, official request from feds for interview with Brown was made."

Do you know anything about this official request from the feds?

A. Yes.

Q. What do you know?

MR. HOCHMAN: Objection. Foundation.

MR. FOX:  Be happy to lay it, Your Honor.

THE COURT:  All right.

BY MR. FOX:

Q.   Special Agent Tanner, did you speak with your supervisor about whether he could reach out to the sheriff's department to try to schedule an interview of Anthony Brown?

A.   Yes.

Q.   And approximately when did this happen?

A.   After Anthony Brown was not provided to the grand jury on September 7th, I spoke to my supervisor to find out what else we could do and he -- he then, in turn, said he would see how he could maybe arrange to go through somebody he knew that knew the department.

MR. FOX:  Your Honor, we're putting on the calendar a magnet that says "Fed interview request," and putting it on September the 9th.

BY MR. FOX:

Q.   At some point, Special Agent Tanner, did you learn that Anthony Brown had been placed in state custody?

A.   Yes.

Q.   What did you do after you learned that he was in state custody?

A.   As soon as I found out, I contacted the prison that he was sent to, which was in Lancaster, and asked if I could come in for an interview, and they set up the interview.

Q.    Now, we see from the records that he was booked in
Lancaster on September the 12th of 2011.

Approximately when did you learn that that had
happened?

A.    It was either -- I believe it was the 13th, later in the
day on the 13th, I had learned that he was sent to state
prison.

Q.    When did you interview him?

A.    On September 15th.

Q.    So two days later?

A.    Yes.

Q.    Did you bring anyone with you?

A.    Yes.

Q.    Who?

A.    I believe for that meeting, it was Efren Delgado, who was
an agent on my squad at the time.

Q.    What was Anthony Brown's demeanor initially?

A.    He was incredibly angry at me when I showed up.

Q.    Did he say why he was angry at you?

A.    He told me that I left him for dead.

MR. HOCHMAN:  Objection.  Hearsay.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  He told me that I had left him for dead
and he was angry that he would have helped us with all of this

information and that I would just leave him high and dry.

BY MR. FOX:

Q.    Did you talk to him about anything else?

A.    Yes.

Q.    I want to talk about a couple of the subject matters you talked to him about.

Was one of those subject matters what had happened to him over the last couple of weeks?

A.    Yes.

Q.    And did he tell you anything about any names that had been used by the sheriff's department for him?

A.    Yes.

Q.    What did you do with this information?

A.    He had told me that they had changed his name and he had written down the names that they changed it to, along with his booking number, because he told me that it was -- he knew it would be important, and he gave me the names and the booking numbers that they had used on him during that time period.

Q.    And ultimately, what did you do with this information?

A.    I took that information and we requested through the grand jury a subpoena for the sheriff's department to produce those records, the records jackets for those names.

Q.    Had there been a previous request for documents related to Anthony Brown?

A.    Yes.

Q.   And as part of the response to those documents, did his alias information also come through?

A.   Nope.

Q.   So this was a separate request?

A.   It was -- the initial request that we -- the first subpoena, we had asked for anything related to Anthony Brown, and we did not receive any of those documents.  It wasn't until I specifically requested --

MR. HOCHMAN:  Objection.

THE WITNESS:  -- the three --

THE COURT:  Excuse me.  Excuse me one second.

Yes.

MR. HOCHMAN:  Objection.  Foundation on when they didn't receive the documents.

THE COURT:  All right.  "It wasn't until I specifically requested," that objection is sustained as to that phrase.

Next question.

BY MR. FOX:

Q.   Special Agent Tanner, did you become familiar with many of the documents that were being produced by the sheriff's department in this investigation?

A.   Yes.

Q.   And, generally, what was the process being used in obtaining documents from the sheriff's department?

A.    The subpoena that we would outline everything that we wanted would be served on an attorney hired by the county and the sheriff's department.

Q.    Was this Jones Day?

A.    Yes.

Q.    Okay.  Go ahead.

A.    And then the attorney would gather the documents and then, through the attorney, they would provide us the response to the grand jury subpoena.

Q.    Would you obtain indexes of what had been produced?

A.    Yes.

Q.    And at some point, did you learn whether the sheriff's department had produced records related to Anthony Brown's aliases when they produced records requested of Anthony Brown, if that made sense?

A.    It does not.

Q.    Okay.  We've seen the subpoena that discusses Anthony Brown on it.

      At some point, did you learn whether their response to that subpoena provided you with the information regarding Chris Johnson, Kevin King, John Rodriguez, or anyone else?

A.    Yes.  I -- when the --

      MR. HOCHMAN:  Objection.  Nonresponsive at this point.

      THE COURT:  I don't think I've heard anything yet,

so --

MR. HOCHMAN:  Beyond the word "yes," Your Honor.

MR. FOX:  Your Honor --

THE COURT:  That's fine.  Next question.

MR. FOX:  Yeah.

BY MR. FOX:

Q.    Special Agent Tanner, when you didn't obtain records related to those aliases, what did you do?

MR. HOCHMAN:  Objection.  Assumes facts not in evidence as to when she obtained those records, Your Honor.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  Maybe I can be more specific.

I received the first -- or the first subpoena was served in August of 2011.  It requested any and all documents related to Anthony Brown.  We received that response and did not get the information related to his aliases.

At that time, I requested additional subpoena --

MR. HOCHMAN:  Objection.  Vague and nonresponsive as to what "at that time" is, Your Honor.

MR. FOX:  Your Honor, I would like Mr. Hochman, please, to let her finish the answers to the questions.

THE COURT:  Yes.

Go ahead.  That objection is overruled.  You can answer.

THE WITNESS: After not receiving the aliases in the first subpoena where we asked for any and all documents related to Anthony Brown, we used the alias information that Anthony Brown had given us during our interview and had a separate subpoena served on the department specific to those aliases and then finally received that -- those documents much later.

BY MR. FOX:

Q.   Now, let's go back to August 23rd.

After you were -- after your interview with Anthony Brown was terminated by the sheriff's department, did that change your investigation in any way?

A.   Yes.

Q.   What happened?

A.   We had to accelerate portions of the investigation that we had not intended to do at that point.

Q.   Can you explain.

A.   At that point, when we were kicked out of the interview, it was very clear that it was a different environment with the sheriff's department.

And so we were not planning on approaching Gilbert Michel at that point yet until we had a more solid overall view of what he may have been engaged in. But given what had happened in the jails that day, we made the decision that we had to approach him fairly quick in order to seek his cooperation.

Q.    So what did you do?

A.    The very next day on August 24th, a group of us from the squad, we went to Gilbert Michel's apartment and waited for him to get home from work and approached him to let him know that we had information that he had committed a crime.

Q.    What happened after you provided him that information?

A.    We showed him the video of the bribe transaction.  He acknowledged it and then we asked if he wanted to cooperate, and at that time he did not.

Q.    Did you disclose to Gilbert Michel that CJ was an undercover agent?

A.    Yes.

Q.    And when Mr. Michel -- you said that he said that he did not want to cooperate?

A.    It wasn't so much that he didn't want to cooperate; he told us he didn't think he had any information that was helpful for us in our investigation.

        MR. FOX:  Your Honor, I now want to play some of the recordings from the August 30th interview of Gilbert Michel that ICIB conducted that we moved into evidence this morning as Government Exhibit.

        92.  And in the jury books, they've got the transcript binder, and this will be past Tab 93.

BY MR. FOX:

Q.    And, Special Agent Tanner, I'm sorry, I should have done

this before, but have you reviewed a transcript of this

recording that is Exhibit 92?

A.   Yes.

Q.   And is that -- the transcript you reviewed is Exhibit 93;

is that correct?

A.   Correct.

Q.   And is it a true and accurate copy of the clips from

Exhibit 92 that we are going to be playing for this jury?

MR. HOCHMAN:  Objection, Your Honor.  Foundation as

to her knowledge.

MR. FOX:  I can lay a foundation.

THE COURT:  All right.

BY MR. FOX:

Q.   Special Agent Tanner, did you come in yesterday, Sunday,

to review this transcript and listen to the recording?

A.   Yes.

Q.   Did you initial a CD that I'm holding up (indicating)

that's Exhibit 92 --

A.   Yes.

Q.   -- to indicate that you reviewed it?

A.   Yes.

Q.   And did you place markings on the transcript 93 that I'm

holding up that showed that you reviewed this?

A.   Yes.

Q.   And those markings, do they reflect the clips that we are

going to be playing for the jury?

A.    Yes.

Q.    All right.

        MR. HOCHMAN:  Objection.  Foundation as to her

knowledge of the different voices and who they are, Your Honor.

        MR. FOX:  Be happy to lay that foundation,

Your Honor.

BY MR. FOX:

Q.    Special Agent Tanner, during the course of your

investigation, have you become familiar with the name Scott

Craig and the voice?

A.    Very much so.

Q.    How did you become familiar with the voice of Scott Craig?

A.    Because he approached me outside my home and told me he

was going to arrest me.

