UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE PERCY ANDERSON, U.S. DISTRICT JUDGE

- - -

UNITED STATES OF AMERICA, )
                          )
            PLAINTIFF,    )
                          )
     vs.                  ) No. CR16-66(A)-PA
                          )
LEROY BACA,               )
                          )
            DEFENDANT.    )
_____)

REPORTER'S TRANSCRIPT OF JURY TRIAL

DAY 10, VOLUME II OF II

PAGES 2027-2108

LOS ANGELES, CALIFORNIA

TUESDAY, MARCH 7, 2017

11:59 A.M.

_____

CINDY L. NIRENBERG, CSR 5059, FCRR
U.S. Official Court Reporter
350 W. 1st Street, #4455
Los Angeles, CA 90012
*www.msfedreporter.com*

APPEARANCES OF COUNSEL:

FOR THE PLAINTIFF:
                    OFFICE OF THE UNITED STATES ATTORNEY
                    BY: BRANDON FOX,
                        ASSISTANT U.S. ATTORNEY
                        EDDIE A. JAUREGUI,
                        ASSISTANT U.S. ATTORNEY
                        LIZABETH A. RHODES,
                        ASSISTANT U.S. ATTORNEY
                    312 NORTH SPRING STREET
                    13TH FLOOR
                    LOS ANGELES, CA 90012
                    213-894-2434

FOR THE DEFENDANT:
                    MORGAN LEWIS & BOCKIUS
                    BY: NATHAN J. HOCHMAN, ATTORNEY AT LAW
                        BRIANNA L. ABRAMS, ATTORNEY AT LAW
                    THE WATER GARDEN
                    1601 CLOVERFIELD BOULEVARD
                    SUITE 2050 NORTH
                    SANTA MONICA, CA 90404
                    310-255-9025

ALSO PRESENT:
                    LEAH TANNER, FBI SPECIAL AGENT

                                I N D E X


*GOVERNMENT'S WITNESSES:*                    *PAGE*

LEAH TANNER

    CROSS BY MR. HOCHMAN (RESUMED)        2035

    REDIRECT BY MR. FOX                   2064

    RECROSS BY MR. HOCHMAN                2090




*FURTHER PROCEEDINGS*

DISCUSSION HELD OUTSIDE PRESENCE OF JURY 2031

DISCUSSION HELD AT SIDEBAR               2031

DISCUSSION HELD AT SIDEBAR               2082

DISCUSSION HELD AT SIDEBAR               2085

DISCUSSION HELD AT SIDEBAR               2088

DISCUSSION HELD AT SIDEBAR               2093

DISCUSSION HELD OUTSIDE PRESENCE OF JURY 2099

DISCUSSION HELD AT SIDEBAR               2100

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

E X H I B I T S

| GOVERNMENT'S EXHIBITS | MARKED | ADMITTED |
|---|---|---|
| 30 | | 2081 |

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES, CALIFORNIA; TUESDAY, MARCH 7, 2017

11:59 A.M.

- - - - -

*(The following was heard outside the presence of the jury.)*

MR. FOX:  Your Honor, may we have a sidebar about an issue?

THE COURT:  Um-hmm.

*(Proceedings held at sidebar under seal 11:59 P.M.)*

*(The following proceedings were held in open court.)*

MR. FOX:  Your Honor, may the witness take the stand?

THE COURT:  Yes, please.

Let's bring the jury in.

*(Jury in at 12:05 P.M.)*

THE COURT:  Ladies and gentlemen, I'd like to know if any of you have been exposed, even accidentally, to any news stories, articles, radio, television reports, or anything on social media having to do about anything with this case.  You can either raise your hands or give me a note a little later today.

JUROR NO. 12:  Do you mean from the start of this trial?

THE COURT:  From the start of this -- from the start, when we started.

JUROR NO. 12:  No.

THE COURT:  Okay.  All right.

MR. HOCHMAN:  May I proceed, Your Honor?

THE COURT:  And, again, ladies and gentlemen, please do not read any news stories, articles, or listen to any radio or television reports about the case or about anyone who has anything to do with it.

Okay.

MR. HOCHMAN:   Thank you, Your Honor.

LEAH TANNER,

having been previously duly sworn,

testified further as follows:

CROSS-EXAMINATION

(RESUMED)

BY MR. HOCHMAN:

Q.   Agent Tanner, after approximately September 26, I think you testified that you did not go back into the jails for a number of months; is that correct?

A.   Correct.

Q.   Approximately when did you start going back?  Which month would it have been?

A.   I don't know the specific date.  I believe it was sometime in January, maybe, of 2012, but I believe it had been at least three to four months.

Q.   Okay.  Could it have been December 2011 when you went back?

A.   It's possible.

Q.   And you said that you stayed on as the case agent for the investigation, correct?

A.   Yes.

Q.   What did you do in the time period between September 26 and when you went back into the jails a number of months later --

A.    There was a lot --

Q.    -- in connection with your investigation?

A.    There was a lot of leads that we were following up on.

Since we weren't going into the jails, we kind of diverted our attention to looking at phone records, bank records, you know, other types of things that we could do in the investigation, since we weren't going into the jail, as well as determining if there were inmates that had since been moved to state prison, and at that point start to interview them in state prison.

Q.    So now I'd like to direct your attention to your summary charts that Mr. Fox asked you about.  I'm going to start with Summary Chart 157, if I might ask Mr. Fox to put that on the screen.

And before we get into all the summary charts, let me ask you some overview questions that will probably pertain to all your charts.

        *(The exhibit was displayed on the screen.)*

BY MR. HOCHMAN:

Q.    The first question, I think you said to Mr. Fox that the fact that you put a phone call on your chart only indicates that a number was dialed and received and sent, correct?  It does not indicate the content of that phone call, correct?

A.    That's correct.

Q.    And with respect to when it has sort of duration, that

duration is always in minutes, correct, on your charts?

A.    Correct.

Q.    And I think you said that, for instance, if it has a "1" next to it, that would be one minute, correct?

A.    Correct.

Q.    But you don't know whether or not that phone call lasted literally one second or all the way up to one minute, correct?

A.    That's correct.

Q.    And if it says a "2" on it, again, that phone call could have lasted anywhere from one minute and one second all the way to two minutes, correct?

A.    I don't believe that's accurate.  I think if it says two minutes, it was either right at two minutes or above.  I don't think it rounded up from one minute one second to be two minutes.  I don't believe that's the case.

Q.    Well, I think you gave the example that if it's, let's say, a minute and 20 seconds or a minute and 31 seconds, that some phone calls -- some phone companies round up and some round down, correct?

A.    Every phone company is different.  Some companies actually list the exact 1 minute 31 seconds.

        Verizon records, as we have here, it just shows the solid minute, and so my understanding is that if it's one minute one second, it's going to show one minute.

        But I don't know exactly when it switches over to say

two minutes, so it could be 1 minute 31 seconds and once it's past a minute and a half it goes to two minutes and rounds up or not.

Q.   So you don't know one way or the other if, in our example, one minute one second becomes two minutes or it was some other time period between one minute one second all the way to two minutes, correct?

A.   My understanding is that one minute one second would show as "1," but that's just from spending a lot of time doing phone records and looking at various phone companies.

So I couldn't tell you a hundred percent that one minute one second does not go to two, but I'm pretty sure it goes to only one minute.

Q.   I see.  But, again, I mean, your understanding on Verizon records is actually speaking with people from Verizon?

A.   Both speaking with Verizon -- they also send -- when they send back phone results, they send kind of like a coded key of terms and, you know, different numbers they use to signify various things.  So it's through that, as well as speaking to people at Verizon.

Q.   And when you spoke to people at Verizon and you got this -- whatever this document is from Verizon, did it actually tell you where the cutoff was between where, in our example, between one minute one second and two minutes it would either round up or round down?

A.    I don't believe the documents they sent did.  I believe I called.  And I don't think it was related to this case specifically, it was another case that I was asking them those questions about.

Q.    And what did they say?

A.    Again, I cannot recall if it was the 1 minute 31 seconds that rounded up or one minute one second.  I don't believe the one minute one second shows as two minutes.

Q.    And the third concept I want to talk about before we get into a specific record is the word "unavailable."

      When it says "unavailable," that can be from any phone in the United States that has a blocked number; is that correct?

A.    Correct.

Q.    All right.  Let's turn, if we could, to start with Exhibit 157, which is the Baca county cell.

      Do you see that?

A.    Yes.

Q.    Now, I'm noticing that there are a number of "unavailables" throughout this -- these records.

      Do you see that?

A.    Yes.

Q.    There's over -- between August 8, 2011, and when this record is over -- let's say we'll take it down to September 27, 2011 -- there are probably over 40 different "unavailables"

listed on Sheriff Baca's records, correct?

A.    I have never counted.

Q.    Well, if you can look very briefly in the first pages of these records.

A.    You want me to go through the record and count the "unavailables"?

Q.    Does 40 sound like an approximate number of "unavailables" for this record?

A.    Without reviewing it, I cannot tell you how many there are.  If you would like me to count, I'm happy to do so.

Q.    Maybe we can have you count during a break, but -- when you wrote "unavailable," again, you didn't know on 157 which phone call that was coming in from, correct?

A.    No.

Q.    All right.  We'll turn now to Exhibit 158.

    *(The exhibit was displayed on the screen.)*

BY MR. HOCHMAN:

Q.    Now, Exhibit 158 is a summary document that you prepared that shows the phone calls between Sheriff Baca and Captain Carey, Lieutenant Leavins, Lieutenant Thompson, Sergeants Craig and Long, Deputies Manzo, Smith, and Sexton.

        Do you see that?

A.    Just between their cell phones, yes.

Q.    Between their cell phones.

        And this has one, one record that you were able --

one phone call that you were able to find in the cell records between, excuse me, Lieutenant Levins and Sheriff Baca on August 26th; is that correct?

A.    Yes.

Q.    Now, you also then prepared Exhibit 212; is that correct?

        MR. HOCHMAN:  If we could put Exhibit 212 on.

    *(The exhibit was displayed on the screen.)*

        MR. HOCHMAN:  And if we could just highlight the wording of it.

BY MR. HOCHMAN:

Q.    And you were looking specifically here for Captain Carey and Lieutenant Leavins calls with Sheriff Baca or his driver; is that correct?

A.    Correct.

Q.    Because if we eliminate all the calls with the -- Baca's driver, we're back to that one phone call between Lieutenant Leavins and Sheriff Baca, correct?

A.    If you're talking specifically and just the records, then, yes.  But as -- you know --

Q.    No, I'm talking specifically in just your summary charts.

A.    Specifically just the records and the phone calls, yes, just that one.

Q.    All right.  Now, it says here on the second line "Baca Driver."

        Do you see that?

A.   Yes.

Q.   Who is that?

A.   That's -- it's not necessarily a person, it's a cell phone that is dedicated specifically to Mr. Baca's driver.  Even when they rotated through different people, that phone number was assigned to the driver at all times.

Q.   Who was Sheriff Baca's driver in August and September of 2011?

A.   One of them was Jack DeMello.

Q.   And Jack DeMello was someone who was Sheriff Baca's driver normally Monday through Thursday; is that correct?

A.   I believe that the way it was explained to me is that they generally had a schedule, but they frequently would fill in for other people; if something came up and they couldn't drive or do something, that they would fill in for another driver.  But, generally, I believe that he was the Monday through Thursday driver, I think.

Q.   And Kevin Brown was generally the backup driver; is that correct?

A.   Generally, yes.

Q.   And these are all calls with Carey and a backup driver -- excuse me, Carey and a Baca driver and Leavins and a Baca driver, correct?

A.   Yes.

Q.   I'd like to focus on a couple of these calls.

August 29th, this call right here (indicating) between Leavins and the Baca driver is for one minute.

Do you see that?

A.    Yes.

Q.    Now, a one-minute phone call could be someone speaking, as we said, for as little as one or a couple of seconds, correct?

A.    Yes.

Q.    And someone could be leaving a voice mail message in a one-minute phone call; is that correct?

A.    They could.

Q.    And the same thing probably would be true of maybe -- well, of any number of phone calls, but let's say a two-minute phone call could also be a voice mail message, correct?

A.    It could be a conversation or a voice mail.

Q.    And on the 29th and the 30th, we each have one-minute conversations; is that correct?

A.    Yes.

Q.    And we see on September 12th, there are some conversations between Mr. Leavins and Mr. Baca's driver listed on your chart; is that correct?

A.    Both Mr. Leavins and Mr. Carey.

Q.    Now, let's start with the Leavins.  Well, actually, we could do both, because they're both on September 12th.

Sheriff Baca is out of the country on that day; isn't that correct?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

A.   Yes.

Q.   He is in a place called Givatayim, Israel, isn't he?

A.   I don't know the specific location, but his trip was, in general, over in Spain and Israel.  So I don't know specifically where he was at at that time.

Q.   So the cell phone records -- Sheriff Baca's cell phone records would indicate -- would be one indication as to where he was on September 12th; is that correct?

A.   Yes.

Q.   And have you had a chance to look at Sheriff Baca's cell phone records to see that he was in a place called Givatayim, Israel on that day?

MR. FOX:  Objection to the relevance of the city --

BY MR. HOCHMAN:

Q.   Well, let's -- well --

MR. FOX:  -- and asked and answered about the country.

THE COURT:  You want a ruling or you want to rephrase?

MR. HOCHMAN:  Your Honor, if I may, can you put 197 up for the witness?

And if we could turn to -- I think it was page 16.

(The exhibit was displayed on the screen.)

MR. HOCHMAN:  If you could highlight the bottom portion that talks about September 12th.  One above it.

BY MR. HOCHMAN:

Q.    Now, on September 12th, it shows that the phone has a location of Givatayim, Israel?

A.    It doesn't say Israel -- oh, it does after that, correct.

Q.    And so when you list Leavins speaking to Baca's driver and Carey speaking to Baca's driver on September 12, Sheriff Baca's phone is showing he's in Israel, correct?

A.    Correct.

Q.    And on September 20th, I believe --

        MR. HOCHMAN:  If we could turn to the next page, please, and go to September 20th, which is in a column of "Spains" down below.

BY MR. HOCHMAN:

Q.    September 20th, you list a phone call from Leavins to Baca's driver, do you see that, for two minutes?

A.    That's not what's on the screen.

Q.    Oh.  Assume that that's on your chart, September 20th. We'll go back to it in a second.

        Here on September 20th, Sheriff Baca's, at least, cell phone records show he was in Spain, correct?

A.    Correct.

        MR. HOCHMAN:  If we can go back to Exhibit 212.

        *(The exhibit was displayed on the screen.)*

BY MR. HOCHMAN:

Q.    And just to be clear, that was the September 20th call

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

between Lieutenant Leavins and Sheriff Baca for two minutes,
correct?

A.   With the driver, correct.

Q.   Yes, I'm sorry, "Baca Driver," as you list it.

And as best you understand, on September 20th, Baca's
driver was Jack DeMello?

A.   I believe during that time period, but, again, I can't
tell you that that's who -- every time it says "Baca driver
county cell," I can't tell you that that was for sure Jack
DeMello at that moment, because frequently other people filled
in and forwarded calls from that number.  But I can tell you
during that time period, I believe he was still the primary
driver.

Q.   And that would be true, just so I'm clear, every time you
list a "Baca driver," that's the Baca driver's cell phone that
you understand to be mostly with Jack DeMello, correct?  And
that would be true for all your charts?

A.   Again, it's the number; it's not necessarily him
specifically.  It's the phone number assigned to the driver and
the phone number assigned to the backup driver.

And so if somebody was filling in, then that number
may have gone to somebody who was filling in, which is not Jack
DeMello, but in general, his primary drivers during that time
were Jack DeMello and Kevin Brown.

MR. HOCHMAN:  Now, if we could turn to Exhibit 170.

(The exhibit was displayed on the screen.)

BY MR. HOCHMAN:

Q.    Exhibit 170 is an analysis you did of Paul Tanaka's phone calls between August 2, 2011, and September 30, 2011.

Do you recall that?

A.    Yes.

Q.    Did you also do an analysis of Paul Tanaka's phone calls with Lieutenant Leavins, Captain Carey, Sergeants Craig or Long, and Deputies Manzo, Smith, and Sexton?

A.    In general, did I?

Q.    Have you done that, yes.

A.    I believe I have, yes.

Q.    How long ago did you do that analysis?

A.    A few years ago.

Q.    I'm sorry?

A.    A few years ago.

Q.    Have you updated it?

A.    Probably.  As I'm going along, I'm sure there's things that I find here and there that I update it.  But, generally, it was done a few years ago.

MR. HOCHMAN:  If we could turn to Exhibit 172, please.

(The exhibit was displayed on the screen.)

BY MR. HOCHMAN:

Q.    All right.  Exhibit 172 is when you did a summary chart

that has both the time, an event, and references an exhibit number.

          Do you recall that?

A.   Yes.

Q.   And with respect to August 18, 2011, that was the day when assistant director Steve Martinez and Sheriff Baca spoke about the cell phone, correct?

A.   Yes.

Q.   And then Sheriff Baca goes ahead and speaks with Undersheriff Tanaka on that day, correct?

A.   Yes.

Q.   And they have a nine-minute phone call at 5:57 p.m.; is that correct?

A.   Correct.

Q.   Then if we can turn to the next day.

          The next day, Anthony Brown is interviewed in the morning, 8:08 a.m. to 10:05 a.m.; is that correct?

A.   Yes.

Q.   And then there was a meeting that was set for that afternoon between -- on Sheriff Baca's calendar between him, Undersheriff Tanaka, Captain Carey, and Lieutenant Thompson; is that correct?

A.   Correct.

Q.   And then there is a series of phone calls after that August 19th meeting.

Do you see that?

A.    Yes.

Q.    Now, August 20th --

MR. HOCHMAN:  Go to the next page, if you could, of this chart.

BY MR. HOCHMAN:

Q.    The chart jumps to August 23rd, but I want to talk about August 20th for a second, which isn't on your chart.

August 20th is that Saturday morning meeting, correct?

A.    Yes.

Q.    And that's the meeting that had Sheriff Baca, Undersheriff Tanaka, and a lot of other people, correct?

A.    Yes.

Q.    And thereafter on August 23rd, your chart continues, correct?

A.    I don't know that it continues.

Q.    Well, your chart continues from the August 19th date, correct?  The next date you have in your chart is August 23rd, correct?

A.    Correct.

Q.    And you talk about the FBI meeting that you participated in from 10:40 to 11:40 a.m.; is that correct?

A.    Yes.

Q.    And then you talk about there was a series of phone calls,

but where is the meeting that -- what's been called the butt-chewing meeting between Lieutenant Thompson, Carey, and others that occurs on August 23, 2011?  That's not on your chart, correct?

A.   This chart is for e-mails and phone calls --

Q.   So --

A.   -- and then other meetings that we had specific times for.

Q.   Well, your chart is entitled "Event"; isn't that correct?

A.   Correct.

Q.   And the event of the butt-chewing conversation with Undersheriff Tanaka, Thompson, Carey, and the others is not on your chart, correct?

A.   The meeting with them and Mr. Baca was also not on there.

Q.   That was my next question.

        The meeting -- the follow-on meeting with Lieutenant Thompson, Carey, and Sheriff Baca also is not on your chart, correct?

A.   Correct.

Q.   Now, turn to the next page in this exhibit.

        Now, I see that the next page goes from August 23rd to August 25th, correct?

A.   Yes.

Q.   And the purpose of this chart, I think you said, were to put down summary chart with phone calls and events dealing with key dates in the case, correct?

A.    Not necessarily just key dates; it's also key events that occurred.

Q.    Key events.

      Well, on August 24th, the day before the next entry in your chart, that's when you have that interview with Gilbert Michel at his house; isn't that correct?

A.    Yes.

Q.    And now we'll turn to August 25th.

      On August 25th, you say for 8:35 and 9:40 a.m., "US Marshals Service fax to LASD."

      Do you see that?

A.    Yes.

Q.    Do you know if the 8:35 a.m. fax was ever received by the sheriff's department?

A.    All I have is the faxes that were sent and interviewing the Marshals Service individual who said she received confirmation that they received the fax.

Q.    Well, there's two.  Are there -- are you aware there -- are there two writs out there that the Marshals Service might have sent that day?  Because I see that there's two "US Marshal fax LASD" indicated on your charts.

      Are there actually two writs that you're aware of?

A.    There was a writ served.  Whether or not they served it twice or re-sent it, I don't know.  There's two faxes at that day.  That's all I can tell you.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Q.   And then at 1:59 p.m., it says, "Baca calls US Attorney's office."

Do you see that?

A.   Yes.

Q.   And you don't know if it's just a coincidence that Sheriff Baca called at 1:59 p.m., a minute after some record shows that Brown was released, whether or not they're actually tied together, correct?  You don't know that.

A.   I believe they are.

Q.   But you don't know one -- you don't know for a fact that they're actually tied together; is that correct?

A.   I believe they are.

Q.   And then there's a -- well, it then says at the very end, 5:52 p.m., "US Attorney's office calls Baca"; is that correct?

A.   Yes.

Q.   You don't know what was said during that conversation, correct?

A.   I do not.

Q.   And you don't know what was said in the prior conversation between Sheriff Baca and the US Attorney's office?

A.   No, I do not.

MR. HOCHMAN:  If we may turn to the next day.

BY MR. HOCHMAN:

Q.   Now, on -- let's focus on 11:21 a.m., "Paul Tanaka calls Baca on your chart, two minutes."

Do you see that?

A.    Yes.

Q.    And you don't know what was said by Paul Tanaka and Sheriff Baca in that two-minute phone call, correct?

A.    No.

Q.    And -- but you know that the most that phone call could have lasted on August 26th, 2011, was two minutes or maybe two minutes and change, correct?

A.    According to you, it could have been all the way up to 2 minutes and 59 seconds.

Q.    Unless they rounded up, correct, then it would be three?

A.    Or it could be 2 minutes and 59 seconds.

Q.    All right.  So the most it could have lasted was 2 minutes and 59 seconds for that phone call at 11:21 a.m., correct?

A.    Correct.

Q.    And then, generally, I want to understand how your chart works.

Let's say the 5:57 p.m. call.  All right?  It says --

MR. HOCHMAN:  If we could highlight the 5:57 p.m. call.  I'm sorry, highlight the 5:45 down to 5:57, if we could.

MR. FOX:  There's no highlight.

MR. HOCHMAN:  I'm sorry.  When I said "highlight," I'm sorry, could you make bigger the 5:45 p.m. to 5:57?

Yeah.  Thank you very much.

///

BY MR. HOCHMAN:

Q.   The reason I'm highlighting these calls is I see at 5:45 p.m., Tanaka calls Baca for four minutes.

You referenced two exhibits, 171 and 197; isn't that right?

A.   Yes.

Q.   And 171 are Paul Tanaka's phone records; is that right?

A.   I'd have to look back, but I believe those are his records.

Q.   And 197 is Sheriff Baca's phone records, correct?

A.   Yes.

Q.   And this way you were able to compare on both records that the phone call shows up on both records, correct?

A.   It didn't always work that way.

Q.   Well, let's actually -- and when it doesn't work that way, doesn't that show you that a phone call may have been made but not received --

A.   No.

Q.   -- by the sending party?

A.   No.

Q.   Receiving party.  Excuse me.

Well, looking down at 5:57 p.m., for instance, or even 5:56 p.m., you were only able to find those phone calls on Lieutenant Leavins' cell records, not on Captain Carey or Sheriff Baca's records for the calls indicated, correct?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

A.    That's not necessarily true.

Q.    Well, if you would have found them, you would have listed -- for instance, with Mr. Baca, like you listed before, you would have put down a reference to his Exhibit Number 197, correct?

A.    If you could clearly show on both of the records, then, yes, both would be put down.

There are plenty of times where phone calls do not show up.  If they were on another call, if they were out of service, things like that, they will not show up on the phone records.  It absolutely does not mean the phone call was not completed.

Q.    But it's some evidence that maybe it wasn't, correct?

A.    Absolutely --

MR. FOX:  Objection.

THE WITNESS:  -- not.

MR. FOX:  Argument.

THE COURT:  Sustained.

MR. HOCHMAN:  If we can turn to the next event, August 29th.

BY MR. HOCHMAN:

Q.    Now, for August 29th here on your calendar, this is when Sheriff Baca has his meeting with André Birotte, correct?

A.    Yes.

Q.    That's the first of two meetings.  He has one on

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

August 29th and another one on September 27th with US Attorney Birotte; is that correct?

A.   Yes.

Q.   And then your chart shows afterwards Sheriff Baca and Undersheriff Tanaka had a couple of phone calls, correct?

A.   Correct.

Q.   But Undersheriff Tanaka was at the meeting with US Attorney Birotte, correct?

A.   Yes.

MR. HOCHMAN:  And now if we can focus on August 30th.

BY MR. HOCHMAN:

Q.   On August 30th, there's a long interview that Sheriff's Department Investigators Leavins, Scott Craig, and Maricela Long have with Gilbert Michel.

Do you see that?

A.   Yes.

Q.   And in the middle of that interview, you have Paul Tanaka calling Baca's driver.

And August 30th -- August 30th would be a Monday, correct?

A.   I'd have to look at the calendar.

MR. HOCHMAN:  May I have a moment, Your Honor, to put the calendar up for a second?

THE COURT:  Yes.

///

BY MR. HOCHMAN:

Q.   Does this refresh your recollection that August 30th is a Monday?

A.   August 30th is a Tuesday.

Q.   Tuesday.  I'm sorry.  My mistake.

So August 30th, a Tuesday, would be in that Monday to Thursday time period when Jack DeMello was Baca's driver, correct?

A.   Generally.  But, again, it's not guaranteed that he was working that day.

Q.   And then you have at 10:56 a.m., "Baca calls Tanaka."

Do you see that?

A.   Yes.

Q.   Again, that's a one-minute phone call?

A.   Correct.

Q.   And the thing we know is that this phone call -- you don't know whether or not they actually spoke at that point, left a voice mail, or were unable to speak at all, correct?

A.   They could have done any of the three.

Q.   Then you have at 11:00 a.m., "Unavailable calls Baca."

Do you recall that?

A.   Yes.

Q.   Now, again, that "unavailable" could be any unavailable out there in the country, correct?

A.   Technically, yes.

Q.    And you have at the end, "Carey calls Baca's driver."

        Do you see that?

A.    Yes.

Q.    Another one-minute phone call.

        And, again, with that one-minute phone call, you don't know if they spoke, left a voice mail, or they didn't even speak at all, correct?

A.    Again, it could have been any of the three.

        MR. HOCHMAN:  If you could turn to the next page, please.

        MR. FOX:  One second, please.

BY MR. HOCHMAN:

Q.    Before we turn to the next page, with your calendar, you're trying to be as accurate as possible, given the exhibits that you were looking at, correct?

A.    I'm not sure what calendar you're referencing.

Q.    I'm sorry.  With respect to your summary chart, Exhibit 172, you were trying to be as accurate as possible based on the exhibits that you were looking at and you referenced, correct?

A.    Yes.

        MR. HOCHMAN:  Okay.  We can turn to the next page, September 26.

BY MR. HOCHMAN:

Q.    Let's start with the first one.  It says, "8:30 a.m., Baca appears on Good Day LA"; isn't that right?

A.   Per his calendar, yes.

Q.   But we know he didn't appear at 8:30 a.m. on Good Day LA, correct?

A.   The actual time of his appearance or when he showed up? Because there's a lot of different situations there.

         What we know is that at 8:30, it shows in his calendar.  When the actual interview took place was around 9:30.

Q.   Well, you wrote, "Baca appears on Good Day LA, 8:30 a.m."

         We know that's wrong, correct?

A.   I disagree with your statement that it's wrong.

         I'm saying that at 8:30 a.m. on his calendar, he has an appearance on Good Day LA.  If you want to parse words, then, yes, he did not actually go on air at 8:30 a.m.

Q.   Because he went on air at 9:37 a.m., correct?

A.   Yes.

Q.   And he was on air for about four or five minutes; isn't that correct?

A.   Approximately.  I never timed it.

Q.   So when you list the next call, "Baca backup driver calls Tanaka," that call -- and you list it for two minutes.

         You see that?

A.   Yes.

Q.   That call couldn't have involved Sheriff Baca because he was literally on TV at that time; is that correct?

A.   He may not have been the one on the call, but they could have been discussing that he told them to call.  We have no idea.

Q.   We have no idea.

And then you talk -- you have later at 6:18 p.m., "Tanaka calls Baca's executive assistant."

Do you see that?

A.   Yes.

Q.   You don't have any minutes for that one, do you?

A.   I don't.

Q.   That was probably like another one of those one-minute calls; is that right?

A.   I don't know.  I'd have to look at the records.

MR. FOX:  What time is this, Mr. Hochman?

MR. HOCHMAN:  6:18 p.m.

MR. FOX:  Thank you.

BY MR. HOCHMAN:

Q.   And then we have 6:37 p.m., "Baca calls sheriff's office main line" for one minute; is that correct?

A.   Yes.

Q.   And you don't know whether or not he actually reached the sheriff's main office or who he spoke to in the sheriff's main office line, correct?

A.   He could have; he could not have.  I don't know.

Q.   And then 6:39 p.m. right below it, it says, "Baca backup

driver calls Tanaka for three minutes"; is that right?

A.    Yes.

Q.    So you have no idea if Baca's backup driver is the one speaking directly to Tanaka, Sheriff Baca is speaking to Tanaka, or who is speaking to Tanaka at that point, correct?

A.    I would not know.

Q.    And at the very end, it says, "Unavailable call to Baca, 22 minutes."

        Do you see that?

A.    Yes.

Q.    And I think Mr. Fox at this point asked you whether or not you knew what United States Attorney André Birotte's phone number came back to.

        Do you remember that question?

A.    I don't know if he said André Birotte specifically.  He said the US Attorney's office, any of the attorneys there.  I don't know if he specifically said André Birotte.

Q.    So any of the attorneys at the United States Attorney's office, their phone numbers come back to "unavailable"; is that correct?

A.    Yes.

Q.    Are you familiar with all of the cell phones of all the people in the United States Attorney's office at that time?

A.    I'm familiar with the way their phone calls came in and it was "unavailable."

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Q.    And you said after 7:35 p.m., Sheriff Baca makes no other calls, correct?

A.    Correct.

Q.    Well, what I think you said -- I should have actually said it more precisely -- is that on Sheriff Baca's cell phone records, it shows that he made no other calls after 7:35 p.m. that night; is that correct?

A.    Correct.

Q.    But if Sheriff Baca used a different number other than his cell phone to call someone in the sheriff's department like Captain Carey, that wouldn't be on his cell phone record, correct?

A.    No, but it would show up on Captain Carey's records.

Q.    Assuming he called Captain Carey's cell phone, correct?

A.    I don't know what other number he would call.

        MR. HOCHMAN:  May I have a moment, Your Honor?

        THE COURT:  Yes.

BY MR. HOCHMAN:

Q.    Which is September 26th?  I think you said on the calendar, it lists a "President of the United States event"; isn't that correct?

A.    Yes.

Q.    And you understood that even though it's listed on the calendar --

        MR. HOCHMAN:  If we could put Exhibit 120 and we'll

just focus on the September 26th page, which I think is towards the back, last page.

*(The exhibit was displayed on the screen.)*

MR. HOCHMAN:  And just focus on the line starting at 4:30 p.m., if we could.  That's fine.

BY MR. HOCHMAN:

Q.    All right.  We have two different mentions of POTUS.

Do you see that?

A.    Yes.

Q.    POTUS is the acronym that's the short form for president of the United States; is that correct?

A.    Yes.

Q.    I'm sorry?

A.    Yes.

Q.    And your best information is that even though it's listed on the calendar, Sheriff Baca never attended an event with the president of the United States; is that correct?

A.    All I know is that his cell phone records during at least the period of that time did not show him in West Hollywood.

I don't know that I can say whether he stopped in for five minutes or not, but in general, the location that I got from his cell phone doesn't show that he was there for that entire time in West Hollywood.

Q.    And also Kevin Brown, who was driving him that day, said he never took him to a president of the United States event;

isn't that correct?

MR. FOX:  Objection, Your Honor.  Hearsay.

THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.  So sometimes the calendar will show events at which Sheriff Baca wasn't at and sometimes the calendar won't have events that Sheriff Baca participated in; is that correct?

MR. FOX:  Objection.  Foundation and argument.

THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.  Well, it's your understanding that Sheriff Baca's calendar may have events that he showed up at and may not have events that he actually did show up at, correct?

A.  All I can tell you is that there are meetings that I know occurred through my investigation that are not on here.

I can't tell you whether or not he went for five minutes to this fundraising dinner or not, based on his calendar.

MR. HOCHMAN:  No further questions.

THE COURT:  All right.  Redirect?

REDIRECT EXAMINATION

BY MR. FOX:

Q.  Special Agent Tanner, Mr. Hochman was just asking you questions about whether Mr. Baca could have placed a call from another number on September 26th to Mr. Carey.

Do you recall those questions?

A.    Yes.

Q.    And according to Mr. Baca's records on September 26th, where was he when he received that unavailable call at 7:35 p.m.?

A.    In San Marino.

Q.    And what's in San Marino?

MR. HOCHMAN:   Objection.   Asked and answered.

BY MR. FOX:

Q.    Well, did you obtain Mr. Baca's phone records for his home phone in San Marino?

A.    Yes.

Q.    Did his home phone number for the records you received show any calls that were made to any of the individuals we've been talking about on September 26th after 7:35 p.m.?

A.    No.

Q.    I believe you also told Mr. Hochman that Mr. Carey's records didn't show any contact between Mr. Baca and Mr. Carey on that date; is that correct?

A.    Correct.

Q.    Pulling up Exhibit 196, these are Mr. Carey's records in Exhibit 196; is that correct?

A.    The screen is blank.

Q.    I'll show it to you as soon as I get to the date.

Do you know where Mr. Carey lived?

A.   Generally, yes.

Q.   Special Agent Tanner, I would like you to focus on September 26.

First of all, this is Exhibit 196.

Whose phone records are these?

A.   William Tom Carey.

Q.   And then if you could please look at 9/26 at 7:33 p.m.

Where does it show that Mr. Carey is at that point?

A.   Castaic.

Q.   And does he have any other phone calls -- I'm sorry.

Do you know where he lived?

A.   Generally, in the Castaic/Santa Clarita/Valencia area.

Q.   Does this exhibit show any other phone calls that Mr. Carey had after 7:33 p.m. on September 26th?

A.   No.

Q.   Now, Mr. Hochman asked you about Mr. Baca's drivers, and you were discussing the system that was set up for Mr. Baca's drivers so that if Mr. Baca was being driven by one person, there was only one phone number that needed to be called in order to reach Mr. Baca; is that correct?

A.   Correct.

Q.   I'm going to show you Exhibit 194.

*(The exhibit was displayed on the screen.)*

BY MR. FOX:

Q.   Do you recognize the number that I'm showing you,

(323)829-7183?

A.    I believe that is the aide's number, Mr. Baca's aide.

Q.    I'm sorry.  So now we're looking at Eli Vera, 7180.

Do you recognize that number?

A.    Yes.

Q.    Whose number is that?

A.    That's the number that is assigned to the driver.  So not a specific person, it's a job role, I guess you could say, it's assigned to.

Q.    And showing you, say, on September 26th of 2011, what does this document show was occurring on the driver's phone records on that date?

A.    The calls were forwarded with the other number that's listed there, the 7181, that is the phone assigned to the backup driver.  And so the calls were forwarded so that if somebody called the driver, it would be forwarded and vice versa.  That's the way it worked.

Q.    And in the same exhibit, does it also include the backup driver's numbers?

A.    Yes.

Q.    And with the backup driver's number, were you able to see when a call was forwarded if the backup driver also received that call?

A.    Yes.

Q.    Now, Mr. Hochman asked you about one exhibit in your

summary chart.  I believe it was in Exhibit 172, August 26th at 5:57 p.m., this three-minute call from Exhibit 168.  And Mr. Hochman asked you what would happen -- or what did it mean if that wasn't reflected in Mr. Baca's phone records, as well; is that right?

A.    Yes.

Q.    And Mr. Baca's phone records are listed in Exhibit 197?

A.    Yes.

Q.    Can you please remember this 5:57 p.m. time on August 26th for a second?

A.    Yes.

Q.    I'm going to go to Mr. Baca's records from August 26th. This is 197.

        *(The exhibit was displayed on the screen.)*

BY MR. FOX:

Q.    What time did I tell you to remember?

A.    5:57.

Q.    And what's reflected on Mr. Baca's phone records on August 26th at 5:57 p.m.?

A.    A phone call from Mr. Leavins.

Q.    For how long?

A.    Three minutes.

Q.    Is that the same amount that was reflected on your chart?

A.    Yes.

Q.    Now, Special Agent Tanner, I want to now go back to some

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

of the questions that Mr. Hochman asked you about early on, and he asked you questions about statements that you made to Mr. Courson.

As part of your duties as a special agent with the FBI, are you allowed to engage in what's called ruses?

A.    Yes.

Q.    What are ruses?

A.    It's when, through the course of our investigation, we may provide information to someone or tell them something that may not be a hundred percent accurate, but it's done in an attempt to gather information from that individual.

Q.    Mr. Hochman asked you many questions about the William David Courson interview that ICIB conducted.

Do you recall those questions?

A.    Yes.

Q.    And the statements where Mr. Courson said things like he might have been played and things like that?

A.    Yes.

Q.    In your review of these recordings, who was suggesting to Mr. Courson that he had been played?

A.    It was the -- Sergeant Craig, Sergeant Leavins -- or Lieutenant Leavins, and Sergeant Long.

Q.    Mr. Hochman asked you questions about Exhibit 53, suggesting that your investigation at the time had, I guess, been tracking the ACLU complaints.

Do you recall that?

A.   Yes.

Q.   If I show you the subpoena that was served on the sheriff's department on August 26th, can you remember -- I'm sorry, I think it's August 24th -- can you remember these names and see if you see them on the subpoena?

A.   Yes.

Q.   Are any of those five names on this subpoena that is on page 13 of Government Exhibit 110?

A.   I don't believe there's any of the same names.

Q.   Mr. Hochman asked you questions about providing phone cards, I believe, to the shot callers through Anthony Brown.

Do you recall that?

A.   Yes.

Q.   Those phone cards, what system would the shot callers have to use in order to place calls?

A.   The ITMS monitored jail phones.

Q.   So if they wanted to provide hits on witnesses, they would be using that?

A.   Yes.

MR. HOCHMAN:  Objection.  Argumentative.  Move to strike.

THE COURT:  Sustained.  The answer is stricken.  The jury should disregard it.

///

BY MR. FOX:

Q.    Mr. Hochman asked you questions about the danger of this cell phone that was used.

What type of cell phone did you use?

A.    It was a flip phone.

Q.    How old was it?

A.    It was the typical flip phone that -- it didn't -- it wasn't a touch screen, there was no apps or anything like that; it was strictly a flip phone that most of us had ten years ago.

Q.    And in terms of the apps that we have today on our cell phones, was it similar to that?

A.    Not even close.

Q.    Mr. Hochman, in asking you about -- well, let me strike that.

Still sticking on the danger of cell phones, are you familiar, as an FBI agent, with whether cell phones are rare or prevalent in jails and prisons throughout the country?

A.    Yes.

Q.    And are they?

A.    Absolutely.

Q.    I'm sorry.  Are they rare or are they prevalent?

A.    They're prevalent in both jails and state prison.

Q.    Mr. Hochman asked you questions about the recording.

MR. FOX:  I'm going to publish Government Exhibit 67, page 4.

(The exhibit was displayed on the screen.)

BY MR. FOX:

Q.   These are the ITMS recordings that reflect your calls with Anthony Brown in July of 2011; is that correct?

A.   Yes.

Q.   And your comment at the top here that I'm going to highlight in this e-mail that's in evidence, it says that "you will be having your phone soon.  Then you can call who you need."

What did you mean by that?

A.   Anthony Brown had been advised multiple times that once he received the phone, that he was only to contact CJ, our undercover agent.  And so when I said, "You can call who you need," it was CJ.

Q.   Mr. Hochman asked you about Defense Exhibits 501 and 503.

These are the phone records of Anthony Brown's phone; is that correct?

A.   I don't know the numbers.

Q.   Here, let me put the first page up here for you so you can see it.

(The exhibit was displayed on the screen.)

BY MR. FOX:

Q.   This is -- let me focus on page 2 of 6.

Special Agent Tanner, do you see my three lines right here next to -- on the right, it says 296, 517, and 518

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

(indicating)?

A.    Yes.

Q.    And then there's a fourth line that's right next to 525.

      Do you see that?

A.    Yes.

Q.    On page 2 -- do you have that exhibit in front of you?  It might be easier.

      Other than these -- well, first of all, are these calls or text messages?

A.    I believe when it shows zero, that was for a text message.

Q.    And other than these four text messages, are there any other communications between the cell phone that Gilbert Michel provided to Anthony Brown and Mr. Brown's cellmate's girlfriend?

A.    I believe there's -- on the page 1.

Q.    Well, we'll get to that, but if you see page 2 --

A.    Oh, you're saying just this page?

Q.    Just this page, correct.

A.    Oh.  Yes.

Q.    So we've got four text messages and zero calls on this page.

      What is the date that these text messages occur?

A.    On --

Q.    Page 2 of 6.

A.    -- July 26, 2011.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Q.   Now, you just referenced the one that says page 1 of 6.

Do you see two lines that I've made next to what says 268 right here and here (indicating)?

A.   Yes.

Q.   And these are showing duration and seconds of 37 seconds and 39 seconds; is that correct?

A.   Yes.

Q.   Other than these two calls on July 26, 2011, of about a minute and 16 seconds, are there any other calls reflected on this exhibit between Mr. Brown's phone and his inmate's girlfriend?

A.   No.

Q.   And we do see a couple of things up here that are numbers we haven't talked about.

Do you see the (626)394-0530, and it says "Routed call"?

A.   Yes.

Q.   Do you have an understanding, based on these records, of what a routed call is?

A.   Generally, yes.

Q.   Okay.  It shows no called number next to it.

Do you see that?

A.   Yes.

Q.   What is a routed call, according to these records?

A.   A routed call is when a phone call that's either incoming

or outgoing, when it sometimes will either -- if it goes through voice mail or different things, it can bounce off of different towers.

And so for -- even though that number is not a number being called by that phone, it will show a number that it's routing it through like through the phone system.  So when it says "routed call" with another number, it's not a call -- that number was never called or received on that phone; it's just being routed through that number by the phone company.

Q.   And we see, "Dialed digits, 225."

Are you familiar with what that is?

A.   Not specifically, no.

Q.   Does it relate to an 888 number?  See "Called Number"?

A.   I know that, generally, the 888 numbers were when it was receiving information from the phone, like, "You have this many minutes left on your phone," or, "Your service is activated," things like that.

Q.   Now, if you could flip through Defense Exhibit 501.

Can you please see if you notice any other calls between Mr. Brown's cellmate's girlfriend and this phone?

And I will show you actually page 4 of 6.

Do you see one that I put a dash next to on 83 where there's a Number 268 next to it?

A.   Yes.

Q.   Approximately how many minutes is this?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

A.    Under two.

Q.    So we're up to about three minutes of calls; is that right?

A.    Yes.

Q.    And four text messages?

A.    Yes.

Q.    Other than that, are there any other calls between this cell phone and Anthony Brown's cellmate's girlfriend's phone?

A.    No.  I take that back.  There's one more additional one on page 5 for approximately -- under four minutes.

Q.    Can you let me know where that is?

A.    On page 5 of 6 at the very bottom.

Q.    Right here (indicating)?

A.    Yes.

Q.    Okay.  There are two that are -- one is at 291 seconds and one is at 207 seconds?

A.    Yes.

Q.    All right.  So we've got three calls on August 3rd of 2011, and at this point we're up to how many minutes, approximately?

A.    Oh, gosh.

Q.    We had three before.

A.    Under ten minutes at that point.

Q.    Do you know whether Anthony Brown had the cell phone at all times when he was in Men's Central Jail after Gilbert

Michel had given him the phone but before the sheriff's

department had recovered it?

A.    He did not.

Q.    What was happening during this time if --

          MR. HOCHMAN:  Objection.  Foundation.

          THE COURT:  Sustained.

BY MR. FOX:

Q.    Did Mr. Brown inform you or the undercover agent what was

happening to his phone when he didn't have it?

A.    Yes.

Q.    What did he say?

          MR. HOCHMAN:  Objection.  Foundation for time.

          MR. FOX:  I'll be happy to lay more.

BY MR. FOX:

Q.    Special Agent Tanner, is this information that Mr. Brown

was conveying to you at the time that you were conducting the

undercover activity with respect to Mr. Michel, around that

date?

A.    It wasn't to me directly, it was through the undercover

agent, but yes.

Q.    And what is it that Mr. Brown told the undercover agent?

A.    It was that the -- there's no plugs or anything in the

cells, so the phone had to be recharged.  So Gilbert Michel

would take the phone when he would leave his shift, charge the

phone, and then give it back whenever he was back on shift or

when he would see him.

Q.   Mr. Hochman asked you if you had ever received any voice mails from anybody within ICIB at any point in time between August 18th and September 26th of 2011.

Do you recall that question?

A.   Correct.

Q.   Based on your analysis of the phone records that you've analyzed, did you see any calls where they dialed your number?

A.   No.

Q.   Oh, Mr. Hochman asked you questions about Mr. Brown's cellmate being on the 3000 floor.

I believe you testified on direct that Mr. Brown was a pro per in 2500; is that correct?

A.   When we first met him, he was on 2500.  For the majority of the time that I met with him, he was on the 2000 Floor.

Q.   When he had the cell phone, do you know whether he was on the 2000 or the 3000 floor?

A.   I do not know.

Q.   Mr. Hochman asked you questions about whether you did anything to determine where Anthony Brown was on August 26th of 2011, when it showed in the records that Anthony Brown was released.

Based on your investigation, where was Anthony Brown on August 26th of 2011?

A.   He was in San Dimas.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Q.   And based on your investigation, what was the alias being used on Anthony Brown on August 26th of 2011?

A.   I believe at that time, he was Kevin King.

Q.   Mr. Hochman asked you questions about visiting inmates in state prison.

Do you recall those questions?

A.   Yes.

Q.   And the rules involved in their procedure?

A.   Yes.

Q.   Do you know whether they had special rules that restricted FBI's access compared to other law enforcement agencies?

A.   I don't know of any.

Q.   Mr. Hochman asked you questions about whether you went to the grand jury and reported on what the inmates were telling you during the course of the beginning stages of your investigation.

Over time, approximately how many witnesses have gone in to the grand jury?

MR. HOCHMAN:  Objection.  Time and relevancy, Your Honor.

MR. FOX:  I can restrict the time period, Your Honor.

BY MR. FOX:

Q.   Let's say between 2011 and December of 2013, approximately how many people testified in the grand jury?  Can you just give us a ballpark?

A.    Dozens.   I wouldn't even be able to -- I would say at least 50 to 75, if not more.

Q.    And Mr. Hochman asked you about Anthony Brown going into the grand jury to testify in December of 2012.

In terms of the obstruction of justice investigation, was this towards the beginning or end of the obstruction of justice investigation that Mr. Brown went in to the grand jury?

A.    It was not long after we started to present witnesses and information to the grand jury on the obstruction.

Q.    And when Mr. Brown was turned over to the grand jury for his testimony in December of 2012, who was it that brought Anthony Brown to federal custody at that point?

A.    The Marshals Service.

Q.    And where was Mr. Brown housed before he was brought into federal custody?

A.    In state prison.

Q.    Mr. Hochman asked you if you went back to the grand jury the night that you approached Gilbert Michel and Angela Caruso, his girlfriend, on August 24th.

Do you recall that?

A.    Yes.

Q.    And he asked you whether you asked the grand jury whether you should withdraw the subpoena.

Do you recall that?

A.    Yes.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Q.   Would the grand jury have been sitting at that time of night?

A.   No, absolutely --

Q.   Why not?

A.   Grand juries only operate from about 9:00 to 3:00, 9:00 to 4:00 at most, one day a week.

          MR. FOX:  Your Honor, based on an agreement between the parties, I move for the admission of Government Exhibit 30.

          MR. HOCHMAN:  No objection.

          THE COURT:  It will be received.

     (Government's Exhibit 30 admitted into evidence.)

BY MR. FOX:

Q.   Special Agent Tanner, you mentioned that you approached Gilbert Michel and confronted him the evening of August 24, 2011; is that correct?

A.   Yes.

Q.   The e-mail that I've just highlighted for you in Government Exhibit 30, when is this in relation to your confrontation with Gilbert Michel?

A.   It's not on the screen.

Q.   Oh.

          How's that?

     (The exhibit was displayed on the screen.)

BY MR. FOX:

Q.    When is this in relation to when you approached Gilbert

Michel?

A.   It's the following day.

Q.   And could you please read what it is that Mr. Martinez, your assistant director in charge of the FBI, wrote to Mr. Baca's e-mail account.

MR. HOCHMAN:  Objection, Your Honor.  Beyond the scope.

THE COURT:  Let's go to sidebar.

MR. HOCHMAN:  If we could take down the document, Your Honor, in the meantime.

THE COURT:  That's fine.

*(Proceedings held at sidebar under seal 1:10 P.M.)*

*(The following proceedings were held in open court.)*

THE COURT:  All right.  The objection is overruled.

BY MR. FOX:

Q.   Special Agent Tanner, Mr. Hochman asked you questions about whether you notified the sheriff's department about the approach you made of Gilbert Michel on August 24th, the evening of August 24th.

I'd like you to read this e-mail from the very next morning, August 25th at 11:06 a.m., from your assistant director in charge, Steve Martinez, to the e-mail account of Mr. Baca.

A.   "Lee, I'd like to provide an update on the matter I spoke with you about a few days ago.  Please give me a call or a good time/number to call you.  Regards, Steve."

Q.   What is the subject of this e-mail?

A.   "MCJ."

Q.   And I'd like you to now read the "From" in this forwarded e-mail.

A.   It's from Kevin Goran on behalf of Leroy D. Baca.

Q.   And this is about five or ten minutes later; is that correct?

A.    Yes.

Q.    And who is this sent to?

A.    Chris Nee.

Q.    Who was Chris Nee at the time?

A.    He was Paul Tanaka's aide.

Q.    And what is written in this e-mail?

A.    "Chris, earlier today Ester told me to refer all FBI inquiries to Mr. Tanaka, so here you go."

Q.    Mr. Hochman asked you with respect to Government Exhibit 172 whether you placed in here things that people had either testified about or told you about in terms of the events.

      Is there a reason why you did not put in what somebody testified about or what they may have told you about?

A.    The first reason is that the timing isn't always something that someone can say for sure it was at 3:42 in the afternoon, something like that.  So it's hard to place it in there when you don't know the exact time.

      But I also did not want to make it appear that I was placing someone's testimony into this chart.  This was strictly a way to show, between documents, phone records, and the times listed on the recordings, what was occurring during that time.

      MR. FOX:  One moment.

      (Counsel confer off the record.)

BY MR. FOX:

Q.    Special Agent Tanner, Mr. Hochman asked you about Exhibit

96.   This is just the video of their approach of you, is that correct, their confrontation with you?

A.   Yes.

     *(Playing of videotape.)*

BY MR. FOX:

Q.   I'm going to move it on to about the middle of the video.

          Mr. Hochman timed this as this video was occurring and said -- I think it was between one and two minutes.

          During this time that you were confronted by Mr. Craig and Ms. Long, how did it make you feel?

A.   You're talking just timing?  It felt like an eternity.

Q.   What about emotionally?

A.   It was very difficult.

Q.   Why?

          MR. HOCHMAN:  Objection.  Relevancy.

          MR. FOX:  Your Honor, I can explain at sidebar if you would prefer.

          THE COURT:  Let's go to sidebar.

     *(Proceedings held at sidebar under seal 1:15 P.M.)*

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

*(The following proceedings were held in open court.)*

MR. FOX:  May I continue, Your Honor?

THE COURT:  Yes.

*(Playing of videotape.)*

BY MR. FOX:

Q.   Special Agent Tanner, why was this difficult for you?

A.   Because at that time, I had done -- I had worked really hard.  I --

MR. HOCHMAN:  I'm sorry, Your Honor.

THE COURT:  Excuse me one --

MR. HOCHMAN:  I apologize.  The video is playing.  I didn't know if she was responding to a question on the video or she was responding -- because the video was playing while she

was answering.

THE COURT:  All right.

MR. FOX:  May I continue playing the video, Your Honor?

THE COURT:  Yes.

*(Playing of videotape.)*

BY MR. FOX:

Q.   Special Agent Tanner, why was it difficult on you?

A.   I had worked really hard on the investigation.  I had done everything I was supposed to do.  I got all the approvals I needed.  I did everything the proper way.

And to have something like this happen that I felt was purely to intimidate me and to try to get me to back off the investigation, it was incredibly difficult.  But it also made me believe I was doing the right thing in continuing to investigate the sheriff's department.

Q.   When you went back to the FBI -- well, first of all, are you aware of what a CDC is in FBI language?

A.   Yes.

Q.   What is a CDC?

A.   It's basically the attorney that handles anything that comes in for the FBI.  In our office, we have an attorney that will address any legal issues that we may have or questions.

Q.   Are you aware of whether your attorney, the FBI's attorney, did anything after hearing that you were threatened

with arrest?

A.   Yes.

Q.   What did the attorney do?

A.   After I informed executive management what had occurred, the CDC at the time had told me that he was beginning to --

MR. HOCHMAN:  Objection.  Relevancy.  Move to strike and hearsay, Your Honor.

THE COURT:  We'll come back to this.

MR. FOX:  This is my last question, Your Honor.

THE COURT:  Okay.  Let's go to sidebar.

*(Proceedings held at sidebar under seal 1:19 P.M.)*

*(The following proceedings were held in open court.)*

MR. FOX:  May I proceed, Your Honor?

THE COURT:  Yes.

BY MR. FOX:

Q.   Special Agent Tanner, I believe my question to you was what did your CDC do after he learned the information that you had been threatened with arrest?

A.   That -- the office of the CDC was researching what they would do if in the future the sheriff's department did actually come to arrest me and how they would legally step in and handle all of that.

MR. FOX:  One moment, Your Honor.

No further questions, Your Honor.

MR. HOCHMAN:  May I proceed, Your Honor?

THE COURT:  Yes.

RECROSS-EXAMINATION

BY MR. HOCHMAN:

Q.   Agent Marx, what Sergeants Craig and Long said to you on September 26th when they threatened you with arrest and they threatened to bring charges against you was 100 percent wrong; isn't that correct?

MR. FOX:  Objection, Your Honor.  Argumentative. Beyond the scope.

THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.   Well, if Sergeants Craig and Long didn't have a declaration in support of your arrest warrant but told you they did, that was 100 percent wrong, correct?

MR. FOX:  Same objection, Your Honor.

THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.   You would agree with me that if a sergeant for the sheriff's department said to a person that they had a declaration for their arrest warrant and, in fact, did not have a declaration for an arrest warrant, that would be improper, correct?

MR. FOX:  Same objection, Your Honor.

THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.   Anthony Brown was on the 3000 floor in August/September of

2011, correct?

A.    I don't know his specific location.  I know at some point after he was sentenced, he may have been moved.  I'm just saying when we were interviewing him, he was on the 2500 module.

Q.    Well, but Gilbert Michel was on the 3000 floor in August and September of 2011, correct?

A.    He worked in other areas, but I think he primarily worked 3000.

Q.    Now, with respect to the cell phone, you bought a new cell phone in July 2011 to give to Gilbert Michel, correct?

A.    I don't know what you mean by buy a new one.  The one that we used?

Q.    Yeah, the one you used.

A.    Yes.

Q.    It was new, right?

A.    Yes.

Q.    And you bought it in approximately July of 2011?

A.    Yes.

Q.    You looked at the phone and inspected it before you gave it to CJ to give to Gilbert Michel; is that correct?

A.    Took it out of the package.  I don't know what you mean by "inspect."

Q.    Did you load it up with photos of drugs when you gave it to CJ to give to Gilbert Michel?

MR. FOX:  Objection, Your Honor.  Beyond the scope.

THE COURT:  It is.

BY MR. HOCHMAN:

Q.   Did you put any photographs on the cell phone when you were inspecting it in July of 2011?

MR. FOX:  Same objection, Your Honor.

THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.   Now, you said that an instruction was given to Anthony Brown that he was only supposed to contact CJ with the cell phone; is that correct?

A.   Yes.

Q.   When Anthony Brown contacted you right on the first day he got the cell phone, he violated your instruction -- or he violated your or CJ's instruction, correct?

A.   We told him not to do it.  I wouldn't say -- "violate" is a very strong word.  We didn't want him to do it.  He did.

Q.   What word would you use instead of "violate" as to what Anthony Brown did with your instruction?

A.   He didn't follow our instructions.

Q.   He didn't follow your instructions.

And when he didn't follow your instructions on July 26, did you terminate the service on the cell phone?

A.   There was no reason to.

Q.   On July 26 when he didn't follow your instruction, did you

stop using Anthony Brown as an informant?

A.    No.

          MR. HOCHMAN:  No further questions.

          MR. FOX:  Nothing, Your Honor.

          THE COURT:  All right.  You may step down.

          Let me see counsel at sidebar.

     *(Proceedings held at sidebar under seal 1:26 P.M.)*

*(The following proceedings were held in open court.)*

THE COURT:  Ladies and gentlemen, I believe I asked you earlier whether anybody had been exposed to any -- even accidentally, any news stories, articles, any radio or television reports about the case or about anyone who has

anything to do with it.

If anybody has, could you please raise your hand? Okay. The record should reflect that there were no hands raised in response to that question.

One of the lawyers is not feeling well and so we are going to not -- we're not going to be in session tomorrow and we're going to resume on Thursday at 8 o'clock.

Again, I want to remind you until this trial is over, you're not to discuss this case with anyone, including your fellow jurors, members of your family, people involved in the trial, or anyone else, nor are you allowed to permit others to discuss the case with you. If anyone approaches you and tries to talk with you about this case, please let me know about it immediately.

Do not read any news stories or articles or listen to any radio or television reports about the case or about anyone who has anything to do with it.

Do not do any research, such as consulting dictionaries, searching the internet, or using other reference materials, and do not make any investigation about the case on your own.

If you need to communicate with me, simply give a note to the clerk.

And don't make up your mind about what your verdict should be until after you've gone into the jury room to decide

the case and you and your fellow jurors have discussed the evidence.  Please keep an open mind until then.

All right.  We'll see everybody on Thursday morning at 8 o'clock.

THE CLERK:  All rise.

*(Jury out at 1:36 P.M.)*

*(The following was heard outside the presence of the jury.)*

THE COURT:  All right.  So the government has --

MR. FOX:  Two witnesses left.

THE COURT:  -- two witnesses.

MR. FOX:  I expect that the first witness will have about a ten-minute direct, I can't imagine much cross, and then the second witness is Judge Birotte, and his direct is -- Ms. Rhodes tells me it's going to be about 45 minutes, I believe.

THE COURT:  Okay.

MR. FOX:  And then we will be resting.  I don't believe there are any other stipulations that we need to read into the record, so I think we will be resting at that point.

THE COURT:  Okay.  And the defense plans on calling --

MR. HOCHMAN:  The people that we listed at sidebar, Your Honor.

THE COURT:  Let's go back to sidebar.

*(Proceedings held at sidebar under seal 1:38 P.M.)*

*(The following proceedings were held in open court.)*

THE COURT:  All right.  Anything else?

MR. FOX:  No, Your Honor.

MR. HOCHMAN:  No, Your Honor.

THE COURT:  All right.  Thank you.

*(Evening recess taken at 1:49 p.m.)*

--oOo--

CERTIFICATE


I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.


Date: AUGUST 10, 2017


                        /s/  Cindy L. Nirenberg, CSR No. 5059

                                Official Court Reporter


UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA