UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE PERCY ANDERSON, U.S. DISTRICT JUDGE

- - -

UNITED STATES OF AMERICA,            )
                                     )
                  PLAINTIFF,         )
                                     )
           vs.                       ) No. CR16-66(A)-PA
                                     )
LEROY BACA,                          )
                                     )
                  DEFENDANT.         )
_____)

REPORTER'S TRANSCRIPT OF JURY TRIAL

DAY 11, VOLUME II OF II

PAGES 2198-2291

LOS ANGELES, CALIFORNIA

THURSDAY, MARCH 9, 2017

10:05 A.M.

_____

CINDY L. NIRENBERG, CSR 5059, FCRR
U.S. Official Court Reporter
350 W. 1st Street, #4455
Los Angeles, CA 90012
*www.msfedreporter.com*

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

APPEARANCES OF COUNSEL:


FOR THE PLAINTIFF:
                        OFFICE OF THE UNITED STATES ATTORNEY
                        BY: BRANDON FOX,
                            ASSISTANT U.S. ATTORNEY
                            EDDIE A. JAUREGUI,
                            ASSISTANT U.S. ATTORNEY
                            LIZABETH A. RHODES,
                            ASSISTANT U.S. ATTORNEY
                        312 NORTH SPRING STREET
                        13TH FLOOR
                        LOS ANGELES, CA 90012
                        213-894-2434








FOR THE DEFENDANT:
                        MORGAN LEWIS & BOCKIUS
                        BY: NATHAN J. HOCHMAN, ATTORNEY AT LAW
                            BRIANNA L. ABRAMS, ATTORNEY AT LAW
                        THE WATER GARDEN
                        1601 CLOVERFIELD BOULEVARD
                        SUITE 2050 NORTH
                        SANTA MONICA, CA 90404
                        310-255-9025




ALSO PRESENT:
                        LEAH TANNER, FBI SPECIAL AGENT

I N D E X


GOVERNMENT'S WITNESSES:                          PAGE

ANDRÉ BIROTTE

   REDIRECT BY MS. RHODES                      2203




DEFENDANT'S WTNESSES:

MICHAEL GENNACO

   DIRECT BY MR. HOCHMAN                       2215

   REDIRECT BY MR. FOX                         2249

   REDIRECT BY MR. HOCHMAN                     2270




FURTHER PROCEEDINGS

DISCUSSION HELD OUTSIDE PRESENCE OF JURY 2202

DISCUSSION HELD AT SIDEBAR                    2207

DISCUSSION HELD AT SIDEBAR                    2239

DISCUSSION HELD AT SIDEBAR                    2264

DISCUSSION HELD AT SIDEBAR                    2276

DISCUSSION HELD OUTSIDE PRESENCE OF JURY 2281

DISCUSSION HELD AT SIDEBAR                    2281

DISCUSSION HELD OUTSIDE PRESENCE OF JURY 2284

DISCUSSION HELD AT SIDEBAR                    2284

DISCUSSION HELD OUTSIDE PRESENCE OF JURY 2289

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

E X H I B I T S

*DEFENDANT'S EXHIBITS*                          *MARKED    ADMITTED*

2-12                                                          2279

2-24                                                          2279

LOS ANGELES, CALIFORNIA; THURSDAY, MARCH 9, 2017

10:05 A.M.

- - - - -

*(The following was heard outside the presence of the jury.)*

THE COURT:  All right.  Let's bring the jury in.

MR. FOX:  Your Honor, there's something sitting on the jury box that says -- looks like it's an old transcript that is not in the jury binder.  Do you mind if I take it -- and I'll show it to counsel -- so the jury is not exposed to something that looks like an old transcript to me?

THE COURT:  That isn't what Mr. Hochman was using at some point?

MR. FOX:  I don't think so.  I can show it to Mr. Hochman.

THE COURT:  Okay.

*(Jury in at 10:07 A.M.)*

MR. HOCHMAN:  No further questions, Your Honor.

THE COURT:  All right.

MS. RHODES:  Briefly, Your Honor.

*///*

ANDRÉ BIROTTE,

having been previously duly sworn,

testified further as follows:

REDIRECT EXAMINATION

BY MS. RHODES:

Q.   Mr. Birotte, Mr. Hochman spoke to you about continued cooperation.

As of September 27, 2011, when you were handed the letter by Mr. Baca which is Exhibit 112, had the sheriff's department done anything to cooperate?

MR. HOCHMAN:   Objection, Your Honor.   Vague and foundation.

THE COURT:   Sustained.

BY MS. RHODES:

Q.   Turning your attention to Exhibit 112, which is before you -- it's the letter that Mr. Baca gave to you on September 27, 2011 -- in the first section, does it -- it talks about grand jury subpoenas, correct?

A.   Yes.

Q.   Was it your understanding that any of those grand jury subpoenas had been complied with at the time of September 26, 2011?

A.   No.

Q.   Or September 27, 2011?

A.   I don't believe they had been responded to at that point.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Q.    Turning your attention to Exhibit 69 --

        MS. RHODES:  And if I could please have Agent Tanner put that up on the screen and the first paragraph blown up.

        (The exhibit was displayed on the screen.)

BY MS. RHODES:

Q.    You write this to -- who is this letter written to?

A.    It's written to Mr. Baca.

Q.    And what is the date of the letter?

A.    October 13, 2011.

Q.    Approximately two -- a little over two weeks after your meeting with Mr. Baca and Mr. Martinez?

A.    That sounds right, yes.

Q.    And can you read the sentence that starts, "I have spoken with...."

A.    All right.  It reads, "I have spoken with county counsel, Andrea Ordin, who assured me that your department would comply with these subpoenas as quickly as possible."

Q.    And --

A.    "You" -- sorry.

Q.    And county counsel Andrea Ordin is not part of the sheriff's department; is that correct?

A.    That's correct.

Q.    Now, I want to take you back and if you can read the second sentence -- or, actually, read from, "I write...."

A.    All right.  It reads:

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

"I write to follow up on our recent discussions concerning the FBI's investigation of alleged criminal conduct by Los Angeles County Sheriff's Department deputies assigned to the Men's County Jail.  That investigation remains ongoing and we are now at the point where we need to ensure that we quickly obtain the documents sought by the grand jury subpoenas that were previously served on the department."

Q.   So is it your understanding of whether -- was it your understanding that the grand jury had received any subpoenas that were at issue --

MR. HOCHMAN:  Objection.

BY MS. RHODES:

Q.   -- at this time?

MR. HOCHMAN:  Objection.  Leading and foundation, Your Honor.

MS. RHODES:  I can rephrase, Your Honor.

THE COURT:  All right.

BY MS. RHODES:

Q.   Does this letter go back to the subpoenas that were discussed in Mr. Baca's letter of September -- dated September 26, 2011?

A.   Yes, I believe so, yes.

Q.   And you had received assurances about compliance from

where?

A.    From county counsel Andrea Ordin.

Q.    And was the purpose of this letter to Mr. Baca -- what was the purpose of this letter to Mr. Baca?

A.    If my memory serves me correctly, I don't know how else to describe this other than the -- I don't know, the tide was shifting or sort of -- things were starting to turn.

I mean, at the beginning when all this happened, Mr. Baca very upset, you know, "We're not playing ball, we're out of here," you know, all the stuff I described.

And then I don't know what happened.  The tide started to shift and then it was like, "Okay, it is what it is, we need to cooperate."

I spoke with county counsel Andrea Ordin, who I knew before, and said, "Okay, we're going to move forward."

Q.    And when you say the tide had turned, was it at this point in October that the cooperation -- that the tide toward cooperation started?

A.    In my opinion, sort of after the big meeting of the three of us, then things started to shift and we started to get, you know, more cooperation.

Q.    Did you ever change your intent to go forward with this investigation?

A.    Absolutely not.

MS. RHODES:  May I have a moment, Your Honor?

THE COURT:  Yes.

MS. RHODES:  Nothing further.

MR. HOCHMAN:  Nothing further, Your Honor.

THE COURT:  All right.  You may step down.

THE WITNESS:  Thank you.

THE COURT:  All right.  May I see counsel at sidebar.

*(Proceedings held at sidebar under seal 10:14 A.M.)*

*(The following proceedings were held in open court.)*

MR. FOX:  May I proceed, Your Honor?

THE COURT:  Yes.

MR. FOX:  At this time, the United States rests.

THE COURT:  All right.  Does the defense wish to call a witness?

MR. HOCHMAN:  Yes.  Michael Gennaco, please.

THE CLERK:  Please raise your right hand.

Do you solemnly swear that the testimony you shall give in the cause now before this Court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

THE CLERK:  Please be seated.

Please state your full name and spell your last name for the record.

THE WITNESS:  My name is Michael Gennaco, and my last name is spelled G-E-N-N-A-C-O.

MR. HOCHMAN:  May I proceed, Your Honor?

THE COURT:  Yes.

MR. HOCHMAN:  Thank you.

MICHAEL GENNACO,

having been first duly sworn,

testified as follows:

DIRECT EXAMINATION

BY MR. HOCHMAN:

Q.   Mr. Gennaco, what is your current occupation?

A.   My current occupation is to design and provide independent police oversight for numerous agencies in the country.

Q.   What do you mean by "independent police oversight"?

A.   Our responsibility is to come up with systems and to work within those systems in order that there is an outside independent review of internal investigations, officer-involved

shootings, and participate in some cases in the disciplinary

process to ensure that there's accountability.

Q.    Let me deal briefly with your background, if I might.

How long have you been an attorney for?

A.    I graduated from law school in 1983.  I took the

California Bar in 1984, so since 1984.

Q.    And which law school was that?

A.    Stanford Law School.

Q.    Where did you go after law school?

A.    After law school, I clerked for a judge on the United

States Court of Appeals for the Ninth Circuit, and after that I

was hired by the honors program and worked at the United States

Department of Justice, Civil Rights Division.

Q.    And what did you do in the -- and were you based in

Washington, D.C.?

A.    My office was in Washington, yes, sir.

Q.    And what did you do while you worked for the civil rights

division of the United States Department of Justice?

A.    I worked for two years in the voting section working on

discrimination cases and then eight more years in the criminal

section, where I was a federal prosecutor prosecuting criminal

civil rights violations.

Q.    And during those eight years while you were prosecuting

criminal civil rights violations, what types of cases did you

prosecute?

A.    They boiled into three major categories:  Human trafficking, hate crimes, federal hate crimes, and officer misconduct, criminal allegations of officer misconduct.

Q.    And when you say "officer misconduct," what does that mean?

A.    It means law enforcement misconduct, misconduct conducted by police officers, deputies, other law enforcement officials.

Q.    Now, did you prosecute all those cases in Washington, D.C.?

A.    No.

Q.    Where did you prosecute them?

A.    The cases that were assigned to me occurred throughout the country.

Q.    How many, approximately, investigations did you do during that -- those eight years involving law enforcement?

        MR. FOX:  Objection.  Relevance.

        THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.    Did you ever prosecute any cases in Los Angeles?

A.    Yes.

Q.    How many?

A.    There were a number of investigations.  There was the prosecution of an LAPD officer that I was involved in that went to trial.

Q.    Now, after working -- you said you worked for eight years

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

in the criminal enforcement section of the civil rights division; is that correct?

A.    It was called the criminal section, yes, sir.

Q.    And so just to try to get the time frame, this takes you up from about 1984 to 1992; is that approximately right?

A.    The time I was in the criminal section was 1986 to 1994.

Q.    So in 1994, then, where did you go?

A.    In 1994, I was hired by the United States Attorney for the Central District of California, Nora Manella.

Q.    And that's the US Attorney's office here in Los Angeles?

A.    Yes, sir.

Q.    What did you do in the US Attorney's office when you were hired?

A.    I did the same kind of work that I was doing in Washington, but I was assigned in the US Attorney's office to do that work here in Central California.

Q.    And when you say "that work," you mean civil rights prosecutions?

A.    Yes, sir.

Q.    Was there a dedicated civil rights section when you arrived in 1994?

A.    No, sir.

Q.    What section did you work in, then?

A.    It was called the public corruption and government fraud section at the time.

Q.    At some point, did you work in the civil rights -- was a dedicated civil rights section set up?

A.    I worked with the US Attorney to create a civil rights section.  One had never existed prior to my coming to the office.

Q.    And approximately how many civil rights investigations of law enforcement officers did you do while you were at the United States Attorney's office?

A.    Hundreds.

Q.    And what years, then, would you have been at the United States Attorney's office?

A.    I was in the United States Attorney's office from 1994 until 2001.

Q.    And then starting in 2001, where did you go next?

A.    In 2001, I created an oversight entity called the LA County Office of Independent Review.

Q.    Now, was that an oversight entity for any particular law enforcement organization?

A.    It was created to oversee the Los Angeles County Sheriff's Department.

Q.    And what did you model the Office of Independent Review after?

A.    There was nothing to model it after.

Q.    Why not?

A.    There was no other entity or oversight entity that was as

vibrant as the one we ended up creating.

Q. And what actually did you create as far as the Office of Independent Review?

A. It was an oversight entity of myself and five other lawyers who were assigned full time to ensure that there were honest investigations of deputies and that when deputies committed misconduct, based on the evidence, that they were held accountable for their misdeeds.

Q. How did you go about that at the Office of Independent Review?

A. We worked closely in monitoring and reviewing and providing quality control of the internal investigations that were conducted by the sheriff's department and then wrote public reports indicating our involvement in firing of deputies.

Q. Let's start with the quality control.

What did you do to ensure quality control of the investigations of the sheriff's department deputy misconduct?

A. The internal decision maker in the sheriff's department has to have a fair set of facts and a thorough set of facts upon which to make a decision about whether or not, for example, there was excessive force in the jails.

Our role and responsibility was to ensure that that decision maker had those facts.

Q. Did you have something called realtime access to the

investigation reports?

A.   That's correct.

Q.   What does that mean?

A.   It means that we had the ability to have database sharing with the database that the Internal Affairs Division had.  We could access the interviews at any time.

Q.   And how did realtime access to those interviews differ from whatever else was going on in the country?

A.   Almost all other agencies had --

     MR. FOX:  Objection.  Relevance.

     THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.   When you were modeling the Office of Independent Review, did you model it after any other organization that had realtime access?

     MR. FOX:  Objection.  Asked and answered.

     THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.   Besides this realtime access, did you also get to participate in the disciplinary decisions being made of sheriff's personnel -- or sheriff's law enforcement personnel?

A.   That was an essential component of our responsibilities, yes, sir.

Q.   In what way did you get to participate?

A.   We were able to make independent recommendations based on

the evidence that came from the investigation about whether or not the deputies had violated the policy and their oath of office with regard to them having a badge.

Q.   And who were you making those recommendations to?

A.   The decision makers within the department, everybody from a captain all the way up to the sheriff at times.

Q.   So let me understand.  You would actually offer your recommendation to a captain or a decision maker during -- before a final decision was made; is that correct?

          MR. FOX:  Objection.  Leading.  Asked and answered.

          THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.   Would you be able to offer your recommendations before a final decision had been made?

          MR. FOX:  Objection.  Leading and asked and answered.

          THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.   What point in the process from the beginning of the process to the end were you able to make your recommendations for discipline?

A.   It was after the investigation had been completed, but before any decision had been made with regard to whether or not there was a violation of policy.

Q.   Now, when you were making your recommendations, did -- what would happen if the person, the decision maker you made it

to -- let's use a captain, for instance -- did not agree with it?

A.   If we did not have an agreement and we did not believe that the decision or the recommendation the captain had reached was unreasonable, we would appeal that to a person of higher rank.

Q.   So higher rank than a captain would be like a commander?

A.   Yes, sir.

MR. FOX:  Objection.  Relevance and leading.

THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.   Who would you appeal the decision of a captain to?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.   At some point, did you actually speak to Sheriff Baca in the appellate process?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.   Now, did Office of Independent Review have its own investigators?

A.   No.

Q.   And what impact on your independence was the fact that you didn't have your own investigators?

A.    None.

Q.    Why is that?

A.    The --

        MR. FOX:  Objection, Your Honor.  Relevance and vague.

        THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.    Well, what was the impact of the fact that you didn't have your own investigators on the Office of Independent Review's independence?

        MR. FOX:  Objection.  Irrelevant, Your Honor.

        THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.    Did you have to rely on the sheriff's department investigators in connection with doing your independent review?

A.    We used the information they collected during their interviews, but we were certainly involved in shaping those investigations.

Q.    What do you mean by "shaping"?

A.    What I mean is if we looked at the interviews and the wrong questions were asked or they were not asked in the correct way, we could then interpose an objection to that and make sure that the investigations got back on the right track.

Q.    And was your office properly resourced or undersourced to do your job?

A.    We had significant resources.  You can always, you know,
have more, but it was a significant allocation of resources and
probably unsurpassed by most other agencies at the time.

          MR. FOX:  Objection.  Move to strike the last
sentence.

          THE COURT:  The last sentence is stricken.  The jury
should disregard it.

BY MR. HOCHMAN:

Q.    Now, is the Office of Independent Review able to bring
criminal charges itself --

A.    No.

Q.    -- like, for instance, a US attorney's office or a DA's
office?

A.    No.

Q.    How did that impact your independence?

          MR. FOX:  Objection.  Relevance and vague.

          THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.    Mr. Gennaco, where were the Office of Independent Review's
offices located?

A.    They were located in an off-site location in Commerce,
California.

Q.    And do you know where the -- were the offices of the
Internal Affairs Bureau and the Internal Criminal
Investigations Bureau of the sheriff's department located in

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

the same office?

A.    Yes, sir.

Q.    Did you work with the Internal Affairs Bureau in connection with your duties at the Office of Independent Review?

A.    Yes, sir.

Q.    Did you also work with ICIB, the Internal Criminal Investigations Bureau, in connection with your duties at the Office of Independent Review?

A.    Yes.

Q.    Are you aware what rank of deputies were assigned to IAB and ICIB at that time?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.    Are you aware of what type of violations Internal Affairs Bureau would investigate?

A.    Any violation that would be a violation of department policy, the core values of the sheriff's department, or the oath of office that the sheriff's deputies take.

Q.    And what was the difference between the investigations of the Internal Affairs Bureau and the investigations of the Internal Criminal Investigations Bureau, IAB versus ICIB?

A.    ICIB was created to focus exclusively on criminal allegations that would then be presented for the DA for a

determination.

Internal Affairs had a broader scope and encompassed any potential misconduct that would also be a violation of department policy.

Q.   I'd like to show you Exhibit 53.

MR. HOCHMAN:  If I might ask Agent Tanner if she would put it on the screen, please.

MR. FOX:  I need to log back in.

MR. HOCHMAN:  Your Honor, I can come back to that.

Is it going to take you --

MR. FOX:  Two minutes.

MR. HOCHMAN:  Yeah, I'll come back to that, Your Honor, while they're setting up the computer.

THE COURT:  All right.

BY MR. HOCHMAN:

Q.   You talked about the IAB dealing with administrative violations; is that correct?

A.   Yes.

Q.   What is an administrative violation versus, let's say, a criminal violation?

A.   There is a manual of policy and procedures that all deputies are expected to understand and expected to follow. And if, in fact, they knowingly violate those expectations, violate the policies, that would be a potential violation of that -- Internal Affairs or administrative violation.

Q.    And if the criminal folks at ICIB determine that there wasn't enough evidence to proceed, would the case go to the Internal Affairs Bureau for an administrative look?

A.    ICIB does not make determinations.   That determination would come from the district attorney.

Q.    So if a district attorney determined that there was not enough information to proceed, would the Internal Affairs Bureau -- let me ask it differently.

What role did the Internal Affairs Bureau play in connection with an ICIB investigation that it had terminated, it had ended?

MR. FOX:   Objection.   Irrelevant.

THE COURT:   Sustained.

BY MR. HOCHMAN:

Q.    You talked about that you worked with five other attorneys at the Office of Independent Review; is that correct?

A.    Yes, sir.

Q.    Were these other attorneys people who also had civil rights experience?

A.    Some of them did, some of them did not.

Q.    And the ones that did, was it on the prosecution side or the defense side or both?

MR. FOX:   Objection.   Irrelevant.

THE COURT:   Sustained.

///

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

BY MR. HOCHMAN:

Q.   You talked about the fact that the Office of Independent Review issued public reports.

Do you recall that?

A.   Yes, sir.

Q.   And were those public reports on a quarterly and annual basis?

A.   Yes, and then there were special reports whenever there were situations that occurred that were of significant public interest.

Q.   What was generally in those public reports?

MR. FOX:  Objection.  Irrelevant.

THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.   Did you issue a quarterly report in the summer of 2011 -- excuse me, an annual report in the summer of 2011?

A.   Yes.

Q.   By the way, when I say "quarterly," I mean your report would come out every quarter, basically four times a year?

A.   That's correct.

Q.   So -- and then now go back.

You issued an annual report in June 2011; is that correct?

A.   Yes, sir.

Q.   And without getting into the specifics of the report, did

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

that report review your investigations that you had conducted during that time frame?

MR. FOX: Objection. Relevance.

THE COURT: Sustained.

BY MR. HOCHMAN:

Q. Did you ever offer criticisms of the Los Angeles County Sheriff's Department in the summer of 2011?

MR. FOX: Objection. Relevance.

THE COURT: Sustained.

BY MR. HOCHMAN:

Q. Did you have weekly meetings with Sheriff Baca during the summer of 2011?

A. Yes.

Q. And had you -- was that a general practice that you had with Sheriff Baca, to have weekly meetings with him?

A. Yes, sir.

Q. And during those weekly meetings, what generally were the concerns that you would share with Sheriff Baca? And I'll focus on the summer -- or, actually, the August/September 2011 period of 2011.

MR. FOX: Objection. Relevance.

THE COURT: Sustained.

BY MR. HOCHMAN:

Q. In addition to the weekly meetings that you would have with Sheriff Baca, were those the only opportunities that you

had to speak with Sheriff Baca?

A.    No, sir.

Q.    What other types of occasions would you have to speak with Sheriff Baca?

A.    He presided over other meetings that I participated in, such as overdue case meetings.

Q.    Were those meetings conducted in the EPC room of the fourth floor, if you recall?

        MR. FOX:  Objection.  Relevance.

        THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.    Did you attend an executive planning council weekly meeting that Sheriff Baca was present for?

A.    Yes, sir.

Q.    Was Undersheriff Tanaka also there?

A.    Usually.

Q.    And would you attend a pre-meeting, a meeting that happened before those weekly EPC meetings?

A.    Sometimes.

Q.    And was Sheriff Baca ever at those meetings?

A.    No.

Q.    And at the pre-meeting, did Undersheriff Tanaka play a role?

        MR. FOX:  Objection.  Relevance.

        THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.   Well, to the extent that you were at both pre-meetings and at the EPC meetings, did Undersheriff Tanaka's demeanor change between the pre-meetings and the weekly EPC meetings, if you're aware?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.   I'd like to focus you on the sort of mid to late period of August of 2011.

Do you have that in mind?

A.   Yes.

Q.   And during that time period, did you find out that a cell phone had been introduced by the FBI into the Men's Central Jail?

A.   Yes.

Q.   And were you informed at some point who that cell phone belonged to?

MR. FOX:  Objection.  Foundation.

THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.   At some point, did you find out who that cell phone belonged to, yes or no?

A.   Yes.

Q.   Who provided you with that information, if you recall?

A.    My recollection, it was -- it was Sheriff Baca.

Q.    And what, if anything, was the significance when you learned about the fact that the FBI had put a cell phone in the Men's Central Jail?

A.    I was surprised.

Q.    In what way?

        MR. FOX:  Objection.  Relevance.  Move to strike.

        THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.    Well, did you --

        THE COURT:  The answer -- excuse me.  The answer is stricken.  The jury should disregard it.

BY MR. HOCHMAN:

Q.    Well, did anyone from the FBI contact you before you heard from Sheriff Baca that they had found an FBI cell phone in the Men's Central Jail?

        MR. FOX:  Objection.  Relevance.

        THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.    Well, when Sheriff Baca told you in -- sometime in August of 2011 that the FBI had inserted a cell phone in the Men's Central Jail, had you already known about it before Sheriff Baca told you?

A.    No.

Q.    Now, at some point thereafter, did you speak with United

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

States Attorney André Birotte about that cell phone?

MR. FOX:  Objection.  Foundation.

THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.   At some point after you learned about the FBI cell phone in the Men's Central Jail, did you speak to United States Attorney André Birotte?

MR. FOX:  Same objection, Your Honor.

THE COURT:  Same ruling.

BY MR. HOCHMAN:

Q.   Sometime in August, August of 2011, did you speak to United States André Birotte about the cell phone?

A.   I spoke to him about the discovery of the cell phone, I believe.

Q.   And approximately how many conversations did you have with US Attorney André Birotte in this sort of August 2011 time frame?  And I'm going to do it before any meetings with US Attorney Birotte.

A.   Probably once.

Q.   And, generally, what topics were discussed in that one conversation?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.   Well, as -- after you had that conversation with US

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Attorney Birotte, did you then participate in a meeting with United States Attorney Birotte on August 29, 2011?

A.    Yes.

Q.    Who was at that meeting?

A.    There were a number of folks at the meeting.  I probably, at this time, cannot recall all who attended.  I do know for sure that then Sheriff Baca was there.  My recollection is that the undersheriff was there, certainly.

Q.    That's Paul Tanaka at the time?

A.    That was Mr. Tanaka.

       There were other individuals from the Los Angeles Sheriff's Department's command staff that were in attendance and there were a number of folks from the supervisory ranks of the United States Attorney's office who were present, including Mr. Birotte, who was the US Attorney at the time.

Q.    Was Lawrence Middleton there?

A.    I believe he was.

Q.    Bruce Riordan and George Cardona, if you recall?

A.    I am sure that they were there.

Q.    And these are the senior management for the United States Attorney's office?

A.    At the time, yes.

Q.    Did you know these people before the August 29th meeting?

A.    Yes.

Q.    How?

A.   I had worked with them when I was in the US Attorney's office.

Q.   And that was back in the late 1990s?

A.   Correct.

Q.   So at that meeting that you attended, who spoke on behalf of the sheriff's side of the table?

A.   Sheriff Baca.

Q.   And did Undersheriff Tanaka speak at all during that meeting with United States Attorney Birotte?

A.   While the sheriff was there, he said, if anything, virtually nothing.

Q.   And during that meeting, what generally were the topics that were discussed?

A.   The sheriff was communicating to the United States Attorney his concern about the entry of the cell phone into the jail.

Q.   And when he got done communicating his concerns about the entry of the cell phone into the jail, what was the United States Attorney's side's reaction --

A.   They --

Q.   -- to those concerns?

A.   Sorry for interrupting.

        They were cordial, relatively nonresponsive, appreciated the meeting, said so, and that was about it.

Q.   Was there any discussion during that meeting about a writ

being issued to -- for Anthony Brown?

A.   Not that I can recall.

Q.   Now, after that meeting occurs, did you then have a separate meeting with United States Attorney Birotte and his senior management at the United States Attorney's office?

A.   I'd characterize it as a continuation of the larger meeting.  There was really no break.

Q.   Was Sheriff Baca, though, at that -- I'll call it a second meeting.  Was Sheriff Baca at that second meeting?

A.   No.

Q.   And this was also still in the United States Attorney's office; is that correct?

A.   Yes, sir.

Q.   Did Undersheriff Tanaka attend the beginning of that second meeting, what I'm calling the second meeting, on August 29th?

A.   My recollection is he stayed behind for a few minutes after the sheriff and the rest of the command staff from the sheriff's department had left the room.

Q.   And did he address the United States Attorney and the senior management at that time?

A.   Yes, sir.

Q.   And, generally, without getting into specific statements, what were the topics and demeanor of Undersheriff Tanaka at that point?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

A.    He expressed complete -- he expressed extreme displeasure

with the introduction of the cell phone in a way that had --

that was quite different than the earlier conversation.

Q.    In what way?

A.    It was much more -- much stronger, much more filled with

disdain, and I characterize it as sort of a very hawkish and

aggressive position.

Q.    And Sheriff Baca was not in the room while Undersheriff

Tanaka was making these comments; is that correct?

A.    That's correct.

Q.    And, generally, what topics did you address, Mr. Gennaco,

with the senior management during that meeting?

        MR. FOX:  Objection.  Relevance.

        THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.    After that meeting, did you -- did you pursue a course of

cooperation with the United States Attorney's office or a

different course?

        MR. FOX:  Objection.  Vague and relevance.

        THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.    During that second meeting -- we'll focus on that second

meeting -- did the United States Attorney and his senior staff

address the issues that you were raising?

        MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

MR. HOCHMAN:  Your Honor, may I be heard at sidebar briefly on this?

THE COURT:  Yes.

MR. HOCHMAN:  Thank you.

*(Proceedings held at sidebar under seal 10:51 A.M.)*

*(The following proceedings were held in open court.)*

BY MR. HOCHMAN:

Q.   Mr. Gennaco, I focus you now on September 2011.

Do you have that in mind?

A.   Yes.

Q.   Did you have any conversations with United States Attorney André Birotte about setting up a second meeting -- the first meeting being that August 29th meeting -- a second meeting that would involve Sheriff Baca and the head of the FBI, Steve Martinez?

A.   Yes.

Q.    What were those discussions, generally --

A.    In general --

Q.    -- with US Attorney Birotte?

MR. FOX:  Objection.  Hearsay.

THE COURT:  You want to tell us what you said, fine, but omit anything else -- anybody else's statements at this point.

THE WITNESS:  Okay, Your Honor.  I was -- I told the US Attorney, Mr. Birotte, that I was looking forward to the meeting and hopeful that the meeting would repair relationships between all.

BY MR. HOCHMAN:

Q.    And then there was this meeting -- are you aware that they actually did have a meeting on September 27th, 2011?

A.    I'm not sure of the date.  I was present at a subsequent meeting, yes, sir.

Q.    And did you subsequently, after -- I'll focus you now after September 27th, 2011 -- did you have another phone call with United States Attorney Birotte?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.    Did you have any communication with United States Birotte after September 27th about anything that was dealt with in the September 27th meeting?

MR. FOX:  Objection.  Relevance and calls for hearsay.

THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.   Without going into anything that André Birotte told you and just focus on your part of the conversation, did you have any conversation with United States Attorney Birotte after September 27th, 2011?

MR. FOX:  Objection.  Relevance and calls for hearsay.

THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.   Now, does the Office of Independent Review actually exist today?

A.   No.

Q.   What happened to it in 2014?

A.   The duties of the office were folded into a larger office called the Inspector General.

MR. HOCHMAN:  No further questions at this time.

Oh, you know what, I apologize, Your Honor.  I think we were trying to get Exhibit 53 on the screen earlier.  May I reopen my direct just to deal with Exhibit 53?

THE COURT:  That's fine.

MR. HOCHMAN:  And if we may put the first page of Exhibit 53 on the screen.

BY MR. HOCHMAN:

Q.    And if you could turn to Exhibit 53 in I think Volume I of the exhibit books you have before you, Mr. Gennaco.

Do you have that in front of you, Mr. Gennaco, Exhibit 53?

A.    Yes, sir.

Q.    Could you just briefly look through that exhibit.

MR. HOCHMAN:  And if we could turn to the -- I think it's the third page of this exhibit, please, and then rotate it, if we could, possibly.

Thank you.

BY MR. HOCHMAN:

Q.    Exhibit 53 deals with alleged retaliation complaints and the executive summary of those complaints; is that correct?

A.    Yes.

MR. HOCHMAN:  And then if we could turn, then, back to page 1.

(The exhibit was displayed on the screen.)

MR. HOCHMAN:  And if you can scroll down to the bottom, please.  So we'll just do the second -- the bottom two e-mails first.

Thank you very much.

BY MR. HOCHMAN:

Q.    All right.  The bottom e-mail is from a Walter Katz on September 1st, 2011, and you're cc'd on that e-mail; is that

correct?

A.    Yes.

Q.    Who is Walter Katz?

A.    He was an attorney for the Office of Independent Review.

Q.    Was he one of the attorneys working with you at the time?

A.    Yes, sir.

Q.    And he's forwarding on the ACLU retaliation claims that make up Exhibit 53; is that correct?

A.    Yes.

Q.    What is a retaliation claim?

A.    It is a claim that an inmate makes alleging that something inappropriate has happened to the inmate as a result of the inmate complaining about conditions in the jail.

Q.    And then the next e-mail up is -- you're still part of this e-mail chain from Michael Boreman and you're cc'd on the September 1st, 2011, 12:32 p.m. e-mail; is that correct?

A.    Yes.

Q.    And Michael Boreman, who is he?

A.    He was a lieutenant who worked in Central Jail, and he was assigned the responsibility for ensuring that the retaliation complaints be thoroughly investigated.

        MR. HOCHMAN:  And then if we could focus on the upper half of the e-mail, please -- or of the exhibit.

        Thank you.

///

BY MR. HOCHMAN:

Q.   And now the next e-mail up, that's from you to a Tom Carey; is that correct?

A.   Yes.

Q.   Tom Carey, what position did he have at that point in -- September 1st, 2011?

A.   He was the captain of the ICIB and Criminal -- Internal Criminal Investigations Bureau.

Q.   And was the Office of Independent Review working with ICIB on this retaliation allegations list at that time?

A.   In part.

Q.   And with respect to this particular list, what exactly was the Office of Independent Review doing?

         MR. FOX:  Objection, Your Honor.  Relevance.

         THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.   And then the -- and you weren't involved on the higher e-mail, which is from Mr. Carey to Mr. Leavins, is that correct, and others?

A.   Correct.

         MR. HOCHMAN:  Thank you.  No further questions, Your Honor.

         THE COURT:  All right.

         MR. FOX:  May I proceed, Your Honor?

         THE COURT:  Yes.

REDIRECT EXAMINATION

BY MR. FOX:

Q.   Mr. Gennaco, it wasn't your goal to provide this to Mr. Carey so that he and Mr. Leavins, Ms. Long, and Mr. Craig could figure out what the feds were looking at, correct?

A.   Correct.

MR. FOX:  You can take that down.  Thank you.

BY MR. FOX:

Q.   You testified on direct examination, Mr. Gennaco, that OIR's job was to ensure that there were honest investigations that were thoroughly handled; is that correct?

A.   Yes, sir.

Q.   Now, that was your job, but that didn't always happen, correct, with the investigations?

A.   There's no perfect system, that's correct.

Q.   There were many times where deputies, you know, were not held accountable for their actions while you were the head of OIR, correct?

MR. HOCHMAN:  Objection.  Time frame, Your Honor. Vague as to time frame.

THE COURT:  Sustained.

BY MR. FOX:

Q.   Mr. Gennaco, you don't believe that OIR was a substitute for federal prosecution, correct?

A.   No.

Q.    Was that -- I'm sorry, was what I said incorrect or correct?

A.    I agree with your question.

Q.    And prior to August of 2011, while you were head of OIR, there were hundreds of allegations of excessive force by deputies in the jail, correct?

A.    You mean against deputies in the jail?

Q.    Correct.

A.    Yes.

Q.    And in the ten years before this federal investigation became public, so let's say ten years before August of 2011, there were fewer than five deputies who had been charged with committing excessive force by the county, correct?

        MR. HOCHMAN:  Objection.  Relevancy.  403, Your Honor.

        THE COURT:  Overruled.

        You can answer.

        THE WITNESS:  If you're talking about charged administratively, a number were charged.  Criminally, there were a few that were charged.

BY MR. FOX:

Q.    And in terms of criminally charged by the DA's office, there were fewer than five over that ten-year period of time, correct?

A.    I don't have the exact number.  That might be a good

estimate.

Q.    And that's an estimate you provided to the federal government when you were interviewed in July of 2013, correct?

MR. HOCHMAN:  Objection.  Improper impeachment, Your Honor.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  I think that was the number that I gave you, yes, sir.

BY MR. FOX:

Q.    Mr. Gennaco, given your experience, you've always been very skeptical of local prosecutions of excessive force of local officers, correct?

A.    Are you asking about filing decisions or the prosecutions themselves?

Q.    The prosecutions themselves -- well, not in terms of the merits of the prosecution, but in terms of the ability of local prosecutors and local law enforcement agencies to appropriately decide which cases are brought.

A.    I think that there are issues with regard to that nationwide, yes, sir.

Q.    And you don't believe that local law enforcement has the skill set to do effective prosecutions of excessive force cases even when they try, correct?

A.    At times.

Q.    And your experience is that local prosecution of constitutional violations by law enforcement officers is often ineffective, correct?

A.    Could you repeat the question?

Q.    Sure.  Your experience is that local prosecution of constitutional violations by local law enforcement officers is often ineffective, correct?

A.    Local law enforcement does not prosecute constitutional violations.  They prosecute violations of the Penal Code, generally.

Q.    And the reason why the United States Department of Justice's Civil Rights Division came into existence is because local prosecutions were often ineffective, correct?

A.    Certainly in the 1960s and since that time, yes, sir.

Q.    And that's also the reason why the FBI investigates these types of cases, correct?

A.    In part, yes.

Q.    Now, you talked about your extensive experience as a federal prosecutor both in Washington, D.C., and also locally here in Los Angeles.

        A majority of the cases you worked on as a federal prosecutor were conducted without allowing the local law enforcement agency to take part in your investigation, correct?

A.    Some were and some weren't.  I think a majority take part.  I mean, they were certainly cooperative in many cases, but

actually investigating the cases, I would say the majority were ones in which the FBI was the lead agency, yes, sir.

Q.    And in which the local law enforcement agency was not part of that investigation, correct?

A.    It depends on how you define "part," sir.  If you're talking about actually being involved in the investigation, I would agree with you.

Q.    Now, the Office of Independent Review's responsibilities included the entire sheriff's department, not just the jails, correct?

A.    That's right.

Q.    And you talked about the six people that made up the Office of Independent Review.

    Other than that, those were the only employees that were part of the Office of Independent Review with the exception of some county employees, correct?  Do you understand my question?

A.    I did.  I'm just trying to think.

    I think that's essentially a fair characterization.

Q.    OIR had no investigators, correct?

A.    That is correct.

Q.    And it was not an investigative body, correct?

A.    That is correct.

Q.    And it didn't have the resources to conduct its own investigations, correct?

A.    That is correct.

Q.    Now, while you were the Office of Independent Review, you were paid by the county, correct?

A.    Yes, sir.

Q.    And you had an attorney-client relationship with the sheriff's department?

A.    Yes.

Q.    You had an attorney-client relationship with the sheriff, correct?

A.    Not in the traditional sense.  I did have an attorney-client relationship.  I was not his lawyer.

Q.    And you worked in county office space, correct?

A.    It was leased space that was provided to us by the county, yes, sir.

Q.    You used county supplies?

A.    Yes, sir.

Q.    And you had county staff working under you as secretaries?

A.    Yes, sir.

Q.    Now, in 2008 and 2009, you noticed an uptick in force incidents at Men's Central Jail, correct?

A.    Yes.

Q.    But OIR didn't have the resources to review every force incident coming out of the jails, correct?

        MR. HOCHMAN:  Objection.  403.  Relevancy, Your Honor.  Motion in limine.

THE COURT: Overruled.

You can answer.

THE WITNESS: The resources to review every force incident would have been stretched, yes, sir.

BY MR. FOX:

Q.   OIR was not set up to handle systemic issues within the sheriff's department, correct?

A.   That is not correct.

Q.   Well, OIR dealt with issues on a case-by-case basis, correct?

A.   In part, yes.

Q.   And OIR didn't look at -- and let's make this the time period -- from 2001 to September of 2011, OIR didn't look at the statistics going on in the sheriff's department and try to figure out if there were any systemic issues, correct?

A.   That is not correct, sir.

Q.   You recall talking to the Citizen's Commission of Jail Violence in 2012, Mr. Gennaco?

A.   Yes.

Q.   And isn't it true that you and -- you were there with another person from OIR, correct?  While you were being interviewed, they were interviewing two of you?

A.   I have no independent recollection.  I'll take your word for it.

Q.   All right.  And do you remember telling the Citizen's

Commission of Jail Violence that OIR's meat and potatoes was dealing with issues on a case-by-case basis?

A.    I may have said that, yes.  That isn't different from what I just told you.

Q.    And do you remember telling OIR that OIR didn't have the capacity to look at statistical issues and determine if something was going on in the sheriff's department?

A.    I don't think you asked the question correctly.  I didn't tell OIR anything.

Q.    I'm sorry.  The Citizen's Commission for Jail Violence. Thank you for correcting me.

A.    I don't recall making that statement.

Q.    OIR did not prosecute deputies for committing wrongdoing, correct?

A.    OIR is not a prosecutive agency.

Q.    And it did not prosecute deputies for committing wrongdoing, correct?

A.    Correct.

Q.    OIR was not even the entity that could discipline deputies who committed wrongdoing, correct?

A.    That's correct.

Q.    You said that you can make recommendations, but ultimately those recommendations might not be something that occurs, correct?

A.    On occasion, yes, sir.

Q.    You discussed on direct examination that you had realtime

access to the Internal Affairs reports; is that correct?

A.    Yes.

Q.    And that was when the Internal Affairs investigators would

write reports, you would be able to look at them as they were

filed; is that right?

A.    What do you mean by "filed"?  I'm not sure I understand

the question.

Q.    Well, with the sheriff's department, you'd be able to look

at the reports, you said, in realtime.  You'd have realtime

access to the reports.

A.    Correct.

Q.    And that means after they were written, you'd have a

chance to look at them?

A.    No --

Q.    Okay.

A.    -- that's not what I meant.

Q.    What did you mean by that, Mr. Gennaco?

A.    What I meant is that all interviews of witnesses,

including subject deputies, deputy witnesses, civilian

witnesses, inmate witnesses, are all recorded.  They're

digitally recorded.

        And the instruction that investigators are provided

is that they are then to immediately download those interviews

onto a database.  That download then came right into our

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

database, because it was a shared database, and we could access the actual recordings.  So we didn't have to wait until any reports were written in order to access the information.

Q.    And you found that there were times where people who were the subject of these interviews were being bullied, correct?

A.    People who were the subject of these interviews?

Q.    People being interviewed were being bullied by members of Internal Affairs, correct?

A.    I'm not recalling that.  I believe that there were times in which lieutenants who were assigned to the jails conducted inappropriate interviews of inmates.

Q.    You're referring to the unit-level investigations; is that correct?

A.    What could have been an initial interview that blossomed into an Internal Affairs investigation, yes, sir.

Q.    And those investigations internally, you saw that there were times in which these lieutenants were bullying inmates who were reporting misconduct, correct?

A.    I'm not sure I'd use the term "bullied," but I certainly do think that there were times in which the interviews were not professionally undertaken.

Q.    And for the most part, most of your time was dealing with Internal Affairs and unit-level investigations, correct? Talking about, again, the time period before 2011.

A.    If you're talking about the office, I would agree with

that statement.

Q.   Okay.  And OIR generally, that meant, oversaw many of the administrative-level investigations and not the criminal investigations, correct?

A.   Yes.

Q.   You talked about realtime access.

        With ICIB, before September of 2011, the Office of Independent Review generally did not have realtime access to their investigations, correct?

A.   Not in the same way as Internal Affairs.

Q.   So you couldn't, as you would do with Internal Affairs, see videos and recorded interviews as they occurred; is that correct?

A.   Yes.

Q.   The only way to get current information on ICIB investigations for you was to ask for ongoing briefings on particular investigations when you communicated with ICIB, correct?

A.   Yes.

Q.   And if there was a particular investigation that caught your eye, you would check with ICIB periodically on that investigation, correct?

A.   Yes.

Q.   ICIB, though, had the ability to open investigations without you knowing about them, correct, in the time period

before September of 2011?

A.   We probably would have -- we would learn about them, but they could open them, you know, a day or two before we learned about them, likely.

Q.   Weeks before?

A.   Possibly.

Q.   Well, let's talk about this case.

You weren't aware that ICIB opened up a criminal investigation of the FBI until you found out that someone had threatened the arrest of Special Agent Marx, correct?

A.   I really need clarification on what part of the investigation you're talking about.  Are you talking about the investigation that Inmate Brown -- the allegations that Brown made or --

Q.   Mr. Gennaco, let me ask the question again.

You were not aware that ICIB had opened up an investigation in which FBI agents were considered subjects until after ICIB had threatened to arrest Special Agent Marx, correct?

A.   The reason I'm having a problem with your question is I don't recall when I learned or even -- the characterization of "threatened to arrest," I'm not sure when I learned that part.

It is correct to say that I did not become aware of the investigation into the FBI activity by ICIB at the time it was opened.  That is a fair statement.

Q.    And if you didn't know about an investigation by ICIB, you would not know to ask for a briefing, correct?

         MR. HOCHMAN:  Objection.  Argumentative.

         THE COURT:  Sustained.

BY MR. FOX:

Q.    In August and September of 2011, no one from the sheriff's department, including Mr. Baca, told you that ICIB had begun investigating whether the FBI committed a crime by helping get a phone into Men's Central Jail, correct?

A.    That's correct.

Q.    And in your discussions with Mr. Baca early on, he informed you that the assistant director in charge of the FBI, Steve Martinez, told him the phone was discovered -- that the phone that was discovered was an FBI phone, correct?

A.    Yes.

Q.    And based on the information Mr. Baca presented to you, you had no reason to believe that this was anything other than an authorized FBI investigation, correct?

A.    Yes.

Q.    And you cannot recall Mr. Baca or anyone else communicating to you that they believed this was an unauthorized FBI operation, correct?

A.    Yes.

Q.    Around the time of your August 29th meeting between Mr. Baca and the US Attorney's office, Mr. Baca told you that

he understood that it was lawful for the FBI to conduct an undercover operation, even if it was otherwise a technical violation of local law, correct?

A.    No.

Q.    Mr. Baca informed you that he was told that the FBI could insert a phone into the jail in order to enforce federal law, correct?

A.    Yes.

Q.    Mr. Baca made the statement to you repeatedly, correct?

A.    Yes.

Q.    Now let's talk about the August 29th meeting that you attended between the US Attorney's office and Mr. Baca.

        You thought Mr. Baca, during this meeting, came on too strong at certain points, correct?

A.    Yes.

Q.    He was too emotional, you felt, correct?

A.    He was emotional.

Q.    And he vented during this meeting, correct?

A.    Yes.

Q.    You were concerned that a reasonable person listening to his statements might believe that he was threatening to stop all working relationships with the US Attorney's office and the FBI?

A.    I was concerned that might be one takeaway, yes, sir.

Q.    And you discussed Mr. Tanaka staying behind and saying

that he was extremely upset.

He also said that Mr. Baca was extremely upset, correct?

A.   He purported to speak on behalf of the sheriff, yes, sir.

Q.   And when he purported to speak on behalf of the sheriff, he said that Mr. Baca was upset, correct?

A.   Yes.

Q.   And Mr. Baca is the one that named Paul Tanaka as undersheriff in 2011, correct?

A.   Yes.

Q.   Mr. Baca is the one that promoted Paul Tanaka to assistant sheriff before that, correct?

A.   Yes.

Q.   Now, in September of 2011, you received a call from either FBI Supervisory Special Agent Carlos Narro, Assistant United States Attorney Lawrence Middleton, or US Attorney André Birotte telling you that the federal government was looking for Anthony Brown, correct?

MR. HOCHMAN:  Objection.  Compound and beyond the scope of direct.

THE COURT:  Sustained.

BY MR. FOX:

Q.   Mr. Gennaco, you mentioned Anthony Brown earlier when I was asking you about ICIB and it opening an investigation into the FBI.

At the time of August -- well, before September of 2011, you had no idea who Anthony Brown was, correct?

A.    I don't believe so.

Q.    And showing you Government Exhibit 52 --

        MR. FOX:  Do I need to log in again?

    *(The exhibit was displayed on the screen.)*

BY MR. FOX:

Q.    Mr. Gennaco, you communicated to Tom Carey that the feds wanted to interview Anthony Brown, correct?

        MR. HOCHMAN:  Objection.  Beyond the scope of direct, Your Honor.

        THE COURT:  Sustained.

        MR. HOCHMAN:  Ask to have the document removed from the screen, please.

BY MR. FOX:

Q.    At the end of September, near the end of September of 2011, before Mr. Baca had a second meeting with Mr. Birotte, you received a call from either André Birotte or Lawrence Middleton regarding the potential arrest of an FBI agent who had been investigating deputy excessive force in the jail, correct?

        MR. HOCHMAN:  Objection.  Beyond the scope. Foundation.  Compound.

        THE COURT:  Let's go to sidebar.

    *(Proceedings held at sidebar under seal 11:24 A.M.)*



(The following proceedings were held in open court.)

MR. FOX:  May I proceed, Your Honor?

THE COURT:  Yes.

BY MR. FOX:

Q.    Mr. Gennaco, I think my question to you was that you received a call from either US Attorney André Birotte or Assistant United States Attorney Lawrence Middleton regarding the potential arrest of an FBI agent who had been investigating deputies for excessive force in the jails, correct?

MR. HOCHMAN:  And objection.  Foundation as to time.

MR. FOX:  I will ask that question after he answers this one, Your Honor.

If you would like me to put the date on there, Your Honor, I will ask the question again.

THE COURT:  That's fine.

BY MR. FOX:

Q.    Mr. Gennaco, in late September 2011, you received another call from either US Attorney André Birotte or Assistant United States Attorney Lawrence Middleton regarding the potential

arrest of an FBI agent who had investigated deputies within the jails for excessive force, correct?

A.    My best recollection, it was mid-September, and I don't recall whether there was any information provided about what that agent was doing.

Q.    You expressed surprise and concern when you heard this information, correct?

A.    Yes.

Q.    And that's because no one within the sheriff's department at that point had told you that ICIB was criminally investigating the FBI, correct?

A.    I believe that is correct.

Q.    And Mr. Baca had never told you that the sheriff's department was criminally investigating the FBI up to that point, correct?

A.    That's my recollection, yes, sir.

Q.    And having the sheriff's department criminally investigate the FBI agent investigating deputies for excessive force was certainly something you would have advised against, correct?

A.    Yes.

Q.    And you knew at the time, and you continued to know it, that it's legal for law enforcement officers to conduct undercover operations, correct?

A.    If done appropriately, yes, sir.

Q.    And if done legally, correct?

A.    Yes.

Q.    In an authorized fashion?

A.    Correct.

Q.    And you know that the same thing goes for the FBI?  It's legal for the FBI to conduct undercover operations within the scope of their duties, correct?

         MR. HOCHMAN:  Objection.  Asked and answered.

         THE COURT:  Overruled.

         You can answer.

         THE WITNESS:  Yes.

BY MR. FOX:

Q.    Now, Mr. Gennaco, you said that you oversaw investigations within the sheriff's department up until when you left in 2014, I think; is that right?

A.    Yes.

Q.    And during that time from -- let's just go two years out -- from September 2011 to September of 2013, Internal Affairs didn't investigate Greg Thompson for hiding Anthony Brown from the FBI, correct?

         MR. HOCHMAN:  Objection.  Irrelevant as to time frame.  Beyond the scope.

         THE COURT:  Overruled.

         You can answer.

         THE WITNESS:  I don't recall.  I honestly don't recall.

BY MR. FOX:

Q.   So you don't recall any -- strike that.

You don't recall any investigations by Internal Affairs into whether Mickey Manzo had violated sheriff's department policy in hiding Anthony Brown from the FBI, correct?

A.   I'm not aware of one, yes.

Q.   You're not aware of any investigation into Gerard Smith for hiding Anthony Brown from the FBI, correct?

A.   My recollection is these were federal investigations, that's correct, so that I was not involved in an investigation, correct.

Q.   And you're not aware of Internal Affairs investigating, say, Scott Craig for threatening to arrest Special Agent Marx after September of 2011?

A.   Same answer.

Q.   And that is that you were not aware of it?

A.   Correct.

Q.   You're not aware of Internal Affairs investigating Maricela Long for attempting to scare the FBI into believing that they were going to arrest Special Agent Marx, correct?

A.   It depends on how you define investigation, sir.

Q.   You're not aware of an Internal Affairs investigation into Maricela Long after September of 2011 in which she was investigated for threatening to arrest Special Agent Marx,

correct?

A.   I need to explain.  In order to answer that question, I need to explain it.

Q.   Did the Internal -- Mr. Gennaco, you're not aware of any sergeant within ICIB being disciplined for threatening to arrest Special Agent Marx, correct?

A.   No, I'm -- that is not correct.

Q.   You're -- let's again confine the time period, because obviously something may have happened after the federal charges.

A.   Yes.

Q.   So let's confine them to before the federal charges.

A.   Okay.

Q.   Are you aware of any sergeant within ICIB being disciplined before federal charges for threatening to arrest Special Agent Marx?

A.   No.

          MR. FOX:  Nothing else, Your Honor.

                    REDIRECT EXAMINATION

BY MR. HOCHMAN:

Q.   Mr. Gennaco, when it comes to deciding whether or not a particular deputy will be prosecuted by the state, does the sheriff's department make the prosecution decision or someone else?

A.   Someone else.

Q.   Who's that someone else?

A.   It's the Justice System Integrity Division of the District Attorney's office.

Q.   And the District Attorney's office is the district attorney of Los Angeles County; is that correct?

A.   Yes, sir.

Q.   So the sheriff's department investigates, but the district attorney makes that final decision, correct?

A.   Yes, sir.

Q.   Now, Mr. Fox talked to you a bit about the contract that OIR had with Los Angeles County.  I'd like to ask you a few questions about that.

          What did that contract detail as far as the independence of the Office of Independent Review?

          MR. FOX:  Objection.  Vague.  Beyond the scope.

          THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.   What did that contract call for as far as whether or not the Office of Independent Review was going to be independent of the sheriff's department?

          MR. FOX:  Objection.  Vague.  Beyond the scope.

          MR. HOCHMAN:  I'll rephrase, Your Honor.

BY MR. HOCHMAN:

Q.   In what ways, if any, did the contract establish the independence of the Office of Independent Review?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

MR. FOX:  Objection.  Vague and relevance.

THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.   Did the contract have provisions dealing with independence in it?

A.   Yes.

Q.   What were those provisions?

MR. FOX:  Objection.  Relevance and beyond the scope.

THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.   Well, you talked about an attorney-client relationship that the Office of Independent Review had with the county, correct?

A.   Yes.

Q.   And had with the position of the sheriff, as well, correct?

A.   In his official capacity, yes.

Q.   What -- how did the fact that you had an attorney-client relationship with the county and the position of the sheriff affect the independence of your review?

A.   It protected confidential communications from being provided to lawyers suing the county.

Q.   How did it affect whether or not you were able to do an independent review of the sheriff's department, the fact that you had an attorney-client relationship?

MR. FOX:  Objection.  Relevance.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  Not at all.

BY MR. HOCHMAN:

Q.    And what do you mean by that?

A.    We were asked to perform an independent review.  I was a civil rights lawyer, so that's what I did.

Q.    Now, Mr. Fox kept focusing you, when he was dealing with the Office of Independent Review's dealing with ICIB and what happened before September --

THE COURT:  Let's get to the question, please.

BY MR. HOCHMAN:

Q.    How did the Office of Independent Review's dealings with ICIB change between August and September of 2011?

A.    We became more involved in reviewing cases before they were submitted to the district attorney.

Q.    In what way?

MR. FOX:  Objection.  Vague.

BY MR. HOCHMAN:

Q.    I'm sorry.  In what way did the Office of Independent Review become more involved in the cases before they were submitted to the district attorney?

MR. FOX:  Can I have one moment with counsel, Your Honor?

THE COURT:  Yes.

          (Counsel confer off the record.)

          MR. HOCHMAN:  May I withdraw the last question and restate, Your Honor?

          THE COURT:  Yes.

BY MR. HOCHMAN:

Q.   We talked about the difference -- what was happening between August and September of 2011, and I want to focus on ICIB investigations and OIR's role in them and what the -- and you said that there was a difference, and I'm asking you, then, what was the difference on OIR's role between August and September of 2011 as pertained to the ICIB investigations?

          MR. FOX:  Objection.  Asked and answered.

          THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.   I think you said you were involved in it and I then -- how were you involved in the investigations that ICIB was doing after August 2011?  And now I'm focusing on September 2011.

A.   On targeted investigations into the jails, we were more engaged on a daily basis with ICIB, very engaged, and they agreed that before they would submit their investigative reports to the DA, that they would have us take a look at them, in the same way that I had been doing for years.

Q.   And Mr. Fox asked you about a phone call that you may have had with Lawrence Middleton or André Birotte dealing with the

situation of the threat of arrest for -- with Special Agent Marx.

Q. Do you recall that call --

A. I don't recall.

Q. -- or question?

A. I'm sorry.

Q. Do you recall the question?

A. I recall the question.

Q. Well, the phone call with -- would then have to have happened after the threatened arrest of Special Agent Marx; isn't that correct?

A. I don't know.

Q. Well, the phone call involved -- from André Birotte or Lawrence Middleton talked about something that had already happened; in other words, the agents had already approached Special Agent Marx, correct?

A. I don't know and I don't think so.

Q. And that phone call would have been in late September of 2011?

A. Again, my recollection is it was mid-September.

Q. Mid-September.

With respect to -- Mr. Fox asked you questions about whether or not the Office of Independent Review addressed systemic issues.

Do you recall that?

A.    Yes.

Q.    And I believe you answered that it did -- or you answered when he asked you -- let me just ask you directly.

What type of systemic issues did the Office of Independent Review address?

MR. FOX:  Objection.  Vague and beyond the scope.

THE COURT:  Sustained.

BY MR. HOCHMAN:

Q.    In August and September of 2011, what type of systemic issues of the sheriff's department did the Office of Independent Review address?

MR. FOX:  Objection.  Beyond the scope.  403.  Motion in limine.

THE COURT:  Why don't we come back to this if we have to.  Do you have anything else?

MR. HOCHMAN:  May I have one moment, Your Honor?

THE COURT:  Yes.

MR. HOCHMAN:  This would be the last line of inquiry, Your Honor.

THE COURT:  Okay.  Well, if you don't have anything else, let me let him finish and then I'll hear you at sidebar.

MR. HOCHMAN:  Yes, Your Honor.  Thank you.

MR. FOX:  Your Honor, I don't have anything.

THE COURT:  Okay.

(Proceedings held at sidebar under seal 11:40 A.M.)

*(The following proceedings were held in open court.)*

THE COURT:  Sir, I think you can step down.

THE WITNESS:  Oh, thank you, Your Honor.

THE COURT:  Have a nice lunch, something I doubt that I'm going to have.

All right.  Do you have --

MR. HOCHMAN:  May I have a moment, Your Honor?

THE COURT:  Yes.

MR. HOCHMAN:  Your Honor, there will be no further witnesses, but before we rest, Your Honor, we have two clips that we'd like to play -- move into evidence and play, Your Honor.  They are Exhibit 2, Clip 12, and Exhibit 2, Clip 34, Your Honor.

THE COURT:  Okay.  I'm going to -- how long are they?

MR. HOCHMAN:  Short, Your Honor.  They'll probably take less than two minutes, I'm imagining, between the two.

THE COURT:  Okay.  Any objection?

MR. FOX:  No, Your Honor.

THE COURT:  Okay.

*(Defendant's Exhibit 2-12 admitted into evidence.)*

*(Defendant's Exhibit 2-24 admitted into evidence.)*

MR. HOCHMAN:  If we could start with Clip 2-12, and ask the jury to use their transcript books.  It's Exhibit 3 and then Tab 12 we'll start with.

If I might ask Agent Tanner that she might play that.

*(Playing of audiotape.)*

MR. HOCHMAN:  And if we may turn to Tab 34 and play Clip 2 -- Exhibit 2-34.

*(Playing of audiotape.)*

MR. HOCHMAN:  I think that's the only clips we'd like to show, Your Honor.

THE COURT:  All right.  Does the defense rest?

MR. HOCHMAN:  Subject to confirming with your court clerk the -- that the exhibit list we have is the same one that she has, Your Honor, the defense would rest.

THE COURT:  All right.  Ladies and gentlemen, we're going to take our final break of the day.  Again, I want to remind you until this trial is over, you're not to discuss this case with anyone, including your fellow jurors, members of your family, people involved in the trial, or anyone else, nor are you allowed to permit others to discuss the case with you.  If anyone approaches you and tries to talk with you about this case, please let me know about it immediately.

Do not read or listen to any news reports or other accounts about the trial.

Finally, you're reminded to keep an open mind until all of the evidence has been received, you've heard the arguments of counsel, the instructions of the Court, and the views of your fellow jurors.

If you need to speak with me, simply give a note to the clerk.

I'm going to ask that each of the jurors provide the clerk with those transcript notebooks.  Let's collect those.  As a matter of fact, you can just leave them up there and we'll collect them.  That's fine.

And if you would leave your -- any transcripts just

leave up there on the bar.  Your notebooks, why don't you put those on your chairs.

And we're going to come back at -- let's make it ten after.

THE CLERK:  All rise.

*(Jury out at 11:49 A.M.)*

*(The following was heard outside the presence of the jury.)*

MR. HOCHMAN:  Your Honor, we would renew the Rule 29 motion on the same grounds as we set forth at sidebar.

THE COURT:  All right.  I'll rule on that in good time.

Okay.  Let me see counsel at sidebar.

*(Proceedings held at sidebar under seal 11:50 A.M.)*

*(The following proceedings were held in open court.)*

THE CLERK:  All rise.

*(Recess taken 11:55 a.m. to 12:06 P.M.)*

*(The following was heard outside the presence of the jury.)*

THE COURT:  Okay.  As to the motion that has been made by the defense, viewing the evidence in a light most favorable to the government, that motion is denied.

All right.  Let's go to sidebar for a couple minutes.

*(Proceedings held at sidebar under seal 12:07 P.M.)*

*(The following proceedings were held in open court.)*

THE COURT:  All right.  Let's bring the jury in.

*(Jury in at 12:14 P.M.)*

THE COURT:  Ladies and gentlemen, the presentation of the evidence has now concluded.  Unfortunately, one of the lawyers continues to feel ill, so we've probably done all we can do today and we will not be in session tomorrow.  We will be in session on Monday at 8:00.  At that time, there will be the closing arguments by counsel.  You should plan on being here at least until 3:30.  If you want to stay longer, you can. That's up to you.

So what's going to happen on Monday is we'll have the closing arguments.  That's probably going to -- that's going to start at 8:00.  We'll probably take a break for lunch at around

12:15, 12:30, somewhere in there, break for an hour for lunch.

Lunch will be brought in for you.  You'll be able to have that in the jury room.  Then we'll complete the closing arguments and the Court is going to have some instructions for you, which will take probably about 30 minutes, and then the case will be submitted to you for your deliberations.

You can start deliberating, you can -- you need to stay here at least until 3:30, but if you want to stay longer, that's up to you.  If you don't finish on Monday, you come back Tuesday starting at 8:00, goes until 3:30, lunch will be brought in.

So -- and, again, I apologize for the delay, but, you know, the fact of life is people sometimes don't feel well.

So, again, I want to remind you you're not to discuss this case with anyone, including your fellow jurors, members of your family, people involved in the trial, or anyone else, nor are you allowed to permit others to discuss the case with you. If anyone approaches you and tries to talk with you about this case, please let me know about it immediately.

Do not read any news stories or articles or listen to any radio or television reports about the case or about anyone who has anything to do with it.

Do not do any research, such as consulting dictionaries, searching the internet, or using other reference materials, and do not make any investigation about the case on

your own.

If you need to communicate with me, simply give a note to the clerk.

And do not make up your mind about what your verdict should be until after you've gone into the jury room to decide the case and you and your fellow jurors have discussed the evidence.  Keep an open mind until then.

So if you would leave your notebooks on your chairs and then we will see you Monday starting at 8:00.  All right.  Thank you very much.  Have a nice weekend.

THE CLERK:  All rise.

*(Jury out at 12:18 P.M.)*

*(The following was heard outside the presence of the jury.)*

THE COURT:  All right.  I believe we have some jury instructions to review.  I have another matter that's going to probably not take too long.  If you'd like, you can come back at 1:00, 1:15.

MR. FOX:  Mr. Hochman, it's up to --

MR. HOCHMAN:  I mean, if we can do it now, great, Your Honor.  If you need --

THE COURT:  I've got to take up this other matter.  I don't think it's going to take that long, so why don't you step out, and as soon as this is over, I'll have the clerk come out and get you or you can have a seat.

MR. HOCHMAN:  Thank you, Your Honor.

*(End of requested portion.)*

*(Recess taken at 12:19 p.m.)*

--oOo--

CERTIFICATE

I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Date: AUGUST 10, 2017

/s/  Cindy L. Nirenberg, CSR No. 5059

Official Court Reporter

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA