UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

HONORABLE PERCY ANDERSON, U.S. DISTRICT JUDGE

- - -

UNITED STATES OF AMERICA,               )
                                        )
                    PLAINTIFF,          )
                                        )
            vs.                         ) No. CR16-66(A)-PA
                                        )
LEROY BACA,                             )
                                        )
                    DEFENDANT.          )
_____)

REPORTER'S TRANSCRIPT OF JURY TRIAL

DAY 12, VOLUME I OF III

PAGES 2292-2446

LOS ANGELES, CALIFORNIA

MONDAY, MARCH 13, 2017

8:02 A.M.

_____

CINDY L. NIRENBERG, CSR 5059, FCRR
U.S. Official Court Reporter
350 W. 1st Street, #4455
Los Angeles, CA 90012
*www.msfedreporter.com*

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

APPEARANCES OF COUNSEL:


FOR THE PLAINTIFF:
                    OFFICE OF THE UNITED STATES ATTORNEY
                    BY: BRANDON FOX,
                        ASSISTANT U.S. ATTORNEY
                        EDDIE A. JAUREGUI,
                        ASSISTANT U.S. ATTORNEY
                        LIZABETH A. RHODES,
                        ASSISTANT U.S. ATTORNEY
                    312 NORTH SPRING STREET
                    13TH FLOOR
                    LOS ANGELES, CA 90012
                    213-894-2434


FOR THE DEFENDANT:
                    MORGAN LEWIS & BOCKIUS
                    BY: NATHAN J. HOCHMAN, ATTORNEY AT LAW
                        BRIANNA L. ABRAMS, ATTORNEY AT LAW
                    THE WATER GARDEN
                    1601 CLOVERFIELD BOULEVARD
                    SUITE 2050 NORTH
                    SANTA MONICA, CA 90404
                    310-255-9025


ALSO PRESENT:
                    LEAH TANNER, FBI SPECIAL AGENT

I N D E X

DISCUSSION HELD AT SIDEBAR                        2296

CLOSING ARGUMENT BY MS. RHODES                   2301

DISCUSSION HELD OUTSIDE PRESENCE OF JURY 2348

DISCUSSION HELD AT SIDEBAR                        2348

CLOSING ARGUMENT BY MR. HOCHMAN                  2350

DISCUSSION HELD AT SIDEBAR                        2378

DISCUSSION HELD AT SIDEBAR                        2385

DISCUSSION HELD AT SIDEBAR                        2422

DISCUSSION HELD OUTSIDE PRESENCE OF JURY 2444

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES, CALIFORNIA; MONDAY, MARCH 13, 2017

8:02 A.M.

- - - - -

THE CLERK:  CR 16-66(A)-PA, USA versus Leroy Baca United States of America versus Leroy Baca.

Counsel, please state your appearances.

MR. FOX:  Good morning, Your Honor.  Brandon Fox, Lizabeth Rhodes and Eddie Jauregui on behalf of the United States.  Also with us at counsel table is FBI Special Agent Leah Tanner.

THE COURT:  Good morning.

MR. HOCHMAN:  Morning, Your Honor.  Nathan Hochman and Brianna Abrams on behalf of Defendant Leroy Baca, who is present.

Your Honor, if there's a way to put down the shade that the Court has.  It's just -- the sun is right at the mark where, if I look at you, I'm seeing the sun.

THE COURT:  Okay.

MR. HOCHMAN:  Thank you.

THE COURT:  On the issue of the jury instructions, is there any need to take this up before the closing arguments?

MR. HOCHMAN:  I didn't intend to argue those specific instructions, Your Honor, more than the ones that counsel and I have agreed to.  I don't know if counsel is going to argue it in a particular way.

MR. FOX: And some of that, Your Honor, depends on how Mr. Hochman argues in his closing argument. Because if he is going to insinuate certain benefits were provided to witnesses that weren't really benefits, then that matters.

If he's going to attack the government's case for the danger of the phone and those type of things, then -- the agents experienced at the time, then I think a response is appropriate and it would be beneficial to be able to say as we believe Your Honor is going to instruct the jury and then be able to tell the jury -- paraphrase what you are going to say.

THE COURT: All right. I'm not going to include Mr. Thompson in the Revised Joint Instruction 34. Mr. Thompson received immunity, but it was court-ordered immunity. It wasn't as a result of some agreement or deal he reached with the government.

MR. HOCHMAN: Your Honor, may I be heard briefly at sidebar where I can say either way, Your Honor, on that issue?

THE COURT: Yeah, just one second.

All right. Let's go to sidebar.

*(Proceedings held at sidebar under seal 8:05 A.M.)*

*(The following proceedings were held in open court.)*

THE COURT:  All right.  Let's bring the jury in.

And, I'm sorry, you are going to be how long?

MS. RHODES:  The time?  About 90 minutes.

MR. HOCHMAN:  Two and a half hours, Your Honor.

THE COURT:  Okay.

*(Jury in at 8:13 A.M.)*

THE COURT:  Good morning.

Does the government wish to give a closing argument at this time?

MS. RHODES:  Yes, Your Honor.

May I proceed?

THE COURT:  Yes, please.

MS. RHODES:  When Defendant Baca learned that the FBI and the federal grand jury was investigating his department for civil rights violations, he obstructed.  And when he thought that the FBI might be turning their focus about obstruction of justice on him, he lied.

And so that is why, in the words of Assistant Sheriff Rhambo, who testified, we find ourselves here today, because of the defendant's obstruction and his lies.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

In the summer of 2011, Defendant Baca knew he had a big problem.  And that problem was not a cell phone and it wasn't narcotics -- pictures of narcotics on the cell phone, and it wasn't even Anthony Brown or the safety of Anthony Brown.  No, the problem was much bigger than that for Defendant Baca.

The problem went to his department and his legacy.  The problem was that the FBI was investigating him, his department, his jails for civil rights violations.

And that is why we're here today, because he first obstructed justice in order to stop the federal investigation and the federal grand jury, and then he lied.

Ladies and gentlemen, Defendant Baca has been charged with three counts:  First, conspiracy to obstruct justice; second, obstruction of justice; and, third, false statements.

But before we get to the charges, I'd like to take you back.  Because every crime has a context, and the context for this crime was the federal investigation.

The federal investigation in August of 2011 had two prongs.

First, it had the grand jury subpoenas.  You've seen those in Exhibit 110.  The grand jury subpoenas started early in that summer of 2011.  And they were requesting discrete events, events of use of force that had gone on in Defendant Baca's jails.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

The other prong of the investigation was the undercover operation.

Now, you've heard a lot about this undercover operation, but essentially it boiled down to a simple set of events.  The federal government, the FBI, had an informant in jail, Anthony Brown.  And Anthony Brown was telling the FBI about abuses, about excessive force inside the jail.  He also told the FBI that some deputies were willing to accept money to smuggle in contraband.

And so the undercover operation began because the FBI wanted to know was their informant telling them the truth.  Would a deputy accept money to smuggle in contraband into the jail?  And if so, could they use that contraband, in the form of a cell phone, to advance the investigation into civil rights and abuses within the jail?

And the answer, of course, was, yes, their informant was telling the truth.  Because Gilbert Michel did agree to take a bribe and smuggle a cell phone into the jail.  And, no, they couldn't use that phone to further their investigation into civil rights abuses because the sheriff's department found the phone.

But what happened next was unexpected for the FBI.  And what happened next showed the culture of Defendant Baca's department as much as the hundreds of beatings that had occurred.  What happened next was obstruction, and obstruction

started from the top and went all the way down.

And that is why we're here today, ladies and gentlemen.  That's the backdrop for the charges that we have.

I'd like to talk first about the first two charges, conspiracy to obstruct justice and obstruction of justice.

Just like every crime having a context, every crime also has elements.  And the elements for conspiracy are:

One, an agreement, an agreement between two or more people to commit, in this case, obstruction of justice;

Two, the defendant has to join that agreement or be part of that agreement, knowing of its object, that is, the obstruction of justice and intending to help accomplish that goal, the obstruction of justice; and,

Three, one overt act has to be committed by one co-conspirator.  It need not be the defendant, but one overt act has to be committed.

And in the Indictment, you will see, when you go back into the jury room, there are 15 of them.  The government has proven them all.

The government has to prove all of the acts -- all of the elements of both conspiracy, obstruction of justice, and false statements, and the government has to prove them beyond a reasonable doubt.

Beyond a reasonable doubt is something that leaves you firmly convinced of the defendant's guilt.  It is not a

doubt -- it is a doubt that is not reasonable. But that doesn't mean the government has to prove its case beyond all possible doubt. The standard is high, but it is not beyond all doubt.

Now, an agreement, which is what the first element of conspiracy has, can be done in many ways. It doesn't have to be a formal contract, something in writing. And in this case, you will see the agreement to obstruct over and over again, through meetings, through briefings. There are telephone calls between the co-conspirators. There are e-mails. There are letters. There are notes. And all of that and the interplay between them show an agreement.

Now, an agreement has to be more than just meetings between two co-conspirators where they discuss common interests. It has to be, and you have to find, that there was a plan to commit the crime of obstruction of justice, as alleged in the Indictment. And I'd like to take you through just exactly what that plan was and how all the evidence you've heard goes to that plan.

But first I'd like to dwell just a little bit on Count Two. Count One is conspiracy to obstruct justice. Count Two is obstruction of justice. And that count also has elements. It has two"

First, defendant had to -- defendant obstructed or tried to obstruct a federal grand jury investigation. And we

have proven that to you;

Second, defendant acted corruptly.  And corruptly just means he acted with the intent of obstructing or trying to obstruct the federal grand jury investigation.

So with those elements in mind, let's go to the evidence that was presented in this trial.

It began in August 2011.  And in August 2011, on the 8th, Anthony Brown was found with a phone on him in Men's Central Jail.  And after Anthony Brown was found with a phone, nothing happened, at least nothing happened quickly.  ICIB wasn't notified.  The sheriff's executives, Mr. Baca and Mr. Tanaka, weren't told.  There was no Saturday meeting held.

At this point, the co-conspirators didn't even know who the phone belonged to.  It could have been to a dangerous gang member.  It could have been linked to a drug cartel.  It could have been something for hits.  In fact, the phone was linked to the FBI.  None of those things happened.

And so the investigation into the cell phone found in custody, which Assistant Sheriff Rhambo told you was not an uncommon occurrence, proceeded.  And it proceeded in regular and due course.  It proceeded that way until it didn't.

And it didn't on August 18th.  Because on August 18th, from the bottom levels of the conspiracy, the deputy levels, Mr. Baca's sheriff's department learned that there was a civil rights investigation going on.

And you'll see in the e-mail, which is Exhibit 18, that a task force officer, that is, a deputy who is working with the federal government, specifically the FBI, takes the recorded calls that Anthony Brown had made from his cell, that is, from the phones provided to all inmates by the sheriff's department. He makes a call to a number, and they discuss the phone. The task force officer, Noah Kirk, talks to an FBI analyst and finds out that the number Anthony Brown had called was to the civil rights squad, the civil rights squad of the FBI.

And based on that, Lieutenant Thompson makes some decisions. He says, "Anthony Brown needs to go to 1750," and Anthony Brown does. 1750 is one of the most secure places in Men's Central Jail. And you've seen pictures of 1750, and you've heard testimony from both Mr. Manzo and Mr. Sexton about 1750. I believe the pictures start at about 219.

There are bars. Then there is a solid steel door that just is punctuated by small holes. On top of that is plexiglass, and then there are ways that you can push food in or take things out. It's safe. No deputy could get to Gilbert Michel [sic].

Mr. Thompson also decides that Mr. Brown should be on the first bustout, the first bustout of jail. And he does that, and he testified, for safety reasons.

Here, Mr. Thompson, in charge of Operation Safe Jail

with about 30 years of experience, the boots on the ground, told you that the safest place for Anthony Brown, after it was discovered that the phone was linked to the FBI, was out of jail and into prison.

Now, while this is occurring at the lower level, Sheriff Baca also gets a call from the assistant director in charge, the man in charge of the FBI for Los Angeles, Steven Martinez. And Steven Martinez talks to Defendant Baca about the fact that it is an FBI phone.

You will remember that the first witness in this case was Defendant Baca's driver, Kevin Brown. And Kevin Brown heard two things on that phone call. Mr. Baca was in the car and Kevin Brown heard, one, that the FBI wanted access to their informant, Inmate Anthony Brown; and, two, that they wanted their phone back.

These would both be things that were disregarded when Defendant Baca obstructed justice.

After Defendant Baca speaks to Mr. Martinez, he calls Mr. Tanaka. And what you have seen over and over again in the presentation of this evidence is what happened here.

Mr. Baca called Mr. Tanaka. Mr. Tanaka called his aide, Mr. Nee. Mr. Nee called Mr. Thompson and Mr. Carey. Mr. Tanaka called Mr. Baca back and a meeting was set up.

And you heard from -- you heard from Mr. Baca, in one of the clips that was played for you, exactly why this was.

And that's because Defendant Baca ran this conspiracy the same way he ran his department.  He wanted to make one phone call and figure out what was going on.  And so he could just make or receive a phone call from Undersheriff Tanaka, and Undersheriff Tanaka would have to find out what was going on.

Here's what he said.

*(Playing of audiotape.)*

MS. RHODES:  And after that sequence of phone calls back and forth, a meeting is set up, a meeting for Mr. Baca.  And that's in Exhibit 16.

Now, Mr. Hochman spent a long time in opening statement talking about just how busy Mr. Baca was at this time.  He had a lot of stations.  He had a lot of jails.  He had a lot of miles in his territory.

But when the assistant director in charge of the FBI called and told him that a -- that it was an FBI phone that was found in custody, he was able to set up a meeting that night, and the meeting happened the very next day.

And the next day, of course, was August 19.  At that meeting -- and you heard testimony from Mr. Manzo, from Mr. Thompson, from Mr. Carey -- Mr. Baca is briefed that Anthony Brown is an FBI informant.  And you know that because before that meeting, Mr. Manzo and Mr. Smith interviewed Anthony Brown.

And the subject of that interview is, "What are you

doing working with the feds?  You're working with the feds.  We know it."  And they didn't play, but they read a transcript, basically, of the call between Anthony Brown and Special Agent Leah Marx.

And Anthony Brown said, yes, he was working with the FBI and he was looking into abuses and beatings.  That is all done -- that is what Mr. Baca was briefed about.

Abuses and beatings, those are civil rights violations.  Excessive force, those are civil rights violations.

Additionally, Mr. Smith and Mr. Manzo, along with Mr. Thompson, told Mr. Baca that the number Anthony Brown had been calling was to the civil rights squad of the FBI.

So Mr. Baca, by the 19th, knew Mr. Martinez had called him and it was an FBI phone; Anthony Brown, the person with the phone, said he was working with the FBI; and before finding the phone, Anthony Brown had made calls to the civil rights squad of the FBI.

Mr. Baca knew that there was an FBI civil rights investigation within the jails and there was an FBI informant informing them of violations of civil rights in the jails.  And later that night, you know that he met with Assistant Sheriff Rhambo, a person you heard testify.

Now, at that meeting, Mr. Baca did what he had done on the phone and what he would do over and over again in this

conspiracy.  He put Mr. Tanaka in charge, and Mr. Tanaka was overseeing all the other co-conspirators.

In terms of his meeting with Assistant Sheriff Rhambo, at almost 10:00 p.m. that night, Mr. Rhambo writes to Mr. Thompson, "Paul" -- that's Assistant Undersheriff Tanaka -- "brief me.  We went to see the sheriff."  That's Defendant Baca.  "I was given a partial briefing.  I don't even want to know."

And you heard Mr. Rhambo testify that at this time, when he learned there was a phone in custody and it was linked to the FBI, he told Defendant Baca to do two things.  Those two things happened to be the same things that Assistant Director in Charge Martinez had asked for.  Assistant Sheriff Rhambo told Defendant Baca, "Give the FBI back their phone.  Give the FBI their inmate."

But just as the requests of Mr. Martinez would be ignored, so would Defendant Baca not heed the warnings of Assistant Sheriff Rhambo.

And so on the 20th, there is another meeting.  There is another meeting because the ITMS calls, the recorded calls on the phones that were placed in the cells of the inmates, had not been able to be played on the 19th.

So on the 20th, there is another meeting.  And at that meeting, the phone calls are played.  At that meeting, it is clear that a special agent of the FBI who works on the civil

rights squad tells the inmate who is found with the phone that he will be getting his phone soon.

There is proof that the FBI is working with Anthony Brown, their informant, and it's a civil rights investigation.

And at that time, Mr. Tanaka has an emotional outburst. He says, "Fuck the FBI." And Mr. Baca, his senior commanding officer, his boss, his sheriff, doesn't say anything to contradict the sentiment that Mr. Tanaka has just given.

No. He -- unlike Mr. Tanaka, you know that Sheriff Baca used anger in a tactical manner. And it wouldn't be strategically important to continue with anger. He did something far more obstructive. He gave orders, and he gave orders to everyone below him.

His orders were, "Isolate the inmate," which everyone in that meeting knew meant don't let the FBI see him. He gave orders that no one would see him without going through Mr. Tanaka, the man who had just had the emotional outburst against the FBI. Knowing of Mr. Tanaka's sentiment, Defendant Baca put Mr. Tanaka in charge of making sure that no one saw that inmate.

And, finally, he asked for what would be a sham criminal investigation by the Internal Criminal Investigations Bureau. That's Tom Carey's shop.

It's important that Mr. Baca made sure that the investigation was going to be run out of ICIB. And it's

important because IA, Internal Affairs, was at this Saturday meeting.  You heard testimony about that.  But if Defendant Baca had given IA the responsibility of looking into the FBI, then Michael Gennaco, the head of OIR, would have realtime access to whatever IA did.

And if Michael Gennaco, the former federal prosecutor, had realtime access, he would know that the investigation -- the criminal investigation that Defendant Baca wanted conducted was a sham.  And that's why Defendant Baca put ICIB in charge.  And you heard Mr. Gennaco testify that he didn't even know an investigation was opened.  It was kept from him.

Now, after the Saturday meeting, the next day, members of Baca's conspiracy, including Mr. Manzo, Mr. Smith and Mr. Leavins, go to interview Anthony Brown.  And it is at that time, early on in the conspiracy, that Brown informs them the corrupt deputy is Gilbert Michel.

Mr. Hochman in opening said that all of this investigation was to find out who the corrupt deputy was, that Anthony Brown was kept in sheriff's custody to find out more about the corrupt deputy.

But on August 21st, the co-conspirators learned the corrupt deputy was Gilbert Michel.  And they would do nothing to confront Gilbert Michel for nine days, and that's because the orders from the top were about isolate the inmate and

investigating the FBI.  Learning about who the corrupt deputy was being important is an after-the-fact, made-up story for trial.

Now, on August 23rd, the FBI, who is unaware that they are banned from seeing their informant in the jail, goes and interviews Anthony Brown.  And this case, the case of obstruction, is often, as you will see in this timeline, about a move and a countermove, an action and a reaction, an investigation and an obstruction.  And that's exactly what happened on August 23rd, 2011.  The FBI sees Anthony Brown, and after that, a whole host of things happen.

First of all, Mr. Tanaka informs Mr. Thompson that he is going to have to come to sheriff's headquarters, sheriff's headquarters, where both Mr. Tanaka and Mr. Baca have offices, and he is going to have to report in person.  So Mr. Thompson, Mr. Smith, Mr. Manzo and Mr. Carey all go to sheriff's headquarters.

They first talk to Mr. Tanaka, and then they talk to Mr. Baca.  And we will talk about that in a minute.

And at the same time, or that same day, the investigation has moved forward by seeing Anthony Brown.  So the obstruction will move forward by putting the man who had just come out of the hospital onto the infectious diseases floor for his safety.  And also Brown would be guarded by two OSJ deputies, deputies who received overtime, authorized, as

you saw on the overtime sheet of Mr. Sexton, by Defendant Baca.

So what happens at sheriff's headquarters?

First, Mr. Thompson and Mr. Carey talk to Mr. Tanaka. Again, Mr. Tanaka has an emotional outburst.  He swears.  He yells.  And then he says, "Mr. Thompson, you're going to go -- you're going to have to go and talk to Defendant Baca.  You're going to have to be the one who tells him."

Tells him what?  Tells him that his order has been disobeyed.

And Mr. Thompson told you again and again, when he testified on the stand, that it was Mr. Baca's August 20th order that the FBI be kept away from Anthony Brown, and that's why he had to go talk to Mr. Baca.

It makes no sense whatsoever that Mr. Thompson had to go talk to Mr. Baca if Mr. Baca hadn't given the order.  It makes no sense whatsoever if he didn't have to apologize for allowing the FBI in to see their federal informant.

And in addition to Mr. Thompson's testimony and Mr. Carey's testimony and Mr. Manzo's testimony, you heard that all of the co-conspirators were in -- at sheriff's headquarters at the same time.  And you know that based on the calendar, which is Exhibit 120, and the phone records, Exhibit 167, which is Thompson's, and Exhibit 196 and 197, which are Carey's and Mr. Baca's.

And for the time of that meeting, from 2:20 to

approximately 5:00 p.m., all of the co-conspirators are at sheriff's headquarters where Mr. Baca's office is.

Now, you also heard that while Mr. Tanaka was emotional and had outbursts, while he yelled, Mr. Baca was calm. And Mr. Baca was calm because, again, he used anger tactically and he used calmness tactically. Mr. Carey and Mr. Thompson were already apologizing for what had happened, for allowing the FBI to see Anthony Brown. So it would serve no strategic purpose to have anger at that time.

Additionally, Mr. Baca had promoted Mr. Tanaka through the ranks. He knew who Mr. Tanaka was. So he must have suspected that Mr. Tanaka had already had the anger, the emotional outburst. Mr. Baca didn't have to duplicate it. Instead, he told Lieutenant Thompson, "It's okay. This is a chess match."

There will be investigative moves and there will be obstruction. He was playing things strategically to get what he wanted. And what he wanted was no federal investigation, no grand jury looking at what was going on inside his jails.

On August 24th, the FBI, who had been kicked out of the interview with their informant, knew that the sheriff's department not only knew about their investigation, but based on the size and the comments of the sergeant who came in and said, "This interview is over. Who gave you permission?" they knew that the sheriff's department was upset.

And so they went to interview Gilbert Michel.  On that same date, Mr. Manzo first drafts a policy, and it's the policy that says there's to be no FBI interviewing any inmates in custody.  And that's important because Mr. Manzo testified that Mr. Thompson, after meeting with the executives, handed him notes, and thereafter he drafts a policy of what would be in those notes and sends it to Mr. Thompson.

Mr. Thompson sends it to Mr. Tanaka, and then there -- through his aide, Mr. Nee.  And then there is an e-mail exchange, which you will see in Exhibit 27, and that exchange is, "Will it be okay if I take the executives' names off, if I give them plausible deniability?"

He doesn't say, "Will it be okay if I take Paul Tanaka's name off?"  He doesn't say, "Will it be okay if I take the undersheriffs' names off."  He says, "if I take the executives' names off."

And he testified and Manzo testified and Carey testified and Sexton testified that, in the course of this conspiracy, when it came to executives, there were two; Mr. Tanaka and Defendant Baca.

Now, on the 25th a federal writ is served on the sheriff's department.  What Special Agent Marx said would happen is exactly what happened; the federal government came back for Anthony Brown.

When the interviewed had been interrupted, when

Anthony Brown had gone one way and the Federal Bureau of Investigation agents were sent the other, Special Agent Marx said to Anthony Brown, "We'll be back for you."

And the writ was the lawful legal way for the FBI to come back for Anthony Brown and make it so that he should be transported by the marshals service, in federal custody to testify before the federal grand jury.  That's what the writ meant.

After that, Martinez, who knows that his special agents have interviewed Anthony Brown the day before, sends an e-mail to Defendant Baca.  And that e-mail you will see -- it's in evidence -- is Exhibit 30.  "I want to provide you with an update."

Now, Mr. Hochman said in opening that Mr. Baca had many, many questions, that he wanted answers from the federal government, but instead of calling Mr. Martinez back or getting in touch with Mr. Martinez to find out what the update was, he had his people send that e-mail to Mr. Tanaka.  And there were no questions sent or asked of Assistant Director in Charge Martinez.

Instead, what Mr. Tanaka knew is that Defendant Baca was consumed with this case.  It was all-consuming, and so every little tidbit of information that any of the co-conspirators could provide him would help ease his mind.

And you know that Mr. Carey, Mr. Leavins -- there

were briefings, multiple, multiple briefings.  And you know that happened because Mr. Carey testified about it and Mr. Brown testified about it and Mr. Hannemann testified about it.

The sheriff was having multiple briefings because he wanted to know every little thing that was going on with regard to Anthony Brown and the cell phone and his sham investigation of the FBI.  His mind was consumed.

Now, while Defendant Baca did not call Assistant Director in Charge Martinez back to get any answers, he did call the US Attorney's office.  He did call the jovial André Birotte, the man he had helped get his job, because Defendant Baca thought he could bully the United States Attorney into stopping the investigation.

And you will recall he made that call to the United States Attorney's Office and André Birotte one minute after Mr. Brown was released from Men's Central Jail.  So he wanted to set up a meeting.  He wanted this investigation stopped.

After Brown is released from Men's Central Jail, at least in the computer, John Rodriguez is booked.  Of course John Rodriguez has no similarity to Anthony Brown at all except for the fact that they are both men.  He wasn't born on the same day.  He's not the same height.  He doesn't have the same weight.  He's not the same race.  He doesn't have the same booking number.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

And you will recall Mr. Sexton's testimony that where it says he refused fingerprints, he wasn't ever given a choice, and that's because the fingerprints are digital.  And if the real Anthony Brown were fingerprinted as John Rodriguez, the computers would show that that was an alias for Anthony Brown.

And Mr. Baca's co-conspirators were told to keep the FBI away from Anthony Brown, and so they couldn't let John Rodriguez and Anthony Brown be connected in any way that the FBI could find them.

Additionally, the draft policy that Mr. Thompson had sent to Mr. Nee goes out that day.  Effective immediately, no FBI interviews of inmates without the approval of the man who had emotional outbursts at the mere mention of the investigation, without the approval of Paul Tanaka.

Now, on August 26th, John Rodriguez is released and Kevin King is booked.  You've seen the exhibits that show how Anthony Brown became John Rodriguez and John Rodriguez became Kevin King.  And since there was a writ, Baca's co-conspirators decided that, in order to effectuate his order to keep Anthony Brown away from the federal grand jury, they moved him to San Dimas.

Now, you saw the pictures of the San Dimas station.  I think it's Exhibits 199 through about 208.  The San Dimas station was not meant to house a violent, dangerous criminal.  The San Dimas station had a patio, had a low wall and a gate

that you could climb over.

This was not a place that was for Anthony Brown's safety, because deputies could walk in and out of that patio. This was taking Anthony Brown out of Men's Central Jail, the place the writ commanded that the marshals be able to pick him up and bring him to testify before the federal grand jury.

Now, on August 26th, Defendant Baca is also briefed. He's briefed constantly, but he's briefed on the 26th about the fact that Mr. Brown has been moved. And the idea that the federal investigators may show up with a writ has trickled all the way down so that even James Sexton hears about it. And he's given instructions, "If the feds show up to get Anthony Brown, don't release him."

Again, the decision was made not to tell Defendant Baca about this undercover investigation. And once he learned, it was a big, open secret which would, of course, make any civil rights investigation harder. And then you also saw the charts about the number of calls between Mr. Baca and the co-conspirators.

First, looking at the phone records, you see where calls originated. And on August 26th, the very day that Carey said he briefed Mr. Baca and Mr. Tanaka about the fact -- he and Mr. Thompson both say they were there, and Mr. Baca was briefed about the fact that Anthony Brown had been moved to San Dimas. The phone records show that from 2 o'clock to 4:15, all

of those co-conspirators were at sheriff's headquarters, the very time the briefing took place.

But after that, after that, you also see calls.  At 3:30 Mr. Brown becomes Kevin King and is moved to San Dimas.  And then Paul Tanaka calls Sheriff Baca.  And after that conversation, he calls co-conspirator Carey and co-conspirator Leavins.  There are four calls between Mr. Tanaka and those two co-conspirators.

And after that, in a familiar way, Mr. Baca is briefed.  He's first briefed because he gets a call from Mr. Leavins.  He's then briefed because his driver gets a call from Captain Carey.  And you heard testimony that when the driver received calls from Tanaka, from Carey, from people like that, it wasn't a call for Mr. Brown; it was a call for Mr. Baca.  And then the driver calls Mr. Carey back.

Now, when you first became a jury, the Court talked to you about the kinds of evidence you would hear; direct and circumstantial.  And in a court of law, a real one like this, not on television, they are to be given equal weight.

Now, Mr. Hochman in cross-examination has tried to make a big deal that you don't know the content of the calls that were made between the co-conspirators, including the calls made on the 26th.

But Mr. Baca's call with Undersheriff Tanaka was followed by calls to these co-conspirators, not to other

places, not to other things that Mr. Baca might have to do. And then the co-conspirators called Mr. Baca. And that is how you know that this circumstantial evidence is kind of like looking outside and seeing the sidewalk wet and knowing that it has rained.

But, ladies and gentlemen, in this case, you do not have to rely just on seeing a wet sidewalk and wondering if it has rained or if a garden hose has been left on, because in addition to this circumstantial evidence, you have direct evidence of obstruction.

It's as if you go outside, you see the rain and you feel the rain falling directly on your head and body. You have the direct testimony of Mr. Manzo. You have the direct testimony of Mr. Thompson. You have the direct testimony of Mr. Carey. All of that is direct evidence of the obstruction and the conspiracy to obstruct that Defendant Baca is guilty of.

Now, on August 29, Defendant Baca goes to the US Attorney's Office. He goes with Captain Carey. He goes with Paul Tanaka. And he tries to do what his underlings had been unsuccessful at; he tries to stop the investigation.

He doesn't want to respond to federal grand jury subpoenas. He doesn't want to have the federal grand jury investigate him at all. He has what US Attorney André Birotte called a rant and what Michael Gennaco, his lawyer, said was

too emotional.

And Michael Gennaco also told you that it was around this time that Defendant Baca confided that many people had told him what the FBI had done was not against the law.  But Mr. Baca continues to rant that it was.

That evening there were calls between Mr. Tanaka and Mr. Baca.  And that's important because the next day, they go -- Mr. Tanaka goes to Men's Central Jail.  And that is when Sergeants Craig, Long and Lieutenant Leavins interview Gilbert Michel.

You will recall that the interview of Gilbert Michel had two parts.  There was about an hour-and-45-minute break between the beginning and the end.  And certainly that is circumstantial evidence that the people in the interview talked to Mr. Tanaka, who was there.  And later, when the interview resumes, Mr. Tanaka calls Mr. Baca.

Sergeants Craig, Long and Lieutenant Leavins also interview Mr. Courson.  He was the person who told Special Agent Marx about certain things that were going on in the jail.  And after that interview, Mr. Carey calls Mr. Baca.

It is that same day -- and you'll see in Exhibit 42 -- that Mr. Thompson sends an e-mail to Noah Kirk, the task force officer, the person who had first learned that the phone number Anthony Brown was calling was -- belonged to the civil rights squad at the FBI.

And you heard what Mr. Thompson had to say about that, specifically that Mr. Tanaka was going to have to hold a meeting and tell the task force officers that they were not to participate in task forces anymore.  And Mr. Tanaka did not want to do it.

But, of course, there is one person that was above Mr. Tanaka, both in the department and in the conspiracy, and that -- that was Defendant Baca.  And you know that that was Defendant Baca's desire because a month later he would write the same thing to US Attorney André Birotte in his letter.

Now, September starts and the jails are swept for phones.  Again, Mr. Hochman tried to make you believe in opening that this was all a question about how many phones, how many inmates, how many informants.  But by September 1st, the jails were swept for phones and other contraband, and nothing was found that could be linked to the FBI.

Thereafter, the next day, a different kind of sweep happened.  And that sweep was for bugs in the offices of Defendant Baca, Undersheriff Tanaka and the executive conference room.  ICIB, the people who were supposed to investigate internally the department for criminal activity by deputies and others in the department were suddenly conducting a bug sweep in the offices of the executives.

And that's because they knew -- they, the co-conspirators, knew, that obstructive conversations had been

had in Sheriff Baca's office, in Undersheriff Tanaka's office and in that executive conference room.

At the same time, of course, Anthony Brown continues to be moved around. This time he's moved around -- he's moved from San Dimas back to Men's Central Jail. He will become Chris Johnson, which will be his third and final name change by Baca's co-conspirators. And he will go back to the place that allegedly was too dangerous for him to be before, and there he will stay until he is transported to state prison.

Now, when Brown is transported back to Men's Central Jail, there's a reason for that. And the reason is Baca's co-conspirators think that he has been turned. He writes a letter to many of the co-conspirators, and he says, "I will not cooperate with the FBI any longer because they have left me for dead."

And, in fact, you heard a conversation with Maricela Long, co-conspirator Maricela Long, where she says, "And they haven't come back for you."

The federal government was trying to get Anthony Brown. They were trying to get him to testify before the federal grand jury. They had a court order for Anthony Brown. Agent Marx was looking for Anthony Brown, but he was nowhere in the system, and that was the direct result of the co-conspirators' actions and Mr. Baca's order that the FBI should not be able to interview Anthony Brown.

Now, on the 7th, that's the date that the writ, the court order, says Anthony Brown should be produced to the grand jury. And he wasn't, and Baca and Tanaka have further calls that day.

On the 8th Mr. Thompson, for a second time, sends a no-FBI policy out to all custody commanders and captains. But this time -- this time he hadn't had a conversation with Mr. Tanaka's aide, Mr. Nee, and so he slips up. And he slips up and he tells the truth, that this policy is mandated per the executives.

Again, not per Mr. Tanaka, not per the undersheriff, but per the executives. And the executives, as he said in his testimony, were, one, Mr. Baca, and, two, Mr. Tanaka.

Additionally, Mr. Craig goes to get a court order from a Superior Court and is told that the state court has no jurisdiction over any federal agency. That includes the FBI. You heard Judge Torribio testify about that.

The next day, Mr. Craig leaves a voice mail for Special Agent Marx, but of course she doesn't get it because he called the wrong number. And because the writ had not been honored, the -- there was a federal request for an interview. That, too, would not be honored. Baca again calls the US Attorney's office, and then Baca leaves the country.

Now, Mr. Baca is out of the country through the 21st, and during that time, several non-obstructive acts happen.

First, Anthony Brown is rebooked as Anthony Brown and he goes to state prison, something that should have happened the month before.

Second, Gilbert Michel confesses to beating handcuffed inmates, the very thing that the FBI's investigation was looking at, excessive force, civil rights abuses.  And, of course, what is the reaction of the co-conspirators?  You've seen it in Exhibit 58, an e-mail, "That idiot."  Michel is that idiot.  "Doesn't look good."

Mr. Baca returns on the 22nd.  And when he is back in the country, he first meets with Mr. Tanaka and then with Mr. Rhambo.  Mr. Rhambo tells you that at some point he knew that people in his department were thinking about approaching Special Agent Leah Marx.

And he tells the sheriff, "Don't do that.  That would be obstruction of justice.  Don't fuck with the feds."

He knows what he is saying, and he uses his words to have an effect on the sheriff to shock him into not doing what Assistant Sheriff Rhambo has heard might be done because, as Mr. Rhambo testified, it was just getting outrageous.

On the 25th, you'll see that there are numerous articles on this.  Those are Exhibits, I think, 61 through 63.  And Baca and Tanaka have more phone calls.

On the 26th, that's Mr. Baca's first Monday back, he goes on television, and he says again, "The FBI committed a

crime."  That's true, even though Mr. Gennaco told you that way back at the first meeting with the United States Attorney, Mr. Baca knew that there was no such crime.

Then he has a meeting with Mr. Carey, Mr. Tanaka, and they talk about an approach of Special Agent Leah Marx.  What does Defendant Baca say about that approach?  "Just don't put handcuffs on her."  He wants that approach to be as intimidating as it possibly can, and it is.

You saw the video.  A very large Sergeant Craig mills about the front door of Special Agent Marx's home.  He's not wearing a jacket.  He's got his badge and his gun prominently displayed, and he says what we're going to do "to arrange for your arrest."  The co-conspirators followed Mr. Baca's orders to a T.  They did everything but put handcuffs on her.

The 26th is also the day -- the date of the letter that Mr. Baca writes to the US Attorney's Office.  And he receives a call from André Birotte.

What happens in that call?  André Birotte, the US Attorney, knowing that Mr. Baca's co-conspirators have just approached Special Agent Marx, says, "Is this what we're doing now?"

And Mr. Baca is not surprised.  He's not like the LAPD chief who says, "What?  What are you talking about?  I will try to find out.  I know nothing."

No.  Mr. Baca continues his now five-week rant, "I'm

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

still upset.  I should have been informed."

Mr. Baca is unrepentant and unsurprised.

The next day -- and we know that the meeting about no handcuffs happened because, again, from the location -- origination of the phone records, it shows that Mr. Carey, Mr. Baca and Mr. Tanaka are all at sheriff's headquarters from 10:19 a.m. to 1:20 p.m.

Now, on the 27th you heard Mr. Carey say that when Mr. Baca saw the video, the video that was shot of Special Agent Marx on September 26, he said that's the best laugh he's had in a long time.  And then he met with United States Attorney and Mr. Martinez.

And in that September 27th meeting was where Mr. Baca was angry.  And he used that anger tactically.  He said, "I am the goddamn sheriff and these are my goddamn jails.  And if you want, we are prepared to gun up.  We are prepared to go to war over this."

It was an emotional outburst.  It was anger, and it was Mr. Baca's corrupt intent that was showing.  And it was showing after he knew what had happened at the front door of Special Agent Marx's home by his co-conspirators.

Now, Mr. Birotte testified that that meeting ended with handshakes.  Mr. Baca had used his anger tactically and, after it was over, it ended with handshakes.  But that's not what Mr. Baca's intent was.

The next day, Defendant Baca admitted to Reporter Robert Faturechi of the LA Times that he had sent the investigators to Special Agent Marx's house.  The LA Times -- the article is published the next day.  And the surveillance of Special Agent Marx and her partner at the time, Special Agent David Lam, continues by Mr. Baca's sheriff's department.

And you will see that in evidence, the logs of the surveillance that was continually done even after this alleged clearing-the-air meeting, and those are Exhibits 145 and 152.

Now, that, ladies and gentlemen, the action/the reaction, the investigation/the obstruction, is what this case is about.

I'd like to take a couple of minutes and talk to you about what this case is not about.

This is not about a cell phone.  The dangers of a cell phone have been gone over and over again by Mr. Hochman.  That's in 2017.  But that's a made-up story for trial.  And you know that because in 2011 many of the co-conspirators talked about the cell phone.

Mr. Smith and Mr. Manzo, in their very first interview of Anthony Brown, said, "What am I going to do, give you six more months for having a cell phone?  What am I going to do, give you 18 more months for having dope?"

"Nope.  No, Mr. Smith, you're not," responds Anthony Brown.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

And then Mr. Smith says, "Yeah, because the DA is going to laugh at me when I walk in with that."

How else do we know?  Based on Gilbert Michel's response to Sergeant Long when she asks him, "What made you think that it was okay to bring a cell phone in?"

Mr. Hochman would have you believe that everybody who worked in the jail knew just how dangerous a cell phone was, but in 2011, when Mr. Michel is interviewed, he says, "Because a phone isn't going to hurt anyone."  That was the attitude of the people who worked in custody in 2011.

And, of course, not only do you know that this case is not about a cell phone, but the co-conspirators knew that this case was not about a cell phone.  When Mr. Leavins spoke to Gilbert Michel on the 30th of August, this is what he said.

(Playing of audiotape.)

MS. RHODES:  This case is not about a cell phone and it's not about Anthony Brown.

Mr. Hochman tried over and over again to tell you that Anthony Brown was a violent criminal and he was sentenced to 423 years in jail.  And that's absolutely true.

But Anthony Brown was doing what he did, that is, becoming an informant for the FBI to report on civil rights abuses occurring in the jails, because, as he told Defendant Baca's co-conspirators, he was just tired of all the BS going on.

And he wasn't even going to receive any benefit if the BS stopped because he knew he was on his way out of county jail and in to state prison.  Mr. Brown received no time off his sentence for cooperating with the federal investigators, the federal grand jury, and all he got was a little money on his books.

This case is not about Anthony Brown.  This case is about conspiracy to obstruct -- obstruction of justice and false statements.

So let's just go over quickly the elements.

Count One, conspiracy requires an agreement between two or more people to obstruct justice, which defendant joined knowing of its object and intending to help accomplish its purpose, and one overt act.

The first element, agreement.  You've seen that in meetings, briefings, phone calls, e-mails, notes, letters, and court documents.

You saw the meetings on the 19th, on the 20th -- that's the Saturday meeting.  That 20th meeting is also Overt Act 1.  It's the meeting where Sheriff Baca issues the orders, and it's the meeting where he puts Mr. Tanaka in charge.

The 23rd, that's Overt Act 3.  This is the time when he learns from Tom Carey that the FBI had gotten into the jail and had interviewed Anthony Brown.  The agreement was going on because Mr. Thompson and Mr. Carey went to go see Mr. Baca and

apologize.

The 26th of August, that's the time that Mr. Baca authorized overtime -- and that's in the Indictment as Overt Act 4 -- that Mr. Brown is moved, and that Mr. Baca is briefed on the movement of Anthony Brown.  Those are also overt acts in the conspiracy that's charged.

And then 9/26.  I'd like to talk to you about that meeting for a moment.

On 9/26 is the day that Mr. Carey says he thinks he talked to Defendant Baca about approaching Special Agent Marx.  The Indictment says the 22nd.  It says, "on or about."  And you will receive an instruction that "on or about" means exactly what it says, on or about.

So sometime between when Defendant Baca gets back from being overseas and when Special Agent Marx is approached, we know that there's a meeting that took place.  It's on or about that time frame.  And those meetings are all evidence of the agreement between the co-conspirators and Defendant Baca.

You also have briefings.  The briefings are talked about by Mr. Brown and Mr. Hannemann, who both sat at least for some period of time outside Mr. Baca's office.  Mr. Carey talks about the briefings.  Mr. Tanaka, in an e-mail that's Exhibit 31, where he talks about the sheriff being consumed and any little tidbits, any briefings that you can give him will help.  And then, of course, Mr. Baca says he was getting briefings

from Carey and Leavins.  All of that shows agreement.

The phone calls -- and you will have back with you Exhibit 157, which shows act and phone call, act and phone call.  Those phone calls are further agreements between Defendant Baca and the co-conspirators.

You also will see the e-mails.  Now, Defendant Baca did not communicate by e-mail, but his co-conspirators communicated by e-mail to effectuate his conspiracy.  Those orders were carried out by e-mail.

Just showing you a couple.

First is Exhibit 28.  That's the e-mail that Gerard Smith sends to the OSJ deputies who are going to guard Anthony Brown, who are going to make sure that Baca's order is followed to keep Anthony Brown and the FBI away from each other.

And in that e-mail, he says there will be no other movement without the presence of the person that Mr. Baca had put in charge, Undersheriff Tanaka.  And we've talked about the policy e-mails that Mr. Thompson put forth:  Effective immediately, all FBI requests for inmate interviews will be approved by him or Mr. Tanaka.

Now, you also know that an agreement can be carried out when multiple things come together.  We know that Sheriff Baca gave André Birotte, the US Attorney, a letter.  He gave it to him on the 27th of September.  But that letter, as we went through with United States Attorney Birotte -- while Mr. Baca

admits that that letter was his, that he wrote it and approved it before signing, has much of the language of the co-conspirators. And you don't get the same language and the same exact thoughts without an agreement.

So, for example, in his letter, which you will have with you in the jury room, Exhibit 112, he says -- he wants to know from United States Attorney Birotte, "What are the locations of any additional cellular telephones currently in use, owned or deployed by the FBI within the confines of the Los Angeles County Jail system?"

Almost the exact same words are what Co-conspirator Craig puts in his proposed order on September 8th, an order that, of course, would be denied because there was no jurisdiction.

Similarly, he wanted any -- the disclosure of any and all items of contraband. That's the exact same request that Co-conspirator Craig puts in his proposed order. That's not a coincidence; that's an agreement between Co-conspirator Baca and Co-conspirator Craig.

Additionally, within Mr. Baca's letter, he doesn't want to be responsible for producing things to the grand jury. He doesn't want to have any accountability. And he says, "It's estimated that it will take a thousand man-hours to retrieve all the documents asked for in the subpoenas."

Mickey Manzo wrote the very same thing in his

notebook on August 31st, 2011.  That's an agreement.  When notes, letters and court documents by different co-conspirators all say the same thing, you know you have an agreement.  And so through meetings and briefings and phone calls and e-mails, notes, letters and court documents, you know that there was a conspiracy.

The second element is also met because Defendant Baca joined the conspiracy.  On August 20th, he formed it.  He scheduled and attended meetings, he received briefings and he condoned the actions of the co-conspirators.

Again, you will have the outstanding reviews of the co-conspirators, including the outstanding review of Captain Tom Carey that he received.  Mr. Baca knew by the time those reviews came out that crimes had been committed.  He knew that the federal investigation was continuing, but he still gave them outstanding reviews with no discipline.  He had encouraged the obstruction and he continued to.

One overt act -- we've gone over several of them, but they include the August 20th meeting and Sheriff Baca's orders to keep Brown away from the FBI.  They include putting Mr. Tanaka in charge of the investigation on August 20th.  They include the August 23rd meeting where Thompson and Carey tell them the FBI got in despite his order.

They include the August 25th change of Brown's name after the writ has come in seeking Anthony Brown from Men's

Central Jail.  And the overt acts include the meeting on or about September 20th where Mr. Baca is informed that the co-conspirators are going to approach Special Agent Marx.

Count Two is obstruction.  And similar to conspiracy, it talks about what Defendant Baca did to obstruct the grand jury investigation.  Obstruction has two elements:  One, the defendant obstructed or tried to obstruct a federal grand jury investigation; and, two, he acted corruptly.

Now, there are two main obstructive acts that Mr. Baca committed or helped commit or tried to commit.  The first one -- obstructive act is hiding the informant.  And you know that this happened because you saw all the paperwork that Anthony Brown became John Rodriguez, who became Kevin King, who became Chris Johnson, that Anthony Brown was moved to the most secure place, 1750, while he was still Anthony Brown.

But once the FBI got in, he had to be moved to 8000 and guarded.  And once the writ came in, he had to have his name changed to Kevin King and go to San Dimas.  Hiding the informant was an obstructive act that Sheriff Baca committed by having his people do it.

The second obstructive act is intimidation, or the attempted intimidation of Special Agent Leah Marx.  He approved the confronting of Special Agent Leah Marx.  The confrontation was to take place outside her home and he said, "Just don't put cuffs on her."  And this is exactly what happened.

*(Playing of videotape.)*

MS. RHODES:  And the obstruction and the intimidation is furthered when Sergeant Long says to the supervisor special agent that the sheriff knows --

*(Playing of audiotape.)*

MS. RHODES:  -- and then gives Agent Tampubolon and Supervisory Special Agent Carlos Narro the number to the office of the sheriff, not the undersheriff, 5000, the office of the sheriff.

Those are the corrupt acts.  Those are the acts intended to obstruct justice.

Now, the government also has to prove intent, corrupt intent; that is, the intent to obstruct justice.  And it needs to prove that it was substantial, but not the sole or primary purpose of Defendant Baca's acts.

That means that even if you think that there was some reason to move Anthony Brown for his safety, but Defendant Baca also wanted to have Anthony Brown moved so that he was away from the federal investigation, the federal grand jury, then a corrupt intent is found.  Because it need not be Defendant Baca's sole or primary purpose; it just needs to be intended to obstruct justice.

The government must also prove that there was knowledge of a federal grand jury investigation.  And, of course, there was.  Exhibit 110 are the subpoenas that

started -- the grand jury subpoenas to the sheriff's department served starting in June 2011.

On August 25th, there was a writ to have Anthony Brown testify before the federal grand jury.

At the August 29th meeting, United States Attorney André Birotte told you that Mr. Baca talked about those grand jury subpoenas, showing that he had knowledge that this was a grand jury investigation.  Later, Mr. Birotte said he received a phone call from Mr. Baca, again talking about those grand jury subpoenas.

And, of course, it is in Mr. Baca's September 26th letter where, again, he does not want to have to respond to any grand jury subpoenas.  Mr. Baca certainly knew that this was a grand jury investigation.

And as Agent Dahle told you, the FBI was an arm of the grand jury.  It undertook this investigation to supply information to the grand jury.  The FBI was intricately involved in a grand jury investigation, providing information to the grand jury, and it was presenting evidence to the grand jury.

There were, as I think Special Agent Tanner testified, approximately 80 witnesses put in front of the grand jury.

The corrupt intent is also shown by the warning that Assistant Sheriff Rhambo gave Defendant Baca.  As if it needed

to be any clearer to a man who is experienced in law enforcement, Assistant Sheriff Rhambo told Sheriff Baca, "Undercover work is what we do.  Don't fuck with the feds." And he said that for emphasis.

He told Defendant Baca, "What you're doing is obstruction of justice," and he gave him the Penal Code section for the California state law, because obstruction of justice is not just a federal crime; obstruction of justice is a state crime, too, that the sheriff should know about.

As Assistant Sheriff Rhambo testified, it was just outrageous, and he had several frank conversations with Defendant Baca.

The sheriff's department also has a clear policy that employees shall not take any action to interfere, delay, distort or unduly influence any investigation.  Those policies are found in Exhibit 116.

And now I'd like to talk about the false statements.

The elements are the defendant made a false statement within the jurisdiction of the FBI.  And you know that this civil rights investigation, this obstruction of justice investigation was certainly within the jurisdiction of the FBI. Special Agent Dalton told you that.  The defendant has to know it's false, it has to be willful, and it has to be material to influence the FBI.

On August 12, 2013, the Federal Bureau of

Investigation and the US Attorney's Office were still investigating, and they were looking for answers.  They were not -- these were not gotcha moments, and these were not, as Mr. Hochman has suggested, some memory questions.

These were what was Sheriff Baca aware of.  There was a conspiracy.  They were trying to find out how high it would go.  And so there have been four lies charged that all the evidence in this case shows were, in fact, lies.

The first one was that Mr. Baca didn't know it was a civil rights investigation.  And I encourage you to listen closely to these clips, because while you will have paper back with you -- the paper exhibits back with you in the jury room, you will not be able to have this audio.

The audio can be played for you if you need to come back and listen to it, but please listen carefully to it now.

*(Playing of audiotape.)*

MS. RHODES:  Of course it was important that it was a civil rights investigation, and that's why Defendant Baca lied about it.  It was important because, even as Junior Deputy James Sexton testified, the FBI's civil rights squad were the people who investigated police.  They were the people who were charged with enforcing excessive force violations.

Now, Mr. Baca's statement that he had no clue that this was a civil rights investigation is completely belied by all the evidence that you heard in court.  Mr. Manzo testified,

"I played Mr. Baca those calls," those calls on the ITM system that he said he didn't hear.  And Mr. Baca was briefed that this was a civil rights investigation.

Greg Thompson testified that Smith and Manzo told Mr. Baca that Brown claimed to be an inmate -- an FBI informant reporting on jail abuses to the FBI.  Jail abuses are civil rights violations that law enforcement is committing.

And William Carey told you that Thompson told Baca on August 20th that the phone was connected to the civil rights division of the FBI.  That's lie one.  And all those witnesses testified that Mr. Baca's statement he had no clue it was a civil rights investigation was a lie.

Now, lie number two, he was not involved in any conversations about keeping Brown away.

(Playing of audiotape.)

MS. RHODES:  Of course Defendant Baca would say he was not aware.  To be aware would be to say, yes, he ordered that they were kept away from each other.  And that's, in fact, what all the evidence shows he did.  Manzo testified that Baca wanted Defendant -- Baca wanted Brown isolated and no one was to see him without executive approval.  That's Mr. Baca or Mr. Tanaka.

Thompson testified that Baca said no one was to see Anthony Brown without Tanaka approval, that they were to be kept away.

Carey testified, not only on the 20th, but also on the 23rd, when the FBI got in on 8/23.  And that was against Baca's direction, and so there was another direct involvement on August 23rd trying to keep the FBI and Brown away from one another.

Mr. Baca's statement, "I had no direct involvement" is a lie and a false statement.

The third lie, "I was unaware and not informed about that August 23rd interview."

*(Playing of audiotape.)*

MS. RHODES:  Defendant Baca knows how to say, "I don't remember."  He also knows how to lie, and he lied by saying, "No," "No," "No."  And that's a lie because, as Mickey Manzo told you, "Lieutenant Thompson went into Mr. Baca's office and he later told me that he had apologized."  Baca called it a chess match.

Thompson told you that he explained to Mr. Baca that the FBI agent had interviewed Brown.  Baca said, "I thought there were precautions put in place," meaning, "I thought I said it had to be authorized by Paul Tanaka.  But it's okay. It's a chess game."

And William Carey testified, "I was there when he did it.  I know that he apologized to" -- that Thompson apologized to Defendant Baca.  That's Defendant Baca's third lie.

Now, his fourth lie is about the approach of Special

Agent Marx and how he was not aware.

(Playing of audiotape.)

MS. RHODES:  He was aware of the investigative particular that he ordered.  He was aware that he had said, "Just don't put cuffs on her."

But he continues in his lie.

(Playing of audiotape.)

MS. RHODES:  He knew what was going to happen and when it was going to happen because he ordered it.

Lie Number 4 is that he wasn't aware of the approach of Leah Marx, but former United States Attorney André Birotte testified that when he called Mr. Baca, Mr. Baca was not surprised.

Maricela Long, in the recorded call between Agent Tampubolon, Carlos Narro and herself, says, "Baca knows.  The sheriff knows," and then she gives out Baca's number.  You can't do that to the head of your organization unless you know that he knows.

William Carey, "I'm a thousand percent positive.  I was there and told Baca."

Remember, Carey testified that he was uncomfortable about what was happening, and so he wasn't going to do anything or let his people do anything unless Baca said it was okay.

And then LA Times Reporter Robert Faturechi also said that Baca told him, the LA Times reporter, that, in fact, he,

Baca, had sent investigators to Agent Marx's home.  And that is why all of those things are lies.

We have, as to lie one, Manzo, Thompson and Carey; as to lie two, the same; three, the same; and four, Carey, Faturechi, Birotte and Long.

Now I'd like to end by talking to you a little bit about what Mr. Hochman said in his opening statement and tell that you this case, just like it's not about a cell phone, just like it's not about Anthony Brown, is also not about time.

Age is irrelevant in terms of who can commit a crime.  Mr. Sexton was in his 20s.  Mr. Manzo was in his 30s.  Thompson and Carey were in their 50s.  You can commit a crime at any adult age.

Experience is more damning than anything.  Mr. Sexton committed a crime as a junior deputy.  Mr. Manzo was only a mid-level deputy.  Thompson and Carey had 30-year careers with Mr. Baca's department.

Mr. Baca may have been a law enforcement officer at one time, but that experience is damning, not a positive, when you talk about committing these crimes.

And, finally, Mr. Hochman talked about measuring Mr. Baca's career down, a long career, six weeks of obstruction, a four-hour interview, and then I think he said 45 seconds of lies.

Now, I've just played for you the lies that the

government has charged, and I think it's substantially longer than 45 seconds.  We timed it at over 200.

But that's not important, because it takes almost no time at all to tell a lie.  To the right question, the answer "no" is a lie.  To a different question, the answer "yes" is a lie.  You can lie in one second.  It doesn't make it any less of a lie.

The United States is not asking you to measure Defendant Baca down to anything; it is asking that you hold him up to the same standard that all criminal defendants are held to, and that is, when the case is proved against him beyond a reasonable doubt, as it has been here, there's only one verdict.

And for Mr. Baca's obstruction and his lies, that verdict, based on the evidence, is guilty.

Thank you.

THE COURT:  All right.  Ladies and gentlemen, we are going to take about a ten-minute break.

Again, I want to remind you, until this trial is over, you're not to discuss this case with anyone, including your fellow jurors, members of your family, people involved in the trial, or anyone else, nor are you to permit others to discuss the case with you.  If anyone approaches you and tries to talk with you about this case, please let me know about it immediately.

Do not read or listen to any news reports or other accounts about the trial.  Finally, you are reminded to keep an open mind until all the evidence has been received, you've heard the arguments of counsel, the instructions of the Court and the views of your fellow jurors.

If you need to speak with me, simply give a note to the clerk.

We will come back at 10 o'clock.

THE CLERK:  All rise.

*(Jury out at 9:52 A.M.)*

*(The following was heard outside the presence of the jury.)*

MR. FOX:  Your Honor, there is one matter that I'd like to discuss, whether it's now or before the jury comes out again, and I would like to do it at sidebar, if that's okay.

MR. HOCHMAN:  May I go to the restroom real quick?  I apologize.  I just need to use the restroom.

THE COURT:  That's fine.

*(Recess taken 9:53 to 10:04 A.M.)*

*(Proceedings held at sidebar under seal 9:53 A.M.)*

*(The following proceedings were held in open court.)*

THE COURT:  All right.  Let's bring the jury in.

*(Jury in at 10:08 A.M.)*

THE COURT:  All right.  Counsel.

MR. HOCHMAN:  Before I begin, I want to thank the Court, counsel, ladies and gentlemen of the jury.

I've been doing this a long time, and last week was the first time that I have had to miss two trial days for an illness.  So I thank you for your time.  I thank you for your patience, because this was just too important of a closing argument to do at a quarter speed.  So thank you very much.

On August 18th, 2011, Sheriff Baca spoke to the head of the FBI's Los Angeles office, Steve Martinez, and was told

something he had never been told before; that the FBI had smuggled in a cell phone into the Men's Central Jail, had done it without telling anyone at the sheriff's department, including the sheriff, the cell phone had been compromised after having been discovered, and the inmate, Anthony Brown, needed to be kept safe and they wanted the cell phone back.

Mr. Martinez provided no further details of how many deputies involved, how many inmates were involved, how much or what type of contraband was involved and how big a problem Sheriff Baca was facing.

In the next two days, Sheriff Baca found out from the sheriff's department investigators that there were multiple deputies involved, not just one deputy; that there were sheriff's department employees, like nurses, involved; that there may be multiple cell phones involved; that there were narcotics involved, like heroin, cocaine, methamphetamine and ecstasy; and that the inmate involved, Anthony Brown, was a violent and dangerous criminal who had just received a life sentence of 423 years.

The problem for Sheriff Baca wasn't getting smaller; it was getting bigger over time.

Now, this case is all about seeing the situation through the eyes of Sheriff Baca, from his point of view at that moment in time on August 18th and in the ensuing six weeks that followed.

To see through the eyes of Sheriff Baca, you learned that on August 18th, 2011, he had been with the sheriff's department for about 45 years, and he had been the elected sheriff at that point for about 12 years.

As you heard about Sheriff Baca's responsibilities, he was personally responsible for the safety and security of the over 1,000 employees that worked at the Men's Central Jail and the thousands of inmates who were housed there. Thousands of inmates, over a thousand employees. He, not the FBI, carried that responsibility 24/7, 24 hours a day, seven days a week.

From Sheriff Baca's eyes, how dangerous was it having a cell phone in the jail? As you heard testified by every government witness who had any actual experience in the jails, a cell phone could be used as a weapon, it could be used for contract killings or hits on witnesses, to run a criminal enterprise, to plan escapes or to smuggle in drugs.

The fact that it wasn't used for those purposes doesn't mean that -- for instance, Mr. Carey told you about the dangers that they knew a cell phone posed, particularly with a dangerous inmate.

Now, from Sheriff Baca's eyes, how dangerous was it having serious narcotics in the jail? Again, you heard from every government witness who worked in the jails that inmates will kill each other over a marijuana cigarette, and these type

of drugs can lead to overdoses and violence in the jails.

So when you see the case through Sheriff Baca's eyes, through his point of view, putting yourself in his shoes, and you see the potential for harm for the thousands of inmates and thousands of sheriff's department employees who were working in the jails, imagine if Sheriff Baca, hearing all this, did nothing; he didn't investigate, he just waited for the FBI to do their investigation; he didn't look into whether or not there were more cell phones or serious narcotics in the jails; he didn't look into whether or not there was one, two or up to 50 dirty deputies taking bribes and engaging in the excessive force in the jails; he just left them there and decided to do nothing.

Imagine if one of the dangers of the cell phone were realized and all of a sudden a contract hit was put out on a witness or dangerous inmates did escape or inmates killed each other over narcotics or overdose. The federal government and the public, who elected Sheriff Baca, would be justifiably outraged if he did nothing.

Now, from Sheriff Baca's eyes, to carry out that responsibility to the thousands of people that he personally was responsible for, he had to act immediately. He did not have the luxury of time, like the FBI, to wait months or years to investigate. He needed to get to the bottom of how big a problem he had immediately.

Now, the FBI had the answers.  They had worked with him and the sheriff's department for decades on task forces. As you heard Cecil Rhambo say, "Like brothers in arms fighting crime, narcotics, trafficking, gangs and even terrorists." They had decades of a successful partnership, the FBI and the sheriff's department.

And that very summer of 2011, you heard when Mr. Carey said, "The sheriff's department was working with the United States Attorney's Office on a public corruption investigation of a sheriff's department captain."

Let me say that one again.

The summer of 2011, the sheriff's department was working with the United States Attorney's Office on a public corruption investigation of a sheriff's department captain, that very summer.  But the FBI was not giving any answers to Sheriff Baca on how big a problem he had.

Now, from Sheriff Baca's eyes, from his perspective, the six weeks between August 18th and September 26th were about two things:  Get to the bottom of the investigation and keep Anthony Brown safe.  Those were the two goals of Sheriff Baca at that -- during that six-week period.

As I will show you, all the evidence in this case can be seen through Sheriff Baca's eyes and through these two goals.  And there was not a third goal.  At no point during the six weeks was there a third goal through Sheriff Baca's eyes of

obstructing the FBI's investigation.  It was not one of the goals.

Indeed, from his view, from his point of view, from his eyes, he wanted to work with the US Attorney's Office and the FBI during that time.

And how do we know that?  Because recall what was said in the August 29th meeting, the first André Birotte, US Attorney, meeting.  He didn't say at that point that he wanted the -- that the sheriff's department wanted to take over the investigation.  What he said -- and you heard Mr. Carey say this, you heard Mr. Birotte say this, you heard Mr. Gennaco say this -- is that Sheriff Baca wanted to join the United States Attorney and the FBI in their investigation.  He wanted to join it.

But you heard what happened at the end of that August 29th meeting.  André Birotte listened, he called it his listening meeting, and he provided no response.

Now, on September 27th, almost a month later, Sheriff Baca did finally meet again with André Birotte and Steve Martinez in Mr. Birotte's office.  And you heard it was a heated meeting.  But Sheriff Baca finally got answers to his questions after six weeks.

And then what you heard -- Ms. Rhodes alluded to, is that they left the meeting shaking hands.  They had reestablished that partnership, that cooperation that André

Birotte talks about in his letter of continued cooperation.  It had grown again.

Now, the government calls -- and, now, if you recall also what André Birotte described the meeting like, is that these were guys in a sandbox.  That was the metaphor that he talked about, and these are two younger brothers basically yelling at each other in a sandbox, the sheriff's department and the FBI.

Now, what the government calls this six-week period in the sandbox is conspiracy and obstruction of justice.  It's neither.

During this six weeks, Sheriff Baca did not conspire, did not obstruct and did not in any way attempt to obstruct a civil rights grand jury investigation.

And on April 12, 2013, during that four-and-a-half-hour voluntary interview in which 4- to 500 questions were asked, Sheriff Baca did not knowingly make any of the four alleged false statements about what happened 20 months before, in August and September of 2011.

Now, before we get into a discussion about the evidence, let me discuss with you a few of the rules, a few of the instructions that the Court will give you that are very important to your role as a juror.  Because, as you heard from the Court early on, your role as a juror in the American system is incredibly special.

In certain countries, you are not -- in certain countries, you are actually presumed guilty, from China, to Russia.  They will actually start you out presuming you guilty and you have to prove your innocence.  But in America, we decided to do it differently, because in this country, you are presumed innocent all the way through trial, all the way into jury deliberations until and unless the government meets its burden of proof of beyond a reasonable doubt.

Now, you will hear me say that, "burden of proof beyond a reasonable doubt" very often, over and over, because as you look at each piece of evidence in this case, you have to have going on in the back of your mind does this piece of evidence show me beyond a reasonable doubt that Sheriff Baca committed these crimes.

And this is a burden that the government has to prove each and every element of the crime.  And if the government has not met this burden of proof with each and every element, the Court will instruct you it is your duty to find Sheriff Baca not guilty.

Now, what is this burden, this very high burden of proof?  Beyond a reasonable doubt is something in a criminal case that is our highest form of burden of proof in the entire system.  It's a burden of proof that's existed for 200 years -- over 200 years, that the government needs to meet.

Now, you also heard in this case -- I think Judge

Torribio talked about it a little -- about a lower burden of proof called probable cause.

You heard about that burden because that's the very low burden, for instance, that the grand jury has to meet. Remember, the grand jury doesn't get to hear from defense counsel. They don't get to have their witnesses cross-examined by defense counsel. And the burden to return an Indictment is very low. It's probable cause. It's whether or not a defendant might have committed the crime. And remember that the Indictment itself, therefore, is not evidence at all.

Now, in contrast to that very low burden of probable cause, beyond a reasonable doubt is a much higher amount of evidence. And counsel is right; it's not beyond all possible doubt, but it's much higher than, let's say, 51 percent of the evidence. And a reasonable doubt is this: It's a doubt based on your reason and common sense.

So if you look at the charge and you find that you have a doubt based on your reason and common sense about whether or not the government has proved its case, then they have not proved it beyond a reasonable doubt and you must find Sheriff Baca not guilty.

Now, one way to visualize proof beyond a reasonable doubt as it applies to those elements -- those are the different things that the government has to prove -- is to visualize the reasonable doubt as sort of big, strong, heavy

doors in a hallway, and each door represents reasonable doubt, and in order to go from one door to the other door to the other door, you have to go beyond a reasonable doubt.

But with each door -- if you cannot get through one door, you don't even get to the second door.  And if you get through the second door and you don't get through that, you never reach the third door.

So each one of those elements are like those big doors in a hallway, and you don't even reach the second or third doors unless you can get through the first.

And as I will show you, the government doesn't get through the doors, those big heavy doors of reasonable doubt, in each of the crimes charged.

Now, why do I keep saying the government has the burden of proof?  Because that's because the defendant does not have to prove anything in this trial.  The government has the burden of proof at the beginning, the middle and the end of trial, all the way through your jury deliberations.

In fact, when you get the verdict form, you're going to see it doesn't say "Guilty" or "Innocent."  It says "Guilty" or "Not guilty" because the defendant never has a burden of proof in this case, ever.  And since the government always has the burden of proof and it never shifts to the defense, you must also understand this, that a defendant always has the right not to testify, especially in a case where the government

has not met its burden of proof.

Just like it's your duty not to read the newspaper or go on the internet or talk about this case, so, too, is it your sacred duty not to in any way hold the fact that a defendant didn't testify as part of the evidence that you consider.  You cannot in any way consider the fact that defendant did not testify, particularly in a case where the government has so failed to meet its burden of proof.

Also, the Court will instruct you that the number of witnesses called by one side or the other does not matter.  And as you saw, through the cross-examination of the government's witnesses, we brought out all you need to know of what was going on through Sheriff Baca's eyes to show he did not commit conspiracy, obstruction of justice, or false statements.

All right.  We've covered the very high burden of proof.  We've covered the fact that the defendant has a right not to testify.  But there's one more thing you need to consider, and that's these are the only three charges against Sheriff Baca.

Now, that sounds pretty obvious, that these conspiracy, obstruction, and false statements are the only charges against Sheriff Baca, but the government has presented testimony about inmate beatings, retaliation complaints, coverup of excessive force.

Now, there is absolutely no excuse for anybody in the

sheriff's department who did any of these things, and the federal government should prosecute and punish them.  But here the government did not charge Sheriff Baca with any of these beatings, retaliation, or coverup.

And while the government argued in its opening statement that there was widespread abuse at the jail, the government has not introduced one document or one witness that shows that anyone brought to Sheriff Baca's attention, to his notice, at any time before August of 2011 that such widespread abuse was going on.

In fact, you heard Agent Tanner tell you that for an entire year, she went out of her way to keep her investigation secret and hidden from everyone in the sheriff's department, telling them that she was involved in investigating human trafficking.  If you remember her statements, as they dealt with Deputy Courson, for instance.

She heard from about two dozen inmates during this time and went and met with them in the Men's Central Jail but each time kept hidden the fact that she was there for a civil rights investigation about the sheriff's department.

So why did the government introduce in this trial -- if they did not charge Sheriff Baca with these crimes and there is no evidence to show he even was put on notice of this abuse before August 2011, why did they bring in this evidence?  To poison your view of Sheriff Baca, poison your view of him.

Because they figured that if you heard about these inexcusable beatings that occurred in the jail, but committed by deputies down in the chain of command, you would want to hold someone criminally responsible for them even though those charges are not before you.

And this is very important:  The mere fact that Sheriff Baca was the sheriff at the time the beatings occur does not make him criminally responsible for what went on down below.

Similarly, the mere fact that he was sheriff during the six weeks between August 18th and September 26th does not make him criminally responsible for what went on down below because unless the government can meet its burden of proof beyond a reasonable doubt that he was personally involved, as they said, the leader or the driving force of this conspiracy that he was charged with, the mere fact that he was at the top of the chain of command does not mean that he personally conspired or obstructed justice.

The mere fact that he was at the top of the chain of command does not mean that he personally conspired or committed these crimes.

Likewise, the mere fact that you might think one way or the other that Sheriff Baca's response to these inmate complaints was either adequate, timely or effective is not an issue that Sheriff Baca is on trial for.  It's not an issue for

you to decide.

In fact, that would be an issue, for instance, for the voters who voted in Sheriff Baca and considered him every four years to decide, because unlike anyone else at the sheriff's department, he was the only one that was elected into his office, and voters could hold him responsible for anything that went on in his department.

But you, the jury, can only hold him responsible, through his eyes, on what he personally did. And the government has failed to meet that high burden of proof beyond a reasonable doubt to show that he personally conspired and obstructed justice, as charged in this case.

But what was Sheriff Baca's response when the FBI finally served him with subpoenas on August 24th, 2011, that laid out a list of deputies and a list of inmates in their civil rights investigation?

Well, you heard Mickey Manzo and Tom Carey tell you that a task force was formed to look into those allegations, which had its first meeting on August 31, 2011, seven days after he received the first subpoenas; that that task force was given space right in the sheriff's headquarters basement.

And ICIB, which led that task force -- that's the Internal Criminal Investigations Bureau that Tom Carey led. That ICIB had its resources go from 30 investigators and staff to almost a hundred investigators and staff.

MR. FOX:  Objection, Your Honor.  Misleading.  No evidence to support the argument.

THE COURT:  Sustained.

MR. HOCHMAN:  Well, you heard Tom Carey say that his resources went up in September and the months that followed from originally 30 investigators and staff to somewhere between 75 to a hundred investigators and staff.

And you heard Mr. Manzo tell you that during September of 2011, he was tracking down inmates that were no longer in the Men's Central Jail who were part of these allegations to interview them.

And you also heard Mr. Carey say that ICIB was even reviewing some of the retaliation cases in Exhibit 53 that had been closed for over a year.

Now, with that as the type of response, where Sheriff Baca hears about an allegation on August 24th, and you heard the actions that were then taken.

So let's turn to Count One.  And as Ms. Rhodes did, I will do with you as well.  I will go through the elements, those doors, those big heavy doors of reasonable doubt that the government has to prove.

Now, the first element -- and this is true for both the conspiracy and the obstruction of justice charge -- is that we're dealing with a very confined time frame, August 18th to September 26, 2011.  We are not dealing with a time frame

before that for this charge, nor are we dealing with a time frame after that.

And you see here, again, this is an agreement to commit -- by two or more people to commit the crime of obstruction of justice of a federal grand jury investigation.

The second element is that Sheriff Baca became a member of that conspiracy, knowing of its objects and intending to help accomplish it.

And the third element has to do with the overt act.

Now, the Court's going to give you some additional instructions on how to deal with this conspiracy charge.  The Court's going to tell you that it's not enough that Sheriff Baca simply met with others who may have been involved in the conspiracy, discussed matters of common interest, acted in similar ways or perhaps even helped one another.  It's not enough to show conspiracy, if that's what the government has proven.

Second, that Sheriff Baca did not become part of a conspiracy merely by associating with one or more persons who are conspirators.

And, third, Sheriff Baca is not a conspirator if he had no knowledge of the conspiracy but happened to act in a way which furthered the object or purpose of the conspiracy.

So if he had no knowledge of the conspiracy to obstruct justice, but happened to act in a way which furthered

the object or purpose of the conspiracy, does not make him a conspirator.

Now, with the Count Two, obstruction of justice, again we're going to be focused on that same exact time frame of August 18 to September 26, 2011.

And the first element, or big door, is that Sheriff Baca influenced, obstructed or impeded or tried to influence, obstruct or impede a federal grand jury investigation.

And the second element is that Sheriff Baca acted corruptly, meaning that he had knowledge of the federal grand jury investigation and substantially intended to obstruct that investigation.

It's not -- it doesn't have to be a sole or primary purpose, that's correct, but he had to substantially intend to obstruct that investigation.

So let's look at the two ways that a grand jury, as you heard from Special Agent Dahle, gets information in order to conduct a grand jury investigation.  They get information in these two ways:  First, with documents, audiotapes and videotapes, you heard; and then, second, they get witness statements.

So let's start with the audiotapes, documents -- the documents, audiotapes and videotapes.  And what evidence was there that Sheriff Baca either tried to or did impede, influence or obstruct the grand jury obtaining these documents,

audiotapes and videotapes during this six-week period?

Absolutely nothing.  Not even a shred of evidence that Sheriff Baca did anything to obstruct the grand jury obtaining these documents.

In fact, one of the things that you heard that Ms. Rhodes didn't focus on is that at the August 29 meeting and the telephone conversation around then, when the grand jury subpoenas got brought up by Sheriff Baca to the US Attorney Birotte -- do you remember what he said on the stand?  He said that "You could stand down."

And when we asked him what it meant to stand down, he said, "You don't have to go ahead and comply with the dates on the subpoena," which were three and four weeks away.  "I'll get back to you on a protocol, a procedure, when you can go ahead and produce those documents."

And you heard, eventually, hundreds of thousands of documents were produced.  Audiotapes, videotapes were produced. And what's very interesting is that the government is hard-pressed to say that Sheriff Baca obstructed a grand jury getting documents, audiotapes and videotapes when those very documents, audiotapes and videotapes are being used by the government to try to convict Sheriff Baca.

MR. FOX:  Objection, Your Honor.  Misleading.  Not Count Two's charge.

THE COURT:  Sustained.

MR. HOCHMAN:  Now, if Sheriff Baca wanted to obstruct the grand jury's investigation in this regard, you would have heard evidence of him ordering someone between August 24th and September 26th altering, deleting, destroying, modifying the documents, the audiotapes and the videotapes.  You heard not a shred of evidence that Sheriff Baca engaged in any of those actions to deal with the first way the grand jury gets evidence through the documents, audiotapes and videotapes.

But how about the second way?  The second way was witness statements.  What evidence did the government present that Sheriff Baca, during this six-week period, prevented the grand jury from getting any witness statements?

Well, first you heard that the grand jury did not even start taking evidence in this case until March of 2012, and then met for 12 to 18 months.

Let me say that once again.

The grand jury, you heard, did not start taking evidence in this case -- not during the six-week period, but until March of 2012 and then met for 12 to 18 months.

And you heard that the grand jury could consider the witness statements in two ways:  Either the witness could come live and go ahead and make the statement in a grand jury to them directly or they could do something that a trial jury can't do and take hearsay evidence.

In other words, FBI Agent Marx -- remember, she met

with Anthony Brown for an entire year.  She took down his statements and put those statements in her case file.  She could have gone ahead at any point and gone into the grand jury and told them word-for-word everything that Anthony Brown said.

And to the extent that she -- and, remember, she met with him all the way up to August 23rd.  Then she didn't meet with him again until September 15th, but that's before September 26th.  So at any point between September 15th, when she meets him in state prison and he resumes his relationship with her, talking with her, she could have done one of two things.  She could then --

By the way, when she meets with him on September 15th, he fills in all the details between what happened between August 23rd and September 15th while he was in sheriff's department custody.  So on September 15th or anytime until September 26th, she could have either gone in the grand jury herself and provided the grand jury with all the information that she now has, and she has it all by September 15, or she could have even had Anthony Brown writted down from state prison to make the presentation himself.

And if you recall, when she actually brings Anthony Brown down -- was it sometime in September of 2011?  No.  How about anytime in 2011?  No.  She brings Anthony Brown -- has Anthony Brown writted to speak in front of the grand jury in December of 2012.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

So with respect to this element, again, if you didn't -- if Sheriff Baca or the evidence does not show beyond a reasonable doubt that Sheriff Baca tried to or did impede the grand jury getting documents, audiotapes and videotapes --

MR. FOX:  Objection, Your Honor.  Not Count Two's charge.

THE COURT:  Sustained.

MR. HOCHMAN:  -- impeded the -- in any way, if Sheriff Baca impedes the grand jury investigation, including with witness statements, and the government has not proven at all that Sheriff Baca tried to or did impede the grand jury getting all of Anthony Brown's information either by Anthony Brown or by Special Agent Marx before September 26th, they don't get through that very heavy door of the first element. And then you never even get to the second door, because that first element they have to show is the impeding or trying to impede the federal grand jury investigation.

But let's just talk for argument's sake about that second element, the second door.

Now, how did the government prove beyond a reasonable doubt that Sheriff Baca acted corruptly, which, again, means substantially intended to obstruct the grand jury's investigation?  The answer is the government failed this proof as well.

And before we go through the key events that will

actually show that the government failed to prove that Sheriff Baca substantially intended to obstruct the grand jury investigation, let's discuss just, in general principle, that when someone wants to act corruptly, they normally act in a secretive, hidden -- or a manner in which you keep out of sight, out of the spotlight.  That would be the normal way one would think that you would act if you wanted to corruptly do something.

Did Sheriff Baca act like that at all?  Absolutely not.  Sheriff Baca could not have been more open, more direct and more transparent.  When he told the United States Attorney himself, the chief law enforcement officer, the one who could bring obstruction of justice charges -- he told that person directly what he was thinking.  He told him that he thought the FBI was committing a crime, that the FBI's investigation -- its undercover investigation was incompetent.

He couldn't have been more direct with the very people who could actually bring charges against him.  He told that directly to Steve Martinez in the September 27th meeting.

And who else did he tell this to?  The public.  He went on TV and answered the questions.  And when he answered the questions, he basically communicated the same thoughts, that he thought the FBI was committing a crime, that they had given a cell phone to a very dangerous inmate.  And he told that to the whole world.  That is the exact opposite of the

general thinking of corrupt, secret, hidden, deceptive.  He is open, transparent and direct to everybody.

Now, for Sheriff Baca, through his eyes, the FBI's smuggling of a cell phone into his jail was unprecedented, as he said, a very big deal, because while counsel is right and the testimony was that cell phones do show up periodically in the jail, it was unprecedented that a law enforcement agency would actually insert a cell phone into the jail and give it to a dangerous and violent inmate serving a life sentence of over 400 years.

For Sheriff Baca, that crossed a line in the sand, which is basically what he was saying when he was saying you can't break the law to enforce the law.

For Sheriff Baca, as you must look through his eyes, his 45 years of law enforcement with the sheriff's department, giving a live cell phone in the jails to a violent and dangerous criminal serving a life sentence was a recipe for disaster.

Now, for Agent Marx, someone who had no personal experience with the dangers of a cell phone and also didn't even read the FBI's bulletin dealing with the cell phone at the time she did her undercover operation, she viewed the dangers of a cell phone as theoretical possibilities, as she put it on the stand, could bes.  These were all could bes.  Because she had never worked in a jail before.

But where was her line in the sand?  Her line in the sand was introducing drugs into the jail.  Because remember the testimony, there was allegations that Gilbert Michel or other deputies had gotten drugs from the FBI.  And when I asked her about that, I said, "Did you give drugs to them?"

And she said, "No, I didn't.  I could have.  I technically under the law could have done it, but I wouldn't do that.  I'm not going to give drugs and put them in the jail."

Well, the cell phone for Sheriff Baca was what drugs were for Agent Marx, line in the sand that should not be crossed, even if you could technically cross them.  And that is what he meant when he consistently and publicly said that the FBI broke the law to enforce the law and shouldn't have done that.

Now, you heard with Mr. Rhambo in August -- by the way, that conversation was not in September.  The conversation, the "Don't F with the feds" conversation, he said -- he linked it to his August e-mails, but you heard in that conversation that he said to the sheriff, "You know, Sheriff, you know, this isn't breaking the law.  It's like an undercover operation."

You heard André Birotte say that to the sheriff in the September 27th meeting.  But in each case, right or wrong, this was the line in the sand that, for the sheriff, you should not cross even if you could cross.

This was not a corrupt belief, but a reasonable one

based on his 45 years of experience in the sheriff's department and being responsible, unlike the FBI, for the safety and security of all the inmates and sheriff's department people in the jail.

Now, from Sheriff Baca's viewpoint, he had nothing to hide and hid nothing from the head people in the federal government. And he also did not substantially in any way intend to obstruct their investigation. His goal was simple, because from his eyes, he wanted to get to the bottom of the investigation, he wanted to keep Anthony Brown safe, and he wanted to answer this question, how big of a problem did he have.

Now, on August 18th, you heard that he first learned about the problem when he had the phone call with Steve Martinez. And who did Sheriff Baca call at that point? He called his number two person. Because this was a sizable problem. And who would you bring in, if you were Sheriff Baca, but the guy who does your day-to-day operations, Undersheriff Tanaka.

And you would call your Undersheriff Tanaka to find out -- to help set up the investigation that was going to look into how big a problem that you had. Because in order to find that out, you had to find out how many deputies were involved, how many inmates were involved, and what type and how much contraband was involved.

And then you would tell Undersheriff Tanaka, which he did, that "I'd like to get a briefing the next day," and that's exactly what happened on August 19.

Now, this is very important to know, that on August 19th -- excuse me, on August 18th, you recall Lieutenant Thompson saying they were going to send Anthony Brown back to state prison. And the reason they were going to send him back to state prison is because -- Lieutenant Thompson writes in the e-mail, on Exhibit 17, "Because if he," Anthony Brown, "doesn't want to cooperate, there is nothing we can offer him with the 400 years hanging over his head."

But what happens, you find out, on August 19th is that -- we call this the cheeseburger interview. That morning Anthony Brown actually does start cooperating. And he says to the investigators who he's interviewing with that, "Yes, I've actually been dealing with a nurse -- or maybe it was a nurse for the narcotics, and now it was actually a deputy that I'm dealing with in connection with the phone."

He said he was involved with the FBI, but he wouldn't provide specifics. And he said to them, "If you want to get the deputy's name and get more information, get me a cheeseburger, fries, soda and some cigarettes, and I'll get you the information."

Now, what's very important about this interview -- and this is a tape-recording that's in evidence -- is that if

you look at the excerpts in evidence, what is not found in any excerpt on the August 19 interview? A discussion about beatings or excessive force. It's not there. Anthony Brown didn't mention it.

In fact, when we asked Mr. Manzo -- when I asked Mr. Manzo to go ahead and look at an entire transcript of a two-hour interview, he could find the word "beating" once in the middle of a sentence about three-quarters of the way in the interview. The focus on August 19 was on cell phones and it was on drugs and it was on the FBI's connection, and that's it.

It wasn't on a civil rights investigation. It wasn't about inmate beatings, excessive force, retaliation or nothing. And the reason that's important is you'll see that Sheriff Baca gets informed about that interview. And there's nothing to inform him about that there's an inmate-beating investigation going on because Anthony Brown hasn't mentioned it.

The only thing that they mention is that the FBI agent is from the civil rights squad. But we heard that the FBI's civil rights squad people can also do investigations of bribery, which isn't civil rights violations. Agent Dahle told you that. Agent Tanner told you that.

So what Sheriff Baca is then briefed on that day -- as he is briefed, that Anthony Brown is willing to cooperate, he is willing to answer the questions that the FBI did not answer, but he wants a cheeseburger, soda, fries and some

cigarettes.  And so Sheriff Baca says, "Fine.  Let's keep him here.  Let's not send him to the state because we need to get these answers," a completely reasonable response by Sheriff Baca, not a corrupt one to obstruct the FBI's investigation.

And he says, "Let's keep him here.  Keep talking to him.  In fact, at some point get him some fast food and cigarettes and see what happens."

And then he also orders that for the next day, there would be a subsequent meeting.  And that meeting then occurs on August 20th, has been called the Saturday morning meeting because it's on a Saturday in the morning.  And you heard that a number of items were discussed in that meeting that lasted relatively a short amount of time, around 45 minutes.

Sheriff Baca told the people that were assembled that he had received that phone call from Steve Martinez, and he told them what he had heard from Steve Martinez about Anthony Brown being the inmate who had an FBI cell phone.

They also learned during that meeting -- and this is very important -- that the cell phone had photos on it -- Ms. Rhodes didn't mention this part -- that the cell phone that they are talking about on August 20th had photos of heroin, cocaine, methamphetamine, ecstasy and marijuana.

MR. FOX:  Objection.  No evidence to support that argument.

THE COURT:  Let's go to sidebar.

*(Proceedings held at sidebar under seal 10:50 A.M.)*

*(The following proceedings were held in open court.)*

THE COURT:  Ladies and gentlemen, your memory of the

evidence controls in this case.  The statements and arguments of counsel are not evidence in this case.  All right.

MR. HOCHMAN:  And if you will recall, on the August 19th tape -- if you recall the conversations, Mr. Manzo and Smith directly talk about meth and weed with Anthony Brown based on what had been discovered at that point, and he actually answered those questions.  And that information about the August 19th call was explained on the August 20th meeting.

And they also talked about obtaining those recorded public jail phone calls that went to the FBI's civil rights squad, and they played the tapes.  And you heard what those tapes showed of what happened on July 18th, 19th, and 21st of 2011 between, at that time, an unidentified female.  That's "UF."  They later figure out that that is Agent Tanner, but at the time they didn't know who exactly was the unidentified female.

And what she said in those recorded phone calls is that, "We are good to go.  We'll get you a phone soon.  You will be having your phone soon.  Then you can call who you need.  You're good.  You're good."

And you heard shortly after that meeting, the investigators were actually able to get cell phone records from Anthony Brown's cell phone, and they were able to determine on July 26 itself that Special Agent Tanner, who they knew was the unidentified female from the FBI, had actually spoken directly

to Anthony Brown, forever connecting Anthony Brown to the FBI, to the cell phone.

And you heard that when you have a connection like this in the jails, that an inmate can be killed for being an FBI snitch and an inmate can suffer harm from deputies that he snitched on.

Now, in the August 20th meeting, Sheriff Baca again went through his two goals in that meeting. And the first goal was to get to the bottom of the investigation, and this is what Captain Carey testified as the who, what, when, where and why of the investigation.

And the second goal was to keep Anthony Brown safe. Again, Mr. Carey said that Sheriff -- it was discussed in the meeting that not a hair on Anthony Brown's head was to be touched.

Now, with respect to the investigation, who did Sheriff Baca put in charge of the investigation? Remember, through Sheriff Baca's eyes, there's an unknown number of deputies, there's an unknown number of inmates and contraband, and we don't know at that point how big a problem he was facing. All we know is that the FBI was giving him no answers.

So who did he put in charge of a very important investigation? Well, did he put a rookie investigator in charge, someone with no experience in the jails, someone who had never done an undercover investigation? No. He put Tom

Carey in charge.

And Tom Carey, if you heard, had 30 years of experience in the sheriff's department at that time, and he had done thousands of investigations personally or supervised at that point in time.  If you wanted to put someone who would be able to do not a sham investigation, but a real investigation to answer the questions that you had to get answered immediately, you would put your head of your ICIB unit, someone as experienced as Tom Carey, in that position.

And who else did he put?  He put Paul Tanaka, his number two person, to show the importance that he attached to this investigation.

Now, what type of relationship did Sheriff Baca have with Paul Tanaka?  Well, the government's evidence is mainly a two-and-a-half-minute clip from an unrelated civil deposition that occurred in January of 2015, about three-and-half years after this.  And the clip only represents part of a deposition. That is their evidence.  But -- and you didn't hear Ms. Rhodes actually play for you the evidence.  My guess is that Mr. Fox will do it in rebuttal.

But what did that clip show you?  The clip showed you that Sheriff Baca viewed his relationship with Paul Tanaka like a father/son relationship.  But, unfortunately, we know that sometimes a son does not share the same loyalty to the father that the father has to the son.  Sometimes a son hides things

from his dad, sometimes he only tells his dad part of the story, and sometimes he ultimately rebels against his father.

And that's exactly what we saw play out, unfortunately, in the father/son relationship between Sheriff Baca and Mr. Tanaka. Because as you heard on that tape, Sheriff Baca, naively, viewed Mr. Tanaka as someone who operated on a high level of great competence and who would do exactly what he wanted done.

Now, that view does not in any way show that Sheriff Baca somehow gave an illegal order to Undersheriff Tanaka that he wanted Undersheriff Tanaka to carry out. Indeed, you heard no evidence that Sheriff Baca gave that order to obstruct the investigation. You heard at no point Sheriff Baca saying, "F the FBI, MF the FBI," or anything like that.

Now, Ms. Rhodes would say, "That's because, oh, he uses his anger tactically." No. That's because Sheriff Baca had very important things that he needed to get done. He had to basically get to the bottom of the investigation and keep Anthony Brown safe. F-ing the FBI was not part of his goals. He didn't need to have that happen. He had already -- he had decades of cooperation with the FBI.

He was cooperating with them -- with the federal government at that very moment in a public corruption investigation of a sheriff's department captain, and he valued his relationship with the FBI.

Now, were people in that room upset at what had gone on with the FBI?  Yes.  Was the sheriff upset at what had happened?  Absolutely.  Did he voice those concerns to the US Attorney and the head of the FBI and the public?  Absolutely.  But did he ever give an order to obstruct the grand jury investigation?  No.  Did he ever -- now, let's look at it this way.  Did he ever prevent the FBI from speaking with Anthony Brown at the August 20th meeting or thereafter?  The answer is no.

The evidence did not show that Sheriff Baca prevented the FBI from speaking with Anthony Brown.  And how do we know that?  Because you heard that the instruction at the August 20th meeting and thereafter was that if Undersheriff Tanaka approved the interview, the FBI could speak with Anthony Brown.  Now, was there any evidence to show that Undersheriff Tanaka did not approve of an FBI request to interview Anthony Brown?  No.

In fact, as we know, the evidence was that Agent Tanner herself never contacted the sheriff's office after August 23rd to request that interview.  So Mr. Tanaka never had a request from Agent Marx to approve or not approve or maybe approve with conditions on it.  We'll never know because the request was never made.

What Sheriff Baca did not appreciate at that time that he put Undersheriff Tanaka in charge of the investigation

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

was that Undersheriff Tanaka had a different agenda as it would play out concerning the FBI and would restrict the flow of information to Sheriff Baca that deviated from those two goals of Sheriff Baca; get to the bottom of the investigation and keep Anthony Brown safe.

Now, Exhibit 31, which the government points to this first part, is an e-mail from Paul Tanaka to Steve Leavins on August 25th.  And he talks about -- Undersheriff Tanaka talks about speaking with the sheriff, with the sheriff popping in, and the case is consuming his entire thought process.

This was a very important case to the sheriff.  There are thousands of people in his jails that he doesn't know what the heck's going on.  He doesn't know how many deputies, inmates or how much contraband is involved.  And he, unlike the FBI, needs that answer right away, immediately.  He can't wait months or years for the FBI to complete its investigation to go ahead and deal with that.

But Ms. Rhodes does not focus on the second part of that sentence, which is, "providing him with updated tidbits helps to ease his mind."

Now, the key word there is "tidbits."  Now, she says they provided him with lots and lots and lots of tidbits.  There's no evidence to show that.  Undersheriff Tanaka was providing him with tidbits of information.  And how do we know that beyond this e-mail?

Do you remember what Mickey Manzo said?  Mickey Manzo said that Undersheriff Tanaka told him to only tell the sheriff about the main stuff and you didn't have to share with the sheriff the details.

Remember also that you had James Sexton that said after the phone was found, Undersheriff Tanaka ran the investigation.  And also --

THE COURT:  Let me see counsel at sidebar.

*(Proceedings held at sidebar under seal 11:02 A.M.)*

*(The following proceedings were held in open court.)*

MR. HOCHMAN:  Now, one way to sort of see the problem that Sheriff Baca is facing is to look at it in terms of all the information that is coming through his eyes.  And let's say by even August 23rd.

You heard that Anthony Brown talked about a nurse.  Then he talked about one deputy.  Then he talked about a second deputy.  Then there might be other deputies.  You heard that it involves one inmate, Anthony Brown, but it might very well involve other inmates, a second inmate or even a third.

You heard that there's at least one cell phone, but Anthony Brown talked about a second cell phone and there might even be additional cell phones.  You heard about cocaine, heroin, methamphetamine, ecstasy.  You heard eventually Anthony Brown talking about -- after August 19th about up to 50 deputies that could have been involved in connection with the excessive force.

So this -- in some ways this slide kind of graphically shows you what's -- what Sheriff Baca is seeing, as to what he's hearing is going on potentially in his jails.

And, again, he doesn't have the luxury to wait months or years to figure out the answer to this question.

Now, with respect to another form of evidence that the government has used to establish its case, that form of evidence actually shows how Undersheriff Tanaka did, in fact, give updated tidbits, and only updated tidbits, to Sheriff Baca.  Those are the phone records.

And with respect to the phone records, what did we learn about the phone records?  Because the government makes a very big deal about the circumstantial validity of these phone records.  But what do they really show?

Well, these phone records are in some ways like the e-mails.  Because, remember, in many respects, what the government has done is they have just basically taken a bunch of evidence, like spaghetti, and thrown it against the wall, and they are just hoping something sticks.

To give you an example before we get to the phone records, how about the e-mails?  There are over a hundred e-mails in this case.  And what we heard is not that Sheriff Baca doesn't have an e-mail address.  He absolutely does.  In fact, he has two aides that you heard actually screen his e-mails on a daily basis.

But when the government went through all the evidence it has, it brought to you over a hundred different e-mails from the various people.  And how many, of those over a hundred

e-mails, had "Sheriff Baca" in the "To," the "From" or the "cc" line?  Two, and both of those were from Steve Martinez.

So the e-mails that they introduce is -- again, they're trying to distract you, throw the spaghetti on the wall and hope that you won't notice that the e-mails don't involve Sheriff Baca at all in the "To," the "from" and the "cc" line.

What else do we have?  They bring in, for instance, policies.  They spent a lot of time having people read Exhibit 116's policies.  But what did we learn from Mr. Carey?  Well, we learned that the small number of policy statements they gave you were part of over a thousand-page policy manual that nobody was consulting with at the time.

It's not like they cracked open the policy manual and said, "What about this policy?  Are we violating this or complying with this?"  Nobody is consulting these policies at the time.  So why did they bring it up?  To throw more spaghetti against the wall hoping that will distract you.

How about overtime slips?  Ms. Rhodes focuses on overtime slips and says, "Aha, that shows Sheriff Baca was involved."

Look at the overtime slips.  What you will see on one slip, and only one slip, is the name "L. Baca" written, and it's written in the same handwriting as Mr. Thompson, who signed it.  And then every other slip after that doesn't have "L. Baca," but has Mr. Thompson's signature and handwriting in

it.  That is their evidence to show Sheriff Baca was involved with overtime slips.  Again, more spaghetti on the wall.

And how about evaluations?  When you look at the evaluations, again, what you will see is that Sheriff Baca wasn't involved in the evaluations of Mr. Manzo, Craig, Smith, Long, Leavins, Carey -- actually, excuse me -- Leavins.  With respect to Mr. Carey, you will find out that Paul Tanaka was the reviewer, prepared the entire evaluation, signed a little handwritten note, effectively, "Good job, Tom," and then Sheriff Baca signed off on it.

And, by the way, at that time, Sheriff Baca, as you'll hear when we get into the evidence, thought Tom Carey had done his job.  He later found out he didn't, but at the time, he thought Tom Carey -- who told him, for instance, that the interview would only be -- excuse me -- the approach of Leah Marx would only be an interview, he thought Tom Carey was doing his job.

But now let's go back to the phone records.  So what do these phone records show?  The most important thing is what they don't show, which is actually what is being said on the phone call.  Ms. Rhodes wants to downplay this.  Oh, that's not very important because there's circumstantial evidence.

It's actually very important, particularly the phone calls between Undersheriff Tanaka and Sheriff Baca.  Because, remember, the one-minute phone calls can be everything from one

second to one minute.  We don't know.  We don't know if they answered or if they left a voice mail.

And with respect to the other phone calls, let's focus on what Undersheriff Tanaka and Sheriff Baca were dealing with at that time.  Because when Ms. Rhodes puts it on her chart, these lines between Tanaka and Baca, there's a huge assumption that the only thing they can be talking about is this investigation.

But what else were they involved with?  You heard that they were running the entire sheriff's department. Sheriff Baca and Undersheriff Tanaka were in charge of all of this, which is on the organization chart.  And one small little part -- there's 80 different bureaus, divisions, jails.  One of the jails is Men's Central Jail.

And you saw in the demonstrative aid that in Men's Central Jail alone, there were 500 deputies.  And they were supervised by 30 or 40 sergeants, who were in turn supervised by five to seven lieutenants, who in turn were supervised by one captain.

And imagine that.  Imagine you're the captain of Men's Central Jail and you're in charge of the thousands of inmates -- I think it was over 4,000 inmates that are there. And between the deputies and the staff, about over a thousand sheriff's department people, and that was your only responsibility.

Imagine how daunting that responsibility would be and how it would keep you busy 24/7, just that responsibility. And if you had a number two person, you'd be talking about a lot of things constantly about what's going on in the Men's Central Jail.

Now go back to this chart (indicating). This Men's Central Jail is just one of seven jails that Sheriff Baca was in charge of. There's three additional detention facilities. Just on the right-hand side of the chart, they've got technical services division, correctional services division, court services, leadership, and the budget, the administrator. And that's just on this side of the chart.

Let's look at the other side. You have 23 patrol stations on this side of the chart all over the county. You've got an entire detective division, and you've got a Homeland Security division. This is what Undersheriff Tanaka and Sheriff Baca are talking about.

MR. FOX: Objection. No evidence to support this argument.

THE COURT: Sustained.

MR. HOCHMAN: Circumstantially, knowing that they are both in charge of all of this and that there are activities going on every day within the sheriff's department, you can circumstantially infer that they were going ahead and having discussions about what was going on in the sheriff's

department.

So let's look at actually the phone charts for a second and see what they actually tell us about Undersheriff Tanaka and Sheriff Baca's dealings together and, as importantly, Sheriff Baca and all the investigators. And by "investigators," I mean Mr. Carey, Leavins, Smith, Manzo, Sexton, Craig and Long.

What these show you is -- let's start out with Undersheriff Tanaka. How many phone calls did he make between August and September of 2011 between himself and all these investigators?

Now, Exhibit 170, which is in evidence, was prepared by Agent Tanner and only lists all the Paul Tanaka calls that occurred.

I asked her on the stand, "Did you do another chart where you broke down how many Paul Tanaka calls there were to these investigators?" She said she did. The government did not introduce that chart into evidence. But if you go ahead and go to 170, and you count the number of phone calls between Undersheriff Tanaka and all those investigators, you will find out there were 49 phone calls during that time.

If you then look at Exhibit 158 and you see the number of phone calls between Sheriff Baca and all those investigators, it was one. Forty-nine calls from Undersheriff Tanaka to the investigators to one between Sheriff Baca and the

investigators.

And I would say if Sheriff Baca is the leader, the driving force, maybe even the heartbeat of this conspiracy to obstruct justice, you would see constant phone calls, like Undersheriff Tanaka, not 49 to 1. And even if you add in the calls to Sheriff Baca's driver or his backup driver -- remember, we heard from the backup driver, Kevin Brown, and Kevin Brown said that he would not be able to listen when Sheriff Baca was on the phone but would periodically give him the phone.

By the way, when Ms. Rhodes said that Kevin Brown heard what Steve Martinez said to Sheriff Baca on the August 18th situation, you heard Mr. Brown admit on the stand that he couldn't hear what Steve Martinez was telling Sheriff Baca. But you also heard there is another driver, a guy named Jack Demello.

Where's he? What do we hear about Jack Demello? Did he ever show up? Did he ever tell you what he did with his phone? But let's assume for the sake of argument that we include all the Baca driver and backup driver phone calls. All that does is it shifts the numbers, the 49 calls for Tanaka and 7 with Baca and the investigators.

What you'll also see when you do the analysis is, of the 30 or so calls that Undersheriff Tanaka had with Sheriff Baca during this time period, two-thirds of them, about 23 of

them, are four minutes or less, which is completely consistent if Undersheriff Tanaka is giving him updated tidbits of information as opposed to full details of what's going on.

And how do we also know that Undersheriff Tanaka's loyalties were not to Sheriff Baca?  Well, recall Lieutenant Thompson told you he attended a fundraiser for Undersheriff Tanaka when he ran against Sheriff Tanaka -- Sheriff Baca for election.  The son had rebelled -- yeah, the son had rebelled against the father.

Undersheriff Tanaka's loyalties were not to Sheriff Baca, were not to his two goals, but he added his third goal of F-ing the FBI.

And what else do we know about the people who were reporting up to Undersheriff Tanaka?  Well, we know that Steve Leavins was Undersheriff Tanaka's personal aide in early 2011 and that Tanaka went ahead and selected him to be on the ICIB investigative force as a lieutenant under Captain Carey.

And what did we learn about Tom Carey?  Well, we learned that Tom Carey directly reported to Mr. Tanaka and met with him, he said, three times more than he met with Sheriff Baca.

And what did we learn about Tom Carey in his testimony?  Well, the first day he testified as the government's witness where Mr. Fox was asking him questions, all you learned was that he was a retired captain from the

sheriff's department for 35 years and two months; he was an accomplished investigator. And he tried to mention Sheriff Baca as often as possible during the six weeks of August, September 2011. He couldn't remember a lot, other than his dealings, of course, with Sheriff Baca.

And you would have no idea from that first day's testimony, if you can recall it, that Mr. Carey had any problems telling the truth or that he was a government cooperator.

Now, the next day in the testimony, you finally learned a little bit more about Mr. Carey from Mr. Fox's questions. The next day you learned that he had been charged with four counts: Conspiracy; obstruction of justice; and, importantly, lying to two juries under oath, the same oath that he had taken to tell the truth to this jury.

And when he was questioned further, he admitted that he made a single lie to each jury. And when he was asked by Mr. Fox what benefits he was receiving from the government in his plea deal to be that cooperator, he said that the only benefit he was receiving was that the government was going to dismiss the other three counts. Because he had pled guilty to one lie, and the government was going to dismiss the other three counts he was charged with.

Now, that's bad, but it doesn't sound that bad. But the government, unfortunately, only shared with you a fraction

of the Tom Carey story.

Now, on cross-examination, the rest of Tom Carey's story came out, and you found out that the government had given him a basket of goodies in connection with his cooperation. You found out that Tom Carey did not only just lie under oath to two juries, but he actually lied to three juries:  The first Sexton jury, the Thompson jury, and the second Sexton jury.

And he didn't just lie once per testimony.  He lied, he said, over five times to each one of those juries, for a total of over 15 lies to those juries.  And he didn't just lie to juries, but he admitted that he lied when he was interviewed by the government and made a false statement in connection with his December 2012 interview.

And he told you on cross-examination that he was looking at 25 years of prison, or, if you added in the additional lie to a jury and the lie to the government, potentially up to 35 years.

MR. FOX:  Objection, Your Honor.  Legally incorrect.

THE COURT:  Sustained.

MR. HOCHMAN:  Now, what type of goodies from the basket of goodies did the government offer him?  Well, they offered him -- they offered him first the sweetheart plea deal. You next heard they moved to dismiss the charges, which put his maximum exposure from 25 years down to 5 years.  They then were not going to prosecute him, as he said, for the other

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

violations that he committed.

His fine -- his maximum fine they got lowered to $250,000 from a million dollars because it's $250,000 per charge.  They then said they would give him potentially a cooperation motion at sentencing.  So basically, according to Tom Carey, he went from a maximum exposure of 25 years down to 5 years.

And then under the sentencing guidelines that the government agreed to with him, the range would be 10 to 16 months.  And on the 10 to 16 months, the government has the right to make a further motion at sentencing for cooperation to go lower than 10 to 16 months.  And then you have the -- Tom Carey's right to even ask for lower than that.

This is the basket of goodies that comes out to Tom Carey on cross-examination.  It does not come out when you originally heard his testimony.

And why is that important?  How did Tom Carey's incentives to cooperate and please the government affect his testimony?  Well, you will recall that Mr. Fox asked him how many times he spoke with Sheriff Baca, either in person or on the phone, between August 18th and September 26.  If you recall, his original answer was "Several."

But apparently that wasn't the right answer.  It wasn't the answer, I guess, that they discussed in the 25 hours that Mr. Carey met with the government to prepare for his

testimony, 18 of which were in February 2017 alone.

So Mr. Fox follows up and says, "Well, do you think -- was that the approximate range?"

And Mr. Carey gets the idea and says, "Well, it was more than five."

And then Mr. Fox follows up again, and Mr. Carey realizes that "more than five" is not the right answer and essentially settles on a dozen. That's what happens. That's the believability problem. And the Court will instruct you that when you get these benefits and you're Mr. Tom Carey, that his testimony must be viewed with greater caution than any other witness -- or than the other witnesses.

And what happened with respect to other aspects of what Mr. Carey was talking about? Well, what you found out again is that Mr. Carey had to concede on cross-examination that he did not provide the details to Sheriff Baca every time he talked. He said it varied. And then again, he had to concede on cross-examination that he spoke to Undersheriff Tanaka three times more than he talked to Sheriff Baca.

So who else was on Team Tanaka that you heard in this case? You heard from Greg Thompson. And Greg Thompson, you heard, went back with Undersheriff Tanaka to the 1980s in the Lynwood station, the 1990s on an Asian crime task force, smoked cigars with Undersheriff Tanaka in the sheriff's headquarters patio. And he -- Cecil Rhambo and Undersheriff Tanaka were all

good friends for at least 20 to 25 years.

You heard that he was sentenced to three years of imprisonment -- three years' imprisonment on the conspiracy and the obstruction of justice and that he has not surrendered yet, but the surrender date was pushed after his testimony in this case.

And how do we see Mr. Thompson's motivation to cover for Undersheriff Tanaka play out in this case? Well, you heard about the meeting, August 23rd. And what did you hear about it? What you heard is that at that meeting, Mr. Thompson said that he blocked out of his memory everything that Mr. Tanaka said, that he was screaming at him, but he blocked out of his memory the details.

But when it came time for the Sheriff Baca portion of the meeting, what you heard was that he said that Sheriff Baca -- when he went into the meeting, Mr. Carey wasn't there. He apologized, and then Mr. Carey burst into the room, and he also apologized and left.

What you also heard that was very important is that he came up with this concept of a chess game, that all of a sudden he cannot remember anything from the meeting he had with Undersheriff Tanaka, but conveniently feeds into the government's theory from opening statement that he recalls the word "chess game."

And if you recall, Mickey Manzo testifies about this

later.  And he says that, "Oh, yeah, I recall Mr. Thompson telling me about a chess game."

But when I pushed him, I said, "Well, was that in that conversation right afterwards?"

All of a sudden, "No.  It wasn't in the conversation right afterwards.  It was two days later."

And I said, "Well, had you ever gone ahead" --

MR. FOX:  Objection, Your Honor.  There's no evidence to support this.

THE COURT:  Sustained.

Ladies and gentlemen, counsel's statements are not evidence in this case.

MR. HOCHMAN:  Mickey Manzo said that on August 24th, about two days after -- excuse me -- one day after, he was speaking with Mr. Thompson.  And that's when he first heard at that point this notion about a chess game.

MR. FOX:  Objection, Your Honor.  The evidence does not support this argument.

THE COURT:  Sustained.

MR. HOCHMAN:  Well, what you'll hear is that Mickey Manzo never, when he spoke to the government between December 2016 all the way through February 2017, mentioned the concept of a chess game when he was asked these questions by the government.

Now, with respect to Mr. Manzo, what you also heard

is that the government went into its basket of goodies for him. And you heard that he expects to get something called a Rule 35 motion for his testimony. What's a Rule 35 motion? A Rule 35 motion is something that you can get after you've been sentenced. And if you cooperate with the government, the government and the government alone, not the defense, can ask the Court, based on your cooperation, to lower your sentence. And without the Rule 35 motion that the government files, the Court is incapable -- cannot lower your sentence at all.

And you heard that two people have that. Mr. Manzo had that -- or hasn't had it yet, but is hoping to get one. But then you heard that Mr. Sexton has actually gotten one. And you remember what Mr. Sexton's testimony was on this. He received 18 months in connection with the conspiracy and the obstruction of justice and started serving that sentence in August of 2016, and he was a couple of months into that sentence.

And you recall he talked about being put in isolation because he was a law enforcement officer. And he went ahead and said that he got an opportunity in a prior proceeding to testify and got no deal from it. But a month after that opportunity to testify, he went ahead and struck a deal with the government. And the government actually filed a Rule 35 motion, in part, based on his anticipated testimony in this case.

And you will -- what you found out is that Mr. Sexton -- the power of a Rule 35 motion is that that then opened up the possibility for Mr. Sexton to go to 18 months, and the Court ultimately sentenced him to just over 4 months in prison.

Now, how did Mr. Sexton try to benefit the government's case?  Well, you will recall that when the government did its opening and when he talked to Mr. Sexton originally, they kept calling this Operation Pandora's Box. And Mr. Sexton in his direct stated, "Oh, I called this Operation Pandora's Box."

And that was completely misleading.  And how was it misleading?  Because you found out that Mr. Sexton, and Mr. Sexton alone, was the only one who called it Operation Pandora's Box.  Nobody else called it that.  In fact, everybody else called it Operation Summer Security.  Mr. Sexton only used that word, "Operation Pandora's Box," in two e-mails on September 12.

So when the government refers to this as Operation Pandora's Box, what you found out is that Mr. Sexton -- it was his private name for it, but it was not a name that was shared in any way, shape or form with any of the investigators and certainly not with Sheriff Baca.

But what else did you find out from Mr. Sexton?  It shows you, with respect to his testimony, that he either had

mistaken memories or he went ahead and was lying.  And we will look at it right here.

With respect to what he said about the writ, Mr. Sexton, again, was asked questions about "whether or not you heard that any type of writ had been served."

And what he said is -- he says, "Yes.  I recall being at the Inmate Reception Center and hearing a deputy say that the US Marshals were looking for Anthony Brown."

And that sounds like pretty important testimony, but then on cross-examination, I asked him the dates.  And he confirmed that it was between the first date that he heard about this investigation, when he had the meeting with Mr. Thompson on August 22nd, to August 24th, the Heroes Park meeting.

But that's impossible.  Because the US Marshals' fax was on August 25th, so he couldn't have heard between August 22nd and 24th that the US Marshals were looking for Anthony Brown because they weren't.

Now, is that a mistake in memory or is that a lie?  Because I would venture to say the government will say that, for its witnesses, they have mistaken memories, but when Sheriff Baca tries to remember what went on 20 months before, they call that a lie.

And what was the second version of this?  Well, this was when they asked James Sexton about the Thompson

butt-chewing situation. And if you recall what he said, he linked it to August 24th where -- because he remembered that Mr. Thompson was wearing a suit that day, and it was the same date as the August 24th Heroes Park meeting.

And what he said, it was Mr. Tanaka and Sheriff Baca who gave Lieutenant Thompson the butt-chewing. Again, that's impossible in two respects: The butt-chewing meeting occurred the day before. Lieutenant Thompson could not have had that butt-chewing meeting and could not have told Sexton on August 24th that he had the butt-chewing that day.

And the second, as you all know from the testimony, the butt-chewing was just Undersheriff Tanaka. It did not involve Sheriff Baca.

So where does that leave you? Is that Mr. Sexton having a mistake in memory? I think the government would probably say that. Is he, on the other hand, lying? Well, the only lies that they ascribe for people with mistaken memories are just Sheriff Baca.

Now, you heard that there were other people that were not called in this case. There's Paul Tanaka, Steve Leavins, Scott Craig, Maricela Long. And I would venture to say -- remember this: Number one, the government has the burden of proof, not the defense; Number two, you saw that the government can bring people in from all over the place. They even subpoenaed a reporter, who had to bring his own lawyer in, for

ten minutes of testimony that I asked no questions about.

If they thought that Paul Tanaka, Steve Leavins, Scott Craig or Maricela Long would help their case, they would have called them in.  I don't have any basket of goodies to offer anyone, and the government has potentially a basket of goodies to offer witnesses.

So when you go ahead and consider whether or not there's reasonable doubt here, keep in mind who the key players were that the government did not call to fulfill its burden of proof.

Now, in order to see the different agendas, August 23rd is probably the best date to see that, because on August 23rd, you saw that Undersheriff Tanaka's response was basically a tirade, a volcanic tirade of F bombs and MF bombs.  And why is that?  Because that was his agenda.  He really wanted to F the FBI.  That was his agenda.

That was not Sheriff Baca's agenda.  If Undersheriff Tanaka said it in an August 20th meeting one time and never again in Sheriff Baca's presence, at least as far as the evidence goes, everyone was upset in the August 20th meeting. But Undersheriff Tanaka took it to a different level.  And when he goes ahead and starts throwing the tirade against the FBI -- you know, this is the butt-chewing meeting that at least Lieutenant Thompson has said he has blocked out of his mind, but you heard from Carey and Manzo about what happened.

Well, what's important is Baca's response.  Calm, compassionate and understanding.  And why does that make sense?  Because from Sheriff Baca's intent, from his eyes, his goal is not to obstruct the FBI's investigation.  So if the FBI gets to speak to Anthony Brown, that's okay.  He's not being tactical.  He just -- that's fine.

But will we actually get some information from the FBI?  Because, again, the policy was never to prevent the FBI entirely from going ahead and speaking with Anthony Brown.  If they made a request, it was supposed to go to Undersheriff Tanaka.  And he might have put conditions on that request, "Well, if you share information with us, we'll let you speak with him," whatever it would be.

But from Sheriff Baca's perspective, if he thought that he wanted to F the FBI, he would have launched into F bombs or at least screamed or use the word "GD" about the FBI.  He would have done that, because these were supposedly the people who violated his orders.  But that wasn't his goal at all, to F the FBI.  It was actually to work with the FBI, to join in their investigation.

Now, you also see on August 23rd something interesting about memory again.  Remember what Mr. Manzo's testimony was, who was at the butt-chewing meeting with Undersheriff Tanaka.  You had five people there.  You had Undersheriff Tanaka, Mr. Thompson, Mr. Carey, Mr. Smith and

Mr. Manzo.

But then when you have Carey's memory about that meeting, two of the people are missing. You have Undersheriff Tanaka and you have Mr. Thompson and Carey, but no Mr. Smith and Mr. Manzo. Is that a mistake in memory? Is he lying?

How about Thompson's memory? He remembers Undersheriff Tanaka and Mr. Thompson, but nobody else. Carey, Manzo and Smith aren't there. This is what happens when you are trying to remember.

And, remember, two of these three people have been working with the government going over -- getting the questions ahead of time, getting the documents ahead of time to refresh their memory, unlike Sheriff Baca during the 2013 interview. And still you have three different witnesses with three different memories about a very emotional and important event in their lives. Is it a mistake in memory or are two, three -- one, two or all three of them lying about this?

Now, August 24th, you heard that Gilbert Michel was interviewed. And what's important about that interview is that you got the whole sequence of what had happened. Because there were four different times you learned that Agent Marx could have arrested Gilbert Michel. And, by the way, the law says she can do whatever she wants, but there are four times she could have arrested Gilbert Michel that would have changed the course of everything that went on.

The first time was on July 20th, 2011.  And you heard that they videotaped it, they surveilled it, the bribe transaction was complete, the money was exchanged from the cell phone, but they didn't go ahead and arrest at that time.

And then you heard on July 26 that they wanted to actually get the cell phone in the jail because that would complete the crime.  Well, the cell phone goes into the jail on July 26.  Anthony Brown calls C.J., then he calls Agent Marx directly.  And, again, no arrests occurred.

And you heard that at this point, the cell phone, Anthony Brown and the FBI are linked.  Anthony Brown's very life and safety are at issue.  But, again, Agent Marx doesn't arrest Gilbert Michel at this point.  She balances the could bes of the dangers of the cell phone against the ridiculously unplausible likelihood that he could videotape or take photos of a deputy beating right in front of him, you know, while he's in his cell secretly.  That's the balancing she does, and also balances Anthony Brown's life in the process.

What you also heard that happens later that day is that the cellmate asked for the phone.  And Agent Marx allows the cellmate to use it.  Didn't know who the cellmate was.  Didn't know his name.  Didn't know what he was in jail for.  Didn't know who the girlfriend was.  Couldn't monitor the conversation because she hadn't set up the system in order to actually monitor conversations and find out what they were

talking about.  But she went ahead -- again, in her balancing, this is how she ended up, allowing a cellmate to use the phone.

Well, you heard that on August 4th was again -- so they could have arrested on July 20.  They could have arrested on July 26 when the cell phone actually went in the jail.  They could have arrested on August 4th.  Because on August 4th, you had the situation where the second bribe payment was paid.  Now, if you haven't gotten Gilbert Michel once or twice, you certainly would have gotten him on August 4th.

But, again, Agent Marx allows the cell phone to stay in the jail live.  And on August 24th, she interviews him.  And what we find out about that interview is that Gilbert Michel told you that he was confronted -- actually, Agent Tanner as well -- said that they showed up at his apartment.  They spoke to him for hours, either at a Starbucks or at the apartment.  They showed him the videotape of the surveillance of the bribe transaction, and he said basically, "You got me."

Now, did they arrest him at that point?  No.  They didn't arrest him at that point because he wouldn't confess to the beatings that they were trying to get him to confess to.

If you remember what Gilbert Michel talked about, he was being threatened, "Either you can lose your job or lose your job and go to prison."

But at the end of the meeting, he wasn't arrested. He was allowed to go back to the sheriff's department.  They

didn't take his gun from him.  And he had one very valuable piece of information, and that piece of information was that Anthony Brown was a snitch.

Now, I asked Agent Tanner if she told the sheriff's department or warned them that Gilbert Michel now knew that Anthony Brown was a snitch.  Absolutely she didn't.  She took no steps to make sure that Anthony Brown would be protected now that Gilbert Michel knew that Anthony Brown was a snitch.

In fact, she didn't know that there was actually protection that had been put in place, that there were these two guards guarding Anthony Brown and they changed his name and moved location.  She didn't know that.  She just let Gilbert Michel go back to the sheriff's department.

The other thing about August 24th is the federal grand jury subpoenas were -- you know, the ones that detail the whole civil rights investigation, were issued on that day.  And you'll recall, again, that Sheriff Baca had the conversation with André Birotte that those two subpoenas were to be stood down on until you had the situation of him working out the procedures to comply with them.

Now, with respect to the next date, which is August 26, the important -- the government focuses on this date.  And, again, you have to look at things through Sheriff Baca's eyes.  Because there is a meeting, and the meeting is Carey, Leavins, Tanaka and Sheriff Baca.

And if you recall the testimony of Mr. Carey and Mr. Thompson on this, the only thing that was discussed with Sheriff Baca in his presence is that they wanted to move Anthony Brown to keep him safe, and they wanted to change his name to keep him safe.

What Mr. Carey testifies is that, with respect to his internal emotions, his own thoughts, he thought this was being done to hide Anthony Brown from the FBI.  But when he was asked the questions, "What did you actually discuss with Sheriff Baca?" those thoughts were not discussed.  Sheriff Baca never said that, "We are doing this to hide him from the FBI."

Neither Carey, Leavins or Tanaka ever mentioned that, "We are going to do this to hide him from the FBI."  And why is that important?  Because Mr. Sexton told you that changing an informant's name for safety reasons is something that he had done over a hundred times, that it's done for their protection, that it's completely legitimate to go ahead and change an inmate's name.

Anthony Brown's name could be changed once or a hundred times, and it's completely legitimate, as long as you go ahead and Live Scan or fingerprint him every time you change his name, because then the aliases can come back to the original name.

Well, what did you hear about that?  You heard that Mr. Carey didn't know whether or not Live Scanning had

occurred, and, obviously, if Mr. Carey doesn't know it, there is no way Sheriff Baca is going to know it.

And with respect to that issue, if Sheriff Baca doesn't know that Live Scanning is not occurring, then Anthony Brown's name being changed is like all the hundred or so people that Sexton has done before, completely legitimate.  It's only a problem -- and Sexton confessed that it was a problem when you know that you're not fingerprinting them at the time.  And neither Sheriff Baca, nor Mr. Carey knew that at the time.

And the same thing about moving them to different locations.  Because, remember, by August 26, they knew from Anthony Brown that he went ahead and told them that there were up to 50 deputies now.  It wasn't just Mr. Michel.  It wasn't just Mr. Bravo, who turns out to be a lie, but there is up to 50 deputies that he had provided information on about excessive force.

So when you're dealing with over 50 deputies and it's being presented to Sheriff Baca, and you, the jury, are looking through his eyes and say does it make sense to bring him to another location away from the jail that he's reported on 50 deputies, it makes complete sense, complete sense.

And when the government talks about these phone calls pinging around, again, from Sheriff Baca's perspective on August 26, this makes complete sense, to move Anthony Brown and change his name for his safety, as Mr. Carey and Mr. Thompson

said.

Now, on August 29th, again, that meeting is incredibly important because it shows that Sheriff Baca publicly, to the United States Attorney himself -- and not just him, the entire staff. You had Mr. Middleton there. You had Mr. Cardona, his whole senior management. And the sheriff says directly to their face that the FBI's investigation was incompetent. And he says it was dangerous. He says that they engaged in a dangerous undercover investigation, giving an inmate with a life sentence a cell phone. He says it to them right then and there.

And the important part to take away from that was André Birotte's response. Did he say, "Lee, you know, you're wrong. You know, the FBI can't commit a crime. Lee, you're wrong. The FBI can do whatever investigation it wants"?

No. His response was silence. He called it his listening meeting. For a month, there's no response from André Birotte, when Sheriff Baca lays it all on the line, puts the white hot spotlight on everything he is thinking, and the response back was silence from André Birotte.

So with respect to that meeting, the other thing to know about that meeting is what happened in the side meeting. Because in the main meeting, Sheriff Baca is doing all the talking, but in the side meeting that Mr. Gennaco talked about, Undersheriff Tanaka shows up. And, as he put it, he took a

much more hawkish view with the US Attorney's Office, much more severe than Sheriff Baca had said during the main meeting. Because, again, Undersheriff Tanaka has a different agenda than Sheriff Baca, and the August 29 meeting helps prove that as well.

And with respect to Mr. Gennaco, you heard that Mr. Gennaco was at the August 29 meeting, that he had learned about the cell phone, that it wasn't somehow he was being kept -- that OIR, the Office of Independent Review, which he headed up, was being kept out of the loop. He was at the meeting. He was at the side meeting. He's right in the loop.

And what's very important is that the Office of Independent Review was led by Mr. Gennaco and not somebody else. Because what did we learn about Mr. Gennaco? In fact, if Sheriff Baca wanted to make the Office of Independent Review toothless or ineffective as an independent investigation, who would you have put in there? Probably a rookie lawyer who had no civil rights experience.

But who is Mr. Gennaco in 2011? He's someone who had worked eight years as a criminal federal prosecutor.

MR. FOX: Objection, Your Honor. Motion in limine.

THE COURT: Sustained.

Move on.

MR. HOCHMAN: Mr. Gennaco is at those meetings, and he's also -- he's also in charge of the Office of Independent

Review.  And why is the Office of Independent Review important in this case?  Because Sheriff Baca on the Good Day LA tape speaks about how he, the sheriff's department, was policing itself.  And not just with the Internal Affairs Bureau and not just with the Internal Criminal Investigations Bureau, but also with the help of the Office of Independent Review.

*(Playing of videotape.)*

MR. HOCHMAN:  Now, the government would have you believe that because Sheriff Baca thought that it was important for the police to police themselves with the Office of Independent Review's help, that that somehow means that he didn't think the FBI also had a role to play in investigating the sheriff's department.

Nothing could be further from the truth.  And you actually saw, in the clips that the government played for you, two examples of this.  Sheriff Baca says, "The idea," in Excerpt 2.5, "that brutality coming from police will be scrutinized by the federal government is appropriate."

In 2.6, he's asked by Mr. Fox, "And you are aware that sometimes that enforcement of public corruption and civil rights laws causes the federal government to look at law enforcement agencies' employees as well; is that correct?"

He says, "Yes."

And why is that important?  Because what's happening in Sheriff Baca's eyes is that both the sheriff's department

and the FBI have equal jurisdiction over certain crimes that are going on in the jails. And the sheriff's department, they can investigate -- and you'll hear that it's completely lawful for them to investigate the crimes -- the state crimes that are going on.

What did those include? A deputy getting a bribe to bring in a cell phone, deputies bringing in narcotics, deputies engaging in excessive force. Those are both state crimes and they are also federal crimes. So there's an overlap in the jurisdiction.

In fact, you heard when the witnesses were testifying that a task force can often -- a federal state task force, an FBI/sheriff's department task force, can both investigate at the same time federal and state violations of the law.

So the notion that Sheriff Baca is trying to say, "Well, we, the sheriff's department, are the only ones who can police us and you, the FBI, can't," is absolutely wrong. He welcomed the FBI and wanted to join. And that's the other thing we learned on August 29. He wanted to join the investigation; he didn't want to thwart it.

Now, Ms. Rhodes pointed to that September 26 letter. And remember the significance of that letter where Sheriff Baca requests -- he asks the US Attorney to have the sheriff's department basically go first because of their expertise, and what he said was effectively the incompetence of the FBI.

And remember what happens with that letter.  That letter is given to André Birotte at the beginning of the meeting and he doesn't read it during the meeting, at any point.  Doesn't read it.  By the end of the meeting, there's the handshake because they have hashed out their issues during the meeting.

And André Birotte never responds to that letter because they have hashed out those issues of whether it's the sheriff's department that will go first, whether they will work together, how it's going to be.  So when Ms. Rhodes points to that letter and says, "Aha, that shows that Sheriff Baca was corruptly intended," no.  The issues of that letter got hashed out on that September 27th meeting.  And that letter actually played no role in André Birotte's decision making because he never read it during the meeting and then never responded to it thereafter.

Now, from August 24 to September 12, what you saw is a series of actions that occurred, none of which Sheriff Baca authorized, condoned, knew about or agreed to.

Let's start with the e-mails on the federal writ.  The most important thing you can remember on the federal writ is that Tom Carey never saw it, which is extraordinary.  When I showed him Exhibit 113, the federal writ, and I said, "Sir, have you ever seen this before," he said the first time he is seeing it was when he was on the stand, which is kind of

interesting that it wasn't shown to him during 25 hours of preparation.  But if Tom Carey doesn't see the federal writ, then there is absolutely no evidence that Sheriff Baca saw it.

In fact, there's no evidence by any sheriff's department person that testified for the government that anybody actually saw the writ that was sent by the marshals service.  And that even might be explained by the fact, if you remember, they faxed it twice.  Why would you fax it twice if it went through the first time?

MR. FOX:  Objection, Your Honor.  No evidence to support this argument.

THE COURT:  Sustained.

MR. HOCHMAN:  You recall there were two faxes from the US Marshals to the sheriff's department on August 25th.  Whether it was this writ being faxed twice -- maybe there was two different writs.  What you know is that no one who testified in the sheriff's -- from the sheriff's department actually saw this writ at that time.  And there's no evidence connecting that somehow Sheriff Baca independently saw it.

And the other way you know that, by the way, is that in the August 29 meeting, this writ had been sent by the federal government.  Chances are, rather than just listening, they would have mentioned something about the writ on August 29 since the writ went out on August 25th.

How about September 7th when Anthony Brown doesn't

show up? Ms. Rhodes might describe Mr. Birotte as jovial, but Mr. Birotte is a strong leader. And if on September 7th he had a writ that the sheriff's department was not complying with, he would have picked up the phone and called Sheriff Baca. And you saw no evidence that any of that happened.

How about seeking the court order from the FBI files? Again, no evidence whatsoever that Sheriff Baca was told anything about this court order.

How about the voice mail message for Agent Marx threatening her arrest Sergeant Craig left? Again, not only is there no evidence that Sheriff Baca knew, but you heard that Tom Carey didn't even know that Sergeant Craig had left a voice mail message -- not asking Agent Marx for an interview, but threatening her arrest. And that is what he did, Sergeant Craig.

And then what he later does, when he actually threatens to charge and arrest Agent Marx, is 100 percent wrong. It's just wrong. It shouldn't have been done. But there was no evidence that Sheriff Baca knew about this voice mail message and, we will address in a second, knew about the encounter that was going to go on where Agent Marx was going to be threatened with anything. And as we also heard about this voice mail message, it even went to the wrong number.

And how about telling deputies not to cooperate? Again, 100 percent wrong. You should not tell deputies not to

cooperate with the FBI. But did Sheriff Baca know that this was being said? Remember what Mr. Carey said when I asked him, "Did you know that the investigators had told the witnesses, Michel and Courson, not to cooperate with the FBI?" Mr. Carey said, "No, I didn't know at the time."

So if he didn't know, obviously Sheriff Baca didn't know. And there is no other evidence that the government introduced to show that somehow Sheriff Baca knew that the deputies were being told not to cooperate.

So why put it in this case? More spaghetti on the wall. They figure, oh, we show that these people are being told not to cooperate, that you are going to think automatically Sheriff Baca must know that. But there is no evidence to show that he was told this at all.

How about the sweeping jail for contraband and bugs? Again, that might have occurred, but there's no evidence connecting what happened with these sweeps to Sheriff Baca, no evidence whatsoever. No e-mails. No phone calls where you actually heard the phone call. No witnesses saying that, yes, I told Sheriff Baca this during a meeting or a phone call.

That's what reasonable doubt's all about. When you are trying to guess what went on in these phone calls, that is what reasonable doubt is all about.

And how about the surveillance of the FBI agents? Again, no evidence whatsoever that Sheriff Baca ordered,

condoned, agreed with this in any way, shape or form.

Now, September 15th was a date that wasn't as much focused on by Ms. Rhodes. And that's understandable because that's the date when the FBI gets to interview Anthony Brown in state prison. And if you recall, while that interview started out with Anthony Brown trying to manipulate her and say, "Oh, you left me for dead," by the end of that interview, they are in good graces again. And, thereafter, the FBI provides Anthony Brown with a lot of money on his accounts to buy the things he wanted.

And, remember, after this date, since they are on good graces and Anthony Brown has filled in all the information, at any point, Anthony Brown can go to the grand jury or Agent Marx can go to the grand jury at any point before September 26, but it doesn't happen.

So what happens on September 26? Well, you had the Good Day LA interview. And, again, we discussed that before. Sheriff Baca couldn't have been more open, more direct and more transparent about everything he was thinking at the time, including that the FBI committed a crime.

And then you had this meeting with Carey, Leavins and Tanaka. And what's very important to know about this meeting is what Mr. Carey said about the meeting on the stand. He said that he told Sheriff Baca that there had been a prior phone call, a message left, with Agent Marx to ask her for an

interview.  And that's that Sergeant Craig message.  Only Mr. Carey didn't know --

MR. FOX:  Objection.  No evidence to support.

THE COURT:  Sustained.

Let's go to sidebar.

*(Proceedings held at sidebar under seal 11:58 A.M.)*

*(The following proceedings were held in open court.)*

MR. HOCHMAN:  So how do we know that the only thing Mr. Carey told Mr. Baca was that there was going to be an interview that occurred that day?  We know it because that is

what Mr. Carey told us on the stand, that he believed, and he told Sheriff Baca, that the only point of going ahead and approaching Leah Marx that day was to interview her.

And remember what else he discussed.  He said one of the investigative particulars -- he didn't tell Sheriff Baca what time of day it was going to happen, which investigators were going to do it, what questions were going to be asked, but he did say it was going to be videotaped and audiotaped, surveilled and miked.

And why is that important?  Because if you believe that you're sending investigators there to interview her, you'd want to have it videotaped.  You would want to have it videotaped in case she says, "Well, they threatened me or they took their gun out" and then you have a videotape to show what happened.

You would want it miked if you are just doing an interview, because if she says anything of any value, you would want a recording of it.  But if you are sending them there to threaten to arrest her or charge her with a crime, lie to her, you wouldn't want it audiotaped or videotaped at all.  But it was audiotaped and videotaped.

And what else do we know?  That if you are going to go ahead and somehow send her there to be threatened with arrest or you are going to lie to her, you know very well you are going to be meeting with US Attorney Birotte and the head

of the FBI, Steve Martinez, the next day.

This isn't chess.  This isn't even checkers.  That would be a ridiculously dumb thing.  To go ahead and send these investigators to go ahead and intimidate or threaten to arrest or charge with a crime that's a complete lie, an outrageous thing, it would be absolutely ridiculous to do.  Because it wasn't done.

From Sheriff Baca's eyes, from his perspective, the investigators said that they wanted an interview with the FBI agent who might have the answers.  Now, she could talk, she could not talk.  At least it sends the message that they want the information, a message he's then going to confirm the next day with the FBI, and they leave shaking hands.

So those are all the reasons, including the fact that Mr. Carey said it, why the FBI went ahead -- excuse me -- why Mr. Carey only said that Leah Marx was going to be interviewed and not threatened with arrest.  And you heard that night -- well, actually, you heard right afterwards that there was a September 26 call between Agent Marx's supervisor, Mr. Narro, and Ms. Long.  This is an important phone call because it shows how Sheriff Baca was actually out of the loop.

Ms. Rhodes only played you the beginning of that call.

"Does the sheriff know this?"

"The sheriff knows this, sure."

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

What she didn't play for you is the next two lines.

"Okay.  Just so you know that the ADIC," that's Steve Martinez, "and the US Attorney, Birotte, are in the process of reaching out to him.  What can I ask that the charges are going to be?"

Now, if you are Sergeant Long, and Sheriff Baca is in the loop, and he's actually sent you out and he knows that there's going to be a warrant issued for the arrest, you would say, "Okay.  Go ahead and talk to Sheriff Baca.  That's who you should talk to."

But that's if Sheriff Baca is in the loop.  If Sheriff Baca's not in the loop and you are Sergeant Long, but Undersheriff Tanaka is, you will quickly change the subject and say, "Okay.  You are going to have to speak to the undersheriff," and that's Mr. Paul Tanaka.

Ms. Rhodes makes a big deal about the fact that they gave out the 5000 number.  But remember what Mr. Hannemann said.  He said that you could call the 5000 number and then, if you're looking for Undersheriff Tanaka, they'll switch you over.

And look at the end of this interview.  At the end -- excuse me -- at the end of this telephone call.  Mr. Narro again says -- this is the last question -- "Sergeant Long, do you have any idea when the warrant's going to come out?  Do you?"

And, again, she could refer this to Sheriff Baca, but she doesn't. She says, "It could go tomorrow, sir. You're going to have to talk to the undersheriff."

Because the Undersheriff Tanaka, he is in the loop about what was going to go on in that interview. And it wasn't just going to be an interview, but Sheriff Baca was not in the loop, and this phone call confirms it.

And what you also hear, at the end of September 26, is the phone call with André Birotte. And what's important to know about that phone call is that, with respect to that phone call, André Birotte gets no qualifications from the sheriff that he's somehow going to arrest Agent Marx the next day or the day after, none whatsoever.

And André Birotte had heard and said, "Lee, what's going on here? Oh, you're not going to arrest her tonight. What about tomorrow? Are you going to arrest her tomorrow or the day after?"

Of course not. There is no qualifications to what Sheriff Baca said. He wasn't going to arrest her that night or any night thereafter. And if he did, André Birotte would not have stood for allowing Sheriff Baca to say, "Well, I'm going to arrest her in the future." No qualifications whatsoever.

On September 27th, you heard about this clear-the-air meeting that they had. And, again, the language was -- this was a heated meeting; GD sheriff, GD jails, gun up. That's not

tactical anger, that's anger.  Because for six weeks, Sheriff Baca has gotten no answers.  It's been almost a month since the August 29th meeting with André Birotte and no answers.

And you'll remember that chart that had all of the things in it of what's going on in the jail.  Well, the investigation had eliminated some of those things, but a lot of those things still existed, including the up to 50 deputies that might have been engaging in excessive force.  And Sheriff Baca is not getting any answers, but starts on the September 27th meeting when they clear the air and they begin that process again of cooperation.

So that is Counts One and Two.  And the government did not get through the door, the big heavy door of reasonable doubt in showing that Sheriff Baca obstructed or tried to obstruct the grand jury investigation, nor that he substantially intended to obstruct that investigation and do it in a corrupt way.

So let's turn to Count Three.  And what do we know about Count Three?  Again, there's three doors or elements with respect to Count Three.

The first one is that the false statement was basically made to the FBI and the US Attorney's Office, and that happened on April 12, 2013.  But the second and third statements are the ones we need to focus on.

The second one says that the defendant acted

willfully, which means he acted deliberately and with knowledge both that the statement was untrue and that his conduct was unlawful.  Basically that means that when you make the statement, you have to know that it's false at the time.

And the government has to prove that beyond a reasonable doubt, that you knew.  It wasn't just a mistake in memory, it wasn't just a poorly asked question, it wasn't even a truthful answer; that it's a knowing, false lie at the time you made it.

And the last part is that the statement has to be material, which basically means it has to be capable of influencing the FBI or the US Attorney's actions.

Now, what's interesting about that last one -- and this is a door that you can go right to and see that you can't -- can't go beyond.  And you can stop your deliberations and quit right on materiality.  And why do I say that?

Because the government called three FBI agents: Dahle, Dalton and Tanner.  They called the former US Attorney.  And what did they fail to ask them the question about?  They failed to ask them about any of those four questions that are at issue here, the four statements, and ask them this question: Were any of these statements capable of affecting your decisions as of April 12, 2013?

Because, remember, you heard from Agent Tanner and Dahle that the government had done a lot of investigation, a

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

lot.  You heard up to 80 witnesses went into the grand jury. You heard that they reviewed hundreds of thousands of documents -- or pages of documents by April 12, 2013.

So where was the evidence that they asked any of the three FBI agents or the US Attorney how any of these four statements were capable of affecting their decisions or -- excuse me -- their decisions or activities as of April 12th, 2013?

That is a huge gaping hole in the government's case as it pertains to materiality and one that they can't fill up at this point.  The evidence is over.

So let's look, if we could, at the factors of what was going on through Sheriff Baca's eyes as of the time of April 12, 2013.

On that day, he's 71 years old.  And you heard much younger people testify here.  You heard André Birotte, when he was on the stand, he couldn't even remember the August 29th date that was actually the date of the meeting.  We had to basically refer to it as "your first meeting."  And this is somebody who is much younger than Sheriff Baca.

You heard the mistaken memories of Thompson, of Manzo, of Carey, much younger men who are trying to -- remember, many of these people, including Carey and Manzo, have been given the questions -- or many of the questions ahead of time to refresh their memory and have been given documents to

review with their memory, to go over it to make sure that you can jog your member as much as you can.

And you heard that Sheriff Baca received no questions ahead of time, and he received no documents that the government was going to ask him about during the interview ahead of time. And he was 71 years old. And think to yourself -- and this is where you can apply your life experiences, your own common sense -- if you were asked to recall a conversation that you had, let's say, a week ago, maybe you could do it, maybe you couldn't. How about a month ago, and particularly if there's a series of conversations and meetings that Ms. Rhodes points to that are all one after the other?

And I'm telling you, pick one out and tell me what you remember from that conversation. And, let's say, it's a month ago. How about a year ago? But how about in this case, 20 months ago? That would be asking you to recall something from, let's say, June 2015. And you are being asked to recall exactly what was being said on a particular meeting in a particular conversation in June 2015.

Now, if you were asked 4- to 500 questions and 99 percent of those questions weren't even charged as false, you would think you did pretty well.

So let's focus then on the four that Sheriff Baca, according to the government, didn't do well on, that they don't think are just a mistaken memory, a poorly worded question or

an actual truthful response, but they think was a deliberate lie.

To do what? What exactly is he going to do in April 12, 2013, a year and a half into this investigation, after they have interviewed Carey, they have interviewed all of these other people at that point? They have seen hundreds of thousands of documents. So what did they think that Sheriff Baca is going to accomplish by lying out of -- 4 out of 4- to 500 questions?

Well, the other thing you have to realize is that 20 months -- this is the August, September time period -- that 20 months basically represents over 600 days. And Sheriff Baca, between August and September 2011 and April 12, 2013, if you just look at his calendar, you know that he's working 12 to 14 hours a day, 6 to 7 days a week, he's probably had thousands of meetings or thousands of phone calls or thousands of conversations in between, but he's asked on April 12, 2013, to pick out the conversations, and do them clearly -- that is a 71-year-old man -- of what happened 20 months before.

Again, it was just that one day. The conversation was over four hours, but you're not getting the whole four-hour conversation. The government can play some or all of it. It's their choice. But they have only played for you about an hour of the four hours that occurred. They asked over 400 questions. There's four answers. And whether it's 200

seconds, if you include the question, or 45 seconds, if you just deal with the answers, that's what we are dealing with here.

And what's important?  If you are going to lie and you know you are going to come into this interview and lie, why even show up?  It's a voluntary interview.  You can stop it whenever you want.  But Sheriff Baca not only agreed to three hours, he stayed for over four and a half hours.

And he was given a nontarget letter.  This was -- you know, he was basically told, "Look, we are not looking at you at this point as a target of our investigation.  Sure, that can change.  But, look, after all of this investigation we've done up until now, April 12, 2013, based on the evidence today, we're not viewing you as a target."

And Sheriff Baca viewed this as a conversation more than, let's say, a deposition with a court reporter.

How do we know that?  You saw in one of the excerpts that Mr. Fox said, "So later on if you've told me one thing and we learn the opposite, I will give you every chance to tell me what it is, what it was."

This was a conversation that Sheriff Baca thought he was having and didn't think that every single nuance of every single word was going to be examined and that if he made a mistake, all of a sudden the criminal book was going to be thrown on top of his head.  He had no motivation to lie.

And let's -- and during the conversation, you actually -- the interview, you actually heard many times where Sheriff Baca couldn't remember something.

(Playing of audiotape.)

MR. HOCHMAN:  You'll hear, if you listen to the tapes, many of the times where Sheriff Baca is trying to recall as best he can, trying to limit down the possibilities.  But sometimes he will make a mistake, or sometimes a question isn't asked as explicitly as it should be, or sometimes you actually get a truthful response.

(Playing of audiotape.)

MR. HOCHMAN:  What's an example of how this played out?  Well, you heard the Jim Leavins remark.  Now, the first time this comes up, Sheriff Baca says, "Well, it was Carey and Jim Leavins."

And Mr. Fox corrects him and says, "Well, you mean Steve Leavins."

And he says, "Well, I only know him by his last name."

But then the two other times after this clip, he keeps calling him Jim Leavins because, in his mind, he's Jim Leavins.  He doesn't remember Steve Leavins.  Is that a mistake in memory or is Sheriff Baca lying about it?  It's a mistake in memory.

And how do we see this playing out in the four false

statements?  Let's start with -- we'll go actually in reverse order, and we'll start with statement four.  In statement four, what do you have?  You have Mr. Fox saying, "So the call from Mr. Martinez" -- this is a September 26 call.  Mr. Fox says, "The call from Mr. Martinez."  And Mr. Baca orients the September 26 Leah Marx meeting by the call from Mr. Martinez.

What do we know about that?  We know that Sheriff Baca got it wrong.  That's a mistake in memory.  In his mind, he spoke to the head of the FBI.  He spoke to André Birotte.  But does Mr. Fox correct him in these questions and say, "Well, the call wasn't from Mr. Martinez, it was actually from Mr. Birotte.  Would that help refresh your memory?"

No, he keeps repeating the idea that the call was from Mr. Martinez, when -- he's the head of the FBI.  Certainly the FBI can talk to the head of the FBI to find out if he made the call that night.  The US Attorney's Office was prosecuting the case.  Certainly they can ask the US Attorney whether it was you or Mr. Martinez.

But Sheriff Baca got it wrong.  In his mind, he -- somehow he thought it was Martinez that made the call instead of André Birotte.  But, again, this goes to show you a mistake in memory of a 71-year-old trying to remember events that happened 20 months before.

And then Mr. Fox asks about whether or not he knew that anyone had gone out to threaten to charge or arrest Leah

Marx, threaten to charge or arrest her. And as you heard, from Sheriff Baca's understanding, based on what Mr. Carey told him during that meeting, that didn't happen; that the investigators were only being sent to go ahead and interview her and not being sent to threaten to arrest or charge her.

So, finally, Mr. Fox says, "Well, were you aware when you received that call from Mr. Martinez, even more generally than that, that someone within LASD was going to approach Leah Marx to try to talk to her?"

And what's the answer? Does he say no? He doesn't say no. He says, "I wasn't aware of any of the investigative particulars."

Now, you heard that Mr. Carey could only remember a few of the investigative particulars himself, and his memory has been refreshed on this topic. So when Sheriff Baca is saying, "I wasn't aware of any of the investigative particulars," first, as you heard from Mr. Carey, he wasn't told most of them; and, second, is it a mistake in memory if he was told about one or two and couldn't remember it?

Because here there's no follow-up question by Mr. Fox. You don't see that Mr. Fox says, "Well, wait, let's see if we can get this right. Did you go -- do you know that this thing was going to occur or not? I don't care about investigative particulars."

No. He says, "I wasn't aware of any of the

investigative particulars."  And at that time, that's a hundred percent truthful statement.  He never denies in this back-and-forth that he actually didn't know that someone was going to approach Agent Marx.

That's why it's completely consistent with what that reporter says, Faturechi, two days later.  Sheriff Baca said, "Yeah, I sent them out there.  It was to interview her.  It wasn't to arrest her."  And that's -- and, again, in this statement, "I wasn't aware of any of the investigative particulars," this is the key statement.  Because this is both a truthful answer -- it shows you that -- based on his memory.

Does the government prove beyond a reasonable doubt that he was lying when he said it?  Absolutely not.

How about the statement number three?  This deals with the Greg Thompson meeting with Sheriff Baca on August 23rd and the apology.  And the back-and-forth is -- and this is what the government showed you -- "Were you aware that they kicked out -- they were kicked out of an interview that they were conducting" --

THE REPORTER:  You have to slow down, Counsel.

MR. HOCHMAN:  I'm sorry.

"Were you aware that they were kicked out of an
interview that they were conducting of Anthony Brown
with your jail?
"No.

"You were never later informed --

"No.

-- "of that?

"And so Mr. Thompson never came to you and apologized for allowing the FBI to interview Anthony Brown in jail?

"No."

What the government didn't show you is the remainder of that clip.  The next question by Mr. Fox is, "Do you recall having any meetings with Mr. Thompson about Anthony Brown or the Gilbert Michel investigation?"

What does Mr. Baca say?

"Not that I can recall."

And that's the key to Statement number three.  Why is that the key?  Because for Sheriff Baca on April 12th, 2013, looking back, it actually says, "So the only meetings you can recall are meetings involving Mr. Carey and Mr. Leavins?"

"Yes."

When he is looking back, what his memory is is not the Thompson meeting that he had on August 23rd, because he -- because that was basically, you know, one meeting that he had with Mr. Thompson.  He met with him probably on the 19th and 20th, and that's it.  The key meetings he was having, to the extent he had them, was with Carey and Leavins.  As he says right here, he doesn't recall the Thompson meeting.

And if he doesn't recall ever meeting with Thompson about this investigation, he's not going to recall that Mr. Thompson went ahead and apologized to him and brought this issue up.

Now, is that a mistake in memory?  Is he trying to remember and just doesn't remember it?  Does Mr. Fox follow-up and say, "Well, do you remember that Mr. Carey was with you in that meeting where you were calm, compassionate and understanding after Mr. Tanaka had done a butt-chewing and was enraged?"

No, you don't see that in the clip at all, that Mr. Fox tried to jar his memory and say, "Well, what about this?  What about that?  Do you remember there was a butt-chewing incident.  Maybe that will jar your memory."

Maybe if they showed him a policy.  Not that Sheriff Baca saw the policy at the time, but show him the document about the policy at that point.  Maybe that would jar his memory.

This is the key part, that for this statement, he doesn't recall any meeting with Lieutenant Thompson, more or less the apology meeting.

How about for statement number two?  For that statement, Mr. Fox says, "So assuming for the sake of this question that there was a discussion at that Saturday meeting" -- that's the August 20th meeting -- "about how to

keep Mr. Brown away from the FBI, were you present for such a discussion?"

What's missing here?  What's missing is that when Mr. Fox says, "Assuming for the sake of this question," there's obviously a discussion that went on before this question that led Mr. Fox to then say, "Assuming for the sake of this question."

Well, that discussion would help inform Sheriff Baca's information.  And what do we know about his answer?  He says, "I'm not aware of any direct involvement with any conversation about keeping the FBI and Mr. Brown away from one another."

What does "direct involvement" mean as Sheriff Baca is using those words back on April 12, 2013?  We have no idea, no idea at all.  There's no follow-up, like, "What do you mean by you weren't directly involved with any conversation?  Does that mean that you think that you allowed the FBI to speak with Anthony Brown as long as they got Undersheriff Tanaka's approval?  Is that what you're thinking, so that when I ask you the conversation about keeping the FBI and Mr. Brown away from one another, that wasn't your intent?"

Because, according to everybody, the policy is that they can speak -- the FBI can speak with Mr. Brown as long as they got Undersheriff Tanaka's approval.  Was that what was going on in Sheriff Baca's mind?  We will never know because

Mr. Fox did not follow up with the question to find out what he actually meant by "direct involvement," what he understood by keeping the FBI and Anthony Brown apart. Does that include the Undersheriff Tanaka's approval or not? That's what reasonable doubt is all about.

And then the final statement. That false statement deals with whether or not Sheriff Baca knew at the time -- and the time was the August 20th, 2011, Saturday meeting -- that he was aware that the federal government was conducting a civil rights investigation.

And these are the questions that are asked: "Would it have been important for you to know that Mr. Brown was in contact with the civil rights unit of the FBI? What about that fact makes it important to you?

"A lot of things, but I don't know exactly what this -- the whole process was at this time in terms of this phone. You know, I had no clue that this was a civil rights investigation, therefore, I don't have any predetermined perspective on pieces of information."

This is why I spent a little time to show that, by the time of the Saturday morning meeting, they knew that the civil rights squad was involved. But that August 19th phone call -- or meeting or interview with Anthony Brown, where he is focused on the phone, he's focused on the drugs, and he's not focused on the beatings -- so by the time you get to the August

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

20th Saturday meeting and now Sheriff Baca is being asked, on April 12, 2013, to put himself in the mindset of what he remembers, without any help from the government, as to whether or not civil rights investigation is being discussed on August 20th or whether or not it came up maybe on August 24th, when I got the subpoenas, or August 29, when I met with Mr. Birotte, or maybe some point later, September 27, when I met with Mr. Birotte.

That's the problem with these questions, is that Mr. Fox in this interchange doesn't go ahead and say to him, "Well, here is the evidence.  I'm going to play for you those ITMS tapes again," as we did here in trial, "and you can hear -- I will show you the reports that happened.  Maybe that jars your memory."

And then Sheriff Baca can say, "Yes, it jars my memory" or "It doesn't jar my memory, but if I think about" -- he is answering the question right then and there.  He thinks to himself, "My focus is the phone, the drugs, getting to the bottom of this problem."  It's not on the civil rights investigation as of August 20, 2011.

Or he's jumbled up all the dates in his head and he doesn't know.  Again, there's no follow-up or effort by Mr. Fox to try and jar his memory.  In fact, again, you saw the clip -- or the part of the clip that I referenced that later on -- that, you know, Mr. Fox, you know -- or at least he says to

Mr. Baca, "Later on if you said something and it's the opposite, you know, we can have this discussion."

So that's where we are with all four statements.

Are they mistake in memories?  Are they poorly asked questions?  Are they in some cases actually truthful answers?  What I've just described is all reasonable doubt.  That is reasonable doubt, to charge someone with four questions out of the over 400 asked, you know, during a four-and-a-half-hour voluntary interview and then come back later, years later, and say, "Aha, you have lied to us for no apparent reason."

And this last one is probably the best.  In some ways, the materiality standard is who cares?  How did this influence -- or capable of influencing the FBI or the US Attorney's Office decision if Sheriff Baca said that he knew about the civil rights investigation on August 20th as opposed to August 24th when he got the subpoenas or August 29 when he is having the discussion?

How could that statement possibly be material when all the evidence shows that Sheriff Baca acknowledged he knew about the civil rights investigation certainly by the time he went ahead and got the subpoenas on August 24th.

So for all those reasons, the government can't get through the reasonable doubt door of materiality, nor can they get through the reasonable doubt door that Sheriff Baca knowingly made any one of the four false statements.

Through Sheriff Baca's eyes.

In 1965, Sheriff Baca was 23 years old when he joined the Los Angeles County Sheriff's Department.  And for the next 48 years, until he was 71 years old, he served the people of the County of Los Angeles.  Fifteen of those years, he was the elected sheriff.

And while he is serving the people of the County of Los Angeles, he was in charge of ensuring their security as well as the security of the inmates and the sheriff's department people that he was responsible for.  Not the FBI, not the US Attorney's Office, Sheriff Baca.

Sheriff Baca did not abuse his power.  He responsibly used his power to try to get to the bottom of the investigation and to keep Anthony Brown safe.  And the evidence or lack of evidence that the government has established does not prove in any way, shape or form beyond a reasonable doubt that Sheriff Baca committed any one of the three crimes that have been charged.  And as a result, the lack of evidence compels only one verdict on all three counts, and that's the verdict of not guilty.

Thank you very much.

THE COURT:  All right.  Ladies and gentlemen, we're going to take another break.  I believe some lunch has been brought in to you.  And so we'll come back at -- we'll take about 30 minutes and we will come back at 1 o'clock.

Do you think 30 minutes is going to be enough or do you want 40?  30?

A JUROR:  30 minutes.

THE COURT:  All right.  We'll come back in 30 minutes.

Again, I want to remind you, until this trial is over, you're not to discuss this case with anyone, including your fellow jurors, members of your family, people involved in the trial or anyone else, nor are you allowed to permit others to discuss the case with you.  If anyone approaches you and tries to talk with you about this case, please let me know about it immediately.

Do not read or listen to any news reports or other accounts about the trial.  Finally, you are reminded to keep an open mind until all of the evidence has been received, you've heard the arguments of counsel, the instructions of the Court and the views of your fellow jurors.

If you need to speak with me, simply give a note to the clerk.  We will come back at 1 o'clock.

THE CLERK:  All rise.

*(Jury out at 12:32 P.M.)*

*(The following was heard outside the presence of the jury.)*

THE COURT:  All right.  Is there anything we need to take up?

MR. FOX:  No, Your Honor.

MR. HOCHMAN:  No, Your Honor.

THE COURT:  All right.

*(Recess taken 12:33 P.M.)*

--oOo--

CERTIFICATE


I hereby certify that pursuant to Section 753,

Title 28, United States Code, the foregoing is a true and

correct transcript of the stenographically reported

proceedings held in the above-entitled matter and that the

transcript page format is in conformance with the

regulations of the Judicial Conference of the United States.


Date: AUGUST 10, 2017



/s/  Cindy L. Nirenberg, CSR No. 5059

Official Court Reporter

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA