UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE PERCY ANDERSON, U.S. DISTRICT JUDGE

- - -

UNITED STATES OF AMERICA,      )
                               )
               PLAINTIFF,      )
                               )
          vs.                  ) No. CR16-66(A)-PA
                               )
LEROY BACA,                    )
                               )
               DEFENDANT.      )
_____)

REPORTER'S TRANSCRIPT OF JURY TRIAL

DAY 13

PAGES 2529-2583

LOS ANGELES, CALIFORNIA

TUESDAY, MARCH 14, 2017

8:25 A.M.

_____

CINDY L. NIRENBERG, CSR 5059, FCRR
U.S. Official Court Reporter
350 W. 1st Street, #4455
Los Angeles, CA 90012
*www.msfedreporter.com*

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

APPEARANCES OF COUNSEL:


FOR THE PLAINTIFF:
                    OFFICE OF THE UNITED STATES ATTORNEY
                    BY: BRANDON FOX,
                        ASSISTANT U.S. ATTORNEY
                        EDDIE A. JAUREGUI,
                        ASSISTANT U.S. ATTORNEY
                        LIZABETH A. RHODES,
                        ASSISTANT U.S. ATTORNEY
                    312 NORTH SPRING STREET
                    13TH FLOOR
                    LOS ANGELES, CA 90012
                    213-894-2434


FOR THE DEFENDANT:
                    MORGAN LEWIS & BOCKIUS
                    BY: NATHAN J. HOCHMAN, ATTORNEY AT LAW
                        BRIANNA L. ABRAMS, ATTORNEY AT LAW
                    THE WATER GARDEN
                    1601 CLOVERFIELD BOULEVARD
                    SUITE 2050 NORTH
                    SANTA MONICA, CA 90404
                    310-255-9025


ALSO PRESENT:
                    LEAH TANNER, FBI SPECIAL AGENT

I N D E X

*PROCEEDINGS*                                              *PAGE*

DISCUSSION HELD OUTSIDE PRESENCE OF JURY 2532

DISCUSSION HELD OUTSIDE PRESENCE OF JURY 2569

JURY NOTE                                           2582

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES, CALIFORNIA; TUESDAY, MARCH 14, 2017

8:25 A.M.

- - - - -

*(The following was heard outside the presence of the jury.)*

THE CLERK:  Item Number 1, CR 16-66(A)-PA, United States of America versus Leroy Baca.

Counsel, please state your appearances.

MR. FOX:  Good morning, Your Honor.  Brandon Fox, Lizabeth Rhodes and Eddie Jauregui on behalf of the United States.  Also with us at counsel table is Special Agent Leah Tanner.

THE COURT:  Good morning.

MR. HOCHMAN:  Good morning, Your Honor.  Nathan Hochman along with Brianna Abrams on behalf of Defendant Mr. Leroy Baca, who is present.

THE COURT:  Good morning.

I wanted to advise the parties that I have moved the four alternates.  They were -- had been told to return to the jury assembly room on the first floor.  I've moved them back up here to the ninth floor, and they are being sequestered, if you will, in Judge Hatter's jury deliberation room.  And there will be a court security officer stationed outside of that door.  And the jury is deliberating in my jury deliberation room.

I can either have the alternates come in here and

instruct them that they are not to have any contact with the deliberating jurors, or I can ask the clerk to tell them that. If you want, I'll have them brought in and tell them that.

MR. HOCHMAN:  We have no problem with having your clerk advise them.

I think you advised them on the record when they were separated originally they were to have no contact with anyone, including the jurors.  If Your Honor feels, because we are on this -- now the same floor, you need to emphasize that message, we have no problem with your clerk doing it.

THE COURT:  I think it's highly unlikely that they are going to run into each other, but --

MR. HOCHMAN:  They will have court security officers when they -- are you anticipating sort of before the day starts and after the day ends?  Because I assume the court security officer will be with them otherwise?

THE COURT:  Well, at the moment, there is no one with them because the court security officer, I think, is momentarily going to come up and join them.  And that is -- that's another reason why we're going to have a little talk this morning.  So I either intend to have a court security officer with them or a law clerk stationed either outside that door or in that office with the alternates, unless somebody has an objection.

MR. HOCHMAN:  No, Your Honor.  And I think we would

be fine if your court clerk wanted to just give them that brief admonition that you just said on the record.

THE COURT:  Okay.  Part of the reason for moving them is the fact that we're having jurors summoned in today.  And there's a lot of jurors who are being given an orientation down in the jury assembly room.  And to prevent the alternates from being exposed to any source of contact with these jurors was one reason for moving them.

The other reason for moving them was an incident that I was advised of yesterday by the government.  And this was after closing arguments and after the Court had sworn two court security officers, given them their oaths.  And their jobs, of course, is to safeguard the jury from any contacts or any outside sources of information.

The defendant was present when those court security officers undertook their oaths.  That oath includes the court security officers' promise to keep that jury together and not to permit any person to speak or to communicate with the jury. The jury then retired to begin their deliberations.

The defendant was present when the Court instructed the jury repeatedly that they're not to have any contact or to communicate with anyone, including people involved in this case.  That instruction has been given at least four times a day for the last two weeks in the defendant's presence.

The defendant I believe had also been present when

his own lawyer requested that the Court instruct the jury that the lawyers were not to talk to them even -- and even if they ran into a lawyer out in the hallway and said, "Hi," and the lawyer didn't say anything, that they were not to hold that against the lawyer because they had all been instructed not to have any contact with the jurors.

Yesterday after the jury commenced their deliberations, the Court was advised by the government that the defendant had had contact with the court security officer assigned to this case in front of the deliberating jurors.  I spoke with the court security officer last night, who confirmed that there was some contact by the defendant.

Mr. Baca, can you tell me what your purpose was in contacting this court security officer?

MR. HOCHMAN:  May I have a moment, Your Honor?

THE COURT:  Yeah.

(Counsel and defendant confer off the record.)

THE COURT:  Mr. Hochman, maybe I can short-circuit this for a moment.  And then if you still wish to confer with your client, that will be fine.

Let me explain something to you, Mr. Baca.  The Court and the lawyers have an obligation to safeguard the integrity of this process and to assure that both sides receive a fair trial.  Now, when you have some contact with the court security officer, that is inappropriate.  It's especially inappropriate

when there are jurors around, especially deliberating jurors.

And it gives the impression -- or it can create an impression -- or create an exposure of the jurors to something that's inappropriate.  And I can guarantee you that last night these people over here (indicating) probably had some discussions about the subject of jury tampering.  Now, I don't know that, but it wouldn't surprise me.

Now, to avoid that problem from resurfacing and to assure the integrity of these proceedings and to protect your rights, I'm going to order you not to have any contact with the court security officers, the jurors, the alternates or anyone having anything to do with this trial.  Don't have any contact with any court personnel.  It just -- it's a bad -- it creates a bad impression.

MR. HOCHMAN:  And, Your Honor --

THE COURT:  Excuse me, Mr. Hochman.

And, Mr. Hochman, I'm going to ask you to ensure that your client has no contact with any of the court security officers, any of the jurors.

Even, Mr. Baca, if you see people with a jury badge on, please, put your hands in your pocket, put your head down and walk the other way.

MR. HOCHMAN:  Your Honor -- I'm sorry.  Is Your Honor -- may I comment at this point briefly, Your Honor?

THE COURT:  Yes.

MR. HOCHMAN:  After you raised this issue with Mr. Baca and myself yesterday, he and I had that exact discussion.  And he will absolutely follow your order, Number one.

Number two, with respect to what happened yesterday, Your Honor, what was happening -- and it was the first time it had ever happened.  Obviously, this trial -- its deliberations just started, but even dealing with the deliberations last time that -- we came out of the elevator at the exact moment that the jury was walking in front of your hallway.

I was in front of Mr. Baca.  And by the time I looked up, I almost actually ran into the court security officer because the hallway is fairly narrow and there were 12 people and the court security officer coming down it.  I averted my glance and headed right into your courtroom.  Didn't see what had happened behind me.

Mr. Jauregui told me about the contact, and we brought it to the Court's attention.  I -- again, I explained to Mr. Baca the situation.  This was the first time we had ever unfortunately been in an unexpected situation.

It's not an excuse for it; it's just an explanation to Your Honor that this had never occurred before in any of the prior trials where literally you come out of the elevator, you start walking down the hall, and there's 12 jurors and the court security officer coming right at you.

I will do my absolute best to make sure that we have absolutely no contact.  I raised with Your Honor that when we come in the court every day, there are court security officers who go through screenings in which -- I have interactions. Just "Hello" and "How are you," and nothing more than usually "Hello," "How are you?"

Some of them may know Mr. Baca because he's been here now, I don't know, two months, roughly, of trial.  So they may say, "Hi," "Hello."  I want to make sure that if they do that -- or unless you are going to give them an order as well so that they understand down in security as well that they shouldn't make any eye contact with Mr. Baca other than asking him the normal security questions.

I don't want to have a problem when the prosecutor comes to you tomorrow and says Mr. Baca had an interaction with the court security officers down at the initial security, and somehow that violated your order.

THE COURT:  Mr. Hochman, you know, the same thing that I tell -- you know, the problem is is that the jurors were able to see that contact yesterday and some might believe that the defendant was seeking to ingratiate himself in front of the jurors by acknowledging the court security officer.

Unfortunately, even saying, "Hello" to court security officers as he comes into the building, there is a possibility that jurors could see that, and especially now while they're

deliberating.

So my advice to you is to have Mr. Baca, as I said before, cease having any contact with any of these court personnel and that he simply puts his head down and goes where he needs to go.

MR. HOCHMAN:  Absolutely, other than if they ask him security questions, and certainly he has to answer them.

THE COURT:  That's fine.

MR. HOCHMAN:  And I would ask the Court to advise, if you could, the court security personnel that while the jury is deliberating, Mr. Baca will be acting in this regard so they don't think he's being rude to them or that somehow he's being impolite to them, that this is now a court order.

THE COURT:  Sir, he doesn't have to worry about the court security officers thinking that he's being impolite.

MR. HOCHMAN:  That's fine, Your Honor.  We will --
Mr. Baca has heard you.  I will do my absolute best to ensure that it happens, and hopefully we will have no further problems in this regard, Your Honor.

THE COURT:  And, you know, one of the -- well, we'll just leave it at that for now.

MR. HOCHMAN:  Your Honor, may I raise a brief issue with you?

MR. FOX:  Your Honor, I've got something, actually, somewhat related to what we were just talking about, if I can

just jump in.

In last trial, there was interaction -- not an inappropriate interaction, but interaction in the cafeteria between the jurors and the defense team because they were stationed there.  And I don't know if the alternates or the jurors are going to be going down for coffee at any point, but I think to avoid any contact, it would be good if the defense team could station themselves elsewhere than the cafeteria.

THE COURT:  Well, one of the reasons for moving the alternates up on this floor is that maybe we can avoid these runs for snacks.  So we will do what we can to do that.

Now, as I understand it, there is an attorneys' lounge I believe either on the second floor or the fourth floor.

MR. HOCHMAN:  There is, Your Honor.  The cell phone reception is not great in the attorneys' lounge, which is why I stationed myself at the very back of the cafeteria.

And I can tell you the last time, we had no contact with any jurors in the area that we were.

We brought to the Court's attention that because of the glass that separates where the alternate jurors were -- it's actually glass.  You can see all the way through, and there's a courtyard in between.  We brought that to the Court's attention, and then I believe the Court had those four alternates put in a separate room within the jury room.

Since we don't have that situation here, Your Honor, I don't anticipate having any contact whatsoever with the jurors. We never saw them ever come down for lunch. We never saw them ever come down for a snack. So I'm unaware of the jurors actually using the cafe.

And to the extent they want to use the cafe, your court clerk can advise us and we will move out of the court cafe when the jury is on its way. And then once they have safely left, if they ever go there, we can resume.

THE COURT: Are you saying that you have -- for the lack of a better term, you've set up sort of a -- that's where you're maintaining your presence is in the cafeteria?

MR. HOCHMAN: Yeah. There is a long table in the very back of the cafeteria --

THE COURT: No. You can go up to the attorneys' lounge. If you want to -- if you need to go down to the cafeteria to get something to eat, some snack or something, but you shouldn't be permanently ensconced down in that cafeteria.

MR. HOCHMAN: Again, Your Honor, the cell phone reception was better in the cafeteria, and I wanted to make sure --

THE COURT: Sir, if you need to make a call, go outside and do it.

MR. HOCHMAN: No. It's actually when your court clerk calls us, Your Honor.

THE COURT:  That's fine.  We'll know where you are.

MR. HOCHMAN:  Okay.

THE COURT:  If we can't reach you, we will find you.

MR. HOCHMAN:  Okay, Your Honor.  That's fine.  We'll be on the second floor then, Your Honor.

THE COURT:  All right.  Thank you.

MR. HOCHMAN:  And, Your Honor, may I -- unless counsel has more on this issue, I would like to raise something with Your Honor.

THE COURT:  Okay.

MR. HOCHMAN:  I had a chance overnight to think about the sequence that occurred in closing and rebuttal, Your Honor, and I'd like to offer these additional thoughts for the record, if I might.

THE COURT:  I think we addressed that yesterday.

MR. HOCHMAN:  But, Your Honor, then I would like to put in the record --

THE COURT:  The record has already been made, sir.

MR. HOCHMAN:  Your --

THE COURT:  Excuse me.  There were objections that were made.  The Court ruled on them.  There was a reporter who recorded all of that, and so it's in the record.

I have taken steps to address that issue, and if that is not -- if that is not satisfactory, you can raise that in the event that there is an appeal in this case.

MR. HOCHMAN:  I want to put on the record, Your Honor, what I'm asking for, because I would actually need that in the event there was appeal.

What I'm asking the Court for is an additional instruction that says to the jury that, "The Court, during the defense closing, sustained certain objections based on misstatement of the testimony.  The Court hereby overrules those objections."

And the reason I think that is important, Your Honor, is because of what actually ended up happening.  Mr. Fox made these objections based on certain statements that I made.  Each one of those statements -- and I will refer the Court to --

THE COURT:  Excuse me, sir.

MR. HOCHMAN:  Yes.

THE COURT:  Have you discussed this with the government?

MR. HOCHMAN:  Yesterday, Your Honor.

MR. FOX:  No, Your Honor.

THE COURT:  Okay.  So what I'm going to ask is if you would take a moment and discuss this issue with the government and your requested instruction.

MR. HOCHMAN:  Yes, Your Honor.

May I have a moment?

    (Counsel confer off the record.)

MR. FOX:  Your Honor, we disagree still with

Mr. Hochman.  He just cited to Mr. Carey's testimony on pages 783 and 784 for the proposition that Mr. Carey told Mr. Baca that there had been messages left for Special Agent Tanner. And that's not what that portion says.  What it says is that Mr. Carey was aware --

THE COURT:  Excuse me.  Okay.  Is there another instance?

MR. HOCHMAN:  Yes, Your Honor.

THE COURT:  Okay.

(Counsel confer off the record.)

MR. HOCHMAN:  Your Honor, the second cite, again, is to Mr. Carey.  It's his testimony on March 2nd, pages 526 and 738.  This deals with whether or not Mr. Carey, during the August 20th meeting, said that he had discussed the fact that there were photos on the phone.

And he says, "In addition to playing the audio phone calls" -- this is on 525 and 526 of the transcript -- "did he provide" -- and this is -- we are talking about the meeting on August 20th.  "In addition to playing the audio phone calls, did he provide any briefing about what his unit" -- that's Lieutenant Thompson -- "had learned up to that point for Mr. Anthony Brown?

"Yes."

"What was that?"

"The phone was connected to the civil rights

division.  He had -- I believe he did the criminal background of Anthony Brown.  There were photographs on the phone.  That is what was coming to mind right now."

He later, on page 738, describes what he had found with respect to those photographs.

"Did you determine those photographs were narcotics?"

"They were photographs depicting narcotics."

And, Your Honor, I was making the point to the jury that in the August 20th meeting, one of the things that was discussed in Sheriff Baca's presence is that there were photographs on the phone and the photographs were of narcotics.

You at that point sustained an objection, I believe, called me up to sidebar, said that you yourself had gone through Carey's testimony and you didn't find it.

I said, "Look, it was -- to the best of my recollection, it was in Carey's testimony, but maybe it was in Mr. Manzo's," assuming that the Court had actually gone through all of Carey's testimony and didn't find it.

I then went back in the break, before rebuttal, found what I was referring to and then brought it and told Mr. Fox, before his rebuttal, Your Honor, that I had the pin cites to show that I was not misstating testimony.

He told me, before his rebuttal, that he didn't have time to see the pin cites and then did the following thing, which was extremely prejudicial.  He said that "Nathan

Hochman," "Mr. Hochman," which he referred to me over 15 times during his rebuttal, "made stuff up," Your Honor, "distorted and misled the jury."

He didn't say, "The defense," Your Honor.  He said, "Mr. Hochman," and he said it over 15 times.  So my --

THE COURT:  Excuse me.  Is there a reason you are raising your voice?

MR. HOCHMAN:  I'm sorry, Your Honor.  You're right.  You know what, you're absolutely right, Your Honor.

He said "Mr. Hochman" over 15 times.  He put my credibility before the jury on the line.  Not the defense, Your Honor, Nathan Hochman, Mr. Hochman's credibility, and he said I made stuff up.  And you sustained objections for the fact that I misstated testimony, which I did not.

And you didn't say -- when you sustained those objections or held sidebars at my -- during my closing and not Mr. Fox's closing, when you sustained objections because he misstated the testimony, your sustaining the objections and holding the sidebar is an absolute message to the jury that Mr. Fox then used in his rebuttal to say Mr. Hochman made stuff up.

THE COURT:  That -- sir, holding a sidebar is not a message to the jury.

MR. HOCHMAN:  Again, Mr. Fox, in the first three minutes of his rebuttal, said, "Mr. Hochman made stuff up,

misled you and distorted the evidence."

And the jury heard that you sustained objections to misstating the evidence, which you should, at this point, either have done one of two things:  Either at that point told the jury, "Your recollection controls" --

THE COURT:  Which I did.

MR. HOCHMAN:  -- which you eventually did, or you should, at this point, as you've done before, Your Honor, when you've made a ruling in this case and then reversed a ruling -- I give you Exhibit 120, where you allowed an entire exhibit in that had Mr. Perez's identification and then reversed, in part, that ruling to take it out.

My point to you, Your Honor -- and obviously you've done it before, where you've sustained an objection, overruled an objection and then thought about it and changed your mind.

We need the Court at this point to tell the jury that the objections that you sustained -- several of the objections, I believe there were two, that you sustained dealing with misstatement of the testimony, you are overruling.  And then you can give the additional instruction that, "Ladies and gentlemen, anything I say shouldn't be affecting your verdict."

But at this point, you need to overrule the objections that you improperly sustained at that time.

MR. FOX:  Your Honor, my recollection is that you did not sustain the objection to this point, that we went over to

sidebar, Mr. Hochman raised Mr. Carey's testimony where he got this from and that you then instructed the jury it was their memory that controlled based on Mr. Hochman's representation. That's my recollection.

MR. HOCHMAN:  And, Your Honor, I would add that since the government had these transcripts -- because the government ordered these transcripts ahead of time.  They have had the transcripts all weekend.  When I made these references to stuff that was in Mr. Carey's testimony and Mr. Fox jumps up and says, "Misstates the testimony," and then says that I made stuff up to the jury, complete bad faith, Your Honor, complete bad faith.  He --

THE COURT:  Excuse me.  Take a moment.

Ms. Reporter, do you have the transcript from yesterday?

*(Discussion held off the record with the reporter.)*

THE COURT:  Unless one of you have a transcript from yesterday.

MR. HOCHMAN:  We don't have that transcript from yesterday.

THE COURT:  That's all I need to know.  So I will get a copy of that.

MR. FOX:  And I would like to see the second portion of this transcript that Mr. Hochman is talking about where he says it ties in that they talked about the photographs of the

meth, cocaine and whatnot with Mr. Baca on Saturday, August 20th.  Because that's what he argued, and I don't think the evidence supported that.  But, again, you didn't sustain this objection, is my recollection, so ultimately it doesn't matter.

MR. HOCHMAN:  And I don't believe that's true.  And I believe that the Court even held a sidebar because it believed that I was misleading the jury.  And if you recall --

THE COURT:  No, Mr. Hochman, I had a sidebar because there had been an objection, and I wanted to hear your response and I wanted to hear from the government.

MR. HOCHMAN:  Yes, Your Honor.

And the third issue, Your Honor, involved Mr. Manzo.  And that issue involved an issue as to whether or not Mr. Manzo made the chess match comment the day that he went ahead and had a meeting with Lieutenant Thompson, the same day, or, as I argued, it was two days later.

And, again, Mr. Fox pops up and says, "Misstates the testimony."  I believe the Court sustained this one.  I'd have to go back and check on this one.  But I will refer the Court to Manzo's testimony, February 27, 2017.

The page cite is 101 to 102.  And Mr. Manzo says, on this chess match comment, because this is now on cross-examination, "Lieutenant Thompson" -- I asked the question:

"Lieutenant Thompson never told you that he had any

discussions about anything involving a chess match during his meeting with Sheriff Baca on August 23rd; isn't that correct?

"He did, but not directly after.  It was a couple days later."

He then goes on to say:

"So a couple days later, Lieutenant Thompson added one additional word or words to what he had relayed to you right afterwards; is that correct?

"No, he recounted the whole encounter because I asked him again because I thought I was going to get fired.

"So you asked him -- just so I get the sequence, he is first telling you immediately after the meeting with the Sheriff Baca -- the meeting with Sheriff Baca what Sheriff Baca told him?

"Correct.

"And in that meeting, he doesn't bring up the notion of a chess match; correct?

"Not that I remember, no.

"And then how long thereafter did you have this next conversation with Lieutenant Thompson?

"Not very long" --

THE COURT:  Is the reporter supposed to be getting this down?  Because you are talking awfully fast.

MR. HOCHMAN:  I'm sorry, Your Honor.  I am referring

to pages 101 and 102 of Mr. Manzo's testimony.

THE COURT:  I think that's stuff's already in the record; right?

MR. HOCHMAN:  Again, what I'm referring to, Your Honor, is what -- and the reason to cite it is to back up the statement --

THE COURT:  It's already in the record.

MR. HOCHMAN:  It's actually not, Your Honor, because I didn't say what I based my statement during my closing on, and I wanted to be very clear what I based it on.

And then Mr. Fox objects, "Misstates the testimony."

And I believe -- and I'd have to check on this one. I think the Court sustained this one.  The Court might at this point not have sustained it or just said, "Your recollection controls."  I don't remember on this one, Your Honor.  I'd have to check.

But I was a hundred percent right, Your Honor, in what I said.  And Mr. Fox knows that and knew it at the time because he had Mr. Manzo's testimony, I believe, because the government had ordered the transcripts.

MR. FOX:  Your Honor, let me just say this.  For a two-and-a-half-week trial or a two-week trial, Mr. Hochman is going to argue things and pick things out, which he should do. It's perfectly appropriate for a defense attorney to do that.

But then to allege bad faith if my recollection about

something that was said in one portion of a transcript fits with my memory is -- you know, that -- I haven't heard that before.

But there were plenty of other times that Mr. Hochman misled the jury in his arguments.  He misled the jury about what Count Two was.  And he and I had that discussion downstairs before his argument about what Count Two meant.  There had never been a disagreement.

And if we had argued about Count Two had been about destroying documents a year later when we began our obstruction of justice investigation, Mr. Hochman would have said that it was a variance and that it was an amendment to the indictment and it was improper.

So, like I said, there were plenty of other things that he did to mislead the jury.

MR. HOCHMAN:  And, Your Honor, on that specific one, what I said --

THE COURT:  Please.  That's enough from both of you.

MR. HOCHMAN:  Yes, Your Honor.

THE COURT:  So I'm going to get a copy of this transcript.  I'll take a look at it, and -- though I'm not convinced that the instruction that I gave the jury earlier isn't sufficient, but I'll consider your request --

MR. HOCHMAN:  Thank you very much, Your Honor.

THE COURT:  -- after I've had a chance to look at the

transcript.

MR. HOCHMAN:  Okay.  And I assume that transcript will include Mr. Fox's rebuttal because then you'll see in the first --

THE COURT:  Sir --

MR. HOCHMAN:  -- five minutes or so --

THE COURT:  Sir, you ought to quit while you are ahead.

MR. HOCHMAN:  Thank you very much, Your Honor.

Nothing further from the defense, Your Honor.

MR. FOX:  Your Honor, we sent the defense yesterday an exhibit list and have not yet heard from them about whether they have any objections to what's listed on the exhibit list. And we would like that to go back to the jury.  We've provided it to your clerk.

MR. HOCHMAN:  We've taken a quick look at it, Your Honor, and we need to look at it more.  I would ask the Court -- actually, we will object to the jury getting an exhibit list for the following reasons:  Number one, they didn't get one, I'm aware, at the last trial.  I'm not aware of any trial in the sheriff cases in which they got one.

MR. FOX:  They got one in the Thompson case.  I'm not sure about Sexton, but I recall them getting one at Thompson.

MR. HOCHMAN:  I don't know if they got one in Tanaka. I wasn't there.  And they certainly didn't get one in

Mr. Baca's case.

Two, I don't believe they are entitled to an exhibit list, obviously, under the rules.

Three, again, we are going to have to go through this --

THE COURT:  Then you'd better hurry up because they are going to get an exhibit list, and you'll have an opportunity to go through it, and you'd better hurry up and go through it.

MR. HOCHMAN:  We will do that right now, Your Honor.

THE COURT:  All right.  Thank you.

Why don't both of you wait right here, and I'll see if I can get this transcript and have a look at it.

*(Recess taken 9:01 to 9:34 A.M.)*

THE COURT:  All right.  I have looked at a partial transcript.

Here's the problem I think with this entire issue, but I do have something I would be willing to do.  The problem is -- is that there were more than two or three objections. You are complaining about three and -- maybe two.  And it will take some time for the Court to go back and to figure out who's right and who's wrong.

And even if I did that, then I've got to -- then we've got the possibility of, well, which ones?  What do I tell the jury?  Because we're talking about those two and how to

distinguish those two.

So I think rather than try to decipher who's right or who's wrong, what I would be -- and I want to hear from the government with this, but what I'd be willing to do is to say that, "There were objections that were made during the parties' closing arguments -- or during the defense and the government's closing arguments.  Any of those objections that were sustained by the Court are now overruled."

And then I would give the instruction that, "It's your recollection -- if the facts as stated by the lawyers differ from how you remember them, your memory of the facts controls."

MR. HOCHMAN:  And here's why that doesn't work if you include the government.  There's two objections that I recall that the Court sustained that I made.  One dealt with the Cecil Rhambo situation where Mr. Fox said that in the April 12, 2013 interview, Mr. Baca denied ever making the statement to Cecil Rhambo.  The actual language is, "I don't recall."  And that is why I believe the Court sustained that objection when I objected when Mr. Fox said that Sheriff Baca denied making it.

He later, actually, in the excerpt, explains that he doesn't think it would be appropriate for Mr. Rhambo to make it, but the actual answer was, "I don't recall," not, "I didn't make the statement."  You sustained that objection, Your Honor.  And that was a correct sustaining of the objection.

THE COURT:  Listen, if you want me to tell the jury something, I will tell the jury that, "The parties made objections during their closing arguments, and those objections are now overruled."

MR. HOCHMAN:  The problem is -- is that the Court should not overrule the objections I made because they were proper.

THE COURT:  Then I shouldn't overrule the objections that the government made that are correct.  It's the same thing.  So, look, there -- if you want something, that's what I am willing to do at this point --

MR. HOCHMAN:  To the extent -- I'm sorry, Your Honor.

THE COURT:  -- otherwise you can live with what it is.

MR. FOX:  Your Honor --

MR. HOCHMAN:  May I just briefly respond and then Mr. Fox may respond?

THE COURT:  Okay.

MR. HOCHMAN:  Again, I will -- my memory on the objections that Mr. Fox made about misstating the testimony -- because he made, for instance, a separate objection on the whole OIR situation.  And it wasn't an objection that I misstated the testimony; it's that I just basically shouldn't argue what were -- the facts that were in the record about Mr. Gennaco's background.  That's not a misstating testimony;

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

that's basically it's irrelevant type of testimony.

The problem, Your Honor, is that Mr. Fox, in his opening rebuttal, basically said I made stuff up. I didn't say that Mr. Fox made stuff up. I didn't say that Ms. Rhodes made stuff up. He's the only one on the record that said I made stuff up. And the jury heard you sustain objections that I misstated testimony. That's the part that has to get fixed.

When I objected -- I'm sorry, Your Honor, I didn't mean to -- you looked like you were going to cut me off.

MR. FOX: Your Honor, I have proposed language for you that I wrote down that I think will satisfy this issue.

THE COURT: Okay. That's fine. Go ahead. Give me what you have.

MR. FOX: Because I think that -- I would also contest whether the objection that he had to the Cecil Rhambo comment should be sustained, but I don't think that's appropriate to fight that now. I just don't want to concede that issue.

What I've written down here is, "During closing arguments for the prosecution and the defense, I sustained and overruled certain objections to factual assertions. It is your memory that controls whether the factual assertions are supported by the evidence and testimony at trial."

And then your standard line about, "You should not infer anything from the Court's rulings on objections."

MR. HOCHMAN:  It can't undo the damage in his rebuttal argument, is where I am coming at, Your Honor.

THE COURT:  I understand that.  So --

MR. FOX:  Your Honor, just so the record is clear, you just said, "I understand that," but you weren't agreeing with Mr. --

THE COURT:  No.  I understand -- I understand his argument.

Okay.  How about something like this?

"Yesterday both counsel during closing argument objected that counsel misstated the evidence.  Those objections are now overruled.  It is your memory that controls whether the factual assertions are supported by the evidence and the testimony at trial."

MR. HOCHMAN:  And here's why I don't believe that's an appropriate instruction, Your Honor.

I will give you the other objection that you sustained that I made.

Mr. Fox said that Mr. Manzo testified consistent with the way he had testified in other proceedings.  Completely inappropriate and absolutely no facts to support that.  There were no prior consistent statements brought in by Mr. Manzo, and it was completely inappropriate to try to bolster his credibility by saying that he had testified at prior proceedings consistent with it.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

There was never that prior consistent statement brought in by Mr. Manzo.  I objected, the Court sustained. That's a correct sustaining of an objection.  To then overrule --

THE COURT:  Sir -- sir, there were objections made by the government that were correct as well.  So, listen, if you want to participate -- if you want something given to the jury, then I suggest that both of you sit down and try to work something out or you come up with something to help us.  But I am not going to give an objection that is one-sided as to one party.

So if you want -- if you want me to basically tell the jury, "Look, there were objections that were made during closing arguments.  Both sides made objections that the other side was misstating the evidence in the case."

And if you want me to tell the jury that, "Both of those -- all those objections are now overruled, and you shouldn't consider them" --

MR. HOCHMAN:  Again, I'll talk to the government to see if we can come up with anything.  Because that statement is inappropriate, Your Honor.  Because the objections you sustained -- and, again, I'm happy to go -- and I don't have the transcript from yesterday to see if there were any objections that you sustained on my misstating testimony that I don't have something in the record for.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

I am very convinced -- and I might be wrong, but I am very convinced, based on the three for three I was, that if I go back and look, I'll be able to be, if not a hundred percent -- well, a hundred percent, because I base my closing, Your Honor, on tracking transcripts.

And when Your Honor brought me up on the third time -- the second time at sidebar, and you said to me -- and you chastised me, "Counsel, if you do this again" -- you know, "How much longer do you have?"  Because --

THE COURT:  Mr. Hochman, you really don't want to get into what you've done during the course of this trial, so --

MR. HOCHMAN:  I'm just telling you --

THE COURT:  Look --

MR. HOCHMAN:  Your Honor, I -- let me stop there. Okay.  I'm just reacting to being chastised for misleading -- making misleading statements that you had sustained --

THE COURT:  Trust me.  You don't know what chastise is.  You haven't been chastised, so --

MR. HOCHMAN:  Your Honor, then I --

THE COURT:  Mr. Hochman --

MR. HOCHMAN:  Let me withdraw the word "chastise."

When you spoke to me at sidebar and you said, "Counsel, if you," you know, "if you" -- basically, you were fed up with what you thought were misleading statements.  And you basically indicated to me if I continued to make misleading

statements, you were going to cut me off.

And the problem there, Your Honor, is that since I was three for three in not misleading the jury, two of which at least you sustained, your -- I am not going to use the word "anger" -- your thought process at that moment in time was unfortunately tainted by Mr. Fox making inappropriate misstate-the-testimony objections that, you know -- you didn't have the transcript in front of you, and you sustained based, presumably, I guess, on your memory of what had occurred.

The problem was is that, you know, it turns out that I was not misstating the testimony.  And that's why I'm just reacting today, Your Honor, to try to fix this problem.  Because, again, if Mr. Fox had just talked about the defense and he kept it to the arguments and he said the arguments don't have evidence for them, that's one thing.

But if you recall, Your Honor, he said "Mr. Hochman" at least 15 times.  And he started out by saying that I made stuff up, distorted the record and misled the jury.

I mean, that's what I'm trying to cure, Your Honor, is his argument where he chose not to call out the defense or my evidence or my arguments, but he made it personal to me, Your Honor, in order to defeat my credibility before the jury.

THE COURT:  Well, again, the jury is deliberating, so if you want something given to the jury, then we can try to work to do something like that.

MR. HOCHMAN:  May I have a moment with counsel, Your Honor?

THE COURT:  That's fine.

*(Counsel confer off the record.)*

MR. HOCHMAN:  I didn't ever go ahead and say Mr. Fox was making stuff up or Mr. Fox --

THE COURT:  You did indicate on a couple of occasions that Mr. Fox was misstating the record and that there was no evidence to support his argument.

MR. HOCHMAN:  Mr. Fox hadn't spoken at that time, Your Honor.

THE COURT:  I'm sorry?

MR. HOCHMAN:  I was addressing -- to the extent I was addressing anyone on the government's team, it would have been Ms. Rhodes.  I never actually had a chance to respond to Mr. Fox.

THE COURT:  You objected during Mr. Fox's rebuttal argument; right?

MR. HOCHMAN:  Correct.  And you never overruled any one of my objections, Your Honor, because the times I objected --

THE COURT:  Excuse me, sir.  This isn't helpful, keeping score.  So, look, again, if you want to try to -- see, what you asked me to do is to say the defense's objections are now overruled -- or the government's objections are overruled.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

MR. HOCHMAN:  Or at least certain objections dealing with misstatement of testimony are now overruled.

THE COURT:  Well, quite frankly, as long as I include you both, I don't see what the problem is.

MR. HOCHMAN:  May I have a moment, Your Honor, to talk to my co-counsel?

THE COURT:  Yes.

*(Counsel confer off the record.)*

MR. HOCHMAN:  Your Honor, may I have the Court, if you wouldn't mind, reading again what you were proposing?  I just want to make sure I wrote it down correctly.

THE COURT:  Well, I have made a couple of different proposals this morning.

MR. HOCHMAN:  Let me restate it as best -- I wrote it down as fast as I could -- to make sure I'm understanding the point.

"Yesterday both counsel objected that" -- you said "the other counsel," or however you were going to phrase that, "misstated the evidence.  Those objections are now overruled. Your memory controls."

Is that what you are proposing?

THE COURT:  In essence, yes.

MR. HOCHMAN:  That will be fine, Your Honor.

Obviously we've got to get the final wording of that. And I don't believe it fully cures the situation that I've

explained at length, but in light of the fact that the Court has indicated that it will not give an instruction that just says, "Government counsel objected that defense counsel misstated the evidence and that objection is overruled" -- in light of the fact that the Court has indicated it won't give that instruction, the defense would accept this instruction, although we want to just understand exactly what words the Court's going to use.

THE COURT:  Okay.  What's the government's position?

MR. FOX:  That instruction is fine.  I do think that you should add in your standard language about the jury should not infer anything from your rulings at the end of that instruction.

THE COURT:  Okay.

MR. FOX:  And, Your Honor, I'm not going to get into it now because I think this is for -- if there is a conviction and appeal, that it's more for that, but I believe in my rebuttal that I tied, every time I said he was misstating something, to a specific fact.  And I've got a list of certain things that he misstated outside of these objections.

I don't think we need to get into it now, but I just want to point out that my rebuttal did not tie his misleading arguments to what he said about Mr. Carey, what he said about Mr. Manzo.  They were separate arguments.

THE COURT:  All right.  How about something like

this:

"Yesterday both counsel objected during their respective closing arguments that the other side had misstated the evidence. Those objections that were sustained during closing arguments are overruled. Your memory controls whether the factual assertions are supported by the evidence and testimony at trial. Please do not read into anything I may have said or done any suggestion as to what verdict you should return. That is a matter entirely up to you."

MR. FOX: Yes, Your Honor. That's fine with the government.

MR. HOCHMAN: Again, we note our objection to it for the record, but given the Court's indications on what it will rule, that language is acceptable, Your Honor.

THE COURT: All right. Just give me a minute and then --

MR. FOX: It also sounds like, Your Honor, we are going to need your intervention on the exhibit list because counsel cannot reach an agreement on descriptions.

THE COURT: Okay.

*(Recess taken 10:02 to 10:08 A.M.)*

MR. HOCHMAN: I think we've made progress on the exhibit list. I think there's a few items we are still in disagreement on.

THE COURT:  That's fine.  Let's put that aside for a moment.  Let's finish up on this and we can get the jury in here.

MR. HOCHMAN:  Thank you, Your Honor.

THE COURT:  Now, so I'm going to give the instruction that we talked about, that I recited to everybody.

Now, there's an instruction, I believe, on page 6 of the instructions.  I was trying to deal with this issue yesterday.

Does everybody have that?

MR. FOX:  We do not, Your Honor.

MR. HOCHMAN:  Hold on one sec, Your Honor.  Let me get my copy.

Yes, I have a copy, Your Honor.

THE COURT:  All right.  Maybe you can let Mr. Fox look on.

MR. HOCHMAN:  I will.  Page 6, Your Honor?

THE COURT:  Page 6.  Go down to line 11.

MR. HOCHMAN:  Yes, Your Honor.

THE COURT:  See where it says, "Please do not read into anything I may have said or done or any rulings," comma, "including I have made during closing arguments of the defense and the government any suggestion as to what verdict you should return or what the facts are."

I think that word "including" probably ought to come

out because what we are really trying to address is the closing arguments.

MR. HOCHMAN:  Yes, Your Honor.  I agree.

THE COURT:  So what I would propose to do is to take the instructions back from the jury, take out the word "including" and substitute this page -- take out the old one and substitute this page.

MR. HOCHMAN:  We'd ask the Court to do that in open court with the jury and read the new instruction to the jury, Your Honor.

MR. FOX:  Your Honor, I am -- I just want to make sure I'm on the same page as everybody.  Are you saying that we will still give the instruction we were talking about earlier?

THE COURT:  We are still going to give this instruction.

MR. HOCHMAN:  Yes, Your Honor.

MR. FOX:  And then -- I don't know why we would be taking out the "including," then, because --

THE COURT:  I think -- I don't -- quite frankly, I'm not sure the jury is going to pick up on it, but somebody might look at that and say, "Well, the judge is telling us we can disregard any other rulings he made during the course of the trial in determining facts," and I don't think that's what we intended.

MR. FOX:  No.

THE COURT:  That's not what I intended.

MR. HOCHMAN:  Yeah, we agree.

MR. FOX:  I don't think that's the way it reads by saying "including" during closing arguments, but I can see what you're saying.  But I wonder if by just striking the word "including," then, that we're now saying -- that we're now limiting it to closing arguments of the defense and government by striking that word.

MR. HOCHMAN:  I think, Your Honor -- I see Your Honor's point.  I think that point I'd be -- I'd be very surprised if the jury goes there with that.  I don't think --

THE COURT:  Then we'll leave it alone.

MR. HOCHMAN:  Yes, Your Honor.

THE COURT:  Okay.  All right.  So why don't we bring in the jury and I will give this instruction.

MR. HOCHMAN:  Yes, Your Honor.

*(Jury in at 10:14 A.M.)*

THE COURT:  Ladies and gentlemen, I have another instruction I want to give you.

Yesterday both counsel objected during their respective closing arguments that the other side had misstated the evidence.  Those objections that were sustained during closing arguments are overruled.  Your memory controls whether the factual assertions are supported by the evidence and the testimony at trial.  Please do not read into anything I may

have said or done any suggestion as to what verdict you should return.  That is a matter entirely up to you.

All right.  Thank you very much.  And you can return to the jury room to resume your deliberation.

*(Jury out at 10:16 A.M.)*

*(The following was heard outside the presence of the jury.)*

THE COURT:  All right.  If we could turn to the exhibit list.

MR. HOCHMAN:  So, Your Honor, I took the government's exhibit list they gave me.  And the edits I made, Your Honor -- for instance, there is obviously a whole series of e-mail chains.  And it says, "E-mail or e-mail chain" dated a certain date.  And then it has either a "Re" line after it or a "From" line.  The problem with the "From" line, Your Honor, is that many of these documents had multiple e-mails contained within them.

And what I suggested is that we just write "E-mail dated," for instance, "8/18/2011 1:30 p.m.; e-mail dated 8/19/11," different e-mail, whatever the date and time was of the e-mail chain, rather than referring to who's on the e-mail chain.  Because then you would have to refer to all the multiple layers of it, and that doesn't help them.

If the jury wants to track an e-mail that happened on 8/18, they will at least know the, in this case, three or four

to go to very quickly.

MR. FOX:  Your Honor, do you have a copy of it?

THE COURT:  I don't.

MR. JAUREGUI:  May I approach, Your Honor?

THE COURT:  Yes.

MR. HOCHMAN:  So this will cover -- if you see from Exhibit Number 14 -- and it keeps going all the way through like Exhibit 67, Your Honor.

And, again, what I left in was "E-mail dated" whatever date it is at whatever time it is, period.  And I got rid of all of the other information.

THE COURT:  Okay.

MR. HOCHMAN:  And then -- so that would get us through Exhibit 67.

MR. FOX:  Well, if I could address that issue before we move on.  I think that's going to make it more confusing to the jury because there are a lot of e-mails around the same times, and they may get confused about things.  By just adding in the "From" and the "To," which is always the last "From" and "To" at the top of the e-mail, it's going to help the jury identify which exhibits they're looking at and which ones they may have taken notes on earlier.

MR. HOCHMAN:  And the problem is is that within each -- maybe not every e-mail, but within many of the e-mails, Your Honor, we discussed and counsel -- either counsel for the

government or counsel -- or myself discussed one of the lower e-mails on the chain that, in fact, then wouldn't be referenced.

So I think if we put in the date -- and even if there's four e-mails on that date, the exhibit list will have the jury go down to those four, and they can quickly choose within the four of that date.  And I think only 8/18 has four, 8/19 has two, and some of the other ones have two or three, Your Honor.

MR. FOX:  Your Honor, the problem that Mr. Hochman is trying to solve he is actually hurting because if he is saying that we didn't discuss the top e-mail and we are leaving in that time of the top e-mail, it's going to again hurt the jury's ability to identify what this e-mail is.

So the identification of the people who were sending or receiving the top e-mail will only provide further clarification to the jury.  If we just leave in the times and Mr. Hochman is confused -- or concerned about confusion over which e-mail we are talking about, it's going to be worse for the jury.

MR. HOCHMAN:  And to the extent we can solve that is just put the date range of the e-mail.  So if an e-mail covered 8/19 and 8/18, you would say, "E-mail dated" -- you know, "E-mail chain" -- because assuming it's more than one e-mail, it would be an e-mail chain -- "dated 8/18, 8/19."

Again, the purpose is, Your Honor, to take the hundred or so exhibits and the jury can quickly reduce that to three or four and then go look for them, if, in fact, they want to use the exhibit list as a way to quicken that process.

MR. FOX:  Well, what we have agreed to do is delete the "Re" line or the "Subject" line that we have in the description of the e-mail, but I think, again, it's good for the jury to know who's sending and receiving e-mails.

MR. HOCHMAN:  But then with the internal part of the e-mail -- if you remember Exhibit 53, Your Honor, you have Walter Katz to Mike Gennaco and Mike Borman; Mike Borman then to Mike Gennaco and Walter Katz; and then you have Mike Gennaco and Tom Carey; and then you have Tom Carey to Steve Leavins.

So putting in the "To" and the "From" would actually make it -- I guess you could conceivably put in every "To" and every "From" and every "cc" that was talked about in this trial, but then all of a sudden you're -- I think you are exceeding the purpose of what we're trying to do here.

If they want to find the e-mail in this range, this helps them refine it down to three, four, or five maximum, and they can pull the one.  And, remember, the last jury didn't even have an exhibit list to go from to lower it from a hundred exhibits or so down to five.

THE COURT:  Any other objections?

MR. HOCHMAN:  And so I think, Your Honor, beyond

that -- beyond 67 -- let me just quickly look.

MR. FOX:  I assume you don't need to know what our agreements are for the changes; you're just looking to intervene where needed.

THE COURT:  Right.

MR. FOX:  So one of them is 142 to 145 and then 151 and 152.  Mr. Hochman would like us to delete who the subjects -- or the targets, as they're described, on the surveillance -- who the targets are of the surveillance.  And the document itself identifies that it's Leah Marx or David Lam.  So this is another one where we think this provides clarification to the jury about who it is that they are providing surveillance on.

And if the word "Target" is used, that's because the document itself uses the word "Target."  That's on Exhibit 152. It says, "Target."  142 to 145 says, "Log of Target Leah Marx," and I believe that those documents also say that she's the target when you look at them.

MR. HOCHMAN:  And, again, Your Honor, what we are saying is that the only evidence that dealt with this was very minimal.  And if the jury wants to figure out where the surveillance logs are -- or the Surveillance Operation -- I'm sorry -- the SOG weekly, which is the weekly reports or the Special Operation Group Surveillance Log, then they can quickly see -- go from basically 142 to 150 and then within them find

whatever they're looking for.

I think highlighting a particular document -- that the target was Leah Marx is highlighting testimony, in essence.

THE COURT:  Is that -- isn't that what the document says?

MR. FOX:  Yes, Your Honor.

MR. HOCHMAN:  Well, the title of the document, Your Honor -- I have it right here.  The title of the document -- and I can show it to you -- is "Special Operations Group Surveillance Log."  Then when you get into the document, it says, "Target:  Leah Marx."  And we've been using titles for documents.

It didn't say, "Special Operations Group Surveillance Log for Target Leah Marx," which is what they're putting, you know, in the caption.

So that's why we're saying, again, if they want to find Special Operations Group Surveillance Logs, this will limit it then to a very -- you know, I think roughly eight documents, and then they can quickly find whatever they're looking for, which is presumably the purpose of giving them the exhibit list.

MR. FOX:  The portion of the document that says, "Target:  Leah Marx" is also in the caption that they have. It's the second line.  The first line is the "Surveillance Log."  The second line, still in bigger font, is "Target:  Leah

Marx," and then the date.  And that's what we've listed here.

MR. HOCHMAN:  And, again, it's probably the word "Target," Your Honor.  If we could -- if Your Honor wants to include this, which I believe we don't need -- because we don't do it for the SOG weekly, which is right below it, weekly reports.  We don't identify that the target was Leah Marx, even though within the body of it, Your Honor, you see the name Leah Marx.

So, again, to the extent they're looking for surveillance records, they can quickly go here, see there's roughly eight documents or so and take a look at them.  I think highlighting that she was the target is testimonial and not necessary in an exhibit list.

MR. FOX:  It's in the documents.  It's not testimonial.

THE COURT:  Can I see, for example, 142?

MR. HOCHMAN:  Yes, Your Honor.  May I approach?

THE COURT:  Yes.

MR. HOCHMAN:  This book also has the other ones in it as well.

THE COURT:  I just need -- I take it one is -- okay. Thanks.

Anything else?

MR. FOX:  Yes, Your Honor.  Not too many more.

194 -- and this is similar with 210.  These are phone

records.  You will recall that the sheriff's department did not change the name of the user of the telephone when they gave the telephone to somebody else.  So these phone records will list people that have not been mentioned in this trial as people who are important to any of the facts here.

So, for example, under 194, Mr. Hochman wants us to delete "Drivers' aides."  And the evidence shows that those were the drivers' aides.  That came from the sheriff's department's own phone rosters.  And he wants us to add instead phone records for Steve Sciacca, Eli Vera and Maher Michael.

I don't even know who most of these people are.  And I don't think that's going to aid the jury when the sheriff's department's own records show who those phone records belong to.

And that's similar for 210.  The phone rosters show that that number belongs to Chris Nee.  And Mr. Hochman would like us to add instead -- delete Nee and add that it's Jack McClive's phone records.

THE COURT:  That it's what?

MR. FOX:  Jack McClive.  That's what the document says, but that's not going to aid the jury in any way.

MR. HOCHMAN:  Again, Your Honor, it's testimonial that a particular phone number comes back to Chris Nee.  If you actually look at the documents themselves -- and I'm happy to present the Court with either 210 or 195.  Those documents, for

instance, for 195 say "Detail for" this gentleman, Steve Sciacca, Eli Vera, whose name was in trial, and Maher Michael. That's what the record says.

Agent Tanner then, through her testimony, tried to connect up the phone number to a different individual, but the actual records say that they are for these individuals. So if the government thinks -- and, for instance, with Tom Carey, his phone records say "Tom Carey." Steve Leavins, his records say "Steve Leavins." Same thing with Sheriff Baca and Mr. Tanaka and Mr. Manzo.

But for whatever reason, these records have other gentlemen's names and it's only testimony that then connects these records back to, you know, a Baca driver or back to Mr. Nee. So accurately stated, this is what the record says.

MR. FOX: Your Honor, I don't think this is something that Mr. Hochman is contesting, that this is accurate. And it's not testimony. It comes from the sheriff's departments own records, which were introduced through a records custodian 902(11). Again, not contested at all throughout trial.

MR. HOCHMAN: It's the name, Your Honor.

If we are going to be accurate in this exhibit list that we are giving them, that's what it says. And if it's testimony that then switches the name to Christopher Nee because he was using the same phone at that time, it's not what the record says.

THE COURT:  I know it's not what the record says, but that name isn't going to mean anything to the jury.

MR. HOCHMAN:  Then we should put no names in it, Your Honor.  It should say "Phone records" for that phone number and that's fine.  And the jury then will know that if they want to look up that phone number, here are the phone records for that phone number.  And that would be an accurate statement, Your Honor.

THE COURT:  Okay.

MR. HOCHMAN:  It's not accurate to say it's for Chris Nee or for Baca drivers or anything like that.

MR. FOX:  I think, Your Honor, there's only one more point of dispute, and that's Exhibit 195.  What we've written is, "ITMS phone calls between S.A. Tanner and Anthony Brown." Mr. Hochman at first said that he wanted to add "unidentified female" in there.  It's not clear why that's the case because it's her voice on --

MR. HOCHMAN:  This is what I would like right now.

MR. FOX:  Okay.  He now would like the dates listed and not the people listed.  So it would list ITMS phone calls for July 18th, 19th, 21st, 2011.

Again, I don't think it's in dispute that that's Anthony Brown's voice and Special Agent Tanner's voice.  I think this would just aid the jury.

MR. HOCHMAN:  The point I was making, Your Honor, is

that when these phone calls were originally taken down on July 18th, 19th and 21st and then presented originally, they didn't know it was Agent Tanner. They identified her as an unidentified female. We know later on, you know, seven years later, whatever it was, that Agent Tanner -- or whenever they could identify or connected that it was Agent Tanner.

So what I suggested is that just to reference -- and these I think are the only ITMS phone calls. And I said, "ITMS phone calls for July 18th, 19th, 21st, 2011." That will clearly tell the jury that these are the ITMS phone calls, and we don't have to get into the dispute as to did the -- you know, did people know that it was Agent Tanner at the time? Was it an unidentified female? We don't even have to deal with that dispute. We just identify the date range.

MR. FOX: And, Your Honor, I'm happy to add instead, "ITMS phone calls between FBI and Anthony Brown," because they certainly knew and the testimony was that they knew it was connected to the FBI civil rights squad at the time.

So if he's concerned with whose voice it is and whether they knew it was Special Agent Tanner's voice, we can absolutely say, "ITMS phone calls between FBI and Anthony Brown."

MR. HOCHMAN: That's fine, Your Honor.

And we can get you the rest of the changes, beyond the ones we've listed, that we've already agreed to,

Your Honor.

THE COURT: Okay. Well, let me just go ahead and go through these quickly.

My goal here is to assist the jury in identifying these documents and to assist them in getting through the evidence. And wherever we can do that that's consistent with the evidence that's presented during the trial, that's what's really going to guide my decisions here.

So as to -- let's see. I believe -- as to the e-mails, which I believe went through 14 through --

MR. HOCHMAN: 67. And there's a couple later, after that, Your Honor, one or two.

THE COURT: Okay. I'm going to ask that you leave in the "To" and the "From"s because I think that will help the jury.

MR. HOCHMAN: And just take out the "Re" line, Your Honor?

THE COURT: I thought you had already agreed to that.

MR. FOX: Yes, Your Honor.

MR. HOCHMAN: Yes, Your Honor, that's correct.

THE COURT: And what's the next one?

MR. FOX: 142 to 145 and 151 and 152.

THE COURT: What's wrong with leaving in her name and taking out the word "Target"?

MR. HOCHMAN: That's fine, Your Honor.

MR. FOX:  So, Your Honor, we will do that for 142, 143, 144, 145 and 152.  151 did not have in the document itself "Target" -- or, I'm sorry, in the description itself "Target" or "Subject," so we will just leave that one as is.

MR. HOCHMAN:  That's fine, Your Honor.

THE COURT:  Okay.  And what's the next one?

MR. FOX:  194 and 210, same issue on both of those.

THE COURT:  194 is fine as written.

And 210, did you say?

MR. FOX:  Yes, Your Honor.

THE COURT:  And 210 is fine.

And what's the next one?

MR. FOX:  I think that's it.

MR. HOCHMAN:  I think that's it, Your Honor.

THE COURT:  Okay.  Thank you.

MR. FOX:  Thank you.

THE COURT:  When this is finalized, does the clerk have permission to take it back in?

MR. FOX:  Yes, Your Honor.

MR. HOCHMAN:  Yes, Your Honor.

*(Recess taken 10:36 to 12:33 P.M.)*

THE CLERK:  Recalling Item 1, CR16-66(A)-PA, United States of America versus Leroy Baca.

Counsel, please state your appearances.

MR. FOX:  Good afternoon, Your Honor.  Brandon Fox,

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Lizabeth Rhodes and Eddie Jauregui on behalf of the United States.  Also with us at counsel table is FBI Special Agent Leah Tanner.

THE COURT:  Good afternoon.

MR. HOCHMAN:  Good afternoon, Your Honor.  Nathan Hochman and Brianna Abrams on behalf of defendant Leroy Baca, who is present.

THE COURT:  Good afternoon.

We have a note from the jury.

Everybody's so serious.

"The jury requests the following:  White board, easel and/or chart paper."

And I have managed to obtain a white board easel and will, unless somebody has an objection, provide that to the jury.

MR. HOCHMAN:  No objection, Your Honor.

MR. FOX:  No objection.

THE COURT:  All right.  Thank you very much.

*(Recess taken 12:34 P.M.)*

*(Jury continues to deliberate.)*

--oOo--

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

CERTIFICATE


I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.


Date: AUGUST 10, 2017


/s/  Cindy L. Nirenberg, CSR No. 5059

Official Court Reporter


UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA