# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

### HONORABLE PERCY ANDERSON, U.S. DISTRICT JUDGE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. |
| | ) | |
| vs. | ) | CR 16-00066(A)-PA |
| | ) | |
| LEROY D. BACA, | ) | PAGES 411 to 610 |
| | ) | VOLUME 5 |
| Defendant. | ) | |
| | ) | |

**REPORTER'S TRANSCRIPT OF**
**TRIAL DAY 3**
**WEDNESDAY, DECEMBER 7, 2016**
**8:06 A.M.**
**LOS ANGELES, CALIFORNIA**

**MIRANDA ALGORRI, CSR 12743, CRR**
FEDERAL OFFICIAL COURT REPORTER
312 NORTH SPRING STREET, ROOM 435
LOS ANGELES, CALIFORNIA 90012
MIRANDAALGORRI@GMAIL.COM

**UNITED STATES DISTRICT COURT**

412

**APPEARANCES OF COUNSEL:**

**FOR THE PLAINTIFF:**

　　SANDRA R. BROWN
　　Acting United States Attorney
　　BY:　BRANDON FOX
　　BY:　EDDIE A. JAUREGUI
　　Assistant United States Attorneys
　　United States Courthouse
　　312 North Spring Street
　　Los Angeles, California 90012

**FOR THE DEFENDANT:**

　　MORGAN LEWIS AND BOCKIUS LLP
　　BY:　NATHAN J. HOCHMAN
　　BY:　BRIANNA ABRAMS
　　The Water Garden
　　1601 Cloverfield Boulevard
　　Suite 2050 North
　　Santa Monica, California 90404

　　MORGAN LEWIS AND BOCKIUS LLP
　　BY:　TINOS DIAMANTATOS
　　77 West Wacker Drive
　　Chicago, Illinois 60601

**UNITED STATES DISTRICT COURT**

# I N D E X

## WEDNESDAY, DECEMBER 7, 2016

## Chronological Index of Witnesses

Witness: _____                 Page

JUAREZ RAMIREZ, Paulino

    Direct examination by Mr. Jauregui               500
    Cross-examination by Mr. Diamantatos             514


YANAGI, Brian

    Direct examination by Mr. Jauregui               528
    Cross-examination by Mr. Hochman                 533
    Redirect examination by Mr. Jauregui             535


ROSENBAUM, Mark

    Direct examination by Mr. Fox                    537
    Cross-examination by Mr. Hochman                 549
    Redirect examination by Mr. Fox                  557


ELIASBERG, Peter J.

    Direct examination by Mr. Fox                    562
    Cross-examination by Mr. Hochman                 581
    Redirect examination by Mr. Fox                  593
    Recross-examination by Mr. Hochman               594


OLMSTED, Robert

    Direct examination by Mr. Fox                    595

UNITED STATES DISTRICT COURT

414

**EXHIBITS**

**WEDNESDAY, DECEMBER 7, 2016**

| Exhibits | | For ID | In EVD |
|---|---|---|---|
| 9 | ACLU Correspondence Rosenbaum to Baca | 540 | 540 |
| 11 | ACLU Document | 570 | |
| 13 | ACLU Letter | 575 | 576 |
| 14 | E-mail | 530 | 533 |
| 15 | E-mail | 530 | 533 |
| 16 | E-mail | 530 | 533 |
| 17 | E-mail | 530 | 533 |
| 19 | E-mail | 530 | 533 |
| 20 | E-mail | 530 | 533 |
| 21 | E-mail | 530 | 533 |
| 22 | E-mail | 530 | 533 |
| 23 | E-mail | 530 | 533 |
| 24 | E-mail | 530 | 533 |
| 25 | E-mail | 530 | 533 |
| 26 | E-mail | 530 | 533 |
| 27 | E-mail | 530 | 533 |
| 28 | E-mail | 530 | 533 |
| 29 | E-mail | 530 | 533 |
| 30 | E-mail | 530 | 533 |
| 31 | E-mail | 530 | 533 |

**UNITED STATES DISTRICT COURT**

415

**EXHIBITS CON'T**

**WEDNESDAY, DECEMBER 7, 2016**

| Exhibit | | For ID | In EVD |
|---|---|---|---|
| 32 | E-mail | 530 | 533 |
| 33 | E-mail | 530 | 533 |
| 34 | E-mail | 530 | 533 |
| 35 | E-mail | 530 | 533 |
| 36 | E-mail | 530 | 533 |
| 37 | E-mail | 530 | 533 |
| 38 | E-mail | 530 | 533 |
| 39 | E-mail | 530 | 533 |
| 40 | E-mail | 530 | 533 |
| 41 | E-mail | 530 | 533 |
| 42 | E-mail | 530 | 533 |
| 43 | E-mail | 530 | 533 |
| 45 | E-mail | 531 | 533 |
| 46 | E-mail | 531 | 533 |
| 47 | E-mail | 531 | 533 |
| 48 | E-mail | 531 | 533 |
| 49 | E-mail | 531 | 533 |
| 50 | E-mail | 531 | 533 |
| 51 | E-mail | 531 | 533 |
| 52 | E-mail | 531 | 533 |

**UNITED STATES DISTRICT COURT**

416

**EXHIBITS CON'T**

**WEDNESDAY, DECEMBER 7, 2016**

| Exhibit | For ID | In EVD |
|---|---|---|
| 53   E-mail | 531 | 533 |
| 54   E-mail | 531 | 533 |
| 55   E-mail | 531 | 533 |
| 56   E-mail | 531 | 533 |
| 57   E-mail | 531 | 533 |
| 60   E-mail | 531 | 533 |
| 61   E-mail | 531 | 533 |
| 62   E-mail | 531 | 533 |
| 63   E-mail | 531 | 533 |
| 64   E-mail | 531 | 533 |
| 65   E-mail | 531 | 533 |
| 67   E-mail | 532 | 533 |
| 182  E-mail | 531 | 533 |
| 183  E-mail | 531 | 533 |

**UNITED STATES DISTRICT COURT**

417

**LOS ANGELES, CALIFORNIA; WEDNESDAY, DECEMBER 7, 2016**

**8:06 A.M.**

**---**

(The following proceedings were held in open court out of the presence of the jury:)

THE CLERK:  Calling item No. 1 CR 16-66(A), USA versus Leroy D. Baca.

Counsel, state your appearances, please.

MR. FOX:  Good morning, Your Honor.

Brandon Fox and Eddie Jauregui on behalf of the United States.  Also sitting at counsel table is Special Agent David Dahle with the FBI.

MR. HOCHMAN:  Good morning, Your Honor.

Nathan Hochman along with Brianna Abrams and will momentarily be joined by Tinos Diamantatos, and we represent Leroy Baca who is present before the Court.

THE COURT:  Good morning.  Are there any issues we need to take up before the jury is brought in?

MR. JAUREGUI:  Yes, Your Honor.  Briefly.

Monday the Court closed the courtroom for part of the day.  We believe it was for the for-cause examination of potential jurors only.  We -- our recollection is that the Court did make some findings or explanation about why the Court was doing so.  We wanted to ask the Court just to ensure that

**UNITED STATES DISTRICT COURT**

the record is clear if the Court could explain that the -- what the basis was for closing the Court for that portion of the jury selection.

Our understanding is that it was to help protect the juror privacy because I believe the Court said that effectively these were sidebars.  So our understanding is that it was to protect juror privacy and avoid their embarrassment, help to elicit more candid responses from those jurors, and also so the defendant could be present for those sidebars without having to interact with the potential jurors at a real sidebar.

So, again, we believe the Court may have explained some of that.  Unfortunately our recollection is a little fuzzy on that, and we wanted to ask the Court if it could make findings so the record was clear and in one place.

THE COURT:  Yeah.  I will do that.  But briefly, the Court did that not only to protect the privacy of the jurors, but there had been a motion made for a change of venue in this case, and there had been allegations or claims that the case was being overrun by media publicity, and there was still active a motion to show actual prejudice.

It was always the Court's intention that, once we determined that -- determined the issue of whether or not there was any actual prejudice to reopen the courtroom -- and I'll elaborate on those reasons a little later today.  I don't want

to keep the jury waiting.  But it was not only for the privacy of the jury but also to determine the extent to which there was any actual prejudice as a result of pretrial publicity.  And once the Court satisfied itself that the claims of actual prejudice were wanting or really wasn't an issue, the Court then reopened it.

And moreover, it's always been the Court's practice to take up sensitive issues at sidebar and, in this case, because we were going to do it individually, I was going to actually have those jurors into my chambers along with counsel and the defendant and the court reporter.  And in essence, anybody who wanted to come in would not have heard it in any event.  This isn't the first time that I've taken sensitive matters outside -- either at sidebar or outside the presence of both.

MR. JAUREGUI:  And, Your Honor, I think this related to the actual prejudice point, but I did neglect to point out that our understanding was also that what the Court was trying to do was avoid a potential juror blurting out and potentially tainting other jurors by saying they had heard of the procedural history of this case, Your Honor.

THE COURT:  That was -- that's true as well.  In fact, I think both sides wanted to avoid having any jurors blurt out things that they had either heard or read in the paper about this case.  So the Court, in weighing all the

**UNITED STATES DISTRICT COURT**

alternatives, thought that was a viable way to do it and certainly was going to reopen the proceedings once we got through the for-cause challenges.  And I satisfied myself that pretrial publicity wasn't really going to be an issue in this case.

MR. JAUREGUI:  Thank you, Your Honor.

MR. FOX:  Thank you, Your Honor.

MR. HOCHMAN:  Thank you, Your Honor.

One other very quick thing that will apply to the first witness, Your Honor.  The Government and myself have spoken about that limiting instruction.  We've come up with a draft of one.  May I approach the Court?  It will apply to the first witness -- actually, the first three witnesses, Your Honor.

THE COURT:  That's fine.

MR. HOCHMAN:  Thank you.

THE COURT:  I'm sorry.  This is an agreed to instruction?

MR. HOCHMAN:  Yes, Your Honor.

THE COURT:  Okay.  That's fine.

MR. HOCHMAN:  I would ask that -- actually, I think it's the first four witnesses if I'm not mistaken.  It's the chaplain, Your Honor, the two ACLU witnesses, Mr. Eliasberg and Mr. Rosenbaum, and one of the deputy sheriffs and Mr. Olmsted.  And it might apply potentially to additional

witnesses.  We'll see what the testimony is, Your Honor.

THE COURT:  I'm not sure I need to give it for each and every witness, but I'll certainly give it before the first witness testifies.  I'll give it again at some point.

MR. HOCHMAN:  Thank you very much, Your Honor.

MR. JAUREGUI:  Your Honor, one minor housekeeping thing.

Special Agent Dahle has a computer in front of him.  I believe the Court has allowed him to have a computer at counsel table in the past, and we are requesting permission to do that again.

THE COURT:  That's fine.

MR. JAUREGUI:  Thank you.

MR. HOCHMAN:  At some point we might have a computer as well, Your Honor.  It will be for the same reason.

THE COURT:  All right.

MR. FOX:  One moment, Your Honor.

(Counsel confer.)

MR. HOCHMAN:  Your Honor, I e-mailed the Court and the court clerk last night about the motion in limine.  We have reached an agreement, Your Honor, so that the -- so we didn't file an opposition.  We think -- and that should come in probably tomorrow or the -- sometime this week, Your Honor.

THE COURT:  I'm sorry.  What should come in?

MR. HOCHMAN:  The Baca interview statements that

we have agreed to between the two parties, Your Honor.  They're excerpts from Mr. Baca's interview.  The Government wanted not the whole interview.  They wanted certain excerpts.  We went through each one of the excerpts and agreed with them, Your Honor.

MR. FOX:  And, Your Honor, just to explain the entire agreement, we've agreed that the portions that will be coming in in this trial from 2013 will not necessitate the defense calling Dr. Spar.  It will not call Dr. Spar even though we are eliciting those statements in our case in chief.

Secondly, if the defendant takes the stand, we possibly could cross-examine him and possibly admit the 2015 Antuna depositions against him, but we will not put that in our case in chief.  If we do cross-examine the defendant, should he testify on the 2015 deposition, the defense still will not call Dr. Spar as a witness.

MR. HOCHMAN:  That's correct, Your Honor.  That was our agreement.

THE COURT:  All right.  All right.  Have the parties reviewed demonstrative exhibits that are going to be used during opening statements?

MR. HOCHMAN:  Yes, Your Honor.

MR. FOX:  Yes, Your Honor.

MR. HOCHMAN:  We reviewed each of them, and we accept the Government's.  I believe the Government accepts

mine.

MR. FOX:  Yes, Your Honor.

THE COURT:  And the Government's opening statement is going to be how long?

MR. FOX:  About 45 minutes.

THE COURT:  And the defense?

MR. HOCHMAN:  Approximately an hour, Your Honor.

THE COURT:  All right.  I'm going to give the jury some preliminary instructions.  I'm going to give 1.1, 1.2.  I'm going to include the elements of the offenses that I believe the parties have agreed upon.

MR. HOCHMAN:  Your Honor, I apologize.  When the trial got reconfigured, we're going to be submitting a new instruction on the obstruction of justice.  If the Court denies it as the Court has done in the prior trial -- and the issue right now is on a petition for cert in the Thompson trial -- then we will agree without waiving our objection to the one that's been submitted.  We want to preserve our objection, Your Honor, for the same issue that's up on potential cert petition in the Thompson matter.

MR. FOX:  Just to actually state what that issue is, they have proposed in the last few days a jury instruction for Count 2 in which it defines corrupt intent as necessitating bribery.  There's been one judge in the 9th Circuit who has said that.  It's a very much minority view, and that is the

**UNITED STATES DISTRICT COURT**

424

issue that they wanted to present in the jury instruction.  We obviously dispute that.  We believe that the 9th Circuit precedent holds.

MR. HOCHMAN:  I'm sorry, Your Honor.  I didn't mean to interrupt.  We just wanted to preserve the issue for the record.

THE COURT:  As I understand it, the instruction that everybody has agreed to -- everybody has agreed to save this issue.  Everybody has agreed to that obstruction instruction that was submitted to the Court?

MR. FOX:  Yes, Your Honor.

THE COURT:  In Document 175.

MR. HOCHMAN:  Yes.  Without waiving the right to bring the other obstruction jury instruction.

THE COURT:  Okay.  I'm going to give 1.3, 1.4, 1.5, 1.6, 1.7, 1.8, 1.9, 1.10, 1.11, 1.12, 2.2.

All right.  If there's nothing else, we'll have the jury brought in.

MR. FOX:  Your Honor, may I just have 30 seconds? I'm still trying to get used to this new court setup, and I would like to change the input of my computer and move a microphone so I have more space available.

THE COURT:  That's fine.

MR. HOCHMAN:  Thank you.

MR. FOX:  Thank you, Your Honor.  We'll change

**UNITED STATES DISTRICT COURT**

the input so the jury doesn't see this until we begin.

THE COURT:  Is everybody all set?

MR. DIAMANTATOS:  Yes.

MR. FOX:  Yes, Your Honor.

THE COURT:  All right.  Let's bring the jury in.

(The following proceedings were held in open court in the presence of the jury:)

THE CLERK:  Calling item No. 1, CR 16-66(A), United States versus Leroy D. Baca.

Counsel, state your appearances, please.

MR. FOX:  Good morning, Your Honor.

Brandon Fox and Eddie Jauregui on behalf of the United States.  Also with us at counsel table is Special Agent David Dahle of the FBI.

THE COURT:  Good morning.

MR. HOCHMAN:  Good morning, Your Honor.

Nathan Hochman along with Tinos Diamantatos and Brianna Abrams representing Leroy Baca.

THE COURT:  Good morning.

Good morning, ladies and gentlemen.  Sorry we got started a little late this morning.

I have some brief preliminary instructions for you.

*"Ladies and gentlemen, you are now the jury in this case, and I want to take a few minutes to tell you*

*something about your duties as jurors and to give you some instructions. These are preliminary instructions. At the end of the trial I will give you more detailed instructions. Those instructions will control your deliberations. You should not take anything I may say or do during the trial as indicating what I think of the evidence or what your verdict should be.*

*"This is a criminal case brought by the United States Government. The Government charges the defendant with conspiring to obstruct justice and with obstruction of justice. The charges against the defendant are contained in an Indictment. The Indictment is simply a description of the charges made by the Government against the defendant. It is not evidence of anything.*

*"The defendant has pleaded not guilty to the charges and is presumed innocent unless and until the Government proves the defendant guilty beyond a reasonable doubt.*

*"In addition, the defendant has a right to remain silent and never has to prove innocence or present any evidence.*

*"In order to help you follow the evidence, I will now give you a brief summary of the elements of the crimes which the Government must prove beyond a reasonable doubt to make its case.*

*"In order for the defendant to be found guilty of*

*conspiring to obstruct justice, the Government must prove each of the following elements beyond a reasonable doubt:*

*"First, beginning on or about August 18, 2011, and ending on or about September 26, 2011, there was an agreement between two or more persons to commit the crime of obstruction of justice;*

*"Second, the defendant became a member of the conspiracy knowing its objects and intending to help accomplish it; and,*

*"Third, one of the members of the conspiracy performed at least one overt act for the purpose of carrying out the conspiracy.*

*"A conspiracy is a kind of criminal partnership, an agreement of two or more persons, to commit one or more crimes. The crime of conspiracy is the agreement to do something unlawful. It does not matter whether the crime agreed upon was committed.*

*"For a conspiracy to have existed, it is not necessary that the conspirators made a formal agreement or that they agreed on every detail of the conspiracy. It is not enough, however, if they simply met, discussed matters of common interest, acted in similar ways, or perhaps helped one another. You must find there was a plan to commit the crime of obstruction of justice as alleged in the Indictment.*

*"One becomes a member of a conspiracy by*

willfully participating in the unlawful plan with the intent to advance or further some object for the purpose of a conspiracy even though the person does not have full knowledge of all the details of the conspiracy.  Furthermore, one who willfully joins an existing conspiracy is as responsible for it as the originators.

"On the other hand, one who has no knowledge of the conspiracy but happens to act in a way which furthers the object or purpose of the conspiracy does not thereby become a conspirator.

"Similarly a person does not become a conspirator merely by associating with one or more persons who are conspirators, nor merely by knowing that a conspiracy exists.

"An overt act does not itself have to be unlawful.  A lawful act may be an element of a conspiracy if it was done for the purpose of carrying out the conspiracy.  The Government is not required to prove that the defendant personally did one of the overt acts.

"The defendant is charged in Count 2 of the Indictment with obstruction of justice.  In order for the defendant to be found guilty of that charge, the Government must prove each of the following elements beyond a reasonable doubt:

"First, the defendant influenced, obstructed, or impeded or tried to influence, obstruct, or impede a

*Federal Grand Jury investigation; and,*

*"Second, the defendant acted corruptly, meaning the defendant had knowledge of the Federal Grand Jury investigation and intended to obstruct justice.*

*"The Government need not prove that the defendant's sole or even primary intention was to obstruct justice so long as the defendant proves beyond a reasonable doubt that one of the defendant's intentions was to obstruct justice.  The defendant's intention to obstruct justice must be substantial.*

*"The Government does not need to prove that actual obstruction of the pending grand jury investigation occurred so long as you find that the defendant acted with the purpose of obstructing the pending grand jury investigation and he knew that his actions had the natural and probable effect of interfering with the pending grand jury investigation and the Government proves the elements of the offense beyond a reasonable doubt.*

*"These instructions are preliminary, and the instructions I will give you at the end of the case will control.*

*"The evidence you are to consider in deciding what the facts are consists of the sworn testimony of any witness, the exhibits which are to be received into evidence, and any facts to which all the lawyers stipulate.*

**UNITED STATES DISTRICT COURT**

*"The following things are not evidence, and you must not consider them as evidence in deciding the facts of this case: Statements and arguments of the attorneys, questions and objections of the attorneys, testimony that I instruct you to disregard, and anything you may see or hear when court is not in session, even if what you see or hear is done or said by one of the parties or by one of the witnesses.*

*"Some evidence is admitted for a limited purpose only. When I instruct you that an item of evidence has been admitted for a limited purpose, you must consider it only for that limited purpose and for no other.*

*"Evidence may be direct or circumstantial. Direct evidence is direct proof of a fact such as testimony by a witness about what that witness personally saw or heard or did.*

*"Circumstantial evidence is indirect evidence, that is, it is proof of one or more facts from which one can find another fact. For example, if you wake up in the morning and see that the sidewalk is wet, you may find from that fact that it rained during the night. However, other evidence such as a turned-on garden hose may explain the water on the sidewalk. Therefore, before you decide that a fact has been proved by circumstantial evidence, you must consider all of the evidence in light of reason, experience, and common sense.*

*"You are to consider both direct and*

*circumstantial evidence.  The law permits you to give equal weight to both, but it is for you to decide how much weight to give any evidence.*

*"There are rules of evidence which control what can be received into evidence.  When a lawyer asks a question or offers an exhibit into evidence and a lawyer on the other side thinks that is not permitted by the rules of evidence, that lawyer may object.  If I overrule the objection, the question may be answered or the exhibit received.  If I sustain the objection, the question cannot be answered, and the exhibit cannot be received.*

*"When I sustain an objection to a question, you must ignore the question and must not guess what the answer would have been.  Sometimes I may order that evidence be stricken from the record and that you disregard or ignore the evidence.  That means that, when you're deciding the case, you must not consider the evidence which I told you to disregard.*

*"In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe.  You may believe everything a witness says or part of it or none of it.*

*"In considering the testimony of any witness, you may take into account the opportunity and ability of the witness to see or hear or know the things testified to, the witness' memory, the witness' manner while testifying, the*

*witness' interest in the outcome of the case, and any bias or prejudice, whether other evidence contradicted the witness' testimony, the reasonableness of the witness' testimony in light of all the evidence, and any other factors that bear on believability.*

*"The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testified.*

*"I will now say a few words about your conduct as jurors.  First, keep an open mind throughout the trial and do not decide what verdict -- what your verdict should be until you and your fellow jurors have completed your deliberations at the end of the case.*

*"Second, because you must decide the case based only on the evidence received in the case and on my instructions as to the law that applies, you must not be exposed to any other information about the case or to the issues it involves during the course of your jury duty.  Thus, until the end of the case or unless I tell you otherwise, do not communicate with anyone in any way, and do not let anyone else communicate with you in any way about the merits of the case or anything to do with it.*

*"This includes discussing the case in person, in writing, by phone or electronic means, via e-mail, text messages, or any Internet chat room, blog, website, or other feature including Facebook, YouTube, Twitter, Instagram,*

*Linkedin, Snapchat, or any other forms of social media or any other feature.*

*"This applies to communicating with your fellow jurors until I give you the case for your deliberation.  It applies to communicating with everyone else including your family members, your employer, the media or press, and the people involved in the trial although you may notify your family and your employer that you've been seated as a juror in the case.  But if you're asked or approached in any way about your jury service or anything about this case, you must respond that you've been ordered not to discuss the matter and report that contact to the Court.*

*"Because you will receive all the evidence and legal instruction you may properly consider to return a verdict, do not read, watch, or listen to any news or media accounts or commentary about the case or anything to do with it.  Do not do any research such as consulting dictionaries, searching the Internet, or using other reference materials, and do not make any investigation or in any other way try to learn about the case on your own.*

*"The law requires these restrictions to ensure the parties have a fair trial based on the same evidence that each party has had an opportunity to address.  A juror who violates these restrictions jeopardizes the fairness of these proceedings, and a mistrial could result that will require the*

**UNITED STATES DISTRICT COURT**

*entire trial process to start over.  If any juror is exposed to any outside information, please notify me immediately.*

*"At the end of the trial, you will have to make your decision based on what you recall of the evidence.  You will not have a written transcript of the trial.  I urge you to pay close attention to the testimony as it is given.*

*"If you wish, you may take notes to remember what witnesses said.  If you do take notes, please keep them to yourself until you and your fellow jurors go into the jury room to decide the case.  Do not let note taking distract you so that you do not hear other answers by witnesses.  When you leave for the day, your notes should be left in the courtroom.*

*"Whether or not you take notes, you should rely on your own memory of what was said.  Notes are only to assist your memory.  You should not be overly influenced by the notes.*

*"The next phase of the trial will now begin. First, each side may make an opening statement.  An opening statement is not evidence.  It is simply an outline to help you understand what that party expects the evidence will show.  A party is not required to make an opening statement.  The Government will then present evidence, and counsel for the defendant may cross-examine.  Then the defendant may present evidence, and counsel for the Government may cross-examine. After the evidence has been presented, the attorneys will make closing arguments, and I will instruct you on the law that*

*applies to the case.  After that, you will go into the jury room to deliberate on your verdict.*

*"From time to time during the trial, it may become necessary for me to talk with the attorneys out of the hearing of the jury either by having a conference at the bench when the jury is present in the courtroom or by calling a recess.  Most often these conferences will involve a determination as to whether evidence is admissible under the Rules of Evidence.  It is appropriate to take these matters up outside the presence of the jury.  Should I conclude that a more prolonged discussion is necessary, I may excuse you from the courtroom.*

*"We will, of course, do what we can to keep the number and length of these conferences to an absolute minimum. I may not always grant an attorney's request for a conference. Do not consider my granting or denying a request for a conference as any indication of my opinion of the case or what your verdict should be."*

All right.  Does the Government wish to make an opening statement at this time.

MR. FOX:  Yes, Your Honor.  Thank you.

May I proceed, Your Honor?

THE COURT:  Yes, please.

MR. FOX:  An abuse of power in order to obstruct justice.  For more than a decade, the defendant, Leroy Baca,

was sheriff of Los Angeles County.  During that time the citizens of Los Angeles County entrusted him with an important power, the power to oversee the law enforcement efforts of the Los Angeles County Sheriff's Department in Los Angeles County. It was his job during that time to investigate criminal acts, make sure his department was enforcing the law, and to bring to light any criminal acts that were occurring.

But in August and September of 2011, when it was his department that was being investigated, when it was his deputies being investigated, when it was the jails that he was supposed to run that were being investigated, Mr. Baca abused that power.  Instead of bringing criminal conduct to light, he tried to sweep it under the rug.  He tried to obstruct the federal investigation through concealment, through threats, and through intimidation.  I'll explain to you how that all occurred, but first let me talk about the two charges that he's charged with in the Indictment.

First of all, Mr. Baca is charged with conspiring to obstruct justice, in other words, agreeing with at least one other person to obstruct justice.  And, secondly, he's charged with endeavoring to obstruct justice, trying to obstruct justice.  These are the two charges against Mr. Baca, and these are the charges that you are going to need to decide over the next couple weeks.

During this time, we will present to you an

overwhelming amount of evidence that will show you that Mr. Baca was the heartbeat of this conspiracy.  He was the leader of this conspiracy.  He was the driving force behind it. You will hear from witnesses.  You will see e-mails that will prove this to you beyond a reasonable doubt.

Now, let me take you back a little bit and explain to you how we're going to prove this to you.  First of all, you're going to hear about Mr. Baca's knowledge of the beatings that were going on in Men's Central Jail and Twin Towers Correctional Facility.  These are two jails that are located just blocks from here in Downtown Los Angeles. These are two county jails, and the sheriff's department was supposed to be operating those jails.  That was their duty -- keep the inmates safe, make sure that no contraband got in the jail, make sure that they were being run properly.

Throughout his tenure as sheriff, Mr. Baca heard allegations about deputies abusing inmates in those jails. This reached a crescendo in the months leading up to him learning about the federal investigation.  It came from many different sources.

First, a chaplain who met with Mr. Baca -- this was in 2011 -- told Mr. Baca about the brutal beating that the chaplain had seen in Men's Central Jail -- an inmate who was handcuffed, an inmate who was shackled, couldn't move his hands or his legs, an inmate who was beaten by two deputies to the

point where the inmate was unconscious.  The chaplain told Mr. Baca about what he had seen, met with him personally.  And Mr. Baca turned a blind eye to those allegations, told the chaplain, you know what, my internal investigators already looked at this, and they found the deputies had done nothing wrong, nothing to see here.

That wasn't the only person who announced what they had seen firsthand in the jails.  There was a jail monitor who worked for the ACLU, court-appointed.  A federal court had appointed the ACLU to monitor the jails to make sure that deputies were not committing abuse, to make sure they were not retaliating against inmates who were complaining about misconduct as had happened over the years.

And a jail monitor doing her job in the Twin Towers Correctional Facility, which is right across the street from Men's Central Jail, was visiting with an inmate, talking to an inmate.  At this time in the visiting room, she looked out the window into the common area, and she saw deputies beat an inmate right in front of her, beat him to the point he was unconscious on the ground, lying on the ground.  And at that point, they Tasered him.  While he was unconscious, Tasered him, shocked him.

This witness, Esther Lim, and the ACLU decided to go public with these allegations, filed these allegations with the Court, went public, went to a press conference, and said

what happened.  There was one criminal charge involved in that conduct.  The inmate was charged in that case for being abused.  He was charged with assault himself.  No reforms happened because of that incident.  Nothing to see here.

A commander, someone inside the sheriff's department, went to Mr. Baca on two occasions leading up to the federal investigation.  This commander's job was to oversee what was happening in the jails in this area.  And there were two jails -- actually, one jail in particular he was concerned about, and that was Men's Central Jail.

You'll hear his concerns about what is known as the 3000 floor.  It's the floor where the most violent criminals are kept, inmates are kept.  And the deputies on that floor were engaging in a lot of force, excessive force.  The commander saw this, saw the numbers, was concerned about the force, and went to Mr. Baca on two occasions and said, "We need to meet.  I have concerns about the force in MCJ, Men's Central Jail."  And on two occasions, Mr. Baca ignored his request for a meeting, ignored his concerns.  Nothing to see here.

From 2009 to 2011 there were dozens of inmates' allegations about abuse, about retaliation.  Mr. Baca sent his internal investigators to look at these allegations and almost always, almost 100 percent of the time, they came back saying, "Nothing to see here.  The accusations are unfounded.  The

deputies did nothing wrong.  Nothing to see here."

But in August and September of 2011, he found out about the federal investigation.  Mr. Baca and his department couldn't deny the allegations because at that point they didn't know what the allegations were.  They just knew that the Federal Government was investigating excessive force and corruption in the jails.  Couldn't discredit the accusers, the whistleblowers, the eyewitnesses because they didn't know who they were.  Who was telling the Federal Government about this conduct?  Was it employees of the sheriff's department?  Was it the ACLU?  Couldn't discredit them because they didn't know who they were.

So Mr. Baca and his department came up with this conspiracy.  They decided to conceal an inmate from the Federal Government, hide him, tamper with witnesses, and ultimately confront the agent, threaten to arrest her for conducting an investigation of the sheriff's department and doing nothing more than that.  We'll talk about this in more detail, but let me start with what the federal investigation was.

As I mentioned, it was into excessive force. There was one special agent in particular, someone who was newly assigned to the FBI, just became an agent, just started looking at cases, and her supervisor gave her a letter from an inmate.  The inmate was detailing all the abuse that was going

441

on in Men's Central Jail, and this special agent -- her name is Special Agent Leah Marx.  She has since changed her name to Leah Tanner.  So you'll hear her referred to as both names.

Special Agent Marx began looking into these allegations, and the FBI did as well.  The entire organization did, learned about dozens of accusations of abuse going on in Men's Central Jail and Twin Towers, began interviewing inmates who were all saying similar things about the abuse by the deputies, also hearing that there was corruption going on in the jails.  Deputies were willing to accept bribes to bring contraband into the jails.

FBI believed that these were real and serious allegations, and they decided to do something about it.  They contacted the U.S. Attorney's Office, the FBI did, and jointly began conducting a grand jury investigation issuing subpoenas, trying to see if documents would or would not corroborate the allegations of the inmates.  They knew that inmates alone, their testimony would not necessarily be relied on solely by a jury; so they needed more information.  They started a grand jury investigation.

Not only that, but the U.S. Attorney's Office and FBI decided that the FBI should conduct an undercover operation to see if the allegations of corruption were legitimate.  One inmate, in particular, you're going to hear a lot about in this case, his name is Anthony Brown.  Anthony Brown was one of the

**UNITED STATES DISTRICT COURT**

informants for the FBI.  He was one of the people housed on the 3000 floor, the biggest problem area in Men's Central Jail, the biggest problem area in any of the county jails.  He was housed there, and he was one of the inmates telling them about the abuse and corruption going on in Men's Central Jail.

He said there was one deputy, in particular, that was willing to accept bribes to bring in contraband.  Later on the FBI learned this deputy was named Gilbert Michel.  There are going to be a lot of names I'll go through.  You'll hear a lot about all these people as we proceed in this trial.

So the FBI decided to conduct an undercover operation to see if Gilbert Michel would accept bribes and would bring contraband into the jail to Anthony Brown, the informant.  The undercover operation was successful. Mr. Michel accepted the bribes, thousands of dollars in cash, brought a phone in to Anthony Brown, the informant.  And the FBI had decided in the undercover operation that Anthony Brown would use this phone to have realtime contact with the FBI, to be able to tell the FBI when an abuse incident happened because a lot of information is confined in the jails.  FBI couldn't find out about these incidents until months later, and then they wouldn't even know necessarily who the victims were, who the deputies were that were involved in the abuse.  So they could get realtime information.  "Something just happened. This inmate was beaten.  Here were the deputies involved."

That was the plan.

But a few days later after that plan was put in place, after Mr. Michel took the bribes and brought the phone to Anthony Brown, the sheriff's department conducted a routine search of Anthony Brown and found this phone in a potato chip bag that Mr. Brown had put it in. So they found a phone. Not all that unusual. And during that time, a routine investigation occurred of Anthony Brown of the phone, just another phone.

But on August 18 something happened. Mr. Baca received a call from the head of the FBI in Los Angeles -- his name is Steve Martinez. And the deputies will go through this a little bit later also -- found out about the connection with the FBI and a Civil Rights Squad, in particular. And at that point, Anthony Brown was moved from Men's Central Jail, 3500 floor, to 1750.

Now, this floor, this area was the most secure floor of Men's Central Jail. It was the one to put all the high profile inmates in, celebrities, informants, high-up people in gangs. This was the place to put them so that they were protected. They had a camera trained on each one of these cells to record who was coming and going from these cells. They knew who was going into those cells. It was on the camera that was there 24 hours a day, an appropriate place to put Anthony Brown at that time.

They then decided to keep Anthony Brown away from anybody else, away from the FBI, away from anybody but the sheriff's department, conducted interviews of Anthony Brown in which he said he was a federal informant, told them that Deputy Michel was the one who had been set up to take the bribes, told them about the beatings. And they kept Anthony Brown in that area where he should have been, 1750.

But on August 23rd, a deputy messed up, allowed the FBI to have contact with Anthony Brown when the sheriff's department had decided the FBI couldn't. The FBI went to visit their own informant, took him into a room, began talking to him. After the sheriff's department found out about that, Anthony Brown was moved from 1750 to an area of the jail that was reserved for inmates with staph infections, an infectious diseases floor. And from that point on, he was guarded by two deputies at a time standing outside of his cell to make sure that slipup wouldn't happen again, that the FBI would not have contact with their informant again while he was in county custody.

On August 25th you'll learn that a federal court order, a writ, was faxed to Men's Central Jail demanding the appearance of Anthony Brown to testify in the grand jury. At that point Anthony Brown couldn't be Anthony Brown anymore. The sheriff's department made up a fake alias for him, John Rodriguez, changed his name, changed his race, left no

connection between Anthony Brown and his new alias.

When the sheriff's department, Mr. Baca's department, became concerned that the FBI or the U.S. Marshal Service was going to come and give the writ to them in person, couldn't deny receiving a fax at that point because there they were in person with the writ. They decided that Men's Central Jail wasn't the place for Anthony Brown, John Rodriguez. They changed his name, again, and moved him out of Men's Central Jail. He became Kevin King, again, no connection to Anthony Brown, and they moved him to a station jail 30 miles from Men's Central Jail. That's the beginning of the obstruction. You're going to hear a lot about the middle, but I'm going to glance over that a little now, but I'm going to talk to you about the end.

It culminated with the approach of Special Agent Leah Marx. They confronted her outside of her house and threatened her arrest for doing nothing more than her job, doing nothing more than investigating the sheriff's department. They decided that they -- Mr. Baca decided that they would investigate the investigators. We'll go through this all now in more detail.

Mr. Baca, as I mentioned on August 18, received a phone call from Steve Martinez who was the head of the FBI in Los Angeles. At that point in time, he contacted his No. 2 in charge Paul Tanaka, a man that Mr. Baca had been grooming for

this position, his right-hand man, his trusted advisor, the man who had a unique ability to do whatever it was that Mr. Baca wanted done.

Mr. Tanaka and Mr. Baca then set up meetings for August 19, the next day, with their co-conspirators. Let me discuss who these people are. As I mentioned, you're going to hear a lot of names in this case. I'll discuss them briefly now.

OSJ, you'll hear that acronym, Operation Safe Jails. Its job was to keep the jails safe. It was headed up by Greg Thompson. During this conspiracy, Greg Thompson and his deputies would make sure that Anthony Brown was hidden from the FBI, the U.S. Marshal Service, the Federal Grand Jury. He promised to keep Anthony Brown hidden from the FBI.

And during this time, he brought in his trusted deputies Mickey Manzo, who you will hear from, Gerard Smith, and James Sexton. Mr. Manzo and Mr. Smith, they did the nuts and bolts of moving Anthony Brown. They are the ones figuring out which deputies would stand guard over Anthony Brown. And Deputy James Sexton was one of the people not only standing guard but using the computer system to figure out how they could hide Anthony Brown. He knew what everybody else in this conspiracy knew, the true purpose of this was to keep all the evils within Men's Central Jail in Men's Central Jail. He called this operation "Operation Pandora's Box." That was his

pet nickname for the operation because he knew, just like in Greek mythology, if the box was opened, all the evils within would go out to the world.

On the right-hand side, ICIB, the Internal Criminal Investigations Bureau, Mr. Baca tasked them with investigating the investigators. This was led by Captain William Tom Carey. You'll hear him primarily referred to as Tom Carey in this case. He was the captain. Mr. Baca, as sheriff, was able to select anyone from the rank of captain and above. He was able to pick who was in each position, and he picked Tom Carey for this position.

Also, within ICIB was Lieutenant Steve Leavins. Mr. Leavins was a close aide formerly of Paul Tanaka's, and Mr. Tanaka had placed him in ICIB. And you'll hear that Mr. Carey and Mr. Leavins were reporting directly to Mr. Baca and Mr. Tanaka during this time period as was Greg Thompson on the left-hand side of the screen.

Mr. Carey and Mr. Leavins brought in two sergeants -- Sergeant Scott Craig and Sergeant Maricela Long. They were the ones doing the nuts and bolts with respect to investigating the investigators and tampering with witnesses as I will get into.

So on August 18, this is when Mr. Baca learned of the FBI phone from Steve Martinez. "You have our phone. This is an FBI phone that you've recovered." At the same time,

**UNITED STATES DISTRICT COURT**

Mickey Manzo and Gerard Smith listened to recorded calls from the inmate's telephone system that the sheriff's department had.  Every inmate was able to use the phone and call people. Anthony Brown had used a landline to call the Civil Rights Squad of the FBI, asked for a phone.  That's when the deputies realized that this was a civil rights investigation that they had on their hands.

They told their boss Lieutenant Thompson, and the three of them went to Paul Tanaka, went to Sheriff Baca on August 19 and told them what they had learned.  Not only did they hear the calls, but Mr. Manzo and Mr. Smith had interviewed Anthony Brown on August 19, and they learned that Anthony Brown was setting up deputies for corrupt transactions. And they said, "Is it okay if we take this to our boss?"  And Anthony Brown said, "Go ahead, and do that."  They took it to Paul Tanaka and Leroy Baca that Anthony Brown was reporting on abuse.  Anthony Brown was setting up deputies and corrupt transactions.

And Mr. Baca decided at that point that Anthony Brown, who was scheduled to be transferred to state because he had been sentenced for his crimes, sentenced to 400 years in prison, which he was going to serve, would then be kept in sheriff's department custody.  He would not be sent to the state because he did not want to have Anthony Brown leave his control.

**UNITED STATES DISTRICT COURT**

That night Mr. Baca met with Cecil Rhambo, an assistant sheriff, who told Mr. Baca just give the Federal Government back their inmate.  Give the feds back their phone.  It was advice that Mr. Baca would ignore, and that's not the only time he ignored Assistant Sheriff Rhambo.

On August 20 they had another meeting.  You'll hear this referred to as the "Saturday meeting."  And during the Saturday meeting, Mr. Baca learned more details about what was going on.  He listened to the phone calls between Anthony Brown and the Civil Rights Squad, about "Where is the phone?"  "You'll have your phone soon."

Mr. Tanaka and Mr. Baca were mad at this meeting.  Mr. Baca issued an order, isolate the inmate.  He and Mr. Tanaka were about to leave the room, and he told everybody in that room, "Everything runs through Undersheriff Tanaka.  I'm putting Undersheriff Tanaka in charge."  And the two of them, Mr. Baca and Mr. Tanaka, left the room for several minutes.  Only Mr. Tanaka returned, and Mr. Tanaka told the group, "I've never seen the sheriff this mad, never seen him this mad.  We're going to do whatever it is that he wants done."  And Mr. Tanaka at that point discussed what it was that Mr. Baca wanted done.

We're going to keep the FBI out of the jails and away from Anthony Brown.  Mr. Tanaka then discussed a policy that four days later they put into place.  They then put a note

on Anthony Brown's door in 1750 saying that he should not be allowed to have access to the FBI or anyone else.

On August 23rd, as I mentioned, the FBI came in not knowing anything about that order. They met with Anthony Brown. Deputy had messed up. And when Mr. Tanaka learned about this from the people you see at the bottom of the screen, Mr. Tanaka was extremely upset, extremely upset. Started ripping into all those people that were telling him this. "You told me this wouldn't happen. 'F' the FBI, those MF'ers. You told me this wouldn't happen."

When Mr. Thompson asked Mr. Tanaka whether the sheriff was aware of what had happened with the FBI having access to Brown, Mr. Tanaka said, "I'm not going to be the one that tells him that. You're going to have to tell him that." So Mr. Thompson went in to see Mr. Baca, told Mr. Baca what had occurred. FBI got in to see Anthony Brown, coming up with a plan to figure out what to do about this.

"We stopped the interview after about an hour. I'm sorry, Sheriff. I'm sorry." Mr. Thompson would tell Mr. Manzo this later that that conversation occurred. At that point the sheriff's department took additional steps to hide Anthony Brown. That's when they put him in the floor that's relegated to those with staph infections, and that's when they put two guards outside of his jail at all times. They used Greg Thompson's trusted deputy with OSJ to keep guard on

Anthony Brown.

On August 24 you'll see the written policy that was put in place.  Mickey Manzo e-mailed it to Greg Thompson, word-for-word nearly, with what Paul Tanaka said the policy should be.  It basically said that in the future -- starting now, and for the foreseeable future, all FBI interviews would not be conducted unless it had the approval of Paul Tanaka.  That's what the initial draft said.  Mr. Thompson sent this to Mr. Tanaka's aide and had a conversation with them, sent a confirming e-mail.  "On the FBI notice of facility matters, would Mr. Tanaka be satisfied if I remove all reference to him or the executives?"  Mr. Baca and Mr. Tanaka knew they shouldn't be doing what they were doing and wanted the names kept off of everything that was going on.  So the policy that went out did remove all references to any executive.  Doesn't say who is supposed to be doing those approvals, left it to Greg Thompson's crew.

The next day, what the sheriff's department was concerned about, a federal writ came in for Anthony Brown demanding his appearance, his production to the Federal Grand Jury on September 7, 2011, signed by a federal judge.  This was faxed over to the sheriff's department.  Very next day Mr. Carey and Mr. Thompson engaged in e-mails talking about the possibility of the FBI or a marshal coming with that writ in hand demanding the production of that inmate.

Mr. Carey wrote, "Has to be clear that this inmate is not released without approval." And when the captain of Men's Central Jail asked, "Which attorney are we going to use for this? Possible court order from the FBI," Mr. Thompson responded showing what the intent was of this conspiracy. "Probably use the one who is on vacation for a month." The whole goal here was to stall the investigation, slow it down, let the sheriff's department do what they needed to do to cause the investigation to be stopped during the time when the investigation was stalled.

So this policy goes out, sent from the captain to all of custody. "The Court order is presented by federal officers, receive the order, and advise the federal officer that, before you can proceed, you have to submit the order to the department's legal advisor for review. Do not release the inmate or allow contact." This was a new policy, never been used before or since with respect to any other inmate. Just for this case, just so Anthony Brown would not get into federal custody.

That was the day that they moved him out of Men's Central Jail. They moved him to San Dimas, and they told him that he was abandoned.

(A cd commenced playing before the jury.)

MR. FOX: "And they haven't come back for you." The FBI had told Anthony Brown on August 23rd, when they

453

interviewed him, when the sheriff's department pulled him out of the interview, that they'd be back for him.  Anthony Brown told everybody that, told the sheriff's department this. Anthony Brown didn't know about the writ.  They wanted Anthony Brown to feel as though he was abandoned, left for dead.  And you'll learn that that's exactly what he felt.

Although Mr. Baca and Mr. Tanaka were trying to keep their names off of things, you'll see that they were having meetings with all of the people we've been discussing. Mr. Baca was meeting frequently with Steve Leavins, Tom Carey, Greg Thompson, Paul Tanaka about these issues.  And in this e-mail that you'll see -- this is Exhibit 31 that we will introduce -- Mr. Tanaka tells Steve Leavins, his former trusted advisor, "The sheriff popped in looking for an update.  This case is consuming his entire thought process."

The sheriff's department has a lot of responsibilities.  The sheriff has a lot of responsibilities, but this was his priority during this time.  This is what was consuming his entire thought process.

You'll see also that there were secret meetings that were being held in the fourth floor conference room. You'll learn that that was the conference room being used by the executives reserved only for the executives.  The two executives that I'm talking about is Sheriff Baca and Paul Tanaka.  Those are the only two allowed to use those

**UNITED STATES DISTRICT COURT**

conference rooms.  Greg Thompson and William Carey -- Tom Carey were meeting in that fourth floor conference room on key dates.  This is August 26 when Anthony Brown is moved out of Men's Central Jail.

On August 29 Mr. Baca set up a meeting with the U.S. Attorney's Office, spoke to the U.S. Attorney and several others at a meeting, and expressed his displeasure with the investigation, expressed his anger toward the FBI, told the U.S. Attorney's Office how unhappy he was with this investigation.  But nothing changed.  Nothing changed from the U.S. Attorney's Office side, didn't agree to do anything.  So the sheriff's department decided to amp things up even more.

August 30 Mr. Baca's department went to Men's Central Jail, and the key players in this conspiracy went there.  Paul Tanaka was at Men's Central Jail, so was Tom Carey, the captain.  And during that time, Steve Leavins, Scott Craig, and Maricela Long were tampering with witnesses. They were approaching deputies that they believed were cooperating with the Federal Government and telling them not to talk.  You'll hear on one occasion Mr. Craig says, "You understand I'm a sergeant," pulling out his rank.  "I'm a sergeant ordering you not to talk to the Federal Government."

They discussed grand jury subpoenas, told people, "Report those grand jury subpoenas to me, and we'll go from there."  They didn't want deputies going in front of the grand

jury.  They didn't want deputies talking at all about what was happening in Men's Central Jail.

On September 2nd, with all these meetings occurring in those executive offices, Mr. Baca's office, Mr. Tanaka's office, and the conference room, they had their offices swept for bugs, listening devices.  We're not talking about crawly things.  We're talking about listening devices that the FBI uses.  They wanted to make sure the FBI wasn't listening in to their secret corrupt conversations.  That's what happened on September 2nd.

And on September 8 they decided to change course, try to figure out what is it that the Federal Government is investigating?  So they sought a court order from a superior court, a state court, asking the state court to order the FBI to turn over all of its records of its investigation of the sheriff's department to the sheriff's department.  You'll hear from the judge in that case who denied the Court order out of hand because the superior court, you'll learn, has no jurisdiction over a federal agency.  The county, the state doesn't have jurisdiction over federal agency.  Doesn't happen. While the Federal Government has jurisdiction to look at crimes by a local agency, the same is not true on the other side.

On September 13 the same deputy, Gilbert Michel, who had taken the bribes, admitted that he and others engaged in brutal beatings within Men's Central Jail.  He told the

**UNITED STATES DISTRICT COURT**

sheriff's department this.  He discussed how he and others would beat handcuffed inmates within Men's Central Jail. Mr. Carey reported this to Mr. Tanaka.

Now, during this time -- this is an interesting time that I'm sure Mr. Hochman is going to talk about as well. Mr. Baca was out of the country from September 8 to, I think, about the 22nd he was out of the country.  And during this time things calmed down to some degree.  The sheriff's department on September 12 had sent Anthony Brown to state custody to serve his time, and once he was there, the Federal Government interviewed him, talked to Anthony Brown because they finally had access to him.

During that time there wasn't a lot of huge obstruction going on, but they did learn about the inmate abuse by Gilbert Michel.  They also talked about conducting surveillance and began conducting surveillance on the FBI agents involved in the investigation, primarily surveillance of Special Agent Leah Marx.  They found that she had done nothing during this surveillance, found that she walked her dog, even picked up after the dog, nothing to indicate that she had done anything wrong.

Mr. Baca returned, as I said, on September 22nd, and then he came up with a plan, set up a meeting with the Federal Government on the 27th.  But before that he had to implement a plan to increase the pressure on the

Federal Government.

His August 29 meeting with the U.S. Attorney's Office was not good enough.  He hadn't played his pieces well enough.  This time he was going to play his pieces the right way.  So he went on television, went on *Good Day L.A.,* said that he resented the FBI's intrusion, said "LASD polices itself."  "We police ourselves" is what he said.  And then he claimed the FBI committed a crime.  He didn't really believe this.  What the FBI had done was conducted undercover investigation, something that happens in law enforcement all the time.  He did mention a meeting that he had set up with the Federal Government, the reason for his plan.  The reason to increase the pressure was this meeting.

Around the same time, sometime in September, Mr. Baca met with Assistant Sheriff Rhambo, the same guy who had told Mr. Baca to give the feds back their phone, give the feds back their inmate.  Mr. Rhambo at this point had heard about a potential approach of an FBI agent, went to Mr. Baca, "what's this I hear about knocking down the door of an FBI agent?"  And Mr. Baca said same thing that he said on television.  "They committed a crime."  Mr. Rhambo said, "This is an undercover operation.  There is no crime.  They didn't tell us about the investigation because we're subjects of the investigation.  They're looking at us.  They committed no crime."  Mr. Rhambo discussed his experience, said, "I've been

on task forces, and in these task forces, we conduct undercover operations and large-time drug dealing, and there's no crime when you set up a drug transaction undercover.  This is the same thing."  Mr. Baca said, "I'm going to go talk to the U.S. Attorney about that."

On September 26 after that television appearance, Mr. Baca since got Scott Craig out, Maricela Long out to confront the agent.  Mr. Craig told Special Agent Marx, "Do you know that you're named in a felony complaint?"  It was a lie. She was not.  She didn't know that, but she was not.  Discussed what they were going to do to arrange for her arrest, intimidation tactic, tried to get the FBI to back down.

Also on September 26 you'll see all this activity that day to try to increase the pressure on U.S. Attorney Andre Birotte and the FBI.  Mr. Baca wrote a letter, pinned a letter to the U.S. Attorney asking him to withdraw the Federal Grand Jury subpoenas that had been issued to the department, asked him to withdraw support for the FBI. "Don't support the FBI's efforts."  What did Mr. Baca want done instead?  He wanted the U.S. Attorney's Office to work only with Mr. Baca's investigators, the same ones who had whitewashed all those incidents over the years; the same ones that Mr. Baca controlled; the same ones who kept finding that deputies had not committed the abuses they had, in fact, committed; the same ones who always found their allegations

against them to be unfounded.

And then during the September 27 meeting, the U.S. Attorney told Leroy Baca, "This investigation is continuing.  We're going to be following the same course.  We're going to continue to investigate the deputy beatings, and we're not involving you in that investigation.  You can't be a partner in it."  So Mr. Baca couldn't do anything else.  He was done.  He turned to the FBI and said, "I'm the goddamn sheriff.  These are my goddamn jails.  And we are prepared to gun-up, if necessary."  Law enforcement on law enforcement, if necessary.

Now, despite Mr. Baca's attempts of intimidation and threats, ultimately he did not entirely get his way.  While he was able to slow things down, try to circle the wagons while his department tampered with as many witnesses as they could, while they hid Anthony Brown for a while, while they had caused the FBI to stay out of their jails for many months, the investigation would continue.

And you'll hear about some of what the investigation found during this trial today.  Some of those evils from those jails were released.  You'll hear Gilbert Michel, for example, talk about his beatings.  You'll hear him talk about his corruption.

The world will never know the full impact of this obstruction, how many deputies decided not to talk to the Federal Grand Jury as a result of his conduct, how many inmates

felt they were left for dead because the FBI stayed out of the jails during that time.  The world will never know.  But Mr. Baca, through concealment, through threats and intimidation, attempt to affect the Federal Grand Jury investigation.  He conspired with his right-hand man Paul Tanaka to do so.

We'll prove to you beyond a reasonable doubt that not only a conspiracy existed, not only that there was conspiracy to obstruct justice, but Mr. Baca was at the top of that conspiracy.  We'll prove to you beyond a reasonable doubt that he was the heartbeat of this conspiracy.  He was the reason why people were doing what they were doing, to follow the sheriff's orders.  That's what was going on.

He was the one who ultimately was abusing the power that was entrusted to him by the citizens of Los Angeles County because, instead of enforcing the law and bringing criminal conduct to light, he instead was obstructing justice and trying to hide the criminal acts of his co-conspirator -- I'm sorry -- of the deputies in the jails.

And after several days when we present this evidence to you, we will come back up here, and we will ask you to return the only verdict that will be consistent with the evidence in this case, and that's a verdict that Mr. Baca abused his power and that he's guilty of both counts of the Indictment.

Thank you.

THE COURT: All right. Thank you.

Does the defense wish to give an opening statement at this time?

MR. HOCHMAN: Yes, Your Honor. It's going to take us a few minutes to set up the electronics, Your Honor.

THE COURT: All right.

MR. HOCHMAN: May it please the Court, counsel, ladies and gentlemen of the jury.

On August 18, 2011, at around 5:00 p.m. in the afternoon Sheriff Baca received a call on his cell phone from FBI Assistant Director Steve Martinez, the head of the Los Angeles office. Now, it was not unusual for Assistant Director Martinez to call Sheriff Baca because, as the heads of their organizations, brothers in arms, they were partners in the fight in task force, task forces against narcotic traffickers, terrorists, arms, and gangs. But this particular phone call, however, was unusual. It was unprecedented.

On this call, Assistant Director Martinez told Sheriff Baca something that he had never told him even once in the entire time they worked together or at any time in sheriff's department history. Steve Martinez in this phone call told Sheriff Baca that the FBI had smuggled a cell phone into the sheriff's jails as part of an undercover operation,

**UNITED STATES DISTRICT COURT**

had done so without letting anyone in the sheriff's department or the sheriff know, and now had an inmate that might be in danger and was in need of protection.

Sheriff Baca couldn't believe it.  He couldn't believe it so much so that you will hear Assistant Director Martinez say Martinez had to repeat it several times because, what he couldn't believe and understand is that the FBI itself had smuggled a cell phone into the jail.

This unprecedented act of the FBI involved what you will hear to be an extremely dangerous form of contraband. Now, contraband is something like a cell phone that is strictly prohibited and illegal in a secured jail since a cell phone can be used like a weapon in a jail, because it can be used to plan crimes, arrange to actually kill witnesses, plan escapes, and smuggle drugs into the jail.  The cell phone was given to a violent and dangerous inmate, Anthony Brown, who is working with the FBI and had just received a life sentence of 423 years.

Now, listening to this on Sheriff Baca's cell phone, the evidence will show that Sheriff Baca needed to know how big of problem he had in his jails, how many deputies or inmates were involved, how compromised was the safety in the jail that he was personally responsible for.  You will hear that Assistant Director Martinez would give him no details.  No details.

For the next six weeks, the evidence will show that the FBI stonewalled Sheriff Baca in giving him the information to get to the bottom of what happened with the smuggled cell phone.  Now, Sheriff Baca, you will hear, set a very clear agenda of what he wanted done, protect Anthony Brown and investigate the smuggled cell phone.  You will hear that others went beyond that agenda, and that was wrong.  But the evidence will also show that Sheriff Baca did not know, authorize, agree to, or condone any of those wrongful actions.

The Government talks about "they" over 50 times in their opening, but "they" did not include Sheriff Baca agreeing, condoning, authorizing, or knowing about those wrongful actions.

Now, Sheriff Baca, you will hear, as the evidence in this case will show, had no problem at all with the FBI, the ACLU, or anyone else looking into his jails.  No problem.  He treated them all as partners if their intent was to make the jails better and safer.

Now, this case is not about civil rights violations, deputy beatings, or inmate abuse.  It is not.  Because while these are all very serious issues, none of them, none of them have been charged in this case.  Instead, this case is about whether Sheriff Baca, in the six weeks following that August 18 phone call in 2011, agreed to and obstructed the FBI's investigation into civil rights violations which the

**UNITED STATES DISTRICT COURT**

464

evidence will show he did not.

My name is Nathan Hochman, and along with Tinos Diamantatos and Brianna Abrams, we have the privilege and responsibility of representing Sheriff Leroy Baca.

You will hear how these six weeks in August and September of 2011 fit within the career of Sheriff Baca. Sheriff Baca is 74 years old. He grew up in East Los Angeles and first served his country in the Marine Corps Reserves as a young man. He then spent the next 48 years of his life, almost five decades, serving the people of Los Angeles County in the Los Angeles County Sheriff's Department including being the elected sheriff, the head of the department, being re-elected three different times, and serving a total of over 15 years as a sheriff of the Los Angeles County Sheriff's Department until he retired in 2014.

You will hear that the focus of the evidence during these six weeks in August and September of 2011 is on one of the seven jails, Men's Central Jail. And the sheriff was in charge, not just of this one jail, but you will hear that his responsibilities stretch far, far greater than this just one jail.

As a Los Angeles County sheriff, his territory covered over 4,000 square miles from Long Beach to Lancaster, from Pacific Palisades to Pomona, the largest county in the United States with 10 million people in the county, an amount

**UNITED STATES DISTRICT COURT**

that's more than the population of 40 states in the United States.

He was in charge of the largest jail system in the entire country, a jail system that had a $2.4 billion budget that many -- which is actually greater than many states' entire budgets.  He is in charge of 18,000 inmates in seven different custody facilities.  The jail has run the largest mental health facility in the entire country.  They actually ran the largest homeless facility in the entire county.  And the sheriff's department employed 18,000 people -- 9,000 sworn deputies, 9,000 civilians -- in 23 different patrol stations.

Now, you will hear, in addition to all that, the sheriff's department was the law enforcement provider.  What that basically means is that certain cities, 40 different cities, didn't have their own police, and they would contract with the sheriff's department to be their police.  So the sheriff was in charge of policing 40 different cities, 90 different unincorporated areas, and other service areas including nine community colleges, 58 superior courts, and the Metropolitan Transit Authority and the Rapid Rail Transit District that dealt with hundreds of thousands of people every day.  So all this responsibility was on the sheriff's plate every day, but especially including during those six weeks that will be focused about in the summer of 2011.

Now, you will hear that the -- evidence that the

sheriff not only dealt with the incredibly busy activities of the sheriff's department, but he also met throughout the county, throughout those 4,000 square miles, with community organizations, elected leaders, individuals, religious groups, nonprofits.  He would even testify in front of the L.A. County Board of Supervisors, and he would even go to Congress to bring more funding back to Los Angeles County for law enforcement if that wasn't enough.

Sheriff Baca, who regularly worked 12- to 14-hour days, six to seven days a week, was a California Region 1 Director of Homeland Security, and that covered Los Angeles and Orange County, and was in charge of 13 million people, and worked with not only the FBI but it also partnered with federal, state, and local agencies.

So for over 48 years, Sheriff Baca worked at the sheriff's department.  Those 48 years represent approximately 2,500 weeks.  Of those 2,500 weeks, which you will hear about, is that we're just going to focus on six of them between August and September of 2011.  So 48 years or 2,500 weeks becomes six weeks.  And then how much of the evidence in those six weeks will actually involve Sheriff Baca?  As you will hear, it will be less than three hours of that evidence.  So 48 years will go down to six weeks, will go down to three hours.

Now, how do we get to that August 18, 2011, phone call?  Well, the evidence is going to take you back over a

decade when Sheriff Baca came in as sheriff.  You will hear that there was an old school way of dealing with inmates -- warehouse them, get them in, get them out.  Don't give them any skills while they're there because that's not part of our job, and if they come back, they come back.

Well, what you will hear is that, when Sheriff Baca came in, he had a different approach to inmates. From the beginning, he, himself, drafted a statement of core values that was given to every member of the sheriff's department, and that emphasized respecting inmates rather than treating them as the enemy.

The core values stated, "As a leader in the Los Angeles Sheriff's Department, I commit myself to honorably perform my duties with respect for the dignity of all people, integrity to do right and fight wrongs, wisdom to apply common sense and fairness in all I do, and courage to stand against racism, sexism, anti-Semitism, homophobia, and bigotry in all its forms."

The sheriff also adopted a new mission statement when he came in, and that mission statement highlighted defending the rights of all including the incarcerated.  It stated, "Lead the fight to prevent crime and injustice. Enforce the law fairly and defend the rights of all including the incarcerated.  Partner with the people we serve to secure and promote safety in our communities."

**UNITED STATES DISTRICT COURT**

468

Now, the evidence in this case will show that the core values and mission statements were taught in the sheriff academy to up-and-coming sheriffs. They were posted in all those 23 patrol stations. They were posted in the jails. They were posted online. They were constantly emphasized by the sheriff when he was talking to the 18,000 members of the sheriff's department and when he gave hundreds of speeches to the public. The sheriff created policies, procedures, and programs to implement the core values and mission statements throughout the jails.

Now, as part of the defending the rights of all including the incarcerated, the sheriff sought out partners. And you will hear that one of those partners, starting all the way back when he took office in 1998, was the ACLU. And you will also hear, when the ACLU representatives testify, that the ACLU has been working with the sheriff's department for over 20 years at the time in 1998 when the sheriff came in. At this point it's over 30 years.

You will hear that the ACLU serves a vital and important role in the jail, a role that Sheriff Baca welcomed. You will hear that what the ACLU had that basically nobody else had was this thing called a monitor, a jailhouse monitor. And what is a monitor? The evidence will show that what a monitor is is an actual person who gets to go inside the jails, gets to talk to any inmate that they want to, gets to go into housing,

**UNITED STATES DISTRICT COURT**

the actual cell area, not the visiting area but go inside the jail, that they actually have access to the Court and they can report their court findings directly to the federal judge and that they actually issue annual reports to the public, a very unique role that the ACLU was partnering with the sheriff to monitor what was going on in the jails.

But the sheriff did not just rely on the ACLU to monitor the jails and tell him about the interactions between deputies and inmates.  He also had at the sheriff's department two different bureaus.  The first one is called the Internal Affairs Bureau.  The second one is called the Internal Criminal Investigations Bureau.  That's the IAB and the ICIB.

And what you'll hear is that the deputies who were employed in these bureaus had a full time job to do one thing, and that was investigate allegations of any deputy doing something wrong.  That was these people's full time job.

So the evidence will show that the sheriff was not afraid of having anyone look at those jails.  In fact, what you will hear is that, in addition to the ACLU, in addition to the IAB, the Internal Affairs Bureau, the Internal Criminal Investigations Bureau, the sheriff set up something that was unique, first of its kind in the nation, not just for the L.A. County Sheriff's Department but for any sheriff's department in the entire nation, and it was called the Office of Independent Review.

470

Now, the Office of Independent Review is, as its name suggests, an office that is independent of the sheriff and provides review sort of like a watchdog organization. Now, OIR investigated allegations of misconduct by sheriff deputies, and they had something that was unique that made it a unique organization. They had realtime access to the investigations. What does that mean "realtime access"? They didn't have to wait until the investigators did the investigation, wrote their reports and months and months later get some reports that they can then maybe look back into. What they were able to do was get the access as the reports were being written which made OIR a particularly effective independent review of the sheriff's department.

And what you will also hear is that they were actually also able to weigh in on discipline recommendations for deputies that committed wrongful conduct.

Now, who led OIR? Was OIR, this Office of Independent Review, led by someone who is inexperienced, who would be a rubber stamp for the sheriff? No. The person who led OIR from 2001 to the present is a gentleman named Michael Gennaco. You will hear him testify in this case. And who is Michael Gennaco?

Michael Gennaco is a former federal prosecutor who, not only worked for the United States Department of Justice civil rights division, but he was the head civil rights

prosecutor for the Los Angeles U.S. Attorney's Office where these two prosecutors work. He was the head civil rights prosecutor of that office. That's who was brought in, one of the most accomplished civil rights prosecutors in the nation.

And while he was a prosecutor, Mr. Gennaco brought numerous cases, civil rights cases, against police officers who violated people's civil rights by beating them or using excessive force. He knows the difference between what is excessive force and what is not, and he has prosecuted before. And now he and five other attorneys are the Office of Independent Review monitoring the sheriff's department.

So he will testify that Sheriff Baca created the OIR and ensured that OIR had sufficient resources to do its job. And then what you will also hear is that the -- when OIR would actually publish annual reports, many of those reports were actually critical of the sheriff's department. The sheriff invited the ACLU, OIR, and the public to bring him the good, the bad, and the ugly.

Now, the evidence will show that the ACLU was working with OIR, the sheriff's department from 2001 to 2009 to address these problems. But in 2009, '10, '11, the ACLU raised concerns in reports that they publish widely. You will hear one of the ACLU's directors speak to you, Peter Eliasberg. What he will tell you is that, in addition to the chaplain, in addition to other ACLU people, Mr. Eliasberg published the

472

ACLU's reports widely.  He gave press conferences.  He gave TV and radio interviews.  He went ahead and filed these reports with the Court in order to make sure that the sheriff knew this public information and so did the FBI.

Now, the evidence will show that the sheriff and his department responded with programs, policies, and procedures to deal with the ACLU's complaints of deputy abuse.  And what is important to know -- and this is very important -- is that you will not be asked to decide whether the sheriff's programs, policies, and procedures were adequate, sufficient, whether they investigated quickly enough, whether they disciplined enough deputies, whether they could have put in different programs, policies, and procedures to deal with the ACLU's complaints that might have worked better.  Basically whether the sheriff could have done a better job in responding to these issues.

You will not have to decide that, nor are you going to be asked to decide whether the sheriff is responsible for any particular incident or allegation of excessive force or deputy beating.  These are civil rights charges, and this case has not charged Sheriff Baca with violating any civil rights crimes, not one.  Instead, this case is only about a much different issue of whether or not the Government can prove beyond a reasonable doubt that Sheriff Baca conspired and obstructed a grand jury investigation during this six-week

period, and only this six-week period, in August and September of 2011.

Now, as the ACLU is issuing its reports in 2010, you're going to hear that the FBI decides to investigate these allegations. You will hear that the FBI in Los Angeles has over 800 special agents, many of whom have decades of experience investigating these crimes. And who does the FBI choose to lead its investigation into this inmate abuse in June, 2010? You will hear they choose FBI Agent Leah Marx as the lead case agent.

How many years of experience and years had she been at the FBI in June, 2010? One year. This was her rookie year. How many years of prior law enforcement experience had she had at that point? None. How many civil rights investigations had she been a case agent for at that point? None. And what about experience in the jails? Did she have any unique experience in the jails so that she would know how basically inmates and deputies worked in the jail? She had none. How about undercover experience? You heard Mr. Fox talk to you there will be undercover experience. How many undercover operations had she run at that point? None.

What you will hear is, instead, the evidence will show that she began her investigation in June 2010 and she started interviewing about 25 inmates over the next year. And she will testify that each time she interviewed an inmate, she

474

would go down to the Men's Central Jail, she would show her FBI credential, she would then write the inmate's name down on the form, and then the inmate would be brought to her in a room.

She didn't go in with an alias.  She didn't try to hide her name.  She didn't try to hide that she was from the FBI or that she was from the FBI's Civil Rights Squad.  Over and over and over FBI Special Agent Leah Marx is writing her name, showing her ID, and showing the deputies at the jail that the FBI is talking to inmates, many of whom have made complaints against the sheriff's department for abuse.

Now, of the 25 inmates that rookie Agent Marx interviewed over that year, she selected one particular inmate to try to build her civil rights investigation around.  Who did she select?  She selected Anthony Brown.  And who is Anthony Brown?  Well, you will hear that Anthony Brown is a dangerous and violent criminal, that Anthony Brown had a criminal record dating to the 1980's, that Anthony Brown was convicted of a 2005 armed robbery, basically went into a bunch of banks with a gun and got caught.  And then you will hear in 2009 he did it again.  He went into three different banks in 2009, put his gun up against certain tellers and customers.  And as he will say, he was high on crack cocaine at that time and even fired his gun at one woman barely missing her.

This is who Special Agent Leah Marx, rookie Agent Marx, selected amongst those 25 inmates to build her

civil rights case on.  And what happened in the middle of that investigation in June of 2011 before the undercover went -- before Anthony Brown gets his cell phone?  You will find that he is sentenced to 423 years.

You will also hear that Anthony Brown, amongst other things, is a serial liar and, as Agent Marx will describe on the stand, a manipulator.  This is who Agent Marx chose.

So Agent Marx meets with Anthony Brown 10 to 20 times at Men's Central Jail and along the way tells her that there are deputies willing to take bribes in order to bring in stuff.  Well, what kind of stuff?  Again, we're talking about contraband.  And remember, contraband is something that, while on the outside might be particularly fine like food -- outside food on the outside, fine.  You bring outside food or you bring drugs or you bring cigarettes or even pornography or outside food into a secured facility, and it's illegal.  It's strictly prohibited.

So what's the other thing that's also strictly prohibited?  A cell phone.  And why, again, is a cell phone a problem?  Because what you'll hear and the evidence will show is that, when an inmate wants to make a call to someone on the outside and they're in the jail, they have to use one of the jail's public phones, and those phone calls are recorded.  You can actually hear what's being said.  It's recorded.  You can see what numbers are being dialed.

When an inmate uses a cell phone, they're able to bypass the system.  And if they can bypass the system, you will see that they can and have in the past used a cell phone to plan escapes, to arrange to kill witnesses in their cases, to smuggle drugs into a prison, and to commit new crimes.

Now, you will hear that Anthony Brown told Agent Marx that he knew of one deputy that could be bribed for cigarettes or outside food or a cell phone.  Which one of those three things did Agent Marx pick?  The cigarettes, the outside food, or the cell phone?  Evidence will show she picked the most dangerous thing to introduce into a jail, the cell phone.

But as Agent Marx will testify, she and her supervisors nevertheless decided to test out the cell phone and see what would happen with Anthony Brown, a dangerous and violent criminal who is sentenced to 423 years.

Now, as the evidence will show, Agent Marx's bribe plan was as follows:  What she was going to do is have Anthony Brown lie to what they later determined to be Deputy Gilbert Michel.  And what was that lie?  The lie was that Anthony Brown, through his bank robberies, had $800,000 stashed on the outside.  And what he wanted was he wanted Deputy Michel to bring him a cell phone.  How much would he pay him?  He would pay $2,000 to bring the cell phone in and $2,000 every time he charged a cell phone and brought it back to him. He gave him a $20,000 bribe.  And you will hear that

Deputy Michel agreed to it.

But how are they going to pay the bribe because obviously Anthony Brown in the jail doesn't have $2,000 or $20,000 for that matter.  Well, what you will hear is Agent Marx cooked up the bribe plan, and the bribe plan was, in essence, that Deputy Michel would go ahead and be contacted by C.J. on the outside, and C.J. would arrange to get him the money and arrange to get him the phone.

Who is C.J.  Well, what Agent Marx did was she had an undercover FBI agent -- and they call him C.J. -- make the contact with Deputy Michel and do that in order to keep the FBI distanced from the cell phone and Anthony Brown in the Men's County Jail because they did not want to connect the FBI to the cell phone because that could endanger Anthony Brown's life if he got it because it would show, if they found the cell phone, that he was an FBI snitch.  And being an FBI snitch in the violent wing of Men's Central Jail was extremely dangerous, as you will hear, because of how the other inmates could treat you or the deputies that you're snitching on.

So Agent Marx took two steps to try to distance herself.  She brought C.J. in instead of herself, and she even used a prepaid cell phone that would not be connected with the FBI.  But she made three rookie mistakes that connected the FBI to the cell phone and endangered Anthony Brown's safety.

To understand these mistakes, you have to go back

to the month before August and September of 2011 to July 18th because what you're going to hear on July 18th is that Deputy Michel and C.J. finally got together on the phone, and they struck the deal. We're going to make -- two days later on July 20th I will give you a bribe payment -- they didn't call it a bribe payment -- I will give you cash, and I will also give you the cell phone, and you can bring it to Anthony Brown in the jail. So that's what's decided on July 18. They have the meeting on July 20th.

But the evidence will show that on July 18th, 19th, and 21st something happened that did not happen before, the three rookie mistakes of Agent Marx. What happened is that Anthony Brown in the jail is very anxious. He wants to get this whole thing going. So rather than wait until he gets a cell phone, he calls Agent Marx on those publicly recorded jail phones, and he calls her on her desk line at the Civil Rights Squad at the FBI building in Westwood.

Now, for the past year he had made those phone calls, and she had never actually taken them because she knows that would then connect Anthony Brown, who is making the phone call, with the FBI Civil Rights Squad. But on July 18th, 19th, and 21st she took the calls. And what you will hear is that on July 18, for instance, in a recorded call Agent Marx talks to Anthony Brown about the transaction.

You'll hear on July 19th Agent Marx tells him in

a recorded call that the sheriff's department is recording, "You will have your phone soon.  Then you can call whoever you need."  Then you'll hear on July 21st, again, Agent Marx talks to Anthony Brown when he calls from the jail on the public phone and assures him that, "You're good.  You're good."  What is Anthony Brown good for?

Well, you'll hear that on July 20th Deputy Michel showed up in a parking lot near the Men's County Jail to do the transaction with C.J.  What you will hear is that C.J. gave Deputy Michel a partial payment of $700 and the cell phone. And how will the evidence show this?  You will see that there were six FBI agents surrounding these two cars.  And where was Agent Marx?  She was in a plane overhead with three other FBI agents taking high quality aerial photos, one of which is on the screen in front of you, that were so good that you could actually see the transaction from thousands of feet above.

The FBI got their man, they got it all on video, and they arrested him for the bribe.  Well, you will hear that two of these three things occurred.  The FBI got their man, they got it all on video, but they didn't arrest him.  Instead, you will hear that Agent Marx let Deputy Michel go and bring that extremely dangerous cell phone into Men's County Jail to Anthony Brown even though at that point, because of the July 18th, 19th, and 21st phone calls, that phone call could be connected directly to the FBI and put Anthony Brown's safety in

danger. Inmates would know he was an FBI snitch, and deputies could know who was snitching on them.

Why did Agent Marx allow this? As the evidence will show, Agent Marx believed that the numerous dangers of having a cell phone in the prison was outweighed by the possibility that Anthony Brown would somehow be able to shoot videos or photos of deputy beatings that might just coincidentally occur right in front of his cell by somehow, I don't know, taking his cell phone, sticking it through the bars, and trying to video or photograph what was going on. That was the plan.

And what safeguards did Agent Marx use to make sure the cell phone wasn't used for some illegal or sinister purpose? Well, you'll hear Agent Marx testify that the FBI had a system that would allow her, if you plugged in a pin number, to actually hear the call that's being made or the text messages being sent as they were done. Did she use this system? No.

You will hear that she could have set up an online alert so that, every time the phone was used to call or text, she would be alerted through her e-mail. Did she do that? No. Was she -- was she somehow otherwise able to listen to the calls or see the text messages being sent? No. Instead, once the cell phone got into the jail, it did not go as planned. Anthony Brown's cellmate saw Brown with the cell

phone, and he says to Anthony Brown, "Hey, I want to use that to call my girlfriend. And if you don't give it to me, I'm going to tell on you."

So Anthony calls C.J., "C.J., can I do this?" C.J. calls Agent Marx, "Agent Marx, can we do this?" Agent Marx says, "Go ahead. Go ahead." Now, had Agent Marx known who the cellmate was at that time? The evidence will show no. Did Agent Marx know what crimes -- remember, they're on the violent wing -- the most violent wing of the Men's Central Jail. Does she know what crimes that particular cellmate was in for? No. Did she take any steps to then trace the calls that the cellmate used the phone for? No. Did she even know if the cellmate had a girlfriend or is calling someone on the outside to do something very sinister with the cell phone? No.

You will hear Agent Marx agree to let this cell phone be used by the cellmate to call the girlfriend without doing any checks whatsoever. You will also hear that, at any moment in time, she could have just terminated the service for the cell phone so it couldn't be used, and she chose not to do that as well.

Instead, on August 4 you will see that there's a second bribe payment. Again, at this point they have another meeting in another parking lot. C.J. shows up with $800. So now you have a combined $1,500 for the bribe payment, and he

gives that money on video, a dozen FBI agents surveilling. Once again, the FBI has got their man twice. They've got it on video twice, and they let him go again. When they let him go again, again, there are no provisions taken to make sure that the cell phone is not being used for a dangerous purpose.

Now, four days later what you heard on August 8 is that the deputies found the cell phone in Anthony Brown's stuff buried inside a glove inside of a Doritos bag. And Deputy Michel finds out almost immediately that the cell phone has been discovered, and he calls C.J. He says, "C.J., they've got the phone. You have to go get rid of your phone." He's panicked. He's very worried that they now found the cell phone. C.J. calls Agent Marx and tells Agent Marx the cell phone has been discovered on August 8 in the jail.

Now, the evidence will show that the clock is ticking before Anthony Brown is going to be found out to be an FBI snitch. Does Agent Marx go to the jail on August 8 or C.J. go to the jail and warn Anthony Brown that there can be possible repercussions or warn anybody in the jail that there could be possible repercussions? No. What you'll hear is they discovered the cell phone on August 8, and then from the 8th to the 23rd -- August 8th to the 23rd, at no point from the 8th, 9th, 10th, 11th, 12th, 13th, 14th, 15th, 16th, 17th does Agent Marx or C.J. go to the jail to see how Anthony Brown is doing and let him know that the FBI is there for him.

483

On the 18th, as you heard, it all comes out it's an FBI phone. At this point there's no reason not to go to the jail. But does she go on the 18th? 19th? 20th? 21st? 22nd? No. You'll hear that the first time she goes is on August 23rd.

So then let me take you then back to August 18 because August 18 is when FBI Assistant Director Martinez calls Sheriff Baca to tell them about the FBI phone. What's also important to know is that why was it August 18 that Assistant Director Martinez is calling Sheriff Baca? Why didn't he call him on August 8th? What the evidence will show is that Agent Marx didn't even tell her boss, the head of the FBI's office, that the cell phone had been found on August 8th, and he doesn't find out about it until August 18th, ten days later. She keeps Anthony Brown in the dark. She keeps the head of her office, Assistant Director Martinez, in the dark.

Now, on the 18th what you'll hear is that Assistant Director Martinez does make this call to Mr. Baca, and he provides him with the information of two points. The FBI cell phone has been compromised, and we've got to keep Anthony Brown safe. That's it. No more details. Despite years of partnership, despite the fact that they had agents, there's sheriffs and FBI agents on 20 -- over 20 sheriff deputies are on FBI task forces. This is a partnership that had been working together for years. And despite that

**UNITED STATES DISTRICT COURT**

partnership, Assistant Director Martinez only provides Sheriff Baca with those two details.

What did he not provide him?  The evidence will show that Assistant Director Martinez for that six-week period did not tell Sheriff Baca how the phone was smuggled into the jail, whether or not there were other FBI-smuggled cell phones in the jail that could compromise the jail security, whether or not there was other FBI-smuggled contraband.  Maybe they were running multiple undercovers that the -- in the sheriff jails that he was personally responsible for the safety of.

Is Assistant Director Martinez assuring him, look, this is the only one?  Not at all.  Well, how many deputies were involved?  You know, at some point Assistant Director Martinez talks about Gilbert Michel, but he won't confirm or deny that there's other deputies that may be involved.  How many inmates were involved?  Well, they know about Anthony Brown, but is the FBI running multiple undercovers compromising the safety of the jail?  How big of problem was this for Sheriff Baca?

Sheriff Baca -- Assistant Director Martinez would provide him with no answers to these questions.  What you will hear is that Sheriff Baca had to begin his own investigation to find out the answers to these questions.  And towards that end, he spoke with Undersheriff Paul Tanaka.

Undersheriff Paul Tanaka, as you will hear, was

in charge of the day-to-day operations of the sheriff's department, and he was the No. 2 person of the sheriff's department.  And the sheriff talked to him on August 18th, and on August 19th they had a briefing meeting with Undersheriff Tanaka and members of the investigative team.  And it was decided then at the last meeting to have an August 20th meeting, so a bigger meeting with Sheriff Baca, Undersheriff Tanaka, and the rest of the team.  And this is going to be called the Saturday morning meeting because it's on a Saturday morning.

And what you will hear is that at that meeting Sheriff Baca is very explicit as to what his agenda is, and there's two points on it.  First, keep Inmate Brown safe, which is what the FBI had requested; and, second, investigate how the cell phone was smuggled into the jail.

Now, you will hear about the relationship between Sheriff Baca and Undersheriff Paul Tanaka.  When under -- and what you will hear is that, when Undersheriff Paul Tanaka was in Sheriff Baca's presence, he was, "yes, sir," "no, sir," "thank you, sir."  But when Undersheriff Tanaka was outside Sheriff Baca's presence, what you will hear is that he operated his own agenda.  He had people that were loyal to him, not Sheriff Baca, and he often advocated the old school way of dealing with inmates -- warehouse them, get them in, get them out, us versus them -- instead of Sheriff Baca's view that

**UNITED STATES DISTRICT COURT**

inmates were to be respected and rehabilitated.

Undersheriff Tanaka had not just the first point of the agenda or second point of the agenda, but you will hear that Undersheriff Tanaka added a third point to his agenda, something that Sheriff Baca didn't agree with, authorize, condone, or know about it.  "F the FBI."  That was a third part of Undersheriff Tanaka's agenda, not Sheriff Baca's agenda.

So over 50 times in opening statement Mr. Fox referred to "they" doing something, "they," trying to group everybody together each time because it's "they."  But what you will need to consider is what Sheriff Baca knew, authorized, participated in, agreed to, not what they did because this case is not about "they."  It is about Sheriff Baca.

Now, on August 23rd you will hear how Sheriff Baca's agenda and Paul Tanaka's agenda clashed.  On that day, as you heard, Agent Marx meets with Anthony Brown in the jails.  She finally comes to visit them, and she meets with him for over an hour with two other FBI agents until Anthony Brown is taken out of the room by other deputy sheriffs.

Now, when Lieutenant Thompson, Greg Thompson, that was on the Government's chart, one of the sheriff's department investigators found out about this, he went to Paul Tanaka, and he said, "Mr. Tanaka, I'm sorry.  The FBI went ahead and violated your order to keep the FBI away without your

487

permission.  I'm very sorry."  And what you will hear and see in an e-mail is that Lieutenant Thompson had a "butt-chewing," quote/unquote, by Undersheriff Tanaka.  They chewed his butt out apparently and was mad and angry that the FBI had been able to talk to Anthony Brown.

But what you're going to hear also is Sheriff Baca's response because Mr. Fox told you about the incident, but what he didn't tell you, when Lieutenant Thompson went to go ahead and say the same thing to Sheriff Baca, is what Sheriff Baca's response was.  And his response was not angry at all, "Thank you very much," unlike Undersheriff Tanaka's response which was incredibly mad, "F the FBI."  Sheriff Baca's response was -- because his agenda was not to keep the FBI at bay, keep them away, was not angry at all.

Now, as the evidence will show, what Sheriff Baca's agenda was was to be open, transparent, and direct, the opposite of hidden, secretive, and deceptive.  He had nothing to hide from the FBI or anybody else.  And where do we see that best?  Well, Mr. Fox told you about a meeting on August 29th.  That's a meeting with someone called the United States attorney.

Now, the United States Attorney is their boss, the head of the United States Attorney's Office.  He's not only in charge of Los Angeles County, but he's got all the six

**UNITED STATES DISTRICT COURT**

counties around it.  They call it the Central District of California.  That's Orange County, Los Angeles County, Riverside and San Bernardino, Ventura, Santa Barbara, and San Luis Obispo.  That's the United States Attorney, and that gentleman who you will hear testify, his name is Andre Birotte.

Now, you will hear that Sheriff Baca scheduled a meeting with Andre Birotte, the very person who had the ability to bring conspiracy and obstruction of justice charges against anyone, and that's who Sheriff Baca meets with in person.  And the evidence will show that the purpose of this meeting, again, was to be open, transparent, and direct with the United States Attorney, and that's exactly what Sheriff Baca did.

He told the United States Attorney, Mr. Fox calls it his displeasure, his anger, about the FBI inserting a very dangerous cell phone into the jail without his participation.  And he proposed in this meeting that the sheriff's department work with the U.S. Attorney's Office and the FBI in conducting their investigations.

Again, they were partners in task forces.  They had been partners for years.  They could partner at this point because there's no more undercover investigation.  And what you'll hear is that Sheriff Baca made these points himself.  He didn't send some underwing, someone underneath him to make these points.  He made them openly, transparently, and directly and said the sheriff's department has the expertise with the

UNITED STATES DISTRICT COURT

jails for decades that the FBI lacks that we can bring into this investigation.

And what did United States Attorney Birotte do? What was his response?  He listened very politely, and he didn't engage in a dialogue at all.  He didn't provide Sheriff Baca with the answers to any of the questions that Assistant Director Martinez wouldn't answer.  He just sat there very politely listening.  And also, importantly, he didn't raise with Sheriff Baca that the federal investigation was having any problems like with a writ or anything else.  So that meeting then was over.

And what next happens is that the evidence will show that many actions now occur between about August 25th and September 8th.  And all those actions, I ask you to consider whether or not Sheriff Baca knew about them, participated in them, agreed with them, authorized or condoned them because the evidence will show it's not "they" but that Sheriff Baca did not do any of the above.

So for instance, complying with the federal writ, not at all.  The evidence will show Sheriff Baca didn't even know a writ was served, didn't know it was being complied with or not complied with.  That will be the evidence.

Anthony Brown having his name changed.  What will the evidence show about Sheriff Baca's knowledge or agreement with that?  Zero.  How about Anthony Brown being moved from

place-to-place?  The evidence will show Sheriff Baca didn't know, authorize, or participate in that in any way.  How about the issuance of that policy regarding the FBI visits?  Again, Sheriff Baca wasn't involved in that policy, wasn't e-mailed on it, wasn't communicated with it at all.  How about seeking that court order for the FBI's files?  Was Sheriff Baca involved with that at all?  No.

How about telling deputies not to cooperate?  Again, Mr. Fox called it "they."  But will the evidence in this case show that Sheriff Baca was in any way involved or knew about deputies being told not to cooperate with the FBI's investigation?  No.  How about sweeping for FBI listening devices?  Absolutely no evidence you will hear that Sheriff Baca was involved with that.

And how about the surveillance of FBI agents ordering that surveillance?  You will hear that Sheriff Baca wasn't involved with that.  In fact, was out of the country at the time.  In fact, the time period that he's out of the country was right darn smack in the middle of this six weeks.  So in the six-week period, he's out of the country on an international business trip.  He's actually the keynote speaker at a counterterrorism conference outside the country between September 8 and September 21st.

Now, on September 22nd when he came back or around there, he has a meeting with the investigators, and

Undersheriff Tanaka and the issue of whether or not they should go ahead and interview Agent Marx comes up, and you will hear that Sheriff Baca -- because at that point, again, the FBI had provided no details to him whatsoever about their investigation. You will hear that Sheriff Baca okayed that interview.

But what's also very important to listen to is that Sheriff Baca at no point told those investigators to threaten to arrest Agent Marx or to arrest her. He didn't give either one of those directives. His only directive was to go ahead and interview her because he had gotten no information from the FBI at that point in time.

Now, on September 26, what you will hear is that two things occur. The first is, as the Government mentioned in their opening, Sheriff Baca appeared on TV on *Good Morning L.A.*, one of the Fox morning shows. He was actually on the show to promote a charity raising funds for the disease Lupus, and the host asks him, while he's making his appearance, what about this FBI investigation? What's going on?

And what you'll hear is that on public TV Sheriff Baca is open, transparent, and direct. He actually answers the questions. And what does he say? He says, well, the FBI lacks experience in the jails. You'll hear that he says publicly it's illegal to have a cell phone in the jails,

which it is.  You will hear that the sheriff has the responsibility to run the jails, and lastly the sheriff was going to meet the next day with the FBI to talk about it.

This wasn't some type of public pressure on the United States Attorney.  You will hear the evidence that you can't pressure United States Attorney Birotte with a public TV appearance.  This is the United States Attorney, the head of the FBI office, and you will hear that they cannot be pressured.  The evidence will show Sheriff Baca going on TV and openly, transparently, and directly stating his view.

Now, what you will also hear is that later that day Sheriff Baca receives a phone call from Assistant Director Martinez.  And what did that phone call say?  That phone call actually wasn't mentioned by Mr. Fox.  He told you -- he showed you that little clip from the video where they approached Leah Marx.  They had the two investigators, the guy going like this approaching Leah Marx.

But what he didn't tell you is that what happens thereafter is that Assistant Director Martinez calls up Sheriff Baca and says to him directly, "Are you going to arrest Agent Marx?  Two of your agents just threatened to arrest her."  Immediately Sheriff Baca responds to him, "No.  That was not the plan.  We are not going to arrest her.  We don't arrest FBI agents."  And learned that those two FBI agents had not just done what he asked them to do which was interview Leah Marx but

had gone beyond his orders which was wrong. And as soon as Sheriff Baca heard about it, he assured Assistant Director Martinez it would not be happening.

Now, on September 27 what you will hear is that Sheriff Baca did have that second meeting with the United States Attorney Birotte, and this time the head of the FBI's office was also at that meeting. That's the Assistant Director Martinez. This is the clear-the-air meeting because for six weeks Sheriff Baca has gotten no answers from the FBI, no answers from the U.S. Attorney's Office about how big of problem he has in his jails.

So what happens at this meeting is that you will hear that the sheriff was angry. And again, the sheriff did not hide his anger. It's not who he is. You will hear that. He was open, he was transparent, and he was direct to the United States Attorney, the man who had the capability of bringing charges against him for conspiracy or obstruction of justice and the head of the FBI's office.

And he said to them words to the effect of what Mr. Fox showed you about "These are my jails, G.D.," and "I'm the G.D. sheriff." And then he said if you, the FBI, want to gun up -- and by that it means, if you want to go ahead and draw the line in the sand and no longer be a partner with the sheriff's department, all right. That's not the way I want to deal with it. I want to be your partner. I've been your

partner for decades.  But you won't trust us.  How are we going to trust you back?

And at that point for the first time in six weeks Assistant Director Martinez tells Sheriff Baca what had happened, why they went into the jails without bringing it to his attention, what the FBI's investigation was.  And at that moment in time, you will hear the air was cleared.

How did that meeting end?  If you had just listened to Mr. Fox's opening, you would think the sheriff took out his gun.  That meeting ended with these gentlemen shaking hands and agreeing to work together going forward in the future.  And the sheriff understood that the U.S. Attorney made it clear there was going to be a federal investigation.  They didn't want the sheriff's department to play an active role other than responding to document requests.  But that was okay because the air had been cleared in the September 27th meeting.

So as you listen to the evidence over the next several weeks, the Government will present you documents, audio, video, and testimony to prove their case beyond a reasonable doubt because, as the judge has and will instruct you, Sheriff Baca is presumed innocent until the end of this trial and into your jury deliberations, until or unless the Government proves beyond a reasonable doubt that he committed any of the crimes charged.

And when you consider the avalanche of e-mails,

for instance, that the Government is going to present, pay very close attention to whether or not Sheriff Baca is on the "to," the "from," or the "cc" or "bcc" line.  Pay close attention because you will find in these avalanche of e-mails that Sheriff Baca is not on any of these e-mails other than the two he receives from Assistant Director Martinez.

Pay also close attention to how many cell phone calls exist between Sheriff Baca and the investigators during these six weeks.  What you will hear is that there are about 60 phone calls between Undersheriff Tanaka, the man with his own agenda, and the investigators.  And then during this entire six weeks, Sheriff Baca calls the investigators two times.

And also pay close attention to what the witnesses are going to say about whether or not Sheriff Baca was at all involved with Anthony Brown being moved around, a federal writ being issued, witnesses being told not to cooperate.  The evidence will consistently show that Sheriff Baca was not involved.

Instead, you will hear that Sheriff Baca was extraordinarily busy.  He was working 12- to 14-hour days six to seven days a week with that enormous responsibility that I described before in running the sheriff's department and dealing with the entire responsibilities of being a sheriff.

You will hear that, when Sheriff Baca got involved with the investigation, as he pointed out, he was

open, transparent, and direct, the very opposite of secretive, deceptive, and hidden -- the hallmarks of obstruction of justice.

The ACLU was his partner; the U.S. Attorney's Office was his partner; the FBI was his brother in arms.  And the Government will fail to prove beyond a reasonable doubt that the sheriff conspired or obstructed a grand jury investigation into civil rights violations as charged in this Indictment.

Accordingly, we will ask you at the end of this case to return the only verdict, the only verdict that will be consistent with the evidence presented, a verdict of not guilty on both counts.

Thank you very much.

THE COURT:  All right.  Thank you.

Ladies and gentlemen, we're going to take a 15-minute break.  Again, I want to remind you, until this trial is over, you're not to discuss this case with anyone including your fellow jurors, members of your family, people involved in the trial, or anyone else, and do not allow others to discuss the case with you.  This includes discussing the case on the Internet, through blogs, bulletin boards, by e-mails or text messages.

If anyone tries to communicate with you about this case, please let me know about it immediately.  Do not

watch, read, or listen to any news reports or other accounts about the trial or anyone associated with it.  Do not do any research such as consulting dictionaries, searching the Internet, or using other reference materials, and do not make any investigation about the case on your own.

Finally, you're reminded to keep an open mind until all of the evidence has been received, you've heard the arguments of counsel, the instructions of the Court, and the views of your fellow jurors.

We'll come back at 25 to the hour.  Thank you very much.

(The following proceedings were held in open court out of the presence of the jury:)

THE COURT:  All right.  Is there anything we need to take up?

MR. FOX:  No, Your Honor.

MR. HOCHMAN:  No, Your Honor.

THE COURT:  Who's your first witness?

MR. FOX:  It is Chaplain Paulino Juarez Ramirez.

MR. HOCHMAN:  And, Your Honor, that's -- if we could -- since he's going to be testifying about the subject of the limiting instruction, if we could offer that at that point, that would be appreciated.

THE COURT:  If we could what?

MR. HOCHMAN:  I'm sorry.  Since the chaplain will

**UNITED STATES DISTRICT COURT**

be talking about deputy abuse which is the subject of the limiting instruction we gave you this morning, if the Court would be amenable to read it in connection at least with his testimony.

THE COURT:  All right.  Thank you.

MR. HOCHMAN:  Thank you.

(A recess was taken at 10:22 a.m.)

(The following proceedings were held in open court out of the presence of the jury:)

THE COURT:  Let's bring the jury in.

MR. JAUREGUI:  Your Honor, should we bring our first witness into the courtroom or not?  He's in the witness room; so it will be fast.

THE COURT:  It's fine.  As soon as the jury comes in, you can bring him in.

MR. JAUREGUI:  Okay.  Thank you.

(The following proceedings were held in open court in the presence of the jury:)

THE COURT:  All right.  I believe the Court has passed out notebooks for each of the jurors.  Make sure your juror number is written on the outside of your notebook.  Make sure you leave your notebooks on your chairs at the end of the day.

Ladies and gentlemen, I want to remind you that the defendant is not on trial for any conduct, offenses, or

allegations of inmate beatings or deputy abuse that are not charged in the Indictment.  You're only to determine whether the defendant is guilty or not guilty of the charges in the Indictment.

All right.  Call your first witness, please.

MR. JAUREGUI:  Your Honor, the Government calls Chaplain Paulino Juarez Ramirez.

THE CLERK:  Stand here for me, please.  Raise your right hand.

Do you solemnly state that the testimony you may give in the cause now pending before this court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

THE CLERK:  Please be seated.  Please state your full name and spell your last name for the record.

THE WITNESS:  Paulino Juarez Ramirez.  My last name is Juarez Ramirez, J-u-a-r-e-z.

THE COURT:  If you would speak directly into that microphone.  If you need to adjust it, that's fine.  All right, counsel.

MR. JAUREGUI:  Thank you, Your Honor.

///

///

///

**UNITED STATES DISTRICT COURT**

**PAULINO JUAREZ RAMIREZ,**

**GOVERNMENT'S WITNESS, SWORN:**

**DIRECT EXAMINATION**

BY MR. JAUREGUI:

    Q       May I refer to you as Mr. Juarez?

    A       Yes.

    Q       Mr. Juarez, what do you do for a living?

    A       I am employed by the Archdioceses of Los Angeles.
I am minister.  I am a permanent deacon, and my place of
minister is chaplain at Men's Central Jail.

    Q       How long have you been doing that?

    A       I has been there for the last 18 years and five
months.  Going to be six months in December.  So 18 years and
six months.

    Q       As a jail chaplain, what do you do?

    A       Well, usually we attend the operation in the jail
not just for the catholics but for all the inmates.  Some of
them, they are able -- well, we provide services.  We talk
one-on-one, and we counseling them.  Sometimes we try to reach
the embassies when they don't have nobody here in this country.
Some of them come to our office, and some of them, they are in
single cells.  So we go where they are.

    Q       And how often do you do this?

    A       I do five days a week, regularly from 9:00 to
4:30, 5:00, depends on the circumstances.

**UNITED STATES DISTRICT COURT**

501

Q        Do inmates come to you, or do you go to them?

A        Some of them come to the services for counseling to my office inside the jail.  Some of them, we go to visit them where they are.

Q        And are you allowed to go alone, or are you escorted?

A        No.  Usually I go alone.

Q        When you go to see inmates, where do you see them?

A        In their cells.  They are dorms.  Some of those dorms have four rows.  Each row has different numbers of cells.  So I go one-by-one.

Q        Is there any particular floors that you work?

A        We work everywhere.  Usually I am in the 3000 floor, but I go -- depends on the request.  I can go everywhere.  But usually I stay in 3000 floor, and also I go to 1750 -- sometimes it has been assigned to me.

Q        I want to direct your attention to February 11, 2009.  Do you recall what happened that day, Chaplain?

A        Yes.

Q        What happened?

A        That day I asked permission to go early.

Q        When you say you asked permission to go early, what do you mean?

UNITED STATES DISTRICT COURT

A       I asked to Sergeant Barbosa who was in charge of the floor that day.  It was around 10:30 in the morning.  I asked permission.  I went.  I got into the dorm.  The officer opened for me the first gate, and two more doors with bars.  I walking to 3700 Able row.

Q       And that's on the 3000 floor?

A       Yes, it is.

Q       Okay.  And what happened?

A       I start walking with my little cart with my books.  In the cell No. 3 was Armando Carrillo, an inmate who was there before.  He called me and said, "Hey, Chaplain Paulino," I stop -- I stop, and when I would stop talking -- stop talking, I hear some noise like somebody has been punched and (indicating).  So I -- I walk through the door and --

Q       Chaplain, where were these noises coming from?

A       From -- when you enter into the dorm, there is a little hallway, hallway inside.  And then there are the doors to get into the booth of the deputies, the officers, and you pass through those.  They are doors that are taking you into the rows.  So the officer who opened for me closed the doors after I was in.  So this noise was inside dorm in the front of one of the booths of the officers.  And what I saw, because it was only right there, but this inmate was beaten up by three officers.

**UNITED STATES DISTRICT COURT**

Q        Okay.  Let me stop you there, Chaplain.

First you heard noises.

A        Yes.

Q        Did you walk away from Mr. Carrillo?

A        Yes.

Q        And where did you go?

A        I went to the door, and I stopped there because it was closed.  Through the bars I was looking what was going on there.

Q        What did you see?

A        I see this inmate against the wall and three officers -- one in the middle, one here, and the other here -- punching him.

Q        When you say "one here and the other here," Chaplain --

A        Yes.  On the right, on the left.  And they were -- he was saying, "Please stop.  Please stop."  They continued punching him.

Q        Where were they punching him?

A        In the upper torso here, in the face.  I never see his hand trying to cover or trying to punch back or kick back.  He just was against the wall and receiving all these blows.

Q        Do you know where his hands were?

A        I didn't see hands.  I didn't see his hands go

up.  They were like this here.

Q    Just so the record is clear, Chaplain, when you say they were like this, can you just describe in words where they were?

A    In the waist.  Because usually in that dorm, when they were taking inmates out, they were cuffed to their waist chains.  So I suppose that he was handcuffed to the waist chains and this is why he didn't try to cover himself.

Q    The officers, were they deputies?

A    Yes.

Q    Did you hear them say anything?

A    Yes.  They were saying -- yelling trying, "Stop fighting.  Stop resisting."  And they continued punching him.

Q    Did you see the inmate fighting or resisting?

A    No.  No.

Q    What happened next?

A    Well, he fell, and when he fell on the floor, they start kicking him everywhere.  And I -- I tried to say something.  I can't.  I was -- I was horrified.  I couldn't say nothing.  And they continued saying, "Stop fighting.  Stop resisting."  And one of the officers put his left knee on him, on his back, and he start punching him on the back.

Q    Chaplain, you just put your hand toward your neck.

A    Yeah.

UNITED STATES DISTRICT COURT

Q        Were they punching him in his neck?

A        Yes.

Q        What happened next?

A        And then he put back, and then the others start -- continue kicking, the other two.  And then he tried to call again, but then he saw that I was there on the door, and he froze.  Somehow he -- the others noticed that, and they also -- they froze.  One of the officers inside, he was saying "Code 4, code 4" on the sound system.  Two -- the door near to the hallway was opened.  Two deputies came, they look, and they saw the inmate.  They run where he was lying.  He came again, and one of them, he -- with his leg, with his boot, he did three stomps on his spinal cord.  They also, the deputy, the three there, somehow they look where I was, and also they were froze.

Q        Okay.  Did they say anything to you at that point?

A        No silence.

Q        What happened next?

A        And then more deputies came, 20, I don't know.  A lot of them.  One of them, he walked to them.  He opened the two doors with bars and walked up to me and told me, "You have to go."  I said, "Yeah."  So I was walking with my -- I went for my cart where it was in front of Carrillo.  So I took the cart back, and I left with my cart.  And I saw like from here

506

to the door he was lying on the floor with a lot of blood.

Q        Okay.  Chaplain, let me stop you.

You just said "From here to the door."  You're pointing to a door.

A        Where he was -- yeah.  Where he was lying where I was passing from here to where he was lying on the floor, the inmate.

Q        Approximately how many feet away were you?

A        I don't know.  15 feet probably.

MR. JAUREGUI:  Your Honor, if the Court could just take notice that Chaplain Juarez is looking at the exit door in the courtroom that's approximately 10 to 15 feet away from the witness stand.

THE COURT:  The Court will take notice.

Q        BY MR. JAUREGUI:  Mr. Juarez, what did you see as -- did you pass the inmate on your way out?

A        Yes.  I saw him lying on the floor with a lot of blood around his head and was no moving at all, silence.

Q        Did you say anything to anyone about this?

A        No.  I passed through them to the officers.  I walked to my office.  Near to the -- like half the way to my office, Sergeant Barbosa was coming, and I told him that some of your guys are in big trouble.

I told him -- I continued walking to my office. There was another chaplain.  She saw me.  She said, "What

**UNITED STATES DISTRICT COURT**

happened?" because I was shaking.  I really felt worried about what I saw.  I told her, "I have to know.  I have to know what happened."  And I explained.

Q        Now, Chaplain, that day, did you report what happened to anyone in the archdiocese?

A        I called to my director Father George Horan.  I leave messages, and he called me back that night because he was out of town.

Q        Did you eventually write a report or a statement about what you saw that day?

A        Yes.  He told me that I have to make a report.  Yeah.  I told him, and I did the report.

Q        When did you write that report?

A        I didn't do immediately, immediately.  But the next day I spoke with Sergeant Barbosa around -- with him about this, and I start writing because my -- I was -- that changed my life.

Q        Chaplain, do you remember when you wrote your statement?

A        I wrote it probably the five days, one week later probably.  And I -- I give to Sergeant Barbosa a copy.

Q        After that did anybody from the sheriff's department interview you about what you saw?

A        Yes.  Sergeant Barbosa told me that the Internal Affairs were going to interview -- to have interview,

and they have -- they want to have a video about my statement about what I saw.

Q        Did they interview you?

A        Yes.

Q        When was that interview?

A        That was probably after the 20th.  I don't remember exactly the date.  It was not immediately.  It was later.

Q        Was it weeks?  Months?  Do you remember?

A        Weeks, yes.

Q        Did you learn that anything happened as a result of your writing that report?

A        Well, after that in the jail really things still.  But things it would change was that, when I was passing through where the deputies were, usually they were in numbers, five or six in the 3000 floor.  When I pass, they didn't see on my face, but when I just passed, they were saying like "Fucking rat."

Q        Chaplain, just so that -- I didn't really understand what you said.  Could you repeat that?

A        "Fucking rat."  They called me "Mother fucker."  They were -- "This is the mother fucker who --" so I was sometimes walking the rows where I was walking which they don't supposed to do because they know I was in the row walking, visiting the inmates.  Sometimes I have to jail for 30 minutes,

35 minutes, "Would you open, please?  Would you open, please?" So I feel kind of retaliation because the report.

Q      Let me take you back just briefly, Chaplain.

After your meeting with Internal Affairs, were you told what happened to that inmate?

MR. DIAMANTATOS:  Objection, Judge.  Foundation.

THE COURT:  Sustained.

Q      BY MR. JAUREGUI:  Chaplain, the people that interviewed you from Internal Affairs, did you advise them of what happened in February of 2009, the month before?

A      Yes.

Q      What, if anything, did they say to you?

A      They told me -- they said, "I'm sorry for what you saw.  We are going to investigate, and we are going to let you know what happened."

Q      Did those people let you know what happened?

A      No.

Q      Okay.  I want to take you now to June, 2011, Chaplain.

Did you, again, report what you had seen in February of 2009?

A      Yes.

Q      To whom?

A      Finally we have a meeting with Mr. Michael Gennaco from the Office of Independent Review, and

Mr. Walter Katz and Father George Horan, Patricia Bartlett, and myself.  We went to his office.

Q        Where was his office?

A        In Commerce where he was -- his office.

Q        Why did you talk to them?

A        Because violence is still after that.  So nothing was changed.  I told Father George, "Father, somebody have to stop this."  And looks like nothing changed.  So, finally, we have this meeting, and I explained the events and something else also from the other chaplains brought something else.  And he said, okay.  So we are going to be in contact, and we are going to plan meetings regularly to see how we can do something.

Q        Chaplain, did you ever speak to Sheriff Baca about the February 11, 2009, assault?

A        The only time I spoke with him was on July finally because Michael Gennaco, I think he set up the meeting. I don't know really who set up the meeting with former Sheriff Baca.  And we -- we have that meeting.

Q        And that was July of 2011?

A        Yes.

Q        Where was the meeting?

A        It was in his work where he is usually, Monterey Park.  We were there.  So it was Father George, Patricia Bartlett.  It was sheriff assistant at that time

Cecil Rhambo and also was captain at that time.

Q       Why did you speak to Sheriff Baca at that time?

A       Because we really want to explain what happened and what was going there in the jail and to advise him of other things were there happening.

Q       Chaplain, did Sheriff Baca have any papers with him during the meeting?

A       Father was passing to him with a report, and he asked me about what I saw.  I explained.  And he was looking into the folder.  And he asked me for my report, but my report was not in the folder.  So he was reading some of the -- I think the report from the officers.

Q       How do you know that, Chaplain?

A       Because they said that this inmate has received some punch because he didn't want to go back to his cell and also that he was schizophrenic.  This is why the bruises that he have was because he has been run over by a truck before coming into the jail.  So he read one part that said that the chaplain was exaggerating what he saw.  So this is was -- I think it was from the officers.

Q       Did you tell Sheriff Baca what -- let me just step back a second.

The report was not in the file to your understanding; correct?

A       Yes.

Q        Did you tell Sheriff Baca what you had seen?

A        Yes.  I -- yes.

Q        And what did you say to him?

A        I explained what I explained here.  I did exactly the same what I saw.

Q        Did you show Sheriff Baca what you saw?

A        Yes.

Q        How did you do that?

A        Well, in -- we were around the table, and also I -- like today I did, I was showing how I saw, where I was.

Q        And, Chaplain, just, again, so we're clear, you just made some motions with your hands.  Can you explain in words what you showed him?

A        Yes.  That the inmate was -- in the beginning he was just punching, and then when he fell, he was kicked in head, in the -- everywhere in his body.

Q        You just said the inmate was punching.  Is that what you meant to say, that the inmate was punching?

A        Yes.  No.  He was -- the officers were punching him.  He never -- he never --

Q        So you demonstrated for Sheriff Baca?

A        Yes.

Q        What did Sheriff Baca say to you in response?

A        Well, when he hear that the -- he was punching and kicking, he said that kicks are not allowable in the

UNITED STATES DISTRICT COURT

513

department.  So then he put that note that that was not
allowable in the -- he talked to Cecil Rhambo to write down
about that.

Q    How did this meeting end, Chaplain?

A    Well, there were other things from all the other
chaplains.  But at the end I think nothing really was -- like
was exaggerating.

MR. DIAMANTATOS:  Objection.  Nonresponsive,
Your Honor.

THE COURT:  Overruled.

THE WITNESS:  Was exaggerating.  So I think they
were diminishing what I saw.

Q    BY MR. JAUREGUI:  After this meeting with
Mr. Baca, did you talk to the ACLU?

A    Yes.

Q    Why?

A    Because I didn't see any change after this
meeting.  Like this was not taken serious about events.  We
really as chaplains, we -- we are there to help to everybody.
And if something is not right, we as chaplains, we have to try
to stop what is not right.  And especially if we preach about
justice and those things, we are not -- if we don't do nothing,
what we are preaching about?  And this is why we try in
different ways because, also, I knew that something -- not
something -- inmates were sending complaints already to ACLU.

**UNITED STATES DISTRICT COURT**

514

MR. DIAMANTATOS:  Objection, Your Honor. Narrative.

THE COURT:  Sustained.

MR. JAUREGUI:  Your Honor, can I just have a moment?

THE COURT:  Yes.

MR. JAUREGUI:  No further questions, Your Honor.

THE COURT:  Cross-examination.

MR. DIAMANTATOS:  Thank you, Your Honor.

**CROSS-EXAMINATION**

BY MR. DIAMANTATOS:

Q      Chaplain, if you could describe for us how many chaplains there were during this time period that you're describing in 2011.

A      How many?

Q      During your direct examination you indicated "we."  If we could just explain to the members of the jury how many chaplains there were at the prison at this time.

A      Yes.  The catholics in that time we were Father George, Father Bartlett, myself, Sister Patricia who is assistant chaplain.  Four catholic chaplains.

Q      Were there other denominations?

A      Yes.  There were protestants.  A number -- a big number.  They come at different times.  So I can't tell you exactly how many of those chaplains exactly.

**UNITED STATES DISTRICT COURT**

515

Q       The chaplain's role was to provide a service to the inmates; correct?

A       Yes.

Q       You were there to assist them with getting through life inside prison; correct?

A       Yes.

Q       And during your direct examination, you described that chaplains had access to the inmates; correct?

A       Yes.

Q       I think you indicated on direct examination, Chaplain, that you were able to either have the inmates come to you -- correct?

A       Yes.

Q       Is that "yes"?

A       Yes.

Q       -- for one-on-one meetings if you thought that was appropriate; correct?

A       Yes.

Q       And you also described for the members of our jury that you were able to go through the prison and meet with inmates in their dorms.

A       Yes.

Q       That included the 3000 floor; correct?

A       Yes.

Q       The 4000 floor?

UNITED STATES DISTRICT COURT

516

A        Yes.

Q        5000 floor?

A        Yes.

Q        You had full access to the dorms in Men's Central Jail; correct, sir?

A        Yes.

Q        Inmates deserved to be treated with respect; correct?

A        Every person, yes.

Q        The events that you described for the members of our jury on direct examination that occurred in February of 2009, it was your understanding that inmate was not being treated respectfully; correct, sir?

A        Yes.

Q        Now, just to be abundantly clear, Sheriff Baca was not present for that event; correct?

A        Correct.

Q        The officers that you described during your direct examination are not here today in court; is that right, sir?

A        Yes.

Q        Okay.  You indicated on direct examination that there were certain codes played over the radio.  I think you indicated code 4 on direct examination.

Did I say that correctly, sir?

**UNITED STATES DISTRICT COURT**

A       Yes.

Q       As a chaplain, having access to inmates, would you often hear certain radio calls over various deputies' radios at times?

A       Yes.

Q       Were you ever familiar with something called a code 10?

A       No.

Q       Okay.  Would you ever be present, Chaplain, when either the sheriff was present in the Men's Central Jail and his presence was being announced over the radios to other deputies?

A       I hear when they said, "I need somebody to come, police officer, something, so please come to this," yes.

Q       So it's fair to say that there's communication between deputies over the radio depending on what was going on in the prison?

A       Yes.

Q       And when other higher-ups were present, that could be communicated over the radio?

A       I don't know.

Q       You described for the members of the jury that the troubling 2009 incident, sir, that you witnessed, you reported it; correct?

A       Yes.

**UNITED STATES DISTRICT COURT**

Q       You indicated during direct examination you spoke with Father Horan; correct?

A       Yes.

Q       It's another chaplain at the Men's Central Jail?

A       Yes.  He's the former director, yes.

Q       And Father Horan was troubled by what you told him; correct?

A       Yes.

Q       He asked you to file the report; correct, sir?

A       (Inaudible.)

Yes.

Q       If you could just answer audibly for the court reporter.

And you prepared that report; right?

A       Yes.

Q       You described for the members of the jury on direct examination that you spoke with a gentleman by the name of Mike Gennaco; correct?

A       Correct.

Q       Am I correct that Father Horan arranged that meeting for you with Mike Gennaco?

A       Yes.

Q       And Mr. Gennaco's title was the head of Office of Independent Review at that time in 2011; is that correct?

A       Yes.

Q        Would you agree with me, Chaplain, from deputy, there's other ranks that outrank deputies in the prison system; correct?

A        Correct.

Q        So, for example, if we start with a deputy, above a deputy is a sergeant; is that right, sir?

A        Senior.

Q        So sergeant is more senior than a deputy; correct, sir?

A        No.  It's the CA, then the deputy, senior, then the sergeant.

Q        Okay.  Is a lieutenant --

A        Lieutenant, captain.

Q        Captain is above a lieutenant; correct, sir?

A        Yes.

Q        A commander is above a captain; correct?

A        Yes, sir.

Q        And then there's chiefs who are above the commanders; correct?

A        Correct.

Q        There's an assistant sheriff who's above the chief and all the other ranks we just went through; correct?

A        Correct.

Q        And then there's an undersheriff; correct?

A        Correct.

Q        And then there's the sheriff; is that right, Chaplain?

A        Yes.

Q        And if you -- as a chaplain, you and other chaplains at the prison system were encouraged, if you viewed anything, to report it to the chain of command.

A        Yes.

Q        So you could report it to a deputy, of course, if you saw fit.

A        (Inaudible.)

Q        Is that a "yes," sir?

A        Yes.

Q        Thank you.

Each and every individual that we just described would outrank that deputy; correct?  You could go to a sergeant?

A        Yes.

Q        A lieutenant?

A        Yes.

Q        A captain?

A        Yes.

Q        Commander?

A        Yes.

Q        All the way up through the sheriff if you weren't getting the relief you wanted; correct?

A       Yes.

Q       And is it -- so you had a conversation with Mike Gennaco where you described your concerns to him; correct?

A       Correct.

Q       Isn't it true that almost immediately after that meeting you had a meeting directly with Sheriff Baca that Mike Gennaco arranged; correct?

A       One month later.

Q       Isn't it true that Father Horan had a vacation in between that time period, and upon Father Horan's return, that's when you had the meeting with Sheriff Baca?

A       Yes.

Q       So you meet with Sheriff Baca and others; correct?

A       Yes.

Q       Mike Gennaco was there; right?

A       Yes.

Q       Father Horan -- sorry, sir.

A       Yes.  Yes.

Q       Thank you.

        Father Horan is there?

A       Yes.

Q       Other chaplains are there?

A       Yes.

Q       Sergeant Rhambo is there?

UNITED STATES DISTRICT COURT

A    Yes.

Q    And it's true you did not have to go through all of these intermediary layers to get to this meeting with Sheriff Baca; right?

A    Yeah.

Q    Mike Gennaco made it happen; right?

A    Yeah.  Yeah.

Q    With the help of Father Horan.

And you, of course, were reporting to Father Horan; correct?

A    Uh-huh.

Q    Is that "yes"?

A    Yes.

Q    Thank you, sir.

You indicated for the members of our jury that you saw that Sheriff Baca had a file in his hand; correct?

A    Yes.

Q    And he appeared to read through that file; correct?

A    Yes.

Q    Now, to be sure, you, yourself, didn't read through that actual file that the sheriff was holding to know each and every document in that file.

Isn't that right, sir?

A    Yeah.  I never see that.

**UNITED STATES DISTRICT COURT**

Q       But you sat patiently and watched the sheriff go through the file; correct?

A       Yes.

Q       You also indicated on direct examination that you showed physically to the sheriff the horrific things that you witnessed back in February of '09; right?

A       Yes.

Q       And he watched you act that out; correct?

A       Yes.

Q       Am I correct that, when Sheriff Baca learned of what you acted out and what he was viewing in that report, he responded with a question saying, "Why wasn't I told of this sooner?"

A       Yeah.  He asked to the -- to the table.

Q       He asked the entire group that was sitting there; correct?

A       Yes.

Q       "Why wasn't I told of this sooner?"

A       (Inaudible.)

Q       Is that "yes"?

A       Yes.

Q       I'm sorry.  The court reporter can't --

THE COURT:  Sir, if you have a problem with the witness, address the Court.  Not the witness.

MR. DIAMANTATOS:  Yes, Your Honor.

**UNITED STATES DISTRICT COURT**

524

THE COURT:  Next question.

Q     BY MR. DIAMANTATOS:  Am I correct, Chaplain, that, also, in response, Sheriff Baca gave an order right then and there; correct?

A     Uh-huh.  Yes.

Q     And the order was to Sergeant Rhambo who was present; correct?

A     Yes.

Q     And he ordered Sergeant Rhambo to address the use-of-force policy right then and there; correct?

A     Yes.

Q     Specifically that deputies should not be using their boots on inmates to subdue any inmates; correct?

A     Correct.

Q     Is it true, Chaplain, that the sheriff within a two-month period had set up a commander's task force to directly deal with inmate abuse?

A     Yes.  After -- after the 2011, yes.

Q     And Sheriff Baca -- the meeting ended; correct?

A     Yes.

Q     Chaplain, am I correct that the chaplains have access to an internal website that exists for employees that work at the MCJ?

A     Internal, yeah.  But in our office, they remove the Internet from our offices.

**UNITED STATES DISTRICT COURT**

Q        You have access to e-mail; correct?

A        E-mail, yes.

Q        And there's an employee directory where, if you want to look up an employee, you can see his or her information and contact information?

A        Yes.

Q        Am I correct that you had access, if you wanted, to e-mail the sheriff after this meeting that you had with him? You could have sent him an e-mail if you wanted to; correct?

MR. JAUREGUI:  Objection, Your Honor.

THE COURT:  What's the objection?

MR. JAUREGUI:  Scope.

THE COURT:  Sustained.

Q        BY MR. DIAMANTATOS:  Am I correct that you did not have -- make any efforts yourself to contact the sheriff again after the meeting that you had with him that you described?

A        Because we supposed to follow the chain of command.

Q        Sure.

A        And that is the thing.  And we know as a chaplain all this time that usually, when we want, for example, if I -- and this is true.  I go to the captain for something, sometimes the sergeant --

MR. DIAMANTATOS:  I'm going to object.

**UNITED STATES DISTRICT COURT**

Nonresponsive to the question.

THE COURT:  Overruled.

You can finish your answer.

THE WITNESS:  Yes.  If I go to the captain immediately, the sergeant get upset because they don't -- we don't go to them because we don't follow the chain of command.

Q      BY MR. DIAMANTATOS:  The meeting that you had with Sheriff Baca in July of 2011, the sheriff wasn't upset to meet with you; right?

A      No.

Q      I'm not asking about the sergeants, the commanders, the undersheriff.  The sheriff welcomed that meeting; right?

A      Yeah.

Q      He listened to your concerns.

A      (Inaudible.)

Q      Is that a "yes," sir?

A      Yes.

Q      And in your presence, he commanded somebody to do something about it; correct?

MR. JAUREGUI:  Asked and answered, Your Honor.  Objection.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  Yeah.

**UNITED STATES DISTRICT COURT**

Q    BY MR. DIAMANTATOS:  Father Horan and you worked together; correct?

A    Yes.

Q    You certainly could speak to Father Horan after July of 2011 if something, again, troubled you; isn't that right?

A    Yes.

MR. DIAMANTATOS:  May I have a moment, Your Honor?

THE COURT:  Yes.

MR. DIAMANTATOS:  Nothing further, Your Honor.

THE COURT:  Any redirect?

MR. JAUREGUI:  No redirect, Your Honor.

THE COURT:  All right, sir.  Thank you very much. You may step down.

Call your next witness.

MR. JAUREGUI:  Your Honor, the Government calls Brian Yanagi.

THE CLERK:  Stand right here.  Raise your right hand.

Do you solemnly state that the testimony you may give in the cause now pending before this court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

**UNITED STATES DISTRICT COURT**

528

THE CLERK:  Please be seated.

Would you please state your first name and spell your last name for the record.

THE WITNESS:  Brian Yanagi, Y-a-n-a-g-i.

THE CLERK:  Brian is with an "I"?

THE WITNESS:  Correct.

THE CLERK:  Thank you.

**BRIAN YANAGI,**

**GOVERNMENT'S WITNESS, SWORN:**

**DIRECT EXAMINATION**

BY MR. JAUREGUI:

Q     Sir, are you employed?

A     Yes, I am.

Q     How are you employed?

A     I'm employed by the Los Angeles County Sheriff's Department.

Q     How long have you been with the sheriff's department?

A     Since 1994.

Q     Are you a civilian or sworn employee?

A     I am a sworn employee.

Q     And what is your rank?

A     Lieutenant.

Q     Are you in a specific unit or subsection of the sheriff's department?

**UNITED STATES DISTRICT COURT**

A        Yes.  It's Data Systems Bureau.

Q        What is the Data Systems Bureau?

A        Data Systems Bureau is a unit within the sheriff's department that handles the IT for the department.

Q        As a lieutenant in the Data Systems Bureau, are you familiar with the sheriff's department's e-mail system?

A        Yes, I am.

Q        Are you familiar with how the sheriff's department maintains and stores e-mails?

A        Yes, I am.

Q        Have you reviewed exhibits in preparation for your testimony today?

A        Yes, I have.

MR. JAUREGUI:  Your Honor, may I direct the witness to the exhibit binders?

THE COURT:  Yes.

Q        BY MR. JAUREGUI:  Mr. Yanagi, to your left, I believe, you will see Government exhibit binders Volumes 1 through 3?

A        Yes.

Q        Can you just pull them out, maybe start with Volume 1 and bring it out in front of you.  I'm going to direct your attention to some specific exhibits, Mr. Yanagi, and I'm going to do them in groups because there are quite a number of them.

530

I'd like to direct your attention, first, to Exhibits 14 to 17 and 19 to 43.  I would just like you to take a look at them and let us know when you're ready.

A        Okay.  I'm at Exhibit 14 right now.

Q        Okay.  I'm sorry.  Go through 14 through 17 and 19 through 43.

A        (Witness reviewing exhibits.)

Okay.

(Marked for identification Exhibit Nos.

14 through 17 and 19 through 43.)

Q        BY MR. JAUREGUI:  Okay.  Mr. Yanagi, I'm going to break these up.

Have you previously reviewed each of those exhibits in preparation for your testimony today?

A        Yes.  I believe so.  I was given a number of documents --

Q        And --

A        -- to review.

Q        Were you given documents on a digital format, pdf format?

A        I believe it came from our counsel in a digital format, yes.

Q        And generally speaking, what kinds of documents are these that you're looking at?

A        They are e-mail documents or printed-out version

**UNITED STATES DISTRICT COURT**

of e-mail documents.

Q       And do the e-mails -- are they either "to" or "from" -- each one of those e-mails "to" or "from" an LASD employee?

A       For the most part I believe.  I believe some have an e-mail address that isn't.  But either "to" or "from," yes, correct.

Q       Either "to" or "from."  Okay.

And did you do anything to verify whether those e-mails came from the Los Angeles County Sheriff's Department's e-mail system?

A       I did.

Q       What did you do?

A       I compared them to our digital extractions of an LASD user -- sheriff's department user.

Q       What did you determine having done that?

A       I determined that they were the same.

Q       When you say "the same," what do you mean?

A       I compared the "to" or "from," the subject lines, and the content of the e-mail.

Q       The next set of exhibits, Mr. Yanagi, are going to be 45 to 57 and 60 to 65.

A       Okay.

        (Marked for identification Exhibit Nos.

        45 through 57 and 60 through 65.)

**UNITED STATES DISTRICT COURT**

Q        BY MR. JAUREGUI:  Did you review all of those exhibits prior to your testimony today?

A        Yes.

Q        Are all of those "to" or "from" a Los Angeles County Sheriff's Department employee?

A        Yes.

Q        Did you find matches for those in your digital storage system?

A        I did.

Q        And did you do the same kind of comparison with the "to," "from," subject line, and content?

A        Yes.

Q        And three more exhibits, Mr. Yanagi.  No. 67, and then in Volume 3, it's going to be No. 182 and 183.  It's 182 and 183.

A        (Witness reviewing exhibits.)

         Okay.

         (Marked for identification Exhibit Nos. 67, 182 and 183.)

Q        BY MR. JAUREGUI:  Had you reviewed those exhibits prior to today's testimony?

A        Yes.

Q        Did you do the same kind of analysis in the "to" "from" line, subject line, content of the e-mail?

A        I did.

UNITED STATES DISTRICT COURT

Q      Did you determine that they were all found in the sheriff's department or, I should say, stored in the sheriff's department digital archive of the e-mails?

A      Yes.

MR. JAUREGUI:  Your Honor, at this point I would move to admit Exhibit Nos. 14 through 17, 19 through 43, 45 through 57, 60 to 65, 67, 182, and 183.

THE COURT:  Any objection?

MR. HOCHMAN:  No objection.

THE COURT:  They will be received.

(Received into evidence Exhibit Nos.
14 through 17, 19 through 43, 45 through 57,
60 to 65, 67, 182, and 183.)

MR. JAUREGUI:  No further questions, Your Honor.

THE COURT:  All right.  Cross-examination.

**CROSS-EXAMINATION**

BY MR. HOCHMAN:

Q      Mr. Yanagi, we just talked about 59 different documents that have e-mails in them.

Is that accurate?

A      Around that, yes, sir.

Q      If you could take a look at those 59 documents, and with the exception of Exhibit 15, which is an e-mail from Steve Martinez to Leroy Baca, could you please tell the jury how many of the remaining 58 documents have Leroy Baca's name

UNITED STATES DISTRICT COURT

534

in the "to," the "from," or the "cc" lines of any of the remaining 58 documents.

A        I don't recall all the numbers of the documents.

Q        I'm sorry.  It's Exhibits 14 to 17.  And I am excluding Exhibit 15 which is a Steve Martinez/Leroy Baca e-mail.  So you've got 14, 16 and 17.  Let's start with those.  I'll just give you the numbers once you've finished reviewing them.

A        (Witness reviewing exhibits.)

         All right.  I'm at 17, sir.

Q        19 to 43.

A        (Witness reviewing exhibits.)

         19 to 43, sir.

Q        45 to 57.

A        (Witness reviewing exhibits.)

         I'm at 57, sir.

Q        60 to 65 and 67.

A        (Witness reviewing exhibits.)

         Okay.

Q        And then in the other book, 182 and 183.

A        (Witness reviewing exhibits.)

Q        And the question then, in the 58 documents -- 58 exhibits of the e-mails you just reviewed, how many had Sheriff Baca's name in the "to," "from," "cc" line?

A        None.

**UNITED STATES DISTRICT COURT**

535

MR. HOCHMAN:  No further questions.

MR. JAUREGUI:  Briefly, Your Honor.

THE COURT:  All right.

**REDIRECT EXAMINATION**

BY MR. JAUREGUI:

Q    Mr. Yanagi, the sheriff's department has an e-mail server; is that right?

A    Back in 2011 it did.

Q    Okay.  And would that server preserve e-mails for a period of time?

A    Yes.

MR. HOCHMAN:  Objection, Your Honor.  Beyond the scope of cross.

THE COURT:  Overruled.

Q    BY MR. JAUREGUI:  And the e-mails that you just testified about, were those e-mails preserved?

A    Yes.

Q    If e-mails had been deleted from the server before they were preserved, would you be able to find them today?

A    I'm sorry.  Repeat the question.

MR. JAUREGUI:  One moment, Your Honor.

Q    If an e-mail had been deleted before it was preserved, would you be able to find it?

A    No.

UNITED STATES DISTRICT COURT

Q       Today does the server -- the sheriff's department have a server with 2011 e-mails?

A       Yes.  The e-mails that we previously preserved.

MR. JAUREGUI:  No further questions, Your Honor.

THE COURT:  All right.

MR. HOCHMAN:  No further questions, Your Honor.

THE COURT:  All right.  Sir, you may step down.

Call your next witness.

MR. FOX:  Your Honor, the United States calls Mark Rosenbaum.

THE CLERK:  Sir, please stand here and raise your right hand.

Do you solemnly state that the testimony you may give in the cause now pending before this court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  Yes, I do.

THE CLERK:  Please have a seat.

Would you state your full name and spell your last name for the record.

THE WITNESS:  I'm Mark D. Rosenbaum, R-o-s-e-n-b-a-u-m.

THE CLERK:  Thank you.

MR. FOX:  Your Honor, may I proceed?

THE COURT:  Yes.

MR. FOX:  Thank you.

**MARK ROSENBAUM,**

**GOVERNMENT'S WITNESS, SWORN:**

**DIRECT EXAMINATION**

BY MR. FOX:

Q       What do you do for a living?

A       I'm an attorney.

Q       Where do you work?

A       I work with Public Counsel here in Los Angeles.

Q       What is Public Counsel?

A       Public Counsel is a public interest civil rights group.  We do direct service work, and we also do impact litigation.  We're the largest pro bono law firm in the United States.  We're affiliated with the Lawyer's Committee for Civil Rights.

Q       How long have you been with the Public Counsel?

A       Around two years, a little bit over two years.

Q       Where did you work before that?

A       Before that I worked at the ACLU of Southern California.

Q       For how long did you work for the ACLU of Southern California?

A       For 40 years.

Q       What were your duties then?

A       Well, I ran the gamut.  I started as a staff

UNITED STATES DISTRICT COURT

counsel.  Then after a number of years, I became general counsel, and then I ultimately became legal director.  I think that was the order.  I did all manner of civil rights and civil liberties litigation, particularly in the area of race and poverty, education.  But a whole series of cases.

Q       Can you describe what the ACLU is?

A       Well, I hope so.  The ACLU is part of a national organization.  It is concerned with assuring that constitutional values are respected.  It uses a variety of mechanisms to work on that including litigation as well as grassroots organizing, lobbying, legislation.  We look at any number of issues and matters that raise serious constitutional questions with respect to government and sometimes with respect to private parties.

Q       While you were with the ACLU, did it have any responsibilities as it related to the sheriff's department?

A       Yes.  Yes, we did.

Q       What were those responsibilities?

A       In the mid to late 70's, we filed litigation, rather, referred litigation with respect to conditions in the county jail system, particularly Men's Central Jail, but really throughout the jail system.  And as a result of that litigation, an order was issued to correct serious conditions.  There were a whole variety of sets of conditions.

My recollection is, in the mid 80's, we became

involved in assuring there would be compliance.  We had access to the jails, and on a number of matters what the -- which Judge Gray at the time, Federal Judge Gray, issued his order, our job was to work to ensure that his order was complied with.

Q        You mentioned that this was filed in the 70's, and you referenced the 80's.  For how long of a period of time did this litigation continue?

A        It's still continuing.

Q        Right now are you aware of what the ACLU's duties are with respect to the jails?

A        I can tell you what they were at the time I left.  I don't know for certain what they are currently.

Q        Then let me direct you to the late 2000's.

First of all, what were your duties at the ACLU in the late 2000's?

A        You know, I can't remember if I was legal director or general counsel or both, but I had major supervision responsibilities.  Those responsibilities included working with the individual who had access to the jails.  It was a series of persons who had that responsibility.  But my job was to work with the social worker who went in there, work with her team, and where necessary, go to court to deal with issues that could not be resolved informally.

Q        I want to direct your attention to Exhibit 9.  It should be, I believe, to your left in the cabinet there,

**UNITED STATES DISTRICT COURT**

bookshelf there.

A      Okay.  I have that.

Q      What is Exhibit 9?

A      Can I just have a moment to review it, please?

Q      Yes.

A      (Witness reviewing document.)

This was a letter that I signed along with Margaret Winter who worked with the ACLU National Prison Project who was brought in to assist us on the case and Melinda Byrd who had worked at the ACLU in the capacity of working with the jails and then had moved on to disability rights California.

It was a letter that we sent to Sheriff Baca that expressed our concerns.  My recollection is that we also sought to meet with him regarding those concerns about retaliation and abuse of individuals who were in the jails.

Q      Mr. Rosenbaum, is Exhibit 9 a true and accurate copy of the letter that you sent to Mr. Baca at the time?

A      Yes, it certainly is.

MR. FOX:  Your Honor, I move for the admission of Government Exhibit 9.

MR. HOCHMAN:  No objection.

THE COURT:  It will be received.

(Marked for identification and received into evidence Exhibit No. 9.)

541

MR. FOX:  May I publish it, Your Honor?

THE COURT:  Yes.

Q      BY MR. FOX:  Mr. Rosenbaum, can you see what I've put on the screen?

A      I do.

Q      Is this the letter you were just referring to?

A      Yes, it is.

Q      What is the date of this letter?

A      October 28, 2009.

Q      And who is it addressed to?

A      Sheriff Leroy Baca.

Q      I'd like you to read the first paragraph of your letter.

A      We are requesting -- "We are writing to request a personal meeting with you to discuss a series of grave allegations that have come to light through our monitoring of the conditions at Men's Central Jail, MCJ.  We have documented a persistent and increasing number of retaliation incidents when inmates have complained about conditions in the jail. Attached are copies of new declarations from inmates describing acts of retaliation and deputy misconduct as well as some additional declarations that are already under investigation by department staff."

Q      Twice in that paragraph it refers to declarations.  What are you referring to there?

**UNITED STATES DISTRICT COURT**

A        A declaration is a legal document.  It is a document where an individual recites what he or she observes or knows, signs his or her name to it, and it has the force and effect of testimony.  We regularly in this case as well as other cases, we'd speak to individuals who had percipient knowledge -- actual knowledge of circumstances, and then we'd ask them to work to draft declarations that would disclose what they observed or what they knew.

Q        And this discusses in the last line declarations that are already under investigation by the department staff.  Can you please explain what that means?

A        Yes.  We would regularly under -- under the work of Mary Tiedeman, who was the individual who was most in the jails, would collect declarations, and then we would submit those declarations to members of the sheriff's department.  Those declarations would document concerns with respect to compliance with the Court order that you and I discussed a few moments ago.

Q        I'm now highlighting the second paragraph for you.  Can you please read that?

A        Sure.  "These complaints of retaliation came to our attention last year, and since then we have tried to work collaboratively with your department to respond.  The department created a system whereby complaints that we report are tracked and investigated by a designated sergeant.  Over

the course of about a month, we submitted more than

15 complaints to the department for investigation."

Q        I'm now highlighting the third paragraph.  Can
you please read this.

A        Certainly.

"However, our joint efforts have not been
adequate to address the problem of retaliation and excessive
force which has continued to worsen despite the creation of the
reporting process."

Q        I'm going to now highlight the middle portion of
the second page.

A        "We request that the department make every effort
to ensure that these inmates are not subjected to additional
retaliation or injury and that their safety is protected.  We
have made this request every time we have submitted
declarations regarding deputy misconduct as the inmates who
agree to cooperate with us have already been injured and are
very fearful of another violent incident.  We note harassment
and deputy retaliation has continued and worsened for several
of the new people submitting declarations and for at least one
person whose statement we provided to the department earlier
this year."

Q        Now I ask you to read -- and, by the way, this is
probably pretty clear to everyone, but we've seen some black on
the first page and on the second page of this letter.  Do you

544

know if this is what's known as redactions?

A      Yes.  Exactly.

Q      The original letter had some text in there.  So this is not how the original document looked; is that right?

A      That's correct.

Q      Please read the last paragraph on the second page.

A      "We would also like to discuss the timing and independence of the investigations into these complaints by Rutherford class members."  Rutherford is the name of the case.  That's my language.  "The investigation process is very slow.  Many of these investigations have been pending for months without any report back to us on the outcome or the process.  If our clients are to have any confidence in the process, prompt results are critical.  The department also assures us that the investigations are very thorough, but we have serious concerns about the impartiality of the investigation in the one case on which we have been --"

Q      And I'll now take you to the top of the next page.

A      "-- briefed -- on the one case we have been briefed in the case" -- and then there's a redaction.  "The department concluded that charges were unfounded after interviewing the deputy who denied any retaliatory statements.  Neither the inmate nor his attorney was interviewed, and there

**UNITED STATES DISTRICT COURT**

was apparently no assessment of whether the deputy's use of force was excessive.  We would like to discuss whether these investigations can be referred to an independent entity rather than being investigated internally.

"We encourage you to share this letter with your staff and counsel.  It is imperative that we meet promptly.  We are ready to meet at your earliest convenience and await confirmation of a date and time when you are available for a meeting."

Q       On the second page that we just discussed, you questioned the independence of these investigations.  What did you mean by that?

A       We regularly made reports when we had documentation of abuse or retaliation.  That was submitted, as you asked me earlier, to department personnel, but we have no knowledge of what the process was, how determinations were made, who was interviewed, if anyone, what took place.  We consistently got back reports that there was no basis to the claims, but as this letter indicates, we also received information that the people who were involved in the process were not spoken to and that there had been retaliation.

So we urged repeatedly that the process be set up so that outside individuals who had no stake in the outcome could be involved in making a serious and thorough independent investigation.

**UNITED STATES DISTRICT COURT**

Q    Did you have specific entities that you were referring to there or that you were trying to imply that you would go to?

A    I honestly don't recall.  I know we worked with OIR.  I think we worked with -- I'm forgetting the gentleman's name who was involved with the jails, but I can't recall exactly to whom we were making reference.

Q    Did you, during your position with the ACLU, ever have an opportunity to meet with Sheriff Leroy Baca?

A    Yes.

Q    Approximately when did that occur?

A    Sometime shortly after this letter was sent.

Q    And where did this meeting occur?

A    I'm not certain.  I think it was Bauchet.  I think it was near the Men's Central Jail.  It could have been elsewhere, but that's my best recollection.

Q    Do you recall who with your staff attended that meeting with you?

A    I recall at least some of the people who were there.  The executive director of the ACLU Ramona Ripston I recall being present.  I recall that Mary Tiedeman, who, as I said, was the individual who was tasked with the responsibility of being in the jail, she was present.  I don't know if anyone else was present.

Q    What about on the other side?  Who was there from

**UNITED STATES DISTRICT COURT**

the sheriff's department?

A    There were a number of persons who were there.  I know Sheriff Baca was present.  I remember Assistant Sheriff Cavanaugh being present.  There were a number of other people that were present at the table.  It was a large table. We had a number of meetings over the years.  And so I would be -- I would be filling in based on that.  I couldn't tell you who else was there, but there were a number of persons there from the department.

Q    You mentioned Mr. Baca --

A    I think the lawyers were there also.  My recollection is that Paul Beach, who was the outside lawyer whom the county utilized in the Rutherford case, was present.

Q    Now, at this one meeting we're talking about, was this a direct result of the letter you sent?

A    That was my understanding, yes.

Q    You mentioned that Mr. Baca was present.  Do you think you'd recognize Sheriff Baca if you saw him again?

A    Yes, I do.

Q    Can you please look around the courtroom and tell me if you identify him if you recognize him?

A    He's at the defense table.  He's got a striped tie.

MR. HOCHMAN:  So stipulated, Your Honor.

THE COURT:  The record will reflect that the

**UNITED STATES DISTRICT COURT**

548

witness has identified the defendant.

MR. FOX:  Thank you, Your Honor.

Q       We talked about what the purpose of the meeting was.  What happened at this meeting?

A       My best recollection is that the meeting went an hour or so.  We expressed the concerns that were referred to in the letter that I just reviewed with you.  We talked primarily about abuse and retaliation.  We talked at length about retaliation for individuals who made complaints.

My best recollection is that there were other concerns raised too about overcrowding, sanitation conditions. My best recollection is there were discussions about the mentally disabled and how they were being treated.

Q       Focusing on the abuse and retaliation though for the purposes of these questions --

A       Okay.

Q       Do you recall what, if anything, Mr. Baca said in response to what was occurring?

A       My recollection is Mr. Baca did all the talking for the department.  He said he wanted to know about the abuses that we reported.  He said that he was concerned about that. He said that he was going to -- he said he did not want us to go to court on these matters.  The case was still in court. And he said that he was going to assign Assistant Sheriff Cavanaugh to be his personal eyes and ears -- that's my

**UNITED STATES DISTRICT COURT**

phrase, but that was how I understood it -- to work with us. And then he asked if there could be a series of meetings where we would regularly brief Assistant Sheriff Cavanaugh as to what we were observing, how we felt things were going.

Q    Did you see any real changes made, any progress in the problems you saw after that meeting?

A    Absolutely not.

MR. FOX:  One moment, Your Honor.

Your Honor, we don't have any more questions for this witness at this time.

THE COURT:  All right.

**CROSS-EXAMINATION**

BY MR. HOCHMAN:

Q    Mr. Rosenbaum, at this point the ACLU has been working with the sheriff's department in connection with the Men's Central Jail for over about 30 years; is that correct?

A    You mean at this point today?

Q    Yes.

A    Yes.  In the late 70's, mid 80's, yes.

Q    And the ACLU has played a vital and important role in connection with the Men's Central Jail, hasn't it?

A    Yes, sir.

Q    And for -- well, since the 1980's, the ACLU has been able to have a monitor inside the jail; is that correct?

A    I can't speak to the last couple years.  We had

an individual who was, in fact, inside the jails who had access to the jails.  That's correct.

Q        And they were a monitor.  Is that a correct sort of description of --

A        Well, it depends what you mean by a monitor.  We certainly were looking for compliance.  You know, I've been in other cases where I work with monitors like the cases involving the police department, and those monitors had complete access to anything that they needed.  That was not our case.  But yes, we were inside the jails.

Q        And that was a jails project coordinator.  I think that was the title of the person?

A        That's correct.

Q        Mary Tiedeman was one of the people who was part of those jails project coordinators; correct?

A        Yes, sir.

Q        Now, the access that the ACLU had to the Men's Central Jail, because of the litigation, was unique; is that correct?

A        No.

Q        Well, was there any other organization that had the same type of access to the Men's Central Jail that the ACLU had, to your knowledge?

A        Not that I'm aware of.  There would be particular issues like around mental health, and mental health groups

UNITED STATES DISTRICT COURT

might come in.  But in terms of the scope that you're talking about, the ACLU was the only organization that had that access.

Q       And Ms. Tiedeman was a civil rights lawyer?

A       No.  She was a social worker.

Q       Social worker.

And she was able to walk inside the jail and talk to inmates; is that correct?

A       That's correct.

Q       She didn't have to have the inmates meet her in, let's say, a visiting room with bulletproof glass between her and the inmate; is that correct?

A       That's correct.

Q       Nor was she assigned an office at the bottom of Men's Central Jail and the inmates had to come to her at that office at the bottom of Men's Central Jail; is that correct?

A       As far as I'm aware, that's correct.

Q       So she was able to actually go in the housing units where the inmates were housed in order to speak with them; is that correct?

A       When you say "housing units," you mean their actual cells?

Q       Not the actual cells but the area inside of -- the cell area but not the actual cell.

A       That's correct.

Q       And Ms. Tiedeman or the jail projects

coordinator, they would get access to use-of-force reports that were generated in connection with Men's Central Jail; is that correct?

A    I think that was a problem.  She would get access to some reports, as I recall.  But in terms of detailed reports themselves on an ongoing and permanent basis, no.  In terms of methodologies that were utilized, we repeatedly requested it.  That's clear from this letter as well.  So some.  But we certainly didn't get access to full investigations or full reports on those matters.

Q    Now, she was able to go inside the jail several times a week; is that correct?

A    That is correct.

Q    And she would bring volunteers with her as well to assist her in meeting with the inmates; is that correct?

A    That is correct.  I mean, we had to clear those volunteers so the department knew who was coming in, and we ran checks on those individuals, but she went in with other persons.

Q    So once those persons were checked out, they were able to join her and meet with the inmates as well; correct?

A    That's correct.

Q    And the ACLU projects jail coordinator was then able to inform the federal judge who was overseeing the litigation of what the jail projects coordinator saw inside the

**UNITED STATES DISTRICT COURT**

jails; is that correct?

A       What she saw, yes.  That's correct.

Q       Now, with respect to Exhibit 9 that you have which is that October 28 letter --

A       Yes, sir.

Q       Again, it's the October 28, 2009, letter written from you to Sheriff Leroy Baca?

A       Me and two other individuals, yes.

Q       And in that letter, you were basically saying that the joint efforts between the ACLU and the sheriff's department had not been adequate to address the problem of retaliation and excessive force; is that correct?

A       That's right.

Q       And you also point out that the investigation process is very slow; is that correct?

A       That's correct.

Q       And then you said that, in response to this letter, you had a meeting with Sheriff Baca; is that correct?

A       That's correct.

Q       And at that meeting, it wasn't just Sheriff Baca, but you said the assistant sheriff Mark Cavanaugh; is that correct?

A       Marv Cavanaugh.

Q       Marv Cavanaugh, M-a-r-v?

A       Correct.

554

Q        Assistant Sheriff Cavanaugh, that would be -- in understanding the ranks in the sheriff's department, there's the sheriff, the undersheriff, and then the assistant sheriff; is that correct?

A        I don't know.  That seems to be my experience, but I don't remember exactly what the hierarchy was.  I know that Assistant Sheriff Cavanaugh was high up.

Q        And he was high up in connection with the jail system and the custody system for the sheriff's department; correct?

A        Yes, sir.

Q        You said, in addition to Assistant Sheriff Cavanaugh, there were other Los Angeles Sheriff's Department there as well?

A        That's right.

Q        And the meeting, you said, lasted about an hour?

A        Give or take.

Q        It covered not only deputy abuse of inmates but also overcrowding, sanitation, mentally disabled, and other issues that you raised during the --

A        That was my best recollection.  The focus was retaliation and abuse.  But my recollection is we discussed other issues as well.

Q        And you discussed Sheriff Baca's response during that meeting; correct?

**UNITED STATES DISTRICT COURT**

A       Yes, sir.

Q       And as part of that response, he assigned the assistant sheriff, Marv Cavanaugh, to meet with you thereafter to deal with your concerns; is that correct?

A       That is correct.

Q       And you actually had a meeting with Assistant Marv Cavanaugh; isn't that correct?

A       We had multiple meetings with him.

Q       And when you would have a meeting with Assistant Sheriff Marv Cavanaugh, would it be a spontaneous meeting where you just meet for coffee at Starbucks, or was it more of a planned-out meeting with an actual agenda?

A       There were -- they were all planned-out meetings as I recall.  Agendas would be prepared by Mary Tiedeman, I think, in conjunction -- well, I know in conjunction with Assistant Sheriff Cavanaugh.  The meetings proceeded according to that agenda.  At the end of the agenda, there would be discussion if there was anything else that needed to be raised, but they were formal meetings.

Q       And in these formal meetings that Ms. Tiedeman -- that's the jail projects coordinator; correct?

A       Yes, sir.

Q       Were you at these meetings as well?

A       Yes.  I don't know that I was at each and every one of them.  I remember being in quite a few.

**UNITED STATES DISTRICT COURT**

Q        So a formal agenda would be prepared.  Would that agenda list out different issues dealing with retaliation or deputy abuse or those kind of complaints?

A        Absolutely.

Q        And they would be discussed with Assistant Sheriff Marv Cavanaugh at the meeting?

A        That's correct.

Q        Did he have anybody else in the sheriff's department at these meetings?

A        I recall that he would sometimes bring other persons to those meetings.  He may have always brought other persons to those meetings.

Q        At the end of the meeting, would there be sort of an action item understanding of what was to happen in response to the complaints?

A        Yes.  As I recall, on a number of the occasions, there would be a follow-up to make certain that we agreed on what the actual elements were.

Q        And there wasn't just one meeting with Assistant Sheriff Marv Cavanaugh in connection with these complaints; correct?

A        That's right.

Q        You referenced there was actual multiple meetings with Assistant Sheriff Marv Cavanaugh and potentially other people from the sheriff's department to discuss these

complaints?

A      That's correct.

MR. HOCHMAN:  No further questions.

THE COURT:  Any redirect?

MR. FOX:  Yes, Your Honor.

**REDIRECT EXAMINATION**

BY MR. FOX:

Q      On cross-examination, Mr. Rosenbaum, you answered that you were not provided complete access, that that was not the case.  What did you mean by that?

A      We were limited into the areas where we could go. We were not given access to information that we needed in order to actually bring forward all that was necessary.  We repeatedly sought information regarding the conduct of investigation processes that were utilized, methodologies that were utilized, why things were taking too long, who was testifying, and we were routinely denied that.

Q      I believe you said that was different than your experience with other law enforcement agencies; is that correct?

MR. HOCHMAN:  Objection.  Relevancy.

THE COURT:  Overruled.

You can answer.

Q      BY MR. FOX:  Can you please explain what you meant by that?

558

A        Sure.  I can give you a couple examples.  I had a --

MR. HOCHMAN:  Objection.  Relevancy again.

THE COURT:  Overruled.

THE WITNESS:  Thank you.  I had a very close relationship with Chief Bratton.  That dealt with the fact that we were parties to the Consent Decree with the United States and the city of Los Angeles in terms of reforming use-of-force protocols that were utilized, racial profiling.  Chief Bratton always made clear that we could come and talk with him.  We had full information.

There was an independent monitor that was assigned to that, the Kroll Group.  We worked with them very closely.  We were real partners.  They wanted to know what was going on, if we had any questions.  I don't ever remember asking a question about methodology or materials.  They would frequently come back and discuss questions in order to make sure we were satisfied.

I also worked closely with Chief Bratton on issues involving homelessness.  We filed litigation --

MR. HOCHMAN:  Objection, Your Honor.  Beyond the scope.  Relevance.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  We filed litigation regarding

police practices in skid row toward the homeless, and I remember having multiple meetings with Chief Bratton, with Jerry Chaleff who was --

MR. HOCHMAN:  Objection, Your Honor.  Relevance.  Beyond the scope.

THE COURT:  Overruled, counsel.

Go ahead.

THE WITNESS:  Jerry Chaleff who was his designated person.  I would on occasion receive phone calls from them.  There was complete transparency, and, in fact, a settlement was worked out in that case which resulted from a desire to have full open candid discussions and sharing of information about those matters.  I don't ever remember being denied access to any information.

Q     BY MR. FOX:  Now, Mr. Hochman asked you about Exhibit 9 and did you inform the Court of some of the problems that were addressed in your letter.  You were talking about the federal court there; is that correct?

A     That's correct.

Q     And from 2009 until, say, 2011, even informing the federal court of what was going on, were the issues that you were seeing getting better?

A     No.  No.  We actually had -- on occasion had to go to court and have litigation when they could not be resolved informally.  Severe overcrowding is one example of that.

**UNITED STATES DISTRICT COURT**

Treatment of individuals who had mental health issues was another.  Matters got worse, not better.

MR. FOX:  No more questions.

THE COURT:  Anything else?

MR. HOCHMAN:  Nothing further, Your Honor.

THE COURT:  You may step down.

Ladies and gentlemen, we're going to take our final break of the day.

Again, I want to remind you, until this trial is over, do not discuss this case with anyone including your fellow jurors, members of your family, people involved in the trial, or anyone else, and do not allow others to discuss the case with you.  This includes discussing the case on the Internet, blogs, bulletin boards, by e-mail, text messages.  If anyone tries to communicate with you about this case, please let me know about it immediately.

Do not read, watch, or listen to any news reports or other accounts about the trial or anyone associated with it. Do not do any research such as consulting dictionaries, searching the Internet, or using other reference materials, and do not make any investigation about the case on your own.

Finally, you're reminded to keep an open mind until all the evidence has been received, you've heard arguments of counsel, instructions of the Court, and deliberations with your fellow jurors.

**UNITED STATES DISTRICT COURT**

We're going to come back at half past the hour.

(The following proceedings were held in open court out of the presence of the jury:)

THE COURT:  Who's your next witness?

MR. FOX:  Peter Eliasberg and then, if we have time, it will be Bob Olmsted after that, Robert Olmsted.

THE COURT:  Okay.  We'll see everybody in 15 minutes.

(A recess was taken at 12:14 p.m.)

(The following proceedings were held in open court out of the presence of the jury:)

THE COURT:  All right.  Let's bring the jury in.

(The following proceedings were held in open court in the presence of the jury:)

THE COURT:  Ladies and gentlemen, there are some monitors in front of you, and those are adjustable.  So if you need to raise them up and pull them closer to you, please feel free to do it.

Call your next witness, please.

MR. FOX:  United States calls Peter Eliasberg.

THE CLERK:  Stand over here for me, please.  Raise your right hand.

Do you solemnly state that the testimony you may give in the cause now pending before this court shall be the truth, the whole truth, and nothing but the truth, so help you

God?

THE WITNESS:  I do.

THE CLERK:  Please be seated.  Please state your full name and spell your last name for the record.

THE WITNESS:  Full name is Peter J. Eliasberg, E-l-i-a-s-b-e-r-g.

THE CLERK:  Thank you.

MR. FOX:  May I proceed, Your Honor?

THE COURT:  Yes, please.

**PETER J. ELIASBERG,**

**GOVERNMENT'S WITNESS, SWORN:**

**DIRECT EXAMINATION**

BY MR. FOX:

Q      Mr. Eliasberg, what do you do for a living?

A      I'm a civil rights lawyer.

Q      For who?

A      For the ACLU of Southern California.

Q      How long have you worked for the ACLU of Southern California?

A      20 years.

Q      Generally, what are the responsibilities of the ACLU?

A      We work to protect civil rights and civil liberties for people in the Southern California area.

Q      I want to direct your attention to 2009.  Were

you working for the ACLU then?

    A     I was.

    Q     In what capacity?

    A     I believe my title at that point was managing attorney at the ACLU.

    Q     What were your responsibilities?

    A     I did primarily litigation.  I did a number of different kinds of legal matters, 1st Amendment work.  But I was also -- I took over from -- the responsibilities from somebody who left the ACLU in overseeing our work in the L.A. County Jails.

    Q     Who was that?

    A     Her name was Melinda Berg.

    Q     And in terms of your job as it related to the county jails, what was it that you were doing?

    A     Well, we -- the ACLU had been working in the county jails for three decades almost at that point, and we had a Jails Project.  We had a Jails Project director.  She worked with interns, MSW students and law students, interviewing inmates, going into the jails, talking to both sheriff deputies and so on but also talking to inmates about the conditions and what was happening in the county jails.  We would also receive complaints and letters from inmates about issues they were having in the jails.

    Q     Are you familiar with the *Rutherford* litigation?

A        Yes, I am.

Q        What is that?

A        *Rutherford* was a case that was actually brought in 1975 about conditions in the L.A. County Jails.  It relates most, in general terms, to crowding and inmates' inability to get items that we felt were essential to their basic health and safety because the jails were so crowded.

Q        At some point in time during that litigation, did the ACLU begin raising issues related to other civil rights violations potentially going on in the jails?

A        Yes.  Absolutely.

Q        Specifically with respect to deputies' treatment of inmates, what were some of those issues?

A        We were concerned specifically about the physical abuse of inmates by deputies.  We focused a lot in 2007, 2008 and -9 on what we believed were the mistreatment of inmates, particularly inmates with mental illness.  And one of our concerns was that deputies were using unnecessary and excessive force against those inmates.

         We also had concerns about treatment and mental health care.  But we were concerned about the use of force.  And we also were broadly concerned with what we believed was grossly excessive use of force against all inmates, not just those with mental illness.

Q        What about retaliation?  Did you raise any issues

generally with respect to retaliation?

A       Yeah.  We were very concerned about inmates telling us that, if they tried to talk to us, people who worked with me, about complaining to the ACLU, meeting with us, talking to us either cell front or meeting with us in attorney rooms, that subsequently they would get retaliated against. Deputies would say things like *Don't talk to the ACLU* or punish them or do other things for communicating with us.

Q       In what ways would you bring these complaints that you received about deputy abuse or retaliation to the public light?

A       To the public, we do it in the form of reports that we issued.  We filed those reports with the Court, but we also issued them publicly.  We did two of those reports, I believe, in 2010 and then a third one in 2011.

Q       What about press releases?  Were there times where the ACLU would issue press releases as it related to any deputy abuse or retaliation?

A       Well, I think we issued press releases around the release of our report, but I specifically remember issuing a press release when one of my colleagues was in the jails and came back and told me she had witnessed two deputies --

MR. HOCHMAN:  Objection.  Calls for hearsay at this point, Your Honor.

THE COURT:  Sustained.

566

Q       BY MR. FOX:  Focusing on the first part of what you were talking about, the reports that you would file with the Court, that you would pronounce publicly and file with the Court -- can you do me a favor and look in your exhibit book at Exhibit 10.  Do you recognize that?

A       Yes, I do.

Q       What is it?

A       It's a report that we -- the ACLU issued in 2010, but it's called *The Annual Report on Conditions Inside Los Angeles County Jails, 2008/2009.*

Q       How is it that you recognized that exhibit?

A       I worked very hard with the principal authors, Mary Tiedeman and Daniel Ballon.  I did a substantial amount of editing, talking to them about the contents and so on of the report.  So I was familiar with every word in it through my role overseeing its production.

Q       Now, Mr. Eliasberg, I don't want to get into any specifics about what the report said.  I just want to talk generalities.  So just generally, what did the report discuss?

A       It discussed a number of different issues, crowding in the jails.  But I think the primary issues were the treatment of inmates with mental illness, crowding in the jails, and lack of services that inmates got that related to that crowding and physical abuse of inmates in the jails.

Q       Are you familiar with the term "declarations"?

**UNITED STATES DISTRICT COURT**

567

A       Yes, I am.

Q       As it relates to this report and your litigation against the sheriff's department, what were declarations?

A       Declarations are sworn statements by people in which it sets forth facts or their experiences.  And in this case, we did submit a bunch of declarations with -- each of the reports that we submitted had declarations with them.

Q       I'm not going to ask you to count them.  But ballpark, do you remember approximately how many declarations you submitted?

A       With this particular report?  My memory was that it was about 20 to 25.

Q       Do they relate to some of the issues that you just described as being part of this report?

A       Yes, they did.

Q       What happened as a result of this filing with respect to how the sheriff's department was handling these complaints?

A       Well, I didn't see any difference in the way the sheriff's department handles the concerns that we express in these.  And my recollection was that the sheriff's department spokesperson made a statement to the effect that --

MR. HOCHMAN:  Objection, Your Honor.  Hearsay at this point.

MR. FOX:  May I respond, Your Honor?

**UNITED STATES DISTRICT COURT**

568

THE COURT:  Let's go to sidebar.

MR. FOX:  Thank you.

(The following proceedings were held at sidebar:)

THE COURT:  Okay.  So if everybody can speak clearly into the microphone.  Okay.

MR. FOX:  In response to the objection regarding hearsay, what I'm trying to elicit is a statement from Mr. Baca's spokesperson, and it's not being elicited for the truth of the matter asserted.  In fact, we think it's untrue. My belief is that Mr. Eliasberg will state that Mr. Whitmore's response -- the sheriff's department spokesperson's response was that all these declarations were untrue and there is no retaliation.  That's what I believe he's going to say.

THE COURT:  Okay.

MR. HOCHMAN:  I'll add the foundation on top of the hearsay objection, Your Honor, for three reasons.  First, it is unclear that Mr. Whitmore is speaking for the Sheriff as opposed to the sheriff's department.  His profession is actually the sheriff's department spokesperson, not Mr. Baca's personal spokesman.  Second, it's unclear when all this occurred.  Is he issuing this statement in connection with that first report back in 2010?  There are actually two reports he said, in 2010 and one in 2011.  When he's talking is unclear. It's vague at this point.  And again, he's eliciting the out-of-court statement for -- we would argue for its truth,

**UNITED STATES DISTRICT COURT**

what the actual Sheriff's reaction was to it.

THE COURT:  The objection is overruled.

You may want to clean up when the statements --

MR. FOX:  Yes, Your Honor.

MR. HOCHMAN:  Yes, Your Honor.

(The following proceedings were held in open court in the presence of the jury:)

MR. FOX:  May I proceed, Your Honor?

THE COURT:  Yes.  The hearsay objection is overruled.

Q    BY MR. FOX:  Mr. Eliasberg, before we get into what the spokesperson may have said, I want to ask you about the date of that filing of the report you were just discussing.

A    It was in May of 2010.

Q    And do you recall how soon after you filed the report that the spokesperson said something about the report?

A    Shortly thereafter is my best recollection because I think there was an *L.A. Times* story a day or two after about the filing of the report.

Q    And do you remember the name of the person who was the spokesperson for the sheriff's department?

A    They had two people who played that role, Steve Whitmore and Nicole Nishida.  But my recollection is it was Steve Whitmore who made the response to this report.

Q    And to the best of your recollection, what is it

**UNITED STATES DISTRICT COURT**

that Mr. Whitmore said?

A        Basically that inmates make things up, the ACLU exaggerates, and to the extent that there is -- that there may be any problems in the jails, that they're thoroughly investigated and taken care of appropriately.

Q        Did you consider the Los Angeles Sheriff's Department to be a partner with the ACLU?

A        No.

Q        Why not?

A        Well, I guess, when I think of partnership, I think of working together to solve a problem and working together and listening to each other.  I felt that, while we talked to the sheriff's department, made complaints to the sheriff's department, warned them that there were problems, I didn't get the sense that they took it seriously.  I didn't see that we got acceptance in trivial areas, that there were changes made in response to the concerns that we expressed.

Q        Can you please look at Exhibit 11.  And, please, tell me if you recognize it.

A        I do.

    (Marked for identification Exhibit No. 11.)

Q        BY MR. FOX:  What is it?

A        Well, it's the cover page to a report that we filed with the Court.  Unless I'm missing something, I don't see the report itself.  But I recognize the sort of cover for

**UNITED STATES DISTRICT COURT**

571

the filing of the report.

Q       It just doesn't have the substance of the report in it?

A       It does not.

Q       What generally, if you recall, was the substance of the report?  Again, not getting into any specifics.

A       It was similar to the substance of the report we issued in May.  And even though we called May an annual report, our concerns after approximately six months were that things were so bad and continued to be so bad and there were no changes that we issued the second report.

Q       When did you issue that report?

A       I think it was October, perhaps -- let me check the date.  I think it was October of 2010.  There should be a date stamp on there.  September of 2010.

Q       Do you recall whether there were different inmate concerns that you raised in that declaration or -- excuse me -- in that filing?

A       No.  I think in large part it was reiterating that we were seeing the same concerns -- we had new evidence of the same problems but know it was largely the same issues that we had addressed in the report that we issued in May of 2010.

Q       You said new evidence but same issues.  Does that mean that there were new incidents?

A       Yes.  We had declarations from people -- some

UNITED STATES DISTRICT COURT

people who were reporting new incidents since the previous report, yes.

Q        Did you do anything else to bring this report to the attention of the sheriff's department?

A        My recollection is that we sent it directly -- well, in filing it to the Court, it would have gone to the sheriff's department's counsel, but I believe we also transmitted it by letter to officials in the sheriff's department, yes.

Q        Now, without, for now, getting into the substance of what was reported to you, are you familiar with Esther Lim?

A        Yes, I am.

Q        Who is Esther Lim?

A        She's a colleague of mine at the ACLU.  She originally was hired with the title of Jails Project coordinator, I believe, and then promoted to Jails Project director.

Q        Going back to early 2011, at some point did the ACLU publicize an event that she said she saw?

A        Yes, we did.

Q        Approximately when was that?

A        It was -- she started, I believe, in late 2010. So I think it was early 2011, maybe January or February.  I don't remember the precise date, but it was early in 2011 I believe.

**UNITED STATES DISTRICT COURT**

573

Q        How did you publicize this?

A        Well, we filed a statement that she wrote -- a declaration that she wrote with two other declarations from inmates with the Court, and we issued a press release about that filing.

Q        Do you recall what it is that the ACLU said that Ms. Lim saw?

A        Yes.

Q        What was that?

A        That she was interviewing an inmate in an attorney room in Twin Towers, but the attorney rooms are located in a way where there's a Plexiglass window that looks out into a central area which is part of the housing unit for inmates.  She was interviewing an inmate who reported to the ACLU that he had been beaten up in the jails by deputies, and she said that she heard loud noises.  She rushed to the Plexiglass window and saw two deputies beating an inmate and Tasing an inmate whom she believed, as far as she could tell, appeared to be unconscious.

Q        After publicizing Ms. Lim's account of what occurred, do you recall whether the sheriff's department responded in any way?

A        Yes.  I do recall.

Q        Do you know who responded?

A        Yes.  Steve Whitmore.

UNITED STATES DISTRICT COURT

Q        That's the same person you referred to earlier as a sheriff's department spokesperson?

A        That's correct.

Q        Do you recall, generally, what it was -- let me ask you when.

How soon after you publicized this event did the spokesperson for the sheriff's department respond?

A        Very quickly thereafter.  There might have been an *L.A. Times* story the next day which reported what Ms. Lim had said and what had been filed with the Court and what Mr. Whitmore had responded for the sheriff's department.

Q        What was your recollection as to what he said?

A        Well, he basically called into question her integrity, in so many words, how can we believe -- why didn't she just immediately report to a deputy that she had seen other deputies beating an inmate and is that consistent with somebody who really saw what she said she saw?  Is that behavior consistent with -- basically, I read it to be his impugning her integrity or questioning her integrity.

Q        Did you find that to be unusual in any way?

A        Yeah.  I found it very unusual.  Yes, I did.

Q        Why?

A        Well, I'm not a criminal lawyer, but my first thought was, if deputies potentially were doing something illegal and using unnecessary force on an inmate who might have

**UNITED STATES DISTRICT COURT**

575

been unconscious, that the sheriff's department -- if there's a criminal matter, that the sheriff's department might be, in fact, the ones who would investigate that criminal matter.  And I thought it would be very odd for the sheriff's department spokesperson to be impugning the integrity of somebody who might be a principal witness in a case.

Q        I want to direct your attention right now to Exhibit 13.  Can you please look at that.

Do you recognize it?

A        I do recognize it.

(Marked for identification Exhibit No. 13.)

Q        BY MR. FOX:  What is it?

A        It's a letter that I wrote to Sheriff Baca.

Q        Is it an accurate copy of that letter?

A        Yes.  Except for the big black part that's crossed out.  But yes otherwise.

Q        As a lawyer, do you know what that big black part is?

A        Yeah.  We call it redaction.

Q        Other than the redaction that you referenced, is this an accurate copy of the letter that you sent to Mr. Baca?

A        It is.  That's my signature at the end, and it is an accurate copy.

MR. FOX:  Your Honor, I move for the admission of Government Exhibit 13.

**UNITED STATES DISTRICT COURT**

576

THE COURT:  Any objection?

MR. HOCHMAN:  No objection.

THE COURT:  It will be received.

(Received into evidence Exhibit No. 13.)

MR. FOX:  May I publish it, Your Honor?

THE COURT:  Yes.

Q      BY MR. FOX:  What is the date of the letter?

A      July 20th, 2011.

Q      Can you please read the re line, r-e line.

A      "Re Esther Lim and the investigation of the beating of James Parker."

Q      Who was James Parker?

A      James Parker is the inmate that Ms. Lim said she saw lying face down in Twin Towers being beaten and Tased by two deputies.

Q      Could you please read the first paragraph.

A      "Dear Sheriff Baca.  I am responding to your recent letter asking for my assistance in arranging to have Esther Lim, the ACLU's Jails Project coordinator, speak with an investigator from LASD's Internal Criminal Investigations Bureau, ICIB, about the beating and repeated Tasering of James Parker by deputies Ochoa and Hirsch."

Q      Now the second paragraph, please.

A      "The actions of the county concerning this incident have convinced us that it is more interested in

**UNITED STATES DISTRICT COURT**

defending the behavior of the deputies involved --"

MR. HOCHMAN:  Your Honor, may I have a moment to speak to Mr. Fox?

THE COURT:  Yes.  That's fine.

(Counsel confer.)

Q      BY MR. FOX:  If I could, Mr. Eliasberg, could you just actually read the last partial paragraph -- actually, can you read the -- the paragraph I was showing you, for some reason the redactions didn't show up on my computer.  That's the problem.  Up until "credibility" in the second paragraph.

A      So that paragraph up until that.  Okay.

"The actions of the county concerning this incident have convinced us that it is more interested in defending the behavior of the deputies involved and LASD generally than it is in conducting an impartial investigation. Specifically, shortly after Ms. Lim filed in federal court a sworn declaration describing what she had witnessed, the LASD spokesperson made a public statement that attacked her credibility."

Q      Let me go back to the computer right here.

Could you please read the paragraph that I've now highlighted.

A      "Our concerns about the county's actions have been magnified by the fact that the county is aggressively proceeding with the criminal prosecution of Mr. Parker for

assaulting a custodial officer and interfering with the custodial officer in the performance of his duties.  His trial is currently scheduled for July 27, 2011.  We cannot understand why the county intends to try Mr. Parker before it has concluded its investigation of whether deputies Hirsch and Ochoa engaged in --"

Q     Before I get to the next page, this portion of the paragraph discusses a criminal prosecution of the inmate Mr. Parker.

Do you recall what he was being prosecuted for?

A     My recollection is it was assaulting a deputy or custodial officer and interfering with the officer in the performance of his duties.

Q     During which incident?

A     The incident that ended up with his lying facedown on the floor of Twin Towers being Tasered and beaten.

Q     Now publishing the partial paragraph, the first partial paragraph on page 2, could you please read this.

A     "-- criminal conduct in their interaction with Mr. Parker.  Moreover, it is our understanding that one of the deputies was the principal witnesses --" typo "-- in the preliminary hearing and the two deputies will be the principal, perhaps only witnesses, for the prosecution in Mr. Parker's criminal trial.  However, the ICIB investigation could well cast light on the guard's credibility and, thus, may be

**UNITED STATES DISTRICT COURT**

essential to a fair trial of Mr. Parker."

Q       What about this last paragraph?

A       "Ms. Lim and the ACLU are eager to see this incident thoroughly investigated and criminal prosecutions brought if they are warranted.  However, the actions of the LASD and the county have undermined our confidence in the impartiality of the county's criminal process with respect to this matter.  Accordingly, Ms. Lim has been and will continue to cooperate with the FBI and the U.S. Attorney's Office in their criminal investigation of the beating of Mr. Parker.  She will not agree to be interviewed by ICIB.  I have, however, enclosed her declaration which provides a very thorough account of what she witnessed and is consistent with any testimony she would give."

Q       Were you involved in the decision not to have Ms. Lim meet with ICIB?

A       I was.

Q       And let's talk about ICIB for a second.

Are you familiar with what that entity is?

A       Yes.

Q       What is it?

A       It is the entity -- investigative entity within the sheriff's department whose job -- and I believe the sole job -- is to investigate whether any sheriff's personnel have committed any criminal offenses.

Q        Why did you decide not to have Ms. Lim be interviewed by ICIB?

A        Because of the reasons set forth in this letter. In addition, Ms. Lim -- when you go into the jails, you fill out a log.  So basically anybody who goes into the jails, the deputies -- there's a way for the sheriff's department to know who's gone into the jails.  When Ms. Lim left after witnessing the beating of Mr. Parker, the sheriff's department had every opportunity to read that log, determine who was there, reach out, make a phone call, and say we'd like to talk to you.

But instead what we saw was the first response to the sheriff's department was a public statement attacking her credibility.  They didn't reach out for, my best recollection was, a week to ten days.  Might have been less, but it was well after Mr. Whitmore was in the paper making comments about her.

So the combination -- their response to this incident, their complete lack of effort to have a sit down with Ms. Lim before they were blasting her publicly in the paper and then the fact that the county was racing ahead to prosecute Mr. Parker without having even concluded an investigation into the deputy's own behavior made us feel that there was really no evidence that they were serious about investigating this behavior and really doing it impartially on top of the fact that there was a long history that the ACLU and I had had with bringing problems to the sheriff's department and getting blown

off by them.  So I had no faith there would be a fair investigation by the sheriff's department.

Q        Now, this letter is dated July 20, 2011.  Up until August 18, 2011, did you have any response from the sheriff's department about this letter?

A        Not that I recall.

MR. FOX:  One moment.  No further questions, Your Honor.

THE COURT:  Okay.  Cross-examination.

**CROSS-EXAMINATION**

BY MR. HOCHMAN:

Q        Mr. Eliasberg, you said you've been working for the ACLU for 20 years now; is that correct?

A        That's correct.

Q        So you started in approximately 1996?

A        That's correct.

Q        And then it was in late 2009 approximately that you started working on a regular basis monitoring the Men's Central Jail; is that correct?

A        Basically.  Although I wasn't so much monitoring myself but overseeing the office's monitoring process, yes.

Q        And that was from approximately 2009, early 2010?

A        That's correct.

Q        Mark Rosenbaum at that time, was he your boss, or how was the structure?

**UNITED STATES DISTRICT COURT**

A    At that point I was the managing attorney.  I believe he was still the legal director.  So yes, he would have been my -- the person to whom I reported directly, yes.

Q    Okay.  And you talked about the Jails Project coordinator that the ACLU had in Men's Central Jail since the 1980s approximately; correct?

A    Well, no.  We didn't actually have a Jails Project coordinator position until much later than that, but we did have a process for many years of going in and speaking to inmates and so on and being in the jails.  But we didn't create the jail project position until, I believe, about 2002 or -3.

Q    I see.  Was the person who went into the jails, do we call that person a monitor?

A    Yes.

Q    So I guess I'll use the general term "monitor" rather than Jails Project coordinator.  You had a monitor in the Men's Central Jail -- and by you, I mean the ACLU -- since approximately the 1980's; correct?

A    That's correct.

Q    Are you familiar with the Office of Independent Review?

A    Yes, I am.

Q    Did the ACLU work with the Office of Independent Review concerning deputy allegations or allegations of deputy abuse in Men's Central Jail?

**UNITED STATES DISTRICT COURT**

A        I wouldn't say work with.  I would say we would report stuff to them, yes.

Q        And are you familiar with Michael Gennaco who headed -- who has headed up the Office of Independent Review since 2001?

A        Yes.

Q        Are you familiar with the fact that Mr. Gennaco is a former civil rights prosecutor?

A        Yes.

Q        And he was the former head of the U.S. Attorney's Office in Los Angeles Civil Rights Unit?

A        I didn't know that was his exact title, no.

Q        Now, with respect to the ACLU, the ACLU has worked with many people in the sheriff's department in trying to deal with the abuses that have occurred in Men's Central Jail; is that correct?

A        Again, I didn't actually find them to really work with us.  We would report things to them.  But what I generally got were responses like we'll look into it, nothing would come of it, or we don't think that's a problem.  So I didn't consider that to be working with.  But we certainly did try to bring problems to their attention, yes.

Q        The ACLU received valuable assistance from certain sheriff's department people in connection with promptly responding to and addressing individual complaints regarding

**UNITED STATES DISTRICT COURT**

584

jail conditions; is that correct?

A       Most of the conditions we would get quick responses to would be medical complaints.  We file a lot of complaints saying they weren't getting medical attention, and we generally did get pretty prompt responses on those where we would get a report that they are now scheduled to see a doctor or whatever.  But in terms of complaints about abuse and retaliation, we actually generally didn't get prompt responses.

Q       So complaints regarding jail conditions is more general than with respect to particular complaints involving an inmate?

A       I'm not sure I understand --

Q       I'm trying to understand.  I apologize.  I didn't mean to talk over you -- your answer.

So you did receive valuable assistance from the sheriff's department in connection with addressing individual complaints regarding jail conditions; is that correct?

A       Yes.  We certainly did on a number of occasions.  We would -- to give you a for example, an inmate would say, I don't have a blanket and it's really cold, and we would make a report.  They would say, I asked for one, and we haven't gotten it.  We would make a report, and oftentimes we would get a response back quickly.  Yes, we got the complaint.  We've taken care of it.

Q       If you could turn to Exhibit 10.  Exhibit 10 is

**UNITED STATES DISTRICT COURT**

585

the notice that you filed with the Court in May, 2010, dealing with, in part, abuses that the ACLU had seen by deputies in the Men's Central Jail; correct?

A    Well, again, there's a ton of redaction here. But yes, this looks like -- the index page and so on certainly looks like the report we did file with the Court, yes.

Q    And I'll just direct your attention for you just to review.  If you look on the bottom right-hand corner, it's page A134767.  The top of the page is an acknowledgment.

Do you see that?

A    Uh-huh.

Q    So you singled out "For valuable assistance to the ACLU L.A. Sheriff's Department Commander Stephen Johnson"; is that correct?

A    Yes.

Q    Los Angeles Sheriff's Department Commander David Fender; is that correct?

A    Uh-huh.

Q    Los Angeles -- you have to answer "yes" or "no."

A    Yes.

Q    Los Angeles Sheriff's Department Commander Dennis Conte; is that correct?

A    Yes.

Q    Los Angeles Sheriff's Department Commander Robert Olmsted; is that correct?

UNITED STATES DISTRICT COURT

A        Yes.

Q        Men's Central Jail Captain Danielle Cruz.

A        Daniel Cruz.

Q        Excuse me.  Daniel Cruz.

Is that yes?

A        Yes.

Q        Los Angeles Sheriff's Department Chief Dennis Burns.

A        Yes.

Q        And Los Angeles Sheriff's Department Chief Alexander Yim; is that correct?

A        Yes.

Q        And you provided the acknowledgment of all these sheriffs, chiefs, commanders to the federal court when you filed your report; correct?

A        That's correct.  This was part of the report.

Q        And did you also have a chance to deal with a Los Angeles Sheriff's Department commander named Paul Pietrantoni?

A        Yes, I did.

Q        And does he go by the nickname Peety?

A        Yes, he does.

Q        I'll use pet -- may I call him Peety?

A        Everyone else calls him Peety.

Q        Was Commander Peety or Commander Pietrantoni

brought by Sheriff Baca to deal with the use-of-force problems that were occurring in Men's Central Jail?

MR. FOX:  Objection, Your Honor.  Goes to motion in limine.

THE COURT:  Let's go to sidebar.

(The following proceedings were held at sidebar:)

MR. HOCHMAN:  So, Your Honor, we'll get a timeline for when he was dealing with Peety.  But the -- in either event, the reason Peety is brought in is he's an expert in the use of force deescalation.  So much so that he works with the ACLU in connection with their complaints to bring the violence down in the jails, and he does such a good job that Mr. Eliasberg actually recommends him to the current sheriff Jim McDonald to deal with -- to hire him because he did such a good job in the Men's Central Jail.

So to the extent that part of the Government's argument with the ACLU and the chaplain is what was the Sheriff's response to all these allegations, in part, bringing in Peety was one of the Sheriff's responses directly for the allegations of inmate abuse and excessive force.

MR. FOX:  Your Honor, our conspiracy starts, as alleged, August 18 of 2011 and continues to September 26 of 2011 as alleged.  I believe that all this conduct that Mr. Hochman is talking about occurs after the end of September of 2011.  It's what we filed the motion in limine on.  The

UNITED STATES DISTRICT COURT

prior good acts or reform they tried to do after the conspiracy ended has nothing to do with Mr. Baca's intent during the conspiracy, and it is not admissible evidence.

MR. HOCHMAN:  And, again, Your Honor, what we would argue is that the response of Sheriff Baca -- the argument can be by the Government that it's too late, that the obstruction occurred and his response was not quick enough. But I think that goes to the weight of the evidence, not to the admissibility.

THE COURT:  No, it doesn't.  The objection is sustained.

MR. FOX:  Thank you, Your Honor.

(The following proceedings were held in

open court in the presence of the jury:)

Q    BY MR. HOCHMAN:  Mr. Eliasberg, when did you first start dealing with Commander Pietrantoni?

A    It would have been, I would think, a couple months after we issued our 2011 report.  And I'm sorry.  Our 2011 report came out I think the very beginning of October of 2011.  So my memory is dealing with him shortly thereafter, a month or two thereafter.

Q    Was that report filed I believe in the end of September of 2011 if that's -- if you recall that?

MR. FOX:  Objection, Your Honor.  Relevance.

THE COURT:  Sustained.

**UNITED STATES DISTRICT COURT**

Q      BY MR. HOCHMAN:  Well, you mentioned in direct testimony that you filed two reports in 2010 and one annual report in 2011; is that correct?

A      It wasn't so much an annual report, but we did file one report in 2011.

Q      So I'm just clarifying when you filed the 2011 report.

A      It was either --

Q      The end of September, 2011?

A      It was either the end of September or very beginning of October, yes.

Q      And in that end of September 2011 report that was referenced by you in your direct testimony, with respect to that report, did you file additional declarations of inmate abuse?

MR. FOX:  Your Honor, at this point I don't object to this line of questioning, but this was not part of the direct.  I just want to make that clear this was not part of direct.  If I may have a moment, Your Honor.

THE COURT:  It's all right.

(Counsel confer.)

MR. FOX:  Thank you, Your Honor.

Q      BY MR. HOCHMAN:  If we could focus on these annual reports that you filed.  Let's focus on the ones you filed in 2010 first.

Now, my understanding is you filed these -- I'm calling them annual reports, but they're really a report that's filed by the ACLU to the Court; correct?

A       Well, we filed them with the Court but also released them publicly, yes.

Q       Let me just deal with the public release for a moment.

When you filed something in the report, it's actually a public document; is that correct?

A       That's correct.

Q       But then you want to make sure the public sees it; so you issue a press release.

Correct?

A       That's correct.

Q       And you did that with each of the reports?

A       I believe so, yes.  I certainly know with two of the three we did.  I think with all three we did.

Q       Then you would also hold a press conference?

A       That's correct.

Q       And you would give TV and radio interviews?

A       If TV and radio asked, yes.

Q       And do you recall giving TV and radio interviews in connection with these reports?

A       With two of or three of them definitely, and probably with the third, yes.

**UNITED STATES DISTRICT COURT**

Q        And you would also go ahead and put it on your website; is that correct?

A        Yes.

Q        So there would be an online publication of the reports as well.

A        That's correct.

Q        And the idea was to make sure that the sheriff's department knew about the reports; correct?

A        Well, not just the sheriff's department.  We wanted the public to know.  We also filed the reports with the board of supervisors.  We wanted to get the word out broadly.  But yes, we did provide them to the sheriff's department to make sure they were aware, yes.

Q        And part of the effort of the ACLU in connection with these complaints was to work with the FBI; is that right?

A        Well, not in 2009 or 2010, no.  We didn't have any interaction with the FBI on any of the complaints until around the time that Ms. Lim witnessed what she saw at Twin Towers.

Q        What was that month?  Or do you know the day or year?

A        It was early 2011, yes.

Q        Like February 2011?

A        That sounds right, yes.

Q        Let's turn to Exhibit 13 if we could.  Exhibit 13

**UNITED STATES DISTRICT COURT**

is the letter you and Mr. Fox were discussing, that July 20, 2011, letter that you wrote to Sheriff Baca?

A       That's correct.

Q       And with respect to that, on your first line, you say, "I'm responding to your letter asking for my assistance." So did you receive a letter from Sheriff Baca before July 20, 2011, asking for your assistance?

A       Yes.

Q       And you say down -- excuse me -- lower in that first page, "We cannot understand why the county intends to try Mr. Parker."

Do you see that?

A       Yes.

Q       Now, the sheriff's department are not prosecutors; correct?

A       That's correct.

Q       That's the district attorney's office; isn't that right?

A       That's correct.

Q       So the district attorney's office makes the decision whether or not to try or not try someone; correct?

A       Yes.

Q       And then if you can turn to the second page. You see in the last paragraph you say, as you're writing to Sheriff Baca on July 20, 2011, "Accordingly, Ms. Lim has been

**UNITED STATES DISTRICT COURT**

and will continue to cooperate with the FBI and U.S. Attorney's Office in their criminal investigation of the beating of Mr. Parker."

Do you see that?

A        Yes, I do.

Q        So your purpose in writing that line to Sheriff Baca was to make sure he knew that the FBI and the U.S. Attorney's Office was working with the ACLU in connection with these allegations of deputy abuse; correct?

A        Yes.

MR. HOCHMAN:  May I have one moment, Your Honor?

THE COURT:  Yes.

MR. HOCHMAN:  No further questions.

MR. FOX:  May I inquire, Your Honor?

THE COURT:  Yes.

MR. FOX:  Thank you.

**REDIRECT EXAMINATION**

BY MR. FOX:

Q        Just to make it clear, Mr. Eliasberg, Mr. Hochman asked you about the D.A.'s office.  Do you know, is that a federal entity?

A        The district attorney's office, no.

Q        What type of entity is it?

A        It's kind of hybrid, county/state.

Q        And do you know who brings them cases generally?

A          Law enforcement agencies in L.A. County including the L.A. County Sheriff's Department.

MR. FOX:  No more questions.

MR. HOCHMAN:  Just a quick follow-up on that, Your Honor.

THE COURT:  All right.

**RECROSS-EXAMINATION**

BY MR. HOCHMAN:

Q          The district attorney's office of Los Angeles County has the final say of whether or not a particular person is tried or not tried; correct?

A          That's my understanding, yes.

MR. HOCHMAN:  No further questions.

THE COURT:  Anything else?

MR. FOX:  No, Your Honor.

THE COURT:  All right.  You may step down.  Call your next witness.

MR. FOX:  United States calls Robert Olmsted.

THE CLERK:  Stand here for me, please, and raise your right hand.

Do you solemnly state that the testimony you may give in the cause now pending before this court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

**UNITED STATES DISTRICT COURT**

THE CLERK:  Please be seated.

Please state your full name and spell your last name for the record.

THE WITNESS:  Robert Olmsted, O-l-m-s-t-e-d.

THE CLERK:  Thank you.

MR. FOX:  May I begin, Your Honor?

THE COURT:  Yes, please.

**ROBERT OLMSTED,**

**GOVERNMENT'S WITNESS, SWORN:**

**DIRECT EXAMINATION**

BY MR. FOX:

Q     Mr. Olmsted, what is it that you do for a living?

A     I'm retired.

Q     How long have you been retired?

A     Six years now.

Q     And what did you do before you were retired?

A     I worked for the L.A. County Sheriff's Department for 33 years.

Q     Do you remember when your employment with the sheriff's department ended?

A     It would have been November of '10.

Q     November of 2010?

A     Correct.

Q     When did it begin?

A     January, '78.

Q        Why did you become a deputy?

A        My father was in law enforcement for the sheriff's department.  I saw how much fun he was having, how successful he was.  I liked the idea of doing the same thing myself.  I wanted to follow in my father's footsteps, and I felt it was an honorable profession and still do.

Q        When you retired, what was your rank?

A        Commander.

Q        What is a commander?

A        Commander is one of the executive members of the sheriff's department.  I can give you the ranking structure if you'd like.

Q        Sure.  Why don't we do that.

So who's at the top?

A        At the top is the sheriff and then undersheriff, two assistant sheriffs.  You have 12, 13 chiefs depending on the time of year, time of day.  They have commanders, captains, lieutenants, sergeants, and deputies.

Q        And, generally, the promotion process, who decides who's promoted to undersheriff?

A        The sheriff himself.

Q        And what I'm referring to -- I just use the present tense, but I'm referring to the time when you were in the sheriff's department just to make that clear.

When you were in the sheriff's department, who

decided who would be undersheriff?

A       The sheriff would.

Q       What about assistant sheriff?  Who had the ultimate decisionmaking authority?

A       The sheriff as well.

Q       And who had the ultimate decisionmaking authority to name chiefs?

A       The sheriff would.

Q       What about commanders?

A       The sheriff as well.

Q       How far down did that go?

A       Generally to the captain position.  The sheriff will go ahead and promote captain on up.

Q       Is it a linear progression?  In other words, you said you were commander.  Does that mean you promoted at some point from the rank of captain?

A       Yes.

Q       When did you become captain?

A       Captain, I'm trying to remember now.  Probably in '04, I want to say.  April of '04.

Q       How long were you captain?

A       Two years.  Almost three years.

Q       And then that's when you became commander?

A       Correct.

Q       When you were with the sheriff's department, did

UNITED STATES DISTRICT COURT

you work both in custody and patrol?

A      Yes.

Q      Could you please explain the differences?

A      Custody, we're in charge of the individuals that are mandated to go to court or serve time for misdemeanor type crimes generally.  Patrol, we do recognize patrol protocols as any other police station would -- handle robberies, calls of service, that type of stuff.

Q      When you were captain, where were you captain?

A      I was the captain of our Commercial Crimes Bureau.  That would be our fraud unit.  And then I was asked to be the captain of Men's Central Jail.

Q      Is Men's Central Jail also referred to as MCJ?

A      Yes.

Q      Where is it located?

A      441 Bauchet Street, Downtown L.A.

Q      Is there a facility across the street from MCJ?

A      Yes.

Q      What is the name of that?

A      Twin Towers Correctional Facility.

Q      When you were at Men's Central Jail as captain, what were your duties?

A      I was in charge of the overall security and safety of the inmates, the employees, all vendors coming into the location, ensuring that we came within budget, handling all

**UNITED STATES DISTRICT COURT**

protocols and processes we need to help inmates and deputies inside the facility.  Basically the safety and security.

Q      Where was your office at the time?

A      It was in Men's Central Jail outside of custody.

Q      Was there any one higher ranking than you that was located within Men's Central Jail?

A      No.

Q      And when did you begin as captain of MCJ?

A      It would have been December of '06.

Q      When you began your tenure as captain of Men's Central Jail, did you learn about any pressing issues that you needed to deal with as captain?

A      Yes.

Q      What were those pressing issues?

A      Morale and force issues that were occurring at Men's Central Jail.

Q      When you mention "force issues," what are you referring to?

A      I was advised and did some research to find out that there were a lot of force used in that one particular facility as opposed to others, some of which were very significant uses of force.  So when I arrived, I would walk around and kind of do an assessment to find out exactly how bad the problem really was.

Q      Did anything unusual occur during these times

when you were walking around?

A        Absolutely.  I remember my first walk up on to the 3000 floor, which is a one large block area.  I walked up onto the floor, and I was immediately greeted by nine, ten deputies.  They surrounded me almost like a cover wagon configuration.  And the ringleader just looked at me and asked "What are you doing up on my floor?"  And that I felt was not only inappropriate, uncalled for, but I knew that probably seven or eight of those deputies weren't doing their job at that particular time frame.

Q        How did you know that?

A        They have a silence, and you don't huddle or you don't congregate in a particular area.  There's jobs that need to be done in the jail -- processing the inmates, sending to school, processing medical care, sending them to court.  They all had jobs.  That freeway area where they congregated at probably should have been no more than two people at that particular time.

Q        Do you recall how many ranks below you the person was who said to you, "What are you doing on my floor?"

A        He was a deputy with about two-and-a-half years on.

Q        I think we got to the captain level.  Why don't you take us down below the captain level to deputy.

A        The captain at Men's Central Jail, I have an

operations lieutenant which is my right-hand man, person.  You have several lieutenants that work the floors on all the shifts.  You have sergeants that work with and for the lieutenants, and then you've got a large cadre of deputies and custody assistants.

Q    And the custody assistants are below deputies?

A    Correct.

Q    You mentioned that one of the issues that you were alerted to that was going on at Men's Central Jail was too much force.  What did you observe when you were captain of Men's Central Jail?

A    I walked around on my first couple days, and I was very -- it was very easy to tell that the deputies were not in uniform.  I walked all the floors and managed by walking around talking to the deputies.

On each floor there's a control booth.  In those control booths, which is an isolated area, I found deputies in every one of the control booths that had broken right hands.  So I would ask, "What happened to you?" and inquire.  And they would say, "It was a fight with an inmate.  Fight with an inmate."  One of them said he missed the inmate and broke the wall and hit his hand.  I found it rather unusual to see so many injuries.

I saw deputies that were not in uniform, per se, carrying the right tools to do the job properly.  A lot of the

tools were locked up.  So there was a wide range of things that needed to be immediately addressed.

Q        Are you familiar with the term "force packages"?

A        Yes.

Q        What are force packages?

A        Anytime force is used on an inmate, there must be documentation.  Part of the documentation is the deputy would need to write a report as to what led up to the incident.  Any witnesses to that particular incident would have to write a report on their own.  A sergeant would be there to review the force packets to ensure that everything is filled out properly and do a summary assessment of the type of force that was used -- it was appropriate, inappropriate, needed training, whatever the case may be.  Sergeant's lieutenant would review it.  It would go to the operations lieutenant who would review it, and then I would be the last reviewer out of Men's Central Jail.

Q        When you were with the sheriff's department, were there different types of investigations that would come out of a force incident?

A        Absolutely.  Some force is completely legitimate. Others were training issues that needed to be addressed.  Some were insignificant from a standpoint of didn't rise to a level of a unit investigation or internal criminal investigation. Some did rise to levels of investigations that we had to look

**UNITED STATES DISTRICT COURT**

at.  Some went to our Internal Affairs, and some went to our Internal Criminal which handled the criminal element of any use of force that we saw that rose to that particular level.

Q       You mentioned how ICIB, Internal Criminal, handled the criminal elements.  What did IAB, Internal Affairs, handle?

A       They would handle basically the significant uses of force.  There were two categories when we addressed the force packet, less than significant and significant uses of force.  Significant use of force is basically a head strike to the head, hospitalization, broken bone, that type of thing, a very significant force that might have occurred.  And Internal Affairs would have first right to take a look at that force package to determine if it rose to a level that they wanted to investigate.

Q       During your time as captain and later as commander, do you know who IAB, Internal Affairs, and Internal Criminal reported to?  Did they report to you?

A       No.

Q       Who did they report to?

A       At the time I don't remember.  I think they reported directly to their chief.  It might have gone up one extra level.

Q       Do you know how force packages came into play with the investigations?  So you mentioned force packages.  Do

**UNITED STATES DISTRICT COURT**

you know how they would be used during the investigations?

A      Sure.  If a force package came to me and I took a look at it and realized training needed to be done, I would indicate that the individual, the deputy involved, would go to a training class and be retrained in a particular incident.  If it was one that led to inappropriate use of force but not criminal and not into an IA level, I would take it and impose whatever penalty I felt was appropriate at the time frame to recorrect the bad behavior of the deputy.

Q      Did you notice anything unusual with some of the reports that you saw in the force packages?

A      Yeah.  I saw a lot of what we referred to as just boilerplate type protocols.  It was the same verbiage over and over and over again.  When I would read them, it would be, "I took my flashlight, I swung at the inmate, I missed the inmate's shoulder and hit the inmate's head."  A lot of typical boilerplate stuff that, to me, were reds flags.  It immediately stood out that something is wrong, that they're using the same thing.  Every fight, every incident in its entirety is unique in and of itself, and a lot of that was not captured.

Q      Did you do anything to fix some of the issues you just discussed?

A      Absolutely.  A lot of training.  Walked around, managed by walking around and questioned the deputies constantly on what's right, what's wrong.  How do you handle

force?  A wide variety of things we would deal with.

THE COURT:  All right, ladies and gentlemen.  I think we're going to call it a day.

Again, I want to remind you, until this trial is over, you're not to discuss this case with anyone including your fellow jurors, members of your family, people involved in the trial or anyone else.  And do not allow others to discuss the case with you.  This includes discussing the case on the Internet, through blogs, bulletin boards, by e-mails or text messages.  If anyone tries to communicate with you about this case, please let me know about it immediately.

Do not read, watch, or listen to any news reports or other accounts about the trial or anyone associated with it including looking at anything online.  Do not do any research such as consulting dictionaries, searching the Internet, or using other reference materials.  And do not make any investigation about the case on your own.

Finally, you're reminded to keep an open mind until all the evidence has been received, you've heard the arguments of counsel, the instructions of the Court, and the views of your fellow jurors.  If you need to speak with me, simply give a note to the clerk.

We're going to resume tomorrow at 8:00 a.m.  Have a nice day, and drive carefully.  We'll see you tomorrow morning.

**UNITED STATES DISTRICT COURT**

Leave your notebooks on your chairs, please.

(The following proceedings were held in open court out of the presence of the jury:)

THE COURT:  All right, sir.  You may step down.

Do you know who is going to follow Mr. Olmsted?

MR. FOX:  Yes, Your Honor.  Robert Bayes.  Then Mickey Manzo, Cecil Rhambo, Judy Gerdhardt, Michele Miller.  What is tomorrow?  The 9th?  Okay.  She can testify tomorrow.  And if we get to David Dahle, but I expect Mr. Manzo's testimony is going to be rather lengthy.

THE COURT:  All right.  Anything else?

MR. FOX:  Not from the Government, Your Honor.

MR. HOCHMAN:  Nothing, Your Honor, at this time.

THE COURT:  All right.  I'll see everybody tomorrow morning.

MR. HOCHMAN:  Thank you, Your Honor.

(A pause in the proceedings.)

THE COURT:  The record should reflect that both counsel and the defendant are present.

MR. FOX:  Thank you, Your Honor, for coming back out.

I just had a scheduling issue based on an out-of-town witness and his attorney's schedule.  I was just wondering if Your Honor was planning on having us be dark on Monday or not.  I think right now we are on schedule for what

we talked about for the timeline of this case.  So I don't think there's a need to go on Monday, and that's better for the traveling witness and his counsel as well.

I think the way that we're looking at this right now, if you do not go on Monday, we are likely to rest, depending on cross and all of that, Tuesday or Wednesday of next week.

THE COURT:  Okay.

MR. HOCHMAN:  No objection, Your Honor.  If you would like to not go this coming Monday, we obviously logged in this Monday of this week.  Our case is still on schedule as well depending on where the Government's case is.  So we're indifferent to the Court.  We can go on Monday or not.

THE COURT:  Okay.  How long do you anticipate your case is going to be?

MR. HOCHMAN:  If Mr. Baca testifies, three days. If Mr. Baca doesn't, one to two days.

THE COURT:  Okay.  So assuming for the moment that they rest on Wednesday, you would anticipate that you -- if Mr. Baca did not testify, you would be done by the 16th or Friday.

MR. HOCHMAN:  Yes.  I would anticipate being done by Friday.  That would be correct, Your Honor.

THE COURT:  Okay.  And if Mr. Baca testifies, we might go over to the week of the 19th.

**UNITED STATES DISTRICT COURT**

MR. HOCHMAN:  Correct, Your Honor.

THE COURT:  All right.  Now, I, quite frankly, forgot.  How many jurors do we have that have vacation plans the week of the 19th?

MR. HOCHMAN:  I believe that nobody -- well, the 23rd, Your Honor, which is that Friday, I believe we had a couple if I'm not mistaken.  I don't know if it was -- it wasn't the majority.  I think there was certainly one or more.

THE COURT:  I guess what I'm trying to figure out is if we have anybody that's going to be leaving who has to leave either the 19th or the 20th.

MR. FOX:  I don't think so, Your Honor.  There was one person that we considered that said that she was unavailable on the 20th for I can't remember if it was wedding or anniversary, but she's not one of our 16.

THE COURT:  Okay.  I guess what I would like to do is to make sure that we can get the case to the jury before people start breaking for the holidays.

MR. FOX:  What we can do, Your Honor, if you want to go on Monday and we run out of witnesses, if you would agree to break at that point on Monday, whenever we run out of witnesses, and then the witness who is traveling can testify first thing Tuesday.  And he will be a very short witness. This is Mr. Faturechi who my direct will, I assume, be less than ten minutes with him.  So we could do it that way.

MR. HOCHMAN:  Or, Your Honor, we could go on the 19th, that Monday, so that that way we'd have that full week. Again, if -- you know, unless Mr. Baca testifies or the Government's cross-examination becomes much longer than I anticipate, we should have all the evidence in by that Friday the 16th.  Obviously I don't know yet if Mr. Baca is going to testify, Your Honor.

THE COURT:  Okay.  If neither side has any strong feelings, then, fine.  We don't have to go on Monday.  But we ought to leave the 19th as a possibility.

MR. FOX:  Yes, Your Honor.

MR. HOCHMAN:  Yes, Your Honor.

THE COURT:  Okay.

MR. HOCHMAN:  Thank you, Your Honor.

MR. FOX:  Thank you, Your Honor.

(Proceedings concluded at 1:42 p.m.)

**UNITED STATES DISTRICT COURT**

610

CERTIFICATE OF OFFICIAL REPORTER

I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME

COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR

THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT

PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE

FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN

CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF

THE UNITED STATES.

DATED THIS  14TH  DAY OF AUGUST, 2017.

/S/ MIRANDA ALGORRI

MIRANDA ALGORRI, CSR NO. 12743, CRR
FEDERAL OFFICIAL COURT REPORTER

**UNITED STATES DISTRICT COURT**