611

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

HONORABLE PERCY ANDERSON, U.S. DISTRICT JUDGE

UNITED STATES OF AMERICA,      )
                               )
           Plaintiff,          )   Case No.
                               )
     vs.                       )   CR 16-00066(A)-PA
                               )
LEROY D. BACA,                 )   PAGES 611 to 804
                               )   VOLUME 6
           Defendant.          )
_____)

REPORTER'S TRANSCRIPT OF
TRIAL DAY 4
THURSDAY, DECEMBER 8, 2016
8:05 A.M.
LOS ANGELES, CALIFORNIA

MIRANDA ALGORRI, CSR 12743, CRR
FEDERAL OFFICIAL COURT REPORTER
312 NORTH SPRING STREET, ROOM 435
LOS ANGELES, CALIFORNIA 90012
MIRANDAALGORRI@GMAIL.COM

UNITED STATES DISTRICT COURT

612

**APPEARANCES OF COUNSEL:**


**FOR THE PLAINTIFF:**

        SANDRA R. BROWN
        Acting United States Attorney
        BY:  BRANDON FOX
        BY:  EDDIE A. JAUREGUI
        Assistant United States Attorneys
        United States Courthouse
        312 North Spring Street
        Los Angeles, California 90012


**FOR THE DEFENDANT:**

        MORGAN LEWIS AND BOCKIUS LLP
        BY:  NATHAN J. HOCHMAN
        BY:  BRIANNA ABRAMS
        The Water Garden
        1601 Cloverfield Boulevard
        Suite 2050 North
        Santa Monica, California 90404


        MORGAN LEWIS AND BOCKIUS LLP
        BY:  TINOS DIAMANTATOS
        77 West Wacker Drive
        Chicago, Illinois 60601

**UNITED STATES DISTRICT COURT**

613

**I N D E X**

**THURSDAY, DECEMBER 8, 2016**

**Chronological Index of Witnesses**

Witnesses:                                                          Page

OLMSTED, Robert

    Direct examination resumed by Mr. Fox              620
    Cross-examination by Mr. Diamantatos               634
    Redirect examination by Mr. Fox                    654


BAYES, Robert

    Direct examination by Mr. Jauregui                 657
    Cross-examination by Mr. Hochman                   668


GERHARDT, Judy

    Direct examination by Mr. Jauregui                 693
    Cross-examination by Mr. Hochman                   706


MILLER, Michele

    Direct examination by Mr. Jauregui                 717
    Cross-examination by Mr. Hochman                   736


MANZO, Mickey

    Direct examination by Mr. Fox                      746

**UNITED STATES DISTRICT COURT**

614

**EXHIBITS**


**THURSDAY, DECEMBER 8, 2016**


| Exhibits | | For ID | In EVD |
|---|---|---|---|
| 18 | E-mail | 751 | 751 |
| 71 | Recording of Brown interview 08/19/11 | 764 | 764 |
| 72 | Transcript of Brown interview 08/19/11 | 764 | |
| 74 | Recording of Brown interview 08/21/11 | 782 | 782 |
| 75 | Transcript of Brown interview 08/21/11 | 782 | |
| 77 | Recording of Brown interview 08/23/11 | 799 | 799 |
| 78 | Transcript of Brown interview 08/23/11 | 799 | |
| 84 | Recording of Brown interview 08/26/11 | 728 | 730 |
| 85 | Transcript of Brown interview 08/26/11 | 728 | 730 |
| 86 | Recording of Brown interview 09/02/11 | 730 | 732 |
| 87 | Transcript of Brown interview 09/02/11 | 731 | |
| 94 | Recording of phone message | 732 | 733 |
| 95 | Transcript of phone message | 732 | 733 |
| 100 | Recording of phone call | 733 | 734 |
| 101 | Transcript of phone call | 733 | 734 |
| 110 | Grand Jury subpoenas | 696 | 696 |
| 118 | Sexton 2010-2011 evaluation | 700 | 701 |
| 119 | Craig 2011-2012 evaluation | 700 | 701 |


**UNITED STATES DISTRICT COURT**

615

**EXHIBITS CON'T**

**THURSDAY, DECEMBER 8, 2016**

| Exhibits | | For ID | In EVD |
|---|---|---|---|
| 120 | Baca calendar | 702 | 703 |
| 121 | Brown release processing record | 699 | 700 |
| 122 | Records | 696 | 698 |
| 123 | Records | 696 | 698 |
| 124 | Inmate movement history record | 696 | 698 |
| 125 | Rodriguez booking record | 696 | 698 |
| 126 | IIC Record for Rodriguez | 696 | 698 |
| 127 | Rodriguez inmate movement record | 696 | 698 |
| 128 | King booking record | 696 | 698 |
| 129 | IIC records for Johnson | 699 | 700 |
| 130 | Johnson Inmate movement history | 699 | 700 |
| 131 | IIC record for Brown | 699 | 700 |
| 134 | Daily activities notebook | 734 | |
| 137 | E-mail | 780 | 780 |
| 142 | Surveillance log | 721 | 724 |
| 143 | Surveillance log | 721 | 724 |
| 144 | Surveillance log | 721 | 724 |
| 145 | Surveillance log | 721 | 724 |
| 146 | SOG weekly report | 724 | 725 |
| 147 | SOG weekly report | 724 | 725 |

**UNITED STATES DISTRICT COURT**

616

**EXHIBITS CON'T**

**THURSDAY, DECEMBER 8, 2016**

| Exhibits | | For ID | In EVD |
|---|---|---|---|
| 148 | SOG weekly report | 724 | 725 |
| 149 | SOG weekly report | 724 | 725 |
| 150 | SOG weekly report | 724 | 725 |
| 151 | LASD surveillance request | 725 | 726 |
| 152 | Surveillance log | 725 | 726 |
| 173 | Pages from MCJ roster | 703 | 706 |
| 174 | Pages from TTCF phone roster | 703 | 706 |
| 175 | Page from TTCF phone roster | 703 | 706 |
| 176 | Phone roster | 703 | 706 |
| 177 | Cell phone roster | 703 | 706 |
| 178 | Administrative phone roster | 703 | 706 |
| 179 | Executives roster | 703 | 706 |
| 180 | LASD landline phone roster | 703 | 706 |
| 184 | Tom Carey evaluation | 700 | 701 |
| 528 | Document | 683 | 686 |
| 529 | Document | 683 | 686 |
| 601 | Document re core values | 637 | |
| 737 | Document | 676 | 680 |

**UNITED STATES DISTRICT COURT**

**LOS ANGELES, CALIFORNIA; THURSDAY, DECEMBER 8, 2016**

**8:05 A.M.**

**---**

(The following proceedings were held in open court out of the presence of the jury:)

THE CLERK:  Calling item No. 1, CR 16-66(A), USA versus Leroy D. Baca.

Counsel, state your appearances, please.

MR. FOX:  Good morning, Your Honor.

Brandon Fox and Eddie Jauregui on behalf of the United States.  Also with us at counsel table is Special Agent David Dahle of the FBI.

THE COURT:  Good morning.

MR. HOCHMAN:  Good morning, Your Honor.

Nathan Hochman on behalf of Defendant Leroy Baca. I'm joined at counsel table by Tinos Diamantatos and Brianna Abrams.

I have one request.  This is the first time today I think the sun has appeared.  When I'm looking at you, Your Honor, I'm getting hit directly with the sun in my eyes. I don't know if there's a way to close the blind at least in a way that -- maybe I'll keep moving -- behind you has certain risers and then blank spaces.  If you're in the wrong section, you're completely blinded by the sun, and I couldn't see you.

**UNITED STATES DISTRICT COURT**

I don't know if you have the ability to control that. If you do, I'd appreciate it if you could darken it at this point so I can be at counsel table when I'm addressing you.

THE COURT: All right.

MR. HOCHMAN: And then the other issue we were going to bring up, Your Honor -- and I discussed this with the Government -- since Mr. Olmsted is another witness that is talking about deputy abuse, we'd ask the Court to read that limiting instruction at the beginning, Your Honor. I believe you read it before the very first witness. Yesterday there were a couple witnesses thereafter. We'd ask that you read it this morning again to the jury.

THE COURT: What's the Government's position?

MR. FOX: Your Honor, we don't object. We'll leave it to your discretion. The jury has heard it, but I don't think there's any harm in the jury hearing it again.

THE COURT: That's fine. I believe all the jurors are here. We'll see what we can do about lowering the shade.

MR. HOCHMAN: That's much better, Your Honor. Thank you very much.

THE COURT: Okay. Now, if I can just push a button and make everybody disappear. All right.

MR. HOCHMAN: I don't think that technology has been invented just yet, Your Honor.

THE COURT:  You'd be surprised what I have up here.

All right.  Let's bring the jury in.

MR. FOX:  Your Honor, do you want Mr. Olmsted in the gallery?

THE COURT:  That's fine.

MR. FOX:  Your Honor, I assume you don't want -- that you would like the public in now rather than waiting until the jury comes in, or what would you prefer?

THE COURT:  The public can come in now.  It's fine.

MR. FOX:  Thank you.

(The following proceedings were held in open court in the presence of the jury:)

THE CLERK:  Calling item No. 1, CR 16-66(A), USA versus Leroy D. Baca.

Counsel, state your appearances.

MR. FOX:  Good morning, Your Honor.

Brandon Fox and Eddie Jauregui on behalf of the United States.  Also with us at counsel table is Special Agent David Dahle of the FBI.

THE COURT:  Good morning.

MR. HOCHMAN:  Good morning, Your Honor.

Nathan Hochman along with Tinos Diamantatos and Brianna Abrams on behalf of Leroy Baca.

MR. DIAMANTATOS:  Good morning, Your Honor.

THE COURT:  Good morning.  Good morning, ladies and gentlemen.  Let's have the witness come forward, please.

THE CLERK:  You are reminded you are still under oath.

THE WITNESS:  Yes.

THE COURT:  All right.  All right, ladies and gentlemen.

Again, I want to remind you that the defendant is not on trial for any conduct, offenses, or allegations of inmate beatings or deputy abuse that are not charged in the Indictment.  You're only to determine whether the defendant is guilty or not guilty of the charges in the Indictment.

**ROBERT OLMSTED,**

**GOVERNMENT'S WITNESS, PREVIOUSLY SWORN:**

**DIRECT EXAMINATION (RESUMED)**

BY MR. FOX:

Q     Mr. Olmsted, I believe we wrapped up yesterday with you talking about the force packages and the boilerplate language you saw in those packages.  What types of things did you do to try to fix these issues while you were captain at Men's Central Jail?

A     Several things.  One, managed by walking around, getting to know everybody, talk to them, find out their personalities which is a lot.  I also requested some reports to

**UNITED STATES DISTRICT COURT**

be drawn up to determine type of forces that were being used, who was doing a lot of the force, why the force was occurring. There's a lot of different protocols and processes that I inquired about.

Q      How long were you captain at Men's Central Jail?

A      16 months.

Q      And then what happened?

A      I got promoted to commander in April of '08.

Q      When you were promoted to commander in April of 2008, how did your duties change?

A      I went from the captain of Men's Central Jail to the commander of overseeing the southern jails which would be Men's Central Jail, Twin Towers Correctional Facility, and Century Regional Detention Facility.

Q      How many captains did you have reporting to you at that point?

A      Three.

Q      Was there one captain assigned to Men's Central Jail after you left Men's Central Jail?

A      Yes.

Q      Who was that?

A      Captain Cruz, Dan Cruz.

Q      Were there any issues brought to your attention regarding Men's Central Jail after you became commander of Men's Central Jail?

A        Quite a few.

Q        Can you please describe some of those for us in general detail?

A        In general detail, I was getting reports from various people telling me I need to look into incidents of force that transpired that are not true and accurate according to the reports that were written.  I got information that the deputies were being heavy handed again and were allowed to do so.  So again, I dealt a lot with Captain Cruz to try to reconcile the issues as well as generating more reports to try to ascertain exactly what the problems were.

Q        You mentioned earlier force packages and how they played a role in investigations.  When you were commander at Men's Central Jail, did you have a chance to look at force packages or do anything with respect to force packages?

A        Yes.  Force package, as I said yesterday, is a comprehensive review of a force incident with multiple layers in between.  So once I realized that force was being used, in my opinion, heavy handedly, again, with significant force going up dramatically according to the stats that I read, I asked to have a couple of reports authored, one of which I asked the operations lieutenant of Men's Central Jail who was a friend who confided in me, and I said, do me a favor.  Just pull 30 random reports, just random, and take a look at them.

Q        What did you find out?

**UNITED STATES DISTRICT COURT**

A       Out of the 30, he said you'll be surprised -- you won't be surprised.  18 of the 30 were out of policy and a variety of processes whether they're minor or significant.  18 of the 30.  I read it.  I concurred.  I gave it to other people to take a look at to ensure we weren't reading too much into this or I was too close to the processes.  And they also concurred that 18 out of the 30 random reports were in violation of departmental policy.

Q       What does that mean, "out of policy"?

A       It means they weren't properly looked at or investigated.  That means the protocols weren't being followed, right questions weren't asked, heavy handedness, again, was being applied.  They didn't follow the rules and protocols of what's been established by the custody policies on use of force.

Q       What did you do with this information?

A       I gave it -- I brought that information over to my boss who was the chief of all of custody.

MR. DIAMANTATOS:  Objection.  Foundation, Your Honor.

MR. FOX:  Your Honor, I can try to lay some foundation if that's okay.

THE COURT:  That's fine.  Go ahead.

Q       BY MR. FOX:  Approximately when did you bring this to your boss?

UNITED STATES DISTRICT COURT

624

A        Probably around June -- May, June, July of '09.

Q        Who did you say that was?

A        Dennis Burns, the chief of custody division.

Q        Did anything change after you brought this information to your chief?

A        No.

Q        So what did you do next?

A        I told him that, if he can't do anything -- let me backtrack.  I said I think the problem, as I see it, is the lack of proper leadership.  And being a new captain on a large scale operation of Men's Central Jail, he needs to be transferred, and we need to bring in a tenured captain to run the place.  I said, that I see as a recommendation.  He said, "I'm not going to do it."  I told him, "If you're not going to do it, then I'm going to have to take these over your head and go to your boss and show him exactly what's going on."

Q        Who was his boss at the time?

A        Marvin Cavanaugh who was the assistant sheriff overseeing custody and courts.

Q        Did you bring this information to Mr. Cavanaugh?

A        Yes, I did.

Q        Approximately when did you do this?

A        About two weeks after, maybe a week and a half after I met with Chief Burns.

Q        And where did this conversation with Assistant

UNITED STATES DISTRICT COURT

Sheriff Cavanaugh occur?

A       I went to his office with documentation in hand.

Q       What happened when you went to his office with that documentation?

A       We spoke for an hour, hour and 15 minutes.  And he looked up and said, "I can't do anything about this."  I was astounded since he is in charge of custody.  He says, "I agree, but let me see what I can do."

Q       And what happened next?

A       Next thing, about a week after that, I got a phone call from Assistant Sheriff Tanaka.

Q       What was Assistant Sheriff Tanaka's role at that time?

A       At that time he was on the other side of the shop which means he would be handling patrol and detectives.

Q       If he was handling patrol, why would he have been involved in the jails?

A       He shouldn't have, in my opinion.

Q       What happened when Assistant Sheriff Tanaka called you?

A       He seemed astounded, seemed very upset, said a few words to me, said, "Leave my office.  I'll look into it."  So I left, and about ten days later I got a phone call to come back to his office.

Q       What happened when you went back to his office?

A       I went back to his office.  He was apologetic. He said, "I think you might be right.  We looked into it, and we're going to promote Dan Cruz, and you're going to help get him promoted."

Q       Did he explain to you why a captain who was unable to deal with these issues should be promoted?

A       He said he's the only Hispanic available in the band to get promoted.  He said the other three Hispanics in the captain band he will not promote.

Q       So what happened?

A       At that time a couple -- I'd say a week or two later, Mr. Tanaka's aide was assigned as the operations lieutenant at Men's Central Jail.  It was the game plan that he, working for Mr. Tanaka and I, overseeing Dan Cruz, together the two of us would try to mold Dan Cruz into a better captain.

Q       Did that occur?

A       No.

Q       Why not?

A       There were still too many issues going on, too many fights.  Undermined -- I'm sorry.  A lot of undermining that was going on behind doors that precluded any oversight from my standpoint.

Q       What do you mean there was a lot of undermining that was going on behind closed doors?

MR. DIAMANTATOS:  Objection.  Foundation.

**UNITED STATES DISTRICT COURT**

THE COURT:  Overruled.  Go ahead.

THE WITNESS:  There were other -- I developed a cadre of good solid supervisor and deputies at Men's Central Jail, really good people.  They would call me up constantly, let me tell you what's going on, why and how things are happening.

MR. DIAMANTATOS:  Objection.  Foundation.

THE COURT:  Sustained.

Q     BY MR. FOX:  I just want to focus on, when you say "undermine," what did you mean by "undermine"?

A     I would give an order, and it wouldn't be followed by Captain Dan Cruz.

Q     At some point did you take this information to anyone above the assistant sheriff level?

A     Not until after I retired.  I take that back.  I had a personal event that occurred in my life.  I left the department for a period of time and decided it was time to retire.  I came back to an event that occurred in September of '10 where Sheriff Baca attended.  I was --

Q     Let me slow this down a little bit.

You went to this event.  Where was the event?

A     Twin Towers Correctional Facility.

Q     You said it was in September of 2010.  I believe you're about to reference a conversation that you had.

Was anyone else present in that conversation that

UNITED STATES DISTRICT COURT

628

you had besides you and Mr. Baca?

A    I don't think so.

Q    Okay.  And what is it that happened during this conversation?

A    He was walking to the event to kind of MC the event.  I said, "Hey, boss, I think I'm going to retire.  I think it's time."  He was concerned, said, "Try to stay on as a reserve if you can."  I then told him, "We have some significant events going on at Men's Central Jail, some force issues and problems that are occurring."  And his next statement to me is, "Who do you think should take your place as commander?"

Q    How did you respond?

A    Well, I anticipated the question, but I was kind of put off or I stepped back a little bit.  I didn't expect that response to come right away.  I expected a response to my particular statement.  So I gave him a recommendation, and then he said, "Okay.  Well, let's go on to the event."

Q    Did you hear from him at any point in time, let's say, between September of 2010 and early December, 2010, about the issues you raised with him?

A    Yes.  I saw Sheriff Baca again.  I remember succinctly it was the last Sunday before Christmas in 2010.

Q    Before that event that you're talking about and the September 10th event, did you hear from Mr. Baca about the

issues you raised with him?

A    No.

Q    By the way, do you think you'd recognize Mr. Baca if you saw him again?

A    Oh, yes.

Q    Can you please look around the courtroom and tell me if you see him?

A    Yes.  He's sitting there.

THE COURT:  The record will reflect the witness has identified the defendant.

MR. FOX:  Thank you.

Q    You just referenced a December event that happened right before Christmas in 2010.  Where was this event?

A    This particular event was the Barker Hangar in Santa Monica.  It was a food drive event that I coordinate every year.

Q    You mentioned that you were near retirement in September of 2010.  Come this event, had you retired?

A    Yes.

Q    What happened at this event?

A    I felt it was necessary to bring up my concerns to Mr. Baca again.  He showed up around 9:00 o'clock as scheduled.  I walked up to greet him since I coordinate the event.  I said, "Boss, we've got some significant problems and force issues going on at Men's Central Jail.  I need to talk to

**UNITED STATES DISTRICT COURT**

you about this stuff here, and I think it's getting out of hand." And he said, "We'll talk about it afterwards. Let's go on with the event." I said, "Okay."

Q    Did you hear from him in December of 2010 after that event?

A    No.

Q    What about in the next few months? Did you hear from him, let's say, in the first quarter of 2011?

A    I did receive a phone call. I don't remember the exact time frame. I want to say it was June, maybe.

Q    Okay.

A    After I retired.

Q    And up until June of 2011, did you hear from Mr. Baca about any of the force issues?

A    No.

Q    Okay. Did you meet with Mr. Baca about any of these force issues up until, say, end of September, 2011?

A    Yes. He asked me to come to his office. I said, "I need at least one hour to tell you everything that's going on." And at that particular time, I think I got about ten minutes.

Q    Okay. When, approximately, did this occur?

A    July maybe. July of '11.

Q    And during those ten minutes, what is it that you explained to Mr. Baca?

631

A        I told him there's a -- again, I brought in some documentation.  Don't go anywhere without foundation.  I told him there's force issues that were going on that are out of control.  I said, "You're being undermine by your undersheriff," then.  I think he was the undersheriff at that time, Mr. Tanaka.  I told him there's a lot of -- there's going to be potential lawsuits like crazy if we don't start addressing some of the problems going on in Men's Central Jail.  Things similar to that.

Q        How did he react during that meeting?

A        I remember one particular phrase he said, when I told him, "You were being undermine by Mr. Tanaka," he said, "Yes.  Sometimes I just have to hip check him every once in a while."  And I thought of the hockey metaphor.  I remember that succinctly because I would have used a much more severe hockey metaphor than "hip check."

MR. FOX:  One moment, Your Honor.

No more questions, Your Honor.

THE COURT:  Cross-examination.

MR. HOCHMAN:  Your Honor, can we be heard very briefly at sidebar?

THE COURT:  Yes.

(The following proceedings were held at sidebar:)

MR. HOCHMAN:  So, Your Honor, they -- they just brought up this meeting July, 2011, with Mr. Olmsted.  He's

**UNITED STATES DISTRICT COURT**

raising these concerns at that time where apparently it's the first time he's had these ten minutes to raise the concerns in more detail than he's done before.

The response to Olmsted's concerns, in part, was the -- which occurs literally within two months, two, two-and-a-half months, is the commander's management task force. And the commander's management task force was set up, and part of that revised the use-of-force policy which is something that Mr. Olmsted wanted done. It addressed the concerns in the jails because the commanders actually went back and revised many of the policies going on in Men's Central Jail.

And, again, the Government, we believe, has opened the door because you have to be able to say or to at least ask the question what was the response to your concerns? Even if that response didn't occur before September 22nd, it is the response. They've left the jury thinking that Mr. Baca had no response to it, and he did.

MR. FOX: Your Honor, this is the second or third time that we've heard that Mr. Baca's response to something was this commander's management task force. Apparently he -- I don't know the cause. It keeps moving on us, what was the reason for setting up this commander's management task force.

Yesterday we heard it was Chaplain Paulino that caused it. Now we're hearing it was Mr. Olmsted. The bottom

633

line is it all happened after September 22nd of 2011.  So we're talking about the prior good acts or post good acts of Mr. Baca that don't go to his intent whatsoever.

MR. HOCHMAN:  In response to that, it's all of it.  Mr. Baca has been told by the chaplain.  Mr. Baca is being told by the ACLU.  Mr. Baca -- now they've added a third person, Mr. Olmsted.  It's contemporaneous, Your Honor.  The chaplain talked about a July 26th, 2011, meeting.  We just heard this is a July, 2011, meeting.  The ACLU has reports throughout 2011.

So to not let the jury understand there's a response from Mr. Baca, even if it took -- it wasn't immediate.  It didn't happen the next week.  But within two months is a reasonable time frame for someone to set up an entire commander's task force, bring in six different commanders that are dedicated to fixing the problems in Men's Central Jail as well as the other jails.  Otherwise, the jury thinks he did nothing, and that's not true.

THE COURT:  I'm going to sustain the objection at this point.  I'll look at the testimony and think about it a little more.  If you need to recall somebody, if I change my mind --

MR. HOCHMAN:  Okay.  So we could not then dismiss Mr. Olmsted.  I believe he's under subpoena.  We didn't have him under subpoena, Your Honor.  So in case we have to recall

him in our case, if you could just let him know he's not been dismissed and he will be contacted by the defense, if necessary.  I don't have him under subpoena.

THE COURT:  Do you have him under subpoena?

MR. FOX:  He didn't need a subpoena.  He said he did not need a subpoena.  So we did not subpoena him.  My experience with him is he's a very cooperative person and if he --

THE COURT:  We'll get him back.

MR. HOCHMAN:  Thank you very much.

MR. FOX:  Thank you, Your Honor.

(The following proceedings were held in open court in the presence of the jury:)

MR. DIAMANTATOS:  May I inquire, Your Honor?

THE COURT:  Yes.

**CROSS-EXAMINATION**

BY MR. DIAMANTATOS:

Q    Mr. Olmsted, yesterday on direct examination you described for us the various layers of command that exist.

It's true that a chain of command has to be followed; correct?

A    Correct.

Q    And the chain of command that you described specifically with regard to force packages any time force was used, one of these packages had to be filled out; correct?

635

A        Correct.

Q        And you indicated yesterday, Mr. Olmsted, that there's times when force is appropriate; correct?

A        Correct.

Q        And there's times where force, on the other end, is inappropriate; correct?

A        Correct.

Q        Any use of force should be looked into in order to make that determination; is that right, sir?

A        It must be looked into, yes.

Q        And let's focus on the time period that you described for us yesterday, 2006 and beyond to the point of your retirement.

Was there a system in place where a deputy had to fill out a use-of-force package?

A        Yes.

Q        And then that would go to the particular deputy's sergeant; correct?

A        Correct.

Q        The lieutenant, who is in charge of the sergeant and below, would have to look into it as well; correct?

A        Correct.

Q        And then the captain, who's above the lieutenant, would maintain oversight of that process and could also look into it; correct?

**UNITED STATES DISTRICT COURT**

A        Correct.  And there's an operations lieutenant that collects it all and looks into it as well before they give it to the captain.

Q        So an operations lieutenant can gather all the information at that point and provide it to the captain who oversees that particular use-of-force package.

A        Correct.

Q        Am I correct that the force package should contain materials such as interview of the deputy or deputies involved in that particular --

A        Correct.

Q        Any witnesses that may have witnessed that event?

A        Correct.

Q        And made interviews that were involved?

A        Correct.

Q        And any doctor's notes or medical information stemming as the result of that use-of-force incident?

A        Correct.  They need to cooperate.

Q        When you were promoted in 2006 and you described for us yesterday your various roles with the sheriff's department and earlier this morning we heard about your promotion in 2006, who is it that promoted you, sir?

A        I believe I was promoted in 2004, and it was Sheriff Baca that promoted me.

Q        Yet when you were promoted by Sheriff Baca in

UNITED STATES DISTRICT COURT

2004, there existed a set of core values; correct?

A        Correct.

Q        Are you familiar with the core values?

A        It's been years.  I can probably recite one or two lines in it, but it's been a few years, yes.

MR. DIAMANTATOS:  Your Honor, permission to approach the bench -- the witness.

THE COURT:  What is it that you would like to do?

MR. DIAMANTATOS:  Defense exhibit, Your Honor.

THE COURT:  What's the exhibit?

MR. DIAMANTATOS:  Exhibit 601.

(Marked for identification Exhibit No. 601.)

THE COURT:  Do you have a copy?

MR. DIAMANTATOS:  Yes, Your Honor.

THE COURT:  If you'll provide that to the clerk, please.

MR. DIAMANTATOS:  A copy for opposing counsel as well.

MR. FOX:  Your Honor, I believe this is a different exhibit.  I believe you just said 601, and this is 302 on it.  I think he just said 601.

MR. DIAMANTATOS:  It should be 601.  I will alter it on the exhibit.

THE COURT:  601 is before the witness.

Q        BY MR. DIAMANTATOS:  Mr. Olmsted, if you could

**UNITED STATES DISTRICT COURT**

638

take a moment to review the document that has been handed to
you.  Take a moment, and let us know if you recognize it.

A       (Witness reviewed exhibit.)

Yes.  I recognize it.

Q       Are you familiar with the core values that were
in place in 2006 and beyond?

A       Yes.

Q       Were they in place before that?

What's your understanding of how long they were
in place, this particular set of core values?

A       At least 10, 12 years.

Q       Does this appear to be a true and accurate copy
of the core values that were in place?

A       Yes, Your Honor.

MR. DIAMANTATOS:  Your Honor, the defense would
move for the admission of Defense Exhibit 601.

MR. FOX:  At this point we have a relevance
objection to this.

THE COURT:  Is there anything else you want to
cover with him other than this?

MR. DIAMANTATOS:  Yes, Your Honor.

THE COURT:  Why don't you move on to that, and
then we'll take that up.

MR. DIAMANTATOS:  Yes, Your Honor.

Q       Thank you, Mr. Olmsted.

Earlier this morning you described for us interactions with Mr. Tanaka that you had; correct?

A    Correct.

Q    You described for us the -- in 2006 Dan Cruz was your supervisor; correct?

A    No.

Q    Describe for us the force packages you said you looked at, 30 incidents of use-of-force packages.

A    Yes.

Q    You brought those to the attention of your supervisor; correct?

A    Yes.

Q    And then you were told that you didn't seek relief and you went above that person; correct?

A    Correct.

Q    Ultimately it culminated into a conversation with at the time Assistant Sheriff Tanaka?

A    Eventually, yes.

Q    You indicated that the thought would be that Mr. Cruz would be promoted and that you and Mr. Cavanaugh would help Mr. Cruz become successful in his position; correct?

A    No.

MR. DIAMANTATOS:  May I have a moment, Judge?

THE COURT:  Yes.

Q    BY MR. DIAMANTATOS:  Isn't it true that, during

UNITED STATES DISTRICT COURT

640

this time period, Mr. Tanaka had made it clear to you that he was in charge of promotions?

A        Yes.  He did say that.

Q        Isn't it true that he also expressed to you that it was important for him to keep -- to know the people he was promoting?

A        Yes.

Q        And he also indicated to you that he was of the view that he one day would be sheriff and would -- would be sheriff for the next 15 years?

A        He did say that.

Q        Now, as sheriff, Sheriff Baca had a number of subordinates; correct?

A        Correct.

Q        Isn't it true, Mr. Olmsted, that you observed instances where his subordinates would purposely keep him in the dark about things?

A        Yes.

Q        Isn't it true, in your view, they would even conspire to have meetings outside of Sheriff Baca's presence?

A        Yes.

Q        And they would do that before the actual meeting with the sheriff; correct?

A        That would be in the EPC meetings, yes. Executive Planning Council.

**UNITED STATES DISTRICT COURT**

Q        Describe for us what the Executive Planning Council is, sir.

A        If I remember it correctly, they met every Wednesday, and it was all the chiefs, assistant sheriffs, undersheriff.  They would have a premeeting ahead of time to discuss the issues they were going to bring up to the sheriff.  And the subsequent meeting an hour later, the sheriff would then walk in.  And this is the same process that had been in place for -- that I know of when I was working as a sergeant for 25 years when Mr. Baca was a chief as well.

Q        Yesterday you described for the members of the jury when you -- the first time you visited the 3000 floor at Men's Central Jail, that seven or eight deputies surrounded you, and immediately that struck you as bizarre; correct?

A        Yes.  Out of place.

Q        You indicated yesterday, Mr. Olmsted, that one of the reasons that was out of place was because it meant, at a minimum, five or six of those deputies weren't doing their job; right?

A        Correct.

Q        If they're corralling around you to find out why you're there, they're not where they're supposed to be; correct?

A        Correct.

Q        You had run through for us yesterday a number of

different tasks that duties are expected -- that deputies are expected to perform; right?

A        Correct.

Q        What were some of those tasks that you described for us yesterday?

A        Safety and welfare of the inmates, ensure visitors -- family visitors they can meet.  They've got doctor's appointments, court appearances.  They've got education.  They've got chaplain services.  There's a wide variety of things that the inmates need, and that's part of the deputies' jobs.

Q        So there's different tasks that deputies are expected to perform including the safety of the inmates.

You indicated chaplain visits; correct?

A        Correct.

Q        Can you briefly describe for us what you mean by that?

A        Any time they needed to talk to a clergy member or the clergy members would be walking around freely, because we have a large cadre of volunteer clergy members as well as Sunday services, that they would help expedite or escort either the inmate to the clergy member or the clergy member to the inmate.

Q        What about education?

A        Same thing.

Q        What about any medical visits?

A        Absolutely.  Sometimes the medical visits they would get a pass like a hall pass in school, and they would walk down to the clinic themselves.

Q        Are you familiar with -- would the deputies ever behave differently if someone of your rank was around?

A        Absolutely.

Q        Are you familiar with a code 10?

A        I believe it's -- I'm not familiar with code 10, no.

Q        Is there any announcement that deputies would make over the radio to the extent a higher up --

A        It would be a 1012 Charlie.

Q        1012 Charlie.  Sorry.  Thank you.

What does 1012 Charlie mean?

A        That means captain is walking.

Q        And all of the deputies would carry some type of radio on them, or they were supposed to; correct?

A        Correct.  They're supposed to.

Q        To the extent they had that radio on them, they would be able to communicate with one another; correct?

A        Correct.

Q        One of the communications would be to indicate whenever there was a captain around; correct?

A        That was the informal process for them to, shall

I say, let them know the captain is walking.

Q    And would you observe anything, any changes in behavior once that code was announced?

A    No.  Not really.  I'd be greeted at the door maybe.  It's like we knew you were coming, so let me greet you.

Q    And would that apply for all the positions that outrank captain?

A    And below.

Q    And below?

A    Lieutenant, sergeants.

Q    So any time somebody above deputy was going to be walking the central jail, these announcements would typically be made?

A    Generally, yes.  Generally.

Q    Would they be made if Sheriff Baca ever visited Men's Central Jail?

A    Yes.

Q    What about Twin Towers?

A    Yeah.

Q    You described for us a meeting that you had with Sheriff Baca.  Now, around the time that you needed to take some time for personal events in your life, you were able to address that with Sheriff Baca; correct?

A    Yes.  Yes.

Q    And for that reason, you had face-to-face

interaction with Sheriff Baca; correct?

A       On the two times that I mentioned, yes.

Q       First -- let's take them in order.

There's an interaction with Sheriff Baca with regard to you needing to take a leave of absence; correct?

A       No.

Q       You did have to take a leave of absence from your position right before your retirement; correct?

A       Yes.

Q       And you described for us that there was an event where you had interaction with Mr. Baca, the first one that you and Mr. Fox described this morning, with regard to you approaching him to ask him to have a discussion about the force that was occurring that was troublesome.

A       Yes.

Q       Can you describe for us what type of event this was?

A       It was the initiation of a barbecue employee break area that was built at Twin Towers Correctional Facility for the welfare of the deputies at no cost to the county.

Q       Approximately how many people were in attendance?

A       Hundred I think.

Q       So it's fair to say -- sorry.

So perhaps a hundred people; correct?

A       Correct.

**UNITED STATES DISTRICT COURT**

Q       It's more of a social function?

A       Social, and it would be a hundred over a period of like two hours or something coming and going.

Q       So I think you indicated it was a barbecue.  So there was food being served to the guests that were there?

A       Yes.

Q       Any music in the background?

A       I don't recall.

Q       And you indicated that you brought the subject up with Sheriff Baca; correct?

A       Correct.

Q       I think Mr. Fox asked you, after that time period, if there was any follow-up from the -- before then that -- the Christmas meeting that you described, the next meeting, during that time period between the barbecue and the Christmas meeting, if Sheriff Baca ever reached out to you to continue that discussion; correct?

A       He asked me that, and the answer was "No."

Q       The answer was no.

Now, Mr. Olmsted, you certainly know where Sheriff Baca's office was, correct?

A       Sure.

Q       Where was that located?

A       At the time Monterey Park.

Q       And you didn't travel to Monterey Park to meet

with Sheriff Baca after the barbecue meeting and before the --

A       No.

Q       Did you contact -- you certainly had his desk number; correct?

A       I'm sorry?

Q       You had his desk phone number?

A       Oh, yeah.  Yeah.

Q       His cell phone number?

A       I might have.  Yeah.  I think so.

Q       You knew ways to get into contact with him over the phone?

A       Absolutely.

Q       Isn't it true that Sheriff Baca had pretty much an open-door accessible policy?

A       Yes.  Yes.

Q       I didn't mean to interrupt you, sir.

A       Yes.

Q       So if you wanted to get in touch with him to set up a meeting, you certainly could have done so.

A       Yes.

Q       Now, with regard to the second -- the other event that you described, the Christmas party, how many people were at that event?

A       Probably a couple hundred.  They're workers.

Q       Okay.  So these are employees that work together,

**UNITED STATES DISTRICT COURT**

maybe a hundred people?

A        Yeah.  Hundred, hundred and a half, maybe close to 200 workers packaging food baskets.

Q        So, again, food at this event?

A        Yes.

Q        Social event?

A        Yes.

Q        You indicated that you brought up to Sheriff Baca -- you brought up to Sheriff Baca the -- the purpose of that particular party, was it a one-voice event?

A        No.

Q        You brought up, once again, the issue of force, and you wanted to have a conversation with Sheriff Baca about that; correct?

A        Yes.

Q        And he indicated to you, "Not now.  We should have this discussion later"; correct?

A        Yeah.  Later that day.

Q        You indicated on direct examination that Sheriff Baca never followed up with you, according to you; correct?

A        Correct.

Q        Did you ever reach out to Sheriff Baca later that day or any point thereafter?

A        No.  He left, and he was gone.

**UNITED STATES DISTRICT COURT**

Q        Isn't it true that Sheriff Baca had suggested to you, Mr. Olmsted, that -- at this point, by the way, you're in retirement; correct?

A        Correct.

Q        Many years of service, and at this point you've retired from the sheriff's department.

A        Correct.

Q        Isn't it true that Sheriff Baca offered to you a post-retirement position or first six-month period where you would come back and serve again as a commander in the jails?

MR. FOX:  Objection, Your Honor.  Motion in limine.

THE COURT:  Sustained.

Q        BY MR. DIAMANTATOS:  On direct examination this morning, you described some type of position that Sheriff Baca offered you.

Is that right, sir?

MR. FOX:  Objection, Your Honor.

THE COURT:  Sustained.

Q        BY MR. DIAMANTATOS:  Now, Mr. Olmsted, you were still -- in 2011, I think you said you retired in September.  I'm sorry.  In 2010; correct?

A        November of '10.

Q        And up until that point, you had a supervisory position over the Men's Central Jail; correct?

**UNITED STATES DISTRICT COURT**

650

A    Correct.

Q    You had that supervisory position for a number of years; right?

A    Correct.

Q    You, yourself, sir, have never been charged with any type of offense stemming from the abuses that occurred in that prison; correct?

A    Correct.

Q    There are certain things in the jail system that are considered contraband; is that right?

A    Correct.

Q    What are some of those items, sir?

A    Knives, guns, drugs, stuff like that.

Q    What about cigarettes?

A    Yes.

Q    Inmates are not allowed to have that; correct?

A    Correct.

Q    What about outside food, in other words, food that isn't served as part of the prison system?

A    Yeah.  You're generally correct, yes.

Q    What about cellular phones?

A    Correct.

Q    Inmates are not allowed to have those; correct?

A    Correct.

Q    Now, there is a phone system in place to the

**UNITED STATES DISTRICT COURT**

extent inmates do want to make calls to the outside; correct?

A    Yes.

Q    And that's a monitored phone system; right?

A    Yes.

Q    Where there's a clear indication that these calls would be recorded.

A    I'm not sure if that's on all the phones or just designated areas, but we do have that capability.

Q    Isn't it true, Mr. Olmsted, that one of the reasons cellular phones are contraband in the hands of inmates is because it would be unmonitored contact with the outside?

MR. FOX:  Objection.  Beyond the scope.

THE COURT:  Sustained.

MR. DIAMANTATOS:  May I have a moment, Judge?

THE COURT:  Yes.

Q    BY MR. DIAMANTATOS:  The conversation on direct examination that you described having with Sheriff Baca in July of 2010 where you told him you felt he was being undermine by Sheriff Tanaka --

A    Yes.

Q    -- that was your view that Mr. Tanaka was doing things that weren't to the advantage of Mr. Baca; correct?

A    Yes.

Q    And you were concerned about that?

A    Yes.

UNITED STATES DISTRICT COURT

MR. DIAMANTATOS:  May I have a moment, Your Honor?

THE COURT:  Yes.

Q      BY MR. DIAMANTATOS:  Mr. Olmsted, you, again, raised your concerns in July of 2011 with Sheriff Baca including the Tanaka concerns and others.

Are you aware of any response that Sheriff Baca had to the concerns you addressed with him?

MR. FOX:  Objection.  Vague.

THE COURT:  Sustained.

Q      BY MR. DIAMANTATOS:  This meeting in July of 2011, this is one that Sheriff Baca freely took with you?

A      Yes.  He initiated.

Q      He initiated it; correct?

A      Correct.

Q      And you went down and met with him; correct?

A      Right.

Q      In his office?

A      Correct.

Q      As the sheriff, aside from the responsibilities of the facilities, there's other responsibilities that sheriffs have; correct?

A      Yes.

Q      Let me ask a more specific question.

There's seven facilities as far as where inmates

653

are housed; correct?

A    Jail custody facilities?

Q    Yes.

A    Yes.

Q    So those include the Twin Towers that we've discussed; correct?

A    Correct.

Q    Men's Central Jail.

A    Correct.

Q    And others.

A    Yes.

Q    There is also a policing function as far as what the sheriff is responsible for; correct?

A    Correct.

Q    There's about 23 patrol stations around the time you retired?

A    I believe it was.  I think that's what it was.

Q    And also, the sheriff's department has police functions where there's cities that don't have their own police force, they hire essentially the police department to be their police; correct?

A    Correct.  Contract cities.

Q    And all those fall under the sheriff's umbrella; correct?

A    Correct.

UNITED STATES DISTRICT COURT

654

MR. DIAMANTATOS:  No further questions, Your Honor.

THE COURT:  Redirect.

**REDIRECT EXAMINATION**

BY MR. FOX:

Q      Mr. Olmsted, on cross-examination you were asked about the 1012 Charlie announcements where deputies would announce when there was a supervisor on the floor; is that correct?

A      Correct.

Q      Were you still able to observe that there were problems with force in Men's Central Jail despite the 1012 Charlie announcements?

A      Absolutely.

Q      How were you able to do that?

A      There's a -- as I was stating earlier, a good cadre of deputies who knew or observed the wrongdoing but may have been afraid to speak up.  So I was barraged of information daily of various people saying look into this, look into that.

Q      Were you also able to look at paperwork and determine there were problems at Men's Central Jail?

A      Absolutely.

Q      And you were asked on cross-examination about whether there were premeetings before the group would go meet with Mr. Baca on occasion; is that right?

UNITED STATES DISTRICT COURT

A       Correct.

Q       Did you keep Mr. Baca in the dark about all of these issues that you talked about today?

A       No.  I was telling everyone up the chain of command that there is an issue.  I love the department, and I needed to protect the deputies and the inmates, and I wanted everybody to know.  That's why I went outside the organization too.

Q       And in 2010 and 2011, let's say, specifically between September 10th and July, 2011, did you tell Mr. Baca about these issues?

A       What were the dates again?

Q       Between September, 2010, and July of 2011, did you tell Mr. Baca about these issues?

A       Yes.  The three incidents that I mentioned, yes.

Q       Now, on cross-examination you were asked whether you've ever been charged with an offense.  Have you ever covered up the abuse that you were aware of in Men's Central Jail?

A       Absolutely not.

Q       Have you ever hid an informant from the Federal Government?

A       No.  No.

MR. DIAMANTATOS:  Objection, Your Honor.

THE COURT:  Overruled.

UNITED STATES DISTRICT COURT

Q        BY MR. FOX:  Have you ever tampered with any witnesses in a federal investigation?

A        No.  Never.

Q        Have you ever sent deputies to a federal agent's house who was attempting to investigate the department?

A        No.

MR. DIAMANTATOS:  Objection, Your Honor.

THE COURT:  Overruled.  You opened the door.

MR. FOX:  Thank you, Your Honor.  No further questions.

THE COURT:  Anything else?

MR. DIAMANTATOS:  No, Your Honor.

THE COURT:  Call your next witness.

MR. JAUREGUI:  The United States calls Sergeant Robert Bayes.

THE CLERK:  Stand here and raise your right hand.

Do you solemnly state that the testimony you may give in the cause now pending before this court shall be the truth, the whole truth, and nothing but the truth, so help you god?

THE WITNESS:  Yes, I do.

THE CLERK:  Please have a seat.

Would you please state your full name and spell your last name for the record.

THE WITNESS:  Robert Bayes, B-a-y-e-s.

**UNITED STATES DISTRICT COURT**

THE CLERK:  Thank you.

**ROBERT BAYES,**

**GOVERNMENT'S WITNESS, SWORN:**

**DIRECT EXAMINATION**

BY MR. JAUREGUI:

Q      Mr. Bayes, what do you do for a living?

A      I am a sergeant with the Los Angeles County Sheriff's Department.

Q      How long have you worked for the sheriff's department?

A      26 years.

Q      In August of 2011, what was your position or rank within the department?

A      I was a detective working the Jail Investigation Unit.

Q      What is the Jail Investigation Unit?

A      Jail Investigation Unit is one component of four in the Custody Investigative Services Unit, and we were detectives that were assigned cases of criminal matters that happen inside the jail.

Q      And who did you investigate?

A      I investigated primarily inmates.

Q      Who was in charge of the CISU?

A      Lieutenant Greg Thompson.

Q      Did Lieutenant Thompson also oversee the other

UNITED STATES DISTRICT COURT

components that you mentioned that there were four components in CISU?

A      Yes.

Q      Was OSJ one of those components?

A      Yes.

Q      What was OSJ?

A      Operation Safe Jail.

Q      In your role as investigator in the Jail Investigations Unit, what did you do generally?

A      We were assigned cases that were generated inside the jails, anything from simple petty theft, vandalism, up to attempted murder.  Once we are assigned those cases, we work those to conclusion, interviewing inmates, interviewing deputy victims or inmate victims, gathering that total to write a report and take it to a city attorney or district attorney for filing purposes.

Q      Did you make charging recommendations?

A      Yes.

Q      Did there come a time, Sergeant Bayes, when you came to be involved in an investigation involving somebody named Anthony Brown?

A      Yes.

Q      And was Anthony Brown an inmate in Men's Central Jail?

A      Yes, he was.

**UNITED STATES DISTRICT COURT**

Q       Approximately when was it that you became involved in that investigation?

A       August 8, 2011.

Q       What happened on that day?

A       I received a call when I was inside my office from Sergeant Orpe, O-r-p-e, a Men's Central Jail sergeant, that a cell phone had been recovered by deputies working in Anthony Brown's property.

Q       Initially what steps did you take?

A       The deputies brought me the phone to my office. I took down the pertinent information, serial numbers from the cell phone, so I could write a court order to fax that to Sprint Nextel to obtain the information that was on the phone.

Q       Did you interview Anthony Brown?

A       Yes, I did.

Q       Approximately when was that?

A       August 16, 2011.

Q       How was that interview arranged?

A       When I arrived at work on August 16, I read an e-mail from Deputy Colon, C-o-l-o-n, and he had interviewed Anthony Brown the night prior. Deputy Colon was walking by my office and said he was going to go reinterview Anthony Brown and asked me if I would like to go with him.

Q       And do you know, Sergeant Bayes, where Deputy Colon worked?

A        He was working OSJ or Operation Safe Jail.

Q        Did you participate in the interview with him on the 16th?

A        Yes, I did.

Q        During that interview, Sergeant Bayes, did you come to find out -- what did you find out in that interview, generally?

A        Me and Deputy Colon and Detective Villa-Gomez, V-i-l-l-a-G-o-m-e-z, interviewed Anthony Brown for approximately an hour.  Deputy Colon started the interview, and Anthony Brown didn't seem to be too responsive to him.  And so I took over and let Anthony Brown know that I was handling the cell phone case, and he over the hour opened up and said that a deputy brought in a cell phone to his contact --
Anthony Brown's contact of C.J., and they met on the streets, and C.J. would give him the cell phone and/or narcotics to bring into the jail.  And he paid the deputy $4,000.

Q        Sergeant Bayes, you said earlier you make charging recommendations.  Did you say anything to Anthony Brown about what you would recommend how this case would be charged?

A        Yes, I did.

Q        What did you say?

A        I told Anthony Brown, since he was in custody at that time looking at several life sentences or 400 plus years

**UNITED STATES DISTRICT COURT**

for armed robbery, I told him that I was not going to file possession of a cell phone due to it was a misdemeanor and the most I could get would be 30 days from the city attorney.

Q    Why did you tell him that?

A    I told him that to see -- relax his mind and maybe that he would free up his talking knowing he wouldn't have any additional charge on him.

Q    Did you continue to investigate the cell phone incident after that day?

A    Yes.

Q    I want to direct your attention to August 18, 2011.  Did you receive any correspondence from your lieutenant on that day?

A    Yes.

Q    Okay.  In front of you, Sergeant, is a Government exhibit binder, and I want to direct your attention to Government Exhibit No. 14 which is in evidence, I believe.

Your Honor, this exhibit is in evidence.  I request permission to publish the exhibit.

THE COURT:  You don't need to ask for permission.

MR. JAUREGUI:  Thank you, Your Honor.

Your Honor, we just need a second to connect this.  It wasn't working from counsel's table.  My apologies.

Q    Okay, Sergeant, do you recognize this exhibit?

A    Yes, I do.

Q       What is it?

A       It's an e-mail that was sent from Gregory Thompson, my lieutenant, on Thursday, August 18, 2011, at 1:31 p.m. to myself.

Q       Could you please read the e-mail.

A       "Bob, I had to change plans.  Anthony Brown will be shipped to CDC on the next available bus.  Until then, he is in 1750 and no phones, no visits, especially from outside LE without my approval."

Q       Do you know, Sergeant Bayes, when Mr. Thompson says he had to change plans, did you know what his plans were?

A       No, I did not.

Q       The next sentence says, "Anthony Brown will be shipped to CDC."  What is "CDC"?

A       CDC is California Department of Corrections.

Q       Next line says, "Until then, he is in 1750." What is "1750"?

A       1750 is a module where inmates are held in Men's Central Jail.  1750 encompasses the noteworthy or celebrities or high status inmates and are usually in single-man cells.

Q       And the e-mail continues, "And no phones, no visits, especially from outside LE without my approval."  Did you have an understanding of what "LE" meant?

A       Yes.  LE is law enforcement.

UNITED STATES DISTRICT COURT

Q        Now, Sergeant Bayes, directing your attention to August 23rd, by that date had you written your report on the Anthony Brown cell phone incident?

A        No.

Q        Did anything happen that day to cause you to begin writing your report?

A        My lieutenant, Greg Thompson, called me and notified me that the report will now be written as a conspiracy.

Q        And was that a change from what you had intended to write?

A        Yes.

Q        What did you intend to write?

A        Possession of a cell phone in a jail facility.

Q        And do you know, Sergeant Bayes, whether that crime is a felony or a misdemeanor?

A        Which one, sir?

Q        Possession of a cell phone.

A        That is a misdemeanor.

Q        And conspiracy, do you know whether that crime is a felony or a misdemeanor?

A        That's a felony.

Q        What else, if anything, did Lieutenant Thompson tell you about writing this up as a conspiracy?

A        He gave me two -- well, it's not even names.

**UNITED STATES DISTRICT COURT**

It's a male and a female voice as conspirators with Anthony Brown.

Q        Did he tell you anything more?

A        No.

Q        Did you start writing on August 23rd?

A        No.

Q        By August 26th, had you started writing?

A        Yes.

Q        What happened on August 26th?

A        August 26th I received a call from Lieutenant Greg Thompson, and he sounded as if he was in a hurry or urgent, and he asked me to write the conspiracy report and bring it over to him as soon as possible.

Q        And did you proceed to do that?

A        Yes, I did.

Q        What did you put in that report?

A        I put in what knowledge I had for the investigation including the unknown name of male and female voices, walked over to Twin Towers Correctional Facility where his office was, and gave him my report.

Q        What happened next?

A        He read my report, and he said it was a piece of shit, and he said that "I want you to go next door to Sergeant Gutierrez's office," which was adjacent to him.  And he said, "I will start -- I want you to write a report, and I'm

**UNITED STATES DISTRICT COURT**

going to send you the information via e-mail.  I want you to cut and paste exactly what I give you," and I did.

Q        And what kind of information was coming to you via e-mail from Lieutenant Thompson?

A        The information that he was sending me was a timeline that apparently he was writing of all the interactions they had with Anthony Brown and what they had been doing.

Q        You just said "they."  Who is "they"?

A        That would be Lieutenant Greg Thompson, Deputy Mickey Manzo, M-a-n-z-o, Deputy Gerard Smith, G-e-r-a-r-d S-m-i-t-h.

Q        And had you seen this timeline before?

A        I had not.

Q        Did you know what these individuals were doing in connection with the Anthony Brown cell phone investigation?

A        Just assisting Lieutenant Thompson.

Q        Did you know the details in that timeline?

A        No.

Q        Did he provide you names?

A        Yes.  He actually -- as the conspirators, he gave me three names that were FBI agents.

Q        What were those names?

A        Dave Dahle, D-a-h-l-e, Leah Marx, and William Plymptom, P-l-m-p-t-o-m {sic}.

Q        What did you do next, Sergeant Bayes?

**UNITED STATES DISTRICT COURT**

A        I finished the report, sent it back over -- actually, printed it, gave it to Lieutenant Thompson.  He read it.  He was satisfied, and he then went to the Sheriff's Headquarters Bureau to have a meeting with the undersheriff, ICIB, and others.

Q        Let me backtrack a little bit.

When he gave you the names of the three FBI agents, did you know anything about their involvement in the Anthony Brown cell phone incident?

A        No.

Q        Where was the meeting that Lieutenant Thompson was going to?

A        To the Sheriff's Headquarters Bureau.

Q        Did you accompany him to that -- to Sheriff's Headquarters?

A        Yes.  He asked me to follow in my personal car and go to the meeting or outside the meeting in case he had any questions.

Q        And did you do that?

A        Yes.

Q        Where did you go?

A        I went to the fourth floor Sheriff's Headquarters Bureau and waited in a lobby that's outside the sheriff's office.

Q        And what happened next?

A        While sitting there, I was there about two-and-a-half hours.  During that time period, Sheriff Baca came from my left walking to my right.  He stopped.  I got up.  He shook my hand, and he continued to my right and out of view.

Q        And do you -- would you recognize Sheriff Baca if you saw him today, sir?

A        Yes.

Q        Do you see him in the courtroom?

A        Yes.  He's the gentleman on the left second -- or the brown suit.  It looks like gold tie.

MR. HOCHMAN:  So stipulated, Your Honor.

THE COURT:  The record will reflect the witness has identified the defendant.

Q        BY MR. JAUREGUI:  What, Sergeant Bayes, happened after that?

A        To my right appeared to be a meeting room, and the door was closed.  The door flew open, and Undersheriff Tanaka came barging out irate and screaming "Mother fuck.  Fuck.  Shit" and other curse words as he went from my right to his left -- to my left.

Q        Then what happened?

A        Shortly thereafter, Lieutenant Thompson came out and came to me and asked me why I was there.

Q        What did you say?

A        I told him that you had asked me to come here in

case you had questions.  He said, "I don't need you" and "Go home."

Q      Did you continue working on the Anthony Brown case after that day?

A      Yes.

Q      Approximately how much longer did you work the case?

A      Until -- I closed the case on September 1st, 2011.

Q      Why did you do that?

A      I had completed my investigation of the case, and the case was being transferred to ICIB or Internal Criminal Investigation Bureau per Lieutenant Thompson.

Q      Did Lieutenant Thompson ask you to give him your file?

A      Yes.

Q      Did you do that?

A      Yes.

MR. JAUREGUI:  One moment, Your Honor.

No further questions, Your Honor.

THE COURT:  All right.  Cross-examination.

MR. HOCHMAN:  Yes, Your Honor.

**CROSS-EXAMINATION**

BY MR. HOCHMAN:

Q      Sergeant Bayes, let me take you back to that last

episode that you just were describing.

If I understand you correctly, August 26, 2011, Lieutenant Thompson asked you to go down to the sheriff's department; correct?

A        Sheriff's Headquarters Bureau, yes.

Q        And you go down there; correct?

A        Yes.

Q        And you go to the fourth floor conference room where he asked you to go?

A        Yes.

Q        And you sit outside the lobby for two-and-a-half hours waiting to be called; is that correct?

A        Correct.

Q        And Lieutenant Thompson is in a meeting with Undersheriff Tanaka; is that correct?

A        Correct.

Q        And at some point you see Sheriff Baca come to you from a different direction, greet you, and shake your hand; is that correct?

A        Correct.

Q        And then Sheriff Baca leaves to the opposite direction he had started; correct?

A        Yes.

Q        And he never enters the meeting with Undersheriff Tanaka and Lieutenant Thompson; correct?

**UNITED STATES DISTRICT COURT**

A        I never saw him enter the meeting, no.

Q        And after he's gone, that's when you hear Undersheriff Tanaka come out of the room screaming profanities; is that correct?

A        Correct.

Q        Now, you started -- you said you were with the sheriff's department -- I believe in 2011 it had been 23 years before that; is that correct?

A        Yes.

Q        About 1988?

A        1990.

Q        1990.  And in 1990 -- from 1990 until August, 2011, you had that one encounter on August 26 with Sheriff Baca -- is that correct? -- and then you had -- I'll get to a second encounter in a moment.

A        Yes.

Q        So one encounter is on August 26, and there was a prior encounter, I believe, in 2006 at a sergeant school ceremony that Sheriff Baca spoke at that you attended; correct?

A        That was actually January, 2014.

Q        2014.

          Was there also a 2006 encounter that you had with Sheriff Baca?

A        Yes.

Q        So you have then three encounters with

Sheriff Baca.  One is in 2006, one is on August 26, 2011, and then one is in 2014; is that correct?

A       Yes.

Q       And aside from those three times where you actually physically met with Sheriff Baca, you never spoke to him on the telephone; is that correct?

A       That's correct.

Q       And you never sent or received an e-mail from him; is that correct?

A       Correct.

Q       Now, as part of your duties in the Jail Investigative Unit at Men's Central Jail, you deal with a variety of situations that involve contraband; is that correct?

A       Yes.

Q       And contraband are items that are strictly prohibited at Men's Central Jail; is that correct?

A       Throughout all the jails, yes.

Q       Including Men's Central Jail.

A       Yes.

Q       And that would be drugs.  Drugs are strictly prohibited; is that correct?

A       Yes.

Q       And if you have drugs on your possession, that would actually be a felony, wouldn't it?

A       Yes.

**UNITED STATES DISTRICT COURT**

Q        And if you were dealing drugs, that also would be a felony; correct?

A        Yes.

Q        And you said outside food inside the jail would be strictly prohibited; is that correct?

A        Correct.

Q        Cigarettes would be prohibited?

A        Yes.

Q        And a lighter, you know one of the lighters to light up a cigarette, that would also be strictly prohibited contraband; correct?

A        Yes.

Q        Pornography would be strictly prohibited; is that correct?

A        Yes.

Q        And having a cell phone inside Men's Central Jail would be strictly prohibited; correct?

A        Correct.

Q        That would be contraband, wouldn't it?

A        Yes.

Q        Because when an inmate makes a call from the jail, they do it through something called the inmate telephone monitoring system; correct?

A        Correct.

Q        And that's all ITMS, Inmate Telephone Monitoring

**UNITED STATES DISTRICT COURT**

System; correct?

A       Correct.

Q       And that system basically records the call as the inmate is making it; correct?

A       Yes.

Q       And it actually registers the phone number that the inmate is calling; is that correct?

A       Yes.

Q       Now, the danger of a cell phone is that it can actually bypass that system; isn't that right?

A       Yes.

Q       And a cell phone can be as dangerous as, like, a weapon; isn't that correct?

A       Yes.

Q       And a cell phone could be used for a variety of things inside a jail.  What would be some of those things a cell phone could be used for?

            MR. JAUREGUI:  Your Honor, at this point I would object.  Speculation.  Beyond the scope.

            THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  A moment ago, when you said a cell phone can be as dangerous as a weapon, what did you mean?

A       Well, the cell phone in a jail, a person could make phone calls to the outside, gang members to do hits on witnesses of their murder trials.  They could order up

674

narcotics, order up weapons to be brought into the jail, plan escapes.

Q      And a cell phone in a jail situation is a fairly rare occasion -- rare occurrence; isn't that correct?

A      Yes.

Q      In the seven years that you were dealing with the Men's Central Jail in that capacity, about how often would you find an inmate had a contraband cell phone inside the jail?

A      Maybe once a year.

Q      And in the 23 -- in your entire career, your entire career lasts up to now about 26 years; is that correct?

A      Yes.

Q      How many times had you encountered a situation where the FBI had smuggled a cell phone into Men's Central Jail?

MR. JAUREGUI:  Same objection, Your Honor.

THE COURT:  Sustained.

Q      BY MR. HOCHMAN:  So on August 8, 2011, that's when you find out that Anthony Brown was found with a cell phone; is that correct?

A      Yes.

Q      And that cell phone was found, I believe, inside of a potato chip bag; is that correct?

A      Correct.

Q      I think it was actually inside of a latex glove

UNITED STATES DISTRICT COURT

inside of a Doritos bag if I'm not mistaken.

Am I correct?

A        Yes.

Q        When you also found that cell phone, you went ahead and learned what was inside the cell phone.  In other words, whether or not there were any photos, texts, cell phone calls that had been made; is that correct?

A        Yes.

Q        And with respect to the photos, what type of photos did you learn were on the cell phone?

A        Narcotics.  There was two photos.  One had narcotics and money; the other one had narcotics.

Q        And what kind of narcotics did you see in a photograph of the cell phone?

A        There were various narcotics and one photo that looked like balloons of heroin and baggies of methamphetamine, baggies of -- small baggies of cocaine and marijuana.

Q        And these were the photos of all these type of drugs that were on Anthony Brown's cell phone; correct?

A        Yes.

Q        And with respect to cell phone numbers dialed, you were able to determine that the cell phone had dialed certain numbers?

A        Yes.

Q        Do you recall which numbers or how many numbers

had been dialed?

A        There was one number dialed.

Q        Do you know if that number came back to a preprogrammed name in the cell phone?

A        No.

Q        Would it refresh your recollection to see a phone examination record on or about August 8, 2011, of the phone?

A        Yes.

MR. HOCHMAN:  May I have a moment, Your Honor?

THE COURT:  Yes.

MR. HOCHMAN:  Your Honor, may I approach the witness with what has been marked as Defense Exhibit 737?  I'll give a copy to the Government as well.

THE COURT:  Approach the clerk.

MR. HOCHMAN:  I'm sorry.  Approach the clerk. Thank you, Your Honor.

(Marked for identification Exhibit No. 737.)

THE COURT:  Is there a particular page you want to direct him to?

MR. HOCHMAN:  Yes, Your Honor.  If he can look at page 2 of 4, the second page of the exhibit.

THE COURT:  Just read that to yourself, sir.

THE WITNESS:  My memory has been refreshed.

Q        BY MR. HOCHMAN:  Were there certain names that were listed on the cell phone that came back to certain numbers

**UNITED STATES DISTRICT COURT**

that were recovered from the cell phone?

THE COURT:  Excuse me, counsel.  That wasn't the question that he was refreshed on.

MR. HOCHMAN:  Then, Your Honor, may I try the question again?

THE COURT:  Okay.

MR. HOCHMAN:  Thank you.

Q    I believe the question -- if not, I'll just make this a new question.  In fact, it would probably be easier, Your Honor, just to make it a new question.

With respect to the cell phone, were you aware of any names that were in the cell phone related to particular numbers that were dialed by the cell phone?

A    Yes.

Q    And what was the name that you were -- what was the name that you were aware of?

A    C.J.

Q    And were two calls made to C.J. by the phone that was recovered?

THE COURT:  Excuse me, counsel.  Sorry.  Go ahead.  You can answer that.

THE WITNESS:  Yes.

Q    BY MR. HOCHMAN:  And were text messages --

THE COURT:  Let's go to sidebar.

(The following proceedings were held at sidebar:)

**UNITED STATES DISTRICT COURT**

THE COURT:  It appears as though, at least from my vantage point, you're reading from a document that hasn't been offered, and the jury may infer that you're reading from a document that hasn't been offered.  So if you want to ask him questions, that's fine.  But until that document is admitted, I'm not sure you can read from it.

MR. HOCHMAN:  Sure.  This document is an LASD-produced document.  I believe the LASD custodians are the next in line that I was going to authenticate it.  Assuming that the -- if the Government is okay, I would move it for admission now unless they're going to object to the authentication because the LASD custodian is going to authenticate it.

And, Your Honor, I believe I also can have -- I believe the date on this document at the bottom is August 8, 2008, the day that the phone was found.  So I believe this witness will also say he saw this document on or about August 8, 2011.

THE COURT:  You know more than I do.  I don't know what he's going to say.

MR. FOX:  Your Honor, we offered to stipulate to a number of documents, and it was -- the defense did not want to stipulate to the authenticity.  I've told them today that we have no objection to stipulating to the authenticity.

We haven't been able to compare this to what was

produced to us.  I would like to have the opportunity to compare to make sure it is a complete document, and I'm not sure if this is the right person to lay that foundation.  If it is and he can lay the foundation, we have no objection, and we won't have an objection in the future if we go back and see this is the document that was produced to us.  I know he's asking these questions in good faith, but I would still like to do our due diligence and make sure this is the correct document.

MR. HOCHMAN:  And, again, for the record, I received this document not from the sheriffs --

THE COURT:  It doesn't matter, counsel.  If he's the right witness, that's fine.  If you want to stipulate, that's fine.  So stop reading from it.

MR. HOCHMAN:  Thank you, Your Honor.

(The following proceedings were held in open court in the presence of the jury:)

Q    BY MR. HOCHMAN:  Mr. Bayes, did you receive this document on or about August 8, 2011, and towards that -- I would reference you to the bottom right-hand corner of the document.

A    Yes.

MR. HOCHMAN:  Your Honor, I'd move to admit Defense Exhibit 737.

THE COURT:  Any objection?

MR. JAUREGUI:  No, Your Honor.  No objection.

THE COURT:  It will be received.

MR. HOCHMAN:  Thank you, Your Honor.

(Received into evidence Exhibit No. 737.)

MR. HOCHMAN:  I'm going to switch to the ELMO screen, Your Honor.

Q    Sergeant Bayes, I'll draw your attention to the second page of the document.  The middle of the document, it has phone numbers on the left.  Do you see that, 213-278-4608?  Do you see that?

A    Yes.

Q    And then the name listed next to it is C.J.?

A    Yes.

Q    It says, "Incoming call."  That would be an incoming call into the cell phone.

Would that be correct?

A    Yes.

Q    And then there is a free -- the second item listed on that page talks about some free message at boostmobile.com.

Do you see that?

A    Yes.

Q    And it references on the far right -- it's a text message, isn't it?

A    Yes.

UNITED STATES DISTRICT COURT

Q       It says it's actually an incoming text message; is that right?

A       Yes.

Q       It's an incoming text message from Free MSG at boostmobile.com.  It lists an account pin number of 4174; is that correct?

A       Yes.

Q       And then the third item on that chart, again, lists a No. 213-271-4608 for C.J.

Do you see that?

A       Yes.

Q       And that time it is listed as an outgoing call; is that right?

A       Correct.

Q       And then there's actually -- we're now going -- I'm sorry.  Outgoing text.  And there's actually a -- the words of the text that were found; is that correct?

A       Yes.

Q       And the words of the text are, "When you meet due today, can you give him an extra battery charger and earbuds to give to me?  I will find a way to charge myself.  Dude left me with phone but no charger for three days.  No good."

Do you see that?

A       Yes.

Q       And then the fourth message is another text from

UNITED STATES DISTRICT COURT

Free Message at boostmobile.com; is that correct?

A       Yes.

Q       And this was an outgoing text from that phone to the boostmobile.com e-mail address; is that correct?

A       Yes.

Q       And it says, "How do I download albums?"

Do you see that?

A       Yes.

Q       If you can turn to the next page, and this next page talks about phone outgoing call list.  So these are the outgoing calls that were made by the cell phone; is that correct?

A       Yes.

Q       And there appear to be ten outgoing phone calls that were made from August 4th, 2011, to August 8, 2011; is that correct?

A       Yes.

Q       And when you found the phone on August 8, 2011, these were all the calls that you were able to retrieve from the phone calls basically for the prior four days; is that correct?

A       Yes.

Q       And do you -- were you able to retrieve any phone calls before August 4, 2011?

A       No.

Q      So if a phone call had actually been deleted from the phone, would that be one of the reasons why you would not be able to retrieve it, if you know?

A      I would not know why I couldn't retrieve them. It appears that the activity was from 8/4/2011 to 8/8/2011.

Q      Now, at some point did you actually subpoena the phone records from Sprint Mobile?

A      Yes.

MR. HOCHMAN:  Your Honor, may I approach the clerk with what's been marked as Defense Exhibit 529?

THE COURT:  Yes.

(Marked for identification Exhibit No. 529.)

MR. HOCHMAN:  I'll give the Government a copy of 529.

THE COURT:  Do you have any other exhibits for this witness?

MR. HOCHMAN:  One more, Your Honor.  It will be Defense Exhibit 528, Your Honor.

May I approach the clerk?

THE COURT:  Yes.

(Marked for identification Exhibit No. 528.)

Q      BY MR. HOCHMAN:  I'd like to start with what's been marked as Defense Exhibit 529.  At some point in your --

MR. JAUREGUI:  Your Honor, we don't know which one is 529.

**UNITED STATES DISTRICT COURT**

684

MR. HOCHMAN:  I'm sorry.

Q       Do you have Defense Exhibit 529 before you?

A       Yes.

Q       And you said that you worked at the Jail Investigations Unit, the Los Angeles County Sheriff's Department Men's Central Jail; is that correct?

A       Correct.

Q       Was it at 441 Bauchet Street, Los Angeles, California 90012 with the phone number of 213-974-0085?

A       Yes.

Q       And do you recognize the fax cover sheet that are part of Defense Exhibit 529?

A       Yes.

Q       What are those fax cover sheets?

A       Fax cover sheet that I would use to send any type of fax transmission.

Q       And would it have been part of your normal investigation of a cell phone to send a request to the company, the cell phone company, that you determined was the provider of the cell service in order to determine what numbers were dialed by the cell phone?

A       Yes.

Q       Did you follow that normal practice in connection with the Anthony Brown cell phone?

A       Yes.

UNITED STATES DISTRICT COURT

685

Q       As part of making a request to get the numbers, you actually have to go to the Court first in order to get a court order to then transmit to the cell phone company in order for them to produce the numbers; correct?

A       Yes.

Q       And you did that in this case with Anthony Brown. You went ahead and got a court order for the phone number and serial number of the Anthony Brown phone; is that correct?

A       Yes.

Q       And you then transmitted, it looks like twice, this court order to the Sprint Nextel Company in order to retrieve the phone records for that phone number; correct?

A       There was two separate court orders, yes, that I faxed to Sprint Nextel.

Q       And at some point -- I'll direct your attention -- actually, if you could look through the rest of Exhibit 529 and confirm whether or not you recognize this as the information in the court orders you faxed to Sprint Nextel on or about August 17, 2001, and August 9, 2011.

A       Yes.

MR. HOCHMAN:  Your Honor, I'd seek to admit and -- move to admit Defense Exhibit 529.

THE COURT:  Any objection?

MR. JAUREGUI:  No objection, Your Honor.

THE COURT:  It will be received.

**UNITED STATES DISTRICT COURT**

(Received into evidence Exhibit No. 529.)

Q     BY MR. HOCHMAN:  Now, if you could turn to Defense Exhibit 528.  Do you recognize your name Robert Bayes on Defense Exhibit 528?

A     Yes.

Q     And is that your address, Los Angeles County Sheriff's Department, 441 Bauchet Street, Los Angeles, California?

A     Yes.

Q     And the date on this is 8/12/2011; is that correct?

A     Correct.

Q     And it's from the Sprint subpoena compliance people in connection with the Anthony Brown cell phone number; correct?

A     Correct.

MR. HOCHMAN:  Your Honor, I'd seek to move Defense Exhibit 528 into evidence.

MR. JAUREGUI:  No objection, Your Honor.

THE COURT:  It will be received.

(Received into evidence Exhibit No. 528.)

Q     BY MR. HOCHMAN:  If you just go to the back, I won't publish it at this point.  If you just look at the last couple pages of this exhibit, this exhibit has all the cell phone numbers either going into the phone or going out of the

UNITED STATES DISTRICT COURT

Anthony Brown phone going back from July 26, 2011, all the way to August 8, 2011; is that correct?

A        Correct.

Q        And that's the date range that you requested the Sprint phone company to provide you; is that correct?

A        Yes.

Q        Now, with respect to the August 16 interview that you had with Anthony Brown, I'd like to go into that for one moment.

If I understood you correctly, Anthony Brown has a cell phone found on August 8; is that correct?

A        Correct.

Q        And that's approximately when you get involved with the investigation; is that correct?

A        Correct.

Q        And then the first time you speak with Anthony Brown is on August 16; is that right?

A        Correct.

Q        And you learn that other deputies had actually spoken to Anthony Brown, I believe, a couple days before you did; is that correct?

A        Yes.

Q        And when you spoke with Anthony Brown, I believe you said that he told you that a deputy had agreed to bring a cell phone and narcotics to him for $4,000; is that correct?

UNITED STATES DISTRICT COURT

A        Correct.

Q        Did he identify who the deputy was?

A        No.

Q        Did he also talk about the deputy bringing him cigarettes and a lighter?

A        Yes.

Q        Did he mention anything about not only paying $4,000 for the initial cell phone to be brought to him but $2,000 for each additional package?

A        Yes.

Q        And during your interview with him on August 16, you said he mentioned a gentleman named C.J.; is that correct?

A        Yes.

Q        What did he describe or how did he describe or who did he describe C.J. to be?

A        His contact.

Q        Did he provide you any more information other than C.J. is his contact?

A        No.

Q        Did you ask?

A        Yes.

Q        And by the way, was this a voluntary interview with Anthony Brown?

A        Yes.

Q        So Anthony Brown wasn't in any way being

compelled to speak with you during that interview; is that correct?

A    Correct.

Q    And did Anthony Brown tell you that he had had the cell phone on him for about two months?

A    Yes.

Q    And did Anthony Brown say that multiple deputies were involved with smuggling contraband into the jail for him?

A    Yes.

Q    And did Anthony Brown tell you that the only way he would further cooperate with you is being declassified as a -- something called a K-10; is that correct?

A    Correct.

Q    What is a K-10?

A    K-10 is a high-power inmate that they could be a celebrity, noteworthy, a person that is an escape risk, somebody that is assaultive or high assaultive to inmates and personnel.

Q    So -- and I assume because -- well, let me ask.

Anthony Brown wasn't classified as a K-10 at that point; correct?

A    No.

Q    Anthony Brown was in Men's Central Jail about to serve a 423-year sentence; correct?

A    Yes.

Q    So by asking to be a K-10, he's asking to go from a classification that doesn't apply at all to someone about to serve a 423-year sentence into someone that would be much -- in a much -- what's the word I'm looking for? -- a much less position or less classification as a K-10; is that correct?

A    Yes.  I think I answered there on the K-10 matter, is that for August 16 or --

THE COURT:  Sir, there's no question pending.

Next question.

Q    BY MR. HOCHMAN:  Did you agree -- did you agree with Anthony Brown that you would exchange K-10 status if he gave you more information?

A    No.

MR. HOCHMAN:  No further questions, Your Honor.

THE COURT:  Redirect?

MR. JAUREGUI:  We have no further questions for this witness, Your Honor.

THE COURT:  Sir, you may step down.

Ladies and gentlemen, we're going to take our first break of the day.  Again, I want to remind you, until this trial is over, you're not to discuss this case with anyone including your fellow jurors, members of your family, people involved in the trial, or anyone else.  And do not allow others to discuss the case with you which includes discussing the case online, through blogs, bulletin boards, e-mails, or text

messages.  If anyone tries to communicate with you about this case, please let me know about it immediately.

Do not watch or listen to any news reports or other accounts about the trial or anyone associated with it. Do not do any research such as consulting dictionaries, searching the Internet, or using other reference materials. And do not make any investigation about the case on your own.

Finally, you're reminded to keep an open mind until all of the evidence has been received, you've heard the arguments of counsel and the instructions of the Court and the views of your fellow jurors.  If you need to speak with me, simply give a note to the clerk.

Our current plan is not to be in session on Monday.  If that's a problem for anyone, let us know, and we can -- maybe we'll make some other arrangements.

All right.  We'll be back at five after the hour.

(The following proceedings were held in open court out of the presence of the jury:)

THE COURT:  We'll see everybody in about 15 minutes.

MR. FOX:  Thank you.

MR. HOCHMAN:  Thank you, Your Honor.

(A recess was taken at 9:52 a.m.)

THE COURT:  All right.  Let's bring the jury in.

MR. JAUREQUI:  Your Honor, there are some

**UNITED STATES DISTRICT COURT**

exhibits I'm going to use with Michele Miller.  She's going to follow Ms. Gerhardt.  May I place them on the witness stand?

THE COURT:  That's fine.

(The following proceedings were held in open court in the presence of the jury:)

THE COURT:  Ladies and gentlemen, as I indicated before, we're not going to be in session on Monday the 12th. It's a possibility that we will be in session on Monday the 19th.  We'll let you know that next week.  We'll probably know by Wednesday.

If you'll call your next witness, please.

MR. JAUREQUI:  Yes, Your Honor.  United States calls Judy Gerhardt.

THE CLERK:  Stand here for me, please.  Raise your right hand.

Do you solemnly state that the testimony you may give in the cause now pending before this court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

THE CLERK:  Please be seated.

Will you please state your full name and spell your last name for the record.

THE WITNESS:  Judy Gerhardt, G-e-r-h-a-r-d-t.

THE CLERK:  Thank you.

**UNITED STATES DISTRICT COURT**

**JUDY GERHARDT,**

**GOVERNMENT'S WITNESS, SWORN:**

**DIRECT EXAMINATION**

BY MR. JAUREGUI:

Q       Ms. Gerhardt, what do you do for a living?

A       I'm a commander for the Los Angeles County Sheriff's Department.

Q       How long have you been with the sheriff's department?

A       Just over 36 years.

Q       And how long have you held the rank of commander?

A       Ten months.

Q       In 2011, summer, fall of 2011, what rank did you hold?

A       I held the rank of lieutenant.

Q       In what division or unit within the sheriff's department were you in?

A       I was assigned to the discovery unit of the Risk Management Bureau.

Q       And generally speaking, can you explain what the discovery unit does?

A       I had several responsibilities.  I oversaw the personal performance index, our pitchess motion which is a court process, and I had the responsibility of responding to subpoenas regarding personnel or confidential issues.

**UNITED STATES DISTRICT COURT**

Q        Were you acting as a custodian of records at that time?

A        In some cases, yes.

Q        As a result of your work in the discovery unit, are you familiar with the department's record-keeping systems in 2011, '12?

A        Generally, yes.

Q        Did you -- are you also familiar with how certain documents are created within the sheriff's department?

A        Generally, yes.

Q        Focusing on the summer of 2011, did you play a role in responding to Federal Grand Jury subpoenas issued to the sheriff's department?

A        I did.

Q        And generally speaking, what did those subpoenas pertain to?

A        There is a myriad of topics.  Generally they dealt with use of force in the jails.

Q        What was your role in responding to those subpoenas?

A        I would receive the subpoenas, distribute them out to the most appropriate people that I thought would have that requested information, gather that information in return, and forward the information to the Government.

Q        So in connection with the Federal Grand Jury

**UNITED STATES DISTRICT COURT**

subpoenas pertaining to use of force, did you act as a custodian of records?

A       Yes.

Q       Are you familiar with something called ICIB?

A       Yes.

Q       What is it?

A       It's a bureau within the sheriff's department. ICIB stands for Internal Criminal Investigations Bureau.

Q       What about something called the task force?  Are you familiar with the task force?

A       Yes.

Q       Within ICIB?

A       Yes.

Q       And what is that?

A       The task force was a detail or a subunit of ICIB that was created specifically to deal with use of force in the jail.

Q       Did you work with individuals from those two entities, ICIB and the task force, to collect and produce documents to the Federal Government in connection with this case?

A       Yes.

Q       I want to direct your attention to some exhibits now, Ms. Gerhardt.  Let's look at Exhibit 110.  And there will be three binders on the witness stand.  So they should say what

**UNITED STATES DISTRICT COURT**

exhibit numbers are in those binders.

A       I'm sorry.  110?

Q       Correct.

A       Yes, sir.

(Marked for identification Exhibit No. 110.)

Q       BY MR. JAUREGUI:  Do you recognize that exhibit?

A       (Witness reviewing document.)

Yes.

Q       How do you recognize it?

A       My initials are on the bottom of each page.

Q       What is it?

A       They are subpoenas that were issued to the sheriff's department from the Federal Government.

MR. JAUREQUI:  Your Honor, at this time we'd move to admit Exhibit 110.

MR. HOCHMAN:  No objection.

THE COURT:  It will be received.

(Received into evidence Exhibit No. 110.)

Q       BY MR. JAUREGUI:  Now, Commander Gerhardt, I'm going to direct you to a series of exhibits, 122 through 128, please.  Just let us know when you're done, Commander.

A       Yes, sir.

(Marked for identification Exhibit Nos. 122 through 128.)

Q       BY MR. JAUREGUI:  Do you recognize those

**UNITED STATES DISTRICT COURT**

exhibits?

A    Yes.

Q    Generally speaking, what are they?

A    They are documents that were produced in response to various subpoenas from the Federal Government.

Q    And what types of documents are they?

A    They are booking records or movement records for inmates in the jail system.

Q    And are those records created with -- in the regular course of business by the sheriff's department with people -- by people with knowledge of what's in those records?

A    Yes.

Q    And did you gather those documents and produce them -- did you play a role in gathering those documents and producing them to the Government?

A    Yes.

Q    And if you can tell us -- well, let me just ask you.

Do some of those records relate to Anthony Brown?

A    Yes.

Q    To John Rodriguez?

A    Yes.

Q    And what about Kevin King?

A    Yes.

Q    Do you know, Ms. Gerhardt, from your role in

**UNITED STATES DISTRICT COURT**

producing documents to the Government, what relationship, if any, Anthony Brown had to John Rodriguez and Kevin King?

A       Yes.  Today I know that those names were aliases for Anthony Brown.

Q       Commander Gerhardt, are these true and correct copies of documents that the sheriff's department provided to the Federal Government in response to grand jury subpoenas?

A       Yes.

MR. JAUREQUI:  Your Honor, I would move to admit Government Exhibits 122 to 128.

MR. HOCHMAN:  No objection.

THE COURT:  They will be received.

(Received into evidence Exhibit Nos.

122 through 128.)

Q       BY MR. JAUREGUI:  Commander Gerhardt, I wanted to ask you a couple follow-ups about 110.  I apologize.  Can I redirect you to 110?

Are you there, Commander Gerhardt?

A       Yes, sir.

Q       Those subpoenas, are those Federal Grand Jury subpoenas?

A       Yes.

Q       Approximately how many are there?

A       I'm counting eight.

Q       Do you know, Commander Gerhardt, whether the

**UNITED STATES DISTRICT COURT**

sheriff's department received more than eight grand jury subpoenas from the Federal Government?

A      Yes, sir.

Q      And do you know approximately how many?

A      I believe there were over 70.

Q      And what time period is covered in -- when were those subpoenas issued, approximately?

A      I believe they began in the summer or July of 2011, and this particular exhibit goes through November 2011.

Q      Okay.  Now I'm going to take you to another cluster -- and I think we can do these together -- of exhibits, and they are 121 and 124, 126 and -27, and 129 through -- I'm sorry -- 128 through 131.  We already did 128.  So it's 129 through 131.

      (Marked for identification Exhibit Nos.

      121 and 129 through 131.)

Q      BY MR. JAUREGUI:  Do you recognize those exhibits, Commander?

A      (Witness reviewing documents.)

      Yes.

Q      Generally, what are they?

A      They are booking information regarding inmates in the L.A. County jail system.

Q      And what inmates do they pertain to?

A      Anthony Brown, Chris Johnson.  Those are the ones

**UNITED STATES DISTRICT COURT**

I'm referring to, and I lost track of the other --

Q       Okay.  Were those records created -- were those

records maintained in the sheriff's department's electronic

systems?

A       Yes.

Q       Were those produced to the Federal Government in

response to Federal Grand Jury subpoenas?

A       Yes.

MR. JAUREGUI:  Your Honor, I'd move for the

admission of 121, 124, 126 and 127, and 129 through 131.

MR. HOCHMAN:  No objection.

THE COURT:  Those will be received.

(Received into evidence Exhibit Nos.

121 and 129 through 131.)

Q       BY MR. JAUREGUI:  Commander Gerhardt, I'm going

to direct your attention to Exhibits 118 and -19 and 184,

please.

A       Yes, sir.

(Marked for identification Exhibit Nos.

118, 119 and 184.)

Q       BY MR. JAUREGUI:  Do you recognize those

exhibits?

A       Yes.

Q       Generally speaking, what are they?

A       They are annual performance evaluations for

**UNITED STATES DISTRICT COURT**

employees of the sheriff's department.

Q        What is 118?

A        It's an annual performance evaluation for James Sexton.

Q        119?

A        Annual performance evaluation for Scott Craig.

Q        And 184?

A        An evaluation for William T. Carey.

Q        Were those exhibits -- were those documents maintained by the sheriff's department?

A        Yes.

Q        And did you produce those to the Federal Government in response to a grand jury subpoena?

A        Yes, sir.

MR. JAUREQUI:  Your Honor, I'd move for the admission of 118, 119, and 184.

MR. HOCHMAN:  May I have just a moment, Your Honor?  I just need to get 184.

THE COURT:  Yes.

MR. HOCHMAN:  No objection, Your Honor.

THE COURT:  It will be received.

(Received into evidence Exhibit Nos. 118, 119, and 184.)

Q        BY MR. JAUREGUI:  Commander Gerhardt, could you please look at Exhibit 120.

A        Yes.

(Marked for identification Exhibit No. 120.)

Q        BY MR. JAUREGUI:  Do you recognize that exhibit?

A        Yes.

Q        What is it?

A        It is a printout of a calendar for Sheriff Leroy Baca.

Q        What time period is covered there?

A        It begins on Thursday, August 18, 2011, and it continues through Wednesday, September 28, 2011.

Q        And is that a paper calendar or electronic calendar, if you can tell?

A        It appears to be a printout of an electronic calendar.

Q        And was that calendar or part of that calendar, was it maintained in the sheriff's department's electronic systems?

A        Yes, sir.

Q        Did you produce that to the Government in response to a Federal Grand Jury subpoena?

A        Yes.

MR. JAUREQUI:  Your Honor, we would move for the admission of Exhibit 120, please.

THE COURT:  Any objection?

MR. HOCHMAN:  No objection, Your Honor.

UNITED STATES DISTRICT COURT

703

THE COURT:  It will be received.

(Received into evidence Exhibit No. 120.)

Q      BY MR. JAUREGUI:  Commander, the last set of exhibits would be 173 to 180.

A      (Witness reviewing documents.)

Yes, sir.

(Marked for identification Exhibit Nos. 173 through 180.)

Q      BY MR. JAUREGUI:  Do you recognize those exhibits?

A      Yes.

Q      What are they?

A      Phone records for various people or facilities within the sheriff's department.

Q      Would that include telephone rosters?

A      Yes.

Q      Were those rosters maintained in the sheriff's department's record systems or created with information from the sheriff's department's record systems?

A      Yes.

Q      Did you produce those rosters and telephone records to the United States Government in response to a Federal Grand Jury subpoena?

A      Yes.

MR. JAUREQUI:  Your Honor, we would move for the

**UNITED STATES DISTRICT COURT**

admission of 173 to 180.

MR. HOCHMAN:  Just, Your Honor, objection on foundation as to when the documents were created.

MR. JAUREQUI:  Just 173?

MR. HOCHMAN:  Actually, all of them, Your Honor. I can't tell from the document.  Foundation.

MR. JAUREQUI:  Your Honor, I can ask a couple follow-up questions.

THE COURT:  All right.

Q     BY MR. JAUREGUI:  Ms. Gerhardt, you mentioned these were all produced in response to Federal Grand Jury subpoenas?

A     Yes, sir.

Q     And the subpoenas came in the beginning -- I think you said in the summer of 2011; correct?

A     That's when they began.

Q     And you played a role in producing Government -- producing documents to the Government beginning at that time?

A     In the summer of 2011; correct.

Q     Until when?

A     I guess until recently.

Q     Okay.  And at the time that you produced these documents to the Federal Government, did these -- were these responsive to the subpoenas issued by the Government in terms of asking for the time -- in terms of the time period requested

**UNITED STATES DISTRICT COURT**

by the Government?

A    If I can answer this way, the documents were as responsive as we could be to whatever was requested within each subpoena.

MR. JAUREQUI:  One moment, Your Honor.

Q    And Commander Gerhardt, were these documents the best effort you could make to respond to the Government's request for documents pertaining to the summer of 2011?

A    Again, I have to -- I would have to refer back to the specific subpoenas and what the Government asked for in those subpoenas.  If the request was such that that was the time frame that was requested within the subpoena, that was the time frame we tried to adhere to.

Q    And these documents existed in the sheriff's department's records at that time that you received the subpoena; right?

A    Correct.

Q    And you started receiving subpoenas in the fall -- summer and fall of 2011?

A    Correct.

MR. JAUREQUI:  Your Honor, we would move for admission of these records.

MR. HOCHMAN:  Objection.  Motion in limine, Your Honor, as for time frame and foundation.

THE COURT:  Overruled.  They will be received.

**UNITED STATES DISTRICT COURT**

(Received into evidence Exhibit Nos.

173 through 180.)

MR. JAUREQUI:  No further questions for this witness, Your Honor.

**CROSS-EXAMINATION**

BY MR. HOCHMAN:

Q     Commander Gerhardt, you said you've been with the sheriff's department now for 36 years; is that correct?

A     Yes, sir.

Q     And in August 2011, you were a lieutenant in the discovery unit risk management review; correct?

A     The Risk Management Bureau.

Q     Risk Management Bureau.

And as part of your job, it was to, in part, receive Federal Grand Jury subpoenas that the Los Angeles Sheriff's Department were issued; is that correct?

A     It would depend on the nature of the subpoena, but yes, that would be correct.

Q     Well, the subpoenas that were issued in connection with this case would come to you; is that correct?

A     Yes, sir.

Q     And then you would contact the various people in the sheriff's department who might have information responsive to the subpoena; is that correct?

A     Yes, sir.

**UNITED STATES DISTRICT COURT**

Q        And then they would provide that information back to you?

A        Yes, sir.

Q        And you would, in turn, provide it back to the Federal Government?

A        Can I clarify one thing?  Most instances those documents would come back to me, and I would provide it to the Government.  In some instances, depending on the confidentiality of the records, those particular entities may respond directly to or produce those documents directly to the county's attorney for production to the Federal Government without my hands on them.

Q        I see.  But the documents we've been talking about today and the exhibits you've been shown, those are the ones that went through you; is that correct?

A        Yes, sir.

Q        Now, you said that one of the units that you contacted was a task force; is that correct?

A        I don't believe I testified to that, but that would be a true statement.

Q        What was the name of that task force?

A        I'm not certain.

Q        Was that the jail investigations task force, if you recall?

A        I believe that some would call it that, yes.

**UNITED STATES DISTRICT COURT**

Q       And that was set up in September of 2011; is that correct?  The beginning of September of 2011?

A       That sounds accurate.

Q       And that task force's mission that was set up in the beginning of September of 2011 was to look into incidents of excessive force by deputies; is that correct?

A       That was my understanding, yes.

Q       Now, with respect to Exhibit 110, those are the grand jury subpoenas that you looked at.  I believe you said there were eight of them; correct?

A       I believe so, yes.

Q       But you actually -- and then the time frame that you gave for those subpoenas was -- it started when?  When did you receive the first subpoena approximately?

A       My recollection is I believe it was in the summer of 2011.

Q       And then you respond to the subpoenas, and I think you said the last subpoena -- if we look at the last one in this bunch which is page -- if you look at the very bottom right-hand corner, it's page 30.

        Do you see that?

A       Yes, sir.

Q       And that's dated October 19, 2011?

A       Yes.

Q       And you would receive that subpoena somewhere on

UNITED STATES DISTRICT COURT

709

or after October 19, 2011?

A        Yes.

Q        And that's after the end of September, September 27, 2011, in particular; is that correct?

A        Yes.

Q        And your response to these subpoenas would have occurred immediately after you received the subpoena, or it would take you a while to gather all the documents?

A        It would depend on the nature of the request.

Q        So, for instance, there's certain dates on these subpoenas where it says they want you to provide those documents at a U.S. Courthouse.  In fact, let's use that last one as an example.

So I'm directing your attention to page 30 of Exhibit 110.  All right.  So Exhibit 30 -- Exhibit 110, page 30, this is a Federal Grand Jury subpoena issued to the Los Angeles County Sheriff's Department, attention legal department; correct?

A        Yes.

Q        And this is the subpoena you would have received?

A        Yes.

Q        And it says for you to bring documents to the United States Courthouse, 312 North Spring Street, Los Angeles, California; correct?

A        Yes.

**UNITED STATES DISTRICT COURT**

710

Q        And it identifies a date and time,
November 9, 2011, at 9:00 a.m.?

A        Yes.

Q        Now, were you able, if you can recall, to gather
all the documents requested by the subpoena and have them over
to the U.S. Courthouse by November 9, 2011?

A        Again, it would depend on the nature of the
request, whether we complied by that particular deadline.

Q        Do you remember for that particular subpoena?

A        I don't remember.  I'm sorry.

Q        In general, would it often be the case that you
would need additional time beyond the date listed on the
subpoena in order to fully comply with the request?

A        It would depend on the nature of the request.
But some of the requests were voluminous, and we needed
additional time.  Some of the requests could be produced fairly
easily; so we could comply with the requested date.

Q        And just focusing for a moment on the voluminous
ones, would you get additional time in order to fully comply
with the request from the grand jury?

A        We went through counsel for those requests.  So
my permission, if you will, or deadlines came from the counsel
that was representing the county.

Q        And you received that additional time?

A        Generally.

UNITED STATES DISTRICT COURT

711

Q        Well, did you ever have to go to court, to this courtroom here, on the date and explain to the grand jury that you needed more time?

A        I personally did not, no.

Q        Do you know if anyone went on your behalf to the grand jury and asked for more time?

A        Not to my knowledge, no.

Q        And you did your best, and in fact -- well, you did your best to fully comply with each and every grand jury subpoena request that you received; is that correct?

A        Yes, sir.

Q        You didn't delete any records, did you, in order not to comply --

A        No, sir.

Q        I'm sorry.  With the grand jury request?

A        I apologize.  No, sir.

Q        You didn't modify or change any records that you received in order to comply with the grand jury request; is that correct?

A        No, sir.  That's correct.  No, I did not do that.

Q        And your compliance -- you said you actually got -- on direct you talked about not just these eight grand jury subpoenas but you got 70 grand jury subpoenas; is that correct?

A        I believe the number was in excess of 70.

**UNITED STATES DISTRICT COURT**

712

Q        And did you fully comply, to the best of your abilities, with all 70 of them?

A        I tried, yes.

Q        And the compliance period that you would have had would have started in the summer of 2011; is that correct?

A        Yes, sir.

Q        And how long thereafter did it continue for until you complied with all 70 of them?

MR. JAUREQUI:  Objection.  Motion in limine, Your Honor.

THE COURT:  Sustained.

MR. HOCHMAN:  Well, again, let's just focus on the last one as part of Exhibit 110 which is this October 19, 2011, request.  How long did it take you to -- approximately to -- if you can look through the whole request --

MR. JAUREQUI:  Objection.  Relevance, Your Honor.

THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  Did you comply with this October 19, 2011, request?

MR. JAUREQUI:  Same objection, Your Honor.

THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  Now, I'll focus you on Exhibits 122 to 128.  Actually, if you can look at -- I'll use all the Government's numbers that they used here which are 121

**UNITED STATES DISTRICT COURT**

through 127 and then 129 to 131.  If you could take a look at all those.  And as you're looking at them, the question will be do you see any communication to or from Sheriff Baca in any of these documents?

A        (Witness reviewing documents.)

Can you give me a moment, please?

THE COURT:  Why don't you continue to look at those.  Let's go to sidebar.

(The following proceedings were held at sidebar:)

THE COURT:  I guess I'm not sure what we're trying to do here.  It seems to me, if there's nothing in there for Baca, that's something you want to argue to the jury.  She's merely a custodian.  And it's not a test for her to page through them.

MR. JAUREQUI:  Not only that, Your Honor, Exhibits 121 through 129, none of them are communications.  They're inmate booking records and booking jackets.  So there's not going to be communications to Baca or anybody else.

MR. HOCHMAN:  There actually are.  It's signed by numerous deputies.  These are actually movement sheets.

THE COURT:  Okay.  This is a waste of time.  If you want to argue that there's nothing in those documents, you can look at them, you can look through them.  If there's nothing in there, you can argue that to the jury.

MR. HOCHMAN:  Yes, Your Honor.

(The following proceedings were held in open court in the presence of the jury:)

THE COURT:  All right.  The Court sustains its own objection.

Next question.

Q    BY MR. HOCHMAN:  I'll direct your attention to Exhibits 118, 119, and 184.  I'm going to ask about all three at the same time.  So if you can have them in mind as I'm asking these questions.

So 118, 119, and 184 are reports on performance evaluations for certain deputy sheriffs; is that correct?

A    One deputy sheriff, one sergeant, one captain.

Q    One deputy sheriff, one sergeant, and one captain.

So 118 is the report on performance evaluation for Deputy Sheriff James Sexton; is that correct?

A    Yes, sir.

Q    And Mr. Baca doesn't sign any of the information with respect to this report on performance evaluation; is that correct?

A    That's correct.

Q    119 is the -- Exhibit 119 is the report on performance evaluation for a sergeant and lieutenant, and that's Mr. Scott Craig; is that correct?

A    Sergeant Scott Craig, yes.

**UNITED STATES DISTRICT COURT**

Q       Sergeant Scott Craig, yes.

        And does Mr. Baca sign any of the information for this performance evaluation, Sergeant Scott Craig, in Exhibit 119?

A       No, sir.

Q       And Exhibit 184 is a management personnel evaluation for a Captain William Carey; is that correct?

A       Yes, sir.

Q       And Mr. Baca does sign this particular evaluation for William Carey; is that correct?

A       Yes, sir.

Q       Are you -- were you otherwise involved in this performance evaluation for Captain Carey?

A       No, sir.

Q       Do you know anything about it other than the fact it was produced to the United States Government in connection with a Federal Grand Jury subpoena?

A       No, sir.

Q       I'm sorry.  The question was phrased improperly.

        Is it correct or not correct that you know nothing else about it other than the fact it was produced to the Federal Government pursuant to a Federal Grand Jury subpoena; is that correct?

A       That's a correct statement.

Q       If you could turn to Exhibit 120.  I'll direct

UNITED STATES DISTRICT COURT

716

your attention to just page 1.

This page and the ensuing pages are Mr. Baca's calendar through September 28 of 2011; is that correct?

A    They appear to be printouts of an electronic calendar, yes.

Q    Were you involved in actually doing the printout of the electronic calendar?

A    No, sir.

Q    Do you know if this calendar, this electronic calendar that has been printed out that is part of Government's Exhibit 120, whether or not it contains all the events that Sheriff Baca participated in in the particular days noted from August 18 of 2011 to September 28 of 2011?

A    I don't know.

MR. HOCHMAN:  No further questions, Your Honor.

MR. JAUREQUI:  No more questions, Your Honor.

THE COURT:  All right.  Thank you.  You may step down.

Call your next witness.

MR. JAUREQUI:  The United States calls Michele Miller, Your Honor.

While we're waiting, Your Honor, if I may approach and take these exhibits up to the witness stand.

THE COURT:  That's fine.

THE CLERK:  Raise your right hand.

**UNITED STATES DISTRICT COURT**

Do you solemnly state that the testimony you may give in the cause now pending before this court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  Yes.

THE CLERK:  Please be seated.

Please state your full name and spell your last name for the record.

THE WITNESS:  Michele Miller, M-i-l-l-e-r.

THE CLERK:  Thank you.

**MICHELE MILLER,**

**GOVERNMENT'S WITNESS, SWORN:**

**DIRECT EXAMINATION**

BY MR. JAUREGUI:

Q      Good morning, Ms. Miller.

A      Good morning.

Q      How are you employed?

A      I'm employed by the Los Angeles County Sheriff's Department.

Q      How long have you been employed by the sheriff's department?

A      Since May of 1997, 19-and-a-half years.

Q      What is your position within the department?

A      I'm a law enforcement technician.

Q      Do you work in a specific unit or subdivision of

the sheriff's department?

A        Yes.  I'm assigned to Internal Criminal Investigations Bureau.

Q        When did you start working in -- is that also known as ICIB?

A        Yes.

Q        When did you start working in ICIB?

A        I started on September the 6th of 2011.

Q        Who hired you to work there?

A        Sergeant Scott Craig.

Q        And who was in charge of ICIB if you recall?

A        That was Captain Tom Carey.

Q        Ms. Miller, do you know who the lead investigators were at that time in ICIB?

A        Sergeant Scott Craig and Sergeant Maricela Long.

Q        In addition to working with Mr. Craig and Ms. Long, did you work with other officers within ICIB?

A        Yes.

Q        Did that include Deputy Manzo and Deputy Smith?

A        Yes.

Q        And are you familiar with the name Anthony Brown, Ms. Miller?

A        Yes.

Q        How are you familiar with that name?

A        That was one of the cases ICIB was investigating

when I started working there.  We were investigating a suspect
by the name of Deputy Gilbert Michel.  He was alleged to have
smuggled in a cell phone into the Men's Central Jail to
Anthony Brown.

Q        And initially when you started in ICIB, what were
you doing?

A        I was working case management.

Q        Did there come a time when your role within ICIB
changed?

A        Yes.

Q        When was that?

A        That was primarily in January of 2012.  I began
working document production for the grand jury investigation.

Q        And was that a Federal Grand Jury investigation?

A        Yes.

Q        Do you know what the nature of that investigation
was?

A        They were investigating allegations of abuse
inside Men's Central Jail.

Q        Did you help look for and gather and produce
documents to the Government in response to grand jury
subpoenas?

A        Yes.

Q        I want to -- and in that time period, Ms. Miller,
did you come to learn how the ICIB maintained and stored its

**UNITED STATES DISTRICT COURT**

records?

MR. HOCHMAN:  Objection.  Vague as to what time period counsel is referring to.

MR. JAUREQUI:  I'll rephrase, Your Honor.

THE COURT:  All right.

Q     BY MR. JAUREGUI:  In late 2011 and beginning in early 2012, did you come to learn how ICIB kept and stored records?

A     Yes.

Q     Okay.  Did they do that -- did they -- did ICIB store records in electronic format?

A     Yes.

Q     Paper format?

A     Yes.

Q     How did ICIB store records electronically?

A     We had a server set up for a task force by the name of Clean Sweep, and we had subfolders for different categories like investigations, audio interviews, photos, videos, things like that.

Q     I want to direct your attention to some documents in the exhibits in front of you -- exhibit binders in front of you, Ms. Miller.  Why don't we start with Exhibits 142 to 145, please.

A     (Witness reviewing documents.)

///

UNITED STATES DISTRICT COURT

721

(Marked for identification Exhibit Nos. 142 through 145.)

Q        BY MR. JAUREGUI:  Do you recognize those documents?

A        Yes.

Q        How do you recognize those documents?

A        These are surveillance logs for a target by the name of Leah Marx.

Q        And 142, is there a date on that exhibit that you can look at?

A        Yes.  142 is dated September 13 of 2011.

Q        Do you know from looking at that document or can you tell from looking at that document who created -- what entity within the sheriff's department created that document?

A        Special Operations Group.

Q        Do you know what the Special Operations Group is?

A        Yes.  It is referred to as SOG by ICIB.  It is ICIB's surveillance team.

Q        If you can look at Exhibit 143, please.  Is there a date on that document?

A        Yes.  143 is dated 9/14/11.

Q        Was that also created by SOG?

A        Yes.

Q        Who is the target of the surveillance in that exhibit?

**UNITED STATES DISTRICT COURT**

A        Leah Marx.

Q        144, please.  Same question.  Is that also created by SOG?

A        Yes.

Q        Is there a date on that exhibit?

A        This is 9/26/11.

Q        Is there a target listed?

A        Yes.  Leah Marx.

Q        And 145, please.  Is that also a surveillance log?

A        Yes, it is.

Q        Is there a target listed?

A        Leah Marx.

Q        And the date?

A        9/28/11.

Q        And, Ms. Miller, did you play a role in gathering these documents and producing them in connection with a Federal Grand Jury subpoena?

A        Yes, I did.

Q        Were those documents stored within ICIB?

A        Yes.

MR. JAUREGUI:  Your Honor, I would move for the admission of 142 to 145, please.

THE COURT:  Any objection?

MR. HOCHMAN:  May I have just a second,

Your Honor?

THE COURT:  Yes.

MR. HOCHMAN:  Your Honor, may I be heard at sidebar on 145?

THE COURT:  Yes.

(The following proceedings were held at sidebar:)

MR. HOCHMAN:  Your Honor, 142 is a -- surveillance for 9/13.  143 is 9/14 -- 2011 each time.  144 is 9/26 of 2011.  145 is 9/28/2011.  I'm trying to understand the Court's rulings that the defense is restricted to everything that happens 9/26/11 and before but the Government is able to introduce grand jury subpoenas beyond that and now is seeking to introduce Exhibit 145 which is surveillance after the conspiracy.  So if the -- I would -- I would not object if the Court is going to allow me to introduce incidents that occur relatively shortly --

THE COURT:  Is this some sort of negotiation, or do you have an objection to this specific document?

MR. HOCHMAN:  My objection is this is -- in light of the Court's prior rulings, this document appears to be outside the time frame of the conspiracy.  On that basis I object.

THE COURT:  Okay.

MR. JAUREQUI:  Your Honor, I believe the rulings have been with regard to other acts under prior good acts or

**UNITED STATES DISTRICT COURT**

724

good works afterward, part of our motion in limine, and this document certainly doesn't fall into that category of documents.  It's created on -- or the date on the exhibit is 9/28/2011 which certainly would be on or about the dates charged in the Indictment.

THE COURT:  The objection is overruled.

(The following proceedings were held in open court in the presence of the jury:)

THE COURT:  Okay.  Those documents will be received.

(Received into evidence Exhibit Nos. 142 through 145.)

Q       BY MR. JAUREGUI:  Now, Ms. Miller, I want to direct you to Exhibits 146 to 150, please.

(Marked for identification Exhibit Nos. 146 through 150.)

Q       BY MR. JAUREGUI:  Do you recognize those documents, Ms. Miller?

A       Yes, I do.

Q       How do you recognize them?

A       These are SOG weekly activity reports.

Q       Did you play a role in gathering and producing those documents to the Federal Government in connection with the Federal Grand Jury subpoena?

A       Yes.

**UNITED STATES DISTRICT COURT**

MR. JAUREQUI:  We would move for the admission of those documents as well, 146 to 150.

THE COURT:  Any objection?

MR. HOCHMAN:  Your Honor, no objection to 146, 147, 148.  Objection to the bottom half of 149, and objection to -- pursuant to my prior objection, everything on 150 from about one third of the way down.  I could be more specific if Your Honor would like.

THE COURT:  No.  Okay.  The objection to 150 is overruled.  It will be received.  I'm sorry.  Did you say 149?

MR. HOCHMAN:  149, Your Honor.  There are three dates on it, Your Honor, at the bottom -- towards the bottom of the document that I would object to.

THE COURT:  Okay.  Objection will be overruled. It will be received.

MR. HOCHMAN:  Yes, Your Honor.

(Received into evidence Exhibit Nos.

146 through 150.)

Q      BY MR. JAUREGUI:  Ms. Miller, I want to direct your attention now to Exhibits 151 and 152.

A      (Witness reviewing documents.)

(Marked for identification Exhibit Nos.

151 and 152.)

Q      BY MR. JAUREGUI:  Do you recognize those exhibits?

**UNITED STATES DISTRICT COURT**

A        Yes, I do.

Q        What are they?

A        They are more surveillance logs from Special Operations Group.

Q        Did you play a role in gathering and producing those documents to the Federal Government in connection with the Federal Grand Jury subpoena?

A        Yes.

MR. JAUREQUI:  Your Honor, we would move for the admission of 151 and 152, please.

THE COURT:  Any objection?

MR. HOCHMAN:  Yes, Your Honor.  On 151 it would be the foundation.  I can't see it.  There doesn't appear to be a date on this document, Your Honor.  I can explain further at sidebar if you want more explanation on the foundational objection.  And on 152, again, I incorporate my prior objection at sidebar for 152.

THE COURT:  The objection to 152 is overruled.

(Received into evidence Exhibit No. 152.)

MR. JAUREQUI:  I can ask some further questions on 151, Your Honor.

THE COURT:  All right.  Go ahead.

Q        BY MR. JAUREGUI:  Ms. Miller, do you recall how you found this document?

A        Yes.

**UNITED STATES DISTRICT COURT**

Q        How did you find it?

A        I was doing follow-up regarding special requests from your office to locate any more surveillance items and paper and/or electronic documents from the subpoena that was issued in January of 2012.  I then went through electronically and started searching for the FBI agents' names listed in that subpoena.  I located some documents electronically and then realized there should be some paper documents.  I contacted the SOG sergeant and my lieutenant at the time and went over to the SOG office and went to the file cabinet to retrieve this folder.

Q        And was this document held together with other documents relating to David Lam?

A        Yes.

Q        Let me just direct your attention to Exhibit 151 which is now in -- I'm sorry -- 152 which is now in evidence. No.  152 is not in evidence.  Okay.  152 is in evidence.  If I could just direct your attention to the first line on that log.

         Do you see that?

A        Where it says "target"?  Are you talking about the entry?

Q        The entry.

A        The entry is time 13:45, surveillance established at 11000 Wilshire Boulevard, United States Federal Building. It is believed this is possibly the workplace of the target.

**UNITED STATES DISTRICT COURT**

728

Q       Ms. Miller, do you know if this Exhibit 151 is the paperwork that was used to initiate surveillance on David Lam on or about 9/28/2011?

A       Yes.

MR. JAUREQUI:  All right.  Your Honor, we would move for the admission of Exhibit 151.

MR. HOCHMAN:  Objection as to foundation as to when this document was produced to the Government, Your Honor.

THE COURT:  Overruled.  It will be received.

Q       BY MR. JAUREGUI:  Now, Ms. Miller, I want to direct your attention to some loose exhibits that should be there on top of your witness stand there.

A       Yes.

Q       Do you see them?

A       Yes.

Q       Directing your attention, first, to Exhibit Nos. 84 and 85.

A       Okay.

(Marked for identification Exhibit Nos. 84 and 85.)

Q       BY MR. JAUREGUI:  Do you recognize those exhibits?

A       Yes, I do.

Q       What is 84?

A       84 is a compact disc recording of an interview that occurred on 8/26 of Anthony Brown.

**UNITED STATES DISTRICT COURT**

Q        And what is 85?

A        85 is the transcript of this recording.

Q        And have you previously listened to that CD?

A        Yes.

Q        How do you -- how can you tell that you listened to that CD that's in your hand?

A        My initials are on the CD.

Q        When did you listen to that CD?

A        This morning.

Q        Had you heard it before?

A        Several times before, yes.

Q        Did you recognize the voices on that CD?

A        Yes.

Q        How did you recognize those voices?

A        I worked with the parties doing the interview.

Q        And what is Exhibit No. 85?

A        85 is the transcript of the audio recording.

Q        When you listened to 84, did you follow along with that transcript?

A        Yes.

Q        And what are the voices on that CD that you heard?

A        Who or what?

Q        Whose voices?

A        Whose?  Sergeant Maricela Long,

**UNITED STATES DISTRICT COURT**

Sergeant Scott Craig, and Sergeant Todd Webber.

Q       And how did you recognize their voices?

A       I worked with all of those individuals on the ICIB task force.

Q       Did you play a role in producing that audio recording to the United States?

A       Yes.

Q       What role did you play?

A       I located the audio recording electronically on our shared files and made a copy of it and produced it to the Federal Government.

MR. JAUREQUI:  Your Honor, we would move for the admission of Government Exhibit 84.

MR. HOCHMAN:  No objection, Your Honor.

THE COURT:  It will be received.

(Received into evidence Exhibit No. 84.)

Q       BY MR. JAUREGUI:  Now, 85, Ms. Miller.  I'm sorry.  86, Ms. Miller.

A       (Witness reviewing exhibit.)

(Marked for identification Exhibit No. 86.)

Q       BY MR. JAUREGUI:  Do you recognize those exhibits?

A       Yes, I do.

Q       What are they?

A       This is also a compact disc that contains an

**UNITED STATES DISTRICT COURT**

audio recording of Anthony Brown conducted on September the 2nd of 2011.

Q        And what is 87?

A        87 is a transcript to this recording.

(Marked for identification Exhibit No. 87.)

Q        BY MR. JAUREGUI:  Whose voices are on that recording?

A        I can identify Deputy Gerard Smith and Anthony Brown.

Q        And did you also listen to that recording this morning?

A        Yes.

Q        Did you sign and note that CD to indicate that you had listened to it today?

A        Yes.  My initials are on there.

Q        And did you play a role in producing that according to the Government?

A        Yes, I did.

Q        In connection with a Federal Grand Jury subpoena?

A        Yes.

MR. JAUREQUI:  We would move for the admission of Exhibit 86, please.

THE COURT:  Any objection?

MR. HOCHMAN:  No objection.

THE COURT:  It will be received.

**UNITED STATES DISTRICT COURT**

(Received into evidence Exhibit No. 86.)

Q    BY MR. JAUREGUI:  Now, Exhibits 94 and 95, Ms. Miller, do you recognize those exhibits?

A    Yes, I do.

(Marked for identification Exhibit Nos. 94 and 95.)

Q    BY MR. JAUREGUI:  What is 94?

A    94 is a compact disc that contains an audio recording of a voicemail left by Sergeant Scott Craig to Leah Marx.

Q    And how do you know that?

A    When I located the audio file, that's how it was labeled.

Q    And had you listened to that prior to today's testimony?

A    Yes.

Q    Did you listen to it today?

A    Yes.

Q    Before today?

A    Yes.

Q    And what about 95?

A    95 is a transcript of this recording.

Q    Did you follow that transcript when you were listening to the recording this morning?

A    Yes.

Q    And whose voices are on it?

**UNITED STATES DISTRICT COURT**

A        Sergeant Scott Craig.

Q        And did the transcript in 95 accurately reflect the words and the voice that you heard on Exhibit 94?

A        Yes.

MR. JAUREQUI:  Your Honor, we would move for the admission of Government Exhibit 94.

MR. HOCHMAN:  No objection, Your Honor.

THE COURT:  It will be received.

(Received into evidence Exhibit No. 94.)

Q        BY MR. JAUREGUI:  And No. 100 and 101, please, Ms. Miller.

(Marked for identification Exhibit Nos. 100 and 101.)

Q        BY MR. JAUREGUI:  Do you recognize those exhibits?

A        Yes.

Q        What is No. 100?

A        100 is a compact disc containing an audio recording of the phone call from the FBI to ICIB.

Q        And what is 101?

A        101 is the transcript to the audio recording.

Q        Did you listen to the CD this morning?

A        Yes.

Q        Did you follow the transcript as you were listening to the CD?

A        Yes.

**UNITED STATES DISTRICT COURT**

Q       Did you recognize the voices on the CD?

A       Yes.

Q       Whose voices were on the CD?

A       Sergeant Scott Craig and Sergeant Maricela Long.

Q       And did you play a role in producing that recording -- let me ask you.

Did the transcript accurately reflect the voices of Sergeant Scott Craig and Maricela Long and the words that they used?

A       Yes.

Q       And did you play a role in producing that recording to the Federal Government in connection with the grand jury subpoena?

A       Yes.

MR. JAUREQUI:  Your Honor, we would move for the admission of No. 100, please.

MR. HOCHMAN:  No objection, Your Honor.

THE COURT:  It will be received.

(Received into evidence Exhibit No. 100.)

MR. JAUREGUI:  Last exhibit, Your Honor, is 134.

(Marked for identification Exhibit No. 134.)

MR. JAUREGUI:  And, Your Honor, may I approach the clerk and have the original exhibit put before the witness?

THE COURT:  Yes.

THE WITNESS:  (Witness reviewing exhibit.)

**UNITED STATES DISTRICT COURT**

Q       BY MR. JAUREGUI:  Ms. Miller, do you recognize Government Exhibit 134?

A       Yes.

Q       And how do you recognize that exhibit?

A       Photocopies of this particular document were produced to the Federal Government in the grand jury investigation as a steno book containing handwritten investigator notes.

Q       And the original exhibit that's in front of you, did you ever find that exhibit?

A       Yes, I did.

Q       When did you find that?

A       I located this exhibit in October of 2013.

Q       And how did you find it?

A       The prior production was photocopied pages out of this notebook.  I was tasked later with going back and taking the photocopied Bates stamped documents and mirroring them up with the original notebook.

Q       And did you do that?

A       Yes, I did.

MR. JAUREQUI:  May I have one moment, Your Honor?

THE COURT:  Yes.

MR. JAUREQUI:  Your Honor, no further questions from the Government, Your Honor.

THE COURT:  Is Exhibit 134 --

**UNITED STATES DISTRICT COURT**

MR. JAUREQUI:  We wanted to authenticate it through Ms. Miller, but we'll move it in through another witness.

THE COURT:  All right.  Cross-examination.

MR. HOCHMAN:  Yes, Your Honor.

**CROSS-EXAMINATION**

BY MR. HOCHMAN:

Q      Let me start with Exhibit 134 that you have in front of you.  That's a steno book notebook.  Do you know whose steno book notebook that is?

A      I do not.

Q      Was it someone from ICIB, if you know?

A      My impression of what this or who this notebook may have belonged to was either Deputy Gerard Smith or Deputy Mickey Manzo.  They were all located -- there were several other notebooks rubberbanded together, and it said "Smith and Manzo notebook."

Q      Let me understand how this notebook came to be here today.  You originally produced, in connection with the Federal Grand Jury subpoenas, certain pages from the notebook; is that correct?

A      Yes.

Q      And then -- and approximately when would that have been produced, if you know?

A      The photocopies of the pages were produced in

UNITED STATES DISTRICT COURT

January of 2012.  They were provided to me by Deputy Gerard Smith.

Q    I see.  So Deputy Smith provides you with the photocopies of the pages.  You, in turn, produce that for the Federal Grand Jury.

A    Correct.

Q    And then probably, what, a little over a year and a half later, the Federal Government wants to or the grand jury wants to get the whole notebook; correct?

A    I don't know if they wanted the whole notebook. They wanted me to source the document to determine that all of the pages that were produced to the Federal Government existed as original form in a notebook.  That was my understanding was my task.

Q    So about October 2013, you're actually able to locate the notebook; correct?

A    Correct.

Q    It hadn't been destroyed at that point?

A    No, sir.

Q    It was in a location in the ICIB area that you were able to retrieve?

MR. JAUREQUI:  Your Honor, objection.  Motion in limine.

THE COURT:  Let's go to sidebar.

(The following proceedings were held at sidebar:)

UNITED STATES DISTRICT COURT

MR. JAUREQUI:  Your Honor, based on the prior question, my understanding of where Mr. Hochman is going with this is to show that the -- there was compliance with the grand jury subpoenas and that the Sheriff didn't order noncompliance with the subpoenas.  It's part of our motion -- I think explicitly part of our motion in limine.

MR. HOCHMAN:  Your Honor, the last document custodian was talking about at least production of grand jury subpoenas within the -- what the Government has called the conspiratorial time frame up through September 27, 2011.  This particular witness they decide to call doesn't even enter the picture to start complying with anything until January 2012.

THE COURT:  Uh-huh.

MR. HOCHMAN:  And then his talk in direct testimony of producing things all the way through October 2013, the Government opened the door on this one.  They didn't need to call a custodian that was involved with production way after the conspiratorial time frame.  What I'm asking is not any good works or anything like that.  I'm asking if she's aware that the document she found was in the ICIB area where they've alleged back all the way in the conspiratorial time frame of these folks that are obstructing justice.  And part of obstructing justice is not complying with a grand jury subpoena.

MR. JAUREQUI:  Again, Your Honor, she is just

UNITED STATES DISTRICT COURT

serving as a custodian of records, and as the Court has already indicated, this also can be argued.

MR. FOX:  If I may add also, if Mr. Hochman is saying that he's not going to argue that they fully complied with the subpoenas and that's not obstruction, then therefore no obstruction is committed, if that's not where he's going with this, then the questions on this are fine.  I think he's doing this so he can say he fully complied with this.

As we talked about, the county hired outside counsel for them, and that's when they were producing these documents.  This is all red herring, and Mr. Hochman is looking to mislead the jury on this.  We're going to get into a sideshow to bring in board of supervisors.  That's not where we should be going with this case.

MR. HOCHMAN:  The witness they called wasn't a lawyer on behalf of the county to authenticate the documents. They called an LASD custodian who doesn't start until January of 2012, Your Honor, well outside the conspiracy.  They didn't have to call them, but they decide to call this one as well as the last one.  She's already testified she's complying with this all the way through October, 2013.  So clearly her efforts in what she did to comply with it, I believe, are irrelevant to that -- her exact testimony having -- I'll leave it at that, Your Honor.

MR. FOX:  And, Your Honor, we had to call the

records custodian because they would not stipulate to it.  So they're trying to walk us down into a trap.  This is a 403 issue where it's going to risk confusion, waste of time.  It already has.  And the probative value is outweighed by all the confusion and waste of time.

THE COURT:  Do you have something else you want to cover with her and I'll give it some consideration?  Or if you want a ruling now, I'll rule now.

MR. HOCHMAN:  I do have other things I'd like to cover with her, Your Honor.

THE COURT:  Okay.  Well, let's get to that.

MR. HOCHMAN:  Thank you.

(The following proceedings were held in
open court in the presence of the jury:)

Q      BY MR. HOCHMAN:  If I might direct your attention back to Exhibit 100.  Exhibit 100 and 101 was a September 26, 2011 recording.

Do you see that?

A      Yes.

Q      And 101 is the transcript of that recording.  Do you see that as well?

A      Yes.

Q      There's a gentleman identified as Carlos Norrow.  Have you ever met Mr. Norrow?

MR. JAUREQUI:  Objection.  Relevance, Your Honor.

**UNITED STATES DISTRICT COURT**

THE COURT: Sustained.

Q    BY MR. HOCHMAN: Well, you identified that you listened to the recording and that the transcript is a true and accurate transcription of the recording; is that correct?

A    Yes.

Q    And the transcript indicates that there's some gentleman named Norro as one of the speakers in the recording; is that correct?

A    Yes.

Q    Have you ever met Mr. Norro?

A    Not that I'm aware of, sir.

Q    Have you ever heard his voice?

A    I don't know.

Q    So you don't know if, when it says Narro here on the transcript, that that is Carlos Narro?

A    No. I'm only able to identify two parties on that phone call.

Q    Which two parties were those?

A    Sergeant Craig and Sergeant Long.

Q    So there's another person that's identified in the transcript which is Teresa Tambou --

THE COURT: Sir, the transcript is not evidence. So it's irrelevant. Next question.

MR. HOCHMAN: Yes, Your Honor.

Q    Turning to Exhibit 94, please, and 95. This is

a -- Exhibit 94 is a voicemail recording from September 9, 2011; is that correct?

A       Yes.

Q       How is it, if you know, that the Los Angeles Sheriff's Department has a voicemail recording of a phone call that was made by the Los Angeles Sheriff's Department to someone?

A       Are you asking the process of how we maintain the document, or are you asking the process of, in the investigation, as to why it's kept?

Q       Good distinction.

What I was asking is that this is -- this appears to be a call that Mr. -- Sergeant Craig is making, and then it's a -- it goes to a voicemail.  What I'm trying to understand, is that because Sergeant Craig is recording his own phone call that went to the voicemail?

A       Correct.

Q       I see.  And then that recording of Sergeant Craig making his own phone call eventually gets passed to you to turn on -- to turn over to the Federal Grand Jury; is that correct?

A       Correct.

Q       Got it.  Thank you.

86, if you could go to 86, and then 87 is the transcript.  Now, this is a September 2nd, 2011, recording between what's identified as Anthony Brown and Gerard Smith; is

**UNITED STATES DISTRICT COURT**

743

that correct?

          A       Correct.

          Q       Had you ever met Anthony Brown?

          A       No, sir.

          Q       At any point?

          A       No, sir.

          Q       Do you know what his voice sounds like?

          A       I have heard it several times on audio recordings.

          Q       Did you ever hear it live from Anthony Brown?

          A       No, sir.

          Q       And again, just so I understand this, this is a recording of a meeting, an interview, between Sergeant Smith and Anthony Brown; is that correct?

          A       Yes.

          Q       And the way the tape exists is that a -- when these interviews take place, they're actually recorded as they take place; is that correct?

          A       Correct.

          Q       And then that recording is given to you pursuant to the grand jury subpoena.

                  MR. JAUREQUI:  Your Honor, objection.  Misstates testimony on direct examination as to "given to you."

                  THE COURT:  Sustained.

          Q       BY MR. HOCHMAN:  How do you get the recording?

**UNITED STATES DISTRICT COURT**

744

A    The recording -- once the investigator is done with the recording -- this is standard practice for ICIB.  Once the investigator has concluded their interview, they then transfer the audio file from their recorder onto the ICIB shared files.

Q    And then you retrieved it from the ICIB shared files in order to give it to the Federal Grand Jury.

A    This is correct, yes.

Q    Now, would the same thing be true for Exhibit 84 which is a CD interview of Anthony Brown on August 26 that has the Exhibit 85 being the transcript?

A    Yes.

Q    And who is Todd Webber?

A    Todd Webber was a sergeant assigned to ICIB.

Q    And with respect to what's been shown to you as Exhibits 142 to -45, 151, and 152, these are the surveillance logs.  Again, when the surveillance logs are completed, are they loaded onto that server that you told me about?

A    Yes.  They are usually loaded onto the ICIB shared files.  SOG has their own separate files.

Q    Are they usually loaded around the time they're completed?

A    Yes.

Q    And then you retrieve them from the server, gave them to the Federal Grand Jury; is that correct?

**UNITED STATES DISTRICT COURT**

A       On these particular documents, they were provided to me, and then I provided them to the Federal Government.

Q       And just so I'm clear, your timing in this, the first time you're involved with the production on the grand jury subpoena starts at approximately January 2012?

A       Yes.

Q       And it continues all the way through October 2013?

A       It continues until today.

Q       Until today?

A       Yes.  It's still part of my responsibilities.

MR. HOCHMAN:  I see.  No further questions.

MR. JAUREQUI:  No further questions, Your Honor.

THE COURT:  You may step down.

THE WITNESS:  Thank you, sir.

THE COURT:  Call your next witness.

MR. FOX:  United States calls Mickey Manzo.

THE CLERK:  Stand here for me, please.  Raise your right hand.

Do you solemnly state that the testimony you may give in the cause now pending before this court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

THE CLERK:  Please be seated.

**UNITED STATES DISTRICT COURT**

Please state your full name and spell your last name for the record.

THE WITNESS:  My full name is Mickey Manzo, M-a-n-z-o.

THE CLERK:  Thank you.

MR. FOX:  May I proceed, Your Honor?

THE COURT:  Yes, please.

**MICKEY MANZO,**

**GOVERNMENT'S WITNESS, SWORN:**

**DIRECT EXAMINATION**

BY MR. FOX:

Q     Mr. Manzo, what is it that you do for a living?

A     I currently work at Home Depot.

Q     How long have you done that?

A     A little over a year and a half.

Q     Before working for Home Depot, what did you do for a living?

A     I was a deputy sheriff for Los Angeles County.

Q     How long were you a deputy sheriff for Los Angeles County?

A     About eight years.

Q     Could you please provide us the general time frame when that was?

A     July of 2006 until October of 2014.

Q     Are you still employed or -- what happened that

**UNITED STATES DISTRICT COURT**

caused you to leave the Los Angeles County Sheriff's Department?

A    I was convicted of obstruction -- conspiracy and obstruction of justice.

Q    What did the charges involve?  What were the allegations against you?

A    Myself along with other co-conspirators basically obstructed an FBI investigation into the civil rights abuses at Men's Central Jail.

Q    Let's go back to when you first became a deputy sheriff.

What was your first assignment?

A    Men's Central Jail, custody.

Q    And what specifically were you assigned to do at MCJ at the time?

A    I was in charge of modules 36 and 38, the inmates' welfare in those modules.

Q    When you say "36 and 38," is that also known as the 3000 floor, a portion of the 3000 floor?

A    Yes.  That's a portion of it.

Q    Before you began your assignment in Men's Central Jail, what did you have to do to receive training?

A    To get hired by the sheriff's department, I had to go through an academy.  I went through Rio Hondo Police Academy.

**UNITED STATES DISTRICT COURT**

Q        In terms of custodial training, did you receive any custody training?  Did you receive any?

A        No.

Q        Who was your sheriff at the time?

A        Sheriff Leroy Baca.

Q        How long did you work on the 3000 floor before your assignment changed?

A        Roughly two, two-and-a-half years.

Q        What did you -- where did you go at that point?

A        I went to something called OSJ, Operation Safe Jails.

Q        When was this?

A        Initially it was in August of 2008 I went on loan, and then officially full time, I want to say, May of 2009, somewhere around there.

Q        What is OSJ?

A        It stands for Operation Safe Jails, and it's a group of deputies that are in charge of the safety and security and gang intelligence in our jail, in that particular jail.

Q        Now, Mr. Manzo, I want to discuss briefly -- you said that you were convicted of obstruction of justice.  Prior to your conviction, were you ever investigated internally for hiding Anthony Brown by the Los Angeles County Sheriff's Department?

A        Not that I'm aware of.

Q        Were you still working for OSJ in August of 2011?

A        Yes.

Q        Who was your lieutenant at the time?

A        Greg Thompson.

Q        Was there anyone within OSJ who was ranked higher than Greg Thompson?

A        No.

Q        What was his rank?

A        Lieutenant.

Q        At some point in August of 2011, did you learn that a cellular phone had been found on an inmate?

A        Yes.

Q        How did you become aware of that?

A        I believe the deputy or one of the deputies that did the search that found the cell phone came up to OSJ and talked to one of the OSJ deputies.

Q        Eventually did you learn the name of the inmate who had the cell phone?

A        Yes.

Q        What is that inmate's name?

A        Anthony Brown.

Q        After you learned of the cell phone, did you find that there was a connection between the inmate and any law enforcement agency?

A        Yes.

Q        What did you find out?

A        I don't know how long from when we found it to when we found out it was, but we found that the phone was connected to the civil rights division of the FBI.

Q        How did you find out that information?

A        An OSJ deputy by the name of Noah Kirk was assigned to an FBI task force, and he called that task force about a number that we couldn't identify on the phone, and they identified it as the civil rights division.

Q        Now, when you said "A number that you couldn't identify in the phone," are we talking about the cell phone at this point or the jail's phone system?

A        The jail's phone system.

Q        How did you identify that number in terms of a number to research?

A        I can't remember if I did it or Deputy Smith did it, but we ran that cell that Anthony Brown was in on the ITMS for phone calls.

Q        You said you ran the cell.  Are we talking about a jail cell or cell phone?

A        I was actually saying the jail cell.  Each jail cell has a pay phone in it.  We ran the number for that cell, that pay phone.

Q        And that was the number that you sent to your Deputy Noah Kirk in order to find out what it was related to?

A       Yes.

Q       When you sent him that cell phone number, did you know it was connected to the FBI?

A       I don't believe so, no.

Q       Showing you Exhibit 18, there should be some books there.  There should be one that is labeled 1 to 18, Exhibits 1 to 18 -- I'm sorry -- 1 to 80 something, and within there will be Exhibit 18.

Do you recognize that?

A       Yes.

Q       What is it?

A       It is a copy of an e-mail that Deputy Kirk sent to Deputy Smith.  And I asked him to forward it to me.

Q       Is this a true and accurate copy of the e-mail that was forwarded to you?

A       It looks to be, yes.

MR. FOX:  Your Honor, I move for the admission of Government Exhibit 18.

THE COURT:  Any objection?

MR. DIAMANTATOS:  No objection.

THE COURT:  It will be received.

(Marked for identification and received into evidence Exhibit No. 18.)

Q       BY MR. FOX:  Showing you now that e-mail on your monitor, can you see that e-mail?

**UNITED STATES DISTRICT COURT**

A        Yes.

Q        What is the date this is forwarded to you?

A        August 19.

Q        We see Gerard Smith in the "from" line.  Who is Gerard Smith?

A        He was an OSJ deputy at the time.

Q        And you said this was a forwarded e-mail; so I'm actually going to blow up that lower half so it's easier to see.

Who is Noah Kirk a task force officer with?

A        He was assigned -- I don't know what his task force was called, but it was an FBI joint task force in Pomona.

Q        What was his regular duty when he was not with the task force?

A        OSJ deputy.

Q        When was this e-mail sent?

A        Thursday, August 18.

Q        Okay.  Can you please read after the "Hello, sir" in this text?

A        "Per our conversation, I took the number that was called of the ITMS and forwarded that to Jennifer Naujock. Naujock is the analyst for the FBI task for that I am on. Naujock agreed to do a workup on the number and told me she would contact me when she was done.  A few minutes later Naujock contacted me by and phone and questioned me as to why I

UNITED STATES DISTRICT COURT

wanted information on this number.  I told her that I believed that this number was responsible for assisting to bring cell phone into the jail.

Naujock then informed that the number belonged to the FBI out of West Los Angeles.  She said the number belonged to a civil rights investigator.  Naujock then informed me that she needed to speak with her supervisor before she spoke with me anymore about the situation.  I agreed and informed her that she should have her supervisor contact Lieutenant Thompson.  I gave her Lieutenant Thompson's phone number to his office, and the call ended.  Kirk."

Q      When you and Mr. Smith received this information, what did you do with it?

A      If I remember correctly, we talked to Lieutenant Thompson.

Q      And was that soon after Mr. Smith had received the original e-mail?

A      Probably.  I don't remember if Noah called and then sent the e-mail or -- but yes.  As soon as we found out, we talked to Lieutenant Thompson.

Q      When you spoke to Mr. Thompson, was it on the phone or in person?

A      I probably called first, and then we walked over.

Q      I'm going to focus on, then, your conversation with Mr. Thompson when you were in person.  You said, we walked

**UNITED STATES DISTRICT COURT**

over.  Where did you walk to?

A    Well, we were at Men's Central Jail, and his office was at Twin Towers.  We just had to walk across the street.

Q    And when you say "we," who was there besides you?

A    Deputy Smith.

Q    As far as you recall, it sounds like you, Deputy Smith, and Lieutenant Thompson at this meeting; is that correct?

A    Yes.

Q    What did you talk about when you met with Lieutenant Thompson?

A    Just that the phone was connected with the FBI.

Q    Did Lieutenant Thompson give you any orders, any instructions?

A    Yes.  He wanted us to interview Anthony Brown and put him on tape.

Q    Did he tell you why?

A    Just to lock him into whatever story he was going to tell.

Q    And did you go ahead and do that?

A    We did.

Q    Now, Mr. Manzo, do you have any agreements with the United States currently?

A    Yes.

**UNITED STATES DISTRICT COURT**

Q        What is that agreement?

A        That in -- for my cooperation, I would get consideration for time off my sentence.

Q        Are you familiar with the term a Rule 35 motion?

A        Yes.

Q        Have you -- what has the United States told you about a Rule 35 motion?

A        That you would consider it.

Q        And what is a Rule 35 motion?

A        The best way to explain it, you would file that on my behalf for cooperating, and you would consider, depending on the information I give, time off my sentence.

Q        Who ultimately decides whether you get time off your sentence?

A        The judge.

Q        Okay.  Have you testified previously in proceedings?

A        Yes.

Q        In the previous proceedings where you've testified, have you received any reward for your testimony?

A        No.

Q        Why did you testify in those previous proceedings?

A        Because I got subpoenaed to.

MR. DIAMANTATOS:  Objection.  Relevance.

**UNITED STATES DISTRICT COURT**

756

THE COURT:  Overruled.

You can answer.

THE WITNESS:  I was subpoenaed to.

Q      BY MR. FOX:  Along with being subpoenaed, did you willingly testify in those proceedings?

A      I did.

Q      Now, going back to August 18 of 2011, you said that Mr. Thompson ordered you -- Lieutenant Thompson ordered you to speak to Anthony Brown.  Did you go ahead and do that?

A      Yes.

Q      When?

A      I believe it was the next morning, the Friday the 19th.

Q      And when you spoke to Mr. Brown on generally -- I just want to talk general topics, nothing specific -- what is it that you talked about?

A      For the parts that I was there for, he told us that he was working for the FBI as an informant or he was working for the FBI.  I don't think he said the word "informant."  That there was a third party on the street that had facilitated the cell phone into the jail.

Q      Is this a conversation that you recorded or just took notes?

A      We did both.

Q      Why did you record it?

UNITED STATES DISTRICT COURT

A        Because Lieutenant Thompson wanted us to.

Q        Did Mr. Thompson in the meeting the previous day explain to you why he wanted you to record this?

MR. DIAMANTATOS:  Objection.  Asked and answered.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  Yes.  He wanted to play the tape at a meeting.

Q        BY MR. FOX:  Did he explain to you who he wanted to play the tape for?

A        The executives.

Q        Did you have an understanding as to who the -- as to who the executives were when he made that statement?

A        Yes.

Q        Who did you understand that to mean?

A        The sheriff and the undersheriff.

Q        Could you please look in that same exhibit book at Exhibit 15.  This is in evidence.  I'm going to publish it, Your Honor.  Could you please read this.

First of all, starting from the "from" line.

A        "From Martinez, Steven M., Steven.Martinez@ic.fbi.gov, sent Thursday, August 18, 2011, at 5:06 p.m. to Baca, Leroy D.  Subject, please call.

"Lee, I have an important and sensitive matter I need to discuss with you.  If you have an opportunity this

evening, please call me at 310-883-8539.  Regards, Steven."

Q     And, Mr. Manzo, I'm now going to publish for you Government Exhibit 16 already in evidence.

Mr. Manzo, are you familiar with who Chris Nee is that's listed in the from line and what his role was in August of 2011 within the sheriff's department?

A     Yes.

Q     What role did Mr. Nee play in August of 2011 within the sheriff's department?

A     He was Mr. Tanaka's aide.

Q     Are you familiar with who Julie Montgomery was during that time?

A     No.

Q     What is the date that this e-mail was sent and the time, please?

A     Thursday, August 18, 2011, 8:59 p.m.

Q     And what is the subject?

A     "Sheriff's meeting."

Q     Could you please read the text of this e-mail.

A     "Regarding the sheriff's meeting with the undersheriff, Captain Carey, Lieutenant Thompson, and Lieutenant Gallagher at 2:00 p.m., I have reserved the EPC room from 2:00 p.m. to 2:30 p.m."

Q     Are you familiar with the term "EPC room" that is listed in that e-mail?

A       Yes.

Q       What is the EPC room?

A       It is a conference room on the fourth floor of the sheriff's headquarters.

Q       Have you been there before?

A       Yes.

Q       How many times?

A       Twice.

Q       And when you were there, were there any executives you met with during those times?

A       Yes.

Q       Who were those executives?

A       The sheriff, the undersheriff, Lieutenant Thompson, Captain Carey, Lieutenant Peacock, Lieutenant Leavins, and Lieutenant Chris Nee was there also.

Q       You said the fourth floor Monterey Park.  Is there a name for that building?

A       SHB, Sheriff's Headquarters Bureau.

Q       Who was located on the fourth floor of that building?

A       The executives.  The sheriff and the undersheriff.

Q       And now I'm going to show to you what's in evidence as Government Exhibit 17 starting with the bottom of the first page, and I'll move on to the substance of the e-mail

**UNITED STATES DISTRICT COURT**

which is on the second page.

Do you see where it says, "From Chris Nee to William T. Carey" and then a couple other names after that?

A    Yes.

Q    Who was William T. Carey?

A    I know him as Tom Carey.  He was the captain of ICIB.

Q    Do you know who William Gallagher was?

A    No.

Q    And then Greg Thompson, is that the e-mail address or the way Mr. Thompson's name would show up in e-mails?

A    Yes.

Q    What is the subject of this e-mail?

A    "Meeting."

Q    Publishing the second page now, can you please read what I've highlighted?

A    "Good evening, gentlemen.  Mr. Tanaka would like to meet with you in his office tomorrow at 1330 hours.  If you have any questions, please call me at 323-526-5118, office, or 213-505-0878, cell.  Thank you."

Q    Now going back to the first page of that document, highlighting the third e-mail down that is from August 18, 2011, at 9:02 p.m. from Greg Thompson to Chris Nee, could you please read what Mr. Thompson wrote?

**UNITED STATES DISTRICT COURT**

A        "Chris, FYI, I was going to wait until I had more evidence to go at Anthony Brown in an interview as to the source of the phone.  I may have to bump the plan up to tomorrow due the fact he will be on the state bus Saturday night.  At this time I would rather dump him and make him the state's problem while we continue collecting facts to ascertain if my suspicions were correct of we have an employee problem. Besides, if he doesn't want to cooperate, there is nothing we can offer him with 400 plus years handing over his head.  Could you also provide a computer so I can play the calls and everybody can make their own opinion?  Greg."

Q        I want to ask you a few questions about this e-mail.  It references a state bus.  Are you familiar with that term?

A        Yes.

Q        What is a state bus?

A        A state bus is the bus that takes the inmates that are now prisoners of the state of California from Men's Central Jail to wherever they're going in the state prison system.

Q        Did you have any role in attempting to get Mr. Brown on a state bus that would go out two days later, August 20, 2011?

A        I did, yes.

Q        What was that role?

A        I worked along with Detective Idleberg from jail liaison to get a hold that was placed on Brown removed and then have him placed on the bus.

Q        Now, the sheriff's department's responsibilities with respect to Men's Central Jail were to run that jail; is that correct?

A        That's one, yes.

Q        Did the sheriff's department have a responsibility with respect to any state prison in terms of running that prison?

A        No.

Q        Now, this discusses -- and I'm going to show you the next e-mail as well.

Mr. Nee says, "Absolutely.  I will have a laptop available."  Do you recall whether you attended any meetings where there was a laptop and Mr. Thompson played any calls as he referenced in the previous e-mail?

A        Yes.

Q        Okay.  And we'll get into that in a little bit.

Now, reading this top e-mail, what does Mr. Thompson write to Mr. Nee at 10:31 p.m. on August 18?

A        "Thanks, Chris.  Will it be okay to bring two of the OSJ guys working the case?"

Q        Now, I want to ask you now about the Anthony Brown interview that you've discussed, the recording

**UNITED STATES DISTRICT COURT**

that you did.

Where did you conduct that interview?

A        It was on the 6000 floor of Men's Central Jail in the large interview room.

Q        Can you look now through that exhibit book at Exhibit 71, please.

Do you recognize that exhibit?

A        I recognize that as a CD.

Q        Yes.  Can you take it out of its sleeve.  I'm sorry.  Is that not the original exhibit?  Let me grab the original exhibit.  71.

And, Mr. Manzo, I'm going to also be asking them to take a look at -- well, we can do this as we go.  We'll do this as we go if that's okay.  Thank you.

Do you recognize that CD?

A        I do, yes.

Q        How do you recognize it?

A        I signed it.

Q        And look at Exhibit 72 from your book, please.  Do you recognize Government Exhibit 72?

A        Yes.

Q        Okay.  Now, talking about those two exhibits, is Government Exhibit 71 a true and accurate copy of excerpts from your recording of the interview that you conducted of Anthony Brown?

**UNITED STATES DISTRICT COURT**

764

A        Yes, it is.

Q        And looking at Exhibit 72, is it a fair and accurate transcription of those excerpts of that recording that you conducted of Anthony Brown?

A        Yes.

(Marked for identification Exhibit No. 72.)

Q        BY MR. FOX:  Does it accurately list the speakers?

A        Yes.

Q        How do you know that?

A        I listened to it, and I was there.

MR. FOX:  Your Honor, I move for the admission of Government Exhibit 71.

THE COURT:  Any objection?

MR. DIAMANTATOS:  No objection, Your Honor.

THE COURT:  It will be received.

(Marked for identification and received into evidence Exhibit No. 71.)

MR. FOX:  And, Your Honor, we have transcript books we'd like to hand out to the grand jury at this time -- I'm sorry -- to the jury at this time.

THE COURT:  That's fine.

MR. FOX:  Your Honor, can we ask the jury to not flip through it and just go to the exhibit number that we ask them to at the correct time?

**UNITED STATES DISTRICT COURT**

THE COURT:  That's fine.  If you just keep those notebooks closed, and we'll let you know what page to open them up to.  Try not to look ahead.  Once the recording is going to play, if you would then close the notebooks.

You're about to hear a recording that has been received into evidence.  A transcript of that recording is being provided to help you identify the speakers and to help you decide what the speakers say.  Remember, the recording is the evidence, not the transcript.  If you hear something different than what appears in the transcript, what you heard is controlling.  Listen carefully.  The transcript will not be available during your deliberations.

MR. FOX:  And, Your Honor, I'm now going to play the first clip from Government Exhibit 71.

THE COURT:  Is there a page that they can --

MR. FOX:  If they just flip to 72, it's going to be the first page in Exhibit 72.

May I proceed, Your Honor?

THE COURT:  Yes, please.

(The cd, Exhibit No. 71, commenced playing before the jury.)

MR. FOX:  I'm going to play the next clip on that page, the second excerpt in 71.

(The cd, Exhibit No. 71, commenced playing before the jury.)

Q        BY MR. FOX:  Mr. Manzo, we just heard Mr. Smith tell Anthony Brown that he was going to state prison tomorrow.

Had you already arranged for his transportation there?

A        Yes.

Q        How difficult was that to do?

A        It wasn't easy.

Q        Why was that?

A        There's a line when you go to state prison, and he wasn't on that -- he wasn't very close.  So we had to bump him up to get him on the list.

MR. FOX:  I'm now going to play the clip that is starting on the transcript at the bottom of page 1.

(The cd, Exhibit No. 71, commenced playing before the jury.)

MR. FOX:  I'm now going to play the clip at the bottom of page 2.

(The cd, Exhibit No. 71, commenced playing before the jury.)

Q        BY MR. FOX:  We heard on page 4 of that transcript Deputy Smith discussing how he was quoting something it sounded like.  What he was quoting at that point?

Let me direct your attention, Mr. Manzo, to refresh your recollection on page 4 about halfway down when we heard Mr. Smith say, "Don't worry.  You'll have your phone

**UNITED STATES DISTRICT COURT**

soon.  All right.  Okay.  I need to see somebody.  Yeah.  We're working on that on our end?"

A    That was almost an exact transcript of the phone call that we recovered off the ITMS.

Q    And that was the jail landline phone you're discussing?

A    Yes.

Q    A call between who and who at that point?

A    Anthony Brown and at that point we didn't know. We knew it was the FBI, but we didn't know who from the FBI.

Q    Did you know which squad that belonged to?

A    Civil rights division.

MR. FOX:  I'm now going to play the clip that starts on -- about halfway down on page 5.

(The cd, Exhibit No. 71, commenced playing

before the jury.)

MR. FOX:  Now playing the clip that begins on the top -- near the top of page 6.

One second, Your Honor.

THE COURT:  Is this a good time to take our recess?

MR. FOX:  Yes.  This is a good time.

THE COURT:  All right.  Ladies and gentlemen, we're going to take our final break of the day.  Again, I want to remind you, until this trial is over, you're not to discuss

UNITED STATES DISTRICT COURT

this case with anyone including your fellow jurors, members of your family, people involved in the trial, or anyone else.  And do not allow others to discuss the case with you.  This includes discussing the case on the Internet, through chat rooms, blogs, bulletin boards, by e-mails or text messages.  If anyone tries to communicate with you about the case, please let me know about it immediately.

Do not read, watch, or listen to any news reports or other accounts about the trial or anyone associated with it.  Do not do any research such as consulting dictionaries, searching the Internet, or using other reference materials.  And do not make any investigation about the case on your own.

Finally, you're reminded to keep an open mind until all the evidence has been received, you've heard the arguments of counsel, the instructions of the Court, and the views of your fellows jurors.  If you need to speak with me, simply give a note to the clerk.

We'll come back at a quarter after the hour.

(The following proceedings were held in
open court out of the presence of the jury:)

THE COURT:  All right, sir.  You may step down.

All right.  We'll see everybody around 12:15.

(A recess was taken at 11:58 a.m.)

THE COURT:  All right.  Let's bring the jury in.

///

(The following proceedings were held in open court in the presence of the jury:)

MR. FOX:  May I proceed, Your Honor?

THE COURT:  Yes, please.

Q     BY MR. FOX:  Mr. Manzo, I want to go back to something you said a few minutes ago.  You said in the previous proceedings that you testified voluntarily.  Were you, in fact, compelled to testify in those cases?

A     Yes.

Q     Was that pursuant to a court order?

A     Yes.

Q     Now, let's go back to Exhibit 71 which is reflected in the transcript book on page 7 -- on Exhibit 72, page 6.  I'm going to play that now.

(The cd, Exhibit No. 71, commenced playing before the jury.)

MR. FOX:  Now on page 8 playing the next clip.

(The cd, Exhibit No. 71, commenced playing before the jury.)

MR. FOX:  I'm playing the next clip on the same page.

(The cd, Exhibit No. 71, commenced playing before the jury.)

MR. FOX:  I'm playing the clip that's listed on page 9 of this transcript.

**UNITED STATES DISTRICT COURT**

(The cd, Exhibit No. 71, commenced playing before the jury.)

MR. FOX:  Sorry.  I played the same clip.  I'm sorry, Your Honor.  I'm playing the correct one now.

(The cd, Exhibit No. 71, commenced playing before the jury.)

MR. FOX:  Mr. Manzo, there are a few references to C.J. in this transcript on that recording.  At that time do you know who C.J. was?

A      No.

Q      Why were you asking about somebody named C.J.?

A      Anthony Brown had said that the third party the deputy had met with to get the phone was named C.J.

Q      And we heard you saying that there was going to be a meeting with some very influential people in the department.  Who did you mean by that?

A      The executives.  The sheriff and the undersheriff.

Q      Now, playing for you the last clip listed on the bottom of page 10.

(The cd, Exhibit No. 71, commenced playing before the jury.)

THE COURT:  All right, ladies and gentlemen.  If you'd close your notebooks, please.

Q      BY MR. FOX:  Mr. Manzo, after you received this

information from Mr. Brown on August 19, what did you do with that information?

A        Took it to Lieutenant Thompson.

Q        Who took it to Lieutenant Thompson?

A        I don't remember if we called or we walked over, but Deputy Smith and I.

Q        And was there anybody else that was a party to the conversation when you took this to Lieutenant Thompson?

A        I don't think so.  I don't remember.

Q        Now, in general terms, what is it that you explained to Mr. Thompson?

A        That the reason Anthony Brown had a cell phone was that deputy brought it to him and that it was, in essence, a sting operation by the FBI who were conducting a civil rights investigation.

Q        You've discussed already that there was a meeting set up with the executives that afternoon.  Did that meeting occur?

A        Yes.

Q        And we've seen in e-mails that there was a meeting scheduled at 1:30 with Undersheriff Tanaka and one scheduled at 2:00 o'clock with Sheriff Baca.  Do you recall whether both of those meetings occurred?

A        I only went to the one.  I don't know if the earlier one happened.

**UNITED STATES DISTRICT COURT**

Q       When you say "only the one," which one did you go to?

A       The one where the sheriff and the undersheriff were there.

Q       Besides you and the undersheriff and sheriff, who else were present?

A       Deputy Smith, Lieutenant Thompson.  On the Friday that's all I can remember.  There's maybe three other people, but I don't know who they were.

Q       Where did this meeting take place?

A       In the fourth floor conference room, the EPC conference room.

Q       Do you know what the purpose of the meeting was?

A       To brief the sheriff and the undersheriff on the investigation.

Q       Did that happen?

A       Yes.

Q       Who briefed the sheriff and the undersheriff on the operation?

A       Lieutenant Thompson.

Q       And in general terms, what is it that Lieutenant Thompson told Mr. Baca and Mr. Tanaka?

A       Basically the same, that a cell phone was found and where it was found and that a deputy is alleged to be bringing it in from a third party and that it is linked to the

UNITED STATES DISTRICT COURT

FBI on a sting operation because they're investigating civil rights.

Q        Prior to this meeting, had you seen Mr. Baca before?

A        Yes.

Q        How many times?

A        Three or four.

Q        Do you think you'd recognize him again if you saw him?

A        Yes.

Q        Could you please look around the courtroom and let me know if you identify him?

A        I do.

MR. HOCHMAN:  So stipulated, Your Honor.

THE COURT:  All right.  The record will reflect the witness has identified the defendant.

Q        BY MR. FOX:  At that meeting, that August 19 meeting in the afternoon, did Mr. Baca say anything?

A        After Lieutenant Thompson's briefing, progress report, it was quiet for a while, and he asked open-ended questions like, "Why are they doing this?  Why didn't they come to us?  We could have helped them," things like that.  But he didn't get answers.  He was kind of talking out loud.

Q        Did Mr. Tanaka say anything?

A        I don't remember him saying anything.  He

probably did, but I don't remember what it was.

Q    Did Mr. Baca say anything about any prior conversations he had had with the FBI?

A    Yes.

Q    What did he say?

A    He said that he spoke to someone at the FBI and that they didn't acknowledge the investigation but they asked to see the phone.

Q    Was there a plan with respect to Anthony Brown that anybody came up with at the August 19 meeting?

A    Well, we were going to put him on the state bus, and he would have been gone on the 20th, but we were told not to do that.

Q    Who told you not to do that?

A    The sheriff wanted him to stay in our custody.

Q    How long did that meeting last?

A    Oh, man.  I don't remember.

Q    Okay.  Are we talking about a couple minutes, or are we talking about --

A    No.  It was longer than a couple minutes.  Closer to an hour maybe.

Q    How detailed of a briefing did Mr. Thompson provide to Mr. Baca and Mr. Tanaka?

A    It was pretty detailed without who did what but basically these are the steps we took.

**UNITED STATES DISTRICT COURT**

Q        I want to -- actually, I'll publish this Exhibit 19.

Do you see this e-mail on the lower half of Exhibit 19 that I've published for you?

A        Yes.

Q        Okay.  Can you please read what Mr. Thompson writes -- well, first of all, do you know who Cecil Rhambo is?

A        Yes.

Q        Who was Cecil Rhambo at this time?

A        At the time I think he was the assistant sheriff over something.  I don't know exactly what, but I think so.

Q        What about Dennis Burns?

A        He was the chief of custody division.

Q        Did OSJ report to the chief of custody division?

A        Yes.

Q        And what is it that Mr. Thompson writes to Mr. Burns and the Assistant Sheriff Rhambo?

A        "Sir, I met with the sheriff, Mr. Tanaka, Tom Carey, and IIB in regards to the cell phone.  Too much to type.  I'm on the SHB patio waiting to brief you."

Q        Now, highlighting the top e-mail, what does this say from Mr. Rhambo to Mr. Thompson on August 19 at 9:52 p.m.?

A        "Paul briefed me.  We went to see the sheriff.  I was given a partial briefing.  I don't even want to know." Sent from the BlackBerry of Cecil Rhambo, Jr.

UNITED STATES DISTRICT COURT

Q        You mentioned that you had seen Mr. Baca three or four times before that in your career before that August 19 meeting.  Did you have another meeting with him soon after the August 19 meeting?

A        Yes.  The next day.

Q        And what was the purpose of that meeting?

A        To play the recorded phone calls we recovered.

Q        Which recorded phone calls are you discussing?

A        The three that Anthony Brown made to the civil rights division of the FBI from his cell.

Q        Now, this was on August 20th.  What day of the week was August 20th?

A        Saturday.

Q        How do you know that?

A        I don't work Saturdays.

Q        Did you work that Saturday?

A        I did.

Q        Where was this meeting held?

A        Same EPC conference room on the fourth floor.

Q        Along with playing the recordings, was there -- let me back up.

         Who was present at that meeting?

A        The sheriff, undersheriff, myself, Deputy Smith, Lieutenant Thompson, Captain Carey, Lieutenant Peacock, Lieutenant Leavins, and Lieutenant Krisney.

**UNITED STATES DISTRICT COURT**

Q        I'm going to ask some questions about some of those people you talked about.

You've already told us that Nee was Undersheriff Tanaka's aide.  You mentioned a Steve Leavins in there.  Who was Steve Leavins?

A        He was the lieutenant at ICIB.

Q        What about Tom Carey?  Is that -- you mentioned him earlier.  Which entity did he belong to?

A        He was the captain of ICIB.

Q        I believe you said there was a Gallagher there as well; is that right?  I'm sorry.

What happened at this meeting?

A        The same briefing was given to catch up the people that weren't there, and then I played the phone calls.

Q        What happened after you played the phone calls?

A        Mr. Tanaka slammed his hands on the desk and pretty much kind of went off, or he did go off.  He didn't kind of.

Q        When you said he did go off, was this in front of everybody in the room?

A        Yes.

Q        What did he say?

A        Initially he was kind of "What the hell?"  Then "There it is right there.  That's what they're doing.  What are they doing?  You know, fuck them."  Excuse my language.  I

UNITED STATES DISTRICT COURT

apologize.  Things like that.

Q        Is there anything else that you recall him saying?

A        No.

Q        What happened after he said all this?

A        There was general discussion again about what, why.

Q        Let me stop you there.

You said there was a general discussion about why.  Are you talking about the cell phone itself and why the cell phone was there?

A        No.  I'm talking about why the FBI would do that, why they would introduce the phone.

Q        Did Mr. Thompson provide any briefing to anybody in the room?

A        Yes.

Q        What did he say?

A        He went off of a timeline that I had done.  He pretty much went straight off the timeline that I had typed up to them.  I can't remember exactly what was on it.

Q        What about Mr. Baca?  Did he give any briefing to the people in the room about anything?

A        No.  I don't remember him giving a briefing.  I remember him kind of -- well, he basically told us what we were going to do.

**UNITED STATES DISTRICT COURT**

Q        I want you to now look at Exhibit 137.  That should be in a different exhibit book than the one you were just looking at.

Have you reviewed that?

A        Yes.

Q        What is it?

A        It is the -- well, it's an e-mail that is also part of my timeline or my timeline.  Excuse me.

Q        You mentioned a timeline that Mr. Thompson was going off of on that Saturday meeting.  Is this the timeline you're referring to?

A        Yes.

Q        In substance was this the timeline that was handed out in any way at that start meeting?

A        I don't remember if we handed it out.  I know that there were enough copies to do so.  But I think for some reason I want to say we didn't.  We just had Lieutenant Thompson read off of it.

Q        You said earlier that you read almost word-for-word off this?

A        Pretty close.

MR. FOX:  Your Honor, I move for the admission of Government Exhibit 137.

THE COURT:  Any objection?

MR. DIAMANTATOS:  No objection, Your Honor.

**UNITED STATES DISTRICT COURT**

THE COURT:  It will be received.

(Marked for identification and received
into evidence Exhibit No. 137.)

Q       BY MR. FOX:  Showing you now the first three
entries underneath your timeline.

Do you see that there?

A       Yes.

Q       Generally, what is discussed there?

A       These are the three calls that we played for
the -- at the meeting.

Q       Showing you now the third page of that exhibit,
we see two entries -- 8/18 at 0830 hours and 8/18 at
0845 hours.  Generally, what are you discussing in this portion
of the timeline?

A       Getting Anthony Brown on the state line bus.

Q       After this briefing was given about this timeline
and after Mr. Tanaka had this outburst, what happened next?

A       The sheriff said that Captain Carey, Tom Carey,
his shop was going to conduct the investigation.  He was going
to run through ICIB.  Everything was supposed to be run through
the undersheriff up to the sheriff and that he wanted
Anthony Brown isolated and protected.  He wanted to know -- he
wanted everything off the cell phone.  He wanted to know what
was going on in regards to the FBI investigation.

Q       After he gave those orders, what occurred?

**UNITED STATES DISTRICT COURT**

A        He and the undersheriff stepped out.

Q        How long were they gone?

A        I don't remember.

Q        After he and the undersheriff stepped out, what did you do?

A        We stayed there.  Just waited.

Q        What happened next?

A        Mr. Tanaka came back in.

Q        What, if anything, did Mr. Tanaka say when he came back in?

A        Mr. Tanaka said that he had known the sheriff a long time and he hadn't seen him that upset in that time and that he stated what he wanted done and that you guys are going to do it for him.

Q        Did Mr. Tanaka provide you any more information at that point in time about what to do with Anthony Brown?

A        Yes.  I'm sorry.  Yes.

Q        What did he say?

A        That he wanted final approval on whoever visited him.

Q        Can you please look at Exhibit 74, the original exhibit, which should be, I think, on the witness stand.

Do you recognize it?

A        I do.

Q        What is it?

782

A        It is a CD of the Brown audio clips from the 21st.

Q        Were you present for an interview of Mr. Brown on the 21st of August?

A        Yes.

Q        At that point in time, was OSJ, you, and Deputy Smith running the interviews anymore?

A        No.

Q        What happened instead?

A        After the meeting on the 20th, Lieutenant Leavins took over as the interviewer.

Q        Is Government Exhibit 74 a true and accurate copy of certain excerpts from that August 21st recording?

A        Yes.

Q        And please look at Government Exhibit 75 which should be in your book.

        (Marked for identification Exhibit No. 75.)

            MR. FOX:  Your Honor, while he does that, I'd like to move for the admission of Government Exhibit 74.

            MR. DIAMANTATOS:  No objection, Your Honor.

            THE COURT:  It will be received.

        (Marked for identification and received

         into evidence Exhibit No. 74.)

Q        BY MR. FOX:  Do you recognize what Government Exhibit 75 is?

**UNITED STATES DISTRICT COURT**

A          Yes.

Q          What is it?

A          It's a transcript of the clips from Exhibit 74.

Q          Does it truly and accurately depict the speakers and the content of Government Exhibit 74?

A          Yes.

MR. FOX:  I'd like to play portions of -- all of Government Exhibit 74 which are reflected in the jury binders under the tab 75.

THE COURT:  All right.  Ladies and gentlemen, if you'll open your notebooks to tab 75, I believe.

Again, you're going to hear recordings that been received into evidence.  The transcript of the recording is being provided to help you identify the speakers and help you decide what the speakers say.  Remember, the recording is the evidence, not the transcript.  If you hear something different from what appears in the transcript, what you heard is controlling.  Listen carefully.  The transcript will not be available during your deliberations.

MR. FOX:  May I proceed, Your Honor?

THE COURT:  Yes, please.

(The cd, Exhibit No. 74, commenced playing before the jury.)

MR. FOX:  I'm playing the clip at the very bottom of that page.

**UNITED STATES DISTRICT COURT**

(The cd, Exhibit No. 74, commenced playing before the jury.)

Q        BY MR. FOX:  Mr. Manzo, we just heard Anthony Brown discuss a Deputy Michel.  Did you know at the time who Deputy Michel was?

A        Yes.

Q        How did you know him?

A        I had worked with him off and on.

Q        What was his first name?

A        Gilbert.

Q        What about a Deputy Bravo that he mentions?

A        Yes.

Q        Are you familiar with him?

A        Yes.

Q        How are you familiar with him?

A        I also worked with him.

Q        Do you know of any relationship that he had to any executive?

A        Yes.

Q        What was that relationship?

A        He was the sheriff's nephew.

MR. FOX:  I'm playing you now the clip that's listed on the second page about halfway down.

(The cd, Exhibit No. 74, commenced playing before the jury.)

MR. FOX:  I'm now playing the clip at the top of page 3.

(The cd, Exhibit No. 74, commenced playing before the jury.)

Q      BY MR. FOX:  Mr. Brown in this portion referenced a cell phone that he received in 2009.  During your investigation, did you ever learn whether Mr. Brown actually had a cell phone in 2009?

A      I don't believe he did.

Q      And we heard earlier that he was referring to drugs and other types of contraband that he was bringing in taking away -- let's talk specifically about the drugs.

Did you ever find any information in this investigation that led you to believe that he, in fact, was receiving drugs from the Federal Government?

A      No.

MR. FOX:  Playing now at the bottom of page 3.

(The cd, Exhibit No. 74, commenced playing before the jury.)

MR. FOX:  Now playing the part in the middle of page 4.

(The cd, Exhibit No. 74, commenced playing before the jury.)

MR. FOX:  Now playing a portion at the bottom of that page.

**UNITED STATES DISTRICT COURT**

(The cd, Exhibit No. 74, commenced playing before the jury.)

MR. FOX:  Playing the portion now the first third of page 5.

(The cd, Exhibit No. 74, commenced playing before the jury.)

Q      BY MR. FOX:  Was this the first time that you learned that C.J. was an FBI agent?

A      Yes.

MR. FOX:  Playing now the part at the bottom of page 5.

(The cd, Exhibit No. 74, commenced playing before the jury.)

MR. FOX:  Playing the next part on page 6.

(The cd, Exhibit No. 74, commenced playing before the jury.)

MR. FOX:  Go to the next portion on that page.

(The cd, Exhibit No. 74, commenced playing before the jury.)

Q      BY MR. FOX:  You discussed -- there was a discussion there about 6000.  I believe that's the same room that you said you interviewed Anthony Brown in previously; is that right?

A      Yes.

Q      What is 6000 in Men's Central Jail?

UNITED STATES DISTRICT COURT

A       It's the hospital.

Q       And the room that you would interview Anthony Brown in, what was it like?  Describe it for us.

A       It was a large room, large enough for a table and four chairs.

MR. FOX:  Now playing for you the clip that is on page 7.

(The cd, Exhibit No. 74, commenced playing before the jury.)

MR. FOX:  Your Honor, I'm not going to play any more clips at this time.

THE COURT:  All right.  Ladies and gentlemen, if you'll close your notebooks, please.

Q       BY MR. FOX:  Mr. Manzo, I now want to take you to a couple days later, August 23rd, 2011.  Did anything unusual happen at that time?

A       Yes.  Brown was interviewed by the FBI.

Q       Was this supposed to happen?

A       No.

Q       Why not?

A       There had been, I guess, words -- they had been instructed not to.

Q       When you say "They had been instructed not to," are you referring to deputies within the sheriff's department, or are you referring to the FBI?

UNITED STATES DISTRICT COURT

A       The deputies that were working the module where Brown was housed had been instructed not to let him out.

Q       How did you find out about it?

A       The interview?

Q       Yes.

A       Deputy Smith and I arrived back from one of the northern jails, and we were told by somebody from jail liaison that the FBI was currently interviewing Anthony Brown.

Q       What did you do when you found out this information?

A       I called Lieutenant Thompson.

Q       What happened next?

A       About that same time that we found out, Lieutenant Leavins walked into the room, and he also found out.

Q       What happened after Mr. Leavins found out?

A       He called somebody, and the interview was canceled.

Q       Do you know where Mr. Brown had been housed up until this point in time?

A       I want to say 1751G row.

Q       Do you know what 1751G row -- why don't you just describe that location for us.

A       1751G row is the second most secure spot in the entire county, probably.  It is a single-man cell with Plexiglass over the bars and a camera 24/7.

Q        What type of inmates are placed in 1751G row?

A        The only one I remembered, we called him Benji, and he was interesting to say the least.

Q        You say it's the second most secure area in the county jails; is that right?

A        I would say that, yes.

Q        What about in Men's Central Jail?

A        It would be second.

Q        And the camera you discussed, does that -- is that able to record who's coming to the cells and who is leaving the cells?

A        I believe at that time it just showed in the cell.  I'm not a hundred percent sure, but I'm pretty sure it was just in the cell.

Q        I'm now going to show you what's in evidence as Government Exhibit 20.  Showing you the last e-mail listed on that document.

Do you know who Daniel Fedele was?

A        I believe he was the operations lieutenant at Men's Central Jail.

Q        What is this date and time that this e-mail was sent?

A        Tuesday, August 23rd, 2011, at 2:35 p.m.

Q        What does Mr. Fedele write to Mr. Thompson?

A        It says that he "Personally just looked at the

**UNITED STATES DISTRICT COURT**

board in 1750.  Right now there is a note on there that no one talks to him without your approval.  I talked to Senior Bonner who said they just changed it.  Prior to the change, the board reflected that no one sees him without your, my, or Lamar's approval.  Lamar says that the A/senior knew of the special handle and ignored it."

Q        What is an A/senior?

A        1750 and 1751 have to have a hard senior at all times because of the inmates.  When there isn't an available hard senior, there is what is called an A/senior who is the deputy that has of the most experience and they throw in there.

Q        What is a "senior"?

A        It is the next rank above deputy but before sergeant.

Q        What happened after Lieutenant Leavins made that phone call to stop the interview with the FBI?

A        Sergeant Waterman interrupted the interview and escorted -- had deputies escort Brown out.

Q        What did you do next?

A        Immediately after, Lieutenant Leavins wanted all the deputies from 17 in the jail liaison office; so I stayed with them for that.

Q        What happened when he brought them all into the jail liaison office?

A        He wanted to know what happened.  He said that

they were given orders and what happened, and the A/senior at the time stepped up, to his credit, and said that he screwed up.

Q    Did you go anywhere that day outside of Men's Central Jail?

A    Yes.

Q    Where did you go?

A    SHB, Sheriff's Headquarters Bureau.

Q    Is that the one in Monterey Park you discussed earlier?

A    Yes.

Q    Where within SHB did you go?

A    Mr. Tanaka's office on the fourth floor.

Q    Who else was present?

A    Deputy Smith, Lieutenant Thompson, and Captain Carey.

Q    I'm now going to show you that same exhibit again, Exhibit 20.  Can you please read this e-mail.

A    "Delayed re a meeting with P.T."

Q    Who sent this e-mail?

A    Lieutenant Thompson.

Q    What happened in this meeting with Mr. Tanaka?

A    The four of us got our asses chewed off.

Q    What do you mean by that?

A    He wanted to know why it happened.  Why did the

FBI get in?  He wanted to let us know that we let him down and we let the sheriff down and that, if we couldn't do our job, that he'd find somebody to do it for us.

Q      Did he use any expletives?

A      Just a few.  He basically repeated the same thing he repeated in the meeting that, "Who the fuck do they think they are?  Fuck the FBI," things like that.

Q      What happened next?

A      Lieutenant Thompson asked him if the sheriff knew.

Q      What did Mr. Tanaka say?

A      No.  But you're going to tell him.

Q      Was there also a discussion at this meeting about what to do in the future with respect to Mr. Brown?

A      Yes.

Q      Who said what, if you recall?

A      Mr. Tanaka wanted a hundred percent guarantee that it would not happen again.

Q      Was there a plan to take Anthony Brown anywhere that was developed at this meeting?

A      I don't know if it original -- it originated at this that he was going to move out of Men's Central Jail to a station jail.

Q      Was there any discussion about OSJ deputies and changing their roles in terms of whether anybody would be

**UNITED STATES DISTRICT COURT**

guarding his cell?

A      Yes.

Q      Tell me about that.

A      Mr. Tanaka wanted two deputies, two OSJ deputies -- I think he said "Greg's people" is what he used, the term, to sit on Brown 24/7.

Q      You mentioned earlier that Mr. Tanaka told Mr. Thompson that he would go brief the sheriff.  Did you see anything happen at the conclusion of this meeting?

A      Yes.

Q      What did you see?

A      Lieutenant Thompson went into the sheriff's office.

Q      What did you do during this time?

A      Sat in the lobby.

Q      Actually, I want to go back a little bit.  Was there also a discussion in Mr. Tanaka's office about a change in policy, a written policy that would --

A      Yes.

Q      -- take effect?

       Please describe that.

A      Now, because of the breach, the executives -- excuse me -- the executives wanted, any time an FBI agent or someone from the FBI came in to interview an inmate, they wanted a badge and an ID.  They wanted a case number, and there

UNITED STATES DISTRICT COURT

were a couple other things.  I don't remember them all.

Q      Did Mr. Tanaka go in with Mr. Thompson to Mr. Baca's office?

A      No.

Q      Did Mr. Tanaka provide Mr. Thompson with any information about what not to tell Mr. Baca when he went in?

A      No.

Q      Based on your observations of Mr. Tanaka and Mr. Baca at the meetings you were in, was Mr. Tanaka trying to shield Mr. Baca from any information?

MR. DIAMANTATOS:  Objection, Your Honor.  Calls for speculation.  Foundation as to what Mr. Tanaka --

THE COURT:  You can rephrase the question.

Q      BY MR. FOX:  Did you observe in your interactions with Mr. Tanaka during this time him say anything that indicated to you that he wanted information shielded from Mr. Baca about this operation?

MR. DIAMANTATOS:  Objection.  Vague.

THE COURT:  Overruled.

MR. DIAMANTATOS:  May I be heard at sidebar on this, Your Honor?

THE COURT:  No, you may not.  Sit down.

Go ahead.

THE WITNESS:  No.

Q      BY MR. FOX:  When Mr. Thompson left Mr. Baca's

office, did you go anywhere?

A        Yes.  We headed back to Men's Central Jail.

Q        Did you have a discussion with Mr. Thompson at some point about what happened in Mr. Baca's office?

A        Yes.

Q        Who was present for that conversation?

A        Myself, Deputy Smith, and Lieutenant Thompson.

Q        Do you remember where this meeting occurred?

A        No.

Q        Was it around the time that you left Mr. Baca's -- that you left the executive offices in Monterey Park?

A        Yes.

Q        And what, if anything, did Mr. Thompson tell you took place in Mr. Baca's office?

A        He said that he briefed him about the breach and that the sheriff was understanding and that his main focus was trying to get -- figure out a way to help Brown understand the 423 years that he's facing.

Q        What, if anything, did -- well, you said "the breach."  What, if anything, did Mr. Thompson tell you about what he told Mr. Baca about the breach?  In other words, who breached?

A        He let him know that the FBI interviewed Brown.

Q        Did Mr. Thompson tell you whether he informed

Mr. Baca whether the meeting was stopped between the FBI and Anthony Brown?

A    Yes, he did.

Q    Did Mr. Thompson tell you anything about whether he had informed Mr. Baca that he had already briefed the undersheriff?

A    I believe he did, yes.

Q    Did Mr. Thompson say anything to you about whether he apologized to Mr. Baca?

A    He did.

Q    What did he say?

A    He said that he apologized, and basically he dove on the sword.  Those were his words.

MR. FOX:  I'm now going to publish what's in evidence as Government Exhibit 22 and specifically the second page.  Actually, I'm going to start on the top of the previous page.

Do you see what I'm highlighting right here at the very bottom?

A    Yes.

Q    This is an e-mail that carries over to the next page.

Who is this e-mail from?

A    Cecil Rhambo.

Q    Who's it written to?

UNITED STATES DISTRICT COURT

A        Greg Thompson.

Q        What is the date and time of this e-mail?

A        August -- Tuesday, August 23rd, 2011, at 10:08 p.m.

Q        What does it say?

A        "Hang in there."

Q        Who is this e-mail from on the first page that I'm highlighting?

A        Greg Thompson.

Q        And what's the date and time?

A        August 23rd, 2011, at 10:12 p.m.

Q        What is it that Mr. Thompson wrote?

A        "I'm good for the butt chewing.  It was the 'You failed me' that hurt me.  The last thing I want to hear from you, him, or the sheriff are those words.  But as always, I learned who to rely on.  Thanks."

Q        Now highlighting the next e-mail up, can you please read who this is from and to?

A        From Cecil Rhambo to Gregory Thompson.

Q        What date and time?

A        Tuesday, August 23rd, 2011, at 10:49 p.m.

Q        What does Mr. Rhambo state?

A        "I think in this instance assumption, which is the mother of all screw-ups, occurred.  Combine that with the sensitive nature of the event, and it becomes a very complex

UNITED STATES DISTRICT COURT

issue to manage.  I hear you.  I'm sensitive to letting him or the sheriff down too.  He still loves you as do I.  Believe me, it hurt him to emote on you that way."

Q      And now I'm highlighting a portion of the e-mail that is right above it at 11:05 p.m. from Mr. Thompson.  What did Mr. Thompson write?

A      "I know.  That's why the act is already forgotten.  I did learn something.  Follow up on every direction, even if your friends assure you they will handle the task.  Just --" I'm sorry.

Q      Go ahead.

A      "Just to let you know, I briefed MCJ p.m. and e.m. supervisors in regards to new FBI and outside LE interviewing procedures, and that revised policy will be following."

Q      Is "LE" an --

MR. DIAMANTATOS:  Objection, Your Honor, to this witness explaining the e-mail that he didn't draft.

MR. FOX:  Your Honor, I'm going to ask him about an acronym and whether he's aware what it means.

THE COURT:  Let's wait for the question.  If you have an objection --

MR. DIAMANTATOS:  Yes, Your Honor.

Q      BY MR. FOX:  Mr. Manzo, are you aware of what the abbreviation "LE" means within the sheriff's department?

A        Yes.

Q        What does it mean?

A        Law enforcement.

Q        I think next to you now should be Exhibit 77.  It should be another CD.

A        Okay.

Q        What is Exhibit 77?

A        It's a CD of recordings from the August 23rd interview.

Q        How do you know that's what it is?

A        I listened to it and signed it.

Q        And look at Exhibit 78 that should be in the book.

            (Marked for identification Exhibit No. 78.)

                MR. FOX:  While he does that, Your Honor, I'd like to move for the admission of Government Exhibit 77.

                MR. DIAMANTATOS:  No objection, Your Honor.

                THE COURT:  It will be received.

            (Marked for identification and received

            into evidence Exhibit No. 77.)

Q        BY MR. FOX:  Are you familiar with Government Exhibit 78?

A        Yes.

Q        What is it?

A        Transcript of the CD.

**UNITED STATES DISTRICT COURT**

Q        Does it truly and accurately reflect the speakers and what was said on Government Exhibit 77?

A        Yes.

MR. FOX:  Your Honor, I'd like to begin playing Government Exhibit 77 for the jury which is reflected in the jury book in transcript 78.

THE COURT:  All right.  If you'd open your notebooks, please.  I believe it's tab 78.

MR. FOX:  Yes, Your Honor.  Thank you.

Playing the first clip.

(The cd, Exhibit No. 78, commenced playing before the jury.)

Q        BY MR. FOX:  What are those numbers after all the names?

A        After the sheriff's department personnel, those are our employee numbers.  And after Inmate Brown, that's his booking number.

MR. FOX:  Now I'm going to play the second clip.

(The cd, Exhibit No. 78, commenced playing before the jury.)

Q        I'm going to stop right there and ask you a follow-up question.  This is on page 2.

Mr. Brown just said, "They were just here." Going into that interview with Anthony Brown, were you already aware that the FBI had been there to interview Mr. Brown?

**UNITED STATES DISTRICT COURT**

A        Yes.

MR. FOX:  Continuing.

(The cd, Exhibit No. 78, commenced playing before the jury.)

MR. FOX:  Now playing the clip on page 7.

(The cd, Exhibit No. 78, commenced playing before the jury.)

MR. FOX:  And the top of page 8.

(The cd, Exhibit No. 78, commenced playing before the jury.)

MR. FOX:  The next one on page 8.

(The cd, Exhibit No. 78, commenced playing before the jury.)

MR. FOX:  The bottom of page 8.

(The cd, Exhibit No. 78, commenced playing before the jury.)

MR. FOX:  Another clip at the bottom of page 9.

(The cd, Exhibit No. 78, commenced playing before the jury.)

MR. FOX:  Now the clip on page 10.

(The cd, Exhibit No. 78, commenced playing before the jury.)

MR. FOX:  Your Honor, there's one more clip that I'd like to play.  It's at the bottom of page 13.

///

**UNITED STATES DISTRICT COURT**

(The cd, Exhibit No. 78, commenced playing

before the jury.)

THE COURT:  Is this a convenient time to break?

MR. FOX:  Yes, Your Honor.

THE COURT:  All right, ladies and gentlemen.

Again, I want to remind you, until this trial is over, you're not to discuss this case with anyone including your fellow jurors, members of your family, people involved in the trial, or anyone else.  And do not allow others to discuss the case with you.  This includes discussing the case on the Internet, through chat rooms, blogs, bulletin boards, by e-mails or text messages.  If anyone tries to communicate with you about this case, please let me know about it immediately.

Do not read, watch, or listen to any news reports or any accounts about the trial or anyone associated with it. Do not do any research such as consulting dictionaries, searching the Internet, or using other reference materials, and do not make any investigation about the case on your own.

Finally, you're reminded to keep an open mind until all the evidence has been presented, you've heard the arguments of counsel, the instructions of the Court, and the views of your fellow jurors.  If you need to speak with me, simply give a note to the clerk.

We'll see you tomorrow morning at 8:00 o'clock. Drive safely.

803

(The following proceedings were held in open court out of the presence of the jury:)

THE COURT:  All right, sir.  You may step down.  Thank you.

Who's going to follow this witness?

MR. FOX:  I've got to move a witness around based on travel restrictions.  I think we may put Linda Farrar on next.  She is F-a-r-r-a-r.  The other witnesses I expect to testify tomorrow are Cecil Rhambo, David Dahle, and if we get to him, James Sexton.

And, Your Honor, Mr. Sexton is in custody currently.  I don't know if you've had anybody use the transport yet here, but I just wanted to put that out to the Court.

THE COURT:  Okay.  Anything else?

MR. FOX:  No, Your Honor.

MR. HOCHMAN:  Nothing from the defense, Your Honor.

THE COURT:  All right.  Thank you very much.  We'll see everybody tomorrow morning at 8:00 o'clock.

(Proceedings concluded at 1:35 p.m.)

**UNITED STATES DISTRICT COURT**

804

CERTIFICATE OF OFFICIAL REPORTER

I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

DATED THIS  14TH  DAY OF AUGUST, 2017.


/S/ MIRANDA ALGORRI

MIRANDA ALGORRI, CSR NO. 12743, CRR
FEDERAL OFFICIAL COURT REPORTER

**UNITED STATES DISTRICT COURT**