**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION**

**HONORABLE PERCY ANDERSON, U.S. DISTRICT JUDGE**

UNITED STATES OF AMERICA,      )
                               )
          Plaintiff,           )    Case No.
                               )
     vs.                       )    CR 16-00066(A)-PA
                               )
LEROY D. BACA,                 )    PAGES 1023 to 1223
                               )    VOLUME 8
          Defendant.           )
_____)

**REPORTER'S TRANSCRIPT OF**
**TRIAL DAY 5**
**TUESDAY, DECEMBER 13, 2016**
**8:12 A.M.**
**LOS ANGELES, CALIFORNIA**

**MIRANDA ALGORRI, CSR 12743, CRR**
FEDERAL OFFICIAL COURT REPORTER
312 NORTH SPRING STREET, ROOM 435
LOS ANGELES, CALIFORNIA 90012
MIRANDAALGORRI@GMAIL.COM

**UNITED STATES DISTRICT COURT**

1024

**APPEARANCES OF COUNSEL:**


**FOR THE PLAINTIFF:**

    SANDRA R. BROWN
    Acting United States Attorney
    BY:  BRANDON FOX
    BY:  EDDIE A. JAUREGUI
    Assistant United States Attorneys
    United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012


**FOR THE DEFENDANT:**

    MORGAN LEWIS AND BOCKIUS LLP
    BY:  NATHAN J. HOCHMAN
    BY:  BRIANNA ABRAMS
    The Water Garden
    1601 Cloverfield Boulevard
    Suite 2050 North
    Santa Monica, California 90404


    MORGAN LEWIS AND BOCKIUS LLP
    BY:  TINOS DIAMANTATOS
    77 West Wacker Drive
    Chicago, Illinois 60601

**UNITED STATES DISTRICT COURT**

1025

**I N D E X**


**TUESDAY, DECEMBER 13, 2016**


**Chronological Index of Witnesses**

Witnesses:                                                      Page

DAHLE, David

     Direct examination by Mr. Fox                           1032
     Cross-examination by Mr. Hochman                        1057
     Redirect examination by Mr. Fox                         1094
     Recross-examination by Mr. Hochman                      1097


ADAMS, Tara

     Direct examination by Mr. Jauregui                      1099
     Cross-examination by Mr. Diamantatos                    1124


DAHLE, David

     Direct examination by Mr. Fox                           1125


MICHEL, Gilbert

     Direct examination by Mr. Jauregui                      1127
     Cross-examination by Mr. Hochman                        1169
     Redirect examination by Mr. Jauregui                    1216

**UNITED STATES DISTRICT COURT**

1026

**EXHIBITS**


**TUESDAY, DECEMBER 13, 2016**


| Exhibits | | For ID | In EVD |
|---|---|---|---|
| 58 | E-mail Leavins to Carey 09/13/11 | 1027 | 1027 |
| 59 | E-mail Carey to Nee 09/13/11 | 1027 | 1027 |
| 92 | Recording of Michel Interview | 1149 | 1150 |
| 93 | Transcript of Michel Interview | 1149 | |
| 185 | Michel Plea | 1212 | |
| 634 | Photograph | 1190 | 1191 |
| 636 | Photograph | 1187 | 1188 |
| 739 | Photograph | 1203 | 1203 |

**UNITED STATES DISTRICT COURT**

1027

**LOS ANGELES, CALIFORNIA; TUESDAY, DECEMBER 13, 2016**

**8:12 A.M.**

**---**

(The following proceedings were held in open court out of the presence of the jury:)

THE CLERK:  Calling item No. 1, CR 16-66A, USA versus Leroy D. Baca.

Counsel, state your appearances, please.

MR. FOX:  Good morning, Your Honor.

Brandon Fox and Eddie Jauregui on behalf of the United States.  Also with us at counsel table is David Dahle with the FBI.

THE COURT:  Good morning.

MR. HOCHMAN:  Good morning, Your Honor.

Nathan Hochman, Tinos Diamantatos, and Brianna Abrams on behalf of Defendant Leroy Baca who is present, Your Honor.

MR. DIAMANTATOS:  Good morning, Your Honor.

THE COURT:  Good morning.

I received information yesterday that Alternate No. 3 had been involved in a bicycle mishap and had been hospitalized.  She had, I guess, suffered some facial injuries.  I inquired whether or not she could continue to serve.  It was relayed to her that the Court had no concerns

**UNITED STATES DISTRICT COURT**

1028

about her serving assuming that she felt physically well enough to be here.

So she is here today. I'm just going to caution her, unless somebody has an objection, caution all the jurors, if they need a break before we take one, just raise their hand and let us know.

MR. HOCHMAN: Your Honor, does it make any sense to ask her to come out just to inquire of her personally, or do you want to just do it as a group? I don't obviously know if she's just trying to be a good soldier and be here or if she's in some pain and that pain is going to potentially distract her as she's listening to testimony.

THE COURT: I think it was made clear to her that -- of course, if she physically was unable to perform, then the Court would entertain, after consulting with the parties, excusing her. But I'm happy to do it either way.

MR. FOX: We have no objection to an individual voir dire if you want to inquire of her in front of us to see if she's okay. I think that's fine. But, Your Honor, if you'd rather do that at the end of the day -- I just -- I wonder if -- then she'll be informed about how well she was able to listen. I just hate to have the rest of the jury waiting right now. It's already 8:15.

Again, Your Honor, the last thing I'd want is a juror potentially distracted because she's in pain. I think we

**UNITED STATES DISTRICT COURT**

can do it very briefly and then lay that issue to rest.  Either way, Your Honor.  I'll defer to the Court.

THE COURT:  I'm going to bring them all in.  I'll just make sure that she and anybody else who isn't feeling well, let us know.  We'll take a break.  "I understand you were involved in an accident.  I want to make sure you're physically up to this.  If you're not, let us know."

MR. HOCHMAN:  Very well, Your Honor.  Thank you.

THE COURT:  All right.  Let's bring the jury in.

MR. FOX:  Your Honor, we are going to ask you to take judicial notice before Special Agent David Dahle's testimony.  He is our first witness today.  This is related to the judicial notice of a grand jury.

THE COURT:  And I assume this is in connection with the document that was filed -- I think it's 162 on the docket.

MR. FOX:  That's correct.  And I have an extra copy if you need one.

MR. HOCHMAN:  And, Your Honor, is it Your Honor's practice for, for instance, Mr. Fox to read the request or read the information in the judicial notice and then ask the Court to take judicial notice of this fact?  That's what we would prefer, Your Honor.

THE COURT:  I think during the last -- I think I actually read this.  I'll read it, and I'm going to instruct

**UNITED STATES DISTRICT COURT**

them they may or may not be required to accept these facts as true.

MR. HOCHMAN:  Thank you, Your Honor.

THE COURT:  Okay.  Let's bring the jury in.

(The following proceedings were held in open court in the presence of the jury:)

THE COURT:  Good morning, ladies and gentlemen. I apologize for the late start that we're getting to this morning.

I understand one of the alternates was involved in a mishap over the weekend.  I just wanted to make sure that you're physically feeling okay, and if at any time either you or any other juror feels the need for a break, please raise your hand, and we'll take one.

ALTERNATE JUROR NO. 3:  Thank you.

THE COURT:  All right.  If you'll call your first witness, please.

MR. FOX:  United States calls Special Agent David Dahle.

THE CLERK:  Raise your right hand for me.

Do you solemnly state that the testimony you may give in the cause now pending before this court shall be the truth, the whole truth, and nothing but the truth, so help you god?

THE WITNESS:  Yes.

**UNITED STATES DISTRICT COURT**

1031

THE CLERK:  Please be seated.

State your full name and spell your last name for the record.

THE WITNESS:  David Dahle, last name spelled D-a-h-l-e.

THE CLERK:  Thank you.

MR. FOX:  And, Your Honor, before we get into Special Agent Dahle's testimony, we ask you to take judicial notice of a grand jury.

THE COURT:  All right.  "Ladies and gentlemen, in the federal criminal justice system, grand juries investigate crimes, and absent a stipulation or agreement, all felony crimes must be prosecuted by a grand jury Indictment.

A grand jury investigation is the same thing as a grand jury proceeding.  Grand juries do not have the same function as trial juries.  For example, grand juries are not required to presume defendants innocent and may return an Indictment without considering the same burden of proof as a trial jury.  Grand juries do not hear arguments from defense attorneys and do not necessarily receive the same evidence that is later introduced at trial.

Grand jury Indictments are not evidence against any defendant.  Grand juries are ordered by the district court and are summoned, selected, and impaneled pursuant to federal law.  A grand jury must consist of no less than 16, no more

**UNITED STATES DISTRICT COURT**

1032

than 23 members.  The only people permitted inside the grand jury room are the witnesses under examination, grand jurors, the attorney for the Government, the interpreter, and a court reporter.

The attorney for the Government assists the grand jury in deciding which witnesses to hear from and which subpoenas to issue.  Counsel for witnesses or defendants are not permitted inside the grand jury room.  By law all participants other than witnesses are bound to strict secrecy regarding proceedings before the grand jury.  The term of a normal grand jury is not to exceed 18 months."

Ladies and gentlemen, you may or may not accept these noticed facts as conclusive.

MR. FOX:  May I proceed, Your Honor?

THE COURT:  Yes, please.

**DAVID DAHLE,**

**GOVERNMENT'S WITNESS, SWORN:**

**DIRECT EXAMINATION**

BY MR. FOX:

Q     Special Agent Dahle, what do you do for a living?

A     I'm a special agent with the Federal Bureau of Investigation.

Q     How long have you been with the FBI?

A     A little over seven years.

Q     Are you assigned to a particular squad?

**UNITED STATES DISTRICT COURT**

A        Yes.

Q        Which squad is that?

A        It's a Public Corruption Squad here in Los Angeles.

Q        Are you familiar with the investigation of the Los Angeles County Sheriff's Department for corruption and civil rights abuses in the jails?

A        Yes.

Q        How are you familiar with that investigation?

A        I'm familiar with it because I've been assigned to the case for the last five, almost five-and-a-half years.

Q        Do you remember when, approximately, you were assigned to the case?

A        I was assigned to the case approximately mid August of 2011.

Q        Was the investigation new at the time, or had it already existed?

A        The investigation was open sometime in mid 2010. So when I joined the case, it had been going on a little over a year.

Q        Did you do anything to get up to speed on the investigation?

A        Yes.

Q        What did you do?

A        I started looking at and reading reports written

**UNITED STATES DISTRICT COURT**

1034

by the agents before me, and I spoke to them about things that had happened prior to me joining the case.

Q    What were the general allegations at the time you joined the investigation?

A    The allegations were that sheriff's department deputies in the jails were committing civil rights violations by using excessive force and sometimes charging the inmates that were the victims of the force in order to cover up the use of force.  Other allegations were that deputies were willing to smuggle in contraband in exchange for bribes.

Q    At the time you joined the investigation, were there other FBI agents involved in it?

A    Yes.

Q    Who were they?

A    The original case agents were Special Agent Leah Marx and Special Agent David Lam.

Q    Does Leah Marx have a different last name today?

A    Yes.

Q    What is that?

A    Tanner.

Q    Special Agent Dahle, are you familiar with grand jury subpoenas?

A    Yes.

Q    What are they?

A    The grand jury subpoena is a court order

**UNITED STATES DISTRICT COURT**

1035

compelling a person to either produce something or compelling them to come in front of the grand jury and provide testimony.

Q    As part of your role as case agent in this investigation, did you have a special duty as it related to the grand juries?

A    Yes.

Q    What was that?

A    I was appointed to be the custodian of records for this investigation.

Q    What does that mean?

A    It meant that, after we served the subpoena, somebody or some entity would produce something, and I helped catalogue whatever that was.  In this investigation most of it was digital files which we poured through and looked at and organized.

Q    Along with being the custodian of records for the grand jury, have you done anything else to support the grand jury investigation?

A    Yes.

Q    What have you done?

A    Not by myself, but I've participated in numerous interviews of witnesses, victims, sometimes subjects, and sometimes either brought that information to the grand jury or wrote reports about it to disseminate.

Q    Have you done anything to help determine which

**UNITED STATES DISTRICT COURT**

incidents the grand jury will investigate?

A      Yes.

Q      What have you done?

A      I've helped participate in discussions with assistant United States attorneys and fellow agents about which -- either excessive use-of-force incidents to further investigate or which possible corruption related offenses to investigate.

Q      Were there times in which you served grand jury subpoenas on either witnesses or entities for documents?

A      Yes.

Q      And what was the purpose of serving these subpoenas?

A      To obtain information relevant to the investigation.

Q      I want to focus on the first part of my question, the subpoenas for witness testimony.

Would they always testify before the grand jury if you subpoenaed them there?

A      Not always.

Q      Okay.  And were there times when you would interview them instead?

A      Yes.  Sometimes a person who is subpoenaed would agree to interview with us outside of the grand jury with an attorney present in lieu of going in front of the grand jury.

**UNITED STATES DISTRICT COURT**

1037

Q    What would you do with the information you received during these interviews?

A    Document and sometimes present it to the grand jury.

Q    When would you decide to present it to the grand jury?

A    We decided what to present to the grand jury. Agents in consultation with assistant United States attorneys would make those kind of decisions.

Q    What was the purpose of subpoenaing documents in this investigation?

A    The purpose was to obtain information to sometimes corroborate things we heard about and other times to see if the deputies' accounts -- to look at their accounts to evaluate whether we believe them or not in light of all the other evidence that we had.

Q    What would you do with documents if you felt they were relevant to the grand jury investigation?

A    Present it to them.

Q    Were there times when the grand jury itself would ask for certain documents or certain testimony?

A    Sometimes.

Q    What would you do if the grand juries asked for certain documents or certain testimony?

A    Generally try to get it for them.

UNITED STATES DISTRICT COURT

Q        Was there any other law enforcement agency besides the FBI involved in this investigation?

A        The FBI was the organization driving the investigation.  The U.S. Marshal Service wasn't involved in our investigation, but they participated by transporting witnesses who were writ out of jails or prisons.

Q        How many abuse incidents have been part of the Federal Grand Jury investigations over the years?

A        Dozens if not hundreds.

Q        And what years did these abuse incidents that the Federal Grand Juries were looking at to take place?

A        Most of them that we looked at took place between 2009 and 2012.  However, there were some prior to 2009 that we looked at and some after 2012 that we looked at also.

Q        Did the investigation involve particular jails?

A        Yes.

Q        Which jails were those?

A        Men's Central Jail which is a sheriff-controlled custody facility not too far away from here in downtown Los Angeles and Twin Towers which is another sheriff-controlled custody facility across the street from Men's Central Jail.

Q        Were there particular areas of those jails that were the focus of the investigation?

A        Yes.

Q        Which areas were those?

1039

A    In Men's Central Jail we focused on floors that were called the 2000 floor and the 3000 floor. They were floors that generally at that time housed the most violent inmates and/or inmates with other kind of issues that made them a higher level in the jail classification system. In Twin Towers, we investigated allegations that came out from the floors that housed mental health inmates.

Q    Why was there focus on those areas?

A    Because that's where the majority of the allegations were coming from.

Q    Are there special considerations focusing on the more violent areas of Men's Central Jail? Are there special considerations with respect to these inmates?

A    Yes.

Q    What are those?

A    In this case those inmates that we were hearing allegations from are victims. And inmates that have histories of violence or other issues like that, we know in the future, if the case ever goes to trial, they're going to have credibility issues, and it's going to be their word against the word of a law enforcement officer. So our problem was building a case strong enough to build cases against deputies with those concerns at a future date.

Q    What about any special considerations with inmates with mental illness problems?

A       Similar concerns.

Q       Were you able to determine in many of these investigations whether the incidents that caused the allegations of abuse, whether they were recorded in some fashion?

A       The sheriff's department had video cameras in some locations of those facilities but not -- in the majority of the jail but not in the places where deputies were alleged to have been committing most of the excessive force.

Q       Are you generally aware of the number of grand jury subpoenas that have been issued in these -- in this investigation?

A       Yes.

Q       Approximately how many have there been?

A       Approximately over 80.

Q       Are you familiar with the number of witnesses who have testified before the grand juries?

A       Generally.

Q       Approximately how many have testified?

A       Over 80.

Q       Now, I've used the plural "grand juries."  Have there been more than one grand jury used?

A       Yes.

Q       Why is that?

A       It's been a long investigation, and we have been

UNITED STATES DISTRICT COURT

investigating several use-of-force investigations this case other incidents involving the sheriff's department.  So there have been several grand juries that have heard evidence.

Q    Approximately when was the first grand jury subpoena issued in this investigation?

A    Approximately July of 2011.

Q    How many documents overall have been obtained using grand jury subpoenas?

A    Somewhere between half a million and a million.

Q    Have you reviewed yourself every single document that's come in?

A    No.  But I've seen the vast majority of them.

Q    I now want to discuss overt versus covert investigations.

Are you familiar with the term "overt investigations"?

A    Yes.

Q    What is an overt investigation?

A    An overt investigation is where the subject who you're investigating may be aware that they're being investigated.

Q    What about a covert investigation?

A    It's the opposite.  It means that your subject is unaware that he's being investigated.

Q    When you joined the investigation in August of

2011, was the investigation covert, or was it overt?

A       When I joined in August, 2011, this investigation had elements of both covert and overt.  It had elements of both kinds of investigations.

Q       What were some of the overt aspects of it?

A       The subpoenas that we had served on the sheriff's department asking for use-of-force reports.  So, generally, the department knew that we were investigating civil rights violations.

Q       What about the covert aspects?

A       The covert aspect included the undercover operation involving Gilbert Michel.

Q       Who was Gilbert Michel?

A       Gilbert Michel was a -- at that time Los Angeles County Sheriff's Department deputy working in Men's Central Jail.

Q       And what was the covert investigation of Deputy Michel?

A       It was an undercover operation to see if Deputy Michel would accept a cash bribe in exchange for smuggling contraband into Men's Central Jail.

Q       How did this fit into the overall investigation of the sheriff's department?

A       It fit in because, like I said earlier, these are really tough cases to make.  Without corroborating the inmate's

allegations, you almost certainly cannot bring charges.  So a decision was made to have an undercover operation to see if a deputy was willing to smuggle something in like the agents had heard from the inmates before and to test that out because we could never go on the word of an inmate alone.

Q     Did it present any opportunities for you, the fact that he did take these bribes?

A     Yes.

Q     What opportunities were those?

A     To see if the case was larger like we had heard about, to see if there were other deputies who may be willing to smuggle things in who are -- or who had committed other excessive use-of-force incidents.

Q     What about specific to Deputy Michel himself?  Did it present opportunities for the FBI with respect to Deputy Michel?

A     Yes.

Q     What was that?

A     It gave us the opportunity to confront him with the evidence that had been obtained and to see if he would admit the behavior and provide us with information on stuff he had done that we didn't know about or information on other deputies that he had either participated in with or knew about in some fashion.

Q     Around the time that you joined the

**UNITED STATES DISTRICT COURT**

investigation, did you learn that something had happened with the cellular phone?

A    Yes.

Q    What did you learn?

A    Sometime right after I joined the investigation, we learned the cell phone had been found by the sheriff's department.

Q    At that time had the sheriff's department been told that the cellular phone belonged to the FBI?

A    I don't know exactly when I knew; so I can't answer that question.

Q    Have you ever met Anthony Brown?

A    Yes.

Q    Who is Anthony Brown?

A    Anthony Brown is and at that time was an inmate -- at that time he was an inmate in Men's Central Jail waiting to be shipped to state prison.  Currently he's in the custody of the state prison system.

Q    When was the first time that you met Mr. Brown?

A    I met Anthony Brown for the first time August 23rd, 2011.

Q    Why did you go meet with him that day?

A    Because we had heard the cell phone had been found, and then there was -- we wanted to know the circumstances of that.

**UNITED STATES DISTRICT COURT**

Q        You said "we."  Who did you go there with?

A        I went to Men's Central Jail that day with Special Agent Leah Marx and Special Agent Wayne Plympton.

Q        Did you wind up meeting with Mr. Brown that day?

A        Yes.

Q        Where?

A        We met with Anthony Brown in a room in Men's Central Jail on the first floor.

Q        Do you remember the time that you met with him?

A        Approximately 10:40 a.m.

Q        What, generally, did you talk to Mr. Brown about in this interview?

A        The circumstances of how the phone was found.

Q        What, if anything, did he tell you about the phone?

A        He said that, while he was being escorted to another part of the facility, there was a search, and they found the cell phone in a bag of chips.

Q        Did anything unusual happen during your interview of Mr. Brown?

A        Yes.

Q        What happened?

A        About an hour and ten minutes into the interview, the door was flung open.  It had been -- we had the room closed during the interview.  The door was flung open.  A very large

UNITED STATES DISTRICT COURT

1046

male sergeant with the last name Waterman started yelling, "This interview is over.  Who gave you guys permission to interview this inmate?  He's not to be interviewed." Simultaneously several deputies rushed in, grabbed Anthony Brown, and physically escorted him out of the room and down the hall.

Q     What, if anything, did anyone from your side say as this was occurring?

A     Special Agent Marx told Anthony Brown something similar to "We'll be back for you."

Q     What happened next?

A     We exited the room, walked down to the watch commander's office.  Special Agent Plympton used a phone in the office to call someone, and then we were asked to wait for a Captain Carey who is in route.  That's what we were told.

Q     Did you wait?

A     We waited between 5 and 15 minutes.  Agent Marx and I were just outside the glass doors of the entrance of Men's Central Jail.  Special Agent Plympton was just inside of the doors.  After sometime between 5 and 15 minutes, we left. Agent Plympton never received a phone call from anybody.  Even if he had, we weren't able to provide information about our investigation to the sheriff's department because it's secret. So we just decided to leave.

Q     Did you do anything differently with respect to

**UNITED STATES DISTRICT COURT**

your investigation after Mr. Brown was pulled from the interview?

A    Yes.

Q    What did you do?

A    We decided to accelerate what we were planning to do in the future, and we approached Deputy Michel the next day on August 24th.

Q    Was this part of the plan eventually to approach Deputy Michel?

A    It was a part of the original plan to eventually approach him, but we made the determination after that meeting that we needed to do it sooner.

Q    And what was the intent?

A    The intent was to confront him with the evidence that had been gathered during the undercover operation and see if he would basically cooperate with our investigation and provide us with information on things maybe that he had done previously that we didn't know about or give us information on other deputies who were possibly committing the same types of violations.

Q    What date did this occur?

A    August 24th, 2011.

Q    On that date did he agree to cooperate?

A    At the end of that day, it was unclear whether Deputy Michel was going to actually cooperate with our

investigation.  So we left unsure.

Q    I want to ask you about a discrete issue we heard about in this trial.

There's been testimony about a polygraph that was administered on Anthony Brown.  As part of your investigation, have you obtained documents relating to a polygraph that was administered on Anthony Brown?

A    Yes.

Q    Okay.  We heard specifically about his allegations that there were drugs being brought in the jail.  Do you know which date this polygraph occurred?

A    August 24th.

Q    All right.  Now I want to ask you about, going back to your investigation, around that time, after Deputy Michel -- it was unclear whether he was going to cooperate, were there other ways during the investigation that the investigation became overt at that point?

A    Yes.

Q    What ways did it become overt?

A    Right around that time we served grand jury subpoenas on the sheriff's department asking for records and files relating to dozens of sheriff's department employees, deputies, who we had heard allegations about.  There was also a subpoena that asked for records for dozens of inmates who we had heard may have been victims of excessive use of force.

Q      Special Agent Dahle, could you go in your book and look at Exhibit 110, please.  Actually, I can pull this up if it's easier for you.  Let me do that.

This is in evidence as Government Exhibit 110. Just, generally, what is this exhibit?

A      It's a subpoena.

Q      Okay.  If you look at 110, can you just look at the overall exhibit in your book please, Special Agent Dahle?

A      I'm finished.

Q      Okay.  What is Exhibit 110?

A      It is the subpoena that was served on the sheriff's department asking for records for an excessive use-of-force incident regarding an inmate named James Parker.

Q      This is just the first subpoena; right?

A      Yes.

Q      Are there any other subpoenas in that exhibit?

A      (Witness reviewing exhibit.)

There's another subpoena that was served on the sheriff's department related to a use-of-force incident with a visitor to the jail named Gabriel Carrillo.

Q      Let's talk first about Mr. Parker, and then we're going to get into the others.

Do you know who -- whether there were any witnesses to that incident involving Mr. Parker?

MR. HOCHMAN:  Objection.  Relevance.  403.

UNITED STATES DISTRICT COURT

THE COURT:  Overruled.

THE WITNESS:  Yes, there were.

Q     BY MR. FOX:  Who was the witness to that incident?

A     One of the witnesses was an ACLU jail monitor named Esther Lim.

Q     Let me show you now -- you mentioned a Mr. Carrillo.

A     Yes.

Q     He was the alleged victim in one of these subpoenas; is that correct?

A     Yes.

Q     Okay.  I'm going to now show you the seventh page of this exhibit.

What is this subpoena?

A     This was the subpoena that was served on the sheriff's department regarding the incident involving the visitor Gabriel Carrillo.

Q     We see several deputies' names.  Excluding "P," who were these deputies?

A     Those are deputies who worked in the visiting center that day during the incident.

Q     We see some redactions there where it's white.

A     Yes.

Q     What about "P"?  Who is Robert Bayes as it

relates to Mr. Carrillo?

A       At that point Robert Bayes, who you previously heard testimony from, was a deputy who was assigned to the Jail Investigations Unit.  He would receive use-of-force packages and conduct investigation and ultimately decide whether or not to bring those packets to the D.A.'s office to see if the D.A.'s office would charge those cases.

Q       And I'm now showing you -- highlighting for you under paragraph 2.  Is this the name of the alleged victim with this incident?

A       Yes.

Q       Gabriel Carrillo?

A       Yes.

Q       I'm going to show you now Exhibit 33 which is in evidence.  This is an e-mail from somebody named Saif Kutubi, K-u-t-u-b-i, to Greg Thompson with a copy to Judy Gerhardt with the subject "Documents for grand jury subpoena."  Can you please read this e-mail.

A       "Dear, Lieutenant.  Discovery unit received a grand jury subpoena from federal court, and following documents/materials are needed to hand over to the Court ASAP. Lieutenant Judy Gerhardt requested to please arrange to find the requested materials as soon as possible and send to discovery unit for the earliest response to the federal court. Please keep this information confidential.  The requests items

UNITED STATES DISTRICT COURT

are as follows: All documents related to the presentation of the Carrillo case for consideration as indicated in the report of Robert Bates, No. 402121, dated February 28, 2011."

Q    As of this time when you were investigating the Carrillo incidents, had anybody involved in that incident been charged with any crimes?

A    Yes.

Q    Who?

A    Gabriel Carrillo was charged with using force against the deputies.

Q    What ultimately happened with that charge?

A    It was dropped.

Q    And who would have charged him with that offense?

A    Ultimately the D.A. relying on the evidence obtained by the sheriff's department charged Gabriel Carrillo before the charges were dropped.

MR. HOCHMAN:  Objection.  Motion to strike as nonresponsive, the second half of the answer.

THE COURT:  Overruled.  The answer will stand.

MR. FOX:  Thank you.

Q    I'm showing you now, Special Agent Dahle, the middle e-mail in Exhibit 31 from Mr. Thompson dated August 26 to Steve Leavins and William Tom Carey forwarding the e-mail. Can you please read what Mr. Thompson wrote.

A    "Steve, Tom, I sent copies of the investigator's

**UNITED STATES DISTRICT COURT**

package to the discovery unit on August 25th, 2011.  The file number is 911-00189-5100-058.  Suspect name, Carrillo.  I'm not sure if it has anything to do with the current investigations, but read below.  Greg."

Q      Now I'm going to go to the twelfth page of Exhibit 110.  Actually, move on to the thirteenth which lists a number of people in the subpoena attachment.

Who were these people?

A      Those were inmates who in some way or another were alleged to have either witnessed or been victims of excessive use-of-force incidents.

Q      Now looking at the subpoena that is on -- the attachment which is on page 16.  I'll move up a page to show 15.

What is the date of this subpoena?

A      August 24th, 2011.

Q      Is it the same with all of the subpoenas that we've just been reviewing?  We'll just say the last couple of subpoenas that we've just reviewed.

A      Yes.

Q      Showing you now the attachment, we see --

MR. HOCHMAN:  Which page are you on?

MR. FOX:  This is page 16.  Excuse me.  Page 16.

Q      Could you please read the names of the deputies who you were requesting information from in this subpoena?

UNITED STATES DISTRICT COURT

1054

A       This subpoena is redacted.  There were several. But the ones we're seeing on the screen, first one is Justin Bravo, employee No. 524035.  Under G is Gilbert Emmanuel Michel, employee No. 541591.  Next, Q, Angela Marie Caruso, unknown employee number.  At the bottom, X, all deputies with the last name of Gomez and Rodriguez who have worked at the Men's Central Jail at any time between the dates of January, 2009, to the present.

Q       Do you know why the grand jury was seeking information in "X"?

A       Yes.

Q       Why was the grand jury seeking the information in "X"?

A       Because there were several deputies with those last names that work in Men's Central Jail at the time, and when you heard allegations -- some of the allegations didn't include first names.  Deputies didn't wear nametags with their first names on them.  So at that point it was unknown for some of the incidents who those individuals actually were.

Q       We've heard about the person listed in "D" and the one in "G."

What about Angela Caruso listed in "Q"?  Who was she?

A       At that point in time, she was living with Gilbert Michel and assumed to be in some kind of relationship

**UNITED STATES DISTRICT COURT**

1055

with him.

Q        And why were you seeking documents relating to her?

A        She was a sheriff's department employee also. She was a deputy.  And her car -- Mr. Michel had used her car during the bribery operations.  So we were unsure what her level of involvement, if any, was with that.

Q        Now showing you page 19 of this exhibit, what is the date of this subpoena?

A        August 24th, 2011.

Q        I'm going to show you the second page.

Without reading it entirely, can you please describe for the grand jury what this subpoena sought?

A        This subpoena generally sought all use-of-force reports between January, 2009, to then present occurring in those facilities.

Q        Why was the grand jury seeking and why were you seeking on behalf of the grand jury reports from 2009 to the present?

A        At that point it looked like there were widespread abuses going on.  And to conduct a thorough pattern practice investigation, we felt it was necessary to get all the documents and compare them to each other to see if some of them looked the same, if they looked cut and pasted, to obtain corroborating information, if any, or just to see generally

what they look like.

Q       You mentioned that on August 24th that it was unclear whether Deputy Michel would agree to cooperate.  What eventually happened to him?

A       He eventually did cooperate a few weeks later.  He got an attorney and agreed to cooperate.

Q       Was he indicted by the grand jury at that point?

A       No.

Q       Why not?

A       He agreed to give up his constitutional right to be indicted and agreed to plead guilty to what we call an Information and pled guilty to that.

Q       Are you familiar with whether Anthony Brown was turned over to testify before the Federal Grand Jury in September of 2011?

A       He was not turned over by the sheriff's department to testify in front of the grand jury.

Q       At some point, did Mr. Brown testify before the Federal Grand Jury?

A       He did about a year and a half later.  He was writ out of the prison system to testify.  He appeared in front of the grand jury and provided testimony.

Q       When you say "the prison system," who runs the prisons?

A       The state of California.

**UNITED STATES DISTRICT COURT**

MR. FOX:  One moment.  Nothing further, Your Honor.

THE COURT:  Cross-examination.

MR. HOCHMAN:  Yes, Your Honor.

**CROSS-EXAMINATION**

BY MR. HOCHMAN:

Q    Agent Dahle, you joined the FBI in August of 2009; is that correct?

A    Yes.

Q    So by June, 2010, that would be your first rookie year at the FBI; is that correct?

A    Yes.

Q    And your title is special agent; is that right?

A    Nothing special about it, but that's the title.

Q    That was actually my next question.

Is every agent at FBI a special agent?

A    That's what we're called.

Q    Now, you've been assigned, you said, since 2010, approximately, to the public corruptions squad?

A    Yes.

Q    And how do public corruption cases differ from civil rights cases?

A    Well, here in L.A., there's different squads investigating both.  Public corruption offenses are -- the violations themselves look at people in the public, in the

UNITED STATES DISTRICT COURT

government or local law enforcement to see if they're abusing the trust that's been put to them.  Civil rights doesn't -- it's not contained with law enforcement or politicians.  It may be other violations like human trafficking or other things.

Q        So civil rights violation investigations can involve human trafficking and potentially law enforcement officers violating someone's civil rights; is that correct?

A        Yes.

Q        But public corruption is where you have some type of public official or someone who has the public trust and they take a bribe, for instance; is that right?

A        Generally, yes.

Q        And how many public corruption cases have you participated in the last seven years?

A        It's hard to quantify because some cases I'm intimately involved.  Some cases I just help out on.

Q        So the ones you were intimately involved and help out on, are we talking 50 or more?

A        That's pretty high.  Maybe between 15 and 30.

Q        15 and 30.

         And over that seven years, approximately how many witnesses have you interviewed yourself or participated in the interview with?

A        Hundreds.

Q        Hundreds.

1059

Now, you first said you started working on this investigation involving Anthony Brown in mid August of 2011; is that correct?

A       Yes.

Q       Do you have the precise date?

A       No.

Q       You said in your original testimony that you could remember the precise start time on the August 23rd interview of Anthony Brown; is that correct?

A       That's correct.

Q       And you could remember the precise end time, as you sit here over five years later, the interview of Anthony Brown on August 23rd; is that correct?

A       Well, it's in a report that I wrote.

Q       Is there a report somewhere in your file that would indicate the precise date on which you became part of this investigation?

A       No.

Q       Have you talked to -- you said you talked to other agents in connection with your preparation for understanding what the investigation concerned; correct?

A       Yes.

Q       Did you talk to the other agents before you got here today to find out the precise date that you started this investigation?

**UNITED STATES DISTRICT COURT**

A        I don't think anybody documented when I was asked to join the investigation.

Q        Now, when you joined the investigation, Agent Leah Marx was already on the investigation; is that correct?

A        Correct.

Q        And Agent David Lam as well?

A        Correct.

Q        And you are aware that -- I believe you said that investigation started in June of 2010; is that correct?

A        Yes.

Q        And over that time, they had interviewed about 25 different inmates in the Men's Central Jail; is that right?

A        Approximately.

Q        And you've conducted inmate interviews at the Men's Central Jail as well; is that correct?

A        Yes.

Q        In fact, you testified about the one you did on August 23rd of Anthony Brown; correct?

A        Yes.

Q        And you know the processes that involved back then when you would come in to do an inmate interview; is that right?

A        What date are you talking about?

Q        This is in the August -- when you first got on

UNITED STATES DISTRICT COURT

1061

the investigation August of 2011, you were aware of the process by which one could go through the sheriff's department to interview an inmate at the Men's Central Jail; correct?

A        It changed after the Anthony Brown incident.  I can tell you what we did the day we interviewed Anthony Brown.

Q        Let's focus on that if we could.

So the day you come in to interview Anthony Brown, you entered Men's Central Jail; is that correct?

A        Correct.

Q        And then you'd check in with a deputy who is there?

A        Yes.

Q        And you show that deputy your FBI credential; correct?

A        Yes.

Q        And your FBI credential has the FBI badge on it -- is that correct? -- or insignia?

A        It has some sort of insignia.

Q        It has your name; is that correct?

A        Correct.

Q        Now, when you went into the Men's Central Jail that day, you didn't use an alias; correct?

A        No.

Q        And you didn't say you were from some other organization other than the FBI; correct?

**UNITED STATES DISTRICT COURT**

A       Correct.

Q       And you were at that point with Agent Marx; is that correct?

A       Yes.

Q       And you observed her give her FBI badge to the sheriff deputy on that day; correct?

A       Yes.

Q       Same thing with Agent Plympton of the FBI.  He gave his FBI badge and showed it to the deputy upon entering Men's Central Jail; correct?

A       We showed our credentials.  I'm not sure we gave them our badge or showed them the badge.  They're two separate things.

Q       Let's focus on the credential.

        The credential has an FBI insignia on it; correct?

A       If I can look at it, I can tell you for sure.

Q       If you have it with you, certainly.

        THE COURT:  That's fine.

        THE WITNESS:  Yes.

Q       BY MR. HOCHMAN:  And it has your name on it; correct?

A       Yes.

Q       So after you show the deputy -- the Los Angeles sheriff deputy your credentials, then you would actually fill

1063

out a form to indicate which inmate you wanted to speak with; is that correct?

A    With Anthony Brown, I can't remember if we actually filled out a form.

Q    Well, you'd have to identify the inmate to the deputy in order for them to bring that inmate down; correct?

A    We told them who we wanted to interview.

Q    And that day you told them it was Anthony Brown; correct?

A    Yes.

Q    And you would actually have to give them the inmate's booking number in order to find them in the system; is that correct?

A    Yes.

Q    And then after you gave your -- showed your credential, gave the inmate's name and booking number, then you were brought into the jail at that point; is that correct?

A    Yes.

Q    And you were actually put in a room that only the three of you -- and by three, I mean yourself, Agent Marx, and Agent Plympton -- were in; correct?

A    Yes.

Q    And eventually Anthony Brown is brought down to you so you could speak to him; correct?

A    Correct.

**UNITED STATES DISTRICT COURT**

1064

Q       And then the door is shut behind him, and it's just the four of you in the room -- yourself, the two other FBI agents, and Anthony Brown.

Is that correct?

A       Yes.

Q       And there's no Los Angeles sheriff deputy in that room; correct?

A       There wasn't during that interview.

Q       And that's that interview that lasts -- it starts at 10:40 a.m.; correct?

A       Yes.

Q       And it lasts about an hour and ten minutes; is that correct?

A       Yes.

Q       Now, we'll get back to that interview in a second.  Let me first ask you questions about the grand jury that you testified about.

Now, you've participated in a number of grand jury investigations; is that correct?

A       Yes.

Q       About how many?

A       Ten to 15 approximately.  It's hard -- it depends on how you define it.  I would say 10 to 15.

Q       And a grand jury is made up of 16 to 23 people; is that right?

**UNITED STATES DISTRICT COURT**

A       Yes.

Q       And a grand jury has a foreperson; is that right?

A       Yes.

Q       And so physically the grand jury meetings take place in a room; is that correct?

A       Yes.

Q       And you have most of the grand juries seated in part of the room in chairs; is that right?

A       Yes.

Q       And then you have -- on the other hand, you've got on the other side a foreperson that's sort of on an elevated platform like his Honor is here in the courtroom; is that correct?

A       Correct.

Q       And then the other people that would be there would be the secretary of the grand jury; is that correct?

A       Yes.

Q       And then eventually there would be a prosecutor who would come in to the grand jury and ask questions or make statements to the grand jury; is that correct?

A       Correct.

Q       And then they'd bring in a witness -- there would be also a witness area for the witness to sit in; is that correct?

A       Yes.

UNITED STATES DISTRICT COURT

1066

Q        And then there would be a court reporter; is that right?

A        Yes.

Q        Now, defense attorneys are not allowed into the grand jury; correct?

A        No.

Q        And grand juries last approximately 18 months or so, but they can be extended; is that right?

A        Generally.

Q        Now, with respect to the evidence of a grand jury, the Government can present evidence to the grand jury on the first week the grand jury meets; is that correct?

A        Anytime.

Q        Anytime.

They meet on basically a weekly basis -- is that right? -- during the term they're in session?

A        Generally.

Q        And at the end of all the presentation of evidence, they can consider whether or not the evidence is sufficient to return an Indictment; is that correct?

A        Correct.

Q        And the standard that the grand jury uses to return an Indictment is probable cause; is that correct?

A        Correct.

Q        That's a much lower standard than the beyond a

UNITED STATES DISTRICT COURT

reasonable doubt standard here in court; is that correct?

A        Of course.

Q        And, again, the defense attorneys are not allowed to present their arguments to the grand jury before an Indictment is returned; is that correct?

A        Correct.

Q        So the grand jury can consider any evidence between, let's say, week one and, let's say, at the end I'll just use week 52.  If they get evidence on weeks 1, 10, 30, 40, and 52, the fact it came in week 1 or week 51 is irrelevant; is that correct?

A        Generally I think you're right.  I mean, I'm not in the grand jury when they're making their decisions, but theoretically you're right.

Q        Thank you.

Now, also, you testified that there's different types of ways to get information to a grand jury.  One you said was subpoenas; is that correct?

A        Correct.

Q        And so the grand jury issues a subpoena, and the FBI serves it; is that right?

A        Yes.

Q        And you talked about 80 or so subpoenas that were served in connection with your investigation of the L.A. Sheriff's Department; is that right?

**UNITED STATES DISTRICT COURT**

A        Approximately.

Q        Did Sheriff Baca, to your knowledge, interfere with the service of any one of those 80 subpoenas?

A        How do you mean?

Q        Well, did he take any steps that prevented an FBI agent from physically serving the Los Angeles Sheriff's Department with a subpoena?

A        Himself, he did not interfere physically with the service of any subpoena.

Q        And so -- and then a subpoena -- let me ask you this.

When the grand jury issues a subpoena and, let's say, you're the one to go ahead and serve it, do you actually get the subpoena directly from that foreperson of the grand jury?

A        Generally, no.

Q        Do you consult with the foreperson of the grand jury or any of the grand jurors about that particular subpoena before you serve it?

A        Generally, no.

Q        Well, when you say "generally," we have certain grand jury subpoenas that you looked at which is part of Exhibit 110; is that correct?

A        Correct.

Q        Did you consult with the grand jury, any member

UNITED STATES DISTRICT COURT

of the grand jury, before those subpoenas that we looked at a moment ago in Exhibit 110 were served on the Los Angeles Sheriff's Department?

A        With these I don't believe so.

Q        So serving subpoenas is one role.  And as part of serving subpoenas, you said you got documents back from the Los Angeles Sheriff's Department; correct?

A        Correct.

Q        When you got documents, it wasn't just documents. It was documents.  It was audiotapes, recordings.  It was videotapes.  It was that whole collection of evidence; is that correct?

A        It was a lot of different things.

Q        You mentioned it was 500,000 to a million different documents; correct?

A        Correct.

Q        To be clear, that included audiotapes and videotapes as well; is that right?

A        Correct.

Q        It included a lot of e-mails; is that right?

A        Yes.

Q        And with respect to the audiotapes -- let's focus on the audiotapes for a moment.

You've been here in court the entire time that all the testimony before you has been presented; is that

**UNITED STATES DISTRICT COURT**

correct?

A        Minus the few seconds or minutes that I've had to run outside, yes.

Q        And you've also seen the exhibits that have been admitted in this Court as well.

A        Correct.

Q        So let's focus on a couple of them.

The Anthony Brown records that exist when Anthony Brown is interviewed by a member of the sheriff's department, do you have those in mind?

A        Yes.

Q        I believe there were ones on August 19, 2001; August 21st, 2001; 23rd, 24th, 26th; and September 2nd, 2001.

Is that correct?

A        Yes.

Q        Each one of those recordings you got from the Los Angeles Sheriff's Department in connection with their production on a grand jury subpoena; correct?

A        Correct.

Q        Did you have -- and you didn't have any other source of that recording than getting it from the sheriff's department itself; is that correct?

A        Correct.

Q        So like the FBI didn't have its own recorder in those interviews, so you would have a different source from

1071

getting those particular recordings; correct?

A      Correct.

Q      And then with respect to any recordings, let's say, of a voicemail message, a voicemail message that Sergeant Craig left for Leah Marx, that voicemail message you got pursuant to the sheriff's department producing it in connection with the grand jury subpoena; is that correct?

A      Correct.

Q      And you didn't have another source to get a voicemail message that was left by Sergeant Craig to Leah Marx; is that correct?

A      Correct.

Q      In fact, what happened with that particular voicemail message is that he called the wrong number; isn't that right?

MR. FOX:  Objection.  Beyond the scope.

THE COURT:  Sustained.

BY MR. HOCHMAN:  With respect then to the September 26 audiotape, did you obtain that September 26 audiotape in connection with the compliance from a Federal Grand Jury subpoena?

A      Yes.

Q      And the FBI didn't have an audiotape of the approach of the agents to Leah Marx on its own; correct?

A      No.

UNITED STATES DISTRICT COURT

Q        So the only source of the audiotape that shows the approach of the Los Angeles Sheriff's Department personnel to Leah Marx at her house was actually from the Los Angeles Sheriff's Department in connection with its production on a grand jury subpoena; correct?

A        Yes.

Q        And you're aware that there was also a videotape of that particular incident that was done by the Los Angeles Sheriff's Department; is that correct?

A        Yes.

Q        Now, the FBI didn't have its own video cameras running at the time to see the Los Angeles Sheriff's Department people approach Leah Marx; is that correct?

A        That's correct.

Q        And so the only source of the videotape of the approach of Leah Marx -- excuse me -- the Los Angeles Sheriff's Department people to Leah Marx on September 26 comes from the Los Angeles Sheriff's Department in connection with their compliance on a grand jury subpoena; is that correct?

A        Correct.

Q        So the dealing with subpoenas is one of the ways that the FBI's involved with the grand jury; correct?

A        Correct.

Q        And another way that you said that the FBI is involved with the grand jury has to do with witnesses appearing

before the grand jury; is that right?

A        Yes.

Q        Because you could actually subpoena someone to testify, physically testify, in front of the grand jury; is that right?

A        Correct.

Q        But a witness does not necessarily have to physically be there to have the witness' information presented to the grand jury; is that correct?

A        Correct.

Q        Because an FBI agent, for example, like yourself can interview someone and then go in front of the grand jury yourself and tell the grand jury everything you heard from that witness; is that correct?

A        Correct.

Q        And the grand jury can then consider that information in deciding whether or not it wants to return an Indictment; correct?

A        They can consider hearsay.

Q        They can consider hearsay.

Now I want to make sure that -- the word "hearsay," what do you mean by the word "hearsay"?

A        Testimony -- one person testifying to what was told by another person.

Q        Okay.  So secondhand statements the grand jury

**UNITED STATES DISTRICT COURT**

can consider; is that correct?

A       Yes.

Q       And so, for instance, yourself, with the August 23rd interview of Anthony Brown, you could have gone in front of the grand jury right after that interview and told the grand jury what you heard Anthony Brown tell you on August 23rd; is that correct?

A       Yes.

Q       Did you do that on August 23rd, by the way?

A       No.  We had other things on our mind.

Q       Did you do that on August 24th, maybe the next day?

A       That was the day we approached Gilbert Michel.

Q       Okay.  Well, how about after that, the 25th then?

A       No.

Q       How about anytime in August?

A       No.

Q       Anytime in September, 2011?

A       No.

Q       Anytime before the end of 2011?

A       No.  At that time Gilbert Michel had agreed to cooperate.

Q       We'll get back to that in a moment if we could.

        With respect to -- we then have subpoenas.  We then have witnesses.  And then you can also go ahead and

**UNITED STATES DISTRICT COURT**

produce other types of evidence to the grand jury like the videotapes and the audiotapes and stuff like that; is that correct?

A        Correct.

Q        And so with respect to -- with respect to some of the other types of evidence -- e-mails, for instance, you can present e-mails to the grand jury; is that correct?

A        You can.

Q        And you actually did present the e-mails that you received from the Los Angeles Sheriff's Department to the grand jury in connection with this investigation.

A        I believe so.

Q        And you can also present surveillance logs; is that correct?

A        You can.

Q        And the only source for the surveillance log of a Los Angeles Sheriff's Department surveillance operation group was the Los Angeles Sheriff's Department in connection with the production of the grand jury subpoena; is that correct?

A        They are the ones who surveilled Agent Marx.

Q        And they're the ones who produced that document in connection with the grand jury subpoena; is that correct?

A        Correct.

Q        And they would -- and the only source you had for it was the Los Angeles Sheriff's Department itself; correct?

UNITED STATES DISTRICT COURT

A       Well, they are the ones who did it; so yes.

Q       And so, for instance, the original steno notebook of Sergeant Craig, the only source of the original steno notebook of Sergeant Craig was the Los Angeles Sheriff's Department in connection with its production on a grand jury subpoena; is that correct?

A       Correct.

Q       Mr. Baca's calendar, Sheriff Baca's calendars, the only source to the FBI of Sheriff Baca's calendars was the production by the Los Angeles Sheriff's Department in connection with the Federal Grand Jury subpoena; is that correct?

A       I know we asked for it in the subpoena.  I'm not sure if it was produced -- if there was an agreement or if it was produced in response -- it was produced in response to us asking for it.

Q       And the record jackets for Anthony Brown, John Rodriguez, Kevin King, Chris Johnson, all those Los Angeles Sheriff's Department record jackets for all those various names that were produced by the Los Angeles Sheriff's Department in connection with the Federal Grand Jury subpoena; is that correct?

A       Correct.

Q       Now, after the documents were produced, you were appointed something called a custodian of records for the

1077

documents?

A        Yes.

Q        And that was in approximately November of 2013; is that correct?

A        Yes.

Q        And did you speak in person to anyone in the grand jury to find out which documents they wanted from the Los Angeles Sheriff's Department?

A        No.

Q        Did you speak to anyone from the grand jury to find out which audiotapes they wanted from the Los Angeles Sheriff's Department?

A        No.

Q        Any videotapes?

         Did you speak to anyone in the grand jury concerning videotapes that the grand jury wanted in connection with the investigation?

A        Me personally, no.

Q        Are you aware of anyone who spoke to the grand jury and asked them which documents, which videotapes, and which audiotapes they wanted?

A        I was only in there when I was called in there. I'm unaware of what was going on when I wasn't in the grand jury.

Q        Well, you said that you decided which documents

**UNITED STATES DISTRICT COURT**

to try to get in connection with the grand jury investigation; is that correct?

A        I, in consultation with the assistant United States attorneys, yes.

Q        And in consultation with the assistant United States attorneys, did you, the United States attorneys, and the grand jury ever get together and decide what type of information the grand jury wanted?

A        I was not in a meeting like that.

Q        So it didn't happen; is that correct?

A        I don't know what happened inside the grand jury when I wasn't in there.

Q        Again, I was focusing on when you were involved.

So when you were involved, you, United States Attorney's Office, and the grand juries, did you ever get together and decide which documents the grand jury wanted?

A        There was never a meeting that we all sat down and decided what they wanted to see.

Q        Did you ever get direction from the grand jury in August and September of 2011, on what documents they wanted to see?

A        You're saying August, 2011?

Q        Yes.  August and September of 2011, did you ever get any direction from the grand jury on what documents they wanted to see?

**UNITED STATES DISTRICT COURT**

A        I don't think the grand jury started to hear evidence until March of 2012.

Q        And let me do it -- let me see if I understand the concept of a -- an FBI grand jury investigation versus an FBI non-grand jury investigation.

You said that the FBI grand jury investigation here started in July, 2011; correct?

A        Yes.

Q        So when Agent Marx is doing her original investigation back in June of 2010, that is a non-grand jury investigation at that point; is that correct?

A        I don't know if that's a correct legal statement.

Q        Well, if the grand jury investigation starts in if July of 2011, then whatever happened before that would be presumably a non-grand jury investigation; is that correct?

A        I don't know if that's accurate.  Just because a subpoena was sent out in July, 2011, I don't know if that makes whatever happened before a non-grand jury investigation.

Q        Well, is every FBI investigation a grand jury investigation?

A        All the ones I've been involved in.

Q        At some point there's a start point for it; is that correct?

A        All the ones I've been involved in have been grand jury investigations from the start.

UNITED STATES DISTRICT COURT

Q        That's because a grand jury subpoena was issued from the start of your investigations?

A        I don't think that is what denotes a grand jury investigation.

Q        What does?

A        I don't know legally what denotes it, but everything I've been involved in has been a grand jury investigation from the start.

Q        But with respect -- so are you aware, based on being an FBI agent for seven years, that the FBI conducts non-grand jury investigations?

A        I've never been a part of one.

Q        But are you aware, having -- you said you've spoken to other agents.  Are you aware that the FBI conducts non-grand jury investigations?

A        I don't know what those would be.  I've never had a conversation about conducting non-grand jury investigations.

Q        Are there certain situations where the FBI will investigate, for example, an inmate's complaint, determine it's not founded, and then end the investigation?

A        Yes.

Q        And would you consider what I just described, assuming, let's say, it happens within a day or two, talked to the inmate, the inmate recants what they said and says it's not true, would you consider that to be grand jury investigation?

**UNITED STATES DISTRICT COURT**

A       No.

Q       So there are some FBI investigations that are non-grand jury investigations; is that correct?

MR. FOX:  Objection.  Argumentative.

THE COURT:  Sustained.  Next question.

BY MR. HOCHMAN:  Now, you said that you came in mid August, 2011; is that correct?

A       Yes.

Q       That was after the cell phone was discovered on Anthony Brown in the Men's Central Jail; is that correct?

A       Yes.

Q       Did you have any role in selecting Anthony Brown to serve as the FBI informant?

A       No.

Q       Did you have any role in choosing the cell phone as compared to other forms of contraband like cigarettes, lighter, or outside food as the contraband that would be introduced into the Men's Central Jail with Anthony Brown?

A       No.

Q       Did you have any role in the discussions about the dangers of a cell phone before it was put into the Men's Central Jail?

A       No.

Q       Did you have any role in picking Deputy Gilbert Michel as the Los Angeles Sheriff's Department

deputy that was going to be bribed?

A        I don't think "picked" is the right term, but I didn't have anything to do with the undercover operation.

Q        Did you have any role in dealing with C.J., the FBI undercover operative?

A        No.

Q        And all those decisions were made before you entered this investigation and Agent Leah Marx; is that correct?

A        I don't think they were solely Agent Marx's decision, but they were made before I joined the case.

Q        Agent Marx participated in the decisions, to your knowledge, that we've just gone through, the various decisions that I've just asked you questions about; correct?

A        Her and other agents and supervisors and the U.S. Attorney's Office, yes.

Q        And based on -- you said you've been with Public Corruption Squad about seven years or so?

A        Yes.

Q        In your seven years with the Public Corruption Squad, have you ever inserted a cell phone into a jail as part of an undercover operation during that time?

                MR. FOX:  Objection.  Relevance.

                THE COURT:  Sustained.

                BY MR. HOCHMAN:  Now, when you -- you said you

1083

met -- let's go back, if we could, to the August 23rd meeting where you're now speaking with Anthony Brown.

And during that meeting, did Anthony Brown have the opportunity to tell you what had happened from the time that his cell phone was discovered?

A        Yes.

Q        And did he tell you that it had been discovered by the deputies when he was being escorted to the medical wing as part of a routine search of him?

A        Yes.

Q        And that he had hidden it in a potato chips bag that was part of his stuff; is that correct?

A        Correct.

Q        Did he also tell you that he had told the Los Angeles Sheriff's Department investigators, because this is now August 23rd he's speaking to you, that he had had meetings with the Los Angeles Sheriff's Department investigators before August 23rd?

A        I believe he did.

Q        And did he tell you that he had told them that Deputy Michel was the deputy that had brought him the cell phone?

A        Yes.

Q        And did he also tell you that he told them that he was working with the FBI?

**UNITED STATES DISTRICT COURT**

A      Yes.

Q      Did he also tell you that he was involved with drugs?

A      He did.

Q      And he actually mentioned very specific drugs that Deputy Michel was going to bring him into prison; is that correct?

A      He did.

Q      In fact, he said that Deputy Michel would bring him one pound of marijuana at $50 a gram; is that correct?

A      I think that's what he told us.

Q      And he told you that Deputy Michel was going to bring him 28 grams of coke and methamphetamine at $250 a gram; is that right?

A      I think that's what he told us.

Q      He also told you Deputy Michel had brought him drugs on two separate occasions; is that correct?

A      Yes.

Q      He told you that he also faked a heart attack; is that correct?

A      Yes.

Q      And then he told you that he was actually dealing with another deputy that he had taken photographs of, drugs that other deputy had brought him; is that correct?

A      Yes.

1085

Q        And those drugs included ecstasy, something called Pokemon, and other illegal drugs; is that correct?

A        Correct.

Q        Now, based on your investigation, Anthony Brown was lying to you on August 23rd when he went ahead and told you that he had gotten drugs brought to him by Deputy Michel; is that correct?

A        Yes.

Q        And he was lying to you when he went into the descriptions of marijuana at $50 a gram; is that correct?

A        I believe so.

Q        And he was lying to you when he talked about the 28 grams of coke and meth being $250 a gram?

A        Yes.

Q        And he was lying to you when he said that Deputy Michel brought him the drugs on two separate occasions; is that correct?

A        I believe so.

Q        But you didn't know at the time that -- whether or not he was lying or telling the truth; is that correct?

A        Yes.

Q        And you also -- I think you've heard Anthony Brown on one of the tapes talk about this Deputy Bravo bringing him a cell phone.

Do you recall hearing that?

**UNITED STATES DISTRICT COURT**

1086

A       Yes.

Q       And the FBI never had Deputy Bravo bring Anthony Brown a cell phone; is that correct?

A       No.

Q       So that was another lie that he told about Deputy Bravo; is that correct?

A       He told a lot of lies.

Q       That was another lie that he told about Deputy Bravo; correct?

A       Correct.

Q       Now, after speaking to Anthony Brown on August 23rd for about that hour and ten minutes, you said the deputies came in and took him away; correct?

A       Yes.

Q       Now, were you and the other FBI agents arrested by the deputies at that moment in time?

A       No.

Q       You laugh.  Was there something funny about my question?

                MR. FOX:  Objection, Your Honor.

                THE COURT:  Sustained.

                BY MR. HOCHMAN:  Were you detained at the time?

                MR. FOX:  Objection.  Relevance.

                THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  You said that Captain Carey --

**UNITED STATES DISTRICT COURT**

you were told that Captain Carey wanted to speak with you and he was on his way; is that correct?

A       We were told that.

Q       And you waited, you said, 5 to 10 minutes and then left without speaking with Captain Carey?

A       Somewhere between 5 and 15 minutes we left.

Q       Now, after you left, did you or any of the other agents, Leah Marx or Agent Plympton, to your knowledge, arrange another interview with Anthony Brown between August 23rd, 2011, and September 12, 2011?

A       No.

Q       Now, you had -- you heard evidence, I believe, on an exhibit starting on August 25th, 2011, there was a policy that came down from Undersheriff Tanaka requiring that a jail liaison approve any meeting before the FBI could meet with an inmate; is that correct?

MR. FOX:  Objection.  Beyond the scope.

THE COURT:  Sustained.

BY MR. HOCHMAN:  Well, as part of the documents that you collected as the --

THE COURT:  Let's go to sidebar.

(The following proceedings were held at sidebar:)

THE COURT:  Let's try and stay within the confines of the direct testimony.

MR. HOCHMAN:  Your Honor, what I was trying to

establish is that, even though this policy existed, that he wasn't aware of it at the time.  So in other words, the sheriff's department passed a policy that they didn't let everyone know about.

THE COURT:  Sir, the only thing I can do is rule on the objections.

MR. HOCHMAN:  Okay.

THE COURT:  So let's try to stay within the scope of what the direct testimony was.

MR. HOCHMAN:  Thank you, Your Honor.

(The following proceedings were held in
open court in the presence of the jury:)

BY MR. HOCHMAN:  So dealing with Gilbert Michel, you said that on August 23rd you spoke with Anthony Brown at Men's Central Jail; correct?

A     Correct.

Q     And then the next day you went ahead and spoke with Gilbert Michel.

Do you recall that?

A     Yes.

Q     That's August 24th.  I think it was a Wednesday if I'm not mistaken.

A     That sounds right, but I can't be sure of the date.

Q     And let me understand how that actually worked.

**UNITED STATES DISTRICT COURT**

1089

Q       Was it a number of you that showed up to speak --
and by "you," I mean FBI agents -- who showed up on August 24th
to speak with Gilbert Michel?

A       There were a number of us.

Q       There was you.  There was Agent Marx; is that
correct?

A       Correct.

Q       Agent Lam?

A       Yes.

Q       Agent Plympton?

A       Yes.

Q       What other agents?

A       Special Agent Jason Dalton.

Q       Jason Dalton.  That's five.

        Any others?

A       Special Agent Ferrell Binder.

Q       I'm sorry?

A       Ferrell Binder, F-e-r-r-e-l-l B-i-n-d-e-r.

Q       So six.

        And then Agent Binder is the sixth; correct?

A       Yes.

Q       And the FBI shows up originally at
Gilbert Michel's house after he got off of work that day on
August 24th; is that correct?

A       We had been there all day long, but we approached

**UNITED STATES DISTRICT COURT**

him after he got back from his shift.

Q       That was sometime in the early afternoon?

A       Yes.

Q       And I'll be clear.  Of August 24th of 2011; correct?

A       Correct.

Q       And when you originally approached him, do you know if he was armed?

A       He turned out to be armed.

Q       Did you ask him to secure his weapon in his trunk?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  Well, you ended up speaking to him, you said, on August 24th; is that correct?

A       Other agents spoke to Deputy Michel, yes.

Q       And they spoke to him at a Starbucks nearby?

A       Yes.

Q       For a couple hours.

A       Yes.

Q       And then he was brought back to his girlfriend's apartment which is where you met him originally; is that correct?

A       Correct.

Q       And the agents spoke to him for a couple more

UNITED STATES DISTRICT COURT

hours; is that correct?

A        Correct.

Q        And when the agents spoke to him, the FBI agents spoke to him, either at the Starbucks or his apartment, he confessed, did he not, to receiving bribes in connection with the cell phone?

A        I wouldn't call it a full confession.

Q        Well --

A        He admitted some conduct and wavered on his culpability.

Q        Well, let's start on the stuff he admitted.  He admitted that he had received $1,500 in two different payments from C.J.; is that correct?

A        Are you asking me about my -- I wasn't involved in the conversations with Michel.  I was observing and around.

Q        Again, I'm dealing with your observations and being around and being the case agent who has reviewed the reports as well and spoken to the agents.  That's the information database I'm referring to.

         Is that understood?

A        Yes.

Q        So on August 24th Gilbert Michel admits to receiving two bribes; is that correct?

         MR. FOX:  Objection.  Calls for hearsay.

         THE COURT:  Sustained.

UNITED STATES DISTRICT COURT

1092

Q        BY MR. HOCHMAN:  Well, when you said before he admitted certain things and didn't admit others, what did he admit?

MR. FOX:  Objection.  Calls for hearsay.

THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  Do you believe that Deputy Michel confessed to the bribe that day?

A        I wouldn't call it a confession.  He said he was trying to run his own sort of operation which negates his mental -- his intent.  So I wouldn't call it a full confession. It was left unclear whether he was going to take full responsibility.

Q        Well, what he was not taking any responsibility for are any inmate beatings; isn't that correct?

MR. FOX:  Objection.  Calls for hearsay.

THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  Well, you were present in the second conversations in which Gilbert Michel was present that occurred back at his girlfriend's house; is that correct?

A        I wasn't present during those conversations. They were with other agents.

Q        Where were you?

A        I was -- I was different places at various times. There was a lot of hours we're talking about.  I was outside talking to supervisors, being the perimeter agent.  I was

getting relayed information, but I was not the one talking to Gilbert Michel.

Q    At any point during the entire August 24th, 2011, interviews of Gilbert Michel?

A    I may have been present in locations where he was at talking to other agents and may have overheard various things, but I was not the one conducting the interviews.

MR. HOCHMAN:  May I have a moment, Your Honor?

THE COURT:  Yes.

Q    BY MR. HOCHMAN:  Well, at the end of Gilbert Michel's interview, did the FBI arrest him?

A    No.

Q    Had the FBI ever arrested him on July 20, 2011, to your knowledge?

A    No.

Q    Did the FBI ever arrest him on August 4th when the second bribe payment was given to him on that day?

A    No.

Q    At the end of the August 24th interview by the FBI of Gilbert Michel, Gilbert Michel now knows that Anthony Brown has been working with the FBI; correct?

A    I don't know what Gilbert Michel knows at the end of that day.

Q    Well, Gilbert Michel now knows that this was an FBI operation that had been involved in connection with his

receiving these payments; correct?

A        Yes.

Q        Did the FBI take any steps, to your knowledge, that prevented Gilbert Michel from going back to the Men's Central Jail where Anthony Brown was housed?

A        No.

Q        Did the FBI tell Gilbert Michel not to talk to anyone?

MR. FOX:  Objection.  Calls for hearsay.

THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  Were you present at the end of the interview of Gilbert Michel?

A        I don't think so.

MR. HOCHMAN:  No further questions, Your Honor.

THE COURT:  Redirect?

**REDIRECT EXAMINATION**

BY MR. FOX:

Q        Special Agent Dahle, Mr. Hochman asked you a number of questions about documents obtained relating to the obstruction of justice investigation relating to the Los Angeles County Sheriff's Department.  Is that what was being investigated in August of 2011?

MR. HOCHMAN:  Objection.  Misstates what investigation I was referring to.

MR. FOX:  Your Honor, I'll be happy to break it

down.

THE COURT:  All right.

Q      BY MR. FOX:  Mr. Hochman asked you questions about audiotapes of Sergeant Craig.  Were you aware of these audiotapes in August and September of 2011?

A      No.

Q      When did the FBI, the U.S. Attorney's Office, and the Federal Grand Jury begin investigating allegations of obstruction of justice with respect to Anthony Brown and the cell phone?

A      It was not until approximately the middle of 2012.  We didn't have any clue what was going on.

Q      At that time were you dealing directly with the sheriff's department or with counsel hired by the County Board of Supervisors in connection with the grand jury subpoenas?

A      Outside counsel.

Q      Do you remember the name of the law firm?

A      Jones Day.

Q      So when Mr. Hochman was asking you questions about whether you received documents directly from the sheriff's department, who were you receiving documents directly from?

A      Law firm Jones Day.

Q      Mr. Hochman asked you questions about whether grand juries were meeting with you and asking for documents.

Are you aware of whether the grand juries ever asked for specific documents or items?

A      Yes, they did.

Q      Okay.  Can you give us some examples?

A      They asked us for type of batons that deputies use, I think handcuffs.

Q      With respect to Mr. Carrillo, as we saw in the subpoena earlier, did they ever ask for any items related to that investigation?

Special Agent Dahle, can you remember --

A      I can't remember.

Q      Do you remember an issue relating to somebody's jacket?

A      Yes.  They did ask for a jacket, Los Angeles County Sheriff's Department deputy jacket to be produced.

Q      In gathering all of these documents and all of this information, what was the intent with -- what was your intent with respect to the grand jury?

A      To provide them with relevant --

MR. HOCHMAN:  Objection.  Relevance.  State of mind of witness.

THE COURT:  Sustained.

Q      BY MR. FOX:  You testified about the approach of Gilbert Michel.  Mr. Hochman asked you if August 24th was a

**UNITED STATES DISTRICT COURT**

Wednesday, and you said you couldn't be sure of the date.  Did you mean date or day of the week?

A    The day of the week.  I'm sure it was August 24th, 2011.  I just can't remember the day of the week that it was now without looking it up.

MR. FOX:  Your Honor, I have no further questions for this witness.

MR. HOCHMAN:  Just a few, Your Honor.

**RECROSS-EXAMINATION**

BY MR. HOCHMAN:

Q    When you say "Jones Day produced the documents," Jones Day are the lawyers for the sheriff's department; correct?

A    The department, yes.  They're lawyers for the sheriff's department.

Q    And they're not producing Jones Day documents.  They're producing Los Angeles Sheriff's Department documents, audiotapes, and videotapes; correct?

A    Correct.

Q    You said before, I believe, in your testimony that the grand jury started hearing evidence in March, 2012; is that correct?

MR. FOX:  Objection.  Beyond the scope of cross or redirect.  Excuse me, Your Honor.

THE COURT:  Sustained as to that question.

**UNITED STATES DISTRICT COURT**

Q    BY MR. HOCHMAN:  With respect to redirect, Mr. Fox asked you certain questions on whether or not the grand jury had asked for certain things.

Do you recall that?

A    Yes.

Q    Now, the grand jury doesn't start asking for certain things until approximately March, 2012; is that correct?

A    That's when the first hearing started, yes.

Q    So the grand jury didn't ask for anything in August and September of 2011; is that correct?

A    The grand jury members, no.

MR. HOCHMAN:  No further questions.

MR. FOX:  Nothing, Your Honor.

THE COURT:  All right.  You may step down.

Call your next witness.

MR. JAUREGUI:  Your Honor, the United States calls Tara Adams.

THE CLERK:  Stand right here and raise your right hand.

Do you solemnly state that the testimony you may give in the cause now pending before this court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

**UNITED STATES DISTRICT COURT**

THE CLERK:  Please be seated.

Please state and spell your full name and spell your last name for the record.

THE WITNESS:  Tara Adams.  Last name A-d-a-m-s.

THE CLERK:  Thank you.

**TARA ADAMS,**

**GOVERNMENT'S WITNESS, SWORN:**

**DIRECT EXAMINATION**

BY MR. JAUREGUI:

Q      Ms. Adams, are you presently employed?

A      No, I'm not.

Q      Were you at some point employed by the Los Angeles County Sheriff's Department?

A      Yes, I was.

Q      When were you employed by the sheriff's department?

A      2007 to 2014.

Q      What happened in 2014 that caused you to leave the department?

A      I resigned.

Q      In August of 2011, what was your rank within the department?

A      I was a deputy sheriff.

Q      Where did you work?

A      I worked at the Inmate Reception Center, IRC, the

records unit.

Q        Okay.  And what does IRC do?

A        IRC is like a processing hub for the county.  It receives all male inmates that are to be housed within the county jail system.  It also receives all paper documentation for every inmate, male and female, for the system.  It processes the inmates as well as the paperwork, and it also releases all inmates from the jail system.

Q        And who works in IRC?  Is it just deputies, or do civilian staff work there?

A        Yeah.  It's kind of a dual setup.  So half of it is a deputy portion, so secured side where there's deputies and inmates.  And then there's also a civilian side, and that side handles all paperwork aspects of the jail.

Q        Why are deputies assigned to IRC?

A        Well, the IRC is to process all inmates.  So they give them classifications, get them dressed in their county blues, and ship them out to housing facilities.  They're assigned to the unsecured side -- the civilian side, there's a select few deputies that are assigned there, basic protection of that side of the jail facility, as well as various jobs.

Q        And are you familiar with the term "case jacket"?

A        Record jacket, yes, sir.

Q        Yes.

A        Yes.

Q        Do deputies have any responsibilities, vis-à-vis, records jackets?

A        Records deputies do, and that's to basically make sure that they are secure.

Q        In August of 2011, what were your duties specifically?

A        I was a records deputy assigned as a watch deputy to the unsecured side of the jail.  So the records unit.

Q        Who did you work with?

A        I would work in an office.  It's a real small office, and I would work across or with head custody records clerk which would be the equivalent of a, say, lieutenant for me on my side.  But I would work with a clerical who was a head clerk.

Q        What was that person's name?

A        Gus Academia.

Q        At that time who did you report to?

A        We didn't have a direct supervisor at that time. So I reported to the operations -- the IRC operations lieutenant, Lieutenant Libertone.

Q        I want to take you to August 25th, 2011.  Do you remember that day?

A        Yes, I do.

Q        Did you work on that day?

A        Yes, I did.

UNITED STATES DISTRICT COURT

Q        Approximately what time did you come into work?

A        It was 1:45.  My shift started at 2:00.

Q        Did anything unusual happen when you arrived to work that day?

A        Yeah.  When I walked into the unit, I saw inside my office, because there's glass windows, that there were three deputies and one lieutenant standing with or in the office with my head clerk which was Gus Academia.

Q        Who was the lieutenant?

A        Lieutenant Libertone.

Q        Did you recognize the deputies at that time?

A        No, I didn't.

Q        Did you recognize them as being from a specific unit or division of the sheriff's department?

A        Yeah.  They were -- they were wearing three -- or all three of them were wearing green, like, windbreakers with the sheriff's logo and jeans.  So I identified them as either being detectives or working OSJ which is Operation Safe Jails.

Q        At any point did they identify themselves to you?

A        Yes.  They said they were from Operation Safe Jails.

Q        What happened when you approached these individuals?

A        Well, I walked into the office.  I walked past my lieutenant, and I saw my head clerk.  He looked a little

scared, a little frazzled.  So I asked what was going on, what they needed.

Q       Did anybody respond to you?

A       One of the deputies, he said that -- I think it was one of the deputies.  He said, we need an inmate released.

Q       What does it mean to release an inmate in relation to what you did in IRC?

A       For what I did, it would be the computer aspect of release.  So we would -- we would make sure all the information was inputted into the computer reflecting that the inmate was physically released from the facility.

Q       And Gus Academia, did he have the capability of releasing the inmate from the computer system?

A       Yes.  He was the head clerk.  So he knew all aspects of the records unit.  And then he ultimately was promoted to a point where he could do all aspects of it.  So, yes, he could release them.

Q       Did you also have the capability to release an inmate from the computer system?

A       I had capability, but it wasn't my job to do.  I would go to a clerk to perform it.

Q       What happened when one of these OSJ deputies said to you that they needed you to release an inmate?

A       I said, okay.  You know, let's see what we have going on.  I sat down at my desk and asked for a booking number

**UNITED STATES DISTRICT COURT**

and put it into the system.

Q    Before we get to that booking number, is that request that somebody asked you to release an inmate from the computer system, is that in and of itself unusual?

A    No.  No.

Q    What are the reasons why you would release an inmate from the computer system?

A    Say the inmate had been released and the detectives or deputies or someone discovered that, hey, this inmate is still showing.  He's in the system, but he's no longer in custody or the inmate was about ready to be released and they wanted to make sure that the computer reflected that he was released on time.

Q    And to release an inmate from a system -- from the computer system, do you need any kind of order or approval to do that?

A    Always, yes.

Q    What do you need to do that?

A    Every inmate that's released from county jail, they're wards of the Court.  So they're going to have a court order of release for some aspect.  They're going to have a release -- just release to the street, release from custody to mental health facility, state prison.  You need a court document that states this inmate is eligible for release.

Q    Are there times when you would release an inmate

UNITED STATES DISTRICT COURT

from the computer system without a court order?

A     Yes.

Q     What are those circumstances?

A     This is probably where I would step in mostly and help out.  Say an inmate is in custody under a booking number and his name is, I don't know, Bob Brown, and I was being asked to release this inmate from the system to reflect that they were no longer Bob Brown.  I would rebook him under John Doe.  But it was basically kind of a way to -- I don't know how to explain it.  A way to kind of disguise the inmate.  Say if the inmate was a high profile inmate and he was booked in under an original name, we would give him a John Doe name to make it a little harder to find.

Q     Why would you do that?

A     For safety reasons.  Maybe the inmate had a green light or a hit on him.  Other people were trying to find this inmate.  Say it's a high profile person and they wanted it to have less knowledge that the person was in custody.  Various reasons.

Q     So who -- going with the example of a high profile inmate --

A     Okay.

Q     -- if you change that person's name, how does it help to protect that person's safety?

A     Oh, a lot.  Everyone has access to, I guess, a

custody information portal.  So anyone can go on to LASD, I guess their jail custody portal, and look up and see if someone is in custody.

Q      So you've done this before?

A      Yes.

Q      Okay.  But generally speaking, you required a court order to release an inmate from the system?

A      Yes.

Q      So I think you testified that you asked for a booking number and a name --

A      Yes.

Q      -- of these OSJ deputies?

A      That's correct.

Q      Did you get a booking number and a name?

A      I did.  They gave me the booking number, and then I entered it into my computer and saw it came up to Anthony Brown.

Q      And what happened when you punched that information in or when you saw that information?

A      With that on the screen that I use, it gives also a lot of other information on the inmate.  So I realized right away that the inmate was a state prison inmate and he wasn't eligible for release.  He had already been convicted of a crime.

Q      Did you convey this information to the deputy

**UNITED STATES DISTRICT COURT**

standing near you -- let me ask you this.

Where were the deputies standing when you were doing this?

A       They were standing -- it's a pretty small office. They were standing behind my head clerk, the clerk that I work with, facing me.

Q       And did you convey this information to them or to your lieutenant?

A       I did.  I looked at my lieutenant actually because he was in the office and he's who I report to.  So I looked to him and said this inmate is not eligible for release.

Q       What happened when you said that?

A       The deputies seemed pretty angry, kind of -- they seemed like they were very focused on getting this inmate released.  So I asked why they wanted the inmate released.

Q       Did they answer your question?

A       No, they didn't.

Q       What did they say?

A       They didn't give me an answer.  They just said, you know, we have our orders.  We want this inmate released.

Q       What did you say in response to that?

A       Well, I tried to help them.  So I sat back, thought about what I could do to make the release happen.  You know, they had already said they didn't have a court order; so they didn't have an order from a judge.  So I thought what I

could do was release this inmate as Anthony Brown and immediately rebook him into the system as a John Doe, and that would allow the release to happen.

Q       Did you make that recommendation?

A       I did.  Yeah.  I recommended that and then also made it clear that we would be immediately fingerprinting him so that way all the important documentation that was pertinent, which would be the sentence, his state prison sentence, would be reflected on to John Doe.  We wanted to make sure it all stayed together.

Q       Let me ask you about that.

How does that information stay together?

A       Well, my job as a records deputy or a watch deputy, I know what units, what clerks to go to to make sure certain things happen.  So it would have been my job to make sure the record jacket for Anthony Brown would -- all the contents would move over and merge over to John Doe and that every, say, case or charge that Anthony Brown had would be reflected on to John Doe.

Q       And how does fingerprinting, in this case, Anthony Brown, how does fingerprinting help link that information to John Doe?

A       Okay.  Every inmate that comes into custody is Live Scanned.

Q       What does that mean?

A        With a Live Scan, it is fingerprinting of the inmate.  The way it works is, when you fingerprint an inmate on the Live Scan machine, it links to a CII number.

Q        What is a CII number?

A        It gives them like an identification number.  So each person has their own identification number.  So with that we would always know that John Doe was Anthony Brown based on Live Scan fingerprint.  The Live Scan also gives you other identification numbers and one being an FBI number.

Q        And what happened when you said that Anthony Brown would need to be fingerprinted?

A        Yeah.  I made it clear that this is something that I would be overseeing, that I would make sure happened.  That if we did merge -- rebook him to a new booking number, he would have to immediately be fingerprinted.  Sorry.  Can you repeat the question?

Q        Sure.  What happened when you said he would have to be fingerprinted?

A        No.  They said no.  They were not going to fingerprint the inmate.

Q        Did you then release the inmate, Ms. Adams?

A        No, I did not.

Q        What did you do?

A        At that point they were pretty agitated now.  They were getting pretty frustrated.  I was offering up all

that we could possibly do to help them.  I turned to my lieutenant.  I'm sorry, sir.  This inmate is not eligible for release.  We can't release him.  Then the deputies -- their voices got a little louder.  They were a little more forceful with we have our orders.  At that point I stood up because we had exhausted all chances to help them.  I said, sorry, this inmate is not eligible for release.

Q       What did they say to you, if anything?

A       They said they had their orders from Tanaka.

Q       At that time did you know who Tanaka was?

A       Yeah.  He was the Undersheriff of the department.

Q       What did you say, if anything, in response to that?

A       I said that's fine.  You know, we can't release this inmate.  One of the deputies then said, are you going to tell Tanaka no?  So I said, yes, you know.  I will tell him no.

Q       And did you ask for any other kind of information from these deputies at that time?

A       No, no, I didn't.  After they said, are you going to tell him no, it was pretty much clear where we stood.  I think I then mentioned, you know, he needs to put it in writing, you know.

Q       When you said, he needs to put it in writing, to whom were you referring?

A       Tanaka.

Q       What did they say to you when you said that?

A       They said, you know, if you're going to ask him to put it in writing, then you're going to have to tell him yourself.  One of the deputies moved to my desk to use the phone and started making a call.

Q       What was your reaction to that, Ms. Adams?

A       I was scared.  I was nervous.  I guess I was going to tell him I needed him to put that in writing.

Q       At that point did they end up calling Paul Tanaka?

A       No.  As they were dialing and going to make the call, at the same time the head clerk that I work with, he released the inmate from the system.

Q       And who was that?

A       Anthony Brown.

Q       I'm sorry.  Who was the head clerk?

A       Gus Academia.

Q       How did you know that he had released the inmate at that time?

A       He kind of yelled out, it's done.

Q       When he said, it's done, what did the deputies do next?

A       They kind of waited for Gus to finish filling out the record jacket, signing off where he needed to.  As he was holding it and kind of signing his name on the record jacket,

1112

one of the deputies took the jacket from him.

Q        And what did the deputy do with it?

A        He put it in a manila envelope and then kind of tucked it under his arm.

Q        Did you say anything at that point?

A        Yeah.  I was already standing.  It was already pretty tense in there.  I started forcefully telling my lieutenant, you know, he can't take this records jacket.

Q        Why were you saying that?

A        Because no record jackets leave our unit.  It stays within the records unit.  And there's a system set up where we need to scan, archive, make sure all the paperwork is properly processed.

Q        When you said he can't take that jacket, what did they say, if anything, to you?

A        They didn't say anything.  They just stayed quiet and started making their way to the door to leave.

Q        And are there ever occasions, Ms. Adams, when records jackets do leave IRC?

A        Yeah.  I mean, after they're scanned and properly archived, all records jackets after inmates are released and we're done with them, they get shipped off to a warehouse where they're archived there for a few years.

Q        When you say -- you said they're scanned before they leave?

A        Yes.

Q        In this case was the records jacket scanned before it left?

A        No.  Unh-unh.

Q        Let me just backtrack very briefly, Ms. Adams.

Earlier you talked about an FBI number being assigned to an inmate when that person is Live Scanned.  Does that FBI number track the John Doe name or the inmate's true name?  Do you know?

A        I believe the FBI number would be tracked with the inmate -- whoever the inmate is always.  It's just like a CII number.  It's a self-identifying number.

THE COURT:  Ladies and gentlemen, we're going to take our first break of the morning.  Again, I want to remind you, until this trial is over, you're not to discuss this case with anyone including your fellow jurors, members of your family, people involved in the trial, or anyone else.  And do not allow others to discuss the case with you.  This includes discussing the case on the Internet, through bulletin boards, blogs, by e-mails or text messages.

If anyone tries to communicate with you about this case, please let me know about it immediately.  Do not read, watch, or listen to any news reports or other accounts about the trial or anyone associated with it.  Do not do any research such as consulting dictionaries, searching the

1114

Internet, or using other reference materials, and do not make any investigation about the case on your own.

Finally, you're reminded to keep an open mind until all of the evidence has been received, you've heard the arguments of counsel, the instructions of the Court, and the views of your fellow jurors. If you need to speak with me, simply give a note to the clerk.

We're going to come back at 20 after the hour.

(The following proceedings were held in open court out of the presence of the jury:)

THE COURT: All right. You may step down.

MR. FOX: May I raise a brief issue with you, Your Honor, before we take our break?

THE COURT: Yes.

MR. FOX: Mr. Hochman objected to my inquiry of Special Agent Dahle about his intent with respect to acquiring the documents. Mr. Hochman has proposed a jury instruction that talks about the FBI acting as an arm of the grand jury, and one of the factors is the intent in their investigation whether they're going to present this information to the grand jury. So I do think that the intent is relevant, and it is something that is admissible.

So I wanted -- I didn't want to raise that at sidebar because of the jury being here and not wanting to waste their time. But it is something that I think we should be

**UNITED STATES DISTRICT COURT**

allowed to admit through Special Agent Dahle, the intent.  And I can probably do that with a different special agent that we might have testifying, but I wanted to raise that with you.

THE COURT:  Okay.  Do you wish to be heard?

MR. HOCHMAN:  Your Honor, I don't have the jury instruction in front of me.  So I just need to look at the jury instruction to -- I don't doubt what Mr. Fox says, but I'd like to look at it and evaluate it in light of the proposed question.

THE COURT:  Okay.

MR. HOCHMAN:  I don't have it in front of me.

THE COURT:  Well, I'll take a look at it.  If I decide that I'm going to overrule that objection, do you want to put Agent Dahle back on?

MR. FOX:  Probably for that limited purpose because I'd rather not expand Special Agent Tanner's testimony.  I've told you her special circumstances, and I would like to narrowly tailor her testimony as a result.

THE COURT:  Okay.  Why don't we take a look at it, and then we'll talk about it when we come back.

MR. FOX:  Thank you, Your Honor.

MR. HOCHMAN:  Thank you, Your Honor.

(A recess was taken at break time.)

THE COURT:  Okay.  Mr. Hochman, have you had an opportunity to review the jury instruction?

UNITED STATES DISTRICT COURT

MR. HOCHMAN:  I have, Your Honor.  The third part of the jury instruction, which was joint Instruction No. 42, Your Honor, said that the FBI agents undertook the investigation with the intention of presenting evidence before the grand jury.

To the extent that the question is, Agent Dahle, did you undertake the investigation with the intention of presenting evidence to the grand jury, we would not oppose that instruction -- or that question, Your Honor.  I don't believe that was the way Mr. Fox phrased the question which is why I objected.

MR. FOX:  Your Honor, of course that's not why he objected.  He objected because he forgot about his jury instruction that he proposed and we agreed to said.  I think what Mr. Hochman is right now saying is that he's concerned about this word "undertook."  And whether they began the investigation on day one with the intent to bring it there or by March of 2012 -- I mean, during the scope of the investigation, at some point intentions can change.  In this case it would not have changed.  I don't think I need to ask the question undertook.  Was it your intention in August, September of 2011 to bring this information before the grand jury is the same way as phrasing it the way he did it.  I don't think Mr. Hochman should be dictating how our questions are posed.

THE COURT:  Okay.  So how long are we going to be with the current witness?

MR. JAUREGUI:  On direct just a few more minutes.  Maybe five to eight minutes.

THE COURT:  And how --

MR. HOCHMAN:  Very briefly, Your Honor.  We'll be very brief on cross.

THE COURT:  All right.

MR. JAUREGUI:  After Ms. Adams is Gilbert Michel.

THE COURT:  Okay.  You want to put him back on after?

MR. FOX:  Yes, Your Honor.  I think that would make sense.

MR. HOCHMAN:  And, Your Honor, what I would also request, since the jury hasn't heard the limiting instruction in a while and Agent Dahle's testimony went into the beatings, the abuse, the excessive force, before he gets on, if Your Honor would be amenable to reading that limiting instruction one more time.

MR. FOX:  I think I'm asking one question, Your Honor.

THE COURT:  I think that's correct.  So I'm not going to give it when Dahle is up there for that one question.

MR. HOCHMAN:  When Gilbert Michel, who is the next witness, we believe, is going to go into the same topic

area at some point in his testimony, perhaps the Court can give it before Gilbert Michel's testimony when he hits those topic areas during that testimony.

THE COURT:  All right.  Now, do you want the jury taken out before --

MR. FOX:  Yes, Your Honor.

THE COURT:  -- Mr. Michel?

MR. FOX:  Yes, Your Honor.

THE COURT:  Okay.  All right.  Let's bring the jury in.

(The following proceedings were held in open court in the presence of the jury:)

MR. JAUREGUI:  May I proceed, Your Honor?

THE COURT:  Yes, please.

Q     BY MR. JAUREGUI:  Ms. Adams, before the break, you testified that the records jacket for Mr. Brown was not scanned before it left IRC on August 25th, 2011; is that correct?

A     That's correct.

Q     Do you know, Ms. Adams, whether IRC was able to obtain a copy of the records jacket before it left?

A     Yes.  After the deputies had left and my lieutenant had left the area, a supervising clerk walked up to me and whispered, you know, don't worry, Deputy Adams, I have a copy of the jacket.

**UNITED STATES DISTRICT COURT**

Q        And at this point, August 25th, 2011, how long had you worked in IRC?

A        In IRC, up until then, about four years.

Q        And at any point in those four years, had you ever had a situation like this where you were told to release an inmate without a court order upon Paul Tanaka's instruction?

A        No.

Q        I'm going to show you a couple exhibits, Ms. Adams.

If I can ask AUSA Fox to pull up Government Exhibit 122 which is in evidence.

You can take a look at 122 in front of you, Ms. Adams.

THE COURT:  I think there's a copy on the screen if that's more convenient.

THE WITNESS:  Thank you.  It is.

Q        BY MR. JAUREGUI:  Okay.  Do you recognize this exhibit, Ms. Adams?

A        Yes, I do.

Q        What do you recognize it to be?

A        It's the records jacket, the outside cover of the records jacket for Anthony Brown.

Q        Well, I guess it's flipped over a little bit.

Do you see there at the top where it says "Reason for release" and "Released by"?

1120

A       Yes, I do.

Q       Can you read the handwriting there, or do you recognize that signature where it says "Released by"?

A       Released by Gus Academia.

Q       Before it where it says "Reason for release," do you see that?

A       Yes.

Q       What is listed there?

A       It says "Other."

Q       Do you have an opinion, Ms. Adams, as to what that should have said based on the way Anthony Brown was released?

A       Yes.  The way he was released, orders would have been probably a better release reason.

Q       Now I'm going to direct your attention to Government Exhibit No. 34 which is also in evidence.  Earlier you were testifying about these deputies being OSJ deputies.

        Do you recall that?

A       Yes, sir.

Q       Do you know, Ms. Adams, who their lieutenant was at that time?

A       At that time I know the lieutenant was Lieutenant Thompson.

Q       Okay.  And Exhibit No. 34, if you can just take a look at the bottom part there, I'd like you to -- if you can

**UNITED STATES DISTRICT COURT**

tell the jury what we're looking at here -- from, to, and date?

A    From, it says, "Thompson, Gregory."  To, it says, "Carey, William."  And date is Friday, August 26, 2011.

Q    And this would have been the day after your encounter with the OSJ deputies?

A    Yes.  That's correct.

Q    Can you read the e-mail, please?

A    It says, "Handled.  MCJ will accept if forced but will advise that county attorneys have to review it.  Is this acceptable?"

MR. JAUREGUI:  And then if we can just highlight the rest of that e-mail.

Q    Could you please read William T. Carey's response to that e-mail, please.

A    Yes.  It says, "Gentlemen, it has to be very clear he is not released without approval."

Q    And above that Gregory Thompson's response to William T. Carey and Ralph Ornelas?

A    Yes.  It says, "Yes.  Captain Ornelas is briefing his watch commanders and following up with an e-mail to each.  Greg."

Q    And lastly, the response to that e-mail from William T. Carey to Greg Thompson.

A    "Perhaps a note on cell door.  I'll call Ralph as well."

Q        Now, if you wouldn't mind taking a look at Government Exhibit No. 35.  It's in evidence.  It's in evidence.

If we can just pull up the top part of that e-mail.  Thank you.

Now, actually, can you see Exhibit 35 in the binder in front of you, Ms. Adams?

A        Yes.

Q        While you're doing that, I just want to ask you does the bottom half of this e-mail overlap with the exhibit we just looked at?

A        Yes, it does.

Q        Okay.  Now, focusing on the top half which is on the screen in front of you, could you please read Ralph Ornelas' e-mail to Greg Thompson, August 26, 2011, at 10:47 a.m.

A        Yes.  It says, "Greg, what attorney are we going to use to review, if possible, court order from FBI?"

Q        And the response, please, from Greg Thompson to Ralph Ornelas and William T. Carey?

A        It says, "Tom handle.  Probably the one who is on vacation for a month."

Q        And the last exhibit, Ms. Adams, is Government Exhibit No. 36.  It's also in evidence.  If you wouldn't mind reading the from, to, and date line and then the subject on the

**UNITED STATES DISTRICT COURT**

bottom one, please.

A    From Ornelas, Ralph, to MCJ lieutenants, MCJ sergeants, cc Thompson, Gregory.  And the date is Friday, August 26, 2011.

Q    Subject?

A    Subject is "Court order presented by federal officers."

Q    And could you please read the e-mail?

A    "Watch commanders and watch sergeants.  If any federal law enforcement agency comes to MCJ with an inmate removal order, visitation order, or any other order of the Court, you shall receive the order and advise the federal officer that, before you can proceed, you have to submit the order to the department's legal advisor for review.  Do not release the inmate or allow contact.  Take complete contact information from the federal officer and advise him or her that you will advise when the inmate is available.  Immediately contact Captain Ornelas or Lieutenant Fedele for further instructions."

Q    Ms. Adams, in your time at IRC as a records deputy, did you have any experience with court orders or court writs?

A    Yes.

Q    Ordinarily, Ms. Adams, would a court order for an inmate go directly to MCJ?

A       No, it wouldn't.

Q       Where would it go?

A       It would go to the records unit, the unit with the civilian clerical staff.

Q       And ordinarily, Ms. Adams, when a court order does come to IRC or to the sheriff's department, does it go to the department's legal advisor for review?

A       I don't believe so.  I don't know.  I mean, typically it wouldn't, no.

Q       And then the last thing, directing your attention to the top of this e-mail, is this e-mail then forwarded from Greg Thompson to William T. Carey?

A       Yes.

Q       And with the notation that says "FYI"; correct?

A       That's correct.  Yes.

MR. JAUREGUI:  One moment, Your Honor.

No further questions for this witness, Your Honor.

THE COURT:  All right.  Cross-examination?

MR. DIAMANTATOS:  Yes, Your Honor.

**CROSS-EXAMINATION**

BY MR. DIAMANTATOS:

Q       Ms. Adams, for all the events that you just described, you had no communications of any kind, whether in person, over the phone, or in writing, with Sheriff Baca; isn't

**UNITED STATES DISTRICT COURT**

1125

that right?

    A       That's correct.

                MR. DIAMANTATOS:  No further questions, Your Honor.

                MR. JAUREGUI:  Nothing further, Your Honor.

                THE COURT:  All right.  Thank you.

                MR. FOX:  Your Honor, may we re-call Special Agent David Dahle?

                THE COURT:  Yes.

                THE CLERK:  You're reminded that you're still under oath.

                MR. FOX:  May I proceed, Your Honor?

                THE COURT:  Yes, please.

                            **DAVID DAHLE,**

                **GOVERNMENT'S WITNESS, PREVIOUSLY SWORN:**

                        **DIRECT EXAMINATION**

BY MR. FOX:

    Q       Special Agent Dahle, in August and September of 2011, what was your intent with respect to the documents that you were subpoenaing from the sheriff's department?

    A       The intent was to eventually provide it to the grand jury.

                MR. FOX:  No further questions, Your Honor.

                THE COURT:  Anything else?

                MR. HOCHMAN:  No cross, Your Honor.


                    **UNITED STATES DISTRICT COURT**

THE COURT:  All right.  Thank you.  You may step down.

Ladies and gentlemen, we're going to take a -- an unscheduled break for about five minutes.  So if you would step out, and it will be very, very quickly.  Five minutes.

(The following proceedings were held in open court out of the presence of the jury:)

MR. FOX:  Your Honor, Mr. Michel is represented by Ed Robinson who is in court right now.

THE COURT:  All right.  Mr. Robinson.

MR. FOX:  Your Honor, may I test some of our audio right now to make sure it's working?

THE COURT:  That's fine.  Are we ready to proceed?

MR. JAUREGUI:  Yes, Your Honor.

MR. HOCHMAN:  Yes, Your Honor.

(The following proceedings were held in open court in the presence of the jury:)

THE COURT:  All right.  Ladies and gentlemen, again, I want to remind you that the defendant is not on trial for any conduct, offenses, or allegations of inmate beatings or deputy abuse that are not charged in the Indictment.  The only thing you are to determine is whether the defendant is guilty or not guilty of the charges in the Indictment.

I'm going to ask the clerk to swear the witness,

**UNITED STATES DISTRICT COURT**

please.

THE CLERK:  Raise your right hand.

Do you solemnly state that the testimony you may give in the cause now pending before this Court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  Yes.

THE CLERK:  Will you please state your full name and spell your last name for the record.

THE WITNESS:  Gilbert Emannuel Michel, M-i-c-h-e-l.

THE CLERK:  Thank you.

MR. JAUREGUI:  And, Your Honor, before we get started with Mr. Michel's testimony, the Government moves for the admission of Exhibit Nos. 58 and 59.

MR. HOCHMAN:  No objection, Your Honor.

THE COURT:  All right.  They'll be received.

(Marked for identification and received

into evidence Exhibit Nos. 58 and 59.)

**GILBERT MICHEL,**

**GOVERNMENT'S WITNESS, SWORN:**

**DIRECT EXAMINATION**

BY MR. JAUREGUI:

Q     Mr. Michel, were you ever a deputy in the Los Angeles County Sheriff's Department?

**UNITED STATES DISTRICT COURT**

1128

A       Yes, sir.

Q       When was that?

A       Between December of 2008 until April of 2011.

Q       And do you know -- did you leave the department on your own, or were you fired, sir?

A       I resigned in lieu of being fired.

Q       I want to start with your becoming a deputy in the sheriff's department.

What type of training did you receive when you became a deputy?

A       Initially I went through the sheriff's academy, which was between December, 2008, until April of 2009.

Q       And what was your first assignment out of the academy?

A       My first actual assignment was -- I was assigned to Men's Central Jail in Downtown Los Angeles.

Q       Were you assigned to a specific floor?

A       Yes.  Originally I was assigned to the 2000 floor in Men's Central Jail.

Q       While you were on the 2000 floor, did you encounter an inmate named Anthony Brown?

A       Yes, sir.

Q       And did anything unusual happen in your encounter with Anthony Brown at that time?

A       The first time, no, sir.  Just a "hi" and "bye."

**UNITED STATES DISTRICT COURT**

Q        After your assignment in 2000, where were you assigned?

A        After 2000, I went to vac relief, which is -- I just went throughout the whole jail just filling in for everyone who had a normal spot.  I would just cover their spot for a day or a couple days.

Q        And is "vac" short for anything?

A        It's short for vacation relief.

Q        While you were assigned to vac relief, did you work on the 3000 floor of Men's Central Jail?

A        Yes, sir.

Q        I want to ask you about your experience on 3000. While you were there, did you come into contact with a deputy named Justin Bravo?

A        Yes, sir.

Q        In that time period or at that time, did you witness any unprovoked force by Deputy Bravo?

A        Yes, sir.

Q        What did you see?

A        What happened is I was --

MR. HOCHMAN:  Objection.  Relevance, Your Honor. And prior objections as well incorporated.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  I was actually doing a trade on

**UNITED STATES DISTRICT COURT**

this particular day.  It was a p.m. shift that I was working.  Some inmates had come back from a pill call or visit or -- I don't even know where they were coming back from.  But usually when inmates return back to the module, they would go inside what we called the laundry room.  It's a little empty space where inmates can come and just wait until we have to house them back into the normal housing area.

Well, an inmate had come back, and he was inside of the laundry room, and he was doing pull-ups on top of the -- on the pipes, the exposed plumbing that was in the laundry room.  And inmate -- or CA Winlet had actually saw him doing that, and he went in there and told him to stop doing that because he could possibly break the pipes and we would have some problems.

Q    BY MR. JAUREGUI:  Let me stop you really quickly.  What is a CA?

A    A CA is a custody assistant.  They help the deputies in the operation of the modules.  Like, they run a module, but they don't do, like, the major paperwork, like if there's a crime that was committed or -- they just do a little bit lesser -- have a little bit lesser responsibilities than the deputies do.

Q    Okay.  Continue.

A    So Winlet goes in and tells the inmate to stop doing the pull ups, and the inmate kind of gave him a little

bit of an attitude.  So CA Winlet goes outside into the hallway and brings back Deputy Bravo.

Q    And when Deputy Bravo came back with CA Winlet, what happened?

A    Well, Deputy Bravo tells the inmate to face the wall inside of the laundry room, and he gets the inmate to put his hands behind his back.  When the inmate puts his hands behind his back, Deputy Bravo grabs his hands behind his back, and he slaps him in the -- kind of like in the back of the head area.

You know, he continues to talk to him.  I don't remember exactly the words that he said.  The inmate still -- he's pushed up against the wall, and then Deputy Bravo also strikes him with his fist to the back of his ribcage.  He tells him a couple more things, and then Deputy Bravo actually leaves out of the module.

Q    Did you watch all of this happen?

A    Yes.

Q    Did either Deputy Bravo or CA -- can you please tell me again how you pronounce his name?

A    CA Winlet.

Q    Winlet.  Did they approach you at that point?

A    No.

Q    At some point did you talk to them about what you had seen?

A        Yes.  Later on after everything -- we put all the inmates back that were in the laundry room because other inmates kept coming.  We put them back.  And a little bit -- some time goes by, and actually Deputy Bravo and Deputy Snyder, I believe was his name, they asked to speak with me inside of the rec room.  We also had a rec room at that time -- or there was a rec room.

Q        And did you speak with them?

A        Yes.  I went over and started talking to them, yes.

Q        What did they ask you?

A        Well, first of all, they started off, like, asking me, like, "Oh, hey, you're new to the floor.  Where have you been working?  Where have you worked?"  They asked me if I was on training.  And I had just gotten off training.  They asked me if there was -- if I had any family members that lived on the department, which I never told anyone that I had family members on the department.  It just kind of -- I don't know if it was a coincidence or what.  They were fishing me for answers.

                Then after they asked me to --

                MR. HOCHMAN:  Objection.  Calls for a narrative at this point.

                MR. JAUREGUI:  I can ask another question, Your Honor.

**UNITED STATES DISTRICT COURT**

THE COURT: That's fine.

Q       BY MR. JAUREGUI: After they asked you if you were related to anyone on the department, what did they ask you, if anything?

A       Well, after they finished asking me those questions, finally they said, "Hey, did you see anything earlier?" I knew what they were referring to just by their implying that I seen something, and I told them that I didn't -- I didn't know what they were talking about.

Q       And how did they respond when you said you didn't know what they were talking about?

A       They -- they basically just said, like, okay, and then that was pretty much the end of the conversation.

Q       Did you ever learn, Mr. Michel, that -- if Deputy Bravo was related to anyone else on the department?

A       At the time, no, I did not know that Deputy Bravo was related to anyone.

Q       Did you ever learn that?

A       Yes.

Q       What did you learn?

A       Someone told me that Deputy Bravo --

MR. HOCHMAN: Objection. Calls for hearsay.

THE COURT: Overruled.

You can answer.

THE WITNESS: That Deputy Bravo was, in fact,

UNITED STATES DISTRICT COURT

related to Sheriff Baca.

Q        BY MR. JAUREGUI:  At some point after this incident, Mr. Michel, did you receive a permanent assignment?

A        Yes.

Q        Where were you assigned?

A        I eventually was assigned to 3000 floor.

Q        When you got to the 3000 floor, did you encounter Anthony Brown again?

A        Yes.

Q        In the summer of 2011, were you still working on 3000?

A        Yes.

Q        At that time, did you make an agreement with Anthony Brown?

A        Yes.

Q        What was your agreement?

A        The agreement was that I would bring him in a cell phone and he would pay me for that cell phone.

Q        Did you ultimately acquire a cell phone to bring in to Anthony Brown?

A        Yes.

Q        Who did you contact to get that cell phone?

A        Initially I had brought -- I had brought my personal cell phone into the custody area, and I allowed Anthony Brown to use my cell phone to call his associate on the

1135

outside, who was named C.J.

Q       Then what happened?

A       Then I did not get -- we did not talk to C.J. the first time, but later on, a day or two after, I actually got ahold of C.J., and we made arrangements to meet at a location outside of Men's Central Jail.

Q       At that time, did you know C.J.'s true identity?

A       No.

Q       Did you later come to learn who C.J. was?

A       Yes.

Q       Who was C.J.?

        MR. HOCHMAN:  Objection.  Foundation.

        THE COURT:  Sustained.

Q       BY MR. JAUREGUI:  At this time, Mr. Michel, did you know that -- let me just ask a different question.

        Did you end up meeting C.J.?

A       Yes.

Q       And when did you meet him?

A       I don't remember the exact date.

Q       How long after your phone call?

A       A couple days.

Q       And what happened when you met C.J.?

A       Well, we -- I had called -- we had made contact over the phone.  And when we picked a location to meet and we actually exchanged a cell phone and money -- well, he gave me a

**UNITED STATES DISTRICT COURT**

cell phone and money, and then I left the location.

Q    Where was this?

A    It was off of the 105 and Vermont, I believe.

Q    Were you alone, or were you with someone else?

A    I was alone.

Q    Whose car were you driving?

A    I was driving my girlfriend's at the time.

Q    What was her name?

A    Angela Caruso.

Q    Did she have any role in the sheriff's department?

A    She was a deputy as well.

Q    You said C.J. gave you money; correct?

A    Yes.

Q    How much money did C.J. give you?

A    He gave me $700 cash.

Q    And how did he give you that money?

A    He actually threw it into my vehicle, because my window was down, in a little, like, sunglasses case.

Q    And did you -- were you in your vehicle the entire time?

A    Yes.

Q    Where was C.J.?

A    He was in his vehicle -- he was -- when I met him, he was parked in an east-and-west direction, and I was --

and I pulled up to his driver's side.  So we were parked parallel to each other with our driver's side windows together.

Q       And what did you do when this transaction was completed?

A       I drove home.

Q       And once you got home, what did you do, if anything, with the cell phone that he had given you?

A       Well, at first, I opened it up to see if there was -- if there was a battery and if there was anything inside of the cell phone, like possibly drugs or any, you know, weapons or anything like that.

Q       And why did you do that, Mr. Michel?

A       Because I didn't want to give Anthony Brown any drugs or any weapons.  And I didn't know what his intentions were besides actually using the phone to contact people on the outside.

Q       What did you do when you took apart the cell phone?

A       So I took it apart and checked it.  Then I put it back.  And then I turned it on to see if it actually worked, if it was functioning.  And it turned on.  And then after that, I actually charged it.

Q       Okay.  Why did you want to make sure that the phone worked?

A       Because I wanted to -- the agreement was for --

between me and Anthony Brown that he would allow me to talk to the people that he was dealing with on the outside through the cell phone.

Q       Did there come a time, Mr. Michel, where you learned that the cell phone was connected with an FBI investigation?

A       Yes.

Q       Did there come a time where you learned that C.J. was an undercover FBI agent?

A       Yes.

Q       At that time of that first transaction, did you know that C.J. was an undercover FBI agent?

A       No.

Q       Did you eventually give the phone to Anthony Brown?

A       Yes.

Q       Approximately when was that in relation to the transaction.

A       It was, like, the following week when I went back to work.

Q       How did you get the phone to Anthony Brown?

A       Well, after I had checked the phone, charged it, and made sure that it worked and there was nothing inside of it, I put it inside a rubber glove that we used to use at work. Then I just put it into my backpack.  And when I got to work, I

changed out, and I put it in my right -- in my uniform.  I had a little -- like, a flashlight pocket.  I put it inside that pocket and walked up to the 3000 floor -- it was Module 32 and -4 -- and walked straight up to Anthony Brown's cell and placed it -- the cell phone with the glove over it on his bunk.

Q      Why did you put it on his bunk?

A      Because he was actually asleep.  And I woke him up and just placed it on the bunk.

Q      Did there come a time that day when you took the cell phone back from Anthony Brown?

A      Later on that afternoon, after my shift was over, I recovered the cell phone back from him.

Q      Why did you do that?

A      Because he needed it to be charged, so I took it home and recharged it again.

Q      This agreement you had with Anthony Brown, who was supposed to provide you with money?

A      C.J. was the one who was -- who gave me the money.

Q      Did you ever meet with C.J. again?

A      Yes.

Q      When was that relative to the first transaction?

A      About a week after the first time that I had given Anthony Brown the cell phone.

Q      Where did you meet him?

**UNITED STATES DISTRICT COURT**

A       Off of Los Feliz in Burbank/Glendale area.

Q       Why were you meeting with him again?

A       Because Anthony Brown wanted the cell phone again because he didn't keep the cell phone overnight.  So he wanted to use the cell phone again, so he wanted me to bring it to him.

Q       Why is that relevant to your meeting C.J. again?

A       Because C.J. was going to pay me more money so Anthony Brown could get the phone.

Q       How much money did C.J. give you at the second transaction?

A       $800.

Q       Did you and Anthony Brown discuss a plan where you would get more money than this $800 the second time and $700 the first time?

A       Yes.

Q       What was that discussion?

A       Anthony Brown offered me $20,000 to -- because I was giving him the cell phone.

Q       Did that ever happen, that you received $20,000?

A       Not that I'm aware of, no.

Q       In total, how much money did you receive from C.J.?

A       $1,500.

Q       Mr. Michel, are you aware that at some point

deputies found this cell phone on Anthony Brown?

A       Yes.

Q       How did you learn that?

A       Because my -- one of my partners had come into the module and told me that they had found a cell phone.

Q       And how long after you had given Anthony Brown the cell phone did this happen?

A       That morning I gave Anthony Brown the cell phone around 5:40, 5:50, and maybe like a couple hours after that.

Q       What happened when you found out that deputies had found the cell phone?

A       Well, initially my heart, like, dropped to my stomach, and I was just shocked.  After I kind of pulled myself together, I went out to the hallway where all the deputies were at, and they were actually on -- they were, like, touching the cell phone and looking at it and everything.  And I told them that I needed to go to my vehicle to -- I needed to go to my locker to get something.

Q       Why did you do that?

A       Because I was freaking out.  So I wanted to go to make a phone call to C.J. and tell him to get rid of his phone because I did not want the phone that Anthony Brown got caught with to come back to me.

Q       At this point, Mr. Michel, did you know C.J. was an undercover FBI agent?

UNITED STATES DISTRICT COURT

A        Still I did not know.

Q        Did you call C.J.?

A        Yes, I did.

Q        What happened?

A        I called, and he didn't answer.  I left a message on his -- on the cell phone telling him that my partners had found the cell phone.

Q        After you made that phone call, what did you do?

A        I just went back into -- actually, before I went back into work, my cell phone -- I took the battery out, and I hid it inside of my vehicle.

Q        Why did you do that?

A        Because I didn't want the phone that they had found in the jail to come -- to be routed to my phone.

Q        What was the next thing that happened, Mr. Michel, with regard to your cell phone?

A        Well, I -- I lost my cell phone.

Q        How did you -- when you say you lost it, do you mean you never found it again?

A        I never found it, yes.

Q        At some point, Mr. Michel, were you contacted by special agents of the FBI?

A        Yes.

Q        Who in the FBI contacted you?

A        Initially it was Agent Dahle, Agent Marx, and

Agent Wayne.

Q      Do you remember approximately when that was?

A      I don't remember.  It was weeks after the cell phone had been found, I believe.

Q      What happened when you were approached by these agents?

A      Well, I had just gotten off work.  It was around 2:30, 3:00 o'clock in the afternoon.  I parked my vehicle.  I noticed that two people were approaching me.  So I, you know, get out of my vehicle, and they asked me if I -- if my name was Gilbert Michel.  And I said "yes."  And I thought, you know, that's kind of strange that someone would know my name.

That's when I noticed there was someone actually behind me, and then they started asking me if they could ask me questions and if I would be willing to, like, go up to my -- I lived in an apartment at the time -- up to my apartment and ask more questions.

Q      Did they identify themselves to you as FBI agents?

A      After they asked me my name, yes, they pulled out their credentials, yes.

Q      Did you agree to go up to your apartment to talk to them?

A      No.  At that time, I didn't agree to go up to my apartment, but I had suggested we go somewhere else.

1144

Q        Why did you do that?

A        Because at the time my girlfriend was at my residence, and she had nothing to do with all this stuff that was going on.  So I didn't want her to be involved or talk to her about it.

Q        So did you end up speaking to the FBI agents?

A        Yes.  We actually went to a -- they asked me if there was anyplace that we could speak, like a Starbucks or a restaurant or something like that.  And there happens to be a -- there happened to be a Starbucks up the street.  So that's where we went.

Q        Did you end up speaking with them?

A        Yes.

Q        What happened when you sat down to speak with these agents?

A        Well, we get to the Starbucks, and it was pretty small, and there was a lot of people inside.  So we actually went to the back of the Starbucks where it was, like, an outside open area.  They had, like, a binder that was this binder that's up here, and they had a laptop computer.

Agent Marx was sitting across from me, and Agent Wayne was sitting to the left of me.  And they started asking me questions like where I worked, who I worked with. And as soon as they asked me the questions, that computer, the laptop that they had, it actually, like, popped -- the screen

**UNITED STATES DISTRICT COURT**

came up, and there was, like -- it looked like video surveillance. And it was of my girlfriend's at the time car. And I knew that it was the day of me and Anthony -- me and C.J. exchanging the money and the cell phone.

Q        Did you agree to talk to them about that cell phone incident at that time?

A        At that time, yes. Well, what also was transpiring at that time is there was agents at my house. So they were actually talking to Angela, and I did not know about that. After they were talking to her, she -- because she is a deputy, she actually tried to contact her sergeant, which I guess the FBI did not want that to happen at that time.

Q        Let me stop you really quickly, Mr. Michel.

You were at the Starbucks meeting with Special Agent Marx and Agent Plympton, you said?

A        No. Agent Marx, Agent Dahle was there, and Agent Wayne.

Q        And I believe you testified you were talking with Agent Marx and Agent Wayne; correct?

A        Yes.

Q        Okay. The agents that were at your house, were these different agents?

A        Yes.

Q        Before we get to your house, did Agent Marx and Agent Wayne, did they inform you that you would be charged with

**UNITED STATES DISTRICT COURT**

a crime?

A      Yes.

Q      Ultimately did you return back to your apartment?

A      Yes.

Q      Did you continue talking to the agents?

A      Yes.

Q      What happened?

A      Well, we go back to my apartment, and we sit at my dining room table.  Agent Marx was on my left.  I don't remember the agent that was on my right.  He was not at Starbucks.  I'd never seen him before.  And Special Agent Wayne was sitting across from me.

Then when we sat down, Agent Marx starts asking me questions about -- her questions were about the -- about who I worked with at CJ, Men's Central Jail.  Then almost, like, simultaneously, the agent that was to my right starts asking me questions as well.

I felt like they were just bombarding me.  I got really upset, and I basically told them to charge me with whatever they were going to charge me with and basically leave me alone.

Q      How did the meeting end?

A      Not very good.

Q      Did any agent give you anything before they left?

A      At the very end, Agent Wayne gave me his business

card and told me, if I -- if I wanted to -- if I changed my mind and I wanted to speak with them, to give him a call.

Q       After this encounter with the agents, what did you do?

A       The next day I was just freaking out, and I didn't know what to do.  But I did know that I needed to get a lawyer.  So I actually had tried.  I went to try to meet with a lawyer.

Q       And did you eventually hire a lawyer?

A       Yes.

Q       Did you then later contact the FBI?

A       When I had contacted my lawyer, he told me to call Agent Wayne back and tell him that I had gotten a lawyer and that I was going to speak with him to talk to the agent. But Agent Wayne said -- when I called him, I told him that I had acquired a lawyer.

        And at that time, he said that he could no longer speak with me and that my attorney had to call the U.S. Attorney's Office and speak with -- I believe Lawrence Middleton was the U.S. Attorney's name that he gave me.

Q       After this encounter, Mr. Michel, did you continue working at MCJ?

A       Yes.

Q       When was your next shift relative to this FBI

interview?

A       I don't remember exactly, but it was, like, days after.

Q       And what happened when you got to work?

A       I had -- I was working days.  I went to the module that I was working at, 36 and -8.  And when I got there, like, a couple minutes I had just sat down and the telephone rings in the module.  So I pick up the phone, and they -- whoever it was -- I think it was the booth on 3000 floor, the main booth -- they told me to 10-19 the captain's office, which means go down to the captain's office.

Q       And did you go to the captain's office?

A       Yes, I did.

Q       What happened when you got there?

A       Well, as I was walking down the hallway out of the sally port, the main entrance to Men's Central, I'm walking down to the hallway to the captain's office.  Sergeant Long and Sergeant Craig met me in the hallway.

Q       And what happened after they met you in the hallway?

A       Well, they asked me if I was Deputy Michel.  And obviously it was written on my uniform, so I said, "Yes."  And then also at that time Lieutenant Leavins came walking up as well.  And they asked if they could speak with me.  So I said, *Yes*.

UNITED STATES DISTRICT COURT

1149

They said, "Well, let's go into this office here."  We went into the office, and they started talking to me.

Q    Do you know, Mr. Michel, if that conversation that you had with Sergeant Craig, Sergeant Long, and Lieutenant Leavins, do you know whether that was recorded?

A    Yes.

MR. JAUREGUI:  Your Honor, I'd like to show the witness Government Exhibit Nos. 92 and 93.  And if I can ask the Court clerk to grab those for the original and place them before the witness.

(Exhibit Nos. 92 and 93 for identification.)

THE COURT:  That's fine.

MR. JAUREGUI:  Your Honor, I will be referring to the transcript binders during this portion of the testimony.

Q    Mr. Michel, can you please look at Exhibits 92 and 93.

A    Yes, sir.

Q    Do you recognize Exhibit 93?

A    Yes, sir.

Q    What is it?

A    It's a written transcript.

Q    Of what?

A    Of the audio of the meeting with me, Sergeant Craig, Sergeant Long, and Lieutenant Leavins.

**UNITED STATES DISTRICT COURT**

1150

Q      Have you seen it before?

A      Yes.

Q      How do you know that?

A      Because I reviewed it on 11/30/16.

Q      What about Exhibit No. 92?

A      Yes.

Q      What is it?

A      At this time, a CD of the audio of the transcript.

Q      And have you listened to that CD before?

A      Yes, sir.

Q      And how do you know that you listened to that CD?

A      Because I wrote the date and my initials on it after I had listened to it on 11/30/16.

Q      Is the transcript at Exhibit No. 93, does it accurately reflect the audio recording that's in Government Exhibit No. 92?

A      Yes.

MR. JAUREGUI:  Your Honor, I'd move for the admission of Exhibit No. 92.

MR. HOCHMAN:  No objection, Your Honor.

THE COURT:  It will be received.

(Exhibit 92 received into evidence.)

MR. JAUREGUI:  Your Honor, at this point, I'd like to start playing some excerpts from Exhibit No. 92.

UNITED STATES DISTRICT COURT

1151

THE COURT:  All right.  Ladies and gentlemen, if you'd open your notebooks.

Again, a transcript of the recording is being provided to help you identify speakers and to help you decide what the speakers say.  Remember, the recording is the evidence, not the transcript.  If you hear something different from what appears in the transcript, what you heard is controlling.  Listen carefully.  The transcript will not be available during your deliberations.

MR. JAUREGUI:  If I can ask AUSA Fox to play the first clip, 92-1.

Your Honor, I believe the Court has already instructed the jury, the transcript binder at Exhibit No. 93.

THE COURT:  If you'd open up your notebooks to Tab 93.

        (The CD, Exhibit No. 92, commenced

          playing before the jury.)

Q        BY MR. JAUREGUI:  Now, Mr. Michel, did you hear Sergeant Craig at the part of this clip say, "Okay.  Today is August 30th, wow, 2011"?

A        Yes, sir.

Q        Earlier you testified that you believe you left the department in April 2011.

A        Yes, sir.

Q        Were you still employed by the department in

**UNITED STATES DISTRICT COURT**

August of 2011?

A       Yes, sir.

Q       Do you recall now when you left the department?

A       No.  I mean, it was in 2011.

Q       Would it have been August 30th, 2011?

A       It was -- yes.  It was after.  Yes.

Q       Okay.  During this interview, Sergeant Craig says to you, "Does this guy look familiar to you?"  Do you remember that?

A       Yes.

Q       What was he doing at that time?

A       He was actually showing me a picture, photo on a piece of paper of Inmate Anthony Brown.

MR. JAUREGUI:  Now if we can play 92-2.

(The CD, Exhibit No. 92, commenced

playing before the jury.)

MR. JAUREGUI:  Next clip, 93-3.

(The CD, Exhibit No. 92, commenced

playing before the jury.)

MR. JAUREGUI:  92-6.

(The CD, Exhibit No. 92, commenced

playing before the jury.)

MR. JAUREGUI:  92-7.

(The CD, Exhibit No. 92, commenced

playing before the jury.)

**UNITED STATES DISTRICT COURT**

Q        BY MR. JAUREGUI:  Now, Mr. Michel, you referred to something called a kite during this; correct?

A        Yes.

Q        What is a kite?

A        In jails and in prison, they call written notes kites.

MR. JAUREGUI:  92-11, please.

(The CD, Exhibit No. 92, commenced playing before the jury.)

Q        BY MR. JAUREGUI:  Now, Mr. Michel, you referenced a tall female in this clip; correct?

A        Yes.

Q        Have you since learned who this female was?

A        Yes.

Q        Who was it?

A        Agent Marx.

Q        You also referenced an older -- a person in his 40's; right?

A        Yes.

Q        Have you since learned who that was?

A        Yes.

Q        Who was that?

A        Agent Wayne.

(The CD, Exhibit No. 92, commenced playing before the jury.)

**UNITED STATES DISTRICT COURT**

1154

Q        BY MR. JAUREGUI:  Mr. Michel, at the end of the clip you said something about it being really good; right?

A        Yes.

Q        What were you referring to at that point?

A        The video footage that Agent Marx had brought up on her laptop computer.

Q        And you heard Sergeant Craig say, "Oh, so they employ you now."  Do you remember that?

A        Yes.

Q        Was it your impression, Mr. Michel, that Sergeant Craig was offended at this?

A        He was very offended and, like, very annoyed by that -- the fact that the FBI could determine my fate.

MR. JAUREGUI:  Next clip, 92-13, please.

(The CD, Exhibit No. 92, commenced

playing before the jury.)

Q        BY MR. JAUREGUI:  Mr. Michel, without getting into the details of it, what is the Christmas party fight that you referenced?

A        MCJ would have, like, an annual Christmas party that was like -- it wasn't sanctioned by the department.  It was just something that they had done on their own.  Two groups of deputies got into a physical altercation at that party.

MR. JAUREGUI:  92-14, please.

///

**UNITED STATES DISTRICT COURT**

(The CD, Exhibit No. 92, commenced

playing before the jury.)

MR. JAUREGUI:  92-15.

(The CD, Exhibit No. 92, commenced

playing before the jury.)

MR. JAUREGUI:  92-16.

(The CD, Exhibit No. 92, commenced

playing before the jury.)

MR. JAUREGUI:  92-18.

(The CD, Exhibit No. 92, commenced

playing before the jury.)

MR. JAUREGUI:  92-20.

(The CD, Exhibit No. 92, commenced

playing before the jury.)

MR. JAUREGUI:  92-23.

(The CD, Exhibit No. 92, commenced

playing before the jury.)

Q        BY MR. JAUREGUI:  Now, Mr. Michel, on August 24th
when the FBI came to your house, did you think they were trying
to manipulate you?

A        No, sir.

Q        On the date of this interview, August 30th, 2011,
when you spoke to ICIB, what did you begin to think about the
FBI?

A        Just that they were conducting a lawful

**UNITED STATES DISTRICT COURT**

investigation into the sheriff's department.

MR. JAUREGUI:  92-24, please.

(The CD, Exhibit No. 92, commenced

playing before the jury.)

MR. JAUREGUI:  92-25.

(The CD, Exhibit No. 92, commenced

playing before the jury.)

MR. JAUREGUI:  92-26.

(The CD, Exhibit No. 92, commenced

playing before the jury.)

MR. JAUREGUI:  92-27.

(The CD, Exhibit No. 92, commenced

playing before the jury.)

MR. JAUREGUI:  92-28.

(The CD, Exhibit No. 92, commenced

playing before the jury.)

MR. JAUREGUI:  Your Honor, may we have a quick
sidebar?

THE COURT:  Yes.

(The following proceedings were held at sidebar:)

MR. JAUREGUI:  Your Honor, there's a woman on the
Government side in the audience, blonde.  This was the woman,
the same woman who took a photograph we think during the Tanaka
trial.  And while we were playing this clip, AUSA Fox and I and
others, I'm sure, heard her say, "He's a liar."

**UNITED STATES DISTRICT COURT**

THE COURT:  Okay.

(The following proceedings were held in open court in the presence of the jury:)

THE COURT:  All right.  Ladies and gentlemen, I'm going to ask you to step out for a moment.

(The following proceedings were held in open court out of the presence of the jury:)

THE COURT:  All right.  I'm going to ask counsel to join me at sidebar for a moment.

(The following proceedings were held at sidebar:)

THE COURT:  Okay.  Now, which lady is this?

MR. FOX:  Your Honor, it's the blonde in the second row wearing all white.  And she is the same one, I believe, gave her name as Betty Crocker during the Tanaka trial and took a photograph and then took off so we could not admonish her later.  She's been here many of the days of the proceedings.  She sometimes wears sheriff's department earrings, I've noticed.

THE COURT:  Okay.  So my view at this point is I want to caution people not to -- I'm going to ask the CSO's to excuse her.

MR. HOCHMAN:  We take no position one way or the other, Your Honor.

(The following proceedings were held in open court out of the presence of the jury:)

**UNITED STATES DISTRICT COURT**

1158

THE COURT:  All right.  If I could have one of the Court security officers.

(The following proceedings were held at sidebar:)

THE COURT:  There is a blonde lady sitting in the second row.  I would ask you guys to escort her out.

THE COURT SECURITY OFFICER:  Okay.

THE COURT:  All right.

(The following proceedings were held in open court out of the presence of the jury:)

THE COURT:  All right.  I understand there have been some comments made during this witness' testimony.  You're invited here to watch this trial, not to make comments.  Young lady, you're excused from this trial.  You can't come back.

UNIDENTIFIED AUDIENCE MEMBER:  Okay.

THE COURT:  Okay.  So everybody is welcome, but please remember this is a trial.  You're there to sit and listen.

All right.  Let's get the jury back in.  Let's get the witness back in.

MR. JAUREGUI:  Just so the Court is aware, Your Honor, we have about two minutes, maybe a little more than two minutes left of recordings.

(The following proceedings were held in open court in the presence of the jury:)

THE COURT:  All right.  Sir, you can have a seat

UNITED STATES DISTRICT COURT

there.

MR. JAUREGUI:  May I proceed?

THE COURT:  Let's resume.

MR. JAUREGUI:  Next clip.

THE COURT:  What page are we --

MR. JAUREGUI:  We're on page 27 of the transcript, Your Honor, and it's 92-29.

(The CD, Exhibit No. 92, commenced playing before the jury.)

MR. JAUREGUI:  Next clip.

(The CD, Exhibit No. 92, commenced playing before the jury.)

MR. JAUREGUI:  Next clip.

(The CD, Exhibit No. 92, commenced playing before the jury.)

MR. JAUREGUI:  Last clip.

(The CD, Exhibit No. 92, commenced playing before the jury.)

THE COURT:  All right.  If you'll close your notebooks, please.

MR. JAUREGUI:  Your Honor, for planning purposes, I have under ten minutes of testimony with this witness.  Do we want to break or just continue at this point?

THE COURT:  Why don't we continue for ten minutes and then give the jury a break.

**UNITED STATES DISTRICT COURT**

Q       BY MR. JAUREGUI:  Now, Mr. Michel, on August 30, 2011, the date of this interview when you admitted to taking a bribe, were you fired by the sheriff's department that day?

A       No.

Q       Were you asked to resign that day?

A       No.

Q       Were you arrested for admitting to having taken bribes?

A       No.

Q       And bringing a phone into the jail?

A       No.

Q       Did your employment change in any way that day --

A       Yes.

Q       -- or after?

        How did it change?

A       They took away my deputy rights.  So they took my badge and my gun, but they -- I was still employed as an employee with the sheriff's department.

Q       Did you later have another interview with Sergeants Craig and Long?

A       I had several, yes.

Q       Ultimately did you admit to Sergeants Craig and Long to committing assaults on inmates?

A       Yes.

Q       Do you recall when that interview took place when

you made those admissions?

A    It was when I actually resigned.  I believe it was, like, September 13th or 14th of 2011.

Q    Did you tell the sergeants, Craig and Long, that you had committed assaults on inmates with other deputies from the sheriff's department?

A    Yes.

Q    Do you have in mind -- do you recognize the name Bragg, Mr. Michel?

A    Yes.

Q    Do you have an understanding of what the Bragg incident is?

A    Yes.

Q    What is the Bragg incident?

MR. HOCHMAN:  Objection.  Same relevancy objection as before, Your Honor.

THE COURT:  Overruled.

You may answer.

THE WITNESS:  How the Bragg incident started was I had a neighbor who had a teenage daughter who was abducted and prostituted out.  She was about 14 years old.

One day I had -- it was Halloween, and I had taken my young children to -- in my neighborhood, and she -- when we got to this neighbor's house, she had asked me -- after, you know, they give the candy and everything, she asked

UNITED STATES DISTRICT COURT

me if I was still a deputy, and I said yes.  And so she said --
told me the story about her daughter being abducted and
prostituted out.  And so she gave me Mr. Bragg's name.

So when I went back to work the next day, I
looked up Mr. Bragg on our AJIS in the sheriff's department
computer system for the inmates.  And when I looked him up,
Inmate Bragg just so happened to be in the module that I was
working in.

Q      BY MR. JAUREGUI:  And did you go to see
Inmate Bragg?

A      Immediately I did not go see Mr. Bragg, but I did
tell my partners at the time which were Deputy Aguire,
Deputy Ibarra, and Deputy Carvajal.

Q      What happened after you told them?

A      After I told them, Deputy Aguire who was the shot
caller in the module, he was like the senior deputy, he was the
one who was the most respected in the module, he said that we
wouldn't be doing anything to go talk to him or do anything
about it because we were busy but he would get back to me later
on and we would discuss, you know, what to do to talk to the
inmate.

Q      Did you ultimately talk to that inmate?

A      Yes, we did.

Q      What happened?

A      Well, later on that day, Deputy Aguire came up to

UNITED STATES DISTRICT COURT

me and said, "Hey, let's go talk to that inmate that you told us about earlier."  So me, Deputy Aguire go upstairs because he was housed up in the upper floors in the module.  I go, and I cuff the inmate up in his cell.

Deputy Aguire was on the gates there.  They manually open and close with a lever.  So he racks the gate. We pull the inmate out and pull him up into the upstairs shower area.  Deputy Aguire initially starts talking to the inmate who is Mr. Bragg and asking him questions like, "Why is he there? Why was he housed in this special area that he was being housed at?"  And he started to lie.  He said that he was there for a parole violation, which he was not there for a parole violation.

Q      And what, if anything, did this group of deputies do in response to that -- this inmate's comments that he was there for a parole violation?

A      As soon as we knew he was lying, Deputy Aguire told him that he was lying because he -- I mean, we actually looked up the information, and we knew that he was lying.  So Deputy Aguire actually struck the inmate with an open hand, slap to the face and head area.

After he did that, the inmate like kind of, like -- kind of fell down a little, and then Deputy Aguire continued to punch the inmate.  After he had punched him a couple times, I don't know exactly how many times, he -- I came

UNITED STATES DISTRICT COURT

up and started asking him why he had done what he had done.

And I started asking him questions about the girls, and he also denied that as well. And he -- the inmate stated that it wasn't him who had taken the girls. He said his nephew had done it, and he just took the blame for it.

Q    And what did you do when he said that?

A    Well, I called him a liar, and I punched him in the right stomach/rib area. And then I also -- when he was laying, like -- because the shower has, like, a curb and then the actual shower so the water doesn't just flow out into the actual tier. He went down to the -- to his knees, and I kneed him with my right knee in his back.

After he -- after that, then Deputy Aguire picked him up and pulled him back to the outside of the shower area into the flat, and he -- he hit him a couple times again on his right-hand side. And then Deputy Ibarra was behind us, and he came up from back and just punched him right in the -- the center of his back. And that's when the inmate went -- he went down to the ground again.

At some point, I don't remember exactly how, but the inmate gets back up to his feet, and I kick him on the inside of his right thigh area. The inmate went down to the ground. After he -- after that happened, basically like told him that, if he was going to continue to lie about the questions that we asked him, that we would basically go back

every single day and beat the shit out of him until he started telling the truth.

Q       Did you tell Sergeant Long and Sergeant Craig this story?

A       Yes.

Q       Did you tell Sergeant Craig and Sergeant Long about another incident called the pill call incident?

A       Yes -- no.  I don't remember exactly, but eventually, yes, that story did come out.

Q       Okay.  Did you tell Sergeant Long and Sergeant Craig that these -- I'm sorry.  And what was that incident?

MR. HOCHMAN:  Same objection of relevancy, Your Honor.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  I'm sorry?

Q       BY MR. JAUREGUI:  The pill call incident that you said eventually came out, what is that?

A       The pill call incident is -- basically I lied on a report saying that an inmate actually assaulted me when I -- the inmate did not assault me.  I went to that inmate, me and my partner at the time, Deputy Castillo, and basically picked a fight with that inmate.

Q       These inmates that were involved in these

incidents, were they handcuffed?

A        Some of them were, yes.

Q        Did you tell that to Sergeants Craig and Long?

A        I don't remember.  But I did tell them about the incidents.  So I don't remember exactly what I told them.

Q        Okay.  Mr. Michel, I'm going to direct your attention to Government Exhibit No. 58, and we'll also put it up on the screen.  It's in evidence.

If you can just read this, "From" and "To" and "Date," please.

A        Yes, sir.  "From Leavins, Steven E., sent Tuesday, September 13, 2011, at 3:47 p.m.  To Craig, William T.  Subject:  That idiot Michel is confessing to beating handcuffed inmates with other deputies.  Not looking good.  They are still investigating him.  Will advise."

Q        And if you could just look up from that part of the e-mail and then read to the jury William T. Carey's response.

A        It says, "Tell me about it."

Q        I'm directing you --

A        I'm sorry.  The bottom part.  It says, "Wow."

Q        And then the response from Steven Leavins?

A        "Tell me about it."

Q        Was Steven Leavins one of the people that interviewed you about these assaults?

A       No.

Q       And then if we could look at Government Exhibit No. 59 which is also in evidence.  Again, the "From" line, "To" line, and "Date"?

A       It says, "From Carey, William T., sent Tuesday, September 13, 2011, at 4:25 p.m.  To Nee, Christopher P."  And it says, "Chris, the boss in?"

Q       And Government Exhibit 60 which is also in evidence.  And same thing.  "From," "To," "Date" and the content of the e-mail, please?

A       "From Carey, William T., sent Tuesday, September 13, 2011, at 4:34 p.m., to Nee, Christopher P." "Made contact.  Thank you."

Q       Now, Mr. Michel, after you admitted to beating inmates to Sergeants Craig and Long, were you arrested by the Los Angeles County Sheriff's Department?

A       No, sir.

Q       What happened with regards to your employment after that?

A       Well, that's when they said that I was going to be either fired or I needed to resign, and I resigned right then.

Q       At some point, Mr. Michel, did you decide to cooperate with the FBI and the Federal Government?

A       Yes.

UNITED STATES DISTRICT COURT

Q        And after you made that decision to cooperate, were you charged with a crime?

A        Yes.

Q        What crime were you charged with?

A        Bribery.

Q        Did you ultimately plead to that crime?

A        Yes.

Q        How did you plead?

A        Guilty.

Q        Have you been sentenced for that crime?

A        Yes, sir.

MR. JAUREGUI:  One moment, Your Honor.

No further questions, Your Honor.

THE COURT:  All right.  Ladies and gentlemen, do you want to take your final break of the day now?

MR. HOCHMAN:  Your Honor, may I ask?  We haven't had a break at counsel's table since 10:20.  Can we take a five-minute break, Your Honor?

THE COURT:  That's fine.

Ladies and gentlemen, I guess we are going to take a break.

Again, I want to remind you, until this trial is over, you're not to discuss this case with anyone, including your fellow jurors, members of your family, people involved in the trial, or anyone else.  And do not allow others to discuss

the case with you.  This includes discussing the case on the

Internet, by e-mail, text messages.  If anybody tries to

communicate with you about this case, please let me know about

it immediately.  Do not read, watch, or listen to any news

reports or other accounts about the trial or anyone associated

with it.  Do not do any research, such as consulting

dictionaries, searching the Internet, or using other reference

materials.  And do not make any investigation about the case on

your own.

            If you need to speak with me, simply give a note

to the clerk.

            All right.  We'll come back in ten minutes.

        (The following proceedings were held in

          open court out of the presence of the jury:)

            THE COURT:  All right.  Sir, you can step down if

you'd like.  Okay.

            MR. HOCHMAN:  Thank you, Your Honor.

        (A recess was taken at 12:20 p.m.)

            THE COURT:  Let's bring the jury in.

        (The following proceedings were held in

          open court in the presence of the jury:)

            THE COURT:  All right, sir.

            MR. HOCHMAN:  Thank you very much.

                    **CROSS-EXAMINATION**

BY MR. HOCHMAN:

                    **UNITED STATES DISTRICT COURT**

Q      Mr. Michel, you were a deputy from December --
deputy Los Angeles County sheriff from approximately
December, 2008, until September 13, 2011; is that correct?

A      Yes.

Q      And the first part, I believe you said, when you
came in in December 2008, that you spent the next five months
or so at the sheriff's academy; is that correct?

A      It was 18 weeks, sir.

Q      I'm sorry?

A      It's 18 weeks.

Q      18 weeks at the sheriff's academy; is that
correct?

A      Yes, sir.

Q      At the sheriff's academy, they teach you a set of
standards under which you're supposed to conduct your
activities; is that correct?

A      Yes, sir.

Q      They call these the core values?

A      Yes, sir.

Q      And the core values basically said -- or the
standards of which you are to operate as deputy, once you
became a full-time deputy, included honorably performing your
duties; is that correct?

MR. JAUREGUI:  Objection, Your Honor.

THE COURT:  Sustained.

**UNITED STATES DISTRICT COURT**

Q      BY MR. HOCHMAN:  Did they teach you in the academy to beat up inmates?

A      No, sir.

MR. JAUREGUI:  Objection.  Argumentative, Your Honor.

THE COURT:  Next question.

Q      BY MR. HOCHMAN:  Did they also instruct you on the standards from a mission statement of the sheriff's department?

MR. JAUREGUI:  Same objection.

Q      BY MR. HOCHMAN:  Did they also instruct you at the academy that you spent 18 weeks at about the mission statement of the sheriff's department?

MR. JAUREGUI:  Objection.  Relevance.

THE COURT:  Sustained.

Q      BY MR. HOCHMAN:  Now, when you were beating up those inmates, did you ever tell Sheriff Baca that?

A      No, sir.

Q      When you were taking the bribes, did you ever tell Sheriff Baca that?

A      No, sir.

Q      When you were falsifying reports, did you ever tell Sheriff Baca that?

A      No, sir.

Q      Did you ever tell your sergeant that you were

**UNITED STATES DISTRICT COURT**

beating up inmates?

A    No, sir.

Q    And above a sergeant is a lieutenant; correct?

A    Yes, sir.

Q    Did you ever tell the lieutenant at the time you were beating up inmates that you were beating up inmates?

A    No, sir.

Q    And above a lieutenant is a captain; correct?

A    Yes, sir.

Q    Did you ever tell the captain that you were beating up inmates?

A    No, sir.

Q    Taking any bribe?  Did you ever tell the captain you were taking any bribe?

A    No, sir.

Q    And you didn't tell the lieutenant or the sergeant as well; is that correct?

A    Correct, sir.

Q    Above a captain is a commander; correct?

A    Yes, sir.

Q    And did you ever tell the commander that you were beating up inmates, falsifying reports, or taking bribes?

A    No, sir.

Q    And above a commander is a chief; correct?

A    Yes, sir.

Q        Did you ever tell the chief that you were taking bribes, beating up inmates, or falsifying reports?

A        No, sir.

Q        And above the chief is an assistant sheriff; isn't that correct?

A        Yes, sir.

Q        Did you ever tell the assistant sheriff that you were beating up inmates, taking bribes, or falsifying reports?

A        No, sir.

Q        And above the assistant sheriff is the undersheriff; is that correct?

A        Undersheriffs at the time, yes, sir.

Q        And you didn't tell the undersheriff that you were beating up inmates, falsifying reports, or taking bribes; correct?

A        No, sir.

Q        Now, do you know what a code "10-12" is?

A        Yes, sir.

Q        What is it?

A        It's a radio code used in -- we used it at Men's Central Jail to notify someone who was coming up to our location.

Q        And what would it be used for, code 10-12?

A        10-12 would be like if a sergeant was coming to the floor or a group of visitors or just anyone coming off of a

different floor to our location.

Q    And what would you do if someone like a sergeant or a higher rank was coming to your floor and you issued a 10-12?

A    I don't understand your question.

Q    I'm sorry.

When you would say -- when a sergeant or above was coming to your floor and people said 10-12 on the radio, what would happen?

A    You have to be very specific.

Q    Certainly.

If a sergeant or above was coming to your floor --

A    Yes.

Q    -- would you issue a 10-12?  Would people say 10-12 on the radio?

A    Well, see, you're saying would I issue it or would the people on my floor?  So you need to be specific.

Q    Thank you.

Would people on your floor, so that you could hear it in your radio, state 10-12?

A    Yes.

Q    And then what would happen on the floor -- what would the deputies on the floor do in preparation for the sergeant coming to their floor?

**UNITED STATES DISTRICT COURT**

A       It depends on what -- it depends on what was going on on the floor.

Q       So, for instance, would people on the floor stop horsing around if they were otherwise horsing around?

A       Yes.

Q       If they had their cell phones on, would they get off their cell phone?

A       Yes.

Q       Because deputies were not allowed to use their cell phones inside the jail; is that correct?

A       Correct.

Q       If they were on the Internet, would they get off the Internet if a sergeant or above was coming to the floor?

A       No.

Q       How about texting?  Would they stop texting if a sergeant or above was coming to the floor?

A       Well, you have to be specific.  You're not saying -- you're not saying on their phone.  You're just saying texting --

Q       Fair enough.

        Texting on their cell phone?

A       On their personal cell phones that they weren't supposed to have inside the jail?

Q       Yes.  They would stop doing that, if they were doing it, when a sergeant was coming to the floor or above;

UNITED STATES DISTRICT COURT

correct?

A        Yes.

Q        And when I say sergeant or above, I say sergeant all the way to Sheriff Baca himself.  You understand that?

A        The chain of command, yes, sir.

Q        And if someone was abusing an inmate and the word went out that the sergeant or above was coming to the floor, they would stop abusing the inmate; correct?

MR. JAUREGUI:  Objection.  Calls for speculation.

THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  Now, when you would come into the jail, would you actually be searched?

A        No.  Not at the time that I -- when I worked there, no.  I was never searched.  I was never, like, body searched.  If you brought a bag in, they would -- there were some times where they would search your -- the bag.

Q        But that's how you were able to bring your cell phone into the jail is that you would put it on your self and just walk right into the jail; correct?

A        Yes.

Q        Now, at some point -- and this is actually also how you brought the cell phone that eventually went to Anthony Brown, that you just carried it on your self and walked right into the jail; correct?

A        Correct.

**UNITED STATES DISTRICT COURT**

Q        Now, at some point in 2009/2010 is when you first met Anthony Brown; is that correct?

A        Correct.

Q        And he was on the 2000 floor?

A        Yes.

Q        And the 2000 floor is where the pro pers were, if you recall that?

A        No, sir, I don't.  There were pro pers all over the jail.  There's not just a specific area for pro pers.  I mean, there are some, but pro pers could have been anywhere in the jail.

Q        Well, you knew that Anthony Brown was a pro per; correct?

A        No, I did not.

Q        You knew he was charged with armed bank robbery; isn't that right?

A        What time are you talking -- referring to?

Q        When he first came to the jail, 2009/2010.

A        I had no idea what Anthony Brown was even in jail for or if he was a pro per.

Q        Well, didn't you at some point search his belongings and see a lot of paperwork and photos that had photos of guns and drugs in them?

A        Right.  That was in 2011.

Q        I see.

**UNITED STATES DISTRICT COURT**

So in 2011 is when you searched his paperwork?

A       Correct.

Q       So you didn't know back in 2009/10 what he was in for, but by 2011 you knew he was there for armed robbery?

MR. JAUREGUI:  Objection.  Relevance, Your Honor.

THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  Well, you mentioned in the tape-recording we listened to searching his large trash bag and seeing a lot of stuff in it; is that correct?

A       Correct.

Q       And that stuff you saw was photos of guns, AK-47's, different types of drugs, including cocaine, marijuana, and ecstasy; is that correct?

A       Correct.

Q       And you also believed that Anthony Brown had money on the outside; is that correct?

A       Yes.

Q       And, in fact, Anthony Brown told you that he had about $800,000 stashed away on the outside; is that correct?

A       I don't recall the number amount, but he told me that he had a significant amount of money, yes.

Q       And what do you mean by "significant"?  What do you consider to be "significant"?  Hundreds of thousands of dollars?

A       Maybe.

**UNITED STATES DISTRICT COURT**

Q        Maybe, or that is approximately how much he told you?

A        I don't recall the exact amount.

Q        Now, eventually he asked you if you'll bring in cigarettes, a lighter, outside food, and a cell phone; is that correct?

A        Correct.

Q        And you understand -- let's start with cigarettes.  Cigarettes are contraband inside a secured jail; is that correct?

A        Correct.

Q        Which means that inside the jail you can't give an inmate cigarettes; correct?

A        Correct.

Q        And an inmate can't just, you know, willy-nilly take a pack of cigarettes and start smoking in his cell; correct?

A        Correct.

Q        And the same thing as a lighter, that you can't give an inmate inside a secured jail a lighter; is that correct?

A        Yes, sir.

Q        Same thing with outside food.  You can't bring outside food into an inmate and give the inmate outside food into the jail; is that correct?

**UNITED STATES DISTRICT COURT**

A       Yes, sir.

Q       And as well a cell phone.  You can't bring a cell phone and give the cell phone to the inmate inside the jail; is that correct?

A       Correct.

Q       Now, when you said that you gave Anthony Brown the cell phone, you said you did not know what his intentions with the cell phone were; is that correct?

A       I believe I said that it would -- he would be able to contact his people on the outside is what I thought I said, I think I said.

Q       So did you ever instruct Anthony Brown, when you gave him the cell phone, that he couldn't use it to plot an escape?

A       No.

Q       Did you ever instruct Anthony Brown, when you gave him the cell phone, that he couldn't use it to bring any harm to any witnesses that have been in his case?

MR. JAUREGUI:  Your Honor, objection.  Relevance.

THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  The idea of a cell phone, was that your idea getting Anthony Brown a cell phone in exchange for money, or was that his idea?

A       It was Anthony Brown's idea.

Q       So before Anthony Brown brought up this idea of

**UNITED STATES DISTRICT COURT**

paying you to bring him a cell phone, you didn't go to him first and say, "Look, I have a great idea.  I can get you a cell phone if you pay me"; correct?

A       Correct.

Q       And when he originally brought up the cell phone idea, giving you money to bring in a cell phone, did you immediately jump on the idea?

A       I don't recall.

Q       Did he have to bring it up a couple times before you eventually agreed to it?

A       I don't recall.

Q       Now, with respect to the actual deal that was struck, Anthony Brown agreed to get you $2,000 in order to bring the cell phone into the jail for him; is that correct?

A       Yes.  It was something like that, yes.

Q       And then you were going to be paid $2,000 every time you recharged a cell phone and brought it back to him; is that correct?

A       The second time it was $2,300.

Q       $2,300.

        And then if you did it enough times, the expectation is it would be $20,000; is that correct?

A       No.

Q       Well, you mentioned in your direct testimony the sum of $20,000.  That was the amount that you anticipated being

paid on behalf of Anthony Brown; isn't that correct?

A    No.

Q    Did the number $20,000 ever -- was the number $20,000 ever discussed between you and Anthony Brown?

A    Yes.

Q    What was it in the context of?

A    Anthony -- because I was not going to give him the cell phone anymore.  Anthony Brown suggested that he would pay me $20,000 for the phone -- the cell phone.

Q    So let me see if I understand this.  You brought in the cell phone once for $2,000; correct?

A    No.

Q    Explain to the jury what exactly the deal was that was struck and how it involved $20,000.

A    Well, okay.  Initially Anthony Brown said it was $2,000.  The FBI -- C.J. that I met with only gave me $700.  The second time Anthony Brown told me that it would be $2,300.  The FBI agent gave me $800, which is a total of $1,500.

The last time that I gave Anthony Brown the cell phone, I told him that I didn't want anything to do with it anymore because Anthony Brown did not -- he did not leave any information, which he said that I could look at the phone and see any of his contact information, who was he talking to, he would leave that information on the phone.

When I got the phone back, it was totally empty,

**UNITED STATES DISTRICT COURT**

1183

deleted, no record of any calls, no saved numbers, anything.
So at that point, I wasn't going to deal with Anthony Brown
anymore.

So he offered me $20,000.  At no time ever, any
point that I spoke with Anthony Brown, did I ask Anthony Brown
for any amount of money.  No dollar amount.  I never told
Anthony Brown to give me one penny or $20,000 ever.
Anthony Brown was the one who suggested every single amount
of -- every single dollar amount.

Q      All right.  And then with the -- $20,000 was a
lot to you back in August of 2011; correct?

MR. JAUREGUI:  Objection.  Relevance, Your Honor.

THE COURT:  Sustained.

Q      BY MR. HOCHMAN:  Well, were you in debt back in
August 2011?

MR. JAUREGUI:  Same objection, Your Honor.

THE COURT:  Sustained.

Q      BY MR. HOCHMAN:  Did Anthony Brown discuss
sending a lot of money to Richard, someone whose name you gave
him, in San Pedro?

A      Yes.

Q      And Richard was your father?

A      Correct.

Q      And you gave Anthony Brown your father's address
in San Pedro?

**UNITED STATES DISTRICT COURT**

1184

A       Correct.

Q       And he was supposed to send Richard a lot of money; is that correct?

A       Yes.

Q       Now, Anthony Brown then put you in touch with what you said was the outside contact of this person C.J. to pay the money; correct?

A       Repeat the question.

Q       Anthony Brown put you in touch with C.J. who would pay you the money; is that correct?

A       What money are you talking about?

Q       Money for the cell phone.

A       Are you talking about every time I would give him the money or every time -- give him the cell phone, or are you just specifically asking me about $20,000 that was supposed to be sent to my dad's house?

Q       Let's just go to the first payment.  The first payment comes about when Anthony Brown tells you that he'll put you in touch with C.J. in order to get paid for the cell phone. Do you recall that?

A       Yes.

Q       Okay.  And that was a situation where you were actually in the jail with Anthony Brown and you gave him your cell phone; correct?

A       Correct.

**UNITED STATES DISTRICT COURT**

Q        And you said that -- you actually let him call C.J. right in front of you; is that correct?

A        Correct.

Q        And he discussed with C.J. the fact that C.J. would now get in touch with you in order for you to go ahead and get the cell phone and the money; is that correct?

MR. JAUREGUI:  Objection.  Misstates the testimony.

THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  Well, when Anthony Brown is speaking to C.J. on the line, after he's done speaking to C.J., does he tell you that C.J. will now meet with you?

MR. JAUREGUI:  Objection.  Vague as to time.

THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  I'll direct your attention to the first and only time, my understanding, that you have a telephone call -- excuse me.

You allowed Mr. Brown to use your personal cell phone.  Was that the one and only time?

A        Yes.

Q        And at that one and only time, Anthony Brown calls C.J.; is that correct?

A        Correct.

Q        After that phone call, does Anthony Brown tell you something?

**UNITED STATES DISTRICT COURT**

A        Yes.  We have a conversation.

Q        And that conversation is that you're going to meet with C.J. on the outside.  He'll give you cash, and he'll give you a cell phone to bring to Anthony Brown; is that correct?

A        No.

Q        What was that conversation?

A        Well, you're missing that Anthony Brown never got in contact with C.J.  He -- all he did was -- a recording came on.  So he never even spoke with C.J.  After he hung up the phone, he gave me C.J.'s number.  He wrote it down on a piece of paper, but it was also saved in my phone that he just had called C.J. with.

So after that, me and Anthony Brown were inside the dayroom at Men's Central Jail.  I actually put Anthony Brown back in his cell.  And later on, days later, I actually called the number that was -- that Anthony Brown had given me.  And that's how I got into contact with C.J., who was, in fact, an FBI agent or an informant for the FBI.

Q        And at that time you didn't know that Anthony Brown was working with the FBI as well; is that correct?

A        Correct.

Q        So then when you actually -- you do set up a meeting with C.J. to exchange -- to get the money and the cell

**UNITED STATES DISTRICT COURT**

1187

phone from him; is that correct?

        A        Correct.

        Q        And that meeting was about July 20th, 2011; is that correct?

        A        It's about that time, yes.  I don't know the exact date, but it's around July or August sometime.  I don't know the exact date.

        Q        And when you show up to that meeting, you said you drove in one car and you pulled driver's side to driver's side with C.J.; is that correct?

        A        Correct.

        Q        And that was in the parking lot by the 105 and Vermont?

        A        It was in -- yes.

        Q        If you could take a look at what's been marked in front of you as Exhibit 636, marked for identification.

            (Exhibit 636 for identification.)

        Q        BY MR. HOCHMAN:  I believe there might be some papers that are on the counsel table -- or witness table?

        A        There's a 634.

        Q        Look below 634, please.

            Is 636 a true and accurate picture of your vehicle and C.J.'s vehicle on the day of July 20th, 2011, when you met to get the bribe payment and the cell phone?

        A        That's not my vehicle.

**UNITED STATES DISTRICT COURT**

Q    Which one is not your vehicle?  When I say "your vehicle," my understanding is you were driving your girlfriend's vehicle at the time; correct?

A    Correct.

Q    So is that a true and correct picture of the vehicle you showed up in, your girlfriend's vehicle, and C.J.'s vehicle on July 20th, 2011, when you got the bribe payment and the cell phone?

A    Yes.

MR. HOCHMAN:  Your Honor, the defense would seek to admit Defense Exhibit 636.

MR. JAUREGUI:  No objection, Your Honor.

THE COURT:  It will be received.

(Exhibit 636 received into evidence.)

MR. HOCHMAN:  I would ask permission to publish.

THE COURT:  That's fine.

Q    BY MR. HOCHMAN:  All right.  We're looking at Defense Exhibit 636.  Which is the vehicle you showed up in?

A    The silver one, the one on the right.

Q    And then the -- and C.J. showed up in which vehicle?

A    Well, he was there in the black vehicle when I pulled up.

Q    That's at the point where I believe you said C.J. threw in a sunglasses case that had money in it?

UNITED STATES DISTRICT COURT

A        Yes.

Q        And he also gave you the cell phone at that point?

A        Correct.

Q        Now, at that point -- at that point, did the FBI arrest you for getting a bribe from C.J.?

A        No.

Q        And had you actually -- at that moment in time, you had the cell phone on you.  You still hadn't brought it into Men's Central Jail; correct?

A        Correct.

Q        And I believe you testified that you received the $700 payment in that first transaction; is that correct?

A        Yes.

Q        And, thereafter, that's when you brought the cell phone into Men's Central Jail; correct?

A        Yes.

Q        And you put it on your body to get through security so that they wouldn't see it; is that correct?

A        Yes.

Q        And then you handed it to Anthony Brown in his bunk; is that right?

A        Yes.

Q        Now, on August 4th, 2011, that's when you get the second bribe payment from C.J.; is that correct?

**UNITED STATES DISTRICT COURT**

A    I don't recall the actual date, but there was a second time that I met with C.J., yes.

Q    And that was after the first payment on July 20th and before they found the cell phone on August 8th; is that correct?

A    Yes.

Q    I'll show you what's in front of you that's been marked as Defense Exhibit 634.

(Exhibit 634 for identification.)

Q    BY MR. HOCHMAN:  Do you have that in front of you?

A    Yes, sir.

Q    This transaction also takes place in a parking lot; is that correct?

A    Yes.

Q    And this was a Best Buy parking lot, if you recall?

A    I don't recall -- I don't recall if there was a Best Buy there or not.  I just -- yes.  It was in a parking lot.

Q    In Glendale/Burbank area?

A    Yes.

Q    And, again, you went driver's side to driver's side with C.J.; is that correct?

A    Yes.

UNITED STATES DISTRICT COURT

Q       At that point, he gives you $800; is that right?

A       Yes.

Q       If you could look at Defense Exhibit 634.

Is this an accurate picture of the bribe transaction that occurred in that August, 2011, period with C.J.?

A       Yes.

MR. HOCHMAN:  Your Honor, the defense would seek to admit Defense Exhibit 634.

MR. JAUREGUI:  No objection, Your Honor.

THE COURT:  It will be received.

(Exhibit 634 received into evidence.)

Q       BY MR. HOCHMAN:  Looking at Defense Exhibit 634, which car are you in and which car is C.J. in?

A       I'm in the gray Chevy Silverado.

Q       That's actually a picture of you that we can see. There's one individual who is wearing sunglasses in the picture.  Is that you?

A       Yes.

Q       And C.J. is in the other car?

A       Correct.

Q       Did the FBI arrest you at that moment in time when you got the second bribe payment from C.J.?

A       No.

Q       And you said that not only did C.J. give you

**UNITED STATES DISTRICT COURT**

$800, but he gave you something called a kite?

A       At some point I was supposed to transfer a kite from C.J. to Anthony Brown or Anthony Brown to C.J.  I don't remember the exact hand-off or what.  But yes, there was a kite involved in this situation, yes.

Q       And did you receive the kite when you got the $800 in the transaction we were just looking at?  It's pictured in Defense Exhibit 634.

A       I don't recall that, but there was -- like I said, there was a kite involved in this whole grand scheme of things, yes.

Q       And did the kite have numbers on it that were in the tens of thousands of dollars?

A       One of the kites, yes, had high dollar amounts of thousands of dollars, yes.

Q       Reflecting big transactions; correct?

A       Correct.

Q       So the total $1,500 that you received -- by the way, did you ever report that on your tax return?

MR. JAUREGUI:  Objection, Your Honor.

THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  Now, with respect to the remainder of the -- you got $1,500.  What about the remainder of the $2,000 that you were supposed to get?  Did you ever receive the remainder of that $2,000?

**UNITED STATES DISTRICT COURT**

A        No, sir.

Q        So then let me take you, then, to August 8, 2011, when the cell phone was found.  I believe you said that you heard about it from one of your partners that day after you had given the cell phone to Anthony Brown; is that correct?

A        Yes.

Q        And once you heard about it, you called C.J.; correct?

A        Not immediately, but yes.  There was -- some time had passed.  And yes, I did.

Q        When you called C.J., you told him, basically, "Destroy the evidence"; is that correct?

            MR. JAUREGUI:  Objection, Your Honor.  Misstates the testimony.

            THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  When you called C.J., you told him to get rid of his cell phone and all the evidence that was going to connect C.J. to yourself; is that correct?

            MR. JAUREGUI:  Same objection, Your Honor.

            THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  When you called C.J., what did you tell him?

A        My exact words were to drop his line.  My partners had found the phone.

Q        What did you mean by "drop his line"?

A        Shut the line off, disconnect the line.

Q        That was in order to not connect C.J. to yourself; is that correct?

A        Yes.

Q        And then you, in turn, you said, took your phone out to the car, your personal cell phone?

A        It was -- yes.  It was in my vehicle, yes.

Q        Then that cell phone got lost.

A        Correct.

Q        So from August 8 when the phone was found until August 24th when the FBI met up with you, you were hoping that no one would ever link the cell phone to yourself; correct?

            MR. JAUREGUI:  Objection.  Form.

            THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  Well, between that time period when the cell phone was found, you had no information that the FBI had linked you to the cell phone; correct?

A        Can you repeat the question?

Q        When the cell phone was found, you had no information that Anthony Brown was working for the FBI; correct?

A        Correct.

Q        That C.J. was an FBI undercover agent; correct?

A        Correct.

Q        Or that any of your conversations or any of your

UNITED STATES DISTRICT COURT

meetings had been monitored by the FBI; correct?

A    Correct.

Q    But on August 24th, you found out for the first time about the FBI's connection to the cell phone; correct?

A    Correct.

Q    Because it was on that day when you came home from work that the FBI was waiting for you at your apartment; isn't that correct?

A    Correct.

Q    And when they -- when they originally came there, they asked you to secure your gun; is that correct?

A    Yes.

Q    And you did.  You put it in your trunk, if I'm not mistaken; is that correct?

A    No.  That is not correct.

Q    Where did you put your gun?

A    Under my driver's side seat.

Q    And then you left your car; is that correct?

A    I locked my vehicle, yes, and then I went with the agents.

Q    You went with the agents to Starbucks; is that right?

A    Correct.

Q    In their car.

A    Correct.

Q        And then you spent about the next two hours or so at Starbucks talking with the agents; is that correct?

A        Yes.

Q        And at some point when you're speaking with Agent Marx, Agent Marx shows you on her laptop video surveillance of that first bribe payment; correct?

A        Correct.

Q        And if you recall the original photograph you looked at -- and this is Defense Exhibit 636 -- this is actually Defense Exhibit 636, what you were being shown by Agent Marx on August 24, 2011, at the Starbucks; correct?

A        Something similar to this, yes.

Q        It was actually a video that had this image in it; is that correct?

A        I don't recall the exact -- if it was this exact same picture, but it was something very similar to this on a laptop monitor, yes.

Q        And I believe you said this was like aerial surveillance of what you were looking at -- of the transaction. Excuse me.

A        Correct.

Q        And at the time when you spoke -- originally you spoke at the Starbucks for about two hours -- is that correct? -- with the agents?

A        It was some time.  I don't know the exact time.

UNITED STATES DISTRICT COURT

But yes, there was time spent at Starbucks.

Q      Then they went back to your apartment and spent more time with you that day; is that correct?

A      Correct.

Q      And between those two conversations, it lasted a couple hours; is that correct?

A      It could have been hours, yes.

Q      And in those hours, you acknowledged that was you in the picture who had taken the bribe payments from C.J.; correct?

A      I don't remember.

Q      Well, didn't you tell them and acknowledge that, yes, you had gone ahead and received the $1,500 from C.J.?

A      Who?  You're asking me anyone -- like, I don't know specifically.  You need to be specific of who asked me that question.

Q      I'm sorry.

During the time you were speaking with any FBI agent that day, August 24th, did you admit to them that you had taken $1,500 from C.J. in exchange for bringing the cell phone to Anthony Brown?

A      I do not recall them ever asking me specifically if I had taken money -- the $1,500.  I don't recall that question that you're asking me.

Q      Didn't they spend a couple hours with you

inquiring about the bribe transaction that you had been involved with?

A        Yes.  We discussed it, but we -- we never had a long enough conversation about specifically that, that I -- like we sat down and -- yes.  We did sit down, and we were having conversations.  But specifically that question, I do not ever recall me answering that question.

Q        What do you recall telling them about the bribe transactions?

A        I don't recall any of the specifics about that conversation because at the time when we really were sitting down and talking, both agents, Mrs. Marx and the other agent that was sitting to the right of me, were both asking me questions at the same time.  So I did not, like, answer her and answer him and -- that's where the misunderstanding came about.

I told them to just charge me with whatever they were going to charge me with, and it went -- that meeting went south from there.

Q        So the misunderstanding, though, occurs back at your apartment -- isn't that correct? -- not at Starbucks?

A        Correct.

Q        So at Starbucks when they initially -- that's when they initially show you that photograph or what's on the laptop, which is depicted in Defense Exhibit 636; correct?

A        Correct.

**UNITED STATES DISTRICT COURT**

Q        And they're not talking -- the two agents are not talking at the same time at that moment in time at Starbucks.

A        Correct.  But at that same time, the other agents were getting phone calls because they were at my residence. And my girlfriend was trying -- at the time was trying to call her sergeant.  So it caused -- it caused more chaos and confusion.

So we didn't -- like, yes, they started asking me questions.  But all of a sudden, things went south again.  So we never -- like, they asked me questions, and we were talking. At that time, Agent Wayne leaves.  And I'm just sitting there with Mrs. Marx at the table.

Q        So when you're sitting there with Agent Marx at the table, at that point she's discussing with you the bribe transactions; correct?

A        I don't remember specifically because she also had -- we talked about -- we talked about this picture, this Exhibit 636, and deputies that worked with me at Men's Central Jail at the time.

Q        And, again, I'm going to divide this into two. We have the deputies that were with you at Men's Central Jail second, but let's deal with the first thing about this picture.

What did you tell her about the picture?

A        I didn't say anything.

Q        Did she ask you questions in connection with the

UNITED STATES DISTRICT COURT

picture?

A       I don't recall.

Q       Now, at some point during this interview, you found out, again, that -- actually, that the agents were accusing you of lying; isn't that correct?

A       What --

Q       This is now the interview you were having with the agents at Starbucks and your apartment on April 24; is that correct?

MR. JAUREGUI:  Objection, Your Honor.  Vague.

THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  During the several hours you're interviewing with FBI agents on August 24th, at some point the agents, the FBI agents accuse you of lying to them; isn't that correct?

A       Correct.

Q       And they tell you that lying to a federal agent is a crime; is that right?

A       I believe so, yes.

Q       And they tell you that you can cooperate with them and not go to jail or you can not cooperate with them and go to jail; is that right?

A       No.

Q       Well, again, the exact words, if I recall, were that you could lose your job or you could lose your job and go

1201

to jail; is that correct?

A     That's correct.

Q     Now, the way that you weren't going to lose your job and go to jail is if you cooperated with the FBI; correct?

MR. JAUREGUI:  Objection.  Calls for speculation, Your Honor.

THE COURT:  Sustained.

Q     BY MR. HOCHMAN:  Your understanding of what it meant to lose your job versus lose your job and go to jail was what?

A     The FBI never promised me anything.  That statement is -- they were making -- my understanding of that statement were one or two things were going to happen.  It wasn't because the FBI was going to do it.  Those were the two options that I had at that point in time.

Q     So what did you have to do to do the second option, which was only lose your job but not go to jail?

MR. JAUREGUI:  Objection.  Calls for speculation.

THE COURT:  Sustained.

Q     BY MR. HOCHMAN:  What was your understanding, as it's being relayed to you, as to those two options, as to what you had to do with the FBI in order not to lose your job and go to jail?

MR. JAUREGUI:  Objection to the form, Your Honor.

THE COURT:  Sustained.

**UNITED STATES DISTRICT COURT**

1202

Q        BY MR. HOCHMAN:  You do recall Agent Marx saying to you you have those two options, lose your job or lose your job and go to jail?

A        I don't recall who said it.

Q        That one of the FBI agents said it to you on August 24th during the interview of you; is that correct?

A        Yes.

Q        And what was your understanding of what they meant by what you had to do in order not to lose your job and go to jail?

A        I didn't -- I didn't have any understanding.  I just -- those were options.  It wasn't like I -- like I wasn't -- it didn't mean that I help them and still go to jail and lose my job or I just -- I didn't have an understanding of that.

Q        Well, again, didn't they first tell you that they wanted you to cooperate and that you then had a choice, you could lose your job or lose your job and go to jail?

A        I don't recall.

MR. HOCHMAN:  If we could turn to Exhibit 92, Your Honor, which is the tape-recording, and then 93 is the transcript.

Q        You say at the beginning of that recording -- and now I'm referring to an August 30th recording that you're having with the investigators that we played -- that you were

**UNITED STATES DISTRICT COURT**

1203

familiar with Anthony Brown.  Do you recall that?

A       Yes.

Q       Can you take a look at the exhibit that's in front of you, which has been marked Defense Exhibit 739.

(Exhibit 739 for identification.)

Q       BY MR. HOCHMAN:  Do you have that in front of you?

A       Yes, sir.

Q       Is that a photograph of Anthony Brown?

A       Yes.

MR. HOCHMAN:  Defense would move Defense Exhibit 739 into evidence, please.

MR. JAUREGUI:  No objection, Your Honor.

THE COURT:  It will be received.

(Exhibit 739 received into evidence.)

Q       BY MR. HOCHMAN:  Now, this is the inmate Anthony Brown that you gave the cell phone to; is that correct?

A       Correct.

Q       At the time you gave him the cell phone, at that point -- now we're talking 2011 -- you know he's at the Men's Central Jail for armed robbery; correct?

MR. JAUREGUI:  Objection.  Relevance, Your Honor.

THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  Well, at the point you gave him the cell phone, you understand -- do you understand that he's

UNITED STATES DISTRICT COURT

1204

already been sentenced?

MR. JAUREGUI:  Objection.  Relevance, Your Honor.

THE COURT:  Sustained.

Q     BY MR. HOCHMAN:  Do you understand that he's on his way to state prison?

MR. JAUREGUI:  Same objection.

THE COURT:  Same ruling.

Q     BY MR. HOCHMAN:  If I could direct your attention to page 4 of the transcript, which is Exhibit 93.

MR. JAUREGUI:  Your Honor, the transcript is not in evidence.

THE COURT:  It's not.

MR. HOCHMAN:  I'm not seeking to introduce it, Your Honor.

THE COURT:  I don't care.  Sustained.

Next question.

Q     BY MR. HOCHMAN:  In the August 30th tape-recording, you talk about a property bag, a large trash bag, being found by you of Anthony Brown's stuff.  Do you recall that?

A     Yes.

Q     And then you later talk about the fact that -- if I might just have a moment -- the FBI wanted -- in that trash bag, you saw, I think you said a moment ago, photos of drugs; is that correct?

UNITED STATES DISTRICT COURT

MR. JAUREGUI:  Asked and answered, Your Honor.

THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  But the FBI wanted you, when they met with you on August 24th, to find anyone else who is bringing drugs into Men's Central Jail; is that correct?

A        That's not correct.

Q        Well, didn't you state to the investigators in the August 30th phone call, "They wanted me to find out if anyone else was bringing in drugs or anything"?

A        That was my statement, not from the FBI.

Q        When you're saying "they," in the "they wanted me to find out," who did you refer to as the "they"?

A        I was referring to the FBI, but I was the one who made the suggestion that they were probably looking for drugs or any other things that any other deputies were doing.  The FBI did not specifically ever ask me if I knew of anyone who was bringing in drugs or anything into the jail.  That was my comment.

Q        So your comment is that you're telling the sheriff's investigators on August 30th that the FBI had asked you about drugs when the FBI had never asked you about drugs?

A        You're twisting -- you're twisting what I said. The FBI never specifically asked me about drugs.  I made that comment, that the FBI would be interested if someone was bringing in drugs or any other illegal acts that were happening

or occurring inside Men's Central Jail where I worked at the time.

Q       Now, you mentioned slightly later in the tape-recording that the agents called their supervisor during the August 24th meeting they had with you.  Do you recall that?

A       Yes.

Q       And that the supervisor got on the phone and said, you know, "You lied to an FBI agent.  That's another crime we're going to charge you with."  Do you recall that?

A       Yes.

Q       And then you also said, "Did the FBI" -- the question was asked of you, "Did the FBI ever tell you not to tell anybody in the Los Angeles Sheriff's Department they contacted you?"

        And you told the investigators, yes, that the FBI had told you not to tell anyone else in the sheriff's department that they, the FBI, contacted you; is that correct?

A       Yes.

Q       Now, when the FBI is giving you these two options, lose your job or lose your job and go to jail, the FBI was threatening you, weren't they?

        MR. JAUREGUI:  Objection to form of the question.  Argumentative.

        THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  Did you feel the FBI was

UNITED STATES DISTRICT COURT

threatening you?

A        At the time, no.

Q        Well, you said you were freaking out at that time; is that correct?

A        Yeah.  But not over that question.  I was freaking out over the whole situation that had just occurred.

Q        You told the investigators on August 30th, when they asked you, well, they were threatening me -- actually, they asked you the question, "So when the FBI tells you that they're going to put you in prison, what do you think that they were doing there?"

And you answered, "Well, they were threatening me."

Was that your belief on August 24th, when the FBI is giving you these options, that they were threatening you?

MR. JAUREGUI:  Objection, again, to the form of the question, Your Honor.

THE COURT:  Do you understand the question?

THE WITNESS:  Kind of, yes.

I mean, you're asking -- I don't remember the feelings that I was feeling at that time specifically, so I couldn't answer yes or no.  But, I mean, I obviously stated that in my testimony.  But I don't remember those feelings that I had at that specific time.

Q        BY MR. HOCHMAN:  Now, at one point in the

questioning you are asked about whether or not the FBI could have given the cell phone directly to Anthony Brown.  Do you recall that?

A       Yes.

Q       And the FBI is allowed to conduct unsupervised visits with Anthony Brown -- is that correct? -- to your knowledge?

MR. JAUREGUI:  Objection.  Calls for speculation, Your Honor.

THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  When you were working the Men's Central Jail, you were aware that outside law enforcement could come into the jail and have unsupervised visits with inmates; is that correct?

MR. JAUREGUI:  Objection.  Relevance.

THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  When you say in the question and answer on August 30th, the question was asked of you, "And they have one-on-one visits, unsupervised visits.  Couldn't they have just f'ing handed him a phone?"  Pardon my French.  But "Couldn't they have just handed him a phone?"

And you answered, "Yes."

Do you recall that?

A       Yes.

Q       And do you recall that the -- then do you also

recall being asked the question about leverage?  And the question had to do with, "I'm sorry.  The FBI used that leverage to now control you."

And you answered, "Yes, sir."

Do you recall that?

A       Yes.

MR. JAUREGUI:  Your Honor, objection.  Counsel is testifying, reading from the transcript.

THE COURT:  How much longer do you have with this witness?

MR. HOCHMAN:  I'm sorry?

THE COURT:  How much longer do you have with this witness?

MR. HOCHMAN:  Your Honor, probably about ten minutes.

THE COURT:  Okay.

Q       BY MR. HOCHMAN:  Do you recall telling the investigators that the FBI tried to scare you when they met with you on August 24th?

A       I don't remember that.  If it's written in the transcript, then that's --

Q       Now, with respect to the meeting that you then had on September 13th with the investigators, you told them for the first time on September 13th about the beatings that you were involved in; is that correct?

**UNITED STATES DISTRICT COURT**

A       Yes.

Q       And you didn't tell them back on the August 30th meeting; is that correct?

A       No.

Q       You told them about the beatings in the August 30th meeting?

A       No.  The first time I ever told them was the time when I met with them in September.

Q       That's what I'm clarifying.

So you told them originally about the bribe situation and your contact with the FBI in the first meeting on August 30th; correct?

A       That was just the bribe incident, yes.

Q       At that point, they take your gun away; correct?

A       Correct.

Q       They take your badge away?

A       Correct.

Q       And you're put in an administrative role?

A       Correct.

Q       Then September 13th you tell them about the beating incidents that you're aware of; correct?

A       Correct.

Q       And they let you resign in lieu of firing you on that day.

A       Correct.

**UNITED STATES DISTRICT COURT**

1211

Q        And when you left that meeting, did the FBI arrest you at that moment in time?

A        No.

Q        Now, you never -- with respect to the agreement that you struck, Mr. Jauregui talked about you entering into a plea agreement with the Government; is that correct?

A        Correct.

Q        And that plea agreement had you plead to a single count; is that right?

A        Yes.  I believe so.

Q        And that single count was a single count of bribery; is that correct?

A        Correct.

Q        But you committed two bribes; isn't that right?

A        I took money twice, yes.

Q        And each bribe carries a maximum sentence of ten years in jail; is that correct?

MR. JAUREGUI:  Objection, Your Honor.  Calls for a legal conclusion from the witness.

THE COURT:  Overruled.

You can answer if you know.

THE WITNESS:  I have no idea, sir.

Q        BY MR. HOCHMAN:  You signed a plea agreement, did you not?

A        Yes.

UNITED STATES DISTRICT COURT

1212

Q    And that plea agreement, you read it over before you signed it?

A    Correct.

Q    Would it refresh your recollection to look at that plea agreement and see what it says about the maximum sentence that you were looking at?

A    Of course.

MR. HOCHMAN:  Can Government Exhibit 185, which I believe is in Volume 3, be placed before the witness?

(Exhibit 185 for identification.)

Q    BY MR. HOCHMAN:  Do you have Exhibit 185 before you?

A    It's 136 to 200, yes.

Q    I need you to turn to Exhibit 185 if you could. If you could turn to page 8 of Exhibit 185 when you're ready.

A    Okay.

Q    And if you could look at page 8 and read paragraph 11 to yourself.

A    (Witness reviewing exhibit.)

Q    Let me know when you're done.

A    Yes.

Q    Does that refresh your recollection that the crime of bribe, to which you pled guilty to, carries a ten-year maximum sentence?

THE COURT:  If you'd close that, sir.  Just close

it.

THE WITNESS:  Well, it doesn't specifically say a maximum of ten years.

Q    BY MR. HOCHMAN:  I'm sorry.  Ten years' imprisonment.

I'd like to restate, Your Honor?

That you were looking at a ten-year imprisonment sentence in connection --

THE COURT:  Sir, I believe the witness -- I believe we're done with that line.  If you have another question, that's fine.

Q    BY MR. HOCHMAN:  The Government -- you pled to one count of bribery; correct?

A    Correct.

Q    Did you plead to any of the false statements that you made to the FBI?

A    No, sir.

Q    And you haven't been charged with any of those false statements; correct?

A    No, sir.

Q    And you talked about a number of beatings that you either participated in or witnessed.  Do you recall that?

A    Yes, sir.

Q    Let's start with the Bravo beating that you described.  Did you ever plead guilty to being involved with

**UNITED STATES DISTRICT COURT**

1214

that Bravo beating?

A       No, sir.

Q       Were you ever prosecuted for that Bravo beating?
Were there charges filed against you in connection with the
Bravo beating?

A       No, sir.

Q       You talked about that Bragg, Inmate Bragg
beating.  That was your neighbor giving you the information
about the daughter who got sold or who got prostituted.  Do you
recall that?

A       Yes, sir.

Q       Did you ever plead guilty in connection to the
beating you administered on Inmate Bragg at any point?

A       No, sir.

Q       Did the U.S. Attorney's Office here ever charge
you with any violation concerning the beating that you did on
Inmate Brown?

A       No, sir.

Q       You talked about that pill box or -- excuse me --
the pill situation where you falsified a report.  Do you recall
that?

A       Yes, sir.

Q       Did you ever plead guilty to falsifying a report
in connection with an inmate beating?

A       No, sir.

**UNITED STATES DISTRICT COURT**

1215

Q        Did the U.S. Attorney's Office here ever charge you with any crimes relating to that pill line inmate beating?

A        No, sir.

Q        You've cooperated with the U.S. Attorney's Office; is that correct?

A        Yes.

Q        Cooperated with the FBI; is that correct?

A        Yes.

Q        You met with them a bunch of times?

A        Yes.

Q        And as a result of your cooperation, the U.S. Attorney's Office made a recommendation at your sentencing; is that correct?

A        Yes.

Q        And that recommendation was for probation with four months of home detention; correct?

A        Yes.

Q        And you got six months' imprisonment; is that correct?

A        Yes.

Q        It was His Honor who sentenced you to six months imprisonment?

A        Yes.

Q        And as part of your agreement, you won't be prosecuted for all these offenses; correct?

**UNITED STATES DISTRICT COURT**

1216

A       I don't believe so, sir.

MR. HOCHMAN:  No further questions.

THE COURT:  All right.  Any redirect?

MR. JAUREGUI:  Briefly, Your Honor.

**REDIRECT EXAMINATION**

BY MR. JAUREGUI:

Q       Mr. Michel, do you recall when you entered into your plea agreement with the Government?

A       I don't remember.

Q       Do you recall whether that was years ago?  Months ago?

A       It was years ago.

Q       And Mr. Hochman was asking you about benefits you received and the Government's recommendation.  As part of your plea agreement, were you required to cooperate with the Government?

A       I believe so.

Q       And in connection with your plea agreement, have you testified in other cases?

A       Yes.

Q       Have you testified in more than one case?

A       Yes.

Q       More than two cases?

A       Yes.

Q       Were you prepared to testify in a third case?

**UNITED STATES DISTRICT COURT**

A       Yes.

MR. HOCHMAN:  Objection.  Leading.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  Yes.  I was prepared to testify at a third, fourth, fifth, sixth.

Q       BY MR. JAUREGUI:  And, Mr. Michel, when were you sentenced?

A       I was sentenced in July.  I don't remember the exact date.  But in July of 2016.

Q       Who sentenced you?

A       Judge Anderson.

Q       In your previous trials, did you testify before Judge Anderson?

A       Yes.

Q       Did you talk about receiving bribes?

A       Yes.

Q       Did you talk about the $20,000?

MR. HOCHMAN:  Objection.  Leading.

THE COURT:  Sustained.

Q       BY MR. JAUREGUI:  Counsel asked you about making false reports.  Do you recall that?

A       Yes.

Q       Have you testified before about those reports?

A       Yes.

UNITED STATES DISTRICT COURT

Q       In front of Judge Anderson?

A       Yes.

Q       Have you testified before about beatings?

A       Yes.

Q       Was that before Judge Anderson?

A       Yes.

Q       And you testified that you were sentenced in July of 2016; correct?

A       Correct.  Yes.

Q       Do you have an understanding about whether or not you're receiving benefits for testifying today?

A       Yes.

Q       Are you receiving any benefits for testifying today?

A       No.

MR. JAUREGUI:  No further questions, Your Honor.

MR. HOCHMAN:  May I have just one moment, Your Honor?

THE COURT:  Yes.

MR. HOCHMAN:  No further questions, Your Honor.

THE COURT:  All right.  Ladies and gentlemen, we're going to conclude for the day.

Again, I want to remind you, until this trial is over, you're not to discuss this case with anyone, including your fellow jurors, members of your family, people involved in

UNITED STATES DISTRICT COURT

the trial, or anyone else, and do not allow others to discuss the case with you.  This includes discussing the case on the Internet, chat rooms, through blogs, bulletin boards, by e-mails or text messages.  If anyone tries to communicate with you about this case, please let me know about it immediately.

Do not read, watch, listen to any news reports or other accounts about the trial or anyone associated with it.  Do not do any research, such as consulting dictionaries, searching the Internet, or using other reference materials.  And do not make any investigation about the case on your own.

Finally, you're reminded to keep an open mind until all of the evidence has been received, you've heard the arguments of counsel, the instructions of the Court and the views of your fellow jurors.  If you need to speak with me, simply give a note to the clerk.

We'll resume tomorrow morning at 8:00 a.m. Please leave your notebooks on your chairs.

(The following proceedings were held in

open court out of the presence of the jury:)

THE COURT:  All right.  Sir, you may step down.

THE WITNESS:  Thank you, sir.

MR. FOX:  Your Honor, witnesses for tomorrow -- so you're aware, I think we are behind.  I was hoping that we'd rest tomorrow, but I think that's unlikely at this point.  It will be William David Courson, John Torribio, Robert Faturechi,

Leah Tanner.  And if we have time at that point, we will call Judge André Birotte.

THE COURT:  Okay.

MR. HOCHMAN:  Your Honor, yesterday we filed a response to the Court's minute order, Docket No. 131, where the Court had indicated it tentatively was going to preclude certain evidence and then deferred ruling on the rest of the motion in limine.  We pointed out various things in our response.

I know the Government hasn't had a chance yet to respond in writing yet.  I didn't know if the Court wanted to take it up today, tomorrow.  It would be part of the defense case, certainly.

And so if the Government may not finish tomorrow, so we wouldn't be dealing with it until Thursday, but I wanted to just get a sense when the Court wanted to take this issue up.

THE COURT:  I've already taken the issue up.

MR. FOX:  Your Honor, I expect that we will be able to file something in response by 5:00 o'clock today.

THE COURT:  That's fine.

MR. HOCHMAN:  And the reason I asked, Your Honor, is that the Court gave a tentative ruling on one aspect dealing with the Education-based Incarceration Program.  We've now sort of addressed the trial evidence that has come in that we

believe makes it relevant.  And then the Court deferred ruling on everything else.

So I wanted to, again, based on the fact we now have trial evidence to reference, reference that evidence to the Court.  And I did it in writing.  Obviously didn't include anything from today, but I did it as of the end of last week, Your Honor.

MR. FOX:  Your Honor, they attached no declarations.  And I just want Your Honor to be aware -- and this will be part of our filing -- we have received zero witness statements from them.  So this is not to be sufficient for a proffer about what their evidence is going to be.  And they make conclusory statements that are not supported by the public record, which we will point out as well in our response.

So I think it's premature to take this up, and we will file our response today.

THE COURT:  Okay.  I guess I'll get the Government's response and then see where we are.

MR. HOCHMAN:  Thank you very much, Your Honor.

MR. FOX:  Thank you.

THE COURT:  Okay.  We'll see you tomorrow morning.

MR. FOX:  Your Honor, I'm sorry.  I missed one witness, I was just reminded.  Mike Hannemann is also going to be a witness tomorrow.  He's a very short direct witness, so

that's why I forgot about him.  I expect his direct will be about 10 to 15 minutes.

THE COURT:  Okay.  Thank you.

(Proceedings concluded at 1:39 p.m.)

1223

CERTIFICATE OF OFFICIAL REPORTER

I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

DATED THIS  14TH  DAY OF AUGUST, 2017.


/S/ MIRANDA ALGORRI

MIRANDA ALGORRI, CSR NO. 12743, CRR
FEDERAL OFFICIAL COURT REPORTER

**UNITED STATES DISTRICT COURT**