1224

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

### HONORABLE PERCY ANDERSON, U.S. DISTRICT JUDGE

UNITED STATES OF AMERICA,            )
                                     )
            Plaintiff,               )    Case No.
                                     )
      vs.                            )    CR 16-00066(A)-PA
                                     )
LEROY D. BACA,                       )    PAGES 1224 to 1436
                                     )    VOLUME 9
            Defendant.               )
_____)

REPORTER'S TRANSCRIPT OF
TRIAL DAY 6
WEDNESDAY, DECEMBER 14, 2016
8:02 A.M.
LOS ANGELES, CALIFORNIA

_____

**MIRANDA ALGORRI, CSR 12743, CRR**
FEDERAL OFFICIAL COURT REPORTER
312 NORTH SPRING STREET, ROOM 435
LOS ANGELES, CALIFORNIA 90012
MIRANDAALGORRI@GMAIL.COM

**UNITED STATES DISTRICT COURT**

1225

**APPEARANCES OF COUNSEL:**

**FOR THE PLAINTIFF:**

    SANDRA R. BROWN
    Acting United States Attorney
    BY:  BRANDON FOX
    BY:  EDDIE A. JAUREGUI
    Assistant United States Attorneys
    United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012


**FOR THE DEFENDANT:**

    MORGAN LEWIS AND BOCKIUS LLP
    BY:  NATHAN J. HOCHMAN
    BY:  BRIANNA ABRAMS
    The Water Garden
    1601 Cloverfield Boulevard
    Suite 2050 North
    Santa Monica, California 90404


    MORGAN LEWIS AND BOCKIUS LLP
    BY:  TINOS DIAMANTATOS
    77 West Wacker Drive
    Chicago, Illinois 60601

**UNITED STATES DISTRICT COURT**

1226

# I N D E X

**WEDNESDAY, DECEMBER 14, 2016**

## Chronological Index of Witnesses

Witnesses: _____    Page

COURSON, David William

    Direct examination by Mr. Jauregui             1231
    Cross-examination by Mr. Diamantatos           1243
    Redirect examination by Mr. Jauregui           1254
    Recross-examination by Mr. Diamantatos         1256


TORRIBIO, John A.

    Direct examination by Mr. Fox                  1258
    Cross-examination by Mr. Diamantatos           1266


HANNEMANN, Michael William

    Direct examination by Mr. Fox                  1269
    Cross-examination by Mr. Hochman               1298
    Redirect examination by Mr. Fox                1320


FATURECHI, Robert

    Direct examination by Mr. Fox                  1323
    Cross-examination by Mr. Hochman               1332


TANNER, Leah

    Direct examination by Mr. Fox                  1347

**UNITED STATES DISTRICT COURT**

**EXHIBITS**


**WEDNESDAY, DECEMBER 14, 2016**


| Exhibits | | For ID | In EVD |
|---|---|---|---|
| 66 | E-mail from James Lopez 05/05/11 | 1259 | 1259 |
| 99 | Synched audio and video of approach of Leah Marx | 1417 | 1418 |
| 100 | Recording of phone call from Carlos Narro to Maricela Long | 1417 | |
| 102 | Baca appearance on FOX Good Day LA | 1414 | 1414 |
| 132 | Inmate Information Center record for Anthony Brown | 1391 | 1391 |
| 139 | Map of SHB 4th Floor | 1284 | 1284 |
| 140 | Statement of probable cause | 1259 | 1260 |
| 141 | Proposed order | 1259 | 1260 |
| 154 | *Los Angeles Times* article | 1324 | |
| 157 | Baca phone summary | 1373 | 1375 |
| 170 | Tanaka phone summary | 1374 | 1375 |
| 172 | Phone summary for select days | 1374 | 1375 |

**UNITED STATES DISTRICT COURT**

**LOS ANGELES, CALIFORNIA; WEDNESDAY, DECEMBER 14, 2016**

**8:02 A.M.**

**---**

(The following proceedings were held in open court out of the presence of the jury:)

THE CLERK:  Calling item No. 1, CR 16-66(A), USA versus Leroy D. Baca.

Counsel, state your appearances, please.

MR. FOX:  Good morning, Your Honor.

Brandon Fox and Eddie Jauregui on behalf of the United States.  Special Agent David Dahle will be joining us at counsel table, but I think he's checking on witnesses right now.

THE COURT:  Good morning.

MR. HOCHMAN:  Good morning, Your Honor.

Nathan Hochman with Tinos Diamantatos and Brianna Abrams on behalf of Leroy Baca who is present.

MR. DIAMANTATOS:  Good morning.

THE COURT:  Good morning.

Yesterday there was a spectator who the Court removed from the courtroom and who the Court intends to remove from these proceedings through the conclusion of this trial. It was reported to the Court that that person was making disparaging comments during a witness' testimony that could be

**UNITED STATES DISTRICT COURT**

overheard by the lawyers and presumably the jury.

This is not the first time that that person has disrupted proceedings in this courtroom. In fact, it was brought to the Court's attention that she had interrupted proceedings in a related case.

The Court recognizes her right to be present during these proceedings. However, spectators do have to conform their conduct consistent with the decorum that's required in a courtroom. And the Court, in balancing her right to be here with the defendant's right to a fair trial and the Court's obligation to maintain the integrity of the judicial process, the Court believes that it warrants or finds that she will not be allowed to be present during the remainder of these proceedings.

All right. We're ready to proceed?

MR. FOX: Yes, Your Honor. It looks like there's a couple extra chairs over here. I'm not sure if they're going to get in the way of the jury. If they're fine, I'll leave them. If they're not fine, I will be happy to move them.

THE COURT: We will get them.

MR. JAUREGUI: Your Honor, should we call our first witness to the stand?

THE COURT: Yes. If you would. We'll have the jury brought in.

///

1230

(The following proceedings were held in open court in the presence of the jury:)

THE COURT:  If you'd call your first witness, please.

MR. JAUREGUI:  Your Honor, the United States calls William David Courson.

THE COURT:  I will ask the clerk to swear the witness, please.

THE CLERK:  Please stand and raise your right hand.

Do you solemnly state that the testimony you may give in the cause now pending before this court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  Yes, sir.

THE CLERK:  Would you please state -- please be seated.  State your full name and spell your last name for the record.

THE WITNESS:  William David Courson, C-o-u-r-s-o-n.

THE CLERK:  Thank you.

///

///

///

///

**UNITED STATES DISTRICT COURT**

**WILLIAM DAVID COURSON,**

**GOVERNMENT'S WITNESS, SWORN:**

**DIRECT EXAMINATION**

BY MR. JAUREGUI:

Q      Mr. Courson, what do you do for a living?

A      I work for the Los Angeles County Sheriff's Department.

Q      What do you do there?

A      I'm a deputy sheriff.

Q      How long have you been a deputy with the sheriff's department?

A      A little over eight years.  Eight-and-a-half years.

Q      Where within the department do you work now?

A      Men's Central Jail.

Q      When you started at the sheriff's department, did you receive any training?

A      Yes, sir.

Q      Approximately when was that?

A      November 13, '07, I believe.

Q      And who conducted -- what was your -- what did your training consist of?

A      Well, that was Black Monday.  So you had the academy.  Then after graduation, I think it was March 3rd of '08.  Then you have two weeks of Jail Ops.

**UNITED STATES DISTRICT COURT**

Q        What is Jail Ops?

A        Jail operations.  It, I guess, tells you the day-in-day-out, what goes on at the jail, what to expect.

Q        In Jail Ops training, are you taught about rules in MCJ?

A        Yes.

Q        What kind of rules are you taught about -- or are you taught, generally speaking?

A        I guess, like I said, it's just the searching, the waist-chaining, about shanks, drugs, stuff like that, stuff you're going to deal with in custody environment.

Q        Are you taught formal written rules?

A        Yes.

Q        What about unwritten rules?

MR. DIAMANTATOS:  Objection, Your Honor.  Leading.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  I heard an unwritten rule during that time, yes, sir.

Q        BY MR. JAUREGUI:  When you say you heard an unwritten rule, what did you hear?

MR. DIAMANTATOS:  Objection.  Foundation.

THE COURT:  Sustained.

Q        BY MR. JAUREGUI:  When you mentioned an unwritten

**UNITED STATES DISTRICT COURT**

rule, where did you hear that?

A       At the academy at STAR Center during Jail Operations.

Q       From whom did you hear this rule?

A       I do not recall who I heard it from.

Q       Do you recall what the rule was?

MR. DIAMANTATOS:  Objection.  Hearsay.

THE COURT:  Overruled.

THE WITNESS:  I'm sorry?

Q       BY MR. JAUREGUI:  Do you recall what the rule was?

A       Yes, sir.

Q       What was it?

A       That, if an inmate fights with a deputy, the inmate goes to the hospital.

Q       And do you have an understanding of what that means?

A       What I thought at the time was, if an inmate fights with a deputy, the inmate was to be hurt bad enough to go to the hospital.

Q       In 2000 -- I'm sorry.

Throughout the course of your career at the sheriff's department, have you worked at MCJ?

A       Yes, sir.

Q       Did there come a time, Mr. Courson, where you

**UNITED STATES DISTRICT COURT**

1234

encountered an FBI agent named Leah Marx?

A       Yes, sir.

Q       Approximately when was that?

A       Sometime in 2010.

Q       Do you recall the circumstances under which you met Ms. Marx?

A       She would come and interview inmates at Men's Central Jail.

Q       Do you know, Mr. Courson, why she was conducting interviews at MCJ?

A       She said human trafficking cases was what she worked on.

Q       Did you make -- did you make an effort to get to know Special Agent Marx?

A       Yes, sir.

Q       What did you do?

A       Asked her for her e-mail and phone number.

Q       Why did you do that?

A       I thought she was cute.

Q       Did you want to get to know her personally?

A       Yes.

Q       What happened after you asked Ms. Marx for her e-mail and phone number?

A       I got her e-mail address.

Q       Did you end up contacting Ms. Marx?

**UNITED STATES DISTRICT COURT**

A        Yes, sir.

Q        What happened?

A        I would e-mail.  She would e-mail back.  At some point we got together for a few times, went out for dinner and drinks or lunch.

Q        When you went out with Special Agent Marx, what kinds of things did you discuss?

A        We discussed motorcycles.  We discussed tattoos. We talked about her dog.  We talked about my work.  Just random stuff most of the time.

Q        What kinds of things did you discuss with Special Agent Marx pertaining to your work?

A        Well, I mentioned the unwritten rule.  I talked about a force that I witnessed but didn't report.  I talked -- some paper she was doing, I gave her our DT manual or use-of-force policy.

Q        What is "DT"?

A        I'm sorry.  Defensive tactics.

Q        I want to ask you some questions about the use of force that you mentioned.

The incident that you witnessed and didn't report, what was that?

MR. DIAMANTATOS:  Objection.  Foundation.

THE COURT:  Sustained.

Q        BY MR. JAUREGUI:  Mr. Courson, approximately when

**UNITED STATES DISTRICT COURT**

did this incident occur?

A        Maybe end of 2008, maybe '09.  I don't recall.

Q        Where did it occur?

A        At Men's Central Jail.

Q        What were the circumstances surrounding that incident?

MR. DIAMANTATOS:  Objection.  Foundation.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  During pill call, we were doing -- well, pill call was conducted in the hallway at the time for the general population.

Q        BY MR. JAUREGUI:  What is "pill call"?

A        The nurses pass out pills.

Q        Okay.

A        I noticed an inmate coming back into the module followed by at least one deputy.  Then I heard noise.  I looked over, and they were on the ground.

Q        I'm sorry.  Who was on the ground?

A        The inmate and the deputy.  The deputy was restraining the inmate.

Q        And what happened after that incident occurred?

A        They handcuffed the inmate.  They took him out into the hallway.  Senior deputy, supervising line deputy came into the module, started asking people what did they see.

**UNITED STATES DISTRICT COURT**

1237

Q        Did the senior deputies contact you?

A        Yes, sir.

Q        What, if anything, did they ask you?

A        He asked me if I saw anything or what did I see. I told him, "What do you want to hear?"  And he said, "You were upstairs running showers."

Q        And were you actually upstairs running showers?

A        No, sir.

Q        What did you say, if anything, in response to him?

MR. DIAMANTATOS:  Objection.  Hearsay.

THE COURT:  Overruled.

THE WITNESS:  I just said, "Okay."

Q        BY MR. JAUREGUI:  Deputy Courson, are you familiar with the term "drive-bys"?

A        Yes, sir.

Q        Did you discuss in any of your social visits with Special Agent Marx the term "drive-by"?

A        Yes, sir.

Q        What did you tell her about that?

A        I told her it's where -- if there's a force going on and they've put out 415, which is disturbance, which in jail we use it for fights, is occurring at whatever location, everybody would respond.  Well, when you get there, once -- people would just hit the inmate and then leave without doing

**UNITED STATES DISTRICT COURT**

1238

paperwork.

Q     On these occasions when you met with Special Agent Marx, Deputy Courson, were you aware that Special Agent Marx was recording these conversations?

A     No, sir.

Q     Did there come a time when you learned that Special Agent Marx was, in fact, recording your conversations?

A     Yes, sir.

Q     Did there come a time when Special Agent Marx was investigating excessive force in the jails?

MR. DIAMANTATOS:  Objection.  Leading, Your Honor.

THE COURT:  It is, but you can answer.

THE WITNESS:  Yes.  I found out.

Q     BY MR. JAUREGUI:  How did you learn that, Deputy Courson?

A     The captain of Men's Central Jail put on a briefing and informed everyone.

Q     What did that captain say?

MR. DIAMANTATOS:  Objection.  Foundation.

THE COURT:  Sustained.

Q     BY MR. JAUREGUI:  Approximately when did that briefing occur?

A     I do not recall.

Q     Do you know, Deputy Courson, what the purpose of

the briefing was?

A    Yes.

Q    What was your understanding of that purpose?

MR. DIAMANTATOS:  Objection.  Foundation.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  He was informing all the personnel at Men's Central Jail of what the FBI was doing there and, if we had any contact with him, to come and speak to him.

Q    BY MR. JAUREGUI:  What did you do in response to that briefing?

A    I approached Captain Ornelas and told him I had contact with Leah Marx.

Q    What happened after that?

A    He told me to come to his office and speak to him in private.

Q    Did you go to Captain Ornelas' office?

A    Yes, sir.

Q    What happened at that meeting?

MR. DIAMANTATOS:  Objection.  Foundation.

THE COURT:  Sustained.

Q    BY MR. JAUREGUI:  After speaking with Captain Ornelas, did you speak with anyone else?

A    Yes, sir.

Q    With whom did you speak?

**UNITED STATES DISTRICT COURT**

A        ICIB, Internal Criminal Investigation Bureau.

Q        Do you remember the name of the individuals with whom you spoke?

A        Yes, sir.

Q        Who?

A        It was Sergeant Craig, Sergeant Long, and Lieutenant Leavins.

Q        And when was that relative to your meeting with Captain Ornelas?

A        Immediately after.

Q        Deputy Courson, I want to direct your attention to exhibit -- I'm sorry.

Your Honor, may I ask the court clerk to present Exhibits 88 and 89 to this witness, please.

If you could just take a look at those exhibits, please, Deputy Courson.  Do you recognize them?

A        Yes, sir.

Q        What is Government Exhibit No. 88?

A        That is a CD of, I guess, the recording of the ICIB interview.

Q        How do you recognize that exhibit?

A        It has my initials and date from yesterday.

Q        And what about Government Exhibit No. 89?  Do you recognize it?

A        Yes, sir.

Q        What is it?

A        That's the excerpts from 88.

Q        And have you reviewed the -- is that a transcript?

A        Yes, sir.

Q        Have you reviewed that transcript before?

A        Yes, sir.

Q        And does that transcript accurately reflect the recording in Government Exhibit No. 88?

A        Yes, sir.

            MR. JAUREGUI:  Your Honor, I would move for admission of Government Exhibit No. 89 -- No. 88.  Excuse me.

            MR. DIAMANTATOS:  No objection, Your Honor.

            THE COURT:  It will be received.

            MR. JAUREGUI:  And, Your Honor, at this point I'd like to play a few clips from that recording.  The transcript is in the transcript binder at Exhibit No. 89.

            THE COURT:  All right.  If everybody would open their binders to tab 89.

            MR. JAUREGUI:  Okay.  I'd like to now play the first clip from Government Exhibit No. 88.

        (The cd, Exhibit No. 88, commenced

          playing before the jury.)

            MR. JAUREGUI:  Next clip.

///

(The cd, Exhibit No. 88, commenced

playing before the jury.)

MR. JAUREGUI:  Next clip.

(The cd, Exhibit No. 88, commenced

playing before the jury.)

MR. JAUREGUI:  And final clip, please.

(The cd, Exhibit No. 88, commenced

playing before the jury.)

Q       BY MR. JAUREGUI:  Now, Deputy Courson, you heard Sergeant Craig say, "If somebody starts threatening you with a subpoena or some other nonsense"; right?

A       Yes, sir.

Q       At any point during your interactions with FBI Special Agent Leah Marx, did the FBI threaten you?

A       No, sir.

Q       At any point during your interactions with the FBI, did the FBI intimidate you?

MR. DIAMANTATOS:  Objection, Your Honor. Improper bolstering.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  No, sir.

Q       BY MR. JAUREGUI:  Bully you?

A       No, sir.

Q       Coerce you?

A        No, sir.

Q        Blackmail you?

A        No, sir.

MR. JAUREGUI:  No further questions, Your Honor.

THE COURT:  Cross-examination.

MR. DIAMANTATOS:  Thank you, Your Honor.

May I proceed?

THE COURT:  Yes, please.

**CROSS-EXAMINATION**

BY MR. DIAMANTATOS:

Q        You described an event where you allegedly witnessed a takedown of an inmate, I believe you said, during a pill call; correct?

A        Yes, sir.

Q        Now, according to you, during the pill call incident, you observed two deputies take down an inmate; correct?

A        Yes, sir.

Q        The inmate was not handcuffed; correct?

A        Correct.

Q        Now, you worked with those two deputies that you observed; right?

A        Yes, sir.

Q        Yet you don't remember either of their names; correct?

A     That is correct.

Q     You never provided that information to the Government.

A     Correct.

Q     Never provided that information to anyone at the sheriff's department.

A     Correct.

Q     You can't remember where specifically at Men's Central Jail this pill line incident allegedly occurred; right?

A     Correct.

Q     You can't even remember what year it happened.

A     That is correct.

Q     Now, you also described that, after the pill line incident, one of the two deputies asked you to lie about what happened; correct?

A     No, sir.

Q     Well, he indicated that you shouldn't indicate that you were there to observe the incident; correct?

MR. JAUREGUI:  Objection.  Misstates the testimony.

THE COURT:  Sustained.

Q     BY MR. DIAMANTATOS:  That you were not to fill out a report indicating what you observed.

A     No, sir.

**UNITED STATES DISTRICT COURT**

1245

Q        You don't remember the person's race that told you that?

A        His rank?

Q        Race.  Not rank, sir.

A        No idea, sir.

Q        You don't remember his height?

A        No, sir.

Q        Isn't it true, Mr. Courson, that you never observed how that incident started?

A        That is correct.

Q        And isn't it true that you have no idea whether that use of force was reasonable or unreasonable?

A        That is correct.

Q        You have no idea why it even happened; right?

A        Correct.

Q        Isn't it true, Mr. Courson, that, in your seven plus years as a deputy at Men's Central Jail, you have never observed an unreasonable use of force?

A        Correct.

Q        This morning you talked about your training that you received, I believe you said, in late 2007 through up and including March of 2008; is that correct?

A        Yes, sir.

Q        You testified about receiving certain written documentation; correct?

**UNITED STATES DISTRICT COURT**

A       Yes, sir.

Q       Defensive tactic manuals?

A       Yes, sir.

Q       Sheriff Baca would come to the training; isn't that correct?

A       Sometimes.  I don't remember seeing him, but sometimes he probably did.

Q       He would come and instruct his deputies on what was expected of them.

Isn't that right, sir?

A       Again, I do not recall if I saw him or not.

Q       You don't recall if Sheriff Baca came and instructed deputies to treat inmates with respect?

MR. JAUREGUI:  Objection.  Foundation. Relevance.

THE COURT:  Sustained.

Q       BY MR. DIAMANTATOS:  You indicated you were trained in March of 2008; right, Mr. Courson?

A       Correct.

Q       Yet you don't recall if the sheriff of the department came and addressed deputies that were being trained?

MR. JAUREGUI:  Objection.  Asked and answered.

THE COURT:  Sustained.

Q       BY MR. DIAMANTATOS:  Isn't it true, sir, that you actually resent inmates?

**UNITED STATES DISTRICT COURT**

MR. JAUREGUI:  Objection.  Argumentative.

THE COURT:  Sustained.

Q    BY MR. DIAMANTATOS:  Well, you deal with inmates as a deputy each day, don't you, sir?

A    Yes, sir.

Q    And inmates receive certain benefits when they're incarcerated.

Isn't that right, sir?

A    Yes, sir.

Q    And you resent the fact that these inmates receive benefits while in prison that they wouldn't ordinarily receive while outside of prison.

Isn't that true, sir?

A    Yes, sir.

Q    And you resent the programs that give these inmates benefits; right?

MR. JAUREGUI:  Objection, Your Honor.  Relevance.

THE COURT:  Sustained.

Q    BY MR. DIAMANTATOS:  Are you aware of who put those programs in place?

MR. JAUREGUI:  Same objection, Your Honor.

THE COURT:  Sustained.

Q    BY MR. DIAMANTATOS:  Now, you indicated that, when you first met Leah Marx, you knew she was a special agent with the FBI; correct?

UNITED STATES DISTRICT COURT

A        Yes.

Q        The first time you interacted with Ms. Marx was at Men's Central Jail?

A        Yes, sir.

Q        You were a deputy there?

A        Yes, sir.

Q        She's an FBI agent?

A        Yes, sir.

Q        Visiting an inmate in the prison; correct?

A        Correct.

Q        She was there with a fellow FBI agent; correct?

A        Correct.

Q        And that individual was also there to visit an inmate; correct?

A        Correct.

Q        Now, you made a lot of small talk with Ms. Marx before she even passed you her business card with her e-mail; correct?

A        Yes, sir.

Q        You would tell her things like -- refer to your metal flashlight and hitting it into your palm like you use it on inmates; right?

A        Yes, sir.

Q        Are you aware whether or not you've been investigated for using your metal flashlight on inmates?

UNITED STATES DISTRICT COURT

MR. JAUREGUI:  Objection.  Relevance, Your Honor.

THE COURT:  Overruled.  You can answer that question.

Q     BY MR. DIAMANTATOS:  Are you aware, sir, whether or not you've been investigated for using your metal flashlight on inmates as you claimed to Special Agent Marx that you did?

A     I was.

Q     Are you aware of the results of that investigation?

A     I am.

Q     What were the results?

A     I ended up with 30 days' suspension.

Q     To be clear, who investigated that?

MR. JAUREGUI:  Objection, Your Honor.  Foundation.  Vague.

THE COURT:  Sustained.

Q     BY MR. DIAMANTATOS:  The FBI didn't suspend you from your job for 30 days; isn't that right, sir?

A     Correct.  They did not.

Q     All right.  Now, after observing Special Agent Marx at Men's Central Jail, you indicated to the members of the jury this morning that you wanted to be in contact with her; correct?

A     Correct.

Q     And she slipped you her business card with a

personal e-mail address on the back.

A       Correct.

Q       You began writing e-mails to each other?

A       Correct.

Q       In fact, you exchanged a lot of e-mails; right?

A       Yes, sir.

Q       Special Agent Marx later provided you with her
cell phone number; correct?

A       Yes, sir.

Q       You began texting one another.

A       Probably, yes, sir.

Q       You liked her.

A       Yes, sir.

Q       You thought she was attractive.

A       Yes, sir.

Q       You indicated this morning that you started
meeting in person; correct?

A       Correct.

Q       Went out a few times.

A       Correct.

Q       For lunch; right?

A       Yes, sir.

Q       Dinner?

A       Yes, sir.

Q       Drinks?

**UNITED STATES DISTRICT COURT**

1251

A       Yes, sir.

Q       You flirted with her each of these times that you met with her; correct?

A       Yes, sir.

Q       You indicated this morning that you even chatted about your tattoos; right?

A       Correct.

Q       You even saw the one on her back; correct?

MR. JAUREGUI:  Objection.  Relevance, Your Honor.

THE COURT:  Sustained.

Q       BY MR. DIAMANTATOS:  At one point -- well, you indicated that it turns out she was recording all of these interactions that you had; correct?

A       Yes, sir.

Q       Now, during the course of your meetings with Agent Marx, you told her about falsifying reports and inmate abuse; correct?

A       No, sir.

Q       Well, you indicated that you talked to her about this pill call incident.

A       Yes, sir.

Q       That you talked about the drive-bys that you described; correct?

A       Yes, sir.

Q       All right.  And you indicated to her that you

**UNITED STATES DISTRICT COURT**

didn't fill out reports when you would observe these alleged instances; correct?

A    I only observed that one, sir.

Q    The one you're referring to as the pill call incident?

A    Correct.

Q    Going back for a moment to this unwritten rule training that you described to us, isn't it true you have no recollection of which person at the training told you this unwritten rule?

A    That is correct.  Yes, sir.

Q    Now, you've already indicated to us that, during your seven plus years as a deputy, you've never observed an unreasonable use of force.  You've also never seen an inmate being sent to a hospital as a result of getting in a fight with a deputy.

Isn't that true, sir?

A    Yes, sir.

Q    You understand it's a crime not to report inmate abuse if you observe it?

A    Yes, sir.

MR. JAUREGUI:  Objection.  Relevance, Your Honor.

THE COURT:  The answer will stand.

Next question.

Q    BY MR. DIAMANTATOS:  Now, at some point it became

UNITED STATES DISTRICT COURT

apparent to you that Ms. Marx -- Agent Marx was recording your interactions; right?

A       Correct.

Q       We heard the recording this morning about you describing that to individuals with ICIB; right?

A       Correct.

Q       After that point in 2013, you began cooperating with the Government; correct?

A       Correct.

Q       You had meetings with the Government?

A       Yes, sir.

Q       Multiple meetings?

A       Yes, sir.

Q       In fact, you met with the Government and testified for them before the grand jury; right, sir?

A       Yes, sir.

Q       Isn't it true that you admitted to all the lies that you told Special Agent Marx during the meetings that you had with her in 2010?

A       Yes.

Q       And after admitting to the members of the grand jury that you had lied to Special Agent Marx when you met with her in 2010, you, thereafter, testified for the Government in multiple other hearings.

Isn't that true, sir?

A       Correct.

Q       Yet, as you sit here today, you've never been charged with lying to an FBI agent; isn't that right?

A       Correct.

Q       In fact, sir, you've never been charged with any crime ever?

A       That's not true.

Q       Well, you've never been charged with any crime related to inmate abuse.

A       Correct.

Q       Falsifying reports?

A       Correct.

Q       Or lying to an agent?

A       Correct.

MR. DIAMANTATOS:  May I have a moment, Your Honor?

THE COURT:  Yes.

MR. DIAMANTATOS:  Nothing further.

MR. JAUREGUI:  Briefly, Your Honor.

**REDIRECT EXAMINATION**

BY MR. JAUREGUI:

Q       Deputy Courson, you testified on cross-examination about having spoken to Special Agent Marx about using your flashlight on inmates?

A       Yes, sir.

**UNITED STATES DISTRICT COURT**

1255

Q        Did you actually use your flashlight on inmates?

A        Once.

Q        And were you suspended -- when were you suspended?

A        Last November 2nd through December 2nd, I believe.

Q        So that would be 2015?

A        Yes, sir.

Q        And do you know why you were suspended, Deputy Courson?

A        Yes, sir.

Q        Why?

A        For telling Agent Marx about the unwritten rule --

MR. DIAMANTATOS:  Objection, Your Honor. Foundation how this witness knows that.

THE COURT:  Overruled.

Q        BY MR. JAUREGUI:  Continue, please.

A        Then it was telling Agent Marx that an inmate does not have to fight or have to swing on the deputy first. All you have to do is perceive that threat, and then you're allowed to defend yourself or fight.  One was telling Agent Marx that I didn't care if inmates killed each other and leading her to believe there was a use of force every single day or every minute of every day or something like that.

**UNITED STATES DISTRICT COURT**

Q      Do you know, Deputy Courson, whether you were suspended for causing embarrassment to the department?

A      Yes, sir.  That was mentioned.

Q      And was that in connection with your testimony in other cases?

A      I believe so, but I don't know what their thought process is.

MR. JAUREGUI:  One moment, Your Honor.

Q      Do you know, Deputy Courson, when you were suspended -- do you recognize the defendant in this case?

A      Yes, sir.

Q      Who is he?

A      That's previous Sheriff Lee Baca.

Q      You were suspended in November of 2015.  Was he the sheriff of the department?

A      Yes, sir.

MR. JAUREGUI:  No further questions, Your Honor.

MR. DIAMANTATOS:  Briefly, Your Honor.

May I proceed?

THE COURT:  Yes.

**RECROSS—EXAMINATION**

BY MR. DIAMANTATOS:

Q      Mr. Courson, you indicated that you were suspended in 2015; isn't that right, sir?

A      Yes, sir.

**UNITED STATES DISTRICT COURT**

Q       Do you recall when in 2015 you were suspended?

A       November 2nd through December 2nd.

Q       November 2nd through December 2nd, you said?

A       Yes, sir.

Q       Of 2015?

A       I believe so.  Yes, sir.

Q       Isn't it true that Sheriff Baca retired in January of 2014, sir?

A       I don't know when he retired.

MR. DIAMANTATOS:  Nothing further, Your Honor.

THE COURT:  All right.  Anything else?

MR. JAUREGUI:  No, Your Honor.

THE COURT:  All right.  You may step down.

Call your next witness.

MR. FOX:  United States calls John Torribio.

THE CLERK:  Stand here for me, please.  Raise your right hand.

Do you solemnly state that the testimony you may give in the cause now pending before this court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

THE CLERK:  Please be seated.

Will you please state your full name and spell your last name for the record.

**UNITED STATES DISTRICT COURT**

1258

THE WITNESS:  John A. Torribio, T-o-r-r-i-b-i-o.

THE CLERK:  Thank you.

MR. FOX:  May I proceed, Your Honor?

THE COURT:  Yes.

**JOHN A. TORRIBIO,**

**GOVERNMENT'S WITNESS, SWORN:**

**DIRECT EXAMINATION**

BY MR. FOX:

Q    What do you do for a living?

A    I'm a judge at the Los Angeles Superior Court.

Q    What types of cases do you handle?

A    Everything from family law to death penalties, but mostly over the last 15 years criminal.

Q    How does your court differ from the one we're in today?

A    Well, we're a state court as opposed to a federal court.  So our jurisdiction is more restricted.

Q    In addition to your casework, do you handle any requests from law enforcement agencies?

A    All kinds of requests for search warrants, ping orders, removal orders, raise bail, lower bail.

Q    How long have you been a judge?

A    27 years.

Q    Going back to September of 2011, how do your duties compare to what they are today?

**UNITED STATES DISTRICT COURT**

1259

A        Same.

Q        In 2011, did you know a sheriff's department sergeant named Scott Craig?

A        Yes.

Q        How did you know him?

A        He used to come to me for search warrants.

Q        Do you recall Mr. Craig ever bringing you an unusual request?

A        Yes.

Q        What was that?

A        It was a -- well, actually, I think it was a -- it was either a search warrant or an order to turn over documents directed to the Federal Bureau of Investigation.

Q        Could you please look in your book at Exhibit 140.  It should be below you to the left.  There should be three binders.  What I'm looking for is for you to look at Exhibits 140 and 141, please.

A        (Witness reviewing exhibits.)

         I have Exhibit 140 in front of me.

            (Marked for identification Exhibit Nos. 140 and 141.)

Q        BY MR. FOX:  Is this one of the documents you were describing in your testimony?

A        Just give me a second, please.

            (Witness reviewing exhibit.)

            Yes.

**UNITED STATES DISTRICT COURT**

1260

Q        When Mr. Craig brought you this document, what, if anything, did he tell you when he brought you the document?

A        He just brought it in like a normal search warrant or some request and just handed it to me, and I looked at it.

Q        Did Mr. Craig indicate whether a superior had asked him to bring you that request?

A        No.

Q        If you can look at also Exhibit 141.

A        Yeah.  I have it.

Q        Are Exhibits 140 and 141 true and accurate copies of the documents that Mr. Craig provided to you in September of 2011?

A        Yes.

MR. FOX:  Your Honor, I move Government's Exhibits 140 and 141 into evidence.

MR. DIAMANTATOS:  No objection, Your Honor.

THE COURT:  It will be received.

(Received into evidence Exhibit Nos. 140 and 141.)

Q        BY MR. FOX:  Judge Torribio, showing you on our screen here now -- while we wait for it to load up, can you just look through 140 and tell the jury whether there's any allegation that -- in 140 whether there's any allegation that the FBI or Anthony Brown was involved in bringing narcotics into Men's Central Jail?

**UNITED STATES DISTRICT COURT**

A        No.  There is none.

Q        Could you just explain for the jury what a statement of probable cause is?

A        In order to issue a search warrant, any law enforcement officer of any level must obtain a search warrant from the Court.  That is a right to invade someone's privacy, office, computer.  You must have probable cause.  It's the lowest burden in the law.

It merely means that the officer, and therefore the Court, has reasonable cause to believe that a crime likely had been committed and that the suspect in question might have done it.  If these two factors are met, then the Court will review the warrant and sign it.

And as an example, if you're looking for an elephant, you can't start looking in every desk drawer.  So the search must be reasonable and related to the subject matter.

Q        When Mr. Craig gave you these documents, what, if anything, did you say to him after you reviewed it?

A        Well, after I read them, I said I can't sign this.

Q        Why did you say that?

A        Because the United States Government is the highest level of Government and we're an entity below it.  We do not have any jurisdiction over the Federal Government.  The state court can't order the Federal Government to do anything

**UNITED STATES DISTRICT COURT**

at all.

Q      What, if anything, did you say to Mr. Craig about that?

A      I told him that we didn't have any jurisdiction over the Federal Government.

Q      Showing you now Exhibit 141, what is this?

A      This is the -- 140 is the declaration or the statement of probable cause that the Court looks at in order to decide whether it will sign the next document which is, in this case, an order for investigative records.

Q      Did you sign this document?

A      No, I didn't, for the reasons stated.

Q      And whose handwriting is this?

A      That is my handwriting.

Q      What did you write there?

A      "Denied.  Court has no jurisdiction over any federal agency.  John A. Torribio.  September 8, 2011."

Q      What did you do with this document after you signed it?

A      I gave it back to him.

Q      Why did you sign it in this fashion?

A      Well, I wanted to let -- sometimes officers don't understand why you're rejecting warrants, and I will sometimes tell them.  In this particular instance it's the only time in 27 years I've been asked to sign an order to search the Federal

**UNITED STATES DISTRICT COURT**

Government.  And it was so unusual that I wanted to let the officer -- and I know that he -- the captain or whoever is running the investigation would want to know what happened.  So I was telling him, you know, you can't do this.

Q    Who prepares these documents for you to sign?

A    I have no idea.

Q    This is not something that you prepared; is that correct?

A    No.  No.  This is brought -- these documents are brought to me by whatever agency it happens to be.

Q    This area that I've highlighted starting with the No. 1, do you see that?

A    I'm sorry.

Q    About four lines down, there's a number --

A    Any and all investigative records, reports, office correspondence, and/or notes?

Q    Yeah.  What are these things that are listed under 1, 2, 3, and 4?  What is being sought generally?  I don't want to know the specifics here.

A    Well, they're just asking for records of any documents -- any reports that have been prepared regarding the underlying investigation at the county jail.  That's No. 1.

Q    That's No. 1.

I've just highlighted that right here.  Is that correct?

A      That's correct.

Q      And who are you to order?  I'm highlighting it.

A      I'm to order the Federal Bureau of Investigation to turn these over.

Q      Could you please read what's written under No. 2?

A      "Investigating agents, true identities, and current assignments."

Q      Please read No. 3.

A      "Locations of additional cellular telephones currently in use and/or deployed within the confines of the Los Angeles County jail system and the identities of those persons possessing said cellular telephones."

Q      Please, No. 4 now.

A      "Disclosure of any and all contraband items given to any Los Angeles County jail inmates through any means at the direction, consent, or knowledge of the FBI to include a description of the item, the identity of the inmate, and the date, time, and location of occurrence relative to any and all investigations past or present occurring within the confines of the Los Angeles County jail system from August 5th, 2009, to present."

Q      I'm now going to publish for you Exhibit 41.  I'm just going to ask you to read this, please.  This is an e-mail from Christopher Nee to Steve Leavins, September 7, 2011, at 4:59 p.m.  Could you please read what's written in the e-mail.

UNITED STATES DISTRICT COURT

A        You mean not the whole thing.  Just after the "Good afternoon"?

Q        Yes, please.

A        "After the document gets signed tomorrow, would you please make a copy for Mr. Tanaka?  Thank you."

Q        And now the portion that I've highlighted in response, Mr. Leavins to Mr. Nee.

A        "You got it."

Q        Judge Torribio, did you give, that day, any indication to Mr. Craig that would lead him to believe that it was okay to arrest an FBI agent for what he had put into that affidavit?

A        I'm sorry.  Could you ask --

Q        You read a statement of probable cause.  So based on that statement of probable cause, did you give him any indication that it would be okay to arrest the special agent for the conduct that he wrote into the probable cause statement?

A        No.  Because even if there was a crime, we have no jurisdiction over the Federal Government.

Q        Did Mr. Craig at that point say anything --

A        I'm sorry.  That's a little too broad of a statement.  Obviously if a federal agent was driving under the influence, that would be an arrestable offense.  But any federal agent acting within the course and scope of his

employment, which this statement seemed to imply, would clothe them with immunity in terms of any state action.

Q    Did Mr. Craig say anything about intending to arrest a special agent with the FBI based on what was in his affidavit?

A    No.

MR. FOX:  One moment, Your Honor.

No further questions.

THE COURT:  Cross-examination.

MR. DIAMANTATOS:  Thank you, Your Honor.

May I proceed, Your Honor?

THE COURT:  Yes.

**CROSS-EXAMINATION**

BY MR. DIAMANTATOS:

Q    Judge Torribio, you have no knowledge that Sergeant Craig communicated to Sheriff Baca about him seeking the order that we observed.

A    Correct.

Q    And also, Judge Torribio, you have no knowledge that Sheriff Craig {sic} communicated the denial of the statement of probable cause that Sergeant Craig had presented to you.

A    Correct.

Q    In fact, for all of the events that you described, you had no communications of any kind with

**UNITED STATES DISTRICT COURT**

Sheriff Baca whether they be in person, over the phone, in writing of any kind?

A        Correct.

MR. DIAMANTATOS:  No further questions, Your Honor.

MR. FOX:  Nothing, Your Honor.

THE COURT:  All right.  You may step down.

MR. HOCHMAN:  Your Honor, may I be heard at sidebar very quickly?

THE COURT:  Yes.

MR. HOCHMAN:  Thank you, Your Honor.

(The following proceedings were held at sidebar:)

MR. HOCHMAN:  Your Honor, I apologize.  My stomach is acting up today; so I need to use the restroom for about five minutes.

THE COURT:  Okay.  Who's your next witness?

MR. FOX:  Mike Hannemann.  He's a very brief witness.

MR. HOCHMAN:  It will be five minutes.

THE COURT:  That's fine.

(The following proceedings were held in open court in the presence of the jury:)

THE COURT:  Ladies and gentlemen, we're going to need just a few minutes.  If you want to stay in your seats, that's fine.  If you want to go back to the jury room, that's

1268

fine.  Whatever you'd like to do.  Okay.  So why don't we take about a five-minute break.

(A recess was taken at 9:06 a.m.)

(The following proceedings were held in open court out of the presence of the jury:)

MR. FOX:  Your Honor, when you have a minute, we have a couple issues to bring up.

THE COURT:  All right.

MR. FOX:  The first is that Mr. Courson misstated when Mr. Baca was sheriff, and the parties have a stipulation that we'd like to read that says that, on January 31st of 2014, Leroy Baca resigned as Los Angeles County Sheriff -- I'm sorry -- retired.

(The following proceedings were held in open court in the presence of the jury:)

MR. FOX:  Your Honor, may I read a stipulation?

THE COURT:  That's fine.

MR. FOX:  The parties stipulate that, on January 31st of 2014, Leroy Baca retired as Los Angeles County Sheriff.

THE COURT:  All right.  Ladies and gentlemen, the parties have agreed to certain facts that have been stated to you.  You should, therefore, treat these facts as having been proved.

MR. FOX:  Your Honor, the United States calls

**UNITED STATES DISTRICT COURT**

Mike Hannemann.

THE CLERK:  Please stand here for me, please. Raise your right hand.

Do you solemnly state that the testimony you may give in the cause now pending before this court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

THE CLERK:  Please be seated.

Would you state your full name and spell your last name for the record.

THE WITNESS:  My name is Michael William Hannemann.  Last name is H-a-n-n-e-m-a-n-n.

THE CLERK:  Thank you.

MR. FOX:  May I proceed, Your Honor?

THE COURT:  Yes, please.

**MICHAEL WILLIAM HANNEMANN,**

**GOVERNMENT'S WITNESS, SWORN:**

**DIRECT EXAMINATION**

BY MR. FOX:

    Q    What do you do for a living?

    A    I am a lieutenant with the Los Angeles County Sheriff's Department.

    Q    How long have you been with the sheriff's department?

**UNITED STATES DISTRICT COURT**

1270

A        February will be 28 years.

Q        What do you do currently?

A        I am the detective lieutenant at Compton Station.

Q        What are your duties at Compton?

A        I run all of the detective bureau operations.  I manage our traffic services.  I'm in charge of our secretariat.  I'm in charge of our emergency operations center, and I also am the coordinator for the violence reduction network that the city of Compton is involved in.

Q        Was there a time in which you were an executive aide within the sheriff's department?

A        Yes, sir, I was.

Q        When was that?

A        From January, 2011, to May, 2013.

Q        Who were you an aide to during this time?

A        Sheriff Lee Baca.

Q        I want to show you Exhibit 16 which is in evidence.  I just want to ask you about the person on the "To" line in this e-mail.  It says, "Julie A. Montgomery."  Do you know what role she served?

A        Yes, I do.

Q        What role did she serve in August of 2011?

A        Julie was one of two scheduling secretaries for Sheriff Baca.

Q        Mr. Hannemann, when you were an aide to Mr. Baca,

UNITED STATES DISTRICT COURT

what were your duties?

A        I was kind of a Jack of all trades.  I fielded incoming traffic into the office.  I greeted scheduled visitors.  I answered phone calls.  I opened sheriff's mail.  I assisted the executive assistant commander with going through sheriff's e-mails, and I was also a back-up driver.

Q        Let's focus on the e-mails that you just talked about.  You said you assisted in going through Mr. Baca's e-mails.  What did you mean by that?

A        Sheriff Baca got a very large number of e-mails daily, and it was the commander's job and mine to go through those and let the sheriff know which ones were pertinent for him and then which ones would need to go somewhere else on the department for some type of an action.

Q        What would you do if they were pertinent to Mr. Baca?

A        I would print them out.  I would give them to the commander, and the commander would place them in a "read" folder for the sheriff to read.

Q        Are you aware during this time whether Mr. Baca himself sent e-mails from his sheriff's department e-mail address?

A        I was never aware of the sheriff sending any e-mails.

Q        I want to now have you look at Exhibit 66 in one

of the books that is to your left.  If you look below it, I think it's going to be on a shelf that's below your seat.

A        I'm sorry.  Which one was it again?

Q        No. 66.  There should be three binders.  One should be labeled 1 through 84, I believe.  So it's No. 66 I'm asking you to look at.

A        Okay.  Okay.  I have it.

Q        Do you recognize that document?

A        Yes, I do.

Q        What is it?

A        It is an e-mail correspondence from the commander at the time, James Lopez, who was the executive assistant.

Q        Were you copied on that e-mail?

A        Yes, I was.

Q        Is that a true and accurate copy of the e-mail that you received on that date that's reflected in the e-mail?

A        It appears to be.

MR. FOX:  Your Honor, I move for the admission of Government Exhibit 66.

MR. HOCHMAN:  Objection.  Relevance, Your Honor.

THE COURT:  Overruled.

MR. FOX:  Your Honor, may I publish the exhibit?

THE COURT:  Yes.

(Marked for identification and received into evidence Exhibit No. 66.)

**UNITED STATES DISTRICT COURT**

Q      BY MR. FOX:  Mr. Hannemann, do you see the portion of Exhibit 66 that I've just highlighted on the top of page one?

A      Yes, I do.

Q      Who is James Lopez?

A      He at the time was a commander, and he was the executive assistant in Sheriff Baca's office.

Q      How many assistants and aides did Mr. Baca have at this time?

A      He had a commander who was an executive assistant, and he had a sergeant who was an executive aide.

Q      We see a number of people in the "cc" line, but I want to first ask you about the "To" line.  Are you familiar with this e-mail address?

A      No, I'm not.

Q      What is your understanding about why the e-mail address bcenter11@gmail.com was sent this e-mail?

A      This was routine because the sheriff did not check e-mail, and usually someone that traveled with him would be our point of contact, and we would send it to them.  They would print the e-mail out and give it to the sheriff for his review.

Q      What is the subject line of this e-mail?

A      Sheriff's briefing, Thursday, May 5th, 2011, document for Sheriff Lee Baca.

**UNITED STATES DISTRICT COURT**

1274

Q       This lists a number of people in the "cc" line as I just mentioned.  Who was Larry Waldie at the time in May of 2011?

A       He was our undersheriff.

Q       What about Paul Tanaka?

A       He was one of two assistant sheriffs.

Q       Marv Cavanaugh?

A       He was the other assistant sheriff.

Q       What about Chris Nee?

A       Christopher Nee was an executive aide.  I believe he was the executive aide for undersheriff Waldie at the time.

Q       Could you please read the part of the text that I just highlighted?

A       "Good morning, sir.  Yesterday was busy but uneventful.  Assistant Sheriff Tanaka hosted your weekly staff meeting.  All chiefs were in attendance.  Issues relating to the recent media coverage of the department were discussed."

Q       Please read the portion that I've now highlighted.

A       "The Channel 5 News broadcast *Gang Behind the Badge*, both segments have been copied on DVD for your review. I will send them with Mark when he picks you up from San Diego so that you can view them on the laptop if you wish."

Q       Please read the portion I've highlighted now.

A       "Below is a copy of an article in today's

**UNITED STATES DISTRICT COURT**

*Los Angeles Times,* Faturechi and Blankstein reporting on a lawsuit filed yesterday by the deputies assaulted during the MCJ Christmas party.  And the title is *L.A. County Sheriff's Department Fosters gang-like Activity Among Jail Deputies, Suit Alleges*."

Q      Could you please read the portion that I've highlighted.

A      "That's about it for now, sir.  Hope you are enjoying D.C. and are having a productive trip.  Best."

Q      You mentioned that at this time Mr. Waldie was the undersheriff.  What role did the undersheriff perform in the department?

A      He was the number two person on the department.

Q      And in terms of Mr. Waldie in May of 2011, was he often in the office?

A      It was my experience, when I got there, that Mr. Waldie had some health issues and he was spending a lot of time on an injured status.

Q      Based on your experience, who was filling in for Mr. Waldie during this time?

A      It appeared to be Assistant Sheriff Tanaka.

Q      Why do you say that?

A      Because the sheriff was having dealings with him.

Q      Could you please explain your observations about Mr. Baca's relationship with Mr. Tanaka during this time.

**UNITED STATES DISTRICT COURT**

A       I would see Mr. Tanaka come over and request a meeting with the sheriff.  I would periodically see the sheriff leave his office and walk over to the other side of the building where Mr. Tanaka was located.

Mr. Tanaka frequently would come up and tell me that he would like to have a word with the sheriff while the sheriff was in with another meeting.  So when the sheriff completed whatever appointment he had, I would let him know that Mr. Tanaka desired to speak with him.

Q       Was there a time when Mr. Waldie retired?

A       Yes, there was.

Q       And what happened after he retired?

A       Once Mr. Waldie retired, Assistant Sheriff Tanaka became the undersheriff, and Cecil Rhambo, who at the time was a chief, became an assistant sheriff.

Q       Do you remember approximately when that occurred?

A       I know it was in 2011.  I want to say at least six months into my tenure there, maybe June, July-ish maybe.

Q       Before Mr. Waldie retired, did you notice anything change with respect to his relationship with Mr. Baca?

A       I can't say that it changed from my standpoint because I didn't see the way it was before because, when I came into the office, Mr. Waldie, like I said, was gone most of the time.  But I did notice that I didn't see Mr. Baca dealing with Mr. Tanaka as much as I saw him dealing with Mr. Tanaka.

**UNITED STATES DISTRICT COURT**

Q        I think you just said I didn't see him dealing with Mr. Tanaka as much as I saw him dealing with Mr. Tanaka.

A        Let me rephrase it.  I did not see Sheriff Baca dealing with Undersheriff Waldie as much as I saw the sheriff dealing with Assistant Sheriff Tanaka.

Q        I want to direct your attention now to the months after Mr. Tanaka was selected as undersheriff by Mr. Baca.

Did you hear anything about a phone being recovered in Men's Central Jail around that time?

A        Yes, I did.

Q        Did you hear anything about an FBI informant who was an inmate?

A        All later, yes.

Q        Did you notice anything different with respect to Mr. Baca's mood during this time?

MR. HOCHMAN:  Objection as to which exact time we're talking about, Your Honor.

THE COURT:  Sustained.

Q        BY MR. FOX:  Mr. Hannemann, you discussed how Mr. Tanaka was selected undersheriff around June or July of 2011.  In the August to September, 2011, time frame, generally, so a couple months after Mr. Tanaka was undersheriff, is that around the time that you heard about this phone?

A        Yes, I believe so.

Q        And during -- and what I was referring right now

to this period of time, I'm talking about August, September, 2011, around the time that you heard about the phone.  Did you notice anything different about Mr. Baca's mood during this time?

A       I noticed that he seemed upset.  I don't know, somewhat angry.  It's just he was different than usual.

Q       What about Mr. Tanaka?

A       I would say the same.

Q       Did you ever ask what was going on?

A       Other people.  Not either of those two.

Q       Why didn't you ask Mr. Baca what was going on?

MR. HOCHMAN:  Objection.  Relevancy.  Foundation, Your Honor.

THE COURT:  I'm sorry?

MR. HOCHMAN:  On foundation as well, Your Honor.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  I didn't ask either one of them because I personally didn't feel it was my place for a person of my position to ask somebody that high kind of what's going on.

Q       BY MR. FOX:  How were Mr. Baca and Mr. Tanaka conducting meetings during this time?  Was there anything different about it?

A       They were having closed-door meetings, and they

were bringing in individuals from custody and Internal Criminal Investigations Bureau.

Q        Approximately how long did this occur?

A        Well, I'd say that initially it was -- it seemed heavy because it was new, and then it kind of tapered off.  But because of a task force that was started, it never completely went away because I was under the impression there were updates as to how this team was working.

Q        I'm going to ask you about a few individuals, and my question is going to be did you see them having meetings with Mr. Baca or Mr. Tanaka during this time.

Let's start with Greg Thompson.  Did you see Mr. Thompson in the executive offices meeting with Mr. Baca or Mr. Tanaka during this time?

A        Yes.

Q        Approximately how frequently?

A        He was one of the ones that in the beginning was there somewhat frequently, and then it was rare.

Q        What about Steve Leavins?  Are you familiar with Steve Leavins?

A        Yes, I am.

Q        How do you know Steve Leavins?

A        I know Steve from when he was Assistant Sheriff Tanaka's aide, and then I knew him when he was the operations lieutenant at Internal Criminal Investigations

**UNITED STATES DISTRICT COURT**

Bureau.

Q      What did you notice with respect to Steve Leavins and the executive offices during this time?

MR. HOCHMAN:  Objection.  Vague as to what "executive offices" is.

MR. FOX:  I'll be happy to be more specific, Your Honor.

Q      What did you notice with respect to Steve Leavins and any meetings he was having with Mr. Baca or Mr. Tanaka during this time?

MR. HOCHMAN:  Vague as to "Baca or Tanaka."

THE COURT:  Overruled.

THE WITNESS:  I noticed that Steve Leavins was up meeting with both the sheriff and Mr. Tanaka, and then it wound up evolving into a weekly meeting.

Q      BY MR. FOX:  When you say that he was meeting with both Mr. Baca and Mr. Tanaka, was it always joint --

A      No.

Q      -- meetings?

A      No.

Q      Okay.  What would you notice?

A      I would notice that sometimes he may meet with just the sheriff and sometimes he might meet with just now Undersheriff Tanaka.

Q      Are you familiar with someone named

UNITED STATES DISTRICT COURT

William Tom Carey?

A      Yes.

Q      What about him during this time?  Did you notice that he was having any meetings with either Mr. Baca or Mr. Tanaka during this time?

A      Initially he and Steve Leavins were together.  He at the time was Steve Leavins' captain.  And he was there frequently initially, and then it was, from my observation, it was only Steve Leavins coming up from Internal Criminal Investigations.

Q      Now, with respect to Mr. Carey, was he having meetings always jointly with Mr. Baca or Mr. Tanaka?

A      I believe I remember him meeting with Mr. Tanaka by himself as well.

Q      How often were you seeing Mr. Carey, Mr. Leavins, and Mr. Thompson -- I should say and/or Mr. Thompson meeting with Mr. Baca or Mr. Tanaka during this time?

MR. HOCHMAN:  Vague, Your Honor, as to "and/or."

THE COURT:  Sustained.

Q      BY MR. FOX:  How often did you see one of these individuals meeting with Mr. Baca or Mr. Tanaka during this time?

A      When this all initially started, I would see them maybe anywhere from four to six times a week.  Then it gradually decreased and then went to, like I said, the one time

a week.

MR. FOX:  Your Honor, I'm going to now publish Exhibit 37.

Q       I'd like for you to read the e-mail that's from the bottom here from Gregory L. Thompson to William T. Carey, Friday, August 26, 2011 at 2:13 p.m.  Could you read what's written under "Subject."

A       First I would have to correct you.  It's actually from William T. Carey to Greg Thompson.

Q       Thank you.  I misspoke obviously.

Could you please read what's written under "Subject."

A       And it says "Copy" -- well --

Q       I'm looking at the bottom one.

A       Oh, the bottom one.  Okay.  All right.  My bad.

Q       This portion.

A       "En route from CJ."  That's from Greg Thompson to William -- or Tom Carey.  It says "En route from CJ."

Q       Can you please read the top e-mail from Mr. Carey to Mr. Thompson on August 26th, 2011, at 2:18 p.m.

A       Carey's response is, "Copy.  We're in the fourth floor conference room."

Q       Are you familiar with what the fourth floor of Sheriff's Headquarters Bureau was at the time?

A       Yes.

**UNITED STATES DISTRICT COURT**

Q        What was it?

A        It was the executive floor.  It housed the sheriff, the undersheriff, the assistant sheriffs, and the chiefs of a couple of the regions and their command staff.

Q        Now I'm going to publish for you what's in evidence as Government Exhibit 67.  I just want you to look at this top e-mail that I've highlighted from Greg Thompson to Mickey Manzo and Paul Yoshinaga, August 29, 2011, at 11:46 a.m. re cell phone in INV.  Could you please read what I've highlighted there.

A        It says, "Paul, I'm carping this morning at MCJ.  If you need me, please call 213-4916.  I will be here until 10:30.  Then en route to SHB to meet with you and the sheriff."

Q        Could you please look in the binder that has Exhibit 139 in it.  It's probably the one I asked you to put away a little bit ago.

A        Okay.  I have it.

Q        Do you recognize that?

A        It looks like a variation schematic of the fourth floor.

Q        By fourth floor, you're referring to the fourth floor executive offices in Monterey Park at Sheriff's Headquarters Bureau?

A        Yes.  Sheriff's Headquarters, the Sherman Block Building.

**UNITED STATES DISTRICT COURT**

Q        Is it a true and accurate depiction of the way the fourth floor looked in August and September of 2011?

A        It does appear so, yes.

MR. FOX:  Your Honor, I move for the admission of Government Exhibit 139.

MR. HOCHMAN:  No objection, Your Honor.

THE COURT:  It will be received.

(Marked for identification and received into evidence Exhibit No. 139.)

Q        BY MR. FOX:  I'm going to highlight the area that is in the lower half of this map or this schematic.

Could you please explain to the jury, based on what I've magnified right now, where Mr. Baca's office was during this time.

A        If you look at the far right portion of the highlighted area -- and it's almost in the middle -- you'll see the office of the sheriff in a walkway, the area that leads right off of No. 9 with -- actually, it looks like it says "fourth floor 9" inside the box.  That is the sheriff's office.

Q        Is it what I've just put a red circle around?

A        That is correct.

Q        Where was your office?

A        I had a cubical.  I was just outside.  If you see where it says "Office of the sheriff," you look at the second cubical in, directly above where it says "office" is where I

UNITED STATES DISTRICT COURT

sat.

Q        Do you see my highlighter right now?  Is that where --

A        Yes.

Q        I'm going to put a circle there as well.

And what about Mr. Tanaka's office when he was undersheriff, when he was promoted to undersheriff?  Where was his office at the time?

A        When he became undersheriff, he moved to the undersheriff's office which is bottom center of the page where it says "U/S office."

Q        Have I just circled that now?

A        Yes, you have.

Q        If people were waiting for meetings with Mr. Baca, where would they wait?

A        Referencing my location, if you move to the left, there's one more cubical, and then there's an open space in front of that.  There was actually a chair and two couches in that portion.  That's where visitors would wait for their appointment.

Q        And is it right here that I'm highlighting right now?

A        Yes.  It's pretty much there.  It actually butted up to the cubical.

Q        And the chairs, were there backs to what in this

UNITED STATES DISTRICT COURT

picture is up?

A    I'm sorry.  Could you say that again?

Q    The backs of the chairs, where were the backs of the chairs facing?

A    Well, there's a couch that was backed up against the front of that cubical, and then there was a little coffee table, and then there was another couch that actually faced inward so you could actually sit at the waiting area and converse.

And then at the top, which up by the wall there was tables with plants on it, and then there was a chair there that actually butted up to the wall as well.  So they all faced inward.

Q    Are you familiar with what's called a large EPC room?

A    Yes.

Q    What is EPC, first of all?

A    It stands for Executive Planning Committee.

Q    When you were the aide to Mr. Baca, what would this room be used for?

A    It would regularly be used for the weekly EPC meeting in which the sheriff would address the upper executives of the department so that he could get feedback from them on different events and he could pass on whatever he wanted them to know about and just detailing duties, stuff like that.

UNITED STATES DISTRICT COURT

Q       Other than the EPC weekly meetings, in August and September of 2011, did you see this -- these conference rooms being used?

A       Yes.

Q       Okay.  And who would use them?

A       Well, referencing the people that were coming up, depending on how many people there were -- typically when the sheriff was having an appointment or meetings with individuals, if he was seeing more than four people, it would move from his office over to the EPC room.

Q       Do you see the EPC room on this diagram?

A       Yes, I do.

Q       Where is it?

A       Bottom left.

Q       Is it the one that has "800SF" written on it?

A       Correct.

Q       I've just highlighted that?

A       Yes, you have.

Q       What about small EPC room?  Are you familiar with that?

A       Yes.  That is the room that's directly to the right next to it.  It says "225" in it.

Q       Are you familiar with what the use of the small EPC room was in August and September of 2011?

A       I was never aware of an actual specific purpose

**UNITED STATES DISTRICT COURT**

for it.  It seemed like it was just an impromptu location if nothing else was available.

Q        You mentioned before that Mr. Nee was the aide to the undersheriff.  Was that true not only under Mr. Waldie but also under Mr. Tanaka?

A        Yes.  I believe so.

Q        Where was his seat or cubical during this time?

A        If you reference the undersheriff office and your circle, at the very tip of it, that cubical is where the undersheriff's aides sat.

Q        It looks like there are two seats there.  Did he --

A        He sat on the bottom one.  The top one was occupied by a secretary.

Q        Okay.  So it's what I've just highlighted right now?

A        That's correct.

Q        And if somebody was waiting for a meeting with Mr. Tanaka, where would they wait?

A        There were, I believe, two chairs that were along the wall.  If you look at the No. 6 after undersheriff and then just move upward past the open door, along that wall to the left, go past that door, keep going up, a little bit more.  And then right in there is where those sheriffs were.

Q        Right here?

UNITED STATES DISTRICT COURT

A       Yep.

Q       Okay.  I'll do my best to highlight that.

Is that approximately where they were?

A       Approximately, yes.

Q       Okay.  And were their backs up against this wall that it says "office" and then a little bit below that?

A       Correct.

Q       So if they were sitting in the chairs and someone was proceeding to their right, what are the office spaces that they could go to?  So they observe somebody walking past them as they're sitting down to the right, where could that person be going to?

A       They would either be going to the undersheriff's office or EPC.

Q       During the time that you were Mr. Baca's aide, did he keep a calendar?

A       Yes, he did.

Q       Did he do it personally, or did somebody else do it?

A       No.  It was done by his two scheduling secretaries.

Q       And who were they?

A       One was Julie Montgomery, and his primary was Suzie Martin.

Q       You've described a number of meetings.  Do you

know whether those would necessarily be on his calendar?

A    Not all of them were.

Q    Why not?

A    Because some of them would be impromptu. Something may happen, or somebody might get a phone call, and they would need to come over and talk to the sheriff and advise him about it.

Q    We've discussed the number of meetings that some individuals had with Mr. Baca during this August and September, 2011, time frame.  What about Mr. Tanaka?  How frequently did you observe him meeting with Mr. Baca during this time frame?

MR. HOCHMAN:  Objection.  Asked and answered.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  It varied.  During this time initially it was more often, maybe as many as five times a day. But it was definitely every day for probably two weeks.

Q    BY MR. FOX:  Would these meetings necessarily be referred to in Mr. Baca's calendar?

A    No.

Q    Why not?

A    Because they weren't scheduled ahead of time, and he would be just getting time, or the sheriff would ask for them to come up depending on the situation.  And they wouldn't go through the scheduling process.

**UNITED STATES DISTRICT COURT**

Q       Did you ever overhear what they were talking about during these meetings?

A       No.

Q       Why not?

A       Because they would talk out of earshot, and they would be in an office with -- in an office and possibly with the door closed.

Q       Did you ever hear any outbursts from Mr. Baca or Mr. Tanaka during this time?

A       A couple times.

Q       What did you hear?

A       Just a loud voice being raised.

MR. FOX:  One moment, Your Honor.  No further questions from this witness.

THE COURT:  All right.  Ladies and gentlemen, we're going to take our first break of the day.  I guess it's our first.

Again, I want to remind you, until this trial is over, you're not to discuss this case with anyone including your fellow jurors, members of your family, people involved in the trial, or anyone else.  And do not allow others to discuss the case with you.  This includes discussing the case on the Internet, through chat rooms, blogs, bulletin boards, social media, e-mails or text messages.

If anyone tries to communicate with you about

1292

this case or anyone associated with it, please let me know about it immediately.

Do not do any research such as consulting dictionaries, searching the Internet or using other reference materials, and do not make any investigation about the case on your own.

Finally, you're reminded to keep an open mind until all of the evidence has been received, you've heard the arguments of counsel, the instructions of the Court, and the views of your fellow jurors.

If you need to speak with me, simply give a note to the clerk.

We'll come back at 5 after the hour.

(The following proceedings were held in open court out of the presence of the jury:)

THE COURT:  All right, sir.  You may step down.

MR. FOX:  Your Honor, counsel for Mr. Faturechi is here, and I think that she would just like, before we have the jury come out with the witness on the stand, to be able to ask you about objections.  I don't know if you want to do that when you come back after the break or when.

THE COURT:  Okay.

MR. FOX:  Do you want me to find her?

THE COURT:  If she's not here, we'll do it after the break.

**UNITED STATES DISTRICT COURT**

MR. FOX: Okay. She was here. I think she's probably in the witness room right now.

THE COURT: Okay.

MS. SAGER: Good morning, Your Honor.

THE COURT: Good morning.

MS. SAGER: Kellie Sager for non-party journalist Robert Faturechi. I always mispronounce his name.

Before the jury came in and he took the stand, I just wanted to raise with the Court, as I had mentioned before, I would appreciate the opportunity to object to questions on his behalf if it delves into areas that go beyond the published information which we think would interfere with his 1st Amendment rights.

I hope that there won't be questions like that, but in the event that one side or the other delves beyond what I understand the Court has ordered, I would like an opportunity to object.

THE COURT: That's fine. We'll find a place where you can sit. And if you'll -- I'll let you and the lawyers see if you can work out some procedure that everybody can live with. If not, I'll devise something that allows you to get my attention and then we can hear your objection.

MS. SAGER: Thank you, Your Honor. And I'm happy to use whatever language. I obviously don't want to make a speech in front of the jury. But to preserve the objection for

the record, I would simply say that on 1st Amendment grounds we object, and hopefully that would preserve it and the Court would understand what the purpose is of the objection.

THE COURT:  Okay.  And as I understand it -- well, do you know now if that's going to be the only objection you're going to be making?

MS. SAGER:  Unless somebody is asking for communications with counsel, Your Honor, I don't expect to make any other objections.

THE COURT:  Okay.

MS. SAGER:  If there's hearsay or other things, I'm assume the parties will make any objections they want on other issues, but only privilege would be the subject matter of my objections.

THE COURT:  All right.  So we'll just assume, if you have an objection, that it's on 1st Amendment grounds, and we'll figure out where you sit.  I'll keep an eye out.  If you just raise your hand, and then we'll take it at sidebar.  If it looks like it's going to be a lot, then we'll adjust.  We'll make some change.

MS. SAGER:  Thank you, Your Honor.  And I can sit here if that would be convenient for the Court and the parties just so that I'm not in anyone's way.

THE COURT:  That's fine.

MR. FOX:  Your Honor, I told Ms. Sager and I told

the Court it's only my intention to get out the published information. I'm not sure if Mr. Hochman has different intentions or if Mr. Diamantatos has different intentions, but that's all I'm going to do.

THE COURT: Okay.

MS. SAGER: Is the jury going to be told anything about this witness' testimony and the limits of it or not?

THE COURT: No.

MS. SAGER: The only other thing I would raise with the Court is, if there's an open-ended question, I understand that counsel is going to say he's only eliciting information that's published.

If there's an open-ended question, the witness may make that clear as well and not to -- we don't want to talk about what's in the article, but he may feel like he needs to make clear that his answer is published information even if there might be other information that he knows that was not published, that he's restricting his answer to the published information, and that's what counsel is eliciting. I don't know if I said that very articulately.

MR. HOCHMAN: Your Honor, just to front part of the cross, if you read the article -- well, in reading the article, you'll see that Mr. Faturechi uses quotes on some of the statements, Your Honor, and doesn't have quotes on others and references sources in between.

**UNITED STATES DISTRICT COURT**

So whether or not he's actually referring to something that Mr. Baca told him or some source told him and he's interspersing statements that may or may not appear to be associated with Mr. Baca, but when pressed, he would indicate it's not Mr. Baca but some other source, I obviously don't know his answer.  I haven't had a chance to interview him, Your Honor.

But I want to make it clear that I'll certainly be going into that area to determine what is exactly something coming from Mr. Baca and what is something that might have come from some other source.

MR. FOX:  Your Honor, I'm not going to be introducing the article.  So it's just going to be his recollection of the statements Mr. Baca made to him.  So I don't think this is going to be an appropriate area of cross given the article is not coming in.  We can deal with it at the time though.

MS. SAGER:  The simplest thing, Your Honor -- and I know that we're trying not to have leading questions from the Government or hearsay coming into the record.

Often asking the reporter if a statement in the article is accurate, then that enables him to answer the question without getting beyond the scope of the article if that's an easy way for the parties to proceed.  He can answer if the statement in the article that is in quote marks is

**UNITED STATES DISTRICT COURT**

something that Mr. Baca said.  If it's not in quote marks, it may have been paraphrased, and counsel may ask whether that's something that was said.

But to make it as easy as possible for the Court, I would rather not object at all.  I would be happy to not have to object to any questions.  But if the witness is asked is there anything else that you were told by Mr. Baca, that kind of open-ended question is going to cause, in his mind, an inquiry about whether someone is asking him about what's in the article or something that's not in the article.  And that's why we're trying to figure out a way of proceeding that's as least obtrusive and interfering as possible.

THE COURT:  Well, what I understand defense counsel to be saying is that I think he wants to make sure that the statements that he's asked about are statements that were made by Mr. Baca which, I think, is fair.

And since counsel doesn't intend to introduce the article, I'm not sure we're going to -- I'm not sure we're going to have any issues because I'm going to keep the cross-examination limited to what's raised in the direct.

MS. SAGER:  Thank you, Your Honor.

MR. DIAMANTATOS:  Thank you, Your Honor.

(A recess was taken at 9:56 a.m.)

THE COURT:  All right.  Let's bring the jury in.

///

**UNITED STATES DISTRICT COURT**

(The following proceedings were held in

open court in the presence of the jury:)

THE COURT:  All right.  Let's resume.

**CROSS-EXAMINATION**

BY MR. HOCHMAN:

Q      Mr. Hannemann, you were Sheriff Baca's executive aide from approximately January, 2011 to May, 2013; is that correct?

A      That's correct.

Q      But you've been with the department for 28 years since about 1989?

A      Correct.

Q      Now, before you were Sheriff Baca's executive aide, did you go to the sheriff's academy?

A      Yes, I did.

Q      After that, did you go to some jail facility to work as a deputy?

A      Yes, I did.

Q      Which one was that?

A      It was Pitchess Detention Center south facility.

Q      And after that, did you go to a patrol station?

A      Yes, I did.

Q      Which one was that?

A      I went to Firestone Station first.

Q      And what was the next one?

A        Then I went to Century Station.

Q        Did you go to another patrol station after that or somewhere else?

A        I went to Training Bureau as a use-of-force instructor.

Q        At some point were you promoted to a sergeant?

A        I promoted to sergeant from that unit.

Q        Did you go to another station at that point?

A        I did go to another patrol station.  I went to Lakewood Station.

Q        Did you go to one more station after that?

A        Yes, I did.

Q        What was that?

A        I went to Cerritos Station.

Q        Did you finally end up in narcotics bureau?

A        Yes, I did.  From Cerritos Station I went to Narcotics Bureau.

Q        After Narcotics Bureau, that's when you became executive aide to Sheriff Baca; is that correct?

A        That is correct.

Q        Now, when you became the executive aide to Sheriff Baca, you said that you were sort of a jack of all trades; is that correct?

A        Correct.

Q        You were Sheriff Baca's back-up driver.

**UNITED STATES DISTRICT COURT**

A       Yes.

Q       And what other types of functions did you function as?

A       I would also author correspondence.  I forgot to mention that before.  The sheriff's office in-took a lot of different types of paperwork.  Some of it required responses. And we also would do certificate proclamations for Eagle Scouts, letters of recognition, things of that nature.  That was some of my primary duties.  I did a lot of that.

Q       You were with the sheriff a lot of time during that time period; correct?

A       On the days when he was in the office, yes.

Q       And you were able to observe the hours that he kept while he was sheriff while you were his executive aide?

A       Yes, I did.

Q       What were they?

A       He typically started at 9:00 o'clock in the morning and would conclude the day somewhere between 9:00 and 11:00 p.m. depending on when the last event would end.

Q       So roughly 12 to 14 hours a day?

A       Yes, sir.

Q       How many days a week?

A       That was the average Monday through Friday. Saturdays and Sundays he had events, but it varied.  It might be a 2- to 4-hour workday or 10- to 14-hour workday.  It kind

of depended.  The ones that had the most regularity were Monday through Friday.

Q        As the sheriff's executive aide, you were familiar with the different types of responsibilities he had for what was going on in the sheriff's department; is that correct?

A        Some of them, yes.  I would imagine there was probably some I didn't know.

Q        Well, the sheriff -- I'm focusing on the period from January to September of 2011.

A        Okay.

Q        The sheriff was in charge of patrol stations; is that correct?

MR. FOX:  Objection to that time frame. Relevance of that time frame.  Your Honor, if I might have one moment with counsel.

(Counsel confer.)

MR. FOX:  Your Honor, I've conferred with counsel.  I'll withdraw the objection to that question.

THE COURT:  All right.

THE WITNESS:  Could you repeat the question?

Q        BY MR. HOCHMAN:  Yes.  The sheriff was in charge of patrol stations throughout the county; correct?

A        Yes, he was.

Q        And that would include the Altadena Station?

1302

A       Yes, it would.

Q       The Crescenta Valley Station?

A       Yes.

Q       The East Los Angeles Station?

A       Yes.

Q       The Lancaster Station?

A       Yes.

Q       The Malibu Lost Hills Station?

A       Yes.

Q       The Palmdale Station?

A       Yes.

Q       The Santa Clarita Valley Station?

A       Yes.

Q       The Temple Station?

A       Yes.

Q       The Avalon Station?

A       Yes.

Q       The Century Station?

A       Yes.

Q       The Carson --

MR. FOX:  Objection, Your Honor.  Relevance at this point.

THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  He was also in charge of certain detective divisions; is that correct?

UNITED STATES DISTRICT COURT

A        Of detective division, yes.

Q        And there were five different detective divisions; is that correct?

A        There are bureaus within the detective division.

Q        And were there five different bureaus within the detective division?

A        Yes.

Q        And they ranged from homicide to narcotics; correct?

A        Correct.

Q        And there were 23 patrol stations.  I didn't go through all 23, but there are 23 patrol stations at that time; correct?

A        Correct.

Q        And also there was a Homeland Security division that the sheriff was in charge of; is that correct?

A        That is correct.

Q        And that has different bureaus ranging from Emergency Operations Bureau to the Special Enforcement Bureau.

A        That is correct.

Q        And he was also in charge of court services division; is that correct?

A        That is correct.

Q        And that had different bureaus ranging from court services to transportation to civil management; correct?

1304

A       That is correct.

Q       He was also in charge of the custody operations division; is that correct?

A       That is correct.

Q       And that had custody facilities ranging from the Men's Central Jail and Twin Towers to that Pitchess Center that you worked at; correct?

A       Correct.

Q       And he was also in charge of the leadership and training division; is that right?

A       That is correct.

Q       And that ranged from financial programs to the Training Bureau to facilities planning; correct?

A       That is correct.

Q       And he was also in charge of the technical services division; is that correct?

A       That is correct.

Q       And that ranged from crime analysis to data systems to scientific services; is that right?

A       Yes.

Q       And he was also in charge of the Internal Affairs Bureau and the Internal Criminal Investigations Bureau; is that correct?

A       That is correct.

Q       Now, in addition to -- and there was

**UNITED STATES DISTRICT COURT**

approximately 18,000 employees at the sheriff's department during this time?

A       That is correct.

Q       About 9,000 sworn detectives; is that right?

A       Sworn personnel.

Q       And approximately 9,000 civilians or non-sworn personnel?

A       Professional staff, yes.

Q       And professional staff is everything from maintenance to IT and technology and stuff like that; is that correct?

A       That is correct.

Q       Now, in addition to what the sheriff was responsible for inside the sheriff's division, he was also the elected sheriff; is that correct?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  Well, you said that Mr. Tanaka and Sheriff Baca were having meetings; correct?

A       Yes.

Q       And Mr. Tanaka is the No. 2 person in the department; correct?

A       Yes.

Q       So everything that you've just been discussing that the sheriff is in charge of, he's in charge of as well; is

that correct?

A     Correct.

Q     And did the sheriff and Mr. Tanaka also have to deal with community organizations out in Los Angeles County?

A     Periodically.

Q     And did they also deal with religious organizations?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

Q     BY MR. HOCHMAN:  Well, you testified that Mr. Tanaka and Sheriff Baca were having certain discussions behind closed doors; correct?

A     Correct.

Q     Do you know if any of those discussions were concerning all this responsibility that Sheriff Baca and Mr. Tanaka shared or anything else?  Do you have any idea what those discussions entailed?

A     Not always.

Q     And these -- and that's because you're not actually in the room when these discussions are taking place, at least the ones we've been talking about?

A     Correct.

Q     Now, with respect to -- I just want to make it clear that, when you're talking about -- we went through a couple examples.  But the sheriff also is in charge of

UNITED STATES DISTRICT COURT

providing law enforcement for superior courts; is that right?

A       That is correct.

Q       And he was also in charge of providing law enforcement for the Metropolitan Transit District; is that correct?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  Now, you said that you were familiar with Mr. Tanaka when you started working for Sheriff Baca as an executive aide; is that correct?

A       I'm not sure how familiar I -- you are trying to imply.  I knew who he was, but we're not somebody that ever worked together.

Q       So did you know that Mr. Tanaka was a CPA, a certified public accountant?

MR. FOX:  Objection to the form of the question.

THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  Did you have any information about whether or not Mr. Tanaka was a certified public accountant?

MR. FOX:  Objection to relevance as well.

THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  Did you know whether or not Mr. Tanaka worked on the budget of the Los Angeles County Sheriff's Department?

A    Yes.  I was told he did that when he was a chief.

Q    And do you know if he's also worked on it when he was the assistant sheriff or undersheriff during this time period?

A    I was always under the understanding that, once he initially worked on it as a chief, he kept an eye on it.

Q    And did you observe whether or not your position as the executive aide for Sheriff Baca, whether or not Mr. Tanaka would promote people who were loyal to him?

A    Mr. Tanaka would refer people, and ultimately promotions had to be approved by the sheriff.

Q    And when you say "Mr. Tanaka would refer people," would he refer these people to Sheriff Baca for the final okay?

A    Correct.

Q    Now, when you spoke about e-mails, you talked about Sheriff Baca receiving a lot of e-mails every day; is that correct?

A    Yes.

Q    And these would be e-mails that you and the commander who was working with you would go through to see which ones would actually go to the sheriff and which ones would go to other parts in the department; is that correct?

A    That is correct.

Q    Now, when the sheriff is actually in the office and Mr. Fox gave you schematics of where the sheriff sat and

where the undersheriff sat, did Mr. -- Sheriff Baca actually sit a lot in his office?

A       No, he did not.  The only time he would sit in his office was during a meeting with people.  But to sit in his office and do paperwork, that rarely happened.

Q       Where was he?

A       If you reference the schematic of the office layout --

MR. FOX:  May I ask that that schematic be placed back on the screen if possible, please, Mr. Hochman.

Q       BY MR. HOCHMAN:  So we're going to highlight, again, the -- blow up a little of the same area that Mr. Fox was showing you so that you could just indicate for us where Sheriff Baca would stand when he was in the office?

A       If you reference the area where it says "office of the sheriff" to the lower right section of the highlight and then it's got the circled No. 9, above it are the cubicles.

Q       Okay.

A       All but the very last section to the left, those walls that bordered that walkway were actually desks.  It had a desktop flat top.  It was about a foot and a half wide.  So it was basically -- that whole area was standing desks.  And we would put things up there for the sheriff to see.  We kept a copy of the calendar up there.  And that's where his "read" folders were placed, and he would go back and forth between

meetings and do his correspondence there.

Q       Did you -- and the sheriff actually would spend a decent amount of time in this sort of standing desk area. Would that be accurate?

A       When he wasn't obligated with another meeting or an appearance event, yes, that's where he was at probably 90 percent of the time.

Q       Did the sheriff have a computer in his office, if you're aware?

A       He did not.

Q       Was he sort of old school, didn't use computers, you know, wrote out things by hand, stuff like that?

A       Yes, he was.  Yes, he is.

Q       Now, when Mr. Tanaka would meet with Sheriff Baca in your presence, was Mr. Tanaka very respectful toward Sheriff Baca?

A       Yes, he was.

Q       And did you have the occasion to go with Sheriff Baca to the Men's Central Jail during this time period of January to September, 2011?

A       Yes.

Q       What was the reason that you went with Sheriff Baca to the Men's Central Jail during this time period?

A       I don't remember the exact reason for the meeting, but the sheriff was addressing deputies on career

survival, doing the right thing, respecting the department. The core values were very big to the sheriff. He would always stress them. So it was just -- it was a motivational-type speech visit.

Q    What were the core values?

A    I cannot cite them, but it's a guideline of things that we should aspire to do and how we should be.

Q    And is that something that you would learn as well in the academy?

A    They do now, yes.

Q    And do you know if the core values were actually posted at the jails?

A    Yes, they were. They're on the walls.

Q    Now, with respect to the Twin Towers, did you ever go with Mr. Baca to the Twin Towers during this time period frame of January to September, 2011?

A    I drove Sheriff Baca there once, yes.

Q    What happened when you got there?

A    We were greeted by supervisory personnel at Twin Towers because the sheriff had received a report --

MR. FOX:  Objection to hearsay, Your Honor.

THE COURT:  Sustained.

Q    BY MR. HOCHMAN:  Are you aware of whether or not the sheriff received an ACLU complaint dealing with the Twin Towers in approximately February of 2011?

UNITED STATES DISTRICT COURT

A    Yes.

Q    And after he received that complaint -- was that complaint concerning Ms. Esther Lim seeing some inmates being abused at the Twin Towers?

A    I remember the incident but not the name.

Q    Well, did it involve an ACLU person observing abuse of an inmate at Twin Towers?

A    Yes.

Q    And did Sheriff Baca go to the Twin Towers to actually go to the very area where the ACLU person had observed the inmate abuse to see for himself?

A    Yes.

Q    Did you go with him?

A    Yes.

Q    What did you and Sheriff Baca do together when you got there?

MR. FOX:  Objection.  Vague.

THE COURT:  Overruled.

Do you understand the question?

THE WITNESS:  Yes, sir.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  The supervisory personnel had told the sheriff that there was an ongoing force investigation, and they pointed out where it had happened.  It was just outside of

**UNITED STATES DISTRICT COURT**

a dorm room in partial view of the visiting center for that floor. And the ACLU lawyer had alleged that she saw the entire use of force from the second position in this visiting center.

Q    BY MR. HOCHMAN:  And did you go yourself with Sheriff Baca into the area where the ACLU lawyer was and then on the other side where the actual abuse alleged to have occurred?

A    Yes.

Q    And were you able to make an observation of whether or not the ACLU lawyer was able to observe everything she claimed to have observed?

MR. FOX:  Objection to foundation, Your Honor.

THE COURT:  Sustained.

Q    BY MR. HOCHMAN:  So you were aware -- were you aware of the allegations that the ACLU lawyer made concerning that particular incident?

A    Yes.

Q    And did you place yourself in the section where the ACLU lawyer was when she said she could see the incident to determine whether or not it was possible from that position to see what she claimed?

MR. FOX:  Objection to foundation, Your Honor.

THE COURT:  Sustained.

Q    BY MR. HOCHMAN:  Did you stand in the same spot at the Twin Towers that the ACLU lawyer had claimed to stand

in?

MR. FOX:  Objection to foundation, Your Honor.

THE COURT:  Sustained.

Q    BY MR. HOCHMAN:  Did you go to the area where the ACLU lawyer claimed to have been standing when she observed the incident?

MR. FOX:  Objection to foundation, Your Honor.

THE COURT:  Sustained.

Q    BY MR. HOCHMAN:  When you read the ACLU complaint that the ACLU lawyer made, did she specify a particular area in the Twin Towers facility where she was standing when she observed the incident?

A    That's not how I was advised how she -- where she was located.

Q    How were you advised?

MR. FOX:  Objection, Your Honor.  Hearsay.

THE COURT:  Sustained.

Q    BY MR. HOCHMAN:  Where did you exactly go when you went to the Twin Towers facility?

A    I went up to the floor where the alleged use of force took place accompanying Sheriff Baca along with the supervision from Twin Towers.  We were walked around in the exterior dayroom behind the dorm patrol officer booth.  We were shown where the use of force took place.

MR. FOX:  Objection.

**UNITED STATES DISTRICT COURT**

THE COURT:  Next question.

MR. FOX:  Sorry, Your Honor?

THE COURT:  I was going to say next question.

MR. FOX:  Thank you, Your Honor.

Q      BY MR. HOCHMAN:  Did you at some point go -- walk yourself to a particular location in the visiting room?

A      Yes.

Q      What were you able to see at that point?

A      We could see a good portion of the dayroom area but not all of it.

Q      And are you aware whether or not the ACLU lawyer claimed to see all of that dayroom as opposed to just a portion?

MR. FOX:  Objection to foundation.

THE COURT:  Sustained.

MR. HOCHMAN:  I'll move on, Your Honor.

Q      Now, you said that one of the things that started to get busy in September of 2011 was that a task force got formed that month; is that correct?

A      Correct.

Q      And that was a task force formed by Sheriff Baca; is that correct?

A      I'm under that understanding, yes.

Q      And that was a task force that looked into the incidents of alleged inmate abuse that the ACLU had been

1316

making; is that correct?

A       Correct.

Q       And as part of that task force, they actually had to get all the use-of-force reports for the inmates that had made allegations against the sheriff's department as transmitted by the ACLU; is that correct?

A       Correct.

Q       Now, you said during that time period -- and again, I want to focus sort of on the July to September, 2011, time period.

You saw various people coming and going into the -- Sheriff Baca's office and Mr. Tanaka's office; is that correct?

A       Correct.

Q       Now, let's start with Steve Leavins. Steve Leavins was Mr. Tanaka's former assistant; is that correct?

A       Yes.  He was his former aide.

Q       His former aide.  Sort of what you were for Sheriff Baca, Mr. Leavins was for Mr. Tanaka; is that correct?

A       Correct.

Q       And Mr. Leavins would come and speak with Mr. -- go into Mr. Tanaka's office during this time period of August to September, 2011; is that correct?

A       Yes.

**UNITED STATES DISTRICT COURT**

Q       And again, when that door was shut, you couldn't actually hear what Mr. Leavins and Mr. Tanaka were discussing; is that correct?

A       That's correct.

Q       And Mr. Thompson, Greg Thompson, Lieutenant Greg Thompson, are you aware that he went back and had dealings with Mr. -- excuse me -- Mr. Tanaka back to the 1980's?

MR. FOX:  Objection to the form of the question.

THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  Are you aware of Lieutenant Thompson's past relationships with Mr. Tanaka before 2011?

A       No.

Q       And you saw Lieutenant Thompson go and meet with Mr. Tanaka in his office during this time period; correct?

A       Correct.

Q       And again, when the door was shut, you don't know what Mr. Thompson is saying to Mr. Tanaka; correct?

A       Correct.

Q       And then you said that as well Lieutenant Thompson and Lieutenant Leavins would also meet with Sheriff Baca; is that correct?

A       Correct.

Q       And then there was even meetings where there was

**UNITED STATES DISTRICT COURT**

all of them -- Leavins, Thompson, Tanaka, and Baca -- in the same meeting; is that correct?

A     Correct.

Q     And you don't know what they're discussing because the door is shut; correct?

A     Correct.

Q     And also, Mr. Carey -- you described Mr. Carey, Captain Carey, having meetings with Mr. Tanaka as well; is that correct?

A     That's correct.

Q     And again, you don't know what was said in those meetings because the door was shut; is that correct?

A     That's correct.

Q     You talked about Sheriff Baca's calendar.  Do you remember that?

A     Yes.

Q     And with respect to his calendar, you said that the official calendar might not have everything that occurred during Sheriff Baca's day; is that correct?

A     That's correct.

Q     Because Sheriff Baca, again, would have the responsibility for everything we discussed in the department; correct?

A     That's correct.

Q     And he would also have the responsibility for

UNITED STATES DISTRICT COURT

everything outside the department, for instance, meeting with elected leaders; is that correct?

A       Yes.

Q       And he would meet with nonprofit organizations as well; is that right?

MR. FOX:  Objection.  Relevance and cumulative at this point.

THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  Well, a lot of these meetings he's having with these outside organizations also wouldn't always show up on his calendar; is that correct?

A       I'm sorry.  Could you say that again?

Q       A lot of the meetings that Sheriff Baca is having with these outside organizations also wouldn't show up on his calendar; is that correct?

A       No.  It's my understanding that, when someone from the outside was having a meeting with him, it would be prearranged and it would be scheduled.

Q       And to the extent that there was an impromptu meeting, a meeting that occurred the same day, would it actually get retroactively put on the calendar?

A       Again, if it's an outsider, it would be prescheduled and arranged.  The impromptu's are departmental executives, and they would not be put on the calendar.

Q       Would you actually go with Sheriff Baca when he

would go outside the sheriff's department to these type of outside meetings?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

Q    BY MR. HOCHMAN:  And in the August and September, 2011 time period, did you ever hear anyone order any sheriff's department personnel not to cooperate with the FBI?

A    No.

MR. HOCHMAN:  No further questions.

MR. FOX:  Your Honor, may I ask some questions of Mr. Hannemann at this time?

THE COURT:  Yes.

MR. FOX:  Thank you.

### REDIRECT EXAMINATION

BY MR. FOX:

Q    Mr. Hannemann, Mr. Hochman was asking you questions about all these meetings that were occurring in Mr. Tanaka's office.  Was Steve Leavins also having meetings in Mr. Baca's office at this time?

A    At times.

Q    That would not be in the standing desk area. That would actually be in his office?

A    Correct.

Q    And generally, when Steve Leavins was meeting with Mr. Baca during this time, would Mr. Baca's door be open

or closed?

A     It depended.

Q     What about Greg Thompson?  You mentioned in questioning from Mr. Hochman whether Mr. Thompson met with Mr. Tanaka during this time.  Did he also meet with Mr. Baca during this period of time?

A     I don't remember Lieutenant Thompson meeting with the sheriff by himself.

Q     Who was he meeting with Mr. Baca with?

A     The ones I remember, he was with Steve Leavins, Undersheriff Tanaka, and possibly Captain Carey.

Q     Would these occur in Mr. Baca's office or one of the conference rooms?

A     I think both.

Q     So it would not be by the standing desk area?

A     Never.

Q     Would the doors generally be opened or closed during these meetings?

A     Those were typically closed.

Q     What about Tom Carey?  Was he also meeting separately with Mr. Baca at this time?

A     No.

Q     Who was he meeting with when he met with Mr. Baca?

A     He would usually have Steve Leavins with him and

Assistant Sheriff Tanaka.

Q    Where would they meet?

A    If it was just those four total, it would be in the sheriff's office.  But if there was anybody else, they would go over to the EPC.

MR. FOX:  One moment, Your Honor.  No further questions.

MR. HOCHMAN:  No further questions, Your Honor.

THE COURT:  All right.  You may step down.

Call your next witness.

MR. FOX:  Robert Faturechi, Your Honor.  The United States calls Robert Faturechi.

THE CLERK:  Please stand here for me, please. Raise your right hand.

Do you solemnly state that the testimony you may give in the cause now pending before this court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  Yes.

THE CLERK:  Please be seated.

Will you please state your full name and spell your last name for the record.

THE WITNESS:  Robert Faturechi, F-a-t-u-r-e-c-h-i.

THE CLERK:  Thank you.

**UNITED STATES DISTRICT COURT**

MR. FOX:  May I proceed, Your Honor?

THE COURT:  Yes.

**ROBERT FATURECHI,**

**GOVERNMENT'S WITNESS, SWORN:**

**DIRECT EXAMINATION**

BY MR. FOX:

Q       Mr. Faturechi, what do you do for a living?

A       I am a reporter.

Q       Who do you work for?

A       *ProPublica*.

Q       What is *ProPublica*?

A       It is an investigative journalism nonprofit based in New York.

Q       What did you do before working for *ProPublica*?

A       I was a reporter for the *L.A. Times*.

Q       Did you have a particular beat?

A       For most of my time there, my beat was L.A. County Sheriff's Department.

Q       Why are you here today?

A       Because I was subpoenaed.

Q       Did you do anything to try to avoid testifying today?

MR. HOCHMAN:  Objection.  Relevance.

THE COURT:  Sustained.

Q       BY MR. FOX:  Mr. Faturechi, if you don't mind

**UNITED STATES DISTRICT COURT**

1324

looking in an exhibit binder that contains Exhibit 154 -- there are three of them, one next to you and two on the shelf.  I'm not sure which one has 154.  I just want you to look at this for identification purposes.

A        Okay.  154.

(Marked for identification Exhibit No. 154.)

Q        BY MR. FOX:  Do you recognize that?

A        Yes.

Q        What is it?

THE COURT:  Excuse me, one moment.  Let's go to sidebar.

(The following proceedings were held at sidebar:)

THE COURT:  There was an objection.  I think the question was asked did the witness attempt to do anything to avoid testifying, and there was an objection which I sustained. Does the Government want to be heard on that issue?

MR. FOX:  Sure, Your Honor.  I believe that it goes to Mr. Faturechi's state of mind today, whether he's cooperating or not.  I don't know if he's going to be refusing to answer certain questions or not.  And I think that, as he forms his answers to these questions, that it will help the jury understand whether he's telling the truth or not or whether he's being evasive and why he's being evasive.  That's why I believe it's appropriate.

MR. HOCHMAN:  Your Honor, because I didn't know

**UNITED STATES DISTRICT COURT**

what the answer would be, I didn't know if he would say, look, I got my 1st Amendment lawyer here ready to object which I think would be inappropriate or -- again, because -- because the variety of answers, some of which could be completely unobjectionable and some would be objectionable, that is the basis for my objection.

THE COURT:  Okay.  I'm going to reverse my ruling and allow him to answer that question.

(The following proceedings were held in open court in the presence of the jury:)

MR. FOX:  May I proceed, Your Honor?

THE COURT:  Yes.

Q       BY MR. FOX:  Mr. Faturechi, what, if anything, did you do to try to avoid testifying here today?

A       Our attorneys worked to quash the subpoena.

Q       I just had you look at Exhibit 154.  I'm not asking to introduce it into evidence.  I just want to know if you recognize that exhibit.

A       Yes.

Q       What is it?

A       A newspaper article.

Q       Who wrote that article?

A       Me.

Q       What is the date of that article?

A       September 29, 2011.

UNITED STATES DISTRICT COURT

1326

Q        Did you interview -- well, first of all, are you familiar with Leroy Baca?

A        Yes.

Q        Did you interview Mr. Baca for purposes of writing that article?

A        Yes.

Q        When did you interview him?

A        September 28, 2011.

Q        Was this in person or on the telephone?

A        In person.

Q        Where did it occur?

A        At the headquarters for the L.A. County Sheriff's Department at the time.

Q        Was anyone else present when you were interviewing Mr. Baca?

A        Can you define "present"?

Q        If I understand you correctly, you were having a conversation with Mr. Baca.  Was anyone in there participating in the conversation?

A        No one else was participating in the conversation.

Q        What was generally the subject matter of the interview?

A        The FBI investigation into inmate abuse and other issues at the L.A. County jails and, you know, the FBI sting,

**UNITED STATES DISTRICT COURT**

and the response to that.

Q    What, if anything, did Mr. Baca tell you about his knowledge of an inmate who was using pay phones within the Men's Central Jail?

MS. SAGER:  Your Honor, subject to the prior discussion about the objection, the limitation on Mr. Faturechi's testimony.

THE COURT:  All right.  Ladies and gentlemen, the witness has a lawyer here today, Ms. Sager, who may from time to time object.  She's not affiliated with either of the parties here.

MR. FOX:  Your Honor, I believe Ms. Sager wants me to clarify something with this witness, and I'm happy to do that.

THE COURT:  All right.

Q    BY MR. FOX:  Mr. Faturechi, is it your understanding that what I'm trying to elicit from you is what you've published previously and nothing that you have heard that you did not publish?  Is that appropriate?

What I want to hear about this conversation that you had with Mr. Baca is only something that you published in one form or another.

Do you understand that?

A    Yes.  Only published.

Q    And with respect to the question that I just

1328

asked you, what, if anything, did Mr. Baca tell you about what the inmate in Men's Central Jail was doing with respect to the FBI?

A    That he was working as an informant for the FBI.

Q    What, if anything, did Mr. Baca tell you about the informant's use of pay phones at Men's Central Jail?

A    That he had been given a cell phone by his FBI handlers indirectly so that he could communicate with them about what was happening inside.

Q    What, if anything, did Mr. Baca tell you about a list that the informant was creating, compiling?

A    That he was creating a list of deputy names.

Q    What, if anything, did Mr. Baca tell you about what he believed the inmate was doing with that list of deputy names?  Who he was writing it for?

A    The FBI.

Q    What, if anything, did Mr. Baca tell you about what the FBI did with respect to the deputy who had allegedly smuggled in the telephone?

A    I'm sorry.  Can you repeat the question?

Q    Sure.  What, if anything -- let me back up, actually.

Are you familiar with the name Gilbert Michel?

A    Yes.

Q    And did you discuss Gilbert Michel with Mr. Baca?

UNITED STATES DISTRICT COURT

A        I discussed the deputy at the center of the sting with Sheriff Baca.

Q        Okay.  And with respect to that deputy at the center of the sting, what, if anything, did Mr. Baca tell you that the FBI had done with respect to this deputy?

A        That they had tried to flip him upon learning about what was going on in regards to the FBI.

Q        What, if anything, did Mr. Baca tell you about where this flip attempt occurred?

A        Can I review the article?

Q        Would it refresh your recollection as to whether this was published information if you reviewed the article?

A        Yes.  I just want to make sure that it's published information.

MR. FOX:  Your Honor, may I direct the witness to a certain paragraph in that article?

THE COURT:  Yes.

Q        BY MR. FOX:  At the bottom of the first page, the second paragraph up.

A        The second to the last paragraph?

Q        Correct.

THE COURT:  Just read that to yourself, and let us know when you've finished.

THE WITNESS:  The second to the last paragraph has nothing to do with that.

UNITED STATES DISTRICT COURT

MR. FOX:  Starting, if we're looking to -- do you see a paragraph that starts with "After the FBI"?

A        Yes.

Q        Okay.  Can you read that line and the next line to yourself, and please tell me if that refreshes your recollection.

A        Yes.  So it is published that it was at his home.

Q        And we've discussed now on two answers the term "flip."  Do you have an understanding as to what that term means?

A        As we publish that, that term means turning someone into an informant.

Q        Did you speak to Mr. Baca about what the sheriff deputies had done in response to the federal undercover investigation?

A        Yes.

Q        What, if anything, did Mr. Baca tell you about what two investigators had done with respect to the FBI agent involved in the investigation?

A        That they went to her home.

Q        What, if anything, did Mr. Baca tell you about the agent's response when these investigators went to her house?

A        Can you be more specific?

Q        Did Mr. Baca tell you what the FBI agents told

the investigators who had gone to her house?

A    She referred them to, you know, her superiors.

Q    What, if anything, did Mr. Baca say about whether the encounter with the FBI agent was intended to intimidate her?

A    He said that the way that the FBI did it was substantial.  It involved substantially more intimidating tactics.

Q    With respect to the deputy that the FBI had approached?

A    Yes.  You know, comparing the agent's approach to the deputy versus the deputies' approach to the other agent.

Q    Did Mr. Baca tell you whether he knew ahead of time that the investigators were going to be going out to the FBI agent's home?

A    Yes.

Q    What did he say?

A    That he did.

Q    Did he say whether he had directed this to happen?

A    Yes.

Q    What did he say?

A    That he did.

MR. FOX:  One moment, Your Honor.

I have no further questions for this witness.

THE COURT:  Cross-examination.

MR. HOCHMAN:  Yes, Your Honor.

**CROSS-EXAMINATION**

BY MR. HOCHMAN:

Q      Mr. Faturechi, when you were talking at the beginning of your testimony and you said that your attorneys have worked to quash a subpoena, I'm not your attorney; correct?

A      No.

Q      None of Mr. Baca's attorneys are your attorneys; correct?

A      Yes.  Correct.

Q      So I'm not -- let's start over.

I'm not your attorney; correct?

A      You are not my attorney.

Q      None of Mr. Baca's attorneys are your attorney; is that correct?

A      That is correct.

Q      Your attorney is Kelli Sager to the -- in this court to my left; is that correct?

A      Yes.

Q      Is she your personal attorney, or does she represent the *Los Angeles Times*, do you know?

A      You know, I'm not a legal expert.  She represents both of us.

1333

Q      And Mr. -- Sheriff Baca took absolutely no action to prevent you from testifying here today; correct?

A      I'm sorry?

Q      Sheriff Baca took absolutely no action to prevent you from testifying here today; is that correct?

A      That is correct.

Q      And Sheriff Baca's attorneys, myself and the other counsel, took absolutely no action to prevent you from testifying here today; is that correct?

MR. FOX:  Objection.  Foundation.

THE COURT:  Sustained.

Q      BY MR. HOCHMAN:  Are you aware of any of Sheriff Baca's attorneys taking any action to prevent you from --

THE COURT:  That's sustained, counsel.  Move on.

Q      BY MR. HOCHMAN:  Now, with respect to the -- you're testifying here in December of 2016 about your memory of events that happened on September 28th, 2011; is that correct?

A      Yes.

Q      And by the time that you're interviewing Sheriff Baca on September 28, 2011, that's two days after the September 26th, 2011, approach of the sheriff's investigators to Leah Marx at her home; is that correct?

A      I do not recall the date of that approach.

Q      Well, the date of the approach was before

UNITED STATES DISTRICT COURT

September 28; is that correct?

A        Yes.

Q        And the day of the approach is after -- excuse me -- is before also -- strike that.

When you spoke to the sheriff on September 28, 2011, he had already had his meeting with U.S. Attorney Andre Birotte; is that correct?

MR. FOX:  Objection.  Foundation.

THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  Didn't you report --

MR. FOX:  Objection, Your Honor.  Foundation.

THE COURT:  Sustained.

MR. FOX:  Calls for hearsay.

Q        BY MR. HOCHMAN:  Do you remember when you wrote your article back in September 29, 2011, referencing a meeting that Sheriff Baca had had with United States Attorney Andre Birotte?

MR. FOX:  Objection.  Foundation.

THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  Did you have any information on September 29, 2011, when your article was published, that Sheriff Baca had met with United States Attorney Birotte?

MR. FOX:  Objection.  Calls for hearsay.

THE COURT:  Let's go to sidebar.

(The following proceedings were held at sidebar:)

**UNITED STATES DISTRICT COURT**

MR. FOX:  Your Honor, I don't expect --

THE COURT:  Just one second.

MR. FOX:  I don't expect this to be a point of contention when that meeting occurred.  My only point is this witness would only know about that meeting through hearsay; so he should not be testifying to it.  We'll ultimately agree that this meeting with the U.S. Attorney and the FBI happened on September 27, but this witness would only know about that through a statement through either Mr. Baca, Mr. Birotte, or somebody else that was aware of that meeting, and that's a hearsay statement.

MR. HOCHMAN:  But, Your Honor, he publishes in the article -- he says in the September 29 article he met with U.S. Attorney Andre Birotte earlier this week to discuss the tensions between the two sides.

THE COURT:  But that doesn't answer the question.

MS. SAGER:  I was going to object, Your Honor, for the same reason that I want to make clear that he's asking about what's being published, not other information the witness has.  He did put it in the article; so he could say that --

THE COURT:  Well, that doesn't answer -- just because he put it in the article doesn't mean what his source was for that.

MS. SAGER:  I understand.

THE COURT:  Okay.  Look, it's not going to be an

issue.  They're going to call Birotte.  Birotte will say when the meeting was, and then you'll be able to argue.

MR. HOCHMAN:  That's why I just wanted to tie it in with this particular witness because it's not going to be an issue.  If he didn't write it in the article, Your Honor, then I wouldn't bring it up with this witness.  The fact that he had that information --

THE COURT:  Okay.  But you're going to have to establish a foundation as to how he got it, and then I think we'll be kind of in the --

MR. HOCHMAN:  That's what I was trying not to -- I was trying to avoid going into his sources, but I could.

THE COURT:  No.  You're probably not going to be able to.  Look, this really -- you really ought to move on.  He's going to object on the foundation.  Unless you can establish a foundation, you're not going to be able to get past this, and it's really needless because we're all in agreement as to when the meeting occurred.

MR. FOX:  And, Your Honor, if I can make a suggestion.  If Mr. Hochman -- Exhibit 120 is Mr. Baca's calendar which is already in evidence and references the meeting.  So Mr. Hochman could put that on and say it happened after September 27 at 1:30, your interview of Mr. Baca.

THE COURT:  Okay.  Let's go.

///

(The following proceedings were held in open court in the presence of the jury:)

MR. HOCHMAN:  Your Honor, I'd ask that Exhibit 120, which is already admitted into evidence, be published so the witness can look at it as well.

THE COURT:  All right.

Q    BY MR. HOCHMAN:  So I'm referencing you to what's in evidence as Exhibit 120 which is Mr. Baca's calendar.  I'm focusing you on Tuesday, September 27, at a line that's been highlighted from 2:30 to 3:30.

Do you see that?

A    Yes.

Q    Could you read the bold letters starting with the word "meet" down to "Martinez," please.

A    From the word what to -- I see.  "Meet with U.S. Attorney Andre Birotte and FBI assistant director in charge Steve Martinez.  U.S. Attorney's Office, 312 North Spring Street, 12th floor, Los Angeles, 90012. 213-894-7369."

Q    Thank you.  You can take it off the screen.

When you interviewed Sheriff Baca on September 28, did you tape-record that interview?

A    I don't have the article in front of me, again.  The date of the article was September 28th?

Q    Yes.  The article is September 29, 2011.

**UNITED STATES DISTRICT COURT**

1338

A       The interview was on September 28th.  What was your question?

Q       Did you tape-record the interview?

A       No.

Q       Did you videotape the interview?

A       No.

Q       Did you take notes during the interview?

A       Yes.

Q       And then you wrote the article in connection with your interview; is that correct?

A       Yes.

Q       And there's certain parts -- when you write an article, you'll put certain things in quotation marks; is that correct?

A       Yes.

Q       And that's because that's the exact words that were used by the person you were interviewing; is that correct?

A       Yes.

Q       And other times you'll say, for instance, with Sheriff Baca, "Baca said" something -- is that correct? -- but it won't have quotations marks next to it?

A       Yes.

Q       Sometimes you'll say "Baca revealed" something, and there wouldn't be quotation marks; is that right?

A       I don't recall if I used the word "revealed" in

UNITED STATES DISTRICT COURT

that story.

Q        Or "Baca argued" without quotation marks.

A        I don't recall if I used the word "argue."  I mean, do you want me to look at the article?  I mean, in general, sure, those are the kinds of words that one might use. I'm not sure if I used "argued" or "revealed" in that particular article, but I can look.

Q        We'll get to the specifics in one moment.

The article that you wrote was for the *Los Angeles Times*; correct?

A        Yes.

Q        And it was published on September 29, 2011?

A        Right.  The interview on the 28th, article on the 29th.

Q        And when Mr. Baca met with you, he knew you were going to publish an article; correct?

MR. FOX:  Objection.  Foundation.

THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  Did you tell Mr. Baca that the reason for your interview was so that you could publish an article that included his statements?

MR. FOX:  Objection, Your Honor.  We'll have the issue with Ms. Sager.

THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  What were the -- what did you

**UNITED STATES DISTRICT COURT**

tell Sheriff Baca in setting up this interview as to why you wanted to interview him?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

Q     BY MR. HOCHMAN:  Were you going to keep the interview of Sheriff Baca secret and to yourself?

MS. SAGER:  Your Honor, I don't think that the witness' editorial function is something that --

THE COURT:  Sustained.

Q     BY MR. HOCHMAN:  At the time that you are interviewing Sheriff Baca on September 28th, did you tell him that an article that you were going to write about his statements was going to come out the next day?

MS. SAGER:  Again, Your Honor, this is not published information.  It is going to be hearsay.

THE COURT:  Sustained.  It's beyond the scope.

Q     BY MR. HOCHMAN:  Did Sheriff Baca ever tell you during the interview on September 28, 2011, that everything he was saying to you was off the record and you couldn't use it in your publication?

MS. SAGER:  Objection, Your Honor, as to anything that's not published.

THE COURT:  I'll let that witness answer that question.  The objection is overruled.

THE WITNESS:  Can you repeat the question?

UNITED STATES DISTRICT COURT

1341

Q        BY MR. HOCHMAN:  Did Sheriff Baca, when you interviewed him on September 28, 2011, tell you that everything he was telling you was off the record and couldn't be published?

A        Can I speak to my counsel outside the presence of the jury?

THE COURT:  Let's go to sidebar.

(The following proceedings were held at sidebar:)

MS. SAGER:  The difficulty, Your Honor, if we start getting into what --

THE COURT:  I know.

MS. SAGER:  -- was said about a reporter, what was said that's not in the article --

THE COURT:  I know.

MR. FOX:  The point is Mr. Baca was admitting to a source, and I think that that's where we can go with this questioning.  We can get out the information Mr. Hochman wants to be able to argue in his closing, and if he just gets out that he published the name of Baca and there were no misrepresentations to him --

MR. HOCHMAN:  If we can stipulate, Your Honor, that Sheriff Baca knew that this was an on-the-record interview and was going to be published, I'm happy to do that.

MS. SAGER:  Can we be clear that the information in the article -- that he understood that the information in

**UNITED STATES DISTRICT COURT**

the article was on the record?

MR. HOCHMAN:  I can certainly do it that way, Your Honor.

MS. SAGER:  I don't know whether there was any off-the-record stuff.

THE COURT:  Okay.  That's fine.

(The following proceedings were held in open court in the presence of the jury:)

MR. HOCHMAN:  May I proceed, Your Honor?

THE COURT:  Yes.

Q    BY MR. HOCHMAN:  Just focusing on the stuff that was published in your September 29, 2011, article, when you interviewed Sheriff Baca about the statements that occurred -- that were published by you in that article, did Sheriff Baca -- did you communicate to Sheriff Baca that it was -- that it was a -- that these were public statements, not background or off-the-record statements?

A    So I didn't --

Q    I'm sorry.  I missed the question.

You were going to use these statements in a public way as part of your article.  And again, I'm talking about the published statements, not that it was somehow some off-the-record background conversation.  I'm only referring to the published statements.

A    Can I clarify or restate your question as I

**UNITED STATES DISTRICT COURT**

understand it?

Q        Please.

A        So you're asking if the statements that I published attributed to him were off the record?

Q        Correct.  Or basically actually that those statements were on the record.  That's the point I'm trying to ask you.

A        Yes.  I only published the statements -- the statements attributed to him in this article were on the record.

Q        And didn't Sheriff Baca tell you that earlier in the week -- and again, I'm talking about the week of September 28th -- to give you reference points, September 26, 2011, was a Monday, and September 28, 2011, was a Wednesday, and the article comes out on September 29, 2011, a Thursday.

         Does that sound about accurate?

A        Yes.

Q        All right.  So when you're writing -- when you're speaking with Sheriff Baca, didn't Sheriff Baca tell you that earlier that week, so earlier than September 28, 2011, two sheriff's investigators showed up at the home of the lead FBI agent involved in the cell phone sting to question her?

A        So your question is, during this interview, did he tell me that deputies went to the home of the FBI agent?

UNITED STATES DISTRICT COURT

Q       Yes.

A       As published in the article, yes.

Q       Did he tell you that, in response to a question whether or not the sheriff's department was going to seek criminal charges, Sheriff Baca said, "No, I don't think so. It's not worthy of pursuing in view of the greater good"?

A       Did he say that?  Is that your question?

Q       Yes.

A       Yes.

Q       And did Sheriff Baca ever say to you that he instructed any deputies or investigators of the sheriff's department to threaten or seek charges against the FBI agent Leah Marx?

MS. SAGER:  Same objection as to unpublished information.

THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  Did Sheriff Baca tell you during that September 28, 2011, interview, "My goal is the truth"?

MR. FOX:  Objection, Your Honor.  Irrelevant. Beyond the scope.  Hearsay.

THE COURT:  Sustained.

THE WITNESS:  Do you mind, Judge, if I open up the exhibit?  He's referring to things I would like to --

THE COURT:  No.  Just for a moment, we'll leave it the way it is.  I don't think he's going to be too much

1345

longer.

MR. HOCHMAN:  A few more questions, Your Honor.

Q      Did Sheriff Baca tell you that the FBI agents tried to dissuade the inmate Anthony Brown from using a jail house line, telling him that they would be monitored by the sheriff's officials?

MR. FOX:  Objection, Your Honor.  Mr. Hochman is referencing something that's not attributed.

THE COURT:  Does somebody have -- did we mark this?

MR. FOX:  I can put it on the screen for our purposes.  Just let me know when that's okay to do.

MR. HOCHMAN:  Your Honor, I'll withdraw the question.

THE COURT:  All right.

Q      BY MR. HOCHMAN:  Did Sheriff Baca tell you during that September 28, 2011, interview that the visit of the two sheriff's investigators to Leah Marx's house was not intended to intimidate the agent?

A      You said "was not"?

Q      So Sheriff Baca told you that the visit by the two sheriff's investigators to Leah Marx's house was not intended to intimidate the agent?

A      He dismissed any suggestion that the intent was to intimidate the agents -- or the agent.

**UNITED STATES DISTRICT COURT**

MR. HOCHMAN:  No further questions.

MR. FOX:  Nothing, Your Honor.

THE COURT:  I'm sorry?

MR. FOX:  I have no further questions.

THE COURT:  All right, sir.  You may step down.

THE WITNESS:  Thank you.

MR. FOX:  United States calls Special Agent Leah Tanner.

THE CLERK:  Stand here for me, please.  Raise your right hand.

Do you solemnly state that the testimony you may give in the cause now pending before this court shall be the truth, the whole truth, and nothing but the truth, so help you god?

THE WITNESS:  I do.

THE CLERK:  Please be seated.

Would you please state your full name and spell your last name for the record.

THE WITNESS:  Leah Tanner, T-a-n-n-e-r.

THE CLERK:  Thank you.

MR. FOX:  May I proceed, Your Honor?

THE COURT:  Yes.

///

///

///

**UNITED STATES DISTRICT COURT**

**LEAH TANNER,**

**GOVERNMENT'S WITNESS, SWORN:**

**DIRECT EXAMINATION**

BY MR. FOX:

Q      What do you do for a living?

A      I'm a special agent with the FBI.

Q      How long have you been a special agent with the FBI?

A      Approximately seven-and-a-half years.

Q      Are you assigned to a particular squad?

A      Yes.

Q      What squad is that?

A      Public Corruption Squad.

Q      What are your duties on the squad?

A      I'm responsible for investigating public corruption offenses in Los Angeles region.

Q      Can you give some examples of public corruption offenses?

A      Sure.  Some of the things we investigate would be mail fraud, wire fraud, bribery, other types of public corruption offenses involving public officials.

Q      How long have you been on the squad?

A      Approximately five-and-a-half years.

Q      What did you do before that?

A      I worked on a civil rights squad.

**UNITED STATES DISTRICT COURT**

Q      What were your responsibilities when you were working on the civil rights squad?

A      We were tasked with investigating various civil rights offenses that are federal crimes.  So hate crimes, human trafficking, and then Color of Law.

Q      What are Color of Law offenses?

A      Color of Law offenses are when an individual under the authority of, say, law enforcement, under the authority of their badge, their job, violates the civil rights of an individual.

Q      Did there come a time when you were working on the civil rights squad that you were assigned to an investigation involving the Los Angeles County Sheriff's Department?

A      Yes.

Q      When was that?

A      Approximately June of 2010.

Q      How long had you been an agent at that point?

A      Approximately one year.

Q      How was it that you were initially assigned this task?

A      My supervisor came to me with a letter from an inmate who was housed at the county jail and asked if I wanted to follow up on the contents of the letter.

Q      Now, the supervisor, was he assigned to a

particular squad?

A       Yes.

Q       What squad was that?

A       He was the supervisor for the civil rights squad.

Q       Do you know how long he had been an FBI agent at that point?

A       Somewhere between 15 and 20 years.

Q       What was in that letter that he provided to you?

A       It was a letter from an inmate that alleged deputies within the county jail were assaulting inmates for no reason and causing significant injuries such as broken bones, knocking out teeth, things like that.

Q       What did you do once you received this letter?

A       I was able to locate the inmate, and he was still housed at county jail.  So along with another agent from the squad, I went down and interviewed the inmate.

Q       Over time, did your investigation expand in any way?

A       Yes.

Q       In what way?

A       After interviewing the initial inmate and talking to him, I received additional names and information on other inmates who alleged similar things.  And so I began to interview additional inmates and get information from them about what they were alleging was occurring in the jails.

**UNITED STATES DISTRICT COURT**

1350

Q        Was there a pattern to the allegations?

A        Yes.

Q        What was that pattern?

A        The inmates were -- despite being on different floors and having, you know, different accounts of actual incidents, the description of what was occurring was similar which was deputies were assaulting inmates for no reason and then lying on the reports in order to falsely charge the inmates with a crime they didn't commit.

Q        In the beginning, how were you investigating these incidents?

A        It was in a covert way.  We were just trying to gather information from the inmates and in a way that wouldn't tip off the sheriff's department that we were looking into these things.

Q        How were you doing that?

A        It was not very easy.  It was pretty much just interviewing inmates and doing anything that we could with phone records and other types of outside investigation that wouldn't involve the sheriff's department.

Q        So these interviews were occurring in the jails?

A        Yes.

Q        Which jail specifically?

A        We went to two jails.  Twin Towers, but primarily the interviews were at Men's Central Jail.

**UNITED STATES DISTRICT COURT**

Q       Were there occasions when you were asked why you wanted -- why you were there?

A       Every once in a while it would just be small talk with the deputies.  They would ask why, and I would -- we would usually just say we were trying to get information from an inmate.  But I also told a couple of deputies that I was working a human trafficking case.

Q       Why did you tell them that?

A       We did not want to tip our hand that we were investigating civil rights offenses in the jails.  So I just told them that we were investigating a human trafficking case given that I did investigate human trafficking at the time as well.

Q       At the beginning, how many agents were involved in your investigation?

A       Primarily it was two.  There was myself and Special Agent Lam, but a lot of times, if there wasn't someone available or if Agent Lam wasn't available, I would take another agent from the squad.  And then, in addition to that, with my supervisor and other individuals at the U.S. Attorney's Office.

Q       When you went to the jails, would you go alone?

A       Never.

Q       Why?

A       In general, we try to have two agents on every

**UNITED STATES DISTRICT COURT**

1352

interview with individuals.  Just having two people there is helpful.  But especially in the jails, we would never go and interview an inmate by ourselves in the jail.

Q      Why?

A      Just for safety reasons as well as to make sure that there's always two agents there to verify what the inmate said or didn't say.

Q      What would you do with the information you received from the inmates you were interviewing?

A      It would be written in a report.  It would be documented to outline everything the inmate told us, the day, all that type of information so we could go back and review it.

Q      Who would write the reports?

A      Either myself or the other agent that was in the room for that interview.

Q      What would happen to these reports that you wrote?

A      After we drafted them, we would send them to my supervisor.  He would read them, make any grammar corrections that he felt were appropriate, and then he would approve them, and they would go into the case file.

Q      Are you familiar with a deputy named William David Courson?

A      Yes.

Q      Did you engage in any covert work with respect to

**UNITED STATES DISTRICT COURT**

Mr. Courson?

A       I did.

Q       Before we get into what that covert work was, why don't you explain why you did this with Mr. Courson specifically.

A       When I would go to the jails, the inmate interview rooms were on the 6000 floor which is just an area. It's not a specific -- it's not like sixth floor.  It's just a floor.  Mr. Courson worked right outside the interview rooms and would periodically strike up conversations with me while we were waiting for an inmate to come down.  One of the times he was talking, he, off the cuff, made a statement to me about how he got into an altercation with an inmate and used his flashlight on the inmate and when he did not need to use the flashlight.

Q       And what happened with Mr. Courson over time? Did he ever ask you for anything?

A       He asked me to meet up outside of work.

Q       When he asked you that, what did you do?

A       I initially said no.  I don't even know if I said no.  I just kind of ignored it.  But then after that I went and spoke to my supervisor and explained to him what Deputy Courson had said about hitting the inmate with the flashlight.  And given that that's what we were investigating, my supervisor asked if I would be willing to meet up with Deputy Courson and

1354

wear a wire so I could record what he was saying.

Q        Where would you meet him generally?

A        Usually at a restaurant.

Q        Would you have any alcoholic beverages?

A        Never.

Q        Would he?

A        I think one time he might have had one drink.

Q        And how many times, approximately, did you meet with him in a covert fashion?

A        I think it was three or four.

Q        In terms of your first meeting with him, did he provide you with any information that corroborated some of the allegations you were receiving from inmates?

A        Yes.

Q        What did he tell you?

MR. HOCHMAN:  Objection.  Foundation as to the date of this meeting, Your Honor.

MR. FOX:  Your Honor, I'm happy to ask the questions.  Thank you.

Q        Special Agent Marx, your first meeting with Mr. Courson, was it around August of 2010?

A        Yes.

Q        And where did it occur?

A        I believe the first meeting was at Century City Mall at a restaurant there.

**UNITED STATES DISTRICT COURT**

Q        Was anyone else present during your conversation with Mr. Courson?

A        There was a surveillance team that was at the restaurant to make sure that there was somebody watching the whole interaction.  But in terms of having someone sitting there with us in the conversation, no.  It was just the two of us.

Q        What, if anything, did Mr. Courson say at this first meeting that corroborated the allegations you were receiving from inmates?

A        There were a couple things, but some of the things that stood out were -- one of his statements was, when discussing a deputy being involved in an altercation with an inmate, he stated that, if you --

MR. HOCHMAN:  Objection.  Hearsay.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  He basically said, if you write it, it happened, meaning, if a deputy wrote that an inmate swung at him, then that's what happened even if it didn't happen.

Q        BY MR. FOX:  On your second meeting with Mr. Courson, did that also occur around the time of the end of August, 2010?

A        Yes.

Q        And in this meeting, did he provide you with

**UNITED STATES DISTRICT COURT**

1356

additional information about maybe unwritten rules that were going on?

A        Yes.

Q        What, if anything, did he say about an unwritten rule?

A        So one of the unwritten rules in the jails was that, if an inmate --

MR. HOCHMAN:  Objection.  Nonresponsive.

THE COURT:  Overruled.  You can answer.

THE WITNESS:  One of the unwritten rules was, if an inmate did get into an altercation with the deputy, that the inmate would always go to the hospital, meaning the injuries would be so significant that it would require the inmate to go to the hospital, and that was just an unwritten rule no matter what the inmate was doing.

Q        BY MR. FOX:  Was your next meeting with Mr. Courson about a month later?

A        I think it was about a month, yes.

Q        Do you remember where that meeting occurred?

A        I want to say that one was at B.J.'s Restaurant if I'm not mistaken.

Q        Was anyone else present besides you and he?

A        Another surveillance team.  Every single meeting there was either a team or at least one other agent watching.

Q        What, if anything, did Mr. Courson say to you at

UNITED STATES DISTRICT COURT

that point about the inmates and whether they deserved what happened to them?

A     He told me that most of the inmates did not deserve what happened to them in the jails at the hands of the deputies.

Q     What, if anything, did Mr. Courson's statements to you do to your investigation?  What effect did they have on the investigation?

A     Well, at that point we only had statements from inmates which is always an issue because you always have to question the credibility of individuals in that situation.  But he was corroborating a significant amount of what the inmates were telling us in the interviews.

Q     Why not then go at that point and approach Special Agent Courson -- I'm sorry -- Deputy Courson and ask him to cooperate in the investigation?

A     There was a couple reasons.  One of the main reasons is that, if I had approached him and asked him to cooperate and he said no, I would have completely outed our investigation at that point.  We felt it was really important to continue to investigate prior to anyone knowing that we were investigating so that we could get additional evidence.  But, also, the fact that at that point in time, you know, Deputy Courson had made statements that he had engaged in the very conduct that we were investigating.

**UNITED STATES DISTRICT COURT**

Q        Did you continue to interview inmates during this time?

A        Yes.

Q        Did you encounter at some point one named Anthony Brown?

A        Yes.

Q        What is it -- well, how do you know -- how did you come to meet Anthony Brown?

A        Anytime we would interview an inmate, it was typical that that inmate would then tell us you should go speak to this inmate or this inmate also has information.  And so during the interview of one inmate, they mentioned that we should speak to this individual named Anthony Brown.

Q        Where was he located when you were interviewing him?

A        He was housed on the 2000 floor.

Q        What did the 2000 floor mean to you?

A        The 2000 and 3000 floor were both floors that we had been focusing a lot of our attention on based on the interviews with inmates and what Deputy Courson had told me in terms of what goes on in the jails.  And so knowing that he was housed on the 2000 floor, we definitely wanted to interview him.

Q        Did you eventually sign him up as an informant?

A        Yes.

UNITED STATES DISTRICT COURT

Q       When?

A       I think it was September of 2010.

Q       Why Anthony Brown?

A       Anthony Brown had the access we needed.  He was housed on a floor that a lot of the incidents had occurred on as well as he had a lot of medical issues and, therefore, was out of his cell quite a bit to go down to the clinic or just to, you know, leave for medical treatments.  So it allowed him to walk around and see more things on the floors than a typical inmate who was in his cell a lot.

Q       What does it mean to be an FBI informant?

A       It's a formal process that we go through in order to sign some -- we call it sign someone up as an informant.  And we approach someone that has access to the information we're looking for and asks whether or not they would be willing to work for us and gather information on our behalf.  They're given source numbers so that their name is protected.

Q       What are some of the things you are required to do before you sign somebody up as an informant?

A       In any case you usually talk to your supervisor, just explain to them who the person is and whether or not the supervisor agrees that this would be an appropriate person as a source.  You run a criminal history check on the individual, and then you run checks within the FBI system to determine whether or not they either are already a source or were a

source in the past.

Q      At the time you signed him up as a source, then you were aware that Mr. Brown had an extensive criminal history?

A      Yes.

Q      Why sign him up as a source then?

A      It would be impossible to have an inmate source who doesn't have a criminal history.  The most important thing in this situation was not that we had someone with a clean criminal history.  It was that we had someone with access who could tell us what was going on, and he had the access on the 2000 floor.

Q      Did you decide on your own to sign Mr. Brown up as an informant?

A      No.

Q      Who did you discuss this with?

A      I discussed it with other members of my squad as well as my supervisor.  But, in general, in order to sign an individual up as a source, it requires multiple levels of approval from management and the FBI.

Q      In 2010 alone -- let's just stick to 2010 -- approximately how many inmates had you interviewed at that point?

A      I'm sorry.  What time frame?

Q      2010.

A        A couple dozen probably at that point.

Q        At some point did you stop going to the jails?

A        Yes.

Q        When is that?

A        I believe it was the end of 2010, maybe early 2011.

Q        Why did you stop going to the jails at that point?

A        It was becoming too obvious that I was going to the jails frequently, and I could only keep up my cover story for so long that I was interviewing about human trafficking or other types of cases.  So in order to not draw too much suspicion on myself or the inmates, I decided to stop physically going to the jail myself.

Q        Were you able to continue your investigation in any way after stopping?

A        Yes.

Q        What did you do?

A        I reached -- I spoke to my supervisor, and we agreed that we would actually introduce an undercover to start going to the jails to meet with Anthony Brown to continue gathering information.

Q        Did the undercover go by an undercover name?

A        Yes.

Q        What was that name?

**UNITED STATES DISTRICT COURT**

A       C.J.

Q       Now, I'm going to ask you about the covert operation in a second involving C.J.  But first, based on your experience, are there any inherent difficulties in civil rights investigations involving jails?

A       Yes.

Q       What are those difficulties?

A       One of the main ones is access, of course, that we are not able to go into the jails, you know, without individuals being aware that we're there because we have to sign in, show our ID's, things like that.  But the other thing is inmates, again, are witnesses where you have a lot of questionable credibility.  And so in order to get corroborating info, you have to have more than just an inmate saying something is happening.

Q       So what did you decide to do in order to try to get more information in order to see if federal crimes were occurring in the jails?

A       Based on the information we had received from Anthony Brown as well as other inmates, we decided to engage in an undercover operation.

Q       Eventually -- well, let's just talk about that undercover operation.

What was the general plan for the undercover operation?

**UNITED STATES DISTRICT COURT**

A        The general plan was that the allegations we had received about deputies being willing to smuggle in contraband in exchange for cash, we were going to set up C.J., our undercover agent on the outside of the jails, to attempt to meet with a deputy who had agreed to accept a bribe and smuggle in contraband.

Q        Now, you said "we" there.  Was it just you and Special Agent Lam who decided this?

A        No.

Q        Who was part of the decision-making process with this undercover operation?

A        There was a significant amount of people. Discussions included the -- my supervisor, executive management in the FBI, the headquarters unit in Washington, D.C., as well as the U.S. Attorney's Office.

Q        Are you familiar with the term "otherwise illegal acts"?

A        Yes.

Q        What are "otherwise illegal acts"?

A        It's when an individual, if they were to engage in a specific behavior that's against the law on their own, it would be illegal.  But if we're asking at the direction of the FBI for an investigation, we're asking someone to do something, then it's not illegal.  It's authorized.

Q        Did you obtain the necessary approvals to engage

in those undercover operations?

A       Yes.

Q       Were those locally or --

A       It was -- I'm sorry.

Q       Go ahead.

A       It was both.  It was locally through executive management in the L.A. office as well as Washington D.C. in our FBI Public Corruptions Civil Rights Unit in D.C.

Q       Special Agent Tanner, did you ever take a phone call from Anthony Brown while you were sitting at your desk?

A       I did.

Q       Why did you answer the phone call?

A       It was after the undercover agent had provided Gilbert Michel with the phone and the cash, or it was either right before they were about to meet or right after they met, and I knew Anthony Brown was getting very anxious because he knew something was about to happen.  And I wanted him to calm down and, one, to stop calling me and, also, to understand that things were moving and the operation would happen soon.  And so I answered the phone to tell him that.

Q       Was anyone in your presence when you answered the phone?

A       My supervisor.

Q       Did you answer the phone on your own, or did somebody tell you to answer the phone?

A       At first I wasn't going to answer it, and my supervisor said, "Go ahead."  So I did.

Q       How was Anthony Brown as an informant?

A       Difficult.

Q       In what ways?

A       He was very anxious.  He always wanted to know what was going on.  Even if it had nothing to do with him, he just always felt like he needed to know what was happening, who said what.  In order to get him to calm down, it took a lot of just talking to him and explaining to him there were things we couldn't tell him about the investigation, but he was just very anxious.

Q       If he was difficult, why use him?

A       He had the access and was also willing to work with us which, again, not everyone is willing to be an informant, especially with law enforcement.  It's not something that everyone wants to do, and he was willing to do that.

Q       Approximately when did this first undercover meeting occur between C.J. and the deputy?

A       It was the end of July of 2011.

Q       At the time did you know who the deputy was?

A       No.

Q       Did you eventually learn who it was?

A       Yes.

Q       Who was the deputy?

**UNITED STATES DISTRICT COURT**

1366

A        Gilbert Michel.

Q        Please describe the undercover operation that occurred at the end of July of 2011.

A        C.J. got in contact with Gilbert Michel, and they agreed to meet in a parking lot.  The agreement was that he -- C.J. would provide half of the cash bribe along with the cell phone to the deputy, and once the phone was delivered, then he would receive the remaining cash at a separate meeting.

Q        How many agents were participating in the undercover events at this time?

A        There was a ground surveillance team which had probably five, six, seven agents who were watching the exchange.  A couple agents on the squad were watching from far back as well as an air surveillance -- an airplane that was able to get video of the exchange.

Q        Was it recorded?

A        Yes.

Q        Where were you?

A        I was in the airplane.

Q        In order to do an undercover operation, is there any sort of written plan that you need to come up with?

A        Yes.

Q        Did you do that here?

A        Yes.

Q        What happens with your written plan?

**UNITED STATES DISTRICT COURT**

A        It goes through the approval process with management.  So once I draft it, it goes to my supervisor.  He makes any changes or additions that he feels necessary, and then from there it goes to additional levels of approval.  In addition, it's almost a -- I don't know if you call it a dual track.  You also go to the D.C. group of supervisors to get their approval on the same operation.

Q        What was the result of that first undercover operation?

A        Gilbert Michel accepted the bribe and took the cell phone from the undercover agent.

Q        Why not arrest him on the spot?

A        At that point in time, we did not know 100 percent that he was going to take the phone in.  And if he had just taken the cash and walked away and never brought the phone in, that wouldn't have met the statute for a federal crime.  So it wouldn't have been something we could have charged anyway.

Q        Were there other reasons?

A        At that point in time, for all we knew, Gilbert Michel could have told the sheriff's department that he had someone who was trying to bribe him and was actually doing his own -- I don't want to say his own operation but was actually taking the cash and going to the sheriff's department and saying here's the case.  Go ahead, C.J.

Q       Was there a second meeting?

A       Yes.

Q       When, approximately, did this occur?

A       Early August of 2011.

Q       What was the purpose of this second meeting?

A       The second meeting was to give the remaining cash to Gilbert Michel as well as a kite, which is a note basically, to Gilbert Michel.

Q       Did you come up with an operations plan for this undercover event?

A       Yes.

Q       Did it receive the same approvals as your other one?

A       Yes.

Q       What happened with the undercover operation on that date?

A       Gilbert Michel took the additional cash and the kite from C.J. and left.

Q       Why not arrest him then?

A       At that point, even though we knew the cell phone had been introduced into the jail at that point, we still had no way to learn whether or not Michel had, in fact, notified the sheriff's department that this was going on.  In addition, we believed we needed more information to solidify our case in order to charge him; so we didn't want to arrest him and not

**UNITED STATES DISTRICT COURT**

have enough in order for the charges to stick.

Q      Did you have a plan with respect to this undercover operation as to what Anthony Brown would be doing with the cell phone if he received it?

A      Yes.

Q      What was that plan?

A      It was primarily to contact the undercover agent so that he could text him.  Texting was more likely than phone calls just because it's more difficult to hide a phone if you're on it.  But to text the undercover agent various information, deputy names if there were altercations that occurred.  And there was also a small camera on the flip phone that, if he were in his cell and had a view of something that had happened, he could take a picture.

Q      Why couldn't you just go back to the jails and find out this information from Anthony Brown?

A      Again, I was trying to stay away at that point to not draw more attention to the fact that I was constantly visiting Anthony Brown.  And so it just allowed -- at this point, it allowed C.J., our undercover agent, to continue to get information without it being obvious that Anthony Brown was providing us information.

Q      Were you aware of some of the risks of a cell phone in jail?

A      Yes.

UNITED STATES DISTRICT COURT

Q      Why take those risks?

A      There are risks, but at this point in time, the allegations we had received were pretty significant including, you know, the significant injuries on these inmates as well as inmates being charged for not even doing anything.  But then also the allegations that deputies were smuggling in contraband, and not just Gilbert Michel, but we had allegations of additional deputies.  So we felt it was worth the risk to determine whether or not there was more stuff going on.

Q      Now, you've talked about things that you learned during your interviews of inmates.  Did you also take into account other things that were in the public light regarding allegations in the jails?

A      Yes.

Q      What were those?

A      Prior to or around the time that I started to investigate, I learned that there were a lot of outside agencies that had made allegations of significant inmate abuse for many years.  So it wasn't just the inmates claiming it was happening.  I had learned that multiple outside nonprofits or other government entities even were alleging this was going on.

Q      Did you do anything with the phone to try to track how it was being used?

A      Yes.

Q      What did you do?

A       So the phone was set up that I could log onto like an online system and look at phone calls that were made. I couldn't get content, but I was able to see almost like a phone log. So if a phone call was made, I would see the phone number that was called, or if a text message was sent or received, I could see the numbers that were going back and forth. And I also had the ability to terminate the service immediately online if I needed to.

Q       How often did you check it?

A       Every day.

Q       Did you learn at some point that Anthony Brown had used that phone in a way that it was not intended to be used?

A       Yes.

Q       What did you learn?

A       It was actually prior to it even happening. Anthony Brown reached out to the undercover agent and told him, when Gilbert Michel gave him the phone for the day, that his cellmate -- Anthony Brown's cellmate had seen the phone and said, "I want to call my girlfriend." So Anthony Brown was getting nervous and asked the undercover agent is it okay if he calls his girlfriend on it because, if I tell him no, basically it won't end well. So he asked the undercover agent for permission.

The undercover agent called me, and we discussed

1372

it and agreed, for Anthony Brown's safety, that he would, in fact, let the cellmate call his girlfriend.  But the undercover agent advised listen to the entire call or review any text message before he sends it.

Q      At some point did you learn that the cell phone had been recovered by the sheriff's department?

A      Yes.

Q      How did you learn this information?

A      The day that it -- actually, I believe right around the moment it was found, Gilbert Michel called the undercover agent and frantically told him to drop, meaning drop his number, meaning get rid of your phone number because they found the phone.

Q      Did you tell the sheriff's department that this was an FBI phone on August the 8th after it was recovered?

A      No.  Once the undercover called me, I went and immediately notified my supervisor and terminated the service on the phone.

Q      Why didn't you then tell the sheriff's department that the phone was connected to the FBI?

A      At that point we had no reason that our investigation was actually compromised because the cell phone itself was not linked to the FBI.  It was paid for in cash.  So we believed it was possible for us to continue our investigation without actually notifying the sheriff's

department.

Q      Did you personally go to Men's Central Jail to meet with Anthony Brown right after the phone was recovered?

A      No.

Q      Did you send anybody there?

A      Yes.

Q      Who did you send there?

A      In order to, again, not be too obvious in showing up to the jail, especially right after this had happened, I reached out to one of our gang agents and asked if he would be willing to go down and meet with Anthony Brown just to check in and make sure everything was okay.

Q      Did he agree to do that?

A      He did.

Q      Without getting into the substance of what he reported back to you, do you know whether he was able to meet with Anthony Brown?

A      He was not.

Q      I want you to look in the exhibit books.  There should be one that has Exhibits 157 through 172 in it.  Can you look at that book.  I'd like you to look through Exhibit 157.

        (Marked for identification Exhibit No. 157.)

Q      BY MR. FOX:  Please tell me if you recognize it.

A      (Witness reviewing exhibit.)

UNITED STATES DISTRICT COURT

It's a summary sheet -- a summary spreadsheet of phone records.

Q        For who?

A        Lee Baca.

Q        How was that sheet created?

A        The bureau -- the FBI subpoenaed phone records for Lee Baca's county-issued cell phone.  Once we received those records, I took the records and put them into a spreadsheet and then analyzed them, meaning, instead of just having phone numbers, I was able to determine who the numbers belonged to and then put it into a spreadsheet for a specific period of time so it would be easier to determine who Mr. Baca was speaking to.

Q        Could you please also look at Exhibit 170.

A        Okay.

(Marked for identification Exhibit No. 170.)

Q        BY MR. FOX:  Do you recognize that?

A        Yes.

Q        What is it?

A        It's a phone summary sheet that I created for Paul Tanaka's county-issued cell phone.

Q        What about Exhibit 172?

(Marked for identification Exhibit No. 172.)

THE WITNESS:  This is, again, a phone summary spreadsheet that I created that is with -- for specific days,

**UNITED STATES DISTRICT COURT**

and it includes multiple individuals from the sheriff's department as well as some additional people that were called, and it's specific to certain days between August 18 and September 26th.

Q    BY MR. FOX:  Are Exhibits 157, 170, and 172 accurate summaries of documents that you compiled using voluminous records?

A    Yes.

MR. FOX:  Your Honor, I move for the admission of Exhibits 157, 170, and 172.

MR. HOCHMAN:  No objection.

THE COURT:  It will be received.

(Received into evidence Exhibit Nos.
157, 170 and 172.)

MR. FOX:  I'm now going to publish Exhibit No. 15.

THE COURT:  Is this a convenient time for us to take our final break?

MR. FOX:  Yes, Your Honor.

THE COURT:  All right.  Ladies and gentlemen, we're going to take our final break of the day.  Again, I want to remind you you're not to discuss this case with anyone including your fellow jurors, members of your family, people involved in the trial, or anyone else.  And do not allow others to discuss the case with you.  This includes discussing the

**UNITED STATES DISTRICT COURT**

case on the Internet, bulletin boards, various social media, by e-mails, text messages.  If anyone tries to communicate with you about this case, please let me know about it immediately.

Do not read, watch, or listen to any news reports or other accounts about the trial or anyone associated with it.  Do not do any research such as consulting dictionaries, consulting the Internet, or using other reference materials, and do not make any investigation about the case on your own.

Finally, you're reminded to keep an open mind until all of the evidence has been received, you've heard the arguments of counsel, the instructions of the Court, and the views of your fellow jurors.  If you need to speak with me, simply give a note to the clerk.

We'll come back at 12:00 o'clock.

(The following proceedings were held in open court out of the presence of the jury:)

THE COURT:  You may step down.

MR. FOX:  Your Honor, may I ask Special Agent Tanner one question about her schedule?

Okay.  Thank you, Your Honor.  Nothing further.  I just wanted to make sure with her special services if she needed more time.  She's okay.

THE COURT:  All right.  I was going to ask you.  Do we need to take another break?

MR. FOX:  I don't think so.  I think this is

**UNITED STATES DISTRICT COURT**

going to be good enough.  If we're just going until 1:30, I think that will be good enough.

THE COURT:  All right.

MR. FOX:  Thank you.

(A recess was taken at 11:46 a.m.)

THE COURT:  Let's bring the jury in.

(The following proceedings were held in open court in the presence of the jury:)

MR. FOX:  May I continue, Your Honor?

THE COURT:  Yes, please.

Q     BY MR. FOX:  Special Agent Tanner, I probably should have asked this in the beginning.

In August and September of 2011, did you have a different last name?

A     I did.

Q     What was your last name then?

A     Marx.

Q     Now, showing you what we left with which is Government Exhibit 15, this is an e-mail from Steve Martinez to Leroy Baca saying, "Please call."  Who was Steve Martinez at this time?

A     He was the assistant director in charge of the FBI Los Angeles office.

Q     What time is the next e-mail sent on August 18?

A     5:06 p.m.

**UNITED STATES DISTRICT COURT**

Q    What does it state?

A    "Lee, I have an important and sensitive matter I need to discuss with you.  If you have an opportunity this evening, please call me at 310-883-8539.  Regards, Steve."

Q    I'm now going to publish what's in evidence as Government Exhibit 157.  What is this chart again?

A    This is the summary of Lee Baca's county-issued cell phone.

Q    I'm going to highlight for you certain times from August 18 at 5:40 to August 18 at 5:57 p.m.  Could you please tell the jury -- obviously the left column is the date.

What do you base the time on?

A    On the phone records it would be the time that the call is made.  Either the incoming call is -- comes through or when the individual -- so in this case, Lee Baca -- made an outgoing call.

Q    You say "when the person made the call."  Is the person listed on the left the one making the call?

A    Correct.

Q    And the one on the right receiving the call?

A    Correct.

Q    What about the ones we see on the far right column?

A    That's the duration.  I believe it's either rounded up or rounded down depending on -- in the phone

**UNITED STATES DISTRICT COURT**

records, they either round it up or down depending, if it was a minute, 1, it might just say one minute.  If it was a minute 59, it would say two minutes.

Q       So that's in minutes on the right-hand side?

A       Yes.

Q       What do your records show occurred at 5:40 p.m. on August 18?

A       Lee Baca called Steve Martinez's cell phone, and they talk for five minutes.

Q       What happened next on the call?

A       There's a second call at 5:45.  Same thing. Lee Baca calls Steve Martinez's cell phone, and they speak for five minutes.

Q       Other than the voicemail call we see at 5:50, what do we see at 5:49 and 5:55?

A       At 5:49 Lee Baca calls the executive secretary, and at 5:55 he calls the main line like the sheriff's office main line.

Q       What happens at 5:57 p.m.?

A       Paul Tanaka calls Lee Baca's cell, and they speak for nine minutes.

Q       I'll now show you Government Exhibit 120.  Do you recognize this document?

A       Yes.

Q       What is it?

**UNITED STATES DISTRICT COURT**

A        It's a copy of Lee Baca's calendar.

Q        How did you obtain his calendar?

A        It was in response to a Federal Grand Jury subpoena that we served on the sheriff's department.

Q        Do you see an entry for 2:00 o'clock p.m. on August 19?

A        Yes.

Q        What does it state at that time?

A        "Meet with U/S," which means undersheriff, "Tanaka, Captain Tom Carey, Lieutenant Liam Gallagher, and Lieutenant Greg Thompson here or EPC."

Q        I'm now going to go back to your summary chart of Mr. Baca's cell phone records and ask you about this entry starting with 3:45 p.m. on August 19.

         What happened at that time?

A        At 3:45 Lee Baca called the FBI Westwood office.

Q        And what does 5:07 reflect?

A        That Steve Martinez called Lee Baca's cell phone, and they spoke for three minutes.

Q        I'm going to show you the entry right below that as well now.

         What happened at 5:09 p.m.?

A        Lee Baca called Paul Tanaka's cell phone right after speaking to Steve Martinez, and they spoke for ten minutes.

**UNITED STATES DISTRICT COURT**

Q        Now I'm going to show you Exhibit 170.

What was this chart again?

A        This is a summary chart of Paul Tanaka's county-issued cell phone.

Q        And the second page of that chart starting with 5:09 p.m., is this the same call that you just referenced that showed up on Mr. Baca's cell phone chart?

A        Yes.

Q        The 5:09.

What happened at 5:23?

A        Paul Tanaka called Greg Thompson's county-issued cell, and they spoke for seven minutes.

Q        And now starting from 7:22, I'm now highlighting from there to the end of the page.  What happened at 7:22?

A        Lee Baca called Paul Tanaka, and they spoke for four minutes.

Q        You see a series of calls between Mr. Tanaka and various people.  Can you read who those people were at 7:25 p.m.?

A        At 7:25 it was Tom Carey.

Q        7:27?

A        Jim Ritenour.

Q        Do you know who Jim Ritenour was at the time?

A        He was the captain of the Major Crimes Bureau.

Q        What about 7:32?

UNITED STATES DISTRICT COURT

A        Tom Carey's county-issued cell.

Q        And 7:37?

A        Is Greg Thompson's cell phone.

Q        Showing you the third page of that exhibit, first three entries.  We'll go first six entries.

What happens at 7:55?

A        Paul Tanaka speaks to Steve Leavins for six minutes.

Q        And then 8:04?

A        Tom Carey calls Paul Tanaka's cell phone for four minutes.

Q        And 8:07?

A        Paul Tanaka calls Lee Baca's cell phone, and they speak for three minutes.

Q        You mentioned that you did not go see Anthony Brown initially.  Did there come a point in time in which you did decide to go see Anthony Brown?

A        Yes.

Q        When was that?

A        After we had learned that the sheriff's department had linked the phone to the FBI, I wanted to go to the jails and speak to Anthony Brown.  So on August 23rd, 2011, I went to the jails.

Q        Who did you go there with?

A        I went with Special Agent David Dahle and

UNITED STATES DISTRICT COURT

Special Agent Wayne Plympton.

Q       Did you meet with Mr. Brown that day?

A       Yes.

Q       What was the process?

A       Same as always.  We went to the jails, showed our credentials, gave our driver's license to a deputy in the sally port which they keep with them, and we signed in, put our names down, our agency, phone number, and then let them know the inmate that we wanted to speak to.  We then went and checked in with the watch commander and let him know that we were there for an interview, and we were told to go ahead and proceed to the interview rooms.

Q       Approximately what time did you meet with Mr. Brown?

A       It was a little before 11:00 a.m.

Q       Did anything unusual happen during your meeting with Mr. Brown?

A       Yes.

Q       What happened?

A       Approximately an hour after we started the interview with Anthony Brown, there was pounding on the door, and a very large sergeant was standing at the door with other deputies and screamed at us that the interview was over and grabbed Anthony Brown and ripped him out of the room.

Q       What, if anything, did you say to Mr. Brown as he

**UNITED STATES DISTRICT COURT**

was being taken out of the room?

A        Something to the effect of "Don't worry.  We'll get you out of here.  Don't worry.  We'll be back."  Something to that effect.

Q        I'm now going to show you your summary chart 172.  What is this chart again?

A        This is a date-specific chart.  So I took the phone records of multiple individuals and put them into one chart that was specific to one day.

Q        And I want to highlight for you the calls -- actually, I'm not going to call these out.

Approximately how many calls were there between 10:40 a.m. and the approximate time in which you were told that you could interview Anthony Brown?

A        There were five calls.

Q        And that's over about an hour period of time?

A        Yes.  Approximately.

Q        And then what about for the next, we'll say, hour to start with on this page?  How many calls are there actually -- it's only half an hour.  How many calls approximately are there in the next half hour?

A        It looks about close to 20.

Q        And how did you create this chart?  Who's reflected on there?

A        It would be specific individuals that came up

during the investigation.  So Greg Thompson, Steve Leavins, Tom Carey, Gerard Smith, Cecil Rhambo, various individuals that for various reasons came up during the investigation as important to add their involvement.

Q    Approximately how many calls are there between 12:20 and 2:20?

A    Approximately 15.

Q    And what do you see starting at 2:20 to 5:02?

A    There's a large break between the phone calls between all those individuals for approximately two-and-a-half hours.

Q    Focusing on the 2:18 p.m. call that I'm highlighting right now, who is that a call from and to?

A    It's a call from Tom Carey to Christopher Nee's desk.

Q    Do you know who -- do you know who Christopher Nee was at the time?

A    Yes.

Q    What was his role?

A    He was the aide to Undersheriff Paul Tanaka.

Q    You mentioned that you told Anthony Brown that you'd be back to get him or something to that effect.  Did you try to do that?

A    Yes.

Q    What did you try to do?

**UNITED STATES DISTRICT COURT**

A       After we -- the interview was interrupted and we were kicked out of the jails, I contacted the U.S. Attorney's Office and spoke to them about what we could do in order to get Anthony Brown out to secure his testimony.  And so the discussion was had with our management and the U.S. Attorney's Office that we would seek a federal writ for Anthony Brown to bring him into federal custody to testify in front of the grand jury.

Q       Why did you want him to testify before a grand jury at that point?

A       At that time, since we were kicked out of the jails, we wanted to make sure that we could lock in Anthony Brown's testimony.  We had no idea what was happening to him, what was being said to him, and we wanted to make sure that we could get his statements about what occurred with Gilbert Michel.  So if we were able to charge Gilbert Michel with a federal violation, we needed to lock in Anthony Brown's testimony.

Q       You mentioned Gilbert Michel.  Did you do anything with respect to Gilbert Michel on August 23rd?

A       Yes.

Q       What did you do?

A       We kind of had to speed up the process because of what happened at the jails that day.  We met that evening as a team and agreed that we -- despite not being ready to do so, we

UNITED STATES DISTRICT COURT

were going to put together a quick plan and going and approach Gilbert Michel the next day and let him know that we had evidence that he had committed a crime.

Q        And what happened with that approach?

A        On the 24th of August, we did go to Gilbert Michel's apartment and met him as he was returning from work and notified him or asked if he would be willing to speak to us.  He agreed.  At that time we notified him that we had evidence that he may have committed a crime.

Q        Did you have an operations plan with respect to that?

A        I believe so, yes.

Q        How many agents approximately joined you?

A        I believe there was six maybe.  Five or six agents.

Q        Okay.  I'm now going to publish the eighth page of 172.  What does this page show?

A        This is a summary chart of multiple individuals, phone records that were compiled for August 25th, 2011.

Q        And we see bold in two different spots.  What is the bold?

A        What I did was in bold I added times of significant -- I don't know if you would call it events but significant facts.  So when the Marshals Service faxed the warrant to the LASD warrants and detainers, I put that in bold

the time we knew the fax went through.

Q    Approximately how many calls occur between the time that the first fax transmittal goes through and the next hour, let's say?

A    There's five calls.

Q    And then after the second fax transmittal goes through, let's pick the next hour starting at 10:37. Approximately how many calls are there during the next hour?

A    I would say probably 12, 14.

Q    And the first three involve Mr. Tanaka; is that right?

A    Correct.

Q    Who is the 10:47 a.m. call to?

A    Tom Carey.

Q    What about the one right before that?

A    Greg Thompson.

Q    Now I'm going to publish for you Exhibit 31. This is an e-mail from Steve Leavins to Paul Tanaka on August 25th at 11:45 a.m.  What is written in this e-mail?

A    "Boss, I did not have much to report last night. We have an undercover operation today.  I will call you tonight with an update."

Q    How does Mr. Tanaka respond to this e-mail at 11:47 a.m.?

A    "Thanks, Steve.  Right after, and I mean right

after, I spoke with Tom this morning.  The sheriff popped in looking for an update.  This case is consuming his entire thought process.  Providing him with updated tidbits helps to ease his mind."

Q        Going back to the eighth page of 172 -- actually, I'm going to move to the ninth page of 172.  You have something else in bold there.  What is that at 1:58?

A        "Anthony Brown being released from the LASD computer system."

Q        Actually, I'm going to highlight the call right before 1:58 and the two after.  What happens at 1:43 p.m.?

A        Greg Thompson calls Chuck Antuna's desk line.

Q        Do you know what role Mr. Antuna performed on August 25th, 2011?

A        I believe he was the captain at IRC.

Q        What is "IRC"?

A        Inmate Reception Center.  That's where inmates both check in when they're arrested, but also that's where they keep all of the inmate records and files and various things for inmates as well as where they receive writs.

Q        And what happened at 1:59 p.m.?

A        Lee Baca called the United States Attorney's Office and spoke to someone for 12 minutes.

Q        What about the 2:00 o'clock call?

A        Greg Thompson called Chris Nee's desk line for

four minutes.

Q       Now, this is on August 25th.  I want to turn your attention to August 26th of 2011.

Did you do anything personally to determine whether you could find Anthony Brown after you were told that you couldn't interview him anymore on August 23rd?

A       Initially I was able to locate him just like always on the 23rd, 24th when I provided necessary information to the U.S. Attorney's Office for the writ.  On the 26th, however, when I logged onto the inmate locator to find Anthony Brown on there, it showed that he was released.

Q       This inmate locator, what is it?

A       It's a website that is available to the public. Anyone can go on it.  It's on the sheriff's department's website.  And you can go on the website, type in information like, I believe it's DOB, date of birth, and inmate name, and it will tell you where an inmate is located.  So which jail facility they're located at, not specific cell information or anything.  Just what jail facility.

Q       When you saw on August 26th that Mr. Brown had been released, according to the inmate locator system, what did you do?

A       I immediately printed off the form because -- the screenshot from the page because it didn't make any sense knowing that Anthony Brown had been convicted and sentenced to

state prison.  It would not make sense that he was released from custody.

Q       Can you look in the exhibit book at Exhibit 132, please.

A       Okay.

(Marked for identification Exhibit No. 132.)

Q       BY MR. FOX:  Do you recognize that document?

A       I do.

Q       What is it?

A       It's a screenshot that I printed off on August 26th, 2011, from the inmate locator page.

Q       Is it in substantially the same condition as it was when you printed it off?

A       Yes.

MR. FOX:  Your Honor, I move for the admission of Government Exhibit 132.

MR. HOCHMAN:  No objection, Your Honor.

THE COURT:  It will be received.

(Received into evidence Exhibit No. 132.)

MR. FOX:  Now publishing it to the jury.

Q       What does this show, the top portion that I've highlighted?

A       It shows that it's a printout for Anthony Brown with his booking number and date of birth identifying information.

**UNITED STATES DISTRICT COURT**

Q       Now I'm showing you what's written under "Release."

First of all, let's talk about that word "Release."  That doesn't look like it's a computer printout. So what is that?

A       I wrote on it.

Q       Does it generally say "Release" and you wrote over it?

A       It does.

Q       When did you write over it?

A       Probably while I was nervous and writing after I printed it off.  I tend to do it also.  I guess I didn't think anything of it at the time and just wrote over it.

Q       What does this show occurred, according to this document, on August 25th, 2011, at 1:58 p.m.?

A       It shows that Anthony Brown was released from custody at 1:58 p.m. on August 25th, 2011.

Q       What is the release agency listed?

A       "Other."

Q       What is the reason for the release listed?

A       "Custody release."

Q       Now I'm going to go to the 12th page of Exhibit 172.  What is this page?

A       This is the compilation of all of the phone records of various individuals for August 26, 2011.

**UNITED STATES DISTRICT COURT**

Q        I'm going to show you now the first two -- all the entries up to 10:42 a.m.?

Let's start with 9:15 a.m.  What happens at that time?

A        Tom Carey calls Paul Tanaka's desk line for 15 minutes.

Q        And, generally, are there a number of calls after that between Mr. Leavins, Mr. Thompson, and Mr. Carey?

A        Yes.

Q        And last one shows Leavins to Craig; is that correct?

A        Correct.

Q        Who did you know -- well, do you know now who Mr. Craig was at the time?

A        Yes.

Q        What role did he perform?

A        He was the sergeant for the Internal Criminal Investigations Bureau.

Q        Now, you have 10:42 e-mails begin between Thompson and Carey.  I'm going to show you now Exhibit 35.  Are these the e-mails you're referring to?

A        Yes.

Q        And these are the ones that discuss that MCJ will accept, if forced, but they will have county attorneys review it with the court order; is that correct?

A        Correct.

Q        And what time do these e-mails end in this string of e-mails?

A        At 10:50 a.m.

Q        I'm now going to show you Exhibit 36.

What time does this federal law enforcement agency policy come out from Ralph Ornelas?

A        At 10:53 a.m.

Q        Now taking you back to Exhibit 172, page 13, do you see the area I'm highlighting?

A        Yes.

Q        What happens about 15 minutes later?

A        There are phone calls back and forth between Steve Leavins, Tom Carey, Paul Tanaka, and Lee Baca.

Q        Let's focus on 11:21 a.m.  What happens then?

A        Paul Tanaka called Lee Baca for two minutes.

Q        What happened next?

A        At that point Tom Carey called Paul Tanaka's cell phone.

Q        Now publishing Exhibit 37.  What time is this e-mail?

A        2:18 p.m.

Q        That discusses the fourth floor conference room; is that correct?

A        Correct.

**UNITED STATES DISTRICT COURT**

Q        And I'm now showing you the sixth page from Government Exhibit 128.

Do you recognize this document?

A        Yes.

Q        What is it?

A        It's a document we received in response to a Federal Grand Jury subpoena on the sheriff's department.

Q        What does it reflect?

A        It's a booking of property record for an arrestee Kevin King, but it was actually Anthony Brown.

Q        Does this -- according to this document, the date and time, how long after that e-mail we just saw that Thompson was en route from CJ and Carey said that they're in the fourth floor conference room, how long after that is Mr. Brown booked as Kevin King?

A        He was booked at 3:30.  So an hour'ish.

Q        Going back to 172, page 13, is that reflected in this chart that you have?

A        Yes.

Q        What entry?

A        Where it says, "Kevin King arrested in San Dimas."

Q        And, generally, what is occurring according to phone calls from 2:05 to 3:09 on that date?

A        It is Gerard Smith who is one of the OSJ deputies

was calling Steve Leavins, Greg Thompson, Mickey Manzo, and Scott Craig.

Q    What happens after Kevin King is arrested in San Dimas, according to documents?

A    Tom Carey and Greg Thompson make phone calls to Sergeant Craig, Sergeant Long, and Gerard Smith.

Q    Now I'm going to move to the next page of this document.  Starting at 5:20, it shows "unavailable" to the Baca county-issued cell.  Generally what does it mean if you put "unavailable" down?

A    It means that on the phone records, whoever called -- whoever called Lee Baca on that call had a blocked number.

Q    How long did this call at 5:20 last?

A    11 minutes.

Q    That's not unusual for law enforcement for there to be a blocked number; is that right?

A    Yes.  In general the sheriff's department phone numbers primarily came up as unavailable which is why I had to kind of piece together some of the records.

Q    What happened in the next phone call?

A    Paul Tanaka called Lee Baca's cell phone.

Q    What about after that?  What's the 5:48 -- let's say the first call, Tanaka to who?

A    Tom Carey.

UNITED STATES DISTRICT COURT

Q        And then 5:49 and 5:50?

A        Paul Tanaka is calling Steve Leavins.

Q        5:55?

A        Tom Carey is calling Paul Tanaka.

Q        And 5:56?

A        Steve Leavins is calling Tom Carey.

Q        I'm going to now highlight 5:57.  What does that show?

A        Steve Leavins is calling Lee Baca's county-issued cell.

Q        What happens after that?

A        At that point Steve Leavins calls Tom Carey and back and forth between Tom Carey and Steve Leavins for the next few minutes.

MR. FOX:  Your Honor, I now would like to play Exhibit 83 which is in evidence.  I'm so sorry.  84 which is in evidence and reflected in the jury's transcript book under 85.

THE COURT:  All right.  If everybody wants to open their tabs.  I'm sorry.  You want -- the transcript is which tab?

MR. FOX:  Is 85.  The excerpts are on 84.

THE COURT:  Okay.

MR. FOX:  May I begin, Your Honor?

THE COURT:  Yes, please.

///

(The cd, Exhibit No. 84, commenced

playing before the jury.)

MR. FOX:  Playing the next one.

(The cd, Exhibit No. 84, commenced

playing before the jury.)

MR. FOX:  Now playing the next clip.

(The cd, Exhibit No. 84, commenced

playing before the jury.)

Q     BY MR. FOX:  Do you know who the supervisors were of Sergeant Craig, Sergeant Long, and the Sergeant Webber we just heard from?

A     Yes.  It was Steve Leavins and Tom Carey.

Q     Now I'm going to show you the fifth page of 170. This is the Paul Tanaka chart; is that correct?

A     Correct.

Q     I'm going to highlight, first of all, August 28th starting at 7:36.  What occurs at 7:36 p.m. on August 28?

A     Paul Tanaka called Tom Carey for 22 minutes.

Q     What happened next?

A     Paul Tanaka then called Lee Baca for three minutes.

Q     And the next call?

A     Lee Baca called Paul Tanaka, and they spoke for 12 minutes.

Q     What are the next two calls?

A        Paul Tanaka calls Tom Carey and Steve Leavins.

Q        What happens next?

A        Tom Carey calls Paul Tanaka back.

Q        Now I want to focus on the 29th at 9:03 a.m. and 9:07 a.m.  What does your chart reflect?

A        Lee Baca calling Paul Tanaka for two minutes, and then Paul Tanaka calling Steve Leavins for two minutes.

Q        This is at what time?

A        9:03 followed by a phone call from Paul Tanaka at 9:07.

Q        Now highlighting an e-mail that says that Thompson is en route to SHB to meet with the sheriff and two others, what time -- this is -- excuse me.  This is Exhibit 67. What time is this e-mail?

A        11:46 a.m.

Q        I want to show you the fourth page of Mr. Baca's calendar in evidence as Exhibit 120.  What day of the week does it show August 29th is?

A        A Monday.

Q        We were just looking at phone calls on the 28th; so that would have been a Sunday?

A        Correct.

Q        So let's focus on his calendar.  Does it show he has any meetings with anybody at 1:30 p.m. on August 29th?

A        Yes.

**UNITED STATES DISTRICT COURT**

1400

Q        Who is that?

A        Andre Birotte.

Q        Showing you the fourth page of 157 now.  This is Mr. Baca's summary chart.  Showing you at 6:20 and 6:25 p.m., what does this show?

A        There's an exchange of calls between Lee Baca and Paul Tanaka.

Q        Special Agent Tanner, at this point you're familiar with the interviews that ICIB does of Deputy Michel and Courson on the morning of August 30th; is that correct?

A        Yes.

Q        I now want to show you page 5 of Exhibit 157. What does it show occurs on August 30th at 10:56 a.m. and 11:00 a.m.?

A        Lee Baca makes a call to Paul Tanaka, and then shortly after, Lee Baca receives an unavailable call for 13 minutes.

Q        I'm going to now publish Exhibit 50 in evidence. Do you see this e-mail that I've highlighted September 7, 2011, at 7:17 p.m.?

A        Yes.

Q        This is from John Powell to Steve Leavins?

A        Yes.

Q        Do you know what role John Powell played in the sheriff's department in September of 2011?

UNITED STATES DISTRICT COURT

A       Yes.

Q       What role was that?

A       He was a sergeant that was assigned to basically a tech squad at the sheriff's department.

Q       And this e-mail that he sends to Mr. Leavins, it reflects some things that occurred on what date?

A       September 2nd.

Q       Could you please read what he wrote occurred on September 2nd, the first two lines?

A       On September 2nd, Brian DeRuyter and I conducted a technical surveillance counter measures, TSCM, security inspection on the fourth floor of SHB and the basement area at your direction.  The operation used the following technical equipment.

Q       I want to ask you some questions about some of the terms you just read.

Are you familiar with the term "technical surveillance counter measure"?

A       Yes.

Q       What do you know that to be?

A       In layman's terms, it's basically sweeping for bugs.  So looking to determine whether or not there are recording devices in a certain area.  So using technical equipment to determine if there's anything in a specific area.

Q       This states it occurred on the fourth floor of

UNITED STATES DISTRICT COURT

SHB?

A       Yes.

Q       Do you know what "SHB" was?

A       Yes.

Q       What was it?

A       Sheriff's Headquarters Bureau.

Q       And the fourth floor housed who?

A       It was executive management.  So the sheriff and undersheriff.

Q       In the basement area, do you know what was located in the basement area of SHB at that time?

A       At that time that's where Steve Leavins, Maricela Long, and Scott Craig were working.

Q       Now highlighting on the second page what looks like the second full paragraph, can you please read what is stated here?

A       "The inspection was then conducted utilizing the above equipment to locate any RF, radio frequency, transmitters, hidden cameras, or other concealed surveillance equipment.  Additionally, a visual and physical search was conducted for anomalies consistent with the installation of these type devices."

Q       Did you have any bugs installed in SHB at the time?

A       We did not.

**UNITED STATES DISTRICT COURT**

Q        It lists a room here.  What does it state?

A        The large EPC conference room.

Q        It also lists another place searched, what I've highlighted here.  What does it say?

A        "The small EPC conference room."

Q        On page 3, does it list another place that was searched?

A        The executive offices.

Q        Does this e-mail state the conclusion of Mr. Powell?

A        Yes.

Q        What does it state?

A        "At the time of this operation, no surveillance devices were detected."

Q        I want to now move ahead a few days and move to September 7th of 2011.  Was that the date that Mr. Brown was supposed to be turned over to the Federal Grand Jury?

A        Yes.

Q        Was he turned over?

A        No.

Q        Now publishing Exhibit 47.

At some point in time, did you request information via subpoena relating to Brown?

A        Yes.

Q        And I'm going to highlight the top e-mail.  What

**UNITED STATES DISTRICT COURT**

time is this e-mail that states, "FYI, federal request?" from Mr. Thompson to Mr. Carey sent, according to this document?

A       It's at 3:45 p.m.

Q       Now moving on to Exhibit 48.  It's referencing, after a document gets signed, they're looking for a copy for Mr. Tanaka.

What time does this e-mail string end?

A       At 5:30 p.m.

Q       Now I'm going to the summary chart of Mr. Tanaka's cell phone on page 6.  What occurs --

MR. HOCHMAN:  Hold on, please.

MR. FOX:  Sure.

MR. HOCHMAN:  What exhibit?

MR. FOX:  170, page 6.

Q       What occurs at 5:56 p.m., according to your chart, on September the 7th?

A       Paul Tanaka calls Lee Baca's cell.

Q       What about at 5:59 p.m. on that date?

A       Lee Baca calls Paul Tanaka.

Q       Showing you now Exhibit 51, Special Agent Tanner, is this e-mail, according to the documents, sent a day after Mr. Brown was supposed to be turned over to the grand jury?

A       Yes.

Q       Who sends this e-mail?

A       Greg Thompson.

Q        To who?

A        All the custody captains, custody commanders, and then with cc to Assistant Sheriff Cecil Rhambo, Dennis Burns who is in charge of custody, Alex Yim in charge of custody, and Richard Barrintes.

Q        What is the subject of this e-mail?

A        "FBI requests for inmate interviews."

Q        What does it state?

A        "Just a reminder to inform your staff that all requests for inmate interviews made by the FBI or any LE officer associated with the FBI must be referred to MCJ jail liaison for approval.  After approval, jail liaison will arrange for the inmate to be transported to MCJ where the interview may occur.  No explanation is necessary as MCJ jail liaison and/or myself will provide the FBI with any information they are entitled to.  This has been mandated by department executives and will remain in effect until further notice."

Q        Now I'm going to show you what's in evidence as Government Exhibit 52.  This is an e-mail from Mr. Carey to Mr. Leavins at 4:41 p.m. on September the 9th.

         What is it that Mr. Carey wrote in this e-mail?

A        "Steve, official request from feds for interview with Brown was made."

Q        Are you aware of any requests from the Federal Government to interview Mr. Brown at this time?

**UNITED STATES DISTRICT COURT**

A       Yes.

Q       What happened?

A       After he was not produced to the grand jury, my supervisor reached out to Mike Gennaco with the Office of Independent Review and asked if we could have access to Anthony Brown.

Q       Who was your supervisor?

A       Carlos Narro.

Q       Were you able to interview Anthony Brown while he was in county custody?

A       No.

Q       Special Agent Tanner, based on your investigation, you're aware of the denied court order that occurred on September the 8th, 2011; is that correct?

A       Yes.

Q       I'm now going to play what's in evidence as Government Exhibit 94.  This is reflected in the jury binders in transcript 95.

May I proceed, Your Honor?

THE COURT:  Just one second.  Okay.

(The cd, Exhibit No. 94, commenced

playing before the jury.)

Q       BY MR. FOX:  Special Agent Tanner, did you call Mr. Craig back that day?

A       No.

**UNITED STATES DISTRICT COURT**

Q       Why not?

A       I never received that message.  He called the wrong number.

Q       So how did you obtain this recording?

A       It was in response to a Federal Grand Jury subpoena we served on the sheriff's department.

Q       How do you know that he called the wrong number?

A       In there he says the number he's calling.  In addition to it -- when he calls the mailbox, it says it's extension 4147, and my number was 4174.

Q       I'm now going to publish for you Mr. Baca's calendar on page 7, 8, and 9 of 120.  7, 8, and 9.

What does his calendar show for these dates between September the 9th and September the 21st?

A       It shows "Personal."

Q       When you received phone records for Mr. Baca during this time, showing you now 157, page 8, we see under "chart" a bunch of unavailable numbers during this time.  Why is that?

A       At that time the phone records showed that the cell phone was roaming out of the country, and so numbers were not showing up when there was incoming calls out of the country.  It was just roaming.  And so I wasn't able to determine who was calling on those incoming numbers during that time period.

UNITED STATES DISTRICT COURT

Q        I want to direct your attention to three days after Mr. Craig left you that message.  Publishing Government Exhibit 53.  This is an e-mail from Mike Gennaco to William T. Carey on September the 1st, 2011, at 12:48 p.m. Now, this is dated September the 1st.

I'm actually going to next refer to the one that's above it which is September 12th.  But for the time being, please read the subject and then what's written below the subject line.

A        It's a forward "Retaliation allegations list. Tom, this is the current complete list of ACLU complaints regarding retaliation.  It may be duplicative of what I had delivered to you earlier today.  Mike."

Q        This is an e-mail from Mr. Carey to who?

A        Scott Craig and Maricela Long with a cc to Steve Leavins.

Q        What date?

A        On September 12, 2011.

Q        What time?

A        9:43 a.m.

Q        What does he write?

A        "List of ACLU complaints out of CJ.  Probably lead us in part to where/what the feds are looking at."

Q        I'm not going to publish it for the jury, but if you could -- maybe I will since you don't have it in front of

you.  It will be quicker this way.

The attachments showing you page 4 as an example, what generally did these attachments show from this e-mail?

A    It shows the disposition of the sheriff's department investigation into these various allegations of deputy assaulting inmates, and it shows the majority of them were closed and unfounded.

Q    What date does it show that these complaints occurred overall?

A    In general, it was in 2009.

Q    And what dates does it show the review was completed?

A    It was, for a lot of these, not until mid to late 2010.

Q    At some point did you learn that Mr. Brown was no longer in county custody?

A    Yes.

Q    Approximately when did you learn that?

A    I believe it was the -- September 13th, maybe even 14th of 2011.

Q    How did you learn that?

A    I believe my supervisor had contact with someone in the sheriff's department.  I believe it might have actually been Mike Gennaco.  And they were -- they informed us that Anthony Brown was no longer in their custody.  And so I

UNITED STATES DISTRICT COURT

1410

contacted the state corrections and asked if -- to find out
where he was.

Q       What did you find out?

A       He was at Lancaster State Prison.

Q       What did you do after finding out he was at
Lancaster State Prison?

A       I immediately called the state prison and
requested to set up an interview so I can go meet with
Anthony Brown.

Q       Did you do that?

A       Yes.

Q       Approximately when did you meet with him?

A       I believe it was September 15th of 2011.

Q       And without initially getting into the substance
of your communications with him, what was his general demeanor
when you met with him?

A       He was incredibly angry at me.

Q       Why?

A       He believed that I left him for dead in sheriff's
department custody because, at the time that I was kicked out
of the interview with him to the time that I had spoken to him,
it had been approximately three weeks.  And he believed I had
just left him for dead, and he was incredibly angry.

Q       Did you decide at that point -- at that time to
writ him over to the Federal Grand Jury?

**UNITED STATES DISTRICT COURT**

A        Not at that time.

Q        Why not?

A        At that point in time, he was out of the sheriff's department custody.  So I wasn't as concerned with rushing him in to lock in his testimony.  I was actually able to speak to him.  In addition to that, around that same time, Gilbert Michel had retained an attorney and was beginning discussions with the U.S. Attorney's Office to potentially cooperate with our investigation.

Q        Now I'm going to show you from Exhibit 120, page 12, of Mr. Baca's calendar.  Actually, I'm going to go back one page first.  So this is page 11.

Showing you an entry on the 22nd at 4:30, what does this show?

A        "Meet with Tanaka."

Q        At some point -- well, obviously your investigation became overt after you approached Mr. Michel. Was there any media coverage of your investigation at some point in time?

A        Yes.

Q        I'm going to publish now Exhibit 61.  Can you please read the "from" line in what I've just highlighted for you?

A        MManzo7@yahoo.com.

Q        What is the date of this e-mail?

A        September 24, 2011.

Q        At what time?

A        At 10:32.

Q        What is the subject?

A        "FBI probing reports of beatings in L.A. County jails."

Q        Where is this article published?  What publication?

A        The *L.A. Times*.

Q        By who?

A        Robert Faturechi.

Q        And showing you now the top of this e-mail, does Mr. Manzo forward that e-mail on to anybody?

A        Yes.

Q        Who?

A        Scott Craig, Maricela Long, Steve Leavins, and Gerard Smith.

Q        What date and time?

A        Same date, September 24th, 2011, at 10:33 p.m.

Q        What does he write?

A        "FYI."

Q        Now sending you -- showing you Exhibit 62, what is Exhibit 62?

A        It is a link to an *L.A. Times* story from Paul Tanaka to Steve Leavins and Tom Carey.

UNITED STATES DISTRICT COURT

1413

Q       What is the subject line?

A       "FBI investigating reports of beatings in Los Angeles County jails."

Q       What is the date?

A       September 25th, 2011.

Q       At what time?

A       9:20 a.m.

Q       Is this a link to the *L.A. Times*?

A       Yes.

Q       Now showing you Exhibit 63 which is in evidence; what is this that I've highlighted?

A       It's an e-mail from Paul Tanaka to Steve Leavins and Tom Carey.

Q       What's the subject?

A       "Justice Department boosts activity to police the police."

Q       What's the date and time?

A       September 25th, 2011, at 9:26 a.m.

Q       What is the publication?

A       It's the *Washington Post*.

Q       Highlighting now the e-mail above that, this is from Steve Leavins to Paul Tanaka on September 25th at 9:34 a.m.

What does Mr. Leavins write in this e-mail?

A       "I figured that was the motivation, especially

**UNITED STATES DISTRICT COURT**

1414

when Holder had to approve the *L.A. Times* grand jury subpoena."

Q        What does Mr. Tanaka write back at 10:33 a.m.?

A        "This certainly clarifies where the," quote, "'orders' into investigating the local law enforcement agencies are coming from, the top."

Q        I'm going to show the 12th page of Mr. Baca's calendar on Exhibit 120, specifically the first entry of the day there.

What does this show?

A        "Live interview with Fox 11 regarding Lupus race for life."

MR. FOX:  Your Honor, I'm going to move now pursuant to 902.11 for the admission of Government Exhibit 102.

MR. HOCHMAN:  No objection, Your Honor.

THE COURT:  It will be received.

(Marked for identification and received

into evidence Exhibit No. 102.)

MR. FOX:  Your Honor, I'm going to play it for the jury at this time.

(The video, Exhibit No. 102, commenced

playing before the jury.)

Q        BY MR. FOX:  Special Agent Tanner, Mr. Baca referenced a meeting that he had set up the next day.  I'm going to go back to Exhibit 120, page 12, and ask you about Tuesday, September 27th at 2:30 p.m.

**UNITED STATES DISTRICT COURT**

What does this reflect?

A        "Meet with U.S. Attorney Andre Birotte and FBI assistant director in charge Steve Martinez."

Q        Let's go back to September 26th.  There is a 10:00 o'clock and a 12:00 o'clock entry that I want to ask you about.

Can you please read what's listed for September 26th at 10:00 o'clock a.m.?

A        "Weekly briefing with undersheriff and assistant sheriffs."

Q        What about the 12:00 o'clock meeting?

A        "Meet with Undersheriff Tanaka, Assistant Sheriff Rhambo, Chief Yim and Chief Burns."

Q        Are you familiar with the roles that Assistant Sheriff Rhambo, Chief Yim, and Chief Burns played at the time?

A        Yes.

Q        Can you please describe them?

A        Assistant Sheriff Rhambo was the assistant sheriff over custody, and Chief Yim and Chief Burns were the chiefs of various components of the custody operations.

Q        Now I'm going to show you what's in evidence as Government Exhibit 64.  What is this e-mail?

A        It's from Paul Tanaka to Tom Carey on September 26th, 2011, at 1:25 p.m.  It's a forwarded e-mail of a link to Sheriff Baca on *Good Day L.A.*

UNITED STATES DISTRICT COURT

1416

Q        What's the subject?

A        "Sheriff Lee Baca on GDLA, *Good Day L.A.*"

Q        I'm now going to show you the top e-mail.

By the way, a lot of these e-mails have a name David Royston at the top.  Do you know why his name is at the top of a lot of these e-mails?

A        David Royston was a sergeant with the sheriff's department who was in charge of, when we issued subpoenas on the sheriff's department, to turn over documents. David Royston was in charge of gathering all of those documents.  And so when he would gather e-mails from individuals, they would come up with his name on the very top when he printed them off to produce them to the FBI.

Q        It doesn't mean he received them at the time. It's that he produced them later; is that correct?

A        Correct.

Q        Let's talk about this e-mail.  This is September 26, 2011, at 12:09 p.m.  This is an e-mail from Mr. Carey to Mr. Craig.

What is he doing at this point?

A        That's 2:09, not 12:09.

Q        Sorry.

A        He's forwarding the e-mail to Scott Craig, the link to the Sheriff Baca interview on *Good Day L.A.*

Q        Anything unusual occur to you about three hours

UNITED STATES DISTRICT COURT

later?

A       Yes.

Q       What happened?

A       I was returning home from work, and when I was walking to the door of my apartment, there were two individuals standing outside my apartment.  I could see their guns, at least the gun on one individual and badge was showing.  And so I knew they were sheriff's department employees.

Q       And what happened during that encounter?

A       When I walked up to them, they asked if I was Leah Marx.  I said, yes.  And they proceeded to tell me that they were in the process of swearing out an arrest warrant for me.

Q       Can you please look at Exhibit 99.  It's actually one of the original exhibits.  As long as you're doing that, would you mind grabbing 100 as well, please.

        (Marked for identification Exhibit Nos. 99 and 100.)

Q       BY MR. FOX:  Do you recognize Exhibit 99?

A       99, yes.

Q       What is it?

A       It's a synched video of -- and audio of Sergeant Craig and Sergeant Long approaching me at my apartment.

Q       What do you mean it's synched?

A       When we subpoenaed the documents from the

sheriff's department, there were two separate files.  One was an audio file of what occurred, and one was a video file.  And so in order to play them as one, they were synched so that the audio and the video went together by the U.S. Attorney's Office.

MR. FOX:  Your Honor, I move for the admission of Government Exhibit 99.

THE COURT:  Any objection?

MR. HOCHMAN:  No objection, Your Honor.

THE COURT:  It will be received.

(Received into evidence Exhibit No. 99.)

MR. FOX:  I'd like to play that for the jury now.

THE COURT:  All right.

(The video, Exhibit No. 99, commenced playing before the jury.)

Q      BY MR. FOX:  Special Agent Tanner, what did you understand Mr. Craig to mean when he said, "We can either do this," and he raised his arms?

A      That they could arrest me right in front of my apartment in front of everybody.

Q      Now, I want to show you what's in evidence as Government Exhibit 65.  Who is this an e-mail from and to?

A      It's from Scott Craig to Steve Leavins.

Q      What is the date and time?

A      September 26, 2011, at 6:39 p.m.

Q      Now, in reference to what we just saw, the 6:39 p.m., how far later is it?

A      It was approximately an hour.

Q      Are you familiar with this file name?

A      Yes.

Q      What is it?

MR. HOCHMAN:  Objection.  Foundation.

MR. FOX:  Happy to lay it, Your Honor.

THE COURT:  All right.

Q      BY MR. FOX:  In terms of the documents that were produced to the Federal Grand Jury in response to the Federal Grand Jury subpoena, did you obtain a file with this name on it?

A      Yes.

Q      What was on it?

A      It was the audio recording of the sheriff's department approaching me outside my apartment.

Q      What does it state under this message that is sent with the following link file or link attachments?

MR. HOCHMAN:  Objection.  Who has served the Federal Grand Jury from which she received it, Your Honor? Vague as to the foundation.

MR. FOX:  I can certainly ask that question, Your Honor.

THE COURT:  All right.

**UNITED STATES DISTRICT COURT**

1420

Q        BY MR. FOX:  Who did you receive this file from?

A        We subpoenaed the sheriff's department, and they provided the document in response to the Federal Grand Jury subpoena.

Q        Now, you said a few times that you subpoenaed the sheriff's department.  When you were obtaining documents, say, after October of 2011, were you subpoenaing Sheriff Baca?

A        No.

Q        Who would you provide grand jury subpoenas to?

A        They would actually go to an attorney because, at that point in time, the county had hired a law firm to actually handle all of the subpoena requests.  So nothing was actually being served necessarily on the sheriff's department employees. It was actually being served on an attorney law firm.

Q        What was that law firm's name?

A        Jones Day.

Q        And you said the county hired this law firm; is that correct?

A        Correct.

Q        When you received documents from the sheriff's department, did you receive them directly from the sheriff's department generally?

A        They would come from -- again, from the law firm. They would gather the documents, and then they would go through the law firm and then provide them to the FBI.

**UNITED STATES DISTRICT COURT**

Q       Were there times when you would go on-site to help search for documents as well that you had subpoenaed?

A       Yes.

Q       And, generally, would the law firm accompany you or not be there?

A       They were -- I believe they were there almost -- actually, I believe they were there every single time.

Q       So this was sending the file -- the recording of your video from Craig to Leavins about an hour after the incident; is that right?

A       Yes.

Q       What did you do after this happened?

A       After they were standing outside my apartment, I went inside and immediately called my supervisor, and he advised I needed to immediately return to the office.

Q       Who was your supervisor at the time?

A       Carlos Narro.

Q       What did you do?

A       I returned to the FBI office and went inside to meet with executive management.

Q       Did you give anything to your supervisor?

A       I did.

Q       What did you give him?

A       I gave him the business cards that the two sergeants that were outside my house provided to me.  I gave

**UNITED STATES DISTRICT COURT**

them to my supervisor.

Q    Now, Special Agent Tanner, do you recognize what's in front of you as Government Exhibit 100?

A    Yes.

Q    What is it?

A    It's an audio recording of a phone call between my supervisor at the time, Carlos Narro, and members of the sheriff's department.

Q    What's 101?

A    It's a transcript of that phone call.

MR. FOX:  Your Honor, I'd like to play this for the jury.  It's in their jury binder at 101, and the exhibit I want to play is 100.  It's already in evidence.

THE COURT:  If everybody would open their binders to tab 101.

(The cd, Exhibit No. 100, commenced

playing before the jury.)

Q    BY MR. FOX:  Special Agent Tanner, we heard a number referred to there ending in 5000.  Are you familiar with that number?

A    Yes.

Q    What is that number?

A    On the rosters we receive from the sheriff's department, it's listed as Sheriff Baca's number.  It seems to be a general number that you call when you're reaching out to

the sheriff's department, but it specifically says "Office of the Sheriff."

Q       Going back to the meeting that you attended with your executive management on September 26 of 2011, did you have a conversation at some point with your assistant director in charge, Steve Martinez, about the future of the investigation?

A       Yes.

Q       What did you talk about?

A       After I was -- we went through various things in the office, and then Mr. Martinez asked to meet with me, sent me down, and asked whether or not I wanted to stay on the investigation given what had happened, and I told him I absolutely did.

Q       Why?

A       At that point I had put a significant amount of work into the --

MR. HOCHMAN:  Objection.  Relevance as to why.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  I had put a significant amount of work into the investigation.  I felt I had built very good rapport with a lot of the inmates and a lot of individuals along the way.  I had a very decent knowledge of things within the jails and the way things worked, and I felt that was very important in the investigation.  I also felt like I was not

UNITED STATES DISTRICT COURT

going to let someone intimidate me and get me to stop working a case that I felt was important.

Q        BY MR. FOX:  Was that the only discussion you had with your supervisors about whether you would remain on the case?

A        No.

Q        Approximately how many others have you had?

A        There were at least a few other conversations with executive management as well as the U.S. Attorney's Office to make sure that there was not going to be a conflict with me staying on the case as a case agent.

Q        Over what period of time did this occur?

A        I would say at least a few months, probably longer, over the course of the investigation.

Q        Did this encounter with Mr. Craig and Ms. Long effect your investigation at all?

A        Yes.

Q        In what ways?

A        Initially I wasn't able to go back to the jails. I had major concerns about showing back up to a sheriff's-run facility and being in a position where I was unable to really control anything because I was in a locked sheriff custody facility.

But it also impacted the fact that, not going back, there were inmates that I agreed to go back and talk to.

UNITED STATES DISTRICT COURT

And because I wasn't able to go back there, I damaged the rapport with them, and they didn't want to meet with me anymore because they believed I wasn't being truthful with them.

Q      What about others involved in the investigation, other agents?  Did they go back right away?

A      I believe the soonest that anyone related to the case went back was not for three to four months.

Q      Now, I want to publish for you Government Exhibit 172, page 22.  This is a summary chart for which day?

A      This is September 26th, 2011, the date that the sergeants were at my home.

Q      Let's just look at the four calls before the bolded line there.

Do you know who Rubin Martinez was at the time?

A      Yes.

Q      Who was he?

A      He was the sergeant that was in charge of the surveillance team that was outside videotaping.

Q      What about Shaughenssy?  Do you know who Shaughenssy is?

A      He was also part of the surveillance team.

Q      What occurs in the four phone calls after 5:31 p.m.?

A      There's phone calls between Carey and Leavins, Sergeant Long and Rubin Martinez, and then Scott Craig and

Carey and Leavins.

Q        Let's look at 5:45 to 6:26.  What do we see here?

A        Multiple calls between Steve Leavins and Scott Craig along with Tom Carey and Scott Craig, and then Lee Baca calling the sheriff's main line, the sheriff's office.

Q        What about -- I'm highlighting the bullet first.  This is the time that's reflected in that recording that we just heard of the phone call.

A        Yes.

Q        What happens at the same time?

A        Paul Tanaka calls Steve Leavins' cell phone.

Q        Showing you now the 7:35 call, what does this reflect?

A        An unavailable number calls Lee Baca's cell phone, and they speak for 22 minutes.

Q        Are you familiar with whether calls from the U.S. Attorney's Office cell phones show up as unavailable on cell phones?

A        They do.

Q        Now showing you page 10 of Exhibit 157, Mr. Baca's chart, are there any other calls that occur besides the ones you just described, the one-minute call to the sheriff's office main line and the 7:35 unavailable call from Mr. Baca's cell phone around this time?

A        No.  The last call he -- he receives a call at

**UNITED STATES DISTRICT COURT**

7:35 and then does not make any outgoing calls until the next day.

Q      Now I'm going to show you page 10 of the same exhibit.  Yeah.  Page 10 at 1:02 p.m.  What does this show that I've highlighted?

A      It's a phone call from Robert Faturechi to Lee Baca's cell phone.

Q      And what about on September 29 at 8:02 A.M.?

A      There's a 10-minute -- 12-minute call between Lee Baca and Robert Faturechi.

Q      Special Agent Tanner, I now want to show you Exhibit 119 which is in evidence.  Do you recognize this document?

A      Yes.

Q      What is it?

A      It's a yearly performance evaluation for Scott Craig who was a sergeant in the sheriff's department.

Q      You said he was a sergeant in the sheriff's department.  Do you know him for some other reason?

A      He's the individual that was outside my apartment on the 26th.

Q      What are the dates in this performance review?

A      July of 2011 to July of 2012.

Q      Who does it show rated Mr. Craig during this period of time?

**UNITED STATES DISTRICT COURT**

A        Steve Leavins and Tom Carey.

Q        And below it there's something that says, "I concur and approve this report."  Do you recognize this name?

A        Roberta Abner.

Q        Do you know who Roberta Abner was in October of 2012?

A        She was in charge of Internal Criminal Investigations Bureau and Internal Affairs.

Q        What is the rating that Mr. Craig received for the time period?

A        Outstanding.

Q        Now I'm going to show you the third page of this exhibit.  I'm just going to ask you about one of them.

There's different categories here that Mr. Craig is rated on; is that correct?

A        Correct.

Q        They all show that he's outstanding; right?

A        Right.

Q        Let me just ask you about the first one.

What does it show for what I've just highlighted?

A        That he received an outstanding marking for exudes the department's core values.

Q        Those are Mr. Baca's core values?

A        Correct.

Q        Now I'm going to highlight a section under

assignment of work, and I'm going to in yellow just highlight the part I would like you to read.  Can you please read the portion that I've just highlighted?

A    "On larger cases requiring multiple investigators and when assigned as the," quote, "'lead investigator,' Sergeant Craig displayed the ability to ensure compliance to all assigned tasks."

Q    I have one last document to show you, Special Agent Tanner.

Highlighting and now zooming in on the top portion of this document, do you recognize this document in evidence as 184?

A    Yes.

Q    What is this document?

A    It's a performance review for Tom Carey.

Q    During what period of time?

A    From April of 2011 to April of 2012.

Q    What does it show that Mr. Carey's position was at the time?

A    He was a captain.

Q    Of what department, division, and unit?

A    ICIB.

Q    Now I want to show you the second page of 184. Can you please read this paragraph.

A    "Captain Carey's professionalism and his

**UNITED STATES DISTRICT COURT**

interpersonal skills allowed him to work harmoniously with his subordinates as well as the various executives he reported to on a daily basis.  His duties required him to be familiar with every aspect and function of the bureau and ensure each of his investigators completed their investigations in a timely, objective, and thorough manner.  Captain Carey continue continually demonstrated outstanding judgment that enabled the bureau to achieve goals that would not have been possible without his superior leadership.  He embraced new challenges and provided ethical guidance for his subordinates."

Q      Now I want to highlight a handwritten portion at the bottom of the document.  Can you read this?

A      "Tom, thanks for your great work.  Paul T."

Q      Do you know who in Mr. Carey's chain of command had the first name Paul and the last name starting with T.?

A      Paul Tanaka.

Q      I want to take you back now to the first page of this exhibit.  Does it show who evaluated Mr. Carey?

A      Paul Tanaka.

Q      What's the date?

A      April 26, 2012.

Q      And what is his rank?

A      Undersheriff.

Q      Could you please review or -- I'm sorry -- read under where it says print typed name, job title.  Read starting

with the word -- I'm sorry.  Starting with the "I concur."

A        "I concur in and approve this report."

Q        Whose signature is that?

A        Lee Baca's.

Q        What's the date?

A        April 27, 2012.

MR. FOX:  One moment, Your Honor.

I have no further questions of this witness at this time.

THE COURT:  All right.  Ladies and gentlemen, I think we've done about all we can do today.

Again, I want to remind you, until this trial is over, you're not to discuss this case with anyone, including your fellow jurors, members of your family, people involved in the trial, or anyone else.  And do not allow others to discuss the case with you.  This includes discussing the case on the Internet, in chat rooms, blogs, bulletin boards, any form of social media, by e-mails or text messages.  If anyone tries to communicate with you about this case, please let me know about it immediately.

Do not read, watch, or listen to any news reports or other accounts about the trial or anyone associated with it. Do not do any research such as consulting dictionaries, searching the Internet, or using other reference materials, and do not make any investigation about the case on your own.

**UNITED STATES DISTRICT COURT**

1432

Finally, you're reminded to keep an open mind until all the evidence has been received, you've heard the arguments of counsel, the instructions of the Court, and your views of your fellow jurors.

I'm sure many of you are wondering whether or not we will be in session on Monday, and we will be.

All right.  Thank you very much.

We're going to resume tomorrow at 8:00 a.m.

(The following proceedings were held in open court out of the presence of the jury:)

THE COURT:  You may step down.

MR. FOX:  Your Honor, may I ask her about scheduling for the morning whether it will be a problem?

THE COURT:  Who's going to follow Agent Tanner?

MR. FOX:  Judge Birotte will.  He has a jury trial right now.  It's a civil jury.  I believe he starts his trial times at 8:30.  He said he will be flexible.  I think, if we can break after we're done with this witness -- and I'm guessing it's going to be around break time anyway -- I'll be happy to pop down in his courtroom so he can see that we need him.

THE COURT:  Okay.  Who follows that?

MR. FOX:  We may at that point rest, Your Honor. We will be looking at the transcripts of the recording of Mr. Baca's interview to see if we're going to be introducing

UNITED STATES DISTRICT COURT

1433

that or not.  I think at this point it's unlikely, but we just want to compare that to what has been introduced into evidence already to see if there's anything we're missing.  And I will let Mr. Hochman know tonight whether we're -- well, probably in the next two hours whether we're going to have Special Agent Dalton testify to that or not or whether we're just going to rest.

THE COURT:  All right.  And who do you -- are you going to put on a case?

MR. HOCHMAN:  Yes, Your Honor.

THE COURT:  Okay.  And who are you calling?

MR. HOCHMAN:  Your Honor, in light of Special Agent Marx's testimony, we're going to evaluate who we're going to call in what order tonight, Your Honor, and I will let the Government know tonight who that will be.

MR. FOX:  Your Honor, as I mentioned before, we don't have any witness statements.  And we've been very transparent with the defense every day providing in our trial brief and providing them all the time with the order of witnesses that we received.  If we hear that we're going to find out tonight who their witnesses are and we don't know anything about what they're going to say, it puts us in an incredibly difficult --

THE COURT:  That's all right.

That's not acceptable.  So when are you going to

**UNITED STATES DISTRICT COURT**

1434

know?

MR. HOCHMAN:  It's 1:30.  I'll know by 4:00 o'clock today.

THE COURT:  Make it 3:00.  Let them know by 3:00 o'clock.

MR. HOCHMAN:  I will, Your Honor.

THE COURT:  And notify my clerk.

MR. HOCHMAN:  I will.

THE COURT:  Then every day thereafter, you'll have to let them know who the witnesses are and the order in which they're going to be called.

MR. HOCHMAN:  Yes, Your Honor.

THE COURT:  Okay.  Anything else?

MR. FOX:  No, Your Honor.

MR. HOCHMAN:  Your Honor, again, depending on which witnesses we call, the issue that we have raised and the Government has responded to -- and obviously we can respond to the Government's response --

THE COURT:  I don't need any further responses to the Government's responses.  This was already a motion in limine that was fully briefed.  You even filed another document.  They filed.  I don't need any more briefing.

MR. HOCHMAN:  Very good, Your Honor.

THE COURT:  Now, I can -- if you want to come back this afternoon, I can rule on it, or we can rule on it

**UNITED STATES DISTRICT COURT**

tomorrow.

MR. HOCHMAN:  If we can rule on it tomorrow, Your Honor, that would be great, since I have to get to the Government that information by 3:00 o'clock today.

THE COURT:  Okay.  Anything else?

MR. FOX:  No, Your Honor.

THE COURT:  Okay.  Thank you.

MR. HOCHMAN:  Thank you, Your Honor.

(Proceedings concluded at 1:30 p.m.)

**UNITED STATES DISTRICT COURT**

1436

CERTIFICATE OF OFFICIAL REPORTER

I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

DATED THIS __14TH__ DAY OF AUGUST, 2017.


/S/ MIRANDA ALGORRI
_____
MIRANDA ALGORRI, CSR NO. 12743, CRR
FEDERAL OFFICIAL COURT REPORTER


**UNITED STATES DISTRICT COURT**