1437

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

HONORABLE PERCY ANDERSON, U.S. DISTRICT JUDGE

UNITED STATES OF AMERICA,           )
                                    )
            Plaintiff,              )    Case No.
                                    )
      vs.                           )    CR 16-00066(A)-PA
                                    )
LEROY D. BACA,                      )    PAGES 1437 to 1688
                                    )    VOLUME 10
            Defendant.              )
_____)

REPORTER'S TRANSCRIPT OF
TRIAL DAY 7
THURSDAY, DECEMBER 15, 2016
8:08 A.M.
LOS ANGELES, CALIFORNIA

MIRANDA ALGORRI, CSR 12743, CRR
FEDERAL OFFICIAL COURT REPORTER
312 NORTH SPRING STREET, ROOM 435
LOS ANGELES, CALIFORNIA 90012
MIRANDAALGORRI@GMAIL.COM

UNITED STATES DISTRICT COURT

1438

**APPEARANCES OF COUNSEL:**


**FOR THE PLAINTIFF:**

    SANDRA R. BROWN
    Acting United States Attorney
    BY:  BRANDON FOX
    BY:  EDDIE A. JAUREGUI
    Assistant United States Attorneys
    United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012


**FOR THE DEFENDANT:**

    MORGAN LEWIS AND BOCKIUS LLP
    BY:  NATHAN J. HOCHMAN
    BY:  BRIANNA ABRAMS
    The Water Garden
    1601 Cloverfield Boulevard
    Suite 2050 North
    Santa Monica, California 90404


    MORGAN LEWIS AND BOCKIUS LLP
    BY:  TINOS DIAMANTATOS
    77 West Wacker Drive
    Chicago, Illinois 60601

**UNITED STATES DISTRICT COURT**

1439

**I N D E X**


**THURSDAY, DECEMBER 15, 2016**


**Chronological Index of Witnesses**

Witness: _____    Page

TANNER, Leah

    Cross-examination by Mr. Hochman                    1443
    Redirect examination by Mr. Fox                    1570
    Recross-examination by Mr. Hochman                 1576


BIROTTE, JR., Andre

    Direct examination by Mr. Fox                      1580
    Cross-examination by Mr. Hochman                   1612
    Redirect examination by Mr. Fox                    1648
    Recross-examination by Mr. Hochman                 1653


RAMBO, Cecil

    Direct examination by Mr. Hochman                  1654

**UNITED STATES DISTRICT COURT**

1440

**EXHIBITS**

**THURSDAY, DECEMBER 15, 2016**

| Exhibit | | For ID | In EVD |
|---|---|---|---|
| 69 | Letter | 1609 | 1609 |
| 112 | Letter | 1596 | 1596 |
| 637 | Summary chart | 1560 | |
| 638 | Summary chart | 1562 | 1563 |
| 639 | Summary chart | 1561 | |
| 744 | Chart | 1655 | 1655 |
| 745 | Chart of chain of command | 1657 | |

**UNITED STATES DISTRICT COURT**

1441

**LOS ANGELES, CALIFORNIA; THURSDAY, DECEMBER 15, 2016**

**8:08 A.M.**

**---**

(The following proceedings were held in open court out of the presence of the jury:)

THE CLERK:  Calling item No. 1, CR 16-66(A), USA versus Leroy D. Baca.

Counsel, state your appearances, please.

MR. FOX:  Good morning, Your Honor.

Brandon Fox and Eddie Jauregui on behalf of the United States.  Also with us at counsel table is Special Agent David Dahle from the FBI.

MR. DIAMANTATOS:  Your Honor, good morning.

Tinos Diamantatos, and Nathan Hochman should be entering the doors any second, Your Honor.  I'm joined at counsel table with Brianna Abrams and the defendant Leroy Baca who is present.

THE COURT:  Good morning.

MR. HOCHMAN:  Good morning, Your Honor.

THE COURT:  Good morning.

I received a list.  Is this a complete list of witnesses who the defense anticipates calling in its case?

MR. HOCHMAN:  Today, Your Honor.  I thought that's what the Court had asked for was the witnesses that we

**UNITED STATES DISTRICT COURT**

1442

were going to call today.  I was going to inform the Government, as they have done with me, at the close of each day which was who we would call for the next day.

THE COURT:  Well, the Court would like to have a list of who you're going to call in your case.

MR. HOCHMAN:  Your Honor, we provided the Court with an extensive list at the very beginning.

THE COURT:  I want a real list.

MR. HOCHMAN:  I will get you that list, Your Honor.

THE COURT:  Thank you.

Okay.  The witness --

MR. FOX:  She's here.  Would you like her on the stand?

THE COURT:  Yes.  Let's bring her in.

MR. HOCHMAN:  Did Your Honor want to take up that matter we took up -- it doesn't pertain to this particular witness.  Actually, it doesn't pertain to either of the witnesses in the Government's case.  So we can take it up at the close of the Government's case if you'd like, Your Honor.

THE COURT:  Okay.  Let's bring the jury in.

(The following proceedings were held in open court in the presence of the jury:)

THE COURT:  Good morning, ladies and gentlemen.

All right.  Let's proceed.

**UNITED STATES DISTRICT COURT**

1443

MR. HOCHMAN:  Thank you, Your Honor.

**LEAH TANNER,**

**GOVERNMENT'S WITNESS, PREVIOUSLY SWORN:**

**CROSS-EXAMINATION**

BY MR. HOCHMAN:

Q     Agent Marx, you opened an investigation into Los Angeles County Sheriff's Department deputy misconduct in June of 2010; is that correct?

A     Correct.

Q     And if I recall, you did that after receiving a letter from an inmate that had been given to you by your supervisor alleging that deputies had been assaulting inmates and covering up their assaults; is that correct?

A     It wasn't just from the letter.  It was after doing multiple interviews that we determined that there was sufficient evidence to be able to open an investigation.

Q     And when you opened that investigation in June of 2010, you had been a special agent with the FBI for approximately one year; correct?

A     Correct.

Q     It was your rookie year; is that right?

A     If you want to call it that.

Q     And before you were a special agent, you had never worked for any law enforcement agency; is that correct?

A     Correct.

**UNITED STATES DISTRICT COURT**

1444

Q      Now, of that one-year period that you had been a special agent, four months of it was spent at the FBI's training academy in Quantico, Virginia; correct?

A      Correct.

Q      You were assigned -- your first assignment upon coming to the Los Angeles office was the civil rights squad; is that right?

A      Yes.

Q      So then you had only been with the civil rights squad about eight months at the time you received that inmate letter in June, 2010; is that correct?

MR. FOX:  Objection.  Relevance, Your Honor.

THE COURT:  You can answer that question.

THE WITNESS:  I believe it was ten months because I got to Los Angeles in September of 2009.  So I believe that's ten, nine, ten months.

Q      BY MR. HOCHMAN:  And you said you were assigned to the civil rights squad; is that correct?

A      Yes.

Q      You weren't the only person on that squad; right?

A      No.

Q      How many agents were on that squad?

A      At the time I arrived, I believe seven, maybe eight.

Q      And were you the most junior of those agents?

**UNITED STATES DISTRICT COURT**

1445

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

Q     BY MR. HOCHMAN:  And beyond the civil rights squad, there is an entire Los Angeles FBI office; is that correct?

A     Yes.

Q     And there's about 800 agents in that Los Angeles office?

A     Yes.  That includes offices as far as Santa Barbara, Santa Maria area, and stuff.  But yes.  800 in the Los Angeles field office.

Q     When you received that inmate letter, June, 2010, how many jails had you investigated at that point?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

Q     BY MR. HOCHMAN:  Well, as part of your training, did you work in any jails?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

Q     BY MR. HOCHMAN:  When you were doing due diligence concerning the Los Angeles County Sheriff's Department jails, did you have any comparison in your own life history with any jails that you had investigated?

MR. FOX:  Objection to relevance.

THE COURT:  Sustained.

UNITED STATES DISTRICT COURT

1446

Q    BY MR. HOCHMAN:  How many undercover operations had you participated in by June, 2010?

A    This was the first one.

Q    And how many times had you actually been inside the Los Angeles County Sheriff's Department jails before June, 2010?

A    I had not been prior to that time.

Q    Now, you wanted to make sure you conducted a thorough investigation in connection with that inmate letter; correct?

A    Yes.

Q    And did you get an organization chart of the Los Angeles County Sheriff's Department in June, 2010, to see how it was put together?

A    I don't really understand your question.

Q    Do you understand what an organization chart is where it sort of lists everyone from the sheriff all the way down to a deputy?

A    I understand what an organizational chart is.  I don't understand what you mean by whether or not I looked at an organizational chart in relation to the jails.  Is that what you're asking?

Q    In relation to the jails, yes.

A    I had researched plenty on the sheriff's department during that time.  Whether or not I looked at a

UNITED STATES DISTRICT COURT

specific organizational chart for the jails, I don't believe so.

Q      Well, did you know that the sheriff's department had something called an Internal Criminal Investigations Bureau during the first year of your investigation?

MR. FOX:  Objection to the form of the question.

THE COURT:  Sustained.

Q      BY MR. HOCHMAN:  At any point before you do the bribe transaction in July, 2011, did you know that the sheriff's bureau had an Internal Criminal Investigations Bureau?

A      I knew that the sheriff's department had internal investigations.  I don't know that I knew specifically there was an internal criminal investigations and an Internal Affairs, but I knew that they had an internal investigative body that would look into deputy misconduct.

Q      Did you know who ran the internal investigative body as of the summer of 2011 at the sheriff's department?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

Q      BY MR. HOCHMAN:  Did you contact any people in, let's say, July, 2011, as you're doing the first bribe transaction, that was part of this Internal Affairs organization inside the sheriff's department?

A      No.  We intentionally did not.

**UNITED STATES DISTRICT COURT**

Q        Did you later learn that the person who ran Internal Criminal Investigations Bureau was Captain William Tom Carey?

A        I did learn that later, yes.

Q        And starting in 2015, did Tom Carey cooperate with your investigation?

MR. FOX:  Objection.  Relevance.  Improper, Your Honor.

THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  Well, did you ever have a chance to meet William Tom Carey as of 2011?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  When doing your research about the Los Angeles Sheriff's Department, did you come to learn that in the -- between June, 2010, and July, 2011, that it had an Office of Independent Review?

A        I did know that, yes.

Q        You did know that?

A        Yes.

Q        Did you contact the head of the Office of Independent Review, Michael Gennaco, any time between June, 2010, and June, 2011?

A        Again, we intentionally did not.

Q        Did you ever read their annual reports of what

**UNITED STATES DISTRICT COURT**

was going on in the Men's County Jail between June, 2010, and June, 2011?

A       That's actually one of the reasons why we continued on with our investigation, based on some of the reports that they had written.

Q       Now, the FBI periodically issues enforcement bulletins for its agents; is that correct?

A       I'm not sure what you mean by "enforcement bulletins."  They have law enforcement bulletins.  I'm not sure if that's the same thing that you're discussing.

Q       Yes.  The FBI periodically issues FBI law enforcement bulletins for its agents; is that correct?

A       Yes.

Q       And they publish these bulletins to provide information on law enforcement techniques to the agents; is that correct?

A       Yes.

Q       Now, in July, 2010, did you read an FBI enforcement bulletin entitled "Cell Phones as Prison Contraband"?

A       No.

Q       At any time between July, 2010, and July of 2011, when you do the first bribe transaction, did you read an FBI law enforcement bulletin entitled "Cell Phones as Prison Contraband"?

**UNITED STATES DISTRICT COURT**

1450

A       No.

Q       Are you aware, though, that a cell phone -- are you aware in that time period of June, 2010, to July, 2011, that a cell phone could be used to plot escapes in a jail?

A       I knew that it could be.

Q       And you also knew that a cell phone could be used to arrange a hit on witnesses; correct?

A       It could be.

Q       And a cell phone could be used to threaten or intimidate witnesses?

A       It could be.

Q       And a cell phone could be used to conduct gang activity inside of a secured jail?

A       It could.

Q       And a cell phone could be used to smuggle drugs inside a jail?

A       It could be.

Q       And the reason a cell phone could be used for all these purposes is it's not a monitored phone call that's happening as the phones used inside the jail?

A       That's true.  But phones in the jail are not monitored realtime; so they could also be used for the same purposes.

Q       Well, you are aware, when an inmate makes a call from one of the phone calls -- public phone calls in these jail

cells, that that phone call will be monitored and recorded by the sheriff's department?

A        It's recorded.  It's not monitored realtime is what I was told.

Q        But a cell phone call inside the jail is never recorded by the sheriff's department, to your knowledge; is that right?

A        Correct.

Q        Now, to determine the validity of these inmate complaints, you went with another agent at all times to the Men's County Jail to interview inmates; correct?

A        Correct.

Q        Did you go in an undercover capacity?  And by that, I mean did you get a fake credential and say you were from some other agency other than the Federal Bureau of Investigation?

A        No.

Q        Did you take any steps, as you were going through the entryway, to hide the fact you were with the FBI?

A        No.

Q        And your partner was an FBI agent as well?

A        Correct.

Q        And did you see your partner take any steps to hide the fact that your partner was an FBI agent?

A        No.

**UNITED STATES DISTRICT COURT**

Q        And if I understand what you said in your testimony before, when you would enter the Men's Central Jail, you would provide your credential to the deputy who was present; is that correct?

A        We would show it to them.  They would not keep it.  They kept our driver's license, but they did not keep our credentials.  They just reviewed them, looked at them, and verified that they were, in fact, who we say we were.

Q        And the credential had an FBI insignia to indicate you were an FBI agent?

A        Yes.

Q        And it had your name which, I believe, at the time was Leah Marx?

A        Correct.

Q        And then the driver's license would have an address on it for yourself?

A        Mine has a P.O. Box.

Q        P.O. Box.

Then you would sign a register that would put your name, telephone number, and the inmate that you wanted to speak with; is that correct?

A        Yes.  I can't remember at the time if we actually wrote down the inmate's name or we just provided that verbally to the deputy.  But either way, we signed in with our name and credential number and things like that.

**UNITED STATES DISTRICT COURT**

Q        So name, telephone, credential number; is that correct?

A        I believe so, yes.

Q        And then -- and in order to get the correct inmate, you'd also have to provide them with an inmate booking number; is that correct?

A        Correct.

Q        Now, the number of inmates you interviewed, I think you said, were dozens in this time period from June, 2010, to June, 2011; is that correct?

A        Quite a few, yes.

Q        Was it dozens?

A        I believe so, yes.

Q        And many of the inmates who you had interviewed or you interviewed in this time period between June, 2010, and July, 2011, these were inmates who had filed complaints against the sheriff's department; correct?

A        Not all of them.  Some of them may have; some of them have not.

Q        Have some of them also filed complaints with the ACLU against the sheriff's department?

A        Again, some did; some did not.

Q        Now, as an FBI agent, you can't just go into the jails, walk through the doors, go to a cell of an inmate, pull the inmate out, put him in a room, and start speaking with him;

UNITED STATES DISTRICT COURT

correct?

A    Correct.

Q    You actually have to go through the sheriff's process, as you've just described, in order to have the inmate brought down to you; is that correct?

A    Yes.

Q    And that's because the sheriff's department is in charge of the jails; isn't that right?

A    Yes.

Q    And the sheriff's department being in charge of the jails gets to set the rules for the jails; correct?

MR. FOX:  Objection.  Argumentative.  Relevance.

THE COURT:  Sustained.

Q    BY MR. HOCHMAN:  Well, the sheriff's department determines when inmates can be interviewed; correct?

A    I don't know if that's accurate.  I don't know that they can restrict an interview just based on the fact that they feel like restricting an interview of an inmate between law enforcement officers.

Q    I'm actually talking about the timing.  In other words, are you allowed to go in 24 hours a day to interview with an inmate, or are there certain time periods that you can?

A    In the past there's been plenty of times where you've been able to go off hours as long as you coordinate it with them.  I think now there's a change in policy that there

may be specific hours, but I know that other agents as well have gone in after hours plenty of times.

Q       Now, when you have the inmate brought down to you, I think it's the 6000 room that you actually speak with the inmate; is that correct?

A       It's the 6000 floor.

Q       6000 floor.  There's a room inside that floor; is that correct?

A       There's a few rooms.

Q       These are interview rooms for agents?

A       Yes.

Q       Now, these rooms differ than, for instance, when a visitor from the general public wants to speak with an inmate; correct?

A       Correct.

Q       And because a visitor doesn't get to -- a visitor has to go through a different process in order to speak with an inmate; is that correct?

A       Correct.

Q       And a visitor will have that glass partition between them and the inmate when they're speaking with them; is that correct?

A       Yes.

Q       And they would have to speak with one of those phones where they have a phone and the inmate has a phone in

order to speak with each other; is that correct?

A       Yes.

Q       But you -- when you come in as a law enforcement agent, you can get -- you get put in one of these rooms on the 6000 floor; is that correct?

A       Yes.

Q       And when you get put in the room, the inmate at some point is brought down to you by the sheriff deputies?

A       Yes.

Q       Then they leave the room; is that correct?

A       Yes.

Q       And you close the door?

A       Yes.

Q       So you're now having a visit with that inmate in which no sheriff's department deputies are present; is that correct?

A       Correct.

Q       And in this -- basically -- in this type of meeting where you're there, the inmate is there, but the sheriff's deputies are not there, are you able to actually give an inmate any items at that point?

A       I don't know what you mean by "items."  Like if I have a piece of paper for him to read or look at, absolutely.

Q       And if the inmate brought down papers, they could hand them to you to look at; is that correct?

1457

A        Correct.

Q        Now, if an inmate -- if you wanted to give an inmate at that point -- well, when you came into that room, does the sheriff's department take your cell phone away?

A        There's signs all over the place saying that you cannot take your cell phone into the secured area of the jails.

Q        When you enter the jails, in order to go into that room, are you searched?

A        No.

Q        So if you wanted at that point to give an inmate -- if you had your cell phone on you -- and periodically, did you carry your cell phone into one of those inmate rooms?

A        I did not.

Q        Do you know if Mr. Plympton ever carried his cell phone at any point?

A        He did not.  We locked them in the boxes as we were told to do every time.

Q        And with respect to -- if you had wanted to, for instance, give Anthony Brown a camera, a small little camera embedded in a cross that he could wear as a necklace, you could have done that; correct?

A        I could have.

Q        And, in fact, you contemplated, did you not, actually giving Anthony Brown a necklace with a cross on it

UNITED STATES DISTRICT COURT

that would have a camera embedded in it in order for him to photograph what was going on that he could see in the Men's Central Jail; correct?

A      It's partially correct.  We were not going to give him the actual necklace.  There was inmates in the jail that were allowed to make these rope-type necklaces that were allowed by the sheriff's department.  Anthony Brown told us that, and we were looking into whether or not we could have our tech crew outfit that actual necklace that he got from the jails and put a camera in it so that it would be something that he could video things in there.

So we were not going to provide the necklace. That was coming from the jail.  We were going to attempt to put a camera in it and see if that was possible.

Q      Now, did -- when you would enter that room, did any of the sheriff's deputies on any of the occasions that you were speaking with inmates tell you that there were certain questions that were off limits that you couldn't ask the inmates?

A      No.

Q      So you had complete freedom while you were in the room with the inmate to ask the inmate any question that you wanted; correct?

A      Correct.

Q      And I think you said yesterday that you would

document everything that the inmates were telling you on those -- on the forms that the FBI has; is that correct?

A    Correct.

Q    Those are -- they go by the name of Form 302; is that correct?

A    Correct.

Q    And then you said you would then give the Form 302 to your supervisor who might do some grammatical edits; is that correct?

A    If needed, yes.

Q    And then it would go into your case file; is that correct?

A    Correct.

Q    And as -- you were the case agent during this time of June, 2010, let's say, all the way through September, 2011, for the case involving Anthony Brown; is that correct?

A    It wasn't a case involving Anthony Brown.  It was a case on the sheriff's department.  He was part of it; so I'm not sure if you were referencing something other than that.

Q    No.  The case on the sheriff's department, you were the case agent; correct?

A    Correct.

Q    You were the lead case agent; correct?

A    Yes.

Q        Now, you said that, when you interviewed the first inmate back in June of 2010 or thereabouts, they provided you with the names of at least five to seven other inmates that also had allegations against the sheriff's department; is that correct?

A        No.  The letter that the inmate wrote had a list of inmates with booking numbers that the inmate originally sent.  I don't know if, when we interviewed him, he gave us those same names.  He may have just told us generally what was going on.  We had the names from the letter.

Q        And when you talked about the dozens of inmates that you, thereafter, interviewed -- I just want to be clear -- at no point did anyone in the sheriff's department tell you that, when you were interviewing those inmates who had allegations of misconduct against the sheriff's department, that there were certain questions that were off limits?

          MR. FOX:  Objection.  Asked and answered.

          THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  Well, when you said before that, for one inmate interview, a sheriff's department deputy did not curtail your questions, I just want to be clear that that occurred every time you spoke with an inmate between June, 2010, and July, 2011.

          MR. FOX:  Objection.  Misstates the testimony.

          THE COURT:  Sustained.

**UNITED STATES DISTRICT COURT**

1461

Q       BY MR. HOCHMAN:  Did any Los Angeles County Sheriff's Department deputy curtail any of your interviews with any of the inmates between June, 2010, and June, 2011?

MR. FOX:  Objection.  Asked and answered.

THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  Now, when you were conducting this investigation between June, 2010, and July, 2011, was this a private Leah Marx investigation?

A       I have absolutely no idea what that means.

Q       Well, you weren't doing it for your own personal reasons, doing this investigation; correct?

A       Again, I'm not sure what you mean by that.  I work for the FBI, and we conduct investigations.  It was -- I was the lead case agent.  I don't know what you mean by "for my own reasons."  I'm not sure I understand.

Q       Well, it's -- when you conduct an FBI -- not every FBI investigation is a grand jury investigation; is that correct?

A       That's correct.

Q       And when you opened up this particular FBI investigation, it didn't open up as a grand jury investigation; is that correct?

A       Not initially.  Within a matter of probably a month or two, it had.

Q       And in what way did it become a grand jury

UNITED STATES DISTRICT COURT

investigation?

A    As soon as we got to the point where the investigation was opened and we determined that there was a need to start to issue Federal Grand Jury subpoenas and other things like that, that is when a grand jury is opened to start investigating.

Q    And so the first grand jury subpoena that was actually issued, though, was about a year later in July, 2011; is that correct?

A    No.

Q    There were other grand jury subpoenas that were issued?

A    There was a significant amount of grand jury subpoenas issued early on for phone records, bank records, other types of documents that we requested very early on in the investigation prior to the Gilbert Michel portion coming into play.

Q    Was this your first grand jury investigation?

A    No.

Q    How many others had you done?

A    At that point, one on the state side and then a human trafficking case on the federal side.

Q    So by that point, this is your third grand jury investigation; is that correct?

A    Second federal and then one on the state side.

Q        And you understand that an FBI agent who speaks to a witness can go in front of the grand jury and provide word-for-word everything that that witness said to them in order to convey that information to the grand jury; is that correct?

A        Yes.

Q        And that's because the grand jury can consider hearsay and doesn't need the actual person who gave you that information to appear before the grand jury in order to have that information given to the grand jury; is that correct?

A        Correct.

Q        Now, between June, 2010, and July, 2011, you had the chance to meet Anthony Brown; correct?

A        Yes.

Q        Did you ever go to the grand jury at any point between June, 2010, and July, 2011, and provide the grand jury with any statements that Anthony Brown had given you?

A        I'm not sure what the point of that would be.  We were still working on our investigation.  So I don't know what statements I would have brought forward to the grand jury to present.  At that point we weren't bringing forward any charges.  And so I don't know what we would have brought forth any testimony at that point for.

Q        Well, you had spoken -- between June, 2010, and July, 2011, you had spoken to Anthony Brown yourself dozens of

times; is that correct?

A        It wasn't dozens at that point.

Q        10 to 20 times?

A        It was probably 10, maybe 15.

Q        Let's just focus on those ten.

Did you document each one of those ten conversations with Anthony Brown?

A        Yes.

Q        That was that FBI 302 we talked about a moment ago?

A        Initially was a 302.  Once he officially became an informant, it's a separate form number, but it's the same type of thing.  It's a report about what he told us.

Q        So focusing on those ten times that you spoke with Anthony Brown between June, 2010, and July, 2011, did you ever go in front of a grand jury during that time and relay to the grand jury any of those ten conversations?

A        Again, there wouldn't have been a reason to at that point because we were still investigating.  There's nothing to bring forward to just say this individual told me these things and not to have any additional information to provide the grand jury in terms of what we were investigating.

Q        Did you ever go before the grand jury between June, 2010, and July, 2011, and relay to them any of the Anthony Brown statements?

A       Nope.

Q       Now, during these ten statements, Anthony Brown is telling you about different allegations of deputy abuse against inmates; is that correct?

A       Some of them were just piecemeal-type information.  I saw an incident on this day.  I don't know anyone involved, but it was in this area.  But, in general, yes, he was providing us that type of information regularly.

Q       Well, some of the information was piecemeal, and some was very specific as to which floor, approximately which day, descriptions of the deputies involved; is that correct?

A       Correct.  But usually not enough information to have the full name of a deputy, full name of an inmate, things like that.  So it was very piecemeal at that point.

Q       Now, you mentioned that Anthony Brown transitioned from just someone that you were interviewing into an informant at some point; is that correct?

A       Yes.

Q       And do you refer to informants as "confidential human sources"?

A       That's an FBI term.  But, yes, it's confidential human sources is what the FBI calls it, but it's an informant. That's basically what it is.

Q       I think the acronym is CHS; is that correct?

A       Correct.

**UNITED STATES DISTRICT COURT**

Q    You said you actually have different reports that you file with confidential human sources as opposed to just an ordinary person that you're interviewing; is that correct?

A    It's just a technicality.  It's a different program that the bureau uses for sources.  It's the same thing. You're documenting what the individual told you, but it's the exact same thing.  It's just a different form number.

Q    Well, in the CHS report, you don't actually put down the person's name -- is that correct? -- that you're speaking with?

A    Correct.  Because at that point it goes into their source file.  So you don't list their name because it's going into their personal source file.

Q    So Anthony Brown got a unique FBI CHS number; is that correct?

A    Correct.

Q    And that way you could track Anthony Brown through that CHS number in your files; correct?

A    It's not so much tracking.  It's just everything that he provided us would go into his specific source file number.

Q    And you took his -- you used the source number, that CHS number, instead of his name to -- for what reason? Why do you actually need to do that?

A    It's usually done in an attempt to at least

**UNITED STATES DISTRICT COURT**

initially protect the identity of the person giving us the information. And so eventually the name may come out, but at least at that time during the investigation he was just a number and not a name.

Q       Now, had you signed up between June, 2010, and July, 2011, other confidential human sources besides Anthony Brown?

A       No.

Q       Now, when you signed someone up, I believe you gave admonishments; is that correct?

A       Correct.

Q       Now, the admonishment is an instruction from you on what they can do when they work for you as a confidential human source; correct?

A       Correct.

Q       Some of the admonishments include following your instructions; correct?

A       Yes.

Q       The admonishments will include don't lie to us; correct?

A       Correct.

Q       Be truthful.

A       Yes.

Q       And Anthony Brown agreed to follow your instructions, not lie to you, and be truthful; is that correct?

**UNITED STATES DISTRICT COURT**

A        Correct.

Q        And you -- before, though, you signed him up as a confidential human source, an informant, you went ahead and checked him out, didn't you?

A        Ran a criminal history check, checked our files to determine if he had already been a source or had a pending FBI investigation on him or anything like that.

Q        And that's because you wanted to actually see if he had some type of background that would show that he can be trustworthy, honest, and reliable; is that correct?

A        That's part of it, but it's required that we do that for every source, even if it's a CEO of a company.  It's just a requirement.  But, yes, it's also to determine whether or not there's anything we can find that shows he's not being truthful.

Q        Well, in this particular case, when you're running an undercover operation with Anthony Brown as part of it, his ability to follow your orders is crucial or else the undercover operation can blow up; is that correct?

A        It's important, but at the same time, it's not the only factor that comes into play with a source or an undercover investigation.

Q        Now, you said that one of the things you do is check the FBI's files in order to determine whether or not Anthony Brown had been a confidential human source, an

informant, before; isn't that correct?

A       Yes.

Q       And you actually found out that back in 1989 he had worked with the New York FBI office; is that correct?

A       All we were able to determine is that he took a plea deal for a case many, many years ago and that he had provided information.  We determined that he was not officially signed up as an informant.  It was just an informal plea deal, provided information type of situation.

Q       And that was a plea deal where he agreed to plead guilty to fraud; correct?

A       I believe it was the fraud charge.

Q       And did you look into that fraud to see what Anthony Brown had lied about at the time you signed him up as an informant in 2010?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  Now, you also found out through Anthony Brown's criminal history that he had a violent criminal history; is that correct?

A       He had some pending charges for armed robbery at that time.

Q       Well, you knew that in -- and that time is 2010 that you just referred to; is that correct?

A       Yes.

UNITED STATES DISTRICT COURT

1470

Q        Well, you knew in 2005 from his criminal history that he had been convicted on three counts of using a gun to commit a robbery and received a five-year sentence; is that correct?

A        Off the top of my head right now, I can't tell you the exact charge, but I did review his criminal history at the time, and I believe that was the -- that was the charge.  I can't remember specific right this moment.

Q        So it wasn't just in 2010 he was facing charges dealing with armed bank robbery.  He had actually already been convicted years before of essentially the same crimes; correct?

A        I believe so, yes.

Q        Now, with respect to the charges that he was facing, you were aware that one of those charges involved three robberies between July 10, 2009, and August 3rd, 2009, of banks where he used a gun; correct?

A        All we knew was the pending charges against him at that time.  We didn't know the specifics of the case.

Q        Well, did you know that the pending charges against him at that time included 13 counts of armed bank robbery?

A        I knew that -- I believe there was 12, I thought.  Either way, we knew that there were pending charges, multiple pending charges for armed robbery.  Correct.

Q        I stand corrected.  12 counts of armed bank

UNITED STATES DISTRICT COURT

1471

robbery and one count of assault with a deadly weapon using a gun; is that correct?

A       I don't recall the assault with a deadly weapon, but again, I don't have the criminal history in front of me. That was five years ago that I reviewed it. I'm not sure about that one.

Q       And did you review the probation report in connection with the 2009 charges with respect to the threat to the community section?

MR. FOX: Objection. Cumulative and relevance.

THE COURT: Sustained.

Q       BY MR. HOCHMAN: Now, Anthony Brown would write you letters from prison in addition to speaking with you; is that correct?

A       During what time period?

Q       June, 2010, to July, 2011.

A       I don't believe he wrote, like, letters that were sent to the office during that time. What he would do is, knowing that we would be coming to visit him periodically prior to the undercover getting involved, he would write down things that would happen during the week. So he would document on Monday this deputy was in the hallway and punched this inmate on the side of the face for no reason on this date at this time. So it was almost like a log of what was going on.

I believe later on he sent letters, but I don't

**UNITED STATES DISTRICT COURT**

think during that time period -- I think it was just -- he would write them and then hand them to us as like a log of what occurred.

Q      And when you say "hand it to you," those would be those unsupervised meetings you're having at the Men's Central Jail with just Anthony Brown; is that correct?

A      Correct.

Q      You said at one point C.J., an undercover FBI agent, was -- started meeting with Anthony Brown in your place; is that correct?

A      Correct.

Q      Approximately when did that start happening?

A      I don't remember the exact date.  I want to say it was early 2011 when he started going to the jail as a visitor, and we stopped going to visit Anthony Brown on the -- as law enforcement officers.

Q      When you were -- and did -- and did Anthony Brown give C.J. information like he had given you during your visits?

A      It was a little more difficult because he was on the phones between glass in the visitor section.  So he kind of had to be a little less obvious talking about deputies since there were deputies walking around in the visiting area.  So he would try to tell C.J. information such as a deputy name and then maybe talk about something else that seemed like it was casual conversation and then go back to try to get more

information.  So it was definitely not the same as when we were meeting with him, but they attempted to exchange information as best they could.

Q    Now, did you have something set up in your computer so that, when there was a court event for Anthony Brown, you would be notified of it?

A    No.

Q    Did you find out that Anthony Brown was convicted of the charges that he was facing, these armed bank robbery charges, in June of 2011?

A    I don't know if I knew immediately, but I believe I found out very soon after that he was convicted at that point.

Q    And that was he was sentenced to 423 years in prison?

A    I don't know if I knew about the time period at that point, the sentence, but I knew that he had been convicted.  I found out sometime soon after about the amount of time he had received.

Q    So you might not have found out on June 27, 2011, the date on which he was sentenced, but soon thereafter you would have found out?

A    At some point soon after, yes.

Q    And, again, the first bribe transaction took place on July 20, 2011; correct?

1474

A        I can't remember the exact date.  I thought it was the 24th, but it was late July of 2011.

Q        You've been the case agent on this -- on this case since June, 2010; is that correct?

A        Correct.

Q        And you have access to the whole case file; isn't that correct?

A        I do.

Q        You have access to the reports that actually have the date on which the first bribe transaction took place; is that right?

A        Yes.

Q        And did you -- and you've had a chance over the last six years to review those reports to determine that date in July; correct?

A        Yes.

Q        And that date in July is July 20th, isn't it?

A        Again, Gilbert Michel pled guilty.  So at this point, the specific dates are not something I keep in my head.  I'm off by four days potentially.  But late July is what I recall is when the first interaction took place.

Q        Did you review anything from the case file, any reports prior to testifying today?

A        I did.  Not specific -- again, Gilbert Michel took responsibility and pled guilty; so I was not focused on

**UNITED STATES DISTRICT COURT**

specific dates of that transaction, as well as being on maternity leave the last month. So I've had a little bit limited access to those.

Q Did you have a chance to speak with Mr. Fox over this last weekend before you testified here?

A I did.

Q Did you have a chance to spend hours with Mr. Fox going over your testimony before you testified, starting yesterday?

A I would not say hours. We went over my testimony, but it was not hours.

Q Was it at least two hours?

A Possibly.

Q Now, when you were dealing with Gilbert -- excuse me -- with Anthony Brown, Anthony Brown wanted certain things from you; isn't that correct?

A I'm not sure what you're referencing.

Q Well, Anthony Brown wanted money to pay for phonecards so that he could make public phone calls; correct?

A That's not actually accurate.

Q Tell the jury what is accurate.

A He did not come to us and say, "I want money to make public phone calls." He explained to us that, in order to make phone calls from the jail phones, it's either a collect call or the person you're calling has to pay for it. So if

he's trying to make a call to either C.J. or he was trying to call the office, despite us not wanting him to, he would have to have a phonecard in order to do that.  So when he told us that, we agreed to put some money on his books in order to allow him to purchase those phonecards as well as some food for his cell.

Q      So can you explain what that means, to put money on an inmate's books?

A      Inmates are not allowed to have cash in the jails, and so they all have almost an account -- it's kind of like a bank account.  But they can only purchase certain things within the jail, so snack foods, phonecards.  That's pretty much it, toiletries.  That's pretty much it.

So there's only certain things they can purchase, and it has to be purchased through the jail.  So they can't just go online and buy things.  It has to be jail-approved things through a very specific vendor, and they have to have money on their account in order to purchase those things.

Q      So the FBI is putting money -- transferring money onto the sheriff's department's computer so that Anthony Brown can make purchases while he's in the jail; is that correct?

MR. FOX:  Objection.  Asked and answered.

THE COURT:  Sustained.

Q      BY MR. HOCHMAN:  Now, you gave Anthony Brown money on his books, not just to purchase phonecards for

himself; is that correct?

A        Correct.

Q        In fact, you gave Anthony Brown money on his books in order to purchase phonecards for people called shot-callers inside the Men's Central Jail; is that correct?

A        Correct.

Q        And a shot-caller is an inmate; isn't that correct?

A        Yes.

Q        And when we're talking about the 2000 and 3000 floors of Men's Central Jail, these are violent inmates; isn't that correct?

A        They can be.

Q        In fact, when you were interviewing these inmates from the 2000 and 3000 floor, you always wanted to have another agent with you for your safety; is that correct?

A        I always do an interview, no matter who it is, with a second agent.

Q        And in the particular case of interviewing inmates from the 2000 and 3000 floor, you wanted to have another agent with you to make sure you were safe; correct?

A        It was not specific to the 2000, 3000 floor.  It could be an inmate who is in there for drunk driving, and I would want a second agent in the interview room with me at all times.

Q      Well, you knew that the people you were interviewing from the 2000 and 3000 floor had violent criminal histories; correct?

A      Some did; some did not.

Q      And when you're giving -- and you were the one who authorized Anthony Brown to pass out these phonecards to these shot-callers; correct?

MR. FOX:  Objection.  Relevance and cumulative.

THE COURT:  Sustained.

Q      BY MR. HOCHMAN:  What is a shot-caller?

MR. FOX:  Objection.  Asked and answered.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  Shot-caller is an individual who the deputies select for usually a module or a floor, and it's someone that they allow out of their cell frequently.  And so the deputies pick someone.  They allow them out of their cell more often, and that person is supposed to keep the inmates on that tier, I guess you could say, in-line.  So the deputies are the ones that select those inmates.

Q      BY MR. HOCHMAN:  But the shot-callers can be gang members; is that correct?

A      They can be.

Q      And did you monitor how the phone calls were made with these phonecards that Anthony Brown was giving to the gang

shot-callers?

A    Again, those were the phonecards that were used on the recorded lines in the jail; so anybody could have reviewed those calls.  As you mentioned before, they were monitored, recorded jail lines.

Q    Did you monitor any of the phone calls that were being made with the phonecards that Anthony Brown gave to gang shot-callers?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

Q    BY MR. HOCHMAN:  Now, in addition to putting money on Anthony Brown's books for phonecards, Anthony Brown wanted other things from you, like a TV, earphones, transcripts for his case; is that correct?

A    That was after he left the county jail.  They're not allowed to have those items in county jail.

Q    When Anthony Brown and you were speaking, you determined that Anthony Brown lied to you during the June, 2010, to July, 2011, time frame; is that correct?

A    There were a few things we could not verify as truthful or not and other things we believed he was not being truthful about.

Q    Well, during that time frame -- I'll expand the time frame all the way through August, 2011 -- Anthony Brown said to you that he had brought a cell phone in, not just from

Deputy Michel, but from Deputy Bravo; is that correct?

A    He did.

Q    And that's a lie because you never gave Anthony Brown or arranged to have a cell phone brought in from Deputy Bravo to Anthony Brown; is that correct?

A    That's actually not possible to determine if that's a lie or not because it is possible that Deputy Bravo did bring in a cell phone, and Deputy Bravo was an individual we were looking at as someone who was engaging in illegal behavior.

Q    It's possible, but you have no evidence of it; correct?

A    Correct.  So I wouldn't say he lied if I can't verify yes or no.

Q    Well, how about this.  When Anthony Brown said that Deputy Michel gave him marijuana, ecstasy, heroin, cocaine, and methamphetamine, that was a lie; correct?

A    We later determined that was a lie.

Q    Because you never gave -- the FBI never gave marijuana, ecstasy, heroin, cocaine, and methamphetamine to Deputy Michel to bring to Anthony Brown; is that correct?

A    Correct.

Q    Why not?

A    We would never insert drugs into a custody facility.  At that point in time, we would not even contemplate

**UNITED STATES DISTRICT COURT**

inserting, say, fake contraband, fake drugs or anything.  So there was nothing like that we engaged in.

Q     And that's because drugs are very dangerous and illegal inside of a secured jail facility; correct?

A     They could be, yes.

Q     Now, Anthony Brown was also a manipulator; isn't that correct?

A     He could be.

Q     Could be or was?

A     He could be.

Q     Why do you qualify?

A     Because there was plenty of information that he provided that was not helpful to him and actually put him in a bad position as an inmate to provide us that information, and yet there was some information he provided us that was more beneficial to him to tell us or to give us information.  So I wouldn't call him a hundred percent that all he did was manipulate when he put himself out there plenty for the bureau in order to determine whether or not all these allegations were true or not.

Q     Now, in January, 2012, I think you said a moment before that Gilbert Michel pled guilty to the crime of bribery; correct?

A     Correct.

Q     So after January, 2012, you didn't need

1482

Anthony Brown to testify in front of a grand jury about Gilbert Michel's bribe; correct?

A        At that point in time in January of 12, no.  We did not need specific to the bribe payment.  It doesn't mean we didn't want his information on what occurred and what he had knowledge of.  But in terms of the information specific to charge and convict Michel, that's correct.  We did not need his testimony.

Q        Yet you writted out Anthony Brown in December of 2012 to testify in front of the grand jury; is that correct?

A        Correct.

Q        And he was testifying in front of the grand jury based on the Gilbert Michel bribe transaction; correct?

A        Correct.

Q        Testified for about 45 minutes in December of 2012 about the Gilbert Michel bribe transaction; is that correct?

A        I don't know how long he testified for, but yes, he testified specific about what went on with that interaction.

Q        Now, I just used the term "writ."  When you writ someone out of -- in this case it was state prison to the Federal Grand Jury; correct?

A        Correct.

Q        Does the FBI serve the writ?

A        No.

**UNITED STATES DISTRICT COURT**

Q       Does the FBI transport the prisoner back and forth from the prison to the grand jury and then back to the prison?

A       Usually we don't.  We have before, but in this situation we did not.

Q       Because usually -- or in this situation, it was U.S. Marshal Service that would transfer Anthony Brown in connection with a writ to the grand jury and then, when he was done with his grand jury, bring him back to the state prison; is that correct?

A       Correct.

Q       Now, a writ to testify before a grand jury does not include an FBI interview as part of it; is that correct?

A       I mean, we are absolutely allowed to speak to the individual before, after, even if they're writted over.  It's not something that, because they're writ over for their grand jury testimony, that we're allowed to speak to them.  So frequently we will bring them over and speak to them prior to them ever testifying.

Q       Wait a minute.

        The writ, though, is a writ to testify in front of the grand jury on a specific date and a specific time; is that correct?

A       Correct.

Q       And the U.S. Marshal Service has to bring them

**UNITED STATES DISTRICT COURT**

over to testify in front of the grand jury that specific date and that specific time; correct?

A    Correct.  But oftentimes they'll bring them over two, three hours before the grand jury time just because they have other inmates to transport, and in those situations, we'll frequently talk to the inmate prior to going into grand jury.

Q    So you would talk to them the two to three hours beforehand, and then after they're done with the grand jury, they get brought back to where they came from; correct?

A    Correct.

Q    Let's focus for a moment, if we could, on William David Courson.

May I have a moment, Your Honor?

I believe you testified that you first met Deputy Courson when you started to go to the jails in June, 2010; is that correct?

A    I don't know if I met him immediately in June of 2010, but I met him soon after I started going to the jails because he worked right outside the law enforcement interview rooms.

Q    And in your first meeting with him, you lied to him about what you were doing there; is that correct?

MR. FOX:  I'll withdraw.

THE WITNESS:  Yes.

Q    BY MR. HOCHMAN:  You lied to him each time you

saw him about what you were doing; is that correct?

A    I don't think that's accurate.  I didn't tell him every time we were there why we were there.  It didn't come up.  It was something that maybe once or twice he would ask a question, but typically he wouldn't ask why I was there.

Q    And you knew he was interested in you for more than a professional relationship; isn't that correct?

A    Yes.

Q    And you took advantage of that because you wanted to leverage his interest in order to get information from him?

MR. FOX:  Objection.  Argumentative.

THE COURT:  Sustained.

Q    BY MR. HOCHMAN:  Well, you did not tell him at the time that you were an FBI agent investigating allegations of deputy misconduct at the Los Angeles County jails; is that correct?

A    Correct.

Q    And you wanted to get information from him about any potential deputy misconduct; is that correct?

A    Including himself since he made the statement to me about potentially engaging in excessive force.  So yes.

Q    And you went out to dinner with him; is that correct?

A    I don't know if it was dinner.  We met there one of the evenings at a restaurant.  I don't know if it was

specific to dinner because I don't think I ate anything.

Q    When you were giving him questions about why you wanted information, like, for a report, that was a lie; is that correct?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

Q    BY MR. HOCHMAN:  Well, you went out for dinner and drinks with him on separate occasions?

A    I did not have anything to drink.

Q    He had something to drink; is that correct?

A    I believe the first time he had one drink.

Q    And then you went out to lunch as well with him; is that correct?

A    Correct.

Q    And every time you're going out with him, you're never sharing with him the fact that you're wearing a body recorder; is that correct?

A    That would defeat the purpose of wearing a body wire if I told him I was wearing one.

Q    Every time you went out with him, you did not tell him that you were wearing a body recorder; is that correct?

A    That's correct.

Q    And David Courson describes in the interview that he had with the L.A. County Sheriff's Department that you were

playing him.  Were you playing him?

A        The first time I met him, he told me he was engaged.  So I wasn't exactly concerned about whether or not an individual who was engaged and had asked me out was being played.

Q        So you don't think he has any credibility?

MR. FOX:  Objection, Your Honor.

THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  Now, you got a Defense Tactical Manual from him of the Los Angeles County Sheriff's Department that was not available to the public; isn't that correct?

A        Correct.

Q        What did you tell him to get that report from him?

A        I told him that I was writing a paper for my Ph.D course and I was hoping that he could give me a copy of that so I could use it for my report or for my paper.

Q        And that was a lie; right?

MR. FOX:  Objection, Your Honor.  Argumentative.

THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  Now, each one of those meetings that you had with Deputy Courson, were they tape-recorded?

A        Yes.  I believe one of them the recorder failed, and so it was not recorded, and I just wrote a report for it, I believe.

Q        And those recordings would go into your case file?

A        Correct.

Q        And the case file would eventually go over to the U.S. Attorney's Office?

A        Yes.

Q        And the -- those recordings were made so that you could preserve the evidence in case you ever needed it for trial; correct?

A        Correct.

Q        At any point -- while you were dealing with Deputy Courson, he admitted to witnessing an inmate being beaten and falsifying a report about it; correct?

A        I don't believe that's correct.  He did not falsify a report.  I believe he saw something happen, and a sergeant told him to pretend like you weren't on the floor so he didn't have to write a report.

Q        Did you ever arrest Deputy Courson for any of the statements that he had made to you?

        MR. FOX:  Objection.  Relevance.

        THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  I'll take you back to June, 2011.  So fast forward from June, 2010.  Now if you can have June, 2011, in your mind.

        At that point -- and, actually, June, 2011, up

through July, 2011, as well.  You said that you learned about Anthony Brown's 423-year sentence shortly after it happened; correct?

A      Yes.

Q      Which meant, to your understanding, that Anthony Brown was going to spend the rest of his life in state prison; correct?

A      Yes.

Q      And you -- at that point you had spoken to dozens of inmates; correct?

A      Yes.

Q      But you chose Anthony Brown amongst those dozens of inmates to be involved in the undercover bribe operation of Gilbert Michel; is that correct?

A      It's not always choosing.  What happens is, when an individual is giving you information -- he's the individual that said deputies had approached him, knowing that he was charged with bank robbery, and they believed he had a lot of cash on the outside.  So he's the one that deputies went to saying we'll bring in something in exchange for cash.  Not all the inmates had that ability or had that access to the deputies.

Q      You said not all the inmates had that ability, but some did; correct?

A      No other ones had the specific access saying

"This deputy approached me and offered this."  They just said -- they would give general information, "We know that deputies are bringing in contraband in exchange for bribes." None of them were saying, "This deputy approached me and agreed to do it."  Anthony Brown did.

Q     And one of the reasons you said that you thought Anthony Brown was a good idea to give a cell phone to is because he had access to medical facilities; is that correct?

A     No.  That's not what I said.

Q     Well, Anthony Brown had a medical condition; correct?

A     Multiple, yes.

Q     Multiple.

A heart condition?

A     Correct.

Q     And as part of the treatment in the Men's Central Jail for his condition, he was allowed to go back and forth to the medical facilities at the Men's Central Jail; correct?

A     Correct.

Q     He would be escorted, of course, by the deputies; is that right?

A     No.

Q     He could just wander the halls himself?

A     Yes.

Q     Were you aware that at times Anthony Brown would

**UNITED STATES DISTRICT COURT**

be searched going in and out of the medical facilities?

A    He never told us of a time when he was searched prior to the phone being found.

Q    Did you separately investigate whether or not an inmate would be searched going in and out of the medical facilities at Men's Central Jail at this time?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

Q    BY MR. HOCHMAN:  Now, you knew at the time when you had Anthony Brown become your informant in this Gilbert Michel investigation that, if it was found out that Anthony Brown was working for the FBI, he would be in danger with other inmates; correct?

A    It's possible that, if other inmates found out, that they may retaliate against him.  But at that point in time, we had talked with him about that risk, and he still wanted to proceed and work with us.

Q    And you knew also that, if it was found out that he was snitching on behalf of the FBI on a particular deputy, that he could be at risk from that deputy that he snitched on; correct?

A    It's possible.  I think that would be pretty risky for a deputy to go after an FBI informant, but -- if they knew that.  But at the same time, we had also discussed that with Anthony Brown, and he wanted to proceed and help us.

UNITED STATES DISTRICT COURT

Q        Did you ever discuss with Anthony Brown that, if he proceeded and helped you, that you would put him in a witness protection program so no one could ever find out he had been an FBI informant?

A        All we did was explain to him that, wherever he was housed, whatever state prison, we would make sure we note the prison that he was, in fact, informing on law enforcement officers so that they would give him added protection within the custody facility because that's what's required in state facilities.

Q        Did you ever tell Anthony Brown he would be put in a witness protection program?

A        Not specifically witness protection.

Q        Now, when C.J. is coming to visit Anthony Brown, he's coming in an undercover capacity; correct?

A        Correct.

Q        He's not going through the law enforcement line. He's going through the general public situation; correct?

A        Correct.

Q        And did you instruct or discuss with C.J. that he was not to identify himself as an FBI agent when he entered the Men's Central Jail?

A        Correct.  Because that would be the point of being undercover.

Q        And if you're aware, did law enforcement have to

UNITED STATES DISTRICT COURT

identify themselves as law enforcement when they entered the Men's Central Jail?

A     If you went through the non-visitor area, then, yes, because there's no other way you would be able to get into that area if you weren't a law enforcement or sheriff's department employee.  If you're in the visitor area, I don't think there's any requirement at that area.

Q     But you don't know one way or the other.

A     I don't.

Q     Now, you said you came up with an operational plan to deal with the bribe transactions of Gilbert Michel; correct?

A     Correct.

Q     And that operational plan was to have Anthony Brown tell Gilbert Michel that he would be willing to pay him money in exchange for Gilbert Michel bringing the cell phone into the jail for Anthony Brown; is that correct?

A     It didn't exactly work out that way because we had already had information from Anthony Brown that Gilbert Michel had already approached him and offered to do it. So it was more giving Anthony Brown the authority to, in fact, say, yes, I will pay you cash through my buddy on the outside.

Q     And did you instruct Anthony Brown how much cash he was supposed to offer Gilbert Michel?

A     I believe C.J., again, through kind of the code

**UNITED STATES DISTRICT COURT**

1494

system tried to explain to him how much we were going to offer Gilbert Michel, and so I believe he had a general idea.  Now, whether or not that was conveyed accurately through their little code system, I'm not sure.

Q     And, again, going back to the operational plan, at some point then Gilbert Michel was supposed to contact C.J. on the outside; correct?

A     Correct.

Q     And Gilbert Michel would get C.J.'s phone number from Anthony Brown; is that correct?

A     Correct.

Q     And then Gilbert Michel would set up a meeting with C.J. in order to do the exchange of money for the cell phone; correct?

A     Correct.

Q     And at that point you would also surveil and video record that meeting.  That was the operational plan?

A     Correct.

Q     And that was the operational plan that was approved by your supervisors, you said?

A     Yes.

Q     That was the operational plan that was sent to Washington, D.C., for approval as well?

A     There's two different things.  There's the approvals from Washington, D.C., and then an operations plan

for the actual event itself. They're two separate things. Washington, D.C., just approved the general plan and bribe payment. The operations plan was specific to the date, the time, the location, who's going to be watching from the surveillance team, things like that.

Q   So wait a minute.

So Washington, D.C., doesn't approve the operational plan. They just approve the general idea of having an undercover operation with Gilbert Michel.

A   It's a little more specific. They're approving the actual bribe payment, the phone, the phone going in, the whole premise of the case. It's just the operations plan is specific details of that day, meaning the individuals that are going to be on the surveillance team, the time we're going to meet, the location we're going to meet at.

Q   So you -- did the operational plan include a plan B in case the cell phone was discovered inside the Men's Central Jail?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

Q   BY MR. HOCHMAN:  Did you have any part of your plan that anticipated what would happen if the cell phone was discovered inside the Men's Central Jail?

A   No.

Q   Did you have any part of your plan that

anticipated what would happen when Gilbert -- excuse me -- when Anthony Brown eventually went to state prison?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  Well, you knew, at some point after Anthony Brown was sentenced to the 423-year sentence, that he was going to be going to state prison; correct?

A       Correct.

Q       And at the point that he's going to state prison, you knew that he would have all his stuff searched; correct?

A       I don't know specifically.  I know generally they would search individuals before going to prison.  So it wasn't necessarily something very specifically focused on, but I know they were searched prior to going to prison.

Q       And at that point, if Anthony Brown had the cell phone on him, it would be discovered; correct?

A       Could be.

Q       When you came up with your original operational plan, was any part of that plan dealing with what would happen if the cell phone was discovered on his way to state prison?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  Now, Anthony Brown actually got the cell phone from Gilbert Michel on July 26, 2011; is that correct?

**UNITED STATES DISTRICT COURT**

A        I believe so, yes.

Q        At the time that Anthony Brown gets the cell phone, you can track online when the cell phone is being used; is that correct?

A        Correct.

Q        You said you checked daily; correct?

A        Correct.

Q        How often each day?

A        It depended on the day.  There were some times where I would have it up all day long.  While I was on my computer, I would have the website up in the background.  There were some days where it would only be a couple times a day depending on what I was doing that day.

Q        And when you say "a couple times a day," one to three times?

A        Depended on the day.

Q        And did you work seven days a week?

A        At this time, yes.

Q        So when you say it was on your computer, were you actually physically in the office on your computer seven days a week at this time?

A        No.  But I could also access it from my phone.  So if I wasn't in the office, I could go to my phone and pull it up and get the same website that I had at the office.  But when I was in the office for long periods of time, I would

**UNITED STATES DISTRICT COURT**

frequently just have it up in the background as I was doing other things.

Q       What times of day were you in the office at that point around July 26 to August 8th of 2011?

A       I would not be able to tell you specifics.  I worked nearly seven days a week for months during that time period.  So I would say anywhere from 7:00, 8:00 a.m. in the morning until the evening, and then frequently at night I would check it from my own phone.  I can't give you specifics on the times I worked five years ago.

Q       So we'll do as broad a capacity as we can.  Let's say 7:00 a.m. to midnight.  Would that be accurate that you might have checked the phone during this time period of July 26, 2011, until August 8, 2011?

A       It could have been anywhere during that time.

Q       So the time period in my example from midnight to 7:00 a.m., Anthony Brown could have made unlimited number of calls and texts during that time and you wouldn't know it until you next checked the phone first thing in the morning; is that correct?

                MR. FOX:  Objection.  Relevance.

                THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  Well, you put in this monitoring ability in order to minimize any risks of a cell phone being in the secured facility; correct?

**UNITED STATES DISTRICT COURT**

A        Correct.

Q        And there were no risks that were minimized during that time period when you're not looking at your screen either on your computer or your cell phone between, in my example, midnight and 7:00 a.m.; is that correct?

A        You're assuming he had the phone 24 hours a day. He did not.  He only had the phone when Gilbert Michel was working.  So there were plenty of time periods I wouldn't have had to check the phone because he didn't even have it on him. But, yes, there were going to be periods of time that I wouldn't see the phone call until a couple hours later.

Q        And it could be a phone call or a text.

I want to be clear that this phone also had the ability to text; is that correct?

A        Correct.

Q        And the phone also had the ability to access the Internet?

A        It was a flip phone.  So technically, yes, but I don't believe most of the websites worked.  This was back in 2011.

Q        You don't believe that most of the websites could be -- like Yahoo or Google could be accessed from the Internet with that flip phone?

A        From that flip phone -- I don't know if you've ever had a flip phone, but flip phones did not really work for

UNITED STATES DISTRICT COURT

accessing the Internet at the time.  So when you would try to access the Internet, a lot of websites would not come up.  Some of them would give you error messages.

So could he technically access the Internet?  Yes.  Do I believe it was something easy and that he could do?  No.

Q     Now, when you're looking at the online screen to see who Anthony Brown is calling, if he gets a call from an unlisted number, it will show as unavailable or something along those lines; correct?

A     I don't believe there was any.  So I don't know how it would have shown up.  There may have been, but I don't recall there being unavailable numbers that showed up.

Q     If he were to receive something from an unavailable number, you wouldn't be able to know what number called him when you're just looking at the online record; correct?

A     Again, I wouldn't know if it showed up as unavailable or if somebody blocked their call.  I don't know how that would have shown up since I don't believe it happened.

Q     Did you set an e-mail alert that would alert you anytime Anthony Brown made a telephone call or sent a text from that phone between July 26, 2011, and August 8, 2011, when it was found?

A     No.

**UNITED STATES DISTRICT COURT**

Q        Now, the FBI had technology back then that would have allowed you to listen into every call that Anthony Brown made and see every text he sent as it was actually occurring; correct?

A        We had a system available, but it would not have worked the same way as a regular cell phone.

Q        Well, it would have required Anthony Brown to input a PIN number before he made a phone call or sent a text; is that correct?

A        There's actually a multistep process, and it's not just a PIN number.  It's dialing certain numbers and various things.  So it wouldn't have worked like a regular cell phone, which is why we did not do that.

Q        Well, let's break that down.

You said Anthony Brown would have to dial a number before he actually made the phone call or sent the text in order to activate this system that would have allowed you to listen in to every single phone call and see every single text message as they were being sent; is that correct?

A        It is not realtime.  It would record the call.  The system would record it, or it would document the text, and I would get notification after the fact that it was -- a phone call was made.  Here's the recording of that phone call.  So it would not have been a realtime wiretap situation.

Q        Well, it would have been fairly immediately after

**UNITED STATES DISTRICT COURT**

it occurred; correct?

A        Sometimes a few hours later is when we'll actually get the recording sent to us.

Q        But then that recording -- but without that system in place, you had no ability at all to determine what was being said on the phone calls that Anthony Brown was making and the content of any text messages he was sending or receiving; correct?

A        Correct.

Q        Now, if Anthony -- if you saw online that Anthony Brown was using the cell phone for some other purpose than he was authorized, you could terminate the service at that point; correct?

A        Yes.

Q        And if Anthony Brown was following your orders -- I think you talked about this otherwise illegal concept -- that he would get protection from being prosecuted for any crimes he might be committing at your direction; correct?

A        Correct.

Q        And if Anthony Brown does not follow your orders, then he doesn't get that protection; correct?

MR. FOX:  Objection.  Calls for a legal conclusion.

THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  Now, you never gave

Anthony Brown permission to do drug deals for marijuana, cocaine, methamphetamine, heroin, and ecstasy while he was at Men's Central Jail; correct?

A        No.

Q        So he could be prosecuted for those crimes; correct?

A        As we discussed earlier, we do not believe those to be true.  So we wouldn't prosecute someone for doing something that -- not doing something even though they claim they did.

Q        Did you happen to see, as part of your investigation, the two photos that were recovered from Anthony Brown's cell phone that showed marijuana, baggies of cocaine, balloons of heroin, ecstasy, and methamphetamine?

A        I obviously from my cell phone photo could not tell you what specifically was in there.  It looked like they were drugs on the photo, but we received a different story about what that was and couldn't verify either way.

Q        Well, if Anthony Brown was photographing drugs as part of a drug deal in the Men's Central Jail, he was not following your orders; correct?

A        If that's what he was doing, that's correct.

Q        Now, before Anthony Brown received the cell phone on July 26, I believe you took a number of steps to make sure that the cell phone could not be connected to the FBI; is that

correct?

A       Correct.

Q       You had -- the cell phone itself was a prepaid cell phone; so there would be no record of the FBI actually purchasing the cell phone that went to Anthony Brown; correct?

A       Correct.

Q       And I believe you said you had stopped visiting Anthony Brown in jail to make sure that the FBI wouldn't be connected directly with him; is that correct?

A       It wasn't specific to the phone being connected, but, in general, that we didn't want to continue to associate with him like that in the jails.

Q       And that's why you brought C.J. in because C.J. was posing as one of Anthony Brown's friends, not an undercover agent or not an FBI agent when he went to visit Anthony Brown; correct?

A       Correct.

Q       And C.J. wasn't even from the Los Angeles office. You brought him in all the way from the San Diego office; is that correct?

                MR. FOX:  Objection.  Relevance.

                THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  Now, before you gave the cell phone to C.J. to then give to Gilbert Michel, you checked that cell phone yourself; is that correct?

**UNITED STATES DISTRICT COURT**

A        I don't know what you mean by "check it."  It was in a package at the store, and I opened it up and, you know, put in C.J.'s number into the address book, things like that.

Q        And that was C.J.'s number that Anthony Brown was to call from the cell phone?

A        Correct.

Q        Did you put in any other numbers?

A        I think that was the only one I put in.

Q        You didn't put your number in, did you?

A        No.

Q        Now, you're aware that C.J. and Gilbert Michel agreed to do the bribe transaction on July 18, and they basically said they would do the transaction two days later on July 20; is that correct?

A        They had a phone call, and then set it up for a few days after that.  So the initial phone call, and then, yes, a few days later they agreed to meet after he finished work.

Q        Now, on July 18th, 2011, when that agreement was set up to do the deal days later, Anthony Brown called you at your desk phone in the FBI's office in Westwood in the Civil Rights Squad; correct?

A        Correct.

Q        And for -- Anthony Brown called you on one of the public jail phones at that time; is that correct?

A        Correct.

UNITED STATES DISTRICT COURT

Q      And for over a year at that point, since you had started dealing with Anthony Brown going back to the summer of 2010, when Anthony Brown would call you on one of those public jail phones, he would identify his name as the inmate calling, and then you would hang up; correct?

A      A lot of times it was voicemails.  I didn't actually pick up the phone.  It was a voicemail, and he would say his name in the collect call -- you have a telephone call from, and he would say his name, and then it would hang up because it was a voicemail.

Q      When you say -- but there were some times where it wasn't a voicemail and you received the call directly at your desk that you hung up; correct?

A      Correct.

Q      And the reason you hung up is you knew that those calls were being monitored -- excuse me -- recorded by the sheriff's department; correct?

A      It was kind of twofold.  One, because they're recorded and, two, because our office does not want us to accept collect calls.  So I wasn't about to start accepting jail calls on my desk phone.  But it was primarily the recording and then not accepting collect calls on my desk line.

Q      Well, you gave Anthony Brown -- you put money on the books so Anthony Brown could have phonecards in order to use the phone; correct?

A        Not to call me.

Q        So when Anthony Brown called you during that time period of June, 2010, let's say, all the way up until June of 2011, he was not following your instructions?

A        That's actually not accurate at all.  What we had was a system with him.  He would call, say his name.  At the time when we were still going down to the jail, we knew that meant he needed to talk to us about something, and we would go down to the jail.  So there was no need for him to call and talk to us.  That was kind of our code system.  He would call, say his name.  We would go down and visit him.

Q        All right.  And approximately, he made between June, 2010, and July, 2011, about 100 of those calls where he would just say his name and otherwise hang up; correct?

A        I have no idea how many times he called.

Q        Would it refresh your recollection to look at an analysis done by Mickey Manzo of how many times Anthony Brown called you before August 8, 2011, from the jail phone to your number at 310-996-4174?

A        No.

Q        You're aware who Mickey Manzo is?

A        Yes.

Q        Who is he?

A        He's an OSJ deputy -- was an OSJ deputy.

Q        You're aware he did an analysis of the phone

1508

calls that Anthony Brown made to various people?

A    I'm aware that he has an e-mail saying, "Here's what I found."

Q    And are you aware that he found over 100 phone calls that were made to you from January 1st, 2009, until August 17, 2011?  And by "to you," I mean to the number 310-996-4174.

A    I can't tell you where he got that number or where the information is from.  If that's what the e-mail says, that's his account of what occurred, but I could not verify the authenticity of what he's recording.

Q    Does that sound approximately accurate?

A    I don't know.

Q    Was it at least dozens?

A    I don't know.

THE COURT:  All right, ladies and gentlemen. We're going to take our first break of the day.

Again, I want to remind you, until this trial is over, you're not to discuss this case with anyone, including your fellow jurors, members of your family, people involved with the trial, or anyone else, and do not allow others to discuss the case with you.  That includes discussing the case on the Internet, through bulletin boards, various forms of social media, e-mails or text messages.  If anyone approaches you and tries to talk with you about this case, please let me

**UNITED STATES DISTRICT COURT**

1509

know about it immediately.

Do not read, watch, listen to any news reports or other accounts about the trial or anyone associated with it. Do not do any research, such as consulting dictionaries, searching the Internet, or using other reference materials. And do not make any investigation about the case on your own.

Finally, you're reminded to keep an open mind until all the evidence has been received, you've heard the arguments of counsel, the instructions of the Court, and the views of your fellow jurors. If you need to speak with me, simply give a note to the clerk.

We'll come back at a quarter until the hour.

(The following proceedings were held in open court out of the presence of the jury:)

THE COURT:  You may step down.

MR. FOX:  Your Honor, may I just ask how long she needs at this point?

Thank you, Your Honor.

THE COURT:  How long do you expect to be with this witness?

MR. HOCHMAN:  Your Honor, again, to the extent that the -- I've got to ask a question more than once because -- I'm trying to pace the witness --

THE COURT:  The question is how long do you expect to be with this witness?

**UNITED STATES DISTRICT COURT**

1510

MR. HOCHMAN:  Two more hours, Your Honor.  I'll try to make it as short as I can, Your Honor.

THE COURT:  There are limits.

MR. HOCHMAN:  This is --

THE COURT:  There are limits.

MR. HOCHMAN:  Absolutely, Your Honor.

(A recess was taken at 9:34 a.m.)

(The following proceedings were held in open court out of the presence of the jury:)

THE COURT:  Have you spoken with the witness as to the timing of the breaks that she needs?

MR. FOX:  I spoke to her on the way off of the stand.  She told me that she thought a 15-minute break right now would be okay.  I did not know at the time that it would be another two hours.

Mr. Hochman told me during the break he was fine with me speaking to her, which I think she went down to a different space to be with her children.  I have not had the opportunity to do that yet.  If you would like me to step outside, I can talk to her about it, or you can talk to her about it if you bring her inside.

MR. HOCHMAN:  I'm okay if the Government wants to talk to her about the scheduling, Your Honor.  I'm fine with that.

THE COURT:  Either way.

**UNITED STATES DISTRICT COURT**

MR. FOX:  Let me step outside.

Your Honor, Special Agent Tanner informs me she's going to need another break in about an hour and 15 minutes, and she believes 20 minutes will be the length of time she needs at that point if we're still going on cross.

THE COURT:  All right.  Let's bring the jury in.

(The following proceedings were held in open court in the presence of the jury:)

THE COURT:  Let's resume.

MR. HOCHMAN:  Thank you, Your Honor.

Q     Agent Tanner, when we left off, we were on July 18, 2011, and I was asking you questions about receiving a phone call from Anthony Brown that day on one of the public jail phones.

Do you recall that?

A     Yes.

Q     And that was a phone call you knew would be recorded by the sheriff's department; correct?

A     Correct.

Q     And that's the first time that you actually took a phone call from Anthony Brown in the entire year you've been working with him and spoke to him on that call; correct?

A     Yes.

Q     I'd like to direct your attention to Exhibit 67 if I could.  Exhibit 67, which is in evidence -- do you have

UNITED STATES DISTRICT COURT

1512

that before you?

A       Yes.

Q       Exhibit 67, which is in evidence, has a transcription of the phone call that you had with Anthony Brown on 7/18/2011; correct?

A       It's a transcription of a call.  I can't verify its accuracy.

Q       I will put the first page of Exhibit 67 on the screen.

Could you read the date there that's about midway down on the first page?

A       July 18, 2011.

Q       And then it says "O.R."  If you could read what it says for the first line of the call.

A       "This is Global Tell.  Your call may be monitored or recorded.  You have a collect call from."

Q       And then the next line is "A.B."  That's Anthony Brown; is that correct?

A       Correct.

Q       And is the name "Anthony Brown" then stated by the person who is listed as A.B.?

A       Yes.

Q       What is the line that follows that?

A       "An inmate in Men's Central Jail.  To hear the maximum cost of this call, press 9.  If you wish to accept and

**UNITED STATES DISTRICT COURT**

pay for this call, dial zero now.  Your call is being connected.  Thank you."

Q       And that's when Anthony Brown and you have a conversation after that message; correct?

A       Correct.

Q       Because that means you accepted the phone call; correct?

A       Correct.

Q       If you could go down a little, it says "U.F." "U.F." is unidentified female; is that correct?

A       Yes.

Q       That was you; correct?

A       Yes.

Q       If you can do where it says "U.F.," and I've highlighted it three lines on the bottom.

A       "We got all the info.  We are working on our end."

Q       And what does Anthony Brown answer?

A       "Okay."

Q       And what do you say?

A       "Um, do you know when you are moving?"

Q       Turn the page, please.  Keep reading from the first three lines on the top.

A       "No, I don't know.  But, um -- I don't know when I'm moving, but it could be any day.  But I, um, gave dude the

**UNITED STATES DISTRICT COURT**

number, and he called."

Q    And then you responded to Anthony Brown.

A    "Yeah.  Yeah.  He is not calling us back now.  He called a couple of times, and we wanted to go, and he's not calling back now."

Q    And what does Anthony Brown say?

A    "Yeah.  I seen him yesterday."

Q    And then if you can go down a little farther to the highlight under "unidentified female," which is you, can you just read the highlighted line?

A    "Yeah.  Tell him to call.  He is ready.  He's got everything.  We are good to go."

Q    And this conversation is two days before the first bribe transaction is going to take place; correct?

A    Correct.

Q    If you can turn, then, to the next page.

This reflects a phone call on July 19, 2011, the very next day with Anthony Brown; correct?

A    Again, I'm only verifying what's in this e-mail. I cannot tell you this is an accurate transcription of the call, but yes, there obviously is another call.

Q    Well, you recall receiving a phone call from Anthony Brown the very next day from the public jail phone; correct?

A    I recall one phone, but obviously there was two.

UNITED STATES DISTRICT COURT

1515

Q      And, again, this would have been a call that you would have accepted; correct?

A      If there's a conversation, then, yes, I would have had to accept the charges for the collect call.

Q      Knowing it was being recorded by the sheriff's department; correct?

A      Yes.

Q      So if I could show you and have you focus about the middle of that page, what is the date?

A      July 19, 2011.

Q      And the first part, again, is that automated message about it being Global Tell.  "The call may be monitored or recorded, and you're receiving a collect call from Anthony Brown."

Do you see that?

A      Yes.

Q      If you can go to the highlighted lines about -- towards the bottom.  Again, it says "U.F.," unidentified female.  That's you?

A      Yes.

Q      And what do you say?

A      "We are good to go."

Q      And then what does Anthony Brown answer?

A      "Um, and everything is good to go here.  So just checking in to let you know."

**UNITED STATES DISTRICT COURT**

Q       If you can turn the page and start at the top with the unidentified female, who is you.

A       "Well, you get a phone soon."

Q       And what does Anthony Brown answer?

A       "Huh?"

Q       And what do you answer at that point?

A       "You will be having your phone soon, and then you can call who you need."

Q       And this is the day before the bribe transaction took place on July 20th; correct?

A       Yes.

Q       Now, you said you recalled one or two phone calls with Anthony Brown, but isn't it true you had a third phone call with Anthony Brown on July 21st, the day after the bribe transaction took place?

A       Obviously it's on here.  So -- I don't recall a phone call after the fact, but, again, it's on here.

Q       If you could look about midway down and tell the jury, when it says "Call 3," what the date is?

A       July 21st, 2011.

Q       If you could read the highlighted portion starting with "unidentified female," which is you.

A       "You're good.  You're good."

Q       And what does Anthony Brown answer?

A       "I'm good?"

**UNITED STATES DISTRICT COURT**

Q        And what do you answer?

A        "Yep."

Q        Now, when you're talking about "You're good, you're good," by that you meant that the first bribe had occurred and the cell phone was on its way to Anthony Brown; is that correct?

A        Just reading, "You're good, you're good," I have no idea the context of it.

Q        Well, by July 21st -- the bribe had occurred on July 20th, and the cell phone was on its way to Anthony Brown; is that correct?

A        At that time I didn't know if it was on the way. I assumed it was.  Again, I can't say that the "You're good, you're good" is specific to that without reading the whole thing and having more context.

Q        And that's because C.J. had met up with Gilbert Michel in that parking lot on July 20th; correct?

A        Yes.

Q        And I believe you told me that there was approximately six surveillance agents that were surrounding the parking lot; is that correct?

A        They were in the area.  They weren't necessarily all in the parking lot.  They were in the area so that, when he left, we'd be able to follow him.

Q        And you had members of your own team that were in

**UNITED STATES DISTRICT COURT**

the area as well?

A        From the squad?

Q        Yes.

A        Yes.

Q        How many?

A        I think there was only two, maybe three.

Q        So that's approximately nine that were on the ground; is that correct?

A        I would say approximately, yes.

Q        And you and three other agents are up in a plane watching the transaction?

A        There were two agents that are pilots and one that's not an agent, but he's in charge of running the camera in the plane.

Q        And the camera -- you're presumably thousands of feet up so you can't be detected from the ground; correct?

A        Correct.

Q        And this camera has sufficient enough resolution and quality in order to film what is going on down below; is that correct?

A        Correct.

Q        And it videotaped the entire Gilbert Michel, C.J. exchange; is that correct?

A        Yes.

Q        I'll show you what's in evidence as Defense

**UNITED STATES DISTRICT COURT**

1519

Exhibit 636, and that is a still photograph that shows Gilbert Michel meeting with C.J. on July 20th, 2011; correct?

A       Again, I assume so based on, you know, what I remember.  But I can't say that this photo that you have is a hundred percent for sure from our video because I did not review it.

Q       And C.J. is in the black car; is that correct?

A       C.J. was in a black Jeep.

Q       Black Jeep.

And there's a black Jeep pictured in Exhibit 636?

A       That's what it looks like.

Q       And Gilbert Michel was in a white or silver car that appears next to the black car; correct?

A       That looks like the car he was in, yes.

Q       And this was your view of the transaction because you're up in the plane; correct?

A       Correct.

Q       Now, during that transaction, that's where C.J. gave Deputy Michel the first bribe payment of $700; is that correct?

A       Yes.

Q       So by the end of that bribe payment, you had approximately -- well, you had a number of agents that were on the ground that had personally observed the payment; correct?

A       I don't know if everyone that was on the ground

**UNITED STATES DISTRICT COURT**

1520

was able to see the payment because they could have been three
blocks away waiting to follow his car when he left.  So I can't
tell you how many people actually saw it on the ground level.

Q       Well, there was some; correct?

A       I don't know if anyone on the ground level
actually saw the payment.

Q       All right.  You're up in the plane with the
videotape of the transaction; correct?

A       Correct.

Q       And C.J. had actually recorded all his
conversations with Deputy Michel leading up to the bribe
transaction; correct?

A       Correct.

Q       And you had those recordings?

A       At the time I don't know if I actually physically
had them in my possession.  I might have just gotten a summary
from the undercover agent about what was said.  We may not have
had the actual disk of the conversations by that point.

Q       Well, you or C.J. had those recordings; correct?

A       Again, he might not have had the disks that were
downloaded from the recording, but he obviously knew what was
said to him on the phone.

Q       And at that moment in time, you could have
arrested Deputy Michel; correct?

MR. FOX:  Objection.  Relevance.

**UNITED STATES DISTRICT COURT**

1521

THE COURT:  Sustained.

Q    BY MR. HOCHMAN:  I believe the Government asked you the question in your direct testimony that you could have arrested Deputy Michel at that time; is that correct?

MR. FOX:  Objection, Your Honor.  Misstates the testimony.

THE COURT:  Sustained.

Q    BY MR. HOCHMAN:  Did you arrest Gilbert Michel at that time?

A    No.

Q    And the reason you didn't arrest him was that you wanted him to bring the cell phone into the jail so that he wouldn't have any defense that somehow he had done this transaction not to bring the cell phone into the jail; is that correct?

A    It's actually not the case.  It's not that he would have a defense.  If he did not bring a cell phone in, that would not have been a federal crime to meet someone on the outside and stiff him for money.  So to say that we wouldn't have been able -- we wouldn't have been able to charge him if he hadn't brought the phone in.

Q    So once he brings the phone into the jail, you can charge him; correct?

A    We still had to do additional investigation to shore up our case and make sure we were bringing a solid case

with charges.

Q    But then it's a crime at least when he brings in the cell phone into the jail?

A    You have to look at the elements of a crime, and you have to determine whether or not -- for a bribe charge, there's certain elements that need to be met.  At that point we weren't a hundred percent sure we had met every element of that crime at that time; so we still had additional investigation to do.

Q    Well, you had the ability to allow him to bring the cell phone into the jail, have Anthony Brown make one phone call on that cell phone to C.J., and then terminate the service of the cell phone; correct?

A    Could I have done that?

Q    Yes.

A    Yes.

Q    And at that point the cell phone would no longer be live and be able to be used by anybody in the jail; correct?

A    That's correct.

Q    So all the dangers that you talked about about having a live cell phone in the jail couldn't be realized if you terminated the service; correct?

A    If that was the only purpose for the cell phone going in, then yes, but that wasn't the only purpose. Therefore, that wouldn't have been the plan to terminate

service immediately.

Q      Now, when you first had -- and I assume that, as soon as the cell phone went to Gilbert Michel and you knew it was on the way to Anthony Brown, you were monitoring those cell records that you talked about online; correct?

A      I don't know if I looked on there at that time because the cell phone was not in Anthony Brown's hands.

Q      Well, when -- July 26th, 2011, is when you realized that Anthony Brown was making phone calls on the cell phone; correct?

A      When he reached out to the undercover agent, yes.

Q      And that's because the undercover agent then reached out to you?

A      Correct.

Q      And that's when you would have started monitoring online, as you said, on a daily basis; correct?

A      Correct.

Q      You're aware, aren't you, that the call immediately after -- well, did Anthony Brown -- you said before -- I apologize.

You said before that you had taken precautions to make sure that the cell phone wasn't connected with the FBI; correct?

A      Correct.

Q      Did Anthony Brown, after he called C.J. on

UNITED STATES DISTRICT COURT

July 26, call you at your FBI desk number?

A        I believe he did.  I don't remember if it was immediately following, but it was soon after he called to let me know that he had the phone.

Q        And so -- I'll show you what's in evidence as Defense Exhibit 528.  If you could turn to Defense Exhibit 528 or look on the screen, if you would, this is the cell phone record for the Anthony Brown cell phone; correct?

A        Yes.  That's what it looks like.

Q        And I'll direct your attention to some of the highlighted numbers here.  Let's start with the 213-278-4608. That is C.J.'s number; is that correct?

A        I don't remember offhand what the number was for the undercover agent at the time, but I believe that was his number, but I'm not a hundred percent positive.

Q        I can show you an exhibit that would list his number if that would help refresh your recollection.

A        It would not.

Q        Well, do you believe that number to be, as you sit there today, 213-841-4407, to be C.J.'s number?

A        You actually just said a 278 number.

Q        I misspoke.  213-278-4608.

A        Just based on the interaction on the phones, I would say that's C.J.'s number because that's the back-and-forth between Anthony Brown's cell phone and C.J.'s

**UNITED STATES DISTRICT COURT**

cell phone.

Q    Could you look very quickly at Defense Exhibit 737 that's in evidence.

A    I don't have --

Q    I'll put it up on the screen.

Do you see where it says "C.J.," and you see there's a phone number next to it?

A    I can't see.

Q    It will hopefully come into focus.

A    Yes.

Q    And you see it's 213-278-4608?

A    Yes.

Q    All right.

THE COURT:  What exhibit number was that?

MR. HOCHMAN:  213 --

MR. FOX:  No.

MR. HOCHMAN:  That was Exhibit 737.  To the extent it's not in evidence, I'll move it into evidence. Defense Exhibit 737.

MR. FOX:  No objection, Your Honor.

THE COURT:  All right.

Q    BY MR. HOCHMAN:  All right.  Back to Exhibit 528.

So on 7/26/2011 at 8:37 in the morning, that is when Anthony Brown is calling C.J. on his cell phone that he has in the Men's Central Jail; correct?

**UNITED STATES DISTRICT COURT**

A    Just looking at this, given that it's the first one on there, I would assume that's the call saying, yes, I have the cell.  But based on this, I can't tell you specifically that was that conversation without the recording.

Q    If you look at the phone record, which is Exhibit 528, immediately thereafter -- relatively immediately thereafter, about six minutes later, he calls you, 310-996-4174, on August 26th.

Do you see that?

A    Yes.

Q    And he speaks to you for 65 seconds.

A    That could have been a voicemail as well.  I can't recall right at this moment whether or not I got a voicemail or if I actually picked up the phone and he said "I have the phone."  It could have been a voicemail.

Q    But you knew at that exact moment because you're monitoring it online; correct?

A    At that moment was I monitoring online?  I can't tell you whether or not I had the website up at that very second, no.

Q    Sometime that day on July 26, 2011, you monitored the online access for the phone; correct?

A    Correct.

Q    And you would have seen that Anthony Brown has just called you and forever linked that cell phone to your

**UNITED STATES DISTRICT COURT**

number at the FBI office; correct?

A       Correct.

Q       Did you terminate the service when you found out on July 26, 2011, that Anthony Brown had violated your order and linked his cell phone to your phone number?

A       I don't know what you mean "violated the order."

Q       Well, you told me before you gave him an instruction not to call you at your desk; correct?

A       Correct.

Q       And Anthony Brown has now violated that instruction or order by calling you with his cell phone directly to your desk number; correct?

A       I would not say he violated an order.  Again, he was anxious and did things sometimes that I wish he wouldn't have, but I would not say he violated an order by calling my desk phone.

Q       He didn't follow your instruction.

A       Correct.

Q       And in not following your instruction, he linked his cell phone to you; correct?

A       Correct.

Q       And you knew that because on that date you reviewed the phone records; correct?

A       I probably knew that prior to even looking on the website because I either answered the call or received the

UNITED STATES DISTRICT COURT

voicemail -- listened to the voicemail, I should say.

Q    And you knew at some point, if the cell phone was found, that they would be able to get the phone records to determine what numbers the cell phone had called?

MR. FOX:  Objection.  Relevance and cumulative.

THE COURT:  Sustained.

Q    BY MR. HOCHMAN:  One of the instructions for Anthony Brown was to just call C.J. -- correct? -- with his cell phone?

A    Correct.

Q    There's a number here that is a dial-in number. Were you able to determine what this 713-981-0098 number was?

A    That's a jail phone.

Q    And that's a jail phone calling Anthony Brown?

A    That's what it looks like.

Q    And the numbers above it dealing with what appears to be Anthony Brown's number, calling Anthony Brown's number -- and again, I'm referring to page 1 of 6 for the phone record in Exhibit 528 where you have sort of, it looks like, Anthony Brown calling Anthony Brown -- what exactly is that?

A    There was a lot of text messages that came from the phone company when we set up the account.  So they would come through and say, you know, you set up the account online linked to this number or here's a special deal for Boost Mobile.  So that's the only thing I can think of that was

UNITED STATES DISTRICT COURT

going through at that time.

I obviously didn't have the phone in my hand to verify that, but those were coming through prior to the phone ever being given to C.J.  I was getting these almost junk text messages to the phone asking me to renew service, things like that.

Q    Now, at some point you testified that Anthony Brown reached out to C.J. because Anthony Brown's cellmate wanted to use the phone; correct?

A    Correct.

Q    You and C.J. had a discussion about this, about whether or not to permit it; right?

A    Yes.

Q    Did you go back to Washington, D.C., to get any approvals for --

MR. FOX:  Objection.  Relevance, Your Honor.

THE COURT:  Sustained.

Q    BY MR. HOCHMAN:  And you and C.J. discussed it and agreed that Anthony Brown could allow his cellmate to use the phone one time in order to call his girlfriend; is that correct?

A    I don't know if it was specific to say "this one time."  I think it was basically an admonishment that we did not want Anthony Brown to be in danger with his cellmate by saying, "No, you can't touch my phone."  So he did give him

1530

permission to use it, and we just advised him, listen to the call and review any text message to make sure there's nothing going on that shouldn't be.

Q    And Anthony Brown was supposed to allow this to happen one time?

A    I don't think it was discussed as a "This is the only time you're allowed to do this."

Q    How many times was Anthony Brown instructed to allow his cellmate to use the phone?

A    I don't think it was discussed.

Q    At the time did you know who the cellmate was?

A    No.

Q    Did you know if the cellmate was in -- Anthony Brown was on the 3000 floor at that time; correct?

A    I don't know if I knew where he was housed at that time because, again, I wasn't going to see him.  So I didn't know if he was on the 3000 floor at that point.

Q    When you were seeing him, was he on the 3000 floor?

A    No.

Q    He was on the 2000 floor?

A    Correct.

Q    Did you speak to C.J. and find out from C.J. where Anthony Brown was housed when C.J. was speaking with him?

A    I don't think so.

**UNITED STATES DISTRICT COURT**

1531

Q        Was Gilbert Michel on the 3000 floor?

A        He was sometimes, and other times he would rotate around.

Q        In July of 2011, he was on the 3000 floor; correct?

A        I think primarily, yes.

Q        Now, did you do any investigation of the girlfriend, the cellmate's girlfriend, before you authorized Anthony Brown or -- excuse me -- C.J. sent the message to Anthony Brown that the cellmate could use a cell phone?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  Did you check out the phone number that you saw on the phone records to determine what -- who actually the phone number came back to that had been used by the cellmate?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  I'd like to show you, if we can keep going with Exhibit 528, toward the bottom -- this is Exhibit 528, page 1 of 6.  I'll show you numbers that are here. There are two numbers.  There's 323-337-6640 dialed twice.  You can see it's 37 and 39 seconds each.

A        Yes.

Q        Were those numbers, to your knowledge, as you're

UNITED STATES DISTRICT COURT

1532

reviewing it on July 26, 2011, for Anthony Brown's cellmate -- cellmate's girlfriend?

A    At this point in time, this many years later, I can't tell you specifically that that number right there is the one that I remember searching and doing research on.  But based on these phone records, yes, that would appear to be that phone call that was made, the two phone calls that were made to the girlfriend.

Q    You just said a moment ago "searching and doing research on."  You didn't do any searching and research on these numbers at the time they were being made; correct?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

Q    BY MR. HOCHMAN:  When did you do the searching and researching?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

Q    BY MR. HOCHMAN:  I will show you what is 2 of 6 of Exhibit 528.  I will zoom in just for a touch.

All right.  You see some more numbers there on 726, and I point you to a different 323 number that is being dialed.  It's 674-9948.

Do you see that?

A    Yes.

Q    Whose number is that?

UNITED STATES DISTRICT COURT

A       It could have been the girlfriend's number as well.  I don't know.

Q       Do you know if the cellmate had more than one girlfriend?

A       He did.

Q       Do you know if he actually had a wife?

A       I believe the girlfriend called herself his wife, but they were not actually married.

Q       Did you know that at the time on July 26, 2011, or did you find out at some point later?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  We've just been talking about phone calls on 7/26/2011.  I want to point you to page 4 of 6 of this Exhibit 528.  There's a 115-second phone call made to that 323-337-6640 number on August 3rd, 2011.

Do you see that?

A       Yes.

Q       Did you see that at the time it was happening on August 3rd, 2011?

A       It would not have been at the time, no.

Q       Well, you said you daily monitored the phone records; correct?

A       It would be after the fact.  It's not going to show up until the phone call is finished.  It would not show up

at the time.

Q    After the phone call was made on August 3rd, 2011, that's when you would have seen it; correct?

A    Correct.

Q    And, again, you might not have seen it.  It was made at 6:39 p.m.  Unless you were looking at it at nighttime, you wouldn't have seen it until the following morning; correct?

A    It depends.

Q    If you will look at page 5 of 6 of this exhibit at the very bottom, you see even more phone calls are being made -- one to the 323-337-6640 number and one to the 323-674-9948 number.  The first one for 207 seconds, the second for 291 seconds, again, on August 3rd, 2011.

Do you see that?

A    Yes.

Q    Did C.J. give Anthony Brown permission to let his cellmate use the phone on August 3rd, 2011, as well as July 26, 2011?

A    Like I said, I do not believe -- the initial time when Anthony Brown asked C.J. if he can use it this one time and one time only, I do not believe that was the discussion they had.  He just basically told him, if your cellmate is calling his girlfriend, you need to monitor and listen to what he's saying -- or text messages.

Q    And you have no idea -- you weren't able to

monitor the phone at that point in time to see what the cellmate is saying to whoever he is calling; correct?

A        Correct.

Q        Now, in addition to -- well, when Gilbert Michel brings the cell phone into the jail, I believe what you said is that you wanted Anthony Brown to use the cell phone to contact C.J. about anything he was seeing concerning potential deputy misconduct in the jail; is that correct?

A        Correct.

Q        And then you also said that the cell phone had video or photographic capability, a camera in it, so that Anthony Brown can presumably stick the camera in front of him and photograph or videotape any deputy misconduct that was occurring in front of him through his cell bars; is that right?

A        I think you're overexaggerating.  There's views from the cells.  You would not have to hold the phone out with your arm out and be obvious about it.  It's entirely possible that you could have a view from your cell, be able to conceal it behind the cell bars, and take a photo of something happening.  So he would not have to be on top of something or with his arm outstretched looking obvious in doing it.

Q        But you said that one of the advantages of Anthony Brown is he got to move around outside the cell; correct?

A        Correct.

**UNITED STATES DISTRICT COURT**

Q        So your anticipation was that he was going to be walking by some deputy abuse, pull out the camera real quick, flip it open, because it's a flip phone, and then quickly videotape what was going on; is that correct?

A        Again, I think you're overexaggerating the fact that I'm not expecting him to do anything that would make it obvious that he's doing it.  If he had the opportunity and something was there, then, yes, of course we wanted him to do it.  But it was not something we expected, every time he saw something or every time something was going on, that he would be there with a video camera videoing it.  It's just something that, if it occurred or if he was able to do it discreetly, then we were going to ask him to do that.

Q        Well, instead of giving Anthony Brown a live cell phone that could make these calls and texts and also has a camera capability, you could have gone ahead and just had secret recording devices installed inside the Men's Jail which could have obtained that information for you; is that correct?

            MR. FOX:  Objection.  Relevance.

            THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  Well, you had a source inside the sheriff's department's technical operations detail, didn't you?

            MR. FOX:  Objection.  Relevance.

            THE COURT:  Sustained.

UNITED STATES DISTRICT COURT

Q        BY MR. HOCHMAN:  Can you turn to Exhibit 50, please.

MR. FOX:  Objection, Your Honor.  May we have a sidebar?

THE COURT:  Yes.

(The following proceedings were held at sidebar:)

MR. FOX:  Your Honor, I believe that Mr. Hochman is going to go exactly where he was going before.  I think he's going to try to have Special Agent Tanner say that this person, John Powell -- let me back up.  I don't think the court reporter heard me.

I believe where Mr. Hochman is going with this is he's going to try to have Special Agent Tanner say that this person, John Powell, was a source for the FBI.  It's irrelevant that he's a source, and it's outing a former source and with no relevance.  I don't think that it's appropriate for him to do that.

MR. HOCHMAN:  Three responses, Your Honor. Number one, John Powell was outed as a source in the Tanaka trial when he testified, which is where I'm getting all the information from.  So it's a publicly -- he's already been publicly outed.

Second, I didn't bring up Exhibit 50 with this witness.  Mr. Fox did.  He didn't have to go into Exhibit 50, but he made it ripe within the scope of the cross-examination

UNITED STATES DISTRICT COURT

1538

because he brought it in.  And they went through everywhere --
they went through this whole exhibit with her to deal with the
sweeping for the bugs.  That's this exhibit, Your Honor.

MR. FOX:  Your Honor, my point is it's irrelevant
that he's a source.  He's not testifying right now.  It's
irrelevant.  If Mr. Hochman's questions relate to this document
and not the fact that he's a source, I probably don't have
objections to it.  Question about the fact that he's a source
or was a source is irrelevant.  It was relevant in Tanaka
because he was testifying.  He hasn't testified in this case.

MR. HOCHMAN:  Again, part of our whole defense,
Your Honor, is there were other things that she could have done
other than use a cell phone to get this information.

THE COURT:  That's the defense?

MR. HOCHMAN:  Well, no.  But it's part of the
attack on her credibility, Your Honor.  And, again, if she
hadn't opened the door -- what I'll ask is -- she went into
John Powell, sergeant of the technical operations detail.  I
think it's fair to say, "Have you ever met him before?  How do
you know him?" which is basically where I was going to go with
this exhibit away from the -- at least at a minimum that
they've known -- the FBI has been working with him since 2001.
I think that's at least relevant to show her connection in that
she knows something about him and she personally interviewed
him --

**UNITED STATES DISTRICT COURT**

1539

THE COURT:  If you want to get into what he covered in this document, that's fine.  But Mr. Powell is out.

And let me just say this.  You really need to focus on what you think is important here because I'm not going to sit here for a deposition for two hours, and at some point, I'm going to cut you off.

MR. HOCHMAN:  Your Honor, I'll move it along.

(The following proceedings were held in open court in the presence of the jury:)

Q      BY MR. HOCHMAN:  You have an Exhibit 50 in front of you?

A      Yes.

Q      Exhibit 50, I believe, is an exhibit you testified in your direct testimony regarding sweeping the bugs.

Do you recall that?

A      Yes.

Q      I'll put the first page of that exhibit on the screen.

I believe you testified about communications in an e-mail of a gentleman named John P. Powell to Stephen Leavins; correct?

A      Yes.

Q      And John P. Powell is someone, if you can look at the third page of the exhibit, he's a sergeant with the technical ops detail, Los Angeles County Sheriff.

**UNITED STATES DISTRICT COURT**

Do you see that?

A        Yes.

Q        And did he -- and this e-mail, which is dated September 7, 2011, describes, I think you said, different sweeping for bugs, that it happened in the large conference room -- large EPC conference room, small EPC conference room, and the executive offices; correct?

A        Yes.

Q        And John Powell provided you before --

MR. FOX:  Objection, Your Honor.

Q        BY MR. HOCHMAN:  September 7?

MR. FOX:  Objection.  Sorry, Your Honor.

THE COURT:  We'll come back to this.  Next question.

Q        MR. HOCHMAN:  Okay.  August 4th you have a second bribe; correct?

A        Yes.

Q        And I'll show you what is Exhibit 634.  Is that a photograph of a second bribe payment that Gilbert Michel received from C.J.?

A        That's what it appears to be, yes.

Q        And, again, this was being surveilled by FBI agents.  And were you in the plane this time?

A        No.

Q        You were on the ground?

UNITED STATES DISTRICT COURT

1541

A      I stayed back just because I wasn't sure if Gilbert Michel had ever seen me in the jail.  So I didn't want to be anywhere near the area in case he saw me.

Q      This was the $800 payment?

A      Yes.

Q      At that point the cell phone was already in the jail; correct?

A      Correct.

Q      Did you arrest Gilbert Michel at that point?

A      No.

Q      Now, August 8, 2011, you find out that the cell phone has been discovered by the L.A. County Sheriff's Department; correct?

A      Yes.

Q      And between August 8th and August 23rd, you yourself never went to visit Anthony Brown in the Men's Central Jail; is that correct?

A      Correct.

Q      And on August 18, 2011, you heard or you learned that the FBI had notified the sheriff's department that the phone that had been discovered was an FBI phone; correct?

A      Correct.

Q      And once it was out, that that information was out on August 18, you could have visited -- there was no -- there was no problem in connecting the FBI to the cell phone --

**UNITED STATES DISTRICT COURT**

correct? -- after August 18?

A        I don't understand the question.

Q        In other words, one of the reasons that you didn't visit Anthony Brown before the FBI told the sheriff's department about the cell phone is you didn't want to connect yourself to Anthony Brown during that period; correct?

A        It was, I guess, technically, yeah.  I mean, he was already connected to me in some way.  We didn't think the phone was connected to the FBI in general which is why we weren't concerned with it going in.

Q        That's why you sent someone from the gang unit to try to talk to Anthony Brown between the August 8 and August 18 period; correct?

A        Correct.

Q        But after August 18, when the phone was outed, any day until August 23rd, you could have come and spoke with Anthony Brown; correct?

A        I was out of state visiting family; so as soon as I got back is when I went.

Q        Now, between August 8 and August 18, you did not personally inform Steve Martinez, the assistant director in charge of the FBI's office, about the fact that the cell phone had been found; correct?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

**UNITED STATES DISTRICT COURT**

Q        BY MR. HOCHMAN:  Well, you know Steve Martinez because Mr. Fox showed you an e-mail on August 18 notifying Sheriff Baca on August 18 that the cell phone had been found and it was an FBI cell phone; correct?

A        Correct.

Q        Did you notify Steve Martinez before August 18 personally, yourself, that the FBI's cell phone had been found?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

Q        BY MR. FOX:  When you visited Anthony Brown on August 23rd, 2011, you said that you were able to talk to him for about an hour or so; is that correct?

A        Yes.

Q        And after you talked to him for about an hour, that's when the meeting got interrupted and he was taken away by sheriff's deputies; correct?

A        Correct.

Q        Did you, thereafter, you, yourself, ever make another request for you to visit with Anthony Brown between August 23rd and September 12, 2011?

A        We issued the federal -- or sought the federal writ.  So there was absolutely no reason for us to try to go back after what had happened.

Q        Did you ever make a request to the sheriff's department for you personally to interview Anthony Brown

**UNITED STATES DISTRICT COURT**

1544

between August 23rd and September 12, 2011?

A        I don't know if you mean me personally making a phone call to executive management of the sheriff's department. No, I did not.

Q        Or anyone at the sheriff's department.

A        No, I did not.

Q        Did anyone in your Civil Rights Squad make such a phone call to the sheriff's department to set up an interview with Anthony Brown between September -- let's say, August 23rd until -- or at least September 12, 2011?

A        They did reach out to the Office of Independent Review prior to that when he didn't show up at the grand jury.

Q        Now, when Anthony Brown -- you testified about certain orders that were put in place restricting the FBI's access to -- restricting or requiring an approval before any FBI agent got to speak to an inmate.

Do you recall those?

A        Yes.

Q        Around August 26, I believe, the e-mail shows.

A        I think that's the time.

Q        The time between August 23rd and September 12th, 2011, you didn't know that that particular order was in place; correct?

A        I did.

Q        I'm sorry?

UNITED STATES DISTRICT COURT

A       I did.

Q       You did know?

A       Yes.

Q       And that's because you tried to go down to the jail and meet with Anthony Brown and you were somehow restricted in doing it?

A       It's actually because I had multiple agents calling me very angry because they tried to go for their cases to go and interview inmates and they were angry because they were being turned away and they were blaming me for that.  So I got angry phone calls as a result.  So I learned from them that was exactly what was in place.

Q       Now, September 12th you found out that Anthony Brown got transferred to the Lancaster State Prison; is that correct?

A       I don't know if it was on the 12th or 13th but somewhere around that time.

Q       Then you set up a meeting with Anthony Brown on the 13th; is that correct?

A       Correct.

Q       You said Anthony Brown started off the meeting very mad at you; is that right?

A       Very much so.

Q       He thought you had left him and abandoned him; correct?

A       Yes.

Q       And that was the beginning part of the meeting. The rest of the meeting, did Anthony Brown calm down and provide you with the information of what had happened to him in the sheriff's department?

A       Yes.

Q       And he provided you, in fact, with even additional information about things that he had observed in the sheriff's department; is that correct?

A       Just, in general, he told us what had happened and anything else that had occurred during that time period that we hadn't been able to talk to him.

Q       And did you go ahead and writ Anthony Brown out on September 13, 2011, so he could testify right away to the grand jury within a week, let's say?

A       No.

Q       Did you do that?

        How about by the end of September, 2011?

A       No.

Q       How about by the end of the year, 2011?

A       No.

Q       And then you kept in contact with Anthony Brown between September 15th, 2011, all the way until he spoke to the grand jury in December, 2012; is that correct?

A       Yes.

**UNITED STATES DISTRICT COURT**

Q        He would send you letters at that point?

A        Sometimes.

Q        And he would request things in those letters?

A        Sometimes.

Q        And sometimes you would provide some of the things; is that correct?

A        Sometimes.

Q        And that's when he's requesting a TV, earbuds, and a lot of hip hop music; is that correct?

A        He requested some of the same type of system as the jail system.  Anything that was allowed in the prison system, if we could get some of those things for him.

Q        August 24th, 2011, you meet with Gilbert Michel; correct?

A        Yes.

Q        And that was you and probably about another three or four or five FBI agents at that time?

A        Something like that, yes.

Q        You meet with him initially at the -- at his apartment; is that correct?

A        We were waiting for him at his apartment when he returned home from work.  We met him in the parking lot and asked if he would be willing to speak to us.  When he said "yes," we went to a Starbucks.

Q        You spent about two hours or so at the Starbucks

UNITED STATES DISTRICT COURT

with him?

A        I don't know how long we spent there.

Q        Did you have the videotape from the video surveillance that we saw a still photo of to show him during that Starbucks meeting?

A        Yes.

Q        And did you have a binder with him that had other photographs in it?

A        The binder was kind of just for show.  It was a binder that had a lot of documents in it just to show him that we had a lot of evidence.  Some of it was just criminal background checks of him or his girlfriend.  It wasn't necessarily all photos from the operation.

Q        And you asked him questions both about the bribe transaction, and then you asked him questions as well as to whether or not he had engaged in any sort of deputy beatings; correct?

A        I think it was not just whether he had engaged in but if he knew anything or could tell us any information about what was going on.

Q        With respect to the bribe transaction, he owned up to that; correct?

A        Pretty much, yeah.

Q        And then with respect to all the other misconduct, he basically told you he knew nothing; correct?

1549

A       He said he just didn't have any information to provide.

Q       And that was a lie; correct?

A       Yes.

Q       Because he actually had information.  He just wasn't sharing it with you then?

A       Correct.

Q       And you told him then right there in the meeting that lying to the FBI is a federal crime; correct?

A       Yes.

Q       And then you actually brought your supervisor, Carlos Narro, on the phone who told him the same thing; correct?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  So at the end of the meeting -- this is now sort of late afternoon on August 24th -- you have all this videotape and surveillance evidence of Gilbert Michel taking bribes; correct?

A       Yes.

Q       You also know that he's brought the cell phone in to the jail, and the cell phone has been used; correct?

A       Yes.

Q       In fact, he's had to take the cell phone and recharge it and give it back to Anthony Brown on multiple

UNITED STATES DISTRICT COURT

1550

occasions; correct?

A        I believe so.  I wouldn't know.

Q        And he had taken two bribes, actually, at that point; is that correct?

A        Yes.

Q        You know that he still was a deputy sheriff at that moment in time; correct?

A        Yes.

Q        He had a gun; he had a badge.

         Correct?

A        I would assume so, yes.

Q        And at the end of that meeting, did you let him go?  In other words, did you arrest him at the end of the meeting?

A        We did not.

Q        Focusing your attention on Government Exhibit 15 -- I'm going to go through just a few Government exhibits that Mr. Fox showed you.  All right.

         Government Exhibit 15, this is the Steve Martinez e-mail.  Do you see that?

A        Yes.

Q        On August 18, 2011.  Do you see that?

A        Yes.

Q        Were you party to the conversation that Steve Martinez had with Sheriff Baca that day?

**UNITED STATES DISTRICT COURT**

1551

A        No.

Q        Did you ever at any point speak with Sheriff Baca?

A        No.

Q        Did you ever e-mail him or text him?

A        No.

Q        Are you aware of any other e-mail from Steve Martinez to Sheriff Baca before August 18, 2011, on the subject of the cell phone?

A        I would have no idea if they e-mailed prior to based on the content of this e-mail.

I would assume this is the first one given the way he basically explains he has something to discuss.

Q        And this e-mail comes from the Los Angeles County Sheriff's Department records because, on the bottom right-hand corner, do you see "LASD" with a number next to it?

A        Yes.

Q        So this e-mail doesn't come from the FBI's internal server records; correct?

A        I believe we actually had both from the FBI as well as from the sheriff's department, but, yes, that copy right there is from the sheriff's department.

Q        If you could turn to Exhibit 120, so focusing on Exhibit 120, that's Sheriff Baca's calendar.  Do you see that?

A        Yes.

**UNITED STATES DISTRICT COURT**

1552

Q        And in going through all the records and -- you did a phone record analysis; is that correct?

A        Yes.

Q        Did you also happen to do sort of an event analysis to determine whether or not this calendar had all the events of Sheriff Baca that are listed on a particular day?

A        I'm not sure I understand your question.  I would have no way of knowing every event he went to to compare it to this calendar if that's what you're asking.

Q        I think I am because you had done some type of analysis on phone calls, and I was wonder if you had done a similar analysis with respect to events.

A        Again, I'm not sure what you're asking in terms of analysis on the event.  Did I do additional research to find out if there's events not on the calendar?

Q        Yes.

A        No.

Q        If you could turn to Exhibit 31.  Exhibit 31, this is an e-mail that you discussed in your direct testimony from Paul Tanaka to Stephen Leavins.

Do you see that?

A        Yes.

Q        It says, "Thanks, Steve.  Right after, and I mean right after, I spoke with Tom this morning.  The sheriff popped in looking for an update.  This case is consuming his entire

**UNITED STATES DISTRICT COURT**

thought process."

Do you see that?

A      Yes.

Q      Can you see the next line?

A      "Providing him with updated tidbits helps to ease his mind."

Q      Do you know what an "updated tidbit" is as referenced in this e-mail?

A      I didn't write the e-mail; so I can't tell you what Paul Tanaka meant by that.

Q      If you could turn to Exhibit 35, Exhibit 35 is a discussion dealing with whether or not the county attorneys are going to have to review certain orders.

Do you recall that?

A      Yes.

Q      Discussions between William Carey and Greg Thompson, do you see that?

A      Primarily.  And then also Ralph Ornelas.

Q      Just for clarification, Sheriff Baca is no where on this particular e-mail; is that correct?

A      Correct.

Q      If you could turn to Exhibit 36, Exhibit 36 is the continuation of that e-mail, and that too does not reflect that Sheriff Baca is anywhere on this e-mail.

MR. FOX:  Objection, Your Honor.  Cumulative to

**UNITED STATES DISTRICT COURT**

Mr. Yanagi's testimony.

THE COURT:  Sustained.

Q     BY MR. HOCHMAN:  If you could turn to Exhibit 128 -- actually, if you have Exhibit 128 in front of you, I will reference it generally.

This is the Kevin King documents; is that correct?

A     I'm not there yet.

Q     And these are the records dealing with Kevin King, I believe.

A     Yes.

Q     And, again, are there any indications on these records that this information was communicated to Sheriff Baca?

MR. FOX:  Objection.  Argumentative and cumulative.

THE COURT:  Sustained.

Q     BY MR. HOCHMAN:  I'd like to turn your attention to Exhibit 100.  Exhibit 100 was a recording that we listened to involving your supervisor, Carlos Narro, calling Sergeant Long.

Do you recall that?

A     Yes.

Q     And Exhibit 101, I believe, was the transcript for that.

Do you recall that?

**UNITED STATES DISTRICT COURT**

A        Yes.

Q        Now, in that recording, Mr. Narro asks, "Does the sheriff know this?"

Do you see that?

A        Yes.

Q        And what he is referencing, I believe, to be that there is going to be a warrant issued for your arrest; is that correct?

A        Correct.

Q        And Sergeant Long says, "The sheriff knows this, sir."

Do you see that?

A        Yes.

Q        Do you know whether or not Sergeant Long knew at that point that Sheriff Baca actually knew that the agents were going to come out and threaten to arrest you?

MR. FOX:  Objection.  Speculation.  Foundation. Hearsay.

THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  Well, did you ever -- were you party to the phone call, listening in on maybe when Mr. Narro is calling the agent at that time?

MR. FOX:  Objection.  Argumentative.

THE COURT:  You can answer it "yes" or "no."

THE WITNESS:  You said call that agent; so I'm

**UNITED STATES DISTRICT COURT**

1556

not sure what you mean.

Q    BY MR. HOCHMAN:  Your supervisor is Carlos Narro; correct?

A    Right.  But you said "To call the agent."  Yes. You said call the agent.

Q    I misspoke.

Your supervisor, Carlos Narro, on September 26 is making a phone call to Sergeant Long; correct?

A    Correct.

Q    And on that phone call, she says words to the effect of "The sheriff knows this, sir."

Do you see that?

A    Yes.

Q    Do you understand that?

A    Yes.

Q    My question was, were you listening in on that phone call on Carlos Narro's end of it to have an understanding -- let me leave it at that.

Were you listening in on the phone call on Carlos Narro's end of it?

A    No.

Q    And did you speak to Sergeant Long that day after she had come to your apartment on September 26 and spoke with you?

A    Absolutely not.

**UNITED STATES DISTRICT COURT**

Q        I'm going to turn to Exhibits 157, 170, and 172, your summary charts.  Let me know when you have those in front of you.

A        Okay.

Q        Starting with 157, 157 was the summary chart in which you looked at Sheriff Baca's phone calls.

Do you recall that?

A        Yes.

Q        If I show you the first page of that, 157, this is where you identified on August 18 that Sheriff Baca had a phone call with Steve Martinez and then spoke with Paul Tanaka thereafter; correct?

A        Correct.

Q        And on August 19, the second page, August 19 you identified a Sheriff Baca phone call to FBI Westwood.  Is that where your FBI office is located?

A        Correct.

Q        Then Steve Martinez spoke with Sheriff Baca on August 19; is that correct?

A        Yes.

Q        And Sheriff Baca then, thereafter, spoke with Paul Tanaka; is that correct?

A        Correct.

Q        And you're aware that they had a meeting, that being Sheriff Baca called Tanaka and others, on August 19;

correct?

A       That's what the schedule says.

Q       That's what the schedule says.

And as just a general idea about these cell phone records, when you say "duration" and it says "1," for instance, that phone call could have lasted one second or all the way up to one minute; correct?

A       Correct.

Q       And still say "1"?

A       Correct.

Q       Same thing for each of the numbers.  So if it says "3," that phone call could have lasted 3 minutes exactly or up to, what, 3, 59, it would still say 3?

A       I believe so.  The Verizon phone records only show full numbers, but I would assume that's the case that 3 minutes and 59 seconds would show up the same way as 3 minutes and 1 second.

Q       Okay.  If we could focus on Exhibit 170 now. Exhibit 170 was your analysis of all Paul Tanaka's phone calls; correct?

A       Correct.

Q       Then for Exhibit 172, you put it all together, and you put it all together between Sheriff Baca, Undersheriff Tanaka, and then you made it in reference to certain dates in this case; is that correct?

1559

A       Yes.  There's also other individuals on it --
Tom Carey, Steve Leavins, the OSJ deputies.

Q       Just to be clear then, let's just go through them briefly.

Sheriff Baca, Undersheriff Tanaka; correct?

A       Correct.

Q       Steve Leavins?

A       Yes.

Q       Tom Carey?

A       Yes.

Q       Greg Thompson.

A       Yes.

Q       Mickey Manzo.

A       Yes.

Q       Christopher Nee.

A       Yes.

Q       Tom Carey.

A       Yes.

Q       Anyone else?

A       I believe Gerard Smith, Cecil Rhambo.

Q       Cecil Rhambo.

Do we also have Sergeant Long?

A       Yes.  And Scott Craig.

Q       So basically all the investigators that were involved in connection with the cell phone; correct?

**UNITED STATES DISTRICT COURT**

A       All of the employees involved in the cell phone investigation plus some desk lines that may be relevant, aides to some of the assistant sheriffs, undersheriff, things like that.

Q       Now, you also did an analysis, did you not, summary analysis, just the phone calls between Sheriff Baca and Undersheriff Tanaka; is that correct?

A       Yes.

Q       I'm going to present to you what will be marked as Defense Exhibit 637.

(Marked for identification Exhibit No. 637.)

MR. HOCHMAN:  May I approach the court clerk, Your Honor?

THE COURT:  Yes.

Q       BY MR. HOCHMAN:  Defense Exhibit 637, a summary chart that you prepared of the phone calls in the time period of August 18, 2011, to September 26, 2011, between Sheriff Baca and Undersheriff Tanaka?

A       Given that I am not the one that put this forward with the Government, I can't tell you a hundred percent that this is my full chart because I don't know if you did any altering to it or anything.  All I can tell you is it looks similar to the one I did, but I can't tell you based on just this that this is the one I did.

MR. HOCHMAN:  Your Honor, I'd offer as a

UNITED STATES DISTRICT COURT

summary -- and would this chart be a summary of voluminous records?

A        Again, I can't tell you that -- unless this is the one that I wrote and I actually had it to turn over, I can't tell you that this one that you have and gave to me is the exact same as mine.

MR. HOCHMAN:  May I have a moment, Your Honor, with counsel?

(Counsel confer.)

MR. HOCHMAN:  I'm going to defer on this particular exhibit, Defense Exhibit 637, Your Honor, and present the witness with what will be marked for identification as Defense Exhibit 639, Your Honor.

(Marked for identification Exhibit No. 639.)

MR. HOCHMAN:  If I might have a moment.

May I approach the clerk, Your Honor?

THE COURT:  Yes.

Q        BY MR. HOCHMAN:  Do you have what is marked as Defense Exhibit 639 in front of you?

A        Yes.

Q        And is this a summary chart that reflects the calls between Paul Tanaka, Messrs. Carey, Leavins, Thompson, Craig, Manzo, Smith, Sexton, and Ms. Long?

A        It looks like the one I did.  Again, I can't tell you that a hundred percent this is mine just based on you

giving me this right now.

Q    And the time period is August 18, 2011, to September 26, 2011?

A    That's what it says, yes.

MR. HOCHMAN:  The defense would seek to admit Defense Exhibit 639 as a summary chart, Your Honor.

MR. FOX:  Your Honor, may I have a moment with counsel again, please?

THE COURT:  Yes.

(Counsel confer.)

MR. HOCHMAN:  Your Honor, I'll defer the request for admission at this moment.

Q    Approximately -- there are approximately 60 entries on this chart of calls between Mr. Tanaka and all those other individuals that I specified?

A    Approximately, yes.

MR. HOCHMAN:  I'd like to show you what will be marked for identification as Defense Exhibit 638.  I'm sorry, Your Honor.

May I approach the clerk?

THE COURT:  Yes.

(Marked for identification Exhibit No. 638.)

Q    BY MR. HOCHMAN:  Defense Exhibit 638 is another summary chart that has a comparison or has the number of -- identifies the calls between Sheriff Baca and Messrs. Carey,

Leavins, Thompson, Craig, Long, Manzo, Smith, and Sexton between August 18, 2011, and November -- September 26, 2011; is that correct?

A        Yes.

Q        And you prepared this chart?

A        Yes.

MR. HOCHMAN:  Your Honor, I would seek to admit Defense Exhibit 638.

MR. FOX:  No objection.

THE COURT:  It will be received.

(Received into evidence Exhibit No. 638.)

MR. HOCHMAN:  Permission to publish.

THE COURT:  Yes.

Q        BY MR. HOCHMAN:  Agent Marx, in preparing this chart, you went through all the cell phone records for Sheriff Baca, Messrs. Carey, Leavins, Thompson, Craig, Long, Manzo, Smith, and Sexton between August 18, 2011, and September 16, 2011; is that correct?

A        Only cell phones.  This doesn't include desk phones unless a cell phone called a desk phone.  So in terms of records for these individuals, it's strictly cell phones I've reviewed.

Q        But those are the exact records you used to compile those other charts we've been talking about -- Exhibits 157, 170, 172 -- correct?

**UNITED STATES DISTRICT COURT**

1564

A        Yes.

Q        And after all that review, how many phone calls did you find between any of those individuals -- Mr. Carey all the way down to Sexton -- and Sheriff Baca during this August 18 to September 26, 2011, time period?

A        The ones that were identified and not unavailable or unknown that I wouldn't have a way to know who was calling Sheriff Baca, it's one call with Steve Leavins and Lee Baca on August 26.

Q        And I think you said with Mr. Tanaka there were 60 phone calls, and with Mr. Baca there's just this one; correct?

A        Again, I can't say there was only one.  I can tell you that I can identify.  The "unknowns" and "unavailables," there could be many more.  On this just being able to identify it, yes, there's only one.

Q        And by the way, unknown and unavailable, that's anybody with an unlisted number; correct?

A        Could be.

Q        That's not just restricted to the FBI or U.S. Attorney's Office.  It could be anyone in Los Angeles County who has an unlisted number; correct?

A        Could be.

Q        For that matter, it could be anyone in the United States that has an unlisted number if it's calling into

**UNITED STATES DISTRICT COURT**

the cell phones; correct?

A       It could be.

MR. HOCHMAN:  No further questions.

THE COURT:  All right.  Ladies and gentlemen, we're going to take a break.  Again, I want to remind you you're not to discuss this case with anyone including your fellow jurors, members of your family, people involved in the trial, or anyone else, and do not allow others to discuss the case with you.  This includes discussing the case on the Internet, various forms of social media, by e-mails, or text messages.  If anyone tries to communicate with you about this case, please let me know about it immediately.

Do not read, watch, or listen to any news reports or other accounts about the trial or anyone associated with it. Do not do any research such as consulting dictionaries, searching the Internet, or using other reference materials.  Do not make any investigation about the case on your own.

Finally, you're reminded to keep an open mind until all of the evidence has been received, you've heard the arguments of counsel, the instructions of the Court, and the views of your fellow jurors.

If you need to speak with me, simply give a note to the clerk.

We'll come back at 20 after the hour.

///

(The following proceedings were held in open court out of the presence of the jury:)

THE COURT:  You may step down.

Is there anything else we need to take up at this time?

MR. HOCHMAN:  Very briefly, Your Honor.

You deferred ruling on one question that I asked in connection with Exhibit 50.  That's Mr. Powell.  The information I sought to elicit, which I believe the witness would have confirmed, is that that e-mail is dated September 7, 2011, when they did the bug sweep.  But in reality, Mr. Powell informed her ahead of time that they were going to do the bug sweep.

Now, it's for the reasons that I identified before and are part of the public record in the Tanaka trial as to why Mr. Powell is providing that information to Ms. Marx, but I believe it's relevant for that purpose, Your Honor.

MR. FOX:  And, Your Honor we don't believe it's relevant whatsoever.  He just says it's relevant without explaining why.  There's nothing to respond to because he hasn't explained how it's relevant whatsoever.

MR. HOCHMAN:  Your Honor, I explained it at sidebar.  I can explain it again since it is a matter of -- it's already out there publicly.

Mr. Powell was a confidential human source for

**UNITED STATES DISTRICT COURT**

1567

the FBI going back to 2001.  He had the ability to install secret recording devices anywhere within the sheriff's department if the FBI had requested.

As I pointed out, we talked about, you know, cameras and different options that Special Agent Marx has.  One of the options was to ask Mr. Powell to install secret recording devices which wouldn't have had any of the dangers of a cell phone obviously because you can't use it to communicate with.  She had that option.  She didn't avail herself of that option.

It was a four-question additional cross-examination, Your Honor.  So obviously very, very brief.  But that's what I was seeking, Your Honor.

MR. FOX:  Your Honor, two things on that.  First of all, it's irrelevant whether Mr. Baca liked or disliked the way the FBI and the Federal Grand Jury went about its investigation.  He can't obstruct an investigation even if he doesn't like how it went about.  Even if it's dangerous and it's a Federal Grand Jury investigation, he can't obstruct it.  So it's irrelevant to this case.

Secondly, as Your Honor knows, in order to install an audio listening device, there needs to be a Court that orders that to happen based on probable cause, based on necessity, based on a lot of things.  You can't just put a device in just because somebody says that you have the ability

1568

to -- someone who is within the organization says that he has the ability to have access to that area.

So, again, I would say this is irrelevant. There's certainly a 403 problem as well.

MR. HOCHMAN:  And a very brief response to that, Your Honor, is Sheriff Baca's state of mind, whether or not he was intending to obstruct justice or obstruct an FBI civil rights investigation or he was just very upset that the FBI had used a cell phone technique to do an undercover when so many other techniques existed that wouldn't have created the dangers in the jails, I believe that is relevant both for his motivation and his intent.

THE COURT:  I don't think that's very helpful to that argument.

MR. FOX:  And, Your Honor, if I may point out, this was with respect to Mr. Baca's office, Mr. Baca's conference room, Mr. Tanaka's office, and Mr. Tanaka's conference room.  This had nothing to do with the violence -- installing a camera to capture violence within the jails.  So this is not going to his state of mind whatsoever.

MR. HOCHMAN:  And the Government didn't connect up that Mr. Powell or any of this surveillance evidence ever reached Mr. Baca.  So the Government has introduced sort of this orphan evidence that existed but in no way is going to at all connect it to Mr. Baca's knowledge that it was actually

**UNITED STATES DISTRICT COURT**

ordered, approved by Mr. Baca or even known of.

And we were trying to elicit that, since they brought out this evidence, that the FBI had a direct connection into the sheriff's department in order to, again, explain why Mr. Baca is quite upset at the FBI that they could have done everything but use a cell phone but chose not to.

THE COURT:  Okay.  Thank you.

MR. FOX:  Thank you, Your Honor.

(A recess was taken at 11:06 a.m.)

MR. FOX:  Your Honor, during break, I went downstairs to check on our next witness, and he saw me, nodded to me, and went to sidebar with counsel.  So I assume he's going to be up here in just a couple minutes.  This is Judge Andre Birotte.  So I don't see him now.  I expect that he'll be up here in a couple minutes.  My redirect of Special Agent Tanner will only be a couple minutes.  He's here now.  I have the signal.  It's going to be smooth sailing. Never mind.

THE COURT:  Okay.  As to the issue that was raised when we left, I don't find that this line of questioning that counsel wanted to get into is relevant.  Even assuming there is some probative value, that probative value is substantially outweighed by the danger of confusion of the issues and misleading the jury, undue delay, and a waste of time.

**UNITED STATES DISTRICT COURT**

Okay.  Let's bring the jury in.

(The following proceedings were held in open court in the presence of the jury:)

MR. FOX:  May I begin, Your Honor?

THE COURT:  Yes.

**REDIRECT EXAMINATION**

BY MR. FOX:

Q    Special Agent Tanner, Mr. Hochman was asking you questions about whether cell phones could be used to plot escapes.  Have you uncovered any evidence that Anthony Brown was using that cell phone to plot an escape?

A    No.

Q    Mr. Hochman was asking you questions about whether cell phones could be used to put a hit out on a witness.  Have you uncovered any evidence that Anthony Brown used that phone to put a hit out for a witness?

A    No.

Q    What about to threaten or intimidate witnesses?  Any evidence he did any of that with his cell phone?

A    No.

Q    Mr. Hochman asked you about gang ties and how a cell phone could be used with respect to gangs.  Based on your background of Mr. Brown, did he have any gang ties?

A    He did not.

Q    Mr. Hochman asked you if you were case agent up

to September, 2011.  Do you continue to be one of the case agents on this case?

A       Yes.

Q       Mr. Hochman asked you about your investigation becoming a grand jury investigation through the use of subpoenas and then, when you provided that information to grand juries.  When you undertook this investigation and started to issue grand jury subpoenas, what was your intention with the information you were receiving with respect to that grand jury?

A       Once we requested those subpoenas, we would eventually go back and return that information to the grand jury and explain what we had received and whether or not there would be any potential Indictments or charges as a result of our investigation.

Q       And with respect to Mr. Michel, was it your intention to go to the grand jury for any reason with respect to Mr. Michel in July -- as of July and August of 2011?

Actually, that's a bad question.  Let me ask it differently.

With the evidence you were obtaining with respect to Mr. Michel in July and August of 2011, was it your intention to ultimately go before the grand jury with respect to Michel?

A       Yes.  Eventually.

Q       And why was that?

A       Because, in order to bring either an Indictment

**UNITED STATES DISTRICT COURT**

or any type of charge against Gilbert Michel, we would bring that information to the grand jury, and they would determine whether or not to bring charges on Gilbert Michel.

Q     And with respect to the investigation as a whole, you were talking about the dozens of allegations you were receiving regarding abuse.  What were you doing with that information before you were deciding whether to present that specific incident to the grand jury?

A     Most of the information we had to vet and determine whether or not there was anything there.  Sometimes we -- again, we wouldn't have complete information.  So we spent a lot of time trying to match up, you know, partial information from multiple inmates and put it together to determine if we had enough information to bring forward any civil rights charges on the deputies.

Q     Mr. Hochman asked you several questions about whether you lied to the sheriff's department when you were visiting the jails and doing other things.  As part of your investigations, is that something that you are allowed to do when you are conducting an undercover operation and covert operation?

A     Yes.

Q     And why were you saying things that weren't true at the time?

A     At the time I did not want to alert the sheriff's

**UNITED STATES DISTRICT COURT**

department that we were investigating them.  And so just telling a deputy that I was investigating human trafficking, that sort of thing, would just avoid the possibility that they would know that we're actually looking into the very deputies that we were there talking to every time we went to the jail.

Q    Mr. Hochman showed you some phone charts and, before doing so, asked you about unknown calls that might have come in on a given cell phone.  Based on your review of those charts that he provided to you, were there unknown calls that were coming in to Mr. Brown?

A    No.

Q    And Mr. Hochman asked you about several calls or texts that occurred right when Mr. Brown got the phone when he was in MCJ.  You discussed at that point how it was the phone system that was, you think, calling or texting him back; is that right?  Can you explain that?

A    So it was -- when I initially set up the phone, I noticed that I would get text messages or just random messages sent to the phone that would be from Boost Mobile, and it would either say "Thanks for setting up your service" or "We have a special deal for you," almost like junk mail that would come to an e-mail.  So knowing that they were coming from, you know, 800 numbers or 888 numbers, that appears to be what is on those records.

Q    And if Mr. Brown wanted to use a phone to call

into the new cell phone he received, how would that call from his cell show up on the cell phone?

A    It would show up as a jail call.

Q    Mr. Hochman asked you questions about Government exhibit -- well, he asked you questions about Anthony Brown and the writ.  I'm going to bring up that writ.

MR. HOCHMAN:  Which exhibit?

MR. FOX:  113.

Q    What was the date that Anthony Brown was supposed to be produced to the Federal Grand Jury according to this writ?

A    September 7, 2011.

Q    Showing you now Exhibit 52 which is in evidence, e-mail reads, from Carey to Leavins, "Steve, official request from feds for interview with Brown was made."  What was the date of this e-mail?

A    September 9, 2011.

Q    Mr. Hochman asked you questions about why you didn't writ Anthony Brown over once he was in the state system. Can you explain why you did not do that?

A    At the time we were able to speak to him, and we had at that point the ability to go and speak with him whenever we wanted through the state prison system because they were not restricting our visits with him.  And so at that time we didn't have to rush to get his statement because we were able to speak

**UNITED STATES DISTRICT COURT**

to him.

In addition, around the exact same time is when Gilbert Michel retained an attorney, and at that point his attorney started conversations with the United States Attorney's Office to possibly cooperate with our investigation.

Q       Mr. Hochman asked you questions about you approaching Mr. Michel in the evening of August 24, 2011.

Do you recall those questions?

A       Yes.

Q       I'll show you now Government Exhibit 30 in evidence.

When is this an e-mail from?

A       August 25th, 2011.

Q       Is that the morning after you approached Mr. Michel?

A       Yes.

Q       And what does Mr. Martinez write to Mr. Baca's e-mail account with the subject MCJ?

A       "Lee, I'd like to provide an update on the matter I spoke with you about a few days ago.  Please give me a call or a good time/number to call you.  Regards, Steve."

Q       Could you please read the "from" line in this top e-mail I've highlighted?

A       Kevin Goran on behalf of Leroy Baca.

Q       Who is this to?

1576

A       Chris Nee.

Q       What does it say?

A       "Chris, earlier today Esther told me to refer all FBI inquiries to Mr. Tanaka.  So here you go."

Q       Mr. Hochman asked you about the Exhibit 638, the Defense Exhibit 638, that showed one call between Mr. Leavins' cell phone and Mr. Baca's cell phone.

         Do you recall that?

A       Yes.

Q       Did that chart include any calls between Mr. Tanaka and Mr. Baca?

A       No.

         MR. FOX:  No further questions, Your Honor.

         MR. HOCHMAN:  Briefly, Your Honor.

         Can you put Exhibit 113 back up.

**RECROSS—EXAMINATION**

BY MR. HOCHMAN:

Q       Agent Marx, we're putting Exhibit 113 back up. It is the writ.  If we could highlight the -- sort of the -- starting with "The Court" all the way to the bottom.

         Special Agent Marx, this is a writ to bring Anthony Brown to testify in front of the grand jury; is that correct?

A       Yes.

Q       And Anthony Brown -- and the grand jury wants to

**UNITED STATES DISTRICT COURT**

hear what Anthony Brown has to say on September 7, 2011, at 9:30 a.m.; is that correct?

A    Yes.

Q    The grand jury doesn't necessarily want to lock him down.  They just want to hear what he has to say; correct?

A    Correct.

Q    And you could have shown up on that day, September 7, 2011, and tell them everything that Anthony Brown had told you for over a year at that point; is that correct?

MR. FOX:  Objection.  Beyond the scope.

THE COURT:  Sustained.

Q    BY MR. HOCHMAN:  Did you show up on September 7, 2011, to the grand jury to testify?

A    No.  The writ is for Anthony Brown to testify, not me.

Q    Well, you don't need a writ to show up in a Los Angeles Federal Grand Jury to testify; is that correct?

MR. FOX:  Objection.  Beyond the scope.

THE COURT:  Sustained.

Q    BY MR. HOCHMAN:  Did you testify on that day in front of the grand jury?

MR. FOX:  Objection.  Asked and answered and beyond the scope.

THE COURT:  Sustained.

Q    BY MR. HOCHMAN:  Now, you said that you had no

UNITED STATES DISTRICT COURT

evidence that Anthony Brown had any gang ties; is that correct?

A        Correct.

Q        Did you have any evidence, one way or the other, as to whether or not his cellmate who had access to the phone had gang ties?

MR. FOX:  Objection.  Beyond the scope.

THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  You said that you lied to the sheriff's department because you didn't want to alert the sheriff's department that you were doing civil rights investigations by telling them that you were a civil rights investigator from the FBI; correct?

A        No.  It was -- I was fine telling him I investigated civil rights.  I wasn't going to tell them that I was there to investigate deputies assaulting inmates when I was in the jail with the deputies that we were investigating.

Q        Well, members of your squad were in the jails at the time that grand jury subpoenas came out in July of 2011 asking for information about deputy abuse of inmates; correct?

A        I don't understand your question.  My squad mates were in the jail at the time?

Q        Well, you said you didn't want to be in the jail -- in the Men's Central Jail identifying that you're doing civil rights investigations at the time -- for the very people you're investigating; correct?

UNITED STATES DISTRICT COURT

A        I do not understand what you're asking me.

Q        Let me break it down now.

You had -- you lied, for instance, to Deputy Courson about the fact you were an FBI civil rights investigator because you didn't want to alert him that you were doing civil rights investigations into the jail; correct?

A        That's absolutely not true.  Human trafficking is a civil rights violation.  So, therefore, it wasn't that I was lying about being a civil rights investigator.  I did not tell him that I was there investigating the sheriff's department which is two totally separate things.

Q        But in July, 2011, you're aware that a grand jury subpoena came out asking for records of civil rights violations in the Men's Central Jail or relating to deputy abuse; correct?

A        It was one specific incident.  Not all of the incidents we were investigating.  One specific incident that had been in the media.

Q        But one specific incident relating to deputy abuse in the Men's Central Jail; correct?

A        Correct.

Q        That was the overt part of your case; isn't that right?

A        The one small part, yes.

MR. HOCHMAN:  No further questions.

MR. FOX:  Nothing, Your Honor.

**UNITED STATES DISTRICT COURT**

THE COURT:  You may step down.

Call your next witness.

MR. FOX:  The United States calls Andre Birotte.

THE CLERK:  Stand here for me, please.  Raise your right hand.

Do you solemnly state that the testimony you may give in the cause now pending before this court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

THE CLERK:  Please be seated.

Will you please state your full name and spell your last name for the record.

THE WITNESS:  Yes.  My name is Andre Birotte, Jr. Last name is spelled B-i-r-o-t-t-e.

THE CLERK:  Thank you.

MR. FOX:  May I proceed, Your Honor?

THE COURT:  Yes.

**ANDRE BIROTTE, JR.,**

**GOVERNMENT'S WITNESS, SWORN:**

**DIRECT EXAMINATION**

BY MR. FOX:

Q     What did you do for a living in 2011?

A     In 2011 I was the United States Attorney for the Central District of California.

UNITED STATES DISTRICT COURT

Q        What does that mean?

A        United States Attorney is known as the chief federal law enforcement officer for -- in my case, the Central District of California which encompasses seven counties going as far north as San Luis Obispo, down to Orange County, and all of Inland Empire.  So we handled both criminal and civil litigation involving the United States.

Q        For purposes of your testimony today, I'm going to focus on the criminal work that you did.

A        All right.

Q        Are you familiar with the Federal Bureau of Investigation?

A        Yes.

Q        In what ways were you familiar with the FBI in 2011 while you were U.S. Attorney?

A        I mean, they were one of our many law enforcement partners and, quite frankly, probably the largest law enforcement partner that we dealt with in the office.

Q        You mentioned "law enforcement partners."  Do you also work with the Los Angeles County Sheriff's Department?

A        Yes.

Q        And is there -- in terms of a partnership, is there anything odd about the way that you work with local law enforcement agencies as the U.S. Attorney?

A        No.  Nothing odd about it.  It was sort of

UNITED STATES DISTRICT COURT

1582

expected.  As resources got trunked amongst the various agencies, it was not uncommon, certainly in our district but I would argue nationwide, for law enforcement agencies to pull resources together, form joint task forces to address the issues in the community.

Q       Are there times when the U.S. Attorney's Offices begin Federal Grand Jury investigations of local law enforcement agencies?

A       Yes.

Q       Is that unusual at all?

A       No.  I mean, that -- I mean, one -- if you go back, historically speaking, I mean, the role of the Department of Justice in many instances, particularly going back to the civil rights area, is to investigate issues that local law enforcement, for whatever reason, may not be able to address.

Q       Ordinarily how does that affect your partnership that you have with the local law enforcement agencies if you were also investigating them?

A       It shouldn't have an effect.  That's just the reality of the work that we have to do.

Q       I want to go back now to the summer of 2011.

Did you become aware at some point of an investigation involving the Los Angeles County Sheriff's Department in terms of allegations of abuse in the jails?

**UNITED STATES DISTRICT COURT**

A       Yes.

Q       Was that part of the scope of your duties that you became aware of it?

A       Absolutely, yes.

Q       Did you authorize an undercover operation to occur with respect to the Los Angeles County Sheriff's Department?

A       I believe I did.  I mean, yes.

Q       At the time the investigation started, when you became aware of it, do you recall what the Federal Grand Jury was looking at?

A       At that time initially the Federal Grand Jury was looking at various allegations of excessive force and use by Los Angeles County sheriff deputies.

Q       Do you generally remember what the undercover operation was about?

A       The undercover operation, if my memory serves me correctly, was to ascertain if any deputies were engaged in any type of corruption.

Q       Did you know how that was going to be going about with the undercover operation?

A       I don't have a great memory of it.  I believe they were trying to work -- I think they were utilizing undercover, talking with some deputies to see what kind of information they could gather.  Ultimately it culminated to

UNITED STATES DISTRICT COURT

seeing if a deputy would take a bribe to smuggle contraband into the jail.

Q  Do you recall what that contraband was?

A  It was a cell phone.

Q  At some point in time, did you learn that the sheriff's department had found that cell phone?

A  Yes.

Q  And let me go back.

Did you notify the sheriff's department of that undercover operation when you learned of it?

A  No.

Q  Why not?

A  Because we were investigating the sheriff's department. I didn't think it was appropriate to notify the agency that we were investigating that we were conducting investigation.

Q  Do you know Leroy Baca?

A  Yes.

Q  How do you know him?

A  I've known Lee a number of years. I mean, in my prior life, in various jobs, our paths have crossed, and then certainly as the head of the sheriff's department, we had a professional relationship by virtue of that.

Q  Did you notify him about the undercover operation?

UNITED STATES DISTRICT COURT

A       No.

Q       Why not?

A       Because, again, we didn't think -- we wanted to preserve the integrity of the investigation, didn't think it would be appropriate to notify anyone within the department; so we did not.

Q       After the sheriff's department recovered the cellular phone, did you have a meeting set up with respect to the sheriff's department and Mr. Baca?

A       Yes.

Q       Do you remember, approximately, when this happened?

A       I couldn't tell -- I don't remember, but a meeting did happen with the sheriff's department and our office.

Q       Was that within several days of the sheriff's department learning that the phone was traced to the FBI, or was that within several months?

A       I honestly don't remember.  I mean, it was relatively soon thereafter.

Q       I'm going to refer to this as the first meeting for the purposes of your testimony.

A       All right.

Q       Where was this meeting held?

A       It was held in the U.S. Attorney's Office,

**UNITED STATES DISTRICT COURT**

312 North Spring.

Q    Do you remember which floor?

A    12th floor.

Q    Where within the 12th floor was it held?

A    It was in what's known as the Daniel Goodman Conference Room.

Q    Who was there?

A    Representatives from the county, the sheriff's department, I think county counsel.  I believe Mike Gennaco, G-e-n-n-a-c-o, from the Office of Independent Review was there. And then there were representatives from my office at the time.

Q    Was the FBI there?

A    No.

Q    Why not?

A    If my memory serves me correctly, I think Lee had expressly said, "I want to meet with you.  I don't want the FBI there.  I want to have a conversation with you all."

Q    I'm going to publish for you Government Exhibit 120.  I'll represent to you that this is Mr. Baca's calendar from August 29 which is what I'm showing you.

Do you see the entry at 1:30 p.m. on Monday, August 29?

A    Yes, I do.

Q    Do you think that this is the day that you met with Mr. Baca for the first time?

**UNITED STATES DISTRICT COURT**

1587

A        That makes sense, yes.

Q        Could you please describe the setup of the room when the meeting was occurring?

A        So the room, it has a big conference room -- table.  You know, for lack of a better term, the county folks were on one side, and the feds, meaning our office, we were on the other side of the table.

Q        What happened at this meeting?

A        I mean, the gist of it was -- I mean, we had expressed sort of his concerns and displeasure about the investigation and why it was going on and why he wasn't notified.  I believe he laid out a series of sort of questions about what was going to happen, us working together or not working together, what was the status going forward.  I think also there was some discussion about trying -- going forward and working with the sheriff's department as the investigation moved forward.

Q        Did you agree to do that?

A        No.  I didn't agree to anything at that time.

Q        Why not?

A        I viewed this as more sort of a listening meeting.  I knew he was upset about it.  He voiced his displeasure, and my position was, okay, all right.  Thank you for sharing.  We'll get back to you.

Q        What's Mr. Baca's demeanor during this meeting?

**UNITED STATES DISTRICT COURT**

1588

A       I mean, he was -- he was not happy.  You knew he wasn't happy about what had happened but, you know, nothing out of the ordinary.  Nothing unexpected, I should say.

Q       I believe you said that Mr. Tanaka was also there; isn't that right?

A       I think that's right, yes.

Q       Was Mr. Tanaka doing a lot of the talking?

A       No.  I don't think he said anything.  I don't recall him saying anything.

Q       Who was doing most of the talking from that side of the conference room?

A       I think it was mostly Lee.  It was Lee.  Lee, Sheriff Baca, that's Lee.

Q       Within days of that meeting, did you have a conversation with Mr. Baca with respect to grand jury subpoenas?

A       Yes.  And forgive me because I know that was a topic of discussion at the first meeting.  I think because -- between the time of the cell phone getting discovered and the meeting, I think our office had issued a bunch of subpoenas relative to -- of various things.  And I'm fairly certain Lee had expressed his concern about the voluminous nature of the subpoenas and responding to them, and so we had a conversation later about those subpoenas.

Q       Was this on the phone or in person?

**UNITED STATES DISTRICT COURT**

A        I think that was on the phone.

Q        Was there anyone else present besides the two of you?

A        No.  I don't believe so.

Q        And what is it that you agreed to at that point?

A        I think -- it was a very brief conversation.  I think I just told Lee, "Look, as it relates to subpoenas, stand down.  Let's figure out what we're going to do here, but stand down," which means don't do anything with respect to the subpoenas.

Q        Does that mean ever?

A        No.  No.  I mean, look, for now let's just stand down and figure out what we're going to do.

Q        Why did you agree to do that?

A        I think it was -- he expressed a concern it was going to take a lot of person hours to comply.  You know, he had raised some issues about sort of what was going on with the investigation, and so I wanted to sort of take a step back and figure out, okay, what do we really want?  Let's try to get what we want and do it in a way that is the most efficient.  So I said, "Look, just stand down the initial request and let's figure this out."

Q        I want to now direct your attention to approximately a month later.  So we're talking about late September, 2011.  Did you receive an unusual call at some point

**UNITED STATES DISTRICT COURT**

in late September, 2011, as it related to an FBI agent?

A    Yes, I did.  Yeah.

Q    What was this call?

A    All right.  I was heading home.  I was going to my kids' open house at school.  I got a phone call from, I believe, the chief of the public corruption section Lawrence Middleton.  He said, "Andre, I've got to let you know LAPD officers --" I think he said something along the lines of "LAPD officers are either outside an agent's door or trying to arrest an FBI agent."  And I was like, "What?"  And he's like, "Yeah.  That's what's going on."  I said, "Okay.  Hold on.  Hold on.  Let me call some of my folks from LAPD and find out what's going on."

Q    Let me break that down a little bit.

You mentioned Lawrence Middleton.  You said he was the chief of the public corruption section at the time?

A    Correct.

Q    Did public corruption have another responsibility as well?

A    Public corruption and civil rights, yes.  So they were the section that -- in doing the investigation with regard to the sheriff's department.

Q    Now, I believe you said that Mr. Middleton told you it was LAPD, meaning the Los Angeles Police Department, that was outside of an FBI agent's house; is that correct?

**UNITED STATES DISTRICT COURT**

1591

A        Yes.  The agency was -- he first said LAPD.

Q        And did you have any previous experience with LAPD in a different role?

A        Yes.  From 2003 to 2010, I was Inspector General for the Los Angeles Police Commission working with the police department extensively; so I had a lot of contacts at the department.

Q        So what did you do after you received this phone call?

A        So then I called -- I believe I called Earl Paysinger who at that time he may have been a deputy chief of South Bureau or assistant chief of operations.  I can't remember.  But Earl and I had a close relationship.  So I called Earl.  I said, "Earl, this is what I'm hearing.  Do you know anything about it?"  He said, "That sounds odd.  Let me get off the phone, figure it out."  I get off the phone with Earl.  Lawrence calls me back and says, "Andre, I'm sorry.  I messed up.  It's LASD."  I was like, "Oh, God.  Okay."

Q        Why did you respond that way when you heard that it was LASD?

A        Because then it made more sense.  I mean, with LAPD, I'm like I don't know why LAPD would be going investigating an agent.  We don't have any cases -- at least I didn't know of any cases involving LAPD.  And so it didn't make sense to me.  And Earl's reaction was similar, sort of

**UNITED STATES DISTRICT COURT**

confusing.  Earl had a -- he had his post of what was going on, especially with the big investigations.

Q      Why did it make sense to you that an LASD person was outside of the home of an FBI agent?

A      Tensions were -- things were tense, and tensions were building as it relates to LASD and the feds, you know, U.S. Attorney's Office and the FBI more specifically.  So when he said that, I was like, "Oh, God.  Okay."

Q      Now, you said tensions were high between the two agencies.  I'm going to follow up on that in a little bit, but let's first focus on what you did after you learned that it was the sheriff's department that was the one that was -- had approached the FBI agent.

A      Okay.  So I think the sequence -- the timeline may be off.  But I think, after I realized it was the sheriff's department, I don't know if I spoke with the assistant director in charge Steve Martinez or he called -- he might have called at or near that time because I had -- I was aware that FBI agents had Leah Marx at headquarters or the local headquarters in Westwood, and the only reason why I say that is because at some point I ended up speaking with Lee.

Q      You're referring to Mr. Baca?

A      Yeah.  Mr. Baca.  I'm sorry.

Q      How is it that you were able to contact Mr. Baca that night?

A        I assume I called him on his cell.

Q        How did you know his cell phone number?

A        I mean, I just had -- I don't know if -- I can't remember specifically if he gave me his cell number personally, but by virtue of the fact I was U.S. Attorney, I had a lot of numbers of the head law enforcement agents and local law enforcement in the region.

Q        I'm now going to publish the tenth page of Exhibit 157.

         Do you know how your cell phone showed up when you called people?

A        Yes.  It's unavailable.  It blocks out the number.

Q        Can you read what this record shows, September 26 at 7:35 p.m.?

A        You want me to read it out loud?

Q        Yes, please.

A        So "26, September, 7:35 p.m., unavailable.  Baca county-issued cell," and then it says "22."

Q        Could you please describe this phone call that you had with Mr. Baca?

A        So Mr. Baca and I are on the phone, and again, I don't remember all the specifics.  I just remember something along the lines of, I'm like -- I said something along the line like, "Lee, I'm getting this call that agents are out

trying --" I'm sorry -- "deputies are out trying to arrest an agent. Is this what we're doing here?" And that's sort of just -- I remember that part.

And Mr. Baca is like, "No. No. But I'm really upset about what's going on," and he was going on sort of reciting sort of the same issues he had had at a prior meeting. I said, "Lee, look, like, I just need to know, is one of my agents going to get arrested tonight or not?" He said, "No. No. That's not going to happen." I said, "All right. I've got to go. I have to deal with this. We're going to talk later." And then, you know, I called, I believe, Steve Martinez, let him know, look, that's not going to happen. She can go home.

Q     I'm going to focus, again, on Mr. Baca's calendar, Government Exhibit 120, and specifically the entry from September 27th. Do you see this 2:30 entry on September 27th?

A     I do.

Q     And it says, "Meet with U.S. Attorney Andre Birotte and FBI assistant director in charge Steve Martinez."

Did that meeting occur?

A     It did.

Q     Where?

A     That was in my personal office on the 12th floor

at the U.S. Attorney's Office.

Q    Who was present?

A    That was just Mr. Baca, Mr. Martinez, and myself.

Q    What was the purpose of that meeting?

A    The purpose of that meeting was -- well, from my perspective, the purpose of the meeting was to bring the folks together and address questions that Mr. Baca had had at the prior meeting.  I seem to recall that he had raised a number of points at the prior meeting, and I actually sort of typed up notes to sort of make sure we could address those specific concerns that he had had, and it was also an opportunity to just let him know that, look, we're going to move forward.

We have this investigation going on.  You know, we're not going to -- we'll do what we can to keep you as informed as we can.  You designate a point of contact with our point of contact, we'll work these things out.  I think I may have said like, look, the stuff you've been raising about the alleged illegality of the operation is just not well-taken.  It's just, you know -- that's what cops do.  Undercovers do these things.  There's no question about whether it's legal or not; so we have to agree to disagree on that.

But the reality of it is we have a big district.  We have a lot of issues here.  We need to continue to work together, but we're not going to stop doing this investigation.

Q    Okay.  I want to get into more of that

**UNITED STATES DISTRICT COURT**

conversation, but first I want to look at, if you don't mind, Exhibit 112 which is a book that's probably beneath you.  There are three binders, and it's 112.

A      All right.  I see this letter.

Q      Do you recognize it?

A      Yes.

Q      What is it?

A      It's a letter from Mr. Baca to me raising, it looks like -- he made several requests with respect to subpoenas and some other issues as well.

Q      Is that a true and accurate copy of a letter that Mr. Baca provided to you at the September 27 meeting?

A      I think, yes.  Yes.  I mean, this is the meeting at the beginning he gave me the letter.

MR. FOX:  Your Honor, I move for the admission of Government Exhibit 112.

MR. HOCHMAN:  No objection, Your Honor.

THE COURT:  It will be received.

(Marked for identification and received
into evidence Exhibit No. 112.)

MR. FOX:  Now showing it to the jury.

Q      Could you please read the section that I've highlighted?

A      From the top?

Q      You can start with, "Dear Mr. Birotte."

**UNITED STATES DISTRICT COURT**

A        All right.  "Dear Mr. Birotte.  This letter will serve to confirm and thank you for agreeing to hold the responses due for various Federal Bureau of Investigation requests seeking voluminous documents concerning employees at the Men's Central Jail of the Los Angeles County Sheriff's Department."

Q        And this agreement, this came in the previous phone call you were telling us about?

A        Yes.

Q        I'm not going to ask you to read all the text I just highlighted at the bottom of the page, but is it fair to say it details some of the grand jury subpoenas that have been issued to the sheriff's department on August 24th and 25th?

A        Yes.

Q        Now, what is this -- it says, "a preservation of records dated August 25th."  What is "a preservation of records"?

A        Just hold on to all records.  Don't delete, shred.  Just hold everything as it is.

Q        I want to show you the second page.  This may sound strange.  How do you -- I think you said, "Agree to hold the responses."  How would you hold a preservation of records?

A        Just don't do anything with the records.  Just make sure they remain intact.

Q        That's what you were seeking; correct?

**UNITED STATES DISTRICT COURT**

A        Correct.

Q        I'm highlighting now on the second page the first full paragraph.  Could you please read this out loud.

A        All right.  "As I indicated at our prior meeting, I am extremely displeased with the conduct of the FBI in causing the introduction of a cell phone into the jail system as illegal, unethical, and irresponsible.  The sheriff's department will be conducting an investigation into the breach of security of the jail system and will be examining inmate Anthony Brown's allegations that he received a cell phone from a deputy who received it from an FBI agent.  The FBI admitted the cell phone was their property after it was discovered during a search of the jail.  The sheriff's department's investigation of this matter will encompass possible violations of California Penal Code Sections 4575 and 4573, conspiracy, entrapment, coercion, and civil rights violations.

"The sheriff's department will also fully investigate allegations regarding excessive force by deputies at the Men's Central Jail during the period from January, 2009, to the present.  The deputy involved with the cell phone has since resigned from the sheriff's department.  The sheriff's department is continuing its investigation of his involvement in this matter."

Q        Now, in this letter, this paragraph you just read, it says a couple times there may have been violations of

criminal law.  Do you see that in this paragraph?

A     Yes.

Q     From your perspective, did the FBI violate any law in what it did?

A     Absolutely not.

Q     Why not?

A     We were doing an undercover investigation.  At the risk of sounding -- everybody does this.  Law enforcement agents do this, local law enforcement, federal law enforcement.  When you -- when you're investigating crimes, these kind of things happen, and perhaps, more importantly, the deputy took a bribe to bring the cell phone in the jail.  It wasn't like the FBI walked into the jail and dropped this cell phone in.  The deputy committed a crime by introducing the cell phone into the jail.

Q     It discusses how the sheriff's department will fully investigate allegations of excessive force from January, 2009, to the present.  Is that the same time period that the Federal Grand Jury investigation was supposed to be focusing on incidents?

A     I believe so, yes.

Q     Can you please read the paragraph I've just highlighted?

A     All right.  "The expertise and experience of the sheriff's department in conducting these types of

1600

investigations are considerably contrasted by the FBI's actions in this case.  The FBI has no experience in the running of a jail system of such magnitude as the Los Angeles County jails, nor have they completed anywhere near the number of investigations involving matters emanating from within the confines of a jail system.

"Their lack of qualification combined with unethical and illegal actions in this instance demonstrates the need to allow the sheriff's department to conduct its own investigation free from the encumbrance of the FBI's attempt to justify their actions retroactively by now seeking information with an overbroad request for documents."

Q      Let me stop you there for a second.

What did you understand this to mean that Mr. Baca was seeking for you to allow the sheriff's department to conduct its own investigation free from the encumbrance of the FBI?

MR. HOCHMAN:  Objection for this witness commenting on Mr. Baca's state of mind.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  I'm sorry.  Can you repeat the question?

Q      BY MR. FOX:  Sure.  What did you understand this statement to mean that Mr. Baca had written that -- there was a

UNITED STATES DISTRICT COURT

need to allow the sheriff's department to conduct its own investigation free from any encumbrance of the FBI?

MR. HOCHMAN:  Objection.  Relevance as to this witness' understanding.

THE COURT:  Overruled.

THE WITNESS:  Basically back off.  We're going to do it ourselves.

Q    BY MR. FOX:  Can you continue starting with the "given" part, "Given that the FBI's --"

A    "Given that the FBI's sweeping request asked for sensitive personnel information affecting numerous employees, my concern also encompasses knowing what their basis is for this inquiry.

"One request asks for records for all personnel who worked at Men's Central Jail over a three-year period. This request alone encompasses records of hundreds of employees.  It is estimated that it will take more than 1,000 man-hours to retrieve all of the documents asked for in the subpoenas.

"It is also estimated that it could take the FBI more than a year to review all of these documents once they are gathered.  Clearly the requests are not focused on issues pertaining to specific allegations concerning excessive use of force but rather are a fishing expedition designed to speculatively seek anything that might be interpreted as an

1602

indication of culpability.  Acquisition of documents prior to the sheriff's department's completion of its own investigation will likely taint the fair and truthful completion of a properly-focused investigation."

Q       Let's focus on that last sentence, the statement that he made to you, "Acquisition of documents prior to the sheriff's department's completion of its own investigation will likely taint the fair and truthful completion of a properly-focused investigation."  What did you understand that to mean?

A       Basically we're going to do our investigation first and giving you these documents beforehand might taint their own investigation.

Q       Now highlighting the last partial paragraph on that page, can you please read that?

A       "I am also entitled to know what specific evidence there is, if any, for initiating an investigation into sheriff's department personnel without my knowledge and what would be the source initiating the FBI's involvement in this matter.  I am at a loss to determine what would justify the taking of illegal actions by the FBI in order to investigate unspecified allegations of excessive use of force.  I also do not understand what was important enough for an investigation of this department to --"

Q       Now showing you the next page, if you can

continue to read that paragraph.

A       "-- to proceed while assuming there are no grounds for cooperation by our respective law enforcement agencies.  The FBI's decision to proceed without input or participation by the Los Angeles County Sheriff's Department is not in the best interests of truth or justice, particularly since there is now confirmed information that FBI investigators participated in the sanctioning of criminal acts in furtherance of an investigation by their admission of ownership of the cell phone that was discovered in the jail."

Q       Can you please read this paragraph I've just highlighted?

A       All right.  "A further related issue is the allegation of excessive uses of force at the Twin Towers Correctional Facility made by Esther Lim, ACLU jail monitor.  Ms. Lim claimed that she observed excessive force as described in a declaration filed in court.  That matter was investigated by the sheriff's department at the outset and has also been investigated by the Office of Independent Review.

"It is my understanding that the FBI has interviewed Ms. Lim as well, but the FBI refuses to share the results of the interview with the sheriff's department investigators who are seeking a complete and thorough review of that matter."

Q       Can you please read this third paragraph.

1604

A        "I invite the U.S. Attorney to participate in the sheriff's department's investigation in this instance by monitoring our progress along with the Office of Independent Review.  The sheriff's department will provide regular updates on the status of the investigation at your request."

Q        Can I stop you there for a second?

What did you understand these two sentences to mean?

A        Basically the sheriff's department was going to continue.  They wanted us to participate in their investigation and that the department would -- the sheriff's department would provide updates to us on the status.

Q        Based on these two sentences, was it going to be active participation or passive participation that he was seeking?

A        I mean, I took it to mean will provide you --

MR. HOCHMAN:  Objection.  Relevance, Your Honor.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  That sentence suggests more passive than active to me.

Q        BY MR. FOX:  Could you please read the third sentence.

A        "I also asked the United States Attorney to instruct the FBI to withdraw their above referenced request for

UNITED STATES DISTRICT COURT

information and documents until the sheriff's department has completed its investigation whereupon the results of the full investigation will be shared.

"Due to the FBI's apparent aforementioned incompetence in investigating alleged civil rights violations concerning force taken by deputy sheriffs, I am requesting the United States Attorney's Office ameliorate support of the FBI's actions and support the sheriff's department's investigation until its conclusion.

"I am very hopeful of a mutually agreeable resolution.  But if not, the sheriff's department will not be able to continue participation with the FBI in many ongoing joint task force missions due to the breach of trust which will undoubtedly take time and much corrective action to heal."

Q     I'm now going to turn to the fifth page of this letter.

Were there attachments to this letter?  Am I showing you one of the attachments?

A     Yes, there were.

Q     Highlighting the fourth bullet point on the fifth page, what does it say?

A     "What are the names of the agents who are conducting the investigation?"

Q     Now showing you the attachment that is labeled "Risk Management," could you please read this paragraph?

**UNITED STATES DISTRICT COURT**

1606

A        "What are the locations of any additional cellular telephones currently in use, owned, or deployed by the FBI within the confines of the Los Angeles County jail system?"

Q        Now showing you the paragraph below that, can you please read it?

A        "Please disclose any and all items of contraband given to any Los Angeles County Jail inmate or inmates through any means including a description of the item, the identity of the inmate receiving the item, and the date, time, and location of occurrence."

Q        You were stating earlier the things you said to Mr. Baca at the meeting.  Was there anything else you said to him at that time?

A        At the first meeting or the meeting with the three of us?

Q        This meeting, the September --

A        I mean, just trying to talk to see, okay, what are we going to do to try to dim things down.  I'm not -- I'm not sure I'm understanding your question though.

Q        What, if anything, did Mr. Baca say after you finished your --

A        Oh, okay.  All right.

Stepping back, I think I had sort of points I wanted to raise which were consistent with this letter.  This letter that we just discussed seemed to be sort of a written

**UNITED STATES DISTRICT COURT**

documentation of some of the issues that he raised at the first meeting.

This meeting, I told him -- I answered some of these questions, you know.  I told him, "Look, at the end of the day, we did not tell you.  That's my decision.  Blame me. We wanted to keep the integrity of the investigation.  You know there has been all this stuff going around.  We had to investigate it, thought it was best not to inform you.  Blame me."

And I probably went through that, I think, then -- again, I don't remember all the details.  But the meeting, in my opinion, the meeting got -- Mr. Baca and Mr. Martinez, this was their opportunity to sort of talk one-on-one.  And, to be candid, it got heated.

Q    What happened?

A    Mr. Baca was upset.  I mean, the most upset I've ever seen him, you know.  "This was wrong.  Why didn't you tell me?  I'm the GD sheriff," or something along the lines or "This is my GD jail."  You know, again, I don't have the sequencing down because it was many years ago.  I remember Mr. Baca kept talking about, like, "Your FBI agents committed a crime," and this and that.  And Mr. Martinez is, like, "Your deputy took a bribe.  Knock this off."  It got very heated, very tense.

And at one point Mr. Baca is like, "Do you want to gun up in here?  Is that what you want to do?"  And I think

UNITED STATES DISTRICT COURT

at that point I was like, "Guys, guys, look, enough.  We've got to work together.  None of us are going anywhere.  Let's just knock this -- let's just calm this down."

You know, I kept trying to say, "Lee, blame me.  I'm the one who made the call.  So we've got to work together."

Q    Now, you said earlier that tensions were high, and you described in this meeting how tensions were high.

From your perspective, was this a turf war?

A    No.  No.  Not at all.

Q    Why not?

A    I should say, if it was, it was a one-sided turf war.

Q    What do you mean by that?

A    Look, the role of the Federal Government, the role of the Department of Justice, we investigate crimes both at the state and local level.  Going back to history, the feds come in to investigate these types of crimes.  That's the nature of the business.  Does it cause tension?  Yes.  But that's what we do.

From my perspective, I said, okay, look, I understand.  They're upset.  We'll deal with it.  I never thought it was going to get to this point.  I just didn't.  And so there was anger from, at least my perspective, anger from the sheriff's department side, but I don't -- I didn't view that from the -- certainly our office and certainly from the

**UNITED STATES DISTRICT COURT**

FBI.  It was just, look, this is what we have to do.

Q    Could you please look at Exhibit 69.  It's going to be in a separate binder.

A    Yes.  I see 69.

Q    What is this?

A    It appears to be a letter signed by me dated October 13, 2011.

Q    Is this a true and accurate copy of a letter that you signed on or about October 13 of 2011?

A    It is.

MR. FOX:  I move for the admission of Government Exhibit 69.

MR. HOCHMAN:  No objection.

THE COURT:  It will be received.

(Marked for identification and received

into evidence Exhibit No. 69.)

Q    BY MR. FOX:  I'm not going to have you read anything in this letter.  What I'd like you to do is summarize what this letter is.

A    All right.  Just give me a moment because this is, I think, the first time I've seen this since it was written.

All right.  So it appears -- this is a letter that I wrote to Mr. Baca indicating, like, look, following up on our recent discussions, the investigation is continuing.

**UNITED STATES DISTRICT COURT**

1610

It's ongoing.  I spoke to county counsel who is Andrea Ordin.  She assured me that the department, LASD, would comply with the subpoenas.  Again, just want to work together.  I'll try to keep Mr. Baca in the loop as much as I can.  I think that was the sum and substance of the letter.

Q    Now, I'm showing you a highlighted portion, county counsel Andrea Ordin that you just referenced.  What was her role?

A    At that time she was Los Angeles County Counsel which, I guess, acts as the attorney/advisor for the county and county agencies including, among other agencies, the sheriff's department.

Q    I want to show you -- I'll have you read the second paragraph on the first page.

A    All right.  "As the investigation continues, I look forward to continued cooperation from you, your command staff, and your department, and trust that all steps will be taken to permit the prosecutors and the FBI agents conducting the investigation free access to the jail and to inmates and other deputies who may have information necessary to the investigation and to ensure that nothing impedes or interferes with the lawful exercise of the agents' and prosecutors' duties to conduct and complete the investigation.  Again, I will be sure to bring any issues in this regard to the attention of both you and Ms. Ordin."

**UNITED STATES DISTRICT COURT**

Q        I want to highlight for you -- can you see this highlight I made under "continued cooperation"?

A        Yes.

Q        What did you mean by this?

A        Look, as U.S. Attorney, one of the responsibilities is to try to keep everyone -- keep the children in the sandlot from fighting all the time.  That's just the nature of the job.  I wanted to just dampen things down and say, "Look, we all said our piece.  Let's move forward.  So I'm looking forward to continued cooperation as we move forward with the investigation."

Q        Did that mean that there had been cooperation previously?

A        Not necessarily.  I mean, obviously, look, there was tensions.  There were issues that occurred before, but again, I'm trying to be kindler, gentler, and make sure we move forward.

Q        Who do you copy on this letter?

A        The assistant director in charge who is Steven Martinez who was present at the meeting we talked about earlier, Andrea Ordin who was county counsel, and then Brian Hershman who I think still is an attorney at Jones Day that, I believe, at that time had come in to represent the sheriff's department at that time.

Q        Do you know whether the county brought him in

**UNITED STATES DISTRICT COURT**

1612

or --

A        I'm assuming the --

MR. HOCHMAN:  Objection.  Move to strike.  Lack of foundation.

THE COURT:  Sustained.

MR. FOX:  I have no further questions for this witness.

THE COURT:  Cross.

MR. HOCHMAN:  Yes, Your Honor.

**CROSS-EXAMINATION**

BY MR. HOCHMAN:

Q        Mr. Birotte, I'd just like to get some background before you became the United States Attorney.  You started your legal career as a deputy public defender for the County of Los Angeles?

A        That's correct.

Q        Then in 1995 you became an assistant United States attorney; is that correct?

A        Yes.

Q        How is an assistant -- here in Los Angeles, by the way?

A        Yes.

Q        How does an assistant United States attorney differ from the U.S. Attorney?

A        They get paid more.  An assistant United States

UNITED STATES DISTRICT COURT

1613

attorney is the line prosecutor responsible for investigating
and prosecuting cases on the criminal side.

Q        You were one of those line prosecutors for four
years between 1995 and 1999?

A        Yes.

Q        And in the U.S. Attorney's Office, generally,
there's probably about 250 or so of these line prosecutors in
the office?

A        Yes.  On both the criminal and civil side.
Combined total, yes.

Q        And then in 1999 you left the U.S. Attorney's
Office as an assistant United States attorney, and you went
into private practice; is that correct?

A        Correct.

Q        You were there about two years or so?

A        Approximately.

Q        Then you had the chance to go into the
Inspector General's Office which is part of the Los Angeles
Police Commission; is that correct?

A        That's correct.

Q        What were your roles in the Inspector General's
Office for the police -- Los Angeles Police Commission?

A        As Inspector General, I guess we were commonly
referred to as a, quote/unquote, "watchdog" over the
Los Angeles Police Department and also the eyes and ears of the

**UNITED STATES DISTRICT COURT**

1614

Los Angeles Police Commission.  So we reviewed complaints of

misconduct against LAPD officers.  We reviewed any -- all

officer-involved shootings involving LAPD officers and other

significant uses of force involving LAPD officers.

Q       Basically you're doing independent review of

these allegations of -- against police officers?

A       Correct.

Q       Sort of like the Office of Independent Review at

the sheriff's department?

A       They were our counterpart, yes.  They had a

little different formation, but by and large, yes, they were

our counterpart.

Q       You were both -- is it called a deputy

Inspector General or assistant Inspector General and the

Inspector General as well?

A       Correct.

Q       Which was the title?

A       So I was an assistant Inspector General from 2001

to 2003, and then from 2003 to 2010 I served as

Inspector General.

Q       And in 2010, that is when you became the

United States Attorney for the office you used to be a line

prosecutor for here in Los Angeles; is that correct?

A       Yes.

Q       And you were the United States Attorney until

**UNITED STATES DISTRICT COURT**

2014; is that correct?

A     That is correct.

Q     And at that point you became a federal judge.

A     That is correct.

Q     All right.  And your court is actually here in this courthouse?

A     As of last week, yes.

Q     I'd like to focus you back in 2011.  That would have been one of the years you were the United States Attorney for; is that right?

A     Yes.

Q     And, again, you had said that the United States Attorney is not just Los Angeles County; correct?

A     That's correct.

Q     Like the D.A.'s office for Los Angeles County would just be Los Angeles County; correct?

A     Correct.

Q     But you had a much bigger responsibility of Los Angeles County and then those six surrounding counties, I think you said, from San Luis Obispo down to Orange County and the whole Inland Empire; is that correct?

A     Yes.

Q     At that time in 2011, there was about 250 line prosecutors under you?

A     I think that's right, yes.

UNITED STATES DISTRICT COURT

Q        And they're working thousands of investigations?

A        Yes.

Q        You didn't personally supervise each one of those investigations; correct?

A        No.

Q        You couldn't.  It would be impossible; correct?

A        That is correct.

Q        You had to delegate responsibilities to those below you to supervise the investigations; isn't that correct?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  Well, you mentioned Lawrence Middleton, the chief of the public corruption and civil rights section; correct?

A        Yes.

Q        He was someone below you sort of in the rankings; is that correct?

A        Correct.

Q        If you're the U.S. Attorney at the top, right below you is the chief assistant?

A        First assistant, chief assistant, yes.

Q        Then for the criminal side, it's the chief of the criminal division?

A        Correct.

Q        Then below that would be the chief of one of

UNITED STATES DISTRICT COURT

these sections; correct?

A        The chief of the various sections, yes.

Q        So Lawrence Middleton is about three rungs lower than you in the organizational chart?

A        Yes.

Q        And then even below Lawrence Middleton, that's where you would have the line assistants doing the investigations; correct?

A        Typically -- well, there may be a deputy chief and then the line assistant.

Q        So there could be one more rung between the line assistant -- it would go line assistant, deputy chief, and then a chief; correct?

            MR. FOX:  Objection.  Relevance.

            THE COURT:  Sustained.  The answer is stricken. The jurors should disregard.

Q        BY MR. HOCHMAN:  Now, the United States Attorney's Office is part of the United States Department of Justice; is that correct?

A        Yes.

Q        And the head of the United States Department of Justice is the Attorney General; correct?

            MR. FOX:  Objection.  Relevance.

            THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  In civil rights, there's not

only the local United States Attorney's Office that does civil rights prosecution but also a civil rights division in the Department of Justice; is that correct?

A       Yes.

Q       And the FBI has a Washington, D.C., counterpart as well that deals with civil rights violations; is that correct?

A       Yes.

Q       And as part of your job as the United States Attorney, you work with federal, state, and local law enforcement agencies to fight crime; is that correct?

A       Yes.

Q       And I think you said that the FBI would be one of those agencies?

A       That's correct.

Q       The Los Angeles Police Department would be one of those agencies?

A       Yes.

Q       And the Los Angeles Sheriff's Department is one -- are one of those agencies?

A       Yes.

Q       You used the analogy about children in a sandbox, but in reality, you're all sort of brothers in arms in fighting crime; correct?

A       That's correct, yes.

**UNITED STATES DISTRICT COURT**

Q       You're all partners?

A       All law enforcement partners, yes.

Q       And the United States Attorney's Office also works with numerous federal, state, and local task forces that involve the FBI and the Los Angeles Sheriff's Department; correct?

A       Yes.

Q       And these task forces included fighting terrorism, narcotics crime, narcotics trafficking, gangs, and other types of crimes; correct?

A       Yes.

Q       With respect to the Los Angeles County Sheriff's Department, you worked with Sheriff Baca after you became United States Attorney in March of 2010; is that correct?

A       Yes.

Q       And you know Sheriff Baca.  You can identify him here in court?

A       He's right over there in the suit and pink shirt and nice tie.

        MR. HOCHMAN:  Your Honor, may the record reflect that the witness has identified Leroy Baca?

        THE COURT:  Yes.

Q       BY MR. HOCHMAN:  When was the first time that you met Sheriff Baca?

A       Well, I couldn't tell you.  I mean, I have to

1620

believe it was during my tenure as Inspector General.  So in that 2003, -4, or -5 realm, probably then.

Q      Because he had already been the sheriff as of the end of 1998; correct?

A      Yes.  He had been longtime sheriff.  I don't remember when he began his duties as sheriff, but yes.  A while back.

Q      When you were up for consideration for the United States Attorney position, Sheriff Baca wrote a letter on your behalf; is that correct?

A      He did.

Q      Once you became the United States Attorney, you worked with him starting in March, 2010.

A      Correct.

MR. FOX:  Objection.  Asked and answered.

THE COURT:  Sustained.

Q      BY MR. HOCHMAN:  And you would often communicate with Sheriff Baca considering the numerous matters that you had and his office had; correct?

A      Yeah.  The big cases.  I mean, you communicate with all the head law enforcement agencies that you're working with, yes.

Q      You would talk to him on the phone; is that correct?

A      Yes.

**UNITED STATES DISTRICT COURT**

Q        See him at different places where you would meet together?

A        Yes.

Q        And those were meetings unconnected with anything dealing with this case; correct?

A        Yes.

Q        Now I'd like to focus your attention on August, 2011.  Were you aware that month or were you aware that summer that the FBI had been running an undercover operation in the Men's Central Jail?

A        Yes.

Q        And it was targeting a deputy sheriff in the jail; is that correct?

A        I believe so.  I don't know if the investigation was focusing -- charging specifically one sheriff's deputy, but there was an investigation involving LASD and the jails.

Q        And did you approve the investigation -- strike that.

Did you know that the investigation at its inception was going to have a cell phone as part of it?

A        I honestly don't remember.  I mean, I -- I'm assuming I knew about the investigation.  I can't sit here as I -- and tell you I knew the specifics of it.  I knew when the phone got discovered, but I just don't have a memory of someone sitting there telling me, okay, we're going to do this

**UNITED STATES DISTRICT COURT**

investigation.  We're using a phone.  I'm not saying it didn't happen.  I just don't have a memory of it.

Q      Well, you approved the undercover operation on August 10, 2011; is that right?

A      That sounds right, yes.

Q      When you approved it on August 10, 2011 --

MR. FOX:  Objection, Your Honor.  We need to have a sidebar, please, Your Honor, on this issue.

THE COURT:  All right.

(The following proceedings were held at sidebar:)

MR. FOX:  Your Honor, this is misleading.  There was a group one proposal that was separate from the cell phone that he approved, and Mr. Hochman knows that.  He received the discovery, and he's suggesting that Mr. Birotte approved of the group one retroactively approving of the cell phone.  He just said the date that the group one letter was, I believe, signed or proposed to Mr. Birotte and he's insinuating that he did not approve of the undercover operation.  So this is misleading and confusing to the jury.

MR. HOCHMAN:  That's actually not where I was going.  Where I was going is that it's August 10, 2011, and I believe he'll say he didn't know that the cell phone had been found in the sheriff's jails on August 8, 2011.  In other words, they did not provide him one of the key pieces of information when he approved this investigation.

**UNITED STATES DISTRICT COURT**

MR. FOX:  There's a relevance issue there, Your Honor.  It's irrelevant.  So I move to strike the previous question and answer and this question.

MR. HOCHMAN:  The Government brought in that he approved the operation.  I should be allowed to cross-examine to get some details of what he knew when he approved the operation.  They opened the door.  That's all I'm doing, Your Honor.

MR. FOX:  It's a separate approval, and this is what I'm saying is prejudicial is that he's conflating the two, and there was a separate approval that happened beforehand based on this witness' testimony.  He said he approved of the undercover operation related to the cell phone.  That's different from the August 10 group one that he was prepared to approve that never happened because of the discovery of the cell phone.

MR. HOCHMAN:  He actually approved it.  He didn't "going to approve."  He approved it on August 10.  Again, I'm asking the witness -- and I didn't -- it is an undercover operation related to the cell phone.  He -- when he approved it, he did not have the information -- key information, I would suggest, that the cell phone had actually been discovered by the sheriff's department, and that's what I'm inquiring is what information he had when the Government opened up the door and said he approved the operation.

**UNITED STATES DISTRICT COURT**

THE COURT:  Objection sustained.

(The following proceedings were held in open court in the presence of the jury:)

THE COURT:  All right.  Ladies and gentlemen, the last question and answer is stricken, and the jury should disregard it.

Q    BY MR. HOCHMAN:  Mr. Birotte, you said that you knew that the undercover operation was targeting a deputy Los Angeles sheriff; is that correct?

A    No.  I don't know if -- I'm sorry.  I don't know if I knew the investigation was targeting a deputy or the Los Angeles County Sheriff's Department generally.  I don't remember.

Q    Did you know whether or not it was using inmates as FBI informants?

A    I believe I did.

Q    And did you know which inmates were being used by the FBI?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

Q    BY MR. HOCHMAN:  Now, the head of the Los Angeles FBI office in August, 2011, was Steve Martinez; is that correct?

A    Correct.

Q    And he is called an assistant director in charge

UNITED STATES DISTRICT COURT

of the office; correct?

A       Correct.

Q       That's different than a special agent in charge; correct?

A       Correct.

Q       Or a line FBI agent like Agent Marx; correct?

A       Correct.

Q       You had met with Assistant Director Martinez many times before August, 2011; is that correct?

A       Yes.

Q       And on August 18 -- I'll direct your attention to August 18, 2011.  Do you recall receiving a call from Assistant Director Martinez around that time informing you that the FBI's cell phone had been discovered in the Men's Central Jail by the sheriff's department?

A       Yes.

Q       And did you speak with Sheriff Baca after that FBI phone was discovered?

A       I assume I -- I think I did, yes.

Q       And did you also speak with Michael Gennaco, the head of the Office of Independent Review, after the FBI's phone was discovered?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  Well, Michael Gennaco, you said,

UNITED STATES DISTRICT COURT

1626

was at that August 29, 2011, meeting at your office where the county people showed up and the people from the U.S. Attorney's Office showed up; correct?

A      Yes.

Q      And at the point of August 29, 2011, was that the first time you had ever seen Mr. Gennaco?

A      Well, in connection with this matter --

Q      No.  In general.

A      No.  I've known Mr. Gennaco for years.

Q      15 years?

A      Probably.  We were both in the U.S. Attorney's Office together.

Q      And you were in the U.S. Attorney's Office 1995 to 1999?

A      Correct.

Q      And when you said -- did you say you also worked -- you mentioned that the Office of Independent Review is the counterpart to the Inspector General's Office when you headed it; correct?

MR. FOX:  Objection.  Asked and answered.

THE COURT:  Sustained.

Q      BY MR. HOCHMAN:  Did you meet Mr. Gennaco as well when you were in the Inspector General's Office?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

**UNITED STATES DISTRICT COURT**

Q        BY MR. HOCHMAN:  The meeting at your office on your side included the chief assistant or First Assistant George Cardona, and this was the August 29 meeting?

A        Yes.

Q        Included the chief of the public corruption civil rights section Lawrence Middleton; correct?

A        Yes.

Q        Gentleman named Bruce Riordan, if you recall?

A        Yes.  He was my special counsel.

Q        And others on your side as well; is that correct?

A        There were.  I just don't have a good memory of who.  I think there were.

Q        During that meeting -- that actually wasn't that long of a meeting.  Maybe a half hour or so?

A        That sounds right.

Q        And I think you said that Sheriff Baca expressed his concerns about what had happened with the cell phone being introduced by the FBI in the Men's Central Jail; is that correct?

A        Yes.

Q        And he asked you at that time -- you said he asked a bunch of questions during that meeting; correct?

A        Yes.

Q        Is one of the questions that he's asking you as to why the FBI had not consulted with him before they ran an

1628

undercover operation into the Men's Central Jail?

A       I think that's one of the questions that he asked.

Q       And you listened very politely during that meeting of Sheriff Baca expressing his concerns; is that correct?

A       Yes.

Q       You called it, I think, a listening meeting on your part?

A       From my part, yes.  I assumed that Lee wanted to vent or express his displeasure, and I just listened.

Q       You didn't provide Sheriff Baca with any information about the scope or the extent of the FBI's investigation in the Men's Central Jail, did you?

A       At that meeting, no.

Q       You didn't provide him with any information what was happening as to whether or not there were other FBI undercover investigations going on at that time in the Men's Central Jail; is that correct?

A       No, I did not.

Q       You didn't provide him with any information about whether it was one deputy or many deputies that were potentially corrupt in the Men's Central Jail; is that correct?

A       That is correct.

Q       Now, after the meeting was over, did you ever

UNITED STATES DISTRICT COURT

write out a report in which you indicated that you thought that

Sheriff Baca had obstructed justice during the meeting?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

Q    BY MR. HOCHMAN:  Well, did you ever communicate

to anyone right after the meeting that you thought that

Sheriff Baca had obstructed justice during the meeting?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

Q    BY MR. HOCHMAN:  Your office prosecutes

obstruction of justice cases -- correct? -- at that time?

A    The office did do that, yes.

Q    And you were the head of the office; correct?

A    Correct.

Q    Now, after the meeting with Sheriff Baca, you and

others in the U.S. Attorney's Office stayed behind and met with

Mr. Gennaco separately; is that correct?

A    At this first meeting?

Q    Yes.

A    I think so.

Q    And Mr. Gennaco expressed to you, generally, that

the sheriff's department wanted to work with the

U.S. Attorney's Office and the FBI; is that correct?

MR. FOX:  Objection.  Irrelevant as to what

Mr. Gennaco said.

UNITED STATES DISTRICT COURT

THE COURT: Sustained.

Q        BY MR. HOCHMAN: Well, did Mr. Gennaco suggest an approach during that separate meeting he had with you that you then agreed with and tried to implement thereafter?

A        I think so, yeah.

Q        And that approach was sort of a building bridges between the sheriff's department and the FBI to deal with the rift that had occurred; correct?

A        I think -- that sounds right. Mr. Gennaco and I knew each other. So we had that relationship. And so I think this was an effort to try to sort of get what we needed and, again, try to dampen tensions.

Q        And towards that end at the end of September, you scheduled a meeting with Sheriff Baca and Assistant Director Steve Martinez on September 27 in your office; is that correct?

A        I don't remember if I scheduled a meeting, but we had a meeting on that date. I don't remember how it came about.

Q        So I'm just -- so you don't know if you scheduled the meeting or Mr. Martinez did or Sheriff Baca did.

A        Yeah. Correct. I don't remember if I told my assistant, "Hey, we need to set up a meeting with the sheriff and Mr. Martinez" or if Mr. Martinez called and said, "Let the three of us get together." I just know we had that meeting that day.

Q      And the point of the meeting, from your perspective, was, again, to try to, as you put it, get these brothers that are arguing amongst each other in the sandlot back together; correct?

A      A couple things.  One, to try to answer some of the questions that Sheriff Baca had and let him know we're going to move forward and let's work together.  So those were sort of the things I was thinking about going into the meeting.

Q      You wanted Sheriff Baca to get a chance to clear the air; correct?

A      Yes.  I mean, he cleared the air earlier, but yes.  In the prior meeting Mr. Martinez was not there.  So this time it was the three of us and just the three of us.  My thought, as professionals, just get in the room, talk this out, figure it out, and then be done with it.

Q      And with respect to that meeting then, your role was sort of like an older brother trying to get the younger brothers together?

A      Look, like I said earlier, my job, one of the responsibilities is to make sure that everyone plays in the sandlot together.  The sheriff's department, the FBI are law enforcement partners.  We need to work together.  So I was trying to do what I could to continue that.

Q      And Sheriff Baca during that meeting -- you said it got heated at the beginning; correct?

UNITED STATES DISTRICT COURT

1632

A        Yes.  I mean, it got heated.  I don't remember the timeline, but yeah.  It got heated.

Q        And he was very open, direct, and transparent with his feelings in that meeting; correct?

A        That is correct.

Q        At some point he used that expression "gun up"; correct?

A        Yes.

Q        You didn't think that this was some scene from the wild west where people were actually going to pull guns, did you?

A        No.

Q        That's not how the expression was used during the meeting; correct?

A        That's not how I took it, no.

Q        It was sort of, if you're going to not trust us, then we're not going to trust you, and each side is going to have its own guns, and it's not going to work out; correct?

A        I took it more like, look, you want to go to war on this, fine.  We'll do that, and then let the chips fall where they may.

Q        And on the flip side, if you want to resolve this, then we'll resolve it.  But one way or the other, we've got to move forward.

A        I mean, look, that part I'll never know.  I just

**UNITED STATES DISTRICT COURT**

1633

know what was said and his emotions behind it that, look, you want to go to war, we're going to go to war or not.  You make the decision and then move forward.

Q       And during the meeting, Sheriff Baca asked Assistant Director Martinez that question that he had asked in the earlier meeting that you didn't answer which is why?  Why did you not involve me when you did your undercover investigation; correct?

A       I think that question was asked.

Q       At that point Mr. Martinez gave him an answer; isn't that correct?

A       I believe that is correct.

Q       And after Assistant Director Martinez gave him the answer, Sheriff Baca calmed down in the meeting; correct?

                MR. FOX:  Objection.  Relevance.

                THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  Well, did the meeting end with Sheriff Baca leaving in a huff and running out of the room?

A       No.

Q       Meeting ended with Sheriff Baca shaking your hand; correct?

A       Yes.

Q       And he shook the hand of Assistant Director Martinez; correct?

A       I believe so, yes.

**UNITED STATES DISTRICT COURT**

1634

Q      And as you said in your letter on October 13, 2011, the cooperation was occurring at that point or at least the movement toward cooperation was occurring at that point.

Would that be right?

A      I was trying to continue to convey that message, yes.

Q      Now, turning to Exhibit 112 which is the letter that you read many of the portions of -- can we put 112 on the screen, please.  First page.  First paragraph.

MR. HOCHMAN:  Your Honor, this monitor is off.  I don't know if the jury's monitors are off as well.

THE COURT:  No.  They're on.

MR. HOCHMAN:  Thank you, Your Honor.

Q      So, Mr. Birotte, you talked about the concept of holding responses to various subpoenas; correct?

A      Yes.

Q      And by that you meant there is a date on each of the grand jury subpoenas on which you need to comply with and return those documents to the grand jury; is that correct?

A      Correct.

Q      And you, as the U.S. Attorney, were informing Sheriff Baca that, if they didn't have -- that they could have -- actually, they could stand down and they didn't have to produce the documents by the dates on the grand jury subpoenas;

**UNITED STATES DISTRICT COURT**

is that correct?

A        Correct.

Q        Now, did you -- when you made that statement to Sheriff Baca that he could stand down and not produce the documents on the dates listed on the grand jury subpoenas, did you tell the grand jury that too, that the document production is going to be delayed?

A        No.

Q        Do you know if anyone on your behalf told the grand jury that?

A        I don't know.

MR. HOCHMAN:  And then if you could then put the rest of the page.

Q        In the letter that Sheriff Baca gave you, he referenced the voluminous amount of information that was requested from the subpoenas.

Do you remember that?

A        Yes.

Q        And he referenced, in part, that the subpoena -- and we can focus on the No. 1 here.  The August 24th, 2011, subpoena was asking for documents and information for all employees at the Men's Central Jail from January, 2009, to the present which at that point was September 26, 2011.

A        Okay.  Yes.

Q        And you understood that to be a huge amount of

**UNITED STATES DISTRICT COURT**

information that was going to have to be produced by the sheriff's department in connection with these Federal Grand Jury subpoenas; correct?

A     Yeah.  We knew we were asking for a lot of information, yes.

Q     And the subpoena date was September 28, 2011, when it was due, and you understood that there was no way they could possibly get all the information within a month.  So that's why you gave them additional time; is that correct?

A     Right.  And out of respect for Mr. Baca, he said, "Look, we need more time."  I said, "Okay.  Fine.  You've got more time."

Q     And that would be true with the other subpoenas that are identified on page 1 of Exhibit 112; correct?

A     Correct.

Q     Now, again, this letter we're talking about, Exhibit 112 dated September 26, 2011, this was the letter that Sheriff Baca gave you at the meeting on September 27, 2011; correct?

A     Yes.

Q     Did he give you -- do you recall whether or not he gave it to you at the beginning of the meeting?  At the end of the meeting?  Do you recall which?

A     I think it was -- if my memory is correct -- again, this is a number of years ago.  He gave it to me but in

1637

the beginning of the meeting.  Again, I viewed this as sort of this was a verbal -- I'm sorry -- a written documentation of the stuff that he had raised earlier and then some additional stuff.  So it was more like, "Here, Andre.  Here.  This is for you."  I put it down.  I'm not sure -- I'm 99 percent certain I didn't read the letter before we began the meeting.

Q     And, again, this letter is pretty open and transparent and direct about Sheriff Baca's feelings about the investigation; correct?

A     He's expressing his views.

Q     It says here in the first sentence that you read that he was extremely displeased with the conduct of the FBI in causing the introduction of a cell phone into the jail as illegal, unethical, and irresponsible.

       Do you see that?

A     Yes.

Q     That was a point he made in the August 29 meeting as well?

A     Yes.  He made that several times.

Q     He also actually made that orally to you in that September 27 meeting with you as well.

A     Yes.

Q     And he says, "The sheriff's department will be conducting an investigation into the breach of security of the jail system and will be examining Inmate Anthony Brown's

**UNITED STATES DISTRICT COURT**

1638

allegations that he received a cell phone from a deputy who received it from an FBI agent."

Do you see that?

A       Yes.

Q       Now, the sheriff had the ability and the duty to investigate violations in his jail; correct?

A       I'm sorry.  The sheriff's department has the responsibility to investigate violence -- yes.  Theoretically from a 30,000-foot level, yes.  That's what they have a responsibility to do.

Q       Because the sheriff's department has jurisdiction over the jails and -- while your office has jurisdiction over the jails as it pertains to federal crimes; correct?

A       Yes.

Q       And so the sheriff -- if the sheriff has a dirty deputy, for instance, who received a bribe, the sheriff has an obligation to investigate that because they may have also violated state law; is that correct?

MR. FOX:  Objection.  Argumentative.

THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  Well, in the letter here it talks about the sheriff's department investigation, and it references California Penal Code sections.

Do you see that?

A       Yes.

**UNITED STATES DISTRICT COURT**

Q      Those would be the California Penal Codes that someone like a dirty deputy might violate if they took a bribe in a jail; correct?

A      Yes.

Q      And it says here the sheriff's department will also fully investigate allegations regarding excessive force by deputies in the Men's Central Jail.

Do you see that?

A      Yes.

Q      And the sheriff has the duty to investigate excessive force allegations by deputies in the Men's Central Jail; correct?

A      Yes.  But it's not an exclusive duty.

Q      Very good point.  It's not exclusive because the sheriff can investigate and the Federal Government can investigate at the same time; correct?

A      They can.  That's not wise, but they can.

Q      Well, it's better if they work together; correct?

A      Correct.

Q      It's better if the sheriff's department works with the United States Attorney's Office; correct?

A      In most instances.  I mean, again, there are certain investigations that it's just not going to happen.  I mean, we're not -- the U.S. Attorney's Office is not -- generally speaking, is not going to do an investigation of the

**UNITED STATES DISTRICT COURT**

sheriff's department or any local law enforcement agency with that agency.

Q      Are you aware that the FBI was working with the Los Angeles Sheriff's Department at that time doing a public corruption investigation of a dirty sheriff?

MR. FOX:  Objection to the form of the question and relevance.

MR. HOCHMAN:  I'm sorry.  Let me qualify the end of the question.  A dirty deputy sheriff, Your Honor.

MR. FOX:  Objection to the form of the question and relevance.

THE COURT:  Sustained.

Q      BY MR. HOCHMAN:  You said in your original testimony that you were unaware of any situation involving public corruption of a sheriff's department deputy where the Federal Government was working with the sheriff's department to do an investigation; is that correct?

MR. FOX:  Objection.  Misstates the testimony.

THE COURT:  Sustained.

Q      BY MR. HOCHMAN:  Were you aware at that time -- and that time I'm referring to is the summer of 2011 -- of the sheriff's department actually working with the FBI in the investigation of a Los Angeles County deputy sheriff engaged in criminal activity?

MR. FOX:  Objection.  Relevance, Your Honor.

**UNITED STATES DISTRICT COURT**

THE COURT:  Sustained.

Q    BY MR. HOCHMAN:  If you could turn to the next paragraph, please.

Now, it says in the first sentence, "The expertise and experience of the sheriff's department in conducting these types of investigations are considerably contrasted by the FBI's actions in this case."  The next sentence is "The FBI has no experience in the running of a jail system of such magnitude as the Los Angeles County jails, nor have they completed anywhere near the number of investigations involving matters emanating within the confines of a jail system."

Now, you're aware, are you not, that the sheriff's department does have certain expertise when it comes to the jails; is that correct?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

Q    BY MR. HOCHMAN:  In working with the FBI, would you -- and comparing the FBI's expertise with the jails and the sheriff's department's expertise with the jails, would you consider the sheriff's department as having more expertise with the jails?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.  Move on.

Q    BY MR. HOCHMAN:  If you focus on the last

sentence here, it says, "Acquisition of documents prior to the

sheriff's department's completion of its own investigation will

likely taint the fair and truthful completion of a

properly-focused investigation."

Do you see that?

A        Yes.

Q        So is it your understanding that the sheriff's

department -- excuse me -- that Sheriff Baca wanted to do an

investigation of the allegations relating to the cell phone?

A        That's what he says in the letter.

Q        And then if you could turn to the next page,

third to the bottom paragraph, it starts with "I invite."  Did

Sheriff Baca order yourself at the U.S. Attorney's Office

during your September 27 meeting with him and tell you what you

had to do?

A        No.

Q        He invited you as a United States Attorney to

participate in the sheriff's department investigation; is that

correct?

A        That's what the letter says, yes.

Q        And he also, if you go down to sort of halfway

down, he requested that the United States Attorney's Office

ameliorate support of the FBI's agents and support the

sheriff's department investigation until its conclusion.

Do you see that?

A      I do.

Q      If you could go to the next sentence below this, the next paragraph down, towards the end of the letter he writes, "The Cardinal Rule of law --" "The Cardinal Rule of all law enforcement agencies, local or federal, is simple.  One cannot break the law in order to enforce the law?"

Do you see that?

A      Yes.

Q      That's something that Sheriff Baca repeated in the August 29 meeting you had with him and the September 27 meeting you had with him; correct?

A      I don't remember.  I'm not suggesting he didn't, but I just don't have a specific memory of that.

Q      If you can turn to the "Criminal Acts" page that you showed, Mr. Birotte, under the "Criminal Acts" page, again, Sheriff Baca's letter has a number of questions in it.  Can we focus on the first half.

"When did the FBI decide to investigate the conduct of deputies working the county jails who authorized the investigation?"

"Which office in the FBI was tasked to conduct the investigation?  The names of the agents.  The specific reasons for the investigation and for not notifying his office"; is that correct?

A      Yes.

1644

Q    And you -- if you recall, during the August 29 meeting, these are similar to the types of questions he asked in the August 29 meeting; is that correct?

A    Yes.  In that first meeting, yes.

Q    And you didn't answer any of these questions in the August 29 meeting; correct?

A    Correct.

MR. HOCHMAN:  If we could scroll down to "Risk Management," please.  Highlight the two paragraphs, "What are the locations and the pleas disclosed?"

Q    Sheriff Baca asked in this September 26, 2011, letter, "What are the locations of any additional cellular phones currently in use, owned, or deployed by the FBI within the confines of the Los Angeles County jail system?"

Do you see that?

A    Yes.

Q    And "Please disclose any and all items of contraband given to any Los Angeles County jail inmates through any means including a description of the item, the identity of the inmate receiving the item, and the date, time, and location of the occurrence."  These, again, are questions that Sheriff Baca was even asking as early as the August 29 meeting; is that correct?

A    I believe that's right, yes.  I mean, yes.  I think, in general, he was asking questions about the

**UNITED STATES DISTRICT COURT**

investigation, yes.

Q    And you didn't provide any answers during that August 29 meeting to these questions; correct?

A    Correct.

Q    With respect to Exhibit 69, that's the October 13, 2011, letter that you wrote to Sheriff Baca.

A    Okay.

Q    All right.  Do you see the middle of the first paragraph it says, "I've spoken with county counsel Andrea Ordin"?

A    I do.

Q    Now, the lawyers for the sheriff's department would be represented by the county counsel Andrea Ordin; correct?

A    Typically, yes.

Q    They also had an outside counsel, a gentleman by the name of Brian Hershman, from the law firm of Jones Day; correct?

A    Correct.

Q    But the documents that are being produced in connection with the Federal Grand Jury subpoena from the Los Angeles County Sheriff's Department come from the Los Angeles County Sheriff's Department; correct?

A    Yes.

Q    They're not Jones Day documents; correct?

UNITED STATES DISTRICT COURT

A        No.  I mean, you are correct.  They are not Jones Day documents, or they shouldn't be.

Q        Right.  And they're not county counsel documents; correct?  They're Los Angeles County Sheriff's Department documents; correct?

A        Yes.

Q        And the counsel are just sort of the intermediaries between the documents on the left side, county counsel facilitating them to get over to the grand jury on the right-hand part; correct?

A        You're talking about with respect to complying with a grand jury subpoena?

Q        Yes.

A        Oh, I don't know that.  I don't know that.  If what you're asking me is in response to a grand jury subpoena, is it county counsel's job to hand over the documents to the grand jury, or is it LASD's job?  I don't know the answer to that.

Q        Let me make it a little bit clearer.

         The document request went to the Los Angeles County Sheriff's Department to get the documents requested in the subpoena; correct?

A        Correct.

Q        They then gathered all those documents, they being the Los Angeles County Sheriff's Department; correct?

**UNITED STATES DISTRICT COURT**

A        Correct.

Q        Then they gave them to their lawyers, the counsel; correct?

MR. FOX:  Objection.  Foundation, Your Honor.

THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  You've in your career, both as a line prosecutor and assistant United States attorney, dealt with many grand jury subpoenas; correct?

A        I have, yes.

Q        And you've dealt with many counsel assisting their clients in complying with grand jury subpoenas; is that correct?

A        I've dealt with counsel in some cases, yeah, the turning over the documents.

Q        And the counsel have to work with the client in order to get the documents; correct?

MR. FOX:  Objection.  Foundation and relevance.

THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  Now, in the middle of this letter, you write, "Given this --" actually, "I've spoken with county counsel Andrea Ordin who assured me that your department would comply with these subpoenas as quickly as possible."  And then you write, "Given this assurance and based on your recent comments to the press that you too wish to have your department cooperate fully with the ongoing investigation, I look forward

to my attorneys and the FBI working with representatives from your department to ensure a prompt response to these subpoenas."

Do you see that?

A      Yes.

MR. HOCHMAN:  No further questions, Your Honor.

MR. FOX:  May I begin, Your Honor?

THE COURT:  Yes.

MR. FOX:  I'll be brief because I know you have your own jury trial -- civil trial going on downstairs.  I promise I will not be lengthy.

**REDIRECT EXAMINATION**

BY MR. FOX:

Q      Mr. Hochman just ended asking you about Mr. Baca's comments to the press.  Are you aware of some of Mr. Baca's comments to the press beginning at the end of September, 2011, about the grand jury investigation?

MR. HOCHMAN:  Objection, Your Honor.  Beyond the scope.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  Am I aware of Mr. Baca's comments to the press in that -- in this time period?

Q      BY MR. FOX:  Yeah.  Regarding the federal investigation of his department.

UNITED STATES DISTRICT COURT

1649

A        I mean, yes.  Yeah.

Q        Generally, at the end of September, 2011, what was he saying to the press?

MR. HOCHMAN:  Objection.  Foundation.

Q        BY MR. FOX:  Are you aware of what he was saying --

MR. HOCHMAN:  Beyond the scope.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  Okay.  So let me just make sure I get the timing correct.  At the end, meaning, by the time -- it was after our meeting?

Q        BY MR. FOX:  Let's take September 26 to September 27 time period first.

A        Well, okay.  It evolved.  Initially there were a lot of comments, generally speaking.  The FBI doesn't know what they're doing.  They're committing a crime.  We're the best people -- we, meaning the sheriff's department.  We should be investigating ourselves.  There was a whole what I would characterize as sort of an immediate push to get this message out that the FBI doesn't know what they're doing and then that they committed a crime and that we, the sheriff's department -- I created the Office of Independent Review.  No one is better to find that corruption in my department than me.  That message was in the beginning, and then it changed.

**UNITED STATES DISTRICT COURT**

Q       Do you know what caused it to change?

A       I don't know.

Q       Now, Mr. Hochman was asking you questions about your experience with the LAPD Inspector General's Office.  Were your duties and your investigations in lieu of federal prosecutions?

A       No.  No.  Not at all.

Q       Mr. Hochman asked you questions about whether an August 29, 2011 -- at that first meeting, whether you attempted to build bridges after that meeting.

Do you recall that?

A       Yes.

Q       Would you consider tampering with witnesses to be building bridges?

MR. HOCHMAN:  Objection.  403.  Beyond the scope and foundation, Your Honor.

THE COURT:  Overruled.

THE WITNESS:  Can you ask the question again?

Q       BY MR. FOX:  Yes.  Would you consider tampering with witnesses to be building bridges?

A       Of course not.

Q       Would you consider approaching Special Agent Leah Marx -- I'll ask it a different way.

Would you consider sending sergeants out to approach Special Agent Leah Marx at her home the night before

UNITED STATES DISTRICT COURT

your meeting with Mr. Baca to be building bridges?

MR. HOCHMAN:  Objection.  Relevancy and leading, Your Honor.

THE COURT:  Overruled.

THE WITNESS:  Not at all.

MR. FOX:  Could you please pull up 112-1. Actually, -2, please.

Q      Do you see the portion after 4575 and 4573 which discusses conspiracy, entrapment, coercion, and civil rights violations?

A      Yes.

Q      Are you familiar with what entrapment is?

A      Yes.  A little bit.

Q      What is entrapment?

A      Entrapment is -- how do I articulate it?  In essence, when you basically have convinced someone -- basically made someone commit a crime who otherwise was not predisposed to commit that crime.

Q      In public corruption cases involving bribery, what does that mean?

A      That basically, to be successful in entrapment cases would be to prove that this individual who took the bribe was not otherwise predisposed -- for lack of a better term, was just standing by himself being Mr. or Mrs. Innocent and that law enforcement coerced, cajoled, and forced him into

**UNITED STATES DISTRICT COURT**

1652

committing this crime.

Q      Mr. Hochman asked you questions about this paragraph about the Cardinal Rule of all law enforcement agencies, local or federal, is simple.  One cannot break the law in order to enforce the law.

Did the Federal Government break the law in its undercover investigation involving Gilbert Michel?

MR. HOCHMAN:  Objection.  Calls for a legal conclusion.

THE COURT:  I think he can probably do that.

MR. FOX:  I'm sorry, Your Honor?

THE COURT:  Overruled.

THE WITNESS:  No.  No.

Q      BY MR. FOX:  And in your August 29 meeting with Mr. Baca, did you give him any reason to believe that the FBI had committed a crime when it conducted its undercover operation?

A      No.  The exact opposite.  I told him, "Look, Lee --" I'm sorry, Mr. Baca.  But in the meeting I said, "Lee, look --" I think I even said, "You know, we didn't commit a crime.  You know this is what happens.  Undercovers do this all the time.  Your deputy took a bribe.  We can agree to disagree."  I was trying to be respectful.  "I understand your view, but it's wrong.  It's just wrong."

MR. FOX:  No further questions.

**UNITED STATES DISTRICT COURT**

**RECROSS-EXAMINATION**

BY MR. HOCHMAN:

Q      In your August 29 and September 27 meetings with Mr. Baca and this issue of the Cardinal Rule and you can't break the law to enforce the law came up, did you believe Sheriff Baca was sincere when he was making these comments to you?

MR. FOX:  Objection.  Foundation.

THE COURT:  Sustained.

MR. HOCHMAN:  No further questions, Your Honor.

THE COURT:  All right.  You may step down.

THE WITNESS:  Thank you.

MR. FOX:  Your Honor, at this time the United States rests.

THE COURT:  All right.

MR. HOCHMAN:  Your Honor, at this time we have a motion I'd like to argue to the Court.

THE COURT:  We'll do that later.  Call your first witness.

MR. HOCHMAN:  Thank you.  The defense calls Cecil Rhambo to the stand, Your Honor.

THE CLERK:  Stand here for me.  Raise your right hand.

Do you solemnly state that the testimony you may give in the cause now pending before this court shall be the

UNITED STATES DISTRICT COURT

truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  Yes.

THE CLERK:  Please be seated.

Would you please state your full name and spell your last name for the record.

THE WITNESS:  Cecil Rhambo, R-h-a-m-b-o.

THE CLERK:  Thank you.

**CECIL RHAMBO,**

**DEFENDANT'S WITNESS, SWORN:**

**DIRECT EXAMINATION**

BY MR. HOCHMAN:

Q    Mr. Rhambo, I'd like to focus your attention in the summer of 2011.  Do you have that in mind?

A    Yes.

Q    Now, in the, sort of, May, June time period, did you get a promotion at that time period?

A    Yes.

Q    What were you promoted to?

A    The rank of assistant sheriff.

Q    And the rank of -- from the rank of assistant sheriff, you understood the entire organizational structure of the sheriff's department; correct?

A    Yes.

MR. HOCHMAN:  Your Honor, I'd like to place

**UNITED STATES DISTRICT COURT**

before the witness what has been -- it's a chart.  It will be marked as Defense Exhibit 744.  Your Honor, I need the easel, if I could, because it's a large chart.  If I may approach the court clerk or the witness to set up the easel.

THE COURT:  That's fine.

(Marked for identification Exhibit No. 744.)

MR. HOCHMAN:  Can we have the chart put on the easel, Your Honor?  Or I can -- I'm sorry.

If you could just show the chart to the witness, please, and not show it to the jury.

Q    Mr. Rhambo, exhibit -- Defense Exhibit 744 marked for identification is now being held in front of you.

Is Exhibit 744 a true and accurate organizational chart of the sheriff's department as it was in August, September of 2011?

A    Yes.

MR. HOCHMAN:  I'd seek the admission of Defense Exhibit 744, Your Honor.

MR. FOX:  No objection.

THE COURT:  It will be received.

(Received into evidence Exhibit No. 744.)

MR. HOCHMAN:  If we can put it on the easel, please.

Your Honor, I will publish a smaller version for the jury if that's okay.

Q        Now, starting at the head of this organizational chart, that is Sheriff Leroy Baca at the top of the chart; correct?

A        Yes.

Q        And then the undersheriff Paul Tanaka is right below him; correct?

A        Correct.

Q        And the sheriff and the undersheriff now have responsibility for everything below them; is that correct?

A        Yes.

Q        And at the time there were two assistant sheriffs; is that right?

A        Yes.

Q        Yourself, you're listed on the right hand, Assistant Sheriff Cecil Rhambo, Jr.; correct?

A        Yes.

Q        And the other assistant sheriff was Marvin Cavanaugh; is that correct?

A        Yes.

Q        And below you amongst the various divisions included the Custody Operations Division; correct?

A        Yes.

Q        And within the Custody Operations Division was the Men's Central Jail; correct?

A        Correct.

**UNITED STATES DISTRICT COURT**

1657

Q        And the Twin Towers as well.

A        Yes.

MR. HOCHMAN:  Now, if we can have the other chart shown to the witness without to the jury which is defense exhibit marked for identification 745.

(Marked for identification Exhibit No. 745.)

Q        BY MR. HOCHMAN:  Is Exhibit 745 a true and accurate rendering of the organizational chain of command in the Men's Central Jail in August, September 2011?

A        Yes.

MR. HOCHMAN:  I'd seek the admission then, Your Honor, of Defense Exhibit 745.

MR. FOX:  Your Honor, we will agree for demonstrative purposes, but we object to this being substantive evidence.

MR. HOCHMAN:  Your Honor, we can use it for demonstrative purposes at this point.  We can seek its admission at a later point.

THE COURT:  All right.

MR. HOCHMAN:  May I publish it for demonstrative purposes, Your Honor.

THE COURT:  Okay.

Q        BY MR. HOCHMAN:  So Defense Exhibit 745 is a pyramid sort of formation that describes the chain of command of the Men's Central Jail in August, September of 2011;

**UNITED STATES DISTRICT COURT**

1658

correct?

        A       Yes.

        Q       Just going, again, the top to the bottom,
Sheriff Leroy Baca is at the top; correct?

        A       Yes.

        Q       And Undersheriff Paul Tanaka is below him.

        A       Yes.

        Q       And then comes you, the assistant, Mr. Rhambo?

        A       Correct.

        Q       And underneath yourself is the chief of Custody
Operations Division; correct?

        A       Yes.

        Q       And, again, Custody Operations Division is a
little bit more than just Men's Central Jail.  It includes
Twin Towers and some other facilities; correct?

        A       Correct.

        Q       And then below the chief is the commander of
Men's Central Jail and Twin Towers; correct?

        A       Yes.

        Q       So that commander actually has two different
facilities, Men's Central Jail and Twin Towers; correct?

        A       Yes.

        Q       Then there's the captain of Men's Central Jail
below the commander; correct?

        A       Yes.

**UNITED STATES DISTRICT COURT**

1659

Q    Then, for lieutenants, there were approximately five to seven lieutenants at Men's Central Jail at that time; correct?

MR. FOX:  Object to the leading nature of these questions.

THE COURT:  You can answer this one.

THE WITNESS:  Approximately, yes.

Q    BY MR. HOCHMAN:  And how many, approximately, were there of sergeants at Men's Central Jail in August and September of 2011?

A    This chart is depicting 30 to 40.

THE COURT:  Excuse me.  Without looking at the chart, do you know the answer?

THE WITNESS:  I would say 30 to 40.

THE COURT:  Next question.

Q    BY MR. HOCHMAN:  And approximately how many deputies were at Men's Central Jail in the August to September 2011 time frame?

A    About 500.

Q    When you came in as assistant sheriff in that sort of May 2011 time frame, I believe you stated in your prior earlier testimony that you were aware of the ACLU's complaints of deputy abuse; is that correct?

A    Yes.

Q    And those complaints, looking at Defense

**UNITED STATES DISTRICT COURT**

1660

Exhibit 745, they were complaining about what was happening at the deputy level on the chart; correct?

A    Yes.

Q    Were they also complaining about what was happening at the sergeant level?

A    I don't have a vivid recollection of that, but I believe so, yes.

Q    And were there complaints about what was happening at the lieutenant level or all the way up to the top?

MR. FOX:  Objection.  Relevance, Your Honor.

THE COURT:  Sustained.

Q    BY MR. HOCHMAN:  In looking at -- well, in talking about the ACLU's complaints, you actually also joined Sheriff Baca at a meeting in July of 2011 with the complaints being made by a Chaplain Juarez; correct?

A    Yes.

Q    Also at that meeting was Fr. George Horan and St. Patty, if I recall.

A    I believe so.

Q    And the meeting was set up by --

MR. FOX:  Objection to the leading nature of these questions, Your Honor.

THE COURT:  Sustained.

Q    BY MR. HOCHMAN:  At the meeting, did you hear Chaplain Juarez make any statements concerning deputy abuse he

**UNITED STATES DISTRICT COURT**

viewed in 2009?

A        Yes.

Q        Very generally, what do you recall of those statements?

A        If I can recall this meeting, he was complaining that there was some excessive force on an inmate that they witnessed or he witnessed.  I'm not sure how many people were there in that.  He wanted the sheriff to either reopen that investigation or it was almost a plea to the sheriff that what they saw was disturbing to them.

Q        And did the sheriff turn to you at some point and give you an instruction?

A        At that time, yes.  He asked me to take another look at the case which, I believe, actually happened in 2009.

Q        I'm sorry.

         The allegations of Chaplain Juarez were 2009 allegations?

A        I believe so, yes.

Q        This is now the end of July 2011; is that correct?

A        Correct.

Q        And he's asking you, the assistant sheriff, to take a look into those --

         THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  And did you look into those

**UNITED STATES DISTRICT COURT**

allegations?

A       I believe I did, yes.

Q       Now, in your personal background, did you have any tours of duty in Internal Affairs?

A       Yes.

Q       How many tours of duty?

A       Two.

Q       And what did they involve?

A       My first tour was as a sergeant, and this was shortly after the Rodman King incident.  So one of my responsibilities there was to actually head up and be part of what was to be the use of force response team, and I also investigated officer misconduct, allegations of misconduct.  I investigated officer-involved or deputy-involved shootings and also incidents that required hospitalization of a deputy and/or a suspect after contact with deputy personnel.  That was the first tour.  I was there for about three years.

Q       Was there a second tour?

A       Yes.

Q       What did that involve?

A       I was the -- one of three lieutenants assigned to Internal Affairs.  During that one area tour, I actually headed up the shooting enforcement team for a period of time and acted in the capacity of acting captain in absence of the captain periodically.

Q      I'd like to focus you on the undersheriff for a moment, Mr. Paul Tanaka, if I could.

I believe in your earlier testimony you said that you knew Mr. Tanaka going all the way back to the 1980s; is that correct?

A      Yes.

Q      When did you first meet him?

A      I believe at patrol school in 1983.

Q      Did you actually work patrol with him in any particular station?

A      Yes.

Q      Which station?

A      Carson Station.

Q      And when you say "worked patrol," what does that mean?

A      Well, we were initially assigned to the same station as patrol trainees.  I was at Carson from '83 to '86. He left a year, maybe a year and a half before I did.  So we actually worked a police car together for a cycle which I think at the time was maybe a month.

Q      I'm sorry.  When you say you worked a police car, does that mean you were both in the police car --

A      He was my partner, yes.

Q      He was your partner at that time?

A      Yes.

Q        Over the years did you develop a close personal relationship with him?

A        I would consider him a friend.

Q        Did you have another overlap with him in your duties in the sheriff's department?

MR. FOX:  Objection to relevance of this, Your Honor.

THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  When you were assistant sheriff, did you run with Mr. Tanaka on an often basis?

MR. FOX:  Objection to relevance, Your Honor.

THE COURT:  Sustained.

Ladies and gentlemen, we're going to end the day. Again, I want to remind you not to discuss this case with anyone including your fellow jurors, members of your family, people involved in the trial, or anyone else.  Do not allow others to discuss the case with you.  This includes discussing the case on the Internet, through various forms of social media, by e-mails or text messages.  If anyone approaches you or tries to communicate with you about this case, please let me know about it immediately.

Do not read, watch, or listen to any news reports or other accounts about the trial or anyone associated with it. Do not do any research such as consulting dictionaries, searching the Internet, or using other reference materials, and

do not make any investigation about the case on your own.

Finally, you're reminded to keep an open mind until all the evidence has been received, you've heard the arguments of counsel, the instructions of the Court, and the views of your fellow jurors.  If you need to speak with me, simply give a note to the clerk.

We'll see everybody tomorrow morning at 8:00 o'clock.

(The following proceedings were held in open court out of the presence of the jury:)

THE COURT:  All right.  Sir, you may step down.

Who's next?

MR. HOCHMAN:  Your Honor, we're going to work with the Government to see with respect to Special Agent David Dahle.  We anticipated calling him next.

THE COURT:  Other than the people I already know about.

MR. HOCHMAN:  Oh, after the people you know about, Your Honor, there will be some -- I'm sorry.  I need to grab my witness list if I might have a moment.

THE COURT:  That's fine.

MR. HOCHMAN:  Your Honor, the witnesses will include -- may I ask Your Honor what the last witness was that you had?

THE COURT:  Cooley.

MR. HOCHMAN:  A gentleman named Richard Weintraub, Rose Ochi.

THE COURT:  Excuse me.

MR. HOCHMAN:  Rose Ochi, Alice Harris, Cameron Saul, Your Honor.  Paul Pietrantoni, P-i-e-t-r-a-n-t-o-n-i.  And then we're working with the Government on Maricela Long, Your Honor.  She may or may not be called as a witness depending on what happens with certain things, Your Honor.

Those things, Your Honor, are actually before the Court.  I have not heard back yet one way or the other on whether or not she's been given court-ordered immunity.

MR. FOX:  Your Honor, we have authority to provide immunity -- to provide an application to Your Honor to order her to be immunized.  But until she hits the stand and is called as a witness, it's not a ripe issue.  So we have it ready to go.  If Mr. Hochman wants to call her as a witness, we will provide to you the ex parte application and the proposed order.

MR. HOCHMAN:  So we'll get back to you on Maricela Long, Your Honor.  She's a potential witness.

THE COURT:  Who else?

MR. HOCHMAN:  And then depending on what we can work out tonight, Your Honor, Agent Leah Marx or Leah Tanner she goes by now.  That would be it, Your Honor.  And then we

1667

will decide tonight or if the case goes beyond tomorrow whether or not to call the defendant as a witness, Your Honor.

THE COURT:  Okay.  So you'll know in the morning whether or not the defendant is going to testify?

MR. HOCHMAN:  Yes, Your Honor.

THE COURT:  Okay.  When do you anticipate that you would conclude your case?

MR. HOCHMAN:  I would think we would conclude tomorrow, Your Honor, or first thing on Monday.  Again, if the defendant testifies, you can add -- I don't know how long the cross-examination would be, but you can probably add at least a day to that estimate, Your Honor.

THE COURT:  Okay.  Are any of these witnesses character witnesses?

MR. HOCHMAN:  Yes, Your Honor.  And they'll be brief character witnesses along those lines.  I can identify them if you'd like, Your Honor, or I can send an e-mail to your court clerk if you would like.

THE COURT:  Who are they?

MR. HOCHMAN:  They are Ms. Ochi, Rose Ochi.  I missed one witness, Your Honor.  John March, Carl -- I'm sorry. Let me start over.  The character witnesses will be as follows: Rose Ochi, Ira Reiner, Steve Cooley, Alice Harris, a gentleman named John March.  Your Honor, not myself this time, but we need a restroom break for five minutes, if possible.

**UNITED STATES DISTRICT COURT**

THE COURT:  That's fine.

MR. HOCHMAN:  Thank you, Your Honor.

(A recess was taken at 1:35 p.m.)

MR. HOCHMAN:  All right, Your Honor.  I'll go through the list.  There are five character witnesses, Your Honor.  I'll just do them in order -- or not in order but list them all.  Steve Cooley, Ira Reiner, Rose Ochi, John March, Alice Harris.  We believe each one of these will be relatively very brief, Your Honor.

THE COURT:  What's Mr. Covitz?  Do you still plan on calling him?

MR. HOCHMAN:  Yes.  He's a fact witness, Your Honor.  And actually, he's a very brief fact witness, Your Honor.  One thing that nobody has testified about in the case.

THE COURT:  And Saul?

MR. HOCHMAN:  Cameron Saul is -- actually one of the former inmates in the ACLU's allegations of inmate abuse. He's going to testify about what he saw in the prisons in approximately -- well, the earlier time period when he was there and then later in 2010, Your Honor.

THE COURT:  And Weintraub?

MR. HOCHMAN:  Weintraub will talk about -- he's a person that was involved with the education programs, Your Honor.  His testimony will be that, in response to the

**UNITED STATES DISTRICT COURT**

1669

ACLU's complaints in 2009 and 2010, one of Sheriff Baca's responses that the Sheriff tasked him personally with was to bring educational programs to the Men's Central Jail based on education programs decreasing violence between deputies and inmates which is a direct response to the ACLU's complaints about violence between deputies and inmates.

THE COURT:  Which particular program is he going to talk about?

MR. HOCHMAN:  Your Honor, he was actually involved in a variety of them.  It was adult education. There's GED programs that they brought.  He talks about parenting programs, anger management programs, drug rehab programs.  I'm trying to remember off the top of my head all the different types of programs.  Basically these are programs that they started and kept expanding in part -- in response to the ACLU's complaints because they found that, when inmates were occupied for hours during the day doing something productive and then studying afterwards, the inmate/deputy violence levels dropped dramatically because inmates weren't sitting around idle with nothing to do causing problems and then cause interactions for the deputies that, in part, led to violence.

THE COURT:  And Paul --

MR. HOCHMAN:  Paul Pietrantoni, Your Honor. Paul Pietrantoni was a Los Angeles deputy sergeant.  What his

situation was was that in 2009, 2010, he was asked by one of, I believe, the commanders -- commanders or captains -- I'd have to look back at my notes -- at Men's Central Jail to come in and teach use of force reduction classes in the 2010 time period, 2010 all the way until he went on medical leave in June 2011 approximately.

In response to those allegations, he taught groups of deputies -- I believe he will say four to five times a year -- groups of deputies of approximately 60 in force reduction techniques that he happened to be an expert, in mostly dealing with wrestling moves, Your Honor, so that they didn't have to resort to flashlights, punching, kicking, and the like.

This was actually giving the deputies techniques that they didn't have to deal with inmates so that force would be reduced and they would be able to control the situation rather than striking them with excessive force.

THE COURT:  Okay.  So do we have everybody now?

MR. HOCHMAN:  Let me make sure.  Yeah.  And then you have the names that I gave you yesterday, Your Honor.

THE COURT:  Right.

MR. HOCHMAN:  That's correct.  That would be, unless something changes tonight in response as we think about the testimony we heard today and see whether or not there's any particular witness that we need -- and I don't have one in

mind -- that would be responsive to Mr. Birotte and Ms. Marx's testimony today, I just need to give that a little thought, Your Honor.  I haven't given it any thought at this point.

I will let the Court and the Government know immediately.  I do not anticipate someone like that.  I want to reserve the right, as I think through it, that there might be something that would be rebutting what Agent Marx and Mr. Birotte said today.

MR. FOX:  The detail that Mr. Hochman just provided to you about the new witnesses that he just told the Court about, it's the first time that we're hearing about what most of these people are saying.  He did say that the five would be character witnesses, and we have no problem with that.  But with some of the witnesses that were on tap for today that have now been tabled for tomorrow, we don't have a very good idea of what they're going to say.  For example, Mike Gennaco, we don't know what it is that he's going to say.

Mr. Hochman has told us previously that he doesn't take notes of witness interviews and therefore he couldn't turn them over to us, but he just referenced in his comments to the Court that he has notes of these interviews.  I would again ask for reciprocal discovery of these witnesses. We have continued to provide witness statements as we must, and we deserve reciprocal discovery.

MR. HOCHMAN:  Your Honor, my notes are my

**UNITED STATES DISTRICT COURT**

questions that I sort of type out in rough outline as I --

THE COURT:  Have you talked to these witnesses?

MR. HOCHMAN:  I personally talked to them, yes,
Your Honor.

THE COURT:  Have you discussed with them the
questions that they might be asked?

MR. HOCHMAN:  Always telling them that these are
the sort of questions that actually might be asked, but I
certainly don't guarantee any witness that --

THE COURT:  I understand that.  But I also
understand that, if you have notes, then these witnesses -- and
you've gone over these questions that you're going to ask with
these witnesses and you're trying to avoid your discovery
obligations, that may not play very well.  So you run the risk
of having their testimony -- if it comes out that there's some
notes, all I'll say is you might be better off turning those
over rather than trying to be cute.

MR. HOCHMAN:  I will create, Your Honor -- I
don't want to obviously turn over my witness outline to the
Government.  But I will -- I can summarize, as the Government
has summarized to me very generally -- not general, the points
that the witnesses will make.  I can certainly summarize those
points which will be a brand new document that I will create.

THE COURT:  Mr. Gennaco, how long do you expect
to be with him?

1673

MR. HOCHMAN:  I would say the direct, Your Honor -- I don't think there's that many exhibits I need to show him.  So I would imagine somewhere between -- depending on how fast it goes, 35 to 55 minutes, Your Honor.  I don't know how long the Government will have him on cross.

THE COURT:  I'm just asking about you.  And what points is Mr. Gennaco going to cover?

MR. HOCHMAN:  So Mr. Gennaco, as you've heard, actually shows up at a variety of the events in this case from the beginning, Your Honor.  We've made the point of what the Office of Independent Review is.  So he'll briefly explain to the jury what the Office of Independent Review is.  You heard that the ACLU coordinated with the Office of Independent Review.  So he'll touch on that.  You will hear that -- what the ACLU, in part, complains about the Office of Independent Review.  So we'll ask him what his response was, in part, to those complaints.

Then as it moves forward, Your Honor, and we get into sort of the August, September time frame, I think you'll hear that Mr. Gennaco -- and by the way, I referenced, Your Honor, that most of Mr. Gennaco's testimony, with not very much exception, is in the Government interview that they gave me.  They've had a chance to interview him.  They've had a chance to grand jury him.  He's actually testified at other trials.  I was reviewing his transcripts.

**UNITED STATES DISTRICT COURT**

So much of what I'm saying may or may not be included, but he's got a wealth of information.  He gave a very detailed interview to the CCJV as well, Your Honor, that the Government provided to me.  So most of what I'm working off of, Your Honor, are Mr. Gennaco's statements.  If the Government wants me to hand them back to them, I'm happy to hand those back and then add whatever isn't in those statements as to what Mr. Gennaco will be saying.

He was involved, as the Government knows because they provided me with the information, in the August 29th meeting.  He then deals with Mr. Birotte, as you heard today, in this sort of side meeting that they had right afterwards.  He was involved, as the Government pointed out in its case, in passing on information to Captain Carey in September.  I believe it was September 8th or 9th.  They've shown the e-mail that deals with this about -- to four different witnesses and published it three times.  He was involved in helping set up the September 27th meeting with Mr. Birotte.

So he will cover -- again, I will keep it moving.  There's not many exhibits I need to show to Mr. Gennaco.  So I won't be doing what the Government does which is show an exhibit and then have them read the whole thing into the record.  That would slow me down.  I won't do that, Your Honor.  He might obviously reference a certain sentence here and there, but he won't be reading an entire letter into the record.  So

that will be Mr. Gennaco approximately.

THE COURT:  How long do you plan on being with Mr. Rhambo?

MR. HOCHMAN:  With Mr. Gennaco?

THE COURT:  Mr. Rhambo.

MR. HOCHMAN:  Short, Your Honor.  I will probably be done within 15 minutes.

MR. FOX:  What I would like to point out with Mr. Rhambo, we had just finished objecting to what appeared to me to be building a bias that he has toward Mr. Tanaka.  If that's the purpose of his testimony recalling him to try to build a bias, they had an opportunity to do that already in the Government's case.  We were told something completely different about what the purpose of calling Mr. Rhambo was, and we've not even gotten to that.  So this is all stuff that was not disclosed to us.

With respect to any bias, they've had an opportunity to cross him, and you can't call a witness just to attack his credibility which it appears they're doing.

MR. HOCHMAN:  Your Honor, Mr. Rhambo serves a variety of purposes, not just to attack his credibility.  There were certain parts that the Government didn't introduce that, if I had sought to introduce it at the time, the Government most likely would have said beyond the scope, and they would have been right.  The Court might have very well and properly

**UNITED STATES DISTRICT COURT**

1676

sustained an objection.

So we are filling in details, Your Honor, that would have arguably been beyond the scope.  In accordance with my understanding of how the Court has ruled, when the Government doesn't go into an issue and then we seek to go into it, Your Honor -- I've been shut down multiple times with beyond the scope.  Again, if the Government doesn't go into it, I can't go into it.  But that's what the defense case is all about is that's a chance, an opportunity for us to go into those areas.

MR. FOX:  Your Honor, on direct with Mr. Rhambo, I took him through his relationship with Paul Tanaka.  So I don't know why we're going over that again.

MR. HOCHMAN:  Again --

MR. FOX:  It would not have been beyond the scope for him to be crossed on those points, and they chose not to cross him on those points in their initial cross-examination.

MR. HOCHMAN:  And, again, two responses.  They asked one question about Mr. Tanaka's relationship back in 1983 with Mr. Rhambo.  And he said, *I met him in 1983.*  We could have gone into it a little bit more then, or the Court would have potentially looked at it, if I went through the whole relationship all the way to 2011, as inappropriate.  Or we can choose to do it in the defense case because, A, you can impeach your own witness, but that's not the only reason we're calling

**UNITED STATES DISTRICT COURT**

him.

I've already called him to provide a fuller explanation on the Paulino incident, the Father Juarez incident, which the Government did not go into in its direct of Mr. Rhambo. And had I gone into it, Your Honor, I would have been shut down quite correctly so.

So again, we can call the witness back for these variety of things that the Government didn't touch on. I'll give you another one, Your Honor. The Government only -- there's two e-mails that have Mr. Rhambo involved with them. The Government chose to go into one of the e-mails but not the second one. We're going to go into the second one. Again, had I gone into it at the time, the Government would have said beyond the scope, and Your Honor would have quite correctly probably sustained that objection, and then I'd be in the same position I am in right now.

So these are the areas we'll go into. Again, I anticipate about 15 more minutes, Your Honor, on direct.

THE COURT: And you anticipate that your case will conclude either tomorrow or first thing Monday morning?

MR. HOCHMAN: With the exception of --

THE COURT: With the exception of if the defendant elects to testify.

MR. HOCHMAN: Yes, Your Honor.

THE COURT: We'll know that tomorrow morning.

**UNITED STATES DISTRICT COURT**

MR. HOCHMAN:  You will, Your Honor.  And I want to have one caveat, Your Honor, because I always put that caveat in.  If something happens during the testimony tomorrow and my client reaches over to me and says he wants to testify, he has a constitutional right to do so.  So I never want to preclude anyone -- we'll give the Court our best estimate before we hear all the evidence.  And I don't know if the Government is presenting a rebuttal case.  But if my client reaches over and says at some point that he wants to testify, it's his constitutional right, Your Honor.

THE COURT:  How long do you expect to be with Ms. Tanner?

MR. HOCHMAN:  With Ms. Tanner, I'd say five minutes, Your Honor.  We're using her in connection with prior inconsistent statement.  We're hoping to work out with the Government some type of arrangement that we actually don't need to call her to do that.  Otherwise, it's the amount of time it takes to introduce a prior inconsistent statement.

THE COURT:  How long do you expect to be with Agent Dahle?

MR. HOCHMAN:  Agent Dahle is a prior inconsistent statement as well and maybe one other thing.  I would say 10, 15 minutes tops.

THE COURT:  And Mr. Covitz?

MR. HOCHMAN:  Mr. Covitz, 10, 15 minutes,

Your Honor, on direct. I'm giving you the direct approximations.

THE COURT: And Mr. March?

MR. HOCHMAN: Mr. March, character witness, ten minutes, Your Honor. Five to ten minutes. It's just -- we'll go through the question -- I'd say five to ten minutes for every character witness.

THE COURT: Saul?

MR. HOCHMAN: Saul, probably about on direct 15, 20 minutes, Your Honor. It might be shorter. 10 to 20 minutes, Your Honor. I just don't know how -- it's how fast a witness answers questions. And I'm not -- I can't lead. So it's more general questions, Your Honor.

THE COURT: Weintraub?

MR. HOCHMAN: Weintraub, probably about 15 minutes, Your Honor.

MR. FOX: Your Honor, I think that everything Mr. Hochman just described with Mr. Weintraub is the education-based incarceration program. I think he broke it down, and that's the umbrella. I think that's based on the explanation.

MR. HOCHMAN: And the Government is correct that the umbrella organization was called EBI, but what he would be testifying about, Your Honor, are the specific programs, not some umbrella organization.

THE COURT:  And Paul --

MR. HOCHMAN:  I would say 15, 20 minutes tops. And Maricela Long, Your Honor, would be a very specific issue, and we will -- I'll get back to the Court on whether or not we'll be calling her.  You know what, Your Honor, I apologize. I forgot one.  Steve Martinez.  Mr. Martinez is the FBI director that the Court has heard about.  We anticipate, again -- I've only got probably those two e-mails.  So the amount of documents is not very heavy.  So I would anticipate 15, 20 minutes.  Maybe 20 minutes for Mr. Martinez on direct, maybe 15.  15 to 20 minutes, Your Honor.

THE COURT:  And Long?

MR. HOCHMAN:  I'm sorry.  Which one?

THE COURT:  Long.

MR. HOCHMAN:  Long, it is only about the September 26 incident, Your Honor.  I have not had a chance to speak directly to her.  I've only spoken to her counsel.  So I don't know -- I mean, I'd say at most 15, 20 minutes. Depending on her answers to questions, it might be 10.  So let's say 10 to 20 minutes for that one, Your Honor.

THE COURT:  It's my understanding that her appeal --

MR. FOX:  It's been affirmed.

THE COURT:  Appeal was affirmed, but isn't she one of the people that are going on to --

UNITED STATES DISTRICT COURT

1681

MR. FOX:  Applying for cert, Your Honor, yes.

THE COURT:  So her appeal is not final.

MR. FOX:  Correct.

THE COURT:  If you know, what did Mr. Covitz witness in this case?

MR. HOCHMAN:  Mr. Covitz has a small piece of the puzzle, Your Honor.  If you recall, Sheriff Baca is out of the country between the 8th and 21st of September.  Mr. Covitz -- I mentioned in opening that he was the keynote speaker at a counterterrorism conference.  Mr. Covitz will fill in that small piece, Your Honor, because he was there with Sheriff Baca.  Like I said, it will be very quick testimony just to fill in a piece of the puzzle.

THE COURT:  So he's going to basically confirm that Mr. Baca was out of the country during that period of time.

MR. HOCHMAN:  Yes, Your Honor.  Right now we have -- the only evidence of it is the calendar that says "personal time."  So he will actually describe what Sheriff Baca was doing during that time.  It's a very small piece but --

THE COURT:  Yes.  I understand that.

MR. FOX:  It's not in dispute that he was out of the country, and this is obviously being introduced to show a good act by Mr. Baca in order to bolster him as a person.  We

UNITED STATES DISTRICT COURT

are not disputing he was out of the country.  We don't think that his testimony is something that is necessary in this trial.

MR. HOCHMAN:  I mean, he's -- part of the evidence, Your Honor, is whether or not he's doing something other than sitting on a beach.

THE COURT:  What does it matter whether he's sitting on a beach or doing whatever he's doing?

MR. HOCHMAN:  Because, Your Honor --

THE COURT:  He wasn't in the country, and nobody is going to say he was.

MR. HOCHMAN:  Right.  But it's a lot different because the Government has cell phone records during that time period, and the Government may make the argument that says that Mr. Baca somehow was --

THE COURT:  And Mr. Covitz is going to say he was with him every second that he was out of the country?

MR. HOCHMAN:  Not every second.

THE COURT:  And knew about all of his phone calls, if any?

MR. HOCHMAN:  No.  He won't say that he knows about all the phone calls.  He will say generally what he was doing which I think --

THE COURT:  What does it matter?  I don't care what he was doing.  I don't think the jury cares what he was

UNITED STATES DISTRICT COURT

doing.  The only real issue, which is uncontested, is that he wasn't in the country.  Nobody is going to say he was.  Nobody is going to argue that he was.

MR. HOCHMAN:  As long as the Government also is not arguing that at any point during that two-week period he was informed of anything going on with the cell phone incident.

THE COURT:  I don't see how Mr. Covitz helps you with that.  We know what he was doing.  He was at some antiterrorism conference.  So what.  Why is that relevant?

MR. HOCHMAN:  Because, again, Your Honor, I think it shows that he's busy during the days.  He's --

THE COURT:  Doesn't matter.  I don't think that's going to come in.  So you can -- if you want to put him up there, but when he starts getting into what they were doing over there, that's probably not going to come in unless you can make a further showing other than the fact that he was busy.

MR. HOCHMAN:  Okay, Your Honor.  I'll think about it in how to address the Court's statements today.

THE COURT:  Okay.

MR. HOCHMAN:  Your Honor, I need to make a motion.  The Government has closed its case.

As the Government closed its case, Your Honor, I stood up and said I wanted to make a motion.  You then had me proceed to my case, but I want to make sure this motion is considered as of the close of the Government's case.

UNITED STATES DISTRICT COURT

1684

THE COURT:  It will be.

MR. HOCHMAN:  So I don't waive anything.

THE COURT:  It certainly will be.

MR. HOCHMAN:  Thank you, Your Honor.

It is a motion under Rule 29 of the Federal Rules of Criminal Procedure, Your Honor.  It argues that -- the motion argues that the Government has failed to meet its burden of proof in establishing all the elements of the two crimes of conspiracy, Count 1 and Count 2, obstruction of justice.

In particular, with respect to the elements of obstruction of justice, Your Honor, we would contend that the word "corruptly" in the obstruction statute does not refer to a state of mind but a forbidden means of influencing, obstructing, or impeding.  We rely on Judge Fletcher's concurrence opinion in *U.S. versus Bonds*, Your Honor, where corruptly means by bribery.

Judge Fletcher goes into a detailed analysis on how Judge Fletcher analyzes the word corruptly.  Judge Fletcher goes back into the original statute in 1831, Your Honor, that had -- that made it illegal for any person, corruptly or by threats or force, to obstruct or impede or endeavor to obstruct or impede the due administration of justice.

Judge Fletcher then outlines that there are three different means of violating the statute, and the notion that corruptly became an intent element actually is against the

UNITED STATES DISTRICT COURT

legislative history, against interpretive principles on how one looks at the legislative history seeking the narrowist definition of corruptly in connection with analyzing whether or not corruptly is a means or an intent element.

Judge Fletcher sees that the three different corrupt means were threats or force, which this case does not involve, threatening letters or communications, which this case does not involve, or bribery which is how Judge Fletcher outlines the corrupt element. And there's no evidence in this case -- and I think the Government would concur -- that shows that Sheriff Baca bribed anyone in connection with this case.

As a result, Your Honor, the first-level argument would be that this -- this is the correct definition of corruptly as a means rather than intent, and if the Court were to accept that, we also propose it in a jury instruction. Then the evidence is -- it's nonexistent that Sheriff Baca bribed anyone in connection with this case. And we'd ask for a judgment of acquittal on that basis.

Alternatively, Your Honor, if the Court does not accept that corruptly is a means rather than an intent, we believe that the Government still has not satisfied its burden of proof to show sufficient evidence beyond a reasonable doubt that Sheriff Baca is guilty of every element of obstruction of justice and every element of conspiracy.

Submit.

MR. JAUREGUI:  Briefly, Your Honor, on the issue of the definition of corruptly, the Government's position is that that issue has been settled.  It's settled by the *Rasheed* case, also by *United States versus Gerard Smith*.

As to the second-level argument, the standard is, as very well-known to this Court, viewing all the evidence in light most favorable to the Government any rational jury could find the defendant guilty beyond a reasonable doubt.

Obviously we submit the evidence in its totality, but I would point to the testimony of Special Agent Tanner, Mr. Hannemann, Mr. Sexton, Manzo, Rhambo, Judge Birotte, the phone logs, the e-mails, the Narro Long phone call, the defendant's *Good Day L.A.* appearance, and his calendar.

MR. FOX:  Your Honor, just to the extent we need to preserve this bribery record and the threaten communication, I don't think it's ever going to be changed, but we don't want to lose out on the possibility that a judge might find that the threats to Special Agent Marx and the threats to the deputies, do not talk to the FBI and comply with grand jury subpoenas, would not be included in that definition.  So that's just to preserve the record should the 9th Circuit change its mind.

THE COURT:  All right.  Well, I'm going to take another look at Judge Fletcher's opinion, and I'll rule on the motion in the morning.

MR. HOCHMAN:  Thank you very much, Your Honor.

**UNITED STATES DISTRICT COURT**

THE COURT:  Anything else?

MR. FOX:  No, Your Honor.  Thank you.

MR. HOCHMAN:  No, Your Honor.

THE COURT:  All right.  Thanks very much.  See you tomorrow morning.

(Proceedings concluded at 2:07 p.m.)

**UNITED STATES DISTRICT COURT**

CERTIFICATE OF OFFICIAL REPORTER

I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

DATED THIS  14TH  DAY OF AUGUST, 2017.


/S/ MIRANDA ALGORRI

MIRANDA ALGORRI, CSR NO. 12743, CRR
FEDERAL OFFICIAL COURT REPORTER

**UNITED STATES DISTRICT COURT**