**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA — WESTERN DIVISION**

**HONORABLE PERCY ANDERSON, U.S. DISTRICT JUDGE**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. |
| | ) | |
| vs. | ) | CR 16-00066(A)-PA |
| | ) | |
| **LEROY D. BACA,** | ) | PAGES 1689 to 1900 |
| | ) | VOLUME 11 |
| Defendant. | ) | |
| | ) | |

**REPORTER'S TRANSCRIPT OF**
**TRIAL DAY 8**
**FRIDAY, DECEMBER 16, 2016**
**8:11 A.M.**
**LOS ANGELES, CALIFORNIA**

**MIRANDA ALGORRI, CSR 12743, CRR**
FEDERAL OFFICIAL COURT REPORTER
312 NORTH SPRING STREET, ROOM 435
LOS ANGELES, CALIFORNIA 90012
MIRANDAALGORRI@GMAIL.COM

**UNITED STATES DISTRICT COURT**

1690

**APPEARANCES OF COUNSEL:**

**FOR THE PLAINTIFF:**

SANDRA R. BROWN
Acting United States Attorney
BY:  BRANDON FOX
BY:  EDDIE A. JAUREGUI
Assistant United States Attorneys
United States Courthouse
312 North Spring Street
Los Angeles, California 90012

**FOR THE DEFENDANT:**

MORGAN LEWIS AND BOCKIUS LLP
BY:  NATHAN J. HOCHMAN
BY:  BRIANNA ABRAMS
The Water Garden
1601 Cloverfield Boulevard
Suite 2050 North
Santa Monica, California 90404

MORGAN LEWIS AND BOCKIUS LLP
BY:  TINOS DIAMANTATOS
77 West Wacker Drive
Chicago, Illinois 60601

**UNITED STATES DISTRICT COURT**

1691

**I N D E X**

**FRIDAY, DECEMBER 16, 2016**

**Chronological Index of Witnesses**

Witnesses:                                                    Page


RHAMBO, Cecil

     Direct examination resumed by Mr. Hochman      1699
     Cross-examination by Mr. Fox                   1709
     Redirect examination by Mr. Hochman            1717
     Recross-examination by Mr. Fox                 1718


GENNACO, Michael

     Direct examination by Mr. Hochman              1719
     Cross-examination by Mr. Jauregui              1777
     Redirect examination by Mr. Hochman            1793
     Recross-examination by Mr. Jauregui            1797


COVITZ, Carl Lee

     Direct examination by Mr. Hochman              1798
     Cross-examination by Mr. Jauregui              1806
     Redirect examination by Mr. Hochman            1808


MARCH, John

     Direct examination by Mr. Hochman              1811


REINER, Ira

     Direct examination by Mr. Hochman              1815
     Cross-examination by Mr. Jauregui              1819

**UNITED STATES DISTRICT COURT**

## **Chronological Index of Witnesses Con't**

Witnesses:                                                        Page

COOLEY, STEPHEN L.

    Direct examination by Mr. Hochman             1822
    Cross-examination by Mr. Fox                  1826
    Redirect examination by Mr. Hochman           1830


OCHI, Rose

    Direct examination by Mr. Hochman             1831
    Cross-examination by Mr. Jauregui             1839


PIETRANTONI, Paul

    Direct examination by Mr. Hochman             1861
    Cross-examination by Mr. Fox                  1872

**UNITED STATES DISTRICT COURT**

1693

**EXHIBITS**


**FRIDAY, DECEMBER 16, 2016**


| Exhibit | For ID | In EVD |
|---|---|---|
| 600   Letter dated 07/19/2011 | 1741 | 1742 |
| 637A Revised summary chart of Baca/Tanaka phone calls | 1895 | 1895 |
| 639   Document | 1895 | 1895 |

**UNITED STATES DISTRICT COURT**

1694

**LOS ANGELES, CALIFORNIA; FRIDAY, DECEMBER 16, 2016**

**8:11 A.M.**

**---**

(The following proceedings were held in open court out of the presence of the jury:)

THE CLERK:  Calling item No. 1, CR 16-66(A), USA versus Leroy D. Baca.

Counsel, state your appearances, please.

MR. FOX:  Good morning, Your Honor.

Brandon Fox and Eddie Jauregui on behalf of the United States.  Also with us at counsel table is Special Agent Dahle of the FBI.

THE COURT:  Good morning.

MR. HOCHMAN:  Good morning, Your Honor.

Nathan Hochman joined with Tinos Diamantatos and will be joined with Brianna Abrams as well, and we represent Leroy Baca who is present before the Court.

MR. DIAMANTATOS:  Good morning, Your Honor.

THE COURT:  Good morning.

All right.  I believe all the jurors are here.

As to the Rule 29 Motion, viewing the evidence in the light most favorable to the Government, the Court finds that a -- any rational jury could find the defendant guilty of both counts beyond a reasonable doubt.  So the motion for

**UNITED STATES DISTRICT COURT**

Rule 29 is denied.

So I believe Mr. Rhambo is still on the stand.

MR. HOCHMAN:  Yes, he is, Your Honor.

I have one more issue to take up with the Court because it will affect some of the witnesses today.  If Your Honor recalls, the Government and I both filed the additional response on the motion in limine that the Court had deferred, in part, ruling on and made a tentative ruling on part of it.

The sequence, Your Honor, is, as we discussed for the witnesses -- the witnesses have all been prepped to not speak about anything that's gone beyond September 26, 2011, Your Honor, because that is obviously the subject of a motion in limine.  What I'd ask obviously is, with respect to the motion in limine, on two different types of issues -- on two different types of issues, we'd ask to permit additional testimony beyond what I've proffered yesterday in this respect.

Starting with the Commanders Management Task Force, Your Honor, the Commanders Management Task Force, it would be spoken about by probably one additional witness.  It would occupy maybe five minutes of testimony, Your Honor, maybe six.  What it would involve is that, in a continuation of efforts that Sheriff Baca had begun before and during the conspiracy to address the ACLU's concerns dealing with deputy abuse, excessive force, retaliation, et cetera, on or about

**UNITED STATES DISTRICT COURT**

October 1st, the sheriff had this Commanders Management Task Force created.

It was people that were put at the commander level. They got together, and amongst the things they did within the months following is they revised the use-of-force policy, Your Honor. They addressed the issues or continued to address the issues of how to bring less violence and less inmate abuse into the jails. It was a fairly significant effort praised actually by ultimately, although we wouldn't bring this out, by the CCJV who considered it.

So we would estimate that it would probably be, let's call it, five to ten minutes of additional testimony if you probably add in the cross-examination, Your Honor. And so that's one issue.

The Government has brought up a response that says that it was in large part set up as a response to an ACLU complaint that came in at the end of September. I believe September 28th, Your Honor, is when they filed these additional declarations. I think Mr. Eliasberg talked about those declarations as additional declarations because he had testified that they --

THE COURT: I have a jury waiting.

MR. HOCHMAN: I'm sorry.

THE COURT: I want to try to get this case done before Christmas. I told people yesterday I really didn't want

**UNITED STATES DISTRICT COURT**

any more argument.  This motion has been briefed.  I'm ready to rule.

MR. HOCHMAN:  Unless the Court has any questions, Your Honor, we'd ask the Court to rule.

THE COURT:  Okay.  I do have one question.

Did the Government make a request under Rule 16?

MR. HOCHMAN:  Under Rule 16, Your Honor, we provided the Government with reciprocal discovery under Commanders Management Task Force and EBI, Your Honor.  We're not introducing any expert testimony on the issues, Your Honor.

THE COURT:  This guy is going to -- isn't there going to be some testimony about how he believes that, as a result of these programs, that violence is decreased?

MR. HOCHMAN:  Your Honor, there's two -- that's why we broke it into two.  One is a period before -- up to the conspiracy and we --

THE COURT:  My question was is there going to be any testimony, some sort of statistical or some analysis that jail violence went down as a result -- dramatically decreased as a result of these programs?

MR. HOCHMAN:  There will be no statistical analysis or expert level analysis or report.

THE COURT:  Let's stop playing around.  Is he going to say -- is he going to testify that, in his view, that, as a result of this program, there's been a reduction in jail

violence?

MR. HOCHMAN:  Your Honor, again, let me break it down.  In the post --

THE COURT:  Let's bring the jury.

MR. HOCHMAN:  The answer is yes, Your Honor, with respect to the post --

THE COURT:  That's real simple.

MR. HOCHMAN:  But there's two different parts to it.  That's why I was trying to break it down, Your Honor.

THE COURT:  Yeah.  Okay.  Bring the jury in.

MR. HOCHMAN:  One is a --

THE COURT:  I'm not going to play these games with you.

MR. HOCHMAN:  I'm sorry, Your Honor, if I wasn't responsive.

THE COURT:  Who's the first witness that's going to touch on this issue?

MR. HOCHMAN:  Mr. Weintraub, Your Honor.

THE COURT:  Where is that witness going to fall --

MR. HOCHMAN:  He would be probably the fifth witness, Your Honor.

THE COURT:  Okay.  So before we get there, nobody else will be raising this issue?

MR. HOCHMAN:  That's correct, Your Honor.

**UNITED STATES DISTRICT COURT**

1699

THE COURT: Okay. So I'll rule before we get there.

MR. HOCHMAN: Thank you very much, Your Honor.

May I go get the witness, Your Honor?

THE COURT: Yes, please.

(The following proceedings were held in open court in the presence of the jury:)

THE CLERK: Please be seated. You are reminded you're still under oath.

THE COURT: Good morning, ladies and gentlemen. All right. Let's proceed.

**CECIL RHAMBO,**

**DEFENDANT'S WITNESS, PREVIOUSLY SWORN:**

**DIRECT EXAMINATION (RESUMED)**

BY MR. HOCHMAN:

Q    Mr. Rhambo, yesterday we discussed about your hearing about the ACLU complaints of deputy misconduct when you became the assistant sheriff in May, 2001. Do you have those in mind?

A    Yes.

Q    Did you have any discussions in approximately that time period with Sheriff Baca concerning a response to those complaints?

A    I'm sorry. Can you repeat that? I don't know if -- is the mic working?

**UNITED STATES DISTRICT COURT**

Q        Is your microphone working?

I don't think it is, Your Honor.

THE COURT:  Why don't you keep your voice up, and we'll see if we can get it fixed in the interim.

Q        BY MR. HOCHMAN:  All right.  I'm directing your attention to the time period of approximately, we'll call it, May, June, July of 2011.  Okay?

A        Yes.

Q        Okay.  Did you have discussions with Sheriff Baca at that point concerning a response to the ACLU complaints?

A        Yes.

Q        And what, generally, was the discussion -- the response that you received from Sheriff Baca?

MR. FOX:  Objection, Your Honor.  Foundation.

THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  Did you have conversations with Sheriff Baca during that time frame of May, June, July of 2011 when you were assistant sheriff?

A        Yes.

Q        And those conversations were about these ACLU complaints, in part?  I mean, you obviously had more conversations, but one of the topics was the ACLU complaints?

A        Yes.

Q        Did you and Sheriff Baca discuss a response to the complaints during that time period -- May, June, July and

**UNITED STATES DISTRICT COURT**

1701

I'll even add August of 2011?

MR. FOX:  If this is a yes or no, Your Honor, I have no objection.  The substance I have an objection to foundation.

THE COURT:  Why don't we start out and if you can answer the question yes or no.

THE WITNESS:  Repeat it again real quick.  I'm sorry.

Q     BY MR. HOCHMAN:  Did you and Sheriff Baca have discussions about a response to the ACLU's complaints during the time period of May, June, July, and August of 2011?

A     Yes.

Q     Where would you have those discussions?

A     Sometimes they were at EPC or Executive Planning Council meetings.  Sometimes it was in his office.

Q     And generally, what was discussed between the two of you with respect to a sheriff's department response to the ACLU complaints at that time period?

A     Generally we talked about -- I mean, it wasn't uncommon for him to say we have to help ACLU, the ACLU meaning we had to be ahead of the curve on inmate complaints, conditions in custody, overall supervision, and inmate treatment.

Q     Now I'll direct your attention to Mr. Tanaka, the undersheriff, during that time period.  Actually, I'd like to

**UNITED STATES DISTRICT COURT**

1702

back it up a bit.  Did you, starting in the late 2000s, engage in any athletic activity with Mr. Tanaka outside of work?

A     Occasionally.

Q     And what was that?

A     We were runners.

Q     And you would occasionally -- about how often would you run starting in about 2008?

A     We ran almost every day.

Q     And in the -- in that time period up through September of 2011, did you smoke cigars with Mr. Tanaka on the Sheriff's Headquarters patio during this time period?

A     Yes.

Q     Now, did you even attend Mr. Tanaka's bachelor party during this time period?

A     Yes.

Q     Do you know of a Lieutenant Greg Thompson who was the head of Operation Safe Jails during the August, September, 2011, time period?

A     Yes.

Q     At some point did you, Lieutenant Thompson, and Mr. Tanaka all work together?

A     Technically in the same facility at the same unit of assignment, but I was actually assigned to a different bureau.

Q     When was that, approximately?

**UNITED STATES DISTRICT COURT**

1703

A        In the late 1980s.

Q        What was the station that you were assigned to?

A        Lynwood.

Q        And at that time, what -- actually, what position was -- were you, Lieutenant Thompson, and Mr. Tanaka at that time?

A        Mr. Tanaka was a young sergeant at that time. Deputy Thompson, he was a deputy -- Lieutenant Thompson was a deputy.  I believe he was a training officer, but I'm not exactly sure.  And I was a narcotics officer.

Q        At some time in the late 1990s, early 2000s did the three of you have occasion to work together again?

A        Yes.

Q        And what was that?  What was the task force, the bureau that you ended up working on at that point?

A        I was in charge of Asian organized crime and Asian gang team.  Greg Thompson was a -- Lieutenant Thompson was a sergeant at that time.  I think he was a sergeant still. And Paul was our captain.

Q        And this was all -- all together on this Asian crimes gang team?

A        Asian crime task force.

Q        Task force.  Thank you.

And with respect to Sheriff Baca, I think you said before that you started a professional relationship in the

**UNITED STATES DISTRICT COURT**

mid 1990s; is that correct?

A       Well, I wouldn't say relationship.  I knew who he was.

Q       And did you have a close personal relationship with Sheriff Baca?

A       At some point we became -- I mean, he has always been my supervisor, my boss.

Q       Did you socialize outside of work with Sheriff Baca?

A       Rarely.  We've gone to events together or I've been at events where he has been.  I haven't been to his home if you ask that.

Q       Did you ever smoke cigars with Sheriff Baca on that Sheriff's Headquarters patio?

A       The sheriff doesn't smoke.

Q       I'd like to show you what's in evidence as Exhibit 19.  It's in a volume before you.

A       Which volume?

Q       Volume 1.  Do you have that in front of you?  Or maybe it's easier if you want to look on the monitor, either way.

A       I have it on both.

Q       Now, this is a -- an August 19, 2011, e-mail from -- I'll start on the bottom, from Greg Thompson to yourself and Mr. Burns; is that correct?

**UNITED STATES DISTRICT COURT**

A        Yes.

Q        And in this e-mail, it says, from Mr. Thompson to yourself and Mr. Burns.  "Sir, I met with the sheriff, Mr. Tanaka, Tom Carey, and IIB in regards to the cell phone. Too much to type.  I'm on the SHB patio waiting to brief you."

Do you see that?

A        Yes.

Q        Is the SHB patio -- SHB is the Sheriff's Headquarters Bureau?

A        Correct.

Q        Is that where you smoke cigars, on the Sheriff's Headquarters patio?

A        Yes.

Q        And then you respond to Mr. Thompson, the e-mail at the top of that page of Exhibit 19.

Do you see that?

A        Yes.

Q        I see below that Mr. Thompson referred to Mr. Tanaka -- when you referred to Paul, when it says "Paul briefed me," did you mean to mean Paul Tanaka?

A        Yes.

Q        Then you said, "We went to see the sheriff."  Was that the same sheriff that Mr. -- Lieutenant Thompson referenced which was Sheriff Baca?

A        Yes.

UNITED STATES DISTRICT COURT

1706

Q        Now I'll turn your attention to what's in evidence as Government's Exhibit 22.  I'll focus on the first page.  We'll start at the bottom of the e-mail.

Do you see -- do you have that in front of you on the screen?

A        Yes.

Q        So the bottom of the e-mail is Greg Thompson e-mailing on August 23rd, 2011.  "I'm good for the butt chewing."

Do you see that?

A        Yes.

Q        And that was the butt chewing that he received from Mr. Tanaka; is that correct?

A        I don't know for sure.  I would assume either that it was going to happen or that it did happen.

Q        Well, if you look at the next e-mail above it, you sent that e-mail to Mr. Thompson a little over half an hour later on the night of August 23rd, 2011; is that correct?

A        Yes.

Q        In that e-mail, you talk about "I think in this instance assumption, which is the mother of all screw-ups, occurred.  Combine that with the sensitive nature of the event, and it becomes a very complex issue to manage.  I hear you."

Do you see that part of the e-mail?

A        Yes.

**UNITED STATES DISTRICT COURT**

Q        Then it says, "I'm sensitive to letting him or the sheriff down too."  By "him," did you mean Mr. Tanaka?

A        Yes.

Q        Then he said, "He still loves you."  And the "he" is Mr. Tanaka?

A        Yes.

Q        "As do I.  Believe me, it hurt him."  That's Mr. Tanaka as well?

A        I would assume so.

Q        "To emote on you that way."

Then, if you look just above it, he then responds to you about -- within the next 20 minutes at 11:05 p.m., and I'll focus just on the last line of his response.  He says, "Do you want me to write the policy for your review?"

Do you see that?

A        Yes.

Q        And the policy was the policy dealing with -- what was the policy, generally, that you were going to review?

A        I hate to say I'm going to guess but --

THE COURT:  Don't guess.  If you don't know, then say you don't know.

THE WITNESS:  I actually don't remember.

Q        BY MR. HOCHMAN:  Do you know, did you at some point have to review a policy about the FBI being able to interview inmates at the Men's Central Jail?

A        Oh, yes.

Q        And does that -- the policy that you were reviewing as referenced in this e-mail between you and Greg Thompson?

A        I believe so, yes.

Q        And then at the top of the e-mail you write Greg Thompson the next morning.  Do you see that?  On August 24th, 2011.

A        Yes.

Q        And you say, "Okay.  No.  I'm reviewing current policy.  We can look at amending it," and then in parentheses you write the word "them first.  Thanks."

         Do you see that?

A        Yes.

Q        You sent that from your iPad?

A        I don't know.  Maybe.  I don't know.  I don't know if I had an iPad then.

Q        It says right below your e-mail "Sent from my iPad."

A        Okay.

Q        Does that refresh your memory that you sent it from your iPad?

A        Yes.

Q        And at some point, did you review the policy of permitting FBI agents to interview inmates at the Men's Central

Jail?

A       I have to say yes, but I don't vividly remember the policy.

Q       And at that point you were the assistant sheriff over custody; correct?

A       Yes.

Q       And the custody included Men's Central Jail?

A       Yes.

Q       Has the Government ever prosecuted you for obstruction of justice or civil rights violations?

A       No.

MR. HOCHMAN:  No further questions.

THE COURT:  All right.  Cross-examination.

**CROSS-EXAMINATION**

BY MR. FOX:

Q       Mr. Rhambo, I'm displaying the chart that Mr. Hochman showed you.  This is Exhibit 744.

Do you see this?

A       Yes.

Q       And Mr. Hochman asked you questions about the organizational structure and the reporting structure of the sheriff's department; is that right?

A       Yes.

Q       And on the right here, it shows your responsibilities in August and September of 2011.  This is you

listed here that I'm circling right now?

A        Yes.

Q        Underneath here it shows Men's Central Jail. Where is OSJ in this organizational structure?

A        OSJ is under custody investigative services at the bottom.

Q        I see.

So they're right here where I put an "X" in the bottom right-hand corner?

A        Yes.

Q        Okay.  And other than the two e-mails that Mr. Hochman showed you, was OSJ reporting to Dennis Burns during this time in August and September, 2011, with respect to the cell phone and Anthony Brown?

MR. HOCHMAN:  Objection.  Foundation.

THE COURT:  He can answer.

THE WITNESS:  Actually, then I think OSJ in connection with this particular case was probably reporting directly either to the sheriff and/or Mr. Tanaka.

Q        BY MR. FOX:  Other than the two e-mails we saw, was Greg Thompson reporting to you in the chain of command about the cell phone or Anthony Brown?

A        Other than those two e-mails, not a lot, no.

Q        And you said at this time that Mr. Thompson was a lieutenant?

1711

A        Yes.

Q        So he's jumping several ranks in order to get to the sheriff and the undersheriff; is that correct?

A        Yes.

Q        Let's talk about ICIB.

ICIB is located where I've put an "X" in the upper right-hand corner of the box; is that correct?

A        Yes.

Q        Do you know whether ICIB was reporting to Roberta Abner during the events in August and September of 2011 with respect to Anthony Brown, the cell phone, and the FBI?

A        I don't know if they were reporting directly to the chief at that time.

Q        Well, she would have been reporting to you, according to this chart; correct?

A        Technically, yes.

Q        Was Ms. Abner reporting anything to you about Anthony Brown, the cell phone, or the FBI investigation?

A        Not to me, no.

Q        And at that point in time, Mr. Carey was leading ICIB; is that correct?

A        He was the unit commander at the time.

Q        He was a captain.

A        Captain.

Q        And he was jumping rank in order to get to

**UNITED STATES DISTRICT COURT**

1712

Mr. Baca and Mr. Tanaka from your observations; is that correct?

A        Yes.

Q        Mr. Hochman asked you about Government Exhibit 19 which I'm going to show you again.  Is that still in front of you?

A        I can pull it up.

Q        I think this will be sufficient.

You state in this e-mail you didn't even want to know in reference to the cell phone and Anthony Brown; correct?

A        Correct.

Q        And you felt this way because of how strongly executive management reacted to the cell phone incident; correct?

A        Yes.

Q        You felt, in fact, shut out about what happened once the cell phone was linked to the FBI; correct?

A        Correct.

Q        And your observation was that Mr. Baca treated the incident as though it was on a need-to-know basis; correct?

A        That was what I was told directly.

Q        By who?

A        Mr. Tanaka.

Q        And there was a standing morning meeting with you, the undersheriff, and other assistant sheriffs and

**UNITED STATES DISTRICT COURT**

Mr. Baca; correct?

A       Yes.

Q       During this morning meeting on Mondays, they did not bring up the cell phone or Special Agent Marx; correct?

A       Not that I recall, no.

Q       And there was also an executive planning meeting on Wednesdays that you attended that the sheriff would attend; right?

A       Yes.

Q       And during these Wednesday Executive Planning Council meetings, there was a larger group that was there; correct?

MR. HOCHMAN:  Objection.  Foundation as to timing.

THE COURT:  Sustained.

Q       BY MR. FOX:  I'm focusing you now on August and September of 2011.

Do you understand that?

A       Yes.

Q       There were Executive Planning Council meetings in August and September of 2011 every Wednesday; right?

A       Yes.

Q       And this was a larger group that would attend; is that right?

A       Yes.

UNITED STATES DISTRICT COURT

Q        Approximately how many people would attend?

A        Upward to at least 12 to 15.

Q        These were -- the attendees were the sheriff; is that right?

A        Yes.

Q        The undersheriff, Mr. Tanaka?

A        Yes.

Q        You?

A        Yes.

Q        Mr. Cavanaugh, who was another assistant sheriff?

A        Yes.

Q        It would include the chiefs; isn't that right?

A        Yes.

Q        Would it go below that?

A        I think Mr. Gennaco was in the room.  Sometimes commanders were in there depending on if they had presentations.

Q        And Mr. Gennaco was the head of OIR at the time; right?

A        Correct.

Q        At these meetings where there were 10 to 15 people there including Mr. Gennaco, Mr. Baca never brought up the cell phone, Leah Marx, or the inmate; is that correct?

A        Not in that meeting that I can recall.

Q        Not in August or September of 2011.

1715

A       Not that I can recall, no.

Q       You believed that you were not in the loop because Mr. Baca took ownership of the issue; correct?

A       Yes.

Q       You were new to the role of assistant sheriff over custody in August and September of 2011; correct?

A       Yes.

Q       You had only been there for a couple months?

A       Yes.

Q       At the time you learned about the cell phone, you thought not a big deal because cell phones in custody are not that uncommon; correct?

A       Correct.

Q       And when you first learned of it, you learned that the big deal here was because the FBI was linked to the inmate and the cell phone; correct?

A       Yes.

Q       Mr. Baca expressed his frustration with the FBI conducting its investigation; correct?

           MR. HOCHMAN:  Objection.  Foundation.  Timing.

           THE COURT:  Sustained.

Q       BY MR. FOX:  In August and September of 2011, you observed Mr. Baca being frustrated with the FBI conducting its investigation; correct?

           MR. HOCHMAN:  Objection.  Foundation.  Location.

**UNITED STATES DISTRICT COURT**

THE COURT:  Overruled.

You can answer.

THE WITNESS:  Yes.

Q      BY MR. FOX:  These were based on your observations on the fourth floor in Monterey Park at Sheriff's Headquarters Bureau; correct?

A      Yes.

Q      And your observations were that Mr. Baca's frustration caused others in the department to react the same way; correct?

A      Yes.

Q      Based on your observations of how Mr. Baca and Mr. Tanaka acted together, it was your observations that Mr. Tanaka would commonly mirror Mr. Baca's feelings on issues that came up; correct?

MR. HOCHMAN:  Objection.  Foundation.  Relevancy.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  Yes.

Q      BY MR. FOX:  And Mr. Baca, based on your relationship with him, observations of him, you knew that, by August and September of 2011, it was Mr. Baca's philosophy that the sheriff's department should police itself; correct?

A      Yes.

MR. FOX:  One moment.  No further questions.

**REDIRECT EXAMINATION**

BY MR. HOCHMAN:

Q        Mr. Rhambo, focusing on the last answer, I believe you were talking about Mr. Baca's -- Sheriff Baca's philosophy of the sheriff's department policing itself; correct?

A        Yes.

Q        Did that include, as far as the sheriff's department policing itself, the role of the Office of Independent Review, OIR, as part of that mix of policing itself?

A        Yes.  Because the lines got blurred sometimes with OIR.

Q        And OIR, to your knowledge, at this time period was involved in doing reviews of use-of-force cases; correct?

A        Yes.

Q        And you said, with respect to Mr. Fox's questions dealing with cell phones, that cell phones were not uncommon in Men's Central Jail; is that correct?

A        Discovering cell phones inside Central Jail was not an unusual occurrence.  It did happen.

Q        How many FBI cell phones had, to your knowledge, been discovered in Men's Central Jail?

A        Just the one, to my knowledge.

Q        And that knowledge is based on your over 30 years

of experience in the sheriff's department?

A       Yes.

MR. HOCHMAN:  No further questions.

MR. FOX:  I believe I just have two.

**RECROSS-EXAMINATION**

BY MR. FOX:

Q       Mr. Rhambo, OIR cannot bring federal criminal charges; correct?

A       Correct.

MR. FOX:  No further questions.

MR. HOCHMAN:  No further questions.

THE COURT:  All right.  You may step down.

Call your next witness.

MR. DIAMANTATOS:  Your Honor, the defense calls Special Agent David Dahle.

MR. HOCHMAN:  Your Honor, may we just talk to counsel very quickly on this?

THE COURT:  Yes.

(Counsel confer.)

MR. HOCHMAN:  Your Honor, we'll change the witness, Your Honor.  We'll call Michael Gennaco at this point.

THE COURT:  All right.

MR. HOCHMAN:  Your Honor, may I have a moment?  I saw Mr. Gennaco earlier.  I just need to find out where he went.

**UNITED STATES DISTRICT COURT**

THE COURT:  That's fine.

MR. HOCHMAN:  Mr. Gennaco is on his way.

THE COURT:  All right.

THE CLERK:  Stand here for me, please.  Raise your right hand.

Do you solemnly state that the testimony you may give in the cause now pending before this court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

THE CLERK:  Please be seated.

Will you please state your full name and spell your last name for the record.

THE WITNESS:  My name is Michael Gennaco, and the last name is spelled G-e-n-n-a-c-o.

THE CLERK:  Thank you.

**MICHAEL GENNACO,**

**DEFENDANT'S WITNESS, SWORN:**

**DIRECT EXAMINATION**

BY MR. HOCHMAN:

Q     Mr. Gennaco, what is your current occupation?

A     I provide independent oversight to various law enforcement agencies throughout the country.

Q     What is "independent oversight"?

A     Independent oversight is intended to provide an

**UNITED STATES DISTRICT COURT**

independent review of Internal Affairs investigations, uses of force both in the patrol and in the jail settings depending on the jurisdiction.

Q     And as part of doing that independent review, do you normally issue reports as well?

A     I do.

Q     Let me touch a bit on your background.

Are you an attorney?

A     I am.

Q     How long have you been an attorney for?

A     I joined the California State Bar in 1984.

Q     1984.  Did you graduate law school right before that?

A     I graduated from law school in 1983.

Q     Which law school?

A     I graduated from Stanford Law School.

Q     Where did you go after law school?

A     I worked as a law clerk -- judicial law clerk for a judge on the United States Court of Appeal.  I did that for a year.

Q     And the United States Court of Appeal is the Court directly above this Court as far as review goes?

MR. FOX:  Objection.  Relevance, Your Honor.

THE COURT:  Sustained.

Q     BY MR. HOCHMAN:  After you worked as a law clerk

**UNITED STATES DISTRICT COURT**

for the United States Court of Appeal, where did you go next?

A    I was hired by the United States Department of Justice through their Honors Program, and I worked for the civil rights division.

Q    In the civil rights division, did you work on certain kinds of cases?

A    Yes.

Q    Which kinds of cases?

A    The first two -- excuse me.

The first two years I was there, I was in the voting section.  So I was involved in voting discrimination cases throughout the country.

Q    Where was your office based?

A    Washington, D.C.

Q    After you worked on the voting cases for about two years, did you work on any other civil rights types of cases?

A    After two years I transferred into the criminal section of the civil rights division; so I became a federal prosecutor.

Q    And what types of cases did you federally prosecute?

A    I prosecuted criminal civil rights violations.

Q    Do those criminal civil rights violations on occasion involve law enforcement?

1722

A        They do.

Q        What other types of civil rights cases did you prosecute?

A        Hate crimes and human trafficking.

Q        Were those cases all based in Washington, D.C.?

A        No.  None of them were based in Washington, D.C.

Q        Where were they based?

A        The cases occurred throughout the country, and I ended up having over 20 investigations throughout the country.

Q        Was one of the areas that you investigated cases Los Angeles?

A        Yes.

Q        Did you actually prosecute any civil rights cases here in Los Angeles?

A        I did.

Q        Against what organization -- what law enforcement organization?

A        I prosecuted a case in which the defendant was an officer of the Los Angeles Police Department.

Q        Did this case go to trial?

A        It did.

Q        Who did you prosecute the case with?

A        Second chair on the case which is the junior attorney on the case was an individual by the name of Tom Perez.

**UNITED STATES DISTRICT COURT**

Q        Did Tom Perez later head up the civil rights --

MR. JAUREGUI:  Relevance, Your Honor.

THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  After working for the DOJ civil rights section -- what years would that have been again?

A        I was in the civil rights division from 1984 to 1994.

Q        What did you do after 1994?

A        In 1994 I transferred -- still worked for the U.S. Department of Justice but transferred to the U.S. Attorney's Office here in Los Angeles.

THE COURT:  Excuse me, counsel.

Could you back just slightly from that microphone?

THE WITNESS:  Yes, Your Honor.  I will do my best on that.

THE COURT:  Thank you.

Q        BY MR. HOCHMAN:  What did you do at the United States Attorney's Office here in Los Angeles?

A        I did the same kinds of cases, but my work was limited to the Central District of Los Angeles.  So it was a geographical switch more than anything.

Q        When you say the same kinds of cases, what kinds of cases are you referring to?

A        Civil rights -- criminal civil rights offenses is

what I investigated and prosecuted.

Q        And what exactly is a civil rights case as it applies to a law enforcement officer?

A        It usually involves allegations involving use of excessive force or filing a false police report or other 4th Amendment violations of law.

Q        Now, when you came to the U.S. Attorney's Office in 1994, did they have a dedicated civil rights section at that point?

A        No.

Q        What did you do?

A        I started one.  I was hired for that very purpose.

Q        As part of that civil rights section, who was the head of it?

A        I was.

MR. JAUREGUI:  Relevance, Your Honor.  Actually, I withdraw that objection.

Q        BY MR. HOCHMAN:  Did you work with any law enforcement organizations while you were the head of the civil rights section?

A        Yes.

Q        Which ones?

A        The FBI --

MR. JAUREGUI:  Your Honor, I would object on

UNITED STATES DISTRICT COURT

relevance grounds again.

THE COURT:  Sustained.

Q    BY MR. HOCHMAN:  Did you work, generally, with federal, state, and local law enforcement organizations?

A    Yes.

Q    Did you have a chance to meet the heads of these organizations while you were the head of the civil rights section?

MR. JAUREGUI:  Relevance, Your Honor.

THE COURT:  Sustained.

Q    BY MR. HOCHMAN:  Did you ever work with the FBI directly in connection with investigating civil rights violations?

A    Yes.

Q    And besides you in the civil rights section, how many other lawyers did you work with?

MR. JAUREGUI:  Relevance, Your Honor.

THE COURT:  Sustained.

Q    BY MR. HOCHMAN:  How many investigations did you conduct against police officers while you were in the United States Attorney's Office?

MR. JAUREGUI:  Objection, Your Honor.

THE COURT:  Sustained.

Q    BY MR. HOCHMAN:  Did you prosecute any cases against the Los Angeles Sheriff's Department?

**UNITED STATES DISTRICT COURT**

MR. JAUREGUI:  Objection, Your Honor.  Relevance.

THE COURT:  Sustained.

Q     BY MR. HOCHMAN:  How long did you work at the United States Attorney's Office doing civil rights cases?

A     About six-and-a-half years.

Q     What was the year time periods we are talking about now?

A     Toward the end of 1994 to 2001.

Q     In 2001 what did you do next?

A     I began a new oversight group called the Office of Independent Review.

Q     And approximately when was that set up?

A     2001.

Q     Who was the sheriff of the Los Angeles Sheriff's Department at that time?

A     Sheriff Leroy Baca.

Q     Do you see him here in court?

A     I do.

Q     Can you identify where he's sitting?

A     He's seated to your right.  He's seated wearing a gray suit and yellow tie.

MR. HOCHMAN:  Your Honor, may the record reflect the witness has identified Sheriff Baca?

THE COURT:  The record will reflect that the witness has identified the defendant.

**UNITED STATES DISTRICT COURT**

Q    BY MR. HOCHMAN:  What role, if any, did Sheriff Baca help in setting up the Office of Independent Review?

A    It was his idea.

Q    And what exactly is the Office of Independent Review?

A    The Office of Independent Review is created to provide oversight over the L.A. County Sheriff's Department.

Q    Was it independent of the Los Angeles County Sheriff's Department?

A    Yes.

Q    In what way?

A    We were not employees of the sheriff's department, nor the county.  We had a contract with the County Board of Supervisors.

Q    And did Sheriff Baca have, to your knowledge, any power over your contract or over OIR's functions or independence?

MR. JAUREGUI:  Objection, Your Honor.  Compound. Vague.

THE COURT:  Sustained.

Q    BY MR. HOCHMAN:  Did Sheriff Baca have any power over your contract?

MR. JAUREGUI:  Objection, Your Honor.  Vague and relevance.

**UNITED STATES DISTRICT COURT**

THE COURT: Sustained.

Q BY MR. HOCHMAN: You just testified a moment ago you had a contract. Who was the contract with?

MR. JAUREGUI: Your Honor, objection. Asked and answered.

THE COURT: I think we already had that answer.

Q BY MR. HOCHMAN: I just want to be specific as to whether or not Sheriff Baca had any particular power over a contract that you had with the L.A. County Board of Supervisors?

MR. JAUREGUI: Same objection, Your Honor.

THE COURT: Same ruling.

Q BY MR. HOCHMAN: Now, when the Office of Independent Review is set up in 2001, were there other programs in the country that you modeled it after?

A No.

Q Why not?

A There were no other programs that I was aware of that ended up looking like the Office of Independent Review.

Q And what made the Office of Independent Review unique?

MR. JAUREGUI: Objection, Your Honor. Vague and relevance.

THE COURT: You can answer. Go ahead.

THE WITNESS: There were a couple features. One

**UNITED STATES DISTRICT COURT**

1729

is that there was realtime review of individual cases.

Secondly, that, unlike most other agencies, we had an

opportunity to weigh in on accountability such as discipline.

Q       BY MR. HOCHMAN:  Let me start with the first

part, the realtime review.  What does that mean, "realtime

review"?

A       It means that it -- as an allegation of

misconduct is being investigated by the sheriff's department,

that we had an opportunity to shape those investigations.

Q       Shape in what way?

A       We reviewed them, and as they were developed we

had access to the investigators to ensure at the end of the

day, when the investigation was completed, there would be a

thorough and objective investigation.

Q       And you said you also -- what was unique was that

you had input on the disciplinary process; is that correct?

A       Yes, sir.

Q       What does that mean?

A       Most oversight agencies do not get involved in

making recommendations on outcomes of those investigations, and

we had that opportunity to do so.

Q       In what way did you have that opportunity?

A       As the case was completed, we would then dialogue

with the decisionmaker and give that decisionmaker our view

about whether or not the case should be sustained and, if so,

what the discipline should be.

Q      What, if any, support did Sheriff Baca provide in connection with OIR once it was set up?

A      He was supportive of the program.

Q      Did Sheriff Baca play any role, if any, in making sure that the Office of Independent Review received enough resources to do its job?

A      He provided us -- his department provided us some resources in order to complete our responsibilities.

Q      Did you work with the Internal Affairs Bureau of the sheriff's department?

A      I did.

Q      Did you work with the Internal Criminal Investigations Bureau of the sheriff's department as well?

A      Yes.

Q      Were there deputies assigned to those bureaus, or was it a higher rank?

A      Almost exclusively the units were staffed by sergeants.

Q      And were those sergeants -- was this sort of part-time duty for those sergeants or something else?

A      They were full-time assignments.

Q      How did your dealings with Internal Affairs and the Internal Investigations Bureau different, if any?

A      We were much more engaged and involved with the

UNITED STATES DISTRICT COURT

Internal Affairs investigators.

Q        And what types of violations did the Internal Affairs investigators investigate?

A        Any potential violation of policy, any potential misconduct involving a deputy sheriff.

Q        And do you know the difference between administrative investigations and criminal investigations?

A        Yes.

Q        What is the difference of those two types of investigations?

A        A criminal investigation is intended to examine whether or not an act was in violation of California law or federal law.  An administrative violation is conducted to determine whether or not there was a violation of sheriff's department policy or county policy.

Q        And if there was a violation on the administrative -- we'll start with that first, the sheriff's department policy -- what could happen?

A        If, in fact, the violation is established, it can result in accountability all the way from being reprimanded to termination.

Q        And that's the administrative side; correct?

A        Yes, sir.

Q        And which part was it?  Internal Affairs or Internal Criminal Investigations Bureau that investigated the

1732

administrative side of the violations?

A       The Internal Affairs Bureau.

Q       Then you said there were criminal violations, and that was the Internal Criminal Investigations Bureau; is that correct?

A       Yes.

Q       Were these two bureaus -- Internal Affairs on the administrative side and Internal Criminal Investigations Bureau on the criminal side -- would they work together on the same investigation?

A       No.

Q       How would they -- how would the process be between the two?  When would Internal Affairs go first?  When would ICIB go first?  And when would they, if any, come together?

MR. JAUREGUI:  Your Honor, objection.  Relevance. Foundation.  Vague.

THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  When would the Internal Affairs Bureau be sort of the first investigator versus ICIB?

MR. JAUREGUI:  Objection.  Leading and relevance, Your Honor.

THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  Could you explain how Internal Affairs and ICIB operated in connection with a

**UNITED STATES DISTRICT COURT**

particular investigation?

A        If the allegation indicated that there might be a potential violation of California law or federal law, ICIB would be the initiating bureau to investigate that case.

Q        When would the Internal Affairs be the initial bureau?

A        If the allegation was a potential violation of policy that did not implicate any criminal laws, it would start with the Internal Affairs Bureau.

Q        And after ICIB was done with its criminal investigation, would the investigation ever be turned over to the Internal Affairs Bureau?

MR. JAUREGUI:  Objection, Your Honor.  Relevance.

THE COURT:  You can answer.

THE WITNESS:  I would say almost always.

Q        BY MR. HOCHMAN:  And why was that?

A        Because any potential violation of criminal law would also implicate policy -- potential policy violations.

Q        Now, by the way, were you the head of the Office of Independent Review since 2001?

A        Yes.

Q        Did you have any other lawyers that worked in the Office of Independent Review?

A        Yes.

Q        How many?

**UNITED STATES DISTRICT COURT**

1734

A       There were six of us all together.

Q       Were they all former federal prosecutors like yourself?

A       No.

Q       What other types of background did these folks -- did these lawyers have?

MR. JAUREGUI:  Objection, Your Honor.  Relevance.

THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  They were all lawyers; is that correct?

MR. JAUREGUI:  Objection, Your Honor.  Asked and answered.

THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  As the head of the Office of Independent Review since 2001, did you work with the ACLU in connection with the Men's Central Jail?

A       Yes.

Q       What was the ACLU's role with respect to that jail?

A       They had been designated as jail monitors from even before the time we got there.

Q       And what does it mean to be a jail monitor?

A       Jail monitor is entitled to have special access to the jails and to ensure that the remedial plan that had been agreed to was being complied with.

UNITED STATES DISTRICT COURT

1735

Q        How did the -- you at the Office of Independent Review worked with the ACLU in connection with the Men's Central Jail?

A        In many ways the ACLU are our eyes and ears with regard to what was going on in the jail.  They were one of the ways in which we were able to learn about concerns coming out of the jails.

Q        What kind of concerns?

A        Everything from, you know, concerns about conditions to systemic issues, but primarily any concern about mistreatment of inmates.

Q        And generally, what are types of mistreatments -- mistreatment of inmates that the ACLU is bringing to your attention?

A        Withholding of services, excessive force, and potential concerns about retaliation.

Q        What do you mean "retaliation"?

A        If, in fact, an inmate had complained to the ACLU about conditions in the jail and said something happened to that inmate in a negative way, that could be a potential retaliation.

Q        When the ACLU would bring these issues to your attention, what would you do?

A        We would insert ourselves into the review of that incident, make sure that it had been investigated.  If it

UNITED STATES DISTRICT COURT

hadn't, ensure that there was an investigation. And look at any investigation that had already been done to ensure that it was complete and thorough.

Q      Would you communicate what you found back to the ACLU in some form?

A      To the degree allowed by state law, yes.

Q      What does that mean?

A      State law prohibits disclosure of some information back to the complainant.

Q      What type of information?

A      The identity of the deputy, for example, is prohibited by state law.

Q      And at some point, does the Office of Independent Review issue quarterly reports to the public?

A      Yes.

Q      And by "quarterly," you mean, what? Once every three months or so?

A      Yes.

Q      And what is contained in those quarterly reports that you issued to the public?

A      It's a chart of every case that we reviewed, and it contains synopsis of the allegations, the outcome of the investigation, and whether we agreed with the department's decisions with regard to outcome, and if a case was founded, the level of accountability or discipline.

**UNITED STATES DISTRICT COURT**

Q       Do you always agree with the department's decisions in connection with these investigations?

A       No.

Q       Did you also issue an annual report from the Office of Independent Review to the public?

A       Yes.

Q       And in these annual reports, what would you communicate to the public?

A       Trends, statistics, concerns that we had as a result of looking at the 200 plus cases that we reviewed every year.

Q       Would you hold press conferences in connection with the issuance of these annual reports?

                MR. JAUREGUI:  Objection, Your Honor.  Relevance.

                THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  Were these annual reports critical at times of the sheriff's department?

                MR. JAUREGUI:  Objection, Your Honor.  Relevance.

                THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  Did you issue an annual report in June, 2011, entitled your "Ninth Annual Report"?

A       Yes.

Q       And in that June, 2011, Ninth Annual Report, did you have any criticisms of the sheriff's department?

                MR. JAUREGUI:  Objection, Your Honor.  Relevance.

**UNITED STATES DISTRICT COURT**

THE COURT:  Let's go to sidebar.

(The following proceedings were held at sidebar:)

THE COURT:  Okay.

MR. JAUREGUI:  I'm unclear where counsel is going with this.  We don't see the relevance.  I don't know that we received the Ninth Annual Report from counsel in discovery.

MR. HOCHMAN:  It was part of an e-mail link, Your Honor.  The Ninth Annual Report has just a criticism that says the Internal Affairs Bureau doesn't quickly enough investigate cases.  That's all I was going to bring out.

THE COURT:  And that's relevant to what we're talking about?

MR. HOCHMAN:  It's one of the ACLU's complaints, Your Honor.

THE COURT:  So.

MR. HOCHMAN:  And this is, again, establishing the fact that the -- that they're looking at the ACLU's complaints.  OIR is looking at the ACLU's complaints, made a recommendation in connection with it -- did an investigation to confirm it, and then made a recommendation to the sheriff's department that they need to improve the response time because they were able to verify what the ACLU is saying.

All I was going to do is two questions:  Were there criticisms?  Was one of the criticisms about the Internal Affairs Bureau's response time to inmate complaints.  And then

UNITED STATES DISTRICT COURT

I was going to move on.

MR. JAUREGUI:  I just don't see the relevance to any of the elements of the charges or even to the relevance that the Government introduced to motive purposes, Your Honor.

THE COURT:  Okay.  Objection is sustained.

(The following proceedings were held in open court in the presence of the jury:)

Q     BY MR. HOCHMAN:  You talked before about periodically you would have criticisms for the sheriff's department; is that correct?

A     Yes.

Q     Would you share those criticisms directly with Sheriff Baca?

A     Yes.

Q     Did you have weekly meetings that were scheduled with Sheriff Baca during the time frame from 2001, let's say, all the way through September of 2011?

A     Yes.

Q     And at those meetings, what types of concerns would you generally share with Sheriff Baca?

A     I would update Sheriff Baca on significant cases, status of the investigation.  I would inform him of new allegations that we had become aware of.

Q     With respect to these weekly meetings, were these the only times that you had an opportunity to meet with

Sheriff Baca?

MR. JAUREGUI:  Objection, Your Honor.  Relevance.

THE COURT:  You can answer.

THE WITNESS:  No.

Q     BY MR. HOCHMAN:  What were other occasions when you would have to meet with Sheriff Baca?  And I'll focus you on the time period, let's say, in 2011 -- through September of 2011?

A     There were meetings that he convened that we would regularly attend.

Q     And if you needed to speak to Sheriff Baca, would you have to wait for the weekly meeting?

A     No.

Q     Would Sheriff Baca make himself available to you if you needed to meet with him?

A     Yes.

Q     Now, I'll focus you on the time period from 2009 to September, 2011.  During that time period, did you become aware that the ACLU was making certain allegations about excessive force and retaliation in the Men's Central Jail against inmates by deputies?

A     Yes.

Q     Did you discuss those complaints and responses and any potential responses with Sheriff Baca in this time frame from 2011 through -- up through the end of 2011?

**UNITED STATES DISTRICT COURT**

A        Yes.

Q        And what responses, if any, did you discuss generally with Sheriff Baca to the ACLU's allegations?

A        I indicated sort of a progress report on how we were dealing with some of the allegations and how we were dealing with some of the systemic issues that the ACLU had brought to our attention and the sheriff's department's attention.

MR. HOCHMAN:  May I approach the court clerk with what will be identified as Defense Exhibit 600, Your Honor?

THE COURT:  Yes.

(Marked for identification Exhibit No. 600.)

Q        BY MR. HOCHMAN:  Do you have Defense Exhibit 600 before you?

A        I do.

Q        Do you recognize it?

A        Yes.

Q        Do you recognize your signature on the last page of this letter?

A        Yes.

Q        Is this a letter you prepared on or about July 19, 2011?

A        Yes.

MR. HOCHMAN:  Your Honor, the defense would seek the admission of Defense Exhibit 600.

UNITED STATES DISTRICT COURT

1742

MR. JAUREGUI:  No objection, Your Honor.

THE COURT:  It will be received.

(Received into evidence Exhibit No. 600.)

Q    BY MR. HOCHMAN:  I'll turn your attention to the first page of the letter.

This is the Office of Independent Review's letterhead, and I see your name in the upper right-hand corner. Do you see your name there?

A    Yes.

Q    Who are these other five individuals?

A    The other attorneys in the Office of Independent Review.

Q    And then the letter is addressed to the Honorable Dean Pregerson, United States District Court.  Who's the Honorable Dean Pregerson?

A    He's a federal judge.

Q    And why was he -- why did you send a letter to him?

A    The judge had asked me to update him on some progress.

Q    And what was his role in connection with anything dealing with the Men's Central Jail?

A    He was the presiding judge in a case called *Rutherford versus Baca.*

Q    Are you familiar with that case?

**UNITED STATES DISTRICT COURT**

A        Yes.

Q        What is that case?

A        It's a case that's existed for quite a while. The initial allegations involved concerns about conditions in the jail.

Q        And it was the ACLU's case that eventually led them to have a monitor in the Men's Central Jail?

A        That's right.

Q        And I see that there's three things that -- three issues that you are raising in this letter -- 1, 2, and 3.  Do you see those in the first paragraph?

A        Yes.

Q        Could you read the three issues that you are addressing in this letter?

A        The primary issues was:  1, whether the sheriff's department was amenable to developing specific policies that would prohibit retaliation against inmates who complain to the ACLU; whether the sheriff's department's inmate complaint policy could be improved.  That's No. 2.  And, 3, a request by the plaintiffs for the sheriff's department to develop protocols that would permit the use of laptops by the ACLU when visiting inmates.

Q        Why are you raising these three issues with Judge Pregerson?

A        Those issues have been raised by the plaintiffs

with the Court and also with the sheriff's department and with us.

Q        By plaintiffs, you mean the ACLU?

A        Yes, sir.

Q        And if you could turn your attention to the second paragraph, the highlighted section, if you could read that, please.

A        "Pursuant to this Court's direction, I convened in-person meetings at the downtown county jail complex between representatives of the ACLU, the sheriff's department, and attorneys representing the sheriff's department on April 28, May 6, May 13, and May 19.  Since --"

Q        And if I can turn your attention to the second page of the letter at the top, did you make certain observations about what had happened during those meetings?

A        I did.

Q        Could you read the first two sentences.

A        "As noted in further detail below, it is this writer's observation that much has been accomplished as a result of the goodwill and initiative demonstrated by the parties.  This writer appreciates the attentiveness, receptivity, and creativity from the participants that resulted in significant results."

Q        And read the next sentence, if you could.

A        "It is this writer's view that all worked in good

**UNITED STATES DISTRICT COURT**

1745

faith to achieve a result that will further the interests of the parties and improve processes that will benefit those entrusted to keep inmates safe, those responsible for monitoring the conditions in the jails, and most importantly, improve the overall well-being of the inmates housed in the county jails."

Q     And then you actually address the three different aspects in the remainder of the letter; correct?

A     Yes.

Q     I'm not going to have you read this, but the first aspect that you addressed was the development of a centralized anti-retaliation policy; is that correct?

A     Yes, it is.

Q     What does that mean?

A     At the time the sheriff's department did not have a policy that spoke to specific acts of retaliation, and there was no policy that expressly and specifically prohibited such conduct.  We worked with the ACLU and the sheriff's department to develop such a policy.

Q     And the next topic was revisions of the sheriff's department inmate complaint policy.  Could you explain what is referred by that?

A     Yes.  Every jail has a requirement under state law to have a way in which inmates can complain.  The sheriff's department had such a policy.  The ACLU pointed out ways in

**UNITED STATES DISTRICT COURT**

which they thought that policy could and should be improved, and so we worked with the parties to do that.

Q        And turning your attention to the third page of the letter, there's something described as a road map for inmates entering the Los Angeles County jails.  What was that about?

        MR. JAUREGUI:  Your Honor, objection.  Relevance and cumulative at this point.

        THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  Could you read the part that starts "While the development" on page 3 of the letter.

        MR. JAUREGUI:  Same objection, Your Honor.

        THE COURT:  Same ruling.

Q        BY MR. HOCHMAN:  The next part of the letter -- well, as part of your efforts in working with the ACLU, did you develop a road map -- excuse me -- a guide through custody of Los Angeles County jail to give to each inmate upon entering the jail?

        MR. JAUREGUI:  Objection.  Relevance.

        THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  The time frame I want to be clear that I'm talking about is July through -- well, July, 2011, when the date of the letter was written.

        MR. JAUREGUI:  Same objection, Your Honor.

        THE COURT:  Sustained.

**UNITED STATES DISTRICT COURT**

Q       BY MR. HOCHMAN:  And part of your letter deals with these modifications in the Inmate Complaint Form; is that correct?

A       Correct.

Q       Why were you addressing the Inmate Complaint Form at this time?

MR. JAUREGUI:  Objection.  Relevance and cumulative.

THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  Did you develop an administrative handbook for investigating inmate complaints?

MR. JAUREGUI:  Objection.  Relevance, Your Honor.

THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  By that I meant at this time in July, 2011.

MR. JAUREGUI:  Same objection.

THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  Did you have a conclusion at the end of the letter about what had been accomplished?

A       Yes.

Q       And could you read the one sentence on page 4, the first sentence of that last concluding paragraph?

A       "What has been achieved here could not have been accomplished without the constructive participation of each of the participants."

UNITED STATES DISTRICT COURT

Q        If you could turn to the last page of the letter,
that's your signature on the last page of the letter above the
name Michael J. Gennaco?

A        Yes.

Q        And who was the letter copied to?

A        A number of individuals both within the sheriff's
department, lawyers for the county, and Mr. Eliasberg.

Q        Was Sheriff Baca one of those individuals?

A        Yes.

Q        Who is Peter Eliasberg?

A        At the time he was the legal director for the
American Civil Liberties Union known as the ACLU.

Q        Was he one of the people -- when you said you had
worked with the ACLU, was he one of the people representing the
ACLU when you were working with them?

A        Yes.

Q        In 2011, the summer of 2011, did you have
occasion to speak with Father George Horan at the Men's Central
Jail?

A        Yes.

Q        What did you discuss, generally?

A        Father Horan talked about his experiences --

        MR. JAUREGUI:  Objection.  Hearsay, Your Honor.

        THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  Father George Horan is the

UNITED STATES DISTRICT COURT

Father at Men's Central Jail; is that correct?

A    He was one of the individuals who provided religious services and religious counseling to inmates.

Q    Did he work with Chaplain Paulino Juarez, if you know?

A    He did.

Q    As a result of speaking with Father Horan, did you set up a meeting for Father Horan, Chaplain Paulino Juarez, and anyone else at the end of July of 2011?

A    I arranged a number of meetings.

Q    Did you set up one particular meeting where Father Horan, Chaplain Juarez, Sister Patty, Sheriff Baca, and Assistant Sheriff Rhambo was at?

A    Yes.

Q    Were you there as well?

A    I was.

Q    And generally, what was discussed during this meeting?

A    It was a meeting to allow the three representatives of the Chaplain C Program in the sheriff's department to talk with the sheriff about any concerns they might have regarding the jails.

Q    And did they share their concerns with Sheriff Baca and Assistant Sheriff Rhambo during that meeting? And by "they" I mean Father Horan, Sister Patty, and

**UNITED STATES DISTRICT COURT**

Chaplain Paulino Juarez.

A    Yes.

Q    As a result of -- and you heard these concerns voiced during the meeting as well?

A    Yes.

Q    What, if anything, did Sheriff Baca do as a result of hearing these concerns?

A    He instructed Mr. Rhambo to look into some of the allegations that had been raised.

Q    I'd like to direct your attention now to August 18, 2011, the period right around August 18, 2011. Around that time, did you learn that something had happened at the Men's Central Jail?

A    Yes.

Q    And what was that?

A    I was informed that a cell phone had been discovered in the jail.

Q    Who informed you of that?

A    I believe it was then Sheriff Baca.

Q    Were you informed at some point that the cell phone belonged to the FBI?

A    Yes.

Q    Was that normal for you to hear of a cell phone belonging to the FBI in the Men's Central Jail?

MR. JAUREGUI:  Objection, Your Honor.  Form and

**UNITED STATES DISTRICT COURT**

1751

vague.

THE COURT:  You can answer.

THE WITNESS:  Could you repeat the question?  I'm sorry.

MR. HOCHMAN:  I will rephrase, Your Honor.

Q      How many times in your career as a -- going back to the 1980s, had you heard of the FBI inserting a cell phone into a jail facility?

A      Never.

Q      What, if anything, was the significance when you learned of the fact that the FBI had put a cell phone in the Men's Central Jail?

A      I was surprised.

Q      Why?

MR. JAUREGUI:  Objection.  Relevance, Your Honor.

THE COURT:  Sustained.

Q      BY MR. HOCHMAN:  Did you have any knowledge at that time about the dangers of a cell phone in a jail facility?

MR. JAUREGUI:  Objection, Your Honor.  Relevance.

THE COURT:  Sustained.

Q      BY MR. HOCHMAN:  Did anyone from the FBI -- strike that.

Did you work with the FBI when you were a federal prosecutor in Los Angeles?

A      Yes.

UNITED STATES DISTRICT COURT

1752

Q        And had you had contact with the FBI when you were running the Office of Independent Review?

A        Yes.

Q        So did anyone from the FBI prior to August 18, 2011, tell you ahead of time that they were going to insert a cell phone into the Men's Central Jail?

MR. JAUREGUI:  Objection, Your Honor.  Relevance.

THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  When Sheriff Baca told you about the FBI inserting a cell phone into the Men's Central Jail, had you known of that before?

A        No.

Q        Were you familiar with the federal prosecutors in the United States Attorney's Office who did civil rights investigations in July, August, and September of 2011?

A        Some of them.

Q        Did you know the head of the civil rights section Lawrence Middleton?

A        I'm not sure that was his title, but I'm certainly aware of Mr. Middleton.

Q        How long have you known Mr. Middleton for as of 2011?

MR. JAUREGUI:  Objection, Your Honor.  Relevance.

THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  Did you know the United States

**UNITED STATES DISTRICT COURT**

1753

Attorney Andre Birotte in the summer of 2011?

A       Yes.

Q       Did you work with him when you were a federal prosecutor back in the 1990s in the U.S. Attorney's Office here in Los Angeles?

MR. JAUREGUI:  Objection.

THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  Did you speak with U.S. Attorney Birotte at any time before you learned about the FBI's cell phone in the Men's Central Jail?

MR. JAUREGUI:  Objection, Your Honor.  Relevance.

THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  Did you speak to him anytime after you learned about the cell phone in the Men's Central Jail on or about August 18, 2011?

A       Yes.

Q       And approximately when was that?

A       I talked to Mr. Birotte on numerous occasions. If you're talking about the cell phone, I'm not sure I ever talked directly with Mr. Birotte about the cell phone except maybe as a result -- no.  I never talked to him about the cell phone per se, that I can recall.

Q       Did you have any conversations about -- with Mr. Birotte about the FBI's investigation concerning the cell phone after August 18, 2011?

A        Yes.

Q        And approximately when were those conversations?

A        It would have been right around the time that I learned that a cell phone had been placed into the jail.

Q        And generally, what did those conversations cover?

A        They covered where we go from here if I had to phrase those conversations.

Q        And when you say "where do we go from here," what exactly does that mean?

A        Eventually there was a meeting between Mr. Birotte and Sheriff Baca and others.

Q        Were you at that meeting?

A        I was.

Q        Did you help set it up?

A        I think I may have.  I believe it was initially then Sheriff Baca's idea.

Q        And that meeting, where did it take place, if you recall?

A        It was in the United States Attorney's Office.

Q        And was that the -- on August 29th, 2011?

A        I believe that was the date.

Q        Who, generally, was there?

A        There were a lot of people there.  I recall obviously myself there.  Then Sheriff Baca was there.  Other

**UNITED STATES DISTRICT COURT**

1755

people in his command were there.

Q        Was Lawrence Middleton there?

A        I believe Mr. Middleton was there.

Q        Was George Cardona there?

A        I believe he was.

Q        Do you know who George Cardona is?

A        I do.

MR. JAUREGUI:  Objection, Your Honor.  Relevance.

THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  When you attended the meeting on August 29, 2011, you said George Cardona was there.  Do you know in what capacity George Cardona was there for?

MR. JAUREGUI:  Objection.  Relevance, Your Honor.

THE COURT:  You can answer, if you know.

THE WITNESS:  I believe he was chief of the criminal division at the time.  He may have been first assistant, but he was in the upper rungs of the U.S. Attorney's Office.

Q        BY MR. HOCHMAN:  Do you know if someone named Bruce Riordan was there as well?

A        He was there.

Q        In what capacity was Mr. Riordan there?

A        He was the executive assistant of the United States Attorney.

Q        Was this the first time you were meeting

**UNITED STATES DISTRICT COURT**

Mr. Cardona in your life?

A       No.

Q       How long had you known him for?

MR. JAUREGUI:  Objection.

THE COURT:  Let's go to sidebar.

(The following proceedings were held at sidebar:)

THE COURT:  Do you want to tell me what this has to do with?

MR. HOCHMAN:  Yes, Your Honor.  So immediately after this meeting on August --

THE COURT:  No.  What does it have to do with how long he's known George Cardona?  What does that have to do with anything?

MR. HOCHMAN:  Because he's allowed to have a meeting immediately after with just him, Andre Birotte, George Cardona, Lawrence Middleton, and Bruce Riordan which they wouldn't give him if he didn't have a long-term relationship.  So I can ask did you have a long-term relationship with him which would explain --

THE COURT:  I think you really need to get on with what's important in this case.  I don't know if you guys -- I don't know what the deal is, if you just don't want to argue today or what it is.  But we're going to move this case on.  So let's get to the important stuff.

MR. HOCHMAN:  Again, Your Honor, I'm just doing

the foundation.  If I jump right to the last question, there will be an objection to foundation.

THE COURT:  Let's just try it and see.

MR. HOCHMAN:  Okay.

(The following proceedings were held in open court in the presence of the jury:)

Q        BY MR. HOCHMAN:  As of August 29, 2011, did you have a long-term relationship with George Cardona?

MR. JAUREGUI:  Objection.

THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  What happened at the August 29, 2011, meeting?

A        Then Sheriff Baca explained to the individual representatives of the United States Attorney's Office his concerns about the discovery of the cell phone in the jail.

Q        And generally, what were those concerns that he expressed during the meeting?

A        He was concerned about the implications that the introduction of such an object might be able to do with regard to jail security and inmate security.

Q        Did he ask Mr. Birotte, the U.S. Attorney at that time, to answer any questions concerning the FBI's investigation related to that cell phone?

A        Yes, he did.

Q        And generally, what were those questions, if you

UNITED STATES DISTRICT COURT

recall?

MR. JAUREGUI:  Objection, Your Honor.  Hearsay.

THE COURT:  Sustained.

Q    BY MR. HOCHMAN:  Do you recall what U.S. Attorney Birotte's response was to Sheriff Baca's comments?

A    Mr. Birotte was cordial and expressed appreciation for the dialogue.

Q    And I'd like to direct your attention, if I could -- that was an August 29th meeting.  I would like to direct your attention to August 19, 2011.  Was there at that time a U.S. Department of Justice civil rights division investigation of the Los Angeles Sheriff's Department Antelope Valley areas?

MR. JAUREGUI:  Objection, Your Honor.  Relevance.

THE COURT:  Sustained.

MR. HOCHMAN:  Your Honor, may I be heard at sidebar with this?  It pertains to several additional questions.

THE COURT:  Ladies and gentlemen, we're going to take our first break of the day.

Again, I want to remind you, until this trial is over, you're not to discuss this case with anyone, including your fellow jurors, members of your family, people involved in the trial or anyone else, and do not allow others to discuss

**UNITED STATES DISTRICT COURT**

the case with you.  This includes discussing the case on the

Internet, through various forms of social media, by e-mails or

text messages.  If anyone approaches you and tries to talk with

you about this case, please let me know about it immediately.

Do not read, watch, or listen to any news reports

or other accounts about the trial or anyone associated with it.

Do not do any research such as consulting dictionaries,

searching the Internet, or using other reference materials, and

do not make any investigation about the case on your own.

Finally, you're reminded to keep an open mind

until all of the evidence has been received, you've heard the

arguments of counsel, the instructions of the Court, and the

views of your fellow jurors.

We'll come back at 10:00 o'clock.

(The following proceedings were held in

open court out of the presence of the jury:)

THE COURT:  Sir, you may step down.

THE WITNESS:  Thank you.

THE COURT:  So you wanted to be heard concerning

the Justice Department's civil rights division investigation

into the Los Angeles County Sheriff's Department

Antelope Valley?

MR. HOCHMAN:  Yes, Your Honor.

THE COURT:  Okay.

MR. HOCHMAN:  This is discovery that I provided

**UNITED STATES DISTRICT COURT**

the Government weeks ago, and they never raised before just now a relevance objection to the discovery -- to the issue.

What the issue is, Your Honor, August 18, 2011, we have obviously the sheriff -- August 18, 2011, the FBI informs the sheriff about an FBI cell phone.  What goes on for the next six weeks is the heart of this case, and what the sheriff's reaction, whether or not he wanted to obstruct an FBI investigation or cooperate with it, what is in his mindset is absolutely the ground zero of this case.

August 19, 2011, Sheriff Baca appears with Tom Perez who is the head of the civil rights division, Your Honor.  And we provided the Government even with a picture of Tom Perez and Sheriff Baca standing next to each other when they announced a civil rights investigation into the Antelope -- the dealings in the Antelope Valley Sheriff Station.  Mr. Perez said at the time, although I'm not going to elicit the hearsay from Mr. Gennaco, that Sheriff Baca was cooperating with that investigation, Your Honor.

So the fact that he is standing toe-to-toe and cooperating in a civil rights investigation right in the middle of this conspiratorial period, I think, goes significantly to his mindset on whether he has the mindset of cooperating with the FBI and the Department of Justice or obstructing their investigation into civil rights.  It couldn't be more germane to his mindset because they're both dealing with civil rights

investigations, Your Honor, of the sheriff's department.

THE COURT:  Okay.

MR. FOX:  Your Honor, there are plenty of differences here between what was happening in Antelope Valley and what was happening here, and I can go into those differences.  But I think that the issue is that we will allow -- we will not object to some discussion of this.  That picture of him smiling and shaking hands at a press conference with Tom Perez, I think that's certainly 403.

MR. HOCHMAN:  He's not shaking hands.  They're just standing next to each other, Your Honor.

MR. FOX:  I don't know what that shows.  That, to me, is 403.  And there are several other pictures that they provided to us in discovery.

Now, in terms of any relevancy objections, if you want me to get into why -- by the way, I think we did raise it with Mr. Hochman, asked him what the relevance of it was before.  But as you know, Mr. Hochman never disclosed to us in his discussions of what he was going to get into with Mr. Gennaco this very point.  So there was not an opportunity to do that.

Again, we will not object to a limited amount here, but we've been through so much of this with the ACLU, with the *Rutherford* case.  Everything that Mr. Hochman has gone into today with Mr. Gennaco is a fringe issue that doesn't have

1762

to do with what happened with the witness or the inmate, what happened with Leah Marx, what happened with the witness tampering.  These are all fringe issues that he's gone into over and over again.  So we are wasting time.

And I think, if he wants to hit this point and move on, no objections from us.  But if we're going to sit here for another five, ten minutes on every single time that Mr. Baca did not obstruct an investigation, we are certainly into 403 land.

And we -- as Your Honor has pointed out, we also want to have this case over today to the extent that Mr. Baca is not going to testify.  We were hoping that would happen. But if we continue to do that with Mr. Gennaco, we are never going to be done with this case.

THE COURT:  Maybe you'll be here tomorrow.

MR. HOCHMAN:  Your Honor, I had three questions. That's why I asked the Court to have that sidebar, Your Honor. I am going to get in, get out very quickly.

THE COURT:  Why don't you guys talk.

MR. HOCHMAN:  Thank you, Your Honor.  I will.

MR. FOX:  And, Your Honor, we have a prior inconsistent statement debate that we need to have with you as well outside the presence of the jury.  That's why the defense did not call David Dahle when they had first named him.  We could not reach a resolution on some issues last night.

**UNITED STATES DISTRICT COURT**

THE COURT:  Okay.  Who's the witness that you're seeking to impeach with Mr. Dahle?

MR. DIAMANTATOS:  Mr. Sexton, Your Honor.

THE COURT:  Okay.  That was the question when -- I have a vague recollection of that question.  It was having to do with Mr. Tanaka.

MR. FOX:  Yes, Your Honor.

MR. DIAMANTATOS:  Yes, Your Honor.  The testimony that we've highlighted for the Government has to do with Mr. Sexton's trial testimony of his view that Mr. Tanaka was in charge, and then it was Mr. Tanaka who was authorizing what occurred during the investigation.

Your Honor will recall that we challenged Mr. Sexton on the fact that he told you --

THE COURT:  What's the question that you asked Mr. Sexton, and what was his answer?

MR. DIAMANTATOS:  The question, Your Honor, during the trial testimony was "In reference to the

       August through September, 2011, conspiracy

       that you described earlier in your testimony,

       isn't it true that it was your understanding

       that Mr. Tanaka was running the show?

      "Answer:  That's my optic perspective,

      sir.

      "Question:  Sir, isn't it true

that Mr. Tanaka, based on what you observed in August and September of 2011, it was your understanding that Mr. Tanaka was running the show?

"Answer: No, sir.

"Question: Isn't it true that you made the statement to the FBI when you met with them November 19 of 2012?

"Answer: I said Mr. Tanaka was one of two people that could authorize the sheriff's department to coordinate three divisions of the L.A. County Sheriff's Department to move Inmate Anthony Brown."

It is directly inconsistent with two separate 302s, Your Honor. Specifically, there's a 302 authored by Special Agent Leah Marx where the 302 spells out --

THE COURT: Well, Leah Marx is --

MR. DIAMANTATOS: Okay. I'll go directly to Special Agent Dahle.

During a subsequent interview which occurred on November 26 of 2012 with Special Agent Dahle --

THE COURT: Do you have the 302?

MR. DIAMANTATOS: I do, Your Honor. It says deputies referred to Tanaka as the big boss, and there's a

**UNITED STATES DISTRICT COURT**

section of Mr. Sexton's trial testimony where he addresses big bosses as well.

The question and answer that I just read from the trial testimony is inconsistent with Special Agent Leah Marx's 302.

THE COURT: That doesn't have anything to do with Dahle, does it?

MR. DIAMANTATOS: We intended -- this was part of our agreement with the Government to avoid having to recall Special Agent Marx to the extent Special Agent Dahle reviewed that 302 and can say he made that statement with the FBI.

So if we don't have that agreement, Judge --

THE COURT: Enough. Okay.

MR. FOX: Your Honor, and just so you're aware, we will stipulate -- if Your Honor finds against the Government, we will stipulate to Special Agent Tanner's testimony.

But with respect to the "big boss" comment, we looked at the transcript. The defense sent it to us so we could review it. There wasn't anything inconsistent overall with it. He defined what big bosses were. Mr. Diamantatos wanted to ask him about big bosses, and in the 302 it discusses one person, "big boss." That's what he crossed him on.

There is one portion where it is arguably inconsistent. He said that "Captains and above is the big

boss, sir."  It's not entirely clear whether that is inconsistent.  But the problem is he did not cross him on this statement that he made to the FBI.  He never crossed Mr. Sexton on the fact that he told the FBI on this date that Mr. Tanaka was the big boss.

Under Federal Rule of Evidence 613(b), they need to confront him with that statement in order to impeach him.  That way the statement {sic} is able to explain why he made the statement and what his understanding of that term was and any confusion, and it gives us the opportunity to inquire the same way of that witness.  That didn't happen with the big bosses comment.

So it is prejudicial to the Government for that now to come out where it's not clear that it's inconsistent and they didn't impeach him with the statement, didn't attempt to impeach him with the statement at the time.

THE COURT:  Somebody give me the trial transcript and the 302.

MR. FOX:  May I respond also to Mr. Tanaka being in charge comment?

Mr. Diamantatos discussed how Mr. Sexton said that it was not his impression that Mr. -- I'm sorry.  His impression was that others were running the show along with Mr. Tanaka.  The portion of Mr. Dahle's -- the portion of the 302 with Special Agent Dahle is Sexton tells him he thought

Tanaka was in charge of the Brown jacket situation.  First of all, "in charge" versus "running the show" is different.  And the "Brown jacket situation" versus -- they're trying to get out that there were, you know -- Mr. Tanaka was in charge of the entire thing which is not inconsistent with -- the statement of the 302 is not inconsistent with the trial testimony.

MR. DIAMANTATOS:  Your Honor, I have the 302s that you requested as well as Mr. Sexton's trial testimony.

THE COURT:  Okay.

MR. DIAMANTATOS:  May I approach the court clerk, Your Honor?

THE COURT:  Yes.  That's fine.

MR. FOX:  And, Your Honor, he never said in his testimony -- Mr. Sexton never said in his testimony that Mr. Tanaka was not in charge.  He did not say that in any portion of his testimony.

MR. DIAMANTATOS:  Your Honor, he's qualifying that there isn't -- when he spoke to the FBI in the 302s that I've tendered to the Court, Your Honor, he indicated that Mr. Tanaka was in charge of the investigation.  As clear as day that's what the FBI 302 states, and that it was Mr. Tanaka who was authorizing the investigation.

On the witness stand, Mr. Sexton qualified that it wasn't Mr. Tanaka.  It was a bunch of people.  And then we

get into the reference of "big bosses" which is in plural.  The Dahle 302 clearly he says "It was well-known in the department that Tanaka was the big boss," singular.  Those two statements are inconsistent.

Further, Your Honor, there's another point --

THE COURT:  The reporter has to get a break, and so do I.

MR. DIAMANTATOS:  Understood, Your Honor.  Thank you.

(A recess was taken at 9:55 a.m.)

THE COURT:  Just so that I'm clear, the 302 that you're focusing on is page 2 of 8.  It's got a Bates number of A72576?

MR. DIAMANTATOS:  There are two pages in that 302, Your Honor, that you're referring to.  So the date of entry of that 302 is November 19 of 2012.  At the bottom left-hand corner of that 302, the date the interview occurred was November 16, 2012.

There is the portion we believe is inconsistent on page 2 of 8 which says, in general, the impression Sexton had was that Tanaka was in charge of the --

THE COURT:  Sir, please.

MR. DIAMANTATOS:  And then page 6 of 8 as well, Your Honor.  Page 6 of 8, the paragraph that starts with "Clear."

THE COURT:  I'm looking on -- okay.  I'm on page 6 of 8.  Which paragraph are you looking at?

MR. DIAMANTATOS:  There's a sentence that reads, Your Honor, "Clear in the department."  I should have it tabbed, Your Honor.

THE COURT:  Okay.

MR. FOX:  Your Honor, with respect to that last statement, there was absolutely no cross-examination about whether Mr. Tanaka was in charge in 2008 which is what was referenced in the 302, and it's not relevant to this trial whether he was in charge in 2008.

THE COURT:  Okay.  Well, assuming we'll resume this issue, I take it it's not going to be -- it's not going to take very long -- if he's called back, it's not going to take very long; correct?

MR. DIAMANTATOS:  Correct, Your Honor.

THE COURT:  Okay.  I'll take another look at it.

There is nothing in the 302 about running the show; right?

MR. DIAMANTATOS:  That language, correct, Your Honor.

THE COURT:  Okay.  All right.  I'll take a look at it at the next break, and we'll resolve it.

MR. DIAMANTATOS:  Thank you, Your Honor.

MR. HOCHMAN:  May I go get Mr. Gennaco,

UNITED STATES DISTRICT COURT

Your Honor?

THE COURT:  Please.  And how long do you have with him left?

MR. HOCHMAN:  10, 15 minutes, Your Honor.

THE COURT:  Okay.  And who's after Mr. Gennaco?

MR. HOCHMAN:  I need to check.  Mr. Carl Covitz, Your Honor.  The problem is Mr. Covitz is recovering from throat cancer radiation.  He wanted me actually to bring to the Court's attention that he can't swallow.  So periodically, if his mouth gets very dry, he needs to actually drink something, slush it around and spit it out.  Not as a way to offend the Court obviously, but he can't swallow.

So I just need to check.  He was outside.  I just want to make sure he's okay because he would be my next witness, a short one, Your Honor.  And I've worked out with the Government the questions for him.

By the way, what we're going to do, Your Honor, is Ms. Alice Harris, who was going to be a character witness, is no longer going to be a character witness.  We were going to ask Mr. Covitz the character witness questions in addition to the one question dealing with the overseas trip.  I've worked out that one question with the Government, and it's one question, Your Honor.

So I think Mr. Covitz will be a relatively short witness assuming he's okay.  We're going to go check on him

**UNITED STATES DISTRICT COURT**

now.

THE COURT:  Okay.  Well, let's get the jury in.

MR. HOCHMAN:  I'll go get Mr. Gennaco if I could.

THE COURT:  Okay.

(The following proceedings were held in open court in the presence of the jury:)

THE COURT:  If we can have the witness come forward, please.

All right.  Let's resume.

MR. HOCHMAN:  Thank you, Your Honor.

Q     Mr. Gennaco, on August 19, 2011, did you attend a press conference with Sheriff Baca and Tom Perez, the head of the U.S. Department of Justice's civil rights division that day?

A     Yes.

Q     Do you know what the purpose -- was it in connection with a civil rights investigation that the U.S. Department of Justice civil rights division was conducting into the Antelope Valley area of the Los Angeles Sheriff's Department?

A     Assistant Attorney General Perez announced the initiation of a civil rights investigation.

Q     And what was that civil rights investigation concerning?

A     It had to do with potential violations of federal

law relating to Section 8 housing enforcement in the

Antelope Valley.

Q    And did Sheriff Baca state during that press

conference that he was cooperating with that investigation?

A    He agreed to cooperate, yes.

Q    I'll draw your attention now back to

August 29, 2011.  You said that you participated in the meeting

which Mr. Birotte and Sheriff Baca were at; is that correct?

A    Yes.

Q    Immediately after that meeting, did you have a

separate meeting with U.S. Attorney Birotte, George Cardona,

Lawrence Middleton, and Bruce Riordan of the U.S. Attorney's

Office?

A    It was a continuation of the initial meeting.

Q    Was Sheriff Baca at that continuation meeting?

A    No.

Q    Was anyone else from the sheriff's department at

that meeting for most of the point that it was taking place?

A    It was nobody from the sheriff's department at

the end of the meeting.

Q    So it was just you and the people from the

U.S. Attorney's Office; correct?

A    Correct.

Q    What was generally discussed during that meeting?

A    I talked about ways in which we could potentially

move forward and tried to explain ways in which there could be continued cooperation between the two agencies.

Q        And what was the response from U.S. Attorney Birotte and the others present?

A        I would say noncommittal but appreciative.

Q        Did you have prior relationships with everyone on the U.S. Attorney's side in the room that day?

A        To some degree, yes.

Q        What do you mean "to some degree"?

A        Some I knew way better than others, and some I had not worked with but I knew, and had worked with most of the folks that were in attendance.

Q        Did you subsequently later in September of 2011 have any conversations with U.S. Attorney Birotte about setting up a second meeting in which the Sheriff Lee Baca and someone from the FBI would be present with U.S. Attorney Birotte?

A        Yes.

Q        What were those discussions about?

A        Largely logistical.  I'm not sure I did the schedule, but I was glad that we were going to have a meeting. It was a very brief conversation until the meeting happened.

Q        And your conversations before that meeting were with U.S. Attorney Birotte?

A        Correct.

Q        And now I'm going to focus you to after a

**UNITED STATES DISTRICT COURT**

September 27 meeting between U.S. Attorney Birotte,

Steve Martinez, and Sheriff Baca.

Did you subsequently at that point speak with U.S. Attorney Birotte?

MR. JAUREGUI:  Objection.  Relevance, Your Honor. After September 27.

MR. HOCHMAN:  Your Honor, I can clarify if I might.

THE COURT:  Do you want to withdraw that question?

MR. HOCHMAN:  I will withdraw that question, and let me ask a different question if I might.

Q     Did you speak -- after September 27 -- after the September 27 meeting between U.S. Attorney Birotte, Sheriff Baca, and the Assistant Director Martinez of the FBI, did you speak to U.S. Attorney Birotte about that meeting?

A     My recollection, it was the same day.

Q     Generally, what were those discussions that you had with the U.S. Attorney Birotte?

A     It was a brief discussion.  There had been some things talked about at the meeting that I wanted Mr. Birotte's opinion about.

Q     What were those?

A     We had talked about the --

MR. JAUREGUI:  Your Honor, objection.

**UNITED STATES DISTRICT COURT**

Foundation.

THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  Was this discussion you were having with U.S. Attorney Birotte that same day on the telephone or in person?

A       On the phone.

Q       And you said it happened that same day, September 27, 2011?

A       That's my best recollection.

Q       How long did the conversation last?

A       Five minutes maybe.

Q       In those five minutes, generally, what was discussed?  What topics were discussed?

A       Mr. Birotte expressed appreciation for the meeting.  He indicated that he had believed things --

MR. JAUREGUI:  Objection, Your Honor.  Hearsay.

THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  If you could just focus on the topics that were discussed as opposed to any particular statements.  What were the topics that were discussed between you and U.S. Attorney Birotte in that phone call?

A       How the meeting went, whether I should follow up with the assistant director in charge regarding providing training to FBI agents on how to do civil rights investigations.

**UNITED STATES DISTRICT COURT**

Q        Anything else?

A        I believe we may have -- I may have -- I believe another topic may have been whether or not agents should appear before the sheriff's academy to talk about civil rights violations -- civil rights statutes.  I'm sorry.

Q        I'm sorry?

A        Civil rights statutes to inform soon-to-be deputy sheriffs about civil rights laws that might impact their career.

Q        And did any deputies subsequently then appear before sheriff's academy deputies to give any type of talks about civil rights violations from the federal perspective?

MR. JAUREGUI:  Objection.  Relevance, Your Honor.

THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  Now, in this general time period in the summer of 2011, were you aware that there was an investigation going on of a captain from the Los Angeles Sheriff's Department involved in misconduct that the sheriff's department was working with the FBI?

A        Yes.

MR. HOCHMAN:  No further questions.

THE COURT:  Cross-examination.

MR. JAUREGUI:  Yes, Your Honor.

///

///

**UNITED STATES DISTRICT COURT**

**CROSS-EXAMINATION**

BY MR. JAUREGUI:

Q        Mr. Gennaco, OIR does not exist today; correct?

A        That's correct.

Q        It was shut down by the county in 2014?

A        The duties were given to a broader agency.

Q        Your contract was terminated?

A        No.

Q        During your tenure in OIR, you had approximately six attorneys in OIR?

A        There were six of us together.

Q        And the sheriff's department had over 9,000 sworn officers around that time; right?

A        More or less, yes.

Q        OIR, itself, did not conduct investigations?

A        That's correct.

Q        And OIR had no power to bring criminal charges.

A        That's correct.

Q        And you felt very strongly that OIR shouldn't conduct its own investigations.

A        I would disagree with that.

Q        Well, you said you felt strongly -- you said previously that you felt strongly that OIR should not conduct its own independent investigations.

A        The model was not intended to conduct independent

**UNITED STATES DISTRICT COURT**

investigations.  That's correct.

Q    And you did not believe that OIR was equipped to do its own independent investigations.

A    It was a resource, yes, sir.

Q    And during the course of your time, I think you used the word, overseeing the sheriff's department, you always felt that OIR was underresourced; correct?

A    Not for the job we were asked to do.

Q    Well, haven't you said previously that OIR was always underresourced?

A    I believe that, for the job we were asked to do, there were certainly significant resources devoted to OIR.

Q    And OIR's offices, Mr. Gennaco, were located where?

A    In Commerce, California.

Q    And I think Mr. Hochman showed you a letter dated July 19, 2011, and at the top it said Office of Independent Review, 4900 South Eastern Avenue, Suite 204; correct?

A    Yes, sir.

Q    And that's where your offices were?

A    That's right.

Q    And those were L.A. County Sheriff's Department offices; correct?

A    It was a building not owned by the department, but they leased space in the building, yes, sir.

**UNITED STATES DISTRICT COURT**

Q        And who was on the first floor of that address, 4900 South Eastern Avenue?

A        Sheriff's Department Discovery Unit, the Internal Affairs Bureau, and the Internal Criminal Investigations Bureau.

Q        So you were upstairs from the IA and ICIB?

A        Correct.

Q        And you've previously said that that arrangement was a nightmare, didn't you?

A        No.

MR. HOCHMAN:  Objection.  Improper form of the question, Your Honor.

THE COURT:  The answer will stand.

Q        BY MR. JAUREGUI:  Do you recall doing an interview with United States Attorney's Office in 2013?

A        I certainly do.

Q        And do you recall telling the assistant United States attorneys present that you thought it was a nightmare that you were upstairs from IA and ICIB?

A        That's out of context.  No.

Q        You don't recall saying that?

A        It's out of context.

Q        OIR had an attorney/client relationship with the Los Angeles County Sheriff's Department.

A        With the sheriff and with the County Board of

Supervisors.

Q      So you personally had an attorney/client relationship with the sheriff?

A      Yes.

Q      So any discussions that you had with the sheriff would have been private and privileged?

A      Not necessarily.

Q      And any discussion in which you were providing legal guidance?

A      On specific cases, yes.

Q      Mr. Hochman asked you about the differences between IA and ICIB, and I think you said IA investigates violations of policy; correct?

A      Allegations.

Q      Allegations of violations of policy; correct?

A      Yes, sir.

Q      And ICIB investigates potential criminal violations by sheriff's department employees; correct?

A      Yes, sir.

Q      And OIR's role, vis-à-vis, those two organizations, was very different; right?

A      It was different, yes.

Q      In August of -- and September of 2011, OIR's role, vis-à-vis, IA, was to conduct oversight of IA's investigations; right?

**UNITED STATES DISTRICT COURT**

A        Correct.

Q        And you could do that in realtime?

A        Yes, sir.

Q        And that was because IA investigators had audio recordings of their interviews which you could access in realtime?

A        Correct.

Q        And you could provide them feedback and suggestions about their investigations?

A        Yes, sir.

Q        And ultimately you could provide recommendations about the kind of discipline that the officers investigated by IA should receive; right?

A        Correct.

Q        And sometimes the department took your recommendations, and sometimes they didn't.

A        Yes.

Q        And sometimes they initially took your recommendation, and then downgraded the discipline that they provided to an officer.

A        That occurred.

Q        And they sometimes would do that without telling you that that had happened.

A        Early on in our relationship, yes.

Q        And ICIB investigates criminal -- potential

UNITED STATES DISTRICT COURT

criminal violations.  Your relationship with them was different from the relationship we just discussed with IA?

A        Correct.

Q        You did not generally -- now I'm talking about 2011, August, September.  You did not generally provide oversight of ICIB's investigations?

A        Not in the same way that we did with IAB.

Q        And generally you didn't have realtime access to their investigations.

A        I think that's fair.

Q        Going back to IA really briefly, when you would provide oversight of their investigations, that was largely based on the information provided to you by IA investigators; right?

A        Not entirely.

Q        Well, but generally they provided you information, you took it and then reviewed what they gave to you?

A        Oftentimes.

Q        And so are you aware, Mr. Gennaco, that sometimes sheriff's department investigators will start a recording and then stop it and have conversations once the recording is turned off?

A        That happens often.

Q        So if you're reviewing audio of their

**UNITED STATES DISTRICT COURT**

investigations, you wouldn't have access to the part that wasn't recorded.

A        Probably not.

Q        And IA recordings, those were transcribed; right?

A        Not always.

Q        In 2011, were they being transcribed?

A        It depends on the case.

Q        Generally, were they transcribed?

A        Some were transcribed; and some were not.

Q        But ICIB recordings were not.

A        Sometimes they were transcribed.

Q        But generally they were not.

A        I don't understand "generally."  I'm sorry.  I can't answer your question.

Q        Okay.  That's fine.

         Mr. Hochman asked you several questions about the cell phone that was introduced to Men's Central Jail by the FBI.  Mr. Gennaco, you talked about that whole incident with the U.S. Attorney's Office at length in 2013; right?

A        When I talked to the U.S. Attorney's Office, are you asking?

Q        Yes.

A        Yes.

Q        Okay.  And at that time you were asked a lot of questions by the assistant United States attorneys about the

details and the timeline that Mr. Hochman reviewed with you?

MR. HOCHMAN:  Objection.  Improper impeachment. Form of the question, Your Honor.

THE COURT:  Do you understand the question?

THE WITNESS:  I think I can answer, Your Honor.

THE COURT:  All right.  That's fine.  Go ahead.

THE WITNESS:  Yes.

Q    BY MR. JAUREGUI:  And during that interview, you told the assistant United States attorneys that you couldn't remember a lot of things about the August of 2011 time period in connection with the cell phone; correct?

A    There were things that I couldn't remember, and there were things I could remember, yes.

Q    So, for instance, you were not sure when you first became aware of the cell phone.

A    That's correct.

Q    And Mr. Hochman directed you to August 18, 2011, and said -- you learned about the cell phone around that time; right?

A    That's correct.

Q    But you're not sure when you learned about the cell phone.

A    I can't tell you the date, no.

Q    And you're not sure who told you about the cell phone.

A        Not a hundred percent sure.

Q        You think it might have been Sheriff Baca, but maybe it wasn't?

A        I believe it was Sheriff Baca.

Q        And if it was Sheriff Baca, you weren't sure if that meeting was in person or not in person?

A        I believe it was in person as I told --

Q        But in 2013, when you did your interview with the U.S. Attorney's Office, you said you weren't sure if you learned about it in person or not in person.

A        As I indicated then, I believed that it was in person.

Q        And then after learning about the cell phone, you said that you think you might have talked to Andre Birotte but you don't remember.

A        My recollection is that I believe that I did talk to Andre Birotte.

Q        And directing your attention to August 29 now, you said during -- let me ask you this.  I'll withdraw that and ask another question.

You talked about staying after the August 29 meeting to talk with people in the U.S. Attorney's Office.

A        Yes, sir.

Q        And Mr. Hochman listed off all the people that were present for that interview; right?

A        He asked me about certain individuals that may have been at the meeting if I -- as I recall.

Q        But you weren't sure who stayed for that meeting and who didn't stay for that meeting?

A        I'm sure about some and not sure about others.

Q        Do you recall that Paul Tanaka stayed for a little bit after that August 29 meeting?

A        I do.

Q        And do you recall that Paul Tanaka made some comments to the U.S. Attorney's side of that meeting about the sheriff's perspective on the cell phone?

A        He made some brief comments, yes, sir.

Q        And is it your understanding, Mr. Gennaco, that Paul Tanaka wanted to convey the hawkish position to the U.S. Attorney's Office?

A        I believe that's how I described it when I talked to you all.

Q        And what was the hawkish position?

A        I would characterize it as being very upset that this investigation -- that a cell phone had been introduced into the jail.

Q        And that position that he was conveying was Sheriff Baca's position; right?

A        I don't know.

Q        Your purpose for staying after that August 29

UNITED STATES DISTRICT COURT

meeting was to smooth things over with the U.S. Attorney's Office?

A        I had a number of purposes for staying over.

Q        Was that one of your purposes?

A        To move forward as agencies, yes.

Q        And one of the reasons you did that was because you thought that the sheriff had gotten too emotional at that meeting; right?

A        There was venting, yes, sir.

Q        And Mr. Hochman asked you at length about your background at the start of your direct; correct?

A        Yes.

Q        And you were a former federal prosecutor?

A        Correct.

Q        And he asked you about working with local law enforcement entities when you were a federal prosecutor?

A        Correct.

Q        And you know, based on your experience, Mr. Gennaco, that FBI works with informants all the time.

A        Not all the time.  Frequently.

Q        Frequently.  Fine.

And you know, based on your experience, that it's lawful for the FBI to work with informants.

A        Correct.

Q        And you know, based on all of your experience,

**UNITED STATES DISTRICT COURT**

that sometimes the FBI works with informants and does things that would otherwise not be lawful in order to effectuate their investigations.

A    That's correct.

Q    And doing that is not a crime; right?

A    There is an exemption, yes.

Q    At some point, Mr. Gennaco, you learned that ICIB was conducting an investigation of the FBI; correct?

A    Yes.

Q    And never in that August, September, 2011, period or now did you think that the FBI was doing anything but a lawful investigation into the sheriff's department; correct?

A    I had no reason to think otherwise, yes, sir.

Q    We talked earlier about your attorney/client relationship with Sheriff Baca.

A    Yes.

Q    Did he talk to you about the ICIB investigation into the FBI?

A    No.

Q    During the course of this time period, Mr. Gennaco, you found out that there were a lot of meetings about this issue that were being held behind your back; right?

MR. HOCHMAN:  Objection.  Argumentative.

THE COURT:  You can answer.

THE WITNESS:  I learned much later that there

**UNITED STATES DISTRICT COURT**

were meetings that I was not aware of.

MR. JAUREGUI:  One moment, Your Honor.

Just a couple more questions, Your Honor.

Q      Mr. Gennaco, Mr. Hochman asked you about the press conference attended by Sheriff Baca and Tom Perez; correct?

A      Mr. Perez convened the press conference.  Then Sheriff Baca attended.

Q      Okay.  And I believe that Mr. Hochman referred to an investigation -- civil rights investigation; correct?

A      Yes, sir.

Q      Was that, do you know, a civil investigation or a criminal investigation?

A      Civil investigation.

Q      And Mr. Hochman asked you a lot of questions about OIR's relationship with the ACLU; correct?

A      Yes, sir.

Q      And the ACLU would bring the sheriff's department and OIR a lot of information about violence in the jails; correct?

A      Most of the time that I was at OIR, that is correct.

Q      And you would track that information.

A      We would look into it, yes, sir.

MR. JAUREGUI:  If I could just ask Mr. Fox to

bring up Government Exhibit No. 53, it's in evidence.

Q       And many of the cases that were brought to OIR by the ACLU were cases that had been closed from IA's perspective; correct?

A       Some of them had been, yes.

Q       What you're looking at now, Mr. Gennaco, are some of those cases that were brought to the sheriff's department's attention that were found to be closed and unfounded; correct?

A       It appears that way, yes.

Q       Directing your attention to the bottom part of this e-mail, if you could just read this -- do you see it's an e-mail from Walter Katz to Mike Bornman copying you, "Subject: Retaliation allegations list"?

A       You'd like me to read?

Q       No.  I'm just asking if you see that's what it says.

A       Yes.

Q       On this e-mail, Walter Katz is an attorney at OIR?

A       He was.

Q       And he's -- well, go ahead and read this e-mail that says, "Good morning, Lieutenant," please.

A       "I have pages 1 and 2 of the executive summary of the original ACLU retaliation claims and then the newest set of five complaints you recently sent.  If there are any additional

pages, could you please send them to me as well."

Q        Okay.  Now, directing you -- one second, Your Honor.

Now, directing you to page 7 of this document, it says "Michael Holguin summary."  Do you see that?

A        Yes.

Q        If you could just read that bullet point under "summary."

A        "Involved in a use of force with deputies. Alleged that this occurred after he complained to the ACLU regarding infrequent showers."

Q        Next page.  And then if you could just look at the bottom of it.  Do you see where it says "IAB has"?

A        Yes.

Q        Can you please read that?

A        "IAB has been assigned to investigate this incident."

Q        Mr. Gennaco, excessive use of force is a criminal violation; correct?

A        Could be.

Q        And this is assigned to IA which does administrative violations; correct?

A        According to the document.

Q        Okay.  Now, taking you back to the e-mail, this is an e-mail from you to William Tom Carey dated

**UNITED STATES DISTRICT COURT**

1792

September 1st, 2011.  At that time who was Tom Carey?

A    He was captain of the Internal Criminal Investigations Bureau.

Q    And in this e-mail, Mr. Gennaco, you're sending him a current complete list of ACLU complaints regarding retaliation; correct?

A    Yes.

MR. JAUREGUI:  If we can just go to the top again.

Q    And then Mr. Carey sends this e-mail to Scott Craig and Maricela Long.  They were sergeants in ICIB; correct?

A    Yes.

Q    And the "cc" line is Stephen Leavins.  He was a lieutenant in ICIB?

A    Yes.

Q    The date is 9/12/2011?

MR. HOCHMAN:  Objection.  Cumulative.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  That appears to be the date.

Q    BY MR. JAUREGUI:  Can you read Tom Carey's e-mail, please?

A    "List of ACLU complaints out of CJ.  Probably lead us in part to where/what the feds are looking at."

**UNITED STATES DISTRICT COURT**

Q       Mr. Gennaco, you didn't send this list of ACLU complaints to Tom Carey so ICIB could track the FBI, did you?

A       No.

MR. JAUREGUI:  No further questions, Your Honor.

**REDIRECT EXAMINATION**

BY MR. HOCHMAN:

Q       Mr. Gennaco, let's go back, and we don't even have to show it to -- that Exhibit 53, that Mike Holguin line that the prosecutor showed you, do you recall that?

A       Yes.

Q       And it said that IAB had been assigned to the case; is that correct?

A       Yes.

Q       Does IAB get assigned to cases after ICIB makes a determination that there's insufficient evidence to go criminally?

A       Correct.

Q       And what is the significance of IAB being assigned to a case at that point?

A       If there's not enough evidence in the District Attorney's Office's opinion to prosecute the subject of the investigation, the case automatically goes to Internal Affairs Bureau to see whether or not there were violations of internal departmental policy.

So it's looked at through two prisms.  The

1794

administrative prism is a lower bar. You don't need to prove

beyond a reasonable doubt. And there are things that may be

easier to prove on the admin side than the criminal side.

Q      The prosecutor asked you questions about when you

learned that the FBI had inserted a cell phone into the

Men's Central Jail.

Do you recall those questions?

A      Correct.

Q      Did you learn of it before the August 29 meeting

which you had with U.S. Attorney Birotte, Sheriff Baca, and the

others?

A      Certainly.

Q      Now, the prosecutor asked you questions dealing

with having an attorney/client relationship with the sheriff's

department and Sheriff Baca. What was the purpose of that

attorney/client relationship?

A      To protect the liability -- to protect

conversations from being used in plaintiffs' lawsuits against

the county.

Q      Did that attorney/client relationship allow you

certain abilities to have discussions that you otherwise

couldn't have with the sheriff's department?

A      I could have the discussions, but they would be a

subject to discovery, and I would be testifying in plaintiffs'

lawsuits.

Q        And if you didn't have the attorney/client privilege, would you have been able to have the free discussions with the sheriff's department that you had?

A        It would have been more difficult.

Q        Now, in September -- well, you talked about, in the prosecutor's questions, certain dealings with -- between OIR and the Internal Criminal Investigations Bureau, ICIB.

Do you recall that?

A        Yes.

Q        Did your relationship change in September of 2011 between OIR and ICIB?

A        Yes.

Q        How?

A        We became more involved in reviewing their investigations, at least some of their investigations that were brought to life by the ACLU.

Q        When you say "more involved," what do you mean?

A        Before the case went to the District Attorney's Office for prosecutorial review, we would review the cases for completeness and thoroughness similar to what we did on the IAB side.

Q        And when OIR is the -- the prosecutor asked you certain questions about OIR's abilities to deal with certain investigations that were recorded.

Do you recall that?

UNITED STATES DISTRICT COURT

A        Yes.

Q        Did OIR have the ability to ask the investigators to interview additional witnesses?

A        Yes.

Q        And did OIR do that?

A        Yes.

Q        In the appropriate case?

A        Yes, sir.

Q        And why was that?

A        That was part of our responsibility to make sure that, before the investigation went to the decisionmaker within the department, that it was a complete and thorough investigation.

Q        And did OIR have the ability, if a statement wasn't recorded, to go to the investigator and ask about what the unrecorded part of the statement was all about?

A        Yes.

Q        And did OIR do that as well?

A        Yes.

MR. HOCHMAN:  May I have a moment, Your Honor?

THE COURT:  Yes.

MR. HOCHMAN:  No further questions, Your Honor.

MR. JAUREGUI:  Just one question, Your Honor.

THE COURT:  All right.

MR. JAUREGUI:  Two questions, Your Honor.

UNITED STATES DISTRICT COURT

**RECROSS-EXAMINATION**

BY MR. JAUREGUI:

Q      Mr. Gennaco, you just testified that OIR's relationship to ICIB changed at some point in September of 2011 as a result of the ACLU filing?

A      That was part of it, yes, sir.

Q      That ACLU filing had like 78 declarations attached to it; right?

A      That's about right.

Q      And that was filed on September 28th, 2011; correct?

A      I don't know.

MR. JAUREGUI:  No further questions, Your Honor.

THE COURT:  All right.

MR. HOCHMAN:  No further questions, Your Honor.

THE COURT:  All right.  Sir, you may step down.

THE WITNESS:  Thank you, Your Honor.

MR. HOCHMAN:  The defense would call Carl Covitz to the stand, Your Honor.

THE COURT:  All right.

THE CLERK:  Stand right here, please, and raise your right hand.

Do you solemnly state that the testimony you may give in the cause now pending before this court shall be the truth, the whole truth, and nothing but the truth, so help you

God?

THE WITNESS:  I do.

THE CLERK:  Please be seated.

Will you please state your full name and spell your last name for the record.

THE WITNESS:  Carl Lee Covitz, C-o-v-i-t-z.

THE CLERK:  Thank you.

**CARL LEE COVITZ,**

**DEFENDANT'S WITNESS, SWORN:**

**DIRECT EXAMINATION**

BY MR. HOCHMAN:

    Q    Mr. Covitz, what is your current occupation?

    A    I'm a -- the CEO and president of Landmark Capital.

    Q    CEO is chief executive officer?

    A    Yes, sir.

    Q    What does Landmark Capital do?

    A    We invest in companies and startups.

    Q    How long have you been doing that for?

    A    30 years.

    Q    At some point about 30 years ago, did you serve in Washington, D.C.?

    A    Yes, I did.

    Q    In what capacity?

    A    I was the deputy secretary and acting secretary

**UNITED STATES DISTRICT COURT**

of the United States Department of Housing and Urban Development.

Q    Mr. Covitz, I think you have to step just slightly -- move slightly back from that microphone to make sure you're not too close.

A    Okay.

Q    So I'm sorry.  You were the deputy secretary and acting secretary of the U.S. Housing and Urban Development Department?

A    Yes, sir.

Q    That would have been in Ronald Reagan's Administration?

A    Yes.  The second term of Ronald Reagan's Administration.

Q    And after that, did you serve in any capacity for the state of California Governor Pete Wilson?

A    Yes.  After a few years back in Los Angeles, I became the California Secretary of Business, Transportation and Housing in Governor Wilson's first Administration.

Q    And after that, did you have a chance to serve on any commission?

MR. JAUREGUI:  Your Honor, relevance.  Objection. Relevance.

THE COURT:  Let's go to sidebar.

///

**UNITED STATES DISTRICT COURT**

1800

(The following proceedings were held at sidebar:)

THE COURT:  Okay.  What's this answer going to be?

MR. HOCHMAN:  He did.  I mean, I have three questions.  In other words, I'm trying to establish who he is so that, when he gives character witness, the jury can evaluate --

THE COURT:  I'm sorry.  What is going to be the answer to this question about this commission?

MR. HOCHMAN:  He served on the Little Hoover Commission, Your Honor, which was a bipartisan independent commission.  And then the other things I'll be asking immediately thereafter is if he was the chairman of the Board of the Federal Home Loan Bank of San Fernando and if he was the chairman of the City of Los Angeles Housing Authority.

MR. JAUREGUI:  It seems to me like that's just bolstering this witness.  It's completely disconnected from any relationship with Mr. Baca.

THE COURT:  Okay.  Is there something you want to add?

MR. HOCHMAN:  He was whispering in my ear.

THE COURT:  I know.

MR. HOCHMAN:  I apologize.

THE COURT:  Let's get on with -- let's do this little commission thing, and I think people have the idea of

UNITED STATES DISTRICT COURT

1801

who he is.

MR. HOCHMAN:  Okay.  Thank you, Your Honor.

(The following proceedings were held in open court in the presence of the jury:)

Q      BY MR. HOCHMAN:  Mr. Covitz, did you serve on any commission for the state of California in the 1990s?

A      Yes.

Q      What was that commission?

A      That was the Little Hoover Commission.

Q      What does the -- what was or is the Little Hoover Commission?

MR. JAUREGUI:  Objection, Your Honor.  Relevance.

THE COURT:  Sustained.  Let's move on.

Q      BY MR. HOCHMAN:  How long have you known -- do you know Sheriff Lee Baca?

A      Yes.

Q      Do you see him here in court today?

A      Yes.

Q      Can you identify where he's seated?

A      Yes.

Q      If you could just identify him by what color suit and tie he's wearing?

A      The third gentleman on the right with the orange tie.  I think orange.

THE COURT:  Close enough.

UNITED STATES DISTRICT COURT

1802

MR. HOCHMAN:  Close enough.

We would ask the Court to take notice that the witness identified Sheriff Baca.

THE COURT:  That's fine.

MR. HOCHMAN:  Close enough.

Q        How long have you known Lee Baca for?

A        Approximately ten years.

Q        And when did you first meet him?

A        I was on the board of the -- of an entity, and Sheriff Baca was also on the board.

Q        And was that entity the Homeland Security Advisory Council?

A        Yes, it was.

Q        And in what -- you said you were on the Board --

A        Yes.

Q        What is the Homeland Advisory Council?

MR. JAUREGUI:  Objection, Your Honor.

THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  Were there other people on the Board as well?

A        Yes, there were.

Q        Were other law enforcement people on the Board?

A        Yes.  Yes, there were.

MR. JAUREGUI:  Objection.

THE COURT:  Excuse me.

UNITED STATES DISTRICT COURT

1803

That is sustained.  The answer is stricken.  The jury should disregard it.

Q    BY MR. HOCHMAN:  At some point -- and you've known Sheriff Baca continuously since you first met him ten years ago?

A    Yes.

Q    At some point during -- sometime during September 8th to September 21st, 2011, did you go with Sheriff Baca to Israel to attend a conference that --

THE COURT:  Let's go to sidebar.

(The following proceedings were held at sidebar:)

MR. HOCHMAN:  Your Honor, we spent all last night working out the one question.

THE COURT:  And this is it?

MR. HOCHMAN:  This is it.

THE COURT:  Okay.

MR. HOCHMAN:  Literally the wording is approved by the Government.

THE COURT:  That's fine.

MR. JAUREGUI:  That's correct, Your Honor.

THE COURT:  Okay.

(The following proceedings were held in open court in the presence of the jury:)

MR. HOCHMAN:  May I ask the question again, Your Honor?

**UNITED STATES DISTRICT COURT**

THE COURT:  Yes.

MR. HOCHMAN:  Thank you very much.

Q        Sometime during September 8th to 21st, 2011, did you go with Sheriff Baca to Israel to a conference at which Sheriff Baca was a speaker?

A        Yes.  By that time I had --

MR. HOCHMAN:  Your Honor, if that's okay, we'll just take the "yes" answer.

THE COURT:  That's fine.

MR. HOCHMAN:  Thank you.

Q        Now, did you come to learn Sheriff Baca's reputation in the community for obeying the law?

A        Yes.

Q        And how did you come to learn Sheriff Baca's reputation in the community for obeying the law?

A        By that time, I had become the chairman of the Homeland Security Advisory Council, and I would work with the sheriff on the -- in the business community as well as law enforcement community and first responders.

Q        And did you have a chance to have discussions with other people in the community about Sheriff Baca's reputation for obeying the law?

A        Yes.  Continually.

Q        And based on your -- those discussions, did you form -- do you have -- excuse me.

**UNITED STATES DISTRICT COURT**

Are you aware of Sheriff Baca's reputation for obeying the law?

A       Yes.

Q       What is that reputation?

A       It is of great admiration, great respect and --

MR. JAUREGUI:  Your Honor, nonresponsive.  Move to strike.

THE COURT:  Sustained.  The answer is stricken.  The jury should disregard.

You can ask the question again.

Q       BY MR. HOCHMAN:  What is that reputation of Sheriff Baca in the community for obeying the law?

A       Great admiration and great respect.

MR. JAUREGUI:  Your Honor, same objection.  Move to strike.

THE COURT:  Answer is stricken.  The jury should disregard it.

Q       BY MR. HOCHMAN:  What is Sheriff Baca's reputation in the community for obeying the law?  Is it a good reputation?  A -- provide your --

A       One of the finest reputations in law enforcement.

MR. JAUREGUI:  Objection, Your Honor.  Nonresponsive.  Move to strike.

THE COURT:  Sustained.  The answer is stricken, and the jury should disregard it.

**UNITED STATES DISTRICT COURT**

Q        BY MR. HOCHMAN:  Did Sheriff Baca have an excellent reputation in the community for obeying the law?

A        Yes, he did.

Q        Did you form a personal opinion about Sheriff Baca's reputation -- excuse me -- character for obeying the law?

A        Yes, I have.

Q        What is that opinion?

A        It is of personal great admiration for --

MR. JAUREGUI:  Your Honor, same objection.  Move to strike.

MR. HOCHMAN:  Can I withdraw the question, Your Honor, if possible?

THE COURT:  Yes.

Q        BY MR. HOCHMAN:  Did Sheriff Baca -- do you have a -- is your personal opinion that Sheriff Baca has an excellent reputation for -- excellent character for obeying the law?

A        Yes, I do.

MR. HOCHMAN:  No further questions, Your Honor.

THE COURT:  All right.  Cross-examination.

MR. JAUREGUI:  Very briefly, Your Honor.

**CROSS-EXAMINATION**

BY MR. JAUREGUI:

Q        Mr. Covitz, I see that you have a -- what looks

**UNITED STATES DISTRICT COURT**

like a sheriff's insignia on your coat?

A       Yes.  It is a badge.

Q       That badge is similar to the one the defendant is wearing; right?

A       Well, I can't see the defendant's.  This is the badge of the Los Angeles County Sheriff's Department.

Q       And you are a Los Angeles County Sheriff's Reserve detective?

A       That is correct.

Q       And you've been one for -- you became one in the last ten years?

A       Yes.  That's correct.

Q       At the invitation of Sheriff Baca?

A       That's correct.

Q       Okay.  You testified to Sheriff Baca's reputation for being law-abiding.

A       Yes.

Q       Were you employed at the sheriff's department in Sheriff's Headquarters Bureau in August of 2011?

A       I believe that is correct.

Q       Okay.  Did you participate in -- you did not participate in any meetings at Sheriff's Headquarters Bureau in August of 2011 about moving an inmate named Anthony Brown, did you?

A       No, sir.

**UNITED STATES DISTRICT COURT**

1808

Q       You did not participate in any meetings where there was a discussion about changing Anthony Brown's name.

A       No, sir.

Q       You did not participate in any meetings about approaching a special agent named Leah Marx and threatening to arrest her.

A       No, sir.

Q       You've not been here for the past two weeks --

A       No, sir.

Q       -- in this courtroom.

You've not heard any of the evidence presented to this jury.

A       No, sir.

MR. JAUREGUI:  No further questions, Your Honor.

MR. HOCHMAN:  Briefly, Your Honor.

**REDIRECT EXAMINATION**

BY MR. HOCHMAN:

Q       Mr. Covitz, you said you were a Reserve detective in the Los Angeles Sheriff's Department; correct?

A       Yes, sir.

Q       How long have you been a Reserve detective?

A       I've been a detective about six years.

Q       How old are you, by the way?

A       77.

Q       And what, generally, do you do?

**UNITED STATES DISTRICT COURT**

A        I work --

MR. JAUREGUI:  Your Honor, objection.  Asked and answered.

THE COURT:  Sustained.

Q        BY MR. HOCHMAN:  Are you paid for your position?

A        Yes, I am paid.

Q        How much are you paid?

A        One dollar a year.

MR. JAUREGUI:  Objection.  Relevance.

THE COURT:  Sustained.  The answer is stricken. The jury should disregard it.

MR. HOCHMAN:  No further questions.

MR. JAUREGUI:  Nothing further.

THE COURT:  All right.  Thank you.  You may step down.

MR. HOCHMAN:  The defense calls John March, Your Honor.

THE COURT:  While we're waiting for the witness, let's see counsel at sidebar.

(The following proceedings were held at sidebar:)

THE COURT:  I take it that all of these witnesses have been cautioned that testimony about --

MR. HOCHMAN:  Yes, Your Honor.  I have cautioned every witness on what the proper extent of the answer to my question should be.  Obviously I'm not going to put words in

their mouth.

THE COURT:  That's fine.

MR. FOX:  And we're not imputing anything on Mr. Hochman.  He's cautioned us that there were some concerns with these witnesses.  The one thing that we are concerned about is, they say something about his honesty, and then we think they've opened the door to --

MR. HOCHMAN:  I have done my absolute best to, and I will not ask a question that gets close to it.

THE COURT:  Okay.

(The following proceedings were held in open court in the presence of the jury:)

THE CLERK:  Stand here for me, please.  Raise your right hand.

Do you solemnly state that the testimony you may give in the cause now pending before this court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

THE CLERK:  Please be seated.

Please state your full name and spell your last name for the record.

THE WITNESS:  John March, M-a-r-c-h.

THE CLERK:  Thank you.

///

**UNITED STATES DISTRICT COURT**

**JOHN MARCH,**

**DEFENDANT'S WITNESS, SWORN:**

**DIRECT EXAMINATION**

BY MR. HOCHMAN:

Q      Mr. March, what is your current occupation?

A      I am a consultant in the amusement park business.

Q      How long have you been doing that for?

A      I've been doing it off and on since 1975.

Q      So over 40 years approximately?

A      Uh-huh.

Q      Do you know Sheriff Lee Baca?

A      Yes, I do.

Q      Do you see him here in court today?

A      Yes.  He's right over there.

MR. HOCHMAN:  May the record reflect the witness has identified Sheriff Baca?

THE COURT:  The record will so reflect.

Q      BY MR. HOCHMAN:  How long have you known Sheriff Baca for?

A      14 years.

Q      What was the occasion that -- where you first met Sheriff Baca?

A      I met him on the night that my son was killed. He was a deputy with L.A. County.

Q      When was that, please?

**UNITED STATES DISTRICT COURT**

1812

A       April 29, 2002.

Q       And how is it that you met Sheriff Baca that night?

A       We went to the hospital where my son's body was, and the sheriff was there, and he sat with us, consoled us.

Q       And was your son killed in the line of duty?

A       Yes, he was.

Q       After that night, did you see Sheriff Baca again?

A       Many times.

Q       Did you also speak to him as well?

A       Yes.  He made sure that we had his home phone number, his cell phone number, and was always available for us day and night.

Q       Did you ever have a chance to work with Sheriff Baca?

A       Yes, I did.

Q       How did that come about?

A       He asked me to -- if I could come and help with the Sheriff's Youth Foundation, and anything he would ask, I would do.  So I came and helped out with the Youth Foundation for about two years.

Q       Approximately when was that?

A       It was in the time frame of 2012, 2013.

Q       And what did you do for the Youth Foundation?

A       I helped get it more organized and also helped in

UNITED STATES DISTRICT COURT

1813

fund-raising and setting up programs to help the kids.

Q      And what type of programs are those?

MR. FOX:  Objection, Your Honor.

THE COURT:  Sustained.

Q      BY MR. HOCHMAN:  Did you work with Sheriff Baca when you started at the Sheriff's Youth Foundation?

A      Yes.

Q      In what capacity?

A      I was director of operations.

Q      And was the sheriff involved at all?

A      Yes.  He was the chairman of the foundation.

Q      Now, since April 29, 2002, did you come to learn the reputation of Sheriff Baca in the community for obeying the law?

A      Yes, I did.

Q      And from whom in the community did you learn this reputation?

A      In the Sheriff's Youth Foundation, we dealt with many religious groups of all sorts -- Jewish, Muslim, Christian.  We dealt with all racial groups, and all were supportive of the foundation, and all of them had a great deal of respect for Lee's standard of following the law.

Q      And what is that reputation of Sheriff Baca in the community for following the law?

A      That he doesn't compromise.

UNITED STATES DISTRICT COURT

Q        Did you form a personal opinion of Sheriff Baca's character for following the law?

A        Yes, I did.

Q        And what is that personal opinion that you have of Sheriff Baca's character for following the law?

A        In 14 years, I've never seen him compromise in following the rule of law and being a good example to me and others.

MR. HOCHMAN:  No further questions, Your Honor.

THE COURT:  All right.

MR. FOX:  Nothing, Your Honor.

THE COURT:  All right.  You may step down.  Thank you.

MR. HOCHMAN:  Your Honor, the defense calls Ira Reiner to the stand.

THE CLERK:  If you'll stand here for me, please. Raise your right hand.

Do you solemnly state that the testimony you may give in the cause now pending before this court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

THE CLERK:  Please be seated.

THE WITNESS:  Thank you.

THE CLERK:  Will you please state your full name

and spell your last name for the record.

THE WITNESS:  Ira Reiner.  That's R-e-i-n-e-r.

THE CLERK:  Thank you.

**IRA REINER,**

**DEFENDANT'S WITNESS, SWORN:**

**DIRECT EXAMINATION**

BY MR. HOCHMAN:

Q      Mr. Reiner, are you an attorney?

A      Yes, I am.

Q      Licensed in the state of California?

A      That's correct.

Q      And how long have you been a licensed attorney in the state of California?

A      Since 1964.

Q      So over 50 years?

A      Yes.  Ouch, but yes.

Q      Have you had a chance to work for the City of Los Angeles during that time?

A      I have.

Q      In what capacity?

A      Well, several.  I was -- right out of law school I was a deputy city attorney for three years.  Later I was a city fire commissioner.  That was a Mayoral appointment by Tom Bradley.  After that I was the elected city controller for Los Angeles for one term.  Then I was the elected City Attorney

UNITED STATES DISTRICT COURT

1816

of Los Angeles for one term.  And then after that -- well, that would be county -- elected District Attorney for two terms.

Q       When you say two terms, that's --

A       Eight years.

Q       And then after you served as the District Attorney for the County of Los Angeles, what did you do next?

A       Well, then I went into private law practice.  It was my own firm, Riley & Reiner, and that was for about -- I think it was 17 years.  It was primarily civil litigation.

Q       And after that, were you the president of an organization?

A       Yes.  I was -- during the latter part of that, I was recruited to be the president and CEO of the Homeland Security Advisory Council.

Q       And what is that?

MR. JAUREGUI:  Objection, Your Honor.  Relevance.

THE COURT:  Sustained.

Q       BY MR. HOCHMAN:  How long have you known Sheriff Lee Baca for?

A       I first met Sheriff Lee Baca in 1984.

Q       What were you doing in 1984 at that point?

A       Well, I had just been elected -- just began to take office as District Attorney, and I was making the rounds of all of the sheriff substations meeting the captains that were in charge of the substations.  And Sheriff Baca -- at that

**UNITED STATES DISTRICT COURT**

time it was Captain Baca in charge of one of the sheriff substations.

Q      And did you have a chance to work with him back then?

A      I did, of course.

Q      In what capacity?

A      Well, as District Attorney, you're obviously working with all law enforcement agencies.  There's some 50 police agencies in Los Angeles County of which the sheriff is the largest.

Q      And did you also have a chance to work with him in the 2000s -- in the 2000 -- the decade of the 2000s?

A      Well, yes.  Let me figure out where I was at that time, that particular time.  That would have been when I was with the Homeland Security Advisory Council.  Our board of directors there was made up of about 50 percent from what we call emergency first responders.

MR. JAUREGUI:  Objection, Your Honor.  Relevance.  Move to strike.

THE COURT:  Sustained.  The answer is stricken.  The jury should disregard it.

Q      BY MR. HOCHMAN:  Did you work with Sheriff Baca in connection with business leaders?

A      That's correct.

Q      Now, did you work with Sheriff Baca in connection

**UNITED STATES DISTRICT COURT**

with other law enforcement?

A    That's correct.

Q    And were you able to learn over these years, over the 30 years or so that you've known Sheriff Baca, the reputation of Sheriff Baca in the community for obeying the law?

A    Yes.

Q    In what way were you able to learn that?

A    In working with members of the sheriff's department, the District Attorney's Office, other law enforcement agencies that also worked with the sheriff's department including, I guess, every federal agency, law enforcement agency within this area.  That would be drug enforcement.  It would be also, of course, the FBI.

Q    And what was Sheriff Baca's reputation in the community for obeying the law?

A    Excellent.

Q    Did you also form a personal opinion of Sheriff Baca's character for obeying the law?

A    Yes, I did.

Q    And what is your personal opinion of Sheriff Baca's character for obeying the law?

A    Excellent.

MR. HOCHMAN:  No further questions.

///

**UNITED STATES DISTRICT COURT**

**CROSS-EXAMINATION**

BY MR. JAUREGUI:

Q    Mr. Reiner, you were not the District Attorney at the time that the defendant became the sheriff of Los Angeles County; correct?

A    I'm sorry.  At the time that --

Q    The defendant became the sheriff of Los Angeles County.

A    No.  That would be Sherman Block at that time.

Q    When you were the district attorney, you said you worked with multiple law enforcement agencies including the FBI?

A    That's correct.

Q    And as the District Attorney, you knew that the FBI could and did investigate local law enforcement agencies for civil rights abuses; correct?

MR. HOCHMAN:  Beyond the scope, Your Honor.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  Yes.

Q    BY MR. JAUREGUI:  And you knew then that the FBI could and did investigate local elected officials for public corruption?

MR. HOCHMAN:  Beyond the scope, Your Honor. Objection.

1820

THE COURT:  Overruled.

You can answer.

THE WITNESS:  I'm sorry, Your Honor.  I couldn't hear your answer.

THE COURT:  You can answer the question.

THE WITNESS:  Thank you.

Yes.

Q    BY MR. JAUREGUI:  And, Mr. Reiner, you also knew, having been a criminal attorney for so many years, that a law enforcement officer, whether state or federal, conducting an undercover operation does not commit a crime simply by conducting that undercover operation.

MR. HOCHMAN:  Objection, Your Honor.  Beyond the scope.  Calls for legal conclusion.

THE COURT:  Sustained.

Q    BY MR. JAUREGUI:  Now, Mr. Reiner, you testified that you believe the defendant has a reputation for being law-abiding?

A    That's correct.

Q    And that you have a personal opinion of him being law-abiding?

A    That's correct.

Q    And in order to be law-abiding, someone must know the law; right?

A    I suppose, as you put it, the answer would

**UNITED STATES DISTRICT COURT**

obviously have to be yes.

Q    And you believe that the defendant, when he was sheriff, knew the law; right?

A    I would make such an assumption if you're asking for an assumption, of course.

MR. JAUREGUI:  No further questions.

THE COURT:  All right.

MR. HOCHMAN:  No further questions, Your Honor.

THE COURT:  All right.  You may step down.

THE WITNESS:  Thank you.

MR. HOCHMAN:  Your Honor, defense calls Steve Cooley to the stand.

THE CLERK:  Stand over here for me, please. Raise your right hand.

Do you solemnly state that the testimony you may give in the cause now pending before this court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

THE CLERK:  Please be seated.

Would you please state your full name and spell your last name for the record.

THE WITNESS:  Stephen, S-t-e-p-h-e-n, middle initial L., last name Cooley, C-o-o-l-e-y.

THE CLERK:  Thank you.

**UNITED STATES DISTRICT COURT**

**STEPHEN L. COOLEY,**

**DEFENDANT'S WITNESS, SWORN:**

**DIRECT EXAMINATION**

BY MR. HOCHMAN:

Q      Mr. Cooley, what is your current occupation?

A      I currently operate my own sole practitioner law firm, Steve Cooley & Associates.

Q      What does that law firm do?

A      I'd say the bulk of our clients, we conduct investigations on behalf of victimized individuals and entities.

Q      How long have you been doing that for?

A      I formed the firm in January of 2013.

Q      Now, prior to January, 2013, what was your occupation?

A      Well, for nearly four decades I was with the Los Angeles County District Attorney's Office.  I started out as a law clerk August 6, 1973, and my last 12 years in the D.A.'s Office I was the elected district attorney.

Q      And in between being a law clerk with the Los Angeles County District Attorney's Office and being the District Attorney of that office, did you have other positions in the office?

A      Numerous.

Q      And very briefly, what were they?

UNITED STATES DISTRICT COURT

1823

A      I did entry level misdemeanor and preliminary hearing work in El Monte.  I was then assigned to Central Juvenile downtown and did those cases, primarily real heavy cases.  Then was assigned to Central trials for a couple of years doing felonies, adult felonies.  And then I went to Pasadena Juvenile as a deputy in charge and then went to major narcotics as a deputy in charge.  I was then promoted to head deputy and did eight years in the Antelope Valley, then four years in San Fernando as the head deputy, and then four years as the head deputy in the Welfare Fraud Division.

Q      And you said that you were the District Attorney. Is that an elected position?

A      Yes.

Q      How many times were you elected?

A      I was elected to three consecutive terms.

Q      Three consecutive terms of four years each?

A      Yes.  Starting in 2000 and ending in my -- my terms ended in December of 2012.

Q      And as the district attorney in charge of the entire office, that was for Los Angeles County; correct?

A      That's correct.

Q      That's the -- so that includes Los Angeles city but then has the surrounding areas that make up the county; is that correct?

A      Well, the jurisdiction of Los Angeles County

**UNITED STATES DISTRICT COURT**

D.A.'s Office is to prosecute felonies that occur within the county limits and misdemeanors that occur where there is no city prosecutor.  In Los Angeles County there are 88 cities. 78 of the cities rely upon the district attorney to prosecute their misdemeanors.

THE COURT:  Okay.  Thank you, sir.

Next question.

THE WITNESS:  Prosecutes misdemeanors.

THE COURT:  Excuse me.  Thank you.

Next question.

Q      BY MR. HOCHMAN:  How long have you known Sheriff Lee Baca for?

A      I think I first met Lee before he was sheriff when he was campaigning for sheriff.

Q      All right.  And then at some point were you aware that Sheriff Baca was elected sheriff in approximately 1998?

A      That's correct.

Q      And thereafter -- and you said you were elected District Attorney first when?

A      2000.

Q      And at the point at which you were elected District Attorney for Los Angeles County, did you start working with Sheriff Lee Baca of the Los Angeles County Sheriff's Department?

A      Yes.

Q        In what capacity did you work with him?

A        Well, numerous capacities.  We served on various committees and groups together.  We worked individually on certain projects such as the crime lab out at Cal State L.A. So there were ad hoc projects.  There were meetings with different groups we both belonged to.

Q        And in those meetings and in the different group -- you also had individual meetings with Sheriff Baca; is that correct?

A        Yes.

Q        In those group meetings and the individual meetings, did the meetings also include other law enforcement agencies?

A        Oftentimes.

Q        Did you become familiar in all these meetings with all these groups with Sheriff Baca's reputation in the community for obeying the law?

A        Yes.

Q        And did you form -- did you -- and what is that reputation of Sheriff Baca in the community for obeying the law?

A        That he's law-abiding.

Q        And did you form a personal opinion of Sheriff Baca's character for obeying the law?

A        Yes.

**UNITED STATES DISTRICT COURT**

Q    And what is your opinion of Sheriff Baca's character for obeying the law?

A    That he's law-abiding.

MR. HOCHMAN:  No further questions.

MR. FOX:  May I inquire, Your Honor?

THE COURT:  Yes, please.

**CROSS-EXAMINATION**

BY MR. FOX:

Q    Mr. Cooley, you're not here today to tell this jury that Mr. Baca did not break the law with respect to the charges in this case; correct?

A    I'm not here to do that.

Q    You believe that's for the jury to decide; correct?

A    Correct.

Q    Now, Mr. Cooley, while you were District Attorney and while Mr. Baca was sheriff, the sheriff's department conducted undercover operations; correct?

A    Yes.

Q    And sometimes these undercover operations would be when a deputy in an undercover fashion might exchange money for drugs; correct?

MR. HOCHMAN:  Objection.  Beyond the scope, Your Honor.

THE COURT:  Overruled.

**UNITED STATES DISTRICT COURT**

You can answer.

THE WITNESS:  That would be one context.

Q    BY MR. FOX:  And in that context, Mr. Baca never referred to you any deputy for prosecution who, as part of his undercover operation, exchanged money for drugs; correct?

MR. HOCHMAN:  Objection, Your Honor.  Beyond the scope.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  Can you repeat the question?

MR. FOX:  Sure.

Q    When Mr. Baca was sheriff and when you were District Attorney, Mr. Baca never referred, to you, for prosecution a deputy who had simply in an undercover operation exchanged money for drugs; correct?

A    Well, the sheriff himself does not submit cases to the District Attorney.  There are subordinates that bring those cases from one department, the sheriff's department, to the District Attorney's Office.

Q    As far as you're aware, during your time as D.A. and during Mr. Baca's time as sheriff, the sheriff's department never submitted for prosecution a deputy who had simply exchanged money for drugs as part of an undercover operation; correct?

A    I would have to research that.

**UNITED STATES DISTRICT COURT**

Q        You cannot think of a time right now when that would have happened; correct?

A        I'd have to research that.

Q        As you sit there right now, Mr. Cooley, you can't think of a time in which that happened; correct?

MR. HOCHMAN:  Objection.  Asked and answered.

THE COURT:  Overruled.

THE WITNESS:  I'd have to research that.

Q        BY MR. FOX:  Do you understand my question?  I'm saying, as you're sitting there right now, you can't, in your mind, think of one instance in which that happened; correct?

MR. HOCHMAN:  Objection.  Asked and answered.

THE COURT:  Overruled.

THE WITNESS:  Correct.

Q        BY MR. FOX:  Mr. Cooley, during the time when you were District Attorney and Mr. Baca was sheriff, if Mr. Baca had a question about whether anyone had committed a crime, he could have called you; correct?

A        He could have.

Q        Okay.

A        That's not the way it's ordinarily done.

Q        If he had a question about whether in a high-profile case somebody had committed a crime, he could have called you; correct?

A        Correct.

UNITED STATES DISTRICT COURT

Q        If he had a question about whether the FBI had committed a crime, he could have called you; correct?

A        Correct.

Q        If he felt that the FBI had committed a crime in an undercover operation by bribing a deputy to take a phone into Men's Central Jail, he could have called you; correct?

MR. HOCHMAN:  Objection.  Improper hypothetical. Beyond the scope.

THE COURT:  Sustained.  It's beyond the scope.

Q        BY MR. FOX:  Well, in terms of the facts of this case, you -- in August and September of 2011, you weren't aware of any of the meetings that were going on with Mr. Baca concerning the cell phone; correct?

A        That's correct.

Q        And he never called you and asked for your advice with respect to the cell phone; correct?

A        Correct.

Q        Mr. Baca never called you for advice with respect to whether to approach an FBI special agent and threaten her arrest; correct?

A        Correct.

Q        And you would have never advised him to do that; correct?

A        Correct.

MR. FOX:  No further questions.

UNITED STATES DISTRICT COURT

1830

**REDIRECT EXAMINATION**

BY MR. HOCHMAN:

Q        Mr. Cooley, was it the sheriff's department or the District Attorney's Office that makes the final decisions on whether or not to bring criminal charges against anyone in Los Angeles County?

A        It's the District Attorney's Office.

MR. HOCHMAN:  No further questions.

MR. FOX:  Nothing, Your Honor.

THE COURT:  All right.  You may step down.

THE WITNESS:  Thank you.

MR. HOCHMAN:  Your Honor, may I have a moment to consult with counsel?

THE COURT:  Yes.

(Counsel confer.)

MR. HOCHMAN:  The defense calls Rose Ochi to the stand.  May I go outside to --

THE COURT:  That's fine.

THE CLERK:  If you'll stand here for me, please.  Raise your right hand.

Do you solemnly state that the testimony you may give in the cause now pending before this court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

**UNITED STATES DISTRICT COURT**

1831

THE CLERK:  Please be seated.

Please state your full name and spell your last name for the record.

THE WITNESS:  Rose Matsui Ochi, O-c-h-i.

**ROSE OCHI,**

**DEFENDANT'S WITNESS, SWORN:**

**DIRECT EXAMINATION**

BY MR. HOCHMAN:

Q     Ms. Ochi, are you an attorney?

A     Yes.

Q     How long have you been an attorney for?

A     Since 1972.

Q     I'd like to take you back to your first employment.  Where was that for?

A     My first employment?

Q     Yes.

A     I was a Reggie Fellow which is a poverty lawyer, and I was working for the Western Center on Law and Poverty. My boss was Terry Hatter.

Q     Let me ask you, at this point -- at some point after you worked for the Western Center of Law and Poverty, did you work for Mayor Tom Bradley, the Los Angeles Mayor's Administration?

A     Yes.  Terry Hatter became the --

MR. JAUREGUI:  Objection if this is going where I

UNITED STATES DISTRICT COURT

1832

think it's going to go.

THE COURT:  I'm not sure where it's going.

MR. HOCHMAN:  Your Honor, I'll --

THE COURT:  That's fine.

Q       BY MR. HOCHMAN:  At some point you worked for Mayor Tom Bradley's Administration?

A       Yes.  I worked for Terry Hatter.

Q       When you worked for Mayor Tom Bradley's Administration, did you work in any particular department?

A       Yes.  It was a -- it was a criminal justice planning office.

Q       And did you work there for approximately 17 years?

A       Yes.

Q       And thereafter, did you have a chance to work in the Clinton Administration back in Washington, D.C., in the 1990s?

A       Yes.

MR. JAUREGUI:  Objection.  Relevance, Your Honor. Move to strike.

THE COURT:  That answer will stand.

What's the next question?

Q       BY MR. HOCHMAN:  And what was the position that you had or did you have a position in the Office of Drug Control and Policy in connection with the Clinton

UNITED STATES DISTRICT COURT

Administration?

MR. JAUREGUI:  Objection.  Relevance.

THE COURT:  You can answer that question.

THE WITNESS:  The first position in the Clinton Administration was I was the associate director of the White House Drug Control Policy.  My boss was a drug czar.  His name was Lee Brown.

Q    BY MR. HOCHMAN:  Let me stop you there.

At some point -- and then you worked for the Drug Control Policy Office for a number of years; is that correct?

A    Well, not quite.  Maybe -- not quite two years. Lee Brown left to run for Mayor of Houston.

Q    At some point did you work with the High-intensity Drug Trafficking Program?

A    At that time I headed up -- that was under my shop, yes.

Q    And then --

A    I was able to expand that from one model program into ten including Los Angeles.

MR. JAUREGUI:  Your Honor.

THE COURT:  Excuse me.  Let's get to the pertinent part here.

MR. HOCHMAN:  I'm almost there.

THE COURT:  You'd better get there pretty quick.

1834

Q        BY MR. HOCHMAN:  Were you the director of
Community Relations Service at the United States
Department of Justice during the Clinton Administration?

A        Yes.  I worked for Janet Reno.

Q        Just --

A        Yes.

Q        And did you serve in that position for seven
years?

A        Yes.

Q        Now, at some point after that, did you go from
Washington, D.C., and come back to Los Angeles, and were you
appointed to the Los Angeles Police Commission?

A        That's correct.

Q        And did you serve for the police commission for
about four or five years?

         And now this is in the 2000s?

A        Yes.  That was about four years during
Mayor Hahn's Administration.

Q        And at some point did you become the director of
the California Forensic Science Institute that had a crime lab
as part of it?

A        Yes, sir.

Q        And was that at Cal State -- is it Cal State
Los Angeles or Cal State Northridge?

A        This was Cal State Los Angeles.  This is in the

**UNITED STATES DISTRICT COURT**

crime lab.

Q      And when you -- and I'll only focus on how you know Sheriff Lee Baca.

How long ago did you first meet Sheriff Lee Baca?

A      Actually, probably when I was in the Clinton Administration I attended many law enforcement conferences, and I believe Lee Baca has been speakers on different topics over the years.  And then I met him when I returned as I was a police commissioner.  And so I became very familiar with the things that they were doing, the department as well as -- can I give an example?

THE COURT:  No.  Just tell us how long have you known him.  How long have you known him?

THE WITNESS:  How long ago?

THE COURT:  Yes.  How long have you known --

THE WITNESS:  It was in the Hahn Administration.

THE COURT:  Okay.  Next question.

MR. HOCHMAN:  Okay.

Q      And did you work with Sheriff Baca in connection with the crime lab that you were the director of?

A      Yes.  Well, actually, Lee Baca was instrumental in securing the support from Sacramento --

MR. JAUREGUI:  Your Honor, objection.

THE COURT:  Sustained.  The answer is stricken. The jury should disregard it.

1836

Q        BY MR. HOCHMAN:  Yes or no.  Did you work with --

A        Yes, I did.

Q        I'm sorry.  Let me finish the question.

Did you work with Sheriff Lee Baca in connection with the crime lab that you were the director of?

A        Yes.  The crime lab came into existence because of --

MR. JAUREGUI:  Your Honor.

THE COURT:  Excuse me.  That answer is stricken, and the jury should disregard it.

Please just answer his questions.

THE WITNESS:  I see.

MR. HOCHMAN:  Your Honor, can we keep the "yes" part of that answer?

THE COURT:  The "yes" part will stand.  The rest of it is stricken.

MR. HOCHMAN:  Thank you, Your Honor.

Q        And then did you continue to work with Lee Baca in connection with the crime lab over the last many years?

A        Yes.  The crime lab -- yes.

Q        Thank you.

And were there others involved in the community that were involved with you and Sheriff Lee Baca and the crime lab?

A        Well, they're members of our board of

UNITED STATES DISTRICT COURT

directors --

THE COURT:  Let's go to sidebar.

(The following proceedings were held at sidebar:)

THE COURT:  Okay.  This is the fifth or sixth character witness that we've heard.  It's getting a little cumulative.  So if you want her to give her opinion, you should get to it right now because otherwise we're going to be done.

MR. HOCHMAN:  It was -- the next question was the four questions, Your Honor.

THE COURT:  Well, let's get to that.

MR. HOCHMAN:  Thank you, Your Honor.

(The following proceedings were held in open court in the presence of the jury:)

Q     BY MR. HOCHMAN:  Ms. Ochi, did you learn of Sheriff Lee Baca's reputation in the community for obeying the law?

A     Yes.  Yes.  I've worked with him for a number of years.  Yes.

Q     And what is that reputation?

A     It was -- he was -- when I say community, community in the political world and the community in terms of the community -- the county as a whole.  He's held in high esteem.  He's someone that really --

MR. JAUREGUI:  Your Honor, objection.  Move to strike that answer.  Nonresponsive.

UNITED STATES DISTRICT COURT

1838

THE COURT:  Sustained.  The answer is stricken. The jury should disregard it.

Q    BY MR. HOCHMAN:  What is his reputation in the community for obeying the law?

A    He was a sheriff that was out there in the community --

Q    Did sheriff -- I'm sorry.

Did Sheriff Lee Baca have a very good reputation in the community for obeying the law?

A    Very solid, and he was very out there.

Q    And did you have a personal opinion of his character for obeying the law?

A    Yes, I do.

Q    What is your personal opinion of his character for obeying the law?  Was it very high?  Or please tell us what your opinion is.

A    He's someone that I hold in high regard.  He's someone that --

Q    For obeying the law?

A    Oh, yes.

MR. HOCHMAN:  No further questions.

MR. JAUREGUI:  Briefly.

THE COURT:  All right.

///

///

**UNITED STATES DISTRICT COURT**

## CROSS-EXAMINATION

BY MR. JAUREGUI:

Q      Ms. Ochi, you said you worked for the United States Department of Justice?

A      Yes, I did.

Q      And you've also worked for the Office of Criminal Justice Planning here in Los Angeles?

A      Yes.  That's correct.

Q      And you've served on the Los Angeles Police Commission for four years; right?

A      Yes.  That's right.

Q      And so you had a lot of exposure to law enforcement individuals?

A      I would say so.

Q      And you yourself are an attorney.

A      Yes, I am.

Q      Just because someone wears a badge, Ms. Ochi, doesn't mean that they are law-abiding; correct?

A      I agree.

Q      And just because someone holds elected office doesn't mean that they are law-abiding; correct?

A      Of course.

Q      In preparation for this trial, you provided your biography to the defense; correct?

A      My resume?

**UNITED STATES DISTRICT COURT**

1840

Q        Your resume.  Sure.

A        Yes.  My biography.

Q        And on your resume, you listed references.

A        Yes.

Q        You listed five of them?

A        I don't know which biography, but do you want me to name them?

Q        No.  That's fine.  Let me ask you this.

You would only list people as references if you believe they were law-abiding.

A        Yes.

Q        And you listed on your list of references someone named Richard Alarcon; correct?

A        Yes.

Q        And he is someone who reported to you at some point?

A        Yes.  Richard is someone I --

Q        Yes or no.

A        Yes.

Q        And he is someone you know who has been charged with felonies for lying about his residency; isn't that right?

MR. HOCHMAN:  Objection.  Improper --

THE WITNESS:  Actually --

THE COURT:  Excuse me.

MR. HOCHMAN:  Objection.  Improper impeachment.

**UNITED STATES DISTRICT COURT**

THE COURT:  Let's go to sidebar.

(The following proceedings were held at sidebar:)

MR. JAUREGUI:  Your Honor, she's expressing her opinion about the defendant's character for law-abidingness, and she listed Richard Alarcon on her list of references.  Even after Mr. Alarcon was charged, convicted and then appealed and then recharged, she provided a contribution to him earlier this year.  That's where I'm going with this.

MR. HOCHMAN:  Your Honor, that's about as 403 and as far away from improper impeachment as you can have.  It's not that she provided some -- Mr. Alarcon is still fighting the charges, Your Honor.  He's not presumed to be guilty.  He's presumed to be innocent until he's found guilty.  The fact it overturned, he's innocent again.

MR. JAUREGUI:  I'm not litigating his guilt, but she knows he has been charged again, and she still contributed to his campaign.  And again --

MR. HOCHMAN:  The 403, the minimal probative value, if there is any, is vastly outweighed by the prejudicial value, waste of time.  It's a character witness, Your Honor.  It's not a fact witness.  And their credibility, while like every witness at issue -- I mean, again, this is about as collateral as you can attack, tenuous, and I think it's substantially outweighed by prejudice, waste of time, jury confusion of another case that Sheriff Baca has nothing to do

**UNITED STATES DISTRICT COURT**

with.

THE COURT:  Okay.  So what is it that you want to ask her?

MR. JAUREGUI:  Your Honor, the question is is he someone who has been charged with felonies for lying about his residency in order to get elected.  Even after learning that he lied, you donated to his campaign?  I can withdraw the last question.

THE COURT:  Okay.  So what is it that you want to ask her?

MR. JAUREGUI:  If he is someone who has been charged with felonies for lying.  So she's answered she would only put people on her reference list who she believed were law-abiding.  She listed Richard Alarcon.  She answered the question that he is someone who reported to her.  Then I would ask her if he's someone who was charged with felonies for lying.

MR. HOCHMAN:  Your Honor, I would suggest that that is about as far afield for attacking a character witness' credibility as you can get, and the 403 issues that the jury might get confused that Richard Alarcon's case is now before them that they have to evaluate.

MR. JAUREGUI:  Your Honor, I don't want to -- I'll withdraw the question and just close it up.

THE COURT:  All right.

**UNITED STATES DISTRICT COURT**

1843

(The following proceedings were held in

open court in the presence of the jury:)

MR. JAUREGUI:  No further questions, Ms. Ochi.

Thank you.

MR. HOCHMAN:  No further questions.

THE COURT:  You may step down.

THE WITNESS:  Thank you.

MR. HOCHMAN:  The defense would call

Cameron Saul, Your Honor.

THE COURT:  Ladies and gentlemen, we're going to

take our final break of the day.  Again, I want to remind you,

until this trial is over, you're not to discuss this case with

anyone, including your fellow jurors, members of your family,

people involved in the trial, and do not allow anyone else to

discuss the case with you.  If anyone approaches you and tries

to talk to you about this case, please let me know about it

immediately.

Do not read, watch, or listen to any news reports

about the trial or anyone associated with it.  If anybody

approaches you and tries to talk with you about this case,

please let me know about it immediately.

We'll come back at 12:00 o'clock.

(The following proceedings were held in

open court out of the presence of the jury:)

MR. HOCHMAN:  Your Honor, a couple quick points

**UNITED STATES DISTRICT COURT**

1844

if I might.

THE COURT:  Yes.

MR. HOCHMAN:  I just spoke with my client. Unless something changes in the next two witnesses, he will not be testifying in this trial.

THE COURT:  Okay.

MR. HOCHMAN:  And then with respect to the next witness, Your Honor, it involves an individual who actually is one of the inmates who filed one of the ACLU complaints, Your Honor.  He will talk about his time in Men's County Jail in the relevant time period of 2007 to 2010.

He did, Your Honor, have -- himself, he went through an education program that he will talk about that he took in the Men's Central Jail in this time frame as being one of the inmates who reported deputy abuse at the same time.

So it doesn't get into any statistical analysis. It doesn't talk about decreasing or any of the issues the Court has dealt with.  Although the witness after him would be a gentleman named Richard Winetraub.  He is an individual who was in charge of the Bureau of Training and Education.  He would talk about in a pre-September, 2011, context -- actually, strike that.

In 2009, '10, he would talk about the education programs for the first time being brought into the jail system including the Men's Central Jail.  He would say, Your Honor,

**UNITED STATES DISTRICT COURT**

that those programs -- he would list the same ones that I listed for you yesterday, GED program, vocational programs, anger management, drug awareness and rehabilitation programs. He would say that -- and this was at Sheriff Baca's direction.

They expanded these programs at the same time that the ACLU is making these complaints, and he would be the one, Your Honor, who would say that he personally observed -- and it's based on his own personal observations -- that deputy-on-inmate violence was reduced for the inmates to whom they expanded the programs for.

He would also say that the programs didn't reach every inmate. They had certain budgetary restrictions and whatnot. But to the ones that they were able to expand it to, it did have that impact.

And then he would explain it by saying that one of the reasons or the reasons for why it has that impact is that inmates at that point are given education. They're given the ability to have something to do and hope for and work for that they otherwise didn't have at that point.

He would also talk about the education of deputies that occurred at the same exact time that made them more aware of how to deal with inmates with these anger management issues in a way that they didn't have a tool set at that point to deal with.

So it's a direct -- it deals with the ACLU's

**UNITED STATES DISTRICT COURT**

allegations of deputy-on-inmate violence, Your Honor.  It came from Sheriff Baca.  It was one of the responses to that issue. And again, to the extent that the Government is saying that part of Sheriff Baca's motivation is that he didn't want anybody to look into the jails and see what was going on, Sheriff Baca was promoting these programs to deal with these precise issues that the ACLU was raising, and his motivation was to partner with the ACLU and deal with these programs, not to fight them or the FBI looking into allegations of inmate abuse that stemmed from the ACLU's allegations, Your Honor.

MR. FOX:  Your Honor, do you mind if I step outside?  I have to deal with something with respect to -- thank you.

MR. JAUREGUI:  Your Honor, I think both of these witnesses comes clearly within the motion that was filed by the defense and that we responded to.  Based on the proffer that Mr. Hochman has provided, I think both of these witnesses' testimony are irrelevant.  I also think they are a waste of time, unnecessary -- they come within 403, and as I've notified Mr. Hochman, I believe that, at least with regard to Mr. Saul, and it sounds like also Mr. Weintraub, this really is just character evidence.  And both of these witnesses were noticed as fact witnesses.

So I just don't see how either one of these witnesses can make a direct connection back to Mr. Baca's

intent.  We've explained the authority in our brief, Your Honor, and we would submit on that.

THE COURT:  Okay.

MR. HOCHMAN:  And, Your Honor, Mr. Saul actually, when he was -- he not only participated in the education programs, but he dealt directly with Sheriff Baca in the 2007 and 2009 period to be a teacher of other inmates at Sheriff Baca's direct urging at that point.  And what he would say is this is the -- you know, the Government has called the ACLU to put in inmate complaints about deputy abuse.  He is actually an inmate who complained, and we'll get into the complaint about deputy abuse.  And, you know, it's fairly extensive.  It was filed on June of -- excuse me.  His declaration was dated June of 2011 which is right in the heart of the period we're looking at.

So he both explains what's going on in the jails, which the Government has done indirectly through the ACLU, but he's a real inmate.  And then he explains the response directly that he saw both from Sheriff Baca himself and then how it played out at Sheriff Baca's direction in the very jail we're dealing with, Men's Central Jail, at the relevant time period.

THE COURT:  Okay.  All right.  The Government has filed on September 26, 2016, a joint motion in limine seeking to preclude the defendant from proffering evidence concerning good works and remedial measures taken after the end of the

**UNITED STATES DISTRICT COURT**

alleged conspiracy.

Included, as an example of this type of evidence, the Government sought to exclude evidence concerning the Education-based Incarceration Program, or EBI, and measures occurring after the end of the alleged conspiracy such as changes within the county jails that would help inmates or tamp down on inmates' civil rights violations, any meetings with the ACLU or other jail monitors, and cooperation by defendant or the sheriff's department including responding to Federal Grand Jury subpoenas.

The Government argued that such evidence is not relevant under Rule 401, as inadmissible character evidence under Rule 404, and its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

At the October 31st, 2016, hearing on the motion, the Court tentatively granted the motion with respect to evidence concerning the EBI Program.  The defendant then filed a response to the Court's ruling on December 12th, and the Government filed an opposition on December the 13th.  In its opposition the Government pointed out that the defendant never provided a proffer or any other detailed description of the good works and remedial measures evidence the defendant intended to introduce.

According to the defendant's December 12, 2016, filing, the defense intends to admit evidence that's starting in approximately 2006.  In 2007, the same years that the Government Witness Robert Olmsted testified at trial about observing conditions of deputy excessive force against inmates, Sheriff Baca implemented the Maximizing Education Reaching Individual Transformation Programs or MERIT Programs which sought to educate inmates and provide them with life skills rather than just warehouse them.

Inmates recall students that attended classes for six hours a day with night classes available as well.  These classes were taught by educators from USC, UCLA, Claremont McKenna College, and California State University at Los Angeles, among other universities.

The MERIT Program was subsequently expanded to a number of other educational programs.  They were placed under the umbrella designation Education-based Incarceration or EBI, and EBI included academic programs like the adult basic education and GED preparation programs as well as vocational courses, parenting classes, anger management classes, drug rehabilitation classes, and classes that promoted tolerance and leadership.

The proffered testimony will show -- and this is according to the defense -- will show that the violence among inmates and deputies who participated in these educational

UNITED STATES DISTRICT COURT

1850

programs decreased dramatically.  Evidence of these programs is not offered as good works but rather as direct responses by Sheriff Baca to address the inmate and deputy violence in the jails.

The defendant's December 12 filing also states, to the extent that EBI continued after the charged end of the conspiracy and, in particular, was emphasized by the Commanders Management Task Force immediately after the end of the conspiracy, the Court should permit such evidence under Rules 401 and 403 as highly relevant and probative of Sheriff Baca's intent and motivation during the conspiracy.  The evidence will show that, as Sheriff Baca expanded EBI in Men's Central Jail violence among deputies and inmates substantially decreased.

In the Court's view, among the problems with this evidence is that the defense has conflated inmate-on-inmate and inmate-on-deputy violence with incidents of excessive force committed by deputies.  The defense has not linked efforts to reduce inmate-on-inmate and inmate-on-deputy violence with excessive force committed by deputies.

As a result, even if that violence in those first two categories decreased dramatically or substantially, it's not relevant as a response to the complaints about excessive force.

Additionally, phrases like "decreased dramatically" and "substantially decreased" appear to call for

**UNITED STATES DISTRICT COURT**

assessment of the effectiveness of these programs which call for opinion testimony and some showing of the reliability or general acceptance of the methodology used to support such opinions.  The defense has made no such showing, particularly in light of the evidence adduced both in trial, the use-of-force reports were falsified, along with convictions of several deputies or falsifying reports to cover up the use of excessive force, it appears that any data that someone might rely on to support claims concerning the effectiveness of these programs is hopelessly inaccurate.

As a result, it's not clear how anyone could provide an admissible opinion if these programs have dramatically or substantially decreased violence, let alone the frequency of excessive force that is actually relevant here. As a result, the defense has not shown how this evidence is either relevant or admissible.

Finally, whatever probative value the defense evidence may have, it's substantially outweighed by the danger of unfair prejudice, confusing the issues, misleading the jury, and undue delay under Rule 403.

MR. HOCHMAN:  Your Honor, may I briefly inquire?

If we eliminate the testimony that has the opinion which is a significant decrease by the head of the -- the director of the bureau, that would be Richard Weintraub. So let's say we eliminate that.  So what he would be able to

**UNITED STATES DISTRICT COURT**

1852

say is that these programs addressed it, but he won't be able to say -- I would not ask him the next question that, in addressing it, did it actually as a factual matter reduce the violence or did it address it.  And then the jury has the fact that Sheriff Baca took -- instituted a program that addressed it, but I'm not going the extra question that the Court has concern about that might turn into an opinion as to whether or not it actually created a decrease.

And I think that, in part, is the Government's concern on the prejudicial impact that, if we get in that it actually worked and decreased it, that that would somehow confuse the jury into some analysis as to whether or not it worked, didn't work.

And the point though, the point of bringing it -- well, there's two points.  One, obviously if we could argue that it worked, we'd like to.  But the second and also extremely important point is that Sheriff Baca addressed the problems.  Even if he didn't solve them, he just addressed them.  And I would be prepared to step back from that last question, Your Honor, and just deal with the addressed point of it.

And it is certainly in the relevant time frame. It is in connection with the ACLU's complaints.  And we would also limit it, Your Honor, to the education programs that dealt with deputy-on-inmate violence, not inmate-on-inmate.  I would

**UNITED STATES DISTRICT COURT**

take out any reference or question dealing with inmate-on-inmate, again, because that could confuse the jury.

So it would be a much more restricted approach, Your Honor, not to get into the results of the program, focus just on deputy-on-inmate violence which the program addressed, and it would be offered for much more limited purpose to just show that Sheriff Baca addressed the problem as it was being raised in the relevant time frame.

MR. JAUREGUI:  Your Honor, I think I'm confused right now.  There are two different programs that Mr. Hochman has been talking about.  Just to put them into two separate categories -- the Education-based Initiatives and the Commanders Task Force.  I think we're not talking about the Commanders Task Force --

MR. HOCHMAN:  To the extent there was any confusion, I'm not talking about the post-September, 2011, programs whether it's EBI, Commanders Task Force, or whatever. I understand the Court's ruling on that.

This is a -- what Weintraub -- Weintraub's testimony could be cabined and reduced to is that, in 2009, 2010, while the ACLU complaints were being made about deputy-on-inmate violence and excessive force, Sheriff Baca's response or one of Sheriff Baca's responses was to expand programs to educate inmates and deputies.  And then I won't go into the opinion as to the effectiveness of those programs.  I

1854

would take -- I wouldn't ask -- I wouldn't go that far so that it's a much more restricted testimony that, I believe, is highly relevant.  Doesn't have these problems of potential jury confusion, wasting time, or anything.

Mr. Weintraub's testimony in a much more limited capacity, Your Honor, would be 10 to 15 minutes at most.

MR. JAUREGUI:  Your Honor, it still seems largely -- it still seems irrelevant that one thing was happening at the same time that another thing was happening. Nobody has proffered -- the defense has not proffered how this is going to be connected back to Mr. Baca.  I don't know how Mr. Weintraub could introduce it without getting into hearsay. And it is, I think, just 403.  It's irrelevant and it's a waste of time and it's needless.

MR. HOCHMAN:  Mr. Weintraub --

THE COURT:  Excuse me.  The reporter needs a break.

MR. HOCHMAN:  I'm sorry, Your Honor.

THE COURT:  So do I.

MR. HOCHMAN:  May I talk with the Government for a moment while you take a break?

THE COURT:  Sure.

MR. FOX:  Before the jury comes back out, there may be something we need to address at sidebar that I just learned, but I think we can take a break.  I'd like to talk to

**UNITED STATES DISTRICT COURT**

1855

defense counsel about that issue as well before we do that.  It would be something that would be relatively significant, I believe, if my facts are correct.

THE COURT:  Let's talk about that now.

MR. FOX:  Okay.  May we go to sidebar, please?

THE COURT:  Yes.

(The following proceedings were held at sidebar:)

MR. FOX:  FBI Special Agent Jason Dalton was waiting outside the courtroom, and one of their next witnesses, Mr. Pietrantoni informed him that he was here to testify about a conversation, in which he claims he was in, involving Baca, Tanaka, I believe Leavins, and Carey in which he claims that Mr. Baca said, "Go approach the inmate, go approach the special agent to talk to her."  He left the room, and then Mr. Tanaka said "Fuck with her."  That's what Mr. Pietrantoni just told our agent.

That was not disclosed to us.  We had a long proffer last night from the defense.  So I don't know if Mr. Pietrantoni is messing with us or if the defense didn't disclose something.  I assume they would have disclosed that had that been what they said.

THE COURT:  That's fine.  You guys talk among yourselves.  Then if there's an issue, we'll work it out.

MR. HOCHMAN:  Thank you, Your Honor.

MR. FOX:  Thank you.

UNITED STATES DISTRICT COURT

1856

(A recess was taken at 12:02 p.m.)

MR. FOX:  Your Honor, as I had hoped, everything we talked about at sidebar appears to be a misunderstanding, and I think we can proceed forward without any concerns about that.

THE COURT:  Okay.

MR. HOCHMAN:  Your Honor, in light of -- in light of the Court's ruling, I believe that the Court's ruling effectively would keep out a good portion of Cameron Saul's testimony, and it sounds like a good portion of Richard Weintraub's or maybe all of Richard Weintraub's testimony.

I would like to make the record on that respect that, given your rulings, we're not going to call a witness just to have the Government object to the testimony and the Court sustain the objection.  So I would just make the record that the reason that we would otherwise be calling these witnesses, Cameron Saul and Richard Weintraub, for the purposes I've described for the Court.  But given the Court's rulings, we believe it effectively guts each one of their testimony.

So in order to avoid having -- calling them, asking the questions, and having the Court sustain, sustain, sustain leaving them virtually nothing left to testify, we are not going to call Cameron Saul or Richard Weintraub.

We would then call Paul Pietrantoni.  And after

UNITED STATES DISTRICT COURT

that, Your Honor, we need to resolve the James Sexton inconsistent statement issue which would involve calling Special Agent Dahle who is obviously here and easy to call if we need to call him.  Then we would -- the defendant is not going to testify unless something happens with the last witness before the end of this case, Your Honor.

And then we would need to confirm with your court clerk that we've admitted all -- just to make sure that our list of admitted evidence is the same as your court clerk's because I don't want to officially rest before I make sure I've moved in everything I need to move in.

In fact, along those lines, the Government and myself would propose to move into evidence Defense Exhibit 637A, Your Honor, which is a -- I'll give the court clerk a copy of it.  It's a revised summary chart.  This was Leah Tanner's testimony, Your Honor.  We didn't move in the original 637 because she couldn't be sure that it had all the information of the Baca/Tanaka phone calls.

THE COURT:  Well, I do mean to interrupt you.  We can take care of all that once we get the jury squared away.

MR. HOCHMAN:  Okay.  As long as I don't have to officially rest, Your Honor.

THE COURT:  That's fine.

MR. FOX:  Your Honor, as long as Mr. Hochman is explaining these witnesses that he's not calling, I just wanted

to say that I think it would have been appropriate, had he called them, for us to either in our rebuttal case or through cross-examination, if Mr. Hochman is bringing up changes in Men's Central Jail, that we bring up all of the convictions that have occurred in '09, '10, and '11.  And I think that's fair, and I think that's part of your ruling is that, if this comes in in Mr. Hochman's case, then -- you said it already -- but that we would be able to cross-examine or introduce in our rebuttal case all of the convictions that have occurred if they're saying that Men's Central Jail and Twin Towers were good places to be in '09, '10, and '11.

MR. HOCHMAN:  We're not saying they're obviously good places to be, Your Honor.  We're saying there's a response to it.  Obviously it was a work in progress.  It didn't solve the problem immediately obviously.  We believe that that type of -- it certainly wouldn't be proper cross-examination for an inmate and a director of training.  If the Government was going to introduce it in his rebuttal case, we would say it would be an improper 403 rebuttal case, but again, I'm making that for the record, Your Honor.

THE COURT:  Okay.

MR. HOCHMAN:  Then our final witness will be this Mr. Pietrantoni, and after that we can address these other issues we brought to the Court's attention.

THE COURT:  How long do you expect to be with

this witness?

MR. HOCHMAN:  20 minutes or so, Your Honor. Maybe less, maybe more.

THE COURT:  Okay.

MR. HOCHMAN:  Probably less.  I don't think -- I don't have any exhibits to show him.  So it won't be slowed down by that.

THE COURT:  Okay.  And did you ask to have Mr. Sexton -- did you ask the Court not to excuse Mr. Sexton?

MR. DIAMANTATOS:  During the course of his cross-examination, Your Honor, when I made the point to the Court that we would like to avoid recalling Mr. Sexton, we did say "No further questions" at the end of his cross-examination, Your Honor.

THE COURT:  Okay.

MR. DIAMANTATOS:  And that statement, just to be clear, was in direct connection to the testimony that he was offering that we believe is inconsistent with his prior testimony.  It was during the cross of his cross-examination where I had objected to one of his answers that I believed was nonresponsive.  I attempted to put a follow-up question to the witness that was also objected to, and there's a statement on the record where I said, "To avoid having to recall this witness," and I moved on as I was instructed to do so by the Court.

**UNITED STATES DISTRICT COURT**

THE COURT:  Okay.  My tentative view would be that we go ahead with this next witness, get him done.  My preference would be, as to Agent Dahle, to look at that over the weekend and then, if he -- if we -- if I decide that I'm going to let you impeach -- use him to impeach the witness, to put him on first thing Monday because, as I understand, that's only going to take --

MR. DIAMANTATOS:  That would be the only purpose for calling Special Agent Dahle during direct examination would be to complete and impeachment Mr. Sexton.  No other subject matters, Your Honor.

MR. FOX:  We would also stipulate to -- if you find that the Special Agent Tanner report is also inconsistent, we will stipulate to her testimony as well.  So that should not be lengthy.

THE COURT:  Okay.  Okay.  Let's get the jury back in here and see if we can --

MR. HOCHMAN:  May I go get the witness, Your Honor?

THE COURT:  Yes.  Please.

MR. HOCHMAN:  Thank you, Your Honor.

(The following proceedings were held in open court in the presence of the jury:)

THE COURT:  All right.  If you'll call your next witness, please.

**UNITED STATES DISTRICT COURT**

MR. HOCHMAN:  Yes, Your Honor.  We call Paul Pietrantoni.

THE CLERK:  Raise your right hand for me.

THE WITNESS:  Yes, sir.

THE CLERK:  Do you solemnly state that the testimony you may give in the cause now pending before this court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  Yes, I do.

THE CLERK:  Will you please have a seat.

THE WITNESS:  Sure.

THE CLERK:  Will you please state your full name and spell your last name for us.

THE WITNESS:  My name is Paul Pietrantoni.  Last name is spelled P-i-e-t-r-a-n-t-o-n-i.

THE CLERK:  Thank you.

**PAUL PIETRANTONI,**

**DEFENDANT'S WITNESS, SWORN:**

**DIRECT EXAMINATION**

BY MR. HOCHMAN:

Q    Mr. Pietrantoni, do you also go by the nickname Pety?

A    Yes, sir.

Q    What is your current occupation?

A    I'm a retired Los Angeles County sheriff

commander.

Q      And what do you currently do?

A      Right now I work for Lockheed Martin, and I'm at their nuclear missile facilities teaching SWAT teams how to secure the area.

Q      You said you're a retired -- retired from the Los Angeles County Sheriff's Department?

A      Yes, sir.

Q      How long did you work for the Los Angeles County Sheriff's Department?

A      A little over 32 years.

Q      So you would have started -- when did you retire? What year?

A      It was 2014.

Q      So 1981-ish?

A      Late '81, yes.

Q      And between -- we'll do it rather briefly.

       But between 1981 and, let's say, 2011, what were the different positions that you held?

A      My starting position, of course, was the sheriff's academy.  Then I went to MCJ as a deputy sheriff.

Q      Let me stop you there.

       MCJ is the Men's Central Jail?

A      Yes, sir.

Q      And you went there as a deputy sheriff?

UNITED STATES DISTRICT COURT

1863

A        Yes, sir.

Q        And where did you go after that?

A        I spent eight months as a deputy sheriff at MCJ. I was assigned to patrol at Firestone Station in South Central until 1987 at which time I went to the department's SWAT team. I spent -- worked SWAT from '87 to '91 where I went to the academy where I specifically went to the force training unit for '91 and '92.  I returned to SWAT in '93 until 1999 when I promoted to sergeant.

Q        What happened at that point when you promoted to sergeant?

A        I went to East Los Angeles Station.

Q        Let me ask you this.

As you're doing these promotions, at some point do you speak with the sheriff?  And now I'm dealing with the sort of 2000 time period.  Did you speak with Sheriff Lee Baca?

A        Yes.

Q        Do you see him here in court today?

A        Yes, I do.

Q        Could you please identify where he's sitting?

A        Yes.  He's sitting at counsel table wearing the gold tie.

MR. HOCHMAN:  May the record reflect the witness has identified Sheriff Baca?

THE COURT:  The record will so reflect.

**UNITED STATES DISTRICT COURT**

Q        BY MR. HOCHMAN:  All right.  You said in 2000 --
the year 2000 you become a sheriff -- excuse me -- a sergeant.
Where were you at that point?

A        I was at East Los Angeles Station.

Q        What were you doing there?

A        I was patrol -- assigned to patrol in East L.A.,
and then I was assigned a special unit.

Q        Where was that special unit?

A        It was in the area of East L.A., predominantly
City Terrace.

Q        At that point were you doing something called the
COPS Policing Program?

A        Yes.  It was called Community Oriented Policing.

Q        What is that program?

A        The program is to actually go out and ask the
community what they think their crimes are and then handle them
that way because sometimes the community's idea of what's
really bad is different from what ours is.

Q        And at some point thereafter, around 2002, do you
return to SWAT as a sergeant?

A        Yes.

Q        And for the people who don't know what SWAT
stands for, what is SWAT?

A        Special Weapons and Training.

Q        And what does that mean?

A       It means that -- the easiest scenario is, when a policeman calls 911, that's who shows up.  We're there to -- from barricaded suspects, high-risk warrants, anything that's dangerous because they equip us better than the average policemen to handle such situations.

Q       By the year of 2002, you had already done those rotations on SWAT in the 1990s; correct?

A       Repeat that.

Q       By the year 2002, you had already done rotations as a deputy sheriff in SWAT already; correct?

A       Correct.

Q       So then you were in SWAT as a sergeant for which years?

A       Until 2005.

Q       And then at that point what happened?

A       I became a lieutenant, and I was assigned to Century Station.

Q       And who assigned you to Century Station as a lieutenant?

A       Sheriff Lee Baca.

Q       What did you do at that point?

A       I ran patrol operations and made sure that issues that were at the time -- it was considered a violent station, and I wanted to monitor it and make sure that the deputies were doing what they were supposed to be doing.

**UNITED STATES DISTRICT COURT**

Q       Were you able to do what you were asked to do?

A       Yes.

Q       And what was that?

A       I was able to reduce a lot of the force and a lot of the problems in the area.

MR. FOX:  Objection.  Relevance.  Move to strike.

THE COURT:  Sustained.  The answer is stricken. The jury should disregard it.

Q       BY MR. HOCHMAN:  Now, at some point after Century Station, did Sheriff Baca have you go to another station?

A       Yes.

Q       What station was that?

A       Well, he had pulled me down -- the station was Compton.

Q       And did you get a promotion at that point?

A       No.

Q       What was your title at the Compton Station?

A       I was a lieutenant.

Q       And at some point did you get promoted?

A       Yes.

Q       To captain?

A       After the year in Compton, I was promoted to captain.

Q       What were you the captain of?

A    I was the captain of all the gang units in L.A. County.

Q    And did you run a particular operation?

A    Yes.

Q    What was that?

A    I ran an operation in Compton that -- to lower the murder rate.

Q    And now at some point did you have the opportunity to go and teach any classes at the Men's Central Jail?

A    Several.

Q    Now, I will direct your attention to the time period of 2009, 2010.  Did Sheriff Baca request you to do anything at that time period with respect to Men's Central Jail?

A    Yes.

Q    What was that?

A    He wanted me to teach force reduction in the -- it's the jail familiarization class that they get when they first leave the academy and go to the jail.

Q    And were you aware of the ACLU complaints that were happening in 2009, '10, and '11 at that time alleging excessive force by deputies at the Men's Central Jail?

A    Yes.

Q    And when you said that you were tasked to go to

the Men's Central Jail and teach classes, how -- what type of techniques did you teach that dealt with force reduction?

A      We tried to teach a technique, and I surround myself with some great individuals that reduce the striking and did more of controlling an individual than actually striking an individual.

Q      And when you say "a technique that reduced the striking," is it a -- did you have any training in wrestling?

A      Yes.

Q      Were these wrestling-type techniques?

A      Predominantly wrestling techniques, yes.

Q      What is your training in wrestling?

MR. FOX:  Objection to relevance, Your Honor.

THE COURT:  Sustained.

Q      BY MR. HOCHMAN:  Did you teach these wrestling techniques on how to reduce force to the deputies at the Men's Central Jail in the 2010 time frame?

A      Yes.

Q      And, again, how long were the classes that you would teach the deputies in that time frame at Men's Central Jail?

A      The classes were two weeks long.  I would be in there for about a day.

Q      And approximately how many deputies would you teach in each class that you were teaching?

UNITED STATES DISTRICT COURT

A        Depends how big the class size, depending on the graduation class, and then they spread them out to different custody facilities.  Men's Central Jail can have anywhere from 20 to 50.

Q        And in these classes, did you go through various scenarios of when deputies would be dealing with inmates either inside their cells or escorting them along the hallways?

A        Yes.

Q        And what did you teach the deputies at that time?

A        It was all scenario-based training on how they can escort them without getting into a compromising position where they might have to fight, how to do a cell extraction -- a preplanned cell extraction before they went in, not just rush in, and each deputy would have a specific assignment.

Q        So let me break that down.

You used the concept of "cell extraction."  What is a cell extraction?

A        A cell extraction is when an inmate for many reasons will not come out of his cell.  Sometimes he's going to do harm to himself and we need to get in there quickly so he doesn't hurt himself.

THE COURT:  Excuse me one second, sir.

MR. FOX:  Objection.  Relevance to this, Your Honor.  I think if we just move on, it's fine.

THE COURT:  Okay.  Next question.

**UNITED STATES DISTRICT COURT**

1870

Q        BY MR. HOCHMAN:  So with respect to cell
extractions, it's actually extracting or removing an inmate
from his cell; is that correct?

A        Yes.

Q        And the techniques that you were teaching, how
did they reduce the violence that a deputy might have in
connection with an inmate dealing with a cell extraction?

MR. FOX:  Objection, Your Honor.

MR. HOCHMAN:  Actually, may I rephrase?

Q        How would it reduce the course that a deputy
might engage an inmate within a cell extraction?  How did your
techniques address that?

A        Well, it was a complete reversal of the old
technique.  Rather than go in and slam somebody into a back
wall or use batons or tools, it was all precise wrestling
techniques in unison to control a person at the same time.

Q        And just if you can give us just one example of
what you mean by "a wrestling technique" so the jury can
understand what it is you mean.

A        What I mean is we would have a person in a cell
that wouldn't want to come out.  Many times he was mentally
ill.

MR. FOX:  Objection, Your Honor.  Objecting to
relevance and 403.

THE COURT:  Sustained.

**UNITED STATES DISTRICT COURT**

Q        BY MR. HOCHMAN:  If you can give a very brief example of what you were teaching the deputies back in -- Men's Central Jail deputies in these classes that you would teach about how to reduce force dealing with an inmate who is in his cell and you're trying to extract them.

A        Yes.  First, we have an individual using good communication to the inmate.  Then we'd use a slight distraction with that person, and two deputies would enter the cell with a plan.  Your job was only to grab his left arm.  Your job is only to grab his right arm.  So everybody knew what they were doing.  They would go in, we would hook the arms.  It was done.  And we'd be able to escort him outside the cell without having to hurt him because there was a plan, not just you go in and grab them and nobody knows which arm or what leg they're grabbing.  They had a specific task to do when they went in there on that cell extraction.

Q        How often did you teach these classes to the deputies in the years 2010 through about mid 2011?

A        Four times a year.

Q        And what happened in mid 2011?

A        I left the department.

Q        Was that for medical leave for yourself?

A        Yes.  I'm sorry.  Yes.  I had back surgery.

Q        And at some point did you come back to the department?

**UNITED STATES DISTRICT COURT**

A       Yes.

Q       What position did you come back as?

A       I was promoted to commander.

Q       Were you the commander of any particular jail facility?

A       Yes.  I was commander of Men's Central Jail.

Q       And who made you the commander of Men's Central Jail?

A       Sheriff Lee Baca.

MR. HOCHMAN:  No further questions.

MR. FOX:  May I begin, Your Honor?

THE COURT:  Yes.

**CROSS-EXAMINATION**

BY MR. FOX:

Q       Mr. Pietrantoni, did I pronounce that right?

A       Perfect.

Q       Mr. Baca promoted you to be commander of Men's Central Jail well after the August, September, 2011 time frame; correct?

A       Yes, sir.

Q       And it was when you came back from your medical leave at some point in 2012 when you received that promotion and assignment; is that correct?

A       Yes.

Q       Now, I think you were just testifying that you in

**UNITED STATES DISTRICT COURT**

2009 and '10 were doing this training in Men's Central Jail; is that correct?

A       Yes.

Q       And that was with Jail Ops training that they would receive before they became deputies in the jail?

A       Yes.

Q       That means that in '09, '10, you had a different assignment as well; is that correct?

A       I'm not sure I know what you mean.

Q       You testified how you were captain of the gang unit, I believe.

A       Yes.

Q       That was also in '09 and '10; is that correct?

A       Yes.

Q       And you would spend, I think you just said, four times a year in Men's Central Jail; is that right?

A       Yes.

Q       That's both in '09 and '10?

A       Yes.

Q       So you were there about eight times during that time period; is that right?

A       Approximately, yes.

Q       And most of the other times you were working in your normal duties as a gang captain; is that correct?

A       Correct.

**UNITED STATES DISTRICT COURT**

1874

Q      Now, you were there to teach deputies the right way of doing things; correct?

A      Yes.

Q      The way that you thought would reduce force.

A      That's a better -- yes.

Q      And you couldn't control, once they were done with training, what the deputies did; right?

A      No, I could not.

Q      And if they wanted to willfully violate an inmate's civil rights by beating them, that obviously is outside of your control.

A      Yes.

Q      And the correct technique would not involve flashlight strikes to an inmate who is posing no threat; correct?

A      Not taught by me, no.

Q      Right.  So that's what I'm focusing on.

Your technique that you taught these deputies working in Men's Central Jail beginning in 2009 did not involve flashlight strikes to inmates who posed no threat to the deputies; correct?

A      Correct.

Q      And your training to these deputies did not involve having them strike inmates who were handcuffed and shackled if they pose no threat to the deputies; correct?

**UNITED STATES DISTRICT COURT**

A       Correct.

Q       You were not there when Bob Olmsted spoke to the sheriff about problems at Men's Central Jail; correct?

MR. HOCHMAN:  Objection.  Foundation for this particular witness.

THE COURT:  Sustained.

Q       BY MR. FOX:  One moment, Your Honor.  Let me see if I can get it right one more time.  Mr. Pietrantoni.

A       Yes.

Q       You were not at Sheriff's Headquarters in August and September of 2011 during any conversations about the cell phone or the sheriff's department's response to the cell phone; correct?

A       That is correct.

Q       That's because you were out on your medical leave.

A       Yes, sir.

MR. FOX:  I have no further questions.

MR. HOCHMAN:  No further questions, Your Honor.

THE COURT:  All right.  Sir, you may step down.

May I see counsel at sidebar?

MR. HOCHMAN:  Yes, Your Honor.

(The following proceedings were held at sidebar:)

THE COURT:  Do you have another witness?

MR. HOCHMAN:  No more witnesses other than

**UNITED STATES DISTRICT COURT**

Mr. Dahle, Your Honor, potentially.

THE COURT: Okay.

MR. HOCHMAN: We need the Court to rule on that.

THE COURT: All right. So subject to confirming that all of the exhibits are in that you think should be in --

MR. HOCHMAN: Yes, Your Honor.

THE COURT: -- and subject to the issue with Mr. Dahle, do you rest now?

MR. HOCHMAN: Yes, Your Honor. Subject to all that, we would rest and then renew our motion for Rule 29.

THE COURT: Okay. I think what I'd like to tell the jury is that we're going to quit for the day and that the case will be submitted to them on Monday.

MR. FOX: We do not have a rebuttal case unless something changes.

THE COURT: I'm sorry. Okay.

So what we'll do is come back on Monday. I'll have you rest formally in front of the jury and go into the closing arguments, and then I'll instruct the jury.

MR. HOCHMAN: Very good.

MR. FOX: Very good. Thank you, Your Honor.

(The following proceedings were held in open court in the presence of the jury:)

THE COURT: All right, ladies and gentlemen. We're going to adjourn for the day. On Monday the case will be

UNITED STATES DISTRICT COURT

submitted to you -- I anticipate that the case will be submitted to you early on Monday.  You should be prepared to -- we're going to start at 8:00.  If everything goes as expected, we'll have counsel give their closing arguments, I'll have some instructions for you, and then the case will be submitted to you for your deliberations.

Lunch will be brought in, and your hours will -- your hours will be extended until 3:30.  Okay.  So we're going to break for the day.

Again, I want to remind you, until the trial is over, you're not to discuss this case with anyone including your fellow jurors, members of your family, people involved in the trial, or anyone else, and do not allow others to discuss the case with you.  This includes discussing the case on the Internet, through various forms of social media, e-mails, text messages.  If anyone tries to communicate with you about this case, please let me know about it immediately.

Do not read, watch, or listen to any news reports or other accounts about the trial or anyone associated with it. Do not do any research such as consulting dictionaries, searching the Internet, or using other reference materials. And do not make any investigation about the case on your own.

Finally, you're reminded to keep an open mind until all of the evidence has been received, you've heard the arguments of counsel, the instructions of the Court, and the

**UNITED STATES DISTRICT COURT**

views of your fellow jurors.

If you need to speak with me, simply give a note to the clerk.

So we're going to resume Monday at 8:00 o'clock, and at that time I fully expect the case -- we'll have closing arguments at some point early that morning, and then I'll have some instructions for you, and then the case will be submitted to you for your deliberations.

All right.  Thank you very much.  Have a nice weekend.  If you leave your notebooks on the chairs.

(The following proceedings were held in open court out of the presence of the jury:)

THE COURT:  Do you know if Mr. Sexton has been taken back to the institution, or is he still here?

MR. FOX:  As of Tuesday he was in Santa Ana.  I don't know -- I think that they were waiting until this trial concluded in order to -- before they brought him back to -- I think Alabama is where he is.

THE COURT:  Okay.  Let me ask you this.  Assuming the Court grants the defense's request, do you anticipate calling Mr. Sexton back?

MR. FOX:  I don't know right now.

THE COURT:  If you do, you might want to think about that and confirm whether or not he's still in Santa Ana, and if he's not in Santa Ana, I just need to know that.

**UNITED STATES DISTRICT COURT**

MR. FOX:  Okay.

THE COURT:  Okay.  Do the parties have an estimate as to how long their closing arguments are going to be?

MR. FOX:  I think we've actually gotten it worked out if it's okay with Your Honor.  Obviously we've not written anything yet, but my plan was to go about an hour and a half at the most in the summation portion, and then I think that Mr. Hochman -- do you want to speak for yourself?

MR. HOCHMAN:  Yes, Your Honor.  I think we talked about the total of closings being about four-and-a-half hours, under five hours, Your Honor.  They would go approximately an hour and a half.  I would go approximately two hours, two hours and 15 minutes.  They would then come back with about 45 minutes getting us into about four-and-a-half hours, Your Honor, plus or minus obviously.

THE COURT:  Your rebuttal portion?

MR. FOX:  I usually like to reserve about a third of what the defense does.  So I think he just said he will go two --

MR. HOCHMAN:  Two hours, two hours and 15 minutes.

MR. FOX:  So I think 40 minutes is probably sufficient.

THE COURT:  Okay.  I have somebody's 302.

**UNITED STATES DISTRICT COURT**

1880

MR. DIAMANTATOS:  Those are extra copies for the Court to the extent they're usable for the Court as you're deciding the issues, Your Honor.  You may keep them.  Of course they're extra copies as is Mr. Sexton's trial transcript.

THE COURT:  Okay.  So you don't need this back?

MR. DIAMANTATOS:  I don't, Your Honor.

THE COURT:  Okay.

MR. DIAMANTATOS:  Thank you.

THE COURT:  Now, other than that -- I know one disputed instruction that the defense wanted.  Other than that, as I recall, the instructions are pretty much agreeable.

MR. FOX:  Yes.  Although we have to tailor it to the trial for statements, for example.  And any witnesses with special considerations, we need to discuss.  So let me -- I don't know if you have time this afternoon, Your Honor, but I think we can work out these issues in probably a half hour and be able to provide you with a concise list of any disputes that we have at this point post-trial.

THE COURT:  Okay.  Do you want to -- do you want to come back today to do that?

MR. FOX:  I think that makes sense so we know exactly what the instructions are going to be before closings if you have a court reporter available to you and if the Court obviously has time to deal with it.

THE COURT:  I think that would probably be

UNITED STATES DISTRICT COURT

advisable that we take care of that today.

The other thing I want to caution people is you can't flash jury instructions up.  You can certainly paraphrase what you think they're going to be, but you can't display jury instructions.  You can't display transcripts.

MR. HOCHMAN:  Your Honor, just so I'm clear, we can't display the actual page that will have the jury instruction, but can we -- if we're focusing on the word "corruptly" within the element of the jury instruction, can we write out ourselves on, let's say, a PowerPoint slide the Government would need to prove beyond a reasonable doubt and then list corruptly, et cetera, and then argue at that point, just not flash the actual instruction?

THE COURT:  Right.  That's fine.

MR. HOCHMAN:  Very good, Your Honor.

MR. DIAMANTATOS:  And, Your Honor, to Mr. Fox's point, I do believe that a half hour should give us enough time to iron out -- make sure that the set that we proposed to the Court is in accord with the trial.  I think that shouldn't take too long, Your Honor.

THE COURT:  What time do you want to --

MR. HOCHMAN:  2:00 o'clock, Your Honor.

THE COURT:  That's fine.

MR. FOX:  Your Honor, since it will take less time, if the court reporter needs a longer break, we can, of

course, come back at 2:30 or 3:00.

THE COURT:  Let's make it 2:15.

MR. HOCHMAN:  Yes, Your Honor.

MR. DIAMANTATOS:  Thank you, Your Honor.

THE COURT:  All right.  Thank you very much.

One other thing.  Make sure, if you're going to use any demonstrative exhibits during your closings, make sure you've both seen each other's so we can resolve any disputes.

MR. FOX:  Yes, Your Honor.  The only one that might be done on the fly is the rebuttal one because I obviously don't know what it is they have to say.  I don't know if I'll have a PowerPoint for that, but I'll show them everything.

MR. HOCHMAN:  Thank you, Your Honor.  We'll do that.

(A recess was taken at 12:58 p.m.)

THE CLERK:  Recalling item No. 1, CR 16-66(A), USA versus Leroy D. Baca.

Counsel, state your appearances, please.

MR. FOX:  Good afternoon, Your Honor.

Brandon Fox and Eddie Jauregui on behalf of the United States.

MR. HOCHMAN:  Good afternoon, Your Honor.

Nathan Hochman, Tinos Diamantatos and Brianna Abrams along with Leroy Baca for the defense.

**UNITED STATES DISTRICT COURT**

1883

MR. DIAMANTATOS:  Good afternoon, Your Honor.

THE COURT:  Good afternoon.

Defendant's decision not to testify we don't need anymore.

MR. HOCHMAN:  Which number are you on?

THE COURT:  23.

MR. HOCHMAN:  Thank you, Your Honor.

THE COURT:  31.

MR. FOX:  The parties have agreed 31, 32 both are withdrawn.

MR. DIAMANTATOS:  Your Honor, with regard to joint Instruction No. 33, we've reached an agreement with the Government, actually, as it relates to the issue of Mr. Sexton. We anticipate that we'll have a stipulation that will be a testimonial stip, and it will negate the issue we asked Your Honor to decide.  As far as jury Instruction No. 33, we just request that that instruction still be given to the members of the jury.

THE COURT:  Okay.  What's the Government's position on Instruction 33?

MR. FOX:  On the instruction, Your Honor?

THE COURT:  Yes.

MR. FOX:  Yes.  And we were hoping to actually have a little bit more time to work out if there were other witnesses who were impeached on various issues, but we ran out

**UNITED STATES DISTRICT COURT**

1884

of time on this one.  I don't remember other than Mr. Sexton if there were others who were impeached on various issues or not.

MR. DIAMANTATOS:  Right.  And I agree with Mr. Fox, Your Honor, that we should take a look at this because there were some witnesses that were impeached as far as 609 impeachment as it relates to their prior conviction.  The proposed instruction obviously covers the different types of impeachment which would, of course, also be impeachment of prior inconsistent statement.  I do think we can come up with some language that addresses both of those that occurred during the course of the trial.

MR. FOX:  How late can we submit an amended instruction to Your Honor for you to incorporate it into the jury instructions for Monday?

THE COURT:  Well, let's see.  I'll probably be here tomorrow.  I'll be here Sunday.

MR. FOX:  So if we submit by noon on Sunday, would that be sufficient?

THE COURT:  That will be fine.

MR. DIAMANTATOS:  Thank you, Your Honor.

MR. FOX:  Your Honor, if we can just go back, on 17 we did not play the deposition testimony that we thought we might.  So the Government is withdrawing that instruction.

No. 16 we've altered to say the Court has taken judicial notice of certain facts.  It sounds awkward to say the

UNITED STATES DISTRICT COURT

Court has decided it's not necessary to receive evidence of the fact of a grand jury.  So we thought that language would be better and then continue with the second sentence:  "Of course you may but are not required to accept this fact as true."

THE COURT:  Okay.  So the beginning of that instruction is going to -- hold on a second.  So it's just going to read "The Court has taken judicial notice of certain facts"?

MR. FOX:  Yes, Your Honor.  And then, of course, the second sentence.

THE COURT:  Uh-huh.

MR. FOX:  And then 14, I think, was the only one before the ones that we were just discussing, and that one had a placeholder in it.  It will now say, "The parties have agreed what certain witnesses' testimony would be if called as witnesses."  I think we just have to say "The parties have agreed what certain witnesses' testimony would be," then continue with the second sentence.

THE COURT:  That's fine.

MR. FOX:  Other than that, I think we're caught up to where you were.

MR. DIAMANTATOS:  Agreed, Your Honor.  On joint Instruction No. 19 --

THE COURT:  Hold on one moment.  Let's go back to 14 for one moment.  So that one is going to read "The parties

**UNITED STATES DISTRICT COURT**

1886

have agreed what certain witnesses' testimony would be"?

MR. DIAMANTATOS:  "If called to testify."

MR. FOX:  "What certain witnesses' testimony would be if called to testify."

MR. DIAMANTATOS:  Then the second sentence.

THE COURT:  Okay.  I think somebody was on to 19.

MR. DIAMANTATOS:  Yes, Your Honor.

Just to point out that we had proposed the 9th Circuit Model Instruction for the 404(b) instruction, and we had some discussion with regard to -- because Your Honor has been giving the limiting instruction that the parties had agreed to during the course of the trial.  I think for purposes of charging the jury, we should give the pattern instruction on Instruction No. 19.  I think the Government deferred to the defense preference as far as which be given.  That would be our proposal that the Model Instruction, as proposed here for No. 19, is the one given to the jury.

MR. JAUREGUI:  Your Honor, I'm not sure that it's No. 19.  No. 19 is other crimes, wrongs, or acts of defendant, and I thought -- page 25.

MR. FOX:  It's 29 that you're talking about.

THE COURT:  I think you want -- go ahead.

MR. FOX:  Your Honor, I think that 19 is for during the course of trial.  I think what Mr. Diamantatos is referring to is Instruction No. 29 that they're going to

substitute the instruction for.  19 says you are about to hear evidence.

MR. DIAMANTATOS:  Yes, Your Honor.  So 19 the language is pre-deliberations.  Joint Instruction No. 29 is the 404(b) standard Model Instruction.  We would propose that that be given to the jury as contemplated here.

THE COURT:  So 31 is out?

MR. FOX:  Yes, Your Honor.

THE COURT:  And 32?

MR. FOX:  Withdrawn, Your Honor.

THE COURT:  Okay.  Let's take a look at -- and you're going to -- 33 we're coming back to?

MR. DIAMANTATOS:  Yes.  33 is the one we'll submit a joint proposal to the Court prior to noon on Sunday.

34 we've conferred on and made proposed alterations to in light of the testimony that the members of the jury have heard, Your Honor.

THE COURT:  Okay.  So Carey is out.

MR. DIAMANTATOS:  With regard to Mr. Manzo, the second paragraph, he did, in fact, testify.  Our proposal would be to leave clause (A) as proposed.  Clause (B) would change now based on his testimony.  And the proposal would be to read, (B), hoping the U.S. -- is hoping the Government files a motion seeking a sentence reduction on his behalf.  And then it would continue as proposed the fact Mr. Manzo was convicted.  No

proposed alterations to that sentence.

                With regard to Gilbert Michel --

                THE COURT:  Hold on one second.

                MR. DIAMANTATOS:  I'm sorry, Your Honor.

                THE COURT:  Okay.  On Mr. Manzo, on line 16,
Mr. Manzo's believability, period.

                MR. FOX:  Yes.

                THE COURT:  There is no court-ordered immunity in
this case; correct?

                MR. FOX:  Right.  So line 17 and 18 would be
deleted.

                THE COURT:  Okay.

                MR. DIAMANTATOS:  Agreed, Your Honor.

                THE COURT:  Okay.  And then Mr. Michel.

                MR. DIAMANTATOS:  For Mr. Michel, the only change
would be to change the word "this" to change to "his case."  So
in other words, it would read, "Gilbert Michel, a witness who
received favorable treatment at sentencing from the Government
in connection with his case."

                THE COURT:  Okay.  Mr. Sexton?

                MR. DIAMANTATOS:  I believe we agreed that it
should be given as proposed.  So "James Sexton, a witness who
admitted --"

                MR. FOX:  I think the defense actually wanted to
have basically it mirror the Mickey Manzo (A) clause.  So

James Sexton was convicted of a crime arising out of the same offense for which the defendant is on trial.

MR. DIAMANTATOS:  That's right.  Thank you.

THE COURT:  So it's going to read James Sexton, a witness who was convicted of a crime arising out of the same events for which the defendant is on trial.

MR. DIAMANTATOS:  And (B).

MR. FOX:  Yes, Your Honor.  There's no (B).

MR. DIAMANTATOS:  That's right.  Yes, Your Honor.

THE COURT:  Are there any others?

MR. FOX:  There are no other witnesses. Obviously lines 26 on that page and the first three lines of the next page will just have to be fixed to show that there are multiple witnesses, and some of the brackets will need to be taken out.  I don't think there are any other witnesses receiving special benefits.

THE COURT:  Okay.

MR. DIAMANTATOS:  The next ones to withdraw, joint Instruction 37 as well as joint Instruction 38.

THE COURT:  All right.  So 37 is out.  38?

MR. DIAMANTATOS:  Yes, Your Honor.

THE COURT:  Okay.  And then I take it 43 is out.

MR. DIAMANTATOS:  Yes, Your Honor.  We've agreed that 43 should be withdrawn as well as 44.

And, Your Honor, I think this issue is already

preserved for the record. Just to make note with regard to the elements instruction, joint Instruction No. 41. Of course we've made the record here with regard to our proposed instruction, Your Honor, but to the extent Your Honor denies the defense request, we do agree in the alternative that this is the appropriate obstruction element instruction.

THE COURT: Okay. I take it that we will not be giving 51 unless we're asked or unless it's necessary.

MR. FOX: That's correct, Your Honor. We just included that because that's part of your standing criminal order.

THE COURT: Okay.

MR. FOX: The parties didn't talk about this, but I think we all agree that on page 65 Count 3 of the verdict form obviously should be withdrawn.

MR. DIAMANTATOS: Agreed, Your Honor. The only disputed instruction is the element instruction. To the extent the Court provides us a rule on that, we obviously know how to handle that for our closing argument on Monday morning. I think that was the only one there was a dispute, Your Honor.

MR. FOX: They want the bribery and threats from the previous --

THE COURT: Right. I take it, when I ruled on your Rule 29 Motion -- so I'm going to give the instruction that the parties agreed upon with respect to the elements

**UNITED STATES DISTRICT COURT**

instruction.

MR. DIAMANTATOS:  Okay.  Thank you, Your Honor.

THE COURT:  I may have -- I may have a stylistic change with the verdict form, but essentially it's going to be pretty much the same.  I'll share that with you before it goes back so you'll have a chance to look at it.

Now, in the past we've had lawyers sometimes say to the jury "Check the transcript if you have --" I'd ask that you refrain from asking the lawyers to ask for reread or to look at the transcript because I don't think we have a -- necessarily have a transcript of everything.  And besides, they watch *Perry Mason*.  They'll figure it out if they want to hear somebody's testimony.

MR. HOCHMAN:  Your Honor, I've got two points.

THE COURT:  Okay.

MR. HOCHMAN:  The first one, Mr. Fox was discussing with me and I want to make sure it's okay for closing argument, periodically in describing what beyond a reasonable doubt looks like, I certainly go over the concept that would be reflected in the jury instruction but not show the jury instruction.  And then I compare it to lower levels that the jury may have heard of, you know, probable cause.  In fact, I think the probable cause statement is actually in this case.  So I would say that's a lower level than beyond a reasonable doubt, preponderance of the evidence, clear and

**UNITED STATES DISTRICT COURT**

1892

convincing, and then beyond a reasonable doubt.

I just want to make sure -- counsel alerted me that sometimes the Court has had an issue if some counsel goes crazy on this. I just sort of lay it to say this is beyond a reasonable doubt and then describe what it is and why the evidence didn't meet that standard. I just wanted to make sure there wasn't something that the Court would object to if I describe it like that.

Particularly in this case since that probable cause statement that attached to the order that they sought that the judge denied is part of the evidence.

MR. FOX: Your Honor, my recollection was that either Mr. Stewart or Mr. Haig had a chart, and I can't remember how many columns they had in it. I remember the Court didn't allow them to display it. So that's what I communicated to Mr. Hochman. We take no position on this issue. I should say I haven't seen the chart either.

THE COURT: Do you have a chart?

MR. HOCHMAN: You know, it's like a -- it sort of does this, Your Honor. It has plateaus in the chart. It's not a bar chart. It's like a plateau chart and just has beyond a reasonable doubt at the top. I've used it in other trials. It's one of my few charts that I actually recycle from trial-to-trial.

Certainly I'll show it ahead of time to Mr. Fox

UNITED STATES DISTRICT COURT

and see if he has any issues with it.  If Mr. Fox and Mr. Jauregui agree to it, then I didn't want to have a separate problem with the Court on it if the Court had some different issue.

THE COURT:  Well, I haven't seen it.  So I don't know.

MR. HOCHMAN:  Can I send a copy to the Court by Sunday?

THE COURT:  That's fine.

MR. HOCHMAN:  Okay.  I'll do that.  And obviously the Government counsel as well.

The second issue, Your Honor, is -- I was going back in the record in my head.  I remember that I proposed limiting Mr. Weintraub's testimony, and then the Court took the break before you ruled on it.  I just thought, to make sure that the record was clean that, even though I was proposing a limited amount of testimony from Mr. Weintraub, I just wanted to make sure that the Court's order would have remained the same, that that would have still been unacceptable.

THE COURT:  Well, I don't think -- as I recall, the way you described that testimony, that wouldn't change the result because, in my mind, it doesn't cure the problem.

MR. HOCHMAN:  Okay.  For the record, Your Honor, I just wanted to make sure I understood the Court's ruling correctly.

**UNITED STATES DISTRICT COURT**

1894

THE COURT:  That's fine.

MR. HOCHMAN:  Thank you, Your Honor.  That's all from the defense.

MR. DIAMANTATOS:  Your Honor, one point. Your Honor had described stylistic changes to the verdict form. We, of course, defer to whatever the Court's preference is on this.  I had requested, as we were going through the joint instructions with the Government, to the extent the options are put on parallel ground, in other words, guilty first and then to the right of it not guilty, that would be the defense preference.  I understand, if the Court has a different preference, that's fine.  To the extent it's inappropriate to highlight one over the other, whether it's not guilty on top or guilty on top, perhaps it makes sense just to put them on the same field with guilty first, not guilty second but on level field.  That would be our proposal, Your Honor, to the extent you would consider it.

THE COURT:  Okay.  Okay.  Anything else?

MR. FOX:  I think you had asked about Mr. Sexton.

THE COURT:  There was one other thing.  Go ahead.

MR. FOX:  Based on our stipulation, we will not be calling Mr. Sexton.  We will not have a rebuttal case if all the defense has is the stipulation.  I think they do need to move some items into evidence as well.

MR. HOCHMAN:  Yes, Your Honor.  I don't know if

UNITED STATES DISTRICT COURT

1895

we can do it right now or if you'd rather have us do it in

front of the jury, whatever the Court's preference.  But it's

Defense Exhibit 637A and defense Exhibit 639.  I believe the

Government has no objection to either one.

MR. FOX:  That's correct.

THE COURT:  So it's 637A and 639?

MR. HOCHMAN:  Yes, Your Honor.

THE COURT:  So they'll be received.

MR. HOCHMAN:  Thank you very much, Your Honor.

(Marked for identification and received

into evidence Exhibit Nos. 637A and 639.)

THE COURT:  You've resolved the Sexton issue.

MR. DIAMANTATOS:  Yes, Your Honor.

THE COURT:  When will you have that stipulation?

MR. DIAMANTATOS:  We can work out the

stipulation, perhaps provide it to the Court Sunday when we

provide the revamped joint Instruction No. 33.  So the plan

would be Monday morning to just read that stipulation to the

members of the jury, and once the Government agrees that it is

so stipulated, we can officially rest at that point,

Your Honor, and then proceed to closing arguments.

MR. HOCHMAN:  Then we need to -- for the record,

I'll have to make that Rule 29 Motion when we rest.  Would it

be sufficient if I just say Rule 29 Motion, Your Honor?  Or

should we just go -- actually, my preference would be to go

**UNITED STATES DISTRICT COURT**

quickly to sidebar if we could to make the motion.

THE COURT:  That's fine.

MR. HOCHMAN:  Then we can get onto closing arguments.

MR. FOX:  And, Your Honor, we have no objection if you want to consider this now, if Mr. Hochman wants to make the motion now even though they haven't officially rested yet. It's one very minor piece of evidence that's not going to affect the standard.  I don't know if we want to be taking a break in front of the jury right after they rest.  If that's what he prefers to do, that's perfectly fine with me.  I'm talking about an efficiency standpoint.

MR. HOCHMAN:  The problem is it's jurisdictional for the 9th Circuit on a Rule 29 Motion.  You have to actually do it after you've rested or else --

THE COURT:  You know, that's what I thought too, but apparently I'm not so sure anymore.  That's exactly what I thought.

MR. HOCHMAN:  To be quite candid, I haven't looked up the law in probably a decade.  When I did look it up, it was jurisdictional, Your Honor.

THE COURT:  That's exactly what I thought. That's fine.

MR. HOCHMAN:  Thank you, Your Honor.

THE COURT:  We can do it then.  If you'll give me

**UNITED STATES DISTRICT COURT**

30 seconds, I think I had a note on one other issue.  Just give me 30 seconds.  I'll be right back.

(A pause in the proceedings.)

THE COURT:  I'm not sure what that thought was.  Anyway, there is a -- wasn't there an Indictment, or was there an Indictment that removed count --

MR. FOX:  We did file it.  There is one paragraph in the overt acts we would like to strike because we didn't prove it up.  It would have been proved up through Tom Carey.  So if you don't mind, Your Honor, I'd like to submit a revised version of that.  I can't remember which paragraph it was.  It was discussing the meeting that Mr. Baca had with Mr. Carey, Mr. Leavins, and Mr. Tanaka.  It was either September 22nd or September 25th in the overt acts.  I don't recall which.  We move to strike that paragraph, and we will file a new version if you will agree to allow us to strike that without that paragraph.

MR. HOCHMAN:  No objection, Your Honor.

THE COURT:  Okay.

MR. HOCHMAN:  If just the Government can submit us a copy of the new redacted Indictment before they send it to Your Honor, we'd appreciate that.

THE COURT:  That's fine.  I assume, once the jury goes out and starts deliberating -- they probably won't get this until 1:30, 1:00 o'clock, somewhere in there.  If they

have questions, they'll probably be sooner rather than later. So if everybody can be in the building.  And both sides now have -- well, have you discussed with the clerk -- confirmed which exhibits are in?

MR. HOCHMAN:  Yes, Your Honor.  Including the ones that the Court just admitted, yes, Your Honor.

THE COURT:  Okay.

MR. JAUREGUI:  Yes, Your Honor.

THE COURT:  Okay.  All right.  Anything else?

MR. HOCHMAN:  Not from the defense, Your Honor.

MR. FOX:  Your Honor, the one thing we'd like to do before the jury gets the exhibits is actually go through the original exhibits to make sure --

MS. ABRAMS:  We didn't do that yet, but I'd like to do that.

MR. FOX:  Maybe if we can come here at 7:30 on Monday morning in order to go through those exhibits so, when the jury gets the case, we can actually give them the evidence, that would be great rather than having a delay.

THE COURT:  And the recorded statements will not go back, and if they want to hear those, we'll do it here in open court.

MR. HOCHMAN:  Yes, Your Honor.

THE COURT:  If you're going to go through the exhibits, let's make sure both sides are here, and of course,

1899

the exhibits don't leave.

                    MR. FOX:  Okay.  Thank you, Your Honor.

                    MR. DIAMANTATOS:  Thank you, Your Honor.

                    THE COURT:  Have a nice weekend.

                    MR. DIAMANTATOS:  You too, Your Honor.  Thank
you.

          (Proceedings concluded at 2:51 p.m.)

**UNITED STATES DISTRICT COURT**

CERTIFICATE OF OFFICIAL REPORTER

I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

DATED THIS  14TH  DAY OF AUGUST, 2016.


/S/ MIRANDA ALGORRI

MIRANDA ALGORRI, CSR NO. 12743, CRR
FEDERAL OFFICIAL COURT REPORTER


**UNITED STATES DISTRICT COURT**