# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

### HONORABLE PERCY ANDERSON, U.S. DISTRICT JUDGE

UNITED STATES OF AMERICA,            )
                                     )
            Plaintiff,               )    Case No.
                                     )
      vs.                            )    CR 16-00066(A)-PA
                                     )
LEROY D. BACA,                       )    PAGES 805 to 1022
                                     )    VOLUME 7
            Defendant.               )
_____)

REPORTER'S TRANSCRIPT OF
TRIAL DAY 5
FRIDAY, DECEMBER 9, 2016
8:03 A.M.
LOS ANGELES, CALIFORNIA

MIRANDA ALGORRI, CSR 12743, CRR
FEDERAL OFFICIAL COURT REPORTER
312 NORTH SPRING STREET, ROOM 435
LOS ANGELES, CALIFORNIA 90012
MIRANDAALGORRI@GMAIL.COM

UNITED STATES DISTRICT COURT

806

**APPEARANCES OF COUNSEL:**


**FOR THE PLAINTIFF:**

        SANDRA R. BROWN
        Acting United States Attorney
        BY:  BRANDON FOX
        BY:  EDDIE A. JAUREGUI
        Assistant United States Attorneys
        United States Courthouse
        312 North Spring Street
        Los Angeles, California 90012


**FOR THE DEFENDANT:**

        MORGAN LEWIS AND BOCKIUS LLP
        BY:  NATHAN J. HOCHMAN
        BY:  BRIANNA ABRAMS
        The Water Garden
        1601 Cloverfield Boulevard
        Suite 2050 North
        Santa Monica, California 90404


        MORGAN LEWIS AND BOCKIUS LLP
        BY:  TINOS DIAMANTATOS
        77 West Wacker Drive
        Chicago, Illinois 60601

**UNITED STATES DISTRICT COURT**

**I N D E X**


**FRIDAY, DECEMBER 9, 2016**


**Chronological Index of Witnesses**


Witnesses:                                                          Page

MANZO, Mickey

    Direct examination resumed by Mr. Fox              811
    Cross-examination by Mr. Diamantatos               861
    Redirect examination by Mr. Fox                    913
    Recross-examination by Mr. Diamantatos             918
    Further redirect examination by Mr. Fox            919

FARRAR, Linda K.

    Direct examination by Mr. Jauregui                 922
    Cross-examination by Mr. Hochman                   929
    Redirect examination by Mr. Jauregui               931

SEXTON, James McAbee

    Direct examination by Mr. Fox                      934
    Cross-examination by Mr. Diamantatos               977
    Redirect examination by Mr. Fox                    998
    Recross-examination by Mr. Diamantatos            1001

RAMBO, Cecil

    Direct examination by Mr. Fox                     1004
    Cross-examination by Mr. Diamantatos              1012


**UNITED STATES DISTRICT COURT**

808

**EXHIBITS**


**FRIDAY, DECEMBER 9, 2016**


| Exhibit | | For ID | In EVD |
|---|---|---|---|
| 81 | Recording of Brown interview 08/24/11 | 835 | 835 |
| 82 | Transcript of Brown interview 08/24/11 | 834 | |
| 107 | Stipulation re phone records | 922 | 922 |
| 113 | Brown writ | 922 | 922 |
| 115 | Sexton time cards | 952 | 952 |
| 133 | Original calendar book 2011 | 825 | 825 |
| 134 | Daily activities notebook (2 pgs) | 847 | 847 |
| 155 | Handwritten letter from Anthony Brown 09/03/11 | 849 | 850 |
| 160 | E-mails | 923 | 923 |
| 162 | Phone records | 922 | 922 |
| 163 | Phone record | 922 | 922 |
| 164 | AT&T records | 922 | 922 |
| 165 | AT&T records | 922 | 922 |
| 166 | Verizon records | 922 | 922 |
| 167 | Verizon records | 922 | 922 |
| 168 | Verizon records | 922 | 922 |
| 169 | Verizon records | 922 | 922 |
| 171 | Verizon records | 922 | 922 |

**UNITED STATES DISTRICT COURT**

**EXHIBITS**


**FRIDAY, DECEMBER 9, 2016**


| Exhibit | For ID | In EVD |
|---|---|---|
| 622   Document | 866 | |
| 684   Document | 1014 | |


**UNITED STATES DISTRICT COURT**

810

**LOS ANGELES, CALIFORNIA; FRIDAY, DECEMBER 9, 2016**

**8:03 A.M.**

**---**

(The following proceedings were held in open court out of the presence of the jury:)

THE CLERK:  Calling item No. 1, USA versus Leroy D. Baca.

Counsel, state your appearances, please.

MR. FOX:  Good morning, Your Honor.

Brandon Fox and Eddie Jauregui on behalf of the United States.  Also with us at counsel table is Special Agent David Dahle with the FBI.

THE COURT:  Good morning.

MR. HOCHMAN:  Your Honor, I apologize.  Mr. Baca has been in the courtroom the last 15 minutes.  He just ran to the restroom.  I will go get him.

Good morning, Your Honor.  Nathan Hochman along with Tinos Diamantatos and Brianna Abrams on behalf of the defendant Leroy Baca who is present, Your Honor.

THE COURT:  Good morning.  All right.  Are we ready to proceed?

MR. HOCHMAN:  Yes, Your Honor.

MR. FOX:  Yes, Your Honor.

THE COURT:  I believe all the jurors are here.

**UNITED STATES DISTRICT COURT**

811

Let's bring the jurors in.

MR. FOX:  Would you like Mr. Manzo on the stand right now?

THE COURT:  That's fine.

(The following proceedings were held in open court in the presence of the jury:)

THE COURT:  Good morning, ladies and gentlemen. All right.  Let's proceed.

**MICKEY MANZO,**

**GOVERNMENT'S WITNESS, PREVIOUSLY SWORN:**

**DIRECT EXAMINATION (RESUMED)**

BY MR. FOX:

Q      Mr. Manzo, did you have a chance to think about all your answers from yesterday after you went home last night?

A      I did, yes.

Q      Is there anything, thinking about your answers, that you wanted to clarify this morning?

A      Yes.

Q      What is that?

A      You had asked if Mr. Tanaka had ever ordered or said if I should keep anything from the sheriff.

Q      And what is it that you remembered after thinking about your testimony?

A      During the -- one of the meetings -- I'm not sure which one -- he explained that he wanted just the -- the main

UNITED STATES DISTRICT COURT

812

stuff.  We found the phone.  This is how we did it.  He didn't want the ITMS and the technical stuff because he didn't think that the sheriff would understand that because of the gap between when the sheriff was an investigator and now.

Q    Are you referring to that timeline that you were talking about?

A    Yes.

Q    Okay.  I want to now move on to August 23rd.  We had just listened to the recording about moving around to a station jail.

Do you recall that?

A    Yes.

Q    Was Mr. Brown moved to a station jail on August 23rd?

A    I don't remember the date.  But, yes, he was ultimately moved.

Q    Okay.  I want to focus on right after the FBI had been to see Mr. Brown.  At that point you testified yesterday that he was in 1751G row.

Do you remember that?

A    Yes.

Q    What was the next move for Mr. Brown?

A    He went to 8200.

Q    And what is 8200?

A    I don't know what it is now, but it was the

**UNITED STATES DISTRICT COURT**

communicable disease ward in the hospital.

Q        And is that whole floor the communicable disease ward, or is there a specific area for that?

A        It's the 8000 floor, and it's separated by 81, 82, and then 8000.  8000 was diabetics at the time.  81 was wheelchair inmates, and 82 was the communicable diseases.

Q        What types of diseases are you referring to?

A        It's almost entirely staph, MRSA.

Q        Is it also known as MRSA?

A        Yes.

Q        Why was Mr. Brown brought to 8200 at that point in time instead of to a station jail?

A        He had medical issues with getting him out of Men's Central Jail.

Q        And why do medical issues mean that somebody can't go to a station jail?

A        His type of medical -- I don't remember exactly what they were, but he needed to be somewhere where there were nurses 24/7.

Q        What types of -- generally, what types of inmates are housed in the county jails compared to the station jails?

A        Well, the station jails are mostly, with the exception of trustee inmates that work at the station jails, they're mostly just holding cells until they are transported to IRC.  They are not for long-term housing.

**UNITED STATES DISTRICT COURT**

814

Q        Do you know how it was decided that Mr. Brown would be placed in 8200 versus another area of Men's Central Jail?

A        Yes.

Q        How did that occur?

A        Captain Carey decided that.

Q        How do you know that?

A        I showed him, I think, two or three options of where we could put Brown, and he chose 82.

Q        Along with moving him to Men's Central Jail -- within Men's Central Jail, we heard you discuss yesterday having OSJ people guard him at all times.  Did that start taking place in 8200?

A        Yes.

Q        Please explain what happened at that point.

A        I was ultimately -- myself -- I can't remember who sat with me, but I just sat in the hallway right outside his door.

Q        Was it just you?

A        There was somebody else, but I don't remember who it was.

Q        Typically how was it staffed with deputies outside of his door?  How many deputies were there?

A        Two.

Q        And how long did this occur?

**UNITED STATES DISTRICT COURT**

A        For the duration of the assignment, or just sitting on Brown itself?

Q        How long did it occur that deputies were sitting on Brown while he was in county custody?

A        Until he left.

Q        I'm now going to publish what's in evidence as Government Exhibit 21.  The bottom e-mail on that page, this is from Gregory Thompson, your lieutenant, to a William Gilbert.

Do you know who William Gilbert was at the time?

A        Yes.

Q        What role did he play?

A        He was a jail liaison detective.

Q        And in terms of his reporting, who did he report to?

A        Lieutenant Thompson.

Q        This e-mail is dated August 24, 2011, at 7:56.  Can you please read what Mr. Thompson wrote?

A        "In your rounds this morning, could you stroll up to 8200 and ensure our OSJ contingent is outside of Anthony Brown's cell.  We also need to discuss why you were not notified for Brown's visit.  See you around 10:00."

Q        And now I'm going to highlight the top e-mail.  This is from Mr. Gilbert to Mr. Thompson.  Can you please write what was said -- read what was written.  Excuse me.

A        Sure.  "Sorry, boss.  I meant to say on my way.

**UNITED STATES DISTRICT COURT**

We have two OSJ deputies sitting in the hallway by his door. They said Smitty briefed them on the rules and what is expected of them."

Q      Was there an effort to figure out a schedule of who would be standing guard outside of Mr. Brown's door?

A      Yes.

Q      Who was in charge of that?

A      Deputy Smith and myself.

Q      How did you decide that?

A      We had a meeting.  I don't remember the date.  It was in Hero's Park.  We explained to them what was going on and what we had been ordered to do.  We set up a schedule, and we let them pretty much pick when they were available and what worked for them.

Q      Which deputies did you choose?

A      MCJ, OSJ, IRC OSJ, and a couple jail liaison detectives.

Q      You mentioned Hero's Park.  What was Hero's Park?

A      It's a little tiny open area attached to Men's Central Jail.  It's like a break area for the deputies.

Q      Where is it located?  You said it's outside of Men's Central Jail?

A      Outside the security of Men's Central Jail.

Q      When did this briefing take place?

A      It was midmorning.  I don't remember the date.

817

Q      Do you recall how soon after that meeting that you had with the executives on August 23rd that you had a meeting with the OSJ deputies?

A      Shortly after.

Q      And what happened at that meeting?

A      They all -- we all sat down, and Deputy Smith explained to them about the investigation, on all of it but the pertinent details.  We found the phone.  It's connected to the FBI.  Brown is an informant, and now his safety is what we're going to be safeguarding and that he -- we've been ordered by Mr. Tanaka to sit on his cell.

Q      What, if anything, did you tell the deputies at that meeting?

A      I reiterated what Mr. Tanaka said in the meetings we had.

Q      What was that?

A      "Fuck the FBI."

Q      Did you say anything else about what Mr. Tanaka had said?

A      I think I explained to them that he was -- obviously by that statement that he was mad.  I can't remember any -- no.  I can't remember anything else.

Q      I now want to publish for you Exhibit 28.

Do you recognize this document?  Would it be helpful if I blow it up?

**UNITED STATES DISTRICT COURT**

A        I can read it.  I do recognize it, yes.

Q        Okay.  What is it?

A        This is the e-mail that Deputy Smith sent out to the OSJ guys after the meeting with the finalized schedule and kind of their roles they were going to play.

Q        You said "the finalized schedule."

I'll show the bottom third of this e-mail.  What is this?

A        That is the -- that's the schedule for the 24th.

Q        When you say "the schedule," what are you referring to?

A        Who's going to sit on Brown and what time.

Q        What were the directions for the people that were going to be sitting on Mr. Brown?

A        To be outside of his cell and that, if for any reason, if somebody needed to open it, they were the ones to do it, and they would notify Deputy Smith or I, and we would notify Lieutenant Thompson.

Q        What about anybody having any access to Mr. Brown?

A        No access.

Q        Showing the second page at the top third, is this just a continuation of that schedule?

A        Yes.

Q        This shows this is an e-mail from Mr. Smith.  Do

UNITED STATES DISTRICT COURT

you know if Mr. Smith wrote this e-mail?

        A       He wrote it.

        Q       How do you know it?

        A       I proofread it.

        Q       Could you please read the first paragraph in this e-mail?

        A       "If you are getting this e-mail, you have been signed up to work this very important detail.  I am in charge of security and scheduling for this detail.  Please don't let me or the unit down.  I have covered the background regarding Anthony Brown, male black, birthday 2/19/68, booking No. 2009547, no local gang affiliation.

                "The inmate we are tasked with protecting, for clarification, his cell door 8225 will not be opened without the two OSJ deputies who are assigned to be posted.  If you get a pass for any movement other than medical, call me for approval.  Use your common sense.

                "There will be no other movement without the presence of the following people: Undersheriff Tanaka, ICIB Captain Tom Carey, ICIB Lieutenant Leavins, Lieutenant Greg Thompson, Deputy G. Smith, or Deputy M. Manzo."

        Q       Can you please read the second paragraph now.

        A       "At the beginning of each shift at MCJ, e.m., 2200 to 0600; a.m., 0600 to 1400; p.m., 1400 to 2200, call 1750, extension 40134, and tell the senior deputy your name and

employee number and confirm that you have Inmate Brown and that he is alive and log who you talk to in the black book.  I have left a black book/calendar with the posted deputies.

"The book will be updated as a movement log.  It is not a Title 15 log.  It's a CYA log.  So please make pertinent brief notes to pass along to your relief.  Examples are meals, nurse, name and time, and/or moved out for interview by Smith at 1030 hours, things of that nature.  If Brown has any requests, both deputies shall be present during any conversation.  To keep yourself free of any controversy, don't talk to him.  Let the approved listed people deal with Brown's issues."

Q      What about this third paragraph?  Can you please read it?

A      "It has been expressed to me several times now that this is one of the most important investigations involving the Los Angeles County Sheriff's Department in its 160-year history.  No joke.  So please do not hesitate to call me first if you need anything."

Q      Mr. Smith wrote in there that it had been expressed to him several times that this was one of the most important investigations involving the Los Angeles County Sheriff's Department in its history.

Did you hear those comments as well?

A      I did, yes.

Q        Who made those comments?

MR. DIAMANTATOS:  Objection.  Foundation.

MR. FOX:  Your Honor, I'm happy to lay a foundation.  Thank you.

THE COURT:  All right.

Q        BY MR. FOX:  Do you know when these comments were made?

A        I do.

Q        Approximately when?

A        The meeting -- I want to say the meeting on the 20th and then again in Mr. Tanaka's office after the FBI interview.

Q        You mentioned that it was during the meeting on the 20th and then in his office.  Were the same people present in those meetings as you've described previously when he made the comment?

A        Yes.

Q        And what is it that -- well, who made this comment?

A        Mr. Tanaka.

Q        What did he say?

A        Exactly what it says.

Q        In terms of this being the most important investigation or one of the most important investigations involving the Los Angeles County Sheriff's Department, from

**UNITED STATES DISTRICT COURT**

your perspective, any crime that was committed that the sheriff's department was investigating at this point involved what?

A       At this point I still think they were looking into the drug allegations.

Q       Okay.  And what about the cell phone?

A       They were looking in the cell phone too.

Q       And the cell phone is -- is it a felony or misdemeanor to have a phone in jail?

A       It's a misdemeanor.

Q       What about drugs?  Is it rare or -- a rare occurrence that drugs are in jail?

A       No.

MR. DIAMANTATOS:  Objection.  Form.

MR. FOX:  Your Honor, I'll be happy to ask the question again.

THE COURT:  All right.

Q       BY MR. FOX:  Do you have any experience regarding whether drugs come in to the county jails?

A       Yes.

Q       And based on that experience, what is your opinion about whether drugs are frequently in the jail?

MR. DIAMANTATOS:  Objection.  Form.

THE COURT:  Overruled.

You can answer.

**UNITED STATES DISTRICT COURT**

THE WITNESS:  Drugs are common in county jail.

Q       BY MR. FOX:  Could you please read this last paragraph on this first page.

A       "There are four 12-hour shifts each day: Midnight to noon, 0600 to 1800, noon to midnight, 1800 to 0600. There will always be two deputies assigned.  However, they have offset start and end times.  Do not leave until properly relieved.  Once again, you all have my number, 909-815-8064, if you do not get relief.  All CARPS are been canceled for you until we have accomplished our mission.  Overtime will only be paid once you have completed your 40.  We must still provide our service to custody division.  Starting next week I will require a straight 12-hour slot before you are eligible for an OT spot."

Q       This mentioned something called "CARPS."  What were CARPS?

A       I don't remember what it actually -- it's an acronym for something.  But in lieu of working your regular assignment, you would fill an open spot at an -- in our case, it was a custody facility.  So we would CARP at CRDF as a line deputy instead of working OSJ.

Q       As a result of this e-mail, what was happening?

A       We were not doing that.  We were not filling that spot.

Q       Why was that?

A      Because we were now filling this spot.

Q      This mentioned a CYA log earlier.  What is a CYA log?

MR. DIAMANTATOS:  Objection, Your Honor.  Foundation.

MR. FOX:  I'm sorry.  I'm happy to ask the question, Your Honor, if I can withdraw that question and re-ask it.

THE COURT:  That's fine.

Q      BY MR. FOX:  Are you familiar with what a CYA log is?

A      Yes.

Q      What is it?

A      It's not a technical term, but that's just what we called it.  It was a cover-your-ass log.

Q      There should be an Exhibit 133 in front of you.  If not, I might have to ask Mr. Montes Kerr to help.

A      It's right here.

Q      Great.  Can you please look at that and tell me if you recognize it.

A      (Witness reviewed exhibit.)

I do.

Q      What is it?

A      It is our CYA log.

Q      How do you know?

UNITED STATES DISTRICT COURT

825

A       I've seen it before prior during the investigation.

Q       Did you help create it as well?

A       I did.

Q       Can you just look through it and see if it's in substantially the same condition as it was in in August and September of 2011.

A       It looks the same.

MR. FOX:  Your Honor, I move for the admission of Government Exhibit 133.

THE COURT:  Any objection?

MR. DIAMANTATOS:  No objection, Your Honor.

THE COURT:  It will be received.

(Marked for identification and received into evidence Exhibit No. 133.)

Q       BY MR. FOX:  You said it was in substantially the same condition.  I'm going to ask you something in the bottom right-hand corner.  Did that exist at the time, LASD and some numbers after that?

A       No.

Q       Now I'm showing you the third page of that exhibit.

Just generally, is there anything listed before August 23rd in that CYA log?

A       No.

**UNITED STATES DISTRICT COURT**

Q        Why is that?

A        We didn't start the rotation of sitting on him until the 23rd.

Q        You see some names listed here.  It says, "Tuesday, the 23rd, Smith/Manzo."  What did that refer to?

A        The first two people that sat on him were supposed to be Smith and I, but he was dealing with the medical situation for Brown trying to get him cleared to leave.  So it was me and then another deputy.

Q        What about the times listed under there?  Let me clarify that actually.

It says 0200 to 0000.  What did that refer to?

A        Probably the times that we were sitting on him. But that's -- that doesn't match up.

Q        Well, look at next to it.  You see "Thompson Pearson."

A        Uh-huh.

Q        It says "12:00 a.m. to 8:00 a.m."  What does that refer to?

A        That means that Thompson and Pearson relieved me at midnight.

Q        This says Thompson.  Was that Lieutenant Thompson?

A        No.

Q        Who was it?

**UNITED STATES DISTRICT COURT**

A        Matt Thompson.

Q        Who was Matt Thompson?

A        Lieutenant Thompson's son.

Q        Can you look at Exhibit 29, please.  I'm going to publish it for you.

This is an e-mail from Mr. Smith to a number of people.  Who are these people that he sent the e-mail to?

A        Most of them are OSJ deputies from either MCJ or IRC.  There's one custody K-9 detective and one -- I don't know if he was a senior at 17 or he was in jail liaison at the time.

Q        This is sent on August 24th at approximately 9:16 p.m.  Can you please read what is written.

A        "I am in the process of making the next week or two of schedules for the Brown detail.  I need to know who is going to be out of town, Vegas conference.  Include dates and/or hours you are unavailable.  If you anticipate being unavailable for any other reason, I need to know that ASAP so I can get this schedule done and you can make some money.  Thank you."

Q        This is an e-mail from Noah Kirk to the same group of people.  Is that the same Deputy Kirk that you referred to as being the task force officer previously?

A        Yes.

Q        What is it that Mr. Kirk wrote?

A        "Just FYI, the extension to the location is

UNITED STATES DISTRICT COURT

47979, and from the outside it is 213-974-7979."

Q    Are you familiar with that extension?

A    Yes.

Q    What was it?

A    It was the nurse's station closest to where Brown was housed.

Q    What floor?

A    8200.

Q    I'm now going to show you and the jury Exhibit 23.  What is this?

A    This is an e-mail that I drafted to Lieutenant Thompson.

Q    Why did you draft this e-mail to Mr. Thompson?

A    He asked me to draft basically -- he had notes on a piece of paper, and he asked me to make it look official.

Q    What were these notes about?

A    How the FBI could gain access to Brown, what they needed to do.

Q    Can you please read what you wrote to Mr. Thompson on August 24th at 9:47 a.m.?

A    "Good morning.  Effective immediately, all FBI requests for interview will be approved by Undersheriff Tanaka. If the FBI requests access for any reason to your facility, get the following information:  Name and badge or ID number; place of assignment, i.e., special problems, robbery detail; contact

phone number; inmate who is being interviewed; case number or brief synopsis of case; future date and time they are available to interview.

"The above information will be documented by the facility's main control and verified by the facility's watch sergeant and watch commander.  If any of these questions cannot be answered, they will not be allowed access to your facility.  Once all of the information is obtained, a phone call to Undersheriff Tanaka's office will be made.  An e-mail response from Undersheriff Tanaka or someone he designates will be sent to the requesting party with an approval or denial."

Q      You mentioned that this came from Mr. Thompson's notes.  Did you hear anyone else orally state this?

A      Yes.

Q      Approximately when was this?

A      It's -- I don't remember.  I know that it was discussed, I think, in the 20 -- the meeting after the FBI visited Brown.

Q      That was August 23rd?

A      Yes.

Q      And who discussed this policy?

A      Mr. Tanaka.

Q      Was that the only time that Mr. Tanaka dictated the policy to you?

A      I believe it was brought up at one of the

**UNITED STATES DISTRICT COURT**

meetings, either the Friday or Saturday meeting.

Q       And you're talking about the 18th -- I'm sorry -- the 19th and 20th; is that correct?

A       Yes.

Q       I'm now going to publish Exhibit 27.  Who's this an e-mail from and to?

A       It's from Greg Thompson to Christopher Nee and Crystal Miranda.

Q       Who is Mr. Nee?

A       At the time he was Mr. Tanaka's aide.

Q       What about Crystal Miranda?  You don't know?

A       I'm not sure.

Q       Could you please read the first two sentences that I've highlighted here that Mr. Thompson wrote on August 24th at 11:27 a.m.?

A       "Chris, Crystal, can I get the boss' approval to put this out custody-wide?  Verbal notification isn't working as well as I thought it would."

Q       And then without reading exactly what's written here, generally, what is this?  And I've highlighted below the first two sentences.

A       It's the e-mail I wrote.

Q       Regarding the new FBI policy?

A       Yes.

Q       Now I'm going to show you the bottom of the first

**UNITED STATES DISTRICT COURT**

page.  Substance is on the second page.  But who wrote this e-mail?

A       Chris Nee.

Q       To who?

A       Greg Thompson.

Q       At the top of the second page, what did he write?

A       "Greg, can you give me a call at 323-526-5118? Thanks."

Q       Now highlighting the 6:02 p.m. e-mail from Mr. Thompson to Mr. Nee on the 24th, can you please read what Mr. Thompson wrote.

A       "Chris, was Mr. Tanaka going to make the changes on the FBI notice to facility commanders, or will he be satisfied if I remove all reference to him or the executives? If so, I will send it out tomorrow morning."

Q       What did Mr. Nee write at 9:23 p.m.?

A       "He said that you were going to make changes to it."

Q       Now I'm going to publish what's in evidence as Government Exhibit 32.

        Do you recognize this e-mail?

A       No.

Q       Do you know if you were copied on this e-mail?

A       I was not.

Q       I'd like you to read the e-mail that was sent

from Mr. Thompson to custody captains, custody ops,

lieutenants, custody commander, and MCJ jail liaison with the

subject "Inmate interviews."

A       "Effective immediately, all FBI requests for

inmate interviews will be approved by MCJ jail liaison.  All

FBI requests in person or telephonic shall be referred to MCJ

jail liaison.  Once approved, the inmate will be transported to

MCJ and made available to the FBI.  MCJ jail liaison shall be

the only entity to facilitate FBI interviews inside of our

custody facilities."

Q       As far as you're aware, Mr. Manzo, was the FBI

ever able to interact with Anthony Brown while he was in county

custody after August 23rd, 2011?

A       I don't believe they were, no.

Q       Now publishing Government Exhibit 26 which is in

evidence, please look at this, and tell me if you recognize

this e-mail.

A       I recognize it.

Q       What is it?

A       An e-mail that I wrote.

Q       About what?

A       Tracking the FBI phone calls.

Q       From where to where?

A       It looks like January 1st of '09 to August 24th

of 2011.

**UNITED STATES DISTRICT COURT**

833

Q        I'm sorry.  You said you were tracking every FBI phone call.  How were you able to track these phone calls?

A        Through our ITMS system.

Q        Which is what?

A        Inmate Telephone Monitoring System.

Q        So what did you do to track those calls?

A        Just like any search program, you enter in the parameters, the date, the time if you have it, and then the phone number you're looking for, and it spits out whatever number it's going to spit out.

Q        Why did you do this?

A        Lieutenant Thompson asked me to.

Q        What did you find out when you ran the numbers?

A        I remember there were a lot of phone calls.

Q        We see here that you sent the e-mail on August 24th at 9:31 p.m. to Steve Leavins, Scott Craig, and Maricela Long.  Who were Scott Craig and Maricela Long at the time?

A        They were sergeants assigned to ICIB.

Q        Did they have any involvement with Anthony Brown up to this point?

A        They may have.  I don't remember.

Q        I now want you to look at Exhibit 81 which should be next to you.

A        In the folder?

**UNITED STATES DISTRICT COURT**

834

Q        Yes.  Is there a folder there with 81?

A        I don't know.

Q        Do you see it?

A        I do, sir.

Q        What is it?

A        It is a CD of the interview that was conducted on the 24th at Temple Station.

Q        How do you know that?

A        I've listened to it, and I signed it, and I wrote "Temple" on it.

Q        These are excerpts of that interview; is that correct?

A        That's correct.

Q        Are they true and accurate excerpts of that interview that was conducted on August 24th?

A        Yes.

Q        I'd like you to look at Government Exhibit 82 and see if you recognize that.

        (Marked for identification Exhibit No. 82.)

        MR. FOX:  While you look at that, Your Honor, I move for the admission of Government Exhibit 81.

        THE COURT:  Any objection?

        MR. DIAMANTATOS:  No, Your Honor.  No objection.

        THE COURT:  It will be received.

///

**UNITED STATES DISTRICT COURT**

(Marked for identification and received into evidence Exhibit No. 81.)

Q        BY MR. FOX:  Do you recognize that?

A        Yes.

Q        What is it?

A        It is a transcript of the interview from the 24th.

Q        Does that transcript fairly and accurately reflect what was said in those excerpts in Government Exhibit 81 and the speakers in those excerpts?

A        Yes.

Q        How do you know?

A        I was there.  I listened to it on the CD, and I've read the transcript.

MR. FOX:  Your Honor, I'd like to begin playing the excerpts from Government Exhibit 81, and the transcript in 82 is in juror binders.

THE COURT:  All right.  Ladies and gentlemen, if you would open your binders.

And, again, you're about to hear a recording that's been received in evidence.  A transcript of the recording is being provided to help you identify speakers and help you decide what the speakers say.  Remember, the record is the evidence, not the transcript.  If you hear something different from what appears in the transcript, what you heard

is controlling.  Listen carefully.  The transcript will not be available during your deliberation.

MR. FOX:  I'm now going to play the first clip that is reflected on page 1 of the transcript.

(The cd, Exhibit No. 81, commenced playing before the jury.)

MR. FOX:  Playing the second clip on page 2.

(The cd, Exhibit No. 81, commenced playing before the jury.)

MR. FOX:  Now playing the clip listed at the bottom of page 3.

(The cd, Exhibit No. 81, commenced playing before the jury.)

MR. FOX:  Now playing the first clip listed at the top of page 4.

(The cd, Exhibit No. 81, commenced playing before the jury.)

MR. FOX:  And now the clip in the middle of page 4.

(The cd, Exhibit No. 81, commenced playing before the jury.)

MR. FOX:  Your Honor, for now I'm done playing excerpts.

THE COURT:  All right, ladies and gentlemen.  If you'll close your books, please.

**UNITED STATES DISTRICT COURT**

Q       BY MR. FOX:  Mr. Manzo, you discussed yesterday that Deputy Bravo is the nephew of Mr. Baca.  At some point did Mr. Brown make any allegations against Mr. Bravo?

A       Yes.

Q       What did he say?

MR. DIAMANTATOS:  Objection.  Foundation.

MR. FOX:  I have to lay more foundation, Your Honor.

THE COURT:  All right.

Q       BY MR. FOX:  Who was present when he made these allegations, if you recall?

A       Myself, Deputy Smith, and, I believe, Lieutenant Leavins.

Q       Do you remember when he made these allegations approximately?

A       It was during an interview.  I don't remember the date.

Q       Was it in one of these interviews that -- around the time of these interviews we've been listening to?

A       Yes.

Q       And where did this interview occur?

A       It was either in the 6000 interview room or 7000 interview room.

Q       Is the 7000 interview room also within Men's Central Jail?

**UNITED STATES DISTRICT COURT**

A        Yes.

Q        And what is it that Mr. Brown told you about Mr. Bravo?

A        That he got his first phone, one of the two phones he had, from Deputy Bravo.

Q        What did you do with that information?

A        After that interview, I ultimately typed a report.

Q        What happened with that report?

A        When I went to turn it in to Sergeant Craig, because we were probably a week or so after it, we had formed a big task, he asked me to redact Bravo's name from the report.

Q        Did he explain why?

A        No.  Even though I asked.

Q        Did he provide you with any instructions?

A        No.  He just told me that, you know, he didn't agree with it either but it was coming from way above him and to do it, and we had an argument about it for a little while.

Q        Are you aware of any efforts by the sheriff's department to conduct an undercover operation with respect to Mr. Brown?

A        Yes.

Q        When did this occur?

A        I do not remember the date, but it was the same day that we had him polygraphed.

Q    Was Mr. Brown in Men's Central Jail at this point, or was he at a station jail at this point?

A    He was in 8200 at Men's Central Jail.

Q    And how do you know that this undercover operation was going to take place?

A    I helped facilitate it.

Q    How did you help facilitate it?

A    We were tasked by Lieutenant Leavins -- Deputy Smith and I were tasked to get a van and bring, I think he said, four sets of triple extra large brown jumpsuits to the SEB parking lot.

Q    Why was that necessary?

A    They were going to dress two of our detectives as inmates and place them in the cell with Brown.

Q    Do you know what the purpose of that undercover operation was?

A    No.

Q    Did you bring those uniforms to that parking lot you were discussing?

A    I did, yes.

Q    What happened once you got there?

A    Lieutenant Leavins was there, and he was talking to the two detectives, and we were just standing by the van waiting for further instructions.  And then Mr. Tanaka and Lieutenant Nee pulled up.

UNITED STATES DISTRICT COURT

Q      What happened when they pulled up?

A      They got out, shook hands with Lieutenant Leavins, and talked to the detectives for a little bit.

Q      Could you hear that conversation?

A      No.

Q      Mr. Manzo, having worked in the jails and within Men's Central Jail for the years that you did, are you familiar with what a records jacket is?

A      Yes.

Q      What is a records jacket?

A      It is the personal info, information of an inmate, and also their charges.

Q      Around the same time period in late August of 2011, did Mr. Leavins ask you to do something with respect to Mr. Brown's record jacket?

A      Yes.

Q      What did he -- when did this occur?

A      I don't remember when it occurred.

Q      Do you recall whether Mr. Brown was still in MCJ custody, or had he been transferred to a station jail?

A      No.  I don't recall.

Q      Do you remember how it is that Mr. Leavins communicated information to you?  Were you in person or on the phone?

UNITED STATES DISTRICT COURT

A       I don't remember.

Q       Would it refresh your recollection about the time period if you reviewed -- well, it's in evidence.  Let me actually just pull it up.  Publishing Government Exhibit 39.

MR. DIAMANTATOS:  Objection, Your Honor. Improper refreshing recollection.

MR. FOX:  Your Honor, I'm just publishing an exhibit.

THE COURT:  Overruled.

Q       BY MR. FOX:  Mr. Manzo, do you know who Jason Pearson is?

A       Yes.

Q       He's the sender of this e-mail I just highlighted in Government Exhibit 39.

Who does he send this e-mail to?

A       Greg Thompson, and he copies Michael Rathbun and Gerard Smith.

Q       Where was Mr. Pearson's assignment at that time?

A       He is IRC OSJ.

Q       What is "IRC"?

A       Inmate Reception Center.

Q       Who does Mr. Pearson copy on this e-mail?

A       Michael Rathbun and Gerard Smith.

Q       Who is Michael Rathbun?

A       He was also an IRC OSJ deputy.

**UNITED STATES DISTRICT COURT**

842

Q        What is the subject of this e-mail?

A        "Jacket."

Q        What about the date of this e-mail?

A        August 26.

Q        What does this e-mail state?

A        "Sir, Rathbun will be delivering the inmate record jacket for our friend.  It will be slid under your door for your review in the morning.  Jason."

Q        Did your conversation with Mr. Leavins about Mr. Brown's record jacket occur before or after this e-mail?

A        Before.

Q        What did Mr. Leavins tell you?

A        That he wanted Brown's jacket.

Q        Did he tell you why?

A        I don't believe so, no.

Q        What did you do after Mr. Leavins told you that he wanted Mr. Brown's jacket?

A        I called one of the IRC OSJ deputies and asked them if they could grab it for me.

Q        I'm now going to publish Government Exhibit 40.

Actually, before I do that, I'm going to ask you, did you personally ever see Mr. Brown's record jacket?

A        No.

Q        I'm now going to publish Exhibit 40.

Are you familiar with this e-mail?

**UNITED STATES DISTRICT COURT**

A      Yes.

Q      What is it?

A      It is an e-mail to the OSJ contingent that was sitting on Anthony Brown to let them know that we were no longer at Men's Central Jail, that we were moving to San Dimas Station.

Q      What is the date of this e-mail?

A      August 27.

Q      What are the dates of the schedule that are listed in the e-mail?  You can just go with the range.

A      August 29 of 2011 to September 4, 2011.

Q      Are you familiar with Mr. Brown's aliases that he had during this time?  I'm sorry.  I shouldn't say his aliases.

       At some point in time, when he moved to San Dimas, did he keep the name Anthony Brown?

A      No.

Q      What happened?

A      We changed it.

Q      Do you know why?

A      We were ordered to.

Q      Showing you now Government Exhibit 38, this is an e-mail from John Bonner to Greg Thompson.

       Do you know who John Bonner was?

A      Yes.  He was either the senior in 17 at the time or he was in jail liaison.  I don't remember.  He was both at

**UNITED STATES DISTRICT COURT**

844

one time.

Q      You say "Senior in 17."  Do you mean 1750?

A      Yes.

Q      And the subject says "John Rodriges," R-i-g-e-s.
Looks like a misspelling.  Do you know who John Rodriguez was
at this time?

A      That was the first name that we changed
Anthony Brown from or to.  Excuse me.

Q      I'm going to now publish the second page from
that CYA notebook you discussed.

Do you see at the top of the second page it has
two names listed?

A      Yes.

Q      We see John Rodriguez listed in handwriting and
then a number beneath that.

What is that?

A      That would be his booking number.

Q      Had Anthony Brown been actually released from
custody at this point, physically released from custody?

A      No.

Q      Why did he need a new booking number?

A      I don't know how to answer that.  The easiest way
to say it is, in order to -- the way it was explained to me, in
order to safeguard him from the deputies and the inmates, we
were going to change him to John Rodriguez.

**UNITED STATES DISTRICT COURT**

845

Q        Who explained that to you?

A        If I remember correctly, Lieutenant Thompson.

Q        What about Kevin King?  That name is listed there.  Who is Kevin King?

A        Anthony Brown.

Q        And it listed another number next to him.  What is that?

A        That is his booking number.

Q        What is that barcode there beneath the number?

A        I think this is a copy of the sticker that you would put on a wristband.

Q        Do you have Exhibit 134 in front of you?  Do you recognize it?

A        Yes.

Q        Okay.  Before we get into that, you mentioned safety was explained to you by Mr. Thompson.  At the August 23rd meeting with Mr. Tanaka, you mentioned that it was -- that was when it was decided that you would be putting two OSJ deputies on Mr. Brown and moving him out of 1750.

         Did Mr. Tanaka ever discuss safety as the reason for that at that meeting?

A        No.

Q        So what is Exhibit 134?

A        This is my notebook from the task force.

Q        What were you using that notebook for?

UNITED STATES DISTRICT COURT

A       Writing down anything that came up during meetings, anything like that.

Q       What time period, generally, was this?

A       Probably from best estimate would be around the 19th.

Q       And I want to have you look at page 10 of that exhibit.  Do you see that?

A       The one that starts out 8/19/11?

Q       Let me -- you're on 134, page 10?

A       I think so.  They don't have page numbers.

MR. FOX:  Your Honor, may I see what Mr. Manzo is looking at there?  I want to make sure he and I are looking at the same document.

THE COURT:  That's fine.

Q       BY MR. FOX:  It's a different page I'd like to show you that Mr. Montes Kerr is putting in front of you.

Do you recognize that?

A       Yes.

Q       Okay.  And without getting into the substance of it, what generally is it?

A       It's the notes I took at a briefing.

MR. FOX:  Your Honor, may I have one moment with counsel?

THE COURT:  Yes.

MR. FOX:  Your Honor, with agreement from

counsel, we are only going to be admitting the cover page and the page that I'm going to be publishing to the jury of this exhibit. This is Exhibit 134. With your permission I'd like to admit those two pages and publish the second page.

MR. DIAMANTATOS: No objection, Your Honor.

THE COURT: All right.

(Marked for identification and received into evidence two pages of Exhibit No. 134.)

Q      BY MR. FOX: Mr. Manzo, is this the page you were just referring to?

A      Yes.

Q      Could you please read your notes from that exhibit?

A      "8/31/11, meeting/briefing, 1030 hours. 1,000 man-hours, federal grand jury investigation. Subpoenas. One, inmates A through T all records including force/injury, complaints, et cetera, 24 inmates.

"One, deps, deputies, A through W reports use of force, alleges, criminal charges on inmates, disciplinary documentation and e-mails.

"One, all jail personnel, i.e., carpers/transfers. 9/14/11, inmate info subpoena due; 9/21/11, deputy A through W info subpoena due; 9/28/11, jail personnel info subpoena due," at the very bottom.

Q      Mr. Manzo, you discussed how Mr. Brown was

848

brought to San Dimas at some point in late August of 2011.  At some point did he return to Men's Central Jail?

A       Yes.

Q       Why was that?

A       He had an -- I guess an outburst.  That's what we were told.  And that he would -- he was making too much of a stink at San Dimas.  So we had to bring him back.

Q       Do you have Exhibit 86 in front of you?  Do you recognize it?

A       I recognize it as a CD.

Q       Does it have your signature on it?  Okay.  I will then not do this one with you.

Can you look at -- actually, it's already in evidence.  Can you look at Exhibit 87.

MR. HOCHMAN:  Your Honor, I don't believe 87 is in evidence.

MR. FOX:  It's not in evidence.  It's a transcript.

Q       Do you recognize that?

A       Yes.

Q       Have you seen this transcript before?

A       I have.

Q       And do you know whether this transcript fairly and accurately depicts what was said in a September 2nd, 2001, recording?  2011 recording.  Excuse me.

**UNITED STATES DISTRICT COURT**

A       It does.

Q       Does it also accurately list the speakers?

A       Yes.

MR. FOX:  Your Honor, I'd like to now play for the jury Exhibit 86 which is reflected in the jury books under Government Exhibit 87.

THE COURT:  All right.  If you'd open your notebooks, please.  I believe it's tab 87.

(The cd, Exhibit No. 86, commenced playing before the jury.)

Q       BY MR. FOX:  Mr. Manzo, there was some discussion there about legal pads.  I'd like you to look at Government Exhibit 155, please.

(Marked for identification Exhibit No. 155.)

Q       BY MR. FOX:  Do you recognize it?

A       Yes.

Q       What is it?

A       It is a copy of a letter Brown had written to the ICIB.

Q       How do you know that that's a letter that Mr. Brown wrote to ICIB?

A       I saw the original.

Q       How did you see the original?  How did it come into your possession?

A       I think, if I remember correctly, Brown gave it

**UNITED STATES DISTRICT COURT**

to Deputy Smith.

Q    And what did you do with it once you got it?

A    Gave it to Lieutenant Leavins.

Q    There are some redactions in that exhibit; is that correct?

A    There look to be, yes.

Q    Other than the redactions where some information is not in there, does that appear to be a true copy of what you received from Mr. Brown?

A    It appears to be, yes.

MR. FOX:  Your Honor, I move for the admission of Government Exhibit 155.

MR. DIAMANTATOS:  No objection, Your Honor.

THE COURT:  It will be received.

(Received into evidence Exhibit No. 155.)

Q    BY MR. FOX:  Before we go through it, I want to ask you, when Mr. Brown was moved back to Men's Central Jail, did he receive a new alias, or did he keep the one he had when he was in San Dimas?

A    I believe we changed it again.

Q    I'm now going to publish what's in evidence as Government Exhibit 43.

Do you see the e-mail I'm highlighting on this page?

A    Yes.

**UNITED STATES DISTRICT COURT**

Q       It's written from Gerard Smith to Greg Thompson September 2nd at 9:21 a.m.  Can you please read it.

A       "Sergeant Johnson has made him a K-10 per OSJ and you.  Updated housing will be 8225.  Inmate new name Johnson, Chris, No. 2863148, case No. 999999999.  Getting medical update now.  Go kill something."

Q       What -- that's reference to hunting; is that right?

A       Yes.

Q       What is that case number?

A       Not one that I know.  I think you have to put something when you book somebody.  So that's what we chose.

Q       Now showing you what's in evidence as Government Exhibit 45, is this another schedule of the OSJ deputies who were supposed to be guarding Mr. Brown?

A       Yes.

Q       And showing you the first page and then the second page -- I'm sorry.  It looks like there's only one page.

What is the date range here?

A       September 4 of 2011 to September 10, 2011.

Q       Now showing you what's in evidence as Government Exhibit 46, what is this?

A       It looks to be a continuation of the schedule.

Q       Until what time -- what date?

A       Saturday, September 17, 2011.

UNITED STATES DISTRICT COURT

Q        Now I want to publish the first page of Mr. Brown's letter.  Can you please read what I've highlighted.  Actually, just tell me the date of this letter.  This is 155.

A        September 8, 2011.

Q        If you could please look at the last page of that exhibit in front of you and see if there's a date that's better written than that, a copy that's better, I should say.

A        Last page is signed September 3rd, 2011.

Q        Can you please read the portion I've highlighted here.

A        "I understand that you guys are very, very busy and you have many things to do.  So I will make this letter short as possible."

Q        Having said that, this is a lengthy letter; is that correct?

A        Yes.

Q        Showing you page 14, could you please read what's written.

A        "As a person who knows a little something about the law, I know the evidence that I provided to the FBI means nothing without my testimony and without my testimony being that I am the one who shot the videos, took the pictures, gave them the notes, names of inmates, and deputies involved means nothing.  If I don't testify and after being put in this position by the feds and then hung out to dry, I have no desire

UNITED STATES DISTRICT COURT

to testify for the FBI.

"However, I will cooperate with the following people of LASD: Lieutenant Steve, Captain Tom, Sergeant Long --" I can't read that one.  It looks like -- "Sergeant Grey, Sergeant Webber, and Sergeant Lopez.  And I can't forget Lieutenant --" it looks like Tampson, but I'm sure he meant Thompson.  "And I will testify for LASD only if needed."

Q     Now showing you the bottom of page 22 of that letter, can you please read it.

A     "I am not a hostile witness, and I will cooperate to the fullest in my --" oh, boy.

Q     If you can't make it out, go on.

A     "I believe LASD should handle their own problems, not FBI or any other agency.  And so no one has to bully me or take my stuff and legal work to make me cooperate with this investigation.  But that has happened.  I'm not hostile.  There is no reason to be hostile with LASD, especially when the FBI --"

Q     Showing you now the top of the next page.

A     "-- has left me for dead.  However, I am concerned about my safety."

Q     Can you read this page, page 25, starting with "I will not."

A     "I will not testify for the FBI, and I don't --"

**UNITED STATES DISTRICT COURT**

854

I can't read that "-- the FBI ever again.  I just want to help with the investigation and with the requested --" I don't know "-- fight my case.  End of story.  It is up to LASD, not me, how they handle this investigation.  Again, it is not my problem, and that is my position.  Sincerely, Anthony Brown."

Q    Showing you now what is in evidence as Government Exhibit 47.  This is an e-mail from Judy Gerhardt to someone named Patrick Libertone saying "Need document from September 7, 2011."  Can you please read what it says.

A    "Pat, I was referred to you for this.  Please assist ASAP.  Please provide the following: Base files including but not limited to full name, date of birth, social security number, last known address, last known phone number, criminal history, if available, and photos for the following LASD inmate.  Please advise of an ETA for these records.  Brown, Anthony, 2009547.  Please contact Lieutenant Libertone for booking slip."

Q    Showing you now the next e-mail from there from Mr. Libertone to Mr. Thompson.

By the way, did you know who Mr. Libertone was?

A    He was a lieutenant at IRC.

Q    And in this e-mail, it just lists "FYI" to Mr. Thompson.  I'm showing you the top e-mail at 3:45 p.m. on September 7.

What does Mr. Thompson do with this e-mail?

**UNITED STATES DISTRICT COURT**

A        He forwards it to Captain Carey.

Q        And what does he write?

A        "FYI, federal request?"

Q        I'm going to show you what's in evidence as Government Exhibit 52.

Who is this e-mail from and to?

A        From Captain Carey to Lieutenant Steve Leavins.

Q        What is the date?

A        September 9, 2011.

Q        What is written in this e-mail from Mr. Carey to Mr. Leavins?

A        "Steve, official request from feds for interview with Brown was made."

Q        At some point, Mr. Manzo, was Mr. Brown transferred to state custody?

A        Yes.

Q        Do you remember approximately when this occurred?

A        If I remember, around September -- early September.

Q        At some point, were you loaned to any other bureau within the sheriff's department?

A        Yes.

Q        What bureau was that?

A        ICIB.

Q        Where was it located?

A        ICIB was located in Commerce.

Q        When were you loaned to ICIB?

A        After the 20th meeting.

Q        Were there ever any meetings in -- or within ICIB with any executives?

A        Yes.  But after we moved from Commerce to the Sheriff's Headquarters Bureau.

Q        When did that occur?

A        Early September.

Q        Do you ever recall seeing the sheriff there, Mr. Baca there?

A        Yes.

Q        Approximately when?

A        The first full task force briefing we had, I don't remember the date.  It was on a Tuesday.  He came to that one.

Q        Who else was there?

A        All of the -- well, the sergeants that were assigned to the task force at the time because it was still growing, myself, Deputy Smith, Captain Carey, Lieutenant Peacock, Lieutenant Leavins, Undersheriff Tanaka, and then there were some support personnel.

Q        Where within the task force offices did this meeting occur?

A        It was in the task force office that was

commandeered.  It was in the basement of Sheriff's Headquarters Bureau.  They called it an EPC conference room.

Q      What occurred -- what type of briefing occurred after Mr. Baca arrived?

A      Lieutenant Leavins, Sergeant Craig, and Sergeant Long gave a once-over of everything catching all the sergeants up for the cell phone investigation.

Q      Was there any discussion about the jail policy with respect to the FBI at that meeting?

A      I'm not sure.  I don't remember.

Q      Was there any discussion about any communications that had occurred with the FBI with respect to the cell phone previously?

A      Yes.  I was part of the briefing that the sheriff had been in contact with the FBI and they hadn't acknowledged the investigation but they wanted their phone back, or the phone back.  Excuse me.

Q      Mr. Manzo, are you familiar with FBI Special Agent Leah Marx?

A      Yes.

Q      Going back to the end of September, 2011, did you ever see any videos that were taken of Special Agent Marx?

A      I did, yes.

Q      What was that video?

A      It was the video of Sergeant Long and

Sergeant Craig talking with Lieutenant Marx -- I'm sorry -- Special Agent Marx.

Q        Was there any audio on it?

A        No.

Q        How was it that you were able to see it?

A        Scott Craig played for -- what was his name?  I can't remember the other sergeant's name, but he played it for -- there were a couple sergeants.

Q        And you were there too?

A        I was.

Q        I want to take you back to a couple days before you saw that video.

Did you observe anything unusual with Mr. Craig at that point?

A        I did.

Q        What did you see?

A        He had -- he was leaving the task force office, and the sergeant to my right who sat next to me -- I can't remember his name -- said something to the effect of I don't think this is a good idea.  And Sergeant Craig kind of gave a half bow half curtsy, and he said, "I've been so ordered."  And then he walked out of the room, and I just thought that was odd.

MR. FOX:  One moment, Your Honor.

I have no further questions for this witness at

this time.

THE COURT:  All right.  Ladies and gentlemen, we're going to take our first break of the day.  Again, I want to remind you you're not to discuss this case with anyone including your fellow jurors, members of your family, people involved in the trial, or anyone else, and do not allow others to discuss the case with you.  This includes discussing the case on the Internet, by e-mails or text messages.  If anyone tries to communicate with you about this case, please let me know about it immediately.

Do not watch or read or listen to any news reports or other accounts about the trial or anyone associated with it.  Do not do any research such as consulting dictionaries, searching the Internet, or using other reference materials, and do not make any investigation about the case on your own.

Finally, you're reminded to keep an open mind until all the of the evidence has been received, you've heard the arguments of counsel, the instructions of the Court, and the views of your fellow jurors.  If you need to speak with me, simply give a note to the clerk.  We'll come back at a quarter to the hour.

(The following proceedings were held in open court out of the presence of the jury:)

THE COURT:  All right.  Sir, you may step down.

**UNITED STATES DISTRICT COURT**

THE CLERK:  Please be seated.

MR. FOX:  Your Honor, I just wanted to briefly let you know at some point either today or Tuesday we will be asking you to take judicial notice of what a grand jury is.  We filed this as document 162 on the docket, and happy to provide you with a copy of what we filed right now.  My understanding is that Mr. Hochman may have an objection to it.

MR. HOCHMAN:  Your Honor, I'm reviewing it again today.  I will be able to tell the Court by the next break if we have any objection.

THE COURT:  All right.  Do you anticipate using it before then?

MR. FOX:  No, Your Honor.

THE COURT:  Okay.

(A recess was taken at 9:30 a.m.)

(The following proceedings were held in

open court out of the presence of the jury:)

MR. HOCHMAN:  Your Honor, I've had a chance to look over the judicial notice.  We would not oppose it.

THE COURT:  Okay.  Do you have a rough idea of how long you're going to be?

MR. DIAMANTATOS:  An hour to an hour and a half at the most, Your Honor.

THE COURT:  Okay.  Who is the next --

MR. FOX:  It's going to be Linda Farrar.  She

UNITED STATES DISTRICT COURT

will be a very short witness.  At that point we may want to call Mr. Sexton if he's here.  If we need some time, we do have another witness we can put on the stand at that point.

THE COURT:  I think the plan is they would have him available around 10:30.

MR. FOX:  Your Honor, will you take a break right before we call him?

THE COURT:  Uh-huh.

MR. FOX:  Thank you.  So it will be after Ms. Farrar that we'd like to call Mr. Sexton.

THE COURT:  Okay.  Let's bring the jury in.

(The following proceedings were held in

open court in the presence of the jury:)

THE COURT:  All right.  Let's resume.

MR. DIAMANTATOS:  Thank you, Your Honor.

**CROSS-EXAMINATION**

BY MR. DIAMANTATOS:

Q     You testified that you were convicted for conspiracy to obstruct justice of the Government's FBI civil rights investigation to the Men's Central Jail in the summer of 2011; is that right, sir?

A     Yes.

Q     That's a felony; correct?

A     Yes.

Q     You were also convicted of actual obstruction of

**UNITED STATES DISTRICT COURT**

justice of that same investigation; isn't that right, sir?

A    Yes.

Q    That's also a felony?

A    Yes.

Q    So you are a twice-convicted felon?

A    Yes.

Q    Once convicted, the next step was your sentencing; correct?

A    Yes.

Q    At that sentencing, you knew, based on your convictions, you were facing a maximum penalty of 15 years imprisonment; correct?

A    Yes.

Q    Five years for the conspiracy?

A    I don't know the breakdown, but that sounds about right.

Q    But you knew it was 15 years that you were facing; correct?

A    Yes.

Q    At that sentencing, the Government recommended that you go to prison for two-and-a-half years; correct?

        MR. FOX:  Objection, Your Honor.  Relevance.

        THE COURT:  Sustained.

Q    BY MR. DIAMANTATOS:  You were sentenced to two years imprisonment; isn't that right, sir?

A    Yes.

Q    The events that brought you to the witness stand today, you indicated yesterday that the Government may or may not file a Rule 35 motion.

Do you recall that testimony, sir?

A    Yes.

Q    And you explained to the jury that your understanding of the Rule 35, if it's filed, is where the Government would make a motion to the judge; correct?

A    Yes.

Q    Where the judge can consider that motion and potentially reduce your two-year sentence; right?

A    Yes.

Q    Now, you certainly want the Government to make that motion on your behalf; right, sir?

A    Yes.

Q    You're hoping that they will?

A    Yes.

Q    Is that "yes"?

A    Yes.

Q    Because, if they don't make that motion, the sentencing judge cannot change your two-year sentence; correct?

A    Correct.

Q    You don't want to go to jail for two years; isn't that right, Mr. Manzo?

**UNITED STATES DISTRICT COURT**

864

A        I don't want to go to jail at all.  But yes, you're correct.

Q        In fact, the events you were convicted for occurred in 2011; right?

A        Yes.

Q        It's December, 2016, now; right?

A        Yes.

Q        You have not yet served one day in prison; is that correct?

A        Correct.

Q        I want to discuss the August 20 meeting, the Saturday morning meeting you testified about yesterday and this morning.

Okay.  Mr. Manzo, it was a meeting that was brought together at the last minute; right?

A        I don't know.  I knew about it on Friday.  I knew we had to come back on Friday.

Q        So you knew about it on Friday.

Do you recall when on Friday you knew you had to be at a Saturday morning meeting?

A        Probably shortly after because we weren't able to play the recordings on Friday.

Q        So let's take a step back.

August 19 is the Friday; correct?

A        Yes.

**UNITED STATES DISTRICT COURT**

Q      You indicated you had a short meeting -- this was the meeting you described for the jury with regard to the recordings -- right? -- a debriefing meeting?

A      I think we're mixing up two different things.

Q      Okay.  You had a meeting on August 19 where you gave the down low of what you knew about the investigation at that point; correct?

A      Yes.

Q      What time of the day was that, sir?  Do you recall?

A      No.  After 1:00 o'clock or around 1:00 o'clock maybe.

Q      So based on your recollection, it was in the afternoon; right?

A      Yes.

Q      The Saturday morning meeting happened in the morning; correct?

A      Yes.

Q      So the Saturday morning was set up less than 24 hours' notice; right?

A      Yes.

Q      You indicated that Sheriff Baca was present for the Saturday morning meeting; right, sir?

A      Yes.

Q      Isn't it true that Sheriff Baca left that meeting

because he had to go for a preplanned 5K charity run that morning?

A        I don't know.  I don't remember him leaving.

Q        You recall him being in a bright orange shirt and running shorts at that meeting that morning; correct?

A        I remember the shirt, yes.

Q        Okay.  You remember he was wearing shorts too; right?

A        I don't remember if he was wearing shorts or not.

Q        Would a copy of your prior testimony refresh your recollection?

A        Yes.

MR. DIAMANTATOS:  May I have a moment, Your Honor?

THE COURT:  Yes.

MR. DIAMANTATOS:  Permission to approach the clerk, Your Honor.

THE COURT:  Yes.  Let's mark this as defendant's next in order for identification.

MR. DIAMANTATOS:  We've marked it for identification, Your Honor.

THE COURT:  That's fine.  What's the number?

MR. DIAMANTATOS:  We've marked for identification as Exhibit 622.

(Marked for identification Exhibit No. 622.)

Q        BY MR. DIAMANTATOS:  Mr. Manzo, you've been handed what has been previously marked for identification.  I would ask you, sir, to turn to page 29.  Once you're there, let me know.

A        Okay.

Q        I'm going to ask you to look to lines 20 through 23.

A        (Witness reviewing exhibit.)

Q        It was odd --

THE COURT:  Excuse me, counsel.

Sir, why don't you just read that page to yourself and let us know when you're finished.

THE WITNESS:  (Witness reviewing exhibit.)

Okay.

THE COURT:  If you could close that.  Thank you.

Q        BY MR. DIAMANTATOS:  Is your memory now refreshed with regard to what Sheriff Baca was wearing that morning?

A        Yes.

Q        What was he wearing that morning?

A        Orange shirt and running shorts.

Q        You indicated Sheriff Baca was there for part of that meeting; correct?

A        Yes.

Q        The rest of the individuals who were at that meeting included Undersheriff Tanaka.

**UNITED STATES DISTRICT COURT**

A    Yes.

Q    Yourself.

A    Yes.

Q    Deputy Smith.

A    Yes.

Q    Lieutenant Thompson.

A    Yes.

Q    Lieutenant Leavins.

A    Yes.

Q    Lieutenant Peacock.

A    Yes.

Q    Captain Carey.

A    Yes.

Q    Those individuals stayed for the duration of the Saturday morning meeting; correct?

A    Yes.

Q    Assistant Sheriff Rhambo was not at that meeting; correct?

A    No.

Q    You testified about certain questions that Sheriff Baca asked when he was present for that meeting.  You indicated that he said, "Why didn't they tell us?"

Correct?

A    Yes.

Q    Was it your understanding that the "they"

**UNITED STATES DISTRICT COURT**

Sheriff Baca was referring to was the FBI?

A    Yes.

Q    He also questioned why they couldn't work together; correct?

A    Yes.

Q    Again, was it your understanding that the "they" Sheriff Baca was referring to was the FBI?

A    Yes.

MR. DIAMANTATOS:  Your Honor, permission to republish Government Exhibit 15.

THE COURT:  It's in evidence.  Go ahead.

MR. DIAMANTATOS:  Yes, Your Honor.  It is in evidence.

Q    Mr. Manzo, I'd like to direct your attention to what has been received in evidence as Government 15.  It's an e-mail you testified about yesterday.  In the top from sent to section, according to Government Exhibit 15, it's from Martinez, Steven; correct?

A    Yes.

Q    It's sent on Thursday, August 18, 2011; correct?

A    Yes.

Q    About six minutes after 5:00 o'clock p.m. according to the exhibit; correct?

A    Yes.

Q    To Baca, Leroy D.; correct?

870

A        Correct.

Q        The subject line is "Please call."

A        Yes.

Q        And the body of the e-mail, there's an indication that it's Lee first name; correct?

A        Correct.

MR. FOX:  Objection.  Relevance.

THE COURT:  The answer will stand.  Next question.

Q        BY MR. DIAMANTATOS:  The e-mail is signed "Regards, Steve"; correct?

A        Correct.

Q        Going back to the Saturday morning meeting, Sheriff Baca, you indicated, gave a few orders right then and there; correct?

A        Yes.

Q        Those orders included that the inmates should be isolated; correct?

A        Correct.

Q        Protected?

A        Correct.

Q        Deputy Manzo, when did you first join the Los Angeles Sheriff's Department?

A        It would be July of 2006.

Q        Okay.  And you were a deputy; correct?

UNITED STATES DISTRICT COURT

A       Correct.

Q       You've received training.

A       Yes.

Q       Part of your duties as a Los Angeles Sheriff's Department deputy is to help maintain the prison; correct?  And by "maintain," I mean keep the inmates safe?

A       Yes.

Q       Keep other brother and sister deputies safe; correct?

A       Correct.

Q       Other people that outrank you safe; correct?

A       Correct.

Q       Any civilian employees that work in that prison system, to keep them safe as well.

A       Correct.

Q       It's true that an inmate, based on your training and experience, that is discovered to be an informant for the Government could be in danger while incarcerated; correct?

A       Correct.

Q       And that's an informant that might be working with local law enforcement; right?

A       Right.

Q       Or federal law enforcement; correct?

A       Correct.

Q       Isn't it true that in slang terms those people

are called snitches?

A      Yes.

Q      And an inmate snitch could be in grave danger; correct?

A      Correct.

Q      Danger -- I'm sorry.  I should have let you finish.

A      Correct.

Q      Danger from other inmates to find out that that inmate is a snitch; right?

A      Yes.

Q      And to the extent that inmate is snitching on crooked deputies, he or she could be in danger from those crooked deputies; correct?

A      Yes.

Q      Sheriff Baca at the Saturday morning meeting ordered that Anthony Brown is to be kept isolated and safe.  He also put Mr. Carey in charge of the investigation; correct?

A      Yes.

Q      Sheriff Baca also said that everything should go through Undersheriff Tanaka; correct?

A      Correct.

Q      Now, for the portion of the Saturday morning meeting that Sheriff Baca was present, you indicated that Undersheriff Tanaka was upset; correct?

A        Correct.

Q        He didn't hide how upset he was.

A        No.

Q        You described that he was swearing.

A        Yes.

Q        You indicated that Sheriff Baca stepped out of the meeting and left the meeting; correct?

A        Yes.

Q        And Undersheriff Tanaka had stepped out with Sheriff Baca for a few moments, I think you said, or a few minutes; correct?

A        Yes.

Q        And then Undersheriff Tanaka returned to the meeting; correct?

A        Correct.

Q        When Tanaka came back into the room without Sheriff Baca present, he was still upset?

A        Yes.

Q        You indicated that he kept saying, "F the FBI."

A        Not at that point.

Q        He was mad?

A        He was visibly upset, but he stopped dropping F-bombs.

Q        You were testifying about events that occurred in 2011; right, sir?

874

A       Yes.

Q       You testified about an August 23rd meeting; correct?

A       Yes.

Q       You called this the ass-chewing meeting; is that right?

A       Yes.

MR. DIAMANTATOS:  May I have a moment, Judge?

THE COURT:  Yes.

Q       BY MR. DIAMANTATOS:  You described being present at that ass-chewing meeting; correct?

A       That's correct.

Q       And the person administering that butt chewing was Undersheriff Tanaka; correct?

A       Correct.

Q       He was upset?

A       Yes.

Q       He was really upset?

A       Yes.

Q       He laid into you guys; right?

A       Correct.  Yes.

Q       It was uncomfortable being there?

A       Yes.

Q       You testified that you're aware that Tanaka ordered Mr. Thompson to go apologize; correct?

**UNITED STATES DISTRICT COURT**

A        Yes.  Inform the sheriff and apologize, yes.

Q        I think you indicated that a question was posed to Undersheriff Tanaka that, you know, "Does the sheriff know?"

Right?

A        Lieutenant Thompson asked, "Does the boss know?"

Q        Does the boss know; correct?

A        Correct.

Q        Your understanding of, in that instance, reference to the boss was sheriff; correct?

A        Yes.

Q        Because there were no bigger bosses in the room than Sheriff Baca because Undersheriff Tanaka was sitting right there?

A        Correct.

Q        And Undersheriff Tanaka's response was "No"; correct?

A        Correct.

Q        But you're going to tell him.

A        Correct.

Q        And he continued with the butt chewing; right?

A        Just for a minute.  It was pretty much done at that point.

Q        Isn't it true that Tanaka kept swearing during that meeting as well?

A        Yes.  He was -- yes.

**UNITED STATES DISTRICT COURT**

876

Q        You indicated he kept saying "F the FBI"; right?

A        Yes.  Yes.

Q        And he said it multiple times.

A        Yes.  He made his position very clear.

Q        All right.  Now, Mr. Thompson went in to meet
with Sheriff Baca; correct?

A        Correct.

Q        You testified that you weren't present inside
that room; correct?

A        Correct.  I didn't go in.

Q        So you don't know exactly what was said in that
room, of course, because you weren't there.

A        No.  I have no idea.

Q        But you certainly heard about it from
Mr. Thompson after the meeting; correct?

A        Yes.

Q        And Mr. Thompson relayed to you what he observed
in that room talking to Sheriff Baca about the fact that the
FBI had been allowed access to Anthony Brown; correct?

A        Correct.

Q        He said that the sheriff said he understood;
correct?

A        Yes.

Q        He wasn't upset with the information.

A        No.

**UNITED STATES DISTRICT COURT**

Q    Mr. Thompson didn't say that Sheriff Baca gave him a butt chewing; correct?

A    Correct.

Q    He didn't lay into him; right?

A    No.

Q    He didn't drop any F-bombs with him.

A    No.

Q    He never said, "F the FBI"?

MR. FOX:  Objection.  Foundation.

THE COURT:  Sustained.

Q    BY MR. DIAMANTATOS:  Mr. Thompson never indicated that Sheriff Baca was upset with any of that information; correct?

A    Correct.

Q    Let's talk about Men's Central Jail, Mr. Manzo.

We spoke a little bit earlier that your duties as a deputy is to keep inmates safe; correct?

A    Correct.

Q    And anybody in that prison whether they're employees or inmates; correct?

A    Correct.

Q    Now, you -- it's a difficult job; correct?

A    That is correct.

Q    There's a lot of things on your plate that you need to focus on.

UNITED STATES DISTRICT COURT

A        Yes.

Q        And you need to do those things well; correct?

A        Correct.

Q        That was part of your training?

A        Yes.

Q        Part of your everyday experience on the job; right?

A        Correct.

Q        You had to honorably perform those duties that were given to you.

A        Correct.

Q        You had to do them with respect and dignity for all people.

A        Correct.

Q        Your fellow employees.

A        Yes.

Q        Civilian or law enforcement, sworn law enforcement; right?

A        Yes.

Q        And that includes respect for inmates; correct?

A        Correct.

Q        You had to apply common sense and fairness to all of your duties; right?

A        Yes.

Q        You had to have courage to stand up against any

**UNITED STATES DISTRICT COURT**

kind of bigotry in all of --

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

Q    BY MR. DIAMANTATOS:  Your job duties were described in certain core values; correct?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

Q    BY MR. DIAMANTATOS:  LASD had a mission statement.

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

Q    BY MR. DIAMANTATOS:  Mr. Manzo, you knew your job duties; correct?

A    Correct.

Q    You violated those job duties; right?

A    I don't believe I did.

Q    You were asked earlier this morning by counsel for the Government about cell phones in prison; correct?

A    Yes.

Q    And you indicated that it's a misdemeanor violation; right?

A    Yes.

Q    You would agree cell phones in prison are dangerous; correct, sir?

A    Absolutely.

Q        Absolutely dangerous.

A        Yes.

Q        Particularly working cell phones; right?

A        Yes.

Q        Because, when an inmate is incarcerated, if he or she wants to use a phone, they have access to it; right?

A        Correct, yes.

Q        But they need to use the phone system that is in-house at the particular prison or jail facility; right?

A        Yes.

Q        And that's because those are monitored phone calls?

A        Right.

Q        They're recorded.

A        Yes.

Q        So if somebody wants to investigate those calls, as you did, they could listen to those recordings to monitor what the inmate is discussing with the outside world; correct?

A        Yes.

Q        Make sure they're not trying to do anything they shouldn't be doing during that phone call.

A        Correct.

Q        So a live cell phone that's not monitored could be used for things like plotting escapes.

A        Yes.

**UNITED STATES DISTRICT COURT**

Q        Smuggling drugs into the jail.

A        Yes.

Q        Putting hits on witnesses?

A        Yes.

Q        And MCJ is a -- is a jail facility; right?

A        Correct.

Q        And that's a little bit different than an actual prison; correct?

A        Correct.

Q        Explain the difference.

A        The inmates at Men's Central Jail for the most part are awaiting trial.  If you're in a prison, you have been convicted and have moved out of the county into a state facility.

Q        So individuals who are housed at Men's Central Jail, many of them are waiting to go to trial; correct?

A        Yes.

Q        Where witnesses would testify against them potentially.

A        Yes.

Q        I want to jump ahead for a moment to -- you described for the members of the jury that you actively engaged in discussions with Anthony Brown; right?

A        Yes.

Q        And we heard some of those recordings; correct?

A        Yes.

Q        And we're going to get to those.  But I want to highlight one point that came up during the course of your investigation of Anthony Brown.  Okay?

A        Okay.

Q        Isn't it true that you learned that Anthony Brown was involved in a situation where he was representing himself; correct?

A        Yes.  He was a pro per.

Q        Pro per.  Right.  So P-r-o P-e-r; right?

A        Yes.

Q        And that means that an individual has exercised his or her own right to represent himself in any particular proceeding; correct?

A        Right.

Q        And Mr. Brown was in a situation where he lost his pro per status; right?

A        Possibly.  I don't remember.

Q        Isn't it true he had blamed a deputy named Maricela for causing him to lose his pro per status and threatened to harm her?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

MR. DIAMANTATOS:  May we be heard at sidebar,

Your Honor?

THE COURT:  No.  Next question.

Q    BY MR. DIAMANTATOS:  There's a lot of things you learned about Anthony Brown when you were investigating him; correct?

A    Correct.

Q    He was a multi-convicted felon.

A    Yes.

Q    His most recent conviction had to do with armed robbery; right?

A    Yes.

Q    He had pulled out a gun.

A    Yes.

Q    Fired it at somebody.

A    I don't remember that part.

Q    He was sentenced to 423 years in prison; correct?

A    Yeah.  I remember that part.

Q    You remember that part.  All right.

He was housed on the 3000 level?

A    Yes.

Q    3000 level is an area of Men's Central Jail that is reserved for dangerous inmates; correct?

A    Yes.  That's correct.

Q    Explain what you mean by that.

A    3000 -- it fluctuated, but for the majority of

UNITED STATES DISTRICT COURT

the time I was at Men's Central Jail, it was the general population on one side, but it was security level 8 which is as high as -- pretty much as high as you can go as far as general population.  The other side was K-10 inmates which are our highest security level in single-man cells.

Q    And the K-10 high security inmates could be because the person is a celebrity; right?

A    Right.

Q    And they might have extra attention on him or her if they're in the prison facility?

A    That is correct.

Q    So you have to take special precautions as a deputy to house those individuals.

A    Correct.

Q    And the 3000 level inmates, again, heightened scrutiny because of their status within the jail system.

A    Correct.

Q    Now, we heard that Mr. Brown -- we'll get to the investigation and what you were learning about Mr. Brown.

But we heard some testimony this morning with regard to when Anthony Brown was moved from the 3000 level.  Do you recall that, sir?

A    Yes.

Q    And there was indication that he was moved to an area 8200; correct?

**UNITED STATES DISTRICT COURT**

A       Yes.

Q       That's the medical area?

A       Yes.

Q       You indicated that that's where -- well, let me ask you this.

What type of inmates are housed in the 8200 level?

A       8200 is communicable disease.

Q       Okay.  And what type of inmates are housed on the 3000 level?

A       General population --

MR. FOX:  Objection.  Asked and answered.

THE COURT:  Sustained.

Q       BY MR. DIAMANTATOS:  Isn't it true that it is security level 8 on the 3000 level?

A       There are security level 8's on the 3000 level.

Q       And how high on the scale is security level 8?

A       That is as high as you can go without being in a single-man cell.

Q       Now, Mr. Brown, you had indicated, was -- Captain Carey had ordered you to move him to the 8200; correct?

A       Correct.

Q       Now, isn't it true Mr. Brown was not kept with the MRSA patients?

A       He was in his own cell that we had cleaned.

886

Q        Right.  He was in his own cell; correct?

A        Correct.

Q        You indicated it was a clean cell.

A        With a bathtub.

Q        With a bathtub.

A        (Inaudible.)

Q        Is that a "yes," sir?

A        Yes, sir.

Q        So he was kept isolated from other inmates that were on the 8200 level?

A        Correct.

Q        Now, Mr. Brown himself had certain medical conditions; correct?

A        Correct.

Q        There was an issue with -- a cardiovascular issue with him.

A        Correct.

Q        His heart.

If we could take a look, sir, it's in the binder in front of you.  It's been received in evidence.  It's Government Exhibit 133.  Let me know when you're there, sir.

A        I'm ready.

Q        Okay.  Government Exhibit 133 was the CYA book that you described; correct?

A        Correct.

UNITED STATES DISTRICT COURT

Q        The cover-your-butt book.

A        Yes.

Q        You were shown this morning page 2 of that exhibit if you could turn in, please.  It's the date entries that start with August 22nd through August 24th.  Let me know when you're there.

A        Okay.

Q        Are you there?  Okay.

If we go to the bottom right-hand corner -- it's also on the screen in front of you, Mr. Manzo.  If we look at the bottom portion of Government Exhibit 133, it says, "Wednesday the 24th."

Do you see that?

A        Yes.

Q        The bottom right-hand corner, there is an entry in handwriting that says "Blood pressure"; correct?

A        Yes.

Q        Isn't it true that, while Mr. Brown was at the 8200 level, he was cared for; correct?

A        Correct.

Q        All of his medical concerns were addressed.

A        Yes.

Q        He was given food?

A        Yes.

Q        Checked on medically?

**UNITED STATES DISTRICT COURT**

A       Yes.

Q       Not harmed by any fellow inmates?

A       Correct.

Q       Not harmed by any deputies.

A       Correct.

Q       When you began debriefing Mr. Brown, so this was before he got to the 8200 level, it was part of your task to find out what you heard from him; correct?

A       Correct.

Q       You already described what you knew about him as far as his criminal resume; correct?

A       Correct.

Q       We heard a number of recordings yesterday where Mr. Brown is being debriefed, and you were in -- you had participated in many of those interviews; correct?

A       Correct.

Q       The first one was an August 19 recording which, for the record -- it was Government Exhibit 71 was the recording, sir, and then we read along in the transcript which was Government Exhibit 72; correct?

A       Correct.

Q       Now, isn't it true that Anthony Brown, during this meeting and then the few others that we'll get to in a minute, that he said a lot of things to yourself that were not true?

UNITED STATES DISTRICT COURT

A      Correct.

Q      In fact, if we look at Government Exhibit 72, the transcript of that --

MR. FOX:  Objection, Your Honor.

THE COURT:  Sustained.

Q      BY MR. DIAMANTATOS:  All right.  We heard on the recording that Mr. Brown, when we listened to it, he's challenged by Mr. Smith, when you're present in the room, telling him, "You've given out a couple different versions of stories."

Right?

A      Correct.

Q      And Mr. Brown is responding about -- "The bribe went to a nurse.  That's how the phone got in."

Correct?

A      Correct.

Q      Or it was a deputy who brought the phone in; right?

A      Right.

Q      Your investigation revealed there was never any nurse involved; right?

A      That is correct.

Q      But as you were sitting here in this meeting, you didn't know that?

A      Correct.

UNITED STATES DISTRICT COURT

Q        Mr. Smith didn't know that either?

A        No, he didn't.

Q        You were trying to gather as much information as you could from Mr. Brown to investigate.

A        Correct.

Q        Find out what he was saying that was accurate potentially?

A        Correct.

Q        Or not accurate?

A        Correct.

Q        He also made a comment where he was being reluctant to give you the story with regard to the FBI, and he made a reference for "What are you going to give me?  18 months for having dope or cell phone in here?"

         Do you recall that exchange?

A        I think Deputy Smith said that.

Q        Well, Deputy Smith said that to him that, you know, "What am I going to do?  Give you 18 months for having dope in here?"

         Correct?

A        Correct.

Q        And is it your understanding that the point was he was dealing with an inmate who was serving 423 years?

A        Right.  It didn't matter.

Q        We talked about a cell phone in prison and the

**UNITED STATES DISTRICT COURT**

dangers it poses.  Drugs in prison also poses significant danger; correct?

A       Yes.

Q       And if an inmate was found with drugs, that's a felony?

A       Correct.

Q       Isn't it true, as part of your investigation, there was reason to believe that potentially Mr. Brown had been involved with getting drugs smuggled into the prison; correct?

A       Correct.

Q       You saw certain things that led you to believe that; right?

A       Yes.

MR. FOX:  Objection.  Vague as to time.

THE COURT:  Sustained.

Q       BY MR. DIAMANTATOS:  You did a review of his cell phone; right?

A       Yes.

Q       When did you do that?

A       Probably shortly after it was found.  I don't remember the exact date.  The beginning half of August.

Q       There were a couple pictures on that phone; right?

A       Yes.

Q       Some balloons of heroin?

**UNITED STATES DISTRICT COURT**

A        I don't remember if it was heroin.  The balloons I remember.

Q        Little baggies with cocaine?

A        Yes.

Q        Pictures of methamphetamine?

A        Yes.  That sounds familiar.

Q        This is information that came to you from the cell phone Mr. Brown had; right?

A        Correct.

Q        Pictures on that phone.

A        Yes.

Q        That at least at that point you knew he somehow bribed somebody to smuggle that into the prison; right?

A        Correct.

Q        Now, Mr. Brown was being challenging of yourself and Mr. Smith in that first recording we heard, that August 19 recording; right?

A        Yeah.  We were feeling each other out, all of us.

Q        You were feeling each other out; right?

A        Yes.

Q        You were feeling him out; correct?

A        Correct.

MR. FOX:  Objection.  Asked and answered.

MR. DIAMANTATOS:  I can ask another question, Your Honor.

Q        He was certainly, as far as you could tell,
feeling you and Mr. Smith out?

MR. FOX:  Objection.  Asked and answered.

THE COURT:  Sustained.

Q        BY MR. DIAMANTATOS:  He said he would talk to you
but he would only do so after you gave him some smokes?

A        Yes.

Q        After you gave him a cheeseburger?

A        Yes.

Q        And after he got what he wanted, you would get
what you wanted?

A        Yes.

Q        During the course of the interview, yourself and
Mr. Smith were providing some information to Mr. Brown about
what you knew; correct?

A        Yes.

Q        That you had been in contact with an agent on a
recorded line.

A        Yes.

Q        In fact, Mr. Smith had read out, you told us, an
almost verbatim transcript of one of those recorded calls that
Mr. Brown had; correct?

A        Yes.

Q        Isn't it true, as part of your investigation, you
learned -- you testified about this that he had made three

**UNITED STATES DISTRICT COURT**

recorded phone calls; correct?

A      Correct.

Q      Using the prison inmate system.

A      Yes.

Q      And he was speaking to, at that time, an unknown female voice?

A      Yes.

Q      And it was portions of that call that Mr. Smith was telling Mr. Brown "We've heard the calls."

Right?

A      Yes.

Q      And he quoted it; right?

A      Yes.

Q      And that's a technique, based on your training and experience, to let somebody you're interviewing know I've got the goods on you.  You might as well tell me what's really going on; correct?

A      Correct.

Q      So over time Mr. Brown started telling you more and more; correct?

A      Yes.

Q      And the many lies that he said, you had to parse through what was true and what wasn't.

A      Correct.

Q      We heard a recording from a subsequent interview

you were present for, Mr. Manzo, which occurred on August 28 --
I'm sorry.  I misspoke -- August 21st, which, for the record,
was received in evidence as Government Exhibit 74.  And we
listened to that recording, and now there's additional people
in the interview with Mr. Brown; right?

A      Yes.

Q      You're there, of course, again?

A      Yes.

Q      Mr. Leavins is there?

A      Yes.

Q      And now Steve Leavins is present for the meeting;
correct?

A      Yes.

Q      Isn't it true, Mr. Manzo, that, again, during
this interview, yourself, Mr. Smith, and Mr. Leavins are trying
to figure out if Mr. Brown had smuggled drugs successfully into
the prison?

A      Yes.

Q      Whether there's more than one cell phone;
correct?

A      Correct.

Q      Whether he had smuggled cigarettes into the
prison?

A      I don't remember that part.

Q      Well, how many deputies he had bribed?

A       Yes.

Q       Because at this point it was known that he had identified Mr. Michel as being the dirty deputy that took the bribe -- correct?

A       Yes.

Q       -- to get the cell phone, and that you knew about; correct?

A       Correct.

Q       But at this stage of your investigation, you don't know if there are more dirty deputies out there aside from Mr. Michel?

A       Correct.

Q       It was your job to look for those dirty deputies; correct?

A       Not at that point.

Q       You certainly wanted to know if there were more you could report up on; correct?

A       Correct.

Q       Now, Mr. Brown also indicated that this was the second phone that he had received; correct?

A       Yes.

Q       He had talked about receiving a previous phone; right?

A       Correct.

Q       I'm sorry.  I spoke over you.

**UNITED STATES DISTRICT COURT**

897

A        Yes.

Q        And that he indicated that another deputy named Bravo was involved with that; correct?

A        Correct.

Q        You investigated that; right?

A        I did not.

Q        Wasn't it determined that that was false?

MR. FOX:  Objection, Your Honor.

THE COURT:  Sustained.

MR. DIAMANTATOS:  Opened the door, Judge.

THE COURT:  Sustained.

MR. DIAMANTATOS:  Yes, Your Honor.

Q        The next meeting that we listened to, August 23rd, 2011, which was Government exhibit -- received in evidence as Government Exhibit 77, now you're there again; right, Mr. Manzo?

A        Yes.

Q        Mr. Smith was there again?

A        Yes.

Q        Mr. Leavins is present?

A        Yes.

Q        And now Tom Carey is at this meeting?

A        Correct.

Q        I'm sorry?

A        Correct.

**UNITED STATES DISTRICT COURT**

Q        And Mr. Leavins introduces Mr. Carey to Mr. Brown as his boss; right?

A        Correct.

Q        And the purpose of this interview was, again, to get as much information from Mr. Brown as possible; right?

A        Correct.

Q        You spoke a moment ago about the three recorded phone calls that you had become aware of during your investigation that were used to confront Mr. Brown with; right?

A        Correct.

Q        You also determined from phone analysis that Mr. Brown had used the phone to contact the FBI number 107 times; correct?

A        I don't remember the number, but I know I did run it.

Q        You prepared a -- well, you did an analysis on No. 310-996-4147; correct?

A        I don't remember the phone number.

Q        You had analyzed the phone that -- well, you did an analysis on Mr. Brown's phone -- right? -- you testified about that yesterday -- to determine what numbers he had been contacting?

A        The jail phone or his cell phone?

Q        His cell phone.  I'm sorry, sir.

A        We did take the cell phone and get it downloaded,

**UNITED STATES DISTRICT COURT**

yes.

Q      And you downloaded and did an analysis to see from January 1st, 2009, through August 17, 2011, the numbers that the cell phone had been in contact with; correct?

A      No.  That's not correct.

Q      You did the analysis on the prison system phone; right?

A      Yes.

Q      And you were able to determine that the prison system phone had made 107 calls to a number linked to the FBI civil rights division; correct?

A      I don't know if it was 107, but I can do the analysis.

Q      And only three of those calls were actually recorded because there was communication during the call; right?

A      Yes.

Q      That log that you reviewed identifies attempted calls; right?

A      Yes.

Q      So in other words, where somebody dials the number but there's no actually anybody picking up on the other line other than a voicemail?

A      Correct.

Q      Do you recall that number being high in

comparison to the three that actually went through?

A    Yes.

Q    More than 50?

A    Yes.

Q    More than 100?

A    I would say yes.

Q    There was testimony yesterday about early on in the investigation before that first recording -- I'm sorry -- right after the August 18 recording, the first one where Mr. Brown was set to be on the bus the next morning?

A    Yes.

Q    He was set to go on the bus and be out of your custody; correct?

A    Yes.

Q    And then once you interviewed him, you and Mr. Smith, on the 18th and started gathering information from him, you determined he shouldn't go on that bus; correct?

A    No.

Q    Wasn't he taken off the bus?

A    We put him on the bus, myself and Detective Idleberg, on the list for the next bus.  Excuse me. I didn't physically put him on the bus.

Q    Well, when you determined that Mr. Brown was going to continue to engage in discussions with you and Mr. Smith and any of your bosses, you kept him there; correct?

UNITED STATES DISTRICT COURT

A       Yes.  He ultimately stayed in my custody.

Q       You testified about an undercover operation this morning involving Mr. Anthony Brown.

        Do you recall that?

A       Yes.

Q       That some deputies dressed up to make themselves look like inmates?

A       Yes.  Detectives, yes.

Q       Detective.  Sorry.

        And those detectives were going to pose as inmates to try to have a conversation with Mr. Brown; right?

A       Yes.

Q       Where Mr. Brown wouldn't know that they're actually detectives, not just fellow inmates; correct?

A       Correct.

Q       Hoping that something would come of that that Mr. Brown could say something that the detectives could report back on?

A       That sounds accurate.

Q       That never actually occurred; right?

A       The undercover operation?

Q       No.  That Mr. Brown said something to the detectives.

A       I don't believe anything came out of the undercover operation.

Q        That was done in connection with a polygraph test that Mr. Brown was given; correct?

A        Yes.

Q        Mr. Brown failed the polygraph test; correct?

A        He failed -- I believe he failed the drug part of the polygraph test.

Q        That was administered to him on August 30th, 2011?

A        I don't remember the date.

Q        You testified about a letter, September 3rd letter, that we reviewed this morning where Mr. Brown was indicating that he no longer wants to work with the FBI; correct?

A        Correct.

Q        They left him for dead; right?

A        Yes.

Q        And that he wants to continue to work, and he listed the LASD people on there that he wants to continue to work with; correct?

A        Correct.

Q        At that point Mr. Brown knew that he had failed the polygraph test; correct?

A        Yes.

Q        I'm going to go through some of the e-mails that you were shown yesterday and this morning, the first being

UNITED STATES DISTRICT COURT

what's been received in evidence as Exhibit 18, Government Exhibit 18.

Mr. Manzo, directing your attention to the screen in front of you, I'm showing you what has previously been admitted into evidence as Exhibit No. 18.

Do you see that, sir?

A    Yes.

Q    This e-mail was sent from Mr. Smith; right?

A    Yes.

Q    On Friday, August 19; correct?

A    Correct.

Q    To you.

A    Correct.

Q    Nobody cc'd?

A    No.

Q    Sheriff Baca appears nowhere on that e-mail; correct?

A    Correct.

Q    I'm going to show you what's been received in evidence as Government Exhibit 15.  I'm sorry.  Government Exhibit 16.  On the screen I'm showing you what has been received into evidence as Government Exhibit 16.

Once again, this is an e-mail that you testified about; correct?

A    Correct.

**UNITED STATES DISTRICT COURT**

Q        The from is from Christopher Nee?

A        Yes.

Q        Again, sent on August 18?

A        Yes.

Q        To Julie Montgomery; correct?

A        Correct.

Q        Who is Julie Montgomery?

A        I don't know.

Q        You don't know if she's Mr. Tanaka's assistant?

A        No.  I have no idea.

Q        The subject is "Sheriff's meeting"; correct?

A        Correct.

Q        If you look through the -- this e-mail, Mr. Baca is not on the "to," the "from," or the "cc" line; correct?

        MR. FOX:  Objection.  Argument.

        THE COURT:  Sustained.

Q        BY MR. DIAMANTATOS:  Government Exhibit 17 on the screen in front of you, sir, I'm showing you what has been received in evidence as Government Exhibit 17.  The entire -- this e-mail does not have Mr. Baca --

        MR. FOX:  Objection, Your Honor.

        THE COURT:  Sustained.

Q        BY MR. DIAMANTATOS:  Mr. Baca did not send the e-mail?

        MR. FOX:  Objection, Your Honor.

UNITED STATES DISTRICT COURT

THE COURT:  Let's go to sidebar.

(The following proceedings were held at sidebar:)

THE COURT:  Well, we can all see that, and if you want to argue that, that's fine.  But it's kind of a waste of time here.  We're trying to get this thing done before Christmas.  So I'm going to sustain those objections.  So let's see if we can move it along.

MR. DIAMANTATOS:  Thank you, Your Honor.

(The following proceedings were held in open court in the presence of the jury:)

MR. DIAMANTATOS:  May I proceed, Your Honor?

THE COURT:  Yes.

Q     BY MR. DIAMANTATOS:  I'm going to show you what has been received into evidence as Government Exhibit 15.  It's in evidence.  It's on the screen in front of you.

This e-mail was sent to Mr. Baca; correct?

MR. FOX:  Same objection, Your Honor.  This is also asked and answered.

MR. DIAMANTATOS:  Just the fact it was sent to Mr. Baca, Your Honor.

MR. FOX:  Again, asked and answered.

THE COURT:  Sustained.

Q     BY MR. DIAMANTATOS:  Mr. Manzo, what is Operation Safe Jails?

A     It is the intelligence unit that is -- for

UNITED STATES DISTRICT COURT

906

L.A. County, the jail part of L.A. County.

Q    What are the duties of Operation Safe Jails?

A    They're in charge of basically the safety and security of the facilities and any intelligence that comes out of them.

Q    Okay.  You mentioned intelligence.  What type of intelligence are you trying to gather?

A    It can be anywhere from gang intelligence to notes between inmates -- they call them kites -- those recovered.  We work or they work informants just to make sure that the safety is paramount and that it's being maintained.

Q    Okay.  The kites that you indicated are the communications between inmates in prison, those are something of concern; correct?

A    They can be, yes.

Q    And gangs, it goes without saying there are rival gangs; right?

A    Yes.

Q    And sometimes rival gangs are housed together in a facility; correct?

A    Correct.

Q    That's something that, as a deputy, you want to know about; correct?

A    Correct.

Q    That's part of the function of OSJ?

**UNITED STATES DISTRICT COURT**

A       Yes.

Q       Isn't it true that Men's Central Jail, there are gangs on the 3000 floor?

A       Yes.

Q       I want to discuss your testimony with regard to the policy that Mr. Tanaka put forth with regard to FBI coming to interview any inmates.

Do you recall that from this morning, sir?

A       Yes.

Q       There was an indication that -- that was Mr. Tanaka's directive; right?

A       I remember him saying it, yes.

Q       You recall seeing e-mails on there; correct?

A       Yes.

Q       We looked at one this morning.

A       Yes.

Q       And exactly the steps that had to be followed if an FBI agent was going to interview an inmate.

A       Correct.

Q       Isn't it true that, during this time period, there was a policy where everybody had to log in when they would go to see an inmate; correct?

A       That is correct.

Q       It includes law enforcement.

A       Yes.

Q        Even local law enforcement.

A        Yes.

Q        Even federal law enforcement.

A        Yes.

Q        Now, at times the policy was -- law enforcement could just badge in; correct?

A        Correct.

Q        And there were efforts made to make that policy more stringent; right?

A        Correct.

Q        Where -- just not let people badge in but take down their information; correct?

A        Correct.

Q        And this was a policy that not only affected FBI but state agents as well.

A        Yes.

Q        Mr. Tanaka's policy that was set forth didn't say no FBI agents can come into the jail; correct?

A        Correct.

Q        Just that they needed to get the following documentation from them that is listed in this order; correct?

A        Yes.

Q        You were asked this morning if -- we know that Mr. Brown was interviewed by FBI on August 23rd; correct?

A        Yes.

Q        And then that meeting was cut short; right?

A        Yes.

Q        You were asked if the FBI was ever able to have access to interview Mr. Brown after August 23rd; right?

A        Yes.

Q        And you said, no, they were not.

A        Not that I know of.

Q        Not that you know of; correct?

A        Right.

Q        And you're not aware they made any efforts to interview him again after the 23rd.

A        I'm not aware of any.

Q        Let me show you Government Exhibit 134, please.

         Mr. Manzo, directing your attention to the screen in front of you showing you what's been received in evidence as Government Exhibit 134, do you see that there, sir?

A        Yes.

Q        There's an indication of 1,000 man-hours.  Do you see that?

A        Yes.

Q        What does that mean?

A        I don't remember.

Q        You wrote that note; correct?

A        I did write the note.  Correct.

         MR. DIAMANTATOS:  May I have a moment,

**UNITED STATES DISTRICT COURT**

Your Honor?

Q      Next to the reference of 1,000 man-hours there's handwriting that you indicate "Fed grand jury INV."  Do you see that?

A      Yes.

Q      What did you mean by that?

A      Federal Grand Jury investigation.

Q      Are the 1,000 man-hours you wrote related to the grand jury investigation?

A      It could have.

Q      And the effort it would take to comply with the grand jury investigation?

A      I don't know.

Q      You knew that you had been receiving subpoenas; correct?

A      I think I found out right here.

Q      In fact, we see those notations on the bottom of Government Exhibit 134 on this particular page; correct?

A      Correct.

Q      There are some indications of when an inmate info subpoena is due?

A      Yes.

Q      The date noted is September 14, 2011; correct?

A      Correct.

Q      Directly below that, Mr. Manzo, you see on

September 21st "Deputy A through W info subpoena due"; correct?

A        Correct.

Q        And then another under that on September 28; correct?

A        Correct.

Q        Having to do with jail personnel.

A        Correct.

Q        Those were what you had listed as certain tasks that needed to be completed; correct?

A        No.  I didn't have any -- I didn't have to do that part.

Q        You discussed having a meeting on September 2nd, and you testified that Sheriff Baca was there; correct?

                MR. FOX:  Objection.  Misstates the testimony.

                THE COURT:  Sustained.

Q        BY MR. DIAMANTATOS:  You testified that you were at a meeting on September 2nd; correct?

                MR. FOX:  Objection.  Misstates the testimony.

                THE COURT:  Sustained.

Q        BY MR. DIAMANTATOS:  You learned on September 2nd that Sheriff Baca had been in communication with the FBI?

A        I don't know if I was in a meeting on the 2nd.  I don't remember the date.

Q        Had you learned by September 2nd, Mr. Manzo, that it was your understanding Mr. Baca had been in communications

with the FBI; correct?

A       Yes.  I learned that on the 20th.

Q       You indicated that the meeting that you were in, this was Sheriff Baca's first full task force meeting; correct?

A       It's the first one he attended.  It's the first task force we had.  I wouldn't call it his.  He was there.

Q       When did that occur?

A       It was -- I don't know the date.  It was probably early September.  I'm not sure.  We went from five people to a lot of people very quickly.

MR. DIAMANTATOS:  Your Honor, I'm going to move to strike the witness' answer as nonresponsive.  There's no question pending.

THE COURT:  Just one second.

"We went from five people to a lot of people very quickly," that will be stricken.  The jury should disregard.

Q       BY MR. DIAMANTATOS:  You indicated, Mr. Manzo, that the meeting took place in the EPC conference room.

A       That's what I called it.  It's the conference room on the fourth floor.  I'm sorry.  Excuse me.  The basement.  It was the basement.

Q       So this meeting took place in the basement; is that right?

A       Yes.

Q       What does "EPC" stand for?

A        I have no idea.

Q        What was the purpose of the meeting?

A        It was the task force briefing, the first one.

Q        You described during your testimony references to the most important investigation in LASD history; correct?

A        Correct.

Q        Those references came from Mr. Tanaka, didn't they?

A        Yes.

MR. DIAMANTATOS:  May I have a moment, Your Honor?

THE COURT:  Yes.

MR. DIAMANTATOS:  Your Honor, at this point we have no further questions of the witness.

THE COURT:  Recross.  Or redirect.

**REDIRECT EXAMINATION**

BY MR. FOX:

Q        Mr. Manzo, you were asked on cross-examination if you've served one day in prison yet for your sentence.  Are you scheduled to report at some point?

A        Yes.

Q        When is that?

A        January 9 of 2017.

Q        Do you recall whether you received bond pending appeal in your case?

**UNITED STATES DISTRICT COURT**

914

A        I believe we did, yes.

Q        Okay.  So you being out on bond during this time, that's not a benefit the Government gave you; correct?

A        No.

Q        That's something that the Court ordered; is that right?

A        Yes.

Q        On cross-examination, you were asked about Mr. Baca leaving the Saturday meeting on August 20th.

Do you remember that?

A        Yes.

Q        Who did he leave that meeting with?

A        Undersheriff Tanaka.

Q        Did Mr. Tanaka return?

A        He did.

Q        What did Mr. Tanaka say when he returned?

A        He said that he's known the sheriff a long time and that he's never seen him this upset and that we know what he wants done and we're going to do it for him.

Q        Before Mr. Baca left the room, I believe you indicated that Mr. Tanaka was swearing at that meeting; is that correct?

A        That is correct.

Q        Was he swearing under his breath?

A        No.

**UNITED STATES DISTRICT COURT**

915

Q        Was he swearing loud enough for everybody in the room to hear?

A        Yes.

Q        You were asked questions on cross-examination about placing Mr. Brown in 8200.  Is that a normal place for informants to be placed?

A        No.  I wouldn't say it is.

Q        Are there other areas of the jail -- I'll ask it differently.

         Where, generally, are informants kept within Men's Central Jail?

A        It depends on the level of the informant, I guess you could say.

Q        When Mr. -- were there informants on 3000?

A        Yes.

Q        Were there informants in 1750?

A        Yes.

Q        On cross-examination you were asked about things that Mr. Brown was given while he was on 8200.  For example, food.  Is that something that Mr. Brown also received when he was in 1750?

A        Yes.

Q        And medical care, is that something that Mr. Brown also received when he was in 1750?

A        Yes.

**UNITED STATES DISTRICT COURT**

916

Q        He also asked you whether Mr. Brown was harmed by deputies when he was on 8200.  Was he harmed by deputies when he was in 1750?

A        No.

Q        Was he harmed by inmates when he was in 1750?

A        No.

Q        What occurrence led Mr. Brown to be moved from 1750 to 8200?

A        The fact that the deputies working in 17 couldn't follow the verbal instructions from Lieutenant Thompson.

Q        What happened?

A        The FBI got to Anthony Brown.

Q        On cross-examination you were asked about Mr. Brown being pulled from the next available bus because he was providing information.

Do you recall that?

A        Yes.

Q        Why was it that Mr. Brown stayed in county custody during that time?

A        Why did he stay?

Q        Why did you keep him?

A        We were ordered to.

Q        By who?

A        The sheriff.

Q        On cross-examination you were asked about inmates

UNITED STATES DISTRICT COURT

with gang affiliation on 3000.

A       Yes.

Q       Do you recall that?  Did you do background work on Anthony Brown to determine if he had gang affiliation?

A       Yes.

Q       What did you find out?

A       None.

Q       On cross-examination you were asked about the policy that was put in place on August -- on or about August 24th, 2011, regarding FBI interviews.  On cross you were asked whether these policies generally about law enforcement access applied to any law enforcement agency.

        Do you remember those questions?

A       Yes.

Q       I'm showing you now Government Exhibit 27.  Did this policy apply to local law enforcement?

A       No.

Q       Did it apply to any other federal agency?

A       Only --

Q       According to this policy?

A       Only the FBI.

        MR. FOX:  One moment, Your Honor.

        No further questions.

        MR. HOCHMAN:  One moment, Your Honor.

        MR. DIAMANTATOS:  Very brief recross, Your Honor.

UNITED STATES DISTRICT COURT

THE COURT:  All right.

**RECROSS-EXAMINATION**

BY MR. DIAMANTATOS:

Q      Mr. Manzo, you indicated that Sheriff Baca had ordered keeping Mr. Brown at Men's Central Jail; correct?

A      Correct.

Q      This was after he got briefed on August -- he, being the sheriff, on August 19; correct?

A      Yes.

Q      That Mr. Brown was willing to talk to the sheriffs; correct?  Sheriff investigators?

A      He was willing to talk to us, yes.

Q      But at that point on the 19th, Mr. Brown had yet to tell you the name or names of dirty deputies; right?

A      Correct.

Q      You were asked about your surrender date, and you indicated that you expect to begin serving your prison sentence on January 9, 2017; correct?

A      Correct.

Q      You expect your testimony in this case to be over today; correct?

A      Correct.

Q      And the Rule 35 motion that the Government may or may not file could be filed at any point before January 9; correct?

A        I honestly don't know.

Q        Your understanding is that the prosecution can decide if they file it; correct?

A        Yes.

Q        And when they file it.

A        Yes.

MR. DIAMANTATOS:  Nothing further, Your Honor.

MR. FOX:  I have one question if I may.

**FURTHER REDIRECT EXAMINATION**

BY MR. FOX:

Q        Mr. Manzo, do you have any reason to believe you won't be serving your prison sentence after this trial is over?

Let me ask it a different way.

Do you have any reason to believe that any motion on the Government's behalf would cause you not to serve time in prison?

A        No.  I'm going.

MR. FOX:  No further questions.

THE COURT:  All right.  You may step down.

Call your next witness.

MR. JAUREGUI:  Your Honor, the United States calls Linda Farrar.

THE CLERK:  Please stand here for me, please. Raise your right hand.

Do you solemnly state that the testimony you may

give in the cause now pending before this court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  Yes.

THE CLERK:  Please be seated.

Will you please state your full name and spell your last name for the record.

THE WITNESS:  My name is Linda K. Farrar.  Last name is F-a-r-r-a-r.

THE CLERK:  Thank you.

MR. JAUREGUI:  And, Your Honor, before we begin with questioning, if I may read a stipulation into the record.

THE COURT:  That's fine.

MR. JAUREGUI:  Your Honor, the parties have entered into a stipulation which is Government Exhibit No. 107. It's document 183 on the docket.

And in that stipulation the parties agreed that, if called to testify, custodians of records for AT&T and Verizon Wireless would state that Government Exhibits 162 through 169 and 171 are true and correct copies of records that were created by a person with knowledge of the facts or were made from the information transmitted by a person with knowledge of the facts, made at or near the time of the acts or events appearing within them, part of the regular practice of AT&T and Verizon Wireless, and kept in the course of regularly

**UNITED STATES DISTRICT COURT**

921

conducted activity of AT&T and Verizon Wireless.

Government Exhibit 162 contains phone records for 213-894-3881 and 213-894-7998 which were two numbers assigned to the fax machines used by the marshal service in Los Angeles -- the United States Marshal Service in Los Angeles.

And Government Exhibit 163 contains phone records for 213-217-4973 which was a number assigned to a fax machine used by the Los Angeles County Sheriff's Department Inmate Reception Center. That is, in substance, the agreement between the parties, and it's outlined in Exhibit 107, Your Honor.

THE COURT: Ladies and gentlemen, the parties have agreed what certain testimony would be if certain witnesses were called. You should consider that testimony the same way as if it had been given here in court. The parties have agreed to certain facts that have been stated to you. You should, therefore, treat these facts as having been proved.

MR. JAUREGUI: And, Your Honor, on the basis of that agreement, I would move to admit Government Exhibits 162 to 169 and 171 as well as Exhibit 107.

THE COURT: Any objection?

MR. HOCHMAN: No objection, Your Honor.

THE COURT: All right. They will be received.

///

**UNITED STATES DISTRICT COURT**

(Marked for identification and received into evidence Exhibit Nos. 162 to 169, 171 and 107.)

MR. JAUREGUI:  And, Your Honor, Government Exhibit 113 is the certified copy of a writ, and I would move for the admission of that exhibit as well.

MR. HOCHMAN:  No objection, Your Honor.

THE COURT:  It will be received.

MR. JAUREGUI:  Thank you.

(Marked for identification and received into evidence Exhibit No. 113.)

**LINDA K. FARRAR,**

**GOVERNMENT'S WITNESS, SWORN:**

**DIRECT EXAMINATION**

BY MR. JAUREGUI:

Q     Ms. Farrar, what do you do for a living?

A     I work for the U.S. Marshal Service.

Q     How long have you been employed by the marshal service?

A     Almost 25 years.

Q     In the summer and fall of 2011, what were your duties within the marshal service?

A     I was a supervisor detention enforcement officer.

Q     Did you serve writs on local law enforcement agencies at that time?

A     Yes, I did.

**UNITED STATES DISTRICT COURT**

Q        Very briefly, can you explain to the jury what a writ is?

A        A writ is a court order signed by the judge for us to take -- for the marshal service to take custody of an inmate out of local or state custody.

Q        Okay.  Directing your attention to Government Exhibit No. 160 which is in the binder in front of you --

A        Yes.  Go ahead.

Q        -- do you recognize that exhibit?

A        Yes, I do.

        (Marked for identification Exhibit No. 160.)

Q        BY MR. JAUREGUI:  How do you recognize it?

A        It's an e-mail from U.S. Attorney Lawrence Middleton that he sent to myself regarding a writ on an inmate that was housed at Los Angeles County Jail that he wanted us to take custody of.

Q        What is the date of the e-mail?

A        It is 8/24/2011.

        MR. JAUREGUI:  And, Your Honor, I would move for the admission of Government Exhibit 160.

        THE COURT:  Any objection?

        MR. HOCHMAN:  No objection, Your Honor.

        THE COURT:  It will be received.

        (Received into evidence Exhibit No. 160.)

Q        BY MR. JAUREGUI:  Ms. Farrar, I'm going to

                    **UNITED STATES DISTRICT COURT**

924

highlight the bottom of page 1 of this exhibit for you.  Can you just tell the jury what we're looking at here?

A    It looks like it's from Lawrence Middleton to myself, Linda Farrar, subject, writ from state custody.

Q    And it starts Senior Detention Enforcement Officer Farrar; correct?

A    Yes.  That is correct.

Q    Let me go to the next page.  Take a look at this paragraph here, and just, generally speaking, what is Mr. Middleton writing to you about?

A    He's asking me how quickly we can get this inmate out of Men's Central Jail, Los Angeles County Jail.

Q    And who was Lawrence Middleton at that time?

A    He was Assistant U.S. Attorney chief of public corruption and civil rights.

Q    Highlighting the middle portion of page 1 of the exhibit, if you can just take a look at the bottom part, did you respond to Mr. Middleton?

A    Yes.  I told him that we could possibly get the inmate in our custody within a week depending on if Los Angeles County would let us have the inmate.

Q    And did he respond to you?

A    Yes, he did.  He thanked me for that and said he would like to get him as soon as possible.  It is a sensitive issue with the sheriff's department and, you know, might be

**UNITED STATES DISTRICT COURT**

some issues stemming from that.

Q    Could you just read the first three lines of that, please?

A    Sure.  It says, "Thank you for your response.  We have an individual at Men's Central Jail, Anthony Brown, No. 2009547, who we would like to writ over to testify.  We would like to get him here as soon as possible and will be filing the writ today.  We have scheduled his testimony for two weeks from today, September 7th."

Q    Did you end up responding to Mr. Middleton?

A    I did.  I told him that I was going to refer this to Yolanda Baines because I was going out of town until September 6 and to call her to check on the status.

Q    And did you direct Ms. Baines to follow up on this request from Mr. Middleton?

A    Yes, I did.

Q    I'm going to show you Government Exhibit No. 113 which is in evidence.  Do you recognize this exhibit, Ms. Farrar?

A    Yes, I do.

Q    What is it?

A    It is the writ signed by Judge Snyder that was issued to us.

Q    Could you please read the part that starts at "The Court hereby orders"?

**UNITED STATES DISTRICT COURT**

926

A          It says, "The Court hereby orders the application for writ of habeas corpus submitted within be granted and that a writ of habeas corpus ad testificandum be issued to secure the appearance of Anthony Brown who is the name of the detainee."

Q          Is there a date and place where the -- where Anthony Brown is supposed to be produced?

A          He needed to be produced by September 7th, 2011, at 9:30 in front of the grand jury.

Q          I'm showing you Exhibit No. 162.

A          Uh-huh.

Q          Let me just blow up this upper left-hand part of the exhibit for you.  I want to direct your attention to the third line from the top that says "landline usage."

Do you see that?

A          Yes, I do.

Q          What is the phone number listed there?

A          213-894-7998.

Q          What is that phone number?

A          That is one of the fax numbers in the U.S. Marshal's office.

Q          I'm going to highlight the middle portion of this exhibit.

I want to direct your attention to line 18, Ms. Farrar.  Do you see the date and time there?

**UNITED STATES DISTRICT COURT**

A       Yes.  It's 8/25/2011.  Time is 9:40:53 a.m.

Q       There are two columns of telephone numbers there. Do you see those listed?

A       Yes, I do.

Q       Do you know from looking at the exhibit what those two columns represent?

A       The first column is our fax number from the Marshal's Office, and the second number, 213-217-4973, belongs to Los Angeles County Sheriff's Department warrants and detainers.

Q       Okay.  Do you recognize that Los Angeles County Sheriff's Department warrants and detainers number from memory, Ms. Farrar?

A       Yes.

Q       How do you do that?

A       Because we have faxed hundreds of documents to Los Angeles County like writs or detainers or warrants.

Q       I'm now showing you Government Exhibit 163, page 2.  And I'm going to highlight the bottom part of this as well.

A       Okay.

Q       I want to direct your attention, first, to line 105.  Do you see that?

A       Uh-huh.

Q       What is the date and time on that?

**UNITED STATES DISTRICT COURT**

A       The date is 8/25/2011.  Time is 8:35:29 a.m.

Q       And the first column there, what is the phone number listed?

A       It's 213-894-3881.

Q       Do you recognize that number?

A       Yes.  It's another fax line we have in the U.S. Marshal Service.

Q       To the right of that is another number.  Do you recognize that number?

A       It is 213-217-4973, the fax number to Los Angeles County Jail warrants and detainers section.

Q       And directing your attention now to line 111.

A       Yes.

Q       And if you could just, again, tell us the date and time and the two numbers listed there.

A       Yes.  8/25/2011, 9:40:53 a.m., fax number for the U.S. Marshal Service 213-894-7998, and the number for Los Angeles County Jail warrants and detainers section 213-217-4973.

        MR. JAUREGUI:  If I may just have a moment, Your Honor.

        No further questions, Your Honor.

        THE COURT:  All right.  Cross-examination.

///

///

**UNITED STATES DISTRICT COURT**

**CROSS-EXAMINATION**

BY MR. HOCHMAN:

Q      Ms. Farrar, did you ever speak to Sheriff Baca in connection with this writ?

A      No, sir.

Q      Did you ever e-mail him in connection with this writ?

A      No, sir.

Q      And at some point, did the U.S. Marshal Service bring Anthony Brown to the U.S. Courthouse to testify in front of a Federal Grand Jury?

A      Yes, I did.

MR. JAUREGUI:  Objection.  Vague, Your Honor.

THE COURT:  Sustained.

Q      BY MR. HOCHMAN:  Well, you've been talking about a writ to bring Anthony Brown to the U.S. Courthouse to testify in front of a Federal Grand Jury; is that correct?

A      That is correct.

Q      And at some point did the U.S. Marshal's Office bring Anthony Brown in connection with a writ to testify in front of a Federal Grand Jury?

MR. JAUREGUI:  Same objection, Your Honor.

THE COURT:  Same ruling.  Sustained.

Q      BY MR. HOCHMAN:  At some point -- approximately when would the U.S. Marshal's Office -- did the

U.S. Marshal's Office receive two requests for a writ to bring Anthony Brown to testify in front of a U.S. -- United States Grand Jury in the federal courthouse here in Los Angeles?

A    I am only aware of the one that we are working -- referring to right now.

Q    And was Anthony Brown, in connection with that one, brought to the U.S. Courthouse to testify in front of a Federal Grand Jury at some point?

MR. JAUREGUI:  Same objection.

THE COURT:  Same ruling.  If you don't -- well, same ruling.  Sustained.

MR. HOCHMAN:  May I approach sidebar, Your Honor?

THE COURT:  No, you may not.

Q    BY MR. HOCHMAN:  In connection with that writ, did the marshals bring Anthony Brown to testify in front of a U.S. Federal Grand Jury?

A    From my personal standpoint, I do not know.  I did not handle that inmate.  I did not -- I don't know -- from hearsay I know he finally did come, but I wasn't involved in it.

Q    And who actually was involved?

A    At that time I do not know.  It was probably one of my supervisors.

Q    Was Yolanda Baines involved at all, if you know?

A    She was involved.

Q      I see.

A      Yes.

Q      She was one of the people who worked with you?

A      Yes, she did.

MR. HOCHMAN:  No further questions.

MR. JAUREGUI:  Very briefly, Your Honor.

**REDIRECT EXAMINATION**

BY MR. JAUREGUI:

Q      Ms. Farrar --

A      Yes.

Q      -- do you know whether Anthony Brown was in county custody or state custody when he was finally writted over?

A      As far as I know, he was in Los Angeles County Jail, but I'm really not sure.

Q      At the time he was writted over?

A      At the time he was writted over that we're speaking of right here on this writ, he was at Los Angeles County Jail.

Q      Ms. Farrar, when Mr. Brown was physically brought over to the grand jury, do you know whether he was in state custody or local custody?

A      I do not.

MR. JAUREGUI:  No further questions, Your Honor.

MR. HOCHMAN:  No further questions, Your Honor.

UNITED STATES DISTRICT COURT

932

THE COURT:  All right.  You may step down.

Ladies and gentlemen, we're going to take a very brief unscheduled break.  We're going to come back in about ten minutes.

Again, I want to remind you you're not to discuss this case with anyone including your fellow jurors, members of your family, people involved in the trial, or anyone else.  Do not read, watch, or listen to any news reports or any other accounts about the trial.  Do not do any research such as consulting dictionaries, searching the Internet, or using other reference materials.

All right.  We're going to come back in about ten minutes.

(The following proceedings were held in

open court out of the presence of the jury:)

THE COURT:  Let me see counsel at sidebar.

(The following proceedings were held at sidebar:)

THE COURT:  I thought I saw Mr. O'Brien earlier. Does he need a moment with Mr. O'Brien?

MR. FOX:  Yes.  I believe so.

THE COURT:  Is he here or --

MR. FOX:  He's in the hallway.  I can grab him.

THE COURT:  Okay.  Why don't we take a few minutes.  You can bring him in.

MR. FOX:  Would you like him with Mr. Sexton on

**UNITED STATES DISTRICT COURT**

the witness stand?  I know there are two chairs there.

THE MARSHAL:  The lawyer is talking to him right now.

THE COURT:  All right.  We'll just take a couple minutes, let him get situated.

(A recess was taken at 11:22 a.m.)

(The following proceedings were held in open court out of the presence of the jury:)

THE COURT:  Are we ready to proceed?

MR. FOX:  Yes, Your Honor.

MR. HOCHMAN:  Yes, Your Honor.

THE COURT:  Mr. O'Brien, do you need to confer with your client?

MR. O'Brien:  No, Your Honor.

THE COURT:  All right.  Let's bring the jury in.

(The following proceedings were held in open court in the presence of the jury:)

THE COURT:  All right.  If you'd call your next witness, please.

MR. FOX:  The United States calls James Sexton.

THE CLERK:  Please raise your right hand.

Do you solemnly state that the testimony you may give in the cause now pending before this court shall be the truth, the whole truth, and nothing but the truth, so help you God?

**UNITED STATES DISTRICT COURT**

THE WITNESS:  Yes, sir.

THE CLERK:  Will you please state your full name for the record.

THE WITNESS:  James McAbee Sexton.

THE CLERK:  Sexton is spelled?

THE WITNESS:  S-e-x-t-o-n.

THE CLERK:  Thank you.

MR. FOX:  May I proceed, Your Honor?

THE COURT:  Yes, please.

**JAMES MCABEE SEXTON,**

**GOVERNMENT'S WITNESS, SWORN:**

**DIRECT EXAMINATION**

BY MR. FOX:

Q     Mr. Sexton, have you been employed by the Los Angeles County Sheriff's Department?

A     Yes, sir.

Q     When was that?

A     From February of 2008 until 2014.

Q     Mr. Sexton, could you pull the microphone closer to you.

A     Yes.  Can you hear me, sir?

Q     Yes.  Thank you.

Can you say those dates again?

A     Yes, sir.  From February of 2008 until 2014, sir.

Q     How did your employment end?

**UNITED STATES DISTRICT COURT**

A        I was terminated, sir.

Q        For what reason?

A        I was convicted for obstruction of justice.

Q        Why are you here today?

A        Sir, I have been writted out by the Court from Talladega Federal Prison Camp.

Q        What is a writ?

A        It's an order of the Court, sir, to appear before.

Q        Are you receiving any benefits for testifying here today?

A        No, sir.

Q        Have you been made any promises?

A        No, sir.

Q        Do you have any expectations?

A        No, sir.

Q        I want to direct your attention to August of 2011.  What unit within the sheriff's department were you working in?

A        I was assigned to Operation Safe Jails, sir.

Q        What is Operation Safe Jails?

A        It is a custody investigative unit that has responsibilities for developing human informants in an effort to provide safety and security to the Los Angeles County jail system and to assist with investigations throughout the County

**UNITED STATES DISTRICT COURT**

of Los Angeles Sheriff's Department.

Q        Who was in charge of OSJ?

A        My lieutenant at the time was Lieutenant Greg Thompson, sir.

Q        Did you have a specific responsibility within OSJ?

A        Yes, sir.

Q        What was that?

A        I was assigned to the Inmate Reception Center.

Q        What is the Inmate Reception Center?

A        Inmate Reception Center is also known as IRC.  It is the first point of contact that inmates come -- let me back up.  It's the first point of contact that inmates touch in the L.A. County jail system proper.  It's where we conduct the -- we conduct the operations to classify inmates and house them within the greater Los Angeles County jail system.

Q        Does IRC play any role with respect to court documents coming in for inmates?

A        Yes, sir.  There's another side of IRC that receives the paperwork and pushes it through the civilian personnel where they process court assignments, court dates, release dates, et cetera.

Q        Does IRC have any responsibilities regarding writs?

A        Yes, sir.

**UNITED STATES DISTRICT COURT**

Q       What responsibilities are those?  And I'm speaking in the present tense, but I'm really talking about the time period of August and September of 2011.

A       Yes, sir.  I was on the enforcement and tactical side and secure side.  But my understanding at the time was that they would receive writs, process them on the civilian side, and that would, in turn, dictate orders for us to provide inmates to the courts at the time, sir.

Q       In August of 2011, did you learn anything with respect to a cellular phone that was found in jail custody?

A       Yes, sir.

Q       What did you learn?

A       I was -- in the beginning of August, I was in Washington D.C. for training.  I received several phone calls that a cell phone had been discovered in Men's Central Jail 3000.  I was ordered to return early from that trip.  It was a training trip.  My partner and I left Washington, D.C. and returned to Los Angeles County.

Q       Who was your partner?

A       Jason Pearson, sir.

Q       When you returned, did you learn anything more about the cellular phone?

A       I started to receive context about where it was discovered, the inmate it was discovered on.  And at a point in time, I learned potentially who the owner was of that cell

UNITED STATES DISTRICT COURT

phone, sir.

Q    When you say "who the owner was," what are you referring to?

A    The person that either purchased the phone or made efforts to provide the phone to that inmate's facilitator and contacts to the outside.

Q    At some point in time, did you learn that the phone was traced back somehow to the FBI?

A    Yes, sir.

Q    How did you learn this?

A    OSJ at the time was about 30 deputies broken up into the north team and the south team.  One of my partners assigned to the south division, if you will, and in Men's Central Jail -- his name is Noah Kirk -- explained to me that his contacts at the FBI had traced the phone back to the FBI itself.

Q    Did you have a meeting with any deputies regarding what to do with this information?

A    There were several meetings about this information, sir.

Q    Let me direct your attention to the first one specifically.  Did you have any meetings with deputies Manzo and Smith?

A    Yes.

Q    Let's talk about your first one.

A        Yes, sir.

Q        Where was this meeting held?

A        It was in the middle of August, and it was -- again, I had just returned from this trip.  The first of several meetings was held at Men's Central Jail.  I believe the address is 441 Bauchet Street, and it was on the 3000 floor in the Men's Central Jail, OSJ office.

Q        Who else was present?

A        The majority of the Men's Central Jail OSJ team.

Q        And what was said at this meeting?

A        I was asked to come over from the Inmate Reception Center, and I was briefed on how the phone was recovered, the inmate that had the phone, and again, who potentially was the owner of the phone and circumstances of how the phone was placed with that inmate and why it was in the jail.

Q        At that meeting, did people discuss that it was an FBI phone?

A        Yes, sir.

Q        And who was providing the briefing?

A        Kirk -- again, Deputy Kirk was assigned to a task force -- he was a task force liaison officer for Operation Safe Jails.  He had the ability to contact FBI analysts.  He provided an FBI analyst the cell phone serial number, I believe.  He showed me an e-mail between himself and the

UNITED STATES DISTRICT COURT

analyst.  Deputy Kirk, Deputy Manzo, and Deputy Smith briefed me the phone potentially was owned by -- was owned by the FBI and a specific squad within the FBI.

Q       Which squad was that?

A       The civil rights division.

Q       What was the tone of this conversation?

A       Serious.  It had a tone of -- the beginning of a confrontation between the sheriff's department and the FBI.

Q       Was there anything significant, in your mind, about hearing that the phone might be traced to the civil rights squad of the FBI?

A       Yes.

Q       What was that significance?

A       Civil rights squad are the people that investigate law enforcement officers and their actions, sir.

Q       What was the result of that meeting?  Were there any directions given?

A       Yes, sir.  I was asked to think about how to develop framework for name changes of informants.  It's something that I had done in the past, I had experience with. And they said -- they being the Deputy Smith and Deputy Manzo who identified themselves as the representation of my unit commander -- they would be having a handle on the investigation.  They asked me to start providing recommendations to potentially remove a particular inmate out

**UNITED STATES DISTRICT COURT**

of the system and make name changes for him.

Q        You just referred to their, your unit commander. Is that the same person you referred to earlier?

A        Yes.  Lieutenant Greg Thompson, sir.

Q        Did you have a follow-up meeting?

A        Yes, I did, sir.

Q        When was that?

A        It was within 24 to 48 hours, sir.  I believe it was closer to 24 hours, and it was held at his office in Twin Towers.

Q        Who all was present there?

A        Deputy Smith, Deputy Manzo, and Lieutenant Greg Thompson, sir.

Q        What happened at that meeting?

A        Lieutenant Thompson briefed me on the development of where the investigation was at the time.  He told me that I had to cooperate and collaborate with Deputy Manzo and Deputy Smith and support any request they had at that time regarding this particular inmate.  Pretty much shifted my priorities completely into supporting their operation.

Q        Did Mr. Thompson indicate in any way what the purpose was of changing this inmate's name?

A        He provided two or three scenarios that they believed at the time, and Deputy Manzo was making remarks out of the side of his mouth trying to be sarcastic.

**UNITED STATES DISTRICT COURT**

Q        Let's focus first then on what Mr. Thompson was saying.

What was Mr. Thompson saying about the reasons for changing Mr. Brown's name?

A        Well, first off, he reiterated the cell phone is dangerous in a correctional facility.  I think that's pretty well understood, sir.  We're trying to get to the bottom of how one was recovered inside the secure area of the Men's Central Jail.

He made query that we were trying to figure out who was involved, the extent of -- extent of the usage of that particular cell phone by not only the inmate that had it but the inmates around him particularly, and then they really wanted to know who provided that inmate that cell phone.

Q        But in terms of changing the name of the inmate, what was the purpose of changing the name that was expressed to you at that meeting by Mr. Thompson?

A        It was inferred through Deputy Manzo that we were changing it to --

MR. DIAMANTATOS:  Objection.  Objection, Your Honor.

MR. FOX:  Your Honor, I'll ask a different question that I think will elicit the response.

Q        Mr. Sexton, you had referred earlier to Mr. Manzo making sarcastic remarks.  What were those remarks?

UNITED STATES DISTRICT COURT

A       While the lieutenant was providing three possible scenarios of why the cell phone was in the jail, one of them was potentially a corrupt FBI agent.

Q       And what did Mr. Manzo say?

A       Mr. Manzo was removing the "corrupt" and just basically stating that the FBI was investigating the Los Angeles County Sheriff's Department.

Q       Was there any statement about Mr. Brown being protected from deputies and that was the reason for the protection that he was being given?

A       I wasn't really briefed on Mr. Brown's safety concerns.  I didn't -- even in this meeting, I had not known much about Anthony Brown.

Q       Do you know why Mr. Thompson had you be part of that meeting?

A       Yes, sir.

Q       What was that?

MR. DIAMANTATOS:  Objection.  Form.

THE COURT:  Sustained.

Q       BY MR. FOX:  Based on your experience working in IRC and knowing Mr. Thompson, do you have an opinion about why Mr. Thompson brought you into that meeting?

MR. DIAMANTATOS:  Objection.  Form.

THE COURT:  Overruled.

You can answer.

**UNITED STATES DISTRICT COURT**

THE WITNESS:  One of my functions as a deputy sheriff at the Inmate Reception Center OSJ team was to work on a high value transport team.  It was called an HVT team.  That team was responsible for dealing with sensitive inmates that often required their name to be changed in the L.A. County database known as AJIS.  It's the Automated Jail Information System.

Q      Did you attend a next meeting regarding this inmate after the one that you just had with Mr. Thompson?

A      Yes, sir.

Q      Where was this?

A      This is the meeting at Hero's Park.  Hero's Park is an outside -- it's an outside gathering area or meeting area at Men's Central Jail.  It has several picnic tables, a barbecue pit.  It's called Hero's Park.  It's a memorial of deputy sheriffs that had fallen that were previously assigned at Men's Central Jail.

Q      When did this meeting occur?

A      The following Wednesday from when I got back.  So August 20th, August 21st, sir.

Q      Showing you what's in evidence as Government Exhibit 28, can you see that in front of you?

A      Yes, sir.

Q      What does this e-mail relate to?

A      This is the background regarding Anthony Brown.

I would call it a warning letter.  Basically it's the preamble to an operation that myself and other teammates were about to start.

Q    In relation to the meeting you had at Hero's Park, do you recall when you received -- when you received this e-mail?

A    Yes, sir.  This says this is from -- I recognize this to be an L.A. County Outlook e-mail, and it says Wednesday, August 24th, 2011, at 11:17 p.m.

Q    In relation to your meeting in Hero's Park regarding this operation, was this e-mail sent days later, hours later, or do you know?

A    The meeting was late in the afternoon, early evening.  I remember the sun setting.  So this is two to three hours later.

Q    And let's talk about that Hero's Park meeting.  Who was providing the information in that meeting?

A    Lieutenant Greg Thompson, Deputy Gerard Smith, and Deputy Mickey Manzo, sir.

Q    Let's talk about what was said by those three individuals.  Can you please provide us with that information?

A    That's the first time I got information on Anthony Brown and the totality of where the investigation stood.  At that point we were told that Anthony Brown was going to be removed from Men's Central Jail.  We were told that two

UNITED STATES DISTRICT COURT

other divisions were going to be joining our division, custody division, and that we were to collaborate and cooperate with detective division, patrol division, and other members of our own division and custody, and that we would be treated with respect, that we'd be treated as equals which is not a norm for custody deputies at that time, and that we would be operating outside of Men's Central Jail at other locations in the county.

Q    Did anyone at that meeting explain why this was happening?

A    They were still briefing other potential theories of how the phone got in, but I would say a week later they, they being my unit commander and the two deputies responsible for the investigation, were indicating that the FBI had brought the phone -- or I apologize.  The FBI had coordinated the smuggling of a cell phone in and that we were removing Anthony Brown from Men's Central Jail so that we could -- when I say "we," I apologize.  I should be more precise with my collective pronouns.  But that the sheriff's department was looking into the extent of Anthony Brown's cooperation with the FBI.

Q    Along -- you've already discussed how you were going to be using your knowledge to help change his name and move him.  Were you going to be having another role in Mr. Brown -- with respect to Mr. Brown?

Maybe I'll ask a different question.

We just saw a bunch of deputies listed in that e-mail I just showed to you.

A        Yes, sir.  Can I --

Q        Let me put it up there again.

Was there a role that you and these other deputies were supposed to have with respect to Mr. Brown?

A        Yes, sir.  We were custody deputies at that time. So Anthony Brown was a high security inmate.  He was a K-10 at that time.  That required security detail.  And we were told that we would be shifted to 12-hour shifts which is a -- it's a -- it's a different structure for our days.  Normally we work either four 10-hour shifts throughout the week to make a 40-hour week or five eights to make a 40-hour week.  When you are shifted onto 12's, that's a -- that's generally done when there's an emergency in the sheriff's department.

Q        Did any of the people providing the briefing explain to you where this idea came from to move Mr. Brown?

A        Yes, sir.  They were speak -- the Los Angeles County Sheriff's Department is a paramilitary organization, and they often refer to "the big bosses."

Q        What did "the big bosses" mean?

A        There are big bosses and little bosses.  Little bosses are your sergeants and lieutenants.  Big bosses are captains and above.

Q        What did the people who were providing the

briefing explain to you about the big bosses?

A    Deputy Smith -- Deputy Smith and Deputy Manzo said this was coming all the way from the top and that this is -- at this time there was no overtime in the department.  It would have been tough to shift our schedules into 12's on short notice.  So they were speaking as if they had spoken directly to someone above, an assistant sheriff and above.

MR. DIAMANTATOS:  Objection, Your Honor.  The answer is nonresponsive.  Speculation.

THE COURT:  Sustained.  Ask another question.

Q    BY MR. FOX:  Mr. Sexton, when you said "from the top," who did you hear -- you heard "from the top," who did you understand that to mean?

A    Deputy Smith and Deputy Manzo had said they had briefed Sheriff Baca and Undersheriff Tanaka.

Q    What, if anything, did Mr. Manzo state about what happened in that meeting with Mr. Baca?

A    Manzo was excited it was his first time to brief the sheriff.  So he spoke a lot of Sheriff Baca's mannerisms. He described him putting his hands or putting his face in his hands and potentially -- or I apologize.

MR. DIAMANTATOS:  Objection, Your Honor. Nonresponsive to the question.

THE COURT:  Overruled.  You can continue.

THE WITNESS:  I recall him making a statement --

I recall Deputy Manzo making a statement about what Sheriff Baca said to Lieutenant Thompson.

Q        BY MR. FOX:  What was that statement?

A        "How are we going to fix this, Greg?"

Q        Showing you this last paragraph in the e-mail, how was it that it was going to be decided who was going to be assisting with the guarding of Brown on any given shift?  You mentioned a number of shifts, and there were a bunch of deputies here.  How was it going to be divided who was going to be sitting on Brown on an individual shift?

A        I believe you're asking how were we assigned to each shift?

Q        Correct.  Did you sign up voluntarily for it or did -- go ahead.

A        You're often told to do things in the sheriff's department, sir.  The senior deputies, which were Deputy Manzo, Deputy Smith, coordinated with guys that had more time on all the way down, and the shifts were assigned based on seniority and availability.

Q        This paragraph discusses overtime.  What was going on with overtime in the department at this point in time?

A        It was nonexistent, sir.

Q        So was there a discussion at this Hero's Park meeting about how overtime was going to be paid in this instance?

A        Yes, sir.  First off, we were working carps.  So we didn't have to carp anymore.  And that was exciting for us at that time.  And, second, we were told that there was a budget item created -- basically this operation was funded out of headquarters -- for us to receive paid overtime.  Normally at this time, if we ever got overtime, we would receive what's called "saved time."  But this was paid overtime.

Q        Did you, in fact, receive overtime for your duties around the end of August and early September of 2011?

A        Yes, sir.

Q        I'm going to now publish for you 115.

Do you see this in front of you?

A        Yes, sir.

Q        What is it?

A        This is our weekly timecard that myself and our -- myself and my teammates would fill out and then we would provide to our sergeant to sign and approve.

Q        I'm showing you now the bottom left-hand corner.

Whose signature is this?

A        That's --

MR. HOCHMAN:  May I have a moment with counsel?

(Counsel confer.)

MR. FOX:  Your Honor, we've had a little -- probably our technology.  Let me provide a hard copy to the witness.

**UNITED STATES DISTRICT COURT**

Q        You should have 115 in front of you in one of the binders.

A        Yes, sir.

Q        Just to make sure we're all on the same page here, what is 115?

A        Sir, I'm looking at what we would call the green slip.  It's basically a receipt that you worked overtime, sir.

Q        Do you recognize this document?

A        Yes, sir.

Q        And whose green slip is this?

A        This is mine, sir.

Q        Is this a true and accurate copy of the green slip that you had at the time?  Is this a true and accurate copy of your green slip from August of 2011?

A        Yes, sir.

MR. FOX:  Your Honor, I move for the admission of Government Exhibit 115.

MR. HOCHMAN:  I think counsel meant green slips, plural, because there's more than one in this exhibit.  Or are you just referring to the first page?

(Counsel confer.)

Q        BY MR. FOX:  Can you look through all of Exhibit 115 then and tell me if these are true and accurate copies of all of the green slips that you had in August and September of 2011?

UNITED STATES DISTRICT COURT

A        Yes, sir.

MR. FOX:  Your Honor, I move for the admission now of Government Exhibit 115.

MR. HOCHMAN:  No objection, Your Honor.

THE COURT:  It will be received.

MR. FOX:  Thank you, Your Honor.

(Marked for identification and received into evidence Exhibit No. 115.)

Q        BY MR. FOX:  Who needs to sign these slips for you to get paid?

A        It's a series of supervisors, sir.

Q        Who's listed at the bottom left of the supervisor preapproving overtime?

A        My unit commander Greg Thompson and my sheriff at the time Lee Baca.

Q        Can you tell whether that's the same handwriting for both names?

MR. DIAMANTATOS:  Objection, Your Honor.  I'll withdraw the objection, Judge.

Q        BY MR. FOX:  Is this the same writing that appears for Mr. Thompson and Mr. Baca?

A        Yes, sir.

Q        Looking at the following pages, is that the only time that Mr. Baca's name is on these documents?

MR. DIAMANTATOS:  Objection, Your Honor.

**UNITED STATES DISTRICT COURT**

Case 2:16-cr-00066-PA   Document 473   Filed 08/14/17   Page 149 of 218   Page ID #:14245

953

Q        Is Mr. Baca's name on any of the other documents that are in Exhibit 115?

A        That is the only time that is depicted, sir.

MR. FOX:  Your Honor, may I have a moment to --

THE COURT:  Yes.

Q        BY MR. FOX:  Mr. Sexton, I want to now have you look at Exhibit 124 in your binder.

A        Stand by, sir.

Q        What is that?

A        This is a Los Angeles County Sheriff's Department inmate total movement history.

Q        What is this type of document?  How is it used by the sheriff's department?

A        It is a -- it's a record of the individual movements for a particular inmate, sir.

Q        And showing you now on the screen this blowup, who is this inmate movement for?

A        I see on the paper Anthony Brown, yes, sir.

Q        Okay.

A        Anthony Brown, sir.

Q        I want you now to focus on August 18, 2011, at 10:46 a.m.  Does it show where Mr. Brown was being housed at that time?

A        The facility is Men's Central Jail which is depicted by "CJ," and the module is 3500.

**UNITED STATES DISTRICT COURT**

954

Q        According to this document, was Mr. Brown moved at 1:00 o'clock p.m. that date?

A        Yes.

Q        Where was he moved to?

A        1750.

Q        And then I want you to look a few lines above that.  Does it show that anything changed with his custodial status after that date?

A        Yes.  On August 25th it says he's released.

Q        Let's talk about 1750.  In here it says 1751G. Do you see that?

A        Yes, sir.

Q        Can you please describe this area of Men's Central Jail.

A        Do you want me to explain the finite 1751G or -- I'm kind of lost in the --

Q        Sure.  Let's go with 1751G.

A        1751G is a very specific housing assignment within Men's Central Jail for VIP inmates, by that, extended media, celebrities, or gravely mentally ill.

Q        In your duties working at IRC near the end of August, 2011, did you hear anything about the U.S. Marshals Service as it related to Anthony Brown?

A        I heard one deputy assigned to --

MR. DIAMANTATOS:  Objection.  Foundation,

**UNITED STATES DISTRICT COURT**

Your Honor, and hearsay.

MR. FOX:  I will provide the foundation, Your Honor.

THE COURT:  All right.

Q       BY MR. FOX:  Approximately when in -- August of 2011, can you provide us with any more details of that with respect to the date?

A       I apologize, Mr. Fox.  Which date, sir?

Q       We're talking about this conversation where you heard something about the U.S. Marshals Service and Mr. Brown?

A       Yes, sir.

Q       So you said it was in late August of 2011.  Is that the best you can do, or can you narrow it down a little bit?

A       Around August 20th, sir, I was assigned -- I was assigned to OSJ.  Throughout my duties and working on items to support Deputy Smith and Deputy Manzo, I found myself at IRC main control which is where outside agencies contact the Los Angeles County jail system to receive information about inmates.

Q       And specific to the U.S. Marshals Service and Mr. Brown, who did you hear this information from?

A       I heard it from an IRC deputy assigned to IRC main, Deputy Sherry Panzone.

Q       Where were you when you received this

information?

A        I was in her presence at her work assignment.

Q        What is it that she said to you?

MR. DIAMANTATOS:  Objection.  Hearsay.

THE COURT:  Let me see counsel at sidebar.

(The following proceedings were held at sidebar:)

MR. FOX:  Your Honor, it's their normal duties to process writs.  So this information will have an effect on the listener.  He then provides that information.  That is the purpose of the statement.

MR. DIAMANTATOS:  It is being offered for its truth and would be hearsay that, in fact, he was transferred.

MR. FOX:  That he was transferred is not the portion.

MR. HOCHMAN:  Maybe we can get a proffer from Mr. Fox as to what he's trying to elicit to see whether or not it's hearsay or not hearsay.

THE COURT:  Maybe we could, but I don't really need it.  The objection is overruled.

(The following proceedings were held in open court in the presence of the jury:)

MR. FOX:  May I continue, Your Honor?

THE COURT:  Yes.

Q        BY MR. FOX:  What is it she said to you?

A        She asked me a question.  A series of questions.

UNITED STATES DISTRICT COURT

I apologize.

Q      What were those questions?

A      She asked me if I knew an inmate by the name of Anthony Brown.

Q      What did you tell her?

A      Yes.

Q      What else did she ask you?

A      She asked me would there be any reason that the U.S. Marshals is calling to ask about him.

Q      Did you respond to that?

A      I did, but I didn't give her any specifics.  I just said I need to let my bosses know they called.  I asked her if she had any information about the inquiries they asked.

Q      Did she provide you with any additional information?

A      She did not have any.  It was broad at that time, sir.

Q      What did you do with that information?

A      I immediately told Lieutenant Greg Thompson in person that the U.S. Marshals had called looking for Anthony Brown specifically.

Q      Why did you do that?

A      We were beginning to receive directions from our big bosses on down to not use the phones or e-mail to talk about Anthony Brown.

**UNITED STATES DISTRICT COURT**

Q        When you took this information to Mr. Thompson, what happened?

A        He took it under advisement, sir.  It wasn't up for discussion.  He thanked me for my time and asked me to continue on.

Q        Did anything change with respect to Mr. Brown after you provided this information to Mr. Thompson?

A        A few days later he moved from 1751 to other places.

Q        What places were those?

A        The first time I came in contact with Anthony Brown would have been at San Dimas Station, but I was briefed he was at Temple Station, other places that we used to move sensitive inmates or high valued inmates.

Q        How was this decision to move him to San Dimas and possibly other stations communicated to you?

A        In person and on my cell phone.

Q        By who?

A        Deputy Gerard Smith, Deputy Mickey Manzo.

Q        What did they say to you?

A        You're talking about several days together, sir. So I was briefed to not respond, as we would say it, to 450 Bauchet Street which is my normal work assignment.  And I was directed to other places in the county.

Q        Did they tell you who these orders were coming

from?

A       Yes, sir.

Q       Who did they state they were coming from?

A       They would routinely say, "All the way from the top," sir.

Q       Can you tell us how -- well, were you part of this plan to move Mr. Brown and to change his name?

A       Yes, sir.

Q       What did you do specifically?

A       I was asked several questions about the tolerances of the AJIS, the Automated Jail Information System, the constraints, and to provide recommendations for entering new data into the computer system.

Q       Mr. Sexton, just so it's clear, you and I have not spoken in a few years; is that correct?

A       Yes, sir.

Q       I want to now show you, again, Government Exhibit 124.  You mentioned that this showed that Mr. Brown was released, according to this document, on August 25th, 2011. Was he, in fact, released from sheriff's department custody that day?

A       Not to my knowledge, sir.

Q       Did you -- well, when you say "not to your knowledge," do you know whether he was in county custody after that date?

**UNITED STATES DISTRICT COURT**

960

A        I don't think that we put Anthony Brown on the street that day, sir.

Q        I'd like you now to look at Government Exhibit 125.

A        Yes, sir.

Q        Do you recognize that document?

A        Yes, sir.

Q        What is it?

A        It's a xerox of a records jacket at the IRC, sir.

Q        Whose record jacket is this?

A        I'm reading here John Rodriguez, sir.

Q        I'm now going to publish Exhibit 125 which is in evidence.

You mentioned that this was the booking record for John Rodriguez.  Who was John Rodriguez at this point?

A        Anthony Brown, sir.

Q        I want to now show you the fourth page of that exhibit.

What descent does it say Mr. Brown -- or Mr. Rodriguez was?

A        Hispanic.

Q        Was Anthony Brown Hispanic?

A        No, sir.

Q        What race was Anthony Brown?

A        Male black, sir.

**UNITED STATES DISTRICT COURT**

Q        Do you see on the right-hand portion after CCB there is a prisoner signature when booked?

A        Yes, sir.

Q        What does it state?

A        "Refused."

Q        Do you know why it stated refused?

A        I did not fill out this form, sir.  But generally when we --

MR. DIAMANTATOS:  Objection.  Foundation. Nonresponsive to the question, Your Honor.

THE COURT:  Sustained.

Q        BY MR. FOX:  Mr. Sexton, generally, when you book inmates, do you seek their signature?

A        Yes, sir.

Q        What about their social security number?

A        Yes, sir.

Q        Do you know why receiving fingerprints, by the way, are important in these documents?

A        Yes, sir.

Q        Why is that?

A        When a fingerprint is retrieved from one of these documents, it assigns -- first off, the fingerprints are verified.  When a fingerprint is verified to a previous historical record, it will assign any new monikers or aliases or names to the original verified ID.

**UNITED STATES DISTRICT COURT**

Q        So if somebody was using an alias, what would happen if they were fingerprinted?

A        That alias would be attached to the previous verified ID.

Q        Can you see on your screen now the fifth page of this exhibit?  It says "Refused."

A        Yes, sir.

Q        What is usually placed in this portion?

A        That would be the left -- I'm sorry.  This is right four fingers when booked and then when released.

Q        Now I want to show you Government Exhibit 126.

         Can you look at that and tell me if you recognize it.

A        Yes, sir.

Q        It should be in front of you as well.

         What is this?

A        This is the custody portal printout of -- again, the nomenclature of the department, we would say "horsepower." But that's their booking number, last name, first name, gender, et cetera.

Q        What does this state here on the portion under "Arrest"?

A        This is the arrest charge and then the arrest date, the time he was arrested, the agency he was arrested, where he was booked, when he was booked, and the last location.

**UNITED STATES DISTRICT COURT**

Q        What does it state in terms of when he was booked and when he was arrested?

A        Arrest date of August 25th, 2011; a book date of August 25th, 2011, at 1705 at Temple Station.

Q        Do you see the arrest time says 1703 and the book time says 1705?

A        Yes.

Q        Does it typically take -- or during that time, did it typically take two minutes to book somebody after arrest?

A        No, sir.

Q        Why not?

A        There's a lot to that process.  It's complicated.

Q        Can you please explain some of the parts of that process?

A        Mental evaluation, health evaluation, ID verification, gang classification.  Generally it takes 4 to 12 hours depending on any special circumstances for a particular inmate.

Q        What if somebody is arrested on the street?

A        You have to transport them to the station and then from the station to IRC.  It takes a little bit more. Especially on a felony too.  People are field cited for misdemeanors and things, but robbery.

Q        All right.  Let's look at the second page under

UNITED STATES DISTRICT COURT

actual release date.  It says 8/26/11.  What is the release time?

A        Release time of 2029 which is 8:29, sir.

Q        What did it state for the reason for the release?

A        It says, "Ordered for release."

Q        Now, I'm going to show you Government Exhibit 127 which is in evidence.

What is this document?

A        It is the same document you showed me earlier. It's inmate total movement history.

Q        You said it was like the one I showed you for Anthony Brown.  Which inmate is this?

A        This is John Rodriguez.

Q        What does it show occurred on August 25th at 5:10 p.m.?

A        It says he's at booking front.

Q        And where does it say that John Rodriguez is housed from 6:17 p.m. until 8:25 p.m.?

A        1750, sir.

Q        What does it show happens to Mr. Rodriguez at 8:29 p.m.?

A        It says he's released, sir.

Q        I want to now show you Government Exhibit 128. Do you recognize this document?

A        Stand by, sir.

Q      It should be right in front of you, Mr. Sexton.

A      Yes, sir.

Q      What is this document?

A      We call it a nine line, sir.  It's a booking and property record.

Q      Did we see a similar document for John Rodriguez?

A      Yes, sir.

Q      Who is this one for?

A      Kevin King.

Q      Who is Kevin King?

A      Anthony Brown, sir.

Q      Could you please read what's in the jail custody record box on the right-hand side?

A      "Felony ICIB OSJ Lieutenant Thompson" and then "CTTCF."

Q      Does it state the city where this booking occurred or -- I'm sorry.

Does it list the address of Kevin King right underneath his name?

A      Transient, sir.  I apologize.

Q      What about city?

A      San Dimas.

Q      What about his race?

A      It has him as a male black on this one, sir.

Q      What is listed for his charge?

**UNITED STATES DISTRICT COURT**

A        We have 11350 Health & Safety Code, possession of cocaine.

Q        Do you know if Anthony Brown was possessing cocaine at that point?

A        No, sir.  He wasn't.

Q        Are you familiar with the name Chris Johnson as it relates to this case?

A        Yes, sir.

Q        Who was Chris Johnson?  Who was Chris Johnson?

A        He's an NFL wide receiver.

Q        And how does that name relate to this case?

A        It was probably some OSJ deputy's fantasy football pick that they decided would be --

MR. DIAMANTATOS:  Objection, Your Honor.

MR. FOX:  Let me ask a different question, Your Honor, please.

THE COURT:  All right.

Q        BY MR. FOX:  Was this another alias of Anthony Brown?

A        Yes, sir.

Q        Showing you now Government Exhibit 128, page 3, and now 129.

What is this document, Mr. Sexton?

A        It's an Inmate Information Center custody portal printout, sir.

**UNITED STATES DISTRICT COURT**

Q        What generally does this show, this information show?

A        Referred to as horsepower.  Again, it's booking number, last name, first name.

Q        I'm going to show the arrest information for Mr. Johnson from this page.  What does it list his arrest date?

A        Here we have September 2nd, 2011, date booked September 2nd, 2011.

Q        What about the arrest time and the time booked?

A        Arrest time is 9:20 in the morning.  Time booked is 9:21 in the morning.

Q        What's listed as the booking location?

A        San Dimas Station.

Q        How about the agency description?

A        It was 8,000 which is what's used for court returnee out of state prison.

Q        Do you see to the right of that it says, "Other states."  Do you know what that meant?

A        At that point they're telling the computer it could have been an extradition or hold for another agency.

Q        Mr. Sexton, what does this show for the release?

A        An actual release date of September 12, 2011, at the time of 1329 for reason other.  Custody of agency not listed.

Q        Do you know why Anthony Brown -- do you know why

this shows a release of Chris Johnson on September 12 of 2011?

A        Yes, sir.

Q        What happened on that date?

A        His name was changed back to Anthony Brown, and he was being prepared to go to Lancaster State Prison.

Q        When you say "his name was changed," who changed his name back?

A        I participated in that, sir.

Q        Why did you do that?

A        I was ordered to do it, sir.

Q        By who?

A        Lieutenant Greg Thompson, sir.

Q        Showing you now Government Exhibit 131, is this the same form you were discussing with John Rodriguez and Chris Johnson?

A        Yes, sir.

Q        Who is this one for?

A        Sir, this is for Anthony Brown.

Q        What does it show for Mr. Brown's arrest?

A        Court returnee, court-ordered returnee.  Arrest date of 9/12/2011, arrest time of 1256.  Agency is IRC.  The date booked 1300.

Q        What does it show for Mr. Brown's release?

A        Custody release, release agency of LAN LASD, Lancaster.

**UNITED STATES DISTRICT COURT**

969

Q        Do you know why Mr. Brown was released to state custody in Lancaster that day?

A        Yes, sir.  When sensitive inmates are moved out of the Los Angeles County Jail, they are often placed at Lancaster State Prison.

Q        Do you know why the sheriff's department decided to send him to state custody that day?

A        I was told that they were done with their investigation --

MR. DIAMANTATOS:  Objection.  Objection, Your Honor.

MR. FOX:  I will provide the proper foundation, Your Honor, if that's okay.

THE COURT:  All right.

Q        BY MR. FOX:  Who told you -- who described for you why Mr. Brown was going to be released to state prison?

A        Deputy Manzo and Deputy Smith, along with Deputy Noah Kirk transported him with myself.

Q        So you were driving with them.

A        Well, prior to moving any sensitive or high value inmate, there is a briefing and an ops order.  And I was briefed at detectives out of ICIB, detectives out of Internal Affairs, detectives out of custody.  So pretty much detectives from both my division and other divisions were done interviewing him and had received all the information they

needed, and it was my responsibility along with Deputy Manzo, Deputy Smith, and Deputy Kirk to return him to state prison.

Q        Showing you now what's in evidence as Government Exhibit 54, what is this e-mail that I'm highlighting for you at the bottom of the page?

A        Yes, sir.  It's an e-mail from myself on Monday, September 12, 2011, to Deputy Smith.  I'm cc'ing Deputy Manzo, Lieutenant Thompson, and Detective Gilbert regarding Operation Pandora's Box.

Q        Why did you call this Operation Pandora's Box?

A        I was referring to a Greek mythology story, sir.

Q        What is that about?

A        It's about one of the children of the greater Greek gods that was told not to open Pandora's box.  She did. There was evil and suffering released on the world, and the bug of hope came last.

Q        Could you please read the first sentence of this e-mail.

A        "Gents, I am going to handle booking our friend back under his true alias."

Q        Continue, please.

A        "Can you please shoot me the URC case information he was originally charged under.  I am going to try to reinstate his old booking number as we speak.  I am 97 at the nurse's station until further notice.  J.S."

**UNITED STATES DISTRICT COURT**

Q       What did "97" mean?

A       LASD radio code for on scene.

Q       Were you able to book Mr. Brown under his same booking number?

A       Not his original booking number, sir.

Q       What did you do?

A       I had to work with Deputy Smith and Deputy Manzo. They weren't there personally, but they were directing me on e-mail and phone.  I had to coordinate with the greater -- now I'm working with several units, sir.  So I had to facilitate the civilian personnel at IRC who had the passwords to work with the metadata, and I had to receive that from the detectives and Manzo.  And the computer would not accept his old booking number because it was missing -- it said it was released.  So you can't regenerate a released booking number. So we had to -- I was directed to generate a new booking number for Anthony Brown who was sentenced to 450 years.

Q       Showing you now the top e-mail listed in this exhibit, what is this?

A       It's an LASD Outlook e-mail from myself on Monday, September 12, 2011, to IRC Sergeant Sean Geske at the time.  He was the watch commander.  And I have cc'd my unit commander Lieutenant Thompson and my senior deputy in charge of this operation Gerard Smith.

Q       Can you please read what you wrote?

A        Yes, sir.  "Sergeant Geske is the WC," watch commander, "and is assisting us with our inmate. Captain Antuna wanted to be notified when there was movement of this inmate out of custody.  Sergeant will advise when and what.  Need to prep him for movement to state."

Q        Now, showing you Government Exhibit 55 in evidence.  Can you please read the e-mail that I've highlighted in the middle of the page from you to Mr. Smith on September 12th at 11:51 a.m.?

A        Yes, sir.  "Boss, on the phone with the head clerk in document control.  They're onboard, but they need the jacket regardless for court case, in his judgment, in order to get him released out of the system properly.  I am going to book him under his old booking number as court returnee and re-Live Scan him at IRC ASAP.  By the time you return downtown with the jacket, we should be ready for the next phase.  In route to IRC shortly.  J.S."

Q        What is Live Scan?

A        Live Scan is a digital capture of an arrestee's fingerprints.

Q        Do you know who that is shared with?

A        Yes, sir.

Q        Who?

A        DOJ.

Q        The Department of Justice?

A        Yes, sir.

Q        Are you talking about United States Department of Justice or California Department of Justice?

A        United States Department of Justice is the primary, sir.  There's several others attached.

Q        And this is an e-mail from someone named Eliel Teixeira; is that correct?

A        Yes, sir.

Q        E-l-i-e-l T-e-i-x-e-i-r-a?

A        Yes, sir.

Q        Who is that?

A        That is an assigned position to IRC known as the head clerk, but it is the sworn deputy that fills that.  So Deputy Teixeira was the head clerk at that time, and I was working with him because he had the proper passwords to create this new booking number for an inmate that had been sentenced to 450 years.

Q        Could you please read what he wrote to you.

A        Yes, sir.  "James, no need to pull a new booking number.  Please use 2863148.  We are changing the info on this booking number to Anthony Brown."

Q        Now I'm going to publish for you Government Exhibit 56.  There's a lot of information on this e-mail at the bottom that I'm actually going to ask you about.

But just, generally, can you please explain what

**UNITED STATES DISTRICT COURT**

all this information in the second e-mail is?

A       That's the raw data -- raw metadata that makes the nice forms for the inmate information.

Q       And can you see the subject line of that e-mail?

A       Yes, sir.

Q       What does it say?

A       Brown, Anthony, and his booking number.

Q       And now I'm highlighting for you the e-mail you sent at 6:28 p.m. on September 12.

A       Yes, sir.

Q       What did you write?

A       I'm writing about Anthony Brown.  I said, "Sir, per IRC's request, Inmate Brown is an in-custody release to CDCR," which is the California Department of Corrections and Rehabilitation.  "If you have any questions, please contact OSJ Lieutenant Thompson.  Respectfully, Deputy Sexton."

Q       Now showing you Government Exhibit 57, what was this document?

A       This was an e-mail that I received from my LASD e-mail Outlook from Gerard Smith thanking me -- thanking myself and others for our participation in the security detail.

Q       Can you please read what Mr. Smith wrote to you and others?

A       Yes, sir.  Starting at the top, "Over the past few weeks we have helped --" I apologize.  "Over the past few

**UNITED STATES DISTRICT COURT**

weeks, you have helped out tremendously with safeguarding of Inmate Brown.  You have done so without asking too many questions and prying into the investigation at hand. Inmate Brown was transferred to Lancaster State Prison last night.  So that part of the investigation is over.

"However, this investigation is and will continue to be a time-consuming affair.  I am both proud and thankful to have each and every one of you to rely on in a time of need. Your dedication and professionalism is and will continue to be needed.  There will continue to be times during this investigation when I will need your help.  I am confident that I will be able to call on any of you in a time of need.  Once again, thank you.

"Always remember we are a unit.  We were picked by people who want to see us succeed and grow.  I believe we will all have similar goals for our unit.  So if someone is lacking in a particular area, we must all work together to help them succeed.  If we work together, we will always succeed.  If you need anything, give me a call.  Thanks, Smitty."

Q     Mr. Sexton, you stated in the beginning of your testimony that you've been convicted of obstruction of justice. What did those charges relate to?

A     Inmate Anthony Brown, sir.

Q     What specifically?

A     My participation in the augmenting and

UNITED STATES DISTRICT COURT

manipulating of inmate database and transporting him to Lancaster State Prison.

Q    Mr. Sexton, when did your involvement in this conspiracy end?

A    September, sir.

Q    Okay.  Of 2011?

A    Yes, sir.

Q    I want you to now look at Government Exhibit 118 that is in evidence.

A    You said 118, sir?

Q    Yes, sir.  It should be right before you.

A    Yes, sir.

Q    What is this document?

A    Hold on.

That is my report on performance evaluation.

Q    For what time period?

A    2010 to 2011.

Q    What rating did you receive over that time period?

A    An outstanding.

MR. FOX:  One moment, Your Honor.

I don't have any further questions for this witness at this time.

THE COURT:  All right.  Cross-examination.

MR. DIAMANTATOS:  Yes, Your Honor.

**UNITED STATES DISTRICT COURT**

Just one moment, Your Honor.  May I proceed, Your Honor?

THE COURT:  Yes.

**CROSS-EXAMINATION**

BY MR. DIAMANTATOS:

Q    Mr. Sexton, Mr. Fox asked you if you had spoken to him recently, and you indicated you have not; correct?

A    I have not seen Mr. Fox since my trial, sir.

Q    You indicated that you haven't seen Mr. Fox for years; correct?

A    That is correct, sir.

Q    But as little as three days ago, you did meet with one of Mr. Fox's colleagues and FBI agents; correct?

A    Yes, sir.

Q    And that was for the purpose of going over your testimony for today; correct?

A    Yes, sir.

Q    You met with him?

A    Yes, sir.

Q    Discussed the nature of your testimony.

A    Yes, sir.

Q    Provided them information?

A    Yes, sir.

Q    So you have met with the Government?

A    I have, sir.

**UNITED STATES DISTRICT COURT**

Q        This wasn't the first meeting you've had with the Government; correct?

A        I apologize, sir.  In 2016?  In my lifetime?

Q        Well, the meeting that occurred three days ago, Mr. Sexton, that's not the first time you've met with the Government; correct?

A        That's the first time I met with the Government in 2016, sir.  Yes, it is.

Q        Okay.  After the events that you described -- and we'll go through them in a moment.

         You began meeting with agents of the Federal Government, Mr. Fox's team -- correct? -- after 2011?

A        I met with FBI agents starting in 2012, yes, sir.

Q        So in 2012 which is after the events that we described; correct?

A        It's after -- I apologize, sir.

Q        After the events that you described in your testimony today, Mr. Sexton?

A        Of Anthony Brown, yes, sir.

Q        You began meeting with agents?

A        In 2012, yes, sir.

Q        And you continued to meet with agents in 2012; correct?

A        Yes, sir.

Q        You met with them how many times?

**UNITED STATES DISTRICT COURT**

A       In 2012 I met with them 15 to 20 times, sir.

Q       15 to 20 times?

A       Yes, sir.

Q       That's an estimate?

A       That's the best I can provide, sir.

Q       You met with them in person?

A       That includes several phone calls, personal meetings, and meetings at the FBI headquarters, sir.

Q       So the estimate that you provided included the face-to-face meetings as well as phone calls?

A       Yes, sir.  It did, sir.

Q       And during those meetings, Mr. Sexton, you were providing the Government with information about its civil rights investigation; correct?

A       Among other things, yes, sir.

Q       You indicated a moment ago that you were convicted; correct?

A       Yes, sir.  I am, sir.

Q       You testified that you were convicted of obstruction of justice; right?

A       Yes, sir.

Q       Stemming from the FBI's investigation into alleged civil rights violations in the summer and fall of 2011; correct?

A       Yes, sir.

Q        You were also convicted of actual obstruction of that same investigation; right?

A        I'm convicted of one count of obstruction, sir.

Q        Correct.  Of obstruction; correct?

A        Obstruction of justice, yes, sir.

Q        And you were sentenced?

A        Yes, sir.

Q        You were sentenced to serve a year and a half in prison; isn't that right, Mr. Sexton?

A        Yes, sir.

Q        And you testified that you expect to see -- to receive no benefit from the Government; right?

A        I have a hard time seeing how this is going to benefit me, sir.

Q        But you certainly, over the course of 2012 through and including today, met with the Government a number of times; right?

A        Yes, sir.

Q        Answered their questions?

A        For the most part, yes, sir.

Q        Provided information to them?

A        Yes, sir.

Q        And you're testifying today in the Government's case; correct?

A        I have been writted out by the Court, sir.  I am

**UNITED STATES DISTRICT COURT**

a federal inmate in my fourth month of an 18-month sentence. I'm not in charge of my own decisions.  My travel agent told me to be here, and I'm here, sir.

MR. DIAMANTATOS:  Judge, I'm going to object as nonresponsive to the question I asked whether he was called by the Government as a witness.

THE COURT:  Next question.

Q      BY MR. DIAMANTATOS:  The meeting that you had with the agents three days ago on December 6 to go over your testimony, that happened at 300 North Los Angeles Street?

A      Sir, I'm a federal inmate serving in a security housing unit.  I was walked through several tunnels.  I do not know where I was.

Q      You had a meeting with the Government face-to-face?

A      Yes, sir.  I did, sir.

Q      Not in a prison facility.

A      Yes, sir.

Q      Your attorney was present?

A      Yes, sir.

Q      Mr. Thomas O'Brien?

A      Yes, sir.

Q      He's a former United States attorney; correct?

A      Yes, sir.  He is, sir.

Q      Present in court here today watching you testify;

correct?

A    Yes, sir.

Q    I'm sorry.  I spoke over you.

A    Yes, sir.  He is, sir.

Q    This morning you told us about how you first learned information with regard to a cell phone being linked that an inmate had and was discovered; correct?  That Mr. Brown's cell phone was discovered; correct?

A    Yes, sir.

Q    And that once that phone was discussed, analysis was performed that turned out linking that phone to FBI; correct?

A    Yes, sir.

Q    You indicated it was known to be linked to the FBI civil rights division; right?

A    Yes, sir.

Q    You explained to the members of the jury that the way that Los Angeles Sheriff's Department was able to make that connection was through the assistance of task force officer Noah Kirk; correct?

A    Yes, sir.

Q    What is a task force officer?

A    It's a TLO, task force liaison officer, sir. Generally they are deputy sheriffs and at times supervisors or detectives that are assigned to various Federal Government

UNITED STATES DISTRICT COURT

agencies to help them perform their functions.

Q       All right.  So a task force liaison officer or TLO for short is employed by Los Angeles Sheriff's Department; correct?

A       Yes, sir.

Q       They have a dual duty as far as working with a federal agency?

A       Yes, sir.

Q       Isn't it true that the Los Angeles Sheriff's Department had a number of TLO's during this time period in 2011?

MR. FOX:  Objection.  Beyond the scope and relevance.

THE COURT:  Sustained.

MR. DIAMANTATOS:  Judge, may I be heard?

THE COURT:  No.

MR. DIAMANTATOS:  To avoid recalling the witness, Your Honor?

THE COURT:  Next question.

Q       BY MR. DIAMANTATOS:  But Mr. Kirk certainly in his role as a task force liaison officer had partnered with the FBI; correct?

A       Yes, sir.

Q       He had partnered with federal agencies; correct?

A       Yes, sir.

**UNITED STATES DISTRICT COURT**

984

Q        And he was able to -- he was uniquely situated for LASD to have communication with him about what he knew; correct?

A        Yes, sir.

Q        And the TLO's didn't begin in 2011; correct?

MR. FOX:  Objection.  Relevance.  Beyond the scope.

THE COURT:  Sustained.

Q        BY MR. DIAMANTATOS:  You indicated that, when you were first -- you had a meeting in the middle of August that you described with Mr. Manzo and Mr. Smith and the TLO Kirk, and you learned some general information; correct?  That the phone was owned by the FBI?

A        I think it's pretty specific, sir, that I was told that it was an FBI phone and, not only within the FBI, it was a squadron within the FBI, sir.

Q        The civil rights squadron; correct?

A        Yes.  But that's a very specific description. That's the difference between homicide detectives and vice. It's a very, very specific declination, sir.

Q        Mr. Sexton, you were told specific information; right?

A        Yes, sir.

Q        You knew that a phone had been discovered.

A        Yes, sir.

UNITED STATES DISTRICT COURT

Q        You were told this; correct?

A        Yes, sir.

Q        That that phone was linked to the civil rights squad of the FBI; correct?

A        Yes, sir.

Q        The next meeting that you described, Mr. Smith and Mr. Manzo and Mr. Thompson told you that they were trying to get to the bottom of it; right?

A        Yes, sir.

Q        Now, the meetings that you described, the first one Sheriff Baca was not there; correct?

A        No, sir.

Q        Sheriff Baca was not at the second meeting that you described?

A        No, sir.

Q        He wasn't at any meeting that you participated in.

A        No, sir.

Q        You indicated, when you said that they were trying to get to the bottom of the phone, Mr. Thompson talked about three different scenarios of how that phone got in the jail; correct?

A        Yes, sir.

Q        What were those three scenarios?

A        One was a preacher or priest, one was a nurse,

UNITED STATES DISTRICT COURT

and one was a corrupt FBI agent.

Q      It was your understanding it was one of those scenarios they were trying to get to the bottom of, which one of those scenarios was the case?

A      Absolutely.  Yes, sir.

Q      You testified about -- one moment.

Let's go through the first scenario.  What was your understanding of the preacher scenario?

A      I had no information on that, sir.

Q      What was your understanding of the second scenario, the teacher {sic} scenario?

A      I was given no information on that.

Q      What about the third?  Were you given any information on that?

A      Yes, sir.  I saw an e-mail from Deputy Noah Kirk that a phone was recovered and identified as an FBI phone to the civil rights squad.

Q      You didn't know at that point, Mr. Sexton, any information that the FBI had been gathering or was attempting to gather for Mr. Brown; correct?

A      No, sir.  I didn't.

Q      Were you given any information about Mr. Brown and his background?

A      Yes, sir, I was.

Q      What were you told about him?

A        I was told that Anthony Brown was sentenced to 450 years for several bank robberies.  I was told that he was charming, charismatic, manipulative, a liar, and dangerous.

Q        And to be clear, Mr. Sexton, the August 20th meeting that you discussed this morning or this afternoon during your testimony, you were not present for that August 20th meeting; correct?

A        I apologize.

Q        A meeting that you described where Mr. -- Sheriff Baca was present on a Saturday morning meeting, that was relayed to you secondhand; correct?

A        It was relayed to me by Deputy Smith and Deputy Manzo, sir.

Q        So you yourself were not present?

A        I was not at that meeting, sir.

Q        You had to rely on their recollection that occurred?

A        You have to have trust in your partners.

Q        You trusted them; right?

A        At that time, yes, sir.

Q        They told you what happened.  You listened.

A        That was the genesis of my orders, yes, sir.

Q        You testified with regard to the role that you served to change Mr. Brown's inmate name; correct?

A        Yes, sir.

Q        And you did that.

A        Yes, sir.

Q        You did that a number of times.

A        I was one of several deputies that did it, and I did it -- one is enough, but I did it two or three times.

Q        Just to be clear, there are times where that task is performed for a completely legitimate purpose?

A        Absolutely, sir.  I had done it about a hundred times prior to.

Q        Why would you have to do it in those hundred times that you described?

A        We were often protecting human sources.  We're making moves to protect people that are involved in high profile cases, et cetera, et cetera, sir.

Q        What is the et cetera, et cetera?  What are some other examples?

A        I didn't always participate in these, but homicide or special victims units would do it for cooperators.

Q        You indicated that -- one moment, Your Honor.

When you indicated "protect human sources," that means to protect individuals that are providing information; correct?

A        Yes, sir.

Q        Mr. Sexton, I want to direct your attention to an exhibit you were shown.  It has been received in evidence as

**UNITED STATES DISTRICT COURT**

Government Exhibit 54.  It should appear on the screen in front of you in a moment.

Sir, does that appear on the screen in front of you?

A    Yes, sir.

Q    You were asked questions about this e-mail.  The subject line, we see, is "Operation Pandora's Box"; correct?

A    Yes, sir.

Q    You indicated for the members of the jury the reference to Greek mythology; right?

A    Yes, sir.

Q    You came up with that name?

A    Yes, sir.

Q    You drafted the original e-mail that had that in the subject line; right?

A    Yes, sir.

Q    I want to direct your attention to Government Exhibit 55.  I'm sorry.  56.  I'm going to show you what's been received in evidence as Government Exhibit 56.  I'm going to ask to highlight the top half portion of that exhibit.

Does that appear in front of you, Mr. Sexton, on the screen?

A    Yes, sir.

Q    This particular e-mail is from you; correct?

A    Yes, sir.

**UNITED STATES DISTRICT COURT**

Q       It's sent on Monday, September 12, 2011, according to the e-mail; correct?

A       Yes, sir.

Q       And you are addressing this to Raymond Cardenas?

A       Yes, sir.

Q       Who is Raymond Cardenas?

A       At that time, sir, he was assigned to watch commander spot for the Inmate Reception Center.

Q       The cc line includes Gregory Thompson; correct?

A       Yes, sir.

Q       David Gutierrez who is a sergeant according to the e-mail?

A       Yes, sir.

Q       William Gilbert?

A       Yes, sir.

Q       Eliel Teixeira?  I'm sure I'm mispronouncing that.

A       Teixeira.

Q       He's on the e-mail in the cc line?

A       Yes, sir.

Q       Paterno Giovanni?

A       Yes, sir.

Q       Jason Pearson?

A       Yes, sir.

Q       Mickey Manzo?

UNITED STATES DISTRICT COURT

991

A       Yes, sir.

Q       Gerard Smith?

A       Yes, sir.

Q       And the subject line in this one is Anthony Brown; correct?

A       Correct.

Q       And it includes a booking number?

A       Correct.

Q       You didn't use the term "Pandora's box" on this e-mail, did you?

A       I did not, sir.

Q       When you met with the FBI in 2012 and discussed the events that bring you to the stand today, isn't it true you told the FBI that Tanaka was running the show?

MR. FOX:  Objection, Your Honor.  Hearsay.

THE COURT:  Let's go to sidebar.

(The following proceedings were held at sidebar:)

MR. FOX:  Your Honor, my objection is that it's clearly hearsay.  Mr. Diamantatos is not using it for non-hearsay purposes such as a prior inconsistent statement. He has not said that Tanaka was not running the show or Baca was running the show.  So it is absolutely hearsay.

MR. DIAMANTATOS:  My response, Your Honor, is that this witness has made that statement, and I can confront him with the fact that Mr. Tanaka has made the statement.  Now,

**UNITED STATES DISTRICT COURT**

the fact that he made it to FBI, it doesn't matter.  It's a statement that he's made in the past.

THE COURT:  What are you offering it for?

MR. HOCHMAN:  Well, he --

THE COURT:  Excuse me, counsel.  It's one lawyer.

Go ahead.

MR. DIAMANTATOS:  During his direct examination he talked about bosses and reference to bosses.

THE COURT:  Uh-huh.

MR. DIAMANTATOS:  I can certainly go back into the questioning, Your Honor, and highlight the fact that, during his direct examination, he described the higher ups, and he said from lieutenant on up.  I think that is probative to --

THE COURT:  That statement is not inconsistent with that, is it?

MR. DIAMANTATOS:  Well, highlighting the fact it is Mr. Tanaka that was running the show of the higher ups during that time period when he's asked about it by the FBI.

MR. HOCHMAN:  May I have a brief moment, Your Honor?

THE COURT:  That's fine.

(Counsel confer.)

MR. DIAMANTATOS:  Your Honor, I can go back in with a better series of questions to lay the proper foundation.

THE COURT:  Okay.

**UNITED STATES DISTRICT COURT**

(The following proceedings were held in open court in the presence of the jury:)

MR. DIAMANTATOS:  May I proceed, Your Honor?

THE COURT:  Yes.

Q       BY MR. DIAMANTATOS:  Mr. Sexton, you testified earlier today references to "big bosses."

Do you remember that?

A       Yes, sir.

Q       And you indicated that you and others would refer to the big bosses; right?

A       Yes, sir.

Q       And you told us that that was a reference to the higher ups; right?

A       Yes, sir.

Q       People from lieutenant, I think you said, all the way up.

A       Captain and above is the big boss, sir.

Q       Captain and above.

Who would that include, sir?

A       The big bosses?

Q       Yes.

A       I'll go from the top to captain.  That would be the sheriff, the undersheriff, the assistant sheriffs, the chiefs, commanders, and then captain.

Q       So big bosses would include -- and let's make

sure we have the numbers right.

Sheriff is one person; correct?

A        Yes.

Q        Undersheriff is one person?

A        Yes.

Q        Assistant sheriff are two individuals?

A        At that time, yes, sir.

Q        How about chiefs?  How many chiefs were there?

A        I believe there were 12 chiefs at that time. Maybe 8.  I know it's 8 or 12.

Q        So 8 to 12 during this time period?

A        Yes, sir.

Q        Based on your recollection?

A        Yes, sir.

Q        How many commanders were there?

A        Could be anywhere from 35 to 60.  The department got bigger very quickly after this.

Q        What about captains?

A        I don't know, sir.  A lot.

                MR. FOX:  Objection.  Relevance.

                MR. DIAMANTATOS:  Your Honor, he referred to big bosses during his direct examination.

                THE WITNESS:  Around a hundred, sir.

                THE COURT:  Excuse me.

                Objection sustained.  Let's move it on.  The

answer is stricken.  The jury should disregard it.

Next question.

Q    BY MR. DIAMANTATOS:  It was your understanding in August of 2011 that the big bosses were involved; correct?

A    Yes, sir.  Based on experience, yes, sir.

Q    And you met with the FBI in November of -- I'm sorry, sir.

Isn't it true that Mr. Tanaka was running the show?

MR. FOX:  Objection.  Vague.

THE COURT:  Sustained.

Q    BY MR. DIAMANTATOS:  In reference to the August through September, 2011, conspiracy that you described earlier in your testimony, isn't it true that it was your understanding that Mr. Tanaka was running the show?

A    That's my optic perspective, sir.

Q    Sir, isn't it true that Mr. Tanaka, based on -- you observed in August and September of 2011, it was your understanding that Mr. Tanaka was running the show?

A    No, sir.

Q    Isn't it true that you made that statement to the FBI when you met with them November 19 of 2012?

A    I said Mr. Tanaka was one of two people that could authorize the sheriff's department to coordinate three divisions in the L.A. County Sheriff's Department to move

Inmate Anthony Brown.

Q    You told the FBI that Mr. Tanaka was in charge, didn't you?

A    I told them he was one of the people in charge that could coordinate three divisions to move Inmate Anthony Brown.

Q    Isn't it true that you told the FBI that Mr. Sexton -- I'm sorry.

You told the FBI that Mr. Tanaka was in charge of the Brown investigation?

A    Sir, I need to refresh my memory on that.  Again, I made it very clear to the FBI over 15 to 20 meetings that there were three divisions in the L.A. County Sheriff's Department moving Inmate Anthony Brown, and that leaves it to one of two people, sir.  That's above an assistant sheriff.

Q    It was your impression that Mr. Tanaka was authorizing everything that had occurred.

A    It was my impression that the people above assistant sheriff were aligned that this was okay.  Mr. Tanaka was never fired or removed for using resources at that level.

Q    Isn't it true that you thought Sheriff Baca and Mr. Tanaka were not on good terms?

MR. FOX:  Objection, Your Honor.  Vague as to time.

THE COURT:  Sustained.

Q        BY MR. DIAMANTATOS:  From -- you testified about the name change to Mr. Brown.  You never spoke with Sheriff Baca about those name changes; correct?

A        Never directly, sir.

Q        Well, or indirectly; correct?

A        Sir, we're a paramilitary organization.

Q        Did you ever send him an e-mail?

A        No, sir.  But I received --

Q        Did you ever receive an e-mail from him?

THE COURT:  Let him finish his answer, counsel.

MR. DIAMANTATOS:  Yes, Your Honor.

THE COURT:  You asked the question.

THE WITNESS:  Sir, I received e-mails from my unit commander who was operating under the authority of executives in the L.A. County Sheriff's Department, and he represented that he was in a meeting with Sheriff Baca and Undersheriff Tanaka and that these orders were approved by them.

Q        BY MR. DIAMANTATOS:  But you weren't present for that meeting, were you, Mr. Sexton?

A        No, sir.  Because I was 25 years old and a junior deputy.

Q        So you were not present, right?

A        Yes, sir --

MR. FOX:  Objection asked and answered.

**UNITED STATES DISTRICT COURT**

THE COURT:  Sustained.

Q     BY MR. DIAMANTATOS:  You had to rely on what was told to you?

A     Yes, sir.  And you have to trust your supervisors and partners that where they're getting this information from is valid.

Q     But you had no personal firsthand knowledge if that information was true and valid; right?

MR. FOX:  Objection.  Asked and answered.

THE COURT:  Sustained.

Q     BY MR. DIAMANTATOS:  In August through September of 2011, you were not personally present for any meetings when Sheriff Baca was present?

A     That is correct, sir.

MR. DIAMANTATOS:  May I have a moment, Your Honor?

THE COURT:  Yes.

MR. DIAMANTATOS:  Nothing further, Your Honor.

THE COURT:  Redirect?

**REDIRECT EXAMINATION**

BY MR. FOX:

Q     Mr. Sexton, you were asked on cross-examination about a number of meetings that you had with the Federal Government in 2012.  Do you remember when you were charged in this case?

A       I was indicted in December of 2013, sir.

Q       Since December, 2013, until Wednesday when you met with somebody from the Federal Government, had you had any conversations with the Federal Government about any of this?

A       Absolutely not, sir.

Q       Did you receive any benefits for providing information to the Federal Government in 2012?

A       No, sir.  I went to prison in August of 2016, sir.

Q       But in -- in terms of -- in 2012, that specific information you were providing to the Government, did you receive any time off your sentence?

A       No, sir.

Q       Any charging consideration?

A       None, sir.

Q       Mr. Diamantatos asked you about the three different scenarios that Mr. Thompson provided.  One of that was we're looking into a corrupt FBI agent?

A       Yes, sir.

Q       Was it your understanding that, based on what Mr. Manzo was saying at that meeting, that they were looking into a corrupt FBI agent?

MR. DIAMANTATOS:  Objection, Your Honor.

THE COURT:  Overruled.

THE WITNESS:  At the time, sir, when we were

UNITED STATES DISTRICT COURT

discussing the scenarios, I was approaching it like I would approach any investigation.  I had information.  The most -- the scenario that I had the most information about, sir, was the one that I saw the e-mail where there was, first and foremost, the FBI involved.  Secondly, the civil rights squad was involved.

Q        BY MR. FOX:  So how did that form, in your opinion, the fact the civil rights squad was involved?

A        I quickly ruled out the preacher and the nurse, sir.

Q        I want to now ask you about that e-mail with Mr. Cardenas that you changed the subject line from "Operation Pandora's Box" to "Anthony Brown."

Do you recall that?

A        Yes, sir.

Q        Was Mr. Cardenas one of your co-conspirators in this --

A        No, sir.  And the reason I changed the subject line was because there are a lot of people on that e-mail.  This operation was very -- it was expansive.  It included a lot of divisions and personnel in the department.  I was showing respect to Lieutenant Cardenas at the time, and I was being more formal.  You saw -- in the signature line you saw "Respectfully, James Sexton," no initials.

MR. FOX:  No further questions.

UNITED STATES DISTRICT COURT

1001

THE COURT:  Anything else?

MR. DIAMANTATOS:  Very briefly.  Thank you, Your Honor.

**RECROSS-EXAMINATION**

BY MR. DIAMANTATOS:

Q     Mr. Sexton, isn't it true that Mr. Thompson never referred to this as Operation Pandora's Box?

MR. FOX:  Objection.  Beyond the scope.

THE COURT:  Sustained.

Q     BY MR. DIAMANTATOS:  Mr. Leavins never referred to it as that; correct?

MR. FOX:  Objection.

THE COURT:  Sustained.  Counsel, unless you have something new, you're beyond the scope.

Q     BY MR. DIAMANTATOS:  During the meetings that you were asked about with the Government before you were charged, you recall that; correct?

A     I recall most of them, yes, sir.

Q     You were hoping the Government would view you favorably for doing that; correct?

A     No, sir.

Q     You were meeting with them out of your own just to meet with them?

A     I was meeting with them because I was trying to participate in change of the Los Angeles County Sheriff's

**UNITED STATES DISTRICT COURT**

1002

Department.

Q    And you had several meetings with them; correct?

A    I had -- in totality I had 38, sir.

MR. DIAMANTATOS:  Nothing further, Your Honor.

MR. FOX:  Nothing, Your Honor.

THE COURT:  All right.  Ladies and gentlemen, we're going to take a short break.  Again, I want to remind you, until this trial is over, you're not to discuss this case with anyone including your fellow jurors, members of your family, people involved in the trial, or anyone else.  And do not allow others to discuss the case with you.  This includes discussing the case on the Internet, by e-mails or text messages, or any form of social media.  If anyone tries to communicate with you about this case, please let me know about it immediately.

Do not read, watch, or listen to any news reports or other accounts about the trial or anyone associated with it.  Do not do any research such as consulting dictionaries, searching the Internet or using other reference materials, and do not make any investigation about the case on your own.

Finally, you're reminded to keep an open mind until all the evidence has been received, you've heard the arguments of counsel, the instructions of the Court, and the views of your fellow jurors.  If you need to speak with me, simply give a note to the clerk.

**UNITED STATES DISTRICT COURT**

We'll come back in ten minutes.

(The following proceedings were held in open court out of the presence of the jury:)

THE COURT:  Let me see counsel at sidebar.

(The following proceedings were held at sidebar:)

THE COURT:  Okay.  Who's next?

MR. FOX:  It is Cecil Rhambo.

THE COURT:  Okay.  And how long do you expect him?

MR. FOX:  I think his direct is under 30 minutes.  It might be even less than that.  It may be 20 minutes.  I think it's worth getting him on the stand.

THE COURT:  Okay.  I have a note from one of the jurors.  I believe it's Alternate No. 2.  It reads "Need to talk to the judge.  Thank you."

So get them back in here.  We'll get Rhambo on the stand.  We're going to quit at 1:30.  I know the reporter has something she's got to do.  So we're going to quit right at 1:30.  I'll send the jury out.  We'll bring him in and leave them here until we get some idea what this is about.

He was coming in this morning and said, "Judge, can I ask you a question?"  I let him in.  And I said, "Write a note."

MR. FOX:  Thank you, Your Honor.

MR. HOCHMAN:  Thank you, Your Honor.

**UNITED STATES DISTRICT COURT**

MR. FOX:  You want the witness on the stand?

THE COURT:  Yes, please.

(The following proceedings were held in open court in the presence of the jury:)

THE COURT:  Call your next witness.

MR. FOX:  The United States calls Cecil Rhambo.

THE CLERK:  Please raise your right hand.

Do you solemnly state that the testimony you may give in the cause now pending before this court shall be the truth, the whole truth, and nothing but the truth, so help you god?

THE WITNESS:  Yes.

THE CLERK:  Please be seated.

Could you state your full name and spell your last name for the record.

THE WITNESS:  My full name is Cecil Rhambo, R-h-a-m-b-o.

THE CLERK:  Thank you.

MR. FOX:  May I proceed, Your Honor?

THE COURT:  Yes, please.

**CECIL RHAMBO,**

**GOVERNMENT'S WITNESS, SWORN:**

**DIRECT EXAMINATION**

BY MR. FOX:

Q    Mr. Rhambo, what do you do for a living?

**UNITED STATES DISTRICT COURT**

A        Currently I'm the assistant city manager for the city of Carson.

Q        How long have you been doing that?

A        Since July of 2014.

Q        What did you do before that?

A        I worked -- I was employed for Los Angeles County by the L.A. County Sheriff's Department.

Q        For how long?

A        33 years.

Q        What was your title in August and September of 2011?

A        Assistant sheriff.

Q        What were your duties?

A        I was in charge of roughly half the department. I had custody, court services division, all the training in the department and records bureau, crime lab, just -- communications, fleet.

Q        As of August of 2011, how long had you been assistant sheriff?

A        I'm thinking maybe May, June -- maybe three months.

Q        What was the position you held before that?

A        I was a division chief in field operations region II.

Q        What happened with the assistant sheriff level

UNITED STATES DISTRICT COURT

that allowed you to receive a promotion?

A    One of -- I believe one of the assistant sheriffs retired.  No.  Actually, the undersheriff retired, and Mr. Tanaka was promoted up, and that left a vacancy.

Q    And you took that vacancy?

A    I took -- I think Mr. Tanaka was in charge of patrol, and I took the vacancy -- Mr. Cavanaugh went to the patrol side, and I took the custody side.

Q    Who selected you to be assistant sheriff?

A    Sheriff Baca.

Q    Who selected the undersheriff?

A    Sheriff Baca.

Q    How long had you known Mr. Tanaka at that point?

A    Since 1983.

Q    What about Mr. Baca?

A    Well, he was in the department since '65.  So we knew of him.  I personally knew him since the mid 90's.

Q    And when you were at the executive levels, would you have an opportunity to interact with both Mr. Baca and Mr. Tanaka?

A    Yes.

Q    Could you please describe their relationship as it existed up until September of 2011?

A    The sheriff's relationship with Mr. Tanaka was professional.  Probably a little closer -- almost personal.  I

**UNITED STATES DISTRICT COURT**

1007

think the sheriff viewed Paul as kind of mentoring him.  Almost father son sort of.

Q        When you were in charge of custody as assistant sheriff, what were your duties?

A        I oversaw the division chief in custody.  As the assistant sheriff, custody was just one part but a very large part of that responsibility.  So, you know, the day-to-day management or administration of custody at that point went through the division chiefs.

Q        Who did you report to?

A        Directly to Mr. Tanaka.

Q        Where was your office located?

A        It was located on the fourth floor in the southwest portion of the building.

Q        When you first became assistant sheriff over custody, can you please describe the relationship between the ACLU and the sheriff's department?

A        It was -- if I'm recalling the time frame, the ACLU was bringing some things to the sheriff's attention, to our department's attention that they were very concerned about.  So they were raising the flag like, you know, you need to pay attention to some things that are going on.

Q        I'm going to show to you what's in evidence now as Government Exhibit 19.  It will be on your screen.

                Do you see this e-mail, Mr. Rhambo?

**UNITED STATES DISTRICT COURT**

1008

A       Oh, yes.

Q       Can you please read what Mr. Thompson wrote to you on August 19 at 3:40 p.m.?

A       It says, "Sir, I met with the sheriff, Mr. Tanaka, Tom Carey, and IIB in regards to the cell phone. Too much to type.  I'm on the SHB patio waiting to brief you."

Q       Around this time, did you learn some information about a cell phone that was found in custody?

A       Yes.

Q       What did you -- well, how did you learn it?

A       I can's remember if I heard it from the briefing on the patio or if I heard it just in the discussions.  I don't remember exactly how I heard the --

Q       Please read the e-mail that you wrote to Mr. Thompson at 9:51 p.m.

A       I said, "Paul briefed me.  We went to see the sheriff.  I was given a partial briefing.  I don't even want to know."

Q       At some point in time, however, you learned that that cell phone was linked to the FBI; is that correct?

A       Yes.

Q       Did you happen to have a conversation with anybody that was in your chain of command above you at that point?

A       The sheriff and I both spoke briefly one evening,

UNITED STATES DISTRICT COURT

but -- so there was some discussion, you know, when this was happening.

Q      Specifically, as it related to the inmate, did you have any discussions with Mr. Baca about the inmate?

A      I don't know so much about the inmate but more so about the FBI's investigation.

Q      When did this conversation occur as best as you can recall?

A      Sometime shortly after there was the hubbub about the phone and it being -- I don't remember exactly.  Probably August, September.  I don't remember exactly.

Q      Who was present in this meeting that you had with Mr. Baca?

A      It was just the sheriff and I actually in his office.

Q      And what is it that you said -- well, what is it that he said to you or you said to him at that time?

A      Well, so when you're working in the sheriff's office, sometimes the sheriff would be there really late.  So I walked in, and he was real calm, and he was talking about the phone.  And he said, "Hey, you know, they committed a crime by bringing this phone in.  And, you know, I don't know why Martinez or the head of the FBI couldn't just talk to me.  Why couldn't we just have a discussion about this, you know?"

Q      What did you say in response to that?

1010

A        Well, is it okay to use profane language?  So the bottom line is I told him -- so I worked undercover for the feds in the late 80's.  So I told him, "Look, don't 'F' around with the feds."  Don't -- I know there was some talk about something to do with this agent who planted the phone, and I just said, "Don't do that.  Don't do that.  You know, they're not going to cooperate with us.  We're the suspects."

Q        Did you provide Mr. Baca with any advice about what to do with the inmate who was the FBI's informant?

A        I don't recall, but if I did, it would have been, "Give them their phone.  Give them their inmate."

MR. DIAMANTATOS:  Objection, Your Honor. Speculation.

THE COURT:  Sustained.  The answer is stricken. The jury should disregard it.

Q        BY MR. FOX:  What else did Mr. Baca say to you in that conversation?

A        I don't remember.  I just know the conversation resolved around why -- you know, the FBI was like our partner, you know, and we could have worked this out and, you know, bringing the phone in was a crime.  And I had to explain to him, you know, having worked narcotics in that world, I mean, I bought kilos of cocaine from folks.  I would violate the law to enforce the law.  That kind of happens.  And the feds will let thousands of dollars walk on the street.  I mean, it's part of

**UNITED STATES DISTRICT COURT**

the investigative -- what we do.

Q    Did you have a discussion with Mr. Baca about the special agent who had been involved in that undercover operation and whether the sheriff's department was going to do anything about her?

MR. DIAMANTATOS:  Objection.  Foundation, Your Honor.

THE COURT:  You can answer that question.

THE WITNESS:  Again, if I recall correctly, I mean, if we were talking about it, I kind of knew that they were thinking about intimidating or somehow talking to this agent.

MR. DIAMANTATOS:  Objection, Your Honor. Nonresponsive to the question.

THE COURT:  Overruled.

THE WITNESS:  Again, I just told him don't -- you know, there's a -- in regular law enforcement, there's the 148 which is obstruction.  You know, I said, "If you do that, that's obstruction of justice.  Don't do that."

Q    BY MR. FOX:  How did he respond to you?

A    "They broke the law."

Q    Did Mr. Baca reference any meetings that he had coming up?

A    He may have, but I don't remember.

MR. FOX:  No further questions at this time,

Your Honor.

THE COURT:  Cross-examination?

MR. DIAMANTATOS:  Thank you, Your Honor.

May I proceed?

THE COURT:  Yes.

MR. DIAMANTATOS:  Thank you.

**CROSS-EXAMINATION**

BY MR. DIAMANTATOS:

Q       Assistant Sheriff Rhambo, you indicated that the meeting that you had with Sheriff Baca, as far as when it occurred, you had already heard some discussion of a Special Agent Leah Marx being approached potentially; correct? That was part of the information that you knew of when you had this meeting with Sheriff Baca.

Is that accurate, sir?

A       I had heard some discussion about it.  I didn't know the agent's name or any of that.

Q       Okay.  But you had -- when you had the meeting with Sheriff Baca, you already had the understanding that there was going to be approach of some agent regardless of what her name was; correct?

A       Possibly.  Maybe a criminal report written like a criminal complaint written.

Q       And you indicated that the conversation that you had with Sheriff Baca, he was questioning, you know, why didn't

the FBI partner with us on this one; correct?

A    Correct.

Q    Is it true, Assistant Sheriff Rhambo, that, over the course of your career, you, in fact, had partnered with federal law enforcement on different matters?

MR. FOX:  Objection.  Relevance.

THE COURT:  Sustained.

Q    BY MR. DIAMANTATOS:  Did it shock you that Sheriff Baca wanted to partner with federal law enforcement?

MR. FOX:  Objection, Your Honor.

THE COURT:  Sustained.

Q    BY MR. DIAMANTATOS:  When you told -- you indicated that you gave certain advice to Sheriff Baca as far as "Don't F with the feds."

Correct?

A    Yes.

Q    And you went back and discussed with him your experiences in undercover officer and telling him you don't want to mess with him; correct?

A    Correct.

Q    Didn't Sheriff Baca in response say to you that he planned to talk to Andre Birotte?

A    He may have.  I don't recall.

Q    Is there anything that would refresh your memory?

Go ahead, sir.  I didn't mean to speak over you.

**UNITED STATES DISTRICT COURT**

1014

A        If I testified earlier that I said that, I don't remember.

Q        I just want what you recall, sir.

Would something refresh your memory about those events?

A        Perhaps a tape-recorded session.  I don't know.

MR. DIAMANTATOS:  May I approach the Court, Your Honor, just to provide to refresh the witness' recollection on this event?

THE COURT:  You want to -- I'm sorry.  You want to come to sidebar?

MR. DIAMANTATOS:  Yes, Your Honor.  Approach the Court to hand an exhibit to the witness to refresh his recollection, Your Honor.

THE COURT:  Yes.  Show it to counsel.  You can provide it to the clerk.

MR. DIAMANTATOS:  Showing opposing counsel what's been marked for identification as Defense Exhibit 684.

(Marked for identification Exhibit No. 684.)

Q        BY MR. DIAMANTATOS:  One moment, sir.  I'm going to tell you where to look specifically and read to yourself.

Okay.  Sir, just for the record, I'm showing you what has been marked for identification as Defense Exhibit 685.  Please take a moment, sir, to -- 684.  684.  My apologies.  I'm going to ask you to read the bottom of page 41, sir, on to

UNITED STATES DISTRICT COURT

1015

page 42.  Please read it quietly to yourself.  When you're finished, let his Honor know.

A          (Witness reviewing exhibit.)

Okay.

Q          Have you read that --

THE COURT:  Close that, please.

Q          BY MR. DIAMANTATOS:  If you put that to the side, sir.

Is your memory refreshed with regard to how Sheriff Baca responded to you telling them, "Don't mess -- 'F' with the feds"?

A          Yes.

Q          How did he respond?

A          He said that he was going to go talk to Mr. Birotte.

Q          Did you have an understanding of who he was referring to -- I'm sorry.

Did he say Mr. Birotte or --

A          Andre.

Q          So he used the first name?

A          I believe so, but I don't know.

Q          Do you need to re-refer back to what you read to refresh your memory?

MR. FOX:  Objection, Your Honor.  I'll withdraw the objection.

1016

THE WITNESS:  Well, what I read was that he said Andre Birotte --

THE COURT:  Don't tell us what you read.

MR. DIAMANTATOS:  I'll put another question to the witness, Your Honor.

Q      What was your understanding of who Andre Birotte was?

A      At the time he was the U.S. Attorney in charge on the West Coast.

Q      Okay.  So he was the U.S. Attorney, you said, on the West Coast.  He was the U.S. Attorney for the Central District of California?

A      Yes.

Q      Now, does he still hold that position?

A      I don't believe so.

Q      He's actually on the bench; correct?

A      I guess, yes.

Q      But certainly, at the time Sheriff Baca is telling you this, you understood who he was referring to when he said "Andre Birotte."

Correct?

A      Yes.

Q      It was your understanding that Sheriff Baca wanted to go talk to Andre Birotte about it; correct?

A      Yes.

UNITED STATES DISTRICT COURT

MR. DIAMANTATOS:  May I have a moment, Your Honor?

THE COURT:  Yes.

Q     BY MR. DIAMANTATOS:  Assistant Sheriff Rhambo, you did not attend the August 29, 2011, meeting with Sheriff Baca and U.S. Attorney Andre Birotte; correct?

A     Correct.

Q     You did not attend a meeting on September 27 with the sheriff, U.S. Attorney Andre Birotte, and FBI assistant director in charge Steve Martinez.

A     No.

Q     You were not present for a Saturday morning meeting that occurred on August 20th of 2011.

Isn't that true, sir?

A     Yes.  That's true.

MR. DIAMANTATOS:  May I have a moment, Your Honor?

THE COURT:  Yes.

MR. DIAMANTATOS:  Nothing further, Your Honor, at this time.

MR. FOX:  Nothing, Your Honor.

THE COURT:  All right.  Sir, you may step down. Thank you very much.

Ladies and gentlemen, again, I want to remind you, until this trial is over, you're not to discuss this case

**UNITED STATES DISTRICT COURT**

with anyone including your fellow jurors, members of your family, people involved in the trial, or anyone else. And do not allow others to discuss the case with you. This includes discussing the case on the Internet, through bulletin boards, by e-mails or text messages. If anybody tries to communicate with you about this case, please let me know about it immediately.

Do not watch, read, listen to any news reports or other accounts about the trial or anyone associated with it. Don't look online. Don't do any research such as consulting dictionaries, searching the Internet, or using other reference materials. And do not make any investigation about the case on your own.

Finally, you're reminded to keep an open mind until all the evidence has been presented, you've heard the arguments of counsel, the instructions of the Court, and the views of your fellow jurors. If you need to speak with me, simply give a note to the clerk.

Now, I'm going to ask that you return to the jury room, and I think -- and we'll have somebody come back and tell you when you can leave. But we may need you for another maybe about five minutes. All right.

So why don't you leave your notebooks on your chairs. Have a nice weekend. We won't be in session on Monday. We're going to resume on Tuesday at 8:00 o'clock.

(The following proceedings were held in open court out of the presence of the jury:)

THE COURT:  All right.  Ask Alternate No. 2 to step in for a moment, please.

MR. FOX:  While we're waiting for him, do you want me to provide you with our Tuesday list?

THE COURT:  Sure.  That's fine.  Wait for a second.

MR. FOX:  I think Mr. Montes Kerr left.

THE COURT:  Okay.

MR. FOX:  Special Agent David Dahle, Tara Adams, Gilbert Michel, William David Courson, Mike Hannemann, and I think that's probably going to do it for the day.  And I think we're still on track for, depending on obviously cross, Wednesday is looking like when we hopefully will rest.

THE COURT:  Okay.

MR. FOX:  And, Your Honor, we do have one special consideration with Special Agent Tanner.  I think I explained to you earlier and you saw a few months ago that she has given birth at this point and she has twins.  They are a couple of weeks old.  She will need some special considerations from the witness stand where she will need to take breaks.

THE COURT:  All right.

(The following proceedings were held in open court in the presence of

**UNITED STATES DISTRICT COURT**

1020

Alternate Juror No. 2:)

THE COURT:  All right, sir.  If you could just have a seat there for a minute, please.

Did you send me a note?

ALTERNATE JUROR NO. 2:  Yes, Your Honor.

They did two implants, one in my upper and one in my lower.  And the one in the lower came up.  So I'm going to Loma Linda on Monday.  So I was wondering, do you think we'll be here in January still?

THE COURT:  No.

ALTERNATE JUROR NO. 2:  Okay.  So I can schedule --

MR. HOCHMAN:  I didn't hear the question he asked.

THE COURT:  He wanted to know if we would still be here in January.

MR. HOCHMAN:  I see.  Thank you.

ALTERNATE JUROR NO. 2:  So I can schedule to redo it on that week, first week of January?

THE COURT:  Sure.  Yeah.

ALTERNATE JUROR NO. 2:  Thank you, Your Honor.

(The following proceedings were held in open court out of the presence of the jury:)

THE COURT:  Okay.  Have a nice weekend.  We'll see everybody Tuesday at 8:00.

**UNITED STATES DISTRICT COURT**

MR. HOCHMAN:  Thank you, Your Honor.

MR. FOX:  Thank you, Your Honor.

(Proceedings concluded at 1:40 p.m.)

**UNITED STATES DISTRICT COURT**

1022

CERTIFICATE OF OFFICIAL REPORTER

          I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

                    DATED THIS  14TH  DAY OF AUGUST, 2017.


                    /S/ MIRANDA ALGORRI

                    MIRANDA ALGORRI, CSR NO. 12743, CRR
                    FEDERAL OFFICIAL COURT REPORTER


**UNITED STATES DISTRICT COURT**