        MR. FOX:  Your Honor, there's probably one issue that

we should address at sidebar related to one of these voices if

Mr. Hochman is going to be objecting to this.

        THE COURT:  All right.  Let's go to sidebar.

    (Proceedings held at sidebar under seal 11:15 A.M.)

(The following proceedings were held in open court.)

BY MR. FOX:

Q.   And, Special Agent Tanner, without getting into specifics about how you know these voices, are you familiar with the voice of Steven Leavins?

A.   Yes.

Q.   Are you familiar with the voice of Maricela Long?

A.   Yes.

Q.   Are you familiar with the voice of Gilbert Michel?

A.   Yes.

        MR. FOX:  Your Honor, I would now like to be able to use Exhibit 93 as the transcript for Exhibit 92 --

        THE COURT:  All right.

        MR. FOX:  -- and I'll be playing Clip 1 from Exhibit 92.

        (Playing of audiotape.)

        MR. FOX:  Your Honor, I'm putting on the calendar under August 30th, "ICIB Michel."

BY MR. FOX:

Q.   Special Agent Tanner, in the clip we just heard, Mr. Michel said that he had been approached by the FBI the previous Wednesday.

        Which date was that?

A.   August 24th.

MR. FOX:  I'm now going to play the second clip.

*(Playing of audiotape.)*

MR. FOX:  Now playing the next clip, which is Clip 6.

*(Playing of audiotape.)*

MR. FOX:  Now playing Clip 12.

*(Playing of audiotape.)*

BY MR. FOX:

Q.  Special Agent Tanner, we just heard Mr. Michel describe your encounter with him on August 24th.  Initially, he talks about you summarizing the evidence for him and your investigation.

Was that portion largely accurate?

A.  Yes.

Q.  What about the part that he says about, "You could either lose your job or lose your job and go to prison"?  Is that an accurate summary of what you told him?

A.  I don't know that it was those words specifically, but in general, we were explaining to him that given what we knew at that point about what he had done by accepting a bribe is that there really was no question that he was going to lose his job, but if he cooperated with us, you know, maybe we could help him if and when he was charged with his crime.

MR. FOX:  I'm now going to play the 13th clip.

*(Playing of audiotape.)*

*///*

BY MR. FOX:

Q.   I want to ask you about a few things we heard in that clip.

First of all, he describes for you that -- he says the FBI wanted to question him about the brutality inside of the jail.

Is that an accurate depiction of what you told him?

A.   Yes.

Q.   And asking him if he had ever been involved in or ever seen any excessive force, did you ask him those questions, as well?

A.   Yes.

Q.   What about this reference to the Christmas party?  Do you know what that's a reference to?

A.   Yes.

Q.   What is it?

A.   At the end of 2010, there was a Christmas party for the jail deputies and there was an incident where one floor of deputies had gotten into an altercation and assaulted deputies on another floor at the Christmas party.

Q.   Did either of those floors relate to your investigation?

A.   Yes.

Q.   In what way?

A.   The deputies that were responsible for the assault worked on the 3000 floor.

Q.   And where did the other deputies work?

A.   In the visiting section of the jail.

Q.   Was that a part of your investigation, as well?

A.   Yes.

          MR. FOX:  Now I'm going to play Clip Number 18 on page 9.

          (Playing of audiotape.)

          MR. FOX:  Now I'm going to play the 20th clip, which is starting on page 10.

          (Playing of audiotape.)

          MR. FOX:  Now I'm going to play Clip Number 23, which is on page 11.

          (Playing of audiotape.)

BY MR. FOX:

Q.   What information were you trying to get out of Gilbert Michel?

A.   Any information related to our investigation about excessive force in the jails.

          MR. FOX:  Now I'm going to play Clip Number 24, which is on page 12.

          (Playing of audiotape.)

          MR. FOX:  Stopping it in the middle of that clip.

BY MR. FOX:

Q.   Did you instruct Mr. Michel not to contact anyone in the sheriff's department?

A.    Yes.

Q.    And why is that?

A.    Again, it's the same reason as with Deputy Courson, where if he told the sheriff's department that we had approached him and tried to get him to cooperate, if he tells the sheriff's department that, then they become even more aware of our large investigation.

        MR. FOX:  I'm going to continue that clip.

        (Playing of audiotape.)

        MR. FOX:  Now playing Clip 25 on page 14.

        (Playing of audiotape.)

BY MR. FOX:

Q.    I'm going to stop right there and ask you a few questions.

        This is on the middle of page 16.

        First of all, Mr. Leavins mentions something about, "Did they ever mention wiring you up?"

        Do you understand what that means?

A.    Yes.

Q.    What does that mean?

A.    To wear a recording device, like a -- that -- either a video or audio recording device.

Q.    There's another mention to Lawrence Middleton and then that the FBI agent said to Mr. Michel, "I can't talk to you anymore."

        Who said that to Mr. Michel?

A.   I believe it was Special Agent Lam.

Q.   Is there generally a reason why the FBI at that point would not be able to talk to Gilbert Michel?

A.   Absolutely.

Q.   What is that reason?

A.   As soon as somebody tells us that they have retained an attorney, we cease all contact with them and tell them that their attorney has to contact the United States Attorney's office, because it's not appropriate for us to continue to have contact with someone once they have an attorney.

Q.   And who at the US Attorney's office did Mr. Michel get instructed to talk to?

A.   Lawrence Middleton, the chief of the section.

Q.   And that was his -- I said Mr. Michel, but that's actually his lawyer, right, that was supposed to contact Mr. Middleton?

A.   Correct.

         MR. FOX:  Let me continue.

         (Playing of audiotape.)

         MR. FOX:  All right.  Now going to play Clip Number 26 on page 17.

         (Playing of audiotape.)

         MR. FOX:  Now playing Clip Number 27, which is on page 18.

         (Playing of audiotape.)

         MR. FOX:  Now playing Clip 29.  That's on page 19.

(Playing of audiotape.)

BY MR. FOX:

Q.   Special Agent Tanner, based on the times reflected in the recordings, how long of a break was it between their sessions with Mr. Michel?

We just heard they were going back off tape of Mr. Michel and that they would be going back on.  Are you aware of how long they were off tape?

A.   I believe it was an hour.

Q.   Okay.  And it says "8:10" at the end.

MR. FOX:  Let me play now Clip 30.

(Playing of audiotape.)

BY MR. FOX:

Q.   Okay.  So how long was it?

A.   An hour and 45.

Q.   Thank you.

(Playing of audiotape.)

MR. FOX:  Now playing Clip Number 31.

(Playing of audiotape.)

MR. FOX:  Now playing the 33rd clip, which is on page 21.

(Playing of audiotape.)

MR. FOX:  Your Honor, I would like temporarily for the jury to put away this transcript binder and take out the Exhibit 3 binder, because I'm going to be playing for them Clip

Number 15 from Exhibit 2, which is obviously right behind the 15th tab in Exhibit 3.

I'm going to play that now.

(Playing of audiotape.)

BY MR. FOX:

Q.   We just heard on that interview of Mr. Baca on April 2013 him saying that as things emerged, Captain Carey would call him and tell him.

I want to have you look, Special Agent Tanner, at Government Exhibit 196.

(The exhibit was displayed on the screen.)

BY MR. FOX:

Q.   What are we looking at here?

A.   These are the County-issued cell phone for William Tom Carey.

Q.   I'm going to be going over a lot of phone records with you later in your testimony.  This one, we see that the number is assigned to William Carey or Tom Carey.

Is that the case with all sheriff's department cell phones, that you can see who the individual is based on the number it's assigned to according to the phone records?

A.   On some of them.

Q.   And what about the others?

A.   The other ones, they're -- sometimes the name is accurately reflected with the number; other times, the name and

the number listed, the name associated with the number is from

the previous sheriff's department employee that had the phone

number and not the current person who holds that number.

Q.   Did you obtain rosters that would show you who was

assigned which number around the time of August and September

of 2011?

A.   Yes.

Q.   Was this an accurate number for Mr. Carey, according to

that roster?

A.   Yes.

Q.   I'm now going to show you at the 3:43 p.m. time on

August 30th.

        MR. FOX:  Still on page 15.

BY MR. FOX:

Q.   I've just highlighted the 3:43 p.m. call.

        Do you recognize this number, (323)829-7180?

A.   Yes.

Q.   What is that number?

A.   That's Mr. Baca's driver.

Q.   What does it show that happened at 3:43 p.m., according to

these phone records?

A.   Mr. Carey called Mr. Baca's driver.

Q.   How long does it reflect that this one call was?

A.   One minute.

Q.   And, again, we're going through a lot of phone records, so

I'll ask you this now.

You obviously can't tell the content of any call that we're going to go through; is that correct?

A.   Correct.

Q.   And when we see a one-minute call, do you know whether they were able to connect during that one minute?

A.   There's no way to know, just based on these records, whether or not they spoke or if it just went to voice mail.

MR. FOX:   Now going back to the Exhibit 3 binder, Your Honor, I'd like the jury to flip to Tab 23.   I'm going to play Exhibit 2, Clip 23, once they're there.

All right.   I'm going to begin.

(Playing of audiotape.)

MR. FOX:   And, Your Honor, I'm going to put on the calendar "Carey calls Baca driver" on August 30th.

The next portion that I'm going to be going into is about 20 minutes in recordings.   I see that it's noon.   I'm happy to go into it unless you want to take a break.

THE COURT:   Why don't we take our final break of the day.

Again, ladies and gentlemen, I want to remind you until this trial is over, you are not to discuss this case with anyone, including your fellow jurors, members of your family, people involved in the trial, or anyone else, nor are you allowed to permit others to discuss the case with you.   If

anyone approaches you and tries to talk with you about this case, please let me know about it immediately.

Do not read or listen to any news reports or other accounts about the trial.

Finally, you're reminded to keep an open mind until all of the evidence has been received, you've heard the arguments of call, the instructions of the Court, and the views of your fellow jurors.

If you need to speak with me, simply give a note to the clerk.

Let's come back at 12:15.

THE CLERK:  All rise.

*(Jury out at 11:57 A.M.)*

*(The following was heard outside the presence of the jury.)*

THE COURT:  All right.  You may step down.

Is there anything else we need to take up at this time?

MR. FOX:  No, Your Honor.

MR. HOCHMAN:  Not at this time, Your Honor.

THE COURT:  All right.

*(Recess taken 11:58 A.M. to 12:15 P.M.)*

*(The following was heard outside the presence of the jury.)*

THE COURT:  All right.  Let's bring the jury.

(Jury in at 12:17 P.M.)

MR. FOX:  May I proceed, Your Honor?

THE COURT:  Yes, please.

BY MR. FOX:

Q.   Special Agent Tanner, did you yesterday also review what's in evidence as Government Exhibit 88?

A.   Yes.

Q.   And did you initial it, as well (indicating)?

A.   Yes.

Q.   Is this the recording of William David Courson that's conducted by ICIB on August 30th of 2011?

A.   Yes.

Q.   Did you compare it to Government Exhibit 89, which is a transcript?

A.   Yes.

Q.   And did you make markings on which clips were being played that are reflected in Government's Exhibit 89?

A.   Yes.

Q.   Does Government Exhibit 89 accurately state what was said and who said what on Government Exhibit 88?

A.   Yes.

MR. FOX:  Your Honor, at this point in time, I'd like to have the jury take out their transcript binder that has the transcript in -- 89 in it, and I'm going to play clips from Government Exhibit 88.

May I proceed, Your Honor?

THE COURT:  Yes.

MR. FOX:  Here's the first clip from page 1.

*(Playing of audiotape.)*

MR. FOX:  Your Honor, putting on the calendar a magnet that says "ICIB Courson" for August 30th.

BY MR. FOX:

Q.   Special Agent Tanner, we saw the phone record earlier that shows that Mr. Carey called Mr. Baca's driver at 3:43.

When does this interview happen in relation to that phone call?

A.   This interview was prior to that phone call.

MR. FOX:  Now I'm going to play the second clip, which is on page 2.

*(Playing of audiotape.)*

BY MR. FOX:

Q.   I'm going to stop right there and just ask you a quick question.

We just heard Mr. Courson tell Mr. Craig, Mr. Leavins, and Ms. Long that you informed him that you didn't want David to know that you were meeting up with him.

Is that true, that you didn't want him meeting up -- you didn't want David Lam knowing that you were meeting up with Mr. Courson?

A.   That's what I told him in terms of why -- when I gave him

the business card, but Agent Lam was well aware of the entire recording -- me wiring up and recording Deputy Courson.

Q.   Why did you tell Mr. Courson that you didn't want your partner knowing about it?

A.   It was one additional way to keep Deputy Courson from telling other people that we were meeting up, so it was one more way for me to get him to keep the meetings quiet.

MR. FOX:  Continuing to play that clip.

(Playing of audiotape.)

BY MR. FOX:

Q.   Stopping right there for a second.

Mr. Courson just said that he got an e-mail maybe two weeks ago and this is being -- this interview is being conducted on the 30th.

Is there a reason why you interviewed Mr. Courson approximately two weeks before August 30th?

A.   We didn't interview --

Q.   I'm sorry.  Did I say interview?  E-mail.  E-mail Mr. Courson approximately two weeks before August 30th.

A.   Yes.

Q.   Why was that?

A.   I was trying to spark a conversation to see if he would mention anything about the phone being found.

Q.   Why did you want that?

A.   Just to see if there had been any deputies talking about

it or if there was anything internally in the jails that anyone knew.

So when I asked that, I was hoping that he would give me some sort of indication about maybe what he had heard, if anything at all.

Q.   Was that to see if they had made the connection between the phone and the FBI?

MR. HOCHMAN:  Objection.  Leading.

THE COURT:  Sustained.

BY MR. FOX:

Q.   Why was that, Special Agent Tanner?

A.   To determine if the sheriff's department had any idea that the FBI was investigating, as well as whether the phone was linked to us.

MR. FOX:  Continuing that clip.

*(Playing of audiotape.)*

BY MR. FOX:

Q.   Stop right there.

What is a 415?

A.   It's a deputy-involved fight.

MR. FOX:  I'm going to continue.

BY MR. FOX:

Q.   Oh, whose code is that?

A.   The sheriff's department uses that.

*(Playing of audiotape.)*

BY MR. FOX:

Q.   Stopping right there on page 5, Mr. Courson just explained how you had told him that you were conducting human trafficking investigations.

Why did you tell him that?

A.   Because I was not going to tell him the real reason I was there was to investigate the department members -- the deputies in the jails.

MR. FOX:  Continuing that clip.

(Playing of audiotape.)

BY MR. FOX:

Q.   Stopping right there after Mr. Courson says that you were doing some kind of report.

Do you have an understanding as to what Mr. Courson is referencing there?

A.   Yes.

Q.   What is that?

A.   I told him that I was writing a paper for school and that I wanted to reference the manual that they used for use of force defensive tactics so that I could obtain it.  And so I believe that's what he's referencing in terms of the report.

MR. FOX:  Continuing with the clip.

(Playing of audiotape.)

BY MR. FOX:

Q.   Stop right there.

Who was Deputy Rhodes in term of your investigation?

A.   He was a deputy that was mentioned by multiple inmates as one of the deputies that was engaging in the excessive force.

Q.   And why did you ask Mr. Courson about Deputy Rhodes?

A.   Well, this deputy did, in fact, give us dirty looks when we were there, but more importantly, that was my way of trying to spark the conversation to see if he would give me any information about Deputy Rhodes.

MR. FOX:   Continuing the clip.

(Playing of audiotape.)

MR. FOX:   I'm now going to play Clip Number 3 from Exhibit 88.

(Playing of audiotape.)

BY MR. FOX:

Q.   Is that your real personal e-mail address?

A.   No.

Q.   Then why did you give that e-mail address to Mr. Courson?

A.   That's the e-mail that I set up specifically to communicate with him.

Q.   Did you save all the e-mails that you sent and you received from Mr. Courson -- you sent to and received from Mr. Courson during this time?

A.   Yes.

MR. FOX:   I'm now going to play Clip Number 4.

(Playing of audiotape.)

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

MR. FOX:  I'm going to stop it right there on the top of page 8.

BY MR. FOX:

Q.    He's referring to the "3000 boys."

Do you know who the "3000 boys" was a reference to?

A.    Yes.

Q.    What was that?

A.    On the 3000 floor, one of the floors we were focusing on, there was a group of deputies that labeled themselves as the "3000 boys."  And those were the group of deputies that we were primarily focusing on because those were the ones that were alleged to be engaging in the excessive force.

Q.    And Mr. Courson referred to them as a clique.

Did the fact that there might have been a clique on the 3000 floor affect your investigation in any way?

MR. HOCHMAN:  Objection.  Relevance and prior motions, Your Honor.

THE COURT:  Let's go to sidebar.

*(Proceedings held at sidebar under seal 12:38 P.M.)*

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

(*The following proceedings were held in open court.*)

MR. FOX:  May I proceed, Your Honor?

THE COURT:  Yes.

BY MR. FOX:

Q.   Special Agent Tanner, by this time, August 30, 2011, had you heard about allegations there were cliques in the jails?

A.   Yes.

Q.   And did that affect your investigation in that you believed that the deputies would be less likely to cooperate with your investigation if it meant that they would have to report on other deputies within their clique?

A.   Yes.

MR. FOX:  I'm going to continue, Your Honor.

(*Playing of audiotape.*)

BY MR. FOX:

Q.   Special Agent Tanner, we just heard some questions about that briefing that happened with Mr. Courson's captain and they said, "Let's go off tape."

Did you ever receive any recordings as part of your investigation that showed what they talked about with Mr. Courson once they went off tape?

A.   No.

Q.   Any reports of that that you saw either?

A.   No.

        MR. FOX:  Your Honor, pursuant to an agreement with counsel, I'd like to move in Government Exhibit 94, which is a voice mail that Scott Craig left on a number on September 9, 2011.

        THE COURT:  All right.

        MR. HOCHMAN:  I'm sorry.  No objection.

     *(Government's Exhibit 94 admitted into evidence.)*

BY MR. FOX:

Q.   And, Special Agent Tanner, have you reviewed this exhibit I just referenced?

A.   Yes.

Q.   Can you look at Exhibit 95.  Do you see it?

A.   Yes.

Q.   What is Exhibit 95?

A.   It is a transcript of the voice mail call.

        MR. FOX:  Your Honor, I'd like to play Exhibit 94 for the jury now.

        The transcript is in the transcript binder behind Tab 95.

        *(Playing of audiotape.)*

BY MR. FOX:

Q.   Let me stop it right there.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Sorry, you're in mid-drink, but he just said "4147" were the last four digits he was dialing.

Were those your last four digits?

A.    No.

Q.    What were your last four digits of your phone at the time?

A.    It was 4174, not -47.

Q.    Did you ever receive this voice mail?

A.    No.

*(Playing of audiotape.)*

MR. FOX:  Your Honor, putting on the calendar under September 9th "Craig voice mail."

BY MR. FOX:

Q.    Special Agent Tanner, where in relation to the denied court order -- when in relation to the denied court order did that voice mail occur, according to the date on the voice mail?

A.    It was the day after the denied court order.

Q.    Did you receive any phone calls from any member of ICIB from August to September of 2011?

A.    No.

Q.    And in your investigation, did you receive copies of any other voice mails left for you by any member of the sheriff's department from August to September of 2011?

A.    No.

Q.    You mentioned earlier that the investigation was going to become overt as soon as some of this -- well, some of these

events happened.

Did it also become public at some point?

A.   Yes.

Q.   And we saw an e-mail earlier today about -- and I'll put it up on the screen -- this LA Times article on September 25th.

*(The exhibit was displayed on the screen.)*

MR. FOX:   This is Exhibit 62.

BY MR. FOX:

Q.   Did anything unusual happen to you the day after this article was published?

A.   Yes.

Q.   What happened?

A.   I arrived home from work, and as I was walking to the door of my apartment, there were two sheriff's department sergeants standing at my door.

Q.   Is the confrontation they had with you that day reflected in Government Exhibit 99?

A.   Yes.

MR. FOX:   Your Honor, you previously admitted this provisionally.  I would move the full admission of Government Exhibit 99.

THE COURT:   Any objection?

MR. HOCHMAN:   No objection, Your Honor.

THE COURT:   It will be received.

*(Government's Exhibit 99 admitted into evidence.)*

MR. FOX:  I'm going to now play this for the jury.

*(Playing of videotape.)*

BY MR. FOX:

Q.   Pausing it right there with Sergeant Craig raising his arms after he said, "We could either do this," what did you understand him to mean at that point?

A.   That he could arrest me right there in front --

MR. HOCHMAN:  Objection.  Calls for speculation.

THE COURT:  Overruled.

THE WITNESS:  That he could arrest me right in front of my apartment, in front of neighbors and everything.

MR. FOX:  I'm going to continue the recording.

*(Playing of videotape.)*

BY MR. FOX:

Q.   Did Mr. Craig or Ms. Long tell you what you had done that might warrant you being arrested or charged with a crime?

A.   No.

Q.   Had you done anything wrong?

A.   No, absolutely not.

Q.   What did you do after you went inside?

A.   I immediately contacted my supervisor and told him what had just happened, and he told me to immediately return to the FBI office.

Q.   Did you do that?

A.   Yes.

Q.   And what happened after you returned?

A.   When I got back to the office, I was asked to go and meet with the executives and explained to them what had happened, and they basically said they were going to address it as soon as possible.

Q.   Did you obtain anything from Mr. Craig or Ms. Long when they confronted you?

A.   Yes.

Q.   What did you obtain?

A.   Their business cards.

Q.   Did you do anything with their business cards?

A.   Yes.

Q.   What did you do?

A.   I gave the business cards to my supervisor, Carlos Narro.

Q.   And you said that you also had meetings with your front office; is that right?

A.   Yes.

Q.   Who was that?

A.   The assistant director in charge, Steve Martinez at the time.

Q.   And what is it the two of you discussed?

A.   After just explaining what had happened, he asked me -- given everything that had occurred, he wanted to make sure I felt comfortable staying on the investigation, given what had happened.

Q.   What did you tell him?

A.   I told him I absolutely wanted to stay on the investigation.

Q.   Why?

A.   At that point, I had put a significant amount of work into the investigation.  I had built a very good rapport with a lot of the individuals I was working with, and I believed that it was an important investigation and I wanted to continue working on it.

Q.   Was that the only discussion you had with anybody about whether you should remain on the investigation?

A.   No.

Q.   Who else did you speak with?

A.   There were at least one or two conversations along with my office, as well as the United States Attorney's office, on whether I would stay on as the case agent on the case.

Q.   Over what period of time are we talking about?

A.   It was at least a few months.

Q.   Did this confrontation affect your investigation in any way?

A.   Yes.

Q.   What way?

A.   After what happened, I had -- I didn't go back to the jails to interview many inmates that I had planned to interview because I had absolutely no idea what was going to happen if I

did try and go to the jails.

There were also plans to potentially approach and speak to other deputies, and at that time, given what had happened, I held off on doing that because, again, I just didn't know what was going on and didn't want there to be any -- any other incident like that happened at my apartment that day.

Q.   Did this affect the FBI's ability to have other inmates cooperate in any way?

A.   Yes.

Q.   How so?

A.   One of the things that we were doing in the jails is we would see an inmate and sometimes tell them we would be back to talk to them again.

At that time, since we weren't going back to the jails, we weren't going back to talk to those inmates, and that can be very damaging with our rapport with those inmates, who already have a hard time trusting us and now we've said we were going to come back and then we didn't come back.

Q.   Special Agent Tanner, we've heard that the investigation into the obstruction began about a year after these events; is that correct?

A.   Approximately.  A little less than a year, yes.

Q.   And at some point in time, did you begin participating in that investigation?

A.   Yes.

Q.   As part of that, did you obtain and analyze any records?

A.   Yes.

Q.   What types of records?

A.   I received a significant amount of phone records, as well as other documents, but a large volume of phone records.

Q.   Why?

A.   One of the things that I wanted to do in addition to the investigation we had already conducted was also look over phone records and see if there was any information that I could take away from the phone records for all of the individuals involved.

Q.   Can you please look at Government Exhibit 210.

A.   Okay.

Q.   What is Government Exhibit 210?

A.   It is the Verizon cell phone records for Chris Nee's County-issued cell phone.

Q.   Is that the name that's listed in Government Exhibit 210?

A.   No.

Q.   How do you know it's Chris Nee's records, then?

A.   Through sheriff's department rosters, as well as I believe there was e-mails that Chris Nee had sent that he lists this number as his cell phone number.

          MR. FOX:  Your Honor, I move for the admission of Government Exhibit 210.  There has already been a 902(11)

certificate with it.

MR. HOCHMAN:  No objection, Your Honor.

THE COURT:  It will be received.

*(Government's Exhibit 210 admitted into evidence.)*

BY MR. FOX:

Q.    Showing you just the first page, you said it was not Chris Nee's name.  Whose name was it?

A.    Jack McClive.

Q.    And this is for (213)505-0878?

A.    Correct.

Q.    I'd now like, Special Agent Tanner, for you to look at the following exhibits, please:  156 -- it may be in two separate books and I apologize for that -- 156, 157 -- let me know when you've gotten to both of those.

A.    Okay.

Q.    158.

A.    Okay.

Q.    170.

A.    Okay.

Q.    172.

A.    Okay.

Q.    181.

A.    Okay.

Q.    211.

A.    Okay.

Q.    212.

A.    Okay.

Q.    What are these exhibits?

A.    They are phone summary charts that I did using the Verizon phone records from the phone company.  I put them into charts that made them easier to look at and view and understand.

Q.    Are they based on voluminous phone records?

A.    Yes.

Q.    And are they accurate depictions of what the phone records show?

A.    Yes.

        MR. FOX:  Your Honor, I move for the admission of those exhibits, 156, 157, 158, 170, 172, 181, 211, and 212.

        MR. HOCHMAN:  Objection, Your Honor, to the accuracy of the charts.

        THE COURT:  Overruled.  They will be received.

    *(Government's Exhibits 156-158 admitted into evidence.)*

    *(Government's Exhibit 170 admitted into evidence.)*

    *(Government's Exhibit 172 admitted into evidence.)*

    *(Government's Exhibit 181 admitted into evidence.)*

    *(Government's Exhibits 211-212 admitted into evidence.)*

BY MR. FOX:

Q.    Special Agent Tanner, I'd like you to look at Exhibit 226.

A.    Okay.

Q.    Do you recognize 226?

A.   Yes.

Q.   What is it?

A.   It's printouts of a PowerPoint that is a visual of the phone summary charts.

Q.   Will Exhibit 226 assist you in your testimony today?

A.   Yes.

         MR. FOX:  Your Honor, for demonstrative purposes, at some point I will be referencing and showing to the jury Exhibit 226, again solely for demonstrative purposes.

         MR. HOCHMAN:  Objection as to the earlier stated grounds, Your Honor.

         THE COURT:  Overruled.

BY MR. FOX:

Q.   Special Agent Tanner, I want to start with Government Exhibit 197.

     *(The exhibit was displayed on the screen.)*

BY MR. FOX:

Q.   What is this that we're looking at?  This is not one of your summary charts, right?

A.   Correct.

Q.   And what is it?

A.   These are the phone records, the toll records, for the cell phone that belonged to Leroy Baca.

Q.   And showing you the time period, when does this start?

A.   It starts on August 1st.

Q.   When does it end?

A.   September 30th.

Q.   Have you looked to see how many calls there were between your assistant director in charge, Steve Martinez, and Mr. Baca from August 1, 2011, to September 30, 2011, that are reflected in Mr. Baca's cell phone records?

A.   Yes.

Q.   How many?

A.   I believe there's four total, three from Steve Martinez's cell phone and then one that is from an FBI desk line to the cell phone.

Q.   Now, with all these records that we're going to be looking at, I think you said that they're cell phones that you've analyzed; is that correct?

A.   Correct.

Q.   So with all these records, do they reflect every call that might have occurred between the participants that we're going to be talking about?

A.   No.

Q.   Why not?

A.   If there were phone calls on cell phones that I don't know of or it could be on a desk line, a hard line that I don't have records for.

Q.   Special Agent Tanner, I'm going to show you Government Exhibit 231.

What does Government Exhibit 231 depict?

A.   It's similar to an organizational chart, but it's only the members that we've discussed here in the last few weeks.

MR. FOX:  And, Your Honor, for demonstrative purposes only, I'm going to be referencing this in Special Agent Tanner's testimony.

BY MR. FOX:

Q.   Special Agent Tanner, I'm showing you one of your summary charts, Government Exhibit 156.

(The exhibit was displayed on the screen.)

BY MR. FOX:

Q.   What does this chart reflect?

A.   This chart is any phone calls that occurred between -- between cell phones of Paul Tanaka and either Mr. Baca, his driver, or his aide.

Q.   And what does it show for August -- the period of August 18, 2011, and September 26th of 2011?

A.   Generally, it shows that on key days when things were occurring within this six-week time period, that there were phone calls between Mr. Tanaka and either Mr. Baca and his aide or his driver.

Q.   Does this include all calls between the two during this period?

A.   No.

Q.   Why not?

A.   Any calls that would have been on a different cell phone that I don't have or a desk line between either one of them, I don't have those records.

Q.   And what does this generally reflect as you're looking -- well, first of all, let me back up.

Why did you create this chart?

A.   It's a much easier way to look at phone calls between individuals than to look at just pages and pages of records that only show phone numbers.  It's just a way to get a better visual of days and times specific to the individuals that we were looking at.

Q.   What did you determine after conducting this analysis?

A.   That the days and times where significant things happened with Anthony Brown or the cell phone, there were phone calls between Mr. Baca, his aide and driver, or Paul Tanaka.

Q.   If you can look now at Government Exhibit 158, which I'll put on the screen.

     *(The exhibit was displayed on the screen.)*

BY MR. FOX:

Q.   What does this reflect?

A.   This is a chart I made that showed any phone calls that Mr. Baca had from the cell phone of either Tom Carey, Steve Leavins, Greg Thompson, Scott Craig, Maricela Long, Mickey Manzo, Gerard Smith, or James Sexton.

Q.   Why did you analyze Mr. Baca's calls with these

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

individuals during this time period?

A.   These were the individuals we knew to be involved and so I wanted to look to see the type of contact that was going on between them.

Q.   When you saw only one call between any of these individuals and Mr. Baca, did you stop your analysis there?

A.   No.

Q.   Why not?

A.   Because I knew that there was also additional ways that they would contact each other, and so I did additional investigation and additional charts to show once I added in Mr. Baca's aides and Mr. Baca's drivers, then the chart became larger.

Q.   If you can look now at Government Exhibit 212, which I'll put on the screen.

     (The exhibit was displayed on the screen.)

BY MR. FOX:

Q.   What does Government Exhibit 212 reflect?

A.   These are phone calls that -- from Tom Carey's and Steve Leavins' cell phones, county cell phones, along with Mr. Baca or his driver.

Q.   And what did you determine after you conducted this analysis?

A.   Similar to the chart with Mr. Tanaka is that on days when key things were occurring throughout this time period was the

day -- were the days when Mr. Leavins and Mr. Carey had contact with either Mr. Baca or his driver.

Q.   With the last two charts we've looked at, the one with the one call with Mr. Leavins and this one with several between these participants and Mr. Baca or his driver, did they include Mr. Tanaka's contacts with Mr. Baca or Mr. Baca's driver?

A.   Not in the last two charts, no -- well, this one and the chart before.

Q.   Let me show now Government Exhibit 211.

      (The exhibit was displayed on the screen.)

BY MR. FOX:

Q.   What is this?

A.   This is a chart that includes Paul Tanaka, Tom Carey, and Steve Leavins, and calls that they had with Mr. Baca, his driver, or aide.

Q.   And this is more than one page; is that right?

A.   Yes.

Q.   Approximately how many calls are on this page from August 18th to August 28th?

A.   Between 18 and 20.

Q.   Between the 18th and 28th.

A.   I was saying between 18 and 20 calls.

Q.   Oh, I'm sorry.  I thought you were repeating what I said.

      Let me go to the second page now.  How many calls are reflected between August 29th and September 27th?

A.   If my counting is correct, about 22.

Q.   So overall, approximately how many calls are between these cell phones that we've been discussing?

A.   Over 40.

Q.   Now I'm going to show the first page of Government Exhibit 172.

     (The exhibit was displayed on the screen.)

BY MR. FOX:

Q.   What is this?

A.   This is a chart that outlines -- it has both times of e-mails and what those e-mails were generally about, as well as the phone calls.  And it puts it together in kind of like a timeline, including the e-mails or significant events that occurred.

Q.   And we see the first one, "Baca receives e-mail from Steve Martinez," that says -- in the column under Exhibit 15.

          MR. FOX:  Showing Exhibit 15.

     (The exhibit was displayed on the screen.)

BY MR. FOX:

Q.   Is this where you got that information that Mr. Martinez reached out to Mr. Baca?

A.   Yes.

Q.   And, Special Agent Tanner, we're now going to be showing the Government Exhibit 226, and if you can keep Exhibit 172 in front of you if that would help you.

Could you please describe for the jury what happens initially?

A.   Well, at 5:06 is when Mr. Baca receives the e-mail from Steve Martinez requesting the phone call, and then at 5:40 and 5:45 Mr. Baca has a phone call with Steve Martinez.

Q.   What happens next?

A.   At that point, right after those phone calls, Mr. Baca calls his executive secretary, and then at 5:55 he calls like the general office of the sheriff line.

Q.   What line is that?

A.   The last part of the extension is -5000, 526-5000.

Q.   And after these two calls to his secretary in his office, what occurs?

A.   Mr. Baca receives a call from Paul Tanaka.

Q.   What happens next?

A.   After that call, Mr. Tanaka calls his aide, Chris Nee.

Q.   And that's at 6:07 and 6:21 p.m.?

A.   Correct.

Q.   And it says "Tanaka aide" on here.  That's a reference to Chris Nee; is that correct?

A.   Correct.

Q.   And what happens with Mr. Nee at that point?

A.   Around that time period, there's four separate calls between Chris Nee and Tom Carey.

Q.   And then?

A.   At 6:48, Paul Tanaka called Mr. Baca's driver.

          MR. FOX:   Can you please advance this one slide.

          Thank you.

BY MR. FOX:

Q.   Go ahead and describe what we see here.

A.   Chris Nee called Greg Thompson at 6:49 p.m.

Q.   And then what happens?

A.   And then Chris Nee also calls Tom Carey at 7:20 p.m.

          MR. FOX:   Go ahead and advance, please.

BY MR. FOX:

Q.   What do we see at 7:42?

A.   Greg Thompson calls Mickey Manzo at 7:42.

Q.   And what about Mr. Tanaka?  Who does he call at 7:42?

A.   At the same time, Paul Tanaka calls his aide, Chris Nee.

Q.   How long is their discussion?

A.   It's four minutes.

Q.   And what happens right after that?

A.   Paul Tanaka calls Lee Baca.

Q.   And is there another call at 7:46?

A.   Yes.

Q.   What is that?

A.   Right after that, Paul Tanaka calls Mr. Baca's driver.

Q.   How long is that call?

A.   Two minutes.

Q.   And then I want to show you Government Exhibit 16.

*(The exhibit was displayed on the screen.)*

BY MR. FOX:

Q.   On August 18th at 8:59 p.m., what is the subject of this e-mail between Mr. Nee and Julie Montgomery?

A.   "Sheriff's meeting."

Q.   And go ahead and read what it says.

A.   "Regarding the sheriff's meeting with the undersheriff, Captain Carey, Lieutenant Thompson, and Lieutenant Gallagher at 2:00 p.m., I have reserved the EPC room from 2:00 p.m. to 2:30 p.m."

MR. FOX:   Putting on the calendar under August 18th "Baca meeting scheduled."

BY MR. FOX:

Q.   Special Agent Tanner, I'd now like to turn your attention to Government Exhibit 172, page 2.

*(The exhibit was displayed on the screen.)*

BY MR. FOX:

Q.   What does this reflect?

A.   This is the same type of chart, only for August 19.

Q.   And what is reflected in the first entry?

A.   That is the time period where Deputy Mickey Manzo and Gerard Smith were interviewing Anthony Brown.

Q.   What do you base that on?

A.   In the recording when they say the start and end times, that's what that's based on.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

Q.   And what about the 10:13 a.m. entry?

A.   Mickey Manzo called Greg Thompson for a minute.

Q.   I'm now going to show you Government Exhibit 120.

     *(The exhibit was displayed on the screen.)*

BY MR. FOX:

Q.   What is Government Exhibit 120?

A.   It's one of the pages from Mr. Baca's calendar.

Q.   And on August 18th [sic], what's reflected in what I've just highlighted?

A.   A 2:00 to 2:30, "Meet with Undersheriff Tanaka, Captain Tom Carey, Lieutenant Liam Gallagher, and Lieutenant Greg Thompson."

          THE COURT:   Is that August 18th or August 19th?

          MR. FOX:   19th, Your Honor.   I'm sorry if I misspoke.

BY MR. FOX:

Q.   So this is August 19th, a 2:00 to 2:30 p.m. meeting between Mr. Baca, Mr. Tanaka, Mr. Carey, Mr. Gallagher, and Mr. Thompson scheduled; is that correct?

A.   Yes.

Q.   Where does it say the meeting's going to be held?

A.   "Here" or EPC.

Q.   Now I'm going to show you Government Exhibit 226 on the screen for August 19th starting at 3:45, about an hour after that meeting.

          What happened at 3:45?

A.    Mr. Baca called the FBI Los Angeles office.

Q.    And at 5:07?

A.    Mr. Martinez of the FBI called Mr. Baca.

Q.    How long is that call?

A.    For three minutes.

Q.    And what happens at 5:09?

A.    Mr. Baca called Paul Tanaka and they spoke for ten minutes.

Q.    Now, let's just go over the math a little bit.

      You said the phone records reflected a three-minute call between Mr. Martinez and Mr. Baca and then, according to the records, they show a call two minutes later.

      Do you know how that can happen?

A.    Yes.

Q.    How can that happen?

A.    The phone record -- the minutes and the times on the portion of the phone records, they are solid numbers.  So if it was one minute one second, it will either round down or round up, depending on how close it is.  So if a call is two minutes and 31 seconds, it may round it up to three, and then also if it's -- like depending on the time of the call.

      So it's just that the numbers are solid numbers, one minute, two minute, three minute, four minute, as opposed to the exact amount of the call.

      MR. FOX:  Okay.  If we can advance now.

BY MR. FOX:

Q.   What happens at 5:23 p.m.?

A.   Paul Tanaka called Greg Thompson and they speak for seven minutes.

Q.   And at 7:22?

A.   Mr. Baca called Mr. Tanaka and they speak for four minutes.

Q.   What happens next?

A.   There are multiple calls between Paul Tanaka, Tom Carey, Greg Thompson, and Steve Leavins.

Q.   And although you don't know the content of these calls, how does this help you?

A.   It helps to show the involvement between the various individuals that were involved.  And so when you're looking at phone records, you're not -- if you don't have content, you're just looking at the type of communication, the frequency, and also the flow -- I shouldn't say the flow of information -- the way the calls work if there's multiple calls and then at the end of that sequence of calls, if they go back to another individual.  And that's what happened here.

Q.   And we see five calls between Mr. Tanaka, Mr. Carey, Mr. Thompson, and Mr. Leavins that begin right after the call between Mr. Baca and Tanaka.

      What happens next?

A.   After that, Mr. Tanaka calls Mr. Baca.

Q.   How long of a phone call is that?

A.   Three minutes.

          MR. FOX:  Putting on August 19th a magnet that says "Baca/Tanaka calls."

BY MR. FOX:

Q.   I now want to have you look at Government Exhibit 172, page 3.

          *(The exhibit was displayed on the screen.)*

BY MR. FOX:

Q.   What does this reflect?

A.   This is another -- another chart that is for August 23rd.

Q.   And what happens from 10:40 to 11:40, approximately?

A.   That's the time that we were at Men's Central Jail interviewing Anthony Brown.

Q.   What do we see at 12:29?

A.   Mr. Thompson calls Paul Tanaka for two minutes.

Q.   And three minutes later?

A.   Mr. Carey calls Mr. Tanaka for eight minutes.

Q.   And then after the 12:32 call between Mr. Carey and Mr. Tanaka, what happens next?

A.   During that time, that's when Mr. Carey, Mr. Leavins, Mr. Smith, and Mr. Manzo interviewed Anthony Brown.

Q.   And at 2:18, about 12 minutes after the interview of Mr. Brown ends?

A.   Mr. Carey calls Chris Nee, who was Undersheriff Tanaka's

aide.

Q.   And we see at 2:30 p.m., it says Mr. Baca has a calendar entry that says, "Meet with Mr. Tanaka."  I'm showing you now the second page from Mr. Baca's calendar.

     *(The exhibit was displayed on the screen.)*

BY MR. FOX:

Q.   Where does it show that that meeting occurred?

A.   That says "Here."

Q.   Showing you the now fourth page of Exhibit 172, your timeline.

     What do the first two entries reflect occurred?

A.   That is -- from the phone records, it shows the two faxes from the Marshals Service to the sheriff's department warrants and detainers section.

Q.   Actually, I want to go back for a second to another exhibit, 196.

     *(The exhibit was displayed on the screen.)*

BY MR. FOX:

Q.   These are Mr. Carey's records; is that correct?

A.   Yes.

Q.   All right.  Is there a way to tell where the person using the phone is using the phone, according to phone records?

A.   Yes.

Q.   How so?

A.   In the sixth column under where it says "Origination."

So where it lists from the top "Los Angeles, California," "Los Angeles, California," "Monterey Park," those are the location of the individual's phone generally at the time the phone call was either received or made.

Q.   And we see, for example, on 8:23 that there is about a two and a half hour gap between his call at 2:18 and his call at 4:57.

Do you see that?

A.   Yes.

Q.   Is there any way, based on these records, to determine where Mr. Carey was between these times?

A.   No.

Q.   So at 2:18, where does it show that Mr. Carey is?

A.   In Los Angeles.

Q.   Is that what I've just circled there with the 2:18 call (indicating)?

A.   Yes.

Q.   And then at 4:57, the next call that he makes, where does it show that he is?

A.   Monterey Park.

Q.   Do you know where sheriff's headquarters was located at the time?

A.   Yes.

Q.   Where?

A.   In Monterey Park.

Q.    Now, in terms of -- are you familiar with how accurate this information is in terms of, you know -- do we know for sure that Mr. Carey was in Monterey Park at that time?

A.    I can speak to what I know from my investigations, which is it's not a -- it can't tell you the exact location with like an address.  What it can tell you is within that region, within a mile or two of that area, is where it will tell you.

So there's multiple cell phone towers that your phone will hit off of when you're there, and so it's generally telling you the area, but it can't give you a specific address. It's just a general 1- to 2-mile radius.

Q.    Where do these charts show that Mr. Carey was between 4:57 p.m. and 6:42 p.m.?

A.    In Monterey Park.

Q.    And now I'm going to show you Government Exhibit 167, which is in evidence, page 9.

(The exhibit was displayed on the screen.)

BY MR. FOX:

Q.    Whose phone records are these?

A.    Greg Thompson.

Q.    And we're still talking about August 23rd, and I want to show you between 2:11 and 4:59 p.m.

Where does it show that Mr. Thompson is between 2:11 and 4:59 p.m. on August 23rd?

A.    It shows both Monterey Park and Alhambra.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Q.   Are you familiar with where Alhambra is compared to Monterey Park?

A.   Yes.   They're directly next to each other.

Q.   Now I'm going to show you Mr. Baca's cell phone records, Government Exhibit 197, page 9.

(The exhibit was displayed on the screen.)

BY MR. FOX:

Q.   From 2:20 -- at 2:20, where does it show Mr. Baca is?

A.   Alhambra.

Q.   And what about after that?

A.   Monterey Park.

Q.   And going back to what we were talking about before, is there any way to tell, based on these records, where Mr. Baca was between 2:20 and 6:04?

A.   No.

Q.   Now, we just saw three records, Mr. Carey's records during this time period, Mr. Thompson's records, and Mr. Baca's records.

Do these records reflect whether Mr. Baca, Mr. Carey, or Mr. Thompson used their cell phones at any point between 2:20 and 4:30 p.m. that day?

A.   None of them did.

Q.   Now showing you Government Exhibit 171.

(The exhibit was displayed on the screen.)

///

BY MR. FOX:

Q.   Whose records are these?

A.   Paul Tanaka's.

Q.   I'm going to show you, again from page 7, on August 23rd from 2:20 -- I'm sorry, from -- does this show whether Mr. Tanaka used his phone during that same time period we were just talking about from 2:20 to 4:30?

A.   He did not.

Q.   Where does this phone record show Mr. Tanaka was at 2:02 p.m.?

A.   Monterey Park.

Q.   And when is the next time he used his phone?

A.   Not until 6:34 p.m.

Q.   Now I'm going to turn to page 4 of 172 again.

     You had mentioned the first two entries were the faxes from the US Marshals Service to the sheriff's department's Inmate Reception Center.

     At 1:58, what does it reflect -- your chart reflect?

A.   That was the time that Anthony Brown was released from the system.

Q.   That's on the computer?

A.   On the computer, yes.

Q.   What about at 1:59?  What do the phone records reflect?

A.   It shows that Mr. Baca made a phone call to the United States Attorney's office.

Q.   And when is Mr. Brown booked?

A.   He's rebooked as John Rodriguez at 4:30 p.m. that day.

Q.   I'm going to show you now Government Exhibit 35.

     *(The exhibit was displayed on the screen.)*

BY MR. FOX:

Q.   These are the e-mails -- one of the string of e-mails regarding the -- what to do if a court order comes in; is that correct?

A.   Yes.

Q.   And the last one in this string is at what time on August 26th of 2011?

A.   10:50 a.m.

Q.   And Government Exhibit 36, what time does it reflect this policy went out not to release the inmate or allow contact?

     *(The exhibit was displayed on the screen.)*

          THE WITNESS:  It was at 10:53 a.m.

BY MR. FOX:

Q.   When is the e-mail that -- with Mr. Thompson forwarding this policy to Mr. Carey?

A.   At 10:56 a.m.

Q.   And now I want to take you to Government Exhibit 226, which reflects what happens on August 26th of 2011 in the morning.

          MR. FOX:  Ms. Rhodes, could you please advance the slide?

BY MR. FOX:

Q. What happened at 9:15 a.m.?

A. Mr. Carey called Mr. Tanaka and they spoke for 15 minutes.

Q. When is this in relation to the e-mails we just reviewed?

A. It was approximately an hour and a half before the e-mails were sent out.

MR. FOX: Can we see what happens next?

BY MR. FOX:

Q. Can ahead and describe what we just saw.

A. Mr. Carey calls Mr. Thompson and they speak for two minutes.

Q. What happens next?

A. At 10:30, Mr. Carey calls Mr. Thompson and they speak for six minutes.

Q. And then what?

A. There is the string of e-mails in that ten-minute time span regarding the court order and -- possible court order.

Q. What happens about 15 minutes later?

A. Mr. Carey calls Mr. Tanaka.

Q. And one minute later?

A. He calls him again.

Q. How long of a phone call was that?

A. The first phone call was one minute; the second phone call was four minutes.

Q. So that one would have ended around 11:18; is that

correct?  The second phone call between Mr. Carey and Mr. Tanaka would have ended around 11:18 a.m.?

A.  Yes, would have ended, yes.

Q.  Yes.  What happens at 11:21 a.m., just a couple minutes later?

A.  Mr. Tanaka calls Mr. Baca.

Q.  How long of a phone call is that?

A.  Two minutes.

Q.  What happens at 11:22 a.m.?

A.  Mr. Carey calls Mr. Tanaka.

Q.  Now I want to turn you to the afternoon -- actually, before I do that, I want to ask you about some locations again.

Where does it show on August 26th --

MR. FOX:  This is 196, page 13.

*(The exhibit was displayed on the screen.)*

BY MR. FOX:

Q.  Where does it show Mr. Carey is starting at 11:54 a.m. that day?

A.  In Monterey Park.

Q.  And are there some Alhambras, as well?

A.  Yes.

Q.  I'm just going to show the bottom of page 13.

At 4:15, where does it show Mr. Carey is?

A.  In Alhambra.

Q.  So he's there from -- about four and a half hours that

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

day; is that correct?

A.   Yes.

Q.   And showing you now Mr. Baca -- his phone records for August 26th, where do these phone records show Mr. Baca is starting at 11:33 a.m. that day?

A.   Monterey Park.

Q.   And we see an Arcadia call at 1:47.

Is there any way to tell where Mr. Baca is between 11:33, that call, and the 1:47 p.m. call, according to these records?

A.   No.

Q.   And where do these records show Mr. Baca is, according to his cell records, from 2:03 p.m. to 5:20 p.m.?

A.   Alhambra, Monterey Park.

Q.   Is that approximately the same location over the same time as Mr. Carey's records?

A.   Yes.

Q.   I'm now going to show you Mr. Tanaka's records for that day.

MR. FOX:   This is Exhibit 171, page 9.

*(The exhibit was displayed on the screen.)*

BY MR. FOX:

Q.   Where do these show Mr. Tanaka is from, let's say, 11:14 a.m. until 5:51 p.m. that day?

A.   It's Alhambra, Los Angeles, and then Monterey Park.

Q.   Now showing you Government Exhibit 37, which is in evidence.

(The exhibit was displayed on the screen.)

BY MR. FOX:

Q.   Mr. Thompson writes at 2:13 p.m., "E&R from CJ," and Mr. Carey responds five minutes later, "Copy.  We are in the fourth floor conference room."

I want to show you now Mr. Thompson's records on page 12 of Government Exhibit 167.

(The exhibit was displayed on the screen.)

BY MR. FOX:

Q.   Do these records reflect where Mr. Carey is at 4:21 -- I'm sorry, Mr. Thompson is at 4:21 p.m. on August 26th?

A.   In Alhambra.

Q.   Is there anything showing where he was between 9:16 a.m. and 4:21 p.m. that day?

A.   No.

Q.   I'm showing you Government Exhibit 128, page 6.

(The exhibit was displayed on the screen.)

BY MR. FOX:

Q.   Around this time, what is happening, according to the sheriff's department records, with Anthony Brown?

A.   He's being rebooked under the name of Kevin King.

Q.   What time is that?

A.   It is at 3:30 in the afternoon.

Q.   Is that what I've just circled here?

A.   Yes.

Q.   Now let's go to Government Exhibit 226 and look at the phone charts for August 26th in the afternoon.

        MR. FOX:  Go ahead.

BY MR. FOX:

Q.   After Mr. Brown is booked as Kevin King in San Dimas --

        MR. FOX:  Please advance.

BY MR. FOX:

Q.   -- what happens there?

A.   Mr. Tanaka calls Mr. Baca and they speak for four minutes.

Q.   What happens next?

A.   There's a few calls between Mr. Tanaka and Mr. Carey and Mr. Leavins.

Q.   And after those calls end, what happens next?

A.   Mr. Leavins calls Mr. Carey.

Q.   And what happens one minute later?

A.   Mr. Leavins calls Mr. Baca.

Q.   How long is that call, by the way?

A.   Three minutes.

Q.   And what happens between 6:00 and 6:04 when that phone call ends?

A.   There's three calls between Mr. Leavins and Mr. Carey.

Q.   And at 6:20 p.m., what happens?

A.   Mr. Carey calls Mr. Baca's driver.

Q.   We see a car logo there.  Is that to show that he was in contact with the driver?

A.   Yes.

Q.   How long of a phone call is that?

A.   Seven minutes.

Q.   And what happens at 6:30 p.m.?

A.   Mr. Baca's driver calls Mr. Carey and they speak for six minutes.

Q.   And this is backup driver on this occasion; is that right?

A.   Yes, backup driver.

Q.   Based on your review of the records, when somebody would call Mr. Baca's driver's records [sic], would they be forwarded to the backup driver on occasion?

A.   Yes.  If -- whoever was in charge of driving Mr. Baca at that time period, the other phone would switch it to call forwarding.

THE COURT:  All right.  Ladies and gentlemen, we're going to end for the day.  Again, I want to remind you until this trial is over, you are not to discuss this case with anyone, including your fellow jurors, members of your family, people involved in the trial, or anyone else, nor are you allowed to permit others to discuss the case with you.  If anyone approaches you and tries to talk with you about this case, please let me know about it immediately.

Do not read any news stories or articles or listen to

any radio or television reports about the case or about anyone that has anything to do with it.

Do not do any research, such as consulting dictionaries, searching the internet, or using other reference materials, and do not make any investigation about the case on your own.

If you need to communicate with me, simply give a note to the clerk, and do not make up your mind what your verdict should be until after you've gone into the jury room to decide the case and you and your fellow jurors have discussed the evidence.  Keep an open mind until then.

All right.  We'll resume tomorrow morning at 8:00 a.m.

THE CLERK:  All rise.

THE COURT:  Please leave your notebooks on your chairs.

*(Jury out at 1:34 P.M.)*

*(The following was heard outside the presence of the jury.)*

THE COURT:  You may step down.

MR. FOX:  Your Honor, I think I have another about 10 or 15 minutes with this witness and then after cross-examination, we will have Special Agent Terri Tampubolon and then Judge Birotte as our witnesses, and then we will likely rest at that point.

THE COURT:  All right.

MR. HOCHMAN:  Your Honor, I'd like to just briefly raise one issue that the Court had deferred ruling on.

If you recall, government admitted Exhibit 120, Sheriff Baca's calendar, and at the time they had performed no redactions on it with respect to August 19th.

August 19th, as you recall, is an indication that Sheriff Baca had a meeting with Assistant Attorney General Thomas Perez -- or Tom Perez.  We believe that that redaction -- I now noticed that when they showed the jury a flash and included August 19th from the calendar, they've already taken it off.

There's two reasons, Your Honor, why it should not be taken off.  First, as the Court --

THE COURT:  I'm sorry.  What shouldn't be taken off?

MR. HOCHMAN:  The references to Tom Perez on the August 19th calendar.  I can give the Court a copy of it.

THE COURT:  That's fine.  Okay.  Go ahead.

MR. HOCHMAN:  Two reasons, Your Honor.  The first reason is that the government played a clip.  They could have played that clip, any clip they wanted, but they played a clip that specifically referenced Tom Perez.  So to the extent -- and they referenced it -- it's actually an important reference, Your Honor, because it explains -- Sheriff Baca is explaining what he understood to be civil rights investigations.

And if you recall, he understood that a civil rights investigation could be done basically by the national folks, because he had dealt with them before, but he was unaware the local office did civil rights investigations.  These are the clips the government chose to play, Your Honor.

Showing that actually Sheriff Baca -- and he says actually he knows -- in the clip, he says he knows Tom Perez quite well.

Showing that Sheriff Baca had a meeting at the exact time and putting aside, obviously, any reference to the purpose of the meeting, that it had to do with, you know, the sheriff's department cooperating in the Antelope Valley investigation, but showing that they had that contact and Sheriff -- it helps corroborate Sheriff Baca's statement that the government has now entered showing that he did know Tom Perez quite well.  And so I think that, you know, for that reason, it should be admitted.

The second reason, Your Honor, is a reason that you gave me with respect to my objection that was untimely.

In other words, the government could have redacted and sought to redact this calendar before they entered the evidence.  They entered it with -- this unredacted version on August 19th and now, after the fact, sort of like with my late objection, Your Honor, the government is trying to redact something that was already in evidence.

And, again, the thing that's in evidence is not where the Court ruled. The Court ruled that we couldn't have any mention of any cooperation with Sheriff Baca and the investigation that Mr. Perez and his civil rights division was doing, and that's not mentioned in the August 19th. It's just a -- it mentions a press conference with no delineation as to what the press conference was for and a meeting before the press conference with Tom Perez.

Therefore, for these two different reasons, Your Honor, we would seek to not have the August 19th references to Tom Perez redacted.

MR. FOX: Your Honor, I believe that I cleared this with you before we did the redactions and then we said that we were going to put in a new first page.

The reason why we did that is because Mr. Hochman, we felt, had gone beyond what he was supposed to do based on the motion in limine that we had filed and your order and he started referencing Tom Perez, and we decided that it would be best to take this out, raise that with the Court.

In terms of any probative value that this has, the fact that Mr. Baca says in the recording that he is very familiar with and has worked with Tom Perez and corroborating that has very little probative value and, as Your Honor has already ruled with respect to the motion in limine, it has a prejudicial effect that vastly outweighs it.

And the other thing is Mr. Perez is now the head of the Democratic National Committee for the DNC, and that also can make some political ramifications here that I don't think is appropriate for the jury to think about at this point.

So, again, the probative value is not very high at all -- in fact, there's very minimal probative value -- and it's vastly outweighed by any prejudicial effect that could happen by Mr. Hochman getting in that he had a press conference with Tom Perez that day, stood up and said he would be cooperating with the DOJ's civil investigation into the Section 8 housing violations that were occurring in Antelope Valley.

MR. HOCHMAN:  And, Your Honor, you were crystal clear in what you excluded, which is what Mr. Fox just alluded to, that we would be precluded from speaking about what they were having a press conference about.  But the relationship itself corroborates Mr. Baca's statement that they did have a relationship.  The fact that he actually had meetings with him in this time frame corroborates that.

So the prejudicial value of corroborating a statement that the government introduced in one of the clips is extremely minimal, since we're not mentioning the fact.

In fact, if they wanted to even take out the words "Press Conference," I'm fine with that, so it just shows that there's a meeting with the Assistant Attorney General Tom

Perez, which corroborates Mr. Baca's statement in the clip.

At that point, there is no prejudicial value because it doesn't show that there's a separate civil rights investigation, nor will I argue that there's a separate civil rights investigation based on, you know, Exhibit 120.  There's nothing in that dealing with that civil rights investigation, especially if we want to take out "Press Conference."  I'm fine with taking out "Press Conference," because that's not my point, that they had necessarily a press conference; it's that they had these meetings together that corroborates the point.

MR. FOX:  Your Honor, I'm still unclear on the relevance.  He mentions Tom Perez, that he knows Tom Perez; therefore, he's able to get in a calendar entry showing that he knows Tom Perez when his relationship with Tom Perez is irrelevant to this trial.

MR. HOCHMAN:  Again, if I might --

MR. FOX:  It's right here.

MR. HOCHMAN:  Excerpt 5 of Exhibit 2 says, "I'm generally aware" -- the question was, "Are you aware that there are federal statutes dealing with civil rights offenses?"

"Yes."

"All right.  So I'm generally aware that that has happened in headquarters, US Attorney's office, with Mr. Tom Perez, who I am very familiar with and have worked with."

We're not going to bring in, obviously, the nature of

how they worked together, but the familiarity helps provide credibility to Mr. Baca's statement. And that's the probative value, and at this point, then, there's no prejudicial value since we've excised any potential prejudicial value to the fact that he had meetings at this time with Mr. Tom Perez.

MR. FOX: The last thing I'll say on the subject, Your Honor, is that to the extent Mr. Hochman is saying that Mr. Baca was not aware of what had gone on locally and then he gets up in closing argument last time and says that Mr. Gennaco prosecut- -- something that's not true, that he prosecuted more deputies than anyone else in the country when he was a local prosecutor working in the US Attorney's office.

I don't know how any of this is relevant, but to the extent that Mr. Baca was aware of Mr. Gennaco's past, then it seems to be completely undermined by this.

MR. HOCHMAN: Again, Your Honor, a little apples and oranges with Mr. Gennaco.

On this particular issue right here, you know, part of what I need to show the jury is Mr. Baca's credibility when he makes certain statements, whether they're true or not. Because the government is going to attack not just the four false statements, but they've already indicated by showing different witnesses, like Mr. Carey or Mr. Manzo, that he's lied on other -- and made misstatements on other parts of the excerpts beyond the four at issue.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

So this happens to be --

THE COURT:  They're going to claim that he was lying when he said that he was familiar with Mr. Perez?

MR. FOX:  No, Your Honor.

MR. HOCHMAN:  But, again, the more times I can show that he's telling the truth to the government with not just him saying it, Your Honor, but there's actual corroborating evidence to corroborate the fact that he's telling the truth --

THE COURT:  Because there's a calendar entry, and that's relevant to these charges?

MR. FOX:  And it's not like there's a percentage here, Your Honor, under 1001 where over 50 percent of the time you tell the truth you're not guilty of the crime, or even over 90 percent of the time.  You lie once, you lie once.  So it's -- there's no probative value here.

MR. HOCHMAN:  It's his mindset, Your Honor.  Mr. Fox I certainly expect to argue that he lied those four instances, but we're going to argue that his mindset was to do his best to tell the truth.

And to the extent that I have some corroboration in the record -- and, again, there's no prejudicial value to it, Your Honor, so even if Mr. Fox says there's minimal probative value, there's certainly minimal probative value without any prejudicial value and, therefore, under 401, it should be deemed relevant and admissible.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

MR. FOX:  Your Honor, just look at what he's done with Mr. Gennaco throughout this trial.  He's trying to do the same thing with Mr. Perez, even though there's an order on the motions in limine.

THE COURT:  Okay.  The reporter's got to go and so do I, so we'll rule on this in the morning.

MR. HOCHMAN:  Thank you very much, Your Honor.

THE CLERK:  All rise.

*(Evening recess taken 1:44 P.M.)*

--oOo--

CERTIFICATE

I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Date: AUGUST 10, 2017

/s/   Cindy L. Nirenberg, CSR No. 5059

Official Court Reporter

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA